Dakota Pearce (WSBA #57011)
BUCHALTER
1420 5th Avenue, Suite 3100
Seattle, Washington 98101
Telephone: (206) 319-7052
Email: dpearce@buchalter.com

Bernard D. Bollinger, Jr. (*pro hac vice* pending) (CA SBN: 132817)
Julian I. Gurule (*pro hac vice* pending) (CA SBN: 251260)
Khaled Tarazi (*pro hac vice* pending) (AZ SBN: 032446)
BUCHALTER
1000 Wilshire Blvd., Suite 1500
Los Angeles, California 90017
Telephone: (213) 891-0700
Email: jgurule@buchalter.com

*Proposed Counsel to Debtors and Debtors in Possession*

HONORABLE WHITMAN L. HOLT

HEARING DATE: October 4, 2023
HEARING TIME: 2:00 p.m. PST
RESPONSE DUE: At Hearing
LOCATION: Telephonic

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

In re:

ICAP ENTERPRISES, INC., *et al.*,

Debtors. [1]

Chapter 11

Lead Case No. 23-01243-WLH11
Jointly Administered

**EMERGENCY MOTION FOR ORDER: (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING; (II). AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; (III) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE**

---

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01256-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01253-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund, LLC (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); iCap Broadway, LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care LLC (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH 2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding LLC (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11) ; Vault Holding, LLC (23-01270-11); iCap Pacific Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); and iCap Holding 6 LLC (23-01274-11).

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING - 1

BN 78623460v5

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 1 of 117

Pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the corresponding local rules (the "Local Rules"), the above-captioned debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") submit this *Emergency Motion for Order: I. Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant; II. Authorizing the Debtors to use Cash Collateral; III. Granting Superpriority Administrative Expense Claims; IV. Providing Adequate Protection; V. Scheduling a Final Hearing; and VI. Granting Related Relief* (the "Motion").

By the Motion, the Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit 1** (together with all annexes and exhibits thereto, the "Interim Order"), and a final order (the "Final Order"[2] and, together with the Interim Order, the "DIP Orders") seeking authorization for the Debtors to, among other things:

    i.    to enter into, be bound by, and perform under (a) a debtor-in-possession credit facility (the "DIP Facility") pursuant to the Debtor-In-Possession Loan and Security Agreement dated as of October 3, 2023 (the "DIP Agreement"),[3] by and among the Debtors and Serene Investment Management, LLC (the "DIP Lender"), which agreement is attached hereto as **Exhibit 2** (as the same may be amended, restated, supplemented,

---

[2] The Debtors will file the Final Order in advance of the Final Hearing (as defined below).

[3] Capitalized terms not defined herein have the meanings ascribed to them in the DIP Agreement and the Interim Order.

MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN DEBTOR-IN-POSSESSION FINANCING- 2

BN 78623460v5

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 2 of 117

waived, or otherwise modified from time to time) and (b) the documents related to the DIP Agreement (together with the DIP Agreement, the "DIP Documents");

ii.  obtain postpetition loans, advances and other financial accommodations (the "DIP Loans") in an aggregate principal amount not to exceed $5,250,000, or $6,750,000, in the event the DIP Lender is granted a priming lien on the VH Collateral (as defined in the DIP Agreement) pursuant to the terms and conditions of the DIP Documents and the DIP Orders;

iii. borrow, on an interim basis, pursuant to the DIP Documents and the Interim Order, postpetition financing in an aggregate principal amount of up to $2,500,000, consisting of (a) up to $2,000,000 in "new money" loans and (b) rolled-up loans under that certain Promissory Note with Debtors 725 Broadway, LLC and ICAP Campbell Way, LLC dated September 13, 2023 (the "Secured Note") in an aggregate amount of $500,000 in principal plus accrued interest thereon through the Petition Date (defined below) upon entry of the Interim Order;

iv.  grant to the DIP Lender First Priority DIP Liens on all of the Collateral not subject to a lien of any third party to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Agreement, as applicable, and this Interim Order and the Final Order, as applicable, subject only to prior payment of the Carve-Out (defined below), pursuant to section 364(c)(2) of the Bankruptcy Code;

v.   grant to the DIP Lender Second Priority DIP Liens on all Prepetition Collateral to secure the DIP Facility and all DIP Obligations, subject only to (a) the First Priority Pledged Liens and (b) the Carve-Out, pursuant to section 364(c)(3) of the Bankruptcy Code;

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 3

BN 78623460v5

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 3 of 117

vi.    to the extent the Debtors request an additional $1.5 million in financing from the DIP Lender on a final basis, in addition to the $5,250,000 in financing that the DIP Lender has agreed to provide pursuant to the DIP Agreement, grant to the DIP Lender at the Final Hearing priming liens on Prepetition Collateral consisting of the VH Collateral to secure the DIP Facility and all DIP Obligations, subject only to the Carve-Out, pursuant to section 364(d) of the Bankruptcy Code;[4]

vii.   grant to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all amounts advanced to the Debtors under the DIP Agreement;

viii.  grant to the Prepetition Mortgage Lenders (as defined below) adequate protection in respect of their rights under their respective loan documents (the "Prepetition Documents") and their interests in the Prepetition Collateral;

ix.    use the Cash Collateral in accordance with the approved budget (the "Approved Budget") for the Interim Period;

x.     use the proceeds of DIP Loans, subject to the terms, restrictions, and other conditions of the DIP Agreement and the Interim Order, to (a) upon entry of the Interim Order, accrued fees and expenses related to the DIP Agreement and the Chapter 11 Cases, and (b) fund working capital in the ordinary course of the business of the Debtors and other general corporate purposes, in each case, to the extent set forth in the Approved Budget and permitted under the DIP Agreement;

---

[4] If the Debtors request the additional financing, they will submit briefing to support any requested priming liens.

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 4

BN 78623460v5

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

xi.    vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and the Interim Order;

xii.   set a Final Hearing on the Motion; and

xiii.  waive, to the extent applicable, any stay of the immediate effectiveness of the Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that the Interim Order shall be immediately effective upon its entry on the Court's docket.

In support of this Motion, the Debtors submit the *Declaration of Lance Miller in Support of First Day Motions* (the "Miller First Day Declaration"), and the *Declaration of Lance Miller in Support of Debtor in Possession Financing Motion* (the "Miller DIP Declaration"), each filed concurrently herewith.

In support of this Motion, the Debtors respectfully state the following:

## I.    JURISDICTION AND VENUE.

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

2.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The bases for relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(c), and 9014.

## II.   STATEMENT OF FACTS.

### A.    General Background.

4.    The Debtors were founded in 2007 by Chris Christensen ("Christensen") to invest in real estate opportunities in the Pacific Northwest. The Debtors grew quickly, raising more than $211 million in capital and deploying those funds toward

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 5

BN 78623460v5

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 5 of 117

real estate investments. By early 2023, the Debtors employed more than 35 employees in its headquarters based in Bellevue, Washington.

5. On September 28, 2023, Christensen resigned all positions with the Debtors, and Lance Miller was appointed Chief Restructuring Officer with full and exclusive control and authority over the Company and the prosecution of these chapter 11 cases (the "CRO"). The Debtors commenced these bankruptcy cases on September 29 and 30, 2023 (as applicable, the "Petition Date").

6. The Debtors invested in two categories of real estate, across two divisions of operations known as the "Portfolio Business" and the "Vault Business." The Portfolio Business is the oldest of the Debtors' business lines. It operates under Debtor iCap Equity, LLC and various of its subsidiaries. The Portfolio Business focused on development opportunities for multifamily real estate projects. In some cases, these projects started with raw and unpermitted land, and in other cases the projects began with retrofitting existing structures or lots. Properties within the Portfolio Business are held by single purpose entities and managed by iCap Equity, LLC. As of the Petition Date, the Debtors owned four properties in the Portfolio Business.

7. The Vault Business was started in 2018 for the purpose of investing in standalone real estate investments that have the potential to be or already were cash flow positive. The Vault Business operates under Debtor iCap Vault, LLC and various of its subsidiaries. One of these subsidiaries, iCap Vault 1, LLC, is registered with the U.S. Securities and Exchange Commission and issued publicly traded debt under CIK # 1800199. As of the Petition Date, the Debtors owned seven properties in the Vault Business.

MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN DEBTOR-IN-POSSESSION FINANCING- 6

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78623460v5

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 6 of 117

8.      Both Businesses are managed by iCap Enterprises, Inc. This Debtor maintained the Debtors' headquarters and retained the majority of the Debtors' employees.[5]

**B.      Statement Pursuant to Bankruptcy Rule 4001.**

9.      Pursuant to Bankruptcy Rules 4001(b), (c), and (d), the following is a statement and summary of the proposed material terms of the DIP Documents and DIP Orders:[6]

| SUMMARY OF MATERIAL TERMS | |
|---|---|
| **Parties to the DIP Facility**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Borrowers**: All Debtor entities<br><br>**Guarantors**: Christensen<br><br>**DIP Lender**: Serene Investment Management, LLC |
| **Purpose**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);* | The Debtors do not have sufficient available sources of working capital, including cash collateral, to pay administrative expenses and conclude a sale of their assets without the financing requested under the Motion. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Lender as set forth in this Order and the DIP Agreement is vital to the Debtors' ability to maximize the value of the assets of their bankruptcy estates through an orderly sale process. Accordingly, the Debtors have an immediate need to obtain the postpetition financing in order to, among other things, preserve and maximize the value of the assets of their estates.<br><br>*See* Interim Order ¶ F. (ii) |
| **Borrowing Limits**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*4001-2(a)(i)A* | Debtors are authorized to enter into, be bound by, and perform under the DIP Documents and to immediately borrow an aggregate amount not to exceed $2,500,000 during the Interim Period (inclusive of the Rollup Amount), provided that disbursements of such amount are in accordance with the Approved Budget, the DIP Agreement, and the Interim Order. Upon the entry of this Interim Order, and subject to Section 9 of the Interim Order, the Prepetition DIP Lender Obligations (the "Roll-Up Amount") shall be converted into DIP Loans, which will be in addition to the $2,000,000 maximum interim borrowing |

---

[5] The Debtors' organizational chart is included in the Miller First Day Declaration.

[6] This statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, will control. Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms in the Interim Order or the DIP Agreement.

MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN DEBTOR-IN-POSSESSION FINANCING- 7

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78623460v5

| | |
|---|---|
| | *See* Interim Order ¶ 1.2<br><br>Upon entry of the Final Order, Debtors are authorized to borrow up to $5,250,000.00, exclusive of all interest, fees, and expenses; provided, however, in the event that the Loan Parties exercise the VH Priming Liens Option and satisfy all of the conditions precedent with respect to the exercise of the option, the Final Cap shall be increased to Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000.00).<br><br>Credit Agreement, ¶ 1.1 (definition of Final Cap). |
| **Approved Budget**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);* | A copy of the Approved Budget is attached as <u>Exhibit 1</u> to the Interim Order. |
| Interest Rates<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The principal amount outstanding under the DIP Loan Facility shall accrue interest at a per annum rate equal to 18%.<br><br>*See* DIP Agreement, § 2.2(a)<br><br>After the occurrence and during the continuance of an Event of Default and without notice to the borrowers, to the extent permitted by applicable law, the obligations shall bear interest at a rate per annum which is four percentage points (4%) above the rate that is otherwise applicable thereto<br><br>*See* DIP Agreement, § 2.2(b) |
| **Maturity Date**<br><br>*Fed. R. Bankr. P.*<br><br>*4001(c)(1)(B);* | The earlier of (i) the date that is twelve (12) months after the Interim Order Entry Date, (ii) the effective date of the Loan Parties' chapter 11 plan; (iii) entry of an order by the Bankruptcy Court converting any Case to a proceeding or proceedings under Chapter 7 of the Bankruptcy Code; (iv) entry of a final order by the Bankruptcy Court dismissing any Case; (v) the date of filing or support by a Loan Party of a plan of reorganization that does not provide for indefeasible payment in full in cash of all Obligations owing hereunder; or (vi) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loan in accordance with the terms of the Agreement.<br><br>*See* DIP Agreement, § 1.1 |
| **Repayment Features / Roll-Up**<br><br>*Local Rule 4001¬ 2(a)(i)(E) & (O)* | Upon the entry of the Interim Order the Prepetition DIP Lender Obligations shall be converted into DIP Loans<br><br>*See* Interim Order, ¶ 1.2 |

MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN DEBTOR-IN-POSSESSION FINANCING- 8

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78623460v5

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 8 of 117

| | |
|---|---|
| **Conditions Precedent to Closing and Lending**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);* | The effectiveness of the DIP Agreement and the occurrence of the Closing Date are subject to the satisfaction, or waiver by the Required DIP Lenders, of conditions precedent customary for financings of this type.<br><br>*See* DIP Agreement, §§ 3.1 and 3.2 |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);* | The DIP Agreement contains customary events of default for financings of this type and other events of default agreed to by the Debtors and the DIP Lender.<br><br>*See* DIP Agreement, § 8 |
| **Carve-Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*4001-2(a)(i)(F)* | The "Carve-Out" is an amount equal to the sum of (i) all fees required to be paid to the clerk of this Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (which is included in the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs and expenses (the "Professional Fees") incurred by persons or firms ("Professional Persons") retained by the Debtors or the official committee of unsecured creditors appointed in these Cases (the "Creditors' Committee"), if any, whose retention is approved by this Court pursuant to sections 327, 328 or 363 and 1103 of the Bankruptcy Code, subject in all respects to the terms of and amendments set forth in this Interim Order, a Final Order and any other interim or other compensation orders entered by this Court that are incurred (A) at any time before delivery to the Debtors of a Carve-Out Trigger Notice (as defined below), whether allowed by this Court prior to the delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the Approved Budget, this Interim Order or a Final Order; provided that with respect to Professional Persons retained by the Creditors' Committee, such allowed and unpaid claims for unpaid fees, costs, and expenses shall not exceed the limits imposed for such Professional Persons in the Approved Budget; and (B) after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "Carve-Out Trigger Notice") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $200,000; provided, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds. The Carve-Out may be funded to an administrative reserve account (the "Carve-Out Account") on a weekly basis in an amount not to exceed the amount budgeted for such Professional Persons in the Approved Budget, which account shall be |

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 9

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

BN 78623460v5

| | |
|---|---|
| | used to pay Professional Fees and any unpaid fees to the United States Trustee. As cash flow permits, and assuming no issuance of a Carve-Out Trigger Notice, the Debtors may pay the amounts set forth in the Approved Budget for Professional Fees into the Carve-Out Account. Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lender or any of its officers, directors and professionals; (b) attempts to modify any of the rights granted to the DIP Lender; (c) attempts to prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization upon any DIP Collateral in accordance with the DIP Agreement, the Prepetition Documents or this Order (as applicable); provided that nothing in this section shall restrict the rights of parties in interest during the Remedies Notice Period (as defined below); (d) paying any amount on account of any claims arising before the commencement of the Bankruptcy Case unless such payments are approved by an order of the Bankruptcy Court; or (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end or similar fees. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims securing the DIP Loans, any adequate protection liens, if any, the superpriority claims and any and all other liens or claims existing pursuant to the DIP Facility, and may only be paid from the Carve-Out Account. |
| | *See* Interim Order, ¶ 2.2 |
| **Priority of Claims and Liens; Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i)* | To secure the prompt payment and performance of any and all obligations of the Debtors to the DIP Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the DIP Lender shall have effective as of the Petition Date, valid and perfected:<br><br>(i)      Pursuant to Section 364(c)(2) of the Bankruptcy Code, first priority security interests and liens in and upon all of the DIP Collateral which, as of the Petition Date, was not encumbered (besides by DIP Lender) or subject to invalid, unperfected or avoidable liens.<br><br>(ii)     Pursuant to Section 364(c)(3) of the Bankruptcy Code, second priority security interests and liens in and upon all of the DIP Collateral which constitutes Prepetition Pledged Collateral, other than the DIP Prepetition Collateral and valid liens in existence as of the Petition Date that are (i) perfected subsequent to such date as permitted by Section 546(b) of the Bankruptcy Code and (ii) to the extent such Liens are expressly permitted in writing by the Lender in its sole and absolute |

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 10

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78623460v5

| | |
|---|---|
| | discretion. |
| | *See* Interim Order, ¶ 2.1.1 |
| | The term "DIP Collateral" means as defined in the DIP Agreement, which term includes substantially all of the Debtors' real property assets. |
| | *See* Interim Order, ¶ 2.1.2 |
| **Adequate Protection / Identity of Each**<br><br>**Entity with Interest in Cash Collateral**<br><br>*Fed. R. Bankr. P.*<br><br>*4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv);* | As adequate protection of the interests of the Prepetition Mortgage Lenders (as identified in the chart below) in their respective Prepetition Collateral to the extent of any Diminution in value of such Prepetition Collateral, the Debtors hereby grant to the Prepetition Mortgage Lenders continuing, valid, binding, enforceable and perfected security interests and liens on such Prepetition Mortgage Lender's respective Prepetition Collateral. The AP Liens and the Liens of the Prepetition Mortgage Lenders on their respective Prepetition Collateral shall be senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided, however, that the Prepetition Mortgage Lenders Liens be shall junior to the Superpriority Claims (as provided herein) and be subject to the Carve-Out Expenses to the extent provided for in Section 2.2 of this Interim Order.<br><br>*See* Interim Order, ¶ 2.3.2<br><br>As additional adequate protection of the interests of the Prepetition Mortgage Lenders in their respective Prepetition Collateral to the extent of any Diminution in value of such Prepetition Collateral, the Debtors shall pay the Prepetition Mortgage Lenders interest payments required under any applicable agreement. Such interest payments shall be at the contract rate.<br><br>*See* Interim Order, ¶ 2.3.3 |
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr. P.*<br><br>*4001(c)(1)(B)(iii);* | As of the Petition Date, (a) the DIP Lender Prepetition Liens on the DIP Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the DIP Lender for fair consideration and reasonably equivalent value; (b) the DIP Lender Prepetition Liens were senior in priority over any and all other liens on the DIP Prepetition Collateral, subject only to certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable and senior in priority to the DIP Lender Prepetition Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) consisting solely of mechanic's lien and the Prepetition Liens; (c) the Prepetition DIP Lender Obligations constitute |

MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN DEBTOR-IN-POSSESSION FINANCING- 11

BN 78623460v5

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 11 of 117

| | |
|---|---|
| | legal, valid, binding and non avoidable obligations of the Debtors enforceable in accordance with the terms of the Secured Note and the Deeds of Trust and are not subject to any challenge or defense, including without limitation, respectively, avoidance, subordination, recharacterization, recovery, reduction, set-off, offset, attack, counterclaim, cross-claim or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Debtors have waived, discharged and released any right they may have to challenge the Prepetition DIP Lender Obligations and the DIP Lender Prepetition Liens on the DIP Prepetition Collateral and to assert any recoupments, offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the DIP Lender with respect to the Secured Note, the Deeds of Trust, the Prepetition DIP Lender Obligations, the DIP Lender Prepetition Liens or the DIP Prepetition Collateral; and (e) the Prepetition DIP Lender Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code. |
| **Waiver or Modification of Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | Upon and Event of Default, and after the giving five (5) business days' notice to the Debtors, the U.S. Trustee and the Committee, the DIP Lender may exercise all other rights and remedies provided for in this Interim Order or the applicable DIP Loan Documents and applicable law, free of the automatic stay of section 362 of the Bankruptcy Code. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.<br><br>*See* Interim Order, ¶ 3.2. |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The DIP Agreement and the DIP Orders will provide for customary indemnification by each of the Debtors of the DIP Lender, and its respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing.<br><br>*See* Credit Agreement §14.2. |
| **Section 506(c) Waiver / Section 552(b) Waiver**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x)* | The DIP Liens and the Superpriority Claim (a) shall not be subject to the "equities of the case" exception of section 552 of the Bankruptcy Code, or (subject to entry of the Final Order) section 506(c) of the Bankruptcy Code<br><br>*See* Interim Order ¶ 2.1.4 |
| **Marshalling Waiver** | The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.<br><br>*See* Interim DIP Order ¶ 5.2 |
| **Liens on** | . |

MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN DEBTOR-IN-POSSESSION FINANCING- 12

BN 78623460v5

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 12 of 117

| Avoidance Actions<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(xi)* | None |
|---|---|
| Fees<br><br>*Fed. R. Bankr. P. 4001(c)(1);* | Exit Fee.  Upon the earlier of (i) repayment in full of the Obligations at any time, and (ii) the Maturity Date, in addition to the payment of any other amounts then-owing, an exit fee in the amount of the greater of (A) $250,000 and (B) five percent (5.0%) of the aggregate amount of the Advances, which shall be fully earned and non-refundable commitment in connection with each Advance;<br><br>Facility Fee.  A fully earned, non-refundable facility fee of the greater of (A) $250,000 and (B) five percent (5.0%) of the aggregate amount of the Advances payable upon the earlier of (i) repayment in full of the Obligations at any time, and (ii) the Maturity Date.<br><br>Repayment Premium.  On the Maturity Date, the Loan Parties agree to pay a premium to Lender equal to (i) 1.3 times the amount of the Credit Extensions made by Lender to the Loan Parties, *less* (ii) the aggregate amount interest actually paid to Lender (including, for the avoidance of doubt the Exit Fee and the Facility Fee) ; and<br><br>Lender Expenses.  All Lender Expenses (including reasonable and documented attorneys' fees and expenses for documentation and negotiation of this Agreement, incurred through and after the Effective Date, when due (or, if no stated due date, within ten (10) days of written demand from Lender), which Lender Expenses shall be payable in accordance with the Budget on the Maturity Date.  For the avoidance of doubt, the Loan Parties shall be responsible for all reasonable and documented fees, costs and expenses of Lender including any and all reasonable and documented expenses of Lender's counsel, professional advisors, or in house administration, each case subject to the approved Budget<br><br>*See* DIP Agreement, § 2.3 |

## C.     **The Debtors' Prepetition Secured Creditors.**

10.     The Debtors funded their operations with a combination of cash flow from business operations and funded indebtedness.

