# EXHIBIT 1

<u>**DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**</u>

This **DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** is entered into as of October 3, 2023 (this "**Agreement**"), by and among Serene Investment Management, LLC ("**Lender**"), the parties listed on <u>**Schedule I**</u> attached hereto (each, a "**Property Owner**" and collectively, the "**Property Owners**") the parties listed on <u>**Schedule II**</u> attached hereto (collectively, the "**iCap Constituent Party Debtors**"; and together with each Property Owner (each a debtor or debtor-in-possession under Chapter 11 of the Bankruptcy Code) each individually a "**Loan Party**," and also referred to as a "**Debtor**," and collectively, the "**Loan Parties**" or "**Debtors**").

**RECITALS**

WHEREAS, on September 29, 2023 (the "**Petition Date**"), each Loan Party filed a voluntary petition with the Bankruptcy Court initiating a case pending under Chapter 11 of the Bankruptcy Code (the "**Case**" and collectively, the "**Cases**") and has continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, each of the Property Owners is the fee owner of the real property listed next to its name on Schedule I hereto (collectively, the "**Real Properties**");

WHEREAS, the Loan Parties have requested that that the Lender make available to the Loan Parties debtor-in-possession term loans in an aggregate principal amount of up to of Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000.00); and

WHEREAS, Lender is willing to make the Loan (as such term is defined in this Agreement) described herein on the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Lender and Loan Parties agree as follows:

1.      **DEFINITIONS AND CONSTRUCTION**.

      **1.1**      **Definitions**.      As used in this Agreement, the following terms shall have the following definitions:

      "**2nd Street Property**" means the real property located at 2818 E. 2nd Street, Vancouver, Washington.

      "**Account Debtor**" is any "account debtor" as defined in the Code with such additions to such term as may hereafter be made.

      "**Accounts**" means all presently existing and hereafter arising accounts, contract rights, payment intangibles, and all other forms of obligations owing to Loan Parties arising out of the sale or lease of goods (including, without limitation, the licensing of software and other technology) or the rendering of services by Loan Parties, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by any Loan Party and the Loan Parties' Books relating to any of the foregoing.

      "**Advance**" or "**Advances**" means a cash advance or cash advances under the DIP Loan Facility.

"**Advance Request**" has the meaning assigned in Section 2.1(c).

"**Affiliate**" means, with respect to any Person, any other Person that owns or controls directly or indirectly such Person, or any Person that controls or is controlled by or is under common control with such Person.

"**Applicable Law**" means, as to any Person, any law (statutory or common), treaty, rule or regulation of a Governmental Authority or determination of a court or binding arbitrator, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Assignment of Vault Loan**" means an assignment of deed of trust with respect to that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated September 14, 2022 and Recorded November 15, 2022 as Instrument Number 20221115000430.

"**Avoidance Action**" means any claim and cause of action that constitutes an avoidance action under Sections 544, 545, 547, 548, 550 or 553 of the Bankruptcy Code or any other avoidance action under the Bankruptcy Code, state law or similar laws and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Washington or any court having jurisdiction over the Case from time to time.

"**Bankruptcy Sale**" means a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all assets (measured by both aggregate value and number of assets) and other rights of the Debtor(s) on such terms acceptable to Lender in its Permitted Discretion.

"**Bankruptcy Sale Order**" means an order of the Bankruptcy Court, in form and substance acceptable to Lender approving and authorizing a Bankruptcy Sale.

"**Budget**" means a cash flow projection and debtor-in-possession budget in form and substance acceptable to the Lender, which begins on or around the Closing Date; provided that, with the consent of the Lender, such consent not to be unreasonably withheld, the budget may be updated in accordance with Section 6.14.

"**Budget Variance Report**" means a report provided by the Loan Parties to the Lender showing by line item and in the aggregate the actual cash disbursements of the Loan Parties for the period set forth in Section 6.15(b), comparing the actual cash disbursements (on a category by category basis) with the cumulative budgeted amounts for each such line item set forth in the Budget through such period, noting therein all variances on a category-level and cumulative basis from the amounts set forth for such period in the Budget, together with explanations for all material variances, and certified as being true and correct in all material respects by the Loan Parties' Chief Restructuring Officer.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Washington are authorized or required to close.

233739.10048 LEGAL 237636060v8

"**Carve Out**" shall mean all administrative expenses incurred or accrued by either the Loan Parties' or Committee's appointed professionals as subsequently approved by interim or final Court orders, and otherwise as may be defined in the Final Order.

"**Case**" and "**Cases**" have the respective meanings set forth in the recitals.

"**Chief Restructuring Officer**" means Lance Miller.

"**Closing Date**" means the date on which the conditions specified in Section 3.1 are satisfied.

"**Code**" means the Uniform Commercial Code as enacted in the State of Washington and the State of Delaware, as applicable.

"**Collateral**" means the property described on **Exhibit A-1** attached hereto, but in no event will Collateral include the Excluded Assets.

"**Committee**" means an official committee of unsecured creditors appointed in the Cases by the U.S. Trustee.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another; (ii) any reimbursement obligations with respect to undrawn letters of credit; and (iii) all obligations arising under any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Lender in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"**Copyrights**" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof.

"**Credit Extension**" means each Advance or any other extension of credit by Lender for the benefit of the Loan Parties hereunder, including the DIP Loans, but subject to the Interim Cap and the Final Cap.

"**Debtor**" has the meaning set forth in the recitals.

"**Default**" means any event or circumstance that, with the passage of time or giving of notice, would unless cured or waived, constitute an Event of Default.

"**Default Rate**" has the meaning given to such term in Section 2.2(b) hereof.

"**Development Properties**" means, collectively, the Real Properties owned by (i) UW 17th Ave, LLC, (ii) 725 Broadway, LLC and (iii) iCap Campbell Way LLC.

"**DIP Loan**" has the meaning given to such term in Section 2.1(a) hereof.

233739.10048 LEGAL 237636060v8

23-01243-WLH11    Doc 54-1    Filed 10/05/23    Entered 10/05/23 11:00:02    Exhibit 1 Page 36

"**DIP Loan Commitment**" means an aggregate amount not to exceed Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000.00).

"**DIP Loan Facility**" means this Loan facility.

"**DIP Obligations**" has the meaning given to such term in the Interim Order.

"**DIP Prepetition Collateral**" has the meaning given to such term in the Interim Order.

"**Equipment**" means all present and future machinery, equipment, furniture, fixtures, vehicles, tools, parts and attachments in which Loan Party has any interest.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"**Event of Default**" has the meaning assigned in Section 8.

"**Excluded Assets**" means collectively (i) all Avoidance Actions and (ii) any and all amounts paid to Loan Parties' and Committee's bankruptcy professionals as an administrative expense pursuant to an interim or final order of the Bankruptcy Court.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to any obligations under this Agreement pursuant to a law in effect on the date Lender acquired its interest in such obligations or on the date that Lender changes its lending office, except, in each case, to the extent that amounts with respect to such Taxes were payable to Lender immediately before the date it acquired such interest or changed its lending office, (c) Taxes that are attributable to Lender's failure to comply with Section 2.5, and (d) any U.S. federal withholding Taxes imposed under FATCA.  For purposes of this definition, any reference to Lender shall be deemed to include a Foreign Lender.

"**Exit Fee**" has the meaning set forth in Section 2.3(a).

"**Facility Fee**" has the meaning set forth in Section 2.3(b).

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, any intergovernmental agreement entered into in connection with the implementation of such sections of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to, or official interpretations implementing such, intergovernmental agreements.

"**Fees**" means each and all of the amounts set forth in Section 2.3.

"**Final Cap**" means the sum of Five Million Two Hundred Fifty Thousand Dollars ($5,250,000.00), exclusive of all interest, fees, and expenses, tenderable in the form of DIP Loans by Lender

233739.10048 LEGAL 237636060v8

to the Loan Parties upon entry of the Final Order and compliance with all other requirements of this Agreement and the Loan Documents; provided, however, in the event that the Loan Parties exercise the VH Priming Liens Option and satisfy all of the conditions precedent with respect to the exercise of the option, the Final Cap shall be increased to Six Million Seven Hundred Fifty Thousand Dollars ($6,750,000.00).

"**Final Order**" means a final order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) authorizing the Loans, with changes to such form as are satisfactory to the Lender, approving the Loan Documents and authorizing the DIP Loan in such amounts as are contemplated by Section 2.1(b).

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**First Priority DIP Liens**" has the meaning given to such term in Section 4.1(a).

"**First Priority Pledged Liens**" has the meaning given to such term in the Interim Order.

"**GAAP**" means generally accepted accounting principles as in effect from time to time.

"**Governmental Authority**" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Guarantor**" means Chris Christensen.

"**Guaranty**" means the Limited, Secured, Non-Recourse, Conditional Personal Guaranty executed by Guarantor on the Closing Date, as the same may be amended, restated, modified or otherwise supplemented.

"**Highest Lawful Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations evidenced by this Agreement and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Indebtedness**" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all Contingent Obligations, and (d) all capital lease obligations.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Lender under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Insolvency Proceeding**" means any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extension generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"**Intellectual Property**" means all right, title, and interest owned by Loan Parties in and to the following: Copyrights, Trademarks (excluding any U.S. intent-to-use trademark application for which a statement of use has not been filed with and duly accepted by the United States Patent and Trademark Office, but only until such statement is accepted by the United States Patent and Trademark Office) and Patents; trade secrets, design rights, claims for damages by way of past, present and future infringement of any of the rights included above, and all license fees and royalties arising from licenses or rights to use such intellectual property rights; all amendments, renewals and extensions of any of such Copyrights, Trademarks or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"**Interim Cap**" means the sum of Two Million Five Hundred Thousand Dollars ($2,500,000.00), exclusive of all interest, fees, and expenses, tendered by Lender to the Loan Parties in the form of DIP Loans pursuant to the Interim Order and in compliance with all other requirements of this Agreement and the Loan Documents.

"**Interim Order**" means the *Interim Order (i) Authorizing Debtors In Possession to Obtain Post-Petition Secured Financing pursuant to Section 364 of the Bankruptcy Code; (ii) Authorizing Debtors To Use Cash Collateral; (iii) Granting Administrative Expense Priority; (iv) Providing Adequate Protection; (v) Scheduling a Final Hearing; and (vi) Granting Related Relief* (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), authorizing the Loans, in the form set forth as **Exhibit B**, with changes to such form as are satisfactory to the Lender, approving the Loan Documents and authorizing the DIP Loan in such amounts as are contemplated by Section 2.1(b).

"**Interim Order Entry Date**" means the date on which the Interim Order is entered by the Bankruptcy Court.

"**Inventory**" is all "inventory" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of a Loan Party's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"**Investment**" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Lender Expenses**" are all reasonable and documented audit fees and expenses, costs, and expenses (including reasonable attorneys' fees and expenses) for preparing, negotiating, defending and enforcing the Loan Documents (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings), all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by or otherwise incurred by the Lender.

"**Lien**" means with respect to the Real Property and any other Collateral, any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

233739.10048 LEGAL 237636060v8

"**Loan**" means the DIP Loans.

"**Loan Documents**" means, collectively, this Agreement, any note or notes or guaranties executed by Loan Parties, the Guaranty, the Interim Order, the Final Order and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"**Loan Party**" and "**Loan Parties**" have the meanings set forth in the recitals.

"**Loan Parties' Books**" means all of the Loan Parties' books and records including: ledgers; records concerning Loan Parties' assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"**Material Adverse Effect**" means a material adverse effect on (i) the business, operations, condition (financial or otherwise), or prospects of any Loan Party or (ii) the value of the Collateral taken as a whole or priority of Lender's security interests in the Collateral; <u>provided</u> that the term "Material Adverse Effect" will not be deemed to exist as a result of the Case or the circumstances and events leading up thereto.

