Julian I. Gurule (CA SBN: 251260)*
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone: (213) 430-6067
Email: jgurule@omm.com

*Co-Counsel to Debtors and
Debtors in Possession*

Dakota Pearce (WSBA #57011)
BUCHALTER
1420 5th Avenue, Suite 3100
Seattle, Washington 98101
Telephone: (206) 319-7052
Email: dpearce@buchalter.com

Bernard D. Bollinger, Jr. (CA SBN: 132817)*
Khaled Tarazi (AZ SBN: 032446)*
BUCHALTER
1000 Wilshire Blvd., Suite 1500
Los Angeles, California 90017
Telephone: (213) 891-0700
Email: bbollinger@buchalter.com
        ktarazi@buchalter.com

*Admitted *Pro Hac Vice*

*Counsel to Debtors and Debtors in
Possession*

HONORABLE WHITMAN L. HOLT

HEARING DATE: March 27, 2024
HEARING TIME: 10:00 A.M.
LOCATION:  Tower Bldg
           2nd Floor Courtroom
           402 East Yakima Avenue
           Yakima, WA 98901

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Chapter 11 |
| ICAP ENTERPRISES, INC., et al., | Lead Case No. 23-01243-WLH11 |
| Debtors.[1] | Jointly Administered |

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01265-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01248-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund, LLC (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); iCap Broadway, LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care LLC (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH 2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding LLC (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11); Vault Holding, LLC (23-01270-11); iCap Pacific Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); iCap Holding 6 LLC (23-01274-11);

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

hb22rq01gn

**JOINT MOTION OF THE DEBTORS AND COMMITTEE FOR ORDER: (I) AUTHORIZING THE DEBTORS TO OBTAIN SUPPLEMENTAL POSTPETITION SECURED FINANCING; (II) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; AND (III) GRANTING RELATED RELIEF**

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and the corresponding local rules (the "<u>Local Rules</u>"), the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>") and the unsecured creditors' committee appointed in these Chapter 11 Cases (as amended on November 9, 2023 [Dkt. No. 147], the "<u>Committee</u>" and together with the Debtors, the "<u>Movants</u>") submit this *Motion for Order:(I) Authorizing the Debtors to Obtain Supplemental Postpetition Secured Financing; (II) Granting Superpriority Administrative Expense Claims; and (III) Granting Related Relief* (the "<u>Motion</u>").

By the Motion, the Movants seek entry of an order, substantially in the form attached hereto as **<u>Exhibit 1</u>** (together with all annexes and exhibits thereto, the "<u>DIP Order</u>") seeking authorization for the Debtors to, among other things:

    i.      to enter into, be bound by, and perform under (a) a debtor-in-possession credit facility (the "<u>DIP Loan Facility</u>"), pursuant to the Debtor-In-Possession Loan and Security Agreement dated as of February 23, 2024,

---

Colpitts Sunset, LLC (23-01432-11); CS2 Real Estate Development LLC (23-01434-11); and iCap International Investments, LLC (23-01464-11).

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

hb22rq01gn

23-01243-WLH11   Doc 467   Filed 02/23/24   Entered 02/23/24 19:13:50   Pg 2 of 100

by and among the Debtors and iCap DIP Finance Group LLC (the "<u>DIP Lender</u>"), which agreement is attached hereto as **Exhibit 2** (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "<u>DIP Agreement</u>")[2] and (b) the documents related to the DIP Agreement (together with the DIP Agreement, the "<u>DIP Documents</u>");

ii.    obtain postpetition loans, advances, and other financial accommodations (the "<u>DIP Loans</u>") in an aggregate principal amount not to exceed $5,000,000, pursuant to the terms and conditions of the DIP Documents and the DIP Order;

iii.    grant to the DIP Lender first priority liens on all Causes of Action and all proceeds recovered by the Loan Parties pursuant to the Causes of Action, including, without limitation, any real property assets other than those addressed in Section 4.1(b) of the DIP Agreement, to secure the DIP Loan Facility and all obligations owing and outstanding thereunder and under the DIP Agreement, as applicable, and this Order, as applicable (collectively, the "<u>DIP Obligations</u>"), subject only to prior payment of the Carve-Out (as defined below), pursuant to section 364(c)(2) of the Bankruptcy Code;

iv.    grant to the DIP Lender liens on all of the Debtors' real property (the "<u>Real Property</u>") to secure the DIP Loan Facility and the DIP Obligations, subject only to the Carve-Out and the Permitted Liens, including, but not limited to, the liens existing as of the Closing Date in favor of Serene Investment Management, LLC ("<u>Serene</u>") encumbering the Real Property, pursuant to section 364(c)(3) of the Bankruptcy Code;

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the DIP Agreement.

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 3 -

v.    grant to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all amounts advanced to the Debtors under the DIP Agreement;

vi.    use the proceeds of DIP Loans, subject to the terms, restrictions, and other conditions of the DIP Agreement and the DIP Order, to (a) pay the Fees, (b) pay certain costs, premiums, fees, and expenses related to the Chapter 11 Cases, and (c) fund working capital and other needs of the Loan Parties, including, but not limited to, funding the investigation and/or pursuit of any litigation claims held by the Debtors and prepetition payments to taxing authorities previously authorized by the court, in each case, to the extent permitted under the DIP Agreement;

vii.    vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and the DIP Order; and

viii.    waive, to the extent applicable, any stay of the immediate effectiveness of the DIP Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that the DIP Order shall be immediately effective upon its entry on the Court's docket.

In support of this Motion, the Movants submit the *Declaration of Lance Miller in Support of the Supplemental Debtor in Possession Financing Motion* (the "DIP Declaration"), the *Supplemental Declaration of Lance Miller in Support of Postpetition Financing and Related Relief* (the "Miller Declaration"), and the *Declaration of Jeffrey H. Kinrich in Support of Postpetition Financing and Related Relief* (the "Kinrich Declaration" and together with the Miller Declaration the "Ponzi Declarations"), each filed concurrently herewith.[3]

---

[3] The Debtors may file additional supporting documents prior to the hearing on this Motion.

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 4 -

In support of this Motion, the Movants respectfully state the following:

## I.  **PRELIMINARY STATEMENT**

1.      The Debtors have spent the first part of these Chapter 11 Cases liquidating their real estate portfolio and investigating the cause of the Debtors' downfall. Now, they are at a critical juncture to pivot their focus and efforts to pursue claims against third parties to recover value for the Debtors' estates. Once approved, the DIP Loan Facility will provide the Debtors with the funding necessary to begin to litigate the claims arising out of the Debtors' prepetition business in accordance with the Cooperation Agreement between the Debtors and the Committee. The DIP Loan Facility will also provide the necessary working capital to enable the Debtors to formulate a plan of liquidation in consultation with the Committee and move these Chapter 11 Cases forward as quickly and efficiently as possible.

2.      From the outset of these cases, the Debtors, working collaboratively with the Committee, expended significant efforts to analyze the facts and circumstances surrounding the failure of the iCap business and potential causes of action related to such failure. The Debtors' investigation was overseen by their independent Board of Directors and spearheaded by Lance Miller, the Debtors' Chief Restructuring Officer, with substantial support from professionals at Paladin Management and counsel for the Debtors. The Debtors conducted the investigation in collaboration with the Committee and its advisors, including forensic accounting professionals at B. Riley, the Committee's financial advisor, and the Committee's lawyers. The investigation included an analysis of the Debtors' accounting platform, bank statements, financial statements, and other financial records, as well as interviews with former employees willing to speak to the Debtors. The Debtors' investigation was further supported by a forensic accounting professional, Jeffrey H. Kinrich of Analysis Group, who is a

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 5 -

hb22rq01gn

23-01243-WLH11    Doc 467    Filed 02/23/24    Entered 02/23/24 19:13:50    Pg 5 of 100

certified public accountant, with extensive experience investigating and testifying on financial and accounting issues related to distressed companies.

3. Based on all the available information, the Debtors have concluded that for years during the prepetition period, iCap operated as a Ponzi scheme. The Debtors' business enterprise bears all the hallmarks of a Ponzi scheme. Significantly,

- iCap's businesses operated with negative cash flow since inception. For example, Fund 1's real estate investments lost approximately $38 million through 2021, and Fund 2's investments lost $18.5 million through 2021.

- The source of payments to initial iCap investors was from cash infused by new iCap investors. This is reflected in the declining returns for initial investors as compared to later investors.

- iCap's business revenue was not sufficient to continue operations and, accordingly, iCap relied upon increasing fundraising and commingling cash. Fundraising became the near-exclusive source for the Debtors' capital. Between October 2018 and September 2023, fundraising activities represented more than 75% of total receipts (excluding intercompany advances), and were almost 10 times greater than revenues from real estate activities.

- The vast majority of funds received by iCap were from investors and external lenders rather than generated through business operations. Deposits to iCap entities were largely comprised of money from investors (49.4%), intercompany transfers (34.9%), and third-party loans (9.6%), more so than from business operations (6.0%).

- To attract new investors, iCap management repeatedly disseminated false and misleading financial information through quarterly newsletters and investment calls.

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 6 -

- Rather than structure its real estate investments as equity investments, iCap chose to raise capital from investors through privately placed debentures under which investors were promised interest rates ranging from 6% to 15%.

- iCap consistently encouraged investors to "roll over" their investments, rather than be paid in full at maturity. For example, when Fund 1 and Fund 2 matured in December 2016 and December 2017, respectively, iCap was unable to repay either Fund's debentures. After several maturity date extensions, iCap gave investors the option to "roll over" their debentures into the newly created Fund 3.

- Fund 3 never owned or invested in real estate projects directly. Fund 3 was marketed as a "fund of funds" that owned equity interests in Funds 1 and 2 and would benefit from the income generated from those funds.

4. Ultimately, iCap conducted minimal legitimate business operations, did not generate any profits on a standalone basis, and used new investors' money to pay returns to earlier investors.

5. The Debtors are seeking approval of up to $5,000,000 in supplemental financing to pursue claims against third parties arising out of the Ponzi scheme perpetrated by the Debtors' former management. The DIP Loan Facility is expressly conditioned on the court finding and concluding that during the prepetition period the Debtors operated as a Ponzi scheme. Such findings and conclusions are well founded based on the exhaustive investigation conducted by the Debtors and the Committee and are necessary and appropriate to quickly and efficiently pursue claims related to the Ponzi scheme.

6. The DIP Loan Facility is the best path forward for the Debtors and their estates and is critical to maximizing recoveries to creditors. For all of these reasons, and

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 7 -

hb22rq01gn

23-01243-WLH11    Doc 467    Filed 02/23/24    Entered 02/23/24 19:13:50    Pg 7 of 100

as discussed in detail below, the Movants respectfully request that the court grant the relief requested in this Motion and authorize the Debtors to enter into the DIP Agreement.

## II.   JURISDICTION AND VENUE

7.     This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(c), and 9014.

## III.   BACKGROUND

### A.     The Debtors and Commencement of the Chapter 11 Cases.

8.     The Debtors were founded in 2007 by Chris Christensen ("Christensen") to invest in real estate opportunities in the Pacific Northwest. The Debtors grew quickly, raising approximately $250 million in capital and deploying those funds toward real estate investments. By early 2023, the Debtors employed more than 35 employees in their headquarters based in Bellevue, Washington.

9.     On September 28, 2023, Christensen resigned all positions with the Debtors, and Lance Miller was appointed Chief Restructuring Officer with full and exclusive control and authority over the Company and the prosecution of these chapter 11 cases.

10.    The Debtors commenced their respective Chapter 11 Cases on September 29, 2023 (the "Petition Date").[4] Since the commencement of these Chapter 11 Cases, the Debtors continue to control their business and affairs as debtors in possession, under the control of the Chief Restructuring Officer, pursuant to sections 1107 and 1108 of

---

[4] Certain of the Debtors filed their own chapter 11 cases on September 30, November 8, and November 14, 2023. For purposes of this Motion, "Petition Date" as used herein will refer to the earliest of the Debtors' respective filing dates, and "Chapter 11 Cases" includes all of the Debtors' cases, irrespective of when they were filed.

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 8 -

hb22rq01gn

the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

11. On October 2, 2023, the court ordered joint administration of the Chapter 11 Cases, which are now being administered under the lead case of iCap Enterprises, Inc. (Case No. 23-01243-WLH11).

12. On October 20, 2023, the Office of the United States Trustee for the Eastern District of Washington appointed the Committee.

13. Additional information about the Debtors' historical business operations, capital structure, and the events leading up to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Lance Miller in Support of First Day Motions* [Dkt. No. 23].

**B.   The Serene DIP Agreement.**

14. As part of their first day motions, the Debtors sought authority to obtain debtor-in-possession financing from the Serene and enter into that certain debtor-in-possession credit facility, pursuant to an agreement dated as of October 3, 2023, by and among the Debtors and Serene (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "Serene DIP Agreement"). Under the Serene DIP Agreement, the Debtors obtained postpetition loans, advances, and other financial accommodations in an aggregate principal amount not to exceed $5,250,000, or up to $6,750,000, if certain conditions were met.

15. On October 5, 2023, the Court entered the *Interim Order (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing the Debtors to Use Cash Collateral; (Iii) Granting Superpriority Claims; (IV) Providing Adequate Protection And Administrative Expense Claims; (V) Scheduling a Final Hearing; and (V) Granting Related Relief* [Dkt. No. 68] (the "Serene Interim DIP Order").

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 9 -

hb22rq01gn

23-01243-WLH11    Doc 467    Filed 02/23/24    Entered 02/23/24 19:13:50    Pg 9 of 100

16.     On November 13, 2023, the Court entered the *Final Order (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing the Debtors to Use Cash Collateral; (Iii) Granting Superpriority Claims; (IV) Providing Adequate Protection And Administrative Expense Claims; and (IV) Granting Related Relief* [Dkt. No. 154] (the "<u>Serene Final DIP Order</u>" and together with the Serene Interim DIP Order, the "<u>Serene DIP Orders</u>").

17.     Among other things, the Serene DIP Orders granted Serene first priority security interests and liens in and upon the Real Property[5] which, as of the Petition Date, was not encumbered by (besides by Serene) or subject to invalid, unperfected, or avoidable liens. *See* Serene Final DIP Order, ¶ 2.1.1. Serene also has second priority security interests and liens in and upon all of the Real Property that constitutes Prepetition Collateral (as defined in the Serene DIP Orders), other than the Campbell Way Real Property and Broadway Real Property (as defined in the Serene DIP Orders) and valid liens in existence as of the Petition Date that are (i) perfected subsequent to such date as permitted by section 546(b) of the Bankruptcy Code and (ii) to the extent such liens are expressly permitted in writing by Serene in its sole and absolute discretion. *Id.*

18.     Serene has consented to the Debtors filing this Motion seeking authority to enter into the DIP Loan Facility.

**C.     <u>Statement Pursuant to Bankruptcy Rule 4001.</u>**

19.     Pursuant to Bankruptcy Rules 4001(b), (c), and (d), the following is a statement and summary of the proposed material terms of the DIP Documents and the DIP Order:[6]

---

[5] The Real Estate Collateral is described on Exhibit A-1 to the Serene DIP Agreement.

[6] This statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Order, the provisions of the DIP Documents or the DIP Order, as applicable, will control. Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms in the DIP Order or the DIP Agreement.