### i.     **Property-Level Secured Obligations.**

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 13

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

BN 78623460v5

23-01243-WLH11     Doc 33     Filed 10/03/23     Entered 10/03/23 14:37:12     Pg 13 of 117

11.     Various of the SPE Debtors and their real estate properties are subject to deeds of trust for mortgages and other secured debt arising from the acquisition, development, and/or ownership of real property.  These obligations are generally owed by the SPE Debtor that owns the property at issue.  The table below reflects the total debt secured by the Debtors' specific properties, as reflected on title reports procured by the Debtors prior to the Petition Date.[7]  The obligors on the table are referred to as the "Prepetition Mortgage Lenders".

| Property Name | Entity Name | Address | City | State | 1st Lien Debt | 1st Lien Lender |
|---|---|---|---|---|---|---|
| Willow Street - 4906 A, 4910 B, 4912 B | VH Willows Townhomes LLC | 4906 A, 4910 B, 4912 B Willow St. | Seattle | WA | $1,492,500 | Lima One Capital, LLC |
| Willow Street - 4918 C, 4922 A 4922 B | VH Willows Townhomes LLC | 4918 C, 4922 A 4922 B Willow St | Seattle | WA | $336,235 | Lima One Capital, LLC |
| VH 1121 14th LLC | VH 1121 14th LLC | 117 -121 14th Ave, | Seattle | WA | $3,000,000 | Lima One Capital, LLC |
| VH Senior Care LLC (Burien AFH) | VH Senior Care LLC | 302 SE 146th Street | Burien | WA | $612,800 | Redmond Funding Group |
| VH Senior Care LLC (Lynnwood AFH) | VH Senior Care LLC | 1226 160th Street SW | Lynwood | WA | $1,041,400 | Redmond Funding Group |
| **Property in Escrow** | | | | | | |
| VH Pioneer Village LLC | VH Pioneer Village LLC | 4318 S. Settler Dr. | Ridgefield | WA | $2,000,000 | Tritalent Funding |

---

[7] The Debtors continue to reviewing these title reports, and reserve all rights with respect to their validity, existence, or priority.  The Debtors also continue to investigate their real estate holdings and accordingly, information on the table is subject to revision.

MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN DEBTOR-IN-POSSESSION FINANCING- 14

BN 78623460v5

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 14 of 117

| Property Name | Entity Name | Address | City | State | 1st Lien Debt | 1st Lien Lender |
|---|---|---|---|---|---|---|
| - Escrow | | | | | | Group, Inc |
| VH 2nd Street Office LLC - Escrow | VH 2nd Street Office LLC | 2818 E. 2nd St. | Vancouver | WA | $3,000,000 | Socotra REIT 1, LLC |

ii.      **Prepetition Bridge Loan.**

12.    Debtors 725 Broadway, LLC and ICAP Campbell Way, LLC are parties to that certain Promissory Note in the aggregate principal amount of $500,000, dated September 13, 2023 (the proceeds of which were used by the Debtors to pay ordinary course expenses and prepare for this bankruptcy case. The Secured Note is secured by: (i) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of substantially even date herewith, made by and among the Broadway Borrower as "Grantor", in favor of Lender as "Beneficiary" and appointing Chicago Title Company as "Trustee" which encumbers certain real property in the City of Tacoma, County of Pierce, State of Washington as more particularly described in the Broadway Deed of Trust and (ii) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of substantially even date herewith, made by and among the Campbell Way Borrower as "Grantor", in favor of Lender as "Beneficiary" and appointing Chicago Title Company as "Trustee, which encumbers certain real property in the City of Bremerton, County of Kitsap, State of Washington as more particularly described in the Campbell Way Deed of Trust The total balance outstanding under the Secured Note as of the Petition Date was not less than $500,000 plus accrued interest, costs, fees, and expenses.

D.    **Chapter 11 Objectives.**

MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN DEBTOR-IN-POSSESSION FINANCING- 15

BN 78623460v5

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11   Doc 33   Filed 10/03/23   Entered 10/03/23 14:37:12   Pg 15 of 117

13.     The Debtors and their advisors, in consultation with certain creditor constituencies, have developed three primary objectives for these Chapter 11 Cases.

14.     *Real Estate Assessment*.  As described above, the Debtors maintained a portfolio of owned real property assets, as well has ownership or other interests in other real property projects.  The Debtors intend to quickly develop a comprehensive plan to maximize the value of these real estate holdings, which will likely require the services of a specialized real estate advisor and/or broker.  The Debtors' path forward with respect to the real estate assets may involve a sale process or all or some assets or a longer-term development plan.  The Debtors anticipate that the availability and terms of development financing will be a substantial factor in formulating their real estate strategy.

15.     *Investigation and Assessment of Fraud Allegations*.   The Active Prepetition Lawsuits contain serious allegations, including securities fraud claims. These issues must be addressed.  To date, the Debtors' restructuring advisors have not had the time or resources to undertake a comprehensive examination of the Debtors historical financial information, but intend to do so during these Chapter 11 Cases. Needless to say, the estates may hold claims arising from, inter alia, the raising of investor capital.

16.     *Plan of Liquidation*.  The Debtors intend to pursue a confirmation process for a plan of liquidation.  The plan will address any assets that have not already been sold or liquidated, address disposition of causes of action previously identified, and provide a final outcome for all creditors in these cases.

**E.     <u>The Debtor's Need for Dip Financing and Efforts to Secure Financing</u>**.

17.     The Debtors do not have sufficient available sources of working capital, including cash collateral, to pay administrative expenses and conclude a sale of their assets without the financing requested under the Motion.  The ability of the Debtors to

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 16

BN 78623460v5

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

23-01243-WLH11     Doc 33     Filed 10/03/23     Entered 10/03/23 14:37:12     Pg 16 of 117

obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Lender as set forth in this Order and the DIP Agreement is vital to the Debtors' ability to maximize the value of the assets of their bankruptcy estates through an orderly sale process. Accordingly, the Debtors have an immediate need to obtain the postpetition financing in order to, among other things, preserve and maximize the value of the assets of their estates.

18. The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or solely based on the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable solely under section 364(c)(2) or 364(c)(3) of the Bankruptcy Code. The Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Lender pursuant to the DIP Agreement.

19. Prior to the Petition Date, the Debtors expended considerable time and effort to identify favorable sources of DIP financing. Prior to reaching out to potential DIP lenders, the Debtors identified the needed window for closing on new liquidity, created solicitation materials that included a property list with estimated values and existing lien information and a data room with compiled property-level information, and generated a rough budget for these cases, The Debtors then used the foregoing information in order to determine the case and compared with expected/likely DIP capacity to reach a target solicitation amount of between $5.0 million and $7.0 million. $5-7 million.

20. Based on the above, the Debtors compiled a short list of nine appropriate lenders to solicit, derived from Paladin's existing network and input from Buchalter. Teaser emails were sent to all target lenders with a general description of the

MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN DEBTOR-IN-POSSESSION FINANCING- 17

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78623460v5

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 17 of 117

opportunity and requesting an indication of interest to move to non-disclosure agreement ("NDA"). Five of the target lenders execution an NDA, after which each was provided access to a virtual datae room and basic diligence/solicitation information. Thereafter, the Debtors held calls with interested parties and responded to diligence questions. The only party at the end of this process willing to submit a proposal was Serene, and that was only after it was offered a secured guarantee from Christensen. Thereafter, the Debtors went back to some of the target lenders but none were willing to submit a competing bid.

## III  **LEGAL ARGUMENT.**

### A.  **Debtors Should Be Authorized to Access the DIP Facility.**

Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition secured financing, subject to approval of the Court. Section 364(c) requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors including whether:

a.  unencumbered credit or alternative financing without superpriority status is available to the debtor;

b.  the credit transactions are necessary to preserve assets of the estate;

c.  the terms of the credit agreement are fair, reasonable, and adequate;

d.  the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 18

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

BN 78623460v5

23-01243-WLH11   Doc 33   Filed 10/03/23   Entered 10/03/23 14:37:12   Pg 18 of 117

e.     the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

For the reasons discussed herein, including the terms of the DIP Facility, as well as the unavailability of actionable alternative sources of financing, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under section 364(c) of the Bankruptcy Code.

**B.**     <u>**Debtors Cannot Obtain Postpetition Financing on More Favorable Terms**</u>.

In demonstrating that credit is not available without the protections afforded by section 364(c) of the Bankruptcy Code, a debtor need only make a good faith effort. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); *see also* 42 *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (holding "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984) (holding the debtor satisfied its burden to show an inability to obtain credit on other terms through its time and effort spent trying to obtain credit on alternative terms and conditions).

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 19

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78623460v5

Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain alternative sources of interim and long-term financing other than the DIP Lenders, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.

As described above, the Debtors, in consultation with their advisors, reached out to potential third-party financing options, all of which were unwilling to provide postpetition financing on any reasonable basis. Thus, the Debtors, in consultation with their advisors, engaged in weeks-long arm's length negotiations with the DIP Lender to obtain postpetition financing on the best possible terms.

### C. DIP Facility is Necessary to Preserve the Value of the Debtors' Estates.

As debtors in possession, the Debtors have a fiduciary duty to protect and maximize the value of their estates. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The DIP Facility, if approved, will provide working capital critical to funding the Debtors' day-to-day operations and the Chapter 11 Cases, which provide a path for the Debtors' to liquidate their assets for the benefit of their creditors. As described above, the Debtors do not have sufficient available sources of working capital, including cash collateral, to pay administrative expenses and conclude a sale of their assets without the financing requested under the Motion. The ability of the Debtors

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 20

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

BN 78623460v5

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 20 of 117

to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Lender as set forth in this Order and the DIP Agreement is vital to the Debtors' ability to maximize the value of the assets of their bankruptcy estates through an orderly sale process. Accordingly, the Debtors have an immediate need to obtain the postpetition financing in order to, among other things, preserve and maximize the value of the assets of their Estates.

### D. Terms of the DIP Facility Are Fair, Reasonable, and Adequate under the Circumstances.

In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the proposed lender. *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (stating that approval of DIP financing requires terms that are "fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See Transcript of Record* at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

As described above without immediate access to the proceeds of the DIP Facility, the Debtors will lack sufficient liquidity to maintain their business operations and fund the administration of these Chapter 11 Cases. Ultimately, the Debtors engaged with the DIP Lender and successfully negotiated the Bridge Loan and the DIP Facility. The

MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN DEBTOR-IN-POSSESSION FINANCING- 21

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78623460v5

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 21 of 117

Debtors believe that the DIP Facility provides, among other things, (a) necessary liquidity for the Debtors to pursue the value-maximizing process for the benefit of all parties in interest and (b) economic terms that (i) were the result of arm's-length negotiations with the DIP Lender, (ii) are an integral component of the overall terms of the DIP Facility, and (iii) were required by the DIP Lender as consideration for the DIP Facility.

Given the Debtors' urgent need to obtain postpetition financing for the benefit of all parties in interest, the terms of the DIP Facility are fair, appropriate, reasonable, and in the best interests of the Debtors, their estates, and their creditors. As described in the Miller DIP Declaration, the terms of the Bridge Loan and the DIP Facility were negotiated over a period of several weeks in good faith and at arm's-length as required by section 364(e) of the Bankruptcy Code, with all parties represented by experienced advisors.

**E. Entry into the DIP Documents Reflects the Debtors' Reasonable Business Judgment.**

A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Group of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S.

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 22

BN 78623460v5

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 22 of 117

523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to the Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

Bankruptcy courts typically defer to the debtors' business judgment on the decision to borrow money unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974. In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

For the reasons set forth above, the Debtors submit that the entry into the DIP Facility is a reasonable exercise of their business judgment. The DIP Facility will provide the Debtors with sufficient liquidity necessary to maintain their business operations, and the terms of the DIP Facility, which are the result of good faith, arm's length negotiations, are the best available to the Debtors.

### F. Debtors Should Be Authorized to Pay the Fees and Payments Required by the DIP Lender Under the DIP Documents.

The Debtors have agreed, subject to Court approval, to pay certain fees and other payments to the DIP Lender, as described below (the "DIP Fees"). The Debtors understand that the DIP Fees are an integral component of the overall terms of the DIP Facility and were required by the DIP Lenders as consideration for the extension of postpetition financing after arm's length and good faith negotiations. Moreover, the DIP Fees are, taken as a whole with the economics of the DIP Facility, reasonable and generally consistent with debtor in possession financings in other similar cases. Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

### G. Approval of Use of Cash Collateral is Appropriate.

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 23

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78623460v5

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 23 of 117

Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

Substantially all of the Debtors' cash constitutes the Cash Collateral under section 363(a) of the Bankruptcy Code. The Debtors have an urgent need for the immediate use of the Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Documents. The Debtors need the Cash Collateral to fund their businesses and operations, as well as to fund the Chapter 11 Cases so they can pursue a value-maximizing chapter 11 liquidation process. Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

The Debtors believe that the terms and conditions of their use of the Cash Collateral and the provision of adequate protection to the Prepetition Mortgage Lenders described above, are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Documents.

**H.    Dip Lenders Should Be Deemed Good-Faith Lenders.**

Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization
> under this section [364 of the Bankruptcy Code] to obtain

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 24

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78623460v5

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 24 of 117

credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

As explained herein, and in the Miller DIP Declaration, the DIP Documents are the result of: (a) the Debtors' reasonable judgment that the DIP Lenders provided the best (and only possible) postpetition financing option available under the circumstances; and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Lender. The Debtors submit that the terms and conditions of the DIP Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**I.      Modification of the Automatic Stay.**

The Interim Order provides that the automatic stay under section 362 of the Bankruptcy Code is modified to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default under the DIP Documents, all rights and remedies provided in the DIP Documents without further order of or application to the Court. However, the DIP Lender must provide Debtors and various other parties with five business days' notice before exercising such enforcement rights or remedies in respect of their collateral. During such period, the Debtors and other parties in interest may seek an emergency hearing to contest whether an Event of Default has occurred and is continuing.

MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN DEBTOR-IN-POSSESSION FINANCING- 25

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78623460v5

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 25 of 117

Stay modification provisions of this sort are common features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Debtors request that the Court modify the automatic stay solely to the extent contemplated by the DIP Documents and the DIP Orders.

### J.    <u>Approval of Interim Relief</u>.

Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2); (c)(2).

As described above, the Debtors have an urgent and immediate need for cash in order to maintain business relationships with their vendors, suppliers, customers, and other parties, to make capital expenditures, and to satisfy other working capital and operational needs and otherwise finance their operations and the Chapter 11 Cases. Given the immediate and irreparable harm to be suffered by the Debtors, their estates and their creditors absent interim relief, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within two days of the Petition Date or as soon thereafter as practicable to consider the interim relief requested in this Motion.

### K.    <u>Request for a Final Hearing</u>.

Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date and time for the Final Hearing.

### L.    <u>Bankruptcy Rule 6003 Has Been Satisfied and Bankruptcy Rule 6004 Should Be Waived</u>.

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 26

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78623460v5

Under Bankruptcy Rule 6003, the Court may grant a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within 21 days after the chapter 11 case's commencement to the extent "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. The Debtors believe an immediate and orderly transition into Chapter 11 is critical to the viability of their operations and the success of their bankruptcy cases. As discussed in detail above and in the Miller Declaration, immediate and irreparable harm would result if the relief herein is not granted. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and therefore respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

Additionally, with respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), to the extent not satisfied, and of the fourteen-day stay under Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is immediately necessary for the Debtors to be able to continue to operate their businesses and preserve the value of their estates. The Debtors thus submit that the requested waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate, as the exigent nature of the relief sought herein justifies immediate unstayed relief.

///

///

///

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 27

BN 78623460v5

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 27 of 117

**M.    Notice of this Motion is Proper Under the Circumstances.**

Notice of this Motion will be given to: (a) the United States Trustee for the Eastern District of Washington; (b) counsel to any committee appoint in these Chapter 11 Cases; (c) the Debtors' creditors holding the thirty (30) largest unsecured claims; (d) the DIP lender and counsel thereto; (e) all secured creditors and counsel thereto; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the Office of the United States Attorney General for the District of Washington; (i) applicable state taxing authorities; (j) parties who have filed and served on counsel for the Debtors requests for special notice or service of papers; (k) any party directly affected by the this Motion; and (l) any other parties that the court may direct.

**IV.    CONCLUSION.**

WHEREFORE, the Debtors respectfully request entry of the DIP Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

/s/ *Dakota Pearce*
DAKOTA PEARCE (WSBA 57011)

BERNARD D. BOLLINGER, JR. (*pro hac vice* pending)
JULIAN I. GURULE (*pro hac vice* pending)
KHALED TARAZI (*pro hac vice* pending)
BUCHALTER, a Professional Corporation

*Proposed Counsel to Debtors and Debtors in Possession*

MOTION FOR ORDER AUTHORIZING
DEBTORS TO OBTAIN DEBTOR-IN-
POSSESSION FINANCING- 28

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Pg 28 of 117

BN 78623460v5

# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| In re: | Chapter 11 |
| ICAP ENTERPRISES, INC., *et al.,* | Lead Case No. 23-01243-WLH11<br>Jointly Administered |
| Debtors.[1] | **INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; (III) GRANTING SUPERPRIORITY** |

---

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01256-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01253-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund, LLC (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); iCap Broadway, LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care LLC (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH 2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding LLC (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11) ; Vault Holding, LLC (23-01270-11); iCap Pacific Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); and iCap Holding 6 LLC (23-01274-11).

**CLAIMS; (IV) PROVIDING
ADEQUATE PROTECTION AND
ADMINISTRATIVE EXPENSE
CLAIMS; (V) SCHEDULING A
FINAL HEARING; AND (VI)
GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>") of the above-captioned debtors and debtors in possession (the "<u>Debtors</u>"), in the above-captioned chapter 11 cases (the "<u>Bankruptcy Cases</u>"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and the corresponding local rules of the District Court (the "<u>Local Rules</u>"), seeking authorization for the Debtors to, among other things:

    i.    obtain post-petition loans, advances and other financial accommodations (the "<u>DIP Loans</u>") in an aggregate principal amount not to exceed $5,250,000, or $6,750,000, in the event the DIP Lender (as defined below) is granted a priming lien on the VH Collateral (as defined in the DIP Agreement) pursuant to the terms and conditions of the DIP Documents (as defined below), this Order (the "<u>Interim Order</u>"), and the Final Order (as defined below);

    ii.    to enter into, be bound by, and perform under (a) a debtor-in-possession credit facility (the "<u>DIP Facility</u>"), pursuant to an agreement dated as of October 3, 2023, by and among the Debtors and Serene Investment Management, LLC (the "<u>DIP Lender</u>", which agreement is attached

I6656.0002 BN 78851870v4

hereto as **Exhibit 1** (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Agreement") and (b) the documents related to the DIP Agreement (together with the DIP Agreement, the "DIP Documents");

iii.    borrow, on an interim basis, pursuant to the DIP Documents and this Interim Order, postpetition financing in an aggregate principal amount of up to $2,500,000, consisting of (a) up to $2,000,000 in "new money" loans and (b) rolled-up loans under the Secured Note (as defined below) in an aggregate amount of $500,000 in principal plus accrued interest thereon through the Petition Date (as defined below) upon entry of this Interim Order (collectively, the "DIP Roll-Up Loans");

iv.    grant to the DIP Lender First Priority DIP Liens (as defined below) on all of the DIP Collateral (as defined below) not subject to a lien of any third party to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Agreement, as applicable, and this Interim Order and the Final Order (as defined below), as applicable (collectively, the "DIP Obligations"), subject only to prior payment of the Carve-Out (as defined below), pursuant to section 364(c)(2) of the Bankruptcy Code;

v.    grant to the DIP Lender Second Priority DIP Liens (as defined below) on all Prepetition Collateral (as defined below) to secure the DIP Facility and all DIP Obligations, subject only to (a) the First Priority Pledged Liens (as defined below) and (b) the Carve-Out, pursuant to section 364(c)(3) of the Bankruptcy Code;

vi.    to the extent the Debtors request an additional $1,500,000 in financing from the DIP Lender on a final basis, in addition to the $5,250,000 in

financing that the DIP Lender has agreed to provide pursuant to the DIP Agreement, and as described in i. (a) above, grant to the DIP Lender at the Final Hearing (as defined below) priming liens on Prepetition Collateral consisting of the VH Collateral to secure the DIP Facility and all DIP Obligations, subject only to the Carve-Out, pursuant to section 364(d) of the Bankruptcy Code;[2]

vii.   grant to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all amounts advanced to the Debtors under the DIP Agreement;

viii.   grant to the Prepetition Mortgage Lenders (as defined below) adequate protection in respect of their rights under the Prepetition Documents (as defined below) and their interests in the Prepetition Collateral;

ix.   use the DIP Collateral and the Prepetition Collateral (the "Cash Collateral") in accordance with the Approved Budget (as defined below) for the Interim Period (as defined below);

x.   use the proceeds of DIP Loans, subject to the terms, restrictions, and other conditions of the DIP Agreement and this Interim Order, to (a) upon entry of this Interim Order, accrue fees and expenses related to the DIP Agreement and the Cases, and (b) fund working capital in the ordinary course of the business of the Debtors and other general corporate purposes, in each case, to the extent set forth in the Approved Budget and permitted under the DIP Agreement;

xi.   vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

---

[2] The Debtors shall submit additional briefing to support any requested priming liens.