"**Maturity Date**" means the earlier of (i) the date that is twelve (12) months after the Interim Order Entry Date, (ii) closing of a Bankruptcy Sale; (iii) the effective date of the Loan Parties' chapter 11 plan; (iv) entry of an order by the Bankruptcy Court converting any Case to a proceeding or proceedings under Chapter 7 of the Bankruptcy Code; (v) entry of a final order by the Bankruptcy Court dismissing any Case; (vi) the date of filing or support by a Loan Party of a plan of reorganization that does not provide for indefeasible payment in full in cash of all Obligations owing hereunder; or (vi) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loan in accordance with the terms of this Agreement.

"**Mechanics Lien**" means that certain mechanics lien in favor of Oak Hills Construction in the amount of Three Hundred and Eighty Five Thousand and Three Hundred and Eighty Five Dollars ($385,385.00).

"**Negotiable Collateral**" means all letters of credit of which a Loan Party is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and a Loan Party's Books relating to any of the foregoing.

"**Obligations**" means all debt, principal, interest, Fees, and other amounts owed to Lender by the Loan Parties pursuant to this Agreement, including the DIP Obligations and the Roll-Up Obligations.

"**Orders**" means collectively, the Interim Order and the Final Order.

"**Other Connection Taxes**" means, with respect to Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any loan hereunder or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

23-01243-WLH11    Doc 54-1    Filed 10/05/23    Entered 10/05/23 11:00:02    Exhibit 1    Page 40

"**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"**Perfection Certificate**" means that certain Perfection Certificate in the form provided by Lender dated the Closing Date and delivered by the Loan Parties to Lender.

"**Permitted Budget Variance**" has the meaning given to it in <u>Section 6.14</u>.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of its commercially reasonable (from the perspective of a first priority perfected secured asset based lender) business judgment based on how an asset based lender with similar rights providing a credit facility of the type provided under this Agreement would act in similar circumstances at the time with the information then available to it.

"**Permitted Indebtedness**" means:

(a)     Indebtedness of (i) the Loan Parties in favor of Lender arising under this Agreement, any other Loan Document, or as set forth in the Perfection Certificate;

(b)     Indebtedness arising in connection with the Carve Out;

(c)     Indebtedness arising in connection with the Prepetition Loans, including the Prepetition Obligations and the Roll-Up Obligations;

(d)     Indebtedness to trade creditors incurred in the ordinary course of business, including, without limitation, trade payables of a Property Owner relating to the ownership and operation of the related Real Property owned by such Property Owner and including professional fees incurred in the Cases; and

(e)     Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business.

"**Permitted Investment**" means:

(a)     Investments existing on the Closing Date disclosed in the Perfection Certificate; and

(b)     Investments held by the Loan Parties in (i) cash and cash deposits that are maintained at a bank or other financial institution that is insured by the Federal Deposit Insurance Corporation, or (ii) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one (1) year from the date of acquisition thereof, and/or (iii) money market account funds held at financial institutions reasonably acceptable to Lender in Lender's Permitted Discretion.

"**Permitted Liens**" means the following:

(a)     Any Liens existing on the Closing Date and disclosed in the Perfection Certificate, provided that the principal amount secured thereby is not hereafter increased, and no additional assets become subject to such Lien, including any Lien securing Prepetition Obligations (including the Roll-Up Obligations;

(b)     Any Liens arising under this Agreement or the other Loan Documents;

(c)     Liens for taxes, fees, assessments or other governmental charges or levies, either not yet delinquent or being contested in good faith by appropriate proceedings;

(d)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person, as set forth on **Exhibit C**;

(e)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, or letters of credit or guarantees issued in respect thereof, other than any Lien imposed by ERISA;

(f)     all existing leases in effect as of the Closing Date and any future leases entered into by any Property Owner in the ordinary course of its business with a tenant that is not an Affiliate of a Loan Party, in each case as the same may be amended, modified or otherwise supplemented.  With respect to any future Leases, Lender has the right to request a landlord waiver in form and substance reasonably acceptable to Lender and the Loan Parties;

(g)     Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Sections 8.4 (attachment) or 8.8 (judgments/settlements);

(h)     the filing of UCC financing statements solely as a precautionary measure in connection with operating leases and consignment arrangements;

(i)     Subject to Section 6.7, Liens in favor of other financial institutions arising in connection with a Loan Party's deposit accounts held at such institutions to secure standard fees for deposit services charged by, but not financing made available by such institutions, provided that Lender has a perfected security interest in the amounts held in such deposit accounts;

(j)     Liens on cash securing letters of credit constituting Indebtedness permitted pursuant to clause (i) of the definition of Permitted Indebtedness;

(k)     easements, rights-of-way, covenants, conditions, restrictions, encroachments, (including, but not limited to easements or encumbrances in the ordinary course of business for access, water and sewer lines, telephone and cable lines, electric lines or other utilities or for other similar purposes) and other survey defects protrusions and other similar encumbrances and minor title defects affecting real property which were not incurred in connection with the Loan and do not in any case materially and adversely interfere with the use of the related Real Property encumbered thereby for its intended purposes;

(l)     the Prepetition Liens;

(m)     Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (l) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien in the existing priority of such existing Lien, and the principal amount of the indebtedness being extended, renewed or refinanced does not increase; and

(n)     to the extent constituting a Lien, the Carve Out.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"**Petition Date**" has the meaning set forth in the recitals.

"**Pioneer Village Property**" means the real property located at 4318 S. Settler Drive, Ridgefield, Washington.

"**Prepetition DIP Lender Obligations**" has the meaning ascribed to it in the Interim Order.

"**Prepetition Lien Creditors**" has the meaning ascribed to "Prepetition Secured Parties" in the Interim Order.

"**Prepetition Liens**" has the meaning ascribed to it in the Interim Order.

"**Prepetition Loans**" means the loan in the principal sum of $500,000 advanced to the Loan Parties pursuant to the Secured Note.

"**Prepetition Obligations**" means the obligations owing to the Prepetition Secured Parties.

"**Prepetition Collateral**" has the meaning ascribed to it in the Interim Order.

"**Prepetition Secured Parties**" has the meaning ascribed to it in the Interim Order.

"**Priming DIP Liens**" has the meaning assigned to it in Section 4.1(c).

"**Real Property**" means the real property more particularly described on **Exhibit A-1** and set forth next to each Property Owner's name on Schedule 1.

"**Responsible Officer**" means the Chief Restructuring Officer.

"**Roll-Up Obligations**" means the principal sum of $500,000 advanced to the Loan Parties on or about September 13, 2023 in accordance with and pursuant to the Secured Note.

"**Second Priority DIP Liens**" has the meaning assigned in Section 4.1(b).

"**Secured Note**" has the meaning given to such term in the Interim Order.

"**Senza Kenmore Property**" means the real property located at 15550 84th Ave. SE, Kenmore, Washington.

"**Stay Order**" means an Order of the Bankruptcy Court pursuant to section 105(a) of the Bankruptcy Code staying the pending litigations against Chris Christiansen.

"**Superpriority Claim**" means a claim against any Debtor in a Case which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under

Sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code.

"**Tax**" or "**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Trademarks**" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of the Loan Parties connected with and symbolized by such trademarks.

"**Transfer**" has the meaning assigned in Section 7.1.

"**U.S. Trustee**" means the United States Trustee for the Northern District of Texas.

"**VH Collateral**" means the VH 1121 14th Real Property and the VH Senior Care Real Property.

"**VH 1121 14th Real Property**" that certain real property located at the address commonly known as 1121 14th Ave, Seattle, WA and as more particularly described on **Exhibit A-1** and held in fee title by VH 1121 14th, LLC, LLC, a Delaware limited liability company.

"**VH Senior Care Real Property**" collectively that certain real property located at the address commonly known as (i) 302 SW 146th Street, Burien, WA and (ii) 1226 160th St SW, Lynnwood, WA and in each case as more particularly described on **Exhibit A-1** and held in fee title by VH Senior Care, LLC, a Delaware limited liability company.

    **1.2**    **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender) and all calculations made hereunder shall be made in accordance with GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender). When used herein, the terms "financial statements" shall include the notes and schedules thereto.

**2.**    **LOAN AND TERMS OF PAYMENT**.

    **2.1**    **Credit Extensions**. The Loan Parties promise to pay to the order of Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to the Loan Parties hereunder.

    (a)    **Term Loan**. Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in Sections 3.1 and 3.2), Lender agrees that it will make from time-to-time Credit Extensions in an amount not to exceed its DIP Loan Commitment (each, a "**DIP Loan**"). The Initial Credit Extension shall be subject to the conditions precedent set forth in Section 3.1 and shall be substantially concurrent with the Interim Order Entry Date and the subsequent Credit Extensions (and the VH Priming Liens Option, if exercised) shall be subject to the conditions precedent set forth in Section 3.2. Amounts borrowed under this Section 2.1(a) may not be reborrowed once repaid.

    (b)    Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in Sections 3.1 and 3.2), the Loan Parties may

233739.10048 LEGAL 237636060v8

23-01243-WLH11    Doc 54-1    Filed 10/05/23    Entered 10/05/23 11:00:02    Exhibit 1, Page 44

request, and Lender shall make, Credit Extensions, each in an amount necessary for the Loan Parties to meet the expenses set forth in the Budget for each of the prior and subsequent week to such Advance Request, not to exceed in the aggregate the DIP Loan Commitment.  Notwithstanding anything contained herein to the contrary, in no event shall the Lender be obligated to make any DIP Loan in excess of the Final Cap, and prior to the Final Order Entry Date, the Interim Cap.

(c)     Whenever a Loan Party desires an Advance of a DIP Loan, the Loan Party will notify Lender by e-mail transmission or telephone no later than 2:00 p.m. Pacific time (each an "**Advance Request**"), (1) with respect to the initial Advance Request, two (2) Business Days, and (2) with respect to each Advance request thereafter (which for the avoidance of doubt, shall be the subsequent advance upon entry of the Final Order and satisfaction of the conditions precedent in Section 3.2), five (5) Business Days (or such shorter period as agreed by Lender in its discretion) prior to the date the Advance may be made. Lender is authorized to make Advances under this Agreement, based upon instructions received from a Responsible Officer or a designee of a Responsible Officer.   Lender shall be entitled to rely on any telephonic notice given by a person who Lender reasonably believes to be the Responsible Officer or a designee thereof.  Lender will wire Advances in immediately available federal funds to a deposit account identified by the Loan Parties in writing from time to time.

(d)     All Advances under this Section 2.1 and all accrued and unpaid interest thereon shall be repaid in full by Loan Parties on the Maturity Date.

**2.2     Payment of Interest on the Loans**.

(a)     Interest Rate for Advances.  Subject to Section 2.2(b), the principal amount outstanding under the DIP Loan Facility shall accrue interest at a per annum rate equal to 18%.

(b)     Default Rate.  After the occurrence and during the continuance of an Event of Default and without notice to the Loan Parties, to the extent permitted by Applicable Law, the Obligations shall bear interest at a rate per annum which is four percentage points (4%) above the rate that is otherwise applicable thereto (the "**Default Rate**").  Payment or acceptance of the increased interest rate provided in this Section 2.2(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Lender.

(c)     Payment; Interest Computation.  Interest is payable monthly on the first calendar day of each month and shall be computed on the basis of a 360-day year for the actual number of days elapsed.  In computing interest, (a) all payments received after 2:00 p.m. Pacific time on any day shall be deemed received at the opening of business on the next Business Day, and (b) the date of the making of any Loan shall be included and the date of payment shall be excluded; provided, however, that if any Loan is repaid on the same day on which it is made, such day shall be included in computing interest on such Loan.