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

| SUMMARY OF MATERIAL TERMS | |
|---|---|
| **Parties to the DIP Facility**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Borrowers**: All Debtor entities<br><br>**DIP Lender**: iCap DIP Finance Group LLC |
| **Purpose**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Debtors have limited cash resources to fund litigation efforts and pursue recoveries from third parties to maximize the ultimate distribution to investor creditors without the financing requested under this Motion. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Lender as set forth in the DIP Order and the DIP Agreement is vital to the Debtors' ability to maximize the value of the assets of their bankruptcy estates. Accordingly, the Debtors have an immediate need to obtain the DIP Loan Facility to, among other things, preserve and maximize the value of the assets of their estates.<br><br>*See* DIP Order ¶ E.(ii) |
| **Borrowing Limits**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Debtors are authorized to enter into, be bound by, and perform under the DIP Documents and to borrow in an aggregate principal amount not to exceed $5,000,000, provided that disbursements of such amount are in accordance with the DIP Agreement and the DIP Order.<br><br>*See* DIP Order ¶ 1.2<br><br>"**DIP Loan Commitment**" means an aggregate amount not to exceed Five Million Dollars ($5,000,000.00).<br><br>Credit Agreement, ¶ 1.1 (definition of DIP Loan Commitment) |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The principal amount advanced and outstanding under the DIP Loan Facility shall accrue interest at a per annum rate equal to 18%.<br><br>*See* DIP Agreement, § 2.2(a)<br><br>After the occurrence and during the continuance of an Event of Default, to the extent permitted by Applicable Law, the principal balance advanced and outstanding shall bear interest at a rate per annum that is four percentage points (4%) above the Interest Rate that is otherwise applicable thereto.<br><br>*See* DIP Agreement, § 2.2(b) |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The earlier of (i) the date that is twelve (12) months after the Final Order Entry Date, unless extended (or deemed extended) in accordance with Section 2.1(e) of the DIP Agreement, in which case the Maturity Date shall be the Extended Maturity Date or (ii) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loan in accordance with the terms of the DIP Agreement. |

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

| | |
|---|---|
| | *See* DIP Agreement, § 1.1 (definition of Maturity Date) |
| **Conditions Precedent to Closing and Lending**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The effectiveness of the DIP Agreement and the occurrence of the Closing Date are subject to the satisfaction, or waiver by the DIP Lender, of conditions precedent customary for financings of this type.<br><br>*See* DIP Agreement, §§ 3.1 and 3.2 |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Agreement contains customary events of default for financings of this type and other events of default agreed to by the Debtors and the DIP Lender.<br><br>*See* DIP Agreement, § 8 |
| **Carve-Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The "Carve-Out" is an amount equal to the sum of (i) all fees required to be paid to the clerk of this court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (which is included in the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs and expenses (the "<u>Professional Fees</u>") incurred by persons or firms ("<u>Professional Persons</u>") retained by the Debtors or the Committee whose retention is approved by this court pursuant to sections 327, 328 or 363 and 1103 of the Bankruptcy Code (all Professional Persons shall be paid *pro rata* from the Carve-Out), subject in all respects to the terms of and amendments set forth in the DIP Order and any other interim or other compensation orders entered by this court that are incurred at any time before delivery to the Debtors of a Carve-Out Trigger Notice (as defined below), whether allowed by this court prior to the delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the DIP Order; *provided* that after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "<u>Carve-Out Trigger Notice</u>") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for the Committee, if any, in an aggregate amount not to exceed $200,000; *provided further*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), or (iii) above, on any grounds. The Carve-Out may be funded to an administrative reserve account (the "<u>Carve-Out Account</u>"), which account shall be used to pay Professional Fees and any unpaid fees to the United States Trustee. As cash flow permits, and assuming no issuance of a Carve-Out Trigger Notice, the Debtors may pay the amounts set forth for Professional Fees into the Carve-Out Account. Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available |

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 12 -

hb22rq01gn

23-01243-WLH11   Doc 467   Filed 02/23/24   Entered 02/23/24 19:13:50   Pg 12 of 100

| | |
|---|---|
| | for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lender or any of its officers, directors and professionals; (b) attempts to modify any of the rights granted to the DIP Lender; (c) attempts to prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization upon any DIP Collateral in accordance with the DIP Agreement or the DIP Order (as applicable); *provided* that nothing in this section shall restrict the rights of parties in interest during the Remedies Notice Period (as defined below); (d) paying any amount on account of any claims arising before the commencement of the Chapter 11 Cases unless such payments are approved by an order of the court; or (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end or similar fees. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims securing the DIP Loans, the Superpriority Claim, and any and all other liens or claims existing pursuant to the DIP Loan Facility.<br><br>*See* DIP Order, ¶ 2.2 |
| **Priority of Claims and Liens; Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i)* | To secure the prompt payment and performance of any and all obligations of the Debtors to the DIP Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the DIP Lender shall have valid and perfected:<br><br>(i)     Pursuant to Section 364(c)(2) of the Bankruptcy Code, first priority security interests and liens in and upon all Causes of Action and all proceeds recovered by the Loan Parties pursuant to the Causes of Action, including, without limitation, any real property assets other than those addressed in Section 4.1(b) of the DIP Agreement, to secure the DIP Loan Facility and all DIP Obligations, subject only to prior payment of the Carve-Out.<br><br>(ii)    Pursuant to Section 364(c)(3) of the Bankruptcy Code, security interests and liens in and upon all of the Real Property, subject only to the Carve-Out and the Permitted Liens, including, but not limited to, the liens existing as of the Closing Date in favor of Serene encumbering the Real Property.<br><br>*See* DIP Order, ¶ 2.1.1<br><br>The term "DIP Collateral" shall have the meaning ascribed to the term "Collateral" in the DIP Agreement, which term includes the Real Property and Causes of Action and proceeds thereof. |

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 13 -

hb22rq01gn

23-01243-WLH11     Doc 467     Filed 02/23/24     Entered 02/23/24 19:13:50     Pg 13 of 100

| | |
|---|---|
| | *See* DIP Order, ¶ 2.1.2 |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv)* | None. |
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | None |
| **Waiver or Modification of Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | Upon the occurrence and continuation of an Event of Default, and upon the giving of five (5) business days' notice to the Debtors, the U.S. Trustee and the Committee, the DIP Lender may exercise all other rights and remedies provided for in the DIP Order or the applicable DIP Loan Documents and applicable law, free of the automatic stay of section 362 of the Bankruptcy Code. During the Remedies Notice Period (as defined in the DIP Order), any party in interest shall be entitled to seek an emergency hearing with the court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.<br><br>*See* DIP Order, ¶ 4.2. |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The DIP Agreement provides for customary indemnification by each of the Debtors of the DIP Lender and its officers, employees, and agents.<br><br>*See* DIP Agreement § 14.2. |
| **Section 506(c) Waiver / Section 552(b) Waiver**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x)* | The DIP Liens and the Superpriority Claim (a) shall not be subject to sections 510, 542, 549, 550, or 551 of the Bankruptcy Code, the "equities of the case" exception of section 552 of the Bankruptcy Code, or section 506(c) of the Bankruptcy Code, (b) shall be senior in priority and right of payment to (y) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise and (z) any intercompany or affiliate liens or claims of the Debtors, and (c) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Chapter 11 Cases, whether upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or appointed in these Chapter 11 Cases prior to conversion, or in any other proceedings related to any of the foregoing (each, a "<u>Successor Case</u>"), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case. |

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 14 -

hb22rq01gn

23-01243-WLH11   Doc 467   Filed 02/23/24   Entered 02/23/24 19:13:50   Pg 14 of 100

| | |
|---|---|
| | *See* DIP Order ¶ 2.1.4 |
| **Marshalling Waiver** | The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral. |
| | *See* DIP Order ¶ 6.2 |
| **Liens on Avoidance Actions** *Fed. R. Bankr. P. 4001(c)(1)(B)(xi)* | The DIP Lender shall have and was granted first priority security interests and liens in and upon all Causes of Action, which term includes all avoidance actions and proceeds thereof. |
| | *See* DIP Order ¶¶ 2.1.1(i), 2.1.2 |
| | "**Causes of Action**" means claims or causes of action held or controlled by the Loan Parties, including without limitation sections 544, 547, 548, and 550 of the Bankruptcy Code. |
| | *See* DIP Agreement, § 1.1 (definition of Causes of Action) |
| **Fees** *Fed. R. Bankr. P. 4001(c)(1)* | <u>Facility Fee</u>. A facility fee in an amount equal to ten percent (10%) of the Initial Funding Amount. The Facility Fee shall be paid as and when proceeds from Causes of Action exceed the Litigation Proceed Threshold in the aggregate. Any portion of the Facility Fee that then still remains unpaid after the Litigation Proceed Threshold has been exceeded, shall be repaid in full upon the earlier of (i) repayment in full of the Obligations at any time and (ii) the Maturity Date. |
| | <u>Repayment Premium</u>. On the Original Maturity Date, the Loan Parties agree to pay a premium to Lender equal to 0.3 times the amount of the Credit Extensions actually made by the DIP Lender to the Loan Parties during the term of the DIP Agreement, minus the aggregate amount of interest paid to the DIP Lender and/or owed based on the Interest Rate applied to the total amount of Credit Extensions actually made by the DIP Lender to the Loan Parties during the term of the DIP Agreement; *provided, however*, that interest attributable to the Default Rate during an Event of Default shall not be included in the foregoing calculation. If the Option to Extend is exercised (or deemed exercised), on the Extended Maturity Date, the Loan Parties will pay an additional amount equal to 0.3 times the amount of the Credit Extensions actually made by the DIP Lender to the Loan Parties during the term of the DIP Agreement, minus the aggregate amount of interest paid to the DIP Lender and/or owed based on the Interest Rate applied the total amount of Credit Extensions actually made by the DIP Lender to the Loan Parties during the term of the DIP Agreement; *provided, however*, that interest attributable to the Default Rate during an Event of Default shall not be included in the foregoing calculation. For the avoidance of doubt, the Repayment Premium and Extension Premium are fees payable to the DIP Lender separate from and in addition to the Facility Fee, Lender |

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 15 -

hb22rq01gn

| | Expenses, interest (including interest attributable to the Default Rate and interest attributable to <u>Section 2.8(b) of the DIP Agreement</u>) and any other amounts or obligations of the Loan Parties under the DIP Agreement. |
| | <u>Lender Expenses</u>. All Lender Expenses (including reasonable and documented attorneys' fees and expenses for documentation and negotiation of the DIP Agreement, incurred through and after the Effective Date, when due (or, if no stated due date, within ten (10) days of written demand from the DIP Lender, which Lender Expenses must be fully paid upon the Maturity Date)). Lender Expenses are subject to a professionals fee expense cap of $150,000.00 in the aggregate (the "<u>Professional Fees Cap</u>"). For the avoidance of doubt, the Loan Parties shall be responsible for all Lender Expenses, including, without limitation, any and all reasonable and documented expenses of the DIP Lender's counsel, professional advisors, or in house administration, but not to exceed the Professional Fees Cap; *provided, however*, that if there is an Event of Default at any time, the Professional Fee Cap shall not apply with respect to Lender Expenses incurred during or relating to such Event of Default. |
| | <u>Transaction Fee</u>. Separate from and in addition to the Lender Expenses, the Loan Parties shall pay a transaction fee in the amount of Twenty-Five Thousand Dollars ($25,000.00) for fees and costs relating to the due diligence, documentation, and other services performed by the DIP Lender's counsel with respect to the DIP Lender's agreement to provide the DIP Loan Facility. |
| | *See* DIP Agreement, § 2.3 |

**D.**    **The Debtor's Need for Litigation DIP Financing and Efforts to Secure Financing.**

20.    The Debtors have limited cash resources to fund litigation efforts and pursue recoveries from third parties to maximize the ultimate distribution to investor creditors without the DIP Loan Facility. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed DIP Loan Facility is vital to the Debtors' ability to pursue claims arising out of the Ponzi scheme perpetrated by the Debtors' former management and other third parties. Accordingly, the Debtors have a

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

need to obtain the postpetition financing to, among other things, preserve and maximize the value of the assets of their estates.

21.     The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or solely based on the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable solely under section 364(c)(2) or 364(c)(3) of the Bankruptcy Code. The Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Lender pursuant to the DIP Agreement.

22.     The marketing process for this facility was narrowly tailored based on the Debtors' needs. The Debtors compiled a short list of appropriate lenders to solicit, derived from existing networks of Paladin, the Debtors' counsel, and the Committee's professionals. The Debtors made targeted phone calls to those parties in order to describe the opportunity and elicit interest. The parties who were interested in exploring further signed a non-disclosure agreement ("NDA") and received access to diligence information. As part of the diligence process, the Debtors' professionals were made available for calls with interested parties. In total, the Debtors contacted six potential lenders, including Serene, the Debtors' existing DIP lender, and a firm that provides more traditional litigation financing. Of those parties, three executed NDAs and received access to diligence, and only one party – the proposed DIP Lender here – provided an indication of interest towards a DIP facility.

## IV.     LEGAL ARGUMENT.

### A.     The Debtors Should Be Authorized to Access the DIP Loan Facility.

23.     Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition secured financing, subject to approval of the Court. Section 364(c) requires

JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION
FINANCING

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 17 -

hb22rq01gn

23-01243-WLH11     Doc 467     Filed 02/23/24     Entered 02/23/24 19:13:50     Pg 17 of 100

a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

24. In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors including whether:

    a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;

    b.    the credit transactions are necessary to preserve assets of the estate;

    c.    the terms of the credit agreement are fair, reasonable, and adequate;

    d.    the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

    e.    the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

25. For the reasons discussed herein, including the terms of the DIP Loan Facility, as well as the unavailability of actionable alternative sources of financing, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim basis under section 364(c) of the Bankruptcy Code.

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 18 -

hb22rq01gn

23-01243-WLH11    Doc 467    Filed 02/23/24    Entered 02/23/24 19:13:50    Pg 18 of 100

**B.** **The Debtors Cannot Obtain Postpetition Financing on More Favorable Terms.**

26.     In demonstrating that credit is not available without the protections afforded by section 364(c) of the Bankruptcy Code, a debtor need only make a good faith effort. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); *see also* 42  *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (holding "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984) (holding the debtor satisfied its burden to show an inability to obtain credit on other terms through its time and effort spent trying to obtain credit on alternative terms and conditions).

27.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

28.     Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain alternative sources of litigation financing other than the DIP Lender, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 19 -

hb22rq01gn

23-01243-WLH11     Doc 467     Filed 02/23/24     Entered 02/23/24 19:13:50     Pg 19 of 100

29.     As described above, the Debtors, in consultation with their advisors, reached out to potential third-party financing options, all of which were unwilling or unable to provide postpetition financing on any reasonable basis. In light of the unique nature of the requested funding and the facts of this case, one can understand the limited interest in the financial sector to provide this financing. Thus, the Debtors, in consultation with their advisors, engaged in arm's-length negotiations with the DIP Lender to obtain postpetition financing on the best possible terms.

**C.     The DIP Loan Facility is Necessary to Maximize the Value of the Debtors' Estates.**

30.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize the value of their estates. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The DIP Loan Facility, if approved, will provide working capital critical to funding the Debtors' litigation efforts, which will provide a path for the Debtors to maximize recovery for the benefit of their creditors. As described above, the Debtors have limited cash resources to fund litigation efforts and pursue recoveries from third parties that would maximize the distributions to investor creditors without the financing requested under the Motion. Accordingly, the Debtors have an immediate need to obtain the postpetition financing to, among other things, litigate the claims arising out of the Ponzi scheme and maximize the value of the assets of their estates.

**D.     The Terms of the DIP Facility Are Fair, Reasonable, and Adequate under the Circumstances.**

31.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the proposed lender. *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (stating that approval of DIP financing requires terms that are "fair, reasonable and adequate, given the circumstances of the debtor-borrower and the

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 20 -

hb22rq01gn

23-01243-WLH11     Doc 467     Filed 02/23/24     Entered 02/23/24 19:13:50     Pg 20 of 100

proposed lender"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions.

32.     As described above without access to the proceeds of the DIP Loan Facility, the Debtors will lack sufficient liquidity to pursue litigation to maximize the value of the Debtors' estates. Ultimately, the Debtors engaged with the DIP Lender and successfully negotiated the DIP Loan Facility. The Debtors believe that the DIP Loan Facility provides, among other things, (a) necessary liquidity for the Debtors to pursue the value-maximizing process for the benefit of all parties in interest and (b) economic terms that (i) were the result of arm's-length negotiations with the DIP Lender, (ii) are an integral component of the overall terms of the DIP Loan Facility, and (iii) were required by the DIP Lender as consideration for the DIP Loan Facility.

33.     Given the Debtors' need to obtain postpetition financing for the benefit of all parties in interest, the terms of the DIP Loan Facility are fair, appropriate, reasonable, and in the best interests of the Debtors, their estates, and their creditors. As described in the DIP Declaration, the terms of the DIP Loan Facility were negotiated over a period of several weeks in good faith and at arm's-length as required by section 364(e) of the Bankruptcy Code, with all parties represented by experienced advisors.

**E.      Entry into the DIP Documents Reflects the Debtors' Reasonable Business Judgment.**

34.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 21 -

hb22rq01gn

23-01243-WLH11    Doc 467    Filed 02/23/24    Entered 02/23/24 19:13:50    Pg 21 of 100

the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Group of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to the Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

35.     Bankruptcy courts typically defer to the debtors' business judgment on the decision to borrow money unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974. In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

36.     For the reasons set forth above, the Debtors submit that the entry into the DIP Loan Facility is a reasonable exercise of their business judgment. The DIP Loan Facility will provide the Debtors with sufficient liquidity necessary to maintain their business operations and pursue value-maximizing litigation, and the terms of the DIP Loan Facility, which are the result of good faith, arm's length negotiations, are the best available to the Debtors.

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 22 -

hb22rq01gn

23-01243-WLH11     Doc 467     Filed 02/23/24     Entered 02/23/24 19:13:50     Pg 22 of 100

**F. The Debtors Should Be Authorized to Pay the Fees and Payments Required by the DIP Lender In Connection with the DIP Loan Facility.**

37.     The Debtors have agreed, subject to Court approval, to pay certain fees and other payments to the DIP Lender, including a fee of $25,000 payable to the DIP Lender's counsel as consideration for the DIP Lender's due diligence and work to close the DIP Loan Facility (the "DIP Fees"). The Debtors understand that the DIP Fees are an integral component of the overall terms of the DIP Loan Facility and were required by the DIP Lenders as consideration for the extension of postpetition financing after arm's length and good faith negotiations. Moreover, the DIP Fees are, taken as a whole with the economics of the DIP Loan Facility, reasonable and generally consistent with debtor in possession financings in other similar cases. Accordingly, the Court should authorize the Debtors to pay the DIP Fees.

**G. DIP Lenders Should Be Deemed Good-Faith Lenders.**

38.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

39.     As explained herein, and in the DIP Declaration, the DIP Documents are the result of: (a) the Debtors' reasonable judgment that the DIP Lender provided the

best (and only possible) postpetition financing option available under the circumstances; and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Lender. The Debtors submit that the terms and conditions of the DIP Documents are reasonable under the circumstances, and the proceeds of the DIP Loan Facility will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**H.      Modification of the Automatic Stay.**

40.      The DIP Order provides that the automatic stay under section 362 of the Bankruptcy Code is modified to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default under the DIP Documents, all rights and remedies provided in the DIP Documents without further order of or application to the Court. However, the DIP Lender must provide the Debtors and various other parties with five business days' notice before exercising such enforcement rights or remedies in respect of their collateral. During such period, the Debtors and other parties in interest may seek an emergency hearing to contest whether an Event of Default has occurred and is continuing.