23-01243-WLH11   Doc 33   Filed 10/03/23   Entered 10/03/23 14:37:12   Exhibit 1 Page 33

xii. set a Final Hearing on the Motion; and

xiii. waive, to the extent applicable, any stay of the immediate effectiveness of this Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Interim Order shall be immediately effective upon its entry on the Court's docket.

The initial hearing on the Motion having been held by this Court on October 4, 2023 (the "Interim Hearing"); and

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "Notice") was served by the Debtors in accordance with Bankruptcy Rule 4001(c) on (i) the DIP Lender, (ii) counsel to the DIP Lender, (iii) the Prepetition Mortgage Lenders, (iv) the Office of the United States Trustee for the Northern District of California (the "U.S. Trustee"), (v) the holders of the thirty (30) largest unsecured claims against the Debtors' Estates (on a consolidated basis) (the "30 Largest Unsecured Creditors"), (vi) all of the Debtors' pre-petition secured creditors, (vii) the United States Attorney's Office for the Eastern District of Washington; (viii) the attorneys general in the states in which the Debtors conduct their business; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Noticed Parties"); and

This Court having reviewed the Motion and any responses and objections thereto, the *Declaration of Lance Miller in Support of First Day Motions,* the *Declaration of Lance Miller in Support of Debtor in Possession Financing Motion,* the other filings made by the Debtors, the evidence and testimony presented at the Interim Hearing; and it appearing that granting the relief requested in the Motion on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors, and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and their creditors, and is essential for the preservation of the value of the

Debtors' property; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.     <u>Petition</u>. On September 29 and 30, 2023 (as applicable, the "<u>Petition Date</u>"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code. The Debtors continue as debtors-in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.     <u>Jurisdiction and Venue</u>. The Court has jurisdiction over this case and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this Court over the Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     <u>Notice</u>. Under the circumstances, the notice given by the Debtors of the Motion, the Interim Hearing and the relief granted under this Order constitutes due and sufficient notice thereof and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(c) and Local Rule 4001-2.

D.     <u>Findings and Stipulation Regarding the DIP Lender and the Prepetition Mortgage Lenders</u>.  In requesting the financing from DIP Lender and in exchange for and as a material inducement to DIP Lender to agree to provide the financing in accordance with the DIP Facility, the Debtors acknowledge, represent, stipulate and agree, for themselves and their estates, subject to the Challenge (as defined below) rights set forth in Section 9 of this Interim Order, as follows:

(i)     *Secured Note*.  Debtors 725 Broadway, LLC and ICAP Campbell Way, LLC are parties to that certain Promissory Note in the aggregate principal amount of $500,000, dated September 13, 2023 (the "<u>Secured Note</u>"), proceeds of which were

I6656.0002 BN 78851870v4

used by the Debtors to pay ordinary course expenses and prepare for this bankruptcy case. The Secured Note is secured by (the "DIP Lender Prepetition Liens"): (i) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of substantially even date herewith, made by and among the Broadway Borrower as "Grantor", in favor of Lender as "Beneficiary" and appointing Chicago Title Company as "Trustee" (the "Broadway Deed of Trust"), which encumbers certain real property in the City of Tacoma, County of Pierce, State of Washington as more particularly described in the Broadway Deed of Trust (the "Broadway Real Property") and (ii) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of substantially even date herewith, made by and among the Campbell Way Borrower as "Grantor", in favor of Lender as "Beneficiary" and appointing Chicago Title Company as "Trustee" (the "Campbell Way Deed of Trust"; and together with the Broadway Deed of Trust, each a "Deed of Trust", and together the "Deeds of Trust"), which encumbers certain real property in the City of Bremerton, County of Kitsap, State of Washington as more particularly described in the Campbell Way Deed of Trust (the "Campbell Way Real Property"; and together with the Broadway Real Property, collectively referred to as the "DIP Prepetition Collateral"). The total balance outstanding under the Secured Note as of the Petition Date was not less than $500,000 plus accrued interest, fees, costs and expenses (the "Prepetition DIP Lender Obligations").

(ii)     *Prepetition Mortgage Lenders*.  As of the Petition Date, the following entities held first priority liens (the "Prepetition Liens") under their respective loan documents (the "Prepetition Documents") on certain of the Debtors' properties identified on Schedule 1 to this Interim Order (the "Prepetition Collateral"): Lima One Capital, LLC, Redmond Funding Group, and Tritalent Funding Group, Inc. (collectively, the "Prepetition Mortgage Lenders").

23-01243-WLH11     Doc 33     Filed 10/03/23     Entered 10/03/23 14:37:12     Exhibit 1 Page 36

(iii)    *Validity, Perfection and Priority of DIP Lender Prepetition Liens and Prepetition DIP Lender Obligations*.  As of the Petition Date, (a) the DIP Lender Prepetition Liens on the DIP Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the DIP Lender for fair consideration and reasonably equivalent value; (b) the DIP Lender Prepetition Liens were senior in priority over any and all other liens on the DIP Prepetition Collateral, subject only to certain liens senior by operation of law (solely to the extent such liens were valid, non-avoidable and senior in priority to the DIP Lender Prepetition Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) consisting solely of mechanic's lien and the Prepetition Liens; (c) the Prepetition DIP Lender Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the Secured Note and the Deeds of Trust and are not subject to any challenge or defense, including without limitation, respectively, avoidance, subordination, recharacterization, recovery, reduction, set-off, offset, attack, counterclaim, cross-claim or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Debtors have waived, discharged and released any right they may have to challenge the Prepetition DIP Lender Obligations and the DIP Lender Prepetition Liens on the DIP Prepetition Collateral and to assert any recoupments, offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the DIP Lender with respect to the Secured Note, the Deeds of Trust, the Prepetition DIP Lender Obligations, the DIP Lender Prepetition Liens or the DIP Prepetition Collateral; and (e) the Prepetition DIP Lender Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

I6656.0002 BN 78851870v4

F.  <u>Findings Regarding the Post-Petition Financing</u>. Without prejudice to the rights of any other non-Debtor party in interest, the Debtors admit, stipulate, acknowledge and agree that:

(i)  The Debtors have requested from the DIP Lender, and the DIP Lender is willing to extend, the DIP Loans on the terms and conditions set forth in this Order and the DIP Agreement.

(ii)  *Need for Post-petition Financing*. The Debtors do not have sufficient available sources of working capital, including cash collateral, to pay administrative expenses and conclude a sale of their assets without the financing requested under the Motion.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with the DIP Lender as set forth in this Order and the DIP Agreement is vital to the Debtors' ability to maximize the value of the assets of their bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "<u>Estates</u>") through an orderly sale process.  Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, preserve and maximize the value of the assets of their Estates.

(iii)  *No Credit Available on More Favorable Terms*. The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or solely based on the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable solely under section 364(c)(2) or 364(c)(3) of the Bankruptcy Code. The Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Lender pursuant to the DIP Agreement.

(iv) *Approved Budget*. The Debtors have prepared and delivered to the DIP Lender an itemized cash-flow forecast set forth on **Exhibit 2** attached hereto (as may be modified from time to time in accordance with this Interim Order and the DIP Agreement, the "Approved Budget"). The Approved Budget has been approved by the DIP Lender pursuant to the terms of the DIP Agreement. The Approved Budget has been thoroughly reviewed by the Debtors and their management and sets forth, among other things, projections for the periods covered thereby. The DIP Lender is relying upon the Debtors' compliance with the Approved Budget (as further described in Section 2.3.1 of this Interim Order) in accordance with the terms of the DIP Agreement and this Interim Order in determining to enter into the post-petition financing arrangements and consent to the use of Cash Collateral provided for herein, subject to the restrictions set forth herein.

(v) *No Additional Post-Petition Borrowing.* Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time seek allowance of any administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code that is superior to or *pari passu* with the Superpriority Claim (as defined below) provided herein, except with respect to the Carve-Out.

(vi) *No Priming of DIP Liens.* Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens provided to the DIP Lender by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim with respect to the DIP Collateral pursuant to section 364(d)

I6656.0002 BN 78851870v4

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Exhibit 1, Page 39

of the Bankruptcy Code or otherwise, except with respect to the Carve-Out (as defined below);

(vii) *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms of the DIP Facility and this Order reflect the Debtors' exercise of their prudent business judgment, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Agreement and this Order have been negotiated in good faith and at arms' length by and among the Debtors and the DIP Lender, with all parties being represented by counsel. Any credit extended under the terms of this Interim Order shall be deemed to have been extended in good faith by the DIP Lender, as that term is used in section 364(e) of the Bankruptcy Code.

(viii) *Good Cause*. The relief requested in the Motion and granted pursuant to the terms of this Order is necessary, essential, and appropriate, and is in the best interests of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and avoid immediate and irreparable harm to the Debtors, their creditors, and their assets.

(ix) *Reservation of Rights*. Nothing herein shall (i) impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Mortgage Lenders hereunder is insufficient or (ii) prejudice or limit the rights of the Prepetition Mortgage Lenders to seek additional relief with respect to the use of Cash Collateral, to challenge the Debtors' proposed valuation of the Prepetition Collateral or to seek relief for additional adequate protection. The receipt by the Prepetition Mortgage Lenders of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Mortgage Lenders are adequately protected.

I6656.0002 BN 78851870v4

(ix) *Immediate Entry*. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2). No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Order, or any objections that were made (to the extent such objections have not been withdrawn or resolved) are hereby overruled.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, THAT:**

**Section 1.**     Authorization and Conditions to Financing.

1.1     Motion Granted. The Motion is GRANTED in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order.  Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits. This Order shall hereinafter be referred to as the "Interim Order."

1.2     Authorization to Borrow and Use Loan Proceeds. To enable the Debtors to continue to preserve the value of their estates during the period prior to entry of the Final Order (the "Interim Period") and subject to the terms and conditions of this Interim Order, the Approved Budget and the DIP Documents, the Debtors are hereby authorized to enter into, be bound by, and perform under the DIP Documents and to immediately borrow an aggregate amount not to exceed $2,500,000 during the Interim Period (inclusive of the Rollup Amount), provided that disbursements of such amount are in accordance with the Approved Budget, the DIP Agreement, and this Interim Order.  Upon the entry of this Interim Order, and subject to Section 9 of this Interim Order, the Prepetition DIP Lender Obligations (the "Roll-Up Amount") shall be converted into DIP Loans, which will be in addition to the $2,000,000 maximum interim borrowing.  Upon the entry of this Interim Order, the Debtors shall be authorized to use the DIP Collateral (as defined below),

I6656.0002 BN 78851870v4

including Cash Collateral, to execute and deliver all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents, and to draw on the DIP Facility to make any disbursement as specifically provided in the Approved Budget (subject to the variances as set forth in the DIP Agreement and this Interim Order), but solely in accordance with the terms and conditions set forth in this Interim Order and the DIP Agreement.

        1.3    <u>DIP Agreement</u>.

        1.3.1   <u>Approval</u>. The DIP Agreement and each term, condition, and covenant set forth therein are approved. All of such terms, conditions, and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among the Debtors and the DIP Lender, and of each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Agreement for all purposes, including, without limitation, to the extent applicable, the payment when due of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, and such fees and expenses, including, without limitation, all of the DIP Lender's consultant fees and professional fees (including attorney fees and expenses) as more fully set forth in the DIP Agreement and further provided below, are hereby approved.

        1.3.2   <u>Amendment</u>. Subject to the terms and conditions of the DIP Agreement, the Debtors and the DIP Lender may amend, modify, supplement or waive any provision of the DIP Agreement (an "<u>Amendment</u>") without further approval or order of the Court, provided that any material Amendment shall require advance notice and opportunity to object of no less than two (2) business days to the

Prepetition Mortgage Lenders, the U.S. Trustee and any statutory committee appointed in the Cases (the "Committee").

**Section 2.** Authorization and Conditions to Financing. The DIP Lender shall have no obligation to make any loans under the DIP Agreement unless the conditions precedent to making such loans under the DIP Agreement have been satisfied in full or waived by the Lender in its sole discretion.

        2.1   Priority and Liens.

        2.1.1 Lien Grant. To secure the prompt payment and performance of any and all obligations of the Debtors to the DIP Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the DIP Lender shall have and is hereby granted, effective as of the Petition Date, valid and perfected (such liens, the "DIP Liens"):

        (i)    Pursuant to Section 364(c)(2) of the Bankruptcy Code, first priority security interests and liens in and upon all of the DIP Collateral which, as of the Petition Date, was not encumbered (besides by DIP Lender) or subject to invalid, unperfected or avoidable liens (the "First Priority DIP Liens"). For the avoidance of doubt, the First Priority DIP Liens shall encumber the DIP Prepetition Collateral.

        (ii)    Pursuant to Section 364(c)(3) of the Bankruptcy Code, second priority security interests and liens in and upon all of the DIP Collateral which constitutes Prepetition Collateral, other than the DIP Prepetition Collateral and valid liens in existence as of the Petition Date that are (i) perfected subsequent to such date as permitted by Section 546(b) of the Bankruptcy Code and (ii) to the extent such Liens are expressly permitted in writing by the Lender in its sole and absolute discretion. (the "Second Priority DIP Liens").

23-01243-WLH11   Doc 33   Filed 10/03/23   Entered 10/03/23 14:37:12   Exhibit 1 Page 43

2.1.2 DIP Collateral. For purposes of this Interim Order, the term "DIP Collateral" shall have the meaning ascribed to the term "Collateral" in the DIP Agreement, which term includes substantially all of the Debtors' real property assets.

2.1.3 Superpriority Administrative Expense. For all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Agreement, or otherwise, the DIP Lender is granted an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 364(c)(1), 546, 726 or 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment (the "Superpriority Claim"); provided, however, that the Superpriority Claim shall be subject only to the payment of the Carve-Out. The Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject only to the Carve-Out and excluding proceeds of Avoidance. Other than as expressly provided in the DIP Agreement and this Interim Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 326, 328, 330, or 331 of the Bankruptcy Code,

I6656.0002 BN 78851870v4

or otherwise, that have been or may be incurred in these Cases, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the Superpriority Claim or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

2.1.4 <u>Nature of DIP Liens; Section 552(b); Section 506(c) Lien Priority</u>. The DIP Liens shall be subject to the Carve-Out to the extent provided for in Section 2.2 of this Interim Order and shall not attach to Avoidance Actions or the proceeds thereof. The DIP Liens and the Superpriority Claim (a) shall not be subject to sections 510, 542, 549, 550, or 551 of the Bankruptcy Code, (subject to entry of the Final Order) the "equities of the case" exception of section 552 of the Bankruptcy Code, or (subject to entry of the Final Order) section 506(c) of the Bankruptcy Code, (b) shall be senior in priority and right of payment to (y) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise and (z) any intercompany or affiliate liens or claims of the Debtors, and (c) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Cases, whether upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or appointed in these Cases prior to conversion, or in any other proceedings related to any of the foregoing (each, a "<u>Successor Case</u>"), and/or upon the dismissal of any of the Cases or any Successor Case.

2.1.5 <u>Enforceable Obligations</u>. The DIP Agreement shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their Estates, and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and their creditors, in accordance with their terms. No obligation, payment, transfer, or grant of security under the DIP

Agreement or this Interim Order shall be stayed, restrained, voidable, avoidable, disallowable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) or based on any Avoidance Actions), or subject to any avoidance, disallowance, impairment, reduction, setoff, offset, recoupment, recharacterization, disgorgement, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, surcharge, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity. All interest, fees paid or payable, and all reasonable costs and expenses reimbursed or reimbursable (including, without limitation, all fees, costs and expenses referred to in the DIP Facility and the DIP Lender's reasonable attorneys' fees and expenses), by the Debtors to the DIP Lender are hereby approved.

2.1.6 <u>Post-Petition Lien Perfection</u>. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens and the AP Liens (as defined below), effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien (each, a "<u>Perfection Act</u>"). Notwithstanding the foregoing, if the DIP Lender shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the DIP Lender is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or reasonably required by the DIP Lender, which act or acts shall be deemed to have been accomplished as of the Petition Date, notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law. The

DIP Lender may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, and/or record such certified copy of this Interim Order in accordance with applicable law. Should the DIP Lender so choose and attempt to file, record, and/or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

2.2     Carve-Out.  The "Carve-Out" is an amount equal to the sum of (i) all fees required to be paid to the clerk of this Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (which is included in the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs and expenses (the "Professional Fees") incurred by persons or firms ("Professional Persons") retained by the Debtors or the official committee of unsecured creditors appointed in these Cases (the "Creditors' Committee"), if any, whose retention is approved by this Court pursuant to sections 327, 328 or 363 and 1103 of the Bankruptcy Code, subject in all respects to the terms of and amendments set forth in this Interim Order, a Final Order and any other interim or other compensation orders entered by this Court that are incurred (A) at any time before delivery to the Debtors of a Carve-Out Trigger Notice (as defined below), whether allowed by this Court prior to the delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the Approved Budget, this Interim Order or a Final Order; *provided* that with respect to Professional

I6656.0002 BN 78851870v4

Persons retained by the Creditors' Committee, such allowed and unpaid claims for unpaid fees, costs, and expenses shall not exceed the limits imposed for such Professional Persons in the Approved Budget; and (B) after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "Carve-Out Trigger Notice") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $200,000; *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds. The Carve-Out may be funded to an administrative reserve account (the "Carve-Out Account") on a weekly basis in an amount not to exceed the amount budgeted for such Professional Persons in the Approved Budget, which account shall be used to pay Professional Fees and any unpaid fees to the United States Trustee. As cash flow permits, and assuming no issuance of a Carve-Out Trigger Notice, the Debtors may pay the amounts set forth in the Approved Budget for Professional Fees into the Carve-Out Account. Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lender or any of its officers, directors and professionals; (b) attempts to modify any of the rights granted to the DIP Lender; (c) attempts to prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization upon any DIP Collateral in accordance with the DIP Agreement, the Prepetition Documents or this Order (as applicable); *provided* that nothing in this section shall restrict the rights of parties in interest during the Remedies Notice Period (as defined below); (d) paying any amount on account of

I6656.0002 BN 78851870v4

any claims arising before the commencement of the Bankruptcy Case unless such payments are approved by an order of the Bankruptcy Court; or (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end or similar fees. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims securing the DIP Loans, any adequate protection liens, if any, the superpriority claims and any and all other liens or claims existing pursuant to the DIP Facility.

                    2.3     Use of Cash Collateral; Adequate Protection.

                            2.3.1    Authorization to Use Cash Collateral. Subject to the terms and conditions of this Interim Order and the DIP Agreement, the Debtors shall be and are hereby authorized to use Cash Collateral (as defined in the Bankruptcy Code) in accordance with, and solely and exclusively for the disbursements set forth in, the Approved Budget. The DIP Lender's and Prepetition Mortgage Lenders' consent to the use of Cash Collateral is subject to the Debtors' compliance with the Approved Budget, which budget shall depict, on a weekly basis and line item basis, (i) projected cash receipts, (ii) projected disbursements, and (iii) net cash flow, for the first thirteen (13) week period from the Petition Date, and in the event that any actual receipts are less than, or disbursements exceed, 10% of each such line item (with any excess collections in subparagraph (i) or unspent amounts in subparagraph (ii) being carried forward for the subsequent week), an "Event of Default" shall be deemed to have occurred. The Debtors shall, commencing with the first full week following the Petition Date, deliver to the DIP Lender, by not later than Thursday of each week, a certificate (in form and substance acceptable to the DIP Lender) showing a reconciliation for the prior two-week cumulative period and certifying that the Debtors are in compliance with the Approved Budget. The budget shall be updated, modified, or supplemented by the Debtors not less than one time in each

four (4) consecutive week period, and each such updated, modified, or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the DIP Lender, and no such updated, modified or supplemented budget shall be effective until so approved. In the event the Debtors fail to update, modify or supplement the Budget during a four (4) consecutive week period, the Debtors' right to use Cash Collateral shall terminate.

        2.3.2 <u>Adequate Protection Liens</u>. As adequate protection of the interests of the Prepetition Mortgage Lenders in their respective Prepetition Collateral to the extent of any Diminution in value of such Prepetition Collateral, the Debtors hereby grant to the Prepetition Moretgage Lenders continuing, valid, binding, enforceable and perfected security interests and liens (the "<u>AP Liens</u>") on such Prepetition Mortgage Lender's respective Prepetition Collateral (the "<u>AP Collateral</u>"). The AP Liens and the Liens of the Prepetition Mortgage Lenders on their respective Prepetition Collateral (the "<u>Prepetition Mortgage Lenders Liens</u>") shall be senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364 or any other section of the Bankruptcy Code or other applicable law; *provided*, *however*, that the Prepetition Liens shall be junior to the Superpriority Claims (as provided herein) and be subject to the Carve-Out to the extent provided for in Section 2.2 of this Interim Order.

        2.3.3 <u>Adequate Protection Payments</u>. As additional adequate protection of the interests of the Prepetition Mortgage Lenders in their respective Prepetition Collateral to the extent of any Diminution in value of such Prepetition Collateral, the Debtors shall pay the Prepetition Mortgage Lenders interest payments

required under any applicable agreement. Such interest payments shall be at the contract rate.