**2.3     Fees**.  The Loan Parties shall pay to Lender:

(a)     Exit Fee.  Upon the earlier of (i) repayment in full of the Obligations at any time, and (ii) the Maturity Date, in addition to the payment of any other amounts then-owing, an exit fee in the amount of the greater of (A) $250,0000 and (B) five percent (5.0%) of the aggregate amount of the Advances, which shall be fully earned and non-refundable commitment in connection with each Advance (the "**Exit Fee**");

(b)     Facility Fee.  A fully earned, non-refundable facility fee in the amount of the greater of (A) $250,000 and (B) five percent (5.0%) of the aggregate amount of the Advances, payable upon

233739.10048 LEGAL 237636060v8

the earlier of (i) repayment in full of the Obligations at any time, and (ii) the Maturity Date (the "**Facility Fee**");

(c)     Repayment Premium.  On the Maturity Date, the Loan Parties agree to pay a premium to Lender equal to (i) 1.3 times the amount of the Credit Extensions made by Lender to the Loan Parties (without taking into consideration the amounts paid to Lender pursuant to Section 3.4(a)), *less* (ii) the aggregate amount interest actually paid to Lender (including, for the avoidance of doubt, the Exit Fee and the Facility Fee); and

(d)     Lender Expenses.

(i)     All Lender Expenses (including reasonable and documented attorneys' fees and expenses for documentation and negotiation of this Agreement, incurred through and after the Effective Date, when due (or, if no stated due date, within ten (10) days of written demand from Lender)), which Lender Expenses shall be payable in accordance with the Budget on the Maturity Date.  For the avoidance of doubt, the Loan Parties shall be responsible for all reasonable and documented fees, costs and expenses of Lender including any and all reasonable and documented expenses of Lender's counsel, professional advisors, or in house administration, each case subject to the approved Budget.

(ii)     None of Lender's attorneys' fees or disbursements shall be subject to the prior approval of the Bankruptcy Court and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court. Notwithstanding the foregoing, the Bankruptcy Court retains all jurisdiction in regard to a dispute between the Loan Parties regarding the reasonableness of the asserted Lender Expenses.

(e)     Fees Fully Earned.  Unless otherwise provided in this Agreement or in a separate writing by Lender, the Loan Parties shall not be entitled to any credit, rebate, or repayment of any Lender Expenses paid or other fees earned by Lender pursuant to this Agreement notwithstanding any termination of this Agreement or the suspension or termination of Lender's obligation to make Credit Extensions.

**2.4     Crediting Payments**.  Lender has the exclusive right to determine the order and manner in which all payments with respect to the Obligations may be applied.  The Loan Parties shall have no right to specify the order or the accounts to which Lender shall allocate or apply any payments required to be made by the Loan Parties to Lender or otherwise received by Lender under this Agreement when any such allocation or application is not specified elsewhere in this Agreement.  Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 2:00 p.m. Pacific Time shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.  Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day.

**2.5     Withholding**.

(a)     Payments received by Lender from the Loan Parties under this Agreement will be made free and clear of and without deduction for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of the Loan Parties) requires the Loan Parties to make any withholding or deduction of any Tax from any such payment, then the Loan Parties shall be entitled to make such deduction or withholding and, if such Tax is an Indemnified Tax, then the sum payable by the Loan Parties shall be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lender receives a net sum equal to the sum which it would have received had no withholding or deduction been required.

233739.10048 LEGAL 237636060v8

(b)     The Loan Parties shall pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable law, the Bankruptcy Code, and orders of the Bankruptcy Court, and the Loan Parties will, upon request, furnish Lender with proof reasonably satisfactory to Lender indicating that the Loan Parties has made such withholding payment.

(c)     Notwithstanding anything to the contrary in this Section 2.5, the Loan Parties need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings or as to which payment in full is bonded or reserved against by the Loan Parties.  The agreements and obligations of the Loan Parties contained in this Section 2.5 shall survive the termination of this Agreement.

(d)     Lender, if reasonably requested by the Loan Parties, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Loan Parties as will enable the Loan Parties to determine whether or not Lender is subject to backup withholding or information reporting requirements.

(e)     If Lender determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.5 (including by the payment of additional amounts pursuant to this Section 2.5), it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made by the Loan Parties under this Section 2.5 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Parties, upon the request of Lender, agrees to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant taxing authority) to Lender in the event Lender is required to repay such refund to such taxing authority.

**2.6     Term**.  This Agreement shall become effective on the Closing Date and, subject to Section 14.8, shall continue in full force and effect for so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions under this Agreement.  Notwithstanding the foregoing, Lender shall have the right to terminate its obligation to make Credit Extensions under this Agreement immediately and without notice upon the occurrence and during the continuance of an Event of Default.  Notwithstanding termination, Lender's Lien on the Collateral shall remain in effect for so long as any Obligations are outstanding.

**2.7     Right to Credit Bid**.  In connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by Lender, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, the Loan Parties hereby give Lender the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

**3.     CONDITIONS OF LOANS**.

**3.1     Conditions Precedent to Initial Credit Extension**.  The obligation of Lender to make the initial Credit Extension is subject to the satisfaction of the following conditions precedent:

(a)     Lender shall have received, in form and substance satisfactory to Lender, the following:

(i)      executed copies of this Agreement and the other Loan Documents, including the Guaranty and the Assignment of Vault Loan;

(ii)      evidence satisfactory to Lender that the insurance policies required by Section 6.6 hereof are in full force and effect as of the Closing Date (which for the avoidance of doubt, does not require a renewal of the existing umbrella and general liability insurance policies with respect the Development Properties as set forth in Section 3.2(e));

(iii)      true, accurate and complete copies of all documents evidencing any the Prepetition Obligations in existence as of the Closing Date;

(iv)      the initial approved Budget;

(v)      the Perfection Certificate;

(vi)      such other documents, and completion of such other matters, as Lender may reasonably deem necessary or appropriate; and

(b)      the Interim Order Entry Date shall have occurred, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Lender and shall not be subject to a stay.

**3.2      Conditions Precedent to the Subsequent Credit Extension**.  The obligation of Lender to make the subsequent Credit Extension, including any DIP Loan, is further subject to the following conditions:

(a)      the representations and warranties contained in Section 5 shall be true and correct in all material respects on and as of the date of the Loan Parties' request for a Credit Extension and on the effective date of each Credit Extension as though made at and as of each such date;

(b)      no Default or Event of Default shall be continuing or would exist after giving effect to such Credit Extension;

(c)      the Loan Parties shall have delivered to Lender an updated Budget and such Budget has been approved by Lender which approval shall not be unreasonably withheld, conditioned or delayed if no uncured Event of Default then exists;

(d)      the Lender is granted a priming lien on the Mechanics Lien or the Mechanic's Lien obligation is repaid in full (provided that if the Mechanics Lien is neither primed nor fully paid off then this condition shall be satisfied if the Loan Parties establish a reserve using the proceeds from the Credit Extension in an amount equal to the then-outstanding amount of the Mechanics Lien (the "**Reserve**") which Reserve shall be fully released to the Loan Parties upon full release of the Mechanics Lien prior to the Maturity Date (and provided that there exists no Default or Event of Default then continuing));

(e)      with respect to the Development Properties, the Loan Parties' shall have renewed their existing umbrella and general liability insurance policies in form and amount no less than the form and amount of such policies that exist on the date hereof;

(f)      no Case shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; and

233739.10048 LEGAL 237636060v8

(g)    no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Case.

**3.3    VH Collateral.**  The Loan Parties shall have the option in their sole discretion to obtain an additional Advance in an amount equal to One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) (the "**VH Priming Liens Option**"), upon five (5) Business Days written notice delivered to Lender and subject to satisfaction of the following:

(a)    The Bankruptcy Court shall have affirmed the granting of valid first priority senior priming liens on the VH Collateral (the "**Priming DIP Liens**"); and

(b)    The conditions precedent to Subsequent Credit Extensions in Section 3.2 have been satisfied.

**3.4    Senza Kenmore Collateral**.

(a)    As of the date hereof, the Loan Parties are currently in the process of negotiating a sale of the Senza Kenmore Property.  Notwithstanding anything to the contrary in this Agreement, provided that no Default or Event of Default shall be continuing, the Loan Parties may sell the Senza Kenmore Property without the Lender's prior written consent. Upon the closing of the sale of the Senza Kenmore Property, the gross proceeds from such sale less all reasonable and customary third-party costs actually paid by the Loan Parties in connection therewith  (the "**Senza Proceeds**") shall be paid to the Lender (or its designee) as a paydown of the Obligations and, upon Lender's receipt of such Senza Proceeds, the Lender shall make an additional Advance to the Loan Parties in an amount equal to the difference of (i) the Senza Proceeds minus (ii) Three Hundred Thousand Dollars ($300,000) provided that the conditions precedent to Subsequent Credit Extensions in Section 3.2 have been satisfied.

(b)    If the Senza Kenmore Property is not sold prior to the date that is one-hundred eighty (180) days following the date hereof, the Loan Parties shall cause the liens listed on **Exhibit C** affecting the Senza Kenmore Property to be fully released at the Loan Parties' sole cost and expense.

**3.5    2nd Street and Pioneer Village**.  Notwithstanding anything to the contrary in this Agreement, provided that no Default or Event of Default shall be continuing, the Loan Parties may sell the 2nd Street Property and/or the Pioneer Village Property without the Lender's prior written consent.  The proceeds of such sales shall not be required to be paid to Lender or otherwise pay down any of the Obligations.

**4.    CREATION OF SECURITY INTEREST**.

**4.1    Grant of Security Interest**.  To secure prompt repayment of any and all Obligations and prompt performance by the Loan Parties of each of its covenants and duties under the Loan Documents, the Loan Parties grant Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral (subject to Permitted Liens, and excluding the Excluded Assets as set forth herein).  Such security interest shall constitute:

(a)    a valid, perfected First Priority DIP Lien on Collateral that is not subject to valid, perfected, and non-avoidable Liens which, as of the Petition Date, was not encumbered by first priority Liens (besides by Lender) or subject to invalid, unperfected or avoidable liens ("**First Priority DIP Liens**").  For the avoidance of doubt, the First Priority DIP Liens shall encumber the DIP Prepetition Collateral, as well as, without limitation, Collateral acquired after the Petition Date; and

(b)     a valid, perfected Second Priority DIP Lien upon all of the Collateral which constitutes Prepetition Collateral, (other than the DIP Prepetition Collateral); provided that such existing first priority liens are (i) valid and perfected liens in existence as of the Petition Date or (ii) are perfected subsequent to such date as permitted by Section 546(b) of the Bankruptcy Code and (ii) to the extent such Liens are expressly permitted in writing by the Lender in its sole and absolute discretion. ("**Second Priority DIP Liens**").

The Loan Parties agree that the Obligations are entitled to Superpriority Claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expense claims, whether heretofore or hereafter incurred, of the kind specified or ordered pursuant to or in accordance with any provision of the Bankruptcy Code, including, without limitation, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code, subject only to the Carve Out. For the avoidance of doubt, the Superpriority Claim granted herein shall not extend to, nor be collectible from, any Excluded Assets.

**4.2     Delivery of Additional Documentation Required**. The Loan Parties shall from time to time execute and deliver to Lender, at the request of Lender, all Negotiable Collateral, all financing statements, deeds, deeds of trust, bills of sale, security agreements, mortgages, hypothecations, real estate transfer documentation, and other documents that Lender may reasonably request, in form satisfactory to Lender, to perfect and continue the perfection of Lender's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents.

**4.3     Authorization to File Financing Statements**. The Loan Parties hereby authorizes Lender to file financing statements, without notice to Loan Parties, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder. Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Lender's discretion.

5.     **REPRESENTATIONS AND WARRANTIES**.