41.      Stay modification provisions of this sort are common features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Movants request that the Court modify the automatic stay solely to the extent contemplated by the DIP Documents and the DIP Order.

**I.      Bankruptcy Rule 6004 Should Be Waived.**

42.      With respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Movants seek a waiver of

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 24 -

hb22rq01gn

23-01243-WLH11      Doc 467      Filed 02/23/24      Entered 02/23/24 19:13:50      Pg 24 of 100

the notice requirements under Bankruptcy Rule 6004(a), to the extent not satisfied, and of the fourteen-day stay under Bankruptcy Rule 6004(h). As described above, the relief that the Movants seek in this Motion is immediately necessary for the Debtors to be able to administer the Chapter 11 Cases and maximize the value of their estates. The Movants thus submit that the requested waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate, as the exigent nature of the relief sought herein justifies immediate unstayed relief.

## V. <u>NOTICE</u>

43.     Notice of this Motion is being given to the Limited Mailing List as required in the court's Order *Granting Debtors' Ex Parte Motion for Entry of Order: (I) Limiting Scope of Notice; (II) Authorizing Service to Investors by Email; and (III) Granting Related Relief* [Dkt. No. 63] for use in the jointly administered Chapter 11 Cases [Dkt. No. 164]. The Movants respectfully submit that, in light of the nature of the requested relief, no further notice is necessary or required.

## VI. <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, and such additional reasons as may be advanced at or prior to the hearing regarding this Motion, the Movants respectfully request that the court enter the proposed DIP Order granting the relief requested herein and such other and further relief as the court may deem just and proper under the circumstances.

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

hb22rq01gn

DATED this 23rd day of February 2024.

BUCHALTER
A Professional Corporation

By_____/s/ Dakota Pearce_____
Dakota Pearce (WSBA 57011)

BERNARD D. BOLLINGER, JR. (Admitted *Pro Hac Vice*)
KHALED TARAZI (Admitted *Pro Hac Vice*)
BUCHALTER, a Professional Corporation
*Counsel to Debtors and Debtors in Possession*

And

JULIAN I. GURULE (Admitted *Pro Hac Vice*)
O'MELVENY & MYERS LLP

*Co-Counsel to Debtors and Debtors in Possession*

By_____/s/ Armand J. Kornfeld_____
Armand J. Kornfeld (WSBA 17214)

AIMEE S. WILLIG (WSBA 22859)
JASON WAX (WSBA 41944)
BUSH KORNFELD LLP
*Attorney for the Official Committee of Unsecured Creditors*

And

By_____/s/ John T. Bender_____
John T. Bender (WSBA 49658)

CORR CRONIN LLP

*Special Counsel for the Official Committee of Unsecured Creditors*

**JOINT MOTION FOR ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 26 -

# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF WASHINGTON**

In re:

ICAP ENTERPRISES, INC., *et al.,*

Debtors.[1]

Chapter 11

Lead Case No. 23-01243-WLH11
Jointly Administered

**ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN SUPPLEMENTAL POSTPETITION SECURED FINANCING; (II) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; AND (III) GRANTING RELATED RELIEF**

---

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01256-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01253-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); iCap Broadway, LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH 2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding LLC (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11); Vault Holding, LLC (23-01270-11); iCap Pacific Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); and iCap Holding 6 LLC (23-01274-11).

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL DEBTOR-
IN-POSSESSION FINANCING

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (the "<u>Debtors</u>"), in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>") and the unsecured creditors' committee appointed in these Chapter 11 Cases (as amended on November 9, 2023 [Dkt. No. 147], the "<u>Committee</u>" and together with the Debtors, the "<u>Movants</u>"), pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and the corresponding local rules of the United States Bankruptcy Court for the Eastern District of Washington (the "<u>Local Rules</u>"), seeking authorization for the Debtors to, among other things:

    i.    obtain post-petition loans, advances, and other financial accommodations (the "<u>DIP Loans</u>") in an aggregate principal amount not to exceed $5,000,000 pursuant to the terms and conditions of the DIP Documents (as defined below) and this order (the "<u>Order</u>");

    ii.    enter into, be bound by, and perform under (a) a debtor-in-possession credit facility (the "<u>DIP Loan Facility</u>"), pursuant to the Debtor-In-Possession Loan and Security Agreement dated as of February 23, 2024, by and among the Debtors and iCap DIP Finance Group LLC (the "<u>DIP Lender</u>"), which agreement is attached hereto as **<u>Exhibit 1</u>** (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "<u>DIP Agreement</u>") and (b) the documents related to the DIP Agreement (together with the DIP Agreement, the "<u>DIP Documents</u>")*;*

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

2

iii. grant to the DIP Lender first priority liens on all Causes of Action (as defined in the DIP Agreement) and all proceeds recovered by the Loan Parties pursuant to the Causes of Action including, without limitation, any real property assets other than those addressed in Section 4.1(b) of the DIP Agreement, to secure the DIP Loan Facility and all obligations owing and outstanding thereunder and under the DIP Agreement, as applicable, and this Order, as applicable (collectively, the "DIP Obligations"), subject only to prior payment of the Carve-Out (as defined below), pursuant to section 364(c)(2) of the Bankruptcy Code;

iv. grant to the DIP Lender liens on all of the Debtors' real property (the "Real Property") to secure the DIP Loan Facility and the DIP Obligations, subject only to the Carve-Out and the Permitted Liens (as defined in the DIP Agreement), including, but not limited to, the liens existing as of the Closing Date (as defined in the DIP Agreement) in favor of Serene Investment Management, LLC ("Serene") encumbering the Real Property, pursuant to section 364(c)(3) of the Bankruptcy Code;

v. grant to the DIP Lender an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all amounts advanced to the Debtors under the DIP Agreement;

vi. use the proceeds of DIP Loans, subject to the terms, restrictions, and other conditions of the DIP Agreement and this Order, to (a) pay the Fees (as defined in the DIP Agreement), (b) pay certain costs, premiums, fees, and expenses related to the Chapter 11 Cases, and (c) fund working capital and other needs of the Loan Parties (as defined

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

3

in the DIP Agreement), including, but not limited to, funding the investigation and/or pursuit of any litigation claims held by the Debtors and prepetition payments to taxing authorities previously authorized by the court, in each case, to the extent permitted under the DIP Agreement;

vii.   vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and this Order; and

viii.  waive, to the extent applicable, any stay of the immediate effectiveness of this Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Order is immediately effective upon its entry on the court's docket.

The hearing on the Motion having been held by this court on March 27, 2024 (the "Hearing"); and

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Hearing was served by the Debtors on the Limited Mailing List approved by this court [Dkt. Nos. 63 and 164]; and

This court having reviewed the Motion and any responses and objections thereto, the *Declaration of Lance Miller in Support of the Supplemental Debtor in Possession Financing Motion*, the *Supplemental Declaration of Lance Miller in Support of Postpetition Financing and Related Relief* (the "Miller Declaration"), and the *Declaration of Jeffrey H. Kinrich in Support of Postpetition Financing and Related Relief* (the "Kinrich Declaration" and together with the Miller Declaration the "Ponzi Declarations"), the other filings made by the Movants and any other supporting briefs, the evidence and testimony presented at the Hearing; and it appearing that granting the relief requested in the Motion on a final basis is necessary

to avoid immediate and irreparable harm to the Debtors, and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and their creditors, and is essential for the preservation of the value of the Debtors' property; and all objections, if any, to the entry of this Order having been withdrawn, resolved or overruled by the court; and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    <u>Petition</u>. On September 29 and 30, 2023 (as applicable, the "<u>Petition Date</u>")[3], the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code. The Debtors continue as debtors-in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.    <u>Jurisdiction and Venue</u>. The court has jurisdiction over this case and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this court over the Chapter 11 Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    <u>Notice</u>. Under the circumstances, the notice given by the Debtors of the Motion, the Hearing and the relief granted under this Order constitutes due and sufficient notice thereof and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(c) and Local Rule 4001-2.

D.    <u>Findings and Conclusions Regarding Ponzi Scheme</u>. Based upon the court's review of the record, including, without limitation, the Ponzi Declarations, the testimony given at the Hearing, and other supporting briefs and admissible

---

[3] Certain of the Debtors filed their own chapter 11 cases on September 29, September 30, November 8, and November 14, 2023. "Petition Date" as used herein will refer to the earliest of the Debtors' respective filing dates, and "Chapter 11 Cases" includes all of the Debtors' cases, irrespective of when they were filed.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

5

evidence, the court finds and concludes that for years during the prepetition period (the "Ponzi Period") the Debtors' business enterprise operated as a Ponzi scheme.

(i)     *Ponzi Scheme Findings*. iCap has all of the hallmarks of a Ponzi scheme. During the Ponzi Period:

   a. iCap's businesses operated with negative cash flow since inception.

   b. iCap conducted minimal legitimate business operations, did not generate any profits on a standalone basis, and used new investors to pay returns to earlier investors.

   c. The source of payments to initial iCap investors was from cash infused by new iCap investors.

   d. iCap's business revenue was not sufficient to continue its operations and, accordingly, iCap relied upon increasing fundraising and commingling cash. Fundraising became the near-exclusive source for the Debtors' capital.

   e. The vast majority of funds received by iCap were from investors and external lenders rather than business operations.

   f. To attract new investors, iCap management repeatedly disseminated false and misleading financial information through quarterly newsletters and investment calls.

   g. Rather than structure its real estate investments as equity investments, iCap chose to raise capital from investors through privately placed debentures under which investors were promised interest rates ranging from 6% to 15%.

   h. iCap encouraged investors to "roll over" their investments, rather than cash out at maturity.

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL DEBTOR-
IN-POSSESSION FINANCING

6

(ii)     *Ponzi Scheme Conclusions of Law.*

a.   A Ponzi scheme "consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." *Donell v. Kowell*, 533 F.3d 762, 767 n. 2 (9th Cir.2008). Proof of a Ponzi scheme can take different forms but generally consists of evidence that "(1) deposits were made by investors; (2) the Debtor conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors." *See* Kathy Bazoian Phelps & Hon. Steven Rhodes, *The Ponzi Book: Unraveling Ponzi Schemes* at § 2.03 (*quoting Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006)); *Fisher v. Sellas (In re Lake States Commodities, Inc.*), 272 B.R. 233, 242 (Bankr.N.D.Ill.2002) (citing *Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 431 (Bankr.S.D.Tex.1997), aff'd sub nom. *Fisher v. Page*, 2002 WL 31749262 (N.D. Ill. Dec. 3, 2002)). Courts will consider a broad swatch of evidence of fraud for a Ponzi scheme.

E.   <u>Findings Regarding the Post-Petition Financing</u>. Without prejudice to the rights of any other non-Debtor party in interest, the Debtors admit, stipulate, acknowledge and agree that:

(i)     The Debtors have requested from the DIP Lender, and the DIP Lender is willing to extend, the DIP Loans on the terms and conditions set forth in this Order and the DIP Agreement.

(ii)    *Need for Post-petition Financing.* The Debtors have limited cash resources to fund litigation efforts and pursue recoveries from third parties to maximize the ultimate distribution to investor creditors without the financing requested under the Motion. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with the DIP Lender as set forth in this Order and the DIP Agreement is vital to the Debtors' ability to maximize the value of the assets of their bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates"). Accordingly, the Debtors have an immediate need to obtain the post-petition financing to, among other things, preserve and maximize the value of the assets of their Estates.

(iii)   *No Credit Available on More Favorable Terms.* The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or solely based on the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable solely under section 364(c)(2) or 364(c)(3) of the Bankruptcy Code. The Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Lender pursuant to the DIP Agreement.

(iv)    *No Additional Post-Petition Borrowing.* Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time seek allowance of any administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any

administrative expenses of the kind specified in, or arising or ordered under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code that is superior to or *pari passu* with the Superpriority Claim (as defined below) provided herein, except with respect to the Carve-Out.

(v) *No Priming of DIP Liens.* Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens provided to the DIP Lender by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim with respect to the DIP Collateral pursuant to section 364(d) of the Bankruptcy Code or otherwise, except with respect to the Carve-Out;

(vi) *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms of the DIP Loan Facility and this Order reflect the Debtors' exercise of their prudent business judgment, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Agreement and this Order have been negotiated in good faith and at arms' length by and among the Debtors and the DIP Lender, with all parties being represented by counsel. Any credit extended under the terms of this Order shall be deemed to have been extended in good faith by the DIP Lender, as that term is used in section 364(e) of the Bankruptcy Code.

(vii)   *Good Cause*. The relief requested in the Motion and granted pursuant to the terms of this Order is necessary, essential, and appropriate, and is in the best interests of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and avoid immediate and irreparable harm to the Debtors, their creditors, and their assets.

(viii) *Immediate Entry*. Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2). No party appearing in these Chapter 11 Cases has filed or made an objection to the relief sought in the Motion or the entry of this Order, or any objections that were made (to the extent such objections have not been withdrawn or resolved) are overruled.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, THAT:**

**Section 1.** Authorization and Conditions to Financing.

1.1 Motion Granted. The Motion [Dkt. No. ___] is GRANTED in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Order. Any objections to the Motion with respect to entry of this Order to the extent not withdrawn, waived or otherwise resolved, and all reservations of rights included therein, are denied and overruled on the merits.

1.2 Authorization to Borrow and Use Loan Proceeds. To enable the Debtors to continue to preserve the value of their estates, and subject to the terms and conditions of this Order and the DIP Documents, the Debtors are authorized to enter into, be bound by, and perform under the DIP Documents and to borrow in an aggregate principal amount not to exceed $5,000,000, provided that disbursements of such amount are in accordance with the DIP Agreement and this Order. Upon the entry of this Order, the Debtors shall be authorized to continue to use the DIP Collateral (as defined below) to execute and deliver all instruments and documents that may be required or necessary for the performance by the Debtors under the DIP Loan Facility and the creation and perfection of the DIP Liens described in and provided for by this Order and the DIP Documents, and to draw on the DIP Loan Facility to make any disbursement in accordance with the terms and conditions set forth in this Order and the DIP Agreement.

1.3    DIP Agreement.

1.3.1    Approval. The DIP Agreement and each term, condition, and covenant set forth therein are approved. All of such terms, conditions, and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among the Debtors and the DIP Lender, and of each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Agreement for all purposes, including, without limitation, to the extent applicable, the payment when due of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, and fees and expenses, including, without limitation, all of the DIP Lender's consultant fees and professional fees (including attorney fees and expenses) as more fully set forth in the DIP Agreement and further provided below, are approved.

1.3.2    Amendment. Subject to the terms and conditions of the DIP Agreement, the Debtors and the DIP Lender may amend, modify, supplement or waive any provision of the DIP Agreement (an "Amendment") without further approval or order of the court, provided that any Amendment shall require advance notice and opportunity to object of no less than five (5) business days to the U.S. Trustee, the official Committee of Unsecured Creditors that has been appointed by the United States Trustee pursuant to the October 20, 2023 Appointment of Unsecured Creditors Committee [Dkt. No. 102] and the October 30, 2023 Amended Appointment of Unsecured Creditors Committee [Dkt. No. 112] (the "Committee"), and Serene, and if any party objects to the Amendment within the five (5) day notice period, the Debtors may not agree to the Amendment without further order of the court.

**Section 2.**    <u>Authorization and Conditions to Financing</u>. The DIP Lender shall have no obligation to make any loans under the DIP Agreement unless the conditions precedent to making such loans under the DIP Agreement have been satisfied in full or waived by the DIP Lender in its sole discretion.

    2.1    <u>Priority and Liens</u>.

    2.1.1    <u>Lien Grant</u>. To secure the prompt payment and performance of any and all obligations of the Debtors to the DIP Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the DIP Lender shall have and is granted pursuant to this Order valid and perfected (such liens, the "<u>DIP Liens</u>"):

    (i)    Pursuant to Section 364(c)(2) of the Bankruptcy Code, first priority security interests and liens in and upon all Causes of Action (as defined in the DIP Agreement) and all proceeds recovered by the Loan Parties pursuant to the Causes of Action including, without limitation, any real property assets other than those addressed in Section 4.1(b) of the DIP Agreement, to secure the DIP Loan Facility and all DIP Obligations, subject only to prior payment of the Carve-Out.

    (ii)    Pursuant to Section 364(c)(3) of the Bankruptcy Code, security interests and liens in and upon all of the Real Property, subject only to Carve-Out and the Permitted Liens, including, but not limited to, the liens existing as of the Closing Date (as defined in the DIP Agreement) in favor of Serene encumbering the Real Property.