2.3.4 <u>Adequate Protection Claims</u>. Effective as of the Petition Date, the Prepetition Mortgage Lenders are hereby granted allowed superpriority administrative expense claims arising pursuant to section 507(b) of the Bankruptcy Code against each of the Debtors on a joint and several basis with priority over all other administrative claims (subject only to the Carve-Out and DIP Obligations, including the Superpriority Claim), including all claims of the kind specified under sections 503(b) of the Bankruptcy Code (the "<u>Adequate Protection Claims</u>"), which administrative claims shall have recourse to and be payable from all prepetition and postpetition property of the Debtors, including any proceeds or property recovered in respect of any Avoidance Actions. Other than the Carve-Out and the Superpriority Claim, no cost or expense of administration of the Chapter 11 Cases shall be senior to, or *pari passu* with, any of the Adequate Protection Claims.

**Section 3.** <u>Default; Rights and Remedies; Relief from Stay.</u>

3.1 <u>Events of Default</u>. It shall be an "<u>Event of Default</u>" under this Final Order if an "Event of Default" as defined in the DIP Agreement occurs (together with the passage of any applicable cure period set forth therein).

3.2 <u>Rights and Remedies Upon Events of Default</u>. Upon the occurrence and continuance of an Event of Default, (x) the DIP Lender may declare (i) the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Loan Parties, and (iii) the termination of the DIP Facility and the DIP Loans Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the liens or the obligations under the DIP

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Exhibit 1 Page 51

Facility; (y) without further notice, motion or application to, order of, or hearing before, this Court (other than such notice required by this Paragraph), the DIP Lender may terminate, revoke, reduce or restrict the ability of the Debtors to use Cash Collateral under this Interim Order and the other DIP Loan Documents, and the Debtors' ability to use rental proceeds of the DIP Collateral shall automatically terminate, and, notwithstanding anything contained herein to the contrary, no further advances shall be made under the DIP Facility unless and until the Court enters an order directing otherwise; (z) upon the giving of five (5) business days' notice (the "Remedies Notice Period") to the Debtors, the U.S. Trustee and the Committee (the "Notice Parties"), the DIP Lender may exercise all other rights and remedies provided for in this Interim Order or the applicable DIP Loan Documents and applicable law, free of the automatic stay of section 362 of the Bankruptcy Code. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.

**Section 4.** <u>Good Faith</u>. The terms of this Interim Order were negotiated in good faith and at arm's length by and among the Debtors and the DIP Lender. The DIP Lender shall be entitled to the full protections of section 364(e) of the Bankruptcy Code.

**Section 5.** <u>Collateral Rights</u>.

5.1 <u>Collateral Rights</u>. Until all of the DIP Obligations shall have been indefeasibly paid and satisfied in full: (i) no other party shall foreclose or otherwise seek to enforce any lien or claim in any DIP Collateral and (ii) upon and after the occurrence of an Event of Default, and subject to the DIP Lender providing five (5) Business Days prior written notice as set forth in <u>Section 3.2</u>, above, the DIP Lender (or any of its employees, agents, consultants, contractors, or other

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Exhibit 1 Pg 52 of 117 Page 52

professionals) shall have the right, at the sole cost and expense of Debtors, to: (a) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by Debtors, and (b) use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are or were used by any of the Debtors.

5.2     No Marshaling. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

**Section 6.**     Other Rights and Obligations.

6.1     No Modification or Stay of This Interim Order. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order. Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation, or reversal of this Interim Order, any of the DIP Agreement or any term hereunder or thereunder, (b) the failure to obtain a Final Order pursuant to Bankruptcy Rule 4001(c)(2), or (c) the dismissal or conversion of one or more of the Cases (each, a "Subject Event"), (i) the acts taken by the DIP Lender in accordance with this Interim Order, and (ii) the DIP Obligations incurred or arising prior to the DIP Lender's actual receipt of written notice from Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Interim Order, and the acts taken by the DIP Lender in accordance with this Interim Order and the DIP Agreement, and the DIP Liens granted to the DIP Lender in the DIP Collateral, and the AP Liens granted to the Prepetition Mortgage Lenders

in the AP Collateral, and all other rights, remedies, privileges, and benefits in favor of the DIP Lender and the Prepetition Mortgage Lenders pursuant to this Interim Order and the DIP Agreement, shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.

6.2 <u>Power to Waive Rights; Duties to Third Parties</u>. The DIP Lender, in its sole and absolute discretion, shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order in respect of the DIP Lender (the "<u>DIP Lender Rights</u>"), with any such waiver to be made in writing by the DIP Lender, and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Rights. Any waiver by the DIP Lender of any DIP Lender Rights shall not be or constitute a continuing waiver. Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Lender to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert a defense to any obligation owed by the Debtors to the DIP Lender.

6.3 <u>Reservation of Rights</u>. The terms, conditions, and provisions of this Interim Order are in addition to and without prejudice to the rights of the DIP Lender to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Agreement (with respect to the DIP Lender), or any other applicable agreement or law, including, without limitation, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Debtors' Estates.

I6656.0002 BN 78851870v4

6.4    Binding Effect of Interim Order.

6.4.1   Immediately upon entry by this Court, this Interim Order shall be valid and binding upon and inure to the benefit of the DIP Lender, the Prepetition Mortgage Lenders, the Debtors, and the property of the Debtors' Estates, all other creditors of any of the Debtors, any Committee, and all other parties in interest and their respective successors and assigns (including any chapter 11 or chapter 7 trustee or any other fiduciary hereafter appointed as a legal representative of the Debtors), in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

6.4.2   Any order dismissing one or more of the Cases or any Successor Case under section 1112 or otherwise shall be deemed to provide (in accordance with sections 105 and 349 the Bankruptcy Code) that (a) the Superpriority Claim and the DIP Liens shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full, (b) the AP Liens and the Prepetition Liens shall continue in full force and effective notwithstanding such dismissal until the obligations owing to the Prepetition Mortgage Lenders (the "Prepetition Lender Obligations") are indefeasibly paid and satisfied in full, and (c) this Court shall retain jurisdiction to the greatest extent permitted by applicable law, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim, the DIP Liens and the AP Liens and the Prepetition Mortgage Lenders Liens.  In the event any Court modifies any of the provisions of this Interim Order or the DIP Financing Documents following a Final Hearing, (i) such modifications shall not affect the rights or priorities of the DIP Lender and the Prepetition Mortgage Lenders pursuant to this Interim Order with respect to the DIP Collateral or any portion of the DIP Obligations which arise or are incurred or are advanced prior to such modifications, and (ii) this Interim

Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

6.5 <u>Restrictions on Cash Collateral Use, Additional Financing, Plan Treatment</u>. All postpetition advances and other financial accommodations under the DIP Agreement and the other DIP Financing Documents, and the use of Cash Collateral, are made in reliance on this Interim Order and there shall not at any time be entered in the Cases, or in any Successor Case, any order (other than the Final Order) which (a) authorizes the use of Cash Collateral (as defined in the Bankruptcy Code) of the Debtors in which the DIP Lender has an interest, or the sale, lease, or other disposition of property of any Debtor's Estate subject to a lien or security interest granted to the DIP Lender, except as expressly permitted hereunder or in the DIP Agreement, (b) authorizes the use of Cash Collateral of the Debtors, or the sale, lease, or other disposition of property of any Debtor's Estate subject to a lien or security interest granted to the DIP Lender, except as expressly permitted hereunder, or (c) authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which the DIP Lender hold a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to the DIP Lender, herein unless, in each instance (i) the DIP Lender shall have given its express prior written consent with respect thereto (such consent to be in the DIP Lender's absolute and sole discretion and no such consent being implied from any other action, inaction, or acquiescence by the DIP Lender) or (ii) such other order requires that all DIP Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of DIP Agreement, including, without limitation, all debts and obligations of the Debtors to the DIP Lender which arise or result from the obligations, loans, security interests,

and liens authorized herein, on terms and conditions acceptable to the DIP Lender. The security interests and liens granted to or for the benefit of the DIP Lender hereunder, the terms of the DIP Facility approved hereby and the rights of the DIP Lender pursuant to this Interim Order shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of the Debtors without the express prior written consent of the DIP Lender (such consent to be in the DIP Lender's absolute and sole discretion).

6.6 <u>Term; Termination</u>. Notwithstanding any provision of this Interim Order to the contrary, the term of the DIP Agreement among the Debtors and the DIP Lender authorized by this Interim Order may be terminated pursuant to the terms of the DIP Agreement.

6.7 <u>Objections Overruled</u>. All objections to the entry of this Interim Order are, to the extent not withdrawn or resolved, hereby overruled.

6.8 <u>No Liability to Third Parties</u>. With respect to any approval or disapproval of expenditures set forth in the Approved Budget, the DIP Lender shall not: (a) be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 or any similar federal or state statute).

6.9 <u>Payments Free and Clear</u>. Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability.

**Section 7.** <u>Findings and Conclusions</u>. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable, as of the Petition Date, immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

**Section 8.** <u>Interim Order Governs</u>. In the event that any provision of this Interim Order conflicts with any term of the DIP Loan Documents, this Interim Order shall govern.

**Section 9.** <u>Effect of Stipulations on Third Parties</u>. The admissions, stipulations, agreements and waivers set forth in Paragraph (D) of this Interim Order (collectively, the "<u>Prepetition Lien and Claim Matters</u>") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, and other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless and to the extent that a party in interest has properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (other than the Debtors, as to which any Challenge (as defined below) is irrevocable waived and relinquished) and (i) has timely filed an appropriate pleadings, and timely commenced the appropriate proceeding required under the Bankruptcy Code and Bankruptcy Rules challenging the Prepetition Lien and Claim Matters (each such proceeding or appropriate pleading commencing a pleading or other contested matter, a "<u>Challenge</u>") by no later than the earlier of (A) for the Committee (if appointed) sixty (60) days from the formation of the Committee, or (B) seventy-five

I6656.0002 BN 78851870v4

(75) days following entry of the Interim Order for any other party in interest with requisite standing, (the occurrence of (A) or (B), as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the applicable holder of a Prepetition Lien, or by this Court for good cause shown, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and such judgment has become a final judgment that is not subject to any further review or appeal. To the extent no Challenge is timely and properly commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive and final on any person, entity, or party in interest in the Bankruptcy Cases, and their successors and assigns, and in any Successor Case for all purposes.

**Section 10.** <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to interpret and enforce the provisions of this Interim Order.

***Section 11.*** <u>Final Hearing and Response Dates</u>. The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for October __, 2023, at __:__ a.m./p.m. (prevailing Pacific time) before this Court (the "<u>Final Hearing</u>"). The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same has been appointed, or Committee counsel, if same shall have filed a request for notice. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be

I6656.0002 BN 78851870v4

served upon (a) counsel for the Debtors, Buchalter, P.C., 1000 Wilshire Blvd., Suite 1500, Los Angeles, CA 90017 (Attn: Julian I. Gurule jgurule@buchalter.com and Khaled Tarazi ktarazi@buchalter.com) (b) counsel for the DIP Lender, Loeb & Loeb, LLP, 10100 Santa Monica Blvd., Los Angeles, California 90067 (Attn: Lance N. Jurich, ljurich@loeb.com) and 345 Park Avenue, New York, New York 10154 (Attn: Vadim J. Rubinstein, vrubinstein@loeb.com); (c) counsel to any Committee or if no Committee has been appointed, the 30 Largest Unsecured Creditors; and (d) the U.S. Trustee; and shall be filed with the Clerk of the United States Bankruptcy Court for the Northern District of California, in each case, to allow actual receipt of the foregoing no later than seven (7) days prior to the Final Hearing by 4:00 p.m. prevailing Pacific time.

///END OF ORDER///

PRESENTED BY:

/s/ *Dakota Pearce*_____
DAKOTA PEARCE (WSBA 57011)

BERNARD D. BOLLINGER, JR. (*pro hac vice* pending)
JULIAN I. GURULE (*pro hac vice* pending)
KHALED TARAZI (*pro hac vice* pending)
BUCHALTER, a Professional Corporation

*Proposed Counsel to Debtors and Debtors in Possession*

I6656.0002 BN 78851870v4

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Exhibit 1 Page 60

# **SCHEDULE 1**

| Property Name | Entity Name | Address | City | State | Other 1st Lien Debt | 1st Lien Lender |
|---|---|---|---|---|---|---|
| Willow Street - 4906 A, 4910 B, 4912 B | VH Willows Townhomes LLC | 4906 A, 4910 B, 4912 B Willow St. | Seattle | WA | 1,492,500 | Lima One Capital, LLC |
| Willow Street - 4918 C, 4922 A 4922 B | VH Willows Townhomes LLC | 4918 C, 4922 A 4922 B Willow St | Seattle | WA | 336,235 | Lima One Capital, LLC |
| VH 1121 14th LLC | VH 1121 14th LLC | 117 -121 14th Ave, | Seattle | WA | 3,000,000 | Lima One Capital, LLC |
| VH Senior Care LLC (Burien AFH) | VH Senior Care LLC | 302 SE 146th Street | Burien | WA | 612,800 | Redmond Funding Group |
| VH Senior Care LLC (Lynnwood AFH) | VH Senior Care LLC | 1226 160th Street SW | Lynwood | WA | 1,041,400 | Redmond Funding Group |
| **Property in Escrow** | | | | | | |
| VH Pioneer Village LLC - Escrow | VH Pioneer Village LLC | | | | 2,000,000 | Tritalent Funding Group, Inc. |
| VH 2nd Street Office LLC - Escrow | VH 2nd Street Office LLC | | | | 3,000,000 | Socotra REIT 1, LLC |

23-01243-WLH11   Doc 33   Filed 10/03/23   Entered 10/03/23 14:37:12   Exhibit 1 Page 61

# EXHIBIT 2

Also Exhibit 1 of the Order

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** is entered into as of October 3, 2023 (this "**Agreement**"), by and among Serene Investment Management, LLC ("**Lender**"), the parties listed on **Schedule I** attached hereto (each, a "**Property Owner**" and collectively, the "**Property Owners**") the parties listed on **Schedule II** attached hereto (collectively, the "**iCap Constituent Party Debtors**"; and together with each Property Owner (each a debtor or debtor-in-possession under Chapter 11 of the Bankruptcy Code) each individually a "**Loan Party**," and also referred to as a "**Debtor**," and collectively, the "**Loan Parties**" or "**Debtors**").

### RECITALS

WHEREAS, on September 29, 2023 (the "**Petition Date**"), each Loan Party filed a voluntary petition with the Bankruptcy Court initiating a case pending under Chapter 11 of the Bankruptcy Code (the "**Case**" and collectively, the "**Cases**") and has continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, each of the Property Owners is the fee owner of the real property listed next to its name on Schedule I hereto (collectively, the "**Real Properties**");

WHEREAS, the Loan Parties have requested that that the Lender make available to the Loan Parties debtor-in-possession term loans in an aggregate principal amount of up to of Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000.00); and

WHEREAS, Lender is willing to make the Loan (as such term is defined in this Agreement) described herein on the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Lender and Loan Parties agree as follows:

1. **DEFINITIONS AND CONSTRUCTION**.

    1.1    **Definitions**.  As used in this Agreement, the following terms shall have the following definitions:

    "**2nd Street Property**" means the real property located at 2818 E. 2nd Street, Vancouver, Washington.

    "**Account Debtor**" is any "account debtor" as defined in the Code with such additions to such term as may hereafter be made.

    "**Accounts**" means all presently existing and hereafter arising accounts, contract rights, payment intangibles, and all other forms of obligations owing to Loan Parties arising out of the sale or lease of goods (including, without limitation, the licensing of software and other technology) or the rendering of services by Loan Parties, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by any Loan Party and the Loan Parties' Books relating to any of the foregoing.

    "**Advance**" or "**Advances**" means a cash advance or cash advances under the DIP Loan Facility.

"**Advance Request**" has the meaning assigned in Section 2.1(c).

"**Affiliate**" means, with respect to any Person, any other Person that owns or controls directly or indirectly such Person, or any Person that controls or is controlled by or is under common control with such Person.

"**Applicable Law**" means, as to any Person, any law (statutory or common), treaty, rule or regulation of a Governmental Authority or determination of a court or binding arbitrator, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Assignment of Vault Loan**" means an assignment of deed of trust with respect to that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated September 14, 2022 and Recorded November 15, 2022 as Instrument Number 20221115000430.

"**Avoidance Action**" means any claim and cause of action that constitutes an avoidance action under Sections 544, 545, 547, 548, 550 or 553 of the Bankruptcy Code or any other avoidance action under the Bankruptcy Code, state law or similar laws and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Washington or any court having jurisdiction over the Case from time to time.

"**Bankruptcy Sale**" means a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all assets (measured by both aggregate value and number of assets) and other rights of the Debtor(s) on such terms acceptable to Lender in its Permitted Discretion.

"**Bankruptcy Sale Order**" means an order of the Bankruptcy Court, in form and substance acceptable to Lender approving and authorizing a Bankruptcy Sale.

"**Budget**" means a cash flow projection and debtor-in-possession budget in form and substance acceptable to the Lender, which begins on or around the Closing Date; provided that, with the consent of the Lender, such consent not to be unreasonably withheld, the budget may be updated in accordance with Section 6.14.

"**Budget Variance Report**" means a report provided by the Loan Parties to the Lender showing by line item and in the aggregate the actual cash disbursements of the Loan Parties for the period set forth in Section 6.15(b), comparing the actual cash disbursements (on a category by category basis) with the cumulative budgeted amounts for each such line item set forth in the Budget through such period, noting therein all variances on a category-level and cumulative basis from the amounts set forth for such period in the Budget, together with explanations for all material variances, and certified as being true and correct in all material respects by the Loan Parties' Chief Restructuring Officer.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Washington are authorized or required to close.

23-01243-WLH11   Doc 33   Filed 10/03/23   Entered 10/03/23 14:37:12   Exhibit 2 Page 64 of Page 64

"**Carve Out**" shall mean all administrative expenses incurred or accrued by either the Loan Parties' or Committee's appointed professionals as subsequently approved by interim or final Court orders, and otherwise as may be defined in the Final Order.

"**Case**" and "**Cases**" have the respective meanings set forth in the recitals.

"**Chief Restructuring Officer**" means Lance Miller.

"**Closing Date**" means the date on which the conditions specified in Section 3.1 are satisfied.

"**Code**" means the Uniform Commercial Code as enacted in the State of Washington and the State of Delaware, as applicable.

"**Collateral**" means the property described on **Exhibit A-1** attached hereto, but in no event will Collateral include the Excluded Assets.

"**Committee**" means an official committee of unsecured creditors appointed in the Cases by the U.S. Trustee.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another; (ii) any reimbursement obligations with respect to undrawn letters of credit; and (iii) all obligations arising under any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Lender in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"**Copyrights**" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof.

"**Credit Extension**" means each Advance or any other extension of credit by Lender for the benefit of the Loan Parties hereunder, including the DIP Loans, but subject to the Interim Cap and the Final Cap.

"**Debtor**" has the meaning set forth in the recitals.

"**Default**" means any event or circumstance that, with the passage of time or giving of notice, would unless cured or waived, constitute an Event of Default.

"**Default Rate**" has the meaning given to such term in Section 2.2(b) hereof.

"**Development Properties**" means, collectively, the Real Properties owned by (i) UW 17th Ave, LLC, (ii) 725 Broadway, LLC and (iii) iCap Campbell Way LLC.

"**DIP Loan**" has the meaning given to such term in Section 2.1(a) hereof.

233739.10048 LEGAL 237636060v8

"**DIP Loan Commitment**" means an aggregate amount not to exceed Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000.00).

"**DIP Loan Facility**" means this Loan facility.

"**DIP Obligations**" has the meaning given to such term in the Interim Order.

"**DIP Prepetition Collateral**" has the meaning given to such term in the Interim Order.

"**Equipment**" means all present and future machinery, equipment, furniture, fixtures, vehicles, tools, parts and attachments in which Loan Party has any interest.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"**Event of Default**" has the meaning assigned in Section 8.

"**Excluded Assets**" means collectively (i) all Avoidance Actions and (ii) any and all amounts paid to Loan Parties' and Committee's bankruptcy professionals as an administrative expense pursuant to an interim or final order of the Bankruptcy Court.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to any obligations under this Agreement pursuant to a law in effect on the date Lender acquired its interest in such obligations or on the date that Lender changes its lending office, except, in each case, to the extent that amounts with respect to such Taxes were payable to Lender immediately before the date it acquired such interest or changed its lending office, (c) Taxes that are attributable to Lender's failure to comply with Section 2.5, and (d) any U.S. federal withholding Taxes imposed under FATCA. For purposes of this definition, any reference to Lender shall be deemed to include a Foreign Lender.

"**Exit Fee**" has the meaning set forth in Section 2.3(a).

"**Facility Fee**" has the meaning set forth in Section 2.3(b).

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, any intergovernmental agreement entered into in connection with the implementation of such sections of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to, or official interpretations implementing such, intergovernmental agreements.

"**Fees**" means each and all of the amounts set forth in Section 2.3.

"**Final Cap**" means the sum of Five Million Two Hundred Fifty Thousand Dollars ($5,250,000.00), exclusive of all interest, fees, and expenses, tenderable in the form of DIP Loans by Lender

to the Loan Parties upon entry of the Final Order and compliance with all other requirements of this Agreement and the Loan Documents; provided, however, in the event that the Loan Parties exercise the VH Priming Liens Option and satisfy all of the conditions precedent with respect to the exercise of the option, the Final Cap shall be increased to Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000.00).