Each Loan Party represents and warrants as follows:

**5.1     Due Organization and Qualification**. The Loan Parties are corporations or limited liability companies duly existing under the laws of their state of incorporation or registration and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified, except in each case (other than with respect to their states of incorporation) where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.

**5.2     Due Authorization; No Conflict**. Subject to the entry of the Interim Order and the terms hereof, the execution, delivery, and performance of the Loan Documents are within the Loan Parties' powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in the Loan Parties' Certificate of Incorporation, Article of Organization, or Bylaws, nor will they constitute an event of default under any material agreement to which the Loan Parties are a party or by which a Loan Parties is bound. The Loan Parties are not in default under any post-petition agreements to which it is a party or by which it is bound, except to the extent such default would not reasonably be expected to cause a Material Adverse Effect.

**5.3     No Prior Encumbrances**. Each Property Owner has good and marketable title to its respective Real Property owned by it, free and clear of Liens, except for Permitted Liens and subject to any liens set forth in the title commitment delivered to Lender and approved at Closing. Set forth as **Exhibit**

233739.10048 LEGAL 237636060v8

**A-1** hereto is a complete and accurate list of all Real Property owned by each Property Owner, showing, as of the date hereof, the street address, state and any other relevant jurisdiction, record owner. Set forth on **Exhibit A-2** hereto is a complete and accurate list of all written lease agreements entered into by the Property Owners with respect to the Real Property under which any Loan Party or any Subsidiary is the tenant, showing as of the date hereof the street address, state and any other relevant jurisdiction, parties thereto, sublessee (if any), expiration date and annual base rental cost thereof. Set forth on **Exhibit A-3** hereto is a complete and accurate list of all outstanding deeds of trust affecting the Real Properties and the outstanding balance of each applicable loan (collectively, the "**Existing Deeds of Trust**").

        **5.4**    **Diligence**. The Loan Parties are not aware of any fact, condition or circumstance that may materially and adversely affect the assets, liabilities, business, prospects, condition or results of operations of the Loan Parties or the Real Property that has not been previously disclosed to the Lender in writing

        **5.5**    **Name; Location of Business**. The Loan Parties will advise Lender not less than ten (10) business days in advance of any change in the business headquarters of the Loan Parties. Except as disclosed in the Perfection Certificate, the Loan Parties have not done business under any name other than that specified on the signature page hereof.

        **5.6**    **Litigation**. Except as disclosed in writing to Lender or as set forth in the Perfection Certificate, there are no actions or proceedings (other than the Cases) pending by or against Loan Party before any court or administrative agency in which an adverse decision could reasonably be expected to have a Material Adverse Effect.

        **5.7**    **[Intentionally Omitted]**.

        **5.8**    **Prepetition DIP Lender Obligations.** The Loan Parties acknowledge that as of the Petition Date, the Loan Parties are indebted to Lender on account of the Prepetition DIP Lender Obligations in the outstanding principal balance of $500,000, plus accrued and unpaid interest and fees thereunder, which amount would be reduced to $0.00 if the Bankruptcy Court approves the Roll-Up Obligations. The Loan Parties acknowledge that the Secured Note is in full force and effect, and hereby ratify and reaffirm all of their payment and performance obligations (including indemnification obligations) thereunder, and acknowledge that as of the Petition Date, and that all amounts owing thereunder are due and owing without counterclaim, defense, setoff or reduction of any kind by the Loan Parties. The parties acknowledge and agree that if the Bankruptcy Court approves the Roll-Up Obligations and the amount of the outstanding principal balance of the Prepetition DIP Lender Obligations is reduced to $0, then no Exit Fee, Facility Fee or minimum repayment premium shall be paid on such Prepetition DIP Lender Obligations and, instead, the fees shall be paid in accordance with Section 2.3 hereof. In the event that the Bankruptcy Court does not approve the Roll-Up Obligations, the Exit Fee and the Facility Fee shall each be reduced by an amount equal to $27,777.77 and the repayment premium as described in Section 2.3(c) of this Agreement shall be reduced on a dollar-for-dollar basis by amounts collected by Lender on account of the MOIC Amount (as defined in the Secured Note).

        **5.9**    **Regulatory Compliance**. Except for a prepetition deficiency under the Loan Parties' 401(k) plan, to the best of the Loan Parties' knowledge, the Loan Parties have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from the Loan Parties' failure to comply with ERISA that is reasonably likely to result in the Loan Parties' incurring any liability that could reasonably be expected to have a Material Adverse Effect. The Loan Parties are not required to be registered as an "investment company" under the Investment Company Act of 1940. The Loan Parties are not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within

the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System). To the best of the Loan Parties' knowledge, the Loan Parties have complied with all the provisions of the Federal Fair Labor Standards Act except in each case where the failure to do so could not reasonably be expected to cause a Material Adverse Effect. To the best of the Loan Parties' knowledge, the Loan Parties have not violated any statutes, laws, ordinances or rules applicable to it, the violation of which could reasonably be expected to cause a Material Adverse Effect.

**5.10    Environmental Condition**. To the best of the Loan Parties' knowledge and except as would not reasonably be expected to have a Material Adverse Effect and/or except as otherwise disclosed in any property condition reports delivered to Lender in connection with the Loan, none of the Loan Parties' properties or assets has ever been used by the Loan Parties or to the best of the Loan Parties' knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with Applicable Law. To the best of the Loan Parties' knowledge and except as disclosed in any property condition reports delivered to Lender in connection with the Loan, none of the Real Properties has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute. To the best of the Loan Parties' knowledge no lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned by the Loan Parties and the Loan Parties have not received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal, state or other governmental agency concerning any action or omission by or resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

**5.11    Taxes**. Except as otherwise disclosed to Lender at Closing, the Loan Parties have filed or caused to be filed all material tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein, except (i) for taxes for which filing is not yet due, or (ii) for taxes that are being contested in good faith by appropriate proceedings and are reserved against (to the extent required by GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender) by the Loan Parties, or (iii) to the extent taxes are pre-petition taxes, or (iv) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.12    Subsidiaries**. The Property Owners do not own any stock, partnership interest or other equity securities of any Person, except for Permitted Investments.

**5.13    Government Consents**. The Loan Parties have obtained (or will obtain, as and when required under Applicable Law) all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of the Loan Parties' business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

**5.14    Deposit and Securities Accounts**. The Loan Parties maintain deposit or securities accounts only as set forth in the Perfection Certificate.

**5.15    Full Disclosure**. No representation, warranty or other statement made by the Loan Parties in any of the Loan Documents contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements not misleading when made, it being recognized by Lender that the projections and forecasts provided by the Loan Parties in good faith and based upon assumptions that were reasonable at the time such projections were delivered and are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results. No Loan Document has been amended. To the Loan Parties

actual knowledge, the Loan Documents are each in full force and effect and are not subject to any offset, claim, counterclaim or defense in favor of the Loan Parties.

 5.16  **Use of Proceeds**. The Loan Parties shall use the proceeds of the Loans in accordance with the Budget (subject to any Permitted Budget Variance) and the Final Order exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Order):

 (a)  to pay the Fees whether or not set forth in the Budget;

 (b)  to the extent not included in Section 5.16(a), to pay certain costs, premiums, fees and expenses related to the Case (including, without limitation, with respect to the Carve Out) in accordance with the Budget; and

 (c)  to fund working capital and other needs of the Loan Parties in accordance with the Budget (subject to any Permitted Budget Variance).

Proceeds of the DIP Loan Facility or cash collateral shall not be used (a) by the Debtors, or any other party-in-interest, including a Committee, or any of their representatives, to challenge or otherwise contest or institute any proceeding of any kind or nature to determine the validity, perfection, enforceability or priority of claims or security interests in favor of Lender, (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action of any kind or nature against Lender and its agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims, or (c) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the Lender. Notwithstanding the foregoing, nothing herein shall prohibit the Loan Parties or Committee from disputing the alleged occurrence of a default or Event of Default hereunder.

 5.17  **Financial Information**. (a) On and as of the Closing Date, the Budget, copies of which have heretofore been furnished to the Lender and (b) following the Closing Date, any updated Budget delivered pursuant to <u>Section 6.14</u>, in each case, are based on good faith estimates and assumptions made at such time by the persons who prepared it.

 5.18  **Cases**. The Cases were commenced on the Petition Date in accordance with applicable law, and notice of the hearing for the approval of the Final Order has been given as identified in the certificate of service filed with the Bankruptcy Court.

 5.19  **Orders**. The Interim Order, and, after it has been entered, the Final Order is in full force and effect, and has not, in whole or in material part, been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or proceeding in any jurisdiction, and the Loan Parties is in material compliance with the Order.

 6.  **AFFIRMATIVE COVENANTS**.

 Each Loan Party shall do all of the following:

 6.1  **Good Standing**. Each Loan Party shall maintain its corporate existence and good standing in its jurisdiction of incorporation and maintain qualification in each other jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Each Loan Party

233739.10048 LEGAL 237636060v8

shall maintain in force all necessary licenses, approvals, and agreements, the loss of which could have a Material Adverse Effect.

**6.2** **Government Compliance**.  To the extent applicable, each Loan Party shall meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA. Loan Party shall comply with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a Material Adverse Effect.

**6.3** **Financial Statements, Reports, Certificates**.  The Loan Parties shall deliver the following to the Lender:

(a) commencing on October 3, 2023, and thereafter on  monthly basis, a cash flow forecast in form and detail satisfactory to Lender, covering all of the weeks through the Maturity Date;

(b) all reports filed, including monthly operating reports, filed with the Office of the United States Trustee;

(c) [Intentionally Omitted].

(d) (i) together with the reports described in clause (e) below, a report of any legal actions (other than claims asserted in the Case) for worker's compensation, unemployment or counter-claims in intellectual property infringement proceedings which are pending against any Loan Party that could if adversely determined reasonably be expected to result in a Material Adverse Effect; and (ii) promptly upon receipt of notice thereof, a report of (x) any other legal actions (other than the Case) pending against a Loan Party that could reasonably be expected to result in liability to a Loan Party of One Hundred Thousand Dollars ($100,000.00) or more, or (y) any commercial tort claim acquired by a Loan Party;

(e) commencing with the month ending October 30, 2023, within thirty (30) calendar days of the last day of each month, a report signed by Loan Party, in form acceptable to Lender in its Permitted Discretion, listing any applications or registrations that a Loan Party has made or filed in respect of any Patents, Copyrights or Trademarks and the status of any outstanding applications or registrations, as well as any material change in a Loan Party's Intellectual Property along with an updated Perfection Certificate if any of the information contained in the Perfection Certificate delivered to the Lender on the Closing Date is no longer true and correct in all respects;

(f) written notice within five (5) Business Days' of the resignation from or termination of employment of any Responsible Officer;

(g) commencing on October 3, 2023, and thereafter on a monthly basis, on or before 11:59 p.m. Pacific time on the Tuesday following the end of each one week period, a Budget Variance Report certified by a Responsible Officer, and any updates to the Budget that are approved by Lender in Lender's sole discretion; and

(h) such other financial information as Lender may request from time to time in its Permitted Discretion.

233739.10048 LEGAL 237636060v8

To the extent any of the foregoing reports or financial information are due on a day that is not a Business Day, the Loan Parties shall instead deliver such reports or financial information on the next Business Day.

**6.4 Right to Inspect**. Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during a Loan Party's usual business hours to inspect Loan Party's Books and to make copies thereof, to audit a Loan Party's Accounts and to inspect, visit, check, test, and appraise the Collateral in order to verify a Loan Party's financial condition or the amount, condition of, or any other matter relating to, the Collateral; provided that no notice is required if an Event of Default has occurred and is continuing and provided further that during the continuance of an Event of Default all cost and fees associated with Lender's inspection shall be borne by the Loan Parties.