    2.1.2    <u>DIP Collateral</u>. For purposes of this Order, the term "<u>DIP Collateral</u>" shall have the meaning ascribed to the term "Collateral" in the DIP Agreement, which term includes the Real Property and Causes of Action and proceeds thereof.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

12

2.1.3 <u>Superpriority Administrative Expense.</u> For all DIP Obligations now existing or hereafter arising pursuant to this Order, the DIP Agreement, or otherwise, the DIP Lender is granted an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546, 726 or 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment (the "<u>Superpriority Claim</u>"); <u>provided</u>, <u>however</u>, that the Superpriority Claim shall be junior to the Carve-Out and the Serene Superpriority Claim. The Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, subject only to the Carve-Out and the Serene Superpriority Claim. Other than as expressly provided in the DIP Agreement and this Order with respect to the Carve-Out and the Serene Superiority Claim, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 326, 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Chapter 11 Cases, or in any Successor Case (as defined below), and no priority claims are, or will be, senior to, prior to, or on a parity with the Superpriority Claim or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

2.1.4 <u>Nature of DIP Liens; Section 552(b); Section 506(c) Lien Priority</u>. The DIP Liens shall be subject to the Carve-Out to the extent provided in

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

Section 2.2 of this Order. The DIP Liens and the Superpriority Claim (a) shall not be subject to sections 510, 542, 549, 550, or 551 of the Bankruptcy Code, the "equities of the case" exception of section 552 of the Bankruptcy Code, or section 506(c) of the Bankruptcy Code, (b) shall be senior in priority and right of payment to (y) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise and (z) any intercompany or affiliate liens or claims of the Debtors, and (c) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Chapter 11 Cases, whether upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or appointed in these Chapter 11 Cases prior to conversion, or in any other proceedings related to any of the foregoing (each, a "Successor Case"), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.

2.1.5 <u>Enforceable Obligations</u>. The DIP Agreement shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their Estates, and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and their creditors, in accordance with their terms. No obligation, payment, transfer, or grant of security under the DIP Agreement or this Order shall be stayed, restrained, voidable, avoidable, disallowable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d)), or subject to any avoidance, disallowance, impairment, reduction, setoff, offset, recoupment, recharacterization, disgorgement, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, surcharge, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity. All

interest, fees paid or payable, and all reasonable costs and expenses reimbursed or reimbursable (including, without limitation, all fees, costs and expenses referred to in the DIP Loan Facility and the DIP Lender's reasonable attorneys' fees and expenses), by the Debtors to the DIP Lender are approved.

2.1.6 <u>Post-Petition Lien Perfection</u>. This Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien (each, a "<u>Perfection Act</u>"). Notwithstanding the foregoing, if the DIP Lender shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the DIP Lender is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or reasonably required by the DIP Lender, notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law. The DIP Lender may choose to file, record, or present a certified copy of this Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, and/or record such certified copy of this Order in accordance with applicable law. Should the DIP Lender so choose and attempt to file, record, and/or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Order.

23-01243-WLH11    Doc 467    Filed 02/23/24    Entered 02/23/24 19:13:50    Exhibit 1, Page 42

2.2    Carve-Out. The "Carve-Out" is an amount equal to the sum of (i) all fees required to be paid to the clerk of this court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (which is included in the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs and expenses (the "Professional Fees") incurred by persons or firms ("Professional Persons") retained by the Debtors or the Committee whose retention is approved by this court pursuant to sections 327, 328 or 363 and 1103 of the Bankruptcy Code (all Professional Persons shall be paid *pro rata* from the Carve-Out), subject in all respects to the terms of and amendments set forth in this Order and any other interim or other compensation orders entered by this court that are incurred at any time before delivery to the Debtors of a Carve-Out Trigger Notice (as defined below), whether allowed by this court prior to the delivery of a Carve-Out Trigger Notice, subject to any limits imposed by this Order; *provided* that after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "Carve-Out Trigger Notice") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for the Committee, if any, in an aggregate amount not to exceed $200,000; *provided further*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), or (iii) above, on any grounds. The Carve-Out may be funded to an administrative reserve account (the "Carve-Out Account"), which account shall be used to pay Professional Fees and any unpaid fees to the United States Trustee. As cash flow permits, and assuming no issuance of a Carve-Out Trigger Notice, the Debtors may pay the amounts set

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL DEBTOR-
IN-POSSESSION FINANCING

forth for Professional Fees into the Carve-Out Account. Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the DIP Lender or any of its officers, directors, and professionals; (b) attempts to modify any of the rights granted to the DIP Lender; (c) attempts to prevent, hinder, or otherwise delay the DIP Lender's assertion, enforcement, or realization upon any DIP Collateral in accordance with the DIP Agreement or this Order (as applicable); *provided* that nothing in this section shall restrict the rights of parties in interest during the Remedies Notice Period (as defined below); (d) paying any amount on account of any claims arising before the commencement of the Chapter 11 Cases unless such payments are approved by an order of the court; or (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end, or similar fees. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims securing the DIP Loans, the Superpriority Claim, and any and all other liens or claims existing pursuant to the DIP Loan Facility.

**Section 3.**    Ponzi Scheme.

3.1    Given that the Debtors' business enterprise operated as a Ponzi scheme, the Debtors (and any successor in interest, including any liquidating trustee appointed pursuant to a chapter 11 plan of liquidation or chapter 7 trustee), are entitled to the benefit of the Ponzi scheme presumption with respect to any avoidance and recovery actions related to the Debtors and the Chapter 11 Cases, including any causes of action asserted under sections 544 and 548 of the Bankruptcy Code and any other applicable fraudulent transfer, debtor/creditor law, avoidance and recovery statute or cause of action, claim, or argument.

3.2     Because this court has found and concluded that the Debtors' business enterprise operated as a Ponzi scheme during the Ponzi Period, the condition precedent to funding under the DIP Agreement set forth in Section 3.1(b) is satisfied.

**Section 4.**     Default; Rights and Remedies; Relief from Stay.

4.1     Events of Default. It shall be an "Event of Default" under this Order if an "Event of Default" as defined in the DIP Agreement occurs (together with the passage of any applicable cure period set forth therein).

4.2     Rights and Remedies Upon Events of Default. Upon the occurrence and continuance of an Event of Default, (x) the DIP Lender may declare (i) the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Loan Parties (as defined in the DIP Agreement), and (iii) the termination of the DIP Loan Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the liens or the obligations under the DIP Loan Facility; or (y) upon the giving of five (5) business days' notice (the "Remedies Notice Period") to the Debtors, the U.S. Trustee and the Committee (the "Notice Parties"), the DIP Lender may exercise all other rights and remedies provided for in this Order or the applicable DIP Loan Documents and applicable law, free of the automatic stay of section 362 of the Bankruptcy Code. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.

**Section 5.**   Good Faith. The terms of this Order were negotiated in good faith and at arm's length by and among the Debtors and the DIP Lender. The DIP Lender shall be entitled to the full protections of section 364(e) of the Bankruptcy Code.

**Section 6.**   DIP Lender Rights.

6.1   Collateral Rights. Until all of the DIP Obligations shall have been indefeasibly paid and satisfied in full, no other party shall seek to enforce any lien or claim in any DIP Collateral, except Serene with respect to any lien or claim in the Real Property.

6.2   No Marshaling. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

6.3   Rights With Respect to Real Property. Until the obligations due to Serene have been indefeasibly paid in full, the DIP Lender will not exercise or seek to exercise any rights or remedies with respect to the Real Property or take any action against any Serene with respect to the Real Property.

6.4   Voting and Responsive Pleadings. The DIP Lender may vote on any chapter 11 plan, make other filings and make any arguments, pleadings and motions that are, in each case, not otherwise prohibited by the terms of this Order or the DIP Agreement, *provided* that no such filings, arguments, pleadings, motions or chapter 11 plans shall propose to treat any claims or security interests in a manner inconsistent with this Order.

**Section 7.**   Other Rights and Obligations.

7.1   No Modification or Stay of This Order. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no

stay of execution or effectiveness of this Order. Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation, or reversal of this Order, any of the DIP Loan Documents or any term hereunder or thereunder or (b) the dismissal or conversion of one or more of the Chapter 11 Cases (each, a "Subject Event"), (i) the acts taken by the DIP Lender in accordance with this Order, and (ii) the DIP Obligations incurred or arising prior to the DIP Lender's actual receipt of written notice from Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Order, and the acts taken by the DIP Lender in accordance with this Order and the DIP Agreement, and the DIP Liens granted to the DIP Lender in the DIP Collateral, and all other rights, remedies, privileges, and benefits in favor of the DIP Lender pursuant to this Order and the DIP Agreement, shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.

       7.2    <u>Power to Waive Rights; Duties to Third Parties</u>. The DIP Lender, in its sole and absolute discretion, shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Order in respect of the DIP Lender (the "DIP Lender Rights"), with any such waiver to be made in writing by the DIP Lender, and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Rights. Any waiver by the DIP Lender of any DIP Lender Rights shall not be or constitute a continuing waiver. Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Lender to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert a defense to any obligation owed by the Debtors to the DIP Lender.

7.3 <u>Reservation of Rights</u>. The terms, conditions, and provisions of this Order are in addition to and without prejudice to the rights of the DIP Lender to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Agreement, or any other applicable agreement or law, including, without limitation, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Debtors' Estates.

7.4 <u>Binding Effect of Order</u>.

7.4.1  Immediately upon entry by this court, this Order shall be valid and binding upon and inure to the benefit of the DIP Lender, the Debtors, and the property of the Debtors' Estates, all other creditors of any of the Debtors, the Committee, and all other parties in interest and their respective successors and assigns (including any chapter 11 or chapter 7 trustee or any other fiduciary hereafter appointed as a legal representative of the Debtors), in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

7.4.2  Any order dismissing one or more of the Chapter 11 Cases or any Successor Case under section 1112 or otherwise shall be deemed to provide (in accordance with sections 105 and 349 the Bankruptcy Code) that (a) the Superpriority Claim and the DIP Liens shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full and (b) this court shall retain jurisdiction to the greatest extent permitted by applicable law, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and the DIP Liens. In the event any court modifies any of the provisions of this Order or the DIP Loan Documents following the

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL DEBTOR-
IN-POSSESSION FINANCING

Hearing, (i) such modifications shall not affect the rights or priorities of the DIP Lender pursuant to this Order with respect to the DIP Collateral or any portion of the DIP Obligations which arise or are incurred or are advanced prior to such modifications, and (ii) this Order shall remain in full force and effect except as specifically amended or modified at such Hearing.

       7.5    <u>Restrictions on Additional Financing, Plan Treatment</u>. All postpetition advances and other financial accommodations under the DIP Agreement and the other DIP Loan Documents are made in reliance on this Order and there shall not at any time be entered in the Chapter 11 Cases, or in any Successor Case, any order (other than this Order) that authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest that is equal or senior to a lien or security interest in property in which the DIP Lender hold a lien or security interest, or which is entitled to priority administrative claim status that is equal or superior to that granted to the DIP Lender, herein unless, in each instance (i) the DIP Lender shall have given its express prior written consent with respect thereto (such consent to be in the DIP Lender's absolute and sole discretion and no such consent being implied from any other action, inaction, or acquiescence by the DIP Lender) or (ii) such other order requires that all DIP Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of the DIP Agreement, including, without limitation, all debts and obligations of the Debtors to the DIP Lender which arise or result from the obligations, loans, security interests, and liens authorized herein, on terms and conditions acceptable to the DIP Lender. The security interests and liens granted to or for the benefit of the DIP Lender hereunder, the terms of the DIP Loan Facility approved hereby and the rights of the DIP Lender pursuant to this Order shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or

liquidation of the Debtors without the express prior written consent of the DIP Lender (such consent to be in the DIP Lender's absolute and sole discretion).

7.6     Term; Termination. Notwithstanding any provision of this Order to the contrary, the term of the DIP Agreement among the Debtors and the DIP Lender authorized by this Order may be terminated pursuant to the terms of the DIP Agreement.

7.7     Objections Overruled. All objections to the entry of this Order are, to the extent not withdrawn or resolved, overruled.

7.8     No Liability to Third Parties. The DIP Lender shall not: (a) be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 or any similar federal or state statute).

7.9     Payments Free and Clear. Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this Order, the DIP Agreement or any subsequent order of this court shall be received free and clear of any claim, charge, assessment, or other liability to the Debtors or the Debtors' Estates.

7.10     Final Amount Notice Period. The Debtors shall provide fourteen days' notice to the Committee prior to borrowing the Final Amount.

**Section 8.**     Findings and Conclusions. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other

23-01243-WLH11    Doc 467    Filed 02/23/24    Entered 02/23/24 19:13:50    Exhibit 1, Page 50

Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Order.

**Section 9.**     Order Governs. In the event that any provision of this Order conflicts with any term of the DIP Loan Documents, this Order shall govern.

**Section 10.**   Retention of Jurisdiction. The court has and will retain jurisdiction to interpret and enforce the provisions of this Order.

<div align="center">///END OF ORDER///</div>

PRESENTED BY:

By /s/ Dakota Pearce
DAKOTA PEARCE (WSBA 57011)

BERNARD D. BOLLINGER, JR. (Admitted *Pro Hac Vice*)
KHALED TARAZI (Admitted *Pro Hac Vice*)
BUCHALTER, a Professional Corporation

*Counsel to Debtors and Debtors in Possession*

By /s/ Julian I. Gurule

JULIAN I. GURULE (Admitted *Pro Hac Vice*)
O'MELVENY & MYERS LLP

*Co-Counsel to Debtors and Debtors in Possession*

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL DEBTOR-
IN-POSSESSION FINANCING

24

By */s/ Armand J. Kornfeld*
ARMAND J. KORNFELD (WSBA 17214)

AIMEE S. WILLIG (WSBA 22859)
JASON WAX (WSBA 41944)
BUSH KORNFELD LLP

*Attorney for the Official
Committee of Unsecured Creditors*


By */s/ John T. Bender*
JOHN T. BENDER (WSBA 49658)
CORR CRONIN LLP

*Special Counsel for the Official
Committee of Unsecured Creditor*

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL DEBTOR-
IN-POSSESSION FINANCING

25

# EXHIBIT 2
## (TO MOTION)


# EXHIBIT 1
## (TO ORDER)

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** is entered into as of February 23, 2024 (this "**Agreement**"), by and among iCap DIP Finance Group LLC (together with his permitted successors and assigns, the "**Lender**"), the parties listed on **Schedule I** attached hereto (each, a "**Property Owner**" and collectively, the "**Property Owners**") the parties listed on **Schedule II** attached hereto (collectively, the "**iCap Constituent Party Debtors**"; and together with each Property Owner (each a debtor or debtor-in-possession under Chapter 11 of the Bankruptcy Code) each individually a "**Loan Party**," and also referred to as a "**Debtor**," and collectively, the "**Loan Parties**" or "**Debtors**").

### RECITALS

WHEREAS, on September 29, 2023, (the "**Petition Date**"), each Loan Party filed a voluntary petition with the Bankruptcy Court initiating a case pending under Chapter 11 of the Bankruptcy Code (the "**Case**" and collectively, the **"Cases"**) and has continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, each of the Property Owners is the fee owner of the real property listed next to its name on Schedule I hereto;

WHEREAS, the Loan Parties have requested that the Lender make available to the Loan Parties debtor-in-possession term loans in an aggregate principal amount of up to of Five Million and 00/100 Dollars ($5,000,000.00); and

WHEREAS, Lender is willing to make the Loan (as such term is defined in this Agreement) described herein on the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Lender and Loan Parties agree as follows:

1. **DEFINITIONS AND CONSTRUCTION**.

1.1 **Definitions**. As used in this Agreement, the following terms shall have the following definitions:

"**Accounts**" means all presently existing and hereafter arising accounts, contract rights, payment intangibles, and all other forms of obligations owing to Loan Parties arising out of the sale or lease of goods (including, without limitation, the licensing of software and other technology) or the rendering of services by Loan Parties, and any and all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by any Loan Party and the Loan Parties' Books relating to any of the foregoing.

"**Advance**" or "**Advances**" means a cash advance or cash advances under the DIP Loan Facility.

"**Advance Request**" has the meaning assigned in Section 2.1(c).

"**Affiliate**" means, with respect to any Person, any other Person that owns or controls directly or indirectly such Person, or any Person that controls or is controlled by or is under common control with such Person.

"**Applicable Law**" means, as to any Person, any law (statutory or common), treaty, rule or regulation of a Governmental Authority or determination of a court or binding arbitrator, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Washington or any court having jurisdiction over the Case from time to time.

"**Bankruptcy Sale**" means a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all assets (measured by both aggregate value and number of assets) and other rights of the Debtor(s) on such terms acceptable to Lender in its Permitted Discretion.

"**Bankruptcy Sale Order**" means an order of the Bankruptcy Court, in form and substance acceptable to Lender approving and authorizing a Bankruptcy Sale.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Washington are authorized or required to close.

"**Case**" and "**Cases**" have the respective meanings set forth in the recitals.

"**Causes of Action**" means claims or causes of action held or controlled by the Loan Parties, including without limitation sections 544, 547, 548, and 550 of the Bankruptcy Code.

"**Chief Restructuring Officer**" means Lance Miller.

"**Closing Date**" means the date on which the conditions specified in <u>Section 3.1</u> are satisfied.

"**Code**" means the Uniform Commercial Code as enacted in the State of Washington and the State of Delaware, as applicable.

"**Collateral**" means the Real Property and the Causes of Action.

"**Committee**" means an official committee of unsecured creditors appointed in the Cases by the U.S. Trustee.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another; (ii) any reimbursement obligations with respect to undrawn letters of credit; and (iii) all obligations arising under any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such

Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Lender in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"**Copyrights**" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof.

"**Credit Extension**" means each Advance or any other extension of credit by Lender for the benefit of the Loan Parties hereunder, including the DIP Loans, but subject to the Final Cap.

"**Debtor**" has the meaning set forth in the recitals.

"**Default**" means any event or circumstance that, with the passage of time or giving of notice, would unless cured or waived, constitute an Event of Default.

"**Default Rate**" has the meaning given to such term in Section 2.2(b) hereof.