"**Final Order**" means a final order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) authorizing the Loans, with changes to such form as are satisfactory to the Lender, approving the Loan Documents and authorizing the DIP Loan in such amounts as are contemplated by Section 2.1(b).

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**First Priority DIP Liens**" has the meaning given to such term in Section 4.1(a).

"**First Priority Pledged Liens**" has the meaning given to such term in the Interim Order.

"**GAAP**" means generally accepted accounting principles as in effect from time to time.

"**Governmental Authority**" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Guarantor**" means Chris Christensen.

"**Guaranty**" means the Limited, Secured, Non-Recourse, Conditional Personal Guaranty executed by Guarantor on the Closing Date, as the same may be amended, restated, modified or otherwise supplemented.

"**Highest Lawful Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations evidenced by this Agreement and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Indebtedness**" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all Contingent Obligations, and (d) all capital lease obligations.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Lender under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Insolvency Proceeding**" means any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extension generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

233739.10048 LEGAL 237636060v8

"**Intellectual Property**" means all right, title, and interest owned by Loan Parties in and to the following: Copyrights, Trademarks (excluding any U.S. intent-to-use trademark application for which a statement of use has not been filed with and duly accepted by the United States Patent and Trademark Office, but only until such statement is accepted by the United States Patent and Trademark Office) and Patents; trade secrets, design rights, claims for damages by way of past, present and future infringement of any of the rights included above, and all license fees and royalties arising from licenses or rights to use such intellectual property rights; all amendments, renewals and extensions of any of such Copyrights, Trademarks or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"**Interim Cap**" means the sum of Two Million Five Hundred Thousand Dollars ($2,500,000.00), exclusive of all interest, fees, and expenses, tendered by Lender to the Loan Parties in the form of DIP Loans pursuant to the Interim Order and in compliance with all other requirements of this Agreement and the Loan Documents.

"**Interim Order**" means the *Interim Order (i) Authorizing Debtors In Possession to Obtain Post-Petition Secured Financing pursuant to Section 364 of the Bankruptcy Code; (ii) Authorizing Debtors To Use Cash Collateral; (iii) Granting Administrative Expense Priority; (iv) Providing Adequate Protection; (v) Scheduling a Final Hearing; and (vi) Granting Related Relief* (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), authorizing the Loans, in the form set forth as **Exhibit B**, with changes to such form as are satisfactory to the Lender, approving the Loan Documents and authorizing the DIP Loan in such amounts as are contemplated by Section 2.1(b).

"**Interim Order Entry Date**" means the date on which the Interim Order is entered by the Bankruptcy Court.

"**Inventory**" is all "inventory" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of a Loan Party's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"**Investment**" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Lender Expenses**" are all reasonable and documented audit fees and expenses, costs, and expenses (including reasonable attorneys' fees and expenses) for preparing, negotiating, defending and enforcing the Loan Documents (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings), all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by or otherwise incurred by the Lender.

"**Lien**" means with respect to the Real Property and any other Collateral, any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

233739.10048 LEGAL 237636060v8

"**Loan**" means the DIP Loans.

"**Loan Documents**" means, collectively, this Agreement, any note or notes or guaranties executed by Loan Parties, the Guaranty, the Interim Order, the Final Order and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"**Loan Party**" and "**Loan Parties**" have the meanings set forth in the recitals.

"**Loan Parties' Books**" means all of the Loan Parties' books and records including: ledgers; records concerning Loan Parties' assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"**Material Adverse Effect**" means a material adverse effect on (i) the business, operations, condition (financial or otherwise), or prospects of any Loan Party or (ii) the value of the Collateral taken as a whole or priority of Lender's security interests in the Collateral; provided that the term "Material Adverse Effect" will not be deemed to exist as a result of the Case or the circumstances and events leading up thereto.

"**Maturity Date**" means the earlier of (i) the date that is twelve (12) months after the Interim Order Entry Date, (ii) closing of a Bankruptcy Sale; (iii) the effective date of the Loan Parties' chapter 11 plan; (iv) entry of an order by the Bankruptcy Court converting any Case to a proceeding or proceedings under Chapter 7 of the Bankruptcy Code; (v) entry of a final order by the Bankruptcy Court dismissing any Case; (vi) the date of filing or support by a Loan Party of a plan of reorganization that does not provide for indefeasible payment in full in cash of all Obligations owing hereunder; or (vi) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loan in accordance with the terms of this Agreement.

"**Mechanics Lien**" means that certain mechanics lien in favor of Oak Hills Construction in the amount of Three Hundred and Eighty Five Thousand and Three Hundred and Eighty Five Dollars ($385,385.00).

"**Negotiable Collateral**" means all letters of credit of which a Loan Party is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and a Loan Party's Books relating to any of the foregoing.

"**Obligations**" means all debt, principal, interest, Fees, and other amounts owed to Lender by the Loan Parties pursuant to this Agreement, including the DIP Obligations and the Roll-Up Obligations.

"**Orders**" means collectively, the Interim Order and the Final Order.

"**Other Connection Taxes**" means, with respect to Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any loan hereunder or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

23-01243-WLH11   Doc 33   Filed 10/03/23   Entered 10/03/23 14:37:12   Exhibit 2 Page 69 of 117

"**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"**Perfection Certificate**" means that certain Perfection Certificate in the form provided by Lender dated the Closing Date and delivered by the Loan Parties to Lender.

"**Permitted Budget Variance**" has the meaning given to it in Section 6.14.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of its commercially reasonable (from the perspective of a first priority perfected secured asset based lender) business judgment based on how an asset based lender with similar rights providing a credit facility of the type provided under this Agreement would act in similar circumstances at the time with the information then available to it.

"**Permitted Indebtedness**" means:

(a)     Indebtedness of (i) the Loan Parties in favor of Lender arising under this Agreement, any other Loan Document, or as set forth in the Perfection Certificate;

(b)     Indebtedness arising in connection with the Carve Out;

(c)     Indebtedness arising in connection with the Prepetition Loans, including the Prepetition Obligations and the Roll-Up Obligations;

(d)     Indebtedness to trade creditors incurred in the ordinary course of business, including, without limitation, trade payables of a Property Owner relating to the ownership and operation of the related Real Property owned by such Property Owner and including professional fees incurred in the Cases; and

(e)     Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business.

"**Permitted Investment**" means:

(a)     Investments existing on the Closing Date disclosed in the Perfection Certificate; and

(b)     Investments held by the Loan Parties in (i) cash and cash deposits that are maintained at a bank or other financial institution that is insured by the Federal Deposit Insurance Corporation, or (ii) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one (1) year from the date of acquisition thereof, and/or (iii) money market account funds held at financial institutions reasonably acceptable to Lender in Lender's Permitted Discretion.

"**Permitted Liens**" means the following:

(a)     Any Liens existing on the Closing Date and disclosed in the Perfection Certificate, provided that the principal amount secured thereby is not hereafter increased, and no additional assets become subject to such Lien, including any Lien securing Prepetition Obligations (including the Roll-Up Obligations;

23-01243-WLH11     Doc 33     Filed 10/03/23     Entered 10/03/23 14:37:12     Exhibit 2 Page 70

(b)       Any Liens arising under this Agreement or the other Loan Documents;

(c)       Liens for taxes, fees, assessments or other governmental charges or levies, either not yet delinquent or being contested in good faith by appropriate proceedings;

(d)       carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person, as set forth on **Exhibit C**;

(e)       pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, or letters of credit or guarantees issued in respect thereof, other than any Lien imposed by ERISA;

(f)       all existing leases in effect as of the Closing Date and any future leases entered into by any Property Owner in the ordinary course of its business with a tenant that is not an Affiliate of a Loan Party, in each case as the same may be amended, modified or otherwise supplemented.  With respect to any future Leases, Lender has the right to request a landlord waiver in form and substance reasonably acceptable to Lender and the Loan Parties;

(g)       Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Sections 8.4 (attachment) or 8.8 (judgments/settlements);

(h)       the filing of UCC financing statements solely as a precautionary measure in connection with operating leases and consignment arrangements;

(i)       Subject to Section 6.7, Liens in favor of other financial institutions arising in connection with a Loan Party's deposit accounts held at such institutions to secure standard fees for deposit services charged by, but not financing made available by such institutions, provided that Lender has a perfected security interest in the amounts held in such deposit accounts;

(j)       Liens on cash securing letters of credit constituting Indebtedness permitted pursuant to clause (i) of the definition of Permitted Indebtedness;

(k)       easements, rights-of-way, covenants, conditions, restrictions, encroachments, (including, but not limited to easements or encumbrances in the ordinary course of business for access, water and sewer lines, telephone and cable lines, electric lines or other utilities or for other similar purposes) and other survey defects protrusions and other similar encumbrances and minor title defects affecting real property which were not incurred in connection with the Loan and do not in any case materially and adversely interfere with the use of the related Real Property encumbered thereby for its intended purposes;

(l)       the Prepetition Liens;

(m)       Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (l) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien in the existing priority of such existing Lien, and the principal amount of the indebtedness being extended, renewed or refinanced does not increase; and

(n)       to the extent constituting a Lien, the Carve Out.

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Exhibit 2 Page 71

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"**Petition Date**" has the meaning set forth in the recitals.

"**Pioneer Village Property**" means the real property located at 4318 S. Settler Drive, Ridgefield, Washington.

"**Prepetition DIP Lender Obligations**" has the meaning ascribed to it in the Interim Order.

"**Prepetition Lien Creditors**" has the meaning ascribed to "Prepetition Secured Parties" in the Interim Order.

"**Prepetition Liens**" has the meaning ascribed to it in the Interim Order.

"**Prepetition Loans**" means the loan in the principal sum of $500,000 advanced to the Loan Parties pursuant to the Secured Note.

"**Prepetition Obligations**" means the obligations owing to the Prepetition Secured Parties.

"**Prepetition Collateral**" has the meaning ascribed to it in the Interim Order.

"**Prepetition Secured Parties**" has the meaning ascribed to it in the Interim Order.

"**Priming DIP Liens**" has the meaning assigned to it in Section 4.1(c).

"**Real Property**" means the real property more particularly described on **Exhibit A-1** and set forth next to each Property Owner's name on Schedule 1.

"**Responsible Officer**" means the Chief Restructuring Officer.

"**Roll-Up Obligations**" means the principal sum of $500,000 advanced to the Loan Parties on or about September 13, 2023 in accordance with and pursuant to the Secured Note.

"**Second Priority DIP Liens**" has the meaning assigned in Section 4.1(b).

"**Secured Note**" has the meaning given to such term in the Interim Order.

"**Senza Kenmore Property**" means the real property located at 15550 84th Ave. SE, Kenmore, Washington.

"**Stay Order**" means an Order of the Bankruptcy Court pursuant to section 105(a) of the Bankruptcy Code staying the pending litigations against Chris Christiansen.

"**Superpriority Claim**" means a claim against any Debtor in a Case which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under

Sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code.

"**Tax**" or "**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Trademarks**" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of the Loan Parties connected with and symbolized by such trademarks.

"**Transfer**" has the meaning assigned in <u>Section 7.1</u>.

"**U.S. Trustee**" means the United States Trustee for the Northern District of Texas.

"**VH Collateral**" means the VH 1121 14th Real Property and the VH Senior Care Real Property.

"**VH 1121 14th Real Property**" that certain real property located at the address commonly known as 1121 14th Ave, Seattle, WA and as more particularly described on **Exhibit A-1** and held in fee title by VH 1121 14th, LLC, LLC, a Delaware limited liability company.

"**VH Senior Care Real Property**" collectively that certain real property located at the address commonly known as (i) 302 SW 146th Street, Burien, WA and (ii) 1226 160th St SW, Lynnwood, WA and in each case as more particularly described on **Exhibit A-1** and held in fee title by VH Senior Care, LLC, a Delaware limited liability company.

**1.2     Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender) and all calculations made hereunder shall be made in accordance with GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender).  When used herein, the terms "financial statements" shall include the notes and schedules thereto.

**2.     LOAN AND TERMS OF PAYMENT**.

**2.1     Credit Extensions**.  The Loan Parties promise to pay to the order of Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to the Loan Parties hereunder.

(a)     **Term Loan**. Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in <u>Sections 3.1</u> and <u>3.2</u>), Lender agrees that it will make from time-to-time Credit Extensions in an amount not to exceed its DIP Loan Commitment (each, a "**DIP Loan**").  The Initial Credit Extension shall be subject to the conditions precedent set forth in <u>Section 3.1</u> and shall be substantially concurrent with the Interim Order Entry Date and the subsequent Credit Extensions (and the VH Priming Liens Option, if exercised) shall be subject to the conditions precedent set forth in <u>Section 3.2</u>.  Amounts borrowed under this <u>Section 2.1(a)</u> may not be reborrowed once repaid.

(b)     Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in <u>Sections 3.1</u> and <u>3.2</u>), the Loan Parties may

23-01243-WLH11     Doc 33     Filed 10/03/23     Entered 10/03/23 14:37:12     Exhibit 2 Page 73 of 73

request, and Lender shall make, Credit Extensions, each in an amount necessary for the Loan Parties to meet the expenses set forth in the Budget for each of the prior and subsequent week to such Advance Request, not to exceed in the aggregate the DIP Loan Commitment.  Notwithstanding anything contained herein to the contrary, in no event shall the Lender be obligated to make any DIP Loan in excess of the Final Cap, and prior to the Final Order Entry Date, the Interim Cap.

(c)     Whenever a Loan Party desires an Advance of a DIP Loan, the Loan Party will notify Lender by e-mail transmission or telephone no later than 2:00 p.m. Pacific time (each an "**Advance Request**"), (1) with respect to the initial Advance Request, two (2) Business Days, and (2) with respect to each Advance request thereafter (which for the avoidance of doubt, shall be the subsequent advance upon entry of the Final Order and satisfaction of the conditions precedent in Section 3.2), five (5) Business Days (or such shorter period as agreed by Lender in its discretion) prior to the date the Advance may be made. Lender is authorized to make Advances under this Agreement, based upon instructions received from a Responsible Officer or a designee of a Responsible Officer.   Lender shall be entitled to rely on any telephonic notice given by a person who Lender reasonably believes to be the Responsible Officer or a designee thereof.  Lender will wire Advances in immediately available federal funds to a deposit account identified by the Loan Parties in writing from time to time.

(d)     All Advances under this Section 2.1 and all accrued and unpaid interest thereon shall be repaid in full by Loan Parties on the Maturity Date.

### 2.2     Payment of Interest on the Loans.

(a)     Interest Rate for Advances.  Subject to Section 2.2(b), the principal amount outstanding under the DIP Loan Facility shall accrue interest at a per annum rate equal to 18%.

(b)     Default Rate.  After the occurrence and during the continuance of an Event of Default and without notice to the Loan Parties, to the extent permitted by Applicable Law, the Obligations shall bear interest at a rate per annum which is four percentage points (4%) above the rate that is otherwise applicable thereto (the "**Default Rate**").  Payment or acceptance of the increased interest rate provided in this Section 2.2(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Lender.

(c)     Payment; Interest Computation.  Interest is payable monthly on the first calendar day of each month and shall be computed on the basis of a 360-day year for the actual number of days elapsed.  In computing interest, (a) all payments received after 2:00 p.m. Pacific time on any day shall be deemed received at the opening of business on the next Business Day, and (b) the date of the making of any Loan shall be included and the date of payment shall be excluded; provided, however, that if any Loan is repaid on the same day on which it is made, such day shall be included in computing interest on such Loan.

### 2.3     Fees.  The Loan Parties shall pay to Lender:

(a)     Exit Fee.  Upon the earlier of (i) repayment in full of the Obligations at any time, and (ii) the Maturity Date, in addition to the payment of any other amounts then-owing, an exit fee in the amount of the greater of (A) $250,0000 and (B) five percent (5.0%) of the aggregate amount of the Advances, which shall be fully earned and non-refundable commitment in connection with each Advance (the "**Exit Fee**");

(b)     Facility Fee.  A fully earned, non-refundable facility fee in the amount of the greater of (A) $250,000 and (B) five percent (5.0%) of the aggregate amount of the Advances, payable upon

233739.10048 LEGAL 237636060v8

the earlier of (i) repayment in full of the Obligations at any time, and (ii) the Maturity Date (the "**Facility Fee**");

(c)     Repayment Premium.  On the Maturity Date, the Loan Parties agree to pay a premium to Lender equal to (i) 1.3 times the amount of the Credit Extensions made by Lender to the Loan Parties (without taking into consideration the amounts paid to Lender pursuant to Section 3.4(a)), *less* (ii) the aggregate amount interest actually paid to Lender (including, for the avoidance of doubt, the Exit Fee and the Facility Fee); and

(d)     Lender Expenses.

(i)     All Lender Expenses (including reasonable and documented attorneys' fees and expenses for documentation and negotiation of this Agreement, incurred through and after the Effective Date, when due (or, if no stated due date, within ten (10) days of written demand from Lender)), which Lender Expenses shall be payable in accordance with the Budget on the Maturity Date.  For the avoidance of doubt, the Loan Parties shall be responsible for all reasonable and documented fees, costs and expenses of Lender including any and all reasonable and documented expenses of Lender's counsel, professional advisors, or in house administration, each case subject to the approved Budget.

(ii)     None of Lender's attorneys' fees or disbursements shall be subject to the prior approval of the Bankruptcy Court and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court. Notwithstanding the foregoing, the Bankruptcy Court retains all jurisdiction in regard to a dispute between the Loan Parties regarding the reasonableness of the asserted Lender Expenses.

(e)     Fees Fully Earned.  Unless otherwise provided in this Agreement or in a separate writing by Lender, the Loan Parties shall not be entitled to any credit, rebate, or repayment of any Lender Expenses paid or other fees earned by Lender pursuant to this Agreement notwithstanding any termination of this Agreement or the suspension or termination of Lender's obligation to make Credit Extensions.

**2.4     Crediting Payments**.  Lender has the exclusive right to determine the order and manner in which all payments with respect to the Obligations may be applied.  The Loan Parties shall have no right to specify the order or the accounts to which Lender shall allocate or apply any payments required to be made by the Loan Parties to Lender or otherwise received by Lender under this Agreement when any such allocation or application is not specified elsewhere in this Agreement.  Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 2:00 p.m. Pacific Time shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.  Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day.

**2.5     Withholding**.

(a)     Payments received by Lender from the Loan Parties under this Agreement will be made free and clear of and without deduction for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of the Loan Parties) requires the Loan Parties to make any withholding or deduction of any Tax from any such payment, then the Loan Parties shall be entitled to make such deduction or withholding and, if such Tax is an Indemnified Tax, then the sum payable by the Loan Parties shall be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lender receives a net sum equal to the sum which it would have received had no withholding or deduction been required.

23-01243-WLH11     Doc 33     Filed 10/03/23     Entered 10/03/23 14:37:12     Exhibit 2 Page 75 of 117     Page 75

(b)     The Loan Parties shall pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable law, the Bankruptcy Code, and orders of the Bankruptcy Court, and the Loan Parties will, upon request, furnish Lender with proof reasonably satisfactory to Lender indicating that the Loan Parties has made such withholding payment.

(c)     Notwithstanding anything to the contrary in this Section 2.5, the Loan Parties need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings or as to which payment in full is bonded or reserved against by the Loan Parties.  The agreements and obligations of the Loan Parties contained in this Section 2.5 shall survive the termination of this Agreement.

(d)     Lender, if reasonably requested by the Loan Parties, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Loan Parties as will enable the Loan Parties to determine whether or not Lender is subject to backup withholding or information reporting requirements.

(e)     If Lender determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.5 (including by the payment of additional amounts pursuant to this Section 2.5), it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made by the Loan Parties under this Section 2.5 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Parties, upon the request of Lender, agrees to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant taxing authority) to Lender in the event Lender is required to repay such refund to such taxing authority.

**2.6     Term**.  This Agreement shall become effective on the Closing Date and, subject to Section 14.8, shall continue in full force and effect for so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions under this Agreement.  Notwithstanding the foregoing, Lender shall have the right to terminate its obligation to make Credit Extensions under this Agreement immediately and without notice upon the occurrence and during the continuance of an Event of Default.  Notwithstanding termination, Lender's Lien on the Collateral shall remain in effect for so long as any Obligations are outstanding.

**2.7     Right to Credit Bid**.  In connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by Lender, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, the Loan Parties hereby give Lender the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

**3.     CONDITIONS OF LOANS**.

**3.1     Conditions Precedent to Initial Credit Extension**.  The obligation of Lender to make the initial Credit Extension is subject to the satisfaction of the following conditions precedent:

(a)     Lender shall have received, in form and substance satisfactory to Lender, the following:

(i)     executed copies of this Agreement and the other Loan Documents, including the Guaranty and the Assignment of Vault Loan;

(ii)     evidence satisfactory to Lender that the insurance policies required by Section 6.6 hereof are in full force and effect as of the Closing Date (which for the avoidance of doubt, does not require a renewal of the existing umbrella and general liability insurance policies with respect the Development Properties as set forth in Section 3.2(e));

(iii)     true, accurate and complete copies of all documents evidencing any the Prepetition Obligations in existence as of the Closing Date;

(iv)     the initial approved Budget;

(v)     the Perfection Certificate;

(vi)     such other documents, and completion of such other matters, as Lender may reasonably deem necessary or appropriate; and

(b)     the Interim Order Entry Date shall have occurred, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Lender and shall not be subject to a stay.