**6.5 Taxes**. The Loan Parties shall make due and timely payment or deposit of all material Taxes required of it by law (including the Bankruptcy Code), provided that the Loan Parties need not make any payment if (i) the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender)) by Loan Parties and (ii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.6 Insurance**.

(a) The Loan Parties, at their expense, shall keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks (including, but not limited to, insurance sufficient to cover personal injuries caused by Loan Parties' products in an amount not less than the Obligations), and in such amounts, as ordinarily insured against by other owners in similar businesses conducted in the locations where Loan Parties'' business is conducted on the date hereof. Loan Parties shall also maintain insurance relating to Loan Parties' business, ownership and use of the Collateral in amounts and of a type that are customary to businesses similar to Loan Parties'.

(b) All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender (it being hereby acknowledged by Lender that the insurance policies of Loan Parties in place on the Closing Date are satisfactory). All such policies of property insurance shall contain a lender's loss payable endorsement showing Lender as an additional loss payee thereof, and all liability insurance policies shall show the Lender as an additional insured and Loan Parties shall use commercially reasonable efforts to have such policies specify that the insurer must give at least twenty (20) calendar days' notice to Lender before canceling its policy for any reason (or ten (10) calendar days for cancellation for nonpayment of premiums). Upon Lender's request (which shall occur once per year excepting for following the occurrence and during the continuance of an Event of Default), Loan Parties shall deliver to Lender certified copies of such policies of insurance and evidence of the payments of all premiums therefor. All proceeds payable under any such policy shall, at the option of Lender, be payable to Lender to be applied on account of the Obligations.

**6.7 Accounts**. Except as required under the Bankruptcy Code, rules or policies of the U.S. Trustee, and/or a Bankruptcy Court order, each Loan Party shall not establish any deposit or securities account after the Closing Date without the approval of the Lender and shall use a cash management system that is the same as or substantially similar to its prepetition cash management system. Any material changes from such prepetition cash management system must be acceptable to the Lender in its reasonable discretion.

233739.10048 LEGAL 237636060v8

6.8     **Notice of Disputes, Claims**.  The Loan Parties must promptly notify Lender of all returns, recoveries, disputes, claims, or litigation proceedings that involve more than One Hundred Thousand Dollars ($100,000.00).

6.9     **Bankruptcy Filings**.  Not less than one (1) Business Day prior to filing any motion requesting approval for debtor-in-possession financing, use of cash collateral, and approval of bidding procedures, the Loan Parties shall send copies of such motions to Lender, and all such motions shall be satisfactory to Lender in Lender's Permitted Discretion.

6.10     **Further Assurances**.  At any time and from time to time, the Loan Parties shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to effect the purposes of this Agreement.

6.11     **Debtor-in-Possession Obligations**.  Comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

6.12     **First Day Orders**.  The Loan Parties shall cause all proposed "first day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

6.13     **Additional Waivers**.  The Loan Parties further acknowledge and agree to the matters set forth on **Exhibit D**.

6.14     **Budget Compliance and Variances**.

(a)     The Loan Parties will use the proceeds of the Loan solely to make disbursements for expenditures provided for in accordance with Section 5.16 and this Section 6.14.  The Loan Parties shall not pay any expenses (other than *de minimis* amounts) or other disbursements (other than *de minimis* disbursements) other than the type of expenses and disbursements set forth in the Budget.

(b)     Beginning on the Closing Date, the Loan Parties shall not cause expenses to vary from the applicable Budget by more than ten percent (10%) in excess of the aggregate budgeted amount for cash disbursements on a trailing four (4) week basis (collectively, the "**Permitted Budget Variances**"), provided that to the extent the actual cash receipts in any such period exceed the amounts for such period in the applicable Budget, or if the cash disbursements in any such period are less than the amounts for such period in the applicable Budget, then the "Permitted Budget Variance" for such receipts or disbursements, as applicable, for the next succeeding period shall be increased by an amount equal to such difference (and shall continue to roll over into successive periods to the extent such additional budgeted capacity is unused by the Loan Parties).  Solely for purposes of calculating the Permitted Budget Variance, all Lender Expenses shall be excluded from the Budget and shall not be taken into account.  In the event that actual amounts for total cash receipts and cash disbursements from operations line items are in excess of the Budget, the parties hereto agree to negotiate in good faith to discuss any modification to the Budget and Permitted Budget Variances, it being understood and agreed that the Lender shall have no obligation to fund any amounts in excess of the Budget and Permitted Budget Variances.

(c)     If the Budget is updated, modified or supplemented by the Loan Parties, each such updated, modified or supplemented budget shall be approved in writing by, and shall be in form and substance reasonably satisfactory to, the Lender and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed to be a Budget, such approval not to be unreasonably withheld.  Each Budget delivered to Lender shall be accompanied by such supporting

23-01243-WLH11     Doc 54-1     Filed 10/05/23     Entered 10/05/23 11:00:02     Exhibit 1, Page 56

documentation as reasonably requested by the Lender. Each Budget shall be prepared in good faith based upon assumptions which the Loan Parties believes to be reasonable.

(d)     Notwithstanding anything to the contrary in the Budget, from and after the date hereof the Loan Parties shall pay all impositions and obligations imposed by the Existing Mortgage Loans when due. The calculation of Permitted Budget Variances set forth in <u>Section 6.14(b)</u> shall not apply to any payments made by the Loan Parties under the Existing Mortgage Loans.

**6.15     Filing of Motions and Applications**. Without the prior written consent of the Lender, the Loan Parties shall not apply to the Bankruptcy Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the Loan Documents or the Final Order, (b) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Final Order, or (c) permit any Indebtedness or Claim to be *pari passu* with or senior to any of the Loans, except as expressly stated in the Final Order.

**6.16     Superpriority Claim**. The Debtors shall not incur, create, assume, suffer to exist or permit any other Superpriority Claim that is *pari passu* with or senior to the claims of the Lender against the Loan Parties, except for the Carve Out, and as otherwise expressly stated in the Final Order.

7.     **NEGATIVE COVENANTS**.

Other than in accordance with a Bankruptcy Sale Order or a plan of reorganization confirmed by the Bankruptcy Court, no Loan Party shall do any of the following:

**7.1     Dispositions**. Convey, sell, lease, transfer or otherwise dispose of any Collateral (collectively, a "**Transfer**") other than: (i) transfers of (a) non-exclusive licenses and similar arrangements for the use of the property (including Intellectual Property) of a Loan Party in the ordinary course of business, (b) licenses that could not result in a legal transfer of title of the licensed property but that may be exclusive in respects other than territory, (c) licenses relating to discreet geographical areas outside of the United States (for the avoidance of doubt and for sake of clarity, however, a Loan Party may enter into limited non-competition arrangements with its licensees and similar business partners in the ordinary course of business), (d) the transfer or sale or the Loan Parties' goods and inventory in the ordinary course of business; or (ii) Transfers of Equipment as prohibited by this Agreement or the order(s) of the Bankruptcy Court, or (iii) assignment of leases or subleases of real property and (e) the sale of Senza Kemore Property, subject to and in accordance with Section 3.4 of this Agreement and the sale of the 2nd Street Property and/or Pioneer Village Property subject to and in accordance with Section 3.5 of this Agreement. To avoid any ambiguity cash may be used in the ordinary course of business, subject to the provisions of this Agreement and orders of the Bankruptcy Court.

**7.2     Change in Business; Change in Executive Office**. Engage in any business, other than the businesses currently engaged in by the Loan Parties and any business substantially similar or related thereto (or incidental thereto), or cease to conduct business in the manner conducted by the Loan Parties as of the Closing Date; or without thirty (30) calendar days prior written notification to Lender (a) relocate its chief executive office or state of incorporation or change its legal name; (b) add any new offices or business locations or deliver any portion of the Collateral valued, individually or in the aggregate, in excess of One Hundred Thousand Dollars ($100,000.00) to a bailee other than to a bailee and at a location already disclosed in the Perfection Certificate, or (c) without Lender's prior written consent, change the date on which its fiscal year ends.

**7.3     Mergers or Acquisitions**. Merge, divide or consolidate, with or into any other business organization, or acquire, all or substantially all of the capital stock or property of another Person.

233739.10048 LEGAL 237636060v8

**7.4    Indebtedness**.  Create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness. Notwithstanding the foregoing, the Loan Parties may incur debt payable from only an Excluded Asset with the prior written consent of Lender, which shall not be unreasonably withheld.

**7.5    Encumbrances**.  Create, incur, assume or suffer to exist any voluntary Lien with respect to any of its Real Property except for Permitted Liens, or assign or otherwise convey any right to receive income, including the sale of any Accounts, except for Permitted Liens, or enter into any agreement with any Person other than Lender not to grant a security interest in, or otherwise encumber, any of its property.  Notwithstanding the foregoing, the Loan Parties may create a Lien on any Excluded Asset.

**7.6    Distributions**.  Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any equity interests, except that the Loan Parties may repurchase equity interests from current or former employees,  directors, or consultants of the Loan Parties in any amount where the consideration for the repurchase is solely the cancellation of indebtedness owed by such current or former employees, directors or consultants to the Loan Parties regardless of whether an Event of Default exists.

**7.7    Investments**.  Directly or indirectly acquire or own, or make any Investment in or to any Person, other than Permitted Investments and any Loan Parties ownership interest in any subsidiary company in effect as of the Closing Date (including, but not limited to, the Property Owners); or maintain or invest any of its property with a Person other than Lender unless such Person has entered into an account control agreement with Lender in form and substance satisfactory to Lender.

**7.8    Transactions with Affiliates**.  Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of the Loan Parties except for transactions that are either approved by the Bankruptcy Court or entered into in the ordinary course of a Loan Party's business, upon fair and reasonable terms that are no less favorable to the Loan Parties than would be obtained in an arm's length transaction with a non-affiliated Person.

**7.9    Compliance**.  Become an "investment company" or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of any Credit Extension for such purpose. Fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur, or fail to comply with the Federal Fair Labor Standards Act, or violate any law or regulation, which violation could reasonably be expected to have a Material Adverse Effect.

**8.    EVENTS OF DEFAULT**.

Any one or more of the following events shall constitute an Event of Default by the Loan Parties under this Agreement:

**8.1    Payment Default**.  Except to the extent the holder thereof would be stayed from exercising remedies as a result of the Cases after accounting for the relief provided in the Final Order, if the Loan Parties fail to pay, when due, (a) any regularly scheduled payment of interest under the Loan on the applicable payment date or (B) the Obligations in full on the Maturity Date.  In the event of (a) or (b) Lender shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for non-payment has occurred;

233739.10048 LEGAL 237636060v8

### 8.2 Covenant Default.

(a) If a Loan Party violates or fails to perform any obligation under Article 6 or Article 7 and such failure continues for ten (10) Business Days after Lender delivers written notice thereof to the Loan Parties. In such event Lender shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for non-compliance of a specified obligation under Article 6 or Article 7 has occurred; and

(b) If a Loan Party fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement not specified in Section 8.2 above, or in any of the other Loan Documents, for ten (10) Business Days after Lender delivers written notice thereof to the Loan Parties, provided, however, that if the default cannot by its nature be cured within the ten (10) Business Days period or cannot after diligent attempts by the Loan Parties be cured within such ten (10) Business Days period, and such default is likely to be cured within a reasonable time, then the Loan Parties shall have an additional reasonable period (which shall not in any case exceed thirty (30) calendar days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default, but no Credit Extensions will be made. In such case and if an Event of Default is triggered under this Section 8.2(b), Lender may notify the Committee, and the U.S. Trustee.