"**DIP Loan**" has the meaning given to such term in Section 2.1(a) hereof.

"**DIP Loan Commitment**" means an aggregate amount not to exceed Five Million Dollars ($5,000,000.00).

"**DIP Loan Facility**" means this Loan facility.

"**Equipment**" means all present and future machinery, equipment, furniture, fixtures, vehicles, tools, parts and attachments in which Loan Party has any interest.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"**Event of Default**" has the meaning assigned in Section 8.

"**Excluded Asset**" means any and all amounts paid to Loan Parties' and Committee's bankruptcy professionals as an administrative expense pursuant to an interim or final order of the Bankruptcy Court.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to any obligations under this Agreement pursuant to a law in effect on the date Lender acquired its interest in such obligations or on the date that Lender changes its lending office, except, in each case, to the extent that amounts with respect to such Taxes were payable to Lender immediately before the date it acquired such interest or changed its lending office, (c) Taxes that are attributable to Lender's failure to comply with Section 2.5, and (d) any U.S. federal withholding Taxes imposed under FATCA. For purposes of this definition, any reference to Lender shall be deemed to include a Foreign Lender.

"**Extended Maturity Date**" means the first day of the month that is one year after the Original Maturity Date.

"**Facility Fee**" has the meaning set forth in <u>Section 2.3(a)</u>.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, any intergovernmental agreement entered into in connection with the implementation of such sections of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to, or official interpretations implementing such, intergovernmental agreements.

"**Fees**" means each and all of the amounts set forth in <u>Section 2.3</u>.

"**Final Cap**" means the sum of Five Million Dollars ($5,000,000.00), exclusive of all interest, fees, and expenses, tenderable in the form of DIP Loans by Lender to the Loan Parties upon entry of the Final Order and compliance with all other requirements of this Agreement and the Loan Documents.

"**Final Order**" means a final order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) authorizing the Loans, with changes to such form as are satisfactory to the Lender: (i) approving the Loan Documents and authorizing the DIP Loan in such amounts as are contemplated by <u>Section 2.1(b)</u>; and (ii) finding and determining as a matter of law and fact and based on the submission by the Debtors and consideration of an evidentiary record, that the Debtors' pre-petition operations constituted a "Ponzi Scheme," including, without limitation, for purposes of Bankruptcy Code sections 544, 548, 550, and other applicable avoidance and recovery, debtor/creditor, and related authority.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**Future Advance Funding Amount**" means an amount equal to Two Million Dollars ($2,000,000.00).

"**GAAP**" means generally accepted accounting principles as in effect from time to time.

"**Governmental Authority**" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Highest Lawful Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations evidenced by this Agreement and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Indebtedness**" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with

23-01243-WLH11    Doc 467    Filed 02/23/24    Entered 02/23/24 19:13:50    Exhibit 2, Page 57

respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all Contingent Obligations, and (d) all capital lease obligations.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Lender under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Initial Funding Amount**" means an amount equal to Three Million Dollars ($3,000,000.00).

"**Insolvency Proceeding**" means any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extension generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"**Intellectual Property**" means all right, title, and interest owned by Loan Parties in and to the following:  Copyrights, Trademarks (excluding any U.S. intent-to-use trademark application for which a statement of use has not been filed with and duly accepted by the United States Patent and Trademark Office, but only until such statement is accepted by the United States Patent and Trademark Office) and Patents; trade secrets, design rights, claims for damages by way of past, present and future infringement of any of the rights included above, and all license fees and royalties arising from licenses or rights to use such intellectual property rights; all amendments, renewals and extensions of any of such Copyrights, Trademarks or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"**Inventory**" is all "inventory" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of a Loan Party's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"**Investment**" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Lender Expenses**" are all reasonable and documented out-of-pocket expenses and costs (including reasonable attorneys' fees and expenses) for preparing, negotiating, defending and enforcing the Loan Documents, or incurred in connection with respect to the Cases, (including, without limitation, those incurred in connection with appeals or Insolvency proceedings), all reasonable search, filing, recording and title insurance charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by or otherwise incurred by the Lender.

"**Lien**" means with respect to the Real Property and any other Collateral, any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"**Loan**" means the DIP Loans.

"**Loan Documents**" means, collectively, this Agreement, any note or notes executed by Loan Parties, the Final Order and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"**Loan Party**" and "**Loan Parties**" have the meanings set forth in the recitals.

"**Loan Parties' Books**" means all of the Loan Parties' books and records including: ledgers; records concerning Loan Parties' assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"**Material Adverse Effect**" means a material adverse effect on (i) the business, operations, condition (financial or otherwise), or prospects of any Loan Party or (ii) the value of the Collateral taken as a whole or priority of Lender's security interests in the Collateral; provided that the term "Material Adverse Effect" will not be deemed to exist as a result of the Case or the circumstances and events leading up thereto.

"**Maturity Date**" means the earlier of: (i) the Original Maturity Date, unless extended (or deemed extended) in accordance with Section 2.1(e), in which case the Maturity Date shall be the Extended Maturity or (ii) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loan in accordance with the terms of this Agreement.

"**Negotiable Collateral**" means all letters of credit of which a Loan Party is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and a Loan Party's Books relating to any of the foregoing.

"**Obligations**" means all debt, principal, interest, Fees, and other amounts owed to Lender by the Loan Parties pursuant to this Agreement.

"**Original Maturity Date**" means the the date that is twelve (12) months after the Final Order Entry Date.

"**Other Connection Taxes**" means, with respect to Lender, Taxes imposed as a result of a present or former connection between Lender and the jurisdiction imposing such Tax (other than connections arising from Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any loan hereunder or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of its commercially reasonable (from the perspective of a first priority perfected secured asset based lender)

business judgment based on how an asset based lender with similar rights providing a credit facility of the type provided under this Agreement would act in similar circumstances at the time with the information then available to it.

"**Permitted Indebtedness**" means:

(a) Indebtedness of the Loan Parties in favor of Lender arising under this Agreement, any other Loan Document;

(b) Indebtedness of the Loan Parties existing as of the Closing Date in favor of Serene;

(c) Indebtedness in the form of accrued and unpaid administrative claims in the Cases;

(d) Indebtedness to trade creditors incurred in the ordinary course of business, including, without limitation, trade payables of a Property Owner relating to the ownership and operation of the related Real Property owned by such Property Owner and including professional fees incurred in the Cases; and

(e) Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business.

"**Permitted Investment**" means:

(a) Investments existing on the Closing Date disclosed to Lender in writing on or before the Closing Date; and

(b) Investments held by the Loan Parties in (i) cash and cash deposits that are maintained at a bank or other financial institution that is insured by the Federal Deposit Insurance Corporation, or (ii) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one (1) year from the date of acquisition thereof, and/or (iii) money market account funds held at financial institutions reasonably acceptable to Lender in Lender's Permitted Discretion.

"**Permitted Liens**" means the following:

(a) Any Liens existing on the Closing Date and disclosed to Lender in writing on or before the Closing Date;

(b) Liens existing as of the Closing Date in favor of Serene encumbering the Real Property, and any and all other liens, encumbrances and other matters disclosed in "Schedule B-I" of the each lender's title policy issued to Serene.

(c) Any Liens arising under this Agreement or the other Loan Documents;

(d) Liens for taxes, fees, assessments or other governmental charges or levies, either not yet delinquent or being contested in good faith by appropriate proceedings;

(e) carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are being contested in good faith and by

7

appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person, as set forth on **Exhibit C**;

(f)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, or letters of credit or guarantees issued in respect thereof, other than any Lien imposed by ERISA;

(g)     all existing leases in effect as of the Closing Date and any future leases entered into by any Property Owner in the ordinary course of its business with a tenant that is not an Affiliate of a Loan Party, in each case as the same may be amended, modified or otherwise supplemented.  With respect to any future Leases, Lender has the right to request a landlord waiver in form and substance reasonably acceptable to Lender and the Loan Parties;

(h)     Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Sections 8.4 (attachment) or 8.8 (judgments/settlements);

(i)     the filing of UCC financing statements solely as a precautionary measure in connection with operating leases and consignment arrangements;

(j)     Subject to Section 6.7, Liens in favor of other financial institutions arising in connection with a Loan Party's deposit accounts held at such institutions to secure standard fees for deposit services charged by, but not financing made available by such institutions, provided that Lender has a perfected security interest in the amounts held in such deposit accounts;

(k)     Liens on cash securing letters of credit constituting Indebtedness permitted pursuant to clause (i) of the definition of Permitted Indebtedness;

(l)     easements, rights-of-way, covenants, conditions, restrictions, encroachments, (including, but not limited to easements or encumbrances in the ordinary course of business for access, water and sewer lines, telephone and cable lines, electric lines or other utilities or for other similar purposes)  and other survey defects protrusions and other similar encumbrances and minor title defects affecting real property which were not incurred in connection with the Loan and do not in any case materially and adversely interfere with the use of the related Real Property encumbered thereby for its intended purposes; and

(m)     Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (l) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien in the existing priority of such existing Lien, and the principal amount of the indebtedness being extended, renewed or refinanced does not increase.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"**Petition Date**" has the meaning set forth in the recitals.

 "**Real Property**" means the real property more particularly described on **Exhibit A** and set forth next to each Property Owner's name on Schedule 1.

"**Responsible Officer**" means the Chief Restructuring Officer.

"**Serene**" means Serene Investment Management, LLC.

"**Superpriority Claim**" means a claim against any Debtor in a Case which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code.

"**Tax**" or "**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Trademarks**" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of the Loan Parties connected with and symbolized by such trademarks.

"**Transfer**" has the meaning assigned in <u>Section 7.1</u>.

"**U.S. Trustee**" means the United States Trustee for the Eastern District of Washington.

**Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender) and all calculations made hereunder shall be made in accordance with GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender).  When used herein, the terms "financial statements" shall include the notes and schedules thereto.

## 2. LOAN AND TERMS OF PAYMENT.

**2.1 Credit Extensions**.  The Loan Parties promise to pay to the order of Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to the Loan Parties hereunder.

(a) **Term Loan**. Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in <u>Sections 3.1</u> and <u>3.2</u>), Lender agrees that it will make from time-to-time Credit Extensions in an amount not to exceed its DIP Loan Commitment (each, a "**DIP Loan**").  The initial Credit Extension shall be subject to the conditions precedent set forth in <u>Section 3.1</u> and the Initial Funding Amount shall be extended to the Loan Parties substantially concurrent with the Final Order Entry Date and the subsequent Credit Extensions shall be subject to the conditions precedent set forth in <u>Section 3.2</u>.  Amounts borrowed under this <u>Section 2.1(a)</u> may not be reborrowed once repaid.

(b) Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in <u>Sections 3.1</u> and <u>3.2</u>), the Loan Parties may request, and Lender shall make, Credit Extensions, in increments of not less than $500,000.00 and each such Advance Request, not to exceed in the aggregate the DIP Loan Commitment.  Notwithstanding anything contained herein to the contrary, in no event shall the Lender be obligated to make any DIP Loan in excess of the Final Cap.

(c)     Whenever a Loan Party desires an Advance of a DIP Loan, the Loan Party will notify Lender by e-mail transmission or telephone no later than 2:00 p.m. Pacific time (each an "**Advance Request**"), with respect to each Advance request, two (2) Business Days (or such shorter period as agreed by Lender in its discretion) prior to the date the Advance may be made.  Lender is authorized to make Advances under this Agreement, based upon instructions received from a Responsible Officer or a designee of a Responsible Officer.   Lender shall be entitled to rely on any telephonic notice given by a person who Lender reasonably believes to be the Responsible Officer or a designee thereof.  Lender will wire Advances in immediately available federal funds to a deposit account identified by the Loan Parties in writing from time to time.

(d)     All Advances under this Section 2.1 and all accrued and unpaid interest thereon shall be repaid in full by Loan Parties on the Maturity Date.

(e)     The Loan Parties shall have a one-time option to extend the term of the Loan from the Original Maturity Date to the Extended Maturity Date (the "**Option to Extend**").  The Loan Parties shall venture to provide Lender with written notice of Loan Parties' request to exercise the Option to Extend not less than thirty (30) days prior to then Maturity Date (not giving effect to the Option to Extend); provided, however that if all outstanding Advances, including all accrued and unpaid interest thereon as set forth in Section 2.1(d) above are not repaid as of the Original Maturity Date, it shall automatically be deemed and treated as an election by the Loan Parties to exercise the Option to Extend (irrespective of whether or not notice was provided to Lender) and the term of the Loan shall be automatically extended to the Extended Maturity Date.

## 2.2     **Payment of Interest on the Loans**.

(a)     Interest Rate for Advances.  Subject to Section 2.2(b), the principal amount advanced and outstanding by Lender under the DIP Loan Facility shall accrue interest at a per annum rate equal to 18% (the "**Interest Rate**").

(b)     Default Rate.  After the occurrence and during the continuance of an Event of Default, to the extent permitted by Applicable Law, the principal balance advanced and outstanding shall bear interest at a rate per annum which is four percentage points (4%) above the Interest Rate that is otherwise applicable thereto (the "**Default Rate**").  Payment or acceptance of the increased interest rate provided in this Section 2.2(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Lender.

(c)     Payment; Interest Computation.  Interest only payments on the principal balance of the then outstanding Credit Extensions (actually made), are payable monthly in arrears on the first calendar day of each month (each a "**Payment Date**") and shall be computed on the basis of a 360-day year for the actual number of days elapsed.  In computing interest, (a) all payments received after 2:00 p.m. Pacific time on any day shall be deemed received at the opening of business on the next Business Day, and (b) the date of the making of any Loan shall be included and the date of payment shall be excluded; provided, however, that if any Loan is repaid on the same day on which it is made, such day shall be included in computing interest on such Loan.

(d)     PIK Interest Election.  Provided that the no Event of Default has occurred and is continuing as of such date, the Loan Parties may notify Lender in writing two (2) Business Days in advance of the related Payment Date of their election to defer the upcoming monthly cash payment of interest and have such interest obligation continue to accrue and roll-up into the balance of the Loan (a "**PIK Interest Election**").  The Loan Parties' decision to make a PIK Interest Election in any given month shall not apply to the next succeeding monthly payment unless the Loan Parties timely make a

10

subsequent PIK Interest Election. In no event may the Loan Parties make a PIK Interest Election if doing so would cause the outstanding Loan balance to exceed the Final Cap.

        **2.3**      **Fees**. The Loan Parties shall pay to Lender:

        (a)      <u>Facility Fee</u>. A facility fee in an amount equal to ten percent (10%) of the Initial Funding Amount (the "**Facility Fee**"). The Facility Fee shall be paid as and when proceeds from Causes of Action exceed the Litigation Proceed Threshold. Any portion of the Facility Fee that then still remains unpaid after the Litigation Proceed Threshold has been exceeded, shall be repaid in full upon the earlier of (i) repayment in full of the Obligations at any time and (ii) the Maturity Date;

        (b)      <u>Repayment Premium</u>. On the Original Maturity Date, the Loan Parties agree to pay a premium to Lender (the "**Repayment Premium**") equal to 0.3 times the amount of the Credit Extensions actually made by Lender to the Loan Parties during the term of this Agreement, minus the aggregate amount of interest paid to Lender and/or owed based on the Interest Rate applied to the total amount of Credit Extensions actually made by Lender to the Loan Parties during the term of this Agreement; provided, however, that interest attributable to the Default Rate during an Event of Default shall not be included in the foregoing calculation. If the Option to Extend is exercised (or deemed exercised), on the Extended Maturity Date, the Loan Parties will pay an additional amount equal to 0.3 times the amount of the Credit Extensions actually made by Lender to the Loan Parties during the term of this Agreement, minus the aggregate amount of interest paid to Lender and/or owed based on the Interest Rate applied the total amount of Credit Extensions actually made by Lender to the Loan Parties during the term of this Agreement; provided, however, that interest attributable to the Default Rate during an Event of Default shall not be included in the foregoing calculation (the "**Extension Premium**"). For the avoidance of doubt, the Repayment Premium and Extension Premium are fees payable to Lender separate from and in addition to the Facility Fee, Lender Expenses, interest (including interest attributable to the Default Rate and interest attributable to <u>Section 2.8(b)</u>) and any other amounts or obligations of the Loan Parties under this Agreement; and

        (c)      <u>Lender Expenses</u>.

        (i)      All Lender Expenses (including reasonable and documented attorneys' fees and expenses for documentation and negotiation of this Agreement, incurred through and after the Effective Date, shall be paid when due (or, if no stated due date, within ten (10) days of written demand from Lender, which Lender Expenses must be fully paid upon the Maturity Date). Lender Expenses are subject to a professionals fee expense cap of $150,000.00 in the aggregate (the "**Professional Fees Cap**"). For the avoidance of doubt, the Loan Parties shall be responsible for all Lender Expenses, including, without limitation, any and all reasonable and documented expenses of Lender's counsel, professional advisors, or in house administration, but not to exceed the Professional Fees Cap; provided, however, that if there is an Event of Default at any time, the Professional Fees Cap shall not apply with respect to Lender Expenses incurred during or relating to such Event of Default.

        (ii)      None of Lender's attorneys' fees or disbursements shall be subject to the prior approval of the Bankruptcy Court and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court. Notwithstanding the foregoing, the Bankruptcy Court retains all jurisdiction in regard to a dispute between the Loan Parties regarding the reasonableness of the asserted Lender Expenses.