**3.2    Conditions Precedent to the Subsequent Credit Extension**.  The obligation of Lender to make the subsequent Credit Extension, including any DIP Loan, is further subject to the following conditions:

(a)     the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of the Loan Parties' request for a Credit Extension and on the effective date of each Credit Extension as though made at and as of each such date;

(b)     no Default or Event of Default shall be continuing or would exist after giving effect to such Credit Extension;

(c)     the Loan Parties shall have delivered to Lender an updated Budget and such Budget has been approved by Lender which approval shall not be unreasonably withheld, conditioned or delayed if no uncured Event of Default then exists;

(d)     the Lender is granted a priming lien on the Mechanics Lien or the Mechanic's Lien obligation is repaid in full (provided that if the Mechanics Lien is neither primed nor fully paid off then this condition shall be satisfied if the Loan Parties establish a reserve using the proceeds from the Credit Extension in an amount equal to the then-outstanding amount of the Mechanics Lien (the "**Reserve**") which Reserve shall be fully released to the Loan Parties upon full release of the Mechanics Lien prior to the Maturity Date (and provided that there exists no Default or Event of Default then continuing));

(e)     with respect to the Development Properties, the Loan Parties' shall have renewed their existing umbrella and general liability insurance policies in form and amount no less than the form and amount of such policies that exist on the date hereof;

(f)     no Case shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; and

233739.10048 LEGAL 237636060v8

(g) no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Case.

**3.3 VH Collateral.** The Loan Parties shall have the option in their sole discretion to obtain an additional Advance in an amount equal to One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) (the "**VH Priming Liens Option**"), upon five (5) Business Days written notice delivered to Lender and subject to satisfaction of the following:

(a) The Bankruptcy Court shall have affirmed the granting of valid first priority senior priming liens on the VH Collateral (the "**Priming DIP Liens**"); and

(b) The conditions precedent to Subsequent Credit Extensions in Section 3.2 have been satisfied.

**3.4 Senza Kenmore Collateral**.

(a) As of the date hereof, the Loan Parties are currently in the process of negotiating a sale of the Senza Kenmore Property. Notwithstanding anything to the contrary in this Agreement, provided that no Default or Event of Default shall be continuing, the Loan Parties may sell the Senza Kenmore Property without the Lender's prior written consent. Upon the closing of the sale of the Senza Kenmore Property, the gross proceeds from such sale less all reasonable and customary third-party costs actually paid by the Loan Parties in connection therewith (the "**Senza Proceeds**") shall be paid to the Lender (or its designee) as a paydown of the Obligations and, upon Lender's receipt of such Senza Proceeds, the Lender shall make an additional Advance to the Loan Parties in an amount equal to the difference of (i) the Senza Proceeds minus (ii) Three Hundred Thousand Dollars ($300,000) provided that the conditions precedent to Subsequent Credit Extensions in Section 3.2 have been satisfied.

(b) If the Senza Kenmore Property is not sold prior to the date that is one-hundred eighty (180) days following the date hereof, the Loan Parties shall cause the liens listed on **Exhibit C** affecting the Senza Kenmore Property to be fully released at the Loan Parties' sole cost and expense.

**3.5 2nd Street and Pioneer Village**. Notwithstanding anything to the contrary in this Agreement, provided that no Default or Event of Default shall be continuing, the Loan Parties may sell the 2nd Street Property and/or the Pioneer Village Property without the Lender's prior written consent. The proceeds of such sales shall not be required to be paid to Lender or otherwise pay down any of the Obligations.

**4. CREATION OF SECURITY INTEREST**.

**4.1 Grant of Security Interest**. To secure prompt repayment of any and all Obligations and prompt performance by the Loan Parties of each of its covenants and duties under the Loan Documents, the Loan Parties grant Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral (subject to Permitted Liens, and excluding the Excluded Assets as set forth herein). Such security interest shall constitute:

(a) a valid, perfected First Priority DIP Lien on Collateral that is not subject to valid, perfected, and non-avoidable Liens which, as of the Petition Date, was not encumbered by first priority Liens (besides by Lender) or subject to invalid, unperfected or avoidable liens ("**First Priority DIP Liens**"). For the avoidance of doubt, the First Priority DIP Liens shall encumber the DIP Prepetition Collateral, as well as, without limitation, Collateral acquired after the Petition Date; and

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Exhibit 2 Page 78

(b)      a valid, perfected Second Priority DIP Lien upon all of the Collateral which constitutes Prepetition Collateral, (other than the DIP Prepetition Collateral); provided that such existing first priority liens are (i) valid and perfected liens in existence as of the Petition Date or (ii) are perfected subsequent to such date as permitted by Section 546(b) of the Bankruptcy Code and (ii) to the extent such Liens are expressly permitted in writing by the Lender in its sole and absolute discretion. ("**Second Priority DIP Liens**").

The Loan Parties agree that the Obligations are entitled to Superpriority Claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expense claims, whether heretofore or hereafter incurred, of the kind specified or ordered pursuant to or in accordance with any provision of the Bankruptcy Code, including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code, subject only to the Carve Out.  For the avoidance of doubt, the Superpriority Claim granted herein shall not extend to, nor be collectible from, any Excluded Assets.

**4.2      Delivery of Additional Documentation Required**.  The Loan Parties shall from time to time execute and deliver to Lender, at the request of Lender, all Negotiable Collateral, all financing statements, deeds, deeds of trust, bills of sale, security agreements, mortgages, hypothecations, real estate transfer documentation, and other documents that Lender may reasonably request, in form satisfactory to Lender, to perfect and continue the perfection of Lender's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents.

**4.3      Authorization to File Financing Statements**.  The Loan Parties hereby authorizes Lender to file financing statements, without notice to Loan Parties, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Lender's discretion.

5.      **REPRESENTATIONS AND WARRANTIES**.

Each Loan Party represents and warrants as follows:

**5.1      Due Organization and Qualification**.  The Loan Parties are corporations or limited liability companies duly existing under the laws of their state of incorporation or registration and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified, except in each case (other than with respect to their states of incorporation) where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.

**5.2      Due Authorization; No Conflict**.  Subject to the entry of the Interim Order and the terms hereof, the execution, delivery, and performance of the Loan Documents are within the Loan Parties' powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in the Loan Parties' Certificate of Incorporation, Article of Organization, or Bylaws, nor will they constitute an event of default under any material agreement to which the Loan Parties are a party or by which a Loan Parties is bound.  The Loan Parties are not in default under any post-petition agreements to which it is a party or by which it is bound, except to the extent such default would not reasonably be expected to cause a Material Adverse Effect.

**5.3      No Prior Encumbrances**.  Each Property Owner has good and marketable title to its respective Real Property owned by it, free and clear of Liens, except for Permitted Liens and subject to any liens set forth in the title commitment delivered to Lender and approved at Closing. Set forth as **Exhibit**

233739.10048 LEGAL 237636060v8

**A-1** hereto is a complete and accurate list of all Real Property owned by each Property Owner, showing, as of the date hereof, the street address, state and any other relevant jurisdiction, record owner. Set forth on **Exhibit A-2** hereto is a complete and accurate list of all written lease agreements entered into by the Property Owners with respect to the Real Property under which any Loan Party or any Subsidiary is the tenant, showing as of the date hereof the street address, state and any other relevant jurisdiction, parties thereto, sublessee (if any), expiration date and annual base rental cost thereof. Set forth on **Exhibit A-3** hereto is a complete and accurate list of all outstanding deeds of trust affecting the Real Properties and the outstanding balance of each applicable loan (collectively, the "**Existing Deeds of Trust**").

        **5.4**    **Diligence**. The Loan Parties are not aware of any fact, condition or circumstance that may materially and adversely affect the assets, liabilities, business, prospects, condition or results of operations of the Loan Parties or the Real Property that has not been previously disclosed to the Lender in writing

        **5.5**    **Name; Location of Business**. The Loan Parties will advise Lender not less than ten (10) business days in advance of any change in the business headquarters of the Loan Parties. Except as disclosed in the Perfection Certificate, the Loan Parties have not done business under any name other than that specified on the signature page hereof.

        **5.6**    **Litigation**. Except as disclosed in writing to Lender or as set forth in the Perfection Certificate, there are no actions or proceedings (other than the Cases) pending by or against Loan Party before any court or administrative agency in which an adverse decision could reasonably be expected to have a Material Adverse Effect.

        **5.7**    **[Intentionally Omitted]**.

        **5.8**    **Prepetition DIP Lender Obligations.** The Loan Parties acknowledge that as of the Petition Date, the Loan Parties are indebted to Lender on account of the Prepetition DIP Lender Obligations in the outstanding principal balance of $500,000, plus accrued and unpaid interest and fees thereunder, which amount would be reduced to $0.00 if the Bankruptcy Court approves the Roll-Up Obligations. The Loan Parties acknowledge that the Secured Note is in full force and effect, and hereby ratify and reaffirm all of their payment and performance obligations (including indemnification obligations) thereunder, and acknowledge that as of the Petition Date, and that all amounts owing thereunder are due and owing without counterclaim, defense, setoff or reduction of any kind by the Loan Parties. The parties acknowledge and agree that if the Bankruptcy Court approves the Roll-Up Obligations and the amount of the outstanding principal balance of the Prepetition DIP Lender Obligations is reduced to $0, then no Exit Fee, Facility Fee or minimum repayment premium shall be paid on such Prepetition DIP Lender Obligations and, instead, the fees shall be paid in accordance with Section 2.3 hereof. In the event that the Bankruptcy Court does not approve the Roll-Up Obligations, the Exit Fee and the Facility Fee shall each be reduced by an amount equal to $27,777.77 and the repayment premium as described in Section 2.3(c) of this Agreement shall be reduced on a dollar-for-dollar basis by amounts collected by Lender on account of the MOIC Amount (as defined in the Secured Note).

        **5.9**    **Regulatory Compliance**. Except for a prepetition deficiency under the Loan Parties' 401(k) plan, to the best of the Loan Parties' knowledge, the Loan Parties have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from the Loan Parties' failure to comply with ERISA that is reasonably likely to result in the Loan Parties' incurring any liability that could reasonably be expected to have a Material Adverse Effect. The Loan Parties are not required to be registered as an "investment company" under the Investment Company Act of 1940. The Loan Parties are not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within

233739.10048 LEGAL 237636060v8

the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System). To the best of the Loan Parties' knowledge, the Loan Parties have complied with all the provisions of the Federal Fair Labor Standards Act except in each case where the failure to do so could not reasonably be expected to cause a Material Adverse Effect. To the best of the Loan Parties' knowledge, the Loan Parties have not violated any statutes, laws, ordinances or rules applicable to it, the violation of which could reasonably be expected to cause a Material Adverse Effect.

**5.10     Environmental Condition**. To the best of the Loan Parties' knowledge and except as would not reasonably be expected to have a Material Adverse Effect and/or except as otherwise disclosed in any property condition reports delivered to Lender in connection with the Loan, none of the Loan Parties' properties or assets has ever been used by the Loan Parties or to the best of the Loan Parties' knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with Applicable Law. To the best of the Loan Parties' knowledge and except as disclosed in any property condition reports delivered to Lender in connection with the Loan, none of the Real Properties has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute. To the best of the Loan Parties' knowledge no lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned by the Loan Parties and the Loan Parties have not received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal, state or other governmental agency concerning any action or omission by or resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

**5.11     Taxes**. Except as otherwise disclosed to Lender at Closing, the Loan Parties have filed or caused to be filed all material tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein, except (i) for taxes for which filing is not yet due, or (ii) for taxes that are being contested in good faith by appropriate proceedings and are reserved against (to the extent required by GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender) by the Loan Parties, or (iii) to the extent taxes are pre-petition taxes, or (iv) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.12     Subsidiaries**. The Property Owners do not own any stock, partnership interest or other equity securities of any Person, except for Permitted Investments.

**5.13     Government Consents**. The Loan Parties have obtained (or will obtain, as and when required under Applicable Law) all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of the Loan Parties' business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

**5.14     Deposit and Securities Accounts**. The Loan Parties maintain deposit or securities accounts only as set forth in the Perfection Certificate.

**5.15     Full Disclosure**. No representation, warranty or other statement made by the Loan Parties in any of the Loan Documents contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements not misleading when made, it being recognized by Lender that the projections and forecasts provided by the Loan Parties in good faith and based upon assumptions that were reasonable at the time such projections were delivered and are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results. No Loan Document has been amended. To the Loan Parties

233739.10048 LEGAL 237636060v8

actual knowledge, the Loan Documents are each in full force and effect and are not subject to any offset, claim, counterclaim or defense in favor of the Loan Parties.

**5.16    Use of Proceeds**. The Loan Parties shall use the proceeds of the Loans in accordance with the Budget (subject to any Permitted Budget Variance) and the Final Order exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Order):

(a)    to pay the Fees whether or not set forth in the Budget;

(b)    to the extent not included in Section 5.16(a), to pay certain costs, premiums, fees and expenses related to the Case (including, without limitation, with respect to the Carve Out) in accordance with the Budget; and

(c)    to fund working capital and other needs of the Loan Parties in accordance with the Budget (subject to any Permitted Budget Variance).

Proceeds of the DIP Loan Facility or cash collateral shall not be used (a) by the Debtors, or any other party-in-interest, including a Committee, or any of their representatives, to challenge or otherwise contest or institute any proceeding of any kind or nature to determine the validity, perfection, enforceability or priority of claims or security interests in favor of Lender, (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action of any kind or nature against Lender and its agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, or (c) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the Lender. Notwithstanding the foregoing, nothing herein shall prohibit the Loan Parties or Committee from disputing the alleged occurrence of a default or Event of Default hereunder.

**5.17    Financial Information**. (a) On and as of the Closing Date, the Budget, copies of which have heretofore been furnished to the Lender and (b) following the Closing Date, any updated Budget delivered pursuant to <u>Section 6.14</u>, in each case, are based on good faith estimates and assumptions made at such time by the persons who prepared it.

**5.18    Cases**. The Cases were commenced on the Petition Date in accordance with applicable law, and notice of the hearing for the approval of the Final Order has been given as identified in the certificate of service filed with the Bankruptcy Court.

**5.19    Orders**. The Interim Order, and, after it has been entered, the Final Order is in full force and effect, and has not, in whole or in material part, been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or proceeding in any jurisdiction, and the Loan Parties is in material compliance with the Order.

**6.    AFFIRMATIVE COVENANTS**.

Each Loan Party shall do all of the following:

**6.1    Good Standing**. Each Loan Party shall maintain its corporate existence and good standing in its jurisdiction of incorporation and maintain qualification in each other jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Each Loan Party

233739.10048 LEGAL 237636060v8

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Exhibit 2 Page 82

shall maintain in force all necessary licenses, approvals, and agreements, the loss of which could have a Material Adverse Effect.

**6.2    Government Compliance**.  To the extent applicable, each Loan Party shall meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA. Loan Party shall comply with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a Material Adverse Effect.

**6.3    Financial Statements, Reports, Certificates**.  The Loan Parties shall deliver the following to the Lender:

(a)    commencing on October 3, 2023, and thereafter on  monthly basis, a cash flow forecast in form and detail satisfactory to Lender, covering all of the weeks through the Maturity Date;

(b)    all reports filed, including monthly operating reports, filed with the Office of the United States Trustee;

(c)    [Intentionally Omitted].

(d)    (i) together with the reports described in clause (e) below, a report of any legal actions (other than claims asserted in the Case) for worker's compensation, unemployment or counter-claims in intellectual property infringement proceedings which are pending against any Loan Party that could if adversely determined reasonably be expected to result in a Material Adverse Effect; and (ii) promptly upon receipt of notice thereof, a report of (x) any other legal actions (other than the Case) pending against a Loan Party that could reasonably be expected to result in liability to a Loan Party of One Hundred Thousand Dollars ($100,000.00) or more, or (y) any commercial tort claim acquired by a Loan Party;

(e)    commencing with the month ending October 30, 2023, within thirty (30) calendar days of the last day of each month, a report signed by Loan Party, in form acceptable to Lender in its Permitted Discretion, listing any applications or registrations that a Loan Party has made or filed in respect of any Patents, Copyrights or Trademarks and the status of any outstanding applications or registrations, as well as any material change in a Loan Party's Intellectual Property along with an updated Perfection Certificate if any of the information contained in the Perfection Certificate delivered to the Lender on the Closing Date is no longer true and correct in all respects;

(f)    written notice within five (5) Business Days' of the resignation from or termination of employment of any Responsible Officer;

(g)    commencing on October 3, 2023, and thereafter on a monthly basis, on or before 11:59 p.m. Pacific time on the Tuesday following the end of each one week period, a Budget Variance Report certified by a Responsible Officer, and any updates to the Budget that are approved by Lender in Lender's sole discretion; and

(h)    such other financial information as Lender may request from time to time in its Permitted Discretion.

233739.10048 LEGAL 237636060v8

To the extent any of the foregoing reports or financial information are due on a day that is not a Business Day, the Loan Parties shall instead deliver such reports or financial information on the next Business Day.

**6.4    Right to Inspect**.  Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during a Loan Party's usual business hours to inspect Loan Party's Books and to make copies thereof, to audit a Loan Party's Accounts and to inspect, visit, check, test, and appraise the Collateral in order to verify a Loan Party's financial condition or the amount, condition of, or any other matter relating to, the Collateral; provided that no notice is required if an Event of Default has occurred and is continuing and provided further that during the continuance of an Event of Default all cost and fees associated with Lender's inspection shall be borne by the Loan Parties.

**6.5    Taxes**.  The Loan Parties shall make due and timely payment or deposit of all material Taxes required of it by law (including the Bankruptcy Code), provided that the Loan Parties need not make any payment if (i) the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender)) by Loan Parties and (ii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.6    Insurance**.

(a)    The Loan Parties, at their expense, shall keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks (including, but not limited to, insurance sufficient to cover personal injuries caused by Loan Parties' products in an amount not less than the Obligations), and in such amounts, as ordinarily insured against by other owners in similar businesses conducted in the locations where Loan Parties'' business is conducted on the date hereof.  Loan Parties shall also maintain insurance relating to Loan Parties' business, ownership and use of the Collateral in amounts and of a type that are customary to businesses similar to Loan Parties'.

(b)    All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender (it being hereby acknowledged by Lender that the insurance policies of Loan Parties in place on the Closing Date are satisfactory).  All such policies of property insurance shall contain a lender's loss payable endorsement showing Lender as an additional loss payee thereof, and all liability insurance policies shall show the Lender as an additional insured and Loan Parties shall use commercially reasonable efforts to have such policies specify that the insurer must give at least twenty (20) calendar days' notice to Lender before canceling its policy for any reason (or ten (10) calendar days for cancellation for nonpayment of premiums).  Upon Lender's request (which shall occur once per year excepting for following the occurrence and during the continuance of an Event of Default), Loan Parties shall deliver to Lender certified copies of such policies of insurance and evidence of the payments of all premiums therefor.  All proceeds payable under any such policy shall, at the option of Lender, be payable to Lender to be applied on account of the Obligations.

**6.7    Accounts**.  Except as required under the Bankruptcy Code, rules or policies of the U.S. Trustee, and/or a Bankruptcy Court order, each Loan Party shall not establish any deposit or securities account after the Closing Date without the approval of the Lender and shall use a cash management system that is the same as or substantially similar to its prepetition cash management system.  Any material changes from such prepetition cash management system must be acceptable to the Lender in its reasonable discretion.

233739.10048 LEGAL 237636060v8

**6.8    Notice of Disputes, Claims**.  The Loan Parties must promptly notify Lender of all returns, recoveries, disputes, claims, or litigation proceedings that involve more than One Hundred Thousand Dollars ($100,000.00).

**6.9    Bankruptcy Filings**.  Not less than one (1) Business Day prior to filing any motion requesting approval for debtor-in-possession financing, use of cash collateral, and approval of bidding procedures, the Loan Parties shall send copies of such motions to Lender, and all such motions shall be satisfactory to Lender in Lender's Permitted Discretion.

**6.10    Further Assurances**.  At any time and from time to time, the Loan Parties shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to effect the purposes of this Agreement.

**6.11    Debtor-in-Possession Obligations**.  Comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

**6.12    First Day Orders**.  The Loan Parties shall cause all proposed "first day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

**6.13    Additional Waivers**.  The Loan Parties further acknowledge and agree to the matters set forth on **Exhibit D**.

**6.14    Budget Compliance and Variances**.

(a)    The Loan Parties will use the proceeds of the Loan solely to make disbursements for expenditures provided for in accordance with Section 5.16 and this Section 6.14.  The Loan Parties shall not pay any expenses (other than *de minimis* amounts) or other disbursements (other than *de minimis* disbursements) other than the type of expenses and disbursements set forth in the Budget.

(b)    Beginning on the Closing Date, the Loan Parties shall not cause expenses to vary from the applicable Budget by more than ten percent (10%) in excess of the aggregate budgeted amount for cash disbursements on a trailing four (4) week basis (collectively, the "**Permitted Budget Variances**"), provided that to the extent the actual cash receipts in any such period exceed the amounts for such period in the applicable Budget, or if the cash disbursements in any such period are less than the amounts for such period in the applicable Budget, then the "Permitted Budget Variance" for such receipts or disbursements, as applicable, for the next succeeding period shall be increased by an amount equal to such difference (and shall continue to roll over into successive periods to the extent such additional budgeted capacity is unused by the Loan Parties).  Solely for purposes of calculating the Permitted Budget Variance, all Lender Expenses shall be excluded from the Budget and shall not be taken into account.  In the event that actual amounts for total cash receipts and cash disbursements from operations line items are in excess of the Budget, the parties hereto agree to negotiate in good faith to discuss any modification to the Budget and Permitted Budget Variances, it being understood and agreed that the Lender shall have no obligation to fund any amounts in excess of the Budget and Permitted Budget Variances.