### 8.3 [Intentionally Omitted].

### 8.4 Attachment.

Other than in connection with the Cases in each case, if any material portion of the Loan Parties' assets are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within thirty (30) calendar days without the same being contested by the Loan Parties in good faith, or if the Loan Parties are enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a Lien or material monetary encumbrance upon any material portion of the Loan Parties' assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of the Loan Parties' assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not removed, discharged, rescinded or paid within thirty (30) calendar days after receipt of written notice from Lender delivered to the Loan Parties, the Committee, and the U.S. Trustee, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by the Loan Parties (provided that no Credit Extensions will be required to be made during such cure period);

### 8.5 Assets.

Provided that such conditions are not cured within thirty (30) calendar days after receipt of written notice from Lender delivered to the Loan Parties, the Committee, and the U.S. Trustee: (a) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral, which rights under Section 506(c) of the Bankruptcy Code shall be waived (subject only to and effective upon entry of the Final Order), (b) any Person attempts to apply the doctrine of marshalling with respect to the Lender, which shall be waived (subject only to and effective upon entry of the Final Order), or (c) any Person attempts to apply the "equities of the case" exception set forth in Section 552(b) of the Bankruptcy Code, which shall be waived (subject only to and effective upon entry of the Final Order);

### 8.6 Other Agreements.

Except to the extent the counterparty thereto would be stayed from exercising remedies as a result of the Case, if there is an event of default in any material agreement to which any of the Loan Parties is a party or by which it is bound resulting in a right by a third party or parties,

233739.10048 LEGAL 237636060v8

whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Thousand Dollars ($100,000.00) or which could have a Material Adverse Effect;

8.7    **Lien Priority**.  If the Obligations shall not have the priority contemplated by this Agreement, or the entry of any order in the Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations;

8.8    **Judgments**.  If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Thousand Dollars ($100,000.00) (excluding amounts covered by insurance or third party indemnification) shall be rendered against the Loan Parties and shall remain unsatisfied, unvacated or unstayed pending appeal for a period of sixty (60) calendar days after entry of such judgement (provided that no Credit Extensions will be made prior to the satisfaction or stay of such judgment);

8.9    **Misrepresentations**.  If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth herein or in any Loan Document or certificate delivered to Lender and prepared by any Responsible Officer pursuant to this Agreement.  In such event Lender shall provide the Loan Parties, the Committee and the U.S. Trustee written notice that an Event of Default for breach of this Section 8.9 has occurred;

8.10    **Cases**.  Any Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code without the consent of the Lender;

8.11    **Trustee**.  A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Case;

8.12    **Cash Collateral**.  An order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Loan Parties;

8.13    **Relief from Stay**.  The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties constituting Collateral for the DIP Loan which have a value in excess of One Hundred Thousand Dollars ($100,000.00) in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole);

8.14    **Orders**.  The Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected first priority Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lender.  In such event Lender shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for breach of this Section 8.14 has occurred;

8.15    **Compliance with Orders**.  Any of the Loan Parties shall fail to comply with the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) in any material respect;

233739.10048 LEGAL 237636060v8

23-01243-WLH11    Doc 54-1    Filed 10/05/23    Entered 10/05/23 11:00:02    Exhibit 1, Page 60    Pg 28 of 54

**8.16** **Other Financing**. (a) Except as permitted in the Interim Order or the Final Order, the entry of any order of the Bankruptcy Court granting to any third party a Superpriority Claim or Lien *pari passu* with or senior to that granted to and/or for the benefit of the Lender hereunder without the prior written consent of Lender (which consent shall not be unreasonably withheld), or (b) the Loan Parties shall make any payment of principal or interest or otherwise on account of any Indebtedness or payables other than the Obligations under the DIP Facility, or other than in accordance with the Budget approved by Lender; or

**8.17** **Avoidance**. (a) Any suit or action is commenced against the Lender by the Loan Parties that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender, or (b) the Bankruptcy Court rules in favor of any Person in any suit or action commenced against the Lender by or on behalf of such Person (after the Bankruptcy Court has granted such Person standing to commence such suit or action).

The Court shall have jurisdiction to resolve any dispute between the Loan Parties and Debtors regarding whether an Event of Default has occurred;

## 9. LENDER'S RIGHTS AND REMEDIES.

**9.1** **Rights and Remedies**. During the continuance of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by the Loan Parties:

(a) Subject to the Orders, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the DIP Loan Facility with respect to additional Advances, whereupon any additional Advances shall be made or incurred in Lender's sole discretion so long as such Default or Event of Default is continuing. If any Event of Default has occurred and is continuing, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, increase the rate of interest applicable to the Loan to the Default Rate.

(b) Subject to the Orders, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court: (i) terminate the DIP Loan Facility with respect to further Advances; (ii) reduce the DIP Loan Commitments from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of the Loan to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower; or (iv) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise its remedies under this Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, that Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon five (5) Business Days' prior written notice to Borrower, counsel approved by the Bankruptcy Court for the Committee and the U.S. Trustee and as set forth in the Interim Order or Final Order (when applicable).

(c)     Waivers by the Loan Parties.  Except as otherwise provided for in this Agreement (including any notice required pursuant to any of the other Loan Documents) or that is not capable of being waived by Applicable Law, each Loan Party waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which a Loan Party may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

**9.2     Lender's Liability for Collateral**.  So long as Lender complies with reasonable commercial lending practices, Lender shall not in any way or manner be liable or responsible for:  (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever.  All risk of loss, damage or destruction of the Collateral shall be borne by the Loan Parties.

**9.3     Remedies Cumulative**.  Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative.  Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity, subject to the requirements of the Bankruptcy Code.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on the Loan Parties' part shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.  No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the instance and for the purpose for which it was given.

**9.4     Protective Payments**.  If any Loan Party fails to obtain the insurance called for by Section 6.6 or fails to pay any premium thereon or fails to pay any other amount which a Loan Party is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the Collateral, Lender may obtain such insurance or make such payment, and all amounts so paid by Lender are Lender Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral.  Lender will make reasonable efforts to provide the Loan Parties with notice of Lender obtaining such insurance at the time it is obtained or within a reasonable time thereafter.  No payments by Lender are deemed an agreement to make similar payments in the future or Lender's waiver of any Event of Default.

**9.5     Demand; Protest**.  Except for any notice required pursuant to the Loan Documents or that is not capable of being waived by Applicable Law, the Loan Parties waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which Borrower may in any way be liable.

**9.6     Savings Clause**.  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Advances made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of

interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Advances made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Lender an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lender and the Loan Parties to conform strictly to any applicable usury laws. Accordingly, if Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lender's option be applied to the outstanding amount of the Advances made hereunder or be refunded to the Loan Parties.

**9.7     Waiver of Consequential Damages; Etc.**   To the fullest extent permitted by Applicable Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnified Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnified Party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the fraud, bad faith, gross negligence or willful misconduct of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction, **WHICH LIMITATION OF LIABILITY SHALL APPLY REGARDLESS OF WHETHER THE LIABILITY ARISES FROM THE SOLE, CONCURRENT, CONTRIBUTORY OR COMPARATIVE NEGLIGENCE OF THE INDEMNIFIED PARTY.**

**10.     NOTICES**.

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below.  Lender or the Loan Parties may change its mailing or electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this Section 10:

|  |  |
|---|---|
| If to the Loan Parties: | [Applicable Loan Party] |
|  | Attention: Lance Miller |
|  | Paladin Management Group |
|  | 633 W. 5th Street, 26th Floor |
|  | Los Angeles, CA 90071 |
|  | Lmiller@paladinmgmt.com |

With a copy to (which does not constitute notice):

23-01243-WLH11     Doc 54-1     Filed 10/05/23     Entered 10/05/23 11:00:02     Exhibit 1, Page 63

Buchalter, P.C.
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017
Attention: Julian Gurule, Esq. and Daniel Katz, Esq.
Emails: jgurule@buchalter.com / dkatz@buchalter.com

If to Lender:            Serene Investment Management, LLC
                         2625 Alcatraz Ave., Suite 513
                         Berkeley, CA 94705
                         Attention: Adam Phillips
                         Email: adam@sereneim.com

                         With a copy to (which does not constitute notice):

                         Loeb & Loeb LLP
                         345 Park Avenue
                         New York, NY 10154
                         Attention: Vadim Rubinstein, Esq.
                         Email: vrubinstein@loeb.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

**11.     CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE**.

This Agreement was negotiated in the State of California, the Loan was made by Lender and accepted by the Loan Parties in the State of California, and the proceeds of the Loan delivered pursuant hereto were disbursed from the State of California, which state the parties irrevocably and unconditionally agree has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects, including, without limiting the generality of the foregoing, matters of construction, validity and performance, each and all of this Agreement and the other Loan Documents, and the obligations arising hereunder and thereunder shall be governed by, and construed in accordance with, the laws of the State of California applicable to contracts made and performed in such state (without regard to principles of conflicts of laws) and any applicable law of the United States of America, except that at all times the attachment, creation, perfection, and enforcement of the liens and security interests created under the deeds of trust in favor of Lender in respect of real property and/or personal property shall be governed by and construed according to the law of the state in which such real property is located, it being understood that, to the fullest extent permitted by the law of such state, the law of the State of California shall govern the construction, validity and enforceability of this Agreement, the Loan and all of the obligations arising hereunder or thereunder.

To the fullest extent permitted by law, each of the Loan Parties and Lender hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Agreement and/or the Loan.

The Loan Parties and Lender each further submit to the exclusive jurisdiction of the Bankruptcy Court; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Lender from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations located in such other jurisdiction, or to enforce a judgment or other court

233739.10048 LEGAL 237636060v8

order in favor of Lender. The Loan Parties expressly submit and consents in advance to such jurisdiction in any action or suit commenced in any such court, and the Loan Parties hereby waive any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. The Loan Parties hereby waive personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to the Loan Parties at the address set forth in, or subsequently provided by the Loan Parties in accordance with, Section 10 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of the Loan Parties' actual receipt thereof or three (3) calendar days after deposit in the U.S. mails, proper postage prepaid

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE LOAN PARTIES AND LENDER EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

This <u>Section 11</u> shall survive the termination of this Agreement.

## 12. BANKRUPTCY COURT.

For the avoidance of doubt, to the extent there is conflict between the terms of this Agreement and the terms of the Order, the Orders shall control.

## 13. MULTIPLE BORROWERS.

**13.1 Joint and Several Liability; Surety Provisions.** Each Loan Party agrees that it is jointly and severally liable for, and absolutely, irrevocably and unconditionally guarantees to Lender the prompt payment and performance of, all Obligations. Each Loan Party acknowledges and agrees that its Collateral secures and cross-collateralizes each Loan made hereunder. Each Loan Party further acknowledges and agrees to the matters set forth on **Exhibit D**.

**13.2 Marshalling.** Each Loan Party expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel Lender to marshal assets or to proceed against any Loan Party, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Loan Party. Each Loan Party waives all defenses available to a surety, guarantor or accommodation co-obligor other than full payment of all Obligations and waives, to the maximum extent permitted by law, any right to revoke any guaranty of any Obligations as long as it is a Loan Party. It is agreed among each Loan Party and Lender that the provisions of this <u>Section 12.2</u> are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Lender would decline to make DIP Loans.

**13.3 Consolidated Credit Facility.** Each Loan Party has requested that Lender make this DIP Credit Facility available to the Loan Parties on a combined basis, in order to finance the Loan Parties' business most efficiently and economically. The Loan Parties' business is a mutual and collective enterprise, and the successful operation of each Loan Party is dependent upon the successful performance of the integrated group. The Loan Parties believe that consolidation of their credit facility will enhance the borrowing power of each Loan Party and ease administration of the facility, all to their mutual advantage.

23-01243-WLH11    Doc 54-1    Filed 10/05/23    Entered 10/05/23 11:00:02    Exhibit, Page 65

**13.4     Loan Party Subordination.**  Each Loan Party hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Loan Party, howsoever arising, to the full payment of all Obligations.