        (d)      <u>Transaction Fee</u>. Separate from and in addition to the Lender Expenses, the Loan Parties shall pay a transaction fee in the amount of Twenty-Five Thousand Dollars ($25,000.00) (the "**Transaction Fee**") for fees and costs relating to the due diligence, documentation and other

services performed by Lender's counsel with respect to Lender's agreement to provide the DIP Loan Facility. The Transaction Fee shall be paid directly to the law firm of Shulman Bastian Friedman & Bui, LLP, immediately upon execution of this Agreement, but shall be subject to confirmation by the Bankruptcy Court pursuant to the Final Order. The Loan Parties shall seek approval of the Transaction Fee in connection with approval of this DIP Loan Facility.

(e)     <u>Fees Fully Earned</u>.  Unless otherwise provided in this Agreement or in a separate writing by Lender, the Loan Parties shall not be entitled to any credit, rebate, or repayment of any Lender Expenses paid or other fees earned by Lender pursuant to this Agreement, including, without limitation, the Facility Fee and the Repayment Premium, notwithstanding any termination of this Agreement or the suspension or termination of Lender's obligation to make Credit Extensions.

**2.4     Crediting Payments**.  Lender has the exclusive right to determine the order and manner in which all payments with respect to the Obligations may be applied.  The Loan Parties shall have no right to specify the order or the accounts to which Lender shall allocate or apply any payments required to be made by the Loan Parties to Lender or otherwise received by Lender under this Agreement when any such allocation or application is not specified elsewhere in this Agreement.  Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 2:00 p.m. Pacific Time shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.  Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day.

**2.5     Withholding**.

(a)     Payments received by Lender from the Loan Parties under this Agreement will be made free and clear of and without deduction for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of the Loan Parties) requires the Loan Parties to make any withholding or deduction of any Tax from any such payment, then the Loan Parties shall be entitled to make such deduction or withholding and, if such Tax is an Indemnified Tax, then the sum payable by the Loan Parties shall be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lender receives a net sum equal to the sum which it would have received had no withholding or deduction been required.

(b)     The Loan Parties shall pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable law, the Bankruptcy Code, and orders of the Bankruptcy Court, and the Loan Parties will, upon request, furnish Lender with proof reasonably satisfactory to Lender indicating that the Loan Parties has made such withholding payment.

(c)     Notwithstanding anything to the contrary in this <u>Section 2.5</u>, the Loan Parties need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings or as to which payment in full is bonded or reserved against by the Loan Parties.  The agreements and obligations of the Loan Parties contained in this <u>Section 2.5</u> shall survive the termination of this Agreement.

(d)     Lender, if reasonably requested by the Loan Parties, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Loan Parties as will enable the Loan Parties to determine whether or not Lender is subject to backup withholding or information reporting requirements.

(e)     If Lender determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.5 (including by the payment of additional amounts pursuant to this Section 2.5), it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made by the Loan Parties under this Section 2.5 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Parties, upon the request of Lender, agrees to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant taxing authority) to Lender in the event Lender is required to repay such refund to such taxing authority.

**2.6     Term**.  This Agreement shall become effective on the Closing Date and, subject to Section 14.8, shall continue in full force and effect for so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions under this Agreement. For the avoidance of doubt, in no event shall Lender be obligated to make Credit Extensions after the Maturity Date or during such time as an Event of Default exists.

**2.7     Right to Credit Bid**.  In connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by Lender, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, the Loan Parties hereby give Lender the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

**2.8     Causes of Action**.

(a)     Prepayment.  If and to the extent the Loan Parties obtain successful litigation recoveries on account of the Causes of Action ("**Litigation Proceeds**"), in excess of One Million Dollars ($1,000,000.00) in the aggregate after payment of all reasonable and customary third-party costs and expenses associated with such recoveries including, but not limited to, professional fees and expenses of Loan Parties' counsel (the "**Litigation Proceed Threshold**"), all Litigation Proceeds actually received by the Loan Parties in excess of the Litigation Proceed Threshold (such amounts "**Excess Litigation Proceeds**") shall be paid to Lender (or its designee) as a pay down of the outstanding Obligations under this Agreement within ten (10) Business Days of the Loan Parties' receipt.

(b)     Accrual Election.  Notwithstanding anything to the contrary contained in Section 2.8(a) of this Agreement, if the Loan Parties and the Lender mutually agree (which agreement may be documented via e-mail), it shall not be an Event of Default for the Excess Litigation Proceeds to be retained by the Loan Parties, and such Excess Litigation Proceeds shall instead accrue interest at an interest rate equal to eighteen percent (18%) per annum and all interest accrued on any Excess Litigation Proceeds shall be due and payable to Lender on the Maturity Date and shall be excluded from the calculation of the Repayment Premium.

3. **CONDITIONS OF LOANS**.

      3.1    **Conditions Precedent to Initial Credit Extension**.  The obligation of Lender to make the initial Credit Extension of the full Initial Funding Amount is subject to the satisfaction of the following conditions precedent:

      (a)    Lender shall have received, in form and substance satisfactory to Lender, the following:

      (i)    executed copies of this Agreement and the other Loan Documents;

      (ii)    such other documents, and completion of such other matters, as Lender may reasonably deem necessary or appropriate; and

      (b)    the Final Order Entry Date shall have occurred, and the Final Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Lender and shall not be subject to a stay.

      3.2    **Conditions Precedent to the Subsequent Credit Extension**.  The obligation of Lender to make the subsequent Credit Extension, including all or a portion of the Future Advance Funding Amount, is further subject to the following conditions:

      (a)    the representations and warranties contained in <u>Section 5</u> shall be true and correct in all material respects on and as of the date of the Loan Parties' request for a Credit Extension and on the effective date of each Credit Extension as though made at and as of each such date;

      (b)    no monetary Default or Event of Default shall exist as of the date of the extension request or would exist after giving effect to such Credit Extension;

      (c)    Lender shall have received and reviewed a debtor-in-possession budget ("**Budget**") from the Loan Parties acceptable to Lender, provided that Lender's consent and approval of the Budget shall not be unreasonably withheld, conditioned or delayed.

4. **CREATION OF SECURITY INTEREST**.

      4.1    **Grant of Security Interest**.  To secure prompt repayment of any and all Obligations and prompt performance by the Loan Parties of each of its covenants and duties under the Loan Documents, the Loan Parties grant Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral (subject to Permitted Liens, as set forth herein).  Such security interest shall constitute:

      (a)    a valid, perfected first priority Lien on all Causes of Action and all proceeds recovered by Loan Parties pursuant to the Causes of Action, including, without limitation, any real property assets other than those addressed in Section 4.1(b), below.

      (b)    a valid, perfected Lien upon all of the Real Property (i.e., the Collateral previously pledged to Serene), subject only to Permitted Liens, including, but not limited to, the Liens existing as of the Closing Date in favor of Serene encumbering the Real Property.

      The respective rights of Lender and Serene in the same Collateral and any related claims in the Cases shall be governed by the terms of the Final Order.

**4.2    Delivery of Additional Documentation Required**.  The Loan Parties shall from time to time execute and deliver to Lender, at the request of Lender, all Negotiable Collateral, all financing statements, deeds, deeds of trust, bills of sale, security agreements, mortgages, hypothecations, real estate transfer documentation, and other documents that Lender may reasonably request, in form satisfactory to Lender, to perfect and continue the perfection of Lender's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents.  Notwithstanding the foregoing, the Liens granted hereunder shall be and hereby are, immediately deemed duly perfected and recorded under all applicable federal or state or other laws as of the date of this Agreement, and no notice, filing, mortgage recordation, possession, or other third party consent or act shall be required to effect such perfection.

**4.3    Authorization to File Financing Statements**.  The Loan Parties hereby authorizes Lender to file financing statements, with notice to Loan Parties, with all appropriate jurisdictions to perfect or protect Lender's interest or rights hereunder.

**5.    REPRESENTATIONS AND WARRANTIES**.

Each Loan Party represents and warrants as follows:

**5.1    Due Organization and Qualification**.  The Loan Parties are corporations or limited liability companies duly existing under the laws of their state of incorporation or registration and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified, except in each case (other than with respect to their states of incorporation) where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.

**5.2    Due Authorization; No Conflict**.  Subject to the entry of the Final Order and the terms hereof, the execution, delivery, and performance of the Loan Documents are within the Loan Parties' powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in the Loan Parties' Certificate of Incorporation, Article of Organization, or Bylaws, nor will they constitute an event of default under any material agreement to which the Loan Parties are a party or by which a Loan Parties is bound.  The Loan Parties are not in default under any post-petition agreements to which it is a party or by which it is bound, except to the extent such default would not reasonably be expected to cause a Material Adverse Effect.

**5.3    No Prior Encumbrances**.  Each Loan Party holds its Causes of Action, and each Property Owner has good and marketable title to its respective Real Property owned by it, free and clear of Liens, except for Permitted Liens and subject to any liens set forth in the title commitment delivered to Lender and approved at Closing.  Set forth in **Exhibit A** hereto is a complete and accurate list of all Real Property owned by each Property Owner, showing, as of the date hereof, the street address, state and any other relevant jurisdiction, record owner.

**5.4    Diligence**.  The Loan Parties are not aware of any fact, condition or circumstance that may materially and adversely affect the assets, liabilities, business, prospects, condition or results of operations of the Loan Parties or the Real Property that has not been previously disclosed to the Lender in writing

**5.5    Name; Location of Business**.  The Loan Parties will advise Lender not less than ten (10) Business Days in advance of any change in the business headquarters of the Loan Parties.

Except as disclosed in the Perfection Certificate, the Loan Parties have not done business under any name other than that specified on the signature page hereof.

5.6 **Litigation**. Except as disclosed in writing to Lender, there are no actions or proceedings (other than the Cases) pending by or against Loan Party before any court or administrative agency in which an adverse decision could reasonably be expected to have a Material Adverse Effect.

5.7 **Regulatory Compliance**. Except for a prepetition deficiency under the Loan Parties' 401(k) plan, to the best of the Loan Parties' knowledge, the Loan Parties have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from the Loan Parties' failure to comply with ERISA that is reasonably likely to result in the Loan Parties' incurring any liability that could reasonably be expected to have a Material Adverse Effect. The Loan Parties are not required to be registered as an "investment company" under the Investment Company Act of 1940. The Loan Parties are not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System). To the best of the Loan Parties' knowledge, the Loan Parties have complied with all the provisions of the Federal Fair Labor Standards Act except in each case where the failure to do so could not reasonably be expected to cause a Material Adverse Effect. To the best of the Loan Parties' knowledge, the Loan Parties have not violated any statutes, laws, ordinances or rules applicable to it, the violation of which could reasonably be expected to cause a Material Adverse Effect.

5.8 **Environmental Condition**. To the best of the Loan Parties' knowledge and except as would not reasonably be expected to have a Material Adverse Effect and/or except as otherwise disclosed in any property condition reports delivered to Lender in connection with the Loan, none of the Loan Parties' properties or assets has ever been used by the Loan Parties or to the best of the Loan Parties' knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in accordance with Applicable Law. To the best of the Loan Parties' knowledge and except as disclosed in any property condition reports delivered to Lender in connection with the Loan, none of the Real Property has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute. To the best of the Loan Parties' knowledge no lien arising under any environmental protection statute has attached to any revenues or to any real or personal property owned by the Loan Parties and the Loan Parties have not received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal, state or other governmental agency concerning any action or omission by or resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

5.9 **Taxes**. Except as otherwise disclosed to Lender at Closing, the Loan Parties have filed or caused to be filed all material tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein, except (i) for taxes for which filing is not yet due, or (ii) for taxes that are being contested in good faith by appropriate proceedings and are reserved against (to the extent required by GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender) by the Loan Parties, or (iii) to the extent taxes are pre-petition taxes, or (iv) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.10 **Subsidiaries**. The Property Owners do not own any stock, partnership interest or other equity securities of any Person, except for Permitted Investments.

**5.11    Government Consents**.  The Loan Parties have obtained (or will obtain, as and when required under Applicable Law) all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of the Loan Parties' business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

**5.12    Deposit and Securities Accounts**.  The Loan Parties maintain deposit or securities accounts only as set forth in the Perfection Certificate.

**5.13    Full Disclosure**.  No representation, warranty or other statement made by the Loan Parties in any of the Loan Documents contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements not misleading when made, it being recognized by Lender that the projections and forecasts provided by the Loan Parties in good faith and based upon assumptions that were reasonable at the time such projections were delivered and are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results.  No Loan Document has been amended.  To the Loan Parties actual knowledge, the Loan Documents are each in full force and effect and are not subject to any offset, claim, counterclaim or defense in favor of the Loan Parties.

**5.14    Use of Proceeds**.  The Loan Parties shall use the proceeds of the Loans in accordance with the Final Order exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Order):

(a)    to pay the Fees;

(b)    to the extent not included in Section 5.14(a), to pay certain costs, premiums, fees and expenses related to the Case; and

(c)    to fund working capital and other needs of the Loan Parties, including, but not limited to, funding the investigation and/or pursuit of any litigation claims held by the Debtors.

Proceeds of the DIP Loan Facility or cash collateral shall not be used (a) by the Debtors, or any other party-in-interest, including a Committee, or any of their representatives, to challenge or otherwise contest or institute any proceeding of any kind or nature to determine   the validity, perfection, enforceability or priority of claims or security interests in favor of Lender, or (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action of any kind or nature against Lender and its agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims,.  Notwithstanding the foregoing, nothing herein shall prohibit the Loan Parties or Committee from disputing the alleged occurrence of a default or Event of Default hereunder.

**6.    AFFIRMATIVE COVENANTS**.

Each Loan Party shall do all of the following:

**6.1    Good Standing**.  Each Loan Party shall maintain its corporate existence and good standing in its jurisdiction of incorporation and maintain qualification in each other jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect.  Each Loan Party shall maintain in force all necessary licenses, approvals, and agreements, the loss of which could have a Material Adverse Effect.

17

**6.2     Government Compliance**.   To the extent applicable, each Loan Party shall meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA.   Loan Party shall comply with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a Material Adverse Effect.

**6.3     Financial Statements, Reports, Certificates**.   The Loan Parties shall deliver the following to the Lender:

(a)     Commencing 120 days after the Final Order Entry Date, and thereafter on a quarterly basis, within 30 days after the end of such quarter, a status report regarding the Causes of Action.

(b)     all reports filed, including monthly operating reports, filed with the Office of the United States Trustee;

(c)     [Intentionally Omitted].

(d)     (i) together with the reports described in clause (e) below, a report of any legal actions (other than claims asserted in the Case) for worker's compensation, unemployment or counter-claims in intellectual property infringement proceedings which are pending against any Loan Party that could if adversely determined reasonably be expected to result in a Material Adverse Effect; and (ii) promptly upon receipt of notice thereof, a report of (x) any other legal actions (other than the Case) pending against a Loan Party that could reasonably be expected to result in liability to a Loan Party of One Hundred Thousand Dollars ($100,000.00) or more, or (y) any commercial tort claim acquired by a Loan Party;

(e)     commencing with the month ending 120 days after the Final Order Entry Date, and thereafter on a quarterly basis, within 30 days after the end of such quarter, a report signed by Loan Party, in form acceptable to Lender in its Permitted Discretion, listing any applications or registrations that a Loan Party has made or filed in respect of any Patents, Copyrights or Trademarks and the status of any outstanding applications or registrations, as well as any material change in a Loan Party's Intellectual Property along with an updated Perfection Certificate if any of the information contained in the Perfection Certificate delivered to the Lender on the Closing Date is no longer true and correct in all respects;

(f)     written notice within five (5) Business Days' of the resignation from or termination of employment of any Responsible Officer; and

(g)     such other financial information as Lender may request from time to time in its Permitted Discretion.

To the extent any of the foregoing reports or financial information are due on a day that is not a Business Day, the Loan Parties shall instead deliver such reports or financial information on the next Business Day.

**6.4     Right to Inspect**.   Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during a Loan Party's usual business hours to inspect Loan Party's Books and to make copies thereof, to audit a Loan Party's Accounts and to inspect, visit, check, test, and appraise the Collateral in order to verify a Loan Party's financial condition or the amount, condition of, or any other matter relating to, the Collateral; provided that no notice is required if an Event of Default has occurred and is continuing and provided further that during the

23-01243-WLH11     Doc 467     Filed 02/23/24     Entered 02/23/24 19:13:50     Exhibit 2, Page 71

continuance of an Event of Default all cost and fees associated with Lender's inspection shall be borne by the Loan Parties.

**6.5    Taxes**.  The Loan Parties shall make due and timely payment or deposit of all material Taxes required of it by law (including the Bankruptcy Code), provided that the Loan Parties need not make any payment if (i) the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender)) by Loan Parties and (ii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.6    Insurance**.

(a)    The Loan Parties, at their expense, shall keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks (including, but not limited to, insurance sufficient to cover personal injuries caused by Loan Parties' products in an amount not less than the Obligations), and in such amounts, as ordinarily insured against by other owners in similar businesses conducted in the locations where Loan Parties' business is conducted on the date hereof.  Loan Parties shall also maintain insurance relating to Loan Parties' business, ownership and use of the Collateral in amounts and of a type that are customary to businesses similar to Loan Parties'.