(c)    If the Budget is updated, modified or supplemented by the Loan Parties, each such updated, modified or supplemented budget shall be approved in writing by, and shall be in form and substance reasonably satisfactory to, the Lender and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed to be a Budget, such approval not to be unreasonably withheld.  Each Budget delivered to Lender shall be accompanied by such supporting

documentation as reasonably requested by the Lender. Each Budget shall be prepared in good faith based upon assumptions which the Loan Parties believes to be reasonable.

(d) Notwithstanding anything to the contrary in the Budget, from and after the date hereof the Loan Parties shall pay all impositions and obligations imposed by the Existing Mortgage Loans when due. The calculation of Permitted Budget Variances set forth in Section 6.14(b) shall not apply to any payments made by the Loan Parties under the Existing Mortgage Loans.

**6.15    Filing of Motions and Applications**. Without the prior written consent of the Lender, the Loan Parties shall not apply to the Bankruptcy Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the Loan Documents or the Final Order, (b) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Final Order, or (c) permit any Indebtedness or Claim to be *pari passu* with or senior to any of the Loans, except as expressly stated in the Final Order.

**6.16    Superpriority Claim**. The Debtors shall not incur, create, assume, suffer to exist or permit any other Superpriority Claim that is *pari passu* with or senior to the claims of the Lender against the Loan Parties, except for the Carve Out, and as otherwise expressly stated in the Final Order.

## 7.    NEGATIVE COVENANTS.

Other than in accordance with a Bankruptcy Sale Order or a plan of reorganization confirmed by the Bankruptcy Court, no Loan Party shall do any of the following:

**7.1    Dispositions**. Convey, sell, lease, transfer or otherwise dispose of any Collateral (collectively, a "**Transfer**") other than: (i) transfers of (a) non-exclusive licenses and similar arrangements for the use of the property (including Intellectual Property) of a Loan Party in the ordinary course of business, (b) licenses that could not result in a legal transfer of title of the licensed property but that may be exclusive in respects other than territory, (c) licenses relating to discreet geographical areas outside of the United States (for the avoidance of doubt and for sake of clarity, however, a Loan Party may enter into limited non-competition arrangements with its licensees and similar business partners in the ordinary course of business), (d) the transfer or sale or the Loan Parties' goods and inventory in the ordinary course of business; or (ii) Transfers of Equipment as prohibited by this Agreement or the order(s) of the Bankruptcy Court, or (iii) assignment of leases or subleases of real property and (e) the sale of Senza Kemore Property, subject to and in accordance with Section 3.4 of this Agreement and the sale of the 2nd Street Property and/or Pioneer Village Property subject to and in accordance with Section 3.5 of this Agreement. To avoid any ambiguity cash may be used in the ordinary course of business, subject to the provisions of this Agreement and orders of the Bankruptcy Court.

**7.2    Change in Business; Change in Executive Office**. Engage in any business, other than the businesses currently engaged in by the Loan Parties and any business substantially similar or related thereto (or incidental thereto), or cease to conduct business in the manner conducted by the Loan Parties as of the Closing Date; or without thirty (30) calendar days prior written notification to Lender (a) relocate its chief executive office or state of incorporation or change its legal name; (b) add any new offices or business locations or deliver any portion of the Collateral valued, individually or in the aggregate, in excess of One Hundred Thousand Dollars ($100,000.00) to a bailee other than to a bailee and at a location already disclosed in the Perfection Certificate, or (c) without Lender's prior written consent, change the date on which its fiscal year ends.

**7.3    Mergers or Acquisitions**. Merge, divide or consolidate, with or into any other business organization, or acquire, all or substantially all of the capital stock or property of another Person.

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Exhibit 2 Page 86 of Page

**7.4     Indebtedness**.  Create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness. Notwithstanding the foregoing, the Loan Parties may incur debt payable from only an Excluded Asset with the prior written consent of Lender, which shall not be unreasonably withheld.

**7.5     Encumbrances**.  Create, incur, assume or suffer to exist any voluntary Lien with respect to any of its Real Property except for Permitted Liens, or assign or otherwise convey any right to receive income, including the sale of any Accounts, except for Permitted Liens, or enter into any agreement with any Person other than Lender not to grant a security interest in, or otherwise encumber, any of its property.  Notwithstanding the foregoing, the Loan Parties may create a Lien on any Excluded Asset.

**7.6     Distributions**.  Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any equity interests, except that the Loan Parties may repurchase equity interests from current or former employees,  directors, or consultants of the Loan Parties in any amount where the consideration for the repurchase is solely the cancellation of indebtedness owed by such current or former employees, directors or consultants to the Loan Parties regardless of whether an Event of Default exists.

**7.7     Investments**.  Directly or indirectly acquire or own, or make any Investment in or to any Person, other than Permitted Investments and any Loan Parties ownership interest in any subsidiary company in effect as of the Closing Date (including, but not limited to, the Property Owners); or maintain or invest any of its property with a Person other than Lender unless such Person has entered into an account control agreement with Lender in form and substance satisfactory to Lender.

**7.8     Transactions with Affiliates**.  Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of the Loan Parties except for transactions that are either approved by the Bankruptcy Court or entered into in the ordinary course of a Loan Party's business, upon fair and reasonable terms that are no less favorable to the Loan Parties than would be obtained in an arm's length transaction with a non-affiliated Person.

**7.9     Compliance**.  Become an "investment company" or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of any Credit Extension for such purpose. Fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur, or fail to comply with the Federal Fair Labor Standards Act, or violate any law or regulation, which violation could reasonably be expected to have a Material Adverse Effect.

## 8.     EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an Event of Default by the Loan Parties under this Agreement:

**8.1     Payment Default**.  Except to the extent the holder thereof would be stayed from exercising remedies as a result of the Cases after accounting for the relief provided in the Final Order, if the Loan Parties fail to pay, when due, (a) any regularly scheduled payment of interest under the Loan on the applicable payment date or (B) the Obligations in full on the Maturity Date.  In the event of (a) or (b) Lender shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for non-payment has occurred;

### 8.2 Covenant Default.

(a)     If a Loan Party violates or fails to perform any obligation under Article 6 or Article 7 and such failure continues for ten (10) Business Days after Lender delivers written notice thereof to the Loan Parties.  In such event Lender shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for non-compliance of a specified obligation under Article 6 or Article 7 has occurred; and

(b)     If a Loan Party fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement not specified in Section 8.2 above, or in any of the other Loan Documents, for ten (10) Business Days after Lender delivers written notice thereof to the Loan Parties, provided, however, that if the default cannot by its nature be cured within the ten (10) Business Days period or cannot after diligent attempts by the Loan Parties be cured within such ten (10) Business Days period, and such default is likely to be cured within a reasonable time, then the Loan Parties shall have an additional reasonable period (which shall not in any case exceed thirty (30) calendar days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default, but no Credit Extensions will be made.  In such case and if an Event of Default is triggered under this Section 8.2(b), Lender may notify the Committee, and the U.S. Trustee.

### 8.3 [Intentionally Omitted].

### 8.4 Attachment.  Other than in connection with the Cases in each case, if any material portion of the Loan Parties' assets are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within thirty (30) calendar days without the same being contested by the Loan Parties in good faith, or if the Loan Parties are enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a Lien or material monetary encumbrance upon any material portion of the Loan Parties' assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of the Loan Parties' assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not removed, discharged, rescinded or paid within thirty (30) calendar days after receipt of written notice from Lender delivered to the Loan Parties, the Committee, and the U.S. Trustee, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by the Loan Parties (provided that no Credit Extensions will be required to be made during such cure period);

### 8.5 Assets.  Provided that such conditions are not cured within thirty (30) calendar days after receipt of written notice from Lender delivered to the Loan Parties, the Committee, and the U.S. Trustee: (a) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral, which rights under Section 506(c) of the Bankruptcy Code shall be waived (subject only to and effective upon entry of the Final Order), (b) any Person attempts to apply the doctrine of marshalling with respect to the Lender, which shall be waived (subject only to and effective upon entry of the Final Order), or (c) any Person attempts to apply the "equities of the case" exception set forth in Section 552(b) of the Bankruptcy Code, which shall be waived (subject only to and effective upon entry of the Final Order);

### 8.6 Other Agreements.  Except to the extent the counterparty thereto would be stayed from exercising remedies as a result of the Case, if there is an event of default in any material agreement to which any of the Loan Parties is a party or by which it is bound resulting in a right by a third party or parties,

233739.10048 LEGAL 237636060v8

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Exhibit 2 Page 88

whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Thousand Dollars ($100,000.00) or which could have a Material Adverse Effect;

**8.7    Lien Priority**.  If the Obligations shall not have the priority contemplated by this Agreement, or the entry of any order in the Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations;

**8.8    Judgments**.  If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Thousand Dollars ($100,000.00) (excluding amounts covered by insurance or third party indemnification) shall be rendered against the Loan Parties and shall remain unsatisfied, unvacated or unstayed pending appeal for a period of sixty (60) calendar days after entry of such judgement (provided that no Credit Extensions will be made prior to the satisfaction or stay of such judgment);

**8.9    Misrepresentations**.  If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth herein or in any Loan Document or certificate delivered to Lender and prepared by any Responsible Officer pursuant to this Agreement.  In such event Lender shall provide the Loan Parties, the Committee and the U.S. Trustee written notice that an Event of Default for breach of this Section 8.9 has occurred;

**8.10    Cases**.  Any Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code without the consent of the Lender;

**8.11    Trustee**.  A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Case;

**8.12    Cash Collateral**.  An order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Loan Parties;

**8.13    Relief from Stay**.  The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties constituting Collateral for the DIP Loan which have a value in excess of One Hundred Thousand Dollars ($100,000.00) in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole);

**8.14    Orders**.  The Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected first priority Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lender.  In such event Lender shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for breach of this Section 8.14 has occurred;

**8.15    Compliance with Orders**.  Any of the Loan Parties shall fail to comply with the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) in any material respect;

233739.10048 LEGAL 237636060v8

**8.16 Other Financing**. (a) Except as permitted in the Interim Order or the Final Order, the entry of any order of the Bankruptcy Court granting to any third party a Superpriority Claim or Lien *pari passu* with or senior to that granted to and/or for the benefit of the Lender hereunder without the prior written consent of Lender (which consent shall not be unreasonably withheld), or (b) the Loan Parties shall make any payment of principal or interest or otherwise on account of any Indebtedness or payables other than the Obligations under the DIP Facility, or other than in accordance with the Budget approved by Lender; or

**8.17 Avoidance**. (a) Any suit or action is commenced against the Lender by the Loan Parties that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender, or (b) the Bankruptcy Court rules in favor of any Person in any suit or action commenced against the Lender by or on behalf of such Person (after the Bankruptcy Court has granted such Person standing to commence such suit or action).

The Court shall have jurisdiction to resolve any dispute between the Loan Parties and Debtors regarding whether an Event of Default has occurred;

## 9. LENDER'S RIGHTS AND REMEDIES.

**9.1 Rights and Remedies**. During the continuance of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by the Loan Parties:

(a) Subject to the Orders, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the DIP Loan Facility with respect to additional Advances, whereupon any additional Advances shall be made or incurred in Lender's sole discretion so long as such Default or Event of Default is continuing. If any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, increase the rate of interest applicable to the Loan to the Default Rate.

(b) Subject to the Orders, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court: (i) terminate the DIP Loan Facility with respect to further Advances; (ii) reduce the DIP Loan Commitments from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of the Loan to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower; or (iv) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise its remedies under this Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, that Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon five (5) Business Days' prior written notice to Borrower, counsel approved by the Bankruptcy Court for the Committee and the U.S. Trustee and as set forth in the Interim Order or Final Order (when applicable).

233739.10048 LEGAL 237636060v8

(c)     Waivers by the Loan Parties. Except as otherwise provided for in this Agreement (including any notice required pursuant to any of the other Loan Documents) or that is not capable of being waived by Applicable Law, each Loan Party waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which a Loan Party may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

**9.2     Lender's Liability for Collateral**. So long as Lender complies with reasonable commercial lending practices, Lender shall not in any way or manner be liable or responsible for:  (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever.  All risk of loss, damage or destruction of the Collateral shall be borne by the Loan Parties.

**9.3     Remedies Cumulative**.  Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative.  Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity, subject to the requirements of the Bankruptcy Code.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on the Loan Parties' part shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.  No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the instance and for the purpose for which it was given.

**9.4     Protective Payments**.  If any Loan Party fails to obtain the insurance called for by Section 6.6 or fails to pay any premium thereon or fails to pay any other amount which a Loan Party is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the Collateral, Lender may obtain such insurance or make such payment, and all amounts so paid by Lender are Lender Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral.  Lender will make reasonable efforts to provide the Loan Parties with notice of Lender obtaining such insurance at the time it is obtained or within a reasonable time thereafter.  No payments by Lender are deemed an agreement to make similar payments in the future or Lender's waiver of any Event of Default.

**9.5     Demand; Protest**.  Except for any notice required pursuant to the Loan Documents or that is not capable of being waived by Applicable Law, the Loan Parties waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which Borrower may in any way be liable.

**9.6     Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Advances made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of

233739.10048 LEGAL 237636060v8

interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Advances made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Lender an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lender and the Loan Parties to conform strictly to any applicable usury laws. Accordingly, if Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lender's option be applied to the outstanding amount of the Advances made hereunder or be refunded to the Loan Parties.

**9.7    Waiver of Consequential Damages; Etc.**  To the fullest extent permitted by Applicable Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnified Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnified Party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the fraud, bad faith, gross negligence or willful misconduct of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction, **WHICH LIMITATION OF LIABILITY SHALL APPLY REGARDLESS OF WHETHER THE LIABILITY ARISES FROM THE SOLE, CONCURRENT, CONTRIBUTORY OR COMPARATIVE NEGLIGENCE OF THE INDEMNIFIED PARTY.**

**10.    NOTICES**.

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below.  Lender or the Loan Parties may change its mailing or electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this Section 10:

If to the Loan Parties:         [Applicable Loan Party]
                                Attention: Lance Miller
                                Paladin Management Group
                                633 W. 5th Street, 26th Floor
                                Los Angeles, CA 90071
                                Lmiller@paladinmgmt.com

                                With a copy to (which does not constitute notice):

233739.10048 LEGAL 237636060v8

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Exhibit 2, Page 92

Buchalter, P.C.
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017
Attention: Julian Gurule, Esq. and Daniel Katz, Esq.
Emails: jgurule@buchalter.com / dkatz@buchalter.com

If to Lender:          Serene Investment Management, LLC
2625 Alcatraz Ave., Suite 513
Berkeley, CA 94705
Attention: Adam Phillips
Email: adam@sereneim.com

With a copy to (which does not constitute notice):

Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
Attention: Vadim Rubinstein, Esq.
Email: vrubinstein@loeb.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

**11.**     **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE**.

This Agreement was negotiated in the State of California, the Loan was made by Lender and accepted by the Loan Parties in the State of California, and the proceeds of the Loan delivered pursuant hereto were disbursed from the State of California, which state the parties irrevocably and unconditionally agree has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects, including, without limiting the generality of the foregoing, matters of construction, validity and performance, each and all of this Agreement and the other Loan Documents, and the obligations arising hereunder and thereunder shall be governed by, and construed in accordance with, the laws of the State of California applicable to contracts made and performed in such state (without regard to principles of conflicts of laws) and any applicable law of the United States of America, except that at all times the attachment, creation, perfection, and enforcement of the liens and security interests created under the deeds of trust in favor of Lender in respect of real property and/or personal property shall be governed by and construed according to the law of the state in which such real property is located, it being understood that, to the fullest extent permitted by the law of such state, the law of the State of California shall govern the construction, validity and enforceability of this Agreement, the Loan and all of the obligations arising hereunder or thereunder.

To the fullest extent permitted by law, each of the Loan Parties and Lender hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Agreement and/or the Loan.

The Loan Parties and Lender each further submit to the exclusive jurisdiction of the Bankruptcy Court; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Lender from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations located in such other jurisdiction, or to enforce a judgment or other court

31

23-01243-WLH11    Doc 33    Filed 10/03/23    Entered 10/03/23 14:37:12    Exhibit 2 Page 93

order in favor of Lender. The Loan Parties expressly submit and consents in advance to such jurisdiction in any action or suit commenced in any such court, and the Loan Parties hereby waive any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. The Loan Parties hereby waive personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to the Loan Parties at the address set forth in, or subsequently provided by the Loan Parties in accordance with, Section 10 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of the Loan Parties' actual receipt thereof or three (3) calendar days after deposit in the U.S. mails, proper postage prepaid

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE LOAN PARTIES AND LENDER EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

This Section 11 shall survive the termination of this Agreement.

## 12. BANKRUPTCY COURT.

For the avoidance of doubt, to the extent there is conflict between the terms of this Agreement and the terms of the Order, the Orders shall control.

## 13. MULTIPLE BORROWERS.

**13.1 Joint and Several Liability; Surety Provisions.** Each Loan Party agrees that it is jointly and severally liable for, and absolutely, irrevocably and unconditionally guarantees to Lender the prompt payment and performance of, all Obligations. Each Loan Party acknowledges and agrees that its Collateral secures and cross-collateralizes each Loan made hereunder. Each Loan Party further acknowledges and agrees to the matters set forth on **Exhibit D**.

**13.2 Marshalling.** Each Loan Party expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel Lender to marshal assets or to proceed against any Loan Party, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Loan Party. Each Loan Party waives all defenses available to a surety, guarantor or accommodation co-obligor other than full payment of all Obligations and waives, to the maximum extent permitted by law, any right to revoke any guaranty of any Obligations as long as it is a Loan Party. It is agreed among each Loan Party and Lender that the provisions of this Section 12.2 are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Lender would decline to make DIP Loans.

**13.3 Consolidated Credit Facility.** Each Loan Party has requested that Lender make this DIP Credit Facility available to the Loan Parties on a combined basis, in order to finance the Loan Parties' business most efficiently and economically. The Loan Parties' business is a mutual and collective enterprise, and the successful operation of each Loan Party is dependent upon the successful performance of the integrated group. The Loan Parties believe that consolidation of their credit facility will enhance the borrowing power of each Loan Party and ease administration of the facility, all to their mutual advantage.

233739.10048 LEGAL 237636060v8

**13.4    Loan Party Subordination.**  Each Loan Party hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Loan Party, howsoever arising, to the full payment of all Obligations.

**13.5    One Obligation.**  The DIP Loans and other Obligations constitute one general obligation of the Loan Parties and are secured by Lender's first priority Lien on all Collateral; provided, however, that Lender shall be deemed to be a creditor of, and the holder of a separate claim against, each Loan Party to the extent of any Obligations jointly or severally owed by such Loan Party.

**14.    GENERAL PROVISIONS**.

**14.1    Successors and Assigns**.  This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by the Loan Parties or, prior to the occurrence of an Event of Default, Lender, without the other's prior written consent, which consent may be granted or withheld in such party's sole discretion.

**14.2    Indemnification**.  The Loan Parties shall defend, indemnify and hold harmless Lender and its officers, employees, and agents (each an "**Indemnified Party**") against:  (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all actual losses or actual Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and the Loan Parties whether under this Agreement, the DIP Loan Facility, the Case, or otherwise (including without limitation reasonable attorneys' fees and expenses), provided, the foregoing shall specifically expressly exclude (a) any special, exemplary, punitive or consequential damages (unless the same are asserted by a third party against Lender and awarded to such third party in a legal proceeding against Lender and paid (or payable) by Lender), lost profits and diminution in value and any (b) any losses caused by an Indemnified Party's fraud, bad faith, gross negligence or willful misconduct.  This Section 14.2 shall not apply to Taxes.

**14.3    Time of Essence**.  Time is of the essence for the performance of all obligations set forth in this Agreement.

**14.4    Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**14.5    Amendments in Writing, Integration**.  Except as expressly set forth herein, all amendments to or terminations of this Agreement or the Loan Documents must be in writing signed by each of the parties hereto.  All prior agreements, understandings, representations, warranties, and negotiations between any of the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

**14.6    Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

**14.7    Electronic Execution of Documents**.   The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**14.8    Survival**.   All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions to the Loan Parties (excluding any contingent payment obligations which expressly survive repayment of the Loan and which, as of the date of such full repayment, have not yet ripened).   The obligations of the Loan Parties to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in <u>Section 14.2</u> shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

**14.9    Confidentiality; Disclosure**.   In handling any confidential information Lender and all employees and agents of Lender, including but not limited to accountants, shall exercise the same degree of care that it exercises with respect to its own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (i) to prospective transferees or purchasers of any interest in the loans, provided that they are similarly bound by confidentiality obligations, (ii) as required by law, regulations, rule or order, subpoena, judicial order or similar order (including in connection with the Case), (iii) as may be required in connection with the examination, audit or similar investigation of Lender and (iv) as Lender may determine in connection with the enforcement of any remedies hereunder. Confidential information hereunder shall not include information that either:  (a) is in the public domain or in the knowledge or possession of Lender when disclosed to Lender, or becomes part of the public domain after disclosure to Lender through no fault of Lender; or (b) is disclosed to Lender by a third party, provided Lender does not have actual knowledge that such third party is prohibited from disclosing such information. The Loan Parties authorize Lender to disclose its relationship with the Loan Parties, including use of the Loan Parties' logo in Lender's promotional materials.

**14.10    Patriot Act Notice**.   Lender notifies the Loan Parties that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes names and addresses and other information that will allow Lender to identify the Loan Parties in accordance with the Patriot Act.