**13.5     One Obligation.**  The DIP Loans and other Obligations constitute one general obligation of the Loan Parties and are secured by Lender's first priority Lien on all Collateral; <u>provided</u>, <u>however</u>, that Lender shall be deemed to be a creditor of, and the holder of a separate claim against, each Loan Party to the extent of any Obligations jointly or severally owed by such Loan Party.

## 14.     GENERAL PROVISIONS.

**14.1     Successors and Assigns**.  This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by the Loan Parties or, prior to the occurrence of an Event of Default, Lender, without the other's prior written consent, which consent may be granted or withheld in such party's sole discretion.

**14.2     Indemnification**.  The Loan Parties shall defend, indemnify and hold harmless Lender and its officers, employees, and agents (each an "**Indemnified Party**") against:  (a) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all actual losses or actual Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and the Loan Parties whether under this Agreement, the DIP Loan Facility, the Case, or otherwise (including without limitation reasonable attorneys' fees and expenses), provided, the foregoing shall specifically expressly exclude (a) any special, exemplary, punitive or consequential damages (unless the same are asserted by a third party against Lender and awarded to such third party in a legal proceeding against Lender and paid (or payable) by Lender), lost profits and diminution in value and any (b) any losses caused by an Indemnified Party's fraud, bad faith, gross negligence or willful misconduct. This <u>Section 14.2</u> shall not apply to Taxes.

**14.3     Time of Essence**.  Time is of the essence for the performance of all obligations set forth in this Agreement.

**14.4     Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**14.5     Amendments in Writing, Integration**.  Except as expressly set forth herein, all amendments to or terminations of this Agreement or the Loan Documents must be in writing signed by each of the parties hereto.   All prior agreements, understandings, representations, warranties, and negotiations between any of the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

**14.6     Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

233739.10048 LEGAL 237636060v8

**14.7    Electronic Execution of Documents**.   The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**14.8    Survival**.   All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions to the Loan Parties (excluding any contingent payment obligations which expressly survive repayment of the Loan and which, as of the date of such full repayment, have not yet ripened).   The obligations of the Loan Parties to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in <u>Section 14.2</u> shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

**14.9    Confidentiality; Disclosure**.   In handling any confidential information Lender and all employees and agents of Lender, including but not limited to accountants, shall exercise the same degree of care that it exercises with respect to its own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (i) to prospective transferees or purchasers of any interest in the loans, provided that they are similarly bound by confidentiality obligations, (ii) as required by law, regulations, rule or order, subpoena, judicial order or similar order (including in connection with the Case), (iii) as may be required in connection with the examination, audit or similar investigation of Lender and (iv) as Lender may determine in connection with the enforcement of any remedies hereunder. Confidential information hereunder shall not include information that either:  (a) is in the public domain or in the knowledge or possession of Lender when disclosed to Lender, or becomes part of the public domain after disclosure to Lender through no fault of Lender; or (b) is disclosed to Lender by a third party, provided Lender does not have actual knowledge that such third party is prohibited from disclosing such information. The Loan Parties authorize Lender to disclose its relationship with the Loan Parties, including use of the Loan Parties' logo in Lender's promotional materials.

**14.10    Patriot Act Notice**.   Lender notifies the Loan Parties that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes names and addresses and other information that will allow Lender to identify the Loan Parties in accordance with the Patriot Act.

**14.11    Correction of Loan Documents**.   Lender may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

[SIGNATURE PAGE FOLLOWS]

233739.10048 LEGAL 237636060v8

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**PROPERTY OWNERS**

**UW 17th Ave, LLC**,
a Washington limited liability company

By: _____
Name: Lance Miller
Title: Manager

**725 Broadway, LLC**,
a Washington limited liability company

By: _____
Name: Lance Miller
Title: Manager

**iCap Campbell Way, LLC**,
a Washington limited liability company

By: _____
Name: Lance Miller
Title: Manager

**VH 1121 14th, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager

233739.10048 LEGAL 237636060v8

**VH Senior Care, LLC**,
a Delaware limited liability company


By: _____
Name:   Lance Miller
Title:   Manager


**VH Willows Townhomes, LLC**,
a Delaware limited liability company


By: _____
Name:   Lance Miller
Title:   Manager


**Senza Kenmore, LLC**,
a Washington limited liability company


By: _____
Name:   Lance Miller
Title:   Manager


**VH 2nd Street Office, LLC**,
a Delaware limited liability company


By: _____
Name:   Lance Miller
Title:   Manager


**VH Pioneer Village, LLC**,
a Delaware limited liability company


By: _____
Name:   Lance Miller
Title:   Manager

233739.10048 LEGAL 237636060v8

**CONSTITUENT PARTY DEBTORS**


**iCap @ UW, LLC**,
a Washington limited liability company


By: _____
Name:  Lance Miller
Title:   Manager


**iCap Broadway, LLC**,
a Washington limited liability company


By: _____
Name:  Lance Miller
Title:   Manager


**iCap Enterprises, Inc. f/k/a Altius Development, Inc.**,
a Washington limited liability company


By: _____
Name:  Lance Miller
Title:   Manager


**iCap Equity, LLC**,
a Washington limited liability company


By: _____
Name:  Lance Miller
Title:   Manager


**iCap Funding, LLC**,
a Delaware limited liability company


By: _____
Name:  Lance Miller
Title:   Manager

**iCap Investments, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Management LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Northwest Opportunity Fund, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Pacific Income Fund 4, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Pacific Income Fund 5, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


[Signature Page 2 to Debtor-in-Possession Loan and Security Agreement]

**iCap Pacific Northwest Opportunity and Income Fund, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Pacific NW Management, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Realty, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Vault 1, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Vault Management, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Vault LLC,**
a Delaware limited liability company


By: _____
Name:  Lance Miller
Title:   Manager

**iCap Holding 5, LLC,**
a Washington limited liability company


By: _____
Name:  Lance Miller
Title:   Manager

**iCap Holding 6, LLC**
a Washington limited liability company


By: _____
Name:  Lance Miller
Title:   Manager

**iCap Pacific Development LLC**
a Delaware limited liability company


By: _____
Name:  Lance Miller
Title:   Manager

**Vault Holdings LLC,**
a Delaware limited liability company


By: _____
Name:  Lance Miller
Title:   Manager

**Vault Holding 1, LLC,**
a Delaware limited liability company


By: _____
Name:  Lance Miller
Title:   Manager

**Lender:**

**SERENE INVESTMENT MANAGEMENT, LLC**


By:_____
Name:  Adam Phillips
Title:   Principal

# EXHIBIT A-1

## REAL PROPERTY

1.      The real property commonly known as 4740 17th Ave NE Seattle, WA and owned by UW 17th Ave, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

2.      The real property commonly known as 715-775 Broadway Tacoma, WA and owned by 725 Broadway, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

3.      The real property commonly known as 1231 Campbell Way Bremerton, WA and owned by iCap Campbell Way, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

4.      The real property commonly known as 117 -121 14th Ave., Seattle, WA and owned by VH 1121 14th LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

5.      The real property commonly known as 302 SE 146th Street Burien, WA  and owned by VH Senior Care, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

6.      The real property commonly known as 1226 160th Street SW, Lynwood, WA and owned by VH Senior Care, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

7.      The real property commonly known as 4918C, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

8.      The real property commonly known as 4906A, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

9.      The real property commonly known as 4912B, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

10.     The real property commonly known as 4910B, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

11.     The real property commonly known as 2818 E. 2nd Street, Vancouver, WA 98661 and owned by VH 2^nd^ Street Office, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

12.     The real property commonly known as 4318 S. Settler Drive, Ridgefield, WA 98642  and owned by VH Pioneer Village, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

## **EXHIBIT A-2**

LEASES

(Excel file to be attached)

233739.10048 LEGAL 237636060v8

# EXHIBIT A-3
## EXISTING DEEDS OF TRUST

| PROPERTY OWNER | PROPERTY | DEED OF TRUST | OUTSTANDING PRINCIPAL BALANCE | OUTSTANDING INTEREST | OUTSTANDING DEFAULT INTEREST | OUTSTANDING FEES |
|---|---|---|---|---|---|---|
| UW 17th Ave, LLC | 4740 17th Ave NE Seattle, WA | Deed of trust to secure an indebtedness in the amount of $3,000,000.00<br><br>Dated: March 31, 2023<br><br>Beneficiary: Manmohan Dhillon and Sarbjit Dhillon, husband and wife and Sukhvir Singh Josan and Jaswinder Kaur Josan, husband and wife | $3,000,000.00 | - | - | - |
| VH 1121 14th LLC | 117 -121 14th Ave., Seattle, WA | Deed of trust, to secure an indebtedness in the amount of $3,000,000.00<br><br>Dated: January 28, 2022<br><br>Beneficiary: Lima One Capital, LLC, a Georgia limited liability company | $3,000,000.00 | - | - | - |
| VH Senior Care LLC | 302 SE 146th Street Burien, WA | Deed of trust to secure an indebtedness in the amount of $1,651,500.00<br><br>Dated: November 7, 2022<br><br>Beneficiary: Redmond Funding Group, LLC, a Delaware limited liability company | $1,651,500.00 | - | - | - |

| PROPERTY OWNER | PROPERTY | DEED OF TRUST | OUTSTANDING PRINCIPAL BALANCE | OUTSTANDING INTEREST | OUTSTANDING DEFAULT INTEREST | OUTSTANDING FEES |
|---|---|---|---|---|---|---|
| VH Senior Care | 1226 160th Street SW, Lynwood, WA | A deed of trust to secure an indebtedness in the amount of $1,651,500.00<br><br>Dated: November 7, 2022<br><br>Beneficiary: Redmond Funding Group, LLC | $1,651,500.00 | - | - | - |
| VH Willows Townhomes, LLC | 4918C, Willow St., Seattle, WA | Deed of Trust to secure indebtedness in the amount of $2,985,000.00<br><br>Dated: January 28, 2022<br><br>Beneficiary: Lima One Capital, LLC | $2,985,000.00 | - | - | - |
| VH Willows Townhomes, LLC | 4906A, Willow St., Seattle, WA | Deed of Trust to secure indebtedness in the amount of $2,985,000.00<br><br>Dated: January 28, 2022<br><br>Beneficiary: Lima One Capital, LLC | $2,985,000.00 | - | - | - |
| VH Willows Townhomes, LLC | 4912B, Willow St., Seattle, WA | Deed of Trust to secure indebtedness in the amount of $2,985,000.00<br><br>Dated: January 28, 2022<br><br>Beneficiary: Lima One Capital, LLC | $2,985,000.00 | - | - | - |
| VH Willows Townhomes, LLC | 4910B, Willow St., Seattle, WA | Deed of Trust to secure indebtedness in the amount of $2,985,000.00<br><br>Dated: January 28, 2022<br><br>Beneficiary: Lima One Capital, LLC | $2,985,000.00 | - | - | - |

| PROPERTY OWNER | PROPERTY | DEED OF TRUST | OUTSTANDING PRINCIPAL BALANCE | OUTSTANDING INTEREST | OUTSTANDING DEFAULT INTEREST | OUTSTANDING FEES |
|---|---|---|---|---|---|---|
| VH 2nd Street Office, LLC | 2818 E. 2nd Street, Vancouver, WA | Deed of trust to secure an indebtedness in the amount of $3,000,000 in favor of Socotra REIT I LLC, a Delaware limited liability company and as subsequently assigned to: (i) WE Alliance Secured Income Fund, LLC, as to an undivided 1,000/3,000 of the total beneficial and (ii) Jason A. Yelowitz, Trustee of the Jason Yelowitz 2006 Trust, Dated March 31, 2006, as to an undivided 450/3,000 of the total beneficial interest. | $3,000,000.00 | - | - | - |
| VH Pioneer Village, LLC | 4318 S. Settler Drive, Ridgefield, WA | Deed of Trust, to secure an indebtedness in the amount of $2,000,000.00<br><br>Dated: December 8, 2022<br><br>Beneficiary: Tritalent Funding Group, Inc. and Halton Co. c/o Tritalent Funding Group, Inc. | $2,000,000.00 | - | - | - |
| 725 Broadway, LLC | | Deed of trust to secure an indebtedness in the amount of $2,700,000.00 in favor of Vault Holdings, LLC | $2,700,000.00 | | | |
| iCap Campbell Way, LLC | | Deed of trust to secure an indebtedness in the amount of $895,000 in favor of iCap Pacific Income Fund 5, LLC | $895,000.00 | | | |