(b)    All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender (it being hereby acknowledged by Lender that the insurance policies of Loan Parties in place on the Closing Date are satisfactory).  All such policies of property insurance shall contain a lender's loss payable endorsement showing Lender as an additional loss payee thereof, and all liability insurance policies shall show the Lender as an additional insured and Loan Parties shall use commercially reasonable efforts to have such policies specify that the insurer must give at least twenty (20) calendar days' notice to Lender before canceling its policy for any reason (or ten (10) calendar days for cancellation for nonpayment of premiums).  Upon Lender's request (which shall occur once per year excepting for following the occurrence and during the continuance of an Event of Default), Loan Parties shall deliver to Lender certified copies of such policies of insurance and evidence of the payments of all premiums therefor.  All proceeds payable under any such policy shall, at the option of Lender, be payable to Lender to be applied on account of the Obligations.

**6.7    Accounts**.  Except as required under the Bankruptcy Code, rules or policies of the U.S. Trustee, and/or a Bankruptcy Court order, each Loan Party shall not establish any deposit or securities account after the Closing Date without the approval of the Lender and shall use a cash management system that is the same as or substantially similar to its prepetition cash management system.  Any material changes from such prepetition cash management system must be acceptable to the Lender in its reasonable discretion.

**6.8    Notice of Disputes, Claims**.  The Loan Parties must promptly notify Lender of all returns, recoveries, disputes, claims, or litigation proceedings that involve more than One Hundred Thousand Dollars ($100,000.00).

**6.9    Bankruptcy Filings**.  Not less than two (2) Business Days prior to filing any motion requesting approval for debtor-in-possession financing and use of cash collateral, the Loan Parties shall send copies of such motions to Lender.

19

**6.10   Further Assurances**.  At any time and from time to time, the Loan Parties shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to effect the purposes of this Agreement.

**6.11   Debtor-in-Possession Obligations**.  Comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

**6.12   First Day Orders**.  The Loan Parties shall cause all proposed "first day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

**6.13   Additional Waivers**.  The Loan Parties further acknowledge and agree to the matters set forth in **Exhibit C**.

**6.14   Filing of Motions and Applications**.  Without the prior written consent of the Lender, the Loan Parties shall not apply to the Bankruptcy Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the Loan Documents or the Final Order, (b) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Final Order, or (c) permit any Indebtedness (other than any Permitted Indebtedness), except as expressly stated in this Agreement or the Final Order.

**6.15   Superpriority Claim**.  The Debtors shall not incur, create, assume, suffer to exist or permit any other Superpriority Claim that is *pari passu* with or senior to the claims of the Lender against the Loan Parties and as otherwise expressly stated in the Final Order.

**7.   NEGATIVE COVENANTS**.

Other than in accordance with a Bankruptcy Sale Order or a plan of reorganization confirmed by the Bankruptcy Court, no Loan Party shall do any of the following:

**7.1   Dispositions**.  Convey, sell, lease, transfer or otherwise dispose of any Collateral (collectively, a "**Transfer**") other than:  (i) transfers of (a) non-exclusive licenses and similar arrangements for the use of the property (including Intellectual Property) of a Loan Party in the ordinary course of business, (b) licenses that could not result in a legal transfer of title of the licensed property but that may be exclusive in respects other than territory, (c) licenses relating to discreet geographical areas outside of the United States (for the avoidance of doubt and for sake of clarity, however, a Loan Party may enter into limited non-competition arrangements with its licensees and similar business partners in the ordinary course of business), (d) (i) the Transfer or sale or the Loan Parties' goods and inventory in the ordinary course of business; or (ii) Transfers of Equipment as permitted by this Agreement or the order(s) of the Bankruptcy Court, or (iii) assignment of leases or subleases of real property and (e) the sale of a Real Property in an arms-length third party sale transaction.  To avoid any ambiguity cash may be used in the ordinary course of business, subject to the provisions of this Agreement and orders of the Bankruptcy Court.

**7.2   Change in Business; Change in Executive Office**.  Engage in any business, other than the businesses currently engaged in by the Loan Parties and any business substantially similar or related thereto (or incidental thereto), or cease to conduct business in the manner conducted by the Loan Parties as of the Closing Date; or without thirty (30) calendar days prior written notification to Lender (a) relocate its chief executive office or state of incorporation or change its legal name; (b) add any new offices or business locations or deliver any portion of the Collateral valued, individually or in

the aggregate, in excess of One Hundred Thousand Dollars ($100,000.00) to a bailee other than to a bailee and at a location already disclosed in the Perfection Certificate, or (c) without Lender's prior written consent, change the date on which its fiscal year ends.

          **7.3**     **Mergers or Acquisitions**.  Merge, divide or consolidate, with or into any other business organization, or acquire, all or substantially all of the capital stock or property of another Person.

          **7.4**     **Indebtedness**.  Create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness. Notwithstanding the foregoing, the Loan Parties may incur debt payable from only an Excluded Asset with the prior written consent of Lender, which shall not be unreasonably withheld.

          **7.5**     **Encumbrances**.  Create, incur, assume or suffer to exist any voluntary Lien with respect to any of its Real Property except for Permitted Liens, or assign or otherwise convey any right to receive income, including the sale of any Accounts, except for Permitted Liens, or enter into any agreement with any Person other than Lender not to grant a security interest in, or otherwise encumber, any of its property.  Notwithstanding the foregoing, the Loan Parties may create a Lien on any Excluded Asset.

          **7.6**     **Distributions**.  Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any equity interests, except that the Loan Parties may repurchase equity interests from current or former employees, directors, or consultants of the Loan Parties in any amount where the consideration for the repurchase is solely the cancellation of indebtedness owed by such current or former employees, directors or consultants to the Loan Parties regardless of whether an Event of Default exists.

          **7.7**     **Investments**.  Directly or indirectly acquire or own, or make any Investment in or to any Person, other than Permitted Investments and any Loan Parties ownership interest in any subsidiary company in effect as of the Closing Date (including, but not limited to, the Property Owners); or maintain or invest any of its property with a Person other than Lender unless such Person has entered into an account control agreement with Lender in form and substance satisfactory to Lender.

          **7.8**     **Transactions with Affiliates**.  Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of the Loan Parties except for transactions that are either approved by the Bankruptcy Court or entered into in the ordinary course of a Loan Party's business, upon fair and reasonable terms that are no less favorable to the Loan Parties than would be obtained in an arm's length transaction with a non-affiliated Person.

          **7.9**     **Compliance**.  Become an "investment company" or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of any Credit Extension for such purpose.  Fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur, or fail to comply with the Federal Fair Labor Standards Act, or violate any law or regulation, which violation could reasonably be expected to have a Material Adverse Effect.

8. **EVENTS OF DEFAULT**.

Any one or more of the following events shall constitute an Event of Default by the Loan Parties under this Agreement:

8.1 **Payment Default**. Except to the extent the holder thereof would be stayed from exercising remedies as a result of the Cases after accounting for the relief provided in the Final Order, if the Loan Parties fail to pay, when due, (a) any regularly scheduled payment of interest under the Loan on the applicable payment date or (B) the Obligations in full on the Maturity Date (provided, however it is expressly understood and agreed that the Loan Parties failure to pay the Obligations in full on the Original Maturity Date shall be treated as the Loan Parties' automatic exercise of the Option to Extend the term of the Loan to the Extended Maturity Date and such occurrence shall not be an Event of Default). In the event of (a) or (b) Lender shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for non-payment has occurred;

8.2 **Covenant Default**.

(a) If a Loan Party violates or fails to perform any obligation under Article 6 or Article 7 and such failure continues for ten (10) Business Days after Lender delivers written notice thereof to the Loan Parties. In such event Lender shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for non-compliance of a specified obligation under Article 6 or Article 7 has occurred; and

(b) If a Loan Party fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement not specified in Section 8.2 above, or in any of the other Loan Documents, for five (5) Business Days after Lender delivers written notice thereof to the Loan Parties, provided, however, that if the default cannot by its nature be cured within the five (5) Business Days period or cannot after diligent attempts by the Loan Parties be cured within such five (5) Business Days period, and such default is likely to be cured within a reasonable time, then the Loan Parties shall have an additional reasonable period (which shall not in any case exceed thirty (30) calendar days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default, but no Credit Extensions will be made. In such case and if an Event of Default is triggered under this Section 8.2(b), Lender may notify the Committee, and the U.S. Trustee.

8.3 **[Intentionally Omitted]**.

8.4 **Attachment**. Other than in connection with the Cases in each case, if any material portion of the Loan Parties' assets are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within thirty (30) calendar days without the same being contested by the Loan Parties in good faith, or if the Loan Parties are enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a Lien or material monetary encumbrance upon any material portion of the Loan Parties' assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of the Loan Parties' assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not removed, discharged, rescinded or paid within thirty (30) calendar days after receipt of written notice from Lender delivered to the Loan Parties, the Committee, and the U.S. Trustee, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been

posted pending a good faith contest by the Loan Parties (provided that no Credit Extensions will be required to be made during such cure period);

**8.5    Assets**.  Provided that such conditions are not cured within thirty (30) calendar days after receipt of written notice from Lender delivered to the Loan Parties, the Committee, and the U.S. Trustee: (a) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral, which rights under Section 506(c) of the Bankruptcy Code shall be waived (subject only to and effective upon entry of the Final Order), (b) any Person attempts to apply the doctrine of marshalling with respect to the Lender, which shall be waived (subject only to and effective upon entry of the Final Order), or (c) any Person attempts to apply the "equities of the case" exception set forth in Section 552(b) of the Bankruptcy Code, which shall be waived (subject only to and effective upon entry of the Final Order);

**8.6    Other Agreements**.  Except to the extent the counterparty thereto would be stayed from exercising remedies as a result of the Case, if there is an event of default in any material agreement to which any of the Loan Parties is a party or by which it is bound resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of One Hundred Thousand Dollars ($100,000.00) or which could have a Material Adverse Effect;

**8.7    Lien Priority**.  If the Obligations shall not have the priority contemplated by this Agreement, or the entry of any order in the Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations;

**8.8    Judgments**.  If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least One Hundred Thousand Dollars ($100,000.00) (excluding amounts covered by insurance or third party indemnification) shall be rendered against the Loan Parties and shall remain unsatisfied, unvacated or unstayed pending appeal for a period of sixty (60) calendar days after entry of such judgement (provided that no Credit Extensions will be made prior to the satisfaction or stay of such judgment);

**8.9    Misrepresentations**.  If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth herein or in any Loan Document or certificate delivered to Lender and prepared by any Responsible Officer pursuant to this Agreement.  In such event Lender shall provide the Loan Parties, the Committee and the U.S. Trustee written notice that an Event of Default for breach of this <u>Section 8.9</u> has occurred;

**8.10    Cases**.  Any Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code without the consent of the Lender;

**8.11    Trustee**.  A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in the Case;

**8.12    Cash Collateral**.  An order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Loan Parties;

**8.13    Relief from Stay**.  The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the

23

granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties constituting Collateral for the DIP Loan which have a value in excess of One Hundred Thousand Dollars ($100,000.00) in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole);

**8.14   Order**.  The Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected first priority Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lender.  In such event Lender shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for breach of this Section 8.14 has occurred;

**8.15   Compliance with Orders**.  Any of the Loan Parties shall fail to comply with the Final Order (on and after the Final Order Entry Date) in any material respect;

**8.16   Other Financing**.  (a) Except as permitted in the Final Order, the entry of any order of the Bankruptcy Court granting to any third party a Superpriority Claim or Lien *pari passu* with or senior to that granted to and/or for the benefit of the Lender hereunder without the prior written consent of Lender in Lender's Permitted Discretion, or (b) the Loan Parties shall make any payment of principal or interest or otherwise on account of any Indebtedness or payables other than the Obligations under the DIP Facility, or other than in accordance with the Budget approved by  Lender; or

**8.17   Avoidance**.  (a) Any suit or action is commenced against the Lender by the Loan Parties that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender, or (b) the Bankruptcy Court rules in favor of any Person in any suit or action commenced against the Lender by or on behalf of such Person (after the Bankruptcy Court has granted such Person standing to commence such suit or action).

The Court shall have jurisdiction to resolve any dispute between the Loan Parties and Debtors regarding whether an Event of Default has occurred;

**9.   LENDER'S RIGHTS AND REMEDIES**.

**9.1   Rights and Remedies**.  During the continuance of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by the Loan Parties:

(a)   Subject to the Final Order, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, suspend the DIP Loan Facility with respect to additional Advances, whereupon any additional Advances shall be made or incurred in Lender's sole discretion so long as such Default or Event of Default is continuing.  If any Event of Default has occurred and is continuing, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, the rate of interest applicable to the Loan shall be increased to the Default Rate.

(b)   Subject to the Final Order, Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court:  (i) terminate the DIP Loan Facility with respect to further Advances; (ii) reduce the DIP Loan Commitments from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of the Loan to be forthwith due and payable, all without

23-01243-WLH11   Doc 467   Filed 02/23/24   Entered 02/23/24 19:13:50   Exhibit 2, Page 77   Pg 77 of 100

presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower; or (iv) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and pursuant to the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise its remedies under this Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, that Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon five (5) Business Days' prior written notice to Borrower, counsel approved by the Bankruptcy Court for the Committee and the U.S. Trustee and as set forth in the Final Order (when applicable).

(c)     Waivers by the Loan Parties.  Except as otherwise provided for in this Agreement (including any notice required pursuant to any of the other Loan Documents) or that is not capable of being waived by Applicable Law, each Loan Party waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which a Loan Party may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

**9.2     Lender's Liability for Collateral**.  So long as Lender complies with reasonable commercial lending practices, Lender shall not in any way or manner be liable or responsible for:  (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or i) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever.  All risk of loss, damage or destruction of the Collateral shall be borne by the Loan Parties.

**9.3     Remedies Cumulative**.  Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative.  Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity, subject to the requirements of the Bankruptcy Code.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on the Loan Parties' part shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.  No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the instance and for the purpose for which it was given.

**9.4     Protective Payments**.  If any Loan Party fails to obtain the insurance called for by Section 6.6 or fails to pay any premium thereon or fails to pay any other amount which a Loan Party is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the Collateral, Lender may obtain such insurance or make such payment, and all amounts so paid by Lender are Lender Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral.  Lender will make reasonable efforts to provide the Loan Parties with notice of Lender obtaining such insurance at the time it is obtained or within a reasonable time thereafter.  No payments by Lender are deemed an agreement to make similar payments in the future or Lender's waiver of any Event of Default.

**9.5     Demand; Protest**.  Except for any notice required pursuant to the Loan Documents or that is not capable of being waived by Applicable Law, the Loan Parties waive demand,

23-01243-WLH11    Doc 467    Filed 02/23/24    Entered 02/23/24 19:13:50    Exhibit 2, Page 78

protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which Borrower may in any way be liable.

9.6     **Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Advances made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Advances made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Lender an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lender and the Loan Parties to conform strictly to any applicable usury laws. Accordingly, if Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lender's option be applied to the outstanding amount of the Advances made hereunder or be refunded to the Loan Parties.

9.7     **Waiver of Consequential Damages; Etc.** To the fullest extent permitted by Applicable Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnified Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnified Party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the fraud, bad faith, gross negligence or willful misconduct of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction, **WHICH LIMITATION OF LIABILITY SHALL APPLY REGARDLESS OF WHETHER THE LIABILITY ARISES FROM THE SOLE, CONCURRENT, CONTRIBUTORY OR COMPARATIVE NEGLIGENCE OF THE INDEMNIFIED PARTY.**

10.     **NOTICES**.

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below. Lender or the Loan Parties may change its mailing or

electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this <u>Section 10</u>:

<div style="margin-left: 2em;">

If to the Loan Parties:      [Applicable Loan Party]
Attention: Lance Miller
Paladin Management Group
633 W. 5th Street, 26th Floor
Los Angeles, CA 90071
Lmiller@paladinmgmt.com

With a copy to (which does not constitute notice):

Buchalter, P.C.
1000 Wilshire Blvd., Suite 1500
Los Angeles, CA 90017
Attention:  Khaled Tarazi, Esq. and Daniel Katz, Esq.
Emails:  ktarazi@buchalter.com / dkatz@buchalter.com

If to Lender:      iCap DIP Finance Group LLC
1990 S. Bundy Dr., Suite 650
Los Angeles, CA 90025
Attention: Kevin DeMeritt
Email: k_demeritt@learcapital.com

With a copy to (which does not constitute notice):

 Shulman Bastian Friedman & Bui LLP
100 Spectrum Center Drive, Suite 600
Irvine, CA 92618
Attention: Alan J. Friedman, Esq. and Mimi Lin, Esq.
Emails: AFriedman@shulmanbastian.com;
MLin@shulmanbastian.com

</div>

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

23-01243-WLH11    Doc 467    Filed 02/23/24    Entered 02/23/24 19:13:50    Exhibit 2, Page 80

**11. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE**.

This Agreement was negotiated in the State of California, the Loan was made by Lender and accepted by the Loan Parties in the State of California, and the proceeds of the Loan delivered pursuant hereto were disbursed from the State of California, which state the parties irrevocably and unconditionally agree has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects, including, without limiting the generality of the foregoing, matters of construction, validity and performance, each and all of this Agreement and the other Loan Documents, and the obligations arising hereunder and thereunder shall be governed by, and construed in accordance with, the laws of the State of California applicable to contracts made and performed in such state (without regard to principles of conflicts of laws) and any applicable law of the United States of America, except that at all times the attachment, creation, perfection, and enforcement of the liens and security interests created under the deeds of trust in favor of Lender in respect of real property and/or personal property shall be governed by and construed according to the law of the state in which such real property is located, it being understood that, to the fullest extent permitted by the law of such state, the law of the State of California shall govern the construction, validity and enforceability of this Agreement, the Loan and all of the obligations arising hereunder or thereunder.