**14.11    Correction of Loan Documents**.   Lender may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**PROPERTY OWNERS**

**UW 17th Ave, LLC**,
a Washington limited liability company

By: _____
Name: Lance Miller
Title: Manager

**725 Broadway, LLC**,
a Washington limited liability company

By: _____
Name: Lance Miller
Title: Manager

**iCap Campbell Way, LLC**,
a Washington limited liability company

By: _____
Name: Lance Miller
Title: Manager

**VH 1121 14th, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager

233739.10048 LEGAL 237636060v8

**VH Senior Care, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager


**VH Willows Townhomes, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager


**Senza Kenmore, LLC**,
a Washington limited liability company

By: _____
Name: Lance Miller
Title: Manager


**VH 2nd Street Office, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager


**VH Pioneer Village, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager

233739.10048 LEGAL 237636060v8

## CONSTITUENT PARTY DEBTORS

**iCap @ UW, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Broadway, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Enterprises, Inc. f/k/a Altius Development, Inc.**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Equity, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Funding, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

[Signature Page 1 to Debtor-in-Possession Loan and Security Agreement]

**iCap Investments, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Management LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Northwest Opportunity Fund, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Pacific Income Fund 4, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Pacific Income Fund 5, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**iCap Pacific Northwest Opportunity and Income Fund, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager

**iCap Pacific NW Management, LLC**,
a Washington limited liability company

By: _____
Name: Lance Miller
Title: Manager

**iCap Realty, LLC**,
a Washington limited liability company

By: _____
Name: Lance Miller
Title: Manager

**iCap Vault 1, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager

**iCap Vault Management, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager

[Signature Page 3 to Debtor-in-Possession Loan and Security Agreement]

**iCap Vault LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**iCap Holding 5, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**iCap Holding 6, LLC**
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**iCap Pacific Development LLC**
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**Vault Holdings LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**Vault Holding 1, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

[Signature Page 4 to Debtor-in-Possession Loan and Security Agreement]

**Lender:**

**SERENE INVESTMENT MANAGEMENT, LLC**

By: _____
Name:  Adam Phillips
Title:   Principal

# EXHIBIT A-1

## REAL PROPERTY

1.      The real property commonly known as 4740 17th Ave NE Seattle, WA and owned by UW 17th Ave, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

2.      The real property commonly known as 715-775 Broadway Tacoma, WA and owned by 725 Broadway, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

3.      The real property commonly known as 1231 Campbell Way Bremerton, WA and owned by iCap Campbell Way, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

4.      The real property commonly known as 117 -121 14th Ave., Seattle, WA and owned by VH 1121 14th LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

5.      The real property commonly known as 302 SE 146th Street Burien, WA  and owned by VH Senior Care, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

6.      The real property commonly known as 1226 160th Street SW, Lynwood, WA and owned by VH Senior Care, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

7.      The real property commonly known as 4918C, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

8.      The real property commonly known as 4906A, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

9.      The real property commonly known as 4912B, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

10.      The real property commonly known as 4910B, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

11.     The real property commonly known as 2818 E. 2nd Street, Vancouver, WA 98661 and owned by VH 2nd Street Office, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

12.     The real property commonly known as 4318 S. Settler Drive, Ridgefield, WA 98642 and owned by VH Pioneer Village, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

## **EXHIBIT A-2**

LEASES

(Excel file to be attached)

233739.10048 LEGAL 237636060v8

# EXHIBIT A-3
## EXISTING DEEDS OF TRUST

| PROPERTY OWNER | PROPERTY | DEED OF TRUST | OUTSTANDING PRINCIPAL BALANCE | OUTSTANDING INTEREST | OUTSTANDING DEFAULT INTEREST | OUTSTANDING FEES |
|---|---|---|---|---|---|---|
| UW 17th Ave, LLC | 4740 17th Ave NE Seattle, WA | Deed of trust to secure an indebtedness in the amount of $3,000,000.00<br><br>Dated: March 31, 2023<br><br>Beneficiary: Manmohan Dhillon and Sarbjit Dhillon, husband and wife and Sukhvir Singh Josan and Jaswinder Kaur Josan, husband and wife | $3,000,000.00 | - | - | - |
| VH 1121 14th LLC | 117 -121 14th Ave., Seattle, WA | Deed of trust, to secure an indebtedness in the amount of $3,000,000.00<br><br>Dated: January 28, 2022<br><br>Beneficiary: Lima One Capital, LLC, a Georgia limited liability company | $3,000,000.00 | - | - | - |
| VH Senior Care LLC | 302 SE 146th Street Burien, WA | Deed of trust to secure an indebtedness in the amount of $1,651,500.00<br><br>Dated: November 7, 2022<br><br>Beneficiary: Redmond Funding Group, LLC, a Delaware limited liability company | $1,651,500.00 | - | - | - |

| Property Owner | Property | Deed of Trust | Outstanding Principal Balance | Outstanding Interest | Outstanding Default Interest | Outstanding Fees |
|---|---|---|---|---|---|---|
| VH Senior Care | 1226 160th Street SW, Lynwood, WA | A deed of trust to secure an indebtedness in the amount of $1,651,500.00<br><br>Dated: November 7, 2022<br><br>Beneficiary: Redmond Funding Group, LLC | $1,651,500.00 | - | - | - |
| VH Willows Townhomes, LLC | 4918C, Willow St., Seattle, WA | Deed of Trust to secure indebtedness in the amount of $2,985,000.00<br><br>Dated: January 28, 2022<br><br>Beneficiary: Lima One Capital, LLC | $2,985,000.00 | - | - | - |
| VH Willows Townhomes, LLC | 4906A, Willow St., Seattle, WA | Deed of Trust to secure indebtedness in the amount of $2,985,000.00<br><br>Dated: January 28, 2022<br><br>Beneficiary: Lima One Capital, LLC | $2,985,000.00 | - | - | - |
| VH Willows Townhomes, LLC | 4912B, Willow St., Seattle, WA | Deed of Trust to secure indebtedness in the amount of $2,985,000.00<br><br>Dated: January 28, 2022<br><br>Beneficiary: Lima One Capital, LLC | $2,985,000.00 | - | - | - |
| VH Willows Townhomes, LLC | 4910B, Willow St., Seattle, WA | Deed of Trust to secure indebtedness in the amount of $2,985,000.00<br><br>Dated: January 28, 2022<br><br>Beneficiary: Lima One Capital, LLC | $2,985,000.00 | - | - | - |

| Property Owner | Property | Deed of Trust | Outstanding Principal Balance | Outstanding Interest | Outstanding Default Interest | Outstanding Fees |
|---|---|---|---|---|---|---|
| VH 2nd Street Office, LLC | 2818 E. 2nd Street, Vancouver, WA | Deed of trust to secure an indebtedness in the amount of $3,000,000 in favor of Socotra REIT I LLC, a Delaware limited liability company and as subsequently assigned to: (i) WE Alliance Secured Income Fund, LLC, as to an undivided 1,000/3,000 of the total beneficial and (ii) Jason A. Yelowitz, Trustee of the Jason Yelowitz 2006 Trust, Dated March 31, 2006, as to an undivided 450/3,000 of the total beneficial interest. | $3,000,000.00 | - | - | - |
| VH Pioneer Village, LLC | 4318 S. Settler Drive, Ridgefield, WA | Deed of Trust, to secure an indebtedness in the amount of $2,000,000.00  Dated: December 8, 2022  Beneficiary: Tritalent Funding Group, Inc. and Halton Co. c/o Tritalent Funding Group, Inc. | $2,000,000.00 | - | - | - |
| 725 Broadway, LLC | | Deed of trust to secure an indebtedness in the amount of $2,700,000.00 in favor of Vault Holdings, LLC | $2,700,000.00 | | | |
| iCap Campbell Way, LLC | | Deed of trust to secure an indebtedness in the amount of $895,000 in favor of iCap Pacific Income Fund 5, LLC | $895,000.00 | | | |

**EXHIBIT B**

**FORM OF INTERIM ORDER**

**See attached**

233739.10048 LEGAL 237636060v8

## EXHIBIT C

**LIST OF ORDINARY COURSE AND DISPUTED CARRIERS', WAREHOUSEMEN'S, MECHANICS', MATERIALMEN'S, REPAIRMEN'S OR OTHER LIKE LIENS**

| PROPERTY OWNER | PROPERTY | MECHANICS LIENS |
|---|---|---|
| Senza Kenmore, LLC | 15550 84th Ave. SE, Kenmore, WA | Claimant: Van Hoof Construction<br>Against: ICAP Equity<br>Amount: $109,774.52<br><br>Claimant: T.S. Dance Construction LLC<br>Against: Senza Kenmore LLC<br>Amount: $52,043.70<br><br>Claimant: Hugh G. Goldsmith & Associates, Inc., d/b/a Goldsmith Land Development Services<br>Against: Senza Kenmore LLC<br>Amount: $35,432.50 |
| 725 Broadway, LLC | 715-775 Broadway Tacoma, WA | Claimant: Oak Hills Construction LLC<br>Against: 725 Broadway<br>Amount: $385,385.00 |
| UW 17th Ave, LLC | 4740 17th Ave NE Seattle, WA | Claimant: Studio19 Architects<br>Against: iCap Equity<br>Amount: $51,572.30 (Note company record's currently reflect only $27,835 owed to Studio 19 Architects).<br><br>Claimant: Davido Consulting Group<br>Against: iCap Equity, Inc.<br>Amount: $18,060.10 |

# EXHIBIT D

## SURETYSHIP PROVISIONS AND WAIVERS

1.      Condition of Other Loan Parties.  Each Loan Party represents and warrants to Lender that such Loan Party has established adequate means of obtaining from the other Loan Parties, on a continuing basis, financial and other information pertaining to the business, operations and condition (financial and otherwise) of the other Loan Parties and their assets, and each Loan Party now is and hereafter will be completely familiar with the business, operations and condition (financial and otherwise) of the other Loan Parties and their assets.  Each Loan Party hereby expressly waives and relinquishes any duty on the part of Lender to disclose to such Loan Party any matter, fact or thing related to the businesses, operations or condition (financial or otherwise) of the other Loan Parties and their assets, whether now known or hereafter known by Lender during the life of this Agreement.  With respect to any of the Obligations, Lender need not inquire into the powers of any Loan Party, or the officers or employees acting or purporting to act on its behalf, and all Obligations made or created in good faith reliance upon the professed exercise of such powers shall be secured hereby.

2.      Waiver of Rights of Subrogation.  Until no part of any commitment of Lender to lend to Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations which expressly survive the full repayment of the Loan and which, as of the date of such full repayment, have not yet ripened), notwithstanding anything to the contrary elsewhere contained herein or in any other Loan Document to which each Loan Party is a party, each Loan Party hereby waives to the extent if may lawfully do so with respect to the other Loan Parties any and all rights at law or in equity, to subrogation, to reimbursement, to exoneration, to indemnity, to contribution, to setoff or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, or to a holder or transferee against a maker and which any Loan Party may have or hereafter acquire against any other Loan Party in connection with or as a result of such Loan Party's execution, delivery and/or performance of this Agreement or any other Loan Document to which each Loan Party is a party.  Until no part of any commitment of Lender to lend to the Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations which expressly survive the full repayment of the Loan and which, as of the date of such full repayment, have not yet ripened), each Loan Party agrees that it shall not have or assert any such rights against any other Loan Party or its successors and assigns either directly or as an attempted setoff to any action commenced against any Loan Party by any other Loan Party (as a borrower or in any other capacity) or any other Person.  Each Loan Party hereby acknowledges and agrees that this waiver is intended to benefit Lender and shall not limit or otherwise affect each Loan Party's liability hereunder, under any other Loan Document to which any Loan Party is a party, or the enforceability hereof or thereof.  Until no part of any commitment of Lender to lend to the Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations which expressly survive the full repayment of the Loan and which, as of the date of such full repayment, have not yet ripened), each Loan Party expressly waives any right to enforce any remedy that Lender now has or hereafter may have against any other Person and waives the benefit of, or any right to participate in, any other security now or hereafter held by Lender.

3.      Liens on Real Property.  In the event that all or any part of the Obligations at any time are secured by any one or more deeds of trust or mortgages or other instruments creating or granting liens on any interests in real property, subject to the terms of the Agreement, each Loan Party authorizes Lender, upon the occurrence and during the continuance of any Event of Default, at its sole option, without notice or demand, but subject to any all notice required by Applicable Law in the jurisdiction where such Real Property is located and any notice which cannot be waived and without affecting any obligations of any Loan Party hereunder and under the other Loan Documents, the enforceability of this Agreement, or the

validity or enforceability of any liens of Lender on any collateral, to foreclose any or all of such deeds of trust or mortgages or other instruments by judicial or nonjudicial sale.

4.      To the extent a court of competent jurisdiction deems each of the Loan Parties guarantors of the Obligations instead of primary obligors as intended by the parties and to the fullest extent permitted by Applicable Law, each of the Loan Parties expressly waives all rights defenses that each Loan Party may have if the Obligations become secured by real property. This means, among other things, that Lender may collect from any Loan Party without first foreclosing on any real or personal property pledged by any Loan Party, and that if Lender forecloses on any real property collateral pledged by any Loan Party, the amount of the Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if that collateral is worth more than the sale price, and that Lender may collect from any Loan Party even if Lender, by foreclosing on the real property collateral, has destroyed any right any Loan Party may have to collect from any other Loan Party. This is an unconditional and irrevocable waiver of any rights and defenses each Loan Party may have if the Obligations become secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon California Code of Civil Procedure §§ 580a, 580b, 580d or 726, or comparable provisions of the laws of any other jurisdiction, and all other suretyship defenses each Loan Party otherwise might or would have under California law or other applicable law. Further, each of the Loan Parties waive all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as nonjudicial foreclosure with respect to security for the Obligations, has destroyed any Loan Party's rights of subrogation and reimbursement against any other Loan Party by the operation of California Code of Civil Procedure § 580d or otherwise. Each Loan Party expressly waives any right to receive notice of any judicial or nonjudicial foreclosure or sale of any real property or interest therein subject to any such deeds of trust or mortgages or other instruments and each Loan Party's failure to receive any such notice shall not impair or affect each Loan Party's obligations hereunder and under the other Loan Documents or the enforceability of this Agreement or any liens created or granted hereby.

5.      Waiver of Discharge. Without limiting the generality of the foregoing, each Loan Party hereby waives discharge by waiving all defenses based on suretyship or impairment of collateral.

6.      Understandings with Respect to Waivers and Consents. Each Loan Party warrants and agrees that each of the waivers and consents set forth herein is made after consultation with legal counsel and with full knowledge of its significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which any Loan Party otherwise may have against any other Loan Party, Lender or others, or against collateral, and that, under the circumstances, the waivers and consents herein given are reasonable and not contrary to public policy or law. If any of the waivers or consents herein are determined to be contrary to any applicable law or public policy, such waivers and consents shall be effective to the maximum extent permitted by law.

233739.10048 LEGAL 237636060v8

**SCHEDULE I**

**Property Owners and Related Properties**

| Property Owner | Real Property |
|---|---|
| UW 17th Ave, LLC | 4740 17th Ave NE<br>Seattle, WA |
| 725 Broadway, LLC | 715-775 Broadway<br>Tacoma, WA |
| iCap Campbell Way LLC | 1231 Campbell Way<br>Bremerton, WA |
| VH 1121 14th LLC | 117 -121 14th Ave.,<br>Seattle, WA |
| VH Senior Care LLC | 302 SE 146th Street<br>Burien, WA |
| VH Senior Care LLC | 1226 160th Street SW,<br>Lynwood, WA |
| VH Willows Townhomes, LLC | 4918C, Willow St.,<br>Seattle, WA |
| VH Willows Townhomes, LLC | 4906A, Willow St.,<br>Seattle, WA |
| VH Willows Townhomes, LLC | 4912B, Willow St.,<br>Seattle, WA |
| VH Willows Townhomes, LLC | 4910B, Willow St.,<br>Seattle, WA |
| Senza Kenmore, LLC | 15550 84th Ave. SE,<br>Kenmore, WA |
| VH 2nd Street Office LLC | 2818 E. 2nd Street,<br>Vancouver, WA |
| VH Pioneer Village LLC | 4318 S. Settler Drive,<br>Ridgefield, WA |

**SCHEDULE II**

**iCAP Constituent Party Debtors**

iCap @ UW, LLC
iCap Broadway, LLC
iCap Enterprises, Inc. f/k/a Altius Development, Inc.
iCap Equity, LLC
iCap Funding LLC
iCap Investments, LLC
iCap Management LLC
iCap Northwest Opportunity Fund, LLC
iCap Pacific Income 4 Fund,, LLC
iCap Pacific Income 5 Fund, LLC
iCap Pacific Northwest Opportunity and Income Fund, LLC
Icap Pacific NW Management, LLC
iCap Realty, LLC
iCap Vault I, LLC
iCap Vault Management, LLC
iCap Vault, LLC
iCap Holding, 5 LLC
iCap Holding, 6 LLC
iCap Pacific Development LLC
Vault Holding, LLC
Vault Holding 1, LLC

233739.10048 LEGAL 237636060v8

# EXHIBIT 2

OF THE DIP ORDER

CONFIDENTIAL

**iCap Enterprises, Inc.**
Consolidated Budget
USD in $000's

| | Fcst 8/27/23 8/31/23 | Fcst 9/1/23 9/30/23 | Fcst 10/1/23 10/31/23 | Fcst 11/1/23 11/30/23 | Fcst 12/1/23 12/31/23 | Fcst 1/1/24 1/31/24 | Fcst 2/1/24 2/29/24 | Fcst 3/1/24 3/31/24 | Fcst 4/1/24 4/30/24 | Fcst 5/1/24 5/4/24 | Fcst 10 Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Property Sale Proceeds | $ - | $ - | $ - | $ 7,233 | $ - | $ - | $ - | $ - | $ - | $ - | $ 7,233 |
| Rental Income | | | 26 | 26 | 26 | 26 | 26 | 26 | 26 | | 184 |
| Total Receipts | - | - | 26 | 7,259 | 26 | 26 | 26 | 26 | 26 | - | 7,416 |
| | | | | | | | | | | | |
| Mortgage Interest | - | - | (117) | (597) | (50) | (50) | (50) | (50) | (50) | (50) | (1,012) |
| Principal Repayment | - | - | - | (5,000) | - | - | - | - | - | - | (5,000) |
| HOA Fees | - | - | (0) | - | (0) | (0) | (0) | (0) | (0) | (0) | (4) |
| Utilities | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | - | - | - | - | - | - | - | - | - | - | - |
| Wages & Benefits | - | (17) | (46) | (43) | (33) | (27) | (27) | (30) | (27) | (3) | (254) |
| Property Insurance | - | - | (8) | - | - | (13) | (50) | (6) | - | - | (78) |
| Insurance | - | - | (3) | - | - | - | - | - | - | - | (3) |
| Property Taxes | - | - | (87) | - | - | - | - | - | (79) | - | (166) |
| Taxes | - | - | - | - | - | - | - | - | - | - | - |
| Rent & Leases | - | - | - | - | - | - | - | - | - | - | - |
| IT | - | - | (3) | (3) | (3) | (4) | (4) | (4) | (4) | (4) | (29) |
| Other Operating | - | - | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (200) |
| Total Operating Disbursements | - | (17) | (290) | (5,668) | (111) | (120) | (157) | (115) | (186) | (82) | (6,746) |
| | | | | | | | | | | | |
| Operating Cash Flow | - | (17) | (263) | 1,591 | (85) | (94) | (130) | (89) | (160) | (82) | 671 |
| | | | | | | | | | | | |
| AP Vendor Catchup | - | - | - | - | - | - | - | - | - | - | - |
| Other Non-Operating | - | - | (75) | - | - | - | - | - | - | - | (75) |
| I/C Transfer | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Fees | - | - | (1,039) | (1,036) | (1,065) | (632) | (293) | (627) | (555) | (73) | (5,321) |
| Total Non-Operating Cash Flow | - | - | (1,114) | (1,036) | (1,065) | (632) | (293) | (627) | (555) | (73) | (5,396) |
| | | | | | | | | | | | |
| Interest | - | - | - | - | - | - | - | - | - | - | - |
| Principal Amortization | - | - | - | - | - | - | - | - | - | - | - |
| Financing Proceeds | - | - | 2,000 | 2,750 | (300) | - | - | - | - | - | 4,450 |
| Lien Reserve | - | - | - | (385) | - | - | - | - | - | - | (385) |
| Total Financing Cash Flow | - | - | 2,000 | 2,365 | (300) | - | - | - | - | - | 4,065 |
| | | | | | | | | | | | |
| Total Cash Flow | - | (17) | 623 | 2,919 | (1,450) | (726) | (424) | (717) | (715) | (155) | (661) |
| | | | | | | | | | | | |
| Beginning Cash | 536 | 536 | 519 | 1,142 | 4,061 | 2,612 | 1,886 | 1,462 | 745 | 30 | 536 |
| Change in Cash | - | (17) | 623 | 2,919 | (1,450) | (726) | (424) | (717) | (715) | (155) | (661) |
| End Cash | $ 536 | $ 519 | $ 1,142 | $ 4,061 | $ 2,612 | $ 1,886 | $ 1,462 | $ 745 | $ 30 | $ (124) | $ (124) |

23-01243-WLH11 Doc 33 Filed 10/03/23 Entered 10/03/23 14:37:12 Pg 117 of 117 Exhibit 2, Page 88