**<u>EXHIBIT B</u>**

**FORM OF INTERIM ORDER**

**See attached**

## EXHIBIT C

**LIST OF ORDINARY COURSE AND DISPUTED CARRIERS', WAREHOUSEMEN'S, MECHANICS', MATERIALMEN'S, REPAIRMEN'S OR OTHER LIKE LIENS**

| PROPERTY OWNER | PROPERTY | MECHANICS LIENS |
|---|---|---|
| Senza Kenmore, LLC | 15550 84th Ave. SE, Kenmore, WA | Claimant: Van Hoof Construction<br>Against: ICAP Equity<br>Amount: $109,774.52<br><br>Claimant: T.S. Dance Construction LLC<br>Against: Senza Kenmore LLC<br>Amount: $52,043.70<br><br>Claimant: Hugh G. Goldsmith & Associates, Inc., d/b/a Goldsmith Land Development Services<br>Against: Senza Kenmore LLC<br>Amount: $35,432.50 |
| 725 Broadway, LLC | 715-775 Broadway Tacoma, WA | Claimant: Oak Hills Construction LLC<br>Against: 725 Broadway<br>Amount: $385,385.00 |
| UW 17th Ave, LLC | 4740 17th Ave NE Seattle, WA | Claimant: Studio19 Architects<br>Against: iCap Equity<br>Amount: $51,572.30 (Note company record's currently reflect only $27,835 owed to Studio 19 Architects).<br><br>Claimant: Davido Consulting Group<br>Against: iCap Equity, Inc.<br>Amount: $18,060.10 |

23-01243-WLH11    Doc 54-1    Filed 10/05/23    Entered 10/05/23 11:00:02    Exhibit C, Page 82

## EXHIBIT C

**LIST OF ORDINARY COURSE AND DISPUTED CARRIERS', WAREHOUSEMEN'S, MECHANICS', MATERIALMEN'S, REPAIRMEN'S OR OTHER LIKE LIENS**

| PROPERTY OWNER | PROPERTY | MECHANICS LIENS |
|---|---|---|
| Senza Kenmore, LLC | 15550 84th Ave. SE, Kenmore, WA | Claimant: Van Hoof Construction<br>Against: ICAP Equity<br>Amount: $109,774.52<br><br>Claimant: T.S. Dance Construction LLC<br>Against: Senza Kenmore LLC<br>Amount: $52,043.70<br><br>Claimant: Hugh G. Goldsmith & Associates, Inc., d/b/a Goldsmith Land Development Services<br>Against: Senza Kenmore LLC<br>Amount: $35,432.50 |
| 725 Broadway, LLC | 715-775 Broadway Tacoma, WA | Claimant: Oak Hills Construction LLC<br>Against: 725 Broadway<br>Amount: $385,385.00 |
| UW 17th Ave, LLC | 4740 17th Ave NE Seattle, WA | Claimant: Studio19 Architects<br>Against: iCap Equity<br>Amount: $51,572.30 (Note company record's currently reflect only $27,835 owed to Studio 19 Architects).<br><br>Claimant: Davido Consulting Group<br>Against: iCap Equity, Inc.<br>Amount: $18,060.10 |

23-01243-WLH11    Doc 54-1    Filed 10/05/23    Entered 10/05/23 11:00:02    Exhibit C, Page 82

## EXHIBIT D

## SURETYSHIP PROVISIONS AND WAIVERS

1.      Condition of Other Loan Parties.  Each Loan Party represents and warrants to Lender that such Loan Party has established adequate means of obtaining from the other Loan Parties, on a continuing basis, financial and other information pertaining to the business, operations and condition (financial and otherwise) of the other Loan Parties and their assets, and each Loan Party now is and hereafter will be completely familiar with the business, operations and condition (financial and otherwise) of the other Loan Parties and their assets.  Each Loan Party hereby expressly waives and relinquishes any duty on the part of Lender to disclose to such Loan Party any matter, fact or thing related to the businesses, operations or condition (financial or otherwise) of the other Loan Parties and their assets, whether now known or hereafter known by Lender during the life of this Agreement.  With respect to any of the Obligations, Lender need not inquire into the powers of any Loan Party, or the officers or employees acting or purporting to act on its behalf, and all Obligations made or created in good faith reliance upon the professed exercise of such powers shall be secured hereby.

2.      Waiver of Rights of Subrogation.  Until no part of any commitment of Lender to lend to Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations which expressly survive the full repayment of the Loan and which, as of the date of such full repayment, have not yet ripened), notwithstanding anything to the contrary elsewhere contained herein or in any other Loan Document to which each Loan Party is a party, each Loan Party hereby waives to the extent if may lawfully do so with respect to the other Loan Parties any and all rights at law or in equity, to subrogation, to reimbursement, to exoneration, to indemnity, to contribution, to setoff or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, or to a holder or transferee against a maker and which any Loan Party may have or hereafter acquire against any other Loan Party in connection with or as a result of such Loan Party's execution, delivery and/or performance of this Agreement or any other Loan Document to which each Loan Party is a party.  Until no part of any commitment of Lender to lend to the Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations which expressly survive the full repayment of the Loan and which, as of the date of such full repayment, have not yet ripened), each Loan Party agrees that it shall not have or assert any such rights against any other Loan Party or its successors and assigns either directly or as an attempted setoff to any action commenced against any Loan Party by any other Loan Party (as a borrower or in any other capacity) or any other Person.  Each Loan Party hereby acknowledges and agrees that this waiver is intended to benefit Lender and shall not limit or otherwise affect each Loan Party's liability hereunder, under any other Loan Document to which any Loan Party is a party, or the enforceability hereof or thereof.  Until no part of any commitment of Lender to lend to the Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations which expressly survive the full repayment of the Loan and which, as of the date of such full repayment, have not yet ripened), each Loan Party expressly waives any right to enforce any remedy that Lender now has or hereafter may have against any other Person and waives the benefit of, or any right to participate in, any other security now or hereafter held by Lender.

3.      Liens on Real Property.  In the event that all or any part of the Obligations at any time are secured by any one or more deeds of trust or mortgages or other instruments creating or granting liens on any interests in real property, subject to the terms of the Agreement, each Loan Party authorizes Lender, upon the occurrence and during the continuance of any Event of Default, at its sole option, without notice or demand, but subject to any all notice required by Applicable Law in the jurisdiction where such Real Property is located and any notice which cannot be waived and without affecting any obligations of any Loan Party hereunder and under the other Loan Documents, the enforceability of this Agreement, or the

validity or enforceability of any liens of Lender on any collateral, to foreclose any or all of such deeds of trust or mortgages or other instruments by judicial or nonjudicial sale.

4.      To the extent a court of competent jurisdiction deems each of the Loan Parties guarantors of the Obligations instead of primary obligors as intended by the parties and to the fullest extent permitted by Applicable Law, each of the Loan Parties expressly waives all rights defenses that each Loan Party may have if the Obligations become secured by real property. This means, among other things, that Lender may collect from any Loan Party without first foreclosing on any real or personal property pledged by any Loan Party, and that if Lender forecloses on any real property collateral pledged by any Loan Party, the amount of the Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if that collateral is worth more than the sale price, and that Lender may collect from any Loan Party even if Lender, by foreclosing on the real property collateral, has destroyed any right any Loan Party may have to collect from any other Loan Party. This is an unconditional and irrevocable waiver of any rights and defenses each Loan Party may have if the Obligations become secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon California Code of Civil Procedure §§ 580a, 580b, 580d or 726, or comparable provisions of the laws of any other jurisdiction, and all other suretyship defenses each Loan Party otherwise might or would have under California law or other applicable law. Further, each of the Loan Parties waive all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as nonjudicial foreclosure with respect to security for the Obligations, has destroyed any Loan Party's rights of subrogation and reimbursement against any other Loan Party by the operation of California Code of Civil Procedure § 580d or otherwise. Each Loan Party expressly waives any right to receive notice of any judicial or nonjudicial foreclosure or sale of any real property or interest therein subject to any such deeds of trust or mortgages or other instruments and each Loan Party's failure to receive any such notice shall not impair or affect each Loan Party's obligations hereunder and under the other Loan Documents or the enforceability of this Agreement or any liens created or granted hereby.

5.      <u>Waiver of Discharge</u>. Without limiting the generality of the foregoing, each Loan Party hereby waives discharge by waiving all defenses based on suretyship or impairment of collateral.

6.      <u>Understandings with Respect to Waivers and Consents</u>. Each Loan Party warrants and agrees that each of the waivers and consents set forth herein is made after consultation with legal counsel and with full knowledge of its significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which any Loan Party otherwise may have against any other Loan Party, Lender or others, or against collateral, and that, under the circumstances, the waivers and consents herein given are reasonable and not contrary to public policy or law. If any of the waivers or consents herein are determined to be contrary to any applicable law or public policy, such waivers and consents shall be effective to the maximum extent permitted by law.

233739.10048 LEGAL 237636060v8

**SCHEDULE I**

**Property Owners and Related Properties**

| Property Owner | Real Property |
|---|---|
| UW 17th Ave, LLC | 4740 17th Ave NE<br>Seattle, WA |
| 725 Broadway, LLC | 715-775 Broadway<br>Tacoma, WA |
| iCap Campbell Way LLC | 1231 Campbell Way<br>Bremerton, WA |
| VH 1121 14th LLC | 117 -121 14th Ave.,<br>Seattle, WA |
| VH Senior Care LLC | 302 SE 146th Street<br>Burien, WA |
| VH Senior Care LLC | 1226 160th Street SW,<br>Lynwood, WA |
| VH Willows Townhomes, LLC | 4918C, Willow St.,<br>Seattle, WA |
| VH Willows Townhomes, LLC | 4906A, Willow St.,<br>Seattle, WA |
| VH Willows Townhomes, LLC | 4912B, Willow St.,<br>Seattle, WA |
| VH Willows Townhomes, LLC | 4910B, Willow St.,<br>Seattle, WA |
| Senza Kenmore, LLC | 15550 84th Ave. SE,<br>Kenmore, WA |
| VH 2nd Street Office LLC | 2818 E. 2nd Street,<br>Vancouver, WA |
| VH Pioneer Village LLC | 4318 S. Settler Drive,<br>Ridgefield, WA |

233739.10048 LEGAL 237636060v8

**SCHEDULE II**

**iCAP Constituent Party Debtors**

iCap @ UW, LLC
iCap Broadway, LLC
iCap Enterprises, Inc. f/k/a Altius Development, Inc.
iCap Equity, LLC
iCap Funding LLC
iCap Investments, LLC
iCap Management LLC
iCap Northwest Opportunity Fund, LLC
iCap Pacific Income 4 Fund,, LLC
iCap Pacific Income 5 Fund, LLC
iCap Pacific Northwest Opportunity and Income Fund, LLC
Icap Pacific NW Management, LLC
iCap Realty, LLC
iCap Vault I, LLC
iCap Vault Management, LLC
iCap Vault, LLC
iCap Holding, 5 LLC
iCap Holding, 6 LLC
iCap Pacific Development LLC
Vault Holding, LLC
Vault Holding 1, LLC

233739.10048 LEGAL 237636060v8