To the fullest extent permitted by law, each of the Loan Parties and Lender hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Agreement and/or the Loan.

The Loan Parties and Lender each further submit to the exclusive jurisdiction of the Bankruptcy Court; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Lender from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations located in such other jurisdiction, or to enforce a judgment or other court order in favor of Lender. The Loan Parties expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, and the Loan Parties hereby waive any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. The Loan Parties hereby waive personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to the Loan Parties at the address set forth in, or subsequently provided by the Loan Parties in accordance with, Section 10 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of the Loan Parties' actual receipt thereof or three (3) calendar days after deposit in the U.S. mails, proper postage prepaid

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE LOAN PARTIES AND LENDER EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

This Section 11 shall survive the termination of this Agreement.

## 12.    BANKRUPTCY COURT.

For the avoidance of doubt, to the extent there is conflict between the terms of this Agreement and the terms of the Final Order, the Final Order shall control.

## 13.    MULTIPLE BORROWERS.

**13.1    Joint and Several Liability; Surety Provisions.**  Each Loan Party agrees that it is jointly and severally liable for, and absolutely, irrevocably and unconditionally guarantees to Lender the prompt payment and performance of, all Obligations.  Each Loan Party acknowledges and agrees that its Collateral secures and cross-collateralizes each Loan made hereunder.  Each Loan Party further acknowledges and agrees to the matters set forth on **Exhibit C**.

**13.2    Marshalling.**  Each Loan Party expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel Lender to marshal assets or to proceed against any Loan Party, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Loan Party.  Each Loan Party waives all defenses available to a surety, guarantor or accommodation co-obligor other than full payment of all Obligations and waives, to the maximum extent permitted by law, any right to revoke any guaranty of any Obligations as long as it is a Loan Party.  It is agreed among each Loan Party and Lender that the provisions of this Section 13.2 are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Lender would decline to make DIP Loans.

**13.3    Consolidated Credit Facility.**  Each Loan Party has requested that Lender make this DIP Credit Facility available to the Loan Parties on a combined basis, in order to finance the Loan Parties' business most efficiently and economically.  The Loan Parties' business is a mutual and collective enterprise, and the successful operation of each Loan Party is dependent upon the successful performance of the integrated group.  The Loan Parties believe that consolidation of their credit facility will enhance the borrowing power of each Loan Party and ease administration of the facility, all to their mutual advantage.

**13.4    Loan Party Subordination.**  Each Loan Party hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Loan Party, howsoever arising, to the full payment of all Obligations.

**13.5    One Obligation.**  The DIP Loans and other Obligations constitute one general obligation of the Loan Parties and are secured by Lender's first priority Lien on all Collateral; provided, however, that Lender shall be deemed to be a creditor of, and the holder of a separate claim against, each Loan Party to the extent of any Obligations jointly or severally owed by such Loan Party.

## 14.    GENERAL PROVISIONS.

**14.1    Successors and Assigns**.  This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by the Loan Parties or, prior to the occurrence of an Event of Default, Lender, without the other's prior written consent, which consent may be granted or withheld in such party's sole discretion.

**14.2    Indemnification**.  The Loan Parties shall defend, indemnify and hold harmless Lender and its officers, employees, and agents (each an "**Indemnified Party**") against:    (a) all

obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (b) all actual losses or actual Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and the Loan Parties whether under this Agreement, the DIP Loan Facility, the Case, or otherwise (including without limitation reasonable attorneys' fees and expenses), provided, the foregoing shall specifically expressly exclude (a) any special, exemplary, punitive or consequential damages (unless the same are asserted by a third party against Lender and awarded to such third party in a legal proceeding against Lender and paid (or payable) by Lender), lost profits and diminution in value and any (b) any losses caused by an Indemnified Party's fraud, bad faith, gross negligence or willful misconduct. This Section 14.2 shall not apply to Taxes.

14.3 **Time of Essence**. Time is of the essence for the performance of all obligations set forth in this Agreement.

14.4 **Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

14.5 **Amendments in Writing, Integration**. Except as expressly set forth herein, all amendments to or terminations of this Agreement or the Loan Documents must be in writing signed by each of the parties hereto. All prior agreements, understandings, representations, warranties, and negotiations between any of the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

14.6 **Counterparts**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

14.7 **Electronic Execution of Documents**. The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

14.8 **Survival**. All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding or Lender has any obligation to make Credit Extensions to the Loan Parties (excluding any contingent payment obligations which expressly survive repayment of the Loan and which, as of the date of such full repayment, have not yet ripened). The obligations of the Loan Parties to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 14.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

14.9 **Confidentiality; Disclosure**. In handling any confidential information Lender and all employees and agents of Lender, including but not limited to accountants, shall exercise the same degree of care that it exercises with respect to its own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this

Agreement except that disclosure of such information may be made (i) to prospective transferees or purchasers of any interest in the loans, provided that they are similarly bound by confidentiality obligations, (ii) as required by law, regulations, rule or order, subpoena, judicial order or similar order (including in connection with the Case), (iii) as may be required in connection with the examination, audit or similar investigation of Lender and (iv) as Lender may determine in connection with the enforcement of any remedies hereunder. Confidential information hereunder shall not include information that either: (a) is in the public domain or in the knowledge or possession of Lender when disclosed to Lender, or becomes part of the public domain after disclosure to Lender through no fault of Lender; or (a) is disclosed to Lender by a third party, provided Lender does not have actual knowledge that such third party is prohibited from disclosing such information. The Loan Parties authorize Lender to disclose its relationship with the Loan Parties, including use of the Loan Parties' logo in Lender's promotional materials.

**14.10    Intentionally Omitted**[1].

**14.11    Transfer of the Loan.**  Lender may, at any time, upon five (5) Business Days advance written notice to the Loan Parties, sell, transfer or assign a partial interest in the DIP Loan (but not its entire interest in the whole DIP Loan), or grant participations therein.  Any assignee shall be treated as a Lender for all purposes hereunder.  Notwithstanding the foregoing or anything in this Agreement or the other Loan Documents to the contrary, if at the time of any transfer of a less than whole interest in the DIP Loan by Lender there are any remaining unfunded Advances under the Loan Documents, then Lender shall remain fully and primarily liable therefore and Lender shall be required to cure any failure of such transferee to satisfy any Advances not made in violation of the Loan Documents.

**14.12    Patriot Act Notice**.  Lender notifies the Loan Parties that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes names and addresses and other information that will allow Lender to identify the Loan Parties in accordance with the Patriot Act.

**14.13    Correction of Loan Documents**.  Lender may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

[SIGNATURE PAGE FOLLOWS]

---

[1] NTD: reinsert if lending entity will be replaced by licensed lender

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**PROPERTY OWNERS**

**UW 17th Ave, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**725 Broadway, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Campbell Way, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**VH 1121 14th, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

23-01243-WLH11    Doc 467    Filed 02/23/24    Entered 02/23/24 19:13:50    Exhibit 2, Page 85

**VH Senior Care, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**VH Willows Townhomes, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

## CONSTITUENT PARTY DEBTORS

**CS2 Real Estate Development, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**Colpitts Sunset, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap @ UW, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Broadway, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Enterprises, Inc. f/k/a Altius Development, Inc.**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

[Signature Page 1 to Debtor-in-Possession Loan and Security Agreement]

**iCap Equity, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Funding, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Holding, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap International Investment, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Investments, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


[Signature Page 2 to Debtor-in-Possession Loan and Security Agreement]

**iCap Management LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Northwest Opportunity Fund, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Pacific Income Fund 4, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Pacific Income Fund 5, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Pacific Northwest Opportunity and Income Fund, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


[Signature Page 3 to Debtor-in-Possession Loan and Security Agreement]

**iCap Pacific NW Management, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Realty, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Vault 1, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Vault Management, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Vault LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


[Signature Page 4 to Debtor-in-Possession Loan and Security Agreement]

**iCap Holding 5, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Holding 6, LLC**
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**iCap Pacific Development LLC**
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**Senza Kenmore, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**Vault Holdings LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

[Signature Page 5 to Debtor-in-Possession Loan and Security Agreement]

**Vault Holding 1, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**VH 2nd Street Office, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**VH Pioneer Village, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

[Signature Page 6 to Debtor-in-Possession Loan and Security Agreement]

**Lender:**

By: _____
Kevin DeMeritt

[Signature Page 7 to Debtor-in-Possession Loan and Security Agreement]

**EXHIBIT A**

**REAL PROPERTY**


1.      The real property commonly known as 4740 17th Ave NE Seattle, WA and owned by UW 17th Ave, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

2.      The real property commonly known as 715-775 Broadway Tacoma, WA and owned by 725 Broadway, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

3.      The real property commonly known as 1231 Campbell Way Bremerton, WA and owned by iCap Campbell Way, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

4.      The real property commonly known as 117 -121 14th Ave., Seattle, WA and owned by VH 1121 14th LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

5.      The real property commonly known as 302 SE 146th Street Burien, WA  and owned by VH Senior Care, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

6.      The real property commonly known as 1226 160th Street SW, Lynwood, WA and owned by VH Senior Care, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

7.      The real property commonly known as 4918C, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

8.      The real property commonly known as 4906A, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

9.     The real property commonly known as 4912B, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

10.    The real property commonly known as 4910B, Willow St., Seattle, WA and owned by VH Willows Townhomes, LLC, and all buildings and improvements thereon, proceeds, products, rents and profits thereof, including, without limitation, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing that constitute Prepetition Collateral.

**EXHIBIT B**

**FORM OF FINAL ORDER**

**See attached**

EXHIBIT C

## SURETYSHIP PROVISIONS AND WAIVERS

1.      Condition of Other Loan Parties.  Each Loan Party represents and warrants to Lender that such Loan Party has established adequate means of obtaining from the other Loan Parties, on a continuing basis, financial and other information pertaining to the business, operations and condition (financial and otherwise) of the other Loan Parties and their assets, and each Loan Party now is and hereafter will be completely familiar with the business, operations and condition (financial and otherwise) of the other Loan Parties and their assets.  Each Loan Party hereby expressly waives and relinquishes any duty on the part of Lender to disclose to such Loan Party any matter, fact or thing related to the businesses, operations or condition (financial or otherwise) of the other Loan Parties and their assets, whether now known or hereafter known by Lender during the life of this Agreement.  With respect to any of the Obligations, Lender need not inquire into the powers of any Loan Party, or the officers or employees acting or purporting to act on its behalf, and all Obligations made or created in good faith reliance upon the professed exercise of such powers shall be secured hereby.

2.      Waiver of Rights of Subrogation.  Until no part of any commitment of Lender to lend to Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations which expressly survive the full repayment of the Loan and which, as of the date of such full repayment, have not yet ripened), notwithstanding anything to the contrary elsewhere contained herein or in any other Loan Document to which each Loan Party is a party, each Loan Party hereby waives to the extent if may lawfully do so with respect to the other Loan Parties any and all rights at law or in equity, to subrogation, to reimbursement, to exoneration, to indemnity, to contribution, to setoff or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, or to a holder or transferee against a maker and which any Loan Party may have or hereafter acquire against any other Loan Party in connection with or as a result of such Loan Party's execution, delivery and/or performance of this Agreement or any other Loan Document to which each Loan Party is a party.  Until no part of any commitment of Lender to lend to the Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations which expressly survive the full repayment of the Loan and which, as of the date of such full repayment, have not yet ripened), each Loan Party agrees that it shall not have or assert any such rights against any other Loan Party or its successors and assigns either directly or as an attempted setoff to any action commenced against any Loan Party by any other Loan Party (as a borrower or in any other capacity) or any other Person.  Each Loan Party hereby acknowledges and agrees that this waiver is intended to benefit Lender and shall not limit or otherwise affect each Loan Party's liability hereunder, under any other Loan Document to which any Loan Party is a party, or the enforceability hereof or thereof.  Until no part of any commitment of Lender to lend to the Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations which expressly survive the full repayment of the Loan and which, as of the date of such full repayment, have not yet ripened), each Loan Party expressly waives any right to enforce any remedy that Lender now has or hereafter may have against any other Person and waives the benefit of, or any right to participate in, any other security now or hereafter held by Lender.

3.      Liens on Real Property.  In the event that all or any part of the Obligations at any time are secured by any one or more deeds of trust or mortgages or other instruments creating or granting liens on any interests in real property, subject to the terms of the Agreement, each Loan Party authorizes Lender, upon the occurrence of and during the continuance of any Event of Default, at its sole option, without notice or demand, but subject to any all notice required by Applicable Law in the jurisdiction where such Real Property is located and any notice which cannot be waived and without affecting any obligations of

any Loan Party hereunder and under the other Loan Documents, the enforceability of this Agreement, or the validity or enforceability of any liens of Lender on any collateral, to foreclose any or all of such deeds of trust or mortgages or other instruments by judicial or nonjudicial sale.

4.      To the extent a court of competent jurisdiction deems each of the Loan Parties guarantors of the Obligations instead of primary obligors as intended by the parties and to the fullest extent permitted by Applicable Law, each of the Loan Parties expressly waives all rights defenses that each Loan Party may have if the Obligations become secured by real property. This means, among other things, that Lender may collect from any Loan Party without first foreclosing on any real or personal property pledged by any Loan Party, and that if Lender forecloses on any real property collateral pledged by any Loan Party, the amount of the Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if that collateral is worth more than the sale price, and that Lender may collect from any Loan Party even if Lender, by foreclosing on the real property collateral, has destroyed any right any Loan Party may have to collect from any other Loan Party. This is an unconditional and irrevocable waiver of any rights and defenses each Loan Party may have if the Obligations become secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon California Code of Civil Procedure §§ 580a, 580b, 580d or 726, or comparable provisions of the laws of any other jurisdiction, and all other suretyship defenses each Loan Party otherwise might or would have under California law or other applicable law. Further, each of the Loan Parties waive all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as nonjudicial foreclosure with respect to security for the Obligations, has destroyed any Loan Party's rights of subrogation and reimbursement against any other Loan Party by the operation of California Code of Civil Procedure § 580d or otherwise. Each Loan Party expressly waives any right to receive notice of any judicial or nonjudicial foreclosure or sale of any real property or interest therein subject to any such deeds of trust or mortgages or other instruments and each Loan Party's failure to receive any such notice shall not impair or affect each Loan Party's obligations hereunder and under the other Loan Documents or the enforceability of this Agreement or any liens created or granted hereby.

5.      <u>Waiver of Discharge</u>. Without limiting the generality of the foregoing, each Loan Party hereby waives discharge by waiving all defenses based on suretyship or impairment of collateral.

6.      <u>Understandings with Respect to Waivers and Consents</u>. Each Loan Party warrants and agrees that each of the waivers and consents set forth herein is made after consultation with legal counsel and with full knowledge of its significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which any Loan Party otherwise may have against any other Loan Party, Lender or others, or against collateral, and that, under the circumstances, the waivers and consents herein given are reasonable and not contrary to public policy or law. If any of the waivers or consents herein are determined to be contrary to any applicable law or public policy, such waivers and consents shall be effective to the maximum extent permitted by law.

I6656.0002 BN 80765539v2

<u>**SCHEDULE I**</u>

<u>**Property Owners and Related Properties**</u>

| Property Owner | Real Property |
|---|---|
| UW 17th Ave, LLC | 4740 17th Ave NE<br>Seattle, WA |
| 725 Broadway, LLC | 715-775 Broadway<br>Tacoma, WA |
| iCap Campbell Way LLC | 1231 Campbell Way<br>Bremerton, WA |
| VH 1121 14th LLC | 117 -121 14th Ave.,<br>Seattle, WA |
| VH Senior Care LLC | 302 SE 146th Street<br>Burien, WA |
| VH Senior Care LLC | 1226 160th Street SW,<br>Lynwood, WA |
| VH Willows Townhomes, LLC | 4918C, Willow St.,<br>Seattle, WA |
| VH Willows Townhomes, LLC | 4906A, Willow St.,<br>Seattle, WA |
| VH Willows Townhomes, LLC | 4912B, Willow St.,<br>Seattle, WA |
| VH Willows Townhomes, LLC | 4910B, Willow St.,<br>Seattle, WA |

I6656.0002 BN 80765539v2

**SCHEDULE II**

**iCAP Constituent Party Debtors**

CS2 Real Estate Development, LLC
Colpitts Sunset, LLC
iCap @ UW, LLC
iCap Broadway, LLC
iCap Enterprises, Inc. f/k/a Altius Development, Inc.
iCap Equity, LLC
iCap Funding LLC
iCap Holding, LLC
iCap International Investment, LLC
iCap Investments, LLC
iCap Management LLC
iCap Northwest Opportunity Fund, LLC
iCap Pacific Income 4 Fund,, LLC
iCap Pacific Income 5 Fund, LLC
iCap Pacific Northwest Opportunity and Income Fund, LLC
Icap Pacific NW Management, LLC
iCap Realty, LLC
iCap Vault I, LLC
iCap Vault Management, LLC
iCap Vault, LLC
iCap Holding, 5 LLC
iCap Holding, 6 LLC
iCap Pacific Development LLC
Senza Kenmore, LLC
Vault Holding, LLC
Vault Holding, LLC
Vault Holding 1, LLC
VH 2nd Street Office LLC
VH Pioneer Village, LLC

I6656.0002 BN 80765539v2