Julian I. Gurule (CA SBN: 251260)*
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone: (213) 430-6067
Email: jgurule@omm.com

*Co-Counsel to Debtors and
Debtors in Possession*

Dakota Pearce (WSBA #57011)
BUCHALTER
1420 5th Avenue, Suite 3100
Seattle, Washington 98101
Telephone: (206) 319-7052
Email: dpearce@buchalter.com

Bernard D. Bollinger, Jr. (CA SBN: 132817)*
David E. Mark (CA SBN: 247283)*
Khaled Tarazi (AZ SBN: 032446)*
BUCHALTER
1000 Wilshire Blvd., Suite 1500
Los Angeles, California 90017
Telephone: (213) 891-0700
Email: bbollinger@buchalter.com
        ktarazi@buchalter.com

*Admitted *Pro Hac Vice*

*Counsel to Debtors and Debtors in
Possession*

HONORABLE WHITMAN L. HOLT

HEARING DATE: March 27, 2024
HEARING TIME: 10:00 A.M.
LOCATION:  Tower Bldg
           2nd Floor Courtroom
           402 East Yakima Avenue
           Yakima, WA 98901

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

| In re: | Chapter 11 |
|---|---|
| ICAP ENTERPRISES, INC., *et al.*, | Lead Case No. 23-01243-WLH11 |
| Debtors.[1] | Jointly Administered |

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01265-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01248-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund, LLC (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); iCap Broadway, LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care LLC (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF

- 1 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

I, Lance Miller, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

1.     I am the Chief Restructuring Officer and/or Manager of the above-captioned debtors and debtors in possession (together, the "Debtors" or the "Company").  I am generally familiar with the Company's business and financial affairs, and books and records.  I am above 18 years of age and I am competent to testify.

2.     I am a Partner at Paladin Management Group ("Paladin"), a financial advisory firm with an office located at 633 West 5th Street, 28th Floor, Los Angeles, California, 90071.

3.     Paladin provides a broad range of corporate advisory services to its clients including, without limitation, restructuring, strategic and transaction advisory, and strategic communications services.  As a partner at Paladin, I have extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 proceedings.  My experience includes representations in the following matters, among other things: *In re PP Group, LLC*, Case No. 20-10910 (Bankr. D. Del.); *In re Easterday Ranches, Inc.*, Case No. 21-00141 (Bankr. E.D. Wash.); *In re MD America Energy, LLC*, Case No. 20-34966 (Bankr. S.D. Tex.); *In re Yogaworks, Inc.*, Case No. 20-12599 (Bankr. D. Del.); *In re Chesapeake Energy Corp.*, Case No. 20-32333 (Bankr. S.D. Tex.); *In re Lear Capital, Inc.*, Case No. 22-10165 (Bankr. D. Del.);

2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding LLC (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11); Vault Holding, LLC (23-01270-11); iCap Pacific Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); iCap Holding 6 LLC (23-01274-11); Colpitts Sunset, LLC (23-01432-11); CS2 Real Estate Development LLC (23-01434-11); and iCap International Investments, LLC (23-01464-11).

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 2-

*In re CalPlant I Holdco, LLC*, Case No. 21-11302 (Bankr. D. Del.). Prior to joining Paladin, I was the general counsel and chief restructuring officer at Sugarfina, Inc., and general counsel at American Apparel, Inc. I earned a B.A. degree from the University of California, San Diego, and a juris doctor degree from Boston University School of Law. I have approximately 18 years of experience as an advisor and investor in corporate restructurings and distressed situations. I have advised companies, creditors, shareholders, and other stakeholders regarding restructurings and recapitalizations, chapter 11 re-organizations, and mergers and acquisitions.

4.     I am authorized to submit this declaration on behalf of the Debtors. I am one of the Paladin employees that has possession, custody, and control of Paladin's records. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Company's operations, finances, records, and information learned from my review of relevant documents, and information I have received from the Company's advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

## General Background

5.     A general background of the Company and its assets and liabilities was provided in that certain Declaration of Lance Miller in Support of First Day Motions [Dkt. No. 23] (the "First Day Declaration"), the contents of which are incorporated herein by reference.

6.     As discussed in the First Day Declaration, the Company commenced these bankruptcy cases amidst allegations involving fraud, violations of state consumer protection laws, breach of contract, and civil conspiracy, arising from the Debtors' pre-petition fundraising practices. Also as discussed in the First Day Declaration, a core goal of these bankruptcy cases is to undertake a comprehensive investigation and assessment of these allegations.

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 3 -

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Pg 3 of 1366

7.    Since the commencement of these cases, the Debtors' professionals, working in cooperation with the Official Committee of Unsecured Creditors (the "Committee"), have undertaken a robust investigation of the Debtors' books and records and prepetition activities.  The investigation has been far reaching, involving the following efforts, among other things:

a.    More than ten requests for production and/or examination, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure;

b.    Review of the Company's books and records, including its accounting systems, bank statements, email systems, and retained files;

c.    Interviews of more than 15 key former employees;

d.    Interviews of important brokers and other parties involved in prepetition fundraising; and

e.    Interviews of professionals and counterparties involved in prepetition transactions with the Debtors.

8.    The Company's investigation is not completed and will continue. Nevertheless, I am able to make the conclusions and determinations described in this Declaration based on information received thus far and the investigation to date.  The investigation supports the following overarching conclusions:

- The Company raised investment almost exclusively through debt instruments that required monthly interest payments.

- The Company's business model – investing in real estate development opportunities – lacked a regular source of cash flow, and development completion was difficult to project.

- The Company's first two "funds," called Fund 1 and Fund 2 (each defined below), lost substantial amounts of money and could not support investor repayment obligations.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA  98101-1337
TELEPHONE: 206.319.7052

- The Company increasingly relied on new fundraised proceeds in order to pay ongoing investor interest obligations. The Company told investors that its real estate development projects were highly profitable, and that its business performance was strong. It also told investors that new fundraised proceeds would be "secured" by real estate assets and would be used for development needs. In reality, however, these statements were untrue.

- As the Company's business performance suffered, the Company doubled down on its use of fundraising to cover operating expenses and investor interest expenses. Between October 2018 and September 2023, fundraising activities represented more than 75% of total receipts (excluding intercompany advances), and were 10 times greater than revenues from real estate activities. In reality, fundraising new debt **was the Company's business; real estate development was an incidental activity.**

A. **Corporate Founding**

9. The Company was founded by Christopher Christensen in 2011. Mr. Christensen is a licensed attorney in the State of Washington. Prior to founding the Company, Mr. Christensen focused his practice on advising clients with respect to financing for real estate transactions in the Greater Seattle area.

10. The original vision for the Company was primarily focused on investing as a passive investor in developers who would then be required by contract or operating agreement to develop specific projects. Under this structure, the Company would take a preferred equity position in the developer. The Company's activities would then be focused on finding new deals and monitoring the activity of development partners.

11.     My understanding is that most real estate investments of the kind envisioned for the Company are typically completed through various forms of equity. Financing through debt can be challenging for real estate developers because of the difficulty in predicting the timeframe and amount of commercial real estate sales and the industry's sensitivities to macroeconomic conditions.   Nevertheless, for reasons currently unclear, the Company chose to raise capital from investors through debentures that required monthly interest payments – payments that would be required regardless of whether the underlying real estate investments were themselves producing positive cash flow.

**B.     Fund 1**

12.     The Company's first "fund," iCap Pacific Northwest Opportunity and Income Fund, LLC ("Fund 1"), was formed in December 2013.[2]   Fund 1 raised $46.2 million in private placement debentures.   Fund 1 investments were offered in partnership with Skyway Advisors, LLC as a Managing Dealer under the terms of a Selling Agreement.   The debentures were marketed as secured instruments, with liens on substantially all of Fund 1's assets, including the following:

(a)     a first or second position deed of trust in the real estate owned by the special purpose entities now owned or hereafter acquired by the Company;

(b)     all of the assets of the Company, which primarily consist of its membership interests in the special purpose entities now owned or hereafter acquired by the Company;

(c)     all of the Company's partners' membership interests in the special purpose entities now owned, pledged or hereafter acquired by the Company;

(d)     the rights of the Company to take control of the special purpose entities holding the fund's investments, including, by way of illustration, removal and replacement of the manager, the making of investment decisions relating to individual projects, and decisions regarding the manner and

---

[2] Prior to Fund 1, the Company had two earlier investment vehicles, iCap B1, LLC (formed in September 2013) and iCap B2, LLC (formed in October 2013).  My current understanding is that these investment vehicles each had a single investor. The circumstances involving these entities are the subject of ongoing investigations.

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF
- 6-

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Pg 6 of 1366

timing of exits from the projects;

(e) all products, proceeds, rents and profits of the foregoing;

(f) all of the Company's books and records related to any of the foregoing; and

(g) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Company now has or hereafter acquires any rights.

*See* Senior Secured Debenture Purchase Agreement (the "Fund 1 Purchase Agreement"), Exhibit A to Confidential Offering Memorandum, iCap Pacific Northwest Opportunity and Income Fund, LLC, for 12% Senior Debentures due 2016 (the "Fund 1 OM"), a copy of which is attached hereto as Exhibit 1, at § 7.3. The Fund 1 Purchase Agreement further required the Company to enter into a Security Agreement, Pledge and Security Agreement, Deposit Account Control Agreement, and UCC Financing Statements, all of which were attached as exhibits to the Fund 1 OM. *Id*. at *C-1-2 through C-5-1. Finally, the Fund 1 Purchase Agreement provided for appointment of a collateral agent, Kevin A. Carreno, P.A., as the exclusive agent for enforcing rights under the Fund 1 Purchase Agreement.

13. As would become important later, the Fund 1 Purchase Agreement prohibited Fund 1 from incurring indebtedness beyond a specific list of "Permitted Indebtedness." Exhibit 1 at *32. Notably, permitted indebtedness did not include loans made to Fund 1 from other iCap affiliates.

14. The Fund 1 offering was designed to be attractive to both investors and the brokers and registered investment advisors who connected them with the Company. The Fund 1 debentures offered investors a 12% interest rate per annum, paid monthly, plus a premium of 25% of net profits paid upon repayment. In addition, the Company offered brokers, including the Managing Dealer, total compensation of $3.9 million, including a 7.0% selling commission, a 1% due diligence fee, a 2% managing dealer

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 7-

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Pg 7 of 1366

fee, and a 3% fee for marketing and underwriting. These attractants proved powerful, with the Company oversubscribing the Fund 1 debentures for a total raise of $45.4 million.

15.     Our investigation thus far indicates that the Company ultimately ***did not honor*** its promises made in the Fund 1 OM and Fund 1 Purchase Agreement to secure the Fund 1 debentures with liens on substantially all assets of Fund 1 and its special purpose entities. Specifically and among other things, title reports for some of the properties acquired with Fund 1's proceeds ***do not*** reflect deeds of trust to secure liens held by the Fund 1 investors. Similarly, whereas Fund 1 had its own bank account, it does not appear that a Deposit Account Control Agreement was ultimately placed on that account.

16.     The principal for the Collateral Agent died in a March 2016 plane crash. My understanding is that a replacement Agent was not appointed, leaving investors with no ability to enforce rights under the Fund 1 Purchase Agreement or related agreements.

17.     The Company deployed the Fund 1 debenture proceeds between February 2014 and October 2015, investing in more than 30 projects.[3]

## C.     Fund 2

18.     The Company's second "fund," iCap Northwest Opportunity Fund, LLC ("Fund 2"), was formed in April 2015 – almost exactly a year from closure of Fund 1's subscription period. Its structure and fundraising resembled Fund 1 in most respects, with a Managing Dealer (Stillpoint Capital, LLC), a Collateral Agent (Experts Counsel, Inc.), referenced accountants and outside counsel. It raised $46.5 million through private placement debentures. Fund 2's debentures matured December 31, 2017, and

---

[3] In August 2015, the Company formed iCap EVO, LLC, an investment vehicle for one or a small group of investors. We are continuing to investigate the circumstances involving this vehicle. It is unclear as to whether those facts form part of the narrative discussed herein.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 8-

promised interest of 10% per annum, paid monthly in arrears, with a Payoff Premium of 35% of Fund 2's net profits. Brokerage fees and commissions matched those of Fund 1, totaling $4.0 million (albeit comprised of different individual fees).

19. As with Fund 1, the Fund 2 Purchase Agreement anticipated that the debentures would be secured by liens on substantially all assets of Fund 2 and the underlying real estate. *See* Senior Secured Debenture Purchase Agreement (the "<u>Fund 2 Purchase Agreement</u>"), Exhibit A to Confidential Offering Memorandum, iCap Northwest Opportunity Fund, LLC, for 10% Senior Debentures (the "<u>Fund 2 OM</u>"), a copy of which is attached hereto as <u>Exhibit 2</u>, at § 7.3 (granting, among other things, "(a) a first or, where allowed under senior debt instruments, a second position deed of trust in the real estate now owned or hereafter acquired by the special purpose entities in which the Company now owns or hereafter acquires a security interest . . . [and] (b) all of the assets of the Company, which primarily consist of its membership interest in the Project Entities."). As with Fund 1, our investigation thus far indicates that the Company ultimately ***did not honor*** its promises to grant these liens. Similarly, the principal for the Collateral Agent was the same principal for Fund 1's Collateral Agent, and was not replaced after his death, leaving investors in the same position as Fund 1 investors, with no ability to enforce rights under the Fund 2 Purchase Agreement or related agreements.

20. The Company deployed the Fund 2 debenture proceeds between May 2015 and December 2018, investing in more than 25 projects.

**D. Fund 1 and Fund 2 Extensions**

21. The Company modeled Funds 1 and 2 on the assumption that individual investments would conclude within 24 months. *See* Fund 1 OM at \*2 ("The Fund plans to hold each Investment for 6-18 months."); Fund 2 OM at \*2 ("The Fund plans to hold each Investment for 12 months on average and no longer than 24 months."). In reality,

however, the Company's expectations proved too optimistic. By November 2016 (one month before maturity of Fund 1 and only a year before Fund 2 matured), the Company had exited twenty-two (22) of its original investments with an average hold period of four hundred and forty one (441) days. Only nine (9) of those projects were exited within one year of the initial investment date. Another 20 original investments were still pending, with an average hold period of 661 days. In addition, despite consistent statements by the Company in quarterly newsletters and investor calls that both funds were performing well, both Fund 1 and Fund 2 results were abysmal – according to the Company's books and records, Fund 1's real estate investments **lost approximately $38 million** through 2021, and Fund 2's investments **lost $18.5 million** through 2021.[4] Years later, in May 2021, the Company admitted, deep in another Offering Memorandum, that its entities "have operated with negative cash flows **since inception.**" *See* iCap Funding OM (defined below), at *13 (emphasis added).

Fund 1 Extensions

22. Fund 1 matured in December 2016. The Company was unable to repay the Fund 1 debentures. In advance of that maturity date, in May 2016 the Company asked investors to agree to extend the maturity date to December 31, 2017 (the "Fund 1 First Extended Maturity Date"). The extension letter, a copy of which is attached hereto as Exhibit 3, provided investors with the option to either extend the maturity date for their investments, or keep the existing maturity date. The letter stated as follows:

> Given the strong demand for new homes and rental units resulting from the large number of new jobs created in the Pacific Northwest over the last few years, the cities and counties region-wide have experienced longer than anticipated processing times for issuing construction and development permits. Although the real estate investment environment

---

[4] The Debtors did not report EBITDA in a reliable fashion. These figures are reflective of cumulative negative equity reflected on the Fund 1 and Fund 2 balance sheets.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 10-

remains very strong in this region, the additional time needed to obtain permits has extended the anticipated exit dates of a number of the projects in which the Fund has invested, some of which will now be completed after the current Maturity Date of December 31, 2016. In extending the Maturity Date, we anticipate that we will be able to complete these projects that need more time, as well as take advantage of additional investment opportunities.

To that end, the enclosed Holder Election Form provides you with two options: i) you may elect to extend your Debenture Maturity Date to December 31, 2017, or ii) you may elect to keep the current Debenture Maturity Date of December 31, 2016. In the event you choose to extend, all other terms of your Debenture will remain unchanged, including your receiving monthly interest payments at the 12% rate during the extension period. ***Given the additional time needed to exit the current projects in the portfolio, we do not expect that any Payoff Premium under Section 3(b) of the Debentures will exist on the current Maturity Date of December 31, 2016.***[5]

Please note that, for those Holders who elect not to extend their Maturity Date, the Measurement Date for the Payoff Premium, if any, under Section 3(b) of the Debentures will remain the date on which the Loan Amount is repaid in full or December 31, 2016 (as may be extended by 3 months under Section 2(b) of the Debenture). Such Holders will have no right to participate in the Payoff Premium, if any, that may exist as of December 31, 2017, which will be shared pro rata only among those Holders who elect to extend.

Exhibit 3 (emphasis added).

23.    A number of investors elected not to extend their maturity dates, but my understanding is that they did not receive repayment of their principal at that time. We continue to investigate the numbers of investors who did agree to extend. The Company's books and records do not reflect payment of any principal amounts made in response to this letter.

---

[5] The Fund 1 debentures provided for a payoff premium equal to 25% of net profits of the Fund. As of May 2016, Fund 1 did not have any net profits.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 11-

24. The Fund 1 First Extended Maturity Date occurred on December 31, 2017. The Company was still unable to repay the Fund 1 debentures. The Company therefore delivered notice to Fund 1 investors, dated November 30, 2017, purporting to extend the maturity date to March 31, 2018 (the "Fund 1 Second Extended Maturity Date"). Even by the Fund 1 Second Extended Maturity Date, the Company was unable to and did not repay the Fund 1 debentures. On March 1, 2018, the Company again contacted investors and requested an extension to December 31, 2020 with two one-year extensions (the "Fund 1 Third Extended Maturity Date"). This time, the correspondence warned investors that their monthly interest payments would stop unless they agreed to the extension.

25. The Company was unable to repay the Fund 1 debentures by the Fund 1 Third Extended Maturity Date. On November 5, 2020, the Company contacted investors and provided them with a choice to either "rollover" their Fund 1 debentures into another iCap fund, or stay with Fund 1, but subject to a one-year extension of the maturity date (this time to December 31, 2021). We continue to investigate how many investors chose to roll over their investments, and how many stayed with Fund 1.

Despite all of these extensions, the Company continued to pay interest to investors.

Fund 2 Extensions

26. Fund 2 matured on December 31, 2017. The Company was unable to repay the Fund 2 debentures, and therefore exercised an option to extend the maturity date by a year, to December 31, 2018 (the "Fund 2 First Extended Maturity Date"). We continue to investigate whether all Fund 2 investors agreed to extend their maturity dates as requested. The Company's books and records do not reflect payment of any principal amounts made in response to this letter.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 12-

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 12 of 1366

27.     The Company was still unable to repay the Fund 2 debentures by the Fund 2 First Extended Maturity Date.  In advance, on November 9, 2018, the Company emailed investors and asked for an additional extension to December 31, 2020 and two additional one-year extensions (the "Fund 2 Second Extended Maturity Date").  Even by the further extended maturity date, the Company was unable to and did not repay the Fund 2 debentures.  On November 5, 2020, the Company contacted investors and provided them with a choice to either "rollover" their Fund 2 debentures into another iCap fund, or stay with Fund 2 but subject to a one-year extension of the maturity date (this time to December 31, 2021).  We continue to investigate how many investors chose to roll over their investments, and how many stayed with Fund 2.

As with Fund 1, despite all of these extensions, the Company continued to find ways to pay interest to investors.

**E.     Fund 3**

28.     In November 2017 – a month before Fund 2's original maturity date and the Fund 1 First Extended Maturity Date – the Company launched "Fund 3," iCap Equity, LLC.  Fund 3 was unique in that it did not own or invest in real estate projects directly.  Instead, Fund 3 was marketed as a parent vehicle or "fund of funds" that owned equity interests in Funds 1 and 2 and could benefit from income generated from those Funds.  In addition, Fund 3 would ultimately serve as a vehicle to facilitate "rollovers" of investments in Funds 1 and 2.  With an initial raise of $10 million ("Fund 3 Round 1"), the Company sought to raise capital primarily to address "expansion plans."  *See* Memorandum of Terms For the Private Placement of Debt Securities of iCap Equity, LLC (the "Fund 3 Round 1 OM"), a copy of which is attached hereto as Exhibit 4, at *3.  As part of this round, the Company represented that Fund 3's income streams already supported profitable operations, such that proceeds from the proposed investments would be used for corporate growth and expansion:

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

- 13-

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

The proceeds of this offering will be used to fund the expansion plans of the Company as it launches additional investment fund vehicles, makes direct real estate investments, and retires prior Company obligations. The following table is an estimate of the Company's allocation of the available offering proceeds. ***Given that the offering proceeds will be combined with the Company's existing streams of income, and that the Company is already operating profitably, the table illustrates primarily those items that are in addition to the standard operating expenses of the Company.*** If less than the maximum Offering amount is raised, the Manager will determine which line items will receive less than the estimated allocation. The Manager has discretion to utilize all proceeds as it deems necessary to accomplish the Company's business purposes.

Fund 3 Round 1 OM, at *3 (emphasis added).

29.  In reality, however, iCap Equity **had no external source of income and therefore was not operating profitably**.

30.  Fund 3 Round 1 raised a total of $33.6 million in new investment. The Company began deploying the proceeds to address payments owed to Fund 1 and Fund 2 investors.

31.  Following the close of Fund 3 Round 1, the Company expanded Fund 3 with two additional rounds ("Fund 3 Round 2" and "Fund 3 Round 3," respectively). Fund 3 Round 2, for up to $10 million, launched on June 1, 2019 (one month before conclusion of the raise period for Fund 4, discussed below), and Fund 3 Round 3, for up to $50 million, launched on July 1, 2020 (one month after conclusion of Fund 3 Round 2's raise period and two months after launch of Investments, discussed below). The table below compares the primary aspects of the Fund 3 rounds.

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF

- 14-

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

| Fund 3 Fundraising Rounds | | | |
|---|---|---|---|
| | **Round 1** | **Round 2** | **Round 3** |
| Raise Periods: | 11/1/17 – 3/31/18 | 6/1/19 – 5/31/20 | 7/1/20 – 5/1/21 |
| Round Limit: | $10 million | $10 million | $50 million |
| Maturity: | 3 Years, with 1 Year Extension Option | 3 Years, with 1 Year Extension Option | 3 Years, with 1 Year Extension Option |
| Interest: | 10% | 10% | 10% |
| Payoff Premium: | None | 5% if investing more than $2.5M | 5% |
| Security: | None | None | Guaranty from iCap Pacific NW Management, LLC |

*See* Fund 3 Round 1 OM, at *1; Memorandum of Terms for the Private Placement of Debt Securities, iCap Equity, LLC for 10% Senior Note Offering II, a copy of which is attached hereto as Exhibit 5 (the "Fund 3 Round 2 OM"), at *1; Confidential Private Placement Memorandum, iCap Equity, LLC, $50,000,000 Offering of Series 3 – Senior Promissory Notes, a copy of which is attached hereto as Exhibit 6 (the "Fund 3 Round 3 PPM"), at *3.

32. As reflected above, Fund 3 was structured differently from Funds 1 and 2. It was the first fund raised without a Managing Dealer (also avoiding broker fees), and investments were styled as unsecured. Interest, paid monthly, accrued at 10% per annum and no payment premium was offered. And whereas Funds 1 and 2 provided for two-year maturities, Fund 3 anticipated a three-year maturity with a right to extend for a fourth year. Critically, whereas each of the offering documents underlying Fund 3's three rounds of fundraising delineated anticipated use of proceeds, ***none of those disclosures mentioned an intention to pay interest to existing investors***.[6] In actuality,

---

[6] The offering documents for Rounds 2 and 3 stated that "at any time, the Company may use offering proceeds to retire any debt obligation of the Company, including those held by other investors." *See* Fund 3 Round 2 OM, at *4; Fund 3

the majority of the fundraised amounts were used for that purpose. The table below reflects the anticipated uses disclosed in the offering documents.

(in $000's)

| | Rd 1 | Rd 2 | Rd 3 | Total | |
|---|---|---|---|---|---|
| New Hires and Growth Plans | $100 | $0 | $0 | $100 | 0.14% |
| New Company/Investment Vehicle Formation Costs | $50 | $1,000 | $0 | $1,050 | 1.50% |
| Reserves | $1,000 | $1,000 | $5,000 | $7,000 | 10.01% |
| Retirement of Debt (Payables) | $3,720 | $0 | $0 | $3,720 | 5.32% |
| Taxes and Licenses | $100 | $0 | $0 | $100 | 0.14% |
| Marketing | $100 | $500 | $500 | $1,100 | 1.57% |
| Website and Technology Upgrades | $150 | $500 | $1,500 | $2,150 | 3.07% |
| Real Estate Investments and Affiliate Entity Investments | $4,705 | $6,000 | $38,500 | $49,205 | 70.37% |
| General Operations | $0 | $1,000 | $0 | $1,000 | 1.43% |
| Commissions | $0 | $0 | $4,500 | $4,500 | 6.44% |
| Totals: | $9,925 | $10,000 | $50,000 | $69,925 | |

In contrast, the table below reflects how the total amounts raised for Fund 3 were actually spent.

| Fund 3 Disbursements | Total % |
|---|---|
| Intercompany Transfers | 68.6% |
| Investor Interest & Redemptions | 22.0% |
| Broker Fees | 5.0% |
| General & Operating Costs | 4.4% |
| Real Estate Investments | 0.0% |

33.     The table below reflects the total amounts raised under each of the Fund 3 rounds. Notably, the notes issued under Fund 3 Round 1 began to mature in November 2020 – during the Company's fundraising period for Fund 3 Round 3. The Company lacked the ability to repay these notes, and instead elected to extend the maturity dates for a year. The Company continued to fundraise under Fund 3 Round 3 after these extensions, but I do not believe that it amended the Fund 3 Round 3 PPM to disclose the extensions.

---

Round 3 PPM, at *3. These disclosures, however, related only to debt obligations of the Company itself (not affiliates) and said nothing about the fact that prior funds had already been used to pay investor interest owed by affiliated entities. Nor did it refer to payment of interest for ongoing debt obligations.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

| Fund 3 Actual Fundraising Amounts by Round | | | |
|---|---|---|---|
| Round | Cash Receipts for Debenture Subscriptions | Fundraise Period | Earliest Maturity |
| Round 1 | $2.9 million | 11/1/17 – 3/31/18 | November 2020 |
| Round 2 | $7.2 million | 6/1/19 – 5/31/20 | June 2022 |
| Round 3 | $8.4 million | 7/1/20 – 5/1/21 | July 2023 |
| Additional | $13.6 million | 5/1/21-12/31/23 | Post |
| Totals: | $33.6 million | | |

## F.    Fund 4

34.    In late 2017 – as Fund 3 Round 1 was commencing – the Company began to focus its fundraising efforts on foreign investors, particularly those residing in China and/or the Chinese-American community in Washington.  Among other things, the Company retained employees from the Chinese community to focus on its targeted fundraising initiatives and ultimately opened a foreign office in China staffed with local fundraising professionals.  Initially, these efforts centered around two new fundraises that each commenced on October 1, 2018 – six months after the maturity date for Fund 3 Round 1.

35.    iCap Pacific Income Fund 4, LLC ("Fund 4") was tailored to the Chinese community, employing a Private Placement Memorandum and other transaction documents  translated into Chinese.  This fundraise returned to the concept of investing directly in real estate projects, to be held by subsidiary special purpose entities (SPEs). Fund 4, however, differed in important and notable ways from Funds 1 and 2, including the following:

| | **Funds 1 and 2** | **Fund 4** |
|---|---|---|
| Term: | 2 years, with limited extension options. | 20 years, with a right to redeem after 3 years. |
| Round Limit: | $30 million, each Fund | $50 million |
| Interest: | 10-12% per annum, paid monthly | 10% per annum, PIK for first 3 years |
| Repayment Premium: | 25-35% of Net Profits | None |
| Security: | All Assets | None |

*See* Confidential Private Placement Memorandum, iCap Pacific Income Fund 4, LLC, for $50,000,000 of Secured Promissory Notes (the "Fund 4 OM"), a copy of which is attached hereto as Exhibit 7, at *1-2.

36.     Whereas Funds 1 and 2 promised security interests in substantially all assets of those Funds, including liens on the underlying real property, Fund 4 was structured differently. It was still marketed as "secured," but the security was limited to a pledge of the equity interest in Fund 4 itself (an interest that structurally was junior to repayment of the debentures, and therefore not true security for repayment), along with a guaranty from the owner of the equity in Fund 4.

37.     As with Funds 1 and 2, Fund 4 was marketed as a newly formed entity that would invest in real estate: "The Company has been established to provide an investment vehicle that generates a good rate of return, is secured by interests of the Portfolio LLCs, and has a liquidity mechanism for investors."  Exhibit 7 at * 6.

38.     Fund 4 raised a total of $12.4 million.

39.     Shortly after Fund 4 was launched, investors indicated a preference for Vault (discussed below) and Fund 3.  Fund 4 therefore was not fully subscribed and the Company pivoted its fundraising efforts elsewhere.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

## G.    Investments

40.    One month before Fund 3 Round 2's offering expired, on May 1, 2020, the Company began marketing a $10 million raise for a new fund called iCap Investments, LLC ("iCap Investments").  The iCap Investments notes were marketed primarily to Chinese investors, and the subscription documents were all written in English and Chinese.  These notes were structured similarly to Fund 3, with one- or two-year maturities (depending on which interest rate the investors chose), and an interest rate of 4.0% per annum or 6.0% per annum.  As with Fund 4, the Investment notes were marketed as "secured," although the only form of security was a pledge of the equity interests in iCap Investments itself.  *See* Confidential Private Placement Memorandum, iCap Investments, LLC, for $10,000,000 of Secured Promissory Notes dated May 1, 2020, a copy of which is attached hereto as Exhibit 8 (the "iCap Investments OM"), at *1.  iCap Investments, however, had an ownership structure distinct from the other funds in that it was wholly-owned and managed directly by Mr. Christensen.

41.    The iCap Investments OM represented to investors that iCap Investments owned three properties: "[A] single family home located in Issaquah, Washington, which it owns directly; a 26-unit townhome project located in Seattle, Washington, which is owned through Seattle Modern Living, LLC; and a development site for 108 apartment units, located in Renton, Washington, which is owned through Colpitts Sunset, LLC."  *Id.* at *5.  Based upon the Company's records, each of these statements was misleading; in reality, iCap Investments' assets at the time of its fundraising were materially less than represented.

42.  <u>Issaquah Property</u>.  The iCap Investments OM represented ownership of "a single family home located in Issaquah, Washington."  Exhibit 8 at *5.  This was a reference to a large home that the Company had been developing for several years for eventual use as Mr. Christensen's personal residence.  iCap Investments owned this property and spent approximately $2.9 million to develop it between September 2019 and September 2020.  ***When the home was completed in November 2020, iCap Investments transferred this property to Mr. Christensen directly in exchange for his refinance of the construction loan and for no additional consideration.***  Notably, this transfer occurred seven (7) months after iCap Investments began fundraising under the iCap Investments OM (which, as discussed, represented iCap Investments' ownership of the property).  To my knowledge, iCap Investments did not amend the iCap Investments OM to clarify that the property was no longer a company asset; instead, the Company continued to fundraise under the iCap Investments OM, raising an additional $15 million between November 2020 and November 2022.[7]

---

[7] The iCap Investments OM disclosed Mr. Christensen's intentions to take ownership of the Issaquah property, but it did not specify the terms of that transaction and did not discuss transfer of the property for no payments to the Company:

*The Manager's conflicts of interest may result in transactions unfavorable to the Company.*
The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Company or the Project Entities, provided the terms are commercially reasonable. Additionally, Chris Christensen will lease or purchase the single family property owned by the Company and located at 27112 SE Grand Ridge Drive, Issaquah, WA. These measures may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. In addition, before the Company invests all of its investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between investment opportunities that may meet the investment criteria of Affiliates of the Company or of the Manager.

iCap Investments OM, at *11; *see also id.*, Ex. C (Pledge and Security Agreement) at § 5 ("Pledgor may cause the real estate owned by the Company to be sold, encumbered, transferred, pledged, liened, or otherwise disposed of as it sees fit.").

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 20-

43. <u>Willows Properties</u>. The iCap Investments OM represented ownership of a "26-unit townhouse project located in Seattle, Washington" through an entity named Seattle Modern Living, LLC. Exhibit 8 at *5. According to the Company's records, this statement was misleading. Prior to December 2019, this development, commonly referred to as the "Willows Townhomes," was owned by Fund 2, subject to $9.4 million of debt and with recorded book value of $13.5 million. In December 2019 and during the lead-up to launch of the iCap Investments OM, iCap Investments "purchased" the Willows Townhomes development from Fund 2 for an intercompany account payable (not cash) of $4.9 million and assumption of the $9.4 million in debt. At the time of the iCap Investments OM, whereas iCap Investments owned the Willows Townhomes project, it was subject to more debt than the book value of the property – debt that was not disclosed in the iCap Investments OM itself.

44. <u>Colpitts Development</u>. The iCap Investments OM represented ownership of "a development site for 108 apartment units, located in Renton, Washington, which is owned through Colpitts Sunset, LLC." *Id.* at *5. According to Company records, however, at the time the iCap Investments OM was issued, iCap Investments owned ***no*** interest in the Colpitts Sunset development. Instead, in February 2021 iCap Investments used a portion of newly raised investor proceeds to purchase a minority interest (less than 35%) in Colpitts Sunset, LLC.

45. iCap Investments ultimately raised a total of $20.6 million in cash receipts from debenture subscriptions. It used the proceeds as follows:

| iCap Investments Disbursements | Total % |
| --- | --- |
| Intercompany Transfers | 56.3% |
| Investor Interest & Redemptions | 19.7% |
| Advances to Company Principals | 11.4% |
| General & Operating Costs | 7.6% |
| Broker Fees | 5.0% |

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

- 21-

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 21 of 1366

**H.    Vault**

46.    While launching Fund 4, the Company also launched a new fundraising vehicle called iCap Vault 1, LLC ("Vault").  Vault raised funds first through a $500 million Private Placement Memorandum, *See* Confidential Private Placement Memorandum, iCap Vault 1, LLC, for $500,000,000 of Secured Promissory Notes, October 1, 2018, a copy of which is attached hereto as Exhibit 9 (the "Vault OM"), and later through publicly registered Senior Secured Demand Notes, *see* Form S-11, iCap Vault 1, LLC (the "Vault S-11"), a copy of which is attached hereto as Exhibit 10.

47.    Based on my discussions with former Company employees and a review of the Company's books and records, I believe that Vault was envisioned as an alternative to a bank account, whereby investors could place or withdraw funds from their accounts on a daily basis and earn a modest interest rate, calculated daily.  *See* Vault OM, at *4-5.  Among other things, Vault investments had a low minimum initial investment requirement ($25), and an even lower minimum outstanding investment requirement ($1.00).  *See* Vault S-11, at *13.  In addition, Vault was marketed for its convenience, allowing investors to seamlessly transfer funds in and out of their accounts through a dedicated app and website that could be linked to investor bank accounts. Indeed, according to former employees, the Vault concept was regularly referred to internally as an unregulated bank, and the Company marketed the Vault opportunity by comparing it with banking options.  As discussed in the Vault OM:

> At any time following the issuance date, a Noteholder may require the Company to repay all or a portion of the Note and the accrued interest thereon by providing a demand notice to the Company ("Demand Notice") which will generally be done electronically through the Company's website at www.icapvault.com or through a licensed software application (collectively the "App") once it is made available. The App will allow the Noteholder to review his/her transaction history, provide Demand Notice requests, purchase additional Notes, agree to

investment documentation, send messages to the Company, and receive notices from the Company. Additionally, the App will allow Noteholders to link their iCap Vault account to their bank account to facilitate fund transfers. Upon receipt of a Demand Notice, the Company will have up to 30 days to deliver the requested funds to the Noteholder (the "Demand Payment"), but will use its commercially reasonable efforts to deliver funds for the Demand Payment within 2-5 business days.

*Id.*

48.     The following are examples of how the Vault opportunity was marketed:





SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF

- 23 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 23 of 1366

49.     Notably, however, Vault **was not** registered with any governmental entity as a banking institution, it was not regulated as a banking institution, and it lacked the typical controls and procedures used at a bank (including "Know Your Customer" requirements).  *See* Vault S-11, at *50 ("The Notes do not constitute a savings, deposit or other bank account and are not insured by or subject to the protections of the Federal Deposit Insurance Corporation (the 'FDIC'), the Securities Investor Protection Corporation (the 'SIPC') or any other federal or state agency or company.").   In addition, whereas investors were encouraged to think of Vault as a banking alternative *and although investors were promised that Vault would maintain cash reserves equal to 10% of outstanding principal balances*, *see* Vault S-11, at *72, Vault **did not** maintain any specific capital reserve requirements and often fell below this 10% reserve promise.  And whereas Vault was advertised as using an app for ease of access to funds, to my knowledge no such app existed or was accessible to investors (investors were instead required to fill out manual transfer forms that were processed by the Company's finance team).

### a. <u>Vault Fundraising Issues</u>

50.     Vault was a favorite investment vehicle for foreign Chinese investors. That was due, in part, to emphasis by the Company's China-based international marketing team.  It may have also been due, however, to the ease with which investors were told they could deposit and withdraw funds, a benefit resulting from the Company's lack of policies and procedures for conducting any diligence or scrutiny towards the sources or uses of invested amounts.  Specifically, the Company made virtually no effort to implement customary "Know Your Customer" protocols.  Among other things, I understand as follows based on my discussions with former Company employees and a review of the Company's books and records, for example:

- Investors were not asked to provide information to confirm their identities,

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 24-

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Pg 24 of 1366

affiliations, or the sources of the funds invested.

- Investments were accepted in all manner of forms and denominations (including ACH, wire, and check), and in some instances deposits were made in the form of cash delivered physically to the Company's headquarters in Bellevue, Washington.

- Investors were permitted to transfer title to their investments to third parties with the submission of a simple form. When these accounts were transferred, the Company did not complete any diligence to confirm the reason for the transfer, whether consideration was exchanged by the parties, or the identity of the recipient holder.

- In some instances, investment withdrawals were received in the form of cash.

- In some instances, investments were made for reasons other than economic gain. For example, some investments were made into Vault for purposes of supporting applications under the United States EB-5 Immigrant Investor Program. As another example, several sizeable investments were made in order to make Chinese funds look like foreign (i.e., non-Chinese) investment when brought back into China and invested in Chinese projects.

### b. **Vault Proceed Uses**

51.     Vault's stated business model was to invest in income-producing real estate assets. *See, e.g.,* Vault S-11, at *13 ("We are engaged in the business of acquiring income-producing residential properties in selected metropolitan statistical areas in the U.S. with the objective of generating a rate of return from the acquired U.S. real estate that is greater than the costs necessary to purchase, finance and service the U.S. real estate. We also invest in financial instruments secured by such real estate."). Vault initially invested some investor funds into nursing homes and other properties that generated rental income. As Vault's tenure extended, however, its invested capital was increasingly used to prop up both the Company's real estate development projects (projects that were not completed or even close to completion, and therefore would not produce income in the near future), and the Company's faltering ability to satisfy

investor interest payments. The chart below reflects the real estate disbursements that Vault made between December 2021 and January 2023.

| iCap Vault 1, LLC - Project | Project Type | Cash Disbursed Amount $ | Date of First Transaction |
|---|---|---|---|
| 725 Broadway | Undeveloped iCap Project | 1,633,988 | 2021-12-14 |
| Colpitts Development | Undeveloped iCap Project | 8,551,382 | 2022-08-31 |
| CS Real Estate Development | Undeveloped iCap Project | 500,000 | 2022-10-17 |
| iCap @ UW | Undeveloped iCap Project | 2,500,000 | 2022-09-14 |
| UW 17th Ave | Undeveloped iCap Project | 1,085,000 | 2023-01-17 |
| VH 1121 14th Ave | Undeveloped iCap Project | 3,274,436 | 2021-12-03 |
| VH 2nd Street Office | Rent-Producing Property | 2,000,100 | 2022-06-22 |
| VH Pioneer Village | Rent-Producing Property | 3,502,299 | 2022-06-30 |
| VH Senior Care - Burien | Rent-Producing Property | 1,003,768 | 2022-03-25 |
| VH Senior Care - Lynnwood | Rent-Producing Property | 1,754,531 | 2022-03-22 |
| Willow Street Townhomes | Rent-Producing Property | 20,000 | 2022-12-08 |
| | Total | 25,825,504 | |

| Total by Project Type | Cash Disbursed Amount $ | % of Total |
|---|---|---|
| Undeveloped iCap Project | 17,544,806 | 68% |
| Rent Producing Property | 8,280,698 | 32% |

Some of the disbursements reflected above were not utilized by the recipient and were instead forwarded to other iCap entities (resembling an intercompany transfer more than a real estate investment).

52. As reflected above, Vault was an integral part of the Company's continued ability to maintain interest payments for investors in the various funds. As discussed above, the Company had for years been in the practice of moving cash among subsidiary bank accounts as needed to pay investor interest obligations, recording those movements as intercompany loans and payables. But that approach could not work with Vault because, as a publicly registered entity, those types of intercompany loans would not satisfy an audit. To circumvent audit requirements, when Vault's funds were needed to pay investor obligations elsewhere, Vault made an investment in a specific construction project (an SPE) and recorded a deed of trust against that property. Company records show, however, that as soon as the funds were transferred from Vault

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 26-

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 26 of 1366

to the project's bank account, they were immediately transferred to a different affiliate (Fund 1, Fund 2, or Fund 3) and paid to investors. As demonstrated in the table below, this fact-pattern was followed with respect to several "investments" made by Vault:

**Vault Transfers to Related Entitites and Out - Same Day**

| | Tranfer In | Transfer Out | Forwarded to Fund |
|---|---|---|---|
| **725 Broadway** | | | |
| 12/22/2022 | $ 500,000 | $ (500,000) | iCap Equity |
| 2/1/2023 | 610,000 | (610,000) | iCap Equity |
| 2/7/2023 | 265,000 | (265,000) | iCap Equity |
| 2/8/2023 | 90,000 | (90,000) | iCap Equity |
| 2/15/2023 | 30,000 | (30,000) | iCap Equity |
| 2/24/2023 | 170,000 | (170,000) | iCap Equity |
| 3/3/2023 | 430,000 | (430,000) | iCap Equity |
| 3/15/2023 | 210,000 | (210,000) | iCap Equity |
| 3/27/2023 | 32,000 | (32,000) | iCap Equity |
| 3/31/2023 | 200,000 | (200,000) | iCap Equity |
| 4/10/2023 | 200,000 | (200,000) | iCap Equity |
| **Colpitts Development** | | | |
| 1/14/2021 | 350,000 | (350,000) | Fund 2 |
| 1/17/2021 | 696,000 | (640,000) | Fund 5 |
| 11/14/2021 | 1,451,382 | (1,451,382) | Fund 2 |
| 12/21/2022 | 693,000 | (585,000) | Fund 2 |
| 9/14/2022 | 1,500,000 | (1,500,000) | iCap Investments |
| **iCap @ UW** | | | |
| 9/14/2022 | 2,500,000 | (2,000,000) | iCap Investments |
| **UW 17th Ave** | | | |
| 1/17/2023 | 750,000 | (750,000) | iCap Investments |
| 1/17/2023 | 335,000 | (335,000) | iCap Investments |
| | | | |
| Totals | $ 11,012,382 | $ (10,348,382) | |

## I. Funding

53. On May 13, 2021 (one month after close of Fund 3 Round 3), the Company began marketing another $50 million raise, this time for a new fund called iCap Funding, LLC ("Funding"). As with iCap Investments, the Funding notes were marketed primarily to Chinese investors, and the subscription documents were all written in English and Chinese. These notes had a two-year maturity with no extension period, and an interest rate of 12% per annum. As with the Investment notes, the Funding notes were marketed as "secured" despite the only form of security being a pledge of the equity interests in Funding itself. *See* Confidential Private Placement Memorandum, iCap Funding, LLC, for $50,000,000 of Secured Promissory Notes dated May 13, 2021, a copy of which is attached hereto as Exhibit 11 (the "Funding OM"), at *1.

54.     Although Funding had **no assets** when it commenced fundraising, the Funding OM referred to "income from the gains [Funding] receives from its Portfolio Investments" and described its investment focus as seeking "investments that have high yield potential and are related to real estate." *Id.* at *7.  The Funding OM was more explicit than prior offering documents about an intention to invest fundraising proceeds in other Funds:

> The Company's "Portfolio Investments" may consist of any one or more of the following: income-producing properties, including single-family homes, multi-family apartments, townhomes, commercial properties and mixed-use properties; properties that the Company may acquire at a discount from market values, with the intention of selling the property at market prices for a gain; financial instruments that bear a relation to real estate, such as preferred equity, common equity, or loan instruments that are secured or unsecured by the properties; investments into real estate operating companies, real estate holding companies, REIT holdings, joint ventures, and pooled investment funds, any of which may be Affiliates of, or transactions with, the Company or its Manager or entities with whom management of the Company has had prior relationships. ***In particular, the Company expects to invest in debt funds or debt instruments of Affiliates of the Manager. These include, but are not limited to, iCap Pacific Northwest Opportunity and Income Fund, LLC, iCap Northwest Opportunity Fund, LLC, iCap Equity, LLC, iCap Pacific Income Fund 4, LLC, iCap Pacific Income Fund 5, LLC, and other entities controlled by the Affiliates of the Manager including the iCap Vault entities. These entities currently, or at the time of investment, have or will have negative cash flows and negative equity and there may be substantial doubt as to their ability to continue as a going concern.*** The Company may make loans to such entities or invest in equity positions and may do so either directly or through a secondary market transaction with the individual investors in such entities.

Funding OM, at *7 (emphasis added).

55.     While acknowledging that the Company's entities had negative equity (e.g., were insolvent), the Funding OM also stated that at least some of the Company's entities had ***always*** been unprofitable:

> The Company Expects to invest in Affiliate entities that have little or negative cash flow, negative equity, and substantial doubt as to their ability to continue as a going concern, which could prevent the Company from paying its obligations under the Notes.

> The Company will make loans or investments in Affiliates of the Manager. ***Such entities have operated with negative cash flows since inception, have more liabilities than assets, and have substantial doubt as to their ability to continue as a going concern.*** If these Affiliates are unable to pay back the Company's investment amounts, there is a risk that the Company will be unable to pay back the Notes in this Offering when due, if at all, and investors could lose all of their investment.

*Id.* at *13 (emphasis added).

56.     Funding raised approximately $11.5 million from investors. As reflected in the table below, a majority of these funds were used either to purchase existing Fund 1 and Fund 2 notes and/or to advance additional funds to Fund 3 for purposes of paying investor interest.

| iCap Funding Disbursements | Total % |
|---|---|
| Intercompany Transfers | 37.9% |
| Fund 1 & Fund 2 Redemptions | 39.7% |
| General & Operating Costs | 17.7% |
| iCap Funding Investor Interest | 4.7% |

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 29-

## J. Fund 5

57. iCap Pacific Income Fund 5, LLC ("Fund 5") was launched on September 5, 2019. With a maximum subscription amount of $50 million (with an over-allotment of $25 million), Fund 5 was marketed as investing directly in real estate projects, to be held by subsidiary special purposes entities (SPEs). Interest was 9% per annum, paid monthly, with the first $10 million of invested amounts benefitting from a 10% interest rate for the first year. Unlike other notes, Fund 5 contained a limitation on redemption requests:

> Investors will have the option of demanding repayment of all or any part of their outstanding principal and unpaid accrued interest, any time after the 1-year anniversary of their investment date, subject to a limit of no more repayments than 5% of the combined Notes of the Company per quarter. Upon any demand for repayment prior to the 5th anniversary of the issuance date of the Note, a discount will be applied to the amount outstanding under the Note, depending on the time from the issuance of the Note at which the repayment demand is received by the Company.

*See* Confidential Private Placement Memorandum, iCap Pacific Income Fund 5, LLC, for $50,000,000 of Secured Promissory Notes (with an over-allotment amount of $25,000,000), dated September 5, 2019 (the "Fund 5 PPM"), a copy of which is attached hereto as Exhibit 12, at *2.

58. Fund 5 was marketed as secured, with a pledge of the membership interests in the underlying SPEs. *Id*. at *5. Unlike Funds 1 and 2, however, Fund 5 notes were not secured by other collateral, such as cash accounts or underlying properties themselves.

59. In describing the Company's investment experience, the Fund 5 PPM provided as follows:

> Although this Memorandum refers to "iCap" as though it were an entity capable of taking action, prospective investors should bear in mind that

such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. The Company will not acquire an interest in any of iCap's affiliated entities other than Holding, but may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Manager, and therefore the Company, as it conducts its business.

The Company's management team has overseen 57 full-cycle investments in this strategy among its other funds. As the following table illustrates, these investments achieved an average ROI of 27.39%, an average annualized ROI of 18.30%, and an average IRR of 20.26%.

*Id*. at *11. The Fund 5 PPM **did not mention, however, that the Company's prior funds were unprofitable.**

60.     Fund 5 was the first fund since Funds 1 and 2 to have a Managing Dealer, Cobalt Capital, Inc., and a Collateral Agent, MarketPlace Realty Advisors, LLC.  In exchange for its services, the Fund 5 PPM disclosed total fees to be paid to the Managing Dealer of $4.9 million, assuming the round was fully subscribed. *Id*. at *15.

61.     Fund 5 raised a total of $3.0 million.  The table below summarizes how fundraise proceeds were used:

| Fund 5 Disbursements | Total % |
| --- | --- |
| Intercompany Transfers | 68.9% |
| Investor Interest & Redemptions | 16.1% |
| General & Operating Costs | 11.6% |
| Real Estate Investment | 3.4% |

## K.    Fund 6

62.    In the fall of 2019, alongside the rollout of Fund 5, the Company formed iCap Pacific Income Fund 6, LLC ("Fund 6"), with the purpose of launching another publicly registered investment vehicle similar to Vault.  Fund 6 never launched.  The table below compares certain aspects of the Vault S-11 with the draft S-11 prepared for Fund 6 (which remained in draft form as of the petition dates in these cases).

|  | Vault | Fund 6 |
|---|---|---|
| Offering/Concept: | Demand Notes, paid on demand | Income Demand Notes, paid on demand following a five-year lock-up period. |
| Investment Thesis: | We are engaged in the business of acquiring income-producing residential properties in selected metropolitan statistical areas in the U.S. with the objective of generating a rate of return from the acquired U.S. real estate that is greater than the costs necessary to purchase, finance and service the U.S. real estate. We also invest in financial instruments secured by such real estate. | We are engaged in the business of acquiring interests in real estate construction and development projects in selected metropolitan statistical areas in the U.S. (each, a "Portfolio Investment"). . . . We also originate and purchase loans secured by real estate. |
| Interest Rate: | A floating rate in the Company's discretion. | 7% per annum during the lockup period, and thereafter the Average Savings Account Rate published by the FDIC plus a markup in amount TBD. |
| Management Fees: | 1.3% of outstanding principal balances | 1.5% of outstanding principal balances |

## L.    Broadway

63.    The last of the Company's funds, called iCap Broadway, LLC ("Broadway"), launched on April 1, 2022 – two months before expiration of the fundraise period for Funding and two weeks after the last investment in Funding.  Unlike prior funds, Broadway was focused on a specific real estate project and purported to be raising funds specifically for that project.  *See* Confidential Private

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

Placement Memorandum, iCap Broadway, LLC, for $20,000,000 of Secured Promissory Notes, dated April 1, 2022, a copy of which is attached hereto as Exhibit 13 (the "Broadway PPM"), at *7 ("The investment proceeds will be used to recapitalize the debt and equity for the Project and may be used for construction, design, marketing, furnishing, professional services, financing, debt service, and all other expenses related to the Project.").  The Broadway notes had a two-year maturity, bearing interest of 8% per annum, paid monthly.  As with Fund 3, the Broadway notes were marketed as "secured" despite the only form of security being a pledge of the equity interests in Broadway itself.

64.     The Broadway Fund raised **zero dollars** in cash receipts.  Instead, it raised $5.8 million in rollovers from investors, plus $313,000 in intercompany investments (primarily from Vault).  There were no material disbursements from the Broadway Fund.[8]

## THEMES IN THE COMPANY'S FUNDRAISING HISTORY

65.     The foregoing facts, when combined, display a picture of liquidity problems from the inception of Funds 1 and 2. In order to stay afloat, the Company increasingly relied on new fundraising.   This picture is reflected in the following charts and tables.

66.     The timeline below reflects the inadequacy of real estate proceeds to cover *either* project-related disbursements or investor interest obligations.   Real estate receipts are depicted in blue, project-related costs/disbursements are reflected in tan, and investor interest obligations is reflected in the red line at the bottom.

---

[8] Some investor funds and intercompany transfers were transferred directly to the SPE owned by the Broadway Fund. Those amounts are not included here.

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 33-



67.     The timeline below shows how the Company used fundraising to fill the gap between project-related receipts and its disbursement obligations.  As above, project-related receipts are reflected in dark blue, project-related disbursements are reflected in tan, investor interest is reflected in red, and the yellow line tracks investor receipts.  As business revenue suffered, fundraising became the near-exclusive source for the Company's capital.



SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 34 -

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Pg 34 of 1366

Respectfully submitted,

Dated: February __, 2024      LANCE E. MILLER

_____

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 35-

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 35 of 1366

# EXHIBIT 1

Name: _____

Memorandum No. _____

# iCAP Pacific Northwest Opportunity and Income Fund, LLC

## $30,000,000 of

## 12% Senior Debentures due 2016

————————————

This Confidential Offering Memorandum (this "*Memorandum*") is being furnished in connection with the offer and sale (the "*Offering*") of up to $30,000,000 of 12% Senior Secured Debentures due 2016 (the "*Debentures*") by iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "*Fund*"). Offers will be made only to accredited investors, as defined under Rule 501 promulgated under the Securities Act of 1933, as amended (the "*Securities Act*"). Debentures will be issued in denominations of at least $100,000 with additional integral multiples of $10,000. The Fund may accept lower denominations at its discretion.

The minimum amount that the Fund must sell in order to consummate the Offering is $2,000,000 (the "*Minimum Offering Amount*") and the maximum aggregate amount of Debentures being offered is $30,000,000 (the "*Maximum Offering Amount*"). The Fund reserves the right, in its sole discretion, to increase the Maximum Offering Amount to $50,000,000 to accommodate oversubscriptions for the Debentures. The Fund may hold an initial closing any time after the Minimum Offering Amount has been received and may hold additional subsequent closings from time to time thereafter, in the Fund's sole discretion, as subscriptions for the Debentures are received. The Fund will offer the Debentures as of the date of this Memorandum through the earlier of (a) the date on which the Fund closes on the sale of the Maximum Offering Amount, (b) such time, if any, as the Fund, in its sole discretion, elects to withdraw or terminate this Offering; or (c) April 30, 2014 (the "*Offering Period*"), unless extended up to three (3) months by the Manager.

The Fund will pay interest on the Debentures at the rate of 12% per annum. Interest will be payable monthly in arrears on or before the 15th day of the following month. The Debentures will mature on December 31, 2016.

The Debentures will be the Fund's secured senior obligations. Unless otherwise approved by Holders of a majority of the principal amount of the outstanding Debentures, the Debentures will rank senior to all of the Fund's future indebtedness, including any class of debt or equity security that the Fund may issue.

**THIS OFFERING INVOLVES CERTAIN RISKS. <u>See</u> "Risks Factors".**

THE DEBENTURES HAVE NOT BEEN, NOR WILL THEY BE REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT. THEY ARE BEING OFFERED AND SOLD IN THE UNITED STATES ONLY TO ACCREDITED INVESTORS IN RELIANCE ON RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS MEMORANDUM IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

————————————

## Skyway Advisors, LLC

**The date of this Memorandum is December 19, 2013.**

The information contained in this Memorandum is confidential. By acceptance of this Memorandum, each recipient agrees not to reproduce or distribute this Memorandum to others (except the recipient's professional advisors) without the prior written consent of the Fund, that the recipient and his, her or its professional advisors will keep permanently confidential all information contained herein not already in the public domain, and will use this Memorandum for the sole purpose of evaluating a possible investment in the Debentures. Each recipient also agrees to return this Memorandum and any other documents or information furnished by the Fund (and any and all copies thereof) to the recipient upon request of the Fund if the recipient declines to purchase any Debentures.

There will be no public market for the Debentures and there is no obligation on the part of the Fund or any person to register the Debentures under the Securities Act or any state securities laws.

This Memorandum includes data and information obtained from independent third party sources. Although the Fund does not have any reason to believe that such data and information is not accurate, the Fund did not independently verify such data and information and cannot assure the accuracy or completeness of such data and information. Prospective investors must rely upon their own investigations and evaluations with respect to making an investment in the Debentures being offered hereby.

Prospective investors will be advised of any material modifications to the terms of the Offering or the Debentures in writing prior to any sale of Debentures to such prospective investors.

Nothing contained in this Memorandum is, or should be relied upon as, a promise or representation as to the Fund's future performance. Prospective investors must rely upon their own examination of the Fund and the terms of the Offering, including the merits and risks involved.

This Memorandum is qualified in its entirety by the Senior Secured Debenture Purchase Agreement attached hereto as Exhibit A. The Senior Secured Debenture Purchase Agreement, is hereinafter referred to in this Memorandum as the "***Debenture Agreement***".

The Debentures are offered when, as, and if issued, subject to the right of the Fund, in its sole discretion, to approve or reject any subscription in whole or in part and subject to certain other conditions described herein. Subscriptions for Debentures can only be made by delivery to the Fund of an executed Debenture Agreement, together with the form Debenture, in the form attached as Exhibit A to the Debenture Agreement attached hereto as Exhibit A

This offer may be withdrawn at any time before the initial closing or any subsequent closing and is specifically made subject to the terms described in this Memorandum. The Fund reserves the right to reject any subscription, in whole or in part, for any reason whatsoever or to allot to any prospective investor less than the aggregate value of Debentures subscribed for by such prospective investor. Rejected subscriptions will be promptly returned to the subscriber with the amount of the rejected subscription funds without interest.

———————————————

## NOTICES

The following notices apply in certain states where the Debentures, which are referred to below as "securities," may be sold. Compliance with the notice exemption requirements of applicable state securities laws will be undertaken by the Fund as needed.

**Notice to Residents of all States:**

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND OTHER LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ACT AND THE SECURITIES LAWS OF CERTAIN JURISDICTIONS GRANT PURCHASERS OF SECURITIES SOLD IN VIOLATION OF THE REGISTRATION OR QUALIFICATION PROVISIONS OF SUCH LAWS THE RIGHT TO RESCIND THEIR PURCHASE OF SUCH SECURITIES AND TO RECEIVE BACK THEIR CONSIDERATION PAID. THE FUND BELIEVES THAT THE OFFERING DESCRIBED IN THIS MEMORANDUM IS NOT REQUIRED TO BE REGISTERED OR QUALIFIED. MANY OF THESE LAWS GRANTING THE RIGHT OF RESCISSION ALSO PROVIDE THAT SUITS FOR SUCH VIOLATIONS MUST BE BROUGHT WITHIN A SPECIFIED TIME, USUALLY ONE YEAR FROM DISCOVERY OF FACTS CONSTITUTING SUCH VIOLATION. SHOULD ANY INVESTOR INSTITUTE SUCH AN ACTION ON THE THEORY THAT THE OFFERING CONDUCTED AS DESCRIBED HEREIN WAS REQUIRED TO BE REGISTERED OR QUALIFIED, THE FUND WILL CONTEND THAT THE CONTENTS OF THIS MEMORANDUM CONSTITUTED NOTICE OF THE FACTS CONSTITUTING SUCH VIOLATION.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS ATTACHED TO THIS MEMORANDUM. NO ONE HAS BEEN AUTHORIZED TO PROVIDE YOU WITH ANY INFORMATION THAT IS DIFFERENT. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN GIVEN BY THE ISSUER OF THE SECURITIES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE ON THE COVER PAGE AND IS AN OFFER ONLY TO SUCH NAMED OFFEREE.

NEITHER THE INFORMATION CONTAINED HEREIN, NOR ANY PRIOR, CONTEMPORANEOUS OR SUBSEQUENT COMMUNICATION SHOULD BE CONSTRUED BY THE PROSPECTIVE INVESTOR AS FINANCIAL, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS, HER OR ITS OWN FINANCIAL LEGAL AND TAX ADVISORS TO ASCERTAIN THE MERITS AND RISKS OF THE OFFERING AND AN INVESTMENT IN THE FUND PRIOR TO SUBSCRIBING TO PURCHASE THE SECURITIES.

THIS MEMORANDUM AND ITS EXHIBITS MAY CONTAIN STATEMENTS THAT CONSTITUTE FORWARD-LOOKING STATEMENTS, AS DEFINED BY FEDERAL SECURITIES LAWS. FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF TERMINOLOGY SUCH AS "ANTICIPATES," "EXPECTS," "INTENDS," "PLANS," "BELIEVES," "SEEKS," "ESTIMATES" AND VARIATIONS OF THESE WORDS AND SIMILAR EXPRESSIONS. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO RISKS AND UNCERTAINTIES AND INCLUDE STATEMENTS MADE REGARDING EVENTS, FINANCIAL TRENDS, FUTURE OPERATING-RESULTS, FINANCIAL POSITION, CASH FLOWS AND OTHER GENERAL INFORMATION CONCERNING POSSIBLE OR ASSUMED FUTURE RESULTS OF OPERATIONS OF THE FUND OR ANY PROJECT. INVESTORS ARE CAUTIONED THAT SUCH STATEMENTS ARE ONLY PREDICTIONS, FORECASTS OR ESTIMATES OF WHAT MAY OCCUR AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE OR OF THE OCCURRENCE OF EVENTS OR OTHER FACTORS USED TO MAKE SUCH PREDICTIONS, FORECASTS OR ESTIMATES. ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE RESULTS EXPRESSED, IMPLIED OR INFERRED FROM THE FORWARD-LOOKING STATEMENTS AND MAY BE WORSE DUE TO A VARIETY OF FACTORS, INCLUDING, WITHOUT LIMITATION, CHANGES IN LAWS, ADVERSE CHANGES IN REAL ESTATE PRICES, ADVERSE CHANGES IN INTEREST RATES, AND ADVERSE CHANGES IN THE CREDIT AND CAPITAL MARKETS. SUCH STATEMENTS REFLECT THE FUND'S CURRENT VIEWS AND THE FUND UNDERTAKES NO OBLIGATION TO REVISE THE FORWARD-LOOKING STATEMENTS MADE HEREIN OR IN THE EXHIBITS HERETO TO REFLECT EVENTS OR CIRCUMSTANCES THAT OCCUR AFTER THE DATE HEREOF OR THEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS; *PROVIDED*, *HOWEVER*, THAT THE FUND UNDERTAKES TO UPDATE THIS MEMORANDUM TO REFLECT EVENTS THAT OCCUR PRIOR TO THE TERMINATION OF THE OFFERING AND MATERIALLY CHANGE THE NATURE OF THE OFFERING.

**Notice to New York Residents:**

THIS CONFIDENTIAL OFFERING MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

**Notice to Florida Residents:**

THE SECURITIES OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE SECURITIES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER OF THE SECURITIES OR AN AGENT OF SUCH ISSUER, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**Notice to New Hampshire Residents:**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT

THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

DURING THE COURSE OF THIS OFFERING, EACH PROSPECTIVE INVESTOR MAY OBTAIN ADDITIONAL INFORMATION WHICH SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (TO THE EXTENT THE FUND POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY PROSPECTIVE INVESTOR WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE INVESTOR'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE FUND IF THE RECIPIENT DOES NOT PURCHASE THE SECURITIES OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE TO:

<div align="center">

**ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC**
**PO Box 3907**
**Bellevue, WA 98009**

**ATTN: CHRIS CHRISTENSEN**
**(425) 372-7114**
**FAX: (425) 214-4776**

</div>

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 1 Page    Page 43

NOTICES ..................................................................................................................................................i

FORWARD-LOOKING STATEMENTS ...................................................................................................1

WHO MAY INVEST ................................................................................................................................1

SUMMARY OF THE OFFERING .............................................................................................................2

USE OF PROCEEDS ................................................................................................................................5

COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES ................................................6

CONFLICTS OF INTEREST .....................................................................................................................8

RISK FACTORS ......................................................................................................................................10

PRIOR PERFORMANCE OF THE MANAGER AND ITS AFFILIATES ..............................................16

MANAGEMENT OF THE FUND ...........................................................................................................17

DESCRIPTION OF THE BUSINESS ......................................................................................................19

U.S. FEDERAL INCOME TAX MATTERS ............................................................................................25

ERISA MATTERS ..................................................................................................................................28

GLOSSARY ............................................................................................................................................29

SUMMARY OF THE SENIOR SECURED DEBENTURE PURCHASE AGREEMENT........................30

REPORTS TO THE INVESTORS ...........................................................................................................33

THE OFFERING ......................................................................................................................................34

TRANSFERABILITY OF THE DEBENTURES .....................................................................................35

FINANCIAL INFORMATION ................................................................................................................35

PLAN OF DISTRIBUTION .....................................................................................................................36

EXHIBITS

     A   SENIOR SECURED DEBENTURE PURCHASE AGREEMENT

     B   LLC AGREEMENT

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 11 Page 44

## FORWARD-LOOKING STATEMENTS

This Memorandum contains forward-looking statements that involve risks and uncertainties. These statements relate to future events, future developments or the Fund's future financial performance. In some cases, you can identify forward looking statements by terminology including "could," "would," "may," "will be," "will continue," "likely to become," "should," "expect," "intend," "plan," "anticipate," "believe," "estimate," "predict," "potential," "continue," "opportunity," or the negative of these terms or other comparable terminology. These statements are only predictions. Actual events or results may differ materially. In evaluating these statements, you should specifically consider various factors, including the risks described in this Memorandum, specifically those risks listed under "RISK FACTORS." These factors may cause the Fund's actual results to differ materially from any forward-looking statements. Although the Fund believes the expectations reflected in the forward-looking statements are reasonable, the Fund cannot guarantee future results, levels of activity, performance or achievements. These forward-looking statements speak only as of the date on which the statements were made and the Fund undertakes no obligation to update or revise any forward-looking statements made in this Memorandum or elsewhere as a result of new information, future events, future developments or otherwise, except as required by law.

## WHO MAY INVEST

**General**

The Fund intends to sell the Debentures to Investors qualifying as "accredited investors" as defined in Regulation D under the Securities Act.

The term "accredited investors" is defined to include, among others, (a) a natural person with a net worth, or joint net worth with such purchaser's spouse, at the time of purchase in excess of $1,000,000 (exclusive of the equity in the person's primary residence), (b) a natural person who had an individual gross income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year, or (c) any entity in which all of the equity owners are "accredited investors." Other classes of Investors also qualify as "accredited investors" under Regulation D. If you are unsure as to whether you qualify as an accredited investor, you should contact a legal advisor of your choice for advice.

With respect to a prospective investor wishing to invest in his or her individual capacity, the value of the individual's primary residence should be excluded in determining the Investor's net worth. In addition, the mortgage or other indebtedness secured by the individual's primary residence to the extent that such indebtedness does not exceed the value of the residence need not be considered as a liability. When the indebtedness secured by the primary residency exceeds the value of the residence and the lender has other recourse against the individual for payment of the excess liability, the excess liability (and only such excess) should be deducted from the individual's net worth in determining net worth.

**Subscription**

To subscribe for the Debentures, you must complete, execute and deliver to the Fund the Debenture Agreement, in the form attached to this Memorandum as Exhibit A. The Debenture Agreement requires you to represent, among other things, that you are an accredited investor, are acquiring Debentures for your own account for investment and not with a view to resale or distribution, and that you are aware that transfer of the Debentures is restricted by the terms of the Debenture Agreement and by the absence of a market for the Debentures. The Debenture Agreement also requires you to acknowledge that you have received and have had an opportunity to read this Memorandum and are aware of the risks associated with an investment in the Debentures.

THE FUND'S ACCEPTANCE OF YOUR SUBSCRIPTION FOR DEBENTURES DOES NOT CONSTITUTE A DETERMINATION BY THE FUND THAT THE INVESTMENT IS SUITABLE FOR YOU. THE FINAL DETERMINATION AS TO THE SUITABILITY OF AN INVESTMENT IN THE DEBENTURES FOR YOU MUST BE MADE BY YOU AND YOUR ADVISORS.

1

## SUMMARY OF THE OFFERING

The following summary summarizes a number of the material provisions of the Offering and certain provisions of the Debenture Agreement and is qualified in its entirety by the full text of the Debenture Agreement. Capitalized terms used in this Summary not separately defined herein have the meanings assigned to such terms in the Debenture Agreement. No person will be permitted to invest in the Fund unless such person has received and reviewed the Debenture Agreement, this Memorandum and other offering-related documents. This Summary does not constitute an offer to sell, or the solicitation of an offer to buy, the securities referenced herein, and any such offer will be made only to selected persons pursuant to the offering documents prepared and delivered by the Fund.

### General Information

| | |
|---|---|
| Fund | iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company. |
| Manager | iCap Pacific NW Management, LLC, a Washington limited liability company (the "***Manager***"). The Manager was specifically formed for the purpose of serving as the Manager of the Fund. The key executives of the Manager are Chris Christensen (principal and president); Mike Christensen (Chief Investment Officer); Jim Christensen (Chief Operating Officer) and Bryan Brown (Vice President, Construction). |
| Agreement | The Fund's affairs will be governed by the terms of the Debenture Agreement and by the Fund's Limited Liability Company Agreement dated as of December 19, 2013, as may be amended from time to time (the "***LLC Agreement***") attached hereto as Exhibit B. |
| Business Purpose | The primary purpose of the Fund is to invest in real estate projects in the Pacific Northwest ("***Project Entities***"). The Fund's business model is designed to fill the funding gap between lenders, on the one hand, and developers or builders on the other hand (referred to as "***Project Partners***"), although in certain situations the Fund may invest in projects without a Project Partner and may effectively act as the developer of the project. The Fund may also issue debt instruments to Project Entities, acquire Project Entities directly or debt instruments of Project Entities. These activities shall be referred to as "***Investments***." We anticipate such opportunities to be available to the Fund based on its officers' relationships with members of the real estate and banking communities in the Pacific Northwest. |
| Target Investments | The Fund expects that most of its Investments will be in the form of preferred equity positions in Project Entities primarily in the greater Puget Sound and Portland areas. We anticipate Investments being made in Project Entities holding the following types of real estate: |

- single and multi-unit residential properties;
- multi-family residential projects;
- commercial properties; and
- land acquired for entitlement purposes.

| | |
|---|---|
| Investment Time Frame | The Fund plans to hold each Investment for 6 – 18 months. The Fund does not anticipate entering into new Investments within six (6) months of the Maturity Date. |
| Limitations on Investment | The Fund will not make any single Investment that is greater than 10% of the gross Offering proceeds received by the Fund as of the closing date of such Investment. In addition, no more than 15% of the gross Offering proceeds will be invested in projects in which there is no Project Partner (i.e. projects in which the Fund will effectively act as developer). |

2

## Terms of the Offering

| | |
|---|---|
| Offering Size | $30,000,000 to be raised through the sale of Debentures, with an option by the Manager to increase the Offering Size to $50,000,000. Each Debenture represents a minimum investment of $100,000, with additional increased amounts available in $10,000 increments, as set forth below. |
| Minimum Investment | An investment of at least $100,000 (as represented by 1 Debenture), unless a smaller investment is permitted by the Manager in its discretion. |
| Minimum Offering | The Fund must receive a minimum aggregate investment of $2,000,000 before the Fund may break escrow and begin making Investments. |
| Term of Offering | Debentures may be offered by the Fund through April 30, 2014, but such date may be extended for up to three (3) months by the Manager in its discretion. |
| Eligible Investors | Offering limited to persons qualifying as "accredited investors" under Regulation D of the Securities Act. |

## Economic Terms of Investment

| | |
|---|---|
| Interest Payment | Investors are entitled to receive a 12%, per annum simple interest rate on their investment, paid monthly in arrears. |
| Maturity Date | The Fund shall pay back the principal balances of the Senior Debentures to Investors on or before December 31, 2016, subject to a three (3) month extension period available to the Fund (the "***Maturity Date***"). The Fund may prepay all or part of the Debentures without penalty at any time prior to the Maturity Date. The date of any such prepayment in full, shall be referred to as  the "***Prepayment Date***". |
| Payoff Premium | Investors are additionally entitled to a Payoff Premium equal to each Investor's pro-rata share of 25% of the cumulative net profits of the Fund through the date on which the Debentures are paid in full, payable within 12-months after the Fund has fully satisfied its obligations under such Investor's Debenture. |
| Secured Debentures | The Debentures are secured by all of the assets of the Fund and by a pledge of the Manager's membership interest in the Fund. The Fund's assets are comprised principally of the Fund's cash and bank accounts, the Fund's equity interest in each Project Entity, and the rights and collateral interests granted to the Fund in connection with each individual Investment. The Fund's rights and collateral will include the following: |

- a second position or sometimes a first position deed of trust (i.e., mortgage) in the real estate owned by or hereafter owned by the Project Entities to secure the return of the Fund's investment; and
- a secured interest in the Membership Interest held by the Fund's Project Partner; and
- the Fund's right to assume control of the Project Entity and the project owned by it in the event of a default by the Project Entity or a failure to meet applicable project milestones or requirements.

| | |
|---|---|
| Seniority of Debentures | Unless otherwise approved by Holders of a majority of the principal amount of the outstanding Debentures, the Debentures will rank senior to all of the Fund's future indebtedness, including any class of debt or equity security that the Fund may issue. |

**Related Party Transactions and Investor Reports**

| | |
|---|---|
| Compensation and Fees to Manager and Affiliates | The Fund will pay to the Manager an annual management fee equal to 2% of the outstanding principal balance of the Debentures. The annual management fee for the first year will be paid in advance on a pro-rated basis at each closing that occurs during the first year. For subsequent years, the management fee will be paid in advance on a quarterly basis, but will not be paid from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) other than a payment default which has been cured, whether or not such cure occurs during or after the Grace Period (as defined in the Debenture Agreement). For clarification purposes, if the initial closing occurs on January 15, 2014, the annual management fee for the proceeds for the initial closing will be paid on such date and quarterly payments will be paid in advance, beginning January 15, 2015. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." |
| | In addition to fees payable by the Fund, with respect to any investment by the Fund, the Manager may receive a fee from the Project Entity equal to 3.0% of the total investment amount. Such origination fee will be charged directly to the Project Entity and will be paid at the time the Fund invests in the Project Entity. |
| Expense Reimbursement | The Manager has covered or is obligated to cover all out-of-pocket expenses incurred in connection with the Fund's organization and the Offering, up to a maximum amount of $500,000. Any organizational or Offering expenses in excess of $500,000 will be paid from the Offering proceeds. |
| Co-Investments | The Fund may hold its interest in the Investments directly or indirectly through one or more subsidiaries. In addition, the Fund may co-invest with others, subject to any restrictions set forth in the LLC Agreement. |
| Leverage Restrictions | The Fund may only make Investments if the total amount of debt encumbering the underlying property, together with the Fund's Investment, is less than 80% of the finished value of the underlying project. The Fund will not finance any amount above the total cost of the project and will not invest in projects whose combined loan to value ratio exceeds 80%. See "DESCRIPTION OF BUSINESS—Identifying and Monitoring Investments—CLTV Less than 80%." |
| Investor Reports | The Fund will provide the following reports to each Investor: |

- Within 120 days after the end of the fiscal year, audited Fund financial statements; and
- Within 60 days after the end of each fiscal quarter, quarterly financial statements.

| | |
|---|---|
| Annual Audit | The Fund has engaged McGladrey LLP to perform an annual audit, and the audit opinion and related audited financial statements will be provided to the Investors. |

## USE OF PROCEEDS

The Fund is offering a Maximum Offering Amount of $30,000,000 in Debentures (which may be increased to $50,000,000 in the Fund's discretion). The net proceeds to the Fund from the sale of Debentures in this Offering, after deducting the selling commissions, due diligence fee, Placement Agent fee, and Offering and organizational expenses (the "***Net Proceeds***") will be $25,500,000 if the Maximum Offering Amount is subscribed. The following table sets forth the details of these fees and funds available for investment.

| | Sale of Minimum Subscription Amount | Percentage of Gross Proceeds | Sale of Maximum Offering Amount | Percentage of Gross Proceeds |
|---|---|---|---|---|
| Gross Proceeds from Investors | $2,000,000 | 100% | $30,000,000 | 100% |
| Less: Selling Commission (1) | $140,000 | 7% | $2,100,000 | 7% |
| Less: Due Diligence Fee (2) | $20,000 | 1% | $300,000 | 1% |
| Less: Managing Dealer Fee (3) | $40,000 | 2% | $600,000 | 2% |
| Less: Marketing and Underwriting Fee (3) | $60,000 | 3% | $900,000 | 3% |
| Less: Management Fee for one Year (4) | $40,000 | 2% | $600,000 | 2% |
| Available for Investment (before reserves) | $1,700,000 | 85% | $25,500,000 | 85% |

(1) A Selling Commission in an amount up to 7% of the aggregate principal amount of Debentures issued ("***Gross Proceeds***") will be paid to the Placement Agent which it will re-allocate to the Selling Group Members.

(2) The Placement Agent will receive a Due Diligence Fee of 1% of the Gross Proceeds which it will re-allocate to Selling Group Members.

(3) The Placement Agent will also receive a fee of 2% of the Gross Proceeds for serving as the managing dealer in the Offering as well as a marketing and underwriting fee of 3% of the Gross Proceeds, each payable at the time of closing. The Placement Agent, as managing broker-dealer for the Offering, will be responsible for all "wholesaling fees" relating to the selling group, as well as for paying its own expenses associated with the Offering up to $50,000.

(4) The Manager will receive an annual management fee equal to 2% of the outstanding principal balance of the Debentures. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES."

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 1 Page 49

## COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES

The following table and discussion show all of the types of compensation, fees, income, distributions or other payments that the Fund may pay to the Manager and its Affiliates in connection with the Fund's organization, operation and liquidation. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Fund. The Manager has no obligation to advance funds to cover the Fund's expenses, beyond the initial Offering and organizational expenses. However, to the extent that such advances are made, the Fund will repay such loans out of the Fund's funds as soon as they are available, whether such funds are from the Fund's operating revenues or third-party loans.

| Form of Compensation | Person(s) to Whom Paid | Method of Determination |
|---|---|---|
| Organization and Offering Expenses | Manager | The Manager shall cover up to $500,000 of all organizational and other expenses incurred in connection with the Offering, but shall be reimbursed by the Fund (from the Offering proceeds) for any such expenses incurred which are in excess of $500,000. The Manager does not anticipate that such expenses will exceed $500,000. |
| Fund-Level Management Fee | Manager | The Fund will pay to the Manager an annual management fee equal to 2% of the outstanding principal balance of the Debentures outstanding. The annual management fee for the first year will be paid in advance on a pro-rated basis at the closings that occur during the first year. For subsequent years, the management fee will be paid in advance on a quarterly basis. For clarification purposes, if the initial closing occurs on January 15, 2014, the annual management fee on the proceeds from the initial closing will be paid on such date and quarterly payments will be paid in advance, beginning January 15, 2015. Notwithstanding the foregoing, the management fee shall not be due and payable from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) under the Debentures other than a payment default which has been cured, whether or not such cure occurs during or after the Grace Period (as defined in the Debenture Agreement). |
| Service Fees | Affiliated Entities of the Manager | In some instances an Affiliate of the Manager may perform services for a project in which the Fund invests in order to provide better pricing and/or efficiency to the Fund than other third parties might provide for similar services. In these instances, such Affiliates may be paid customary service fees for time, material, or labor, but shall be capped at the rates and amounts set forth in this Memorandum below. |

In addition to the fees set forth above, the Fund will reimburse the Manager and its Affiliates for any reasonable expenses paid by either such Person that properly is to be borne by the Fund.

**Compensation Rates of Affiliates**

The engagement by the Fund of any Person considered to be an Affiliate is designed to achieve an optimal outcome for the Fund by obtaining more efficient service at a cost that is no higher than is standard in the market. In the event the Fund enlists the services of those certain Affiliates of the Manager identified below, the rates of compensation of such Affiliates for their various services shall be limited and all payments subject to inspection by auditors. The Affiliates below have agreed to the following rates:

Edge Construction, LLC: provides general contracting services, including those related to new construction of and rehabilitation of real estate projects.

General Contractor Fee: Cost* plus 10%
*Cost includes all costs of labor, materials and management of a project, including but not limited to costs of project management, supervision, and labor, each of which shall be billed at the hourly rates set forth below.

Project Management Rates:
| | |
|---|---|
| Executive: | $125/hr |
| Project Manager: | $115/hr |
| Onsite Superintendent: | $65/hr |
| Labor: | $35/hr |
| Admin.: | $30/hr |

Altius Development, Inc.: provides development and consulting services to real estate projects.

Project Management Rates:
| | |
|---|---|
| Executive: | $125/hr |
| Project Manager: | $115/hr |
| Admin. | $30/hr |

**Fees Payable by Project Entity**

In addition to the fees charged against the Offering proceeds, the Manager or an Affiliate of the Manager may charge each Project Entity an origination fee in an amount equal to 3% of the total investment amount. In addition, the Manager may charge the Project Partner a non-refundable due diligence fee to cover the costs of due diligence and underwriting. The origination fee will be payable by the Project Entity at the time the Fund invests in the Project Entity. The due diligence fee will be payable by the Project Partner prior to commencement of due diligence, will be non-refundable, and will typically be less than $5,000. Additionally, in the event a Project Partner's project is approved for funding, the Manager may charge a legal fee to the Project Entity, payable at closing, to cover the legal costs associated with such Investment.

# CONFLICTS OF INTEREST

A number of conflicts of interest are inherent in the relationships among the Manager, its Affiliates and the Fund. Certain of these conflicts of interest are summarized below.

## Transactions with the Manager and its Affiliates

The Fund may enter into various transactions with the Manager and its Affiliates, and compensation and fees could be paid with respect to these transactions as disclosed in the section entitled "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." To the extent any such transaction may pose a conflict of interest between the Fund, on the one hand, and the Manager or its Affiliates, on the other hand, this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Fund.

## Independent Activities of the Manager; Exclusivity

The Manager shall cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the projects in which the Fund invests, and other activities of the Fund as much time as may be reasonably necessary for the performance of their respective duties in such capacities as managing principals, which shall be no less than a majority of their full business time during the Offering Period. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Fund's investment objectives, (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund and any pre-existing Investments or undersized Investments, (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates, (d) serve on boards of directors of public and private companies and retain fees for such services for his own account, (e) engage in civic, professional, industry and charitable activities, and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

## Manager's Representation of the Fund in Audit Proceedings

Situations may arise in which the Manager may act on the Fund's behalf in administrative and judicial proceedings involving the IRS or other enforcement authorities. Such proceedings may involve or affect other business entities for which the Manager or its Affiliates act as managers or general partners. In such situations, the positions taken by the Manager may have differing effects on the Fund and such other business entities. Any decisions made by the Manager with respect to such matters will be made in good faith consistent with the Manager's fiduciary duties both to the Fund and the Members and to any other business entity for which the Manager or its affiliates act as a Manager or general partner. However, any Investor who desires not to be bound by any settlement reached by the Manager with the IRS may file a statement within a period prescribed by Regulations stating that the Manager does not have authority to enter into a settlement on his, her or its behalf.

## Legal Representation

The Manager has engaged Perkins Coie LLP as its legal counsel to assist in connection with certain of the transactions contemplated by this Memorandum and in preparing the Debenture Agreement, this Memorandum and the Debenture Agreement. Perkins Coie LLP, in providing such advice has represented the Manager's interests and did not represent nor purport to represent the interests of any other Investor or potential investor. The Fund urges you to engage your own legal counsel and, as necessary, financial consultants for advice regarding the desirability of purchasing the Debentures offered pursuant to this Memorandum. Perkins Coie LLP may in the future represent the Fund, the Manager or related parties on various matters, subject to complying with applicable legal principles for resolving conflicts of interest.

**Receipt of Compensation by the Manager, Placement Agent, Selling Group Members or their respective Affiliates**

The Manager, the Placement Agent, Selling Group Members, or their respective Affiliates will receive certain compensation from the Fund, regardless of whether the Fund ever makes payments to the Investors. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." Although the Fund believes that the fees to be paid to such Persons will be competitive with those that otherwise could be provided by third-parties (taking into account the quality, amount, and degree of specialization of services provided), any such fees will not be determined by arm's-length negotiations. These fees and expenses will be paid prior to any repayment of the Debentures or interest therein, although the Manager's management fee will not be payable from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) other than a payment default which has been cured, whether or not such cure occurs during or after the Grace Period (as defined in the Debenture Agreement).

**Manager's Profits**

After the Fund has paid the principal and 12% annual interest due and payable under the Debentures and paid the Payoff Premium, the Fund will distribute a large portion of any remaining profits to the Manager. These distributions to the Manager represent a distribution that will reward the Manager for establishing and managing the Fund and its assets and is not reliant upon making any capital contributions to the Fund. Manager's profit interest in the Fund may create an incentive for the Manager to make more speculative investments on behalf of the Fund than the Manager otherwise would make in the absence of such profit potential.

By the same token, the Manager has agreed to share a portion of the Fund profits with the Placement Agent. This sharing arrangement may reduce the Manager's incentive to maximize the Fund's investment performance and return to Investors. The Placement Agent will pay a portion of its distributions or profits interest, on a *pro rata* basis, to broker-dealer members of the Selling Group responsible for Investments. Investors are hereby advised that the payment of such incentive compensation, or even the possibility of such payment, may create an additional conflict

**Avoidance of Conflicts**

Neither the Manager nor any of its Affiliates may make any investment on behalf of a new pooled investment fund with investment objectives that are identical to those of the Fund until the earlier of: (a) the date on which at least 75% of the aggregate net Offering proceeds, after payment of commissions and fees and the setting aside of reserves, have been committed to or invested in Investments or (b) November 1, 2015. During the Offering Period, any investment that is presented to the Manager or its members or managing officers that the Manager believes is consistent with the investment objectives of the Fund and is otherwise suitable for the Fund, will be offered by the Manager to the Fund to the extent the Fund has funds available to make such Investments, net of reserves for the management fee and Fund expenses throughout the term of the Fund. For the avoidance of doubt, neither the Manager nor its members or managing officers will be required to offer to the Fund any real estate investment that is not consistent with the investment guidelines, investment objectives, and principles of the Fund or is otherwise not suitable for the Fund. Notwithstanding any provision to the contrary, the Fund and its Affiliates may engage in management and investment activities related to pre-existing Investments and activities or operations related to a successor fund.

# RISK FACTORS

As with all investments, investment in the Debentures is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. In addition to the information set forth elsewhere in this Memorandum, you should consider the following risks before deciding whether to invest.

**Operation and Fund Risks**

> ***Our business prospects are difficult to predict because we are a newly organized entity.***

The Fund is a newly organized entity and does not have an operating history upon which Investors may base an evaluation of its likely performance. The Fund's results will depend upon the availability of suitable investment opportunities for the Fund and the performance of the Fund's Investments. Payment of the principal and interest on the Debentures is subordinated to the prior payment of certain Fund liabilities and expenses and other third party debt to institutional lenders. Before payments are made on the Debentures, the Fund must first pay any senior current liabilities and expenses, including principal and interest payments due on any third-party institutional debt. This includes fees payable to the Manager and its Affiliates.

> ***Investors must rely on the Manager to acquire appropriate Investments for the Fund's portfolio.***

The Fund is conducting the offering as a "blind pool," meaning that the Fund is proceeding to raise funds through the sale of the Debentures, without having specifically identified all Investments in which the Fund intends to invest. When you subscribe for Debentures, however, that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the Investments that the Fund subsequently identifies. You should not invest in the Fund, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum. The Fund may have limited access to financial information regarding the Investments, which may limit the Fund's ability to conduct comprehensive due diligence regarding the Investment and its likelihood of request.

> ***If the Fund is not as successful with the Offering as desired, it may not acquire as diversified a portfolio as is planned.***

The Fund does not know how many Investments it will be able to obtain. The number of Investments ultimately purchased will depend primarily upon the equity raised through the sale of the Debentures, the availability of suitable Investments, and the extent to which the Manager arranges for Investments to be held with co-investors. There is no certainty as to the number of Investments that the Fund will be ultimately be able to obtain and, since one of the Fund's objectives is diversification, no assurance can be given as to the Fund's achievement of that objective.

> ***Control is vested in the Manager; no Investor should purchase the Debentures unless such Investor is comfortable with the Manager's judgment and experience in running the Fund's affairs.***

Control over all decisions affecting the Fund, including decisions regarding the Investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, participation in mergers, consolidation and other restructurings, and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors.

> ***The Manager's conflicts of interest may result in transactions unfavorable to the Fund.***

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Fund, provided the terms are commercially reasonable. These measures may not fully protect the Fund against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Fund as they would have been if the transaction had been with unrelated third parties. Moreover, the Fund will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. See "CONFLICTS OF INTEREST." In addition, before the Fund invests all of its Investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager.

The Manager has the discretion to retain all or a portion of the proceeds from Investments to make new Investments. If the Manager were to take such action, this would place such investment returns at the risk of new investment opportunities and delay payments of the Payoff Premium to the Members.

*Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Debentures.*

The Manager has not arranged for Investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Fund has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

*The Fund will have limited or no control over the underlying Investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the Investments.*

The Fund expects to acquire preferred equity and, occasionally, debt interests in the Investments. Accordingly, the Fund will not likely have control over those Investments (except in certain circumstances relating to the Fund enforcing its creditor rights or contractual rights) and will be required to rely on the Project Partners of such Investments to use their skill, expertise and background to generate value from the Project Entities. Although the Fund routinely requires the Project Partners to grant a mortgage (deed of trust) or to pledge their equity interest in the Project Entity as collateral, there can be no assurance that in the event of a default by the members or managers of such Project Entity that the equity interest or real estate can be readily transferred to the Fund or that the Fund can obtain control of the Project Entity. There is a risk that courts or other governmental parties may oppose such transfers.

*The Fund may take over control and management of properties in which the Fund originally held a passive equity interest if the entity owning such property is in default (as defined in the entity's governing document). Such properties may entail additional risks and lower cash flow during the development period and the subsequent lease up or sale.*

The Fund may acquire a preferred equity position in entities in need of additional capital in order to meet debt service obligations, refinance existing debt or finish developing or renovating the underlying property. The Fund would not be in control of the day-to-day operations of the underlying company, but would have the ability to take control of the company in the event certain conditions were not maintained by the existing manager. Even though the Fund may take over management of the underlying property, it might not be a majority owner of the underlying property and its management authority may be restricted. In the event of default and subsequent acquisition of the underlying property, the Manager may underestimate the costs and time needed to effectuate necessary construction, renovations and repairs. This may present unexpected capital demands upon the Fund, and reduce the potential return on the Investment because of the additional capital needed to renovate the property. Development projects may take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent, lowering the property's cash flow potential. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without preparing detailed budgets, such budgets may understate the expenses.

*Markets in which the Fund is anticipated to invest are subject to a high degree of volatility and therefore the Fund's performance may be volatile.*

The Fund's business will involve a high degree of financial risk. Markets in which the Fund is anticipated to invest are subject to a high degree of volatility and therefore the Fund's performance may be volatile. There can be no assurance that the Fund's investment objective will be realized or that Investors will receive any Payoff Premium. The Fund may invest in various interests related to single, multi-unit and multifamily residential properties, including direct investments in such properties; debt instruments issued by entities owning such properties, which may or may not be collateralized by mortgages against such properties or the equity interests in the ownership entities; equity

interests, such as general and limited partnership and membership interests, in entities holding title to such properties, as well as interests to participate in the cash flow generated by such entities. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

> ***If the Fund were to acquire debt collateralized by residential properties suitable for investment, the Fund will be subject to a number of additional risks not present when investing directly in residential properties.***

The Fund has the authority to purchase debt collateralized by residential properties. If such collateralized debt is acquired, the Fund will be subject to the following risks:

(a)　　The Manager's due diligence must cover not only an assessment of the value of the underlying collateral (since there is the possibility that the Fund will acquire title to the property in satisfaction of the debt), but also an assessment as to whether the Fund will take the debt free from the claims of others and whether the debtor has defenses that might be asserted to forestall or defend against the collection of the debt. To the extent possible, when acquiring debt, the Fund will try to make certain that it is a bona fide purchaser of the debt entitled to be treated as a "holder" in due course under the applicable Uniform Commercial Code.

(b)　　The debtor may default in its obligations under the debt, forcing the Fund to institute collection actions and proceed against the underlying collateral in order to protect its investment. The Manager must, before proceeding with such acquisition, be comfortable that the risk reward profile of the Investment is favorable. Such an analysis will require the Manager to take into account the factors likely to impact the ultimate return on the Investment, including among others, the price at which the debt was acquired (whether and to what extent the debt is acquired at a discount to the outstanding principal), the likelihood of default, the stated principal and interest payments, an assessment of the underlying collateral value of the collateral, the possibility of competing claims to the debt itself or defenses that might be tendered by the debtor in a collection action, the likely costs and delays in proceeding against the collateral, the risk of a debtor bankruptcy proceedings and the presence of personal guaranties from creditworthy/solvent guarantors.

(c)　　The Fund may encounter delays or difficulties in foreclosing upon its interest in the collateral if the debtor cannot pay the debt as and when it becomes due. Moreover, the Fund may incur substantial expenses in foreclosing upon the collateral or pursuing claims against the debtor and, if applicable, the guarantors of the debt. Such costs will increase the Fund's costs in the property, if the Fund subsequently acquires title to the property through foreclosure or a deed in lieu of foreclosure.

(d)　　There is no assurance that the Fund will subsequently acquire title to the collateral property. The debtor may keep the debt current, cure prior events of default or arrange for the debt to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third party may be prepared to outbid the Fund to purchase the collateral property. It would be customary for the Fund to submit as its bid the amount of the outstanding debt at foreclosure sale, but the Fund may not be prepared to bid more than that amount to win the property over other bidders. In those instances, where the Fund does not take title to the collateral, its return on investment will be determined by the terms of the promissory note and related collateral document (such as the deed of trust, mortgage, or other security agreement). The Fund's rate of return on such an investment may be determined by a number of factors, not the least of which is the price of which the debt was acquired. The investment's potential return will be significantly enhanced if the collateralized debt can be purchased at a deep discount to the then outstanding debt. Should that be the case, the Fund's return, even if the debt is subsequently retired, will be substantially greater than would have been the return of the debt in the hands of the originating lender.

(e)　　The debtor may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent borrowers. These protections are at the expense of the Fund as a creditor. Such actions may result in staying the Fund's foreclosure proceedings, restructuring of the debt terms, or otherwise delaying or interfering with the enforcement of the creditor's rights under the applicable security agreements. The Manager will need to balance such considerations before deciding

whether it is advisable to acquire the collateralized debt and, in particular, assess whether the price at which the debt is acquired (including the discount if any) is sufficient to compensate the Fund from the possible risks of delays, additional costs, and debt restructuring on less favorable terms to the creditor.

### *Fees to Manager will be paid while interest and principal remain outstanding under the Debentures.*

Provided that an Event of Default has not occurred, fees payable to the Manager will be paid while interest and principal remain outstanding under the Debentures. The management fee is based on the outstanding principal balance of the Debentures. The Manager will receive such fees whether or not the Investments operate profitably. These fees (like other operating expenses) reduce the amount of cash that otherwise would be available for payment of the Payoff Premium. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES."

### *Various factors could negatively impact the amount of net profits generated by the Fund during the Measurement Date (as defined in the Debenture Agreement); thereby reducing the Payoff Premium that may be paid to the Investors.*

(a)     At this stage, it is not known how much information, including financial information, the Fund will have available to review when conducting due diligence regarding potential Investments. The content and accessibility of such information will be determined by the manager of the respective Investment. While the Manager will not cause the Fund to make an investment in an Investment unless it has what it considers to be reasonable access to such information, the information may not be as comprehensive as the Manager would like. Moreover, neither the Manager nor the Fund will audit the affairs of the Investments and will rely upon the accuracy of the information provided to it regarding the Investments.

(b)     The Fund will obtain insurance policies for the Investments that are commercially prudent given the local market and circumstances of the Investment (typically including liability, fire and extended coverage). However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Investments should be partially or totally destroyed, the Fund may suffer a substantial loss of capital as well as profits. Even if the Fund's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Fund will sustain a substantial uninsured loss as a result of a fire or other casualty.

(c)     Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making an Investment, the Manager will undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation is expected to include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the Investment's site had environmental contamination not detected prior the Fund's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Fund undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Fund may incur environmental clean-up costs or be subject to liability exposure that may reduce the net profits of the Fund.

(d)     Under the Americans With Disabilities Act of 1990 ("**ADA**"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing Investments to allow disabled persons to access to such facility. Most of the Investments the Fund considers will likely be in compliance with the present access requirements. If, however, the Investments the Fund acquires were not in compliance with the ADA, the Fund will be required to make modifications to the Investments to bring them into compliance, or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

(e)        The real estate industry in general, and the multifamily residential sector in particular, are highly competitive, and the Fund will be competing with numerous other entities, some having substantially greater financial resources and experience than the Fund, in seeking attractive investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available Investments or resulting in other less favorable terms to the purchasers.

(f)        The investment returns available from equity investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could have a material adverse impact on the Fund's results of operations or financial condition. In addition, equity real estate investments are difficult to sell quickly and the Fund may not be able to adjust the Fund's portfolio of owned properties quickly in response to economic or other conditions. If the Fund's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Fund's income will be adversely affected.

**Private Offering and Liquidity Risks**

*This private placement of Debentures is being made in reliance on an exemption from registration requirements and there is no guarantee that it will comply with the regulatory requirements for such exemption.*

This private placement of Debentures will not be registered with the Securities and Exchange Commission. The Debentures are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to Investors meeting the investor suitability criteria set forth in this Memorandum. If the Fund should fail to comply with the exemption, Investors may have the right to rescind their purchases of Debentures. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Debentures will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Fund's assets to satisfy the claims of the claimants.

*This is a private offering and as such you will not have the benefit of review of this Memorandum by the SEC or other agency.*

Since this offering is a private placement of securities and, as such, is not registered under federal or state securities laws, you will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

*The limited liquidity of the Debentures may adversely affect your ability to transfer and pledge the Debentures.*

You must represent that you are purchasing the Debentures for your own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, encumber or otherwise dispose of your Debentures unless the Fund obtains an opinion or are otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Code or cause the Fund's termination under Section 708 of the Code. Accordingly, the Debentures may not be readily accepted as collateral for loans and you may not be able to liquidate your investment in the event of emergency or for any other reason, or may be able to liquidate your investment only at a substantial discount. See "TRANSFERABILITY OF THE DEBENTURES," and "U.S. FEDERAL INCOME TAX MATTERS."

***Investments will be illiquid.***

The Fund expects its investments in the Investments to be illiquid. Accordingly, its returns on those investments will be dependent, and be outstanding, over the life time of the Investments. If the underlying assets in those Investments are held for long periods, the Investors will be compelled to wait until the underlying assets are sold, before being in a position to liquidate their investments. The Manager expects most of its Investments to have an investment time frame of 2 to 3 years. The Fund may have little or no control over when the underlying properties are liquidated.

## Tax Risks

***You are urged to consider the United States federal income tax consequences of owning the Debentures***

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to treat the Debentures for U.S. federal income tax purposes as contingent payment debt instruments subject to U.S. federal income tax rules applicable to contingent payment debt instruments. Under that treatment, if you are a U.S. Holder (as defined herein), you will be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by you in that year. You will recognize gain or loss on the sale, repurchase, exchange, conversion or redemption of a Debenture in an amount equal to the difference between the amount realized and your adjusted tax basis in the Debenture. Any gain recognized by you on the sale, repurchase, exchange, conversion or redemption of a Debenture generally will be treated as ordinary interest income and any loss will be treated as ordinary loss to the extent of the interest previously included in income and, thereafter, as capital loss. See "U.S. FEDERAL INCOME TAX MATTERS."

***Interest on Debentures Could be Characterized as Unrelated Business Taxable Income***

We intend to take the position that the Debentures should be classified as debt instruments for U.S. federal income tax purposes and both the stated interest and the Payoff Premium should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("***UBTI***") with respect to tax exempt Investors. However, there is no assurance that the IRS will agree with this position and it is possible that the debentures may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Debentures may be characterized as UBTI with respect to tax exempt Investors.

## PRIOR PERFORMANCE OF THE MANAGER AND ITS AFFILIATES

As a newly formed investment vehicle, the Fund has no operating or prior performance history. The information presented in this section represents the limited historical experience of the principals of the Manager and their Affiliates. Prospective investors in the Fund should not rely on the information below as being indicative of the types of investments the Fund may make or of the types of returns the Fund's Investments may generate. It should be understood that neither the Fund nor the Investors will have any interest in the properties described below. Prospective investors should not assume that the Fund will experience returns, if any, comparable to those described herein.

| Track Record | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property | Acquisition Date | Location | Total Invested Cash Equity | Project Cost | Exit Value | Exit Date | Net Gain to Cash Investors | ROE |
| **Acquisitions** | | | | | | | | |
| Belcera - 11 Unit Condos | 11/1/2006 | Bellevue, WA | $ 240,000 | $ 3,029,612 | $ 3,120,150 | 11/12/2008 | $ 90,538 | 38% |
| Ambaum - 45 Unit Condos | 11/1/2007 | Burien, WA | $ 200,000 | $ 8,511,377 | $ 5,946,368 | 11/1/2010 | $ 20,000 | 10% |
| Oceanaire - Single Family Rental | 8/27/2010 | Pacific Beach, WA | $ 650,000 | $ 1,290,874 | $ 1,695,000 | 12/31/2010 | $ 404,126 | 62% |
| Front Street Townhomes - 9 Unit Townhome | 6/15/2010 | Pacific Beach, WA | $ 75,000 | $ 1,134,000 | $ 1,134,000 | 9/27/2012 | $ 27,000 | 36% |
| Ashton/Ryegate - 126 Unit Apartment | 12/31/2012 | Ellensburg, WA | $ 50,000 | $ 1,766,107 | $ 2,059,702 | 6/3/2013 | $ 293,595 | 587% |
| | | | | | | | | |
| | | | | | | | | |
| **Construction** | | | | | | | | |
| Madeline Woods - 60 Single Family Duplexes | 1/1/2009 | Bremerton, WA | $ 650,000 | $ 9,531,118 | $ 10,878,210 | 3/1/2011 | $ 775,225 | 119% |
| Mill Terrace - 12 Single Family Homes | 1/1/2010 | Bothell, WA | $ 500,000 | $ 2,430,000 | $ 3,012,642 | 7/1/2010 | $ 486,142 | 97% |
| McRea - Single Family Home* | 2/1/2011 | Elma, WA | N/A | $ 160,000 | $ 240,000 | 7/1/2011 | $ 80,000 | 50% |
| Parker - Single Family Home* | 3/15/2011 | Bellevue, WA | N/A | $ 550,000 | $ 1,000,000 | 9/15/2011 | $ 450,000 | 82% |
| Snelling - Single Family Home* | 8/3/2010 | Bonney Lake, WA | N/A | $ 165,000 | $ 230,000 | 12/15/2010 | $ 65,000 | 39% |
| * ROE calculated using total project cost as equity component | | | | | | | | |

YOU SHOULD RECOGNIZE THAT BY PURCHASING DEBENTURES IN THE FUND YOU WILL NOT THEREBY ACQUIRE ANY OWNERSHIP INTEREST IN ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. YOU SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES IS GIVEN SOLELY TO ALLOW YOU TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. YOU SHOULD NOT ASSUME THAT THE INVESTORS IN THIS OFFERING WILL EXPERIENCE RETURNS, IF ANY, ON THEIR INVESTMENTS SIMILAR TO THOSE EXPERIENCED BY INVESTORS IN THE PRIOR PROGRAMS SPONSORED BY THE MANAGER AND ITS AFFILIATES.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 11 Page 60

# MANAGEMENT OF THE FUND

## General

The management and supervision of the Fund is vested exclusively in the Manager (including its duly appointed agents), and the Manager (and its duly appointed agents) shall have full control over the business and affairs of the Fund. Subject to the terms of this Agreement, the Manager shall have the power on behalf and in the name of the Fund to carry out any and all of the objects and purposes of the Fund and to perform all acts and enter into and perform all contracts and other undertakings that the Manager, in its sole discretion, deems necessary or advisable or incidental thereto.

You will have no right to participate in the management and control of the Fund and will have no voice in its affairs except for certain limited matters which may be submitted to a vote of the Members under the terms of the Debenture Agreement. The Members must rely upon the judgment and experience of the Manager to manage the Fund.

## The Fund's Manager

The Fund has selected iCap Pacific NW Management, LLC, a Washington limited liability company solely owned by Chris Christensen, to serve as its Manager. For its services, the Manager will receive an annual management fee as described elsewhere in this Memorandum. <u>See</u> "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." In addition, the Fund will reimburse the Manager for any Fund expenses that are borne by the Manager on behalf of the Fund; provided, however, that the Manager will not be reimbursed for initial organizational and offering expenses which are less than $500,000.

## Affiliates of the Manager

The Fund has two affiliated companies specializing in the acquisition and development of real estate properties: Altius Development, Inc., which is solely owned by Chris Christensen, and Edge Construction, LLC, which is solely owned by Altius Development, Inc. Altius was formed in 2007 and has completed a number of projects in areas of condos, multi-family and single family subdivisions. Edge Construction was formed in 2007 and has been involved in the construction of condos, multi-family, single family subdivisions, remodels, commercial structures and a number of custom homes. Additionally, Chris Christensen is the principal attorney and owner of Altius Legal, PLLC, a law firm specializing in business and real estate law. Each of these Affiliates may provide services to the Fund and may provide additional exit strategies at predetermined rates where needed. <u>See</u> "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES—Compensation Rates of Affiliates" for the fee rates of these Affiliates.

## Key Executives of Manager

Certain biographical information regarding some of the key members of the Manager's senior management team is summarized below.

**Chris Christensen – President**. Prior to forming the Fund, Mr. Christensen formed Altius Development, its subsidiary construction company, Edge Construction, and Altius Legal, PLLC. Mr. Christensen has also advised numerous lenders, developers, and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection, as well as the use of funds in their businesses. He has structured and completed numerous real estate transactions. Mr. Christensen is 37 and holds a J.D. from Seattle University School of Law, a Master's Degree in International Business from Seattle University and a Bachelor of Arts Degree from the University of Utah, and is the brother of Mike and Jim Christensen.

**Michael ("Mike") Christensen – Chief Investment Officer**. Prior to joining the Fund team, Mike was the founder and Managing Director of Vision Ventures Capital & Consulting, LLC, a venture capital firm headquartered in Utah providing consulting with regard to capital raises and corporate financial matters. Mike and his team managed the Dixie Angel Investor group, in addition to a debt fund consisting of pooled money from local banks. Prior to founding Vision Ventures, Mike worked at the Utah Fund of Funds on a small team managing a $300,000,000 fund. Mike is 32, holds an M.B.A. from Pepperdine Graziadio School of Business Management, a Master of Dispute Resolution from Pepperdine University School of Law, and a Bachelor of Arts Degree from the University of Utah, and is the brother of Chris and Jim Christensen.

**Jim Christensen - Chief Operating Officer**. Prior to his role at iCap Equity, Jim was the Chief Operating Officer at Altius Development, Inc., where he managed all aspects of construction, development, finance, and risk control of multifamily, residential, and commercial real estate projects throughout Washington state. While at Altius Development, Jim managed over $30 million in development projects and also consulted property owners on the strategy, finance, and execution of the development of their properties. He has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting, and legal structuring. Jim is 29, holds a Bachelor of Arts Degree from the University of Washington, and is the brother of Chris and Mike Christensen.

**Bryan Brown – Vice President, Construction**. In addition to Mr. Brown's role at the Manager, he is the president of Edge Construction,. Mr. Brown is 37 and has 18 years of experience in new home construction, multifamily construction, and commercial construction. He has built over 1,500 structures. Mr. Brown has trained many construction managers and superintendents. He will perform due diligence, construction management, and budget monitoring for the Fund's Investments.

**Miscellaneous**

The Manager and its Affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding. In addition, the Fund and the Manager have never been involved in or subject to any pending litigation or claims.

## DESCRIPTION OF THE BUSINESS

The Fund has been formed to invest in real estate opportunities in the Pacific Northwest. The Fund may also acquire real estate directly, as well as debt instruments in other real estate companies. The target investment properties include single and multi-unit residential properties, multi-family residential projects, commercial properties and land acquired for entitlement purposes.

### Market Opportunity

#### *Demand for Equity*

Virtually all real estate transactions require an equity investment in order to obtain lender financing. The recent economic downturn has further increased the demand for equity investment in real estate transactions. This need is the result of banks and other real estate lenders tightening their lending criteria. Several years ago lenders routinely loaned up to 90% of a project's bulk value or 80% of retail value. Now they are commonly lending no more than 65-70% of a project's cost and



are requiring the Project Partner to supply the remainder of the money to complete a project. Thirty percent of US banks said their standards for commercial real estate loans are the tightest they have been in six years, while another 37% said that their standards are only slightly easier than their tightest in that same period, according to a Federal Reserve survey of senior bank loan officers (Federal Reserve, http://www.federalreserve.gov/boarddocs/snloansurvey/).

In the past two years 80% of banks have reported a stronger demand for real estate loans, while lending volume has decreased by over $4 trillion nationally (Federal Reserve Bank of St. Louis). Most real estate developers and builders have been severely affected by the economic downturn and may not have the necessary capital to complete attractive real estate projects. As a result of their not having the necessary capital, a funding gap exists that results in short-term and long-term investment opportunities for the Fund.

#### *Capitalizing on the Market Opportunity*

The Fund's business model is designed to fill the funding gap between lenders, on the one hand, and developers or builders ("**Project Partners**"), on the other hand, by providing the additional cash equity needed for real estate projects. The primary difference between the Fund and other equity investors is that the Fund maintains control of each Project Entity.

The Fund's business model is attractive to banks and other lenders because the Fund brings an additional assurance to lenders that they will be repaid through the Fund's and its Affiliates' efforts. Local lenders screen hundreds of potential projects and perform much of the upfront due diligence required to put a project together. For example, a lender who has approved a Project Partner on a loan for a project that the lender likes, will have already performed the appraisal, background checks, financial analysis, and other items for the loan to be approved. The Fund can then review the due diligence file prepared by the lender and then begin its own due diligence process. After reviewing the lender's due diligence file and completing its own due diligence process, the Fund will negotiate an investment structure with the Project Partner. The investment with the Project Partner will be structured in a way that requires a priority return of the Fund's original investment plus a share of the profits. The Fund will then provide the funds needed to meet the cash requirement under the loan. Recently, many banks have reported that they have more cash to lend than ever before; however, they commonly state that there are not enough borrowers capable of qualifying for loans under their new guidelines. This situation is generally the result of low liquidity on the part of the borrower, which can be met by the Fund.

We believe the Fund provides a needed service to developers and builders. Most developers and builders who could not otherwise finance a real estate project without additional cash are willing to agree to the Fund's guidelines and

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 11 Page 63 of 1366

investment criteria. From the Project Partners' (developers and builders) point of view, she, he or it would rather agree to give a share of a project's profits to the Fund and have the chance to earn a smaller profit for himself, herself or itself than to miss the opportunities altogether.

### Market Opportunity's Longevity

Many investors seek to take advantage of the short-term opportunities that have arisen from banks needing to liquidate assets at low prices but do not have the capital or relationships to fund the opportunities. The Fund's investment strategy allows it to participate in both short-term and long-term opportunities. For example, the Fund's business model allows it to provide the necessary capital for a Project Partner to acquire bank owned assets now (a short-term opportunity). The Fund will also provide funding for future projects by Project Partners who need cash to meet the revised lending criteria of banks (a long-term opportunity). In both scenarios, the Fund structures its investments such that the Project Partner and its guarantors bear most of the economic risk, while the Fund gets a priority return of its original investment and shares in the profits of the Project Entity and maintains control of the exit strategy.

## Target Market: Pacific Northwest

The Seattle-Tacoma-Bellevue Metro Area is the third strongest regional economy in the United States[1]. This region contains nearly 65% of the 6.8 million people living in Washington and a majority of manufacturing, research, and technology jobs generated by some of the most stable companies in the world. With several Fortune 500 companies headquartered in the Puget Sound Region, the job growth rate is more than double that of the United States, with a large number of jobs requiring well-educated labor where employees are highly paid, such as aerospace, technology, and life sciences. A projected 4.4% wage growth for adults 18-29 years old[2] makes the Puget Sound region appealing to young professionals, which in return increases the demand across all sectors of real estate development. Below are some of the regional employment and housing statistics:



- Aerospace: 85,000 currently employed at an average wage of $80,000 with an expected 5% industry growth rate for the next 10 years.
- Technology: 70,000 currently employed at an average wage of $90,000 with an expected 12% job growth rate over next the 5 years.
- Life Sciences: 33,500 currently employed at a median wage of $88,000 with an expected 10% job growth rate over the next 5 years.[3]

## Regional Housing Demand

- Seasonally adjusted average home prices rose 12% from $335,089 in Q3 of 2012 to $375,300 in 2013.
- Total housing inventory has decreased an average of 22% quarterly from a year ago for 2013.

---

1 www.policom.com
2 www.payscale.com
3 www.researchcouncil.org

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 11 Page 64

- The Case-Shiller Index has risen 19% from January 2012 to August 2013, indicating a trend in rising home prices independent of home quality changes.
- Five years of pent up demand, affordability, rising home prices, and an improved economy all bode well for the construction and real estate sector in the region.

The Fund will focus its Investments in three types of properties: multi-family (condos and apartments), residential, and commercial. Given that the Fund and its Affiliates are based in the Seattle-Tacoma area, the Fund will primarily invest in Project Entities located in western Washington. The Seattle-area economy has been among the most resilient economies in the country during the recession.

## Market Segment

More than 88% of U.S. commercial real estate transactions are less than $5 million in size.[4] Nevertheless, fewer than 5% of private equity firms invest in transactions that are less than $5 million. There is a $16 billion funding gap that exists today in these smaller transactions, which has been widened by the recent recession.[5] As a result of tightened lending standards, namely more rigid loan-to-cost requirements, many builders and property owners are unable to secure the necessary capital to complete projects. The Fund provides the equity piece (i.e. the gap funding) that enables builders and property owners to secure capital for the completion of their projects.



Lender Requirements Present $16 Billion Capital Demand



Annual Commercial Real Estate Transactions by Price

## Investment Focus and Structure

The Fund intends to focus its investments on new construction properties and income-producing properties located in the Pacific Northwest and to seek projects in which Fund's investments can be repaid within six (6) to 18 months after acquisition. Affiliates of the Fund will add value through legal, development, or construction services, as needed.

Projects are sourced primarily through private lenders, banks, brokers, and property owners. The Manager has existing relationships with various banks and private lenders that are attempting to dispose of Real Estate Owned (REO) properties. A bank will often contact the Manager as they know that the Fund is interested in these types of investment opportunities. A second source of projects is developers and builders. The Manager works with those developers that have quality projects and who are in need of cash so that the developer can have all of the required equity in place prior to approaching the bank for a loan. Specific examples of types of investments the Fund may target include the following:

### *Equity Investments*

An equity investment for the Fund involves the purchase of an ownership position in a Project Entity. An example of this type of investment might be a developer who desires to obtain a loan from a bank to build an apartment building. In the typical situation, the bank's lending guidelines will limit the loan amount to 70% of the construction costs, requiring the developer to pay for the remainder of the construction costs with cash. In this instance, the developer would supply as much cash as he, she or it had, and the Fund would fill the gap in exchange for a priority return of its original investment plus a portion of ownership (and profits) of the Project Entity.

---

[4] ³http://www.corelogic.com/landing-pages/commercial-real-estate-data-and-analytic-capabilities.aspx

[5] ⁴Federal Reserve, http://www.federalreserve.gov/boarddocs/snloansurvey/

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 11 Page 65

The Project Entity LLC Agreement will be structured first to provide a preferred return, followed by a priority repayment of the Fund's capital investment and then a share of the profits in the Project Entity. For example, if the Fund were to invest $100,000 into a project, the Fund would be entitled to a priority repayment of the $100,000, plus interest, and would further be given a share of the profits in the development entity. The Fund's legal agreements with the Project Partner will provide for the Investment in each project to be repaid as soon as possible, but generally no later than 12 months from the time of the Fund's Investment. This structure allows the Fund to re-invest the returned capital received from Project Entities, while continuing to maintain a share of the profits. Failure of the Project Partner to perform on the terms of the Fund's financing, or failure to adequately perform its contractual obligations to the Project Entity, would result in the Fund receiving a larger share of the profits or the ability to take control of the Project Entity and the Project Partner's interest thereto. Such failure will also permit the Fund to demand the return of its investment in the Project Entity.

### Cash Acquisitions

Many current real estate opportunities can be found by buying properties from banks or property owners. Quite frequently, banks and other lending institutions are required by the FDIC to liquidate properties they own in order to meet mandatory ratio requirements with regard to their loans and deposits. This situation often requires lenders to sell their REO properties very quickly, often at discounts. The Fund has a growing network of relationships with lenders who are willing to sell their properties to private parties in off-market transactions before listing them for sale to the general public. The Fund will utilize this network to position itself to purchase properties that meet management's approval. Once an REO asset is acquired from a lender at a discount, the Fund has the option of either selling the property immediately or adding value to the property through entitlement, development, construction, or any combination of these things. Then, depending on market demand, the developed parcels or structures could be sold. In these instances, the Fund would acquire such properties through a wholly-owned special purpose entity and may engage the Manager's Affiliates to perform the value-added work.

### Loans

In the event the Fund makes loans, it will do so in exchange for a first position mortgage (deed of trust) on the underlying property. These loans will typically be underwritten to ensure that the loan is no more than 80% of the property's value. The loans are intended to be short-term loans to be repaid in less than 15 months. The Fund may also provide additional cash as an equity investment to those borrowers. Additionally, the Fund may purchase existing loans from lenders at a discount. In that case, the fund will receive interest payments until the loan is sold or paid off.

### Acquisition of Bank Notes

A number of banks are in a position where they need to divest portions of their loan portfolios in order to comply with various FDIC requirements. The Fund believes it is in a position to opportunistically step in and acquire such bank notes at a discount.

### Other Investments

The Manager may pursue other investment opportunities so long as they are believed to have attractive yield potential.

## Legal Structure of Projects

Each Project Entity will be organized as a new limited liability company with assets consisting of the real property and any fixtures and improvements relating to the same. This organizational structure allows the Fund to limit potential liabilities that may come from unrelated matters of the Project Partner and provides protective measures for the Fund. Unlike traditional real estate investment vehicles, in which the real estate itself serves as the primary or only source of collateral, the Fund will also secure the return of its investment in the Project Entity with the Project Partner's equity interest in the Project Entity. Thus, in addition to recording second position or sometimes first position mortgage (deed of trust) against the property to secure the return of the Fund's investment in the Project Entity, the Project Partner must also pledge his, her or its equity interest in the Project Entity to the Fund. The Fund will be entitled to foreclose against this pledge or exercise its contractual rights under the governing documents of the

Project Entity in the event of the Project Partner's failure to meet the performance obligations it has contractually agreed to. The Fund believes these measures will help ensure the project is completed on time and on budget. In order for the Fund to invest in and form a Project Entity, the Project Partner must contractually agree to:

- Pay all subcontractors, vendors, or service providers of the Project Entity when due;
- File tax returns and pay taxes when due;
- Generate any other report due to government authorities or to the members of the Project Entity when requested or when due;
- Obtain approval from the Fund before incurring expenses that are not included in, or which exceed the line items of, the budget of the project that will be agreed to by the Fund;
- Prohibit any lien, security interest, or other encumbrance to be filed or recorded against any property owned by the Project Entity which has not been previously approved by the Fund;
- Obtain and maintain all permits or licenses, necessary to the operation or development of the Project Entity;
- Meet the project milestones and timelines to be set forth in the Project Entity LLC Agreement;
- Maintain property sale prices or rents within 5% of the values set forth in the Project Entity governing documents unless consent is first obtained from the Fund;
- Maintain financial solvency of the Project Partner or any entity owned by the Project Partner;
- Avoid litigation, disputes, arbitration, or violation of any law or ordinance;
- Do not enter into any agreement on behalf of the Project Entity, the terms of which in the reasonable determination of the Fund manager are likely to reduce the Project Entity's profits;
- Meet with the Fund manager monthly; maintain and produce accurate books and records; and deliver the documents or reports requested by the Fund;
- Maintain adequate insurance for the project or for any affiliate thereof performing work on the project;
- Deliver copies of any notices received by the project manager; and
- Do not encumber, hypothecate, or pledge as collateral, or attempt to encumber, hypothecate, or pledge as collateral, any interest of the Project Entity contrary to the provisions of the Project Entity LLC Agreement or without the prior written consent of the Fund Manager.

**Identifying and Monitoring Investments**

The Fund's due diligence process typically starts with a phone call from a bank, broker or builder and is followed by phases of review, which serve to eliminate those projects that do not meet the Fund's investment criteria. The due diligence process encompasses a methodical and comprehensive review of material elements pertaining to the specific project in question and the real estate market in general. The Fund will consider whether to fund a project based on the following investment criteria:

### *Location of property*

Each Fund investment must fall within an approved geographic area. Due to the strength and diversity of the Pacific Northwest economy, the Fund is currently investing in projects located in the Greater Puget Sound area.

### *Strength of Exit*

Prior to funding a project, the Fund will establish multiple potential exit strategies, thus generating multiple avenues for providing returns to the Company. The strength of an exit is determined by the number of exits available, current market conditions, available take out finance options, and/or the sponsor's ability to refinance. Current market conditions are assessed based on supply and demand of the type of finished products and their locations.

### CLTV less than 80%

Combined loan to value ("**CLTV**") is a ratio used by the Fund to determine the downside risk on each prospective project. It is calculated by taking the sum of the Fund's investment and the first mortgage loan and dividing it by the anticipated value of the property at the completion of the project. The Fund will not finance any amount above the total cost of the project and will not invest in projects whose CLTV exceeds 80%.

### Timing of exit

The Fund invests into projects that will exit in 18 months or less, and preferably 12-months or less. This relatively short investment period is important to minimize changing market conditions. In the event that market conditions change, the Fund is able to adjust the exit strategy quickly to take advantage of every opportunity available.

### Background of the sponsor and their ability to complete the project

Each prospective Project Partner is required to provide a resume, financial statement, a list of current and past projects as well as attend a face-to-face meeting. Through this process the Fund is able to measure the character of each Project Partner and his, her or its ability to execute a project.

### Cash invested by sponsor

Aligning the interests of the Project Partner with those of the Fund is an important goal of the Company. The Fund will require each Project Partner to make a cash contribution into the project. This investment of capital by a Project Partner is returned only after the Fund receives its return of principal investment and a predetermined preferred return. The amount required to be contributed by a Project Partner will be determined on a case-by-case basis, including conditions of the project and the capability of the Project Sponsor.

### Signed Letter of Intent ("LOI")

Prior to investing in a project, the Fund will issue an LOI, outlining the investment terms and anticipated returns. Before proceeding with the due diligence, the Fund will require a signed LOI from the Project Partner, which will usually be accompanied by a nonrefundable due diligence deposit of no more than $5,000.

Assuming that the maximum amount of this Offering is raised, the Fund expects to have between 75 – 100 Investments over the life of the Fund, none of which will, individually, be in an amount greater than 10% of the gross Offering proceeds received by the Fund as of the closing date of such Investment. In addition, no more than 15% of the gross Offering proceeds will be invested in projects in which there is no Project Partner (i.e. projects in which the Fund will effectively act as developer). The Fund expects to have 40 to 60 Investments under management at any given time. Additionally, prior to making an Investment, the Fund identifies multiple exit strategies, thus identifying multiple avenues for providing returns to the Fund. The Fund expects most Investments to range in size between $250,000 and $1,500,000.

Once an Investment is made, the Manager will hold monthly meetings with the respective Project Partner to update all documentation, gather information, offer advice, and maintain familiarity with the Investment. The Fund believes this steady supervision will help Fund management track each project's progress and allows for a more seamless transition if the Project Partner fails to meet the Fund's requirements. In the event the Fund needs to step in to protect the Investment, the Project Entity may engage the Manager's Affiliates to perform the work at the predetermined rates. <u>See</u> "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES: Compensation Rates of Affiliates."

## U.S. FEDERAL INCOME TAX MATTERS

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF FEDERAL TAX CONSEQUENCES CONTAINED OR REFERRED TO IN THIS MEMORANDUM WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY DEBENTURE HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE CODE; (II) SUCH DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (III) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**Introduction**

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Debentures.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Debentures, that purchased Debentures at their original issue price for cash, and that hold such Debentures as capital assets within the meaning of Section 1221 of the Code.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Debentures by certain investors that are subject to special tax rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Debentures in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Debentures, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Debentures, including the applicability of any U.S. federal tax laws or any state, local or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

**Considerations Relating to U.S. Holders of the Debentures**

As used herein, the term "***U.S. Holder***" means a beneficial owner of a Debenture that is, for U.S. federal income tax purposes:

- an individual citizen or resident of the U.S.;

- a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- an estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- a trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Debentures, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Debentures that is a partnership and the partners in such a partnership should consult their tax advisors.

### Classification of the Debentures

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to treat the Debentures, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Fund's determination that the Debentures constitute debt for U.S. federal income tax purposes. The IRS could take the position, for example, that the Payoff Premium should be treated as a separate instrument and classified as equity. If any portion of the Debentures is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Debenture could differ from the timing and character of income, gain or loss recognized in respect of the Debentures described below. The remainder of this discussion assumes that the Debentures will be treated as indebtedness in accordance with that agreement and our determination.

### Interest Income

Holders of the Debentures will be required to report original issue discount ("*OID*") over the term of the Debentures under Treasury Regulations that govern "contingent payment debt instruments" (the "*CPDI Regulations*"). The Debentures will be subject to the CPDI Regulations because they provide for the payment of the Payoff Premium, which is contingent on the net profits of the Fund. The reporting of OID under the CPDI Regulations will be the exclusive method of reporting interest income under the Debentures, including the interest payments required by the Debentures.

Under the CPDI Regulations, each Investor generally will be required to report interest income on the Debentures each year in an amount equal to the OID that accrues each year, regardless of whether such Investor uses the cash or accrual method of tax accounting. The amount of each year's accrual will be calculated under a method that takes into account (in the manner specified below) a portion of our projection of the Payoff Premium. Consequently, an Investor will be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by such Investor in that year.

Under the CPDI Regulations, the amount of OID on a Debenture that is allocable to each annual accrual period will be the product of the "adjusted issue price" of the Debenture as of the beginning of each such annual period and the "comparable yield" for the Debentures. The "adjusted issue price" of a Debenture on any particular date is its "issue price" (i.e., the first price at which a substantial amount of the Debentures is sold to investors), increased by any interest income previously accrued (determined without regard to any adjustments to interest accruals described in "Adjustments to Interest Accruals on the Debentures" below), and decreased by the amount of any non-contingent payments previously made and the projected amount of any contingent payments scheduled to be made on the Debenture through the date on which the adjusted issue price is being calculated (i.e., without regard to the actual amount of the contingent payments made).

Under the CPDI Regulations, the Fund is required to establish the "comparable yield" for the Debentures. The comparable yield for the Debentures is the annual yield we would incur, as of the initial issue date, on a fixed rate nonconvertible debt instrument with no contingent payments, but with terms and conditions otherwise comparable to those of the Debentures. Accordingly, the Fund has determined the comparable yield to be 12% compounded annually.

The Fund is required to provide to Investor, solely for U.S. federal income tax purposes, a schedule of the projected amounts of all payments required to be made on the Debentures (including the Payoff Premium). This schedule must include a projected amount of Payoff Premium sufficient to cause the yield on the Debentures to equal the comparable yield. The Fund's determination of the projected payment schedule for the Debentures, including the monthly interest payments and an estimate of the timing of payment and amount of the Payoff Premium, is below.

| Projected Payment Schedule Per $100,000 of Debentures | | | | |
|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 |
| January | $1,000 | $1,000 | $1,000 | $0 |
| February | $1,000 | $1,000 | $1,000 | $0 |
| March | $1,000 | $1,000 | $1,000 | $0 |
| April | $1,000 | $1,000 | $1,000 | $0 |
| May | $1,000 | $1,000 | $1,000 | $0 |
| June | $1,000 | $1,000 | $1,000 | $0 |
| July | $1,000 | $1,000 | $1,000 | $0 |
| August | $1,000 | $1,000 | $1,000 | $0 |
| September | $1,000 | $1,000 | $1,000 | $0 |
| October | $1,000 | $1,000 | $1,000 | $0 |
| November | $1,000 | $1,000 | $1,000 | $0 |
| December | $1,000 | $1,000 | $1,000 | $0 |

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to be bound by the Fund's application of the CPDI Regulations to the Debentures, including our determination of comparable yield and the related "projected payment schedule" set forth above). The comparable yield and the projected payment schedule are solely for purposes of determining your (and the Fund's) interest accruals and adjustments thereof in respect of the Debentures for U.S. federal income tax purposes and do not constitute a projection or representation regarding the actual amounts payable to you with respect to the Debentures.

### *Adjustments to Interest Accruals on the Debentures*

If Investor receives actual payments of Payoff Premium with respect to the Debentures in a tax year in excess of the total amount of projected payments of Payoff Premium for that tax year, Investor will have a "net positive adjustment" equal to the amount of such excess. Investor will be required to treat the "net positive adjustment" as additional interest income for the tax year.

If you receive actual payments of Payoff Premium with respect to the Debentures in a tax year that in the aggregate are less than the amount of the projected payments of Payoff Premium for that tax year, Investor will have a "net negative adjustment" equal to the amount of such deficit. This adjustment will be applied to reduce Investor's interest income on the Debentures for that tax year, and any remainder will give rise to an ordinary loss to the extent of Investor's interest income on the Debentures during prior tax years, reduced to the extent such interest income was offset by prior net negative adjustments, if any. Any negative adjustment in excess of the amounts described in the

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 11 Page 71

preceding sentence will be carried forward to offset future interest income in respect of the Debentures or to reduce the amount realized upon a sale, exchange, repurchase or redemption of the Debentures.

## Sale, retirement or disposition of Debentures

Upon the sale, retirement or other disposition of a Debenture, Investor generally will recognize taxable gain or loss equal to the difference between the amount realized on the disposition and Investor's adjusted tax basis in the Debenture. A U.S. Holder's adjusted tax basis in a Debenture generally will be equal to its adjusted issue price (as described above) in the Debenture. Gain recognized on the disposition of a Debenture generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Debenture generally will be treated as an ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Debenture is more than one year). The deductibility of capital losses is subject to limitations.

## Backup withholding and information reporting

Information reporting requirements generally will apply to payments of interest (including any amounts treated as interest pursuant to the CPDI Regulations) made by the Fund on, or the proceeds of the sale or other disposition prior to maturity of, the Debentures. Backup withholding tax, currently at a rate of 28%, may apply to such payments if Investor fails to:

- furnish his, her or its taxpayer identification number (social security or employer identification number);
- certify that such number is correct;
- certify that he, she or it is not subject to backup withholding; or
- otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, *provided* that the required information is furnished timely to the Internal Revenue Service (the "***IRS***").

## ERISA MATTERS

### Benefit Plan Investor Considerations

The Debentures offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or an individual retirement account ("***IRA***") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "***Similar Law***"). A fiduciary of an employee benefit plan must determine that the purchase and holding of a Debenture is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Debentures offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Debenture offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Debenture that its acquisition and holding of the Debenture does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

# GLOSSARY

To understand the rights associated with the Debentures, Investor must review carefully the defined terms used in this Memorandum. Some of these definitions are set forth in this "GLOSSARY" and others in the body of this Memorandum. These definitions (some of which have been slightly modified) have been taken from the Debenture Agreement, which defines the preferences, privileges, rights, interests and obligations of the Debentures. Many of these definitions are technical in nature, involve complicated relationships, and can only be understood by reference to other defined terms and, in some cases, to other provisions of the Debenture Agreement. Section references in the definitions refer to sections in the Debenture Agreement. Prospective investors should understand that the definitions in the Debenture Agreement will, for all purposes, be controlling, notwithstanding any simplification of such definitions in this Memorandum. Moreover, you should bear in mind that this GLOSSARY does not include many of the definitions included in the Debenture Agreement.

"*Act*" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

"*Affiliate*" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"*CLTV*" means the combined loan to value. It is calculated by taking the sum of the Fund's investment and the first mortgage loan and dividing it by the anticipated value of the applicable property upon completion of the project.

"*Collateral Agent*" means Kevin A. Carreno, P.A., a Florida professional association.

"*Debenture*" means the secured payment obligation, to be issued by the Fund in favor of the Holder, pursuant to the terms of the Debenture Agreement, with an original principal amount equal to the loan made by the Holder to the Fund at Closing (i.e. the Loan Amount). The Debenture shall be in the form attached hereto as <u>Exhibit A</u>.

"*Debenture Agreement*" means the Senior Secured Debenture Purchase Agreement, as originally executed or as amended by the Parties, and shall include the forms and exhibits attached thereto.

"*Fund*" means iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company, which is the obligor under the Debenture.

"*Holder*" means any Person who has purchased a Debenture pursuant to this Agreement, together with any transferee thereof permitted under Section 9 of the Debenture Agreement.

"*Manager*" means iCap Pacific NW Management, LLC, a Washington limited liability company, which was formed for the sole purpose of being the Manager.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"*Placement Agent*" means Skyway Advisors, LLC, a FINRA licensed broker-dealer.

"*SEC*" means the Securities and Exchange Commission.

**SUMMARY OF THE SENIOR SECURED DEBENTURE PURCHASE AGREEMENT**

The following summarizes certain provisions of the Debenture Agreement, and the Debenture document contained therein, not described elsewhere in this Memorandum. All statements made below and elsewhere in this Memorandum relating to the Debenture Agreement are hereby qualified in their entirety by the actual language of the Debenture Agreement. Such statements do not purport to be complete and in no way modify or amend the Debenture Agreement. The parenthetical references included in this section refer to the referenced sections of the Debenture Agreement. **Prospective investors should read the entire Debenture Agreement, attached as <u>Exhibit A</u>, before deciding to purchase Debentures.**

The Debentures will be issued without coupons, in denominations of at least $100,000 with additional integral multiples of $10,000. The Fund reserves the right, in its sole discretion, to accept subscriptions for amounts less than the minimum.

**Economic Terms**

*Interest*

The outstanding Loan Amount shall bear simple interest at 12% per annum. Interest computation shall be based upon 12, 30-day months. Interest will accrue on the loan made to the Holder under the Debenture from the date that such monies are paid to and are available for use by the Fund. In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of 18% per annum, simple interest, until all amounts due thereunder have been paid in full. Prior to the Maturity Date, or extension thereof, the Fund will be required to make only monthly interest payments to the Holder. Such monthly payments shall include all interest accrued under the Debenture through the end of the prior calendar month, and shall be due and payable to the Holder on the 15th calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter. The Fund may deposit into an interest reserve account proceeds from the issuance of Debentures to cover up to nine (9) months of interest expense on the Debentures.

*Repayment; Fund's Extension Right*

The full Loan Amount will be due and payable, together with all accrued but unpaid interest, on or before December 31, 2016 (the "*Maturity Date*"). The Fund has the option to extend the Maturity Date for an additional three (3) months, provided an Event of Default has not occurred. This option may be exercised by the Fund at any time prior to the Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Maturity Date. If the Fund fails to give such notice, the Debentures will mature upon the expiration of the Maturity Date. The Fund may choose to prepay part or all of the Debenture without penalty at any time prior to the Maturity Date, or extension thereof. The date the Fund prepays in full the Debentures is hereafter referred to as the "*Prepayment Date*". During any time in which the Debentures and Payoff Premium are outstanding, the Fund may not make any distributions to its Members, other than tax distributions.

*Payoff Premium*

Within 12 months after the earlier of (i) the Prepayment Date or (ii) the Maturity Date, including any extension thereof (such earlier date being the "*Measurement Date*"), the Fund will be required to pay to the Holder a "*Payoff Premium*." The Payoff Premium is an amount equal to Holder's *pro rata* share of an amount equal to 25% of the cumulative net profit generated by the Fund through the date on which the Debentures (including all accrued interest thereon) are paid in full (the "*Aggregate Premium Amount*"). The Payoff Premium amount is not intended to constitute an equity interest in the Fund, but rather is intended to constitute additional interest on the Loan Amount, and shall be paid in addition to all principal, penalties and other interest otherwise due to Holder.

*Secured Obligation*

The Debenture represents a secured obligation of the Fund. The Debentures are secured by all of the assets of the Fund and by a pledge of the Manager's membership interest in the Fund. The Fund's assets are comprised principally of the Fund's cash and bank accounts, the Fund's equity interest in each Project Entity, and the rights and collateral interests granted to the Fund in connection with each individual Investment, which will include the following:

- a first or second position deed of trust (i.e., mortgage) in the real estate owned by or hereafter owned by the Project Entities; and
- a secured interest in the Membership Interest held by the Project Partner; and
- the Fund's right to assume control of the Project Entity and the project owned by it in the event of a default by the Project Entity or a failure to meet applicable project milestones or requirements.

### *Events of Default*

The following is a summary of events constituting an "***Event of Default***" under the Debenture and triggering the rights of the Holder to accelerate amounts due thereunder as set forth in the Debenture Agreement:

(a)     The Fund defaults in the payment of any Loan Amount or interest on any of the outstanding Debentures, when the same becomes due and payable and such default continues for a period of 10 Business Days (such period, a "***Grace Period***"), *provided, however,* that no such Grace Period will be available should the Fund default twice in the payment of interest on any of the outstanding Debentures when such interest is due and payable (even if such payments were subsequently made during the Grace Period), such that should the Fund default in the payment of interest on any of the outstanding Debentures when such interest is due and payable after the 2 prior defaults, then an Event of Default shall occur on the date such payment was due and payable;

(c)     The Fund fails to observe or perform any covenant or agreement of the Fund in the Debenture Agreement (other than a covenant or agreement a default in whose performance or whose breach is specifically dealt with elsewhere in this "Events of Default" provision), and such failure continues for a period of 30 calendar days after there has been given, by registered or certified mail, to the Fund by the Holder, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" thereunder;

(e)     A final judgment or judgments for the payment of money aggregating in excess of $500,000 is rendered against the Fund and which judgments are not, within 90 calendar days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within 90 calendar days after the expiration of such stay; *provided, however,* that any judgment which is covered by insurance or an indemnity from a creditworthy party shall not be included in calculating the $500,000 amount set forth above;

(f)     The Fund violates or otherwise defaults on any material contractual obligation that would, as a result of such violation or default, cause the acceleration of the Fund's obligations thereunder and result in the incurrence of a liability, damages or loss to the Fund in excess of $500,000;

(g)     The Fund, pursuant to or within the meaning of any Bankruptcy Law (a) commences a voluntary case; (ii) consents to the entry of an order for relief against it in an involuntary case; (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

(h)     A court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Fund in an involuntary case; (ii) appoints a custodian of the Fund for all or substantially all of its property, or (iii) orders the liquidation of the Fund; and the order or decree remains unstayed and in effect for 90 consecutive calendar days.

The term "***Bankruptcy Law***" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "***Custodian***" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

### *Acceleration, Rescission and Annulment*

Upon the occurrence of an Event of Default, with the consent of the Holder of more than 10% in aggregate loan amount of the outstanding Debentures, the Collateral Agent may declare the loan amount of and accrued but unpaid interest, if any, on all the Debentures (including the Loan Amount or interest on the Holder's Debenture) to be

immediately due and payable. If an Event of Default pursuant to paragraphs (g) and (h) under "Events of Default" above occurs, the loan amount and interest on all Debentures will *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Collateral Agent or any Holders of the Debentures.

The Holders of more than 50% in aggregate loan amount of the outstanding Debentures by notice to the Collateral Agent may rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of acceleration. No such rescission shall affect any subsequent default or impair any right consequent thereon.

### Fund's Rights Regarding Other Indebtedness

For so long as any Debentures remain outstanding, neither the Fund nor any subsidiary of the Fund (other than a special purpose entity organized for the purpose of an investment to be made by the Fund in a real property project) shall, without the prior written consent of the Holders holding a majority of the aggregate outstanding principal amount of the Debentures, incur or otherwise become liable with respect any indebtedness other than (a) Permitted Indebtedness (as defined below) or (b) indebtedness to trade creditors in the ordinary course of business.

### Registered Debentures; Notices; Changes of Address

Each Debenture will be registered in the name of the Investor who subscribed for such Debenture or any transferee of a Debenture (See "TRANSFERABILITY OF THE DEBENTURES"). Unless otherwise provided by the Fund, all payments will be made by the Fund by electronic transfer or check to the registered holder of each Debenture at the registered address of such Holder. In the event that a Holder changes his, her or its address, the Holder is required to notify the Fund under the terms of the Debenture.

### Governing Law

The Debentures will be governed by Washington law.

### Covenants of the Fund

The Debentures provide that the Fund will be prohibited from making any distributions until the Debentures and all other obligations under the Debenture have been repaid in full (including payment of the Payoff Premium). In addition, neither the Fund nor any of its subsidiaries shall: (a) directly or indirectly, declare, order, make or set apart any sum for or pay any Distribution (other than tax distributions as set forth in the LLC Agreement); (b) establish any deposit account other than the account identified in that certain Deposit Account Control Agreement, to be entered into by and among the Company, the Collateral Agent and Sterling Savings Bank (the "***Account Control Agreement***"), or otherwise deposit or fund any cash or cash equivalents of the Fund in any deposit account other than the account identified in the Account Control Agreement; or (c) contract, create, incur, assume or permit to exist any indebtedness, except for (i) indebtedness arising or existing under the Debenture; (ii) indebtedness arising from the issuance of the Debentures in the Offering; (iii) indebtedness arising from trade payables incurred by the Fund in the ordinary course of business; (iv) indebtedness junior to the Holder's interest; or (iv) with respect to a wholly-owned subsidiary of the Fund organized for the purpose of an Investment, indebtedness that results from a commercial loan from a third party commercial lender made in such lender's ordinary course of business ("***Permitted Indebtedness***").

Neither the Manager nor any of its Affiliates may make any investment on behalf of a new pooled investment fund with investment objectives that are identical to those of the Fund until the earlier of: (a) the date on which at least 75% of the aggregate net Offering proceeds, after payment of commissions and fees and the setting aside of reserves, have been committed to or invested in Investments or (b) November 1, 2015.

## REPORTS TO THE INVESTORS

The Fund has adopted a calendar fiscal year ending December 31. For so long as the Holder continues to hold the Debenture, the Fund will provide to the Holder:

        (a)     as soon as practicable after the end of each fiscal year and in any event within one hundred twenty (120) days after each fiscal year, consolidated balance sheets of the Fund as of the end of such fiscal year and consolidated statements of income of the Fund for such fiscal year, prepared in accordance with U.S. generally accepted accounting principles, all in reasonable detail, certified by an officer of the Fund. The Fund's financial statements will be audited by an independent certified public accountant; and

        (b)     quarterly newsletter reports on the Fund's investments, which may be accessed by the Holder at www.iCap.com.

<center>**THE OFFERING**</center>

The following description of certain matters relating to the Debentures does not purport to be complete and is subject in all respects to applicable Delaware Law and to the provisions of the Debenture Agreement.

**General**

The Offering has not been registered under the Securities Act and is intended by the Fund not to involve a public offering within the meaning of the Securities Act and Regulation D promulgated thereunder and, therefore, to be exempt from the registration provisions of the Securities Act. Accordingly, the Offering is being made pursuant to certain conditions which, if satisfied, will qualify the Offering for exemption from registration as provided by the Securities Act and Regulation D. These conditions relate to limitations on the manner of Offering, the nature of the Investors, access to or furnishing information about the issuer, and restrictions on transferability. This Offering is not being offered pursuant to Rule 506(c) of Regulation D.

Subject to the terms of the Debenture Agreement, the Fund is authorized to raise up to $30,000,000, through the Offering at a purchase price of $100,000 per Debenture, with additional incremental increases available in segments of $10,000. Investors must make a minimum investment of $100,000, representing the purchase of one Debenture, unless a smaller purchase is permitted by the Manager.

The minimum amount that the Fund must sell in order to break escrow is $2,000,000. The Manager will have an initial closing for the Fund as soon as practicable after obtaining subscriptions of at least Two Million Dollars ($2,000,000 USD) (the "***Initial Closing Date***"). All cash payments for subscriptions paid by potential Investors prior to the Initial Closing Date will be held in a non-interest bearing escrow account at GulfShore Bank. The Fund will be responsible for all compensation, fees and other expenses relating to maintaining such escrow account. To accommodate the admission of additional Investors and permit existing Investors to increase their subscriptions (each, an "***Additional Investor***"), the Manager may, in its discretion, hold one or more additional closings on or before April 30, 2014, unless extended for three (3) months by the Manager, (each such closing to take place on an "***Additional Closing Date***"). If the Fund does not obtain subscriptions of at least $2,000,000 on or before April 30, 2014, or within the three (3) month extension thereof, the Offering will terminate and all subscription payments that have been deposited in the escrow account will be returned to the potential investors who paid such amounts as promptly as practicable.

Following the initial closing of the Offering, additional investments in Debentures under the Offering will be accepted from time to time by the Manager. The Fund will not offer any of the Debentures pursuant to the Offering after April 30, 2014, but such date may be extended up to 3 months by the Manager in its discretion. Any payments received from prospective investors prior to the applicable closing date will be held in a non-interest bearing escrow account.

**Payment of Investments**

Each payment to the Fund will be made in United States dollars by means of a personal check or a certified or cashier's check or by wire transfer of immediately available funds to GulfShore Bank, as escrow agent for iCap Pacific Northwest Opportunity and Income Fund, LLC.

**Acceptance of Subscriptions; Eligibility Requirements**

Purchases for the Debentures will be accepted on a "first come, first-served" basis. The Manager reserves the right to reject any tendered investment for whatever reason the Manager deems appropriate. If the Manager rejects an investment, the Manager will give notice of such rejection, and return the tendered initial investment payment, no later than 10 business days after the Debenture Purchase Agreement and the accompanying funds have been received by the Manager. As to the eligibility requirements of prospective investors, See "WHO MAY INVEST."

## TRANSFERABILITY OF THE DEBENTURES

Subject to compliance with the requirements of the Debenture Agreement, Investors shall have the right to transfer the Debenture to any qualifying third party of its choice contingent upon securing the Fund's written consent in advance of the proposed transfer. The Fund is under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under the Debenture Agreement, until the Holder has surrendered the original Debenture for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Fund. A new Debenture for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing a Debenture Agreement, and executing a Certificate of Accredited Investor. Interest and principal are payable only to the registered holder of the Debenture.

The Holder and any successor Holder agree(s) to provide to the Fund a Form W-9 upon request. Until registration of a transfer occurs, the Fund shall be entitled to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by the Debenture Agreement and the applicable Debenture.

**State Securities: Blue Sky Laws**

Transfer of the Debentures may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Debentures may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be registered for resale under the Blue Sky laws of any state, the Holders and any Persons who desire to purchase them in any trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Debentures and of purchasers to purchase the Debentures. Accordingly, Investors should be prepared to hold the Debentures until their maturity date as may be extended.

## FINANCIAL INFORMATION

This Memorandum does not include current balance sheets for either the Fund or the Manager. The Manager has limited capitalization. As of the date hereof, the Fund has incurred certain liabilities in connection with the offering of the Debentures, but has no significant assets. The Fund is a newly-organized entity, has no capital (other than the capital to be raised through the sale of the Debentures), and has and will incur substantial expenses in connection with the offering and sale of the Debentures.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 11 Page 79

# PLAN OF DISTRIBUTION

**Placement Agent Compensation**

The Fund has entered into an exclusive engagement agreement (the "***Engagement Agreement***") with the Placement Agent to assist in privately placing the Debentures. The exclusivity period continues until the Offering has been closed. Subsequent to the Engagement Agreement, the Fund and Placement Agent entered into a Placement Agent Agreement (the "***Placement Agent Agreement***") setting forth more specifically the terms of the relationship between the Fund and the Placement Agreement with respect to this Offering.

The Debentures will be offered by the Placement Agent on a "best efforts" basis (which means that there is no guarantee that any minimum amount will be sold). The Placement Agent will engage sub-placement agents for this Offering. The Placement Agent and the Selling Group will collectively receive a selling commission of 7% of the Gross Proceeds of this Offering. The Placement Agent and the Selling Group will also receive a due diligence allowance of 1% of the Gross Proceeds of this Offering. The Placement Agent will also receive a fee for serving as managing broker-dealer in the amount of 2% of the Gross Proceeds of this Offering and a marketing and underwriting fee of 3% of the Gross Proceeds of this Offering. The Placement Agent, as managing broker-dealer of the Offering, will be responsible for all "wholesaling fees" relating to the Selling Group, as well as paying its own expenses associated with the Offering up to $50,000.

The Placement Agent and its officers, employees and affiliates may purchase Debentures in the Offering. Such Debentures will be counted toward the Maximum Offering Amount. The Placement Agent and the Fund may, in their sole discretion, accept offers to purchase Debentures net (or partially net) of the commissions and expense reimbursements described in this Memorandum in certain circumstances deemed appropriate by either of them, including by way of illustration, from Investors purchasing through a registered investment advisor, or from Investors who are affiliates of the Fund or any member of the Selling Group. The Fund may also make sales to registered representatives of the Selling Group or to their spouses and affiliates, in each case net of sales commissions.

In addition to the commissions paid at the time of each closing, the Placement Agent will be issued a profits interest in the Fund, pursuant to which the Placement Agent and its Affiliates or assigns, as one class of members, will have a right to share in 33% of the cash or property distributions of the Fund as set forth in the LLC Agreement after the Debentures and Payoff Premium have been paid.

We have agreed to indemnify the Placement Agent from and against losses, claims, damages or liabilities (collectively, the "***Damages***") arising out of the Offering, except for Damages resulting from the Placement Agent's breach of the Engagement Agreement or Placement Agent Agreement, gross negligence or willful misconduct.

**EXHIBIT A**

**SENIOR SECURED DEBENTURE PURCHASE AGREEMENT**

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

**SENIOR SECURED DEBENTURE PURCHASE AGREEMENT**

**by and between**
**ICAP PACIFIC NORTHWEST OPPORTUNITY**
**AND INCOME FUND, LLC**
**a Delaware limited liability company,**

**and**

**THE HOLDER (AS DEFINED BELOW)**

**Dated as of December 19, 2013**

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

# CONTENTS

1. Definitions ............................................................................................................................ 1

2. Delivery of Loan Amounts ................................................................................................ 3

    2.1 Loan Amounts ............................................................................................................ 3

    2.2 Prepayment ................................................................................................................ 3

    2.3 Event of Default ......................................................................................................... 4

3. Company's Rights Regarding Other Indebtedness ......................................................... 4

4. Closing ................................................................................................................................ 4

5. Representations and Warranties of the Company .......................................................... 4

    5.1 Organization and Authority ...................................................................................... 4

    5.2 Capitalization ............................................................................................................. 5

    5.3 Authorization; Binding Effect .................................................................................... 5

    5.4 No Bankruptcy or Insolvency .................................................................................... 5

    5.5 Valid Issuance of the Debenture ................................................................................ 5

    5.6 Restricted Securities .................................................................................................. 5

    5.7 Full Disclosure; No Other Brokers ........................................................................... 6

    5.8 Governmental Consents and Notices ......................................................................... 6

    5.9 No Litigation .............................................................................................................. 6

    5.10 No Breach; No Default ............................................................................................. 6

    5.11 Taxes ......................................................................................................................... 6

6. Representations, Warranties and Agreements of the Holder ......................................... 7

    6.1 Purchase Entirely for Own Account .......................................................................... 7

    6.2 Due Diligence ............................................................................................................. 7

    6.3 Access to Information; Modification of Offering ........................................................ 8

    6.4 Sophistication ............................................................................................................. 8

    6.5 Suitability ................................................................................................................... 8

    6.6 Professional Advice .................................................................................................... 8

    6.7 Ability to Bear Risk ................................................................................................... 9

    6.8 Possible Loss of Interest and Principal ..................................................................... 9

    6.9 Restricted Securities .................................................................................................. 9

    6.10 Further Limitations on Disposition .......................................................................... 9

    6.11 Age; Residency ......................................................................................................... 9

    6.12 Accredited Investor Status ...................................................................................... 10

    6.13 Tax Identification; Withholding ............................................................................. 10

6.14 No View to Tax Benefits ...................................................................10

6.15 Confidential Information ...................................................................10

6.16 No General Solicitation....................................................................10

6.17 Placement Agent ...........................................................................11

6.18 Representations and Warranties of Organization..................................11

6.19 Representations and Warranties by Employee Benefit Plans ..................11

7. Conditions to Closing; Security Interests.................................................12

    7.1 Holder's Conditions of Closing ........................................................12

    7.2 Company's Conditions of Closing.....................................................12

    7.3 Security Interest ...........................................................................13

    7.4 Interest Reserve ...........................................................................13

8. Covenants.......................................................................................14

    8.1 Information Rights.........................................................................14

    8.2 Other Affirmative Covenants of the Company.....................................14

    8.3 Negative Covenants .......................................................................14

9. Defaults and Remedies .......................................................................15

    9.1 Events of Default ..........................................................................15

    9.2 Acceleration, Rescission and Annulment ............................................16

10. Transfer of the Debenture..................................................................17

11. Tax Matters ...................................................................................18

12. Miscellaneous ................................................................................18

    12.1 Assignment................................................................................18

    12.2 Governing Law............................................................................18

    12.3 Counterparts...............................................................................18

    12.4 Titles and Subtitles.......................................................................18

    12.5 Notices .....................................................................................19

    12.6 Expenses ...................................................................................19

    12.7 Entire Agreement.........................................................................19

    12.8 Amendments and Waivers ..............................................................19

    12.9 Severability................................................................................20

    12.10 Survival...................................................................................20

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 11 Page 86

EXHIBITS

FORM OF DEBENTURE ............................................................................................ EXHIBIT A

CERTIFICATE OF ACCREDITED INVESTOR ..................................................... EXHIBIT B

SECURITY DOCUMENTS RELATING TO THE DEBENTURES  ...................................... EXHIBIT C

    COLLATERAL AGENT AGREEMENT ................................................................................. C-1

    SECURITY AGREEMENT ................................................................................................... C-2

    PLEDGE AND SECURITY AGREEMENT .......................................................................... C-3

    DEPOSIT ACCOUNT CONTROL AGREEMENT ............................................................... C-4

    UCC FINANCING STATEMENTS ...................................................................................... C-5

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 11 Page 87

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

## SENIOR SECURED DEBENTURE PURCHASE AGREEMENT

THIS SENIOR SECURED DEBENTURE PURCHASE AGREEMENT (this "***Agreement***") is made and entered into as of this 19th day of December, 2013 by and between iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "***Company***"), and each Debenture (as defined below) holder (the "***Holder***") whose name is added to the Schedule of Holders attached hereto as ***Schedule I***, which schedule will be amended from time to time as loans are made to the Company by Holders.

### RECITALS

A.      Pursuant to an offering by the Company of up to $30,000,000 of senior secured debentures, with an over-allotment option of up to $50,000,000 (the "***Offering***") as described in detail in that certain Private Placement Memorandum, dated December 19, 2013, as supplemented from time to time by the Company (the "***PPM***"), the Company plans to issue, from time to time, separate senior secured debentures, in substantially the form attached hereto as ***Exhibit A*** (individually, a "***Debenture***" and collectively, the "***Debentures***"), to fund its investment and operational activities.

B.      The Company will accept funds under this Agreement only from an investor (herein referred to as the "***Holder***") qualifying as an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933.

C.      The Debenture, when issued, will constitute a secured obligation of the Company.

D.      The undersigned, by executing this Agreement, agrees to loan to the Company the amount stipulated on the Signature Page, and will receive from the Company a Debenture in the equivalent principal amount. The Company's closing of such transaction is subject to the conditions set forth in this Agreement.

### AGREEMENT

Now, therefore, in consideration of the mutual promises and covenants set forth herein, the Parties hereby agree as follows:

**1.      Definitions**

As used in this Agreement and the exhibits hereto, the following capitalized terms have the meanings set forth below unless the context clearly indicates otherwise. All nouns, pronouns and verbs used in this Agreement shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable.

"***Act***" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

"***Affiliate***" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Agreement**" means this Senior Secured Debenture Purchase Agreement, as originally executed or as amended by the Parties, and shall include the forms and exhibits attached thereto.

"**Bankruptcy Law**" is defined in Section 9.1.

"**Business Day**," when used with respect to any place of payment or any other particular location referred to in this Agreement or in the Debenture, means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions or trust companies in the Borough of Manhattan or The City of New York are authorized or obligated by law or executive order to close.

"**Closing**" is defined in Section 4.

"**Collateral Agent**" means Kevin A. Carreno, P.A., a Florida professional association.

"**Company**" means iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company, which is the obligor under the Debenture.

"**Debenture**" means the secured payment obligation, to be issued by the Company in favor of the Holder, pursuant to the terms of this Agreement, with an original principal amount equal to the loan made by the Holder to the Company at Closing (i.e. the Loan Amount). The Debenture shall be in the form attached hereto as ***Exhibit A***.

"**Debentures**" refer to, collectively, each Debenture issued by the Company in the Offering, with each of the Debentures in the form attached hereto as ***Exhibit A***.

"**Distribution**" means (i) any dividend or other distribution, direct or indirect, on account of any membership interests of the Company, now or hereafter outstanding, (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any membership interests of the Company, now or hereafter outstanding, or (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire membership interests of the Company, now or hereafter outstanding.

"**Event of Default**" means any event which is, or after notice or passage of time, or both, would be, an Event of Default within the meaning of Section 9.

"**Holder**" means any Person listed on ***Schedule I*** who has purchased a Debenture pursuant to this Agreement, together with any transferee thereof permitted under Section 10.

"**Indebtedness**" of the Company or any Subsidiary thereof means all indebtedness representing money borrowed which is created, assumed, incurred or guaranteed in any manner by such entity or for which such entity is otherwise responsible or liable (whether by agreement to purchase indebtedness of, or to supply funds to or invest in, others).

"**Loan Amount**" is defined in Section 2.1.

"**Manager**" means iCap Pacific NW Management, LLC, a Washington limited liability company.

"**Material Permits**" is defined in Section 2.12.

"**Maturity Date**" is defined in Section 2(a) of the Debenture.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 11 Page 90

"***Offering***" means the offering by the Company of the Debentures pursuant to this Agreement as described in the PPM.

"***Operating Agreement***" means the Operating Agreement of the Company, in the form attached to the PPM.

"***Parties***" means the Company and the Holder.

"***Payoff Premium***" is defined in Section 3(b) of the Debenture.

"***Person***" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"***Placement Agent***" means Skyway Advisors, LLC, a Florida limited liability company.

"***PPM***" means the Company's Confidential Offering Memorandum, dated December 19, 2013, as may be supplemented from time to time by the Company, which describes the Company and its business, and sets forth the terms and conditions for the Offering.

"***SEC***" is defined in Section 5.5.

"***Self-Directed Entity***" is defined in Section 6.18.

"***Signature Page***" means the Holder's signature page to this Agreement, upon which the Holder may designate the Loan Amount. Attached to this Agreement are several different versions of the Signature Page, each customized depending on whether the investor is an individual, a Self-Directed Entity or another legal entity (such as a corporation, limited liability company, or trust).

**2.      Delivery of Loan Amounts**

**2.1      Loan Amounts**

By the execution of this Agreement, subject to the terms and conditions of this Agreement, the Holder agrees to lend to the Company principal in an amount set forth on the Signature Page (the "***Loan Amount***"), and the Company agrees to borrow such amount and in exchange for such funds to issue to the Holder a Debenture in the form attached hereto as ***Exhibit A***. At the time of the Holder's execution and subsequent delivery of this Agreement to the Placement Agent, the Holder shall deliver the Loan Amount proceeds to the Placement Agent as described in Section 4.

**2.2      Prepayment**

The Company may choose to prepay part or all of the Debenture without penalty at any time prior to the Maturity Date, <u>provided</u> that the Company makes such prepayments to all of the holders of the Debentures on a pro rata basis according to the respective aggregate loan amounts of each such holder's Debenture. In the event that the Company elects to extend the Maturity Date for three months pursuant to Section 2(b) of the Debenture, the Company may prepay all or part of the Debenture without penalty at any time during the extension, <u>provided</u> that the Company makes such prepayments to all of the holders of the Debentures on a pro rata basis according to the respective aggregate loan amounts of each such holder's Debenture.

3

**2.3**      **Event of Default**

Section 8 sets forth each of the events constituting an "***Event of Default***" under the Debenture and stipulates the rights of the Holder to accelerate amounts due thereunder.

**3.**      **Company's Rights Regarding Other Indebtedness**

Beginning on the date of this Agreement and for so long as any Debentures remain outstanding, neither the Company nor any subsidiary of the Company (other than a special purpose entity organized for the purpose of an investment to be made by the Company in a real property project) shall, without the prior written consent of the Holders holding a majority of the aggregate outstanding principal amount of Debentures, incur or otherwise become liable with respect to any indebtedness other than (a) indebtedness from any commercial lender made in the ordinary course of the commercial lender's business, or (b) indebtedness to trade creditors in the ordinary course of business.

**4.**      **Closing**

Upon satisfaction of the closing conditions, the Company shall borrow moneys from the Holder and the Holder shall lend such moneys to the Company, pursuant to the terms of this Agreement. The Closing (the "***Closing***") shall take place either (a) in the offices of the Company at 10900 NE 8th Street, Suite 1000, Bellevue, Washington 98004, (b) such other address as the Company designates in writing, or (c) via electronic submission of the necessary signed documents, as soon as the closing conditions have been satisfied. The sale of the Debenture is separate and independent from any other borrowings that may be made by the Company. At the Closing, the Holder shall deliver to the Placement Agent by check payable to "Gulfshore Bank, as Escrow Agent for iCap Pacific Northwest Opportunity and Income Fund, LLC" or by wire transfer, to a bank account designated by the Placement Agent, of immediately available funds through the federal wire transfer system, in the amount that the Holder has agreed to lend to the Company (which amount is to be set forth on the Signature Page), and upon receipt and acceptance of the subscription, the Company shall promptly thereafter deliver to the Holder the Debenture (in the form attached hereto as ***Exhibit A***), reflecting such Loan Amount and reflecting the payment options elections made by the Holder on the Signature Page.

**5.**      **Representations and Warranties of the Company**

To induce the Holder to loan monies to the Company, the Company represents and warrants to the Holder as follows as of the date of the Closing:

**5.1**      **Organization and Authority**

The Company is a limited liability company validly existing and in good standing under the laws of the State of Delaware, with full power and authority to enter into and perform this Agreement and the other agreements contemplated hereby to which it is now, or will be, a party. The Company is duly licensed or qualified to do business as a foreign corporation and is in good standing under the laws of all other jurisdictions in which the character of the properties owned or leased by it therein or in which the transaction of its business makes such qualification necessary, except for jurisdictions where failure to so qualify could not reasonably be expected to have a material adverse effect on the business and operations of the Company taken as a whole. The Company has all requisite corporate power and authority to own its properties, to carry on its business as now conducted, and to enter into and perform its obligations under the Closing Documents.

### 5.2 Capitalization

The issued and outstanding membership interests of the Company are as set forth in the Operating Agreement, and the outstanding membership interests of the Company have been duly authorized and are validly issued in compliance with applicable laws, and are fully paid and nonassessable. Except for as set forth in the Operating Agreement and the Pledge and Security Agreement entered into by and between the Manager and the Collateral Agent, in the form attached hereto as *Exhibit C-3* (the "*Pledge Agreement*"), there are no outstanding options, warrants, or securities or rights convertible into, any membership interests or units of the Company, or contracts, commitments, understandings or arrangements by which the Company is or may become bound to issue additional membership interests or units or options, warrants, or securities or rights convertible into, any membership interests or units. Other than the Operating Agreement and the Pledge Agreement, there are no voting trusts, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Company's membership interests.

### 5.3 Authorization; Binding Effect

The Company has taken all actions that are necessary to authorize the execution, delivery and performance of this Agreement and the Debenture, and the consummation of the transactions contemplated hereby. This Agreement and the other agreements contemplated hereby to which the Company is a party constitute the legal and binding obligations of the parties thereto, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights and the enforcement of debtors' obligations generally and by general principles of equity, regardless of whether enforcement is pursuant to a proceeding in equity or at law.

### 5.4 No Bankruptcy or Insolvency

The Company has not filed any voluntary petition in bankruptcy or been adjudicated bankrupt or insolvent, filed any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any federal bankruptcy, insolvency, or other debtor relief law, or sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator of all or any substantial part of its properties. No court of competent jurisdiction has entered an order, judgment or decree (and the Company knows of no action or petition requesting such) approving a petition filed against the Company seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any federal bankruptcy act, or other debtor relief law, and no other liquidator, trustee or conservator has been appointed of the Company or of all or any substantial part of its properties.

### 5.5 Valid Issuance of the Debenture

The Debenture, when issued by the Company to the Holder for the consideration expressed therein, will be duly and validly issued, and, based in part upon the representations of the Holder in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

### 5.6 Restricted Securities

The Company acknowledges that the Debenture has not been and will not be registered with the Securities and Exchange Commission ("*SEC*") under the Act, and covenants that the Debenture will be offered and sold in compliance with an exemption from registration provided by Rule 506 of Regulation D of the Act. Neither the Company nor any person acting on its behalf has conducted any

5

"general solicitation" or "general advertising" (as those terms are used in Regulation D) in connection with the offer or sale of any of the Debentures.

### 5.7    Full Disclosure; No Other Brokers

The Company has fully provided the Holder and its representatives and legal counsel with all the information that the Holder and its representatives and legal counsel have requested for deciding whether to purchase the Debenture. No representation or warranty by the Company in the PPM or this Agreement, nor any statement, certificate, schedule or exhibit hereto furnished or to be furnished by or on behalf of the Company pursuant to the PPM, this Agreement, or in connection with transactions contemplated hereby, contains or will contain any untrue statement of material fact or omits or will omit a material fact necessary to make the statements contained therein not misleading. No Person, other than Placement Agent, will have rights or claims against the Company for any commission, fee or other compensation payable as a finder or broker in connection with the offer and sale of the Debentures.

### 5.8    Governmental Consents and Notices

No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Debenture, or the consummation of any other transaction contemplated hereby, except (a) qualification (or taking such action as may be necessary to secure an exemption from qualification, if available) of the offer and sale of the Debenture under applicable state and federal securities laws, which qualification, if required, will be accomplished in a timely manner, and (b) such filings as shall have been made prior to the Closing Date.

### 5.9    No Litigation

There are no actions, suits or proceedings of any type pending or, to the knowledge of the Company, threatened, against the Company, its properties or assets which if adversely determined could, individually or in the aggregate, have a material adverse effect on (a) the Company's ability to perform the obligations contemplated under this Agreement or other agreements contemplated hereby or (b) the business, operations, prospects, properties, assets or condition (financial or otherwise) of the Company. The Company is not operating under, or subject to, or in default with respect to, any order, writ, injunction or decree, including any of the foregoing affecting the ability of the Company to enter into this Agreement or perform its obligations contemplated under this Agreement and other agreements contemplated hereby.

### 5.10    No Breach; No Default

Neither the execution, delivery or performance of this Agreement or the other agreements contemplated hereby to which the Company is a party, nor the consummation of the transactions contemplated hereby or thereby by the Company, (a) materially conflicts with or results in any material breach of, (b) constitutes a material default under, or (c) results in a material violation of: (i) any contract, commitment, lease, license, note or other instrument, including voting or LLC operating agreements, to which the Company is a party or by which any of its assets are bound, judgment, order, writ or decree or (ii) any provision of the Company's Certificate of Formation.

### 5.11    Taxes

The Company has timely filed or will timely file or cause to be timely filed, all material tax returns (or extensions) required by applicable law to be filed by it prior to or as of the Closing Date, and

paid (a) all amounts of taxes shown thereon to be due (including interest and penalties) and (b) all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangibles taxes) owing by it, except for such taxes (i) which are not yet delinquent or (ii) that are being contested in good faith and by proper proceedings, and against which adequate reserves are being maintained in accordance with United States generally acceptable accounting procedures.

### 5.12    Permits

The Company possesses all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct its business as currently conducted, except where the failure to possess such permits, individually or in the aggregate, has not caused and would not have, individually or in the aggregate, a material adverse effect on the Company's business or its ability to perform its obligations contemplated under this Agreement and other agreements contemplated thereby ("***Material Permits***"). The Material Permits are in full force and effect, the Company is in compliance with each Material Permit, and the Company has not received any notice of proceedings relating to the revocation or modification of any such Material Permits and the Company is unaware of any facts or circumstances that the Company would reasonably expect to give rise to the revocation or modification of any Material Permits. Notwithstanding the above, Material Permits shall not include any construction, development, or similar permits related to the investments described in the PPM.

### 5.13    Title

The Company is the owner of, and has good and marketable title in fee simple to and adequate insurance coverage for, all real property and good and marketable title to all personal property owned by it which is material to the business of the Company, in each case free and clear of all security interests, liens, encumbrances and defects except such as are a result of Section 7.3 of this Agreement, the Offering, or such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company.

## 6.    Representations, Warranties and Agreements of the Holder

To induce the Company to accept the loan from the Holder, the Holder represents and warrants to the Company as of the date of the Closing as follows:

### 6.1    Purchase Entirely for Own Account

The Debenture will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to distributing all or any part of the Debenture, the Holder has no present intention of selling, granting any participation in or otherwise distributing the Debenture in a manner contrary to the Act or any applicable state securities law, and the Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person with respect to the Debenture.

### 6.2    Due Diligence

The Holder has been solely responsible for his, her or its own due diligence investigation of the Company and its business, and his, her or its analysis of merits and risks of the investment and subscription made pursuant to this Agreement, and is not relying on anyone else's analysis or investigation of the Company, its business or the merits and risks of the Debenture other than professional

advisors employed specifically by the Holder to assist the Holder. In taking any action or performing any role relative to arranging the investment being made pursuant to this Agreement, the Holder has acted solely in his, her or its own interest and not in that of any other party, and no other party has acted as an agent or fiduciary for the Holder.

**6.3     Access to Information; Modification of Offering**

The Holder has received and reviewed in its entirety the PPM accompanying this Agreement. The Holder has been offered access to full and complete information regarding the Company and has assessed to his, her, or its satisfaction the risks associated with an investment in the Debenture. In particular, the Holder has been given the opportunity to ask questions of, and receive answers from, the Company's officers concerning the terms and conditions of this Agreement, the Company's organizational documents, and any other matters pertaining to an investment in the Debenture and has been given the opportunity to obtain such additional information necessary to verify the accuracy of the information contained in the PPM. No information has been provided and no representations have been made to the Holder which are inconsistent with any information contained in the PPM. The Holder acknowledges that the Company may, in its sole discretion and for any reason whatsoever, modify, amend, increase or withdraw all or a portion of the Offering. In the event of the foregoing, neither the Company nor the Placement Agent will have any liability whatsoever to the Holder, except that the Company will be obligated to return any moneys transmitted to the Company that have not been applied by the Company for the purchase of Debentures, without interest or deduction.

**6.4     Sophistication**

The Holder, either alone or with the assistance of his, her or its professional advisor, is a sophisticated investor, is able to fend for himself, herself or itself in the transactions contemplated by this Agreement, and has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of acquiring the Debenture.

**6.5     Suitability**

The investment in the Debenture is suitable for the Holder based upon his, her or its investment objectives and financial needs, and the Holder has adequate net worth and means for providing for his, her or its current financial needs and contingencies and has no need for liquidity of investment with respect to the Debenture. The Holder's overall commitment to investments that are illiquid or not readily marketable is not disproportionate to his, her or its net worth, and investment in the Debenture will not cause such overall commitment to become excessive.

**6.6     Professional Advice**

The Holder has obtained, or has had the opportunity to obtain, to the extent he, she or it deems necessary, his, her or its own professional advice with respect to the risks inherent in the investment in the Debenture, the condition and terms of this Agreement and the suitability of the investment in the Debenture in light of the Holder's financial condition and investment needs. The Holder is not relying on the Company or any of its directors, officers, employees or agents with respect to the legal, tax, economic and related considerations of an investment in the Debenture, nor is the Holder relying on the Company or any of its directors, officers, employees or agents (including those of any affiliates) with respect to the appropriateness of this investment for the Holder.

### 6.7 Ability to Bear Risk

The Holder is in a financial position to purchase and hold the Debenture and is able to bear the economic risk and withstand a complete loss of his, her or its investment in the Debenture. The Holder agrees to waive any present or future claim against the Company or the Placement Agent that the Debenture was not an appropriate investment for the Holder.

### 6.8 Possible Loss of Interest and Principal

The Holder recognizes that an investment in the Debenture is subject to certain risks, the occurrence of which might result in a loss of the principal and interest due to the Holder. The Holder has carefully reviewed and understands the risks as described in the PPM.

### 6.9 Restricted Securities

The Holder realizes that (a) the Debenture has not been registered under the Act, are characterized under the Act as "restricted securities" and, therefore, cannot be sold or transferred unless they are subsequently registered under the Act or an exemption from such registration is available; (b) the Company is not being registered as an "investment company" as the term "investment company" is defined in Section 3(a) of the 1940 Act, and (c) there is presently no public market for the Debenture and the Holder would most likely not be able to liquidate his, her or its investment in the event of an emergency or to pledge the Debenture as collateral security for loans. The Holder's financial condition is such that it is unlikely that the Holder would need to dispose of any of the Debenture in the foreseeable future. In this connection, the Holder represents that he, she or it is familiar with Rule 144 of the Securities Act, as promulgated by the Securities and Exchange Commission (the "**SEC**"), as presently in effect, and understands the resale limitations imposed thereby and by the Act.

### 6.10 Further Limitations on Disposition

Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Debenture unless and until there is compliance with the following requirements:

(a)     the Holder shall arrange for the registered transfer of the Debenture as required by Section 9.

(b)     the Holder shall have furnished to the Company a detailed statement of the circumstances surrounding the proposed disposition and, if reasonably requested by the Company, shall have furnished to the Company an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such Debenture under the Act and any applicable state Blue Sky laws.

(c)     notwithstanding any other restrictions on the proposed transfer or disposition of the Debenture, any such proposed transfer or disposition shall be limited to and conditioned upon the proposed transferee qualifying as an "accredited investor" as set forth in Section 6.12.

### 6.11 Age; Residency

The Holder, if an individual, is over 21 years of age and legally competent to execute this Agreement. For purposes of the application of state securities laws, the Holder represents that he, she or it is a bona fide resident of, and/or is domiciled in, the state set forth in such Holder's residence address on

the "Certificate of Accredited Holder" to be delivered to the Company at the Closing as required by Section 7.2(e).

### 6.12 Accredited Investor Status

By the execution of this Agreement, the Holder represents and warrants that he, she or it is an accredited investor within the meaning of Regulation D promulgated under the Act as indicated on the "Certificate of Accredited Investor" delivered to the Company at the Closing, and agrees to provide any additional documents and information that the Company reasonably requests. The Holder acknowledges that the Company is relying upon the Holder's representation of accredited status as a condition of entering into this Agreement, and as such agrees to waive any future claim that Holder was not an accredited investor.

### 6.13 Tax Identification; Withholding

Under penalties of perjury, the Holder certifies that (a) the number listed with the Holder's name on the signature page to this Agreement is the Holder's correct social security number or federal tax identification number, (b) the Holder is not subject to back-up withholding, either because he, she or it has not been notified that he, she or it is subject to back-up withholding as a result of a failure to report all interest and dividends or because the Internal Revenue Service has notified the Holder that he, she or it is no longer subject to back-up withholding and (c) Holder is not a "foreign person," "foreign corporation" or a person which is not a "United States person" within the meaning of Sections 1441, 1442, 1445 and 1446 of the Internal Revenue Code of 1986, as amended. (If the Holder has at any time received notice from the Internal Revenue Service that he, she or it is subject to back-up withholding and has not subsequently received a notice advising the Holder of the termination of back-up withholding, strike clause (b) above).

### 6.14 No View to Tax Benefits

The Holder is not acquiring the Debenture with a view toward realizing any benefits under United States federal income tax laws, and no representations have been made to the Holder that any such benefits will be available as a result of the Holder's acquisition, ownership or disposition of the Debenture.

### 6.15 Confidential Information

The Holder understands that the information contained in the PPM and this Agreement is confidential and non-public information and agrees that all such information shall be kept in confidence by Holder and used by Holder solely for purposes of determining whether to purchase the Debenture.

### 6.16 No General Solicitation

The Holder is unaware of, is in no way relying on, and did not become aware of, the offering of the Debenture through, or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television, radio or Internet and is not subscribing for the Debenture, and did not become aware of the offering of the Debenture through, or as a result of, any seminar or meeting to which the Holder was invited, or any solicitation otherwise initiated, by a person not previously known to the Holder in connection with investments in securities generally.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 11 Page 98

### 6.17 Placement Agent

The Placement Agent has acted as agent for the Company in connection with the Offering, and the Holder consents to the Placement Agent's actions in this regard and hereby waives any and all claims, actions, liabilities, damages or demands the Holder may have against the Placement Agent in connection with any action or inaction or alleged conflict of interest arising from the Placement Agent's engagement as agent of the Company with respect to the sale of the Debentures to the Holder. Holder is purchasing the Debentures directly from the Company and not from the Placement Agent. The Placement Agent did not make any representations, declarations or warranties to Holder, express or implied, regarding the Debentures, the Offering or any information or documents provided to the Holder in connection therewith and the Placement Agent did not offer to sell, or solicit and offer to buy, any of the Debentures that the Holder will acquire from the Company hereunder.

### 6.18 Representations and Warranties of Organization

If the Holder is a corporation, partnership or other association, trust or similar entity, the Holder hereby represents and warrants to the Company that the Holder is authorized and otherwise duly qualified to acquire the Debenture, and the individual executing this Agreement on behalf of the Holder has been duly authorized to do so and to bind the Holder by this Agreement (if the Holder is an individual who is investing through a revocable trust, an IRA or an account in a self-directed employee benefit plan (a "***Self-Directed Entity***"), such representation and warranty applies to the Self-Directed Entity, and, for this purpose, the term "***Holder***" shall be deemed to refer to the Self-Directed Entity).

### 6.19 Representations and Warranties by Employee Benefit Plans

If the Holder is an "employee benefit plan" subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or an individual retirement account, individual retirement annuity or other "plan" subject to Section 4975 of the Code (each such employee benefit plan or plan is referred to in this Agreement as a "***Plan***"), or the nominee of such a Plan, or a trust or custodial account established under such a Plan, the Holder makes each of the following additional representations and warranties:

(a)     **Notification**. The Holder has notified the Company in writing that it is a Plan.

(b)     **Understanding of Fiduciary and Prohibited Transaction Requirements**. The Holder is aware of, and understands, the plan asset rules contained in Department of Labor Regulation Section 2510.3-101; the fiduciary requirements contained in Part 4 of Subtitle B of Title I of ERISA, including, but not limited to, the prudence and diversification requirements contained in Section 404 of ERISA; and the prohibited transaction provisions contained in Sections 406 and 408 of ERISA and Section 4975 of the Code.

(c)     **Not A Fiduciary**. The Holder understands that, so long as the assets of the Company are not considered to be "***plan assets***" within the meaning of ERISA or the regulations promulgated under ERISA, neither the Company nor any Affiliate of the Company will be a "***fiduciary,***" within the meaning of ERISA, of the Plan whose assets it is investing in the Debenture solely by reason of such investment in the Debenture.

(d)     **Investment Objectives and Strategies**. The Holder has carefully reviewed the accompanying Private Placement Memorandum of the Company and understands the loan proceeds will be used by the Company for investments and operating capital.

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 1 Page 99

(e) **Purposes of the Plan**. The Holder has given appropriate consideration to the facts and circumstances relevant to an investment in the Debenture and has determined that such investment is reasonably designed to further the purposes of the Plan whose assets he, she or it is investing in the Debenture.

(f) **Investment Consistent with ERISA**. Taking into account the other investments of the Plan whose assets it is investing in the Debenture and the diversification thereof, an investment in the Debenture by such Plan is consistent with (and does not violate) the applicable requirements of ERISA, including, but not limited to, those contained in Section 404 of ERISA, and the requirements contained in Section 4975 of the Code.

(g) **Cash Flow Requirements**. Taking into account the other investments of the Plan, an investment in the Debenture by such Plan is consistent with the cash flow requirements, investment objectives and funding policy of such Plan.

**7.     Conditions to Closing; Security Interests**

**7.1     Holder's Conditions of Closing**

The obligation of the Holder to purchase the Debenture at the Closing pursuant to this Agreement shall be subject to and conditioned upon satisfaction or the waiver by such Holder of the following conditions on or prior to the applicable Closing Date:

(a) the representations and warranties of the Company contained in this Agreement shall be true and correct in all material respects as of the applicable Closing and all covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the applicable Closing shall have been performed or complied with in all material respects.

(b) the Company shall have obtained all necessary blue sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Debenture.

(c) investors in the Offering shall have offered to lend to the Company, and the Company shall have agreed to borrow from such investors, an aggregate loan amount of at least Two Million Dollars ($2,000,000).

**7.2     Company's Conditions of Closing**

The obligation of the Company to sell the Debenture to a Holder at the Closing pursuant to this Agreement shall be subject to and conditioned upon satisfaction of the following conditions on or prior to the Closing:

(a) all representations and warranties of the Holder contained in this Agreement, including the Certificate of Accredited Investor tendered by the Holder to the Company pursuant to Section 7.2(e), shall be true and correct as of the Closing Date and all covenants, agreements and conditions contained in this Agreement to be performed by such Holder on or prior to the Closing Date shall have been performed or complied with in all material respects.

(b) the Company shall have obtained all necessary blue sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Debenture.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 00 Page 100 of 1366

(c)     no action or proceeding before any court or government body will be pending wherein a judgment, decree or order would prevent any of the transactions contemplated hereby or cause such transactions to be declared unlawful or rescinded.

(d)     execution and delivery by such Holder of this Agreement.

(e)     the Holder has completed, signed and delivered to the Company the "Certificate of Accredited Investor," in the form attached hereto as *Exhibit B*, representing that the Holder's status qualifies as an "accredited investor" within the meaning of Regulation D under the Act.

(f)     investors in the Offering shall have offered to lend, and the Company shall have agreed to borrow, an aggregate loan amount of at least Two Million Dollars ($2,000,000).

**7.3     Security Interest.**

As security for the full and prompt payment, in cash, and performance of the Company's obligations under this Agreement and the Debentures, the Company hereby grants to each Holder, on a *pari passu* basis with all other Holders based on the respective principal amounts of each Holder's Debenture, a security interest (the "*Company Security Interest*") in the Company Collateral, and the Manager hereby grants to each Holder, on a *pari passu* basis with all other Holders based on the respective principal amounts of each Holder's Debenture, a security interest (the "*Manager Security Interest*", and with the Company Security Interest, the "*Security Interest*") in the Manager Collateral. "*Company Collateral*" means all of the following:  (a) a first or second position deed of trust in the real estate owned by the special purpose entities now owned or hereafter acquired by the Company; (b) all of the assets of the Company, which primarily consist of its membership interest in the special purpose entities now owned or hereafter acquired by the Company; (c) all of the Company's partners' membership interest in the special purpose entities now owned, pledged or hereafter acquired by the Company; (d) the rights of the Company to take control of the special purpose entities holding the fund's investments, including, by way of illustration, removal and replacement of the manager, the making of investment decisions relating to individual projects, and decisions regarding the manner and timing of exits from the projects; (e) all products, proceeds, rents and profits of the foregoing; (f) all of the Company's books and records related to any of the foregoing; and (g) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Company now has or hereafter acquires any rights. "*Manager Collateral*" means all of the Manager's membership interest in the Company, and the term "*Collateral*" means, collectively, the Company Collateral and Manager Collateral. Notwithstanding such grant, each Holder specifically agrees that it may take enforcement action and pursue remedies hereunder only in accordance with that certain Collateral Agent Agreement among Kevin A. Carreno, P.A. (the "*Collateral Agent*" and each Holder (the "*Collateral Agent Agreement*") in the form attached hereto as *Exhibit C-1*. Each Holder hereby designates Kevin A. Carreno, P.A. as the "Collateral Agent" and Company and the Manager hereby authorize the Collateral Agent to, and grants the Collateral Agent an irrevocable power of attorney to, perfect, evidence, and maintain the Security Interest in the Collateral pursuant to the Collateral Agent Agreement. By becoming a party to this Agreement and accepting a Debenture, each Holder specifically agrees that enforcement of the Security Interest, exercise of any rights or remedies with respect to the Collateral, or pursuit of any remedies under the Debenture may be taken only by action of the Collateral Agent.

**7.4     Interest Reserve**

The Company may deposit into an interest reserve account proceeds from the issuance of Debentures to cover up to nine (9) months of interest expense on the Debentures. Nothing herein is

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 10.1 Page 101
1366

intended or shall be construed to alter or limit the Company's obligation to make the monthly interest payments on the Debentures if the interest reserve is inadequate.

## 8. Covenants

### 8.1 Information Rights

For so long as the Holder continues to hold the Debenture, the Company will provide to the Holder:

(a)     as soon as practicable after the end of each fiscal year and in any event within one hundred twenty (120) days after each fiscal year, consolidated balance sheets of the Company as of the end of such fiscal year and consolidated statements of income of the Company for such fiscal year, prepared in accordance with U.S. generally accepted accounting principles, all in reasonable detail, certified by an officer of the Company and audited by an independent certified public accountant; and

(b)     as soon as practicable after the end of each fiscal quarter and in any event within sixty (60) days after each fiscal quarter, unaudited consolidated balance sheets of the Company as of the end of such fiscal quarter and consolidated statements of income of the Company for such fiscal quarter;

(c)     quarterly newsletter reports on the Company's investments, which may be accessed by the Holder at www.iCap.com.

### 8.2 Other Affirmative Covenants of the Company

The Company hereby covenants and agrees, as of the Closing and thereafter until the Debentures and all other obligations arising under this Agreement have been repaid in full, the Company shall:

(a)     give notice in writing to the Collateral Agent on behalf of the Holder (promptly, but in any event within five (5) business days after the Company knows or has reason to know thereof), the occurrence of any Default or Event of Default; and

(b)     pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its taxes (federal, state, local and any other taxes) and other obligations and liabilities of whatever nature and any additional costs that are imposed as a result of any failure to so pay, discharge or otherwise satisfy such taxes, obligations and liabilities, except when the amount or validity of any such taxes, obligations and liabilities is currently being contested in good faith by appropriate proceedings and reserves, if applicable, in conformity with U.S. generally accepted accounting procedures with respect thereto have been provided on the books of the Company.

### 8.3 Negative Covenants

(a)     The Company hereby covenants and agrees, as of the Closing and thereafter until the Debentures and all other obligations arising under this Agreement have been repaid in full (including the payment of the Payoff Premium), neither the Company nor any of its subsidiaries shall (i) directly or indirectly, declare, order, make or set apart any sum for or pay any Distribution (other than tax distributions as set forth in the Operating Agreement); (ii) establish any deposit account other than the account identified in that certain Deposit Account Control Agreement, to be entered into by and among the Company, the Collateral Agent and Sterling Savings Bank (the "*Account Control Agreement*"), or otherwise deposit or fund any cash or cash equivalents of the Company in any deposit account other than

the account identified in the Account Control Agreement; or (iii) contract, create, incur, assume or permit to exist any indebtedness, except for (A) indebtedness arising or existing under this Agreement (as in effect on the date hereof); (B) indebtedness arising from the issuance of the Debentures in the Offering; (C) indebtedness arising from trade payables incurred by the Company in the ordinary course of business; (D) indebtedness junior to the Holder's interest; or (E) with respect to a wholly-owned subsidiary of the Company organized for the purpose of a Company-investment in a specific real property project, indebtedness that results from a commercial loan from a third party commercial lender made in such lender's ordinary course of business.

(b)     The Manager hereby covenants and agrees, as of the Closing and thereafter until the earlier of (i) November 1, 2015, or (b) the date on which at least 75% of the aggregate net proceeds from the Offering (after payment of commissions and fees and the setting aside of reserves) has been committed to or invested in real property projects as described in the PPM, neither the Manger nor any of its Affiliates may make any investment on behalf of a new pooled investment fund or investment vehicle having identical investment objectives to those of the Company.

(c)     The Company will not make any single investment that is greater than 10% of the gross Offering proceeds received by the Company as of the closing date of such investment. In addition, no more than 15% of the gross Offering proceeds will be invested in projects in which there is no project partner (i.e. projects in which the Fund will effectively act as developer).

(d)     The Company may only make investments if the total amount of debt encumbering the underlying property, together with the Company's investment, is less than 80% of the finished value of the underlying project. The Company will not finance any amount above the total cost of the project and will not invest in projects whose combined loan to value ratio exceeds 80%.

**9.     Defaults and Remedies**

**9.1     Events of Default**

An "***Event of Default***" occurs if (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     the Company defaults in the payment of interest on any of the outstanding Debentures, when the same becomes due and payable and such default continues for a period of ten (10) Business Days (such period, a "***Grace Period***"), underlined provided, however, that no such Grace Period will available should the Company default twice in the payment of interest on any of the outstanding Debentures when such interest is due and payable (even if such payments were subsequently made during the Grace Period), such that should the Company default in the payment of interest on any of the outstanding Debentures when such interest is due and payable after the two (2) prior defaults, then an Event of Default shall occur on the date such payment was due and payable;

(b)     the Company defaults in the payment of the Loan Amount or the loan amount on any of the outstanding Debentures, when the same becomes due and payable at its maturity, and such default continues for a period of ten (10) Business Days;

(c)     the Company defaults in the performance of, or breaches, any covenant or warranty of the Company in this Agreement (other than a covenant or warranty a default in whose performance or whose breach is elsewhere in this Section specifically dealt with), and such default or breach continues for a period of thirty (30) calendar days after there has been given, by registered or

certified mail, to the Company by the Holder, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(e)  a final judgment or judgments for the payment of money aggregating in excess of Five Hundred Thousand Dollars ($500,000) is rendered against the Company and which judgments are not, within ninety (90) calendar days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within ninety (90) calendar days after the expiration of such stay; provided, however, that any judgment which is covered by insurance or an indemnity from a creditworthy party shall not be included in calculating the Five Hundred Thousand Dollars ($500,000) amount set forth above;

(f)  the Company violates or otherwise defaults on any material contractual obligation that would, as a result of such violation or default, cause the acceleration of the Company's obligations thereunder and resulting in the incurrence of a liability, damages or loss to the Company in excess of Five Hundred Thousand Dollars ($500,000);

(g)  the Company, pursuant to or within the meaning of any Bankruptcy Law (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

(h)  a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Company in an involuntary case, (ii) appoints a custodian of the Company for all or substantially all of its property, or (iii) orders the liquidation of the Company; and the order or decree remains unstayed and in effect for ninety (90) consecutive calendar days.

The term "***Bankruptcy Law***" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "***Custodian***" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

### 9.2    Acceleration, Rescission and Annulment

(a)  Upon the occurrence of an Event of Default, with the consent of the holders of more than 10% in aggregate loan amount of the outstanding Debentures, the Collateral Agent may declare the loan amount of and accrued but unpaid interest, if any, on all the Debentures (including the Loan Amount or interest on the Holder's Debenture) to be due and payable. Upon such a declaration, such principal and interest, if any, shall be immediately due and payable. If an Event of Default pursuant to Section 9.1(g) or Section 9.1(h) occurs, the loan amount and interest on all the Debentures will *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Collateral Agent or any holders of the Debentures. The holders of more than 50% in aggregate loan amount of the outstanding Debentures by notice to the Collateral Agent may rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of acceleration. No such rescission shall affect any subsequent default or impair any right consequent thereon.

(b)  If an Event of Default occurs and is continuing, the Collateral Agent may pursue any available remedy to collect the payment the loan amount of or interest on the Debentures (including the Loan Amount or interest on the Holder's Debenture) or to enforce the performance of any provision of the Debentures. The Collateral Agent may maintain a proceeding even if it does not possess any of the Debentures or does not produce any of them in the proceeding. A delay or omission by the Collateral

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 4 Page 104
1366

Agent in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. All available remedies are, to the extent permitted by law, cumulative. If the Collateral Agent places the Debenture in the hands of an attorney for collection or enforcement, or the Debenture is otherwise is collected or enforced through any legal proceeding or the Collateral Agent otherwise takes action to collect amounts due under the Debenture or to enforce the provisions of this Section 9.2, or (b) there occurs any Event of Default, then the Company shall pay the costs incurred by the Collateral Agent for such collection, enforcement or action, including, but not limited to, attorneys' fees and disbursements.

(c)     The holders of more than 50% in aggregate loan amount of the outstanding Debentures by notice to the Collateral Agent may waive any past or existing Event of Default and its consequences, except an Event of Default pursuant to Section 9.1(a) or Section 9.1(b), which cannot be amended without the consent of the affected Holder. When an Event of Default is waived, it is deemed cured, and any Event of Default arising therefrom shall be deemed to have been cured, but no such waiver shall extend to any subsequent or other Event of Default or impair any consequent right.

(d)     Except to enforce the right to receive payment of principal or interest when due, the Holder may not pursue any remedy with respect to the Debenture unless (i) such Holder has previously given the Collateral Agent written notice that an Event of Default is continuing; (ii) holders of more than 10% in loan amount of the outstanding Debentures have requested in writing that the Collateral Agent  pursue the remedy; (iii) such holders have offered the Collateral Agent security and indemnity satisfactory to it against any loss, liability or expense (with such security including the Collateral Agent's reasonable attorneys' fees or advancements thereof intended to cover services rendered or expected to be rendered by the Collateral Agent); (iv) the Collateral Agent has not complied with such request within sixty (60) calendar days after the receipt thereof and the offer of security or indemnity; and (v) the holders of a majority in loan amount of the outstanding Debentures have not given the Collateral Agent a direction inconsistent with such request within such sixty (60) calendar day period. The Holder may not use the Debenture to prejudice the rights of another holder of the Debentures or to obtain a preference or priority over another holder of the Debentures (it being understood that the Collateral Agent does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to any holder). Nothing in this Agreement shall be construed to restrict or limit the Holder's right to, independently from the Collateral Agent, to receive payment of principal or interest when due.

(e)     From and after the occurrence of an Event of Default, the Company will cease paying any management fees to iCap Pacific NW Management, LLC until the Event of Default is cured.

## 10.     Transfer of the Debenture

Subject to compliance with the requirements of this Agreement, including but not limited to those set forth in Section 6 (and its subparts) and this Section 10, the Holder shall have the right to transfer the Debenture to any qualifying third party of its choice contingent upon securing the Company's written consent in advance of the proposed transfer. The Company shall be under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under this Agreement, until the Holder has surrendered the original Debenture for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Company. A new Debenture for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing a joinder to this Agreement, and executing a Certificate of Accredited Investor. Interest and principal are payable only to the registered holder of the Debenture. The Holder and any successor Holder agree(s) to provide to the Company a Form W-9 upon request. Until registration of a transfer occurs, the Company shall be entitled

to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by this Agreement and the applicable Debenture.

## 11. Tax Matters

Company and Holder shall, for all federal and applicable state and local income tax purposes, treat the transactions contemplated by this Agreement as a contingent payment debt instrument to which the non-contingent bond method described in Treasury Regulations Section 1.1275-4(b) ("***Non-Contingent Bond Method***") applies. The Company shall reasonably make, and shall deliver to Holder, all determinations required to be made pursuant to the Non-Contingent Bond Method, including without limitation, the comparable yield, projected payment schedule and daily portions of interest. Each of Company and Holder agree to (a) prepare and file each of their respective tax returns on a basis consistent with the application of the Non-Contingent Bond Method and the Company's determinations hereunder, and (b) unless otherwise required by applicable law, take no position inconsistent therewith on any applicable tax return, in any audit or proceeding before any taxing authority, or in any report made for federal or applicable state or local income tax purpose.

## 12. Miscellaneous

### 12.1 Assignment

The Company may not assign this Agreement or any of its rights, interests or obligations hereunder without the prior written consent the Holder. Furthermore, the Holder may not transfer any interest in the Debenture except as otherwise provided in this Agreement. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

### 12.2 Governing Law

This Agreement shall be governed by and construed under the laws of the State of Washington as applied to agreements among Washington residents, entered into and to be performed entirely within the State of Washington, without giving effect to principles of conflicts of law. The Parties irrevocably consent to the jurisdiction and venue of and in King County, Washington in connection with any action relating to this Agreement.

### 12.3 Counterparts

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

### 12.4 Titles and Subtitles

The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

### 12.5 Notices

Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) upon confirmation of receipt by fax by the party to be notified if received on or before 5:00 p.m. (local time) on any Business Day or, if received later on such day, upon the close of business on the next Business Day, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (d), or (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by ten (10) days' advance written notice to the other party given in the foregoing manner.

> If to the Company:
> iCap Pacific Northwest Opportunity and Income Fund, LLC
> c/o Chris Christensen
> PO Box 3907
> Bellevue, WA 98009
> Fax: 425.214.4776
>
> With a copy to:
> Perkins Coie LLP
> c/o Martha Sandoval
> 1201 Third Avenue, Suite 4900
> Seattle, WA 98101-3099
>
> If to Holder:
> Kevin A. Carreno, P.A., as Collateral Agent for the Holders
> 3001 Executive Center Drive, Ste. 217
> Clearwater, FL 33762

### 12.6 Expenses

Each party to this Agreement shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Agreement, the related agreements and the transactions contemplated herein and therein.

### 12.7 Entire Agreement

This Agreement and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the Parties with regard to the subjects hereof and thereof.

### 12.8 Amendments and Waivers

Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Holder.

**12.9    Severability**

If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

**12.10    Survival**

The representations and warranties of the Company, and those of Holder, shall survive the consummation of the sale of the Debenture to Holder hereunder.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

> **COMPANY**
> iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company
>
>
> By:  iCap Pacific NW Management, LLC
> Its:  Manager
>
>
> _____
> By:  Chris Christensen
> Its:  Manager

**SIGNATURE PAGE FOR INDIVIDUAL HOLDER**

**Please Complete This Signature Page**[1]

**Loan Amount**:  The Holder agrees to lend to the Company $_____.

**Binding Agreement**:  The Holder hereby agrees to all of the provisions of the Senior Secured Debenture Purchase Agreement.

_____, 2014           _____
Date of Signature                                                      Print or Type Name of Holder


                                                                       _____
                                                                       Signature of Holder

Taxpayer Identification Number/SSN:        _____

Address of Holder:                                     _____

                                                                _____

Fax:                                                            _____

Phone:                                                        _____

Email:                                                         _____

---

[1] If the Holder wishes for the Debenture to be held jointly by two persons, both must sign this signature page.

**Signature Page for Individual Holder if held jointly**:

_____, 2014     _____
Date of Signature                                          Print or Type Name of Holder


                                                                  _____
                                                                  Signature of Holder


Taxpayer Identification Number/SSN:       _____

Address of Holder:                                  _____

                                                                  _____

Fax:                                                          _____

Phone:                                                      _____

Email:                                                        _____

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 10 Page 110
1366

**SIGNATURE PAGE FOR HOLDER INVESTING
THROUGH A SELF-DIRECTED ENTITY**

**Please Complete This Signature Page**

If additional signatures are required for proper authorization,
please submit additional copies of this signature page.

Execution of this Agreement by the Holder shall operate (a) to confirm that the Holder has directed the Self-Directed Entity to acquire the Debenture, (b) to provide such additional authorization for and ratification of the acquisition as may be legally required in order that the acquisition will be effective and both the Holder and the Self-Directed Entity will be bound by the terms of the Agreement (subject, however, to the limitations set forth below), and (c) without limiting the foregoing, to cause the Holder specifically to be bound by the representations and warranties set forth in the Senior Secured Debenture Purchase Agreement.

**Loan Amount**:  The Holder agrees to lend to the Company $_____.

**Binding Agreement**:  The Holder hereby agrees to all of the provisions of the Senior Secured Debenture Purchase Agreement.

_____, 2014       _____
Date of Signature                                              Print or Type Name of Holder


                                                                    _____
                                                                    Signature of Holder


Taxpayer Identification Number:                  _____

Address of Holder:                                        _____

                                                                    _____

Fax:                                                              _____

Phone:                                                          _____

Email:                                                           _____

Execution below by or on behalf of a trustee or custodian of a Self-Directed Entity constitutes (a) the agreement of the Self-Directed Entity to acquire the Debenture and become a Holder of the Company on the terms and conditions of the Senior Secured Debenture Purchase Agreement, and (b) a representation and warranty that the Self-Directed Entity is authorized and otherwise duly qualified to acquire the Debenture and that the individual executing below on behalf of the Self-Directed Entity has been duly authorized to do so and bind the Self-Directed Entity by such execution.

_____, 2014
Date of Signature

_____
Print or Type Name of Trust, IRA or Plan

_____
Print or Type Name of Trustee or Custodian

_____
Signature by or on Behalf of Trustee or Custodian

_____
Print or Type Title (if applicable)

Taxpayer Identification Number: _____

Address of Holder: _____

_____

Fax: _____

Phone: _____

Email: _____

[Signature Page for Self-Directed Entity]
-24-

**A SIGNATURE PAGE FOR
A CORPORATION, LIMITED LIABILITY COMPANY,
TRUST OR OTHER
NONINDIVIDUAL HOLDER**

**Please Complete This Signature Page**

If additional signatures are required for proper authorization,
please submit additional copies of this signature page.

**Loan Amount**:  The Holder agrees to lend to the Company $_____.

**Binding Agreement**:  The Holder hereby agrees to all of the provisions of the Senior Secured Debenture Purchase Agreement.

_____, 2014  _____
Date of Signature        Print or Type Name of Holder

             _____
             Signature by or on Behalf of Officer,
             Manager, Member, Partner or Trustee

             _____
             Print or Type Name of Officer, Manager
             Member, Partner or Trustee

             _____
             Print or Type Title (if applicable)

Taxpayer Identification Number: _____

Fax:         _____

Phone:       _____

Email:       _____

23-01243-WLH11  Doc 468  Filed 02/23/24  Entered 02/23/24 19:33:15  Exhibit 13 Page 113
1366

## SCHEDULE I

## SCHEDULE OF HOLDERS

<u>Holder Name & Address</u>                    <u>Debenture Amount</u>

## EXHIBIT A

## FORM OF DEBENTURE

THIS DEBENTURE (THIS "***SECURITY***") HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. § 15b ET SEQ., AS AMENDED ("***SECURITIES ACT***"), IN RELIANCE UPON ONE (1) OR MORE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE FEDERAL ACT. IN ADDITION, THE ISSUANCE OF THIS SECURITY HAS NOT BEEN QUALIFIED UNDER THE SECURITIES ACT OF WASHINGTON, OR ANY OTHER STATE SECURITIES LAWS (COLLECTIVELY, THE "***STATE ACTS***"), IN RELIANCE UPON ONE OR MORE EXEMPTIONS FROM THE REGISTRATION PROVISIONS OF THE STATE ACTS. THE HOLDER OF THIS SECURITY MAY NOT TRANSFER IT UNLESS IT HAS ARRANGED FOR ITS ASSIGNMENT TO A REGISTERED ASSIGNEE AS PROVIDED IN THIS DEBENTURE, UNLESS HOLDER HAS COMPLIED WITH THE TERMS OF THE DEBENTURE PURCHASE AGREEMENT (INCLUDING OBTAINING THE COMPANY'S CONSENT TO THE TRANSFER), AND UNLESS IT HAS SUBMITTED TO THE COMPANY A DETAILED STATEMENT AND, IF REASONABLY REQUESTED BY THE COMPANY, AN OPINION OF COUNSEL, CONFIRMING THAT SUCH TRANSFER DOES NOT REQUIRE REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE ACTS.

$_____                                    _____, 20____

## ICAP PACIFIC NORTHWEST

## INCOME FUND, LLC

## SENIOR SECURED DEBENTURE

iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "***Company***"), for value received, promises to pay to _____ (the "***Holder***"), or the Holder's registered assigns, the Loan Amount plus interest thereon as set forth herein.

This Senior Secured Debenture ("***Debenture***") is issued pursuant to that certain Senior Secured Debenture Purchase Agreement dated as of December 19, 2013, by and between the Company and the Holder and other purchasers of Debentures of like tenor (the "***Agreement***"), the terms of which are incorporated herein by reference. Capitalized terms that are used in this Debenture and that are not separately defined herein have the meanings assigned to such terms in the Agreement.

The following is a statement of the rights of the Holder and the conditions to which this Debenture is subject, to which the Holder, by the acceptance of this Debenture, agrees:

**1.        Interest on Outstanding Loan Amount**

The outstanding Loan Amount shall bear simple interest at 12% per annum. Interest computation shall be based upon twelve 30-day months. Interest will accrue on the loan made to the Holder under this Debenture from the date that such monies are paid to and are available for use by the Company.

A-1

In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of 18% percent per annum, simple interest, until all amounts due hereunder have been paid in full.

**2.      Stipulated Term; Company's Extension Right**

(a)      The full Loan Amount shall be due and payable, together with all accrued but unpaid interest, on or before December 31, 2016 (the "***Maturity Date***"). The date first set forth above shall be the "***Effective Date***"; provided, however, that if the Holder's funds are not made available to the Company within 7 days of the date first set forth above, then the Effective Date shall be adjusted to reflect the date on which funds were actually made available to the Company.

(b)      So long as an Event of Default has not occurred and is continuing, the Company has the option to extend the Maturity Date for an additional 3 months. This option may be exercised by the Company at any time prior to the Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Maturity Date. If the Company fails to give such notice, this Debenture will mature upon the expiration of the Maturity Date.

(c)      Upon the maturity of this Debenture, the outstanding Loan Amount, together with all accrued but unpaid interest, will be due and payable to the Holder.

**3.      Interest Payments and Payoff Premium**

(a)      Prior to the Maturity Date, or extension thereof, the Company will be required to make only monthly interest payments to the Holder. Such monthly payments shall include all interest accrued under this obligation through the end of the prior calendar month, and shall be due and payable to the Holder on the fifteenth (15th) calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter.

(b)      Within 12-months after the earlier of (i) the date on which the Loan Amount is repaid in full or (ii) the Maturity Date, including any extension thereof (such earlier date being the "***Measurement Date***"), the Company will be required to pay to the Holder a "***Payoff Premium***." The Payoff Premium is an amount equal to Holder's pro rata share (as determined below) of an amount equal to 25% of the cumulative net profit generated by the Company from the initial date of Holder's investment through the Measurement Date (the "***Aggregate Premium Amount***"). Holder's pro rata share of the Aggregate Premium Amount shall be equal to the Aggregate Premium Amount multiplied by a fraction, the numerator of which is such Holder's Loan Amount and the denominator of which is the aggregate loan amount of all other holders of Debentures. The Payoff Premium amount is not intended to constitute an equity interest in the Company, but rather is intended to constitute additional interest on the Loan Amount, and shall be paid in addition to all principal, penalties and other interest otherwise due to Holder.

(c)      So long as the Debentures remain outstanding, the Company shall not make any distributions to its members other than tax distributions as set forth in the Company's Limited Liability Company Agreement.

**4.      Prepayment**

The Company may choose to prepay part or all of the Debenture without penalty at any time prior to the Maturity Date, or extension thereof. Any such prepayment will be credited first to any accrued and unpaid interest and then to the payment of the outstanding Loan Amount.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 16 Page 116
1366

**5. Secured Obligation**

This Debenture represents a secured obligation of the Company. The Debenture is secured by the Collateral.

**6. Transfer of Debenture; Restrictions on Transfer**

This Debenture may be transferred only in compliance with the terms and conditions of the Agreement (including the requirement of obtaining the Company's consent to the transfer) as well as all applicable federal and state securities laws and only upon surrender of the original Debenture for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form reasonably satisfactory to the Company. A new Debenture for like principal amount and interest will be issued to, and registered in the name of, the transferee. Interest and principal are payable only to the registered holder of the Debenture. The Holder agrees to provide a Form W-9 to the Company upon request.

**7. Holder's Representations; Rank of Debenture**

By the acceptance of this Debenture, the Holder re-affirms its representations and warranties in the Agreement in favor of the Company. All payments due or made under this Debenture shall rank *pari passu* with all other Debentures. Any payments made by the Company under the Debentures shall be made pro rata to all holders of Debentures in accordance with the respective outstanding principal amounts of the Debentures.

**8. Events of Default**

Each of the events specified in Section 9 of the Agreement shall constitute an Event of Default under this Debenture. Upon the occurrence of an Event of Default, the Holder shall have the rights, and be subject to the restrictions, set forth in Section 9 of the Agreement, and the Holder shall be entitled to exercise certain enforcement and collection rights on behalf of the Holder as provided for in the Agreement.

**9. Miscellaneous**

**9.1 Costs of Collection**

If, in accordance with the terms and conditions of Section 9.2 of the Agreement, (a) this Debenture is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Debenture or to enforce the provisions of this Debenture in accordance with the terms of the Agreement, or (b) there occurs any Event of Default, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action, including, but not limited to, attorneys' fees and disbursements.

**9.2 Holder as Owner**

The Company may deem and treat the holder of record of this Debenture as the absolute owner for all purposes regardless of any notice to the contrary from third parties.

A-3

### 9.3 No Member or Ownership Rights

This Debenture confers no ownership rights whatsoever in the Company, and shall not entitle the Holder to any voting rights, any management rights, any ownership rights, any rights to distribution, any statutory rights conferred on members, or any other rights as an owner of the Company or to any other rights except the rights stated herein.

### 9.4 Notices

Unless otherwise provided, any notice under this Debenture shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) upon confirmation of receipt by fax by the party to be notified if received on or before 5:00 p.m. (local time) on any Business Day or, if received later on such day, upon the close of business on the next Business Day, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (d), or (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by ten (10) days' advance written notice to the other party given in the foregoing manner.

If to the Holder:

To the address or number last furnished in writing to the Company in accordance with the Agreement.

If to the Company:
iCap Pacific Northwest Opportunity and Income Fund, LLC
c/o Chris Christensen
PO Box 3907
Bellevue, WA 98009
Fax: 425.214.4776

With a copy to:
Perkins Coie LLP
c/o Martha Sandoval
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Fax: 206.359.7244

### 9.5 Amendments and Waivers

No provision of the Debenture or the Agreement may be amended, except by the express written agreement of both the Company and Holder; provided, however, that any provision of this Debenture may be amended and the observance of any term may be waived (either generally or in a particular instance and either retroactively or prospectively) as provided in Section 9 and Section 12.8 of the Agreement.

### 9.6 Governing Law; Jurisdiction; Venue

This Debenture shall be governed by and construed under the laws of the state of Washington without regard to principles of conflict of laws. The Parties irrevocably consent to the jurisdiction and venue for purposes of resolving any disputes in King County, Washington in connection with any action relating to this Debenture.

A-4

**9.7** **Assignment**

The Company may not assign this Debenture or any of its rights, interests or obligations hereunder, except upon receiving the consent of the Holder. Except as otherwise provided herein, the terms and conditions of this Debenture shall inure to the benefit of and be binding on the respective successors and assigns of the Parties.

**9.8** **Severability**

If one or more provisions of this Debenture are held to be unenforceable under applicable law, such provision shall be excluded from this Debenture, and the remaining provisions of this Debenture shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

**9.9** **Waivers**

The Company waives presentment for payment, demand, notice of nonpayment, notice of protest and protest of this Debenture, and all notices in connection with the delivery, acceptance, or dishonor of this Debenture.

<u>Washington State Notice</u>. **The Company notifies the Holder as follows:**

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**iCAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC, a Delaware limited liability company**

By: iCap Pacific NW Management, LLC
Its: Manager

_____

By: Chris Christensen
Its: Manager

**EXHIBIT B**

**CERTIFICATE OF ACCREDITED INVESTOR**

The undersigned, _____ **[NOTE: Insert full name of the party to be recognized as the registered owner of the Debenture]** (the "*Holder*"), hereby represents and warrants, pursuant to Section 6.12 of that certain Senior Secured Debenture Purchase Agreement ("*Agreement*") dated as of December 19, 2013, by and between iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "*Company*"), and the Holder and other purchasers of Debentures of like tenor that: (a) the Holder has elected to invest in and to hold the Senior Secured Debenture of the Company, either individually or through an entity as set forth in the Holder's signature page to the Agreement and (b) if the investment is to be made through an entity, the individual signing the Agreement and this Certificate on behalf of such entity, is legally authorized to do so. Furthermore, the Holder represents and warrants that he, she or it falls within each of the categories or category that are initialed below:

[CHECK THE BOX NEXT TO EACH OF THE
CATEGORY OR CATEGORIES WHICH DESCRIBES THE HOLDER]

1.      The Holder is a natural person whose net worth, either individually or jointly with such person's spouse, at the time of his or her purchase, exceeds $1,000,000 (excluding the value of the Holder's primary residence).

If <u>true</u>, please check the following box: ☐

2.      The Holder is a natural person who had individual income in excess of $200,000, or joint income with that person's spouse in excess of $300,000, in the previous two calendar years and reasonably expects to reach the same income level in the current calendar year.

If <u>true</u>, please check the following box: ☐

3.      The Holder is a corporation, partnership, limited liability company or other organization described in Section 501(c)(3) of the Internal Revenue Code, or Massachusetts or similar business trust, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000.

If <u>true</u>, please check the following box: ☐

4.      The Holder is an entity which falls within one of the following categories of accredited investor set forth in Rule 501(a) of Regulation D under the Securities Act ("*Regulation D*"):

(a)      A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or a fiduciary capacity.

If <u>true</u>, please check the following box: ☐

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 20 Page 120
1366

(b)    A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

If <u>true</u>, please check the following box: ☐

(c)    An insurance company as defined in Section 2(13) of the Securities Act.

If <u>true</u>, please check the following box: ☐

(d)    An investment company registered under the Investment Company Act of 1940 or as a business development company as defined in Section 2(a)(48) of that Act.

If <u>true</u>, please check the following box: ☐

(e)    A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

If <u>true</u>, please check the following box: ☐

(f)    Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such a plan has total assets in excess of $5,000,000.

If <u>true</u>, please check the following box: ☐

(g)    Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

If <u>true</u>, please check the following box: ☐

(h)    An employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company or registered investment adviser or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors as described in one or more of the categories set forth in items 1 through 4 of this ***Exhibit B***.

If <u>true</u>, please check the following box: ☐

(i)    A trust, with total assets in excess of $5,000,000 not formed for the specific purpose of acquiring the Interest, offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D.

If <u>true</u>, please check the following box: ☐

5.    The Holder is a grantor trust, and each grantor of the trust (i) has the power to revoke the trust and regain title to the trust assets and (ii) is an accredited investor as described in one or more of the categories set forth in items 1 through 4 of this ***Exhibit B***. If the Holder is described by this Item 5, the Holder should describe the circumstances under which the trust is revocable by the grantor.

If <u>true</u>, please check the following box: ☐

B-2

6.      The Holder is an entity (excluding a trust) in which all of the equity owners are accredited investors as described in one or more of the categories set forth in paragraphs 1 through 5 above.

If <u>true</u>, please check the following box: ☐

_____
Signature *

_____
Print Name

_____
Title

*The person signing this Certificate has done so either in his individual capacity, if investing individually, or as an authorized representative of the entity constituting the Holder.

# EXHIBIT C

SECURITY DOCUMENTS RELATING TO THE DEBENTURES

**EXHIBIT C-1**

COLLATERAL AGENT AGREEMENT

# COLLATERAL AGENT AGREEMENT

THIS COLLATERAL AGENT AGREEMENT (this "**Agreement**"), dated as of _____, 201_, is entered into by and among the holders of the Debentures (defined below) set forth on Schedule 1 attached hereto, as updated from time to time (the "**Holders**"), and Kevin A. Carreno, P.A., a Florida professional association in its capacity as collateral agent (in such capacity "**Agent**") for the Holders. In addition, any party who executes a Joinder Agreement shall become a Holder (as established by the Joinder Agreement) under this Agreement for all periods from and after the date of such Joinder Agreement to the same extent as if such party had originally executed this Agreement.

## RECITALS

A.      iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company ("**Issuer**") is offering up to $30,000,000 of secured debentures (collectively, the "**Debentures**") to Holders pursuant to that certain Senior Secured Debenture Purchase Agreement dated as of December 19, 2013 among Issuer and the Holders thereto (the "**Purchase Agreement**"). Capitalized terms shall have the meaning set forth in the Purchase Agreement, unless otherwise defined herein.

B.      Issuer has granted to Agent, for the benefit of Holders, a security interest in certain Collateral (as defined in the Purchase Agreement).

C.      In connection with entering into the Purchase Agreement and purchasing the Debentures, the parties have agreed to enter into this Agreement to set forth (i) their respective rights and obligations with respect to the Debentures and (ii) the exercise of rights with respect to the Collateral and certain other matters.

D.      Pursuant to the terms set forth herein, each Holder appoints Agent to act as collateral agent under the Purchase Agreement, and each Holder authorizes Agent to act thereunder as agent of such Holder. Agent agrees to act as such upon the express conditions contained in this Agreement. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Holders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Issuer, nor shall Agent be deemed to be a fiduciary for Holders, this Agreement being solely a contractual relationship.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto, agree as follows:

**1      DEFINITIONS AND CONSTRUCTION**

**1.1      Definitions.** As used in this Agreement, the following terms shall have the following definitions:

"**Bankruptcy Code**" means the federal bankruptcy law of the United States as from time to time in effect, currently as Title 11 of the United States Code. Section references to current sections of the Bankruptcy Code shall refer to comparable sections of any revised version thereof if section numbering is changed.

"**Claim**" means any and all present and future "claims" (used in its broadest sense, as contemplated by and defined in Section 101(5) of the Bankruptcy Code, but without regard to whether

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 25 Page 125
1366

such claim would be disallowed under the Bankruptcy Code) of any Holder or Agent now or hereafter arising or existing under or relating to the Debentures, whether joint, several, or joint and several, whether fixed or indeterminate, due or not yet due, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, or disputed or undisputed, and whether arising under contract, in tort, by law, or otherwise, any interest or fees thereon (including interest or fees that accrue after the filing of a petition by or against Issuer under the Bankruptcy Code, irrespective of whether allowable under the Bankruptcy Code), any costs of Enforcement Actions, including reasonable attorneys' fees and costs, and any prepayment or termination premiums.

"**Collateral**" means the "Collateral" as defined under the Purchase Agreement.

"**Enforcement Action**" means, with respect to any Holder and with respect to any Claim of such Holder or any item of Collateral in which such Holder has or claims a security interest, lien or right of offset, any action, whether judicial or nonjudicial, to repossess, collect, accelerate, offset, recoup, give notification to third parties with respect to, sell, dispose of, foreclose upon, give notice of sale, disposition, or foreclosure with respect to, or obtain equitable or injunctive relief with respect to, such Claim or Collateral. The filing, or the joining in the filing, by any Holder of an involuntary bankruptcy or insolvency proceeding against Issuer also is an Enforcement Action.

"**Joinder Agreement**" shall mean that certain Joinder in Collateral Agent Agreement in substantially the form attached hereto as Exhibit A pursuant to which a Holder who is not an original signatory to this Agreement agrees to become a Holder under the terms set forth in the Joinder Agreement and to otherwise be bound by the terms of this Agreement.

"**Indemnified Holder**" has the meaning given to such term in <u>Section 5.3</u>.

"**Indemnified Payment**" has the meaning given to such term in <u>Section 5.3</u>.

"**Indemnifying Holder**" has the meaning given to such term in <u>Section 5.3</u>.

"**Majority in Interest**" means the Holders of a majority of the principal amount of the outstanding Debentures.

"**Party**" or "**Parties**" means the Agent and Holders from time to time party to this Agreement.

**1.2     Other Interpretive Provisions.** References in this Agreement to "Recitals," "Sections," and "Exhibits" are to recitals, sections, and exhibits herein and hereto unless otherwise indicated. References in this Agreement to any document, instrument or agreement shall include (a) all exhibits, schedules, annexes and other attachments thereto, (b) all documents, instruments or agreements issued or executed in restatement or replacement thereof, and (c) such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time. The words "include" and "including" and words of similar import when used in this Agreement shall not be construed to be limiting or exclusive.

**1.3     Intent.** The primary intent of this Agreement is to set forth the rights, duties and obligations of the Agent, and Holders as co-Holders, under the Debentures.

**2     INTERCREDITOR ARRANGEMENTS (RELATING ONLY TO HOLDERS)**

**2.1     Proportionate Interests.** Except as otherwise provided in this Agreement, all of the rights, interests and obligations of each Holder under the Debentures, including security interests in the

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 126 Page 126
1366

Collateral, shall be shared by the Holders in the ratio of (a) the aggregate outstanding principal amount of such Holder's Debenture to (b) the aggregate outstanding principal amount of all Debentures. Any reference in this Agreement to an allocation between or sharing by the Holders of any right, interest or obligation "ratably," "proportionally" or in similar terms shall refer to this ratio.

    **2.2    Possession of Collateral.** If any Holder shall obtain possession of any Collateral, it shall hold such Collateral as agent and bailee for all Holders for purposes of perfecting Agent's and/or Holders' security interest therein.

**3        ALLOCATION OF PAYMENTS AMONG HOLDERS PRIOR TO AN EVENT OF DEFAULT**

    All amounts received by Holders for the account of Issuer under the Debentures prior to an Event of Default, whether by payment, set-off or otherwise shall be allocated ratably among the Holders. Each Holder shall promptly remit to the other Holder such sums as may be necessary to ensure the ratable repayment of each Holder's Debenture. Notwithstanding the foregoing, a Holder receiving a scheduled payment shall not be responsible for determining whether the other Holder also received its scheduled payment on such date; provided, however, if it is later determined that a Holder received more than its ratable share of scheduled payments made on any date or dates, then such Holder shall remit to the other Holder such sums as may be necessary to ensure the ratable payment of such scheduled payments, as instructed by Agent.

**4        REMEDIES UPON AN EVENT OF DEFAULT**

    **4.1    Decision to Exercise Remedies.** Upon the occurrence of an Event of Default, Agent shall take such actions and only such actions as a Majority in Interest mutually agree to take and shall direct the Agent in writing to enforce the rights and remedies under the Debentures. No Holder shall be entitled to undertake any Enforcement Action without the written consent of a Majority in Interest.

    **4.2    Application of Proceeds after an Event of Default.** Notwithstanding anything to the contrary in the Debentures, as among the Agent and the Holders, the proceeds of the Collateral, or any part thereof, and the proceeds of any remedy under the Debentures after the occurrence and during the continuance of an Event of Default shall upon receipt by the Agent be paid to and applied as follows:

    **4.2.1    First,** to the payment of then outstanding out-of-pocket costs and expenses of the Agent including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made under the Debentures or this Agreement by the Agent (including indemnification claims not otherwise satisfied pursuant to this Agreement).

    **4.2.2    Second** to the Holders (in proportion to such costs and expenses theretofore incurred by each), including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made under the Debentures or this Agreement;

    **4.2.3    Third,** to the Holders ratably, in an amount up to the sum of all accrued interest owing to the Holders on the Debentures;

**4.2.4** <u>Fourth</u>, to the Holders ratably, in an amount up to the sums of the outstanding principal and premium, if any, owing to the Holders on the Debentures;

**4.2.5** <u>Fifth</u>, to the Holders ratably (in proportion to all remaining obligations owing to each), in an amount up to the sum of all other outstanding and unpaid obligations (including indemnification claims not otherwise satisfied pursuant to the preceding clauses); and

**4.2.6** <u>Sixth</u>, to Issuer, as the case may be, or its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

**4.3** **Return of Payments.** To the extent any payment for the account of Issuer is required to be returned as a voidable transfer or otherwise, the Holders shall contribute to one another as is necessary to ensure that such return of payment is on a pro rata basis.

To the extent any proceeds of the Collateral, or any part thereof, and the proceeds of any remedy under the Debentures after the occurrence and during the continuance of an Event of Default shall be received by any Holder, such Holder shall forward the funds to the Agent and upon receipt by the Agent to be applied as set forth in <u>Section 4.2</u>.

**4.4** **Foreclosure**

**4.4.1** <u>Credit Bid By Holders</u>. Only by agreement of a Majority in Interest shall the Holders make or cause to be made a credit bid at any foreclosure sale or other sale of any of the Collateral on behalf of the Holders. If Holders are the successful bidders at the sale, then (a) the amount to be credited against their respective Claims shall be allocated pro rata among the Holders according to the balances of such Claims, and (b) Holders shall take title to the Collateral so purchased together, each holding a pro rata undivided interest in such Collateral. The parties shall mutually agree as to the most favorable disposition of any Collateral purchased with any such credit bid.

**4.4.2** <u>Cash Bid for Account of One Holder</u>**.** No Holder shall make or cause to be made a cash bid at any foreclosure sale or other sale of any of the Collateral without the prior written consent of a Majority in Interest. If a cash bid is made and is successful, then (a) the proceeds of the sale shall be allocated as set forth in <u>Section 4.2,</u> and (b) the Holder that entered the successful bid shall acquire the Collateral so purchased for its own account, and the other Holders shall have no further interest in that Collateral upon the payment to such other Holders of the shares of the proceeds in accordance with <u>Section 4.2</u>.

**5** **EXCULPATION; DELEGATION; AND INDEMNIFICATION OF HOLDERS**

**5.1** **Exculpation.** In connection with any exercise of Enforcement Actions hereunder, neither Agent nor any Holder or any of its partners, or any of their respective directors, officers, employees, attorneys, accountants, or agents shall be liable as such for any action taken or omitted by it or them, except for its or their own gross negligence or willful misconduct with respect to its duties under this Agreement.

**5.2** **Delegation of Duties.** Each Holder and Agent may execute any of its powers and perform any duties hereunder either directly or by or through agents or attorneys-in-fact. Each Holder and Agent shall be entitled to advice of counsel concerning all matters pertaining to such powers and duties. No Holder or Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it, if the selection of such agents or attorneys-in-fact was done without gross negligence or willful misconduct.

**5.3**     **Indemnification.** To the extent not reimbursed by Issuer or from the application of Collateral proceeds pursuant to Section 4.2, a Holder (the "***Indemnified Holder***") shall be indemnified by the other Holders (an "***Indemnifying Holder***"), on a several basis in proportion to each Holder's pro rata share, and each Indemnifying Holder agrees to reimburse the Indemnified Holder for the Indemnifying Holder's pro rata share of the following items (an "***Indemnified Payment***"):

**5.3.1**     all reasonable out-of-pocket costs and expenses of the Indemnified Holder incurred by the Indemnified Holder in connection with the discharge of its activities under this Agreement and the Debentures, including reasonable legal expenses and attorneys' fees; and

**5.3.2**     from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, which may be imposed on, incurred by or asserted against the Indemnified Holder in any way relating to or arising out of this Agreement, or any action taken or omitted by the Indemnified Holder hereunder; provided that the Indemnifying Holder shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements, if the same results from the Indemnified Holder's gross negligence or willful misconduct or from undertaking Enforcement Actions in violation of Section 4.1;

**5.3.3**     provided, however, that the Indemnified Holder shall not be reimbursed or indemnified for an Indemnified Payment, except to the extent that the Indemnified Holder paid more than its ratable share of such payment. All Indemnified Payments (as set forth in this Section 5.3) to an Indemnified Holder are intended to be paid ratably by the other Holder.

**6**     **REPRESENTATIONS AND WARRANTIES**

**6.1**     **Authority.** Each Party represents and warrants that it has all necessary power and authority to execute, deliver and perform this Agreement in accordance with the terms hereof and that it has all requisite power and authority to own and operate its properties and to carry on its business as now conducted.

**6.2**     **Authorization; Enforceability.** Each Party represents and warrants that (a) the execution and delivery of this Agreement and the consummation of the transactions contemplated herein have each been duly authorized by all necessary action on the part of such Party and (b) this Agreement has been duly executed and delivered and constitutes a legal, valid and binding obligation of such Party, enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws of general application relating to or affecting the enforcement of creditors' rights or by general principles of equity.

**7**     **AGENT**

**7.1**     **Appointment, Powers and Immunities**

Each Holder irrevocably authorizes Agent to take such action on such Holder's behalf and to exercise such powers hereunder as are specifically delegated to Agent by the terms hereof, together with such powers as are reasonably incidental thereto. Agent undertakes to perform only such duties as are expressly set forth herein and in the Purchase Agreement and no other duties shall be implied and it may perform such duties by or through its agents, representatives or employees. Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Agreement. The Agent is authorized to take such action and to exercise such powers granted hereunder upon the written request or direction of a Majority in Interest in accordance with the terms hereof, together with such powers as

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 29 Page 129
1366

are reasonably incidental thereto. At the written direction of a Majority in Interest, Agent shall release any items of Collateral at any time without affecting or diminishing the liability of the Issuer to the Holders for any remaining or future indebtedness. Upon written request by a Holder, Agent will promptly deliver to such Holder copies of any statements or notices provided to Agent by Issuer under the Debenture. Agent shall not be responsible to any Holder for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of the Debentures, or for any representations, warranties, recitals or statements made therein or made in any written or oral statement or in any financial or other statements, instruments, reports, certificates or any other documents furnished or delivered in connection herewith or therewith by Agent to any Holder or by or on behalf of Issuer to Agent or any Holder, or be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained herein or therein or as to the use of the proceeds of the Debentures. Agent shall not be responsible for insuring the Collateral or for the payment of any taxes, assessments, charges or any other charges or liens of any nature whatsoever upon the Collateral or otherwise for the maintenance of the Collateral, except in the event Agent enters into possession of a part or all of the Collateral, in which event Agent shall preserve the part in its possession. Unless the officers of Agent acting in their capacity as officer of Agent on Issuer's account have actual knowledge thereof or have been notified in writing thereof by Holders, Agent shall not be required to ascertain or inquire as to the existence or possible existence of any Event of Default. Neither Agent nor any of its officers, directors, employees, attorneys, representatives or agents shall be liable to Holders for any action taken or omitted hereunder or under the Debentures or in connection herewith or therewith unless caused by its or their gross negligence or willful misconduct. No provision of this Agreement or the Debentures, shall be deemed to impose any duty or obligation on Agent to perform any act or to exercise any power in any jurisdiction in which it shall be illegal, or shall be deemed to impose any duty or obligation on Agent to perform any act or exercise any right or power if such performance or exercise (a) would subject Agent to a tax in a jurisdiction where it is not then subject to a tax or (b) would require Agent to qualify to do business in any jurisdiction where it is not so qualified. No Holder shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or the Debentures in accordance with the written instructions of a Majority in Interest. Agent shall be entitled to refrain from exercising any power, discretion or authority vested in it under this Agreement or the Debentures unless and until it has obtained the written instructions of a Majority in Interest. The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon Agent in its individual capacity.

### 7.2    Reliance by Agent

**7.2.1**    Agent may, at the expense of Holders, consult with counsel, and any opinion or legal advice of such counsel shall be full and complete authorization and protection in respect of any action taken, not taken or suffered by Agent hereunder or under the Debentures in accordance therewith. Agent shall have the right at any time to seek instructions concerning the administration of the Collateral from any court of competent jurisdiction.

**7.2.2**    Agent may rely, and shall be fully protected in acting, or refraining to act, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, bond or other paper or document that it has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of cables, telecopies and telexes, to have been sent by the proper party or parties. In the absence of its gross negligence or willful misconduct, Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to Agent and conforming to the requirements of the Debentures.

**7.2.3**     Agent shall not be under any obligation to exercise any of the rights or powers granted to Agent by this Agreement or the Debentures at the request or written direction of a Majority in Interest unless Agent shall have been provided by Holders with security and indemnity satisfactory to Agent against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction.

**7.3**     **Delegation of Duties By Agent.** Agent may execute any of the powers hereof and perform any duty hereunder either directly or by or through agents or attorneys-in-fact. Agent shall be entitled to advice of counsel concerning all matters pertaining to such powers and duties. Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it, if the selection of such agents or attorneys-in-fact was done without gross negligence or willful misconduct.

**7.4**     **Right to Indemnity and Reimbursement.** Each Holder jointly and severally agrees (a) to indemnify and hold Agent (and any Person acting on behalf of Agent) harmless from and against and (b) promptly upon receipt by each Holder of Agent's statement, to reimburse Agent, according to such Holder's ratable share, to the extent Agent shall not otherwise have been reimbursed by Issuer on account of and for, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind of nature whatsoever with respect to Agent's performance of its duties under this Agreement and the Debentures; provided, however, that each Holder shall be jointly and severally liable to Agent to the extent any other Holder has failed to pay its pro rata share of amounts owed to Agent and provided further, however, that no Holder shall be liable for the payment to Agent of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from Agent's gross negligence or willful misconduct. Such reimbursement shall not in any respect release Issuer from any liability or obligation. If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished. Agent's right to indemnification shall survive termination of this Agreement and the resignation or removal of Agent.

**7.5**     **Resignation and Appointment of Successor Agent.** Agent may resign at any time by giving sixty (60) days' prior written notice thereof to Holders and Issuer. Upon any such notice, a Majority in Interest may appoint a successor Agent. In addition, the person or entity serving as Agent may be removed or replaced from time to time by a Majority in Interest, with such removal or replacement being effective immediately upon written notice to the Agent and Issuer, with a copy to each Holder. If Agent shall be unable or unwilling to serve in such capacity, his or her successor shall be named by a Majority in Interest. Upon the acceptance of any appointment as an Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Agent's resignation hereunder as Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

**7.6**     **Financing Statements Not Reviewed by Agent.** Holders acknowledge that (1) Agent has not reviewed and has no responsibility or obligation to review any financing statements related to the Collateral and (2) filing financial statements and maintaining a perfected security interest in the Collateral are solely the responsibilities of the Issuer.

**7.7**     **Debentures Not Reviewed.** Holders acknowledge that Agent has not reviewed and has no responsibility or obligation to review the Debentures.

**8      NOTICES**

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except informal documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by certified mail, postage prepaid, return receipt requested, or by facsimile to the Holders, at the respective addresses or fax numbers set forth below:

|  |  |
|---|---|
| If to Agent: | Kevin A. Carreno, P.A.<br>3001 Executive Center Drive, Suite 217<br>Clearwater, FL 33762<br>Attention: Kevin A. Carreno |
| If to Issuer: | iCap Pacific Northwest Opportunity and Income Fund, LLC<br>10900 NE 8th Street, Suite 1000<br>Bellevue, WA 98004<br>Attention:  Chris Christensen |
| If to a Holder: | At the address for such Holder shown on Schedule 1 |

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

In addition, each Holder agrees (a) to notify the Agent and other Holders promptly upon receipt of any notice from Issuer and (b) at the Agent's or any other Holder's request, to send a copy of any such notice to the Agent and other Holders.

**9      NO BENEFIT TO THIRD PARTIES**

The terms and provisions of this Agreement shall be for the sole benefit of the Holders and Agent and their respective successors and assigns, and no other person or entity (including Issuer) shall have any right, benefit, priority, or interest under or because of this Agreement.

**10      GENERAL PROVISIONS**

**10.1      Successors and Assigns.** This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the Parties.

**10.2      Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**10.3      Entire Agreement; Construction; Amendments and Waivers.**

**10.3.1** This Agreement constitutes and contains the entire agreement between the Parties and supersedes any and all prior agreements, negotiations, correspondence, understandings and communications between the Parties, whether written or oral, respecting the subject matter hereof.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 12 Page 132 of 1366

**10.3.2**  This Agreement is the result of negotiations between and has been reviewed by each of the Parties executing this Agreement as of the date hereof and their respective counsel; accordingly, this Agreement shall be deemed to be the product of the Parties hereto, and no ambiguity shall be construed in favor of or against any Party. Parties agree that they intend the literal words of this Agreement and that no parol evidence shall be necessary or appropriate to establish any Party's actual intentions.

**10.3.3**  Any and all amendments, modifications, discharges or waivers of, or consents to any departures from any provision of this Agreement shall not be effective without the written consent of a Majority in Interest. Any waiver or consent with respect to any provision of this Agreement shall be effective only in the specific instance and for the specific purpose for which it was given. Any amendment, modification, waiver or consent effected in accordance with this Section 10.3 shall be binding upon Agent and each Holder.

**10.3.5.**  The Parties agree that the addition of any Holder to Schedule 1 to this Agreement and the execution by any such additional Holder of a signature page to this Agreement shall not be considered an amendment hereto under this Section 10.3.

**10.4**     **Counterparts.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

**10.5**     **Termination.** This Agreement shall terminate upon the irrevocable payment in full to Agent and each Holder of all amounts owing to them under the Debentures and this Agreement. When all the Secured Obligations (as defined in the Debenture, other than inchoate indemnity obligations) have been paid in full or the Debentures have been converted pursuant to the Debenture, Issuer shall provide Agent with an officer's certificate confirming such payment in full or conversion; and thereafter, no party hereto shall have any further rights or obligations hereunder.   Notwithstanding the prior termination of this Agreement, the respective obligations of Holders to indemnify Agent and each other shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Agent or Holder have run.

**10.6**     **Reinstatement.** Notwithstanding any provision of this Agreement to the contrary, the rights and obligations of the parties hereunder with respect to Issuer shall be reinstated and revived if and to the extent that for any reason any payment by or on behalf of Issuer is rescinded, or must be otherwise restored by any Party, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid. To the extent any payment is rescinded or restored, the obligations of the Issuer under the Debentures shall be revived in full force and effect without reduction or discharge for that payment.

**10.7**     **Survival.** All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any obligations remain outstanding hereunder.

**11**     **RELATIONSHIP OF HOLDERS**

The relationship among the Holders is, and at all times shall remain solely that of co-Holders. Holders shall not under any circumstances be construed to be partners or joint venturers of one another; nor shall the Holders under any circumstances be deemed to be in a relationship of confidence or trust or a fiduciary relationship with one another, or to owe any fiduciary duty to one another. Holders do not undertake or assume any responsibility or duty to one another to select, review, inspect, supervise, pass judgment upon or otherwise inform each other of any matter in connection with Issuer's property, any Collateral held by any Holder or the operations of Issuer. Each Holder shall rely entirely on its own

judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information undertaken or assumed by any Holder in connection with such matters is solely for the protection of such Holder.

## 12     CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF WASHINGTON, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW, EACH OF THE HOLDERS HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF WASHINGTON.

**TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY WAIVES THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

[*Signature Pages Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**Agent:**

KEVIN A. CARRENO, P.A.

By_____

Name: _____

Title: _____

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 15 Page 135 of 1366

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**Holder:**

_____

By_____
Name: _____
Title: _____

## EXHIBIT A

## FORM OF JOINDER IN COLLATERAL AGENT AGREEMENT


This Joinder in Collateral Agent Agreement (the "***Joinder Agreement***") dated as of _____, 20__, is by and between the undersigned ("***Holder***") and Kevin A. Carreno, P.A., as Agent hereunder ("***Agent***"). Terms not defined herein have the meanings given to them in the Collateral Agent Agreement (defined below).

### BACKGROUND

In order to effect the provisions of an underlying Debenture and Collateral Agent Agreement, the parties hereto have entered into this Joinder Agreement.


**NOW, THEREFORE**, in consideration of the premises and agreements contained herein and for other good and valuable consideration, the parties hereby agree as follows:

### AGREEMENTS


1.      Joinder. By execution hereof, the Holder hereby joins in and becomes a Holder under that certain Collateral Agent Agreement dated as of December ____, 2013 between Agent and the Holders therein (the "***Collateral Agent Agreement***"). The Holder has received and read a copy of the Collateral Agent Agreement and understands its provisions. Holder hereby adopts and agrees to be bound by all of the provisions of the Collateral Agent Agreement and all of the provisions of the Collateral Agent Agreement are hereby incorporated herein.


2.      General Provisions.


(a)      Effect of Agreement. This Joinder Agreement shall be binding upon the parties hereto and their respective, successors and assigns.


(b)      Severability. Every provision hereof is intended to be severable, and if any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Joinder Agreement, provided, however, that all provisions hereof shall be enforced to the fullest extent permitted by law.


*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the parties hereto have caused this Joinder Agreement to be executed as of the date first above written.

**Holder:**

_____

By_____

Name: _____

Title: _____

**Agent:**

KEVIN A. CARRENO, P.A.

By_____

Name: _____

Title: _____

[Signature Page to Joinder in Collateral Agent Agreement]

SCHEDULE I
to Collateral Agent Agreement

| Holder's Name and Address | Holder's Email Address | Original Principal Amount of Debenture |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 19 Page 139 of 1366

**EXHIBIT C-2**

**SECURITY AGREEMENT**

This SECURITY AGREEMENT (this "***Agreement***"), dated as of _____, 201_, is made and entered into by and between ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC ("***Borrower***"), and Kevin A. Carreno, P.A., as collateral agent for the Holders (as defined below) ("***Collateral Agent***").

R E C I T A L S :

WHEREAS, in connection with the making of the loan (the "***Loan***") under that certain Senior Secured Debenture Purchase Agreement dated as of December 19, 2013 between Borrower and the holders thereto (the "***Holders***") (together with all amendments and modifications thereto, the "***Purchase Agreement***") which is evidenced by those certain Debentures made by Borrower and payable to each Holder (together with all amendments and modifications thereto and collectively, the "***Debentures***"), and as security for the payment and performance of Borrower's obligations under Purchase Agreement and the Debentures, Holders are requiring that Borrower execute and deliver this Agreement and grant the security interest in all of Borrower's assets, including, but not limited to, those assets listed on Exhibit A.

WHEREAS, pursuant to that certain Collateral Agent Agreement dated as of December ___, 2013 between the Holders and Collateral Agent, Collateral Agent will maintain certain security interests granted by Borrower to the Holders, including the security interests granted herein.

NOW, THEREFORE, in consideration of the promises and the covenants hereinafter contained, and to induce Holders to make the Loan under the Purchase Agreement and the Debentures, it is agreed as follows:

1. **Incorporation of Recitals**. The foregoing Recitals are true and correct and hereby incorporated into this Agreement in their entirety by this reference.

2. **Definitions**. The following terms shall have the meanings set forth below:

"***Collateral***" means all of the Borrower's property and assets, including but not limited to those assets listed on Exhibit A, including all proceeds thereof and all increases, substitutions, replacements, additions, and accretions thereof.

"***Credit Documents***" means this Agreement, the Purchase Agreement, and the Debentures.

"***Event of Default***" has the meaning given in Section 6 below.

"***Obligations***" has the meaning given in Section 3.1 below.

"***Permitted Liens***" mean any of the following: (i) liens for current taxes or other governmental or regulatory assessments which are not delinquent, or which are being contested in good faith by the appropriate procedures and for which appropriate reserves are maintained; and (ii) liens granted in favor of the Collateral Agent pursuant to this Agreement.

"***Security Interest***" has the meaning given in Section 3.2 below.

"*UCC*" means the Uniform Commercial Code as adopted in the State of Washington and in effect from time to time.

### 3. Security for Obligations.

3.1    Obligations. This Agreement secures, and the Collateral is collateral security for, the prompt payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, conversion, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 363(a) of the Bankruptcy Code, 11 U.S.C. §362(a)) of all obligations and liabilities of every nature of Borrower now or hereafter existing under or arising out of the Debentures, the Purchase Agreement, and this Agreement and all extensions or renewals thereof, whether for principal, interest, (including, without limitation, interest that, but for the filing of a petition in bankruptcy with respect to Borrower, would accrue on such obligations), fees, or expenses thereunder (all such obligations of Borrower being the "*Obligations*").

3.2    Grant. As security for the payment of the Obligations, the Borrower hereby grants to the Collateral Agent, for the benefit of the Holders, a security interest in the Collateral (the "*Security Interest*"). Without limiting the foregoing, the Collateral Agent is hereby authorized to file one or more financing statements, continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest, naming the Borrower as debtors and the Collateral Agent, for the benefit of the Holders, as secured party.

3.3    Records. The Borrower agrees at all times to keep in all material respects accurate and complete accounting records with respect to the Collateral, including, but not limited to, a record of all payments and proceeds received.

3.4    Additional Collateral. If Borrower shall at any time after the date hereof (a) obtain any rights to any additional Collateral or (b) become entitled to the benefit of any additional Collateral, the provisions hereof shall automatically apply thereto and any such item shall automatically constitute Collateral as if such would have constituted Collateral at the time of execution hereof and be subject to the security interest created by this Agreement without further action by any party. Borrower shall promptly, with the delivery of its annual financial statements, (i) provide to the Collateral Agent written notice of any of the foregoing and (ii) upon the Collateral Agent's reasonable request, confirm the attachment of the security interest created by this Agreement to any rights described in clauses (a) and (b) of the immediately preceding sentence by execution of an instrument in form reasonably acceptable to the Collateral Agent and the filing of any instruments or statements as shall be reasonably necessary to create, preserve, protect or perfect the Collateral Agent's security interest in such Collateral.

### 4. Representations and Warranties. Borrower represents and warrants to the Holders as follows:

4.1    Legal Name. Borrower's exact legal name is as set forth in the first paragraph of this Agreement. Borrower shall not change its legal name or its form of organization without thirty (30) days' prior written notice to the Collateral Agent.

4.2    Authority. Borrower has the requisite corporate power and authority to grant to the Collateral Agent, for the benefit of the Holders, the Security Interest in such Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other person other than any consent or approval which has been obtained.

4.3     Filing. Fully executed Uniform Commercial Code financing statements containing a description of the Collateral shall have been, or shall be delivered to the Collateral Agent in a form such that they can be, filed of record in every governmental, municipal or other office in every jurisdiction in which any portion of the Collateral is located necessary to publish notice of and protect the validity of and to establish a valid, legal and perfected security interest in favor of the Collateral Agent, for the benefit of the Holders, in respect of the Collateral in which a security interest may be perfected by filing in the United States and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary in any such jurisdiction, except as provided under applicable law with respect to the filing of Uniform Commercial Code continuation statements.

4.4     Validity of Security Interest. The Security Interest constitutes a valid, legal and perfected security interest in all of the Collateral for payment and performance of the Obligations subject only to Permitted Liens.

**5.     Covenants and Agreements**. Borrower covenants and agrees as follows:

5.1     Restrictions. Borrower agrees that until the Debentures shall have been satisfied in full (whether by conversion, payment, or otherwise), Borrower shall not, without Collateral Agent's prior written consent, assign, transfer, encumber or otherwise dispose of the Collateral, or any interest therein, except that Borrower may grant a Permitted Lien.

5.2     Defense. Borrower shall at its own expense take any and all actions reasonably necessary to protect and defend the Collateral against all claims or demands and to defend the Security Interest of the Collateral Agent in such Collateral, and the priority thereof, against any adverse lien of any nature whatsoever (other than Permitted Liens).

5.3     Maintenance. Borrower shall at all times and at its own expense maintain and keep, or cause to be maintained and kept, the Collateral. Borrower shall perform all acts and execute all documents reasonably requested by the Collateral Agent at any time to evidence, perfect, maintain, record and enforce the Collateral Agent's interest in the Collateral in furtherance of the provisions of this Agreement, and Borrower hereby authorizes the Collateral Agent to execute and file one or more financing statements (and similar documents) or copies thereof or of this Agreement with respect to the Collateral signed only by the Collateral Agent.

5.4     Collateral Agent's Right to Take Action. If, after ten business days written notice from Collateral Agent, Borrower fails to materially perform or materially observe any of its covenants or agreements set forth in this Section 5 or if Borrower notifies Collateral Agent that it intends to abandon all or any part of the Collateral, Collateral Agent may (but need not) perform or observe such covenant or agreement or take steps to prevent such intended abandonment on behalf and in the name, place, and stead of Borrower (or, in the case of intended abandonment, in Collateral Agent's own name) and may (but need not) take any and all other actions that Collateral Agent may reasonably deem necessary to cure or correct such failure or prevent such intended abandonment.

5.5     Costs and Expenses. Except to the extent that the effect of such payment would be to render any loan or forbearance of money usurious or otherwise illegal under any applicable law, Borrower shall pay the Collateral Agent on demand the amount of all moneys expended and all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by the Collateral Agent in connection with or as a result of the Collateral Agent's taking any action or exercising any of its rights under this Agreement as a result of an Event of Default, together with interest thereon from the date expended or incurred by the Collateral Agent.

5.6     Use and Disposition of Collateral. Borrower shall not make or permit to be made any assignment, pledge or hypothecation of the Collateral other than Permitted Liens or as permitted by Section 5.1 above, or grant any security interest in the Collateral except for the Security Interest and Permitted Liens. Borrower shall not make or permit to be made any transfer of any Collateral, except as permitted by Section 5.1 above, and Borrower shall remain at all times in possession of the Collateral owned by it other than transfers to the Collateral Agent pursuant to the provisions hereof and as otherwise provided in this Agreement. The Collateral Agent shall have the right, as the true and lawful agent of the Borrower, with power of substitution for the Borrower and in the Borrower's name, the Collateral Agent's name or otherwise, for the use and benefit of the Collateral Agent (for the benefit of the Holders) and solely to effect the purposes of this Agreement, (i) upon the occurrence and during the continuance of an Event of Default, to endorse the Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment with respect to the Collateral that may come into its possession; (ii) upon the occurrence and during the continuance of an Event of Default, to sign the name of the Borrower on any invoice relating to the Collateral and (iii) upon the occurrence and during the continuance of an Event of Default, (A) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences or instruments of payment relating to the Collateral or any part thereof, and Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed, (B) to demand, collect, receive payment of, give receipt for, extend the time of payment of and give discharges and releases of all or any of the Collateral and/or release the obligor thereon, (C) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral, (D) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to or pertaining to all or any of the Collateral, (E) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and (F) to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; provided, however, that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to any such action, make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, and no action taken by the Collateral Agent or omitted to be taken with respect to the Collateral or any part thereof shall give rise to any defense, counterclaim or offset in favor of Borrower or to any claim or action against the Collateral Agent in the absence of the gross negligence or willful misconduct of the Collateral Agent; and provided further that, the Collateral Agent shall at all times act reasonably and in good faith. It is understood and agreed that the appointment of the Collateral Agent as the agent of the Borrower for the purposes set forth above in this Section 5.6 is coupled with an interest and is irrevocable. The provisions of this Section 5.6 shall in no event relieve Borrower of any of its obligations hereunder with respect to the Collateral or any part thereof (other than obligations which are impaired as a result of actions taken by the Collateral Agent pursuant to this Section 5.6 or impose any obligation on the Collateral Agent to proceed in any particular manner with respect to the Collateral or any part thereof, or in any way limit the exercise by the Collateral Agent of any other or further right which it may have on the date of this Agreement or hereafter, whether hereunder or by law or otherwise. Any time action is taken under this Section 5.6, prompt written notice of such action shall be provided to Borrower by Collateral Agent.

5.7     Further Assurances. Borrower agrees, at its expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Collateral Agent may from time to time reasonably request for the assuring and preserving of the Security Interest and the rights and remedies created hereby, including, without limitation, the payment of any fees and taxes required in connection with the execution and delivery of this Agreement, the granting of the Interest and the filing of any financing statements or other documents in connection herewith.

6. **Events of Default**. Each of the following occurrences shall constitute an event of default under this Agreement (herein called "***Event of Default***"):

6.1 The occurrence of any Event of Default as defined by the Purchase Agreement; or

6.2 there is any levy, seizure, or attachment of all or any material portion of the Collateral, other than as set forth in this Agreement; or

6.3 any of the representations or warranties contained in <u>Section 4</u> shall prove to have been incorrect in any material respect when made.

7. **Remedies**. Upon the occurrence of an Event of Default and at any time thereafter while the Event of Default is continuing, unless the Collateral Agent otherwise agrees in writing, the Collateral Agent may, at its option, take any or all of the following actions:

7.1 The Collateral Agent may exercise, without any other notice to or demand upon Borrower, in addition to the other rights and remedies provided for herein or in any other Credit Document or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may:

(a) require Borrower to, and Borrower hereby agrees that it will at its expense and upon request of the Collateral Agent promptly, assemble the Collateral or any part thereof, as directed by the Collateral Agent and make it available to the Collateral Agent at a place and time to be designated by the Collateral Agent;

(b) without notice except as specified below, sell, resell, assign and deliver or grant a license to use or otherwise dispose of the Collateral or any part thereof, in one or more parcels at public or private sale, at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Collateral Agent may deem commercially reasonable;

(c) occupy any premises owned or leased by Borrower where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under law, without obligation to Borrower in respect of such occupation; and

(d) exercise any and all rights and remedies of Borrower under or in connection with the Collateral, or otherwise in respect of the Collateral, including without limitation, any and all rights of Borrower to demand or otherwise require payment of any amount under, or performance of any provision of any agreements related to the Collateral.

7.2 Borrower agrees that, to the extent notice of sale shall be required by law, at least ten (10) business days' notice to Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. At any sale of the Collateral, if permitted by applicable law, the Collateral Agent may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, Borrower waives all claims, damages and demands it may acquire against the Collateral Agent arising out of the exercise by it of any rights hereunder. Borrower hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 14 Page 144
1366

rights, if any, of marshaling the Collateral and any other security for the Obligations or otherwise. The Collateral Agent shall not be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action with regard thereto. The Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice, be made at the time and place to which it was so adjourned. The Collateral Agent shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

7.3     All payments received by Borrower in respect of the Collateral shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other funds of Borrower and shall be forthwith paid over the Collateral Agent in the same form as so received (with any necessary endorsement).

7.4     The Collateral Agent may, without notice to Borrower except as required by law and at any time or from time to time, charge, set off and otherwise apply all or part of the Obligations against any funds deposited with it or held by it.

**8.     No Waiver and Cumulative Remedies**. The Collateral Agent shall not by any act (except by a written instrument pursuant to Section 11), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default. No failure on the part of the Collateral Agent to exercise, no course of dealing with respect to, and no delay on the part of the Collateral Agent in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall the Collateral Agent be required to look first to, enforce or exhaust any other security, collateral or guaranties. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

**9.     Application of Proceeds**. Upon the exercise by the Collateral Agent of its remedies hereunder, any proceeds received by the Collateral Agent in respect of any realization upon any Collateral shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Agreement, in accordance with the Credit Documents. Borrower shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the Obligations and the fees and other charges of any attorneys employed by the Collateral Agent to collect such deficiency.

**10.     Security Interest Absolute**. All rights of the Collateral Agent hereunder, the Security Interest, and all obligations of the Borrower hereunder, shall be absolute and unconditional irrespective of (i) any partial invalidity or unenforceability of the Debentures, any other agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or consent to any departure from the Debentures or any other agreement or instrument, (iii) any exchange, release or nonperfection of any other Collateral, or any release or amendment or waiver of or consent to or departure from any guarantee, for all or any of the Obligations, or (iv) any other circumstance which might otherwise constitute a defense available to, or discharge of the Borrower in respect of the Obligations or in respect of this Agreement.

**11.     Miscellaneous**. This Agreement can be waived, modified, amended, terminated or discharged, and the Security Interest can be released, only explicitly in a writing signed by the party against whom such waiver, modification, amendment, termination, discharge or release is sought to be enforced. No failure on the part of the Collateral Agent to exercise, no course of dealing with respect to,

C-2-6

and no delay on the part of the Collateral Agent in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall the Collateral Agent be required to look first to, enforce or exhaust any other security, collateral or guaranties. All rights and remedies of the Collateral Agent shall be cumulative and may be exercised singularly or concurrently and the exercise or enforcement of any one such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other. The Collateral Agent shall not be obligated to preserve any rights Borrower may have against prior parties, to realize on the Collateral at all or in any particular manner or order, or to apply any cash proceeds of the Collateral in any particular order of application. This Agreement shall be binding upon and inure to the benefit of Borrower and the Collateral Agent (on behalf of the Holders) and their respective participants, successors, and permitted assigns and shall take effect when signed by Borrower and the Collateral Agent, and Borrower waives notice of Collateral Agent's acceptance hereof. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Washington, without regard to the principles of conflicts of law thereof. Each party agrees that any action, proceeding, counterclaim, crossclaim, or other dispute relating to, involving, or resulting from this Agreement or the transactions contemplated by this Agreement will be resolved exclusively in the state or federal courts located in King County, Washington, and each party hereby waives the right to object to any such forum on any grounds. If any provision or application of this Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications which can be given effect and this Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby. All representations and warranties contained in this Agreement shall survive the execution, delivery and performance of this Agreement and the creation and payment of the Obligations. The Borrower acknowledges and agrees that in the event of any breach of the covenants and agreements contained in this Agreement, the Collateral Agent would be irreparably harmed and could not be made whole only by the award of monetary damages. Accordingly, the Borrower agrees that the Collateral Agent, in addition to any other remedy to which the Collateral Agent may be entitled at law or equity, will be entitled to seek and obtain an award of specific performance of any of such covenants and agreements.

12. **No Release**. Nothing set forth in this Agreement, nor the exercise by the Collateral Agent of any of the rights or remedies hereunder, shall relieve Borrower from the performance of any term, covenant, condition or agreement on such Borrower's part to be performed or observed in respect of any of the Collateral or from any liability to any person in respect of any of the Collateral or shall impose any obligation on the Collateral Agent to perform or observe any such term, covenant, condition or agreement on such Borrower's part to be so performed or observed or shall impose any liability on the Collateral Agent for any act or omission on the part of the Borrower relating thereto or for any breach of any representation or warranty on the part of the Borrower contained in this Agreement, the Purchase Agreement or the other Credit Documents, or in respect of the Collateral or made in connection herewith or therewith. Anything herein to the contrary notwithstanding, the Collateral Agent shall not have any obligation or liability under any contracts, agreements and other documents included in the Collateral by reason of this Agreement, nor shall the Collateral Agent be obligated to perform any of the obligations or duties of Borrower thereunder or to take any action to collect or enforce any such contract, agreement or other document included in the Collateral. The obligations of the Borrower contained in this Section 12 shall survive the termination hereof and the discharge of Borrower's other obligations under this Agreement, the Purchase Agreement and the other Credit Documents.

13. **Notices**. Any notices or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by electronic mail or facsimile (provided

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 16 Page 146
1366

confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one business day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

> If to the Borrower:
>
> iCap Pacific Northwest Opportunity and Income Fund, LLC
> 10900 NE 8th Street, Suite 1000
> Bellevue, WA 98004
> Facsimile: 425.214.4776
> Attention: Chris Christensen
> Email: chris@icapequity.com
>
> With a copy to (which shall not constitute notice):
>
> Perkins Coie LLP
> 1201 Third Avenue, Suite 4900
> Seattle, WA 98101
> Facsimile: 206.359.9000
> Attention: Martha Sandoval
>
> If to the Collateral Agent to:
>
> Kevin A. Carreno, P.A., as Collateral Agent for the Holders
> 3001 Executive Center Drive, Suite 217
> Clearwater, FL 33762

or to such other address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

**14. <u>Waiver of Jury Trial</u>: BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT BORROWER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE COLLATERAL AGENT ENTERING INTO THIS AGREEMENT.**

**15. <u>Termination</u>**. This Agreement and the Security Interest shall terminate when the Debentures are satisfied or paid in full (whether by conversion, payment, or otherwise). Upon such termination, the Collateral Agent shall execute and deliver to the Borrower all Uniform Commercial Code termination statements and similar documents which the Borrower shall reasonably request to evidence such termination.

IN WITNESS WHEREOF, this Security Agreement has been duly executed as an instrument under seal as of the date first written above.

**BORROWER**

ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC

By‎                                                        
Name:‎                                                    
Title: ‎                                                  


**COLLATERAL AGENT:**

KEVIN A. CARRENO, P.A.

By‎                                                        
Name:‎                                                    
Title: ‎                                                  

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 18 Page 148    Page 148
1366

**EXHIBIT A**
**to Security Agreement**
**Collateral**

The term "Collateral" shall mean the all of the assets of the Borrower, including but not limited to the following:

(a)     All Accounts, all Inventory, all Equipment, all General Intangibles, all Investment Property.

(b)     All instruments, chattel paper, electronic chattel paper, documents, securities, moneys, cash, letters of credit, letter of credit rights, promissory notes, warrants, dividends, distributions, contracts, agreements, contract rights or other property, owned by Borrower or in which Borrower has an interest, including but not limited to, those which now or hereafter are in the possession or control of Collateral Agent or in transit by mail or carrier to or in the possession of any third party acting on behalf of Collateral Agent, without regard to whether Collateral Agent received the same in pledge, for safekeeping, as agent for collection or transmission or otherwise or whether Collateral Agent had conditionally released the same, and the proceeds thereof, all rights to payment from, and all claims against Collateral Agent, and any deposit accounts of Borrower with Collateral Agent, including all demand, time, savings, passbook or other accounts and all deposits therein.

(c)     All documents, including without limitation any paper that is treated in the regular course of business as adequate evidence that the person in possession of the paper is entitled to receive, hold, and dispose of the goods the paper covers, including warehouse receipts, bills of lading, certificates of title, and applications for certificates of title.

(d)     All assets and all personal property now owned or hereafter acquired; all now owned and hereafter acquired inventory, equipment, fixtures, goods, accounts, chattel paper, documents, instruments, farm products, general intangibles, supporting obligations, software, commercial tort claims, minerals, standing timber, growing crops and all rents, issues, profits, products and proceeds thereof, wherever any of the foregoing is located.

(e)     To the extent not listed above as original collateral, proceeds and products of the foregoing.

The below capitalized terms shall have the following meanings:

(a)     "Accounts" means all accounts, accounts receivable, health-care insurance receivables, credit card receivables, contract rights, instruments, documents, chattel paper, tax refunds from federal, state or local governments and all obligations in any form including without limitation those arising out of the sale or lease of goods or the rendition of services by Borrower; all guaranties, letters of credit and other security and support obligations for any of the above; all merchandise returned to or reclaimed by Borrower; and all books and records (including computer programs, tapes and data processing software) evidencing an interest in or relating to the above; all winnings in a lottery or other game of chance operated by a governmental unit or person licensed to operate such game by a governmental unit and all rights to payment therefrom; and all "Accounts" as same is now or hereinafter defined in the UCC.

(b)     "Equipment" means all goods (excluding inventory, farm products or consumer goods), all machinery, machine tools,' equipment, fixtures, office equipment, furniture, furnishings,

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 19 Page 149
1366

motors, motor vehicles, tools, dies, parts, jigs, goods (including, without limitation, each of the items of equipment set forth on any schedule which is either now or in the future attached to Collateral Agent's copy of this Agreement), and all attachments, accessories, accessions, replacements, substitutions, additions and improvements thereto, all supplies used or useful in connection therewith, and all "Equipment" as same is now or hereinafter defined in the UCC.

(c)    "General Intangibles" means all general intangibles, choses in action, causes of action, obligations or indebtedness owed to Borrower from any source whatsoever, payment intangibles, software and all other intangible personal property of every kind and nature (other than Accounts), including without limitation patents, trademarks, trade names, service marks, copyrights and applications for any of the above, and goodwill, trade secrets, licenses, franchises, rights under agreements, tax refund claims, and all books and records including all computer programs, disks, tapes, printouts, customer lists, credit files and other business and financial records, the equipment containing any such information, and all "General Intangibles" as same is now or hereinafter defined in the UCC.

(d)    "Inventory" means goods, supplies, wares, merchandises and other tangible personal property, including raw materials, work in process, supplies and components, and finished goods, whether held for sale or lease, or furnished or to be furnished under any contract for service, or used or consumed in business, and also including products of and accessions to inventory, packing and shipping materials, all documents of title, whether negotiable or non-negotiable, representing any of the foregoing, and all "Inventory" as same is now or hereinafter defined in the UCC.

(e)    "Investment Property" means a security, whether certificated or uncertificated, security entitlement, securities account, commodity contract or commodity account and all "Investment Property" as same is now or hereafter defined in the UCC.

**EXHIBIT C-3**

PLEDGE AND SECURITY AGREEMENT

# PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT (this "**Assignment**") is made and entered into as of _____, 201\_, among ICAP PACIFIC NW MANAGEMENT, LLC, a Washington limited liability company ("**Pledgor**") and KEVIN A CARRENO, P.A., a Florida association in its capacity as collateral agent ("**Secured Party**", and together with the Pledgor, the "**Parties**").

## R E C I T A L S

A.  iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "**Company**"), will issue up to $30,000,000 of secured debentures (collectively, the "**Debentures**") to certain individuals and entities (the "**Holders**") pursuant to that certain Senior Secured Debenture Purchase Agreement dated as of December 19, 2013, by and among Company and the Holders thereto (the "**Purchase Agreement**"). Terms defined in the Purchase Agreement shall have same meanings when used herein.

B.  The Pledgor owns 1,000,000 uncertificated Class A membership interests in the Company, which such membership interests represent all of the issued and outstanding Class A membership interests of the Company.

C.  Collateral Agent and Holders are party to that certain Collateral Agent Agreement dated as of December \_\_, 2013, whereby Collateral Agent has agreed to act as collateral agent for and on behalf of the Holders.

D.  To induce the Holders to purchase the Debentures and in consideration of the Holders' purchase of the Debentures, the Pledgor desires to grant to the Secured Party, for the benefit of the Holders, a security interest in the Collateral (as defined below) as additional security for the obligations arising under the Debentures and the payment and performance of the Company's obligations under the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Company and Secured Party agree as follows:

1.  <u>Definitions</u>.

1.1  To the extent that any terms or concepts defined or used herein are defined or used in the UCC, such terms or concepts shall be interpreted for purposes hereof in a trimmer that is consistent with such definition or use in the UCC.

1.2  Any capitalized terms used herein but not defined herein shall have the meanings assigned to them in the Purchase Agreement.

1.3  Unless otherwise indicated, the following terms shall have the meanings set forth below:

"**Collateral**" means all of Pledgor's right, title and interest in and to (a) the Formation Agreement and the Equity Interests, including, without limitation, Pledgor's share of the profits, losses and capital of Company, and all Voting Rights, claims, powers, privileges, benefits, options or rights of any nature whatsoever which currently exist or may be issued or granted by Company to Pledgor, and all instruments, whether heretofore or hereafter acquired, evidencing such rights and interests and (b) all Distributions.

"***Distributions***" has the meaning set forth in <u>Section 9.2</u>.

"***Equity Interests***" means all of the membership interests or other equity interests of, and all other right, title and interest now owned or hereafter acquired by, Pledgor in and to Company.

"***Formation Agreement***" means that certain Operating Agreement of Company dated as of December 19, 2013.

"***Lien***" shall mean a pledge, assignment, lien, charge, mortgage, encumbrance or other security interest.

"***Obligations***" shall mean the obligations and liabilities of every nature of the Company now or hereafter existing under or arising out of the Debentures and the Purchase Agreement, and all extensions or renewals thereof, whether for principal, interest, (including, without limitation, interest that, but for the filing of a petition in bankruptcy with respect to the Company, would accrue on such obligations), fees, or expenses thereunder.

"***UCC***" shall mean the Uniform Commercial Code as in effect in the State of Washington from time to time.

"***Voting Rights***" has the meaning set forth in <u>Section 9.1</u>.

2.      <u>Grant of Security Interest</u>.

2.1     As security for the due and punctual payment in full by Company of the Obligations, the Pledgor hereby pledges, assigns, charges, delivers and grants to the Secured Party a continuing first-priority perfected (upon completion of the transactions contemplated under <u>Section 3</u> of this Agreement) security interest in and a general first Lien upon all of the Collateral.

2.2     This Agreement shall (a) remain in full force and effect until the Obligations have been paid in full, (b) be binding upon the Pledgor and its successors, permitted transferees and permitted assigns and (c) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its permitted successors, transferees and assigns.

2.3     Upon the payment in full of the Obligations, the Lien granted hereunder shall terminate and, upon delivery and transfer of the Collateral to Pledgor, all rights to the Collateral shall revert to the respective Pledgor. Upon such termination, the Secured Party shall, at the expense of the Pledgor, execute and deliver to Pledgor such documents as the Pledgor shall reasonably request to evidence such termination.

3.      <u>Perfection</u>. Pledgor hereby authorizes the Secured Party to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral, without the signature of Pledgor where permitted by applicable law, and agrees to take all such other actions and to execute and deliver and file or cause to be filed such other instruments or documents, as the Secured Party may reasonably require in order to establish and maintain a perfected, valid and continuing first-priority security interest in and Lien upon the Collateral in accordance with this Agreement and the UCC and other applicable law. If hereafter any certificates for the Collateral, or certificates for any securities comprising part of the Collateral, are issued, such certificates shall be delivered to the Secured Party, accompanied by instruments of assignment duly executed by the Pledgor and by such other instruments or documents as the Secured Party or its counsel may reasonably request sufficient to transfer the title thereto to the Secured Party or its nominee.

C-3-3

4. <u>Further Assurances and Protections</u>.

4.1    The Pledgor shall, at its individual expense, file, record, make, execute and deliver all such acts, notices, instruments, statements or other documents as the Secured Party may reasonably request to register in the name of the Secured Party, perfect, preserve or otherwise protect the security interest and Liens of the Secured Party in the Collateral or any part thereof or to give effect to the rights, powers and remedies of the Secured Party under this Agreement.

4.2    Pledgor shall give prompt written notice to Secured Party of, and defend the Collateral against, any suit, action or proceeding related to the Collateral or which could materially adversely affect the security interests and Liens granted hereunder.

4.3    Until all the Obligations of the Company to the Secured Party have been fully paid and performed, the Pledgor shall not, except in connection with the concurrent repayment of all the Obligations with any proceeds received, attempt to sell, transfer, assign, deliver or otherwise dispose of the Collateral or any interest therein.

5.    <u>Representations and Warranties</u>. Pledgor represents and warrants to the Secured Party that Pledgor (a) owns the Collateral of record and beneficially free and clear of all Liens, security interests and liabilities except the Lien of this Agreement and (b) has the right and requisite authority to enter into this Agreement and grant the security interests in the Collateral.

6.    <u>Security Interest Absolute</u>. All rights of the Secured Party and all Liens hereunder, and all obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of:

(a)    lack of validity or enforceability of this Agreement or the Purchase Agreement;

(b)    any change in the time, manner or place of payment of, or in any other term of, any or all of the Obligations or any amendment or waiver of any provision of this Agreement; or

(c)    any release or non-perfection of any portion of the Collateral or any exchange, release or non-perfection of any other collateral.

7.    <u>Secured Party's Duties</u>. The powers conferred on the Secured Party hereunder are solely to protect the Secured Party's interest in the Collateral and shall not impose any duty upon it to exercise any such powers except for the safe custody of any Collateral or any portion thereof in its possession, if any, and the Secured Party shall exercise that standard of care with respect to the Collateral in its possession, if any, which it exercises in the administration of its own assets and property.

8.    <u>Rights Cumulative</u>. The rights, powers and remedies of Secured Party under this Agreement shall be in addition to all rights, powers and remedies given to Secured Party by virtue of any statute or rule of law or any agreement, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing Secured Party's security interest or Lien in the Collateral.

9.    <u>Voting Proxy; Distributions</u>.

9.1    In addition to the Secured Party's other rights, Pledgor irrevocably appoints Secured Party as its sole and exclusive proxy, with full power of substitution and revocation, but only after the occurrence of an Event of Default (as defined below) and during the continuance thereof, to exercise Pledgor's rights to call and attend meetings, vote, consent to and/or take any action respecting

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 1-A Page 154
1366

the Collateral as fully as the Pledgor might do (the "***Voting Rights***"). This proxy remains effective so long as any of the Obligations are unpaid; provided, however, that nothing contained herein shall be deemed to constitute the Secured Party as a member of the Company unless and until it acquires absolute title to such limited liability company membership interests upon foreclosure or replevin subsequent to an Event of Default.

9.2    Pledgor acknowledges and agrees that any and all distributions ("***Distributions***"), including liquidating distributions, distributions of property, return of capital or other distributions made on or in respect of the Collateral, including without limitation the issuance of additional limited liability company interests, whether received in exchange for the Collateral or any part thereof or as a result of any acquisition, sale or other exchange of assets or on the liquidation, whether voluntary or involuntary, of any issuer of the Collateral, or otherwise (but not including cash distributions unless there shall have occurred a continuing Event of Default), shall be and become part of the Collateral pledged hereunder and, if received by Pledgor, shall forthwith be delivered to the Secured Party to be handled subject to the terms of this Agreement.

10.    Rights of Secured Party upon Default. Upon the occurrence of an Event of Default and during the continuance thereof, the Secured Party shall have all of the rights and remedies of a secured party under the UCC and, without limiting the generality of the foregoing, shall also have the rights set forth in this Agreement. In addition, the Secured Party hereby irrevocably authorizes and directs the Company to make all distributions and payments in respect of the Collateral directly to the Secured Party (but, with respect to cash distributions, only following the occurrence of an Event of Default and during the continuance thereof) and to deliver to the Secured Party copies of all notices given by the Company to its members as such.

11.    Sale of Collateral.

11.1    Upon at least thirty (30) days written notice to the Pledgor but without further demand, advertisement or notice of any kind except as may be required by law, all of which are hereby expressly waived, the Secured Party shall have the right to sell, assign and deliver the whole or any part of the Collateral, at any time or times, at a public or private sale, for cash, on credit, or for other property, for immediate or future delivery, and for such price and on such terms as are commercially reasonable.

11.2    The proceeds of any sale of Collateral shall be applied (a) first, to the expenses incurred by the Secured Party in connection with any sale or disposition including, without limitation, the expenses or taking, holding, advertising and preparing the Collateral for sale or disposition, all court costs and reasonable attorneys' fees, (b) next, to principal of and interest on the Obligations, and (c) lastly, any surplus to the Pledgor or as a court of competent jurisdiction may direct.

11.3    The rights and remedies provided in this Agreement are cumulative and in addition to any rights and remedies which the Secured Party may have under the Debenture, the Security Agreement, the Account Control Agreement and the Purchase Agreement, or at law or in equity.

12.    Events of Default. The occurrence of any one or more of the following events shall be an "***Event of Default***" under this Agreement:

12.1    The occurrence of any Event of Default as defined by the Purchase Agreement; or

12.2    The Pledgor fails to observe or perform any material covenant or agreement contained in this Agreement, which failure is not cured within ten (10) days after written notice of such

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 15 Page 155
1366

default is sent by the Secured Party, <u>provided</u> that if the default is such that it can be corrected, but not within such 10 days, it will not constitute an Event of Default if Pledgor takes corrective action upon such notice and diligently pursues such cure until the default is corrected; or

        12.3    There is any levy, seizure, or attachment of all or any material portion of the Collateral, other than as set forth in this Agreement; or

        12.4    Any of the representations or warranties contained in <u>Section 5</u> shall prove to have been incorrect in any material respect when made.

        13.    <u>No Liability</u>. The Secured Party shall not have any liability to Pledgor or any other person by reason of taking or refraining from taking any action with respect to the Collateral, except in the case of the Secured Party's gross negligence, fraud, bad faith or willful misconduct.

        14.    <u>Notices</u>. All notices or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (a) upon receipt, when delivered personally; (b) upon receipt, when sent by electronic mail or facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (c) one (1) business day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

        If to the Pledgor:

          iCap Pacific NW Management, LLC
          10900 NE 8th Street, Suite 1000
          Bellevue, WA 98004
          Facsimile:  425.214.4776
          Attention:  Chris Christensen
          Email:  chris@icapequity.com

        With a copy to (which shall not constitute notice):

          Perkins Coie LLP
          1201 Third Avenue, Suite 4900
          Seattle, WA 98101
          Facsimile:  206.359.9000
          Attention:  Martha Sandoval

        If to the Secured Party to:

          Kevin A. Carreno, P.A., as Collateral Agent for the Holders
          3001 Executive Center Drive, Suite 217
          Clearwater, FL 33762

Or to such other address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (i) given by the recipient of such notice or other communication, (ii) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (iii) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (a), (b) or (c) above, respectively.

15.     <u>Waivers</u>. No failure or delay by the Secured Party in exercising any right, power, privilege or remedy hereunder or under the UCC or any other applicable law shall operate as a waiver hereof or thereof, and no single or partial exercise by the Secured Party of any right, power, privilege or remedy of the Secured Party hereunder or thereunder shall preclude any subsequent or further exercise by the Secured Party thereof or of any other right, power, privilege or remedy hereunder or thereunder.

16.     <u>Amendment; Severability</u>. This Agreement may not be amended or modified, nor may any of the Collateral be released, except in a writing signed by the Parties hereto. If any provision of this Agreement is invalid or unenforceable, then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding on the Parties hereto. The invalidity of any other provision of this Agreement shall not affect the validity of any other provision.

17.     <u>Assignment</u>. No Party shall have the right to assign its rights or delegate its obligations hereunder or any part thereof to any other person without the other Party's prior written consent.

18.     <u>Entire Agreement</u>. This Agreement contains the entire agreement between the Parties relating to the subject matter hereof and supersedes all oral statements and prior writings with respect thereto.

19.     <u>Governing Law; Choice of Forum; Waiver of Jury Trial</u>. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Washington, without regard to the principles of conflicts of law thereof. Each party agrees that any action, proceeding, counterclaim, crossclaim, or other dispute relating to, involving, or resulting from this Agreement or the transactions contemplated by this Agreement will be resolved exclusively in the state or federal courts located in King County, Washington, and each party hereby waives the right to object to any such forum on any grounds. **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO A JURY TRIAL IN CONNECTION WITH THIS AGREEMENT OR ANY DISPUTE OR CONTROVERSY HEREUNDER OR THE TRANSACTIONS THAT ARE THE SUBJECT HEREOF.**

IN WITNESS WHEREOF, this Pledge and Security Agreement is duly executed as of the date first written above.

.

**COMPANY:**

ICAP PACIFIC NW MANAGEMENT, LLC

By _____
      Name:_____
      Title: _____

**COLLATERAL AGENT:**

KEVIN A. CARRENO, P.A.

By _____
      Name:_____
      Title: _____

**EXHIBIT C-4**

DEPOSIT ACCOUNT CONTROL AGREEMENT

[See attached]

# DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement (this "**Agreement**") is dated as of _____ __, 201_, and entered into by and among iCap Pacific Northwest Income and Opportunity Fund, LLC, a Delaware limited liability company ("**Depositor**"), Kevin A. Carreno, P.A. ("**Secured Party**"), and Sterling Savings Bank *dba* Sterling Bank ("**Bank**").

## Recitals

A.       Pursuant to certain agreement(s) between Depositor and Secured Party, Depositor has granted to Secured Party a security interest and lien upon deposit account number _____, along with all credits or proceeds thereto and all monies, checks, and other instruments held or deposited therein, maintained by Depositor at Bank ("**Deposit Account**").

B.       In connection therewith, Depositor requests that Bank enter into a deposit account control agreement with regard to the Deposit Account. Bank is willing to do so upon the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

## Agreement

**1.**       **Deposit Agreements**. The terms and conditions of this Agreement are in addition to any deposit account agreements and other related agreements that Depositor has with Bank, including without limitation all agreements concerning banking products and services, treasury management documentation, account booklets containing the terms and conditions of the Deposit Account, signature cards, fee schedules, disclosures, specification sheets, and change of terms notices (collectively, "**Deposit Agreements**"). The provisions of this Agreement shall supersede the provisions of the Deposit Agreements only to the extent the provisions herein are inconsistent with the Deposit Agreements, and in all other respects, the Deposit Agreements shall remain in full force and effect.

**2.**       **Security Interest**. Depositor represents and warrants that it has the legal right to pledge the Deposit Account to Secured Party, that the funds in the Deposit Account are not held for the benefit of a third party, and that there are no perfected liens or encumbrances with respect to the Deposit Account. Except as set forth in Section 5 below, Depositor will not permit the Deposit Account to become subject to any other pledge, assignment, lien, charge, or encumbrance of any kind, other than the security interest of the Secured Party.

**3.**       **Control**. In order to provide Secured Party with control over the Deposit Account, Depositor agrees that Bank shall comply with all written instructions originated by Secured Party directing disposition of the funds in the Deposit Account without any further consent from Depositor, even if such instructions are contrary to any of Depositor's instructions or demands or result in Bank dishonoring items which may be presented for payment. Depositor agrees that written instructions from Secured Party may include instructions to transfer funds to or for the benefit of Secured Party or any other person or entity and instructions to close the Deposit Account.

**4.**       **Access to Deposit Account**. The Deposit Account shall be under the control of Secured Party; <u>provided</u>, that unless and until Bank receives Secured Party's <u>written</u> instructions given in accordance with Section 13 hereof, exercising exclusive control over the Deposit Account in substantially

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 10, Page 160
1366

the form of Exhibit A attached hereto ("**Notice of Exclusive Control**"), Bank shall comply with Depositor's instructions, notices, and directions (which need not be in writing unless required by the Deposit Agreements or applicable law) with respect to the Deposit Account and/or the transfer or withdrawal of funds from the Deposit Account, including, without limitation, paying or transferring the funds to Depositor or any other person or entity, in accordance with the terms and provisions of the Deposit Agreements and applicable law. Following Bank's receipt of a Notice of Exclusive Control and the passage of a reasonable period of time for Bank to act on the Notice of Exclusive Control, Bank will comply with Secured Party's <u>written</u> instructions with regard to the Deposit Account subject to the terms of this Agreement and applicable law. In all cases, Secured Party shall promptly contact Bank to confirm Bank's receipt of Secured Party's written instructions. In connection with Secured Party's written instructions, Bank shall not be required to provide extraordinary services or documentation regarding the Deposit Account unless Bank confirms that such extraordinary services or documentation are available. If there is any additional cost associated therewith, Secured Party agrees to pay such additional cost. A Notice of Exclusive Control may not be rescinded without Bank's prior written consent which may be withheld in Bank's sole and absolute discretion. Deductions for any amounts otherwise reimbursable to Bank as provided in Section 5 may be made before any funds are remitted to Secured Party pursuant to this Section 4.

5.      **Subordination by Bank**. Depositor and Bank acknowledge and recognize Secured Party's continuing security interest in the Deposit Account and in all items deposited in the Deposit Account and in the proceeds thereof. Except for the amounts set forth in this Section 5 and except for any security interest under Article 4-210 of the Uniform Commercial Code, Bank hereby subordinates any statutory or contractual right or claim of offset or lien resulting from any transaction which involves the Deposit Account. Notwithstanding the preceding sentence, nothing herein constitutes a waiver of, and Bank expressly reserves all of its present and future rights with respect to: (a) fees and expenses related to the Deposit Account ("**Fees**"); (b) any checks, ACH entries, wire transfers, merchant card transactions, or other paper or electronic items which were deposited or credited to the Deposit Account that are returned, reversed, refunded, adjusted, or charged back for insufficient funds or for any other reason ("**Returned Items**"); and (c) obligations and liabilities connected with the Deposit Account that arise out of any treasury management services provided by Bank, its subsidiaries or affiliates, including but not limited to, ACH, merchant card, zero balance account, sweeps, controlled disbursement or payroll ("**Overdrafts**"). Bank may charge the Deposit Account to cover Fees, Returned Items, and Overdrafts. If there are insufficient funds in the Deposit Account to cover the Fees, Returned Items, and Overdrafts, Depositor agrees to immediately reimburse Bank for the amount of such shortfall. If Depositor fails to pay the amount demanded by Bank, Secured Party agrees to reimburse Bank within three (3) Business Days of demand thereof by Bank for any Fees, Returned Items, and Overdrafts to the extent funds from the Deposit Account were transferred pursuant to the written instructions of Secured Party. As used in this Agreement, "**Business Day**" means any day other than Saturday, Sunday, or any other day on which commercial banks in Washington are authorized or required by law to close.

6.      **Exculpation of Bank**. Depositor and Secured Party agree that Bank shall incur no liability to either of them for any loss or damage that either or both may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement or any transaction or service contemplated by the provisions hereof unless it is finally adjudicated that such loss or damage was directly caused by Bank's gross negligence or willful misconduct. In no event, shall Bank be liable to Depositor or Secured Party for any of the following:  (a) failing to follow any written instructions of Secured Party that (i) require the disposition of funds in the Deposit Account by a method not available to Depositor under the Deposit Agreements, (ii) in Bank's reasonable belief, would result in Bank failing to comply with a statute, rule, regulation, or guideline of any governmental body or an order or process binding upon Bank, (iii) require the disposition of funds that are not immediately available in the Deposit Account, (iv) direct the disposition of less than all funds in the Deposit Account or direct that the funds be sent to more than one recipient, or (v) do not set forth as reasonably required by Bank, the authority of the person giving Secured Party's written instructions to act for Secured Party; (b) complying with

Depositor's instructions or otherwise completing a transaction involving the Deposit Account, that Bank or an affiliate has started to process before Bank's receipt of a Secured Party's written instructions, including, without limitation, a Notice of Exclusive Control, and the passage of a reasonable period of time for Bank to act upon said instructions; (c) wrongful dishonor of any item as a result of Bank following any of Secured Party's written instructions; or (d) failing to comply or delaying in complying with any Secured Party's instructions or any provision of this Agreement due to a computer malfunction, legal constraint, emergency condition, fire, war, riot, theft, flood, earthquake, or other natural disaster, interruption of communication facilities, labor difficulties, or other cause beyond Bank's reasonable control. **IN NO EVENT WILL BANK BE LIABLE OR RESPONSIBLE FOR ANY INDIRECT DAMAGES, LOST PROFITS, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES WHICH ARISE OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES CONTEMPLATED BY THIS AGREEMENT EVEN IF BANK HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGES.** Bank makes no representation or warranty regarding, and shall not have any responsibility for, the creation, attachment, perfection, or priority of Secured Party's purported security interest in the Deposit Account or any present or future adverse liens, claims, or encumbrances against the Deposit Account, and Bank shall have no liability to Depositor or Secured Party under this Agreement for any claim, loss, cost, or expense resulting from, arising out of, or relating to such matters.

7.      **Indemnity**. Depositor agrees to defend, indemnify, and hold Bank and its affiliates, directors, officers, employees, representatives, attorneys, successors, and assigns (collectively "**Depositary Bank**") harmless from and against any and all claims, causes of action, losses, liabilities, costs, damages and expenses, including, without limitation, reasonable legal and accounting fees and attorney fees (collectively, "**Claims**"), arising out of or in any way related to this Agreement except to the extent the Claims are ultimately adjudicated to be directly caused by Bank's gross negligence or willful misconduct. Without regard to Depositor's indemnification obligations to Bank, Secured Party agrees to defend, indemnify, and hold Depositary Bank harmless from and against any and all Claims arising out of or in any way related to Bank's compliance with any instruction given by Secured Party. Secured Party's obligations to Bank hereunder shall in no way operate to release Depositor from its obligations to Secured Party and shall not impair any rights or remedies of Secured Party to collect any such amounts from Depositor.

8.      **Bank's Responsibility**. The duties of Bank are strictly limited to those set forth in this Agreement. Nothing within this Agreement shall create any agency, fiduciary, joint venture, or partnership relationship between Bank and Depositor or Secured Party. Bank will have no fiduciary duties under this Agreement to any party. Bank shall be protected in relying on any form of instruction, notice, or other communication purporting to be from an authorized representative of Secured Party. Bank shall have no duty to inquire as to the genuineness, validity, or enforceability of any such instruction, notice, or communication even if Depositor notifies Bank that Secured Party is not legally entitled to originate any such instruction, notice, or communication.

9.      **Account Information**. If Secured Party so requests and at Secured Party's expense, to the extent that Bank has the operational ability to do so, Bank will provide to Secured Party, a copy of each period account statement relating to the Deposit Account ordinarily furnished by Bank to Depositor. Depositor authorizes Bank to provide to Secured Party, whether by Internet access or otherwise, such statements and any other information concerning the Deposit Account that Bank may agree to provide to Secured Party at Secured Party's request. Bank will have no liability for failing to provide any statement or other information related to the Deposit Account.

10.     **Termination**. This Agreement shall continue in full force and effect until terminated (a) by Bank upon not less than thirty (30) calendar days' written notice to each of the other parties, (b) by Secured Party upon written notice to Bank, or (c) by Depositor with the prior written consent of Secured Party. Notwithstanding the foregoing, Bank may immediately and automatically close the Deposit

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 62 Page 162
1366

Account and terminate the Agreement (a) in the event that Bank reasonably believes that any fraudulent activity has or is occurring with regard to the Deposit Account or (b) if Bank becomes obligated to close the Deposit Account or terminate this Agreement under any statute, rule, or regulation, or any other order or process binding upon Bank. In addition, Bank may terminate this Agreement upon five (5) calendar days' written notice to the other parties if any party is in material breach of the Deposit Agreement or this Agreement, including, without limitation, Depositor's or Secured Party's failure to reimburse Bank pursuant to Section 5 above. In the event of any termination, all fees incurred under this Agreement shall become immediately due and payable in full. This Agreement shall automatically terminate upon (a) Bank's receipt of written notice from Secured Party of the payment in full of all of Depositor's obligations due and owing to Secured Party or (b) the closure of the Deposit Account (provided, however, that Depositor hereby covenants to Secured Party that Depositor will not close the Deposit Account without the prior written consent of Secured Party). Bank shall not be liable for the closure of the Deposit Account by Depositor or the remittance of any funds therein, on the instructions of Depositor prior to Bank's receipt of a Notice of Exclusive Control pursuant to Section 4 that has not been rescinded pursuant to the terms hereof. Upon termination of this Agreement, and unless otherwise prohibited by order or law, Bank will remit any available funds in the Deposit Account on the date of termination to Secured Party only if a Notice of Exclusive Control is received by Bank prior to the date of termination of this Agreement and said Notice of Exclusive Control has not been rescinded pursuant to the terms hereof; otherwise, Bank may remit said funds to Depositor pursuant to the terms of the Deposit Agreement without any reference to this Agreement. Deductions for any amounts otherwise reimbursable to Bank as provided in this Agreement may be made before any funds are remitted. Termination of this Agreement shall not affect the rights or obligations of any party hereto with respect to the period prior to such termination. Specifically, the rights of Bank and the obligations of Depositor and Secured Party under Sections 5, 6, and 7 of this Agreement shall survive the termination of this Agreement.

**11. Legal Process and Insolvency**. In the event Bank receives any form of legal process concerning the Deposit Account, including, without limitation, court orders, levies, garnishments, attachments, and writs of execution, or in the event Bank learns of any insolvency proceeding concerning Depositor, including, without limitation, bankruptcy, receivership, and assignment for the benefit of creditors, Bank will respond to such legal process or knowledge of insolvency in the normal course or as required by law and shall not be in violation of this Agreement for so doing.

**12. Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Washington. The parties agree that Washington is the "bank's jurisdiction" for purposes of the Uniform Commercial Code.

**13. Notices**. Except as otherwise provided in this Agreement, all communications given by any party to another as required under this Agreement must be in writing, directed to the party at its address(es) as set forth below (or at such other address as such party may hereafter specify in a written notice give to the other parties in accordance with this Section 13) and shall be delivered by hand, sent by nationally-recognized overnight, receipted delivery service, or sent by registered/certified United States mail. Any such communication shall be deemed delivered if delivered by: (a) hand, on the date and time that such communication shall have been delivered, in hand, with proof of receipt by signature, (b) nationally-recognized overnight, receipted delivery service, on the date and time that such communication shall have been delivered and receipted by such delivery service with proof of receipt by signature, or (c) registered or certified United States mail, on the date and time that such communication shall have been delivered and receipted by the United States Postal Service with proof of receipt by signature. Notwithstanding anything to the contrary in this Section 13, any communication hereunder to Bank (including, without limitation, a Notice of Exclusive Control) made by (or believed in good faith by Bank to be made by) Secured Party or Depositor and confirmed to have been delivered after 2:00 pm Pacific Time on a Business Day or delivered on a day that is not a Business Day, shall be deemed delivered to Bank at the opening of the next Business Day. In all circumstances, Bank shall have a

reasonable period of time to act on Secured Party's instructions, including, without limitation, a Notice of Exclusive Control.

Depositor:

Chris Christensen
10900 NE 8th Street, Suite 1000
Bellevue, WA 98004
Facsimile: 425.214.4776
Email: chris@icapequity.com

With a copy to (which shall not constitute notice):

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Facsimile: 206.359.9000
Attention: Martha Sandoval
Email: msandoval@perkinscoie.com

Secured Party:

Kevin A. Carreno, P.A., as Collateral Agent for the Holders
3001 Executive Center Drive, Suite 217
Clearwater, FL 33762

With a copy to (which shall not constitute notice):

Foley & Lardner LLP
100 North Tampa Street, Suite 2700
Tampa, Florida 33602
Facsimile: 813-221-4210
Attention: Curt P. Creely
Email: ccreely@foley.com

Bank:

Sterling Savings Bank
Commercial Client Services
1650 Northpoint Parkway, Ste A
Santa Rosa, CA 95407
Attn: Lois Tapley
Telephone: (707) 568-1971

<u>and</u>

Sterling Savings Bank
Issaquah Branch
705 NW Gilman Blvd
Issaquah, WA 98027
Attn: Svetla Tzekov
Telephone:(425) 427-1715

**14.    Successors and Transferees**. This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and other transferees permitted under this section. An assignment of a party's rights or duties under this Agreement without the prior written consent of the other parties will be void except Bank, without the consent of Secured Party or Depositor, may transfer its rights and duties to a transferee to which, by contract or operation of law, Bank transfers the Deposit Account.

C-4-6

15. **Entire Agreement/Amendments**. This Agreement, the Deposit Agreements, and the instructions and notices required or permitted to be executed and delivered hereunder set forth the entire agreement of the parties with respect to the subject matter hereof. This Agreement may be amended only with the prior written consent of all parties hereto. None of the terms of this Agreement may be waived except as Bank may consent thereto in writing. No delay on the part of Bank in exercising any right, power, or privilege hereunder shall operate as a waiver hereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude other or further exercise thereof or the exercise of any right, power, or privilege. The rights and remedies specified herein are cumulative and are not exclusive of any rights or remedies which Bank would otherwise have.

16. **Jury Trial Waiver**. **THE PARTIES AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, EACH KNOWINGLY, VOLUNTARILY, IRREVOCABLY, AND WITHOUT COERCION, WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY JUDICIAL PROCEEDING ARISING OUT OF, OR RELATING TO, THIS AGREEMENT OR SERVICES RENDERED IN CONNECTION WITH THIS AGREEMENT**.

17. **Counterparts**. This Agreement may be executed by the parties hereto in counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one and the same Agreement. Signature pages may be detached from separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart thereof.

*[Remainder of page intentionally left blank; signatures follow on next page.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**DEPOSITOR:**

ICAP PACIFIC NORTHWEST INCOME AND OPPORTUNITY FUND, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**SECURED PARTY:**

KEVIN A. CARRENO, P.A.

By: _____
Name: _____
Title: _____

**BANK:**

STERLING SAVINGS BANK

By: _____
Name: _____
Title: _____

## Exhibit A

[Letterhead of Secured Party]

### Notice of Exclusive Control

[Date]

Sterling Savings Bank [or successor or transferee of Sterling Savings Bank]

_____

_____

Attn:_____


Sterling Savings Bank [or successor or transferee of Sterling Savings Bank]

_____

_____

Attn:_____


Re:  Notice of Exclusive Control

Ladies and Gentlemen:

      As referenced in the Deposit Account Control Agreement dated as of [____, 20__] among [_____], us and you (the "**Agreement**"), we hereby give you notice of our exercise of exclusive control over deposit account number [_____] (the "**Account**"). You are instructed not to accept any directions from Depositor (as defined in the Agreement) with respect to the Account unless otherwise ordered by a court of competent jurisdiction.

      As an included disposition instruction, we direct you to send available and collected funds in the Account to us by the method [and at the address] indicated below:

    [Insert Method]

    [Insert Address, if applicable]

         Very truly yours,

         _____

         as Secured Party

         By:  _____
         Name: _____
         Title: _____

**EXHIBIT C-5**

UCC FINANCING STATEMENTS

[See attached]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGEMENT TO: (Name and Address) | |

Kevin A. Carreno, P.A.
3001 Executive Center Drive, Suite 217
Clearwater, FL 33762

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 10900 NE 8th Street, Suite 1000 | Bellevue, | WA | 98004 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Experts Counsel Inc. | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3001 Executive Center Drive, Suite 217 | Clearwater | FL | 33762 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

ALL OF DEBTOR'S ASSETS, NOW OWNED AND HEREAFTER ACQUIRED

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions.) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
78404-0001

International Association of Commercial Administrators (IACA)
**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGEMENT TO:  (Name and Address)

Kevin A. Carreno, P.A.
3001 Executive Center Drive, Suite 217
Clearwater, FL 33762

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ICAP PACIFIC NW MANAGEMENT, LLC | | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 10900 NE 8th Street, Suite 1000 | Bellevue, | WA | 98004 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Experts Counsel Inc. | | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3001 Executive Center Drive, Suite 217 | Clearwater | FL | 33762 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

"Collateral" means all of Debtor's right, title and interest in and to (a) that certain Operating Agreement of ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC , a Washington limited liability company ("Company") and all of the membership interests or other equity interests of, and all other right, title and interest now owned or hereafter acquired by, Debtor in and to Company, including, without limitation, Debtor's share of the profits, losses and capital of Company, and all Debtor's rights to call and attend meetings, vote, consent to and/or take any action respecting the Collateral, claims, powers, privileges, benefits, options or rights of any nature whatsoever which currently exist or may be issued or granted by Company to Debtor, and all instruments, whether heretofore or hereafter acquired, evidencing such rights and interests and (b) any and all distributions, including liquidating distributions, distributions of property, return of capital, or other distributions made on or in respect of the Collateral, including without limitation the issuance of additional limited liability company interests, whether received in exchange for the Collateral or any part thereof or as a result of any acquisition, sale or other exchange of assets or on the liquidation, whether voluntary or involuntary, of any issuer of the Collateral, or otherwise, subject to the terms, conditions and limitations of the Pledge and Security Agreement by and between Debtor and Secured Party.

5. Check only if applicable and check only one box:    Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions).    ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
78404-0001

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

**EXHIBIT B**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC**

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**iCAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC**

**December 19, 2013**

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS; INTERPRETATION ......................................................................... 1

    1.1    Definitions ................................................................................................................... 1
    1.2    Interpretation ............................................................................................................... 8

ARTICLE II GENERAL PROVISIONS ..................................................................................... 8

    2.1    Formation of Limited Liability Company .................................................................. 8
    2.2    Certificates .................................................................................................................. 8
    2.3    Name of Company ...................................................................................................... 8
    2.4    Principal Place of Business; Registered Agent for Process ....................................... 8
    2.5    Term of Company ....................................................................................................... 9
    2.6    Purposes ...................................................................................................................... 9
    2.7    Members' Names and Addresses ................................................................................ 9
    2.8    Title to Company Property ......................................................................................... 9
    2.9    Failure to Observe Formalities .................................................................................. 9
    2.10   No Liability of Members and Manager to Third Parties............................................ 9
    2.11   No Third Party Beneficiaries ................................................................................... 10

ARTICLE III ADMISSION OF MEMBERS; CAPITAL ACCOUNTS ................................. 10

    3.1    Authorized Units....................................................................................................... 10
    3.2    Issuance of Units ...................................................................................................... 10
    3.3    Deficit Capital Accounts .......................................................................................... 11
    3.4    Member Loans .......................................................................................................... 11
    3.5    Debt Offering ........................................................................................................... 11

ARTICLE IV ALLOCATION OF NET INCOME AND NET LOSS...................................... 11

    4.1    Allocation of Net Income and Net Loss .................................................................. 11
    4.2    Loss Limitation ........................................................................................................ 11
    4.3    Special Allocations .................................................................................................. 12
          4.3.1   Minimum Gain Chargeback........................................................................ 12
          4.3.2   Member Minimum Gain Chargeback ......................................................... 12
          4.3.3   Qualified Income Offset ............................................................................. 12
          4.3.4   Nonrecourse Deductions ............................................................................ 13
          4.3.5   Member Nonrecourse Deductions .............................................................. 13
    4.4    Curative Allocations ................................................................................................ 13
    4.5    Code Section 704(c) Allocations ............................................................................. 13
          4.5.1   Contributed Property .................................................................................. 13
          4.5.2   Reverse 704(c) Allocations ........................................................................ 14
    4.6    Other Allocation Rules ............................................................................................ 14
          4.6.1   Allocations for Tax Purposes...................................................................... 14

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7 Page 177
    1366

4.6.2 Allocation of Excess Nonrecourse Liabilities.......................................... 14

4.6.3 Allocations in Connection With Varying Interests.................................. 14

ARTICLE V DISTRIBUTIONS.............................................................................................. 14

5.1 Timing of Distributions of Net Cash Flow ............................................. 14
5.2 Priority of Distributions .......................................................................... 15
5.3 Tax Distributions ..................................................................................... 15
5.4 Distributions in Kind................................................................................ 15
5.5 Other Distribution Rules .......................................................................... 15
5.6 Distributions Upon Liquidation ............................................................... 16
5.7 Limitation on Distributions...................................................................... 16

ARTICLE VI MANAGEMENT............................................................................................... 16

6.1 Manager .................................................................................................... 16
    6.1.1 General Powers ........................................................................... 16

    6.1.2 Appointment of Manager ............................................................ 16

    6.1.3 Related Party Transactions ......................................................... 17

6.2 Authority of Manager ............................................................................... 18
    6.2.1 Authority of Manager ................................................................. 18

    6.2.2 Limitation on Authority of Manager........................................... 19

    6.2.3 Limitations on Investments ........................................................ 19

    6.2.4 Obligations of Manager .............................................................. 20

6.3 Tax Matters .............................................................................................. 20
6.4 Co-Investments ........................................................................................ 20

ARTICLE VII APPOINTMENT OF OFFICERS ................................................................... 21

7.1 Authority to Delegate to Officers ............................................................ 21
7.2 Resignation or Removal............................................................................ 21
7.3 Salaries ..................................................................................................... 21
7.4 Signing Authority..................................................................................... 21

ARTICLE VIII RIGHTS AND OBLIGATIONS OF MEMBERS ........................................... 21

8.1 Limited Control......................................................................................... 21
8.2 Call of Meetings........................................................................................ 22
8.3 Notice of Meetings.................................................................................... 22
8.4 Meetings by Communications Equipment................................................. 22
8.5 Manner of Acting...................................................................................... 22
8.6 Action by Members Without a Meeting ................................................... 22
8.7 Other Business of Members; Conflicts of Interest................................... 22

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 18 Page 178
1366

ARTICLE IX ASSIGNABILITY OF UNITS; WITHDRAWAL ............................................... 23

9.1    Restricted Right to Transfer ................................................................. 23
9.2    Effect of Transfer ................................................................................. 24
9.3    No Other Transfer Effective ................................................................ 24
9.4    Effectiveness of Transfer ..................................................................... 24
9.5    Assignees and Substitute Members ..................................................... 24
9.6    Obligations of Substitute Member ...................................................... 25
9.7    No Withdrawal of Members ................................................................ 25

ARTICLE X LIMITATION UPON LIABILITY; INDEMNIFICATION ................................. 25

10.1   Limitation on Liability ........................................................................ 25
10.2   Indemnification ................................................................................... 26
10.3   Advancement Of Expenses .................................................................. 26

ARTICLE XI DISSOLUTION AND TERMINATION ..................................................... 26

11.1   Events of Dissolution .......................................................................... 26
11.2   Effectiveness of Dissolution ............................................................... 27
11.3   Distributions Upon Liquidation .......................................................... 27

ARTICLE XII BOOKS, RECORDS, BANK ACCOUNTS AND OTHER
             MISCELLANEOUS ITEMS ...................................................... 28

12.1   Financial Records ................................................................................ 28
12.2   Accounting Basis and Accounting Year .............................................. 28
12.3   Reports ................................................................................................ 28
12.4   Bank Accounts ..................................................................................... 28
12.5   Tax Elections ....................................................................................... 28

ARTICLE XIII MISCELLANEOUS .......................................................................... 29

13.1   Amendments ........................................................................................ 29
13.2   Arbitration ........................................................................................... 29
13.3   Captions; Counterparts ........................................................................ 29
13.4   Governing Law .................................................................................... 30
13.5   Notices ................................................................................................. 30
13.6   No Waiver ............................................................................................ 30
13.7   Confidentiality ..................................................................................... 30
13.8   Successors and Assigns ....................................................................... 31
13.9   Entire Agreement ................................................................................ 31

SCHEDULE I

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 9 Page 179
1366                                                                    Exhibit 9 Page 179

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## iCAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC

This Limited Liability Company Agreement of iCap Pacific Northwest Opportunity and Income Fund, LLC (this "*Agreement*") is effective as of December 19, 2013, by and among iCap Pacific NW Management, LLC, a Washington limited liability company ("*iCap Management*"), and such other Persons that become Members of the Company from time to time, as hereinafter provided. This Agreement shall be effective as of the Effective Date set forth in Section 2.1.

## RECITALS

A.      iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "*Company*"), was formed on November 12, 2013 pursuant to the filing of the Certificate of Formation of the Company (the "*Certificate*") with the Office of the Secretary of State of the State of Delaware.

B.      The parties hereto desire to enter into this Agreement to reflect the terms and provisions relating to their ownership and management of the Company.

NOW, THEREFORE, in consideration for the mutual promises provided herein, the parties agree as follows:

## ARTICLE I
## DEFINITIONS; INTERPRETATION

### 1.1      Definitions

As used in this Agreement, the following terms shall have the following meanings:

"*Act*" means the Delaware Limited Liability Company Act, as provided in Title 6, Chapter 18 of the Delaware Code § 101 *et. seq*., as amended from time to time.

"*Adjusted Deficit*" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(a)      The Capital Account shall be increased by any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the next to the last sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)      The Capital Account shall be decreased by the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of "Adjusted Deficit" is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"***Affiliate***" means, with respect to the second Person, any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the second Person.

"***Agreement***" means this Limited Liability Company Agreement of iCap Pacific Northwest Opportunity and Income Fund, LLC, as it may be amended from time to time.

"***Bankruptcy***" means, with respect to a Member or the Company, the occurrence of any of the following: (a) the filing of a voluntary petition for relief under the U.S. Bankruptcy Code or an admission by such Person of such Person's inability to pay its debts as they become due, (b) the making by such Person of a general assignment for the benefit of creditors, (c) in the case of the filing of an involuntary petition in bankruptcy against such Person, the filing of an answer admitting the material allegations thereof or consenting to the entry of an order for relief, or a default in answering the petition, or (d) the entry of an order for relief under the U.S. Bankruptcy Code against such Person, or the entry of an order, judgment or decree of any court adjudicating such Person as bankrupt or appointing a trustee or receiver for such Person's assets, unless such order, judgment or decree has been vacated, set aside or stayed within 60 days from the date thereof.

"***Capital Account***" means, with respect to any Member, the Capital Account established on the books of the Company for such Member and maintained in accordance with the following provisions:

> (a)     To each Member's Capital Account there shall be credited (i) the Capital Contributions of such Member, (ii) allocations to such Member of Company Net Income, (iii) allocations to such Member of any items in the nature of income or gain that are specially allocated to such Member pursuant to Section 4.3 and Section 4.4, and (iv) the amount of any Company liabilities assumed by such Member or that are secured by any Company property distributed to such Member.

> (b)     To each Member's Capital Account there shall be debited (i) the amount of cash and the Gross Asset Value of any property (other than cash) distributed to such Member by the Company, (ii) allocations to such Member of Company Net Loss, (iii) allocations to such Member of any items of deductions or losses that are specially allocated to such Member pursuant to Section 4.3 and Section 4.4, and (iv) the amount of any liabilities of such Member assumed by the Company or that are secured by property contributed to the Company by such Member.

> (c)     If the Gross Asset Values of Company property have been adjusted, Capital Accounts shall be maintained in a manner consistent with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) as necessary to reflect any items of Net Income or Net Loss that are computed based on the Gross Asset Value of the Company property.

If a Unit in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred Unit. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 2 Page 182<br>1366

Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

"***Capital Contribution***" means, with respect to any Member, the total amount of money and the initial Gross Asset Value of property other than money, if any, contributed to the Company by such Member.

"***Certificate***" means the Certificate of Formation of the Company filed in the Office of the Secretary of State of the State of Delaware, as amended from time to time.

"***Class A Member***" means a Person who owns Class A Units of the Company and who has been admitted to the Company as a Member.

"***Class A Percentage Interest***" means, with respect to a Member as of a given date, that percentage obtained by dividing the total number of Class A Units owned by such Member by the total number of Company Class A Units issued and outstanding.

"***Class A Units***" means the class of Units of the Company designated as Class A Units pursuant to Section 3.1.

"***Class B Member***" means a Person who owns Class B Units of the Company and who has been admitted to the Company as a Member.

"***Class B Percentage Interest***" means, with respect to a Member as of a given date, that percentage obtained by multiplying 33% by the ratio of the total number of Class B Units owned by such Class B Member as the numerator and the total number of Class B Units issued and outstanding as the denominator.

"***Class B Units***" means the class of Units of the Company designated as Class B Units pursuant to Section 3.1.

"***Co-Investment***" of the Company means any Investment held jointly by the Company with one or more third parties, which may include the Manager or Affiliates thereof, as and to the extent authorized by Section 6.4.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"***Company***" means iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company.

"***Company Minimum Gain***" means the same as "partnership minimum gain" as set forth in Treasury Regulations Sections 1.704−2(b)(2) and 1.704−2(d).

"***Debenture Purchase Agreement***" means that certain Senior Secured Debenture Purchase Agreement dated as of November 13, 2013 and entered into pursuant to the Offering.

"**Debenture**" means that certain Debenture in the form attached as Exhibit A to the Debenture Purchase Agreement.

"**Developer**" means the developer, builder, property owner or similar such Person of the real estate underlying a particular Investment.

"**Effective Date**" means the date set forth in the opening sentence of this Agreement.

"**Estimated Tax Amount**" means, with respect to each Member, the amount equal to (a) the sum of (i) the greater of the highest statutory marginal ordinary federal income tax rate for individuals or corporations for a given tax year plus (ii) the unearned income Medicare contribution tax rate under Code Section 1411 for a given year, multiplied by (b) the taxable income allocated to such Member for such taxable year pursuant to Article IV.

"**Gross Asset Value**" means, with respect to any Company asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Manager;

(b)     In order to preserve the economic interest of each Member in the Company, the Manager may (but shall not be required to) adjust the Gross Asset Values of all Company assets to equal their respective gross fair market values, as determined by the Manager immediately prior to the following times: (i) the acquisition of additional Units in the Company by any new or existing Member; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for all or a portion of the Member's Units in the Company; (iii) the withdrawal of a Member; and (iv) the liquidation of the Company;

(c)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this item (c) to the extent an adjustment is made at that time pursuant to item (a) or (b) of this definition; and

(d)     The Gross Asset Value of any Company asset distributed in kind to any Member pursuant to Section 5.4 shall be adjusted to equal its gross fair market value, as determined by the Manager on the date of distribution.

"**Investment**" means an investment by the Company, whether held directly or indirectly, or wholly-owned or co-owned with others, in one or more of the following assets: (a) unimproved property, improved property, including residential lots, duplexes, or other forms of single-family homes, multi-family projects and commercial properties; (b) debt obligations issued by entities owning real estate, which are collateralized by mortgages, deeds of trusts or other security interests in such real estate and/or equity interests in such entities; and (c) equity

-4-

interests, including but not limited to general partnership interests, limited partnership interests, and limited liability company interests, in entities holding title, directly or indirectly, in real estate assets falling within the categories identified in paragraph (a) above.

"***Majority Vote of the Class A Members***" means the consent of one or more Class A Members having among them more than 50% of the then total outstanding Class A Units held by all Class A Members.

"***Majority Vote of the Class B Members***" means the consent of one or more Class A Members having among them more than 50% of the then total outstanding Class B Units held by all Class B Members.

"***Manager***" means the Person designated or appointed to manage and operate the day-to-day affairs of the Company pursuant to Article VI.

"***Member Nonrecourse Debt***" has the meaning of "partner nonrecourse debt" as set forth in Treasury Regulations Section 1.704−2(b)(4).

"***Member Nonrecourse Debt Minimum Gain***" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability determined in accordance with Treasury Regulations Section 1.704−2(i)(3).

"***Member Nonrecourse Deductions***" has the meaning of "partner nonrecourse deductions" as set forth in Treasury Regulations Section 1.704−2(i)(2).

"***Members***" means the Persons set forth on **Schedule I** hereto as of the Effective Date and any other Person that becomes a Member of the Company in accordance with this Agreement, in each case in such Person's capacity as a Member of the Company and for so long as such Person remains a Member of the Company.

"***Net Cash Flow***" means, for each fiscal year or other period:

(a)     the sum of:

(i)     the gross cash proceeds received by the Company during such year or period; plus

(ii)     all amounts that the Manager releases during such year or period from any existing Reserves;

(b)     reduced (but not to less than zero) by the sum of:

(i)     all cash payments made by the Company during such year or period to cover its liabilities, obligations, capital expenditures and expenses; plus

(ii)     all cash that the Manager elects to set aside as additional Reserves.

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 15 Page 185
1366

"***Net Income***" and "***Net Loss***" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a) Any income of the Company that is exempt from federal income tax shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(I) shall be subtracted from such taxable income or loss;

(c) If the Gross Asset Value of any Company asset is adjusted pursuant to paragraphs (b)-(d) of the definition of "Gross Asset Value", the amount of such adjustment shall be treated as gain or loss arising from the disposition of such asset for purposes of computing Net Income or Net Loss and adjusting the balance of each Member's Capital Account;

(d) Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the asset differs from its Gross Asset Value; and

(e) Notwithstanding any other provision herein, any items of income, gain, loss or deduction specially allocated pursuant to Sections 4.3 and 4.4 shall not be taken into account in computing Net Income or Net Loss.

"***Nonrecourse Liability***" has the meaning set forth in Treasury Regulations Section 1.704−2(b)(3).

"***Offering***" has the meaning set forth in Section 3.5.

"***Offering Period***" means the earlier of (a) the date on which the Company obtains commitments of $30,000,000, subject to an over allotment of up to $50,000,000 in the Manager's discretion, pursuant to the Offering, (b) such time, if any, as the Company, in its sole discretion, elects to withdraw or terminate the Offering; or (c) March 31, 2014 unless extended for an additional 90 days by the Manager in its sole discretion.

"***Officers***" has the meaning set forth in Section 7.1.

"***Partially Adjusted Capital Account***" means, with respect to any Member and any Company fiscal year, the Capital Account of such Member at the beginning of such fiscal year, adjusted for all contributions and distributions during such year and all special allocations pursuant to Sections 4.3 and 4.4 with respect to such fiscal year before giving effect to any allocations of Net Income or Net Losses for such fiscal year pursuant to Section 4.1.

"**Person**" means any natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee, or any other individual or entity in its own or any representative capacity.

"**Related Party**" means the Manager or any of its Affiliates (excluding the Company). The following Persons shall be deemed to be Related Parties in addition to any Persons who fall under the definition set forth in the preceding sentence: Manager, Chris Christensen, Michael Christensen, Jim Christensen, Bryan Brown, and any family member or blood relative of the foregoing individuals.

"**Related Party Transaction**" means any contract or transaction between the Company or any of its subsidiaries, on the one hand, and the Manager or any of its Affiliates, on the other hand.

"**Reserves**" means the funds set aside and held by the Company in amounts reasonably determined by the Manger to cover the payment of future expenses, capital expenditures, retirement of indebtedness, operations and contingencies of the Company, whether known or unknown, including, without limitation, liabilities that may be incurred in litigation and liabilities undertaken pursuant to the indemnification provisions of this Agreement.

"**Skyway**" means Skyway Advisors, LLC.

"**Substitute Member**" means a Person admitted pursuant to Section 9.5 as the successor to all the rights of a Member with respect to all or any part of such Member's interest in the Company.

"**Target Capital Accounts**" means, with respect to any Member and any Company fiscal year, an amount equal to the hypothetical distribution such Member would receive computed immediately prior to the hypothetical sale described in the succeeding sentence. The hypothetical distribution a Member would receive is equal to the amount that would be received by such Member if all Company assets were sold for cash equal to their Gross Asset Value, all Company liabilities were satisfied to the extent required by their terms, and the net assets of the Company were distributed in full to the Members pursuant to Section 5.2 as of the last day of such fiscal year.

"**Transfer**" means, with respect to any Unit, (a) when used as a verb, to sell, assign, dispose of, exchange, pledge, encumber, hypothecate or otherwise transfer such Unit or any participation or interest therein (whether by merger, operation of law or otherwise), or agree or commit to do any of the foregoing and (b) when used as a noun, a direct (whether by merger, operation of law or otherwise) sale, assignment, disposition, exchange, pledge, encumbrance, hypothecation, or other transfer of such Unit or any participation or interest therein or any agreement or commitment to do any of the foregoing.

"**Treasury Regulations**" means the regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"*Unit*" means any unit of interest, of any class or series, of equity securities having such rights, preferences and obligations as provided herein that may be issued by the Company pursuant to Article III herein.

**1.2    Interpretation**

Except as otherwise specified, references to Sections, Articles, or Schedules or Exhibits shall mean the respective Sections or Articles of, or Schedules or Exhibits to, this Agreement.

<div align="center">

**ARTICLE II**
**GENERAL PROVISIONS**

</div>

**2.1    Formation of Limited Liability Company**

The Company has been formed as a limited liability company under the laws of the State of Delaware, and the rights and liabilities of the Members shall be as provided in the Act, except as otherwise expressly provided herein. Irrespective of the date on which this Agreement is executed, this Agreement shall be deemed effective as of August 6, 2013, the date the Company was formed pursuant to the provisions of the Act (the "*Effective Date*").

**2.2    Certificates**

The Manager has filed or caused to be filed the Certificate and all such other certificates, notices, statements or other instruments required by law for the formation and continued operation of the Company as a limited liability company.

**2.3    Name of Company**

The name of the Company is iCap Pacific Northwest Opportunity and Income Fund, LLC. The Manager shall be permitted, from time to time, to change the name of the Company and file appropriate amendments to the Certificate or operate under certain assumed names at its sole discretion.

**2.4    Principal Place of Business; Registered Agent for Process**

(a)    The principal office of the Company shall be at 10900 NE 8th Street, Suite 1000, Bellevue, Washington 98004, or at such place as the Manager may designate from time to time.

(b)    The registered office of the Company in the State of Delaware shall be at 1675 S. State St., Suite B, Dover, Delaware 19901 or such place as the Manager may designate from time to time. The registered agent of the Company in the State of Delaware to accept service of process shall be Capitol Services, Inc. or such Person as the Manager may designate from time to time.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 18 Page 188
1366

**2.5    Term of Company**

The term of the Company commenced on the date the Certificate was filed in the Office of the Secretary of State of the State of Delaware in accordance with the Act and shall thereafter be perpetual, unless terminated prior thereto pursuant to Section 11.1.

**2.6    Purposes**

The purposes of the Company shall be to (a) source, acquire, finance, manage and supervise a portfolio of Investments; (b) engage in all activities incidental or ancillary thereto; and (c) carry on any other lawful activity that may be conducted by a limited liability company organized under the Act. The Manager shall cause the Company to be qualified or registered under applicable laws of any jurisdiction in which the Company transacts business and shall be authorized to execute, deliver and file any certificates and documents necessary to effect such qualification or registration, including without limitation the appointment of agents for service of process in such jurisdictions.

**2.7    Members' Names and Addresses**

The names and addresses of the Members are set forth on **Schedule I** to this Agreement. The Manager is hereby authorized and directed, without further approval of the Members, to amend **Schedule I**, from time to time, to reflect the admission, withdrawal, and substitution of Members or changes in their names and addresses, and to take whatever action the Manager deems appropriate or necessary to update the Company's books and records to reflect such changes in the identity, names and addresses of the Members. If, after admission to the Company as a Member, a Member changes its name or address, or transfers part or all of its Units, subject to the restrictions on Transfer contained in this Agreement, the Member shall promptly notify the Manager of such change to permit the updating of **Schedule I** and the Company's books and records.

**2.8    Title to Company Property**

All property owned by the Company shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in any such property.

**2.9    Failure to Observe Formalities**

A failure to observe any formalities or requirements of this Agreement, the Certificate or the Act shall not be grounds for imposing personal liability on the Members or the Manager for liabilities of the Company.

**2.10    No Liability of Members and Manager to Third Parties**

Except as otherwise provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager of the Company shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or acting as a Manager of the Company.

**2.11    No Third Party Beneficiaries**

This Agreement is entered into among the Members for the sole and exclusive benefit of the Members and their duly recognized successors and assigns. Nothing expressed or mentioned in or to be implied from this Agreement is intended or shall be construed to give to any Person other than the parties hereto any legal or equitable right, remedy or claim under or in respect to this Agreement, and no third party shall have the right to bring an action to enforce any of the provisions of this Agreement, including, but not limited to, the Members' obligations, if any, to make Capital Contributions to the Company.

<div align="center">

**ARTICLE III**
**ADMISSION OF MEMBERS; CAPITAL ACCOUNTS**

</div>

**3.1    Authorized Units**

The Company shall initially be authorized to issue 51,000,000 Units. Of such initial Units, 1,000,000 shall be designated as Class A Units and 50,000,000 shall be designated as Class B Units. The number of authorized Units may be increased by the Manager in its sole discretion, subject to the limitations in Section 3.2 and Article VI. The rights and privileges of each class of Units shall be as set forth in this Agreement.

**3.2    Issuance of Units**

(a)    As of the Effective Date, Units have been issued to the Members in such proportion as set forth on **Schedule I** hereto. No Capital Contributions were required to be made in exchange for the issuance of such Units and no Member shall be required to make any Capital Contributions to the Company.

(b)    After the Effective Date and pursuant to each closing of the Offering, the Class B Units shall be issued as specified and authorized by Skyway. Skyway's authorization of Class B Units shall be made by separate written designation, providing the legal name, address and tax identification number of the Class B Member to be admitted, and the number of Class B Units to be issued to such Member.

(c)    Subsequent to the Effective Date, but subject to the limitations set forth in Article VI, the Manager may cause the Company to issue additional Class B Units at such times and on such terms and conditions as may be determined by the Manager, in consultation with Skyway. Following any such issuance of additional Class B Units, the Manager shall unilaterally update **Schedule I** accordingly.

(d)    No Member shall be paid interest on any Capital Contribution. No Member shall have the right to withdraw, or receive any return of, its Capital Contribution (if any), except as may be specifically provided herein. No Member shall have priority over any other Member, either as to the return of its Capital Contribution (if any) or as to Net Income, Net Loss or distributions, except as otherwise specifically provided herein. No Manager or Member shall have any personal liability for the repayment of the Capital Contributions of any Member.

(e)    No Unit in the Company shall be represented by a separate certificate.

<div align="center">-10-</div>

(f)     The parties hereto intend that the issuance of Class A Units and Class B Units shall constitute the nontaxable issuance of a profits interest in the Company in accordance with IRS Revenue Procedures 93-27 and 2001-43. Notwithstanding any provision of this Agreement to the contrary, any Member issued Class A or Class B Units shall have an initial Capital Account of zero with respect to such Units and shall not be required to make, or be considered to have made, any initial Capital Contribution to the Company with respect to such Units consistent therewith.

(g)     Except as otherwise expressly set forth in this Agreement, the Class B Units shall be non-voting.

## 3.3     Deficit Capital Accounts

Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that a deficit, if any, in the Capital Account of any Member results upon dissolution of the Company, such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## 3.4     Member Loans

The Company may obtain loans from one or more Members or Affiliates thereof, but such loans must be approved in advance in writing by the Manager and be on arm's length terms.

## 3.5     Debt Offering

In order to finance the Company's acquisition of Investments, the Company intends to raise capital through an offering of senior secured debentures (the "**Offering**"). The minimum size of the Offering is $2 million, while the maximum size of the Offering is $30 million (which may be increased to $50 million at the discretion of the Manager). The precise terms of the Offering shall be determined by the Manager. The funds raised through the Offering shall not constitute equity, but shall be subject to the management fee set forth in Section 6.1.3(a).

## ARTICLE IV
## ALLOCATION OF NET INCOME AND NET LOSS

## 4.1     Allocation of Net Income and Net Loss

After giving effect to the limitation contained in Section 4.2 and the special allocations contained in Section 4.3 and Section 4.4, Net Income and Net Loss for any fiscal year or other period shall be allocated among the Members so as to reduce, proportionately, the differences between their respective Target Capital Accounts and their respective Partially Adjusted Capital Accounts for such fiscal year or other period.

## 4.2     Loss Limitation

Notwithstanding the allocation of Net Loss pursuant to Section 4.1, the amount of Net Loss allocated to any Member shall not exceed the maximum amount of Net Loss that can be so

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 1 Page 191
1366

allocated without causing any Member to have an Adjusted Deficit at the end of any fiscal year. If some but not all of the Members would have Adjusted Deficits as a consequence of an allocation of Net Loss pursuant to Section 4.1, the limitation set forth in this Section 4.2 shall be applied on a Member-by-Member basis so as to allocate the maximum permissible Net Loss to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). To the extent Net Loss is subject to the limitation contained in this Section 4.2 and reallocated to other Members, items of income or gain shall be allocated to such other Members to the extent and in reverse order of the Net Loss so reallocated for the purpose of offsetting the effect of this Section 4.2.

### 4.3    Special Allocations

#### 4.3.1    Minimum Gain Chargeback

Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding any other provision of this Article IV, if there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Person's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 4.3.1 is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

#### 4.3.2    Member Minimum Gain Chargeback

Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article IV, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Person's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 4.3.2 is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

#### 4.3.3    Qualified Income Offset

If any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company

income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.3.2 shall be made only if and to the extent that such Member would have an Adjusted Deficit after all other allocations provided for in this Article IV have been tentatively made as if this Section 4.3.3 were not in this Agreement.

### 4.3.4   Nonrecourse Deductions

"Nonrecourse deductions," as defined in and determined under Treasury Regulations Sections 1.704-2(b)(1) and (c), shall be allocated among the Members in proportion to their respective Class A Percentage Interest or Class B Percentage Interest, as applicable.

### 4.3.5   Member Nonrecourse Deductions

Member Nonrecourse Deductions for any taxable year of the Company shall be allocated to the Member that made, or guaranteed or is otherwise liable with respect to the loan to which such Member Nonrecourse Deductions are attributable in accordance with principles under Treasury Regulations Section 1.704−2(i).

## 4.4   Curative Allocations

The allocations set forth in Sections 4.2 and 4.3 are intended to comply with certain regulatory requirements under Code Section 704(b). The Members intend that, to the extent possible, all allocations made pursuant to such Sections will, over the term of the Company, be offset either with other allocations pursuant to Section 4.2 or 4.3 or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 4.4. Accordingly, the Manager is hereby authorized and directed to make offsetting allocations of Company income, gain, loss or deduction under this Section 4.4 in whatever manner the Manager determines is appropriate so that, after such offsetting special allocations are made (and taking into account the reasonably anticipated future allocations of income and gain pursuant to Section 4.3.1 and Section 4.3.2 that are likely to offset allocations previously made under Section 4.3.4 and Section 4.3.5), the Capital Accounts of the Members are, to the extent possible, equal to the Capital Accounts each would have if the provisions of Sections 4.2 and 4.3 were not contained in this Agreement and all Company income, gain, loss and deduction were instead allocated in accordance with the provisions of Section 4.1.

## 4.5   Code Section 704(c) Allocations

### 4.5.1   Contributed Property

In accordance with Code Section 704(c) and the Regulations promulgated under such section, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value using such method under the Treasury Regulations as may be determined by the Manager.

### 4.5.2 Reverse 704(c) Allocations

If the Gross Asset Value of any Company asset is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall consistently take into account any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value using such method under the Treasury Regulations as may be determined by the Manager.

## 4.6 Other Allocation Rules

### 4.6.1 Allocations for Tax Purposes

Except as provided in Section 4.5, items of Company income, gain, loss or deduction recognized for federal income tax purposes shall be allocated in the same manner that the corresponding items comprising Net Income and Net Loss are allocated pursuant to this Agreement. The allocation of such items under this Section 4.6.1 shall not affect the Capital Account of any Member.

### 4.6.2 Allocation of Excess Nonrecourse Liabilities

Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' interest in the Company's profits shall be in accordance with their respective Class A Percentage Interest or Class B Percentage Interest, as applicable.

### 4.6.3 Allocations in Connection With Varying Interests

If during a Company fiscal year there is (a) a permitted Transfer of a Member's Units or (b) the admission of a Member, then Net Income, Net Loss, each item thereof and all other tax items of the Company for such fiscal year shall be divided and allocated among the Members by taking into account their varying interests during such fiscal year in accordance with Code Section 706(d) and using any conventions permitted by law and selected by the Manager. Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.6.3, whether or not any Member or the Company has knowledge of any Transfer.

<div align="center">

## ARTICLE V
## DISTRIBUTIONS

</div>

## 5.1 Timing of Distributions of Net Cash Flow

Except as otherwise provided in this Article V, Net Cash Flow and Company assets in kind shall be distributed in such amounts and at such times as the Manager shall determine; provided that no distributions shall be made under this Section 5.1 until all of Company's obligations under the Debentures have been fully satisfied.

**5.2     Priority of Distributions**

Except as otherwise provided in Section 5.6 in connection with the liquidation of the Company and subject to Sections 5.3, 5.5 and 5.7, Net Cash Flow shall be distributed among the Members as follows: (a) 67% to the Class A Member and (b) 33% to the Class B Members in accordance to their respective Class B Percentage Interests; provided, that other than tax distributions pursuant to Section 5.3, no distributions of Net Cash Flow shall be made until the Company's obligations pursuant to the Debenture Purchase Agreement are fully satisfied.

**5.3     Tax Distributions**

Notwithstanding any limitations provided elsewhere in this Agreement, the Company shall distribute to all Members in cash the Estimated Tax Amount within 90 days after the close of each fiscal year, unless the Manager determines that such distributions would render the Company insolvent or necessitate borrowing by the Company, if an Event of Default (as defined in the Debentures) has occurred under the Debentures or is continuing, or if the distribution would otherwise be materially adverse to the Company. Distributions pursuant to this Section 5.3 shall be made to the Members pro rata in the proportions in which taxable income for such fiscal year has been allocated to them and shall be applied against amounts otherwise distributable to them pursuant to Section 5.2. For purposes of determining the amount distributed under this Section 5.3, all cash distributions made during a fiscal year pursuant to this Article V shall be treated as distributions made pursuant to this Section 5.3 in respect of such fiscal year, except to the extent that such distributions were required to satisfy the obligations of the Company under Section 5.3 in respect of a prior fiscal year. The Company shall not be required to make any distributions prior to dissolution except as provided in this Section 5.3.

**5.4     Distributions in Kind**

At any time after the Company's obligations under the Debentures have been fully satisfied, the Company, the Company may distribute Company assets in kind and the distribution of any such assets in kind shall be made on the basis of the Gross Asset Values thereof on the date of distribution (adjusted as specified in paragraph (d) of the definition of "Gross Asset Value") and shall be made in the manner set forth in Section 5.2. The Manager may elect, in its reasonable judgment and in good faith, to revalue the Gross Asset Value of all or a portion of the Company's assets and adjust the Capital Accounts of the Members accordingly in the manner provided under this Agreement to preserve the economic interests of the Members as the result of any distribution in kind.

**5.5     Other Distribution Rules**

Net Cash Flow and Company assets distributable to the Members shall be distributed to the Persons recognized by the Company as holders of the Units as of the last day of the period for which such distribution is made. Notwithstanding anything contained herein to the contrary, the Manager may in its discretion hold back and retain any distributions attributable to unvested Units, other than tax distributions pursuant to Section 5.3, until such time as the Units in question have vested.

**5.6     Distributions Upon Liquidation**

(a)     To effect the dissolution and liquidation of the Company pursuant to Section 11.1, the Manager shall distribute all assets of the Company to the Members in cash or in kind in accordance with Section 5.6(b). Any assets to be distributed in kind shall be distributed based on their Gross Asset Values on the date of distribution.

(b)     The net cash proceeds resulting from the liquidation of the property of the Company and any assets to be distributed in kind pursuant to a dissolution of the Company shall be distributed and applied in the following order of priority:

(i)     To the payment of the expenses of liquidation and the debts and liabilities of the Company then due other than debts and liabilities owing to the Members;

(ii)     To the payment of debts and liabilities owing to the Members;

(iii)     To the setting up of any Reserves that the Manager determines are reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; and

(iv)     The remainder in accordance with Section 5.2.

**5.7     Limitation on Distributions**

Notwithstanding anything in this Agreement to the contrary, no distribution shall be made if it would render the Company insolvent or be in violation of the Act.

**ARTICLE VI**
**MANAGEMENT**

**6.1     Manager**

**6.1.1     General Powers**

As provided herein, the Members shall appoint a Manager who shall, subject to the terms of this Agreement, have complete authority to manage the day-to-day business and affairs of the Company.

**6.1.2     Appointment of Manager**

(a)     The Manager need not be a Member of the Company and need not meet any other qualifications. The Manager may be an individual or an entity.

(b)     The Manager shall be appointed by a Majority Vote of the Class A Members. The initial Manager shall be iCap Management. The Manager shall hold office until such Manager dies, resigns or is otherwise removed pursuant to Section 6.1.2(d).

(c)     The Manager may resign at any time by delivering written notice to the Members. Any such resignation is effective upon delivery thereof unless the notice of resignation

specifies a later effective date and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(d)     A Manager may be removed with or without cause at any time by a Majority Vote of the Class A Members. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

(e)     Upon the removal, resignation or withdrawal of the Manager, a replacement Manager shall be appointed by a Majority Vote of the Class A Members. Any replacement Manager shall hold office until such Manager dies, resigns or is otherwise removed pursuant to Section 6.1.2(d).

### 6.1.3   Related Party Transactions

(a)     The Company shall pay to the Manager an annual management fee equal to 2% of the outstanding principal balance of the debentures issued pursuant to the Offering. For the initial fiscal year of the Company, the management fee shall be payable in an advance lump sum annual payment on the initial closing date of the Offering (with additional prorated amounts payable on any subsequent closings of the Offering). For subsequent fiscal years, the management fee will be paid in advance on a quarterly basis. Notwithstanding the foregoing, the management fee shall not be due and payable for any quarter in which an Event of Default occurs and is continuing as such term is defined in the Debenture Purchase Agreement.

(b)     In addition to the arrangements authorized by the terms of this Agreement, the Manager (or an Affiliate thereof) may also be paid an origination fee in an amount up to 3% of the Company's total investment amount in the Investment, payable by the special purpose entity holding the investment property.

(c)     Subject to Section 6.2.1(j), the Manager shall not be precluded from serving the Company in any other capacity and receiving compensation therefor.

(d)     the Company shall timely reimburse the Manager and its Affiliates for any reasonable expense paid by either such Person that properly is to be borne by the Company.

(e)     The Company may invest in Investments with one or more Persons, including a Related Party as set forth in Section 6.4. If the Company makes a Co-Investment with others, the fees payable by the Company pursuant to this Section 6.1.3 shall be proportionately reduced to reflect the Company's pro rata share of the Co-Investment.

(f)     Subject to any limitations set forth elsewhere in this Agreement, the Company may also enter into other transactions with a Related Party or engage any such Person to render services to the Company, and to pay compensation, fees or other consideration in respect thereto. The rates of compensation of such Related Party shall be limited to no higher than the rates that would be charged by an unrelated third-party in an arm's length transaction, and all payments subject to inspection by auditors.

(g)     Notwithstanding the foregoing or any other provision of this Agreement, the Manager may not take any action or receive any fee or compensation that would be inconsistent

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 17 Page 197
1366

with the terms of the Debentures or the disclosures set forth in the Confidential Offering Memorandum of the Company relating to the Debentures.

**6.2     Authority of Manager**

**6.2.1     Authority of Manager**

Except as otherwise provided herein, the Manager shall be vested with complete management and control of the day-to-day affairs of the Company and shall have the power and authority to do all things necessary or proper to carry out the purposes of the Company, except to the extent that the Manager delegates such authority to one or more designated Persons. Except as provided in Sections 6.2.2 and 6.2.3, the Manager, in its capacity as such, shall be specifically authorized to execute instruments, documents, agreements, contracts and other undertakings on behalf and in the name of the Company, and parties dealing with the Company shall be entitled to rely upon the authority of the Manager to execute such documents on behalf of the Company. Without limiting the generality of the foregoing, the Manager shall have full power and authority, at the expense of the Company:

(a)     To pay all reasonable expenses relating to the organization of the Company, including attorneys' and accountants' fees;

(b)     To engage, employ and dismiss such agents, attorneys, accountants, custodians, financial advisors, brokers and consultants as are necessary or advisable for the affairs of the Company;

(c)     To open, maintain and close bank accounts and custodial accounts for the Company and to draw checks and other orders for the payment of money;

(d)     To file, on behalf of the Company, all required local, state and federal tax returns and other documents relating to the Company;

(e)     To cause the Company to purchase or bear the cost of any insurance covering the potential liabilities of the Company, the Members, the Manager and the Officers;

(f)     To commence or defend litigation that pertains to the Company or Company property;

(g)     To borrow money, and to make, issue, accept, endorse and execute promissory notes, debentures, drafts, letters of credit, bills of exchange, guarantees and other instruments and evidences of indebtedness, and to secure the payment thereof by mortgage, pledge or assignment of or security interest in all or any part of the property then owned or thereafter acquired by the Company, plus such additional property as the Manager may determine;

(h)     To engage in the Offering;

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 18 Page 198
1366

(i)     To enter into, make and perform such contracts, agreements and other undertakings with any Person other than a Member, Manager, Officer or Affiliate thereof and to do such other acts as are necessary or advisable for, or as may be incidental to, the conduct of the Company's business in the ordinary course;

(j)     In addition to the compensation set forth in Section 6.1.3, to enter into, make and perform contracts, agreements and other undertakings with a Member, Manager, Officer or Affiliate thereof in the ordinary course of the Company's business; provided that the terms of such contracts, agreements or undertakings are on arm's length terms;

(k)     To acquire, manage and dispose of Investments; and

(l)     To appoint Officers pursuant to Article VII.

### 6.2.2   Limitation on Authority of Manager

Notwithstanding anything contained herein to the contrary, the Manager, without the prior written consent or ratification of a Majority Vote of the Class A Members and a Majority Vote of the Class B Members, shall have no authority to:

(a)     Amend this Agreement other than as permitted by Section 13.1;

(b)     Effect a merger of the Company or the sale, lease, exchange or other disposition of all, or substantially all, of the Company's property, or any other similar business combination pursuant to which any interest of the Company is converted into or exchanged for cash, securities or other property of an acquiring entity or any of its Affiliates;

(c)     Effect any dissolution, liquidation, winding up or Bankruptcy of the Company;

(d)     Do any act that would contravene this Agreement or the Debentures;

(e)     Do any act that would make it impossible or impracticable to carry on the ordinary business of the Company; or

(f)     Issue any Units other than (i) additional Class A Units or (ii) additional Class B Units that are issued pursuant to the Placement Agent Engagement Agreement, between the Company and Skyway.

### 6.2.3   Limitations on Investments

The Company will not make any Investment unless the Company's financial commitment with respect to such Investment is no greater than 10% of the aggregate proceeds received by the Company from the sale of the Debentures as of the closing date of such Investment.

### 6.2.4 Obligations of Manager

The Manager shall cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the projects in which the Company invests, and other activities of the Company as much time as may be reasonably necessary for the performance of their respective duties in such capacities as managing principals which shall be no less than a majority of their full business time during the period of the Offering. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as she or he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Company's investment objectives; (b) devote such time and effort as she or he deems reasonably necessary to the affairs of any successor fund and any pre-existing investments of the Company or undersized investments of the Company; (c) devote such time and effort as she or he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his own account; (e) engage in civic, professional, industry and charitable activities, and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investment or business ventures of any kind.

## 6.3    Tax Matters

The Manager shall designate a Member to serve as the tax matters partner as provided in Code Section 6231(a)(7). The initial tax matters partner shall be iCap Management. The tax matters partner shall be indemnified and reimbursed for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with his serving in that capacity. Notwithstanding any other provision of this Agreement, the tax matter partner is authorized to take any action that it determines to be necessary or appropriate to cause the Company to comply with any federal, state and local withholding requirement with respect to any allocation, payment or distribution by the Company to any Member or other Person.

## 6.4    Co-Investments

The Company may, at the Manager's discretion, elect to co-invest with one or more other Persons, including a Related Party, in Co-Investments. There are no restrictions on the nature of the Co-Investment, and the Co-Investment may take whatever form, and have whatever terms, as may be approved by the Manager in its discretion. Such investments may be made through joint ventures, limited partnerships, partnerships, co-tenancies or other legally-recognized entities. For the avoidance of doubt, a co-investor may be an investment fund similar to the Company and sponsored by a Related Party.

## ARTICLE VII
## APPOINTMENT OF OFFICERS

**7.1     Authority to Delegate to Officers**

The Manager shall have sole power and authority to appoint officers of the Company (the "**_Officers_**"). Officers shall have such authority, perform such duties and hold office for such period as may be prescribed by the Manager. The Manager may delegate to any Officer the power to appoint any subordinate Officers and to prescribe their respective terms of office, authority and duties. Any two or more offices may be held by the same Person. Unless an Officer dies, resigns or is removed from office, he or she shall hold office until his or her successor is appointed.

**7.2     Resignation or Removal**

Any Officer of the Company may resign from such position by delivering written notice of the resignation to the Manager. Any Officer may be removed by the Manager, with or without cause, upon receiving written notice from the Manager. Election or appointment of an Officer shall not of itself create any contractual right to continued employment, compensation or other benefit from the Company. Vacancies in any office caused by any reason may be filled by the Manager by selecting an individual to act during the unexpired term.

**7.3     Salaries**

The compensation of any Officers, agents or other employees of the Company shall be fixed by the Manager, and may be changed from time to time by the Manager, provided that no compensation shall be paid to any Related Party without a Majority Vote of the Class B Members.

**7.4     Signing Authority**

The Manager may authorize any Officer or Officers, or agent or agents, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Company. Such authority may be general or confined to specific instances. All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the Company may be signed by such Officer or Officers, or agent or agents, of the Company as is from time to time determined by the Manager and in such manner as is from time to time determined by the Manager.

## ARTICLE VIII
## RIGHTS AND OBLIGATIONS OF MEMBERS

**8.1     Limited Control**

Except in their potential capacity as a Manager and except as required under the Act or as specifically set forth in this Agreement, Members shall take no part in the management or control of the Company business, and have no right or authority to act for the Company, and shall have no right to vote on matters other than the matters set forth in this Agreement or in the Act.

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 1 Page 201
1366

**8.2     Call of Meetings**

The Manager may, and at the request of any Member shall, call meetings of the Members to discuss the business and affairs of the Company. The Manager may designate any place inside of the State of Washington as the location for any meeting of the Members. If no designation is made, the place of meeting shall be the principal office of the Company.

**8.3     Notice of Meetings**

Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than two or more than 50 days before the date of the meeting, either personally or by mail or by electronic mail, by or at the direction of the Manager, to each Member. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at the Member's address as it appears on the books of the Company, with postage thereon prepaid. Any notice required to be given pursuant to this Section 8.3 will be deemed to be waived by any Member by attendance at the meeting in person or by proxy, unless such Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting.

**8.4     Meetings by Communications Equipment**

Members may participate in a meeting of the Members by, or conduct the meeting through the use of, any means of communication by which all Members participating in the meeting can hear each other during the meeting. Participation by such means shall constitute presence in person at a meeting.

**8.5     Manner of Acting**

Any actions that may be taken by the Members shall be duly taken if approved by a Majority Vote of the Class A Members, unless such action requires a Majority Vote of the Class B Members herein. Company actions may be approved by the Members prospectively or ratified retrospectively.

**8.6     Action by Members Without a Meeting**

Any action that could be taken at a meeting of the Members may be taken without a meeting if one or more written consents setting forth the action so taken are signed by Members with the requisite voting authority to approve such action, and delivered to the Company. Action taken by written consent of Members without a meeting is effective when executed Member consents sufficient to approve or take the action have been delivered to the Company, unless the consent specifies a later effective date. Any such written consent shall be inserted in the minute book of the Company as if it were the minutes of a Member meeting.

**8.7     Other Business of Members; Conflicts of Interest**

The Manager and any Member may engage independently or with others in other business or investment ventures of every nature and description. Neither the Company nor any Member shall have any right by virtue of this Agreement or the partnership relationship created

hereby in or to such other ventures or activities or to the income or proceeds derived therefrom, and the pursuit of such ventures shall not be deemed wrongful or improper. Neither the Manager, the Members nor their Affiliates shall be obligated to present any particular business or investment opportunity to the Company, even if such opportunity is of a character which, if presented to the Company, could be taken by the Company, and each of them shall have the right to take for their own account or to recommend to others any such particular business or investment opportunity.

Neither the Manager nor any of its Affiliates may make any Investment on behalf of a new pooled investment fund with investment objectives that are identical to those of the Company until the earlier of: (a) the date on which at least 75% of the aggregate loan commitments to the Company pursuant to the Offering have been committed to or invested in Investments, applied to, or reserved for, Company expenses and management fees or reserved for subsequent investment or (b) the end of the Offering Period. During the Offering Period, any investment that is presented to the Manager or its members or managing officers that the Manager believes is consistent with the investment objectives of the Company and is otherwise suitable for the Company, will be offered by the Manager to the Company to the extent the Company has funds available to make such Investments, net of reserves for the management fee and Company expenses throughout the term of the Company. For the avoidance of doubt, neither the Manager nor its members or managing officers will be required to offer to the Company any real estate investment that is not consistent with the investment guidelines, investment objectives, and principles of the Company or is otherwise not suitable for the Company. Notwithstanding any provision to the contrary, the Company and its Affiliates may engage in management and investment activities related to pre-existing Investments and activities or operations related to a successor fund.

# ARTICLE IX
## ASSIGNABILITY OF UNITS; WITHDRAWAL

**9.1     Restricted Right to Transfer**

(a)     Except as otherwise provided in this Agreement, no Member shall Transfer any of the Units of the Company now owned or hereafter acquired by it without the prior written consent of the Manager.

(b)     Notwithstanding Section 9.1(a), the following Transfers of Units shall not require the consent of the Manager (but shall be subject to the restrictions set forth in Section 9.5):

(i)     Transfers to Affiliates;

(ii)     Transfers to a Member's heirs or personal representative upon the death of the Member; and

(iii)     In the case of Class B Members, Transfers to Persons who are members or participants in the Selling Group for the Offering.

For clarification purposes, a pledge of Class A Member's Units to or for the benefit of the Holders of the Debentures (each as defined in the Debenture Purchase Agreement) shall not constitute a Transfer under this Article IX and shall not require any consent of the Members or Manager.

**9.2    Effect of Transfer**

In the event of any Transfer accomplished in accordance with the provisions of this Agreement, the transferee shall receive and hold any and all Units of the Company so transferred subject to the terms and provisions of this Agreement and subject to the obligations of the transferor hereunder, and shall, upon request by the Company or any Member, forthwith execute an endorsement acknowledging such matter.

**9.3    No Other Transfer Effective**

Except as provided in this Article IX, no Transfer of any right, title or interest in Units of the Company shall be effective, and the Company shall not record or recognize any such Transfer, until there has been compliance with the provisions of this Agreement.

**9.4    Effectiveness of Transfer**

Any Transfer of Units shall be effective as of the first day of the calendar month immediately succeeding the month in which the Transfer occurs. The rights of an assignee who does not become a Substitute Member shall be limited to receipt of its share of the distributions, Net Income, Net Loss and other specially allocated items of the Company as determined by the terms of this Agreement; provided, however, that the Company shall not be required to make distributions to any assignee that does not become a Substitute Member and such assignee's rights shall be only against the assignor.

**9.5    Assignees and Substitute Members**

(a)    The Company need not recognize for any purposes any Transfer of all or any portion of the Units of a Member unless (i) the Company shall have received a fee in the amount established by it from time to time sufficient to reimburse it for all its actual costs incurred in connection with such Transfer, including, but not by way of limitation, any advice of counsel in connection with such Transfer; (ii) the Company shall have received such evidence of the authority of the parties to such Transfer as its counsel may request, (iii) the Transfer is consistent with and not in violation of the restrictions contained in this Agreement, and (iv) there shall have been filed with the Company and recorded on the Company's books a duly executed and acknowledged counterpart of the instrument making such Transfer, and such instrument evidences the written acceptance by the assignee of all the terms and provisions of this Agreement, represents that such Transfer was made in accordance with all applicable laws and regulations (including investor suitability requirements) and in all other respects is satisfactory in form and substance to the Manager.

(b)    Any Member who shall Transfer all of its Units in the Company shall cease to be a Member, except that unless and until a Member is admitted in its stead, such transferring Member shall retain the statutory rights of an assignor of a limited liability company interest

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 2 Page 204
1366

under the Act. The rights of an assignee of an interest who does not become a Member shall be limited to receipt of its share of allocations of Company Net Income and Net Loss as determined under Article IV and Company distributions as determined under Article V.

(c)     Prior to the admission of any transferee as a Substitute Member, the Company must receive a favorable opinion of the Company's legal counsel, or of other legal counsel reasonably acceptable to the Manager, to the effect that the Transfer or admission (i) is exempt from registration under applicable securities laws; (ii) does not adversely affect the characterization of the Company as a partnership for U.S. federal income tax purposes; and (iii) would not cause the Company to have to register as an investment company under Investment Company Act of 1940. The Manager, however, may waive the requirements of this Section 9.5(c), in whole or in part, in such circumstances as it deems appropriate.

(d)     An assignee of Units in the Company who does not become a Substitute Member and who desires to make a further Transfer of Units shall be subject to all the provisions of this Article IX to the same extent and in the same manner as a Member desiring to make a Transfer of Units.

**9.6     Obligations of Substitute Member**

(a)     A Substitute Member has, to the extent assigned, the rights and powers, and is subject to the restrictions and liabilities, of a Member under this Agreement, the Certificate and the Act and is also liable for any obligations of the assignor to make Capital Contributions, but is not obligated for liabilities reasonably unknown to the assignee at the time the assignee becomes a Member.

(b)     Even if an assignee becomes a Substitute Member, the assignor is not released from the assignor's liability to the Company, but ceases to be a Member when the assignee becomes a Substitute Member with respect to the Transferred Units.

**9.7     No Withdrawal of Members**

No Member has the right to withdraw from the Company as a Member (except in connection with a Transfer of all of its Units in accordance with this Agreement) and any attempt to violate the provisions hereof shall be legally ineffective.

## ARTICLE X
## LIMITATION UPON LIABILITY; INDEMNIFICATION

**10.1     Limitation on Liability**

No Member, Manager or officer, equity holder, employee or agent thereof, shall be liable, responsible or accountable in damages or otherwise to the Company or any Member for any act or omission by any such Person if such Person acted in good faith and in a manner in which he, she or it believed to be in the best interests of the Company unless such conduct constitutes fraud, gross negligence, willful misconduct or a material breach of this Agreement.

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 2 Page 205
1366

**10.2    Indemnification**

To the fullest extent not prohibited by law, the Company shall indemnify and hold harmless each Member, Manager, and each member, officer, equity holder, employee or agent thereof, from and against any and all losses, claims, demands, costs, damages, liabilities (joint and several), expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements and other amounts (collectively, "***Damages***") arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which such Person may be involved or threatened to be involved, as a party or otherwise, arising out of or incidental to any business of the Company transacted or occurring while such Person was a Member, Manager, or officer, shareholder, employee or agent thereof, regardless of whether such Person continues in such capacity at the time any such liability or expense is paid or incurred, except the foregoing shall not apply to any Damages to the extent that they shall ultimately be determined by final judicial decision from which there is no further right of appeal to have resulted from fraud, willful misconduct, bad faith or gross negligence on the part of such Person. The indemnification provided by this Section 10.2 shall be in addition to any other rights to which those indemnified may be entitled under any agreement, as a matter of law or equity, or otherwise, and shall continue as to a Person who has ceased to serve in their capacity, and shall inure to the benefit of the heirs, successors, assigns and administrators of the Person so indemnified. With respect to the satisfaction of any indemnification of the above-mentioned Persons, only assets of the Company shall be available therefor and no Member or Manager shall have any personal liability therefor. Any indemnification required hereunder to be made by the Company shall be made promptly as the liability, loss, damage, cost or expense is incurred or suffered. The Manager may establish reasonable procedures for the submission of claims for indemnification pursuant to this Section 10.2, determination of the entitlement of any Person thereto, and review of any such determination.

**10.3    Advancement Of Expenses**

The right to indemnification conferred in this Article X shall include the right to be paid by the Company the reasonable out-of-pocket expenses incurred in defending any proceeding in advance of its final disposition. Such an advancement of expenses shall be made upon delivery to the Company of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Section 10.3.

<center>

**ARTICLE XI**
**DISSOLUTION AND TERMINATION**

</center>

**11.1    Events of Dissolution**

The Company shall be dissolved by the election of the Manager and a Majority Vote of the Class A Members. Subject to the foregoing, the withdrawal, Bankruptcy, death, dissolution or other event of dissociation of a Member shall not dissolve the Company.

<center>-26-</center>

**11.2  Effectiveness of Dissolution**

Dissolution of the Company shall be effective on the date on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Certificate shall have been canceled and the assets of the Company shall have been distributed as provided herein. Notwithstanding the dissolution of the Company, prior to the termination of the Company, as aforesaid, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement. Upon dissolution, the Manager shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this Agreement, and cause the cancellation of the Certificate.

**11.3  Distributions Upon Liquidation**

(a)     Upon a dissolution of the Company, the Manager or court-appointed trustee if there is no Manager (the "***Liquidator***") shall take full account of the Company's liabilities and Company property and the Company property shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient therefor, shall be applied and distributed pursuant to Section 5.6.

(b)     If the Liquidator sets aside reserves for any contingent or unforeseen liabilities or obligations of the Company, such reserves may be paid over by the Liquidator to a bank, trust company or other financial institution to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the Liquidator may deem advisable, the amount in such reserves shall be distributed to the Members in the manner set forth in this Section 11.3.

(c)     If the Manager shall determine that an immediate sale of part or all of the Company's assets would cause undue loss to the Members, the Liquidator shall, to the extent not then prohibited by any applicable law of any jurisdiction in which the Company is then formed or qualified, either (i) defer liquidation of and withhold from distribution for a reasonable time any assets of the Company except those necessary to satisfy the Company's debts and obligations or (ii) distribute any assets to the Members in kind. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser selected by the Manager.

(d)     Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, including the return of his, her or its Capital Contribution thereto and his, her or its share of the Company's cash distributions and shall have no recourse therefor, upon dissolution or otherwise, against any Manager or any other Member. No Member shall have any right to demand or receive property other than cash upon dissolution and termination of the Company.

# ARTICLE XII
## BOOKS, RECORDS, BANK ACCOUNTS AND OTHER MISCELLANEOUS ITEMS

### 12.1   Financial Records

The Company shall keep accurate financial records with respect to its operations. Such records shall be maintained at the principal place of business of the Company.

### 12.2   Accounting Basis and Accounting Year

Unless otherwise determined by the Manager, such financial records shall be kept on a tax cash basis in accordance with the accounting methods followed by the Company for federal income tax purposes and be closed and balanced at the end of each calendar year. In addition, the Company shall keep records for the Capital Account of each Member maintained as provided in the definition of "Capital Account" in Article I.

### 12.3   Reports

(a)     Within 60 days after the end of each of the first three quarters of the Company's fiscal year, the Manager shall provide each Member with unaudited financial statements of the Company for such quarter.

(b)     Within 120 days after the end of each fiscal year of the Company, the Manager shall provide each Member with audited financial statements of the Company for such fiscal year.

(c)     Within 90 days after the end of each tax year of the Company, the Manager shall send to each Person who was a Member at any time during such tax year, all information reasonably necessary to enable such Person to prepare its federal, state and local income tax return for such tax year.

### 12.4   Bank Accounts

The Company shall be responsible for causing one or more accounts to be maintained in a bank (or banks), which accounts shall be used for the payment of expenditures incurred in connection with the business of the Company, and in which shall be deposited any and all cash receipts. All such amounts shall be received, held and disbursed by the Company for the purposes specified in this Agreement. There shall not be deposited in any of such accounts any funds other than funds belonging to the Company, and no other funds shall in any way be commingled with such funds.

### 12.5   Tax Elections

(a)     The Manager, in its sole discretion, may make or revoke an election to adjust the basis of the assets of the Company for federal income tax purposes in accordance with Code Section 754, in the event of a distribution of Company property as described in Code Section 734 or a transfer by any Member of his, her or its Unit(s) in the Company as described in Code Section 743. To the extent an adjustment is made to the adjusted tax basis of the Company's

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 208 Page 208
1366

property pursuant to such an election, the Capital Accounts shall be increased or decreased by the amount of such adjustment as either an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(b)    The Manager may also, from time to time, make such other tax elections as it deems necessary or desirable to carry out the business of the Company or the purposes of this Agreement.

## ARTICLE XIII
## MISCELLANEOUS

**13.1    Amendments**

Amendments may be made to this Agreement from time to time by a Majority Vote of the Class A Members; provided, however, that without the consent of each of the Members to be adversely affected by the amendment, this Agreement may not be amended so as to (a) impose upon the Member general liability for the Company's debts and liabilities or (b) alter the interest of the Member in distributions or allocations of Net Income or Net Loss (other than dilution resulting from the issuance of additional Units in accordance with the provisions of this Agreement). In addition, no amendment that would have any adverse effect on the rights, duties, or benefits of the Class B Members herein (including without limitation any modification of any right of the Class B Members to approve any Company matter under Section 6.2.2 or any other section) shall be effective unless approved by a Majority Vote of the Class B Members.

**13.2    Arbitration**

If any dispute relating to or arising from this Agreement cannot be settled by the parties, then they shall submit the dispute to binding arbitration by an arbitrator selected in the following manner: Within 20 days of receiving written demand for arbitration, each party involved in the dispute shall select an individual to represent it in the selection of an arbitrator. If the individuals selected by the parties cannot agree upon an impartial arbitrator within 30 days from the date written demand for arbitration is filed, the arbitrator shall be selected by a Judge of the Superior Court (or a comparable court) in the county where the Company's principal place of business is located upon 3 days' notice. Any arbitration shall be conducted in accordance with the rules of JAMS then in effect, with any judgment upon an award entered in the Superior Court (or a comparable court) in the county where the Company's principal place of business is located. The selected arbitrator shall also determine which party is the prevailing party, and the non-prevailing party shall pay all reasonable costs and expenses associated with the arbitration, including the prevailing party's reasonable attorneys' fees.

**13.3    Captions; Counterparts**

Titles or captions of articles or sections contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof. This Agreement may be executed

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 209 Page 209
1366

in any number of counterparts (including by facsimile and PDF), all of which together shall for all purposes constitute one agreement, binding on all the Members, notwithstanding that all the Members have not signed the same counterpart.

**13.4   Governing Law**

This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Delaware (regardless of the choice of law principles of the State of Delaware or of any other jurisdiction).

**13.5   Notices**

Except as otherwise expressly set forth in this Agreement, any notice required or permitted by this Agreement shall be in writing and shall be deemed effective (a) at the time of personal delivery; (b) when sent by fax with confirmation of transmission; (c) 72 hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid or (d) 48 hours after being deposited, on a prepaid basis, with a nationally recognized express delivery service (i.e. Federal Express or UPS). In the case of any notice delivered by fax, mail or delivery service, such notice shall be faxed or sent to the party to be notified at such party's fax number or address as set forth on **Schedule I** hereto (or in the case of the Company or a Manager who is not listed on **Schedule I**, to the address of the principal office of the Company).

**13.6   No Waiver**

The observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with a Majority Vote of the Class A Members, and underlined_provided that any provision hereof may be waived by any waiving party on such party's own behalf, without the consent of any other party. In addition, no waiver that would have any adverse effect on the rights, duties, or benefits of the Class B Members herein shall be effective unless approved by a Majority Vote of the Class B Members. Notwithstanding the foregoing, the observance of any term of this Agreement may not be waived with respect to a Member without the written consent of such Member unless such waiver applies to all Members in the same fashion.  No consent or waiver to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation.

**13.7   Confidentiality**

The Members recognize that they may have access to proprietary and confidential information regarding the Company, its investments, its business plans and strategies. In addition, the Members may become aware of information as to the identity and ownership percentages of the Company by other Members. The Members acknowledge that such information is of great value to the Company and the Members and that any such information that may be acquired by them has been acquired by them in confidence. The Members will not at any time reveal, divulge or otherwise make known, except as authorized by the Company or as required pursuant to legal or administrative processes, any information of a proprietary or confidential nature concerning the Company, its business, or its Members; provided, however, that Members shall be permitted to discuss the contents of Company reports received by the

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 10 Page 210
1366

Members and additional information relating to such Members' Capital Accounts with such Members' beneficial owners, advisors, lawyers and accountants on a need-to-know basis.

**13.8    Successors and Assigns**

Subject to the restrictions on transfer set forth herein, this Agreement, and each and every provision hereof, shall be binding upon and shall inure to the benefit of the Members, their respective successors, heirs, successors-in-title and assignees, and each and every successor-in-interest to any Member, whether such successor acquires such Unit(s) by way of gift, purchase, foreclosure or any other method, shall hold such Unit(s) subject to all of the terms and provisions of this Agreement.

**13.9    Entire Agreement**

This Agreement, together with the terms and provisions of any applicable vesting agreement between the Company and a particular Member, contains the entire understanding among the Members and supersedes any prior written or oral agreements between them respecting the Company. The parties hereto acknowledge that the Company, without any further act, approval or vote of any Member, may enter into vesting agreements with individual Members that have the effect of establishing rights under, or altering or supplementing the terms of, this Agreement with respect to such Members. The parties hereto agree that any rights established, or any terms of this Agreement altered or supplemented, in a vesting agreement with an individual Member shall govern with respect to such Member notwithstanding any other provision of this Agreement.

*[Page break intentionally inserted.]*

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 1 Page 211 of 1366

IN WITNESS WHEREOF, the parties have executed this Agreement.

**CLASS A MEMBER:**

> **iCap Pacific NW Management, LLC**,
> a Washington limited liability company
>
> _____
> Name: Chris Christensen
> Title: Manager

IN WITNESS WHEREOF, the parties have executed this Agreement.

**CLASS B MEMBER:**

_____

Name:
Title:

## SCHEDULE I

## Names, Addresses, Units and Percentage Interests of Members

### Class A Units

| Name and Address | Class A Units | Class A Percentage Interest |
|---|---|---|
| iCap Pacific NW Management, LLC<br>PO Box 3907<br>Bellevue, WA 98009<br>Facsimile: (425) 214-4776 | 1,000,000 | 100% |
| Total: | 1,000,000 | 100% |

### Class B Units

| Name and Address | Class B Units | Class B Percentage Interest |
|---|---|---|
| Authorized and Unissued | 50,000,000 | |
| Total: | 50,000,000 | 100% |

<div align="center">

**SUPPLEMENT NO. 1 TO**
**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**
ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC
$30,000,000 Targeted Offering Amount
$100,000 Minimum Debenture Purchase per Investor

</div>



This Supplement No. 1 (this "Supplement") to the Confidential Private Placement Memorandum of iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "Company"), dated December 19, 2013 (such private placement memorandum, together with its exhibits, the "Memorandum"), has been prepared in connection with, and is being delivered to potential investors in, the Company's offering (the "Offering") of 12% Senior Secured Debentures (the "Debentures"). The terms and conditions of the Offering, and the rights, duties and other attributes of the Debentures, are described in detail in the Memorandum and the exhibits thereto.

This Supplement updates and, in certain cases, amends information contained in the Memorandum and the legal agreements related to it, and accordingly, should be read in conjunction with the Memorandum and its agreements. To the extent information disclosed in this Supplement is inconsistent with information contained in the Memorandum, the information disclosed in this Supplement shall be deemed to supersede such inconsistent information in the Memorandum and all other information in the Memorandum derived therefrom. Capitalized terms used in this Supplement without definition shall have the meanings ascribed to them in the Memorandum.

No person has been authorized to make any representation or give any information with respect to the Company, the Offering, the Debentures or any related matter other than those contained in the Memorandum and this Supplement.

**As with all investments, investment in the Debentures is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. See the "Forward-Looking Statements," "Risk Factors," "Conflicts of Interest" and "Federal Income Tax Consequences" sections of the Memorandum for a discussion of certain factors you should consider before making an investment decision. In addition, in making an investment decision, investors must rely on their own examination of the Company and the terms of the Offering, including the merits and risks involved. The Debentures have not been recommended by the Securities and Exchange Commission or any state securities commission, nor has the Securities and Exchange Commission or any state securities commission passed on the accuracy or adequacy of the Memorandum or this Supplement. Any representation to the contrary is a criminal offense.**

<div align="center">

The date of this supplement is February 24, 2014

</div>

## SUPPLEMENT

This Supplement is being distributed to potential investors in the Offering to inform them of the matters discussed below.

### 1. Updated Prior Performance of the Manager and Its Affiliates

The following projects of the Company's management team are being added to the section of the Memorandum entitled "PRIOR PERFORMANCE OF THE MANAGER AND ITS AFFILIATES":

Elmwood

On April 30, 2013, an entity organized by the Company's management team (the "iCap Affiliate Entity") invested $263,000 into a 6-unit townhouse development located in Seattle, WA. The builder requested a cash investment in order to maintain project operations. The project was underwritten with a 6 month term and the option to extend up to 3 additional months. All 6 of the townhomes were sold in just over 8-months. On December 6, 2013 the final townhome was sold and the iCap Affiliate Entity received its principal as well as an additional $157,279, a return on equity of 59.8%.

| Property: | Elmwood |
|---|---|
| Acquisition Date: | 4/30/2013 |
| Location: | Seattle, WA |
| Total Invested Cash Equity: | $263,000 |
| Project Cost: | $1,765,650 |
| Exit Value: | $2,370,000 |
| Exit Date: | 12/6/2013 |
| Net Gain: | $157,279 |
| ROE: | 59.8% |

Bremerton Duplexes

On August 28, 2013, the iCap Affiliate Entity invested $86,700 into a 4-unit duplex project located in Bremerton, WA. The builder requested cash equity in order to obtain financing to purchase, improve, and lease up the existing units. The primary exit for the project was to obtain a permanent loan to pay off the iCap Affiliate Entity. The project was underwritten with a 6 month term and the option to extend an additional 3 months. The iCap Affiliate Entity was paid off on month 5, one month prior to the term. On January 16, 2014, the iCap Affiliate Entity received its principal as well as an additional $33,300, a return on equity of 38.4%.

| Property: | Bremerton Duplexes |
|---|---|
| Acquisition Date: | 8/28/2013 |
| Location: | Bremerton, WA |
| Total Invested Cash Equity: | $86,700 |
| Project Cost: | $1,765,650 |
| Exit Value: | $267,200 |
| Exit Date: | 1/16/2014 |
| Net Gain: | $33,300 |
| ROE: | 38.4% |

**2.      Revisions Prohibiting Non-Cash Payments to Investors**

(a)      The Debenture Purchase Agreement and any exhibits thereto, as appearing in the Original Memorandum, have been amended to include language providing that, upon the occurrence of an Event of Default (as defined in the Debenture Purchase Agreement), the holders of Debentures shall be prohibited from receiving any payment or other consideration for their Debentures other than a cash payment made in accordance with the Debenture Purchase Agreement.

(b)      Section 4.4.1 of the Collateral Agent Agreement (set forth as Exhibit C-1 of the Debenture Purchase Agreement) has been removed and replaced with "Intentionally Omitted."  This section, which refers to investors being able to take title to real property via a credit bid at foreclosure, is being removed so as to keep the agreement consistent with the previous paragraph 2(a) allowing only cash payments to investors.

**SUPPLEMENT NO. 2 TO**
**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**
ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC
$30,000,000 Targeted Offering Amount
$100,000 Minimum Debenture Purchase per Investor



This Supplement No. 2 (this "Supplement") to the Confidential Private Placement Memorandum of iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "Company"), dated December 19, 2013 (such private placement memorandum, together with its exhibits, the "Memorandum"), has been prepared in connection with, and is being delivered to potential investors in, the Company's offering (the "Offering") of 12% Senior Secured Debentures (the "Debentures"). The terms and conditions of the Offering, and the rights, duties and other attributes of the Debentures, are described in detail in the Memorandum and the exhibits thereto.

This Supplement updates and, in certain cases, amends information contained in the Memorandum and the legal agreements related to it, and accordingly, should be read in conjunction with the Memorandum and its agreements. To the extent information disclosed in this Supplement is inconsistent with information contained in the Memorandum, the information disclosed in this Supplement shall be deemed to supersede such inconsistent information in the Memorandum and all other information in the Memorandum derived therefrom. Capitalized terms used in this Supplement without definition shall have the meanings ascribed to them in the Memorandum.

No person has been authorized to make any representation or give any information with respect to the Company, the Offering, the Debentures or any related matter other than those contained in the Memorandum and this Supplement.

**As with all investments, investment in the Debentures is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. See the "Forward-Looking Statements," "Risk Factors," "Conflicts of Interest" and "Federal Income Tax Consequences" sections of the Memorandum for a discussion of certain factors you should consider before making an investment decision. In addition, in making an investment decision, investors must rely on their own examination of the Company and the terms of the Offering, including the merits and risks involved. The Debentures have not been recommended by the Securities and Exchange Commission or any state securities commission, nor has the Securities and Exchange Commission or any state securities commission passed on the accuracy or adequacy of the Memorandum or this Supplement. Any representation to the contrary is a criminal offense.**

The date of this supplement is February 25, 2014

## **SUPPLEMENT**

This Supplement is being distributed to potential investors in the Offering to inform them of the matters discussed below.

1.       **Breaking of Escrow**

On February 20, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC broke escrow having received $3,100,000 in debenture purchases.

2.       **Acquisition of Delridge Way Project**

On February 21, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC acquired, through its wholly owned LLC, a parcel of land located on 5206 Delridge Way SW, Seattle, WA. The project involves the subdividing of the property into five new lots and the construction and sale of homes on the lots. Each home will be between 1,400 SF and 1,600 SF in size, with 2-3 bedrooms, 2.5 baths, and 1-2 car garages. The total investment amount will be $289,391.

<div align="center">

**SUPPLEMENT NO. 3 TO**
**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**
ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC
$30,000,000 Targeted Offering Amount
$100,000 Minimum Debenture Purchase per Investor



</div>

This Supplement No. 3 (this "Supplement") to the Confidential Private Placement Memorandum of iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "Company"), dated December 19, 2013 (such private placement memorandum, together with its exhibits, the "Memorandum"), has been prepared in connection with, and is being delivered to potential investors in, the Company's offering (the "Offering") of 12% Senior Secured Debentures (the "Debentures"). The terms and conditions of the Offering, and the rights, duties and other attributes of the Debentures, are described in detail in the Memorandum and the exhibits thereto.

This Supplement updates and, in certain cases, amends information contained in the Memorandum and the legal agreements related to it, and accordingly, should be read in conjunction with the Memorandum and its agreements. To the extent information disclosed in this Supplement is inconsistent with information contained in the Memorandum, the information disclosed in this Supplement shall be deemed to supersede such inconsistent information in the Memorandum and all other information in the Memorandum derived therefrom. Capitalized terms used in this Supplement without definition shall have the meanings ascribed to them in the Memorandum.

No person has been authorized to make any representation or give any information with respect to the Company, the Offering, the Debentures or any related matter other than those contained in the Memorandum and this Supplement.

**As with all investments, investment in the Debentures is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. See the "Forward-Looking Statements," "Risk Factors," "Conflicts of Interest" and "Federal Income Tax Consequences" sections of the Memorandum for a discussion of certain factors you should consider before making an investment decision. In addition, in making an investment decision, investors must rely on their own examination of the Company and the terms of the Offering, including the merits and risks involved. The Debentures have not been recommended by the Securities and Exchange Commission or any state securities commission, nor has the Securities and Exchange Commission or any state securities commission passed on the accuracy or adequacy of the Memorandum or this Supplement. Any representation to the contrary is a criminal offense.**

<div align="center">

The date of this supplement is May 20, 2014

</div>

# SUPPLEMENT

This Supplement is being distributed to potential investors in the Offering to inform them of the matters discussed below.

**1.      Revision: Offering Period to be Extended to December 31, 2014**

The following extension language applies to all references contained in the private placement memorandum to the length of the "Offering Period":

The Fund will offer the Debentures as of the date of the Memorandum through the earlier of (a) the date on which the Fund closes on the sale of the Maximum Offering Amount, (b) such time, if any, as the Fund, in its sole discretion, elects to withdraw or terminate this Offering; or (c) December 31, 2014 (the "Offering Period").

**2.      Revision: Reference to Company Website**

The following replaces in its entirety bullet point (b) under the section "Reports to the Investors" on page 33 of the private placement memorandum:

(b) quarterly newsletter reports on the Fund's investments, which may be accessed by the Holder at www.icapequity.com.

**3.      Revision: Removal of $10,000 Investment Increments**

The following replaces all references to "additional integral multiples of $10,000" in the private placement memorandum:

The Debentures will be issued without coupons, in denominations of at least $100,000. The Fund reserves the right, in its sole discretion, to accept subscriptions for amounts that are more or less than the minimum.

**4.      Recent Fund Investments**

Delridge Townhomes

On February 21, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC acquired, through its wholly owned LLC, a parcel of land located on 5206 Delridge Way SW, Seattle, WA in the amount of $289,391.  The project involves the subdividing of the property into five new lots and the construction and sale of homes on the lots.  Each home is expected to be between 1,400 SF and 1,600 SF in size, with 2-3 bedrooms, 2.5 baths, and 1-2 car garages.

Capitol Hill 5 Lot

On March 10, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $372,500 for the purchase of a single lot in the City of Seattle.  The project involves the short plat of the land into five lots and the construction of five row houses located in the Capitol Hill neighborhood of

Seattle, WA. The homes will be located within walking distance of transit and shopping. Each home is expected to be between 1,600 SF and 1,800 SF with 2-3 bedrooms, 2.5 baths, and garages.

Yarrow Point

On April 15, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $725,500 for the purchase of a single home in the City of Bellevue. The project involves the short plat of the land into two lots and the construction of two single family homes located in the Yarrow Point neighborhood of Bellevue, WA. The homes will be located within walking distance of Lake Washington. Each home is expected to be between 2,900 SF and 3,500 SF with 4-5 bedrooms, 3 baths, and garages.

Soundview Manor

On April 18, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $724,000 for the purchase of a twenty one lot plat located in the City of Federal Way. The project involves the acquisition and development of twenty one lots and the subsequent construction and sale of twenty one single family homes. Each home is expected to be between 2,600 SF and 3,000 SF with 3-4 bedrooms, 2.5 baths, and garages.

Willow Townhomes

On April 29, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $617,750 for the purchase of a single lot in the City of Seattle. The project involves the short plat of the land into twenty six lots and the construction of twenty six row houses. The homes will be located within walking distance of transit, schools, and shopping. Each home is expected to be between 1,300 SF and 1,400 SF with 2-3 bedrooms, 2.5 baths, and garages.

Rainier Beach Townhomes

On May 9, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $214,000 for the purchase of a ten lot plat in the City of Seattle. The project involves the acquisition and development of ten lots and the subsequent construction and sale of ten townhomes. The homes will be located within walking distance of transit and shopping. Each home is expected to be between 1,200 SF and 1,300 SF with 2-3 bedrooms, 2.5 baths, and garages.

<div align="center">

**SUPPLEMENT NO. 4 TO**
**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**
ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC
$30,000,000 Targeted Offering Amount
$100,000 Minimum Debenture Purchase per Investor

</div>



This Supplement No. 4 (this "Supplement") to the Confidential Private Placement Memorandum of iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "Company"), dated December 19, 2013 (such private placement memorandum, together with its exhibits, the "Memorandum"), has been prepared in connection with, and is being delivered to potential investors in, the Company's offering (the "Offering") of 12% Senior Secured Debentures (the "Debentures"). The terms and conditions of the Offering, and the rights, duties and other attributes of the Debentures, are described in detail in the Memorandum and the exhibits thereto.

This Supplement updates and, in certain cases, amends information contained in the Memorandum and the legal agreements related to it, and accordingly, should be read in conjunction with the Memorandum and its agreements. To the extent information disclosed in this Supplement is inconsistent with information contained in the Memorandum, the information disclosed in this Supplement shall be deemed to supersede such inconsistent information in the Memorandum and all other information in the Memorandum derived therefrom. Capitalized terms used in this Supplement without definition shall have the meanings ascribed to them in the Memorandum.

No person has been authorized to make any representation or give any information with respect to the Company, the Offering, the Debentures or any related matter other than those contained in the Memorandum and this Supplement.

**As with all investments, investment in the Debentures is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment.  See the "Forward-Looking Statements," "Risk Factors," "Conflicts of Interest" and "Federal Income Tax Consequences" sections of the Memorandum for a discussion of certain factors you should consider before making an investment decision. In addition, in making an investment decision, investors must rely on their own examination of the Company and the terms of the Offering, including the merits and risks involved. The Debentures have not been recommended by the Securities and Exchange Commission or any state securities commission, nor has the Securities and Exchange Commission or any state securities commission passed on the accuracy or adequacy of the Memorandum or this Supplement. Any representation to the contrary is a criminal offense.**

<div align="center">

The date of this supplement is July ___, 2014

</div>

<u>**SUPPLEMENT**</u>

This Supplement is being distributed to potential investors in the Offering to inform them of the matters discussed below.

1.      **Recent Fund Investments**

<u>Meridian Greens Apartments</u>

On May 30, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $852,205.00 for the acquisition, development, and construction of a 39 unit mixed use apartment building located in the suburban market of Puyallup, WA. The units will be a combination of 1 and 2 bedrooms ranging from 700 -1200 SF.  iCap will be refinanced out of the project.

<u>Wallingford Townhomes</u>

On May 30, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $630,240.00 for the purchase of a single lot and the subsequent short plat and construction of eight townhomes located in Seattle. The homes will be located within walking distance of transit, shopping, parks, and schools in the desirable Wallingford neighborhood. Each home will be between 1,400 SF and 1,600 SF with 2-3 bedrooms, 2.5 baths, and a 1 car garage, selling for $400,000.

<u>Ruby 62 Apartments</u>

On June 4, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $1,478,000.00 for the acquisition, development, and construction of a 62 unit apartment building located in the suburban market of Lakewood, WA. The property is located in an established golf course community. The units will be a combination of 1, 2, and 3 bedrooms ranging from 700 -1400 SF.  iCap will be refinanced out of the project.

<u>Spanaway Village</u>

On June 10, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $1,212,500.00 for the renovation of a mid-80's retail center anchored by Safeway and Rite Aid Spanaway, WA.  The project is in a well-trafficked retail corridor near Joint Base Lewis McChord. The property consists of two available spaces of 17,067 and 17,032 square feet (one of which has a thrift store operating on a month-to-month basis). Notably, LA Fitness will be building a new 40,000 sf facility on a vacant pad in the same center (and almost adjacent to the subject) which will be complete and open by year-end.  iCap will be refinanced out of the project.

<u>13 Avenue W</u>

On June 12, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $525,000.00 in the purchase of a single lot with an existing duplex on the property. The duplex will be remodeled and three new townhomes will be constructed on the property as well.  The duplex and townhome units will range between 1,400 - 1,700 SF, with 3 bedrooms, 2.5 baths, and 1 car garage. Each unit will sell for approximately $545,000.

## Lake Sammamish Home 1, LLC

On June 24, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $800,000.00 for the acquisition and development of a waterfront property that has been entitled for 8 lots. Each lot has views and access to Lake Sammamish, in a high demand area with limited waterfront space. Lake Sammamish is one of the largest bodies of fresh water in the Puget Sound region. Each lot will sell for approximately $712,000.

## BDR Kirkland II, LLC

On June 30, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $833,000.00 for the acquisition of 4 lots and subsequent construction of 4 homes. The homes will be located in the coveted East of Market neighborhood in downtown Kirkland. Each home will sell for $1,398,000 to $1,498,000.

## Evergreen Village Apartments

On July 1, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $1,060,000.00 for the acquisition and entitlement of of 6.15 acres and the subsequent construction of a 327 unit mixed use apartment building with 12,044 SF commercial space, located in Lynwood, WA. iCap will be refinanced out of the project.

## 725 Broadway Apartments

On July 1, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $1,062,000.00 for the acquisition, development, and construction of a 209 unit mixed use apartment building located in downtown Tacoma, WA. The property is located near shopping, entertainment, and transportation. The units will be a combination of 1 and 2 bedrooms ranging from 500 -1000 SF. iCap will be refinanced out of the project.

## 4422 Woodlawn Townhomes

On July 22, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $182,100.00 in the purchase of a single lot and the subsequent construction of three new townhomes. The units will be 1,600 SF, with 3 bedrooms, 2.5 baths, and 1 car garage. Each unit will sell for approximately $675,000.

## Woodlawn Apartments

On July 22, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $401,876.25 for the purchase and entitlement of a property to be used in a 43 unit mixed use apartment building with 3 commercial units on the main floor. The property is located in the middle of the Wallingford neighborhood and is walkable to shopping, transportation, schools, and entertainment. iCap will be refinanced out of the project.

## 13th and Emmerson

On July 23, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $601,310.00 for the purchase of a single lot where ten new townhomes will be constructed on the property. The units will be 1,400 SF, with 3 bedrooms, 2.5 baths, and 1 car garage. Each unit will sell for approximately $585,000.

<div align="center">

**SUPPLEMENT NO. 5 TO**
**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**
ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC
$30,000,000 Targeted Offering Amount
$100,000 Minimum Debenture Purchase per Investor

</div>



This Supplement No. 5 (this "Supplement") to the Confidential Private Placement Memorandum of iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "Company"), dated December 19, 2013 (such private placement memorandum, together with its exhibits, the "Memorandum"), has been prepared in connection with, and is being delivered to potential investors in, the Company's offering (the "Offering") of 12% Senior Secured Debentures (the "Debentures"). The terms and conditions of the Offering, and the rights, duties and other attributes of the Debentures, are described in detail in the Memorandum and the exhibits thereto.

This Supplement updates and, in certain cases, amends information contained in the Memorandum and the legal agreements related to it, and accordingly, should be read in conjunction with the Memorandum and its agreements. To the extent information disclosed in this Supplement is inconsistent with information contained in the Memorandum, the information disclosed in this Supplement shall be deemed to supersede such inconsistent information in the Memorandum and all other information in the Memorandum derived therefrom. Capitalized terms used in this Supplement without definition shall have the meanings ascribed to them in the Memorandum.

No person has been authorized to make any representation or give any information with respect to the Company, the Offering, the Debentures or any related matter other than those contained in the Memorandum and this Supplement.

**As with all investments, investment in the Debentures is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. See the "Forward-Looking Statements," "Risk Factors," "Conflicts of Interest" and "Federal Income Tax Consequences" sections of the Memorandum for a discussion of certain factors you should consider before making an investment decision. In addition, in making an investment decision, investors must rely on their own examination of the Company and the terms of the Offering, including the merits and risks involved. The Debentures have not been recommended by the Securities and Exchange Commission or any state securities commission, nor has the Securities and Exchange Commission or any state securities commission passed on the accuracy or adequacy of the Memorandum or this Supplement. Any representation to the contrary is a criminal offense.**

<div align="center">

The date of this supplement is August 19, 2014

</div>

4812-6626-2808.1

## SUPPLEMENT

This Supplement is being distributed to potential investors in the Offering to inform them of the following matters:

1.      **Recent Fund Investments**

On August 1, 2014 iCap Pacific Northwest Opportunity and Income Fund, LLC invested $240,000 for the financing of a residential lot and the subsequent construction and sale of a finished home located in Bellevue, WA.  The property has views of Lake Sammamish.  The home will be 3500 SF with 4 bedrooms, 3.5 baths, and 3 car garage.

2.      **Summons and Complaint**

On July 29, 2014 Stalwart Capital, LLC served a summons and complaint upon iCap Pacific Northwest Opportunity and Income Fund, LLC (the "Company") seeking a fee on capital raised by the Company. The Company believes this complaint is without merit and will defend itself vigorously.  Questions can be directed to the Company management by calling Connie Crothers at 425.372.7114.

# EXHIBIT 2

Name: _____

Memorandum No. _____

# iCap Northwest Opportunity Fund, LLC

# $30,000,000 of

# 10% Senior Secured Debentures

_____

This Confidential Offering Memorandum (this "*Memorandum*") is being furnished in connection with the offer and sale (the "*Offering*") of up to $30,000,000 of 10% Senior Secured Debentures due 2017 (the "*Debentures*") by iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company (the "*Fund*"). Offers will be made only to accredited investors, as defined under Rule 501 promulgated under the Securities Act of 1933, as amended (the "*Securities Act*") on a "best efforts" basis. Debentures will be issued in denominations of at least $100,000. The Fund may accept lower denominations at its discretion.

The aggregate amount of Debentures being offered is up to $30,000,000 (the "*Maximum Offering Amount*"). The Fund reserves the right, in its sole discretion, to increase the Maximum Offering Amount to $50,000,000 to accommodate oversubscriptions for the Debentures. The Debentures are being offered on a "Best Efforts" basis, which means there is no guarantee that any Debentures will be sold. The Fund may hold closings, in the Fund's sole discretion, as subscriptions for the Debentures are received. The Fund will offer the Debentures as of the date of this Memorandum through the earlier of (a) the date on which the Fund closes on the sale of the Maximum Offering Amount; (b) such time, if any, as the Fund, in its sole discretion, elects to withdraw or terminate this Offering; or (c) December 17, 2015 (the "*Offering Period*"), unless extended up to ninety (90) days by the Manager.

The Fund will pay interest on the Debentures at the rate of 10% per annum. Interest will be payable monthly in arrears on or before the 15th day of the following month. The Debentures will mature on December 31, 2017.

**THIS OFFERING INVOLVES CERTAIN RISKS. See "Risks Factors."**

THE DEBENTURES HAVE NOT BEEN, NOR WILL THEY BE REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT. THEY ARE BEING OFFERED AND SOLD IN THE UNITED STATES ONLY TO ACCREDITED INVESTORS IN RELIANCE ON RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS MEMORANDUM IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

_____

# StillPoint Capital, LLC

### The date of this Memorandum is April 20, 2015.

The information contained in this Memorandum is confidential. By acceptance of this Memorandum, each recipient agrees (a) not to reproduce or distribute this Memorandum to other persons (except the recipient's professional advisors) without the prior written consent of the Manager; (b) that the recipient and his, her or its professional advisors will keep permanently confidential all information contained herein not already in the public domain; and (c) that the recipient will use this Memorandum for the sole purpose of evaluating a possible investment in the Debentures. Each recipient also agrees to return this Memorandum and any other documents or information furnished by the Fund (and any and all copies thereof) to the recipient upon request of the Fund if the recipient declines to purchase any Debentures.

There will be no public market for the Debentures and there is no obligation on the part of the Fund or any person to register the Debentures under the Securities Act or any state securities laws.

This Memorandum includes data and information obtained from independent third party sources. Although the Fund does not have any reason to believe that such data and information is not accurate, the Fund did not independently verify such data and information and cannot assure the accuracy or completeness of such data and information. Prospective investors must rely upon their own investigations and evaluations with respect to making an investment in the Debentures being offered hereby.

Prospective investors will be advised of any material modifications to the terms of the Offering or the Debentures in writing prior to any sale of Debentures to the prospective investors.

Nothing contained in this Memorandum is, or should be relied upon as, a promise or representation as to the Fund's future performance. Prospective investors must rely upon their own examination of the Fund and the terms of the Offering, including the merits and risks involved.

This Memorandum is qualified in its entirety by the Senior Secured Debenture Purchase Agreement attached hereto as <u>Exhibit A</u>. The Senior Secured Debenture Purchase Agreement, is hereinafter referred to in this Memorandum as the "***Debenture Agreement***."

The Debentures are offered when, as, and if issued, subject to the right of the Manager, in its sole discretion, to cause the Fund to approve or reject any subscription in whole or in part and subject to certain other conditions described herein. Subscriptions for Debentures can only be made by delivery to the Fund of an executed Debenture Agreement, together with the Debenture, in the form attached as <u>Exhibit A</u> to the Debenture Agreement by completing and returning the subscription instruction packet (the "***Subscription Documents***") attached hereto as <u>Exhibit B</u>.

This offer may be withdrawn at any time and is specifically made subject to the terms described in this Memorandum. The Fund reserves the right to reject any subscription, in whole or in part, for any reason whatsoever or to allot to any prospective investor less than the proposed principal amount of a Debenture delivered by the prospective investor. Rejected subscriptions will be promptly returned to the subscriber with the amount of the rejected subscription funds without interest.

———————————————

## NOTICES

The following notices apply in certain states where the Debentures, which are referred to below as "securities," may be sold. Compliance with the notice exemption requirements of applicable state securities laws will be undertaken by the Fund as needed.

**Notice to Residents of all States:**

THE SECURITIES OFFERED IN THE OFFERING HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND OTHER LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ACT AND THE SECURITIES LAWS OF CERTAIN JURISDICTIONS GRANT PURCHASERS OF SECURITIES SOLD IN VIOLATION OF THE REGISTRATION OR QUALIFICATION PROVISIONS OF SUCH LAWS THE RIGHT TO RESCIND THEIR PURCHASE OF SUCH SECURITIES AND TO RECEIVE BACK THEIR CONSIDERATION PAID. THE FUND BELIEVES THAT THE OFFERING DESCRIBED IN THIS MEMORANDUM IS NOT REQUIRED TO BE REGISTERED OR QUALIFIED. MANY OF THESE LAWS GRANTING THE RIGHT OF RESCISSION ALSO PROVIDE THAT SUITS FOR SUCH VIOLATIONS MUST BE BROUGHT WITHIN A SPECIFIED TIME, USUALLY ONE YEAR FROM DISCOVERY OF FACTS CONSTITUTING SUCH VIOLATION. SHOULD ANY INVESTOR INSTITUTE SUCH AN ACTION ON THE THEORY THAT THE OFFERING CONDUCTED AS DESCRIBED HEREIN WAS REQUIRED TO BE REGISTERED OR QUALIFIED, THE FUND WILL CONTEND THAT THE CONTENTS OF THIS MEMORANDUM CONSTITUTED NOTICE OF THE FACTS CONSTITUTING SUCH VIOLATION.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS ATTACHED TO THIS MEMORANDUM. NO ONE HAS BEEN AUTHORIZED TO PROVIDE YOU WITH ANY INFORMATION THAT IS DIFFERENT. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN GIVEN BY THE ISSUER OF THE SECURITIES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE ON THE COVER PAGE AND IS AN OFFER ONLY TO SUCH NAMED OFFEREE.

NEITHER THE INFORMATION CONTAINED HEREIN, NOR ANY PRIOR, CONTEMPORANEOUS OR SUBSEQUENT COMMUNICATION SHOULD BE CONSTRUED BY THE PROSPECTIVE INVESTOR AS FINANCIAL, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS, HER OR ITS OWN FINANCIAL, LEGAL, AND TAX ADVISORS TO ASCERTAIN THE MERITS AND RISKS OF THE OFFERING AND AN INVESTMENT IN THE FUND PRIOR TO SUBSCRIBING TO PURCHASE THE SECURITIES.

**Notice to New York Residents:**

THIS CONFIDENTIAL OFFERING MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

**Notice to Florida Residents:**

THE SECURITIES OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE SECURITIES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER OF THE SECURITIES OR AN AGENT OF SUCH ISSUER, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**Notice to New Hampshire Residents:**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

DURING THE COURSE OF THIS OFFERING, EACH PROSPECTIVE INVESTOR MAY OBTAIN ADDITIONAL INFORMATION WHICH SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (TO THE EXTENT THE FUND POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY PROSPECTIVE INVESTOR WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE INVESTOR'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE FUND IF THE RECIPIENT DOES NOT PURCHASE THE SECURITIES OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE TO:

<div align="center">

**ICAP NORTHWEST OPPORTUNITY FUND, LLC**
**10900 NE 8th Street, Suite 1000**
**Bellevue, WA 98004**

**ATTN: CHRIS CHRISTENSEN**
**(425) 372-7114**
**FAX: (425) 214-4776**
**EMAIL: info@icapequity.com**

</div>

NOTICES ............................................................................................................................................... I

FORWARD-LOOKING STATEMENTS ............................................................................................. 1

WHO MAY INVEST ............................................................................................................................. 1

SUMMARY OF THE OFFERING ........................................................................................................ 2

USE OF PROCEEDS ............................................................................................................................. 5

COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES .................................... 6

CONFLICTS OF INTEREST ............................................................................................................... 8

RISK FACTORS .................................................................................................................................... 10

PRIOR PERFORMANCE OF THE MANAGER AND ITS AFFILIATES ..................................... 17

MANAGEMENT OF THE FUND ....................................................................................................... 19

DESCRIPTION OF THE BUSINESS ................................................................................................. 22

U.S. FEDERAL INCOME TAX MATTERS ...................................................................................... 28

ERISA MATTERS ................................................................................................................................ 31

GLOSSARY ........................................................................................................................................... 32

SUMMARY OF THE DEBENTURE AGREEMENT ....................................................................... 33

REPORTS TO THE INVESTORS ...................................................................................................... 37

THE OFFERING ................................................................................................................................... 38

TRANSFERABILITY OF THE DEBENTURES ............................................................................... 39

FINANCIAL INFORMATION ............................................................................................................ 39

LEGAL REPRESENTATION ............................................................................................................. 39

PLAN OF DISTRIBUTION ................................................................................................................. 40

EXHIBITS

A  SENIOR SECURED DEBENTURE PURCHASE AGREEMENT (with form of Debenture and security documents related to the Debentures)

B  SUBSCRIPTION DOCUMENTS

C  LLC AGREEMENT

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

## FORWARD-LOOKING STATEMENTS

This Memorandum and its exhibits may contain statements that constitute forward-looking statements, as defined by federal securities laws. Forward- looking statements can be identified by the use of terminology such as "anticipates," "expects," "intends," "opportunity," "plans," "should," "predicts," "potential," "continue," "believes," "seeks," "would," "may," "will be," "likely to become," "estimates" and variations of these words and similar expressions. Forward-looking statements are subject to risks and uncertainties and include statements made regarding events, financial trends, future operating-results, financial position, cash flows and other general information concerning possible or assumed future results of operations of the Fund or any project. Investors are cautioned that such statements are only predictions, forecasts or estimates of what may occur and are not guarantees of future performance or of the occurrence of events or other factors used to make such predictions, forecasts or estimates. Actual results may differ materially from the results expressed, implied or inferred from the forward-looking statements and may be worse due to a variety of factors, including changes in laws, adverse changes in real estate prices, adverse changes in interest rates, and adverse changes in the credit and capital markets. These forward-looking statements speak only as of the date on which the statements were made and the Fund undertakes no obligation to update or revise any forward-looking statements made in this Memorandum or elsewhere as a result of new information, future events, future developments or otherwise, except as required by law.

## WHO MAY INVEST

**General**

The Fund intends to sell the Debentures to persons qualifying as "accredited investors" as defined in Regulation D under the Securities Act ("***Investors***").

The term "accredited investors" is defined to include, among others, (a) a natural person with a net worth, or joint net worth with such purchaser's spouse, at the time of purchase in excess of $1,000,000 (exclusive of the equity in the person's primary residence); (b) a natural person who had an individual gross income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or (c) any entity in which all of the equity owners are "accredited investors." Other classes of Investors also qualify as "accredited investors" under Regulation D. If you are unsure as to whether you qualify as an accredited investor, you should contact a legal advisor of your choice for advice.

With respect to a prospective Investor wishing to invest in his or her individual capacity, the value of the individual's primary residence should be excluded in determining his or her net worth. In addition, the mortgage or other indebtedness secured by the individual's primary residence to the extent that such indebtedness does not exceed the value of the residence need not be considered as a liability. When the indebtedness secured by the primary residency exceeds the value of the residence and the lender has other recourse against the individual for payment of the excess liability, the excess liability (and only such excess) should be deducted from the individual's net worth in determining net worth.

**Subscription**

To subscribe for the Debentures, you must complete, execute and deliver to the Fund the Subscription Documents attached hereto as Exhibit B. The Debenture Agreement requires you to represent, among other things, that you are an accredited investor, are acquiring Debentures for your own account for investment and not with a view to resale or distribution, and that you are aware that transfer of the Debentures is restricted by the terms of the Debenture Agreement and by the absence of a market for the Debentures. The Debenture Agreement also requires you to acknowledge that you have received and have had an opportunity to read this Memorandum and are aware of the risks associated with an investment in the Debentures.

THE FUND'S ACCEPTANCE OF YOUR SUBSCRIPTION FOR DEBENTURES DOES NOT CONSTITUTE A DETERMINATION BY THE FUND THAT THE INVESTMENT IS SUITABLE FOR YOU. THE FINAL DETERMINATION AS TO THE SUITABILITY OF AN INVESTMENT IN THE DEBENTURES FOR YOU MUST BE MADE BY YOU AND YOUR ADVISORS.

## SUMMARY OF THE OFFERING

The following summarizes a number of the material provisions of the Offering and certain provisions of the Debenture Agreement and is qualified in its entirety by the full text of the Debenture Agreement and exhibits attached thereto. Capitalized terms used in this Summary not separately defined herein have the meanings assigned to such terms in the Debenture Agreement. No person will be permitted to invest in the Fund unless such person has received and reviewed the Debenture Agreement, this Memorandum and other offering-related documents. This summary does not constitute an offer to sell, or the solicitation of an offer to buy, the securities referenced herein, and any such offer will be made only to selected persons pursuant to the offering documents prepared and delivered by the Fund.

### General Information

| | |
|---|---|
| Fund | iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company. |
| Manager | iCap Pacific NW Management, LLC, a Washington limited liability company (the "***Manager***"). |
| Agreement | The Fund's affairs will be governed by the terms of the Debenture Agreement and by the Fund's Limited Liability Company Agreement dated as of April 20, 2015, as may be amended from time to time (the "***LLC Agreement***") attached hereto as <u>Exhibit C</u>. |
| Business Purpose | The primary purpose of the Fund is to invest in real estate projects in the Pacific Northwest ("***Project Entities***"), which will be held in a limited liability company specifically formed for each investment. The Fund's business model is designed to fill the funding gap between lenders, on the one hand, and developers or builders on the other hand (referred to as "***Project Partners***"), although the Fund may also invest in projects without a Project Partner and may effectively act as the developer of the project ("***Fund Project***"), within certain limits prescribed herein. The Fund may issue debt instruments to Project Entities, acquire an equity interest in Project Entities, acquire Project Entities directly for development of Fund Projects or acquire real estate investments held by Affiliates of the Fund or of the Manager. These activities are referred to in this Memorandum as "***Investments***." We anticipate these opportunities to be available to the Fund based on its Affiliates' relationships with members of the real estate and banking communities in the Pacific Northwest. |
| Target Investments | The Fund intends to initially seek Investments in the greater Puget Sound region; however, Investment opportunities in other parts of the Pacific Northwest, including Oregon, will also be sought and considered. We anticipate Investments being made in Project Entities holding the following types of real estate: |

- Single and multi-unit residential properties;
- Multi-family residential projects;
- Commercial properties; and
- Land acquired for entitlement purposes.

| | |
|---|---|
| Investment Time Frame | The Fund plans to hold each Investment for 12 months on average and no longer than 24 months. The Fund does not anticipate entering into Investments whose term would extend beyond the Maturity Date. |
| Limitations on Investment | The Fund will not make any single Investment that exceeds 10% of the aggregate principal balances of the outstanding Debentures (the "***Gross Offering Proceeds***") as of the closing date of such Investment; *however*, once Gross Offering Proceeds equal at least $3,000,000 the Fund may make a single investment equal to the greater of 10% of the aggregate principal balances of the outstanding Debentures, or |

$1,500,000. In addition, no more than 15% of the Gross Offering Proceeds will be invested in Fund Projects in the aggregate in which there is no Project Partner.

## Terms of the Offering

| | |
|---|---|
| Offering Size | Up to $30,000,000 may be raised through the sale of Debentures, with an option by the Manager to increase the Offering size to $50,000,000. |
| Minimum Investment | An investment of at least $100,000, unless a smaller investment is permitted by the Manager in its discretion. |
| Period of Offering | Debentures may be offered by the Fund through December 17, 2015, but such date may be extended for up to ninety (90) days by the Manager in its discretion. |
| Eligible Investors | Offering limited to persons qualifying as "accredited investors" under Regulation D of the Securities Act. |
| No Minimum Offering Amount | The Fund may hold an initial closing upon receipt of any amount of debenture proceeds. |

## Economic Terms of Investment

| | |
|---|---|
| Maturity Date | The Fund shall pay back the principal balances of the Debentures to Investors on or before December 31, 2017, subject to a one (1) year extension period available to the Fund (the "**Maturity Date**"). The Fund may prepay all or part of the Debentures without penalty at any time prior to the Maturity Date. The date of any prepayment in full, shall be referred to as the "**Prepayment Date**." |
| Interest Payment | An Investor is entitled to receive a 10%, per annum simple interest rate on the outstanding principal balance of his, her or its Debenture, paid monthly in arrears on or before the 15th day of the following month. If the Fund exercises its right to extend the Maturity Date, an Investor will be entitled to receive an 11% per annum simple interest rate on the outstanding principal balance of his, her or its Debenture during the extension period. |
| Payoff Premium | Subsequent to the Fund's complete satisfaction of its obligations under the Debentures, Investors are entitled to a Payoff Premium equal to each Investor's *pro rata* share of 35% of the Net Profits generated by the Fund. See "SUMMARY OF THE DEBENTURE AGREEMENT—Payoff Premium." |
| Secured Debentures | The Debentures are secured by all of the assets of the Fund, a pledge of the Manager's interest in the Fund, and by a pledge of the Project Partner's membership interest in the Project Entity. The Fund's assets include the rights and collateral granted to the Fund in connection with each individual Investment, including the following: <br><br> • A first position or, where allowed under senior debt instruments, a second position deed of trust (i.e., mortgage) in the real estate owned by or thereafter owned by the Project Entities; <br> • A secured interest in the Project Partner's membership interest in the Project Entity; and <br> • The Fund's right to assume control of the Project Entity and the project owned by it in the event of a failure by the Project Partner or Project Entity to meet applicable project milestones or requirements. |
| Seniority of Debentures | Unless otherwise approved by Holders holding a majority of the principal amount of the outstanding Debentures, the Debentures will rank senior to all of the Fund's future indebtedness, including any class of debt security that the Fund may issue; *provided, however*, that the Fund may obtain a senior ranking credit facility to be |

used for, among other things, working capital purposes or loans to Project Entities in an amount not to exceed 15% of the Fund's Gross Offering Proceeds ("**Credit Facility**").

**Related Party Transactions and Investor Reports**

| | |
|---|---|
| Compensation and Fees to Manager and Affiliates | The Fund will pay to the Manager an annual management fee ("**Management Fee**") equal to 1.85% of the outstanding aggregate principal balances of each Debenture. The first year Management Fee will be fully earned and paid at the time of each Closing. Thereafter, the Management Fee will be paid in advance each calendar quarter, commencing on the anniversary of the Closing of the Debenture to which it pertains, but will not be due and payable from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) other than a payment default that has been cured, whether or not the cure occurs during or after the Grace Period (as defined in the Debenture Agreement). In the event the anniversary of a Closing occurs mid-calendar quarter, the quarterly payment of the Management Fee as of such anniversary will be pro-ratably paid for that calendar quarter. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." |
| | In addition to fees payable by the Fund, with respect to any Investment, the Manager may receive an origination fee from each Project Entity equal to up to 3.0% of the total Investment amount. Such origination fee will be charged directly to the Project Entity and the Project Partner, and not to the Fund, and will be paid at the time the Fund invests in the Project Entity. |
| Leverage Restrictions | The Fund may only make Investments if the total amount of debt encumbering the underlying property, together with the Fund's Investment, is less than 80% of the anticipated finished value of the underlying project. See "DESCRIPTION OF THE BUSINESS—Risk Controls." |
| Co-Investments with Affiliates | The Fund may, at the Manager's discretion, enter into Investments with Affiliates of the Fund or the Manager. These Investments may, among other things, be new Investment opportunities for the Affiliated parties, existing and continuing Investments of an Affiliate, or an existing Investment of an Affiliate that the Affiliate is exiting. |
| | Any participation allocated to the Fund in any Investment in which any Affiliate of the Fund or its Manager participates will be determined according to an allocation process established by the Manager. See "CONFLICTS OF INTEREST—Avoidance of Conflicts" for a description of this allocation process. |
| Investor Reports | The Fund will provide the following reports to each Investor: |
| | - Within 120 days after the end of the fiscal year, audited Fund financial statements; and<br>- Within 60 days after the end of each fiscal quarter, quarterly financial statements. |
| Annual Audit | The Fund has engaged McGladrey LLP to perform an annual audit, and the audit opinion and related audited financial statements will be provided to the Investors. |

## USE OF PROCEEDS

The Fund is offering a Maximum Offering Amount of up to $30,000,000 in Debentures (which may be increased to $50,000,000 in the Fund's discretion). If the Maximum Offering Amount is subscribed, the net proceeds to the Fund from the sale of Debentures, after deducting selling commissions and related fees, and estimated organizational and offering expenses, is anticipated to be $25,900,000. The following table sets forth the details of these fees and the funds available for investment in real estate projects as described in this PPM.

| | Sale of Maximum Offering Amount | Percentage of Gross Proceeds |
|---|---|---|
| Gross Proceeds From Investors | $30,000,000 | 100.00% |
| Less: Selling Commission (1) | $2,100,000 | 7.00% |
| Less: Due Diligence Fee (2) | $300,000 | 1.00% |
| Less: Managing Dealer Fee (3) | $1,500,000 | 5.00% |
| Less: Organizational and Offering Expenses | $200,000 | 0.67% |
| Available for Investment (before reserves) | $25,900,000 | 86.33% |

(1) The Managing Dealer will receive a Selling Commission in an amount up to 7% of the aggregate principal amount of Debentures issued ("***Gross Proceeds***"), which it will re-allocate to the Selling Group Members.

(2) The Managing Dealer will receive a marketing reallowance fee of 1% of the Gross Proceeds which it will re-allocate to Selling Group Members.

(3) The Managing Dealer will also receive a fee of 5% of the Gross Proceeds for serving as the managing dealer in the Offering. The Managing Dealer, as managing broker-dealer for the Offering, will be responsible for all "wholesaling fees" and marketing expenses relating to the Offering, as well as for paying its own expenses associated with the Offering.

## COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES

The following summarizes the types of compensation, fees, income, distributions or other payments that the Fund or Project Entities may pay to the Manager and its Affiliates in connection with the Fund's or a Project Entity's organization, operation and liquidation. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Fund. The Manager has no obligation to advance funds to cover the Fund's expenses. However, to the extent that such advances are made, the Fund will repay such loans out of its funds as soon as they are available, whether such funds are from the Fund's operating revenues or third-party loans (not including the Debentures).

**Fund Level Management Fee**

The Fund will pay to the Manager an annual Management Fee equal to 1.85% of the outstanding aggregate principal balances of each Debenture. The first year Management Fee will be fully earned and paid at the time of each Closing. Thereafter, the Management Fee will be paid in advance each calendar quarter, commencing on the anniversary of the Closing of the Debenture to which it pertains, but will not be due and payable from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) other than a payment default that has been cured, whether or not the cure occurs during or after the Grace Period (as defined in the Debenture Agreement). In the event the anniversary of a Closing occurs mid-calendar quarter, the quarterly payment of the Management Fee as of such anniversary will be pro-ratably paid for that calendar quarter.

**Compensation Rates of Affiliates**

The engagement by the Fund, or by one of the Project Entities, of any Person considered to be an Affiliate of the Fund is designed to provide the Fund with more efficient service at a cost that is no higher than is standard in the market. In the event the Fund enlists the services of the Affiliates of the Manager identified below, the rates of compensation of these Affiliates for the performance of their various services will be limited and all payments will be subject to inspection by auditors upon request. The Affiliates below have agreed to the following rates:

Edge Construction, LLC: Provides general contracting services, including those related to new construction of and rehabilitation of real estate projects.

General Contractor Fee: Cost* plus 10%
*Cost includes costs of labor, materials and management of a project, including but not limited to costs of project management, supervision, and labor, each of which shall be billed at hourly rates. The hourly rates for 2015 are set forth below.

Project Management Rates:
| | |
|---|---|
| Executive: | $150/hr |
| Project Manager: | $125/hr |
| Onsite Superintendent: | $80/hr |
| Labor: | $40/hr |
| Administrative: | $30/hr |

Altius Development, Inc.: Provides development and consulting services, as well as accounting and administrative support, to real estate projects.

Project Management Rates:
| | |
|---|---|
| Executive: | $150/hr |
| Project Manager: | $125/hr |
| Administrative | $30/hr |

| Accounting Support Rates: | | In-House Legal Support Rates: | |
|---|---|---|---|
| Controller | $190/hr | Attorney | $200/hr |
| Accounting Associate: | $110/hr | Legal Assistant | $100/hr |

**Fees Payable by Project Entity**

The Manager may charge the Project Partner a due diligence fee to cover the costs of business due diligence and underwriting involved in considering the potential Investment. The due diligence fee, which will be payable by the Project Partner prior to commencement of due diligence, will be non-refundable and will typically be around $10,000. Additionally, in the event a Project Partner's project is approved for funding, the Manager may charge a processing fee to the Project Entity, payable at closing, to cover in-house processing costs associated with document preparation and closing tasks related to such Investment. The processing fees are typically less than $5,000 per project, but may increase depending on the complexity of the Investment. Additionally, the Manager or an Affiliate of the Manager may charge each Project Entity a one-time origination fee in an amount equal to up to 3% of the total investment amount. The origination fee will be payable by the Project Entity at the time the Fund invests in the Project Entity. The foregoing payments to the Manager will be the obligations of the Project Entities and the Project Partners, and not of the Fund.

In some instances an Affiliate of the Manager may perform services for a Project Entity in order to provide better pricing or efficiency to the Fund than would otherwise be available from third parties. In these instances, such Affiliates may be paid customary service fees for time, material, or labor. These fees will be capped at the rates and amounts set under "Compensation Rates of Affiliates." Any payment to Affiliates for work performed on behalf of the Project Entities will be the obligations of the Project Entities, and not of the Fund.

**Expenses Paid by the Manager**

The Manager will cover all of the following expenses: office rent and fees; office common area maintenance charges; payroll expense of the employees of the Manager; employee parking, phone, fax, and internet access; computer hardware and related supplies; general office supplies; office rental of fax, printers, or scanners and maintenance costs related thereto; and any business licenses and registrations related to the Manager entity. All other expenses will be borne by the Fund.

**Reimbursements**

In addition to the fees set forth above, the Fund will reimburse the Manager and its Affiliates for any reasonable expenses paid by the Manager and its Affiliates that properly should be borne by the Fund.

**Distributions**

The Fund must distribute to its Members, equal to the Estimated Tax Amount within 90 days after the close of each fiscal year, unless (a) the Manager determines the tax distribution would render the Fund insolvent or would necessitate borrowing by the Fund; (b) an Event of Default (as defined in the Debentures) has occurred under the Debentures or is continuing, or (c) if the tax distribution would otherwise be materially adverse to the Fund. The Fund may not make any distributions of profit until the Fund's obligations under the Debentures have been fully satisfied.

# CONFLICTS OF INTEREST

## Transactions with the Manager and its Affiliates

The Fund may enter into various transactions with the Manager and its Affiliates, and compensation and fees could be paid with respect to these transactions as disclosed in the section entitled "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." To the extent any such transaction may pose a conflict of interest between the Fund and the Manager or its Affiliates this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Fund.

## Independent Activities of the Manager; Exclusivity

The Manager will cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the Fund Projects, and other activities of the Fund as much time as may be reasonably necessary for the performance of their respective duties in their capacities as managing principals. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Fund's investment objectives; (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund, including a fund which is expected to be released by an Affiliate of the Manager in 2015, any pre-existing funds, and any investments of those successor or pre-existing funds; (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his/her own account; (e) engage in civic, professional, industry and charitable activities; and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

## Receipt of Compensation by the Manager or its Affiliates

The Manager and its Affiliates will receive certain compensation from the Fund, regardless of whether the Fund ever makes payments to the Investors. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." Although the Fund believes that the fees to be paid to these Persons will be competitive with those that otherwise could be paid to third-parties (taking into account the quality, amount, and degree of specialization of services provided), these fees will not be determined by arm's-length negotiations. These fees and expenses will be paid prior to any repayment of the Debentures or interest therein, although the Management Fee will not be payable from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) other than a payment default that has been cured, whether or not the cure occurs during or after the Grace Period (as defined in the Debenture Agreement).

## Manager's Profits

After the Fund has paid 100% of the principal, the 10% annual interest due and payable under the Debentures, and the Payoff Premium, the Fund will distribute any remaining profits to its members, including the Manager. Distributions to the Manager represent a distribution that will reward the Manager for establishing and managing the Fund and its assets. The Manager's profit interest in the Fund may create an incentive for the Manager to make more speculative investments on behalf of the Fund than the Manager otherwise would make in the absence of such profit potential.

## Avoidance of Conflicts

Neither the Manager nor any of its Affiliates may make any investment on behalf of a new pooled investment fund with investment objectives that are identical to those of the Fund until the earlier of: (a) the date on which at least 75% of the Gross Offering Proceeds (less payment of expenses for consulting fees and professional fees, and the setting aside of reserves) have been committed to or invested in Investments or (b) the end of the Offering Period. Notwithstanding the foregoing, Affiliates of the Manager (y) have established other pooled investment funds that were formed prior to the date of this Fund and which have investment objectives identical to the Fund's and (z) are permitted to raise capital for and operate another pooled investment fund that is anticipated to be established in 2015

that will have investment objectives identical to the Fund (the "***Second 2015 Fund***"). The Second 2015 Fund intends to target institutional investors, but will not be limited to institutional investors and seeks to raise up to $100,000,000 in debt investments.

During the Offering Period and thereafter, any investment that is presented to the Manager or its members or managing officers that the Manager believes is consistent with the investment objectives of the Fund and is otherwise suitable for the Fund, will be offered by the Manager to the Fund subject to the following:

1. In the event the Investment is also suitable for one or more Affiliate pooled investment vehicles, including the Second 2015 Fund (an "***Affiliate Fund***"), and the Fund and Affiliate Fund(s) each have sufficient capital available to singularly finance the Investment, after setting aside reserves (each such fund, an "***Eligible Party***"), then the Investment will be offered to each Eligible Party on a rotating basis, with the order of rotation determined by the Manager.
2. To be an "Eligible Party," the Fund or Affiliate Fund must have sufficient capital available to make the entire Investment amount, net of reserves for the Management Fee and Fund expenses throughout the expected term of such entity, and the Investment must be suitable for the Fund or Affiliate Fund based on the criteria established by the Manager for underwriting such investments, which may be dependent upon, among other things, projected timing of the Investment payoff, location of the Investment, the dollar amount of the Investment relative to the Fund's or Affiliate Fund's other investments, the type of property underlying the Investment, and economic forecasts relating to the likelihood of a successful exit for the Investment.

For the avoidance of doubt, neither the Manager nor its members or managing officers will be required to offer to the Fund any real estate investment that is not consistent with the investment guidelines, investment objectives, and principles of the Fund or is otherwise not suitable for the Fund. Notwithstanding any provision to the contrary, the Fund and its Affiliates may engage in management and investment activities related to pre-existing Investments and activities or operations of an Affiliate.

# RISK FACTORS

As with all investments, a purchase of the Debentures is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. In addition to the information set forth elsewhere in this Memorandum, you should consider the following risks before deciding whether to invest.

## Operation and Fund Risks

### *Our business prospects are difficult to predict because we are a newly organized entity.*

The Fund is a newly organized entity and does not have an operating history upon which Investors may base an evaluation of its likely performance. The Fund's results will depend upon the availability of suitable investment opportunities for the Fund and the performance of the Fund's Investments. Payment of the principal and interest on the Debentures is subordinated to the prior payment of certain Fund liabilities and expenses and other third party debt to institutional lenders. Before payments are made on the Debentures, the Fund must first pay any senior current liabilities and expenses, including principal and interest payments due on any third-party institutional debt. This includes fees payable to the Manager and its Affiliates.

### *Investors must rely on the Manager to acquire appropriate Investments for the Fund's portfolio.*

The Fund is conducting the offering as a "blind pool," meaning that the Fund is proceeding to raise funds through the sale of the Debentures, without having specifically identified any Investments in which the Fund intends to invest. When you subscribe for Debentures, however, that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the Investments that the Fund subsequently identifies. You should not invest in the Fund, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum. The Fund may have limited access to financial information regarding the Investments, which may limit the Fund's ability to conduct comprehensive due diligence regarding the Investment and its likelihood of success.

### *If the Fund is not as successful with the Offering as desired, it may not acquire as diversified a portfolio as is planned.*

The Fund does not know how many Investments it will be able to obtain. The number of Investments ultimately purchased will depend primarily upon the equity raised through the sale of the Debentures, the availability of suitable Investments, the eligibility of the Fund to make an Investment relative to Affiliate Funds with similar investment objectives, and the extent to which the Manager arranges for Investments to be held with co-investors. There is no certainty as to the number of Investments that the Fund will be ultimately be able to obtain and, since one of the Fund's objectives is diversification, no assurance can be given as to the Fund's achievement of that objective.

### *Control is vested in the Manager; no Investor should purchase the Debentures unless the Investor is comfortable with the Manager's judgment and experience in running the Fund's affairs.*

Control over all decisions affecting the Fund, including decisions regarding the Investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, participation in mergers, consolidation and other restructurings, refinancings of Project Entities, whether to make an Investment, whether an Affiliate Fund is eligible for an Investment, extensions of Investments and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors. No assurance can be given that sufficient Investments will be presented to the Fund to deploy all of its investible capital.

### *The Manager's conflicts of interest may result in transactions unfavorable to the Fund.*

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Fund or the Project Entities, *provided* the terms are commercially reasonable. These measures may not fully protect the Fund or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Fund as they would have been if the transaction had been with unrelated third parties. Moreover, the

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 26    Page 246
1366

Fund will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. See "CONFLICTS OF INTEREST." In addition, before the Fund invests all of its Investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between Investment opportunities that may meet the Investment criteria of Affiliates of the Fund or of the Manager.

The Manager has the discretion to retain all or a portion of the proceeds from Investments to make new Investments. If the Manager were to take such action, this would place the Investment returns at the risk of new investment opportunities and would delay payments of the Payoff Premium to the Members.

> *Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Debentures.*

The Manager has not arranged for Investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Fund has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

> *The Fund will have limited or no control over the underlying Investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the Investments.*

The Fund expects to acquire preferred equity and, occasionally, debt interests in the Investments. Accordingly, the Fund will not likely have control over those Investments (except in certain circumstances relating to the Fund enforcing its creditor rights or contractual rights) and will be required to rely on the Project Partners of such Investments to use their skill, expertise and background to generate value from the Project Entities. Although the Fund routinely requires the Project Partners to grant a mortgage or to pledge their equity interest in the Project Entity as collateral, there can be no assurance that in the event of non-performance by the Project Partner or a default by the Project Entity that the equity interest or real estate can be readily transferred to the Fund or that the Fund can obtain control of the Project Entity. There is a risk that courts or other governmental parties may oppose such transfers.

> *The Fund may take over control and management of properties in which the Fund originally held a passive equity interest if the entity owning such property is in default (as defined in the entity's governing document). Such properties may entail additional risks and lower cash flow during the development period and the subsequent lease up or sale.*

The Fund may acquire an equity position in entities in need of additional capital in order to meet debt service obligations, refinance existing debt or finish developing or renovating the underlying property. The Fund would not be in control of the day-to-day operations of the underlying company, but would have the ability to take control of the company in the event certain conditions were not maintained by the Project Partner. Even though the Fund may take over management of the underlying property, it might not be a majority owner of the Project Entity and its management authority may be restricted. In the event of default and subsequent acquisition of the underlying property, the Manager may underestimate the costs and time needed to effectuate necessary construction, renovations and repairs. This may present unexpected capital demands upon the Fund, and reduce the potential return on the Investment because of the additional capital needed to renovate the property.

Development projects may take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, lowering the property's cash flow or other income potential. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without preparing detailed budgets, such budgets may understate the expenses.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 27 Page 247
1366

*Markets in which the Fund is anticipated to invest are subject to a high degree of volatility and therefore the Fund's performance may be volatile.*

The Fund's business will involve a high degree of financial risk. Markets in which the Fund is anticipated to invest are subject to a high degree of volatility and therefore the Fund's performance may be volatile. There can be no assurance that the Fund's investment objective will be realized or that Investors will receive any Payoff Premium. The Fund may invest in various interests related to single, multi-unit and multifamily residential properties, as well as commercial properties and land. These investments include direct investments in such properties; debt instruments issued by entities owning such properties, which may or may not be collateralized by mortgages against such properties or the equity interests in the ownership entities; equity interests in entities holding title to such properties, or rights to participate in the cash flow generated by such entities. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

*If the Fund were to acquire debt collateralized by properties suitable for Investment, the Fund will be subject to a number of additional risks not present when investing directly in properties.*

The Fund has the authority to purchase debt collateralized by residential properties. If such collateralized debt is acquired, the Fund will be subject to the following risks:

(a)        The Fund's due diligence must cover not only an assessment of the value of the underlying collateral (since there is the possibility that the Fund will acquire title to the property in satisfaction of the debt), but also an assessment as to whether the Fund will take the debt free from the claims of others and whether the debtor has defenses that might be asserted to forestall or defend against the collection of the debt. To the extent possible, when acquiring debt, the Fund will try to make certain that it is a bona fide purchaser of the debt entitled to be treated as a "holder" in due course under the applicable Uniform Commercial Code.

(b)        The debtor may default in its obligations under the debt, forcing the Fund to institute collection actions and proceed against the underlying collateral in order to protect its investment. The Fund must, before proceeding with such acquisition, be comfortable that the risk-reward profile of the Investment is favorable. Such an analysis will require the Fund to take into account the factors likely to impact the ultimate return on the Investment, including among others, the price at which the debt was acquired (whether and to what extent the debt is acquired at a discount to the outstanding principal), the likelihood of default, the stated principal and interest payments, an assessment of the underlying value of the collateral, the possibility of competing claims to the debt itself or defenses that might be tendered by the debtor in a collection action, the likely costs and delays in proceeding against the collateral, the risk of debtor bankruptcy proceedings and the presence of personal guaranties from creditworthy/solvent guarantors.

(c)        The Fund may encounter delays or difficulties in foreclosing upon its interest in the collateral if the debtor cannot pay the debt as and when it becomes due. Moreover, the Fund may incur substantial expenses in foreclosing upon the collateral or pursuing claims against the debtor and, if applicable, the guarantors of the debt. Such costs will increase the Fund's costs in the property, if the Fund subsequently acquires title to the property through foreclosure or a deed in lieu of foreclosure.

(d)        There is no assurance that the Fund will subsequently acquire title to the collateral property. The debtor may keep the debt current, cure prior events of default or arrange for the debt to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third party may be prepared to outbid the Fund to purchase the collateral property. It would be customary for the Fund to submit as its bid the amount of the outstanding debt at foreclosure sale, but the Fund may not be prepared to bid more than that amount to win the property over other bidders. In those instances, where the Fund does not take title to the collateral, its return on investment will be determined by the terms of the promissory note and related collateral documents (such as a deed of trust, mortgage, or other security agreement). The Fund's rate of return on such an investment may be determined by a number of factors, not the least of which is the price of which the debt was acquired. The investment's potential return will be significantly enhanced if the collateralized debt can be purchased at a deep discount to the then outstanding debt. Should that be the case, the Fund's

return, even if the debt is subsequently retired, will be substantially greater than would have been the return of the debt in the hands of the originating lender.

(e)    The debtor may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent borrowers. These protections are at the expense of the Fund as a creditor. Such actions may result in staying the Fund's foreclosure proceedings, restructuring of the debt terms, or otherwise delaying or interfering with the enforcement of the creditor's rights under the applicable security agreements. The Fund will need to balance such considerations before deciding whether it is advisable to acquire the collateralized debt and, in particular, assess whether the price at which the debt is acquired (including the discount if any) is sufficient to compensate the Fund from the possible risks of delays, additional costs, and debt restructuring on less favorable terms to the creditor.

***Fees to Manager will be paid while interest and principal remain outstanding under the Debentures.***

Provided that an Event of Default has not occurred under the Debentures, fees payable to the Manager will be paid while interest and principal remain outstanding under the Debentures. The Management Fee is based on the outstanding principal balance of the Debentures. The Manager will receive the Management Fee whether or not the Investments operate profitably. These fees (like other operating expenses) reduce the amount of cash that otherwise would be available for payment of the Payoff Premium. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES."

***You will not be investing in iCap. The prior performance data presented should provide you relevant information regarding Affiliates of the Manager, but should not be construed as an indication of the likely financial performance of the Fund.***

By investing in the Fund, you will not be a creditor to iCap nor in any of the prior programs sponsored by iCap Affiliates (other than the Fund). iCap has provided selected information regarding its prior programs because it felt investors might consider those investments to be relevant in assessing the experience and judgment of the Manager or the iCap management team. Investors should not consider the prior performance of those programs to be indicative of the financial performance that may be experienced by the Fund. The Fund may not perform as favorably as the prior programs. Each investment opportunity is unique and the Fund may not be able to replicate the success of prior Affiliated programs, even if the Investments assembled for the Fund's portfolio are similar to those obtained for prior investments.

***Uninsured losses on the Investments could materially reduce Investment returns, which may impact the Payoff Premium Payment payable under the Debenture.***

The Project Partner will obtain insurance policies for the Projects that are commercially prudent given the local market and circumstances of the Project (typically, including liability, fire and extended coverage). However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Projects should be partially or totally destroyed, the Fund, as an investor in the Project Entity, may suffer a substantial loss of capital as well as profits. Even if the Project Partner's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Project Entity will sustain a substantial uninsured loss as a result of the casualty.

***The Collateral Agent will have the authority to act on behalf of all holders of Debentures in dealing with the Fund.***

The Debenture Agreement vests control over matters related to the enforcement of the security interest, the exercise of any rights or remedies with respect to the collateral supporting the Debenture and any remedies under the Debenture in the hands of the Collateral Agent. If an action is brought by the Collateral Agent, such action must be for the collective benefit of all Holders.

***The Fund may prepay the principal and interest on the Debentures at any time.***

The Fund may prepay the principal amount of the Debentures, in whole or in part, at any time. No prepayment penalty is imposed that would discourage the Fund from exercising this right. Accordingly, Investors will not have

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 29 Page 249
1366

certainty as to how long their respective Debentures may be outstanding. If, however, the Fund makes any prepayment, the prepayments must be made ratably against all outstanding Debentures.

***Various factors could negatively impact the amount of Net Profits generated by the Fund during the Measurement Period; thereby reducing the Payoff Premium that may be paid to the Investors.***

(a)        At this stage, it is not known how much information, including financial information, the Fund will have available to review when conducting due diligence regarding potential Investments. The content and accessibility of such information will be determined by the manager of the respective Investment. While the Manager will not cause the Fund to make an investment in an Investment unless it has what it considers to be reasonable access to a material amount of such information, the information may not be as comprehensive as the Fund would like. Moreover, neither the Manager nor the Fund will audit the affairs of the Investments and will rely upon the accuracy of the information provided to it regarding the Investments.

(b)        The Fund may obtain insurance policies for the Investments that are commercially prudent given the local market and circumstances of the Investment. However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Investments should be partially or totally destroyed, the Fund may suffer a substantial loss of capital as well as profits. Even if the Fund's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Fund will sustain a substantial uninsured loss as a result of a fire or other casualty.

(c)        Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making an Investment, the Fund may undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation is expected to include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the Investment's site had environmental contamination not detected prior to the Fund's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Fund undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Fund may incur environmental clean-up costs or be subject to liability exposure that may reduce the Net Profits of the Fund.

(d)        Under the Americans With Disabilities Act of 1990 ("***ADA***"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing Investments to allow disabled persons to access such facilities. Most of the Investments the Fund considers will likely be in compliance with the present access requirements. If, however, the Investments the Fund acquires are not in compliance with the ADA, the Fund will be required to make modifications to the Investments to bring them into compliance, or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

(e)        The real estate industry in general, and the multifamily, residential, and commercial sectors in particular, are highly competitive, and the Fund will be competing with numerous other entities, some having substantially greater financial resources and experience than the Fund, in seeking attractive investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available Investments or resulting in other less favorable terms to the purchasers.

(f)        The investment returns available from equity investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 20, Page 250
1366

incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could have a material adverse impact on the Fund's results of operations or financial condition. In addition, equity real estate investments are difficult to sell quickly and the Fund may not be able to adjust the Fund's portfolio of owned properties quickly in response to economic or other conditions. If the Fund's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Fund's income will be adversely affected.

**Private Offering and Liquidity Risks**

*This private placement of Debentures is being made in reliance on an exemption from registration requirements and there is no guarantee that it will comply with the regulatory requirements for such exemption.*

This private placement of Debentures will not be registered with the Securities and Exchange Commission ("*SEC*"). The Debentures are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to Investors meeting the investor suitability criteria set forth in this Memorandum. If the Fund should fail to comply with the exemption, Investors may have the right to rescind their purchases of Debentures. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Debentures will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Fund's assets to satisfy the claims of the claimants.

*This is a private offering and as such you will not have the benefit of review of this Memorandum by the SEC or other agency.*

Since this offering is a private placement of securities and, as such, is not registered under federal or state securities laws, you will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

*The limited liquidity of the Debentures may adversely affect your ability to transfer and pledge the Debentures.*

You must represent that you are purchasing the Debentures for your own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, encumber or otherwise dispose of your Debentures unless the Fund obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Code or cause the Fund's termination under Section 708 of the Code. Accordingly, the Debentures may not be readily accepted as collateral for loans and you may not be able to liquidate your investment in the event of emergency or for any other reason, or may be able to liquidate your investment only at a substantial discount. See "TRANSFERABILITY OF THE DEBENTURES," and See also "U.S. FEDERAL INCOME TAX MATTERS."

*Investments will be illiquid.*

The Fund expects the Investments to be illiquid. Accordingly, the timing of its returns on those Investments will be dependent upon various market factors. If the underlying assets in those Investments are held for long periods, the Investors will be compelled to wait until the underlying assets are sold, before being in a position to liquidate their investments. The Manager expects most of its Investments to have an investment time frame of 2 years or less. However, the Fund may have little or no control over when the underlying properties are liquidated.

**Tax Risks**

*You are urged to consider the United States federal income tax consequences of owning the Debentures*

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to treat the Debentures for U.S. federal income tax purposes as contingent payment debt instruments subject to U.S. federal income tax rules applicable to contingent payment debt instruments. Under that treatment, if you are a U.S. Holder (as defined herein), you may be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by you in that year. You will recognize gain or loss on the sale, repurchase, exchange, conversion or redemption of a Debenture in an amount equal to the difference between the amount realized and your adjusted tax basis in the Debenture. Any gain recognized by you on the sale, repurchase, exchange, conversion or redemption of a Debenture generally will be treated as ordinary interest income and any loss will be treated as ordinary loss to the extent of the interest previously included in income and, thereafter, as capital loss. See "U.S. FEDERAL INCOME TAX MATTERS."

*Interest on Debentures Could be Characterized as Unrelated Business Taxable Income*

We intend to take the position that the Debentures should be classified as debt instruments for U.S. federal income tax purposes and both the stated interest and the Payoff Premium should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("*UBTI*") with respect to tax exempt Investors. However, there is no assurance that the IRS will agree with this position and it is possible that the debentures may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Debentures may be characterized as UBTI with respect to tax exempt Investors.

## PRIOR PERFORMANCE OF THE MANAGER AND ITS AFFILIATES

As a newly formed investment vehicle, the Fund has no operating or prior performance history. The information presented in this section represents the limited historical experience of the principals of the Manager and their Affiliates. Prospective investors in the Fund should not rely on the information below as being indicative of the types of investments the Fund may make or of the types of returns the Fund's Investments may generate. It should be understood that neither the Fund nor the Investors will have any interest in the properties described below. Prospective investors should not assume that the Fund will experience returns, if any, comparable to those described herein.

iCap, as used in this Memorandum, refers to an affiliated group of companies (excluding the Fund) specializing in investing in single-family, multi-family, light commercial and land development properties. This section contains certain summary information regarding this affiliated group, and the primary entities through which iCap conducts its business activities. The Manager is one of these entities, recently formed for the purpose of serving as the Manager of the Fund. Although this Memorandum refers to "iCap" as though it were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of iCap. By investing in the Fund, the Investor will not acquire an interest in any such entities, but it may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Fund as it conducts its business.

In September 2013, members of the management team established an entity named iCap B1, LLC, which obtained a loan from a foundation in the amount of $3,359,165 for the purpose of making investments into various real estate projects. As of the date of this Memorandum, the remaining balance of the loan is $108,468, which is scheduled to be paid off in full on or before May 1, 2015.

In November 2013, members of the management team established an entity named iCap B2, LLC, which obtained a loan from a high net worth individual in the amount of $3,556,499 for the purpose of making investments into various real estate projects. As of the date of this Memorandum, the loan had been paid down to a remaining balance of $2,145,216. The management team intends to seek an extension of the May 1, 2015 maturity date to November 2015.

Members of the management team recently completed the fundraise for their first pooled investment fund ("*iCap 1*"), having raised $46.2M. The following investment has liquidated:

> On June 24, 2014, iCap 1 made an investment in Lake Sammamish Home 1, LLC in the amount of $514,345. iCap 1's Investment was used to provide equity capital to help cover the costs related to the development of 8, single family lots, each with beach access to Lake Sammamish. The Investment was paid back in approximately 9 months, on March 31, 2015, at the time the project was refinanced. iCap 1 received a total payoff of $835,025. The total return on funds invested was 62.35% and the annualized return on investment was 81.27%.

The table on the next page illustrates certain additional investment activities of iCap 1.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 23 Page 253
1366

| Project Name | Property Type | Investment | Period | City |
|---|---|---|---|---|
| Barcelo Madison Park LLC | Condominium | $ 885,500 | 12 months | Seattle |
| Columbia Property Managers LLC | Commercial | $ 805,000 | 6 months | Poulsbo |
| ENT Ventures II, LLC | Apartments | $ 419,000 | 18 months | Portland |
| Alamo - Alamo NW, LLC | Commercial | $ 1,212,500 | 12 months | Tacoma |
| Longview - Wild Creek Estates, LLC | Single Family Residence(s) | $ 319,000 | 12 months | Port Orchard |
| Sampson - Meridian Greens Holdings LLC | Apartments | $ 1,036,515 | 18 months | Puyallup |
| BDR Kirkland II LLC | Single Family Residence(s) | $ 833,000 | 12 months | Kirkland |
| BDR Medina III LLC | Single Family Residence(s) | $ 935,000 | 15 months | Medina |
| iCap Finn Hill, LLC | Single Family Residence(s) | $ 2,085,000 | 18 months | Kirkland |
| HCH - High Country Soundview Manor, LLC | Single Family Residence(s) | $ 1,479,000 | 18 months | Federal Way |
| BDR Yarrow Point II, LLC | Single Family Residence(s) | $ 725,000 | 12 months | Bellevue |
| ENT Ventures I LLC | Apartments | $ 1,941,250 | 18 months | Portland |
| White - Denali Townhomes LLC | Apartments | $ 196,000 | 6 months | Kennewick |
| Lofts @ Camas Meadows Phase I, LLC | Apartments | $ 1,059,570 | 18 months | Camas |
| Bown - 9041 48th, LLC | Townhomes | $ 235,920 | 15 months | Seattle |
| iCap - iCap Delridge Way, LLC | Townhomes | $ 264,000 | 18 months | Seattle |
| USAsia- Seattle Modern Living, LLC | Townhomes | $ 617,750 | 18 months | Seattle |
| Hardy - 1st Ave NE Development, LLC | Townhomes | $ 630,240 | 15 months | Seattle |
| Hardy - Woodlawn Ave Townhomes LLC | Mixed Use - Apartment | $ 401,876 | 18 months | Seattle |
| Hardy - Aloha Ventures, LLC | Townhomes - Fee Simple | $ 371,500 | 12 months | Seattle |
| TCG Investments, LLC | Mixed Use - Apartment | $ 1,060,000 | 18 months | Lynwood |
| Colpitts Sunset, LLC | Mixed Use - Apartment | $ 1,562,849 | 12 months | Renton |
| Sampson 45th Avenue, LLC | Single Family Residence(s) | $ 497,500 | 6 months | Tacoma |
| Lyle 113th Ave, LLC | Single Family Residence(s) | $ 562,080 | 12 months | Bellevue |
| Blvd - 725 Broadway, LLC | Apartments | $ 1,062,000 | 12 months | Tacoma |
| Hardy - Capitol Hill Development, LLC | Apartments | $ 1,035,730 | 12 months | Seattle |
| Sampson - Ruby 62 Holdings LLC | Apartments | $ 1,478,000 | 18 months | Lakewood |
| Hardy - 13th & Emerson, LLC | Townhomes | $ 601,310 | 18 months | Seattle |
| Hardy - 4422 Woodlawn, LLC | Townhomes | $ 182,100 | 12 months | Seattle |
| Hardy - 13 Ave W LLC | Townhomes | $ 525,000 | 12 months | Seattle |
| iCap - iCap Campbell Way, LLC | Condominium | $ 895,800 | 18 months | Bremerton |
| iCap - Steadman 170th, LLC | Single Family Residence(s) | $ 240,000 | 12 months | Bellevue |
| Volare Townhomes, LLC | Townhomes | $ 916,183 | 12 months | Happy Valley |
| Lofts @ Camas Meadows Phase II, LLC | Apartments | $ 1,056,570 | 18 months | Camas |
| Domus - Charlestown Street, LLC | Townhomes | $ 1,040,000 | 15 months | Seattle |
| ENT Ventures IV LLC | Apartments | $ 368,500 | 12 months | Portland |
| Ankeny Building LLC | Apartments | $ 1,709,500 | 15 months | Portland |

YOU SHOULD RECOGNIZE THAT BY PURCHASING DEBENTURES IN THE FUND YOU WILL NOT THEREBY ACQUIRE ANY OWNERSHIP INTEREST IN ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. YOU SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES IS GIVEN SOLELY TO ALLOW YOU TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. YOU SHOULD NOT ASSUME THAT THE INVESTORS IN THIS OFFERING WILL EXPERIENCE RETURNS, IF ANY, ON THEIR INVESTMENTS SIMILAR TO THOSE EXPERIENCED BY INVESTORS IN THE PRIOR PROGRAMS SPONSORED BY THE MANAGER AND ITS AFFILIATES.

## MANAGEMENT OF THE FUND

**General**

The management and supervision of the Fund is vested exclusively in the Manager (including its duly appointed agents), and the Manager (and its duly appointed agents) has full control over the business and affairs of the Fund. Subject to the terms of this Agreement, the Manager has the power on behalf and in the name of the Fund to carry out any and all of the objects and purposes of the Fund and to perform all acts and enter into and perform all contracts and other undertakings that the Manager, in its sole discretion, deems necessary or advisable or incidental thereto. Investors must rely upon the judgment and experience of the Manager to manage the Fund.

**The Fund's Manager**

The Fund has selected iCap Pacific NW Management, LLC, a Washington limited liability company, to serve as its Manager. For its services, the Manager will receive an annual management fee as described elsewhere in this Memorandum. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." In addition, the Fund will reimburse the Manager for any Fund expenses that are borne by the Manager on behalf of the Fund.

**Affiliates of the Manager**

The Fund has two affiliated companies specializing in the acquisition and development of real estate properties: Altius Development, Inc., which is solely owned by Chris Christensen, and Edge Construction, LLC, which is solely owned by Altius Development, Inc. Altius was formed in 2007 and has completed a number of projects through its subsidiaries, in areas of condos, multi-family and single family subdivisions. Edge Construction was formed in 2007 and has been involved in the construction of condos, multi-family, single family subdivisions, remodels, commercial structures and a number of custom homes. Each of these Affiliates may provide services to the Fund. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES—Compensation Rates of Affiliates" for the fee rates of these Affiliates.

**Key Executives and Employees of Manager**

The following provides a brief description and position of the Manager's principal executives and employees as of the date hereof.

**Chris Christensen,** *President, Chief Investment Officer*

Chris leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. He is also primarily responsible for tax and accounting decisions. Chris is 39 and prior to forming the Fund has managed an affiliated fund, formed and managed Affiliates of the Manager, including Edge Construction, LLC and Altius Development, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a J.D. from Seattle University School of Law, a Master's Degree in International Business from Seattle University and a Bachelor of Arts Degree from the University of Utah, and is the brother of Jim Christensen.

**Jim Christensen,** *Chief Operating Officer*

Jim is the Chief Operating Officer and primary underwriter for new Investments. He manages due diligence, letter of intent preparation, legal documentation, closing processes and sponsor relationships. In addition, he is responsible for the technology-related underpinnings of the Fund. This includes electronic document storage, electronic process automation, and software management. Jim previously was the Chief Operating Officer at Altius Development, Inc., where he managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington state. At Altius Development, Inc., Jim managed over $30 million in development projects and also consulted property owners on the strategy, finance and execution of the development of their properties. Jim has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Jim is 30, holds a Bachelor of Arts Degree from the University of Washington, and is the brother of Chris Christensen.

**John Carlson,** *Senior Project Manager*

John is responsible for overseeing management of all Projects in which the Fund invests. His duties include budget and pro forma preparation, feasibility studies, and the organization of lien waivers, draw requests and final inspections. Furthermore, John oversees contract negotiation and contract management among various service providers and subcontractors. John handles monthly reports for sponsors with whom the Fund invests, in addition to ongoing supervision of sponsors to ensure agreed upon milestones are satisfied. John is 46 and prior to working with the Fund, John served as a senior project manager for McKinstry, a national construction company located in the Pacific Northwest, for 8 years.

**Bryan Brown,** *Senior Construction Manager*

Bryan is responsible for all general contracting functions relevant to Fund Investment Projects. He supervises various activities pertinent to successful construction including due diligence, contract negotiations with subcontractors and suppliers, budget monitoring and overall construction management. Bryan is 38 and has 19 years of experience in new home construction, multifamily construction and commercial construction. Bryan has overseen all activities of Edge Construction, LLC, the Fund's Affiliate general contractor, for the last 8 years. He has built over 1,600 structures and has trained many construction managers and superintendents.

**Organizational Growth**

iCap currently has capacity to accept additional capital from Investors and to deploy such proceeds towards real estate projects meeting the Fund's Investment criteria. iCap intends to grow as an organization with increases in capital under management and Investment transaction activity. With regards to human capital, various support staff will be hired to assist the senior officers, consistent with iCap's growth plan.

For example, a full-time experienced project manager can effectively oversee 30-35 sponsor Projects at a time and 8-10 wholly owned Fund Projects at a given time. This equates to approximately $40 million of capital under management. Additional project managers will be retained as these Project activity thresholds are reached to ensure the Senior Project Manager, and subsequently hired project managers, can perform their respective work effectively.



The iCap growth plan also calls for supplementary support staff in other functional areas of the business. This includes additional underwriters and due diligence specialists to work under the Chief Operating Officer, as well as additional accountants to support the Controller. An experienced underwriter or paralegal can close 5-6 new Fund real estate Investments in a month, translating to 60-65 in a year time frame. With each additional $60 million in capital under management, iCap intends to retain an additional closer to manage this increased transaction volume. As it pertains to the accounting function, Clark Nuber PS, a regional accounting firm, advises iCap on bookkeeping and McGladrey LLP, a national accounting firm, completes audits and tax returns. Each of these third party firms can be relied upon as needed and as iCap scales.

**Organizational Strength**

iCap maintains a network of strategic relationships. The team leverages relationships with sourcing, development, construction, and fund administration constituents to attain return objectives for Investors. Property owners, lenders and brokers are the primary entities for deal sourcing. With regards to development, iCap relies upon numerous environmental analysts, land biologists, water biologists and permitting experts to gather important insights for prospective Investments and to effectively manage existing Fund Projects. iCap turns to its relationships with architects, engineers and various consultants to provide pertinent construction knowledge. Such information is imperative to the various phases of the Investment process and to project management of Investments.

iCap maintains connections with a vast network of sourcing partners who provide potential Fund Projects. iCap evaluates more than $50 million worth of prospective investments each month. Sourcing relationships fall into three categories: property owners, lenders and brokers. Property owners include builders, commercial entities and developers. Meanwhile, lenders include banks, private direct lenders and mortgage companies. Finally, brokers encompass real estate professionals, commercial financing brokers and mortgage brokers. Lenders tend to offer the most abundant and valuable deal flow for iCap, typically representing about 50% of aggregate deal flow. The remaining 50% is usually evenly split between property owners and brokers.

**Miscellaneous**

The Manager and its Affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

On July 29, 2014 Stalwart Capital, LLC served a summons and complaint upon iCap Pacific Northwest Opportunity and Income Fund, LLC ("iCap 1") seeking a fee on capital raised by iCap 1 and up to 10% of its profits on the claim that iCap 1 is a related party of an entity who had entered into an engagement letter with Stalwart Capital, LLC for broker-dealer services on that affiliated fund. iCap 1 believes this complaint is without merit and is defending itself vigorously. In the event a court finds that the Fund is liable because of its relationship to iCap 1, as a successor or otherwise, the Fund may be required to pay the amounts ordered by the court. Such payments could have the effect of reducing the Fund's Net Profits, thereby reducing the Payoff Premium Payment payable under the Debentures.

In November 2007, Chris Christensen signed as a personal guarantor on a commercial loan from Timberland Bank for a condominium development of an Affiliate of the Manager. The project did not sell as planned, and the bank foreclosed. After the foreclosure, the bank sought recourse from the personal guarantors for the deficiency amount, and eventually recorded a judgment of $2,000,000 against Chris personally. The bank has not sought collection of the judgment and Chris has been in negotiations with the bank to have the judgment removed.

## DESCRIPTION OF THE BUSINESS

The Fund has been formed to invest in real estate opportunities in the Pacific Northwest. The Fund may also acquire real estate directly, as well as debt instruments in other real estate companies. The target investment properties include single and multi-unit residential properties, multi-family residential projects, commercial properties and land acquired for entitlement purposes.

### Market Opportunity

#### *Demand for Equity*

Virtually all real estate transactions require an equity investment in order to obtain lender financing. The Great Recession increased the demand for equity investment in real estate transactions because banks and other real estate lenders tightened their lending criteria. Several years ago lenders routinely loaned up to 90% of a project's bulk value or 80% of retail value. Now they are commonly lending no more than 65-70% of a project's cost and are requiring the Project Partner to supply the remainder of the money to complete a project. Additionally, lenders require borrowers to meet rigorous liquidity requirements, which result in borrowers keeping their cash in banks as reserves rather than using the funds for their own real estate projects.  As a result of Project Partners not having the necessary capital to fund their real estate projects, a funding gap exists that results in short-term and long-term investment opportunities for the Fund.

#### *Capitalizing on the Market Opportunity*

The Fund's business model is designed to fill the funding gap between lenders, on the one hand, and developers or builders ("***Project Partners***"), on the other hand, by providing the additional cash equity needed for real estate projects. The primary difference between the Fund and other equity investors is that the Fund maintains control of each Project Entity.

iCap's business model has been attractive to banks and other lenders, we believe because it brings additional assurance to lenders that they will be repaid through the Fund's and its Affiliates' efforts. Local lenders screen hundreds of potential projects and perform much of the upfront due diligence required to put a project together. For example, a lender who has approved a Project Partner on a loan for a project that the lender likes, will have already performed the appraisal, background checks, financial analysis, and other items for the loan to be approved. The Fund can then review the due diligence information prepared for the lender and begin its own due diligence process. After reviewing the lender's due diligence information and completing its own due diligence process, the Fund will negotiate an investment structure with the Project Partner. The investment with the Project Partner will be structured in a way that requires a priority return of the Fund's original investment plus a share of the profits. The Fund will then provide the capital needed to meet the cash requirement under the loan. Recently, many banks have reported that they have more cash to lend than ever before; however, they commonly state that there are not enough borrowers capable of qualifying for loans under their new guidelines. This situation is generally the result of low liquidity on the part of the borrower, which can be met by the Fund.

We believe the Fund provides a needed service in particular to developers and builders. Most developers and builders who could not otherwise finance a real estate project without additional cash are willing to agree to the Fund's guidelines and investment criteria. From the Project Partners' (developers and builders) point of view, she, he or it would rather agree to give a share of a project's profits to the Fund and have the chance to earn a smaller profit for himself, herself or itself than to miss the opportunities altogether.

#### *Market Opportunity's Longevity*

Many investors seek to take advantage of the short-term opportunities that have arisen from banks needing to liquidate assets at low prices but do not have the capital or relationships to fund the opportunities. The Fund's investment strategy allows it to participate in both short-term and long-term opportunities. For example, the Fund's business model allows it to provide the necessary capital for a Project Partner to acquire high quality assets now (a short-term opportunity). The Fund will also provide funding for the projects performed by Project Partners who need cash to meet the revised lending criteria of banks (a long-term opportunity). In both scenarios, the Fund structures its investments such that the Project Partner and its guarantors bear most of the economic risk, while the Fund gets a

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 28 Page 258

priority return of its original investment and shares in the profits of the Project Entity and maintains control of the exit strategy.

**Target Market: Pacific Northwest**

The Seattle-Tacoma-Bellevue Metro Area is the second strongest regional economy in the United States[1]. This region contains nearly 65% of the 6.8 million people living in Washington and a majority of manufacturing, research, and technology jobs generated by some of the most stable companies in the world. The Puget Sound Region is home to several Fortune 500 companies: Microsoft, Nordstrom, Amazon.com, Costco, Starbucks, and several more. These companies have contributed to the job growth rate of the region. In the first three months of 2015, Washington added 31,600 jobs, which is a 4.1% growth rate[2].



The Puget Sound Market has recovered faster from the Great Recession than any other region in the country. Since 2010, jobs in the Greater Puget Sound area have grown annually at an average rate of 2.4% compared to the national average growth rate of 1.6%[3]. This continued growth results in a need for more housing for the people who move into the region, which in turn creates real estate investment opportunities for the Fund.

**Regional Housing Demand**

- 112,000 people moved into the greater Puget Sound area from January 2014 to January 2015. That is a 15% increase from the previous year of 97,000 move-ins.
- The average price per apartment unit in 2014 was $156,000, which is a 5.5% increase from 2013 and an over 60% increase from 2005[4].

The Fund will focus its Investments in three types of properties: multi-family (condos and apartments), residential, and commercial. Given that the Fund and its Affiliates are based in the Seattle-Tacoma area, the Fund will primarily invest in Project Entities located in western Washington. The Fund is also making investments in the greater Portland market.

**Market Segment**

iCap's model addresses the $50 billion gap between the $176 billion amount that lenders are willing to lend and the $25 billion sponsors contribute of their own money (based on $251 billion annual capital activity in small-cap real

---

[1] Source: www.policom.com

[2] Source: www.erfc.wa.gov/publications/documents/mar15.pdf

[3] Source: www.economicforecaster.com - Puget Sound Economic Forecaster Vol. 22, #4, dated March 12, 2015.

[4] Source: www.duprescott.com/articles - Articles: *More people…good or bad? & Record sales?*

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 29 Page 259
1366

estate)[5]. The Fund provides the equity piece (i.e. the gap funding) that enables builders and property owners to secure capital for the completion of their projects.

**Investment Focus and Structure**

The Fund intends to focus its investments on new construction properties and income-producing properties located in the Pacific Northwest and to seek projects in which the Fund's investments can be repaid within 12 to 18 months after acquisition. Affiliates of the Fund will add value through legal, development, or construction services, as needed.

Projects are sourced primarily through private lenders, banks, brokers, and property owners. The Manager has existing relationships with various banks and private lenders that are attempting to dispose of Real Estate Owned (REO) properties. A bank will often contact the Manager as they know that the Fund is interested in these types of investment opportunities. A second source of projects is developers and builders. The Manager works with those developers that have quality projects and who are in need of cash so that the developer can have all of the required equity in place prior to approaching the bank for a loan. Specific examples of types of investments the Fund may target include the following:

*Equity Investments*

An equity investment for the Fund involves the purchase of an ownership position in a Project Entity. An example of this type of investment might be a developer who desires to obtain a loan from a bank to build an apartment building. In the typical situation, the bank's lending guidelines will limit the loan amount to 70% of the construction costs, requiring the developer to pay for the remainder of the construction costs with cash. In this instance, the developer would supply as much cash as he, she or it has, and the Fund would fill the gap in exchange for a priority return of its original investment plus a portion of ownership (and profits) of the Project Entity.

The Project Entity LLC Agreement will be structured first to provide a preferred return, followed by a priority repayment of the Fund's capital investment and then a share of the profits in the Project Entity in the form of an exit fee. For example, if the Fund were to invest $500,000 into a project, the Fund would be entitled to a priority repayment of the $500,000, plus interest, and would further be given an exit fee that is typically an amount equal to 2-6% of the total value of the Project. The Fund's legal agreements with the Project Partner will provide for the Investment in each project to be repaid as soon as possible, but generally no later than 18 months from the time of the Fund's Investment. This structure allows the Fund to re-invest the returned capital received from Project Entities, while continuing to maintain a share of the profits. Failure of the Project Partner to perform on the terms of the Fund's financing, or failure to adequately perform its contractual obligations to the Project Entity, would result in the Fund receiving a larger share of the profits or the ability to take control of the Project Entity and the Project Partner's interest thereto. Such failure will also permit the Fund to demand the return of its investment in the Project Entity.

*Cash Acquisitions*

Many current real estate opportunities can be found by buying properties from banks or property owners. Quite frequently, banks and other lending institutions are required by the FDIC to liquidate properties they own in order to meet mandatory ratio requirements with regard to their loans and deposits. This situation often requires lenders to sell their REO properties very quickly, often at discounts. The Fund has a growing network of relationships with lenders who are willing to sell their properties to private parties in off-market transactions before listing them for sale to the general public. The Fund will utilize this network to position itself to purchase properties that meet management's approval. Once an REO asset is acquired from a lender at a discount, the Fund has the option of either selling the property immediately or adding value to the property through entitlement, development, construction, or any combination of these things. Then, depending on market demand, the developed parcels or structures could be sold.

---

[5] Source: Wall Street Journal, "New Lenders Enter Property Market and Think Small," July 22nd, 2014, 2014; US Loans of $5M or Less in 2013

In these instances, the Fund would acquire such properties through a wholly-owned special purpose entity and may engage the Manager's Affiliates to perform the value-added work.

### Loans

In the event the Fund makes loans to real estate projects, it will do so in exchange for a first position mortgage (deed of trust) on the underlying property. These loans will typically be underwritten to ensure that the loan is no more than 80% of the property's value. The loans are intended to be short-term loans to be repaid in less than 15 months. The Fund may also provide additional cash as an equity investment to those borrowers. Additionally, the Fund may purchase existing loans from lenders at a discount. In that case, the fund will receive interest payments until the loan is sold or paid off. The Fund intends to enter into a limited number of these types of Investments, if any.

### Acquisition of Bank Notes

A number of banks are in a position where they need to divest portions of their loan portfolios in order to comply with various FDIC requirements. The Fund believes it is in a position to opportunistically step in and acquire such bank notes at a discount. The Fund intends to enter into a limited number of these types of Investments, if any.

### Other Investments

The Manager may pursue other investment opportunities so long as they are believed to have attractive yield potential.

## Legal Structure of Projects

Each Project Entity will be organized as a limited liability company with assets consisting of the real property and any fixtures and improvements relating to the same. This organizational structure allows the Fund to limit potential liabilities that may come from unrelated matters of the Project Partner and provides protective measures for the Fund. Unlike traditional real estate investment vehicles, in which the real estate itself serves as the primary or only source of collateral, the Fund will also secure the return of its investment in the Project Entity with the Project Partner's equity interest in the Project Entity. Thus, in addition to recording second position or sometimes first position mortgages (deeds of trust) against the property to secure the return of the Fund's investment in the Project Entity, the Project Partner must also pledge his, her or its equity interest in the Project Entity to the Fund. The Fund will be entitled to foreclose against this pledge or exercise its contractual rights under the governing documents of the Project Entity in the event of the Project Partner's failure to meet the performance obligations it has contractually agreed to. The Fund believes these measures will help ensure the project is completed on time and on budget. In order for the Fund to invest in a Project Entity, the Project Partner must contractually agree to:

- Pay all subcontractors, vendors, or service providers of the Project Entity when due;
- File tax returns and pay taxes when due;
- Generate any other report due to government authorities or to the members of the Project Entity when requested or when due;
- Obtain approval from the Fund before incurring expenses that are not included in, or which exceed the line items of, the budget of the project that will be agreed to by the Fund;
- Prohibit any lien, security interest, or other encumbrance to be filed or recorded against any property owned by the Project Entity which has not been previously approved by the Fund;
- Obtain and maintain all permits or licenses, necessary to the operation or development of the Project Entity;
- Meet the project milestones and timelines to be set forth in the Project Entity LLC Agreement;
- Maintain property sale prices or rents within 10% of the values set forth in the Project Entity governing documents unless consent is first obtained from the Fund;
- Maintain financial solvency of the Project Partner or any entity owned by the Project Partner;
- Avoid litigation, disputes, arbitration, or violation of any law or ordinance;
- Not enter into any agreement on behalf of the Project Entity, the terms of which in the reasonable determination of the Fund manager are likely to reduce the Project Entity's profits;

- Meet with the Fund manager monthly; maintain and produce accurate books and records; and deliver the documents or reports requested by the Fund;
- Maintain adequate insurance for the project or for any affiliate thereof performing work on the project;
- Deliver copies of any notices received by the project manager; and
- Not encumber, hypothecate, or pledge as collateral, or attempt to encumber, hypothecate, or pledge as collateral, any interest of the Project Entity contrary to the provisions of the Project Entity LLC Agreement or without the prior written consent of the Fund Manager.

## Identifying and Monitoring Investments

The Fund's due diligence process typically starts with a phone call from a bank, broker or builder and is followed by phases of review, which serve to eliminate those projects that do not meet the Fund's investment criteria. The due diligence process encompasses a methodical and comprehensive review of material elements pertaining to the specific project in question and the real estate market in general. The Fund will consider whether to fund a project based on the following investment criteria:

### *Location of Property*

Each Fund investment must fall within an approved geographic area. Due to the strength and diversity of the Pacific Northwest economy, the Fund is currently investing in projects located in the Greater Puget Sound area. The Fund will also invest in the greater Portland area.

### *Strength of Exit*

Prior to funding a project, the Fund will establish multiple potential exit strategies, thus generating multiple avenues for providing returns to the Fund. The strength of an exit is determined by the number of exits available, current market conditions, available take out finance options, and/or the sponsor's ability to refinance. Current market conditions are assessed based on supply and demand of the type of finished products and their locations.

### *CLTV less than 80%*

Combined loan to value ("*CLTV*") is a ratio used by the Fund to determine the downside risk on each prospective project. It is calculated by taking the sum of the Fund's investment and the first mortgage loan and dividing it by the anticipated value of the property at the completion of the project. The Fund will not invest in projects whose CLTV exceeds 80%.

### *Timing of Exit*

The Fund seeks to invest in projects that will exit in 18 months or less, and preferably 12-months or less. This relatively short investment period is important to minimize changing market conditions. In the event that market conditions change, the Fund is able to adjust the exit strategy quickly to take advantage of every opportunity available.

### *Background of the Sponsor and their ability to complete the Project*

Each prospective Project Partner is required to provide a resume, financial statement, a list of current and past projects as well as attend a face-to-face meeting. Through this process the Fund is able to measure the character of each Project Partner and his, her or its ability to execute a project.

### *Cash invested by Sponsor*

Aligning the interests of the Project Partner with those of the Fund is an important goal of the Fund. The Fund will require each Project Partner to make a cash contribution into the project. This investment of capital by a Project Partner is returned only after the Fund receives its return of principal investment and a predetermined preferred return. The amount required to be contributed by a Project Partner will be determined on a case-by-case basis, including conditions of the project and the capability of the Project Sponsor.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 22 Page 262
1366

*Signed Letter of Intent ("LOI")*

Prior to investing in a project, the Fund will issue an LOI, outlining the investment terms and anticipated returns. Before proceeding with the due diligence, the Fund will require a signed LOI from the Project Partner, which will usually be accompanied by a nonrefundable due diligence deposit of around $10,000.

Assuming that the maximum amount of this Offering is raised, the Fund expects to have between 65 – 85 Investments while the Fund has obligations outstanding under the Debenture Agreement, none of which will, individually, be in an amount in excess of 10% of the Gross Offering Proceeds received by the Fund as of the closing date of such Investment; however, the Fund may invest up to $1,500,000 into a single Investment once the Fund has raised at least $3,000,000 of Gross Offering Proceeds. In addition, no more than 15% of the Gross Offering Proceeds will be invested in projects in which there is no Project Partner (i.e. projects in which the Fund will effectively act as developer). The Fund expects to have 35 to 45 Investments in its portfolio under management at any given time. Additionally, prior to making an Investment, the Fund identifies multiple exit strategies, thus identifying multiple avenues for providing returns to the Fund. The Fund expects most Investments to range in size between $500,000 and $1,500,000.

Once an Investment is made, the Manager will require the respective Project Partners to send monthly reports and to update all documentation, gather information, offer advice, and maintain familiarity with the Investment. The Fund believes this steady supervision will help Fund management track each project's progress and allows for a more seamless transition if the Project Partner fails to meet the Fund's requirements. In the course of managing its portfolio, the Fund expects that as part of its diversified portfolio some Investments will perform at a loss, while others will perform positively. In the event the Fund needs to step in to protect the Investment, the Project Entity may engage the Manager's Affiliates to perform the work at the predetermined rates. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES—Compensation Rates of Affiliates."

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 23 Page 263
1366

## U.S. FEDERAL INCOME TAX MATTERS

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF FEDERAL TAX CONSEQUENCES CONTAINED OR REFERRED TO IN THIS MEMORANDUM WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY DEBENTURE HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE CODE; (II) SUCH DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (III) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**Introduction**

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Debentures.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Debentures, that purchased Debentures at their original issue price for cash, and that hold such Debentures as capital assets within the meaning of Section 1221 of the Code.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Debentures by certain investors that are subject to special tax rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Debentures in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Debentures, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Debentures, including the applicability of any U.S. federal tax laws or any state, local or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

**Considerations Relating to U.S. Holders of the Debentures**

As used herein, the term "*U.S. Holder*" means a beneficial owner of a Debenture that is, for U.S. federal income tax purposes:

- An individual citizen or resident of the U.S.;
- A corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- An estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- A trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Debentures, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Debentures that is a partnership and the partners in such a partnership should consult their tax advisors.

### Classification of the Debentures

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to treat the Debentures, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Fund's determination that the Debentures constitute debt for U.S. federal income tax purposes. The IRS could take the position, for example, that the Payoff Premium should be treated as a separate instrument and classified as equity. If any portion of the Debentures is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Debenture could differ from the timing and character of income, gain or loss recognized in respect of the Debentures described below. The remainder of this discussion assumes that the Debentures will be treated as indebtedness in accordance with that agreement and our determination.

### Interest Income

Holders of the Debentures will be required to report original issue discount ("*OID*") over the term of the Debentures under Treasury Regulations that govern "contingent payment debt instruments" (the "*CPDI Regulations*"). The Debentures will be subject to the CPDI Regulations because they provide for the payment of the Payoff Premium, which is contingent on the Net Profits of the Fund. The reporting of OID under the CPDI Regulations will be the exclusive method of reporting interest income under the Debentures, including the interest payments required by the Debentures.

Under the CPDI Regulations, each Investor generally will be required to report interest income on the Debentures each year in an amount equal to the OID that accrues each year, regardless of whether such Investor uses the cash or accrual method of tax accounting. The amount of each year's accrual will be calculated under a method that takes into account (in the manner specified below) a portion of our projection of the Payoff Premium. Consequently, an Investor would be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by such Investor in that year.

Under the CPDI Regulations, the amount of OID on a Debenture that is allocable to each annual accrual period will be the product of the "adjusted issue price" of the Debenture as of the beginning of each such annual period and the "comparable yield" for the Debentures. The "adjusted issue price" of a Debenture on any particular date is its "issue price" (i.e., the first price at which a substantial amount of the Debentures is sold to investors), increased by any interest income previously accrued (determined without regard to any adjustments to interest accruals described in "Adjustments to Interest Accruals on the Debentures" below), and decreased by the amount of any non-contingent payments previously made and the projected amount of any contingent payments scheduled to be made on the Debenture through the date on which the adjusted issue price is being calculated (i.e., without regard to the actual amount of the contingent payments made).

Under the CPDI Regulations, the Fund is required to establish the "comparable yield" for the Debentures. The comparable yield for the Debentures is the annual yield the Fund would incur, as of the initial issue date, on a fixed rate nonconvertible debt instrument with no contingent payments, but with terms and conditions otherwise comparable to those of the Debentures. Accordingly, the Fund has determined the comparable yield to be 10% compounded annually.

The Fund is required to provide to Investor, solely for U.S. federal income tax purposes, a schedule of the projected amounts of all payments required to be made on the Debentures (including the Payoff Premium). This schedule must include a projected amount of Payoff Premium sufficient to cause the yield on the Debentures to equal the comparable yield. The Fund's determination of the projected payment schedule for the Debentures, including the

monthly interest payments and an estimate of the timing of payment and amount of the Payoff Premium, is below. In certain limited situations in which the Payoff Premium is expected to be larger than originally contemplated, the Fund may be required to revise the projected payment schedule, which could result in a change to the amount of OID allocable to each annual accrual period.

| Projected Payment Schedule Per $100,000 of Debentures | | | | |
|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 |
| January | | $833.33 | $833.33 | $0 |
| February | | $833.33 | $833.33 | $0 |
| March | $0 | $833.33 | $833.33 | $0 |
| April | $833.33 | $833.33 | $833.33 | $0 |
| May | $833.33 | $833.33 | $833.33 | $0 |
| June | $833.33 | $833.33 | $833.33 | $0 |
| July | $833.33 | $833.33 | $833.33 | $0 |
| August | $833.33 | $833.33 | $833.33 | $0 |
| September | $833.33 | $833.33 | $833.33 | $0 |
| October | $833.33 | $833.33 | $833.33 | $0 |
| November | $833.33 | $833.33 | $833.33 | $0 |
| December | $833.33 | $833.33 | $833.33 | $0 |

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to be bound by the Fund's application of the CPDI Regulations to the Debentures, including our determination of comparable yield and the related "projected payment schedule" set forth above). The comparable yield and the projected payment schedule are solely for purposes of determining your (and the Fund's) interest accruals and adjustments thereof in respect of the Debentures for U.S. federal income tax purposes and do not constitute a projection or representation regarding the actual amounts payable to you with respect to the Debentures.

### Adjustments to Interest Accruals on the Debentures

If Investor receives actual payments of Payoff Premium with respect to the Debentures in a tax year in excess of the total amount of projected payments of Payoff Premium for that tax year, Investor will have a "net positive adjustment" equal to the amount of such excess. Investor will be required to treat the "net positive adjustment" as additional interest income for the tax year.

If you receive actual payments of Payoff Premium with respect to the Debentures in a tax year that in the aggregate are less than the amount of the projected payments of Payoff Premium for that tax year, Investor will have a "net negative adjustment" equal to the amount of such deficit. This adjustment will be applied to reduce Investor's interest income on the Debentures for that tax year, and any remainder will give rise to an ordinary loss to the extent of Investor's interest income on the Debentures during prior tax years, reduced to the extent such interest income was offset by prior net negative adjustments, if any. Any negative adjustment in excess of the amounts described in the

preceding sentence will be carried forward to offset future interest income in respect of the Debentures or to reduce the amount realized upon a sale, exchange, repurchase or redemption of the Debentures.

## Sale, retirement or disposition of Debentures

Upon the sale, retirement or other disposition of a Debenture, Investor generally will recognize taxable gain or loss equal to the difference between the amount realized on the disposition and Investor's adjusted tax basis in the Debenture. A U.S. Holder's adjusted tax basis in a Debenture generally will be equal to its adjusted issue price (as described above) in the Debenture. Gain recognized on the disposition of a Debenture generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Debenture generally will be treated as an ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Debenture is more than one year). The deductibility of capital losses is subject to limitations.

## Backup withholding and information reporting

Information reporting requirements generally will apply to payments of interest (including any amounts treated as interest pursuant to the CPDI Regulations) made by the Fund on, or the proceeds of the sale or other disposition prior to maturity of, the Debentures. Backup withholding tax, currently at a rate of 28%, may apply to such payments if Investor fails to:

- Furnish his, her or its taxpayer identification number (social security or employer identification number);
- Certify that such number is correct;
- Certify that he, she or it is not subject to backup withholding; or
- Otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, *provided* that the required information is furnished timely to the Internal Revenue Service (the "***IRS***").

## ERISA MATTERS

## Benefit Plan Investor Considerations

The Debentures offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or an individual retirement account ("***IRA***") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "***Similar Law***"). A fiduciary of an employee benefit plan must determine that the purchase and holding of a Debenture is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Debentures offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Debenture offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Debenture that its acquisition and holding of the Debenture does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

# GLOSSARY

To understand the rights associated with the Debentures, Investor must review carefully the defined terms used in this Memorandum. Some of these definitions are set forth in this "GLOSSARY" and others in the body of this Memorandum. These definitions (some of which have been slightly modified) have been taken from the Debenture Agreement, which defines the preferences, privileges, rights, interests and obligations of the Debentures. Many of these definitions are technical in nature, involve complicated relationships, and can only be understood by reference to other defined terms and, in some cases, to other provisions of the Debenture Agreement. Section references in the definitions refer to sections in the Debenture Agreement. Prospective investors should understand that the definitions in the Debenture Agreement will, for all purposes, be controlling, notwithstanding any simplification of such definitions in this Memorandum. Moreover, you should bear in mind that this GLOSSARY does not include many of the definitions included in the Debenture Agreement.

"*Act*" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

"*Affiliate*" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"*Collateral Agent*" means Experts Counsel Inc., a Florida corporation.

"*Debenture*" means the secured payment obligation, to be issued by the Fund in favor of the Holder, pursuant to the terms of the Debenture Agreement, with an original principal amount equal to the loan made by the Holder to the Fund at Closing (i.e. the Loan Amount). The Debenture shall be in the form attached to the Debenture Agreement, which is attached hereto as <u>Exhibit A</u>.

"*Debenture Agreement*" means the Senior Secured Debenture Purchase Agreement, as originally executed or as amended by the Parties, and shall include the forms and exhibits attached thereto.

"*Estimated Tax Amount*" means, with respect to each member of the Fund, the amount equal to (a) the sum of (i) the greater of the highest statutory marginal ordinary federal income tax rate for individuals or corporations for a given tax year plus (ii) the unearned income Medicare contribution tax rate under Internal Revenue Code Section 1411 for a given year, multiplied by (b) the taxable income allocated to that member for the taxable year pursuant to the allocation provisions in Article IV of the LLC Agreement.

"*Fund*" means iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company, which is the obligor under the Debenture.

"*Holder*" means any Person who has purchased a Debenture pursuant to this Agreement, together with any transferee thereof permitted under Section 9 of the Debenture Agreement.

"*Manager*" means iCap Pacific NW Management, LLC, a Washington limited liability company, which was formed for the sole purpose of being the Manager.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"*SEC*" means the Securities and Exchange Commission.

## SUMMARY OF THE DEBENTURE AGREEMENT

The following summarizes certain provisions of the Debenture Agreement, and the Debenture document contained therein, not described elsewhere in this Memorandum. All statements made below and elsewhere in this Memorandum relating to the Debenture Agreement are hereby qualified in their entirety by the actual language of the Debenture Agreement. Such statements do not purport to be complete and in no way modify or amend the Debenture Agreement. The parenthetical references included in this section refer to the referenced sections of the Debenture Agreement. **Prospective investors should read the entire Debenture Agreement, attached as <u>Exhibit A</u>, before deciding to purchase Debentures.**

The Debentures will be issued without coupons, in denominations of at least $100,000. The Fund reserves the right, in its sole discretion, to accept subscriptions for amounts less than the minimum.

### Collateral Agent

Each Investor, as a Holder, must appoint Experts Counsel Inc. as its collateral agent under the Debenture Agreement (the "***Collateral Agent***") and authorizes the Collateral Agent to act thereunder as the Holder's agent. The Debenture Agreement vests control over matters related to the enforcement of any rights or remedies with respect to the collateral supporting the Debenture and any remedies under the Debenture in the hands of the Collateral Agent. If an action is brought by the Collateral Agent, such action must be for the collective benefit of all Holders. In performing its function and duties as a Collateral Agent, the Collateral Agent will act solely as agent of Holders and will not assume and will not be deemed to have assumed any obligations towards or relationship of agency or trust with or for the Fund, nor will the Collateral Agent be deemed to be a fiduciary for the Holders.

### Economic Terms

#### *Interest*

Except as described in "Repayment; Fund's Extension Right" or in the this paragraph, the outstanding Loan Amount shall bear simple interest at 10% per annum. Interest computation shall be based on a 360-day year, actual days elapsed. Interest will accrue as of the Closing Date of the Debenture. In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of 16% per annum, simple interest, from and after written notice to the Fund of the Event of Default until all amounts due thereunder have been paid in full or the Event of Default has been cured. Prior to the Maturity Date, or extension thereof, the Fund will be required to make only monthly interest payments to the Holder. Such monthly payments will include all interest accrued as of the Closing date of the Debenture through the end of the prior calendar month, and shall be due and payable to the Holder on the 15th calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter. The Fund may deposit into an interest reserve account proceeds from the issuance of Debentures to cover up to 12 months of interest expense on the Debentures.

#### *Repayment; Fund's Extension Right*

The full Loan Amount will be due and payable, together with all accrued but unpaid interest, on or before December 31, 2017 (the "***Maturity Date***"). The Fund has the option to extend the Maturity Date for an additional one year period, provided an Event of Default has not occurred. This option may be exercised by the Fund at any time prior to the Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Maturity Date. If the Fund fails to give such notice, the Debentures will mature upon the expiration of the Maturity Date. If the Fund exercises its right to extend the Maturity Date, an Investor will be entitled to receive an 11% per annum simple interest rate on the outstanding principal balance of his, her or its Debenture during the extension period. The Fund may choose to prepay part or all of the Debenture without penalty at any time prior to the Maturity Date, or extension thereof. The date the Fund prepays in full the Debentures is hereafter referred to as the "***Prepayment Date***."

#### *Payoff Premium*

Within 12 months after the payment of the Debenture, the Holder is entitled to a "Payoff Premium Payment" equal to Holder's *pro rata* share of 35% of the Net Profits generated by the Fund. "***Net Profits***" means an amount equal to the

net cash available to the Fund from liquidation of its Investments after full satisfaction of is obligations under the Debenture Agreement and the Debentures, plus a credit for any prior Tax Distributions made to the Manager previously under the Fund's LLC Agreement, less any amounts set aside by the Manager to cover liabilities, obligations, capital expenditures, expenses, and reasonable reserves of the Fund. A Holder's *pro rata* share of the Payoff Premium Payment shall be equal to 35% of the Net Profits multiplied by a fraction, the numerator of which is such Holder's Loan Amount and the denominator of which is the aggregate loan amount of all other holders of Debentures. The Fund will calculate and pay the first Payoff Premium Payment on the date of final payoff of the Debenture balances, and then on the last day of each calendar quarter thereafter with respect to any Investments that may liquidate during such subsequent period(s). The Payoff Premium Payment is not intended to constitute an equity interest in the Fund, but rather is intended to constitute additional interest on the Loan Amount, and shall be paid in addition to all principal, penalties and other interest otherwise due to each Holder.

### Secured Obligation

The Debenture represents a secured obligation of the Fund. The Debentures are secured by all of the assets of the Fund, by a pledge of the Manager's membership interest in the Fund, and the Fund's right, title and interest in the membership interest of the Project Partner in the limited liability company specifically formed to hold the Investment, as pledged by the Project Partner to the Fund. The Fund's assets will include the following:

- A first or, where allowed under senior debt instruments, a second position deed of trust (i.e., mortgage) in the real estate owned by or thereafter owned by the Project Entities;
- A secured interest in the Project Partner's membership interest in the Project Entity; and
- The Fund's right to assume control of the Project Entity and the project owned by it in the event of a failure by the Project Partner or the Project Entity to meet applicable project milestones or requirements.

### Events of Default

The following is a summary of events constituting an "*Event of Default*" under the Debenture and triggering the rights of the Holder to accelerate amounts due thereunder as set forth in the Debenture Agreement:

(a)     The Fund defaults in the payment of any Loan Amount or interest on any of the outstanding Debentures, when the same becomes due and payable and such default continues for a period of 10 Business Days (such period, a "**Grace Period**"), *provided, however,* that no such Grace Period will be available should the Fund default twice in the payment of interest on any of the outstanding Debentures when such interest is due and payable (even if such payments were subsequently made during the Grace Period), such that should the Fund default in the payment of interest on any of the outstanding Debentures when such interest is due and payable after the 2 prior defaults, then an Event of Default shall occur on the date such payment was due and payable;

(b)     The Fund fails to observe or perform any covenant or agreement of the Fund in the Debenture Agreement (other than a covenant or agreement a default in whose performance or whose breach is specifically dealt with elsewhere in the "Events of Default" provision in the Debenture Agreement), and such failure continues for a period of 30 calendar days after there has been given, by registered or certified mail, to the Fund by the Holder, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" thereunder;

(c)     A final judgment or judgments for the payment of money aggregating in excess of $500,000 is rendered against the Fund and which judgments are not, within 90 calendar days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within 90 calendar days after the expiration of such stay; *provided*, *however*, that any judgment which is covered by insurance or an indemnity from a creditworthy party shall not be included in calculating the $500,000 amount set forth above;

(d)     The Fund violates or otherwise defaults on any material contractual obligation that would, as a result of such violation or default, cause the acceleration of the Fund's obligations thereunder and result in the incurrence of a liability, damages or loss to the Fund in excess of $500,000;

(e)    The Fund, pursuant to or within the meaning of any Bankruptcy Law (i) commences a voluntary case; (ii) consents to the entry of an order for relief against it in an involuntary case; (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

(f)    A court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Fund in an involuntary case; (ii) appoints a custodian of the Fund for all or substantially all of its property, or (iii) orders the liquidation of the Fund; and the order or decree remains unstayed and in effect for 90 consecutive calendar days.

The term "**Bankruptcy Law**" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "**Custodian**" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

### Acceleration, Rescission and Annulment

Upon the occurrence of an Event of Default, with the consent of the Holder of more than 10% in aggregate loan amount of the outstanding Debentures, the Collateral Agent may declare the loan amount of and accrued but unpaid interest, if any, on all the Debentures (including the Loan Amount or interest on the Holder's Debenture) to be immediately due and payable. If an Event of Default pursuant to paragraphs (e) and (f) under "Events of Default" above occurs, the loan amount and interest on all Debentures will *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Collateral Agent or any Holders of the Debentures.

The Holders of more than 50% in aggregate loan amount of the outstanding Debentures by notice to the Collateral Agent may rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of acceleration. No such rescission shall affect any subsequent default or impair any right consequent thereon.

## Fund's Rights Regarding Other Indebtedness

For so long as any Debentures remain outstanding, neither the Fund nor any subsidiary of the Fund (other than a special purpose entity organized for the purpose of an investment to be made by the Fund in a real property project) shall, without the prior written consent of the Holders holding a majority of the aggregate outstanding principal amount of the Debentures, incur or otherwise become liable with respect to any indebtedness other than (a) Permitted Indebtedness (as defined below) or (b) indebtedness to trade creditors in the ordinary course of business.

## Registered Debentures; Notices; Changes of Address

Each Debenture will be registered in the name of the Investor who subscribed for such Debenture or any transferee of a Debenture (See "TRANSFERABILITY OF THE DEBENTURES"). Unless otherwise provided by the Fund, all payments will be made by the Fund by electronic transfer or check to the registered holder of each Debenture at the registered address of such Holder. In the event that a Holder changes his, her or its address, the Holder is required to notify the Fund under the terms of the Debenture.

## Governing Law

The Debentures will be governed by Washington law.

## Covenants of the Fund or the Manager

The Debentures provide that neither the Fund nor any of its subsidiaries shall (a) directly or indirectly, declare, order, make or set apart any sum for or pay any distribution (other than tax distributions as set forth in the LLC Agreement); (b) establish any deposit account other than the account identified in that certain Deposit Account Control Agreement, to be entered into by and among the Company, the Collateral Agent and Umpqua Bank, or otherwise deposit or fund any cash or cash equivalents of the Company in any deposit account other than the account identified in the Account Control Agreement; or (c) contract, create, incur, assume or permit to exist any indebtedness, except for (i) indebtedness arising or existing under the Debenture Agreement; (ii) indebtedness arising from the issuance of the Debentures in the Offering; (iii) indebtedness arising from trade payables incurred by the Fund in the ordinary

course of business; (iv) indebtedness junior to the Holder's interest; (v) with respect to a wholly-owned subsidiary of the Fund organized for the purpose of an Investment, indebtedness that results from a commercial loan from a commercial lender made in such lender's ordinary course of business or (vi) the Credit Facility ("**Permitted Indebtedness**").

The Fund will not make any single Investment that exceeds 10% of the aggregate principal balances of the outstanding Debentures (the "**Gross Offering Proceeds**") as of the closing date of such Investment; *however*, once Gross Offering Proceeds equals at least $3,000,000 the Fund may make a single investment equal to the greater of 10% of the aggregate principal balances of the outstanding Debentures or $1,500,000. In addition, no more than 15% of the aggregate Gross Offering Proceeds will be invested in Fund Projects in which there is no Project Partner (i.e., Fund Projects in which the Fund will effectively act as the developer). Also, the Fund may only make Investments if the total amount of debt encumbering the underlying property, together with the Company's Investment, is less than 80% of the anticipated finished value of the underlying project.

Neither the Manager nor any of its Affiliates may make any investment on behalf of a new pooled investment fund with investment objectives that are identical to those of the Fund until the earlier of: (a) the date on which at least 75% of the Gross Offering Proceeds (less payment of expenses for consulting fees and professional fees, and the setting aside of reserves) have been committed to or invested in Investments or (b) the end of the Offering Period. Notwithstanding the foregoing, Affiliates of the Manager (y) have established other pooled investment funds that were formed prior to the date of this Fund and which have investment objectives identical to the Fund's and (z) are permitted to raise capital for and operate the Second 2015 Fund. The Second 2015 Fund intends to target institutional investors, but will not be limited to institutional investors and seeks to raise up to $100,000,000 in debt investments. In the event the Investment is also suitable for one or more Affiliate pooled investment vehicles, including the Second 2015 Fund (an "**Affiliate Fund**"), and the Fund and the Affiliate Fund(s) each have sufficient capital available to singularly finance the Investment, after setting aside reserves, then the Investment will be offered to each Eligible Party on a rotating basis, with the order of rotation determined by the Manager.

For the avoidance of doubt, neither the Manager nor its members or managing officers will be required to offer to the Fund any real estate investment that is not consistent with the investment guidelines, investment objectives, and principles of the Fund or is otherwise not suitable for the Fund. Notwithstanding any provision to the contrary, the Fund and its Affiliates may engage in management and investment activities related to pre-existing Investments and activities or operations of an Affiliate.

# REPORTS TO THE INVESTORS

The Fund has adopted a calendar fiscal year ending December 31. For so long as the Holder continues to hold the Debenture, the Fund will provide to the Holder:

(a)     As soon as practicable after the end of each fiscal year and in any event within one hundred twenty (120) days after each fiscal year, consolidated balance sheets of the Fund as of the end of such fiscal year and consolidated statements of income of the Fund for such fiscal year, prepared in reasonable detail, certified by an officer of the Fund. The Fund's financial statements will be audited by an independent certified public accountant; and

(b)     As soon as practicable after the end of each fiscal quarter and in any event within 60 days after the end of each fiscal quarter, quarterly financial statements.

# THE OFFERING

The following description of certain matters relating to the Debentures does not purport to be complete and is subject in all respects to applicable Delaware Law and to the provisions of the Debenture Agreement.

## General

The Offering has not been registered under the Securities Act and is intended by the Fund not to involve a public offering within the meaning of the Securities Act and Regulation D promulgated thereunder and, therefore, to be exempt from the registration provisions of the Securities Act. Accordingly, the Offering is being made pursuant to certain conditions which, if satisfied, will qualify the Offering for exemption from registration as provided by the Securities Act and Regulation D. These conditions relate to limitations on the manner of Offering, the nature of the Investors, access to or furnishing information about the issuer, and restrictions on transferability. This Offering is not being offered pursuant to Rule 506(c) of Regulation D.

Subject to the terms of the Debenture Agreement, the Fund is authorized to raise up to $30,000,000 through the Offering at a purchase price of $100,000 per Debenture. Investors must make a minimum investment of $100,000, representing the purchase of one Debenture, unless a smaller purchase is permitted by the Manager.

The Manager will have an initial closing for the Fund as soon as practicable after the first investments are raised (the "*Initial Closing Date*"). To accommodate the admission of additional Investors and permit existing Investors to increase their investment amounts (each, an "*Additional Investor*"), the Manager may, in its discretion, hold one or more additional closings on or before December 17, 2015, unless extended for ninety (90) days by the Manager, (each such closing to take place on an "*Additional Closing Date*").

Following the Initial Closing, additional investments in Debentures under the Offering will be accepted from time to time by the Manager. The Fund will not offer any of the Debentures pursuant to the Offering after December 17, 2015, but such date may be extended up to ninety (90) days by the Manager in its discretion.

## Payment of Investments

Each payment to the Fund will be made in United States dollars by means of a certified or cashier's check payable to "Gulfshore Bank as escrow agent for iCap" or by wire transfer, to a bank account designated by the Fund, of immediately available funds through the federal wire transfer system, in the amount that the Holder has agreed to lend to the Fund in the Debenture Purchase Agreement.

## Acceptance of Subscriptions; Eligibility Requirements

Purchases for the Debentures will be accepted on a "first come, first-served" basis. The Manager reserves the right to reject any tendered investment for whatever reason the Manager deems appropriate. If the Manager rejects an investment, the Manager will give notice of such rejection, and return the tendered initial investment payment, no later than 10 business days after the Debenture Purchase Agreement and the accompanying funds have been received by the Manager. As to the eligibility requirements of prospective investors, See "WHO MAY INVEST."

## TRANSFERABILITY OF THE DEBENTURES

Subject to compliance with the requirements of the Debenture Agreement, Investors shall have the right to transfer the Debenture to any qualifying third party of its choice contingent upon securing the Fund's written consent in advance of the proposed transfer. The Fund is under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under the Debenture Agreement, until the Holder has surrendered the original Debenture for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Fund. A new Debenture for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing a Debenture Agreement, and executing a Certificate of Accredited Investor. Interest and principal are payable only to the registered holder of the Debenture.

The Holder and any successor Holder agree(s) to provide to the Fund a Form W-9 upon request. Until registration of a transfer occurs, the Fund shall be entitled to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by the Debenture Agreement and the applicable Debenture.

**State Securities: Blue Sky Laws**

Transfer of the Debentures may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Debentures may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be registered for resale under the Blue Sky laws of any state, the Holders and any Persons who desire to purchase them in any trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Debentures and of purchasers to purchase the Debentures. Accordingly, Investors should be prepared to hold the Debentures until their maturity date as may be extended.

## FINANCIAL INFORMATION

This Memorandum does not include current balance sheets for either the Fund or the Manager. The Manager has limited capitalization. As of the date hereof, the Fund has incurred certain liabilities in connection with the offering of the Debentures, but has no significant assets. The Fund is a newly-organized entity, has no capital (other than the capital to be raised through the sale of the Debentures), and has and will incur substantial expenses in connection with the offering and sale of the Debentures.

## LEGAL REPRESENTATION

The Manager has engaged Perkins Coie LLP as its legal counsel to assist in connection with transactions contemplated by this Memorandum and in preparing the Debenture Agreement, this Memorandum and related documents. Perkins Coie LLP, in providing such advice has represented the Manager's interests and did not represent nor purport to represent the interests of any other Investor or potential investor. The Fund urges you to engage your own legal counsel and, as necessary, financial consultants for advice regarding the desirability of purchasing the Debentures offered pursuant to this Memorandum. Perkins Coie LLP may in the future represent the Fund, the Manager or related parties on various matters, subject to complying with applicable legal principles for resolving conflicts of interest.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 25 Page 275
1366

# PLAN OF DISTRIBUTION

**Compensation**

The Fund has entered into an exclusive engagement agreement (the "***Engagement Agreement***") with StillPoint Capital, LLC ("**SPC**") to serve as managing broker dealer of the Offering. The exclusivity period continues until the Offering has been closed.

The Debentures will be offered on a "best efforts" basis (which means that there is no guarantee that any minimum amount will be sold). SPC will engage other broker dealers ("***Selling Group Members***") to assist in privately placing the Debentures. SPC will receive a selling commission of 7% of the Gross Proceeds of this Offering, which it will re-allow to the Selling Group Members. SPC will also receive a marketing re-allowance fee of 1% of the Gross Proceeds of this Offering, which it will re-allow to the Selling Group Members. SPC will receive a fee of 5% of the Gross Proceeds of this Offering for serving as the managing dealer in the Offering. SPC will be responsible for all wholesaling fees and marketing expenses relating to this Offering, as well as paying its own expenses associated with the Offering.

SPC and its officers, employees and affiliates may purchase Debentures in the Offering. Such Debentures will be counted toward the Maximum Offering Amount. SPC and the Fund may, in their sole discretion, accept offers to purchase Debentures net (or partially net) of the commissions and expense reimbursements described in this Memorandum in certain circumstances deemed appropriate by either of them, including by way of illustration, from Investors purchasing through a registered investment advisor ("**RIA**"), or from Investors who are affiliates of the Fund or any member of the Selling Group. The Fund may also make sales to registered representatives of the Selling Group or to their spouses and affiliates, in each case net of sales commissions.

In addition to the commissions paid at the time of each closing, SPC will be issued a profits interest in the Fund, pursuant to which SPC and its Affiliates or assigns, as one class of members, will have a right to share in 23% of the cash or property distributions of the Fund as set forth in the LLC Agreement after the Investors have been paid their principal Debenture balances and Payoff Premium.

We have agreed to indemnify SPC from and against losses, claims, damages or liabilities (collectively, the "**Damages**") arising out of the Offering, except for Damages resulting from SPC's breach of the Engagement Agreement, including gross negligence or willful misconduct as more fully set forth in the Engagement Agreement.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 26 Page 276 1366

**EXHIBIT A**

**SENIOR SECURED DEBENTURE PURCHASE AGREEMENT**

**SENIOR SECURED DEBENTURE PURCHASE AGREEMENT**

**by and between**
**ICAP NORTHWEST OPPORTUNITY FUND, LLC**
**a Delaware limited liability company,**

**and**

**THE HOLDER (AS DEFINED BELOW)**

**Dated as of April 20, 2015**

# CONTENTS

1. Definitions ...................................................................................................................1

2. Delivery of Loan Amounts ..........................................................................................3

    2.1 Loan Amounts .......................................................................................................3

    2.2 Prepayment............................................................................................................4

    2.3 Event of Default ....................................................................................................4

3. Seniority of the Debentures .........................................................................................4

4. Closing ........................................................................................................................4

5. Representations and Warranties of the Company ........................................................4

    5.1 Organization and Authority....................................................................................5

    5.2 Capitalization ........................................................................................................5

    5.3 Authorization; Binding Effect ...............................................................................5

    5.4 No Bankruptcy or Insolvency................................................................................5

    5.5 Valid Issuance of the Debenture............................................................................6

    5.6 Restricted Securities ..............................................................................................6

    5.7 Full Disclosure; No Other Brokers ........................................................................6

    5.8 Governmental Consents and Notices .....................................................................6

    5.9 No Litigation .........................................................................................................7

    5.10 No Breach; No Default ........................................................................................7

    5.11 Taxes ..................................................................................................................7

    5.12 Permits ...............................................................................................................7

    5.13 Title ....................................................................................................................7

6. Representations, Warranties and Agreements of the Holder .......................................7

    6.1 Purchase Entirely for Own Account .......................................................................8

    6.2 Due Diligence........................................................................................................8

    6.3 Access to Information; Modification of Offering.....................................................8

    6.4 Sophistication .......................................................................................................8

    6.5 Suitability..............................................................................................................8

    6.6 Professional Advice ...............................................................................................9

    6.7 Ability to Bear Risk ...............................................................................................9

    6.8 Possible Loss of Interest and Principal ..................................................................9

    6.9 Restricted Securities ..............................................................................................9

    6.10 Further Limitations on Disposition ......................................................................9

    6.11 Age; Residency..................................................................................................10

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 21 Page 281
1366

6.12 Accredited Investor Status ...................................................................10

6.13 Tax Identification; Withholding ...........................................................10

6.14 No View to Tax Benefits .....................................................................11

6.15 Confidential Information.....................................................................11

6.16 No General Solicitation .....................................................................11

6.17 Managing Broker-Dealer ......................................................................11

6.18 Representations and Warranties of Organization ..................................................12

6.19 Representations and Warranties by Employee Benefit Plans.......................................12

7. Conditions to Closing; Security Interests .....................................................13

7.1 Holder's Conditions of Closing ............................................................13

7.2 Company's Conditions of Closing............................................................13

7.3 Security Interest .........................................................................14

7.4 Interest Reserve ..........................................................................14

8. Covenants ...................................................................................14

8.1 Information Rights ........................................................................14

8.2 Other Affirmative Covenants of the Company................................................15

8.3 Negative Covenants .......................................................................15

9. Defaults and Remedies .......................................................................16

9.1 Events of Default .........................................................................16

9.2 Acceleration, Rescission and Annulment ....................................................17

10. Transfer of the Debenture ..................................................................18

11. Tax Matters ................................................................................18

12. Miscellaneous ..............................................................................19

12.1 Assignment ..............................................................................19

12.2 Governing Law ...........................................................................19

12.3 Counterparts ............................................................................19

12.4 Titles and Subtitles ....................................................................19

12.5 Notices .................................................................................19

12.6 Expenses ................................................................................20

12.7 Entire Agreement ........................................................................20

12.8 Amendments and Waivers ..................................................................20

12.9 Severability ............................................................................20

12.10 Anti-Terrorism Matters .................................................................20

12.11 Survival ...............................................................................21

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 22 Page 282
1366

## EXHIBITS

FORM OF DEBENTURE ........................................................................................EXHIBIT A

SECURITY DOCUMENTS RELATING TO THE DEBENTURES ....................................EXHIBIT B

    COLLATERAL AGENT AGREEMENT...............................................................................B-1

    SECURITY AGREEMENT ...............................................................................................B-2

    PLEDGE AND SECURITY AGREEMENT .........................................................................B-3

    DEPOSIT ACCOUNT CONTROL AGREEMENT.................................................................B-4

    UCC FINANCING STATEMENTS.....................................................................................B-5

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

**SENIOR SECURED DEBENTURE PURCHASE AGREEMENT**

THIS SENIOR SECURED DEBENTURE PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of this 20th day of April, 2015 by and between iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company (the "*Company*"), and each Debenture (as defined below) holder (the "*Holder*") whose name is added to the Schedule of Holders attached hereto as *Schedule I*, which schedule will be amended from time to time as loans are made to the Company by Holders.

## RECITALS

A.       Pursuant to an offering by the Company of up to $30,000,000 of senior secured debentures, with an over-allotment option of up to $50,000,000 (the "*Offering*") as described in detail in that certain Private Placement Memorandum, dated April 20, 2015, as supplemented from time to time by the Company (the "*PPM*"), the Company plans to issue, from time to time, separate senior secured debentures, in substantially the form attached hereto as *Exhibit A* (individually, a "*Debenture*" and collectively, the "*Debentures*"), to fund its investment and operational activities.

B.       The Company will accept funds under this Agreement only from an investor (once accepted, the investor herein referred to as the "*Holder*") qualifying as an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933.

C.       The Debenture, when issued, will constitute a secured obligation of the Company.

D.       The undersigned, by executing this Agreement, agrees to loan to the Company the amount stipulated on the Signature Page, and will receive from the Company a Debenture in the equivalent principal amount. The Company's closing of such transaction is subject to the conditions set forth in this Agreement.

## AGREEMENT

Now, therefore, in consideration of the mutual promises and covenants set forth herein, the Parties hereby agree as follows:

**1.       Definitions**

As used in this Agreement and the exhibits hereto, the following capitalized terms have the meanings set forth below unless the context clearly indicates otherwise. All nouns, pronouns and verbs used in this Agreement shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable.

"*Act*" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

"*Affiliate*" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Agreement**" means this Senior Secured Debenture Purchase Agreement, as originally executed or as amended by the Parties, and shall include the forms and exhibits attached thereto.

"**Bankruptcy Law**" is defined in Section 9.1.

"**Business Day**," when used with respect to any place of payment or any other particular location referred to in this Agreement or in the Debenture, means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions or trust companies in the Borough of Manhattan or The City of New York are authorized or obligated by law or executive order to close.

"**Closing**" is defined in Section 4.

"**Collateral Agent**" means Experts Counsel, Inc., a Florida corporation.

"**Collateral Agent Agreement**" means that certain Collateral Agent Agreement among the Collateral Agent and each Holder in the form attached hereto as **Exhibit B-1**.

"**Company**" means iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company, which is the obligor under the Debenture.

"**Debenture**" means the secured payment obligation, to be issued by the Company in favor of the Holder, pursuant to the terms of this Agreement, with an original principal amount equal to the loan made by the Holder to the Company at Closing (i.e. the Loan Amount). The Debenture shall be in the form attached hereto as **Exhibit A**.

"**Debentures**" refer to, collectively, each Debenture issued by the Company in the Offering, with each of the Debentures in the form attached hereto as **Exhibit A**.

"**Distribution**" means (i) any dividend or other distribution, direct or indirect, on account of any membership interests of the Company, now or hereafter outstanding, (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any membership interests of the Company, now or hereafter outstanding, or (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire membership interests of the Company, now or hereafter outstanding.

"**Event of Default**" means any event which is, or after notice or passage of time, or both, would be, an Event of Default within the meaning of Section 9.

"**Fund Projects**" means investments without a Project Partner in which the Company acquires, or causes a subsidiary to acquire, the real property and effectively, directly or indirectly, acts as the developer of the Project.

"**Gross Offering Proceeds**" is defined in Section 3.

"**Holder**" means any Person listed on **Schedule I** who has purchased a Debenture pursuant to this Agreement, or any transferee thereof permitted under Section 10.

"**Indebtedness**" of the Company or any Subsidiary thereof means all indebtedness representing money borrowed which is created, assumed, incurred or guaranteed in any manner by such entity or for which such entity is otherwise responsible or liable (whether by agreement to purchase indebtedness of, or to supply funds to or invest in, others).

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 26 Page 286
1366

"***Loan Amount***" is defined in Section 2.1.

"***Manager***" means iCap Pacific NW Management, LLC, a Washington limited liability company.

"***Material Permits***" is defined in Section 2.12.

"***Maturity Date***" is defined in Section 2(a) of the Debenture.

"***Offering***" means the offering by the Company of the Debentures pursuant to this Agreement as described in the PPM.

"***Operating Agreement***" means the Limited Liability Company Agreement of the Company, in the form attached to the PPM.

"***Parties***" means the Company and the Holder.

"***Payoff Premium Payment***" is defined in Section 3(b) of the Debenture.

"***Person***" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"***Managing Broker-Dealer***" means StillPoint Capital, LLC, a Florida limited liability company.

"***Pledge and Security Agreement***" means that certain Pledge and Security Agreement entered into by and between the Manager and the Collateral Agent in the form attached hereto as ***Exhibit B-3***.

"***PPM***" is defined in Recital A.

"***Project Partner***" means the developers or builders holding an interest in the Project Entities (as defined in Section 7.3).

"***SEC***" is defined in Section 5.5.

"***Security Agreement***" means that certain Security Agreement in the form attached as ***Exhibit B-2***.

"***Self-Directed Entity***" is defined in Section 6.18.

"***Signature Page***" means the Holder's signature page to this Agreement, upon which the Holder may designate the Loan Amount. Attached to this Agreement are several different versions of the Signature Page, each customized depending on whether the investor is an individual, a Self-Directed Entity or another legal entity (such as a corporation, limited liability company, or trust).

"***UCC Financing Statements***" means those financing statements to be filed by the Company and the Manager in the form attached as ***Exhibit B-4***.

**2.     Delivery of Loan Amounts**

**2.1     Loan Amounts**

By the execution of this Agreement, subject to the terms and conditions of this Agreement, the Holder agrees to lend to the Company principal in an amount set forth on the Signature Page (the "***Loan***

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 27 Page 287
1366

*Amount*"), and the Company agrees to borrow such amount and in exchange for such funds to issue to the Holder a Debenture. At the time of the Holder's execution and subsequent delivery of this Agreement to the Company the Holder shall deliver the Loan Amount proceeds to Gulfshore Bank as described in Section 4.

### 2.2 Prepayment

The Company may choose to prepay part or all of the Debenture without penalty at any time prior to the Maturity Date, *provided* that the Company makes such prepayments to all of the Holders on a *pro rata* basis according to the respective aggregate loan amounts of each Holder's Debenture. In the event that the Company elects to extend the Maturity Date for twelve (12) months pursuant to Section 2(b) of the Debenture, the Company may prepay all or part of the Debenture without penalty at any time during the extension, *provided* that the Company makes the prepayments to all of the Holders on a *pro rata* basis according to the respective aggregate Loan Amounts.

### 2.3 Event of Default

Section 8 sets forth each of the events constituting an "***Event of Default***" under the Debenture and stipulates the rights of the Holder to accelerate amounts due thereunder.

### 3. Seniority of the Debentures

Beginning as of the initial Closing and for so long as any Debenture remains outstanding, unless approved by Holders holding a majority of the aggregate principal amount of the outstanding Debentures, the Debentures will rank senior to all of the Company's Indebtedness, including any class of debt security that the Company may issue. Notwithstanding the foregoing, the Company may obtain a senior ranking credit facility to be used for, among other things, working capital purposes and loans to Project Entities with a credit limit not to exceed 15% of the aggregate principal balances of the outstanding Debentures (the "***Gross Offering Proceeds***").

### 4. Closing

Upon satisfaction of the closing conditions, the Company shall borrow moneys from the Holder and the Holder shall lend such moneys to the Company, pursuant to the terms of this Agreement. The Closing (the "***Closing***") shall take place either (a) in the offices of the Company at 10900 NE 8th Street, Suite 1000, Bellevue, Washington 98004; (b) such other address as the Company designates in writing; or (c) via electronic submission of the necessary signed documents, as soon as the closing conditions have been satisfied. The sale of the Debenture is separate and independent from any other borrowings that may be made by the Company. At the Closing, the Holder shall deliver to the Company a check payable to "Gulfshore Bank, as Escrow Agent for iCap Northwest Opportunity Fund, LLC" or by wire transfer, to a bank account designated by the Company, of immediately available funds through the federal wire transfer system, the Loan Amount, and upon receipt and acceptance of the subscription, the Company shall promptly thereafter deliver to the Holder the Debenture, reflecting such Loan Amount and reflecting the payment options elections made by the Holder on the Signature Page.

### 5. Representations and Warranties of the Company

To induce the Holder to loan monies to the Company, the Company represents and warrants to the Holder as follows as of the date of the Closing:

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 28 Page 288 1366

### 5.1 Organization and Authority

The Company is a limited liability company validly existing and in good standing under the laws of the State of Delaware, with full power and authority to enter into and perform this Agreement and the other agreements contemplated hereby to which it is now, or will be, a party. The Company is duly licensed or qualified to do business as a foreign limited liability company and is in good standing under the laws of all other jurisdictions in which the character of the properties owned or leased by it therein or in which the transaction of its business makes such qualification necessary, except for jurisdictions where failure to so qualify could not reasonably be expected to have a material adverse effect on the business and operations of the Company taken as a whole. The Company has all requisite corporate power and authority to, directly or indirectly, own its properties, to carry on its business as now conducted, and to enter into and perform its obligations under the Closing Documents.

### 5.2 Capitalization

The issued and outstanding membership interests of the Company are as set forth in the Operating Agreement, and the outstanding membership interests of the Company have been duly authorized and are validly issued in compliance with applicable laws, and are fully paid and nonassessable. Except for as set forth in the Operating Agreement and the Pledge and Security Agreement entered into by and between the Manager and the Collateral Agent, there are no outstanding options, warrants, or securities or rights convertible into, any membership interests or units of the Company, or contracts, commitments, understandings or arrangements by which the Company is or may become bound to issue additional membership interests or units or options, warrants, or securities or rights convertible into, any membership interests or units. Other than the Operating Agreement and the Pledge Agreement, there are no voting trusts, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Company's membership interests.

### 5.3 Authorization; Binding Effect

The Company has taken all actions that are necessary to authorize the execution, delivery and performance of this Agreement and the Debenture, and the consummation of the transactions contemplated hereby. This Agreement and the other agreements contemplated hereby to which the Company is a party constitute the legal and binding obligations of the parties thereto, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights and the enforcement of debtors' obligations generally and by general principles of equity, regardless of whether enforcement is pursuant to a proceeding in equity or at law.

### 5.4 No Bankruptcy or Insolvency

The Company has not filed any voluntary petition in bankruptcy or been adjudicated bankrupt or insolvent, filed any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any federal bankruptcy, insolvency, or other debtor relief law, or sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator of all or any substantial part of its properties. No court of competent jurisdiction has entered an order, judgment or decree (and the Company knows of no action or petition requesting such) approving a petition filed against the Company seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any federal bankruptcy act, or other debtor relief law, and no other liquidator, trustee or conservator has been appointed of the Company or of all or any substantial part of its properties.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 29 Page 289 1366

### 5.5 Valid Issuance of the Debenture

The Debenture, when issued by the Company to the Holder for the consideration expressed therein, will be duly and validly issued, and, based in part upon the representations of the Holder in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

### 5.6 Restricted Securities

The Company acknowledges that the Debenture has not been and will not be registered with the Securities and Exchange Commission ("*SEC*") under the Act, and covenants that the Debenture will be offered and sold in compliance with an exemption from registration provided by Rule 506 of Regulation D of the Act. Neither the Company nor any person acting on its behalf has conducted any "general solicitation" or "general advertising" (as those terms are used in Regulation D) in connection with the offer or sale of any of the Debentures.

### 5.7 Full Disclosure; No Other Brokers

The Company has fully provided the Holder and, at the Holder's request, its representatives and legal counsel with all the information that the Holder and its representatives and legal counsel have requested for deciding whether to purchase the Debenture. No representation or warranty by the Company in the PPM or this Agreement, nor any statement, certificate, schedule or exhibit hereto furnished or to be furnished by or on behalf of the Company pursuant to the PPM, this Agreement, or in connection with transactions contemplated hereby, contains or will contain any untrue statement of material fact or omits or will omit a material fact necessary to make the statements contained therein not misleading. No Person, other than Managing Broker-Dealer, will have rights or claims against the Company for any commission, fee or other compensation payable as a finder or broker in connection with the offer and sale of the Debentures.

### 5.8 Governmental Consents and Notices

No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Debenture, or the consummation of any other transaction contemplated hereby, except (a) qualification (or taking such action as may be necessary to secure an exemption from qualification, if available) of the offer and sale of the Debenture under applicable state and federal securities laws, which qualification, if required, will be accomplished in a timely manner, and (b) such filings as shall have been made prior to the Closing Date.

### 5.9 No Litigation

There are no actions, suits or proceedings of any type pending or, to the knowledge of the Company, threatened, against the Company, its properties or assets which if adversely determined could, individually or in the aggregate, have a material adverse effect on (a) the Company's ability to perform the obligations contemplated under this Agreement or other agreements contemplated hereby or (b) the business, operations, prospects, properties, assets or condition (financial or otherwise) of the Company. The Company is not operating under, or subject to, or in default with respect to, any order, writ, injunction or decree, including any of the foregoing affecting the ability of the Company to enter into this Agreement or perform its obligations contemplated under this Agreement and other agreements contemplated hereby.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 20 Page 290 1366

### 5.10 No Breach; No Default

Neither the execution, delivery or performance of this Agreement or the other agreements contemplated hereby to which the Company is a party, nor the consummation of the transactions contemplated hereby or thereby by the Company, (a) materially conflicts with or results in any material breach of, (b) constitutes a material default under, or (c) results in a material violation of: (i) any contract, commitment, lease, license, note or other instrument, including voting or limited liability company operating agreements, to which the Company is a party or by which any of its assets are bound, judgment, order, writ or decree or (ii) any provision of the Company's Certificate of Formation.

### 5.11 Taxes

The Company has timely filed or will timely file or cause to be timely filed, all material tax returns (or extensions) required by applicable law to be filed by it prior to or as of the Closing Date, and paid (a) all amounts of taxes shown thereon to be due (including interest and penalties) and (b) all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangibles taxes) owing by it, except for such taxes (i) which are not yet delinquent or (ii) that are being contested in good faith and by proper proceedings, and against which adequate reserves are being maintained in accordance with United States generally acceptable accounting procedures.

### 5.12 Permits

The Company possesses all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct its business as currently conducted, except where the failure to possess such permits, individually or in the aggregate, has not caused and would not have, individually or in the aggregate, a material adverse effect on the Company's business or its ability to perform its obligations contemplated under this Agreement and other agreements contemplated thereby ("***Material Permits***"). The Material Permits are in full force and effect, the Company is in compliance with each Material Permit, and the Company has not received any notice of proceedings relating to the revocation or modification of any such Material Permits and the Company is unaware of any facts or circumstances that the Company would reasonably expect to give rise to the revocation or modification of any Material Permits. Notwithstanding the above, Material Permits shall not include any construction, development, or similar permits related to the investments described in the PPM.

### 5.13 Title

The Company is the owner of, and has good and marketable title in fee simple to and adequate insurance coverage for, all real property and good and marketable title to all personal property owned by it which is material to the business of the Company, in each case free and clear of all security interests, liens, encumbrances and defects except such as are a result of Section 7.3 of this Agreement, the Offering, or such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company.

## 6. Representations, Warranties and Agreements of the Holder

To induce the Company to accept the loan from the Holder, the Holder represents and warrants to the Company as of the date of the Closing as follows:

### 6.1 Purchase Entirely for Own Account

The Debenture will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to distributing all or any part of the Debenture, the Holder has no present intention of selling, granting any participation in or otherwise distributing the Debenture in a manner contrary to the Act or any applicable state securities law, and the Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person with respect to the Debenture.

### 6.2 Due Diligence

The Holder has been solely responsible for his, her or its own due diligence investigation of the Company and its business, and his, her or its analysis of merits and risks of the investment and subscription made pursuant to this Agreement, and is not relying on anyone else's analysis or investigation of the Company, its business or the merits and risks of the Debenture other than professional advisors employed specifically by the Holder to assist the Holder. In taking any action or performing any role relative to arranging the investment being made pursuant to this Agreement, the Holder has acted solely in his, her or its own interest and not in that of any other party, and no other party has acted as an agent or fiduciary for the Holder.

### 6.3 Access to Information; Modification of Offering

The Holder has received and reviewed in its entirety the PPM accompanying this Agreement. The Holder has been offered access to full and complete information regarding the Company and has assessed to his, her, or its satisfaction the risks associated with an investment in the Debenture. In particular, the Holder has been given the opportunity to ask questions of, and receive answers from, the Company's officers concerning the terms and conditions of this Agreement, the Company's organizational documents, and any other matters pertaining to an investment in the Debenture and has been given the opportunity to obtain such additional information necessary to verify the accuracy of the information contained in the PPM. No information has been provided and no representations have been made to the Holder which are inconsistent with any information contained in the PPM. The Holder acknowledges that the Company may, in its sole discretion and for any reason whatsoever, modify, amend, increase or withdraw all or a portion of the Offering. In the event of the foregoing, neither the Company nor the Managing Broker-Dealer will have any liability whatsoever to the Holder, except that the Company will be obligated to return any moneys transmitted to the Company by the Holder that have not been applied by the Company for the purchase of Debentures, without interest or deduction.

### 6.4 Sophistication

The Holder, either alone or with the assistance of his, her or its professional advisor, is a sophisticated investor, is able to fend for himself, herself or itself in the transactions contemplated by this Agreement, and has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of acquiring the Debenture.

### 6.5 Suitability

The investment in the Debenture is suitable for the Holder based upon his, her or its investment objectives and financial needs, and the Holder has adequate net worth and means for providing for his, her or its current financial needs and contingencies and has no need for liquidity of investment with respect to the Debenture. The Holder's overall commitment to investments that are illiquid or not readily

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 22 Page 292
1366

marketable is not disproportionate to his, her or its net worth, and investment in the Debenture will not cause such overall commitment to become excessive.

**6.6     Professional Advice**

The Holder has obtained, or has had the opportunity to obtain, to the extent he, she or it deems necessary, his, her or its own professional advice with respect to the risks inherent in the investment in the Debenture, the condition and terms of this Agreement and the suitability of the investment in the Debenture in light of the Holder's financial condition and investment needs. The Holder is not relying on the Company or any of its directors, officers, employees or agents with respect to the legal, tax, economic and related considerations of an investment in the Debenture, nor is the Holder relying on the Company or any of its directors, officers, employees or agents (including those of any Affiliates) with respect to the appropriateness of this investment for the Holder.

**6.7     Ability to Bear Risk**

The Holder understands that the Company has no prior operating history. The Holder recognizes that there is no market for the Debentures and none is expected to develop; accordingly, his, her or its interest in the Company will be illiquid as well as subject to substantial contractual restrictions upon transferability. The Holder is in a financial position to purchase and hold the Debenture and is able to bear the economic risk and withstand a complete loss of his, her or its investment in the Debenture. The Holder agrees to waive any present or future claim against the Company or the Managing Broker-Dealer that the Debenture was not an appropriate investment for the Holder.

**6.8     Possible Loss of Interest and Principal**

The Holder recognizes that an investment in the Debenture is subject to certain risks, the occurrence of which might result in a loss of the principal and interest due to the Holder. The Holder has carefully reviewed and understands the risks as described in the PPM.

**6.9     Restricted Securities**

The Holder realizes that (a) neither the Debentures nor the offering of the Debentures have been registered under the Act or applicable state securities laws; (b) that the Debentures are characterized under the Act as "restricted securities" and, therefore, cannot be sold or transferred unless they are subsequently registered under the Act or an exemption from such registration is available; (c) the Company is not being registered as an "investment company" as the term "investment company" is defined in Section 3(a) of the 1940 Act, and (d) there is presently no public market for the Debenture and the Holder would most likely not be able to liquidate his, her or its investment in the event of an emergency or to pledge the Debenture as collateral security for loans. The Holder's financial condition is such that it is unlikely that the Holder would need to dispose of any of the Debenture in the foreseeable future. In this connection, the Holder represents that he, she or it is familiar with Rule 144 of the Securities Act, as promulgated by the Securities and Exchange Commission, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

**6.10     Further Limitations on Disposition**

Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Debenture unless and until there is compliance with the following requirements:

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 23 Page 293 of 1366

(a)     the Holder shall arrange for the registered transfer of the Debenture as required by Section 9.

(b)     the Holder shall have furnished to the Company a detailed statement of the circumstances surrounding the proposed disposition and, if reasonably requested by the Company, shall have furnished to the Company an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such Debenture under the Act and any applicable state Blue Sky laws.

(c)     notwithstanding any other restrictions on the proposed transfer or disposition of the Debenture, any such proposed transfer or disposition shall be limited to and conditioned upon the proposed transferee qualifying as an "accredited investor" as set forth in Section 6.12.

### 6.11     Age; Residency

The Holder, if an individual, is over 21 years of age and legally competent to execute this Agreement. For purposes of the application of state securities laws, the Holder represents that he, she or it is a bona fide resident of, and/or is domiciled in, the state set forth in such Holder's residence address on the "Certificate of Accredited Investor" to be delivered to the Company at the Closing as required by Section 7.2(e).

### 6.12     Accredited Investor Status

By the execution of this Agreement, the Holder represents and warrants that he, she or it is an accredited investor within the meaning of Regulation D promulgated under the Act as indicated on the "Certificate of Accredited Investor" delivered to the Company at the Closing, and agrees to provide any additional documents and information that the Company reasonably requests. The Holder acknowledges that the Company is relying upon the Holder's representation of accredited status as a condition of entering into this Agreement, and as such agrees to waive any future claim that Holder was not an accredited investor. The Holder is aware that the Company has been and is relying upon the representations and warranties set forth in this Agreement, in part, in determining whether the Offering will qualify for an exemption from the registration provisions of the Act and applicable state securities laws. All of the information which the Holder has furnished the Company here, previously or in the documents or instruments contemplated by this Agreement with respect to the Holder's financial position and business experience is correct and complete as of the date hereof, and, if there should be any material change in such information, the Holder will immediately furnish the revised and corrected information to the Company. The Holder agrees to indemnify and hold harmless the Company and its Affiliates and their respective officers, managers, directors, members or employees and their successors and assigns from and against any and all losses, damages, liabilities or expenses, including costs and attorneys' fees incurred by reason of any misrepresentation by the Holder or any breach of the Holder's warranties.

### 6.13     Tax Identification; Withholding

Under penalties of perjury, the Holder certifies that (a) the number listed with the Holder's name on the signature page to this Agreement is the Holder's correct social security number or federal tax identification number, (b) the Holder is not subject to back-up withholding, either because he, she or it has not been notified that he, she or it is subject to back-up withholding as a result of a failure to report all interest and dividends or because the Internal Revenue Service has notified the Holder that he, she or it is no longer subject to back-up withholding and (c) Holder is not a "foreign person," "foreign corporation" or a person which is not a "United States person" within the meaning of Sections 1441, 1442, 1445 and 1446 of the Internal Revenue Code of 1986, as amended. (If the Holder has at any time received notice

from the Internal Revenue Service that he, she or it is subject to back-up withholding and has not subsequently received a notice advising the Holder of the termination of back-up withholding, strike clause (b) above).

### 6.14 No View to Tax Benefits

The Holder is not acquiring the Debenture with a view toward realizing any benefits under United States federal income tax laws, and no representations have been made to the Holder that any such benefits will be available as a result of the Holder's acquisition, ownership or disposition of the Debenture.

### 6.15 Confidential Information

The Holder understands that the information contained in the PPM and this Agreement is confidential and non-public information and agrees that all such information shall be kept in confidence by Holder and used by Holder solely for purposes of determining whether to purchase the Debenture. The Holder, if an entity, represents and warrants that, as of the Closing, none of its beneficial owners are public agencies which are subject to state, federal or foreign laws providing for the possible public disclosure of certain records and information relating to the activities of such public agencies. The Holder agrees to notify the Company in the event such a public agency becomes a beneficial owner of the Holder and agrees to reasonably cooperate with the Company in such event to take steps, including entering into confidentiality agreements that restrict the access of certain of the Holder's beneficial owners to certain information, to protect information about the Company and its investments from being publicly disclosed by such public agency.

### 6.16 No General Solicitation

The Holder is unaware of, is in no way relying on, and did not become aware of, the offering of the Debenture through, or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television, radio or Internet and is not subscribing for the Debenture, and did not become aware of the offering of the Debenture through, or as a result of, any seminar or meeting to which the Holder was invited, or any solicitation otherwise initiated, by a person not previously known to the Holder in connection with investments in securities generally.

### 6.17 Managing Broker-Dealer

The Managing Broker-Dealer has acted as agent for the Company in connection with the Offering, and the Holder consents to the Managing Broker-Dealer's actions in this regard and hereby waives any and all claims, actions, liabilities, damages or demands the Holder may have against the Managing Broker-Dealer in connection with any action or inaction or alleged conflict of interest arising from the Managing Broker-Dealer's engagement as agent of the Company with respect to the sale of the Debentures to the Holder. Holder is purchasing the Debentures directly from the Company and not from the Managing Broker-Dealer. The Managing Broker-Dealer did not make any representations, declarations or warranties to Holder, express or implied, regarding the Debentures, the Offering or any information or documents provided to the Holder in connection therewith and the Managing Broker-Dealer did not offer to sell, or solicit and offer to buy, any of the Debentures that the Holder will acquire from the Company hereunder.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 25 Page 295
1366

**6.18    Representations and Warranties of Organization**

If the Holder is a corporation, partnership or other association, trust or similar entity, the Holder hereby represents and warrants to the Company that the Holder is authorized and otherwise duly qualified to acquire the Debenture, and the individual executing this Agreement on behalf of the Holder has been duly authorized to do so and to bind the Holder by this Agreement (if the Holder is an individual who is investing through a revocable trust, an IRA or an account in a self-directed employee benefit plan (a "*Self-Directed Entity*"), such representation and warranty applies to the Self-Directed Entity, and, for this purpose, the term "*Holder*" shall be deemed to refer to the Self-Directed Entity).

**6.19    Representations and Warranties by Employee Benefit Plans**

If the Holder is an "employee benefit plan" subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), or an individual retirement account, individual retirement annuity or other "plan" subject to Section 4975 of the Code (each such employee benefit plan or plan is referred to in this Agreement as a "*Plan*"), or the nominee of such a Plan, or a trust or custodial account established under such a Plan, the Holder makes each of the following additional representations and warranties:

      (a)    **Notification**. The Holder has notified the Company in writing that it is a Plan.

      (b)    **Understanding of Fiduciary and Prohibited Transaction Requirements**. The Holder is aware of, and understands, the plan asset rules contained in Department of Labor Regulation Section 2510.3-101; the fiduciary requirements contained in Part 4 of Subtitle B of Title I of ERISA, including, but not limited to, the prudence and diversification requirements contained in Section 404 of ERISA; and the prohibited transaction provisions contained in Sections 406 and 408 of ERISA and Section 4975 of the Code.

      (c)    **Not A Fiduciary**. The Holder understands that, so long as the assets of the Company are not considered to be "*plan assets*" within the meaning of ERISA or the regulations promulgated under ERISA, neither the Company nor any Affiliate of the Company will be a "*fiduciary,*" within the meaning of ERISA, of the Plan whose assets it is investing in the Debenture solely by reason of such investment in the Debenture.

      (d)    **Investment Objectives and Strategies**. The Holder has carefully reviewed the accompanying PPM and understands the loan proceeds will be used by the Company for investments and operating capital.

      (e)    **Purposes of the Plan**. The Holder has given appropriate consideration to the facts and circumstances relevant to an investment in the Debenture and has determined that such investment is reasonably designed to further the purposes of the Plan whose assets he, she or it is investing in the Debenture.

      (f)    **Investment Consistent with ERISA**. Taking into account the other investments of the Plan whose assets it is investing in the Debenture and the diversification thereof, an investment in the Debenture by such Plan is consistent with (and does not violate) the applicable requirements of ERISA, including, but not limited to, those contained in Section 404 of ERISA, and the requirements contained in Section 4975 of the Code.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 26 Page 296
1366

(g)     **Cash Flow Requirements**. Taking into account the other investments of the Plan, an investment in the Debenture by such Plan is consistent with the cash flow requirements, investment objectives and funding policy of such Plan.

**7.     Conditions to Closing; Security Interests**

**7.1     Holder's Conditions of Closing**

The obligation of the Holder to purchase the Debenture at the Closing pursuant to this Agreement shall be subject to and conditioned upon satisfaction or the waiver by such Holder of the following conditions on or prior to the applicable Closing Date:

(a)     the representations and warranties of the Company contained in this Agreement shall be true and correct in all material respects as of the applicable Closing and all covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the applicable Closing shall have been performed or complied with in all material respects.

(b)     the Company shall have obtained all necessary blue sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Debenture.

**7.2     Company's Conditions of Closing**

The obligation of the Company to sell the Debenture to a Holder at the Closing pursuant to this Agreement shall be subject to and conditioned upon satisfaction of the following conditions on or prior to the Closing:

(a)     all representations and warranties of the Holder contained in this Agreement, including the Certificate of Accredited Investor tendered by the Holder to the Company pursuant to Section 7.2(e), shall be true and correct as of the Closing Date and all covenants, agreements and conditions contained in this Agreement to be performed by such Holder on or prior to the Closing Date shall have been performed or complied with in all material respects.

(b)     the Company shall have obtained all necessary blue sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Debenture.

(c)     no action or proceeding before any court or government body will be pending wherein a judgment, decree or order would prevent any of the transactions contemplated hereby or cause such transactions to be declared unlawful or rescinded.

(d)     execution and delivery by such Holder of this Agreement.

(e)     the Holder has completed, signed and delivered to the Company the "Certificate of Accredited Investor," in the form attached as Exhibit D to the Subscription Instructions Packet, representing that the Holder's status qualifies as an "accredited investor" within the meaning of Regulation D under the Act.

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 27 Page 297
1366

### 7.3    Security Interest.

As security for the full and prompt payment, in cash, and performance of the Company's obligations under this Agreement and the Debentures, the Company hereby grants to each Holder, on a *pari passu* basis with all other Holders based on the respective principal amounts of each Holder's Debenture, a security interest (the "*Company Security Interest*") in the Company Collateral, and the Manager hereby grants to each Holder, on a *pari passu* basis with all other Holders based on the respective principal amounts of each Holder's Debenture, a security interest (the "*Manager Security Interest*", and with the Company Security Interest, the "*Security Interest*") in the Manager Collateral. "*Company Collateral*" means all of the following:  (a) a first or, where allowed under senior debt instruments, a second position deed of trust in the real estate now owned or hereafter acquired by the special purpose entities in which the Company now owns or hereafter acquires a security interest (the "*Project Entities*")*; (b) all of the assets of the Company, which primarily consist of its membership interest in the Project Entities; (c) all of the Company's right, title and interest in the Project Partners' membership interest in the Project Entities; (d) the rights of the Company to assume control of the Project Entities, including, by way of illustration, removal and replacement of the Project Partner as a manager of the Project Entity, the making of investment decisions relating to individual projects, and decisions regarding the manner and timing of exits from the projects; (e) all products, proceeds, rents and profits of the foregoing; (f) all of the Company's books and records related to any of the foregoing; and (g) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Company now has or hereafter acquires any rights. "*Manager Collateral*" means all of the Manager's membership interest in the Company, and the term "*Collateral*" means, collectively, the Company Collateral and Manager Collateral. Notwithstanding such grant, each Holder specifically agrees that it may take enforcement action and pursue remedies hereunder only in accordance with the Collateral Agent Agreement in the form attached hereto as *Exhibit B-1*. Each Holder hereby designates Experts Counsel, Inc. as the "Collateral Agent" and Company and the Manager hereby authorize the Collateral Agent to, and grants the Collateral Agent an irrevocable power of attorney to, perfect, evidence, and maintain the Security Interest in the Collateral pursuant to the Collateral Agent Agreement. By becoming a party to this Agreement and accepting a Debenture, each Holder specifically agrees that enforcement of the Security Interest, exercise of any rights or remedies with respect to the Collateral, or pursuit of any remedies under the Debenture may be taken only by action of the Collateral Agent.

### 7.4    Interest Reserve

The Company may deposit into an interest reserve account proceeds from the issuance of Debentures to cover up to twelve (12) months of interest expense on the Debentures. Nothing herein is intended or shall be construed to alter or limit the Company's obligation to make the monthly interest payments on the Debentures if the interest reserve is inadequate.

## 8.    Covenants

### 8.1    Information Rights

For so long as the Holder continues to hold the Debenture, the Company will provide to the Holder:

(a)    as soon as practicable after the end of each fiscal year and in any event within one hundred twenty (120) days after each fiscal year, consolidated balance sheets of the Company as of the end of such fiscal year and consolidated statements of income of the Company for such fiscal year, prepared in reasonable detail, certified by an officer of the Company and audited by an independent certified public accountant pursuant to a "tax basis" audit; and

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 28 Page 298
1366

(b)     as soon as practicable after the end of each fiscal year and in any event within sixty (60) days after each fiscal quarter, unaudited consolidated balance sheets of the Company as of the end of such fiscal quarter and consolidated statements of income of the Company for such fiscal quarter;

(c)     quarterly newsletter reports on the Company's investments, which may be accessed by the Holder at www.icapequity.com.

**8.2     Other Affirmative Covenants of the Company**

The Company hereby covenants and agrees, as of the Closing and thereafter until the Debentures and all other obligations arising under this Agreement have been repaid in full, the Company shall:

(a)     give notice in writing to the Collateral Agent on behalf of the Holder (promptly, but in any event within five (5) business days after the Company knows or has reason to know thereof), the occurrence of any Default or Event of Default; and

(b)     pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its taxes (federal, state, local and any other taxes) and other obligations and liabilities of whatever nature and any additional costs that are imposed as a result of any failure to so pay, discharge or otherwise satisfy such taxes, obligations and liabilities, except when the amount or validity of any such taxes, obligations and liabilities is currently being contested in good faith by appropriate proceedings and reserves, if applicable, in conformity with U.S. generally accepted accounting procedures with respect thereto have been provided on the books of the Company.

**8.3     Negative Covenants**

(a)     The Company hereby covenants and agrees, as of the Closing and thereafter until the Debentures and all other obligations arising under this Agreement have been repaid in full (including the payment of the Payoff Premium), neither the Company nor any of its subsidiaries shall (i) directly or indirectly, declare, order, make or set apart any sum for or pay any Distribution (other than tax distributions as set forth in the Operating Agreement); (ii) establish any deposit account other than the account identified in that certain Deposit Account Control Agreement, to be entered into by and among the Company, the Collateral Agent and Umpqua Bank (the "***Account Control Agreement***"), or otherwise deposit or fund any cash or cash equivalents of the Company in any deposit account other than the account identified in the Account Control Agreement; or (iii) contract, create, incur, assume or permit to exist any indebtedness, except for (A) Indebtedness arising or existing under this Agreement (as in effect on the date hereof); (B) Indebtedness arising from the issuance of the Debentures in the Offering; (C) Indebtedness arising from trade payables incurred by the Company in the ordinary course of business; (D) Indebtedness junior to the Holder's interest; (E) with respect to a wholly-owned subsidiary of the Company organized for the purpose of a Company-investment in a specific real property project, Indebtedness that results from a commercial loan from an Affiliated commercial lender or non-affiliated third party commercial lender made in such lender's ordinary course of business; or (F) a credit facility, that may or may not be junior to the Debentures, to be used for, among other things, working capital, Debenture interest payments or loans to the special purpose entities formed for the purpose of holding the real estate investment properties in an amount not to exceed 15% of the Gross Offering Proceeds.

(b)     The Manager hereby covenants and agrees, as of the Closing and thereafter until the earlier of (i) the end of the Offering Period, or (b) the date on which at least 75% of the Gross Offering Proceeds (less payment of expenses for commissions and fees and the setting aside of reserves) have been committed to or invested in real property projects of the types described in the PPM, neither

the Manager nor any of its Affiliates will make any investment on behalf of a new pooled investment fund or investment vehicle having identical investment objectives to those of the Company; *provided*, *however*, that the Manager and its Affiliates are not prohibited from establishing during the Offering Period a new pooled fund with investment objectives identical to those of the Company, *provided* that the Manager offers all new investment opportunities to the Company on a rotating basis in the manner set forth in the PPM.

(c)     The Company will not make any single investment that that exceeds 10% of the Gross Offering Proceeds received by the Company as of the closing date of such investment; however, once Gross Offering Proceeds equal at least $3,000,000, the Company may make a single investment equal to the greater of 10% of the Gross Offering Proceeds or $1,500,000. In addition, no more than 15% of the Gross Offering Proceeds will be invested in Fund Projects.

(d)     The Company may only make investments if the total amount of debt encumbering the underlying property, together with the Company's investment, is less than 80% of the finished value of the underlying project. The Company will not invest in projects whose combined loan to value ratio exceeds 80%.

## 9.     Defaults and Remedies

### 9.1     Events of Default

An "***Event of Default***" occurs if any of the following occur, regardless of the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     the Company defaults in the payment of any Loan Amount or interest on any of the outstanding Debentures, when the same becomes due and payable and such default continues for a period of ten (10) Business Days (such period, a "***Grace Period***"), *provided, however,* that no such Grace Period will be available after the Company defaults twice in the payment of interest on any of the outstanding Debentures when such interest is due and payable (even if such payments were subsequently made during the Grace Period), such that should the Company default in the payment of interest on any of the outstanding Debentures when such interest is due and payable after the two (2) prior defaults, then an Event of Default shall occur on the date such payment was due and payable;

(b)     the Company fails to observe or perform any covenant or warranty of the Company in this Agreement (other than a covenant or warranty a default in whose performance or whose breach is specifically dealt with elsewhere in this Section), and such failure continues for a period of thirty (30) calendar days after there has been given, by registered or certified mail, to the Company by the Holder, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(e)     a final judgment or judgments for the payment of money aggregating in excess of Five Hundred Thousand Dollars ($500,000) is rendered against the Company and which judgments are not, within ninety (90) calendar days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within ninety (90) calendar days after the expiration of such stay; *provided*, *however*, that any judgment which is covered by insurance or an indemnity from a creditworthy party shall not be included in calculating the Five Hundred Thousand Dollars ($500,000) amount set forth above;

(f)       the Company violates or otherwise defaults on any material contractual obligation that would, as a result of such violation or default, cause the acceleration of the Company's obligations thereunder and result in the incurrence of a liability, damages or loss to the Company in excess of Five Hundred Thousand Dollars ($500,000);

(g)       the Company, pursuant to or within the meaning of any Bankruptcy Law (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

(h)       a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Company in an involuntary case, (ii) appoints a custodian of the Company for all or substantially all of its property, or (iii) orders the liquidation of the Company; and the order or decree remains unstayed and in effect for ninety (90) consecutive calendar days.

The term "**Bankruptcy Law**" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "**Custodian**" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

### 9.2       Acceleration, Rescission and Annulment

(a)       Upon the occurrence of an Event of Default, with the consent of the holders of more than 10% in aggregate loan amount of the outstanding Debentures, the Collateral Agent may declare the Loan Amount of and accrued but unpaid interest, if any, on all the Debentures (including the Loan Amount or interest on the Holder's Debenture) to be due and payable. Upon such a declaration, such principal and interest, if any, shall be immediately due and payable. If an Event of Default pursuant to Section 9.1(g) or Section 9.1(h) occurs, the loan amount and interest on all the Debentures will *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Collateral Agent or any Holders. The Holders of more than 50% in aggregate loan amount of the outstanding Debentures by notice to the Collateral Agent may rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of acceleration. No such rescission shall affect any subsequent default or impair any right consequent thereon.

(b)       If an Event of Default occurs and is continuing, the Collateral Agent may pursue any available remedy to collect the payment the loan amount of or interest on the Debentures (including the Loan Amount or interest on the Holder's Debenture) or to enforce the performance of any provision of the Debentures. The Collateral Agent may maintain a proceeding even if it does not possess any of the Debentures or does not produce any of them in the proceeding. A delay or omission by the Collateral Agent in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. All available remedies are, to the extent permitted by law, cumulative. If the Collateral Agent places the Debenture in the hands of an attorney for collection or enforcement, or the Debenture otherwise is collected or enforced through any legal proceeding or the Collateral Agent otherwise takes action to collect amounts due under the Debenture or to enforce the provisions of this Section 9.2, or (b) there occurs any Event of Default, then the Company shall pay the costs incurred by the Collateral Agent for such collection, enforcement or action, including, but not limited to, attorneys' fees and disbursements.

(c)     The Holders of more than 50% in aggregate Loan Amount of the outstanding Debentures by notice to the Collateral Agent may waive any past or existing Event of Default and its consequences, except an Event of Default pursuant to Section 9.1(a) or Section 9.1(b), which cannot be amended without the consent of the affected Holder. When an Event of Default is waived, it is deemed cured, and any Event of Default arising therefrom shall be deemed to have been cured, but no such waiver shall extend to any subsequent or other Event of Default or impair any consequent right.

(d)     Except to enforce the right to receive payment of principal or interest when due, the Holder may not pursue any remedy with respect to the Debenture unless (i) such Holder has previously given the Collateral Agent written notice that an Event of Default is continuing; (ii) Holders of more than 10% in loan amount of the outstanding Debentures have requested in writing that the Collateral Agent pursue the remedy; (iii) such Holders have offered the Collateral Agent security and indemnity satisfactory to it against any loss, liability or expense (with such security including the Collateral Agent's reasonable attorneys' fees or advancements thereof intended to cover services rendered or expected to be rendered by the Collateral Agent); (iv) the Collateral Agent has not complied with such request within sixty (60) calendar days after the receipt thereof and the offer of security or indemnity; and (v) the Holders of a majority in loan amount of the outstanding Debentures have not given the Collateral Agent a direction inconsistent with such request within such sixty (60) calendar day period. The Holder may not use the Debenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder (it being understood that the Collateral Agent does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to any Holder). Nothing in this Agreement shall be construed to restrict or limit the Holder's right to, independently from the Collateral Agent, receive payment of principal or interest when due.

(e)     From and after the occurrence of an Event of Default, the Company will cease paying any management fees to iCap Pacific NW Management, LLC until the Event of Default is cured.

10.     **Transfer of the Debenture**

Subject to compliance with the requirements of this Agreement, including but not limited to those set forth in Section 6 (and its subparts) and this Section 10, the Holder shall have the right to transfer the Debenture to any qualifying third party of its choice contingent upon securing the Company's written consent in advance of the proposed transfer. The Company shall be under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under this Agreement, until the Holder has surrendered the original Debenture for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Company. A new Debenture for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing a joinder to this Agreement, and executing a Certificate of Accredited Investor. Interest and principal are payable only to the registered holder of the Debenture. The Holder and any successor Holder agree(s) to provide to the Company a Form W-9 upon request. Until registration of a transfer occurs, the Company shall be entitled to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by this Agreement and the applicable Debenture.

11.     **Tax Matters**

Company and Holder shall, for all federal and applicable state and local income tax purposes, treat the transactions contemplated by this Agreement as a contingent payment debt instrument to which the non-contingent bond method described in Treasury Regulations Section 1.1275-4(b) ("***Non-Contingent Bond Method***") applies. The Company shall reasonably make, and shall deliver to Holder, all determinations required to be made pursuant to the Non-Contingent Bond Method, including without

18

limitation, the comparable yield, projected payment schedule and daily portions of interest. Each of Company and Holder agree to (a) prepare and file each of their respective tax returns on a basis consistent with the application of the Non-Contingent Bond Method and the Company's determinations hereunder, and (b) unless otherwise required by applicable law, take no position inconsistent therewith on any applicable tax return, in any audit or proceeding before any taxing authority, or in any report made for federal or applicable state or local income tax purpose.

## 12.   Miscellaneous

### 12.1   Assignment

The Company may not assign this Agreement or any of its rights, interests or obligations hereunder without the prior written consent the Holder. Furthermore, the Holder may not transfer any interest in the Debenture except as otherwise provided in this Agreement. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

### 12.2   Governing Law

This Agreement shall be governed by and construed under the laws of the State of Washington as applied to agreements among Washington residents, entered into and to be performed entirely within the State of Washington, without giving effect to principles of conflicts of law. The Parties irrevocably consent to the jurisdiction and venue of and in King County, Washington in connection with any action relating to this Agreement.

### 12.3   Counterparts

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

### 12.4   Titles and Subtitles

The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

### 12.5   Notices

Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) upon confirmation of receipt by fax by the party to be notified if received on or before 5:00 p.m. (local time) on any Business Day or, if received later on such day, upon the close of business on the next Business Day, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (d), or (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by ten (10) days' advance written notice to the other party given in the foregoing manner.

If to the Company:
iCap Northwest Opportunity Fund, LLC
c/o Chris Christensen
PO Box 3907
Bellevue, WA 98009
Fax: 425.214.4776

With a copy to:
Perkins Coie LLP
c/o Martha Sandoval
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099

If to Holder:
Experts Counsel, Inc., as Collateral Agent for the Holders
Attn: Kevin A. Carreno
3001 Executive Center Drive, Ste. 335
Clearwater, FL 33762

**12.6    Expenses**

Each party to this Agreement shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Agreement, the related agreements and the transactions contemplated herein and therein.

**12.7    Entire Agreement**

This Agreement and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the Parties with regard to the subjects hereof and thereof.

**12.8    Amendments and Waivers**

Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Holder.

**12.9    Severability**

If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

**12.10    Anti-Terrorism Matters**

The Holder hereby authorizes the Company to take, without prior notice to the Holder, such action as the Company determines to be reasonably necessary or advisable to comply, or to cause the Company to comply, with any anti-terrorism laws, rules, regulations, directives or special measures. Without limiting the foregoing, the Company may disclose any information concerning the Company or the undersigned necessary to comply with such laws, rules, regulations, directives or special measures, and the Holder shall provide the Company, promptly upon request, all information the Company

20

reasonably deems necessary or advisable to comply with such laws, rules, regulations, directives or special measures.

**12.11  Survival**

The representations and warranties of the Company, and those of Holder, shall survive the consummation of the sale of the Debenture to Holder hereunder.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**COMPANY**
iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company

By:  iCap Pacific NW Management, LLC
Its:  Manager

_____

By:  Chris Christensen
Its:  Manager

21

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

**HOLDER SIGNATURE PAGE**

See the Subscription Instructions Packet.

**SCHEDULE I**

**SCHEDULE OF HOLDERS**

| Holder Name & Address | Closing Date | Debenture Amount | Aggregate Percentage |
|---|---|---|---|

A-1

<div align="center">

**EXHIBIT A**

**FORM OF DEBENTURE**

</div>

THIS DEBENTURE (THIS "*SECURITY*") HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. § 15b ET SEQ., AS AMENDED ("*SECURITIES ACT*"), IN RELIANCE UPON ONE (1) OR MORE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE FEDERAL ACT. IN ADDITION, THE ISSUANCE OF THIS SECURITY HAS NOT BEEN QUALIFIED UNDER THE SECURITIES ACT OF WASHINGTON, OR ANY OTHER STATE SECURITIES LAWS (COLLECTIVELY, THE "*STATE ACTS*"), IN RELIANCE UPON ONE OR MORE EXEMPTIONS FROM THE REGISTRATION PROVISIONS OF THE STATE ACTS. THE HOLDER OF THIS SECURITY MAY NOT TRANSFER IT UNLESS IT HAS ARRANGED FOR ITS ASSIGNMENT TO A REGISTERED ASSIGNEE AS PROVIDED IN THIS DEBENTURE, UNLESS HOLDER HAS COMPLIED WITH THE TERMS OF THE DEBENTURE PURCHASE AGREEMENT (INCLUDING OBTAINING THE COMPANY'S CONSENT TO THE TRANSFER), AND UNLESS IT HAS SUBMITTED TO THE COMPANY A DETAILED STATEMENT AND, IF REASONABLY REQUESTED BY THE COMPANY, AN OPINION OF COUNSEL, CONFIRMING THAT SUCH TRANSFER DOES NOT REQUIRE REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE ACTS.

$_____ \hspace{4cm} _____, 20\_\_\_\_

<div align="center">

**ICAP NORTHWEST OPPORTUNITY FUND, LLC**

**SENIOR SECURED DEBENTURE**

</div>

iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company (the "*Company*"), for value received, promises to pay to _____ (the "*Holder*"), or the Holder's registered assigns, the Loan Amount plus interest thereon as set forth herein.

This Senior Secured Debenture ("*Debenture*") is issued pursuant to that certain Senior Secured Debenture Purchase Agreement dated as of _____, 2015, by and between the Company and the Holder and other purchasers of Debentures of like tenor (the "*Agreement*"), the terms of which are incorporated herein by reference. Capitalized terms that are used in this Debenture and that are not separately defined herein have the meanings assigned to such terms in the Agreement.

The following is a statement of the rights of the Holder and the conditions to which this Debenture is subject, to which the Holder, by the acceptance of this Debenture, agrees:

**1.      Interest on Outstanding Loan Amount**

The outstanding Loan Amount shall bear simple interest at 10% per annum. Interest computation shall be based upon twelve 30-day months. Interest will accrue on the loan made to the Holder under this Debenture from the date that such monies are paid to and are available for use by the Company. If the Company exercises its right to extend the Maturity Date as set forth in Section 2(b), the outstanding Loan Amount will bear simple interest at 11% per annum during the extension period.

In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of 16% percent per annum, simple interest from and after written notice to the Company of

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 29 Page 309
1366

the Event of Default, until all amounts due hereunder have been paid in full or the Event of Default has been cured.

## 2. Stipulated Term; Company's Extension Right

(a) The full Loan Amount shall be due and payable, together with all accrued but unpaid interest, on or before December 31, 2017 (the "***Maturity Date***"). The date first set forth above shall be the "***Effective Date***"; *provided*, *however*, that if the Holder's funds are not made available to the Company within 7 days of the date first set forth above, then the Effective Date shall be adjusted to reflect the date on which funds were actually made available to the Company.

(b) So long as an Event of Default has not occurred and is continuing, the Company has the option to extend the Maturity Date for an additional 12 months. This option may be exercised by the Company at any time prior to the Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Maturity Date. If the Company fails to give such notice, this Debenture will mature upon the expiration of the Maturity Date.

(c) Upon the maturity of this Debenture, the outstanding Loan Amount, together with all accrued but unpaid interest, will be due and payable to the Holder.

## 3. Interest Payments and Payoff Premium

(a) Prior to the Maturity Date, or extension thereof, the Company will be required to make only monthly interest payments to the Holder. Such monthly payments shall include all interest accrued under this obligation through the end of the prior calendar month, and shall be due and payable to the Holder on the fifteenth (15th) calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter.

(b) Within 12 months after the Company's complete satisfaction of its obligations under this Debenture, Holder is entitled to a "***Payoff Premium Payment***" equal to Holder's *pro rata* share of 35% of the Net Profits generated by the Company. "***Net Profits***" means an amount equal to the net cash available to the Company from liquidation of its Investments after full satisfaction of its payment obligations under the Debentures with respect to payment of principal and interest, other Company obligations, plus a credit for any prior tax distributions made to the Manager previously under the Operating Agreement, less any amounts set aside by the Manager to cover liabilities, obligations, capital expenditures, expenses, and reasonable reserves of the Company. Holder's *pro rata* share of the Payoff Premium Payment shall be equal to 35% of the Net Profits multiplied by a fraction, the numerator of which is such Holder's Loan Amount and the denominator of which is the aggregate loan amount of all other holders of Debentures. The Company will calculate and pay the first Payoff Premium Payment on the date of final payoff of the Debenture balances, and then on the last day of each calendar quarter thereafter with respect to any Investments that may liquidate during such subsequent period(s). The Payoff Premium Payment is not intended to constitute an equity interest in the Company, but rather is intended to constitute additional interest on the Loan Amount, and shall be paid in addition to all principal, penalties and other interest otherwise due to Holder.

(c) So long as the Debentures remain outstanding, the Company shall not make any distributions to its members other than tax distributions as set forth in the Company's Limited Liability Company Agreement. Notwithstanding the foregoing, upon payment of each periodic payment of the Payoff Premium Payment, the Company will be authorized to make cash distributions to its members under Article V of the Operating Agreement.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 20 Page 310
1366

**4.    Prepayment**

The Company may choose to prepay part or all of the Debenture without penalty at any time prior to the Maturity Date, or extension thereof. Any such prepayment will be credited first to any accrued and unpaid interest and then to the payment of the outstanding Loan Amount.

**5.    Secured Obligation**

This Debenture represents a secured obligation of the Company. The Debenture is secured by the Collateral.

**6.    Transfer of Debenture; Restrictions on Transfer**

This Debenture may be transferred only in compliance with the terms and conditions of the Agreement (including the requirement of obtaining the Company's consent to the transfer) as well as all applicable federal and state securities laws and only upon surrender of the original Debenture for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form reasonably satisfactory to the Company. A new Debenture for like principal amount and interest will be issued to, and registered in the name of, the transferee. Interest and principal are payable only to the registered holder of the Debenture. The Holder agrees to provide a Form W-9 to the Company upon request.

**7.    Holder's Representations; Rank of Debenture**

By the acceptance of this Debenture, the Holder re-affirms its representations and warranties in the Agreement in favor of the Company. All payments due or made under this Debenture shall rank *pari passu* with all other Debentures. Any payments made by the Company under the Debentures shall be made pro rata to all holders of Debentures in accordance with the respective outstanding principal amounts of the Debentures.

**8.    Events of Default**

Each of the events specified in Section 9 of the Agreement shall constitute an Event of Default under this Debenture. Upon the occurrence of an Event of Default, the Holder shall have the rights, and be subject to the restrictions, set forth in Section 9 of the Agreement, and the Holder shall be entitled to exercise certain enforcement and collection rights on behalf of the Holder as provided for in the Agreement.

**9.    Miscellaneous**

**9.1    Costs of Collection**

If, in accordance with the terms and conditions of Section 9.2 of the Agreement, (a) this Debenture is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Debenture or to enforce the provisions of this Debenture in accordance with the terms of the Agreement, or (b) there occurs any Event of Default, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action, including, but not limited to, attorneys' fees and disbursements.

**9.2** **Holder as Owner**

The Company may deem and treat the holder of record of this Debenture as the absolute owner for all purposes regardless of any notice to the contrary from third parties.

**9.3** **No Member or Ownership Rights**

This Debenture confers no ownership rights whatsoever in the Company, and shall not entitle the Holder to any voting rights, any management rights, any ownership rights, any rights to distribution, any statutory rights conferred on members, or any other rights as an owner of the Company or to any other rights except the rights stated herein.

**9.4** **Notices**

Unless otherwise provided, any notice under this Debenture shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) upon confirmation of receipt by fax by the party to be notified if received on or before 5:00 p.m. (local time) on any Business Day or, if received later on such day, upon the close of business on the next Business Day, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (d), or (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by ten (10) days' advance written notice to the other party given in the foregoing manner.

> If to the Holder:
>
> > To the address or number last furnished in writing to the Company in accordance with the Agreement.
> >
> > If to the Company:
> > iCap Northwest Opportunity Fund, LLC
> > c/o Chris Christensen
> > PO Box 3907
> > Bellevue, WA 98009
> > Fax: 425.214.4776
> >
> > With a copy to:
> > Perkins Coie LLP
> > c/o Martha Sandoval
> > 1201 Third Avenue, Suite 4900
> > Seattle, Washington 98101-3099
> > Fax: 206.359.7244

**9.5** **Amendments and Waivers**

No provision of the Debenture or the Agreement may be amended, except by the express written agreement of both the Company and Holder; provided, however, that any provision of this Debenture may be amended and the observance of any term may be waived (either generally or in a particular instance and either retroactively or prospectively) as provided in Section 9 and Section 12.8 of the Agreement.

A-4

### 9.6 Governing Law; Jurisdiction; Venue

This Debenture shall be governed by and construed under the laws of the state of Washington without regard to principles of conflict of laws. The Parties irrevocably consent to the jurisdiction and venue for purposes of resolving any disputes in King County, Washington in connection with any action relating to this Debenture.

### 9.7 Assignment

The Company may not assign this Debenture or any of its rights, interests or obligations hereunder, except upon receiving the consent of the Holder. Except as otherwise provided herein, the terms and conditions of this Debenture shall inure to the benefit of and be binding on the respective successors and assigns of the Parties.

### 9.8 Severability

If one or more provisions of this Debenture are held to be unenforceable under applicable law, such provision shall be excluded from this Debenture, and the remaining provisions of this Debenture shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

### 9.9 Waivers

The Company waives presentment for payment, demand, notice of nonpayment, notice of protest and protest of this Debenture, and all notices in connection with the delivery, acceptance, or dishonor of this Debenture.

Washington State Notice. **The Company notifies the Holder as follows:**

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**ICAP NORTHWEST OPPORTUNITY FUND, LLC, a Delaware limited liability company**

By: iCap Pacific NW Management, LLC
Its: Manager

_____

By: Chris Christensen
Its: Manager

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

EXHIBIT B
SECURITY DOCUMENTS RELATING TO THE DEBENTURES

**EXHIBIT B-1**

COLLATERAL AGENT AGREEMENT

# COLLATERAL AGENT AGREEMENT

THIS COLLATERAL AGENT AGREEMENT (this "***Agreement***"), dated as of _____, 2015, is entered into by and among the holders of the Debentures (defined below) set forth on Schedule 1 attached hereto, as updated from time to time (the "***Holders***"), and Experts Counsel, Inc., a Florida corporation in its capacity as collateral agent (in such capacity "***Agent***") for the Holders. In addition, any party who executes a Joinder Agreement shall become a Holder (as established by the Joinder Agreement) under this Agreement for all periods from and after the date of such Joinder Agreement to the same extent as if such party had originally executed this Agreement.

## RECITALS

A.        iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company ("***Issuer***") is offering up to $30,000,000 of secured debentures (collectively, the "***Debentures***") to Holders pursuant to that certain Senior Secured Debenture Purchase Agreement dated as of _____, 2015 among Issuer and the Holders thereto (the "***Purchase Agreement***"). Capitalized terms shall have the meaning set forth in the Purchase Agreement, unless otherwise defined herein.

B.        Issuer has granted to Agent, for the benefit of Holders, a security interest in certain Collateral (as defined in the Purchase Agreement).

C.        In connection with entering into the Purchase Agreement and purchasing the Debentures, the parties have agreed to enter into this Agreement to set forth (i) their respective rights and obligations with respect to the Debentures and (ii) the exercise of rights with respect to the Collateral and certain other matters.

D.        Pursuant to the terms set forth herein, each Holder appoints Agent to act as collateral agent under the Purchase Agreement, and each Holder authorizes Agent to act thereunder as agent of such Holder. Agent agrees to act as such upon the express conditions contained in this Agreement. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Holders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Issuer, nor shall Agent be deemed to be a fiduciary for Holders, this Agreement being solely a contractual relationship.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto, agree as follows:

**1        DEFINITIONS AND CONSTRUCTION**

**1.1        <u>Definitions</u>.** As used in this Agreement, the following terms shall have the following definitions:

"***Bankruptcy Code***" means the federal bankruptcy law of the United States as from time to time in effect, currently as Title 11 of the United States Code. Section references to current sections of the Bankruptcy Code shall refer to comparable sections of any revised version thereof if section numbering is changed.

"***Claim***" means any and all present and future "claims" (used in its broadest sense, as contemplated by and defined in Section 101(5) of the Bankruptcy Code, but without regard to whether

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 28 Page 318
1366

such claim would be disallowed under the Bankruptcy Code) of any Holder or Agent now or hereafter arising or existing under or relating to the Debentures, whether joint, several, or joint and several, whether fixed or indeterminate, due or not yet due, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, or disputed or undisputed, and whether arising under contract, in tort, by law, or otherwise, any interest or fees thereon (including interest or fees that accrue after the filing of a petition by or against Issuer under the Bankruptcy Code, irrespective of whether allowable under the Bankruptcy Code), any costs of Enforcement Actions, including reasonable attorneys' fees and costs, and any prepayment or termination premiums.

"*Collateral*" means the "Collateral" as defined under the Purchase Agreement.

"*Enforcement Action*" means, with respect to any Holder and with respect to any Claim of such Holder or any item of Collateral in which such Holder has or claims a security interest, lien or right of offset, any action, whether judicial or nonjudicial, to repossess, collect, accelerate, offset, recoup, give notification to third parties with respect to, sell, dispose of, foreclose upon, give notice of sale, disposition, or foreclosure with respect to, or obtain equitable or injunctive relief with respect to, such Claim or Collateral. The filing, or the joining in the filing, by any Holder of an involuntary bankruptcy or insolvency proceeding against Issuer also is an Enforcement Action.

"*Joinder Agreement*" shall mean that certain Joinder in Collateral Agent Agreement in substantially the form attached hereto as Exhibit A pursuant to which a Holder who is not an original signatory to this Agreement agrees to become a Holder under the terms set forth in the Joinder Agreement and to otherwise be bound by the terms of this Agreement.

"*Indemnified Holder*" has the meaning given to such term in Section 5.3.

"*Indemnified Payment*" has the meaning given to such term in Section 5.3.

"*Indemnifying Holder*" has the meaning given to such term in Section 5.3.

"*Majority in Interest*" means the Holders of a majority of the principal amount of the outstanding Debentures.

"*Party* or *Parties*" means the Agent and Holders from time to time party to this Agreement.

**1.2**    **Other Interpretive Provisions.** References in this Agreement to "Recitals," "Sections," and "Exhibits" are to recitals, sections, and exhibits herein and hereto unless otherwise indicated. References in this Agreement to any document, instrument or agreement shall include (a) all exhibits, schedules, annexes and other attachments thereto, (b) all documents, instruments or agreements issued or executed in restatement or replacement thereof, and (c) such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time. The words "include" and "including" and words of similar import when used in this Agreement shall not be construed to be limiting or exclusive.

**1.3**    **Intent.** The primary intent of this Agreement is to set forth the rights, duties and obligations of the Agent, and Holders as co-Holders, under the Debentures.

## 2    INTERCREDITOR ARRANGEMENTS (RELATING ONLY TO HOLDERS)

**2.1**    **Proportionate Interests.** Except as otherwise provided in this Agreement, all of the rights, interests and obligations of each Holder under the Debentures, including security interests in the

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 29 Page 319
1366

Collateral, shall be shared by the Holders in the ratio of (a) the aggregate outstanding principal amount of such Holder's Debenture to (b) the aggregate outstanding principal amount of all Debentures. Any reference in this Agreement to an allocation between or sharing by the Holders of any right, interest or obligation "ratably," "proportionally" or in similar terms shall refer to this ratio.

**2.2    Possession of Collateral.** If any Holder shall obtain possession of any Collateral, it shall hold such Collateral as agent and bailee for all Holders for purposes of perfecting Agent's and/or Holders' security interest therein.

## 3    ALLOCATION OF PAYMENTS AMONG HOLDERS PRIOR TO AN EVENT OF DEFAULT

All amounts received by Holders for the account of Issuer under the Debentures prior to an Event of Default, whether by payment, set-off or otherwise shall be allocated ratably among the Holders. Each Holder shall promptly remit to the other Holder such sums as may be necessary to ensure the ratable repayment of each Holder's Debenture. Notwithstanding the foregoing, a Holder receiving a scheduled payment shall not be responsible for determining whether the other Holder also received its scheduled payment on such date; provided, however, if it is later determined that a Holder received more than its ratable share of scheduled payments made on any date or dates, then such Holder shall remit to the other Holder such sums as may be necessary to ensure the ratable payment of such scheduled payments, as instructed by Agent.

## 4    REMEDIES UPON AN EVENT OF DEFAULT

**4.1    Decision to Exercise Remedies.** Upon the occurrence of an Event of Default, Agent shall take such actions and only such actions as a Majority in Interest mutually agree to take and shall direct the Agent in writing to enforce the rights and remedies under the Debentures. No Holder shall be entitled to undertake any Enforcement Action without the written consent of a Majority in Interest.

**4.2    Application of Proceeds after an Event of Default.** Notwithstanding anything to the contrary in the Debentures, as among the Agent and the Holders, the proceeds of the Collateral, or any part thereof, and the proceeds of any remedy under the Debentures after the occurrence and during the continuance of an Event of Default shall upon receipt by the Agent be paid to and applied as follows:

**4.2.1    First,** to the payment of then outstanding out-of-pocket costs and expenses of the Agent including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made under the Debentures or this Agreement by the Agent (including indemnification claims not otherwise satisfied pursuant to this Agreement).

**4.2.2    Second** to the Holders (in proportion to such costs and expenses theretofore incurred by each), including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made under the Debentures or this Agreement;

**4.2.3    Third,** to the Holders ratably, in an amount up to the sum of all accrued interest owing to the Holders on the Debentures;

**4.2.4** <u>Fourth</u>, to the Holders ratably, in an amount up to the sums of the outstanding principal and premium, if any, owing to the Holders on the Debentures;

**4.2.5** <u>Fifth</u>, to the Holders ratably (in proportion to all remaining obligations owing to each), in an amount up to the sum of all other outstanding and unpaid obligations (including indemnification claims not otherwise satisfied pursuant to the preceding clauses); and

**4.2.6** <u>Sixth</u>, to Issuer, as the case may be, or its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

**4.3** **Return of Payments.** To the extent any payment for the account of Issuer is required to be returned as a voidable transfer or otherwise, the Holders shall contribute to one another as is necessary to ensure that such return of payment is on a pro rata basis.

To the extent any proceeds of the Collateral, or any part thereof, and the proceeds of any remedy under the Debentures after the occurrence and during the continuance of an Event of Default shall be received by any Holder, such Holder shall forward the funds to the Agent and upon receipt by the Agent to be applied as set forth in <u>Section 4.2</u>.

**4.4** **Foreclosure**

**4.4.1** <u>Credit Bid By Holders</u>. Only by agreement of a Majority in Interest shall the Holders make or cause to be made a credit bid at any foreclosure sale or other sale of any of the Collateral on behalf of the Holders. If Holders are the successful bidders at the sale, then (a) the amount to be credited against their respective Claims shall be allocated pro rata among the Holders according to the balances of such Claims, and (b) Holders shall take title to the Collateral so purchased together, each holding a pro rata undivided interest in such Collateral. The parties shall mutually agree as to the most favorable disposition of any Collateral purchased with any such credit bid.

**4.4.2** <u>Cash Bid for Account of One Holder</u>**.** No Holder shall make or cause to be made a cash bid at any foreclosure sale or other sale of any of the Collateral without the prior written consent of a Majority in Interest. If a cash bid is made and is successful, then (a) the proceeds of the sale shall be allocated as set forth in <u>Section 4.2</u>, and (b) the Holder that entered the successful bid shall acquire the Collateral so purchased for its own account, and the other Holders shall have no further interest in that Collateral upon the payment to such other Holders of the shares of the proceeds in accordance with <u>Section 4.2</u>.

**5** **EXCULPATION; DELEGATION; AND INDEMNIFICATION OF HOLDERS**

**5.1** **Exculpation.** In connection with any exercise of Enforcement Actions hereunder, neither Agent nor any Holder or any of its partners, or any of their respective directors, officers, employees, attorneys, accountants, or agents shall be liable as such for any action taken or omitted by it or them, except for its or their own gross negligence or willful misconduct with respect to its duties under this Agreement.

**5.2** **Delegation of Duties.** Each Holder and Agent may execute any of its powers and perform any duties hereunder either directly or by or through agents or attorneys-in-fact. Each Holder and Agent shall be entitled to advice of counsel concerning all matters pertaining to such powers and duties. No Holder or Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it, if the selection of such agents or attorneys-in-fact was done without gross negligence or willful misconduct.

**5.3** **Indemnification.** To the extent not reimbursed by Issuer or from the application of Collateral proceeds pursuant to Section 4.2, a Holder (the "***Indemnified Holder***") shall be indemnified by the other Holders (an "***Indemnifying Holder***"), on a several basis in proportion to each Holder's pro rata share, and each Indemnifying Holder agrees to reimburse the Indemnified Holder for the Indemnifying Holder's pro rata share of the following items (an "***Indemnified Payment***"):

**5.3.1** all reasonable out-of-pocket costs and expenses of the Indemnified Holder incurred by the Indemnified Holder in connection with the discharge of its activities under this Agreement and the Debentures, including reasonable legal expenses and attorneys' fees; and

**5.3.2** from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, which may be imposed on, incurred by or asserted against the Indemnified Holder in any way relating to or arising out of this Agreement, or any action taken or omitted by the Indemnified Holder hereunder; provided that the Indemnifying Holder shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements, if the same results from the Indemnified Holder's gross negligence or willful misconduct or from undertaking Enforcement Actions in violation of Section 4.1;

**5.3.3** provided, however, that the Indemnified Holder shall not be reimbursed or indemnified for an Indemnified Payment, except to the extent that the Indemnified Holder paid more than its ratable share of such payment. All Indemnified Payments (as set forth in this Section 5.3) to an Indemnified Holder are intended to be paid ratably by the other Holder.

**6** **REPRESENTATIONS AND WARRANTIES**

**6.1** **Authority.** Each Party represents and warrants that it has all necessary power and authority to execute, deliver and perform this Agreement in accordance with the terms hereof and that it has all requisite power and authority to own and operate its properties and to carry on its business as now conducted.

**6.2** **Authorization; Enforceability.** Each Party represents and warrants that (a) the execution and delivery of this Agreement and the consummation of the transactions contemplated herein have each been duly authorized by all necessary action on the part of such Party and (b) this Agreement has been duly executed and delivered and constitutes a legal, valid and binding obligation of such Party, enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws of general application relating to or affecting the enforcement of creditors' rights or by general principles of equity.

**7** **AGENT**

**7.1** **Appointment, Powers and Immunities**

Each Holder irrevocably authorizes Agent to take such action on such Holder's behalf and to exercise such powers hereunder as are specifically delegated to Agent by the terms hereof, together with such powers as are reasonably incidental thereto. Agent undertakes to perform only such duties as are expressly set forth herein and in the Purchase Agreement and no other duties shall be implied and it may perform such duties by or through its agents, representatives or employees. Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Agreement. The Agent is authorized to take such action and to exercise such powers granted hereunder upon the written request or direction of a Majority in Interest in accordance with the terms hereof, together with such powers as

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 22 Page 322
1366

are reasonably incidental thereto. At the written direction of a Majority in Interest, Agent shall release any items of Collateral at any time without affecting or diminishing the liability of the Issuer to the Holders for any remaining or future indebtedness. Upon written request by a Holder, Agent will promptly deliver to such Holder copies of any statements or notices provided to Agent by Issuer under the Debenture. Agent shall not be responsible to any Holder for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of the Debentures, or for any representations, warranties, recitals or statements made therein or made in any written or oral statement or in any financial or other statements, instruments, reports, certificates or any other documents furnished or delivered in connection herewith or therewith by Agent to any Holder or by or on behalf of Issuer to Agent or any Holder, or be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained herein or therein or as to the use of the proceeds of the Debentures. Agent shall not be responsible for insuring the Collateral or for the payment of any taxes, assessments, charges or any other charges or liens of any nature whatsoever upon the Collateral or otherwise for the maintenance of the Collateral, except in the event Agent enters into possession of a part or all of the Collateral, in which event Agent shall preserve the part in its possession. Unless the officers of Agent acting in their capacity as officer of Agent on Issuer's account have actual knowledge thereof or have been notified in writing thereof by Holders, Agent shall not be required to ascertain or inquire as to the existence or possible existence of any Event of Default. Neither Agent nor any of its officers, directors, employees, attorneys, representatives or agents shall be liable to Holders for any action taken or omitted hereunder or under the Debentures or in connection herewith or therewith unless caused by its or their gross negligence or willful misconduct. No provision of this Agreement or the Debentures, shall be deemed to impose any duty or obligation on Agent to perform any act or to exercise any power in any jurisdiction in which it shall be illegal, or shall be deemed to impose any duty or obligation on Agent to perform any act or exercise any right or power if such performance or exercise (a) would subject Agent to a tax in a jurisdiction where it is not then subject to a tax or (b) would require Agent to qualify to do business in any jurisdiction where it is not so qualified. No Holder shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or the Debentures in accordance with the written instructions of a Majority in Interest. Agent shall be entitled to refrain from exercising any power, discretion or authority vested in it under this Agreement or the Debentures unless and until it has obtained the written instructions of a Majority in Interest. The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon Agent in its individual capacity.

### 7.2    Reliance by Agent

**7.2.1**    Agent may, at the expense of Holders, consult with counsel, and any opinion or legal advice of such counsel shall be full and complete authorization and protection in respect of any action taken, not taken or suffered by Agent hereunder or under the Debentures in accordance therewith. Agent shall have the right at any time to seek instructions concerning the administration of the Collateral from any court of competent jurisdiction.

**7.2.2**    Agent may rely, and shall be fully protected in acting, or refraining to act, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, bond or other paper or document that it has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of cables, telecopies and telexes, to have been sent by the proper party or parties. In the absence of its gross negligence or willful misconduct, Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to Agent and conforming to the requirements of the Debentures.

**7.2.3** Agent shall not be under any obligation to exercise any of the rights or powers granted to Agent by this Agreement or the Debentures at the request or written direction of a Majority in Interest unless Agent shall have been provided by Holders with security and indemnity satisfactory to Agent against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction.

**7.3** **Delegation of Duties By Agent.** Agent may execute any of the powers hereof and perform any duty hereunder either directly or by or through agents or attorneys-in-fact. Agent shall be entitled to advice of counsel concerning all matters pertaining to such powers and duties. Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it, if the selection of such agents or attorneys-in-fact was done without gross negligence or willful misconduct.

**7.4** **Right to Indemnity and Reimbursement.** Each Holder jointly and severally agrees (a) to indemnify and hold Agent (and any Person acting on behalf of Agent) harmless from and against and (b) promptly upon receipt by each Holder of Agent's statement, to reimburse Agent, according to such Holder's ratable share, to the extent Agent shall not otherwise have been reimbursed by Issuer on account of and for, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind of nature whatsoever with respect to Agent's performance of its duties under this Agreement and the Debentures; *provided*, *however*, that each Holder shall be jointly and severally liable to Agent to the extent any other Holder has failed to pay its pro rata share of amounts owed to Agent and *provided further*, *however*, that no Holder shall be liable for the payment to Agent of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from Agent's gross negligence or willful misconduct. Such reimbursement shall not in any respect release Issuer from any liability or obligation. If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished. Agent's right to indemnification shall survive termination of this Agreement and the resignation or removal of Agent.

**7.5** **Resignation and Appointment of Successor Agent.** Agent may resign at any time by giving sixty (60) days' prior written notice thereof to Holders and Issuer. Upon any such notice, a Majority in Interest may appoint a successor Agent. In addition, the person or entity serving as Agent may be removed or replaced from time to time by a Majority in Interest, with such removal or replacement being effective immediately upon written notice to the Agent and Issuer, with a copy to each Holder. If Agent shall be unable or unwilling to serve in such capacity, his or her successor shall be named by a Majority in Interest. Upon the acceptance of any appointment as an Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Agent's resignation hereunder as Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

**7.6** **Financing Statements Not Reviewed by Agent.** Holders acknowledge that (1) Agent has not reviewed and has no responsibility or obligation to review any financing statements related to the Collateral and (2) filing financial statements and maintaining a perfected security interest in the Collateral are solely the responsibilities of the Issuer.

**7.7** **Debentures Not Reviewed.** Holders acknowledge that Agent has not reviewed and has no responsibility or obligation to review the Debentures.

## 8        NOTICES

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except informal documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by certified mail, postage prepaid, return receipt requested, or by facsimile to the Holders, at the respective addresses or fax numbers set forth below:

| | |
|---|---|
| If to Agent: | Experts Counsel, Inc.<br>3001 Executive Center Drive, Suite 335<br>Clearwater, FL 33762<br>Attention: Kevin A. Carreno |
| If to Issuer: | iCap Northwest Opportunity Fund, LLC<br>10900 NE 8th Street, Suite 1000<br>Bellevue, WA 98004<br>Attention:  Chris Christensen |
| If to a Holder: | At the address for such Holder shown on Schedule 1 |

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

In addition, each Holder agrees (a) to notify the Agent and other Holders promptly upon receipt of any notice from Issuer and (b) at the Agent's or any other Holder's request, to send a copy of any such notice to the Agent and other Holders.

## 9        NO BENEFIT TO THIRD PARTIES

The terms and provisions of this Agreement shall be for the sole benefit of the Holders and Agent and their respective successors and assigns, and no other person or entity (including Issuer) shall have any right, benefit, priority, or interest under or because of this Agreement.

## 10        GENERAL PROVISIONS

**10.1        Successors and Assigns.** This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the Parties.

**10.2        Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**10.3        Entire Agreement; Construction; Amendments and Waivers.**

**10.3.1** This Agreement constitutes and contains the entire agreement between the Parties and supersedes any and all prior agreements, negotiations, correspondence, understandings and communications between the Parties, whether written or oral, respecting the subject matter hereof.

**10.3.2** This Agreement is the result of negotiations between and has been reviewed by each of the Parties executing this Agreement as of the date hereof and their respective counsel; accordingly, this Agreement shall be deemed to be the product of the Parties hereto, and no ambiguity shall be construed in favor of or against any Party. Parties agree that they intend the literal words of this Agreement and that no parol evidence shall be necessary or appropriate to establish any Party's actual intentions.

**10.3.3** Any and all amendments, modifications, discharges or waivers of, or consents to any departures from any provision of this Agreement shall not be effective without the written consent of a Majority in Interest. Any waiver or consent with respect to any provision of this Agreement shall be effective only in the specific instance and for the specific purpose for which it was given. Any amendment, modification, waiver or consent effected in accordance with this Section 10.3 shall be binding upon Agent and each Holder.

**10.3.5.** The Parties agree that the addition of any Holder to Schedule 1 to this Agreement and the execution by any such additional Holder of a signature page to this Agreement shall not be considered an amendment hereto under this Section 10.3.

**10.4    Counterparts.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.

**10.5    Termination.** This Agreement shall terminate upon the irrevocable payment in full to Agent and each Holder of all amounts owing to them under the Debentures and this Agreement. When all the Secured Obligations (as defined in the Debenture, other than inchoate indemnity obligations) have been paid in full or the Debentures have been converted pursuant to the Debenture, Issuer shall provide Agent, upon Agent's request, with an officer's certificate confirming such payment in full or conversion; and thereafter, no party hereto shall have any further rights or obligations hereunder.   Notwithstanding the prior termination of this Agreement, the respective obligations of Holders to indemnify Agent and each other shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Agent or Holder have run.

**10.6    Reinstatement.** Notwithstanding any provision of this Agreement to the contrary, the rights and obligations of the parties hereunder with respect to Issuer shall be reinstated and revived if and to the extent that for any reason any payment by or on behalf of Issuer is rescinded, or must be otherwise restored by any Party, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid. To the extent any payment is rescinded or restored, the obligations of the Issuer under the Debentures shall be revived in full force and effect without reduction or discharge for that payment.

**10.7    Survival.** All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any obligations remain outstanding hereunder.

**11      RELATIONSHIP OF HOLDERS**

The relationship among the Holders is, and at all times shall remain solely that of co-Holders. Holders shall not under any circumstances be construed to be partners or joint venturers of one another; nor shall the Holders under any circumstances be deemed to be in a relationship of confidence or trust or a fiduciary relationship with one another, or to owe any fiduciary duty to one another. Holders do not undertake or assume any responsibility or duty to one another to select, review, inspect, supervise, pass judgment upon or otherwise inform each other of any matter in connection with Issuer's property, any Collateral held by any Holder or the operations of Issuer. Each Holder shall rely entirely on its own

judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information undertaken or assumed by any Holder in connection with such matters is solely for the protection of such Holder.

## 12    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF WASHINGTON, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. EACH OF THE HOLDERS HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF WASHINGTON.

**TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY WAIVES THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

[*Signature Pages Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**Agent:**

EXPERTS COUNSEL, INC.

By_____

Name: _____

Title: _____

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15 Exhibit 28 Page 328
1366

**HOLDER SIGNATURE PAGE TO COLLATERAL AGENT AGREEMENT**

See the Subscription Instructions Packet.

**EXHIBIT A**

**FORM OF JOINDER IN COLLATERAL AGENT AGREEMENT**

This Joinder in Collateral Agent Agreement (the "*Joinder Agreement*") dated as of _____, 20__, is by and between the undersigned ("*Holder*") and Experts Counsel, Inc., as Agent hereunder ("*Agent*"). Terms not defined herein have the meanings given to them in the Collateral Agent Agreement (defined below).

### BACKGROUND

In order to effect the provisions of an underlying Debenture and Collateral Agent Agreement, the parties hereto have entered into this Joinder Agreement.

**NOW, THEREFORE**, in consideration of the premises and agreements contained herein and for other good and valuable consideration, the parties hereby agree as follows:

### AGREEMENTS

1.      Joinder. By execution hereof, the Holder hereby joins in and becomes a Holder under that certain Collateral Agent Agreement dated as of _____ between Agent and the Holders therein (the "*Collateral Agent Agreement*"). The Holder has received and read a copy of the Collateral Agent Agreement and understands its provisions. Holder hereby adopts and agrees to be bound by all of the provisions of the Collateral Agent Agreement and all of the provisions of the Collateral Agent Agreement are hereby incorporated herein.

2.      General Provisions.

(a)      Effect of Agreement. This Joinder Agreement shall be binding upon the parties hereto and their respective, successors and assigns.

(b)      Severability. Every provision hereof is intended to be severable, and if any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Joinder Agreement, *provided*, *however*, that all provisions hereof shall be enforced to the fullest extent permitted by law.

*[Signature Page Follows]*

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 20 Page 330
1366

**HOLDER SIGNATURE PAGE TO JOINDER IN COLLATERAL AGENT AGREEMENT**

See the Subscription Instructions Packet.

SCHEDULE I
to Collateral Agent Agreement

| Holder's Name and Address | Holder's Email Address | Original Principal Amount of Debenture |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**SECURITY AGREEMENT**

This SECURITY AGREEMENT (this "***Agreement***"), dated as of _____, 2015, is made and entered into by and between ICAP NORTHWEST OPPORTUNITY FUND, LLC ("***Borrower***"), and Experts Counsel, Inc., as collateral agent for the Holders (as defined below) ("***Collateral Agent***").

R E C I T A L S :

WHEREAS, in connection with the making of the loan (the "***Loan***") under that certain Senior Secured Debenture Purchase Agreement dated as of _____ between Borrower and the holders thereto (the "***Holders***") (together with all amendments and modifications thereto, the "***Purchase Agreement***") which is evidenced by those certain Debentures made by Borrower and payable to each Holder (together with all amendments and modifications thereto and collectively, the "***Debentures***"), and as security for the payment and performance of Borrower's obligations under the Purchase Agreement and the Debentures, Holders are requiring that Borrower execute and deliver this Agreement and grant the security interest in all of the Borrower's assets, including, but not limited to, those assets listed on Exhibit A.

WHEREAS, pursuant to that certain Collateral Agent Agreement dated as of _____, 2015 between the Holders and Collateral Agent, Collateral Agent will maintain certain security interests granted by Borrower to the Holders, including the security interests granted herein.

NOW, THEREFORE, in consideration of the promises and the covenants hereinafter contained, and to induce Holders to make the Loan under the Purchase Agreement and the Debentures, it is agreed as follows:

1.      **Incorporation of Recitals**. The foregoing Recitals are true and correct and hereby incorporated into this Agreement in their entirety by this reference.

2.      **Definitions**. The following terms shall have the meanings set forth below:

"***Collateral***" means all of the Borrower's property and assets, including but not limited to those assets listed on Exhibit A, including all proceeds thereof and all increases, substitutions, replacements, additions, and accretions thereof.

"***Credit Documents***" means this Agreement, the Purchase Agreement, and the Debentures.

"***Event of Default***" has the meaning given in Section 6 below.

"***Obligations***" has the meaning given in Section 3.1 below.

"***Permitted Liens***" mean any of the following: (i) liens for current taxes or other governmental or regulatory assessments which are not delinquent, or which are being contested in good faith by the appropriate procedures and for which appropriate reserves are maintained; (ii) liens granted in favor of the Collateral Agent pursuant to this Agreement; (iii) liens granted in the form of a deed of trust, pledge, or security agreement relating to investments made by Borrower in the ordinary course of its business.

"***Security Interest***" has the meaning given in Section 3.2 below.

B-2-1

"*UCC*" means the Uniform Commercial Code as adopted in the State of Washington and in effect from time to time.

3. **Security for Obligations**.

3.1 Obligations. This Agreement secures, and the Collateral is collateral security for, the prompt payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, conversion, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 363(a) of the Bankruptcy Code, 11 U.S.C. §362(a)) of all obligations and liabilities of every nature of Borrower now or hereafter existing under or arising out of the Debentures, the Purchase Agreement, and this Agreement and all extensions or renewals thereof, whether for principal, interest, (including, without limitation, interest that, but for the filing of a petition in bankruptcy with respect to Borrower, would accrue on such obligations), fees, or expenses thereunder (all such obligations of Borrower being the "*Obligations*").

3.2 Grant. As security for the payment of the Obligations, the Borrower hereby grants to the Collateral Agent, for the benefit of the Holders, a security interest in the Collateral (the "*Security Interest*"). Without limiting the foregoing, the Collateral Agent is hereby authorized to file one or more financing statements, continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest, naming the Borrower(s) as debtors and the Collateral Agent, for the benefit of the Holders, as secured party.

3.3 Records. The Borrower agrees at all times to keep in all material respects accurate and complete accounting records with respect to the Collateral, including, but not limited to, a record of all payments and proceeds received.

3.4 Additional Collateral. If Borrower shall at any time after the date hereof (a) obtain any rights to any additional Collateral or (b) become entitled to the benefit of any additional Collateral, the provisions hereof shall automatically apply thereto and any such item shall automatically constitute Collateral as if such would have constituted Collateral at the time of execution hereof and be subject to the security interest created by this Agreement without further action by any party. At the Collateral Agent's request, Borrower shall promptly, with the delivery of its annual financial statements, (i) provide to the Collateral Agent written notice of any of the foregoing and (ii) upon the Collateral Agent's reasonable request, confirm the attachment of the security interest created by this Agreement to any rights described in clauses (a) and (b) of the immediately preceding sentence by execution of an instrument in form reasonably acceptable to the Collateral Agent and the filing of any instruments or statements as shall be reasonably necessary to create, preserve, protect or perfect the Collateral Agent's security interest in such Collateral.

4. **Representations and Warranties**. Borrower represents and warrants to the Holders as follows:

4.1 Legal Name. Borrower's exact legal name is as set forth in the first paragraph of this Agreement. Borrower shall not change its legal name or its form of organization without thirty (30) days' prior written notice to the Collateral Agent.

4.2 Authority. Borrower has the requisite corporate power and authority to grant to the Collateral Agent, for the benefit of the Holders, the Security Interest in such Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other person other than any consent or approval which has been obtained.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 24 Page 334
1366

4.3    <u>Filing</u>. Fully executed Uniform Commercial Code financing statements containing a description of the Collateral shall have been, or shall be delivered to the Collateral Agent in a form such that they can be, filed of record in every governmental, municipal or other office in every jurisdiction in which any portion of the Collateral is located necessary to publish notice of and protect the validity of and to establish a valid, legal and perfected security interest in favor of the Collateral Agent, for the benefit of the Holders, in respect of the Collateral in which a security interest may be perfected by filing in the United States and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary in any such jurisdiction, except as provided under applicable law with respect to the filing of Uniform Commercial Code continuation statements.

4.4    <u>Validity of Security Interest</u>. The Security Interest constitutes a valid, legal and perfected security interest in all of the Collateral for payment and performance of the Obligations subject only to Permitted Liens.

**5.**    **<u>Covenants and Agreements</u>**. Borrower covenants and agrees as follows:

5.1    <u>Restrictions</u>. Borrower agrees that until the Debentures shall have been satisfied in full (whether by conversion, payment, or otherwise), Borrower shall not, without Collateral Agent's prior written consent, assign, transfer, encumber or otherwise dispose of the Collateral, or any interest therein, except that Borrower may grant a Permitted Lien or dispose of Collateral, or any interest therein, in the ordinary course of its business.

5.2    <u>Defense</u>. Borrower shall at its own expense take any and all actions reasonably necessary to protect and defend the Collateral against all claims or demands and to defend the Security Interest of the Collateral Agent in such Collateral, and the priority thereof, against any adverse lien of any nature whatsoever (other than Permitted Liens).

5.3    <u>Maintenance</u>. Borrower shall at all times and at its own expense maintain and keep, or cause to be maintained and kept, the Collateral. Borrower shall perform all acts and execute all documents reasonably requested by the Collateral Agent at any time to evidence, perfect, maintain, record and enforce the Collateral Agent's interest in the Collateral in furtherance of the provisions of this Agreement, and Borrower hereby authorizes the Collateral Agent to execute and file one or more financing statements (and similar documents) or copies thereof or of this Agreement with respect to the Collateral signed only by the Collateral Agent.

5.4    <u>Collateral Agent's Right to Take Action</u>. If, after ten business days written notice from Collateral Agent, Borrower fails to materially perform or materially observe any of its covenants or agreements set forth in this <u>Section 5</u> or if Borrower notifies Collateral Agent that it intends to abandon all or any part of the Collateral, Collateral Agent may (but need not) perform or observe such covenant or agreement or take steps to prevent such intended abandonment on behalf and in the name, place, and stead of Borrower (or, in the case of intended abandonment, in Collateral Agent's own name) and may (but need not) take any and all other actions that Collateral Agent may reasonably deem necessary to cure or correct such failure or prevent such intended abandonment.

5.5    <u>Costs and Expenses</u>. Except to the extent that the effect of such payment would be to render any loan or forbearance of money usurious or otherwise illegal under any applicable law, Borrower shall pay the Collateral Agent on demand the amount of all moneys expended and all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by the Collateral Agent in connection with or as a result of the Collateral Agent's taking any action or exercising any of its rights

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 25 Page 335
1366

under this Agreement as a result of an Event of Default, together with interest thereon from the date expended or incurred by the Collateral Agent.

5.6     Use and Disposition of Collateral. Borrower shall not make or permit to be made any assignment, pledge or hypothecation of the Collateral other than Permitted Liens or as permitted by Section 5.1 above, or grant any security interest in the Collateral except for the Security Interest and Permitted Liens. Borrower shall not make or permit to be made any transfer of any Collateral, except as permitted by Section 5.1 above, and Borrower shall remain at all times in possession of the Collateral owned by it other than transfers to the Collateral Agent pursuant to the provisions hereof and as otherwise provided in this Agreement. The Collateral Agent shall have the right, as the true and lawful agent of the Borrower, with power of substitution for the Borrower and in the Borrower's name, the Collateral Agent's name or otherwise, for the use and benefit of the Collateral Agent (for the benefit of the Holders) and solely to effect the purposes of this Agreement, (i) upon the occurrence and during the continuance of an Event of Default that is not cured during any allowable cure period, to endorse the Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment with respect to the Collateral that may come into its possession; (ii) upon the occurrence and during the continuance of an Event of Default that is not cured during any allowable cure period, to sign the name of the Borrower on any invoice relating to the Collateral and (iii) upon the occurrence and during the continuance of an Event of Default that is not cured during any allowable cure period, (A) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences or instruments of payment relating to the Collateral or any part thereof, and Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed, (B) to demand, collect, receive payment of, give receipt for, extend the time of payment of and give discharges and releases of all or any of the Collateral and/or release the obligor thereon, (C) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral, (D) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to or pertaining to all or any of the Collateral, (E) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and (F) to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; *provided*, *however*, that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to any such action, make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, and no action taken by the Collateral Agent or omitted to be taken with respect to the Collateral or any part thereof shall give rise to any defense, counterclaim or offset in favor of Borrower or to any claim or action against the Collateral Agent in the absence of the gross negligence or willful misconduct of the Collateral Agent; and *provided further* that, the Collateral Agent shall at all times act reasonably and in good faith. It is understood and agreed that the appointment of the Collateral Agent as the agent of the Borrower for the purposes set forth above in this Section 5.6 is coupled with an interest and is irrevocable. The provisions of this Section 5.6 shall in no event relieve Borrower of any of its obligations hereunder with respect to the Collateral or any part thereof (other than obligations which are impaired as a result of actions taken by the Collateral Agent pursuant to this Section 5.6) or impose any obligation on the Collateral Agent to proceed in any particular manner with respect to the Collateral or any part thereof, or in any way limit the exercise by the Collateral Agent of any other or further right which it may have on the date of this Agreement or hereafter, whether hereunder or by law or otherwise. Any time action is taken under this Section 5.6, prompt written notice of such action shall be provided to Borrower by Collateral Agent.

5.7     Further Assurances. Borrower agrees, at its expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as

the Collateral Agent may from time to time reasonably request for the assuring and preserving of the Security Interest and the rights and remedies created hereby, including, without limitation, the payment of any fees and taxes required in connection with the execution and delivery of this Agreement, the granting of the Interest and the filing of any financing statements or other documents in connection herewith.

**6.** **Events of Default**. Each of the following occurrences shall constitute an event of default under this Agreement (herein called "*Event of Default*"):

6.1 The occurrence of any Event of Default as defined by the Purchase Agreement; or

6.2 there is any levy, seizure, or attachment of all or any material portion of the Collateral, other than as set forth in this Agreement; or

6.3 any of the representations or warranties contained in Section 4 shall prove to have been incorrect in any material respect when made.

**7.** **Remedies**. Upon the occurrence of an Event of Default and at any time thereafter while the Event of Default is continuing that was not cured during any allowable cure period, unless the Collateral Agent otherwise agrees in writing, the Collateral Agent may, at its option, take any or all of the following actions:

7.1 The Collateral Agent may exercise, without any other notice to or demand upon Borrower, in addition to the other rights and remedies provided for herein or in any other Credit Document otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may:

(a) require Borrower to, and Borrower hereby agrees that it will at its expense and upon request of the Collateral Agent promptly, assemble the Collateral or any part thereof, as directed by the Collateral Agent and make it available to the Collateral Agent at a place and time to be designated by the Collateral Agent;

(b) without notice except as specified below, sell, resell, assign and deliver or grant a license to use or otherwise dispose of the Collateral or any part thereof, in one or more parcels at public or private sale, at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Collateral Agent may deem commercially reasonable;

(c) occupy any premises owned or leased by Borrower where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under law, without obligation to Borrower in respect of such occupation; and

(d) exercise any and all rights and remedies of Borrower under or in connection with the Collateral, or otherwise in respect of the Collateral, including without limitation, any and all rights of Borrower to demand or otherwise require payment of any amount under, or performance of any provision of any agreements related to the Collateral.

7.2 Borrower agrees that, to the extent notice of sale shall be required by law, at least ten (10) business days' notice to Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. At any sale of the Collateral, if permitted by applicable law, the Collateral Agent may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement

or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, Borrower waives all claims, damages and demands it may acquire against the Collateral Agent arising out of the exercise by it of any rights hereunder. Borrower hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshaling the Collateral and any other security for the Obligations or otherwise. The Collateral Agent shall not be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action with regard thereto. The Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice, be made at the time and place to which it was so adjourned. The Collateral Agent shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

7.3     All payments received by Borrower in respect of the Collateral shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other funds of Borrower and shall be forthwith paid over the Collateral Agent in the same form as so received (with any necessary endorsement).

7.4     The Collateral Agent may, without notice to Borrower except as required by law and at any time or from time to time, charge, set off and otherwise apply all or part of the Obligations against any funds deposited with it or held by it.

**8.     No Waiver and Cumulative Remedies**. The Collateral Agent shall not by any act (except by a written instrument pursuant to Section 11), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default. No failure on the part of the Collateral Agent to exercise, no course of dealing with respect to, and no delay on the part of the Collateral Agent in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall the Collateral Agent be required to look first to, enforce or exhaust any other security, collateral or guaranties. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

**9.     Application of Proceeds**. Upon the exercise by the Collateral Agent of its remedies hereunder, any proceeds received by the Collateral Agent in respect of any realization upon any Collateral shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Agreement, in accordance with the Credit Documents. Borrower shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the Obligations and the fees and other charges of any attorneys employed by the Collateral Agent to collect such deficiency.

**10.     Security Interest Absolute**. All rights of the Collateral Agent hereunder, the Security Interest, and all obligations of the Borrower hereunder, shall be absolute and unconditional irrespective of (i) any partial invalidity or unenforceability of the Debentures, any other agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or consent to any departure from the Debentures or any other agreement or instrument, (iii) any exchange, release or nonperfection of any other Collateral, or any release or amendment or waiver of or consent to or departure from any guarantee, for all or any of the Obligations,

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 28 Page 338
1366

or (iv) any other circumstance which might otherwise constitute a defense available to, or discharge of the Borrower in respect of the Obligations or in respect of this Agreement.

11. **Miscellaneous**. This Agreement can be waived, modified, amended, terminated or discharged, and the Security Interest can be released, only explicitly in a writing signed by the party against whom such waiver, modification, amendment, termination, discharge or release is sought to be enforced. No failure on the part of the Collateral Agent to exercise, no course of dealing with respect to, and no delay on the part of the Collateral Agent in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall the Collateral Agent be required to look first to, enforce or exhaust any other security, collateral or guaranties. All rights and remedies of the Collateral Agent shall be cumulative and may be exercised singularly or concurrently and the exercise or enforcement of any one such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other. The Collateral Agent shall not be obligated to preserve any rights Borrower may have against prior parties, to realize on the Collateral at all or in any particular manner or order, or to apply any cash proceeds of the Collateral in any particular order of application. This Agreement shall be binding upon and inure to the benefit of Borrower and the Collateral Agent (on behalf of the Holders) and their respective participants, successors, and permitted assigns and shall take effect when signed by Borrower and the Collateral Agent, and Borrower waives notice of Collateral Agent's acceptance hereof. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Washington, without regard to the principles of conflicts of law thereof. Each party agrees that any action, proceeding, counterclaim, crossclaim, or other dispute relating to, involving, or resulting from this Agreement or the transactions contemplated by this Agreement will be resolved exclusively in the state or federal courts located in King County, Washington, and each party hereby waives the right to object to any such forum on any grounds. If any provision or application of this Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications which can be given effect and this Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby. All representations and warranties contained in this Agreement shall survive the execution, delivery and performance of this Agreement and the creation and payment of the Obligations. The Borrower acknowledges and agrees that in the event of any breach of the covenants and agreements contained in this Agreement, the Collateral Agent would be irreparably harmed and could not be made whole only by the award of monetary damages. Accordingly, the Borrower agrees that the Collateral Agent, in addition to any other remedy to which the Collateral Agent may be entitled at law or equity, will be entitled to seek and obtain an award of specific performance of any of such covenants and agreements.

12. **No Release**. Nothing set forth in this Agreement, nor the exercise by the Collateral Agent of any of the rights or remedies hereunder, shall relieve Borrower from the performance of any term, covenant, condition or agreement on such Borrower's part to be performed or observed in respect of any of the Collateral or from any liability to any person in respect of any of the Collateral or shall impose any obligation on the Collateral Agent to perform or observe any such term, covenant, condition or agreement on such Borrower's part to be so performed or observed or shall impose any liability on the Collateral Agent for any act or omission on the part of the Borrower relating thereto or for any breach of any representation or warranty on the part of the Borrower contained in this Agreement, the Purchase Agreement or the other Credit Documents, or in respect of the Collateral or made in connection herewith or therewith. Anything herein to the contrary notwithstanding, the Collateral Agent shall not have any obligation or liability under any contracts, agreements and other documents included in the Collateral by reason of this Agreement, nor shall the Collateral Agent be obligated to perform any of the obligations or duties of Borrower thereunder or to take any action to collect or enforce any such contract, agreement or

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 29 Page 339
1366

other document included in the Collateral. The obligations of the Borrower contained in this <u>Section 12</u> shall survive the termination hereof and the discharge of Borrower's other obligations under this Agreement, the Purchase Agreement and the other Credit Documents.

13.   <u>Notices</u>. Any notices or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by electronic mail or facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one business day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Borrower:

iCap Northwest Opportunity Fund, LLC
10900 NE 8th Street, Suite 1000
Bellevue, WA 98004
Facsimile:  425.214.4776
Attention:  Chris Christensen
Email:  chris@icapequity.com

With a copy to (which shall not constitute notice):

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Facsimile:  206.359.9000
Attention:  Martha Sandoval

If to the Collateral Agent to:

Experts Counsel, Inc., as Collateral Agent for the Holders
3001 Executive Center Drive, Suite 335
Clearwater, FL 33762

or to such other address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

14.   <u>Waiver of Jury Trial</u>: **BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT BORROWER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE COLLATERAL AGENT ENTERING INTO THIS AGREEMENT.**

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 20 Page 340 of 1366

15. **Termination**. This Agreement and the Security Interest shall terminate when the Debentures are satisfied or paid in full (whether by conversion, payment, or otherwise). Upon such termination, the Collateral Agent shall execute and deliver to the Borrower all Uniform Commercial Code termination statements and similar documents which the Borrower shall reasonably request to evidence such termination.

IN WITNESS WHEREOF, this Security Agreement has been duly executed as an instrument under seal as of the date first written above.

**BORROWER**

ICAP NORTHWEST OPPORTUNITY FUND, LLC

By_____

Name:_____

Title: _____

**COLLATERAL AGENT:**

EXPERTS COUNSEL, INC.

By_____

Name:_____

Title: _____

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 22 Page 342
1366

# EXHIBIT A
## to Security Agreement
### Collateral

The term "Collateral" shall mean the all of the assets of the Borrower, including but not limited to the following:

(a)     All Accounts, all Inventory, all Equipment, all General Intangibles, all Investment Property.

(b)     All instruments, chattel paper, electronic chattel paper, documents, securities, moneys, cash, letters of credit, letter of credit rights, promissory notes, warrants, dividends, distributions, contracts, agreements, contract rights or other property, owned by Borrower or in which Borrower has an interest, including but not limited to, those which now or hereafter are in the possession or control of Collateral Agent or in transit by mail or carrier to or in the possession of any third party acting on behalf of Collateral Agent, without regard to whether Collateral Agent received the same in pledge, for safekeeping, as agent for collection or transmission or otherwise or whether Collateral Agent had conditionally released the same, and the proceeds thereof, all rights to payment from, and all claims against Collateral Agent, and any deposit accounts of Borrower with Collateral Agent, including all demand, time, savings, passbook or other accounts and all deposits therein.

(c)     All documents, including without limitation any paper that is treated in the regular course of business as adequate evidence that the person in possession of the paper is entitled to receive, hold, and dispose of the goods the paper covers, including warehouse receipts, bills of lading, certificates of title, and applications for certificates of title.

(d)     All assets and all personal property now owned or hereafter acquired; all now owned and hereafter acquired inventory, equipment, fixtures, goods, accounts, chattel paper, documents, instruments, farm products, general intangibles, supporting obligations, software, commercial tort claims, minerals, standing timber, growing crops and all rents, issues, profits, products and proceeds thereof, wherever any of the foregoing is located.

(e)     To the extent not listed above as original collateral, proceeds and products of the foregoing.

The below capitalized terms shall have the following meanings:

(a)     "Accounts" means all accounts, accounts receivable, health-care insurance receivables, credit card receivables, contract rights, instruments, documents, chattel paper, tax refunds from federal, state or local governments and all obligations in any form including without limitation those arising out of the sale or lease of goods or the rendition of services by Borrower; all guaranties, letters of credit and other security and support obligations for any of the above; all merchandise returned to or reclaimed by Borrower; and all books and records (including computer programs, tapes and data processing software) evidencing an interest in or relating to the above; all winnings in a lottery or other game of chance operated by a governmental unit or person licensed to operate such game by a governmental unit and all rights to payment therefrom; and all "Accounts" as same is now or hereinafter defined in the UCC.

(b)     "Equipment" means all goods (excluding inventory, farm products or consumer goods), all machinery, machine tools,' equipment, fixtures, office equipment, furniture, furnishings,

motors, motor vehicles, tools, dies, parts, jigs, goods (including, without limitation, each of the items of equipment set forth on any schedule which is either now or in the future attached to Collateral Agent's copy of this Agreement), and all attachments, accessories, accessions, replacements, substitutions, additions and improvements thereto, all supplies used or useful in connection therewith, and all "Equipment" as same is now or hereinafter defined in the UCC.

(c)     "General Intangibles" means all general intangibles, choses in action, causes of action, obligations or indebtedness owed to Borrower from any source whatsoever, payment intangibles, software and all other intangible personal property of every kind and nature (other than Accounts), including without limitation patents, trademarks, trade names, service marks, copyrights and applications for any of the above, and goodwill, trade secrets, licenses, franchises, rights under agreements, tax refund claims, and all books and records including all computer programs, disks, tapes, printouts, customer lists, credit files and other business and financial records, the equipment containing any such information, and all "General Intangibles" as same is now or hereinafter defined in the UCC.

(d)     "Inventory" means goods, supplies, wares, merchandises and other tangible personal property, including raw materials, work in process, supplies and components, and finished goods, whether held for sale or lease, or furnished or to be furnished under any contract for service, or used or consumed in business, and also including products of and accessions to inventory, packing and shipping materials, all documents of title, whether negotiable or non-negotiable, representing any of the foregoing, and all "Inventory" as same is now or hereinafter defined in the UCC.

(e)     "Investment Property" means a security, whether certificated or uncertificated, security entitlement, securities account, commodity contract or commodity account and all "Investment Property" as same is now or hereafter defined in the UCC.

**EXHIBIT B3**


PLEDGE AND SECURITY AGREEMENT

# PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT (this "*Assignment*") is made and entered into as of _____, 201_, among ICAP PACIFIC NW MANAGEMENT, LLC, a Washington limited liability company ("*Pledgor*") and EXPERTS COUNSEL, INC., a Florida association in its capacity as collateral agent ("*Secured Party*", and together with the Pledgor, the "*Parties*").

## R E C I T A L S

A.      iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company (the "*Company*"), will issue up to $30,000,000 of secured debentures (collectively, the "*Debentures*") to certain individuals and entities (the "*Holders*") pursuant to that certain Senior Secured Debenture Purchase Agreement dated as of April 20, 2015, by and among Company and the Holders thereto (the "*Purchase Agreement*"). Terms defined in the Purchase Agreement shall have same meanings when used herein.

B.      The Pledgor owns 1,000,000 uncertificated Class A membership interests in the Company, which such membership interests represent all of the issued and outstanding Class A membership interests of the Company.

C.      Collateral Agent and Holders are party to that certain Collateral Agent Agreement dated as of _____ __, 2015, whereby Collateral Agent has agreed to act as collateral agent for and on behalf of the Holders.

D.      To induce the Holders to purchase the Debentures and in consideration of the Holders' purchase of the Debentures, the Pledgor desires to grant to the Secured Party, for the benefit of the Holders, a security interest in the Collateral (as defined below) as additional security for the obligations arising under the Debentures and the payment and performance of the Company's obligations under the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Company and Secured Party agree as follows:

1.      <u>Definitions</u>.

1.1      To the extent that any terms or concepts defined or used herein are defined or used in the UCC, such terms or concepts shall be interpreted for purposes hereof in a manner that is consistent with such definition or use in the UCC.

1.2      Any capitalized terms used herein but not defined herein shall have the meanings assigned to them in the Purchase Agreement.

1.3      Unless otherwise indicated, the following terms shall have the meanings set forth below:

"*Collateral*" means all of Pledgor's right, title and interest in and to (a) the Formation Agreement and the Equity Interests, including, without limitation, Pledgor's share of the profits, losses and capital of Company, and all Voting Rights, claims, powers, privileges, benefits, options or rights of any nature whatsoever which currently exist or may be issued or granted by Company to Pledgor, and all instruments, whether heretofore or hereafter acquired, evidencing such rights and interests and (b) all Distributions, except for tax Distributions.

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 26 Page 346
1366

"***Distributions***" has the meaning set forth in <u>Section 9.2</u>.

"***Equity Interests***" means all of the membership interests or other equity interests of, and all other right, title and interest now owned or hereafter acquired by, Pledgor in and to Company.

"***Formation Agreement***" means that certain Operating Agreement of Company dated as of April 20, 2015.

"***Lien***" shall mean a pledge, assignment, lien, charge, mortgage, encumbrance or other security interest.

"***Obligations***" shall mean the obligations and liabilities of every nature of the Company now or hereafter existing under or arising out of the Debentures and the Purchase Agreement, and all extensions or renewals thereof, whether for principal, interest, (including, without limitation, interest that, but for the filing of a petition in bankruptcy with respect to the Company, would accrue on such obligations), fees, or expenses thereunder.

"***UCC***" shall mean the Uniform Commercial Code as in effect in the State of Washington from time to time.

"***Voting Rights***" has the meaning set forth in <u>Section 9.1</u>.

2.    <u>Grant of Security Interest</u>.

2.1    As security for the due and punctual payment in full by Company of the Obligations, the Pledgor hereby pledges, assigns, charges, delivers and grants to the Secured Party a continuing first-priority perfected (upon completion of the transactions contemplated under <u>Section 3</u> of this Agreement) security interest in and a general first Lien upon all of the Collateral.

2.2    This Agreement shall (a) remain in full force and effect until the Obligations have been paid in full, (b) be binding upon the Pledgor and its successors, permitted transferees and permitted assigns and (c) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its permitted successors, transferees and assigns.

2.3    Upon the payment in full of the Obligations, the Lien granted hereunder shall terminate and, upon delivery and transfer of the Collateral to Pledgor, all rights to the Collateral shall revert to the respective Pledgor. Upon such termination, the Secured Party shall, at the expense of the Pledgor, execute and deliver to Pledgor such documents as the Pledgor shall reasonably request to evidence such termination.

3.    <u>Perfection</u>. Pledgor hereby authorizes the Secured Party to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral, without the signature of Pledgor where permitted by applicable law, and agrees to take all such other actions and to execute and deliver and file or cause to be filed such other instruments or documents, as the Secured Party may reasonably require in order to establish and maintain a perfected, valid and continuing first-priority security interest in and Lien upon the Collateral in accordance with this Agreement and the UCC and other applicable law. If hereafter any certificates for the Collateral, or certificates for any securities comprising part of the Collateral, are issued, such certificates shall be delivered to the Secured Party, accompanied by instruments of assignment duly executed by the Pledgor and by such other instruments or documents as the Secured Party or its counsel may reasonably request sufficient to transfer the title thereto to the Secured Party or its nominee.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 27 Page 347
1366

4.    Further Assurances and Protections.

4.1    The Pledgor shall, at its individual expense, file, record, make, execute and deliver all such acts, notices, instruments, statements or other documents as the Secured Party may reasonably request to register in the name of the Secured Party, perfect, preserve or otherwise protect the security interest and Liens of the Secured Party in the Collateral or any part thereof or to give effect to the rights, powers and remedies of the Secured Party under this Agreement.

4.2    Pledgor shall give prompt written notice to Secured Party of, and defend the Collateral against, any suit, action or proceeding related to the Collateral or which could materially adversely affect the security interests and Liens granted hereunder.

4.3    Until all the Obligations of the Company to the Secured Party have been fully paid and performed, the Pledgor shall not, except in connection with the concurrent repayment of all the Obligations with any proceeds received, attempt to sell, transfer, assign, deliver or otherwise dispose of the Collateral or any interest therein.

5.    Representations and Warranties. Pledgor represents and warrants to the Secured Party that Pledgor (a) owns the Collateral of record and beneficially free and clear of all Liens, security interests and liabilities except the Lien of this Agreement and (b) has the right and requisite authority to enter into this Agreement and grant the security interests in the Collateral.

6.    Security Interest Absolute. All rights of the Secured Party and all Liens hereunder, and all obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of:

(a)    lack of validity or enforceability of this Agreement or the Purchase Agreement;

(b)    any change in the time, manner or place of payment of, or in any other term of, any or all of the Obligations or any amendment or waiver of any provision of this Agreement; or

(c)    any release or non-perfection of any portion of the Collateral or any exchange, release or non-perfection of any other collateral.

7.    Secured Party's Duties. The powers conferred on the Secured Party hereunder are solely to protect the Secured Party's interest in the Collateral and shall not impose any duty upon it to exercise any such powers except for the safe custody of any Collateral or any portion thereof in its possession, if any, and the Secured Party shall exercise that standard of care with respect to the Collateral in its possession, if any, which it exercises in the administration of its own assets and property.

8.    Rights Cumulative. The rights, powers and remedies of Secured Party under this Agreement shall be in addition to all rights, powers and remedies given to Secured Party by virtue of any statute or rule of law or any agreement, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing Secured Party's security interest or Lien in the Collateral.

9.    Voting Proxy; Distributions.

9.1    In addition to the Secured Party's other rights, Pledgor irrevocably appoints Secured Party as its sole and exclusive proxy, with full power of substitution and revocation, but only after the occurrence of an Event of Default (as defined below) and during the continuance thereof, to exercise Pledgor's rights to call and attend meetings, vote, consent to and/or take any action respecting

B-3-4

the Collateral as fully as the Pledgor might do (the "***Voting Rights***"). This proxy remains effective so long as any of the Obligations are unpaid after proper notice has been delivered and cure periods have lapsed; provided, however, that nothing contained herein shall be deemed to constitute the Secured Party as a member of the Company unless and until it acquires absolute title to such limited liability company membership interests upon foreclosure or replevin subsequent to an Event of Default.

        9.2     Pledgor acknowledges and agrees that any and all distributions ("***Distributions***"), including liquidating distributions, distributions of property, return of capital or other distributions made on or in respect of the Collateral, including without limitation the issuance of additional limited liability company interests, whether received in exchange for the Collateral or any part thereof or as a result of any acquisition, sale or other exchange of assets or on the liquidation, whether voluntary or involuntary, of any issuer of the Collateral, or otherwise (but not including cash distributions unless there shall have occurred a continuing Event of Default), shall be and become part of the Collateral pledged hereunder and, if received by Pledgor, shall forthwith be delivered to the Secured Party to be handled subject to the terms of this Agreement.  Tax Distributions permitted under the Formation Agreement shall not be included in this definition of Distributions.

       10.    Rights of Secured Party upon Default. Upon the occurrence of an Event of Default and during the continuance thereof, the Secured Party shall have all of the rights and remedies of a secured party under the UCC and, without limiting the generality of the foregoing, shall also have the rights set forth in this Agreement. In addition, the Secured Party hereby irrevocably authorizes and directs the Company to make all distributions and payments in respect of the Collateral directly to the Secured Party (but, with respect to cash distributions, only following the occurrence of an Event of Default and during the continuance thereof) and to deliver to the Secured Party copies of all notices given by the Company to its members as such.

       11.    Sale of Collateral.

        11.1    Upon at least thirty (30) days written notice to the Pledgor but without further demand, advertisement or notice of any kind except as may be required by law, all of which are hereby expressly waived, the Secured Party shall have the right to sell, assign and deliver the whole or any part of the Collateral, at any time or times, at a public or private sale, for cash, on credit, or for other property, for immediate or future delivery, and for such price and on such terms as are commercially reasonable.

        11.2    The proceeds of any sale of Collateral shall be applied (a) first, to the expenses incurred by the Secured Party in connection with any sale or disposition including, without limitation, the expenses or taking, holding, advertising and preparing the Collateral for sale or disposition, all court costs and reasonable attorneys' fees, (b) next, to principal of and interest on the Obligations, and (c) lastly, any surplus to the Pledgor or as a court of competent jurisdiction may direct.

        11.3    The rights and remedies provided in this Agreement are cumulative and in addition to any rights and remedies which the Secured Party may have under the Debenture, the Security Agreement, the Account Control Agreement and the Purchase Agreement, or at law or in equity.

       12.    Events of Default. The occurrence of any one or more of the following events shall be an "***Event of Default***" under this Agreement:

        12.1    The occurrence of any Event of Default as defined by the Purchase Agreement; or

12.2    The Pledgor fails to observe or perform any material covenant or agreement contained in this Agreement, which failure is not cured within ten (10) days after written notice of such default is sent by the Secured Party, provided that if the default is such that it can be corrected, but not within such 10 days, it will not constitute an Event of Default if Pledgor takes corrective action upon such notice and diligently pursues such cure until the default is corrected; or

12.3    There is any levy, seizure, or attachment of all or any material portion of the Collateral, other than as set forth in this Agreement; or

12.4    Any of the representations or warranties contained in Section 5 shall prove to have been incorrect in any material respect when made.

13.    No Liability. The Secured Party shall not have any liability to Pledgor or any other person by reason of taking or refraining from taking any action with respect to the Collateral, except in the case of the Secured Party's gross negligence, fraud, bad faith or willful misconduct.

14.    Notices. All notices or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (a) upon receipt, when delivered personally; (b) upon receipt, when sent by electronic mail or facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (c) one (1) business day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

        If to the Pledgor:

          iCap Pacific NW Management, LLC
          10900 NE 8th Street, Suite 1000
          Bellevue, WA 98004
          Facsimile:  425.214.4776
          Attention:  Chris Christensen
          Email:  chris@icapequity.com

        With a copy to (which shall not constitute notice):

          Perkins Coie LLP
          1201 Third Avenue, Suite 4900
          Seattle, WA 98101
          Facsimile:  206.359.9000
          Attention:  Martha Sandoval

        If to the Secured Party to:

          Experts Counsel, Inc., as Collateral Agent for the Holders
          3001 Executive Center Drive, Suite 335
          Clearwater, FL 33762

Or to such other address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (i) given by the recipient of such notice or other communication, (ii) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (iii) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 20, Page 350
1366

by facsimile or receipt from an overnight courier service in accordance with clause (a), (b) or (c) above, respectively.

15. <u>Waivers</u>. No failure or delay by the Secured Party in exercising any right, power, privilege or remedy hereunder or under the UCC or any other applicable law shall operate as a waiver hereof or thereof, and no single or partial exercise by the Secured Party of any right, power, privilege or remedy of the Secured Party hereunder or thereunder shall preclude any subsequent or further exercise by the Secured Party thereof or of any other right, power, privilege or remedy hereunder or thereunder.

16. <u>Amendment; Severability</u>. This Agreement may not be amended or modified, nor may any of the Collateral be released, except in a writing signed by the Parties hereto. If any provision of this Agreement is invalid or unenforceable, then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding on the Parties hereto. The invalidity of any other provision of this Agreement shall not affect the validity of any other provision.

17. <u>Assignment</u>. No Party shall have the right to assign its rights or delegate its obligations hereunder or any part thereof to any other person without the other Party's prior written consent.

18. <u>Entire Agreement</u>. This Agreement contains the entire agreement between the Parties relating to the subject matter hereof and supersedes all oral statements and prior writings with respect thereto.

19. <u>Governing Law; Choice of Forum; Waiver of Jury Trial</u>. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Washington, without regard to the principles of conflicts of law thereof. Each party agrees that any action, proceeding, counterclaim, crossclaim, or other dispute relating to, involving, or resulting from this Agreement or the transactions contemplated by this Agreement will be resolved exclusively in the state or federal courts located in King County, Washington, and each party hereby waives the right to object to any such forum on any grounds. **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO A JURY TRIAL IN CONNECTION WITH THIS AGREEMENT OR ANY DISPUTE OR CONTROVERSY HEREUNDER OR THE TRANSACTIONS THAT ARE THE SUBJECT HEREOF.**

IN WITNESS WHEREOF, this Pledge and Security Agreement is duly executed as of the date first written above.

.

**COMPANY:**

ICAP PACIFIC NW MANAGEMENT, LLC

By _____

Name:_____

Title: _____

**COLLATERAL AGENT:**

EXPERTS COUNSEL, INC.

By _____

Name:_____

Title: _____

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 2, Page 352
1366

**EXHIBIT B-4**

DEPOSIT ACCOUNT CONTROL AGREEMENT

[See attached]

# DEPOSIT ACCOUNT CONTROL AGREEMENT

This Deposit Account Control Agreement (this "**Agreement**") is dated as of _____ __, 201_, and entered into by and among iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company ("**Depositor**"), Experts Counsel, Inc. ("**Secured Party**"), and Umpqua Bank ("**Bank**").

## Recitals

A.  Pursuant to certain agreement(s) between Depositor and Secured Party, Depositor has granted to Secured Party a security interest and lien upon deposit account number _____, along with all credits or proceeds thereto and all monies, checks, and other instruments held or deposited therein, maintained by Depositor at Bank ("**Deposit Account**").

B.  In connection therewith, Depositor requests that Bank enter into a deposit account control agreement with regard to the Deposit Account. Bank is willing to do so upon the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

## Agreement

**1.**     **Deposit Agreements**. The terms and conditions of this Agreement are in addition to any deposit account agreements and other related agreements that Depositor has with Bank, including without limitation all agreements concerning banking products and services, treasury management documentation, account booklets containing the terms and conditions of the Deposit Account, signature cards, fee schedules, disclosures, specification sheets, and change of terms notices (collectively, "**Deposit Agreements**"). The provisions of this Agreement shall supersede the provisions of the Deposit Agreements only to the extent the provisions herein are inconsistent with the Deposit Agreements, and in all other respects, the Deposit Agreements shall remain in full force and effect.

**2.**     **Security Interest**. Depositor represents and warrants that it has the legal right to pledge the Deposit Account to Secured Party, that the funds in the Deposit Account are not held for the benefit of a third party, and that there are no perfected liens or encumbrances with respect to the Deposit Account. Except as set forth in Section 5 below, Depositor will not permit the Deposit Account to become subject to any other pledge, assignment, lien, charge, or encumbrance of any kind, other than the security interest of the Secured Party.

**3.**     **Control**. In order to provide Secured Party with control over the Deposit Account, Depositor agrees that Bank shall comply with all written instructions originated by Secured Party directing disposition of the funds in the Deposit Account without any further consent from Depositor, even if such instructions are contrary to any of Depositor's instructions or demands or result in Bank dishonoring items which may be presented for payment. Depositor agrees that written instructions from Secured Party may include instructions to transfer funds to or for the benefit of Secured Party or any other person or entity and instructions to close the Deposit Account.

**4.**     **Access to Deposit Account**. The Deposit Account shall be under the control of Secured Party; provided, that unless and until Bank receives Secured Party's written instructions given in accordance with Section 13 hereof, exercising exclusive control over the Deposit Account in substantially

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 24 Page 354
1366

the form of Exhibit A attached hereto ("**Notice of Exclusive Control**"), Bank shall comply with Depositor's instructions, notices, and directions (which need not be in writing unless required by the Deposit Agreements or applicable law) with respect to the Deposit Account and/or the transfer or withdrawal of funds from the Deposit Account, including, without limitation, paying or transferring the funds to Depositor or any other person or entity, in accordance with the terms and provisions of the Deposit Agreements and applicable law. Following Bank's receipt of a Notice of Exclusive Control and the passage of a reasonable period of time for Bank to act on the Notice of Exclusive Control, Bank will comply with Secured Party's <u>written</u> instructions with regard to the Deposit Account subject to the terms of this Agreement and applicable law. In all cases, Secured Party shall promptly contact Bank to confirm Bank's receipt of Secured Party's written instructions. In connection with Secured Party's written instructions, Bank shall not be required to provide extraordinary services or documentation regarding the Deposit Account unless Bank confirms that such extraordinary services or documentation are available. If there is any additional cost associated therewith, Secured Party agrees to pay such additional cost. A Notice of Exclusive Control may not be rescinded without Bank's prior written consent which may be withheld in Bank's sole and absolute discretion. Deductions for any amounts otherwise reimbursable to Bank as provided in Section 5 may be made before any funds are remitted to Secured Party pursuant to this Section 4.

5. **Subordination by Bank**. Depositor and Bank acknowledge and recognize Secured Party's continuing security interest in the Deposit Account and in all items deposited in the Deposit Account and in the proceeds thereof. Except for the amounts set forth in this Section 5 and except for any security interest under Article 4-210 of the Uniform Commercial Code, Bank hereby subordinates any statutory or contractual right or claim of offset or lien resulting from any transaction which involves the Deposit Account. Notwithstanding the preceding sentence, nothing herein constitutes a waiver of, and Bank expressly reserves all of its present and future rights with respect to: (a) fees and expenses related to the Deposit Account ("**Fees**"); (b) any checks, ACH entries, wire transfers, merchant card transactions, or other paper or electronic items which were deposited or credited to the Deposit Account that are returned, reversed, refunded, adjusted, or charged back for insufficient funds or for any other reason ("**Returned Items**"); and (c) obligations and liabilities connected with the Deposit Account that arise out of any treasury management services provided by Bank, its subsidiaries or affiliates, including but not limited to, ACH, merchant card, zero balance account, sweeps, controlled disbursement or payroll ("**Overdrafts**"). Bank may charge the Deposit Account to cover Fees, Returned Items, and Overdrafts. If there are insufficient funds in the Deposit Account to cover the Fees, Returned Items, and Overdrafts, Depositor agrees to immediately reimburse Bank for the amount of such shortfall. If Depositor fails to pay the amount demanded by Bank, Secured Party agrees to reimburse Bank within three (3) Business Days of demand thereof by Bank for any Fees, Returned Items, and Overdrafts to the extent funds from the Deposit Account were transferred pursuant to the written instructions of Secured Party. As used in this Agreement, "**Business Day**" means any day other than Saturday, Sunday, or any other day on which commercial banks in Washington are authorized or required by law to close.

6. **Exculpation of Bank**. Depositor and Secured Party agree that Bank shall incur no liability to either of them for any loss or damage that either or both may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement or any transaction or service contemplated by the provisions hereof unless it is finally adjudicated that such loss or damage was directly caused by Bank's gross negligence or willful misconduct. In no event, shall Bank be liable to Depositor or Secured Party for any of the following: (a) failing to follow any written instructions of Secured Party that (i) require the disposition of funds in the Deposit Account by a method not available to Depositor under the Deposit Agreements, (ii) in Bank's reasonable belief, would result in Bank failing to comply with a statute, rule, regulation, or guideline of any governmental body or an order or process binding upon Bank, (iii) require the disposition of funds that are not immediately available in the Deposit Account, (iv) direct the disposition of less than all funds in the Deposit Account or direct that the funds be sent to more than one recipient, or (v) do not set forth as reasonably required by Bank, the authority of the person giving Secured Party's written instructions to act for Secured Party; (b) complying with

B-4-3

Depositor's instructions or otherwise completing a transaction involving the Deposit Account, that Bank or an affiliate has started to process before Bank's receipt of a Secured Party's written instructions, including, without limitation, a Notice of Exclusive Control, and the passage of a reasonable period of time for Bank to act upon said instructions; (c) wrongful dishonor of any item as a result of Bank following any of Secured Party's written instructions; or (d) failing to comply or delaying in complying with any Secured Party's instructions or any provision of this Agreement due to a computer malfunction, legal constraint, emergency condition, fire, war, riot, theft, flood, earthquake, or other natural disaster, interruption of communication facilities, labor difficulties, or other cause beyond Bank's reasonable control. **IN NO EVENT WILL BANK BE LIABLE OR RESPONSIBLE FOR ANY INDIRECT DAMAGES, LOST PROFITS, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES WHICH ARISE OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES CONTEMPLATED BY THIS AGREEMENT EVEN IF BANK HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGES.** Bank makes no representation or warranty regarding, and shall not have any responsibility for, the creation, attachment, perfection, or priority of Secured Party's purported security interest in the Deposit Account or any present or future adverse liens, claims, or encumbrances against the Deposit Account, and Bank shall have no liability to Depositor or Secured Party under this Agreement for any claim, loss, cost, or expense resulting from, arising out of, or relating to such matters.

7. **Indemnity**. Depositor agrees to defend, indemnify, and hold Bank and its affiliates, directors, officers, employees, representatives, attorneys, successors, and assigns (collectively "**Depositary Bank**") harmless from and against any and all claims, causes of action, losses, liabilities, costs, damages and expenses, including, without limitation, reasonable legal and accounting fees and attorney fees (collectively, "**Claims**"), arising out of or in any way related to this Agreement except to the extent the Claims are ultimately adjudicated to be directly caused by Bank's gross negligence or willful misconduct. Without regard to Depositor's indemnification obligations to Bank, Secured Party agrees to defend, indemnify, and hold Depositary Bank harmless from and against any and all Claims arising out of or in any way related to Bank's compliance with any instruction given by Secured Party. Secured Party's obligations to Bank hereunder shall in no way operate to release Depositor from its obligations to Secured Party and shall not impair any rights or remedies of Secured Party to collect any such amounts from Depositor.

8. **Bank's Responsibility**. The duties of Bank are strictly limited to those set forth in this Agreement. Nothing within this Agreement shall create any agency, fiduciary, joint venture, or partnership relationship between Bank and Depositor or Secured Party. Bank will have no fiduciary duties under this Agreement to any party. Bank shall be protected in relying on any form of instruction, notice, or other communication purporting to be from an authorized representative of Secured Party. Bank shall have no duty to inquire as to the genuineness, validity, or enforceability of any such instruction, notice, or communication even if Depositor notifies Bank that Secured Party is not legally entitled to originate any such instruction, notice, or communication.

9. **Account Information**. If Secured Party so requests and at Secured Party's expense, to the extent that Bank has the operational ability to do so, Bank will provide to Secured Party, a copy of each period account statement relating to the Deposit Account ordinarily furnished by Bank to Depositor. Depositor authorizes Bank to provide to Secured Party, whether by Internet access or otherwise, such statements and any other information concerning the Deposit Account that Bank may agree to provide to Secured Party at Secured Party's request. Bank will have no liability for failing to provide any statement or other information related to the Deposit Account. Secured Party agrees to maintain strictly confidential and to not disclose to any other party any information obtained from the Bank.

10. **Termination**. This Agreement shall continue in full force and effect until terminated (a) by Bank upon not less than thirty (30) calendar days' written notice to each of the other parties, (b) by Secured Party upon written notice to Bank, or (c) by Depositor with the prior written consent of Secured

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 26 Page 356
1366

Party. Notwithstanding the foregoing, Bank may immediately and automatically close the Deposit Account and terminate the Agreement (a) in the event that Bank reasonably believes that any fraudulent activity has or is occurring with regard to the Deposit Account or (b) if Bank becomes obligated to close the Deposit Account or terminate this Agreement under any statute, rule, or regulation, or any other order or process binding upon Bank. In addition, Bank may terminate this Agreement upon five (5) calendar days' written notice to the other parties if any party is in material breach of the Deposit Agreement or this Agreement, including, without limitation, Depositor's or Secured Party's failure to reimburse Bank pursuant to Section 5 above. In the event of any termination, all fees incurred under this Agreement shall become immediately due and payable in full. This Agreement shall automatically terminate upon (a) Bank's receipt of written notice from Secured Party of the payment in full of all of Depositor's obligations due and owing to Secured Party or (b) the closure of the Deposit Account (provided, however, that Depositor hereby covenants to Secured Party that Depositor will not close the Deposit Account without the prior written consent of Secured Party). Bank shall not be liable for the closure of the Deposit Account by Depositor or the remittance of any funds therein, on the instructions of Depositor prior to Bank's receipt of a Notice of Exclusive Control pursuant to Section 4 that has not been rescinded pursuant to the terms hereof. Upon termination of this Agreement, and unless otherwise prohibited by order or law, Bank will remit any available funds in the Deposit Account on the date of termination to Secured Party only if a Notice of Exclusive Control is received by Bank prior to the date of termination of this Agreement and said Notice of Exclusive Control has not been rescinded pursuant to the terms hereof; otherwise, Bank may remit said funds to Depositor pursuant to the terms of the Deposit Agreement without any reference to this Agreement. Deductions for any amounts otherwise reimbursable to Bank as provided in this Agreement may be made before any funds are remitted. Termination of this Agreement shall not affect the rights or obligations of any party hereto with respect to the period prior to such termination. Specifically, the rights of Bank and the obligations of Depositor and Secured Party under Sections 5, 6, and 7 of this Agreement shall survive the termination of this Agreement.

**11.** **Legal Process and Insolvency**. In the event Bank receives any form of legal process concerning the Deposit Account, including, without limitation, court orders, levies, garnishments, attachments, and writs of execution, or in the event Bank learns of any insolvency proceeding concerning Depositor, including, without limitation, bankruptcy, receivership, and assignment for the benefit of creditors, Bank will respond to such legal process or knowledge of insolvency in the normal course or as required by law and shall not be in violation of this Agreement for so doing.

**12.** **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Washington. The parties agree that Washington is the "bank's jurisdiction" for purposes of the Uniform Commercial Code.

**13.** **Notices**. Except as otherwise provided in this Agreement, all communications given by any party to another as required under this Agreement must be in writing, directed to the party at its address(es) as set forth below (or at such other address as such party may hereafter specify in a written notice give to the other parties in accordance with this Section 13) and shall be delivered by hand, sent by nationally-recognized overnight, receipted delivery service, or sent by registered/certified United States mail. Any such communication shall be deemed delivered if delivered by: (a) hand, on the date and time that such communication shall have been delivered, in hand, with proof of receipt by signature, (b) nationally-recognized overnight, receipted delivery service, on the date and time that such communication shall have been delivered and receipted by such delivery service with proof of receipt by signature, or (c) registered or certified United States mail, on the date and time that such communication shall have been delivered and receipted by the United States Postal Service with proof of receipt by signature. Notwithstanding anything to the contrary in this Section 13, any communication hereunder to Bank (including, without limitation, a Notice of Exclusive Control) made by (or believed in good faith by Bank to be made by) Secured Party or Depositor and confirmed to have been delivered after 2:00 pm Pacific Time on a Business Day or delivered on a day that is not a Business Day, shall be deemed delivered to Bank at the opening of the next Business Day. In all circumstances, Bank shall have a

reasonable period of time to act on Secured Party's instructions, including, without limitation, a Notice of Exclusive Control.

Depositor:

Chris Christensen
10900 NE 8th Street, Suite 1000
Bellevue, WA 98004
Facsimile: 425.214.4776
Email: chris@icapequity.com

With a copy to (which shall not constitute notice):

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Facsimile: 206.359.9000
Attention: Martha Sandoval
Email: msandoval@perkinscoie.com

Secured Party:

Experts Counsel, Inc., as Collateral Agent for the Holders
3001 Executive Center Drive, Suite 335
Clearwater, FL 33762

With a copy to (which shall not constitute notice):

Foley & Lardner LLP
100 North Tampa Street, Suite 2700
Tampa, Florida 33602
Facsimile: 813-221-4210
Attention: Curt P. Creely
Email: ccreely@foley.com

Bank:

Umpqua Bank
Commercial Client Services
1650 Northpoint Parkway, Ste A
Santa Rosa, CA 95407
Attn: Lois Tapley
Telephone: (707) 568-1971

and

Umpqua Bank
Issaquah Branch
705 NW Gilman Blvd
Issaquah, WA 98027
Attn: Svetla Tzekov
Telephone:(425) 427-1715

**14.** **Successors and Transferees**. This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and other transferees permitted under this section. An assignment of a party's rights or duties under this Agreement without the prior written consent of the other parties will be void except Bank, without the consent of Secured Party or Depositor, may transfer its rights and duties to a transferee to which, by contract or operation of law, Bank transfers the Deposit Account.

B-4-6

15.     **Entire Agreement/Amendments**. This Agreement, the Deposit Agreements, and the instructions and notices required or permitted to be executed and delivered hereunder set forth the entire agreement of the parties with respect to the subject matter hereof. This Agreement may be amended only with the prior written consent of all parties hereto. None of the terms of this Agreement may be waived except as Bank may consent thereto in writing. No delay on the part of Bank in exercising any right, power, or privilege hereunder shall operate as a waiver hereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude other or further exercise thereof or the exercise of any right, power, or privilege. The rights and remedies specified herein are cumulative and are not exclusive of any rights or remedies which Bank would otherwise have.

16.     **Jury Trial Waiver**. **THE PARTIES AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, EACH KNOWINGLY, VOLUNTARILY, IRREVOCABLY, AND WITHOUT COERCION, WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY JUDICIAL PROCEEDING ARISING OUT OF, OR RELATING TO, THIS AGREEMENT OR SERVICES RENDERED IN CONNECTION WITH THIS AGREEMENT**.

17.     **Counterparts**. This Agreement may be executed by the parties hereto in counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one and the same Agreement. Signature pages may be detached from separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart thereof.

*[Remainder of page intentionally left blank; signatures follow on next page.]*

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 29 Page 359
1366

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**DEPOSITOR:**

ICAP NORTHWEST OPPORTUNITY FUND, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

**SECURED PARTY:**

EXPERTS COUNSEL, INC.

By:_____
Name: _____
Title: _____

**BANK:**

UMPQUA BANK
By: _____
Name: _____
Title: _____

**Exhibit A**

[Letterhead of Secured Party]

Notice of Exclusive Control

[Date]

Umpqua Bank [or successor or transferee of Umpqua Bank]

_____

_____

Attn:_____


Umpqua Bank [or successor or transferee of Umpqua Bank]

_____

_____

Attn:_____


Re:  Notice of Exclusive Control

Ladies and Gentlemen:

As referenced in the Deposit Account Control Agreement dated as of [_____, 20___] among [_____], us and you (the "**Agreement**"), we hereby give you notice of our exercise of exclusive control over deposit account number [_____] (the "**Account**"). You are instructed not to accept any directions from Depositor (as defined in the Agreement) with respect to the Account unless otherwise ordered by a court of competent jurisdiction.

As an included disposition instruction, we direct you to send available and collected funds in the Account to us by the method [and at the address] indicated below:

[Insert Method]

[Insert Address, if applicable]

Very truly yours,

_____

as Secured Party

By:  _____
Name: _____
Title: _____

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

**EXHIBIT B-5**

UCC FINANCING STATEMENTS

[See attached]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGEMENT TO: (Name and Address)

Kevin A. Carreno, P.A.
3001 Executive Center Drive, Suite 335
Clearwater, FL 33762

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **ICAP NORTHWEST OPPORTUNITY FUND, LLC** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 10900 NE 8th Street, Suite 1000 | Bellevue, | WA | 98004 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Experts Counsel Inc. | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3001 Executive Center Drive, Suite 335 | Clearwater | FL | 33762 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

ALL OF DEBTOR'S ASSETS, NOW OWNED AND HEREAFTER ACQUIRED

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions). ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
78404-0001

International Association of Commercial Administrators (IACA)

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

C. SEND ACKNOWLEDGEMENT TO: (Name and Address)

Kevin A. Carreno, P.A.
3001 Executive Center Drive, Suite 335
Clearwater, FL 33762

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
| --- | --- | --- | --- | --- | --- |
| **ICAP PACIFIC NW MANAGEMENT, LLC** | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 10900 NE 8th Street, Suite 1000 | Bellevue, | WA | 98004 | | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
| --- | --- | --- | --- | --- | --- |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
| --- | --- | --- | --- | --- | --- |
| Experts Counsel Inc. | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |
| 3001 Executive Center Drive, Suite 335 | Clearwater | FL | 33762 | | USA |

4. COLLATERAL: This financing statement covers the following collateral:

"Collateral" means all of Debtor's right, title and interest in and to (a) that certain Operating Agreement of ICAP NORTHWEST OPPORTUNITY FUND, LLC , a Washington limited liability company ("Company") and all of the membership interests or other equity interests of, and all other right, title and interest now owned or hereafter acquired by, Debtor in and to Company, including, without limitation, Debtor's share of the profits, losses and capital of Company, and all Debtor's rights to call, and attend meetings, vote, consent to and/or take any action respecting the Collateral, claims, powers, privileges, benefits, options or rights of any nature whatsoever which currently exist or may be issued or granted by Company to Debtor, and all instruments, whether heretofore or hereafter acquired, evidencing such rights and interests and (b) any and all distributions, including liquidating distributions, distributions of property, return of capital, or other distributions made on or in respect of the Collateral, including without limitation the issuance of additional limited liability company interests, whether received in exchange for the Collateral or any part thereof or as a result of any acquisition, sale or other exchange of assets or on the liquidation, whether voluntary or involuntary, of any issuer of the Collateral, or otherwise, subject to the terms, conditions and limitations of the Pledge and Security Agreement by and between Debtor and Secured Party.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions.) ☐ being administered by a Decedent's Personal Representative | |
| --- | --- |
| 6a. Check only if applicable and check only one box:<br>☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box:<br>☐ Agricultural Lien ☐ Non-UCC Filing |
| 7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor | |
| 8. OPTIONAL FILER REFERENCE DATA:<br>78404-0001 | |

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

**EXHIBIT B**

**SUBSCRIPTION DOCUMENTS**
**OF**
**ICAP NORTHWEST OPPORTUNITY FUND, LLC**

# ICAP NORTHWEST OPPORTUNITY FUND, LLC

## A REAL ESTATE FUND

BEST EFFORTS OFFERING OF UP TO $30,000,000 OF DEBENTURES

---

**iCap Northwest Opportunity Fund, LLC**

---

A Delaware Limited Liability Company

ACCREDITED INVESTORS ONLY

## SUBSCRIPTION DOCUMENTS

INSTRUCTIONS TO INVESTORS:

Please read carefully the Confidential Private Placement Memorandum of iCAP NORTHWEST OPPORTUNITY FUND, LLC (the "Fund"), dated April 20, 2015, and all exhibits thereto (collectively, the "Memorandum"), before deciding to subscribe. The offering described in the Memorandum (the "Offering") is limited to investors who meet all of the suitability standards and other requirements set forth in the Memorandum. (See the section of the Memorandum entitled "WHO MAY INVEST.")

EACH PROSPECTIVE INVESTOR SHOULD EXAMINE THE SUITABILITY OF AN INVESTMENT IN THE FUND IN THE CONTEXT OF HIS, HER OR ITS OWN NEEDS, INVESTMENT OBJECTIVES, AND FINANCIAL CAPABILITIES AND SHOULD MAKE HIS, HER OR ITS OWN INDEPENDENT INVESTIGATION AND DECISION AS TO THE SUITABILITY OF THE INVESTMENT. EACH PROSPECTIVE INVESTOR IS ALSO ENCOURAGED TO CONSULT WITH HIS, HER, OR ITS BUSINESS OR TAX ADVISOR REGARDING THE RISKS AND MERITS OF AN INVESTMENT IN THE FUND.

**YOU ARE ENCOURAGED TO MAKE YOUR SUBSCRIPTION PAYMENT BY WIRE TRANSFER PURSUANT TO THE WIRE TRANSFER INSTRUCTIONS INCLUDED WITH THESE SUBSCRIPTION DOCUMENTS. HOWEVER, YOU MAY ALSO FUND YOUR SUBSCRIPTION BY CHECK MADE PAYABLE TO "GULFSHORE BANK, N.A. AS ESCROW AGENT FOR iCAP"**

MAIL THE COMPLETED AND EXECUTED VERSION OF THESE SUBSCRIPTION DOCUMENTS (AND, IF PAYING BY CHECK, YOUR CHECK FOR THE SUBSCRIPTION PAYMENT) TO:

iCAP NORTHWEST OPPORTUNITY FUND, LLC
10900 NE 8th Street, Suite 1000
Bellevue, WA 98004

ATTN: iCAP PACIFIC NW MANAGEMENT, LLC,

**IMPORTANT NOTE**: FAILURE TO COMPLETE ALL APPLICABLE INFORMATION AND DELIVER ANY ADDITIONAL INFORMATION REQUESTED BY THE MANAGER WILL RESULT IN THESE DOCUMENTS BEING RETURNED FOR COMPLETION AND MAY CAUSE A REJECTION OR DELAY OF ACCEPTANCE OF THE SUBSCRIPTION. ORIGINAL SUBSCRIPTION DOCUMENTS ONLY. PLEASE NOTE THAT COPIES OF SUBSCRIPTION DOCUMENTS WILL NOT BE ACCEPTED.

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 29 Page 369
1366

| Table of Contents |
|---|

## iCAP NORTHWEST OPPORTUNITY FUND, LLC
### 10900 NE 8th Street, Suite 1000
### Bellevue, WA 98004

1.  **Investor Questionnaire**

2.  **Subscription Agreement**

3.  **Signature Page of Subscription Agreement and Debenture Agreement**

4.  **Registered Representative/RIA & Broker/Dealer Information**

5.  **Subscription Agreement Terms and Conditions-Registered Investment Advisors**

6.  **Distribution Instructions**

7.  **Wire Transfer Instructions**

8.  **W-9 (Taxpayer Identification Number)**

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 20 Page 370
1366

# INVESTOR QUESTIONNAIRE

The purpose of this Investor Questionnaire is to provide information to iCap NORTHWEST OPPORTUNITY FUND, LLC (the "Fund") regarding your qualifications to purchase debentures ("Debentures") being offered pursuant to the Confidential Private Placement Memorandum of the Fund, dated April 20, 2015 (together with all exhibits thereto, the "Memorandum"). Your answers will be kept confidential by the Fund. However, by completing and signing this Investor Questionnaire, the accompanying Subscription Agreement and the signature page to the Senior Secured Debenture Purchase Agreement, you agree that the Fund may present your Investor Questionnaire, Subscription Agreement and other subscription documents to those parties as it deems appropriate if called on to establish the Fund's entitlement to a private offering exemption under the Securities Act of 1933 (the "Securities Act"), or any applicable state securities law. If you have any questions concerning this Investor Questionnaire, please call the person from whom you received this Investor Questionnaire.

**Memorandum No.**_____          **The offer of Debentures to you was made in the State of:** _____

(Please fill in number from your Memorandum)

1.  **FORM OF OWNERSHIP (CHECK ALL APPLICABLE BOXES)**

    □ IRA                                       □ Individual

    □ Keogh                                    □ Husband and Wife

    □ Other Retirement or Profit Sharing Plan **(Please attach plan documents relating to this investment)**

    □ Joint Tenants                           □ Joint Tenants with Right of Survivorship

    □ Trust, Date Formed _____      □ Tenants in Common

    □ Partnership                             □ Corporation of LLC

    □ Other: **(Please specify):**_____

2.  **INVESTOR'S NAME AND ADDRESS**          Please Check:
                                                            □Mr. □Mrs. □Ms. □M.D. □Ph.D. □D.D.S.

|  |  |
|---|---|
| **Name** | |
| **SSN (or EIN)** | |
| **Home Address** | |

| **City** | | **State** | | **Zip Code** | |
|---|---|---|---|---|---|

| **Home Telephone No.** | | **Business Telephone No.** | |
|---|---|---|---|

| **E-mail Address (Required)** | |
|---|---|

| | Investor | Joint Owner | | | Investor | Joint Owner |
|---|---|---|---|---|---|---|
| **Birth Date** | | | Occupation | | | |

A.  Are you associated with a Financial Industry Regulatory Authority, Inc. ("FINRA") member firm?     _____ YES     _____ NO
    (if you answered "YES," additional information may be requested of you in order to process your subscription.)

3

B. Are you a plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA")? _____ YES _____ NO
   (if you answered "YES," additional information may be requested of you in order to process your subscription.)

C. Are you an entity that is tax-exempt for U.S. federal income tax purposes? _____ YES _____ NO
   (if you answered "YES," additional information may be requested of you in order to process your subscription.)

D. Are you subject to the U.S. Bank Holding Company Act of 1956 or directly or indirectly "controlled" (as that term _____ YES _____ NO
   is defined in such act) by an individual or entity that is subject to such act?
   (if you answered "YES," additional information may be requested of you in order to process your subscription.)

3. **IF INVESTING THROUGH AN IRA, KEOGH OR OTHER RETIREMENT OR PROFIT SHARING PLAN, PLEASE COMPLETE THE FOLLOWING (IN ADDITION TO THE INVESTOR INFORMATION ON THE PREVIOUS PAGE):**

| | |
|---|---|
| Account Name | |
| Custodian's EIN | |
| Custodian's Address | |

| City | | State | | Zip Code | |
|---|---|---|---|---|---|

4. **ACCREDITED INVESTOR CERTIFICATION.** To enable the Fund to evidence the basis, in part, of its reliance on the provisions of Regulation D promulgated under the Securities Act — specifically with respect to your status as an "accredited investor" as that term is defined in Regulation D — please complete the following

<u>FOR INDIVIDUAL INVESTORS:</u> I represent and warrant that I am reviewing the Memorandum and the related subscription documents for my own investment interest as a principal and that I am an "accredited investor" because, as indicated below, I satisfy one or more of the following standards.

A. I have an individual net worth, or joint net worth with my spouse, which exceeds $1,000,000. (For purposes of this Investor Questionnaire, "net worth" means, subject to the exception provided in the following sentence, the excess of total assets at fair market value over total liabilities. When determining net worth, however, the value of an investor's primary residence and any indebtedness secured thereby up to its fair market value shall be excluded from the investor's net worth, while indebtedness secured by the residence in excess of its fair market value should be considered a liability and deducted from the investor's net worth.)

   YES_____ NO_____

B. I had individual income (exclusive of any income attributable to my spouse) of more than $200,000 in each of the two most recent years and have a reasonable expectation to have individual income in excess of $200,000 in the current year. (For purposes of this Investor Questionnaire, "individual income" means the investor's adjusted gross income, as reported for federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse.)

   YES_____ NO_____

C. I had joint income with my spouse of more than $300,000 in each of the two most recent years and have a reasonable expectation to have joint income in excess of $300,000 in the current year.

   YES_____ NO_____

D. I am a director or executive officer of the Fund or its manager.

   YES_____ NO_____

4

<u>FOR ENTITY INVESTORS</u>. I am completing this Investor Questionnaire on behalf of an entity, and I represent and warrant that such entity is an "accredited investor" because, as indicated below, it satisfies one or more of the following standards.

E.    The entity is a trust, with total assets in excess of $5,000,000, that was not formed for the specific purpose of acquiring the Debentures and which has its investments directed by a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of purchasing the Debentures.

YES_____          NO_____

F.    The entity is a bank, as defined in Section 3(a)(2) of the Securities Act, or a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

YES_____          NO_____

G.    The entity is a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

YES_____          NO_____

H.    The entity is an insurance company, as defined in Section 2(a)(13) of the Securities Act.

YES_____          NO_____

I.    The entity is an investment company registered under the Investment Company Act of 1940 or a business development company, as defined in Section 2(a)(48) of that act.

YES_____          NO_____

J.    The entity is Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

YES_____          NO_____

K.    The entity is a plan established and maintained by a U.S. state, its political subdivisions, or any agency or instrumentality of such a state or its political subdivisions, for the benefit of its employees, which has total assets in excess of $5,000,000.

YES_____          NO_____

L.    The entity is an employee benefit plan within the meaning of ERISA and: (i) the investment decision with respect to the Debentures is being made by a plan fiduciary, as defined in Section 3(21) of ERISA, of the employee benefit plan that is either a bank, savings and loan association, insurance company or registered investment adviser; (ii) the employee benefit plan has total assets in excess of $5,000,000; or (iii) if the plan is a self-directed plan, the plan's investment decisions are made solely by persons that qualify as "accredited investors" (i.e., IRA, SEP-IRA, KEOGH, etc.).

YES_____          NO_____

M.    The entity is a private business development company, as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

YES_____          NO_____

N.    The entity is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, corporation, Massachusetts or similar business trust, limited liability company or partnership, with total assets in excess of $5,000,000 that was not formed for the specific purpose of acquiring the Debentures.

YES_____          NO_____

O.    All of the equity owners of the entity are "accredited investors" and the entity is not a trust.

YES_____          NO_____

5

5.    **SIGNATURE.**  I declare that the information supplied in this Investor Questionnaire is true and correct and may be relied on by the Fund in connection with my investment as a member in the Fund.

**INDIVIDUAL(S) AND (OR) JOINT OWNER(S):**

| | | |
|---|---|---|
| **Signature of Individual Investor** | **Signature of Joint Owner, if applicable** | **Date** |

**IRA, KEOGH OR QUALIFIED PENSION PLAN:**

| | | |
|---|---|---|
| **Signature of Participant** | **Signature of Custodian, if required** | **Date** |

**ENTITIES (i.e. CORPORATION, PARTNERSHIP, LLC OR TRUST):**

| |
|---|
| |

**Name of Entity**

| | | |
|---|---|---|
| **Print Name and Title of Entity Representative** | **Signature** | **Date** |

6

# SUBSCRIPTION AGREEMENT

I, the undersigned, hereby offer to purchase debentures ("Debentures") in iCap Northwest Opportunity Fund, LLC (the "Fund") in the amount set forth on the Signature Page of this Subscription Agreement and under the terms and conditions contained herein and in the Confidential Private Placement Memorandum of the Fund, dated April 20, 2015, and the exhibits attached thereto (the "Memorandum"), including, without limitation, the Senior Secured Debenture Purchase Agreement (the "Debenture Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Memorandum.

**THE UNDERSIGNED HEREBY MAKES THE FOLLOWING REPRESENTATIONS AND WARRANTIES WITH THE FULL UNDERSTANDING THAT THE FUND AND ITS MANAGER ARE RELYING ON SUCH REPRESENTATIONS AND WARRANTIES.**

1. I have received read and fully understand the Memorandum and all of its exhibits, including, without limitation, the Operating Agreement.

2. I am basing my decision to invest only on the information in the Memorandum and information requested of the Fund in writing by me, and I have not relied on any other representation made by any other person.

3. I am a citizen and/or a legal permanent resident of the United States of America, with my principal residence maintained at the address set forth in the Investor Questionnaire, and I am at least twenty-one years of age.

4. I am executing this Subscription Agreement: (A) on my own behalf, as a natural person, and I have the legal capacity to execute, deliver and perform my obligations under this Subscription Agreement or (B) on behalf of a corporation, partnership, limited liability company, trust or other entity, and (i) such entity is duly organized, validly existing and in good standing under the laws of the jurisdiction where it was formed and is authorized by its governing documents to execute, deliver and perform its obligations under this Subscription Agreement, (ii) I have the full power and authority to execute and deliver this Subscription Agreement on behalf such entity and (iii) this Subscription Agreement, and such entity's execution hereof and performance of its obligations hereunder, has been duly authorized by all requisite corporate or other action by the entity.

5. I am not, and, in the case of a corporation, partnership, limited liability company, trust or other entity, none of its principal owners, partners, members, directors or officers are, included on the Office of Foreign Assets Control list of foreign nations, organizations and individuals subject to economic and trade sanctions based on U.S. foreign policy and national security goals, Executive Order 13224, which sets forth a list of individuals and groups with whom U.S. persons are prohibited from doing business because such persons have been identified as terrorists or persons who support terrorism, or any other watch list issued by any governmental authority, including the Securities and Exchange Commission.

6. The offer and sale of the Debentures to me has not been accompanied by the publication of any public advertisement or by any general solicitation.

7. I understand that an investment in the Fund involves substantial risk, and I am fully aware of and understand all of the risk factors relating to the investment, including, but not limited to, the risks set forth in the "RISK FACTORS" section of the Memorandum.

8. My overall commitment to investments that are not readily marketable is not disproportionate to my individual net worth. My investment in the Fund will not cause my overall commitment to illiquid investments to become excessive. I have adequate means of providing for my financial requirements, both current and anticipated, and have no need for liquidity in this investment. I can bear and am willing to accept the economic risk of losing my entire investment in the Fund.

9. I am purchasing the Debentures for my own account and for investment purposes only, and not for the account of others. I have no present intention, contract, agreement, undertaking or arrangement to assign, resell or subdivide the Debentures.

10. I acknowledge that the Debentures are being offered and sold in reliance on specific exemptions from the registration requirements of applicable federal and state securities laws, and the Fund and the Manager are relying upon the truth and accuracy of my representations, warranties, statements, covenants and agreements set forth herein and in the accompanying Investor Questionnaire in order to determine my suitability to invest in the Fund.

11. All information that I have provided on the accompanying Investor Questionnaire and this Subscription Agreement is complete, accurate and correct as of its date and may be relied on by the Fund and the Manager in connection with my investment. I hereby agree to notify the Fund and the Manager immediately of any material change in any of that information occurring before the acceptance of this Subscription Agreement.

12. I have provided my correct Taxpayer Identification Number in the attached IRS FORM W-9, and I am not subject to back-up withholding as a result of a failure to report all interest or dividends (or the Internal Revenue Service has notified me that I am no longer subject to back-up withholding).

13. I have had the opportunity to ask questions of, and receive answers from, the Fund and the Manager, and their respective

7

principals, concerning the Fund, the Manager, the respective affiliates of each of the foregoing entities, the Debentures and the terms and conditions of the Offering, and to obtain any additional information deemed necessary to verify the accuracy of the information contained in the Memorandum, to the extent possessed by the Manager or obtainable by it without unreasonable effort or expense. I have been provided with all materials and information requested by either me or others representing me, including any information requested to verify any information furnished to me.

14.  I understand that, due to the restrictions described below, and the lack of any public market existing or likely to exist in the future for the Debentures, my investment in the Fund will be illiquid and that I will be required to bear the financial risks of the investment for an indefinite period of time.

15.  I understand that the sale, assignment, transfer or other disposition of the Debentures is restricted under applicable federal and state securities laws and the terms of the Debenture Agreement. I understand that the Fund has no obligation, and does not intend to register any of the Debentures for resale under any federal or state securities laws or to take any action under any such laws to make available an exemption from registration requirements. I further agree that I will not sell, assign, transfer or otherwise dispose of any Debentures I purchase, in whole or in part, unless such sale, assignment, transfer or other disposition is (A) registered under applicable federal and state securities laws, or if required by the Manager, I obtain an opinion of counsel satisfactory to the Manager that such Debentures may be sold in reliance upon an exemption from registration, and (B) otherwise permitted by and made in accordance with the terms of the Debenture Agreement. I also understand and acknowledge that, if the Debentures are certificated, one or more legends will be placed on all certificates evidencing the Debentures with respect to restrictions on any sale, assignment, transfer or other disposition of the Debentures imposed by applicable federal and state securities laws and the Debenture Agreement.

16.  I understand that no state or federal governmental authority has approved or disapproved of the Debentures, reviewed or passed on the accuracy or adequacy of the Memorandum or made any finding or determination relating to the fairness of an investment in the Fund and that no state or federal governmental authority has recommended or endorsed or will recommend or endorse the Debentures.

17.  If subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), I am aware of, and have taken into consideration, the diversification requirements of Section 404(a)(3) of ERISA in determining to invest in the Fund and have concluded that such investment is prudent and not a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA and Section 4975(c) of the Internal Revenue Code of 1986 (the "Code").

18.  If acting on behalf of a charitable remainder trust, I am aware that if any portion of the income derived from the trust's ownership of Debentures is deemed to be unrelated business taxable income ("UBTI"), Section 664(c) of the Code imposed on the trust an excise tax equal to the amount of such UBTI.

19.  I understand and agree that I may not assign this offer or, except as specifically permitted by law, revoke my subscription. I acknowledge that the Manager, in its sole and absolute discretion, has the unconditional right to accept or reject this subscription, in whole or in part.

20.  I understand that if the Offering is withdrawn or my subscription is otherwise not accepted, all funds I have deposited in the escrow account relating to my subscription will be refunded to me on the terms set forth in the Memorandum.

21.  I understand that, if I am acquiring the Debentures in a fiduciary capacity, the representations, warranties, statements, covenants and agreements set forth herein and in the accompanying Investor Questionnaire shall be deemed to have been made on behalf of the person or persons for whose benefit I am acquiring such Debentures. I have properly identified such person or persons in these subscription documents.

**The above representations are not a waiver of any rights that I may have under the acts administered by the Securities and Exchange Commission or by any state regulatory agency administering statutes bearing on the offer and sale of securities.**

Indemnification Obligations of the Undersigned

I hereby agree to indemnify, defend and hold harmless the Fund, the Manager and their respective members, officers, directors, affiliates and advisors from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees) (collectively "Losses") that they may incur by reason of my failure to fulfill all of the terms and conditions of this Subscription Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties, statements, covenants or agreements contained herein, in the accompanying Investor Questionnaire or in any other documents I have furnished to any of the foregoing in connection with my subscription for Debentures. This indemnification includes, but is not limited to, any Losses incurred by the Fund, the Manager, or any of their respective members, officers, directors, affiliates or advisors defending against any alleged violation of federal or state securities laws which is based upon, or related to, any untruth or inaccuracy of any of the representations, warranties, statements, covenants or agreements set forth herein, in the accompanying Investor Questionnaire or in any other documents I have furnished to any of the foregoing in connection with my subscription for Debentures. The foregoing indemnification obligations shall survive until completion of liquidation of the Fund.

Instructions to Investor
You are required to execute your own Subscription Agreement and the signature page to the Debenture Agreement. The Manager will not accept a Subscription Agreement or Debenture Agreement signature page that has been executed by someone other than you, unless such person is

8

acting in a fiduciary capacity on your behalf or otherwise has been given your legal power of attorney to sign on your behalf, and you satisfy all of the requirements for investing in the Fund set forth in the Memorandum, in this Subscription Agreement and in the accompanying Investor Questionnaire.

Your execution of this Subscription Agreement constitutes your binding offer to purchase the Debentures subscribed for. Once you subscribe to purchase Debentures, you may not withdraw your subscription, except as specifically permitted by applicable law. The Manager, in its sole and absolute discretion, may reject or accept your subscription, in whole or in part, and in each case without liability to you. If your subscription is rejected, then all of your funds will promptly be returned to you, without any interest thereon.

Upon the acceptance, if any, of your subscription, your subscription will be released from escrow and paid to the Fund.

NOTICE TO RESIDENTS OF ALL STATES. THE DEBENTURES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE DEBENTURES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE DEBENTURES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OF THE DEBENTURES OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTICE TO NEW YORK RESIDENTS: THE MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THE OFFERING OF THE DEBENTURES. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED THEREIN.

NOTICE TO FLORIDA RESIDENTS: THE DEBENTURES WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE DEBENTURES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE DEBENTURES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE FUND OR AN AGENT THEREOF, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

I ACKNOWLEDGE THAT ALL DOCUMENTS, RECORDS AND BOOKS PERTAINING TO AN INVESTMENT IN THE FUND HAVE BEEN MADE AVAILABLE FOR INSPECTION BY ME AND MY ATTORNEY, ACCOUNTANT AND/ OR OTHER ADVISORS.

## Signature Page of Subscription Agreement and Debenture Agreement

I, the undersigned, agree to purchase \$_____ of Debentures, under the terms and conditions of this Subscription Agreement and the Memorandum and the exhibits attached thereto, including, without limitation, the Debenture Agreement and the Debenture.

I acknowledge and agree that the Debentures I am acquiring will be governed by the terms of the Debenture Agreement and the exhibits thereto, which is attached to the Memorandum as Exhibit A and which I have and understand, I agree to be bound by all of the terms and conditions of the Debenture Agreement and the Debenture if my subscription is accepted, in whole or in part, by the Fund, and I authorize the Fund to treat this Signature Page of Subscription Agreement and Debenture Agreement as my signature page to the Debenture Agreement and the Debenture.

**Payment Instructions**

**You are encouraged to make your subscription payment by wire transfer pursuant to the wire transfer instructions included with these subscription documents. However, you may also fund your subscription by check. If paying by check, make your check payable to: "GulfShore Bank, N.A. as Escrow Agent for iCap"**

**Account Information**

**Please print below the exact legal title to be shown on the Fund's books and records:**

_____

_____

| **Individuals** | **Co-Subscriber/Trustee/Custodian or Plan Administrator** |
|---|---|
| _____ | _____ |
| Print Name (Individual) | Print Name (Joint Owner, Trustee, IRA Custodian, etc.) |
| _____ | _____ |
| Signature | Signature |
| _____ | _____ |
| Date | Date |

**Entities (i.e. Corporation, Partnership or LLC):**

| | |
|---|---|
| _____ | _____ |
| Name of Entity | Print Name & Title of Entity Representative |
| _____ | _____ |
| Signature | Date |

## To be Completed by the Fund

SUBSCRIPTION FOR \$_____ OF DEBENTURES IS HEREBY ACCEPTED BY:

iCAP NORTHWEST OPPORTUNITY FUND, LLC
10900 NE 8th Street, Suite 1000
Bellevue, WA 98004

By: _____     Date:_____

Chris Christensen, Manager

10

This Joinder in Collateral Agent Agreement (the "***Joinder Agreement***") dated as of _____, 2015, is by and between the undersigned ("**Holder**") and Experts Counsel Inc. as Agent hereunder ("**Agent**"). Terms not defined herein have the meanings given to them in the Collateral Agent Agreement (defined below).

<p align="center">**BACKGROUND**</p>

In order to effect the provisions of an underlying Debenture and Collateral Agent Agreement, the parties hereto have entered into this Joinder Agreement. **NOW, THEREFORE**, in consideration of the premises and agreements contained herein and for other good and valuable consideration, the parties hereby agree as follows:

<p align="center">**AGREEMENTS**</p>

1.       <u>Joinder</u>. By execution hereof, the Holder hereby joins in and becomes a Holder under that certain Collateral Agent Agreement dated as of _____, 2015 between Agent and the Holders therein (the "***Collateral Agent Agreement***"). The Holder has received and read a copy of the Collateral Agent Agreement and understands its provisions. Holder hereby adopts and agrees to be bound by all of the provisions of the Collateral Agent Agreement and all of the provisions of the Collateral Agent Agreement are hereby incorporated herein.

2.       <u>General Provisions.</u>

(a)       <u>Effect of Agreement.</u> This Joinder Agreement shall be binding upon the parties hereto and their respective successors and assigns.

(b)       <u>Severability.</u> Every provision hereof is intended to be severable, and if any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Joinder Agreement; <u>provided</u>, <u>however</u>, that all provisions hereof shall be enforced to the fullest extent permitted by law.

**IN WITNESS WHEREOF,** the parties hereto have caused this Joinder Agreement to be executed as of the date first above written.

**Holder:**

Signature*:_____

Entity Name (if applicable):

_____

By_____
Name: _____
Title: _____

*The person signing this Joinder Agreement has done so either in his/her individual capacity, if investing individually, or as an authorized representative of the entity constituting the Holder.

<p align="center">**(if Joint Holders)**</p>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

<p align="center">**Joint Holder (if necessary)**</p>

Signature:_____

By_____
Name: _____
Title: _____

## REGISTERED REPRESENTATIVE/RIA & BROKER/DEALER OR RIA
### (To be Completed by Registered Representative/RIA and/or Broker/Dealer)
### (For Commission and Other Purposes)

I hereby represent and certify that I have discharged my affirmative obligations under FINRA's Conduct Rules, and hereby further certify as follows: (A) a copy of the Confidential Private Placement Memorandum of ICap Northwest Opportunity Fund, LLC, dated April 20, 2015, has been delivered to the subscriber; (B) I have specifically obtained information from the subscriber concerning the subscriber's age, net worth, annual income, investment objectives, investment portfolio and other financial information; and (C) I have determined that an investment in the Fund is suitable for such subscriber. I have also informed the subscriber of all pertinent facts relating to the illiquidity and lack of a public market of an investment in the Fund. **The broker/dealer or authorized representative has personally seen and recorded a government issued identification document evidencing the residence or nationality of the subscriber and has a reasonable basis for verification of the subscriber's identity. The broker/dealer or authorized representative warrants that, in connection with the completion of the Subscription Agreement included as part of these subscription documents, the broker/dealer or authorized representative completed documentation to the effect that the subscriber(s) and registered owner(s) do not appear on the Office of Foreign Assets Control list of foreign nations, organizations and individuals subject to economic and trade sanctions.**

| | |
|---|---|
| Print Name of Registered Representative | Name of Broker/Dealer |
| Registered Representative's FINRA CRD No.:_____ | Print Name of Principal, Branch Manager, other |
| Signature of Registered Representative          Date | Signature of Principal, Branch Manager, other          Date |
| ☐ Registered Representative: please check this box to verify that you have personally seen and recorded a government issued identification document from the Subscriber. | ☐ Broker/Dealer: please check this box to verify that the Registered Representative is licensed with FINRA in the state of sale. |
| Registered Representative Office Address: | Broker/Dealer Address: |
| Phone No.:_____ Facsimile No.:_____ | Phone No.:_____ Facsimile No.:_____ |
| E-mail Address (Required for Correspondence) | E-mail Address (Required for Correspondence) |

**Registered Investment Advisor (RIA)**

Check the following box if the subscriber's investment in the Fund is made through an RIA: ☐
(If an owner or principal or any member of the RIA is a FINRA licensed registered representative affiliated with a broker/dealer, the transaction should be conducted through that broker/dealer, not through the RIA).

The undersigned registered investment advisor of the firm identified below hereby certifies that he or she has procured this subscription and that he or she is familiar with the subscriber making this investment in the Fund and has determined that such subscriber meets the requirements set forth under the caption "Securities Law Matters" in the Memorandum.

The undersigned registered investment advisor further certifies that:

(1)     he or she is registered with (please check one) ☐ the S.E.C. or ☐ the State of _____;

(2)     unless noted below, (a) he or she is not a member of FINRA and, based on the activities he or she performs, is not required to be a member of FINRA or to register as a broker or dealer under federal or state law, and (b) he or she is not affiliated with a member of FINRA.

        ☐ Advisor is a member of FINRA and his or her CRD# is as set forth above.

        ☐ Advisor is affiliated with the following FINRA member (include CRD#):_____; and

(3)     his or her signature below constitutes his/her agreement to be bound by all the provisions of the terms and conditions set forth on the following page.

Print Name of RIA:_____          RIA Signature:_____

RIA Office Address:_____

Phone No.:_____          Facsimile No.:_____          E-mail Address:_____

For Custodial Accounts: Please send a completed original Subscription Agreement directly to the custodian. The custodian should make check(s) payable to "GULFSHORE BANK, N.A. AS ESCROW AGENT FOR ICAP" or remit wired funds pursuant to the wire transfer instructions included as part of these subscription documents, and submit original Investor Questionnaires, Subscription Agreement(s) and check(s) to ICap Northwest Opportunity Fund, LLC, c/o iCap Northwest Management, LLC, 10900 NE 8th Street, Suite 1000, Bellevue, WA 98009

For purposes of the Subscription Agreement and the subscription of the person (the "**Subscriber**") subscribing hereunder (the "**Subscription**"), the advisor identified herein ("**Advisor**") represents and warrants to, and agrees with, the Fund and its Manager, as follows (capitalized terms used herein without definition have the meanings ascribed to such terms in the Subscription Agreement):

1.  Advisor acknowledges and agrees that no compensation will be paid in respect of the Subscription to the Advisor by the Fund or any person acting on its behalf.

2.  In its communications with Subscriber with respect to the Offering and in procuring the Subscription, the Advisor represents as follows:

    a.  The Advisor did not engage in any form of general solicitation or general advertising.

    b.  The Advisor has an investment advisory relationship with the Subscriber, which relationship was established before the commencement of the Offering.

    c.  The Subscriber resides in a jurisdiction that the Fund has identified as a jurisdiction in which the Debentures are qualified for sale or as to which such qualification is not required.

    d.  The Advisor has determined that an investment in the Fund is appropriate for the Subscriber's advisory account.

    e.  The Advisor has reasonable grounds to believe that the Subscriber is an "accredited investor" as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act, and that the Subscriber meets the financial qualification and suitability standards and other requirements established by the Fund for investing in the Offering.

    f.  The Advisor has submitted to the Fund any prescribed pre-qualification questionnaires completed by or for the Subscriber.

    g.  If the Advisor is not exercising investment discretion with respect to the Subscription, the Advisor advised the Subscriber that the Subscriber would be afforded the opportunity to ask questions of, and receive answers from the Fund and the Manager, and their respective principals, concerning the Fund, the Manager, the respective affiliates of each of the foregoing entities, the Debentures and the terms and conditions of the Offering, and to obtain any additional information deemed necessary to verify the accuracy of the information contained in the Memorandum to the extent possessed by the Manager or obtainable by it without unreasonable effort or expense.

    h.  Prior to submitting the Subscription, the Advisor made reasonable inquiry to determine (i) if the Subscriber is acquiring the Debentures for the Subscriber's own account or on behalf of other persons, (ii) that the Subscriber understands the limitations on the Subscriber's disposition of the Debentures under applicable federal and state securities laws and the Operating Agreement, and (iii) that the Subscriber understands that he, she or it must bear the economic risk of the investment for an indefinite period of time because of such limitations.

3.  The Advisor agrees to maintain, for at least six years, a record of the information obtained to determine that an investment in the Fund is a suitable and appropriate investment for the Subscriber and that such Subscriber meets the financial qualification and suitability standards and other requirements imposed on investors in the Offering, and to make such records available to the Fund during such period upon its reasonable request.

4.  The Advisor agrees to keep records indicating by number to whom each Memorandum and related materials was delivered and to make such information available to the Fund upon written request.

5.  The Advisor represents to the Fund that the Advisor or the company with which Advisor is employed (the "**Firm**") has established and implemented: (a) an anti-money laundering compliance program in accordance with applicable laws and regulations, including federal and state securities laws, the USA Patriot Act of 2001, Executive Order 13224 – Executive Order on Terrorist Financing Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, industry practices for the investment advisor industry, and applicable rules of FINRA to the extent applicable to the Advisor or the Firm, and (b) a program, in accordance with applicable laws and regulations, (i) for the verification of the identity of its new clients, (ii) for maintenance of client records, (iii) to check of the names of new clients against government watch lists, including the Office of Foreign Asset Control's list of Specially Designated Nationals and Blocked Persons, and (iv) for the provision of information to the Financial Crimes Enforcement Network upon request.

6.  With respect to any nonpublic personal information, as defined in the Gramm-Leach-Bliley Act of 1999 (the "**GLB Act**"), of Subscriber provided to the Advisor, the Advisor agrees to (a) abide by and comply with and to cause the Firm to abide by and comply with (i) the applicable privacy standards and requirements of the GLB Act and the applicable regulations promulgated thereunder, (ii) the privacy standards and requirements of any other applicable federal or state law, and (iii) the Firm's own internal privacy policies and procedures, each as may be amended from time to time; (b) refrain from the use or disclosure of nonpublic personal information (as defined under the GLB Act) of Subscriber if Subscriber has opted out of such disclosures, except as necessary to service the Subscriber or as otherwise necessary or required by applicable law; and (c) provide Subscriber both initial and annual privacy notices as required pursuant to Rule 6(a) of Regulation S-P, promulgated under the GLB Act.

13

| **WIRE TRANSFER INSTRUCTIONS** |
|---|

**RECEIVING FINANCIAL INSTITUTION:**      GULFSHORE BANK, N.A.

**RECEIVING FINANCIAL INSTITUTION ADDRESS:**      401 S. Florida Avenue, Suite 100
Tampa, Florida 33602

**ABA/ROUTING NUMBER:**      063116371

**ACCOUNT NUMBER:**      1015809

**ACCOUNT NAME:**      ICAP NORTHWEST OPPORTUNITY FUND, LLC

**SPECIAL INSTRUCTIONS:**      GulfShore Bank NA, as Escrow Agent for ICap

AFTER WIRING FUNDS, PLEASE NOTIFY BARBARA CURTS BY E-MAIL AS SET FORTH BELOW SO THAT SHE IS AWARE THE FUNDS ARE BEING SENT (She will not be confirming receipt).

PLEASE MAKE SURE TO HAVE THE ROUTING NUMBER AVAILABLE OR TO INCLUDE THE ROUTING NUMBER IN YOUR FACSIMILE OR E-MAIL.

**GulfShore Bank**
**401 S. Florida Avenue, Suite 100**
**Tampa, Florida 33602**
**Attention: Barbara Curts**
**Fax: (813) 418-3096**
**bcurts@gulfshorebank.com**

**EXHIBIT C**

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**ICAP NORTHWEST OPPORTUNITY FUND, LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**iCAP NORTHWEST OPPORTUNITY FUND, LLC**

**April 20, 2015**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; INTERPRETATION .................................................................1
    1.1     Definitions .........................................................................................................1
    1.2     Interpretation ....................................................................................................8

ARTICLE II GENERAL PROVISIONS ...........................................................................8
    2.1     Formation of Limited Liability Company ...............................................8
    2.2     Certificates ......................................................................................................8
    2.3     Name of Company ...........................................................................................8
    2.4     Principal Place of Business; Registered Agent for Process ...............8
    2.5     Term of Company .............................................................................................9
    2.6     Purposes ...........................................................................................................9
    2.7     Members' Names and Addresses ..................................................................9
    2.8     Title to Company Property ...........................................................................9
    2.9     Failure to Observe Formalities ....................................................................9
    2.10    No Liability of Members and Manager to Third Parties ......................9
    2.11    No Third Party Beneficiaries ......................................................................10

ARTICLE III ADMISSION OF MEMBERS; CAPITAL ACCOUNTS ...................................10
    3.1     Authorized Units ............................................................................................10
    3.2     Issuance of Units ...........................................................................................10
    3.3     Deficit Capital Accounts .............................................................................11
    3.4     Member Loans .................................................................................................11
    3.5     Debt Offering ..................................................................................................11

ARTICLE IV ALLOCATION OF NET INCOME AND NET LOSS .....................................11
    4.1     Allocation of Net Income and Net Loss ....................................................11
    4.2     Loss Limitation ..............................................................................................12
    4.3     Special Allocations .......................................................................................12
           4.3.1   Minimum Gain Chargeback .............................................................12
           4.3.2   Member Minimum Gain Chargeback ..............................................12
           4.3.3   Qualified Income Offset .................................................................13
           4.3.4   Nonrecourse Deductions .................................................................13
           4.3.5   Member Nonrecourse Deductions ..................................................13
    4.4     Curative Allocations .....................................................................................13
    4.5     Code Section 704(c) Allocations ...............................................................13
           4.5.1   Contributed Property .......................................................................13
           4.5.2   Reverse 704(c) Allocations ............................................................14
    4.6     Other Allocation Rules .................................................................................14
           4.6.1   Allocations for Tax Purposes ........................................................14

|  |  |  |  |
|---|---|---|---|
| 4.6.2 | Allocation of Excess Nonrecourse Liabilities | 14 |
| 4.6.3 | Allocations in Connection With Varying Interests | 14 |

ARTICLE V DISTRIBUTIONS ........................................................................................14

| 5.1 | Timing of Distributions of Net Cash Flow | 14 |
| 5.2 | Priority of Distributions | 15 |
| 5.3 | Tax Distributions | 15 |
| 5.4 | Distributions in Kind | 15 |
| 5.5 | Other Distribution Rules | 15 |
| 5.6 | Distributions Upon Liquidation | 16 |
| 5.7 | Limitation on Distributions | 16 |

ARTICLE VI MANAGEMENT ..........................................................................................16

| 6.1 | Manager | 16 |
| | 6.1.1 General Powers | 16 |
| | 6.1.2 Appointment of Manager | 16 |
| | 6.1.3 Related Party Transactions | 17 |
| 6.2 | Authority of Manager | 18 |
| | 6.2.1 Authority of Manager | 18 |
| | 6.2.2 Limitation on Authority of Manager | 19 |
| | 6.2.3 Limitations on Investments | 20 |
| | 6.2.4 Obligations of Manager | 20 |
| 6.3 | Tax Matters | 20 |
| 6.4 | Co-Investments | 20 |

ARTICLE VII APPOINTMENT OF OFFICERS ...............................................................21

| 7.1 | Authority to Delegate to Officers | 21 |
| 7.2 | Resignation or Removal | 21 |
| 7.3 | Salaries | 21 |
| 7.4 | Signing Authority | 21 |

ARTICLE VIII RIGHTS AND OBLIGATIONS OF MEMBERS .....................................22

| 8.1 | Limited Control | 22 |
| 8.2 | Call of Meetings | 22 |
| 8.3 | Notice of Meetings | 22 |
| 8.4 | Meetings by Communications Equipment | 22 |
| 8.5 | Manner of Acting | 22 |
| 8.6 | Action by Members Without a Meeting | 22 |
| 8.7 | Other Business of Members; Conflicts of Interest | 23 |

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 2 Page 388
1366

# TABLE OF CONTENTS
## (Continued)

Page

ARTICLE IX ASSIGNABILITY OF UNITS; WITHDRAWAL .............................................23

9.1    Restricted Right to Transfer .............................................................23
9.2    Effect of Transfer ...........................................................................24
9.3    No Other Transfer Effective ...........................................................24
9.4    Effectiveness of Transfer................................................................24
9.5    Assignees and Substitute Members .................................................24
9.6    Obligations of Substitute Member ..................................................25
9.7    No Withdrawal of Members ...........................................................25

ARTICLE X LIMITATION UPON LIABILITY; INDEMNIFICATION .................................25

10.1    Limitation on Liability ..................................................................25
10.2    Indemnification .............................................................................26
10.3    Advancement Of Expenses .............................................................26

ARTICLE XI DISSOLUTION AND TERMINATION .....................................................26

11.1    Events of Dissolution ....................................................................26
11.2    Effectiveness of Dissolution ..........................................................27
11.3    Distributions Upon Liquidation .....................................................27

ARTICLE XII BOOKS, RECORDS, BANK ACCOUNTS AND OTHER
MISCELLANEOUS ITEMS ....................................................................28

12.1    Financial Records ..........................................................................28
12.2    Accounting Basis and Accounting Year .........................................28
12.3    Reports .........................................................................................28
12.4    Bank Accounts ..............................................................................28
12.5    Tax Elections ................................................................................28

ARTICLE XIII MISCELLANEOUS .........................................................................29

13.1    Amendments .................................................................................29
13.2    Arbitration ....................................................................................29
13.3    Captions; Counterparts ...................................................................29
13.4    Governing Law ..............................................................................30
13.5    Notices .........................................................................................30
13.6    No Waiver ....................................................................................30
13.7    Confidentiality ..............................................................................30
13.8    Successors and Assigns ..................................................................31
13.9    Entire Agreement ..........................................................................31

SCHEDULE I

THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**iCAP NORTHWEST OPPORTUNITY FUND, LLC**

This Limited Liability Company Agreement of iCap Northwest Opportunity Fund, LLC (this "*Agreement*") is effective as of March 23, 2015, by and among iCap Pacific NW Management, LLC, a Washington limited liability company ("*iCap Management*"), and such other Persons that become Members of the Company from time to time, as hereinafter provided. This Agreement shall be effective as of the Effective Date set forth in Section 2.1.

## RECITALS

A.      iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company (the "*Company*"), was formed on March 23, 2015 pursuant to the filing of the Certificate of Formation of the Company (the "*Certificate*") with the Office of the Secretary of State of the State of Delaware.

B.      The parties hereto desire to enter into this Agreement to reflect the terms and provisions relating to their ownership and management of the Company.

NOW, THEREFORE, in consideration for the mutual promises provided herein, the parties agree as follows:

## ARTICLE I
## DEFINITIONS; INTERPRETATION

**1.1     Definitions**

As used in this Agreement, the following terms shall have the following meanings:

"*Act*" means the Delaware Limited Liability Company Act, as provided in Title 6, Chapter 18 of the Delaware Code § 101 *et. seq.*, as amended from time to time.

"*Adjusted Deficit*" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(a)      The Capital Account shall be increased by any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the next to the last sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)      The Capital Account shall be decreased by the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of "Adjusted Deficit" is intended to comply with the provisions of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"**_Affiliate_**" means, with respect to the second Person, any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with the second Person.

"**_Agreement_**" means this Limited Liability Company Agreement of iCap Northwest Opportunity Fund, LLC, as it may be amended from time to time.

"**_Bankruptcy_**" means, with respect to a Member or the Company, the occurrence of any of the following: (a) the filing of a voluntary petition for relief under the U.S. Bankruptcy Code or an admission by such Person of such Person's inability to pay its debts as they become due, (b) the making by such Person of a general assignment for the benefit of creditors, (c) in the case of the filing of an involuntary petition in bankruptcy against such Person, the filing of an answer admitting the material allegations thereof or consenting to the entry of an order for relief, or a default in answering the petition, or (d) the entry of an order for relief under the U.S. Bankruptcy Code against such Person, or the entry of an order, judgment or decree of any court adjudicating such Person as bankrupt or appointing a trustee or receiver for such Person's assets, unless such order, judgment or decree has been vacated, set aside or stayed within 60 days from the date thereof.

"**_Capital Account_**" means, with respect to any Member, the Capital Account established on the books of the Company for such Member and maintained in accordance with the following provisions:

(a) To each Member's Capital Account there shall be credited (i) the Capital Contributions of such Member, (ii) allocations to such Member of Company Net Income, (iii) allocations to such Member of any items in the nature of income or gain that are specially allocated to such Member pursuant to Section 4.3 and Section 4.4, and (iv) the amount of any Company liabilities assumed by such Member or that are secured by any Company property distributed to such Member.

(b) To each Member's Capital Account there shall be debited (i) the amount of cash and the Gross Asset Value of any property (other than cash) distributed to such Member by the Company, (ii) allocations to such Member of Company Net Loss, (iii) allocations to such Member of any items of deductions or losses that are specially allocated to such Member pursuant to Section 4.3 and Section 4.4, and (iv) the amount of any liabilities of such Member assumed by the Company or that are secured by property contributed to the Company by such Member.

(c) If the Gross Asset Values of Company property have been adjusted, Capital Accounts shall be maintained in a manner consistent with Treasury Regulations Section 1.704-1(b)(2)(iv)(g) as necessary to reflect any items of Net Income or Net Loss that are computed based on the Gross Asset Value of the Company property.

If a Unit in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred Unit. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 22 Page 392
1366

Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

"*Capital Contribution*" means, with respect to any Member, the total amount of money and the initial Gross Asset Value of property other than money, if any, contributed to the Company by such Member.

"*Certificate*" means the Certificate of Formation of the Company filed in the Office of the Secretary of State of the State of Delaware, as amended from time to time.

"*Class A Member*" means a Person who owns Class A Units of the Company and who has been admitted to the Company as a Member.

"*Class A Percentage Interest*" means, with respect to a Member as of a given date, that percentage obtained by dividing the total number of Class A Units owned by such Member by the total number of Company Class A Units issued and outstanding.

"*Class A Units*" means the class of Units of the Company designated as Class A Units pursuant to Section 3.1.

"*Class B Member*" means a Person who owns Class B Units of the Company and who has been admitted to the Company as a Member.

"*Class B Percentage Interest*" means, with respect to a Member as of a given date, that percentage obtained by multiplying 23% by the ratio of the total number of Class B Units owned by such Class B Member as the numerator and the total number of Class B Units issued and outstanding as the denominator.

"*Class B Units*" means the class of Units of the Company designated as Class B Units pursuant to Section 3.1.

"*Co-Investment*" of the Company means any Investment held jointly by the Company with one or more third parties, which may include the Manager or Affiliates thereof, as and to the extent authorized by Section 6.4.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"*Company*" means iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company.

"*Company Minimum Gain*" means the same as "partnership minimum gain" as set forth in Treasury Regulations Sections 1.704−2(b)(2) and 1.704−2(d).

"*Debenture*" means that certain Debenture in the form attached as Exhibit A to the Debenture Purchase Agreement.

"**Debenture Purchase Agreement**" means that certain Senior Secured Debenture Purchase Agreement dated as of April 20, 2015 and entered into pursuant to the Offering.

"**Developer**" means the developer, builder, property owner or similar such Person of the real estate underlying a particular Investment.

"**Effective Date**" means the date set forth in the opening sentence of this Agreement.

"**Estimated Tax Amount**" means, with respect to each Member, the amount equal to (a) the sum of (i) the greater of the highest statutory marginal ordinary federal income tax rate for individuals or corporations for a given tax year plus (ii) the unearned income Medicare contribution tax rate under Code Section 1411 for a given year, multiplied by (b) the taxable income allocated to such Member for such taxable year pursuant to Article IV.

"**Gross Asset Value**" means, with respect to any Company asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Manager;

(b)     In order to preserve the economic interest of each Member in the Company, the Manager may (but shall not be required to) adjust the Gross Asset Values of all Company assets to equal their respective gross fair market values, as determined by the Manager immediately prior to the following times: (i) the acquisition of additional Units in the Company by any new or existing Member; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for all or a portion of the Member's Units in the Company; (iii) the withdrawal of a Member; and (iv) the liquidation of the Company;

(c)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this item (c) to the extent an adjustment is made at that time pursuant to item (a) or (b) of this definition; and

(d)     The Gross Asset Value of any Company asset distributed in kind to any Member pursuant to Section 5.4 shall be adjusted to equal its gross fair market value, as determined by the Manager on the date of distribution.

"**Investment**" means an investment by the Company, whether held directly or indirectly, or wholly-owned or co-owned with others, in one or more of the following assets: (a) unimproved property and improved property, including residential lots, duplexes, single-family homes, multi-family projects and commercial properties; (b) debt obligations issued by entities owning real estate, which are collateralized by mortgages, deeds of trusts or other security interests in such real estate and/or equity interests in such entities; and (c) equity

interests, including but not limited to general partnership interests, limited partnership interests, and limited liability company interests, in entities holding title, directly or indirectly, in real estate assets falling within the categories identified in paragraph (a) above.

"***Majority Vote of the Class A Members***" means the consent of one or more Class A Members having among them more than 50% of the then total outstanding Class A Units held by all Class A Members.

"***Majority Vote of the Class B Members***" means the consent of one or more Class B Members having among them more than 50% of the then total outstanding Class B Units held by all Class B Members.

"***Manager***" means the Person designated or appointed to manage and operate the day-to-day affairs of the Company pursuant to Article VI.

"***Member Nonrecourse Debt***" has the meaning of "partner nonrecourse debt" as set forth in Treasury Regulations Section 1.704−2(b)(4).

"***Member Nonrecourse Debt Minimum Gain***" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability determined in accordance with Treasury Regulations Section 1.704−2(i)(3).

"***Member Nonrecourse Deductions***" has the meaning of "partner nonrecourse deductions" as set forth in Treasury Regulations Section 1.704−2(i)(2).

"***Members***" means the Persons set forth on **Schedule I** hereto as of the Effective Date and any other Person that becomes a Member of the Company in accordance with this Agreement, in each case in such Person's capacity as a Member of the Company and for so long as such Person remains a Member of the Company.

"***Net Cash Flow***" means, for each fiscal year or other period:

      (a)     the sum of:

           (i)     the gross cash proceeds received by the Company during such year or period; plus

           (ii)     all amounts that the Manager releases during such year or period from any existing Reserves;

      (b)     reduced (but not to less than zero) by the sum of:

           (i)     all cash payments made by the Company during such year or period to cover its liabilities, obligations, capital expenditures and expenses; plus

           (ii)     all cash that the Manager elects to set aside as additional Reserves.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 25 Page 395
1366

"*Net Income*" and "*Net Loss*" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any income of the Company that is exempt from federal income tax shall be added to such taxable income or loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(I) shall be subtracted from such taxable income or loss;

(c)    If the Gross Asset Value of any Company asset is adjusted pursuant to paragraphs (b)-(d) of the definition of "Gross Asset Value", the amount of such adjustment shall be treated as gain or loss arising from the disposition of such asset for purposes of computing Net Income or Net Loss and adjusting the balance of each Member's Capital Account;

(d)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the asset differs from its Gross Asset Value; and

(e)    Notwithstanding any other provision herein, any items of income, gain, loss or deduction specially allocated pursuant to Sections 4.3 and 4.4 shall not be taken into account in computing Net Income or Net Loss.

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704−2(b)(3).

"*Offering*" has the meaning set forth in Section 3.5.

"*Offering Period*" means the earlier of (a) the date on which the Company obtains commitments of $30,000,000, subject to an over allotment of up to $50,000,000 in the Manager's discretion, pursuant to the Offering, (b) such time, if any, as the Company, in its sole discretion, elects to withdraw or terminate the Offering; or (c) September 30, 2015 unless extended for an additional 90 days by the Manager in its sole discretion.

"*Officers*" has the meaning set forth in Section 7.1.

"*Partially Adjusted Capital Account*" means, with respect to any Member and any Company fiscal year, the Capital Account of such Member at the beginning of such fiscal year, adjusted for all contributions and distributions during such year and all special allocations pursuant to Sections 4.3 and 4.4 with respect to such fiscal year before giving effect to any allocations of Net Income or Net Losses for such fiscal year pursuant to Section 4.1.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 26 Page 396
1366

"**Person**" means any natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee, or any other individual or entity in its own or any representative capacity.

"**Related Party**" means the Manager or any of its Affiliates (excluding the Company). The following Persons shall be deemed to be Related Parties in addition to any Persons who fall under the definition set forth in the preceding sentence: Manager, Chris Christensen, Jim Christensen, Bryan Brown, and any family member or blood relative of the foregoing individuals.

"**Related Party Transaction**" means any contract or transaction between the Company or any of its subsidiaries, on the one hand, and the Manager or any of its Affiliates, on the other hand.

"**Reserves**" means the funds set aside and held by the Company in amounts reasonably determined by the Manger to cover the payment of future expenses, capital expenditures, retirement of indebtedness, operations and contingencies of the Company, whether known or unknown, including, without limitation, liabilities that may be incurred in litigation and liabilities undertaken pursuant to the indemnification provisions of this Agreement.

"**StillPoint**" means StillPoint, LLC.

"**Substitute Member**" means a Person admitted pursuant to Section 9.5 as the successor to all the rights of a Member with respect to all or any part of such Member's interest in the Company.

"**Target Capital Accounts**" means, with respect to any Member and any Company fiscal year, an amount equal to the hypothetical distribution such Member would receive computed immediately prior to the hypothetical sale described in the succeeding sentence. The hypothetical distribution a Member would receive is equal to the amount that would be received by such Member if all Company assets were sold for cash equal to their Gross Asset Value, all Company liabilities were satisfied to the extent required by their terms, and the net assets of the Company were distributed in full to the Members pursuant to Section 5.2 as of the last day of such fiscal year.

"**Transfer**" means, with respect to any Unit, (a) when used as a verb, to sell, assign, dispose of, exchange, pledge, encumber, hypothecate or otherwise transfer such Unit or any participation or interest therein (whether by merger, operation of law or otherwise), or agree or commit to do any of the foregoing and (b) when used as a noun, a direct (whether by merger, operation of law or otherwise) sale, assignment, disposition, exchange, pledge, encumbrance, hypothecation, or other transfer of such Unit or any participation or interest therein or any agreement or commitment to do any of the foregoing.

"**Treasury Regulations**" means the regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"*Unit*" means any unit of interest, of any class or series, of equity securities having such rights, preferences and obligations as provided herein that may be issued by the Company pursuant to Article III herein.

**1.2     Interpretation**

Except as otherwise specified, references to Sections, Articles, or Schedules or Exhibits shall mean the respective Sections or Articles of, or Schedules or Exhibits to, this Agreement.

<div align="center">

**ARTICLE II**
**GENERAL PROVISIONS**

</div>

**2.1     Formation of Limited Liability Company**

The Company has been formed as a limited liability company under the laws of the State of Delaware, and the rights and liabilities of the Members shall be as provided in the Act, except as otherwise expressly provided herein. Irrespective of the date on which this Agreement is executed, this Agreement shall be deemed effective as of March 23, 2015, the date the Company was formed pursuant to the provisions of the Act (the "*Effective Date*").

**2.2     Certificates**

The Manager has filed or caused to be filed the Certificate and all such other certificates, notices, statements or other instruments required by law for the formation and continued operation of the Company as a limited liability company.

**2.3     Name of Company**

The name of the Company is iCap Northwest Opportunity Fund, LLC. The Manager shall be permitted, from time to time, to change the name of the Company and file appropriate amendments to the Certificate or operate under certain assumed names at its sole discretion.

**2.4     Principal Place of Business; Registered Agent for Process**

(a)     The principal office of the Company shall be at 10900 NE 8th Street, Suite 1000, Bellevue, Washington 98004, or at such place as the Manager may designate from time to time.

(b)     The registered office of the Company in the State of Delaware shall be at 1675 S. State St., Suite B, Dover, Delaware 19901 or such place as the Manager may designate from time to time. The registered agent of the Company in the State of Delaware to accept service of process shall be Capitol Services, Inc. or such Person as the Manager may designate from time to time.

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 28 Page 398
1366

**2.5** **Term of Company**

The term of the Company commenced on the date the Certificate was filed in the Office of the Secretary of State of the State of Delaware in accordance with the Act and shall thereafter be perpetual, unless terminated prior thereto pursuant to Section 11.1.

**2.6** **Purposes**

The purposes of the Company shall be to (a) source, acquire, finance, manage and supervise a portfolio of Investments; (b) engage in all activities incidental or ancillary thereto; and (c) carry on any other lawful activity that may be conducted by a limited liability company organized under the Act. The Manager shall cause the Company to be qualified or registered under applicable laws of any jurisdiction in which the Company transacts business and shall be authorized to execute, deliver and file any certificates and documents necessary to effect such qualification or registration, including without limitation the appointment of agents for service of process in such jurisdictions.

**2.7** **Members' Names and Addresses**

The names and addresses of the Members are set forth on **Schedule I** to this Agreement. The Manager is hereby authorized and directed, without further approval of the Members, to amend **Schedule I**, from time to time, to reflect the admission, withdrawal, and substitution of Members or changes in their names and addresses, and to take whatever action the Manager deems appropriate or necessary to update the Company's books and records to reflect such changes in the identity, names and addresses of the Members. If, after admission to the Company as a Member, a Member changes its name or address, or transfers part or all of its Units, subject to the restrictions on Transfer contained in this Agreement, the Member shall promptly notify the Manager of such change to permit the updating of **Schedule I** and the Company's books and records.

**2.8** **Title to Company Property**

All property owned by the Company shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership interest in any such property.

**2.9** **Failure to Observe Formalities**

A failure to observe any formalities or requirements of this Agreement, the Certificate or the Act shall not be grounds for imposing personal liability on the Members or the Manager for liabilities of the Company.

**2.10** **No Liability of Members and Manager to Third Parties**

Except as otherwise provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager of the Company shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or acting as a Manager of the Company.

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 29 Page 399
1366

**2.11    No Third Party Beneficiaries**

This Agreement is entered into among the Members for the sole and exclusive benefit of the Members and their duly recognized successors and assigns. Nothing expressed or mentioned in or to be implied from this Agreement is intended or shall be construed to give to any Person other than the parties hereto any legal or equitable right, remedy or claim under or in respect to this Agreement, and no third party shall have the right to bring an action to enforce any of the provisions of this Agreement, including, but not limited to, the Members' obligations, if any, to make Capital Contributions to the Company.

**ARTICLE III**
**ADMISSION OF MEMBERS; CAPITAL ACCOUNTS**

**3.1    Authorized Units**

The Company shall initially be authorized to issue 51,000,000 Units. Of such initial Units, 1,000,000 shall be designated as Class A Units and 50,000,000 shall be designated as Class B Units. The number of authorized Units may be increased by the Manager in its sole discretion, subject to the limitations in Section 3.2 and Article VI. The rights and privileges of each class of Units shall be as set forth in this Agreement.

**3.2    Issuance of Units**

(a)    As of the Effective Date, Units have been issued to the Members in such proportion as set forth on **Schedule I** hereto. No Capital Contributions were required to be made in exchange for the issuance of such Units and no Member shall be required to make any Capital Contributions to the Company.

(b)    After the Effective Date and pursuant to each closing of the Offering, the Class B Units shall be issued as specified and authorized by StillPoint. StillPoint's authorization of Class B Units shall be made by separate written designation, providing the legal name, address and tax identification number of the Class B Member to be admitted, and the number of Class B Units to be issued to such Member.

(c)    Subsequent to the Effective Date, but subject to the limitations set forth in Article VI, the Manager may cause the Company to issue additional Class B Units at such times and on such terms and conditions as may be determined by the Manager, in consultation with StillPoint. Following any such issuance of additional Class B Units, the Manager shall unilaterally update **Schedule I** accordingly.

(d)    No Member shall be paid interest on any Capital Contribution. No Member shall have the right to withdraw, or receive any return of, its Capital Contribution (if any), except as may be specifically provided herein. No Member shall have priority over any other Member, either as to the return of its Capital Contribution (if any) or as to Net Income, Net Loss or distributions, except as otherwise specifically provided herein. No Manager or Member shall have any personal liability for the repayment of the Capital Contributions of any Member.

(e)    No Unit in the Company shall be represented by a separate certificate.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 20 Page 400
1366

(f)     The parties hereto intend that the issuance of Class A Units and Class B Units shall constitute the nontaxable issuance of a profits interest in the Company in accordance with IRS Revenue Procedures 93-27 and 2001-43. Notwithstanding any provision of this Agreement to the contrary, any Member issued Class A or Class B Units shall have an initial Capital Account of zero with respect to such Units and shall not be required to make, or be considered to have made, any initial Capital Contribution to the Company with respect to such Units consistent therewith.

(g)     Except as otherwise expressly set forth in this Agreement, the Class B Units shall be non-voting.

## 3.3     Deficit Capital Accounts

Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that a deficit, if any, in the Capital Account of any Member results upon dissolution of the Company, such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## 3.4     Member Loans

The Company may obtain loans from one or more Members or Affiliates thereof, but such loans must be approved in advance in writing by the Manager and be on arm's length terms.

## 3.5     Debt Offering

In order to finance the Company's acquisition of Investments, the Company intends to raise capital through an offering of senior secured debentures (the "*Offering*"). The Offering will be conducted on a "best efforts" basis with no minimum Offering amount, while the maximum size of the Offering is $30 million (which may be increased to $50 million at the discretion of the Manager). The precise terms of the Offering shall be determined by the Manager. The funds raised through the Offering shall not constitute equity, but shall be subject to the management fee set forth in Section 6.1.3(a).

## ARTICLE IV
## ALLOCATION OF NET INCOME AND NET LOSS

## 4.1     Allocation of Net Income and Net Loss

After giving effect to the limitation contained in Section 4.2 and the special allocations contained in Section 4.3 and Section 4.4, Net Income and Net Loss for any fiscal year or other period shall be allocated among the Members so as to reduce, proportionately, the differences between their respective Target Capital Accounts and their respective Partially Adjusted Capital Accounts for such fiscal year or other period.

**4.2     Loss Limitation**

Notwithstanding the allocation of Net Loss pursuant to Section 4.1, the amount of Net Loss allocated to any Member shall not exceed the maximum amount of Net Loss that can be so allocated without causing any Member to have an Adjusted Deficit at the end of any fiscal year. If some but not all of the Members would have Adjusted Deficits as a consequence of an allocation of Net Loss pursuant to Section 4.1, the limitation set forth in this Section 4.2 shall be applied on a Member-by-Member basis so as to allocate the maximum permissible Net Loss to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). To the extent Net Loss is subject to the limitation contained in this Section 4.2 and reallocated to other Members, items of income or gain shall be allocated to such other Members to the extent and in reverse order of the Net Loss so reallocated for the purpose of offsetting the effect of this Section 4.2.

**4.3     Special Allocations**

**4.3.1     Minimum Gain Chargeback**

Except as otherwise provided in Treasury Regulations Section 1.704-2(f), notwithstanding any other provision of this Article IV, if there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Person's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 4.3.1 is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

**4.3.2     Member Minimum Gain Chargeback**

Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Article IV, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Person who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Person's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 4.3.2 is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 2 Page 402
1366

### 4.3.3 Qualified Income Offset

If any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Deficit of such Member as quickly as possible, *provided* that an allocation pursuant to this Section 4.3.2 shall be made only if and to the extent that such Member would have an Adjusted Deficit after all other allocations provided for in this Article IV have been tentatively made as if this Section 4.3.3 were not in this Agreement.

### 4.3.4 Nonrecourse Deductions

"Nonrecourse deductions," as defined in and determined under Treasury Regulations Sections 1.704-2(b)(1) and (c), shall be allocated among the Members in proportion to their respective Class A Percentage Interest or Class B Percentage Interest, as applicable.

### 4.3.5 Member Nonrecourse Deductions

Member Nonrecourse Deductions for any taxable year of the Company shall be allocated to the Member that made, or guaranteed or is otherwise liable with respect to the loan to which such Member Nonrecourse Deductions are attributable in accordance with principles under Treasury Regulations Section 1.704−2(i).

## 4.4 Curative Allocations

The allocations set forth in Sections 4.2 and 4.3 are intended to comply with certain regulatory requirements under Code Section 704(b). The Members intend that, to the extent possible, all allocations made pursuant to such Sections will, over the term of the Company, be offset either with other allocations pursuant to Section 4.2 or 4.3 or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 4.4. Accordingly, the Manager is hereby authorized and directed to make offsetting allocations of Company income, gain, loss or deduction under this Section 4.4 in whatever manner the Manager determines is appropriate so that, after such offsetting special allocations are made (and taking into account the reasonably anticipated future allocations of income and gain pursuant to Section 4.3.1 and Section 4.3.2 that are likely to offset allocations previously made under Section 4.3.4 and Section 4.3.5), the Capital Accounts of the Members are, to the extent possible, equal to the Capital Accounts each would have if the provisions of Sections 4.2 and 4.3 were not contained in this Agreement and all Company income, gain, loss and deduction were instead allocated in accordance with the provisions of Section 4.1.

## 4.5 Code Section 704(c) Allocations

### 4.5.1 Contributed Property

In accordance with Code Section 704(c) and the Regulations promulgated under such section, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 23 Page 403
1366

account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value using such method under the Treasury Regulations as may be determined by the Manager.

### 4.5.2 Reverse 704(c) Allocations

If the Gross Asset Value of any Company asset is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss and deduction with respect to such asset shall consistently take into account any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value using such method under the Treasury Regulations as may be determined by the Manager.

## 4.6 Other Allocation Rules

### 4.6.1 Allocations for Tax Purposes

Except as provided in Section 4.5, items of Company income, gain, loss or deduction recognized for federal income tax purposes shall be allocated in the same manner that the corresponding items comprising Net Income and Net Loss are allocated pursuant to this Agreement. The allocation of such items under this Section 4.6.1 shall not affect the Capital Account of any Member.

### 4.6.2 Allocation of Excess Nonrecourse Liabilities

Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' interest in the Company's profits shall be in accordance with their respective Class A Percentage Interest or Class B Percentage Interest, as applicable.

### 4.6.3 Allocations in Connection With Varying Interests

If during a Company fiscal year there is (a) a permitted Transfer of a Member's Units or (b) the admission of a Member, then Net Income, Net Loss, each item thereof and all other tax items of the Company for such fiscal year shall be divided and allocated among the Members by taking into account their varying interests during such fiscal year in accordance with Code Section 706(d) and using any conventions permitted by law and selected by the Manager. Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.6.3, whether or not any Member or the Company has knowledge of any Transfer.

## ARTICLE V
## DISTRIBUTIONS

## 5.1 Timing of Distributions of Net Cash Flow

Except as otherwise provided in this Article V, Net Cash Flow and Company assets in kind shall be distributed in such amounts and at such times as the Manager shall determine;

*provided* that no distributions shall be made under this Section 5.1 until all of Company's obligations under the Debentures have been fully satisfied.

**5.2     Priority of Distributions**

Except as otherwise provided in Section 5.6 in connection with the liquidation of the Company and subject to Sections 5.3, 5.5 and 5.7, Net Cash Flow shall be distributed among the Members as follows: (a) 77% to the Class A Member and (b) 23% to the Class B Members in accordance to their respective Class B Percentage Interests; *provided*, that other than tax distributions pursuant to Section 5.3, no distributions of Net Cash Flow shall be made until the Company's obligations pursuant to the Debenture Purchase Agreement are fully satisfied.

**5.3     Tax Distributions**

Notwithstanding any limitations provided elsewhere in this Agreement, the Company shall distribute to all Members in cash the Estimated Tax Amount within 90 days after the close of each fiscal year, unless the Manager determines that such distributions would render the Company insolvent or necessitate borrowing by the Company, if an Event of Default (as defined in the Debentures) has occurred under the Debentures or is continuing, or if the distribution would otherwise be materially adverse to the Company. Distributions pursuant to this Section 5.3 shall be made to the Members pro rata in the proportions in which taxable income for such fiscal year has been allocated to them and shall be applied against amounts otherwise distributable to them pursuant to Section 5.2. For purposes of determining the amount distributed under this Section 5.3, all cash distributions made during a fiscal year pursuant to this Article V shall be treated as distributions made pursuant to this Section 5.3 in respect of such fiscal year, except to the extent that such distributions were required to satisfy the obligations of the Company under Section 5.3 in respect of a prior fiscal year. The Company shall not be required to make any distributions prior to dissolution except as provided in this Section 5.3.

**5.4     Distributions in Kind**

At any time after the Company's obligations under the Debentures have been fully satisfied, the Company may distribute Company assets in kind and the distribution of any such assets in kind shall be made on the basis of the Gross Asset Values thereof on the date of distribution (adjusted as specified in paragraph (d) of the definition of "Gross Asset Value") and shall be made in the manner set forth in Section 5.2. The Manager may elect, in its reasonable judgment and in good faith, to revalue the Gross Asset Value of all or a portion of the Company's assets and adjust the Capital Accounts of the Members accordingly in the manner provided under this Agreement to preserve the economic interests of the Members as the result of any distribution in kind.

**5.5     Other Distribution Rules**

Net Cash Flow and Company assets distributable to the Members shall be distributed to the Persons recognized by the Company as holders of the Units as of the last day of the period for which such distribution is made. Notwithstanding anything contained herein to the contrary, the Manager may in its discretion hold back and retain any distributions attributable to unvested

Units, other than tax distributions pursuant to Section 5.3, until such time as the Units in question have vested.

**5.6** **Distributions Upon Liquidation**

(a)     To effect the dissolution and liquidation of the Company pursuant to Section 11.1, the Manager shall distribute all assets of the Company to the Members in cash or in kind in accordance with Section 5.6(b). Any assets to be distributed in kind shall be distributed based on their Gross Asset Values on the date of distribution.

(b)     The net cash proceeds resulting from the liquidation of the property of the Company and any assets to be distributed in kind pursuant to a dissolution of the Company shall be distributed and applied in the following order of priority:

(i)     To the payment of the expenses of liquidation and the debts and liabilities of the Company then due other than debts and liabilities owing to the Members;

(ii)     To the payment of debts and liabilities owing to the Members;

(iii)     To the setting up of any Reserves that the Manager determines are reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; and

(iv)     The remainder in accordance with Section 5.2.

**5.7** **Limitation on Distributions**

Notwithstanding anything in this Agreement to the contrary, no distribution shall be made if it would render the Company insolvent or be in violation of the Act.

<div align="center">

**ARTICLE VI**
**MANAGEMENT**

</div>

**6.1** **Manager**

**6.1.1** **General Powers**

As provided herein, the Members shall appoint a Manager who shall, subject to the terms of this Agreement, have complete authority to manage the day-to-day business and affairs of the Company.

**6.1.2** **Appointment of Manager**

(a)     The Manager need not be a Member of the Company and need not meet any other qualifications. The Manager may be an individual or an entity.

(b)     The Manager shall be appointed by a Majority Vote of the Class A Members. The initial Manager shall be iCap Management. The Manager shall hold office until such Manager dies, resigns or is otherwise removed pursuant to Section 6.1.2(d).

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 26 Page 406
1366

(c)     The Manager may resign at any time by delivering written notice to the Members. Any such resignation is effective upon delivery thereof unless the notice of resignation specifies a later effective date and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(d)     A Manager may be removed with or without cause at any time by a Majority Vote of the Class A Members. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

(e)     Upon the removal, resignation or withdrawal of the Manager, a replacement Manager shall be appointed by a Majority Vote of the Class A Members. Any replacement Manager shall hold office until such Manager dies, resigns or is otherwise removed pursuant to Section 6.1.2(d).

### 6.1.3   Related Party Transactions

(a)     The Company shall pay to the Manager an annual management fee equal to 1.85% of the outstanding principal balance of the Debentures issued pursuant to the Offering. The first year management fee will be fully earned and paid at the time of each closing of Debentures in the Offering. Thereafter, the management fee will be paid in advance each calendar quarter, commencing on the anniversary of the closing of the Debenture to which it pertains, but will not be due and payable from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) other than a payment default that has been cured, whether or not the cure occurs during or after the Grace Period (as defined in the Debenture Agreement). In the event the anniversary of a Closing occurs mid-calendar quarter, the quarterly payment of the management fee as of such anniversary will be pro-ratably paid for that calendar quarter.

(b)     In addition to the arrangements authorized by the terms of this Agreement, the Manager (or an Affiliate thereof) may also be paid an origination fee in an amount up to 3% of the Company's total investment amount in the Investment, payable by the special purpose entity holding the investment property.

(c)     Subject to Section 6.2.1(j), the Manager shall not be precluded from serving the Company in any other capacity and receiving compensation therefor.

(d)     the Company shall timely reimburse the Manager and its Affiliates for any reasonable expense paid by either such Person that properly is to be borne by the Company.

(e)     The Company may invest in Investments with one or more Persons, including a Related Party as set forth in Section 6.4. If the Company makes a Co-Investment with others, the fees payable by the Company pursuant to this Section 6.1.3 shall be proportionately reduced to reflect the Company's pro rata share of the Co-Investment.

(f)     Subject to any limitations set forth elsewhere in this Agreement, the Company may also enter into other transactions with a Related Party or engage any such Person to render services to the Company, and to pay compensation, fees or other consideration in respect thereto. The rates of compensation of such Related Party shall be limited to no higher than the rates that

would be charged by an unrelated third-party in an arm's length transaction, and all payments are subject to inspection by auditors.

(g) Notwithstanding the foregoing or any other provision of this Agreement, the Manager may not take any action or receive any fee or compensation that would be inconsistent with the terms of the Debentures or the disclosures set forth in the Confidential Offering Memorandum of the Company relating to the Debentures.

## 6.2    Authority of Manager

### 6.2.1    Authority of Manager

Except as otherwise provided herein, the Manager shall be vested with complete management and control of the day-to-day affairs of the Company and shall have the power and authority to do all things necessary or proper to carry out the purposes of the Company, except to the extent that the Manager delegates such authority to one or more designated Persons. Except as provided in Sections 6.2.2 and 6.2.3, the Manager, in its capacity as such, shall be specifically authorized to execute instruments, documents, agreements, contracts and other undertakings on behalf and in the name of the Company, and parties dealing with the Company shall be entitled to rely upon the authority of the Manager to execute such documents on behalf of the Company. Without limiting the generality of the foregoing, the Manager shall have full power and authority, at the expense of the Company:

(a) To pay all reasonable expenses relating to the organization of the Company and the subsequent operation of the Company, including attorneys' and accountants' fees, consultant fees, expenses related to travel, entertainment, fundraising, conferences, licensing, and information technology, and all other customary business expenses;

(b) To engage, employ and dismiss such agents, attorneys, accountants, custodians, financial advisors, brokers and consultants as are necessary or advisable for the affairs of the Company;

(c) To open, maintain and close bank accounts and custodial accounts for the Company and to draw checks and other orders for the payment of money;

(d) To file, on behalf of the Company, all required local, state and federal tax returns and other documents relating to the Company;

(e) To cause the Company to purchase or bear the cost of any insurance covering the potential liabilities of the Company, the Members, the Manager and the Officers;

(f) To commence or defend litigation that pertains to the Company or Company property;

(g) To borrow money, and to make, issue, accept, endorse and execute promissory notes, debentures, drafts, letters of credit, bills of exchange, guarantees and

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 28 Page 408
1366

other instruments and evidences of indebtedness, and to secure the payment thereof by mortgage, pledge or assignment of or security interest in all or any part of the property then owned or thereafter acquired by the Company, plus such additional property as the Manager may determine;

(h)     To engage in the Offering;

(i)     To enter into, make and perform such contracts, agreements and other undertakings with any Person other than a Member, Manager, Officer or Affiliate thereof and to do such other acts as are necessary or advisable for, or as may be incidental to, the conduct of the Company's business in the ordinary course;

(j)     In addition to the compensation set forth in Section 6.1.3, to enter into, make and perform contracts, agreements and other undertakings with a Member, Manager, Officer or Affiliate thereof in the ordinary course of the Company's business; provided that the terms of such contracts, agreements or undertakings are on arm's length terms;

(k)     To acquire, manage and dispose of Investments; and

(l)     To appoint Officers pursuant to Article VII.

**6.2.2   Limitation on Authority of Manager**

Notwithstanding anything contained herein to the contrary, the Manager, without the prior written consent or ratification of a Majority Vote of the Class A Members and a Majority Vote of the Class B Members, shall have no authority to:

(a)     Amend this Agreement other than as permitted by Section 13.1;

(b)     Effect a merger of the Company or the sale, lease, exchange or other disposition of all, or substantially all, of the Company's property, or any other similar business combination pursuant to which any interest of the Company is converted into or exchanged for cash, securities or other property of an acquiring entity or any of its Affiliates;

(c)     Effect any dissolution, liquidation, winding up or Bankruptcy of the Company;

(d)     Do any act that would contravene this Agreement or the Debentures;

(e)     Do any act that would make it impossible or impracticable to carry on the ordinary business of the Company; or

(f)     Issue any Units other than (i) additional Class A Units or (ii) additional Class B Units that are issued pursuant to the Placement Agent Engagement Agreement, between the Company and StillPoint.

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 29 Page 409
1366

### 6.2.3  Limitations on Investments

The Company will not make any Investment unless the Company's financial commitment with respect to such Investment is no greater than 10% of the aggregate proceeds received by the Company from the sale of the Debentures as of the closing date of such Investment; *provided*, *however*, that after the fund has closed on at least $3,000,000 of Offering proceeds, it may make single investment up to the greater of (a) 10% of the aggregate proceeds received by the Company from the sale of the Debentures as of the closing date of such Investment  or (b) $1,500,000.

### 6.2.4  Obligations of Manager

The Manager will cause each of its managing principals, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the Company's investments, and other activities of the Company as much time as may be reasonably necessary for the performance of their respective duties in their capacities as managing principals. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Fund's investment objectives; (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund, any pre-existing funds, and any Investments; (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his/her own account; (e) engage in civic, professional, industry and charitable activities; and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

## 6.3  Tax Matters

The Manager shall designate a Member to serve as the tax matters partner as provided in Code Section 6231(a)(7). The initial tax matters partner shall be iCap Management. The tax matters partner shall be indemnified and reimbursed for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with his serving in that capacity. Notwithstanding any other provision of this Agreement, the tax matter partner is authorized to take any action that it determines to be necessary or appropriate to cause the Company to comply with any federal, state and local withholding requirement with respect to any allocation, payment or distribution by the Company to any Member or other Person.

## 6.4  Co-Investments

The Company may, at the Manager's discretion, elect to co-invest with one or more other Persons, including a Related Party, in Co-Investments. There are no restrictions on the nature of the Co-Investment, and the Co-Investment may take whatever form, and have whatever terms, as may be approved by the Manager in its discretion. Such investments may be made through joint ventures, limited partnerships, partnerships, co-tenancies or other legally-recognized entities. For

the avoidance of doubt, a co-investor may be an investment fund similar to the Company and sponsored by a Related Party.

## ARTICLE VII
## APPOINTMENT OF OFFICERS

### 7.1 Authority to Delegate to Officers

The Manager shall have sole power and authority to appoint officers of the Company (the "*Officers*"). Officers shall have such authority, perform such duties and hold office for such period as may be prescribed by the Manager. The Manager may delegate to any Officer the power to appoint any subordinate Officers and to prescribe their respective terms of office, authority and duties. Any two or more offices may be held by the same Person. Unless an Officer dies, resigns or is removed from office, he or she shall hold office until his or her successor is appointed.

### 7.2 Resignation or Removal

Any Officer of the Company may resign from such position by delivering written notice of the resignation to the Manager. Any Officer may be removed by the Manager, with or without cause, upon receiving written notice from the Manager. Election or appointment of an Officer shall not of itself create any contractual right to continued employment, compensation or other benefit from the Company. Vacancies in any office caused by any reason may be filled by the Manager by selecting an individual to act during the unexpired term.

### 7.3 Salaries

The compensation of any Officers, agents or other employees of the Company shall be fixed by the Manager, and may be changed from time to time by the Manager, provided that no compensation shall be paid to any Related Party without a Majority Vote of the Class B Members.

### 7.4 Signing Authority

The Manager may authorize any Officer or Officers, or agent or agents, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Company. Such authority may be general or confined to specific instances. All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the Company may be signed by such Officer or Officers, or agent or agents, of the Company as is from time to time determined by the Manager and in such manner as is from time to time determined by the Manager.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 2.1 Page 411
1366

## ARTICLE VIII
## RIGHTS AND OBLIGATIONS OF MEMBERS

**8.1     Limited Control**

Except in their potential capacity as a Manager and except as required under the Act or as specifically set forth in this Agreement, Members shall take no part in the management or control of the Company business, and have no right or authority to act for the Company, and shall have no right to vote on matters other than the matters set forth in this Agreement or in the Act.

**8.2     Call of Meetings**

The Manager may, and at the request of any Member shall, call meetings of the Members to discuss the business and affairs of the Company. The Manager may designate any place inside of the State of Washington as the location for any meeting of the Members. If no designation is made, the place of meeting shall be the principal office of the Company.

**8.3     Notice of Meetings**

Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than two or more than 50 days before the date of the meeting, either personally or by mail or by electronic mail, by or at the direction of the Manager, to each Member. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at the Member's address as it appears on the books of the Company, with postage thereon prepaid. Any notice required to be given pursuant to this Section 8.3 will be deemed to be waived by any Member by attendance at the meeting in person or by proxy, unless such Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting.

**8.4     Meetings by Communications Equipment**

Members may participate in a meeting of the Members by, or conduct the meeting through the use of, any means of communication by which all Members participating in the meeting can hear each other during the meeting. Participation by such means shall constitute presence in person at a meeting.

**8.5     Manner of Acting**

Any actions that may be taken by the Members shall be duly taken if approved by a Majority Vote of the Class A Members, unless such action expressly requires a Majority Vote of the Class B Members herein. Company actions may be approved by the Members prospectively or ratified retrospectively.

**8.6     Action by Members Without a Meeting**

Any action that could be taken at a meeting of the Members may be taken without a meeting if one or more written consents setting forth the action so taken are signed by Members with the requisite voting authority to approve such action, and delivered to the Company. Action

taken by written consent of Members without a meeting is effective when executed Member consents sufficient to approve or take the action have been delivered to the Company, unless the consent specifies a later effective date. Any such written consent shall be inserted in the minute book of the Company as if it were the minutes of a Member meeting.

**8.7    Other Business of Members; Conflicts of Interest**

The Manager and any Member may engage independently or with others in other business or investment ventures of every nature and description. Neither the Company nor any Member shall have any right by virtue of this Agreement or the partnership relationship created hereby in or to such other ventures or activities or to the income or proceeds derived therefrom, and the pursuit of such ventures shall not be deemed wrongful or improper. Neither the Manager, the Members nor their Affiliates shall be obligated to present any particular business or investment opportunity to the Company, even if such opportunity is of a character which, if presented to the Company, could be taken by the Company, and each of them shall have the right to take for their own account or to recommend to others any such particular business or investment opportunity.

Neither the Manager nor any of its Affiliates may make any investment on behalf of a new pooled investment fund with investment objectives that are identical to those of the Company until the earlier of: (a) the date on which at least 75% of the aggregate principal balances of the outstanding Debentures (less payment of expenses for consulting fees and professional fees, and the setting aside of reserves) have been committed to or invested in Investments or (b) the end of the Offering Period. Notwithstanding the foregoing, Affiliates of the Manager have established and are permitted to raise capital for and operate other pooled investment funds whose entities were formed prior to the date of this Fund or in 2015 and which have investment objectives identical to the Company's.

<div align="center">

**ARTICLE IX**
**ASSIGNABILITY OF UNITS; WITHDRAWAL**

</div>

**9.1    Restricted Right to Transfer**

(a)    Except as otherwise provided in this Agreement, no Member shall Transfer any of the Units of the Company now owned or hereafter acquired by it without the prior written consent of the Manager.

(b)    Notwithstanding Section 9.1(a), the following Transfers of Units shall not require the consent of the Manager (but shall be subject to the restrictions set forth in Section 9.5):

(i)    Transfers to Affiliates;

(ii)    Transfers to a Member's heirs or personal representative upon the death of the Member; and

(iii)    In the case of Class B Members, Transfers to Persons who are members or participants in the Selling Group for the Offering.

For clarification purposes, a pledge of Class A Member's Units to or for the benefit of the Holders of the Debentures (each as defined in the Debenture Purchase Agreement) shall not constitute a Transfer under this Article IX and shall not require any consent of the Members or Manager.

**9.2    Effect of Transfer**

In the event of any Transfer accomplished in accordance with the provisions of this Agreement, the transferee shall receive and hold any and all Units of the Company so transferred subject to the terms and provisions of this Agreement and subject to the obligations of the transferor hereunder, and shall, upon request by the Company or any Member, forthwith execute an endorsement acknowledging such matter.

**9.3    No Other Transfer Effective**

Except as provided in this Article IX, no Transfer of any right, title or interest in Units of the Company shall be effective, and the Company shall not record or recognize any such Transfer, until there has been compliance with the provisions of this Agreement.

**9.4    Effectiveness of Transfer**

Any Transfer of Units shall be effective as of the first day of the calendar month immediately succeeding the month in which the Transfer occurs. The rights of an assignee who does not become a Substitute Member shall be limited to receipt of its share of the distributions, Net Income, Net Loss and other specially allocated items of the Company as determined by the terms of this Agreement; *provided*, *however*, that the Company shall not be required to make distributions to any assignee that does not become a Substitute Member and such assignee's rights shall be only against the assignor.

**9.5    Assignees and Substitute Members**

(a)    The Company need not recognize for any purposes any Transfer of all or any portion of the Units of a Member unless (i) the Company shall have received a fee in the amount established by it from time to time sufficient to reimburse it for all its actual costs incurred in connection with such Transfer, including, but not by way of limitation, any advice of counsel in connection with such Transfer; (ii) the Company shall have received such evidence of the authority of the parties to such Transfer as its counsel may request, (iii) the Transfer is consistent with and not in violation of the restrictions contained in this Agreement, and (iv) there shall have been filed with the Company and recorded on the Company's books a duly executed and acknowledged counterpart of the instrument making such Transfer, and such instrument evidences the written acceptance by the assignee of all the terms and provisions of this Agreement, represents that such Transfer was made in accordance with all applicable laws and regulations (including investor suitability requirements) and in all other respects is satisfactory in form and substance to the Manager.

(b)    Any Member who shall Transfer all of its Units in the Company shall cease to be a Member, except that unless and until a Member is admitted in its stead, such transferring Member shall retain the statutory rights of an assignor of a limited liability company interest

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 4 Page 414
Exhibit 4 Page 414
1366

under the Act. The rights of an assignee of an interest who does not become a Member shall be limited to receipt of its share of allocations of Company Net Income and Net Loss as determined under Article IV and Company distributions as determined under Article V.

(c) Prior to the admission of any transferee as a Substitute Member, the Company must receive a favorable opinion of the Company's legal counsel, or of other legal counsel reasonably acceptable to the Manager, to the effect that the Transfer or admission (i) is exempt from registration under applicable securities laws; (ii) does not adversely affect the characterization of the Company as a partnership for U.S. federal income tax purposes; and (iii) would not cause the Company to have to register as an investment company under Investment Company Act of 1940. The Manager, however, may waive the requirements of this Section 9.5(c), in whole or in part, in such circumstances as it deems appropriate.

(d) An assignee of Units in the Company who does not become a Substitute Member and who desires to make a further Transfer of Units shall be subject to all the provisions of this Article IX to the same extent and in the same manner as a Member desiring to make a Transfer of Units.

**9.6      Obligations of Substitute Member**

(a) A Substitute Member has, to the extent assigned, the rights and powers, and is subject to the restrictions and liabilities, of a Member under this Agreement, the Certificate and the Act and is also liable for any obligations of the assignor to make Capital Contributions, but is not obligated for liabilities reasonably unknown to the assignee at the time the assignee becomes a Member.

(b) Even if an assignee becomes a Substitute Member, the assignor is not released from the assignor's liability to the Company, but ceases to be a Member when the assignee becomes a Substitute Member with respect to the Transferred Units.

**9.7      No Withdrawal of Members**

No Member has the right to withdraw from the Company as a Member (except in connection with a Transfer of all of its Units in accordance with this Agreement) and any attempt to violate the provisions hereof shall be legally ineffective.

<div align="center">

**ARTICLE X**
**LIMITATION UPON LIABILITY; INDEMNIFICATION**

</div>

**10.1      Limitation on Liability**

No Member, Manager or officer, equity holder, employee or agent thereof, shall be liable, responsible or accountable in damages or otherwise to the Company or any Member for any act or omission by any such Person if such Person acted in good faith and in a manner in which he, she or it believed to be in the best interests of the Company unless such conduct constitutes fraud, gross negligence, willful misconduct or a material breach of this Agreement.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 25 Page 415
1366

**10.2   Indemnification**

To the fullest extent not prohibited by law, the Company shall indemnify and hold harmless each Member, Manager, and each member, officer, equity holder, employee or agent thereof, from and against any and all losses, claims, demands, costs, damages, liabilities (joint and several), expenses of any nature (including attorneys' fees and disbursements), judgments, fines, settlements and other amounts (collectively, "***Damages***") arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which such Person may be involved or threatened to be involved, as a party or otherwise, arising out of or incidental to any business of the Company transacted or occurring while such Person was a Member, Manager, or officer, shareholder, employee or agent thereof, regardless of whether such Person continues in such capacity at the time any such liability or expense is paid or incurred, except the foregoing shall not apply to any Damages to the extent that they shall ultimately be determined by final judicial decision from which there is no further right of appeal to have resulted from fraud, willful misconduct, bad faith or gross negligence on the part of such Person. The indemnification provided by this Section 10.2 shall be in addition to any other rights to which those indemnified may be entitled under any agreement, as a matter of law or equity, or otherwise, and shall continue as to a Person who has ceased to serve in their capacity, and shall inure to the benefit of the heirs, successors, assigns and administrators of the Person so indemnified. With respect to the satisfaction of any indemnification of the above-mentioned Persons, only assets of the Company shall be available therefor and no Member or Manager shall have any personal liability therefor. Any indemnification required hereunder to be made by the Company shall be made promptly as the liability, loss, damage, cost or expense is incurred or suffered. The Manager may establish reasonable procedures for the submission of claims for indemnification pursuant to this Section 10.2, determination of the entitlement of any Person thereto, and review of any such determination.

**10.3   Advancement Of Expenses**

The right to indemnification conferred in this Article X shall include the right to be paid by the Company the reasonable out-of-pocket expenses incurred in defending any proceeding in advance of its final disposition. Such an advancement of expenses shall be made upon delivery to the Company of an undertaking, by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Section 10.3.

<div align="center">

**ARTICLE XI**
**DISSOLUTION AND TERMINATION**

</div>

**11.1   Events of Dissolution**

The Company shall be dissolved by the election of the Manager and a Majority Vote of the Class A Members. Subject to the foregoing, the withdrawal, Bankruptcy, death, dissolution or other event of dissociation of a Member shall not dissolve the Company.

**11.2    Effectiveness of Dissolution**

Dissolution of the Company shall be effective on the date on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Certificate shall have been canceled and the assets of the Company shall have been distributed as provided herein. Notwithstanding the dissolution of the Company, prior to the termination of the Company, as aforesaid, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement. Upon dissolution, the Manager shall liquidate the assets of the Company, apply and distribute the proceeds thereof as contemplated by this Agreement, and cause the cancellation of the Certificate.

**11.3    Distributions Upon Liquidation**

(a)    Upon a dissolution of the Company, the Manager or court-appointed trustee if there is no Manager (the "*Liquidator*") shall take full account of the Company's liabilities and Company property and the Company property shall be liquidated as promptly as is consistent with obtaining the fair value thereof, and the proceeds therefrom, to the extent sufficient therefor, shall be applied and distributed pursuant to Section 5.6.

(b)    If the Liquidator sets aside reserves for any contingent or unforeseen liabilities or obligations of the Company, such reserves may be paid over by the Liquidator to a bank, trust company or other financial institution to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the Liquidator may deem advisable, the amount in such reserves shall be distributed to the Members in the manner set forth in this Section 11.3.

(c)    If the Manager shall determine that an immediate sale of part or all of the Company's assets would cause undue loss to the Members, the Liquidator shall, to the extent not then prohibited by any applicable law of any jurisdiction in which the Company is then formed or qualified, either (i) defer liquidation of and withhold from distribution for a reasonable time any assets of the Company except those necessary to satisfy the Company's debts and obligations or (ii) distribute any assets to the Members in kind. If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled. The fair market value of such assets shall be determined by an independent appraiser selected by the Manager.

(d)    Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, including the return of his, her or its Capital Contribution thereto and his, her or its share of the Company's cash distributions and shall have no recourse therefor, upon dissolution or otherwise, against any Manager or any other Member. No Member shall have any right to demand or receive property other than cash upon dissolution and termination of the Company.

# ARTICLE XII
## BOOKS, RECORDS, BANK ACCOUNTS AND OTHER MISCELLANEOUS ITEMS

**12.1    Financial Records**

The Company shall keep accurate financial records with respect to its operations. Such records shall be maintained at the principal place of business of the Company.

**12.2    Accounting Basis and Accounting Year**

Unless otherwise determined by the Manager, such financial records shall be kept on a tax cash basis in accordance with the accounting methods followed by the Company for federal income tax purposes and be closed and balanced at the end of each calendar year. In addition, the Company shall keep records for the Capital Account of each Member maintained as provided in the definition of "Capital Account" in Article I.

**12.3    Reports**

(a)    Within 60 days after the end of each of the first three quarters of the Company's fiscal year, the Manager shall provide each Member with unaudited financial statements of the Company for such quarter.

(b)    Within 120 days after the end of each fiscal year of the Company, the Manager shall provide each Member with audited financial statements of the Company for such fiscal year.

**12.4    Bank Accounts**

The Company shall be responsible for causing one or more accounts to be maintained in a bank (or banks), which accounts shall be used for the payment of expenditures incurred in connection with the business of the Company, and in which shall be deposited any and all cash receipts. All such amounts shall be received, held and disbursed by the Company for the purposes specified in this Agreement. There shall not be deposited in any of such accounts any funds other than funds belonging to the Company, and no other funds shall in any way be commingled with such funds.

**12.5    Tax Elections**

(a)    The Manager, in its sole discretion, may make or revoke an election to adjust the basis of the assets of the Company for federal income tax purposes in accordance with Code Section 754, in the event of a distribution of Company property as described in Code Section 734 or a transfer by any Member of his, her or its Unit(s) in the Company as described in Code Section 743. To the extent an adjustment is made to the adjusted tax basis of the Company's property pursuant to such an election, the Capital Accounts shall be increased or decreased by the amount of such adjustment as either an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital

Accounts are required to be adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(b)    The Manager may also, from time to time, make such other tax elections as it deems necessary or desirable to carry out the business of the Company or the purposes of this Agreement.

## ARTICLE XIII
## MISCELLANEOUS

### 13.1    Amendments

Amendments may be made to this Agreement from time to time by a Majority Vote of the Class A Members; *provided*, *however*, that without the consent of each of the Members to be adversely affected by the amendment, this Agreement may not be amended so as to (a) impose upon the Member general liability for the Company's debts and liabilities or (b) alter the interest of the Member in distributions or allocations of Net Income or Net Loss (other than dilution resulting from the issuance of additional Units in accordance with the provisions of this Agreement). In addition, no amendment that would have any adverse effect on the rights, duties, or benefits of the Class B Members herein (including without limitation any modification of any right of the Class B Members to approve any Company matter under Section 6.2.2 or any other section) shall be effective unless approved by a Majority Vote of the Class B Members.

### 13.2    Arbitration

If any dispute relating to or arising from this Agreement cannot be settled by the parties, then they shall submit the dispute to binding arbitration by an arbitrator selected in the following manner: Within 20 days of receiving written demand for arbitration, each party involved in the dispute shall select an individual to represent it in the selection of an arbitrator. If the individuals selected by the parties cannot agree upon an impartial arbitrator within 30 days from the date written demand for arbitration is filed, the arbitrator shall be selected by a Judge of the Superior Court (or a comparable court) in the county where the Company's principal place of business is located upon 3 days' notice. Any arbitration shall be conducted in accordance with the rules of JAMS then in effect, with any judgment upon an award entered in the Superior Court (or a comparable court) in the county where the Company's principal place of business is located. The selected arbitrator shall also determine which party is the prevailing party, and the non-prevailing party shall pay all reasonable costs and expenses associated with the arbitration, including the prevailing party's reasonable attorneys' fees.

### 13.3    Captions; Counterparts

Titles or captions of articles or sections contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provisions hereof. This Agreement may be executed in any number of counterparts (including by facsimile and PDF), all of which together shall for all purposes constitute one agreement, binding on all the Members, notwithstanding that all the Members have not signed the same counterpart.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 29 Page 419 of 1366

**13.4    Governing Law**

This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Delaware (regardless of the choice of law principles of the State of Delaware or of any other jurisdiction).

**13.5    Notices**

Except as otherwise expressly set forth in this Agreement, any notice required or permitted by this Agreement shall be in writing and shall be deemed effective (a) at the time of personal delivery; (b) when sent by fax with confirmation of transmission; (c) 72 hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid or (d) 48 hours after being deposited, on a prepaid basis, with a nationally recognized express delivery service (i.e. Federal Express or UPS). In the case of any notice delivered by fax, mail or delivery service, such notice shall be faxed or sent to the party to be notified at such party's fax number or address as set forth on **Schedule I** hereto (or in the case of the Company or a Manager who is not listed on **Schedule I**, to the address of the principal office of the Company).

**13.6    No Waiver**

The observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with a Majority Vote of the Class A Members, and <u>provided</u> that any provision hereof may be waived by any waiving party on such party's own behalf, without the consent of any other party. In addition, no waiver that would have any adverse effect on the rights, duties, or benefits of the Class B Members herein shall be effective unless approved by a Majority Vote of the Class B Members. Notwithstanding the foregoing, the observance of any term of this Agreement may not be waived with respect to a Member without the written consent of such Member unless such waiver applies to all Members in the same fashion.  No consent or waiver to or of any breach or default in the performance of any obligation hereunder shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation.

**13.7    Confidentiality**

The Members recognize that they may have access to proprietary and confidential information regarding the Company, its investments, its business plans and strategies. In addition, the Members may become aware of information as to the identity and ownership percentages of the Company by other Members. The Members acknowledge that such information is of great value to the Company and the Members and that any such information that may be acquired by them has been acquired by them in confidence. The Members will not at any time reveal, divulge or otherwise make known, except as authorized by the Company or as required pursuant to legal or administrative processes, any information of a proprietary or confidential nature concerning the Company, its business, or its Members; <u>provided</u>, <u>however</u>, that Members shall be permitted to discuss the contents of Company reports received by the Members and additional information relating to such Members' Capital Accounts with such Members' beneficial owners, advisors, lawyers and accountants on a need-to-know basis.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 20 Page 420
1366

**13.8    Successors and Assigns**

Subject to the restrictions on transfer set forth herein, this Agreement, and each and every provision hereof, shall be binding upon and shall inure to the benefit of the Members, their respective successors, heirs, successors-in-title and assignees, and each and every successor-in-interest to any Member, whether such successor acquires such Unit(s) by way of gift, purchase, foreclosure or any other method, shall hold such Unit(s) subject to all of the terms and provisions of this Agreement.

**13.9    Entire Agreement**

This Agreement, together with the terms and provisions of any applicable vesting agreement between the Company and a particular Member, contains the entire understanding among the Members and supersedes any prior written or oral agreements between them respecting the Company. The parties hereto acknowledge that the Company, without any further act, approval or vote of any Member, may enter into vesting agreements with individual Members that have the effect of establishing rights under, or altering or supplementing the terms of, this Agreement with respect to such Members. The parties hereto agree that any rights established, or any terms of this Agreement altered or supplemented, in a vesting agreement with an individual Member shall govern with respect to such Member notwithstanding any other provision of this Agreement.

*[Page break intentionally inserted.]*

IN WITNESS WHEREOF, the parties have executed this Agreement.

**CLASS A MEMBER:**

**iCap Pacific NW Management, LLC**,
a Washington limited liability company

_____
Name: Chris Christensen
Title: Manager

IN WITNESS WHEREOF, the parties have executed this Agreement.

**CLASS B MEMBER:**

_____
Name:
Title:

## SCHEDULE I

## Names, Addresses, Units and Percentage Interests of Members

### Class A Units

| Name and Address | Class A Units | Class A Percentage Interest |
|---|---|---|
| iCap Pacific NW Management, LLC<br>PO Box 3907<br>Bellevue, WA 98009<br>Facsimile: (425) 214-4776 | 1,000,000 | 100% |
| Total: | 1,000,000 | 100% |

### Class B Units

| Name and Address | Class B Units | Class B Percentage Interest |
|---|---|---|
| Authorized and Unissued | 50,000,000 | |
| Total: | 50,000,000 | 100% |

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 2, Page 424
1366

# EXHIBIT 3

May \_\_\_, 2016

[Holder]
[Holder Address]

Dear [Holder]:

I am writing to you regarding two items items related to your investment in iCap Pacific Northwest Opportunity and Income Fund, LLC (the "**Fund**"). First, Kevin Carreno, the principal of the Agent designated under the Collateral Agent Agreement, passed away unexpectedly earlier this year and a replacement is needed. The Manager has proposed that Jouhnson Pope Bokor Ruppel & Burns, LLC, be designated as the successor Agent. Michael Cronin is a partner with Johnson Pope and will be the primary contact for the successor Agent. The terms of your Debenture require that a Majority Interest appoint a successor Agent, so please respond using the enclosed Appointment of Successor Collateral Agent form.

Second, the Fund is providing you the opportunity to extend the Maturity Date of your Senior Secured Debenture. If you choose to exercise this option, you will continue receiving the 12% interest rate for an additional 12-months, and the Maturity Date will be extended until December 31, 2017. All other terms of your Debenture will remain unchanged.

Given the strong demand for new homes and rental units resulting from the large number of new jobs created in the Pacific Northwest over the last few years, the cities and counties region-wide have experienced longer than anticipated processing times for issuing construction and development permits. Although the real estate investment environment remains very strong in this region, the additional time needed to obtain permits has extended the anticipated exit dates of a number of the projects in which the Fund has invested, some of which will now be completed after the current Maturity Date of December 31, 2016. In extending the Maturity Date, we anticipate that we will be able to complete these projects that need more time, as well as take advantage of additional investment opportunities.

To that end, the enclosed Holder Election Form provides you with two options: i) you may elect to extend your Debenture Maturity Date to December 31, 2017, or ii) you may elect to keep the current Debenture Maturity Date of December 31, 2016. In the event you choose to extend, all other terms of your Debenture will remain unchanged, including your receiving monthly interest payments at the 12% rate during the extension period. Given the additional time needed to exit the current projects in the portfolio, we do not expect that any Payoff Premium under Section 3(b) of the Debentures will exist on the current Maturity Date of December 31, 2016.

Please note that, for those Holders who elect not to extend their Maturity Date, the Measurement Date for the Payoff Premium, if any, under Section 3(b) of the Debentures will remain the date on which the Loan Amount is repaid in full or December 31, 2016 (as may be extended by 3 months under Section 2(b) of the Debenture). Such Holders will have no right to participate in the Payoff Premium, if any, that may exist as of December 31, 2017, which will be shared pro rata only among those Holders who elect to extend.

The enclosed Holder Election Form should be returned no later than May 31, 2016. Also enclosed is a First Amendment to the Senior Secured Debenture, which should be executed and returned if you elect to extend the Maturity Date of your Debenture. Additional instructions and information is included in the Holder Election Form.

Very truly yours,


Chris Christensen
President, iCap Equity

# EXHIBIT 4

# MEMORANDUM OF TERMS
## FOR THE PRIVATE PLACEMENT OF DEBT SECURITIES OF

## ICAP EQUITY, LLC

—————————————

This Memorandum of Terms ("**Memorandum**") summarizes the principal terms of the proposed financing of iCap Equity, LLC (the "**Company**"). This term sheet is for discussion purposes only; there is no obligation on the part of any negotiating party until a definitive Note Purchase Agreement is signed by all parties. This term sheet is subject to the satisfactory completion of due diligence. This term sheet does not constitute either an offer to sell or an offer to purchase securities.

### THIS OFFERING INVOLVES CERTAIN RISKS. <u>See</u> "Risks Factors."

The Notes have not been, nor will they be registered OR QUALIFIED under the Securities Act. They are being offered and sold in the United States only to accredited investors in reliance on Rule 506(b) of Regulation D promulgated under the Securities Act OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. neither the securities and exchange commission nor any state securities commission has approved or disapproved of these securities or determined if this memorandum is truthful or complete; any representation to the contrary is a criminal offense.

The information contained in this Memorandum is confidential. By acceptance of this Memorandum, each recipient agrees (a) not to reproduce or distribute this Memorandum to other persons (except the recipient's professional advisors) without the prior written consent of the Manager; (b) that the recipient and his, her or its professional advisors will keep confidential all information contained herein not already in the public domain; and (c) that the recipient will use this Memorandum for the sole purpose of evaluating a possible investment in the Notes. Each recipient also agrees to return this Memorandum and any other documents or information furnished by the Company to the recipient (and any and all copies thereof) upon request of the Company if the recipient declines to purchase any Notes.

There will be no public market for the Notes and there is no obligation on the part of the Company or any person to register the Notes under the Securities Act or any state securities laws.

This Memorandum includes data and information obtained from independent third party sources. Although the Company does not have any reason to believe that such data and information is not accurate, the Company did not independently verify such data and information and cannot assure the accuracy or completeness of such data and information. Prospective investors must rely upon their own investigations and evaluations with respect to making an investment in the Notes being offered hereby.

Prospective investors will be advised of any material modifications to the terms of the offering or the Notes in writing prior to any sale of Notes to the prospective investors.

Nothing contained in this Memorandum is, or should be relied upon as, a promise or representation as to the Company's future performance. Prospective investors must rely upon their own examination of the Company and the terms of the Offering, including the merits and risks involved.

—————————————

## SUMMARY OF MATERIAL TERMS

The following summarizes a number of the material provisions of the proposed promissory note financing of iCap Equity, LLC, a Delaware limited liability company (the "*Company*"). This Memorandum is qualified in its entirety by the full text of the Note Purchase Agreement and the exhibits attached thereto. Capitalized terms used in this summary not separately defined herein have the meanings assigned to such terms in the Note Purchase Agreement. No person will be permitted to invest in the Notes unless such person has received and reviewed the Note Purchase Agreement, this Memorandum and other offering-related documents. This summary does not constitute an offer to sell, or the solicitation of an offer to buy, the securities referenced herein, and any such offer will be made only to selected persons pursuant to the offering documents prepared and delivered by the Company.

| | |
|---|---|
| **Amount to be Raised** | Up to $10,000,000 in aggregate principal amount of promissory notes (the "*Notes*") or such additional amount as determined by the Manager in its sole discretion. |
| **Investors** | Each investor in the Notes must be an "accredited investor" as defined under Regulation D of the Securities Act (the "*Investors*"). |
| **Minimum Investment** | An investment of at least $50,000, unless a smaller investment is permitted by the Manager in its discretion. |
| **Target Closing Date** | The initial closing is anticipated to occur on or around November 1, 2017, with subsequent closings permitted through March 31, 2018, unless extended up to 180-days by the Manager. |
| **Definitive Agreement** | The Notes will be issued and sold pursuant to a note purchase agreement prepared by the Company's legal counsel and will contain customary representations and warranties of the Company and the Investors (the "*Note Purchase Agreement*") in the form attached as **Exhibit A**. |
| **Maturity Date** | Unless extended by a one-year extension at the discretion of the Manager, principal and unpaid accrued interest will be due and payable three years after the date of the initial investment (the "*Maturity Date*"). The Notes may be prepaid prior to the Maturity Date without penalty. |
| **Interest Rate** | Simple interest will accrue on an annual basis at the rate of 10% per annum based on a 360-day year. Accrued interest will be due and payable monthly in arrears on the 15th day of each month following the closing of the Note. |
| **Security** | The Notes will be unsecured. |
| **Amendments** | Any term of the Notes may be amended or waived with the written consent of the Company and holders of Notes comprising a majority of the outstanding principal balance (the "*Majority Holders*"). Any amendment, waiver or extension approved by the Majority Holders will apply to all holders of the Notes. |
| **Events of Default** | Upon the occurrence of an Event of Default, the Holder may declare the Loan Amount to be due and payable. |
| **Fees and Expenses** | Each party will bear its own fees and expenses incurred in the transactions contemplated by this Memorandum. |
| **Company Contact Information** | iCap Equity, LLC<br>3535 Factoria Blvd. SE, Suite 500<br>Bellevue, WA 980006<br>ATTN: CHRIS CHRISTENSEN<br>OFC: (425) 278-9030; FAX: (425) 278-9025<br>EMAIL: investor@icapequity.com |

137330388.4

## FORWARD-LOOKING STATEMENTS

This Memorandum and its exhibits may contain statements that constitute forward-looking statements, as defined by federal securities laws. Forward- looking statements can be identified by the use of terminology such as "anticipates," "expects," "intends," "opportunity," "plans," "should," "predicts," "potential," "continue," "believes," "seeks," "would," "may," "will be," "likely to become," "estimates" and variations of these words and similar expressions. Forward-looking statements are subject to risks and uncertainties and include statements made regarding events, financial trends, future operating-results, financial position, cash flows and other general information concerning possible or assumed future results of operations of the Company or any project. Investors are cautioned that such statements are only predictions, forecasts or estimates of what may occur and are not guarantees of future performance or of the occurrence of events or other factors used to make such predictions, forecasts or estimates. Actual results may differ materially from the results expressed, implied or inferred from the forward-looking statements and may be worse due to a variety of factors, including changes in laws, adverse changes in real estate prices, adverse changes in interest rates, and adverse changes in the credit and capital markets. These forward-looking statements speak only as of the date on which the statements were made and the Company undertakes no obligation to update or revise any forward-looking statements made in this Memorandum or elsewhere as a result of new information, future events, future developments or otherwise, except as required by law.

## INVESTMENTS

To subscribe for the Notes, you must complete, execute and deliver to the Company the Subscription Documents, in the form attached to this Memorandum as **Exhibit B**. The Note Purchase Agreement requires you to represent, among other things, that you are an accredited investor, are acquiring Notes for your own account for investment and not with a view to resale or distribution, and that you are aware that transfer of the Notes is restricted by the terms of the Note Purchase Agreement and by the absence of a market for the Notes. The Note Purchase Agreement also requires you to acknowledge that you have received and have had an opportunity to read this Memorandum and are aware of the risks associated with an investment in the Notes.

THE COMPANY'S ACCEPTANCE OF YOUR SUBSCRIPTION FOR NOTES DOES NOT CONSTITUTE A DETERMINATION BY THE COMPANY THAT THE INVESTMENT IS SUITABLE FOR YOU. THE FINAL DETERMINATION AS TO THE SUITABILITY OF AN INVESTMENT IN THE NOTES FOR YOU MUST BE MADE BY YOU AND YOUR ADVISORS.

## USE OF PROCEEDS

The following table sets forth the details of the fees and the funds available for use by the Company upon the sale of the Notes:

| | Minimum Investment | Maximum Offering |
|---|---|---|
| Gross Offering Proceeds | $50,000 | $10,000,000 |
| Offering Expenses[1] | $40,000 | $40,000 |
| Organizational Expenses[2] | $35,000 | $35,000 |
| Amount Available for Company investment | $0 | $9,925,000 |

1  The Company may incur additional offering costs, including brokerage and finders fees of up to 8% of the capital such brokers and finders raise, and other expenses, the aggregate amount of which is not yet known. Such expenses, to the extent incurred, will reduce the net proceeds realized by the Company.

2  Organizational expenses include the cost of forming the Company in Delaware and the cost of preparing this Memorandum and other offering documents.

### Allocation of Offering Proceeds

The proceeds of this offering will be used to fund the expansion plans of the Company as it launches additional investment fund vehicles, makes direct real estate investments, and retires prior Company obligations. The following table is an estimate of the Company's allocation of the available offering proceeds. Given that the offering proceeds will be combined with the Company's existing streams of income, and that the Company is already operating profitably, the table illustrates primarily those items that are in addition to the standard operating expenses of the Company. If less than the maximum Offering amount is raised, the Manager will determine which line items will receive less than the estimated allocation. The Manager has discretion to utilize all proceeds as it deems necessary to accomplish the Company's business purposes.

| Line Item | Estimated Amount | Total |
|---|---|---|
| New Hires and Growth Plans | $100,000 | $100,000 |
| New Company Formation Costs[3] | $50,000 | $150,000 |
| Reserves | $1,000,000 | $1,150,000 |
| Retirement of Debt (Payables) [4] | $3,720,000 | $4,870,000 |
| Taxes and Licenses | $100,000 | $4,970,000 |
| Marketing | $100,000 | $5,070,000 |
| Website and Technology Upgrades | $150,000 | $5,220,000 |
| Real Estate Investments | $4,705,000 | $9,925,000 |

3.  Each time the Company launches a new investment fund vehicle, it advances the initial capital for the organizational and offering expenses, including preparation of the offering documents, entity formation, and marketing expenses. The Company is reimbursed for these expenses when the fund's first closing is held, and the newly formed fund begins generating management fee income for the Company. The Company expects to form at least 2 pooled investment vehicles over the next 4-5 years in addition to the three funds identified in this offering memorandum.

4.  Retirement of debt and payables refers to legacy obligations of the iCap Affiliates, which were incurred as part of the establishment of the Company and its track record.

3

The following table outlines the principal balances of debt obligations, which may be serviced or paid. Each obligation was a private party arrangement in the form of a loan or payable, with the exception of the Eric Shipley obligation, which was an LLC preferred unit arrangement. The Company may choose to retire some obligations, but not others. All obligations are contained within iCap Enterprises, Inc.

| Item | Amount |
| --- | --- |
| Claus Mueller – iCap Equity, LLC | $180,000.00 |
| David Straz Jr. – iCap B2, LLC | $1,890,000.00 |
| Bob Walsh – iCap Enterprises, Inc. | $400,000.00 |
| T&L One, LLC – iCap Enterprises, Inc. | $245,000.00 |
| Grogan/Blair – iCap Enterprises, Inc. | $125,000.00 |
| iCapEquity Real Estate Fund I, LLC | $180,000.00 |
| Mike Gould Notes – Oceanaire, LLC | $650,000.00 |
| Eric Shipley – Front Street Townhomes, LLC | $50,000.00 |

137330388.4

# COMPANY OVERVIEW

**The Company**

The Company is a Delaware limited liability company, whose sole member is the Manager. The Manager is wholly owned by Chris Christensen. The Company has recently acquired a number of affiliated entities for the purpose of consolidating operations, income, debt and expenses. This consolidation was made to allow the Company to centralize its operations, intellectual property, and technology.

The Company primarily derives its income from fees generated through subsidiary operations. It will also receive income from real estate investments that it plans to make with the proceeds of this offering. The Company's investment strategy focuses on preferred equity investments in Pacific Northwest real estate projects. The Company's subsidiary funds have primarily made secured, short-term investments in single-family, multi-family, light commercial and land development projects. Most investments involve some element of construction or development.

Although this Memorandum refers to "iCap" and the Company as though each were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. By investing in the Company, the Investor will not acquire an interest in any of its affiliated entities, but it may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Company as it conducts its business.

The following chart illustrates the relationship among the various iCap entities.



Members of the management team previously established iCap B1, LLC, and iCap B2, LLC in 2013, which raised a total of $6,915,664 for the purpose of making investments into various real estate projects. These special purpose vehicles made 10 investments and generated a gross IRR to investors of 20%. The management team also issued a total of $93 Million in debentures across two pooled investment funds, iCap Pacific NW Opportunity and Income Fund, LLC, and its follow-on fund, iCap Northwest Opportunity Fund, LLC. As of the date of this Memorandum, iCap has $87 Million in assets under management (including reserves and committed capital for investments), which is invested across 69 projects. Of these 69 projects, 37 have exited and achieved a 33% annualized ROI and 1.43 multiple of invested capital. The financial statements of the Company and its affiliates can be viewed in the Data Room, which is available to all potential Investors upon request.

YOU SHOULD RECOGNIZE THAT BY PURCHASING NOTES IN THE COMPANY YOU WILL NOT THEREBY ACQUIRE ANY OWNERSHIP INTEREST IN ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM

137330388.4

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 4, Page 435    Pg 4 of 1366

SPONSORED BY THE MANAGER OR ITS AFFILIATES. YOU SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES IS GIVEN SOLELY TO ALLOW YOU TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. YOU SHOULD NOT ASSUME THAT THE INVESTORS IN THIS OFFERING WILL EXPERIENCE RETURNS, IF ANY, ON THEIR INVESTMENTS SIMILAR TO THOSE EXPERIENCED BY INVESTORS IN THE PRIOR PROGRAMS SPONSORED BY THE MANAGER AND ITS AFFILIATES.

**Investment Structure**

In utilizing the proceeds from this Offering, the Company plans to pursue three primary investment strategies. These strategies include: forming new fund vehicles, investing in financial instruments secured by real property, and acquiring and holding real estate for investment purposes. Initially, the Company will focus its investment in the greater Puget Sound region. The real estate holdings will be limited to single and multi-unit residential properties, light commercial properties, and land acquired for entitlement purposes. It is anticipated that approximately half of the proceeds from this Offering will be dedicated to the furtherance of these three strategies. The Company may directly or indirectly, through subsidiary operations, carry out these forms of investments depending on the opportunity.

**Investment Process**

The Company has developed proven processes and controls to evaluate possible investment opportunities. This process begins with an initial review by a committee consisting of key members of the management team (the "***Investment Committee***"). Specifically, the Investment Committee is comprised of the Company's President, Chief Operating Officer, and Controller. Every investment opportunity is subject to preliminary due diligence performed by the Company's underwriters, who in turn will present investment opportunities to the Investment Committee for its review and approval. The Investment Committee meets weekly to review new opportunities. The Company completes diligence on prospective investments and maintains post-closing procedures that provide for the ongoing supervision of the investments. The investment process has four major areas of focus: analysis and approval, documentation and closing, and post-closing and management.

**Risk Controls**

The Company's entity structure and investment strategy have been designed to mitigate risk and increase the likelihood of success. Each investor will receive a note upon closing, which will provide the investor with a priority return for repayment over equity holders, an ongoing interest rate, and a payoff premium. The Company's subsidiary management entities will then offer a corporate guaranty. Additionally, the Company has devised a three-prong investment strategy to ensure multiple income streams and has assembled an experienced and proven management team to oversee the business. Lastly, the Company has targeted strong markets for its investments in the Pacific Northwest. Recently ranked as the top city for 2018, Seattle, Washington (and the Pacific Northwest by extension) offers the "strongest outlook for investment and development in Industrial and Single Family housing."[1]

**Tightening Lending Criteria**

Although the creation of new jobs in the Pacific Northwest has created an increase in demand for investment in real estate transactions, banks and other real estate lenders have tightened their lending criteria in order to ensure that they remain in a safe position with regard to their loans. Lenders now commonly lend no more than 65% of a project's cost and require the borrower to supply the remainder of the funds to complete a given project. Additionally, most real estate developers and builders have been forced to place their available cash into deposit accounts to meet aggressive liquidity requirements imposed by their banks and direct lenders who provide these loans for their projects. Consequently, real estate developers and builders frequently lack the ability to obtain the remaining funds needed to finance their projects.

As a result of the last financial crisis, banks and other traditional lenders have been forced to tighten their lending criteria for real estate based loans. Their stricter set of rules for mortgage lending programs and products limit their ability to address consumer need. New regulations translate to less flexibility when underwriting mortgages, in addition to higher compliance costs. The ability to lend is substantially constrained and, therefore, banks and other lenders find it harder to meet the

---

[1] PWC, *Emerging Trends in Real Estate*, "The outlook for 2018," https://www.pwc.com/us/en/asset-management/real-estate/emerging-trends-in-real-estate.html

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:18    Exhibit 4, Page 436
1366

increased demand for loans. This, in turn, frustrates borrowers and banks while slowing economic growth. The resultant funding void creates short-term and long-term investment opportunities.

**Opportunity in the Greater Puget Sound Region**

A fundamental need for capital in real estate projects, coupled with the growth of the Greater Puget Sound regional economy, has resulted in many real estate investment opportunities in the area. As noted below, the Greater Puget Sound regional economy has grown significantly in recent years.

The following are a few characteristics of the Greater Puget Sound Region:

- The region is home to many national companies from a variety of industries
- Hundreds of new companies move into the area annually
- Property sales and rental rates continue to increase
- Job creation has been steady
- Foreign and global investor interest has risen significantly



King, Pierce, Snohomish and Kitsap are the four largest counties in the area. The economy is generating 5,000 new jobs each month in these four counties alone. The annual job growth rate for the region is 3.1%, compared to the 1.8% rate for the rest of the country.[2]

The region is supported by an educated workforce. With regards to higher education, 40% of the regional population has earned a bachelor's degree (57% in Seattle alone) and 14.7% of the population has earned an advanced degree; these figures are higher than countrywide figures of 28.8% for bachelor's degree holders and 10.6% for recipients of an advanced degree.[3] The median annual household income in the region is $75,331, as compared to $55,775 for the country.[4]

The increased job growth has resulted in a housing inventory shortfall in the area, which has produced a supply and demand imbalance. In a balanced market, it is typical to maintain 6 months of housing inventory. As of September 2017, King

---

[2] Source: The United States Census Bureau, as of April 2015

[3] Source: The United States Census Bureau, as of April 2015

[4] Source: Census ACS 1-year Survey, http://www.deptofnumbers.com/income/washington/seattle/#household

137330388.4

County, the largest county—by both geography and population—in the region, has a mere 1.13 months of inventory.[5] Given this shortage of housing inventory, builders and developers have been able to take advantage of opportunities to bring new homes to the market and sell them for a profit. The Company's three investment strategies are calculated to address this imbalance.

## Management of the Company

The management and supervision of the Company is vested exclusively in the Manager (including its duly appointed agents), who has full control over the business and affairs of the Company. The Manager has the power on behalf and in the name of the Company to carry out any and all of the objects and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings that the Manager, in its sole discretion, deems necessary or advisable or incidental thereto. Investors must rely upon the judgment and experience of the Manager to manage the Company. The sole member of iCap Enterprises, Inc. is Chris Christensen. The managers of iCap Enterprises, Inc. are Chris Christensen and Jim Christensen.

The Manager and its Affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

## Professional Biographies

### Chris Christensen, *President*

Chris leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. He is also primarily responsible for tax and accounting decisions. Chris is 41, and prior to forming the Company, he managed affiliated funds, formed and managed operating entities, including Edge Construction, LLC and iCap Enterprises, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a Juris Doctor degree from Seattle University School of Law, a Master's degree in International Business from Seattle University, and a Bachelor of Arts degree in Economics from the University of Utah. He is the brother of Jim Christensen.

### Jim Christensen, *Chief Operating Officer*

Jim is iCap's Chief Operating Officer and assists the President with the day-to-day operations of iCap and its investment funds, including overseeing investment underwriting, project and construction management, project financing, disposition of distressed assets, and management of the various strategic relationships involving iCap and its affiliates. In addition, he is responsible for the technology-related underpinnings of iCap. This includes electronic document storage, electronic process automation, and software management. Jim has managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington State for iCap Enterprises, Inc. Jim directly managed over $30 million in development projects and also consulted property owners on the strategy, finance and execution of the development of their properties. As an investment manager, he has been responsible for the oversight of over $260 million of projects. Jim has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Jim is 33, and he holds a Master of Business Administration degree and a Bachelor of Arts degree in Economics from the University of Washington. Jim is the brother of Chris Christensen.

---

[5] Source: Northwest Multiple Listing Service, Market Update, http://www.northwestmls.com/library/content/statistics/PRTables_Sept17.pdf

137330388.4

Trace ("TD") Croshaw, *Controller*

As Controller, TD is responsible for managing financial controls and accounting procedures of the Company and its investments. TD provides forecasts, budgets and other financial analysis of the Company and its investments, assists with investor reports and communications, manages cash flows and cash flow projections, and establishes and ensures adherence to internal control policies and procedures within the Company. TD also supervises iCap's accounting personnel, and manages the Company's third-party audit, tax and accounting firms, PwC and Huber, Erickson & Bowman, LLC, to complete annual audit and tax returns. TD is 39 and a licensed CPA. Prior to joining iCap, TD had 15 years of experience as an audit manager at an accounting firm performing financial audits for businesses. TD holds a Bachelor of Arts degree in Accounting from the University of Utah, and a Master of Business Administration degree from the University of Phoenix, and he is a member of the AICPA.

Levi Rowse, *Director, Construction and Development*

Levi is responsible for overseeing all development and construction efforts for projects that are actively managed by iCap, as well as monitoring projects controlled by Project Sponsors in which the Company invests. Levi also assists with pro forma preparation, budget analysis and due diligence review of proposed Company investments. Furthermore, Levi manages relationships with numerous third parties imperative to development efforts including contractors, engineers, and other professional service providers, and interfaces with jurisdictional representatives with regards to entitlement, zoning and permitting issues. Levi is 39 and has 21 years of experience in construction, land development and project management. He most recently was a Senior Development Manager for Quadrant Homes, and before that role was an independent appraiser and designated broker, in addition to being a Superintendent for McBride Construction and a Development Manager with Tarragon. Levi holds a Bachelor of Arts degree in Business Administration with a Finance & Real Estate emphasis, is a Certified Residential Appraiser and Designated/Managing Broker, and possesses a LEED AP designation from the U.S. Green Building Council.

Derek Howell, *Director, Underwriting*

Derek directs the underwriting, due diligence review, and closing of Company investments. He evaluates new investment opportunities, performs cashflow analysis, presents potential investments to the Investment Committee, and is the primary point of contact for potential Project Sponsors. Once an investment is approved by the Investment Committee, Derek assists with issuing letters of intent, performing comprehensive due diligence review, negotiating investment documents, and addressing other matters for closing. For existing projects, Derek handles the underwriting relating to project extensions and modifications. Derek also assists with ongoing economic research and market analysis, as well as preparing investor reports and communications. Prior to joining iCap, Derek spent eight years advising hundreds of in-house legal departments at both domestic and multi-national corporations on best practices surrounding implementing cost controls, managing outside counsel, and developing consistent reporting methodologies. Prior to that time, Derek worked in risk management and as in-house counsel for Polygon Northwest and Mosaic Homes, two different Pacific Northwest homebuilders. Derek is 40; he received his Bachelor of Arts degree from Brigham Young University and his Juris Doctor degree from the J. Reuben Clark Law School at Brigham Young University.

**Organizational Growth**

iCap has capacity to accept additional capital and to deploy such proceeds towards real estate projects meeting its investment criteria. iCap intends to grow as an organization with the expected increase in capital under management. With regards to human capital, various support staff will be hired to assist iCap's existing personnel to leverage the systems described above, consistent with iCap's growth plan. Three roles will require additional personnel support: underwriting, transaction closing, and asset management. Based on historical trends, iCap believes it should be able to review up to 20 deals each month and to fully underwrite and close up to five investments per month with its existing personnel. As iCap deploys additional capital raised through the Company, iCap plans to add additional staff members to assist with the increased transaction volume and asset management. iCap also plans to add additional support staff for its in-house accounting and legal departments.

As it pertains to the accounting function, Huber, Erickson & Bowman, LLC, a regional accounting firm, advises iCap on bookkeeping, and PwC, a national accounting firm, completes audits and tax returns. Each of these third-party firms can be relied upon as needed as iCap scales its activity. In addition, iCap relies upon outside legal advisors as necessary.

137330388.4

# POTENTIAL CONFLICTS OF INTEREST

The Manager and its Affiliates will be entitled to certain types of compensation, fees, income, distributions or other payments from the Company or in connection with a Company investment. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Company. The Manager has no obligation to advance funds to cover the Company's expenses. However, to the extent that such advances are made, the Company will repay such amounts out of its funds as soon as they are available, whether such funds are from the Company's operating revenues or third-party loans. Below is a summary of these key payment obligations of the Company and potential conflicts of interest that could arise from these obligations.

## Compensation and Other Payments to the Manager

The Company will not pay a fixed annual management fee to the Manager. However, the Company will pay sums to the Manager as are necessary to allow the Manager to perform those functions that relate to the Company's business purpose, such as payroll, rent, marketing, debt service, and all other such costs.

In addition to the fees set forth above, the Company will reimburse the Manager and its Affiliates for any reasonable expenses paid by either Person that properly should be borne by the Company. Such expenses include costs incurred before and after the formation of the offering, such as organizational and offering expenses; consulting, legal, accounting, and professional fees; and marketing and travel expenses.

The Company must distribute to the Manager, as a member of the Company, in cash the Estimated Tax Amount within 90 days after the close of each fiscal year, unless (a) the Manager determines the tax distribution would render the Company insolvent or would necessitate borrowing by the Company; (b) an Event of Default (as defined in the Notes) has occurred under the Notes or is continuing; or (c) the Manager determines that the tax distribution would otherwise be materially adverse to the Company. The Company is not required to make any distributions to its members prior to dissolution other than tax distributions.

The Manager may authorize non-tax-related distributions of net cash flow as long as the Company is not in default under the terms of any Note. Additionally, after the Company has paid the outstanding principal and annual interest due and payable under the Notes, the Company may distribute any remaining profits to the Manager. The Manager's profit interest in the Company may create an incentive for the Manager to make more speculative investments on behalf of the Company than the Manager otherwise would make in the absence of such profit potential.

## Transactions with the Manager and its Affiliates

The Company may enter into various transactions with the Manager and its Affiliates, including performance of services for a Project Entity, providing financing, guarantying financing, purchasing or selling property, or participating in an investment in a Project Entity alongside a subsidiary of the Company provided the terms are commercially reasonable. Compensation and fees could be paid with respect to these transactions as described below. To the extent any such transaction may pose a conflict of interest between the Company and the Manager or its Affiliates this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company.

In the event the Company enlists the services of any Affiliate of the Manager, the rates of compensation of these Affiliates for the performance of their various services will be at arms-length rates no higher than what the Company could obtain from unaffiliated third parties and all payments will be subject to inspection by auditors upon request.

Additionally, in the event the Manager, or an Affiliate of the Manager, guaranties, whether personally or otherwise, a loan, bond or other obligation of the Company or of any of its subsidiary entities, such Manager or Affiliate will be entitled to an annual fee equal to 1% of the outstanding loan amount, bond amount, or other obligation.

## Fees Payable by the Project Entity

In some instances, an Affiliate of the Manager may perform services for a Project Entity in order to provide better pricing or efficiency than would otherwise be available from third parties. In these instances, such Affiliates may be paid customary service fees for time, material, or labor.

137330388.4

In some instances, an Affiliate of the Manager may provide lending to a Project Entity in connection with or in lieu of financing from non-affiliated third parties. In such circumstances, the Affiliate may charge customary fees in connection with the issuance of such loans such as interest, origination fees, exit fees, and other fees.

**Acquisition, Transfer, and Divestiture of Investments to or from Affiliates**

The Company may acquire investments previously entered into by Affiliates of the Manager, or may partially or wholly transfer an investment to or from Affiliate entities, subject to underwriting and investment criteria of the Company and the Manager's Affiliates. Any investment acquisition or transfer that occurs may require a determination of the value of the investment, which may pose a conflict of interest between the Company and the Manager or its Affiliates, which must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company. Notwithstanding the foregoing, the Manager is not obligated to cause the Company or any Affiliate to enter into any such transactions.

**Devotion of Time and Attention**

The Manager will cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the Company's investments, and other activities of the Company as much time as may be reasonably necessary for the performance of their respective duties in their capacities as managing principals. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Company's investment objectives; (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund, any pre-existing funds, and any investments of those successor or pre-existing funds; (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his/her own account; (e) engage in civic, professional, industry and charitable activities; and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

The Manager and its Affiliates have established, and may establish, other pooled investment funds that have investment objectives identical to those of the Company or its Affiliates, and the principals of the Manager may devote such time and attention as they deem necessary for the success of such funds.

137330388.4

## RISK FACTORS

As with all investments, a purchase of the Notes is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. In addition to the information set forth elsewhere in this Memorandum, you should consider the following risks before deciding whether to invest.

**Operation and Company Risks**

> ***Control is vested in the Manager; no Investor should purchase the Notes unless the Investor is comfortable with the Manager's judgment and experience in running the Company's affairs.***

Control over all decisions affecting the Company, including decisions regarding the investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, refinancing of Project Entities, whether to make an investment, whether an Affiliate is eligible for an investment, extensions of investments and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors. No assurance can be given that sufficient investments will be presented to the Company to deploy all of the capital available for investment.

When you subscribe for Notes that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the investments that the Manager subsequently identifies. You should not invest in the Company, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

> ***Proceeds from Investments will be re-invested during the life of the Company.***

The Manager has the discretion to retain all or a portion of the proceeds from investments to make new investments, and intends to do so over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

> ***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Company or the Project Entities, provided the terms are commercially reasonable. These measures may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. In addition, before the Company invests all of its investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between investment opportunities that may meet the investment criteria of Affiliates of the Company or of the Manager.

> ***Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Notes.***

The Manager has not arranged for Investors to be separately represented by independent counsel. The legal counsel who has performed services for the Company has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

Pursuant to the terms of the Note Purchase Agreement, the Notes may be issued with original issue discount (or "OID") for U.S. federal income tax purposes. As such, if you are a U.S. Holder (as defined herein), you may be required to include OID (taxable as ordinary income) in taxable income each year in excess of the amount of interest payments actually received by you in that year.

> ***You will not be investing in a fund vehicle. The prior performance data presented should provide you relevant information regarding fund entities overseen by the Company, but should not be construed as an indication of the likely financial performance of the Company.***

137330388.4

By investing in the Company, you will not be a creditor to the Affiliates of the Company nor in any of the prior investments sponsored by its Affiliates. The Company has provided selected information regarding its prior investments because it felt investors might consider those investments to be relevant in assessing the experience and judgment of the Manager or the Company's management team. Investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique and the Company may not be able to replicate the success of prior Affiliated investments, even if the investments assembled for the Company's portfolio are similar to those obtained for prior investments.

### *The Company may prepay the principal and interest on the Notes at any time.*

The Company may prepay the principal amount of the Notes, in whole or in part, at any time after one year from the date of investment. The Company may also choose to pay off some of the investor Notes while waiting to pay off the Notes of other investors. After the one-year mark, no prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Investors will not have certainty as to how long their respective Notes may be outstanding.

## Investment Risks

### *The Company will have limited or no control over the underlying investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the investments.*

The Company expects to acquire preferred equity in Project Entities, acquire and hold real estate through Project Entities, or, occasionally, issue debt interests to Project Entities. Accordingly, the Company will not likely have control over such Project Entities (except in certain circumstances relating to the Company enforcing its creditor rights or contractual rights) and will be required to rely on the Project Partners of such Project Entities to use their skill, expertise and background to generate value from the investments.

### *Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.*

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that Investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

Real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without reviewing detailed budgets, such budgets may understate the expenses.

### *The Company is subject to a number of risks in the enforcement of its rights relating to investments.*

The Company's real estate investments will typically involve preferred equity investments in Project Entities, secured by a deed of trust in the underlying real property and a pledge of the Project Partner's membership interest in the Project Entity. The Company also has the authority to issue or purchase debt collateralized by real property. These investments are subject to the following risks:

(a)      The Company's investment structure is unique. Although the Company generally requires a Project Entity to grant a deed of trust in the underlying real property owned by the Project Entity to secure the Company's investment and return, and requires the Project Partners to pledge their equity interest in the Project Entity to the Company, there can be no assurance that such interests will be enforceable or that, in the event of non-performance by the Project Partner or a default by the Project Entity, that the real estate will be readily transferred to the Company or that the Company can obtain control of the Project Entity. There is a risk that Project Partners or other third parties may oppose or contest the enforceability or priority of such security.

137330388.4

(b)     During the course of an investment, or in the event the Company exercises its contractual remedies upon non-performance by the Project Partner or a default by the Project Entity, there is a risk that a Project Partner or other third party oppose or contest the enforceability of the Company's investment documentation, or assert claims or defenses against the Company or the Manager, including claims relating to the Company's ability to remove the Project Partner and take over management of a project. Such claims and potential litigation may result in the Company incurring substantial legal fees, and adversely affect the Manager's ability to mitigate losses resulting from a Project Partner's failure to perform.

(c)     There is no assurance that the Company will subsequently acquire title to the collateral property. The Project Partner may cure defaults or arrange for the Company's investment to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third-party may be prepared to outbid the Company to purchase the collateral property.

(d)     A debtor or Project Partner may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent debtors. These protections are at the expense of the Company, and may result in staying the Company's foreclosure proceedings, proceedings against the Project Partner, restructuring of the terms of the Company's investment, or otherwise delaying or interfering with the enforcement of the Company's rights under its investment documentation.

***Uninsured losses on the investments could materially reduce investment returns, which may impact the ability to return principal balances under the Note.***

The Project Partner will obtain insurance policies for the Projects that are commercially prudent given the local market and circumstances of the Project (typically, including liability, fire and extended coverage). However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Projects should be partially or totally destroyed, the Company, as an investor in the Project Entity, may suffer a substantial loss of capital as well as profits. Even if the Project Partner's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Project Entity will sustain a substantial uninsured loss as a result of the casualty.

**Private Offering and Liquidity Risks**

***This offering of the Notes is being made in reliance on an exemption from registration requirements and there is no guarantee that it will comply with the regulatory requirements for such exemption.***

This private placement of Notes will not be registered with the Securities and Exchange Commission ("**SEC**"). The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to Investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, Investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

***This is a private offering and as such you will not have the benefit of review of this Memorandum by the SEC or other agency.***

Since this offering is a private placement of securities and, as such, is not registered under federal or state securities laws, you will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

***The Notes will be Illiquid***

The Company expects its investments to be illiquid. Accordingly, the timing of its returns on those investments will be dependent upon various market factors. If the underlying assets in those investments are held for long periods or if any income streams of the Company are delayed or reduced, the Investors will be compelled to wait until the underlying assets are sold or improved, before being in a position to liquidate their investments. The Manager expects most of its real estate

137330388.4

investments to have an investment time frame of 2 years or less. However, the Company may have little or no control over when the underlying properties are liquidated.

You must represent that you are purchasing the Notes for your own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, encumber or otherwise dispose of your Notes unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Code or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans and you may not be able to liquidate your investment in the event of emergency or for any other reason, or may be able to liquidate your investment only at a substantial discount.

15

# U.S. FEDERAL INCOME TAX MATTERS

## Introduction

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Notes.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Notes, that purchased Notes at their original issue price for cash, and that hold such Notes as capital assets within the meaning of Section 1221 of the Code.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Notes by certain investors that are subject to special tax rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Notes in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Notes, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Notes, including the applicability of any U.S. federal tax laws or any state, local or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

## Considerations Relating to U.S. Holders of the Notes

As used herein, the term "*U.S. Holder*" means a beneficial owner of a Note that is, for U.S. federal income tax purposes:

- An individual citizen or resident of the U.S.;

- A corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- An estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- A trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Notes that is a partnership and the partners in such a partnership should consult their tax advisors.

137330388.4

**Classification of the Notes**

Pursuant to the terms of the Note Purchase Agreement, the Company and each holder of Notes will agree to treat the Notes, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Company's determination that the Notes constitute debt for U.S. federal income tax purposes. If any portion of the Notes is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Note could differ from the timing and character of income, gain or loss recognized in respect of the Notes described below. The remainder of this discussion assumes that the Notes will be treated as indebtedness in accordance with that agreement and our determination.

**Interest Income and Original Issue Discount**

Payments of "qualified stated interest" (as defined below) on a Note will be taxable to a U.S. Holder as ordinary income at the time that such payments are accrued or are received (in accordance with the U.S. Holder's method of tax accounting).

It is anticipated that the Notes may be issued at a discount from their stated redemption price at maturity and that such discount will be equal to or greater than the product of on-fourth of one percent (0.25%) of the stated redemption price at maturity multiplied by the number of full years to their maturity. As such, it is anticipated that the Holders of the Notes may be required to report original issue discount ("*OID*") over the term of the Notes. U.S. Holders of the Notes should be aware that, as described in greater detail below, they generally must include OID in ordinary gross income for U.S. federal income tax purposes as it accrues, in advance of the receipt of cash attributable to that income.

In general, each U.S. Holder of the Notes, whether such U.S. Holder uses the cash or the accrual method of tax accounting, will be required to include in ordinary gross income the sum of the "daily portions" of OID on the Notes for all days during the taxable year that the U.S. Holder owns the debt security. The daily portions of OID on the Notes are determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of an OID debt security, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. In the case of an initial holder, the amount of OID on a Note allocable to each accrual period is determined by (a) multiplying the "adjusted issue price" (as defined below) of the Note at the beginning of the accrual period by the yield to maturity of the Note (appropriately adjusted to reflect the length of the accrual period) and (b) subtracting from that product the amount (if any) of qualified stated interest (as defined below) allocable to that accrual period. The yield to maturity of a Note is the discount rate that causes the present value of all payments on the Note as of its original issue date to equal the issue price of such Note. The "adjusted issue price" of a Note at the beginning of any accrual period generally will be the sum of its issue price and the amount of OID allocable to all prior accrual periods, reduced by the amount of all payments other than payments of qualified stated interest (if any) made with respect to such Note in all prior accrual periods. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of a Note at a single fixed rate of interest or, subject to certain conditions, based on one or more interest indices.

**Sale, retirement or disposition of Notes**

Upon the sale, retirement or other disposition of a Note, an Investor generally will recognize taxable gain or loss equal to the difference between the amount realized on the disposition and the Investor's adjusted tax basis in the Note. A U.S. Holder's adjusted tax basis in a Note generally will be equal to its adjusted issue price (as described above) in the Note. Gain recognized on the disposition of a Note generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Note generally will be treated as an ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Note is more than one year). The deductibility of capital losses is subject to limitations.

**Backup withholding and information reporting**

Information reporting requirements generally will apply to payments of interest and OID made by the Company on, or the proceeds of the sale or other disposition prior to maturity of, the Notes. Backup withholding tax, currently at a rate of 28%, may apply to such payments if an Investor fails to:

- Furnish his, her or its taxpayer identification number (social security or employer identification number);

17

- Certify that such number is correct;

- Certify that he, she or it is not subject to backup withholding; or

- Otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, *provided* that the required information is furnished timely to the Internal Revenue Service (the "***IRS***").

<div align="center">

## ERISA MATTERS

</div>

**Benefit Plan Investor Considerations**

The Notes offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or an individual retirement account ("***IRA***") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "***Similar Law***"). A fiduciary of an employee benefit plan must determine that the purchase and holding of a Note is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Notes offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Note offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Note that its acquisition and holding of the Note does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

137330388.4

## REPORTS TO THE INVESTORS

The Company has adopted a calendar fiscal year ending December 31. For so long as the Holder continues to hold the Note, the Company will provide to the Holder:

(a)     As soon as practicable after the end of each fiscal year and in any event within one hundred eighty (180) days after each fiscal year, consolidated balance sheets of the Company as of the end of such fiscal year and consolidated statements of income of the Company for such fiscal year, prepared in reasonable detail; and

(b)     As soon as practicable after the end of each fiscal quarter and in any event within 60 days after the end of each fiscal quarter, unaudited quarterly financial statements.

## GLOSSARY

To understand the rights associated with the Notes, Investor must review carefully the defined terms used in this Memorandum. Some of these definitions are set forth in this "GLOSSARY" and others in the body of this Memorandum. These definitions (some of which have been slightly modified) have been taken from the Note Purchase Agreement, which defines the preferences, privileges, rights, interests and obligations of the Notes. Many of these definitions are technical in nature, involve complicated relationships, and can only be understood by reference to other defined terms and, in some cases, to other provisions of the Note Purchase Agreement. Section references in the definitions refer to sections in the Note Purchase Agreement. Prospective investors should understand that the definitions in the Note Purchase Agreement will, for all purposes, be controlling, notwithstanding any simplification of such definitions in this Memorandum. Moreover, you should bear in mind that this GLOSSARY does not include many of the definitions included in the Note Purchase Agreement.

"*Affiliate*" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"*Estimated Tax Amount*" means, with respect to each member of the Company, the amount equal to (a) the sum of (i) the greater of the highest statutory marginal ordinary federal income tax rate for individuals or corporations for a given tax year plus (ii) the unearned income Medicare contribution tax rate under Internal Revenue Code Section 1411 for a given year, multiplied by (b) the taxable income allocated to that member for the taxable year.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

2

# THE OFFERING

The following description of certain matters relating to the Notes does not purport to be complete and is subject in all respects to applicable Washington Law and to the provisions of the Note Purchase Agreement.

## General

The Offering has not been registered under the Securities Act and is intended by the Company not to involve a public offering within the meaning of the Securities Act and Regulation D promulgated thereunder and, therefore, to be exempt from the registration provisions of the Securities Act. Accordingly, the Offering is being made pursuant to certain conditions which, if satisfied, will qualify the Offering for exemption from registration as provided by the Securities Act and Regulation D. These conditions relate to limitations on the manner of Offering, the nature of the Investors, access to or furnishing information about the issuer, and restrictions on transferability. This Offering is not being offered pursuant to Rule 506(c) of Regulation D.

Subject to the terms of the Note Purchase Agreement, the Company is authorized to raise up to $10,000,000 through the Offering. Investors must make a minimum investment of $50,000, unless a smaller purchase is permitted by the Manager.

The Manager will have an initial closing for the Company as soon as practicable after a sufficient quantity of funds is raised in the Manager's sole determination. To accommodate the admission of additional Investors and permit existing Investors to increase their investment amounts, the Manager may, in its discretion, hold one or more additional closings on or before March 31, 2018, unless extended up to 180 days by the Manager.

## Payment of Investments

Each payment to the Company will be made in United States dollars by means of a certified or cashier's check payable to "iCap Equity, LLC" or by wire or electronic funds transfer, to a bank account designated by the Company, of immediately available funds through the federal wire transfer system, in the amount that the Holder has agreed to lend to the Company in the Note Purchase Agreement.

## Acceptance of Subscriptions; Eligibility Requirements

Purchases for the Notes will be accepted on a "first come, first-served" basis. The Manager reserves the right to reject any tendered investment for whatever reason the Manager deems appropriate. If the Manager rejects an investment, the Manager will give notice of such rejection, and return the tendered initial investment payment, no later than 10 business days after the Note Purchase Agreement and the accompanying funds have been received by the Manager.

# TRANSFERABILITY OF THE NOTES

Subject to compliance with the requirements of the Note Purchase Agreement, Investors shall have the right to transfer the Note to any qualifying third party of its choice contingent upon securing the Company's written consent in advance of the proposed transfer. The Company is under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under the Note Purchase Agreement, until the Holder has surrendered the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Company. A new Note for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing a Note Purchase Agreement, and executing a Certificate of Accredited Investor. Interest and principal are payable only to the registered holder of the Note.

The Holder and any successor Holder agree(s) to provide to the Company a Form W-9 upon request. Until registration of a transfer occurs, the Company shall be entitled to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by the Note Purchase Agreement and the applicable Note.

## State Securities: Blue Sky Laws

Transfer of the Notes may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Notes may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be registered for resale under the Blue Sky laws of any state, the Holders and any persons who desire to purchase them in any

78404-0012/137330388.4

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 4, Page 450 of 1366

trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Notes and of purchasers to purchase the Notes. Accordingly, Investors should be prepared to hold the Notes until their maturity date as may be extended.

## FINANCIAL INFORMATION

This Memorandum does not include current balance sheets for either the Company or the Manager. The Manager has limited capitalization. As of the date hereof, the Company has incurred certain liabilities in connection with the offering and will incur substantial expenses in connection with the offering and sale of the Notes.

### Legal Representation

The Manager has engaged Perkins Coie LLP as its legal counsel to assist in connection with transactions contemplated by this Memorandum and in preparing the Note Purchase Agreement, this Memorandum and related documents. Perkins Coie LLP, in providing such advice has represented the Manager's interests and did not represent nor purport to represent the interests of any other Investor or potential investor. The Company urges you to engage your own legal counsel and, as necessary, financial consultants for advice regarding the desirability of purchasing the Notes offered pursuant to this Memorandum. Perkins Coie LLP may in the future represent the Company, the Manager or related parties on various matters, subject to complying with applicable legal principles for resolving conflicts of interest.

4

# NOTICES

The following notices apply in certain states where the Notes, which are referred to below as "securities," may be sold. Compliance with the notice exemption requirements of applicable state securities laws will be undertaken by the Company as needed.

**Notice to Residents of all States:**

THE SECURITIES OFFERED IN THE OFFERING HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND OTHER LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ACT AND THE SECURITIES LAWS OF CERTAIN JURISDICTIONS GRANT PURCHASERS OF SECURITIES SOLD IN VIOLATION OF THE REGISTRATION OR QUALIFICATION PROVISIONS OF SUCH LAWS THE RIGHT TO RESCIND THEIR PURCHASE OF SUCH SECURITIES AND TO RECEIVE BACK THEIR CONSIDERATION PAID. THE COMPANY BELIEVES THAT THE OFFERING DESCRIBED IN THIS MEMORANDUM IS NOT REQUIRED TO BE REGISTERED OR QUALIFIED. MANY OF THESE LAWS GRANTING THE RIGHT OF RESCISSION ALSO PROVIDE THAT SUITS FOR SUCH VIOLATIONS MUST BE BROUGHT WITHIN A SPECIFIED TIME, USUALLY ONE YEAR FROM DISCOVERY OF FACTS CONSTITUTING SUCH VIOLATION. SHOULD ANY INVESTOR INSTITUTE SUCH AN ACTION ON THE THEORY THAT THE OFFERING CONDUCTED AS DESCRIBED HEREIN WAS REQUIRED TO BE REGISTERED OR QUALIFIED, THE COMPANY WILL CONTEND THAT THE CONTENTS OF THIS MEMORANDUM CONSTITUTED NOTICE OF THE FACTS CONSTITUTING SUCH VIOLATION.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS ATTACHED TO THIS MEMORANDUM. NO ONE HAS BEEN AUTHORIZED TO PROVIDE YOU WITH ANY INFORMATION THAT IS DIFFERENT. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN GIVEN BY THE ISSUER OF THE SECURITIES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE ON THE COVER PAGE AND IS AN OFFER ONLY TO SUCH NAMED OFFEREE.

NEITHER THE INFORMATION CONTAINED HEREIN, NOR ANY PRIOR, CONTEMPORANEOUS OR SUBSEQUENT COMMUNICATION SHOULD BE CONSTRUED BY THE PROSPECTIVE INVESTOR AS FINANCIAL, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS, HER OR ITS OWN FINANCIAL, LEGAL, AND TAX ADVISORS TO ASCERTAIN THE MERITS AND RISKS OF THE OFFERING AND AN INVESTMENT IN THE COMPANY PRIOR TO SUBSCRIBING TO PURCHASE THE SECURITIES.

78404-0012/137330388.4

**Notice to New York Residents:**

THIS CONFIDENTIAL OFFERING MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

**Notice to Florida Residents:**

THE SECURITIES OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE SECURITIES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER OF THE SECURITIES OR AN AGENT OF SUCH ISSUER, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**Notice to New Hampshire Residents:**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

DURING THE COURSE OF THIS OFFERING, EACH PROSPECTIVE INVESTOR MAY OBTAIN ADDITIONAL INFORMATION WHICH SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY PROSPECTIVE INVESTOR WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE INVESTOR'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE COMPANY IF THE RECIPIENT DOES NOT PURCHASE THE SECURITIES OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE TO:

78404-0012/137330388.4

CONFIDENTIAL - NOT TO BE REPRODUCED OR REDISTRIBUTED

# EXHIBIT A

## NOTE PURCHASE AGREEMENT

**NOTE PURCHASE AGREEMENT**

**by and between**
**ICAP EQUITY, LLC**
**a Delaware limited liability company,**

**and**

**THE HOLDER (AS DEFINED BELOW)**

**Dated as of _____**

# CONTENTS

1. Definitions ....................................................................................................................... 1

2. Delivery of Loan Amounts ................................................................................................ 2

    2.1 Loan Amounts ............................................................................................................ 2

    2.2 Prepayment ................................................................................................................. 3

    2.3 Event of Default ......................................................................................................... 3

3. Closing ............................................................................................................................. 3

4. Representations and Warranties of the Company ............................................................. 3

    4.1 Organization and Authority ....................................................................................... 3

    4.2 Authorization; Binding Effect ................................................................................... 3

    4.3 No Bankruptcy or Insolvency .................................................................................... 4

    4.4 Valid Issuance of the Note ......................................................................................... 4

    4.5 Restricted Securities .................................................................................................. 4

    4.6 Governmental Consents and Notices ......................................................................... 4

    4.7 No Litigation .............................................................................................................. 4

    4.8 No Breach; No Default ............................................................................................... 5

    4.9 Taxes .......................................................................................................................... 5

5. Representations, Warranties and Agreements of the Holder ............................................ 5

    5.1 Purchase Entirely for Own Account .......................................................................... 5

    5.2 Due Diligence ............................................................................................................ 5

    5.3 Access to Information; Modification of Offering ....................................................... 5

    5.4 Sophistication ............................................................................................................. 6

    5.5 Suitability ................................................................................................................... 6

    5.6 Professional Advice ................................................................................................... 6

    5.7 Ability to Bear Risk ................................................................................................... 6

    5.8 Possible Loss of Interest and Principal ..................................................................... 7

    5.9 Restricted Securities .................................................................................................. 7

    5.10 Further Limitations on Disposition .......................................................................... 7

    5.11 Age; Residency ........................................................................................................ 7

    5.12 Accredited Investor Status ....................................................................................... 7

    5.13 Tax Identification; Withholding ............................................................................... 8

    5.14 No View to Tax Benefits .......................................................................................... 8

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 4, Page 456
1366

5.15 Confidential Information.........................................................................................8

5.16 No General Solicitation.........................................................................................9

5.18 Representations and Warranties of Organization ...................................................9

6. Conditions to Closing; Security Interests .....................................................................9

6.1 Holder's Conditions of Closing ...............................................................................9

6.2 Company's Conditions of Closing............................................................................9

7. Covenants ....................................................................................................................10

7.1 Tax Statements ......................................................................................................10

7.2 Use of Proceeds ....................................................................................................10

7.3 Information Rights..................................................................................................10

7.4 Notice of Default ...................................................................................................10

8. Defaults and Remedies ................................................................................................10

8.1 Events of Default...................................................................................................10

8.2 Acceleration ..........................................................................................................11

9. Transfer of the Note ....................................................................................................11

10. Miscellaneous ...........................................................................................................11

10.1 Assignment..........................................................................................................11

10.2 Governing Law; Jurisdiction................................................................................12

10.3 Waiver of Jury Trial.............................................................................................12

10.4 Counterparts ........................................................................................................12

10.5 Titles and Subtitles..............................................................................................12

10.6 Notices ................................................................................................................12

10.7 Expenses..............................................................................................................13

10.8 Entire Agreement.................................................................................................13

10.9 Amendments and Waivers ...................................................................................13

10.10 Severability........................................................................................................13

10.11 Anti-Terrorism Matters .....................................................................................13

10.12 Survival .............................................................................................................14

EXHIBITS

SCHEDULE OF HOLDERS ..............................................................................EXHIBIT A

FORM OF NOTE...............................................................................................EXHIBIT B

# NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of this _____ day of _____, 20___ by and between iCap Equity, LLC, a Delaware limited liability company (the "*Company*"), and each Note (as defined below) holder (the "*Holder*") whose name is added to the Schedule of Holders attached hereto as *Exhibit A*, which schedule will be amended from time to time as loans are made to the Company by Holders.

## RECITALS

A.    Company desires to borrow up to $10,000,000 from the Holders pursuant to this Agreement and promissory notes in substantially the form attached hereto as *Exhibit B* (individually, a "*Note*" and collectively, the "*Notes*"), to fund its operational activities and debt consolidation as set forth in its Memorandum of Terms for the Private Placement of Debt Securities of iCap Equity, LLC.

B.    The Company will accept funds under this Agreement only from an investor qualifying as an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933.

C.    The undersigned, by executing this Agreement, agrees to loan to the Company the amount stipulated on the Signature Page, and will receive from the Company a Note in the equivalent principal amount. The Company's closing of such transaction is subject to the conditions set forth in this Agreement.

## AGREEMENT

Now, therefore, in consideration of the mutual promises and covenants set forth herein, the Parties hereby agree as follows:

**1.    Definitions**

As used in this Agreement and the exhibits hereto, the following capitalized terms have the meanings set forth below unless the context clearly indicates otherwise. All nouns, pronouns and verbs used in this Agreement shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable.

"*Act*" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

"*Affiliate*" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Agreement*" means this Note Purchase Agreement, as originally executed or as amended by the Parties, and shall include the forms and exhibits attached thereto.

"*Bankruptcy Law*" is defined in Section 8.1.

"*Business Day*," when used with respect to any place of payment or any other particular location referred to in this Agreement or in the Note, means each Monday, Tuesday, Wednesday, Thursday and

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 4, Page 458
Exhibit 4, Page
1366

Friday which is not a day on which banking institutions or trust companies in the City of Seattle are authorized or obligated by law or executive order to close.

"**PPM**" means the Memorandum of Terms for the Private Placement of Debt Securities of iCap Equity, LLC dated November 1, 2017.

"**Closing**" is defined in Section 3.

"**Company**" means iCap Equity, LLC, a Delaware limited liability company, which is the obligor under the Note.

"**Note**" means the payment obligation, to be issued by the Company in favor of the Holder, pursuant to the terms of this Agreement, with an original principal amount equal to the loan made by the Holder to the Company at Closing (i.e. the Loan Amount). The Note shall be in the form attached hereto as *Exhibit B*.

"**Notes**" refer to, collectively, each Note issued by the Company pursuant to this Agreement, with each of the Notes in the form attached hereto as *Exhibit B*.

"**Event of Default**" means any event which is, or after notice or passage of time, or both, would be, an Event of Default within the meaning of Section 8.

"**Holder**" means any Person listed on *Exhibit A* who has purchased a Note pursuant to this Agreement, or any transferee thereof permitted under Section 9.

"**Loan Amount**" is defined in Section 2.1.

"**Maturity Date**" is defined in Section 2(a) of the Note.

"**Offering**" means the offering by the Company of the Notes pursuant to this Agreement.

"**Parties**" means the Company and the Holder.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**SEC**" is defined in Section 4.5.

"**Self-Directed Entity**" is defined in Section 5.17.

"**Signature Page**" means the Holder's signature page to this Agreement, upon which the Holder may designate the Loan Amount. Attached to this Agreement are several different versions of the Signature Page, each customized depending on whether the investor is an individual, a Self-Directed Entity or another legal entity (such as a corporation, limited liability company, or trust).

## 2. Delivery of Loan Amounts

### 2.1 Loan Amounts

By the execution of this Agreement, subject to the terms and conditions of this Agreement, the Holder agrees to lend to the Company principal in an amount set forth on the Signature Page (the "*Loan Amount*"), and the Company agrees to borrow such amount and in exchange for such funds to issue to the

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 4, Page 459
1366

Holder a Note. At the time of the Holder's execution and subsequent delivery of this Agreement to the Company the Holder shall deliver the Loan Amount proceeds to an account of the Company as described in Section 2.

### 2.2    Prepayment

The Company may choose to prepay part or all of the Note without penalty at any time prior to the Maturity Date.  The Company shall have an option to extend the Maturity Date for twelve (12) months pursuant to the Note document, in which case the interest rate during such extension period will increase to 11.0%.  The Company need not prepay any of its noteholders pro rata, and it may choose to prepay some but not others.

### 2.3    Event of Default

Section 8 sets forth each of the events constituting an "***Event of Default***" under the Note and stipulates the rights of the Holder to accelerate amounts due thereunder.

## 3.    Closing

Upon satisfaction of the closing conditions, the Company shall borrow moneys from the Holder and the Holder shall lend such moneys to the Company, pursuant to the terms of this Agreement. The Closing (the "***Closing***") shall take place either (a) in the offices of the Company at 3535 Factoria Blvd SE, Suite 500, Bellevue, Washington 98006; (b) such other address as the Company designates in writing; or (c) via electronic submission of the necessary signed documents, as soon as the closing conditions have been satisfied. The sale of the Note is separate and independent from any other borrowings that may be made by the Company. At the Closing, the Holder shall deliver to the Company a check payable to "iCap Equity, LLC" or by wire transfer, to a bank account designated by the Company, of immediately available funds through the federal wire transfer system, the Loan Amount, and upon receipt and acceptance of the subscription, the Company shall promptly thereafter deliver to the Holder the Note, reflecting such Loan Amount.

## 4.    Representations and Warranties of the Company

To induce the Holder to loan monies to the Company, the Company represents and warrants to the Holder as follows as of the date of the Closing:

### 4.1    Organization and Authority

The Company is a limited liability company, validly existing and in good standing under the laws of the State of Delaware, with full power and authority to enter into and perform this Agreement and the other agreements contemplated hereby to which it is now, or will be, a party. The Company has all requisite power and authority to, directly or indirectly, own its properties, to carry on its business as now conducted, and to enter into and perform its obligations under this Agreement.

### 4.2    Authorization; Binding Effect

The Company has taken all actions that are necessary to authorize the execution, delivery and performance of this Agreement and the Note, and the consummation of the transactions contemplated hereby. This Agreement and the other agreements contemplated hereby to which the Company is a party constitute the legal and binding obligations of the parties thereto, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency,

moratorium or similar laws affecting creditors' rights and the enforcement of debtors' obligations generally and by general principles of equity, regardless of whether enforcement is pursuant to a proceeding in equity or at law.

### 4.3 No Bankruptcy or Insolvency

The Company has not filed any voluntary petition in bankruptcy or been adjudicated bankrupt or insolvent, filed any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any federal bankruptcy, insolvency, or other debtor relief law, or sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator of all or any substantial part of its properties. No court of competent jurisdiction has entered an order, judgment or decree (and the Company knows of no action or petition requesting such) approving a petition filed against the Company seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any federal bankruptcy act, or other debtor relief law, and no other liquidator, trustee or conservator has been appointed of the Company or of all or any substantial part of its properties.

### 4.4 Valid Issuance of the Note

The Note, when issued by the Company to the Holder for the consideration expressed therein, will be duly and validly issued, and, based in part upon the representations of the Holder in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

### 4.5 Restricted Securities

The Company acknowledges that the Note has not been and will not be registered with the Securities and Exchange Commission ("*SEC*") under the Act, and covenants that the Note will be offered and sold in compliance with an exemption from registration provided by Rule 506 of Regulation D of the Act. Neither the Company nor any person acting on its behalf has conducted any "general solicitation" or "general advertising" (as those terms are used in Regulation D) in connection with the offer or sale of any of the Notes.

### 4.6 Governmental Consents and Notices

No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Note, or the consummation of any other transaction contemplated hereby, except qualification (or taking such action as may be necessary to secure an exemption from qualification, if available) of the offer and sale of the Note under applicable state and federal securities laws, which qualification, if required, will be accomplished in a timely manner.

### 4.7 No Litigation

There are no actions, suits or proceedings of any type pending or, to the knowledge of the Company, threatened, against the Company, its properties or assets which is likely to if adversely determined, individually or in the aggregate, have a material adverse effect on (a) the Company's ability to perform the obligations contemplated under this Agreement or other agreements contemplated hereby or (b) the business, operations, prospects, properties, assets or condition (financial or otherwise) of the Company. The Company is not operating under, or subject to, or in default with respect to, any order, writ, injunction or decree, including any of the foregoing affecting the ability of the Company to enter into this Agreement or perform its obligations contemplated under this Agreement and other agreements contemplated hereby.

### 4.8 No Breach; No Default

To the best of the Company's knowledge, neither the execution, delivery or performance of this Agreement or the other agreements contemplated hereby to which the Company is a party, nor the consummation of the transactions contemplated hereby or thereby by the Company, (a) materially conflicts with or results in any material breach of, (b) constitutes a material default under, or (c) results in a material violation of: (i) any contract, commitment, lease, license, note or other instrument, including voting or limited liability company operating agreements, to which the Company is a party or by which any of its assets are bound, judgment, order, writ or decree or (ii) any provision of the Company's Certificate of Formation.

### 4.9 Taxes

The Company has timely filed or will timely file or cause to be timely filed, all material tax returns (or extensions) required by applicable law to be filed by it prior to or as of the Closing Date, and paid (a) all amounts of taxes shown thereon to be due (including interest and penalties) and (b) all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangibles taxes) owing by it, except for such taxes (i) which are not yet delinquent or (ii) that are being contested in good faith and by proper proceedings, and against which adequate reserves are being maintained in accordance with United States generally acceptable accounting procedures.

## 5. Representations, Warranties and Agreements of the Holder

To induce the Company to accept the loan from the Holder, the Holder represents and warrants to the Company as of the date of the Closing as follows:

### 5.1 Purchase Entirely for Own Account

The Note will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to distributing all or any part of the Note; the Holder has no present intention of selling, granting any participation in or otherwise distributing the Note in a manner contrary to the Act or any applicable state securities law; and the Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person with respect to the Note.

### 5.2 Due Diligence

The Holder has been solely responsible for his, her or its own due diligence investigation of the Company and its business, and his, her or its analysis of merits and risks of the investment and subscription made pursuant to this Agreement, and is not relying on anyone else's analysis or investigation of the Company, its business or the merits and risks of the Note other than professional advisors employed specifically by the Holder to assist the Holder. In taking any action or performing any role relative to arranging the investment being made pursuant to this Agreement, the Holder has acted solely in his, her or its own interest and not in that of any other party, and no other party has acted as an agent or fiduciary for the Holder.

### 5.3 Access to Information; Modification of Offering

The Holder has received and reviewed in its entirety the PPM accompanying this Agreement. The Holder has been offered access to full and complete information regarding the Company and has assessed to his, her, or its satisfaction the risks associated with an investment in the Note. In particular, the Holder

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 4, Page 462
1366

has been given the opportunity to ask questions of, and receive answers from, the Company's officers concerning the terms and conditions of this Agreement, the Note, the Company's PPM, and any other matters pertaining to the Company and an investment in the Note and has been given the opportunity to obtain such additional information necessary to verify the accuracy of such information. No information has been provided and no representations have been made to the Holder which are inconsistent with any information contained in the PPM. The Holder acknowledges that the Company may, in its sole discretion and for any reason whatsoever, modify, amend, increase or withdraw all or a portion of the Offering. In the event of the foregoing, the Company will not have any liability whatsoever to the Holder, except that the Company will be obligated to return any moneys transmitted to the Company by the Holder that have not been applied by the Company for the purchase of Notes, without interest or deduction.

### 5.4    Sophistication

The Holder, either alone or with the assistance of his, her or its professional advisor, is a sophisticated investor, is able to fend for himself, herself or itself in the transactions contemplated by this Agreement, and has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of acquiring the Note.

### 5.5    Suitability

The investment in the Note is suitable for the Holder based upon his, her or its investment objectives and financial needs, and the Holder has adequate net worth and means for providing for his, her or its current financial needs and contingencies and has no need for liquidity of investment with respect to the Note. The Holder's overall commitment to investments that are illiquid or not readily marketable is not disproportionate to his, her or its net worth, and investment in the Note will not cause such overall commitment to become excessive.

### 5.6    Professional Advice

The Holder has obtained, or has had the opportunity to obtain, to the extent he, she or it deems necessary, his, her or its own professional advice with respect to the risks inherent in the investment in the Note, the condition and terms of this Agreement and the suitability of the investment in the Note in light of the Holder's financial condition and investment needs. The Holder is not relying on the Company or any of its directors, officers, employees or agents with respect to the legal, tax, economic and related considerations of an investment in the Note, nor is the Holder relying on the Company or any of its directors, officers, employees or agents (including those of any Affiliates) with respect to the appropriateness of this investment for the Holder.

### 5.7    Ability to Bear Risk

The Holder understands that the Company has limited prior operating history. The Holder recognizes that there is no market for the Notes and none is expected to develop; accordingly, his, her or its interest in the Note will be illiquid as well as subject to substantial contractual restrictions upon transferability. The Holder is in a financial position to purchase and hold the Note and is able to bear the economic risk and withstand a complete loss of his, her or its investment in the Note. The Holder agrees to waive any present or future claim against the Company, its officers, directors, representatives or Affiliates that the Note was not an appropriate investment for the Holder.

### 5.8 Risk Factors

The Holder recognizes that an investment in the Note is subject to certain risks, the occurrence of which might result in a loss of the principal and interest due to the Holder. The Holder has carefully reviewed and understands the risk factors set forth in the PPM.

### 5.9 Restricted Securities

The Holder realizes that (a) neither the Notes nor the offering of the Notes have been registered under the Act or applicable state securities laws; (b) that the Notes are characterized under the Act as "restricted securities" and, therefore, cannot be sold or transferred unless they are subsequently registered under the Act or an exemption from such registration is available; (c) the Company is not being registered as an "investment company" as the term "investment company" is defined in Section 3(a) of the 1940 Act, and (d) there is presently no public market for the Note and the Holder would most likely not be able to liquidate his, her or its investment in the event of an emergency or to pledge the Note as collateral security for loans. The Holder's financial condition is such that it is unlikely that the Holder would need to dispose of any of the Note in the foreseeable future. In this connection, the Holder represents that he, she or it is familiar with Rule 144 of the Securities Act, as promulgated by the Securities and Exchange Commission, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

### 5.10 Further Limitations on Disposition

Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Note unless and until there is compliance with the following requirements:

        (a)     the Holder shall arrange for the registered transfer of the Note as required by Section 9.

        (b)     the Holder shall have furnished to the Company a detailed statement of the circumstances surrounding the proposed disposition and, if reasonably requested by the Company, shall have furnished to the Company an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such Note under the Act and any applicable state Blue Sky laws.

        (c)     notwithstanding any other restrictions on the proposed transfer or disposition of the Note, any such proposed transfer or disposition shall be limited to and conditioned upon the proposed transferee qualifying as an "accredited investor" as set forth in Section 5.12.

### 5.11 Age; Residency

The Holder, if an individual, is over 21 years of age and legally competent to execute this Agreement. For purposes of the application of state securities laws, the Holder represents that he, she or it is a bona fide resident of, and/or is domiciled in, the state set forth in such Holder's residence address on the "Certificate of Accredited Investor" to be delivered to the Company at the Closing as required by Section 6.2(e).

### 5.12 Accredited Investor Status

By the execution of this Agreement, the Holder represents and warrants that he, she or it is an accredited investor within the meaning of Regulation D promulgated under the Act as indicated on the "Certificate of Accredited Investor" delivered to the Company at the Closing, and agrees to provide any

7

additional documents and information that the Company reasonably requests. The Holder acknowledges that the Company is relying upon the Holder's representation of accredited status as a condition of entering into this Agreement, and as such agrees to waive any future claim that Holder was not an accredited investor. The Holder is aware that the Company has been and is relying upon the representations and warranties set forth in this Agreement, in part, in determining whether the Offering will qualify for an exemption from the registration provisions of the Act and applicable state securities laws. All of the information which the Holder has furnished the Company here, previously or in the documents or instruments contemplated by this Agreement with respect to the Holder's financial position and business experience is correct and complete as of the date hereof, and, if there should be any material change in such information, the Holder will immediately furnish the revised and corrected information to the Company. The Holder agrees to indemnify and hold harmless the Company and its Affiliates and their respective officers, managers, directors, members or employees and their successors and assigns from and against any and all losses, damages, liabilities or expenses, including costs and attorneys' fees incurred by reason of any misrepresentation by the Holder or any breach of the Holder's warranties.

### 5.13    Tax Identification; Withholding

Under penalties of perjury, the Holder certifies that (a) the number listed with the Holder's name on the signature page to this Agreement is the Holder's correct social security number or federal tax identification number, (b) the Holder is not subject to back-up withholding, either because he, she or it has not been notified that he, she or it is subject to back-up withholding as a result of a failure to report all interest and dividends or because the Internal Revenue Service has notified the Holder that he, she or it is no longer subject to back-up withholding and (c) Holder is not a "foreign person," "foreign corporation" or a person which is not a "United States person" within the meaning of Sections 1441, 1442, 1445 and 1446 of the Internal Revenue Code of 1986, as amended. (If the Holder has at any time received notice from the Internal Revenue Service that he, she or it is subject to back-up withholding and has not subsequently received a notice advising the Holder of the termination of back-up withholding, strike clause (b) above).

### 5.14    No View to Tax Benefits

The Holder is not acquiring the Note with a view toward realizing any benefits under United States federal income tax laws, and no representations have been made to the Holder that any such benefits will be available as a result of the Holder's acquisition, ownership or disposition of the Note.

### 5.15    Confidential Information

The Holder understands that the information contained in the PPM and this Agreement, is confidential and non-public information and agrees that all such information shall be kept in confidence by Holder and used by Holder solely for purposes of determining whether to purchase the Note.  In addition, except as required by law, regulation or regulatory process, each Holder shall keep confidential, and shall cause each of its employees, agents, representatives, advisors or consultants to keep confidential all non-public information received by them with respect to the Company and its Affiliates following the Closing. The Holder, if an entity, represents and warrants that, as of the Closing, none of its beneficial owners are public agencies which are subject to state, federal or foreign laws providing for the possible public disclosure of certain records and information relating to the activities of such public agencies. The Holder agrees to notify the Company in the event such a public agency becomes a beneficial owner of the Holder and agrees to reasonably cooperate with the Company in such event to take steps, including entering into confidentiality agreements that restrict the access of certain of the Holder's beneficial owners to certain information, to protect information about the Company and its investments from being publicly disclosed by such public agency.

### 5.16   No General Solicitation

The Holder is unaware of, is in no way relying on, and did not become aware of, the offering of the Note through, or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television, radio or Internet and is not subscribing for the Note, and did not become aware of the offering of the Note through, or as a result of, any seminar or meeting to which the Holder was invited, or any solicitation otherwise initiated, by a person not previously known to the Holder in connection with investments in securities generally.

### 5.17   Representations and Warranties of Organization

If the Holder is a corporation, partnership or other association, trust or similar entity, the Holder hereby represents and warrants to the Company that the Holder is authorized and otherwise duly qualified to acquire the Note, and the individual executing this Agreement on behalf of the Holder has been duly authorized to do so and to bind the Holder by this Agreement (if the Holder is an individual who is investing through a revocable trust, an IRA or an account in a self-directed employee benefit plan (a "*Self-Directed Entity*"), such representation and warranty applies to the Self-Directed Entity, and, for this purpose, the term "*Holder*" shall be deemed to refer to the Self-Directed Entity).

## 6.   Conditions to Closing; Security Interests

### 6.1   Holder's Conditions of Closing

The obligation of the Holder to purchase the Note at the Closing pursuant to this Agreement shall be subject to and conditioned upon satisfaction or the waiver by such Holder of the following conditions on or prior to the applicable Closing Date:

        (a)     the representations and warranties of the Company contained in this Agreement shall be true and correct in all material respects as of the applicable Closing and all covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the applicable Closing shall have been performed or complied with in all material respects.

        (b)     the Company shall have obtained all necessary blue sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Note.

### 6.2   Company's Conditions of Closing

The obligation of the Company to sell the Note to a Holder at the Closing pursuant to this Agreement shall be subject to and conditioned upon satisfaction of the following conditions on or prior to the Closing:

        (a)     all representations and warranties of the Holder contained in this Agreement, including the Certificate of Accredited Investor tendered by the Holder to the Company pursuant to Section 6.2(e), shall be true and correct as of the Closing Date and all covenants, agreements and conditions contained in this Agreement to be performed by such Holder on or prior to the Closing Date shall have been performed or complied with in all material respects.

(b)     the Company shall have obtained all necessary blue sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Note.

(c)     no action or proceeding before any court or government body will be pending wherein a judgment, decree or order would prevent any of the transactions contemplated hereby or cause such transactions to be declared unlawful or rescinded.

(d)     execution and delivery by such Holder of this Agreement.

(e)     the Holder has completed, signed and delivered to the Company the "Certificate of Accredited Investor," in the form attached as **Exhibit C**, representing that the Holder's status qualifies as an "accredited investor" within the meaning of Regulation D under the Act.

## 7.     Covenants

### 7.1     Tax Statements

The Company will furnish to each Holder as soon as available, and in any event within sixty (60) days after December 31 of each year, all reasonably required tax information applicable to the Holder.

### 7.2     Use of Proceeds

The proceeds from the sale and issuance of the Notes are expected to be used for the purposes set forth in the PPM, and for the fees, costs and expenses incurred in connection with the Offering.  However, the Manager retains sole discretion to determine how such proceeds are ultimately used. Distributions may be made so long as the Company is not in default under the Note obligations.

### 7.3     Information Rights

For so long as the Holder continues to hold the Note, the Company will provide to the Holder annual financial statements of the Company and such information relative to the Company's business operations and performance as its management may deem useful or appropriate.

### 7.4     Notice of Default

The Company hereby covenants and agrees, as of the Closing and thereafter until the Notes and all other obligations arising under this Agreement have been repaid in full, the Company shall give notice in writing to the Holders (promptly, but in any event within fifteen (15) business days after the Company knows or has reason to know thereof), the occurrence of any Event of Default.

## 8.     Defaults and Remedies

### 8.1     Events of Default

An "**Event of Default**" occurs if any of the following occur, regardless of the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

10

(a)     the Company defaults in the payment of any Loan Amount or interest on any of the outstanding Notes, when the same becomes due and payable and such default continues for a period of thirty (30) Business Days (such period, a "**Grace Period**");

(b)     the Company fails to observe or perform any covenant or warranty of the Company in this Agreement (other than a covenant or warranty a default in whose performance or whose breach is specifically dealt with elsewhere in this Section), and such failure continues for a period of thirty (30) calendar days after the Holder has given written notice to the Company specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c)     the Company, pursuant to or within the meaning of any Bankruptcy Law (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

(d)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Company in an involuntary case, (ii) appoints a custodian of the Company for all or substantially all of its property, or (iii) orders the liquidation of the Company; and the order or decree remains unstayed and in effect for ninety (90) consecutive calendar days.

The term "**Bankruptcy Law**" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "**Custodian**" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

## 8.2     Acceleration

Upon the occurrence of an Event of Default, the Holder may declare the Loan Amount (including the Loan Amount or interest on the Holder's Note) to be due and payable. Upon such a declaration, such principal and interest, if any, shall be immediately due and payable.

## 9.     Transfer of the Note

Holder may not sell, assign or transfer this Agreement or the Note or any portion thereof, including, without limitation, the Holder's rights, title, interests, remedies, powers and/or duties hereunder or thereunder, as the case may be, without the express written consent of the Company, which consent may be granted or withheld in the Company's sole discretion, and without complying with the terms of this Agreement and any other requirements set forth by the Company.

## 10.     Miscellaneous

### 10.1     Assignment

The Company may not assign this Agreement or any of its rights, interests or obligations hereunder without the prior written consent the Holder. Furthermore, the Holder may not transfer any interest in the Note. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

### 10.2 Governing Law

This Agreement shall be governed by and construed under the laws of the State of Washington as applied to agreements among Washington residents, entered into and to be performed entirely within the State of Washington, without giving effect to principles of conflicts of law. The Parties irrevocably consent to the jurisdiction and venue of and in King County, Washington in connection with any action arising from or relating to this Agreement or the transaction it contemplates. In the event of any dispute arising from or relating to this Agreement, the prevailing party shall be entitled to an award of its reasonable attorneys' fees and costs.

### 10.3 Waiver of Jury Trial

EACH PARTY, TO THE EXTENT PERMITTED BY LAW, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS IT CONTEMPLATES.  THIS WAIVER APPLIES TO ANY ACTION OR LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

### 10.4 Counterparts

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

### 10.5 Titles and Subtitles

The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

### 10.6 Notices

Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) upon confirmation of receipt by fax by the party to be notified if received on or before 5:00 p.m. (local time) on any Business Day or, if received later on such day, upon the close of business on the next Business Day, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (d), or (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by ten (10) days' advance written notice to the other party given in the foregoing manner.

If to the Company:
iCap Equity, LLC
Attn: Chris Christensen
3535 Factoria Blvd SE Ste 500
Bellevue, WA 98006
Fax: 425-278-9025

With a copy to:
Perkins Coie LLP
c/o Martha Sandoval
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099

If to Holder:
To the address contained on the Holder's Signature Page.

**10.7    Expenses**

Each party to this Agreement shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Agreement, the related agreements and the transactions contemplated herein and therein.

**10.8    Entire Agreement**

This Agreement and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the Parties with regard to the subjects hereof and thereof.

**10.9    Amendments and Waivers**

Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Holder.

**10.10    Severability**

If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

**10.11    Anti-Terrorism Matters**

The Holder hereby authorizes the Company to take, without prior notice to the Holder, such action as the Company determines to be reasonably necessary or advisable to comply, or to cause the Company to comply, with any anti-terrorism laws, rules, regulations, directives or special measures. Without limiting the foregoing, the Company may disclose any information concerning the Company or the undersigned necessary to comply with such laws, rules, regulations, directives or special measures, and the Holder shall provide the Company, promptly upon request, all information the Company reasonably deems necessary or advisable to comply with such laws, rules, regulations, directives or special measures.

13

**10.12   Survival**

The representations and warranties of the Company, and those of Holder, shall survive the consummation of the sale of the Note to Holder hereunder.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**COMPANY**

ICAP EQUITY, LLC

_____

By:  iCap Enterprises, Inc.
Its:  Manager
        By:  Chris Christensen
        Its:  President

14

---

**HOLDER SIGNATURE PAGE**

---

See the Subscription Instructions Packet.

**EXHIBIT A**

**SCHEDULE OF HOLDERS**

| Holder Name & Address | Closing Date | Note Amount |
| --- | --- | --- |

# EXHIBIT B

# FORM OF NOTE

THIS PROMISSORY NOTE (THIS "**NOTE**") HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. § 15b ET SEQ., AS AMENDED ("**SECURITIES ACT**"), IN RELIANCE UPON ONE (1) OR MORE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE FEDERAL ACT. IN ADDITION, THE ISSUANCE OF THIS NOTE HAS NOT BEEN QUALIFIED UNDER THE SECURITIES ACT OF WASHINGTON, OR ANY OTHER STATE SECURITIES LAWS (COLLECTIVELY, THE "**STATE ACTS**"), IN RELIANCE UPON ONE OR MORE EXEMPTIONS FROM THE REGISTRATION PROVISIONS OF THE STATE ACTS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFER AS SET FORTH IN THE NOTE PURCHASE AGREEMENT.

$_____                                                          _____, 20____

# ICAP EQUITY, LLC

# PROMISSORY NOTE

iCap Equity, LLC, a Delaware limited liability company (the "**Company**"), for value received, promises to pay to _____ (the "**Holder**"), or the Holder's registered assigns, the Loan Amount plus interest thereon as set forth herein.

This Note ("**Note**") is issued pursuant to that certain Note Purchase Agreement dated as of _____, 20___, by and between the Company and the Holder (the "**Note Purchase Agreement**"), the terms of which are incorporated herein by reference. Capitalized terms that are used in this Note and that are not separately defined herein have the meanings assigned to such terms in the Agreement.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, to which the Holder, by the acceptance of this Note, agrees:

## 1.      Interest on Outstanding Loan Amount

The outstanding Loan Amount shall bear simple interest at ten percent (10%) per annum. Interest computation shall be based upon twelve 30-day months. Interest will accrue on the loan made to the Holder under this Note from the date that such monies are paid to and are available for use by the Company. If the Company exercises its right to extend the Maturity Date as set forth in Section 2(b), the outstanding Loan Amount will bear simple interest at 11% per annum during the extension period.

In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of fifteen (15%) percent per annum, simple interest from and after written notice to the Company of the Event of Default, until all amounts due hereunder have been paid in full or the Event of Default has been cured.

## 2.      Stipulated Term; Company's Extension Right

(a)      The full Loan Amount shall be due and payable, together with all accrued but unpaid interest, on or before the end of the 36th calendar month that follows the Effective Date (the "**Maturity**

23-01243-WLH11      Doc 468      Filed 02/23/24      Entered 02/23/24 19:33:15      Exhibit, Page 474
1366

*Date*"). The date first set forth above shall be the "*Effective Date*"; *provided, however*, that if the Holder's funds are not made available to the Company within 7 days of the date first set forth above, then the Effective Date shall be adjusted to reflect the date on which funds were actually made available to the Company.

(b)    So long as an Event of Default has not occurred and is continuing, the Company has the option to extend the Maturity Date for an additional twelve (12) months. This option may be exercised by the Company at any time prior to the Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Maturity Date. If the Company fails to give such notice, this Note will mature upon the expiration of the Maturity Date.

(c)    Upon the maturity of this Note, the outstanding Loan Amount, together with all accrued but unpaid interest, will be due and payable to the Holder.

**3.    Interest Payments and Payoff Premium**

Prior to the Maturity Date, or extension thereof, the Company will be required to make only monthly interest payments to the Holder. Such monthly payments shall include all interest accrued under this obligation through the end of the prior calendar month, and shall be due and payable to the Holder on the fifteenth (15th) calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter.  At the Maturity Date, or at the time the Company sooner pays off the principal balance of the Note, Holder shall be entitled to a one-time payment of 5% of the original Note balance ("*Payoff Premium*").

**4.    Prepayment**

The Company may choose to prepay part or all of the Note without penalty at any time prior to the Maturity Date, or extension thereof. Any such prepayment will be credited first to any accrued and unpaid interest and then to the payment of the outstanding Loan Amount.

**5.    Restrictions on Transfer**

This Note may not be transferred unless consented to by the Company, and if done in compliance with the terms and conditions of the Note Purchase Agreement as well as all applicable federal and state securities laws.

**6.    Holder's Representations**

By the acceptance of this Note, the Holder re-affirms its representations and warranties in the Agreement in favor of the Company.

**7.    Events of Default**

Each of the events specified in Section 8 of the Note Purchase Agreement shall constitute an Event of Default under this Note. Upon the occurrence of an Event of Default, the Holder shall have the rights, and be subject to the restrictions, set forth in Section 8 of the Note Purchase Agreement.

## 8. Miscellaneous

### 8.1 Costs of Collection

If this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note in accordance with the terms of the Note Purchase Agreement, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action, including, but not limited to, attorneys' fees and disbursements.

### 8.2 Holder as Owner

The Company may deem and treat the holder of record of this Note as the absolute owner for all purposes regardless of any notice to the contrary from third parties.

### 8.3 No Member or Ownership Rights

This Note confers no ownership rights whatsoever in the Company, and shall not entitle the Holder to any voting rights, any management rights, any ownership rights, any rights to distribution, any statutory rights conferred on members, or any other rights as an owner of the Company or to any other rights except the rights stated herein.

### 8.4 Notices

Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) upon confirmation of receipt by fax by the party to be notified if received on or before 5:00 p.m. (local time) on any Business Day or, if received later on such day, upon the close of business on the next Business Day, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (d), or (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by ten (10) days' advance written notice to the other party given in the foregoing manner.

If to the Holder:     To the address or number last furnished in writing to the Company in accordance with the Note Purchase Agreement.

If to the Company:    iCap Equity, LLC
                      3535 Factoria Blvd. SE Ste 500
                      Bellevue, WA 98006
                      Fax: 425.278.9025

                      With a copy to:

                      Perkins Coie LLP
                      c/o Martha Sandoval
                      1201 Third Avenue, Suite 4900
                      Seattle, Washington 98101-3099
                      Fax: 206.359.7244

### 8.5 Amendments and Waivers

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 4, Page 476
Pg 47 of
1366

No provision of the Note or the Note Purchase Agreement may be amended, except by the express written agreement of both the Company and Holder.

### 8.6 Governing Law; Jurisdiction

This Note shall be governed by and construed under the laws of the State of Washington as applied to agreements among Washington residents, entered into and to be performed entirely within the State of Washington, without giving effect to principles of conflicts of law. Holder irrevocably consent to the jurisdiction and venue of and in King County, Washington in connection with any action arising from or relating to this Agreement or the transaction it contemplates.

### 8.7 Waiver of Jury Trial

HOLDER, TO THE EXTENT PERMITTED BY LAW, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES HIS, HER OR ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE NOTE PURCHASE AGREEMENT AND THIS NOTE. THIS WAIVER APPLIES TO ANY ACTION OR LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

### 8.7 Assignment

The Company may not assign this Note or any of its rights, interests or obligations hereunder, except upon receiving the consent of the Holder. Except as otherwise provided herein, the terms and conditions of this Note shall inure to the benefit of and be binding on the respective successors and assigns of the Parties.

### 8.8 Severability

If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note, and the remaining provisions of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

### 8.9 Waivers

The Company waives presentment for payment, demand, notice of nonpayment, notice of protest and protest of this Note, and all notices in connection with the delivery, acceptance, or dishonor of this Note.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**ICAP EQUITY, LLC**

By:  iCap Enterprises, Inc.
Its:  Manager
    By:  Chris Christensen
    Its:  President

4

CONFIDENTIAL - NOT TO BE REPRODUCED OR REDISTRIBUTED

**EXHIBIT B**

**SUBSCRIPTION DOCUMENTS**
**OF**
**ICAP EQUITY, LLC**

# ICAP EQUITY, LLC
## A DELAWARE LIMITED LIABILITY COMPANY

BEST EFFORTS OFFERING OF UP TO $10,000,000 OF NOTES

---

### iCap Equity, LLC

---

A Delaware Limited Liability Company

ACCREDITED INVESTORS ONLY

## SUBSCRIPTION DOCUMENTS

INSTRUCTIONS TO INVESTORS:

Please read carefully the Memorandum of Terms for the Private Placement of Debt Securities of iCap Equity, LLC (the "Company"), and all exhibits thereto (collectively, the "Memorandum"), before deciding to subscribe. The offering described in the Memorandum (the "Offering") is limited to investors who meet all of the suitability standards and other requirements set forth in the Memorandum. (See the section of the Memorandum entitled "WHO MAY INVEST.")

EACH PROSPECTIVE INVESTOR SHOULD EXAMINE THE SUITABILITY OF AN INVESTMENT IN THE COMPANY IN THE CONTEXT OF HIS, HER OR ITS OWN NEEDS, INVESTMENT OBJECTIVES, AND FINANCIAL CAPABILITIES AND SHOULD MAKE HIS, HER OR ITS OWN INDEPENDENT INVESTIGATION AND DECISION AS TO THE SUITABILITY OF THE INVESTMENT. EACH PROSPECTIVE INVESTOR IS ALSO ENCOURAGED TO CONSULT WITH HIS, HER, OR ITS BUSINESS OR TAX ADVISOR REGARDING THE RISKS AND MERITS OF AN INVESTMENT IN THE COMPANY.

**YOU ARE ENCOURAGED TO MAKE YOUR SUBSCRIPTION PAYMENT BY WIRE TRANSFER PURSUANT TO THE WIRE TRANSFER INSTRUCTIONS INCLUDED WITH THESE SUBSCRIPTION DOCUMENTS. HOWEVER, YOU MAY ALSO FUND YOUR SUBSCRIPTION BY CHECK MADE PAYABLE TO "ICAP EQUITY, LLC."**

MAIL THE COMPLETED AND EXECUTED VERSION OF THESE SUBSCRIPTION DOCUMENTS (AND, IF PAYING BY CHECK, YOUR CHECK FOR THE SUBSCRIPTION PAYMENT) TO:

ICAP EQUITY, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

ATTN: Connie Crothers

**IMPORTANT NOTE**: FAILURE TO COMPLETE ALL APPLICABLE INFORMATION AND DELIVER ANY ADDITIONAL INFORMATION REQUESTED BY THE MANAGER WILL RESULT IN THESE DOCUMENTS BEING RETURNED FOR COMPLETION AND MAY CAUSE A REJECTION OR DELAY OF ACCEPTANCE OF THE SUBSCRIPTION. ORIGINAL SUBSCRIPTION DOCUMENTS ONLY. PLEASE NOTE THAT COPIES OF SUBSCRIPTION DOCUMENTS MAY NOT BE ACCEPTED.

1

| Table of Contents |
|---|

**iCAP EQUITY, LLC**
**3535 Factoria Blvd. SE, Suite 500**
**Bellevue, WA 98006**

1. **Investor Questionnaire**

2. **Subscription Agreement**

3. **Signature Page of Subscription Agreement and Note Purchase Agreement**

4. **Registered Representative/RIA & Broker/Dealer Information**

5. **Subscription Agreement Terms and Conditions-Registered Investment Advisors**

6. **Distribution Instructions**

7. **Electronic Funds Transfer Instructions**

8. **W-9 (Taxpayer Identification Number)**

# INVESTOR QUESTIONNAIRE

The purpose of this Investor Questionnaire is to provide information to iCap Equity, LLC (the "Company") regarding your qualifications to purchase Notes ("Notes") being offered pursuant to the Memorandum of the Company (together with all exhibits thereto, the "Memorandum"). Your answers will be kept confidential by the Company. However, by completing and signing this Investor Questionnaire, the accompanying Subscription Agreement and the signature page to the Note Purchase Agreement, you agree that the Company may present your Investor Questionnaire, Subscription Agreement and other subscription documents to those parties as it deems appropriate if called on to establish the Company's entitlement to a private offering exemption under the Securities Act of 1933 (the "Securities Act"), or any applicable state securities law. If you have any questions concerning this Investor Questionnaire, please call the person from whom you received this Investor Questionnaire.

Memorandum No._____      The offer of Notes to you was made in the State of: _____
(Please fill in number from your Memorandum)

1. **FORM OF OWNERSHIP (CHECK ALL APPLICABLE BOXES)**

   □ IRA                                                    □ Individual

   □ Keogh                                                  □ Husband and Wife

   □ Other Retirement or Profit Sharing Plan (**Please attach plan documents relating to this investment**)

   □ Joint Tenants                                          □ Joint Tenants with Right of Survivorship

   □ Trust, Date Formed _____                   □ Tenants in Common

   □ Partnership                                            □ Corporation of LLC

   □ Other: (**Please specify**):_____

2. **INVESTOR'S NAME AND ADDRESS**        **Please Check:**
                                          □**Mr.** □**Mrs.** □**Ms.** □**M.D.** □**Ph.D.** □**D.D.S.**

| | |
|---|---|
| **Name** | |
| **SSN (or EIN)** | |
| **Home Address** | |

| **City** | | **State** | | **Zip Code** | |
|---|---|---|---|---|---|

| **Home Telephone No.** | | **Business Telephone No.** | |
|---|---|---|---|

| **E-mail Address (Required)** | |
|---|---|

|  | Investor | Joint Owner | | Investor | Joint Owner |
|---|---|---|---|---|---|
| **Birth Date** | | | Occupation | | |

A. Are you associated with a Financial Industry Regulatory Authority, Inc. ("FINRA") member firm?      _____ YES      _____ NO
   (if you answered "YES," additional information may be requested of you in order to process your subscription.)

3

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:54    Exhibit 4, Page 481
1366

B. Are you a plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA")?     \_\_\_\_\_ YES     \_\_\_\_\_ NO
(if you answered "YES," additional information may be requested of you in order to process your subscription.)

C. Are you an entity that is tax-exempt for U.S. federal income tax purposes?     \_\_\_\_\_ YES     \_\_\_\_\_ NO
(if you answered "YES," additional information may be requested of you in order to process your subscription.)

D. Are you subject to the U.S. Bank Holding Company Act of 1956 or directly or indirectly "controlled" (as that term     \_\_\_\_\_ YES     \_\_\_\_\_ NO
is defined in such act) by an individual or entity that is subject to such act?
(if you answered "YES," additional information may be requested of you in order to process your subscription.)

3. **IF INVESTING THROUGH AN IRA, KEOGH OR OTHER RETIREMENT OR PROFIT SHARING PLAN, PLEASE COMPLETE THE FOLLOWING (IN ADDITION TO THE INVESTOR INFORMATION ON THE PREVIOUS PAGE):**

**Account Name**

**Custodian's EIN**

**Custodian's Address**

**City**      **State**      **Zip Code**

4. **ACCREDITED INVESTOR CERTIFICATION.** To enable the Company to evidence the basis, in part, of its reliance on the provisions of Regulation D promulgated under the Securities Act — specifically with respect to your status as an "accredited investor" as that term is defined in Regulation D — please complete the following

<u>FOR INDIVIDUAL INVESTORS:</u> I represent and warrant that I am reviewing the Memorandum and the related subscription documents for my own investment interest as a principal and that I am an "accredited investor" because, as indicated below, I satisfy one or more of the following standards.

A. I have an individual net worth, or joint net worth with my spouse, which exceeds $1,000,000. (For purposes of this Investor Questionnaire, "net worth" means, subject to the exception provided in the following sentence, the excess of total assets at fair market value over total liabilities. When determining net worth, however, the value of an investor's primary residence and any indebtedness secured thereby up to its fair market value shall be excluded from the investor's net worth, while indebtedness secured by the residence in excess of its fair market value should be considered a liability and deducted from the investor's net worth.)

YES\_\_\_\_\_      NO\_\_\_\_\_

B. I had individual income (exclusive of any income attributable to my spouse) of more than $200,000 in each of the two most recent years and have a reasonable expectation to have individual income in excess of $200,000 in the current year. (For purposes of this Investor Questionnaire, "individual income" means the investor's adjusted gross income, as reported for federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse.)

YES\_\_\_\_\_      NO\_\_\_\_\_

C. I had joint income with my spouse of more than $300,000 in each of the two most recent years and have a reasonable expectation to have joint income in excess of $300,000 in the current year.

YES\_\_\_\_\_      NO\_\_\_\_\_

D. I am a director or executive officer of the Company or its manager.

YES\_\_\_\_\_      NO\_\_\_\_\_

4

FOR ENTITY INVESTORS. I am completing this Investor Questionnaire on behalf of an entity, and I represent and warrant that such entity is an "accredited investor" because, as indicated below, it satisfies one or more of the following standards.

E.   The entity is a trust, with total assets in excess of $5,000,000, that was not formed for the specific purpose of acquiring the Notes and which has its investments directed by a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of purchasing the Notes.

      YES_____            NO_____

F.   The entity is a bank, as defined in Section 3(a)(2) of the Securities Act, or a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

      YES_____             NO_____

G.   The entity is a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

      YES_____             NO_____

H.   The entity is an insurance company, as defined in Section 2(a)(13) of the Securities Act.

      YES_____             NO_____

I.   The entity is an investment company registered under the Investment Company Act of 1940 or a business development company, as defined in Section 2(a)(48) of that act.

      YES_____             NO_____

J.   The entity is Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

      YES_____             NO_____

K.   The entity is a plan established and maintained by a U.S. state, its political subdivisions, or any agency or instrumentality of such a state or its political subdivisions, for the benefit of its employees, which has total assets in excess of $5,000,000.

      YES_____             NO_____

L.   The entity is an employee benefit plan within the meaning of ERISA and: (i) the investment decision with respect to the Notes is being made by a plan fiduciary, as defined in Section 3(21) of ERISA, of the employee benefit plan that is either a bank, savings and loan association, insurance company or registered investment adviser; (ii) the employee benefit plan has total assets in excess of $5,000,000; or (iii) if the plan is a self-directed plan, the plan's investment decisions are made solely by persons that qualify as "accredited investors" (i.e., IRA, SEP-IRA, KEOGH, etc.).

      YES_____             NO_____

M.   The entity is a private business development company, as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

      YES_____             NO_____

N.   The entity is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, corporation, Massachusetts or similar business trust, limited liability company or partnership, with total assets in excess of $5,000,000 that was not formed for the specific purpose of acquiring the Notes.

      YES_____             NO_____

O.   All of the equity owners of the entity are "accredited investors" and the entity is not a trust.

      YES_____             NO_____

5.     **SIGNATURE.**  I declare that the information supplied in this Investor Questionnaire is true and correct and may be relied on by the Company in connection with my investment as a member in the Company.

**INDIVIDUAL(S) AND (OR) JOINT OWNER(S):**

|  |  |  |
|---|---|---|
|  |  |  |

**Signature of Individual Investor**      **Signature of Joint Owner, if applicable**      **Date**

**IRA, KEOGH OR QUALIFIED PENSION PLAN:**

|  |  |  |
|---|---|---|
|  |  |  |

**Signature of Participant**      **Signature of Custodian, if required**      **Date**

**ENTITIES (i.e. CORPORATION, PARTNERSHIP, LLC OR TRUST):**

|  |
|---|
|  |

**Name of Entity**

|  |  |  |
|---|---|---|
|  |  |  |

**Print Name and Title of Entity Representative**      **Signature**      **Date**

6

---
**SUBSCRIPTION AGREEMENT**
---

I, the undersigned, hereby offer to purchase a promissory note ("Note(s)") in iCap Equity, LLC (the "Company") in the amount set forth on the Signature Page of this Subscription Agreement and under the terms and conditions contained herein and in the Memorandum of Terms for the Private Placement of Debt Securities of iCap Equity, LLC, and the exhibits attached thereto (the "Memorandum"), including, without limitation, the Note Purchase Agreement (the "Note Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Memorandum.

**THE UNDERSIGNED HEREBY MAKES THE FOLLOWING REPRESENTATIONS AND WARRANTIES WITH THE FULL UNDERSTANDING THAT THE COMPANY AND ITS MANAGER ARE RELYING ON SUCH REPRESENTATIONS AND WARRANTIES.**

1. I have received read and fully understand the Memorandum and all of its exhibits, including, without limitation, the Note Purchase Agreement.

2. I am basing my decision to invest only on the information in the Memorandum and information requested of the Company in writing by me, and I have not relied on any other representation made by any other person.

3. I am a citizen and/or a legal permanent resident of the United States of America, with my principal residence maintained at the address set forth in the Investor Questionnaire, and I am at least twenty-one years of age.

4. I am executing this Subscription Agreement: (A) on my own behalf, as a natural person, and I have the legal capacity to execute, deliver and perform my obligations under this Subscription Agreement or (B) on behalf of a corporation, partnership, limited liability company, trust or other entity, and (i) such entity is duly organized, validly existing and in good standing under the laws of the jurisdiction where it was formed and is authorized by its governing documents to execute, deliver and perform its obligations under this Subscription Agreement, (ii) I have the full power and authority to execute and deliver this Subscription Agreement on behalf such entity and (iii) this Subscription Agreement, and such entity's execution hereof and performance of its obligations hereunder, has been duly authorized by all requisite corporate or other action by the entity.

5. I am not, and, in the case of a corporation, partnership, limited liability company, trust or other entity, none of its principal owners, partners, members, directors or officers are, included on the Office of Foreign Assets Control list of foreign nations, organizations and individuals subject to economic and trade sanctions based on U.S. foreign policy and national security goals, Executive Order 13224, which sets forth a list of individuals and groups with whom U.S. persons are prohibited from doing business because such persons have been identified as terrorists or persons who support terrorism, or any other watch list issued by any governmental authority, including the Securities and Exchange Commission.

6. The offer and sale of the Notes to me has not been accompanied by the publication of any public advertisement or by any general solicitation.

7. I understand that an investment in the Company involves substantial risk, and I am fully aware of and understand all of the risk factors relating to the investment, including, but not limited to, the risks set forth in the "RISK FACTORS" section of the Memorandum.

8. My overall commitment to investments that are not readily marketable is not disproportionate to my individual net worth. My investment in the Company will not cause my overall commitment to illiquid investments to become excessive. I have adequate means of providing for my financial requirements, both current and anticipated, and have no need for liquidity in this investment. I can bear and am willing to accept the economic risk of losing my entire investment in the Company.

9. I am purchasing the Notes for my own account and for investment purposes only, and not for the account of others. I have no present intention, contract, agreement, undertaking or arrangement to assign, resell or subdivide the Notes.

10. I acknowledge that the Notes are being offered and sold in reliance on specific exemptions from the registration requirements of applicable federal and state securities laws, and the Company and the Manager are relying upon the truth and accuracy of my representations, warranties, statements, covenants and agreements set forth herein and in the accompanying Investor Questionnaire in order to determine my suitability to invest in the Company.

11. All information that I have provided on the accompanying Investor Questionnaire and this Subscription Agreement is complete, accurate and correct as of its date and may be relied on by the Company and the Manager in connection with my investment. I hereby agree to notify the Company and the Manager immediately of any material change in any of that information occurring before the acceptance of this Subscription Agreement.

12. I have provided my correct Taxpayer Identification Number in the attached IRS FORM W-9, and I am not subject to back-up withholding as a result of a failure to report all interest or dividends (or the Internal Revenue Service has notified me that I am no longer subject to back-up withholding).

13. I have had the opportunity to ask questions of, and receive answers from, the Company and the Manager, and their respective

7

principals, concerning the Company, the Manager, the respective affiliates of each of the foregoing entities, the Notes and the terms and conditions of the Offering, and to obtain any additional information deemed necessary to verify the accuracy of the information contained in the Memorandum, to the extent possessed by the Manager or obtainable by it without unreasonable effort or expense. I have been provided with all materials and information requested by either me or others representing me, including any information requested to verify any information furnished to me.

14. I understand that, due to the restrictions described below, and the lack of any public market existing or likely to exist in the future for the Notes, my investment in the Company will be illiquid and that I will be required to bear the financial risks of the investment for an indefinite period of time.

15. I understand that the sale, assignment, transfer or other disposition of the Notes is restricted under applicable federal and state securities laws and the terms of the Note Agreement. I understand that the Company has no obligation, and does not intend to register any of the Notes for resale under any federal or state securities laws or to take any action under any such laws to make available an exemption from registration requirements. I further agree that I will not sell, assign, transfer or otherwise dispose of any Notes I purchase, in whole or in part, unless such sale, assignment, transfer or other disposition is (A) registered under applicable federal and state securities laws, or if required by the Manager, I obtain an opinion of counsel satisfactory to the Manager that such Notes may be sold in reliance upon an exemption from registration, and (B) otherwise permitted by and made in accordance with the terms of the Note Agreement. I also understand and acknowledge that, if the Notes are certificated, one or more legends will be placed on all certificates evidencing the Notes with respect to restrictions on any sale, assignment, transfer or other disposition of the Notes imposed by applicable federal and state securities laws and the Note Agreement.

16. I understand that no state or federal governmental authority has approved or disapproved of the Notes, reviewed or passed on the accuracy or adequacy of the Memorandum or made any finding or determination relating to the fairness of an investment in the Company and that no state or federal governmental authority has recommended or endorsed or will recommend or endorse the Notes.

17. If subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), I am aware of, and have taken into consideration, the diversification requirements of Section 404(a)(3) of ERISA in determining to invest in the Company and have concluded that such investment is prudent and not a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA and Section 4975(c) of the Internal Revenue Code of 1986 (the "Code").

18. If acting on behalf of a charitable remainder trust, I am aware that if any portion of the income derived from the trust's ownership of Notes is deemed to be unrelated business taxable income ("UBTI"), Section 664(c) of the Code imposed on the trust an excise tax equal to the amount of such UBTI.

19. I understand and agree that I may not assign this offer or, except as specifically permitted by law, revoke my subscription. I acknowledge that the Manager, in its sole and absolute discretion, has the unconditional right to accept or reject this subscription, in whole or in part.

20. I understand that if the Offering is withdrawn or my subscription is otherwise not accepted, all funds I have deposited in the escrow account relating to my subscription will be refunded to me on the terms set forth in the Memorandum.

21. I understand that, if I am acquiring the Notes in a fiduciary capacity, the representations, warranties, statements, covenants and agreements set forth herein and in the accompanying Investor Questionnaire shall be deemed to have been made on behalf of the person or persons for whose benefit I am acquiring such Notes. I have properly identified such person or persons in these subscription documents.

**The above representations are not a waiver of any rights that I may have under the acts administered by the Securities and Exchange Commission or by any state regulatory agency administering statutes bearing on the offer and sale of securities.**

Indemnification Obligations of the Undersigned

I hereby agree to indemnify, defend and hold harmless the Company, the Manager and their respective members, officers, directors, affiliates and advisors from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees) (collectively "Losses") that they may incur by reason of my failure to fulfill all of the terms and conditions of this Subscription Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties, statements, covenants or agreements contained herein, in the accompanying Investor Questionnaire or in any other documents I have furnished to any of the foregoing in connection with my subscription for Notes. This indemnification includes, but is not limited to, any Losses incurred by the Company, the M a n a g e r , or any of their respective members, officers, directors, affiliates or advisors defending against any alleged violation of federal or state securities laws which is based upon, or related to, any untruth or inaccuracy of any of the representations, warranties, statements, covenants or agreements set forth herein, in the accompanying Investor Questionnaire or in any other documents I have furnished to any of the foregoing in connection with my subscription for Notes. The foregoing indemnification obligations shall survive until completion of liquidation of the Company.

Instructions to Investor

You are required to execute your own Subscription Agreement and the signature page to the Note Agreement. The M a n a g e r will not accept a Subscription Agreement or Note A g r e e m e n t s i g n a t u r e page that has been executed by someone other than you, unless such person is acting in

8

a fiduciary capacity on your behalf or otherwise has been given your legal power of attorney to sign on your behalf, and you satisfy all of the requirements for investing in the Company set forth in the Memorandum, in this Subscription Agreement and in the accompanying Investor Questionnaire.

Your execution of this Subscription Agreement constitutes your binding offer to purchase the Notes subscribed for. Once you subscribe to purchase Notes, you may not withdraw your subscription, except as specifically permitted by applicable law. The Manager, in its sole and absolute discretion, may reject or accept your subscription, in whole or in part, and in each case without liability to you. If your subscription is rejected, then all of your funds will promptly be returned to you, without any interest thereon.

Upon the acceptance, if any, of your subscription, your subscription will be released from escrow and paid to the Company.

NOTICE TO RESIDENTS OF ALL STATES. THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE NOTES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OF THE NOTES OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTICE TO NEW YORK RESIDENTS: THE MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THE OFFERING OF THE NOTES. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED THEREIN.

NOTICE TO FLORIDA RESIDENTS: THE NOTES WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE NOTES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE NOTES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE COMPANY OR AN AGENT THEREOF, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

I ACKNOWLEDGE THAT ALL DOCUMENTS, RECORDS AND BOOKS PERTAINING TO AN INVESTMENT IN THE COMPANY HAVE BEEN MADE AVAILABLE FOR INSPECTION BY ME AND MY ATTORNEY, ACCOUNTANT AND/ OR OTHER ADVISORS.

LEGAL125549257.4

## Signature Page of Subscription Agreement and Note Agreement

I, the undersigned, agree to purchase \$_____ of Notes, under the terms and conditions of this Subscription Agreement and the Memorandum and the exhibits attached thereto, including, without limitation, the Note Agreement and the Note.

I acknowledge and agree that the Notes I am acquiring will be governed by the terms of the Note Agreement and the exhibits thereto, which is attached to the Memorandum as Exhibit A and which I have and understand. I agree to be bound by all of the terms and conditions of the Note Agreement and the Note if my subscription is accepted, in whole or in part, by the Company, and I authorize the Company to treat this Signature Page of Subscription Agreement and Note Agreement as my signature page to the Note Agreement and the Note.

---

**Payment Instructions**

**You are encouraged to make your subscription payment by wire transfer pursuant to the wire transfer instructions included with these subscription documents. However, you may also Company your subscription by check. If paying by check, make your check payable to: "iCap Equity, LLC"**

---

**Account Information**

**Please print below the exact legal title to be shown on the Company's books and records:**

_____

_____

---

| **Individuals** | **Co-Subscriber/Trustee/Custodian or Plan Administrator** |
|---|---|
| _____ | _____ |
| Print Name (Individual) | Print Name (Joint Owner, Trustee, IRA Custodian, etc.) |
| _____ | _____ |
| Signature | Signature |
| _____ | _____ |
| Date | Date |

**Entities (i.e. Corporation, Partnership or LLC):**

| | |
|---|---|
| _____ | _____ |
| Name of Entity | Print Name & Title of Entity Representative |
| _____ | _____ |
| Signature | Date |

---

### To be Completed by the Company

SUBSCRIPTION FOR \$_____ OF NOTES IS HEREBY ACCEPTED BY:

iCAP EQUITY, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

By: _____     Date:_____

Chris Christensen, President

10

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:54    Exhibit 4, Page 488 of 1366

## REGISTERED REPRESENTATIVE/RIA & BROKER/DEALER OR RIA
### (To be Completed by Registered Representative/RIA and/or Broker/Dealer)
### (For Commission and Other Purposes)

I hereby represent and certify that I have discharged my affirmative obligations under FINRA's Conduct Rules, and hereby further certify as follows: (A) a copy of the Memorandum of Terms for the Private Placement of Debt Securities of iCap Equity, LLC has been delivered to the subscriber; (B) I have specifically obtained information from the subscriber concerning the subscriber's age, net worth, annual income, investment objectives, investment portfolio and other financial information; and (C) I have determined that an investment in the Company is suitable for such subscriber. I have also informed the subscriber of all pertinent facts relating to the illiquidity and lack of a public market of an investment in the Company. **The broker/dealer or authorized representative has personally seen and recorded a government issued identification document evidencing the residence or nationality of the subscriber and has a reasonable basis for verification of the subscriber's identity. The broker/dealer or authorized representative warrants that, in connection with the completion of the Subscription Agreement included as part of these subscription documents, the broker/dealer or authorized representative completed documentation to the effect that the subscriber(s) and registered owner(s) do not appear on the Office of Foreign Assets Control list of foreign nations, organizations and individuals subject to economic and trade sanctions.**

---

**Print Name of Registered Representative** _____

**Registered Representative's FINRA CRD No.:** _____

**Signature of Registered Representative**          **Date**

☐ Registered Representative: please check this box to verify that you have personally seen and recorded a government issued identification document from the Subscriber.

**Registered Representative Office Address:**

_____

**Phone No.:** _____  **Facsimile No.:** _____

---

**Name of Broker/Dealer** _____

**Print Name of Principal, Branch Manager, other** _____

**Signature of Principal, Branch Manager, other**          **Date**

☐ Broker/Dealer: please check this box to verify that the Registered Representative is licensed with FINRA in the state of sale.

**Broker/Dealer Address:**

_____

**Phone No.:** _____  **Facsimile No.:** _____

---

\*

**E-mail Address (Required for Correspondence)** _____

### Registered Investment Advisor (RIA)

Check the following box if the subscriber's investment in the Company is made through an RIA: ☐
(If an owner or principal or any member of the RIA is a FINRA licensed registered representative affiliated with a broker/dealer, the transaction should be conducted through that broker/dealer, not through the RIA).

The undersigned registered investment advisor of the firm identified below hereby certifies that he or she has procured this subscription and that he or she is familiar with the subscriber making this investment in the Company and has determined that such subscriber meets the requirements set forth under the caption "Securities Law Matters" in the Memorandum.

The undersigned registered investment advisor further certifies that:

(1)    he or she is registered with (please check one) ☐ the S.E.C. or ☐ the State of _____ ;

(2)    unless noted below, (a) he or she is not a member of FINRA and, based on the activities he or she performs, is not required to be a member of FINRA or to register as a broker or dealer under federal or state law, and (b) he or she is not affiliated with a member of FINRA.

☐ Advisor is a member of FINRA and his or her CRD# is as set forth above.

☐ Advisor is affiliated with the following FINRA member (include CRD#):_____ ; and

(3)    his or her signature below constitutes his/her agreement to be bound by all the provisions of the terms and conditions set forth on the following page.

**Print Name of RIA:**_____    **RIA Signature:**_____

**RIA Office Address:**_____

**Phone No.:**_____  **Facsimile No.:**_____  **E-mail Address:**_____

For Custodial Accounts: Please send a completed original Subscription Agreement directly to the custodian. The custodian should make check(s) payable to "iCap Equity, LLC" or remit wired funds pursuant to the wire transfer instructions included as part of these subscription documents, and submit original Investor Questionnaires, Subscription Agreement(s) and check(s) to ICap Equity, LLC, 3535 Factoria Blvd. SE, Suite 500, Bellevue, WA 98006.

# SUBSCRIPTION AGREEMENT TERMS AND CONDITIONS – REGISTERED INVESTMENT ADVISORS

For purposes of the Subscription Agreement and the subscription of the person (the "**Subscriber**") subscribing hereunder (the "**Subscription**"), the advisor identified herein ("**Advisor**") represents and warrants to, and agrees with, the Company and its Manager, as follows (capitalized terms used herein without definition have the meanings ascribed to such terms in the Subscription Agreement):

1.  Advisor acknowledges and agrees that no compensation will be paid in respect of the Subscription to the Advisor by the Company or any person acting on its behalf.

2.  In its communications with Subscriber with respect to the Offering and in procuring the Subscription, the Advisor represents as follows:

    a.  The Advisor did not engage in any form of general solicitation or general advertising.

    b.  The Advisor has an investment advisory relationship with the Subscriber, which relationship was established before the commencement of the Offering.

    c.  The Subscriber resides in a jurisdiction that the Company has identified as a jurisdiction in which the Notes are qualified for sale or as to which such qualification is not required.

    d.  The Advisor has determined that an investment in the Company is appropriate for the Subscriber's advisory account.

    e.  The Advisor has reasonable grounds to believe that the Subscriber is an "accredited investor" as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act, and that the Subscriber meets the financial qualification and suitability standards and other requirements established by the Company for investing in the Offering.

    f.  The Advisor has submitted to the Company any prescribed pre-qualification questionnaires completed by or for the Subscriber.

    g.  If the Advisor is not exercising investment discretion with respect to the Subscription, the Advisor advised the Subscriber that the Subscriber would be afforded the opportunity to ask questions of, and receive answers from the Company and the Manager, and their respective principals, concerning the Company, the Manager, the respective affiliates of each of the foregoing entities, the Notes and the terms and conditions of the Offering, and to obtain any additional information deemed necessary to verify the accuracy of the information contained in the Memorandum to the extent possessed by the Manager or obtainable by it without unreasonable effort or expense.

    h.  Prior to submitting the Subscription, the Advisor made reasonable inquiry to determine (i) if the Subscriber is acquiring the Notes for the Subscriber's own account or on behalf of other persons, (ii) that the Subscriber understands the limitations on the Subscriber's disposition of the Notes under applicable federal and state securities laws and the Operating Agreement, and (iii) that the Subscriber understands that he, she or it must bear the economic risk of the investment for an indefinite period of time because of such limitations.

3.  The Advisor agrees to maintain, for at least six years, a record of the information obtained to determine that an investment in the Company is a suitable and appropriate investment for the Subscriber and that such Subscriber meets the financial qualification and suitability standards and other requirements imposed on investors in the Offering, and to make such records available to the Company during such period upon its reasonable request.

4.  The Advisor agrees to keep records indicating by number to whom each Memorandum and related materials was delivered and to make such information available to the Company upon written request.

5.  The Advisor represents to the Company that the Advisor or the company with which Advisor is employed (the "**Firm**") has established and implemented: (a) an anti-money laundering compliance program in accordance with applicable laws and regulations, including federal and state securities laws, the USA Patriot Act of 2001, Executive Order 13224 – Executive Order on Terrorist Financing Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, industry practices for the investment advisor industry, and applicable rules of FINRA to the extent applicable to the Advisor or the Firm, and (b) a program, in accordance with applicable laws and regulations, (i) for the verification of the identity of its new clients, (ii) for maintenance of client records, (iii) to check of the names of new clients against government watch lists, including the Office of Foreign Asset Control's list of Specially Designated Nationals and Blocked Persons, and (iv) for the provision of information to the Financial Crimes Enforcement Network upon request.

6.  With respect to any nonpublic personal information, as defined in the Gramm-Leach-Bliley Act of 1999 (the "**GLB Act**"), of Subscriber provided to the Advisor, the Advisor agrees to (a) abide by and comply with and to cause the Firm to abide by and comply with (i) the applicable privacy standards and requirements of the GLB Act and the applicable regulations promulgated thereunder, (ii) the privacy standards and requirements of any other applicable federal or state law, and (iii) the Firm's own internal privacy policies and procedures, each as may be amended from time to time; (b) refrain from the use or disclosure of nonpublic personal information (as defined under the GLB Act) of Subscriber if Subscriber has opted out of such disclosures, except as necessary to service the Subscriber or as otherwise necessary or required by applicable law; and (c) provide Subscriber both initial and annual privacy notices as required pursuant to Rule 6(a) of Regulation S-P, promulgated under the GLB Act.

LEGAL125549257.4

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:14    Exhibit 4, Page 490
1366

---
**ELECTRONIC FUNDS TRANSFER INSTRUCTIONS**
---

**RECEIVING FINANCIAL INSTITUTION:**               UMPQUA BANK

**RECEIVING FINANCIAL INSTITUTION ADDRESS:**       705 NW Gilman Blvd.
                                                   Issaquah, WA 98027

**ABA/ROUTING NUMBER:**                            325171740

**ACCOUNT NUMBER:**                                9690211801

**ACCOUNT NAME:**                                  ICAP EQUITY, LLC

**SPECIAL INSTRUCTIONS:**                          Note Offering


AFTER SENDING FUNDS, PLEASE NOTIFY CONNIE CROTHERS BY E-MAIL AS SET FORTH BELOW
SO THAT SHE IS AWARE THE FUNDS ARE BEING SENT (She will not be confirming receipt).

PLEASE MAKE SURE TO HAVE THE ROUTING NUMBER AVAILABLE OR TO INCLUDE THE ROUTING
NUMBER IN YOUR FACSIMILE OR E-MAIL.

**iCap Equity**
**3535 Factoria Blvd. SE, Suite 500**
**Bellevue, WA 98006**
**Attention: Connie Crothers**
**Fax: (425) 278-9025**
**connie@icapequity.com**



**Payment Remittance Information**

**ACH Authorization**

I hereby authorize **iCap Equity, LLC** ("the Company") to initiate credit entries to the bank account(s) listed below.  I further authorize the financial institution(s) named below to credit such account(s).

| Name of Financial Institution | Checking or Savings | Bank Routing Number | Bank Account Number | % or Amount of Deposit |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

*For iCap to verify bank account and routing numbers, investors should attach a **VOIDED CHECK** for each investor account to be credited.  Investors should retain completed copies of this form for their records.

I understand that this authorization remains in effect until the Company receives from me, in writing, notification to terminate/change the authorization in such a time and manner as to afford the Company a reasonable time to act on it.

_____

Account Holder Signature                                    Date

_____

Joint Account Holder Signature                              Date

14

STERLING PLAZA I, 3535 FACTORIA BLVD. SE, SUITE 500, BELLEVUE, WA 98006

*Office* 425-278-9030 • *Fax* 425-278-9025 • *Website* ICAPEQUITY.COM



Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

<div style="writing-mode: vertical">Print or type — See Specific Instructions on page 2.</div>

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

**6** City, state, and ZIP code

**7** List account number(s) here (optional)

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

**Social security number**

**or**

**Employer identification number**

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**   Signature of U.S. person ▶                              Date ▶

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)

- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

   Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

   *If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X                 Form **W-9** (Rev. 12-2014)

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 4, Page 493 Pg 49 of 1366

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code* on page 3 and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships* above.

## What is FATCA reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code* on page 3 and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account, list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9.

　　a. **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note. ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

　　b. **Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

　　c. **Partnership, LLC that is not a single-member LLC, C Corporation, or S Corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

　　d. **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

　　e. **Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

## Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

## Line 3

Check the appropriate box in line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box in line 3.

**Limited Liability Company (LLC).** If the name on line 1 is an LLC treated as a partnership for U.S. federal tax purposes, check the "Limited Liability Company" box and enter "P" in the space provided. If the LLC has filed Form 8832 or 2553 to be taxed as a corporation, check the "Limited Liability Company" box and in the space provided enter "C" for C corporation or "S" for S corporation. If it is a single-member LLC that is a disregarded entity, do not check the "Limited Liability Company" box; instead check the first box in line 3 "Individual/sole proprietor or single-member LLC."

## Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space in line 4 any code(s) that may apply to you.

**Exempt payee code.**

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

**Note.** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

## Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns.

## Line 6

Enter your city, state, and ZIP code.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see *Limited Liability Company (LLC)* on this page), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at *www.ssa.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting IRS.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** *A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.*

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
|   b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 6. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 7. Disregarded entity not owned by an individual | The owner |
| 8. A valid trust, estate, or pension trust | Legal entity[4] |
| 9. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 10. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 11. Partnership or multi-member LLC | The partnership |
| 12. A broker or registered nominee | The broker or nominee |
| 13. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 14. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships* on page 2.

**\*Note.** Grantor also must provide a Form W-9 to trustee of trust.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Publication 4535, Identity Theft Prevention and Victim Assistance.

Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: *spam@uce.gov* or contact them at *www.ftc.gov/idtheft* or 1-877-IDTHEFT (1-877-438-4338).

Visit IRS.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

# EXHIBIT 5

CONFIDENTIAL - NOT TO BE REPRODUCED OR REDISTRIBUTED

# 10% SENIOR NOTE OFFERING II

## MEMORANDUM OF TERMS
## FOR THE PRIVATE PLACEMENT OF DEBT SECURITIES OF

### ICAP EQUITY, LLC

---

This Memorandum of Terms ("**Memorandum**") summarizes the principal terms of the proposed financing of iCap Equity, LLC (the "**Company**"). This term sheet is for discussion purposes only; there is no obligation on the part of any negotiating party until a definitive Note Purchase Agreement is signed by all parties. This term sheet is subject to the satisfactory completion of due diligence. This term sheet does not constitute either an offer to sell or an offer to purchase securities.

**THIS OFFERING INVOLVES CERTAIN RISKS. <u>See</u> "Risks Factors."**

The Notes have not been, nor will they be registered or qualified under the Securities Act. They are being offered and sold in the United States only to accredited investors in reliance on Rule 506(b) of Regulation D promulgated under the Securities Act or under any applicable state securities laws. Neither the securities and exchange commission nor any state securities commission has approved or disapproved of these securities or determined if this memorandum is truthful or complete; any representation to the contrary is a criminal offense.

The information contained in this Memorandum is confidential. By acceptance of this Memorandum, each recipient agrees (a) not to reproduce or distribute this Memorandum to other persons (except the recipient's professional advisors) without the prior written consent of the Manager; (b) that the recipient and his, her or its professional advisors will keep confidential all information contained herein not already in the public domain; and (c) that the recipient will use this Memorandum for the sole purpose of evaluating a possible investment in the Notes. Each recipient also agrees to return this Memorandum and any other documents or information furnished by the Company to the recipient (and any and all copies thereof) upon request of the Company if the recipient declines to purchase any Notes.

There will be no public market for the Notes and there is no obligation on the part of the Company or any person to register the Notes under the Securities Act or any state securities laws.

This Memorandum includes data and information obtained from independent third party sources. Although the Company does not have any reason to believe that such data and information is not accurate, the Company did not independently verify such data and information and cannot assure the accuracy or completeness of such data and information. Prospective investors must rely upon their own investigations and evaluations with respect to making an investment in the Notes being offered hereby.

Prospective investors will be advised of any material modifications to the terms of the offering or the Notes in writing prior to any sale of Notes to the prospective investors.

Nothing contained in this Memorandum is, or should be relied upon as, a promise or representation as to the Company's future performance. Prospective investors must rely upon their own examination of the Company and the terms of the Offering, including the merits and risks involved.

---

## SUMMARY OF MATERIAL TERMS

The following summarizes a number of the material provisions of the proposed promissory note financing of iCap Equity, LLC, a Delaware limited liability company (the "***Company***"). This Memorandum is qualified in its entirety by the full text of the Note Purchase Agreement and the exhibits attached thereto. Capitalized terms used in this summary not separately defined herein have the meanings assigned to such terms in the Note Purchase Agreement. No person will be permitted to invest in the Notes unless such person has received and reviewed the Note Purchase Agreement, this Memorandum and other offering-related documents. This summary does not constitute an offer to sell, or the solicitation of an offer to buy, the securities referenced herein, and any such offer will be made only to selected persons pursuant to the offering documents prepared and delivered by the Company.

| | |
|---|---|
| **Amount to be Raised** | Up to $10,000,000 in aggregate principal amount of promissory notes (the "***Notes***") or such additional amount as determined by the Manager in its sole discretion. |
| **Investors** | Each investor in the Notes must be an "accredited investor" as defined under Regulation D of the Securities Act (the "***Investors***"). |
| **Minimum Investment** | An investment of at least $50,000, unless a smaller investment is permitted by the Manager in its discretion. |
| **Target Closing Date** | The initial closing is anticipated to occur in June of 2019, with subsequent closings permitted through May 31, 2020, unless extended up to 12-months by the Manager. |
| **Definitive Agreement** | The Notes will be issued and sold pursuant to a note purchase agreement and will contain customary representations and warranties of the Company and the Investors (the "***Note Purchase Agreement***") in the form attached as **Exhibit A**. |
| **Maturity Date** | Unless extended by a one-year extension at the discretion of the Manager, principal and unpaid accrued interest will be due and payable three years after the date of the initial investment (the "***Maturity Date***"). The Notes may be prepaid prior to the Maturity Date without penalty. |
| **Interest Rate** | Simple interest will accrue on an annual basis at the rate of 10% per annum based on a 360-day year. Accrued interest will be due and payable monthly in arrears on the 15th day of each month following the closing of the Note. |
| **Payoff Premium** | Investors who purchase the first $2,500,000 of Notes in the Offering will receive a one-time 5% Payoff Premium, calculated on their outstanding balance and paid at the time of final payoff. |
| **Security and Priority** | The Notes will be unsecured and will be of equal seniority to the promissory notes issued by the Company to investors in previous offerings, the general terms of which are available to all potential investors upon request. |
| **Amendments** | Any term of the Notes may be amended or waived with the written consent of the Company and holders of Notes comprising a majority of the outstanding principal balance of the Notes sold in this Offering (the "***Majority Holders***"). Any amendment, waiver or extension approved by the Majority Holders will apply to all holders of the Notes. Additionally, each individual Note holder may also agree, with the consent of the Company, to make individual amendments to his/her Note. |
| **Events of Default** | Upon the occurrence of an Event of Default, the Holder may declare the Loan Amount to be due and payable. |
| **Fees and Expenses** | Each party will bear its own fees and expenses incurred in the transactions contemplated by this Memorandum. |
| **Company Contact Information** | iCap Equity, LLC<br>3535 Factoria Blvd. SE, Suite 500 |

Bellevue, WA 98006
ATTN: CHRIS CHRISTENSEN
OFC: (425) 278-9030; FAX: (425) 278-9025
EMAIL: investor@icapequity.com

137330388.4

## FORWARD-LOOKING STATEMENTS

This Memorandum and its exhibits may contain statements that constitute forward-looking statements, as defined by federal securities laws. Forward- looking statements can be identified by the use of terminology such as "anticipates," "expects," "intends," "opportunity," "plans," "should," "predicts," "potential," "continue," "believes," "seeks," "would," "may," "will be," "likely to become," "estimates" and variations of these words and similar expressions. Forward-looking statements are subject to risks and uncertainties and include statements made regarding events, financial trends, future operating-results, financial position, cash flows and other general information concerning possible or assumed future results of operations of the Company or any project. Investors are cautioned that such statements are only predictions, forecasts or estimates of what may occur and are not guarantees of future performance or of the occurrence of events or other factors used to make such predictions, forecasts or estimates. Actual results may differ materially from the results expressed, implied or inferred from the forward-looking statements and may be worse due to a variety of factors, including changes in laws, adverse changes in real estate prices, adverse changes in interest rates, and adverse changes in the credit and capital markets. These forward-looking statements speak only as of the date on which the statements were made and the Company undertakes no obligation to update or revise any forward-looking statements made in this Memorandum or elsewhere as a result of new information, future events, future developments or otherwise, except as required by law.

## INVESTMENTS

To subscribe for the Notes, you must complete, execute and deliver to the Company the Subscription Documents, in the form attached to this Memorandum as **Exhibit B**. The Note Purchase Agreement requires you to represent, among other things, that you are an accredited investor, are acquiring Notes for your own account for investment and not with a view to resale or distribution, and that you are aware that transfer of the Notes is restricted by the terms of the Note Purchase Agreement and by the absence of a market for the Notes. The Note Purchase Agreement also requires you to acknowledge that you have received and have had an opportunity to read this Memorandum and are aware of the risks associated with an investment in the Notes.

THE COMPANY'S ACCEPTANCE OF YOUR SUBSCRIPTION FOR NOTES DOES NOT CONSTITUTE A DETERMINATION BY THE COMPANY THAT THE INVESTMENT IS SUITABLE FOR YOU. THE FINAL DETERMINATION AS TO THE SUITABILITY OF AN INVESTMENT IN THE NOTES FOR YOU MUST BE MADE BY YOU AND YOUR ADVISORS.

137330388.4

## USE OF PROCEEDS

The following table sets forth the details of the fees and the funds available for use by the Company upon the sale of the Notes:

|  | Minimum Offering | Maximum Offering |
|---|---|---|
| Gross Offering Proceeds | $100,000 | $10,000,000 |
| Offering Expenses[1] | $80,000 | $80,000 |
| Organizational Expenses[2] | $15,000 | $15,000 |
| Amount Available for Company investment | $0 | $9,905,000 |

1   The Company may incur additional offering costs, including brokerage and finders fees of up to 8% of the capital such brokers and finders raise, and other expenses, the aggregate amount of which is not yet known. Such expenses, to the extent incurred, will reduce the net proceeds realized by the Company.
2   Organizational expenses include the cost of preparing this Memorandum and other offering documents.

### Allocation of Offering Proceeds

The proceeds of this offering will be used for the Company's business purposes, which include operations, technology implementation, new fund formation, investments into existing affiliate funds, consultant and professional engagements, real estate based investments, including loans and preferred equity investments. At any time, the Company may use offering proceeds to retire any debt obligation of the Company, including those held by other investors. The following table is an estimate of the Company's allocation of the available offering proceeds. Given that the offering proceeds will be combined with the Company's existing cash, and that the Company is been in operation for many years, the table illustrates primarily those items that are in addition to the standard operating expenses of the Company. If less than the maximum Offering amount is raised, the Manager will determine which line items will receive less than the estimated allocation. The Manager has discretion to utilize all proceeds as it deems necessary to accomplish the Company's business purposes, regardless of the estimates below.

| Line Item | Estimated Amount | Total |
|---|---|---|
| New Investment Vehicle Formation Costs[3] | $1,000,000 | $1,000,000 |
| Reserves | $1,000,000 | $1,000,000 |
| General Operations | $1,000,000 | $1,000,000 |
| Marketing | $500,000 | $500,000 |
| Website and Technology Upgrades | $500,000 | $500,000 |
| Affiliate Entity Investments | $3,000,000 | $3,000,000 |
| Real Estate Investments | $3,000,000 | $3,000,000 |

3.   Each time the Company launches a new investment fund vehicle, it advances the initial capital for the organizational and offering expenses, including preparation of the offering documents, entity formation, and marketing expenses. The Company is reimbursed for these expenses when the fund's first closing is held, and the newly formed fund begins generating management fee income that may be distributed to the Company.

137330388.4

# COMPANY OVERVIEW

**The Company**

The Company is a Delaware limited liability company, whose sole member is iCap Enterprises, Inc., the Manager. The Manager is wholly owned by Chris Christensen. The Company primarily derives its income from fees generated through the operations of its subsidiary entities. It will also receive income from investments that it plans to make with the proceeds of this offering, whether into real estate or affiliated funds. The Company's primary investment strategy focuses on preferred equity investments in Pacific Northwest real estate projects, but the Company also structures other investment opportunities that are based in real estate and involve the use of technology. The Company's subsidiary funds have primarily made secured, short-term investments in single-family, multi-family, light commercial and land development projects. Most investments of the past involve some element of construction or development. We anticipate that the Company will have negative cash flow for a number of years, before a profit is posted.

Although this Memorandum refers to "iCap" and the Company as though each were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. By investing in the Company, the Investor will not acquire an interest in any of its affiliated entities, but it may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Company as it conducts its business.

The following chart illustrates the relationship among the various iCap entities.



*Funds 1 and 2 are managed by iCap Pacific NW Management, LLC, a wholly owned subsidiary of iCap Equity, LLC. Funds 4 and 5 are managed either directly by iCap Equity, LLC or its wholly owned subsidiary. Fund 3 is the internal label given to the Note offerings within iCap Equity, LLC.

Members of the management team previously established iCap B1, LLC, and iCap B2, LLC in 2013, which raised a total of $6,915,664 for the purpose of making investments into various real estate projects. These special purpose vehicles made 10 investments and generated a gross IRR to investors of 20%. The management team also issued a total of $93 Million in debentures across two pooled investment funds, iCap Pacific NW Opportunity and Income Fund, LLC, and its follow-on fund, iCap Northwest Opportunity Fund, LLC. Additionally, in 2017 and 2018, the Company issued a total of $12.7 million of senior promissory notes to accredited investors. As of the date of this Memorandum, iCap has invested $97 million across 74 investments. Of these 74 investments, 50 have exited and achieved a 23% average annualized ROI. The financial statements of the Company and its affiliates can be viewed in the Data Room, which is available to all potential Investors upon request.

137330388.4

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5, Page 503
1366

YOU SHOULD RECOGNIZE THAT BY PURCHASING NOTES IN THE COMPANY YOU WILL NOT THEREBY ACQUIRE ANY OWNERSHIP INTEREST IN ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. YOU SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES IS GIVEN SOLELY TO ALLOW YOU TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. YOU SHOULD NOT ASSUME THAT THE INVESTORS IN THIS OFFERING WILL EXPERIENCE RETURNS, IF ANY, ON THEIR INVESTMENTS SIMILAR TO THOSE EXPERIENCED BY INVESTORS IN THE PRIOR PROGRAMS SPONSORED BY THE MANAGER AND ITS AFFILIATES.

**Investment Structure**

In utilizing the proceeds from this Offering, the Company plans to support its general corporate purposes and those of its subsidiaries.  The investment plans of the company will change and evolve over time, but currently the Company plans to pursue three primary investment strategies. These strategies include: (1) forming new fund vehicles and lending to or investing in existing affiliate fund vehicles, (2) investing in financial instruments or special purpose entities ("SPE's") that finance real property, and (3) acquiring and holding real estate for investment purposes. Initially, the Company will focus its investment in the greater Puget Sound region. The real estate holdings will be limited to single and multi-unit residential properties, light commercial properties, and land acquired for entitlement purposes. The Company may directly or indirectly, through subsidiary operations, carry out these forms of investments depending on the opportunities available to it.

**Investment Process**

The Company has developed proven processes and controls to evaluate possible investment opportunities. This process begins with an initial review by a committee consisting of key members of the management team (the "***Investment Committee***"). Specifically, the Investment Committee is comprised of the Company's President, Chief Operating Officer, and Controller. Every investment opportunity is subject to preliminary due diligence performed by the Company's underwriters, who in turn will present investment opportunities to the Investment Committee for its review and approval. The Investment Committee meets weekly to review new opportunities. The Company completes diligence on prospective investments and maintains post-closing procedures that provide for the ongoing supervision of the investments. The investment process has four major areas of focus: analysis and approval, documentation and closing, and post-closing and management.

**Risk Controls**

The Company's entity structure and investment strategy have been designed to mitigate risk and increase the likelihood of success. Each investor will receive a note upon closing, which will provide the investor with a priority return for repayment over equity holders, an ongoing interest rate, and a payoff premium. The Company's subsidiary management entity will then offer a corporate guaranty. Additionally, the Company has devised a three-prong investment strategy to ensure multiple income streams and has assembled an experienced and proven management team to oversee the business. Lastly, the Company has targeted strong markets for its investments in the Pacific Northwest.

**Tightening Lending Criteria**

Although the creation of new jobs in the Pacific Northwest has created an increase in demand for investment in real estate transactions, banks and other real estate lenders have tightened their lending criteria in order to ensure that they remain in a safe position with regard to their loans. Lenders now commonly lend no more than 65% of a project's cost and require the borrower to supply the remainder of the funds to complete a given project. Additionally, most real estate developers and builders have been forced to place their available cash into deposit accounts to meet aggressive liquidity requirements imposed by their banks and direct lenders who provide these loans for their projects. Consequently, real estate developers and builders frequently lack the ability to obtain the remaining funds needed to finance their projects.

As a result of the last financial crisis, banks and other traditional lenders have been forced to tighten their lending criteria for real estate based loans. Their stringent rules for mortgage lending programs and products limit their ability to address consumer need. New regulations result in less flexibility when underwriting mortgages, as well as higher compliance costs. The ability to lend is substantially constrained and, therefore, banks and other lenders find it harder to meet the increased demand for loans. This, in turn, frustrates borrowers and banks while slowing economic growth. The resultant funding void creates short-term and long-term investment opportunities.

6

**Opportunity in the Greater Puget Sound Region**

A fundamental need for capital in real estate projects, coupled with the growth of the Greater Puget Sound regional economy, has resulted in many real estate investment opportunities in the area. As noted below, the Greater Puget Sound regional economy has grown significantly in recent years.

The following are a few characteristics of the Greater Puget Sound Region:

- The region is home to many national companies from a variety of industries
- Hundreds of new companies move into the area annually
- Property sales and rental rates continue to increase
- Job creation has been steady
- Foreign and global investor interest has risen significantly



In March 2019, Washington state added 27,900 nonfarm jobs, which was the largest gain of any state in the US, according to the Bureau of Labor Statistics. It also led the US in adding the most employees in the construction sector, by adding 14,800 jobs.[1] The increased job growth has resulted in a housing inventory shortfall in the area, which has produced a supply and demand imbalance. In a balanced market, it is typical to maintain 6 months of housing inventory. As of April 2019, King County, the largest county—by both geography and population—in the region, has a mere 1.7 months of inventory.[2] Given this shortage of housing inventory, builders and developers have been able to take advantage of opportunities to bring new homes to the market and sell them for a profit. The Company's three investment strategies are calculated to address this imbalance.

**Management of the Company**

The management and supervision of the Company is vested exclusively in the Manager (including its duly appointed agents), who has full control over the business and affairs of the Company. The Manager has the power on behalf and in the name of the Company to carry out any and all of the objects and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings that the Manager, in its sole discretion, deems necessary or advisable or incidental thereto. Investors must rely upon the judgment and experience of the Manager to manage the

---

[1] Source: Northwest Multiple Listing Service, Washington job gains in March tops all states, May 6, 2019 http://nwreporter.nwmls.com/Issues/May-2019/page/Washington-Leads-Job-Gains.

[2] Source: Northwest Multiple Listing Service, Northwest MLS housing report for April signals good news for home buyers, http://nwreporter.nwmls.com/Issues/May-2019/page/Latest-Press-Release.

137330388.4

Company. The sole member of iCap Enterprises, Inc. is Chris Christensen. The managers of iCap Enterprises, Inc. are Chris Christensen and Jim Christensen.

The Manager and its Affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

**Professional Biographies**

Chris Christensen, *President*

Chris leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. He is also primarily responsible for tax and accounting decisions. Chris is 43, and prior to forming the Company, he managed affiliated funds, formed and managed operating entities, including Edge Construction, LLC and iCap Enterprises, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a Juris Doctor degree from Seattle University School of Law, a Master's degree in International Business from Seattle University, and a Bachelor of Arts degree in Economics from the University of Utah. He is the brother of Jim Christensen.

Jim Christensen, *Chief Operating Officer*

Jim is iCap's Chief Operating Officer and assists the President with the day-to-day operations of iCap and its investment funds, including overseeing investment underwriting, project and construction management, project financing, disposition of distressed assets, and management of the various strategic relationships involving iCap and its affiliates. In addition, he is responsible for the technology-related underpinnings of iCap. This includes electronic document storage, electronic process automation, and software management. Jim has managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington State for iCap Enterprises, Inc. Jim directly managed over $30 million in development projects and also consulted property owners on the strategy, finance and execution of the development of their properties. As an investment manager, he has been responsible for the oversight of over $260 million of projects. Jim has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Jim is 34, and he holds a Master of Business Administration degree and a Bachelor of Arts degree in Economics from the University of Washington. Jim is the brother of Chris Christensen.

Trace ("TD") Croshaw, *Controller*

As Controller, TD is responsible for managing financial controls and accounting procedures of the Company and its investments. TD provides forecasts, budgets and other financial analysis of the Company and its investments, assists with investor reports and communications, manages cash flows and cash flow projections, and establishes and ensures adherence to internal control policies and procedures within the Company. TD also supervises iCap's accounting personnel, and manages the Company's third-party audit, tax and accounting firms to complete annual audit and tax returns. TD is 41 and a licensed CPA. Prior to joining iCap, TD had 15 years of experience as an audit manager at an accounting firm performing financial audits for businesses. TD holds a Bachelor of Arts degree in Accounting from the University of Utah, and a Master of Business Administration degree from the University of Phoenix, and he is a member of the AICPA.

137330388.4

## POTENTIAL CONFLICTS OF INTEREST

The Manager and its Affiliates will be entitled to certain types of compensation, fees, income, distributions or other payments from the Company or in connection with a Company investment. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Company. The Manager has no obligation to advance funds to cover the Company's expenses. However, to the extent that such advances are made, the Company will repay such amounts out of its funds as soon as they are available, whether such funds are from the Company's operating revenues or third-party loans. Below is a summary of these key payment obligations of the Company and potential conflicts of interest that could arise from these obligations.

### Compensation and Other Payments to the Manager

The Company will not pay a fixed annual management fee to the Manager. However, the Company will pay sums to the Manager as are necessary to allow the Manager to perform those functions that relate to the Company's business purpose, such as payroll, rent, marketing, debt service, and all other such costs.

In addition to the fees set forth above, the Company will reimburse the Manager and its Affiliates for any reasonable expenses paid by either Person that properly should be borne by the Company. Such expenses include costs incurred before and after the formation of the offering, such as organizational and offering expenses; consulting, legal, accounting, and professional fees; and marketing and travel expenses.

The Company must distribute to the Manager, as a member of the Company, in cash the Estimated Tax Amount within 90 days after the close of each fiscal year, unless (a) the Manager determines the tax distribution would render the Company insolvent or would necessitate borrowing by the Company; (b) an Event of Default (as defined in the Notes) has occurred under the Notes or is continuing; or (c) the Manager determines that the tax distribution would otherwise be materially adverse to the Company. The Company is not required to make any distributions to its members prior to dissolution other than tax distributions.

The Manager may authorize non-tax-related distributions as long as the Company is not in default under the terms of any Note. Additionally, after the Company has paid the outstanding principal and annual interest due and payable under the Notes, the Company may distribute any remaining profits to the Manager. The Manager's profit interest in the Company may create an incentive for the Manager to make more speculative investments on behalf of the Company than the Manager otherwise would make in the absence of such profit potential.

### Transactions with the Manager and its Affiliates

The Company may enter into various transactions with the Manager and its Affiliates, including performance of services, being an agent or broker, providing debt or equity financing, guarantying financing, purchasing or selling property, or participating in an investment in an affiliate entity provided the terms are commercially reasonable. Compensation and fees could be paid with respect to these transactions. To the extent any such transaction may pose a conflict of interest between the Company and the Manager or its Affiliates this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company.

In the event the Company enlists the services or engages any Affiliate of the Manager, the rates of compensation of these Affiliates for the performance of their various services will be at arms-length rates no higher than what the Company could obtain from unaffiliated third parties and all payments will be subject to inspection by auditors upon request and at the expense of the requestor.

Additionally, in the event the Manager, or an Affiliate of the Manager, guaranties, whether personally or otherwise, a loan, bond or other obligation of the Company or of any of its subsidiary entities, such Manager or Affiliate will be entitled to an annual fee equal to 1% of the outstanding loan amount, bond amount, or other obligation being guarantied.

### Fees Payable by the Project Entity

In some instances, an Affiliate of the Manager may perform services for a Project Entity in order to provide better pricing or efficiency than would otherwise be available from third parties. In these instances, such Affiliates may be paid customary service fees for time, material, or labor.

9

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:16    Exhibit 5 Page 507

Pg 507 of 1366

In some instances, an Affiliate of the Manager may provide lending to a Project Entity in connection with or in lieu of financing from non-affiliated third parties. In such circumstances, the Affiliate may charge customary fees in connection with the issuance of such loans such as interest, origination fees, exit fees, and other fees.

**Acquisition, Transfer, and Divestiture of Investments to or from Affiliates**

The Company may acquire investments previously entered into by Affiliates of the Manager, or may partially or wholly transfer an investment to or from Affiliate entities, subject to underwriting and investment criteria of the Company and the Manager's Affiliates. Any investment acquisition or transfer that occurs may require a determination of the value of the investment, which may pose a conflict of interest between the Company and the Manager or its Affiliates, which must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company. Notwithstanding the foregoing, the Manager is not obligated to cause the Company or any Affiliate to enter into any such transactions. Additionally, the Company may purchase the equity of any Affiliate entity, lend to any Affiliate entity, or purchase the debt of any Affiliate entity. These decisions will also be made by the Manager, on terms that it feels are appropriate, as it feels is in the best interests of the Company.

**Devotion of Time and Attention**

The Manager will cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the Company's investments, and other activities of the Company as much time as may be reasonably necessary for the performance of their respective duties in their capacities as managing principals. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Company's investment objectives; (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund, any pre-existing funds, and any investments of those successor or pre-existing funds; (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his/her own account; (e) engage in civic, professional, industry and charitable activities; and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

The Manager and its Affiliates have established, and may establish, other pooled investment funds that have investment objectives identical to those of the Company or its Affiliates, and the principals of the Manager may devote such time and attention as they deem necessary for the success of such funds.

# RISK FACTORS

As with all investments, a purchase of the Notes is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. In addition to the information set forth elsewhere in this Memorandum, you should consider the following risks before deciding whether to invest.

## Operation and Company Risks

***Control is vested in the Manager; no Investor should purchase the Notes unless the Investor is comfortable with the Manager's judgment and experience in running the Company's affairs.***

Control over all decisions affecting the Company, including decisions regarding the investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, refinancing of Project Entities, whether to make an investment, whether an Affiliate is eligible for an investment, extensions of investments and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors. No assurance can be given that sufficient investments will be presented to the Company to deploy all of the capital available for investment.

When you subscribe for Notes that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the investments that the Manager subsequently identifies. You should not invest in the Company, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

***Proceeds from Investments will be re-invested during the life of the Company.***

The Manager has the discretion to retain all or a portion of the proceeds from investments to make new investments, and intends to do so over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

***The Company expects to have negative cash flow for a number of years.***

As the Company makes investments into infrastructure, personnel, investments into existing funds, and general business matters, the Company is expected to operate negatively for a number of years. This means that although the Company has provided for the payment of investor interest, there is not assurance that the Company will achieve its goals and eventually have a profit sufficient to pay back the Notes. Additionally, the Company will likely be reliant upon the raising of additional capital to re-finance or otherwise pay off the Notes, and investors must be willing to bear such risks.

***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Company or the Project Entities, provided the terms are commercially reasonable. However, the reasonableness of the terms will be determined by the Manager, and any measures put in place may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. In addition, before the Company invests all of its investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between investment opportunities that may meet the investment criteria of Affiliates of the Company or of the Manager.

***Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Notes.***

The Manager has not arranged for Investors to be separately represented by independent counsel. The legal counsel who has performed services for the Company has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

137330388.4

Pursuant to the terms of the Note Purchase Agreement, the Notes may be issued with original issue discount (or "OID") for U.S. federal income tax purposes. As such, if you are a U.S. Holder (as defined herein), you may be required to include OID (taxable as ordinary income) in taxable income each year in excess of the amount of interest payments actually received by you in that year.

> *You will not be investing in a fund vehicle. The prior performance data presented should provide you relevant information regarding fund entities overseen by the Company, but should not be construed as an indication of the likely financial performance of the Company.*

By investing in the Company, you will not be a creditor to the Affiliates of the Company nor in any of the prior investments sponsored by its Affiliates. The Company has provided selected information regarding its prior investments because it felt investors might consider those investments to be relevant in assessing the experience and judgment of the Manager or the Company's management team. Investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique and the Company may not be able to replicate the success of prior Affiliated investments, even if the investments assembled for the Company's portfolio are similar to those obtained for prior investments.

> *The Company may prepay the principal and interest on the Notes at any time.*

The Company may prepay the principal amount of the Notes, in whole or in part, at any time after one year from the date of investment. The Company may also choose to pay off some of the investor Notes while waiting to pay off the Notes of other investors. After the one-year mark, no prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Investors will not have certainty as to how long their respective Notes may be outstanding.

**Investment Risks**

> *The Company will have limited or no control over the underlying investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the investments.*

The Company expects to acquire preferred equity in Project Entities, acquire and hold real estate through Project Entities, or, occasionally, issue debt interests to Project Entities. Accordingly, the Company will not likely have control over such Project Entities (except in certain circumstances relating to the Company enforcing its creditor rights or contractual rights) and will be required to rely on the Project Partners of such Project Entities to use their skill, expertise and background to generate value from the investments.

> *Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.*

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that Investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

Real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without reviewing detailed budgets, such budgets may understate the expenses.

> *The Company is subject to a number of risks in the enforcement of its rights relating to investments.*

The Company's real estate investments will typically involve preferred equity investments in Project Entities, secured by a deed of trust in the underlying real property and a pledge of the Project Partner's membership interest in the Project Entity.

137330388.4

The Company also has the authority to issue or purchase debt collateralized by real property. These investments are subject to the following risks:

(a)       The Company's investment structure is unique. Although the Company generally requires a Project Entity to grant a deed of trust in the underlying real property owned by the Project Entity to secure the Company's investment and return, and requires the Project Partners to pledge their equity interest in the Project Entity to the Company, there can be no assurance that such interests will be enforceable or that, in the event of non-performance by the Project Partner or a default by the Project Entity, that the real estate will be readily transferred to the Company or that the Company can obtain control of the Project Entity. There is a risk that Project Partners or other third parties may oppose or contest the enforceability or priority of such security.

(b)       During the course of an investment, or in the event the Company exercises its contractual remedies upon non-performance by the Project Partner or a default by the Project Entity, there is a risk that a Project Partner or other third party oppose or contest the enforceability of the Company's investment documentation, or assert claims or defenses against the Company or the Manager, including claims relating to the Company's ability to remove the Project Partner and take over management of a project. Such claims and potential litigation may result in the Company incurring substantial legal fees, and adversely affect the Manager's ability to mitigate losses resulting from a Project Partner's failure to perform.

(c)       There is no assurance that the Company will subsequently acquire title to the collateral property. The Project Partner may cure defaults or arrange for the Company's investment to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third-party may be prepared to outbid the Company to purchase the collateral property.

(d)       A debtor or Project Partner may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent debtors. These protections are at the expense of the Company, and may result in staying the Company's foreclosure proceedings, proceedings against the Project Partner, restructuring of the terms of the Company's investment, or otherwise delaying or interfering with the enforcement of the Company's rights under its investment documentation.

(e)       In the event the Company invests in an Affiliate, it may not be able to enforce its rights of collection or it may incur losses as a result of such investments.  Conflicts of interest may preclude the Manager from enforcing rights to which the Company is entitled.  Any losses the Company experiences in such situations may result in the Company's inability to repay the Notes or to repay them when due.

> ***Uninsured losses on the investments could materially reduce investment returns, which may impact the ability to return principal balances under the Note.***

The Project Partner will obtain insurance policies for the Projects that are commercially prudent given the local market and circumstances of the Project (typically, including liability, fire and extended coverage). However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Projects should be partially or totally destroyed, the Company, as an investor in the Project Entity, may suffer a substantial loss of capital as well as profits. Even if the Project Partner's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Project Entity will sustain a substantial uninsured loss as a result of the casualty.

**Private Offering and Liquidity Risks**

> ***This offering of the Notes is being made in reliance on an exemption from registration requirements and there is no guarantee that it will comply with the regulatory requirements for such exemption.***

This private placement of Notes will not be registered with the Securities and Exchange Commission ("**SEC**"). The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to Investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, Investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

137330388.4

*This is a private offering and as such you will not have the benefit of review of this Memorandum by the SEC or other agency.*

Since this offering is a private placement of securities and, as such, is not registered under federal or state securities laws, you will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

### The Notes will be Illiquid

The Company expects its investments to be illiquid. Accordingly, the timing of its returns on those investments will be dependent upon various market factors. If the underlying assets in those investments are held for long periods or if any income streams of the Company are delayed or reduced, the Investors will be compelled to wait until the underlying assets are sold or improved, before being in a position to liquidate their investments. The Manager expects most of its real estate investments to have an investment time frame of 2 years or less. However, the Company may have little or no control over when the underlying properties are liquidated.

You must represent that you are purchasing the Notes for your own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, encumber or otherwise dispose of your Notes unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Code or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans and you may not be able to liquidate your investment in the event of emergency or for any other reason, or may be able to liquidate your investment only at a substantial discount.

137330388.4

# U.S. FEDERAL INCOME TAX MATTERS

**Introduction**

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Notes.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Notes, that purchased Notes at their original issue price for cash, and that hold such Notes as capital assets within the meaning of Section 1221 of the Code.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Notes by certain investors that are subject to special tax rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Notes in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Notes, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Notes, including the applicability of any U.S. federal tax laws or any state, local or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

**Considerations Relating to U.S. Holders of the Notes**

As used herein, the term "***U.S. Holder***" means a beneficial owner of a Note that is, for U.S. federal income tax purposes:

- An individual citizen or resident of the U.S.;

- A corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- An estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- A trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Notes that is a partnership and the partners in such a partnership should consult their tax advisors.

15

**Classification of the Notes**

Pursuant to the terms of the Note Purchase Agreement, the Company and each holder of Notes will agree to treat the Notes, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Company's determination that the Notes constitute debt for U.S. federal income tax purposes. If any portion of the Notes is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Note could differ from the timing and character of income, gain or loss recognized in respect of the Notes described below. The remainder of this discussion assumes that the Notes will be treated as indebtedness in accordance with that agreement and our determination.

**Interest Income and Original Issue Discount**

Payments of "qualified stated interest" (as defined below) on a Note will be taxable to a U.S. Holder as ordinary income at the time that such payments are accrued or are received (in accordance with the U.S. Holder's method of tax accounting).

It is anticipated that the Notes may be issued at a discount from their stated redemption price at maturity and that such discount will be equal to or greater than the product of one-fourth of one percent (0.25%) of the stated redemption price at maturity multiplied by the number of full years to their maturity. As such, it is anticipated that the Holders of the Notes may be required to report original issue discount ("*OID*") over the term of the Notes. U.S. Holders of the Notes should be aware that, as described in greater detail below, they generally must include OID in ordinary gross income for U.S. federal income tax purposes as it accrues, in advance of the receipt of cash attributable to that income.

In general, each U.S. Holder of the Notes, whether such U.S. Holder uses the cash or the accrual method of tax accounting, will be required to include in ordinary gross income the sum of the "daily portions" of OID on the Notes for all days during the taxable year that the U.S. Holder owns the debt security. The daily portions of OID on the Notes are determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of an OID debt security, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. In the case of an initial holder, the amount of OID on a Note allocable to each accrual period is determined by (a) multiplying the "adjusted issue price" (as defined below) of the Note at the beginning of the accrual period by the yield to maturity of the Note (appropriately adjusted to reflect the length of the accrual period) and (b) subtracting from that product the amount (if any) of qualified stated interest (as defined below) allocable to that accrual period. The yield to maturity of a Note is the discount rate that causes the present value of all payments on the Note as of its original issue date to equal the issue price of such Note. The "adjusted issue price" of a Note at the beginning of any accrual period generally will be the sum of its issue price and the amount of OID allocable to all prior accrual periods, reduced by the amount of all payments other than payments of qualified stated interest (if any) made with respect to such Note in all prior accrual periods. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of a Note at a single fixed rate of interest or, subject to certain conditions, based on one or more interest indices.

**Sale, retirement or disposition of Notes**

Upon the sale, retirement or other disposition of a Note, an Investor generally will recognize taxable gain or loss equal to the difference between the amount realized on the disposition and the Investor's adjusted tax basis in the Note. A U.S. Holder's adjusted tax basis in a Note generally will be equal to its adjusted issue price (as described above) in the Note. Gain recognized on the disposition of a Note generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Note generally will be treated as an ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Note is more than one year). The deductibility of capital losses is subject to limitations.

**Backup withholding and information reporting**

Information reporting requirements generally will apply to payments of interest and OID made by the Company on, or the proceeds of the sale or other disposition prior to maturity of, the Notes. Backup withholding tax, currently at a rate of 28%, may apply to such payments if an Investor fails to:

- Furnish his, her or its taxpayer identification number (social security or employer identification number);

137330388.4

- Certify that such number is correct;

- Certify that he, she or it is not subject to backup withholding; or

- Otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, *provided* that the required information is furnished timely to the Internal Revenue Service (the "***IRS***").

<div align="center">

## ERISA MATTERS

</div>

**Benefit Plan Investor Considerations**

The Notes offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or an individual retirement account ("***IRA***") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "***Similar Law***"). A fiduciary of an employee benefit plan must determine that the purchase and holding of a Note is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Notes offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Note offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Note that its acquisition and holding of the Note does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

<div align="center">

17

</div>

137330388.4

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5.1 Page 515 of 1366

## REPORTS TO THE INVESTORS

The Company has adopted a calendar fiscal year ending December 31. For so long as the Holder continues to hold the Note, the Company will provide to the Holder:

(a)     As soon as practicable after the end of each fiscal year and in any event within one hundred eighty (180) days after each fiscal year, consolidated balance sheets of the Company as of the end of such fiscal year and consolidated statements of income of the Company for such fiscal year, prepared in reasonable detail; and

(b)     As soon as practicable after the end of each fiscal quarter and in any event within 60 days after the end of each fiscal quarter, unaudited quarterly financial statements.

## GLOSSARY

To understand the rights associated with the Notes, Investor must review carefully the defined terms used in this Memorandum. Some of these definitions are set forth in this "GLOSSARY" and others in the body of this Memorandum. These definitions (some of which have been slightly modified) have been taken from the Note Purchase Agreement, which defines the preferences, privileges, rights, interests and obligations of the Notes. Many of these definitions are technical in nature, involve complicated relationships, and can only be understood by reference to other defined terms and, in some cases, to other provisions of the Note Purchase Agreement. Section references in the definitions refer to sections in the Note Purchase Agreement. Prospective investors should understand that the definitions in the Note Purchase Agreement will, for all purposes, be controlling, notwithstanding any simplification of such definitions in this Memorandum. Moreover, you should bear in mind that this GLOSSARY does not include many of the definitions included in the Note Purchase Agreement.

"*Affiliate*" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.  As used throughout this Memorandum, Affiliate refers to Affiliates of the Company.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"*Estimated Tax Amount*" means, with respect to each member of the Company, the amount equal to (a) the sum of (i) the greater of the highest statutory marginal ordinary federal income tax rate for individuals or corporations for a given tax year plus (ii) the unearned income Medicare contribution tax rate under Internal Revenue Code Section 1411 for a given year, multiplied by (b) the taxable income allocated to that member for the taxable year.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

18

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5.1 Page 516
1366

## THE OFFERING

The following description of certain matters relating to the Notes does not purport to be complete and is subject in all respects to applicable Washington Law and to the provisions of the Note Purchase Agreement.

### General

The Offering has not been registered under the Securities Act and is intended by the Company not to involve a public offering within the meaning of the Securities Act and Regulation D promulgated thereunder and, therefore, to be exempt from the registration provisions of the Securities Act. Accordingly, the Offering is being made pursuant to certain conditions which, if satisfied, will qualify the Offering for exemption from registration as provided by the Securities Act and Regulation D. These conditions relate to limitations on the manner of Offering, the nature of the Investors, access to or furnishing information about the issuer, and restrictions on transferability. This Offering is not being offered pursuant to Rule 506(b) of Regulation D.

Subject to the terms of the Note Purchase Agreement, the Company is authorized to raise up to $10,000,000 through the Offering, or any higher amount authorized by the Manager. Investors must make a minimum investment of $50,000, unless a smaller purchase is permitted by the Manager.

The Manager will have an initial closing for the Company as soon as practicable after a sufficient quantity of funds is raised in the Manager's sole determination. To accommodate the admission of additional Investors and permit existing Investors to increase their investment amounts, the Manager may, in its discretion, hold one or more additional closings on or before May 31, 2020, unless extended up to 12-months by the Manager.

### Payment of Investments

Each payment to the Company will be made in United States dollars by means of a certified or cashier's check payable to "iCap Equity, LLC" or by wire or electronic funds transfer, to a bank account designated by the Company, of immediately available funds through the federal wire transfer system, in the amount that the Holder has agreed to lend to the Company in the Note Purchase Agreement.

### Acceptance of Subscriptions; Eligibility Requirements

Purchases for the Notes will be accepted on a "first come, first-served" basis. The Manager reserves the right to reject any tendered investment for whatever reason the Manager deems appropriate. If the Manager rejects an investment, the Manager will give notice of such rejection, and return the tendered initial investment payment, no later than 10 business days after the Note Purchase Agreement and the accompanying funds have been received by the Manager.

## TRANSFERABILITY OF THE NOTES

Subject to compliance with the requirements of the Note Purchase Agreement, Investors shall have the right to transfer the Note to any qualifying third party of its choice contingent upon securing the Company's written consent in advance of the proposed transfer. The Company is under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under the Note Purchase Agreement, until the Holder has met the requirements imposed by the Company as such requirements may be changed from time to time. A new Note for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing the documentation required to effect such a transfer. Interest and principal are payable only to the registered holder of the Note.

The Holder and any successor Holder agree(s) to provide to the Company a Form W-9 or W-8 upon request. Until registration of a transfer occurs, the Company shall be entitled to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by the Note Purchase Agreement and the applicable Note.

### State Securities: Blue Sky Laws

Transfer of the Notes may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Notes may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be registered for resale under the Blue Sky laws of any state, the Holders and any persons who desire to purchase them in any

78404-0012/137330388.4

trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Notes and of purchasers to purchase the Notes. Accordingly, Investors should be prepared to hold the Notes until their maturity date as may be extended.

## FINANCIAL INFORMATION

This Memorandum does not include current balance sheets for either the Company or the Manager. The Manager has limited capitalization. As of the date hereof, the Company has incurred certain liabilities in connection with the offering and will incur substantial expenses in connection with the offering and sale of the Notes.

### Legal Representation

The Company urges you to engage your own legal counsel and, as necessary, financial consultants for advice regarding the desirability of purchasing the Notes offered pursuant to this Memorandum.

78404-0012/137330388.4

# NOTICES

The following notices apply in certain states where the Notes, which are referred to below as "securities," may be sold. Compliance with the notice exemption requirements of applicable state securities laws will be undertaken by the Company as needed.

**Notice to Residents of all States:**

THE SECURITIES OFFERED IN THE OFFERING HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND OTHER LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ACT AND THE SECURITIES LAWS OF CERTAIN JURISDICTIONS GRANT PURCHASERS OF SECURITIES SOLD IN VIOLATION OF THE REGISTRATION OR QUALIFICATION PROVISIONS OF SUCH LAWS THE RIGHT TO RESCIND THEIR PURCHASE OF SUCH SECURITIES AND TO RECEIVE BACK THEIR CONSIDERATION PAID. THE COMPANY BELIEVES THAT THE OFFERING DESCRIBED IN THIS MEMORANDUM IS NOT REQUIRED TO BE REGISTERED OR QUALIFIED. MANY OF THESE LAWS GRANTING THE RIGHT OF RESCISSION ALSO PROVIDE THAT SUITS FOR SUCH VIOLATIONS MUST BE BROUGHT WITHIN A SPECIFIED TIME, USUALLY ONE YEAR FROM DISCOVERY OF FACTS CONSTITUTING SUCH VIOLATION. SHOULD ANY INVESTOR INSTITUTE SUCH AN ACTION ON THE THEORY THAT THE OFFERING CONDUCTED AS DESCRIBED HEREIN WAS REQUIRED TO BE REGISTERED OR QUALIFIED, THE COMPANY WILL CONTEND THAT THE CONTENTS OF THIS MEMORANDUM CONSTITUTED NOTICE OF THE FACTS CONSTITUTING SUCH VIOLATION.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS ATTACHED TO THIS MEMORANDUM. NO ONE HAS BEEN AUTHORIZED TO PROVIDE YOU WITH ANY INFORMATION THAT IS DIFFERENT. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN GIVEN BY THE ISSUER OF THE SECURITIES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE ON THE COVER PAGE AND IS AN OFFER ONLY TO SUCH NAMED OFFEREE.

NEITHER THE INFORMATION CONTAINED HEREIN, NOR ANY PRIOR, CONTEMPORANEOUS OR SUBSEQUENT COMMUNICATION SHOULD BE CONSTRUED BY THE PROSPECTIVE INVESTOR AS FINANCIAL, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS, HER OR ITS OWN FINANCIAL, LEGAL, AND TAX ADVISORS TO ASCERTAIN THE MERITS AND RISKS OF THE OFFERING AND AN INVESTMENT IN THE COMPANY PRIOR TO SUBSCRIBING TO PURCHASE THE SECURITIES.

78404-0012/137330388.4

**Notice to New York Residents:**

THIS CONFIDENTIAL OFFERING MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

**Notice to Florida Residents:**

THE SECURITIES OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE SECURITIES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER OF THE SECURITIES OR AN AGENT OF SUCH ISSUER, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**Notice to New Hampshire Residents:**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

DURING THE COURSE OF THIS OFFERING, EACH PROSPECTIVE INVESTOR MAY OBTAIN ADDITIONAL INFORMATION WHICH SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY PROSPECTIVE INVESTOR WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE INVESTOR'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE COMPANY IF THE RECIPIENT DOES NOT PURCHASE THE SECURITIES OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE TO:

78404-0012/137330388.4

CONFIDENTIAL - NOT TO BE REPRODUCED OR REDISTRIBUTED

# EXHIBIT A

## NOTE PURCHASE AGREEMENT

**SENIOR 10% NOTE OFFERING II**

_____

**NOTE PURCHASE AGREEMENT**

**by and between**
**ICAP EQUITY, LLC**
**a Delaware limited liability company,**

**and**

**THE HOLDER (AS DEFINED BELOW)**

_____

**Dated as of May 15, 2019**

# CONTENTS

1. Definitions ........................................................................................................... 1

2. Delivery of Loan Amounts ................................................................................. 2

    2.1 Loan Amounts ............................................................................................ 2

    2.2 Prepayment ................................................................................................ 3

    2.3 Event of Default ......................................................................................... 3

3. Closing ................................................................................................................ 3

4. Representations and Warranties of the Company .............................................. 3

    4.1 Organization and Authority ....................................................................... 3

    4.2 Authorization; Binding Effect .................................................................... 3

    4.3 No Bankruptcy or Insolvency .................................................................... 4

    4.4 Valid Issuance of the Note ......................................................................... 4

    4.5 Restricted Securities .................................................................................. 4

    4.6 Governmental Consents and Notices ......................................................... 4

    4.7 No Litigation .............................................................................................. 4

    4.8 No Breach; No Default ............................................................................... 5

    4.9 Taxes .......................................................................................................... 5

5. Representations, Warranties and Agreements of the Holder ............................. 5

    5.1 Purchase Entirely for Own Account .......................................................... 5

    5.2 Due Diligence ............................................................................................ 5

    5.3 Access to Information; Modification of Offering ....................................... 5

    5.4 Sophistication ............................................................................................. 6

    5.5 Suitability ................................................................................................... 6

    5.6 Professional Advice ................................................................................... 6

    5.7 Ability to Bear Risk ................................................................................... 6

    5.8 Possible Loss of Interest and Principal ...................................................... 7

    5.9 Restricted Securities .................................................................................. 7

    5.10 Further Limitations on Disposition .......................................................... 7

    5.11 Age; Residency ........................................................................................ 7

    5.12 Accredited Investor Status ....................................................................... 7

    5.13 Tax Identification; Withholding ............................................................... 8

    5.14 No View to Tax Benefits .......................................................................... 8

  5.15 Confidential Information ................................................................................8

  5.16 No General Solicitation...............................................................................9

  5.18 Representations and Warranties of Organization.........................................9

 6. Conditions to Closing; Security Interests..............................................................9

  6.1 Holder's Conditions of Closing ....................................................................9

  6.2 Company's Conditions of Closing.................................................................9

 7. Covenants...........................................................................................................10

  7.1 Tax Statements..........................................................................................10

  7.2 Use of Proceeds .......................................................................................10

  7.3 Information Rights .....................................................................................10

  7.4 Notice of Default .......................................................................................10

 8. Defaults and Remedies .....................................................................................10

  8.1 Events of Default ......................................................................................10

  8.2 Acceleration .............................................................................................11

 9. Transfer of the Note ...........................................................................................11

 10. Miscellaneous .................................................................................................11

  10.1 Assignment ............................................................................................11

  10.2 Governing Law; Jurisdiction....................................................................12

  10.3 Waiver of Jury Trial .................................................................................12

  10.4 Counterparts...........................................................................................12

  10.5 Titles and Subtitles..................................................................................12

  10.6 Notices ...................................................................................................12

  10.7 Expenses ................................................................................................13

  10.8 Entire Agreement ....................................................................................13

  10.9 Amendments and Waivers .......................................................................13

  10.10 Severability ...........................................................................................13

  10.11 Anti-Terrorism Matters ..........................................................................13

  10.12 Survival.................................................................................................14


EXHIBITS

SCHEDULE OF HOLDERS ....................................................................... EXHIBIT A

FORM OF NOTE ....................................................................................... EXHIBIT B

23-01243-WLH11  Doc 468  Filed 02/23/24  Entered 02/23/24 19:33:15  Exhibit 5, Page 524
                     1366

# NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT (this "***Agreement***") is made and entered into as of this _____ day of _____, 20___ by and between iCap Equity, LLC, a Delaware limited liability company (the "***Company***"), and each Note (as defined below) holder (the "***Holder***") whose name is added to the Schedule of Holders attached hereto as ***Exhibit A***, which schedule will be amended from time to time as loans are made to the Company by Holders.

## RECITALS

A.  Company desires to borrow up to $10,000,000 from the Holders pursuant to this Agreement and promissory notes in substantially the form attached hereto as ***Exhibit B*** (individually, a "***Note***" and collectively, the "***Notes***"), to fund its operational activities and make loans and investments as set forth in its Memorandum of Terms for the Private Placement of Debt Securities of iCap Equity, LLC, dated May 15, 2019.

B.  The Company will accept funds under this Agreement only from an investor qualifying as an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933.

C.  The undersigned, by executing this Agreement, agrees to loan to the Company the amount stipulated on the Signature Page, and will receive from the Company a Note in the equivalent principal amount. The Company's closing of such transaction is subject to the conditions set forth in this Agreement.

## AGREEMENT

Now, therefore, in consideration of the mutual promises and covenants set forth herein, the Parties hereby agree as follows:

**1.  Definitions**

As used in this Agreement and the exhibits hereto, the following capitalized terms have the meanings set forth below unless the context clearly indicates otherwise. All nouns, pronouns and verbs used in this Agreement shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable.

"***Act***" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

"***Affiliate***" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"***Agreement***" means this Note Purchase Agreement, as originally executed or as amended by the Parties, and shall include the forms and exhibits attached thereto.

"***Bankruptcy Law***" is defined in Section 8.1.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:16    Exhibit 5, Page 525
1366

"**Business Day**," when used with respect to any place of payment or any other particular location referred to in this Agreement or in the Note, means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions or trust companies in the City of Seattle are authorized or obligated by law or executive order to close.

"**PPM**" means the Memorandum of Terms for the Private Placement of Debt Securities of iCap Equity, LLC dated May 15, 2019.

"**Closing**" is defined in Section 3.

"**Company**" means iCap Equity, LLC, a Delaware limited liability company, which is the obligor under the Note.

"**Note**" means the payment obligation, to be issued by the Company in favor of the Holder, pursuant to the terms of this Agreement, with an original principal amount equal to the loan made by the Holder to the Company at Closing (i.e. the Loan Amount). The Note shall be in the form attached hereto as *Exhibit B*.

"**Notes**" refer to, collectively, each Note issued by the Company pursuant to this Agreement, with each of the Notes in the form attached hereto as *Exhibit B*.

"**Event of Default**" means any event which is, or after notice or passage of time, or both, would be, an Event of Default within the meaning of Section 8.

"**Holder**" means any Person listed on *Exhibit A* who has purchased a Note pursuant to this Agreement, or any transferee thereof permitted under Section 9.

"**Loan Amount**" is defined in Section 2.1.

"**Maturity Date**" is defined in Section 2(a) of the Note.

"**Offering**" means the offering by the Company of the Notes pursuant to this Agreement.

"**Parties**" means the Company and the Holder.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**SEC**" is defined in Section 4.5.

"**Self-Directed Entity**" is defined in Section 5.17.

"**Signature Page**" means the Holder's signature page to this Agreement, upon which the Holder may designate the Loan Amount. Attached to this Agreement are several different versions of the Signature Page, each customized depending on whether the investor is an individual, a Self-Directed Entity or another legal entity (such as a corporation, limited liability company, or trust).

## 2. Delivery of Loan Amounts; Payment of Interest

### 2.1 Loan Amounts

By the execution of this Agreement, subject to the terms and conditions of this Agreement, the Holder agrees to lend to the Company principal in an amount set forth on the Signature Page (the "***Loan Amount***"), and the Company agrees to borrow such amount and in exchange for such funds to issue to the Holder a Note. At the time of the Holder's execution and subsequent delivery of this Agreement to the Company the Holder shall deliver the Loan Amount proceeds to an account of the Company as described in Section 2.

### 2.2 Prepayment

The Company may choose to prepay part or all of the Note without penalty at any time prior to the Maturity Date. The Company shall have an option to extend the Maturity Date for twelve (12) months pursuant to the Note document, in which case the interest rate during such extension period will increase to 11.0%. The Company need not prepay any of its noteholders pro rata, and it may choose to prepay some but not others.

### 2.3 Event of Default

Section 8 sets forth each of the events constituting an "***Event of Default***" under the Note and stipulates the rights of the Holder to accelerate amounts due thereunder.

### 2.4 Interest Payments and Payoff Premium

Prior to the Maturity Date, or extension thereof, the Company will be required to make only monthly interest payments to the Holder. Such monthly payments shall include all interest accrued under this obligation through the end of the prior calendar month, and shall be due and payable to the Holder on the fifteenth (15th) calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter. At the Maturity Date, or at the time the Company sooner pays off the principal balance of the Note, Holder shall be entitled to a one-time payment of 5% of the original Note balance ("***Payoff Premium***"); provided, however, that only holders of notes who purchase the first $2.5 million of notes are eligible to receive the Payoff Premium. If the first $2.5 million of notes have already been purchased prior to Holder's purchase of this Note, then Holder shall not be entitled to a Payoff Premium.

## 3. Closing

Upon satisfaction of the closing conditions, the Company shall borrow moneys from the Holder and the Holder shall lend such moneys to the Company, pursuant to the terms of this Agreement. The Closing (the "***Closing***") shall take place either (a) in the offices of the Company at 3535 Factoria Blvd SE, Suite 500, Bellevue, Washington 98006; (b) such other address as the Company designates in writing; or (c) via electronic submission of the necessary signed documents, as soon as the closing conditions have been satisfied. The sale of the Note is separate and independent from any other borrowings that may be made by the Company. At the Closing, the Holder shall deliver to the Company payment equal to the Loan Amount in the form of ACH transfer, Wire transfer, or a check payable to "iCap Equity, LLC", to a bank account designated by the Company, of immediately available funds. Upon receipt and acceptance of the subscription, this Agreement shall become binding.

## 4. Representations and Warranties of the Company

To induce the Holder to loan monies to the Company, the Company represents and warrants to the Holder as follows as of the date of the Closing:

### 4.1 Organization and Authority

The Company is a limited liability company, validly existing and in good standing under the laws of the State of Delaware, with full power and authority to enter into and perform this Agreement and the other agreements contemplated hereby to which it is now, or will be, a party. The Company has all requisite power and authority to, directly or indirectly, own its properties, to carry on its business as now conducted, and to enter into and perform its obligations under this Agreement.

### 4.2 Authorization; Binding Effect

The Company has taken all actions that are necessary to authorize the execution, delivery and performance of this Agreement and the Note, and the consummation of the transactions contemplated hereby. This Agreement and the other agreements contemplated hereby to which the Company is a party constitute the legal and binding obligations of the parties thereto, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights and the enforcement of debtors' obligations generally and by general principles of equity, regardless of whether enforcement is pursuant to a proceeding in equity or at law.

### 4.3 No Bankruptcy or Insolvency

The Company has not filed any voluntary petition in bankruptcy or been adjudicated bankrupt or insolvent, filed any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any federal bankruptcy, insolvency, or other debtor relief law, or sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator of all or any substantial part of its properties. No court of competent jurisdiction has entered an order, judgment or decree (and the Company knows of no action or petition requesting such) approving a petition filed against the Company seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any federal bankruptcy act, or other debtor relief law, and no other liquidator, trustee or conservator has been appointed of the Company or of all or any substantial part of its properties.

### 4.4 Valid Issuance of the Note

The Note, when issued by the Company to the Holder for the consideration expressed therein, will be duly and validly issued, and, based in part upon the representations of the Holder in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

### 4.5 Restricted Securities

The Company acknowledges that the Note has not been and will not be registered with the Securities and Exchange Commission ("**SEC**") under the Act, and covenants that the Note will be offered and sold in compliance with an exemption from registration provided by Rule 506 of Regulation D of the Act.

### 4.6 Governmental Consents and Notices

No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement, or the offer, sale or issuance of the Note, or the consummation of any other transaction contemplated hereby, except qualification (or taking such action as may be necessary to secure an exemption from qualification, if available) of the offer and sale of the Note under applicable state and federal securities laws, which qualification, if required, will be accomplished in a timely manner.

### 4.7 No Litigation

There are no actions, suits or proceedings of any type pending or, to the knowledge of the Company, threatened, against the Company, its properties or assets which is likely to if adversely determined, individually or in the aggregate, have a material adverse effect on (a) the Company's ability to perform the obligations contemplated under this Agreement or other agreements contemplated hereby or (b) the business, operations, prospects, properties, assets or condition (financial or otherwise) of the Company. The Company is not operating under, or subject to, or in default with respect to, any order, writ, injunction or decree, including any of the foregoing affecting the ability of the Company to enter into this Agreement or perform its obligations contemplated under this Agreement and other agreements contemplated hereby.

### 4.8 No Breach; No Default

To the best of the Company's knowledge, neither the execution, delivery or performance of this Agreement or the other agreements contemplated hereby to which the Company is a party, nor the consummation of the transactions contemplated hereby or thereby by the Company, (a) materially conflicts with or results in any material breach of, (b) constitutes a material default under, or (c) results in a material violation of: (i) any contract, commitment, lease, license, note or other instrument, including voting or limited liability company operating agreements, to which the Company is a party or by which any of its assets are bound, judgment, order, writ or decree or (ii) any provision of the Company's Certificate of Formation.

### 4.9 Taxes

The Company has timely filed or will timely file or cause to be timely filed, all material tax returns (or extensions) required by applicable law to be filed by it prior to or as of the Closing Date, and paid (a) all amounts of taxes shown thereon to be due (including interest and penalties) and (b) all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangibles taxes) owing by it, except for such taxes (i) which are not yet delinquent or (ii) that are being contested in good faith and by proper proceedings, and against which adequate reserves are being maintained in accordance with United States generally acceptable accounting procedures.

## 5. Representations, Warranties and Agreements of the Holder

To induce the Company to accept the loan from the Holder, the Holder represents and warrants to the Company as of the date of the Closing as follows:

### 5.1 Purchase Entirely for Own Account

The Note will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to distributing all or any part of the Note; the Holder has no present intention of selling, granting any participation in or otherwise distributing the Note in a manner contrary to the Act or any

applicable state securities law; and the Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person with respect to the Note.

### 5.2 Due Diligence

The Holder has been solely responsible for his, her or its own due diligence investigation of the Company and its business, and his, her or its analysis of merits and risks of the investment and subscription made pursuant to this Agreement, and is not relying on anyone else's analysis or investigation of the Company, its business or the merits and risks of the Note other than professional advisors employed specifically by the Holder to assist the Holder. In taking any action or performing any role relative to arranging the investment being made pursuant to this Agreement, the Holder has acted solely in his, her or its own interest and not in that of any other party, and no other party has acted as an agent or fiduciary for the Holder.

### 5.3 Access to Information; Modification of Offering

The Holder has received and reviewed in its entirety the PPM accompanying this Agreement. The Holder has been offered access to full and complete information regarding the Company and has assessed to his, her, or its satisfaction the risks associated with an investment in the Note. In particular, the Holder has been given the opportunity to ask questions of, and receive answers from, the Company's officers concerning the terms and conditions of this Agreement, the Note, the Company's PPM, and any other matters pertaining to the Company and an investment in the Note and has been given the opportunity to obtain such additional information necessary to verify the accuracy of such information. No information has been provided and no representations have been made to the Holder which are inconsistent with any information contained in the PPM. The Holder acknowledges that the Company may, in its sole discretion and for any reason whatsoever, modify, amend, increase or withdraw all or a portion of the Offering. In the event of the foregoing, the Company will not have any liability whatsoever to the Holder, except that the Company will be obligated to return any moneys transmitted to the Company by the Holder that have not been applied by the Company for the purchase of Notes, without interest or deduction.

### 5.4 Sophistication

The Holder, either alone or with the assistance of his, her or its professional advisor, is a sophisticated investor, is able to fend for himself, herself or itself in the transactions contemplated by this Agreement, and has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of acquiring the Note.

### 5.5 Suitability

The investment in the Note is suitable for the Holder based upon his, her or its investment objectives and financial needs, and the Holder has adequate net worth and means for providing for his, her or its current financial needs and contingencies and has no need for liquidity of investment with respect to the Note. The Holder's overall commitment to investments that are illiquid or not readily marketable is not disproportionate to his, her or its net worth, and investment in the Note will not cause such overall commitment to become excessive.

### 5.6 Professional Advice

The Holder has obtained, or has had the opportunity to obtain, to the extent he, she or it deems necessary, his, her or its own professional advice with respect to the risks inherent in the investment in the

Note, the condition and terms of this Agreement and the suitability of the investment in the Note in light of the Holder's financial condition and investment needs. The Holder is not relying on the Company or any of its directors, officers, employees or agents with respect to the legal, tax, economic and related considerations of an investment in the Note, nor is the Holder relying on the Company or any of its directors, officers, employees or agents (including those of any Affiliates) with respect to the appropriateness of this investment for the Holder.

### 5.7 Ability to Bear Risk

The Holder understands that the Company has limited prior operating history. The Holder recognizes that there is no market for the Notes and none is expected to develop; accordingly, his, her or its interest in the Note will be illiquid as well as subject to substantial contractual restrictions upon transferability. The Holder is in a financial position to purchase and hold the Note and is able to bear the economic risk and withstand a complete loss of his, her or its investment in the Note. The Holder agrees to waive any present or future claim against the Company, its officers, directors, representatives or Affiliates that the Note was not an appropriate investment for the Holder.

### 5.8 Risk Factors

The Holder recognizes that an investment in the Note is subject to certain risks, the occurrence of which might result in a loss of the principal and interest due to the Holder. The Holder has carefully reviewed and understands the risk factors set forth in the PPM.

### 5.9 Restricted Securities

The Holder realizes that (a) neither the Notes nor the offering of the Notes have been registered under the Act or applicable state securities laws; (b) that the Notes are characterized under the Act as "restricted securities" and, therefore, cannot be sold or transferred unless they are subsequently registered under the Act or an exemption from such registration is available; (c) the Company is not being registered as an "investment company" as the term "investment company" is defined in Section 3(a) of the 1940 Act, and (d) there is presently no public market for the Note and the Holder would most likely not be able to liquidate his, her or its investment in the event of an emergency or to pledge the Note as collateral security for loans. The Holder's financial condition is such that it is unlikely that the Holder would need to dispose of any of the Note in the foreseeable future. In this connection, the Holder represents that he, she or it is familiar with Rule 144 of the Securities Act, as promulgated by the Securities and Exchange Commission, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

### 5.10 Further Limitations on Disposition

Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Note unless and until there is compliance with the following requirements:

(a) the Holder shall arrange for the registered transfer of the Note as required by Section 9.

(b) if requested by the Company, the Holder shall have furnished to the Company a detailed statement of the circumstances surrounding the proposed disposition and shall have furnished to the Company an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such Note under the Act and any applicable state Blue Sky laws.

(c)     notwithstanding any other restrictions on the proposed transfer or disposition of the Note, any such proposed transfer or disposition shall be limited to and conditioned upon the proposed transferee qualifying as an "accredited investor" as set forth in Section 5.12.

### 5.11    Age; Residency

The Holder, if an individual, is over 21 years of age and legally competent to execute this Agreement. For purposes of the application of state securities laws, the Holder represents that he, she or it is a bona fide resident of, and/or is domiciled in, the state set forth in such Holder's residence address on the "Certificate of Accredited Investor" to be delivered to the Company at the Closing as required by Section 6.2(e).

### 5.12    Accredited Investor Status

By the execution of this Agreement, the Holder represents and warrants that he, she or it is an accredited investor within the meaning of Regulation D promulgated under the Act as indicated on the "Certificate of Accredited Investor" delivered to the Company at the Closing, and agrees to provide any additional documents and information that the Company reasonably requests. The Holder acknowledges that the Company is relying upon the Holder's representation of accredited status as a condition of entering into this Agreement, and as such agrees to waive any future claim that Holder was not an accredited investor. The Holder is aware that the Company has been and is relying upon the representations and warranties set forth in this Agreement, in part, in determining whether the Offering will qualify for an exemption from the registration provisions of the Act and applicable state securities laws. All of the information which the Holder has furnished the Company here, previously or in the documents or instruments contemplated by this Agreement with respect to the Holder's financial position and business experience is correct and complete as of the date hereof, and, if there should be any material change in such information, the Holder will immediately furnish the revised and corrected information to the Company. The Holder agrees to indemnify and hold harmless the Company and its Affiliates and their respective officers, managers, directors, members or employees and their successors and assigns from and against any and all losses, damages, liabilities or expenses, including costs and attorneys' fees incurred by reason of any misrepresentation by the Holder or any breach of the Holder's warranties.

### 5.13    Tax Identification; Withholding

Under penalties of perjury, the Holder certifies that (a) the number listed with the Holder's name on the signature page to this Agreement is the Holder's correct social security number or federal tax identification number, (b) the Holder is not subject to back-up withholding, either because he, she or it has not been notified that he, she or it is subject to back-up withholding as a result of a failure to report all interest and dividends or because the Internal Revenue Service has notified the Holder that he, she or it is no longer subject to back-up withholding and (c) Holder is not a "foreign person," "foreign corporation" or a person which is not a "United States person" within the meaning of Sections 1441, 1442, 1445 and 1446 of the Internal Revenue Code of 1986, as amended. (If the Holder has at any time received notice from the Internal Revenue Service that he, she or it is subject to back-up withholding and has not subsequently received a notice advising the Holder of the termination of back-up withholding, strike clause (b) above).

### 5.14    No View to Tax Benefits

The Holder is not acquiring the Note with a view toward realizing any benefits under United States federal income tax laws, and no representations have been made to the Holder that any such benefits will be available as a result of the Holder's acquisition, ownership or disposition of the Note.

8

5.15    **Confidential Information**

The Holder understands that the information contained in the PPM and this Agreement, is confidential and non-public information and agrees that all such information shall be kept in confidence by Holder and used by Holder solely for purposes of determining whether to purchase the Note. In addition, except as required by law, regulation or regulatory process, each Holder shall keep confidential, and shall cause each of its employees, agents, representatives, advisors or consultants to keep confidential all non-public information received by them with respect to the Company and its Affiliates following the Closing. The Holder, if an entity, represents and warrants that, as of the Closing, none of its beneficial owners are public agencies which are subject to state, federal or foreign laws providing for the possible public disclosure of certain records and information relating to the activities of such public agencies. The Holder agrees to notify the Company in the event such a public agency becomes a beneficial owner of the Holder and agrees to reasonably cooperate with the Company in such event to take steps, including entering into confidentiality agreements that restrict the access of certain of the Holder's beneficial owners to certain information, to protect information about the Company and its investments from being publicly disclosed by such public agency.

5.16    **No General Solicitation**

The Holder is unaware of, is in no way relying on, and did not become aware of, the offering of the Note through, or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television, radio or Internet and is not subscribing for the Note, and did not become aware of the offering of the Note through, or as a result of, any seminar or meeting to which the Holder was invited, or any solicitation otherwise initiated, by a person not previously known to the Holder in connection with investments in securities generally.

5.17    **Representations and Warranties of Organization**

If the Holder is a corporation, partnership or other association, trust or similar entity, the Holder hereby represents and warrants to the Company that the Holder is authorized and otherwise duly qualified to acquire the Note, and the individual executing this Agreement on behalf of the Holder has been duly authorized to do so and to bind the Holder by this Agreement (if the Holder is an individual who is investing through a revocable trust, an IRA or an account in a self-directed employee benefit plan (a "***Self-Directed Entity***"), such representation and warranty applies to the Self-Directed Entity, and, for this purpose, the term "***Holder***" shall be deemed to refer to the Self-Directed Entity).

6.    **Conditions to Closing; Security Interests**

6.1    **Holder's Conditions of Closing**

The obligation of the Holder to purchase the Note at the Closing pursuant to this Agreement shall be subject to and conditioned upon satisfaction or the waiver by such Holder of the following conditions on or prior to the applicable Closing Date:

(a)    the representations and warranties of the Company contained in this Agreement shall be true and correct in all material respects as of the applicable Closing and all covenants, agreements and conditions contained in this Agreement to be performed by the Company on or prior to the applicable Closing shall have been performed or complied with in all material respects.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5, Page 533

Pg 533 of 1366

(b)     the Company shall have obtained all necessary blue sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Note.

### 6.2     Company's Conditions of Closing

The obligation of the Company to sell the Note to a Holder at the Closing pursuant to this Agreement shall be subject to and conditioned upon satisfaction of the following conditions on or prior to the Closing:

(a)     all representations and warranties of the Holder contained in this Agreement, including the Certificate of Accredited Investor tendered by the Holder to the Company pursuant to Section 6.2(e), shall be true and correct as of the Closing Date and all covenants, agreements and conditions contained in this Agreement to be performed by such Holder on or prior to the Closing Date shall have been performed or complied with in all material respects.

(b)     the Company shall have obtained all necessary blue sky law permits and qualifications, or have the availability of exemptions therefrom, required by any state for the offer and sale of the Note.

(c)     no action or proceeding before any court or government body will be pending wherein a judgment, decree or order would prevent any of the transactions contemplated hereby or cause such transactions to be declared unlawful or rescinded.

(d)     execution and delivery by such Holder of this Agreement.

(e)     the Holder has completed, signed and delivered to the Company all provisions of the Subscription Agreement, including representation that the Holder's status qualifies as an "accredited investor" within the meaning of Regulation D under the Act.

## 7.     Covenants

### 7.1     Tax Statements

The Company will furnish to each Holder as soon as available, and in any event within sixty (60) days after December 31 of each year, all reasonably required tax information applicable to the Holder.

### 7.2     Use of Proceeds

The proceeds from the sale and issuance of the Notes are expected to be used for the purposes set forth in the PPM, and for the fees, costs and expenses incurred in connection with the Offering.  However, the Manager retains sole discretion to determine how such proceeds are ultimately used. Distributions may be made so long as the Company is not in default under the Note obligations.

### 7.3     Information Rights

For so long as the Holder continues to hold the Note, the Company will provide to the Holder annual financial statements of the Company and such information relative to the Company's business operations and performance as its management may deem useful or appropriate.

### 7.4 Notice of Default

The Company hereby covenants and agrees, as of the Closing and thereafter until the Notes and all other obligations arising under this Agreement have been repaid in full, the Company shall give notice in writing to the Holders (promptly, but in any event within thirty (30) business days after the Company knows or has reason to know thereof), of the occurrence of any Event of Default.

## 8. Defaults and Remedies

### 8.1 Events of Default

An "***Event of Default***" occurs if any of the following occur, regardless of the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a) the Company defaults in the payment of any Loan Amount or interest on any of the outstanding Notes, when the same becomes due and payable and such default continues for a period of thirty (30) Business Days after notice of such default has been delivered to Company by Holder (such period, a "***Grace Period***");

(b) the Company fails to observe or perform any covenant or warranty of the Company in this Agreement (other than a covenant or warranty a default in whose performance or whose breach is specifically dealt with elsewhere in this Section), and such failure continues for a period of thirty (30) calendar days after the Holder has given written notice to the Company specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(c) the Company, pursuant to or within the meaning of any Bankruptcy Law (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

(d) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Company in an involuntary case, (ii) appoints a custodian of the Company for all or substantially all of its property, or (iii) orders the liquidation of the Company; and the order or decree remains unstayed and in effect for ninety (90) consecutive calendar days.

The term "***Bankruptcy Law***" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "***Custodian***" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

### 8.2 Acceleration

Upon the occurrence of an Event of Default and the expiration of any required time periods for notice, cure or other reasons, the Holder may declare the Loan Amount (including the Loan Amount or interest on the Holder's Note) to be due and payable. Upon such a declaration, such principal and interest, if any, shall be immediately due and payable.

## 9. Transfer of the Note

Holder may not sell, assign or transfer this Agreement or the Note or any portion thereof, including, without limitation, the Holder's rights, title, interests, remedies, powers and/or duties hereunder or thereunder, as the case may be, without the express written consent of the Company, which consent may be granted or withheld in the Company's sole discretion, and without complying with the terms of this Agreement and any other requirements set forth by the Company.

## 10. Miscellaneous

### 10.1 Assignment

The Company may not assign this Agreement or any of its rights, interests or obligations hereunder without the prior written consent the Holder. Furthermore, the Holder may not transfer any interest in the Note. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

### 10.2 Governing Law

This Agreement shall be governed by and construed under the laws of the State of Washington as applied to agreements among Washington residents, entered into and to be performed entirely within the State of Washington, without giving effect to principles of conflicts of law. The Parties irrevocably consent to the jurisdiction and venue of and in King County, Washington in connection with any action arising from or relating to this Agreement or the transaction it contemplates. In the event of any dispute arising from or relating to this Agreement, the prevailing party shall be entitled to an award of its reasonable attorneys' fees and costs.

### 10.3 Waiver of Jury Trial

EACH PARTY, TO THE EXTENT PERMITTED BY LAW, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS IT CONTEMPLATES. THIS WAIVER APPLIES TO ANY ACTION OR LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

### 10.4 Counterparts

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

### 10.5 Titles and Subtitles

The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

### 10.6 Notices

Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) upon confirmation of receipt by fax by the party to be notified if received on or before 5:00 p.m. (local

time) on any Business Day or, if received later on such day, upon the close of business on the next Business Day, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (d), or (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by ten (10) days' advance written notice to the other party given in the foregoing manner.

<u>If to the Company</u>:
iCap Equity, LLC
Attn: Chris Christensen
3535 Factoria Blvd SE Ste 500
Bellevue, WA 98006
Fax: 425-278-9025

<u>If to Holder</u>:
To the address contained on the Holder's Signature Page.

**10.7    Expenses**

Each party to this Agreement shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Agreement, the related agreements and the transactions contemplated herein and therein.

**10.8    Entire Agreement**

This Agreement and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the Parties with regard to the subjects hereof and thereof.

**10.9    Amendments and Waivers**

Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Holder, or upon the written consent of a majority of all Note Holders in the Company.

**10.10    Severability**

If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

**10.11    Anti-Terrorism Matters**

The Holder hereby authorizes the Company to take, without prior notice to the Holder, such action as the Company determines to be reasonably necessary or advisable to comply, or to cause the Company to comply, with any anti-terrorism laws, rules, regulations, directives or special measures. Without limiting the foregoing, the Company may disclose any information concerning the Company or the undersigned necessary to comply with such laws, rules, regulations, directives or special measures, and the Holder shall provide the Company, promptly upon request, all information the Company reasonably deems necessary or advisable to comply with such laws, rules, regulations, directives or special measures.

13

### 10.12 Survival

The representations and warranties of the Company, and those of Holder, shall survive the consummation of the sale of the Note to Holder hereunder.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**COMPANY**

ICAP EQUITY, LLC

_____

By: iCap Enterprises, Inc.
Its: Manager
      By: Chris Christensen
      Its: President

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5, Page 538    Pg 53 of 1366

---

**HOLDER SIGNATURE PAGE**

---

See the Subscription Instructions Packet.

**EXHIBIT A**

**SCHEDULE OF HOLDERS**

| Holder Name & Address | Closing Date | Note Amount |
| --- | --- | --- |

# EXHIBIT B

## FORM OF NOTE

THIS PROMISSORY NOTE (THIS "**NOTE**") HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. § 15b ET SEQ., AS AMENDED ("**SECURITIES ACT**"), IN RELIANCE UPON ONE (1) OR MORE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE FEDERAL ACT. IN ADDITION, THE ISSUANCE OF THIS NOTE HAS NOT BEEN QUALIFIED UNDER THE SECURITIES ACT OF WASHINGTON, OR ANY OTHER STATE SECURITIES LAWS (COLLECTIVELY, THE "**STATE ACTS**"), IN RELIANCE UPON ONE OR MORE EXEMPTIONS FROM THE REGISTRATION PROVISIONS OF THE STATE ACTS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFER AS SET FORTH IN THE NOTE PURCHASE AGREEMENT.

$_____                                                     _____, 20____

## ICAP EQUITY, LLC

## PROMISSORY NOTE

iCap Equity, LLC, a Delaware limited liability company (the "**Company**"), for value received, promises to pay to _____ (the "**Holder**"), or the Holder's registered assigns, the Loan Amount plus interest thereon as set forth herein.

This Note ("**Note**") is issued pursuant to that certain Note Purchase Agreement dated as of May 15, 2019, by and between the Company and the Holder and other purchasers of Notes of like tenor (the "**Note Purchase Agreement**"), the terms of which are incorporated herein by reference. Capitalized terms that are used in this Note and that are not separately defined herein have the meanings assigned to such terms in the Agreement.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, to which the Holder, by the acceptance of this Note, agrees:

**1.    Interest on Outstanding Loan Amount**

The outstanding Loan Amount shall bear simple interest at ten percent (10%) per annum. Interest computation shall be based upon twelve 30-day months. Interest will accrue on the loan made to the Holder under this Note from the date that (a) such monies are paid to and are available for use by the Company, and (b) the Company has accepted the Subscription Agreement.  If the Company exercises its right to extend the Maturity Date as set forth in Section 2(b), the outstanding Loan Amount will bear simple interest at 11% per annum during the extension period.

In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of fifteen (15%) percent per annum, simple interest from and after written notice to the Company of the Event of Default, until all amounts due hereunder have been paid in full or the Event of Default has been cured.

1

2. **Stipulated Term; Company's Extension Right**

(a)    The full Loan Amount shall be due and payable, together with all accrued but unpaid interest, on or before the end of the 36th calendar month that follows the Effective Date (the "***Maturity Date***"). The date first set forth above shall be the "***Effective Date***"; *provided, however*, that if the Holder's funds are not made available to the Company within 7 days of the date first set forth above, then the Effective Date shall be adjusted to reflect the date on which funds were actually made available to the Company.

(b)    So long as an Event of Default has not occurred and is continuing, the Company has the option to extend the Maturity Date for an additional twelve (12) months. This option may be exercised by the Company at any time prior to the Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Maturity Date. If the Company fails to give such notice, this Note will mature upon the expiration of the Maturity Date.

(c)    Upon the maturity of this Note, the outstanding Loan Amount, together with all accrued but unpaid interest, will be due and payable to the Holder.

3. **Interest Payments and Payoff Premium**

Prior to the Maturity Date, or extension thereof, the Company will be required to make only monthly interest payments to the Holder. Such monthly payments shall include all interest accrued under this obligation through the end of the prior calendar month, and shall be due and payable to the Holder on the fifteenth (15th) calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter. At the Maturity Date, or at the time the Company sooner pays off the principal balance of the Note, Holder shall be entitled to a one-time payment of 5% of the original Note balance ("***Payoff Premium***"); provided, however, that only holders of notes who purchase the first $2.5 million of notes are eligible to receive the Payoff Premium. If the first $2.5 million of notes have already been purchased prior to the purchase of this Note, then Holder shall not be entitled to a Payoff Premium.

4. **Prepayment**

The Company may choose to prepay part or all of the Note without penalty at any time prior to the Maturity Date, or extension thereof. Any such prepayment will be credited first to any accrued and unpaid interest and then to the payment of the outstanding Loan Amount.

5. **Restrictions on Transfer**

This Note may not be transferred unless consented to by the Company, and if done in compliance with the terms and conditions of the Note Purchase Agreement as well as all applicable federal and state securities laws.

6. **Holder's Representations**

By the acceptance of this Note, the Holder re-affirms its representations and warranties in the Agreement in favor of the Company.

## 7. Events of Default

Each of the events specified in Section 8 of the Note Purchase Agreement shall constitute an Event of Default under this Note. Upon the occurrence of an Event of Default, the Holder shall have the rights, and be subject to the restrictions, set forth in the Note Purchase Agreement.

## 8. Miscellaneous

### 8.1 Costs of Collection

If this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note in accordance with the terms of the Note Purchase Agreement, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action, including, but not limited to, attorneys' fees and disbursements, provided Holder finally prevails on such proceedings.

### 8.2 Holder as Owner

The Company may deem and treat the holder of record of this Note as the absolute owner for all purposes regardless of any notice to the contrary from third parties.

### 8.3 No Member or Ownership Rights

This Note confers no ownership rights whatsoever in the Company, and shall not entitle the Holder to any voting rights, any management rights, any ownership rights, any rights to distribution, any statutory rights conferred on members, or any other rights as an owner of the Company or to any other rights except the rights stated herein.

### 8.4 Notices

Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) upon confirmation of receipt by fax by the party to be notified if received on or before 5:00 p.m. (local time) on any Business Day or, if received later on such day, upon the close of business on the next Business Day, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (d), or (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by ten (10) days' advance written notice to the other party given in the foregoing manner.

| | |
|---|---|
| If to the Holder: | To the address or number last furnished in writing to the Company in accordance with the Note Purchase Agreement. |
| If to the Company: | iCap Equity, LLC<br>3535 Factoria Blvd. SE Ste 500<br>Bellevue, WA 98006<br>Fax: 425.278.9025 |

### 8.5 Amendments and Waivers

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5, Page 543
1366

No provision of the Note or the Note Purchase Agreement may be amended, except by the express written agreement of both the Company and Holder.

### 8.6 Governing Law; Jurisdiction

This Note shall be governed by and construed under the laws of the State of Washington as applied to agreements among Washington residents, entered into and to be performed entirely within the State of Washington, without giving effect to principles of conflicts of law. Holder irrevocably consent to the jurisdiction and venue of and in King County, Washington in connection with any action arising from or relating to this Agreement or the transaction it contemplates.

### 8.7 Waiver of Jury Trial

HOLDER, TO THE EXTENT PERMITTED BY LAW, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THE NOTE PURCHASE AGREEMENT AND THIS NOTE. THIS WAIVER APPLIES TO ANY ACTION OR LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

### 8.7 Assignment

The Company may not assign this Note or any of its rights, interests or obligations hereunder, except upon receiving the consent of the Holder. Except as otherwise provided herein, the terms and conditions of this Note shall inure to the benefit of and be binding on the respective successors and assigns of the Parties.

### 8.8 Severability

If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note, and the remaining provisions of this Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

### 8.9 Waivers

The Company waives presentment for payment, demand, notice of nonpayment, notice of protest and protest of this Note, and all notices in connection with the delivery, acceptance, or dishonor of this Note.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**ICAP EQUITY, LLC**

_____

By: iCap Enterprises, Inc.
Its: Manager
    By: Chris Christensen
    Its: President

4

**EXHIBIT B**

**SUBSCRIPTION DOCUMENTS**
**OF**
**ICAP EQUITY, LLC**



# ICAP EQUITY, LLC
## A DELAWARE LIMITED LIABILITY COMPANY

---

**10% SENIOR NOTE OFFERING II**
BEST EFFORTS OFFERING OF UP TO $10,000,000 OF NOTES

---

ACCREDITED INVESTORS ONLY

## <u>SUBSCRIPTION DOCUMENTS</u>

<u>INSTRUCTIONS TO INVESTORS:</u>

Please read carefully the M e m o r a n d u m of T e r m s for the P r i v a t e P l a c e m e n t of D e b t S e c u r i t i e s of i C a p E q u i t y, L L C (the "Company"), and all exhibits thereto (collectively, the "Memorandum"), before deciding to subscribe. The offering described in the Memorandum (the "Offering") is limited to investors who meet all of the suitability standards and other requirements set forth in the Memorandum. (See the section of the Memorandum entitled "WHO MAY INVEST.")

EACH PROSPECTIVE INVESTOR SHOULD EXAMINE THE SUITABILITY OF AN INVESTMENT IN THE COMPANY IN THE CONTEXT OF HIS, HER OR ITS OWN NEEDS, INVESTMENT OBJECTIVES, AND FINANCIAL CAPABILITIES AND SHOULD MAKE HIS, HER OR ITS OWN INDEPENDENT INVESTIGATION AND DECISION AS TO THE SUITABILITY OF THE INVESTMENT. EACH PROSPECTIVE INVESTOR IS ALSO ENCOURAGED TO CONSULT WITH HIS, HER, OR ITS BUSINESS OR TAX ADVISOR REGARDING THE RISKS AND MERITS OF AN INVESTMENT IN THE COMPANY.

**YOU ARE ENCOURAGED TO MAKE YOUR SUBSCRIPTION PAYMENT BY ACH OR WIRE TRANSFER PURSUANT TO THE WIRE TRANSFER INSTRUCTIONS INCLUDED WITH THESE SUBSCRIPTION DOCUMENTS. HOWEVER, YOU MAY ALSO FUND YOUR SUBSCRIPTION BY CHECK MADE PAYABLE TO "ICAP EQUITY, LLC."**

<u>ELECTRONIC DELIVERY OF THE COMPLETED AND EXECUTED VERSION OF THESE SUBSCRIPTION DOCUMENTS IS ENCOURAGED</u>. IF PAYING BY CHECK, YOUR CHECK FOR THE SUBSCRIPTION PAYMENT MAY BE MAILED TO:

ICAP EQUITY, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006
ATTN: Connie Crothers

**IMPORTANT  NOTE**: FAILURE TO COMPLETE ALL APPLICABLE INFORMATION AND DELIVER ANY ADDITIONAL INFORMATION REQUESTED BY THE M A N A G E R WILL RESULT IN THESE DOCUMENTS BEING RETURNED FOR COMPLETION AND MAY CAUSE A REJECTION OR DELAY OF ACCEPTANCE OF THE SUBSCRIPTION.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5, Page 546
1366



**iCAP EQUITY, LLC**
**3535 Factoria Blvd. SE, Suite 500**
**Bellevue, WA 98006**

1. **Investor Questionnaire**

2. **Subscription Agreement**

3. **Signature Page of Subscription Agreement and Note Purchase Agreement**

4. **Registered Representative/RIA & Broker/Dealer Acnowledgment**

5. **Subscription Agreement Terms and Conditions-Registered Investment Advisors**

6. **Electronic Funds Transfer Instructions**

7. **Payment Remittance Information**

8. **W-9 (Taxpayer Identification Number)**

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5, Page 547
1366



# INVESTOR QUESTIONNAIRE

The purpose of this Investor Questionnaire is to provide information to iCap Equity, LLC (the "Company") regarding your qualifications to purchase Notes ("Notes") being offered pursuant to the Memorandum of the Company (together with all exhibits thereto, the "Memorandum"). Your answers will be kept confidential by the Company. However, by completing and signing this Investor Questionnaire, the accompanying Subscription Agreement and the signature page to the Note Purchase Agreement, you agree that the Company may present your Investor Questionnaire, Subscription Agreement and other subscription documents to those parties as it deems appropriate if called on to establish the Company's entitlement to a private offering exemption under the Securities Act of 1933 (the "Securities Act"), or any applicable state securities law. If you have any questions concerning this Investor Questionnaire, please call the person from whom you received this Investor Questionnaire.

**The offer of Notes to you was made in the State of: _____**

(Please fill in number from your Memorandum)

1. **FORM OF OWNERSHIP (CHECK ALL APPLICABLE BOXES)**

☐ IRA                                                          ☐ Individual

☐ Keogh                                                      ☐ Husband and Wife

☐ Other Retirement or Profit Sharing Plan **(Please attach plan documents relating to this investment)**

☐ Joint Tenants                                          ☐ Joint Tenants with Right of Survivorship

☐ Trust, Date Formed _____    ☐ Tenants in Common

☐ Partnership                                            ☐ Corporation of LLC

☐ Other: **(Please specify):**_____

2. **INVESTOR'S NAME AND ADDRESS**          Please Check:
                                                                      ☐**Mr.** ☐**Mrs.** ☐**Ms.** ☐**M.D.** ☐**Ph.D.** ☐**D.D.S.**

| | |
|---|---|
| **Name** | |
| **SSN (or EIN)** | |
| **Home Address** | |

| | | | |
|---|---|---|---|
| **City** | | **State** | **Zip Code** |

| | | | |
|---|---|---|---|
| **Home Telephone No.** | | **Business Telephone No.** | |

| | |
|---|---|
| **E-mail Address (Required)** | |

| | Investor | Joint Owner | | | Investor | Joint Owner |
|---|---|---|---|---|---|---|
| **Birth Date** | | | Occupation | | | |

A. Are you associated with a Financial Industry Regulatory Authority, Inc. ("FINRA") member firm? (if you answered "YES," additional information may be requested of you in order to process your subscription.)     _____ YES     _____ NO

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 5, Page 548
1366



B. Are you a plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA")?
(if you answered "YES," additional information may be requested of you in order to process your subscription.)

_____ YES   _____ NO

C. Are you an entity that is tax-exempt for U.S. federal income tax purposes?
(if you answered "YES," additional information may be requested of you in order to process your subscription.)

_____ YES   _____ NO

D. Are you subject to the U.S. Bank Holding Company Act of 1956 or directly or indirectly "controlled" (as that term is defined in such act) by an individual or entity that is subject to such act?
(if you answered "YES," additional information may be requested of you in order to process your subscription.)

_____ YES   _____ NO

3. **IF INVESTING THROUGH AN IRA, KEOGH OR OTHER RETIREMENT OR PROFIT SHARING PLAN, PLEASE COMPLETE THE FOLLOWING (IN ADDITION TO THE INVESTOR INFORMATION ON THE PREVIOUS PAGE):**

**Account Name**

**Custodian's EIN**

**Custodian's Address**

**City**                **State**                **Zip Code**

4. **ACCREDITED INVESTOR CERTIFICATION.** To enable the Company to evidence the basis, in part, of its reliance on the provisions of Regulation D promulgated under the Securities Act — specifically with respect to your status as an "accredited investor" as that term is defined in Regulation D — please complete the following

FOR INDIVIDUAL INVESTORS: I represent and warrant that I am reviewing the Memorandum and the related subscription documents for my own investment interest as a principal and that I am an "accredited investor" because, as indicated below, I satisfy one or more of the following standards.

A. I have an individual net worth, or joint net worth with my spouse, which exceeds $1,000,000. (For purposes of this Investor Questionnaire, "net worth" means, subject to the exception provided in the following sentence, the excess of total assets at fair market value over total liabilities. When determining net worth, however, the value of an investor's primary residence and any indebtedness secured thereby up to its fair market value shall be excluded from the investor's net worth, while indebtedness secured by the residence in excess of its fair market value should be considered a liability and deducted from the investor's net worth.)

YES_____         NO_____

B. I had individual income (exclusive of any income attributable to my spouse) of more than $200,000 in each of the two most recent years and have a reasonable expectation to have individual income in excess of $200,000 in the current year. (For purposes of this Investor Questionnaire, "individual income" means the investor's adjusted gross income, as reported for federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse.)

YES_____         NO_____

C. I had joint income with my spouse of more than $300,000 in each of the two most recent years and have a reasonable expectation to have joint income in excess of $300,000 in the current year.

YES_____         NO_____

D. I am a director or executive officer of the Company or its manager.

YES_____         NO_____

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5, Page 549
1366



<u>FOR ENTITY INVESTORS</u>. I am completing this Investor Questionnaire on behalf of an entity, and I represent and warrant that such entity is an "accredited investor" because, as indicated below, it satisfies one or more of the following standards.

E.    The entity is a trust, with total assets in excess of $5,000,000, that was not formed for the specific purpose of acquiring the Notes and which has its investments directed by a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of purchasing the Notes.

YES_____          NO_____

F.    The entity is a bank, as defined in Section 3(a)(2) of the Securities Act, or a savings and loan association or other institution, as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

YES_____          NO_____

G.    The entity is a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

YES_____          NO_____

H.    The entity is an insurance company, as defined in Section 2(a)(13) of the Securities Act.

YES_____          NO_____

I.    The entity is an investment company registered under the Investment Company Act of 1940 or a business development company, as defined in Section 2(a)(48) of that act.

YES_____          NO_____

J.    The entity is Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

YES_____          NO_____

K.    The entity is a plan established and maintained by a U.S. state, its political subdivisions, or any agency or instrumentality of such a state or its political subdivisions, for the benefit of its employees, which has total assets in excess of $5,000,000.

YES_____          NO_____

L.    The entity is an employee benefit plan within the meaning of ERISA and: (i) the investment decision with respect to the Notes is being made by a plan fiduciary, as defined in Section 3(21) of ERISA, of the employee benefit plan that is either a bank, savings and loan association, insurance company or registered investment adviser; (ii) the employee benefit plan has total assets in excess of $5,000,000; or (iii) if the plan is a self-directed plan, the plan's investment decisions are made solely by persons that qualify as "accredited investors" (i.e., IRA, SEP-IRA, KEOGH, etc.).

YES_____          NO_____

M.    The entity is a private business development company, as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

YES_____          NO_____

N.    The entity is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, corporation, Massachusetts or similar business trust, limited liability company or partnership, with total assets in excess of $5,000,000 that was not formed for the specific purpose of acquiring the Notes.

YES_____          NO_____

O.    All of the equity owners of the entity are "accredited investors" and the entity is not a trust.

YES_____          NO_____



5. **SIGNATURE.** I declare that the information supplied in this Investor Questionnaire is true and correct and may be relied on by the Company in connection with my investment as a member in the Company.

**INDIVIDUAL(S) AND (OR) JOINT OWNER(S):**

| | | |
|---|---|---|
| Signature of Individual Investor | Signature of Joint Owner, if applicable | Date |

**IRA, KEOGH OR QUALIFIED PENSION PLAN:**

| | | |
|---|---|---|
| Signature of Participant | Signature of Custodian, if required | Date |

**ENTITIES (i.e. CORPORATION, PARTNERSHIP, LLC OR TRUST):**

| |
|---|
| Name of Entity |

| | | |
|---|---|---|
| Print Name and Title of Entity Representative | Signature | Date |



---

# SUBSCRIPTION AGREEMENT

---

I, the undersigned, hereby offer to purchase a promissory note ("Note(s)") in iCap Equity, LLC (the "Company") in the amount set forth on the Signature Page of this Subscription Agreement and under the terms and conditions contained herein and in the Memorandum of Terms for the Private Placement of Debt Securities of iCap Equity, LLC, and the exhibits attached thereto (the "Memorandum"), including, without limitation, the Note Purchase Agreement (the "Note Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Memorandum.

**THE UNDERSIGNED HEREBY MAKES THE FOLLOWING REPRESENTATIONS AND WARRANTIES WITH THE FULL UNDERSTANDING THAT THE COMPANY AND ITS MANAGER ARE RELYING ON SUCH REPRESENTATIONS AND WARRANTIES.**

1. I have received read and fully understand the Memorandum and all of its exhibits, including, without limitation, the Note Purchase Agreement.

2. I am basing my decision to invest only on the information in the Memorandum and information requested of the Company in writing by me, and I have not relied on any other representation made by any other person.

3. I am a citizen and/or a legal permanent resident of the United States of America, with my principal residence maintained at the address set forth in the Investor Questionnaire, and I am at least twenty-one years of age.

4. I am executing this Subscription Agreement: (A) on my own behalf, as a natural person, and I have the legal capacity to execute, deliver and perform my obligations under this Subscription Agreement or (B) on behalf of a corporation, partnership, limited liability company, trust or other entity, and (i) such entity is duly organized, validly existing and in good standing under the laws of the jurisdiction where it was formed and is authorized by its governing documents to execute, deliver and perform its obligations under this Subscription Agreement, (ii) I have the full power and authority to execute and deliver this Subscription Agreement on behalf such entity and (iii) this Subscription Agreement, and such entity's execution hereof and performance of its obligations hereunder, has been duly authorized by all requisite corporate or other action by the entity.

5. I am not, and, in the case of a corporation, partnership, limited liability company, trust or other entity, none of its principal owners, partners, members, directors or officers are, included on the Office of Foreign Assets Control list of foreign nations, organizations and individuals subject to economic and trade sanctions based on U.S. foreign policy and national security goals, Executive Order 13224, which sets forth a list of individuals and groups with whom U.S. persons are prohibited from doing business because such persons have been identified as terrorists or persons who support terrorism, or any other watch list issued by any governmental authority, including the Securities and Exchange Commission.

6. The offer and sale of the Notes to me has not been accompanied by the publication of any public advertisement or by any general solicitation.

7. I understand that an investment in the Company involves substantial risk, and I am fully aware of and understand all of the risk factors relating to the investment, including, but not limited to, the risks set forth in the "RISK FACTORS" section of the Memorandum.

8. My overall commitment to investments that are not readily marketable is not disproportionate to my individual net worth. My investment in the Company will not cause my overall commitment to illiquid investments to become excessive. I have adequate means of providing for my financial requirements, both current and anticipated, and have no need for liquidity in this investment. I can bear and am willing to accept the economic risk of losing my entire investment in the Company.

9. I am purchasing the Notes for my own account and for investment purposes only, and not for the account of others. I have no present intention, contract, agreement, undertaking or arrangement to assign, resell or subdivide the Notes.

10. I acknowledge that the Notes are being offered and sold in reliance on specific exemptions from the registration requirements of applicable federal and state securities laws, and the Company and the Manager are relying upon the truth and accuracy of my representations, warranties, statements, covenants and agreements set forth herein and in the accompanying Investor Questionnaire in order to determine my suitability to invest in the Company.

11. All information that I have provided on the accompanying Investor Questionnaire and this Subscription Agreement is complete, accurate and correct as of its date and may be relied on by the Company and the Manager in connection with my investment. I hereby agree to notify the Company and the Manager immediately of any material change in any of that information occurring before the acceptance of this Subscription Agreement.

12. I have provided my correct Taxpayer Identification Number in the attached IRS FORM W-9, and I am not subject to back-up withholding as a result of a failure to report all interest or dividends (or the Internal Revenue Service has notified me that I am no longer subject to back-up withholding).

13. I have had the opportunity to ask questions of, and receive answers from, the Company and the Manager, and their respective principals, concerning the Company, the Manager, the respective affiliates of each of the foregoing entities, the Notes and the terms and conditions of the Offering, and to obtain any additional information deemed necessary to verify the accuracy of the information contained in the Memorandum, to the extent possessed by the Manager or obtainable by it without unreasonable effort or expense. I have been provided with all materials and information requested by either me or others representing me, including any information requested to verify any information furnished to me.



14. I understand that, due to the restrictions described below, and the lack of any public market existing or likely to exist in the future for the Notes, my investment in the Company will be illiquid and that I will be required to bear the financial risks of the investment for an indefinite period of time.

15. I understand that the sale, assignment, transfer or other disposition of the Notes is restricted under applicable federal and state securities laws and the terms of the Note Agreement. I understand that the Company has no obligation, and does not intend to register any of the Notes for resale under any federal or state securities laws or to take any action under any such laws to make available an exemption from registration requirements. I further agree that I will not sell, assign, transfer or otherwise dispose of any Notes I purchase, in whole or in part, unless such sale, assignment, transfer or other disposition is (A) registered under applicable federal and state securities laws, or if required by the Manager, I obtain an opinion of counsel satisfactory to the Manager that such Notes may be sold in reliance upon an exemption from registration, and (B) otherwise permitted by and made in accordance with the terms of the Note Agreement. I also understand and acknowledge that, if the Notes are certificated, one or more legends will be placed on all certificates evidencing the Notes with respect to restrictions on any sale, assignment, transfer or other disposition of the Notes imposed by applicable federal and state securities laws and the Note Agreement.

16. I understand that no state or federal governmental authority has approved or disapproved of the Notes, reviewed or passed on the accuracy or adequacy of the Memorandum or made any finding or determination relating to the fairness of an investment in the Company and that no state or federal governmental authority has recommended or endorsed or will recommend or endorse the Notes.

17. If subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), I am aware of, and have taken into consideration, the diversification requirements of Section 404(a)(3) of ERISA in determining to invest in the Company and have concluded that such investment is prudent and not a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA and Section 4975(c) of the Internal Revenue Code of 1986 (the "Code").

18. If acting on behalf of a charitable remainder trust, I am aware that if any portion of the income derived from the trust's ownership of Notes is deemed to be unrelated business taxable income ("UBTI"), Section 664(c) of the Code imposed on the trust an excise tax equal to the amount of such UBTI.

19. I understand and agree that I may not assign this offer or, except as specifically permitted by law, revoke my subscription. I acknowledge that the Manager, in its sole and absolute discretion, has the unconditional right to accept or reject this subscription, in whole or in part.

20. I understand that if the Offering is withdrawn or my subscription is otherwise not accepted, all funds I have deposited in the escrow account relating to my subscription will be refunded to me on the terms set forth in the Memorandum.

21. I understand that, if I am acquiring the Notes in a fiduciary capacity, the representations, warranties, statements, covenants and agreements set forth herein and in the accompanying Investor Questionnaire shall be deemed to have been made on behalf of the person or persons for whose benefit I am acquiring such Notes. I have properly identified such person or persons in these subscription documents.

**The above representations are not a waiver of any rights that I may have under the acts administered by the Securities and Exchange Commission or by any state regulatory agency administering statutes bearing on the offer and sale of securities.**

<u>Indemnification Obligations of the Undersigned</u>

I hereby agree to indemnify, defend and hold harmless the Company, the Manager and their respective members, officers, directors, affiliates and advisors from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees) (collectively "Losses") that they may incur by reason of my failure to fulfill all of the terms and conditions of this Subscription Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties, statements, covenants or agreements contained herein, in the accompanying Investor Questionnaire or in any other documents I have furnished to any of the foregoing in connection with my subscription for Notes. This indemnification includes, but is not limited to, any Losses incurred by the Company, the Manager, or any of their respective members, officers, directors, affiliates or advisors defending against any alleged violation of federal or state securities laws which is based upon, or related to, any untruth or inaccuracy of any of the representations, warranties, statements, covenants or agreements set forth herein, in the accompanying Investor Questionnaire or in any other documents I have furnished to any of the foregoing in connection with my subscription for Notes. The foregoing indemnification obligations shall survive until completion of liquidation of the Company.

<u>Instructions to Investor</u>

You are required to execute your own Subscription Agreement and the signature page to the Note Agreement. The Manager will not accept a Subscription Agreement or Note Agreement signature page that has been executed by someone other than you, unless such person is acting in a fiduciary capacity on your behalf or otherwise has been given your legal power of attorney to sign on your behalf, and you satisfy all of the requirements for investing in the Company set forth in the Memorandum, in this Subscription Agreement and in the accompanying Investor Questionnaire.

Your execution of this Subscription Agreement constitutes your binding offer to purchase the Notes subscribed for. Once you subscribe to purchase Notes, you may not withdraw your subscription, except as specifically permitted by applicable law. The Manager, in its sole and absolute discretion, may reject or accept your subscription, in whole or in part, and in each case without liability to you. If your subscription is rejected, then all of your funds will promptly be returned to you, without any interest thereon.

Upon the acceptance, if any, of your subscription, your subscription will be released from escrow and paid to the Company.



NOTICE TO RESIDENTS OF ALL STATES. THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE NOTES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OF THE NOTES OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTICE TO NEW YORK RESIDENTS: THE MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THE OFFERING OF THE NOTES. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED THEREIN.

NOTICE TO FLORIDA RESIDENTS: THE NOTES WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE NOTES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE NOTES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE COMPANY OR AN AGENT THEREOF, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

I ACKNOWLEDGE THAT ALL DOCUMENTS, RECORDS AND BOOKS PERTAINING TO AN INVESTMENT IN THE COMPANY HAVE BEEN MADE AVAILABLE FOR INSPECTION BY ME AND MY ATTORNEY, ACCOUNTANT AND/ OR OTHER ADVISORS.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5, Page 554
1366



## Signature Page of Subscription Agreement and Note Purchase Agreement

I, the undersigned, agree to purchase $_____ of Notes, under the terms and conditions of this Subscription Agreement and the Memorandum and the exhibits attached thereto, including, without limitation, the Note Purchase Agreement and the Note.

I acknowledge and agree that the Notes I am acquiring will be governed by the terms of the Note Purchase Agreement and the exhibits thereto, which is attached to the Memorandum as Exhibit A and which I have and understand. I agree to be bound by all of the terms and conditions of the Note Agreement and the Note if my subscription is accepted, in whole or in part, by the Company, and I authorize the Company to treat this Signature Page of Subscription Agreement and Note Agreement as my signature page to the Note Agreement and the Note.

**Payment Instructions**

**You are encouraged to make your subscription payment by ACH or wire transfer pursuant to the wire transfer instructions included with these subscription documents. However, you may also Company your subscription by check. If paying by check, make your check payable to: "iCap Equity, LLC"**

**Account Information**

**Please print below the exact legal title to be shown on the Company's books and records:**

_____

**<u>Individuals</u>**                                                  **Co-Subscriber/Trustee/Custodian or Plan Administrator**

_____                  _____
Print Name (Individual)                                           Print Name (Joint Owner, Trustee, IRA Custodian, etc.)

_____                  _____
Signature                                                               Signature

_____                  _____
Date                                                                      Date

**Entities (i.e. Corporation, Partnership or LLC):**

_____                  _____
Name of Entity                                                      Print Name & Title of Entity Representative

_____                  _____
Signature                                                               Date

---

### To be Completed by the Company

SUBSCRIPTION FOR $_____ OF NOTES IS HEREBY ACCEPTED BY:

iCAP EQUITY, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

By: _____        Date:_____
    Chris Christensen, President

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 5, Page 555
1366



## REGISTERED REPRESENTATIVE/RIA & BROKER-DEALER OR RIA
**(To be Completed by Registered Representative/RIA and/or Broker/Dealer)**
**(For Commission and Other Purposes)**

I hereby represent and certify that I have discharged my affirmative obligations under FINRA's Conduct Rules, and hereby further certify as follows:
(A) a copy of the Memorandum of Terms for the Private Placement of Debt Securities of iCap Equity, LLC has been delivered to the subscriber;
(B) I have specifically obtained information from the subscriber concerning the subscriber's age, net worth, annual income, investment objectives, investment portfolio and other financial information; and (C) I have determined that an investment in the Company is suitable for such subscriber. I have also informed the subscriber of all pertinent facts relating to the illiquidity and lack of a public market of an investment in the Company. **The broker/dealer or authorized representative has personally seen and recorded a government issued identification document evidencing the residence or nationality of the subscriber and has a reasonable basis for verification of the subscriber's identity. The broker/dealer or authorized representative warrants that, in connection with the completion of the Subscription Agreement included as part of these subscription documents, the broker/dealer or authorized representative completed documentation to the effect that the subscriber(s) and registered owner(s) do not appear on the Office of Foreign Assets Control list of foreign nations, organizations and individuals subject to economic and trade sanctions.**

---

| | |
|---|---|
| **Print Name of Registered Representative** | **Name of Broker/Dealer** |
| **Registered Representative's FINRA CRD No.** | **Print Name of Principal, Branch Manager, Other** |
| **Signature of Registered Representative          Date** | **Signature of Principal, Branch Manager, Other          Date** |
| ☐ Registered Representative: please check this box to verify that you have personally seen and recorded a government issued identification document from the Subscriber. | ☐ Broker/Dealer: please check this box to verify that Registered Representative is licensed with FINRA in the state of sale. |
| **Registered Representative Office Address:** | **Registered Representative Office Address:** |
| **Phone No.:_____Facsimile No.:_____** | **Phone No.:_____Facsimile No.:_____** |

\*
_____
E-mail Address (Required for Correspondence)

**Registered Investment Advisor (RIA)**

Check the following box if the subscriber's investment in the Company is made through an RIA: ☐
(If an owner or principal or any member of the RIA is a FINRA licensed registered representative affiliated with a broker/dealer, the transaction should be conducted through that broker/dealer, not through the RIA).

The undersigned registered investment advisor of the firm identified below hereby certifies that he or she has procured this subscription and that he or she is familiar with the subscriber making this investment in the Company and has determined that such subscriber meets the requirements set forth under the caption "Securities Law Matters" in the Memorandum.

The undersigned registered investment advisor further certifies that:

(1)    he or she is registered with (please check one) ☐ the S.E.C. or ☐ the State of _____;

(2)    unless noted below, (a) he or she is not a member of FINRA and, based on the activities he or she performs, is not required to be a member of FINRA or to register as a broker or dealer under federal or state law, and (b) he or she is not affiliated with a member of FINRA.

☐ Advisor is a member of FINRA and his or her CRD# is as set forth above.

☐ Advisor is affiliated with the following FINRA member (include CRD#):_____; and

(3)    his or her signature below constitutes his/her agreement to be bound by all the provisions of the terms and conditions set forth on the following page.

**Print Name of RIA:**_____          **RIA Signature:**_____

**RIA Office Address:**_____

**Phone No.:**_____     **Facsimile No.:**_____     **E-mail Address:**_____

For Custodial Accounts: Please send a completed original Subscription Agreement directly to the custodian. The custodian should make check(s) payable to "iCap Equity, LLC" or remit wired funds pursuant to the wire transfer instructions included as part of these subscription documents, and submit original Investor Questionnaires, Subscription Agreement(s) and check(s) to iCap Equity, LLC, 3535 Factoria Blvd. SE, Suite 500, Bellevue, WA 98006.



# SUBSCRIPTION AGREEMENT TERMS AND CONDITIONS – REGISTERED INVESTMENT ADVISORS

For purposes of the Subscription Agreement and the subscription of the person (the "**Subscriber**") subscribing hereunder (the "**Subscription**"), the advisor identified herein ("**Advisor**") represents and warrants to, and agrees with, the Company and its Manager, as follows (capitalized terms used herein without definition have the meanings ascribed to such terms in the Subscription Agreement):

1.  Advisor acknowledges and agrees that no compensation will be paid in respect of the Subscription to the Advisor by the Company or any person acting on its behalf.

2.  In its communications with Subscriber with respect to the Offering and in procuring the Subscription, the Advisor represents as follows:

    a.  The Advisor did not engage in any form of general solicitation or general advertising.

    b.  The Advisor has an investment advisory relationship with the Subscriber, which relationship was established before the commencement of the Offering.

    c.  The Subscriber resides in a jurisdiction that the Company has identified as a jurisdiction in which the Notes are qualified for sale or as to which such qualification is not required.

    d.  The Advisor has determined that an investment in the Company is appropriate for the Subscriber's advisory account.

    e.  The Advisor has reasonable grounds to believe that the Subscriber is an "accredited investor" as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act, and that the Subscriber meets the financial qualification and suitability standards and other requirements established by the Company for investing in the Offering.

    f.  The Advisor has submitted to the Company any prescribed pre-qualification questionnaires completed by or for the Subscriber.

    g.  If the Advisor is not exercising investment discretion with respect to the Subscription, the Advisor advised the Subscriber that the Subscriber would be afforded the opportunity to ask questions of, and receive answers from the Company and the Manager, and their respective principals, concerning the Company, the Manager, the respective affiliates of each of the foregoing entities, the Notes and the terms and conditions of the Offering, and to obtain any additional information deemed necessary to verify the accuracy of the information contained in the Memorandum to the extent possessed by the Manager or obtainable by it without unreasonable effort or expense.

    h.  Prior to submitting the Subscription, the Advisor made reasonable inquiry to determine (i) if the Subscriber is acquiring the Notes for the Subscriber's own account or on behalf of other persons, (ii) that the Subscriber understands the limitations on the Subscriber's disposition of the Notes under applicable federal and state securities laws and the Operating Agreement, and (iii) that the Subscriber understands that he, she or it must bear the economic risk of the investment for an indefinite period of time because of such limitations.

3.  The Advisor agrees to maintain, for at least six years, a record of the information obtained to determine that an investment in the Company is a suitable and appropriate investment for the Subscriber and that such Subscriber meets the financial qualification and suitability standards and other requirements imposed on investors in the Offering, and to make such records available to the Company during such period upon its reasonable request.

4.  The Advisor agrees to keep records indicating by number to whom each Memorandum and related materials was delivered and to make such information available to the Company upon written request.

5.  The Advisor represents to the Company that the Advisor or the company with which Advisor is employed (the "**Firm**") has established and implemented: (a) an anti-money laundering compliance program in accordance with applicable laws and regulations, including federal and state securities laws, the USA Patriot Act of 2001, Executive Order 13224 – Executive Order on Terrorist Financing Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, industry practices for the investment advisor industry, and applicable rules of FINRA to the extent applicable to the Advisor or the Firm, and (b) a program, in accordance with applicable laws and regulations, (i) for the verification of the identity of its new clients, (ii) for maintenance of client records, (iii) to check of the names of new clients against government watch lists, including the Office of Foreign Asset Control's list of Specially Designated Nationals and Blocked Persons, and (iv) for the provision of information to the Financial Crimes Enforcement Network upon request.

6.  With respect to any nonpublic personal information, as defined in the Gramm-Leach-Bliley Act of 1999 (the "**GLB Act**"), of Subscriber provided to the Advisor, the Advisor agrees to (a) abide by and comply with and to cause the Firm to abide by and comply with (i) the applicable privacy standards and requirements of the GLB Act and the applicable regulations promulgated thereunder, (ii) the privacy standards and requirements of any other applicable federal or state law, and (iii) the Firm's own internal privacy policies and procedures, each as may be amended from time to time; (b) refrain from the use or disclosure of nonpublic personal information (as defined under the GLB Act) of Subscriber if Subscriber has opted out of such disclosures, except as necessary to service the Subscriber or as otherwise necessary or required by applicable law; and (c) provide Subscriber both initial and annual privacy notices as required pursuant to Rule 6(a) of Regulation S-P, promulgated under the GLB Act.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5, Page 557
1366



## ELECTRONIC FUNDS TRANSFER INSTRUCTIONS

**RECEIVING FINANCIAL INSTITUTION:** **UMPQUA BANK**

**RECEIVING FINANCIAL INSTITUTION ADDRESS:** **705 NW Gilman Blvd.**
**Issaquah, WA 98027**

**ABA/ROUTING NUMBER:** **325171740**

**ACCOUNT NUMBER:** **9690211801**

**ACCOUNT NAME:** **ICAP EQUITY, LLC**

**SPECIAL INSTRUCTIONS:** **Note Offering**

AFTER WIRING FUNDS, PLEASE NOTIFY CONNIE CROTHERS BY E-MAIL AS SET FORTH BELOW
SO THAT SHE IS AWARE THE FUNDS ARE BEING SENT (She will not be confirming receipt).

PLEASE MAKE SURE TO HAVE THE ROUTING NUMBER AVAILABLE OR TO INCLUDE THE
ROUTING NUMBER IN YOUR FACSIMILE OR E-MAIL.

**iCap Equity**
**3535 Factoria Blvd. SE, Suite 500**
**Bellevue, WA 98006**
**Attention: Connie Crothers**
**Fax: (425) 278-9025**
**connie@icapequity.com**



## Payment Remittance Information:

Please complete the following authorization:

I would like to receive any payments into my bank account in accordance with the following:

☐ **ACH Authorization:**

I hereby authorize **iCap Equity, LLC** ("the Company") to initiate credit entries to the bank account(s) listed below. I further authorize the financial institution(s) named below to credit such account(s).

| Name of Financial Institution | Checking or Savings | Bank Routing Number | Bank Account Number | % or Amount of Deposit |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

For iCap to verify bank account and routing numbers, we recommend investors attach a **VOIDED CHECK** for each investor account to be credited. Investors should retain completed copies of this form for their records.

☐ **Check:**

I hereby authorize **iCap Equity, LLC** ("the Company") to mail my payment remittance to the following:

Name: _____

Institution (if applicable): _____

Account Number (if applicable): _____

Address: _____

_____

_____

I understand that this authorization remains in effect until the Company receives from me, in writing, notification to terminate/change the authorization in such a time and manner as to afford the Company a reasonable time to act on it.

_____

Account Holder Signature                                                    Date

_____

Joint Account Holder Signature                                              Date

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 5, Page 559
1366



Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

---

*Print or type
See Specific Instructions on page 2.*

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

**6** City, state, and ZIP code

Requester's name and address (optional)

**7** List account number(s) here (optional)

---

## Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

**Social security number**

⬚⬚⬚ – ⬚⬚ – ⬚⬚⬚⬚

**or**

**Employer identification number**

⬚⬚ – ⬚⬚⬚⬚⬚⬚⬚

---

## Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**

Signature of U.S. person ▶

Date ▶

---

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued), or

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 5, Page 560

Big Page 560

1366

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code* on page 3 and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships* above.

## What is FATCA reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code* on page 3 and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Line 1

You must enter one of the following on this line; do **not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account, list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9.

**a. Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note. ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

**b. Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

**c. Partnership, LLC that is not a single-member LLC, C Corporation, or S Corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

**d. Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

**e. Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

## Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

## Line 3

Check the appropriate box in line 3 for th... person whose name is entered on line 1.

**Limited Liability Company (LLC).** If the partnership for U.S. federal tax purposes box and enter "P" in the space provided be taxed as a corporation, check the "Li space provided enter "C" for C corporat single-member LLC that is a disregarded Company" box; instead check the first b single-member LLC."

## Line 4, Exemptions

If you are exempt from backup withholdi appropriate space in line 4 any code(s) t

**Exempt payee code.**

• Generally, individuals (including sole p withholding.

• Except as provided below, corporatio for certain payments, including interest a

• Corporations are not exempt from ba settlement of payment card or third part

• Corporations are not exempt from ba fees or gross proceeds paid to attorneys health care services are not exempt fro 1099-MISC.

The following codes identify payees th Enter the appropriate code in the space

1—An organization exempt from tax u custodial account under section 403(b)( of section 401(f)(2)

2—The United States or any of its age

3—A state, the District of Columbia, a any of their political subdivisions or instr

4—A foreign government or any of its instrumentalities

5—A corporation

6—A dealer in securities or commodit States, the District of Columbia, or a U.S

7—A futures commission merchant re Trading Commission

8—A real estate investment trust

9—An entity registered at all times du Company Act of 1940

10—A common trust fund operated by

11—A financial institution

12—A middleman known in the invest custodian

13—A trust exempt from tax under se

The following chart shows types of pa withholding. The chart applies to the exe

**IF the payment is for . . .**

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | |
| Broker transactions | |
| Barter exchange transactions and patronage dividends | |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care

---

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States:

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code* on page 3 and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships* above.

## What is FATCA reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code* on page 3 and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Line 1

You must enter one of the following on this line; do not leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account, list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9.

**a. Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note. ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

**b. Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

**c. Partnership, LLC that is not a single-member LLC, C Corporation, or S Corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

**d. Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

**e. Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

---

to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** *A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.*

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code* earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 6. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i) (A)) | The grantor[4] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 7. Disregarded entity not owned by an individual | The owner |
| 8. A valid trust, estate, or pension trust | Legal entity[4] |
| 9. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 10. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 11. Partnership or multi-member LLC | The partnership |
| 12. A broker or registered nominee | The broker or nominee |
| 13. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 14. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i) (B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships* on page 2.

*Note.* Grantor also must provide a Form W-9 to trustee of trust.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Publication 4535, Identity Theft Prevention and Victim Assistance.

Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: *spam@uce.gov* or contact them at *www.ftc.gov/idtheft* or 1-877-IDTHEFT (1-877-438-4338).

Visit IRS.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

# EXHIBIT 6

**THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM CONTAINS MATERIAL NON-PUBLIC INFORMATION REGARDING ICAP EQUITY, LLC (THE "COMPANY"). BY ACCEPTING THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS HERETO (COLLECTIVELY THIS "MEMORANDUM" OR THESE "OFFERING DOCUMENTS"), THE RECIPIENT AGREES WITH THE COMPANY TO MAINTAIN IN STRICT CONFIDENCE ALL NON-PUBLIC INFORMATION, INCLUDING, BUT NOT LIMITED TO, THE EXISTENCE OF THE PROPOSED FINANCING AND ANY OTHER NON-PUBLIC INFORMATION REGARDING THE COMPANY OBTAINED FROM THIS MEMORANDUM, ANY OTHER TRANSACTION DOCUMENT OR THE COMPANY.**

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## FOR ACCREDITED INVESTORS AND NON-U.S. PERSONS



### iCap Equity, LLC

### $50,000,000 Offering of Series 3 - Senior Promissory Notes

### Pursuant to Rule 506(c) under Regulation D pursuant to the Securities Act of 1933, as amended (the "Securities Act"), and pursuant to Regulation S pursuant to the Securities Act

### July 1, 2020

**AN INVESTMENT IN OUR SECURITIES INVOLVES A HIGH DEGREE OF RISK. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF US AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD ONLY INVEST IN OUR SECURITIES IF YOU CAN AFFORD A COMPLETE LOSS OF YOUR INVESTMENT. YOU SHOULD READ THE COMPLETE DISCUSSION OF THE RISK FACTORS SET FORTH IN THIS MEMORANDUM.**

**DUE TO THE FACT THAT THE OFFERING IS A PRIVATE PLACEMENT AND IS EXEMPT FROM REGISTRATION, NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. SEE "CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS."**



SUPPLEMENT NO. 1 TO

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

DATED July 1, 2020

iCap Equity, LLC has determined to extend the Offering Period as described in this Memorandum for an additional 12-months, to May 1, 2022. Any references in this Memorandum to the "Offering Period" shall now be deemed to reflect such extension.

51125-0 23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 566
1366



SUPPLEMENT NO. 2 TO

CONFIDENTIAL PRIVATE PLACEMENT

MEMORANDUM DATED July 1, 2020


August 31, 2021


iCap Equity, LLC has determined to extend the Maximum Offering Amount as described in this Memorandum to $75,000,000. Any references in this Memorandum to the "Offering Amount" shall now be deemed to reflect such extension.

1



SUPPLEMENT NO. 3 TO

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

DATED July 1, 2020

iCap Equity, LLC has determined to extend the Offering Period as described in this Memorandum for an additional 8 months, to December 31, 2022. Any references in this Memorandum to the "Offering Period" shall now be deemed to reflect such extension.



SUPPLEMENT NO. 4 TO

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

DATED July 1, 2020

iCap Equity, LLC (the "Company") has determined to extend the Offering Period as described in this Memorandum for an additional 12 months to December 31, 2023. Any references in this Memorandum to the "Offering Period" shall now be deemed to reflect such extension. The Company may, in its sole discretion, terminate the Offering Period at any time before the end of this extended Offering Period.

1

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
# FOR
# ACCREDITED INVESTORS AND NON-U.S. PERSONS

## iCap Equity, LLC

## $50,000,000 OF AGGREGATE PRINCIPAL AMOUNT
## OF
## SERIES 3 - SENIOR PROMISSORY NOTES

**Minimum subscription per investor of $5,000 of principal amount, although iCap Equity, LLC reserves the right to accept subscriptions for a lower principal amount.**

**No minimum offering amount.**

This Confidential Private Placement Memorandum for Accredited Investors and Non-U.S. Persons (this "Memorandum") is being furnished in connection with the offer and sale (the "Offering") of up to $50,000,000 of Series 3 - Senior Promissory Notes (the "Notes"), with no over-allotment amount, by iCap Equity, LLC, a Delaware limited liability company (the "Company"). Notes will be issued in denominations of at least $5,000 (and any amounts in excess of $5,000). The Company may accept subscriptions in lesser amounts in its sole discretion. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines.

The Company is a private investment vehicle that seeks to hold and operate real estate investments, both directly and through fund investment vehicles, as described herein. This Memorandum contains certain information that prospective investors should know about the Offering. The manager of the Company is iCap Enterprises, Inc., a Washington limited liability company (the "Manager"). The Company's address is iCap Equity, LLC, Factoria Blvd. SE, Suite 500, Bellevue, Washington 98006.

The Offering is being made by the Company to persons who are either "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to Rule 506(c) under Regulation D, or "Non-U.S. Persons" (as defined below) pursuant to Regulation S promulgated under the Securities Act. The Offering is being made on a "Best Efforts" basis, which means there is no guaranty that any of the Notes will be sold or that a sufficient number of Notes will be sold to fulfill the Company's business plan. The Company expects to engage one or more registered broker-dealers to act as placement agent(s) for the Offering (as applicable, the "Placement Agents") and expects to pay commissions to the Placement Agents as set forth in the Plan of Distribution commencing on page 14, based on the aggregate principal amount of the Notes sold to investors. Investors who purchase Notes are referred to herein as the "Noteholders." The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on May 1, 2021, subject to earlier termination as set forth herein.

**THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. NO INVESTMENT IN THE NOTES SHOULD BE MADE BY ANY INVESTOR NOT FINANCIALLY ABLE TO LOSE THE ENTIRE AMOUNT OF ITS INVESTMENT.**

i

## RISK DISCLOSURE STATEMENT

**THE ATTORNEYS THAT PREPARED THIS MEMORANDUM ("ATTORNEYS") HEREBY DISCLAIM ANY OPINION OR ASSURANCE OF ANY NATURE WHATSOEVER REGARDING THE ACCURACY, COMPLETENESS, REASONABLENESS, TIMELINESS OR VERACITY OF ANY OF THE ASSERTIONS, REPRESENTATIONS OR OTHER INFORMATION CONTAINED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, OR REGARDING THE INVESTMENT-WORTHINESS OF THE SECURITIES DISCUSSED HEREIN ("SECURITIES"). ANY ASSERTION OR REPRESENTATION MADE HEREIN, AND ALL OTHER INFORMATION DISCLOSED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, HAS BEEN MADE OR PROVIDED BY THE PROMOTER. IN CONNECTION WITH THE PREPARATION OF THESE CONFIDENTIAL OFFERING DOCUMENTS, THE ATTORNEYS HAVE NOT BEEN ENGAGED TO ATTEST HERETO, OR TO OPINE IN RESPECT HEREOF. ACCORDINGLY, THE ATTORNEYS HAVE NOT PERFORMED ANY ANALYTICAL, CONFIRMATION, VALIDATION, VERIFICATION OR OTHER PROCEDURES IN RESPECT OF THE ASSERTIONS AND REPRESENTATIONS CONTAINED HEREIN, NOR IN RESPECT OF ANY OF THE OTHER INFORMATION DISCLOSED HEREIN, INCLUDING ANY SIMILAR TO THOSE PROCEDURES UNDERTAKEN BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT IN CONNECTION WITH AN AUDIT OF THE FINANCIAL STATEMENTS OF AN ISSUER OF SECURITIES FOR PURPOSES OF RENDERING AN OPINION THEREON. CONSEQUENTLY, POTENTIAL INVESTORS, IN DECIDING WHETHER OR NOT TO INVEST IN THE SECURITIES, ARE CAUTIONED NOT TO ASCRIBE ANY SPECIAL RELIANCE WHATSOEVER ON THIS MEMORANDUM BY REASON THAT ATTORNEYS HAVE PREPARED THIS MEMORANDUM.**

**THIS BRIEF STATEMENT CANNOT DISCLOSE ALL THE RISKS AND OTHER FACTORS NECESSARY TO EVALUATE YOUR INVESTMENT IN THE NOTES. THEREFORE, BEFORE YOU DECIDE TO MAKE AN INVESTMENT IN THE NOTES, YOU SHOULD CAREFULLY STUDY THIS MEMORANDUM, INCLUDING A DISCUSSION OF CERTAIN RISK FACTORS OF THIS INVESTMENT.**

## CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS

**FOR ALL PROSPECTIVE INVESTORS:** THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT SET FORTH IN SECTION 4(A)(2) THEREOF AND RULE 506(C) OF REGULATION D PROMULGATED THEREUNDER TO ACCREDITED INVESTORS. RULE 506 OF REGULATION D SETS FORTH CERTAIN RESTRICTIONS AS TO THE NUMBER AND NATURE OF PURCHASERS OF SECURITIES OFFERED PURSUANT THERETO. WE HAVE ELECTED TO SELL SECURITIES ONLY TO ACCREDITED INVESTORS AS SUCH TERM IS DEFINED IN RULE 501(A) OF REGULATION D. EACH PROSPECTIVE INVESTOR WILL BE REQUIRED TO MAKE REPRESENTATIONS AS TO THE BASIS UPON WHICH IT QUALIFIES AS AN ACCREDITED INVESTOR.

THE SECURITIES OFFERED HEREBY WILL BE SUBJECT TO RESTRICTIONS ON

TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. ONLY PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT IN THE NOTES SHOULD PURCHASE THE NOTES.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE INFORMATION PRESENTED HEREIN WAS PRESENTED AND SUPPLIED SOLELY BY THE COMPANY AND IS BEING FURNISHED SOLELY FOR USE BY PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING. THE COMPANY MAKES NO REPRESENTATIONS AS TO THE FUTURE PERFORMANCE OF THE COMPANY. THIS MEMORANDUM WERE PREPARED BY THE COMPANY.

THIS OFFERING IS SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION BY THE COMPANY AT ANY TIME AND WITHOUT NOTICE. WE RESERVE THE RIGHT IN OUR SOLE DISCRETION TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART NOTWITHSTANDING TENDER OF PAYMENT OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AGGREGATE PRINCIPAL AMOUNT OF NOTES SUBSCRIBED FOR BY SUCH INVESTOR.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY ANY SECURITY OTHER THAN THE SECURITIES OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY SUCH SECURITIES BY ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN OUR AFFAIRS SINCE THE DATE HEREOF. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN PERTINENT DOCUMENTS, APPLICABLE LAWS AND REGULATIONS. SUCH SUMMARIES ARE NOT COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE COMPLETE TEXTS THEREOF.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES.

THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM OR IN ANY ADDITIONAL EVALUATION MATERIAL, WHETHER WRITTEN OR ORAL, MADE AVAILABLE IN CONNECTION WITH ANY FURTHER INVESTIGATION OF THE COMPANY. THE COMPANY EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY THAT MAY BE BASED UPON SUCH INFORMATION, ERRORS THEREIN OR OMISSIONS THEREFROM. ONLY THOSE PARTICULAR REPRESENTATIONS AND

WARRANTIES, IF ANY, WHICH MAY BE MADE TO A PARTY IN A DEFINITIVE WRITTEN AGREEMENT REGARDING A TRANSACTION INVOLVING THE COMPANY, WHEN, AS AND IF EXECUTED, AND SUBJECT TO SUCH LIMITATIONS AND RESTRICTIONS AS MAY BE SPECIFIED THEREIN, WILL HAVE ANY LEGAL EFFECT. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED TO THE CONTRARY IN WRITING, THIS MEMORANDUM SPEAKS AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE OF NOTES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY AFTER THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE OFFERING OF NOTES BEING MADE PURSUANT HERETO, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

THERE IS NO MARKET FOR THE NOTES AND THERE IS NO ASSURANCES A PUBLIC MARKET WILL EVER BE ESTABLISHED. PURCHASERS OF THE NOTES ARE NOT BEING GRANTED ANY REGISTRATION RIGHTS. A PURCHASE OF THE NOTES SHOULD BE CONSIDERED AN ILLIQUID INVESTMENT.

BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR HEREBY EXPRESSLY AGREES WITH THE COMPANY TO KEEP CONFIDENTIAL ALL OF THE CONTENTS HEREOF, INCLUDING, BUT NOT LIMITED TO, THE OFFERING AND ALL INFORMATION RELATED TO THE COMPANY, AND NOT TO DISCLOSE THE SAME TO ANY THIRD PARTY AND/OR OTHERWISE USE THE SAME FOR ANY PURPOSE OTHER THAN AN EVALUATION BY SUCH OFFEREE OF A POTENTIAL INVESTMENT IN THE NOTES OFFERED PURSUANT HERETO. WE HAVE CAUSED THIS MEMORANDUM TO BE DELIVERED TO YOU IN RELIANCE UPON SUCH AGREEMENT BY YOU.

EACH PROSPECTIVE SUBSCRIBER BY RECEIVING THIS MEMORANDUM AGREES TO RETURN THE SAME TO US IF (A) THE OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY SECURITIES OFFERED HEREBY; (B) THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, AND/OR (C) THE OFFERING IS TERMINATED OR WITHDRAWN.

THIS MEMORANDUM IS SUBJECT TO AMENDMENT AND SUPPLEMENTATION AS APPROPRIATE. WE DO NOT INTEND TO UPDATE THE INFORMATION CONTAINED IN THE OFFERING DOCUMENTS FOR ANY INVESTOR WHO HAS ALREADY MADE AN INVESTMENT. WE MAY UPDATE THE INFORMATION CONTAINED HEREIN FROM TIME TO TIME AND PROVIDE SUCH UPDATED DOCUMENT TO POTENTIAL INVESTORS BUT UNDERTAKE NO OBLIGATION TO PROVIDE SUCH UPDATED DOCUMENTS TO AN INVESTOR WHO HAS ALREADY MADE HIS OR HER INVESTMENT.

# JURISDICTIONAL NOTICES

**FOR RESIDENTS OF ALL STATES:**

**THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN A PARTICULAR STATE. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE HEREBY ADVISED TO CONTACT THE COMPANY. THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS (COMMONLY CALLED "BLUE SKY" LAWS). THESE SECURITIES MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THE STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OF SALE MAY BE MADE IN ANY PARTICULAR STATE.**

**IN MAKING ANY INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. NO FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS RECOMMENDED THESE SECURITIES. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

1. **NOTICE TO ALABAMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

2. **NOTICE TO ALASKA RESIDENTS ONLY**: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHER-MORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD

EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

3. **NOTICE TO ARIZONA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ARIZONA SECURITIES ACT IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PURSUANT TO A.R.S. SECTION 44-1844 (1) AND THEREFORE CANNOT BE RESOLD UNLESS THEY ARE ALSO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

4. **NOTICE TO ARKANSAS RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN RELIANCE UPON CLAIMS OF EXEMPTION UNDER THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING OR PASSED UPON THE ADEQUACY OR ACCURACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

5. **NOTICE TO CALIFORNIA RESIDENTS:** THESE SECURITIES HAVE NOT BEEN QUALIFIED OR OTHERWISE APPROVED OR DISAPPROVED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS UNDER THE CALIFORNIA CORPORATIONS CODE. THESE SECURITIES ARE OFFERED IN CALIFORNIA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PROVIDED BY SECTIONS 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. ACCORDINGLY, DISTRIBUTION OF THIS MEMORANDUM AND OFFERS AND SALES OF THE SECURITIES REFERRED TO HEREIN ARE STRICTLY LIMITED TO PERSONS WHO THE COMPANY DETERMINES TO HAVE MET CERTAIN FINANCIAL AND OTHER REQUIREMENTS. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY WITH RESPECT TO ANY OTHER PERSON. IN ORDER TO RELY ON THE FOREGOING EXEMPTIONS, THE COMPANY WILL RELY IN TURN ON CERTAIN REPRESENTATIONS AND WARRANTIES MADE TO THE COMPANY BY THE INVESTORS IN THIS OFFERING. THOSE REPRESENTATIONS AND WARRANTIES ARE CONTAINED IN THE SUBSCRIPTION AGREEMENT, ATTACHED HERETO AS EXHIBIT A.

6. **FOR COLORADO RESIDENTS ONLY:** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS OFFERING HAS NOT BEEN QUALIFIED WITH COMMISSIONER OF CORPORATIONS OF THE STATE OF COLORADO AND THE ISSUANCE OF SUCH SECURITIES OR PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATIONS IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPTED FROM QUALIFICATION BY SECTION 25100, 25102, OR 25104 OF THE COLORADO CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS OFFERING ARE EXPRESSLY CONDITION UPON SUCH QUALIFICATIONS BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933,

AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991, IF SUCH REGISTRATION IS REQUIRED.

7. **NOTICE TO CONNECTICUT RESIDENTS ONLY:** SECURITIES ACQUIRED BY CONNECTICUT RESIDENTS ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 36B-31-21B-9B OF THE CONNECTICUT, UNIFORM SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF CONNECTICUT. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

8. **NOTICE TO DELAWARE RESIDENTS ONLY:** IF YOU ARE A DELAWARE RESIDENT, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE DELAWARE SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

9. **NOTICE TO DISTRICT OF COLUMBIA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES BUREAU OF THE DISTRICT OF COLUMBIA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

10. **NOTICE TO FLORIDA RESIDENTS ONLY:** THE SECURITIES DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES AND INVESTOR PROTECTION UNDER THE FLORIDA SECURITIES ACT. THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF SAID ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. EACH FLORIDA RESIDENT WHO SUBSCRIBES FOR NOTES HAS THE RIGHT, PURSUANT TO SECTION 517.061(11)(A)(5) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, TO WITHDRAW HIS SUBSCRIPTION AND RECEIVE A FULL REFUND OF ALL MONEYS PAID, WITHIN THREE (3) BUSINESS DAYS AFTER THE EXECUTION OF THE SUBSCRIPTION AGREEMENT AND POWER OF ATTORNEY OR THE PAYMENT FOR AN INTEREST HAS BEEN MADE, WHICH EVER IS LATER. WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER NEED ONLY SEND A LETTER OR A FACSIMILE TO THE COMPANY AT THE ADDRESS SET FORTH IN THIS MEMORANDUM, INDICATING HIS INTENTION TO WITHDRAW. SUCH LETTER OR FACSIMILE MUST BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED THIRD BUSINESS DAY. IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED.

11. **NOTICE TO GEORGIA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE GEORGIA SECURITIES ACT PURSUANT TO REGULATION 590-4-5-04 AND -01. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

12. **NOTICE TO HAWAII RESIDENTS ONLY:** NEITHER THESE CONFIDENTIAL OFFERING DOCUMENTS NOR THE SECURITIES DESCRIBED HEREIN BEEN APPROVED OR DISAPPROVED BY THE COMMISSIONER OF SECURITIES OF THE STATE OF HAWAII NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS.

13. **NOTICE TO IDAHO RESIDENTS ONLY:** THESE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT IN RELIANCE UPON EXEMPTION FROM REGISTRATION PURSUANT TO SECTION 30-14-203 OR 302(C) THEREOF AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SAID ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SAID ACT.

14. **NOTICE TO ILLINOIS RESIDENTS:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF THE STATE OF ILLINOIS NOR HAS THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

15. **NOTICE TO INDIANA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-2-1-2 OF THE INDIANA SECURITIES LAW AND HAVE NOT BEEN REGISTERED UNDER SECTION 23-2-1-3. THEY CANNOT THEREFORE BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID LAW OR UNLESS AN EXEMPTION FORM REGISTRATION IS AVAILABLE. A CLAIM OF EXEMPTION UNDER SAID LAW HAS BEEN FILED, AND IF SUCH EXEMPTION IS NOT DISALLOWED SALES OF THESE SECURITIES MAY BE MADE. HOWEVER, UNTIL SUCH EXEMPTION IS GRANTED, ANY OFFER MADE PURSUANT HERETO IS PRELIMINARY AND SUBJECT TO MATERIAL CHANGE.

16. **NOTICE TO IOWA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED; THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

17. **NOTICE TO KANSAS RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 81-5-15 OF THE KANSAS SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

18. **NOTICE TO KENTUCKY RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE

SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER TITLE 808 KAR 10:210 OF THE KENTUCKY SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

19. **NOTICE TO LOUISIANA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER RULE 1 OF THE LOUISIANA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

20. **NOTICE TO MAINE RESIDENTS ONLY:** THE ISSUER IS REQUIRED TO MAKE A REASONABLE FINDING THAT THE SECURITIES OFFERED ARE A SUITABLE INVESTMENT FOR THE PURCHASER AND THAT THE PURCHASER IS FINANCIALLY ABLE TO BEAR THE RISK OF LOSING THE ENTIRE AMOUNT INVESTED. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION UNDER §16202(15) OF THE MAINE UNIFORM SECURITIES ACT AND ARE NOT REGISTERED WITH THE SECURITIES ADMINISTRATOR OF THE STATE OF MAINE. THE SECURITIES OFFERED FOR SALE MAY BE RESTRICTED SECURITIES AND THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS: (1) THE SECURITIES ARE REGISTERED UNDER STATE AND FEDERAL SECURITIES LAWS, OR (2) AN EXEMPTION IS AVAILABLE UNDER THOSE LAWS.

21. **NOTICE TO MARYLAND RESIDENTS ONLY:** IF YOU ARE A MARYLAND RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 11-602(9) OF THE MARYLAND SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MARYLAND. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

22. **NOTICE TO MASSACHUSETTS RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MASSACHUSETTS UNIFORM SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THIS OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

23. **NOTICE TO MICHIGAN RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE MICHIGAN SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

24. **NOTICE TO MINNESOTA RESIDENTS ONLY:** THESE SECURITIES BEING OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6 Page 578
1366

SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

25. **NOTICE TO MISSISSIPPI RESIDENTS ONLY:** THE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE MISSISSIPPI SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE MISSISSIPPI SECRETARY OF STATE OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE SECRETARY OF STATE NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, OR APPROVED OR DISAPPROVED THIS OFFERING. THE SECRETARY OF STATE DOES NOT RECOMMEND THE PURCHASE OF THESE OR ANY OTHER SECURITIES. EACH PURCHASER OF THE SECURITIES MUST MEET CERTAIN SUITABILITY STANDARDS AND MUST BE ABLE TO BEAR AN ENTIRE LOSS OF THIS INVESTMENT. THE SECURITIES MAY NOT BE TRANSFERRED FOR A PERIOD OF ONE (1) YEAR EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE MISSISSIPPI SECURITIES ACT OR IN A TRANSACTION IN COMPLIANCE WITH THE MISSISSIPPI SECURITIES ACT.

26. **FOR MISSOURI RESIDENTS ONLY:** THE SECURITIES OFFERED HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE PURCHASER IN A TRANSACTION EXEMPT UNDER SECTION 4.G OF THE MISSOURI SECURITIES LAW OF 1953, AS AMENDED. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MISSOURI. UNLESS THE SECURITIES ARE SO REGISTERED, THEY MAY NOT BE OFFERED FOR SALE OR RESOLD IN THE STATE OF MISSOURI, EXCEPT AS A SECURITY, OR IN A TRANSACTION EXEMPT UNDER SAID ACT.

27. **NOTICE TO MONTANA RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A MONTANA RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF FIVE (5) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES.

28. **NOTICE TO NEBRASKA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER CHAPTER 15 OF THE NEBRASKA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

29. **NOTICE TO NEVADA RESIDENTS ONLY:** IF ANY INVESTOR ACCEPTS ANY OFFER TO PURCHASE THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION NRS 90.530 OF THE NEVADA SECURITIES LAW. THE INVESTOR IS HEREBY ADVISED THAT THE ATTORNEY GENERAL OF THE STATE OF NEVADA HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING AND THE FILING OF THE OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE, OR SALE THEREOF, BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEVADA. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. NEVADA ALLOWS THE SALE OF SECURITIES TO 25 OR FEWER PURCHASERS IN THE STATE WITHOUT REGISTRATION. HOWEVER, CERTAIN CONDITIONS APPLY, I.E., THERE CAN BE NO GENERAL ADVERTISING OR SOLICITATION AND COMMISSIONS ARE LIMITED TO LICENSED

x

BROKER-DEALERS. THIS EXEMPTION IS GENERALLY USED WHERE THE PROSPECTIVE INVESTOR IS ALREADY KNOWN AND HAS A PRE-EXISTING RELATIONSHIP WITH THE COMPANY. (SEE NRS 90.530.11.)

30. **NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY:** NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE UNDER THIS CHAPTER HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

31. **NOTICE TO NEW JERSEY RESIDENTS ONLY:** IF YOU ARE A NEW JERSEY RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE CONFIDENTIAL OFFERING DOCUMENTS HAVE NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

32. **NOTICE TO NEW MEXICO RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE NEW MEXICO DEPARTMENT OF BANKING NOR HAS THE SECURITIES DIVISION PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

33. **NOTICE TO NEW YORK RESIDENTS ONLY:** THIS MEMORANDUM HAVE NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE COMPANY HAS TAKEN NO STEPS TO CREATE AN AFTER MARKET FOR THE SECURITIES OFFERED HEREIN AND HAS MADE NO ARRANGEMENTS WITH BROKERS OF OTHERS TO TRADE OR MAKE A MARKET IN THE SECURITIES. AT SOME TIME IN THE FUTURE, THE COMPANY MAY ATTEMPT TO ARRANGE FOR INTERESTED BROKERS TO TRADE OR MAKE A MARKET IN THE SECURITIES AND TO QUOTE THE SAME IN A PUBLISHED QUOTATION MEDIUM, HOWEVER, NO SUCH ARRANGEMENTS HAVE BEEN MADE AND THERE IS NO ASSURANCE THAT ANY BROKERS WILL EVER HAVE SUCH AN INTEREST IN THE SECURITIES OF THE COMPANY OR THAT THERE WILL EVER BE A MARKET THEREFORE.

34. **NOTICE TO NORTH CAROLINA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.

FURTHERMORE, THE FORGOING AUTHORITIES HAVE NOT CONFIRMED ACCURACY OR DETERMINED ADEQUACY OF THIS MEMORANDUM. REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

35. **NOTICE TO NORTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES COMMISSIONER OF THE STATE OF NORTH DAKOTA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

36. **NOTICE TO OHIO RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 1707.03(X) OF THE OHIO SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

37. **NOTICE TO OKLAHOMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF OKLAHOMA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION FOR PRIVATE OFFERINGS. ALTHOUGH A PRIOR FILING OF THESE CONFIDENTIAL OFFERING DOCUMENTS AND THE INFORMATION HAS BEEN MADE WITH THE OKLAHOMA SECURITIES COMMISSION, SUCH FILING IS PERMISSIVE ONLY AND DOES NOT CONSTITUTE AN APPROVAL, RECOMMENDATION OR ENDORSEMENT, AND IN NO SENSE IS TO BE REPRESENTED AS AN INDICATION OF THE INVESTMENT MERIT OF SUCH SECURITIES. ANY SUCH REPRESENTATION IS UNLAWFUL.

38. **NOTICE TO OREGON RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE CORPORATION COMMISSION OF THE STATE OF OREGON UNDER PROVISIONS OF ORS 59.049. THE INVESTOR IS ADVISED THAT THE COMMISSIONER HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS MEMORANDUM SINCE THIS MEMORANDUM IS NOT REQUIRED TO BE FILED WITH THE COMMISSIONER. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE COMPANY CREATING THE SECURITIES, AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

39. **NOTICE TO PENNSYLVANIA RESIDENTS ONLY:** EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(D), DIRECTLY FROM THE ISSUER OR AFFILIATE OF THIS ISSUER, SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER HE

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6 Page 581
of 1366

MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED. IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 (70 PS § 1-207(M), YOU MAY ELECT, WITHIN TWO (2) BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONEYS PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A LETTER OR TELEGRAM TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE CONFIDENTIAL OFFERING DOCUMENTS) INDICATING YOUR INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU SHOULD ASK WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. NO SALE OF THE SECURITIES WILL BE MADE TO RESIDENTS OF THE STATE OF PENNSYLVANIA WHO ARE NON-ACCREDITED INVESTORS. EACH PENNSYLVANIA RESIDENT MUST AGREE NOT TO SELL THESE SECURITIES FOR A PERIOD OF TWELVE (12) MONTHS AFTER THE DATE OF PURCHASE, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION. THE SECURITIES HAVE BEEN ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE PENNSYLVANIA SECURITIES ACT OF 1972. NO SUBSEQUENT RESALE OR OTHER DISPOSITION OF THE SECURITIES MAY BE MADE WITHIN 12 MONTHS FOLLOWING THEIR INITIAL SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION, AND THEREAFTER ONLY PURSUANT TO AN EFFECTIVE REGISTRATION OR EXEMPTION.

40. **NOTICE TO RHODE ISLAND RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE DEPARTMENT OF BUSINESS REGULATION OF THE STATE OF RHODE ISLAND NOR HAS THE DIRECTOR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

41. **NOTICE TO SOUTH CAROLINA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE SOUTH CAROLINA UNIFORM SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE SOUTH CAROLINA SECURITIES COMMISSIONER. THE COMMISSIONER DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

42. **NOTICE TO SOUTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THESE CONFIDENTIAL OFFERING DOCUMENTS ARE TRUE, COMPLETE, AND NOT MISLEADING, NOR HAS THE DIRECTOR

OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

43. **NOTICE TO TENNESSEE RESIDENT ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD. EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

44. **NOTICE TO TEXAS RESIDENTS ONLY:** THE SECURITIES OFFERED HEREUNDER HAVE NOT BEEN REGISTERED UNDER APPLICABLE TEXAS SECURITIES LAWS AND, THEREFORE, ANY PURCHASER THEREOF MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. FURTHER, PURSUANT TO §109.13 UNDER THE TEXAS SECURITIES ACT, THE COMPANY IS REQUIRED TO APPRISE PROSPECTIVE INVESTORS OF THE FOLLOWING: A LEGEND SHALL BE PLACED, UPON ISSUANCE, ON CERTIFICATES REPRESENTING SECURITIES PURCHASED HEREUNDER, AND ANY PURCHASER HEREUNDER SHALL BE REQUIRED TO SIGN A WRITTEN AGREEMENT THAT HE WILL NOT SELL THE SUBJECT SECURITIES WITHOUT REGISTRATION UNDER APPLICABLE SECURITIES LAWS, OR EXEMPTIONS THEREFROM.

45. **NOTICE TO UTAH RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE UTAH SECURITIES ACT. THE SECURITIES CANNOT BE TRANSFERRED OR SOLD EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

46. **NOTICE TO VERMONT RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE STATE OF VERMONT NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

47. **NOTICE TO VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION UNDER SECTION 13.1-514 OF THE VIRGINIA SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

48. **NOTICE TO WASHINGTON RESIDENTS ONLY:** THE ADMINISTRATOR OF SECURITIES HAS NOT REVIEWED THE OFFERING OR CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE SECURITIES HAVE NOT BEEN REGISTERED IN RELIANCE UPON THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, AND THEREFORE, CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, OR UNLESS AN EXEMPTION FROM REGISTRATION IS MADE AVAILABLE.

49. **NOTICE TO WEST VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 15.06(B)(9) OF THE WEST VIRGINIA SECURITIES LAW AND MAY NOT BE REOFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

50. **NOTICE TO WISCONSIN RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A WISCONSIN RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF THREE AND ONE-THIRD (3 1/3) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES OFFERED HEREIN.

51. **FOR WYOMING RESIDENTS ONLY:** ALL WYOMING RESIDENTS WHO SUBSCRIBE TO PURCHASE SECURITIES OFFERED BY THE COMPANY MUST SATISFY THE FOLLOWING MINIMUM FINANCIAL SUITABILITY REQUIREMENTS IN ORDER TO PURCHASE SECURITIES: (1) A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) OF TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000); AND (2) THE PURCHASE PRICE OF SECURITIES SUBSCRIBED FOR MAY NOT EXCEED TWENTY PERCENT (20%) OF THE NET WORTH OF THE SUBSCRIBER; AND (3) "TAXABLE INCOME" AS DEFINED IN SECTION 63 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, DURING THE LAST TAX YEAR AND ESTIMATED "TAXABLE INCOME" DURING THE CURRENT TAX YEAR SUBJECT TO A FEDERAL INCOME TAX RATE OF NOT LESS THAN THIRTY-THREE PERCENT (33%). IN ORDER TO VERIFY THE FOREGOING, ALL SUBSCRIBERS WHO ARE WYOMING RESIDENTS WILL BE REQUIRED TO REPRESENT IN THE SUBSCRIPTION AGREEMENT THAT THEY MEET THESE WYOMING SPECIAL INVESTOR SUITABILITY REQUIREMENTS.

## BASIS OF PRESENTATION

In this Memorandum, unless the context otherwise requires, we," "us," "our," or the "Company," refers collectively to iCap Equity, LLC, a Delaware limited liability company, the issuer of the Notes in this Offering, and its subsidiaries. The Company was initially formed on August 15, 2011 as a Washington limited liability company, and converted to a Delaware limited liability company on September 21, 2017.

We use a twelve-month fiscal year ending on December 31st of each calendar year. In a twelve-month fiscal year, each quarter includes three-months of operations; the first, second, third and fourth quarters end on March 31, June 30, September 30 and December 31, respectively.

Certain monetary amounts, percentages and other figures included in this Memorandum have been subject to rounding adjustments. Percentage amounts included in this Memorandum have not in all cases been calculated on the basis of such rounded figures but on the basis of such amounts prior to rounding. For this reason, percentage amounts in this Memorandum may vary from those obtained by performing the same calculations using the figures in our consolidated financial statements. Certain other amounts that appear in this Memorandum may not sum due to rounding.

Unless otherwise indicated, all references to "dollars" and "$" in this Memorandum are to, and amounts are presented in, U.S. dollars.

Unless otherwise indicated or the context otherwise requires, financial and operating data in this Memorandum reflect the consolidated business and operations of the Company and its subsidiaries.

## MARKET AND INDUSTRY DATA AND FORECASTS

Certain market and industry data included in this Memorandum is derived from information provided by third-party market research firms, or third-party financial or analytics firms that we believe to be reliable. Market estimates are calculated by using independent industry publications, government publications and third-party forecasts in conjunction with our assumptions about our markets. We have not independently verified such third-party information. The market data used in this Memorandum involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates. Certain data are also based on our good faith estimates, which are derived from management's knowledge of the industry and independent sources. Industry publications, surveys and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but there can be no assurance as to the accuracy or completeness of included information. We have not independently verified any of the data from third-party sources nor have we ascertained the underlying economic assumptions relied upon therein. Statements as to our market position are based on market data currently available to us. While we are not aware of any misstatements regarding any market, industry or similar data presented herein, such data involves risks and uncertainties and are subject to change based on various factors, including those discussed under the headings "Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors" in this Memorandum. These and other factors could cause results to differ materially from those expressed in the estimates made by the independent parties and by us. While we are not aware of any misstatements regarding the above matters presented herein, the information described above and our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "Risk Factors" in this Memorandum. Similarly, we believe our internal research is reliable, even though such research has not been verified by any independent sources.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This Memorandum contains certain forward-looking statements that are subject to various risks and uncertainties. Forward-looking statements are generally identifiable by use of forward-looking

terminology such as "may," "will," "should," "potential," "intend," "expect," "outlook," "seek," "anticipate," "estimate," "approximately," "believe," "could," "project," "predict," or other similar words or expressions. Forward-looking statements are based on certain assumptions, discuss future expectations, describe future plans and strategies, contain financial and operating projections or state other forward-looking information. Our ability to predict results or the actual effect of future events, actions, plans or strategies is inherently uncertain. Although we believe that the expectations reflected in our forward-looking statements are based on reasonable assumptions, our actual results and performance could differ materially from those set forth or anticipated in our forward-looking statements. Factors that could have a material adverse effect on our forward-looking statements and upon our business, results of operations, financial condition, funds derived from operations, cash available for dividends and interest payments, cash flows, liquidity and prospects include, but are not limited to, the factors referenced in this Memorandum, including those set forth below.

When considering forward-looking statements, you should keep in mind the risk factors and other cautionary statements in this Memorandum. Readers are cautioned not to place undue reliance on any of these forward-looking statements, which reflect our views as of the date of this Memorandum. The matters summarized below and elsewhere in this Memorandum could cause our actual results and performance to differ materially from those set forth or anticipated in forward-looking statements. Accordingly, we cannot guarantee future results or performance. Furthermore, except as required by law, we are under no duty to, and we do not intend to, update any of our forward-looking statements after the date of this Memorandum, whether as a result of new information, future events or otherwise.

## CONFIDENTIALITY AND RELATED MATTERS

Each recipient hereof agrees by accepting this Memorandum that the information contained herein is of a confidential nature and that such recipient will treat such information in a strictly confidential manner and that such recipient will not, directly or indirectly, disclose or permit its affiliates or representatives to disclose, any information to any other person or entity, or reproduce such information, in whole or in part, without the prior written consent of the Company.

Each recipient of this Memorandum further agrees to use the information solely for the purpose of analyzing the desirability of an investment in the Notes to such recipient and for no other purpose whatsoever.

ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM AND EXHIBITS, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED. NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM OR AN AUTHORIZED SUMMARY HEREOF, OR IN ANY AGREEMENT CONTEMPLATED HEREBY, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR IN SUCH AUTHORIZED SUMMARY OR AGREEMENT MUST NOT BE RELIED UPON.

## RESTRICTIONS ON TRANSFERABILITY

SINCE THE SECURITIES OFFERED HEREBY ARE NOT BEING REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES CANNOT BE SOLD BY AN INVESTOR UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH ACT, OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE AT THE TIME OF DESIRED SALE. THEREFORE, A PURCHASER MUST BE ABLE TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

# TAXES

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. THE TAX ASPECTS OF AN INVESTMENT IN THE NOTES REQUIRE CAREFUL AND INFORMED STUDY WITH RESPECT TO AN INVESTOR'S PERSONAL TAX AND FINANCIAL POSITION. ACCORDINGLY, NO PERSON SHOULD INVEST IN THE NOTES WITHOUT PRIOR INDEPENDENT EXPERT ADVICE AS TO THE TAX IMPACT OF AN INVESTMENT IN THE NOTES. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES. NOTHING IN THIS MEMORANDUM SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO POTENTIAL INVESTORS.

A COPY OF THIS MEMORANDUM AND THE SUBSCRIPTION AGREEMENTS SHALL BE DELIVERED TO EVERY PERSON (EITHER IN PERSON OR VIA MAIL OR ELECTRONIC DELIVERY) SOLICITED TO BUY ANY OF THE SECURITIES HEREBY OFFERED, AT THE TIME OF THE INITIAL OFFER TO SELL.

## WHERE YOU CAN OBTAIN MORE INFORMATION

This Memorandum contains limited information on the Company. While we believe the information contained in this Memorandum is accurate, this Memorandum is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective investor that the abbreviated nature of this Memorandum will not omit to state a material fact, which a prospective investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such investor. As a result, prospective investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **An investment in the Notes is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

Prospective investors may make an independent examination of our books, records and other documents to the extent an investor deems it necessary, and should not rely on us or any of our employees or agents with respect to judgments relating to an investment in the Notes.

Each offeree may, if he, she or it so desires, make inquiries of appropriate members of our management with respect to our business or any other matters set forth herein, and may obtain any additional information which such person deems to be necessary in order to verify the accuracy of the information contained in this Memorandum (to the extent that we possess such information or can acquire it without unreasonable effort or expense) upon the execution and delivery of an agreement to maintain the confidentiality of such information for the benefit of the Company.

Any such inquiries or requests for additional information or documents should be made in writing to us, addressed as follows:

iCap Equity, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006
ATTN: Investor Relations
OFC: (425) 278-9030; FAX: (425) 278-9025
EMAIL: investor@icapequity.com

# Table of Contents

SUMMARY ...................................................................................................................... 1

THE OFFERING ............................................................................................................... 2

THE NOTES ..................................................................................................................... 3

    General ........................................................................................................................ 3
    Transfers ...................................................................................................................... 4
    Events of Default ......................................................................................................... 4
    Covenants .................................................................................................................... 5
    Guaranty ...................................................................................................................... 5
    Deemed Consent .......................................................................................................... 5

THE COMPANY ............................................................................................................... 5

    The Company and its Operations ................................................................................ 5

Investment Strategy of the Enterprises Group Overall ..................................................... 7

Vision and Values ............................................................................................................. 7

    Real Estate Investment Structure ............................................................................... 8
    Investment Process ...................................................................................................... 9
    Risk Controls ............................................................................................................... 9
    Members and Management .......................................................................................... 9
    Biographies of Management Personnel ...................................................................... 9
    Organizational Strength and Experience .................................................................. 10
    Transactions with Related Parties ............................................................................ 11

USE OF PROCEEDS ....................................................................................................... 13

PLAN OF DISTRIBUTION ............................................................................................ 14

INVESTOR SUITABILITY STANDARDS .................................................................... 14

SUBSCRIPTION PROCEDURES ................................................................................... 18

RESTRICTIONS ON TRANSFERABILITY .................................................................. 19

STATEMENT AS TO INDEMNIFICATION .................................................................. 19

RISK FACTORS .............................................................................................................. 20

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS .................................. 34

ERISA MATTERS ........................................................................................................... 37

REPORTS TO THE INVESTORS ................................................................................... 37

## Exhibits

Exhibit A-1    Subscription Agreement for Accredited Investors
Exhibit A-2    Subscription Agreement for Non-U.S. Persons
Exhibit B      Form of Promissory Note
Exhibit C      Guaranty Agreement

# SUMMARY

*This summary of this Memorandum highlights material information concerning our business and this Offering. This summary does not contain all of the information that you should consider before making your investment decision. You should carefully read this entire Memorandum, including the information presented under the section entitled "Risk Factors" and the financial data and related notes, before making an investment decision. This summary contains forward-looking statements that involve risks and uncertainties. Our actual results may differ significantly from future results contemplated in the forward-looking statements as a result of factors such as those set forth in "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements."*

The following is a summary of selected terms of the Company and the Notes. This summary is not intended as a summary of all principal terms and is qualified in its entirety by the more detailed descriptions set forth below, the Subscription Agreements attached hereto as Exhibit A-1 and Exhibit A-2 (the "Subscription Agreement"), and the Note itself. Capitalized terms used in this Summary and not otherwise defined have the meanings given to them elsewhere in this Memorandum.

| | |
|---|---|
| **The Company** | iCap Equity, LLC, a Delaware limited liability company is a Bellevue, Washington-based investment firm formed in 2011. The parent company of iCap Equity, LLC is iCap Enterprises, Inc. ('iCap Enterprises"). Any references herein to "Enterprises Group" refers to iCap Enterprises and its affiliated group of companies, including the Company. |
| | See "The Company" commencing on page 5. |
| **Manager** | The Company is managed by its parent company, iCap Enterprises, whom we also refer to herein as the "Manager". The Company will not pay a fixed annual management fee to the Manager. However, the Company will pay sums to the Manager as are necessary to allow the Manager to perform those functions that relate to the Company's business purpose, such as payroll, rent, marketing, debt service, and all other such costs. The Company may only make distributions to the Manager if the issued and outstanding Notes are not in default. |
| | See "The Company – Members and Management" commencing on page 9. |
| **The Offering** | The Company is issuing up to $50,000,000 in aggregate principal amount of Notes, provided that the Company may issue other additional promissory notes or other instruments at any time, subject to the limitations set forth below. The minimum individual investment is $5,000, with any amounts in excess thereof being permitted, and all subscriptions, whether for the minimum investment amount, or more or less than this amount, are subject to the acceptance or rejection by the Manager in its sole discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one Noteholder or its affiliates. |
| | The Company will offer the Notes for a period commencing on the date of this Memorandum and expiring on May 1, 2021. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines. |
| | The Company may terminate, or amend the terms of, this Offering at any time. |

See "The Offering" commencing on page 2.

**The Notes**  Principal and unpaid accrued interest will be due and payable three years after the date of the initial investment (subject to a one-year extension at the discretion of the Manager as set forth below, the "Maturity Date"). The Notes may be prepaid prior to the Maturity Date without penalty. The outstanding loan amount will shall bear interest at 10% per annum and will be calculated based on twelve 30-day months. At the time of subscribing for a Note, Holders will have the option of electing whether accrued interest is to be paid monthly, or is to be accrued, compounded monthly and added to the outstanding principle amount. On the Maturity Date, or at the time the Company pays off the entire principal balance of the Note, the Holder will be entitled to a one-time payment of 5% of the original Note balance ("Payoff Premium"). The Company reserves the right to issue Notes in the future with a different interest rate or without the Payoff Premium. The Notes will be unsecured and will be of equal seniority to the promissory notes issued by the Company to investors in previous offerings, the general terms of which are available to all potential investors upon request. Upon the occurrence of an Event of Default (as defined below), the Holder may declare the principal balance to be due and payable. The Notes are general unsecured obligations of the Company.

See "The Notes" commencing on page 3.

**Guaranty**  iCap Pacific NW Management LLC, a wholly owned subsidiary of the Company, has entered into a guaranty agreement with the Company for the benefit of the Noteholders.

See "The Notes - Guaranty" commencing on page 5.

**Purpose**  The proceeds of this Offering will be used for the Company's business purposes, which include operations, technology implementation, new fund formation, real estate acquisition, investments into or loans to affiliate entities (both existing and yet-to-be-formed), consultant and professional engagements, and real estate based investments, including loans and preferred equity investments.

See "The Company" commencing on page 5 and "Use of Proceeds" commencing on page 13.

**Expenses**  The Company will bear all costs and expenses incurred in the organization of the Company and this Offering and potential future offerings, and will reimburse Manager for any such costs and expenses advanced by Manager. Each investor will bear his, her or its own fees and expenses incurred in connection with this Offering.

See "The Company - Transactions with Related Parties" on page 11.

## THE OFFERING

The Company is offering for sale up to $50,000,000 of aggregate principal amount of Notes. The Offering is being made by the Company on a "best efforts" basis only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act and to persons who are Non-U.S. Persons pursuant to Regulation S promulgated under the Securities Act. The Company expects to engage one or more registered broker-dealers to act as placement agent(s) for the Offering (as applicable, the "Placement Agents") and expects to pay commissions to the Placement Agents as set forth in the Plan of Distribution commencing on page 14, based on the aggregate principal amount of the Notes sold to investors.

The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on May 1, 2021 (the "Offering Period") or earlier terminated as set forth herein.

The minimum individual investment is $5,000, with any amount in excess of $5,000 being permissible at the Manager's discretion. All subscriptions are subject to acceptance or rejection by the Manager in its sole discretion. The Manager may change, or accept less than, the minimum investment amount in its discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one investor or its affiliates. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines. In order to subscribe for a Note, prospective investors must follow the directions set forth in "Subscription Procedures" commencing on page 18.

An investor must be prepared to bear the economic risk of an investment in the Notes for an indefinite period of time. An investor in the Notes, pursuant to the Subscription Agreement and applicable law, will not be permitted to transfer or dispose of the Notes, unless they are registered for resale or such transaction is exempt from registration under the Securities Act and other applicable securities laws, and in the case of a purportedly exempt sale, such investor provides (at his or her own expense) an opinion of counsel satisfactory to us that such exemption is, in fact, available. The Notes will bear a legend relating to such restrictions on transfer.

This Offering may be withdrawn or terminated by the Company at any time. The Manager reserves the right to reject a subscription for Notes, in whole or in part in its sole discretion.

## THE NOTES

### General

Interest will accrue on the Notes from the date that the purchase price of the Note (which we refer to as the "Loan Amount") is paid to the company and the Company has accepted the applicable Subscription Agreement. The outstanding Loan Amount under a Note will bear interest at 10% per annum, and the interest computation will be based upon twelve 30-day months. In addition, if the Company exercises its right to extend the Maturity Date as discussed below, the outstanding Loan Amount will bear simple interest at 11% per annum during the extension period. In the event of an Event of Default (as described below), the outstanding Loan Amount will accrue interest at a default interest rate of 15% per year, simple interest from and after the date that the Company receives written notice of the Event of Default, until all amounts due under the Note have been paid in full or the Event of Default has been cured.

The full Loan Amount, together with accrued and unpaid interest, is due and payable to the noteholder (the "Holder"), on or before the end of the 36th calendar month following the issuance of the applicable Note, subject to the below. So long as an Event of Default has not occurred and is continuing, the Company has the option to extend the Maturity Date for an additional 12 months. This option may be exercised by the Company at any time prior to the Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Maturity Date.

Prospective investors will have the option of electing, on the signature page of the Note, whether the Company will make monthly interest payments on the Note, which will include all interest accrued through the end of the prior calendar month, or if the interest on the outstanding Loan Amount will accrue and be compounded monthly and added to the then-outstanding Loan Amount on the last day of each calendar month. If no election is made, the accrual option will be the operative provision.

On the Maturity Date, or at the time the Company pays off the entire principal balance of the Note, the Holder will be entitled to a one-time payment of 5% of the original Note balance ("Payoff Premium"). The Company may issue additional promissory notes in the future in later offerings by the Company, which

may be issued with or without a similar payoff premium.

The Company may choose to prepay part or all of the Note without penalty at any time prior to the Maturity Date, or extension thereof. Any such prepayment will be credited first to any accrued and unpaid interest and then to the payment of the outstanding Loan Amount.

**Transfers**

Subject to compliance with the requirements of the Note, Holders will have the right to transfer the Note to any qualifying third party of its choice contingent upon securing the Company's written consent in advance of the proposed transfer. The Company is under no obligation to recognize the transferee as a successor "Holder", until the Holder has surrendered the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Company. A new Note for a like principal amount and interest will be issued to, and registered in the name of, the transferee.

Transfer of the Notes may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Notes may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be registered for resale under the Blue Sky laws of any state, the Holders and any persons who desire to purchase them in any trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Notes and of purchasers to purchase the Notes. Accordingly, Investors should be prepared to hold the Notes until their maturity date as may be extended.

**Events of Default**

An "Event of Default" under a Note is the occurrence of any of the following:

- The Company defaults in the payment of any Loan Amount or interest on the applicable Note, when the same becomes due and payable and such default continues for a period of 30 business says after notice of such default has been delivered to Company by a Holder;

- the Company fails to observe or perform any covenant or warranty of the Company in the applicable Note (other than a covenant or warranty a default in whose performance or whose breach is specifically dealt with elsewhere in the Event of Default provisions, and such failure continues for a period of 30 calendar days after the Holder has given written notice to the Company;

- the Company commences a voluntary case under the bankruptcy laws, consents to the entry of an order for relief against it in an involuntary bankruptcy case, consents to the appointment of a custodian of it for all or substantially all of its property, or makes a general assignment for the benefit of its creditors; or

- a court of competent jurisdiction enters an order or decree under any bankruptcy law that is for relief against the Company in an involuntary bankruptcy case, appoints a custodian of the Company for all or substantially all of its property, or orders the liquidation of the Company; and the order or decree remains unstayed and in effect for 90 consecutive calendar days.

Upon the occurrence of an Event of Default and the expiration of any required time periods for notice, cure or other reasons, the Holder may declare the Loan Amount to be due and payable. Upon such a declaration, such principal and interest, if any, will be immediately due and payable. The occurrence of an Event of Default for one Note in this Offering will not be an Event of Default for any other Note issued

in this Offering.

**Covenants**

The Company has agreed to certain covenants with respect to the Notes, as follows:

- The Company will furnish to each Holder as soon as available, and in any event within 60 days after December 31 of each year, all reasonably required tax information applicable to the Holder.

- The proceeds from the sale and issuance of the Notes are expected to be used for the purposes set forth in this Memorandum, and for the fees, costs and expenses incurred in connection with the Offering. However, the Manager retains sole discretion to determine how such proceeds are ultimately used. Distributions may be made so long as the Company is not in default under the Note obligations.

- For so long as a Holder continues to hold the Note, the Company will provide to the Holder annual financial statements of the Company and such information relative to the Company's business operations and performance as its management may deem useful or appropriate.

**Guaranty**

iCap Pacific NW Management LLC, a wholly owned subsidiary of the Company ("iCap Pacific NW") which holds the equity interests of the Company's operating subsidiaries has entered into a Guaranty Agreement with the Company pursuant to which iCap Pacific NW has guaranteed the obligations of the Company pursuant to the Notes (the "Guaranty Agreement"). The Guaranty Agreement provides that, during the continuation of an Event of Default with respect to a particular Note, the holder of that Note may enforce the guaranty against iCap Pacific NW, but only after attempting to collect or exhausting the applicable Noteholder's efforts to collect from the Company.

**Deemed Consent**

Each Note may be amended by the Company and the applicable Holder. However, the Note also contains a "deemed consent" provision, which provides that if the Company has provided the Holder with two notices of a proposed amendment (or any other consent, approval or waiver required or requested) and the Holder has not responded to either notice within 10 days of delivery, the Holder will be deemed to have consented, in writing, to the proposed amendment, approval, consent or waiver, and the Company may rely on such deemed consent.

<div align="center">***</div>

The descriptions of the Notes and the Guaranty Agreement set forth herein are not a full description of the terms of the Notes or the Guaranty Agreement and are qualified in their entirety to the form of Note as attached hereto as Exhibit B and the Guaranty Agreement as attached hereto as Exhibit C. Prospective investors are urged to read the Note and the Guaranty Agreement in their entireties prior to subscribing for the purchase of a Note.

<div align="center">

**THE COMPANY**

</div>

**The Company and its Operations**

iCap Equity, LLC is a Delaware limited liability company based in Bellevue, Washington, formed in 2011. The Company's sole member is iCap Enterprises, which is also the Company's Manager. The

Manager is wholly owned by Chris Christensen. The Company primarily derives its income from fees generated through the operations of its subsidiary entities, all of which are held by iCap Pacific NW Management LLC. It will also receive income from investments that it plans to make with the proceeds of this Offering, whether into real estate or affiliated funds. The Company's primary investment strategy focuses on preferred equity investments in Pacific Northwest real estate projects, but the Company also structures other investment opportunities that are based in real estate. The Company's subsidiary funds have primarily made secured, short-term investments in single-family, multi-family, light commercial and land development projects. Most investments of the past involve some element of construction or development.

Although this Memorandum refers to "iCap" and the Company as though each were an entity capable of taking action, prospective Investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. By investing in a Note, an Investor will not acquire an interest in any of its affiliated entities, but it may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Company as it conducts its business.

The following chart illustrates the relationship among the various members of the Enterprises Group.



Members of the management team previously established iCap B1, LLC, and iCap B2, LLC in 2013, which raised a total of $6,915,664 for the purpose of making investments into various real estate projects. These special purpose vehicles made 10 investments and generated a gross IRR to investors of 20%. The management team also issued a total of $93 Million in debentures across two pooled investment funds, iCap Pacific NW Opportunity and Income Fund, LLC, and its follow-on fund, iCap Northwest Opportunity Fund, LLC. Investors in these two funds earned a 12% annualized rate of interest and 11% annualized rate of interest, respectively. Additional affiliate entities include iCap Pacific Income Fund 4, LLC, which has raised $10.6 million and pays a 10% annual rate of interest, and iCap Pacific Income Fund 5, LLC, which has raised $2.8 million and pays a 9% annual rate of interest, and iCap Vault 1, LLC which is being registered with the SEC and currently pays a 2% annual rate of interest. As of the date of this Memorandum, iCap has approximately $119 Million in assets under management (including reserves and committed capital for investments), which has been invested across 75 projects.

In November of 2017 and May of 2019, the Company undertook a prior offering of promissory notes, which had substantially the same terms as the Notes in this Offering, other than the deemed consent

provisions above and certain other features (the "Prior Offering"). The Prior Offering resulted in the Company issuing $21.7 million in aggregate principal amount of promissory notes, which are currently issued and outstanding. The Prior Offering was terminated upon commencement of this Offering.

POTENTIAL INVESTORS SHOULD RECOGNIZE THAT BY PURCHASING NOTES THEY WILL NOT THEREBY ACQUIRE ANY INTEREST, DIRECTLY OR INDIRECTLY, IN THE COMPANY OR ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. INVESTORS SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES AS SET FORTH HEREIN IS GIVEN SOLELY TO ALLOW INVESTORS TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. THE MANAGER AND ITS AFFILIATES MAY CONTINUE TO ENGAGE IN MANAGEMENT AND INVESTMENT ACTIVITIES RELATED TO PRE-EXISTING INVESTMENTS AND ACTIVITIES OR OPERATIONS OF THE PRIOR FUNDS AS WELL AS FUTURE INVESTMENTS OR FUNDS.

**Investment Strategy of the Enterprises Group Overall**

The Enterprises Group, of which the Company is a part, creates entities such as the Company, that offer investors high-yield income funds backed by real estate. The Enterprises Group differentiates itself through its innovative investment structures and use of technology. The Enterprises Group has over $118M in Assets Under Management, more than 1,100 investors and is currently raising its 6th fund (the individual funds are collectively referred to herein as the "Funds"). The Enterprises Group's first fund was created to provide preferred equity investments for construction and development projects in the Pacific Northwest, and it is continuously working on new investment products and plans to introduce two new publicly registered offerings over the next six to twelve months.

Additional related parties include Edge Construction, LLC, which is an affiliate general contractor entity that was initially used to develop real estate projects directly, but which is no longer an active part of the Enterprises Group's strategy and is being phased out. The Enterprises Group now relies on its growing network of third-party building and development companies to perform construction and development services. The Enterprises Group recently established offices in Shanghai and Hangzhou, China and has a growing number of Chinese investors, and we use those offices to service their needs.

**Vision and Values**

The Enterprises Group adheres to the following vision and values:

- **Purpose**: to empower people to build and preserve value through real estate
- **Vision**: To be the world's most innovative and reliable real estate investment business
- **Values**:
  - *Integrity* – Do what is right
  - *Accountability* – Hold each other accountable
  - *Open & Clear Communication* – Be direct. Listen to others. Communicate frequently.
  - *Innovation* – identify inefficiencies and find innovative ways to improve them
  - *Smart Business* – Make solid business decisions based on good information
  - *Respect* – Treat everyone professionally. Acknowledge and listen.
  - *Excellence* – Don't just do it. Do it well.

The Enterprises Group desires to be a place where investors can find extraordinary investment opportunities that have unique features. We have established a place where savvy investors can find high yield investments providing both income and liquidity. Our investments typically provide for monthly payments to investors at rates that are among the best available in the market. Additionally, we utilize new technologies that allow for efficient investor onboarding and access to statements and other reports. Our

investors reside all over the world, and we seek to provide each of them with the best tools for managing their investments with iCap.

**Real Estate Investment Structure**

The Company will invest using three real estate investment structures: (a) joint ventures, (b) wholly-owned projects, and (c) credit lending. This mix of investment structures is designed to mitigate risk, while still allowing the Company to take advantage of market opportunities within each type of investment. The structure of investments also allows the Company to take advantage of short-term opportunities, while still maintaining flexibility to benefit from similar gains in the longer term. Each of these three structures is capable of complementing the others, resulting in strong deal flow for the funds.

*Equity Investment & Joint Ventures*

The Company's beginning business model was built on providing preferred equity in the form of a joint venture, relationship structured through a limited liability company (LLC), with a qualified builder or developer (referred to as a "**Project Partner**"). Each investment is structured to provide priority repayment of the iCap investment plus a preferred return and an exit fee in the Project Entity. For example, if iCap were to invest $1 million into a Project, iCap would be entitled to a priority repayment of the $1 million, a preferred return as negotiated with the Project Partner, and a share in the liquidation proceeds in the form of an exit fee. The legal agreements with the Project Entity provide for these returns to be delivered at a specific date, which is generally within 12-18 months from the time of the original investment.

Typical financing for real estate projects consists of two primary capital sources: (a) debt financing, usually through a first-position secured lender; and (b) equity contributions of the project sponsor and other partners. In most cases, a first-position senior lender will provide 70-75% of the total cost of a project, but will require that the project sponsor contribute the remaining capital either directly, or by bringing additional equity partners into the project. This equity contribution is the need that the current iCap funds address by bridging the gap between the cash provided by the senior debt and the developer's available equity contribution.



iCap's Funds receive a preferred membership interest in the Project Entity that accrues a 12% rate of return on its invested capital as well as an exit fee. This exit fee is calculated as a percentage of the total project value (usually 3-5% of the proceeds from a liquidation event, such as a sale or refinance). The exit fee is paid prior to the developer receiving any return of its capital or distribution of profits. Through this structure, the Funds target a gross annualized return on investment of 18-22%. The exit fee, which is based on the entire value of the project, is a key component to iCap's ability to maximize returns, which is enhanced by reinvestment of capital to create multiple exit fees using the same base of capital.

The Fund incorporates a focused investment strategy that is intended to align both the strengths of the management team and the demands of the market. The investment strategy targets a typical investment size for each project ranging from $500,000 to $3,000,000, and an average Investment holding period of 12-18 months per investment. The combined loan to value is the amount of the senior loan plus the Fund's investment and is generally not higher than 75% of the value of the property. The Funds invest in projects that have well established exit strategies and builders with proven track records.

**Investment Process**

The Company's portfolio of investments will consist of a variety of real estate types, including without limitation single-family homes, multi-family apartments, townhomes, condos, and mixed-use properties, generally in construction and development phases. The revenue generated from the investment portfolio will be used to pay interest and principal on the Notes and fund its operations.

To build its investment portfolio, the Company will identify metropolitan statistical areas within which to purchase properties. The Company has developed proven processes and controls to evaluate possible investment opportunities. The process begins by identifying metropolitan statistical areas within the U.S. ("Markets") with strong economic fundamentals that are likely to result in reliable exit strategies and strong returns. The Markets are selected after review of reports and analysis provided by economics professionals, as well as the Company's internal staff. The Markets are thereafter initially reviewed by a committee consisting of key members of the management team (the "Investment Committee"). Specifically, the Investment Committee is comprised of the Company's CEO, Chief Operating Officer, and Chief Financial Officer. Every investment opportunity is subject to preliminary due diligence performed by the Company's asset management team, who in turn will present investment opportunities to the Investment Committee for its review and approval. The Investment Committee meets weekly to review new opportunities. The Company completes diligence on prospective investments and maintains post-closing procedures that provide for the ongoing supervision of the investments. The investment process has three major areas of focus: (1) analysis and approval, (2) documentation and closing, and (3) post-closing and management.

The Investment Committee may delegate investment decision-making authority to sub-teams, provided such investments meet the fundamental criteria established by the Investment Committee. The Company will complete diligence on prospective investments and maintain closing procedures that provide for the safety of the invested funds. The investment process has three major areas of focus: analysis and approval, documentation and closing, and post-closing management.

**Risk Controls**

The Company's entity structure and investment strategy have been designed to mitigate risk and increase the likelihood of success. Each Investor whose subscription is accepted will receive a Note upon closing, which will provide the Investor with a priority return for repayment over equity holders, an ongoing interest rate payment, and a payoff premium. The Company's subsidiary management entity will then offer a corporate guaranty. By making the Notes a senior obligation of the Company, providing additional legal protections through a guaranty, and restricting the ability to make distributions in the event of default, the Company aligns the parties' incentives and limits the investment risk. Additionally, the Company has devised an investment strategy to ensure multiple income streams and has assembled an experienced and proven management team to oversee the business.

**Members and Management**

As discussed above, the sole member of the Company is iCap Enterprises, Inc., the Manager. The Manager is wholly owned by Chris Christensen.

**Biographies of Management Personnel**

***Chris Christensen.*** Mr. Christensen has served as the Chief Executive Officer of the Company since its inception in 2011. Since 2011, he has served as the Chief Executive Officer of iCap Enterprises, Inc. From August 2007 to August 2011, Mr. Christensen served as President of Altius Development, Inc., the predecessor to iCap Enterprises, Inc. Mr. Christensen brings knowledge and experience in the legal, finance and real estate industries, where he previously served as a licensed attorney. His experience in financial structuring, legal compliance, and fund management will help the Company achieve its goals of providing a reliable investment experience for its investors. He is a graduate of the University of Utah with a B.S. in Economics in May 2001, Seattle University School of Law with a J.D. in May 2004, and Seattle University Albers School of Business and Economics with a Master of International Business degree in November 2005. Mr. Christensen was joined as a party to a civil lawsuit initiated in July 2014 claiming Breach of Contract, in which he won on all claims against him, the claims were dismissed, and he was awarded attorney's fees. Chris Christensen is the brother of Jim Christensen. Mr. Christensen does not hold, and has not previously held, any directorships in any reporting companies.

***Jim Christensen.*** Mr. Christensen has served as the Chief Operating Officer of the Company since 2011. Mr. Christensen has also served as the Chief Operating Officer of iCap Enterprises, Inc. He assists the Chief Executive Officer with the day-to-day operations of iCap Enterprises, Inc. and its investment funds, including overseeing investment underwriting, project and construction management, project financing, and processes related to acquisition and disposition of Portfolio Investments. Prior to the formation of the prior funds, Mr. Christensen managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington State for iCap Enterprises, Inc. He has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Mr. Christensen holds a Master of Business Administration degree and a Bachelor of Arts degree in Economics from the University of Washington. Jim Christensen is the brother of Chris Christensen. Mr. Christensen does not hold, and has not previously held, any directorships in any reporting companies.

***Jonathan Siegel.*** Mr. Siegel has served as the Chief Financial Officer of the Company since October 2019. Mr. Siegel has also worked at iCap Enterprises, Inc. since October 2019 where he serves as Chief Financial Officer. From January 2013 to July 2018, he worked at LabConnect Holdings, Inc. and LabConnect, LLC where he served as Chief Financial Officer. From June 2008 to December 2012, Mr. Siegel worked at Emmet Consulting where he served as Principal, providing C-level consulting on operational, financial and economic issues. Mr. Siegel brings knowledge and experience in the financial services, professional services, and corporate governance aspects of companies. His experience in the management of financial processes and controls at rapidly growing companies will help iCap Pacific Income Fund 6, LLC with regard to sustainable growth, efficient processes and client security. Mr. Siegel is a graduate of the University of Chicago with an MBA in Finance and Strategy in 1998 and a BA in Economics in 1991. Mr. Siegel does not hold, and has not previously held, any directorships in any reporting companies.

**Organizational Strength and Experience**

The members of the senior management team have completed a variety of projects in the small-cap real estate space. The team, through its combined experience, has closed in excess of $8 billion in transactions in the small and mid-cap spaces.

The Enterprises Group has capacity to accept additional capital and to deploy such proceeds towards real estate projects meeting its investment criteria. iCap intends to grow as an organization with the expected increase in capital under management. With regards to human capital, various support staff will be hired to assist the Enterprises Group's existing personnel to leverage the systems described above, consistent with the Enterprises Group's growth plan. As the Enterprises Group deploys additional capital raised through the Company, the Enterprises Group plans to add additional staff members to assist with the increased transaction volume and asset management. The Enterprises Group also plans to add additional support staff for its in-house accounting and legal departments.

The Enterprises Group also maintains a network of strategic relationships. The team leverages relationships with sourcing, development, construction, and fund administration constituents to maintain a pipeline of real estate investment opportunities. Property owners, builders, developers, lenders and brokers are the primary sources for deal flow.

The Enterprises Group has capacity to expand its team to manage large amounts of capital from the sale of the Notes and to deploy such proceeds towards real estate that meets its investment criteria. The Enterprises Group has invested significant resources to build the technology and infrastructure needed to manage large amounts of noteholders, capital, and real estate-based investments. The number of employees who manage this infrastructure will grow as the capital under management increases.

The Manager and its affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

## Transactions with Related Parties

The Manager and its affiliates will be entitled to certain types of compensation, fees, income, distributions or other payments from the Company or in connection with a Company investment. Additionally, the Company may make loans to or preferred equity investments in affiliated iCap entities, whether now formed or yet-to-be-formed, and may do so in such amounts and on such terms as the Manager deems appropriate. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Company. The Manager has no obligation to advance funds to cover the Company's expenses. However, to the extent that such advances are made, the Company will repay such amounts out of its funds as soon as they are available, whether such funds are from the Company's operating revenues or third-party loans. Below is a summary of these key payment obligations of the Company and potential conflicts of interest that could arise from these obligations.

### *Compensation and Other Payments to the Manager and Affiliates*

The Company will not pay a fixed annual management fee to the Manager. However, the Company will pay sums to the Manager as are necessary to allow the Manager to perform those functions that relate to the Company's business purpose, such as payroll, rent, marketing, technology, professional services, debt service, and all other such costs.

In addition to the fees set forth above, the Company will reimburse the Manager and its affiliates for any reasonable expenses paid by such Person that properly should be borne by the Company. Such expenses include costs incurred before and after the formation of the Offering, such as organizational and offering expenses; consulting, legal, accounting, and professional fees; and marketing and travel expenses.

The Company is required to distribute to the Manager, as a member of the Company, in cash the amount of taxes that are estimated to be payable by the Manager within 90 days after the close of each fiscal year. The Company is not required to make any distributions to its members prior to dissolution other than tax distributions.

The Manager may authorize non-tax-related distributions as long as an Event of Default has not occurred and is continuing under the terms of any Note, as evidenced by properly delivered notice by Holder to the Company under the terms of the Note. Additionally, after the Company has paid the outstanding principal and annual interest due and payable under the Notes, the Company may distribute any remaining profits to the Manager. Given the ongoing operational nature of the Company, the Company expects to make ongoing distributions to the Manager. The Manager's profit interest in the Company may create an incentive for the Manager to make more speculative investments on behalf of the Company than the Manager otherwise would make in the absence of such profit potential.

The Company is the parent company to various fund entities. The Company may make loans to, or preferred equity investments in, such entities, as well as to or in the Manager or any affiliate of the Manager, whether now existing or yet-to-be-formed. Such entities include, without limitation, iCap Pacific Opportunity and Income Fund, LLC, iCap Northwest Opportunity Fund, LLC, iCap Pacific Income Fund 4, LLC, iCap Pacific Income Fund 5, LLC, iCap Pacific Income Fund 6, LLC, iCap Vault, LLC, iCap Vault 1, LLC, Vault Holding 1, LLC, and any subsidiaries of such entities. Entities in which the Company makes loans, or preferred equity investments in, may have negative cash flows and could result in losses to the Company. Any transactions entered into by the Company with such entities will likely not be made at arm's length terms, and rates of interest, maturity dates, and other material terms will be determined by the management personnel of the Company which also manages these affiliates. Additionally, the Company may choose not enforce its legal rights in the event of default of any investment made to or with an affiliate.

The Company may enter into various transactions with the Manager and its affiliates, including performance of services for entities which hold project investments of the Company (each a "Project Entity"), providing financing, guarantying financing, purchasing or selling property, or participating in an investment in a Project Entity alongside a subsidiary of the Company provided the terms are commercially reasonable. Compensation and fees could be paid with respect to these transactions as described below. To the extent any such transaction may pose a conflict of interest between the Company and the Manager or its affiliates, this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company.

In the event the Company enlists the services of any affiliate of the Manager, the rates of compensation of these affiliates for the performance of their various services will be at arms-length rates no higher than what the Company could obtain from unaffiliated third parties and all payments will be subject to inspection by auditors upon request.

Additionally, in the event the Manager, or an affiliate of the Manager, guaranties, whether personally or otherwise, a loan, bond or other obligation of the Company or of any of its subsidiary entities, such Manager or affiliate will be entitled to an annual fee equal to 1% of the outstanding loan amount, bond amount, or other obligation.

*Fees Payable by the Project Entity*

In some instances, an affiliate of the Manager may perform services for a Project Entity in order to provide better pricing or efficiency than would otherwise be available from third parties. In these instances, such affiliates may be paid customary service fees for time, material, or labor.

In some instances, an affiliate of the Manager may provide lending to a Project Entity in connection with or in lieu of financing from non-affiliated third parties. In such circumstances, the affiliate may charge customary fees in connection with the issuance of such loans such as interest, origination fees, exit fees, and other fees.

*Acquisition, Transfer, and Divestiture of Investments to or from Affiliates*

The Company may acquire investments previously entered into by affiliates of the Manager, or may partially or wholly transfer an investment to or from affiliate entities, subject to underwriting and investment criteria of the Company and the Manager's affiliates. Any investment acquisition or transfer that occurs may require a determination of the value of the investment, which may pose a conflict of interest between the Company and the Manager or its affiliates, which must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company. Notwithstanding the foregoing, the Manager is not obligated to cause the Company or any affiliate to enter into any such transactions.

*Devotion of Time and Attention*

The Manager will cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its affiliates, to devote to the Manager, the Company's investments, and other activities of the Company as much time as may be reasonably necessary for the performance of their respective duties in their capacities as managing principals. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Company's investment objectives; (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund, any pre-existing funds, and any investments of those successor or pre-existing funds; (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his/her own account; (e) engage in civic, professional, industry and charitable activities; and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

The Manager and its affiliates have established, and may establish, other pooled investment funds that have investment objectives identical to those of the Company or its affiliates, and the principals of the Manager may devote such time and attention as they deem necessary for the success of such funds.

## USE OF PROCEEDS

The proceeds of this Offering will be used for the Company's business purposes, which include operations, technology implementation, new fund formation, investments into and loans to affiliate entities (both existing and yet-to-be-formed), consultant and professional engagements, real estate based investments, including acquisitions, loans and preferred equity investments. At any time, the Company may use Offering proceeds to retire any debt obligation of the Company, including those held by other investors. The following table is an estimate of the Company's allocation of the available Offering proceeds. Given that the Offering proceeds will be combined with the Company's existing cash, and that the Company has been in operation for many years, the table illustrates primarily those items that are in addition to the standard operating expenses of the Company. If less than the maximum Offering amount is raised, the Manager will determine which line items will receive less than the estimated allocation. The Manager has discretion to utilize all proceeds as it deems necessary to accomplish the Company's business purposes, regardless of the estimates below.

| Line Item | Estimated Amount |
|---|---|
| Reserves and Miscellaneous Expense | $5,000,000 |
| Commissions | $4,500,000 |
| Marketing | $500,000 |
| Website and Technology | $1,500,000 |
| Portfolio Investments: Real Estate and Affiliate Entities | $38,500,000 |
| Total | $50,000,000 |

*Each time the Company launches a new investment fund vehicle, it advances the initial capital for the organizational and offering expenses, including preparation of the offering documents, entity formation, and marketing expenses. The Company is reimbursed for these expenses when the fund's first closing is held, and the newly formed fund begins generating management fee income that may be distributed to the Company.

The proceeds of this Offering will be used to pay expenses related to this Offering, including as set forth below in "PLAN OF DISTRIBUTION". The proceeds will be used to cover costs associated with this process, such as marketing, management fees, and professional service fees. The Company expects to pay expenses of approximately $5,000,000 related to the Offering, which include the cost of the Company's fundraising efforts, and the cost of preparing this Memorandum, selling commissions and similar costs.

# PLAN OF DISTRIBUTION

The Company expects to engage one or more registered broker-dealers to act as placement agent(s) for the Offering (as applicable, the "Placement Agents") and expects to pay commissions to the Placement Agents in the amount of up to approximately 9% of the aggregate principal amount of the Notes sold to investors.

The Notes will be offered on a "best efforts" basis (which means that there is no guarantee that any minimum amount will be sold). There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines.

The Placement Agents may purchase Notes in the Offering. Such Notes will be counted toward the maximum offering amount of $50,000,000. The Company and the Placement Agent, in their sole discretion, may accept offers to purchase Notes net (or partially net) of the commissions and expense reimbursements described in this Memorandum in certain circumstances deemed appropriate by either of them, including by way of illustration, from Investors purchasing through a registered investment advisor ("RIA"), or from Investors who are affiliates of the Company or any Placement Agent (the "Selling Group"). The Company may also make sales to registered representatives of the Selling Group or to their spouses and affiliates, in each case net of sales commissions.

The Company is offering a maximum offering amount of up to $50,000,000 in Notes. The Company may also elect to sell Notes to particular investors with an "original issue discount", which means that the acquisition price of the particular Note for such invest is less than the Loan Amount for such Note.

If the Maximum Offering Amount is subscribed, the net proceeds to the Company from the sale of Notes, after deducting selling commissions and related fees, and estimated organizational and Offering expenses, is anticipated to be approximately $45,000,000. The following table sets forth the details of these fees and the funds available for investment in the Company's real estate strategy as described in this Memorandum.

| | Sale of Maximum Offering Amount | Percentage of Gross Proceeds |
|---|---|---|
| Gross Proceeds From Investors | $50,000,000 | 100.00% |
| Less: Selling Commission (1) | $4,500,000 | 9.00% |
| Less: Offering Expenses | $500,000 | 1.00% |
| Available for Investment (before reserves) | $45,000,000 | 90.00% |

At any given time, the Company will maintain cash reserves to meet interest payments and operational requirements.

# INVESTOR SUITABILITY STANDARDS

*General*

An investment in our Notes involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in their investment. Our Notes are only suitable for those who desire a relatively long-term investment for which they do not need liquidity until the anticipated Maturity Date of the Note as set forth in this Memorandum.

The offer, offer for sale, and sale of our Notes is intended to be exempt from the registration requirements of the Securities Act pursuant to Rule 506(c) of Regulation D promulgated thereunder as to

"accredited investors" or to "non-U.S. persons" in an "offshore transaction" pursuant to Regulation S under the Securities Act, in each case as further discussed below, and is intended to be exempt from the registration requirements of applicable state securities laws as a federally covered security.

A subscriber must meet one (or more) of the investor suitability standards (be an "accredited investor" or "non-U.S. person") below to purchase a Note. Fiduciaries must also meet one of these conditions. If the investment is a gift to a minor, the custodian or the donor must meet these conditions. For purposes of the net worth calculations below, net worth is the amount by which assets exceed liabilities, but excluding your house, home furnishings or automobile(s) among your assets. In addition, in the subscription agreement, a subscriber will have to confirm satisfaction of these minimum standards:

- Each Investor must have the ability to bear the economic risks of investing in the Notes.

- Each Investor must have sufficient knowledge and experience in financial, business or investment matters to evaluate the merits and risks of the investment.

- Each Investor must represent and warrant that the Note to be purchased are being acquired for investment and not with a view to distribution.

- Each Investor will make other representations to us in connection with purchase of the Note, including representations concerning the Investor's degree of sophistication, access to information concerning the Company, and ability to bear the economic risk of the investment.

*Suitability Requirements*

<u>Accredited Investors</u>

Rule 501(a) of Regulation D defines an "accredited investor" as any person who comes within any of the following categories, or whom the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1) Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Exchange Act; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration undersection 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)     Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)     Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

(6)     Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)     Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in §230.506(b)(2)(ii) of the rules and regulations pursuant to the Securities Act; and

(8)     Any entity in which all of the equity owners are accredited investors.

For purposes of calculating net worth:

(A)     The person's primary residence shall not be included as an asset;

(B)     Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C)     Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

In determining income, a subscriber should add to the subscriber's adjusted gross income any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deduction claimed for depletion, contribution to an IRA or Keogh plan, alimony payments, and any amount by which income for long-term capital gains has been reduced in arriving at adjusted gross income.

<u>Non-U.S. Persons</u>

This Offering is also being made pursuant to Regulation S under the Securities Act, to non-U.S. persons. A non-U.S. person is any person who is <u>not</u> one of the following:

● Any natural person resident in the United States (as defined below);

● Any partnership or corporation organized or incorporated under the laws of the United States;

● Any estate of which any executor or administrator is a US Person;

● Any trust of which any trustee is a US Person;

● Any agency or branch of a foreign entity located in the United States;

● Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US Person;

- Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident of the United States; or

- Any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a US Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) who are not natural persons, estates or trusts.

"United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

As required by Regulation S, sales to non-U.S. persons will be made in "offshore transactions." These are transactions where:

- no offer is made to a person in the United States; and

- either (1) at the time the buy order is originated, the buyer is (or is reasonably believed to be by the seller) physically outside the United States, or (2) the transaction is for purposes of Rule 903, executed on a physical trading floor of an established foreign securities exchange, or for purposes of Rule 904, executed on a "designated offshore securities market" and the seller is not aware that the transaction has been pre-arranged with a U.S. purchaser.

<u>Additional Provisions and Requirements</u>

In addition to the foregoing suitability standards, we cannot accept subscriptions from anyone if the representations required are either not provided or are provided but are inconsistent with our determination that the investment is suitable for the subscriber. In addition to the financial information we require, the representations we require of you state that you:

- Have received this Memorandum, together with the Exhibits attached hereto;

- understand that no federal or state agency has made any finding or determination as to the fairness for investment in, nor made any recommendation or endorsement of, the Notes; and

- understand that an investment in the Company will not, in itself, create a qualified retirement plan as described in the Internal Revenue Code and that you must comply with all applicable provisions of the Internal Revenue Code in order to create a qualified retirement plan.

You will also represent that you are familiar with the risk factors we describe and that this investment matches your investment objectives. Specifically, you will represent to us that you:

- Understand that there will be no public market for the Notes, that there are substantial restrictions on repurchase, sale, assignment or transfer of the Notes and that it may not be possible to readily liquidate an investment in the Notes; and

- have investment objectives that correspond to those described elsewhere in this Memorandum.

You will also represent to us that you have the capacity to invest in our Notes by confirming that:

- You are legally able to enter into a contractual relationship with us, and, if you are an

individual, have attained the age of majority in the state in which you live; and

- if you are a manager, that you are the manager for the trust on behalf of which you are purchasing the Note, and have due authority to purchase the Note on behalf of the trust.

If you are purchasing as a fiduciary, you will also represent that the above representations and warranties are accurate for the person(s) for whom you are purchasing Note. By executing the subscription agreement, you will not be waiving any rights under the Securities Act or the Exchange Act.

We have the right to refuse a subscription for a Note if in our sole discretion if we believe that the prospective Investor does not meet the suitability requirements. It is anticipated that comparable suitability standards (including state law standards applicable in particular circumstances) may be imposed by us in various jurisdictions in connection with any resale of the Notes.

## SUBSCRIPTION PROCEDURES

To subscribe for a Note, each prospective Investor will be required to do the following:

1. Complete, sign and deliver to us one of the Subscription Agreements attached hereto as Exhibit A-1 and Exhibit A-2, as discussed below;

2. Execute a signature page to the Note, which is attached hereto as Exhibit B (i.e., complete the prospective Investor's legal name in the place indicated on the last page of the Note, in "Holder:_____", and execute the Note in the space provided and also complete the election below the signature block as to whether the Investor elects monthly interest payments or for interest to accrue and be added to the principle amount); and

3. Deliver payment by wire pursuant, ACH transfer or certified check pursuant to the instructions on the Subscription Agreement.

*The Subscription Agreement that must be completed by prospective investors who are subscribing based on being an "accredited investor" is attached hereto as Exhibit A-1.*

*The Subscription Agreement that must be completed by prospective investors who are subscribing based on being a "non-U.S. Person" is attached hereto as Exhibit A-2.*

*Investors should complete only one of the Subscription Agreements, depending on which basis they are subscribing.*

Investors who are both accredited investors and non-U.S. persons may elect on which basis to subscribe.

The executed documents should be delivered to the Company as follows:

iCap Equity, LLC
Attn: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

Or:

Investors may scan and email executed documents to:  investor@icapequity.com

With the Subscription Agreement and the executed signature page of the Note (regardless of the

method used for completing), prospective Investors should send their funds via wire transfer or ACH payment pursuant to the instructions as set forth in the Subscription Agreement, or check payable to "iCap Equity, LLC" to the address above, for the total cost of the Note being subscribed.

As opposed to delivery of the executed documents via hard copy or email as set forth above, this process above may also be completed electronically via the Company's website. At any time, the Company may require that investors complete all required documents through its website.

Subscriptions are not binding on the Company until investor funds have cleared and are available, and the subscription has been accepted in writing by the Company. We will refuse any subscription by giving written notice to the prospective Investor by personal delivery or first-class mail. We have the right to refuse to sell the Notes to any prospective Investor for any reason in our sole discretion, including, without limitation, if such prospective Investor does not promptly supply all information requested by us in connection with such prospective Investor's subscription. In addition, in our sole discretion, we may establish a limit on the purchase of Notes by particular prospective Investor.

As noted above, this Memorandum and the Subscription Agreements are available electronically through the Company's website and may in the future be completed through an application developed by iCap or the Company.

The execution of a Subscription Agreement and the signature page to the Note by an Investor constitutes a binding offer to purchase the Note subscribed for. Once an Investor subscribes for a Note, that Investor will not be able to withdraw such subscription. If a subscription is not accepted, subscription funds will be promptly returned to the Investor, without interest or deduction (except for any wire transfer fee). Even though a prospective Investor has executed the Note, the Note will not be issued unless and until the Company accepts the prospective Investor's subscription and returns countersigned copies of the Subscription Agreement and the Note.

By submitting the completed and signed Subscription Agreement with payment for the purchase of Note, you represent and warrant that you meet the relevant suitability standards and are eligible to purchase the Note.

We do not permit sales to discretionary accounts without prior specific written approval of the owner of the account.

## RESTRICTIONS ON TRANSFERABILITY

The Notes offered hereby are restricted securities as that term is defined in Rule 144 promulgated under the Securities Act. These securities have not been registered under the Securities Act and are being offered and will be sold without benefit of registration under the applicable federal or state securities acts by reason of specific exemptions from registration provided by such acts. The availability of such exemptions is also dependent, in part, upon the "investment intent" of the investors. The exemptions would not be available if an investor were purchasing the Notes with a view to redistributing them. Accordingly, each investor when executing the Subscription Agreement will be required to acknowledge that his or her purchase is for investment, for its, his or her own account, and without any view to resale of the Notes except pursuant to an effective registration statement under the Securities Act, or a valid exemption from the registration requirements of the Securities Act, and subject to the terms of the Subscription Agreement.

## STATEMENT AS TO INDEMNIFICATION

Our Operating Agreement provides for indemnification of members and officers of the Company and of the Manager under certain circumstances, which could include liabilities relating to securities laws. The SEC mandates the following disclosure of its position on indemnification for

liabilities under the federal securities laws:

> "Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling an issuer, the Company has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable."

## TRADEMARKS AND COPYRIGHTS

We may own or have rights to trademarks or trade names that we use in connection with the operation of our business, including our corporate names, logos and website names. In addition, we own or have the rights to copyrights, trade secrets and other proprietary rights that protect the content of our products and the formulations for such products. This Memorandum may also contain trademarks, service marks and trade names of other companies, which are the property of their respective owners. Our use or display of third parties' trademarks, service marks, trade names or products in this Memorandum is not intended to, and should not be read to, imply a relationship with or endorsement or sponsorship of us. Solely for convenience, some of the copyrights, trade names and trademarks referred to in this Memorandum are listed without their ©, ® and ™ symbols, but we will assert, to the fullest extent under applicable law, our rights to our copyrights, trade names and trademarks. All other trademarks are the property of their respective owners.

## RISK FACTORS

AN INVESTMENT IN THE NOTES INVOLVES SIGNIFICANT RISK AND IS SUITABLE ONLY FOR PERSONS WHO ARE CAPABLE OF BEARING THE RISKS, INCLUDING THE RISK OF LOSS OF A SUBSTANTIAL PART OR ALL OF THEIR INVESTMENT. CAREFUL CONSIDERATION OF THE FOLLOWING RISK FACTORS, AS WELL AS OTHER INFORMATION IN THIS MEMORANDUM IS ADVISABLE PRIOR TO INVESTING. PROSPECTIVE INVESTORS SHOULD READ ALL SECTIONS OF THIS MEMORANDUM AND ARE STRONGLY URGED AND EXPECTED TO CONSULT THEIR OWN LEGAL AND FINANCIAL ADVISERS BEFORE INVEST-ING IN THE NOTES. THE INFORMATION IN THIS MEMORANDUM CONTAINS BOTH HISTORICAL AND FORWARD-LOOKING STATEMENTS. PLEASE BE ADVISED THAT THE COMPANY'S ACTUAL FINANCIAL CONDITION, OPERATING RESULTS AND BUSINESS PERFORMANCE MAY DIFFER MATERIALLY FROM THAT ESTIMATED BY THE COMPANY IN FORWARD-LOOKING STATEMENTS. THE COMPANY HAS ATTEMPTED TO IDENTIFY, IN CONTEXT, CERTAIN OF THE FACTORS THAT IT CURRENTLY BELIEVES COULD CAUSE ACTUAL FUTURE RESULTS TO DIFFER FROM THE COMPANY'S CURRENT EXPECTATIONS. THE DIFFERENCES MAY BE CAUSED BY A VARIETY OF FACTORS, INCLUDING BUT NOT LIMITED TO, ADVERSE ECONOMIC CONDITIONS, COMPETITORS (INCLUDING THE ENTRY OF NEW COMPETITORS), INADEQUATE CAPITAL, UNEXPECTED COSTS, LOWER REVENUES AND NET INCOME THAN ANTICIPATED, FLUCTUATION AND VOLATILITY OF THE COMPANY'S OPERATING RESULTS AND FINANCIAL CONDITION, INABILITY TO CARRY OUT MARKETING AND SALES PLANS, LOSS OF KEY EXECUTIVES OR OTHER PERSONNEL, AND OTHER RISKS THAT MAY OR MAY NOT BE REFERRED TO IN THESE RISK FACTORS.

### Operation and Company Risks

**_Control is vested in the Manager; no Investor should purchase the Notes unless the Investor is comfortable with the Manager's judgment and experience in running the Company's affairs._**

Control over all decisions affecting the Company, including decisions regarding the investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, refinancing of Project Entities, whether to make an investment, whether an Affiliate is eligible for an

investment, extensions of investments and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors. No assurance can be given that sufficient investments will be presented to the Company to deploy all of the capital available for investment.

When you subscribe for Notes that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the investments that the Manager subsequently identifies. You should not invest in the Company, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

***The Company will have limited or no control over the underlying investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the investments.***

The Company expects to acquire preferred equity in Project Entities, acquire and hold real estate through Project Entities, or, occasionally, issue debt interests to Project Entities. Accordingly, the Company will not likely have control over such Project Entities (except in certain circumstances relating to the Company enforcing its creditor rights or contractual rights) and will be required to rely on the project partners of such Project Entities to use their skill, expertise and background to generate value from the investments.

***Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.***

The Company's business will involve a high degree of financial risk. Markets in which the Company and its subsidiaries are anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that Investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

Real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without reviewing detailed budgets, such budgets may understate the expenses.

***The Company is subject to a number of risks in the enforcement of its rights relating to investments.***

The Company's real estate investments will typically involve preferred equity investments in Project Entities, secured by a deed of trust in the underlying real property when possible and a pledge of the project partner's membership interest in the Project Entity. The Company also has the authority to issue or purchase debt collateralized by real property and to make unsecured loans to or preferred equity investments in Affiliate companies. These investments are subject to the following risks:

- The Company's investment structure is unique. Although the Company generally requires a Project Entity to grant a deed of trust in the underlying real property owned by the Project Entity to secure the Company's investment and return, and requires the project partners to pledge their equity interest in the Project Entity to the Company, there can be no assurance that such interests will be enforceable or that, in the event of non-performance by the project partner or a default by the Project Entity, that the real estate will be readily transferred to the Company or that the Company can obtain control of the Project Entity.

There is a risk that project partners or other third parties may oppose or contest the enforceability or priority of such security.

- During the course of an investment, or in the event the Company exercises its contractual remedies upon non-performance by the project partner or a default by the Project Entity, there is a risk that a project partner or other third party oppose or contest the enforceability of the Company's investment documentation, or assert claims or defenses against the Company or the Manager, including claims relating to the Company's ability to remove the project partner and take over management of a project. Such claims and potential litigation may result in the Company incurring substantial legal fees, and adversely affect the Manager's ability to mitigate losses resulting from a project partner's failure to perform.

- There is no assurance that the Company will subsequently acquire title to the collateral property. The project partner may cure defaults or arrange for the Company's investment to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third-party may be prepared to outbid the Company to purchase the collateral property.

- A debtor or project partner may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent debtors. These protections are at the expense of the Company, and may result in staying the Company's foreclosure proceedings, proceedings against the project partner, restructuring of the terms of the Company's investment, or otherwise delaying or interfering with the enforcement of the Company's rights under its investment documentation.

*Uninsured losses on the investments could materially reduce investment returns, which may impact the ability to return principal balances under the Note.*

The project partner will obtain insurance policies for the projects that are commercially prudent given the local market and circumstances of the project (typically, including liability, fire and extended coverage). However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the projects should be partially or totally destroyed, the Company, as an investor in the Project Entity, may suffer a substantial loss of capital as well as profits. Even if the project partner's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Project Entity will sustain a substantial uninsured loss as a result of the casualty.

*Proceeds from Investments will be re-invested during the life of the Company.*

The Manager has the discretion to retain all or a portion of the proceeds from investments to make new investments, and intends to do so over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

*The Manager's conflicts of interest may result in transactions unfavorable to the Company.*

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Company or the Project Entities, provided the terms are commercially reasonable. The Company may make loans to or preferred equity investments in Affiliates of the Manager on terms determined by the Manager. These measures may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. In addition, before the Company invests all of its capital, the Manager will be subject to

potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between investment opportunities that may meet the investment criteria of Affiliates of the Company or of the Manager.

*Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Notes.*

The Manager has not arranged for Investors to be separately represented by independent counsel. The legal counsel who has performed services for the Company has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

The Notes may be issued with original issue discount (or "OID") for U.S. federal income tax purposes. As such, if you are a U.S. Holder (as defined herein), you may be required to include OID (taxable as ordinary income) in taxable income each year in excess of the amount of interest payments actually received by you in that year.

*You will not be investing in a fund vehicle. The prior performance data presented should provide you relevant information regarding fund entities overseen by the Company, but should not be construed as an indication of the likely financial performance of the Company.*

By investing in the Company, you will not be a creditor to the Affiliates of the Company nor in any of the prior investments sponsored by its Affiliates. The Company has provided selected information regarding its prior investments because it felt investors might consider those investments to be relevant in assessing the experience and judgment of the Manager or the Company's management team. Investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique and the Company may not be able to replicate the success of prior Affiliated investments, even if the investments assembled for the Company's portfolio are similar to those obtained for prior investments.

*Our business prospects are difficult to predict because we have a limited operating history.*

The Company is a relatively newly organized entity and does not have an extensive operating history upon which investors may base an evaluation of its likely performance. The Company's results will depend upon the availability of suitable investment opportunities for the Company and the performance of the Company's investments. The Company's proposed operations are subject to all business risks associated with relatively new enterprises. The likelihood of the Company's success must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with the expansion of a business, operation in a competitive industry, and the continued development of advertising, promotions and a corresponding customer base. There is a possibility that the Company could sustain losses in the future.

There can be no assurance that the Company's efforts will result in successful commercialization or further development of the Company' operations, that the Company's marketing efforts will be successful, or that the Company will ever achieve significant (or any) revenue. If the Company fails to achieve its goals, the Company may run out of money to run its operation and as such, the Company would need to raise additional working capital. Failure to do so could result in Noteholders losing part or all of their money invested.

*Noteholders must rely on the Manager to acquire appropriate investment for the Company.*

The Company is conducting the Offering as a "blind pool," meaning that the Company is proceeding to raise funds through the sale of the Notes, without having specifically identified any investments. When you subscribe for Notes, that subscription is binding, and you will not have the right to revoke that subscription even if you do not approve of the investments that the Company subsequently identifies. Prospective investors should not invest in the Company unless they are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

### Competition with third parties in our contemplated industry is intense, which could reduce our profitability and our ability to pay interest or raise additional funds.

It is possible that over time we may compete with other entities seeking to undertake similar activities to those that we do. These same potential competitors may have significantly greater capital resources, research and development, manufacturing, testing, regulatory compliance, and marketing capabilities. Competitive products and services may render any services, products or product candidates that we may acquire or develop uneconomic or obsolete. We cannot assure investors that we will be able to invest in or develop resources that are required to successfully compete with these competitors .

### Negative publicity could adversely affect our business and operating results.

Negative publicity about our industry or the Company or its Affiliates, even if inaccurate, could adversely affect our reputation and the confidence in our operations, which could harm our business and operating results. Harm to our reputation can arise from many sources, including employee misconduct, misconduct by our partners, outsourced service providers or other counterparties, failure by us or our partners to meet minimum standards of service and quality, compliance failures and claims and any such sources related to our affiliate entities.

### Rapid growth may strain our resources.

We expect to experience significant and rapid growth in the scope and complexity of our business, which may place a significant strain on our management team and our financial and other resources. Such growth, if experienced, may expose us to greater costs and other risks associated with growth and expansion. Although the Company does not expect to have employees, the Company is dependent upon our parent company, iCap Enterprises, Inc., to hire employees who provide services to the Company, and we may be required to hire employees, including other support personnel, among others, in order to successfully advance our operations. We, and our parent company, may be unsuccessful in these efforts or may be unable to project accurately the rate or timing of these increases.

This growth may place a strain on our management and operational resources. The failure to develop and implement effective systems or the failure to manage growth effectively could have a materially adverse effect on our business, financial condition, and results of operations. In addition, difficulties in effectively managing the budgeting, forecasting, and other process control issues presented by such a rapid expansion could harm our business, financial condition, and results of operations.

### The Manager's conflicts of interest may result in transactions unfavorable to the Company.

The Manager and its affiliates may provide certain services to, and enter into transactions with, the Company, its holding companies, any Affiliate of the Manager, or the Project Entities, provided that the terms are commercially reasonable. This limitation may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its affiliates. In addition, the Manager will be subject to potential conflicts

of interest when choosing between investment opportunities for affiliated entities that may generate different fees for the Manager.

**The Manager may retain and reinvest all or a portion of the revenue generated by, or proceeds of a sale of, an investment.**

The Manager has the discretion to sell the investments or related properties the Company acquires and to use the cash proceeds from such sale (or cash proceeds from rental income) to, among other things, satisfy its obligations under the Notes, whether or not then due and payable, or other Company obligations, or to enter into new investments. The Manager intends to make new investments over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

**Without obtaining advice from their personal advisors, potential investors may not be aware of the legal, tax or economic consequences of an investment in the Notes.**

The Manager has not arranged for potential investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Company has not acted as if it had been retained by the potential investors. Potential investors should not construe the contents of this Memorandum or any prior or subsequent communication from the Manager, its affiliates or any professional associated with this Offering, as legal or tax advice. Potential investors should consult their own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability.

**Prior performance data presented provides relevant information regarding affiliates of the Manager, it should not be construed as an indication of the likely financial performance of the Company.**

Potential investors should not consider the prior performance of any investments by the Company or the Manager or their respective affiliates to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments have performed. Each investment opportunity is unique, and the Company may not be able to replicate the success of prior investments, even if the investments assembled for the Company's portfolio are similar to those obtained for the prior funds.

**Various factors could negatively impact the profitability of the Company's investments**

The Company may obtain insurance policies for the investments that are commercially prudent given the local market and circumstances of the investments. However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the investments should be partially or totally destroyed, the Company may suffer a substantial loss of capital as well as profits. Even if the Company's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Company will sustain a substantial uninsured loss as a result of a fire or other casualty.

Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making a investment, the Company may undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation could include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the investment's site had environmental

contamination not detected prior to the Company's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Company undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Company may incur environmental clean-up costs or be subject to liability exposure that may reduce the net profits of the Company.

Under the Americans With Disabilities Act of 1990 ("ADA"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing properties to allow disabled persons to access such facilities. Most of the properties the Company considers will likely be in compliance with the present access requirements. If, however, the properties the Company acquires are not in compliance with the ADA, the Company will be required to make modifications to the properties to bring them into compliance or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

The real estate industry in general, and the multifamily, residential, and commercial sectors, in particular, are highly competitive, and the Company will be competing with numerous other entities, some having substantially greater financial resources and experience than the Company, in seeking attractive investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available investments or resulting in other less favorable terms to the purchasers.

The investment returns available from investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, prolonged timing of permit issuance by cities and counties, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers' decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could have a material adverse impact on the Company's results of operations or financial condition. In addition, real estate investments are difficult to sell quickly and the Company may not be able to adjust the Company's portfolio of owned properties quickly in response to economic or other conditions in order to meet Note obligations. If the Company's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Company's income will be adversely affected.

### Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

### Real estate development projects are subject to numerous risks outside the Company's control such as delays in permitting and other governmental approvals, increased costs, and labor shortages.

Any properties in which the Company invests relating to real estate development or construction are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development and construction projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, and thus lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability,

delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. The Company may enter into contracts to purchase properties before they are finished, and the foregoing risks could adversely impact the purchase prices, valuations, or closings dates of those properties. Although the Manager will not undertake such transactions without reviewing detailed budgets, such budgets may understate the expenses.

### The Company's investments will be illiquid.

The Company expects its investments to be illiquid. Accordingly, the timing of its returns on those investments will be dependent upon various market factors. If the underlying assets in those investments are held for long periods or if any income streams of the Company are delayed or reduced, the Investors will be compelled to wait until the underlying assets are sold or improved, before being in a position to liquidate their investments. The Manager expects most of its real estate investments to have an investment time frame of 2 years or less. However, the Company may have little or no control over when the underlying properties are liquidated.

### There may be unanticipated obstacles to execution of our business plan.

Our proposed plan of operation and prospects will depend largely upon our ability to successfully establish the Company's presence in a timely fashion, retain and continue to hire skilled management, technical, marketing, and other personnel through our parent company, and attract and retain significant numbers of quality business partners and corporate clients. There can be no assurance that we will be able to successfully implement our business plan or develop or maintain future business relationships, or that unanticipated expenses, problems or technical difficulties which would result in material delays in implementation will not occur.

### The volatile credit and capital markets could have a material adverse effect on our financial condition.

Our ability to manage our future debt and liquidity will be dependent on our level of positive cash flow. An economic downturn may negatively impact our cash flows. Credit and capital markets can be volatile, which could make it more difficult for us to refinance our debt or to obtain additional debt or equity financings in the future. Such constraints could increase our costs of borrowing and could restrict our access to other potential sources of future liquidity. Our failure to have sufficient liquidity to make interest and other payments required by our debt or our Notes could result in a default of such debt or the Notes and acceleration of our borrowings, which would have a material adverse effect on our business and financial condition.

### An economic downturn could materially affect us in the future.

The recession from late 2007 to mid-2009 reduced consumer confidence to historic lows, impacting the public's ability and desire to spend discretionary dollars as a result of job losses, home foreclosures, significantly reduced home values, investment losses, bankruptcies and reduced access to credit, resulting in lower levels of customer traffic. If the economy experiences another significant decline, our business and results of operations could be materially adversely affected.

### Information technology system failures or breaches of our network security could interrupt our operations and adversely affect our business.

We rely on our computer systems and network infrastructure to facilitate our operations. Our operations depend upon our ability to protect our computer equipment and systems against damage from physical theft, fire, power loss, telecommunications failure or other catastrophic events, as well as from internal and external security breaches, viruses and other disruptive problems. Any damage or failure of

our computer systems or network infrastructure that causes an interruption in our operations could have a material adverse effect on our business and subject us to litigation or to actions by regulatory authorities.

***The failure to enforce and maintain our trademarks and protect our other intellectual property could materially adversely affect our business, including our ability to establish and maintain brand awareness.***

The success of our business strategy depends on our continued ability to obtain and use trademarks and service marks in order to increase brand awareness and develop our branded products. If our efforts to protect our intellectual property are not adequate, or if any third-party misappropriates or infringes on our intellectual property, whether in print, on the Internet or through other media, the value of our brands may be harmed, which could have a material adverse effect on our business, including the failure of our brands and branded products to achieve and maintain market acceptance. There can be no assurance that all of the steps we have taken to protect our intellectual property in the United States and in foreign countries will be adequate. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent, as do the laws of the United States.

***Third-party claims with respect to intellectual property assets, if decided against us, may result in competing uses or require adoption of new, non-infringing intellectual property, which may in turn adversely affect sales and revenues.***

There can be no assurance that third parties will not assert infringement or misappropriation claims against us, or assert claims that our rights in our trademarks, service marks, trade dress and other intellectual property assets are invalid or unenforceable. Any such claims could have a material adverse effect on us if such claims were to be decided against us. If our rights in any intellectual property were invalidated or deemed unenforceable, it could permit competing uses of intellectual property, which, in turn, could lead to a decline in our results of operations. If the intellectual property became subject to third-party infringement, misappropriation or other claims, and such claims were decided against us, we may be forced to pay damages, be required to develop or adopt non-infringing intellectual property or be obligated to acquire a license to the intellectual property that is the subject of the asserted claim. There could be significant expenses associated with the defense of any infringement, misappropriation, or other third-party claims.

***We depend on certain officers of the Manager, the loss of whom could materially harm our business.***

We rely upon the accumulated knowledge, skills and experience of the officers and personnel of our Manager and its affiliates. If they were to leave the Manager or become incapacitated, we might suffer in our planning and execution of business strategy and operations, impacting our brand and financial results. We also are not required to maintain any key man life insurance policies for any such persons.

***We are exposed to the risk of natural disasters, unusual weather conditions, pandemic outbreaks, political events, war and terrorism that could disrupt business and result in lower sales, increased operating costs and capital expenditures.***

Our headquarters and company-operated locations, as well as certain of our vendors and customers, are located in areas which have been and could be subject to natural disasters such as floods, hurricanes, tornadoes, fires or earthquakes. Adverse weather conditions or other extreme changes in the weather, including resulting electrical and technological failures, may disrupt our business and may adversely affect our ability to continue our operations. These events also could have indirect consequences such as increases in the costs of insurance if they result in significant loss of property or other insurable damage. Any of these factors, or any combination thereof, could adversely affect our operations.

*Members of our Manager will have other business interests and obligations to other entities.*

None of the members and officers of the Manager will be required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company, provided that such activities do not otherwise breach their agreements with the Company. We are dependent on these persons to successfully operate the Company. Their other business interests and activities could divert time and attention from operating the Company.

*We expect that the Covid-19/Coronavirus pandemic will materially impact our ability to move forward with our intended operations.*

Of all the markets that have been impacted by the Coronavirus pandemic, the markets and industries in which the Company expects to operate have been some of the worst hit. As a result, our ability to source and close such investments will be materially impacted and we have no way of knowing when these abilities will be returned to pre-pandemic levels.

*Declining economic conditions could negatively impact our business*.

Our operations are affected by local, national and worldwide economic conditions. Markets in the United States and elsewhere have been experiencing extreme volatility and disruption since the commencement of the Coronavirus pandemic and the consequences of a potential or prolonged recession may include a lower level of economic activity and uncertainty regarding real estate pricing. While the ultimate outcome and impact of the current economic conditions cannot be predicted, a lower level of economic activity might result in a decline in consumer spending and resulting instability in the financial markets, as a result of recession or otherwise, and also may affect the cost of capital and our ability to raise capital and conduct our operations.

*Our operations overall will be impaired by the Coronavirus pandemic.*

The Coronavirus pandemic is expected to cause continued interruptions to, and negative effects on, our business overall. While we are attempting to manage the negative effects of the pandemic, and we currently expect that the Company will be able to ultimately weather the effects of the pandemic, there can be no assurance as to the overall effect on our business.

**Risks Related to this Offering and the Notes**

*The Company may prepay the principal and interest on the Notes at any time.*

The Company may prepay the principal amount and accrued interest of the Notes, in whole or in part, at any time. The Company may also choose to pay off some of the investor Notes while waiting to pay off the Notes of other investors. No prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Investors will not have certainty as to how long their respective Notes may be outstanding.

*There is no minimum Offering size required to be raised by the Company in order to conduct a closing, and the Company may not receive or accept sufficient subscriptions to undertake its business.*

This Offering is not subject to any minimum amount required to be subscribed for by investors in order for the Notes to be sold to any investors or for the Company to access or receive and use such funds. Therefore there is no assurance that the Company will raise sufficient funds to commence or continue operations. If the Company is not able to raise sufficient funds to commence operations and undertake its business plan, investors may lose all of their investment.

*This private placement of Notes is being made in reliance on an exemption from registration*

*requirements, and there is no guarantee that it will comply with the regulatory requirements for such exemption.*

This private placement of Notes will not be registered with the SEC. The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

*If investors successfully seek rescission, we would face severe financial demands that we may not be able to meet.*

We represent that this Memorandum and its exhibits do not contain any untrue statements of material fact or omit to state any material fact necessary to make the statements made, in light of all the circumstances under which they are made, not misleading. However, if this representation is inaccurate with respect to a material fact, if this Offering fails to qualify for exemption from registration under the federal securities laws, or if we fail to register the Notes or find an exemption under the securities laws of each state in which we offer the Notes, each investor may have the right to rescind his, her or its purchase of the Notes and to receive back from the Company his, her or its purchase price. Such investors, however, may be unable to collect on any judgment, and the cost of obtaining such judgment may outweigh the benefits. If investors successfully seek rescission, we would face severe financial demands and may not be able to meet our capital needs, which may adversely affect any non-rescinding investors.

*We may invest or spend the proceeds of this Offering in ways with which you may not agree or in ways which may not yield a return.*

While we have provided guidance on priorities for the use of proceeds, the timing and amount of sales will impact our actual use of proceeds within the uses identified. Our management will have broad discretion in determining how the proceeds of the Offering will be used in each of the identified use categories.

We currently intend to use the proceeds we receive from this Offering after deducting estimated fees and expenses associated with this private placement, including legal, accounting, transfer agent, financial, acquisitions and other professional fees, primarily for the purposes as described above. Our management will have considerable discretion in the application of the net proceeds, and you will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. Investors in this Offering will need to rely upon the judgment of our management with respect to the use of proceeds. If we do not use the net proceeds that we receive in this Offering effectively, our business, financial condition, results of operations and prospects could be harmed, and the market price or value of the Notes could decline as well as the Company's ability to repay the Notes when due.

*This is a private offering, and as such investors will not have the benefit of review of this Memorandum by the SEC or any other agency.*

Since this Offering is a private placement of securities and, as such, is not registered under federal or state securities laws, potential investors will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

*There is no assurance that the Company will be profitable, and there is no assurance of any*

*returns.*

There is no assurance as to whether the Company will be profitable, or earn revenues, or whether the Company will be able to meet its operating expenses. The initial expenses the Company incurs could result in operating losses for the Company for the foreseeable future. No assurance can be made that a subscriber for the Notes offered hereby will not lose his or her entire investment.

### *The Company is obligated to pay certain fees and expenses.*

The Company will pay various fees and expenses related to its ongoing operations regardless of whether or not the Company's activities are profitable. These fees and expenses will require dependence on third-party relationships. The Company is generally dependent on relationships with its strategic partners and vendors, and the Company may enter into similar agreements with future potential strategic partners and alliances. The Company must be successful in securing and maintaining its third-party relationships to be successful. There can be no assurance that such third parties may regard their relationship with the Company as important to their own business and operations, that they will not reassess their commitment to the business at any time in the future, or that they will not develop their own competitive services or products, either during their relationship with the Company or after their relations with the Company expire. Accordingly, there can be no assurance that the Company' existing relationships or future relationships will result in sustained business partnerships, successful service offerings, or significant revenues for the Company.

### *Prospective investors must undertake their own due diligence*.

This Memorandum and its exhibits include limited information regarding the Company, our current and future business and operations, our management and our financial condition. While we believe the information contained in this Memorandum is accurate, such document is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective Investor that the abbreviated nature of this Memorandum will not omit to state a material fact which a prospective Investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such Investor. As a result, prospective Investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **This investment is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

### *The limited marketability of the Notes may adversely affect your ability to transfer and pledge the Notes.*

Noteholders must represent that they are purchasing the Notes for their own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, or encumber your Note(s) unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute unlawful trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Internal Revenue Code of 1986, as amended (the "Code") or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans.

### *The Notes constitute restricted securities and are subject to limited transferability.*

The Notes should be considered a long-term, illiquid investment. The Notes have not been registered under the Securities Act, and cannot be sold without registration under the Securities Act or any exemption from registration. In addition, the Notes are not registered under any state securities laws that would permit their transfer. Because of these restrictions and the absence of an active trading market for our securities, a Noteholder will likely be unable to liquidate an investment even though other personal

financial circumstances would dictate such liquidation.

**There is no public trading market for our Notes.**

There is no established public trading market for the Notes and there can be no assurance that one will ever develop. Market liquidity will depend on the perception of our operating business and any steps that our management might take to bring us to the awareness of investors. There can be no assurance given that there will be any awareness generated. Consequently, investors may not be able to liquidate their investment or liquidate it at a price that reflects the value of the Notes. As a result, Investors may not find purchasers for their Notes. Only accredited investors with no need for immediate short-term liquidity should purchase the Notes.

**The market value of the Notes may decrease due to factors beyond our control.**

Broad market fluctuations may adversely affect the market value of our Notes. The market value of our Notes may also fluctuate significantly in response to the following factors, most of which are beyond our control:

- variations in our quarterly operating results,
- changes in general economic conditions,
- changes in market valuations of similar companies issuing similar investment products,
- announcements by us or our competitors of significant acquisitions, strategic partnerships or joint ventures, or capital commitments,
- poor reviews;
- loss of a major customer, partner or joint venture participant; and
- the addition or loss of key managerial and collaborative personnel.

Any such fluctuations may adversely affect the market value of our Notes, regardless of our actual operating performance. As a result, Noteholders may be unable to sell their Notes (even if permitted by applicable securities laws and the terms of the Notes), or may be forced to sell them at a loss.

**The characteristics of the Notes, including maturity, interest rate, lack of adequate guarantee, and lack of liquidity, may not satisfy your investment objectives.**

The Notes may not be a suitable investment for you, and we advise you to consult your investment, tax and other professional financial advisors prior to purchasing Notes. The characteristics of the Notes, including maturity, interest rate, lack of adequate guarantee and lack of liquidity may not satisfy your investment objectives. The Notes may not be a suitable investment for you based on your ability to withstand a loss of interest or principal or other aspects of your financial situation, including your income, net worth, financial needs, investment risk profile, return objectives, investment experience and other factors. Prior to purchasing any Notes, you should consider your investment allocation with respect to the amount of your contemplated investment in the Notes in relation to your other investment holdings and the diversity of those holdings.

**The Notes will be effectively subordinated to any of our debt that is secured and subordinated to our existing and future unsecured debts.**

The Notes will be junior to any of our secured debt obligations, to the extent of the value of any assets securing such debt. The effect of this subordination is that if we are involved in a bankruptcy, liquidation, dissolution, reorganization or similar proceeding, or upon a default in payment on, or the acceleration of, any of our secured debt, if any, our assets will be available to pay obligations on the Notes only after all debt under our secured debt, if any, has been paid in full from those assets. As of the date of this Memorandum, we had no secured indebtedness outstanding. In such circumstances, Holders of the Notes will participate in any remaining assets ratably with all of our other unsubordinated creditors,

including trade creditors. We may not have sufficient assets remaining to pay amounts due on any or all of the Notes then outstanding.

**The Company may sell promissory notes that have earlier maturity dates or higher interest rates or payoff premiums than those applicable to the Notes.**

The Company may sell promissory notes that have earlier maturity dates or higher interest rates or payoff premiums than those applicable to the Notes. In such event the Company would be obligated to pay such higher rates of return, and the security of the noteholders in this Offering would therefore be negatively impacted as the Company will have greater payment obligations from the same pool of assets as compared to the situation where all promissory notes had equal interest rates.

**Because the Notes will have no sinking fund, insurance, or guarantee, you could lose all or a part of your investment if we do not have enough cash to pay.**

There is no sinking fund, insurance or guarantee of our obligation to make payments on the Notes. We will not contribute funds to a separate account, commonly known as a sinking fund, to make interest or principal payments on the Notes. The Notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation, or any other governmental or private fund or entity. Therefore, if you invest in the Notes, you will have to rely only on our cash flow from operations and other sources of funds for repayment of principal at maturity and for payment of interest when due. Any future cash flows from operations could be impaired under the circumstances described herein. If our cash flow from operations and other sources of funds are not sufficient to pay any amounts owed under the Notes, then you may lose all or part of your investment.

**We do not expect that the Notes will be rated, but if they are, ratings of the Notes may change and affect the market price and marketability of the Notes.**

We do not currently expect that, upon issuance, the Notes will be rated by any rating agencies. If they are, such ratings are limited in scope, and do not address all material risks relating to an investment in the Notes, but rather reflect only the view of each rating agency at the time the rating is issued. There is no assurance that such credit ratings will be issued or remain in effect for any given period of time or that such ratings will not be lowered, suspended or withdrawn entirely by the rating agencies. It is also possible that such ratings may be lowered in connection with future events, such as future acquisitions. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market price or marketability of the Notes. In addition, any decline in the ratings of the Notes may make it more difficult for us to raise capital on acceptable terms.

**Because we may pay off the Notes at any time prior to their maturity, you may be subject to reinvestment risk.**

We have the right to pay off any Note at any time prior to its stated maturity. The Notes would be paid off at 100% of the principal amount plus accrued but unpaid interest, including the payoff premium, up to but not including the date of pay off. Any such pay off may have the effect of reducing the income or return on investment that any investor may receive on an investment in the Notes by reducing the term of the investment. If this occurs, you may not be able to reinvest the proceeds at an interest rate comparable to the rate paid on the Notes.

**The Note contains "deemed consent" provisions.**

The Note contains "deemed consent" provisions which provide that the Company does not actually have to obtain written confirmation from the Investor as to any approval or consent related to, or amendment of or waiver related to, the applicable agreement or document. The Company is required to send the Investor

a notice of the requested consent or approval, or the requested amendment or waiver, and if the Investor does not respond within 10 days, then to send a second notice. If the Investor does not respond within an additional 10 days the Investor will be deemed to have consented, in writing, to the requested approval, consent, amendment of or waiver.

### *We have not retained independent professionals for investors.*

We have not retained any independent professionals to comment on or otherwise protect the interests of potential investors. Although we have retained our own counsel, neither such counsel nor any other independent professionals have made any examination of any factual matters herein, and potential investors should not rely on our counsel regarding any matters herein described.

### *We have no firm commitments to purchase any Notes.*

We have no firm commitment for the purchase of any Notes. The Company may be unable to identify investors to purchase the Notes and as a result may have inadequate capital to support its ongoing business obligations.

## Tax Risks

### *You are urged to consider the United States federal and State tax consequences of owning the Notes.*

This Memorandum does not address material federal or state tax considerations relating to an investment in the Notes. Investors are urged to consult their own tax advisors on these matters prior to investing.

### *Interest on Notes Could be Characterized as Unrelated Business Taxable Income.*

We intend to take the position that the Notes should be classified as debt instruments for U.S. federal income tax purposes and the stated interest should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("UBTI") with respect to tax exempt Noteholders. However, there is no assurance that the IRS will agree with this position and it is possible that the Notes may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Notes may be characterized as UBTI with respect to tax exempt Noteholders.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

This Memorandum does not address all tax considerations that may be relevant to you. You are urged to consult your own tax advisors as to the specific tax consequences of purchasing, owning and disposing of any Notes, including any federal, state or local tax consideration.

**WE URGE YOU TO CONSULT AND RELY UPON YOUR OWN TAX ADVISOR WITH RESPECT TO YOUR OWN TAX SITUATION, POTENTIAL CHANGES IN APPLICABLE LAWS AND REGULATIONS AND THE FEDERAL AND STATE CONSEQUENCES ARISING FROM AN INVESTMENT IN THE NOTES. THE COST OF THE CONSULTATION COULD, DEPENDING ON THE AMOUNT CHARGED TO YOU, DECREASE ANY RETURN ANTICIPATED ON YOUR INVESTMENT. NOTHING IN THIS MEMORANDUM IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY SPECIFIC INVESTOR, AS INDIVIDUAL CIRCUMSTANCES MAY VARY. YOU SHOULD BE AWARE THAT THE INTERNAL REVENUE SERVICE MAY NOT AGREE WITH ALL TAX POSITIONS TAKEN BY US AND THAT LEGISLATIVE, ADMINISTRATIVE OR COURT DECISIONS MAY REDUCE OR ELIMINATE ANY ANTICIPATED TAX BENEFITS OF AN INVESTMENT IN THE NOTES.**

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Notes.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Notes, that purchased Notes at their original issue price for cash, and that hold such Notes as capital assets within the meaning of Section 1221 of the Code. This discussion does not necessarily apply to Investors in the Notes who are Non-U.S. Persons.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Notes by certain investors that are subject to special rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Notes in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Notes, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Notes, including the applicability of any U.S. federal tax laws or any state, local or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

*Considerations Relating to U.S. Holders of the Notes*

As used herein, the term "U.S. Holder" means a beneficial owner of a Note that is, for U.S. federal income tax purposes:

- An individual citizen or resident of the U.S.;

- A corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- An estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- A trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Notes that is a partnership and the partners in such a partnership should consult their tax advisors.

*Classification of the Notes*

Pursuant to the terms of the Notes, the Company and each holder of Notes will agree to treat the Notes, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Company's determination that the Notes constitute debt for U.S. federal income tax purposes. If any portion of the Notes is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Note could differ from the timing and character of income, gain or loss recognized in respect of the Notes described below. The remainder of this discussion assumes that the Notes will be treated as indebtedness in accordance with that agreement and our determination.

*Interest Income and Original Issue Discount*

Payments of "qualified stated interest" (as defined below) on a Note will be taxable to a U.S. Holder as ordinary income at the time that such payments are accrued or are received (in accordance with the U.S. Holder's method of tax accounting).

It is anticipated that the Notes may be issued at a discount from their stated price at maturity. As such, it is anticipated that the Holders of the Notes may be required to report original issue discount ("OID") over the term of the Notes. U.S. Holders of the Notes should be aware that, as described in greater detail below, they generally must include OID in ordinary gross income for U.S. federal income tax purposes as it accrues, in advance of the receipt of cash attributable to that income.

In general, each U.S. Holder of the Notes, whether such U.S. Holder uses the cash or the accrual method of tax accounting, will be required to include in ordinary gross income the sum of the "daily portions" of OID on the Notes for all days during the taxable year that the U.S. Holder owns the debt security. The daily portions of OID on the Notes are determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of an OID debt security, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. In the case of an initial holder, the amount of OID on a Note allocable to each accrual period is determined by (a) multiplying the "adjusted issue price" (as defined below) of the Note at the beginning of the accrual period by the yield to maturity of the Note (appropriately adjusted to reflect the length of the accrual period) and (b) subtracting from that product the amount (if any) of qualified stated interest (as defined below) allocable to that accrual period. The yield to maturity of a Note is the discount rate that causes the present value of all payments on the Note as of its original issue date to equal the issue price of such Note. The "adjusted issue price" of a Note at the beginning of any accrual period generally will be the sum of its issue price and the amount of OID allocable to all prior accrual periods, reduced by the amount of all payments other than payments of qualified stated interest (if any) made with respect to such Note in all prior accrual periods. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of a Note at a single fixed rate of interest or, subject to certain conditions, based on one or more interest indices.

*Sale, Retirement or Disposition of Notes*

Upon the sale, retirement or other disposition of a Note, an Investor generally will recognize taxable gain or loss equal to the difference between the amount realized on the disposition and the Investor's adjusted tax basis in the Note. A U.S. Holder's adjusted tax basis in a Note generally will be equal to its issue price in the Note. Gain recognized on the disposition of a Note generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Note generally will be treated as an

ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Note is more than one year). The deductibility of capital losses is subject to limitations.

*Backup Withholding and Information Reporting*

Information reporting requirements generally will apply to payments of interest made by the Company on, or the proceeds of the sale or other disposition prior to maturity of, the Notes. Backup withholding tax, currently at a rate of 28%, may apply to such payments if an Investor fails to:

- Furnish his, her or its taxpayer identification number (social security or employer identification number);

- Certify that such number is correct;

- Certify that he, she or it is not subject to backup withholding; or

- Otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, provided that the required information is furnished timely to the Internal Revenue Service.

## ERISA MATTERS

The Notes offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or an individual retirement account ("IRA") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "Similar Law").

A fiduciary of an employee benefit plan must determine that the purchase and holding of a Note is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Notes offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Note offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Note that its acquisition and holding of the Note does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

## REPORTS TO THE INVESTORS

The Company has adopted a calendar fiscal year ending December 31. For so long as a Holder continues to hold the Note, the Company will provide to the Holder annual financial statements of the Company and such information relative to the Company's business operations and performance as its management may deem useful or appropriate.

**EXHIBIT A-1**

**SUBSCRIPTION AGREEMENT FOR ACCREDITED INVESTORS**

**(Attached)**

---

*This Subscription Agreement should be used only by investors who are investing on the basis of being an "Accredited Investor" (as defined below).*

*Investors who are investing on the basis of being a "Non-U.S. Person" should complete the Subscription Agreement attached to the Memorandum (as defined below) as Exhibit A-2.*

---



**iCap Equity, LLC**

---

---

## PART I:  <u>Investor Information</u>

(a) **Investor Name**: _____
(hereinafter referred to as "***Investor***").

(b) **Investment Amount**:  Investor agrees to invest the below amount ("Investment Amount") in accordance with the provisions of this Subscription Agreement:

| |
|---|
| $_____ |

(c) **Type of Investor.**  Indicate the form of Investor:

| **Individual Investors** | **Entity Investors** |
|---|---|
| ☐  Individual | ☐  Corporation or Limited Liability Company (LLC) |
| ☐  Husband and Wife | ☐  Partnership |
| ☐  Joint Tenants | ☐  Irrevocable Trust |
| ☐  Revocable Trust | ☐  Other Entities (indicate form of organization): |
| Please complete pages 2, 5, 6, 7, 15, 16, 17, 22 | Please complete pages 4-8, 15, 16, 17, 22 |
| **Individual Investors - Retirement Funds** | |
| ☐  IRA | |
| ☐  ROTH IRA | |
| ☐  Keogh-SEP IRA | |
| ☐  Other Retirement Plan | |
| Please complete pages 2, 3, 5, 6, 7, 15, 16, 17, 22 | |

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 627 of 1366                                            Exhibit 6, Page 627

# INDIVIDUAL INVESTORS

## JOINT ACCOUNTS, REVOCABLE TRUSTS & RETIREMENT FUNDS

Investor Name (Please Print): (1) _____

Investor Name (Please Print): (2) _____

Registered As (Please Print): _____

Physical Address (no PO Box) _____

_____

Mailing Address (if Different) _____

_____

Phone Number: (_____) _____-_____

Birth Date (1): _____

Birth Date (2): _____

Social Security Number (1) : _____

Social Security Number (2) : _____

Primary Email Address (required): _____

Status, if individual(s):

☐ U.S. Citizen (1)   ☐ U.S. Resident Alien   ☐ U.S. Citizen Residing Outside of U.S.

☐ U.S. Citizen (2)   ☐ U.S. Resident Alien   ☐ U.S. Citizen Residing Outside of U.S.

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 6, Page 628   Pg 2 of 1366

## Individual Investors

## For Retirement Funds Only

**IF INVESTING THROUGH AN IRA, KEOGH OR OTHER RETIREMENT OR PROFIT SHARING PLAN, PLEASE COMPLETE THE FOLLOWING (IN ADDITION TO THE INVESTOR INFORMATION ON THE PREVIOUS PAGE):**

**Account Name**

**Custodian's EIN**

**Custodian's Address**

**City**          **State**          **Zip Code**

*Prospective Investors must fill out the Form W-9 attached hereto*

## CORPORATIONS, PARTNERSHIPS, IRREVOCABLE TRUSTS OR OTHER ENTITIES

Investor Entity Name (Please Print): _____

Registered As (Please Print): _____

_____

Name (Please Print): _____

Title: _____

Address: _____

_____

_____

Phone Number: (_____) _____-_____

Date of Formation: _____

State of Incorporation/Formation: _____

SSN or Taxpayer ID Number: _____

Primary Email Address (required): _____

If Investor is a Partnership, LLC, Irrevocable Trust or other Entity, initial the line below which correctly describes the application of the following statement to Investor's situation: *Investor was not organized or reorganized for the specific purpose of acquiring the Notes and has made investments prior to the date hereof, and each beneficial owner thereof has and will share in the investment in proportion to his or her ownership interest in Investor.*

☐ True

☐ False

┌─────────────────────────────┐
│ Initials: _____     │
│                             │
└─────────────────────────────┘

If the "False" Box is checked, each person participating in the entity will be required to fill out a subscription agreement.

***Prospective Investors must fill out the Form W-9 attached hereto***

## PART II: <u>Payment Information</u>

**A. Making Your Investment with the Company.** Please provide payment by one of the following methods (select one):

**Wire Transfer or ACH Transfer to**:

| | |
|---|---|
| Receiving Financial Institution: | Umpqua Bank |
| Receiving Financial Institution Address: | 705 NW Gilman Blvd. |
| | Issaquah, WA 98027 |
| ABA/Routing Number: | 123205054 |
| Account Number: | 9690211801 |
| Special Instructions: | iCap Equity, LLC FBO *Investor Name* |

☐ **Check made out to**:

iCap Equity, LLC
Attn: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

☐ **Vault account transfer**:

By checking this box you acknowledge and agree that (1) you currently have funds in a Vault account with iCap Vault 1, LLC (the "Vault"), an Affiliate of the Company, and (2) you do hereby direct the Company to provide notice to iCap Vault 1, LLC on your behalf to withdraw your investment in the Vault, in the amount set forth above, and to send those funds to the Company for the purchase of a Note.

**Regardless of whether paying by wire transfer, ACH, check or from an iCap Vault account, you must also deliver a fully completed and executed copy of this Subscription Agreement and a completed and executed signature page of the Note (as attached to the Memorandum (as defined below) as Exhibit B) to the Company EITHER:**

| **In Hard Copy to:** | **OR** | **Electronically** |
|---|---|---|
| iCap Equity, LLC | | Either through DocuSign or other means, and |
| Attn: Investor Relations | | emailed to investor@icapequity.com. If this |
| 3535 Factoria Blvd. SE, Suite 500 | | option is selected there is no need to mail hard |
| Bellevue, WA 98006 | | copies of the documents. |

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 63 Page 631
1366

**B. Where the Company Should Send Your Payments of Interest and Principal (Select One)**

    a.  <u>Direct Deposit to my Bank Account</u>

I hereby authorize **iCap Equity, LLC** ("the Company") to send any payments to me at the bank account(s) listed below. I further authorize the financial institution(s) named below to accept such payments and credit such account(s).

| Name of Financial Institution | Checking or Savings | Bank Routing Number | Bank Account Number |
|---|---|---|---|
| | | | |
| | | | |

For iCap to verify bank account and routing numbers, investors are encouraged to attach a **VOIDED CHECK** for each investor account to be credited. Investors should retain completed copies of this form for their records.

    b.  <u>Direct Deposit to my iCap Vault Account</u>[1].  No need to provide additional information for this option.  We can look you up in our records or help you set this up.

I understand that this authorization remains in effect until the Company receives from me, in writing, notification to terminate or change the authorization, provided such notification is delivered in such a time and manner as to afford the Company a reasonable time to act on it.

_____
Account Holder Signature                                              Date

_____
Account Holder Signature                                              Date

---

[1] iCap Vault is an affiliated program in which investors can invest cash into publicly registered demand notes.  An iCap Vault account can be linked to an investor's bank account so that an investor can withdraw funds at any time.  The details of the program can be found at www.icapequity.com/vault.  Many investors choose to send their interest payments to their iCap Vault account as a means of earning additional interest.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 632    Pg 631 of 1366

# PART III:  Investor Status

1. **Representation as to Investor Status.**  In order for the Company to sell the Note in conformance with state and federal securities laws, the following information must be obtained regarding Investor's investor status. Please **initial each item applicable** to you as an investor in the Company.

   **(a) Accredited Investor.**  Rule 501(a) of Regulation D defines an "accredited investor" as any person who comes within any of the following categories, or whom the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

   **(i)** _____ A natural person whose net worth, either individually or jointly with such person's spouse, at the time of Investor's purchase, exceeds $1,000,000.  The term "net worth" means the excess of total assets over total liabilities (including personal and real property but excluding the estimated fair market value of a person's primary home).

   **(ii)** _____ A natural person who had an individual income in excess of $200,000, or joint income with that person's spouse in excess of $300,000, in each of the two most recent years and reasonably expects to reach the same income level in the current year.

   **(iii)** _____ A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

   **(iv)** _____ A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

   **(v)** _____ An insurance company as defined in section 2(13) of the Exchange Act.

   **(vi)** _____ An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act.

   **(vii)** _____ A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

   **(viii)** _____ A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state, or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

   **(ix)** _____ An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

   **(x)** _____ A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

   **(xi)** _____ An organization described in Section 501(c)(3) of the Internal Revenue Code, or a

corporation, business trust or partnership, not formed for the specific purpose of acquiring the Shares, with total assets in excess of $5,000,000.

**(xii)** _____ A director or executive officer of the Company.

**(xiii)** _____ A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Shares, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of investing in the Company.

**(xiv)** _____ An entity in which all of the equity owners qualify under any of the above subparagraphs.

Attached to this Subscription Agreement as Annex 1 is an Accredited Status Certification Letter that Investor who is claiming to be an "accredited investor" under the definitions in Section 4(b)(i) or Section 4(b)(ii) above may provide to the Company to assist it in its determination of whether Investor meets the accredited investor requirements discussed above. An Investor who is claiming to be an "accredited investor" under the definitions in Section 4(b)(i) or Section 4(b)(ii) above should provide this form of Accredited Status Certification Letter to the applicable person (CPA, investment adviser, etc.) and ask them to complete it and return it to the Company. (In this Letter, you as the Investor are the "Client").

_____ Investor does not qualify under any of the investor categories set forth in Section 4(a)(i) through Section 4(a)(xiv).

# PART IV: Covenants and Provisions

**1. Subscription for the Purchase of a Note.**

The undersigned "Investor", on the terms and conditions herein set forth, hereby irrevocably submits this subscription agreement (the "Subscription Agreement") to iCap Equity, LLC, a Delaware limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise capital of up to $50,000,000 through the sale to Investor as an accredited investor of a Series 3 - Senior Promissory Note of the Company (the "Note").

The undersigned, intending to be legally bound, hereby subscribes for a Note in the aggregate principal amount as set forth on Page 1 hereto (the "Subscription Amount") and, in this regard, Investor agrees to forward payment in the amount of the Subscription Amount in accordance with the provision selected in **Part II, Section A**, above.

**Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution**.

The undersigned acknowledges that the Company is offering the Notes pursuant to the terms and provisions of the Offering documented in the Confidential Private Placement Memorandum dated July 1, 2020 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. The Company's private offering of Notes is being made to "accredited" investors within the meaning of Rule 506(c) of Regulation D promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"). By signing this Subscription Agreement, Investor acknowledges receipt of the Memorandum and its Exhibits, including the Note (collectively the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents. Furthermore Investor represents and warrants that all information entered in Parts I-IV of this document are correct and Investor agrees to be bound by all provisions of such sections of this Agreement.

The undersigned agrees to execute this Subscription Agreement and if by mail, send to the Company. You as an individual or on behalf of the subscribing entity are being asked to complete this Subscription Agreement so that a determination can be made as to whether or not you (it) are qualified to purchase the Note under applicable federal and state securities laws. Your answers to the questions contained herein must be true and correct in all respects, and a false representation by you may constitute a violation of law for which a claim for damages may be made against you. Your answers will be kept strictly confidential; however, by signing this Subscription Agreement, you will be authorizing the Company to present a completed copy of this Subscription Agreement to such parties as they may deem appropriate in order to make certain that the offer and sale of the securities will not result in a violation of the Securities Act or of the securities laws of any state. All questions must be answered. If the appropriate answer is "None" or "Not Applicable," please state so. Please print or type your answers to all questions and attach additional sheets if necessary to complete your answers to any item. Please initial any corrections.

2. **Offer to Purchase.** Investor hereby irrevocably offers to purchase the Note and tenders herewith the total Subscription Amount as set forth herein. Investor recognizes and agrees that (i) this subscription is irrevocable and, if Investor is a natural person, shall survive Investor's death, disability or other incapacity, and (ii) the Company has complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement. This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

3. **Effect of Acceptance.** Investor hereby acknowledges and agrees that on the Company's acceptance of this

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 635
1366

Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Investor. As a result, upon acceptance by the Company of this Subscription Agreement, Investor will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note (the Subscription Amount) as specified herein.

In determining individual "income," Investor should add to Investor's individual taxable adjusted gross income (exclusive of any spousal income) any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

4. **Additional Representations and Warranties of Investor.** Investor hereby represents and warrants to the Company as follows:

(a) Investor has been furnished the Memorandum and, if requested by the Investor, other documents. The Investor has carefully read the Memorandum and any such other requested documents. Investor has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Investor requested and deemed material to making an informed investment decision regarding its purchase of the Note. Investor has been afforded the opportunity to review such documents and materials and the information contained therein. Investor has been afforded the opportunity to ask questions of the Company and its management. Investor understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Investor understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Investor has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Investor shall modify, amend or affect such Investor's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Investor has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Investor has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

(b) Investor has read and understood, and is familiar with, this Subscription Agreement, the Note and the business and financial affairs of the Company.

(c) Investor, either personally, or together with its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum. The Investor and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Note. Investor's financial condition is such that Investor is able to bear the risk of holding the Note that Investor may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Investor's entire investment in

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:16    Exhibit 6, Page 636
1366

the Notes.

**(d)** Investor has investigated the acquisition of the Note to the extent Investor deemed necessary or desirable and the Company has provided Investor with any reasonable assistance Investor has requested in connection therewith.

**(e)** The Note is being acquired for Investor's own account for investment, with no intention by Investor to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Investor in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Investor has any interest in or any right to acquire the Note. Investor understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Investor.

**(f)** No representations or warranties have been made to Investor by the Company, or any representative of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

**(g)** Investor is aware that Investor's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Investor will not offer for sale, sell or otherwise transfer the Note without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

**(h)** Investor understands and agrees that the Note it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

**(i)** The Investor has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Investor understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

**(j)** Investor understands that the Note shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such certificates):

"NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT."

The Investor hereby acknowledges and agrees to the Company's making a notation on its records or giving instructions to any registrar and transfer agent of the Company in order to implement the restrictions on transfer set forth and described in this Subscription Agreement.

**(k)** Investor also acknowledges and agrees to the following:

**(i)** an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire

investment in the Notes; and

**(ii)** there is no assurance that a public market for the Notes will be available and that, as a result, Investor may not be able to liquidate Investor's investment in the Note should a need arise to do so.

**(l)** Investor is not dependent for liquidity on any of the amounts Investor is investing in the Note.

**(m)** Investor's address set forth below is his or her correct residence address.

**(n)** Investor has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

**(o)** Investor understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

5. **Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The Investor should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations. Investor hereby represents and warrants to the Company as follows:

**(a)** The Investor represents that (i) no part of the funds used by the Investor to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Investor and no distribution to the Investor shall cause the Company to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Investor acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Note, and the Investor shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals [2] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

**(b)** To the best of the Investor's knowledge, none of: (1) the Investor; (2) any person controlling or controlled by the Investor; (3) if the Investor is a privately-held entity, any person having a beneficial interest in the Investor; or (4) any person for whom the Investor is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a

---

[2] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 638
1366

person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Investor agrees to promptly notify the Company should the Investor become aware of any change in the information set forth in these representations. The Investor understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Investor, either by prohibiting additional subscriptions from the Investor, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Investor's identity to OFAC. The Investor further acknowledges that the Company may, by written notice to the Investor, suspend the redemption rights, if any, of the Investor if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

(c) To the best of the Investor's knowledge, none of: (1) the Investor; (2) any person controlling or controlled by the Investor; (3) if the Investor is a privately-held entity, any person having a beneficial interest in the Investor; or (4) any person for whom the Investor is acting as agent or nominee in connection with this investment is a senior foreign political figure[3], or any immediate family[4] member or close associate[5] of a senior foreign political figure, as such terms are defined in the footnotes below.

(d) If the Investor is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Investor receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Investor represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

(e) The Investor acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Investor agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Investor acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information,

---

[3] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[4] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[5] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

may result in the withholding of amounts with respect to, or other limitations on, distributions made to the Investor and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Investor shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith.

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Investor shall give prompt notice of such fact to the Company by telegram, or facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

6. **Indemnification.** Investor acknowledges that Investor understands the meaning and legal consequences of the representations and warranties made by Investor herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Investor hereby agrees to indemnify and hold harmless the Company and each employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Investor contained in this Subscription Agreement.

7. **Transferability.** Investor agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

8. **Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Investor any money tendered hereunder without interest or deduction.

9. **Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Investor at the address set forth below and to the Company at investor@icapequity.com, or (c) at such other place as the Company may designate by written notice to Investor.

10. **Amendments.** Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Investor and the Company.

11. **Governing Law.** This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

12. **Headings.** The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

13. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

14. **Continuing Obligation of Investor to Confirm Investor Status**. Upon the request of the Company and for as long as the Investor holds the Note or other securities in the Company, the Investor shall confirm Investor's investor status as an "Accredited Investor," as defined by the Securities and Exchange

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6 Page 640
1366

Commission at the time of such request. In connection therewith, the Company shall deliver to the Investor a questionnaire that elicits the necessary information to determine the Investor's investor status. Upon receipt of the questionnaire, the Investor shall: (i) complete it, (ii) execute the signature page therein, and (iii) return it to the Company, or its designee, in accordance with the instructions therein, no later than ten (10) days after receipt of the questionnaire.

SIGNATURES - **ALL INVESTORS MUST SIGN**

THE UNDERSIGNED HAS THE AUTHORITY TO ENTER INTO THIS SUBSCRIPTION AGREEMENT ON BEHALF OF THE PERSON(S) OR ENTITY REGISTERED ABOVE.

Executed on_____ _____

X_____
Signature (Investor, or authorized signatory)

X_____
Signature (Investor, or authorized signatory)

<u>ACCEPTANCE</u>

iCap Equity, LLC

By:      iCap Enterprises, Inc.
Its:     Manager

By:      _____
Name:    _____
Title:   _____

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 641    Pg 641 of 1366

# SIGNATURE PAGE

## SERIES 3 – SENIOR PROMISSORY NOTE

**Loan Amount $**_____          **Date: _____, 202___**

**Monthly Interest Payment Election (optional)**:  by initialing below, Holder hereby elects to receive simple interest, paid monthly, and for this Note to be governed by the provisions of Section 2(c)(ii) instead of the provisions of Section 2(c)(i).

Investor Initials:  _____      _____

*Agreed and accepted:*

HOLDER:

Name (*Individual Holder or entity Holder*): _____

Signature: _____

Name: _____

Title: _____
                 *(if applicable)*

---

In witness whereof, the undersigned has executed this Note as of the Date above.

iCap Equity, LLC

By:     iCap Enterprises, Inc.
Its:     Manager

By:       _____
Name:   _____
Its:       _____

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 642
1366

| **Form W-9**<br>(Rev. October 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification**<br>► Go to *www.irs.gov/FormW9* for instructions and the latest information. | **Give Form to the<br>requester. Do not<br>send to the IRS.** |
|---|---|---|

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ►____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ►

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) ____

Exemption from FATCA reporting code (if any) ____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

**6** City, state, and ZIP code

Requester's name and address (optional)

**7** List account number(s) here (optional)

---

**Part I**  **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

☐☐☐ – ☐☐ – ☐☐☐☐

**or**

**Employer identification number**

☐☐ – ☐☐☐☐☐☐☐

---

**Part II**  **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| **Sign<br>Here** | **Signature of<br>U.S. person** ► | **Date** ► |
|---|---|---|

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

Give Form to the
requester. Do not
send to the IRS.

Print or type.
See Specific Instructions on page 3.

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC    ☐ C Corporation    ☐ S Corporation    ☐ Partnership    ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

**6** City, state, and ZIP code

Requester's name and address (optional)

**7** List account number(s) here (optional)

### Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

[ ] [ ] [ ] – [ ] [ ] – [ ] [ ] [ ] [ ]

or

Employer identification number

[ ] [ ] – [ ] [ ] [ ] [ ] [ ] [ ] [ ]

### Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

Sign Here

Signature of U.S. person ▶

Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

Subscription Agreement

Page | 18

**PART V:  Registered Representatives and Investment Advisors**

**BROKER DEALER/REGISTERED INVESTMENT ADVISOR**

**TO BE COMPLETED BY REGISTERED REPRESENTATIVE**

The Registered Representative of record for this transaction or a Registered Principal authorized by the Broker/Dealer or Registered Investment Advisor to review and approve such securities transactions must sign and date below. The Registered Principal warrants that the Broker/Dealer (or Registered Investment Advisor) is a duly licensed Broker/Dealer (or Registered Investment Advisor) and may lawfully offer the Notes in the state designated as the investor's address of residence. The Registered Representative and the Registered Principal represent that they have reasonable grounds to believe this investment is suitable for the investor and that the investor has been provided full information regarding the risks of this investment including liquidity and marketability.

| B-D/RIA Name | | Telephone No. | |
|---|---|---|---|

| B-D/RIA Street Address or P.O. Box | |
|---|---|

| City | | State | | Zip Code | |
|---|---|---|---|---|---|

| Registered Representative Name | | Telephone No. | |
|---|---|---|---|
| Email Address: | | | |

| Reg. Rep. Street Address or P.O. Box if different | |
|---|---|

| City | | State | | Zip code | |
|---|---|---|---|---|---|

☐ **Registered Representative: please check this box to verify that you have personally seen and recorded a government issued identification document from the Investor.**

☐ **Check this box if the subscriber's investment in the company is made through a RIA**

| | |
|---|---|
| Registered Representative's Signature & Date | Registered Principal's Approval Signature & Date |

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6 Page 645 of
1366

Annex 1

<u>Accredited Status Certification Letter</u>

Date: _____

iCap Equity, LLC
Attn: Investor Relations Team
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

      Re:    <u>Determination of Accredited Status</u>

Dear iCap Equity, LLC

_____ ("Client") has asked us to provide iCap Equity, LLC with this letter to assist you in your determination of whether Client is an "accredited investor" as defined in Rule 501(a) of the Securities Act of 1933, as amended (the "Securities Act").

[I/We] hereby certify that [I/we] [am/are] (please check the appropriate box):

    ☐ a registered representative of a registered broker-dealer, as defined in the Securities Exchange Act of 1934;

    ☐ an investment adviser registered with the Securities and Exchange Commission;

    ☐ a licensed attorney in good standing under the laws of the jurisdictions in which I am admitted to practice law; or

    ☐ a certified public accountant in good standing under the laws of the place of my residence or principal office.

Based solely on a review of the Client Materials (as defined below), the undersigned hereby advises you that Client satisfies one or more of the following criteria (check all boxes that apply):

    ☐ a natural person whose individual "net worth," or joint net worth with Client's spouse, exceeds $1,000,000; or

    ☐ a natural person who had an individual income in excess of $200,000 in each of the two most-recent years or joint income with Client's spouse in excess of $300,000 in each of those years.

       In connection with this letter, we have examined and relied upon the original or copies of **one or more** of the following documents (the "Client Materials"):

    • A certificate executed by Client and [his/her] spouse, attached hereto, addressed to the Issuer and us, stating such persons: (i) have had a joint income in excess of $300,000 in each of the two most-recent years and a reasonable expectation of joint income in the current year in excess of $300,000; or (ii) have a joint "net worth" with Client's spouse in excess of $1,000,000.

    • A certificate executed by Client, attached hereto, addressed to the Issuer and us, stating such person: (i) has had an individual income in excess of $200,000 in each of the two most-recent years and a reasonable

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6 Page 646
Pg 4 Page
1366

expectation of income in the current year in excess of $200,000; or (ii) has an individual "net worth" in excess of $1,000,000.

- The following tax documents to the extent applicable to Client:

    o Tax returns for the years [    ] and [    ] (each, a "Tax Year") filed by Client and [his/her] spouse on Form 1040 (the "Tax Returns"), accompanied by a certificate of the Client that that the copies of the Tax Returns provided were true, correct and complete, filed with the appropriate office of the Internal Revenue Service, prepared in full compliance with applicable law and governmental regulations and have not been amended.

    o Form 1099 filed with the Internal Revenue Service by Client [and [his/her] spouse] for the two most-recent years.

    o Schedule K-1 of Form 1065 filed with the Internal Revenue Service by Client [and [his/her] spouse] for the two most recent-years.

    o Form W-2 issued by the Internal Revenue Service to Client [and [his/her] spouse] for the two most recent-years.

    o Other Internal Revenue Service documents (please specify): _____.

- Bank statements, brokerage statements and other statements of securities holdings, certificates of deposit, tax assessments, or appraisal reports issued by independent third parties to Client, dated within three months of the date of this Letter.

- A consumer or credit report from at least one of the nationwide consumer reporting agencies indicating Client's liabilities, dated within three months of the date of this Letter;

- Other documents (please specify): _____.

We have not conducted any other investigation or inquiries of Client, and have not determined whether the above documents were accurately prepared, agree with source documents, were properly filed or otherwise.

By rendering this letter, we do not intend to waive any attorney-client privilege, as applicable. This letter is limited to the matters set forth herein and speaks only as of the date hereof. Nothing may be inferred or implied beyond the matters expressly contained herein. This letter may be relied upon by you and only you in connection with an offering under Rule 506(c) and only for 30 days from the date of this letter. This letter may not be used, quoted from, referred to or relied upon by you or by any other person for any other purpose, nor may copies be delivered to any other person, without in each instance our express prior written consent. We assume no obligation to update this letter.

 Very truly yours,

[CERTIFIER]:

By:_____

Name:_____

Title:_____

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 6 Page 647
1366

## CERTIFICATION OF CLIENT

The undersigned, being the Client identified above, by my signature below, hereby represents and warrants that the following statements are true, correct, and complete as of the date of my signature below (the "Certification Date"):

- All Client Materials referenced above that have been delivered are true, correct and complete as of the Certification Date;

- If I am relying on my "net worth," either individually or jointly with my spouse, to satisfy the requirements for being an accredited investor, I/we have fully and accurately disclosed all liabilities that are required to be included in the calculation of "net worth" as described above; and

- At least one of the following applies to me:

  o If I am relying on my income and/or that of my spouse to satisfy the requirements for being an accredited investor, I have a reasonable expectation of reaching individual income in excess of $200,000 or joint income with my spouse in excess of $300,000 in the current year.

  o If I am relying on my "net worth," either individually or jointly with my spouse, to satisfy the requirements for being an accredited investor, I/we have a "net worth" in excess of $1,000,000

I hereby affirm that the foregoing is accurate and complete.


Date: _____


Client Signature:_____

Client Name: _____

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 648
1366

**EXHIBIT A-2**

**SUBSCRIPTION AGREEMENT FOR NON-U.S. PERSONS**

**(Attached)**

---

*This Subscription Agreement should be used only by investors who are investing on the basis of being a "Non-U.S. Person" (as defined below).*

*Investors who are investing on the basis of being an "Accredited Investor" should complete the Subscription Agreement attached to the Memorandum (as defined below) as Exhibit A-1.*

---



**iCap Equity, LLC**

---

**SUBSCRIPTION AGREEMENT FOR NON-U.S. PERSONS**

---

### PART I:   Investor Information

### 第一部分：投资者信息

(a) **Investor Name 投资者姓名**:

   (hereinafter referred to as "***Investor***")（以下简称" 投资者"）

(b) **Investment Amount**:  Investor agrees to invest the below amount ("Investment Amount") in accordance with the provisions of this Subscription Agreement:
   **投资金额**：投资者同意根据本"认购协议"的规定投资以下金额（以下简称"投资金额"）：

<div style="border:1px solid;">

$ _____

</div>

(c) **Type of Investor.**  Indicate the form of Investor:

   **投资者类型.**   说明投资者的形式：

| **Individual Investors**<br>**个人投资者** | **Entity Investors**<br>**实体投资者** |
|---|---|
| ☐  Individual 个人<br><br>☐  Husband and Wife 夫妻<br><br>☐  Joint Tenants 联名共有人<br><br>☐  Revocable Trust 可撤销信托<br><br>Please complete pages 1, 2, 5, 7, 8, 23, 24, 25<br><br>请完成第 1、2、5、7、8、23 和 24 页，25 | ☐    Corporation or Limited Liability Company (LLC)<br>　　　公司或有限责任公司（LLC）<br><br>☐    Partnership 合伙企业<br><br>☐    Irrevocable Trust 不可撤销信托<br><br>☐    Other Entities (indicate form of organization):<br>　　　其他实体（注明组织形式）：<br><br>Please complete pages 1, 3, 4, 5, 7, 8, 23, 24 and Form W-8BEN-E<br><br>请完成第 1、3、4、5、7、8、23, 24 页以及 W-8BEN-E 表。 |

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 650
1366

# INDIVIDUAL INVESTORS
## 个人投资者

## JOINT ACCOUNTS, REVOCABLE TRUSTS & RETIREMENT FUNDS
### 联合账户，可撤销信托和退休基金

Investor Name (Please Print) (1):
投资者名称（请以楷体书写）(1): _____

Investor Name (Please Print) (2) :
投资者名称（请以楷体书写）(2): _____

Registered As (Please Print):
注册为（请以楷体书写）: _____

Physical Address (no PO Box) :
居住地址（不可填写邮政信箱）: _____

_____

Mailing Address (if Different)：
邮寄地址（如与居住地址不同）: _____

_____

Phone Number 电话号码:　　(_____) _____-_____

Birth Date 生日 (1): _____

Birth Date 生日(2): _____

Passport Number 护照号码 (1) : _____

Passport Number 护照号码(2) : _____

Primary Email Address 主要电子邮件地址(required 必填): _____

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 651
1366

## CORPORATIONS, PARTNERSHIPS, IRREVOCALBE TRUSTS OR OTHER ENTITIES

## 公司，合伙企业，不可撤销信托或其他实体

Investor Entity Name (Please Print):
投资实体名称（请以楷体书写）： _____

Registered As (Please Print):
注册为（请以楷体书写）： _____

Name (Please Print):
姓名（请以楷体书写）： _____

Title:
称谓/职位： _____

Address:
地址： _____

_____

Phone Number 电话号码 ： (_____) _____-_____

Date of Formation 成立日期: _____

State of Incorporation/Formation 公司注册地: _____

SSN or Taxpayer ID Number 公司社安号或纳税人 ID 号: _____

Primary Email Address (required) 主要电子邮件地址 （必填）:_____

If Investor is a Partnership, LLC, Irrevocable Trust or other Entity, initial the line below which correctly describes the application of the following statement to Investor's situation: *Investor was not organized or reorganized for the specific purpose of acquiring the Notes and has made investments prior to the date hereof, and each beneficial owner thereof has and will share in the investment in proportion to his or her ownership interest in Investor.*

如果投资者是一个合作企业、有限责任公司、不可撤销的信托或其他实体，请勾选下面一行中对投资者情况描述正确的选项，并用姓名首字母签名："投资者不是为了获得本票据的具体

目的而组织或重组的，且已在本协议日期之前进行了投资。其各个受益所有人拥有并将按照其在投资者中的所有者权益比例分享投资。"

☐ True 正确

☐ False 错误

Initials: _____

If the "False" Box is checked, each person participating in the entity will be required to fill out a subscription agreement.
如果勾选"错误"选项，则该实体的每个参与人都需要填写"认购协议"。

***Prospective Investors must fill out the Form W-8BEN attached hereto***
***准投资者必须填写随附的 W- 8BEN 表格***

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 653
1366

## PART II: Payment Information

## 第二部分： 支付信息

A. **Making Your Investment with the Company.** Please provide payment by one of the following methods (select one):

投资"**本公司**"。 请通过以下方式（选择一种）支付款项：

☐ **Wire Transfer or ACH Transfer to 电汇或 ACH 方式支付:**

| | |
|---|---|
| Receiving Financial Institution: | Umpqua Bank |
| Receiving Financial Institution Address: | 705 NW Gilman Blvd. |
| | Issaquah, WA 98027 |
| ABA/Routing Number: | 123205054 |
| Account Number: | 9690211801 |
| Special Instructions: | iCap Equity, LLC FBO *Investor Name* |

☐ **Check made out to 支票方式支付:**

iCap Equity, LLC
Attn: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

☐ **Vault account transfer 小金库帐户转帐:**

By checking this box you acknowledge and agree that (1) you currently have funds in a Vault account with iCap Vault 1, LLC (the "Vault"), an Affiliate of the Company, and (2) you do hereby direct the Company to provide notice to iCap Vault 1, LLC on your behalf to withdraw your investment in the Vault, in the amount set forth above, and to send those funds to the Company for the purchase of a Note.

若您勾选本选项，您知悉并同意(1)您目前在艾珂荣小金库 1 号有限责任公司（"本公司"的附属公司）的小金库账户（以下简称"小金库"）中有资金；（2）您在此指示"本公司"代表您向艾珂荣小金库 1 有限责任公司发送通知，从您的"小金库"资金中提取上述投资款项，并将此款转账至"本公司"以购买一份"本票"。

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 6, Page 654
1366

**Regardless of whether paying by wire transfer, ACH, Swift, check or from an iCap Vault account, you must also deliver a fully completed and executed copy of this Subscription Agreement and a completed and executed signature page of the Note (as attached to the Memorandum (as defined below) as Exhibit B) to the Company EITHER:**

无论通过电汇、ACH、SWIFT、支票还是小金库帐户转账方式支付投资款，您必须另外向本公司通过以下一种方式交付本认购协议的完整已签署副本和票据的完整已签署的签署页各一份（即备忘录（定义见下文）的附件 B）：

| In Hard Copy to: | OR | Electronically 电子签 |
|---|---|---|
| 发纸质副本至： | 或 | |

iCap Equity, LLC
Attn: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

Electronically 电子签

Either through DocuSign or other means, and emailed to investor@icapequity.com. If this option is selected there is no need to mail hard copies of the documents.

通过 DocuSign 或其他方式，通过电子邮件发送至 investor@icapequity.com。如果选择此方式，则无需再邮寄文档的纸质副本。

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 655
1366

**B. Where the Company Should Send Your Payments of Interest and Principal (Select One)**

**"本公司"应将您的利息和本金支付至（选择一项）**

☐ <u>Direct Deposit to my Bank Account</u> <u>直接存款到我的银行帐户</u>

I hereby authorize **iCap Equity, LLC** ("the Company") to send any payments to me at the bank account(s) listed below. I further authorize the financial institution(s) named below to accept such payments and credit such account(s).

本人特此授权**艾珂荣资本有限责任公司**（以下简称"本公司"）通过下面列出的银行帐户向我发送任何付款。我进一步授权以下指定的金融机构接受此类付款并将这些付款记入下述银行账户。

| Name of Financial Institution<br>金融机构名称 | Checking or Savings<br>账户类别<br>（支票账户/储蓄账户） | Bank Routing Number<br>银行汇款<br>路径号码 | Bank Account Number<br>银行账户号码 |
|---|---|---|---|
|  |  |  |  |

For iCap to verify bank account and routing numbers, investors are encouraged to attach a **VOIDED CHECK** for each investor account to be credited. Investors should retain completed copies of this form for their records.
为了让艾珂荣可以验证银行帐户和银行汇款路径号码，我们鼓励投资者为每个存入利息与本金的投资者帐户附加一张**"作废的支票"**。投资者应保留此表格的完整副本作为记录。

☐ <u>Direct Deposit to my iCap Vault Account</u>[1].  No need to provide additional information for this option. We can look you up in our records or help you set this up.
<u>直接存入我的艾珂荣小金库帐户</u>[1]。您无需为此选项提供其他信息。我们可以在记录中查找您的信息或帮助您设置。

I understand that this authorization remains in effect until the Company receives from me, in writing, notification to terminate or change the authorization, provided such notification is delivered in such a time and manner as to afford the Company a reasonable time to act on it.

---

[1] iCap Vault is an affiliated program in which investors can invest cash into publicly registered demand notes.  An iCap Vault account can be linked to an investor's bank account and an investor can withdraw funds at any time.  The details of the program can be found at www.icapequity.com/vault.  Many investors choose to send their interest payments to their iCap Vault account as a means of earning additional interest.

[1] iCap Vault 是 Icap 的子项目，投资者可通过该子项目将现金投资至公开注册的即期票据。投资者可以将 iCap Vault 帐户链接到其银行帐户，以便投资者随时提取资金。有关该产品的详细信息，请访问 www.icapequity.com/vault。许多投资者选择将其利息付款发送至其 iCap Vault 帐户，以获得附加利息。

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 656
1366    Pg 657 of

本人明白，本授权书将持续有效直至"本公司"收到本人终止/更改此授权的书面通知，并给予"本公司"在收到本人书面通知后一定合理时间来采取行动。

_____     Date 日期
Account Holder Signature 帐户持有人签名


_____     Date 日期
Account Holder Signature 帐户持有人签名

## PART III:  Investor Status
## 第三部分：  投资者状态

1. **Representation as to Investor Status.** Subscriber hereby represents and warrants to the Company as of the date hereof that:

   **关于投资者身份的陈述。** 认购人特此向"本公司"声明并保证，自本协议所述日期之日起：

   **(a)** Subscriber understands that the investment offered hereunder has not been registered under the Securities Act and Subscriber's acquiring the Note for Subscriber's own account, for investment purposes only, and not with a view towards resale or distribution.

   投资者须知：本协议所述的投资尚未依据《证券法》登记；认购人是为自己名下帐户获得"本票"；认购人获取"本票"仅出于投资目的，而非转售或分销。

   **(b)** Subscriber is <u>not</u> a "US Person" which is defined as:

   投资者不是"美国人"（不属于如下定义中的任何一项）：

   **(i)** Any natural person resident in the United States (as defined below);

   居住在美国（定义见下文）的任何自然人；

   **(ii)** Any partnership or corporation organized or incorporated under the laws of the United States;

   根据美国法律组建或注册的合伙企业或公司；

   **(iii)** Any estate of which any executor or administrator is a US Person;

   遗产的执行人或管理者是一位美国人；

   **(iv)** Any trust of which any trustee is a US Person;

   信托的受托人是一位美国人；

   **(v)** Any agency or branch of a foreign entity located in the United States;

   位于美国境内的外国实体的代理机构或分支机构；

   **(vi)** Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US Person;

   为美国人利益或帐户而持有非全权委托账户或类似帐户(遗产或信托除外）的经销商或其他受托人；

   **(vii)** Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident of the United States; and

   对任何全权委托的账户或类似账户（不含任何财产账户或信托账户）而言，其持有人是一家在美国境内组织或成立的经销商或其他受托人，或是一位美国居民（对个人而言）；以及

   **(viii)** Any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a US Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) who are not natural persons, estates or trusts.

   (i) 依据外国管辖法组织或注册成立的，且(ii)由一位美国人成立的，主要目的是投资未依照《证券法》注册的证券的合伙企业或公司，但该合伙企业或公司是由作为非自然人、财产管理机构或信托机构的合格投资人（其定义见《证券法》 D 条例 501(a)条款）组织、注册及持有的除外。

"United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

美国"指美利坚合众国、其领土和财产、美国所有的州和哥伦比亚特区。

**(c)** Subscriber, as of the execution date of this Agreement, (i) is not located within the United States, and (ii) is not purchasing the Note for the benefit of any US Person.

截至本协议签署之日，投资者，(i)本人并不在美国境内，且(ii)不是为使任何"美国人"受益而购买的"本票"。

**(d)** Subscriber will not resell any Note except in accordance with the provisions of Regulation S (Rule 901 through 905 and Preliminary Notes thereto), pursuant to a registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

除非"本票"符合 S 条例的规定（第 901 条至 905 条及其附注），已根据《证券法》进行注册，或根据任何适用豁免注册的规定，否则投资者不得转售"本票"；并同意不参与该证券有关的对冲交易，但符合《证券法》的规定的情况除外。

Subscriber has not acquired the Note as a result of, and will not itself engage in, any "directed selling efforts" (as defined in Regulation S under the Securities Act) in the United States in respect of the Note which would include any activities undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the resale of any of the Note; provided, however, that the Subscriber may sell or otherwise dispose of the Note pursuant to registration thereof under the Securities Act and any applicable state and federal securities laws or under an exemption from such registration requirements.

投资者获得"本票"，并非因"本票"能够"定向销售"且投资者本人将不会采取任何"定向销售行为"（定义见《证券法》颁布的 S 条例），包括为达成在美国市场有条件转售的目的或为促成"本票"在美国市场有条件转售的合理预期，而进行的任何活动；然而，若符合《证券法》和任何适用的州和联邦的证券法有关"本票"注册的规定或符合此类豁免注册的规定，投资者可以出售或以其他方式处置"本票"。

# PART IV: Covenants and Provisions

## 第四部分： 承诺和规定

**1. Subscription for the Purchase of a Note. 认购一份"本票"。**

The undersigned "Investor", on the terms and conditions herein set forth, hereby irrevocably submits this subscription agreement (the "Subscription Agreement") to iCap Equity, LLC, a Delaware limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise capital of up to $50,000,000 through the sale to Investor as an accredited investor of a Series 3 - Senior Promissory Note of the Company (the "Note").

以下签名的"投资者"，根据此协议的条款和条件，谨此不可撤销地向艾珂荣资本有限责任公司，一家特拉华州的有限责任公司（以下简称"本公司"）提交本《认购协议》（以下简称《认购协议》"）。前述《认购协议》"内容是"本公司"通过向拥有合格投资者身份的投资者发行"本公司"高级本票系列三（以下简称"本票"），私募（以下简称"发售要约"）最高 5000 万美元的资金。

The undersigned, intending to be legally bound, hereby subscribes for a Note in the aggregate principal amount as set forth on Page 1 hereto (the "Subscription Amount") and, in this regard, Investor agrees to forward payment in the amount of the Subscription Amount in accordance with the provision selected in **Part II, Section A,** above.

拟受法律约束的签字人，在此认购本协议第 1 页所载的本金总额（以下简称"认购金额"）的一份"本票"，并且"投资者"同意根据上文**第二部分** A **节**所选择的规定支付认购的金额。

**Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.**

**只有在"本公司"完全签署并接受了"《认购协议》"以及与该"本票"有关的所有协议，并且"本公司"金融机构指示"本金"已经交付并提供给"本公司"之后，才会开始计算利息。**

The undersigned acknowledges that the Company is offering the Notes pursuant to the terms and provisions of the Offering documented in the Confidential Private Placement Memorandum dated July 1, 2020 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. The Company's private offering of Notes is being made to "accredited" investors within the meaning of Rule 506(c) of Regulation D promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"). By signing this Subscription Agreement, Investor acknowledges receipt of the Memorandum and its Exhibits, including the Note (collectively the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents. Furthermore Investor represents and warrants that all information entered in Parts I-IV of this document are correct and Investor agrees to be bound by all provisions of such sections of this Agreement.

"投资者"认同"本公司"是依据 2020 年 07 月 01 日发布的机密私募备忘录（与本备忘录的所有附录和附件统称"备忘录"）的条款与规定，发行该"本票"。"本公司"依据美国证券交易委员会经 1933 年修订的《证券法》（以下简称"《证券法》"）下的 S 条例颁布的 D 条第 506（c）条的规定，向"合格"投资者进行"本票"的私募发行。"《认购协议》"一经签署，即代表"投资者"确认其已收到"备忘录"及其附录，包括"本票"（上述几项统称"本票文件"），并同意他/她/其已阅读"本票文件

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 6 Page 660

Pg 660 of 1366

"的所有规定，并同意受其约束。此外，"投资者"声明并保证在本文件第一至四部分中输入的所有信息均正确，并且"投资者"同意受本"协议"这些部分的所有条款约束。

The undersigned agrees to execute this Subscription Agreement and if by mail, send to the Company. You as an individual or you on behalf of the subscribing entity are being asked to complete this Subscription Agreement so that a determination can be made as to whether or not you (it) are qualified to purchase the Note under applicable federal and state securities laws. Your answers to the questions contained herein must be true and correct in all respects, and a false representation by you may constitute a violation of law for which a claim for damages may be made against you. Your answers will be kept strictly confidential; however, by signing this Subscription Agreement, you will be authorizing the Company to present a completed copy of this Subscription Agreement to such parties as they may deem appropriate in order to make certain that the offer and sale of the securities will not result in a violation of the Securities Act or of the securities laws of any state. All questions must be answered. If the appropriate answer is "None" or "Not Applicable," please state so. Please print or type your answers to all questions and attach additional sheets if necessary to complete your answers to any item. Please initial any corrections.

签署人同意签署本"《认购协议》"，且如果通过邮件将其发送给"本公司"。您，作为一个个人或代表认购实体将被要求填写完成本"《认购协议》"，以便可以确定您（它）是否有资格根据适用的联邦和州证券法购买"本票"。您对此文件包含的问题的回答在所有方面都必须是真实、正确的。您的虚假陈述可能违反法律，并且因此您可能会被要求赔偿损失。您的回答将严格保密；但是，通过签署本"《认购协议》"，您将授权"本公司"向其认为适当的各方出示本"《认购协议》"的完整副本，以确保要约和出售证券不会违反《证券法》或任何州的证券法。所有问题都必须被回答。如果答案是"无"或"不适用"，请说明。请整洁地书写或键入您对所有问题的答案，并在必要时附加更多纸张以完成对任何项目的答案。请以姓名首字母在任何更正处签字。

2. **Offer to Purchase.** Investor hereby irrevocably offers to purchase the Note and tenders herewith the total Subscription Amount as set forth herein. Investor recognizes and agrees that (i) this subscription is irrevocable and, if Investor is a natural person, shall survive Investor's death, disability or other incapacity, and (ii) the Company has complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement. This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

认购要约。"投资者"在此不可撤回地提出购买"本票"并投标本文所述的总"认购金额"。"投资者"清楚并同意，(i) 此认购协议不可撤销，且若"投资者"是自然人，即使"投资者"死亡、出现残疾或其他失能的情况下，该认购仍然有效，且(ii) "本公司"可以其完全的自由裁量权，全权决定完全接受或拒绝本"《认购协议》"，且不需因拒绝本"《认购协议》"承担任何责任。本"《认购协议》"应经"本公司"签署后才能被视为已被"本公司"接受。

3. **Effect of Acceptance.** Investor hereby acknowledges and agrees that on the Company's acceptance of this Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Investor. As a result, upon acceptance by the Company of this Subscription Agreement, Investor will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note (the Subscription Amount) as specified herein.

接受的效力。"投资者"承认和同意，一旦被"本公司"接受，该"《认购协议》"将成为"本公司"和"投资者"之间具有约束力且可被完全地强制执行的协议。因此，在"本公司"接受该"《认购协议》"后，"投资者"将成为该"本票"记录在案的持有人和受益人，且"本公司"将有权收取本协议

所述的"本票"的购买价格（此指"认购金额"）。

In determining individual "income," Investor should add to Investor's individual taxable adjusted gross income (exclusive of any spousal income) any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

在确定个人"收入"时，投资者"应在其个人调整后应税总收入（不包括任何配偶收入）中加上任何应纳的免税收入，在任何有限合伙企业中作为有限合伙人所声明的损失，折损扣除，对 IRA 或 Keogh 退休计划的供款、赡养费以及为取得调整后的总收入而扣除的长期资本收益的任何金额。

4. **Additional Representations and Warranties of Investor.** Investor hereby represents and warrants to the Company as follows:

**投资者的补充陈述和保证。** 投资者谨此向"本公司"做出如下陈述和保证：

**(a)** Investor has been furnished the Memorandum and, if requested by the Investor, other documents. The Investor has carefully read the Memorandum and any such other requested documents. Investor has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Investor requested and deemed material to making an informed investment decision regarding its purchase of the Note. Investor has been afforded the opportunity to review such documents and materials and the information contained therein. Investor has been afforded the opportunity to ask questions of the Company and its management. Investor understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Investor understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Investor has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Investor shall modify, amend or affect such Investor's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Investor has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Investor has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

投资者已收到"备忘录"及相关文件和投资者要求的其他文件。投资者已仔细阅读"备忘录"及任何投资者要求的其他文件。投资者已获得所有与"本公司"的业务、财务及营运有关的文件及资料，以及投资者要求的其认为对作出有关其购买"本票"的知情投资决定具有重要意义的材料。投资者已获得审阅上述文件、材料和其中包含信息的机会。投资者已获得询问该公司及其管理的机会。投资者理解：此类讨论及"本公司"提供的任何书面信息旨在描述"本公司"的业务和其认为重要的方面，但不一定是全面或详尽的描述，且除非本"《认购协议》"明确规定，"本公司"不保证上述信息的完整性，也不保证"本公司"以外的任何机构提供的任何信息的准确性和完整性。上

述部分信息可能包括对"本公司"未来业绩的预测，而这些预测可能无法实现，也可能基于一些不实的假设，并可能受到"本公司"无法控制的众多因素的影响。此外，投资者理解并陈述，他、她或其仍会认购"本票"，尽管"本公司"可能会在未来披露投资者尚未收到的某些重要信息，包括"本公司"当前财政季度的财务业绩。无论投资者做出的任何询问或任何其他尽职调查均不得改变、修改或影响该投资者参照"《认购协议》"包含的"本公司"所作出的陈述和保证的权利（若有）。为确保这次认购"本票"是一个知晓情况的投资行为，投资者已咨询了所有其认为必要的会计、法律和税务等方面的专业建议。"投资者"拥有完全的权利和权限做出就认购"本票"和签署及交付"《认购协议》"的行为相关的陈述。

**(b)** Investor has read and understood, and is familiar with, this Subscription Agreement, the Note and the business and financial affairs of the Company.

"投资者"已阅读及理解，并熟悉"《认购协议》"、"本票"及"本公司"的业务和财务状况。

**(c)** Investor, either personally, or together with its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum. The Investor and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Note. Investor's financial condition is such that Investor is able to bear the risk of holding the Note that Investor may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Investor's entire investment in the Notes.

"投资者"个人或在其顾问（非任何可能从销售该"本票"的交易中获得报酬的证券经纪/交易商）的协助下，在财务和商务方面有足够的知识和经验来评估投资"本票"的益处和风险，并能够承担投资的风险，并理解认购"本票"相关的风险和其他需考虑的因素，包括"备忘录"中"风险因素"一节中提及的情况。"投资者"及其顾问已向"本公司"询问与"本票"相关的问题并获得关于其回复的机会。"投资者"的财务状况使其能够承担因依据本协议获得的"本票"而需要无限期持有的风险，以及投资者在"本公司"的全部投资额亏损的风险。

**(d)** Investor has investigated the acquisition of the Note to the extent Investor deemed necessary or desirable and the Company has provided Investor with any reasonable assistance Investor has requested in connection therewith.

"投资者"已在其认为必要或需要的范围内对"本票"的购买事宜进行了调查，且"本公司"已为"投资者"提供了相关合理的协助。

**(e)** The Note is being acquired for Investor's own account for investment, with no intention by Investor to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Investor in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Investor has any interest in or any right to acquire the Note. Investor understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Investor.

"投资者"是通过自己名下账户认购的"本票"，且仅作投资之用，且"投资者"无意按照《证券法》的规定对"本票"的任何部分进行分配或出售，且"投资者"不会违反《证券法》或其中

适用的法则或法规转让"本票"。除"投资者"外，其他任何人均没有任何权利购买"本票"或成为"本票"的受益人。"投资者"理解并承认，除"投资者"外，该公司没有义务承认任何其他人士对"本票"的所有权、受益权或其他权利。

**(f)** No representations or warranties have been made to Investor by the Company, or any representative of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

除了本"《认购协议》"中所述外，"投资者"或任何其代表或任何证券经纪/交易商均未对"投资者"做出任何陈述或保证。

**(g)** Investor is aware that Investor's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Investor will not offer for sale, sell or otherwise transfer the Note without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

"投资者"知晓，"投资者"转让"本票"的权利受到《证券法》及适用的州证券法的限制，且除非已依据《证券法》进行注册或依据所有适用的州的证券法律获得出售的资质或"本票"可免注册出售的情况外，"投资者"不会发出出售要约、出售或以其他方式转让"本票"。

**(h)** Investor understands and agrees that the Note it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

"投资者"理解并同意，其购买的"本票"根据《证券法》或任何州的证券法律有关规定被豁免注册，因此该"本票"尚未依据《证券法》或任何州的证券法律进行注册，且"本公司"无义务对其发行的上述"本票"进行注册。

**(i)** The Investor has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Investor understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

"投资者"已有向"本公司"的代表就本次投资的条款和条件提出相关问题并获得答复的机会，且签字人已获得了满意的答复。"投资者"理解，"本公司"并未授权任何除"本公司"外的任何人做出任何陈述。如有相关陈述，需经"本公司"签署书面同意方能生效。但是，"本公司"从未向签署本协议的签署人就是否适合投资的问题提出任何建议。

**(j)** Investor understands that the Note shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such certificates):

"投资者"理解，该"本票"存在以下实质形式的限制转让标记（且可能会针对转让"本票"下达禁止转让令）：

"NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED

UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT."

"本证券的销售以及其发行均依据 1933 年颁布的《美国证券法》及其修订版或适用州证券法进行注册。本证券（I）不能在没有（A）根据 1933 年《证券法》（经修订）的有效证券登记声明，或（B）律师（由持有人选择）以一般可接受的形式下，发表其认为根据《销售税法》本证券不需要注册的意见，或者（II）除非根据《销售法》第 144 条或第 144A 条的规定售出的情况下销售，出售，转让或分配。"

The Subscriber hereby acknowledges and agrees to the Company making a notation on its records or giving instructions to any registrar and transfer agent of the Company in order to implement the restrictions on transfer set forth and described in this Subscription Agreement.

"投资者"承认并同意"本公司"在其注册记录上注明或向"本公司"的任何注册服务商和转让代理人发出指示，以执行本《认购协议》规定及描述的转让限制。

(k) Investor also acknowledges and agrees to the following "投资者"同时承认并同意以下内容:

(i) an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire investment in the Notes; and

对"本票"的投资具有很高的投机性，而其对"本票"的投资也存在很高的损失全部投资款的风险；及

(ii) there is no assurance that a public market for the Notes will be available and that, as a result, Investor may not be able to liquidate Investor's investment in the Note should a need arise to do so.

无法保证日后会有可供"本票"公开交易的市场，因此，"本票"在"投资者"需要流通变现时有可能无法流通变现。

(l) Investor is not dependent for liquidity on any of the amounts Investor is investing in the Note.

"投资者"并不依赖于其投资于"本票"的任何金额的流动性。

(m) Investor's address set forth below is his or her correct residence address.

"投资者"在下方提供的地址是他或她正确的居住地址。

(n) Investor has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

"投资者"拥有全部的权利和权限做出本协议所述的陈述以认购"本票"和签署及交付本《认购协议》"。

**(o)** Investor understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

"投资者"理解，"本公司"将上述陈述及保证作为其豁免注册和依据联邦及州的证券法律获得销售"本票"的资格和其他用途的基础。

5. **Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The Investor should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations. Investor hereby represents and warrants to the Company as follows:

**《爱国者法案》、反洗钱和海外资产控制办公室相关的陈述和保证。** 在做出下述陈述前，"投资者"应访问海外资产控制办公室（"OFAC"）的网站http://www.treas.gov/ofac。"投资者"谨此向"本公司"做出下列陈述和保证：

**(a)** The Investor represents that (i) no part of the funds used by the Investor to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Investor and no distribution to the Investor shall cause the Company to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Investor acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Note, and the Investor shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[2] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

投资者声明：(i) "投资者"用于认购"本票"或履行其相关的资本投入义务的任何资金均未或不得直接或间接来自任何可能违反美国联邦或州或非美国的法律或法规的活动，包括反洗钱的法律和法规，以及(ii) "投资者"向"本公司"做出的任何资本投入、出资或付款以及向"投资者"支付的本金或利息均不得致使"本公司"违反任何适用的反洗钱法律或法规，包括但不限于，2001年颁布的使用适当之手段阻止或避免恐怖主义以团结并强化美国的法律"（《美国爱国者法案》）第三部分和美国财政部海外资产控制办公室的规定。"投资者"知晓并同意，即使有违"《备忘录》"或任何其他协议中的规定，但在任何反洗钱法律或法规要求的范围内，"本公司"可以禁止与该"本票"相关的出资，限制其分配或采取任何其他与

该"本票"相关的合理且必要或有预见性的措施，而投资者不应且不得对"本公司"或与此相关的任何其他人提出索赔。此外，OFAC管理的美国联邦法规和行政命令尤其禁止与某些国家、地区、团体和个人进行交易和向其提供服务。OFAC禁止的国家、地区、个人和团体的名单可以在OFAC网站http://www.treas.gov/ofac上找到。此外，OFAC管理的计划（"OFAC计划"）禁止与个别国家的个人²或团体产生业务，无论这些个人或团体是否出现在OFAC名单里。

**(b)** To the best of the Investor's knowledge, none of: (1) the Investor; (2) any person controlling or controlled by the Investor; (3) if the Investor is a privately-held entity, any person having a beneficial interest in the Investor; or (4) any person for whom the Investor is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Investor agrees to promptly notify the Company should the Investor become aware of any change in the information set forth in these representations. The Investor understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Investor, either by prohibiting additional subscriptions from the Investor, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Investor's identity to OFAC. The Investor further acknowledges that the Company may, by written notice to the Investor, suspend the redemption rights, if any, of the Investor if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

尽"投资者"所知，以下任何一方不是在OFAC名单中的国家、地区、个人或实体，或OFAC计划禁止的个人或实体：(1)"投资者"；(2) 任何控制"投资者"或由"投资者"控制的个人；(3) 若"投资者"是一家私人控制的实体，任何在"投资者"中拥有收益权的个人；或(4) 将"投资者"作为其投资代理人、名义持有者的委托人。请注意：若潜在投资者无法做出本段中规定的声明或陈述，"本公司"有权不接受其任何数额的投资款。"投资者"同意，若投资者知晓上述陈述中的信息发生任何变化，应立即告知"本公司"。"投资者"理解并承认，根据法律规定，"本公司"有权"冻结'投资者'的账户"，即禁止"投资者"继续认购，拒绝任何偿还请求和/或依据政府法规隔离账户中的资产，且任何证券经纪人均有义务向OFAC报告此类行为，并向OFAC披露"投资者"的身份。"投资者"进一步知悉，若"本公司"合理地认为，行使前述行为是遵守适用于"本公司"、任何证券经纪、"本公司"的任何其他服务提供商的反洗钱法规的条件，则"本公司"可以向投资者发出书面通知，暂停"投资者"的还款权利（若有）。前述个人包括特定国家的国民、特定的毒品贩运者和受OFAC制裁和禁运计划限制的其他各方。

---

² These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.
这些人士包括特定国家的国民、特定的毒品贩运者和受OFAC制裁和禁运计划限制的其他各方。

**(c)** To the best of the Investor's knowledge, none of: (1) the Investor; (2) any person controlling or controlled by the Investor; (3) if the Investor is a privately-held entity, any person having a beneficial interest in the Investor; or (4) any person for whom the Investor is acting as agent or nominee in

connection with this investment is a senior foreign political figure[3], or any immediate family[4] member or close associate[5] of a senior foreign political figure, as such terms are defined in the footnotes below. 就"投资者"所知，以下任何一方均不是外国高级政治人物[3]，或其任何直系家庭成员[4]或亲密伙伴[5]（其定义见下方脚注）。：(1) "投资者"；(2) 任何控制"投资者"或由"投资者"控制的个人；(3) 若"投资者"是一家私人控制的团体，任何在"投资者"中拥有收益权的个人；或(4) 将"投资者"作为其投资代理人或名义持有人的委托人。

**(d)** If the Investor is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Investor receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Investor represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.
如果"投资者"附属于一家非美国银行机构（以下简称"外国银行"），或者若"投资者"从一家外国银行收取存款、代表一家 "外国银行"支付款项或处理与一家"外国银行"有关的其他金融交易，则该"投资者"向"本公司"陈述及保证：(1) 该"外国银行"在被授权从事银行业务的国家拥有固定地址，而不仅仅是电子地址；(2) 该"外国银行"维持着与其银行业务有关的经营记录；(3) 该"外国银行"受其金融活动牌照发放机构的监管；且(4) 该"外国银行"不向在任何国家没有实体机构的"外国银行"提供金融服务且不是被监管的附属机构。

**(e)** The Investor acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Investor agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Investor acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information, may result in the withholding of amounts with respect to, or other limitations on, distributions made to the Investor and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Investor shall have no claim, and shall

---

[3] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

"外国高级政治人物"被定义为外国政府（无论是否选举产生）的执行、立法、行政，军事或司法分支机构中的高级官员，主要外国政党的高级官员，或外国政府所有的公司的高级管理人员。此外，"外国高级政治人物"也包括由高级外国政治人物组成或为其谋利的任何公司、企业或其他团体。

[4] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

外国高级政治人物的"直系亲属"通常包括其父母、兄弟姐妹、配偶、子女和姻亲。

[5] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

外国高级政治人物的 "亲密伙伴"系指广为人知、且公开与高级外国政治人物保持异常密切关系的人士，包括代表该高级外国政治人物进行重要的国内和国际金融交易的人士。

not pursue any claim, against the Company or any other person in connection therewith.

"投资者"承认，在适用的范围内，"本公司"将遵守《美国国内税收法》中的《海外账户税收合规法案》的条款以及与之相关的任何规则、条例、表格、指示或其他指引（以下简称为"FATCA条款"）。为了实行这些措施，"投资者"同意，若"本公司"为了遵守FATCA规定而要求"投资者"配合提供任何补充文件或信息要求，"投资者"将会及时提供并在需要时及时向""本公司"更新此类文件或信息。"投资者"承认并同意，尽管可能与"备忘录"、任何附函或任何其他协议中规定相斥，若其未能及时满足"本公司"为遵守FATCA规定而提出的要求、或提供补充信息，并会导致"本公司"向"投资者"偿还本金或支付利息时扣除相应的费用或设置其他限制，或导致"本公司"采取与本协议项下的"本票"相关的合理必要的措施（包括没有限制地提款请求）。但"投资者"不得因此对"本公司"或与其相关的任何其他人士提出任何索赔。

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Investor shall give prompt notice of such fact to the Company by telegram, or facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

截至本协议签署之日，上述陈述和保证均为真实准确，并且应在签署后依旧有效。如果上述任何陈述和保证在"本公司"接受本"《认购协议》"之前不再真实准确，则"投资者"应立即通过电报、传真或电子邮件等方式及时通知"本公司"，详述不真实或不准确的部分，并做出解释。

6. **Indemnification.** Investor acknowledges that Investor understands the meaning and legal consequences of the representations and warranties made by Investor herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Investor hereby agrees to indemnify and hold harmless the Company and each employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Investor contained in this Subscription Agreement.

赔偿。"认购者"承认其理解本本协议中所作出的陈述和保证的含义和法律后果，并且"本公司"是基于这些陈述和保证做出了接受或拒绝该"《认购协议》"的决定。投资者在此同意赔偿公司及其每一位雇员和代理人，因投资者违反本"《认购协议》"而遭受的任何和所有损失，并使公司及其每一位雇员和代理人免受损害。

7. **Transferability.** Investor agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

可转让性。"认购者"同意不转让或出让本"《认购协议》"或其中的任何权益，并进一步同意在转让和出让其获得的该"本票"时，将以相关的联邦和州的证券法作为唯一依据。

8. **Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Investor any money tendered hereunder without interest or deduction.

本协议的终止；资金返还。若因任何原因，本"《认购协议》"被"本公司"全部拒绝，则本"《认购协议》"无效，并不再具有任何效力，且任何一方均不得据此对另一方享有任何权利。若"本公司"拒绝签署本"《认购协议》"，"本公司"应及时向"认购者"返还认购者支付的所有款项，但不计利息，亦不扣除任何费用。

9. **Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 669
1366

writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Investor at the address set forth below and to the Company at investor@icapequity.com, or (c) at such other place as the Company may designate by written notice to Investor.

通知。依据本协议或"本票"发送或发出的所有通知或其他信息均应以书面形式发出，并在以下情况下被视为送达：(a) 通过认证邮件或挂号信邮寄，将要求签收回执且已预付邮资，(b) 通过传真或电子邮件按照下文所示的地址发送至"认购者"，或按照本协议第一页所示的地址发送至"本公司"，或(c) 以"本公司"通过书面形式指定并通知"认购者"的其他地点和方式。

10. **Amendments.** Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Investor and the Company.

修订。除以书面形式列出并经认购者和"本公司"签署外，本《认购协议》或其任何条款均不得被更改、放弃、废除或终止。

11. **Governing Law.** This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

适用法律。本《认购协议》及其所有修订应遵守特拉华州法律的约束并按其解释，而不适用其他与之冲突的法律规定。

12. **Headings.** The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

标题。本《认购协议》的标题仅为阅读方便而设，标题自身并不能决定本《认购协议》或其任何部分的含义。

13. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

副本。本《认购协议》可以签署任意数量的副本，但具有相同的效力，效果如同签署同一份文件。另外双方可以以何种形式数码或电子签署本《认购协议》。以传真或其他电子传送形式签署或递送本《认购协议》的，将被视为等同于递送了一份已签署的原件，已签署的协议上所有的签署者均受本协议约束。

14. **Continuing Obligation of Investor to Confirm Investor Status**. Upon the request of the Company and for as long as the Investor holds the Note or other securities in the Company, the Investor shall confirm Investor's investor status as an "Non-US Person," as defined by the Securities and Exchange Commission at the time of such request. In connection therewith, the Company may at any time deliver to the Investor a questionnaire that elicits the necessary information to determine the Investor's investor status. Upon receipt of the questionnaire, the Investor shall: (i) complete it, (ii) execute the signature page therein, and (iii) return it to the Company, or its designee, in accordance with the instructions therein, no later than ten (10) days after receipt of the questionnaire.

投资者持续确认投资者身份的义务。应"本公司"的要求，只要该"投资者"仍持有"本公司"的"本票"或其他证券，投资者应确认投资者为"非美国人"的投资者身份（定义见投资者收到此类请求时美国证券交易委员会的规定）。与此相关地，公司可以随时向投资者发送调查问卷，

以获取确定投资者的投资者身份所需的信息。收到调查表后，投资者应在收到问卷的十（10）天内：（ⅰ）完成调查表，（ⅱ）在签名页签字，并且（ⅲ）根据调查表中的指示将调查表送返至"本公司"或其指定人。

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[本页剩余部分特意留白]

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:10     Exhibit 6 Page 671
1366

**SIGNATURES -**
**签名-**

THE UNDERSIGNED HAS THE AUTHORITY TO ENTER INTO THIS SUBSCRIPTION AGREEMENT ON BEHALF OF THE PERSON(S) OR ENTITY REGISTERED ABOVE.

签署人具有代表上述个人或实体签署本认购协议的权限。

**ALL INVESTORS MUST SIGN 所有投资者必 须签字**

Executed on 签署于_____ _____

X_____
Signature (Investor, or authorized signatory)
签名（投资者或授权签字人）

X_____
Signature (Investor, or authorized signatory)
签名（投资者或授权签字人）

<u>ACCEPTANCE</u>
接收

iCap Equity, LLC

By:      iCap Enterprises, Inc.
由：iCap Enterprises, Inc.

Its:      Manager
其：经理

By:
接收人签字：_____

Name:
接收人姓名：_____

Title:
接收人职位：_____

**SIGNATURE PAGE**
**签字页**

SERIES 3 – SENIOR PROMISSORY NOTE
系列三-高级本票

**Loan Amount $**_____          **Date : _____, 202___**
借贷金额 （美元）                                     日期

**Monthly Interest Payment Election (optional)**:  by initialing below, Holder hereby elects to receive simple interest, paid monthly, and for this Note to be governed by the provisions of Section 2(c)(ii) instead of the provisions of Section 2(c)(i).

**每月支付利息的选择（非必选）**：若"持有人"在以下横线处用姓名首字母签字，则"持有人"特此选择按月接受单利，并使此"本票"受第 2（c）（ii）节规定的约束，而非受第 2（c）(i)节规定的约束。

Investor Initials:  _____  _____
投资人以姓名首字母签字处

*Agreed and accepted:*
*由下述签字人同意并接受：*

HOLDER:
持有人

Name (*Individual Holder or entity Holder*) :  _____
姓名（*个人"持有者"或实体"持有者"*）

Signature:  _____
签字

Name:  _____
姓名

Title:  _____
职务                    *(if applicable)*
                        （如适用）

| Form **W-8BEN** | **Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individuals)** | |
|---|---|---|
| (Rev. July 2017) | ▶ For use by individuals. Entities must use Form W-8BEN-E. | OMB No. 1545-1621 |
| Department of the Treasury Internal Revenue Service | ▶ Go to *www.irs.gov/FormW8BEN* for instructions and the latest information. ▶ Give this form to the withholding agent or payer. Do not send to the IRS. | |

| **Do NOT use this form if:** | **Instead, use Form:** |
|---|---|
| • You are NOT an individual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | W-8BEN-E |
| • You are a U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . . . | W-9 |
| • You are a beneficial owner claiming that income is effectively connected with the conduct of trade or business within the U.S. (other than personal services) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | W-8ECI |
| • You are a beneficial owner who is receiving compensation for personal services performed in the United States . . . . . . . | 8233 or W-4 |
| • You are a person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . . | W-8IMY |

**Note:** If you are resident in a FATCA partner jurisdiction (i.e., a Model 1 IGA jurisdiction with reciprocity), certain tax account information may be provided to your jurisdiction of residence.

| **Part I** | **Identification of Beneficial Owner (see instructions)** |
|---|---|

| 1 Name of individual who is the beneficial owner | 2 Country of citizenship |
|---|---|
| | |

3 Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**

| City or town, state or province. Include postal code where appropriate. | Country |
|---|---|
| | |

4 Mailing address (if different from above)

| City or town, state or province. Include postal code where appropriate. | Country |
|---|---|
| | |

| 5 U.S. taxpayer identification number (SSN or ITIN), if required (see instructions) | 6 Foreign tax identifying number (see instructions) |
|---|---|
| | |

| 7 Reference number(s) (see instructions) | 8 Date of birth (MM-DD-YYYY) (see instructions) |
|---|---|
| | |

| **Part II** | **Claim of Tax Treaty Benefits (for chapter 3 purposes only) (see instructions)** |
|---|---|

9 I certify that the beneficial owner is a resident of _____ within the meaning of the income tax treaty between the United States and that country.

10 **Special rates and conditions** (if applicable—see instructions): The beneficial owner is claiming the provisions of Article and paragraph _____ of the treaty identified on line 9 above to claim a _____ % rate of withholding on (specify type of income): _____.

Explain the additional conditions in the Article and paragraph the beneficial owner meets to be eligible for the rate of withholding: _____

| **Part III** | **Certification** |
|---|---|

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

- I am the individual that is the beneficial owner (or am authorized to sign for the individual that is the beneficial owner) of all the income to which this form relates or am using this form to document myself for chapter 4 purposes,

- The person named on line 1 of this form is not a U.S. person,

- The income to which this form relates is:

  (a) not effectively connected with the conduct of a trade or business in the United States,

  (b) effectively connected but is not subject to tax under an applicable income tax treaty, or

  (c) the partner's share of a partnership's effectively connected income,

- The person named on line 1 of this form is a resident of the treaty country listed on line 9 of the form (if any) within the meaning of the income tax treaty between the United States and that country, and

- For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner. **I agree that I will submit a new form within 30 days if any certification made on this form becomes incorrect.**

**Sign Here** ▶

| Signature of beneficial owner (or individual authorized to sign for beneficial owner) | Date (MM-DD-YYYY) |
|---|---|
| | |
| Print name of signer | Capacity in which acting (if form is not signed by beneficial owner) |

**For Paperwork Reduction Act Notice, see separate instructions.**     Cat. No. 25047Z     Form **W-8BEN** (Rev. 7-2017)

Form **W-8BEN**

(Rev. July 2017)

Department of the Treasury
Internal Revenue Service

**Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individuals)**

▶ For use by individuals. Entities must use Form W-8BEN-E.
▶ Go to *www.irs.gov/FormW8BEN* for instructions and the latest information.
▶ Give this form to the withholding agent or payer. Do not send to the IRS.

OMB No. 1545-1621

**Do NOT use this form if:**                                                                    Instead, use Form:

- You are NOT an individual  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8BEN-E
- You are a U.S. citizen or other U.S. person, including a resident alien individual  . . . . . . . . . . . . . . W-9
- You are a beneficial owner claiming that income is effectively connected with the conduct of trade or business within the U.S.
  (other than personal services)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8ECI
- You are a beneficial owner who is receiving compensation for personal services performed in the United States  . . . . . . 8233 or W-4
- You are a person acting as an intermediary  . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY

**Note:** If you are resident in a FATCA partner jurisdiction (i.e., a Model 1 IGA jurisdiction with reciprocity), certain tax account information may be provided to your jurisdiction of residence.

### Part I   Identification of Beneficial Owner (see instructions)

| 1 | Name of individual who is the beneficial owner | 2 | Country of citizenship |
|---|---|---|---|

3  Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**

| City or town, state or province. Include postal code where appropriate. | Country |
|---|---|

4  Mailing address (if different from above)

| City or town, state or province. Include postal code where appropriate. | Country |
|---|---|

| 5 | U.S. taxpayer identification number (SSN or ITIN), if required (see instructions) | 6 | Foreign tax identifying number (see instructions) |
|---|---|---|---|

| 7 | Reference number(s) (see instructions) | 8 | Date of birth (MM-DD-YYYY) (see instructions) |
|---|---|---|---|

### Part II   Claim of Tax Treaty Benefits (for chapter 3 purposes only) (see instructions)

9  I certify that the beneficial owner is a resident of _____ within the meaning of the income tax treaty between the United States and that country.

10  **Special rates and conditions** (if applicable—see instructions): The beneficial owner is claiming the provisions of Article and paragraph _____ of the treaty identified on line 9 above to claim a _____ % rate of withholding on (specify type of income): _____ .

Explain the additional conditions in the Article and paragraph the beneficial owner meets to be eligible for the rate of withholding: _____

### Part III   Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

- I am the individual that is the beneficial owner (or am authorized to sign for the individual that is the beneficial owner) of all the income to which this form relates or am using this form to document myself for chapter 4 purposes,
- The person named on line 1 of this form is not a U.S. person,
- The income to which this form relates is:
  - (a) not effectively connected with the conduct of a trade or business in the United States,
  - (b) effectively connected but is not subject to tax under an applicable income tax treaty, or
  - (c) the partner's share of a partnership's effectively connected income,
- The person named on line 1 of this form is a resident of the treaty country listed on line 9 of the form (if any) within the meaning of the income tax treaty between the United States and that country, and
- For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner. **I agree that I will submit a new form within 30 days if any certification made on this form becomes incorrect.**

**Sign Here**  ▶

| Signature of beneficial owner (or individual authorized to sign for beneficial owner) | Date (MM-DD-YYYY) |
|---|---|

| Print name of signer | Capacity in which acting (if form is not signed by beneficial owner) |
|---|---|

For Paperwork Reduction Act Notice, see separate instructions.                Cat. No. 25047Z                Form **W-8BEN** (Rev. 7-2017)

**EXHIBIT B**

**FORM OF NOTE**

**(Attached)**

THIS SERIES 3 - SENIOR PROMISSORY NOTE (THIS "NOTE") HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C.§15b ET SEQ., AS AMENDED ("SECURITIES ACT"), IN RELIANCE UPON ONE (1) OR MORE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE FEDERAL ACT. IN ADDITION, THE ISSUANCE OF THIS NOTE HAS NOT BEEN QUALIFIED UNDER THE SECURITIES ACT OF WASHINGTON, OR ANY OTHER STATE SECURITIES LAWS (COLLECTIVELY, THE "STATE ACTS"), IN RELIANCE UPON ONE OR MORE EXEMPTIONS FROM THE REGISTRATION PROVISIONS OF THE STATE ACTS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFER AS SET FORTH HEREIN.

## ICAP EQUITY, LLC

### SERIES 3 - SENIOR PROMISSORY NOTE

Pursuant to the terms and conditions of this Series 3 – Senior Promissory Note (the "Note") iCap Equity, LLC, a Delaware limited liability company (the "Company"), for value received, promises to pay to the undersigned holder (the "Holder"), or the Holder's permitted assigns, the loan amount set forth on the signature page hereto ("Loan Amount") plus interest thereon as set forth herein. The Company and the Holder may be referred to herein individually as a "Party" and collectively as the "Parties."

This Note is issued pursuant to the terms of a Subscription Agreement between the Company and the Holder (the "Subscription Agreement") and is subject to the terms thereof.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, to which the Holder, by the acceptance of this Note, agrees:

**Section 1.     Definitions.** In addition to the other terms defined herein, as used in this Note, the following capitalized terms have the meanings set forth below unless the context clearly indicates otherwise. All nouns, pronouns and verbs used in this Note shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable.

**(a)** "Act" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

**(b)** "Affiliate" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

**(c)** "Business Day," when used with respect to any place of payment or any other particular location referred to in this Note , means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions or trust companies in the City of Seattle are authorized or obligated by law or executive order to close.

**(d)** "Issue Date" means the date on which (a) this Note and the Subscription Agreement, together with all exhibits thereto, have been fully completed and executed by all parties, and (b) Holder has delivered the entire Loan Amount to the Company, and such funds become available to the Company having cleared the Company's bank account.

**(e)** "Notes" refer to, collectively, each Note issued by the Company pursuant to the Offering (as defined in the PPM).

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 6, Page 677
1366

**(f)** "Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

**(g)** "PPM" means the Confidential Private Placement Memorandum for Accredited Investors and Non-U.S. Persons of the Company, dated as of July 1, 2020.

**Section 2.    Payments and Prepayment.**

**(a)** Subject to the terms and conditions herein, the Company shall repay to Holder, to the extent not prepaid as set forth herein, the outstanding Loan Amount and all accrued and unpaid interest, on the 36-month anniversary of the Issue Date (the "Original Maturity Date").

**(b)** So long as an Event of Default (as defined below) has not occurred and is continuing, the Company shall have the option to extend the Original Maturity Date for an additional twelve (12) months (such Original Maturity Date if so extended, or the Original Maturity Date if not so extended, the "Maturity Date"). This option may be exercised by the Company at any time prior to the Original Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Original Maturity Date. If the Company fails to give such notice, this Note will mature upon the expiration of the Original Maturity Date.

**(c)** With respect to the payment of interest, the provisions of Section 2(c)(i) shall control in the absence of the Holder making the election, on the signature page hereto, to be governed by the provisions of Section 2(c)(ii), in which event the provisions of Section 2(c)(ii) shall control with respect to the payment of interest.

    **(i)** Subject to the other terms and conditions herein, prior to the Maturity Date, interest on the outstanding Loan Amount shall be accrue and shall be compounded monthly and added to the then-outstanding Loan Amount on the last day of each calendar month.

    **(ii)** Subject to the other terms and conditions herein, interest hereunder shall be calculated as simple interest, and prior to the Maturity Date the Company will make monthly interest payments to the Holder. Such monthly payments shall include all interest accrued hereunder through the end of the prior calendar month, and shall be due and payable to the Holder on the fifteenth (15th) calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter, unless otherwise agreed between Company and Holder.

**(d)** At the Maturity Date, or at the time the Company sooner pays off the entire principal balance of the Note, Holder shall be entitled to a one-time payment of 5% of the original Note balance ("Payoff Premium").

**(e)** The Company may choose to prepay part or all of the Note without penalty at any time prior to the Maturity Date. Any such prepayment will be credited first to any accrued and unpaid interest and then to the payment of the outstanding Loan Amount.

**Section 3.    Interest.**

**(a)** This Note shall bear interest at ten percent (10%) per annum, to be calculated, accrued and paid as set forth in Section 2(c)(i) or Section 2(c)(ii), as applicable. Interest computation shall be based upon a 365-day year and calculated in twelve equal monthly installments each year, except for the first and last months of any investment or payment in which case exact interest will be calculated. Interest will accrue on the loan made by the Holder under this Note from the Issue Date. If the

Company exercises its right to extend the Maturity Date as set forth in Section 2(b), the outstanding Loan Amount will bear simple interest at 11% per annum during the extension period.

(b) In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of fifteen (15%) percent per annum, simple interest from and after written notice to the Company of the Event of Default, until all amounts due hereunder have been paid in full or the Event of Default has been cured.

**Section 4.** **Representations and Warranties of the Company.** To induce the Holder to loan monies to the Company, the Company represents and warrants to the Holder as follows as of the Issue Date:

(a) **Organization and Authority.** The Company is a limited liability company, validly existing and in good standing under the laws of the State of Delaware, with full power and authority to enter into and perform this Note and the other agreements contemplated hereby to which it is now, or will be, a party. The Company has all requisite power and authority to, directly or indirectly, own its properties, to carry on its business as now conducted, and to enter into and perform its obligations under this Note.

(b) **Authorization; Binding Effect**. The Company has taken all actions that are necessary to authorize the execution, delivery and performance of this Note and the consummation of the transactions contemplated hereby. This Note and the other agreements contemplated hereby to which the Company is a party constitute the legal and binding obligations of the parties thereto, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights and the enforcement of debtors' obligations generally and by general principles of equity, regardless of whether enforcement is pursuant to a proceeding in equity or at law.

(c) **No Bankruptcy or Insolvency.** The Company has not filed any voluntary petition in bankruptcy or been adjudicated bankrupt or insolvent, filed any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any federal bankruptcy, insolvency, or other debtor relief law, or sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator of all or any substantial part of its properties. No court of competent jurisdiction has entered an order, judgment or decree (and the Company knows of no action or petition requesting such) approving a petition filed against the Company seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any federal bankruptcy act, or other debtor relief law, and no other liquidator, trustee or conservator has been appointed of the Company or of all or any substantial part of its properties.

(d) **Valid Issuance of the Note**. This Note, when issued by the Company to the Holder for the consideration expressed therein, will be duly and validly issued, and, based in part upon the representations of the Holder in this Note, will be issued in compliance with all applicable federal and state securities laws.

(e) **Restricted Securities**. The Company acknowledges that the Note has not been and will not be registered with the Securities and Exchange Commission ("SEC") under the Act, and covenants that the Note will be offered and sold in compliance with an exemption from registration provided by (i) Rule 506 of Regulation D of the Act or (ii) Regulation S of the Act.

(f) **Governmental Consents and Notices.** No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Note, or the offer, sale or issuance of the Note, or the consummation of any other transaction contemplated hereby, except qualification (or taking such action as may be necessary to secure an exemption from qualification, if available) of

the offer and sale of the Note under applicable state and federal securities laws, which qualification, if required, will be accomplished in a timely manner.

**(g)** **No Litigation.** There are no actions, suits or proceedings of any type pending or, to the knowledge of the Company, threatened, against the Company, its properties or assets which is likely to if adversely determined, individually or in the aggregate, have a material adverse effect on (a) the Company's ability to perform the obligations contemplated under this Note or other agreements contemplated hereby or (b) the business, operations, prospects, properties, assets or condition (financial or otherwise) of the Company. The Company is not operating under, or subject to, or in default with respect to, any order, writ, injunction or decree, including any of the foregoing affecting the ability of the Company to enter into this Note or perform its obligations contemplated under this Note and other agreements contemplated hereby.

**(h)** **No Breach; No Default.** To the best of the Company's knowledge, neither the execution, delivery or performance of this Note or the other agreements contemplated hereby to which the Company is a party, nor the consummation of the transactions contemplated hereby or thereby by the Company, (a) materially conflicts with or results in any material breach of, (b) constitutes a material default under, or (c) results in a material violation of: (i) any contract, commitment, lease, license, note or other instrument, including voting or limited liability company operating agreements, to which the Company is a party or by which any of its assets are bound, judgment, order, writ or decree or (ii) any provision of the Company's Certificate of Formation.

**(i)** **Taxes.** The Company has timely filed or will timely file or cause to be timely filed, all material tax returns (or extensions) required by applicable law to be filed by it prior to or as of the Issue Date, and paid (a) all amounts of taxes shown thereon to be due (including interest and penalties) and (b) all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangibles taxes) owing by it, except for such taxes (i) which are not yet delinquent or (ii) that are being contested in good faith and by proper proceedings, and against which adequate reserves are being maintained in accordance with United States generally acceptable accounting procedures.

**Section 5.** **Representations, Warranties and Notes of the Holder.** To induce the Company to accept the loan from the Holder, the Holder represents and warrants to the Company as of the date of the Issue Date as follows:

**(a)** **Purchase Entirely for Own Account.** The Note will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to distributing all or any part of the Note; the Holder has no present intention of selling, granting any participation in or otherwise distributing the Note in a manner contrary to the Act or any applicable state securities law; and the Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person with respect to the Note.

**(b)** **Due Diligence.** The Holder has been solely responsible for his, her or its own due diligence investigation of the Company and its business, and his, her or its analysis of merits and risks of the investment and subscription made pursuant to this Note, and is not relying on anyone else's analysis or investigation of the Company, its business or the merits and risks of the Note other than professional advisors employed specifically by the Holder to assist the Holder. In taking any action or performing any role relative to arranging the investment being made pursuant to this Note, the Holder has acted solely in his, her or its own interest and not in that of any other party, and no other party has acted as an agent or fiduciary for the Holder.

**(c)** **Access to Information; Modification of Offering.** The Holder has received and reviewed in its entirety the PPM. The Holder has been offered access to full and complete information regarding

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 680
1366

the Company and has assessed to his, her, or its satisfaction the risks associated with an investment in the Note. In particular, the Holder has been given the opportunity to ask questions of, and receive answers from, the Company's officers concerning the terms and conditions of this Note, the Note, the PPM, and any other matters pertaining to the Company and an investment in the Note and has been given the opportunity to obtain such additional information necessary to verify the accuracy of such information. No information has been provided and no representations have been made to the Holder which are inconsistent with any information contained in the PPM. The Holder acknowledges that the Company may, in its sole discretion and for any reason whatsoever, modify, amend, increase or withdraw all or a portion of the Offering. In the event of the foregoing, the Company will not have any liability whatsoever to the Holder, except that the Company will be obligated to return any moneys transmitted to the Company by the Holder that have not been applied by the Company for the purchase of Notes, without interest or deduction.

**(d) Sophistication.** The Holder, either alone or with the assistance of his, her or its professional advisor, is a sophisticated investor, is able to fend for himself, herself or itself in the transactions contemplated by this Note, and has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of acquiring the Note.

**(e) Suitability.** The investment in the Note is suitable for the Holder based upon his, her or its investment objectives and financial needs, and the Holder has adequate net worth and means for providing for his, her or its current financial needs and contingencies and has no need for liquidity of investment with respect to the Note. The Holder's overall commitment to investments that are illiquid or not readily marketable is not disproportionate to his, her or its net worth, and investment in the Note will not cause such overall commitment to become excessive.

**(f) Professional Advice.** The Holder has obtained, or has had the opportunity to obtain, to the extent he, she or it deems necessary, his, her or its own professional advice with respect to the risks inherent in the investment in the Note, the condition and terms of this Note and the suitability of the investment in the Note in light of the Holder's financial condition and investment needs. The Holder is not relying on the Company or any of its directors, officers, employees or agents with respect to the legal, tax, economic and related considerations of an investment in the Note, nor is the Holder relying on the Company or any of its directors, officers, employees or agents (including those of any Affiliates) with respect to the appropriateness of this investment for the Holder.

**(g) Ability to Bear Risk.** The Holder understands that the Company has limited prior operating history. The Holder recognizes that there is no market for the Notes and none is expected to develop; accordingly, his, her or its interest in the Note will be illiquid as well as subject to substantial contractual restrictions upon transferability. The Holder is in a financial position to purchase and hold the Note and is able to bear the economic risk and withstand a complete loss of his, her or its investment in the Note. The Holder agrees to waive any present or future claim against the Company, its officers, directors, representatives or Affiliates that the Note was not an appropriate investment for the Holder.

**(h) Risk Factors.** The Holder recognizes that an investment in the Note is subject to certain risks, the occurrence of which might result in a loss of the principal and interest due to the Holder. The Holder has carefully reviewed and understands the risk factors set forth in the PPM.

**(i) Restricted Securities.** The Holder realizes that (a) neither the Notes nor the offering of the Notes have been registered under the Act or applicable state securities laws; (b) that the Notes are characterized under the Act as "restricted securities" and, therefore, cannot be sold or transferred unless they are subsequently registered under the Act or an exemption from such registration is available; (c) the Company is not being registered as an "investment company" as the term "investment company" is defined in Section 3(a) of the 1940 Act, and (d) there is presently no

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 68 Page 681
1366

public market for the Note and the Holder would most likely not be able to liquidate his, her or its investment in the event of an emergency or to pledge the Note as collateral security for loans. The Holder's financial condition is such that it is unlikely that the Holder would need to dispose of any of the Note in the foreseeable future. In this connection, the Holder represents that he, she or it is familiar with Rule 144 of the Securities Act, as promulgated by the Securities and Exchange Commission, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

(j) **Further Limitations on Disposition.** Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Note unless and until there is compliance with the requirements herein, and, if requested by the Company, the Holder shall have furnished to the Company a detailed statement of the circumstances surrounding the proposed disposition and shall have furnished to the Company an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such Note under the Act and any applicable state Blue Sky laws.

(k) **Age; Residency.** The Holder, if an individual, is over 21 years of age and legally competent to execute this Note. For purposes of the application of state securities laws, the Holder represents that he, she or it is a bona fide resident of, and/or is domiciled in, the state or jurisdiction as set forth in the Subscription Agreement.

(l) **Investor Status and Subscription Agreement.** Holder hereby confirms and restates the representations and warranties as given by the Holder in the Subscription Agreement. The Holder is aware that the Company has been and is relying upon the representations and warranties set forth in the Subscription Agreement and in is Note, in part, in determining whether the Offering will qualify for an exemption from the registration provisions of the Act and applicable state securities laws. All of the information which the Holder has furnished the Company here, previously or in the documents or instruments contemplated by this Note with respect to the Holder's financial position and business experience is correct and complete as of the date hereof, and, if there should be any material change in such information, the Holder will immediately furnish the revised and corrected information to the Company. The Holder agrees to indemnify and hold harmless the Company and its Affiliates and their respective officers, managers, directors, members or employees and their successors and assigns from and against any and all losses, damages, liabilities or expenses, including costs and attorneys' fees incurred by reason of any misrepresentation by the Holder or any breach of the Holder's warranties.

(m) **Tax Identification; Withholding.** Under penalties of perjury, the Holder certifies that (a) the number listed with the Holder's name on the signature page to this Note is the Holder's correct social security number or federal tax identification number, (b) the Holder is not subject to back-up withholding, either because he, she or it has not been notified that he, she or it is subject to back-up withholding as a result of a failure to report all interest and dividends or because the Internal Revenue Service has notified the Holder that he, she or it is no longer subject to back-up withholding and (c) Holder is not a "foreign person," "foreign corporation" or a person which is not a "United States person" within the meaning of Sections 1441, 1442, 1445 and 1446 of the Internal Revenue Code of 1986, as amended. (If the Holder has at any time received notice from the Internal Revenue Service that he, she or it is subject to back-up withholding and has not subsequently received a notice advising the Holder of the termination of back-up withholding, strike clause (b) above).

(n) **No View to Tax Benefits.** The Holder is not acquiring the Note with a view toward realizing any benefits under United States federal income tax laws, and no representations have been made to

the Holder that any such benefits will be available as a result of the Holder's acquisition, ownership or disposition of the Note.

(o) **Confidential Information.** The Holder understands that the information contained in the PPM and this Note, is confidential and non-public information and agrees that all such information shall be kept in confidence by Holder and used by Holder solely for purposes of determining whether to purchase the Note. In addition, except as required by law, regulation or regulatory process, each Holder shall keep confidential, and shall cause each of its employees, agents, representatives, advisors or consultants to keep confidential all non-public information received by them with respect to the Company and its Affiliates following the Issue Date. The Holder, if an entity, represents and warrants that, as of the Issue Date, none of its beneficial owners are public agencies which are subject to state, federal or foreign laws providing for the possible public disclosure of certain records and information relating to the activities of such public agencies. The Holder agrees to notify the Company in the event such a public agency becomes a beneficial owner of the Holder and agrees to reasonably cooperate with the Company in such event to take steps, including entering into confidentiality agreements that restrict the access of certain of the Holder's beneficial owners to certain information, to protect information about the Company and its investments from being publicly disclosed by such public agency.

(p) **No General Solicitation.** The Holder is unaware of, is in no way relying on, and did not become aware of, the offering of the Note through, or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television, radio or Internet and is not subscribing for the Note, and did not become aware of the offering of the Note through, or as a result of, any seminar or meeting to which the Holder was invited, or any solicitation otherwise initiated, by a person not previously known to the Holder in connection with investments in securities generally.

(q) **Representations and Warranties of Organization.** If the Holder is a corporation, partnership or other association, trust or similar entity, the Holder hereby represents and warrants to the Company that the Holder is authorized and otherwise duly qualified to acquire the Note, and the individual executing this Note on behalf of the Holder has been duly authorized to do so and to bind the Holder by this Note (if the Holder is an individual who is investing through a revocable trust, an IRA or an account in a self-directed employee benefit plan (a "Self-Directed Entity"), such representation and warranty applies to the Self-Directed Entity, and, for this purpose, the term "Holder" shall be deemed to refer to the Self-Directed Entity).

**Section 6.**     **Covenants**.

(a) **Tax Statements.** The Company will furnish to Holder as soon as available, and in any event within sixty (60) days after December 31 of each year, all reasonably required tax information applicable to the Holder.

(b) **Use of Proceeds.** The proceeds from the sale and issuance of the Notes are expected to be used for the purposes set forth in the PPM, and for the fees, costs and expenses incurred in connection with the Offering. However, the Manager retains sole discretion to determine how such proceeds are ultimately used. Distributions may be made so long as the Company is not in default under the Note obligations.

(c) **Information Rights**. For so long as the Holder continues to hold the Note, the Company will make available to the Holder annual financial statements of the Company and such information relative to the Company's business operations and performance as its management may deem useful or appropriate.

**Section 7.**    **Defaults and Remedies.**

    **(a)  Events of Default.** An "Event of Default" occurs if any of the following occur, regardless of the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

        **(i)**  the Company defaults in the payment of the Loan Amount or interest on this Note, when the same becomes due and payable and such default continues for a period of thirty (30) Business Days after notice of such default has been delivered to Company by Holder (such period, a "Grace Period");

        **(ii)**  the Company fails to observe or perform any covenant or warranty of the Company in this Note (other than a covenant or warranty a default in whose performance or whose breach is specifically dealt with elsewhere in this Section), and such failure continues for a period of thirty (30) calendar days after the Holder has given written notice to the Company specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

        **(iii)**  the Company, pursuant to or within the meaning of any Bankruptcy Law (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

        **(iv)**  a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Company in an involuntary case, (ii) appoints a custodian of the Company for all or substantially all of its property, or (iii) orders the liquidation of the Company; and the order or decree remains unstayed and in effect for ninety (90) consecutive calendar days.

    **(b)**  The term "Bankruptcy Law" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

    **(c)**  Upon the occurrence of an Event of Default under this Note, and the expiration of any required time periods for notice, cure or other actions, the Holder may declare the Loan Amount to be due and payable. Upon such a declaration, such principal and interest, if any, shall be immediately due and payable. If an Event of Default as set forth in Section 7(a)(iii) or Section 7(a)(iv) occurs, Holder will have the right to enforce the Guaranty Agreement entered into between the Company and iCap Pacific NW Management LLC, pursuant to which iCap Pacific NW Management LLC guaranteed the obligations of the Company hereunder for the benefit of the Holder.

    **(d)**  The occurrence of an Event of Default for one Note in the Offering shall not be deemed an Event of Default for any other Note issued in the Offering.

**Section 8.**    **Transfer of the Note**. Holder may not sell, assign or transfer this Note or the Note or any portion thereof, including, without limitation, the Holder's rights, title, interests, remedies, powers and/or duties hereunder or thereunder, as the case may be, without the express written consent of the Company, which consent may be granted or withheld in the Company's sole discretion, and without complying with the terms of this Note and any other requirements set forth by the Company, as well as all applicable federal and state securities laws.

**Section 9.**     **Waivers.** The Company waives presentment for payment, demand, notice of nonpayment, notice of protest and protest of this Note, and all notices in connection with the delivery, acceptance, or dishonor of this Note.

**Section 10.**     **Anti-Terrorism Matters.** The Holder hereby authorizes the Company to take, without prior notice to the Holder, such action as the Company determines to be reasonably necessary or advisable to comply, or to cause the Company to comply, with any anti-terrorism laws, rules, regulations, directives or special measures. Without limiting the foregoing, the Company may disclose any information concerning the Company or the undersigned necessary to comply with such laws, rules, regulations, directives or special measures, and the Holder shall provide the Company, promptly upon request, all information the Company reasonably deems necessary or advisable to comply with such laws, rules, regulations, directives or special measures.

**Section 11.**     **Survival**. The representations and warranties of the Parties shall survive the consummation of the sale of the Note to Holder hereunder.

**Section 12.**     **Oral Agreements. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**Section 13.**     **Deemed Consent.**

   **(a)**  Each request for consent, approval or waiver under this Note, for an amendment hereof or other matter, which is sent by the Company, shall be made in writing to the Holder, and shall include all information necessary for Holder to make an informed decision as to whether to agree to such consent, approval, waiver or amendment, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN SERIES 3 - SENIOR PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND ICAP EQUITY, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

   **(b)**  If the Holder does not approve or reject the proposed matter within ten (10) days of receipt of such notice and all necessary information, via delivery of the same to the Company within such time period, for further distribution to the Company, the Company may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A SECOND AND FINAL REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN SERIES 3 - SENIOR PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND ICAP EQUITY, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT.

   **(c)**  If the Holder does not approve or reject the proposed or requested consent, approval, waiver or amendment or other matter within ten (10) days of receipt of such second and final notice, via delivery of the same to the Company within such time period, Holder shall be deemed to have approved, in writing, the proposed consent, approval, waiver or amendment or other matter as set forth in the notice, and the Company may effect the actions set forth therein in reliance on such consent.

**Section 14.**     **Miscellaneous.**

   **(a)**  **Assignment**. The Company may not assign this Note or any of its rights, interests or obligations hereunder without the prior written consent of the Holder, which consent may be granted pursuant to the deemed consent provisions of Section 13. Except as otherwise provided herein, the terms

and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the Parties. Nothing in this Note, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note.

**(b) Governing Law**. This Note shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Washington residents, entered into and to be performed entirely within the State of Washington, without giving effect to principles of conflicts of law. The Parties irrevocably consent to the jurisdiction and venue of and in King County, Washington in connection with any action arising from or relating to this Note or the transaction it contemplates. In the event of any dispute arising from or relating to this Note, the prevailing party shall be entitled to an award of its reasonable attorneys' fees and costs.

**(c) Waiver of Jury Trial.** EACH PARTY, TO THE EXTENT PERMITTED BY LAW, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE AND THE TRANSACTIONS IT CONTEMPLATES. THIS WAIVER APPLIES TO ANY ACTION OR LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

**(d) Titles and Subtitles.** The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

**(e) Notices.** Subject to Section 13, unless otherwise provided, any notice required or permitted under this Note shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) upon confirmation of receipt by fax by the party to be notified if received on or before 5:00 p.m. (local time) on any Business Day or, if received later on such day, upon the close of business on the next Business Day, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (e), (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested (provided that such notice shall be valid if sent via such method without receipt by sender of the return receipt being required) and addressed to the party to be notified; or (e) via email with return receipt requested (provided that such notice shall be valid if sent via such method without receipt by sender of the return receipt being required), in each case at the address indicated below, or at such other address as such party may designate by ten (10) days' advance written notice to the other party given in the foregoing manner(s).

If to the Company:

iCap Equity, LLC
Attn: Investor Relations Department
3535 Factoria Blvd SE Ste 500
Bellevue, WA 98006
Fax: 425-278-9025
Email: investor@icapequity.com

If to Holder, to the physical address and email address for Holder as set forth in Subscription Agreement.

**(f) Expenses. Other than as set forth herein or in the Subscription Agreement,** each Party shall pay its own costs and expenses that it incurs with respect to the negotiation, execution, delivery

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 6, Page 686
1366

and performance of this Note, the related agreements and the transactions contemplated herein and therein.

**(g) Entire Agreement**. This Note, the Subscription Agreement, and the other documents delivered pursuant hereto or thereto constitute the full and entire understanding and agreement between the Parties with regard to the subjects hereof and thereof.

**(h) Amendments and Waivers.** No term of this Note may be amended, nor the observance of any term of this Note waived (whether generally or in a particular instance and whether retroactively or prospectively), except by the written consent of the Company and the Holder, or pursuant to Section 13 above.

**(i) Severability.** If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

**(j) Costs of Collection.** If this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note in accordance with the terms of the Note Purchase Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action, including, but not limited to, attorneys' fees and disbursements, provided Holder finally prevails on such proceedings.

**(k) Holder as Owner.** The Company may deem and treat the holder of record of this Note as the absolute owner for all purposes regardless of any notice to the contrary from third parties.

**(l) No Member or Ownership Rights.** This Note confers no ownership rights whatsoever in the Company, and shall not entitle the Holder to any voting rights, any management rights, any ownership rights, any rights to distribution, any statutory rights conferred on members, or any other rights as an owner of the Company or to any other rights except the rights stated herein.

**(m) Counterparts**. This Note may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the Parties, it being understood that each Party need not sign the same counterpart. A facsimile copy or electronic transmission of a signature page to this Note shall be deemed to be an original signature page.

*[Signatures appear on following page]*

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:15     Exhibit 6, Page 687
1366

**SIGNATURE PAGE**

**SERIES 3 – SENIOR PROMISSORY NOTE**

**Loan Amount $**_____          **Date: _____, 202___**

**Monthly Interest Payment Election (optional)**:  by initialing below, Holder hereby elects to receive simple interest, paid monthly, and for this Note to be governed by the provisions of Section 2(c)(ii) instead of the provisions of Section 2(c)(i).

Investor Initials:  _____        _____

*Agreed and accepted:*

HOLDER:

Name (*Individual Holder or entity Holder*): _____

Signature: _____

Name: _____

Title: _____
                    *(if applicable)*

---

In witness whereof, the undersigned has executed this Note as of the Date above.

iCap Equity, LLC

By:      iCap Enterprises, Inc.
Its:      Manager

By:      _____
Name:  _____
Its:      _____

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 688
1366

**EXHIBIT C**

**GUARANTY AGREEMENT**

**(Attached)**

# GUARANTY AGREEMENT

This Guaranty (this "Guaranty") is made and entered into as of July 1, 2020 (the "Effective Date") by iCap Pacific NW Management LLC, a Washington limited liability company ("Guarantor"), to and for the benefit of each and of the holders (each, a "Holder") of promissory notes (the "Notes") issued by iCap Equity, LLC, a Delaware limited liability company and the sole member of Guarantor ("Borrower") pursuant to an offering of up to $50,000,000 of promissory notes of Borrower pursuant to Regulation D and Regulation S promulgated under the Securities Act of 1933, as amended, commencing on or about the Effective Date (the "Offering"). Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, following the execution of this Guaranty, Borrower shall issue certain Notes to the Holders, pursuant to a subscription agreement between the Borrower and the applicable Holder in connection with the Offering; and

WHEREAS, Guarantor acknowledges the provisions of the Notes require Guarantor to enter into this Agreement and Guarantor is financially interested in Borrower and will receive certain benefits as a result of Guarantor's promises herein as a result of making this Guaranty for the benefit of the Holders;

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Guarantor agrees as follows:

1. Guarantor hereby unconditionally, absolutely and irrevocably guarantees the full and timely performance of all of the obligations of Borrower under the Notes, including the due and punctual payment of the principal and interest of the Note and all money due or that may become due under the Notes, whether (a) according to the present terms of any of those documents or at any earlier or accelerated date or dates as provided therein, (b) pursuant to any extension of time or (c) pursuant to any amendment, modification or replacement of those documents hereafter made or granted, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such indebtedness may be or hereafter becomes unenforceable (collectively, "Obligations").

2. Guarantor agrees that settlement of any claim by Holder against Borrower, whether in any proceeding or not, and whether voluntarily or involuntarily, will not reduce the amount due under this Guaranty except to the extent of the amount actually paid by Borrower or any other party and retained by Holder.

3. During the continuation of an Event of Default with respect to a particular Note at a time when this Guaranty is in full force and effect, the Holder of such applicable Note may enforce this guaranty against Guarantor, subject to the terms of the applicable Note, but only after attempting to collect or exhausting Holder's efforts to collect from Borrower, in accordance with the provisions of the Notes.

4. Guarantor agrees that its obligation to make payment under the terms of this Guaranty shall not be impaired, modified, changed, released or limited in any manner by any impairment, modification, change, release, defense or limitation of the liability of Borrower or of a receiver,

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 6, Page 690
1366

trustee, debtor-in-possession or estate under any bankruptcy or receivership proceeding. If any payment made by Borrower is reclaimed in a bankruptcy or receivership proceeding, Guarantor shall pay to the applicable Holder(s) the dollar amount of the amount reclaimed. Guarantor further assigns to Holders all rights Guarantor may have in any proceeding under the U.S. Bankruptcy Code or any receivership or insolvency proceeding until all indebtedness of Borrower to Holders has been paid in full. This assignment includes all rights of Guarantor to be paid by Borrower even if those rights have nothing to do with this Guaranty. This assignment does not prevent Holder from enforcing Guarantor's obligations under this Guaranty in any way.

5.  Guarantor is now adequately informed of Borrower's financial condition, and Guarantor agrees to keep so informed. Holder need not provide Guarantor with any present or future information concerning the financial condition of Borrower or any other guarantor, and changes in Borrower's or Guarantor's financial condition shall not affect Guarantor's obligations under this Guaranty. Guarantor has not relied on financial information furnished by Holder, nor will Guarantor do so in the future.

6.  Guarantor represents and warrants to the Holders as follows:

    (a) The Guarantor is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Guaranty does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the Guarantor's organizational documents. The Guarantor has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Guaranty.

    (b) The execution of this Guaranty and the consummation of the transactions contemplated by this Guaranty will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Guarantor is a party or to which any of its assets, properties or operations are subject.

    (c) This Guaranty and all agreements and other documents executed by the Guarantor in connection herewith constitute the valid and binding obligation of the Guarantor, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

    (d) No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Guaranty or the valid and lawful exercise by Holders of remedies available to them under this Guaranty or applicable law.

    (e) Guarantor is fully familiar with all the covenants, terms and conditions of the Notes.

7. If an Event of Default occurs hereunder, a Holder shall have all other remedies provided by law and as set forth in the Note. Guarantor agrees that (a) this Guaranty shall inure to the benefit of and may be enforced by the Holder as set forth in the Notes, and (b) this Guaranty shall be binding upon and enforceable against Guarantor and its successors and assigns.

8. Any notices, communications and waivers under this Agreement shall be in writing and sent in accordance with the provisions for notices as set forth in the Notes.

9. Section 10, Section 12, Section 13 and Section 15 of the Notes are incorporated herein by reference and shall apply to this Agreement as though fully set forth herein, provided that any reference therein to the "Note" shall be deemed a reference to this Agreement.

10. This Agreement may be amended by Parent and the Pledgor at any time, without any approval of the Holders being required.

IN WITNESS WHEREOF, the Guarantor has duly executed this Agreement as of the Effective Date.

iCap Pacific NW Management LLC

By: _____
Name: Chris Christensen
Title: Manager

# EXHIBIT 7

**THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM CONTAINS MATERIAL NON-PUBLIC INFORMATION REGARDING ICAP PACIFIC INCOME FUND 4, LLC (THE "COMPANY"). BY ACCEPTING THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS HERETO (COLLECTIVELY THIS "MEMORANDUM"), THE RECIPIENT AGREES WITH THE COMPANY TO MAINTAIN IN STRICT CONFIDENCE ALL NON-PUBLIC INFORMATION, INCLUDING, BUT NOT LIMITED TO, THE EXISTENCE OF THE PROPOSED FINANCING AND ANY OTHER NON-PUBLIC INFORMATION REGARDING THE COMPANY OBTAINED FROM THIS MEMORANDUM, ANY OTHER TRANSACTION DOCUMENT OR THE COMPANY.**

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# FOR ACCREDITED INVESTORS AND NON-U.S. PERSONS



## iCap Pacific Income Fund 4, LLC

## $50,000,000 of

## Secured Promissory Notes

## October 1, 2018

**AN INVESTMENT IN OUR SECURITIES INVOLVES A HIGH DEGREE OF RISK. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF US AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD ONLY INVEST IN OUR SECURITIES IF YOU CAN AFFORD A COMPLETE LOSS OF YOUR INVESTMENT. YOU SHOULD READ THE COMPLETE DISCUSSION OF THE RISK FACTORS SET FORTH IN THIS MEMORANDUM.**

**DUE TO THE FACT THAT THE OFFERING IS A PRIVATE PLACEMENT AND EXEMPT FROM REGISTRATION, NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. SEE "CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS."**

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 79 Page 694
1366

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
# FOR
# ACCREDITED INVESTORS AND NON-U.S. PERSONS

## iCap Pacific Income Fund 4, LLC
## $50,000,000 OF AGGREGATE PRINCIPAL AMOUNT
## OF
## SECURED PROMISSORY NOTES

**Minimum subscription per investor of $50,000 of principal amount, although iCap Pacific Income Fund 4, LLC reserves the right to accept subscriptions for a lower principal amount.**

This Confidential Offering Memorandum (this "Memorandum") is being furnished in connection with the offer and sale (the "Offering") of up to $50,000,000 of secured promissory notes (the "Notes") by iCap Pacific Income Fund 4, LLC, a Delaware limited liability company (the "Company"). Notes will be issued in denominations of at least $50,000 (and any amounts in excess of $50,000). The Company may accept subscriptions in lesser amounts in its sole discretion.

The Company is a private investment vehicle that seeks to hold real estate investments as described herein. This Memorandum contains certain information that prospective investors should know about the Offering. The manager of the Company is iCap Pacific NW Management, LLC, a Washington limited liability company (the "Manager"). The Company's address is iCap Pacific Income Fund 4, LLC, PO Box 53232, Bellevue, Washington 98015.

The Offering is being made by the Company through its directors and officers only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act") and to non-U.S. Persons in an "offshore transaction," as defined in Rule 902 of Regulation S promulgated under the Securities Act. No commissions will be paid on any sales made by the Company's officers and directors. Investors who purchase notes are referred to herein as the "Noteholders." The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on June 30, 2019, unless extended by us for up to 180-days, subject to earlier termination as set forth herein.

**THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. NO INVESTMENT IN THE NOTES SHOULD BE MADE BY ANY INVESTOR NOT FINANCIALLY ABLE TO LOSE THE ENTIRE AMOUNT OF ITS INVESTMENT.**

---

### RISK DISCLOSURE STATEMENT

---

**THE ATTORNEYS THAT PREPARED THIS MEMORANDUM ("ATTORNEYS") HEREBY DISCLAIM ANY OPINION OR ASSURANCE OF ANY NATURE WHATSOEVER REGARDING THE ACCURACY, COMPLETENESS, REASONABLENESS, TIMELINESS OR VERACITY OF ANY OF THE ASSERTIONS, REPRESENTATIONS OR OTHER INFORMATION CONTAINED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, OR REGARDING THE INVESTMENT-WORTHINESS OF THE SECURITIES DISCUSSED**

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 79 Page 695
1366

HEREIN ("SECURITIES"). ANY ASSERTION OR REPRESENTATION MADE HEREIN, AND ALL OTHER INFORMATION DISCLOSED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, HAS BEEN MADE OR PROVIDED BY THE PROMOTER. IN CONNECTION WITH THE PREPARATION OF THESE CONFIDENTIAL OFFERING DOCUMENTS, THE ATTORNEYS HAVE NOT BEEN ENGAGED TO ATTEST HERETO, OR TO OPINE IN RESPECT HEREOF. ACCORDINGLY, THE ATTORNEYS HAVE NOT PERFORMED ANY ANALYTICAL, CONFIRMATION, VALIDATION, VERIFICATION OR OTHER PROCEDURES IN RESPECT OF THE ASSERTIONS AND REPRESENTATIONS CONTAINED HEREIN, NOR IN RESPECT OF ANY OF THE OTHER INFORMATION DISCLOSED HEREIN, INCLUDING ANY SIMILAR TO THOSE PROCEDURES UNDERTAKEN BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT IN CONNECTION WITH AN AUDIT OF THE FINANCIAL STATEMENTS OF AN ISSUER OF SECURITIES FOR PURPOSES OF RENDERING AN OPINION THEREON. CONSEQUENTLY, POTENTIAL INVESTORS, IN DECIDING WHETHER OR NOT TO INVEST IN THE SECURITIES, ARE CAUTIONED NOT TO ASCRIBE ANY SPECIAL RELIANCE WHATSOEVER ON THIS MEMORANDUM BY REASON THAT ATTORNEYS HAVE PREPARED THIS MEMORANDUM.

THIS BRIEF STATEMENT CANNOT DISCLOSE ALL THE RISKS AND OTHER FACTORS NECESSARY TO EVALUATE YOUR PARTICIPATION IN THIS COMPANY. THEREFORE, BEFORE YOU DECIDE TO PARTICIPATE IN AN INVESTMENT IN THIS COMPANY, YOU SHOULD CAREFULLY STUDY THIS MEMORANDUM, INCLUDING A DISCUSSION OF CERTAIN RISK FACTORS OF THIS INVESTMENT.

## CERTAIN NOTICES REGARDING THIS MEMORANDUM AND

## UNDER STATE SECURITIES LAWS

**FOR ALL PROSPECTIVE INVESTORS:** THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT SET FORTH IN (I) SECTION 4(A)(2) THEREOF AND RULE 506(C) OF REGULATION D PROMULGATED THEREUNDER TO ACCREDITED INVESTORS AND (II) REGULATION S PROMULGATED THEREUNDER TO NON-US PERSONS. RULE 506 OF REGULATION D SETS FORTH CERTAIN RESTRICTIONS AS TO THE NUMBER AND NATURE OF PURCHASERS OF SECURITIES OFFERED PURSUANT THERETO. WE HAVE ELECTED TO SELL SECURITIES ONLY TO ACCREDITED INVESTORS AS SUCH TERM IS DEFINED IN RULE 501(A) OF REGULATION D AND TO NON-US PERSONS AS DEFINED IN REGULATION S. EACH PROSPECTIVE INVESTOR WILL BE REQUIRED TO MAKE REPRESENTATIONS AS TO THE BASIS UPON WHICH IT QUALIFIES AS AN ACCREDITED INVESTOR OR NON-U.S. PERSON. PURSUANT TO RULE 506(C) INDEPENDENT VERIFICATION OF ACCREDITED INVESTOR STATUS FOR INVESTORS INVESTING PURSUANT TO RULE 506(C) WILL BE REQUIRED.

THE SECURITIES OFFERED HEREBY WILL BE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. ONLY PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT IN THE NOTES SHOULD PURCHASE THE

NOTES.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION ("SEC"), NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE INFORMATION PRESENTED HEREIN WAS PRESENTED AND SUPPLIED SOLELY BY THE COMPANY AND IS BEING FURNISHED SOLELY FOR USE BY PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING. THE COMPANY MAKES NO REPRESENTATIONS AS TO THE FUTURE PERFORMANCE OF THE COMPANY. THIS MEMORANDUM WERE PREPARED BY THE COMPANY.

THIS OFFERING IS SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION BY THE COMPANY AT ANY TIME AND WITHOUT NOTICE. WE RESERVE THE RIGHT IN OUR SOLE DISCRETION TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART NOTWITHSTANDING TENDER OF PAYMENT OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AGGREGATE PRINCIPAL AMOUNT OF NOTES SUBSCRIBED FOR BY SUCH INVESTOR.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY ANY SECURITY OTHER THAN THE SECURITIES OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY SUCH SECURITIES BY ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN OUR AFFAIRS SINCE THE DATE HEREOF. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN PERTINENT DOCUMENTS, APPLICABLE LAWS AND REGULATIONS. SUCH SUMMARIES ARE NOT COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE COMPLETE TEXTS THEREOF.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES.

THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM OR IN ANY ADDITIONAL EVALUATION MATERIAL, WHETHER WRITTEN OR ORAL, MADE AVAILABLE IN CONNECTION WITH ANY FURTHER INVESTIGATION OF THE COMPANY. THE COMPANY EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY THAT MAY BE BASED UPON SUCH INFORMATION, ERRORS THEREIN OR OMISSIONS THEREFROM. ONLY THOSE PARTICULAR REPRESENTATIONS AND WARRANTIES, IF ANY, WHICH MAY BE MADE TO A PARTY IN A DEFINITIVE WRITTEN AGREEMENT REGARDING A TRANSACTION INVOLVING THE COMPANY, WHEN, AS AND IF EXECUTED, AND SUBJECT TO SUCH LIMITATIONS AND RESTRICTIONS AS MAY BE SPECIFIED THEREIN, WILL HAVE ANY LEGAL EFFECT. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED TO THE CONTRARY IN WRITING, THIS MEMORANDUM SPEAKS AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE OF NOTES

MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY AFTER THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE OFFERING OF NOTES BEING MADE PURSUANT HERETO, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

THERE IS NO MARKET FOR THE NOTES AND THERE IS NO ASSURANCES A PUBLIC MARKET WILL EVER BE ESTABLISHED. PURCHASERS OF THE NOTES ARE NOT BEING GRANTED ANY REGISTRATION RIGHTS. A PURCHASE OF THE NOTES SHOULD BE CONSIDERED AN ILLIQUID INVESTMENT.

BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR HEREBY EXPRESSLY AGREES WITH THE COMPANY TO KEEP CONFIDENTIAL ALL OF THE CONTENTS HEREOF, INCLUDING, BUT NOT LIMITED TO, THE OFFERING AND ALL INFORMATION RELATED TO THE COMPANY, AND NOT TO DISCLOSE THE SAME TO ANY THIRD PARTY AND/OR OTHERWISE USE THE SAME FOR ANY PURPOSE OTHER THAN AN EVALUATION BY SUCH OFFEREE OF A POTENTIAL INVESTMENT IN THE COMPANY OF THE NOTES OFFERED PURSUANT HERETO. WE HAVE CAUSED THIS MEMORANDUM TO BE DELIVERED TO YOU IN RELIANCE UPON SUCH AGREEMENT BY YOU.

EACH PROSPECTIVE SUBSCRIBER BY RECEIVING THIS MEMORANDUM AGREES TO RETURN THE SAME TO US IF (A) THE OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY SECURITIES OFFERED HEREBY; (B) THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, AND/OR (C) THE OFFERING IS TERMINATED OR WITHDRAWN.

THIS MEMORANDUM IS SUBJECT TO AMENDMENT AND SUPPLEMENTATION AS APPROPRIATE. WE DO NOT INTEND TO UPDATE THE INFORMATION CONTAINED IN THE OFFERING DOCUMENTS FOR ANY INVESTOR WHO HAS ALREADY MADE AN INVESTMENT. WE MAY UPDATE THE INFORMATION CONTAINED HEREIN FROM TIME TO TIME AND PROVIDE SUCH UPDATED DOCUMENT TO POTENTIAL INVESTORS BUT UNDERTAKE NO OBLIGATION TO PROVIDE SUCH UPDATED DOCUMENTS TO AN INVESTOR WHO HAS ALREADY MADE HIS OR HER INVESTMENT.

## JURISDICTIONAL NOTICES

**FOR RESIDENTS OF ALL STATES:**

**THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN A PARTICULAR STATE. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE HEREBY ADVISED TO CONTACT THE COMPANY. THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS (COMMONLY CALLED "BLUE SKY" LAWS). THESE SECURITIES MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THE STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OF SALE MAY BE MADE IN ANY PARTICULAR STATE.**

**IN MAKING ANY INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. NO FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS RECOMMENDED THESE SECURITIES. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

1. **NOTICE TO ALABAMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

2. **NOTICE TO ALASKA RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE NOT BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISIONS OF 3 AAC 08.500 - 3 AAC 08.504. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS MEMORANDUM SINCE THE OFFERING DOCUMENTS ARE NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED, OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF 45.55.170. THE INVESTOR

MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

3. **NOTICE TO ARIZONA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ARIZONA SECURITIES ACT IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PURSUANT TO A.R.S. SECTION 44-1844 (1) AND THEREFORE CANNOT BE RESOLD UNLESS THEY ARE ALSO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

4. **NOTICE TO ARKANSAS RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN RELIANCE UPON CLAIMS OF EXEMPTION UNDER THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING OR PASSED UPON THE ADEQUACY OR ACCURACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

5. **NOTICE TO CALIFORNIA RESIDENTS:** THESE SECURITIES HAVE NOT BEEN QUALIFIED OR OTHERWISE APPROVED OR DISAPPROVED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS UNDER THE CALIFORNIA CORPORATIONS CODE. THESE SECURITIES ARE OFFERED IN CALIFORNIA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PROVIDED BY SECTIONS 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. ACCORDINGLY, DISTRIBUTION OF THIS MEMORANDUM AND OFFERS AND SALES OF THE SECURITIES REFERRED TO HEREIN ARE STRICTLY LIMITED TO PERSONS WHO THE COMPANY DETERMINES TO HAVE MET CERTAIN FINANCIAL AND OTHER REQUIREMENTS. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY WITH RESPECT TO ANY OTHER PERSON. IN ORDER TO RELY ON THE FOREGOING EXEMPTIONS, THE COMPANY WILL RELY IN TURN ON CERTAIN REPRESENTATIONS AND WARRANTIES MADE TO THE COMPANY BY THE INVESTORS IN THIS OFFERING. THOSE REPRESENTATIONS AND WARRANTIES ARE CONTAINED IN THE SUBSCRIPTION AGREEMENT, ATTACHED HERETO AS EXHIBIT A.

6. **FOR COLORADO RESIDENTS ONLY:** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS OFFERING HAS NOT BEEN QUALIFIED WITH COMMISSIONER OF CORPORATIONS OF THE STATE OF COLORADO AND THE ISSUANCE OF SUCH SECURITIES OR PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATIONS IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPTED FROM QUALIFICATION BY SECTION 25100, 25102, OR 25104 OF THE COLORADO CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS OFFERING ARE EXPRESSLY CONDITION UPON SUCH QUALIFICATIONS BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933,

28-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 700
1366

AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991, IF SUCH REGISTRATION IS REQUIRED.

7. **NOTICE TO CONNECTICUT RESIDENTS ONLY:** SECURITIES ACQUIRED BY CONNECTICUT RESIDENTS ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 36B-31-21B-9B OF THE CONNECTICUT, UNIFORM SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF CONNECTICUT. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

8. **NOTICE TO DELAWARE RESIDENTS ONLY:** IF YOU ARE A DELAWARE RESIDENT, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE DELAWARE SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

9. **NOTICE TO DISTRICT OF COLUMBIA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES BUREAU OF THE DISTRICT OF COLUMBIA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

10. **NOTICE TO FLORIDA RESIDENTS ONLY:** THE SECURITIES DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES AND INVESTOR PROTECTION UNDER THE FLORIDA SECURITIES ACT. THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF SAID ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, ALL OFFEREES WHO ARE FLORIDA RESIDENTS SHOULD BE AWARE THAT SECTION 517.061(11)(A)(5) OF THE ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "WHEN SALES ARE MADE TO FIVE OR MORE PERSONS IN [FLORIDA], ANY SALE IN [FLORIDA] MADE PURSUANT TO [THIS SECTION] IS VOIDABLE BY THE PURCHASER IN SUCH SALE EITHER WITHIN 3 DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR AN ESCROW AGENT OR WITHIN 3 DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER." THE AVAILABILITY OF THE PRIVILEGE TO VOID SALES PURSUANT TO SECTION 517.061(11) IS HEREBY COMMUNICATED TO EACH FLORIDA OFFEREE. EACH PERSON ENTITLED TO EXERCISE THE PRIVILEGE TO AVOID SALES GRANTED BY SECTION 517.061 (11) (A)(5) AND WHO WISHES TO EXERCISE SUCH RIGHT, MUST, WITHIN 3 DAYS AFTER THE TENDER OF ANY AMOUNT TO THE COMPANY OR TO ANY AGENT OF THE COMPANY (INCLUDING THE SELLING AGENT OR ANY OTHER DEALER ACTING ON BEHALF OF THE PARTNERSHIP OR ANY SALESMAN OF SUCH DEALER) OR AN ESCROW AGENT CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE COMPANY AT THE ADDRESS PROVIDED IN THIS CONFIDENTIAL EXECUTIVE SUMMARY. SUCH LETTER OR TELEGRAM MUST BE SENT AND, IF POSTMARKED, POSTMARKED ON OR PRIOR TO THE END OF THE AFOREMENTIONED THIRD DAY. IF A PERSON IS SENDING A LETTER, IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ASSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME IT WAS MAILED. SHOULD A PERSON MAKE THIS REQUEST ORALLY, HE MUST ASK FOR WRITTEN CONFIRMATION

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 701
1366

THAT HIS REQUEST HAS BEEN RECEIVED.

11. **NOTICE TO GEORGIA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE GEORGIA SECURITIES ACT PURSUANT TO REGULATION 590-4-5-04 AND -01. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

12. **NOTICE TO HAWAII RESIDENTS ONLY:** NEITHER THESE CONFIDENTIAL OFFERING DOCUMENTS NOR THE SECURITIES DESCRIBED HEREIN BEEN APPROVED OR DISAPPROVED BY THE COMMISSIONER OF SECURITIES OF THE STATE OF HAWAII NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS.

13. **NOTICE TO IDAHO RESIDENTS ONLY:** THESE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT IN RELIANCE UPON EXEMPTION FROM REGISTRATION PURSUANT TO SECTION 30-14-203 OR 302(C) THEREOF AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SAID ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SAID ACT.

14. **NOTICE TO ILLINOIS RESIDENTS:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF THE STATE OF ILLINOIS NOR HAS THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

15. **NOTICE TO INDIANA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-2-1-2 OF THE INDIANA SECURITIES LAW AND HAVE NOT BEEN REGISTERED UNDER SECTION 23-2-1-3. THEY CANNOT THEREFORE BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID LAW OR UNLESS AN EXEMPTION FORM REGISTRATION IS AVAILABLE. A CLAIM OF EXEMPTION UNDER SAID LAW HAS BEEN FILED, AND IF SUCH EXEMPTION IS NOT DISALLOWED SALES OF THESE SECURITIES MAY BE MADE. HOWEVER, UNTIL SUCH EXEMPTION IS GRANTED, ANY OFFER MADE PURSUANT HERETO IS PRELIMINARY AND SUBJECT TO MATERIAL CHANGE.

16. **NOTICE TO IOWA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED; THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

17. **NOTICE TO KANSAS RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 81-5-15 OF THE KANSAS SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

18. **NOTICE TO KENTUCKY RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER TITLE 808 KAR 10:210 OF THE KENTUCKY SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

19. **NOTICE TO LOUISIANA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER RULE 1 OF THE LOUISIANA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

20. **NOTICE TO MAINE RESIDENTS ONLY:** THE ISSUER IS REQUIRED TO MAKE A REASONABLE FINDING THAT THE SECURITIES OFFERED ARE A SUITABLE INVESTMENT FOR THE PURCHASER AND THAT THE PURCHASER IS FINANCIALLY ABLE TO BEAR THE RISK OF LOSING THE ENTIRE AMOUNT INVESTED. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION UNDER §16202(15) OF THE MAINE UNIFORM SECURITIES ACT AND ARE NOT REGISTERED WITH THE SECURITIES ADMINISTRATOR OF THE STATE OF MAINE. THE SECURITIES OFFERED FOR SALE MAY BE RESTRICTED SECURITIES AND THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS: (1) THE SECURITIES ARE REGISTERED UNDER STATE AND FEDERAL SECURITIES LAWS, OR (2) AN EXEMPTION IS AVAILABLE UNDER THOSE LAWS.

21. **NOTICE TO MARYLAND RESIDENTS ONLY:** IF YOU ARE A MARYLAND RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 11-602(9) OF THE MARYLAND SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MARYLAND. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

22. **NOTICE TO MASSACHUSETTS RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MASSACHUSETTS UNIFORM SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THIS OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

23. **NOTICE TO MICHIGAN RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE MICHIGAN SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

24. **NOTICE TO MINNESOTA RESIDENTS ONLY:** THESE SECURITIES BEING OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

25. **NOTICE TO MISSISSIPPI RESIDENTS ONLY:** THE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE MISSISSIPPI SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE MISSISSIPPI SECRETARY OF STATE OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE SECRETARY OF STATE NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, OR APPROVED OR DISAPPROVED THIS OFFERING. THE SECRETARY OF STATE DOES NOT RECOMMEND THE PURCHASE OF THESE OR ANY OTHER SECURITIES. EACH PURCHASER OF THE SECURITIES MUST MEET CERTAIN SUITABILITY STANDARDS AND MUST BE ABLE TO BEAR AN ENTIRE LOSS OF THIS INVESTMENT. THE SECURITIES MAY NOT BE TRANSFERRED FOR A PERIOD OF ONE (1) YEAR EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE MISSISSIPPI SECURITIES ACT OR IN A TRANSACTION IN COMPLIANCE WITH THE MISSISSIPPI SECURITIES ACT.

26. **FOR MISSOURI RESIDENTS ONLY:** THE SECURITIES OFFERED HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE PURCHASER IN A TRANSACTION EXEMPT UNDER SECTION 4.G OF THE MISSOURI SECURITIES LAW OF 1953, AS AMENDED. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MISSOURI. UNLESS THE SECURITIES ARE SO REGISTERED, THEY MAY NOT BE OFFERED FOR SALE OR RESOLD IN THE STATE OF MISSOURI, EXCEPT AS A SECURITY, OR IN A TRANSACTION EXEMPT UNDER SAID ACT.

27. **NOTICE TO MONTANA RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A MONTANA RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF FIVE (5) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES.

28. **NOTICE TO NEBRASKA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER CHAPTER 15 OF THE NEBRASKA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

29. **NOTICE TO NEVADA RESIDENTS ONLY:** IF ANY INVESTOR ACCEPTS ANY OFFER TO PURCHASE THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION NRS 90.530 OF THE NEVADA SECURITIES LAW. THE

INVESTOR IS HEREBY ADVISED THAT THE ATTORNEY GENERAL OF THE STATE OF NEVADA HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING AND THE FILING OF THE OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE, OR SALE THEREOF, BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEVADA. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. NEVADA ALLOWS THE SALE OF SECURITIES TO 25 OR FEWER PURCHASERS IN THE STATE WITHOUT REGISTRATION. HOWEVER, CERTAIN CONDITIONS APPLY, I.E., THERE CAN BE NO GENERAL ADVERTISING OR SOLICITATION AND COMMISSIONS ARE LIMITED TO LICENSED BROKER-DEALERS. THIS EXEMPTION IS GENERALLY USED WHERE THE PROSPECTIVE INVESTOR IS ALREADY KNOWN AND HAS A PRE-EXISTING RELATIONSHIP WITH THE COMPANY. (SEE NRS 90.530.11.)

30. **NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY:** NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE UNDER THIS CHAPTER HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

31. **NOTICE TO NEW JERSEY RESIDENTS ONLY:** IF YOU ARE A NEW JERSEY RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE CONFIDENTIAL OFFERING DOCUMENTS HAVE NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

32. **NOTICE TO NEW MEXICO RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE NEW MEXICO DEPARTMENT OF BANKING NOR HAS THE SECURITIES DIVISION PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

33. **NOTICE TO NEW YORK RESIDENTS ONLY:** THIS MEMORANDUM HAVE NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE COMPANY HAS TAKEN NO STEPS TO CREATE AN AFTER MARKET FOR THE SECURITIES OFFERED HEREIN AND HAS MADE NO ARRANGEMENTS WITH BROKERS OF OTHERS TO TRADE OR MAKE A MARKET IN THE SECURITIES. AT SOME TIME IN THE FUTURE, THE COMPANY MAY ATTEMPT TO ARRANGE FOR INTERESTED BROKERS TO TRADE OR MAKE A MARKET IN THE SECURITIES AND TO QUOTE THE SAME IN A PUBLISHED QUOTATION MEDIUM,

HOWEVER, NO SUCH ARRANGEMENTS HAVE BEEN MADE AND THERE IS NO ASSURANCE THAT ANY BROKERS WILL EVER HAVE SUCH AN INTEREST IN THE SECURITIES OF THE COMPANY OR THAT THERE WILL EVER BE A MARKET THEREFORE.

34. **NOTICE TO NORTH CAROLINA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FORGOING AUTHORITIES HAVE NOT CONFIRMED ACCURACY OR DETERMINED ADEQUACY OF THIS MEMORANDUM. REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

35. **NOTICE TO NORTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES COMMISSIONER OF THE STATE OF NORTH DAKOTA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

36. **NOTICE TO OHIO RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 1707.03(X) OF THE OHIO SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

37. **NOTICE TO OKLAHOMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF OKLAHOMA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION FOR PRIVATE OFFERINGS. ALTHOUGH A PRIOR FILING OF THESE CONFIDENTIAL OFFERING DOCUMENTS AND THE INFORMATION HAS BEEN MADE WITH THE OKLAHOMA SECURITIES COMMISSION, SUCH FILING IS PERMISSIVE ONLY AND DOES NOT CONSTITUTE AN APPROVAL, RECOMMENDATION OR ENDORSEMENT, AND IN NO SENSE IS TO BE REPRESENTED AS AN INDICATION OF THE INVESTMENT MERIT OF SUCH SECURITIES. ANY SUCH REPRESENTATION IS UNLAWFUL.

38. **NOTICE TO OREGON RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE CORPORATION COMMISSION OF THE STATE OF OREGON UNDER PROVISIONS OF ORS 59.049. THE INVESTOR IS ADVISED THAT THE COMMISSIONER HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS MEMORANDUM SINCE THIS MEMORANDUM IS NOT REQUIRED TO BE FILED WITH THE COMMISSIONER. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE COMPANY CREATING THE SECURITIES, AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

23-90243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 706
1366

39. **NOTICE TO PENNSYLVANIA RESIDENTS ONLY:** EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(D), DIRECTLY FROM THE ISSUER OR AFFILIATE OF THIS ISSUER, SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER HE MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED. IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 (70 PS § 1-207(M), YOU MAY ELECT, WITHIN TWO (2) BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONEYS PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A LETTER OR TELEGRAM TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE CONFIDENTIAL OFFERING DOCUMENTS) INDICATING YOUR INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU SHOULD ASK WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. NO SALE OF THE SECURITIES WILL BE MADE TO RESIDENTS OF THE STATE OF PENNSYLVANIA WHO ARE NON-ACCREDITED INVESTORS. EACH PENNSYLVANIA RESIDENT MUST AGREE NOT TO SELL THESE SECURITIES FOR A PERIOD OF TWELVE (12) MONTHS AFTER THE DATE OF PURCHASE, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION. THE SECURITIES HAVE BEEN ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE PENNSYLVANIA SECURITIES ACT OF 1972. NO SUBSEQUENT RESALE OR OTHER DISPOSITION OF THE SECURITIES MAY BE MADE WITHIN 12 MONTHS FOLLOWING THEIR INITIAL SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION, AND THEREAFTER ONLY PURSUANT TO AN EFFECTIVE REGISTRATION OR EXEMPTION.

40. **NOTICE TO RHODE ISLAND RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE DEPARTMENT OF BUSINESS REGULATION OF THE STATE OF RHODE ISLAND NOR HAS THE DIRECTOR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

41. **NOTICE TO SOUTH CAROLINA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE SOUTH CAROLINA UNIFORM SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE SOUTH CAROLINA SECURITIES COMMISSIONER. THE COMMISSIONER DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY

REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

42. **NOTICE TO SOUTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THESE CONFIDENTIAL OFFERING DOCUMENTS ARE TRUE, COMPLETE, AND NOT MISLEADING, NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

43. **NOTICE TO TENNESSEE RESIDENT ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD. EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

44. **NOTICE TO TEXAS RESIDENTS ONLY:** THE SECURITIES OFFERED HEREUNDER HAVE NOT BEEN REGISTERED UNDER APPLICABLE TEXAS SECURITIES LAWS AND, THEREFORE, ANY PURCHASER THEREOF MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. FURTHER, PURSUANT TO §109.13 UNDER THE TEXAS SECURITIES ACT, THE COMPANY IS REQUIRED TO APPRISE PROSPECTIVE INVESTORS OF THE FOLLOWING: A LEGEND SHALL BE PLACED, UPON ISSUANCE, ON CERTIFICATES REPRESENTING SECURITIES PURCHASED HEREUNDER, AND ANY PURCHASER HEREUNDER SHALL BE REQUIRED TO SIGN A WRITTEN AGREEMENT THAT HE WILL NOT SELL THE SUBJECT SECURITIES WITHOUT REGISTRATION UNDER APPLICABLE SECURITIES LAWS, OR EXEMPTIONS THEREFROM.

45. **NOTICE TO UTAH RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE UTAH SECURITIES ACT. THE SECURITIES CANNOT BE TRANSFERRED OR SOLD EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

46. **NOTICE TO VERMONT RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE STATE OF VERMONT NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS

UNLAWFUL.

47. **NOTICE TO VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION UNDER SECTION 13.1-514 OF THE VIRGINIA SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

48. **NOTICE TO WASHINGTON RESIDENTS ONLY:** THE ADMINISTRATOR OF SECURITIES HAS NOT REVIEWED THE OFFERING OR CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE SECURITIES HAVE NOT BEEN REGISTERED IN RELIANCE UPON THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, AND THEREFORE, CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, OR UNLESS AN EXEMPTION FROM REGISTRATION IS MADE AVAILABLE.

49. **NOTICE TO WEST VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 15.06(B)(9) OF THE WEST VIRGINIA SECURITIES LAW AND MAY NOT BE REOFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

50. **NOTICE TO WISCONSIN RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A WISCONSIN RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF THREE AND ONE-THIRD (3 1/3) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES OFFERED HEREIN.

51. **FOR WYOMING RESIDENTS ONLY:** ALL WYOMING RESIDENTS WHO SUBSCRIBE TO PURCHASE SECURITIES OFFERED BY THE COMPANY MUST SATISFY THE FOLLOWING MINIMUM FINANCIAL SUITABILITY REQUIREMENTS IN ORDER TO PURCHASE SECURITIES: (1) A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) OF TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000); AND (2) THE PURCHASE PRICE OF SECURITIES SUBSCRIBED FOR MAY NOT EXCEED TWENTY PERCENT (20%) OF THE NET WORTH OF THE SUBSCRIBER; AND (3) "TAXABLE INCOME" AS DEFINED IN SECTION 63 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, DURING THE LAST TAX YEAR AND ESTIMATED "TAXABLE INCOME" DURING THE CURRENT TAX YEAR SUBJECT TO A FEDERAL INCOME TAX RATE OF NOT LESS THAN THIRTY-THREE PERCENT (33%). IN ORDER TO VERIFY THE FOREGOING, ALL SUBSCRIBERS WHO ARE WYOMING RESIDENTS WILL BE REQUIRED TO REPRESENT IN THE SUBSCRIPTION AGREEMENT THAT THEY MEET THESE WYOMING SPECIAL INVESTOR SUITABILITY REQUIREMENTS.

# BASIS OF PRESENTATION

In this Memorandum, unless the context otherwise requires, we," "us," "our," the "Company" or the "Company," refers collectively to iCap Pacific Income Fund 4, LLC, a Delaware limited liability company, formed on October 11, 2018, the issuer of the Notes in this Offering, and its subsidiaries.

We use a twelve-month fiscal year ending on December 31st of each calendar year. In a twelve-month fiscal year, each quarter includes three-months of operations; the first, second, third and fourth quarters end on March 31, June 30, September 30 and December 31, respectively.

Certain monetary amounts, percentages and other figures included in this Memorandum have been subject to rounding adjustments. Percentage amounts included in this Memorandum have not in all cases been calculated on the basis of such rounded figures but on the basis of such amounts prior to rounding. For this reason, percentage amounts in this Memorandum may vary from those obtained by performing the same calculations using the figures in our consolidated financial statements. Certain other amounts that appear in this Memorandum may not sum due to rounding.

Unless otherwise indicated, all references to "dollars" and "$" in this Memorandum are to, and amounts are presented in, U.S. dollars.

Unless otherwise indicated or the context otherwise requires, financial and operating data in this Memorandum reflect the consolidated business and operations of the Company and its subsidiaries.

# MARKET AND INDUSTRY DATA AND FORECASTS

Certain market and industry data included in this Memorandum is derived from information provided by third-party market research firms, or third-party financial or analytics firms that we believe to be reliable. Market estimates are calculated by using independent industry publications, government publications and third-party forecasts in conjunction with our assumptions about our markets. We have not independently verified such third-party information. The market data used in this Memorandum involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates. While we are not aware of any misstatements regarding any market, industry or similar data presented herein, such data involves risks and uncertainties and are subject to change based on various factors, including those discussed under the headings "Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors" in this Memorandum. These and other factors could cause results to differ materially from those expressed in the estimates made by the independent parties and by us.

Certain data are also based on our good faith estimates, which are derived from management's knowledge of the industry and independent sources. Industry publications, surveys and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but there can be no assurance as to the accuracy or completeness of included information. We have not independently verified any of the data from third-party sources nor have we ascertained the underlying economic assumptions relied upon therein. Statements as to our market position are based on market data currently available to us. While we are not aware of any misstatements regarding the industry data presented herein, our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "Risk Factors" in this Memorandum. Similarly, we believe our internal research is reliable, even though such research has not been verified by any independent sources.

# TRADEMARKS AND COPYRIGHTS

We may own or have rights to trademarks or trade names that we use in connection with the operation of our business, including our corporate names, logos and website names. In addition, we own or

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 710
1366

have the rights to copyrights, trade secrets and other proprietary rights that protect the content of our products and the formulations for such products. This Memorandum may also contain trademarks, service marks and trade names of other companies, which are the property of their respective owners. Our use or display of third parties' trademarks, service marks, trade names or products in this Memorandum is not intended to, and should not be read to, imply a relationship with or endorsement or sponsorship of us. Solely for convenience, some of the copyrights, trade names and trademarks referred to in this Memorandum are listed without their ©, ® and ™ symbols, but we will assert, to the fullest extent under applicable law, our rights to our copyrights, trade names and trademarks. All other trademarks are the property of their respective owners.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This Memorandum contains certain forward-looking statements that are subject to various risks and uncertainties. Forward-looking statements are generally identifiable by use of forward-looking terminology such as "may," "will," "should," "potential," "intend," "expect," "outlook," "seek," "anticipate," "estimate," "approximately," "believe," "could," "project," "predict," or other similar words or expressions. Forward-looking statements are based on certain assumptions, discuss future expectations, describe future plans and strategies, contain financial and operating projections or state other forward-looking information. Our ability to predict results or the actual effect of future events, actions, plans or strategies is inherently uncertain. Although we believe that the expectations reflected in our forward-looking statements are based on reasonable assumptions, our actual results and performance could differ materially from those set forth or anticipated in our forward-looking statements. Factors that could have a material adverse effect on our forward-looking statements and upon our business, results of operations, financial condition, funds derived from operations, cash available for dividends, cash flows, liquidity and prospects include, but are not limited to, the factors referenced in this Memorandum, including those set forth below.

When considering forward-looking statements, you should keep in mind the risk factors and other cautionary statements in this Memorandum. Readers are cautioned not to place undue reliance on any of these forward-looking statements, which reflect our views as of the date of this Memorandum. The matters summarized below and elsewhere in this Memorandum could cause our actual results and performance to differ materially from those set forth or anticipated in forward-looking statements. Accordingly, we cannot guarantee future results or performance. Furthermore, except as required by law, we are under no duty to, and we do not intend to, update any of our forward-looking statements after the date of this Memorandum, whether as a result of new information, future events or otherwise.

## CONFIDENTIALITY AND RELATED MATTERS

Each recipient hereof agrees by accepting this Memorandum that the information contained herein is of a confidential nature and that such recipient will treat such information in a strictly confidential manner and that such recipient will not, directly or indirectly, disclose or permit its affiliates or representatives to disclose, any information to any other person or entity, or reproduce such information, in whole or in part, without the prior written consent of the Company.

Each recipient of this Memorandum further agrees to use the information solely for the purpose of analyzing the desirability of an investment in the Company to such recipient and for no other purpose whatsoever.

ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM AND EXHIBITS, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED.  NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION NOT CONTAINED IN THIS

MEMORANDUM OR AN AUTHORIZED SUMMARY HEREOF, OR IN ANY AGREEMENT CONTEMPLATED HEREBY, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR IN SUCH AUTHORIZED SUMMARY OR AGREEMENT MUST NOT BE RELIED UPON.

## RESTRICTIONS ON TRANSFERABILITY

SINCE THE SECURITIES OFFERED HEREBY ARE NOT BEING REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES CANNOT BE SOLD BY AN INVESTOR UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH ACT, OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE AT THE TIME OF DESIRED SALE. THEREFORE, A PURCHASER MUST BE ABLE TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## TAXES

EXCEPT AS SPECIFICALLY SET FORTH HEREIN PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. THE TAX ASPECTS OF AN INVESTMENT IN THE NOTES REQUIRE CAREFUL AND INFORMED STUDY WITH RESPECT TO AN INVESTOR'S PERSONAL TAX AND FINANCIAL POSITION. ACCORDINGLY, NO PERSON SHOULD INVEST IN THE NOTES WITHOUT PRIOR INDEPENDENT EXPERT ADVICE AS TO THE TAX IMPACT OF AN INVESTMENT IN THE SECURITIES. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES. NOTHING IN THIS MEMORANDUM SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO POTENTIAL INVESTORS.

A COPY OF THIS MEMORANDUM AND THE SUBSCRIPTION AGREEMENTS SHALL BE DELIVERED TO EVERY PERSON SOLICITED TO BUY ANY OF THE SECURITIES HEREBY OFFERED, AT THE TIME OF THE INITIAL OFFER TO SELL.

## WHERE YOU CAN OBTAIN MORE INFORMATION

This Memorandum contains limited information on the Company. While we believe the information contained in this Memorandum is accurate, this Memorandum is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective investor that the abbreviated nature of this Memorandum will not omit to state a material fact, which a prospective investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such investor. As a result, prospective investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **An investment in the Notes is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

Prospective investors may make an independent examination of our books, records and other documents to the extent an investor deems it necessary, and should not rely on us or any of our employees or agents with respect to judgments relating to an investment in the Company.

Each offeree may, if he, she or it so desires, make inquiries of appropriate members of our management with respect to our business or any other matters set forth herein, and may obtain any additional information which such person deems to be necessary in order to verify the accuracy of the information contained in this Memorandum (to the extent that we possess such information or can acquire

it without unreasonable effort or expense) upon the execution and delivery of an agreement to maintain the confidentiality of such information for the benefit of the Company.

Any such inquiries or requests for additional information or documents should be made in writing to us, addressed as follows:

<div align="center">

iCap Pacific Income Fund 4, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006
ATTN: Investor Relations
OFC: (425) 278-9030; FAX: (425) 278-9025
EMAIL: inquiry@icapequity.com

</div>

# Table of Contents

SUMMARY ................................................................................................................................. 1

THE OFFERING ........................................................................................................................ 3

THE NOTES .............................................................................................................................. 3

SECURITY AND GUARANTY; REGISTERED OFFERING ................................................ 4

THE COMPANY ....................................................................................................................... 6

    The Company and its Operations ........................................................................................ 6

    Investment Strategy ............................................................................................................. 7

    Meeting Demand Payment Obligations .............................................................................. 7

    Members and Management ................................................................................................... 7

    Biographies of Management Personnel ............................................................................... 8

    Organizational Strength and Experience ............................................................................ 9

    Investment Experience ........................................................................................................ 9

    Management Fees; Transactions with Related Parties ...................................................... 10

USE OF PROCEEDS ............................................................................................................... 11

INVESTOR SUITABILITY STANDARDS ............................................................................ 11

SUBSCRIPTION PROCEDURES ........................................................................................... 14

RESTRICTIONS ON TRANSFERABILITY .......................................................................... 16

STATEMENT AS TO INDEMNIFICATION .......................................................................... 16

RISK FACTORS ...................................................................................................................... 16

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS .......................................... 28

**Exhibits**

Exhibit A-1     Subscription Agreement for Accredited Investors
Exhibit A-2     Subscription Agreement for non-U.S. Persons
Exhibit B         Form of Promissory Note
Exhibit C         Pledge and Security Agreement
Exhibit D         Guaranty Agreement

# SUMMARY

*This summary of this Memorandum highlights material information concerning our business and this Offering. This summary does not contain all of the information that you should consider before making your investment decision. You should carefully read this entire Memorandum, including the information presented under the section entitled "Risk Factors" and the financial data and related notes, before making an investment decision. This summary contains forward-looking statements that involve risks and uncertainties. Our actual results may differ significantly from future results contemplated in the forward-looking statements as a result of factors such as those set forth in "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements."*

The following is a summary of selected terms of the Company and the Notes. This summary is not intended as a summary of all principal terms and is qualified in its entirety by the more detailed descriptions set forth below, including the Subscription Agreements attached hereto as Exhibit A-1 and Exhibit A-2 (the "**Subscription Agreements**"). Capitalized terms used in this Summary and not otherwise defined have the meanings given to them elsewhere in this Memorandum.

| | |
|---|---|
| **The Company** | iCap Pacific Income Fund 4, LLC, a Delaware limited liability company is an affiliate of iCap Equity, LLC, a Bellevue, Washington-based investment firm formed in 2011. "iCap Equity" or "iCap," as used in this Memorandum, refers to iCap Enterprises, Inc. (the parent company of iCap Equity, LLC) and its affiliated group of companies (excluding the Company). |
| | See "The Company" commencing on page 6. |
| **Purpose** | The primary purpose of the Company is to acquire real estate investments in the United States and provide a rate of return to its investors. The Company has formed iCap Holding, LLC ("Holding") as a wholly owned subsidiary of the Company, and Holding shall own an interest in one or more standalone subsidiaries (each a "Portfolio SPE"), which will then hold real property investments. The Company's business plan targets construction and development projects. |
| | See "The Company" commencing on page 6. |
| **Manager** | The Company is managed by iCap Pacific NW Management, LLC, a Washington limited liability company (the "Manager"). The Company will pay the Manager an annual management fee equal to 2% of the outstanding aggregate principal balances of the Notes. |
| | See "The Company – Members and Management" commencing on page 7. |
| **The Offering** | The Company is issuing up to $50,000,000 in aggregate principal amount of Notes. The minimum individual investment is $50,000, with any amounts in excess thereof being permitted, subject to the acceptance by the Manager. The Manager may change, or accept less than, the minimum investment amount in its discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one Noteholder or its affiliates. |
| | The Company will offer the Notes for a period commencing on the date of |

1

|  | this Memorandum and expiring on June 30, 2019, unless extended by us for up to 180 days.

The Company may terminate, or amend the terms of, this Offering at any time. The Offering will automatically terminate upon the commencement of the Registered Offering, as defined and described below.

See "The Offering" commencing on page 3. |

**The Notes**

The Notes will accrue interest at the rate of 10.00% ("Interest Rate"), per annum, compounded monthly, based on a 365-day year. Investors will have their interest paid monthly by adding such interest to their principal balances each month. Investors will have the option of directing their monthly interest to another account of their choosing.

Investors will have the option of demanding repayment of all or any part of their outstanding principal and unpaid accrued interest, any time after the 3-year anniversary of their investment date, subject to a limit of no more repayments than 25% of the combined notes of the Company per year. Upon a request for demand repayment, the Company will pay the principal over four quarters. The Company may prepay all or any part of the Notes without penalty at any time prior to the Maturity Date. If not earlier paid, the outstanding principal and unpaid accrued interest on the Notes will be due and payable 20 years after the date of the investor's initial investment.

See "The Notes" commencing on page 3.

**Security and Guaranty**

Until the time of the Registered Offering the Notes will be secured by a pledge of Holding's equity interests in the Portfolio SPEs, and Holding shall enter into a guaranty agreement with the Company for the benefit of the Noteholders.

See "The Notes" commencing on page 3 and "Security and Guaranty; Registered Offering" on page 4.

**Expenses**

The Company will bear all costs and expenses incurred in the organization of the Company and this Offering and potential future offerings, and will reimburse Manager for any such costs and expenses advanced by Manager. The Company will also pay the Manager a management fee of 2% of the outstanding aggregate principal balances of the Notes. With the exception of employee payroll expenses, which will be paid by the Manager, all other expenses will be borne by the Company. Each investor will bear his, her or its own fees and expenses incurred in connection with this Offering.

See "The Company - Management Fees; Transactions with Related Parties" on page 10.

## THE OFFERING

The Company is offering for sale up to $50,000,000 of aggregate principal amount of promissory notes. The Offering is being made by the Company through its directors and officers only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act and non-U.S. Persons (as defined below) who meet certain suitability standards established. No commissions will be paid on any sales made by the Company's officers and directors. The Company may elect to engage one or more finders ("Placement Agents") for this Offering, in which event the Placement Agents will also conduct the Offering on a "best efforts" basis, and the Company would expect in such case to pay commissions of no more than eight percent, based on the aggregate principal amount of the Notes sold to investors.

The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on June 30, 2019, unless extended by us for up to 180-days (the "Offering Period") or earlier terminated as set forth herein.

The minimum individual investment is $50,000, with any amount in excess of $50,000 being permissible, subject to the Manager's discretion. The Manager may change, or accept less than, the minimum investment amount in its discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one investor or its affiliates. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines. In order to subscribe for a Note, prospective investors must follow the directions set forth in "Subscription Procedures" commencing on page 14.

An investor must be prepared to bear the economic risk of an investment in the Notes for an indefinite period of time. An investor in the Notes, pursuant to the Subscription Agreement and applicable law, will not be permitted to transfer or dispose of the Notes, unless they are registered for resale or such transaction is exempt from registration under the Securities Act and other applicable securities laws, and in the case of a purportedly exempt sale, such investor provides (at his or her own expense) an opinion of counsel satisfactory to us that such exemption is, in fact, available. The Notes will bear a legend relating to such restrictions on transfer.

This Offering may be withdrawn or terminated by the Company at any time. The Manager reserves the right to reject a subscription for Notes, in whole or in part in its sole discretion.

## THE NOTES

The Notes will bear interest at a rate of 10% per year, and will have a maturity date 20 years following the issuance date (the "Maturity Date"); however, an Investor may request repayment of funds anytime after the 3-year anniversary of the date of Investment. In order to allow the Company to continue its operations successfully, no more than 25% of the aggregate Note balances may be repaid in a given calendar year. Interest will accrue based on a 365-day year and will be paid monthly. Unless otherwise elected by US Investors, the interest will be added to the principal balances of the Notes each month for the first three years. The Company may prepay all or any part of the Notes without penalty at any time prior to the Maturity Date. If the Company makes any prepayment, the prepayments need not be made ratably against all outstanding Notes. If not earlier paid, whether pursuant to a Demand Notice (as described below) or full prepayment by the Company, outstanding principal and unpaid accrued interest on the Notes will be due and payable on the Maturity Date.

At any time following the 3-year anniversary of the issuance date, a Noteholder may require the Company to repay all or a portion of the Note and the accrued interest thereon by providing a demand notice

23-90243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 717
1366

to the Company ("Demand Notice"). Such notice may be delivered via First Class US mail, or electronically via email to an account representative or through the Company's licensed software application ("App"). The App, which will be available to Noteholders through mobile devices and desktops, will allow the Noteholder to review his/her transaction history, provide Demand Notice requests, purchase additional Notes, agree to investment documentation, send messages to the Company, and receive notices from the Company. Upon receipt of a Demand Notice, the Company will pay the requested amount in four equal installments due within 15-days of the beginning of each calendar quarter (the "Demand Payment"). The first Demand Payment will be made in the next calendar quarter that follows delivery of proper notice, provided 45-days notice is provided to the Company. For those investors not wishing to utilize the App, a form of the Demand Notice is attached as Exhibit A to the Note, a form of which is attached hereto as Exhibit B.

The description of the Notes set forth herein is qualified in its entirety by the form of Note as attached hereto as Exhibit B.

## SECURITY AND GUARANTY; REGISTERED OFFERING

Prior to the commencement of the Registered Offering (as described below), the Notes will be secured by a Pledge and Security Agreement to be entered into by Holding and the Noteholders (the "Security Agreement"), pursuant to which Holding will pledge the membership interests of the Portfolio SPEs for the benefit of the Noteholders. Each investor in this Offering, as a condition thereto, shall be required to execute a counterpart signature page to the Security Agreement and become a party thereto. The Security Agreement is attached hereto as Exhibit C, and a counterpart signature page thereto is attached to the Subscription Agreement.

Pursuant to the Security Agreement and to secure the prompt payment and full and faithful performance of the obligations of the Company to the Noteholders pursuant to the Notes, Holding will grant a security interest in its membership interests of the Portfolio SPEs for the benefit of the Noteholders (the "Interests"). In the event that an Event of Default (as defined below) occurs, as determined and claimed by Noteholders holding a majority of the principal amount of the Notes then outstanding (a "Majority-in-Interest of the Noteholders"), then, as determined by a Majority-in-Interest of the Noteholders, the Noteholders may exercise the rights and pursue the remedies provided under Articles 8 and 9 of the Uniform Commercial Code (the "UCC") with respect to the Interests, including the right to exercise all voting rights with respect to the Interests, collecting all dividends and other distributions with respect to the Interests, and foreclosing the liens and security interest created under this Security Agreement by any available judicial procedure or without judicial process and selling the Interests.

The Security Agreement also provides that the Company may make distributions to its Members provided the Company an Event of Default has not occurred and is continuing under the Notes. It further allows the payment of tax distributions (i.e., distributions in the amount of taxes payable by such members on the apportioned income of the entities) regardless of whether an Event of Default exists. Management Fees are not distributions, and will be paid regardless of the value of the Company's assets.

In addition, Holding has entered into a Guaranty Agreement with the Company pursuant to which Holding has guaranteed the obligations of the Company pursuant to the Notes (the "Guaranty Agreement"), which is attached hereto as Exhibit D. The Guaranty Agreement provides that, during the continuation of an Event of Default, the Noteholders may enforce this guaranty against Holding, but only after attempting to collect or exhausting the Noteholders' efforts to collect from Borrower. Any actions under the Guaranty Agreement must similarly be agreed to by a Majority-in-Interest of the Noteholders.

The Company may prepare a registration statement for a registered offering of promissory notes which will be in form and substance materially the same as the Notes being offered in this Offering, to be

registered under the Securities Act (the "Registered Offering"). The promissory notes to be registered and sold in the Registered Offering are referred to herein as the "Registered Notes." At the time of the effectiveness of the registration statement for the Registered Offering, the Company shall terminate this Offering and no additional Notes shall be sold hereunder. In addition, at the commencement of the Registered Offering the Security Agreement shall be terminated and a new security agreement shall be put into place for the Registered Notes, and the Company shall appoint a trustee to act on behalf of the noteholders who acquire Registered Notes in the Registered Offering, and for the Noteholders in this Offering who exchange their Notes for Registered Notes (the "Trustee"), as described below. The duties of the Trustee are further discussed below. In addition, at such time, the Guaranty Agreement shall be terminated and replaced with a guaranty to the holders of the Registered Notes.

At the time of the Registered Offering, Noteholders shall have the right to exchange their Notes acquired in this Offering for the Registered Notes in the Registered Offering, and therefore to continue to have the benefit of the security and guaranty as they had prior to the commencement of the Registered Offering.

Investors in this Offering will not be required to exchange their Notes for Registered Notes, but if such investors elect to continue to hold the Notes from this Offering, such Noteholders will not have any ongoing security interest or guaranty.

We expect that the Registered Notes will be secured by a similar pledge of the Interests, and by the new guaranty agreement as described above, which security interest will be governed by the Trustee. However, the form, terms and conditions of the security documents which will secure the Registered Notes, and the terms of the new guaranty agreement, shall be determined by the Manager and the Trustee.

The description of the Security Agreement set forth herein is qualified in its entirety by the Security Agreement as attached hereto as Exhibit C and the description of the Guaranty Agreement set forth herein is qualified in its entirety to the Guaranty Agreement as attached hereto as Exhibit D.

The Notes, and the Registered Notes at the time of the Registered Offering, will be junior to any credit facilities that are put in place by the Company related to its operations, and the real property assets of the Company may be used as collateral for such credit facilities.

Prior to the time that the Company utilizes the proceeds from this Offering to acquire real estate, and other than for the use of proceeds related to this Offering and the formation of the Company as set forth below, the Company will retain the funds from this Offering in its accounts at commercial banks.

The Notes are subject to four possible "Events of Default." It is an "Event of Default" if any of the following occur, and the Company has not rectified such event within 90 days of receipt of notice thereof signed by a Majority-in-Interest of the Noteholders:

(i)  The Company fails to make a Demand Payment when due;

(ii)  the Company fails to perform any of its material obligations under the Note, or is in breach in any material respect of any representation, warranty, covenant or agreement on the part of the Company set forth in the Note;

(iii) the Company commences any liquidation or dissolution proceedings or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consents to the filing of any bankruptcy petition against it under any similar law; or

(iv) the Company fails to pay all amounts due under the Notes on the Maturity Date.

23-90243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 7, Page 719 of 1366

Only a Majority-in-Interest of the Noteholders can declare an Event of Default, and then only after the 90-day cure period has expired without the Company rectifying the applicable situation.

If an Event of Default occurs, the interest rate will be increased to 15% per annum (the "Default Rate"), which Default Rate will remain in place until the Note is either paid as due or such Event of Default is cured.

If the Event of Default is as described in clause (i), (ii), or (iv) above, a Majority-in-Interest of the Noteholders will have the right to declare only the applicable Note(s) which are subject to the Event of Default due and payable. If the Event of Default is as described in clause (iii) above, a Majority-in-Interest of the Noteholders will have the right to declare all of the Notes (including the Notes sold in the Registered Offering) due and payable.

Upon delivery of written notice to the Company of such default, the Company will have 30 days to honor the payment obligation. If the Company fails to honor the repayment obligation within this time period, then a Majority-in-Interest of the Noteholders will have the right to proceed to enforce the security granted to the noteholders pursuant to the Security Agreement and to enforce the Guaranty Agreement.

## THE COMPANY

### The Company and its Operations

iCap Pacific Income Fund 4, LLC is a newly formed Delaware limited liability company and is an affiliate of iCap Equity, LLC, a Bellevue, Washington-based investment firm formed in 2011. The Company has been established to provide an investment vehicle that generates a good rate of return, is secured by interests of the Portfolio LLCs, and has a liquidity mechanism for investors.

The primary purpose of the Company is to acquire preferred equity interests in construction and development projects in selected metropolitan statistical areas in the United States (each, a "Portfolio Investment"). Portfolio Investments will be held in standalone Portfolio SPEs, which will be held by Holding and the builders or developers who manage the projects (each a "Project Partner"). The Company's business plan targets the acquisition of short-term (less than 24-months) real estate investments with Project Partners who have strong track records of success. The equity interests of the Portfolio SPEs will, until the time of the Registered Offering, secure the amounts due under the Notes.

The geographic areas in which the Company invests are determined by selecting metropolitan statistical areas upon consultation with market professionals and in-depth review of economic data. The Company may adjust its investment criteria to accommodate changing market conditions, but will generally seek attractive locations with strong exit potential and proven Project Partners.

The Manager anticipates that the Company will be exempt from the registration requirements of the Investment Company Act of 1940, as amended (the "Investment Company Act"), by reason of the exemption specified in Section 3(c)(1) of the Investment Company Act (for issuers whose securities are not beneficially owned by more than 100 persons) or Section 3(c)(7) of the Investment Company Act (for issuers whose securities are owned exclusively by "qualified purchasers" within the meaning of Section 2(a)(51) of the Investment Company Act) or other provisions of the Investment Company Act.

POTENTIAL INVESTORS SHOULD RECOGNIZE THAT BY PURCHASING NOTES THEY WILL NOT THEREBY ACQUIRE ANY INTEREST, DIRECTLY OR INDIRECTLY, IN THE COMPANY OR ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. INVESTORS SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE

MANAGER AND ITS AFFILIATES AS SET FORTH HEREIN IS GIVEN SOLELY TO ALLOW INVESTORS TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. THE MANAGER AND ITS AFFILIATES MAY CONTINUE TO ENGAGE IN MANAGEMENT AND INVESTMENT ACTIVITIES RELATED TO PRE-EXISTING INVESTMENTS AND ACTIVITIES OR OPERATIONS OF THE PRIOR FUNDS AS WELL AS FUTURE FUNDS.

**Investment Strategy**

The Company's Investment Portfolio will consist of single-family homes, multi-family apartments, townhomes, and mixed-use properties, often in construction and development projects phases. The revenue generated from the Investment Portfolio will be used to pay interest and principal on the Notes and fund its operations.

To build its Investment Portfolio, the Company will identify metropolitan statistical areas within which to purchase properties. The Company has developed proven processes and controls to evaluate possible investment opportunities. The process begins by identifying metropolitan statistical areas within the U.S. ("Markets") with strong economic fundamentals that are likely to result in strong exit strategies and strong returns. The Markets are selected after review of reports and analysis provided by economics professionals, as well as the Company's internal staff. After reviewing the reports, a committee consisting of key members of the management team (the "Investment Committee") may approve a Market. After a Market has been approved, the Company's acquisition team will search for purchase opportunities for the Company that meet the criteria of the applicable investment policies of the Company.

Every investment opportunity will undergo due diligence performed by the Company's underwriters, who will then present investment opportunities to the Investment Committee for its review and approval. The Investment Committee may delegate investment decision-making authority to sub-teams, provided such investments meet the criteria established by the Investment Committee. The Company will complete diligence on prospective investments and maintain closing procedures that provide for the safety of the invested funds, such as a third-party escrow company. The investment process has three major areas of focus: analysis and approval, documentation and closing, and post-closing management. Post-closing management of the real estate portfolio will be done by real estate management companies, who will manage the leasing, cash flows, and maintenance of the properties.

**Meeting Demand Payment Obligations**

The Company will establish two sources of liquidity to address demand payments: First, the Company will have cash reserves available to honor demand payments; second, the Company may refinance the Note by issuing additional notes, allowing other investors to purchase the notes, or obtaining institutional financing (each a "Liquidity Source") pursuant to which funds will be advanced to the Company. These Liquidity Sources have not been established at present, are not expected to be established until the Registered Offering commences.

The Notes will be subordinate at times to the rights of the Liquidity Sources as well as to other higher-ranking obligations of the Company, including property taxes and management fees.

The Company may, in its discretion, dispose of some or all of its investment properties to reposition the portfolio or to meet the Company's payment obligations. The Company will maintain cash reserves, which may be used to purchase properties, honor demand payment requests of Noteholders, make tax or other distributions to its member, or cover the costs of the Company's day-to-day operations.

**Members and Management**

7

The sole member of the Company is iCap Equity, LLC, which is owned by iCap Enterprises, Inc., a Washington corporation wholly owned by Chris Christensen. The primary officers of iCap Enterprises, Inc. are Chris Christensen and Jim Christensen, whose biographies are below.

The manager of the Company is iCap Pacific NW Management, LLC, a Washington limited liability company (the "**Manager**"). The officers of the Manager are the same as officers of iCap Enterprises, Inc. The management and supervision of the Company is vested exclusively in the Manager (including its duly appointed agents), which has full control over the business and affairs of the Company pursuant to the Company's limited liability company operating agreement (the "Operating Agreement").

Our direct organizational structure is as shown in the chart below.



The Manager may delegate day-to-day management responsibility of the Company to any person, provided that the Manager will retain ultimate responsibility for the management and conduct of the activities of the Company and all decisions relating to the selection and disposition of the Company's investments.

**Biographies of Management Personnel**

*Chris Christensen, President*

Chris leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. He is also primarily responsible for tax and accounting decisions. Prior to forming the Company, Chris managed affiliated funds, formed and managed affiliates of the Manager, including Edge Construction, LLC and iCap Enterprises, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a Juris Doctor degree from Seattle University School of Law, a Master's degree in International Business from Seattle University, and a Bachelor of Arts degree in Economics from the University of Utah. He is the brother of Jim Christensen.

*Jim Christensen, Chief Operating Officer*

Jim is iCap's Chief Operating Officer and assists the President with the day-to-day operations of iCap and its investment funds, including overseeing investment underwriting, project and construction management, project financing, disposition of distressed assets, and management of the various strategic relationships involving iCap and its affiliates. In addition, he is responsible for the technology-related underpinnings of iCap. This includes electronic document storage, electronic process automation, and software management. Prior to the formation of the prior funds, Jim managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington State for iCap Enterprises, Inc. Jim has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Jim holds a Master of Business Administration degree and a

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 7, Page 722   Pg 722 of 1366

Bachelor of Arts degree in Economics from the University of Washington. Jim is the brother of Chris Christensen.

*Trace ("TD") Croshaw, Chief Financial Officer*

As Chief Financial Officer, TD is responsible for managing financial controls and accounting procedures of the Company and its investments. TD provides forecasts, budgets and other financial analysis of the Company and its investments, assists with investor reports and communications, manages cash flows and cash flow projections, and establishes and ensures adherence to internal control policies and procedures within the Company. TD also supervises iCap's accounting personnel, and manages the Company's third-party audit, tax and accounting firms, to complete annual audit and tax returns. TD is a licensed CPA. Prior to joining iCap, TD had 15 years of experience as an audit manager at an accounting firm performing financial audits for businesses. TD holds a Bachelor of Arts degree in Accounting from the University of Utah, and a Master of Business Administration degree from the University of Phoenix, and he is a member of the AICPA.

## Organizational Strength and Experience

The members of the senior management team have completed a variety of projects in the small-cap real estate space. The team, through its combined experience, has closed in excess of $8 billion in transactions in the small and mid-cap spaces.

iCap also maintains a network of strategic relationships. The team leverages relationships with sourcing, development, construction, and fund administration constituents to maintain a pipeline of real estate purchase opportunities. Property owners, builders, developers, lenders and brokers are the primary entities for deal sourcing.

iCap has capacity to expand its team to manage large amounts of capital from the sale of the Notes and to deploy such proceeds towards real estate that meets its investment criteria. iCap has invested significant resources to build the technology and infrastructure needed to manage large amounts of noteholders, capital, and real estate. The number of employees who manage this infrastructure will grow as the capital under management increases.

The Manager and its affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

## Investment Experience

As a newly formed investment vehicle, the Company has no operating or prior performance history. The information presented in this section represents the limited historical experience of the principals of the Manager and its affiliates. Prospective investors in the Company should not rely on the information below as being indicative of the types of investments the Company may make or of the types of returns the Company's investments may generate. Prospective investors should not assume that the Company will experience returns, if any, comparable to those described herein.

iCap has significant prior experience in investing in single-family, multi-family, light commercial and land development properties. Although this Memorandum refers to "iCap" as though it were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. The Company will not acquire an interest in any of iCap's affiliated entities,

but may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Manager, and therefore the Company, as it conducts its business.

**Management Fees; Transactions with Related Parties**

The Company will pay the Manager an annual management fee equal to 2% of the outstanding aggregate principal balances of the Notes ("Management Fee"). The Management Fee for the first year will be fully earned and paid at the time of investment. Thereafter, the Management Fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the Notes during the applicable quarter.

The Company will pay all expenses related to the operation of the Company, other than the costs of the personnel of the Manager. These costs that will be paid by the Company include the fees and expenses related to this Offering, office rent and fees, office common area maintenance charges, phone, fax, and internet access, computer hardware and related supplies, general office supplies, office rental of fax, printers, or scanners and maintenance costs related thereto, consulting, legal, accounting, and professional fees, marketing and travel expenses and any business licenses and registrations required of the Company or the Manager as a result of its management of the Company.

The Manager may elect to pay any of these Company expenses, in which event the Company will reimburse the Manager for those out-of-pocket costs.

The Manager may charge a Portfolio SPE a fee to cover the costs of due diligence and underwriting involved in closing a real estate purchase or disposition. This fee, which may be payable by the Portfolio SPE on or after closing of the purchase or disposition, will be non-refundable and will typically be less than $15,000. Additionally, in the event the Company or the Manager acquires or becomes an affiliate of a real estate brokerage company, the Company may pay customary brokerage fees to such entity for the acquisition or disposition of the Company's assets.

Under the Operating Agreement the Manager may elect to cause the Company to distribute to any member of the Company, a cash distribution equal to the taxes that such member would owe on the income attributed to it from the Company pursuant to the Internal Revenue Code, less any amounts that have been distributed to such member(s) in the applicable year. The Company is not required to make any distributions to its members prior to dissolution. Additionally, the Company may make non-tax distributions to its members in cash or in kind at any time, provided an Event of Default has not occurred and is continuing.

The Company may engage, or cause a Portfolio SPE to engage, an affiliate of the Company to provide the Portfolio SPEs with services. The Company shall not pay compensation to such affiliated entity at a rate that is higher than is standard in the market. In the event the Company enlists the services of any affiliate of the Manager identified below, the rates of compensation of these affiliates for the performance of their various services will be limited and all payments will be subject to inspection by auditors upon request. A description of the affiliated entities and the agreed upon rates are set forth below. To the extent the market rates for these services increase over time, the Company may pay rates in excess of the rates set forth below. Additionally, to the extent the Company in the future provides services that are not listed below, such services must be provided at reasonable market rates.

If the Manager, or an affiliate of the Manager or the Company, guarantees, whether personally or otherwise, a loan, bond or other obligation of the Company, a holding company, or a Portfolio SPE, that guarantor will be entitled to receive from the benefiting entity an annual fee equal to 1% of the total amount of the credit facility, bond amount, or other obligation that is the subject of the guarantee.

The Company may engage the services of certain related or affiliated parties to provide services to

10

the Company un connection with is operations. These include the following:

*Edge Construction, LLC or an affiliated general contractor:* Expected to provide general contracting services, including those related to new construction of and rehabilitation of real estate projects, and is expected to receive a fee of cost plus 10%. Costs include the costs of management of a project, including costs of project management, supervision, materials and labor, each of which will be billed at hourly rates, which are currently between $30 and $180 per hour.

*iCap Enterprises, Inc.:* Expected to Provide development and consulting services, as well as accounting and administrative support at hourly rates which are currently between $30 and $200 per hour.

## USE OF PROCEEDS

The proceeds of this Offering will be used to pay expenses related to its formation and operations and for this Offering, and to purchase and manage preferred equity real estate positions through Portfolio SPEs. The proceeds will be used to cover costs associated with this process, such as marketing, management fees, and professional service fees. The Company expects to pay organizational expenses of approximately $250,000, which include the cost of forming the Company, Holding and the Portfolio SPEs and the cost of marketing and management associated with the Company's operations, including technology infrastructure and maintenance, and Offering expenses of approximately $200,000, which includes the cost of preparing this Memorandum and marketing for this Offering as well as the costs associated with the Registration Statement. As discussed above, the Company may elect to engage one or more Placement Agents in the Offering, Any commissions payable to such Placement Agents are not included in the estimate above.

Proceeds from this Offering will also be used to pay the management fee to the Manager as discussed above, and such amounts are not included in the figures above.

At any given time, the Company will maintain cash reserves to meet demand payments, interest payments, and operational requirements. Such cash may be in the form of the Offering proceeds, cash from operations, or credit facilities available to the Company. With the exception of employee payroll expenses, which will be covered by the Manager, all other expenses will be borne by the Company.

## INVESTOR SUITABILITY STANDARDS

*General*

An investment in our Notes involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in their investment. Our Notes are only suitable for those who desire a relatively long-term investment for which they do not need liquidity until the anticipated return on investment as set forth in this Memorandum.

The offer, offer for sale, and sale of our Notes is intended to be exempt from the registration requirements of the Securities Act pursuant to Rule 506(c) of Regulation D promulgated thereunder as to "accredited investors" and to non-U.S. Persons, as defined in, and pursuant to, Regulation S promulgated pursuant to the Securities Act, and is intended to be exempt from the registration requirements of applicable state securities laws as a federally covered security. This Offering is directed to "accredited investors," as that term is defined in Rule 501(a) of Regulation D as promulgated by the SEC and to non-U.S. Persons as defined in Regulation S as promulgated by the SEC.

A subscriber must meet one (or more) of the investor suitability standards below (be an "accredited investor" or non-U.S. Person) to purchase Notes. Fiduciaries must also meet one of these conditions. If the investment is a gift to a minor, the custodian or the donor must meet these conditions. For purposes of the

net worth calculations below, net worth is the amount by which assets exceed liabilities, but excluding your house, home furnishings or automobile(s) among your assets. In the subscription agreement, a subscriber will have to confirm satisfaction of these minimum standards:

- Each investor must have the ability to bear the economic risks of investing in the Notes.

- Each investor must have sufficient knowledge and experience in financial, business or investment matters to evaluate the merits and risks of the investment.

- Each investor must represent and warrant that the Notes to be purchased are being acquired for investment and not with a view to distribution.

- Each investor will make other representations to us in connection with the purchase of the Notes, including representations concerning the investor's degree of sophistication, access to information concerning the Company, and ability to bear the economic risk of the investment.

*Suitability Requirements*

Rule 501(a) of Regulation D defines an "accredited investor" as any person who comes within any of the following categories, or whom the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1) Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Exchange Act; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration undersection 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

For purposes of calculating net worth:

(A) The person's primary residence shall not be included as an asset;

(B) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

In determining income, a subscriber should add to the subscriber's adjusted gross income any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deduction claimed for depletion, contribution to an IRA or Keogh plan, alimony payments, and any amount by which income for long-term capital gains has been reduced in arriving at adjusted gross income.

<u>Non-U.S. Persons</u>

A "non-U.S. Person" is any person who is not a "US Person", which is any of the following:

(a) Any natural person resident in the United States (as defined below);

(b) Any partnership or corporation organized or incorporated under the laws of the United States;

(c) Any estate of which any executor or administrator is a US Person;

(d) Any trust of which any trustee is a US Person;

(e) Any agency or branch of a foreign entity located in the United States;

(f) Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US Person;

(g) Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident of the United States; and

(h) Any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a US Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by

accredited investors (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) who are not natural persons, estates or trusts.

"United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

<u>Additional Requirements</u>

In addition to the foregoing suitability standards, we cannot accept subscriptions from anyone if the representations required are either not provided or are provided but are inconsistent with our determination that the investment is suitable for the subscriber. In addition to the financial information we require, the representations we require of you state that you:

- Have received this Memorandum, together with the Exhibits attached hereto;

- understand that no federal or state agency has made any finding or determination as to the fairness for investment in, nor made any recommendation or endorsement of, the Notes; and

- understand that an investment in the Company will not, in itself, create a qualified retirement plan as described in the Internal Revenue Code and that you must comply with all applicable provisions of the Internal Revenue Code in order to create a qualified retirement plan.

You will also represent that you are familiar with the risk factors we describe and that this investment matches your investment objectives. Specifically, you will represent to us that you:

- Understand that there will be no public market for the Notes, that there are substantial restrictions on repurchase, sale, assignment or transfer of the Notes and that it may not be possible to readily liquidate an investment in the Notes; and

- have investment objectives that correspond to those described elsewhere in this Memorandum.

You will also represent to us that you have the capacity to invest in our Notes by confirming that:

- You are legally able to enter into a contractual relationship with us, and, if you are an individual, have attained the age of majority in the state in which you live; and

- if you are a manager, that you are the manager for the trust on behalf of which you are purchasing the Notes, and have due authority to purchase Notes on behalf of the trust.

If you are purchasing as a fiduciary, you will also represent that the above representations and warranties are accurate for the person(s) for whom you are purchasing Notes. By executing the subscription agreement, you will not be waiving any rights under the Securities Act or the Exchange Act.

We have the right to refuse a subscription for Notes if in our sole discretion we believe that the prospective investor does not meet the suitability requirements. It is anticipated that comparable suitability standards (including state law standards applicable in particular circumstances) may be imposed by us in various jurisdictions in connection with any resale of the Notes.

<div align="center">

**SUBSCRIPTION PROCEDURES**

14

</div>

All subscriptions for the Notes must be made by the execution and delivery of the applicable Subscription Agreement and a counterpart signature page to the Security Agreement, which is attached to the Subscription Agreement.

The Subscription Agreement that must be completed by prospective investors who are subscribing based on being an "accredited investor" is attached hereto as Exhibit A-1.

The Subscription Agreement that must be completed by prospective investors who are subscribing based on being a "non-U.S. Person" is attached hereto as Exhibit A-2.

*Investors should complete only one of the Subscription Agreements, depending on which basis they are subscribing.*

Subscriptions are not binding on the Company until accepted in writing by the Company. We will refuse any subscription by giving written notice to the subscriber by personal delivery or first-class mail. We have the right to refuse to sell the Notes to any prospective investor for any reason in our sole discretion, including, without limitation, if such prospective investor does not promptly supply all information requested by us in connection with such prospective investor's subscription. In addition, in our sole discretion, we may establish a limit on the purchase of Notes by particular prospective investors.

To subscribe for the Notes, each prospective investor must agree to the Subscription Agreement as attached hereto as Exhibit A-1 or Exhibit A-2, as applicable.

Prospective investors may do so via the App[1], the Company's website, electronic signature, or in hard copy delivered to the Company as follows:

<div align="center">

iCap Pacific Income Fund 4, LLC
ATTN: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

</div>

Regardless of the method of subscribing, for accredited investors (i.e., person who are not subscribing based on being a non-U.S. Person) verification of accredited status will still be required, and one method of such verification is through the procedures as set forth in the Subscription Agreement as set forth on Exhibit A. Other methods may be made available or added to the App.

With the Subscription Agreement (regardless of the method used for completing), prospective investors should send their funds via ACH transfer through the App, wire transfer pursuant to the instructions as set forth in the Subscription Agreement, or check payable to "iCap Pacific Income Fund 4, LLC" for the total cost of the Notes being subscribed.

As noted above, this Memorandum and the Subscription Agreements are available electronically through the App or the Company's website and may be completed on the App, the website or by electronic signature, provided the verification of accredited investor status is sent to the Company either electronically or at the address set forth in the Subscription Agreement.

# RESTRICTIONS ON TRANSFERABILITY

The Notes offered hereby are restricted securities as that term is defined in Rule 144 promulgated under the Securities Act. These securities have not been registered under the Securities Act and are being offered and will be sold without benefit of registration under the applicable federal or state securities acts by reason of specific exemptions from registration provided by such acts. The availability of such exemptions is also dependent, in part, upon the "investment intent" of the investors. The exemptions would not be available if an investor were purchasing the Notes with a view to redistributing them. Accordingly, each investor when executing the Subscription Agreement will be required to acknowledge that his or her purchase is for investment, for its, his or her own account, and without any view to resale of the Notes except pursuant to an effective registration statement under the Securities Act, or a valid exemption from the registration requirements of the Securities Act, and subject to the terms of the Subscription Agreement.

# STATEMENT AS TO INDEMNIFICATION

Our Operating Agreement provides for indemnification of members and officers of the Company and of the Manager under certain circumstances, which could include liabilities relating to securities laws. The SEC mandates the following disclosure of its position on indemnification for liabilities under the federal securities laws:

> "Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling an issuer, the Company has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable."

# RISK FACTORS

AN INVESTMENT IN THE COMPANY AND THE NOTES INVOLVES SIGNIFICANT RISK AND IS SUITABLE ONLY FOR PERSONS WHO ARE CAPABLE OF BEARING THE RISKS, INCLUDING THE RISK OF LOSS OF A SUBSTANTIAL PART OR ALL OF THEIR INVESTMENT. CAREFUL CONSIDERATION OF THE FOLLOWING RISK FACTORS, AS WELL AS OTHER INFORMATION IN THIS MEMORANDUM IS ADVISABLE PRIOR TO INVESTING. PROSPECTIVE INVESTORS SHOULD READ ALL SECTIONS OF THIS MEMORANDUM AND ARE STRONGLY URGED AND EXPECTED TO CONSULT THEIR OWN LEGAL AND FINANCIAL ADVISERS BEFORE INVESTING IN THE NOTES. THE INFORMATION IN THIS MEMORANDUM CONTAINS BOTH HISTORICAL AND FORWARD-LOOKING STATEMENTS. PLEASE BE ADVISED THAT THE COMPANY'S ACTUAL FINANCIAL CONDITION, OPERATING RESULTS AND BUSINESS PERFORMANCE MAY DIFFER MATERIALLY FROM THAT ESTIMATED BY THE COMPANY IN FORWARD-LOOKING STATEMENTS. THE COMPANY HAS ATTEMPTED TO IDENTIFY, IN CONTEXT, CERTAIN OF THE FACTORS THAT IT CURRENTLY BELIEVES COULD CAUSE ACTUAL FUTURE RESULTS TO DIFFER FROM THE COMPANY'S CURRENT EXPECTATIONS. THE DIFFERENCES MAY BE CAUSED BY A VARIETY OF FACTORS, INCLUDING BUT NOT LIMITED TO, ADVERSE ECONOMIC CONDITIONS, COMPETITORS (INCLUDING THE ENTRY OF NEW COMPETITORS), INADEQUATE CAPITAL, UNEXPECTED COSTS, LOWER REVENUES AND NET INCOME THAN ANTICIPATED, FLUCTUATION AND VOLATILITY OF THE COMPANY'S OPERATING RESULTS AND FINANCIAL CONDITION, INABILITY TO CARRY OUT MARKETING AND SALES PLANS, LOSS OF KEY EXECUTIVES OR OTHER PERSONNEL, AND OTHER RISKS THAT MAY OR MAY NOT BE REFERRED TO IN THESE RISK FACTORS.

**Operation and Company Risks**

*Our business prospects are difficult to predict because we have no operating history.*

The Company is a newly organized entity and does not have an operating history upon which investors may base an evaluation of its likely performance. The Company's results will depend upon the availability of suitable investment opportunities for the Company and the performance of the Company's Portfolio Investments. The Company's proposed operations are subject to all business risks associated with new enterprises. The likelihood of the Company's success must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with the expansion of a business, operation in a competitive industry, and the continued development of advertising, promotions and a corresponding customer base. There is a possibility that the Company could sustain losses in the future.

There can be no assurance that the Company's efforts will result in successful commercialization or further development of the Company' operations, that the Company's marketing efforts will be successful, or that the Company will ever achieve significant (or any) revenue. If the Company fails to achieve its goals outlined, the Company may run out of money to run its operation and as such, the Company would need to raise additional working capital. Failure to do so could result in Noteholders losing part or all of their money invested.

*Noteholders must rely on the Manager to acquire appropriate Portfolio Investments for the Company's portfolio.*

The Company is conducting the Offering as a "blind pool," meaning that the Company is proceeding to raise funds through the sale of the Notes, without having specifically identified any real estate properties in which the Company intends to invest. When you subscribe for Notes, that subscription is binding, and you will not have the right to revoke that subscription even if you do not approve of the Portfolio Investments that the Company subsequently identifies. Prospective investors should not invest in the Company unless they are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

*If the Company is not as successful with the Offering as desired, it may not acquire as diversified a portfolio as is planned.*

It is not known how many Portfolio Investments the Company will be able to obtain, or the number of opportunities that will be presented by the market for it to evaluate. The number of Portfolio Investments ultimately made by the Company will depend primarily upon the capital raised through the sale of the Notes, the availability of suitable Portfolio Investments, the number of investors who choose to withdraw their funds through demand notices, and the extent to which the Manager arranges for Portfolio Investments to be held with co-investors. There is no certainty as to the number of Portfolio Investments that the Company will ultimately be able to obtain, and since one of the Company's objectives is diversification, no assurance can be given as to the Company's achievement of that objective.

*Competition with third parties in our contemplated industry is intense, which could reduce our profitability and our ability to pay interest or raise additional funds.*

It is possible that over time we may compete with other entities seeking to undertake similar activities as we do. These same potential competitors may have significantly greater capital resources and research and development, manufacturing, testing, regulatory compliance, and marketing capabilities. Competitive products and services may render any services, products or product candidates that we may acquire or develop uneconomic or obsolete. We cannot assure investors that we will be able to invest or develop

resources for required capabilities successfully or as expediently as necessary.

***Our planned business is inherently expensive, risky and may not be understood by or accepted in the marketplace, which could adversely affect our future value.***

The business currently conducted by the Company is at an early stage and is financially speculative. To date, very few companies have been successful in their efforts to commercialize such a business. Furthermore, the number of people who may use our services is difficult to forecast with accuracy. Our future success is dependent on the establishment of the market for our services and our ability to capture a share of this market with the services and offerings we plan to develop.

***Negative publicity could adversely affect our business and operating results.***

Negative publicity about our industry or the Company, even if inaccurate, could adversely affect our reputation and the confidence in our operations, which could harm our business and operating results. Harm to our reputation can arise from many sources, including employee misconduct, misconduct by our partners, outsourced service providers or other counterparties, failure by us or our partners to meet minimum standards of service and quality and compliance failures and claims.

***Rapid growth may strain our resources.***

We expect to experience significant and rapid growth in the scope and complexity of our business, which may place a significant strain on our management team and our financial and other resources. Such growth, if experienced, may expose us to greater costs and other risks associated with growth and expansion. We may be required to hire a broad range of additional employees, including other support personnel, among others, in order to successfully advance our operations. We may be unsuccessful in these efforts or we may be unable to project accurately the rate or timing of these increases.

This growth may place a strain on our management and operational resources. The failure to develop and implement effective systems or the failure to manage growth effectively could have a materially adverse effect on our business, financial condition, and results of operations. In addition, difficulties in effectively managing the budgeting, forecasting, and other process control issues presented by such a rapid expansion could harm our business, financial condition, and results of operations.

***Control is vested in the Manager; no investor should purchase the Notes unless the investor is comfortable with the Manager's judgment and experience in running the Company's affairs.***

Control over all decisions affecting the Company, including decisions regarding the Portfolio Investments that are to be made, will be made by the Manager and its management team. Many material decisions, such as decisions regarding the purchase or sale of assets, the refinancing of Portfolio SPEs, whether to make an investment, and the incurrence of third-party-debt will be made without separate concurrence from Noteholders. No assurance can be given that sufficient investment opportunities will be presented to the Company to deploy all of the capital available for investment.

***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its affiliates may provide certain services to, and enter into transactions with, the Company, its holding companies, or the Portfolio SPEs, provided that the terms are commercially reasonable. This limitation may not fully protect the Company or the Portfolio SPEs against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Noteholders, the Trustee, or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover,

the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its affiliates. In addition, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities for affiliated entities that may generate different fees for the Manager.

***The Manager may retain and reinvest all or a portion of the revenue generated by, or proceeds of a sale of, a Portfolio Investment.***

The Manager has the discretion to sell the properties the Company acquires and to use the cash proceeds from such sale (or cash proceeds from rental income) to, among other things, satisfy its obligations under the Notes, whether then due and payable, or other Company obligations, or to enter into new Portfolio Investments. The Manager intends to make new investments over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

***Without obtaining advice from their personal advisors, potential investors may not be aware of the legal, tax or economic consequences of an investment in the Notes.***

The Manager has not arranged for potential investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Company has not acted as if it had been retained by the potential investors. Potential investors should not construe the contents of this Memorandum or any prior or subsequent communication from the Manager, its affiliates or any professional associated with this Offering, as legal or tax advice. Potential investors should consult their own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability.

***Fees to Manager will be paid while interest and principal remain outstanding under the Notes.***

Fees payable to the Manager will be paid while interest and principal remain outstanding under the Notes. The Management Fee is based on the outstanding principal balance of the Notes. The Manager will receive the Management Fee whether or not the Portfolio Investments operate profitably. These fees (like other operating expenses) reduce the amount of cash that otherwise would be available for payment of the Notes.

***You will not be investing in the Company, iCap or any of their affiliates. The prior performance data presented provides relevant information regarding affiliates of the Manager, but should not be construed as an indication of the likely financial performance of the Company.***

By investing in the Notes, you will not be investing in the Portfolio Investments, iCap, or in any of the prior investments sponsored by iCap's affiliates. iCap has provided selected information regarding its prior investments because investors might consider those investments to be relevant in assessing the experience and judgment of the Manager, and the iCap management team. Potential investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique, and the Company may not be able to replicate the success of prior investments, even if the Portfolio Investments assembled for the Company's portfolio are similar to those obtained for the prior funds.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 733
1366

***A Majority-in-Interest of the Noteholders is required to take certain actions with respect to the Notes.***

The Notes, the Security Agreement and the Guaranty require the consent of a Majority-in-Interest of the Noteholders to declare an Event of Default and to take certain actions related thereto. Therefore, individual Noteholders will not be able to take certain actions unilaterally.

***The Company may prepay the principal and interest on the Notes at any time.***

The Company may prepay all or a part of the principal amount and accrued interest in the Notes at any time. No prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Noteholders will not have certainty as to how long their respective Note(s) may be outstanding. If the Company makes any prepayment, the prepayments need not be made ratably against all outstanding Notes.

***Various factors could negatively impact the profitability of the Company's Portfolio Investments***

The Company may obtain insurance policies for the Portfolio Investments that are commercially prudent given the local market and circumstances of the Portfolio Investments. However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Portfolio Investments should be partially or totally destroyed, the Company may suffer a substantial loss of capital as well as profits. Even if the Company's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Company will sustain a substantial uninsured loss as a result of a fire or other casualty.

Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making a Portfolio Investment, the Company may undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation could include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the Portfolio Investment's site had environmental contamination not detected prior to the Company's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Company undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Company may incur environmental clean-up costs or be subject to liability exposure that may reduce the net profits of the Company.

Under the Americans With Disabilities Act of 1990 ("ADA"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing properties to allow disabled persons to access such facilities. Most of the properties the Company considers will likely be in compliance with the present access requirements. If, however, the properties the Company acquires are not in compliance with the ADA, the Company will be required to make modifications to the properties to bring them into compliance or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

The real estate industry in general, and the multifamily, residential, and commercial sectors, in particular, are highly competitive, and the Company will be competing with numerous other entities, some having substantially greater financial resources and experience than the Company, in seeking attractive

investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available Portfolio Investments or resulting in other less favorable terms to the purchasers.

The investment returns available from investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers' decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could have a material adverse impact on the Company's results of operations or financial condition. In addition, real estate investments are difficult to sell quickly and the Company may not be able to adjust the Company's portfolio of owned properties quickly in response to economic or other conditions in order to meet Note obligations. If the Company's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Company's income will be adversely affected.

***Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.***

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

***Real estate development projects are subject to numerous risks outside the Company's control such as delays in permitting and other governmental approvals, increased costs, and labor shortages.***

Any properties in which the Company invests relating to real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, and thus lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. The Company may enter into contracts to purchase properties before they are finished, and the foregoing risks could adversely impact the purchase prices, valuations, or closings dates of those properties. Although the Manager will not undertake such transactions without reviewing detailed budgets, such budgets may understate the expenses.

***There may be unanticipated obstacles to execution of our business plan.***

Our proposed plan of operation and prospects will depend largely upon our ability to successfully establish the Company' presence in a timely fashion, retain and continue to hire skilled management, technical, marketing, and other personnel, and attract and retain significant numbers of quality business partners and corporate clients. There can be no assurance that we will be able to successfully implement our business plan or develop or maintain future business relationships, or that unanticipated expenses, problems or technical difficulties which would result in material delays in implementation will not occur.

***The volatile credit and capital markets could have a material adverse effect on our financial condition.***

Our ability to manage our future debt and liquidity will be dependent on our level of positive cash flow. An economic downturn may negatively impact our cash flows. Credit and capital markets can be volatile, which could make it more difficult for us to refinance our debt or to obtain additional debt or equity financings in the future. Such constraints could increase our costs of borrowing and could restrict our access to other potential sources of future liquidity. Our failure to have sufficient liquidity to make interest and other payments required by our debt or our Notes could result in a default of such debt or the Notes and acceleration of our borrowings, which would have a material adverse effect on our business and financial condition.

***A prolonged economic downturn could materially affect us in the future.***

The recession from late 2007 to mid-2009 reduced consumer confidence to historic lows, impacting the public's ability and desire to spend discretionary dollars as a result of job losses, home foreclosures, significantly reduced home values, investment losses, bankruptcies and reduced access to credit, resulting in lower levels of customer traffic. If the economy experiences another significant decline, our business and results of operations could be materially adversely affected.

***Information technology system failures or breaches of our network security could interrupt our operations and adversely affect our business.***

We rely on our computer systems and network infrastructure across our operations. Our operations depend upon our ability to protect our computer equipment and systems against damage from physical theft, fire, power loss, telecommunications failure or other catastrophic events, as well as from internal and external security breaches, viruses and other disruptive problems. Any damage or failure of our computer systems or network infrastructure that causes an interruption in our operations could have a material adverse effect on our business and subject us to litigation or to actions by regulatory authorities.

We are continuing to develop our information technology capabilities, and if we are unable to successfully upgrade or expand our technological capabilities, we may not have the ability to take advantage of market opportunities, manage our costs and transactional data effectively, satisfy customer requirements, execute our business plan or respond to competitive pressures.

***The failure to enforce and maintain our trademarks and protect our other intellectual property could materially adversely affect our business, including our ability to establish and maintain brand awareness.***

The success of our business strategy depends on our continued ability to obtain and use trademarks and service marks in order to increase brand awareness and develop our branded products. If our efforts to protect our intellectual property are not adequate, or if any third-party misappropriates or infringes on our intellectual property, whether in print, on the Internet or through other media, the value of our brands may be harmed, which could have a material adverse effect on our business, including the failure of our brands and branded products to achieve and maintain market acceptance. There can be no assurance that all of the steps we have taken to protect our intellectual property in the United States and in foreign countries will be adequate. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent, as do the laws of the United States.

***Third-party claims with respect to intellectual property assets, if decided against us, may result in competing uses or require adoption of new, non-infringing intellectual property, which may in turn adversely affect sales and revenues.***

28-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 736
1366

There can be no assurance that third parties will not assert infringement or misappropriation claims against us, or assert claims that our rights in our trademarks, service marks, trade dress and other intellectual property assets are invalid or unenforceable. Any such claims could have a material adverse effect on us if such claims were to be decided against us. If our rights in any intellectual property were invalidated or deemed unenforceable, it could permit competing uses of intellectual property, which, in turn, could lead to a decline in our results of operations. If the intellectual property became subject to third-party infringement, misappropriation or other claims, and such claims were decided against us, we may be forced to pay damages, be required to develop or adopt non-infringing intellectual property or be obligated to acquire a license to the intellectual property that is the subject of the asserted claim. There could be significant expenses associated with the defense of any infringement, misappropriation, or other third-party claims.

***We depend on certain officers of the Manager, the loss of whom could materially harm our business.***

We rely upon the accumulated knowledge, skills and experience of the officers and personnel of our Manager and its affiliates. If they were to leave the Manager or become incapacitated, we might suffer in our planning and execution of business strategy and operations, impacting our brand and financial results. We also do not maintain any key man life insurance policies for any such persons.

***We are exposed to the risk of natural disasters, unusual weather conditions, pandemic outbreaks, political events, war and terrorism that could disrupt business and result in lower sales, increased operating costs and capital expenditures.***

Our headquarters and company-operated locations, as well as certain of our vendors and customers, are located in areas which have been and could be subject to natural disasters such as floods, hurricanes, tornadoes, fires or earthquakes. Adverse weather conditions or other extreme changes in the weather, including resulting electrical and technological failures, may disrupt our business and may adversely affect our ability to continue our operations. These events also could have indirect consequences such as increases in the costs of insurance if they result in significant loss of property or other insurable damage. Any of these factors, or any combination thereof, could adversely affect our operations.

***Members of our Manager will have other business interests and obligations to other entities.***

None of the members and officers of the Manager will be required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company, provided that such activities do not otherwise breach their agreements with the Company. We are dependent on these persons to successfully operate the Company. Their other business interests and activities could divert time and attention from operating the Company.

### Risks Related to this Offering and the Notes

***This private placement of Notes is being made in reliance on an exemption from registration requirements, and there is no guarantee that it will comply with the regulatory requirements for such exemption.***

This private placement of Notes will not be registered with the SEC. The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant

to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

***If investors successfully seek rescission, we would face severe financial demands that we may not be able to meet.***

We represent that this Memorandum and its exhibits do not contain any untrue statements of material fact or omit to state any material fact necessary to make the statements made, in light of all the circumstances under which they are made, not misleading. However, if this representation is inaccurate with respect to a material fact, if this Offering fails to qualify for exemption from registration under the federal securities laws, or if we fail to register the Notes or find an exemption under the securities laws of each state in which we offer the Notes, each investor may have the right to rescind his, her or its purchase of the Notes and to receive back from the Company his, her or its purchase price. Such investors, however, may be unable to collect on any judgment, and the cost of obtaining such judgment may outweigh the benefits. If investors successfully seek rescission, we would face severe financial demands and may not be able to meet our capital needs, which may adversely affect any non-rescinding investors.

***We may invest or spend the proceeds of this Offering in ways with which you may not agree or in ways which may not yield a return.***

While we have provided guidance on priorities for the use of proceeds, the timing and amount of sales will impact our actual use of proceeds within the uses identified. Our management will have broad discretion in determining how the proceeds of the Offering will be used in each of the identified use categories.

We currently intend to use the proceeds we receive from this Offering after deducting estimated fees and expenses associated with this private placement, including legal, accounting, transfer agent, financial, acquisitions and other professional fees, primarily for the purposes as described above. Our management will have considerable discretion in the application of the net proceeds, and you will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. Investors in this Offering will need to rely upon the judgment of our management with respect to the use of proceeds. If we do not use the net proceeds that we receive in this Offering effectively, our business, financial condition, results of operations and prospects could be harmed, and the market price or value of the Notes could decline.

***This is a private offering, and as such investors will not have the benefit of review of this Memorandum by the SEC or other agency.***

Since this Offering is a private placement of securities and, as such, is not registered under federal or state securities laws, potential investors will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

***There is no assurance that the Company will be profitable, and there is no assurance of any returns.***

There is no assurance as to whether the Company will be profitable, or earn revenues, or whether the Company will be able to meet its operating expenses. The initial expenses the Company incurs could result in operating losses for the Company for the foreseeable future. No assurance can be made that a subscriber for the Notes offered hereby will not lose his or her entire investment.

***The Company is obligated to pay certain fees and expenses.***

The Company will pay various fees and expenses related to its ongoing operations regardless of whether or not the Company' activities are profitable. These fees and expenses will require dependence on third-party relationships. The Company is generally dependent on relationships with its strategic partners and vendors, and the Company may enter into similar agreements with future potential strategic partners and alliances. The Company must be successful in securing and maintaining its third-party relationships to be successful. There can be no assurance that such third parties may regard their relationship with the Company as important to their own business and operations, that they will not reassess their commitment to the business at any time in the future, or that they will not develop their own competitive services or products, either during their relationship with the Company or after their relations with the Company expire. Accordingly, there can be no assurance that the Company' existing relationships or future relationships will result in sustained business partnerships, successful service offerings, or significant revenues for the Company.

*Prospective investors must undertake their own due diligence.*

This Memorandum and its exhibits include limited information regarding the Company, our current and future business and operations, our management and our financial condition. While we believe the information contained in this Memorandum is accurate, such document is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective Investor that the abbreviated nature of this Memorandum will not omit to state a material fact which a prospective Investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such Investor. As a result, prospective Investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum **This investment is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

*The limited marketability of the Notes may adversely affect your ability to transfer and pledge the Notes.*

Noteholders must represent that they are purchasing the Notes for their own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, or encumber your Note(s) unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Internal Revenue Code of 1986, as amended (the "Code") or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans.

*The Notes constitute restricted securities and are subject to limited transferability.*

The Notes should be considered a long-term, illiquid investment. The Notes have not been registered under the Securities Act, and cannot be sold without registration under the Securities Act or any exemption from registration. In addition, the Notes are not registered under any state securities laws that would permit their transfer. Because of these restrictions and the absence of an active trading market for our securities, a Noteholder will likely be unable to liquidate an investment even though other personal financial circumstances would dictate such liquidation.

*There is no public trading market for our Notes.*

There is no established public trading marketing for the Notes and there can be no assurance that one will ever develop. Market liquidity will depend on the perception of our operating business and any steps that our management might take to bring us to the awareness of investors. There can be no assurance given that there will be any awareness generated. Consequently, investors may not be able to liquidate their

investment or liquidate it at a price that reflects the value of the business. As a result, holders of our securities may not find purchasers for our securities should they to sell securities held by them. Only non-U.S. Persons, accredited investors or institutions with no need for immediate short-term liquidity should purchase the Notes.

**The market value of the Notes may decrease due to factors beyond our control.**

The stock market from time to time has experienced extreme price and volume fluctuations, which have particularly affected the market prices for emerging growth companies and which often have been unrelated to the operating performance of the companies. These broad market fluctuations may adversely affect the market value of our Notes. The market value of our Notes may also fluctuate significantly in response to the following factors, most of which are beyond our control:

- variations in our quarterly operating results,
- changes in general economic conditions,
- changes in market valuations of similar companies,
- announcements by us or our competitors of significant acquisitions, strategic partnerships or joint ventures, or capital commitments,
- poor reviews;
- loss of a major customer, partner or joint venture participant; and
- the addition or loss of key managerial and collaborative personnel.

Any such fluctuations may adversely affect the market value of our Notes, regardless of our actual operating performance. As a result, Noteholders may be unable to sell their Notes (even if permitted by applicable securities laws and the terms of the Notes), or may be forced to sell them at a loss.

**The characteristics of the Notes, including maturity, interest rate, lack of guarantee, and lack of liquidity, may not satisfy your investment objectives.**

The Notes may not be a suitable investment for you, and we advise you to consult your investment, tax and other professional financial advisors prior to purchasing Notes. The characteristics of the Notes, including maturity, interest rate, lack of guarantee and lack of liquidity may not satisfy your investment objectives. The Notes may not be a suitable investment for you based on your ability to withstand a loss of interest or principal or other aspects of your financial situation, including your income, net worth, financial needs, investment risk profile, return objectives, investment experience and other factors. Prior to purchasing any Notes, you should consider your investment allocation with respect to the amount of your contemplated investment in the Notes in relation to your other investment holdings and the diversity of those holdings.

**The Notes will be effectively subordinated to any of our debt that is secured and subordinated to our existing and future unsecured debts.**

The Notes will be junior to any of our secured debt obligations, to the extent of the value of any assets securing such debt. The effect of this subordination is that if we are involved in a bankruptcy, liquidation, dissolution, reorganization or similar proceeding, or upon a default in payment on, or the acceleration of, any of our secured debt, if any, our assets will be available to pay obligations on the Notes only after all debt under our secured debt, if any, has been paid in full from those assets. As of the date of this Memorandum, we had no secured indebtedness outstanding. In such circumstances, Holders of the Notes will participate in any remaining assets ratably with all of our other unsubordinated creditors, including trade creditors. We may not have sufficient assets remaining to pay amounts due on any or all of the Notes then outstanding.

23-91043-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 740
1366

***The Company may sell promissory notes, in the Registered Offering or otherwise, that have higher interest rates than the 10% applicable to the Notes.***

The Company may sell promissory notes in this Offering, or in the Registered Offering, that have higher interest rates than the 10% applicable to the Notes. In such event the Company would be obligated to pay such higher rates of return, and the security of the noteholders in this Offering would therefore be negatively impacted as the Company will have greater payment obligations from the same pool of assets as compared to the situation where all promissory notes had a 10% interest rate.

***Because the Notes will have no sinking fund, insurance, or guarantee, you could lose all or a part of your investment if we do not have enough cash to pay.***

There is no sinking fund, insurance or guarantee of our obligation to make payments on the Notes. We will not contribute funds to a separate account, commonly known as a sinking fund, to make interest or principal payments on the Notes. The Notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation, or any other governmental or private fund or entity. Therefore, if you invest in the Notes, you will have to rely only on our cash flow from operations and other sources of funds for repayment of principal at maturity or upon repayment demand by you and for payment of interest when due. Any future cash flows from operations could be impaired under the circumstances described herein. If our cash flow from operations and other sources of funds are not sufficient to pay any amounts owed under the Notes, then you may lose all or part of your investment.

***We do not expect that the Notes will be rated, but if they are, ratings of the Notes may change and affect the market price and marketability of the Notes.***

We do not currently expect that, upon issuance, the Notes will be rated by any rating agencies. If they are, such ratings are limited in scope, and do not address all material risks relating to an investment in the Notes, but rather reflect only the view of each rating agency at the time the rating is issued. There is no assurance that such credit ratings will be issued or remain in effect for any given period of time or that such ratings will not be lowered, suspended or withdrawn entirely by the rating agencies. It is also possible that such ratings may be lowered in connection with future events, such as future acquisitions. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market price or marketability of the Notes. In addition, any decline in the ratings of the Notes may make it more difficult for us to raise capital on acceptable terms.

***Because we may pay off the Notes at any time prior to their maturity, you may be subject to reinvestment risk.***

We have the right to pay off any Note at any time prior to its stated maturity. The Notes would be paid off at 100% of the principal amount plus accrued but unpaid interest up to but not including the date of pay off. Any such pay off may have the effect of reducing the income or return on investment that any investor may receive on an investment in the Notes by reducing the term of the investment. If this occurs, you may not be able to reinvest the proceeds at an interest rate comparable to the rate paid on the Notes.

***We have not retained independent professionals for investors.***

We have not retained any independent professionals to comment on or otherwise protect the interests of potential investors. Although we have retained our own counsel, neither such counsel nor any other independent professionals have made any examination of any factual matters herein, and potential investors should not rely on our counsel regarding any matters herein described.

*We have no firm commitments to purchase any Notes.*

We have no firm commitment for the purchase of any Notes. The Company has not yet engaged a placement agent or broker for the sale of the Notes, although we may do so in the future. The Company may be unable to identify investors to purchase the Notes and as a result may have inadequate capital to support its ongoing business obligations.

*The Company may not be able to meet all of the payment demands of its Investors if a large number of Investors desires to be repaid or if the Company does not have the liquidity to meet such demands.*

The Company will use its commercially reasonable efforts to maintain sufficient cash reserves on hand and access to liquidity sources to honor repayment demands of Investors. However, in the event there are more demands for repayment than the Company has cash available to meet, the Company may be delayed in the delivery of funds and may be required to sell some of its assets, which may take significant amounts of time and may yield less than is needed to meet the Company's obligations.

## Tax Risks

*You are urged to consider the United States federal income tax consequences of owning the Notes.*

Pursuant to the terms of the Notes, the Company and each Noteholder will agree to treat the Notes for U.S. federal income tax purposes as contingent payment debt instruments subject to U.S. federal income tax rules applicable to contingent payment debt instruments. Under that treatment, if you are a U.S. Holder (as defined herein), you may be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by you in that year. You will recognize gain or loss on the sale, repurchase, exchange, conversion or repayment of a Note in an amount equal to the difference between the amount realized and your adjusted tax basis in the Note. Any gain recognized by you on the sale, repurchase, exchange, conversion or repayment of a Note generally will be treated as ordinary interest income and any loss will be treated as ordinary loss to the extent of the interest previously included in income and, thereafter, as capital loss.

*Interest on Notes Could be Characterized as Unrelated Business Taxable Income.*

We intend to take the position that the Notes should be classified as debt instruments for U.S. federal income tax purposes and the stated interest should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("UBTI") with respect to tax exempt Noteholders. However, there is no assurance that the IRS will agree with this position and it is possible that the Notes may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Notes may be characterized as UBTI with respect to tax exempt Noteholders.

<div align="center">

**CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS**

</div>

This Memorandum does not address any tax considerations that may be relevant to you. You are urged to consult your own tax advisors as to the specific tax consequences of purchasing, owning and disposing of any Notes, including any federal, state or local tax consideration.

**WE URGE YOU TO CONSULT AND RELY UPON YOUR OWN TAX ADVISOR WITH RESPECT TO YOUR OWN TAX SITUATION, POTENTIAL CHANGES IN APPLICABLE LAWS AND REGULATIONS AND THE FEDERAL AND STATE CONSEQUENCES ARISING FROM AN INVESTMENT IN THE NOTES. THE COST OF THE CONSULTATION COULD, DEPENDING ON THE AMOUNT CHARGED TO YOU, DECREASE ANY RETURN**

23-90143-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 742
1366

**ANTICIPATED ON YOUR INVESTMENT. NOTHING IN THIS MEMORANDUM IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY SPECIFIC INVESTOR, AS INDIVIDUAL CIRCUMSTANCES MAY VARY. YOU SHOULD BE AWARE THAT THE INTERNAL REVENUE SERVICE MAY NOT AGREE WITH ALL TAX POSITIONS TAKEN BY US AND THAT LEGISLATIVE, ADMINISTRATIVE OR COURT DECISIONS MAY REDUCE OR ELIMINATE ANY ANTICIPATED TAX BENEFITS OF AN INVESTMENT IN THE NOTES.**

**EXHIBIT A-1**

**SUBSCRIPTION AGREEMENT FOR ACCREDITED INVESTORS**

## EXHIBIT A-2

**SUBSCRIPTION AGREEMENT FOR NON-U.S. PERSONS**

478023.v10



## iCap Pacific Income Fund 4, LLC

### 艾珂榮太平洋收益基金四期有限责任公司

---

#### SUBSCRIPTION AGREEMENT FOR NON-U.S. RESIDENTS

#### 非美国居民认购协议

---

The undersigned "Subscriber", on the terms and conditions herein set forth, hereby irrevocably submits this subscription agreement (the "Subscription Agreement") to iCap Pacific Income Fund 4, LLC, a Delaware limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise capital of up to $50,000,000 US Dollars through the sale to Subscriber as a "Non US Person" (as defined below) of a Secured Promissory Note of the Company (the "Note").

签署本协议的"认购者",依据本协议的条款,谨此向**艾珂榮太平洋收益基金四期有限责任公司**提交本《认购协议》("《认购协议》"),以认购该公司发行的私募证券("私募证券")。此认购协议提交后不可撤销。**艾珂榮太平洋收益基金四期有限责任公司**是一家在特拉华州注册的有限责任公司(以下简称"该公司"),上述私募证券通过面向"非美国居民"(定义见下文)的认购者发售该公司的有担保的本票(以下简称"本票"),最高募集50,000,000美元。

1. **Subscription for the Purchase of Notes.** The undersigned, intending to be legally bound, hereby subscribes for the amount set forth on the Investment Summary page below (the "Principal Balance"). The undersigned acknowledges that the Company is offering the Notes to those who are "Non U.S. Persons" pursuant to the terms and provisions of the Offering documented in the Confidential Private Placement Memorandum dated October 1, 2018 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. In this regard, the Investor agrees to forward payment in the amount of the Principal Balance indicated on the Investment Summary form below. The Company's private offering of Notes is being made to Non US Persons (as defined below) pursuant to Regulation S ("Regulation S") under the Securities Act of 1933, as amended (the "Securities Act"). By signing this Subscription Agreement, Subscriber acknowledges receipt of the Memorandum and its Exhibits, including the Note, the Pledge and Security Agreement and the Guaranty

(collectively the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents.

1. **认购本票**。签署本协议的认购者以此协议为据，认购下文的"投资摘要"中所述的金额（以下统称"本金金额"）。认购者声明，该公司正依据私募备忘录的条款向"非美国人士"发行该本票，该私募备忘录的内容详见2018年10月1日公布的与本私募计划相关的《私募备忘录》（与本备忘录的所有附录和附件统称"备忘录"）。因此，投资人同意支付下文的"投资摘要"中所示的认购款的金额。依据《1933年证券法》及其不定期修订的版本（""《证券法》""）下的S条例（"S条例"），该公司就该本票推出的私募证券仅面向非美国人士（定义见下文）发售。《认购协议》一经签署，认购者即确认收到了《本票协议》及其附录，包括《担保协议》、《抵押物代理协议》以及该本票（统称""《本票协议》""），并同意他/她/其已阅读该《本票协议》的所有条款，并自愿受其约束。

2. **Offer to Purchase.** Subscriber hereby irrevocably offers to purchase the Note and tenders herewith the Principal Balance. Subscriber recognizes and agrees that (i) this subscription is irrevocable and, if Subscriber is a natural person, shall survive Subscriber's death, disability or other incapacity, and (ii) the Company has complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement. This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

2. **认购要约**。认购者自愿认购该本票并在签署本协议时支付上述的本金金额，且知悉并接受此认购协议是不可更改的。认购者清楚并同意，（i）此认购协议不可更改，且若认购者是自然人，即使认购者死亡、出现残疾或其他失能的情况，该认购仍然有效，且（ii）该公司可以其完全的自由裁量权，决定完全接受或拒绝本《认购协议》，且不需因拒绝本《认购协议》而承担任何责任。本《认购协议》应经该公司签署后才能被视为已被该公司接受。

3. **Effect of Acceptance.** Subscriber hereby acknowledges and agrees that on the Company's acceptance of this Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Subscriber. As a result, upon acceptance by the Company of this Subscription Agreement, Subscriber will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note as specified herein.

3. **接受的效力**。认购者承认并同意，一旦此协议被该公司接受，该《认购协议》将成为该公司和认购者之间具有约束力的协议，并具有完全强制性执行能力。因此，在该公司接受该《认购协议》后，认购者将成为该本票的注册持有人和受益人，且该公司有权利按照本票购买协议来接受购买资金。

4. **Representations and Warranties of Non - US Persons.** Subscriber hereby represents and warrants to the Company as of the date hereof that:

4. **非美国人士的陈述和保证**。认购者向该公司陈述及保证，截至签署本协议之日：

**(a)** Subscriber understands that the investment offered hereunder is a private offering and is therefore not required to be registered under the Securities Act. Subscriber is acquiring the Note for Subscriber's own account, for investment purposes only, and not with a view towards resale or distribution.

认购者理解，本协议所述的投资是私募证券，因此根据《证券法》规定，该本票并不要求注册。认购者通过其本人名下的账户获得该本票。该本票仅用作投资，并非为了转售或进行分配。

**(b)** Subscriber is <u>not</u> a "US Person". A US Person is defined as:

认购者<u>不</u>是一位"美国人"，对于美国人的定义如下：

**(i)** Any natural person resident in the United States (as defined below);

居住在美国（定义见下文）的所有自然人；

**(ii)** Any partnership or corporation organized or incorporated under the laws of the United States;

根据美国法律组建或注册的所有合伙企业或公司；

**(iii)** Any estate of which any executor or administrator is a US Person;

遗产执行人或管理者是一位美国人；

**(iv)** Any trust of which any trustee is a US Person;

信托机构的受托人是一位美国人；

**(v)** Any agency or branch of a foreign entity located in the United States;

位于美国境内的任何代理机构或外国实体分支机构；

**(vi)** Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US Person;

因任何美国人获益的所有由交易商或其他由任何美国受托人持有的非全权委托账户或类似账户（不含任何财产账户或信托账户）；

**(vii)** Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident of the United States; and

478023.v10

对任何全权委托的账户或类似账户（不含任何财产账户或信托账户）而言，其持有人是一家在美国境内组织或成立的交易商或其他受托人，或是一位美国居民（对个人而言）；以及

**(viii)** Any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a US Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) who are not natural persons, estates or trusts.

任何合伙企业或公司，若(i)其是依据任何外国司法管辖权下的法律组织或注册成立的，且(ii)是由一位美国人组成的，主要是为了投资那些未依照《证券法》注册的证券，除非是由非自然人、财产管理机构或信托机构的合格投资人（其定义见根据《证券法》颁布的D条例的501(a)条款）组织、注册及持有。

"United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

"美国"指美利坚合众国、其领土和财产、美国所有的州和哥伦比亚特区。

**(c)** Subscriber, as of the execution date of this Agreement, (i) is not located within the United States, and (ii) is not purchasing the Note for the benefit of any US Person.

截至本协议签署之日，认购者，(i)本人并不在美国境内，且(ii)该本票的受益人为非美国人。

**(d)** Subscriber will not resell the Note except in accordance with the provisions of Regulation S (Rule 901 through 905 and Preliminary Notes thereto), pursuant to a registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

除非符合S条例的规定（第901条至905条及其附注），并且已根据《证券法》进行注册，或根据任何适用的豁免注册的规定，否则认购者不得转售该本票；
并同意不参与该证券有关的对冲交易，符合《证券法》的规定的情况除外。

**(e)** Subscriber has not acquired the Note as a result of, and will not itself engage in, any "directed selling efforts" (as defined in Regulation S under the Securities Act) in the United States in respect of the Note which would include any activities undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the resale of any of the Note; provided, however, that the Subscriber may sell or otherwise dispose of the Note pursuant to registration thereof under the Securities Act and any applicable state and federal securities laws or under an exemption from such registration requirements.

认购者获得该本票，并非因为其受美国境内关于本协议项下的本票的导向性销售行为的影响，或因为参加关于该本票的相关一系列能影响本票转售市场的活动；然而，根据《证券法》和任何适用的州和联邦的证券法，若符合有关该本票注册的规定或符合豁免注册的规定，认购者可以出售或以其他方式处置该本票。

5. **Additional Representations and Warranties of Subscriber.** Subscriber hereby represents and warrants to the Company as follows:

**认购者的补充陈述和保证。**认购者谨此向该公司做出如下陈述和保证：

(a) Subscriber has been furnished the Memorandum, the Note Documents, and, if requested by the Subscriber, other documents. The Subscriber has carefully read the Memorandum, the Note Documents (together with all Exhibits thereto), and any such other requested documents, and Subscriber agrees to be bound by the terms of the Note Documents and the Note. Subscriber has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Subscriber requested and deemed material to making an informed investment decision regarding its purchase of the Note. Subscriber has been afforded the opportunity to review such documents and materials and the information contained therein. Subscriber has been afforded the opportunity to ask questions of the Company and its management. Subscriber understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Subscriber understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Subscriber has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Subscriber shall modify, amend or affect such Subscriber's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Subscriber has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

认购者已收到《备忘录》、该《本票协议》及相关文件和认购者要求的其他文件。认购者已仔细阅读该《备忘录》、《本票协议》（及其所有附录）及任何认购者要求的其他文件，且同意受该《本票协议》及相关文件的条款和该本票的约束。认购者已获得所有与该公

司的业务、财务及营运有关的文件及资料，以及认购者要求及认为对认购本票的投资决定有重要影响的信息。认购者已审查了上述文件、材料和信息。认购者已获得询问该公司及其管理的机会。认购者理解，此类讨论以以及该公司提供的任何书面信息旨在描述该公司的业务和其认为重要的方面，但不一定是全面或详尽的描述，且除非本《认购协议》明确规定，该公司不保证上述信息的完整性，也不保证该公司以外的任何机构提供的任何信息的准确性和完整性。上述部分信息可能包括对公司未来业绩的预测，而这些预测可能无法实现，也可能基于一些不实的假设，并可能受到公司无法控制的众多因素的影响。此外，认购者理解并表示，尽管该公司可能会在未来披露认购者尚未收到的某些重要信息，包括该公司当前财政季度的财务业绩，他、她或其仍会认购该本票。无论认购者做出任何问询或任何其他尽职调查均不得改变、修改或影响该认购者相信该《认购协议》包含的该公司的陈述和保证的权利（若有）。为确保这次认购本票是一个明智的投资行为，认购者已咨询了所有其认为是必要的会计、法律和税务等方面的专业建议。就认购本票及签署及交付本《认购协议》的行为，认购者拥有完全的权力和权限做出本协议包含的相关陈述。

**(b)** Subscriber has read and understood, and is familiar with, this Subscription Agreement, the Note Agreement, the Note, and the business and financial affairs of the Company.

认购者已阅读及理解，并熟悉本《认购协议》、备忘录、《本票协议》及其相关文件、和该公司的业务和财务状况。

**(c)** Subscriber, either personally, or together with his/her/its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum. The Subscriber and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Note. Subscriber's financial condition is such that Subscriber is able to bear the risk of holding the Note that Subscriber may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Subscriber's entire investment in the Company.

认购者个人或在其顾问（任何可能从销售该本票的交易中获得报酬的证券经纪/交易商）的协助下，有足够的能力评估投资该本票的益处和风险的财务和商务知识和经验，并能够承担投资的风险，并理解认购本票相关的风险和其他需考虑的因素，包括《备忘录》中"风险因素"一节中提及的情况。
认购者及其顾问已有机会向该公司询问与本票相关的问题并获得回复。认购者的财务状况使其能够承担因依据本协议获得的本票而需要无限期持有的风险，以及认购者在该公司的全部投资额亏损的风险。

**(d)** Subscriber has investigated the acquisition of the Note to the extent Subscriber deemed necessary or desirable and the Company has provided Subscriber with any reasonable assistance Subscriber has requested in connection therewith.

认购者已在其认为必要或需要的范围内对该本票的购买事宜进行了调查，且该公司已向认购者提供了相关合理的协助。

**(e)** The Note is being acquired for Subscriber's own account for investment, with no intention by Subscriber to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Subscriber in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Subscriber has any interest in or any right to acquire the Note. Subscriber understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Subscriber.

认购者所认购该本票的账户，仅作投资之用，并不打算按照《证券法》的规定对其任何部分进行分配或出售，且认购者不会违反《证券法》或适用的法规转让该本票。除认购者外，其他任何人均没有权力购买该本票或作为该本票的受益人。认购者理解并承认，除认购者外，该公司没有义务承认任何其他人士对该本票的所有权、受益权或其他权利。

**(f)** No representations or warranties have been made to Subscriber by the Company, or any representative of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

除了本《认购协议》中所述外，该公司或其任何代表或任何证券经纪/交易商均未对认购者做出任何陈述或保证。

**(g)** Subscriber is aware that Subscriber's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Subscriber will not offer for sale, sell or otherwise transfer the Note without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

认购者知晓，认购者转让该本票的权利受到《证券法》及适用的州证券法的限制，且除非已依据《证券法》进行注册或依据所有适用的州的证券法律获得出售的资质或该本票可免注册出售的情况外，认购者不会发出出售要约、出售或以其他方式转让该本票。

**(h)** Subscriber understands and agrees that the Note he/she/it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

认购者理解并同意，其购买的本票尚未依据《证券法》或任何州的证券法律进行注册，但已依据其中有关豁免注册的规定进行认购，且该公司无义务对其发行的上述本票进行注册。

**(i)** The Subscriber has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Subscriber understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it

is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

认购者已向该公司的代表就本次投资的条款提出相关问题并已获得满意的答复。认购者理解，该公司并未授权任何其他个人或机构做出任何陈述，如有相关陈述，需经公司签署书面同意方能生效。但是，该公司从未向签署本协议的认购者就是否适合投资的问题提出任何建议。

**(j)** Subscriber understands that Notes shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such Note):

认购者理解，该本票存在以下实质形式的销售限制（且该本票有相应的停止转让的指示）：

THESE SECURITIES WERE ISSUED IN AN OFFSHORE TRANSACTION TO PERSONS WHO ARE NOT U.S. PERSONS (AS DEFINED HEREIN) PURSUANT TO REGULATION S UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"). ACCORDINGLY, NONE OF THE SECURITIES TO WHICH THIS CERTIFICATE RELATES HAVE BEEN REGISTERED UNDER THE 1933 ACT, OR ANY U.S. STATE SECURITIES LAWS, AND, UNLESS SO REGISTERED, NONE MAY BE OFFERED OR SOLD IN THE UNITED STATES OR, DIRECTLY OR INDIRECTLY, TO U.S. PERSONS (AS DEFINED HEREIN) EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND IN EACH CASE ONLY IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. IN ADDITION, HEDGING TRANSACTIONS INVOLVING THE SECURITIES MAY NOT BE CONDUCTED UNLESS IN ACCORDANCE WITH THE 1933 ACT.

上述证券是依据《1933年美国证券法》及其修订版（"《1933年法》"）下的S条例向海外交易中的非美国人（定义见下文）发售的。因此，本文涉及的证券均未依据《1933年证券法》或任何美国的州证券法进行注册，且除非特别要求注册，否则任何上述证券均不得在美国任何州直接或间接向任何美国人（定义见下文）发售，除非依据一份有效的注册声明或依据豁免注册的声明，或其交易行为无需受《1933年证券法》的约束。且在上述任何情况下，均须遵守适用的州的证券法。此外，除非符合《1933年证券法》的规定，否则不得进行与该证券相关的任何对冲交易。

The Subscriber hereby acknowledges and agrees to the Company making a notation on its records or giving instructions to any registrar and transfer agent of the Company in order to implement the restrictions on transfer set forth and described in this Subscription Agreement.

认购者承认并同意该公司在其注册记录上注明上述内容或向该公司的任何注册人和转让代理人发出指示，以执行本《认购协议》规定及描述的转让限制。

**(k)** Subscriber also acknowledges and agrees to the following:

认购者同时承认并同意以下内容：

(1) an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire investment in the Note; and

对该本票的投资具有很高的投机性，而其在该本票的投资也存在损失全部投资额的风险；及

(2) there is no assurance that a public market for the Notes will be available and, as a result, Subscriber may not be able to liquidate Subscriber's investment in the Note should a need arise to do so.

无法保证日后会有可供该本票公开交易的市场，因此，该本票在认购者需要流通变现时有 可能不具备流通性。

**(l)** Subscriber is not dependent for liquidity on any of the amounts Subscriber is investing in the Note.

认购者不将所认购的资金作为可流动性资金。

**(m)** Subscriber's address set forth below is his or her correct residence address.

认购者在下方提供的地址是他或她的正确的居住地址。

**(n)** Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

认购者拥有全部的权力和权限做出本协议所述的陈述以认购该本票和签署及提交本《认购协议》。

**(o)** Subscriber understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

认购者理解，该公司可将上述陈述及保证作为其豁免注册或依据联邦及州的证券法律获得销售该本票的资格和其他用途的基础。

6. **Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The Subscriber should check the Office of Foreign Assets Control ("OFAC") website at

http://www.treas.gov/ofac before making the following representations. Subscriber hereby represents and warrants to the Company as follows:

**《爱国者法案》、反洗钱和海外资产控制办公室相关的陈述和保证。** 在做出下述陈述前，认购者应访问海外资产控制办公室（"OFAC"）的网站http://www.treas.gov/ofac。认购者谨此向该公司做出下列陈述和保证：

(a) The Subscriber represents that (i) no part of the funds used by the Subscriber to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Subscriber and no payment of principal or interest to the Subscriber shall cause the Company to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit investments, restrict principal or interest payments, or take any other reasonably necessary or advisable action with respect to the Note, and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith.  U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac.   In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[2] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

认购者声明：（i)认购者用于认购该本票或履行其相关的资本投入义务的任何资金均未或不得直接或间接来自任何可能违反美国联邦或州或非美国的法律或法规的活动，包括反洗钱的法律和法规，以及(ii)认购者向该公司做出的任何资本投入、出资或付款以及向认购者支付的本金或利息均不得致使该公司违反任何相应的反洗钱法律或法规，包括但不限于，"2001年颁布的使用适当之手段阻止或避免恐怖主义以团结并强化美国的法律"（《美国爱国者法案》)第三部分和美国财政部海外资产控制办公室的规定。认购者承认并同意，即使《备忘录》或任何其他协议中有任何相反的规定，但

在任何反洗钱法律或法规要求的范围内，该公司可以禁止与该本票相关的出资，限制其分配或采取任何其他与该本票相关的合理必要或有预见性的措施，而认购者不得对该公司或与此相关的任何其他人提出索赔。除其他限制外，美国联邦法规和OFAC管理的行政命令均禁止与某些国家、地区、团体和个人进行交易和向其提供服务。OFAC禁止的国家、地区、个人和团体的名单可以在OFAC网站http://www.treas.gov/ofac上找到。此外，OFAC管理的计划（"OFAC计划"）禁止与个别国家的个人或团体产生业务，无论这些个人或团体是否出现在OFAC名单里。

(b) To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations. The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber, declining any demand for repayment requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges that the Company may, by written notice to the Subscriber, suspend the repayment rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

据认购者所知，以下任何一方：(1)认购者；(2)任何控制认购者或由认购者控制的个人；(3)若认购者是一家私人控制的团体，任何从认购者的认购中受益的个人；或(4)任何以认购者作为投资代理人的个人，均不在OFAC名单里或者是OFAC禁止涉及的个人或团体。请注意：若潜在投资者无法做出本段中规定的声明或陈述，该公司有权不接受其所有的投资款。认购者同意，若认购者知晓若陈述中的信息发生任何变化，应立即告知该公司。认购者理解并承认，根据法律规定，该公司可"冻结认购者的账户"，即可以禁止该认购者继续认购，或依据政府法规拒绝任何偿还请求和/或隔离账户中的资产，而所有证券经纪需要报告此类行为，并向OFAC披露认购者的身份。认购者进一步知悉，若该公司合理地认为，该公司或任何证券经纪或该公司的任何其他服务提供商为了遵守反洗钱法规，有必要暂停认购者的还款权利（若有），则可以向认购者

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 756
1366

发出书面通知。上述个人包括特定国家的国民、特定的毒品贩运者和受OFAC制裁和禁运计划限制的其他各方。[3]

(c) To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a senior foreign political figure[2], or any immediate family[4] member or close associate[5] of a senior foreign political figure, as such terms are defined in the footnotes below.

就认购者所知，以下任何一方：（1）认购者；（2）任何控制认购者或由认购者控制的个人；（3）若认购者是一家私人控制的团体，任何从认购者的认购中受益的个人；或（4）任何以认购者作为投资代理的个人，均不是外国高级政治人物[6]，或其任何直系家庭成员[7]或亲密伙伴[8]，其定义见下方脚注。

(d) If the Subscriber is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Subscriber represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking

---

[1] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.
这些人士包括特定国家的国民、特定的毒品贩运者和受 OFAC 制裁和禁运计划限制的其他各方。
[2] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.
"外国高级政治人物"被定义为外国政府（无论是否选举产生）的执行、立法、行政，军事或司法分支机构中的高级官员，主要外国政党的高级官员，或外国政府所有的公司的高级管理人员。此外，"外国高级政治人物"也包括由高级外国政治人物组成或为其谋利的任何公司、企业或其他团体。
[3] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.
外国高级政治人物的"直系亲属"通常包括其父母、兄弟姐妹、配偶、子女和姻亲。
[4] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.
外国高级政治人物的"亲密伙伴"系指广为人知、且公开与高级外国政治人物保持异常密切关系的人士，包括代表该高级外国政治人物进行重要的国内和国际金融交易的人士。

478023.v10

authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

如果认购者是一家非美国银行机构（"外国银行"）的附属机构，或者若认购者从一家外国银行收取存款、代表该外国银行支付款项或处理与外国银行有关的其他金融交易，则该认购者向该公司陈述及保证：(1)该外国银行在一个其被授权从事银行业务的国家拥有固定地址，而不仅仅是电子地址;(2)该外国银行维持着与其银行业务有关的经营记录;(3)该外国银行受其金融活动牌照发放机构的监管；且(4)该外国银行不向在其他任何国家都没有实体机构且并非其附属机构的外国银行提供金融服务。

(e) The Subscriber acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Subscriber agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, the Note Documents, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information, may result in the withholding of amounts with respect to, or other limitations on, repayments of principal or interest made to the Subscriber and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith.

认购者承认，在适用的范围内，该公司将遵守《美国国内税收法》中的《海外账户税收合规法案》的条款以及与之相关的任何规则、条例、形式、指示或其他指引（"FATCA条款"）。为了实行这些措施，认购者同意，若该公司为了遵守FATCA规定而提出要求，将及时配合提供任何补充文件或信息，并及时更新。认购者承认并同意，尽管《备忘录》、该《本票协议》及其相关文件、任何附函或任何其他协议中另有规定，若其未能及时满足这些要求、或提供补充信息，可能导致该公司向认购者偿还本金或利息时扣除相应的费用或设置一定的限制，或导致该公司采取与本协议项下的本票相关的合理必要的措施（包括但不限于要求认购者撤回投资），但认购者不得因此对该公司或与其相关的任何其他人士提出任何索赔。

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Subscriber shall give prompt notice of such fact to the Company by facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

478023.v10

截至本协议签署之日，上述陈述和保证均为真实准确，并且应在签署后依然有效。如果上述任何陈述和保证在该公司接受本《认购协议》之前不再真实准确，则认购者应立即通过电报、传真或电子邮件等方式及时通知该公司，详述不真实或不准确的部分，并做出解释。

7. **Indemnification.** Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations and warranties made by Subscriber herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Subscriber hereby agrees to indemnify and hold harmless the Company and each employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Subscriber contained in this Subscription Agreement.

**保护**。认购者确认理解其在本协议中所作出的陈述和保证的含义和法律后果，并且该公司正是基于这些陈述和保证做出了接受或拒绝该《认购协议》的决定。
认购者同意保护该公司及其员工和代理人，并使其免于承担因认购者违反在本《认购协议》中作出的任何声明或保证而导致的部分或所有损失、损害或责任。

8. **Transferability.** Subscriber agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

**不可转让**。认购者同意不转让或出让本《认购协议》或其中的任何权益，并进一步同意在转让和出让该本票时以相关的联邦和州的证券法为唯一依据。

9. **Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Subscriber any money tendered hereunder without interest or deduction.

**本协议的终止；资金返还**。若因任何原因，该公司拒绝签署本《认购协议》，则本《认购协议》无效，并不再具有任何效力，且任何一方均不得据此对另一方享有任何权利。若该公司拒绝签署本《认购协议》，该公司应立即向认购者返还认购者支付的所有款项，但不计利息，亦不扣除任何费用。

10. **Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Subscriber at the address set forth below and to the Company at the address set forth on the first page of this Agreement, or (c) at such other place and in such other method as the Company may designate by written notice to Subscriber.

**通知**。依据本协议或本协议项下的本票发送或发出的所有通知或其他信息均应以书面形式发出，并在以下情况下被视为送达：(a)通过认证邮件或挂号信邮寄，收到回执且已预付邮资，

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 759
1366

(b)通过传真或电子邮件按照下文所示的地址发送至认购者，或按照本协议第一页所示的地址发送至该公司，或(c)认购者指定该公司寄送的其他地址或其他送达方式送达。

**11. Amendments**.   Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Subscriber and the Company. In the event Subscriber purchases additional Notes in the future, Subscriber and the Company may execute an adoption form, in which the Subscriber and Company agree that all terms of this Subscription Agreement apply to any additional Note purchase.   In the event the Parties sign an adoption form, the provisions of this Subscription Agreement shall be binding on the additional Notes as though Subscriber had signed this Subscription Agreement at the time of each purchase.

**修订**。除以书面形式列出并经认购者和该公司签署确认外，本《认购协议》或其任何条款均不得被更改、豁免、废除或终止。如果认购者在将来购买更多本票，认购者和该公司应执行一份额外协议，双方同意本《认购协议》中的所有条款在购买任何附加本票时都适用。如果双方签署额外协议，则本《认购协议》的条款对附加本票具有约束力，等同于认购者在每次购买时签署本《认购协议》。

**12. Governing Law.**  This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

**适用法律**。本《认购协议》及其所有修订应遵守特拉华州法律的约束并按其解释。

**13. Headings.**  The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

**标题**。本《认购协议》的标题仅为阅读方便而设，标题自身并不能决定本《认购协议》或其任何部分的含义。

**14. Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. Additionally this Subscription Agreement may be executed by means of digital or electronic signature of the Parties.  The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

**副本**。本《认购协议》可以签署任意数量的副本，但具有相同的效力和效果，如同签署的是同一份文件。另外无论双方以何种形式的数码或电子签名，本《认购协议》都应执行。若本《认购协议》以传真或其他电子传送形式进行签署或提交，应等同于提交一份已签署的原件，已签署的协议上所有的签署者均受本协议约束。

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

［本页面下方空白］

478023.v10

## INVESTMENT SUMMARY

## 投资摘要


## Initial Investment Amount

## 初始投资金额

Investor agrees to invest the following initial amount ("Principal Balance"):

投资人同意以下述初始投资额（"本金金额"）投资：

$\underline{\hspace{5cm}}$

## Payment Method

## 支付方式

Investor agrees to forward payment of the Principal Balance in <u>one</u> of the following methods (select one):

投资人同意按照以下一种方式（请选择一种）支付该《认购协议》中的本金金额：

☐ **Credit Card**: By entering the following credit card information, you are authorizing the Company to charge your credit card for the Principal Balance. Additionally, you agree to pay any credit card processing fees involved in making the credit card payment.

**信用卡**：输入以下信用卡信息后，您即授权该公司从您的卡中扣除本金金额。此外，你同意支付因使用信用卡支付而产生的任何手续费。

| | |
|---|---|
| **Name of Cardholder**<br>持卡人姓名 | |
| **Credit Card Number**<br>信用卡卡号 | |
| **Expiration Date**<br>到期日 | |
| **Security Code**<br>安全码 | |

478023.v10

☐ **Electronic Funds Transfer**:  by wiring or ACH payment of the Principal Balance to the account set forth below:

电子转账：以电汇或银行转款的方式向以下账户支付本金金额：

Account Name账户名称:                  iCap Pacific Income Fund 4, LLC
ABA Routing Number 美国国内银行代码:      123205054
Account Number账号:                   4864806486
Bank Name银行名称:                     Umpqua Bank
Bank Address 银行地址:                  705 NW Gilman Blvd.,
                                      Issaquah, WA 98027
SWIFT Code国际转账代码:                 UMPQUS6P

☐ **Check**:  by mailing a check made payable to "iCap Pacific Income Fund 4, LLC" along with a completed subscription document to:

支票：邮寄一张收款人为"iCap Pacific Income Fund 4, LLC"的支票连同一份填写完整的认购文件至如下地址：

iCap Pacific Income Fund 4, LLC
Attn: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006 U.S.A.

☐ **Other**其他: _____

\* Interest will accrue only after the Subscription Agreement has been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

\*只有在本《认购协议》已完全签署并被该公司接受，且本金已按照该公司的汇款方式汇至该公司才会开始计算利息。

478023.v10

## SIGNATURE PAGE

## 签名页

### INDIVIDUALS

### 个人

In witness whereof, the parties hereto have executed this Subscription Agreement and hereby agree to the provisions of the Note Documents and their exhibits, as of the date set forth below.

为示信守，在下述日期之日开始，本协议双方已同意签署本《认购协议》，并同意接受《本票协议》及其附属协议。

Dated 日期: _____

Signature(s)签名: _____

_____

Executed at 签名地点: _____

Name(s) (Please Print) 名字(楷体): _____

Residence Address 住址: _____

_____

Phone Number 电话号码: _____

Passport Number 护照号码: _____

Email address 电子信箱: _____

***Together with this Subscription Agreement, please sign and return a counterpart signature page to the Pledge and Security Agreement, which is attached hereto as Annex 1.***

请签署本协议附录1的《承诺和保证协议》以及本《认购协议》，并将签名页发送给该公司。

<u>ACCEPTANCE</u>

<u>接受方</u>

iCap Pacific Income Fund 4, LLC

**艾珂榮太平洋收益基金四期有限责任公司**

Date 日期: _____

By 签署人: iCap Pacific NW Management, LLC

Its 代表人: Manager

By 签署人: _____

Name 姓名: _____

Title 职位: _____

## SIGNATURE PAGE

## 签名页

### CORPORATIONS, PARTNERSHIPS, TRUSTS OR OTHER ENTITIES

### 公司、合伙企业、信托机构或其他实体

In witness whereof, the parties hereto have executed this Subscription Agreement and hereby agree to the provisions of the Note Documents and their exhibits as of the date set forth below.

为示信守，在下述日期之日开始，本协议双方已同意签署本《认购协议》，并同意接受《本票协议》及其附属协议。

Dated 日期: _____

Name of Entity (Please Print) 公司名(楷体): _____

Signature 签名: _____

_____

Executed at 签名地点: _____

_____

Name (Please Print) 名字(楷体): _____

Title 职位: _____

Address 地址: _____

_____

Phone Number 电话号码: _____

Taxpayer ID Number 纳税人ID号码: _____

Email address 电子信箱: _____

***Together with this Subscription Agreement, please sign and return a counterpart signature page to the Pledge and Security Agreement, which is attached hereto as Annex 1.***

请签署本协议附录1的《承诺和保证协议》以及本《认购协议》，并将签名页发送给该公司。

<u>ACCEPTANCE</u>

<u>接受方</u>

iCap Pacific Income Fund 4, LLC

**艾珂榮太平洋收益基金四期有限责任公司**

Date 日期: _____

By 签署人: iCap Pacific NW Management, LLC

Its 代表人: Manager

By 签署人: _____

Name 姓名: _____

Title 职位: _____

478023.v10

**Annex 1**

**附录1**

**Counterpart Signature Page to Pledge and Security Agreement**

**承诺和保证协议签名页**

The undersigned hereby accepts, and becomes a party to, the Pledge and Security Agreement (the "Agreement"), dated as of October 1, 2018, in connection with the acquisition of a Note (as defined in the Agreement), and by its signature below signifies its agreement to be bound by the terms and conditions of the Agreement.

自2018年10月1日起，下方签署者接受并成为关于获得债券（其定义见该协议）的《质押和担保协议》中的一方，受本协议中的相关条款约束。

## INDIVIDUAL 个人

Name(s) 姓名:　　　　　` _____

　　　　　　　　　　　　 _____

Signature(s) 签字: 　　 _____

　　　　　　　　　　　　 _____

Date 日期: 　　　　　　 _____

---

## ENTITY 企业

Entity Name 企业名称: 　 _____

Signature 签字: 　　　　 _____

Name 姓名: 　　　　　　 _____

Title 职位: 　　　　　　 _____

Date 日期: 　　　　　　 _____

**EXHIBIT B**

**FORM OF NOTE**

478023.v10

**NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.**

**Principal Amount: $_____**                    **Issue Date: _____**

                                                       **Account Number: _____**

<div align="center">

### SECURED PROMISSORY NOTE

</div>

FOR VALUE RECEIVED, iCap Pacific Income Fund 4, LLC, a Delaware limited liability company (the "Company" or the "Company"), hereby promises to pay to the order of _____, or registered assigns (the "Holder"), in the form of lawful money of the United States of America by the twentieth (20th) anniversary of the Issue Date (as defined below) (the "Maturity Date"), the amount first set forth above ("Principal Amount"), and to pay interest on the unpaid Principal Amount hereof at the rate of ten percent (10%) per annum, compounded monthly (the "Interest Rate"), from the Issue Date until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise, pursuant to the terms of this Secured Promissory Note (this "Note"). The "Issue Date" is defined as the date on which the Subscription Agreement and all related documents are executed in full, and the Principal Amount is made available to the Company as determined by the Company's financial institution; provided, however, that if this Note is signed by Company, and the entire Principal Amount is not made available to the Company within 21 days of the date first set forth above, then this Note, the Subscription Agreement, and all related documents shall be automatically terminated, cancelled, or rescinded and of no effect. This Note is one of a Series of secured promissory notes being issued by the Company up to a total principal amount of $50,000,000 (collectively, the "Notes"). This Note is issued to Holder pursuant to a Subscription Agreement dated as of _____ (the "Subscription Agreement") by and between the Company and Holder and is subject to the terms and conditions thereof.

1. <u>Payments.</u>

   (a) This Note is a balloon note and there are no scheduled payments prior to the Maturity Date except as otherwise set forth herein. Unless otherwise paid, the outstanding Principal Amount and all unpaid Interest shall be paid on the Maturity Date. The Company may prepay all or any portion of the Principal Amount prior to the Maturity Date without penalty.

   (b) At any time following the third anniversary of the Issue Date, Holder may require the Company to repay all or a portion of the Principal Amount and all unpaid Interest then due and payable (a "Demand Repayment"). Any Demand Repayment may be made through the Company's investor portal accessible at www.icapequity.com, an electronic application as provided by the Company to Holder, or by delivery to the Company of a demand notice in the form as attached hereto as Exhibit A (each as so delivered, a "Demand Notice"). Upon receipt of a Demand Notice, the Company will pay the requested amount in four equal installments due within 15-days of the beginning of each calendar quarter (the "Demand Payment"). The first payment will be made in the next calendar quarter that follows delivery of proper notice, provided 45-days notice is provided to the Company. Notwithstanding the foregoing, the

478023.v10

Company's demand payment obligation is subject to a limit of 25% of the combined notes of the Company requested per year. If more than 25% of the combined notes provide Demand Notice within a given year, then the Notes of Investors who provide subsequent Demand Notice will be paid in the order received after the combined total, including the subsequent Note, has been reduced to less than 25%. Upon a request for demand repayment, the Company will pay the principal over four quarters. All repayments pursuant to this Section 1(b) shall be applied first to accrued and unpaid Interest and thereafter to the Principal Amount.

(c) Unless otherwise agreed between Company and Holder, all monthly interest payments will be added to the Principal Amount as of the 1st of each month during any period of compounding.

2. <u>Security and Guaranty; Exchange</u>.

(a) Until such time as the Company has filed a registration form on S-11 (the "Registration Statement") pursuant to the Securities Act of 1933, as amended (the "Securities Act") for the registration of promissory notes having terms and conditions materially similar to this Note other than for this Section 2 (the "Registered Notes"), (i) payment of this Note and the Interest and Principal Amount hereunder shall be secured by a pledge of the equity securities of any direct wholly owned subsidiaries held by iCap Holding, LLC a wholly owned subsidiary of the Company ("Holding"), pursuant to a Pledge and Security Agreement to be entered into by and between the holders of the Notes, the Company and Holding (the "Security Agreement") provided that such security interest may be junior to any financing in place related to the real estate holdings of such subsidiaries; and (ii) payment of this Note and the Interest and Principal Amount hereunder shall be guaranteed by Holding pursuant to a Guaranty Agreement to be entered into between Holding and the Company (the "Guaranty Agreement"). This Note, the Subscription Agreement pursuant to which Holder acquired this Note, the Pledge and Security Agreement and the Guaranty Agreement may be referred to collectively as the "Transaction Documents."

(b) Upon the effectiveness of the Registration Statement, the Holder shall have the right, but not the obligation, to exchange this Note for a Registered Note in the aggregate principal amount equal to the Interest and Principal Amount then due and owing hereunder. In the event of such exchange this Note shall cease to be of any force or effect. Such exchange right shall be subject to reasonable terms and conditions as determined by the Company and communicated to the Holders, and such exchange offer shall remain open for at least 30 days from effectiveness of the Registration Statement.

(c) On the thirty (30) day anniversary of the effectiveness of the Registration Statement, the Security Agreement and the Guaranty shall automatically terminate without any further action of any party thereto, and this Note shall thereafter be an unsecured obligation of the Company.

(d) This Note will be subordinate at times to the rights of any lender of the Company or its subsidiaries, as well as to other higher-ranking obligations of the Company, including property taxes and management fees, as further set forth in the Security Agreement.

3. <u>Application of Payments</u>. Unless otherwise expressly provided in this Note, all payments made on this Note shall be applied, (i) first to the payment of the Interest and other charges then accrued and due on the unpaid Principal Amount of this Note; and then (ii) the remainder of all such payments shall be applied to the reduction of the unpaid Principal Amount.

4. <u>Events of Default</u>.

(a) <u>Definition</u>. For the purpose of the Transaction Documents, an event of default ("Event of Default") will

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 7, Page 771
Pg 77 of
1366

be deemed to have occurred if, and at the time, holders holding a majority of the principal amount of the Notes then outstanding (a "Majority-in-Interest of the Noteholders") elect to declare such an Event of Default, which a Majority-in-Interest of the Noteholders may only do in the event that any of the following occur, and after the Company has not rectified such event within 90 days of receipt of notice thereof signed by a Majority-in-Interest of the Noteholders:

(i) The Company fails to make a Demand Payment when due pursuant to Section 1(b);

(ii) the Company fails to perform any of its material obligations under this Note, or being in breach in any material respect of any representation, warranty, covenant or agreement on the part of the Company set forth in this Note;

(iii) the Company commences any liquidation or dissolution proceedings or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consents to the filing of any bankruptcy petition against it under any similar law; or

(iv) the Company fails to pay all amounts due under the Notes on the Maturity Date.

(b) <u>Consequences of Events of Default</u>. If, and at the time, an Event of Default occurs, the Interest Rate shall be increased to fifteen percent (15%) per annum (the "Default Rate"), which Default Rate shall remain in place until this Note is either paid as due or such Event of Default is cured. If an Event of Default as set forth in Section 1(a)(i), Section 1(a)(ii), or Section 1(a)(iv) occurs, a Majority-in-Interest of the Noteholders will have the right to declare only the applicable Note(s) which are subject to the Event of Default due and payable. If an Event of Default as set forth in Section 1(a)(iii) occurs, a Majority-in-Interest of the Noteholders will have the right to declare all of the Notes due and payable and, if the Security Agreement and Guaranty Agreement are still in effect as of such time, a Majority-in-Interest of the Noteholders shall have the right to proceed to enforce the security granted to the noteholders pursuant to the Pledge and Security Agreement entered into between the Company and the noteholders, and to enforce the Guaranty Agreement entered into between the Company and iCap Holding, LLC, pursuant to which iCap Holding, LLC guaranteed the obligations of the Company hereunder for the benefit of the noteholders.

5. <u>Cancellation</u>. After all obligations for the payment of money arising under this Note have been paid in full this Note will be surrendered to the Company for cancellation.

6. <u>Failure or Indulgence Not Waiver.</u> No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies of the Holder existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

7. <u>Notices.</u> All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be given in the manner set forth in the Subscription Agreement.

8. <u>Amendments.</u> This Note and the other Transaction Documents, and any provision hereof or thereof, may not be amended at any time without the prior written consent of Holder, unless a Majority in Interest agrees in writing to make such change.

9. <u>Assignability.</u> This Note shall be binding upon the Company and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Each transferee of this Note must be an

"Accredited Investor" (as defined in the Subscription Agreement) and any transfer is subject to the terms and conditions thereof.

10. <u>Governing Law; Venue; Attorney's Fees.</u> This Note shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS NOTE, THE OTHER TRANSACTION DOCUMENTS OR THE CONTEMPLATED TRANSACTIONS SHALL BE INSTITUTED SOLELY IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF WASHINGTON, IN EACH CASE LOCATED IN KING COUNTY, WASHINGTON, AND EACH PARTY IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. **THE COMPANY AND THE HOLDER EACH HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Note or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The prevailing party in any action or dispute brought in connection with this the Note or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorneys' fees and costs.

11. <u>Other Agreements.</u> The Company and the Holder shall be bound by the applicable terms of the Subscription Agreement, and, for such time as they are in effect, the Security Agreement and the Guaranty Agreement. The Subscription Agreement, the Security Agreement, the Guaranty Agreement and this Note constitute the sole and entire agreement of the Company and the Holder with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

12. <u>Remedies.</u> The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, except as expressly set forth herein or in the Transaction Documents the Company acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required. If default is made in the payment of this Note, the Company shall pay the Holder costs of collection, including reasonable attorneys' fees.

13. <u>Construction; Headings</u>. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

14. <u>Usury</u>. To the extent it may lawfully do so, the Company hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any action or proceeding that may be brought by the Holder in order to enforce any right or remedy under this

Note.  Notwithstanding any provision to the contrary contained in this Note, it is expressly agreed and provided that the total liability of the Company under this Note for payments which under Delaware law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums which under Delaware law in the nature of interest that the Company may be obligated to pay under this Note exceed such Maximum Rate.  It is agreed that if the maximum contract rate of interest allowed by Delaware law and applicable to this Note is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to this Note from the effective date thereof forward, unless such application is precluded by applicable law.  If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to the Holder with respect to indebtedness evidenced by this the Note, such excess shall be applied by the Holder to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at the Holder's election.

15. <u>Severability.</u>  In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law (including any judicial ruling), then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Company has executed and delivered this Note on the Issue Date.

iCap Pacific Income Fund 4, LLC

By:     iCap Pacific NW Management, LLC

Its:     Manager

By:    _____

Name:    _____

Title:    _____

478023.v10

Exhibit A

Demand Repayment Notice

This is a Demand Notice pursuant to that certain Secured Promissory Note of iCap Pacific Income Fund 4, LLC, a Delaware limited liability company (the "Company"), issued to the undersigned ("Holder") on _____, 201____ in the original Principal Balance of $_____ (the "Note"). Defined terms used herein shall have the meaning given to them in the Note. Pursuant to the provisions of the Note, Holder hereby demands prepayment of the following amount:

**Amount (Select One)**

☐ Full repayment of all Principal Balance and all unpaid Interest; OR

☐ Repayment of the following amount:        $_____

**Payment Method (Select One)**

☐ Via ACH transfer to:
   Account Name:        _____
   ABA Routing Number:  _____
   Account Number:      _____
   Bank Name:           _____

   SWIFT CODE:          _____

☐ Via Check to the address of Holder as set forth in the Subscription Agreement.

Name of Holder: _____

Signature: _____

Title: _____

Date: _____

**EXHIBIT C**

**PLEDGE AND SECURITY AGREEMENT**

# PLEDGE AND SECURITY AGREEMENT

This Pledge and Security Agreement (this "Agreement"), dated as of October 1, 2018 (the "Effective Date"), is entered into by and between iCap Pacific Income Fund 4, LLC, a Delaware limited liability company ("Parent"), iCap Holding, LLC, a Delaware limited liability company and a wholly owned subsidiary of Parent ("Pledgor") and the holders of promissory notes issued by Parent pursuant to an offering of up to $50,000,000 of promissory notes of Parent (the "Notes") pursuant to Regulation D and Regulation S promulgated under the Securities Act of 1 933, as amended, commencing on or about October 1, 2018, who execute a counterpart signature page to this Agreement and become a party hereto (each a "Pledgees" and collectively the "Pledgees"), and for the benefit of the Pledgees. Each of Parent, Pledgor and each Pledgee may be referred to herein as a "Party" and collectively as the "Parties." Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, the Pledgor is or shall be a member or shareholder of certain subsidiaries of Pledgor which shall hold real estate investment properties, the interests in which will be acquired with the proceeds of the Notes and the proceeds from which will be used to pay amounts due to the Pledgees pursuant to the Notes (the "Portfolio SPEs"), holding all of the Class A membership interests or shares of capital stock of such Portfolio SPEs (the "Pledged Interests"); and

WHEREAS, the Pledgor has agreed to execute and deliver this Agreement pursuant to the terms of the Notes;

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1. PLEDGE.  To secure the prompt payment and full and faithful performance of the obligations of Pledgor to Pledgees pursuant to the Notes, whether direct, contingent, fixed or otherwise, now or hereafter from time to time arising pursuant to the Notes (collectively, the "Indebtedness"), the Pledgor hereby grants a security interest in and to, does hereby pledge and assign to, Pledgees, under Articles 8 and 9 of the UCC (as defined below), all its right, title, share and interest in, to and in respect of (i) the Pledged Interests; (ii) together with only so much of any distribution, whether of cash or in kind, in connection with, relating to or in respect of the applicable Pledged Interests, whether any such distribution or payment is a distribution, is in partial or complete liquidation, or is the result of reclassification, readjustment or other changes in the capital structure of the entity issuing the same, or otherwise, and any and all subscriptions, warrants, options and other rights issued upon and/or in connection therewith; (iii) any and all substitutions, renewals, improvements and replacements of the Pledged Interests and additions thereto; and (iv) all proceeds arising from any of the foregoing.  All of the foregoing items are referred to herein individually and/or collectively as the "Collateral." Capitalized terms not otherwise defined herein or in the Notes shall have the meaning given them in the UCC. For purposes of this Agreement, "UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Delaware; provided, however, in the event that, by reason of mandatory  provisions of law, any or all of the attachment, perfection or priority of Pledgees' security interest in the Pledged Interests is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

2. VOTING AND TRADING RIGHTS. If no Event of Default has occurred and is continuing, the Pledgor may exercise any voting rights that the Pledgor may have as to the Pledged Interests. If an Event of Default has occurred and is continuing, Pledgor shall deliver the Pledged Interests to such party as directed by a Majority-in-Interest of the Noteholders (the "Designated Party"), and thereafter Pledgees may exercise all voting rights as to any of the Pledged Interests and the Pledgor shall deliver to the Designated Party all notices, proxies and other information relating to the exercise of such rights received by the Pledgor promptly upon receipt and, at the request of Designated Party, shall execute and deliver to the Designated Party any proxies or other instruments which are, in the judgment of the Designated Party, necessary for Pledgees to exercise such voting rights.

3. DUTY OF PLEDGEE. Pledgees shall have no liability or duty, either before or after the occurrence of an Event of Default to collect or enforce any of its rights against, the Pledged Interests. If Pledgees actually receive any notices requiring action with respect to Pledged Interests in Pledgees' possession, Pledgees shall take reasonable steps to forward such notices to the Pledgor. Except as provided in Section 2, the Pledgor is responsible for responding to notices concerning the Pledged Interests, voting the Pledged Interests, and exercising any rights and options, calls or conversions in respect of the Pledged Interests.

4. REPRESENTATIONS AND WARRANTIES. The Pledgor represents and warrants to Pledgees that:

   **(a)** The Interests do, or shall, constitute all of Pledgor's ownership interest in the Portfolio SPEs.

   **(b)** The Pledgor is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the Pledgor's organizational documents. The Pledgor has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Agreement.

   **(c)** The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Pledgor is a party or to which any of its assets, properties or operations are subject.

   **(d)** This Agreement and all agreements and other documents executed by the Pledgor in connection herewith constitute the valid and binding obligation of the Pledgor, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

   **(e)** No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Agreement, the pledge of a security interest in the Pledged Interests in favor of Pledgees or the valid and lawful exercise by Pledgees of remedies available to them under this Agreement or applicable law or of the voting

and other rights granted to it in this Agreement, except as may be required for the offer or sale of securities under applicable securities laws.

**(f)** The Pledgor is the sole owner of the Pledged Interests, has the right to grant the security interest provided for herein to Pledgees and, to the knowledge of the Pledgor, has granted to Pledgees a valid and perfected first priority security interest in the Pledged Interests, free of all liens, encumbrances, transfer restrictions and adverse claims.

5. COVENANTS. The Pledgor covenants and agrees that so long as this Agreement shall be in effect:

**(a)** Provided that an Event of Default does not exist and is continuing, then the Parent, Pledgor and the Portfolio SPEs may make distributions to their respective members as they determine. At any time that an Event of Default exists and is continuing, none of Parent, Pledgor or the Portfolio SPEs shall make any distributions to their members, other than tax distributions (i.e., distributions in the amount of taxes payable by such members on the apportioned income of the entities) or as otherwise required by law. Distributions as referenced herein does not include Management Fees, origination fees, or other fees owed to Affiliates of Pledgor. Parent may cause the real estate owned by the Portfolio SPEs to be sold, encumbered, transferred, pledged, liened, or otherwise disposed of as it sees fit.

**(b)** The Pledgor shall defend the Pledgor's title to the Pledged Interests and the security interest of Pledgees against the claims of any person claiming rights in the Pledged Interests.

**(c)** Without the prior written consent of a Majority-in-Interest of the Noteholders, (i) the Pledgor shall not sell, gift, pledge, exchange or otherwise transfer the Pledged Interests. In the event of any such sale, exchange or transfer consented to by Pledgees, the Pledgor shall upon receipt the proceeds of such sale, exchange or transfer to pay any such distribution with respect to the Pledged Interests to the Pledgees for application to the Indebtedness.

**(d)** The Pledgor will pay and discharge when due all of its material obligations and liabilities (including, without limitation, tax liabilities) which if unpaid when due might by law give rise to a lien on the Pledged Interests, except where the same may be contested in good faith by appropriate proceedings.

**(e)** At the Pledgor's expense, do such further facts and execute and deliver such additional conveyances, certificates, instruments, legal opinions and other assurances as a Majority-in-Interest of the Noteholders may reasonably request to protect, assure or enforce their interests, rights and remedies under this Agreement.

6. INDEMNIFICATION. Each Party shall jointly and severally indemnify and hold harmless the other Parties and such other Parties' agents, beneficiaries, affiliates, representatives and their respective successors and assigns (collectively, the "Indemnified Persons") from and against any and all damages, losses, liabilities, taxes and costs and expenses (including, without limitation, attorneys' fees and costs) resulting directly or indirectly from (a) any inaccuracy, misrepresentation, breach of warranty or non-fulfillment of any of the representations and warranties of such Party in this Agreement, or any actions, omissions or statements of fact inconsistent with in any material respect any such representation or warranty, (b) any failure by such Party to perform or comply with any agreement, covenant or obligation in this Agreement.

7. TERMINATION. This Agreement shall automatically terminate and be of no further force or effect, and any security interest in the Pledged Interests shall automatically terminate and be released, on the earlier to occur of the thirty (30) day anniversary of the effectiveness of the Registration Statement or the full payment of the Note.

8. EXPENSES. The Pledgor agrees that, following an Event of Default, the Pledgor will pay to the Pledgees upon demand the amount of any out-of-pocket expenses, including the fees and disbursements of counsel, that Pledgees incurs in connection with the enforcement of this Agreement, including expenses incurred to preserve the value of the Pledged Interests, the sale or other disposition of any of the Pledged Interests, the exercise by Pledgees of any of its rights, or any action to enforce its rights under this Agreement.

9. NOTICES. Any notices, communications and waivers under this Agreement shall be in writing and sent in accordance with the provisions for notices as set forth in the Notes.

10. INCORPORATION. Section 10, Section 12, Section 13 and Section 15 of the Notes are incorporated herein by reference and shall apply to this Agreement as though fully set forth herein, provided that any reference therein to the "Note" shall be deemed a reference to this Agreement.

11. INTERPRETATION. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore shall not be construed against a Party or Parties on the ground that such Party or Parties drafted or was more responsible for the drafting of any such provision(s). The Parties further agree that they have each carefully read the terms and conditions of this Agreement, that they know and understand the contents and effect of this Agreement and that the legal effect of this Agreement has been fully explained to its satisfaction by counsel of its own choosing.

12. AMENDMENT. This Agreement may be amended by Parent and the Pledgor at any time, without any approval of the Pledgees being required.

13. COUNTERPARTS. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which taken together shall be but a single instrument. The Pledgees may join this Agreement at or following the Effective Date by the execution of a Counterpart Signature Page as set forth herein, provided, however, that such Counterpart Signature Page shall not be effective unless and until the Company accepts the applicable proposed Pledgee's subscription for a Note pursuant to the Subscription Agreement. The execution and delivery of a facsimile or other electronic transmission of a signature to this Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

*[Signatures appear on following pages]*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date or as of the date of their joinder hereto.

**Pledgor**: iCap Holding, LLC

By: _____

Name:  Chris Christensen

Title:  Manager

**Parent**: iCap Pacific Income Fund 4, LLC

By:    iCap Pacific NW Management, LLC

Its:    Manager

By: _____

Name:  Chris Christensen

Title:  Manager

478023.v10

**Counterpart Signature Page**

The undersigned hereby accepts, and becomes a party to, the Pledge and Security Agreement (the "Agreement"), dated as of October 1, 2018, in connection with the acquisition of a Note (as defined in the Agreement), and by its signature below signifies its agreement to be bound by the terms and conditions of the Agreement.

**INDIVIDUAL**

Name: _____

Signature: _____

Date: _____

---

**ENTITY**

Entity Name: _____

Signature: _____

Name: _____

Title: _____

Date: _____

478023.v10

**EXHIBIT D**

**GUARANTY AGREEMENT**

478023.v10

# GUARANTY AGREEMENT

This Guaranty (this "Guaranty") is made and entered into as of October 1, 2018 (the "Effective Date") by iCap Holding, LLC, a Delaware limited liability company ("Guarantor"), to and for the benefit of each of the holders (each, a "Holder") of promissory notes (the "Notes") issued by iCap Pacific Income Fund 4, LLC, a Delaware limited liability company and the sole member of Guarantor ("Borrower") pursuant to an offering of up to $50,000,000 of promissory notes of Borrower pursuant to Regulation D and Regulation S promulgated under the Securities Act of 1933, as amended, commencing on or about October 1, 2018 (the "Offering"). Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, following the execution of this Guaranty, Borrower shall issue certain Notes to the Holders, pursuant to a subscription agreement between the Borrower and the applicable Holder in connection with the Offering; and

WHEREAS, Guarantor acknowledges the provisions of the Notes contemplate Guarantor's entering into this Agreement and Guarantor is financially interested in Borrower and will receive certain benefits as a result of Guarantor's promises herein as a result of making this Guaranty for the benefit of the Holders;

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Guarantor agrees as follows:

1. Guarantor hereby unconditionally, absolutely and irrevocably guarantees the full and timely performance of all of the obligations of Borrower under the Notes, including the due and punctual payment of the principal and interest of the Note and all money due or that may become due under the Notes, whether (a) according to the present terms of any of those documents or at any earlier or accelerated date or dates as provided therein, (b) pursuant to any extension of time or (c) pursuant to any amendment, modification or replacement of those documents hereafter made or granted, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such indebtedness may be or hereafter becomes unenforceable (collectively, "Obligations").

2. Guarantor agrees that settlement of any claim by Holder against Borrower, whether in any proceeding or not, and whether voluntarily or involuntarily, will not reduce the amount due under this Guaranty except to the extent of the amount actually paid by Borrower or any other party and retained by Holder.

3. During the continuation of an Event of Default at a time when this Guaranty is in full force and effect, Holder may enforce this guaranty against Guarantor, but only after attempting to collect or exhausting Holder's efforts to collect from Borrower, in accordance with the provisions of the Notes.

4. Guarantor agrees that its obligation to make payment under the terms of this Guaranty shall not be impaired, modified, changed, released or limited in any manner by any impairment, modification, change, release, defense or limitation of the liability of Borrower or of a receiver, trustee, debtor-in-possession or estate under any bankruptcy or receivership proceeding. If any payment made by Borrower is reclaimed in a bankruptcy or receivership proceeding, Guarantor shall pay to Holders the dollar amount of the amount reclaimed. Guarantor further assigns to Holders all rights Guarantor may have in any proceeding under the U.S. Bankruptcy Code or any receivership or insolvency proceeding until all indebtedness of Borrower to Holders has been paid in full. This assignment includes all rights of Guarantor to be paid by Borrower even if those rights have nothing to do with this

Guaranty. This assignment does not prevent Holder from enforcing Guarantor's obligations under this Guaranty in any way.

5. Guarantor is now adequately informed of Borrower's financial condition, and Guarantor agrees to keep so informed. Holder need not provide Guarantor with any present or future information concerning the financial condition of Borrower or any other guarantor, and changes in Borrower's or Guarantor's financial condition shall not affect Guarantor's obligations under this Guaranty. Guarantor has not relied on financial information furnished by Holder, nor will Guarantor do so in the future.

6. Guarantor represents and warrants to the Holders as follows:

    **(a)** The Guarantor is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Guaranty does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the Guarantor's organizational documents. The Guarantor has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Guaranty.

    **(b)** The execution of this Guaranty and the consummation of the transactions contemplated by this Guaranty will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Guarantor is a party or to which any of its assets, properties or operations are subject.

    **(c)** This Guaranty and all agreements and other documents executed by the Guarantor in connection herewith constitute the valid and binding obligation of the Guarantor, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

    **(d)** No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Guaranty or the valid and lawful exercise by Holders of remedies available to them under this Guaranty or applicable law.

    **(e)** Guarantor is fully familiar with all the covenants, terms and conditions of the Notes.

7. If an Event of Default occurs hereunder, Holders shall have all other remedies provided by law that do not conflict with the Note. Guarantor agrees that (a) this Guaranty shall inure to the benefit of and may be enforced by the Holder as set forth in the Notes, and (b) this Guaranty shall be binding upon and enforceable against Guarantor and its successors and assigns.

8. This Guaranty shall automatically terminate and be of no further force or effect on the thirty (30) day anniversary of the effectiveness of the Registration Statement or after the Note is paid in full.

9. Any notices, communications and waivers under this Agreement shall be in writing and sent in accordance with the provisions for notices as set forth in the Notes.

10. Section 10, Section 12, Section 13 and Section 15 of the Notes are incorporated herein by reference and shall apply to this Agreement as though fully set forth herein, provided that any reference therein to the "Note" shall be deemed a reference to this Agreement.

11. This Agreement may be amended by Parent and the Pledgor at any time, without any approval of the Holders being required.


IN WITNESS WHEREOF, the Guarantor has duly executed this Agreement as of the Effective Date.


iCap Holding, LLC



By: _____

Name:  Chris Christensen

Title:  Manager

# EXHIBIT 8

**THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM CONTAINS MATERIAL NON-PUBLIC INFORMATION REGARDING ICAP INVESTMENTS, LLC (THE "COMPANY"). BY ACCEPTING THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS HERETO (COLLECTIVELY THIS "MEMORANDUM"), THE RECIPIENT AGREES WITH THE COMPANY TO MAINTAIN IN STRICT CONFIDENCE ALL NON-PUBLIC INFORMATION, INCLUDING, BUT NOT LIMITED TO, THE EXISTENCE OF THE PROPOSED FINANCING AND ANY OTHER NON-PUBLIC INFORMATION REGARDING THE COMPANY OBTAINED FROM THIS MEMORANDUM, ANY OTHER TRANSACTION DOCUMENT OR THE COMPANY.**

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## FOR ACCREDITED INVESTORS AND NON-U.S. PERSONS

# iCap Investments, LLC

### $10,000,000 of

### Secured Promissory Notes

### May 1, 2020

**AN INVESTMENT IN OUR SECURITIES INVOLVES A HIGH DEGREE OF RISK. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF US AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD ONLY INVEST IN OUR SECURITIES IF YOU CAN AFFORD A COMPLETE LOSS OF YOUR INVESTMENT. YOU SHOULD READ THE COMPLETE DISCUSSION OF THE RISK FACTORS SET FORTH IN THIS MEMORANDUM.**

**DUE TO THE FACT THAT THE OFFERING IS A PRIVATE PLACEMENT AND EXEMPT FROM REGISTRATION, NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. SEE "CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS."**



SUPPLEMENT NO. 1 TO

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

DATED MAY 1, 2020

---

iCap Investments, LLC has determined to extend the Offering Period as described in this Memorandum for an additional 12-months, to May 31, 2022. Any references in this Memorandum to the "Offering Period" shall now be deemed to reflect such extension.

STERLING PLAZA I, 3535 FACTORIA BLVD. SE, SUITE 500, BELLEVUE, WA 98006
*Office* 425-278-9030 • *Fax* 425-278-9025 • *Website* ICAPEQUITY.COM

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 8, Page 790
1366

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**
**FOR**
**ACCREDITED INVESTORS AND NON-U.S. PERSONS**

**ICAP INVESTMENTS, LLC**

**$10,000,000 OF AGGREGATE PRINCIPAL AMOUNT**
**OF**
**SECURED PROMISSORY NOTES**

——————————————

This Confidential Offering Memorandum ("***Memorandum***") summarizes the principal terms of the offering ("***Offering***") of the Senior Secured Promissory Notes ("***Notes***") of iCap Investments, LLC (the "***Company***"). The Notes have not been, nor will they be registered or qualified under the Securities Act. They are being offered and sold in the United States only to non-US investors under Regulation S, and accredited investors in reliance on Rule 506(b) of Regulation D, promulgated under the Securities Act or under any applicable state securities laws. Neither the securities and exchange commission nor any state securities commission has approved or disapproved of these securities or determined if this memorandum is truthful or complete; any representation to the contrary is a criminal offense.

The information contained in this Memorandum is confidential. By acceptance of this Memorandum, each recipient agrees (a) not to reproduce or distribute this Memorandum to other persons (except the recipient's professional advisors) without the prior written consent of the Manager; (b) that the recipient and his, her or its professional advisors will keep confidential all information contained herein not already in the public domain; and (c) that the recipient will use this Memorandum for the sole purpose of evaluating a possible investment in the Notes. Each recipient also agrees to return this Memorandum and any other documents or information furnished by the Company to the recipient (and any and all copies thereof) upon request of the Company if the recipient declines to purchase any Notes.

There will be no public market for the Notes and there is no obligation on the part of the Company or any person to register the Notes under the Securities Act or any state securities laws.

This Memorandum includes data and information obtained from independent third-party sources. Although the Company does not have any reason to believe that such data and information is not accurate, the Company did not independently verify such data and information and cannot assure the accuracy or completeness of such data and information. Prospective investors must rely upon their own investigations and evaluations with respect to making an investment in the Notes being offered hereby.

Prospective investors will be advised of any material modifications to the terms of the offering or the Notes in writing prior to any sale of Notes to the prospective investors.

Nothing contained in this Memorandum is, or should be relied upon as, a promise or representation as to the Company's future performance. Prospective investors must rely upon their own examination of the Company and the terms of the Offering, including the merits and risks involved.

——————————————

# SUMMARY OF MATERIAL TERMS

The following summarizes a number of the material provisions relating to the Notes being offered by iCap Investments, LLC, a Washington limited liability company (the "***Company***"). This Memorandum is qualified in its entirety by the full text of the Note and Subscription Agreement and the exhibits attached thereto. Capitalized terms used in this summary not separately defined herein have the meanings assigned to such terms in the Note and Subscription Agreement. No person will be permitted to invest in the Notes unless such person has received and reviewed the Note and Subscription Agreement, this Memorandum and other offering-related documents.

| | |
|---|---|
| **Amount to be Raised** | Up to $10,000,000 in aggregate principal amount of Senior Secured Promissory Notes (the "***Notes***") or such additional amount as determined by the Manager in its sole discretion. |
| **Investors** | Each investor in the Notes must be a non-US resident under Regulation S or an "accredited investor" as defined under Regulation D of the Securities Act (the "***Investors***"). |
| **Pledge and Security Agreement** | Each Note is secured by the membership interests of the subsidiary entities that hold real estate controlled by the Company through the Pledge and Security Agreement attached hereto as **Exhibit C**. |
| **Minimum Investment** | An investment of at least $50,000, unless a smaller investment is permitted by the Manager in its discretion. |
| **Target Closing Date** | The initial closing is anticipated to occur in May of 2020, with subsequent closings permitted through May 31, 2021, unless extended up to 12-months by the Manager. |
| **Definitive Agreement** | The Notes will be issued and sold pursuant to a subscription agreement and will contain customary representations and warranties of the Company and the Investors (the "***Subscription Agreement***") in the form attached as **Exhibit B**. |
| **Maturity Date** | Investors will be able to select their maturity date from the options on the Subscription Agreement, and principal and unpaid accrued interest will be due on the maturity date selected (the "***Maturity Date***"). The Notes may be prepaid prior to the Maturity Date without penalty. |
| **Interest Rate** | Simple interest will accrue on an annual basis at the interest rate selected on the Subscription Agreement, and shall be a per annum rate of interest based on a 360-day year. Accrued interest will be due and payable monthly in arrears on the 15th day of each month following the closing of the Note, unless the investor elects to have the interest paid at the Maturity Date. The Company may issue Notes with interest rates or maturity dates that are different from the options set forth in the Subscription Agreement. |
| **Security and Priority** | Each of the Notes, regardless of their maturity dates or interest rates, will be secured and will be of equal seniority to the promissory notes issued by the Company to investors in previous offerings. |
| **Events of Default** | Upon the occurrence of an Event of Default, the Holder may declare the Loan Amount to be due and payable and may exercise all legal enforcement rights available in the United States. |
| **Fees and Expenses** | Each party will bear its own fees and expenses incurred in the transactions contemplated by this Memorandum. |
| **Company Contact Information** | iCap Investments, LLC<br>3535 Factoria Blvd. SE, Suite 500<br>Bellevue, WA 98006<br>ATTN: CHRIS CHRISTENSEN<br>OFC: (425) 278-9030; FAX: (425) 278-9025 |

EMAIL: investor@icapequity.com

## FORWARD-LOOKING STATEMENTS

This Memorandum and its exhibits may contain statements that constitute forward-looking statements, as defined by federal securities laws. Forward- looking statements can be identified by the use of terminology such as "anticipates," "expects," "intends," "opportunity," "plans," "should," "predicts," "potential," "continue," "believes," "seeks," "would," "may," "will be," "likely to become," "estimates" and variations of these words and similar expressions. Forward-looking statements are subject to risks and uncertainties and include statements made regarding events, financial trends, future operating-results, financial position, cash flows and other general information concerning possible or assumed future results of operations of the Company or any project. Investors are cautioned that such statements are only predictions, forecasts or estimates of what may occur and are not guarantees of future performance or of the occurrence of events or other factors used to make such predictions, forecasts or estimates. Actual results may differ materially from the results expressed, implied or inferred from the forward-looking statements and may be worse due to a variety of factors, including changes in laws, adverse changes in real estate prices, adverse changes in interest rates, and adverse changes in the credit and capital markets. These forward-looking statements speak only as of the date on which the statements were made and the Company undertakes no obligation to update or revise any forward-looking statements made in this Memorandum or elsewhere as a result of new information, future events, future developments or otherwise, except as required by law.

## INVESTMENTS

To subscribe for the Notes, you must complete, execute and deliver to the Company the Subscription Documents, in the form attached to this Memorandum as **Exhibit B**. The Subscription Agreement requires you to represent, among other things, that you are an accredited investor, are acquiring Notes for your own account for investment and not with a view to resale or distribution, and that you are aware that transfer of the Notes is restricted by the absence of a market for the Notes. The Subscription Agreement also requires you to acknowledge that you have received and have had an opportunity to read this Memorandum and are aware of the risks associated with an investment in the Notes.

THE COMPANY'S ACCEPTANCE OF YOUR SUBSCRIPTION FOR NOTES DOES NOT CONSTITUTE A DETERMINATION BY THE COMPANY THAT THE INVESTMENT IS SUITABLE FOR YOU. THE FINAL DETERMINATION AS TO THE SUITABILITY OF AN INVESTMENT IN THE NOTES FOR YOU MUST BE MADE BY YOU AND YOUR ADVISORS.

3

## USE OF PROCEEDS

The following table sets forth the details of the fees and the funds available for use by the Company upon the sale of the Notes:

| | Minimum Investment | Maximum Offering |
|---|---|---|
| Gross Offering Proceeds | $50,000 | $10,000,000 |
| Offering Expenses[1] | $5,000 | $5,000 |
| Organizational Expenses[2] | $5,000 | $5,000 |
| Amount Available for Company investment | $40,000 | $9,990,000 |

1   The Company may incur additional offering costs, including brokerage and finders fees of up to 6% of the capital such brokers and finders raise, and other expenses, the aggregate amount of which is not yet known. Such expenses, to the extent incurred, will reduce the net proceeds realized by the Company.
2   Organizational expenses include the cost of preparing this Memorandum and other offering documents.

### Allocation of Offering Proceeds

The proceeds of this offering will be used to pay for construction, design, marketing, furnishing, professional services, financing and debt service, preferred equity investments, and all other work related to the real estate properties owned by the Company and its subsidiaries.  At any time, the Company may use offering proceeds to retire any debt obligation of the Company, including those held by other investors.  The following table is an estimate of the Company's allocation of the available offering proceeds. Given that the offering proceeds will be combined with the Company's existing cash, and that the Company is been in operation for many years, the table illustrates primarily those items that are in addition to the standard operating expenses of the Company. If less than the maximum Offering amount is raised, the Manager will determine which line items will receive less than the estimated allocation. The Manager has discretion to utilize all proceeds as it deems necessary to accomplish the Company's business purposes, regardless of the estimates below.

| Line Item | Estimated Amount | Total |
|---|---|---|
| Professional Services | $100,000 | $100,000 |
| Design, Furnishings and Fixtures | $500,000 | $600,000 |
| Marketing | $50,000 | $650,000 |
| Construction Costs | $700,000 | $1,350,000 |
| Organizational and Offering Costs | $10,000 | $1,360,000 |
| Real Estate Investments | $8,640,000 | $10,000,000 |

## COMPANY OVERVIEW

**The Company**

The Company is a Washington limited liability company, whose sole member and manager is Chris Christensen. The Manager is wholly owned by Chris Christensen. The Company primarily derives its income from buying real estate and developing the properties for sale.  It also generates income from rents on such properties.  The Company's primary investment strategy focuses on preferred equity investments in Pacific Northwest real estate projects, but the Company also structures other investment opportunities that are based in real estate and including financing transactions. The Company expects to invest in short-term investments in single-family, multi-family, light commercial and land development projects. Most investments of the past involve some element of construction or development.

The Company currently owns three properties:  a single family home located in Issaquah, Washington, which it owns directly; a 26-unit townhome project located in Seattle, Washington, which is owned through Seattle Modern Living, LLC; and a development site for 108 apartment units, located in Renton, Washington, which is owned through Colpitts Sunset, LLC.

Although this Memorandum refers to "iCap" and the Company as though each were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. By investing in the Company, the Investor will not acquire an interest in any of its affiliated entities, but it may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Company as it conducts its business.

The following chart illustrates the relationship among the various iCap entities.



Members of the management team previously established iCap B1, LLC, and iCap B2, LLC in 2013, which raised a total of $6,915,664 for the purpose of making investments into various real estate projects. These special purpose vehicles made 10 investments and generated a gross IRR to investors of 20%. The management team also issued a total of $93 Million in debentures across two pooled investment funds, iCap Pacific NW Opportunity and Income Fund, LLC, and its follow-on fund, iCap Northwest Opportunity Fund, LLC. Investors in these two funds earned a 12% annualized rate of interest and 11% annualized rate of interest respectively.  Additional affiliate entities include iCap Equity, LLC, which pays a 10% rate of interest annually to its investors, iCap Pacific Income Fund 4, LLC, which pays a 10% annual rate of interest, and iCap Pacific Income Fund 5, LLC, which pays a 9% annual rate of interest.  As of the date of this Memorandum, iCap has approximately $119 Million in assets under management (including reserves and committed capital for investments), which

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 8, Page 796
1366

has been invested across 75 projects. The financial statements of the Company and its affiliates can be viewed in the Data Room, which is available to all potential Investors upon request.

YOU SHOULD RECOGNIZE THAT BY PURCHASING NOTES IN THE COMPANY YOU WILL NOT THEREBY ACQUIRE ANY OWNERSHIP INTEREST IN ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. YOU SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES IS GIVEN SOLELY TO ALLOW YOU TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. YOU SHOULD NOT ASSUME THAT THE INVESTORS IN THIS OFFERING WILL EXPERIENCE RETURNS, IF ANY, ON THEIR INVESTMENTS SIMILAR TO THOSE EXPERIENCED BY INVESTORS IN THE PRIOR PROGRAMS SPONSORED BY THE MANAGER AND ITS AFFILIATES.

**Investment Strategy**

In utilizing the proceeds from this Offering, the Company plans to pursue investments based in real estate located in the United States. Initially, the Company will focus its investment in the greater Puget Sound region. The real estate holdings will be limited to single and multi-unit residential properties, light commercial properties, and land acquired for entitlement purposes. The Company may directly or indirectly, through subsidiary operations, carry out these forms of investments depending on the opportunity.

**Investment Process**

The Manager of the Company will have discretion to select the investment opportunities in which the Company will invest. The Manager will consult with trusted advisors and obtain legal and tax counsel in structuring the investments, but will ultimately have the discretion to make the investment decisions. The Company completes diligence on prospective investments and maintains post-closing procedures that provide for the ongoing supervision of the investments. The investment process has four major areas of focus: analysis and approval, documentation and closing, and post-closing and management.

**Risk Controls**

The Company's entity structure and investment strategy have been designed to mitigate risk and increase the likelihood of success. Each investor will receive a note upon closing, which will provide the investor with a priority return for repayment over equity holders, and an ongoing interest rate. Lastly, the Company has targeted strong markets for its investments in the Pacific Northwest.

**Opportunity in the Greater Puget Sound Region**

A fundamental need for capital in real estate projects, coupled with the growth of the Greater Puget Sound regional economy, has resulted in many real estate investment opportunities in the area. As noted below, the Greater Puget Sound regional economy has grown significantly in recent years.

The following are a few characteristics of the Greater Puget Sound Region:

- The region is home to many national companies from a variety of industries
- Hundreds of new companies move into the area annually
- Property sales and rental rates continue to increase
- Job creation has been steady
- Foreign and global investor interest has risen significantly

6



The increased job growth has resulted in a housing inventory shortfall in the area, which has produced a supply and demand imbalance. In a balanced market, it is typical to maintain 6 months of housing inventory. As of March 2020, King County, the largest county—by both geography and population—in the region, has a mere 1.15 months of inventory.[1] Given this shortage of housing inventory, builders and developers have been able to take advantage of opportunities to bring new homes to the market and sell them for a profit. The Company's investment strategy are calculated to take advantage of this imbalance.

## Management of the Company

The management and supervision of the Company is vested exclusively in the Manager (including its duly appointed agents), who has full control over the business and affairs of the Company. The Manager has the power on behalf and in the name of the Company to carry out any and all of the objects and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings that the Manager, in its sole discretion, deems necessary or advisable or incidental thereto. Investors must rely upon the judgment and experience of the Manager to manage the Company.

The Manager and its Affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

Chris Christensen leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. He is also primarily responsible for tax and accounting decisions. Chris is 44, and prior to forming the Company, he managed affiliated funds, formed and managed operating entities, including Edge Construction, LLC and iCap Enterprises, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a Juris Doctor degree from Seattle University School of Law, a Master's degree in International Business from Seattle University, and a Bachelor of Arts degree in Economics from the University of Utah. He is the brother of Jim Christensen.

## Issuance of Prior Notes and Future Notes

As of the date of this Memorandum, the Company has issued promissory notes to various investors totaling $326,705. Additionally, the Company has borrowed $939,646 from iCap Equity, LLC, and $157,438 from iCap Pacific NW Management, LLC, both affiliates of the Manager. The Notes in this Offering will be of equal seniority to the previously issued notes. In the future, the Company may issue Notes with interest rates or maturity dates under this Offering that are

---

[1] Source: Northwest Multiple Listing Service, Market Update, https://www.nwmls.com/library/corporatecontent/statistics/Recaps.pdf

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 8, Page 798
1366

different from the rates and maturity dates offered to other investors.  Such notes will be of equal seniority and priority as the other promissory notes that have been issued.

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 8, Page 799
1366

## POTENTIAL CONFLICTS OF INTEREST

The Manager and its Affiliates will be entitled to certain types of compensation, fees, income, distributions or other payments from the Company or in connection with a Company investment. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Company. The Manager has no obligation to advance funds to cover the Company's expenses. However, to the extent that such advances are made, the Company will repay such amounts out of its funds as soon as they are available, whether such funds are from the Company's operating revenues or third-party loans. Below is a summary of these key payment obligations of the Company and potential conflicts of interest that could arise from these obligations.

**Compensation and Other Payments to the Manager**

The Company will not pay a fixed annual management to the Manager. However, the Company will pay sums to the Manager as are necessary to allow the Manager to perform those functions that relate to the Company's business purpose, such as payroll, rent, marketing, debt service, and all other such costs. At any time in the future, the Company may choose to impose an annual management fee, provided such fee does not exceed 2.5% per annum of the funds raised.

In addition to the fees set forth above, the Company will reimburse the Manager and its Affiliates for any reasonable expenses paid by either Person that properly should be borne by the Company. Such expenses include costs incurred before and after the formation of the offering, such as organizational and offering expenses; consulting, legal, accounting, and professional fees; and marketing and travel expenses.

The Company must distribute to the Manager, as a member of the Company, in cash the Estimated Tax Amount within 90 days after the close of each fiscal year, unless (a) the Manager determines that tax distribution would render the Company insolvent or would necessitate borrowing by the Company; (b) an Event of Default (as defined in the Notes) has occurred under the Notes or is continuing; or (c) the Manager determines that the tax distribution would otherwise be materially adverse to the Company. The Company is not required to make any distributions to its members prior to dissolution other than tax distributions.

The Manager may authorize non-tax-related distributions of net cash flow as long as the Company is not in default under the terms of any Note. Additionally, after the Company has paid the outstanding principal and annual interest due and payable under the Notes, the Company may distribute any remaining profits to the Manager. The Manager's profit interest in the Company may create an incentive for the Manager to make more speculative investments on behalf of the Company than the Manager otherwise would make in the absence of such profit potential.

The Manager, Chris Christensen, has much involvement with each of the properties in which the Company invests.  He is was the owner of the single family residence in Issaquah, Washington before the Company owned, and he will be leasing and/or purchasing that property upon its completion.  Such terms will not be negotiated at arm's length.  Additionally, Mr. Christensen has signed personal guaranties for the loans to the Company that are secured by the properties in the Company's portfolio.  Customary fees may be paid to Mr. Christensen as a result of the risks involved in such guarantees.

**Transactions with the Manager and its Affiliates**

The Company may enter into various transactions with the Manager and its Affiliates, including performance of services for a Project Entity, providing financing, guarantying financing, purchasing or selling property, or participating in an investment in a Project Entity alongside a subsidiary of the Company provided the terms are commercially reasonable. Compensation and fees could be paid with respect to these transactions as described below. To the extent any such transaction may pose a conflict of interest between the Company and the Manager or its Affiliates this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company.

In the event the Company enlists the services of any Affiliate of the Manager, the rates of compensation of these Affiliates for the performance of their various services will be at arms-length rates no higher than what the Company could obtain from unaffiliated third parties and all payments will be subject to inspection by auditors upon request.

Additionally, in the event the Manager, or an Affiliate of the Manager, guaranties, whether personally or otherwise, a loan, bond or other obligation of the Company or of any of its subsidiary entities, such Manager or Affiliate will be entitled to an annual fee equal to 1% of the outstanding loan amount, bond amount, or other obligation.

9

**Fees Payable by the Project Entity**

In some instances, an Affiliate of the Manager may perform services for a Project Entity in order to provide better pricing or efficiency than would otherwise be available from third parties. In these instances, such Affiliates may be paid customary service fees for time, material, or labor.

In some instances, an Affiliate of the Manager may provide lending to a Project Entity in connection with or in lieu of financing from non-affiliated third parties. In such circumstances, the Affiliate may charge customary fees in connection with the issuance of such loans such as interest, origination fees, exit fees, and other fees.

**Acquisition, Transfer, and Divestiture of Investments to or from Affiliates**

The Company may acquire investments previously entered into by Affiliates of the Manager, or may partially or wholly transfer an investment to or from Affiliate entities, subject to underwriting and investment criteria of the Company and the Manager's Affiliates. Any investment acquisition or transfer that occurs may require a determination of the value of the investment, which may pose a conflict of interest between the Company and the Manager or its Affiliates, which must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company. Notwithstanding the foregoing, the Manager is not obligated to cause the Company or any Affiliate to enter into any such transactions.

**Devotion of Time and Attention**

The Manager will cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the Company's investments, and other activities of the Company as much time as may be reasonably necessary for the performance of their respective duties in their capacities as managing principals. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Company's investment objectives; (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund, any pre-existing funds, and any investments of those successor or pre-existing funds; (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his/her own account; (e) engage in civic, professional, industry and charitable activities; and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

The Manager and its Affiliates have established, and may establish, other pooled investment funds that have investment objectives identical to those of the Company or its Affiliates, and the principals of the Manager may devote such time and attention as they deem necessary for the success of such funds.

# RISK FACTORS

As with all investments, a purchase of the Notes is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. In addition to the information set forth elsewhere in this Memorandum, you should consider the following risks before deciding whether to invest.

## Operation and Company Risks

***Control is vested in the Manager; no Investor should purchase the Notes unless the Investor is comfortable with the Manager's judgment and experience in running the Company's affairs.***

Control over all decisions affecting the Company, including decisions regarding the investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, refinancing of Project Entities, whether to make an investment, whether an Affiliate is eligible for an investment, extensions of investments and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors. No assurance can be given that sufficient investments will be presented to the Company to deploy all of the capital available for investment.

When you subscribe for Notes that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the investments that the Manager subsequently identifies. You should not invest in the Company, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

***Proceeds from Investments will be re-invested during the life of the Company.***

The Manager has the discretion to retain all or a portion of the proceeds from investments to make new investments, and intends to do so over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Company or the Project Entities, provided the terms are commercially reasonable. Additionally, Chris Christensen will lease or purchase the single family property owned by the Company and located at 27112 SE Grand Ridge Drive, Issaquah, WA. These measures may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. In addition, before the Company invests all of its investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between investment opportunities that may meet the investment criteria of Affiliates of the Company or of the Manager.

***Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Notes.***

The Manager has not arranged for Investors to be separately represented by independent counsel. The legal counsel who has performed services for the Company has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

Pursuant to the terms of the Subscription Agreement, the Notes may be issued with original issue discount (or "OID") for U.S. federal income tax purposes. As such, if you are a U.S. Holder (as defined herein), you may be required to include OID (taxable as ordinary income) in taxable income each year in excess of the amount of interest payments actually received by you in that year.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 8 Page 802
1366

> *You will not be investing in a fund vehicle. The prior performance data presented should provide you relevant information regarding fund entities overseen by the Company, but should not be construed as an indication of the likely financial performance of the Company.*

By investing in the Company, you will not be a creditor to the Affiliates of the Company nor in any of the prior investments sponsored by its Affiliates. The Company has provided selected information regarding its prior investments because it felt investors might consider those investments to be relevant in assessing the experience and judgment of the Manager or the Company's management team. Investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique and the Company may not be able to replicate the success of prior Affiliated investments, even if the investments assembled for the Company's portfolio are similar to those obtained for prior investments.

> *The Company may prepay the principal and interest on the Notes at any time.*

The Company may prepay the principal amount of the Notes, in whole or in part, at any time after one year from the date of investment. The Company may also choose to pay off some of the investor Notes while waiting to pay off the Notes of other investors. After the one-year mark, no prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Investors will not have certainty as to how long their respective Notes may be outstanding.

**Investment Risks**

> *The Company will have limited control over the underlying investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the investments.*

The Company expects to acquire preferred equity in Project Entities, acquire and hold real estate through Project Entities, or, occasionally, issue debt interests to Project Entities. Accordingly, the Company will not likely have control over such Project Entities (except in certain circumstances relating to the Company enforcing its creditor rights or contractual rights) and will be required to rely on the Project Partners of such Project Entities to use their skill, expertise and background to generate value from the investments.

> *Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.*

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that Investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

Real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without reviewing detailed budgets, such budgets may understate the expenses.

> *The Company is subject to a number of risks in the enforcement of its rights relating to investments.*

The Company's real estate investments will typically make preferred equity investments in Project Entities, secured by a deed of trust in the underlying real property and a pledge of the Project Partner's membership interest in the Project Entity. The Company also has the authority to issue or purchase debt collateralized by real property. These investments are subject to the following risks:

(a)     The Company's investment structure is unique. Although the Company generally requires a Project Entity to grant a deed of trust in the underlying real property owned by the Project Entity to secure the Company's investment and return, and requires the Project Partners to pledge their equity interest in the Project Entity to the Company, there can be no

assurance that such interests will be enforceable or that, in the event of non-performance by the Project Partner or a default by the Project Entity, that the real estate will be readily transferred to the Company or that the Company can obtain control of the Project Entity. There is a risk that Project Partners or other third parties may oppose or contest the enforceability or priority of such security.

(b)     During the course of an investment, or in the event the Company exercises its contractual remedies upon non-performance by the Project Partner or a default by the Project Entity, there is a risk that a Project Partner or other third party oppose or contest the enforceability of the Company's investment documentation, or assert claims or defenses against the Company or the Manager, including claims relating to the Company's ability to remove the Project Partner and take over management of a project. Such claims and potential litigation may result in the Company incurring substantial legal fees, and adversely affect the Manager's ability to mitigate losses resulting from a Project Partner's failure to perform.

(c)     There is no assurance that the Company will subsequently acquire title to the collateral property. The Project Partner may cure defaults or arrange for the Company's investment to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third-party may be prepared to outbid the Company to purchase the collateral property.

(d)     A debtor or Project Partner may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent debtors. These protections are at the expense of the Company, and may result in staying the Company's foreclosure proceedings, proceedings against the Project Partner, restructuring of the terms of the Company's investment, or otherwise delaying or interfering with the enforcement of the Company's rights under its investment documentation.

*Uninsured losses on the investments could materially reduce investment returns, which may impact the ability to return principal balances under the Note.*

The Project Partner or the Manager will obtain insurance policies for the Projects that are commercially prudent given the local market and circumstances of the Project (typically, including liability, fire and extended coverage). However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Projects should be partially or totally destroyed, the Company, as an investor in the Project Entity, may suffer a substantial loss of capital as well as profits. Even if the Project Partner's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Project Entity will sustain a substantial uninsured loss as a result of the casualty.

**Private Offering and Liquidity Risks**

*This offering of the Notes is being made in reliance on an exemption from registration requirements and there is no guarantee that it will comply with the regulatory requirements for such exemption.*

This private placement of Notes will not be registered with the Securities and Exchange Commission ("**SEC**"). The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to Investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, Investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

*This is a private offering and as such you will not have the benefit of review of this Memorandum by the SEC or other agency.*

Since this offering is a private placement of securities and, as such, is not registered under federal or state securities laws, you will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

*The Notes will be Illiquid*

The Company expects its investments to be illiquid. Accordingly, the timing of its returns on those investments will be dependent upon various market factors. If the underlying assets in those investments are held for long periods or if any income streams of the Company are delayed or reduced, the Investors will be compelled to wait until the underlying assets are sold or improved, before being in a position to liquidate their investments. The Manager expects most of its real estate investments to have an investment time frame of 2 years or less. However, the Company may have little or no control over when the underlying properties are liquidated.

You must represent that you are purchasing the Notes for your own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, encumber or otherwise dispose of your Notes unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Code or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans and you may not be able to liquidate your investment in the event of emergency or for any other reason, or may be able to liquidate your investment only at a substantial discount.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 8, Page 805
1366

# U.S. FEDERAL INCOME TAX MATTERS

**Introduction**

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Notes.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Notes, that purchased Notes at their original issue price for cash, and that hold such Notes as capital assets within the meaning of Section 1221 of the Code.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Notes by certain investors that are subject to special tax rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Notes in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Notes, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Notes, including the applicability of any U.S. federal tax laws or any state, local or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

**Considerations Relating to U.S. Holders of the Notes**

As used herein, the term "***U.S. Holder***" means a beneficial owner of a Note that is, for U.S. federal income tax purposes:

- An individual citizen or resident of the U.S.;

- A corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- An estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- A trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Notes that is a partnership and the partners in such a partnership should consult their tax advisors.

**Classification of the Notes**

Pursuant to the terms of the Note, the Company and each holder of Notes will agree to treat the Notes, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Company's determination that the Notes constitute debt for U.S. federal income tax purposes. If any portion of the Notes is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Note could differ from the timing and character of income, gain or loss recognized in respect of the Notes described below. The remainder of this discussion assumes that the Notes will be treated as indebtedness in accordance with that agreement and our determination.

**Interest Income and Original Issue Discount**

Payments of "qualified stated interest" (as defined below) on a Note will be taxable to a U.S. Holder as ordinary income at the time that such payments are accrued or are received (in accordance with the U.S. Holder's method of tax accounting).

It is anticipated that the Notes may be issued at a discount from their stated redemption price at maturity and that such discount will be equal to or greater than the product of on-fourth of one percent (0.25%) of the stated redemption price at maturity multiplied by the number of full years to their maturity. As such, it is anticipated that the Holders of the Notes may be required to report original issue discount ("**OID**") over the term of the Notes. U.S. Holders of the Notes should be aware that, as described in greater detail below, they generally must include OID in ordinary gross income for U.S. federal income tax purposes as it accrues, in advance of the receipt of cash attributable to that income.

In general, each U.S. Holder of the Notes, whether such U.S. Holder uses the cash or the accrual method of tax accounting, will be required to include in ordinary gross income the sum of the "daily portions" of OID on the Notes for all days during the taxable year that the U.S. Holder owns the debt security. The daily portions of OID on the Notes are determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of an OID debt security, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. In the case of an initial holder, the amount of OID on a Note allocable to each accrual period is determined by (a) multiplying the "adjusted issue price" (as defined below) of the Note at the beginning of the accrual period by the yield to maturity of the Note (appropriately adjusted to reflect the length of the accrual period) and (b) subtracting from that product the amount (if any) of qualified stated interest (as defined below) allocable to that accrual period. The yield to maturity of a Note is the discount rate that causes the present value of all payments on the Note as of its original issue date to equal the issue price of such Note. The "adjusted issue price" of a Note at the beginning of any accrual period generally will be the sum of its issue price and the amount of OID allocable to all prior accrual periods, reduced by the amount of all payments other than payments of qualified stated interest (if any) made with respect to such Note in all prior accrual periods. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of a Note at a single fixed rate of interest or, subject to certain conditions, based on one or more interest indices.

**Sale, retirement or disposition of Notes**

Upon the sale, retirement or other disposition of a Note, an Investor generally will recognize taxable gain or loss equal to the difference between the amount realized on the disposition and the Investor's adjusted tax basis in the Note. A U.S. Holder's adjusted tax basis in a Note generally will be equal to its adjusted issue price (as described above) in the Note. Gain recognized on the disposition of a Note generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Note generally will be treated as an ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Note is more than one year). The deductibility of capital losses is subject to limitations.

**Backup withholding and information reporting**

Information reporting requirements generally will apply to payments of interest and OID made by the Company on, or the proceeds of the sale or other disposition prior to maturity of, the Notes. Backup withholding tax, currently at a rate of 28%, may apply to such payments if an Investor fails to:

- Furnish his, her or its taxpayer identification number (social security or employer identification number);

- Certify that such number is correct;

- Certify that he, she or it is not subject to backup withholding; or

- Otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, *provided* that the required information is furnished timely to the Internal Revenue Service (the "***IRS***").

<div align="center">

**ERISA MATTERS**

</div>

**Benefit Plan Investor Considerations**

The Notes offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or an individual retirement account ("***IRA***") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "***Similar Law***"). A fiduciary of an employee benefit plan must determine that the purchase and holding of a Note is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Notes offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Note offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Note that its acquisition and holding of the Note does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

## REPORTS TO THE INVESTORS

The Company has adopted a calendar fiscal year ending December 31. For so long as the Holder continues to hold the Note, the Company will provide to the Holder, as soon as practicable after the end of each fiscal year and in any event within one hundred eighty (180) days after each fiscal year, consolidated balance sheets of the Company as of the end of such fiscal year and consolidated statements of income of the Company for such fiscal year, prepared in reasonable detail.

## GLOSSARY

To understand the rights associated with the Notes, Investor must review carefully the defined terms used in this Memorandum. Some of these definitions are set forth in this "GLOSSARY" and others in the body of this Memorandum. These definitions (some of which have been slightly modified) have been taken from the Note, which defines the preferences, privileges, rights, interests and obligations of the Notes. Many of these definitions are technical in nature, involve complicated relationships, and can only be understood by reference to other defined terms and, in some cases, to other provisions of the Note and Subscription Agreement. Section references in the definitions refer to sections in the Note and Subscription Agreement. Prospective investors should understand that the definitions in the Note and Subscription Agreement will, for all purposes, be controlling, notwithstanding any simplification of such definitions in this Memorandum. Moreover, you should bear in mind that this GLOSSARY does not include many of the definitions included in the Note and Subscription Agreement.

"*Affiliate*" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"*Estimated Tax Amount*" means, with respect to each member of the Company, the amount equal to (a) the sum of (i) the greater of the highest statutory marginal ordinary federal income tax rate for individuals or corporations for a given tax year plus (ii) the unearned income Medicare contribution tax rate under Internal Revenue Code Section 1411 for a given year, multiplied by (b) the taxable income allocated to that member for the taxable year.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Project Entity**" means any special purpose entity that the Company creates to execute an investment in its real estate strategy.

"*Project Partner*" means any person engaged by the Company to manage a real estate project in which the Company invests.

## THE OFFERING

The following description of certain matters relating to the Notes does not purport to be complete and is subject in all respects to applicable Washington Law and to the provisions of the Note and Subscription Agreement.

### General

The Offering has not been registered under the Securities Act and is intended by the Company not to involve a public offering within the meaning of the Securities Act and Regulation D and S promulgated thereunder and, therefore, to be exempt from the registration provisions of the Securities Act. Accordingly, the Offering is being made pursuant to certain conditions which, if satisfied, will qualify the Offering for exemption from registration as provided by the Securities Act and Regulation D and S. These conditions relate to limitations on the manner of Offering, the nature of the Investors, access to or furnishing information about the issuer, and restrictions on transferability. This Offering is not being offered pursuant to Regulation S and Rule 506(b) of Regulation D.

Subject to the terms of the Note and Subscription Agreement, the Company is authorized to raise up to $10,000,000 through the Offering. Investors must make a minimum investment of $50,000, unless a smaller purchase is permitted by the Manager. The Notes are secured by a Pledge and Security Agreement, the form of which is set forth in Exhibit C.

The Manager will have an initial closing for the Company as soon as practicable after a sufficient quantity of funds is raised in the Manager's sole determination. To accommodate the admission of additional Investors and permit existing Investors to increase their investment amounts, the Manager may, in its discretion, hold one or more additional closings on or before May 31, 2021, unless extended up to 12-months by the Manager.

### Payment of Investments

Each payment to the Company will be made in United States dollars by means of a certified or cashier's check payable to "iCap Investments, LLC" or by wire or electronic funds transfer, to a bank account designated by the Company, of immediately available funds through the federal wire transfer system, in the amount that the Holder has agreed to lend to the Company in the Note and Subscription Agreement.

### Acceptance of Subscriptions; Eligibility Requirements

Purchases for the Notes will be accepted on a "first come, first-served" basis. The Manager reserves the right to reject any tendered investment for whatever reason the Manager deems appropriate. If the Manager rejects an investment, the Manager will give notice of such rejection, and return the tendered initial investment payment, no later than 10 business days after the Note, Subscription Agreement and the accompanying funds have been received by the Manager.

## TRANSFERABILITY OF THE NOTES

Subject to compliance with the requirements of the Note and Subscription Agreement, Investors shall have the right to transfer the Note to any qualifying third party of its choice contingent upon securing the Company's written consent in advance of the proposed transfer. The Company is under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under the Note or Subscription Agreement, until the Holder has surrendered the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Company. A new Note for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing any documentation required by the Company, and executing a Certificate of Accredited Investor. Interest and principal are payable only to the registered holder of the Note.

The Holder and any successor Holder agree(s) to provide to the Company a Form W-9 upon request. Until registration of a transfer occurs, the Company shall be entitled to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by the Subscription Agreement and the applicable Note.

### State Securities: Blue Sky Laws

Transfer of the Notes may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Notes may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be

registered for resale under the Blue Sky laws of any state, the Holders and any persons who desire to purchase them in any trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Notes and of purchasers to purchase the Notes. Accordingly, Investors should be prepared to hold the Notes until their maturity date as may be extended.

## FINANCIAL INFORMATION

This Memorandum does not include current balance sheets for either the Company or the Manager. The Manager has limited capitalization. As of the date hereof, the Company has incurred certain liabilities in connection with the offering and will incur substantial expenses in connection with the offering and sale of the Notes.

# NOTICES

The following notices apply in certain states where the Notes, which are referred to below as "securities," may be sold. Compliance with the notice exemption requirements of applicable state securities laws will be undertaken by the Company as needed.

**Notice to Residents of all States:**

THE SECURITIES OFFERED IN THE OFFERING HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND OTHER LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ACT AND THE SECURITIES LAWS OF CERTAIN JURISDICTIONS GRANT PURCHASERS OF SECURITIES SOLD IN VIOLATION OF THE REGISTRATION OR QUALIFICATION PROVISIONS OF SUCH LAWS THE RIGHT TO RESCIND THEIR PURCHASE OF SUCH SECURITIES AND TO RECEIVE BACK THEIR CONSIDERATION PAID. THE COMPANY BELIEVES THAT THE OFFERING DESCRIBED IN THIS MEMORANDUM IS NOT REQUIRED TO BE REGISTERED OR QUALIFIED. MANY OF THESE LAWS GRANTING THE RIGHT OF RESCISSION ALSO PROVIDE THAT SUITS FOR SUCH VIOLATIONS MUST BE BROUGHT WITHIN A SPECIFIED TIME, USUALLY ONE YEAR FROM DISCOVERY OF FACTS CONSTITUTING SUCH VIOLATION. SHOULD ANY INVESTOR INSTITUTE SUCH AN ACTION ON THE THEORY THAT THE OFFERING CONDUCTED AS DESCRIBED HEREIN WAS REQUIRED TO BE REGISTERED OR QUALIFIED, THE COMPANY WILL CONTEND THAT THE CONTENTS OF THIS MEMORANDUM CONSTITUTED NOTICE OF THE FACTS CONSTITUTING SUCH VIOLATION.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS ATTACHED TO THIS MEMORANDUM. NO ONE HAS BEEN AUTHORIZED TO PROVIDE YOU WITH ANY INFORMATION THAT IS DIFFERENT. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN GIVEN BY THE ISSUER OF THE SECURITIES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE ON THE COVER PAGE AND IS AN OFFER ONLY TO SUCH NAMED OFFEREE.

NEITHER THE INFORMATION CONTAINED HEREIN, NOR ANY PRIOR, CONTEMPORANEOUS OR SUBSEQUENT COMMUNICATION SHOULD BE CONSTRUED BY THE PROSPECTIVE INVESTOR AS FINANCIAL, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS, HER OR ITS OWN FINANCIAL, LEGAL, AND TAX ADVISORS TO ASCERTAIN THE MERITS AND RISKS OF THE OFFERING AND AN INVESTMENT IN THE COMPANY PRIOR TO SUBSCRIBING TO PURCHASE THE SECURITIES.

**Notice to New York Residents:**

THIS CONFIDENTIAL OFFERING MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

**Notice to Florida Residents:**

THE SECURITIES OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE SECURITIES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER OF THE SECURITIES OR AN AGENT OF SUCH ISSUER, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**Notice to New Hampshire Residents:**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

DURING THE COURSE OF THIS OFFERING, EACH PROSPECTIVE INVESTOR MAY OBTAIN ADDITIONAL INFORMATION WHICH SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY PROSPECTIVE INVESTOR WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE INVESTOR'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE COMPANY IF THE RECIPIENT DOES NOT PURCHASE THE SECURITIES OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE TO:

**EXHIBIT A**

**NOTE**

THIS SECURED PROMISSORY NOTE (THIS "NOTE") HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C.§15b ET SEQ., AS AMENDED ("SECURITIES ACT"), IN RELIANCE UPON ONE (1) OR MORE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE FEDERAL ACT. IN ADDITION, THE ISSUANCE OF THIS NOTE HAS NOT BEEN QUALIFIED UNDER THE SECURITIES ACT OF WASHINGTON, OR ANY OTHER STATE SECURITIES LAWS (COLLECTIVELY, THE "STATE ACTS"), IN RELIANCE UPON ONE OR MORE EXEMPTIONS FROM THE REGISTRATION PROVISIONS OF THE STATE ACTS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFER AS SET FORTH IN THE SUBSCRIPTION AGREEMENT.

**Loan Amount $_____**                              **Issue Date: _____, 202___**

<div align="center">

## ICAP INVESTMENTS, LLC

### SECURED PROMISSORY NOTE

</div>

Pursuant to the terms and conditions of this Secured Promissory Note (the "Note") iCap Investments, LLC, a Washington limited liability company (the "Company"), for value received, promises  to pay to _____ (the "Holder"), or the Holder's permitted assigns, the Loan Amount plus interest thereon as set forth herein. The Company and the Holder may be referred to herein individually as a "Party" and collectively as the "Parties."

This Note is issued pursuant to the terms of a Subscription Agreement between the Company and the Holder (the "Subscription Agreement") and is subject to the terms thereof.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, to which the Holder, by the acceptance of this Note, agrees:

**Section 1.**     **Definitions.**  In addition to the other terms defined herein, as used in this Note, the following capitalized terms have the meanings set forth below unless the context clearly indicates otherwise. All nouns, pronouns and verbs used in this Note shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable.

    **(a)**  "Act" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

    **(b)**  "Affiliate" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

    **(c)**  "Business Day," when used with respect to any place of payment or any other particular location referred to in this Note or in the Note, means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions or trust companies in the City of Seattle are authorized or obligated by law or executive order to close.

    **(d)**  "Notes" refer to, collectively, each Note issued by the Company pursuant to the Offering (as defined in the PPM).

    **(e)**  "Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

**(f)** "PPM" means the Confidential Private Placement Memorandum of the Company dated May 1, 2020.

**Section 2.**     **Payments and Prepayment.**

**(a)** Subject to the terms and conditions herein, the Company shall repay to Holder, to the extent not prepaid as set forth herein, the outstanding Loan Amount and all accrued and unpaid interest, on the date selected in the Subscription Agreement (the "Maturity Date").

**(b)** Prior to the Maturity Date the Company will be required to make only monthly interest payments to the Holder. Such monthly payments shall include all interest accrued hereunder through the end of the prior calendar month, and shall be due and payable to the Holder on the fifteenth (15th) calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter. Holder may elect in the Subscription Agreement to have the interest accrue, rather than be paid each month, in which case all principal and interest will be due and payable on the Maturity Date.

**(c)** The Company may choose to prepay part or all of the Note without penalty at any time prior to the Maturity Date. Any such prepayment will be credited first to any accrued and unpaid interest and then to the payment of the outstanding Loan Amount.

**Section 3.**     **Interest.**

**(a)** This Note shall bear simple interest at the per annum rate selected in the Subscription Agreement. Interest computation shall be based upon twelve 30-day months. Interest will accrue on the loan made to the Holder under this Note from the Issue Date as set forth above.

**(b)** In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of eight (8%) percent per annum, simple interest from and after written notice to the Company of the Event of Default, until all amounts due hereunder have been paid in full or the Event of Default has been cured.

**Section 4.**     **Representations and Warranties of the Company.** To induce the Holder to loan monies to the Company, the Company represents and warrants to the Holder as follows as of the Issue Date:

**(a)** **Organization and Authority.** The Company is a limited liability company, validly existing and in good standing under the laws of the State of Washington, with full power and authority to enter into and perform this Note and the other agreements contemplated hereby to which it is now, or will be, a party. The Company has all requisite power and authority to, directly or indirectly, own its properties, to carry on its business as now conducted, and to enter into and perform its obligations under this Note.

**(b)** **Authorization; Binding Effect**. The Company has taken all actions that are necessary to authorize the execution, delivery and performance of this Note and the consummation of the transactions contemplated hereby. This Note and the other agreements contemplated hereby to which the Company is a party constitute the legal and binding obligations of the parties thereto, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights and the enforcement of debtors' obligations generally and by general principles of equity, regardless of whether enforcement is pursuant to a proceeding in equity or at law.

**(c)** **No Bankruptcy or Insolvency.** The Company has not filed any voluntary petition in bankruptcy or been adjudicated bankrupt or insolvent, filed any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any federal bankruptcy,

insolvency, or other debtor relief law, or sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator of all or any substantial part of its properties. No court of competent jurisdiction has entered an order, judgment or decree (and the Company knows of no action or petition requesting such) approving a petition filed against the Company seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any federal bankruptcy act, or other debtor relief law, and no other liquidator, trustee or conservator has been appointed of the Company or of all or any substantial part of its properties.

**(d)** **Valid Issuance of the Note**. This Note, when issued by the Company to the Holder for the consideration expressed therein, will be duly and validly issued, and, based in part upon the representations of the Holder in this Note, will be issued in compliance with all applicable federal and state securities laws.

**(e)** **Restricted Securities**. The Company acknowledges that the Note has not been and will not be registered with the Securities and Exchange Commission ("SEC") under the Act, and covenants that the Note will be offered and sold in compliance with an exemption from registration provided by (i) Rule 506 of Regulation D of the Act or (ii) Regulation S of the Act.

**(f)** **Governmental Consents and Notices.** No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Note, or the offer, sale or issuance of the Note, or the consummation of any other transaction contemplated hereby, except qualification (or taking such action as may be necessary to secure an exemption from qualification, if available) of the offer and sale of the Note under applicable state and federal securities laws, which qualification, if required, will be accomplished in a timely manner.

**(g)** **No Litigation.** There are no actions, suits or proceedings of any type pending or, to the knowledge of the Company, threatened, against the Company, its properties or assets which is likely to if adversely determined, individually or in the aggregate, have a material adverse effect on (a) the Company's ability to perform the obligations contemplated under this Note or other agreements contemplated hereby or (b) the business, operations, prospects, properties, assets or condition (financial or otherwise) of the Company. The Company is not operating under, or subject to, or in default with respect to, any order, writ, injunction or decree, including any of the foregoing affecting the ability of the Company to enter into this Note or perform its obligations contemplated under this Note and other agreements contemplated hereby.

**(h)** **No Breach; No Default.** To the best of the Company's knowledge, neither the execution, delivery or performance of this Note or the other agreements contemplated hereby to which the Company is a party, nor the consummation of the transactions contemplated hereby or thereby by the Company, (a) materially conflicts with or results in any material breach of, (b) constitutes a material default under, or (c) results in a material violation of: (i) any contract, commitment, lease, license, note or other instrument, including voting or limited liability company operating agreements, to which the Company is a party or by which any of its assets are bound, judgment, order, writ or decree or (ii) any provision of the Company's Certificate of Formation.

**(i)** **Taxes.** The Company has timely filed or will timely file or cause to be timely filed, all material tax returns (or extensions) required by applicable law to be filed by it prior to or as of the Issue Date, and paid (a) all amounts of taxes shown thereon to be due (including interest and penalties) and (b) all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangibles taxes) owing by it, except for such taxes (i) which are not yet delinquent or (ii) that are being contested in good faith and by proper proceedings, and against which adequate reserves are being maintained in accordance with United States generally acceptable accounting procedures.

**Section 5.** **Representations, Warranties and Notes of the Holder.** To induce the Company to accept the loan from the Holder, the Holder represents and warrants to the Company as of the date of the Issue Date as follows:

(a) **Purchase Entirely for Own Account.** The Note will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to distributing all or any part of the Note; the Holder has no present intention of selling, granting any participation in or otherwise distributing the Note in a manner contrary to the Act or any applicable state securities law; and the Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person with respect to the Note.

(b) **Due Diligence.** The Holder has been solely responsible for his, her or its own due diligence investigation of the Company and its business, and his, her or its analysis of merits and risks of the investment and subscription made pursuant to this Note, and is not relying on anyone else's analysis or investigation of the Company, its business or the merits and risks of the Note other than professional advisors employed specifically by the Holder to assist the Holder. In taking any action or performing any role relative to arranging the investment being made pursuant to this Note, the Holder has acted solely in his, her or its own interest and not in that of any other party, and no other party has acted as an agent or fiduciary for the Holder.

(c) **Access to Information; Modification of Offering.** The Holder has received and reviewed in its entirety the PPM. The Holder has been offered access to full and complete information regarding the Company and has assessed to his, her, or its satisfaction the risks associated with an investment in the Note. In particular, the Holder has been given the opportunity to ask questions of, and receive answers from, the Company's officers concerning the terms and conditions of this Note, the Note, the PPM, and any other matters pertaining to the Company and an investment in the Note and has been given the opportunity to obtain such additional information necessary to verify the accuracy of such information. No information has been provided and no representations have been made to the Holder which are inconsistent with any information contained in the PPM. The Holder acknowledges that the Company may, in its sole discretion and for any reason whatsoever, modify, amend, increase or withdraw all or a portion of the Offering. In the event of the foregoing, the Company will not have any liability whatsoever to the Holder, except that the Company will be obligated to return any moneys transmitted to the Company by the Holder that have not been applied by the Company for the purchase of Notes, without interest or deduction.

(d) **Sophistication.** The Holder, either alone or with the assistance of his, her or its professional advisor, is a sophisticated investor, is able to fend for himself, herself or itself in the transactions contemplated by this Note, and has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of acquiring the Note.

(e) **Suitability.** The investment in the Note is suitable for the Holder based upon his, her or its investment objectives and financial needs, and the Holder has adequate net worth and means for providing for his, her or its current financial needs and contingencies and has no need for liquidity of investment with respect to the Note. The Holder's overall commitment to investments that are illiquid or not readily marketable is not disproportionate to his, her or its net worth, and investment in the Note will not cause such overall commitment to become excessive.

(f) **Professional Advice.** The Holder has obtained, or has had the opportunity to obtain, to the extent he, she or it deems necessary, his, her or its own professional advice with respect to the risks inherent in the investment in the Note, the condition and terms of this Note and the suitability of the investment in the Note in light of the Holder's financial condition and investment needs. The Holder is not relying on the Company or any of its directors, officers,

employees or agents with respect to the legal, tax, economic and related considerations of an investment in the Note, nor is the Holder relying on the Company or any of its directors, officers, employees or agents (including those of any Affiliates) with respect to the appropriateness of this investment for the Holder.

**(g) Ability to Bear Risk.** The Holder understands that the Company has limited prior operating history. The Holder recognizes that there is no market for the Notes and none is expected to develop; accordingly, his, her or its interest in the Note will be illiquid as well as subject to substantial contractual restrictions upon transferability. The Holder is in a financial position to purchase and hold the Note and is able to bear the economic risk and withstand a complete loss of his, her or its investment in the Note. The Holder agrees to waive any present or future claim against the Company, its officers, directors, representatives or Affiliates that the Note was not an appropriate investment for the Holder.

**(h) Risk Factors.** The Holder recognizes that an investment in the Note is subject to certain risks, the occurrence of which might result in a loss of the principal and interest due to the Holder. The Holder has carefully reviewed and understands the risk factors set forth in the PPM.

**(i) Restricted Securities.** The Holder realizes that (a) neither the Notes nor the offering of the Notes have been registered under the Act or applicable state securities laws; (b) that the Notes are characterized under the Act as "restricted securities" and, therefore, cannot be sold or transferred unless they are subsequently registered under the Act or an exemption from such registration is available; (c) the Company is not being registered as an "investment company" as the term "investment company" is defined in Section 3(a) of the 1940 Act, and (d) there is presently no public market for the Note and the Holder would most likely not be able to liquidate his, her or its investment in the event of an emergency or to pledge the Note as collateral security for loans. The Holder's financial condition is such that it is unlikely that the Holder would need to dispose of any of the Note in the foreseeable future. In this connection, the Holder represents that he, she or it is familiar with Rule 144 of the Securities Act, as promulgated by the Securities and Exchange Commission, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

**(j) Further Limitations on Disposition.** Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Note unless and until there is compliance with the requirements herein, and, if requested by the Company, the Holder shall have furnished to the Company a detailed statement of the circumstances surrounding the proposed disposition and shall have furnished to the Company an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such Note under the Act and any applicable state Blue Sky laws.

**(k) Age; Residency.** The Holder, if an individual, is over 21 years of age and legally competent to execute this Note. For purposes of the application of state securities laws, the Holder represents that he, she or it is a bona fide resident of, and/or is domiciled in, the state or jurisdiction as set forth in the Subscription Agreement.

**(l) Investor Status and Subscription Agreement.** Holder hereby confirms and restates the representations and warranties as given by the Holder in the Subscription Agreement. The Holder is aware that the Company has been and is relying upon the representations and warranties set forth in the Subscription Agreement and in is Note, in part, in determining whether the Offering will qualify for an exemption from the registration provisions of the Act and applicable state securities laws. All of the information which the Holder has furnished the Company here, previously or in the documents or instruments contemplated by this Note with respect to the Holder's financial position and business experience is correct and complete as of the date hereof, and, if there should be any material change in such information, the Holder will immediately furnish the revised and corrected information to the Company. The Holder agrees

to indemnify and hold harmless the Company and its Affiliates and their respective officers, managers, directors, members or employees and their successors and assigns from and against any and all losses, damages, liabilities or expenses, including costs and attorneys' fees incurred by reason of any misrepresentation by the Holder or any breach of the Holder's warranties.

**(m) Tax Identification; Withholding.** Under penalties of perjury, the Holder certifies that (a) the number listed with the Holder's name on the signature page to this Note is the Holder's correct social security number or federal tax identification number, (b) the Holder is not subject to back-up withholding, either because he, she or it has not been notified that he, she or it is subject to back-up withholding as a result of a failure to report all interest and dividends or because the Internal Revenue Service has notified the Holder that he, she or it is no longer subject to back-up withholding and (c) Holder is not a "foreign person," "foreign corporation" or a person which is not a "United States person" within the meaning of Sections 1441, 1442, 1445 and 1446 of the Internal Revenue Code of 1986, as amended. (If the Holder has at any time received notice from the Internal Revenue Service that he, she or it is subject to back-up withholding and has not subsequently received a notice advising the Holder of the termination of back-up withholding, strike clause (b) above).

**(n) No View to Tax Benefits.** The Holder is not acquiring the Note with a view toward realizing any benefits under United States federal income tax laws, and no representations have been made to the Holder that any such benefits will be available as a result of the Holder's acquisition, ownership or disposition of the Note.

**(o) Confidential Information.** The Holder understands that the information contained in the PPM and this Note, is confidential and non-public information and agrees that all such information shall be kept in confidence by Holder and used by Holder solely for purposes of determining whether to purchase the Note. In addition, except as required by law, regulation or regulatory process, each Holder shall keep confidential, and shall cause each of its employees, agents, representatives, advisors or consultants to keep confidential all non-public information received by them with respect to the Company and its Affiliates following the Issue Date. The Holder, if an entity, represents and warrants that, as of the Issue Date, none of its beneficial owners are public agencies which are subject to state, federal or foreign laws providing for the possible public disclosure of certain records and information relating to the activities of such public agencies. The Holder agrees to notify the Company in the event such a public agency becomes a beneficial owner of the Holder and agrees to reasonably cooperate with the Company in such event to take steps, including entering into confidentiality agreements that restrict the access of certain of the Holder's beneficial owners to certain information, to protect information about the Company and its investments from being publicly disclosed by such public agency.

**(p) No General Solicitation.** The Holder is unaware of, is in no way relying on, and did not become aware of, the offering of the Note through, or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television, radio or Internet and is not subscribing for the Note, and did not become aware of the offering of the Note through, or as a result of, any seminar or meeting to which the Holder was invited, or any solicitation otherwise initiated, by a person not previously known to the Holder in connection with investments in securities generally.

**(q) Representations and Warranties of Organization.** If the Holder is a corporation, partnership or other association, trust or similar entity, the Holder hereby represents and warrants to the Company that the Holder is authorized and otherwise duly qualified to acquire the Note, and the individual executing this Note on behalf of the Holder has been duly authorized to do so and to bind the Holder by this Note (if the Holder is an individual who is investing through a revocable trust, an IRA or an account in a self-directed employee benefit plan (a "Self-Directed

Entity"), such representation and warranty applies to the Self-Directed Entity, and, for this purpose, the term "Holder" shall be deemed to refer to the Self-Directed Entity).

**Section 6.**     **Covenants**.

    **(a) Tax Statements.**  The Company will furnish to Holder as soon as available, and in any event within sixty (60) days after December 31 of each year, all reasonably required tax information applicable to the Holder.

    **(b) Use of Proceeds.** The proceeds from the sale and issuance of the Notes are expected to be used for the purposes set forth in the PPM, and for the fees, costs and expenses incurred in connection with the Offering.  However, the Manager retains sole discretion to determine how such proceeds are ultimately used. Distributions may be made so long as the Company is not in default under the Note obligations.

    **(c) Information Rights**. For so long as the Holder continues to hold the Note, the Company will provide to the Holder annual financial statements of the Company and such information relative to the Company's business operations and performance as its management may deem useful or appropriate.

    **(d) Notice of Default**. The Company hereby covenants and agrees, as of the Issue Date and thereafter until the Notes and all other obligations arising under this Note have been repaid in full, the Company shall give notice in writing to the Holders (promptly, but in any event within thirty (30) business days after the Company knows or has reason to know thereof), of the occurrence of any Event of Default.

**Section 7.**     **Defaults and Remedies**.

    **(a) Events of Default.** An "Event of Default" occurs if any of the following occur, regardless of the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

        **(i)** With regard to an individual Note, the Company defaults in the payment of such Loan Amount or interest on the outstanding Note, when the same becomes due and payable and such default continues for a period of thirty (30) Business Days after notice of such default has been delivered to Company by the applicable holder thereof (such period, a "Grace Period");

        **(ii)** the Company fails to observe or perform any covenant or warranty of the Company in this Note (other than a covenant or warranty a default in whose performance or whose breach is specifically dealt with elsewhere in this Section), and such failure continues for a period of thirty (30) calendar days after the Holder has given written notice to the Company specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

        **(iii)** the Company, pursuant to or within the meaning of any Bankruptcy Law (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

        **(iv)** a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Company in an involuntary case, (ii) appoints a

custodian of the Company for all or substantially all of its property, or (iii) orders the liquidation of the Company; and the order or decree remains unstayed and in effect for ninety (90) consecutive calendar days.

**(b)** The term "Bankruptcy Law" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

**(c)** Upon the occurrence of an Event of Default and the expiration of any required time periods for notice, cure or other reasons, the Holder may declare the Loan Amount (including the Loan Amount or interest on the Holder's Note) to be due and payable. Upon such a declaration, such principal and interest, if any, shall be immediately due and payable.

**Section 8.** **Transfer of the Note**. Holder may not sell, assign or transfer this Note or the Note or any portion thereof, including, without limitation, the Holder's rights, title, interests, remedies, powers and/or duties hereunder or thereunder, as the case may be, without the express written consent of the Company, which consent may be granted or withheld in the Company's sole discretion, and without complying with the terms of this Note and any other requirements set forth by the Company, as well as all applicable federal and state securities laws.

**Section 9.** **Waivers.** The Company waives presentment for payment, demand, notice of nonpayment, notice of protest and protest of this Note, and all notices in connection with the delivery, acceptance, or dishonor of this Note.

**Section 10.** **Anti-Terrorism Matters.** The Holder hereby authorizes the Company to take, without prior notice to the Holder, such action as the Company determines to be reasonably necessary or advisable to comply, or to cause the Company to comply, with any anti-terrorism laws, rules, regulations, directives or special measures. Without limiting the foregoing, the Company may disclose any information concerning the Company or the undersigned necessary to comply with such laws, rules, regulations, directives or special measures, and the Holder shall provide the Company, promptly upon request, all information the Company reasonably deems necessary or advisable to comply with such laws, rules, regulations, directives or special measures.

**Section 11.** **Survival**. The representations and warranties of the Parties shall survive the consummation of the sale of the Note to Holder hereunder.

**Section 12.** **Oral Agreements. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**Section 13.** **Deemed Consent.**

**(a)** Each request for consent, approval or waiver under this Note, for an amendment hereof or other matter, which is sent by the Company to the Holder, shall be made in writing to the Holder, and shall include all information necessary for Holder to make an informed decision as to whether to agree to such consent, approval, waiver or amendment, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN SECURED PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND ICAP INVESTMENTS, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

**(b)** If the Holder does not approve or reject the proposed matter within ten (10) days of receipt of such notice and all necessary information, via delivery of the same to the Company within such time period, for further distribution to the Holder, the Company may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A SECOND AND FINAL REQUEST FOR CONSENT,

APPROVAL OR WAIVER UNDER THAT CERTAIN SECURED PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND ICAP INVESTMENTS, LLC. OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT.

**(c)** If the Holder does not approve or reject the proposed or requested consent, approval, waiver or amendment or other matter within ten (10) days of receipt of such second and final notice, via delivery of the same to the Company within such time period, Holder shall be deemed to have approved, in writing, the proposed consent, approval, waiver or amendment or other matter as set forth in the notice, and the Company may effect the actions set forth therein in reliance on such consent.

**Section 14.**       **Miscellaneous.**

**(a)** **Assignment**. The Company may not assign this Note or any of its rights, interests or obligations hereunder without the prior written consent the Holder. Except as otherwise provided herein, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the Parties. Nothing in this Note, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note.

**(b)** **Governing Law**. This Note shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Washington residents, entered into and to be performed entirely within the State of Washington, without giving effect to principles of conflicts of law. The Parties irrevocably consent to the jurisdiction and venue of and in King County, Washington in connection with any action arising from or relating to this Note or the transaction it contemplates. In the event of any dispute arising from or relating to this Note, the prevailing party shall be entitled to an award of its reasonable attorneys' fees and costs.

**(c)** **Waiver of Jury Trial.** EACH PARTY, TO THE EXTENT PERMITTED BY LAW, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE AND THE TRANSACTIONS IT CONTEMPLATES. THIS WAIVER APPLIES TO ANY ACTION OR LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

**(d)** **Titles and Subtitles.** The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

**(e)** **Notices.** Subject to Section 13, unless otherwise provided, any notice required or permitted under this Note shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) 48-hours after being sent by electronic means to the email address set forth in the Subscription Agreement, if to Holder, or to the email address below if to the Company, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (d), or (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by ten (10 days' advance written notice to the other party given in the foregoing manner.

If to the Company:

> iCap Investments, LLC
> Attn: Chris Christensen
> 3535 Factoria Blvd SE Ste 500
> Bellevue, WA 98006
> Fax:  425-278-9025
> chris@icapequity.com

If to Holder, to the address for Holder as set forth in Subscription Agreement.

**(f)** **Expenses. Other than as set forth herein or in the Subscription Agreement,** each Party shall pay its own costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Note, the related agreements and the transactions contemplated herein and therein.

**(g)** **Entire Agreement**. This Note, the Subscription Agreement, and the other documents delivered pursuant hereto or thereto constitute the full and entire understanding and agreement between the Parties with regard to the subjects hereof and thereof.

**(h)** **Amendments and Waivers.** Subject to the provisions of Section 13, any term of this Note may be amended and the observance of any term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Holder.

**(i)** **Severability.** If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

**(j)** **Costs of Collection.** If this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note in accordance with the terms of the Note Purchase Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action, including, but not limited to, attorneys' fees and disbursements, provided Holder finally prevails on such proceedings.

**(k)** **Holder as Owner.** The Company may deem and treat the holder of record of this Note as the absolute owner for all purposes regardless of any notice to the contrary from third parties.

**(l)** **No Member or Ownership Rights.** This Note confers no ownership rights whatsoever in the Company, and shall not entitle the Holder to any voting rights, any management rights, any ownership rights, any rights to distribution, any statutory rights conferred on members, or any other rights as an owner of the Company or to any other rights except the rights stated herein.

**(m)** **Counterparts**. This Note may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the Parties, it being understood that each Party need not sign the same counterpart. A facsimile copy or electronic transmission of a signature page to this Note shall be deemed to be an original signature page.

*[Signatures appear on following page]*

In witness whereof, the undersigned have executed this Note as of the Issue Date.

iCap Investments, LLC

By: _____
Name:   Chris Christensen
Its:       Manager

**EXHIBIT B**

**SUBSCRIPTION DOCUMENTS**
**OF**
**ICAP INVESTMENTS, LLC**

# iCap Investments, LLC

**SUBSCRIPTION AGREEMENT FOR ACCREDITED INVESTORS**

The undersigned "Subscriber", on the terms and conditions herein set forth, hereby irrevocable submits this subscription agreement (the "Subscription Agreement") to iCap Investments, LLC, a Washington limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise working capital of up to $10,000,000 through the sale to Subscriber as an accredited investor of a Secured Promissory Note of the Company (the "Note").

1. **Subscription for the Purchase of Notes.**
The undersigned, intending to be legally bound, hereby subscribes for the amount set forth on the Investment Summary page below (the "Principal Balance"). The undersigned acknowledges that the Company is offering the Notes to those who are "accredited investors" as defined herein, pursuant to the terms and provisions of the Confidential Private Placement Memorandum of the Company dated May 1, 2020 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. In this regard, Investor agrees to forward payment in the amount of the Principal Balance indicated on the Investment Summary form below. The Company's private offering of Notes is being made to "accredited" investors within the meaning of Rule 506 of Regulation D promulgated by the Securities Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"). By signing this Subscription Agreement, Subscriber acknowledges receipt of the Memorandum and its Exhibits, including the Note and the Pledge and Security Agreement (collectively the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents.

The undersigned agrees to execute this Subscription Agreement and if by mail, send to the Company. You as an individual or you on behalf of the subscribing entity are being asked to complete this Subscription Agreement so that a determination can be made as to whether or not you (it) are qualified to purchase the Note under applicable federal and state securities laws. Your answers to the questions contained herein must be true and correct in all respects, and a false representation by you may constitute a violation of law for which a claim for damages may be made against you. Your answers will be kept strictly confidential; however, by signing this Subscription Agreement, you will be authorizing the Company to present a completed copy of this Subscription Agreement to such parties as they may deem appropriate in order to make certain that the offer and sale of the securities will not result in a violation of the Securities Act or of the securities laws of any state. All questions must be answered. If the appropriate answer is "None" or "Not Applicable," please state so. Please print or type your answers to all questions and attach additional sheets if necessary to complete your answers to any item. Please initial any corrections.

2. **Offer to Purchase.** Subscriber hereby irrevocably offers to purchase the Note and tenders herewith the total price noted above. Subscriber recognizes and agrees that (i) this subscription is irrevocable and, if Subscriber is a natural person, shall survive Subscriber's death, disability or other incapacity, and (ii) the Company has complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement. This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

3. **Effect of Acceptance.** Subscriber hereby acknowledges and agrees that on the Company's acceptance of this Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Subscriber. As a result, upon acceptance by the Company of this Subscription Agreement, Subscriber will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note as specified herein.

4. **Representation as to Investor Status.** Investor agrees to complete all applicable portions of the Investor Representations page at the end of this Agreement. Additionally, attached to this Subscription Agreement as Annex 1 is an Accredited Status Certification Letter that Subscriber who is claiming to be an "accredited investor" under the definitions in Section 4(a)(i) or Section 4(a)(ii) may provide to the Company to assist it in its determination of whether Subscriber meets the accredited investor requirements discussed above. A Subscriber who is claiming to be an "accredited investor" under the definitions in Section 4(a)(i) or Section 4(a)(ii) should provide this form of Accredited Status Certification Letter to the applicable person (CPA, investment adviser, etc.) and ask them to complete it and return it to the Company. (In this Letter, you as the Subscriber are the "Client").

5. **Additional Representations and Warranties of Subscriber.** Subscriber hereby represents and warrants to the Company as follows:

(a) Subscriber has been furnished the Memorandum and, if requested by the Subscriber, other documents. The Subscriber has carefully read the Memorandum and any such other requested documents. Subscriber has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Subscriber requested and deemed material to making an informed investment decision regarding its purchase of the Note. Subscriber has been afforded the opportunity to review such documents and materials and the information contained therein. Subscriber has been afforded the opportunity to ask questions of the Company and its management. Subscriber understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Subscriber understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Subscriber has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Subscriber shall modify, amend or affect such Subscriber's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Subscriber has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

(b) Subscriber has read and understood, and is familiar with, this Subscription Agreement, the Note and the business and financial affairs of the Company.

(c) Subscriber, either personally, or together with its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum. The Subscriber and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Note. Subscriber's financial condition is such that Subscriber is able to bear the risk of holding the Note that Subscriber may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Subscriber's entire investment in the Company.

(d) Subscriber has investigated the acquisition of the Note to the extent Subscriber deemed necessary or desirable and the Company has provided Subscriber with any reasonable assistance Subscriber has requested in connection therewith.

(e) The Note is being acquired for Subscriber's own account for investment, with no intention by Subscriber to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Subscriber in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Subscriber has any interest in or any right to acquire the Note. Subscriber understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Subscriber.

(f) No representations or warranties have been made to Subscriber by the Company, or any representative of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

(g) Subscriber is aware that Subscriber's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Subscriber will not offer for sale, sell or otherwise transfer the Note without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

**(h)** Subscriber understands and agrees that the Note it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

**(i)** The Subscriber has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Subscriber understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

**(j)** Rule 506(c) of Regulation D under the Securities Act permits a company offering securities to investors in a private offering to solicit and advertise that offering to the general public, provided that: (i) the company only sells the securities to "accredited investors," as defined by the Securities and Exchange Commission ("SEC"); (ii) the company takes "reasonable steps" to verify that all those purchasers meet the SEC's accredited investor requirements; and (iii) the offering meets the other applicable requirements of Rule 506. Accordingly, the Subscriber acknowledges that, to the extent applicable, the Company will seek to comply with the Rule 506(c) of Regulation D and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "Rule 506(c) Provisions"). In furtherance of these efforts, the Subscriber agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the Rule 506(c) Provisions, including without limitation, tax returns and/or a certification from a U.S. licensed attorney or certified public accountant that the Subscriber is an "accredited investor" as that term is defined in Rule 501 of Regulation D.  Furthermore, such methods also include, without limitation, (1) review of an investor's income tax returns and filings along with a written representation that the person reasonably expects to reach the level necessary to qualify as an accredited investor during the current year, (2) review of one or more of the following, dated within three months, together with a written representation that all liabilities necessary to determine net worth have been disclosed; for assets: bank statements, brokerage statements and other statements of securities holdings, certificates of deposit, tax assessments and appraiser reports issued by third parties and for liabilities, credit report from a nationwide agency, (3) obtaining a written confirmation from a registered broker-dealer, an SEC registered investment advisor, a licensed attorney, or a CPA that such person or entity has taken reasonable steps to verify that the purchaser is an accredited investor within the prior three months.

**(k)** Subscriber understands that the Note shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such certificates):

"NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT."

**(l)** Subscriber also acknowledges and agrees to the following:

**(i)** an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire investment in the Company; and

**(ii)** there is no assurance that a public market for the will be available and that, as a result, Subscriber may not be able to liquidate Subscriber's investment in the Note should a need arise to do so.

**(m)** Subscriber is not dependent for liquidity on any of the amounts Subscriber is investing in the Note.

**(n)** Subscriber's address set forth below is his or her correct residence address.

**(o)** Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

**(p)** Subscriber understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

6. **Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The Subscriber should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations. Subscriber hereby represents and warrants to the Company as follows:

**(a)** The Subscriber represents that (i) no part of the funds used by the Subscriber to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Subscriber and no distribution to the Subscriber shall cause the Company to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Note, and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[2] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

**(b)** To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations. The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges that the Company may, by written notice to the Subscriber, suspend the redemption rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

**(c)** To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this

---

[2] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

investment is a senior foreign political figure[3], or any immediate family[4] member or close associate[5] of a senior foreign political figure, as such terms are defined in the footnotes below.

**(d)** If the Subscriber is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Subscriber represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

**(e)** The Subscriber acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Subscriber agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information, may result in the withholding of amounts with respect to, or other limitations on, distributions made to the Subscriber and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Subscriber shall give prompt notice of such fact to the Company by telegram, or facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

**7. Indemnification.** Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations and warranties made by Subscriber herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Subscriber hereby agrees to indemnify and hold harmless the Company and each employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Subscriber contained in this Subscription Agreement.

**8. Transferability.** Subscriber agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

---

[3] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[4] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[5] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

9. **Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Subscriber any money tendered hereunder without interest or deduction.

10. **Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Subscriber at the address set forth below and to the Company at investor@icapequity.com, or (c) at such other place as the Company may designate by written notice to Subscriber.

11. **Amendments.** Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Subscriber and the Company.

12. **Governing Law.** This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

13. **Headings.** The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

14. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

15. **Continuing Obligation of Subscriber to Confirm Investor Status**. Upon the request of the Company and for as long as the Subscriber holds the Note or other securities in the Company, the Subscriber shall confirm Subscriber's investor status as an "Accredited Investor," as defined by the Securities and Exchange Commission at the time of such request. In connection therewith, the Company shall deliver to the Subscriber a questionnaire that elicits the necessary information to determine the Subscriber's investor status. Upon receipt of the questionnaire, the Subscriber shall: (i) complete it, (ii) execute the signature page therein, and (iii) return it to the Company, or its designee, in accordance with the instructions therein, no later than ten (10) days after receipt of the questionnaire.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## INVESTOR REPRESENTATIONS

**(a) Type of Subscriber.** Indicate the form of entity of Subscriber:

☐     Individual                 ☐     Limited Liability Company

☐     IRA, 401K, Keogh or SEP

☐     Corporation

☐     Other Type of Trust (indicate type): _____

☐     Revocable Trust

☐     Other (indicate form of organization): _____

**(b) Accredited Investor.** In order for the Company to sell the Note (in conformance with state and federal securities laws), the following information must be obtained regarding Subscriber's investor status. Please **initial each item applicable** to you as an investor in the Company.

**(i)**     _____     A natural person whose net worth, either individually or jointly with such person's spouse, at the time of Subscriber's purchase, exceeds $1,000,000.

**(ii)**     _____     A natural person who had an individual income in excess of $200,000, or joint income with that person's spouse in excess of $300,000, in each of the two most recent years and reasonably expects to reach the same income level in the current year.

**(iii)**     _____     A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

**(iv)**     _____     A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

**(v)**     _____     An insurance company as defined in section 2(13) of the Exchange Act.

**(vi)**     _____     An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act.

**(vii)**     _____     A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

**(viii)**     _____     A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state, or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

**(ix)**     _____     An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

**(x)**     _____     A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

**(xi)**     _____     An organization described in Section 501(c)(3) of the Internal Revenue Code, or a corporation, business trust or partnership, not formed for the specific purpose of acquiring the Note, with total assets in excess of $5,000,000.

**(xii)**     _____     A director or executive officer of the Company.

**(xiii)** _____ A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Note, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of investing in the Company.

**(xiv)** _____ An entity in which all of the equity owners qualify under any of the above subparagraphs.

_____ Subscriber does <u>not</u> qualify under any of the investor categories set forth in Section 4(a)(i)(i) through Section 4(a)(xiv).

**(c) Net Worth.** The term "net worth" means the excess of total assets over total liabilities (including personal and real property, but excluding the estimated fair market value of a person's primary home).

**(d) Income.** In determining individual "income," Subscriber should add to Subscriber's individual taxable adjusted gross income (exclusive of any spousal income) any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

**(e) Certification of Subscriber.** If Subscriber is providing a letter from a CPA, attorney, licensed broker-dealer, or SEC registered investment advisor to verify his/her accredited status, then he/she hereby represents and warrants that the following statements are true, correct, and complete as of the date of the signature below (the "Certification Date"):

- All materials that I have delivered are true, correct and complete as of the Certification Date;

- I have fully and accurately disclosed all liabilities that are required to be included in the calculation of my net worth; and

- If I am relying on my income and/or that of my spouse to satisfy the requirements for being an accredited investor, I have a reasonable expectation of reaching individual income in excess of $200,000 or joint income with my spouse in excess of $300,000 in the current year.

## INVESTMENT SUMMARY

**Initial Investment Amount**

Investor agrees to invest the following initial amount ("Principal Balance"):

$_____

**Interest Rate and Maturity Date (Select One):**

☐  1-Year Maturity Date, with 4.00% annual interest

☐  2-Year Maturity Date, with 6.00% annual interest

**Payment Method**

Investor agrees to forward payment of the Principal Balance in <u>one</u> of the following methods (select one):

☐  **Wire Transfer or ACH**:  by wiring payment of the Principal Balance to the account set forth below:

|                        |                                        |
|------------------------|----------------------------------------|
| Account Name:          | iCap Investments, LLC                  |
| ABA Routing Number:    | 123205054                              |
| Account Number:        | 9690216925                             |
| Bank Name:             | Umpqua Bank                            |
| Bank Address:          | 705 Gilman Blvd. NW, Issaquah, WA 98027|
| SWIFT CODE:            | UMPQUS6P                               |

☐  **Check**:  by mailing a check made payable to "iCap Investments, LLC" along with a completed subscription document to:

iCap Investments, LLC
Attn: Investor Relations Department
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

☐  **Other**: _____

*Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note agreement, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

## INDIVIDUALS, JOINT ACCOUNTS, OR REVOCABLE LIVING TRUSTS

| | |
|---|---|
| Investor Name(s) | 1 |
| | 2 |
| Registered As | |
| Address of Principal Place of Residence *(please do not use PO Box)* | |

| City | | State | | Zip Code | |
|---|---|---|---|---|---|

| Mailing Address (if different from above) | |
|---|---|

| Home Telephone No. | ( ) | Business Telephone No. | ( ) |
|---|---|---|---|
| Cell Phone No. | ( ) | Email Address(es) | |

| **Birth Date(s) (required)** | 1 | 2 | Occupation(s) | 1 |
|---|---|---|---|---|
| **SSN or TIN**[1] | | | | 2 |
| **SSN or TIN**[2] | | | | |

Status, if individual:

☐ U.S. Citizen      ☐ U.S. Resident Alien      ☐ U.S. Citizen Residing Outside of U.S.

*Prospective Investors must fill out the Form W-9 attached hereto*

**IF INVESTING THROUGH AN IRA, KEOGH OR OTHER RETIREMENT OR PROFIT SHARING PLAN, PLEASE COMPLETE THE FOLLOWING (IN ADDITION TO THE INVESTOR INFORMATION ON THE PREVIOUS PAGE):**

**Account Name**

**Custodian's EIN**

**Custodian's Address**

**City**          **State**          **Zip Code**

<u>ACCEPTANCE</u>

iCap Investments, LLC

Date: _____.

By:     _____

Name:  _____

Title:    Manager

**CORPORATIONS, PARTNERSHIPS, IRREVOCABLE TRUSTS OR OTHER ENTITIES**

1.  Name of entity_____

    ☐    Partnership

    ☐    Limited Liability Company

    ☐    Corporation

    ☐    Trust or Pension Plan

    ☐    Other _____

           (Specify)

    Taxpayer Identification Number: _____

    Business Address:_____

    State in which organized or incorporated _____

    Date of formation or incorporation: _____

2.  Was this partnership, corporation, trust or other entity formed for the specific purpose of purchasing the Note?

    ☐ Yes    ☐ No

    If yes, each person participating in the entity will be required to fill out a Subscription Agreement.

3.  Has this partnership, corporation, trust or other entity made other investments?

    ☐ Yes    ☐ No

    If no, each person participating in the entity will be required to fill out a Subscription Agreement.

4.  How many persons own an equity interest in this partnership, corporation, trust or other entity (including the investor)?
    _____

    EACH EQUITY OWNER (OTHER THAN A SPOUSE OR CHILD OF AN EQUITY OWNER LIVING WITH SUCH EQUITY OWNER) MUST COMPLETE AND SIGN THIS QUESTIONNAIRE.

5.  If a Trust, does the Trust have assets of at least $5,000,000?

    ☐ Yes    ☐ No    ☐ N/A

    If the prospective investor is an EMPLOYEE BENEFIT PLAN within the meaning of Title 1 of the Employee

    Retirement Income Security Act of 1974, as amended ("ERISA"), please answer question 12.

6.  (a) If an Employee Benefit Plan, does the Employee Benefit Plan have assets of at least $5,000,000?

    ☐ Yes    ☐ No    ☐ N/A

    (b) Is this investment decision being made or directed by the beneficiaries of the Employee Benefit Plan?

    ☐ Yes    ☐ No    ☐ N/A

**SIGNATURES- ALL INVESTORS MUST SIGN**

THE UNDERSIGNED HAS THE AUTHORITY TO ENTER INTO THIS SUBSCRIPTION AGREEMENT ON BEHALF OF THE PERSON(S) OR ENTITY REGISTERED ABOVE.

Executed on_____ _____

X_____
Signature (Investor, or authorized signatory)

X_____
Signature (Investor, or authorized signatory)

*Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

ACCEPTANCE
iCap Investments, LLC

Date: _____.

By:        _____

Name:      _____

Title:     Manager

**Counterpart Signature Page**

The undersigned hereby accepts, and becomes a party to, the Pledge and Security Agreement (the "Agreement"), dated as of May 1, 2020, in connection with the acquisition of a Note (as defined in the Agreement), and by its signature below signifies its agreement to be bound by the terms and conditions of the Agreement.

**INDIVIDUAL**

Name: _____

Signature: _____

Date: _____

---

**ENTITY**

Entity Name: _____

Signature: _____

Name: _____

Title: _____

Date: _____

**Form W-9**

(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

**Print or type.**
**See Specific Instructions on page 3.**

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC    ☐ C Corporation    ☐ S Corporation    ☐ Partnership    ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.

6 City, state, and ZIP code

Requester's name and address (optional)

7 List account number(s) here (optional)

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

☐☐☐ – ☐☐ – ☐☐☐☐

or

**Employer identification number**

☐☐ – ☐☐☐☐☐☐☐

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**

Signature of U.S. person ▶      Date ▶

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

# Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

**iCap Investments, LLC**

---

### SUBSCRIPTION AGREEMENT FOR NON-U.S. RESIDENTS

### 非美国居民认购协议

---

The undersigned "Subscriber", on the terms and conditions herein set forth, hereby irrevocably submits this subscription agreement (the "Subscription Agreement") to iCap Investments, LLC, a Washington limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise capital of up to $10,000,000 US Dollars through the sale to Subscriber as a "Non US Person" (as defined below) of a Secured Promissory Note of the Company (the "Note").

签署本协议的"认购者"，依据本协议的条款，谨此向**艾珂榮投资有限**责任公司提交本《认购协议》（"《认购协议》"），以认购该公司发行的**有抵押私募债卷**（"私募债卷"）。**此**认购协议提交后不可撤销。**艾珂榮投资有限**责任公司是一家在华盛顿州**注册的**有限责任公司（以下简称"该公司"），**上述**私募证券通过面向"非美国人士"（定义见下文）的认购者发售该公司的**有担保的本票**（以下简称"本票"），**最高募集**10,000,000美元。

16. **Subscription for the Purchase of Notes.** The undersigned, intending to be legally bound, hereby subscribes for the amount set forth on the Investment Summary page below (the "Principal Balance"). The undersigned acknowledges that the Company is offering the Notes to those who are "Non U.S. Persons" pursuant to the terms and provisions of the Confidential Private Placement Memorandum of the Company dated May 1, 2020 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. In this regard, the Investor agrees to forward payment in the amount of the Principal Balance indicated on the Investment Summary form below. The Company's private offering of Notes is being made to Non US Persons (as defined below) pursuant to Regulation S ("Regulation S") under the Securities Act of 1933, as amended (the "Securities Act"). By signing this Subscription Agreement, Subscriber acknowledges receipt of the Memorandum and its Exhibits, including the Note and Pledge and Security Agreement (collectively the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents.

1.**认购本票**。签署本协议的认购者以**此**协议为据，认购下文的"**投资摘要**"中所述的金额（以下统称"**本金金额**"）。认购者声明，该公司正依据私募备忘录的条款向"**非美国人士**"发行该本票，该私募备忘录的内容详见2020年04月25日公布的**与本私募**计划相**关的**《**私募备忘录**》（与本备忘录的所有附录和附件统称"备忘录"）。**因此**，投资人同意支付下文的"**投资摘要**"中所示的认购款的金额。依据《1933**年证券法**》及其不定期修订的版本（"《证券法》"）**下的**S条例（"S条例"），该公司就该本票推出的私募证券仅面向非美国人士（定义见下文）发售。《认购协议》一经签署，认购者即确认收到了《本票协议》及其附录，包括《担保协议》、《抵押物代理协议》以及该本票（统称"《本票协议》"），**并同意他/她/其已**阅读该《本票协议》的所有条款，并自愿受其约束。

17. **Offer to Purchase.** Subscriber hereby irrevocably offers to purchase the Note and tenders herewith the Principal Balance. Subscriber recognizes and agrees that (i) this subscription is irrevocable and, if Subscriber is a natural person, shall survive Subscriber's death, disability or other incapacity, and (ii) the Company has complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement. This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

2.**认购要约**。认购者自愿认购该本票并在签署本协议时支付上述的**本金金**额，**且知悉并接受此**认购协议是不可更改的。认购者清楚并同意，(i) **此**认购协议不可更改，**且若**认购者是自然人，即使认购者死亡、出现残疾或其他失能的情况，该认购仍然有效，且(ii) 该公司可以其完全的自由裁量权，决定完全接受或拒绝本《认购协议》，且不需因拒绝本《认购协议》而承担任何责任。本《认购协议》应经该公司签署后才能被视为已被该公司接受。

18. **Effect of Acceptance.** Subscriber hereby acknowledges and agrees that on the Company's acceptance of this Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Subscriber. As a result, upon acceptance by the Company of this Subscription Agreement, Subscriber will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note as specified herein.

3.**接受的效力**。认购者承认并同意，一旦被该公司接受，该《认购协议》将成为该公司和认购者之间具有约束力的协议，并可能完全强制执行。因此，在该公司接受该《认购协议》后，认购者将成为该本票的注册持有人和受益人，且该公司将有权收取本协议所述的该本票的购买价款。

19. **Representations and Warranties of Non - US Persons.** Subscriber hereby represents and warrants to the Company as of the date hereof that:

4.**非美国人士的陈述和保证**。认购者向该公司陈述及保证，截至签署本协议之日：

(a) Subscriber understands that the investment offered hereunder has not been registered under the Securities Act and is acquiring the Note for Subscriber's own account, for investment purposes only, and not with a view towards resale or distribution.

认购者理解，本协议所述的投资尚未依据《证券法》注册，并将通过认购者本人名下的账户获得该本票。该本票仅用作投资，并非为了转售或进行分配。

(b) Subscriber is <u>not</u> a "US Person" which is defined as:

认购者**不是一位**"**美国人**"，**其定**义如下：

(i) Any natural person resident in the United States (as defined below);

**居住在美国**（定义见下文）的所有自然人；

(ii) Any partnership or corporation organized or incorporated under the laws of the United States;

**根据美国法律**组建或注册的所有合伙企业或公司；

**(iii)** Any estate of which any executor or administrator is a US Person;

遗产执行人或管理者是一位美国人；

**(iv)** Any trust of which any trustee is a US Person;

信托机构的受托人是一位美国人；

**(v)** Any agency or branch of a foreign entity located in the United States;

位于美国境内的任何代理机构或外国实体分支机构；

**(vi)** Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US Person;

因任何美国人获益的所有由交易商或其他由任何美国受托人持有的非全权委托账户或类似账户（不含任何财产账户或信托账户）；

**(vii)** Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident of the United States; and

对任何全权委托的账户或类似账户（不含任何财产账户或信托账户）而言，其持有人是一家在美国境内组织或成立的交易商或其他受托人，或是一位美国居民（对个人而言）；以及

**(viii)** Any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a US Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) who are not natural persons, estates or trusts.

任何合伙企业或公司，若(i) 其是依据任何外国司法管辖权下的法律组织或注册成立的，且(ii) 是由一位美国人组成的，主要是为了投资那些未依照《证券法》注册的证券，除非是由非自然人、财产管理机构或信托机构的合格投资人（其定义见根据《证券法》颁布的 D 条例的 501(a)条款）组织、注册及持有。

"United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

"美国"指美利坚合众国、其领土和财产、美国所有的州和哥伦比亚特区。

**(c)** Subscriber, as of the execution date of this Agreement, (i) is not located within the United States, and (ii) is not purchasing the Note for the benefit of any US Person.

截至本协议签署之日，认购者，(i)本人并不在美国境内，且(ii)该本票的受益人为非美国人。

(d) Subscriber will not resell the Note except in accordance with the provisions of Regulation S (Rule 901 through 905 and Preliminary Notes thereto), pursuant to a registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

除非符合S条例的规定（第901条至905条及其附注），并且已根据《证券法》进行注册，或根据任何适用的豁免注册的规定，否则认购者不得转售该本票；并同意不参与该证券有关的对冲交易，符合《证券法》的规定的情况除外。

(e) Subscriber has not acquired the Note as a result of, and will not itself engage in, any "directed selling efforts" (as defined in Regulation S under the Securities Act) in the United States in respect of the Note which would include any activities undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the resale of any of the Note; provided, however, that the Subscriber may sell or otherwise dispose of the Note pursuant to registration thereof under the Securities Act and any applicable state and federal securities laws or under an exemption from such registration requirements.

认购者获得该本票，并非因为其受美国境内关于本协议项下的本票的导向性销售行为的影响，或因为参加关于该本票的相关一系列能影响本票转售市场的活动；然而，根据《证券法》和任何适用的州和联邦的证券法，若符合有关该本票注册的规定或符合豁免注册的规定，认购者可以出售或以其他方式处置该本票。

20. **Additional Representations and Warranties of Subscriber.** Subscriber hereby represents and warrants to the Company as follows:

**认购者的补充陈述和保证。**认购者谨此向该公司做出如下陈述和保证：

(a) Subscriber has been furnished the Memorandum, the Note Documents, and, if requested by the Subscriber, other documents. The Subscriber has carefully read the Memorandum, the Note Documents (together with all Exhibits thereto), and any such other requested documents, and Subscriber agrees to be bound by the terms of the Note Documents and the Note. Subscriber has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Subscriber requested and deemed material to making an informed investment decision regarding its purchase of the Note. Subscriber has been afforded the opportunity to review such documents and materials and the information contained therein. Subscriber has been afforded the opportunity to ask questions of the Company and its management. Subscriber understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may

be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Subscriber understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Subscriber has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Subscriber shall modify, amend or affect such Subscriber's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Subscriber has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

认购者已收到《备忘录》、该《本票协议》**及相关文件**和认购者要求的**其他文件**。认购**者已仔**细阅读该《备忘录》、《本票协议》（及其所有附录）及任何认购者要求的**其他文件，且同意受该《本票协议》及相关文件的条款**和该本票的约束。认购者已获得所有与该公司的业务、财务及营运有关的文件和资料，以及认购者要求及认为对认购本票的投资决定有重要影响的信息。认购者已审查了上述文件、材料和信息。认购者已获得询问该公司及其管理的机会。认购者理解，此类讨论以以及该公司**提供的任何**书面信息旨在描述该公司的业务和其认为重要的方面，但不一定是全面或详尽的描述，且除非本《认购协议》明确规定，该公司不保证上述信息的完整性，也不保证该公司以外的任何机构提供的任何信息的准确性和完整性。上述部分信息可能包括对公司未来业绩的预测，这些预测可能无法实现，也可能基于一些不实的假设，并可能受到公司无法控制的众多因素的影响。此外，认购者理解并表示，尽管该公司可能会在未来披露认购者尚未收到的某些重要信息，包括该公司当前财政季度的财务业绩，他、她或其仍会认购该本票。无论认购者做出任何问询或任何其他尽职调查均不得改变、修改或影响该认购者相信该《认购协议》包含的该公司的陈述和保证的权利（若有）。为确保这次认购本票是一个明智的投资行为，认购者已咨询了所有其认为必要的会计、法律和税务等方面的专业建议。就认购本票和签署及交付本《认购协议》的行为，认购者拥有完全的权力和权限做出本协议包含的相关陈述。

**(b)** Subscriber has read and understood, and is familiar with, this Subscription Agreement, the Note Agreement, the Note, and the business and financial affairs of the Company.

认购者已阅读及理解，并熟悉本《认购协议》、备忘录、《**本票**协议》**及其相关文件、**和该公司的业务和财务状况。

**(c)** Subscriber, either personally, or together with his/her/its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the

risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum. The Subscriber and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Note. Subscriber's financial condition is such that Subscriber is able to bear the risk of holding the Note that Subscriber may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Subscriber's entire investment in the Company.

认购者个人或在其顾问（任何可能从销售该本票的交易中获得报酬的证券经纪/**交易商**）的协助下，有足够的能力评估投资该本票的益处和风险的财务和商务知识和经验，并能够承担投资的风险，并理解认购本票相关的风险和其他需考虑的因素，包括《备忘录》中"风险因素"一节中提及的情况。 认购者及其顾问已有机会向该公司询问与本票相关的问题并获得回复。认购者的财务状况使其能够承担因依据本协议获得的本票而需要无限期持有的风险，以及认购者在该公司的全部投资额亏损的风险。

**(d)** Subscriber has investigated the acquisition of the Note to the extent Subscriber deemed necessary or desirable and the Company has provided Subscriber with any reasonable assistance Subscriber has requested in connection therewith.

认购者已在其认为必要或需要的范围内对该本票的购买事宜进行了调查，且该公司已向认购者提供了相关合理的协助。

**(e)** The Note is being acquired for Subscriber's own account for investment, with no intention by Subscriber to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Subscriber in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Subscriber has any interest in or any right to acquire the Note. Subscriber understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Subscriber.

认购者**所**认购该本票**的**账户，仅作投资之用，并不打算按照《证券法》的规定对其任何部分进行分配或出售，且认购者不会违反《证券法》或适用的法规转让该本票。除认购者外，其他任何人均没有权力购买该本票**或作**为该本票的受益人。认购者理解并承认，除认购者外，该公司没有义务承认任何其他人士对该本票的所有权、受益权或其他权利。

**(f)** No representations or warranties have been made to Subscriber by the Company, or any representative of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

**除了**本《认购协议》中所述外，该公司或其任何代表或任何证券经纪/**交易商均未**对认购者做出任何陈述或保证。

**(g)** Subscriber is aware that Subscriber's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Subscriber will not offer for sale, sell or otherwise transfer the Note

without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

认购者知晓，认购者转让该本票的权利受到《证券法》及适用的州证券法的限制，且除非已依据《证券法》进行注册或依据所有适用的州的证券法律获得出售的资质或该本票可免注册出售的情况外，认购者不会发出出售要约、出售或以其他方式转让该本票。

**(h)** Subscriber understands and agrees that the Note he/she/it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

认购者理解并同意，其购买的本票尚未依据《证券法》或任何州的证券法律进行注册，但已依据其中有关豁免注册的规定进行认购，且该公司无义务对其发行的上述本票进行注册。

**(i)** The Subscriber has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Subscriber understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

认购者已向该公司的代表就本次投资的条款提出相关问题并已获得满意的答复。认购者理解，该公司并未授权任何其他个人或机构做出任何陈述，如有相关陈述，需经公司签署书面同意方能生效。但是，该公司从未向签署本协议的认购者就是否适合投资的问题提出任何建议。

**(j)** Subscriber understands that Notes shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such Note):

认购者理解，该本票存在以下实质形式的销售限制（且该本票有相应的停止转让的指示）：

THESE SECURITIES WERE ISSUED IN AN OFFSHORE TRANSACTION TO PERSONS WHO ARE NOT U.S. PERSONS (AS DEFINED HEREIN) PURSUANT TO REGULATION S UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT").  ACCORDINGLY, NONE OF THE SECURITIES TO WHICH THIS CERTIFICATE RELATES HAVE BEEN REGISTERED UNDER THE 1933 ACT, OR ANY U.S. STATE SECURITIES LAWS, AND, UNLESS SO REGISTERED, NONE MAY BE OFFERED OR SOLD IN THE UNITED STATES OR, DIRECTLY OR INDIRECTLY, TO U.S. PERSONS (AS DEFINED HEREIN) EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND IN EACH CASE ONLY IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. IN ADDITION, HEDGING TRANSACTIONS INVOLVING THE SECURITIES MAY NOT BE CONDUCTED UNLESS IN ACCORDANCE WITH THE 1933 ACT.

上述证券是依据《1933年美国证券法》及其修订版（"《1933年法》"）下的S条例向海外交易中的非美国人（定义见下文）发售的。因此，本文涉及的证券均未依据《1933年证券法》或任何美国的州证券法进行注册，且除非特别要求注册，否则任何上述证券均不得在美国任何州直接或间接向任何美国人（定义见下文）发售，除非依据一份有效的注册声明或依据豁免注册的声明，或其交易行为无需受《1933年证券法》的约束。且在上述任何情况下，均须遵守适用的州的证券法。此外，除非符合《1933年证券法》的规定，否则不得进行与该证券相关的任何对冲交易。

The Subscriber hereby acknowledges and agrees to the Company making a notation on its records or giving instructions to any registrar and transfer agent of the Company in order to implement the restrictions on transfer set forth and described in this Subscription Agreement.

认购者承认并同意该公司在其注册记录上注明上述内容或向该公司的任何注册人和转让代理人发出指示，以执行本《认购协议》规定及描述的转让限制。

**(k)** Subscriber also acknowledges and agrees to the following:

认购者同时承认并同意以下内容：

(1) an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire investment in the Note; and

对该本票的投资具有很高的投机性，而其在该**本票的投**资也存在损失全部投资额的风险；及

(2) there is no assurance that a public market for the Notes will be available and, as a result, Subscriber may not be able to liquidate Subscriber's investment in the Note should a need arise to do so.

**无法保**证日后会有可供该本票公开交易的市场，因此，该本票在认购者需要流通变现时有 **可能不具备流通性**。

**(l)** Subscriber is not dependent for liquidity on any of the amounts Subscriber is investing in the Note.

认购者投资该本票的资金不对其流动资产造成任何影响。

**(m)** Subscriber's address set forth below is his or her correct residence address.

认购者在下方提供的地址是他或她的正确的居住地址。

**(n)** Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

认购者拥有全部的权力和权限做出本协议所述的陈述以认购该本票和签署及提交本《认购协议》。

(o) Subscriber understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

认购者理解，该公司可将上述陈述及保证作为其豁免注册或依据联邦及州的证券法律获得销售该本票的资格和其他用途的基础。

21. **Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The Subscriber should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations. Subscriber hereby represents and warrants to the Company as follows:

**《爱国者法案》、反洗钱和海外资产控制办公室相关的陈述和保证。在做出下述陈述前，认购者应访问海外资产控制办公室（"OFAC"）的网站http://www.treas.gov/ofac。认购者谨此向该公司做出下列陈述和保证：**

(a) The Subscriber represents that (i) no part of the funds used by the Subscriber to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Subscriber and no payment of principal or interest to the Subscriber shall cause the Company to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit investments, restrict principal or interest payments, or take any other reasonably necessary or advisable action with respect to the Note, and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs

administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[1] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

认购者声明：(i) 认购者用于认购该本票或履行其相关的资本投入义务的任何资金均未或不得直接或间接来自任何可能违反美国联邦或州或非美国的法律或法规的活动，包括反洗钱的法律和法规，以及(ii) 认购者向该公司做出的任何资本投入、出资或付款以及向认购者**支付的本金或利息均不得致使**该公司违反任何相应**的反洗**钱法律或法规，包括但不限于，"2001**年**颁布的使用适当之手段阻止或避免恐怖主义以团结并强化美国的法律"（《**美国**爱国者法案》）第三部分和美国财政部海外资产控制办公室的规定。认购者承认并同意，即使《备忘录》或任何其他协议中有任何相反的规定，但在任何反洗钱法律或法规要求的范围内，该公司可以禁止与该本票相关的出资，限制其分配或采取任何其他与该本票相关的合理必要或有预见性的措施，而认购者不得对该公司或与此相关的任何其他人提出索赔。除其他限制外，美国联邦法规和OFAC**管理的行政命令均禁止与某些国家、地区、团体和个人进行交易和向其提供服务。**OFAC**禁止的国家、地区、个人和团体**的名单可以在OFAC**网站**http://www.treas.gov/ofac**上找到。此外**，OFAC**管理的计划（"**OFAC**计划）禁止与个**别国家的个人或团体产生业务，无论这些个人或团体是否出现在OFAC**名**单里。

**(b)** To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations. The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber, declining any demand for repayment requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges that the Company may, by written notice to the Subscriber, suspend the repayment rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

据认购者所知，以下任何一方：(1) 认购者；(2) **任何控制**认购者或由认购者控制的个人；(3) 若认购者是一家私人控制的团体，任何从认购者的认购中受益的个人；或(4) **任何以**认购者作为投资代理人的个人，均不在OFAC名单里或是OFAC**禁止涉及的个人或**团体。请注意：若潜在投资者无法做出本段中规定的声明或陈述，该公司有权不接受其所有的投资款。认购者同意，若认购者知晓若陈述中的信息发生任何变化，应立即告知该公司。认购者理解并承认，根据法律规定，该公司可"冻结认购者的账户"，**即可以禁止**该认购者继续认购，或依据政府法规拒绝任何偿还请求和/**或隔离**账户中的资产，而所有证券经纪需要报告此类行为，并向OFAC**披露**认购者的身份。认购者进一步知悉，若该公司合理地认为，该公司或任何证券经纪或该公司的任何其他服务提供商为了遵守反洗钱法规，有必要暂停认购者的还款权利（若有），则可以向认购者发出书面通知。上述个人包括特定**国家的国民、特定的毒品**贩运者和受OFAC**制裁和禁运**计划限制的其他各方。[2]

(c) To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a senior foreign political figure[2], or any immediate family[3] member or close associate[4] of a senior foreign political figure, as such terms are defined in the footnotes below.

---

[1] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

这些人士包括特定国家的国民、特定的毒品贩运者和受 OFAC 制裁和禁运计划限制的其他各方。

[2] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

"外国高级政治人物"被定义为外国政府（无论是否选举产生）的执行、立法、行政，军事或司法分支机构中的高级官员，主要外国政党的高级官员，或外国政府所有的公司的高级管理人员。此外，"外国高级政治人物"也包括由高级外国政治人物组成或成为其谋利的任何公司、企业或其他团体。

[3] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

外国高级政治人物的"直系亲属"通常包括其父母、兄弟姐妹、配偶、子女和姻亲。

[4] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

就认购者所知，以下任何一方：(1) 认购者；(2) **任何控制**认购者或由认购者控制的个人；(3) **若**认购者是一家私人控制的团体，任何从认购者的认购中受益的个人；或(4) **任何以**认购者作为投资代理的个人，均不是外国高级政治人物[5]，**或其任何直系家庭成员**[6]**或亲密伙伴**[7]，**其**定义见下方脚注。

**(d)** If the Subscriber is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Subscriber represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

**如果**认购者是一家非美国银行机构（**"外国银行"）的附属机构，或者若**认购者从一家外国银行收取存款、代表该外国银行支付款项或处理与外国银行有关的其他金融交易，则该认购者 **向**该公司陈述及保证：(1) 该外国银行在一个其被授权从事银行业务的国家拥有固定地址，而不仅仅是电子地址; (2) 该外国银行维持着与其银行业务有关的经营记录; (3) 该外国银行受其金融活动牌照发放机构的监管; 且(4) 该外国银行不向在其他任何国家都没有实体**机构且并非其附属机构的外国**银行提供金融服务。

**(e)** The Subscriber acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Subscriber agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, the Note Documents, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information, may result in the withholding of amounts with respect to, or other limitations on, repayments of principal or interest made to the Subscriber and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith.

---

外国高级政治人物的"亲密伙伴"系指广为人知、且公开与高级外国政治人物保持异常密切关系的人士，包括代表该高级外国政治人物进行重要的国内和国际金融交易的人士。

认购者承认，在适用的范围内，该公司将遵守《美国国内税收法》中的《海外账户税收合规法案》的条款以及与之相关的任何规则、条例、形式、指示或其他指引（"FATCA条款"）。为了实行这些措施，认购者同意，若该公司为了遵守FATCA规定而提出要求，将及时配合提供任何补充文件或信息，并及时更新。认购者承认并同意，尽管《备忘录》、该《**本票协议》及其相关文件、任何附函或任何其他**协议中另有规定，若其未能及时满足这些要求、或提供补充信息，可能导致该公司向认购者偿还本金或利息时扣除相应的费用或设置一定的限制，或导致该公司采取与**本**协议项下的本票相关的合理必要的措施（包括但不限于要求认购者撤回投资），但认购者不得因此对该公司或与其相关的任何其他人士提出任何索赔。

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Subscriber shall give prompt notice of such fact to the Company by facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

**截至本**协议签署之日，上述陈述和保证均为真实准确，并且应在签署后依然有效。如果上述任何陈述和保证在该公司接受本《认购协议》之前不再真实准确，则认购者应立即通过电报、传真或电子邮件等方式及时通知该公司，详述不真实或不准确的部分，并做出解释。

22. **Indemnification.** Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations and warranties made by Subscriber herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Subscriber hereby agrees to indemnify and hold harmless the Company and each employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Subscriber contained in this Subscription Agreement.

**保护。**认购者确认理解其在本协议中所作出的陈述和保证的含义和法律后果，并且该公司正是基于这些陈述和保证做出了接受或拒绝该《认购协议》的决定。认购者同意保护该公司及其员工和代理人，并使其免于承担因认购者违反在本《认购协议》中作出的任何声明或保证而导致的部分或所有损失、损害或责任。

23. **Transferability.** Subscriber agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

**不可转让。**认购者同意不转让或出让本《认购协议》或其中的任何权益，并进一步同意在转让和出让该本票时以相关的联邦和州的证券法为唯一依据。

24. **Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Subscriber any money tendered hereunder without interest or deduction.

**本协议的终止；资金返还。** 若因任何原因，该公司拒绝签署本《认购协议》，则本《认购协议》无效，并不再具有任何效力，且任何一方均不得据此对另一方享有任何权利。若该公司拒绝签署本《认购协议》，该公司应立即向认购者返还认购者支付的所有款项，但不计利息，亦不扣除任何费用。

25. **Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Subscriber at the address set forth below and to the Company at the address set forth on the first page of this Agreement, or (c) at such other place and in such other method as the Company may designate by written notice to Subscriber.

**通知。** 依据本协议或本协议项下的本票发送或发出的所有通知或其他信息均应以书面形式发出，并在以下情况下被视为送达：(a) 通过认证邮件或挂号信邮寄，收到回执且已预付邮资，(b) 通过传真或电子邮件按照下文所示的地址发送至认购者，或按照本协议第一页所示的地址发送至该公司，或 (c) 认购者指定该公司寄送的其他地址或其他送达方式送达。

26. Amendments. Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Subscriber and the Company. In the event Subscriber purchases additional Notes in the future, Subscriber and the Company may execute an adoption form, in which the Subscriber and Company agree that all terms of this Subscription Agreement apply to any additional Note purchase. In the event the Parties sign an adoption form, the provisions of this Subscription Agreement shall be binding on the additional Notes as though Subscriber had signed this Subscription Agreement at the time of each purchase.

**修订。** 除以书面形式列出并经认购者和该公司签署确认外，本《认购协议》或其任何条款均不得被更改、豁免、废除或终止。**如果**认购者在将来购买更多本票，认购者和该公司应执行一份额外协议，双方同意《认购协议》**中的所有条款在**购买任何**附加本票**时都适用。如果双方签署额外协议，则本《认购协议》**的条款**对附加本票**具有**约束力，等同于认购者在每次购买时签署本《认购协议》。

27. **Governing Law.** This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

**适用法律。** 本《认购协议》及其所有修订应遵守特拉华州法律的约束并按其解释。

28. **Headings.** The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

标题。本《认购协议》的标题仅为阅读方便而设，标题自身并不能决定本《认购协议》或其任何部分的含义。

29. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. Additionally this Subscription Agreement may be executed by means of digital or electronic signature of the Parties. The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

**副本**。本《认购协议》可以签署任意数量的副本，但具有相同的效力和效果，如同签署的是同一份文件。**另外无**论双方以何种形式的数码或电子签名，本《认购协议》都应执行。**若本**《认购协议》以传真或其他电子传送形式进行签署或提交，应**等同于提交一份已**签署的原件，已签署的协议上所有的签署者均受本协议约束。

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## INVESTMENT SUMMARY

### 投资摘要

**Initial Investment Amount**

**初始投资金额**

Investor agrees to invest the following initial amount ("Principal Balance"):

投资人同意以下述初始投资额（"本金金额"）投资：

$_____

**Interest Rate and Maturity Date (Select One):** **This part is new, so we need translation

☐ 1-Year Maturity Date, with 4.00% annual interest

☐ 2-Year Maturity Date, with 6.00% annual interest

**Payment Method**

**支付方式**

Investor agrees to forward payment of the Principal Balance in <u>one</u> of the following methods (select one):

投资人同意按照以下<u>一种方式</u>（请选择一种）支付该《认购协议》中的**本金**金额：

☐ **Electronic Funds Transfer**: by wiring or ACH payment of the Principal Balance to the account set forth below:

**电子转账**：以电汇或银行转款的**方式**向以下账户支付**本金**金额：

| | |
|---|---|
| Account Name 账户名称: | iCap Investments, LLC |
| ABA Routing Number 美国国内银行代码: | 123205054 |
| Account Number 账号: | 9690216925 |
| Bank Name 银行名称: | Umpqua Bank |
| Bank Address 银行地址: | 705 Gilman Blvd. NW Issaquah, WA 98027 |
| SWIFT Code 国际转账代码: | UMPQUS6P |

☐ **Check**: by mailing a check made payable to "iCap Investments, LLC" along with a completed subscription document to:

支票：邮寄一张收款人为"iCap Investments, LLC 的支票连同一份填写完整的认购文件至如下地址：

iCap Investments, LLC

Attn: Investor Relations Department

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006 U.S.A.

☐ **Other** 其他: _____

* Interest will accrue only after the Subscription Agreement has been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

*只有在本《认购协议》已完全签署并被该公司接受，且本金已按照该公司的汇款方式汇至该公司才会开始计算利息。

## SIGNATURE PAGE

### 签名页

### INDIVIDUALS

### 个人

In witness whereof, the parties hereto have executed this Subscription Agreement and hereby agree to the provisions of the Note Documents and their exhibits, as of the date set forth below.

为示信守，**在下述日期之日开始，**本协议双方已**同意**签署本《**认购协议**》，**并同意接受《本票**协议》及其附属协议。

Dated 日期: _____

Signature(s)签名: _____

_____

Executed at 签名地点: _____

*(location outside the U.S. 美国境外)*

Name(s) (Please Print) 名字(楷体): _____

Residence Address 住址: _____

_____

Phone Number 电话号码: _____

Passport Number 护照号码: _____

Email address 电子信箱: _____

<u>ACCEPTANCE</u>

<u>接受方</u>

iCap Investments, LLC

Date 日期: _____

By 签署人: _____

Name 姓名: _____

Title 职位: _____

## SIGNATURE PAGE

## 签名页

## CORPORATIONS, PARTNERSHIPS, TRUSTS OR OTHER ENTITIES

### 公司、合伙企业、信托机构或其他实体

In witness whereof, the parties hereto have executed this Subscription Agreement and hereby agree to the provisions of the Note Documents and their exhibits as of the date set forth below.

为示信守，在下述日期之日开始，本协议双方已同意签署本《认购协议》，并同意接受《本票协议》及其附属协议。

Dated 日期: _____

Name of Entity (Please Print) 公司名(楷体): _____

Signature 签名: _____

Executed at 签名地点: _____

*(location outside the U.S.)*

Name (Please Print) 名字(楷体): _____

Title 职位： _____

Address 地址: _____

_____

Phone Number 电话号码: _____

Taxpayer ID Number 纳税人ID号码: _____

Email address 电子信箱: _____

**Counterpart Signature Page**

The undersigned hereby accepts, and becomes a party to, the Pledge and Security Agreement (the "Agreement"), dated as of May 1, 2020, in connection with the acquisition of a Note (as defined in the Agreement), and by its signature below signifies its agreement to be bound by the terms and conditions of the Agreement.

**INDIVIDUAL**

Name: _____

Signature: _____

Date: _____

---

**ENTITY**

Entity Name: _____

Signature: _____

Name: _____

Title: _____

Date: _____

<u>ACCEPTANCE</u>

<u>接受方</u>

iCap Investments, LLC

Date 日期: _____

By 签署人: _____

Name 姓名: _____

Title 职位: _____

# EXHIBIT C

## PLEDGE AND SECURITY AGREEMENT

# PLEDGE AND SECURITY AGREEMENT

This Pledge and Security Agreement (this "Agreement"), dated as of May 1, 2020 (the "Effective Date"), is entered into by and between Chris Christensen ("Pledgor") and the holders of promissory notes issued by Pledgor pursuant to an offering of up to $10,000,000 of Secured Promissory Notes (the "Notes") pursuant to Regulation D and Regulation S promulgated under the Securities Act of 1933, as amended, commencing on or about May 1, 2020, who execute a counterpart signature page to this Agreement and become a party hereto (each a "Pledgee" and collectively the "Pledgees"), and for the benefit of the Pledgees. Pledgor and each Pledgee may be referred to herein as a "Party" and collectively as the "Parties." Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, the Pledgor is or shall be a member or shareholder of iCap Investments, LLC, a Washington limited liability company (the "Company") which shall hold real estate investment properties, the interests in which may be financed or acquired with the proceeds of the Notes and the proceeds from which will be used to pay amounts due to the Pledgees pursuant to the Notes (the "Pledged Interests"); and

WHEREAS, the Pledgor has agreed to execute and deliver this Agreement pursuant to the terms of the Notes;

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1. PLEDGE.    To secure the prompt payment and full and faithful performance of the obligations of Pledgor to Pledgees pursuant to the Notes, whether direct, contingent, fixed or otherwise, now or hereafter from time to time arising pursuant to the Notes (collectively, the "Indebtedness"), the Pledgor hereby grants a security interest in and to, does hereby pledge and assign to, Pledgees, under Articles 8 and 9 of the UCC (as defined below), all its right, title, share and interest in, to and in respect of (i) the Pledged Interests; (ii) together with only so much of any distribution, whether of cash or in kind, in connection with, relating to or in respect of the applicable Pledged Interests, whether any such distribution or payment is a distribution, is in partial or complete liquidation, or is the result of reclassification, readjustment or other changes in the capital structure of the entity issuing the same, or otherwise, and any and all subscriptions, warrants, options and other rights issued upon and/or in connection therewith; (iii) any and all substitutions, renewals, improvements and replacements of the Pledged Interests and additions thereto; and (iv) all proceeds arising from any of the foregoing.  All of the foregoing items are referred to herein individually and/or collectively as the "Collateral." Capitalized terms not otherwise defined herein or in the Notes shall have the meaning given them in the UCC. For purposes of this Agreement, "UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Delaware; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of Pledgees' security interest in the Pledged Interests is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

2. VOTING AND TRADING RIGHTS. If no Event of Default has occurred and is continuing, the Pledgor may exercise any voting rights that the Pledgor may have as to the Pledged Interests. If an Event of Default has occurred and is continuing, Pledgor shall deliver the Pledged Interests to such party as directed by a Majority-in-Interest of the Noteholders (the "Designated Party"), and thereafter Pledgees may exercise all voting rights as to any of the Pledged Interests and the Pledgor shall deliver to the Designated Party all notices, proxies and other information relating to the exercise of such rights received by the Pledgor promptly upon receipt and, at the request of Designated Party, shall execute and deliver to the Designated Party any proxies or other instruments which are, in the judgment of the Designated Party, necessary for Pledgees to exercise such voting rights.

3. DUTY OF PLEDGEE.  Pledgees shall have no liability or duty, either before or after the occurrence of an Event of Default to collect or enforce any of its rights against, the Pledged Interests.  If Pledgees actually receive any notices requiring action with respect to Pledged Interests in Pledgees' possession, Pledgees shall

take reasonable steps to forward such notices to the Pledgor. Except as provided in Section 2, the Pledgor is responsible for responding to notices concerning the Pledged Interests, voting the Pledged Interests, and exercising any rights and options, calls or conversions in respect of the Pledged Interests.

4.  REPRESENTATIONS AND WARRANTIES. The Pledgor represents and warrants to Pledgees that:

   **(a)** The Interests do, or shall, constitute all of Pledgor's ownership interest in the Company.

   **(b)** The Pledgor is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Washington and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the Pledgor's organizational documents. The Pledgor has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Agreement.

   **(c)** The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Pledgor is a party or to which any of its assets, properties or operations are subject.

   **(d)** This Agreement and all agreements and other documents executed by the Pledgor in connection herewith constitute the valid and binding obligation of the Pledgor, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

   **(e)** No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Agreement, the pledge of a security interest in the Pledged Interests in favor of Pledgees or the valid and lawful exercise by Pledgees of remedies available to them under this Agreement or applicable law or of the voting and other rights granted to it in this Agreement, except as may be required for the offer or sale of securities under applicable securities laws.

   **(f)** The Pledgor is the sole owner of the Pledged Interests, has the right to grant the security interest provided for herein to Pledgees and, to the knowledge of the Pledgor, has granted to Pledgees a valid and perfected first priority security interest in the Pledged Interests, free of all liens, encumbrances, transfer restrictions and adverse claims.

5.  COVENANTS. The Pledgor covenants and agrees that so long as this Agreement shall be in effect:

   **(a)** Provided that an Event of Default does not exist and is continuing, then the Pledgor and the Company may make distributions to their respective members as they determine. At any time that an Event of Default exists and is continuing, none of Pledgor or the Company shall make any distributions to their members, other than tax distributions (i.e., distributions in the amount of taxes payable by such members on the apportioned income of the entities) or as otherwise required by law. Distributions as referenced herein does not include Management Fees, origination fees, or other fees owed to Affiliates of Pledgor. Pledgor may cause the real estate owned by the Company to be sold, encumbered, transferred, pledged, liened, or otherwise disposed of as it sees fit.

**(b)** The Pledgor shall defend the Pledgor's title to the Pledged Interests and the security interest of Pledgees against the claims of any person claiming rights in the Pledged Interests.

**(c)** Without the prior written consent of a Majority-in-Interest of the Noteholders, (i) the Pledgor shall not sell, gift, pledge, exchange or otherwise transfer the Pledged Interests. In the event of any such sale, exchange or transfer consented to by Pledgees, the Pledgor shall upon receipt the proceeds of such sale, exchange or transfer to pay any such distribution with respect to the Pledged Interests to the Pledgees for application to the Indebtedness.

**(d)** The Pledgor will pay and discharge when due all of its material obligations and liabilities (including, without limitation, tax liabilities) which if unpaid when due might by law give rise to a lien on the Pledged Interests, except where the same may be contested in good faith by appropriate proceedings.

**(e)** At the Pledgor's expense, it will do such further facts and execute and deliver such additional conveyances, certificates, instruments, legal opinions and other assurances as a Majority-in-Interest of the Noteholders may reasonably request to protect, assure or enforce their interests, rights and remedies under this Agreement.

6. INDEMNIFICATION. Each Party shall jointly and severally indemnify and hold harmless the other Parties and such other Parties' agents, beneficiaries, affiliates, representatives and their respective successors and assigns (collectively, the "Indemnified Persons") from and against any and all damages, losses, liabilities, taxes and costs and expenses (including, without limitation, attorneys' fees and costs) resulting directly or indirectly from (a) any inaccuracy, misrepresentation, breach of warranty or nonfulfillment of any of the representations and warranties of such Party in this Agreement, or any actions, omissions or statements of fact inconsistent with in any material respect any such representation or warranty, (b) any failure by such Party to perform or comply with any agreement, covenant or obligation in this Agreement.

7. TERMINATION. This Agreement shall automatically terminate and be of no further force or effect, and any security interest in the Pledged Interests shall automatically terminate and be released, on the earlier to occur of the date on which the Notes are repaid in full.

8. EXPENSES. The Pledgor agrees that, following an Event of Default, the Pledgor will pay to the Pledgees upon demand the amount of any out-of-pocket expenses, including the fees and disbursements of counsel, that Pledgees incurs in connection with the enforcement of this Agreement, including expenses incurred to preserve the value of the Pledged Interests, the sale or other disposition of any of the Pledged Interests, the exercise by Pledgees of any of its rights, or any action to enforce its rights under this Agreement.

9. NOTICES. Any notices, communications and waivers under this Agreement shall be in writing and sent in accordance with the provisions for notices as set forth in the Notes.

10. INCORPORATION. Section 10, Section 12, Section 13 and Section 15 of the Notes are incorporated herein by reference and shall apply to this Agreement as though fully set forth herein, provided that any reference therein to the "Note" shall be deemed a reference to this Agreement.

11. INTERPRETATION. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore shall not be construed against a Party or Parties on the ground that such Party or Parties drafted or was more responsible for the drafting of any such provision(s). The Parties further agree that they have each carefully read the terms and conditions of this Agreement, that they know and understand the contents and effect of this Agreement and that the legal effect of this Agreement has been fully explained to its satisfaction by counsel of its own choosing.

12. AMENDMENT AND SUBORDINATION. This Agreement may be amended by the Pledgor at any time, without any approval of the Pledgees being required, if requested to do so by a lender for the purpose of providing financing to any of the properties owned by the Company or any subsidiary entity of the Company. Additionally, all rights of Pledgees under this Agreement are and shall be subordinated to those of any such

lender, and Pledgor shall have the unconditional right to execute any agreement required by a lender to provide additional assurances, subordination, and agreements needed to obtain financing from such lender.

13. COUNTERPARTS. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which taken together shall be but a single instrument. The Pledgees may join this Agreement at or following the Effective Date by the execution of a Counterpart Signature Page as set forth herein, provided, however, that such Counterpart Signature Page shall not be effective unless and until the Company accepts the applicable proposed Pledgee's subscription for a Note pursuant to the Subscription Agreement. The execution and delivery of a facsimile or other electronic transmission of a signature to this Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

*[Signatures appear on following pages]*

DocuSign Envelope ID: 099E59A3-36C8-46CF-A687-BE82D681FA13

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date or as of the date of their joinder hereto.

**Pledgor**:

By: _Chris Christensen_
739DA74937B447C...

Name:   Chris Christensen

**Counterpart Signature Page**

The undersigned hereby accepts, and becomes a party to, the Pledge and Security Agreement (the "Agreement"), dated as of May 1, 2020, in connection with the acquisition of a Note (as defined in the Agreement), and by its signature below signifies its agreement to be bound by the terms and conditions of the Agreement.

**INDIVIDUAL**

Name:               _____

Signature:          _____

Date:               _____

---

**ENTITY**

Entity Name:        _____

Signature:          _____

Name:               _____

Title:              _____

Date:               _____

# EXHIBIT 9

**THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM CONTAINS MATERIAL NON-PUBLIC INFORMATION REGARDING ICAP VAULT 1, LLC (THE "COMPANY"). BY ACCEPTING THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS HERETO (COLLECTIVELY THIS "MEMORANDUM"), THE RECIPIENT AGREES WITH THE COMPANY TO MAINTAIN IN STRICT CONFIDENCE ALL NON-PUBLIC INFORMATION, INCLUDING, BUT NOT LIMITED TO, THE EXISTENCE OF THE PROPOSED FINANCING AND ANY OTHER NON-PUBLIC INFORMATION REGARDING THE COMPANY OBTAINED FROM THIS MEMORANDUM, ANY OTHER TRANSACTION DOCUMENT OR THE COMPANY.**

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# FOR ACCREDITED INVESTORS AND NON-U.S. PERSONS



## iCap Vault 1, LLC

## $500,000,000 of

## Secured Promissory Notes

## October 1, 2018

**AN INVESTMENT IN OUR SECURITIES INVOLVES A HIGH DEGREE OF RISK. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF US AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD ONLY INVEST IN OUR SECURITIES IF YOU CAN AFFORD A COMPLETE LOSS OF YOUR INVESTMENT. YOU SHOULD READ THE COMPLETE DISCUSSION OF THE RISK FACTORS SET FORTH IN THIS MEMORANDUM.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. SEE "CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS."**

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
## FOR
## ACCREDITED INVESTORS AND NON-U.S. PERSONS

## iCap Vault 1, LLC
## $500,000,000 OF AGGREGATE PRINCIPAL AMOUNT
## OF
## SECURED PROMISSORY NOTES

**Minimum subscription per investor of $1,000 of principal amount, although iCap Vault 1, LLC reserves the right to accept subscriptions for a lower principal amount.**

This Confidential Offering Memorandum (this "Memorandum") is being furnished in connection with the offer and sale (the "Offering") of up to $500,000,000 of secured promissory notes (the "Notes") by iCap Vault 1, LLC, a Delaware limited liability company (the "Company"). Notes will be issued in initial denominations of at least $1,000 (and any amounts in excess of $1,000). The Company may accept subscriptions in lesser amounts in its sole discretion.

The Company is a private investment vehicle that seeks to hold real estate investments as described herein. This Memorandum contains certain information that prospective investors should know about the Offering. The manager of the Company is iCap Vault Management, LLC, a Delaware limited liability company (the "Manager"). The Company's address is iCap Vault 1, LLC, PO Box 53232, Bellevue, Washington 98015.

The Offering is being made by the Company through its directors and officers only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act") and to non-U.S. Persons in an "offshore transaction," as defined in Rule 902 of Regulation S promulgated under the Securities Act. No commissions will be paid on any sales made by the Company's officers and directors. The Company may elect to engage one or more FINRA member firms (the "Placement Agents"), as placement agents for this Offering, in which event the Placement Agents will also conduct the Offering on a "best efforts" basis, and the Company would expect in such case to pay estimated total commissions of no more than 1% per year of the aggregate principal amount of the Notes sold to investors. Investors who purchase Notes are referred to herein as the "Noteholders." The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on August 31, 2020, unless extended by us for up to 2-years, subject to earlier termination as set forth herein.

**THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. NO INVESTMENT IN THE NOTES SHOULD BE MADE BY ANY INVESTOR NOT FINANCIALLY ABLE TO LOSE THE ENTIRE AMOUNT OF ITS INVESTMENT.**

---

## RISK DISCLOSURE STATEMENT

---

**THE ATTORNEYS THAT PREPARED THIS MEMORANDUM ("ATTORNEYS") HEREBY DISCLAIM ANY OPINION OR ASSURANCE OF ANY NATURE WHATSOEVER**

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 97 Page 874
1366

REGARDING THE ACCURACY, COMPLETENESS, REASONABLENESS, TIMELINESS OR VERACITY OF ANY OF THE ASSERTIONS, REPRESENTATIONS OR OTHER INFORMATION CONTAINED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, OR REGARDING THE INVESTMENT-WORTHINESS OF THE SECURITIES DISCUSSED HEREIN ("SECURITIES"). ANY ASSERTION OR REPRESENTATION MADE HEREIN, AND ALL OTHER INFORMATION DISCLOSED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, HAS BEEN MADE OR PROVIDED BY THE PROMOTER. IN CONNECTION WITH THE PREPARATION OF THESE CONFIDENTIAL OFFERING DOCUMENT, THE ATTORNEYS HAVE NOT BEEN ENGAGED TO ATTEST HERETO, OR TO OPINE IN RESPECT HEREOF. ACCORDINGLY, THE ATTORNEYS HAVE NOT PERFORMED ANY ANALYTICAL, CONFIRMATION, VALIDATION, VERIFICATION OR OTHER PROCEDURES IN RESPECT OF THE ASSERTIONS AND REPRESENTATIONS CONTAINED HEREIN, NOR IN RESPECT OF ANY OF THE OTHER INFORMATION DISCLOSED HEREIN, INCLUDING ANY SIMILAR TO THOSE PROCEDURES UNDERTAKEN BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT IN CONNECTION WITH AN AUDIT OF THE FINANCIAL STATEMENTS OF AN ISSUER OF SECURITIES FOR PURPOSES OF RENDERING AN OPINION THEREON. CONSEQUENTLY, POTENTIAL INVESTORS, IN DECIDING WHETHER OR NOT TO INVEST IN THE SECURITIES, ARE CAUTIONED NOT TO ASCRIBE ANY SPECIAL RELIANCE WHATSOEVER ON THIS MEMORANDUM BY REASON THAT ATTORNEYS HAVE PREPARED THIS MEMORANDUM

THIS BRIEF STATEMENT CANNOT DISCLOSE ALL THE RISKS AND OTHER FACTORS NECESSARY TO EVALUATE YOUR PARTICIPATION IN THIS COMPANY. THEREFORE, BEFORE YOU DECIDE TO PARTICIPATE IN AN EQUITY INVESTMENT IN THIS COMPANY, YOU SHOULD CAREFULLY STUDY THIS MEMORANDUM, INCLUDING A DISCUSSION OF THE CERTAIN RISK FACTORS OF THIS INVESTMENT.

---

## CERTAIN NOTICES REGARDING THIS MEMORANDUM AND

---

## UNDER STATE SECURITIES LAWS

---

**FOR ALL PROSPECTIVE INVESTORS:** THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT SET FORTH IN (I) SECTION 4(A)(2) THEREOF AND RULE 506(C) OF REGULATION D PROMULGATED THEREUNDER TO ACCREDITED INVESTORS AND (II) REGULATION S PROMULGATED THEREUNDER TO NON-US PERSONS. RULE 506 OF REGULATION D SETS FORTH CERTAIN RESTRICTIONS AS TO THE NUMBER AND NATURE OF PURCHASERS OF SECURITIES OFFERED PURSUANT THERETO. WE HAVE ELECTED TO SELL SECURITIES ONLY TO ACCREDITED INVESTORS AS SUCH TERM IS DEFINED IN RULE 501(A) OF REGULATION D AND TO NON-US PERSONS AS DEFINED IN REGULATION S. EACH PROSPECTIVE INVESTOR WILL BE REQUIRED TO MAKE REPRESENTATIONS AS TO THE BASIS UPON WHICH IT QUALIFIES AS AN ACCREDITED INVESTOR OR NON-U.S. PERSON. PURSUANT TO RULE 506(C) INDEPENDENT VERIFICATION OF ACCREDITED INVESTOR STATUS FOR INVESTORS INVESTING PURSUANT TO RULE 506(C) WILL BE REQUIRED.

THE SECURITIES OFFERED HEREBY WILL BE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES

LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. ONLY PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT IN THE NOTES SHOULD PURCHASE THE NOTES.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION ("SEC"), NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE INFORMATION PRESENTED HEREIN WAS PRESENTED AND SUPPLIED SOLELY BY THE COMPANY AND IS BEING FURNISHED SOLELY FOR USE BY PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING. THE COMPANY MAKES NO REPRESENTATIONS AS TO THE FUTURE PERFORMANCE OF THE COMPANY. THIS MEMORANDUM WERE PREPARED BY THE COMPANY.

THIS OFFERING IS SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION BY THE COMPANY AT ANY TIME AND WITHOUT NOTICE. WE RESERVE THE RIGHT IN OUR SOLE DISCRETION TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART NOTWITHSTANDING TENDER OF PAYMENT OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AGGREGATE PRINCIPAL AMOUNT OF NOTES SUBSCRIBED FOR BY SUCH INVESTOR.

THIS MEMORANDUM DO NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY ANY SECURITY OTHER THAN THE SECURITIES OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY SUCH SECURITIES BY ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN OUR AFFAIRS SINCE THE DATE HEREOF. THIS MEMORANDUM CONTAIN SUMMARIES OF CERTAIN PERTINENT DOCUMENTS, APPLICABLE LAWS AND REGULATIONS. SUCH SUMMARIES ARE NOT COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE COMPLETE TEXTS THEREOF.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES.

THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM OR IN ANY ADDITIONAL EVALUATION MATERIAL, WHETHER WRITTEN OR ORAL, MADE AVAILABLE IN CONNECTION WITH ANY FURTHER INVESTIGATION OF THE COMPANY. THE COMPANY EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY THAT MAY BE BASED UPON SUCH INFORMATION, ERRORS THEREIN OR OMISSIONS THEREFROM. ONLY THOSE PARTICULAR REPRESENTATIONS AND WARRANTIES, IF ANY, WHICH MAY BE MADE TO A PARTY IN A DEFINITIVE WRITTEN AGREEMENT REGARDING A TRANSACTION INVOLVING THE COMPANY, WHEN, AS AND IF

EXECUTED, AND SUBJECT TO SUCH LIMITATIONS AND RESTRICTIONS AS MAY BE SPECIFIED THEREIN, WILL HAVE ANY LEGAL EFFECT. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED TO THE CONTRARY IN WRITING, THIS MEMORANDUM SPEAK AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE OF NOTES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY AFTER THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE OFFERING OF NOTES BEING MADE PURSUANT HERETO, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

THERE IS NO MARKET FOR THE NOTES AND THERE IS NO ASSURANCES A PUBLIC MARKET WILL EVER BE ESTABLISHED. PURCHASERS OF THE NOTES ARE NOT BEING GRANTED ANY REGISTRATION RIGHTS. A PURCHASE OF THE NOTES SHOULD BE CONSIDERED AN ILLIQUID INVESTMENT.

BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR HEREBY EXPRESSLY AGREES WITH THE COMPANY TO KEEP CONFIDENTIAL ALL OF THE CONTENTS HEREOF, INCLUDING, BUT NOT LIMITED TO, THE OFFERING AND ALL INFORMATION RELATED TO THE COMPANY, AND NOT TO DISCLOSE THE SAME TO ANY THIRD PARTY AND/OR OTHERWISE USE THE SAME FOR ANY PURPOSE OTHER THAN AN EVALUATION BY SUCH OFFEREE OF A POTENTIAL INVESTMENT IN THE COMPANY OF THE NOTES OFFERED PURSUANT HERETO. WE HAVE CAUSED THIS MEMORANDUM TO BE DELIVERED TO YOU IN RELIANCE UPON SUCH AGREEMENT BY YOU.

EACH PROSPECTIVE SUBSCRIBER BY RECEIVING THIS MEMORANDUM AGREES TO RETURN THE SAME TO US IF (A) THE OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY SECURITIES OFFERED HEREBY; (B) THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, AND/OR (C) THE OFFERING IS TERMINATED OR WITHDRAWN.

THIS MEMORANDUM IS SUBJECT TO AMENDMENT AND SUPPLEMENTATION AS APPROPRIATE. WE DO NOT INTEND TO UPDATE THE INFORMATION CONTAINED IN THE OFFERING DOCUMENTS FOR ANY INVESTOR WHO HAS ALREADY MADE AN INVESTMENT. WE MAY UPDATE THE INFORMATION CONTAINED HEREIN FROM TIME TO TIME AND PROVIDE SUCH UPDATED DOCUMENT TO POTENTIAL INVESTORS BUT UNDERTAKES NO OBLIGATION TO PROVIDE SUCH UPDATED DOCUMENTS TO AN INVESTOR WHO HAS ALREADY MADE HIS INVESTMENT.

## JURISDICTIONAL NOTICES

**FOR RESIDENTS OF ALL STATES:**

**THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN A PARTICULAR STATE. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE HEREBY ADVISED TO CONTACT THE COMPANY. THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS (COMMONLY CALLED "BLUE SKY" LAWS). THESE SECURITIES MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THE STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OF SALE MAY BE MADE IN ANY PARTICULAR STATE.**

**IN MAKING ANY INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. NO FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS RECOMMENDED THESE SECURITIES. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

1. **NOTICE TO ALABAMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

2. **NOTICE TO ALASKA RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE NOT BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISIONS OF 3 AAC 08.500 - 3 AAC 08.504. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS MEMORANDUM SINCE THE OFFERING DOCUMENTS ARE NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED, OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF 45.55.170. THE INVESTOR

MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

3. **NOTICE TO ARIZONA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ARIZONA SECURITIES ACT IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PURSUANT TO A.R.S. SECTION 44-1844 (1) AND THEREFORE CANNOT BE RESOLD UNLESS THEY ARE ALSO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

4. **NOTICE TO ARKANSAS RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN RELIANCE UPON CLAIMS OF EXEMPTION UNDER THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING OR PASSED UPON THE ADEQUACY OR ACCURACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

5. **NOTICE TO CALIFORNIA RESIDENTS:** THESE SECURITIES HAVE NOT BEEN QUALIFIED OR OTHERWISE APPROVED OR DISAPPROVED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS UNDER THE CALIFORNIA CORPORATIONS CODE. THESE SECURITIES ARE OFFERED IN CALIFORNIA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PROVIDED BY SECTIONS 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. ACCORDINGLY, DISTRIBUTION OF THIS MEMORANDUM AND OFFERS AND SALES OF THE SECURITIES REFERRED TO HEREIN ARE STRICTLY LIMITED TO PERSONS WHO THE COMPANY DETERMINES TO HAVE MET CERTAIN FINANCIAL AND OTHER REQUIREMENTS. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY WITH RESPECT TO ANY OTHER PERSON. IN ORDER TO RELY ON THE FOREGOING EXEMPTIONS, THE COMPANY WILL RELY IN TURN ON CERTAIN REPRESENTATIONS AND WARRANTIES MADE TO THE COMPANY BY THE INVESTORS IN THIS OFFERING. THOSE REPRESENTATIONS AND WARRANTIES ARE CONTAINED IN THE SUBSCRIPTION AGREEMENT, ATTACHED HERETO AS EXHIBIT A.

6. **FOR COLORADO RESIDENTS ONLY:** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS OFFERING HAS NOT BEEN QUALIFIED WITH COMMISSIONER OF CORPORATIONS OF THE STATE OF COLORADO AND THE ISSUANCE OF SUCH SECURITIES OR PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATIONS IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPTED FROM QUALIFICATION BY SECTION 25100, 25102, OR 25104 OF THE COLORADO CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS OFFERING ARE EXPRESSLY CONDITION UPON SUCH QUALIFICATIONS BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933,

AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991, IF SUCH REGISTRATION IS REQUIRED.

7. **NOTICE TO CONNECTICUT RESIDENTS ONLY:** SECURITIES ACQUIRED BY CONNECTICUT RESIDENTS ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 36B-31-21B-9B OF THE CONNECTICUT, UNIFORM SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF CONNECTICUT. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

8. **NOTICE TO DELAWARE RESIDENTS ONLY:** IF YOU ARE A DELAWARE RESIDENT, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE DELAWARE SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

9. **NOTICE TO DISTRICT OF COLUMBIA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES BUREAU OF THE DISTRICT OF COLUMBIA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

10. **NOTICE TO FLORIDA RESIDENTS ONLY:** THE SECURITIES DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES AND INVESTOR PROTECTION UNDER THE FLORIDA SECURITIES ACT. THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF SAID ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, ALL OFFEREES WHO ARE FLORIDA RESIDENTS SHOULD BE AWARE THAT SECTION 517.061(11)(A)(5) OF THE ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "WHEN SALES ARE MADE TO FIVE OR MORE PERSONS IN [FLORIDA], ANY SALE IN [FLORIDA] MADE PURSUANT TO [THIS SECTION] IS VOIDABLE BY THE PURCHASER IN SUCH SALE EITHER WITHIN 3 DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR AN ESCROW AGENT OR WITHIN 3 DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER." THE AVAILABILITY OF THE PRIVILEGE TO VOID SALES PURSUANT TO SECTION 517.061(11) IS HEREBY COMMUNICATED TO EACH FLORIDA OFFEREE. EACH PERSON ENTITLED TO EXERCISE THE PRIVILEGE TO AVOID SALES GRANTED BY SECTION 517.061 (11) (A)(5) AND WHO WISHES TO EXERCISE SUCH RIGHT, MUST, WITHIN 3 DAYS AFTER THE TENDER OF ANY AMOUNT TO THE COMPANY OR TO ANY AGENT OF THE COMPANY (INCLUDING THE SELLING AGENT OR ANY OTHER DEALER ACTING ON BEHALF OF THE PARTNERSHIP OR ANY SALESMAN OF SUCH DEALER) OR AN ESCROW AGENT CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE COMPANY AT THE ADDRESS PROVIDED IN THIS CONFIDENTIAL EXECUTIVE SUMMARY. SUCH LETTER OR TELEGRAM MUST BE SENT AND, IF POSTMARKED, POSTMARKED ON OR PRIOR TO THE END OF THE AFOREMENTIONED THIRD DAY. IF A PERSON IS SENDING A LETTER, IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ASSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME IT WAS MAILED. SHOULD A PERSON MAKE THIS REQUEST ORALLY, HE MUST ASK FOR WRITTEN CONFIRMATION

THAT HIS REQUEST HAS BEEN RECEIVED.

11. **NOTICE TO GEORGIA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE GEORGIA SECURITIES ACT PURSUANT TO REGULATION 590-4-5-04 AND -01. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

12. **NOTICE TO HAWAII RESIDENTS ONLY:** NEITHER THESE CONFIDENTIAL OFFERING DOCUMENTS NOR THE SECURITIES DESCRIBED HEREIN BEEN APPROVED OR DISAPPROVED BY THE COMMISSIONER OF SECURITIES OF THE STATE OF HAWAII NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS.

13. **NOTICE TO IDAHO RESIDENTS ONLY:** THESE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT IN RELIANCE UPON EXEMPTION FROM REGISTRATION PURSUANT TO SECTION 30-14-203 OR 302(C) THEREOF AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SAID ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SAID ACT.

14. **NOTICE TO ILLINOIS RESIDENTS:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF THE STATE OF ILLINOIS NOR HAS THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

15. **NOTICE TO INDIANA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-2-1-2 OF THE INDIANA SECURITIES LAW AND HAVE NOT BEEN REGISTERED UNDER SECTION 23-2-1-3. THEY CANNOT THEREFORE BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID LAW OR UNLESS AN EXEMPTION FORM REGISTRATION IS AVAILABLE. A CLAIM OF EXEMPTION UNDER SAID LAW HAS BEEN FILED, AND IF SUCH EXEMPTION IS NOT DISALLOWED SALES OF THESE SECURITIES MAY BE MADE. HOWEVER, UNTIL SUCH EXEMPTION IS GRANTED, ANY OFFER MADE PURSUANT HERETO IS PRELIMINARY AND SUBJECT TO MATERIAL CHANGE.

16. **NOTICE TO IOWA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED; THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

17. **NOTICE TO KANSAS RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 81-5-15 OF THE KANSAS SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

18. **NOTICE TO KENTUCKY RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER TITLE 808 KAR 10:210 OF THE KENTUCKY SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

19. **NOTICE TO LOUISIANA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER RULE 1 OF THE LOUISIANA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

20. **NOTICE TO MAINE RESIDENTS ONLY:** THE ISSUER IS REQUIRED TO MAKE A REASONABLE FINDING THAT THE SECURITIES OFFERED ARE A SUITABLE INVESTMENT FOR THE PURCHASER AND THAT THE PURCHASER IS FINANCIALLY ABLE TO BEAR THE RISK OF LOSING THE ENTIRE AMOUNT INVESTED. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION UNDER §16202(15) OF THE MAINE UNIFORM SECURITIES ACT AND ARE NOT REGISTERED WITH THE SECURITIES ADMINISTRATOR OF THE STATE OF MAINE. THE SECURITIES OFFERED FOR SALE MAY BE RESTRICTED SECURITIES AND THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS: (1) THE SECURITIES ARE REGISTERED UNDER STATE AND FEDERAL SECURITIES LAWS, OR (2) AN EXEMPTION IS AVAILABLE UNDER THOSE LAWS.

21. **NOTICE TO MARYLAND RESIDENTS ONLY:** IF YOU ARE A MARYLAND RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 11-602(9) OF THE MARYLAND SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MARYLAND. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

22. **NOTICE TO MASSACHUSETTS RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MASSACHUSETTS UNIFORM SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THIS OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

23. **NOTICE TO MICHIGAN RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE MICHIGAN SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

24. **NOTICE TO MINNESOTA RESIDENTS ONLY:** THESE SECURITIES BEING OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

25. **NOTICE TO MISSISSIPPI RESIDENTS ONLY:** THE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE MISSISSIPPI SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE MISSISSIPPI SECRETARY OF STATE OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE SECRETARY OF STATE NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, OR APPROVED OR DISAPPROVED THIS OFFERING. THE SECRETARY OF STATE DOES NOT RECOMMEND THE PURCHASE OF THESE OR ANY OTHER SECURITIES. EACH PURCHASER OF THE SECURITIES MUST MEET CERTAIN SUITABILITY STANDARDS AND MUST BE ABLE TO BEAR AN ENTIRE LOSS OF THIS INVESTMENT. THE SECURITIES MAY NOT BE TRANSFERRED FOR A PERIOD OF ONE (1) YEAR EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE MISSISSIPPI SECURITIES ACT OR IN A TRANSACTION IN COMPLIANCE WITH THE MISSISSIPPI SECURITIES ACT.

26. **FOR MISSOURI RESIDENTS ONLY:** THE SECURITIES OFFERED HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE PURCHASER IN A TRANSACTION EXEMPT UNDER SECTION 4.G OF THE MISSOURI SECURITIES LAW OF 1953, AS AMENDED. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MISSOURI. UNLESS THE SECURITIES ARE SO REGISTERED, THEY MAY NOT BE OFFERED FOR SALE OR RESOLD IN THE STATE OF MISSOURI, EXCEPT AS A SECURITY, OR IN A TRANSACTION EXEMPT UNDER SAID ACT.

27. **NOTICE TO MONTANA RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A MONTANA RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF FIVE (5) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES.

28. **NOTICE TO NEBRASKA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER CHAPTER 15 OF THE NEBRASKA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

29. **NOTICE TO NEVADA RESIDENTS ONLY:** IF ANY INVESTOR ACCEPTS ANY OFFER TO PURCHASE THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION NRS 90.530 OF THE NEVADA SECURITIES LAW. THE

INVESTOR IS HEREBY ADVISED THAT THE ATTORNEY GENERAL OF THE STATE OF NEVADA HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING AND THE FILING OF THE OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE, OR SALE THEREOF, BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEVADA. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. NEVADA ALLOWS THE SALE OF SECURITIES TO 25 OR FEWER PURCHASERS IN THE STATE WITHOUT REGISTRATION. HOWEVER, CERTAIN CONDITIONS APPLY, I.E., THERE CAN BE NO GENERAL ADVERTISING OR SOLICITATION AND COMMISSIONS ARE LIMITED TO LICENSED BROKER-DEALERS. THIS EXEMPTION IS GENERALLY USED WHERE THE PROSPECTIVE INVESTOR IS ALREADY KNOWN AND HAS A PRE-EXISTING RELATIONSHIP WITH THE COMPANY. (SEE NRS 90.530.11.)

30. **NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY:** NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE UNDER THIS CHAPTER HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

31. **NOTICE TO NEW JERSEY RESIDENTS ONLY:** IF YOU ARE A NEW JERSEY RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE CONFIDENTIAL OFFERING DOCUMENTS HAVE NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

32. **NOTICE TO NEW MEXICO RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE NEW MEXICO DEPARTMENT OF BANKING NOR HAS THE SECURITIES DIVISION PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

33. **NOTICE TO NEW YORK RESIDENTS ONLY:** THIS MEMORANDUM HAVE NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE COMPANY HAS TAKEN NO STEPS TO CREATE AN AFTER MARKET FOR THE SECURITIES OFFERED HEREIN AND HAS MADE NO ARRANGEMENTS WITH BROKERS OF OTHERS TO TRADE OR MAKE A MARKET IN THE SECURITIES. AT SOME TIME IN THE FUTURE, THE COMPANY MAY ATTEMPT TO ARRANGE FOR INTERESTED BROKERS TO TRADE OR MAKE A MARKET IN THE SECURITIES AND TO QUOTE THE SAME IN A PUBLISHED QUOTATION MEDIUM,

HOWEVER, NO SUCH ARRANGEMENTS HAVE BEEN MADE AND THERE IS NO ASSURANCE THAT ANY BROKERS WILL EVER HAVE SUCH AN INTEREST IN THE SECURITIES OF THE COMPANY OR THAT THERE WILL EVER BE A MARKET THEREFORE.

34. **NOTICE TO NORTH CAROLINA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FORGOING AUTHORITIES HAVE NOT CONFIRMED ACCURACY OR DETERMINED ADEQUACY OF THIS MEMORANDUM. REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

35. **NOTICE TO NORTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES COMMISSIONER OF THE STATE OF NORTH DAKOTA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

36. **NOTICE TO OHIO RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 1707.03(X) OF THE OHIO SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

37. **NOTICE TO OKLAHOMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF OKLAHOMA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION FOR PRIVATE OFFERINGS. ALTHOUGH A PRIOR FILING OF THESE CONFIDENTIAL OFFERING DOCUMENTS AND THE INFORMATION HAS BEEN MADE WITH THE OKLAHOMA SECURITIES COMMISSION, SUCH FILING IS PERMISSIVE ONLY AND DOES NOT CONSTITUTE AN APPROVAL, RECOMMENDATION OR ENDORSEMENT, AND IN NO SENSE IS TO BE REPRESENTED AS AN INDICATION OF THE INVESTMENT MERIT OF SUCH SECURITIES. ANY SUCH REPRESENTATION IS UNLAWFUL.

38. **NOTICE TO OREGON RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE CORPORATION COMMISSION OF THE STATE OF OREGON UNDER PROVISIONS OF ORS 59.049. THE INVESTOR IS ADVISED THAT THE COMMISSIONER HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS MEMORANDUM SINCE THIS MEMORANDUM IS NOT REQUIRED TO BE FILED WITH THE COMMISSIONER. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE COMPANY CREATING THE SECURITIES, AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

39. **NOTICE TO PENNSYLVANIA RESIDENTS ONLY:** EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(D), DIRECTLY FROM THE ISSUER OR AFFILIATE OF THIS ISSUER, SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER HE MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED. IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 (70 PS § 1-207(M), YOU MAY ELECT, WITHIN TWO (2) BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONEYS PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A LETTER OR TELEGRAM TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE CONFIDENTIAL OFFERING DOCUMENTS) INDICATING YOUR INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU SHOULD ASK WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. NO SALE OF THE SECURITIES WILL BE MADE TO RESIDENTS OF THE STATE OF PENNSYLVANIA WHO ARE NON-ACCREDITED INVESTORS. EACH PENNSYLVANIA RESIDENT MUST AGREE NOT TO SELL THESE SECURITIES FOR A PERIOD OF TWELVE (12) MONTHS AFTER THE DATE OF PURCHASE, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION. THE SECURITIES HAVE BEEN ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE PENNSYLVANIA SECURITIES ACT OF 1972. NO SUBSEQUENT RESALE OR OTHER DISPOSITION OF THE SECURITIES MAY BE MADE WITHIN 12 MONTHS FOLLOWING THEIR INITIAL SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION, AND THEREAFTER ONLY PURSUANT TO AN EFFECTIVE REGISTRATION OR EXEMPTION.

40. **NOTICE TO RHODE ISLAND RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE DEPARTMENT OF BUSINESS REGULATION OF THE STATE OF RHODE ISLAND NOR HAS THE DIRECTOR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

41. **NOTICE TO SOUTH CAROLINA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE SOUTH CAROLINA UNIFORM SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE SOUTH CAROLINA SECURITIES COMMISSIONER. THE COMMISSIONER DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY

23-90243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 98 Page 886
1366

REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

42. **NOTICE TO SOUTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THESE CONFIDENTIAL OFFERING DOCUMENTS ARE TRUE, COMPLETE, AND NOT MISLEADING, NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

43. **NOTICE TO TENNESSEE RESIDENT ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD. EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

44. **NOTICE TO TEXAS RESIDENTS ONLY:** THE SECURITIES OFFERED HEREUNDER HAVE NOT BEEN REGISTERED UNDER APPLICABLE TEXAS SECURITIES LAWS AND, THEREFORE, ANY PURCHASER THEREOF MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. FURTHER, PURSUANT TO §109.13 UNDER THE TEXAS SECURITIES ACT, THE COMPANY IS REQUIRED TO APPRISE PROSPECTIVE INVESTORS OF THE FOLLOWING: A LEGEND SHALL BE PLACED, UPON ISSUANCE, ON CERTIFICATES REPRESENTING SECURITIES PURCHASED HEREUNDER, AND ANY PURCHASER HEREUNDER SHALL BE REQUIRED TO SIGN A WRITTEN AGREEMENT THAT HE WILL NOT SELL THE SUBJECT SECURITIES WITHOUT REGISTRATION UNDER APPLICABLE SECURITIES LAWS, OR EXEMPTIONS THEREFROM.

45. **NOTICE TO UTAH RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE UTAH SECURITIES ACT. THE SECURITIES CANNOT BE TRANSFERRED OR SOLD EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

46. **NOTICE TO VERMONT RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE STATE OF VERMONT NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS

UNLAWFUL.

47. **NOTICE TO VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION UNDER SECTION 13.1-514 OF THE VIRGINIA SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

48. **NOTICE TO WASHINGTON RESIDENTS ONLY:** THE ADMINISTRATOR OF SECURITIES HAS NOT REVIEWED THE OFFERING OR CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE SECURITIES HAVE NOT BEEN REGISTERED IN RELIANCE UPON THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, AND THEREFORE, CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, OR UNLESS AN EXEMPTION FROM REGISTRATION IS MADE AVAILABLE.

49. **NOTICE TO WEST VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 15.06(B)(9) OF THE WEST VIRGINIA SECURITIES LAW AND MAY NOT BE REOFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

50. **NOTICE TO WISCONSIN RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A WISCONSIN RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF THREE AND ONE-THIRD (3 1/3) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES OFFERED HEREIN.

51. **FOR WYOMING RESIDENTS ONLY:** ALL WYOMING RESIDENTS WHO SUBSCRIBE TO PURCHASE SECURITIES OFFERED BY THE COMPANY MUST SATISFY THE FOLLOWING MINIMUM FINANCIAL SUITABILITY REQUIREMENTS IN ORDER TO PURCHASE SECURITIES: (1) A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) OF TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000); AND (2) THE PURCHASE PRICE OF SECURITIES SUBSCRIBED FOR MAY NOT EXCEED TWENTY PERCENT (20%) OF THE NET WORTH OF THE SUBSCRIBER; AND (3) "TAXABLE INCOME" AS DEFINED IN SECTION 63 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, DURING THE LAST TAX YEAR AND ESTIMATED "TAXABLE INCOME" DURING THE CURRENT TAX YEAR SUBJECT TO A FEDERAL INCOME TAX RATE OF NOT LESS THAN THIRTY-THREE PERCENT (33%).  IN ORDER TO VERIFY THE FOREGOING, ALL SUBSCRIBERS WHO ARE WYOMING RESIDENTS WILL BE REQUIRED TO REPRESENT IN THE SUBSCRIPTION AGREEMENT THAT THEY MEET THESE WYOMING SPECIAL INVESTOR SUITABILITY REQUIREMENTS.

## BASIS OF PRESENTATION

In this Memorandum, unless the context otherwise requires, we," "us," "our," the "Company" or the "Company," refers collectively to iCap Vault 1, LLC, a Delaware limited liability company, formed on July 30, 2018, the issuer of the Notes in this Offering, and its subsidiaries.

We use a twelve-month fiscal year ending on December 31st of each calendar year. In a twelve-month fiscal year, each quarter includes three-months of operations; the first, second, third and fourth quarters end on March 31, June 30, September 30 and December 31, respectively.

Certain monetary amounts, percentages and other figures included in this Memorandum have been subject to rounding adjustments. Percentage amounts included in this Memorandum have not in all cases been calculated on the basis of such rounded figures but on the basis of such amounts prior to rounding. For this reason, percentage amounts in this Memorandum may vary from those obtained by performing the same calculations using the figures in our consolidated financial statements. Certain other amounts that appear in this Memorandum may not sum due to rounding.

Unless otherwise indicated, all references to "dollars" and "$" in this Memorandum are to, and amounts are presented in, U.S. dollars.

Unless otherwise indicated or the context otherwise requires, financial and operating data in this Memorandum reflect the consolidated business and operations of the Company and its subsidiaries.

## MARKET AND INDUSTRY DATA AND FORECASTS

Certain market and industry data included in this Memorandum is derived from information provided by third-party market research firms, or third-party financial or analytics firms that we believe to be reliable. Market estimates are calculated by using independent industry publications, government publications and third-party forecasts in conjunction with our assumptions about our markets. We have not independently verified such third-party information. The market data used in this Memorandum involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates. While we are not aware of any misstatements regarding any market, industry or similar data presented herein, such data involves risks and uncertainties and are subject to change based on various factors, including those discussed under the headings "Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors" in this Memorandum. These and other factors could cause results to differ materially from those expressed in the estimates made by the independent parties and by us.

Certain data are also based on our good faith estimates, which are derived from management's knowledge of the industry and independent sources. Industry publications, surveys and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but there can be no assurance as to the accuracy or completeness of included information. We have not independently verified any of the data from third-party sources nor have we ascertained the underlying economic assumptions relied upon therein. Statements as to our market position are based on market data currently available to us. While we are not aware of any misstatements regarding the industry data presented herein, our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "Risk Factors" in this Memorandum. Similarly, we believe our internal research is reliable, even though such research has not been verified by any independent sources.

## TRADEMARKS AND COPYRIGHTS

We may own or have rights to trademarks or trade names that we use in connection with the operation of our business, including our corporate names, logos and website names. In addition, we own or

28-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 98 Page 889
1366

have the rights to copyrights, trade secrets and other proprietary rights that protect the content of our products and the formulations for such products. This Memorandum may also contain trademarks, service marks and trade names of other companies, which are the property of their respective owners. Our use or display of third parties' trademarks, service marks, trade names or products in this Memorandum is not intended to, and should not be read to, imply a relationship with or endorsement or sponsorship of us. Solely for convenience, some of the copyrights, trade names and trademarks referred to in this Memorandum are listed without their ©, ® and ™ symbols, but we will assert, to the fullest extent under applicable law, our rights to our copyrights, trade names and trademarks. All other trademarks are the property of their respective owners.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This Memorandum contains certain forward-looking statements that are subject to various risks and uncertainties. Forward-looking statements are generally identifiable by use of forward-looking terminology such as "may," "will," "should," "potential," "intend," "expect," "outlook," "seek," "anticipate," "estimate," "approximately," "believe," "could," "project," "predict," or other similar words or expressions. Forward-looking statements are based on certain assumptions, discuss future expectations, describe future plans and strategies, contain financial and operating projections or state other forward-looking information. Our ability to predict results or the actual effect of future events, actions, plans or strategies is inherently uncertain. Although we believe that the expectations reflected in our forward-looking statements are based on reasonable assumptions, our actual results and performance could differ materially from those set forth or anticipated in our forward-looking statements. Factors that could have a material adverse effect on our forward-looking statements and upon our business, results of operations, financial condition, funds derived from operations, cash available for dividends, cash flows, liquidity and prospects include, but are not limited to, the factors referenced in this Memorandum, including those set forth below.

When considering forward-looking statements, you should keep in mind the risk factors and other cautionary statements in this Memorandum. Readers are cautioned not to place undue reliance on any of these forward-looking statements, which reflect our views as of the date of this Memorandum. The matters summarized below and elsewhere in this Memorandum could cause our actual results and performance to differ materially from those set forth or anticipated in forward-looking statements. Accordingly, we cannot guarantee future results or performance. Furthermore, except as required by law, we are under no duty to, and we do not intend to, update any of our forward-looking statements after the date of this Memorandum, whether as a result of new information, future events or otherwise.

## CONFIDENTIALITY AND RELATED MATTERS

Each recipient hereof agrees by accepting this Memorandum that the information contained herein is of a confidential nature and that such recipient will treat such information in a strictly confidential manner and that such recipient will not, directly or indirectly, disclose or permit its affiliates or representatives to disclose, any information to any other person or entity, or reproduce such information, in whole or in part, without the prior written consent of the Company.

Each recipient of this Memorandum further agrees to use the information solely for the purpose of analyzing the desirability of an investment in the Company to such recipient and for no other purpose whatsoever.

ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM AND EXHIBITS, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED.  NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION NOT CONTAINED IN THIS

MEMORANDUM OR AN AUTHORIZED SUMMARY HEREOF, OR IN ANY AGREEMENT CONTEMPLATED HEREBY, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR IN SUCH AUTHORIZED SUMMARY OR AGREEMENT MUST NOT BE RELIED UPON.

## RESTRICTIONS ON TRANSFERABILITY

SINCE THE SECURITIES OFFERED HEREBY ARE NOT BEING REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES CANNOT BE SOLD BY AN INVESTOR UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH ACT, OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE AT THE TIME OF DESIRED SALE.  THEREFORE, A PURCHASER MUST BE ABLE TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## TAXES

EXCEPT AS SPECIFICALLY SET FORTH HEREIN PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. THE TAX ASPECTS OF AN INVESTMENT IN THE NOTES REQUIRE CAREFUL AND INFORMED STUDY WITH RESPECT TO AN INVESTOR'S PERSONAL TAX AND FINANCIAL POSITION. ACCORDINGLY, NO PERSON SHOULD INVEST IN THE NOTES WITHOUT PRIOR INDEPENDENT EXPERT ADVICE AS TO THE TAX IMPACT OF AN INVESTMENT IN THE SECURITIES.  EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES. NOTHING IN THIS MEMORANDUM SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO POTENTIAL INVESTORS.

A COPY OF THIS MEMORANDUM AND THE SUBSCRIPTION AGREEMENTS SHALL BE DELIVERED TO EVERY PERSON SOLICITED TO BUY ANY OF THE SECURITIES HEREBY OFFERED, AT THE TIME OF THE INITIAL OFFER TO SELL.

## WHERE YOU CAN OBTAIN MORE INFORMATION

This Memorandum contains limited information on the Company. While we believe the information contained in this Memorandum is accurate, this Memorandum is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective investor that the abbreviated nature of this Memorandum will not omit to state a material fact, which a prospective investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such investor. As a result, prospective investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **An investment in the Notes is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

Prospective investors may make an independent examination of our books, records and other documents to the extent an investor deems it necessary, and should not rely on us or any of our employees or agents with respect to judgments relating to an investment in the Company.

Each offeree may, if he, she or it so desires, make inquiries of appropriate members of our management with respect to our business or any other matters set forth herein, and may obtain any additional information which such person deems to be necessary in order to verify the accuracy of the information contained in this Memorandum (to the extent that we possess such information or can acquire

it without unreasonable effort or expense) upon the execution and delivery of an agreement to maintain the confidentiality of such information for the benefit of the Company.

Any such inquiries or requests for additional information or documents should be made in writing to us, addressed as follows:

iCap Vault 1, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006
ATTN: Investor Relations
OFC: (425) 278-9030; FAX: (425) 278-9025
EMAIL: inquiry@icapvault.com

**Table of Contents**

SUMMARY ..................................................................................................................................... 1

THE OFFERING ............................................................................................................................. 4

THE NOTES .................................................................................................................................... 4

SECURITY AND GUARANTY; REGISTERED OFFERING ...................................................... 5

THE COMPANY ............................................................................................................................. 7

    The Company and its Operations .............................................................................................. 7
    Investment Strategy ................................................................................................................... 8
    Meeting Demand Payment Obligations .................................................................................... 9
    Members and Management ........................................................................................................ 9
    Biographies of Management Personnel .................................................................................... 10
    Organizational Strength and Experience .................................................................................. 11
    Investment Experience ............................................................................................................. 11
    Management Fees; Transactions with Related Parties .............................................................. 11

USE OF PROCEEDS ...................................................................................................................... 13

INVESTOR SUITABILITY STANDARDS ................................................................................... 13

SUBSCRIPTION PROCEDURES .................................................................................................. 16

RESTRICTIONS ON TRANSFERABILITY ................................................................................. 17

STATEMENT AS TO INDEMNIFICATION ................................................................................ 18

RISK FACTORS ............................................................................................................................. 18

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ................................................ 30

**Exhibits**

Exhibit A-1     Subscription Agreement for Accredited Investors
Exhibit A-2     Subscription Agreement for non-U.S. Persons
Exhibit B        Form of Promissory Note
Exhibit C        Pledge and Security Agreement
Exhibit D        Guaranty Agreement

# SUMMARY

*This summary of this Memorandum highlights material information concerning our business and this Offering. This summary does not contain all of the information that you should consider before making your investment decision. You should carefully read this entire Memorandum, including the information presented under the section entitled "Risk Factors" and the financial data and related notes, before making an investment decision. This summary contains forward-looking statements that involve risks and uncertainties. Our actual results may differ significantly from future results contemplated in the forward-looking statements as a result of factors such as those set forth in "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements."*

The following is a summary of selected terms of the Company and the Notes. This summary is not intended as a summary of all principal terms and is qualified in its entirety by the more detailed descriptions set forth below, including the Subscription Agreements attached hereto as Exhibit A-1 and Exhibit A-2 (the "**Subscription Agreements**"). Capitalized terms used in this Summary and not otherwise defined have the meanings given to them elsewhere in this Memorandum.

| | |
|---|---|
| **The Company** | iCap Vault 1, LLC, a Delaware limited liability company is an affiliate of iCap Equity, LLC, a Bellevue, Washington-based investment firm formed in 2011. "iCap Equity" or "iCap," as used in this Memorandum, refers to iCap Enterprises, Inc. (the parent company of iCap Equity, LLC) and its affiliated group of companies (excluding the Company). |
| | See "The Company" commencing on page 7. |
| **Purpose** | The primary purpose of the Company is to acquire real estate investments in the United States and provide a rate of return to its investors. The Company has formed Vault Holding, LLC ("Holding") as a wholly owned subsidiary of the Company, and Holding shall own one or more standalone subsidiaries (each a "Portfolio SPE"), which will then hold real property based investments. The Company's business plan targets revenue generating properties and financial instruments backed by real estate. |
| | See "The Company" commencing on page 7. |
| **Manager** | The Company is managed by iCap Vault Management, LLC, a Delaware limited liability company (the "Manager"). The Company will pay the Manager an annual management fee equal to 1% of the outstanding aggregate principal balances of the Notes. |
| | See "The Company – Members and Management" commencing on page 9. |
| **The Offering** | The Company is issuing up to $500,000,000 in aggregate principal amount of Notes. The minimum individual investment is $1,000, with any amounts in excess thereof being permitted, subject to the acceptance by the Manager. The Manager may change, or accept less than, the minimum investment amount in its discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one Noteholder or its affiliates. |
| | An investor may hold one or more Notes or may make additional investments |

1

via the acquisition of a new Note for as long as this Offering continues, and an investor may demand repayment of part or all of his/her investment at any time.

The Company will offer the Notes for a period commencing on the date of this Memorandum and expiring on August 31, 2020, unless extended by us for up to 2-years.

The Company may terminate, or amend the terms of, this Offering at any time. The Offering will automatically terminate upon the commencement of the Registered Offering, as defined and described below.

See "The Offering" commencing on page 4.

**The Notes**
Investors will be able to withdraw their investment at any time on demand. The Notes will accrue interest at the rate of 2.00% ("Interest Rate"), per annum based on a 365-day year, compounded daily, provided, however, that if an investor agrees to forgo the right to make a demand for payment during the first year after issuance, the Interest Rate for that year will be 3.00%, and then will revert to the standard 2.00% for following periods. The Interest Rate may be increased, and subsequently decreased, in the Company's discretion, provided it does not drop below 2.00% (or 3% for the first year, as applicable).

The Company may prepay all or any part of the Notes without penalty at any time prior to the Maturity Date. If not earlier paid, the outstanding principal and unpaid accrued interest on the Notes will be due and payable 15 years after the date of the investor's initial investment.

See "The Notes" commencing on page 4.

**Security and Guaranty**
Until the time of the Registered Offering the Notes will be secured by a pledge of Holding's equity interests in the Portfolio SPEs, and Holding shall enter into a guaranty agreement with the Company for the benefit of the Noteholders.

See "The Notes" commencing on page 4 and "Security and Guaranty; Registered Offering" on page 5.

**Expenses**
The Company will bear all costs and expenses incurred in the organization of the Company and this Offering and potential future offerings, and will reimburse Manager for any such costs and expenses advanced by Manager. The Company will also pay the Manager an annual management fee of 1% of the outstanding aggregate principal balances of the Notes. With the exception of employee payroll expenses, which will be paid by the Manager, all other expenses will be borne by the Company. Each investor will bear his, her or its own fees and expenses incurred in connection with this Offering.

See "The Company - Management Fees; Transactions with Related Parties" on page 11.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 9, Page 895
1366

| **Document Changes** | Once issued, certain provisions of the Notes may be changed by the Company upon providing notice to the Noteholders. However, the Company may not change a Noteholder's ability to request a demand repayment of his/her investment, any of the notice requirements, or the minimum interest rate of 2% per annum (or 3% if applicable, as discussed below), or the maturity date. In the event of an authorized change by the Company, and provided that notice is given to Noteholders prior to such changes being effective, each Noteholder will have an opportunity to demand repayment of his/her Notes if he/she does not wish to continue as a Noteholder under the revised terms. |
|---|---|

See "The Notes" on page 4 and "Security and Guaranty; Registered Offering" on page 5.

23-90243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 9, Page 896
1366

## THE OFFERING

The Company is offering for sale up to $500,000,000 of aggregate principal amount of promissory notes. The Offering is being made by the Company through its directors and officers only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act and non-U.S. Persons (as defined below) who meet certain suitability standards established. No commissions will be paid on any sales made by the Company's officers and directors. The Company may elect to engage one or more Placement Agents for this Offering, in which event the Placement Agents will also conduct the Offering on a "best efforts" basis, and the Company would expect in such case to pay estimated total commissions of no more than 1% per year of the aggregate principal amount of the Notes sold to investors.

The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on August 31, 2020, unless extended by us for up to 2-years (the "Offering Period") or earlier terminated as set forth herein.

The minimum individual investment is $1,000, with any amount in excess of $1,000 being permissible, subject to the Manager's discretion. The Manager may change, or accept less than, the minimum investment amount in its discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one investor or its affiliates. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one of more closings as it determines. In order to subscribe for a Note, prospective investors must follow the directions set forth in "Subscription Procedures" commencing on page 16.

An investor must be prepared to bear the economic risk of an investment in the Notes for an indefinite period of time. An investor in the Notes, pursuant to the Subscription Agreement and applicable law, will not be permitted to transfer or dispose of the Notes, unless they are registered for resale or such transaction is exempt from registration under the Securities Act and other applicable securities laws, and in the case of a purportedly exempt sale, such investor provides (at his or her own expense) an opinion of counsel satisfactory to us that such exemption is, in fact, available. The Notes will bear a legend relating to such restrictions on transfer.

This Offering may be withdrawn or terminated by the Company at any time. The Manager reserves the right to reject a subscription for Notes, in whole or in part in its sole discretion.

## THE NOTES

The Notes will bear interest at a rate of 2% per year (subject to adjustment as set forth below), and will have a maturity date 15 years following the issuance date (the "Maturity Date"). However, if an Investor agrees that they will not demand repayment of their Note, as described below, during the first year following the issuance date, the interest rate for such first year shall be 3%, and then reverting back to the 2% for following time periods. Interest will accrue based on a 365-day year, compounded daily. The Company may prepay all or any part of the Notes without penalty at any time prior to the Maturity Date. If the Company makes any prepayment, the prepayments need not be made ratably against all outstanding Notes. If not earlier paid, whether pursuant to a Demand Notice (as described below) or full prepayment by the Company, outstanding principal and unpaid accrued interest on the Notes will be due and payable on the Maturity Date.

At any time following the issuance date, a Noteholder may require the Company to repay all or a portion of the Note and the accrued interest thereon by providing a demand notice to the Company ("Demand Notice") which will generally be done electronically through the Company's website at

4

www.icapvault.com or through a licensed software application (collectively the "App") once it is made available. The App will allow the Noteholder to review his/her transaction history, provide Demand Notice requests, purchase additional Notes, agree to investment documentation, send messages to the Company, and receive notices from the Company. Additionally, the App will allow Noteholders to link their iCap Vault account to their bank account to facilitate fund transfers. Upon receipt of a Demand Notice, the Company will have up to 30 days to deliver the requested funds to the Noteholder (the "Demand Payment"), but will use its commercially reasonable efforts to deliver funds for the Demand Payment within 2-5 business days. For those investors not wishing to utilize the App, a form of the Demand Notice is attached as Exhibit A to the Note, a form of which is attached hereto as Exhibit B.

In the event the Company's investors desire to withdraw part or all of their investment via a Demand Payment, the Company will honor these requests by first utilizing its available cash balances, and, if needed, drawing upon third-party capital sources which may temporarily leverage the underlying real estate portfolio in making advances.

As described above, the investors in this Offering may elect to forgo their demand repayment rights for the first year, and thus receive the higher 3% interest rate during such first year. Investors in this Offering will make an election on their subscription agreement, as to whether they do wish to waive their demand rights.

The Company may elect, at any time, to increase the interest rate payable under the Notes, and to thereafter decrease the interest rate payable under the Notes, provided, however, that the Company may not reduce the interest rate below 2% per annum at any time (or 3% for the first year if the Noteholder has agreed to forgo the right to make a demand for payment during the first year).

The Company may, at any time, elect to change any of the terms and conditions of the Notes, except for a Noteholder's ability to request a demand repayment of his/her investment, any of the notice requirements, or the minimum interest rate of 2% (or 3% as applicable) per annum. Prior to any such change being effective, the Company must provide notice of the proposed change to each of the Noteholders. Such notice may be given in accordance with the notice provisions in the Subscription Agreement, which includes electronic notice delivery. Following notice of the proposed change in terms, each Noteholder shall have a period of ten days to provide a Demand Notice to the Company if such Noteholder does not wish to remain a Noteholder pursuant to the amended terms of the Note. The Noteholder may therefore demand repayment of the full amount due to them under the Note at that time, and the Company will pay such amount to such Noteholder pursuant to the then-existing terms and conditions.

The description of the Notes set forth herein is qualified in its entirety by the form of Note as attached hereto as Exhibit B.

## SECURITY AND GUARANTY; REGISTERED OFFERING

Prior to the commencement of the Registered Offering (as described below), the Notes will be secured by a Pledge and Security Agreement to be entered into by Holding and the Noteholders (the "Security Agreement"), pursuant to which Holding will pledge the membership interests of the Portfolio SPEs for the benefit of the Noteholders. Each investor in this Offering, as a condition thereto, shall be required to execute a counterpart signature page to the Security Agreement and become a party thereto. The Security Agreement is attached hereto as Exhibit C, and a counterpart signature page thereto is attached to the Subscription Agreement.

Pursuant to the Security Agreement and to secure the prompt payment and full and faithful performance of the obligations of the Company to the Noteholders pursuant to the Notes, Holding will grant

a security interest in the membership interests of the Portfolio SPEs for the benefit of the Noteholders (the "Interests"). In the event that an Event of Default (as defined below) occurs, as determined and claimed by Noteholders holding a majority of the principal amount of the Notes then outstanding (a "Majority-in-Interest of the Noteholders"), then, as determined by a Majority-in-Interest of the Noteholders, the Noteholders may exercise the rights and pursue the remedies provided under Articles 8 and 9 of the Uniform Commercial Code (the "UCC") with respect to the Interests, including the right to exercise all voting rights with respect to the Interests, collecting all dividends and other distributions with respect to the Interests, and foreclosing the liens and security interest created under this Security Agreement by any available judicial procedure or without judicial process and selling the Interests.

The Security Agreement also provides that, provided that the value of Holding's real estate portfolio is at least 70% of outstanding amounts owned under the Notes, as reasonably determined by the Company, then the Company, Holding and the Portfolio SPEs may make distributions to their respective members as they determine. At any time that the value of Company's real estate portfolio is less than 70% of outstanding amounts owned under the Notes, none of the Company, Holding or the Portfolio SPEs may make any distributions to their members, other than tax distributions (i.e., distributions in the amount of taxes payable by such members on the apportioned income of the entities) or as otherwise required by law.

In addition, Holding has entered into a Guaranty Agreement with the Company pursuant to which Holding has guaranteed the obligations of the Company pursuant to the Notes (the "Guaranty Agreement"), which is attached hereto as Exhibit D. The Guaranty Agreement provides that, during the continuation of an Event of Default, the Noteholders may enforce this guaranty against Holding, but only after attempting to collect or exhausting the Noteholders' efforts to collect from Borrower. Any actions under the Guaranty Agreement must similarly be agreed by a Majority-in-Interest of the Noteholders.

The Company is currently preparing a registration statement for a registered offering of promissory notes which will be in form and substance materially the same as the Notes being offered in this Offering, to be registered under the Securities Act (the "Registered Offering"). The promissory notes to be registered and sold in the Registered Offering are referred to herein as the "Registered Notes." At the time of the effectiveness of the registration statement for the Registered Offering, the Company may terminate this Offering, in which case no additional Notes shall be sold hereunder. In addition, at the commencement of the Registered Offering the Security Agreement shall be terminated and a new security agreement shall be put into place for the Registered Notes, and the Company shall appoint a trustee to act on behalf of the noteholders who acquire Registered Notes in the Registered Offering, and for the Noteholders in this Offering who exchange their Notes for Registered Notes (the "Trustee"), as described below. The duties of the Trustee are further discussed below. In addition, at such time, the Guaranty Agreement shall be terminated and replaced with a guaranty to the holders of the Registered Notes.

At the time of the Registered Offering, Noteholders shall have the right to exchange their Notes acquired in this Offering for the Registered Notes in the Registered Offering, and therefore to continue to have the benefit of the security and guaranty as they had prior to the commencement of the Registered Offering.

Investors in this Offering will not be required to exchange their Notes for Registered Notes, but if such investors elect to continue to hold the Notes from this Offering, such Noteholders will not have any ongoing security interest or guaranty.

We expect that the Registered Notes will be secured by a similar pledge of the Interests, and by the new guaranty agreement as described above, which security interest will be governed by the Trustee. However, the form, terms and conditions of the security documents which will secure the Registered Notes, and the terms of the new guaranty agreement, shall be determined by the Manager and the Trustee.

6

28-91243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 9 Page 899
1366

The description of the Security Agreement set forth herein is qualified in its entirety by the Security Agreement as attached hereto as Exhibit C and the description of the Guaranty Agreement set forth herein is qualified in its entirety to the Guaranty Agreement as attached hereto as Exhibit D.

While the Company currently contemplates acquiring assets without financing, the Notes, and the Registered Notes at the time of the Registered Offering, will be junior to any credit facilities that are put in place by the Company related to its operations, and the real property assets of the Company may be used as collateral for such credit facilities.

Prior to the time that the Company utilizes the proceeds from this Offering to acquire real estate, and other than for the use of proceeds related to this Offering and the formation of the Company as set forth below, the Company will retain the funds from this Offering in its accounts at commercial banks.

The Notes are subject to four possible "Events of Default." It is an "Event of Default" if any of the following occur, and the Company has not rectified such event within 90 days of receipt of notice thereof signed by a Majority-in-Interest of the Noteholders:

(i)   The Company fails to make a Demand Payment when due;

(ii)  the Company fails to perform any of its material obligations under the Note, or is in breach in any material respect of any representation, warranty, covenant or agreement on the part of the Company set forth in the Note;

(iii) the Company commences any liquidation or dissolution proceedings or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consents to the filing of any bankruptcy petition against it under any similar law; or

(iv) the Company failing to pay all amounts due under the Notes on the Maturity Date.

Only a Majority-in-Interest of the Noteholders can declare an Event of Default, and then only after the 90-day cure period has expired without the Company rectifying the applicable situation.

If an Event of Default occurs, the interest rate will be increased to 8% per annum (the "Default Rate"), which Default Rate will remain in place until the Note is either paid as due or such Event of Default is cured.

If the Event of Default is as described in clause (i) or (ii) above, a Majority-in-Interest of the Noteholders will have the right to declare only the applicable Note(s) which are subject to the Event of Default due and payable. If the Event of Default is as described in clause (iii) or (iv) above, a Majority-in-Interest of the Noteholders will have the right to declare all of the Notes (including the Notes sold in the Registered Offering) due and payable.

Upon delivery of written notice to the Company of such default, the Company will have 30 days to honor the payment obligation. If the Company fails to honor the repayment obligation within this time period, then a Majority-in-Interest of the Noteholders will have the right to proceed to enforce the security granted to the Noteholders pursuant to the Security Agreement and to enforce the Guaranty Agreement.

## THE COMPANY

### The Company and its Operations

iCap Vault 1, LLC is a newly formed Delaware limited liability company and is an affiliate of iCap

28-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 9 Page 900

1366

Equity, LLC, a Bellevue, Washington-based investment firm formed in 2011. The Company has been established to provide an investment vehicle that generates a good rate of return, is secured by interests of the Portfolio LLCs, and is accessible by the investors. The rental income allows the Company to provide a rate of return to investors.

The primary purpose of the Company is to acquire revenue-generating residential properties and financial instruments backed by real estate in selected metropolitan statistical areas in the United States (each, a "Portfolio Investment"). Portfolio Investments will be held in standalone wholly owned Portfolio SPEs, which will be held by Holding. The Company's business plan targets the acquisition of revenue-generating properties and seeks to acquire the properties debt-free. It also targets financial instruments secured by US real estate. The equity interests of the Portfolio SPEs will, until the time of the Registered Offering, secure the amounts due under the Notes.

The locations of the properties are determined by selecting metropolitan statistical areas upon consultation with market professionals and in-depth review of economic data. The Company may adjust its investment criteria to accommodate changing market conditions, but will generally seek attractive locations with strong rental income and a likelihood of long-term appreciation of value.

The Manager anticipates that the Company will be exempt from the registration requirements of the Investment Company Act of 1940, as amended (the "Investment Company Act"), by reason of the exemption specified in Section 3(c)(1) of the Investment Company Act (for issuers whose securities are not beneficially owned by more than 100 persons) or Section 3(c)(7) of the Investment Company Act (for issuers whose securities are owned exclusively by "qualified purchasers" within the meaning of Section 2(a)(51) of the Investment Company Act) or other provisions of the Investment Company Act.

POTENTIAL INVESTORS SHOULD RECOGNIZE THAT BY PURCHASING NOTES THEY WILL NOT THEREBY ACQUIRE ANY INTEREST, DIRECTLY OR INDIRECTLY, IN THE COMPANY OR ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. INVESTORS SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES AS SET FORTH HEREIN IS GIVEN SOLELY TO ALLOW INVESTORS TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. THE MANAGER AND ITS AFFILIATES MAY CONTINUE TO ENGAGE IN MANAGEMENT AND INVESTMENT ACTIVITIES RELATED TO PRE-EXISTING INVESTMENTS AND ACTIVITIES OR OPERATIONS OF THE PRIOR FUNDS AS WELL AS FUTURE FUNDS.

## Investment Strategy

The Company's Investment Portfolio will consist of revenue-generating properties, including single-family homes, multi-family apartments, townhomes, and mixed-use properties. It will also acquire financial instruments backed by real estate. The revenue generated from the Portfolio Investments will be used to pay interest and principal on the Notes and fund its operations.

To build its Investment Portfolio, the Company will identify metropolitan statistical areas within which to purchase properties. The Company has developed proven processes and controls to evaluate possible investment opportunities. The process begins by identifying metropolitan statistical areas within the U.S. ("Markets") with strong economic fundamentals that are likely to result in long-term property appreciation and increased rents. The Markets are selected after review of reports and analysis provided by economics professionals, as well as the Company's internal staff. After reviewing the reports, a committee consisting of key members of the management team (the "Investment Committee") may approve a Market. After a Market has been approved, the Company's acquisition team will search for purchase opportunities for the Company that meet the criteria of the applicable investment policies of the Company.

Every investment opportunity will undergo due diligence performed by the Company's underwriters, who will then present investment opportunities to the Investment Committee for its review and approval. The Investment Committee may delegate investment decision-making authority to sub-teams, provided such investments meet the criteria established by the Investment Committee. The Company will complete diligence on prospective investments and maintain closing procedures that provide for the safety of the invested funds, such as a third-party escrow company. The investment process has three major areas of focus: analysis and approval, documentation and closing, and post-closing management. Post-closing management of the real estate portfolio will be done by real estate management companies, who will manage the leasing, cash flows, and maintenance of the properties.

**Meeting Demand Payment Obligations**

The Company will establish two sources of liquidity to address demand payments: First, the Company will set aside reserves of between 5-10% of the outstanding principal balances in available cash reserves; second, the Company plans to establish accounts with lending sources (each a "Liquidity Source") pursuant to which funds will be advanced to the Company. These Liquidity Sources have not been established at present, are not expected to be established until the Registered Offering commences.

Except for the security that may be required by the Liquidity Sources, the Company intends to maintain the Portfolio Investments free and clear of liens and encumbrances. The Notes will be subordinate at times to the rights of the Liquidity Sources as well as to other higher-ranking obligations of the Company, including property taxes and management fees.

The Company may, in its discretion, dispose of some or all of its investment properties to reposition the portfolio or to meet the Company's payment obligations. The Company will maintain cash reserves, which may be used to purchase properties, honor demand payment requests of Noteholders, make tax or other distributions to its member, or cover the costs of the Company's day-to-day operations.

**Members and Management**

The sole member of the Company is iCap Vault, LLC, which is owned by iCap Equity, LLC, which is owned by iCap Enterprises, Inc., a Washington corporation wholly owned by Chris Christensen. The primary officers of iCap Enterprises, Inc. are Chris Christensen and Jim Christensen, whose biographies are below.

The manager of the Company is iCap Vault Management, LLC, a Delaware limited liability company (the "**Manager**"). The officers of the Manager are the same as officers of iCap Enterprises, Inc. The management and supervision of the Company is vested exclusively in the Manager (including its duly appointed agents), which has full control over the business and affairs of the Company pursuant to the Company's limited liability company operating agreement (the "Operating Agreement").

Our direct organizational structure is as shown in the chart below.



The Manager may delegate day-to-day management responsibility of the Company to any person, provided that the Manager will retain ultimate responsibility for the management and conduct of the activities of the Company and all decisions relating to the selection and disposition of the Company's investments.

**Biographies of Management Personnel**

*Chris Christensen, President*

Chris leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. He is also primarily responsible for tax and accounting decisions. Prior to forming the Company, Chris managed affiliated funds, formed and managed affiliates of the Manager, including Edge Construction, LLC and iCap Enterprises, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a Juris Doctor degree from Seattle University School of Law, a Master's degree in International Business from Seattle University, and a Bachelor of Arts degree in Economics from the University of Utah. He is the brother of Jim Christensen.

*Jim Christensen, Chief Operating Officer*

Jim is iCap's Chief Operating Officer and assists the President with the day-to-day operations of iCap and its investment funds, including overseeing investment underwriting, project and construction management, project financing, disposition of distressed assets, and management of the various strategic relationships involving iCap and its affiliates. In addition, he is responsible for the technology-related underpinnings of iCap. This includes electronic document storage, electronic process automation, and software management. Prior to the formation of the prior funds, Jim managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington State for iCap Enterprises, Inc. Jim has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Jim holds a Master of Business Administration degree and a Bachelor of Arts degree in Economics from the University of Washington. Jim is the brother of Chris Christensen.

*Trace ("TD") Croshaw, Chief Financial Officer*

As Chief Financial Officer, TD is responsible for managing financial controls and accounting procedures of the Company and its investments. TD provides forecasts, budgets and other financial analysis of the Company and its investments, assists with investor reports and communications, manages cash flows

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 90 Page 903
1366

and cash flow projections, and establishes and ensures adherence to internal control policies and procedures within the Company. TD also supervises iCap's accounting personnel, and manages the Company's third-party audit, tax and accounting firms, to complete annual audit and tax returns. TD is a licensed CPA. Prior to joining iCap, TD had 15 years of experience as an audit manager at an accounting firm performing financial audits for businesses. TD holds a Bachelor of Arts degree in Accounting from the University of Utah, and a Master of Business Administration degree from the University of Phoenix, and he is a member of the AICPA.

**Organizational Strength and Experience**

The members of the senior management team have completed a variety of projects in the small-cap real estate space. The team has closed in excess of $8 billion in transactions in the small and mid-cap spaces.

iCap also maintains a network of strategic relationships. The team leverages relationships with sourcing, development, construction, and fund administration constituents to maintain a pipeline of real estate purchase opportunities. Property owners, builders, developers, lenders and brokers are the primary entities for deal sourcing.

iCap has capacity to expand its team to manage large amounts of capital from the sale of the Notes and to deploy such proceeds towards real estate that meets its investment criteria. iCap has invested significant resources to build the technology and infrastructure needed to manage large amounts of Noteholders, capital, and real estate. The number of employees who manage this infrastructure will grow as the capital under management increases.

The Manager and its affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

**Investment Experience**

As a newly formed investment vehicle, the Company has no operating or prior performance history. The information presented in this section represents the limited historical experience of the principals of the Manager and its affiliates. Prospective investors in the Company should not rely on the information below as being indicative of the types of investments the Company may make or of the types of returns the Company's investments may generate. Prospective investors should not assume that the Company will experience returns, if any, comparable to those described herein.

iCap has significant prior experience in investing in single-family, multi-family, light commercial and land development properties. Although this Memorandum refers to "iCap" as though it were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. The Company will not acquire an interest in any of iCap's affiliated entities, but may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Manager, and therefore the Company, as it conducts its business.

**Management Fees; Transactions with Related Parties**

The Company will pay the Manager an annual management fee equal to 1% of the outstanding aggregate principal balances of the Notes ("Management Fee"). The Management Fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the Notes during the applicable quarter.

The Company will pay all expenses related to the operation of the Company, other than the costs of the personnel of the Manager. These costs that will be paid by the Company include the fees and expenses related to this Offering, office rent and fees, office common area maintenance charges, phone, fax, and internet access, computer hardware and related supplies, general office supplies, office rental of fax, printers, or scanners and maintenance costs related thereto, consulting, legal, accounting, and professional fees, marketing and travel expenses and any business licenses and registrations required of the Company or the Manager as a result of its management of the Company.

The Manager may elect to pay any of these Company expenses, in which event the Company will reimburse the Manager for those out-of-pocket costs.

The Manager may charge a Portfolio SPE a fee to cover the costs of due diligence and underwriting involved in closing a real estate purchase or disposition. This fee, which may be payable by the Portfolio SPE on or after closing of the purchase or disposition, will be non-refundable and will typically be less than $10,000. Additionally, in the event the Company or the Manager acquires or becomes an affiliate of a real estate brokerage company, the Company may pay customary brokerage fees to such entity for the acquisition or disposition of the Company's assets.

Under the Operating Agreement the Manager may elect to cause the Company to distribute to any member of the Company, a cash distribution equal to the taxes that such member would owe on the income attributed to it from the Company pursuant to the Internal Revenue Code, less any amounts that have been distributed to such member(s) in the applicable year. The Company is not required to make any distributions to its members prior to dissolution. Additionally, the Company may make non-tax distributions to its members in cash or in kind at any time, provided such non-tax distributions are not likely to result in the Company's being unable to provide payments to investors when due related to any Demand Notice.

The Company may engage, or cause a Portfolio SPE to engage, an affiliate of the Company to provide the Portfolio SPEs with services. The Company shall not pay compensation to such affiliated entity at a rate that is higher than is standard in the market. In the event the Company enlists the services of any affiliate of the Manager identified below, the rates of compensation of these affiliates for the performance of their various services will be limited and all payments will be subject to inspection by auditors upon request. A description of the affiliated entities and the agreed upon rates are set forth below. To the extent the market rates for these services increase over time, the Company may pay rates in excess of the rates set forth below. Additionally, to the extent the Company in the future provides services that are not listed below, such services must be provided at reasonable market rates.

If the Manager, or an affiliate of the Manager or the Company, guarantees, whether personally or otherwise, a loan, bond or other obligation of the Company, a holding company, or a Portfolio SPE, that guarantor will be entitled to receive from the benefiting entity an annual fee equal to 1% of the total amount of the credit facility, bond amount, or other obligation that is the subject of the guarantee.

The Company may engage the services of certain related or affiliated parties to provide services to the Company un connection with is operations. These include the following:

*Edge Construction, LLC or an affiliated general contractor:* Expected to provide general contracting services, including those related to new construction of and rehabilitation of real estate projects, and is expected to receive a fee of cost plus 10%. Costs include the costs of management of a project, including costs of project management, supervision, materials and labor, each of which will be billed at hourly rates, which are currently between $30 and $180 per hour.

*iCap Enterprises, Inc.* Expected to Provide development and consulting services, as well as accounting and administrative support at hourly rates which are currently between $30 and $200 per hour.

## USE OF PROCEEDS

The proceeds of this Offering will be used to pay expenses related to its formation and operations and for this Offering, and then to purchase and manage real estate through Portfolio SPEs. The proceeds will be used to cover costs associated with this process, such as marketing, management fees, and professional service fees. The Company expects to pay organizational expenses of approximately $250,000, which include the cost of forming the Company, Holding and the Portfolio SPEs and the cost of marketing and management associated with the Company's operations, including technology infrastructure and maintenance, and Offering expenses of approximately $100,000, which includes the cost of preparing this Memorandum and marketing for this Offering. As discussed above, the Company may elect to engage one or more Placement Agents in the Offering, Any commissions payable to such Placement Agents are not included in the estimate above.

Proceeds from this Offering will also be used to pay the management fee to the Manager as discussed above, and such amounts are not included in the figures above.

At any given time, the Company will maintain 10% cash reserves to meet demand payments, interest payments, and operational requirements. Such cash may be in the form of the Offering proceeds, cash from operations, or credit facilities available to the Company. With the exception of employee payroll expenses, which will be covered by the Manager, all other expenses will be borne by the Company.

## INVESTOR SUITABILITY STANDARDS

*General*

An investment in our Notes involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in their investment. Our Notes are only suitable for those who desire a relatively long-term investment for which they do not need liquidity until the anticipated return on investment as set forth in this Memorandum.

The offer, offer for sale, and sale of our Notes is intended to be exempt from the registration requirements of the Securities Act pursuant to Rule 506(c) of Regulation D promulgated thereunder as to "accredited investors" and to non-U.S. Persons, as defined in, and pursuant to, Regulation S promulgated pursuant to the Securities Act, and is intended to be exempt from the registration requirements of applicable state securities laws as a federally covered security. This Offering is directed to "accredited investors," as that term is defined in Rule 501(a) of Regulation D as promulgated by the SEC and to non-U.S. Persons as defined in Regulation S as promulgated by the SEC.

A subscriber must meet one (or more) of the investor suitability standards below (be an "accredited investor" or non-U.S. Person) to purchase Notes. Fiduciaries must also meet one of these conditions. If the investment is a gift to a minor, the custodian or the donor must meet these conditions. For purposes of the net worth calculations below, net worth is the amount by which assets exceed liabilities, but excluding your house, home furnishings or automobile(s) among your assets. In the subscription agreement, a subscriber will have to confirm satisfaction of these minimum standards:

- Each investor must have the ability to bear the economic risks of investing in the Notes.

- Each investor must have sufficient knowledge and experience in financial, business or investment matters to evaluate the merits and risks of the investment.

- Each investor must represent and warrant that the Notes to be purchased are being acquired for investment and not with a view to distribution.

- Each investor will make other representations to us in connection with the purchase of the Notes, including representations concerning the investor's degree of sophistication, access to information concerning the Company, and ability to bear the economic risk of the investment.

*Suitability Requirements*

Rule 501(a) of Regulation D defines an "accredited investor" as any person who comes within any of the following categories, or whom the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1) Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Exchange Act; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

For purposes of calculating net worth:

(A) The person's primary residence shall not be included as an asset;

(B) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

In determining income, a subscriber should add to the subscriber's adjusted gross income any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deduction claimed for depletion, contribution to an IRA or Keogh plan, alimony payments, and any amount by which income for long-term capital gains has been reduced in arriving at adjusted gross income.

<u>Non-U.S. Persons</u>

A "non-U.S. Person" is any person who is not a "US Person", which is any of the following:

(a) Any natural person resident in the United States (as defined below);

(b) Any partnership or corporation organized or incorporated under the laws of the United States;

(c) Any estate of which any executor or administrator is a US Person;

(d) Any trust of which any trustee is a US Person;

(e) Any agency or branch of a foreign entity located in the United States;

(f) Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US Person;

(g) Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident of the United States; and

(h) Any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a US Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) who are not natural persons, estates or trusts.

"United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

<u>Additional Requirements</u>

In addition to the foregoing suitability standards, we cannot accept subscriptions from anyone if the representations required are either not provided or are provided but are inconsistent with our determination that the investment is suitable for the subscriber. In addition to the financial information we require, the representations we require of you state that you:

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 90 Page 908
1366

- Have received this Memorandum, together with the Exhibits attached hereto;

- understand that no federal or state agency has made any finding or determination as to the fairness for investment in, nor made any recommendation or endorsement of, the Notes; and

- understand that an investment in the Company will not, in itself, create a qualified retirement plan as described in the Internal Revenue Code and that you must comply with all applicable provisions of the Internal Revenue Code in order to create a qualified retirement plan.

You will also represent that you are familiar with the risk factors we describe and that this investment matches your investment objectives. Specifically, you will represent to us that you:

- Understand that there will be no public market for the Notes, that there are substantial restrictions on repurchase, sale, assignment or transfer of the Notes and that it may not be possible to readily liquidate an investment in the Notes; and

- have investment objectives that correspond to those described elsewhere in this Memorandum.

You will also represent to us that you have the capacity to invest in our Notes by confirming that:

- You are legally able to enter into a contractual relationship with us, and, if you are an individual, have attained the age of majority in the state in which you live; and

- if you are a manager, that you are the manager for the trust on behalf of which you are purchasing the Notes, and have due authority to purchase Notes on behalf of the trust.

If you are purchasing as a fiduciary, you will also represent that the above representations and warranties are accurate for the person(s) for whom you are purchasing Notes. By executing the subscription agreement, you will not be waiving any rights under the Securities Act or the Exchange Act.

We have the right to refuse a subscription for Notes if in our sole discretion if we believe that the prospective investor does not meet the suitability requirements. It is anticipated that comparable suitability standards (including state law standards applicable in particular circumstances) may be imposed by us in various jurisdictions in connection with any resale of the Notes.

## SUBSCRIPTION PROCEDURES

All subscriptions for the Notes must be made by the execution and delivery of the applicable Subscription Agreement and a counterpart signature page to the Security Agreement, which is attached to the Subscription Agreement.

The Subscription Agreement that must be completed by prospective investors who are subscribing based on being an "accredited investor" is attached hereto as Exhibit A-1.

The Subscription Agreement that must be completed by prospective investors who are subscribing based on being a "non-U.S. Person" is attached hereto as Exhibit A-1.

*Investors should complete only one of the Subscription Agreements, depending on which basis they*

16

*are subscribing.*

Subscriptions are not binding on us until accepted in writing by us. We will refuse any subscription by giving written notice to the subscriber by personal delivery or first-class mail. We have the right to refuse to sell the Notes to any prospective investor for any reason in our sole discretion, including, without limitation, if such prospective investor does not promptly supply all information requested by us in connection with such prospective investor's subscription. In addition, in our sole discretion, we may establish a limit on the purchase of Notes by particular prospective investors.

To subscribe for the Notes, each prospective investor must agree to the Subscription Agreement as attached hereto as Exhibit A-1 or Exhibit A-2, as applicable.

Prospective investors may do so via the App[1], the Company's website, or in hard copy delivered to the Company as follows:

<center>

iCap Vault 1, LLC
ATTN: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

</center>

Regardless of method of subscribing, for accredited investors (i.e., person who are not subscribing based on being a non-U.S. Person) verification of accredited status will still be required, and one method of such verification is through the procedures as set forth in the Subscription Agreement as set forth on Exhibit A. Other methods may be added to the App.

With the Subscription Agreement (regardless of the method used for completing), prospective investors should send their funds via ACH transfer through the App, wire transfer pursuant to the instructions as set forth in the Subscription Agreement, or check payable to "iCap Vault 1, LLC" for the total cost of the Notes being subscribed.

As noted above, this Memorandum and the Subscription Agreements are available electronically through the App or the Company's website and may be completed on the App or the website, provided the verification of accredited investor status is sent to the Company either electronically or at the address set forth in the Subscription Agreement.

<center>

**RESTRICTIONS ON TRANSFERABILITY**

</center>

The Notes offered hereby are restricted securities as that term is defined in Rule 144 promulgated under the Securities Act. These securities have not been registered under the Securities Act and are being offered and will be sold without benefit of registration under the applicable federal or state securities acts by reason of specific exemptions from registration provided by such acts. The availability of such exemptions is also dependent, in part, upon the "investment intent" of the investors. The exemptions would not be available if an investor were purchasing the Notes with a view to redistributing them. Accordingly, each investor when executing the Subscription Agreement will be required to acknowledge that his or her purchase is for investment, for its, his or her own account, and without any view to resale of the Notes

<center>

17

</center>

except pursuant to an effective registration statement under the Securities Act, or a valid exemption from the registration requirements of the Securities Act, and subject to the terms of the Subscription Agreement.

## STATEMENT AS TO INDEMNIFICATION

Our Operating Agreement provides for indemnification of members and officers of the Company and of the Manager under certain circumstances, which could include liabilities relating to securities laws. The SEC mandates the following disclosure of its position on indemnification for liabilities under the federal securities laws:

"Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling an issuer, the Company has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable."

## RISK FACTORS

AN INVESTMENT IN THE COMPANY AND THE NOTES INVOLVES SIGNIFICANT RISK AND IS SUITABLE ONLY FOR PERSONS WHO ARE CAPABLE OF BEARING THE RISKS, INCLUDING THE RISK OF LOSS OF A SUBSTANTIAL PART OR ALL OF THEIR INVESTMENT. CAREFUL CONSIDERATION OF THE FOLLOWING RISK FACTORS, AS WELL AS OTHER INFORMATION IN THIS MEMORANDUM IS ADVISABLE PRIOR TO INVESTING. PROSPECTIVE INVESTORS SHOULD READ ALL SECTIONS OF THIS MEMORANDUM AND ARE STRONGLY URGED AND EXPECTED TO CONSULT THEIR OWN LEGAL AND FINANCIAL ADVISERS BEFORE INVESTING IN THE NOTES. THE INFORMATION IN THIS MEMORANDUM CONTAINS BOTH HISTORICAL AND FORWARD-LOOKING STATEMENTS. PLEASE BE ADVISED THAT THE COMPANY'S ACTUAL FINANCIAL CONDITION, OPERATING RESULTS AND BUSINESS PERFORMANCE MAY DIFFER MATERIALLY FROM THAT ESTIMATED BY THE COMPANY IN FORWARD-LOOKING STATEMENTS. THE COMPANY HAS ATTEMPTED TO IDENTIFY, IN CONTEXT, CERTAIN OF THE FACTORS THAT IT CURRENTLY BELIEVES COULD CAUSE ACTUAL FUTURE RESULTS TO DIFFER FROM THE COMPANY'S CURRENT EXPECTATIONS. THE DIFFERENCES MAY BE CAUSED BY A VARIETY OF FACTORS, INCLUDING BUT NOT LIMITED TO, ADVERSE ECONOMIC CONDITIONS, COMPETITORS (INCLUDING THE ENTRY OF NEW COMPETITORS), INADEQUATE CAPITAL, UNEXPECTED COSTS, LOWER REVENUES AND NET INCOME THAN ANTICIPATED, FLUCTUATION AND VOLATILITY OF THE COMPANY'S OPERATING RESULTS AND FINANCIAL CONDITION, INABILITY TO CARRY OUT MARKETING AND SALES PLANS, LOSS OF KEY EXECUTIVES OR OTHER PERSONNEL, AND OTHER RISKS THAT MAY OR MAY NOT BE REFERRED TO IN THESE RISK FACTORS.

### Operation and Company Risks

***Our business prospects are difficult to predict because we have no operating history.***

The Company is a newly organized entity and does not have an operating history upon which investors may base an evaluation of its likely performance. The Company's results will depend upon the availability of suitable investment opportunities for the Company and the performance of the Company's Portfolio Investments. The Company's proposed operations are subject to all business risks associated with new enterprises. The likelihood of the Company's success must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with the expansion of a business, operation in a competitive industry, and the continued development of advertising,

18

promotions and a corresponding customer base. There is a possibility that the Company could sustain losses in the future.

There can be no assurance that the Company's efforts will result in successful commercialization or further development of the Company' operations, that the Company's marketing efforts will be successful, or that the Company will ever achieve significant (or any) revenue. If the Company fails to achieve its goals outlined, the Company may run out of money to run its operation and as such, the Company would need to raise additional working capital. Failure to do so could result in Noteholders losing part or all of their money invested.

***Noteholders must rely on the Manager to acquire appropriate Portfolio Investments for the Company's portfolio.***

The Company is conducting the Offering as a "blind pool," meaning that the Company is proceeding to raise funds through the sale of the Notes, without having specifically identified any real estate properties in which the Company intends to invest. When you subscribe for Notes, that subscription is binding, and you will not have the right to revoke that subscription even if you do not approve of the Portfolio Investments that the Company subsequently identifies. Prospective investors should not invest in the Company unless they are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

***If the Company is not as successful with the Offering as desired, it may not acquire as diversified a portfolio as is planned.***

It is not known how many Portfolio Investments the Company will be able to obtain, or the number of opportunities that will be presented by the market for it to evaluate. The number of Portfolio Investments ultimately made by the Company will depend primarily upon the capital raised through the sale of the Notes, the availability of suitable Portfolio Investments, the number of investors who choose to withdraw their funds through demand notices, and the extent to which the Manager arranges for Portfolio Investments to be held with co-investors. There is no certainty as to the number of Portfolio Investments that the Company will ultimately be able to obtain, and since one of the Company's objectives is diversification, no assurance can be given as to the Company's achievement of that objective.

***Competition with third parties in our contemplated industry is intense, which could reduce our profitability and our ability to pay dividends or raise additional funds.***

It is possible that over time we may compete with other entities seeking to undertake similar activities as we do. These same potential competitors may have significantly greater capital resources and research and development, manufacturing, testing, regulatory compliance, and marketing capabilities. Competitive products and services may render any services, products or product candidates that we may acquire or develop uneconomic or obsolete. We cannot assure investors that we will be able to invest or develop resources for required capabilities successfully or as expediently as necessary.

***Our planned business is inherently expensive, risky and may not be understood by or accepted in the marketplace, which could adversely affect our future value.***

The business currently conducted by the Company is at an early stage and is financially speculative. To date, very few companies have been successful in their efforts to commercialize such a business. Furthermore, the number of people who may use our services is difficult to forecast with accuracy. Our future success is dependent on the establishment of the market for our services and our ability to capture a share of this market with the services and offerings we plan to develop.

***Negative publicity could adversely affect our business and operating results.***

Negative publicity about our industry or the Company, even if inaccurate, could adversely affect our reputation and the confidence in our operations, which could harm our business and operating results. Harm to our reputation can arise from many sources, including employee misconduct, misconduct by our partners, outsourced service providers or other counterparties, failure by us or our partners to meet minimum standards of service and quality and compliance failures and claims.

***Rapid growth may strain our resources.***

We expect to experience significant and rapid growth in the scope and complexity of our business, which may place a significant strain on our management team and our financial and other resources. Such growth, if experienced, may expose us to greater costs and other risks associated with growth and expansion. We may be required to hire a broad range of additional employees, including other support personnel, among others, in order to successfully advance our operations. We may be unsuccessful in these efforts or we may be unable to project accurately the rate or timing of these increases.

This growth may place a strain on our management and operational resources. The failure to develop and implement effective systems or the failure to manage growth effectively could have a materially adverse effect on our business, financial condition, and results of operations. In addition, difficulties in effectively managing the budgeting, forecasting, and other process control issues presented by such a rapid expansion could harm our business, financial condition, and results of operations.

***Control is vested in the Manager; no investor should purchase the Notes unless the investor is comfortable with the Manager's judgment and experience in running the Company's affairs.***

Control over all decisions affecting the Company, including decisions regarding the Portfolio Investments that are to be made, will be made by the Manager and its management team. Many material decisions, such as decisions regarding the purchase or sale of assets, the refinancing of Portfolio SPEs, whether to make an investment, and the incurrence of third-party-debt will be made without separate concurrence from Noteholders. No assurance can be given that sufficient investment opportunities will be presented to the Company to deploy all of the capital available for investment.

***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its affiliates may provide certain services to, and enter into transactions with, the Company, its holding companies, or the Portfolio SPEs, provided that the terms are commercially reasonable. This limitation may not fully protect the Company or the Portfolio SPEs against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Noteholders, the Trustee, or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its affiliates. In addition, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities for affiliated entities that may generate different fees for the Manager.

***The Manager may retain and reinvest all or a portion of the revenue generated by, or proceeds of a sale of, a Portfolio Investment.***

The Manager has the discretion to sell the properties the Company acquires and to use the cash proceeds from such sale (or cash proceeds from rental income) to, among other things, satisfy its obligations under the Notes, whether then due and payable, or other Company obligations, or to enter into new Portfolio

20

Investments. The Manager intends to make new investments over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

***Without obtaining advice from their personal advisors, potential investors may not be aware of the legal, tax or economic consequences of an investment in the Notes.***

The Manager has not arranged for potential investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Company has not acted as if it had been retained by the potential investors. Potential investors should not construe the contents of this Memorandum or any prior or subsequent communication from the Manager, its affiliates or any professional associated with this Offering, as legal or tax advice. Potential investors should consult their own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability.

***Fees to Manager will be paid while interest and principal remain outstanding under the Notes.***

Fees payable to the Manager will be paid while interest and principal remain outstanding under the Notes. The Management Fee is based on the outstanding principal balance of the Notes. The Manager will receive the Management Fee whether or not the Portfolio Investments operate profitably. These fees (like other operating expenses) reduce the amount of cash that otherwise would be available for payment of the Notes.

***You will not be investing in the Company, iCap or any of their affiliates. The prior performance data presented provides relevant information regarding affiliates of the Manager, but should not be construed as an indication of the likely financial performance of the Company.***

By investing in the Notes, you will not be investing in the Portfolio Investments, iCap, or in any of the prior investments sponsored by iCap's affiliates. iCap has provided selected information regarding its prior investments because investors might consider those investments to be relevant in assessing the experience and judgment of the Manager, and the iCap management team. Potential investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique, and the Company may not be able to replicate the success of prior investments, even if the Portfolio Investments assembled for the Company's portfolio are similar to those obtained for the prior funds.

***A Majority-in-Interest of the Noteholders is required to take certain actions with respect to the Notes.***

The Notes, the Security Agreement and the Guaranty require the consent of a Majority-in-Interest of the Noteholders to declare an Event of Default and to take certain actions related thereto. Therefore, individual Noteholders will not be able to take certain actions unilaterally.

***The Company may prepay the principal and interest on the Notes at any time.***

The Company may prepay all or a part of the principal amount and accrued interest in the Notes at any time. No prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Noteholders will not have certainty as to how long their respective Note(s) may be

outstanding. If the Company makes any prepayment, the prepayments need not be made ratably against all outstanding Notes.

***Various factors could negatively impact the profitability of the Company's Portfolio Investments***

The Company may obtain insurance policies for the Portfolio Investments that are commercially prudent given the local market and circumstances of the Portfolio Investments. However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Portfolio Investments should be partially or totally destroyed, the Company may suffer a substantial loss of capital as well as profits. Even if the Company's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Company will sustain a substantial uninsured loss as a result of a fire or other casualty.

Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making a Portfolio Investment, the Company may undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation could include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the Portfolio Investment's site had environmental contamination not detected prior to the Company's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Company undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Company may incur environmental clean-up costs or be subject to liability exposure that may reduce the net profits of the Company.

Under the Americans With Disabilities Act of 1990 ("ADA"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing properties to allow disabled persons to access such facilities. Most of the properties the Company considers will likely be in compliance with the present access requirements. If, however, the properties the Company acquires are not in compliance with the ADA, the Company will be required to make modifications to the properties to bring them into compliance or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

The real estate industry in general, and the multifamily, residential, and commercial sectors, in particular, are highly competitive, and the Company will be competing with numerous other entities, some having substantially greater financial resources and experience than the Company, in seeking attractive investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available Portfolio Investments or resulting in other less favorable terms to the purchasers.

The investment returns available from investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers' decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could

have a material adverse impact on the Company's results of operations or financial condition. In addition, real estate investments are difficult to sell quickly and the Company may not be able to adjust the Company's portfolio of owned properties quickly in response to economic or other conditions in order to meet Note obligations. If the Company's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Company's income will be adversely affected.

***Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.***

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

***Real estate development projects are subject to numerous risks outside the Company's control such as delays in permitting and other governmental approvals, increased costs, and labor shortages.***

Any properties in which the Company invests relating to real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, and thus lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. The Company may enter into contracts to purchase properties before they are finished, and the foregoing risks could adversely impact the purchase prices, valuations, or closings dates of those properties.  Although the Manager will not undertake such transactions without reviewing detailed budgets, such budgets may understate the expenses.

***There may be unanticipated obstacles to execution of our business plan.***

Our proposed plan of operation and prospects will depend largely upon our ability to successfully establish the Company' presence in a timely fashion, retain and continue to hire skilled management, technical, marketing, and other personnel, and attract and retain significant numbers of quality business partners and corporate clients. There can be no assurance that we will be able to successfully implement our business plan or develop or maintain future business relationships, or that unanticipated expenses, problems or technical difficulties which would result in material delays in implementation will not occur.

***The volatile credit and capital markets could have a material adverse effect on our financial condition.***

Our ability to manage our future debt and liquidity will be dependent on our level of positive cash flow. An economic downturn may negatively impact our cash flows. Credit and capital markets can be volatile, which could make it more difficult for us to refinance our debt or to obtain additional debt or equity financings in the future. Such constraints could increase our costs of borrowing and could restrict our access to other potential sources of future liquidity. Our failure to have sufficient liquidity to make interest and other payments required by our debt or our Notes could result in a default of such debt or the Notes and acceleration of our borrowings, which would have a material adverse effect on our business and financial condition.

***A prolonged economic downturn could materially affect us in the future.***

The recession from late 2007 to mid-2009 reduced consumer confidence to historic lows, impacting the public's ability and desire to spend discretionary dollars as a result of job losses, home foreclosures, significantly reduced home values, investment losses, bankruptcies and reduced access to credit, resulting in lower levels of customer traffic. If the economy experiences another significant decline, our business and results of operations could be materially adversely affected.

***Information technology system failures or breaches of our network security could interrupt our operations and adversely affect our business.***

We rely on our computer systems and network infrastructure across our operations. Our operations depend upon our ability to protect our computer equipment and systems against damage from physical theft, fire, power loss, telecommunications failure or other catastrophic events, as well as from internal and external security breaches, viruses and other disruptive problems. Any damage or failure of our computer systems or network infrastructure that causes an interruption in our operations could have a material adverse effect on our business and subject us to litigation or to actions by regulatory authorities.

We are continuing to develop our information technology capabilities, and if we are unable to successfully upgrade or expand our technological capabilities, we may not have the ability to take advantage of market opportunities, manage our costs and transactional data effectively, satisfy customer requirements, execute our business plan or respond to competitive pressures.

***The failure to enforce and maintain our trademarks and protect our other intellectual property could materially adversely affect our business, including our ability to establish and maintain brand awareness.***

The success of our business strategy depends on our continued ability to obtain and use trademarks and service marks in order to increase brand awareness and develop our branded products. If our efforts to protect our intellectual property are not adequate, or if any third-party misappropriates or infringes on our intellectual property, whether in print, on the Internet or through other media, the value of our brands may be harmed, which could have a material adverse effect on our business, including the failure of our brands and branded products to achieve and maintain market acceptance. There can be no assurance that all of the steps we have taken to protect our intellectual property in the United States and in foreign countries will be adequate. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent, as do the laws of the United States.

***Third-party claims with respect to intellectual property assets, if decided against us, may result in competing uses or require adoption of new, non-infringing intellectual property, which may in turn adversely affect sales and revenues.***

There can be no assurance that third parties will not assert infringement or misappropriation claims against us, or assert claims that our rights in our trademarks, service marks, trade dress and other intellectual property assets are invalid or unenforceable. Any such claims could have a material adverse effect on us if such claims were to be decided against us. If our rights in any intellectual property were invalidated or deemed unenforceable, it could permit competing uses of intellectual property, which, in turn, could lead to a decline in our results of operations. If the intellectual property became subject to third-party infringement, misappropriation or other claims, and such claims were decided against us, we may be forced to pay damages, be required to develop or adopt non-infringing intellectual property or be obligated to acquire a license to the intellectual property that is the subject of the asserted claim. There could be significant expenses associated with the defense of any infringement, misappropriation, or other third-party claims.

***We depend on certain officers of the Manager, the loss of whom could materially harm our business.***

We rely upon the accumulated knowledge, skills and experience of the officers and personnel of our Manager and its affiliates. If they were to leave the Manager or become incapacitated, we might suffer in our planning and execution of business strategy and operations, impacting our brand and financial results. We also do not maintain any key man life insurance policies for any such persons.

***We are exposed to the risk of natural disasters, unusual weather conditions, pandemic outbreaks, political events, war and terrorism that could disrupt business and result in lower sales, increased operating costs and capital expenditures.***

Our headquarters and company-operated locations, as well as certain of our vendors and customers, are located in areas which have been and could be subject to natural disasters such as floods, hurricanes, tornadoes, fires or earthquakes. Adverse weather conditions or other extreme changes in the weather, including resulting electrical and technological failures, may disrupt our business and may adversely affect our ability to continue our operations. These events also could have indirect consequences such as increases in the costs of insurance if they result in significant loss of property or other insurable damage. Any of these factors, or any combination thereof, could adversely affect our operations.

***Members of our Manager will have other business interests and obligations to other entities.***

None of the members and officers of the Manager will be required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company, provided that such activities do not otherwise breach their agreements with the Company. We are dependent on these persons to successfully operate the Company. Their other business interests and activities could divert time and attention from operating the Company.

## Risks Related to this Offering and the Notes

***This private placement of Notes is being made in reliance on an exemption from registration requirements, and there is no guarantee that it will comply with the regulatory requirements for such exemption.***

This private placement of Notes will not be registered with the SEC. The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

***If investors successfully seek rescission, we would face severe financial demands that we may not be able to meet.***

We represent that this Memorandum and its exhibits do not contain any untrue statements of material fact or omit to state any material fact necessary to make the statements made, in light of all the circumstances under which they are made, not misleading. However, if this representation is inaccurate with respect to a material fact, if this Offering fails to qualify for exemption from registration under the federal securities laws, or if we fail to register the Notes or find an exemption under the securities laws of each state in which we offer the Notes, each investor may have the right to rescind his, her or its purchase of the Notes and to receive back from the Company his, her or its purchase price. Such investors, however, may be unable to collect on any judgment, and the cost of obtaining such judgment may outweigh the benefits. If investors successfully seek rescission, we would face severe financial demands and may not be

able to meet our capital needs, which may adversely affect any non-rescinding investors.

**We may invest or spend the proceeds of this Offering in ways with which you may not agree or in ways which may not yield a return.**

While we have provided guidance on priorities for the use of proceeds, the timing and amount of sales will impact our actual use of proceeds within the uses identified. Our management will have broad discretion in determining how the proceeds of the Offering will be used in each of the identified use categories.

We currently intend to use the proceeds we receive from this Offering after deducting estimated fees and expenses associated with this private placement, including legal, accounting, transfer agent, financial, acquisitions and other professional fees, primarily for the purposes as described above. Our management will have considerable discretion in the application of the net proceeds, and you will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. Investors in this Offering will need to rely upon the judgment of our management with respect to the use of proceeds. If we do not use the net proceeds that we receive in this Offering effectively, our business, financial condition, results of operations and prospects could be harmed, and the market price or value of the Notes could decline.

**This is a private offering, and as such investors will not have the benefit of review of this Memorandum by the SEC or other agency.**

Since this Offering is a private placement of securities and, as such, is not registered under federal or state securities laws, potential investors will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

**There is no assurance that the Company will be profitable, and there is no assurance of any returns.**

There is no assurance as to whether the Company will be profitable, or earn revenues, or whether the Company will be able to meet its operating expenses. The initial expenses the Company incurs could result in operating losses for the Company for the foreseeable future. No assurance can be made that a subscriber for the Notes offered hereby will not lose his or her entire investment.

**The Company is obligated to pay certain fees and expenses.**

The Company will pay various fees and expenses related to its ongoing operations regardless of whether or not the Company' activities are profitable. These fees and expenses will require dependence on third-party relationships. The Company is generally dependent on relationships with its strategic partners and vendors, and the Company may enter into similar agreements with future potential strategic partners and alliances. The Company must be successful in securing and maintaining its third-party relationships to be successful. There can be no assurance that such third parties may regard their relationship with the Company as important to their own business and operations, that they will not reassess their commitment to the business at any time in the future, or that they will not develop their own competitive services or products, either during their relationship with the Company or after their relations with the Company expire. Accordingly, there can be no assurance that the Company' existing relationships or future relationships will result in sustained business partnerships, successful service offerings, or significant revenues for the Company.

**Prospective investors must undertake their own due diligence**.

This Memorandum and its exhibits include limited information regarding the Company, our current and future business and operations, our management and our financial condition. While we believe the information contained in this Memorandum is accurate, such document is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective Investor that the abbreviated nature of this Memorandum will not omit to state a material fact which a prospective Investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such Investor. As a result, prospective Investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **This investment is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

*The limited marketability of the Notes may adversely affect your ability to transfer and pledge the Notes.*

Noteholders must represent that they are purchasing the Notes for their own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, or encumber your Note(s) unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Internal Revenue Code of 1986, as amended (the "Code") or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans.

*The Notes constitute restricted securities and are subject to limited transferability.*

The Notes should be considered a long-term, illiquid investment. The Notes have not been registered under the Securities Act, and cannot be sold without registration under the Securities Act or any exemption from registration. In addition, the Notes are not registered under any state securities laws that would permit their transfer. Because of these restrictions and the absence of an active trading market for our securities, a Noteholder will likely be unable to liquidate an investment even though other personal financial circumstances would dictate such liquidation.

*There is no public trading market for our Notes.*

There is no established public trading marketing for the Notes and there can be no assurance that one will ever develop. Market liquidity will depend on the perception of our operating business and any steps that our management might take to bring us to the awareness of investors. There can be no assurance given that there will be any awareness generated. Consequently, investors may not be able to liquidate their investment or liquidate it at a price that reflects the value of the business. As a result, holders of our securities may not find purchasers for our securities should they to sell securities held by them. Only non-U.S. Persons, accredited investors or institutions with no need for immediate short-term liquidity should purchase the Notes.

*The market value of the Notes may decrease due to factors beyond our control.*

The stock market from time to time has experienced extreme price and volume fluctuations, which have particularly affected the market prices for emerging growth companies and which often have been unrelated to the operating performance of the companies. These broad market fluctuations may adversely affect the market value of our Notes. The market value of our Notes may also fluctuate significantly in response to the following factors, most of which are beyond our control:

- variations in our quarterly operating results,
- changes in general economic conditions,

- changes in market valuations of similar companies,
- announcements by us or our competitors of significant acquisitions, strategic partnerships or joint ventures, or capital commitments,
- poor reviews;
- loss of a major customer, partner or joint venture participant; and
- the addition or loss of key managerial and collaborative personnel.

Any such fluctuations may adversely affect the market value of our Notes, regardless of our actual operating performance. As a result, Noteholders may be unable to sell their Notes (even if permitted by applicable securities laws and the terms of the Notes), or may be forced to sell them at a loss.

*The characteristics of the Notes, including maturity, interest rate, lack of guarantee, and lack of liquidity, may not satisfy your investment objectives.*

The Notes may not be a suitable investment for you, and we advise you to consult your investment, tax and other professional financial advisors prior to purchasing Notes. The characteristics of the Notes, including maturity, interest rate, lack of guarantee and lack of liquidity may not satisfy your investment objectives. The Notes may not be a suitable investment for you based on your ability to withstand a loss of interest or principal or other aspects of your financial situation, including your income, net worth, financial needs, investment risk profile, return objectives, investment experience and other factors. Prior to purchasing any Notes, you should consider your investment allocation with respect to the amount of your contemplated investment in the Notes in relation to your other investment holdings and the diversity of those holdings.

*The Notes will be effectively subordinated to any of our debt that is secured and subordinated to our existing and future unsecured debts.*

The Notes will be junior to any of our secured debt obligations, to the extent of the value of any assets securing such debt. The effect of this subordination is that if we are involved in a bankruptcy, liquidation, dissolution, reorganization or similar proceeding, or upon a default in payment on, or the acceleration of, any of our secured debt, if any, our assets will be available to pay obligations on the Notes only after all debt under our secured debt, if any, has been paid in full from those assets. As of the date of this Memorandum, we had no secured indebtedness outstanding. In such circumstances, Holders of the Notes will participate in any remaining assets ratably with all of our other unsubordinated creditors, including trade creditors. We may not have sufficient assets remaining to pay amounts due on any or all of the Notes then outstanding.

*The Company may sell promissory notes, in the Registered Offering or otherwise, that have higher interest rates than the 2% (or 3% for the first year) applicable to the Notes.*

The Company may sell promissory notes in this Offering, or in the Registered Offering, that have higher interest rates than the 2% applicable to the Notes (or 3% for the first year as described above). In such event the Company would be obligated to pay such higher rates of return, and the security of the Noteholders in this Offering would therefore be negatively impacted as the Company will have greater payment obligations from the same pool of assets as compared to the situation where all promissory notes had a 2% (or 3%, as applicable) interest rate.

*Because the Notes will have no sinking fund, insurance, or guarantee, you could lose all or a part of your investment if we do not have enough cash to pay.*

There is no sinking fund, insurance or guarantee of our obligation to make payments on the Notes. We will not contribute funds to a separate account, commonly known as a sinking fund, to make interest or

principal payments on the Notes. The Notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation, or any other governmental or private fund or entity. Therefore, if you invest in the Notes, you will have to rely only on our cash flow from operations and other sources of funds for repayment of principal at maturity or upon repayment demand by you and for payment of interest when due. Any future cash flows from operations could be impaired under the circumstances described herein. If our cash flow from operations and other sources of funds are not sufficient to pay any amounts owed under the Notes, then you may lose all or part of your investment.

***We do not expect that the Notes will be rated, but if they are, ratings of the Notes may change and affect the market price and marketability of the Notes.***

We do not currently expect that, upon issuance, the Notes will be rated by any rating agencies. If they are, such ratings are limited in scope, and do not address all material risks relating to an investment in the Notes, but rather reflect only the view of each rating agency at the time the rating is issued. There is no assurance that such credit ratings will be issued or remain in effect for any given period of time or that such ratings will not be lowered, suspended or withdrawn entirely by the rating agencies. It is also possible that such ratings may be lowered in connection with future events, such as future acquisitions. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market price or marketability of the Notes. In addition, any decline in the ratings of the Notes may make it more difficult for us to raise capital on acceptable terms.

***Because we may pay off the Notes at any time prior to their maturity, you may be subject to reinvestment risk.***

We have the right to pay off any Note at any time prior to its stated maturity. The Notes would be paid off at 100% of the principal amount plus accrued but unpaid interest up to but not including the date of pay off. Any such pay off may have the effect of reducing the income or return on investment that any investor may receive on an investment in the Notes by reducing the term of the investment. If this occurs, you may not be able to reinvest the proceeds at an interest rate comparable to the rate paid on the Notes.

***We have not retained independent professionals for investors.***

We have not retained any independent professionals to comment on or otherwise protect the interests of potential investors. Although we have retained our own counsel, neither such counsel nor any other independent professionals have made any examination of any factual matters herein, and potential investors should not rely on our counsel regarding any matters herein described.

***We have no firm commitments to purchase any Notes.***

We have no firm commitment for the purchase of any Notes. The Company has not yet engaged a placement agent or broker for the sale of the Notes, although we may do so in the future. The Company may be unable to identify investors to purchase the Notes and as a result may have inadequate capital to support its ongoing business obligations.

***We have the right to make changes to certain terms and conditions of the Notes***.

The Company may from time to time make changes to certain terms and conditions of the Notes upon providing notice to Noteholders of such changes. Although Noteholders will have the option of demanding a payoff of their investment if they are not satisfied with the proposed changes (other than for the first year if they have elected to take advantage of the higher 3% interest rate for that year and as a result have waived their demand repayment rights for that time period), any such changes could result in less

favorable liquidation preferences, tax consequences, security positions, or other legal relationships for the Noteholders or their Notes.

***The Company may not be able to meet all of the payment demands of its Investors if a large number of Investors desires to be repaid or if the Company does not have the liquidity to meet such demands.***

The Company will use its commercially reasonable efforts to maintain sufficient cash reserves on hand and access to liquidity sources to honor repayment demands of Investors. However, in the event there are more demands for repayment than the Company has cash available to meet, the Company may be delayed in the delivery of funds and may be required to sell some of its real estate, which may take significant amounts of time and may yield less than is needed to meet the Company's obligations.

<u>Tax Risks</u>

***You are urged to consider the United States federal income tax consequences of owning the Notes.***

Pursuant to the terms of the Notes, the Company and each Noteholder will agree to treat the Notes for U.S. federal income tax purposes as contingent payment debt instruments subject to U.S. federal income tax rules applicable to contingent payment debt instruments. Under that treatment, if you are a U.S. Holder (as defined herein), you may be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by you in that year. You will recognize gain or loss on the sale, repurchase, exchange, conversion or repayment of a Note in an amount equal to the difference between the amount realized and your adjusted tax basis in the Note. Any gain recognized by you on the sale, repurchase, exchange, conversion or repayment of a Note generally will be treated as ordinary interest income and any loss will be treated as ordinary loss to the extent of the interest previously included in income and, thereafter, as capital loss.

***Interest on Notes Could be Characterized as Unrelated Business Taxable Income.***

We intend to take the position that the Notes should be classified as debt instruments for U.S. federal income tax purposes and the stated interest should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("UBTI") with respect to tax exempt Noteholders. However, there is no assurance that the IRS will agree with this position and it is possible that the Notes may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Notes may be characterized as UBTI with respect to tax exempt Noteholders.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

This Memorandum does not address any tax considerations that may be relevant to you. You are urged to consult your own tax advisors as to the specific tax consequences of purchasing, owning and disposing of any Notes, including any federal, state or local tax consequences.

**WE URGE YOU TO CONSULT AND RELY UPON YOUR OWN TAX ADVISOR WITH RESPECT TO YOUR OWN TAX SITUATION, POTENTIAL CHANGES IN APPLICABLE LAWS AND REGULATIONS AND THE FEDERAL AND STATE CONSEQUENCES ARISING FROM AN INVESTMENT IN THE NOTES. THE COST OF THE CONSULTATION COULD, DEPENDING ON THE AMOUNT CHARGED TO YOU, DECREASE ANY RETURN ANTICIPATED ON YOUR INVESTMENT. NOTHING IN THIS MEMORANDUM IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY SPECIFIC INVESTOR, AS INDIVIDUAL CIRCUMSTANCES MAY VARY. YOU SHOULD BE AWARE THAT THE INTERNAL REVENUE SERVICE MAY NOT AGREE WITH ALL TAX POSITIONS TAKEN BY**

**US AND THAT LEGISLATIVE, ADMINISTRATIVE OR COURT DECISIONS MAY REDUCE OR ELIMINATE ANY ANTICIPATED TAX BENEFITS OF AN INVESTMENT IN THE NOTES.**

# EXHIBIT A-1

**SUBSCRIPTION AGREEMENT FOR ACCREDITED INVESTORS**

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 9, Page 925
1366



# iCap Vault 1, LLC

The undersigned "Subscriber", on the terms and conditions herein set forth, hereby irrevocable submits this subscription agreement (the "Subscription Agreement") to iCap Vault 1, LLC, a Delaware limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise working capital of up to $500,000,000 through the sale to Subscriber as an accredited investor of a Secured Promissory Note of the Company (the "Note").

## 1. Subscription for the Purchase of Notes.

The undersigned, intending to be legally bound, hereby subscribes for the amount set forth on the Investment Summary page below (the "Principal Balance"). The undersigned acknowledges that the Company is offering the Notes to those who are "accredited investors" as defined herein, pursuant to the terms and provisions of the Offering documented in the Confidential Private Placement Memorandum dated October 1, 2018 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. In this regard, Investor agrees to forward payment in the amount of the Principal Balance indicated on the Investment Summary form below. The Company's private offering of Notes is being made to "accredited" investors within the meaning of Rule 506 of Regulation D promulgated by the Securities Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"). By signing this Subscription Agreement, Subscriber acknowledges receipt of the Memorandum and its Exhibits, including the Note, the Pledge and Security Agreement and the Guaranty (collectively the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents

The undersigned agrees to execute this Subscription Agreement and if by mail, send to the Company. You as an individual or you on behalf of the subscribing entity are being asked to complete this Subscription Agreement so that a determination can be made as to whether or not you (it) are qualified to purchase the Note under applicable federal and state securities laws. Your answers to the questions contained herein must be true and correct in all respects, and a false representation by you may constitute a violation of law for which a claim for damages may be made against you. Your answers will be kept strictly confidential; however, by signing this Subscription Agreement, you will be authorizing the Company to present a completed copy of this Subscription Agreement to such parties as they may deem appropriate in order to make certain that the offer and sale of the securities will not result in a violation of the Securities Act or of the securities laws of any state. All questions must be answered. If the appropriate answer is "None" or "Not Applicable," please state so. Please print or type your answers to all questions and attach additional sheets if necessary to complete your answers to any item. Please initial any corrections.

## 2. Offer to Purchase.
Subscriber hereby irrevocably offers to purchase the Note and tenders herewith the total price noted above. Subscriber recognizes and agrees that (i) this subscription is irrevocable and, if Subscriber is a natural person, shall survive Subscriber's death, disability or other incapacity, and (ii) the Company has complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement. This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

## 3. Effect of Acceptance.
Subscriber hereby acknowledges and agrees that on the Company's acceptance of this Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Subscriber. As a result, upon acceptance by the Company of this Subscription

23-01243-WLH11 Doc 468 Filed 02/23/24 Entered 02/23/24 19:33:19 Pg 926 1366 Exhibit 9.23 Page 926

Agreement, Subscriber will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note as specified herein.

4. **Representation as to Investor Status.** Investor agrees to complete all applicable portions of the Investor Representations page at the end of this Agreement. Additionally, attached to this Subscription Agreement as Annex 1 is an Accredited Status Certification Letter that Subscriber who is claiming to be an "accredited investor" under the definitions in Section 4(a)(i) or Section 4(a)(ii) may provide to the Company to assist it in its determination of whether Subscriber meets the accredited investor requirements discussed above. A Subscriber who is claiming to be an "accredited investor" under the definitions in Section 4(a)(i) or Section 4(a)(ii) should provide this form of Accredited Status Certification Letter to the applicable person (CPA, investment adviser, etc.) and ask them to complete it and return it to the Company. (In this Letter, you as the Subscriber are the "Client").

5. **Additional Representations and Warranties of Subscriber.** Subscriber hereby represents and warrants to the Company as follows:

(a) Subscriber has been furnished the Memorandum and, if requested by the Subscriber, other documents. The Subscriber has carefully read the Memorandum and any such other requested documents. Subscriber has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Subscriber requested and deemed material to making an informed investment decision regarding its purchase of the Note. Subscriber has been afforded the opportunity to review such documents and the information contained therein. Subscriber has been afforded the opportunity to ask questions of the Company and its management. Subscriber understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Subscriber understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Subscriber has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Subscriber shall modify, amend or affect such Subscriber's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Subscriber has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

(b) Subscriber has read and understood, and is familiar with, this Subscription Agreement, the Note and the business and financial affairs of the Company.

(c) Subscriber, either personally, or together with its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum. The Subscriber and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the

Note. Subscriber's financial condition is such that Subscriber is able to bear the risk of holding the Note that Subscriber may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Subscriber's entire investment in the Company.

**(d)** Subscriber has investigated the acquisition of the Note to the extent Subscriber deemed necessary or desirable and the Company has provided Subscriber with any reasonable assistance Subscriber has requested in connection therewith.

**(e)** The Note is being acquired for Subscriber's own account for investment, with no intention by Subscriber to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Subscriber in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Subscriber has any interest in or any right to acquire the Note. Subscriber understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Subscriber.

**(f)** No representations or warranties have been made to Subscriber by the Company, or any representative of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

**(g)** Subscriber is aware that Subscriber's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Subscriber will not offer for sale, sell or otherwise transfer the Note without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

**(h)** Subscriber understands and agrees that the Note it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

**(i)** The Subscriber has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Subscriber understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

**(j)** Rule 506(c) of Regulation D under the Securities Act permits a company offering securities to investors in a private offering to solicit and advertise that offering to the general public, provided that: (i) the company only sells the securities to "accredited investors," as defined by the Securities and Exchange Commission ("SEC"); (ii) the company takes "reasonable steps" to verify that all those purchasers meet the SEC's accredited investor requirements; and (iii) the offering meets the other applicable requirements of Rule 506. Accordingly, the Subscriber acknowledges that, to the extent applicable, the Company will seek to comply with the Rule 506(c) of Regulation D and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "Rule 506(c) Provisions"). In furtherance of these efforts, the Subscriber agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the Rule 506(c) Provisions, including without limitation, tax returns and/or a certification from a U.S. licensed attorney or certified public accountant that the Subscriber is an "accredited investor" as that term is defined in Rule 501 of Regulation D. Furthermore, such methods also include, without limitation, (1) review of an investor's income tax returns and filings along with a written representation that the person reasonably expects to reach the level necessary to qualify as an accredited investor during the current year, (2) review of one or

more of the following, dated within three months, together with a written representation that all liabilities necessary to determine net worth have been disclosed; for assets: bank statements, brokerage statements and other statements of securities holdings, certificates of deposit, tax assessments and appraiser reports issued by third parties and for liabilities, credit report from a nationwide agency, (3) obtaining a written confirmation from a registered broker-dealer, an SEC registered investment advisor, a licensed attorney, or a CPA that such person or entity has taken reasonable steps to verify that the purchaser is an accredited investor within the prior three months.

**(k)** Subscriber understands that the Note shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such certificates):

"NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT."

**(l)** Subscriber also acknowledges and agrees to the following:

    **(i)** an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire investment in the Company; and

    **(ii)** there is no assurance that a public market for the will be available and that, as a result, Subscriber may not be able to liquidate Subscriber's investment in the Note should a need arise to do so.

**(m)** Subscriber is not dependent for liquidity on any of the amounts Subscriber is investing in the Note.

**(n)** Subscriber's address set forth below is his or her correct residence address.

**(o)** Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

**(p)** Subscriber understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

**6. Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The Subscriber should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations. Subscriber hereby represents and warrants to the Company as follows:

**(a)** The Subscriber represents that (i) no part of the funds used by the Subscriber to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Subscriber and no distribution to the Subscriber shall cause the Company to be in violation of any

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 9, Page 929
1366

applicable anti-money laundering laws or regulations including, without limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Note, and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[2] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

**(b)** To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations. The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges that the Company may, by written notice to the Subscriber, suspend the redemption rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

---

[2] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

**(c)** To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a senior foreign political figure[3], or any immediate family[4] member or close associate[5] of a senior foreign political figure, as such terms are defined in the footnotes below.

**(d)** If the Subscriber is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Subscriber represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

**(e)** The Subscriber acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Subscriber agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information, may result in the withholding of amounts with respect to, or other limitations on, distributions made to the Subscriber and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Subscriber shall give prompt notice of such fact to the Company by telegram, or facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

---

[3] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[4] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[5] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

7. **Indemnification.** Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations and warranties made by Subscriber herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Subscriber hereby agrees to indemnify and hold harmless the Company and each employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Subscriber contained in this Subscription Agreement.

8. **Transferability.** Subscriber agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

9. **Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Subscriber any money tendered hereunder without interest or deduction.

10. **Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Subscriber at the address set forth below and to the Company at inquiry@icapvault.com, or (c) at such other place as the Company may designate by written notice to Subscriber.

11. **Amendments.** Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Subscriber and the Company.

12. **Governing Law.** This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

13. **Headings.** The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

14. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

15. **Continuing Obligation of Subscriber to Confirm Investor Status**. Upon the request of the Company and for as long as the Subscriber holds the Note or other securities in the Company, the Subscriber shall confirm Subscriber's investor status as an "Accredited Investor," as defined by the Securities and Exchange Commission at the time of such request. In connection therewith, the Company shall deliver to the Subscriber a questionnaire that elicits the necessary information to determine the Subscriber's investor status. Upon receipt of the questionnaire, the Subscriber shall: (i) complete it, (ii) execute the signature page therein, and (iii) return it to the Company, or its designee, in accordance with the instructions therein, no later than ten (10) days after receipt of the questionnaire.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## INVESTOR REPRESENTATIONS

**(a)  Type of Subscriber.**  Indicate the form of entity of Subscriber:

☐  Individual  ☐  Limited Partnership

☐  Corporation  ☐  General Partnership

☐  Revocable Trust  ☐  Other Type of Trust (indicate type): _____

☐  Other (indicate form of organization):

**(i)**  If Subscriber is not an individual, indicate the approximate date Subscriber entity was formed:  _____.

**(ii)**  If Subscriber is not an individual, **initial** the line below which correctly describes the application of the following statement to Subscriber's situation:  Subscriber (x) was not organized or reorganized for the specific purpose of acquiring the Note and (y) has made investments prior to the date hereof, and each beneficial owner thereof has and will share in the investment in proportion to his or her ownership interest in Subscriber.

_____  True

_____  False

If the "False" box is checked, each person participating in the entity will be required to fill out a Subscription Agreement.

**(b)  Accredited Investor.**  In order for the Company to sell the Note (in conformance with state and federal securities laws), the following information must be obtained regarding Subscriber's investor status.  Please **initial each item applicable** to you as an investor in the Company.

**(i)**  _____  A natural person whose net worth, either individually or jointly with such person's spouse, at the time of Subscriber's purchase, exceeds $1,000,000.

**(ii)**  _____  A natural person who had an individual income in excess of $200,000, or joint income with that person's spouse in excess of $300,000, in each of the two most recent years and reasonably expects to reach the same income level in the current year.

**(iii)**  _____  A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

**(iv)**  _____  A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

**(v)**  _____  An insurance company as defined in section 2(13) of the Exchange Act.

**(vi)**  _____  An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act.

**(vii)** _____ A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

**(viii)** _____ A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state, or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

**(ix)** _____ An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

**(x)** _____ A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

**(xi)** _____ An organization described in Section 501(c)(3) of the Internal Revenue Code, or a corporation, business trust or partnership, not formed for the specific purpose of acquiring the Note, with total assets in excess of $5,000,000.

**(xii)** _____ A director or executive officer of the Company.

**(xiii)** _____ A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Note, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of investing in the Company.

**(xiv)** _____ An entity in which all of the equity owners qualify under any of the above subparagraphs.

_____ Subscriber does <u>not</u> qualify under any of the investor categories set forth in Section 4(a)(i)(i) through Section 4(a)(xiv).

**(c) Net Worth.** The term "net worth" means the excess of total assets over total liabilities (including personal and real property, but excluding the estimated fair market value of a person's primary home).

**(d) Income.** In determining individual "income," Subscriber should add to Subscriber's individual taxable adjusted gross income (exclusive of any spousal income) any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

**(e) Certification of Subscriber.** If Subscriber is providing a letter from a CPA, attorney, licensed broker-dealer, or SEC registered investment advisor to verify his/her accredited status, then he/she hereby represents and warrants that the following statements are true, correct, and complete as of the date of the signature below (the "Certification Date"):

- All materials that I have delivered are true, correct and complete as of the Certification Date;

- I have fully and accurately disclosed all liabilities that are required to be included in the calculation of my net worth; and

- If I am relying on my income and/or that of my spouse to satisfy the requirements for being an accredited investor, I have a reasonable expectation of reaching individual income in excess of $200,000 or joint income with my spouse in excess of $300,000 in the current year.

## INVESTMENT SUMMARY

### Initial Investment Amount

Investor agrees to invest the following initial amount ("Principal Balance"):

$_____

### Interest Rate:  The standard interest rate is 2% per annum.  However, as set forth in the Memorandum, you may earn a 3% interest rate if you elect to waive the right to make a demand repayment pursuant to the Note for the *first year* following the issuance date, in which event the minimum interest rate payable during such first year will be 3% instead of 2%. If you wish to make such an election, please indicate so below and initial in the space provided. *(This election is optional)*

Election of 3% Interest and 12-month Lock:

Yes : _____        No : _____        Initials: _____

### Payment Method

Investor agrees to forward payment of the Principal Balance in <u>one</u> of the following methods (select one):

☐ **Credit Card**: by entering the following credit card information, you are authorizing the Company to charge your card for the Principal Balance.  Additionally, you agreed to pay any credit card processing fees involved in making the credit card payment.

| | |
|---|---|
| **Name of Cardholder** | |
| **Credit Card Number** | |
| **Expiration Date** | |
| **Security Code** | |

☐ **Wire Transfer or ACH**:  by wiring payment of the Principal Balance to the account set forth below:

Account Name:           iCap Vault 1, LLC
ABA Routing Number: 123205054
Account Number:        4864314804
Bank Name:                Umpqua Bank
Bank Address:            705 Gilman Blvd. NW, Issaquah, WA 98027
SWIFT CODE:           UMPQUS6P

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit 9, Page 936    Pg 93 of 1366

☐ **Check**:  by mailing a check made payable to "iCap Vault 1, LLC" along with a completed subscription document to:

> iCap Vault 1, LLC
> Attn: Investor Relations Department
> 3535 Factoria Blvd. SE, Suite 500
> Bellevue, WA 98006

☐ **Other**: _____

*Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note agreement, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

## INDIVIDUALS

In witness whereof, the parties hereto have executed this Agreement as of the dates set forth below.

Dated: _____, 20____.

<div style="margin-left:2em">

Signature(s):  _____

Signature(s):  _____

Name(s) (Please Print):  _____

Name(s) (Please Print):  _____

Residence Address:  _____

_____

Phone Number:  _____

Social Security Number(s):  _____

Social Security Number(s):  _____

Email address:  _____

</div>

<div style="text-align:center">

ACCEPTANCE

</div>

iCap Vault 1, LLC

Date: _____, 20_____.

By: iCap Vault Management, LLC

Its: Manager

By:  _____

Name:  _____

Title:  Manager

## CORPORATIONS, PARTNERSHIPS, TRUSTS OR OTHER ENTITIES

In witness whereof, the parties hereto have executed this Agreement as of the dates set forth below.

Dated: _____, 20___.

Name of Purchaser (Please Print): _____

By: _____

Name (Please Print): _____

Title _____

Address: _____

_____

Phone Number: _____

Taxpayer ID Number: _____

Email address: _____

ACCEPTANCE

iCap Vault 1, LLC

Date: _____, 20____.

By: iCap Vault Management, LLC

Its: Manager

By: _____

Name: _____

Title: Manager

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Exhibit 9, Page 939
Pg 35 of 1366

**Annex 1**
[CERTIFIER LETTERHEAD]
<u>Accredited Status Certification Letter</u>

_____, 20_____

iCap Vault 1, LLC
Attn: Investor Relations Department
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

Re:  <u>Determination of Accredited Status</u>

Dear iCap Vault Investor Relations Team:

_____ ("Client") has asked us to provide iCap Vault 1, LLC with this letter to assist you in your determination of whether Client is an "accredited investor" as defined in Rule 501(a) of the Securities Act of 1933, as amended (the "Securities Act").

A.  **My Role**.  [I/We] hereby certify that [I/we] [am/are] (please check the appropriate box):

[ ]  a registered broker-dealer, as defined in the Securities Exchange Act of 1934;
[ ]  an investment adviser registered with the Securities and Exchange Commission;
[ ]  a licensed attorney in good standing under the laws of the jurisdictions in which I am admitted to practice law; or
[ ]  a certified public accountant in good standing under the laws of the place of my residence or principal office.

B.  **Accredited Status of Client**.  Based solely on a review of the Client Materials (as defined below), the undersigned hereby advises you that Client satisfies one or more of the following criteria (check all boxes that apply):

[ ]  a natural person whose individual "net worth,"  or joint net worth with Client's spouse, exceeds $1,000,000;

or

[ ]  a natural person who had an individual income in excess of $200,000 in each of the two most-recent years or joint income with Client's spouse in excess of $300,000 in each of those years.

C.  **Materials**.  In connection with this letter, I/we have examined and relied upon the original or copies of one or more of the following documents (the "Client Materials"):

•  Tax returns for the two most recent tax years filed by Client and his/her spouse on Form 1040 (the "Tax Returns"), accompanied by a certificate of the Client that that the copies of the Tax Returns provided were true, correct and complete, filed with the appropriate office of the Internal Revenue Service, prepared in full compliance with applicable law and governmental regulations and have not been amended.

•  A certificate executed by Client and his/her spouse, attached hereto, addressed to the Issuer and us, stating such persons: (i) have had a joint income in excess of $300,000 in each of the two

478023.v10

most-recent years and a reasonable expectation of joint income in the current year in excess of $300,000; or (ii) have a joint "net worth" with Client's spouse in excess of $1,000,000.

- A certificate executed by Client, attached hereto, addressed to the Issuer and us, stating such person: (i) has had an individual income in excess of $200,000 in each of the two most-recent years and a reasonable expectation of income in the current year in excess of $200,000; or (ii) has an individual "net worth" in excess of $1,000,000.

- Form 1099 filed with the Internal Revenue Service by Client [and [his/her] spouse] for the two most-recent years.

- Schedule K-1 of Form 1065 filed with the Internal Revenue Service by Client [and [his/her] spouse] for the two most recent-years.

- Form W-2 issued by the Internal Revenue Service to Client [and [his/her] spouse] for the two most recent-years.

- Other Internal Revenue Service documents (please specify): _____.

- Bank statements, brokerage statements and other statements of securities holdings, certificates of deposit, tax assessments, or appraisal reports issued by independent third parties to Client, dated within three months of the date of this Letter.

- A consumer or credit report from at least one of the nationwide consumer reporting agencies indicating Client's liabilities, dated within three months of the date of this Letter;

- Other documents (please specify): _____.

D. We have not conducted any other investigation or inquiries of Client, and have not determined whether the above documents were accurately prepared, agree with source documents, were properly filed or otherwise. We draw your attention to the fact that the determination of whether a person is an accredited investor is a factual question and therefore not susceptible to a legal opinion. Accordingly, this letter is not a legal opinion and we make no representations about whether Client is an accredited investor or whether this letter is sufficient for your purposes. By rendering this letter, we do not intend to waive any attorney-client privilege, as applicable. This letter is limited to the matters set forth herein and speaks only as of the date hereof. Nothing may be inferred or implied beyond the matters expressly contained herein. This letter may be relied upon by you and only in connection with an offering under Rule 506(c) and only for 30 days from the date of this letter. This letter may not be used, quoted from, referred to or relied upon by you or by any other person for any other purpose, nor may copies be delivered to any other person, without in each instance our express prior written consent. We assume no obligation to update this letter.

Very truly yours,

[CERTIFIER]:

By:_____
Name:_____
Title:_____

478023.v10

**EXHIBIT A-2**

**SUBSCRIPTION AGREEMENT FOR NON-U.S. PERSONS**

478023.v10

**EXHIBIT B**

**FORM OF NOTE**

478023.v10

**NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.**

**Principal Amount: $_____**                          **Issue Date: _____**

## SECURED PROMISSORY NOTE

FOR VALUE RECEIVED, iCap Vault 1, LLC, a Delaware limited liability company (the "Company" or the "Company"), hereby promises to pay to the order of _____, or registered assigns (the "Holder"), in the form of lawful money of the United States of America by the fifteenth (15th) anniversary of the Effective Date (as defined below) (the "Maturity Date"), the amount first set forth above ("Principal Amount"), and to pay interest on the unpaid Principal Amount hereof at the rate of two percent (2%) per annum, compounded daily (as the same may be adjusted as set forth herein, the "Interest Rate") from the Effective Date until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise, pursuant to the terms of this Secured Promissory Note (this "Note"). The Interest Rate may be changed by the Company from time to time through notice to Holder. The "Effective Date" is defined as the date on which the Subscription Agreement and all related documents are executed in full, and the Principal Amount is made available to the Company as determined by the Company's financial institution; provided, however, that if this Note is signed by Company, and the entire Principal Amount is not made available to the Company within 21 days of the date first set forth above, then this Note, the Subscription Agreement, and all related documents shall be automatically terminated, cancelled, or rescinded and of no effect. This Note is one of a Series of secured promissory notes being issued by the Company up to a total principal amount of $500,000,000 (collectively, the "Notes"). This Note is issued to Holder pursuant to a Subscription Agreement dated as of _____ (the "Subscription Agreement") by and between the Company and Holder and is subject to the terms and conditions thereof.

1. <u>Payments</u>.

    (a) This Note is a balloon note and there are no scheduled payments prior to the Maturity Date except as otherwise set forth herein. Unless otherwise paid, the outstanding Principal Amount and all unpaid Interest shall be paid on the Maturity Date. The Company may prepay all or any portion of the Principal Amount prior to the Maturity Date without penalty.

    (b) At any time following the Effective Date, Holder may require the Company to repay all or a portion of the Principal Amount and all unpaid Interest then due and payable (a "Demand Repayment"). Any Demand Repayment may be made through the Company's investor portal accessible at <u>www.icapvault.com</u>, an electronic application as provided by the Company to Holder, or by delivery to the Company of a demand notice in the form as attached hereto as Exhibit A (each as so delivered, a "Demand Notice"). Upon receipt of a Demand Notice, the Company shall process the Demand Notice and pay the requested funds to Holder within 30 days, but the Company shall utilize its commercially reasonable efforts to pay the requested funds to Holder within 5 business days. All repayments pursuant to this Section 1(b) shall be applied first to accrued and unpaid Interest and thereafter to the Principal Amount.

(c) Notwithstanding anything herein to the contrary, in the event that this Section 1(c) is applicable, as evidenced by Holder's election on the Subscription Agreement noting such applicability, and Company's acceptance thereof, then (i) the Interest Rate applicable during the first year following the Effective Date (the "Rate Increase Period") shall be three percent (3%) instead of two percent (2%), and any references hereto to "2%" or "two percent" shall, solely for such first year, be deemed replaced with "3%" or "three percent" as applicable; and (ii) Holder shall not be entitled to make a Demand Repayment during such Rate Increase Period. Following the expiration of the Rate Increase Period, the base Interest Rate payable hereunder, prior to any other adjustments as set forth herein, shall again be two percent (2%) per annum, and Holder shall, as of such time, be entitled to make a Demand Repayment.

2. Security and Guaranty; Exchange.

   (a) Until such time as the Company has filed a registration form on S-11 (the "Registration Statement") pursuant to the Securities Act of 1933, as amended (the "Securities Act") for the registration of promissory notes having terms and conditions materially similar to this Note other than for this Section 2 (the "Registered Notes"), (i) payment of this Note and the Interest and Principal Amount hereunder shall be secured by a pledge of the equity securities of any direct wholly owned subsidiaries held by Vault Holding, LLC a wholly owned subsidiary of the Company ("Holding"), pursuant to a Pledge and Security Agreement to be entered into by and between the holders of the Notes, the Company and Holding (the "Security Agreement") provided that such security interest may be junior to any financing in place related to the real estate holdings of such subsidiaries; and (ii) payment of this Note and the Interest and Principal Amount hereunder shall be guaranteed by Holding pursuant to a Guaranty Agreement to be entered into between Holding and the Company (the "Guaranty Agreement"). This Note, the Subscription Agreement pursuant to which Holder acquired this Note, the Pledge and Security Agreement and the Guaranty Agreement may be referred to collectively as the "Transaction Documents."

   (b) Upon the effectiveness of the Registration Statement, the Holder shall have the right, but not the obligation, to exchange this Note for a Registered Note in the aggregate principal amount equal to the Interest and Principal Amount then due and owing hereunder. In the event of such exchange this Note shall cease to be of any force or effect. Such exchange right shall be subject to reasonable terms and conditions as determined by the Company and communicated to the Holders, and such exchange offer shall remain open for at least 30 days from effectiveness of the Registration Statement.

   (c) On the thirty (30) day anniversary of the effectiveness of the Registration Statement, the Security Agreement and the Guaranty shall automatically terminate without any further action of any party thereto, and this Note shall thereafter be an unsecured obligation of the Company.

   (d) This Note will be subordinate at times to the rights of any lender of the Company or its subsidiaries, as well as to other higher-ranking obligations of the Company, including property taxes and management fees, as further set forth in the Security Agreement.

3. Application of Payments. Unless otherwise expressly provided in this Note, all payments made on this Note shall be applied, (i) first to the payment of the Interest and other charges then accrued and due on the unpaid Principal Amount of this Note; and then (ii) the remainder of all such payments shall be applied to the reduction of the unpaid Principal Amount.

4. Events of Default.

   (a) Definition. For the purpose of the Transaction Documents, an event of default ("Event of Default") will be deemed to have occurred if, and at the time, holders holding a majority of the principal amount of the

478023.v10

Notes then outstanding (a "Majority-in-Interest of the Noteholders") elect to declare such an Event of Default, which a Majority-in-Interest of the Noteholders may only do in the event that any of the following occur, and after the Company has not rectified such event within 90 days of receipt of notice thereof signed by a Majority-in-Interest of the Noteholders:

(i) The Company fails to make a Demand Payment when due pursuant to Section 1(b);

(ii) the Company fails to perform any of its material obligations under this Note, or being in breach in any material respect of any representation, warranty, covenant or agreement on the part of the Company set forth in this Note;

(iii) the Company commences any liquidation or dissolution proceedings or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consents to the filing of any bankruptcy petition against it under any similar law; or

(iv) the Company fails to pay all amounts due under the Notes on the Maturity Date.

(b) <u>Consequences of Events of Default</u>. If, and at the time, an Event of Default occurs, the Interest Rate shall be increased to eight percent (8%) per annum (the "Default Rate"), which Default Rate shall remain in place until this Note is either paid as due or such Event of Default is cured. If an Event of Default as set forth in Section 1(a)(i) or Section 1(a)(ii) occurs, a Majority-in-Interest of the Noteholders will have the right to declare only the applicable Note(s) which are subject to the Event of Default due and payable. If an Event of Default as set forth in Section 1(a)(iii) or Section 1(a)(iv) occurs, a Majority-in-Interest of the Noteholders will have the right to declare all of the Notes due and payable and, if the Security Agreement and Guaranty Agreement are still in effect as of such time, a Majority-in-Interest of the Noteholders shall have the right to proceed to enforce the security granted to the Noteholders pursuant to the Pledge and Security Agreement entered into between the Company and the Noteholders, and to enforce the Guaranty Agreement entered into between the Company and Vault Holdings, LLC, pursuant to which Vault Holdings, LLC guaranteed the obligations of the Company hereunder for the benefit of the Noteholders.

5. <u>Cancellation</u>. After all obligations for the payment of money arising under this Note have been paid in full this Note will be surrendered to the Company for cancellation.

6. <u>Failure or Indulgence Not Waiver.</u> No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies of the Holder existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

7. <u>Notices.</u> All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be given in the manner set forth in the Subscription Agreement.

8. <u>Amendments.</u> This Note and the other Transaction Documents, and any provision hereof or thereof, may be amended at any time by the Company upon notice to the Holder, including adjustment of the Interest Rate, provided, however, that the Company may not make any amendments to the Interest Rate that would result in the Interest Rate being less than 2% per annum (or 3% per annum for the first year following the issuance date if Section 1(c) is applicable in this Note), or to any of the provisions of Section 1(b), without the prior written consent of Holder.

478023.v10

9. <u>Assignability.</u> This Note shall be binding upon the Company and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Each transferee of this Note must be an "Accredited Investor" (as defined in the Subscription Agreement) and any transfer is subject to the terms and conditions thereof.

10. <u>Governing Law; Venue; Attorney's Fees.</u> This Note shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS NOTE, THE OTHER TRANSACTION DOCUMENTS OR THE CONTEMPLATED TRANSACTIONS SHALL BE INSTITUTED SOLELY IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF WASHINGTON, IN EACH CASE LOCATED IN KING COUNTY, WASHINGTON, AND EACH PARTY IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. **THE COMPANY AND THE HOLDER EACH HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Note or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The prevailing party in any action or dispute brought in connection with this the Note or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorneys' fees and costs.

11. <u>Other Agreements.</u> The Company and the Holder shall be bound by the applicable terms of the Subscription Agreement, and, for such time as they are in effect, the Security Agreement and the Guaranty Agreement. The Subscription Agreement, the Security Agreement, the Guaranty Agreement and this Note constitute the sole and entire agreement of the Company and the Holder with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

12. <u>Remedies.</u> The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, except as expressly set forth herein or in the Transaction Documents the Company acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required. If default is made in the payment of this Note, the Company shall pay the Holder costs of collection, including reasonable attorneys' fees.

13. <u>Construction; Headings</u>. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

14. <u>Usury.</u> To the extent it may lawfully do so, the Company hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage

of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any action or proceeding that may be brought by the Holder in order to enforce any right or remedy under this Note. Notwithstanding any provision to the contrary contained in this Note, it is expressly agreed and provided that the total liability of the Company under this Note for payments which under Delaware law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums which under Delaware law in the nature of interest that the Company may be obligated to pay under this Note exceed such Maximum Rate. It is agreed that if the maximum contract rate of interest allowed by Delaware law and applicable to this Note is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to this Note from the effective date thereof forward, unless such application is precluded by applicable law. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to the Holder with respect to indebtedness evidenced by this the Note, such excess shall be applied by the Holder to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at the Holder's election.

15. <u>Severability.</u> In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law (including any judicial ruling), then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Company has executed and delivered this Note on the Issue Date.

iCap Vault 1, LLC

By: iCap Vault Management, LLC

Its: Manager

By: _____

Name: _____

Title: _____

478023.v10

Exhibit A

Demand Repayment Notice

This is a Demand Notice pursuant to that certain Secured Promissory Note of iCap Vault 1, LLC, a Delaware limited liability company (the "Company"), issued to the undersigned ("Holder") on _____, 201____ in the original Principal Balance of $_____ (the "Note"). Defined terms used herein shall have the meaning given to them in the Note. Pursuant to the provisions of the Note, Holder hereby demands prepayment of the following amount:

**Amount (Select One)**

☐ Full repayment of all Principal Balance and all unpaid Interest; OR

☐ Repayment of the following amount: $_____

**Payment Method (Select One)**

- Via ACH transfer to:
  - Account Name: _____
  - ABA Routing Number: _____
  - Account Number: _____
  - Bank Name: _____

  SWIFT CODE: _____

- Via Check to the address of Holder as set forth in the Subscription Agreement.

Name of Holder: _____

Signature: _____

Title: _____

Date: _____

**EXHIBIT C**

**PLEDGE AND SECURITY AGREEMENT**

478023.v10

# PLEDGE AND SECURITY AGREEMENT

This Pledge and Security Agreement (this "Agreement"), dated as of October 1, 2018 (the "Effective Date"), is entered into by and between iCap Vault 1, LLC, a Delaware limited liability company ("Parent"), Vault Holding, LLC, a Delaware limited liability company and a wholly owned subsidiary of Parent ("Pledgor") and the holders of promissory notes issued by Parent pursuant to an offering of up to $500,000,000 of promissory notes of Parent (the "Notes") pursuant to Regulation D and Regulation S promulgated under the Securities Act of 1933, as amended, commencing on or about October 1, 2018, who execute a counterpart signature page to this Agreement and become a party hereto (each a "Pledgees" and collectively the "Pledgees"), and for the benefit of the Pledgees. Each of Parent, Pledgor and each Pledgee may be referred to herein as a "Party" and collectively as the "Parties." Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, the Pledgor is or shall be the sole member or shareholder of certain subsidiaries of Pledgor which shall hold real estate investment properties, which will be acquired with the proceeds of the Notes and the proceeds from which will be used to pay amounts due to the Pledgees pursuant to the Notes (the "Portfolio SPEs"), holding all of the membership interests or shares of capital stock of such Portfolio SPEs (the "Pledged Interests"); and

WHEREAS, the Pledgor has agreed to execute and deliver this Agreement pursuant to the terms of the Notes;

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1. PLEDGE.  To secure the prompt payment and full and faithful performance of the obligations of Pledgor to Pledgees pursuant to the Notes, whether direct, contingent, fixed or otherwise, now or hereafter from time to time arising pursuant to the Notes (collectively, the "Indebtedness"), the Pledgor hereby grants a security interest in and to, does hereby pledge and assign to, Pledgees, under Articles 8 and 9 of the UCC (as defined below), all its right, title, share and interest in, to and in respect of (i) the Pledged Interests; (ii) together with only so much of any distribution, whether of cash or in kind, in connection with, relating to or in respect of the applicable Pledged Interests, whether any such distribution or payment is a distribution, is in partial or complete liquidation, or is the result of reclassification, readjustment or other changes in the capital structure of the entity issuing the same, or otherwise, and any and all subscriptions, warrants, options and other rights issued upon and/or in connection therewith; (iii) any and all substitutions, renewals, improvements and replacements of the Pledged Interests and additions thereto; and (iv) all proceeds arising from any of the foregoing.  All of the foregoing items are referred to herein individually and/or collectively as the "Collateral." Capitalized terms not otherwise defined herein or in the Notes shall have the meaning given them in the UCC. For purposes of this Agreement, "UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Delaware; provided, however, in the event that, by reason of mandatory  provisions of law, any or all of the attachment, perfection or priority of Pledgees' security interest in the Pledged Interests is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

2. VOTING AND TRADING RIGHTS. If no Event of Default has occurred and is continuing, the Pledgor may exercise any voting rights that the Pledgor may have as to the Pledged Interests. If an Event of Default has occurred and is continuing, Pledgor shall deliver the Pledged Interests to such party as directed by a Majority-in-Interest of the Noteholders (the "Designated Party"), and thereafter Pledgees may exercise all voting rights as to any of the Pledged Interests and the Pledgor shall deliver to the Designated Party all notices, proxies and other information relating to the exercise of such rights received by the Pledgor promptly upon receipt and, at the request of Designated Party, shall execute and deliver to the Designated Party any proxies or other instruments which are, in the judgment of the Designated Party, necessary for Pledgees to exercise such voting rights.

3. DUTY OF PLEDGEE. Pledgees shall have no liability or duty, either before or after the occurrence of an Event of Default to collect or enforce any of its rights against, the Pledged Interests. If Pledgees actually receive any notices requiring action with respect to Pledged Interests in Pledgees' possession, Pledgees shall take reasonable steps to forward such notices to the Pledgor. Except as provided in Section 2, the Pledgor is responsible for responding to notices concerning the Pledged Interests, voting the Pledged Interests, and exercising any rights and options, calls or conversions in respect of the Pledged Interests.

4. REPRESENTATIONS AND WARRANTIES. The Pledgor represents and warrants to Pledgees that:

**(a)** The Interests do, or shall, constitute all of Pledgor's ownership interest in the Portfolio SPEs.

**(b)** The Pledgor is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the Pledgor's organizational documents. The Pledgor has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Agreement.

**(c)** The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Pledgor is a party or to which any of its assets, properties or operations are subject.

**(d)** This Agreement and all agreements and other documents executed by the Pledgor in connection herewith constitute the valid and binding obligation of the Pledgor, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

**(e)** No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Agreement, the pledge of a security interest in the Pledged Interests in favor of Pledgees or the valid and lawful exercise by Pledgees of remedies available to them under this Agreement or applicable law or of the voting

and other rights granted to it in this Agreement, except as may be required for the offer or sale of securities under applicable securities laws.

**(f)** The Pledgor is the sole owner of the Pledged Interests, has the right to grant the security interest provided for herein to Pledgees and, to the knowledge of the Pledgor, has granted to Pledgees a valid and perfected first priority security interest in the Pledged Interests, free of all liens, encumbrances, transfer restrictions and adverse claims.

5. COVENANTS. The Pledgor covenants and agrees that so long as this Agreement shall be in effect:

**(a)** Provided that the value of Pledgor's real estate portfolio is at least 70% of outstanding amounts owned under the Notes, as reasonably determined by the Parent, then the Parent, Pledgor and the Portfolio SPEs may make distributions to their respective members as they determine. At any time that the value of Parent's real estate portfolio is less than 70% of outstanding amounts owned under the Notes, none of Parent, Pledgor or the Portfolio SPEs shall make any distributions to their members, other than tax distributions (i.e., distributions in the amount of taxes payable by such members on the apportioned income of the entities) or as otherwise required by law. Pledgor may cause the real estate owned by the Portfolio SPEs to be sold, encumbered, transferred, pledged, liened, or otherwise disposed of as it sees fit.

**(b)** The Pledgor shall defend the Pledgor's title to the Pledged Interests and the security interest of Pledgees against the claims of any person claiming rights in the Pledged Interests.

**(c)** Without the prior written consent of a Majority-in-Interest of the Noteholders, (i) the Pledgor shall not sell, gift, pledge, exchange or otherwise transfer the Pledged Interests. In the event of any such sale, exchange or transfer consented to by Pledgees, the Pledgor shall upon receipt the proceeds of such sale, exchange or transfer to pay any such distribution with respect to the Pledged Interests to the Pledgees for application to the Indebtedness.

**(d)** The Pledgor will pay and discharge when due all of its material obligations and liabilities (including, without limitation, tax liabilities) which if unpaid when due might by law give rise to a lien on the Pledged Interests, except where the same may be contested in good faith by appropriate proceedings.

**(e)** At the Pledgor's expense, do such further facts and execute and deliver such additional conveyances, certificates, instruments, legal opinions and other assurances as a Majority-in-Interest of the Noteholders may reasonable request to protect, assure or enforce their interests, rights and remedies under this Agreement.

6. INDEMNIFICATION. Each Party shall jointly and severally indemnify and hold harmless the other Parties and such other Parties' agents, beneficiaries, affiliates, representatives and their respective successors and assigns (collectively, the "Indemnified Persons") from and against any and all damages, losses, liabilities, taxes and costs and expenses (including, without limitation, attorneys' fees and costs) resulting directly or indirectly from (a) any inaccuracy, misrepresentation, breach of warranty or non-fulfillment of any of the representations and warranties of such Party in this Agreement, or any actions, omissions or statements of fact inconsistent with in any material respect any such representation or warranty, (b) any failure by such Party to perform or comply with any agreement, covenant or obligation in this Agreement.

7. TERMINATION. This Agreement shall automatically terminate and be of no further force or effect, and any security interest in the Pledged Interests shall automatically terminate and be released, on the thirty (30) day anniversary of the effectiveness of the Registration Statement.

8. EXPENSES. The Pledgor agrees that, following an Event of Default, the Pledgor will pay to the Pledgees upon demand the amount of any out-of-pocket expenses, including the fees and disbursements of counsel, that Pledgees incurs in connection with the enforcement of this Agreement, including expenses incurred to preserve the value of the Pledged Interests, the sale or other disposition of any of the Pledged Interests, the exercise by Pledgees of any of its rights, or any action to enforce its rights under this Agreement.

9. NOTICES. Any notices, communications and waivers under this Agreement shall be in writing and sent in accordance with the provisions for notices as set forth in the Notes.

10. INCORPORATION. Section 10, Section 12, Section 13 and Section 15 of the Notes are incorporated herein by reference and shall apply to this Agreement as though fully set forth herein, provided that any reference therein to the "Note" shall be deemed a reference to this Agreement.

11. INTERPRETATION. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore shall not be construed against a Party or Parties on the ground that such Party or Parties drafted or was more responsible for the drafting of any such provision(s). The Parties further agree that they have each carefully read the terms and conditions of this Agreement, that they know and understand the contents and effect of this Agreement and that the legal effect of this Agreement has been fully explained to its satisfaction by counsel of its own choosing.

12. AMENDMENT. This Agreement may be amended by Parent and the Pledgor at any time, without any approval of the Pledgees being required.

13. COUNTERPARTS. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which taken together shall be but a single instrument. The Pledgees may join this Agreement at or following the Effective Date by the execution of a Counterpart Signature Page as set forth herein, provided, however, that such Counterpart Signature Page shall not be effective unless and until the Company accepts the applicable proposed Pledgee's subscription for a Note pursuant to the Subscription Agreement. The execution and delivery of a facsimile or other electronic transmission of a signature to this Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

*[Signatures appear on following pages]*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date or as of the date of their joinder hereto.

**Pledgor**: Vault Holding, LLC

By: _____

Name: Chris Christensen

Title: Manager

**Parent**: iCap Vault 1, LLC

By: iCap Vault Management, LLC

Its: Manager

By: _____

Name: Chris Christensen

Title: Manager

478023.v10

**Counterpart Signature Page**

The undersigned hereby accepts, and becomes a party to, the Pledge and Security Agreement (the "Agreement"), dated as of October 1, 2018, in connection with the acquisition of a Note (as defined in the Agreement), and by its signature below signifies its agreement to be bound by the terms and conditions of the Agreement.

**INDIVIDUAL**

Name: _____

Signature: _____

Date: _____

---

**ENTITY**

Entity Name: _____

Signature: _____

Name: _____

Title: _____

Date: _____

**EXHIBIT D**

**GUARANTY AGREEMENT**

478023.v10

# GUARANTY AGREEMENT

This Guaranty (this "Guaranty") is made and entered into as of October 1, 2018 (the "Effective Date") by Vault Holding, LLC, a Delaware limited liability company ("Guarantor"), to and for the benefit of each of the holders (each, a "Holder") of promissory notes (the "Notes") issued by iCap Vault 1, LLC, a Delaware limited liability company and the sole member of Guarantor ("Borrower") pursuant to an offering of up to $500,000,000 of promissory notes of Borrower pursuant to Regulation D and Regulation S promulgated under the Securities Act of 1933, as amended, commencing on or about October 1, 2018 (the "Offering"). Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, following the execution of this Guaranty, Borrower shall issue certain Notes to the Holders, pursuant to a subscription agreement between the Borrower and the applicable Holder in connection with the Offering; and

WHEREAS, Guarantor acknowledges the provisions of the Notes contemplate Guarantor's entering into this Agreement and Guarantor is financially interested in Borrower and will receive certain benefits as a result of Guarantor's promises herein as a result of making this Guaranty for the benefit of the Holders;

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Guarantor agrees as follows:

1. Guarantor hereby unconditionally, absolutely and irrevocably guarantees the full and timely performance of all of the obligations of Borrower under the Notes, including the due and punctual payment of the principal and interest of the Note and all money due or that may become due under the Notes, whether (a) according to the present terms of any of those documents or at any earlier or accelerated date or dates as provided therein, (b) pursuant to any extension of time or (c) pursuant to any amendment, modification or replacement of those documents hereafter made or granted, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such indebtedness may be or hereafter becomes unenforceable (collectively, "Obligations").

2. Guarantor agrees that settlement of any claim by Holder against Borrower, whether in any proceeding or not, and whether voluntarily or involuntarily, will not reduce the amount due under this Guaranty except to the extent of the amount actually paid by Borrower or any other party and retained by Holder.

3. During the continuation of an Event of Default at a time when this Guaranty is in full force and effect, Holder may enforce this guaranty against Guarantor, but only after attempting to collect or exhausting Holder's efforts to collect from Borrower, in accordance with the provisions of the Notes.

4. Guarantor agrees that its obligation to make payment under the terms of this Guaranty shall not be impaired, modified, changed, released or limited in any manner by any impairment, modification, change, release, defense or limitation of the liability of Borrower or of a receiver, trustee, debtor-in-possession or estate under any bankruptcy or receivership proceeding. If any payment made by Borrower is reclaimed in a bankruptcy or receivership proceeding, Guarantor shall pay to Holders the dollar amount of the amount reclaimed. Guarantor further assigns to Holders all rights Guarantor may have in any proceeding under the U.S. Bankruptcy Code or any receivership or insolvency proceeding until all indebtedness of Borrower to Holders has been paid in full. This assignment includes all rights of Guarantor to be paid by Borrower even if those rights have nothing to do with this

Guaranty. This assignment does not prevent Holder from enforcing Guarantor's obligations under this Guaranty in any way.

5. Guarantor is now adequately informed of Borrower's financial condition, and Guarantor agrees to keep so informed. Holder need not provide Guarantor with any present or future information concerning the financial condition of Borrower or any other guarantor, and changes in Borrower's or Guarantor's financial condition shall not affect Guarantor's obligations under this Guaranty. Guarantor has not relied on financial information furnished by Holder, nor will Guarantor do so in the future.

6. Guarantor represents and warrants to the Holders as follows:

(a) The Guarantor is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Guaranty does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the Guarantor's organizational documents. The Guarantor has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Guaranty.

(b) The execution of this Guaranty and the consummation of the transactions contemplated by this Guaranty will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Guarantor is a party or to which any of its assets, properties or operations are subject.

(c) This Guaranty and all agreements and other documents executed by the Guarantor in connection herewith constitute the valid and binding obligation of the Guarantor, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

(d) No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Guaranty or the valid and lawful exercise by Holders of remedies available to them under this Guaranty or applicable law.

(e) Guarantor is fully familiar with all the covenants, terms and conditions of the Notes.

7. If an Event of Default occurs hereunder, Holders shall have all other remedies provided by law that do not conflict with the Note. Guarantor agrees that (a) this Guaranty shall inure to the benefit of and may be enforced by the Holder as set forth in the Notes, and (b) this Guaranty shall be binding upon and enforceable against Guarantor and its successors and assigns.

8. This Guaranty shall automatically terminate and be of no further force or effect on the thirty (30) day anniversary of the effectiveness of the Registration Statement.

9. Any notices, communications and waivers under this Agreement shall be in writing and sent in accordance with the provisions for notices as set forth in the Notes.

10. Section 10, Section 12, Section 13 and Section 15 of the Notes are incorporated herein by reference and shall apply to this Agreement as though fully set forth herein, provided that any reference therein to the "Note" shall be deemed a reference to this Agreement.

11. This Agreement may be amended by Parent and the Pledgor at any time, without any approval of the Holders being required.

IN WITNESS WHEREOF, the Guarantor has duly executed this Agreement as of the Effective Date.

Vault Holding, LLC

By: _____

Name: Chris Christensen

Title: Manager

# EXHIBIT 10

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM S-11

**FOR REGISTRATION UNDER THE SECURITIES ACT OF 1933**
**OF SECURITIES OF CERTAIN REAL ESTATE COMPANIES**

# <u>iCap Vault 1, LLC</u>

(Exact name of registrant as specified in governing instruments)

**3535 Factoria Blvd. SE, Suite 500**
**Bellevue, WA 98006**
**(425) 453-7497**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Chris Christensen**
**Chief Executive Officer**
**iCap Vault Management, LLC**
**3535 Factoria Blvd. SE, Suite 500**
**Bellevue, WA 98006**
**(425) 453-7497**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

*With copies to:*

**Laura Anthony, Esq.**
**Craig D. Linder, Esq.**
**Anthony L.G., PLLC**
**625 N. Flagler Drive, Suite 600**
**West Palm Beach, FL 33401**
**(561) 514-0936**

Approximate date of commencement of proposed sale to public: As soon as practicable after this registration statement becomes effective.

If any of the securities being registered on the Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box: [X]

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering: [ ]

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier registration statement for the same offering: [ ]

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier registration statement for the same offering: [ ]

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box: [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | [ ] | Accelerated filer | [ ] |
| Non-accelerated filer | [X] | Smaller reporting company | [X] |
| | | Emerging growth company | [X] |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided to Section 7(a)(2)(B) of the Securities Act. [ ]

### CALCULATION OF REGISTRATION FEE

| Title of Securities to be Registered | Amount to be Registered | Proposed Maximum Aggregate Price Per Security | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee (1) |
|---|---|---|---|---|
| Senior Secured Demand Notes | $ 500,000,000 | $ (2) | $ 500,000,000 | $ 64,900 |

(1) Calculated in accordance with Rule 457(c) by multiplying the maximum aggregate offering price by 0.0001298.
(2) The Senior Secured Demand Notes will be issued in denominations selected by the purchasers thereof, subject to minimum denominations established by the Company.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to Section 8(a) may determine.**

**The information in this preliminary prospectus is not complete and may be changed. These securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell nor does it seek an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**PRELIMINARY PROSPECTUS**                  **SUBJECT TO COMPLETION, DATED FEBRUARY 14, 2020**

<div align="center">

iCap Vault 1, LLC



$500,000,000

**SENIOR SECURED DEMAND NOTES**

</div>

iCap Vault 1, LLC (the "Company" or the "Vault") is offering to sell Variable Denomination Floating Rate Demand Notes, marketed and sold as "Senior Secured Demand Notes" (the "Notes") on a continuous basis, in a direct public offering, without any involvement of underwriters. The Notes will have the following principal terms and features:

- The Notes are subject to repayment at an investor's demand at any time or redemption by the Company at any time.

- The Notes will be secured by the membership interests in Vault Holding, LLC ("Holding"), which will hold interests in real estate, through wholly owned subsidiaries, and real estate-based financial instruments.

- The Notes earn a floating rate of interest that is determined from time to time by the Company in its sole discretion. We may establish different rates of interest for different investors based on their Note balances or other factors.

- Interest on the Notes will accrue and be compounded daily and be automatically reinvested on the last business day of each month.

- The initial interest rate applicable to the Notes and all subsequent changes to the interest rate will be disclosed on the Company's website at www.icapequity.com/vault and in pricing supplements filed with the Securities and Exchange Commission.

- The payment of principal and interest on the Notes is fully and unconditionally guaranteed by Vault Holding, LLC.

- The Notes have no stated maturity.

- The Notes are issuable in any amount, subject to a minimum initial investment for any one Note of $25; however, the Company can waive the minimum initial investment requirement on a case to case basis in its sole discretion.

- The Notes are in book-entry form only.

- The Notes will be senior obligations of the Company issued under an indenture between us, as issuer, Vault Holding, LLC, as guarantor, and American Stock Transfer & Trust Company, LLC, as the indenture trustee.

We intend to commence the offering promptly. The Notes are offered on a continuous basis, and the offering is expected to continue for a period in excess of 30 days, until such time as all of the Notes being offered hereunder have been sold, or until the registration statement relating hereto ceases to be effective with the SEC. The maximum aggregate principal amount of the Notes to be issued is equal to $500,000,000, which amount may be increased from time to time by the Company. Of these Notes, we are offering up to $5,000,000 aggregate principal amount of the Notes to existing noteholders in exchange for tendered Private Placement Notes (as described below), and cancellation of those Private Placement Notes by us, and the balance of the aggregate principal amount of the Notes offered hereby to new and existing investors. The outstanding principal amount of the Notes will increase and decrease from time to time.

The Company has the sole right to accept offers to purchase Notes and may reject, at its sole discretion, any proposed purchase of Notes in whole or in part. The Notes will be offered directly to the public by us, without an underwriter, on a self-underwritten, best efforts basis, which means our officers and directors will attempt to sell the securities we are offering in this prospectus. This prospectus will permit our officers and directors to sell the Notes directly to the public, with no commission or other remuneration payable to them for any securities they may sell. We may elect to engage one or more FINRA member firms (the "Placement Agents"), as placement agents for this Offering, in which event the Placement Agents will also conduct the Offering on a "best efforts" basis, and we would expect in such case to pay estimated total commissions up to 1.0% of the aggregate principal amount of the Notes sold to investors and interest accrued thereon, payable over four calendar quarters ("Quarterly Commission Payments") in arrears on the last day of each calendar quarter (March 31, June 30, September 30 and December 31) (each a "Quarterly Commission Payment Date") at a rate of 0.25% per quarter, commencing on the Quarterly Commission Payment Date following the issuance of such Notes, to the extent that such Notes have not been redeemed or repurchased, with such payments calculated on the average daily outstanding principal balances of the Notes and interest accrued thereon during the applicable calendar quarter; provided, however, to the extent that such Notes have been redeemed or repurchased prior to the completion of the applicable four Quarterly Commission Payment Dates, no Quarterly Commission Payment shall be made on such redeemed or repurchased Notes during any Quarterly Commission Payment Date after such redemption or repurchase of such Notes. Following the four Quarterly Commission Payments, to the extent that such Notes have not been redeemed or repurchased, we expect to pay an annual administration fee of up to 1.0% of the outstanding aggregate principal amount of the Notes sold to investors and interest accrued thereon, payable quarterly ("Quarterly Administration Payments") in arrears on the last day of each calendar quarter (March 31, June 30, September 30 and December 31) (each a "Quarterly Administration Payment Date") at a rate of 0.25% per quarter, commencing on the Quarterly Administration Payment Date following the fourth Quarterly Commission Payment of such Notes, with such payments calculated on the average daily outstanding principal balances of the Notes and interest accrued thereon during the applicable calendar quarter; provided, however, to the extent that such Notes have been redeemed or repurchased, no Quarterly Administration Payment shall be made on such Notes during any Quarterly Administration Payment Date after such redemption or repurchase of such Notes. For more information, see the section titled "Plan of Distribution" and "Use of Proceeds" herein. In offering the securities on our behalf, the officers and directors will rely on the safe harbor from broker-dealer registration set out in Rule 3a4-1 under the Securities and Exchange Act of 1934.

The Company reserves the right to withdraw, cancel or modify the offer to sell Notes, or agree to changes for commissions, at any time without notice. We cannot assure you that all or any portion of the Notes we are offering will be sold. We do not have to sell any minimum amount of Notes to accept and use the proceeds of this offering. Proceeds from the sale of the Notes will be placed in our general corporate bank account when received. We have not made any arrangement to place any of the proceeds from this offering in an escrow, trust or similar account. Therefore, you cannot be guaranteed of the return of your investment. We have the right to reject any subscription for Notes, in whole or in part, for any reason.

The Notes do not constitute a savings, deposit or other bank account and are not insured by or subject to the protection of the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation or any other federal or state agency. The Notes are not a money market fund, which are typically diversified funds consisting of short-term debt securities of many issuers, and therefore do not meet the diversification and investment quality standards set forth for money market funds by the Investment Company Act of 1940.

The Notes will not be listed on any securities exchange or quoted on Nasdaq or any over-the-counter market. We do not intend to make a market in the Notes and we do not anticipate that a market in the Notes will develop. There will be significant restrictions on your ability to transfer or resell the Notes. We have not requested a rating for the Notes; however, third parties may independently rate them. After this registration statement becomes effective, we will file periodic reports, primarily annual and quarterly reports, with the Securities and Exchange Commission.

See "Plan of Distribution" for a description of anticipated expenses to be incurred in connection with our offering and selling the Notes.

We are an "emerging growth company," as such term is defined in Section 2(a)(19) of the Securities Act of 1933, as amended, and we will be subject to reduced public reporting requirements. See "Emerging Growth Company Status."

|  | Per Note | | Total (3) |
|---|---|---|---|
| Public offering price | 100% | $ | 500,000,000 |
| Underwriting discounts and commissions (1) | None | | None |
| Offering proceeds to iCap Vault 1, LLC before expenses (2) | 100% | $ | 500,000,000 |

(1)   The Notes are not being offered or sold pursuant to any underwriting or similar agreement, and no commissions or other remuneration will be paid in connection with their sale. Notwithstanding, we reserve the right to use licensed broker/dealers and pay the brokers a cash commission of up to 1.0% of the aggregate principal amount of the Notes sold to investors through such brokers and interest accrued thereon, compounded on a daily basis, payable over four quarters in arrears on the last day of each calendar quarter to the extent that such Notes have not been redeemed or repurchased.

(2)   Does not include estimated offering expenses including, without limitation, legal, accounting, auditing, transfer agent, other professional, printing, advertising, travel, marketing, blue-sky compliance and other expenses of this Offering. We estimate the total expenses of this Offering, excluding any underwriting commissions and expenses, will be approximately $1,200,000.

(3)   Assumes that the maximum aggregate offering amount of $500,000,000 is received by us (including up to $5,000,000 worth of Private Placement Notes (reflecting aggregate principal amount and interest accrued) previously issued by the Company to noteholders which are being tendered by noteholders as payment for up to $5,000,000 aggregate principal amount of the Notes acquired in this Offering and cancellation of those Private Placement Notes by us.

Persons effecting transactions in the Notes should confirm the registration of these securities under the securities laws of the states in which transactions occur or the existence of applicable exemptions from such registration.

Investing in our Notes may be considered speculative and involves a high degree of risk, including the risk of losing your entire investment. See "Risk Factors" beginning on page 18 of this prospectus to read about the risks you should consider before buying our Notes. You should carefully consider the risk factors set forth in this prospectus. An investment in our Notes is not suitable for all investors. The Notes are only suitable for persons with substantial financial resources and with no need for liquidity in this investment.

**POTENTIAL INVESTORS SHOULD RECOGNIZE THAT BY PURCHASING NOTES OF THE COMPANY, THEY WILL NOT THEREBY ACQUIRE ANY INTEREST, DIRECTLY OR INDIRECTLY, IN THE COMPANY OR ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY ICAP VAULT MANAGEMENT, LLC (THE "MANAGER") OR ITS AFFILIATES. INVESTORS SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES AS SET FORTH HEREIN IS GIVEN SOLELY TO ALLOW INVESTORS TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. THE MANAGER AND ITS AFFILIATES MAY CONTINUE TO ENGAGE IN MANAGEMENT AND INVESTMENT ACTIVITIES RELATED TO PRE-EXISTING INVESTMENTS AND ACTIVITIES OR OPERATIONS OF THE PRIOR FUNDS AS WELL AS FUTURE FUNDS.**

Please read this prospectus before investing and keep it for future reference. Upon completion of this offering, we will file periodic reports and other information about us with the SEC. This information will be available free of charge by contacting us at 3535 Factoria Blvd. SE, Suite 500, Bellevue, Washington 98006 or by phone at (425) 453-7497 or on our website at www.icapequity.com/vault. The Securities and Exchange Commission also maintains a website at www.sec.gov that contains such information.

We anticipate that we will be exempt from the registration requirements of the Investment Company Act of 1940, as amended (the "Investment Company Act"), by reason of the exemption specified in Section 3(c)(5)(C) of the Investment Company Act (excludes from regulation as an "investment company" any entity that is primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate).

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 969 of 1366   Exhibit 10, Page 969

You should read this prospectus and any applicable prospectus supplement, including the information incorporated by reference, carefully before you decide whether to invest in Notes.

You may invest in the Notes by completing the onboarding process available on the Company's website and by sending your investment by one of the methods described in this prospectus under the heading "Description of the Notes—How to Make an Initial Investment."

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THE INFORMATION IN THIS PROSPECTUS IS NOT COMPLETE AND MAY BE CHANGED. WE WILL NOT SELL THESE SECURITIES UNTIL THE REGISTRATION STATEMENT FILED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION HAS BEEN CLEARED OF COMMENTS AND IS DECLARED EFFECTIVE. THIS PROSPECTUS IS NOT AN OFFER TO SELL THESE SECURITIES AND IT IS NOT SOLICITING AN OFFER TO BUY THESE SECURITIES IN ANY STATE WHERE THE OFFER OF SALE IS NOT PERMITTED.**

Delivery of the Notes will be made in book-entry form through American Stock Transfer & Trust Company, LLC, as Security Registrar, for the account of the investors.

**The date of this prospectus is _____, 2020.**

## TABLE OF CONTENTS

|  | Page |
|---|---|
| CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS | 2 |
| INDUSTRY AND MARKET DATA | 2 |
| PROSPECTUS SUMMARY | 3 |
| RISK FACTORS | 18 |
| USE OF PROCEEDS | 39 |
| DISTRIBUTION POLICY | 40 |
| CAPITALIZATION | 40 |
| PLAN OF DISTRIBUTION | 41 |
| DESCRIPTION OF THE NOTES | 49 |
| SUMMARY OF OPERATING AGREEMENT | 63 |
| DESCRIPTION OF BUSINESS | 69 |
| DESCRIPTION OF PROPERTY | 79 |
| LEGAL PROCEEDINGS | 80 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 80 |
| MANAGEMENT | 86 |
| EXECUTIVE COMPENSATION AND CORPORATE GOVERNANCE | 90 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 92 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 94 |
| INVESTMENT POLICIES OF COMPANY | 95 |
| POLICIES WITH RESPECT TO CERTAIN TRANSACTIONS | 95 |
| MATERIAL FEDERAL INCOME TAX CONSIDERATIONS | 96 |
| STATE, LOCAL AND FOREIGN TAXES | 100 |
| ERISA CONSIDERATIONS | 100 |
| LEGAL MATTERS | 101 |
| EXPERTS | 101 |
| APPOINTMENT OF AUDITOR | 102 |
| DISCLOSURE OF COMMISSION'S POSITION ON INDEMNIFICATION FOR SECURITIES ACT LIABILITIES | 102 |
| WHERE YOU CAN FIND ADDITIONAL INFORMATION | 102 |
| INDEX TO FINANCIAL STATEMENTS | F-1 |

You should rely only on the information contained or incorporated by reference in this prospectus and any applicable prospectus supplement. We have not authorized anyone to provide you with any different information. You should not assume that the information contained or incorporated by reference in this prospectus or any prospectus supplement is accurate as of any date other than as of the date of this prospectus, the applicable prospectus supplement or the date the documents incorporated by reference were filed with the SEC. We are offering to sell, and seeking offers to buy, the securities registered by this prospectus only in jurisdictions where these offers and sales are permitted.

For investors outside the United States: We have not done anything that would permit this offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves, and observe any restrictions relating to, the offering of the securities and the distribution of this prospectus outside the United States.

23-01243-WLH11  Doc 468  Filed 02/23/24  Entered 02/23/24 19:33:15  Pg 971 of 1366   Exhibit 10, Page 971

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 972 of
1366

## IMPORTANT INFORMATION

The distribution of this prospectus and the offering of the Notes may be restricted in certain jurisdictions. You should inform yourself about and observe any such restrictions. This prospectus does not constitute, and may not be used in connection with, an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not authorized or in which the person making such offer or solicitation is not qualified to do so or to any person to whom it is unlawful to make such offer or solicitation.

An individual investor must either be at least 18 years of age or must be the adult custodian for a minor under the Uniform Gifts/Transfers to Minors Act (UGMA/UTMA).

An investment in the Notes involves risks. Prospective investors should carefully review the risk factors, as well as the other information, contained or incorporated by reference in this prospectus. You should consult your own financial and legal advisers as to the risks involved in an investment in the Notes and whether an investment is suitable for you.

All of the money you invest will be designated as the principal balance of your Note. All interest earned on your Notes will be reinvested monthly. The Notes are secured debt obligations solely of the Company and are not obligations of, or directly or indirectly guaranteed by, any affiliate of the Company other than Vault Holding, LLC, a direct wholly owned subsidiary of the Company

The Notes are not a money market fund, which is typically a diversified fund consisting of short-term debt securities of many issuers. The Notes are not subject to the requirements of the Investment Company Act of 1940 (including those regarding diversification and quality of investments for money market funds) or the Employee Retirement Income Security Act of 1974, as amended. The Notes are not equivalent to a savings, deposit or other bank account and are not subject to the protection of Federal Deposit Insurance Corporation regulation or any other insurance. The Notes are not transferable, assignable or negotiable (other than by operation of law), they are not listed on any securities exchange, and there is no secondary market for the Notes. As a result, there is no public market valuation for the Notes.

## BASIS OF PRESENTATION

In this prospectus, unless the context otherwise requires, "we," "us," "our," or the "Company" refers collectively to iCap Vault 1, LLC, a Delaware limited liability company, formed July 30, 2018, the issuer of the Notes in this Offering, and its subsidiaries.

We use a twelve-month year ending on December 31st of each calendar year. In a twelve-month calendar year, each quarter includes three-months of operations; the first, second, third and fourth quarters end on March 31, June 30, September 30 and December 31, respectively.

Certain monetary amounts, percentages and other figures included in this prospectus have been subject to rounding adjustments. Percentage amounts included in this prospectus have not in all cases been calculated on the basis of such rounded figures but on the basis of such amounts prior to rounding. For this reason, percentage amounts in this prospectus may vary from those obtained by performing the same calculations using the figures in our consolidated financial statements. Certain other amounts that appear in this prospectus may not sum due to rounding.

Unless otherwise indicated, all references to "dollars" and "$" in this prospectus are to, and amounts are presented in, U.S. dollars.

Unless otherwise indicated or the context otherwise requires, financial and operating data in this prospectus reflect the consolidated business and operations of the Company and its subsidiaries.

1

2:38-bk-43-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 973 of 1366    Exhibit 10, Page 973

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This prospectus includes "forward-looking statements" within the meaning of the federal securities laws that involve risks and uncertainties. Forward-looking statements include statements we make concerning our plans, objectives, goals, strategies, future events, future revenues or performance, capital expenditures, financing needs and other information that is not historical information. Some forward-looking statements appear under the headings "Prospectus Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business." When used in this prospectus, the words "estimates," "expects," "anticipates," "projects," "forecasts," "plans," "intends," "believes," "foresees," "seeks," "likely," "may," "might," "will," "should," "goal," "target" or "intends" and variations of these words or similar expressions (or the negative versions of any such words) are intended to identify forward-looking statements. All forward-looking statements are based upon information available to us on the date of this prospectus.

These forward-looking statements are subject to risks, uncertainties and other factors, many of which are outside of our control, that could cause actual results to differ materially from the results discussed in the forward-looking statements, including, among other things, the matters discussed in this prospectus in the sections captioned "Prospectus Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business."

All forward-looking statements attributable to us in this prospectus apply only as of the date of this prospectus and are expressly qualified in their entirety by the cautionary statements included in this prospectus. We undertake no obligation to publicly update or revise forward-looking statements to reflect events or circumstances after the date made or to reflect the occurrence of unanticipated events, except as required by law.

## INDUSTRY AND MARKET DATA

We are responsible for the disclosure in this prospectus. However, this prospectus includes industry data that we obtained from internal surveys, market research, publicly available information and industry publications. The market research, publicly available information and industry publications that we use generally state that the information contained therein has been obtained from sources believed to be reliable. The information therein represents the most recently available data from the relevant sources and publications and we believe remains reliable. We did not fund and are not otherwise affiliated with any of the sources cited in this prospectus. Forward-looking information obtained from these sources is subject to the same qualifications and additional uncertainties regarding the other forward-looking statements in this prospectus.

2

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 974 of 1366   Exhibit 10, Page 974

## PROSPECTUS SUMMARY

*This summary highlights material information concerning our business and this offering. This summary does not contain all of the information that you should consider before making your investment decision. You should carefully read the entire prospectus and the information incorporated by reference into this prospectus, including the information presented under the section entitled "Risk Factors" and the financial data and related notes, before making an investment decision. This summary contains forward-looking statements that involve risks and uncertainties. Our actual results may differ significantly from future results contemplated in the forward-looking statements as a result of factors such as those set forth in "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements."*

*In this prospectus, unless the context indicates otherwise, the "Company," "we," "our," "ours" or "us" refer to iCap Vault 1, LLC, a Delaware limited liability company, and its subsidiaries. Unless otherwise clear from the context, references throughout this prospectus to "operating agreement" refers to the Company's amended and restated limited liability company operating agreement to be effective on or prior to the effectiveness by the Securities and Exchange Commission of the registration statement of which this prospectus forms a part and the form of which is filed as Exhibit 3.3 to the registration statement of which this prospectus is a part.*

**The Company**

iCap Vault 1, LLC was formed as a Delaware limited liability company on July 30, 2018 and has since been only engaged in limited operations.

We are not a blank check company and do not consider ourselves to be a blank check company as we:

- Have a specific business plan, which is to acquire income-producing real estate properties and financing instruments related to real properties in selected metropolitan statistical areas in the U.S. (each, a "Portfolio Investment") with the objective of generating a rate of return from the acquired U.S. real estate that is greater than the costs necessary to purchase, finance and service the U.S. real estate. We are not a real estate investment trust and do not intend to be treated as such. We have provided a detailed plan for the next twelve (12) months throughout our prospectus.

- Have no intention of entering into a reverse merger with any entity in an unrelated industry in the future.

Since our inception, we have not generated any revenues and have incurred a net loss of $462,390, as of September 30, 2019. We anticipate the commencement of generating revenues in the next twelve months. The capital raised in this offering has been budgeted to cover the costs associated with beginning to operate our company, marketing expense, and acquisition related costs. We intend on using the majority of the proceeds from this Offering for the acquisition of properties and financial instruments. However, closing and other acquisition related costs such as title insurance, professional fees and taxes will likely require cash. We do not have the ability to quantify any of the expenses as they will all depend on size of deal, price, and place versus procuring new financing, due diligence performed (such as appraisal, environmental, property condition reports), legal and accounting, etc. There is no way to predict or otherwise detail the expenses.

We intend on engaging in the following activities:

- Purchase single, multi-family, and commercial properties that have potential to be or are cash flow positive, meaning properties that have a positive monthly income after all expenses (e.g. mortgages, operating expenses, taxes) and maintenance reserves are paid. In order to determine if a property is "cash flow positive," iCap Vault Management, LLC, our manager (the "Manager"), will review the total gross rent, income, or receipts from the property and subtract any and all expenses including utilities, taxes, maintenance, and other reserve expenses. If this number is a positive number, the Company will deem the property "cash flow positive." Depending on how positive the cash flow is, coupled with the estimated market value of the property relative to the purchase price and the potential for price appreciation will determine whether management will purchase the property or not on behalf of the Company.

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 975 of   Exhibit 10, Page 975
1366

- Purchase additional properties or make other real estate investments that relate to varying property types including office, retail and industrial properties. Such property types may include operating properties and properties under development or construction and may be purchased from affiliates of the Company.

- Invest in any opportunity our Manager sees fit within the confines of the market, marketplace and economy so long as those investments are real estate related and within the investment objectives of the Company, including, but not limited to, real estate-based financial instruments, such as loans or investment funds that invest in real estate. To this end, the Company may invest in financial instruments that bear a relation to real estate, such as preferred equity, common equity, or loan instruments that are secured or unsecured by the properties, investments into real estate operating companies, real estate holding companies, pooled investment funds, some of which may be affiliates of the Company or its Manager or entities with whom management of the Company has had prior relationships.

The Company does not currently own any real estate assets. Please see our "DESCRIPTION OF BUSINESS" on page 69. We believe we will need at least $500,000 to provide working capital and $500,000 for professional fees for the next 12 months.

For the period from July 30, 2018 (inception) through December 31, 2018, we generated no revenues, reported a net loss of $289,877, and cash flow used in operating activities of $1. For the nine months ended September 30, 2019, we generated no revenues, reported a net loss of $172,513, and had negative cash flow from operating activities of $37,935. As of the nine months ended September 30, 2019, we had an accumulated deficit of approximately $462,390. Our auditors have raised substantial doubt regarding our ability to continue as a going concern in the independent auditors' report to the consolidated financial statements included in this prospectus as a result of our accumulated deficit and no source of revenue sufficient to cover our cost of operation. See "Risk Factors—We have a history of operating losses and our auditors have indicated that there is a substantial doubt about our ability to continue as a going concern."

## Investment Strategy

The Company's Portfolio Investments will consist of income-producing properties, including single-family homes, multi-family apartments, townhomes, commercial properties and mixed-use properties. The revenue generated from the Portfolio Investments will be used to pay interest and principal on the Notes and fund its operations. Additionally, the Company's Portfolio Investments will consist of properties that the Company may acquire at a discount from market values, with the intention of selling the property at market prices for a gain. These properties may be held for short-term or long-term periods of time as the Company may determine in its discretion, and may or may not generate revenue during the period of ownership by the Company. The Company's Portfolio Investments may also consist of financial instruments related to real estate, including loans, debentures, unsecured loans backed by guarantees of real estate entities, fund investments, REIT holdings and joint ventures, any of which may involve transactions with affiliates of the Company. See the section titled "Certain Relationships and Related Transactions" herein.

Portfolio Investments may be held directly by the Company or held in a standalone wholly owned limited liability company (a "Portfolio SPE") and one or more Portfolio SPEs may be held by a holding company that is wholly owned by the Company, rather than by the Company directly. The rental and interest income allows us to provide a rate of return to investors who acquire the Notes. The Notes will be secured by the membership interests in Vault Holding, LLC. The Company's business plan targets primarily income-producing properties and seeks to acquire the properties debt-free at the subsidiary level, and the Company expects to generate income from the financial instruments that it may hold. Notwithstanding, we may leverage our properties with up to 85% of their value. In all cases, the debt on any given property must be such that it fits with the "Investment Policies of the Company" as discussed in this prospectus. The Portfolio Investments will serve as collateral for one or more credit facilities entered into by the Company or an affiliate of us. The Company has the right to subordinate the obligations and the security interests of the Notes to those of a third party lender, if doing so is required by the lender to secure a loan for the benefit of the Company. Vault Holding, LLC has the right to subordinate the obligations and guaranty of Vault Holding, LLC and the security interests pledged by Vault Holding, LLC to those of a third party lender, if doing so is required by the lender to secure a loan for the benefit of Vault Holding, LLC.

The locations of the properties are determined by selecting metropolitan statistical areas upon consultation with market professionals and in-depth review of economic data. The Company may adjust its investment criteria to accommodate changing market conditions, but will generally seek attractive locations with strong rental income and a likelihood of long-term appreciation of value.

The Company's management has developed proven processes and controls to evaluate possible investment opportunities. The process begins by identifying metropolitan statistical areas within the U.S. ("Markets") with strong economic fundamentals that are likely to result in long-term property appreciation and increased rents. The Markets are selected after review of reports and analysis provided by economics professionals, as well as the Company's internal staff. After reviewing the reports, a committee consisting of key members of the management team (the "Investment Committee") may approve a Market. After a Market has been approved, the Company's acquisition team will search for purchase opportunities for the Company that meet the criteria of the applicable investment policies of the Company.

Every investment opportunity will undergo due diligence performed by the Company's underwriters, who will then present investment opportunities to the Investment Committee for its review and approval. The Investment Committee may delegate investment decision-making authority to sub-teams, provided such investments meet the criteria established by the Investment Committee. The Company will complete due diligence on prospective investments and maintain closing procedures that provide for the safety of the invested funds, generally through a third-party escrow company. The investment process has three major areas of focus: analysis and approval, documentation and closing, and post-closing management. Post-closing management of the real estate portfolio will be done by real estate management companies, who will manage the leasing, cash flows, and maintenance of the properties.

4

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 977 of   Exhibit 10, Page 977
1366

**Meeting Noteholder Demand Payment Obligations**

The Company will establish two sources of liquidity to address demand payments: First, the Company will set aside up to 10% of the outstanding principal balances in available cash reserves; provided, however, the Company reserves the right to increase the amount set aside for available cash reserve; second, the Company plans to establish accounts with lending sources (each a "Liquidity Source"), including, but not limited to, lines of credit, pursuant to which funds will be advanced to the Company.

One or all of these Liquidity Sources may place a lien on one or more of the Portfolio Investments. If the amount of monies extended by the Liquidity Sources exceeds 85% of the Company's aggregate Portfolio Investment value (the "Lending Ratio"), then the Company will be required to sell certain of its Portfolio Investments at such amount needed to satisfy its demand payment obligations and achieve a Lending Ratio of 85% or less. Except for the security that may be required by the Liquidity Sources, the Company intends to maintain the Portfolio Investments free and clear of liens and encumbrances. The Notes will be subordinate at times to the rights of the Liquidity Sources as well as to other higher-ranking obligations of the Company, including property taxes and management fees.

The Company may, in its discretion, dispose of some or all of its Portfolio Investments to reposition the portfolio or to meet the Company's payment obligations. The Company will maintain cash reserves, which may be used to purchase properties, honor demand payment requests of Noteholders, make tax or other distributions to its member, or cover the costs of the Company's day-to-day operations.

**Members and Management**

The sole member of the Company is iCap Vault, LLC, which is owned by iCap Enterprises, Inc., a Washington corporation wholly owned by Chris Christensen. The primary officers of iCap Enterprises, Inc. are Chris Christensen, Jim Christensen, and Jonathan Siegel.

The manager of the Company is iCap Vault Management, LLC, a Delaware limited liability company (the "Manager"). The officers of the Manager are the same as the officers of iCap Enterprises, Inc. The management and supervision of the Company is vested exclusively in the Manager (including its duly appointed agents), which has full control over the business and affairs of the Company pursuant to the Company's Amended and Restated Limited Liability Company Operating Agreement (the "Operating Agreement"). The Board of Managers of the Manager intend to devote a majority of their working hours to the Company, but may be less. Even if we sell all the securities offered, the majority of the proceeds of the offering will be spent for ongoing operational and investment acquisition costs. Investors should realize that following this Offering we may be required to raise additional capital to cover the costs associated with our plans of operation.

5

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 978 of 1366   Exhibit 10, Page 978   5/192

The following diagram reflects our planned organizational structure following the completion of the Offering:



The Manager may delegate day-to-day management responsibility of the Company to any person, provided that the Manager will retain ultimate responsibility for the management and conduct of the activities of the Company and all decisions relating to the selection and disposition of the Company's investments.

The Company anticipates that the Company will be exempt from the registration requirements of the Investment Company Act of 1940, as amended (the "Investment Company Act"), by reason of the exemption specified in Section 3(c)(5)(C) of the Investment Company Act (excludes from regulation as an "investment company" any entity that is primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate).

**Organizational Strength and Experience**

The members of the senior management team have overseen many pooled investment funds based in real estate and have collectively closed in excess of $8 billion in transactions in the small and mid-cap spaces throughout their careers. iCap Enterprises, Inc. ("iCap") also maintains a network of strategic relationships. The team leverages relationships with sourcing, development, construction, and fund administration constituents to maintain a pipeline of real estate purchase opportunities. Property owners, builders, developers, lenders and brokers are the primary entities for deal sourcing.

6

iCap has capacity to expand its team to manage large amounts of capital from the sale of the Notes and to deploy such proceeds towards real estate that meets its investment criteria. iCap has invested significant resources to build the technology and infrastructure needed to manage large amounts of noteholders, capital, and real estate. The number of employees who manage this infrastructure will grow as the capital under management increases.

The Manager and its affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

## Investment Experience

As a newly formed investment vehicle, the Company has no operating or prior performance history. The information presented in this section represents the limited historical experience of the principals of the Manager and its affiliates. Prospective investors in the Company should not rely on the information below as being indicative of the types of investments the Company may make or of the types of returns the Company's investments may generate. Prospective investors should not assume that the Company will experience returns, if any, comparable to those described herein.

iCap has significant prior experience in investing in single-family, multi-family, light commercial and land development properties. Although this prospectus refers to "iCap" as though it were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. The Company will not acquire an interest in any of iCap's affiliated entities, but may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Manager, and therefore the Company, as it conducts its business.

## Management Fees; Transactions with Related Parties

In return for the provision of the services by Manager and for the other actions of the Manager under the Operating Agreement, the Company will pay the Manager an annual management fee equal to 1% of the outstanding aggregate principal balances of the Notes ("Management Fee"). The Management Fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the Notes during the applicable quarter.

The Company will pay all expenses related to the operation of the Company, other than the costs of the payroll and benefits of the personnel of the Manager. The costs that will be paid by the Company include the fees and expenses related to any securities offering of the Company, office rent and fees, office common area maintenance charges, phone, fax, and internet access, computer hardware and related supplies, general office supplies, office rental of fax, printers, or scanners and maintenance costs related thereto, consulting, legal, accounting, and professional fees, marketing and travel expenses and any business licenses and registrations required of the Company or the Manager as a result of its management of the Company. The Manager or an affiliate of the Manager may elect to pay any of these Company expenses, in which event the Company will reimburse such party for those out-of-pocket costs. Additionally, in the event any personnel of the Manager or its affiliates perform any professional service for the Company, the Company shall pay the Manager or such affiliate(s) for such services at rates that are no higher than is standard in the market.

The Manager may charge the Company or any of its subsidiaries an underwriting fee to cover the costs of due diligence and underwriting involved in closing a real estate purchase or disposition. The underwriting fee will be paid at the time of purchase or disposition, will be non-refundable, and is expected to generally be less than $10,000 per transaction. Additionally, in the event the Company or the Manager acquires or becomes an affiliate of a real estate brokerage company, the Company may pay customary brokerage fees to such entity for the acquisition or disposition of the Company's assets.

7

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 981 of   Exhibit 10, Page 981
1366

If the Manager, or an affiliate of the Manager or the Company, guarantees, whether personally or otherwise, a loan, bond or other obligation of the Company, a holding company, or a Portfolio SPE, that guarantor will be entitled to receive from the benefiting entity an annual fee equal to 1% of the total amount of the credit facility, bond amount, or other obligation that is the subject of the guarantee.

Under the Operating Agreement, the Company, in the sole discretion of the Manager, in the event there are Available Funds, may make distributions thereof ("Distributions") to Members on a pro rata basis in accordance with the Members' Membership Interests at any time. "Available Funds" means the Company's cash, including cash from loan proceeds, Note proceeds, and gross cash receipts from operations, which includes the excess of Net Income, less the sum of: (1) payments of principal, interest, charges and fees pertaining to any of the Company's indebtedness; (2) costs and expenses incurred in the conduct of the Company's business; and (3) amounts reserved to meet the reasonable needs of the Company's business. Additionally, the Company may in its discretion make in-kind distributions, which would not be subject to availability of Available Funds. Notwithstanding anything in the Operating Agreement to the contrary, no Member may receive a Distribution to the extent that, after giving effect to the Distribution, all known and currently existing liabilities of the Company outstanding as of the date of such Distribution (other than to a Member on account of its Membership Interests and liabilities for which the recourse of creditors is limited to specific property of the Company) including the principal amounts due to Noteholders, exceed the Fair Value (as defined in the Operating Agreement) of the assets of the Company (except that property that is subject to a liability for which the recourse of the creditors is limited to such property shall be included in the assets of the Company only to the extent the Fair Value of such property exceeds that liability). In the event of a Distribution to a Member that would be deemed violative of applicable law, the applicable Member may be required to return such Distribution to the Company. Notwithstanding the foregoing, within ninety (90) days of the end of each Fiscal Year or such later date at which the Company's accountants have completed their tax preparation for the Company, the Company shall make a Distribution to each holder of Units in an amount necessary to cover any taxes due from such Unit holder to federal, state or local tax authorities, as a result of his/her/its holding Units of the Company ("Tax Distribution"). The Tax Distribution is a required annual payment of the Company, and if the Company has insufficient cash to make the Tax Distribution when due, the Manager is authorized to borrow, including against the assets of the Company or those of its subsidiaries, or liquidate certain assets of the Company or those of its subsidiaries, to meet such obligations. The Manager may engage one or more affiliates or third parties to provide the Manager's services. The Manager shall, to the extent it determines that it would be advisable in connection with its management of the Company, arrange for and coordinate the services of other professionals, experts and consultants to provide any or all of the management services, in which case, the costs and expenses of such third parties for providing such services shall be borne by the Manager other than as set forth in the Operating Agreement. The Manager will not charge the Company any additional fees with respect to these outsourced services, but the Manager will be entitled to reimbursement for these third-party costs incurred in connection with such Services.

Edge Construction, LLC, an affiliated general contractor, is expected to provide general contracting services, including those related to new construction of and rehabilitation of real estate projects, and is expected to receive a fee sufficient to cover the costs of a project plus 10%. Costs include all project costs, as well as the costs of management of a project, including costs of project management, supervision, materials and labor, each of which will be billed at hourly rates, which are currently between $30 and $180 per hour.

iCap Enterprises, Inc. is expected to provide consulting services, as well as accounting and administrative support at hourly rates which are currently between $30 and $200 per hour.

**Public Notes Offering**

We are offering (the "Offering") up to $500,000,000 aggregate principal amount of our Notes, on a "self-underwritten" basis, which means our officers and directors will attempt to sell the Notes (including up to $5,000,000 aggregate principal amount of the Notes to existing noteholders in exchange for tendered Private Placement Notes, and cancellation of those Private Placement Notes by us, and the balance of aggregate principal amount of the Notes offered hereby to new and existing investors).

8

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 982 of 1366   Exhibit 10, Page 982

The Notes will be issued by us under an indenture among iCap Vault 1, LLC, Vault Holding, LLC, and American Stock Transfer & Trust Company, LLC, as trustee (the "trustee"), referred to herein as the "indenture."

The Notes will be general senior secured obligations of iCap Vault 1, LLC. The Notes will bear interest at a floating rate per annum that is determined from time to time by the Company in its sole discretion. Interest payable on the Notes will accrue based on a 365-day year, compounds daily and will be credited to your Notes on the last business day of each calendar month and will be reinvested. The interest rate may be, but is not required to be, different for certain Note balances or ranges of Note balances.

*Collateral and Guarantee*

The Notes will be secured by a pledge of the membership interests in Vault Holding, LLC, our direct and wholly-owned subsidiary, that holds interests in real estate, through wholly owned subsidiaries (Portfolio SPEs), and real estate-based financial instruments. The assets of the Portfolio SPEs will consist primarily of real estate and all other cash and investments they hold in various accounts. The Notes' security interest in the collateral will be subordinated to the security interest in favor of lenders of credit facilities.

The payment of principal and interest on the Notes are fully and unconditionally guaranteed by our wholly owned direct subsidiary, Vault Holding, LLC, but otherwise not guaranteed by any other person or entity. Therefore, the Notes will be structurally subordinated to indebtedness or other liabilities of special purpose entity subsidiaries (as our special purpose entity subsidiaries are not guaranteeing the notes). The indenture does not restrict the ability of our subsidiaries to incur indebtedness.

*Repurchase at Option of Noteholder*

You may redeem all or any part of your Notes at any time by following the procedures described herein. See "Description of the Notes – How to Redeem." Interest on redeemed investments will accrue to, but not including, the redemption date. We may also offer other methods of redemption from time to time, at our option. There is no minimum amount which you may redeem.

*Optional Redemption by Company*

We may redeem, in our discretion, any particular Note that maintains a principal amount of less than $25 for a period consisting of the three consecutive months immediately following the month in which the principal amount of the Note is below $25 as of the last day of the month. The first month your Note is below the required minimum, you will be sent a notice informing you that your Note will be redeemed at the end of the third month. Unless you have brought your Note above the required minimum, your Note will automatically be redeemed at the end of the third month. We may redeem, in our discretion, the portion of a particular Note that exceeds $50,000,000. In addition, we may also redeem, at any time at our option, the Notes of any investor who is not or is no longer eligible to invest in the Notes as we determine in our sole judgment and discretion. Further, we may redeem the entire amount of, or any portion of, any of the outstanding Notes in our sole judgment and discretion. Any such partial redemption of outstanding Notes may be effected by lot or pro rata or by any other method that is deemed fair and appropriate by us. See "Description of the Notes – Optional Redemption by the Company".

*Events of Default*

An event of default is generally defined by the Indenture to mean any of the following:

- the Company's failure to pay principal or interest on any Note upon a request for redemption therefore, which failure continues for 30 days;

- the Company's failure to comply with any of its covenants or obligations contained in the Indenture or the Notes and, after notice thereof from the Trustee or holders of at least 50% in principal amount of the Notes, such failure continues for 90 days;

- the occurrence of certain events of bankruptcy, insolvency or reorganization.

23-01243-WLH11 · Doc 468 · Filed 02/23/24 · Entered 02/23/24 19:33:15 · Pg 983 of 1366 · Exhibit 10, Page 983

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 984 of
1366

Exhibit 10, Page 984

The Indenture provides that the Trustee will, within 90 days after the occurrence of any default that is continuing and known to the Trustee, give the registered holders of Notes notice thereof, but, except in case of a default in the payment of principal or interest, the Trustee may withhold such notice if and for so long as the Trustee in good faith determines that withholding such notice is in the interest of those holders.

### Private Placements during 2018 – Notes

During the period from July 30, 2018 (inception) through December 31, 2018, we issued $370,869 aggregate principal amount of 2% Senior Secured Notes ("2018 Private Placement Notes") to accredited investors in a private placement under Rule 506(c) of Regulation D of the Securities Act.

### Private Placements during the Nine Months Ended September 30, 2019 – Notes

During the period from January 1, 2019 through September 30, 2019, we issued $13,145,892 aggregate principal amount of 2% Senior Secured Notes ("2019 Private Placement Notes") to accredited investors in a private placement under Rule 506(c) of Regulation D of the Securities Act.

### Recent Developments

Prior to the effectiveness of this Offering by the SEC, we are currently conducting a private placement in a transaction that is exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") pursuant to Regulation 506(c) and Regulation S of 2% Senior Secured Notes in which we have issued $1,407,964 during the period from October 1, 2019 through the filing date ("Current Private Placement Notes"; together with 2018 Private Placement Notes and 2019 Private Placement Notes, collectively referred to as "Private Placement Notes").

As of February 14, 2020, we have repaid the noteholders of the Private Placement Notes $14,277,260 of the principal and accrued interest of Private Placement Notes. As of February 14, 2020, we estimate the value of the aggregate principal amount and accrued interest estimated to be $700,710 of the outstanding Private Placement Notes held by our noteholders.

The Notes of this Offering may be acquired by existing noteholders in exchange for tendered Private Placement Notes and cancellation of those Private Placement Notes by us. We anticipate the aggregate principal amount of all Private Placement Notes, together with accrued interest thereon, to be no more than $5,000,000, including (i) the existing principal and accrued interest of $700,710 of outstanding Private Placement Notes, (ii) the prospective accrued interest of outstanding Private Placement Notes between the filing date and the offering, and (iii) the principal and accrued interest of prospective issuances by us of Private Placement notes between the filing date and the offering. If a holder does tender a Private Placement Note as payment for such Notes in the Offering, each $1.00 of principal or interest so tendered will equal $1.00 of purchase price of the Notes; the Notes will not be issued at discount (original issue discount) to such holders.

### Risks Affecting Us

Our business is subject to numerous risks and uncertainties, including those highlighted in the section titled "Risk Factors" beginning on page 18. These risks include, but are not limited to the following:

- We are an emerging growth company with a limited operating history.

- The Manager will manage the day to day operations of the Company. Noteholders will have no voting rights and no control over the Company.

- We may require additional financing, such as bank loans, outside of this offering in order for our operations to be successful.

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 985 of 1366

- We have not conducted any income-producing activities and as such have not generated any revenue since inception.

10

- Investments in real estate and real estate related assets are speculative and we will be highly dependent on the performance of the real estate market.

- Competition in our industry is intense.

- Our independent auditors have expressed substantial doubt about our ability to continue as a going concern in the independent auditors' report to the financial statements included in the prospectus.

- The Company does not currently own any assets.

**See the section entitled "**RISK FACTORS**" beginning on page 18 for a more comprehensive discussion of risks to consider before purchasing our Notes.**

INVESTMENT IN SMALL BUSINESSES INVOLVES A HIGH DEGREE OF RISK, AND INVESTORS SHOULD NOT INVEST ANY FUNDS IN THIS OFFERING UNLESS THEY CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT. SEE THE SECTION ENTITLED "RISK FACTORS."

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THESE AUTHORITIES HAVE NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**Emerging Growth Company Status**

We are an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. We intend to take advantage of all of these exemptions.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a) (2)(B) of the Securities Act for complying with new or revised accounting standards, and delay compliance with new or revised accounting standards until those standards are applicable to private companies. We have elected to take advantage of the benefits of this extended transition period.

We could be an emerging growth company until the last day of the first fiscal year following the fifth anniversary of our first common equity offering, although circumstances could cause us to lose that status earlier if our annual revenues exceed $1.0 billion, if we issue more than $1.0 billion in non-convertible debt in any three-year period or if we become a "large accelerated filer" as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

**Company Information**

Our principal office is located at 3535 Factoria Blvd. SE, Suite 500, Bellevue, Washington 98006 and our phone number is (425) 453-7497. Our corporate website address is *www.icapequity.com/vault*. Information contained on, or accessible through, our website is not a part of, and is not incorporated by reference into, this prospectus.

## The Offering

*The summary below describes the principal terms of the Notes (as defined below). Certain of the terms and conditions described below are subject to important limitations and exceptions. The "Description of the Notes" section of this offering memorandum contains a more detailed description of the terms and conditions of the Notes.*

| | |
|---|---|
| **Issuer** | iCap Vault 1, LLC, a Delaware limited liability company, was formed on July 30, 2018. |
| **Corporate Structure** | iCap Vault 1, LLC is 100% owned by iCap Vault, LLC, which is an affiliate of iCap Equity, LLC, a Bellevue, Washington-based investment firm formed in 2011. "iCap Enterprises" or "iCap," as used in this prospectus, refers to iCap Enterprises, Inc. (the parent company of both iCap Equity, LLC and iCap Vault, LLC) and its affiliated group of companies (excluding the Company). |
| **Title of the Securities** | Variable Denomination Floating Rate Demand Notes, marketed and sold as "Senior Secured Demand Notes" ("Notes"). |
| **Company Business** | We are engaged in the business of acquiring income-producing residential properties in selected metropolitan statistical areas in the U.S. with the objective of generating a rate of return from the acquired U.S. real estate that is greater than the costs necessary to purchase, finance and service the U.S. real estate. We also invest in financial instruments secured by such real estate. |
| **The Offering** | We are offering (the "Offering") up to $500,000,000 aggregate principal amount of our Notes, on a "self-underwritten" basis, which means our officers and directors will attempt to sell the Notes (including up to $5,000,0000 aggregate principal amount of the Notes to existing noteholders in exchange for tendered Private Placement Notes, and cancellation of those Private Placement Notes by us, and the balance of the aggregate principal amount of the Notes offered hereby to new and existing investors). |
| **The Manager** | We are managed by iCap Vault Management, LLC, a Delaware limited liability company (the "Manager"). We will pay the Manager an annual management fee equal to 1% of the outstanding aggregate principal balances of the Notes. |
| **Indenture** | The Notes will be issued by us under an indenture, among iCap Vault 1, LLC, Vault Holding, LLC, and American Stock Transfer & Trust Company, LLC, as trustee (the "trustee"), referred to herein as the "indenture." |
| **The Notes** | The Notes will be general senior secured obligations of iCap Vault 1, LLC which are fully and unconditionally guaranteed by our wholly owned direct subsidiary, Vault Holding, LLC, but are subordinate to our or our subsidiaries' existing and future secured bank debt and credit facilities and structurally subordinated to indebtedness or other liabilities of special purpose entity subsidiaries (as our special purpose entity subsidiaries are not guaranteeing the notes). |
| **Maximum Offering** | $500,000,000 aggregate principal amount of the Notes |
| **No Minimum Offering/No Escrow** | No minimum must be raised in this Offering before we can access the subscription proceeds. We have made no arrangements to place subscription proceeds in an escrow, trust or similar account which means that funds from the sale of the Notes will be immediately available to us for use in our operations. |
| **Offering Price** | 100% of the principal amount per Note. |

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 989 of

1366   Exhibit 10, Page 989

| | |
|---|---|
| **Minimum Initial Investment** | $25; however, the Company can waive the minimum initial investment requirement on a case to case basis in its sole discretion. |
| **Minimum Outstanding Investment** | $1.00 |
| **Maximum Total Investment** | The Company reserves the right to establish a maximum total amount of investment per investor. |
| **Principal Amount** | The principal amount of each Note held by an investor at any time will be equal to all amounts invested in such Note, together with accrued interest, less redemptions |
| **Interest Rate** | The Notes will bear interest at a floating rate per annum that is determined from time to time by the Company in its sole discretion. Interest payable on the Notes will accrue based on a 365-day year, compounds daily and will be credited to your Notes on the last business day of each calendar month and will be reinvested. The interest rate may be, but is not required to be, different for certain Note balances or ranges of Note balances. |
| **Notification of Interest Rate Change** | A holder of Notes will not be expressly notified of changes in any applicable interest rate; then-current interest rates will be available on our website or by calling or visiting our executive offices. |
| **Maturity** | The Notes will have no stated maturity. They will be payable upon your demand. |
| **Investment Eligibility Criteria** | An individual investor must either be at least 18 years of age or must be the adult custodian for a minor under the Uniform Gifts/Transfers to Minors Act (UGMA/UTMA). Additionally, investors must pass Know Your Customer (KYC), Anti-Money Laundering, and OFAC checks. |
| **Investment Options** | ACH Investment – See Page 44<br>Wire Investment – See Page 44<br>Automatic Monthly Investment – See Page 44. |
| **Redemption Options** | ACH Redemption – See Page 55<br>Wire Redemption – See Page 55<br>Automatic Monthly Redemption – See Page 55 |
| **Rescission Rights** | You may rescind your investment within five business days of the date of your purchase confirmation without penalty. In addition, if we accept your subscription agreement at a time when we have determined that a post-effective amendment to the registration statement of which this prospectus is a part must be filed with the Securities and Exchange Commission, but such post-effective amendment has not yet been declared effective, you will be able to rescind your investment subject to the conditions set forth in this prospectus. See "Description of the Notes—Rescission Right" for additional information. |
| **Offering Period** | We intend to commence the offering promptly. The offering will be made on a continuous basis, and is expected to continue for a period in excess of 30 days. |
| **Guarantees** | The payment of principal and interest on the Notes are fully and unconditionally guaranteed by our wholly owned direct subsidiary, Vault Holding, LLC, but otherwise are not guaranteed by any other person or entity. Therefore, the Notes will be |

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 990 of 1366   Exhibit 10, Page 990

structurally subordinated to indebtedness or other liabilities of special purpose entity subsidiaries (as our special purpose entity subsidiaries are not guaranteeing the notes). The indenture does not restrict the ability of our subsidiaries to incur indebtedness.

13

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 991 of  Exhibit 10, Page 991
1366

| | |
|---|---|
| **Collateral** | The Notes will be secured by a pledge of the membership interests in Vault Holding, LLC, our direct and wholly-owned subsidiary, which holds interests in real estate, through wholly owned subsidiaries (Portfolio SPEs), and real estate-based financial instruments. The assets of the Portfolio SPEs will consist primarily of real estate and all other cash and investments they hold in various accounts. The Notes' security interest in the collateral will be subordinated to the security interest in favor of lenders of credit facilities. |
| **Status and Ranking** | The Notes are secured general obligations of the Company and rank equally with its other secured and unsubordinated indebtedness from time to time outstanding. The Notes are secured debt obligations solely of the Company and are not obligations of, or directly or indirectly guaranteed by, any affiliate of the Company other than Vault Holding, LLC. |
| | Payment of the principal and interest on the Notes will rank equally in right of payment and collateral with all of our existing and future secured indebtedness and, to the extent we incur or acquire unsecured indebtedness in the future, rank senior in right of payment and collateral to our unsecured indebtedness. The Notes will rank senior in right of payment to our equity, such as our membership interests/units. The Notes will be subordinated in the right of payment and collateral to our existing and future secured bank debt, such as credit facilities. |
| | We conduct a significant portion of our operations through direct and indirect subsidiaries, which generate a substantial portion of our operating income and cash. Contractual provisions, laws or regulations, as well as any subsidiary's financial condition and operating requirements, may limit our ability to obtain or receive cash from our subsidiaries in order to service our debt obligations, including making payments on the Notes. Claims of creditors of our subsidiaries, including secured credit lines, will have priority with respect to the assets and earnings of such subsidiaries over the claims of our creditors, including holders of the Notes. Accordingly, the Notes will be structurally subordinated to all existing and future obligations of our subsidiaries, including trade creditors of our subsidiaries. |
| | The Notes will be structurally subordinated to indebtedness or other liabilities of special purpose entity subsidiaries (as our special purpose entity subsidiaries are not guaranteeing the notes). The indenture does not restrict the ability of our subsidiaries to incur indebtedness |
| | The Notes do not constitute a savings, deposit, or other bank account and are not insured by or subject to the protection of the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation, or any other federal or state agency. The Notes are not a money market fund, which are typically diversified funds consisting of short-term debt securities of many issuers, and therefore do not meet the diversification and investment quality standards set forth for money market funds by the Investment Company Act of 1940. |
| **Sinking Fund** | None. |

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 992 of   Exhibit 10, Page 992
1366

| **Optional Redemption by Company; Repurchase at Option of Noteholder** | You may redeem all or any part of your Notes at any time by following the procedures described herein. See "Description of the Notes – How to Redeem." Interest on redeemed investments will accrue to, but not including, the redemption date. We may also offer other methods of redemption from time to time, at our option. There is no minimum amount which you may redeem. |
|---|---|
| | We may redeem, in our discretion, any particular Note that maintains a principal amount of less than $25 for a period consisting of the three consecutive months immediately following the month in which the principal amount of the Note is below $25 as of the last day of the month. The first month your Note is below the required minimum, you will be sent a notice informing you that your Note will be redeemed at the end of the third month. Unless you have brought your Note above the required minimum, your Note will automatically be redeemed at the end of the third month. We may redeem, in our discretion, the portion of a particular Note that exceeds $50,000,000. In addition, we may also redeem, at any time at our option, the Notes of any investor who is not or is no longer eligible to invest in the Notes as we determine in our sole judgment and discretion. Further, we may redeem the entire amount of, or any portion of, any of the outstanding Notes in our sole judgment and discretion. Any such partial redemption of outstanding Notes may be effected by lot or pro rata or by any other method that is deemed fair and appropriate by us. See "Description of the Notes – Optional Redemption by the Company". |
| **Further Issuances** | We may, without consent of the holders of the Notes, create and issue additional notes identical to the Notes in all respects (other than with respect to the date of issuance, issue price and in certain circumstances the first interest payment date). These additional notes will be consolidated and form a single series with the Note. |
| **Distribution of Notes** | The offering is being conducted on a self-underwritten, best efforts basis, which means our officers and directors will attempt to sell the securities we are offering in this prospectus. This prospectus will permit our officers and directors to sell the Notes directly to the public, with no commission or other remuneration payable to them for any securities they may sell. We may elect to engage one or more FINRA member firms (the "Placement Agents"), as placement agents for this Offering, in which event the Placement Agents will also conduct the Offering on a "best efforts" basis, and we would expect in such case to pay estimated total commissions up to 1.0% of the aggregate principal amount of the Notes sold to investors through such Placement Agents and interest accrued thereon, compounded on a daily basis, payable over four quarters to the extent that such Notes have not been redeemed or repurchased. In offering the securities on our behalf, the officers and directors will rely on the safe harbor from broker-dealer registration set out in Rule 3a4-1 under the Securities Exchange Act of 1934. |
| **Use of Proceeds** | We expect to receive net proceeds from this Offering of approximately $490,050,000 after deducting (i) assuming FINRA selling agents are utilized to sell the entire offering amount, estimated underwriting discounts and commissions in the amount of $4,950,000 (1% of the gross proceeds of the Offering, excluding the aggregate principal amount and accrued interest of the exchanged Private Placement Notes) and (ii) the value of the aggregate principal amount and accrued interest of $5,000,000 of the Private Placement Notes held by our noteholders exchanged for $5,000,000 aggregate principal amount of the Notes, and cancellation of those Private Placement Notes by us. If a holder does tender a Private Placement Note as payment for such Notes in the Offering, each $1.00 of principal or interest so tendered will equal $1.00 of purchase price of the Notes; the Notes will not be issued at discount (original issue discount) to such holders. We intend to use the net proceeds for the following purposes in the following order: (a) first towards the fees and expenses associated with registration of the Offering of up to $1,200,000, including legal, auditing, accounting, escrow agent, transfer agent, financial printer and other professional fees; (b) second towards the our acquisition of Portfolio Investments; (c) third towards the cost of marketing and management |

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 993 of 1366   Exhibit 10, Page 993

associated with the our operations, including technology infrastructure and maintenance and fees to Manager; and (d) the balance towards working capital and general corporate purposes. See "Use of Proceeds."

| | |
|---|---|
| **Expenses** | We will bear all costs and expenses incurred in the organization of us and this offering and potential future offerings, and will reimburse Manager for any such costs and expenses advanced by Manager. We will also pay the Manager a management fee of 1.00% per year of the outstanding aggregate principal balances of the Notes. With the exception of employee payroll expenses, which will be paid by the Manager, all other expenses will be borne by us. Each investor will bear his, her or its own fees and expenses incurred in connection with the Offering. The Company may apply fees in its discretion to cover expenses associated with wire transactions, statement and 1099 copy requests and other special services. |
| **Subscription Procedures** | Prior to your purchase of Notes, you will be required to complete a Subscription Agreement setting forth the principal amount of your purchase, the term of the Notes, the interest payment and certain other information regarding your ownership of the Notes, and tender the purchase price for the Notes. The form of Subscription Agreement is filed as an exhibit to the registration statement of which this prospectus is a part. We have the right, in our sole discretion, to accept or reject any subscription. See "Subscription Procedures." We will mail you written confirmation if your subscription has been accepted. For more information, see "Plan of Distribution." |
| **Book-Entry Registration** | The Notes are issued in book entry form, which means that no physical note is created. Evidence of your ownership is provided by written confirmation. Except under limited circumstances, holders will not receive or be entitled to receive any physical delivery of a certificated security or negotiable instrument that evidences their Notes. The issuance and transfer of Notes will be accomplished exclusively through the crediting and debiting of the appropriate accounts in our book-entry registration and transfer system. |
| **Company's Website** | Participation in this Note program and transactions within the program are transacted through the Company's website at www.icapequity.com/vault or by calling the Company at (425) 453-7497. If your request cannot be initiated through the Company's website or by phone, then the website or our phone answering service will provide you with or refer you to the necessary documents and instructions. None of the information contained at any time on the Company website is incorporated by reference into this prospectus. |
| **Tax Status** | Interest credited to each of the Notes will be reported as taxable income for Federal tax purposes, unless an exemption applies to a non-US Note holder. Backup withholding may apply to certain persons. See "Material Federal Income Tax Considerations." |
| **Absence of Public Market** | There is no existing market for the Notes. We do not anticipate that a secondary market for the notes will develop. We do not intend to apply for listing of the notes on any securities exchange or for quotation of the notes in any automated dealer quotation system, including without limitation the OTC Markets Group or any over-the-counter market. |
| **Governing Laws** | Delaware |
| **Trustee and Security Registrar** | American Stock Transfer & Trust Company, LLC |
| **Collateral Agent** | Marketplace Realty Advisors, LLC |
| **Risk Factors** | An investment in the Notes involves risks. You should carefully consider these risks before investing in the Notes. Please see the "Risk Factors" section beginning on page 18 of this prospectus. |

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 996 of
1366

Exhibit 10, Page 996

## SUMMARY HISTORICAL FINANCIAL DATA

The following table presents our summary historical financial data for the periods indicated. The summary historical financial data for the period from July 30, 2018 (inception) through December 31, 2018 and the balance sheet data as of December 31, 2018 are derived from the audited consolidated financial statements. The summary historical financial data for the nine months ended September 30, 2019 and the balance sheet data as of September 30, 2019 are derived from our unaudited condensed consolidated financial statements.

Historical results are included for illustrative and informational purposes only and are not necessarily indicative of results we expect in future periods, and results of interim periods are not necessarily indicative of results for the entire year. You should read the following summary financial data in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and related notes appearing elsewhere in this prospectus.

|  | For the Period July 30, 2018 (inception) through December 31, 2018 | Nine months ended September 30, 2019 (unaudited) |
|---|---|---|
| **Statement of Operations Data** |  |  |
| Revenues | $ 0 | $ 0 |
| Cost of revenues | 0 | 0 |
| Gross profit | 0 | 0 |
| Total operating expenses | 288,944 | 130,550 |
| Net loss | $ (289,877) | $ (172,513) |
| Net loss per unit, basic and diluted | $ (290) | $ (173) |
| Weighted-average units—basic and diluted | 1,000 | 1,000 |
|  |  |  |
| **Balance Sheet Data (at period end)** |  |  |
| Cash (inclusive of restricted cash of $33,080 and $222,989, respectively) | $ 329,868 | $ 2,149,065 |
| Working capital (deficit) (1) | (289,877) | (462,390) |
| Total assets | 329,868 | 2,149,065 |
| Total liabilities | 619,745 | 2,611,455 |
| Member's equity (deficit) | (289,877) | (462,390) |

(1)  Working capital represents total current assets less total current liabilities.

17

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 997 of 1366   Exhibit 10, Page 997

# RISK FACTORS

*Investment in our securities involves a number of substantial risks. You should not invest in our securities unless you are able to bear the complete loss of your investment. In addition to the risks and investment considerations discussed elsewhere in this prospectus, the following factors should be carefully considered by anyone purchasing the securities offered through this prospectus. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties not presently known to us or that we currently deem immaterial also may impair our business operations. If any of the following risks actually occur, our business could be harmed.*

## General Risks Related to Our Business

***We are an emerging growth company organized in July 2018 and have engaged in limited operations since then, which makes an evaluation of us extremely difficult. At this stage of our business operations, even with our good faith efforts, we may never become profitable or generate any significant amount of revenues, thus potential investors have a high probability of losing their investment.***

We were organized in July 2018 and have engaged in limited operations since then. As a result of our limited operations we have (i) generated no revenues and (ii) will accumulate deficits due to organizational and start-up activities, business plan development, and professional fees since we organized. There is nothing at this time on which to base an assumption that our business operations will prove to be successful or that we will ever be able to operate profitably. Our results will depend upon the availability of suitable investment opportunities for us and the performance of our Portfolio Investments. Our proposed operations are subject to all business risks associated with new enterprises. Our future operating results will depend on many factors, including our ability to raise adequate working capital, availability of properties for purchase, the level of our competition and our ability to attract and maintain key management and employees. If we fail to achieve our goals outlined, the Company may run out of money to run its operation and as such, the Company would need to raise additional working capital. Failure to do so could result in Noteholders losing part or all of their money invested.

***We have a history of operating losses and our auditors have indicated that there is a substantial doubt about our ability to continue as a going concern***

For the period from July 30, 2018 (inception) through December 31, 2018, we generated no revenues, reported a net loss of $289,877, and cash flow used in operating activities of $1. For the nine months ended September 30, 2019, we generated no revenues, reported a net loss of $172,513, and had negative cash flow from operating activities of $37,935. As of the nine months ended September 30, 2019, we had an accumulated deficit of approximately $462,390. We anticipate that we will continue to report losses and negative cash flow. Such losses have historically required us to seek additional funding through the issuance of debt securities. Our long-term success is dependent upon among other things, achieving positive cash flows from operations and if necessary, augmenting such cash flows using external resources to satisfy our cash needs. However, we may be unable to achieve these goals and actual results could differ from our estimates and assumptions; accordingly, we may have to supplement our cash flow, by debt financing or sales of equity securities. There can be no assurance that we will be able to obtain additional funding, if needed, on commercially reasonable terms, or at all.

As a result of our accumulated deficit and no source of revenue sufficient to cover our cost of operation and other factors, our independent auditors issued an audit opinion with respect to our consolidated financial statements for the period from July 30, 2018 (inception) through December 31, 2018 that indicated that there is a substantial doubt about our ability to continue as a going concern.

Our consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. These adjustments would likely include substantial impairment of the carrying amount of our assets and potential contingent liabilities that may arise if we are unable to fulfill various operational commitments. In addition, the value of our securities would be greatly impaired. Our ability to continue as a going concern is dependent upon generating sufficient cash flow from operations and obtaining additional capital and financing, including funds to be raised in this offering. If our ability to generate cash flow from operations is delayed or reduced and we are unable to raise additional funding from other sources, we may be unable to continue in business even if this offering is successful. For further discussion about our ability to continue as a going concern and our plan for future liquidity, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Going Concern."

***Our Manager will have complete control over the Company and will therefore make all decisions of which Noteholders will have no control.***

23-01243-WLH11  Doc 468  Filed 02/23/24  Entered 02/23/24 19:33:15  Pg 998 of  Exhibit 10, Page 998
1366

Our Manager shall make certain decisions without input by the Noteholders. Such decisions may pertain to employment decisions, including our Manager's compensation arrangements, the appointment of other officers and managers, and whether to enter into material transactions with related parties.

18

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 999 of    Exhibit 10, Page 999
1366

*Fees to Manager will be paid while interest and principal remain outstanding under the Notes.*

Fees payable to the Manager will be paid while interest and principal remain outstanding under the Notes. The Management Fee is based on the outstanding principal balance of the Notes. The Manager will receive the Management Fee whether or not the Portfolio Investments operate profitably. These fees (like other operating expenses) reduce the amount of cash that otherwise would be available for payment of the Notes.

*You will not be investing in the membership interests of the Company, iCap or any of their affiliates or any of their respective investments. The prior performance data presented provides relevant information regarding affiliates of the Manager, but should not be construed as an indication of the likely financial performance of the Company.*

By investing in the Notes, you will not be investing in the membership interests of the Company, iCap, or any of their affiliates or any of their respective investments, including the Portfolio Investments or in any of the prior investments sponsored by iCap's affiliates. iCap has provided selected information regarding its prior investments because investors might consider those investments to be relevant in assessing the experience and judgment of the Manager, and the iCap management team. Potential investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique, and the Company may not be able to replicate the success of prior investments, even if the Portfolio Investments assembled for the Company's portfolio are similar to those obtained for the prior funds.

*Negative publicity could adversely affect our business and operating results.*

Negative publicity about our industry or the Company, even if inaccurate, could adversely affect our reputation and the confidence in our operations, which could harm our business and operating results. Harm to our reputation can arise from many sources, including employee misconduct, misconduct by our partners, outsourced service providers or other counterparties, failure by us or our partners to meet minimum standards of service and quality and compliance failures and claims.

*Rapid growth may strain our resources.*

We expect to experience significant and rapid growth in the scope and complexity of our business, which may place a significant strain on our management team and our financial and other resources. Such growth, if experienced, may expose us to greater costs and other risks associated with growth and expansion. We may be required to hire a broad range of additional employees, including other support personnel, among others, in order to successfully advance our operations. We may be unsuccessful in these efforts or we may be unable to project accurately the rate or timing of these increases.

This growth may place a strain on our management and operational resources. The failure to develop and implement effective systems or the failure to manage growth effectively could have a materially adverse effect on our business, financial condition, and results of operations. In addition, difficulties in effectively managing the budgeting, forecasting, and other process control issues presented by such a rapid expansion could harm our business, financial condition, and results of operations.

*Control is vested in the Manager; no investor should purchase the Notes unless the investor is comfortable with the Manager's judgment and experience in running the Company's affairs.*

Control over all decisions affecting the Company, including decisions regarding the Portfolio Investments that are to be made, will be made by the Manager and its management team. Many material decisions, such as decisions regarding the purchase or sale of assets, the refinancing of Portfolio SPEs, whether to make an investment, and the incurrence of third-party-debt will be made without separate concurrence from Noteholders. No assurance can be given that sufficient investment opportunities will be presented to the Company to deploy all of the capital available for investment.

19

23-01243-WLH11    Doc 763    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1000 of 1366    Exhibit 10, Page 1000

*The Manager's conflicts of interest may result in transactions unfavorable to the Company.*

The Manager and its affiliates may provide certain services to, and enter into transactions with, the Company, its holding companies or the Portfolio SPEs, provided that the terms are commercially reasonable. This limitation may not fully protect the Company or the Portfolio SPEs against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Noteholders, the Trustee, the Collateral Agent, or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its affiliates. In addition, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities for affiliated entities that may generate different fees for the Manager.

*The Manager may retain and reinvest all or a portion of the revenue generated by, or proceeds of a sale of, a Portfolio Investment.*

The Manager has the discretion to sell the properties the Company acquires and to use the cash proceeds from such sale (or cash proceeds from rental income) to, among other things, satisfy its obligations under the Notes, whether then due and payable, or other Company obligations, or to enter into new Portfolio Investments. The Manager intends to make new investments over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

*Without obtaining advice from their personal advisors, potential investors may not be aware of the legal, tax or economic consequences of an investment in the Notes.*

The Manager has not arranged for potential investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Company has not acted as if it had been retained by the potential investors. Potential investors should not construe the contents of this prospectus or any prior or subsequent communication from the Manager, its affiliates or any professional associated with this Offering, as legal or tax advice. Potential investors should consult their own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability.

*Various factors could negatively impact the profitability of the Company's Portfolio Investments*

The Company may obtain insurance policies for the Portfolio Investments that are commercially prudent given the local market and circumstances of the Portfolio Investments. However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Portfolio Investments should be partially or totally destroyed, the Company may suffer a substantial loss of capital as well as profits. Even if the Company's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Company will sustain a substantial uninsured loss as a result of a fire or other casualty.

Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making a Portfolio Investment, the Company may undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation could include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the Portfolio Investment's site had environmental contamination not detected prior to the Company's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Company undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Company may incur environmental clean-up costs or be subject to liability exposure that may reduce the net profits of the Company.

20

23-01273-WLH11   Doc 766   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1001 of 1366   Exhibit 10, Page 1001

Under the Americans With Disabilities Act of 1990 ("ADA"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing properties to allow disabled persons to access such facilities. Most of the properties the Company considers will likely be in compliance with the present access requirements. If, however, the properties the Company acquires are not in compliance with the ADA, the Company will be required to make modifications to the properties to bring them into compliance or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

The real estate industry in general, and the multifamily, residential, and commercial sectors, in particular, are highly competitive, and the Company will be competing with numerous other entities, some having substantially greater financial resources and experience than the Company, in seeking attractive investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available Portfolio Investments or resulting in other less favorable terms to the purchasers.

The investment returns available from investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers' decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could have a material adverse impact on the Company's results of operations or financial condition. In addition, real estate investments are difficult to sell quickly and the Company may not be able to adjust the Company's portfolio of owned properties quickly in response to economic or other conditions in order to meet Note obligations. If the Company's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Company's income will be adversely affected.

***There may be unanticipated obstacles to execution of our business plan.***

Our proposed plan of operation and prospects will depend largely upon our ability to successfully establish the Company's presence in a timely fashion, retain and continue to hire skilled management, technical, marketing, and other personnel, and attract and retain significant numbers of quality business partners and corporate clients. There can be no assurance that we will be able to successfully implement our business plan or develop or maintain future business relationships, or that unanticipated expenses, problems or technical difficulties which would result in material delays in implementation will not occur.

***Information technology system failures or breaches of our network security could interrupt our operations and adversely affect our business.***

We rely on our computer systems and network infrastructure across our operations. Our operations depend upon our ability to protect our computer equipment and systems against damage from physical theft, fire, power loss, telecommunications failure or other catastrophic events, as well as from internal and external security breaches, viruses and other disruptive problems. Any damage or failure of our computer systems or network infrastructure that causes an interruption in our operations could have a material adverse effect on our business and subject us to litigation or to actions by regulatory authorities.

We are continuing to develop our information technology capabilities, and if we are unable to successfully upgrade or expand our technological capabilities, we may not have the ability to take advantage of market opportunities, manage our costs and transactional data effectively, satisfy customer requirements, execute our business plan or respond to competitive pressures.

21

23-01243-WLH11   Doc 463   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1002 of 1366

Exhibit 10, Page 1002

*The failure to enforce and maintain our trademarks and protect our other intellectual property could materially adversely affect our business, including our ability to establish and maintain brand awareness.*

The success of our business strategy depends on our continued ability to obtain and use trademarks and service marks in order to increase brand awareness and develop our branded products. If our efforts to protect our intellectual property are not adequate, or if any third-party misappropriates or infringes on our intellectual property, whether in print, on the Internet or through other media, the value of our brands may be harmed, which could have a material adverse effect on our business, including the failure of our brands and branded products to achieve and maintain market acceptance. There can be no assurance that all of the steps we have taken to protect our intellectual property in the United States and in foreign countries will be adequate. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent, as do the laws of the United States.

*Third-party claims with respect to intellectual property assets, if decided against us, may result in competing uses or require adoption of new, non-infringing intellectual property, which may in turn adversely affect sales and revenues.*

There can be no assurance that third parties will not assert infringement or misappropriation claims against us, or assert claims that our rights in our trademarks, service marks, trade dress and other intellectual property assets are invalid or unenforceable. Any such claims could have a material adverse effect on us if such claims were to be decided against us. If our rights in any intellectual property were invalidated or deemed unenforceable, it could permit competing uses of intellectual property, which, in turn, could lead to a decline in our results of operations. If the intellectual property became subject to third-party infringement, misappropriation or other claims, and such claims were decided against us, we may be forced to pay damages, be required to develop or adopt non-infringing intellectual property or be obligated to acquire a license to the intellectual property that is the subject of the asserted claim. There could be significant expenses associated with the defense of any infringement, misappropriation, or other third-party claims.

*We depend on certain officers of the Manager, the loss of whom could materially harm our business.*

We rely upon the accumulated knowledge, skills and experience of the officers and personnel of our Manager and its affiliates. If they were to leave the Manager or become incapacitated, we might suffer in our planning and execution of business strategy and operations, impacting our brand and financial results. We also do not maintain any key man life insurance policies for any such persons.

*We are exposed to the risk of natural disasters, unusual weather conditions, pandemic outbreaks, political events, war and terrorism that could disrupt business and result in lower sales, increased operating costs and capital expenditures.*

Our headquarters and company-operated locations, as well as certain of our vendors and customers, are located in areas which have been and could be subject to natural disasters such as floods, hurricanes, tornadoes, fires or earthquakes. Adverse weather conditions or other extreme changes in the weather, including resulting electrical and technological failures, may disrupt our business and may adversely affect our ability to continue our operations. These events also could have indirect consequences such as increases in the costs of insurance if they result in significant loss of property or other insurable damage. Any of these factors, or any combination thereof, could adversely affect our operations.

*Members of our Manager will have other business interests and obligations to other entities.*

None of the members and officers of the Manager will be required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company, provided that such activities do not otherwise breach their agreements with the Company. We are dependent on these persons to successfully operate the Company. Their other business interests and activities could divert time and attention from operating the Company.

***As an "emerging growth company" under the JOBS Act, we are permitted to rely on exemptions from certain disclosure requirements.***

We qualify as an "emerging growth company" under the JOBS Act. As a result, we are permitted to, and intend to, rely on exemptions from certain disclosure requirements. For so long as we are an emerging growth company, we will not be required to:

- have an auditor report on our internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act;

- comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditors' report providing additional information about the audit and the consolidated financial statements (i.e., an auditor discussion and analysis);

- submit certain executive compensation matters to stockholder advisory votes, such as "say-on-pay" and "say-on-frequency"; and

- disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the chief executive officer's compensation to median employee compensation.

In addition, Section 102 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have elected to take advantage of the benefits of this extended transition period. Our consolidated financial statements may therefore not be comparable to those of companies that comply with such new or revised accounting standards.

We will remain an "emerging growth company" for up to five years, or until the earliest of (i) the last day of the first fiscal year in which our total annual gross revenues exceed $1 billion, (ii) the date that we become a "large accelerated filer" as defined in Rule 12b-2 under the Exchange Act, which would occur if the market value of our membership interests that is held by non-affiliates exceeds $700 million as of the last business day of our most recently completed second fiscal quarter or (iii) the date on which we have issued more than $1 billion in non-convertible debt during the preceding three year period.

Until such time, however, we cannot predict if investors will find our securities less attractive because we may rely on these exemptions. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the price of our securities may be more volatile.

## Risks Related to the Real Estate Business in General

***The profitability of attempted acquisitions is uncertain.***

We intend to acquire properties selectively. Acquisition of properties entails risks that investments will fail to perform in accordance with expectations. In undertaking these acquisitions, we will incur certain risks, including the expenditure of funds on, and the devotion of management's time to, transactions that may not come to fruition. Additional risks inherent in acquisitions include risks that the properties will not achieve anticipated sales price or occupancy levels and that estimates of the costs of improvements to bring an acquired property up to standards established for the market position intended for that property may prove inaccurate. Expenses may be greater than anticipated.

23

23-01245-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1004 of 1366    Exhibit 10, Page 1004
1/192

*The illiquidity of real estate investments could significantly impede our ability to respond to adverse changes in the performance of our properties.*

Real estate investments are relatively illiquid. As a result, we may not be able to sell a property or properties quickly or on favorable terms in response to changing economic, financial and investment conditions when it otherwise may be prudent to do so. Deteriorating conditions in the U.S. economy and credit markets may make it difficult to sell properties at attractive prices. We cannot predict whether we will be able to sell any property for the price or on the terms set by us or whether any price or other terms offered by a prospective purchaser would be acceptable to us. We also cannot predict the length of time needed to find a willing purchaser and to close the sale of a property. We may be required to expend funds to correct defects or to make improvements before a property can be sold, and we cannot provide any assurances that we will have funds available to correct such defects or to make such improvements. Our inability to dispose of assets at opportune times or on favorable terms could adversely affect our cash flows and results of operations.

*Rising expenses could reduce cash flow and funds available for future acquisitions.*

Our properties will be subject to increases in tax rates, utility costs, operating expenses, insurance costs, repairs and maintenance, administrative and other expenses. If we are unable to lease properties on a basis requiring the tenants to pay all or some of the expenses, we would be required to pay those costs, which could adversely affect funds available for future acquisitions or cash available for distributions.

*Many real estate costs are fixed, even if income from our properties decreases.*

Many real estate costs, such as real estate taxes, insurance premiums and maintenance costs, generally are not reduced even when a property is not fully occupied, rental rates decrease, a tenant fails to pay rent or other circumstances cause a reduction in property revenues. In addition, newly acquired properties may not produce significant revenues immediately, and the property's operating cash flow may be insufficient to pay the operating expenses and debt service associated with these new properties. If we are unable to offset real estate costs with sufficient revenues across our portfolio, our financial performance and liquidity could be materially and adversely affected.

*If we purchase assets at a time when the single family, multifamily, or commercial real estate market is experiencing substantial influxes of capital investment and competition for properties, the real estate we purchase may not appreciate or may decrease in value.*

The multifamily real estate markets are currently experiencing a substantial influx of capital from investors worldwide. This substantial flow of capital, combined with significant competition for real estate, may result in inflated purchase prices for such assets. To the extent we purchase real estate in such an environment, we are subject to the risk that if the real estate market ceases to attract the same level of capital investment in the future as it is currently attracting, or if the number of companies seeking to acquire such assets decreases, our returns will be lower and the value of our assets may not appreciate or may decrease significantly below the amount we paid for such assets.

A single family, multifamily, or commercial property's income and value may be adversely affected by national and regional economic conditions, local real estate conditions such as an oversupply of properties or a reduction in demand for properties, availability of "for sale" properties, competition from other similar properties, our ability to provide adequate maintenance, insurance and management services, increased operating costs (including real estate taxes), the attractiveness and location of the property and changes in market rental rates. Our income will be adversely affected if a significant number of tenants are unable to pay rent or if our properties cannot be rented on favorable terms. Our performance is linked to economic conditions in the regions where our properties will be located and in the market for multifamily space generally. Therefore, to the extent that there are adverse economic conditions in those regions, and in these markets generally, that impact the applicable market rents, such conditions could result in a reduction of our income and cash available for distributions and thus affect the amount of distributions we can make to you.

*We will depend in part on tenants for some of our revenue and therefore our revenue will depend on the success and economic viability of our tenants.*

We will depend in part on income from tenants. Our financial results will depend in part on leasing space in the properties or the full properties we acquire to tenants on economically favorable terms.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1006 of
1366

Exhibit 10, Page 1006

In the event of a tenant default prior to stabilization, we may experience delays in enforcing our rights as landlord and may incur substantial costs in protecting our investment and re-letting our property. A default, of a substantial tenant or number of tenants at any one time, on lease payments to us would cause us to lose the revenue associated with such lease(s) and cause us to have to find an alternative source of revenue to meet mortgage payments and prevent a foreclosure if the property is subject to a mortgage. Therefore, lease payment defaults by tenant(s) could cause us to lose our investment.

*We may not make a profit if we sell a property.*

The prices that we can obtain when we determine to sell a property will depend on many factors that are presently unknown, including the operating history, tax treatment of real estate investments, demographic trends in the area and available financing. There is a risk that we will not realize any significant appreciation on our investment in a property. Accordingly, your ability to recover all or any portion of your investment under such circumstances will depend on the amount of funds so realized and claims to be satisfied therefrom.

*Noteholders must rely on the Manager to acquire appropriate Portfolio Investments for the Company's portfolio.*

The Company is conducting the Offering as a "blind pool," meaning that the Company is proceeding to raise funds through the sale of the Notes, without having specifically identified any real estate properties in which the Company intends to invest. When you subscribe for Notes, that subscription is binding, and you will not have the right to revoke that subscription even if you do not approve of the Portfolio Investments that the Company subsequently identifies. Prospective investors should not invest in the Company unless they are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this prospectus.

*If the Company is not as successful with the Offering as desired, it may not acquire as diversified a portfolio as is planned.*

It is not known how many Portfolio Investments the Company will be able to obtain, or the number of opportunities that will be presented by the market for it to evaluate. The number of Portfolio Investments ultimately made by the Company will depend primarily upon the capital raised through the sale of the Notes, the availability of suitable Portfolio Investments, the number of investors who choose to withdraw their funds through demand notices, and the extent to which the Manager arranges for Portfolio Investments to be held with co-investors. There is no certainty as to the number of Portfolio Investments that the Company will be ultimately be able to obtain, and since one of the Company's objectives is diversification, no assurance can be given as to the Company's achievement of that objective.

*Competition for acquisitions may result in fewer acquisition opportunities and increased prices for properties, which may impede our growth and materially and adversely affect us.*

Our growth depends in part on our ability to identify attractive real estate investment opportunities that are compatible with our acquisition strategy. We may not be successful in identifying such investment opportunities or in consummating acquisitions on favorable terms, if at all. In addition, we can provide no assurances regarding the availability of, or our ability to source and close, off-market or limited-market deals. Failure to identify or consummate acquisitions on favorable terms, or at all, would impede our growth and materially and adversely affect us.

Further, we face significant competition for attractive investment opportunities from an indeterminate number of other real estate investors, including investors with significantly greater capital resources and access to capital than we have, such as commercial developers, real estate companies, and foreign investors that operate in the markets in which we may operate, that will compete with us in acquiring residential, commercial, and other properties that will be seeking investments and tenants for these properties. Moreover, if current market conditions deteriorate resulting in depressed real estate values, owners of real estate may be reluctant to sell, resulting in fewer acquisition opportunities. As a result of such increased competition and limited opportunities, we may be unable to acquire additional properties as we desire or the purchase price of such properties may be significantly elevated, which may impede our growth and materially and adversely affect us.

25

23-01223-WLH11    Doc 268    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1007 of 1366

In addition, our properties may be located in close proximity to other properties that will compete against our properties for tenants. Many of these competing properties may be better located and/or appointed than the properties that we will acquire, giving these properties a competitive advantage over our properties, and we may, in the future, face additional competition from properties not yet constructed or even planned. This competition could adversely affect our business. The number of competitive properties could have a material effect on our ability to rent space at our properties and the amount of rents charged. We could be adversely affected if additional competitive properties are built in locations competitive with our properties, causing increased competition for residential renters. In addition, our ability to charge premium rental rates to tenants may be negatively impacted. This increased competition may increase our costs of acquisitions or lower the occupancies and the rent we may charge tenants. This could result in decreased cash flow from tenants and may require us to make capital improvements to properties which we would not have otherwise made.

***We may not have control over costs arising from rehabilitation or ground up construction of properties.***

We may elect to acquire properties which may require rehabilitation or even be from the "ground up," meaning that we purchase the land and implement a plan to construct a multifamily building, single family residence or commercial building on the land. In particular, we may acquire affordable properties that we will rehabilitate and convert to market rate properties. We may also purchase land, entitle the land for a multifamily building, single family residence or commercial building (if that is not already provided), architect a multifamily building, single family residence, or commercial building and build a brand new multifamily building, single family residence, or commercial building. Consequently, we intend to retain independent general contractors to perform the actual physical rehabilitation and/or construction work and will be subject to risks in connection with a contractor's ability to control rehabilitation and/or construction costs, the timing of completion of rehabilitation and/or construction, and a contractor's ability to build in conformity with plans and specification.

***Inventory or available properties might not be sufficient to realize our investment goals.***

We may not be successful in identifying suitable real estate properties or other assets that meet our acquisition criteria, or consummating acquisitions or investments on satisfactory terms. Failures in identifying or consummating acquisitions would impair the pursuit of our business plan. Members ultimately may not like the location, lease terms or other relevant economic and financial data of any real properties, other assets or other companies that we may acquire in the future. Moreover, our acquisition strategy could involve significant risks that could inhibit our growth and negatively impact our operating results, including the following: increases in asking prices by acquisition candidates to levels beyond our financial capability or to levels that would not result in the returns required by our acquisition criteria; diversion of management's attention to expansion efforts; unanticipated costs and contingent or undisclosed liabilities associated with acquisitions; failure of acquired businesses to achieve expected results; and difficulties entering markets in which we have no or limited experience.

***The consideration paid for our target acquisition may exceed fair market value, which may harm our financial condition and operating results.***

The consideration that we pay will be based upon numerous factors, and the target acquisition may be purchased in a negotiated transaction rather than through a competitive bidding process. We cannot assure anyone that the purchase price that we pay for a target acquisition or its appraised value will be a fair price, that we will be able to generate an acceptable return on such target acquisition, or that the location, lease terms or other relevant economic and financial data of any properties that we acquire will meet acceptable risk profiles. We may also be unable to lease vacant space or renegotiate existing leases at market rates, which would adversely affect our returns on a target acquisition. As a result, our investments in our target acquisition may fail to perform in accordance with our expectations, which may substantially harm our operating results and financial condition.

26

***The failure of our properties to generate positive cash flow or to appreciate in value would harm our financial condition and operating results.***

There is no assurance that our real estate investments will appreciate in value or will ever be sold at a profit. The marketability and value of the properties will depend upon many factors beyond the control of our management. There is no assurance that there will be a ready market for the properties, since investments in real property are generally non-liquid. The real estate market is affected by many factors, such as general economic conditions, availability of financing, interest rates and other factors, including supply and demand, that are beyond our control. We cannot predict whether we will be able to sell any property for the price or on the terms set by it, or whether any price or other terms offered by a prospective purchaser would be acceptable to us. We also cannot predict the length of time needed to find a willing purchaser and to close the sale of a property. Moreover, we may be required to expend funds to correct defects or to make improvements before a property can be sold. We cannot assure any person that we will have funds available to correct those defects or to make those improvements. In acquiring a property, we may agree to lockout provisions that materially restrict us from selling that property for a period of time or impose other restrictions, such as a limitation on the amount of debt that can be placed or repaid on that property. These lockout provisions would restrict our ability to sell a property. These factors and any others that would impede our ability to respond to adverse changes in the performance of our properties could significantly harm our financial condition and operating results.

***Illiquidity of real estate investments could significantly impede our ability to respond to adverse changes in the performance of our properties and harm our financial condition.***

Because real estate investments are relatively illiquid, our ability to promptly sell one or more properties or investments in our portfolio in response to changing economic, financial and investment conditions may be limited. In particular, these risks could arise from weakness in or even the lack of an established market for a property, changes in the financial condition or prospects of prospective purchasers, changes in national or international economic conditions, and changes in laws, regulations or fiscal policies of jurisdictions in which the property is located. We may be unable to realize our investment objectives by sale, other disposition or refinance at attractive prices within any given period of time or may otherwise be unable to complete any exit strategy. An exit event is not guaranteed and is subject to the Manager's discretion.

***Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.***

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

***Real estate development projects are subject to numerous risks outside the Company's control such as delays in permitting and other governmental approvals, increased costs, and labor shortages.***

Any properties in which the Company invests relating to real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, and thus lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. The Company may enter into contracts to purchase properties before they are finished, and the foregoing risks could adversely impact the purchase prices, valuations, or closing dates of those properties. Although the Manager will not undertake such transactions without reviewing detailed budgets, such budgets may understate the expense.

***The volatile credit and capital markets could have a material adverse effect on our financial condition.***

Our ability to manage our future debt and liquidity will be dependent on our level of positive cash flow. An economic downturn may negatively impact our cash flows. Credit and capital markets can be volatile, which could make it more difficult for us to refinance our debt or to obtain additional debt or equity financings in the future. Such

23-01223-WLH11    Doc 763    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1009 of
1366                                                                                Exhibit 10, Page 1009

constraints could increase our costs of borrowing and could restrict our access to other potential sources of future liquidity. Our failure to have sufficient liquidity to make interest and other payments required by our debt or our Notes could result in a default of such debt or the Notes and acceleration of our borrowings, which would have a material adverse effect on our business and financial condition.

27

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1010 of 1366

Exhibit 10, Page 1010

*A prolonged economic downturn could materially affect us in the future.*

The recession from late 2007 to mid-2009 reduced consumer confidence to historic lows, impacting the public's ability and desire to spend discretionary dollars as a result of job losses, home foreclosures, significantly reduced home values, investment losses, bankruptcies and reduced access to credit, resulting in lower levels of customer traffic. If the economy experiences another significant decline, our business and results of operations could be materially adversely affected.

## Risks Related to Financing

*We might obtain lines of credit and other borrowings, which increases our risk of loss due to potential foreclosure.*

We may obtain lines of credit and long-term financing that may be secured by our assets. As with any liability, there is a risk that we may be unable to repay our obligations from the cash flow of our assets. Therefore, when borrowing and securing such borrowings with our assets, we risk losing such assets in the event we are unable to repay such obligations or meet such demands.

*We have broad authority to incur debt.*

Our policies do not limit us or our subsidiary entities from incurring debt until our total liabilities would be at 85% of the value of the real estate held by the SPE's of Holding. We intend to borrow as much as 85% of the value of such properties. We do not currently own any properties. High debt levels would cause us to incur higher interest charges and higher debt service payments and may also be accompanied by restrictive covenants.

## Risks Related to our Corporate Structure

*Since we do not set aside funds in a sinking fund to repay the Notes, you could lose all or a part of your investment if we do not have enough cash to pay.*

There is no sinking fund to make payments on the Notes. We will not contribute funds to a separate account, commonly known as a sinking fund, to make interest or principal payments on the Notes. The Notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation, or any other governmental or private fund or entity. Therefore, if you invest in the Notes, you will have to rely only on our cash flow from operations and other sources of funds for repayment of principal at maturity or redemption and for payment of interest when due. Any future cash flows from operations could be impaired under the circumstances described under "General Risks Related to Our Business." If our cash flow from operations and other sources of funds are not sufficient to pay any amounts owed under the Notes, then you may lose all or part of your investment.

*Investors will not receive the benefit of the regulations provided to real estate investment trusts or investment companies.*

We are not a real estate investment trust and enjoy a broader range of permissible activities. Under the Investment Company Act of 1940, an "investment company" is defined as an issuer which is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities; is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding; or is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis.

We intend to operate in such manner as not to be classified as an "investment company" within the meaning of the Investment Company Act of 1940 as we intend on primarily holding and managing real estate. The management and the investment practices and policies of ours are not supervised or regulated by any federal or state authority. As a result, investors will be exposed to certain risks that would not be present if we were subjected to a more restrictive regulatory situation.

23-01273-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1011 of 1366    Exhibit 10, Page 1011

23-01243-WLH11   Doc 460   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1012 of
1366

Exhibit 10, Page 1012

***If we are deemed to be an investment company, we may be required to institute burdensome compliance requirements and our activities may be restricted***

If we are ever deemed to be an investment company under the Investment Company Act of 1940, we may be subject to certain restrictions including:

- restrictions on the nature of our investments; and

- restrictions on the issuance of securities.

In addition, we may have imposed upon us certain burdensome requirements, including:

- registration as an investment company;

- adoption of a specific form of corporate structure; and

- reporting, record keeping, voting, proxy, compliance policies and procedures and disclosure requirements and other rules and regulations.

***The exemption from the Investment Company Act of 1940 may restrict our operating flexibility. Failure to maintain this exemption may adversely affect our profitability.***

We do not believe that at any time we will be deemed an "investment company" under the Investment Company Act of 1940 as we do not intend on trading or selling securities. Rather, we intend to hold and manage real estate. However, if at any time we may be deemed an "investment company," we believe we will be afforded an exemption under Section 3(c)(5)(C) of the Investment Company Act of 1940, as amended (referred to in this Offering as the "1940 Act"). Section 3(c)(5)(C) of the 1940 Act excludes from regulation as an "investment company" any entity that is primarily engaged in the business of purchasing or otherwise acquiring "mortgages and other liens on and interests in real estate". To qualify for this exemption, we must ensure our asset composition meets certain criteria. Generally, 55% of our assets must consist of qualifying mortgages and other liens on and interests in real estate and the remaining 45% must consist of other qualifying real estate-type interests. Maintaining this exemption may adversely impact our ability to acquire or hold investments, to engage in future business activities that we believe could be profitable, or could require us to dispose of investments that we might prefer to retain. If we are required to register as an "investment company" under the 1940 Act, then the additional expenses and operational requirements associated with such registration may materially and adversely impact our financial condition and results of operations in future periods.

**Insurance Risks**

***We may suffer losses that are not covered by insurance.***

The geographic areas in which we invest in real estate may be at risk for damage to property due to certain weather-related and environmental events, including such things as severe thunderstorms, hurricanes, flooding, tornadoes, snowstorm, sinkholes, and earthquakes. To the extent possible, the Manager may but is not required to attempt to acquire insurance against fire or environmental hazards. However, such insurance may not be available in all areas, nor are all hazards insurable as some may be deemed acts of God or be subject to other policy exclusions.

The Manager expects to obtain a lender's title insurance policy and will require that owners of property securing the Notes maintain hazard insurance naming the Company as the beneficiary. All decisions relating to the type, quality and amount of insurance to be placed on property securing the Notes will be made exclusively by the Manager. Certain types of losses that may impact the security for the Notes could be of a catastrophic nature (due to such things as ice storms, tornadoes, wind damage, hurricanes, earthquakes, landslides, sinkholes, and floods), some of which may be uninsurable, not fully insured or not economically insurable. This may result in insurance coverage that, in the event of a substantial loss, would not be sufficient to pay the full prevailing market value or prevailing replacement cost of the underlying property. Inflation, changes in building codes and

23-01225-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1013 of 1366    Exhibit 10, Page 1013

ordinances, environmental considerations, and other factors also might make it unfeasible to use insurance proceeds to replace the underlying property once it has been damaged or destroyed. Under such circumstances, the insurance proceeds received might not be adequate to restore the property, leaving the Company without security for the Notes.

29

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1014 of 1366    Exhibit 10, Page 1014

Furthermore, an insurance company may deny coverage for certain claims, and/or determine that the value of the claim is less than the cost to restore the property, and a lawsuit could have to be initiated to force them to provide coverage, resulting in further losses in income to the Company. Additionally, properties securing the Notes may now contain or come to contain mold, which may not be covered by insurance and has been linked to health issues.

Further, when a borrower defaults on a Note, it is likely they will allow their hazard insurance to lapse. The Manager will attempt to obtain its own insurance policies on such properties, to the extent such lender's policies are available, but it is possible that some of the properties securing the notes may be uninsured for a period of time or uninsurable. If damage occurred during a time when a property was uninsured, the Company may suffer a loss of its security for the Notes.

**Risks Related to this Offering and the Notes**

***There is no public trading market for our Notes.***

There is no established public trading market for the Notes and there can be no assurance that one will ever develop. Market liquidity will depend on the perception of our operating business and any steps that our management might take to bring us to the awareness of investors. There can be no assurance given that there will be any awareness generated. Consequently, investors may not be able to liquidate their investment or liquidate it at a price that reflects the value of the business. As a result, holders of our securities may not find purchasers for our securities should they to sell securities held by them. Only accredited investors or institutions with no need for immediate short-term liquidity should purchase the Notes.

***The market value of the Notes may decrease due to factors beyond our control.***

The stock market from time to time has experienced extreme price and volume fluctuations, which have particularly affected the market prices for emerging growth companies and which often have been unrelated to the operating performance of the companies. These broad market fluctuations may adversely affect the market value of our Notes. The market value of our Notes may also fluctuate significantly in response to the following factors, most of which are beyond our control:

- variations in our quarterly operating results,

- changes in general economic conditions,

- changes in market valuations of similar companies,

- announcements by us or our competitors of significant acquisitions, strategic partnerships or joint ventures, or capital commitments,

- poor reviews;

- loss of a major customer, partner or joint venture participant; and

- the addition or loss of key managerial and collaborative personnel.

Any such fluctuations may adversely affect the market value of our Notes, regardless of our actual operating performance. As a result, Noteholders may be unable to sell their Notes (even if permitted by applicable securities laws and the terms of the Notes), or may be forced to sell them at a loss.

***The Company may prepay the principal and interest on the Notes at any time.***

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1015 of 1366

Exhibit 10, Page 1015

The Company may prepay all or a part of the principal amount and accrued interest in the Notes at any time. No prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Noteholders will not have certainty as to how long their respective Note(s) may be outstanding. If the Company makes any prepayment, the prepayments need not be made ratably against all outstanding Notes.

23-01243-WLH11    Doc 460    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1016 of 1366

***The Trustee will have the authority to act on behalf of all Noteholders in dealing with the Company.***

The Note vests control over matters related to the enforcement of the security interest, the exercise of any rights or remedies with respect to the collateral supporting the Note and any remedies under the Note in the hands of the Trustee. If an action is brought by the Trustee, such action must be for the collective benefit of all Noteholders, other than with respect to an Event of Default that applies only to particular Notes as described above.

***The characteristics of the Notes, including interest rate, possible lack of sufficient collateral security, lack of guarantees of subsidiary Investment SPEs, and possible lack of liquidity, may not satisfy your investment objectives.***

The Notes may not be a suitable investment for you, and we advise you to consult your investment, tax and other professional financial advisors prior to purchasing Notes. The characteristics of the Notes, including interest rate, possible lack of sufficient collateral security, lack of guarantees of subsidiary Investment SPEs and possible lack of liquidity, may not satisfy your investment objectives. The Notes may not be a suitable investment for you based on your ability to withstand a loss of interest or principal or other aspects of your financial situation, including your income, net worth, financial needs, investment risk profile, return objectives, investment experience and other factors. Prior to purchasing any Notes, you should consider your investment allocation with respect to the amount of your contemplated investment in the Notes in relation to your other investment holdings and the diversity of those holdings.

***The Notes will be structurally subordinated to the indebtedness and other liabilities of our subsidiaries.***

The Notes will not be obligations of any of our subsidiaries and will be effectively subordinated to the liabilities, including trade payables, of our special purpose entity subsidiaries. The incurrence of other indebtedness or other liabilities by any of our special purpose entity subsidiaries is not prohibited in connection with the Notes and could adversely affect our ability to pay our obligations on the Notes. A significant portion of our operations is conducted through our special purpose entity subsidiaries and our cash flow and consequent ability to service our debt, including the Notes, depends in part on our special purpose entity subsidiaries. Our special purpose entity subsidiaries are separate legal entities that have no obligation to pay any amounts due under the Notes or to make any funds available therefore, whether by dividends, loans or other payments. Except to the extent we are a creditor with recognized claims against our special purpose entity subsidiaries, all claims of creditors, including trade creditors, of our special purpose entity subsidiaries will have priority with respect to the assets of such subsidiaries over our claims (and therefore the claims of our creditors, including holders of the Notes). Consequently, the Notes will be structurally subordinated to all liabilities of any of our subsidiaries and any subsidiaries that we may in the future acquire or establish.

***The indenture governing the Notes does not contain financial covenants and only provides limited protection against significant corporate events and other actions we may take that could adversely impact your investment in the Notes.***

While the indenture governing the Notes contains terms intended to provide protection to the holders of the Notes upon the occurrence of certain events involving significant corporate transactions, such terms are limited and may not be sufficient to protect your investment in the Notes.

The indenture for the Notes does not:

- require us to maintain any financial ratios or specific levels of net worth, revenues, income, cash flow or liquidity and, accordingly, does not protect holders of the Notes in the event we experience significant adverse changes in our financial condition. Accordingly, we will not be required to maintain a positive net worth;

- restrict us or our subsidiaries from incurring additional unsecured debt or other liabilities, including additional unsecured senior debt and, accordingly, does not protect holders of the Notes in the event we incur additional debt or liabilities and our ability to pay our obligations on the Notes is adversely affected;

- restrict our ability to repurchase or prepay any other of our securities or other indebtedness;

23-01224-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1017 of 1366          Exhibit 10, Page 1017

- restrict our ability to make investments or to repurchase or pay dividends or make other payments in respect of our Notes or other securities ranking junior to the Notes; or

- restrict our ability to enter into highly leveraged transactions.

31

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1018 of 1366    Exhibit 10, Page 1018

Furthermore, the indenture governing the Notes contains only limited protections in the event of a change in control. As a result of the foregoing, when evaluating the terms of the Notes, you should be aware that the terms of the indenture and the Notes do not restrict our ability to engage in, or to otherwise be a party to, a variety of corporate transactions, circumstances and events that could have an adverse impact on your investment in the Notes.

***Because there will be no trading market for the Notes, it may be difficult to sell your Notes.***

There is no existing market for the Notes. We do not anticipate that a secondary market for the Notes will develop. We do not intend to apply for listing of the Notes on any securities exchange or for quotation of the Notes in any automated dealer quotation system, including without limitation the OTC Markets Group or any over-the-counter market.

***Ratings of the Notes may change after issuance and affect the market price and marketability of the Notes.***

We currently expect that, upon issuance, the Notes will be rated by one or more rating agencies. Such ratings are limited in scope, and do not address all material risks relating to an investment in the Notes, but rather reflect only the view of each rating agency at the time the rating is issued. There is no assurance that such credit ratings will be issued or remain in effect for any given period of time or that such ratings will not be lowered, suspended or withdrawn entirely by the rating agencies. It is also possible that such ratings may be lowered in connection with future events, such as future acquisitions. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market price or marketability of the Notes. In addition, any decline in the ratings of the Notes may make it more difficult for us to raise capital on acceptable terms.

***Because we may repay the Notes at any time, you may be subject to reinvestment risk.***

We have the right to repay any Note at any time. The Notes would be repaid at 100% of the principal amount plus accrued but unpaid interest up to but not including the redemption date. Any such repayment may have the effect of reducing the income or return on investment that any investor may receive on an investment in the Notes by reducing the term of the investment. If this occurs, you may not be able to reinvest the proceeds at an interest rate comparable to the rate paid on the Notes. See "Description of the Notes - Optional Redemption by Company".

***We can provide no assurance that any Notes will be sold or that we will raise sufficient proceeds to carry out our business plans.***

We are conducting this offering of Notes ourselves without any underwriter or placement agent. Although we intend to sell up to $500 million in aggregate principal amount of the Notes, there is no minimum amount of proceeds that must be received from the sale of the Notes in order to accept proceeds from Notes actually sold. Accordingly, we can provide no assurance about the total principal amount of Notes that will be sold. Therefore, we cannot assure you that we will raise sufficient proceeds to carry out our business plans. Specifically, we may not be able to fund new loan originations if sufficient funds are not raised. Accordingly, our inability to raise such proceeds could have a material adverse impact on our business activities, results of operations and financial condition, and may limit our ability to repay amounts owed under the Notes.

***We will be substantially reliant upon the net offering proceeds we receive from the sale of our Notes to meet our liquidity needs.***

Our operations alone may not produce a sufficient return on investment to pay the stated interest rates on the Notes and fund our capital needs. We intend to use the net proceeds to acquire real estate and for other general corporate purposes, which are likely to include the payment of general and administrative expenses. We may not be able to attract new investors or have sufficient borrowing capacity when we need additional funds to repay principal and interest on your Notes or redeem your Notes.

32

23-01243-WLH11   Doc 768   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1019 of 1366   Exhibit 10, Page 1019

*We may invest or spend the proceeds of this Offering in ways with which you may not agree or in ways which may not yield a return.*

While we have provided guidance on priorities for the use of proceeds, the timing and amount of sales will impact our actual use of proceeds within the uses identified. Our management will have broad discretion in determining how the proceeds of the Offering will be used in each of the identified use categories.

We currently intend to use the proceeds we receive from this Offering after deducting estimated fees and expenses associated with this Offering, including legal, accounting, transfer agent, financial, acquisitions and other professional fees, primarily for the purposes as described above. Our management will have considerable discretion in the application of the net proceeds, and you will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. Investors in this Offering will need to rely upon the judgment of our management with respect to the use of proceeds. If we do not use the net proceeds that we receive in this Offering effectively, our business, financial condition, results of operations and prospects could be harmed, and the market price or value of the Notes could decline.

*There is no assurance that the Company will be profitable, and there is no assurance of any returns.*

There is no assurance as to whether the Company will be profitable, or earn revenues, or whether the Company will be able to meet its operating expenses. The initial expenses the Company incurs could result in operating losses for the Company for the foreseeable future. No assurance can be made that a subscriber for the Notes offered hereby will not lose his or her entire investment.

*The Company is obligated to pay certain fees and expenses.*

The Company will pay various fees and expenses related to its ongoing operations regardless of whether or not the Company's activities are profitable. These fees and expenses will require dependence on third-party relationships. The Company is generally dependent on relationships with its strategic partners and vendors, and the Company may enter into similar agreements with future potential strategic partners and alliances. The Company must be successful in securing and maintaining its third-party relationships to be successful. There can be no assurance that such third parties may regard their relationship with the Company as important to their own business and operations, that they will not reassess their commitment to the business at any time in the future, or that they will not develop their own competitive services or products, either during their relationship with the Company or after their relations with the Company expire. Accordingly, there can be no assurance that the Company's existing relationships or future relationships will result in sustained business partnerships, successful service offerings, or significant revenues for the Company.

*We have not retained independent professionals for investors.*

We have not retained any independent professionals to comment on or otherwise protect the interests of potential investors. Although we have retained our own counsel, neither such counsel nor any other independent professionals have made any examination of any factual matters herein, and potential investors should not rely on our counsel regarding any matters herein described.

*We have no firm commitments to purchase any Notes.*

We have no firm commitment for the purchase of any Notes. The Company has not yet engaged a placement agent or broker for the sale of the Notes, although we may do so in the future. The Company may be unable to identify investors to purchase the Notes and as a result may have inadequate capital to support its ongoing business obligations.

*We may not be able to meet all of the payment demands of the Noteholders if a large number of Noteholders desires to be repaid or if we do not have the liquidity to meet such demands.*

We will use our commercially reasonable efforts to maintain sufficient cash reserves on hand and access to liquidity sources to honor repayment demands of Noteholders. However, in the event there are more demands for repayment than our cash on hand available to meet, we may be delayed in the delivery of funds and may be required to sell some

23-01243-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1020 of 1366

Exhibit 10, Page 1020

of our real estate, which may take significant amounts of time and may yield less than is needed to meet our obligations.

33

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1021 of 1366

Exhibit 10, Page 1021

## Risks Related to the Collateral and Guarantee

*The lien on the collateral securing the Notes and the guarantees will be junior and subordinate to the lien on the collateral securing the obligations under secured credit facilities and secured priority bank debt of us and our subsidiaries.*

The Notes and the guarantee are secured by a second-priority lien in the membership interests in Vault Holding, LLC (the subsidiary guarantor) which was granted by the Company as collateral in accordance with the provisions of the Indenture governing the Notes. All obligations arising under secured credit facilities and secured priority bank debt of us and our subsidiaries will be secured by first-priority liens on the same collateral that secure the Notes on a second-priority basis. The collateral agent may enter into an Intercreditor Agreement that provides, among other things, that if the collateral agent obtains possession of any collateral or realizes any proceeds or payment in respect of any collateral, pursuant to the exercise of remedies under any security document or by the exercise of any rights available to it under applicable law as a result of any distribution of or in respect of any collateral or proceeds in any of our or our subsidiary guarantors' bankruptcy, insolvency, liquidation, dissolution, reorganization or similar proceeding or through any other exercise of remedies, at any time prior to the payment in full of the obligations under our or our subsidiaries' secured credit facilities and secured priority bank debt, then it will hold such collateral, proceeds or payment in trust for the lenders under our or our subsidiaries' secured credit facilities and secured priority bank debt and transfer such collateral, proceeds or payment, as the case may be, to the priority lien collateral agent, for payment of the obligations under our secured credit facility and other priority debt. Holders of the Notes would then participate ratably in the remaining portion of our collateral with all holders of indebtedness that are deemed to rank equally with the Notes based upon the respective amount owed to each creditor. In addition, the Indenture governing the Notes permits us and our subsidiaries to incur additional debt secured by liens senior in priority to the liens securing the Notes on the collateral under specified circumstances. Any obligations secured by such liens may further limit the recovery from the realization of the collateral available to satisfy holders of the Notes.

In addition, if we or our subsidiaries' default under our or our subsidiaries' secured credit facilities or secured priority lien debt, the lenders under such secured indebtedness could declare all of the funds borrowed thereunder, together with accrued interest, immediately due and payable and foreclose on the pledged assets. Furthermore, if those lenders foreclose and sell the pledged equity interests in the subsidiary guarantor, then the subsidiary guarantor may be released from its guarantee of the Notes automatically and immediately upon such sale.

*The value of the collateral securing the Notes may not be sufficient to ensure repayment of the Notes because the lenders under our and our subsidiaries' secured credit facilities and secured priority lien debt have a first-priority lien on the collateral securing the Notes and will be paid first from the proceeds of the collateral.*

Our and our subsidiaries' indebtedness and other obligations under our and our subsidiaries' secured credit facilities and secured priority lien debt are secured by a first-priority lien on the collateral securing the Notes. The liens securing the Notes and the guarantees are contractually subordinated to the liens securing obligations under our and our subsidiaries' secured credit facilities and secured priority lien debt, so that proceeds of the collateral will be applied first to repay those obligations before we use any such proceeds to pay any amounts due on the Notes. Accordingly, if we default on the Notes, we cannot assure you that the trustee would receive enough money from the sale of the collateral to repay you.

The collateral has not been appraised in connection with this offering. The Indenture governing the Notes permits us to incur additional debt secured by liens that have priority over the Notes. The value of the collateral at any time will depend on market and other economic conditions, including the availability of suitable buyers for the collateral. The value of the membership interests in the subsidiary guarantor pledged as collateral for the Notes could be impaired in the future as a result of changing economic conditions, commodity prices, competition or other future trends. Likewise, we cannot assure you that the pledged assets will be saleable or, if saleable, that there will not be substantial delays in their liquidation.

34

23-01123-WLH11   Doc 768   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1022 of 1366   Exhibit 10, Page 1022

In addition, the collateral securing the Notes is subject to other liens permitted under the terms of the Indenture and an Intercreditor Agreement, if any, whether arising on or after the date the Notes were issued. To the extent that third parties hold prior liens, such third parties may have rights and remedies with respect to the membership interests subject to such liens that, if exercised, could adversely affect the value of the collateral securing the Notes. The Indenture governing the Notes does not require that we maintain the current level of collateral.

In the event of a foreclosure on the collateral under our or our subsidiaries' secured credit facilities and secured priority lien debt (or a distribution in respect thereof in a bankruptcy or insolvency proceeding), the proceeds from the collateral may not be sufficient to satisfy the Notes because such proceeds would, under an Intercreditor Agreement, first be applied to satisfy our or our subsidiaries' obligations under our or our subsidiaries' secured credit facilities and secured priority lien debt. Only after all of our or our subsidiaries' obligations under our or our subsidiaries' secured credit facilities and secured priority lien debt have been satisfied will proceeds from the collateral be applied to satisfy our obligations under the Notes. In addition, in the event of a foreclosure on the collateral, the proceeds from such foreclosure may not be sufficient to satisfy our obligations under the Notes.

Pursuant to the terms of the Indenture governing the Notes, we may sell collateral so long as such sales comply with applicable provision of the Indenture governing the Notes. Upon any such sale, all or a portion of the membership interests in the subsidiary guarantor sold may no longer constitute collateral.

The membership interest in the subsidiary guarantor pledged as collateral to secure the Notes may have limited value at the time of any attempted realization. In particular, in any bankruptcy or similar proceeding, all obligations of the subsidiary guarantor whose membership interest has been pledged must be satisfied before any value will be available to the owner of or the creditor secured by such membership interest. If the subsidiary guarantor whose membership interest has been pledged as collateral has liabilities that exceed its assets, there may be no remaining value in such subsidiary guarantor's membership interest.

***The provisions of an Intercreditor Agreement relating to the collateral securing the Notes limit the rights of holders of the Notes with respect to that collateral, even during an event of default.***

Under an Intercreditor Agreement between the trustee as second lien collateral agent, on behalf of the holders of the Notes, and the first lien collateral agent, on behalf of the holders of first lien debt, the lenders under our senior credit facility and other holders of first lien debt are generally entitled to receive and apply all proceeds of any collateral to the repayment in full of the obligations under our senior credit facility and under our first lien debt before any such proceeds will be available to repay obligations under the Notes.

Furthermore, because the lenders under our or our subsidiaries' secured credit facilities or secured bank debt will control the disposition of the collateral securing such first lien obligations and the Notes, if there were an event of default under the Notes, the holders of the first lien obligations could decide, for a specified time period, not to proceed against the collateral, regardless of whether or not there is a default under such first lien obligations. During such time period, unless and until discharge of the first lien obligations, including our senior credit facility, has occurred, the sole right of the holders of the Notes will be to hold a lien on the collateral.

***Pursuant to an Intercreditor Agreement, in the event of bankruptcy the collateral agent, on behalf of all Noteholders, may be required to support and vote for certain plans of reorganization. This restriction may prevent the collateral agent from supporting plans of reorganization that propose more favorable recoveries with respect to second lien claims with respect to the Notes.***

Pursuant to an Intercreditor Agreement, in the event of a bankruptcy filing, the collateral agent, on behalf of all Noteholders, may be required to support and vote for any plan of reorganization or disclosure statement of ours or the subsidiary guarantor that (a) is accepted by the class of lenders under our revolving credit facility in accordance with Section 1126(c) of the U.S. Bankruptcy Code, (b) provides for the payment in full in cash of all of our and our subsidiaries' obligations under our and our subsidiaries secured credit facility and secured priority bank debt (including all post-petition interest, fees and expenses) on the effective date of such plan of reorganization or (c) provides for the retention by the trustee of the liens on the collateral securing our obligations under our senior credit facility (and hedge counterparties, bank product providers and letter of credit issuers), and on all proceeds thereof, with the same relative priority with respect to the collateral or other property as provided in an Intercreditor Agreement with respect to the collateral.

25-01243-WLH11   Doc 760   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1023 of 1366

Exhibit 10, Page 1023

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1024 of 1366

Exhibit 10, Page 1024

*Lien searches may not reveal all liens on the collateral.*

We cannot guarantee that any lien searches on the collateral securing the Notes will reveal all existing liens on the collateral securing the Notes. Lien searches have not been conducted in many jurisdictions where the collateral is located, including searches in the real property records, nor has any independent title work with respect to our properties been conducted. Any existing undiscovered liens could be significant, could be prior in ranking to the liens securing the Notes and could have an adverse effect on the ability to realize or foreclose upon the collateral securing the Notes. In addition, there can be no assurance that the mortgages securing the Notes are encumbering the correct properties.

*The rights of holders of Notes to the collateral securing the Notes may be adversely affected by the failure to record or perfect security interests in the collateral and other issues generally associated with the realization of security interests in collateral.*

Applicable law requires that a security interest in certain tangible and intangible assets can only be properly perfected and its priority retained through certain actions undertaken by the secured party. The liens in the collateral securing the Notes may not be perfected with respect to the claims of the Notes if the collateral agent was not able to take the actions necessary to perfect any of these liens on or prior to the date of the issuance of the Notes or within a reasonable time thereafter. In addition, even though it may constitute an event of default under the Indenture governing the Notes, a third-party creditor could gain priority over one or more liens on the collateral securing the Notes by recording an intervening lien or liens. The Indenture governing the Notes does not require liens on certain assets to be perfected. In addition, the security interest of the collateral agent is subject to practical challenges generally associated with the realization of security interests in collateral. For example, the collateral agent may need to obtain the consent of third parties and make additional filings. If the collateral agent is unable to obtain these consents or make these filings, the security interests may be invalid and the holders of the Notes will not be entitled to the collateral or any recovery with respect thereto. We cannot assure you that the collateral agent will be able to obtain any such consent or make any such filing. We also cannot assure you that the consents of any third parties will be given when required to facilitate a foreclosure on such assets. Accordingly, the collateral agent may not have the ability to foreclose upon those assets and the value of the collateral may significantly decrease.

*Bankruptcy laws may limit the ability of the holders of the Notes to realize value from the collateral.*

The right of the collateral agent to repossess and dispose of the pledged membership interests of the subsidiary guarantor upon the occurrence of an event of default under the Indenture governing the Notes is likely to be significantly impaired by applicable bankruptcy law (separate and apart from the limitations set forth in an Intercreditor Agreement) if a bankruptcy case were to be commenced by or against us before the collateral agent repossessed and disposed of the pledged membership interests.

Under the U.S. Bankruptcy Code, a secured creditor is prohibited from repossessing its security from a debtor in a bankruptcy case, or from disposing of security repossessed from such debtor, without bankruptcy court approval. Moreover, the U.S. Bankruptcy Code permits the debtor to continue to retain and to use collateral (the membership interests) even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" may vary according to circumstances, but it is intended in general to protect the value of the secured creditor's interest in the collateral. Adequate protection may include cash payments or the granting of additional security for any diminution in the value of the collateral, if and at such times as the court in its discretion determines, as a result of the stay of repossession, disposition or any use of the collateral by the debtor during the pendency of the bankruptcy case. Generally, adequate protection payments, in the form of interest or otherwise, are not required to be paid by a debtor to a secured creditor unless the bankruptcy court determines that the value of the secured creditor's interest in the collateral is declining during the pendency of the bankruptcy case. However, pursuant to the terms of an Intercreditor Agreement, the holders of the Notes may agree not to seek or accept "adequate protection" in certain situations consisting of cash payments and not to object to the incurrence of additional indebtedness secured by liens that are senior to liens granted to the collateral agent for the Notes. In view of the lack of a precise definition of the term "adequate protection" and the broad discretionary powers of a bankruptcy court, it is impossible to predict (1) how long payments under the Notes could be delayed following commencement of a bankruptcy case, (2) whether or when the trustee could repossess or dispose of the pledged membership interests or (3) whether or to what extent holders of the Notes would be compensated for any delay in payment or loss of value of the pledged membership interests through the requirement of "adequate protection."

In addition to the waiver with respect to adequate protection set forth above, under the terms of an Intercreditor Agreement, the holders of the Notes may also waive certain other important rights that secured creditors may be entitled to in a bankruptcy proceeding. These waivers could adversely impact the ability of the holders of the Notes to recover amounts owed to them in a bankruptcy proceeding.

In addition, a bankruptcy court may decide to substantively consolidate us and some or all of our subsidiaries in the bankruptcy proceeding. If a bankruptcy court substantively consolidated us and some or all of our subsidiaries, the assets of each entity would become subject to the claims of creditors of all consolidated entities. This would expose holders of Notes not only to the usual impairments arising from bankruptcy, but also to potential dilution of the amount ultimately recoverable because of the larger creditor base. Furthermore, a forced restructuring of the Notes could occur through the "cram-down" provisions of the U.S. Bankruptcy Code. Under these provisions, the Notes could be restructured over your objections as to their general terms, primary interest rate and maturity.

Any future pledge of collateral in favor of the collateral agent, including pursuant to security documents delivered after the date of the Indenture governing the Notes (including the mortgages over the real estate), may also be avoidable by the pledgor (as debtor in possession) or by its trustee in bankruptcy as a preferential transfer under the U.S. Bankruptcy Code and certain state insolvency laws if certain events or circumstances exist or occur, including, among others, if:

- the pledgor is insolvent at the time of the pledge;

- the pledge permits the holder of the Notes to receive a greater recovery than if the pledge had not been given; and

- a bankruptcy case or other similar insolvency proceeding is commenced in respect of the pledgor within 90 days following the pledge, or, in certain circumstances, a longer period.

***The value of the collateral securing the Notes may not be sufficient for a bankruptcy court to grant post-petition interest on the Notes in a bankruptcy case of the issuer or any of the guarantors. Should our or the guarantor subsidiary's obligations under the Notes, together with our obligations under our and our subsidiaries' senior credit facility, secured priority bank debt and any other debt secured by the collateral, equal or exceed the fair market value of the collateral securing the Notes, the holders of the Notes may be deemed to have an unsecured claim for the difference between the fair market value of the collateral, on the one hand, and the aggregate amount of the obligations under our and our subsidiaries' secured credit facility, secured priority bank debt and any other secured debt and the Notes, on the other hand.***

In the event of a bankruptcy, liquidation, dissolution, reorganization or similar proceeding against us or the subsidiary guarantor, holders of the Notes will be entitled to post-petition interest under the U.S. Bankruptcy Code only if the value of their security interest in the collateral, taken in order of priority with other obligations secured by the collateral, is greater than the amount of their pre-bankruptcy claim. Holders of the Notes may be deemed to have an unsecured claim if our obligations under the Notes, together with our and our subsidiaries' obligations under our and our subsidiaries' secured credit facilities and secured priority bank debt secured by the collateral, exceed the fair market value of the collateral securing the Notes. Holders of the Notes that have a security interest in the collateral with a value less than their pre-bankruptcy claim will not be entitled to post-petition interest under the U.S. Bankruptcy Code. The bankruptcy trustee, the debtor-in-possession or competing creditors could possibly assert that the fair market value of the collateral with respect to the Notes on the date of the bankruptcy filing (or on the date of confirmation of a chapter 11 plan) was less than the then-current principal amount of the Notes. Upon a finding by a bankruptcy court that the Notes are under-collateralized, the claims in the bankruptcy proceeding with respect to the Notes would be bifurcated between a secured claim equal to the value of the interest in the collateral and an unsecured claim, and the unsecured claim would not be entitled to the benefits of security in the collateral. Other consequences of a finding of under-collateralization would be, among other things, a lack of entitlement on the part of holders of the Notes to receive post-petition interest, fees or expenses and a lack of entitlement on the part of the unsecured portion of the Notes to receive other "adequate protection" under U.S. bankruptcy laws. In addition, if any payments of post-petition interest were made at the time of such a finding of under-collateralization, such payments could be re-characterized by the bankruptcy court as a reduction of the principal amount of the secured claim with respect to Notes. No appraisal of the fair market value of the collateral securing the Notes has been prepared in connection with this offering of the Notes and, therefore, the value of the collateral agent's interests in the collateral may not equal or exceed the principal amount of the Notes and other secured claims. We cannot assure you that there will be sufficient collateral to satisfy our and the subsidiary guarantor's obligations under the Notes.

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1027 of 1366

Exhibit 10, Page 1027

***The collateral securing the Notes is subject to casualty risks.***

We are obligated under the Indenture governing the Notes to maintain adequate insurance or otherwise insure against hazards as is customarily done by companies having assets of a similar nature in the same or similar localities. There are, however, certain losses that may be either uninsurable or not economically insurable, in whole or in part. As a result, it is possible that the insurance proceeds will not compensate us fully for our losses. If there is a total or partial loss of any of the pledged collateral, we cannot assure you that any insurance proceeds received by us will be sufficient to satisfy all of our secured obligations, including the Notes. We may be required to apply the proceeds from any such loss to repay our obligations under the senior credit facility.

***There are circumstances other than repayment or discharge of the Notes under which the collateral securing the Notes and the guarantees will be released automatically, without your consent or the consent of the trustee.***

Under various circumstances, collateral securing the Notes and the guarantees will be released automatically, including:

- a sale, transfer or other disposal or liquidation of such collateral in a transaction not prohibited under the Indenture governing the Notes;

- with respect to collateral (membership interests) in the subsidiary guarantor, upon the release of such subsidiary guarantor from its guarantee in accordance with the Indenture governing the Notes;

- as otherwise required under an Intercreditor Agreement; and

- to the extent we have satisfied and discharged the Indenture governing the Notes.

The guarantee of a subsidiary guarantor will also be released in connection with a sale of such subsidiary guarantor in a transaction permitted under the Indenture governing the Notes.

***The collateral securing the Notes and related guarantees may be diluted under certain circumstances.***

The Indenture governing the Notes and agreements governing our and our subsidiaries' secured credit facilities and secured priority bank debt permit us to incur additional secured indebtedness, including other priority lien debt, subject to our compliance with the restrictive covenants in the Indenture governing the Notes and the agreements governing our and our subsidiaries' secured credit facilities and secured priority bank debt at the time we incur such additional secured indebtedness. Such debt secured by the collateral would dilute the value of the Note holders' rights to the collateral.

**<u>Tax Risks</u>**

***You are urged to consider the United States federal income tax consequences of owning the Notes.***

Pursuant to the terms of the Notes, the Company and each Noteholder will agree to treat the Notes for U.S. federal income tax purposes as contingent payment debt instruments subject to U.S. federal income tax rules applicable to contingent payment debt instruments. Under that treatment, if you are a U.S. holder (as defined herein), you may be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by you in that year. You will recognize gain or loss on the sale, repurchase, exchange, conversion or redemption of a Note in an amount equal to the difference between the amount realized and your adjusted tax basis in the Note. Any gain recognized by you on the sale, repurchase, exchange, conversion or redemption of a Note generally will be treated as ordinary interest income and any loss will be treated as ordinary loss to the extent of the interest previously included in income and, thereafter, as capital loss.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1028 of 1366    Exhibit 10, Page 1028

23-01243-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1029 of 1366

Exhibit 10, Page 1029

*Interest on Notes Could be Characterized as Unrelated Business Taxable Income.*

We intend to take the position that the Notes should be classified as debt instruments for U.S. federal income tax purposes and the stated interest should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("UBTI") with respect to tax exempt Noteholders. However, there is no assurance that the IRS will agree with this position and it is possible that the Notes may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Notes may be characterized as UBTI with respect to tax exempt Noteholders.

## USE OF PROCEEDS

We intend to use the net proceeds for the following purposes in the following order: (a) first towards the fees and expenses associated with registration of the Offering of up to $1,200,000, including legal, auditing, accounting, escrow agent, financial printer and other professional fees; (b) second towards the acquisition of Portfolio Investments for the Company, Vault Holding, LLC, and the Portfolio SPEs; (c) third towards the cost of marketing and management associated with the Company's operations, including technology infrastructure and maintenance and fees to Manager; and (d) the balance towards working capital and general corporate purposes. In the event that we sell less than the maximum Notes offered in the Offering, our first priority is to pay fees associated with the registration of this Offering. There is no minimum amount of Notes that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the Notes are offered. No proceeds will be used to compensate or otherwise make payments to officers or directors except for ordinary payments under employment or consulting agreements.

We may elect to engage one or more Placement Agents in the Offering. If FINRA selling agents are utilized to facilitate the sale of the Notes and the maximum amount of commissions, fees and allowances payable to FINRA selling agents is 1.0% of the aggregate principal amount of Notes sold and interest accrued thereon payable quarterly over four calendar quarters to the extent the Notes are not redeemed or repurchased, if all of the Notes were sold through FINRA selling agents and the maximum commissions, fees and allowances were paid, we expect to receive net proceeds from this offering of approximately $490,050,000 after deducting (i) estimated underwriting discounts and commissions in the amount of $4,950,000 (1.0% of the gross proceeds of the Offering, excluding the aggregate principal amount and accrued interest of the exchanged Private Placement Notes) and (ii) the value of the aggregate principal amount and accrued interest of $5,000,000 of the Private Placement Notes held by our noteholders exchanged for $5,000,000 aggregate principal amount of the Notes, and cancellation of those Private Placement Notes by us. If a holder does tender a Private Placement Note as payment for such Notes in the Offering, each $1.00 of principal or interest so tendered will equal $1.00 of purchase price of the Notes; the Notes will not be issued at discount (original issue discount) to such holders. However, we cannot guarantee that we will sell all of the Notes being offered by us. The following table summarizes how we anticipate using the gross proceeds of this Offering, depending upon whether we sell 25%, 50%, 75%, or 100% of the aggregate principal amount of the Notes being offered in the Offering:

| | If 25% of Notes Sold | If 50% of Notes Sold | If 75% of Notes Sold | If 100% of Notes Sold |
|---|---|---|---|---|
| **Gross Proceeds** | $ 125,000,000 | $ 250,000,000 | $ 375,000,000 | $ 500,000,000 |
| Value of the Private Placement Notes (Principal and Interest) Exchanged for Offered Notes | $ (5,000,000) | $ (5,000,000) | $ (5,000,000) | $ (5,000,000) |
| Offering Expenses (Underwriting Discounts and Commissions to Placement Agent and other broker dealers) | $ (1,200,000) | $ (2,450,000) | $ (3,700,000) | $ (4,950,000) |
| Net Proceeds | $ 118,800,000 | $ 242,550,000 | $ 366,300,000 | $ 490,050,000 |
| **Our intended use of the net proceeds is as follows:** | | | | |
| Fees for Registration (includes legal, auditing, accounting, escrow agent, transfer agent, financial printer and other professional fees) | $ (1,200,000) | $ (1,200,000) | $ (1,200,000) | $ (1,200,000) |
| Acquisition of Real Estate | (100,980,000) | (206,167,500) | (311,355,000) | (416,542,500) |
| Marketing and Management Expenses | (3,564,000) | (7,276,500) | (10,989,000) | (14,701,500) |

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1030 of 1366

Exhibit 10, Page 1030

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Working Capital and General Corporate Purposes | | (13,056,000) | | (27,906,000) | | (42,756,000) | | (57,606,000) |
| Total Use of Proceeds | $ | **125,000,000** | $ | **250,000,000** | $ | **375,000,000** | $ | **500,000,000** |

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1031 of
1366
Exhibit 10, Page 1031

Prior to the time that the Company utilizes the proceeds from this Offering to acquire assets, and other than for the use of proceeds related to this Offering and the formation of the Company as set forth below, the Company will retain the funds from this Offering in its accounts at commercial banks.

At any given time, the Company will maintain sufficient cash reserves and lines of credit to meet demand payments, interest payments, and operational requirements. Such cash may be in the form of the Offering proceeds, cash from operations, or credit facilities available to the Company. With the exception of employee payroll expenses, which will be covered by the Manager, all other expenses will be borne by the Company.

## DISTRIBUTION POLICY

Our subsidiaries have not paid distributions on their membership units in the past. Any future determination to pay distributions on membership units will be at the discretion of our Manager and will depend on various factors, including our results of operations, financial condition, capital requirements, contractual restrictions, outstanding indebtedness, investment opportunities and other factors that our Manager deems relevant. The indenture governing the notes prohibits us from paying distributions to our members if there is an event of default with respect to the Notes or if payment of the distribution would result in an event of default. The indenture also prohibits our Manager from declaring or paying any distributions other than tax distributions if, in the reasonable determination of the Managers, the Company would have insufficient cash to meet anticipated redemption or repayment obligations.

## CAPITALIZATION

The following table sets forth our cash and cash equivalents and capitalization as of September 30, 2019:

- on an actual basis; and

- on a pro forma as adjusted basis to give effect to the sale of the maximum amount of Notes offered hereby.

You should read this table in conjunction with our consolidated financial statements and the notes thereto which are incorporated herein by this reference.

| | As of September 30, 2019 | |
| --- | --- | --- |
| | Actual | As Adjusted |
| | (unaudited) | |
| Cash (inclusive of restricted cash of $222,989 and $50,000,000, respectively) | $ 2,149,065 | $ 492,199,065 |
| Notes offered hereby | $ - | $ 500,000,000 |
| Member's equity: | | |
| Common units: unlimited authorized and 1,000 units issued and outstanding | 0 | 0 |
| Additional paid-in capital | 0 | 0 |
| Accumulated member's deficit | (462,390) | (462,390) |
| Total member's equity (deficit) | (462,390) | (462,390) |
| Total capitalization (1) | $ (462,390) | $ (462,390) |

(1)  Total capitalization represents total long term debt plus total member's equity (deficit)

40

23-01224  WLH11  Doc 466  Filed 02/23/24  Entered 02/23/24 19:33:15  Pg 1032 of 1366  Exhibit 10, Page 1032

## PLAN OF DISTRIBUTION

**The Offering will be Sold by Our Officers and Directors**

We are offering up to $500 million aggregate principal amount of Senior Secured Demand Notes (the "Notes"). We intend to commence the offering promptly. The offering will be made on a continuous basis and is expected to continue for a period in excess of 30 days. In our sole discretion, we have the right to terminate the offering at any time, even before we have sold all the Notes. There are no specific events which might trigger our decision to terminate the offering.

The Notes are being offered by us on a direct primary, self-underwritten basis (that is, without the use of a broker-dealer) and there can be no assurance that all or any of the Notes offered will be subscribed. If less than the maximum proceeds are available to us, our development and prospects could be adversely affected. There is no minimum offering required for this offering to close. All funds received as a result of this offering will not be escrowed or segregated but will be immediately available to us for the purposes set forth in "Use of Proceeds". The minimum investment amount for a single investor is $25 for the Notes; however, we can waive the minimum investment requirement on a case to case basis in our sole discretion. Notes will be issued and sold in initial denominations of $25 or more, and in any amounts thereafter; however, we can reduce the initial denomination on a case to case basis in our sole discretion. The Notes will be sold at face value in this direct public offering. Should all Notes being offered by us hereunder be sold, we would receive an aggregate of $500 million. The total proceeds from this offering will not be escrowed or segregated but will be available to us immediately. There is no minimum number of Notes that must be sold by us for the offering to proceed, and we will retain the proceeds from the sale of any of the offered securities.

We cannot assure you that all or any of the Notes offered under this prospectus will be sold. No one has committed to purchase any of the Notes offered. Therefore, we may sell only a nominal amount of Notes, in which case our ability to execute our business plan might be negatively impacted. We reserve the right to withdraw or cancel this offering and to accept or reject any subscription in whole or in part, for any reason or for no reason. Subscriptions will be accepted or rejected promptly. All monies from rejected subscriptions will be returned immediately by us to the subscriber, without interest or deductions. A written confirmation for Notes (which are issued in book-entry form) transmitted by electronic transmission will be issued and distributed to the subscriber by our security registrar promptly after a subscription is accepted and "good funds" are received in our account.

We will sell the Notes in this offering through our officers and directors, who intend to offer them using this prospectus and a subscription agreement as the only materials to offer potential investors. The officers and directors that offer Notes on our behalf may be deemed to be underwriters of this offering within the meaning of Section 2(11) of the Securities Act. We may elect to engage one or more FINRA member firms (the "Placement Agents"), as placement agents for this Offering, in which event the Placement Agents will also conduct the Offering on a "best efforts" basis, and we would expect in such case to pay estimated total commissions up to 1.0% of the aggregate principal amount of the Notes sold to investors and interest accrued thereon, payable over four calendar quarters ("Quarterly Commission Payments") in arrears on the last day of each calendar quarter (March 31, June 30, September 30 and December 31) (each a "Quarterly Commission Payment Date") at a rate of 0.25% per quarter, commencing on the Quarterly Commission Payment Date following the issuance of such Notes, to the extent that such Notes have not been redeemed or repurchased, with such payments calculated on the average daily outstanding principal balances of the Notes and interest accrued thereon during the applicable calendar quarter; provided, however, to the extent that such Notes have been redeemed or repurchased prior to the completion of the applicable four Quarterly Commission Payment Dates, no Quarterly Commission Payment shall be made on such redeemed or repurchased Notes during any Quarterly Commission Payment Date after such redemption or repurchase of such Notes. Following the four Quarterly Commission Payments, to the extent that such Notes have not been redeemed or repurchased, we expect to pay an annual administration fee of up to 1.0% of the outstanding aggregate principal amount of the Notes sold to investors and interest accrued thereon, payable quarterly ("Quarterly Administration Payments") in arrears on the last day of each calendar quarter (March 31, June 30, September 30 and December 31) (each a "Quarterly Administration Payment Date") at a rate of 0.25% per quarter, commencing on the Quarterly Administration Payment Date following the fourth Quarterly Commission Payment of such Notes, with such payments calculated on the average daily outstanding principal balances of the Notes and interest accrued thereon during the applicable calendar quarter; provided, however, to the extent that such Notes have been redeemed or repurchased, no Quarterly Administration Payment shall be made on such Notes during any Quarterly Administration Payment Date after such redemption or repurchase of such Notes. The officers and directors engaged in the sale of the securities will receive no commission from the sale of the Notes nor will they register as broker-dealers pursuant to Section 15 of the Exchange Act in reliance upon Rule 3(a)4-1. Rule 3(a)4-1 sets forth those conditions under which a person associated with an issuer may participate in the offering of the issuer's securities and not be deemed to be a broker-dealer. Our officers and directors satisfy the requirements of Rule 3(a)4-1 in that:

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1034 of 1366

Exhibit 10, Page 1034

- They are not subject to a statutory disqualification, as that term is defined in Section 3(a)(39) of the Securities Act, at the time of his or her participation;

- They are not compensated in connection with their participation by the payment of commissions or other remuneration based either directly or indirectly on transactions in securities;

- They are not, at the time of their participation, an associated person of a broker-dealer; and

- They meet the conditions of Paragraph (a)(4)(ii) of Rule 3(a)4-1 of the Exchange Act, in that they (A) primarily perform, or are intended primarily to perform at the end of the offering, substantial duties for or on behalf of the issuer otherwise than in connection with transactions in securities; and (B) are not brokers or dealers, or an associated person of a broker or dealer, within the preceding 12 months; and (C) do not participate in selling and offering of securities for any issuer more than once every 12 months other than in reliance on Paragraphs (a)(4)(i) or (a)(4)(iii).

As long as we satisfy all of these conditions, we believe that we satisfy the requirements of Rule 3(a)4-1 of the Exchange Act.

As our officers and directors will sell the Notes being offered pursuant to this offering, Regulation M prohibits us and our officers and directors from certain types of trading activities during the time of distribution of our securities. Specifically, Regulation M prohibits our officers and directors from bidding for or purchasing any Notes or attempting to induce any other person to purchase any Notes, until the distribution of our securities pursuant to this offering has ended.

The Notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation or any other governmental or private fund or entity.

The Notes will not be listed on any securities exchange or quoted on Nasdaq or any over-the-counter market. We do not intend to make a market in the Notes and we do not anticipate that a market in the Notes will develop. There will be significant restrictions on your ability to transfer or resell the Notes. We have not requested a rating for the Notes; however, third parties may independently rate them. After this registration statement becomes effective, we will file periodic reports, primarily annual and quarterly reports, with the Securities and Exchange Commission.

## Terms of the Offering

We are offering up to $500 million aggregate principal amount of Senior Secured Demand Notes (the "Notes"). The minimum investment amount for a single investor is $25 for the Notes; however, we can waive the minimum investment requirement on a case to case basis in our sole discretion. Subscriptions, once received and accepted, are irrevocable. Notes will be issued and sold in initial denominations of $25 or more, and in any amounts thereafter; however, we can reduce the initial denomination on a case to case basis in our sole discretion. The Notes will be general secured obligations of us. The Notes will be issued under an indenture, among iCap Vault 1, LLC, as issuer, Vault Holding, LLC, as guarantor, and American Stock Transfer & Trust Company, LLC, as trustee (the "trustee"), referred to herein as the "indenture." The Notes will bear interest at a floating rate per annum that is determined from time to time by the Company in its sole discretion. Interest payable on the Notes will accrue based on a 365-day year, compounds daily and will be credited to your Notes on the last business day of each calendar month and will be reinvested. The interest rate may be, but is not required to be, different for certain Note balances or ranges of Note balances. The Notes will have no stated maturity. They will be payable upon your demand. We intend to commence the offering promptly. The offering will be made on a continuous basis and is expected to continue for a period in excess of 30 days. In our sole discretion, we have the right to terminate the offering at any time, even before we have sold all the Notes. There are no specific events which might trigger our decision to terminate the offering.

## Deposit of Offering Proceeds

This is a direct primary, self-underwritten basis offering, so we are not required to sell any specific number or dollar amount of securities, but will use our best efforts to sell the securities offered. We have made no arrangements to place subscription funds in an escrow, trust or similar account, which means that all funds collected for subscriptions will be immediately available to us for use in the implementation of our business plan.

## Eligible Investors

An individual investor must either be 18 years of age or older or be the adult custodian for a minor under the Uniform Gifts/Transfers to Minors Act (UGMA/UTMA) (each an "Eligible Investor" and collectively the "investors"). When you enroll in the Company's Notes program, you will be asked to provide certain information, including the name(s), address(es) and tax identification or Social Security number(s), as well as valid government issued identification and, in the case of natural persons, date(s) of birth of the registered owner(s) of each Note. In addition, investors may be required to provide certain other information as required by applicable law.

Investments in the Notes may be made individually, jointly, by corporations, by partnerships, by limited liability companies, by firms, by associations or as custodial or trust investments. For any Note jointly owned by two or more Eligible Investors: (i) such Note will be deemed to be owned by such investors as joint tenants with right of survivorship, meaning that if one Note owner dies, such Note will belong to the survivor(s); and (ii) each Note owner may act individually and independently of the other Note owners to make a redemption or investment transaction with respect to such Note. There may not be more than three joint owners of a Note.

## How to Make an Initial Investment

To make an initial investment, after reading this entire prospectus, you must set up an account and complete the onboarding process at the Company's website at www.icapequity.com/vault. Please refer to the website for instructions, requirements and guidelines with respect to online account setup and initial investments. Certain eligibility rules apply. You will be required to read and accept the Terms of Use before submitting and completing this process online.

Currently, the minimum initial investment is $25; however, we can waive the minimum investment requirement on a case to case basis in our sole discretion. Your initial investment will be made using an ACH transfer from a U.S. bank account you have successfully linked during the online onboarding process. You must verify your ownership of the linked U.S. bank account by completing the bank account verification process online. Funds received as part of your initial investment cannot be redeemed until three business days after such amounts are credited. You may not make an initial investment by wire transfer or by using cash or a check. **Note that this is only for the initial investment and account linking.

**How to Make Additional Investments**

After your initial investment in the Notes, you may make additional investments at any time, without charge to you, in any amount, by the methods described below or by such other means as the Company from time to time determines. There is no required minimum amount for subsequent investments. All investments must be made in U.S. dollars unless otherwise designated by the Company.

43

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1037 of 1366

Exhibit 10, Page 1037

BY ACH INVESTMENT. You may use the Company website or call us at (425) 453-7497 at any time to withdraw any amount of funds from your linked U.S. bank account to invest in the Notes through an ACH transfer. You may also set up automatic recurring ACH investment transactions from a linked U.S. bank account. See "—*BY AUTOMATIC MONTHLY INVESTMENT*" below. If you set up automatic recurring ACH investment transactions, the Company will prepare automatic electronic transfers using the transfer dates each month for the amount authorized and on the business day you have requested. If an automatic transfer day falls on a day that is not a business day, the transfer will be initiated on the next business day; provided, however, if an ACH automatic investment is set for the last weekend of a month, the investment will be made on the last business day of that month. Investments made by ACH transfer are invested in your Notes and begin to accrue interest on the same day your money is credited. In the case of a one-time transfer, the Company will prepare an electronic transfer for the amount authorized and on the business day you have requested. One-time ACH investment requests made prior to 7:30 a.m. Central Time generally will be posted to the Note on the next business day and requests made at or after 7:30 a.m. Central Time generally will be posted two business days following the request. Investments made by ACH cannot be redeemed until three business days after such amounts are credited to the Notes. You may change or terminate any automatic investments at any time. You can confirm the date your investment was made by accessing the Company website at www.icapequity.com/vault or by calling us at (425) 453-7497. We charge no fees for the receipt of ACH transfers; however, your commercial bank or financial institution may charge you a fee if you make an investment by ACH transfer.

BY WIRE INVESTMENT. You may make additional investments by wire transfer. The wire transfer must include the information provided by the Company's designated bank and come from a bank account in your name. Wires may only be originated from a bank located in the U.S. and must be payable in U.S. dollars. Your investment will be credited and you will begin earning interest on the same business day the wire is received provided that the funds have been received by 1:00 p.m. Central Time. Funds received at or after 1:00 p.m. Central Time are invested and begin to accrue interest on the next business day. Investments made by wire are available for redemption beginning the day such investments are credited to the Notes. Investments by wire transfer may incur a charge from your bank or financial institution. See "Description of the Notes— Account Fees and Charges." Neither The Company nor its designated bank is responsible for delays in acting on your request for authorization to make a wire transfer or in the transfer and wiring of funds. You can confirm the date your investment was made by accessing the Company's website at www.icapequity.com/vault or by calling us at (425) 453-7497. If for any reason your wire request is declined, the Company will advise you of that fact and give you instructions for how to make the additional investment through the ACH process.

BY AUTOMATIC MONTHLY INVESTMENT. You may select to make additional investments via ACH on a monthly basis in a specified amount. Automatic monthly investments may not be made by wire transfer. If you set up automatic recurring ACH investment transactions, the Company's designated bank will prepare automatic electronic transfers using the transfer dates each month for the amount authorized and on the business day you have requested. If an automatic transfer day falls on a day that is not a business day, the transfer will be initiated on the next business day; provided, however, if an ACH automatic investment is set for the last weekend of a month, the investment will be made on the last business day of that month. Investments made by ACH transfer are invested in your Notes and begin to accrue interest on the same day your money is credited. Investments made by ACH cannot be redeemed until three business days after such amounts are credited to the Notes. You may request, modify or terminate the Automatic Monthly Investment Option through the Company's website at www.icapequity.com/vault or by calling us at (425) 453-7497. Such notice is effective as soon as practicable after receipt by the Company's designated bank. You can confirm the date your investment was made by accessing the Company's website at www.icapequity.com/vault or by calling us at (425) 453-7497. We charge no fees for the receipt of ACH transfers; however, your commercial bank or financial institution may charge you a fee if you make an investment by ACH transfer.

BY CASH. You may invest in Notes by delivering cash to us at our executive offices located at 3535 Factoria Blvd. SE, Suite 500, Bellevue, WA 98006. Investments in Notes made with cash begin to accrue interest as of the date the investment is made at our executive offices.

44

25-01124-WLH11    Doc 760    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1038 of 1366    Exhibit 10, Page 1038

BY CHECK. You may invest in Notes by check delivered to our executive offices located at 3535 Factoria Blvd. SE, Suite 500, Bellevue, WA 98006. Checks must be drawn in U.S. dollars on a U.S. bank. Investments made by check begin to accrue interest on the date funds are credited to Company's designated bank account.

We reserve the right to reject any investment application and return the funds to a potential investor for any reason, including if any investments are not preceded or accompanied by documentation satisfactory to us to establish that the potential investor meets any applicable eligibility criteria.

## Procedures and Requirements for Subscription

Subscriptions, once received and accepted by us, are irrevocable. Our Trustee, acting in the capacity as security registrar, will issue a written confirmation for Notes (which are issued in book-entry form) through electronic transmission to the subscriber promptly after a subscription is accepted and "good funds" are received in our account. Securities purchased by investors in this offering will remain outstanding upon its termination regardless of the amount of Notes subscribed for.

## ERISA Considerations

Special considerations apply when contemplating the purchase of Notes on behalf of employee benefit plans that are subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), plans, individual retirement accounts ("IRAs") and other arrangements that are subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or provisions under any federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of the Code or ERISA, and entities whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, a "Plan"). A person considering the purchase of our Notes on behalf of a Plan is urged to consult with tax and ERISA counsel regarding the effect of such purchase and, further, to determine that such a purchase will not result in a prohibited transaction under ERISA, the Code or a violation of some other provision of ERISA, the Code or other applicable law. We will rely on such determination made by such persons, although no Notes will be sold to any Plans if management believes that such sale will result in a prohibited transaction under ERISA or the Code.

## Marketability

The Notes will not be listed on any securities exchange or quoted on Nasdaq or any over-the-counter market. We do not intend to make a market in the Notes and we do not anticipate that a market in the Notes will develop. There will be significant restrictions on your ability to transfer or resell the Notes. We have not requested a rating for the Notes; however, third parties may independently rate them. After this registration statement becomes effective, we will file periodic reports, primarily annual and quarterly reports, with the Securities and Exchange Commission.

## Foreign Regulatory Restrictions on Purchase of the Notes

We have not taken any action to permit a public offering of our Notes outside the United States or to permit the possession or distribution of this prospectus outside the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about and observe any restrictions relating to this offering of Notes and the distribution of the prospectus outside the United States.

## Selling Disclaimers and Restrictions

## Notice to prospective investors in Canada

The offering of the securities in Canada is being made on a private placement basis in reliance on exemptions from the prospectus requirements under the securities laws of each applicable Canadian province and territory where the Securities may be offered and sold, and therein may only be made with investors that are purchasing as principal and that qualify as both an "accredited investor" as such term is defined in National Instrument 45-106 Prospectus and Registration Exemptions and as a "permitted client" as such term is defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligation. Any offer and sale of the securities in any province or territory

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1039 of 1366    Exhibit 10, Page 1039

of Canada may only be made through a dealer that is properly registered under the securities legislation of the applicable province or territory wherein the securities is offered and/or sold or, alternatively, by a dealer that qualifies under and is relying upon an exemption from the registration requirements therein.

45

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1040 of 1366

Exhibit 10, Page 1040

Any resale of the securities by an investor resident in Canada must be made in accordance with applicable Canadian securities laws, which may require resales to be made in accordance with prospectus and registration requirements, statutory exemptions from the prospectus and registration requirements or under a discretionary exemption from the prospectus and registration requirements granted by the applicable Canadian securities regulatory authority. These resale restrictions may under certain circumstances apply to resales of the securities outside of Canada.

Upon receipt of this document, each Canadian investor hereby confirms that it has expressly requested that all documents evidencing or relating in any way to the sale of the securities described herein (including for greater certainty any purchase confirmation or any notice) be drawn up in the English language only. *Par la réception de ce document, chaque investisseur canadien confirme par les présentes qu'il a expressément exigé que tous les documents faisant foi ou se rapportant de quelque manière que ce soit à la vente des valeurs mobilières décrites aux présentes (incluant, pour plus de certitude, toute confirmation d'achat ou tout avis) soient rédigés en anglais seulement.*

**Notice to prospective investors in the European Economic Area**

In relation to each Member State of the European Economic Area (each, a "Relevant Member State"), no offer of securities may be made to the public in that Relevant Member State other than:

    A.    to any legal entity which is a qualified investor as defined in the Prospectus Directive;

    B.    to fewer than 100 or, if the Relevant Member State has implemented the relevant provision of the 2010 PD Amending Directive, 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the representatives; or

    C.    in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of securities shall require the Company or the representatives to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

Each person in a Relevant Member State who initially acquires any securities or to whom any offer is made will be deemed to have represented, acknowledged and agreed that it is a "qualified investor" within the meaning of the law in that Relevant Member State implementing Article 2(1)(e) of the Prospectus Directive. In the case of any securities being offered to a financial intermediary as that term is used in Article 3(2) of the Prospectus Directive, each such financial intermediary will be deemed to have represented, acknowledged and agreed that the securities acquired by it in the offer have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to, persons in circumstances which may give rise to an offer of any securities to the public other than their offer or resale in a Relevant Member State to qualified investors as so defined or in circumstances in which the prior consent of the representatives has been obtained to each such proposed offer or resale.

The Company, the representatives and their affiliates will rely upon the truth and accuracy of the foregoing representations, acknowledgements and agreements.

This prospectus has been prepared on the basis that any offer of securities in any Relevant Member State will be made pursuant to an exemption under the Prospectus Directive from the requirement to publish a prospectus for offers of securities. Accordingly, any person making or intending to make an offer in that Relevant Member State of securities which are the subject of the offering contemplated in this prospectus may only do so in circumstances in which no obligation arises for the Company or any of the underwriters to publish a prospectus pursuant to Article 3 of the Prospectus Directive in relation to such offer. The Company has not authorized, nor does it authorize, the making of any offer of securities in circumstances in which an obligation arises for the Company to publish a prospectus for such offer.

23-01243-WLH11    Doc 268    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1041 of 1366
Exhibit 10, Page 1041

For the purpose of the above provisions, the expression "an offer to the public" in relation to any securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the securities to be offered so as to enable an investor to decide to purchase or subscribe the securities, as the same may be varied in the Relevant Member State by any measure implementing the Prospectus Directive in the Relevant Member State and the expression "Prospectus Directive" means Directive 2003/71/EC (including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member States) and includes any relevant implementing measure in the Relevant Member State and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

**Notice to prospective investors in the United Kingdom**

In addition, in the United Kingdom, this document is being distributed only to, and is directed only at, and any offer subsequently made may only be directed at persons who are "qualified investors" (as defined in the Prospectus Directive) (i) who have professional experience in matters relating to investments falling within Article 19 (5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended (the "Order") and/or (ii) who are high net worth companies (or persons to whom it may otherwise be lawfully communicated) falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons").

Any person in the United Kingdom that is not a relevant person should not act or rely on the information included in this document or use it as basis for taking any action. In the United Kingdom, any investment or investment activity that this document relates to may be made or taken exclusively by relevant persons. Any person in the United Kingdom that is not a relevant person should not act or rely on this document or any of its contents.

**Notice to Prospective Investors in Switzerland**

The securities may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange, or SIX, or on any other stock exchange or regulated trading facility in Switzerland. This document has been prepared without regard to the disclosure standards for issuance prospectuses under art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland. Neither this document nor any other offering or marketing material relating to the securities or this offering may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this document nor any other offering or marketing material relating to this offering, the Company, the securities have been or will be filed with or approved by any Swiss regulatory authority. In particular, this document will not be filed with, and the offer of securities will not be supervised by, the Swiss Financial Market Supervisory Authority FINMA (FINMA), and the offer of securities has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes, or CISA. The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of securities.

**Notice to Prospective Investors in the Dubai International Financial Centre**

This prospectus relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority, or DFSA. This prospectus is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this prospectus nor taken steps to verify the information set forth herein and has no responsibility for the prospectus. The securities to which this prospectus relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the securities offered should conduct their own due diligence on the securities. If you do not understand the contents of this prospectus you should consult an authorized financial advisor.

**Notice to Prospective Investors in Australia**

No placement document, prospectus, product disclosure statement or other disclosure document has been lodged with the Australian Securities and Investments Commission, or ASIC, in relation to this offering. This prospectus does not constitute a prospectus, product disclosure statement or other disclosure document under the Corporations Act 2001, or

23-01223-WLH11   Doc 463   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1042 of 1366   Exhibit 10, Page 1042

the Corporations Act, and does not purport to include the information required for a prospectus, product disclosure statement or other disclosure document under the Corporations Act.

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1043 of 1366

Exhibit 10, Page 1043

Any offer in Australia of the securities may only be made to persons, or the Exempt Investors, who are "sophisticated investors" (within the meaning of section 708(8) of the Corporations Act), "professional investors" (within the meaning of section 708(11) of the Corporations Act) or otherwise pursuant to one or more exemptions contained in section 708 of the Corporations Act so that it is lawful to offer the securities without disclosure to investors under Chapter 6D of the Corporations Act.

The securities applied for by Exempt Investors in Australia must not be offered for sale in Australia in the period of 12 months after the date of allotment under this offering, except in circumstances where disclosure to investors under Chapter 6D of the Corporations Act would not be required pursuant to an exemption under section 708 of the Corporations Act or otherwise or where the offer is pursuant to a disclosure document which complies with Chapter 6D of the Corporations Act. Any person acquiring securities must observe such Australian on-sale restrictions.

This prospectus contains general information only and does not take account of the investment objectives, financial situation or particular needs of any particular person. It does not contain any securities recommendations or financial product advice. Before making an investment decision, investors need to consider whether the information in this prospectus is appropriate to their needs, objectives and circumstances, and, if necessary, seek expert advice on those matters.

**Notice to prospective investors in China**

This prospectus does not constitute a public offer of the securities, whether by sale or subscription, in the People's Republic of China (the "PRC"). The securities are not being offered or sold directly or indirectly in the PRC to or for the benefit of, legal or natural persons of the PRC.

Further, no legal or natural persons of the PRC may directly or indirectly purchase any of the securities or any beneficial interest therein without obtaining all prior PRC's governmental approvals that are required, whether statutorily or otherwise. Persons who come into possession of this document are required by the issuer and its representatives to observe these restrictions.

**Notice to Prospective Investors in Hong Kong**

The securities have not been offered or sold and will not be offered or sold in Hong Kong, by means of any document, other than (a) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under that Ordinance; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance. No advertisement, invitation or document relating to the securities has been or may be issued or has been or may be in the possession of any person for the purposes of issue, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance and any rules made under that Ordinance.

**Notice to Prospective Investors in Japan**

The securities have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (Law No. 25 of 1948, as amended) and, accordingly, will not be offered or sold, directly or indirectly, in Japan, or for the benefit of any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to any Japanese Person, except in compliance with all applicable laws, regulations and ministerial guidelines promulgated by relevant Japanese governmental or regulatory authorities in effect at the relevant time. For the purposes of this paragraph, "Japanese Person" shall mean any person resident in Japan, including any corporation or other entity organized under the laws of Japan.

23-01243-WLH11    Doc 768    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1044 of 1366

Exhibit 10, Page 1044

**Notice to Prospective Investors in Singapore**

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of securities may not be circulated or distributed, nor may the securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore, or the SFA, (ii) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A), and in accordance with the conditions specified in Section 275, of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the securities are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(a) a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor, securities (as defined in Section 239(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the securities pursuant to an offer made under Section 275 of the SFA except:

(a) to an institutional investor or to a relevant person defined in Section 275(2) of the SFA, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

(b) where no consideration is or will be given for the transfer;

(c) where the transfer is by operation of law;

(d) as specified in Section 276(7) of the SFA; or

(e) as specified in Regulation 32 of the Securities and Futures (Offers of Investments) (Shares and Debentures) Regulations 2005 of Singapore.

## DESCRIPTION OF THE NOTES

**General**

The Notes we are offering will be senior, secured debt obligations of the Company. The Notes will be issued under an indenture, among iCap Vault 1, LLC, as issuer, Vault Holding, LLC, as guarantor, and American Stock Transfer & Trust Company, LLC, as trustee (the "trustee"), referred to herein as the "Indenture." The terms and conditions of the Notes, in the form attached as Exhibit 4.2 to the registration statement of which this prospectus is a part, include those set out in the Indenture, in the form attached as Exhibit 4.1 to the registration statement of which this prospectus is a part, and those made part of the Indenture by reference to the Trust Indenture Act of 1939. The following is a summary of the material provisions of the Notes and the Indenture. For a complete understanding of the Notes, you should review the definitive terms and conditions contained in the Notes and the Indenture, which include definitions of certain terms used below. A copy of the forms of Notes and Indenture have been filed with the Securities and Exchange Commission as exhibits to the registration statement of which this prospectus is a part and are available from us at no charge upon request.

The Notes will be direct obligations of the Company and will be guaranteed by Vault Holding, LLC and secured by the membership interests in Vault Holding, LLC. Vault Holding, LLC anticipates holding a portfolio of US real estate properties, through wholly owned subsidiaries, and may invest in real estate-related financial instruments. The Notes will be

23-01243-WLH11    Doc 268    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1045 of
1366                                                                    Exhibit 10, Page 1045

identical among the investors except for the issue date, principal amount and interest rate. The Notes have no stated maturity, will not be subject to any sinking fund and will be payable or redeemable at the option of the holder thereof at any time as described below. The Notes will rank equally and ratably with all of our other senior, secured indebtedness.

49

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1046 of 1366    Exhibit 10, Page 1046

The Notes do not constitute a savings, deposit or other bank account and are not insured by or subject to the protection of the Federal Deposit Insurance Corporation (the "FDIC"), the Securities Investor Protection Corporation (the "SIPC") or any other federal or state agency or company. The Notes are not a money market fund, which are typically diversified funds consisting of short-term debt securities of many issuers, and therefore do not meet the diversification and investment quality standards set forth for money market funds by the Investment Company Act of 1940.

The Notes will be issuable in any amount, subject to the minimums and maximums described below under "—How to Make an Initial Investment— Minimum Outstanding Investment" and "— Maximum Outstanding Investment", and will mature upon your demand. We may reject any offer to purchase Notes in whole or in part.

All of the money you invest must be made in U.S. dollars and will be used to purchase Notes for you. Your investments in the Notes and interest thereon will be recorded on a register maintained by the Company, either directly or through a service provider. The Notes will be issued in uncertificated form, and you will not receive any certificate or other instrument evidencing our indebtedness. The principal amount of your Notes will be equal to all of your investments in the Notes, plus reinvested interest, less redemptions and fees, if any. Accrued interest is available to you for redemption as principal when it is reinvested on the last business day of each month. For purposes of the Notes, a "business day" means any day other than Saturday, Sunday or any other day on which banks are authorized or required by federal, Washington or Delaware law, regulation or executive order to close.

Electronic statements will be made available to you on the Company's website at www.icapequity.com/vault, showing a summary of transactions made in the Notes during the previous monthly period, including the beginning investment balance, all investments and redemptions, all interest earned, as well as any relevant fees or charges. Investors may request to receive paper statements to be mailed on a quarterly basis. Investors may also call toll free at (425) 453-7497 to obtain current information about their investment in the Notes.

The Company has no right of set-off against any Note for indebtedness not related to such Note. The Company shall have the right to deduct from the principal amount of a Note any amounts invested by us in error in such Note. In addition, we may, in our sole discretion, put a block on your Notes in connection with an Internal Revenue Service notice, court order or pursuant to any other legal or governmental action or requirement.

Notes that are not accessed within statutorily specified time periods may be subject to applicable state laws regarding escheat (or forfeiture) to the state government of unclaimed Notes.

**Eligible Investors**

An individual investor must either be 18 years of age or older or must be the adult custodian for a minor under the Uniform Gifts/Transfers to Minors Act (UGMA/UTMA) (each an "Eligible Investor" and collectively the "investors"). When you enroll in the Company's Notes program, you will be asked to provide certain information, including the name(s), address(es) and tax identification or Social Security number(s), as well as valid government issued identification and, in the case of natural persons, date(s) of birth of the registered owner(s) of each Note. In addition, investors may be required to provide certain other information as required by applicable law.

Investments in the Notes may be made individually, jointly, by corporations, by partnerships, by limited liability companies, by firms, by associations or as custodial or trust investments. For any Note jointly owned by two or more Eligible Investors: (i) such Note will be deemed to be owned by such investors as joint tenants with right of survivorship, meaning that if one Note owner dies, such Note will belong to the survivor(s); and (ii) each Note owner may act individually and independently of the other Note owners to make a redemption or investment transaction with respect to such Note. There may not be more than three joint owners of a Note.

**Sale and Issuance**

All funds you invest in Notes, together with all accrued interest, and any redemptions, will be recorded on a register maintained by us or the Trustee.

23-01243-WLH11    Doc 266    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1047 of 1366    Exhibit 10, Page 1047

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1048 of 1366

Exhibit 10, Page 1048

Notes will be issued and sold in initial denominations of $25 or more, and in any amounts thereafter, and will be dated the date of purchase; however, we can reduce the initial denomination on a case to case basis in our sole discretion. We may, at our discretion, limit the maximum amount any investor or related investors may maintain in outstanding Notes at any one time.

**Principal Amount**

The principal amount of each Note held by an investor at any time will be equal to all amounts invested in such Note, together with accrued interest, less redemptions.

**Interest**

The Notes will bear interest at a floating rate per annum that is determined from time to time by the Company in its sole discretion. Rates may vary by an investor's principal amount of Notes or other factors as determined by the Company. Interest on the Notes accrues in accordance with the provisions governing the different methods of investing in Notes, as described below under "How to Make Additional Investments." Interest on the Notes is compounded daily, at the rate in effect each day, based on a 365-day year. Interest payable on the Notes accrues daily and will be credited to your Notes on the last business day of each calendar month and will be reinvested.

A holder of Notes will not be expressly notified of changes from time to time in the interest rates. The current interest rates being paid on the Notes at any time may be obtained by visiting our website at www.icapequity.com/vault or calling our offices at (425) 453-7497. The information on our website is not a part of, or incorporated by reference into, this prospectus.

**How to Make an Initial Investment**

To make an initial investment, after reading this entire prospectus, you must set up an account and complete the onboarding process at the Company's website at www.icapequity.com/vault. Please refer to the website for instructions, requirements and guidelines with respect to online account setup and initial investments. Certain eligibility rules apply. You will be required to read and accept the Terms of Use before submitting completing this process online.

Currently, the minimum initial investment is $25; however, the Company can waive the minimum initial investment requirement on a case to case basis in its sole discretion. Your initial investment will be made using an ACH transfer from a U.S. bank account you have successfully linked during the online onboarding process. You must verify your ownership of the linked U.S. bank account by completing the bank account verification process online. Funds received as part of your initial investment cannot be redeemed until three business days after such amounts are credited. You may not make an initial investment by wire transfer or by using cash or a check. **Note that this is only for the initial investment and account linking.

**How to Make Additional Investments**

After your initial investment in the Notes, you may make additional investments at any time, without charge to you, in any amount, by the methods described below or by such other means as the Company from time to time determines. There is no required minimum amount for subsequent investments. All investments must be made in U.S. dollars unless otherwise designated by the Company.

23-01224S-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1049 of 1366    Exhibit 10, Page 1049

BY ACH INVESTMENT. You may use the Company website or call us at (425) 453-7497 at any time to withdraw any amount of funds from your linked U.S. bank account to invest in the Notes through an ACH transfer. You may also set up automatic recurring ACH investment transactions from a linked U.S. bank account. See "—*BY AUTOMATIC MONTHLY INVESTMENT*" below. If you set up automatic recurring ACH investment transactions, the Company will prepare automatic electronic transfers using the transfer dates each month for the amount authorized and on the business day you have requested. If an automatic transfer day falls on a day that is not a business day, the transfer will be initiated on the next business day; provided, however, if an ACH automatic investment is set for the last weekend of a month, the investment will be made on the last business day of that month. Investments made by ACH transfer are invested in your Notes and begin to accrue interest on the same day your money is credited. In the case of a one-time transfer, the Company will prepare an electronic transfer for the amount authorized and on the business day you have requested. One-time ACH investment requests made prior to 7:30 a.m. Pacific Time generally will be posted to the Note on the next business day and requests made at or after 7:30 a.m. Pacific Time generally will be posted two business days following the request. Investments made by ACH cannot be redeemed until three business days after such amounts are credited to the Notes. You may change or terminate any automatic investments at any time. You can confirm the date your investment was made by accessing the Company website at www.icapequity.com/vault or by calling us at (425) 453-7497. We charge no fees for the receipt of ACH transfers; however, your commercial bank or financial institution may charge you a fee if you make an investment by ACH transfer.

BY WIRE INVESTMENT. You may make additional investments by wire transfer. The wire transfer must include the information provided by the Company's designated bank and come from a bank account in your name. Wires may only be originated from a bank located in the U.S. and must be payable in U.S. dollars. Your investment will be credited and you will begin earning interest on the same business day the wire is received provided that the funds have been received by 1:00 p.m. Pacific Time. Funds received at or after 1:00 p.m. Pacific Time are invested and begin to accrue interest on the next business day. Investments made by wire are available for redemption beginning the day such investments are credited to the Notes. Investments by wire transfer may incur a charge from your bank or financial institution. See "Description of the Notes— Account Fees and Charges." Neither the Company nor its designated bank is responsible for delays in acting on your request for authorization to make a wire transfer or in the transfer and wiring of funds. You can confirm the date your investment was made by accessing the Company's website at www.icapequity.com/vault or by calling us at (425) 453-7497. If for any reason your wire request is declined, the Company will advise you of that fact and give you instructions for how to make the additional investment through the ACH process.

BY AUTOMATIC MONTHLY INVESTMENT. You may select to make additional investments via ACH on a monthly basis in a specified amount. Automatic monthly investments may not be made by wire transfer. If you set up automatic recurring ACH investment transactions, the Company's designated bank will prepare automatic electronic transfers using the transfer dates each month for the amount authorized and on the business day you have requested. If an automatic transfer day falls on a day that is not a business day, the transfer will be initiated on the next business day; provided, however, if an ACH automatic investment is set for the last weekend of a month, the investment will be made on the last business day of that month. Investments made by ACH transfer are invested in your Notes and begin to accrue interest on the same day your money is credited. Investments made by ACH cannot be redeemed until three business days after such amounts are credited to the Notes. You may request, modify or terminate the Automatic Monthly Investment Option through the Company's website at www.icapequity.com/vault or by calling us at (425) 453-7497. Such notice is effective as soon as practicable after receipt by the Company's designated bank. You can confirm the date your investment was made by accessing the Company's website at www.icapequity.com/vault or by calling us at (425) 453-7497. We charge no fees for the receipt of ACH transfers; however, your commercial bank or financial institution may charge you a fee if you make an investment by ACH transfer.

BY CASH. You may invest in Notes by delivering cash to us at our executive offices located at 3535 Factoria Blvd. SE, Suite 500, Bellevue, WA 98006. Investments in Notes made with cash begin to accrue interest as of the date the investment is made at our executive offices.

BY CHECK. You may invest in Notes by check delivered to our executive offices located at 3535 Factoria Blvd. SE, Suite 500, Bellevue, WA 98006. Checks must be drawn in U.S. dollars on a U.S. bank. Investments made by check begin to accrue interest on the date funds are credited to Company's designated bank account.

We reserve the right to reject any investment application and return the funds to a potential investor for any reason, including if any investments are not preceded or accompanied by documentation satisfactory to us to establish that the potential investor meets any applicable eligibility criteria.

## Rescission Right

A purchaser of Notes has the right to rescind his or her investment, without penalty, upon written request within five (5) business days from the postmark date of the purchase confirmation, but not upon transfer of a Note. You will not earn interest on any rescinded Note. We will promptly return any funds sent with a subscription agreement that is properly rescinded. A written request for rescission, if personally delivered or delivered via electronic transmission, must be received by us on or prior to the fifth (5) business day following the mailing of written confirmation by us of the acceptance of your subscription. If mailed, the written request for rescission must be postmarked on or before the fifth (5) business day following the mailing of such written confirmation by us.

In addition, if your subscription agreement is accepted at a time when we have determined that an amendment to the prospectus is necessary, we will send to you a notice and a copy of the amendment to the prospectus. You will have the right to rescind your investment upon written request within five business days from the postmark date of the notice of the amendment to the prospectus. We will promptly return any funds sent with a subscription agreement that is properly rescinded without penalty, although any interest previously paid on the Notes being rescinded will be deducted from the funds returned to you upon rescission. A written request for rescission, if personally delivered or delivered via electronic transmission, must be received on or prior to the fifth business day following the mailing of the notice of the amendment to the prospectus. If mailed, the written request for rescission must be postmarked on or before the fifth business day following the mailing of such notice.

## Right to Reject Subscriptions

We may reject any subscription for Notes in our sole discretion. If we reject a subscription for Notes, we will promptly return any funds sent with that subscription, without interest.

## Servicing Agent

We may engage a non-affiliated third party, to act as our servicing agent. Such person's responsibilities as servicing agent would involve the performance of certain administrative and customer service functions for the Notes that we are responsible for performing as the issuer of the notes.

For example, the servicing agent may manage certain aspects of the customer service function for the Notes, which may include handling phone inquiries, mailing investment kits, processing subscription agreements, issuing annual investor statements and redeeming at the option of the Company or repaying at the request of the Noteholders the Notes. In addition, the servicing agent would provide us with monthly reports and analysis regarding the status of the Notes and the amount of Notes that remain available for purchase.

You may contact us with any questions about the Notes at the following address, telephone number and email address:

iCap Vault Management, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006
Attention: Investor Relations Department
Telephone: (425) 453-7497
E-mail: inquiry@icapvault.com

## Ranking

The Notes are secured general obligations of the Company and rank equally with its other secured and unsubordinated indebtedness from time to time outstanding. The Notes are secured debt obligations solely of the Company and are not obligations of, or directly or indirectly guaranteed by, any affiliate of the Company other than Vault Holding, LLC.

23-01243-WLH11  Doc 468  Filed 02/23/24  Entered 02/23/24 19:33:15  Pg 1051 of 1366

Exhibit 10, Page 1051

Payment of the principal and interest on the Notes will rank equally in right of payment and collateral with all of our existing and future secured indebtedness and, to the extent we incur or acquire unsecured indebtedness in the future, rank senior in right of payment and collateral to our unsecured indebtedness. The Notes will rank senior in right of payment to our equity, such as our membership interests/units. The Notes will be subordinated in the right of payment and collateral to our existing and future secured debt, such as credit facilities or indemnity agreements with surety or insurance companies, which may be entered into by the Company or by Vault Holding, LLC.

We will conduct a significant portion of our operations through direct and indirect subsidiaries, which generate a substantial portion of our operating income and cash. Contractual provisions, laws or regulations, as well as any subsidiary's financial condition and operating requirements, may limit our ability to obtain or receive cash from our subsidiaries in order to service our debt obligations, including making payments on the Notes. Claims of creditors of our subsidiaries, including secured credit lines, will have priority with respect to the assets and earnings of such subsidiaries over the claims of our creditors, including holders of the Notes. Accordingly, the Notes will be structurally subordinated to all existing and future obligations of our subsidiaries, including trade creditors of our subsidiaries.

The Notes will be structurally subordinated to indebtedness or other liabilities of special purpose entity subsidiaries (as our special purpose entity subsidiaries are not guaranteeing the notes). The indenture does not restrict the ability of our subsidiaries to incur indebtedness.

The Company has the right to subordinate the obligations and the security interests of the Notes to those of a third party lender, if doing so is required by the lender to secure a loan for the benefit of the Company. Vault Holding, LLC has the right to subordinate the obligations and guaranty of Vault Holding, LLC and the security interests pledged by Vault Holding, LLC to those of a third party lender, if doing so is required by the lender to secure a loan for the benefit of the Vault Holding, LLC.

The Notes do not constitute a savings, deposit, or other bank account and are not insured by or subject to the protection of the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation, or any other federal or state agency. The Notes are not a money market fund, which are typically diversified funds consisting of short-term debt securities of many issuers, and therefore do not meet the diversification and investment quality standards set forth for money market funds by the Investment Company Act of 1940. We are not a real estate investment trust and do not intend to be treated as such.

**Minimum Outstanding Investment**

If the amount of your outstanding investment at month end is less than $25 for three consecutive months, we may notify you in writing that we intend to redeem your investment. If we redeem your investment, the principal amount of your Note, including accrued and unpaid interest less any tax withholding, if applicable, and any other applicable fees, will be remitted to you using the information on file for your Note. Interest on the redeemed Notes accrues to, but does not include, the effective date of the redemption. The minimum required investment balance is subject to change at the Company's discretion without prior notice to investors.

**Maximum Outstanding Investment**

The Company has established a maximum outstanding investment for any one Note of $50,000,000. If the amount of your Note exceeds the maximum, we may notify you in writing that we may redeem the amount of your investment in excess of $50,000,000. If we elect to make such a redemption, we will remit the excess, less any tax withholding, if applicable, and any applicable fees, to you using the information on file for your Note. Interest on the redeemed amount accrues to, but does not include, the effective date of the redemption. The maximum outstanding investment for any one Note is subject to change at the discretion of the Company without prior notice to investors.

**How to Redeem**

Subject to any limitations described in "— Subordination" below, you may redeem all or any part of your Notes at any time by following the procedures described below. Interest on redeemed investments will accrue to, but not including, the redemption date. We may also offer other methods of redemption from time to time, at our option. There is no minimum amount which you may redeem. However, if your investment balance in the Notes at month end is less than $25, for three consecutive months, we may notify you in writing that we intend to redeem your investment. See "— Minimum Outstanding Investment."

23-01243-WLH11   Doc 463   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1052 of 1366   Exhibit 10, Page 1052

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1053 of
1366
Exhibit 10, Page 1053

CLOSING YOUR NOTE. You may at any time close your Note and redeem the entire balance of principal and interest by calling us at (425) 453-7497 or sending a written request, which may be submitted through the Company website at www.icapequity.com/vault. Your Notes will be closed and the principal amount of your Notes, including accrued and unpaid interest less any tax withholding, if applicable, and any other applicable fees, will be remitted to you using the information on file for your Note.

If we redeem your investment, the principal amount of your Note, including accrued and unpaid interest, less any tax withholding, if applicable, and any other applicable fees, will be remitted to you using the information on file for your Note.

ACH REDEMPTION. You may redeem a portion of your Notes and have the proceeds transferred to your linked U.S. bank account through an ACH transfer. To make such redemption, you may use the Company's website at www.icapequity.com or call us at (425) 453-7497. Funds from redemption requests received before 7:30 a.m. Pacific Time generally will be received two business days later. Funds from redemption requests received at or after 7:30a.m. Pacific Time generally will be effective three business days later. Interest will accrue on your Notes to, but not including, the business day on which the redemption proceeds are transferred.

WIRE REDEMPTION. You may redeem a portion of your Notes and have the proceeds sent to you by wire transfer. Redemptions made by wire transfer are subject to a $1,000 minimum. Wires may only be sent to linked U.S. bank account. A wire transfer will generally be sent by 1:00 p.m. Pacific Time the next business day after the initial request is received. Redemptions by wire transfer will incur a processing charge and may also incur an additional charge from your bank or financial institution. Neither the Company nor its designated bank is responsible for delays in acting on your request for authorization to make a wire transfer or in the transfer and wiring of funds. You can confirm the status of your redemption request by accessing the Company's website at www.icapequity.com/vault or by calling us at (425) 453-7497. If your wire transfer request is declined for any reason, the Agent Bank will advise you of that fact and give you instructions for how to make the redemption through the ACH process.

AUTOMATIC MONTHLY ACH REDEMPTION. You may select to automatically redeem, on a monthly basis, a specified principal amount of your Notes. Automatic monthly redemptions may not be made by wire transfer. If you select the automatic monthly redemption option, the redemption date will be the last business day of the month. With respect to such automatic monthly redemptions, the funds will settle on the last business day of the month. On the established redemption date, the Company will redeem your Notes by an amount equal to the redemption amount that you have specified. The Company's designated bank will send, via ACH transfer, the funds to your linked U.S. bank account.

You may request, modify or terminate the Automatic Monthly Redemption Option through the Company's website at www.icapequity.com/vault or by calling us at (425) 453-7497. Such notice is effective as soon as practicable after receipt by the Company and delivery of notice to the Company's designated bank. You can confirm the date your Notes were redeemed by accessing the Company's website at www.icapequity.com/vault or by calling us at (425) 453-7497. We charge no fees for sending ACH transfers; however, your commercial bank or financial institution may charge you a fee if you receive redemption proceeds by ACH transfer.

**Optional Redemption by the Company**

We may redeem, in our discretion, any particular Note that maintains a principal amount of less than $25 for a period consisting of the three consecutive months immediately following the month in which the principal amount of the Note is below $25 as of the last day of the month. The first month your Note is below the required minimum, you will be sent a notice informing you that your Note will be redeemed at the end of the third month. Unless you have brought your Note above the required minimum, your Note will automatically be redeemed at the end of the third month.

We may redeem, in our discretion, the portion of a particular Note that exceeds $50,000,000.

23-01243-WLH11   Doc 763   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1054 of 1366   Exhibit 10, Page 1054

In addition, we may also redeem, at any time at our option, the Notes of any investor who is not or is no longer eligible to invest in the Notes as we determine in our sole judgment and discretion.

Further, we may redeem the entire amount of, or any portion of, any of the outstanding Notes in our sole judgment and discretion. Any such partial redemption of outstanding Notes may be effected by lot or pro rata or by any other method that is deemed fair and appropriate by us.

In each of the redemption transactions described above, we will remit a payment to you based on the information we have on file for your note in an amount equal to the principal amount of your Note, including accrued and unpaid interest less any tax withholding, if applicable, and any other applicable fees. Interest on the redeemed Notes accrues to, but does not include, the effective date of the redemption.

**Access to Investor Statements and Information**

Either we or the Trustee will maintain a register of each investor's investments in Notes. We will maintain the register unless otherwise designated. The principal amount of each Note at any time will be equal to all amounts invested in such Note, together with accrued interest, less redemptions. Electronic statements will be made available to you on the Company's website at www.icapequity.com/vault, showing a summary of all the transactions made in the Notes during the previous monthly period, including the beginning investment balance, all investments and redemptions, all interest earned, as well as any relevant fees or charges. Investors may request to receive paper statements to be mailed.

Investors may access their information at the Company's website at www.icapequity.com/vault. This website will allow investors to:

- enroll in the iCap Vault Notes program;
- access Note and activity information;
- obtain forms to update their profile;
- update their address;
- re-order statements or 1099INTs;
- access thirty-six (36) months of transaction history;
- access funds transfer screens to allow online initiation of funds transfers;
- access eStatements;
- set up notifications of transaction activity;
- view account balances, including opening balance and current available balance;
- view recent transaction history;
- view current interest rate;
- reorder statements;
- reorder 1099s; and
- originate ACH transactions.

You can also obtain current information about the Notes by calling (425) 453-7497. We will only furnish information to you by telephone if you have specified the name, address and certain identifying information, such as Social Security number or U.S. Federal tax identification number, or other security method, associated with the Notes about which you are calling.

Enrollment in the Company's Notes program and many of the other actions in connection with your account may be transacted through the Company's website at www.icapequity.com/vault or by calling us at (425) 453-7497. Certain transaction requests may require additional documentation. For these transactions, the website or the Company staff will provide you with the necessary documents and instructions.

**Requirement to Keep Your Information Current and Review Note Activity**

You must promptly provide written notice of any change in your address. A change of address form may be obtained by accessing the Company's website at www.icapequity.com/vault or by contacting the Company at (425) 453-7497. The notice will be effective as soon as practicable after receipt thereof.

You are responsible for examining each statement or confirmation mailed or otherwise made available to you promptly to determine the accuracy of all redemptions and investments made to your Notes and for notifying the Company if any information is incorrect.

**Account Fees and Charges**

There are no maintenance fees with respect to your investment in the Notes. You may, however, be charged a fee by your commercial bank or financial institution if you make an investment or receive a redemption amount by wire transfer or ACH transfer. Additionally, the Company may in the future impose fees in its discretion. See "-Yearly Statements." As incurred, fees will be promptly debited directly from your investment balance as a partial redemption of your Notes. Any fees and charges will appear on the appropriate account statement.

**Subordination**

The Company has the right to subordinate the obligations and the security interests of the Notes in the membership interests in Vault Holding, LLC to those of a third party lender, if doing so is required by the lender to secure a loan for the benefit of the Company. Vault Holding, LLC has the right to subordinate the obligations and guaranty of Vault Holding, LLC to those of a third party lender, if doing so is required by the lender to secure a loan for the benefit of the Vault Holding, LLC.

Payment of the principal and interest on the Notes will be subordinate in right of payment to all of our third party credit facilities ("Permitted Indebtedness") to the extent of the value of the assets securing such indebtedness outstanding at any time. The Permitted Indebtedness, if existing, will maintain a position senior to the Notes relative to the membership interests in Vault Holding, LLC and relative to the repayment of the Notes. As of the date of this prospectus, we do not have any Permitted Indebtedness outstanding. The Indenture does not restrict our right to incur additional Permitted Indebtedness in the future. No sinking fund will be established to provide for payments on the Notes.

In the event that the Notes are declared due and payable because of a default under the Indenture, a holder of a Note will be entitled to payment only after all principal and interest on all Permitted Indebtedness has been paid, to the extent of the value of the assets securing such indebtedness. Likewise, in the event of our insolvency, bankruptcy or liquidation, or other similar proceeding relating to the Company or to its creditors, as such, or to our property, or in the event of any dissolution or other winding up, whether or not involving insolvency or bankruptcy, then the holders of any Permitted Indebtedness would be entitled to receive payment in full of all principal and interest due to them, to the extent of the value of the assets securing such indebtedness, before the holders of the Notes would be entitled to receive any payments.

**Indenture and Trustee**

The Notes will be issued under an indenture, among iCap Vault 1, LLC, as issuer, Vault Holding, LLC, as guarantor, and American Stock Transfer & Trust Company, LLC, as trustee, referred to herein as the "Indenture." A copy of the form of the Indenture has been filed with the Securities and Exchange Commission as an exhibit to the registration statement of which this prospectus is a part and statements in this prospectus relating to the Notes are subject to the detailed provisions of the Indenture. Whenever any particular section of the Indenture or any term used in it is referred to, the statement in connection with which such reference is made is qualified in its entirety by such reference. The Trustee will also serve as our Security Registrar.

57

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1057 of 1366    Exhibit 10, Page 1057

## Guaranty

The payment of principal and interest on the Notes are fully and unconditionally guaranteed by our wholly owned direct subsidiary, Vault Holding, LLC, but otherwise are not guaranteed by any other person or entity. Therefore, the Notes will be structurally subordinated to indebtedness or other liabilities of special purpose entity subsidiaries (as our special purpose entity subsidiaries are not guaranteeing the notes). The indenture does not restrict the ability of our subsidiaries to incur indebtedness.

## Collateral

The Notes will be secured by a pledge of the membership interests in Vault Holding, LLC, our direct and wholly-owned subsidiary, that will hold interests in real estate, through wholly owned subsidiaries (Portfolio SPEs), and real estate-based financial instruments. The assets of the Portfolio SPEs will consist primarily of real estate and all other cash and investments they hold in various accounts. The Notes' security interest in the collateral will be subordinated to the security interest in favor of lenders of credit facilities.

## Collateral Agent

The Manager will engage a collateral agent to manage the collateral and to act as the Noteholders' agents for purposes of the Notes. The form, terms and conditions of the security documents which will secure the Notes shall be determined by the Manager and shall be put into place from time to time as determined by the Manager. Therefore, there may be period of time when not all of the Company's assets are covered by a security interest, although the Manager will use its good faith efforts to cause such security interest to be in place with respect to all assets as soon as reasonably possible. While the Company currently contemplates acquiring assets without financing, the Notes will be junior to any credit facilities that are put in place by the Company, and the real property assets of the Company may be used as collateral for such credit facilities. The Notes will rank senior in right of payment to our subordinated and/or unsecured debt and our equity, such as our membership interests/units.

## Restrictions on Additional Debt

The Indenture does not limit the total principal amount of debt securities that the Company may issue under the Indenture, including other senior debt or secured obligations. The Company may issue debt securities from time to time in one or more series, with the same or different maturities or interest rates, at par, at a premium or with original issue discount up to the aggregate principal amount from time to time authorized by the Company for each series.

## Successors

The Indenture generally permits a consolidation or merger between us and another entity. It also permits the transfer or lease by us of all or substantially all of our assets. These transactions are permitted if:

- the resulting or acquiring entity, if other than us, is a corporation and assumes all of our responsibilities and liabilities under the Notes and the Indenture; and

- immediately after the transaction, and giving effect to the transaction, no event of default under the Indenture exists.

## Modification of the Indenture

The Indenture contains provisions permitting the Company and the Trustee, with the consent of the holders of a majority of the outstanding principal amount of Notes, to execute supplemental indentures adding any provisions to or changing in any manner or eliminating any of the provisions of the Indenture or of any supplemental indenture or modifying in any manner the rights of the holders of such Notes; provided, however, that no such supplemental indenture can do any of the following without the consent of each holder so affected:

23-01124 5-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1058 of 1366

- reduce the principal amount or change the demand payment nature of any Note;

- reduce the amount of Notes whose holders must consent to an amendment; or

- make any changes regarding the Indenture that relate to a waiver of default, the rights of holders to receive payments, and the requirements of consent of the holders of Notes.

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1059 of 1366

Exhibit 10, Page 1059

We, along with the Trustee, may amend the Indenture without the consent of the holders of the Notes to cure any ambiguity, defect or inconsistency, to make any change that does not adversely affect the rights of any holder, or to comply with requirements of the SEC.

**Events of Default and Notice Thereof**

An event of default is generally defined by the Indenture to mean any of the following:

- the Company's failure to pay principal or interest on any Note upon a request for redemption therefor, which failure continues for 30 days;

- the Company's failure to comply with any of its covenants or obligations contained in the Indenture or the Notes and, after notice thereof from the Trustee or holders of at least 50% in principal amount of the Notes, such failure continues for 60 days;

- the occurrence of certain events of bankruptcy, insolvency or reorganization.

The Indenture provides that the Trustee will, within 90 days after the occurrence of any default that is continuing and known to the Trustee, give the registered holders of Notes notice thereof, but, except in case of a default in the payment of principal or interest, the Trustee may withhold such notice if and for so long as the Trustee in good faith determines that withholding such notice is in the interest of those holders.

**Acceleration of Maturity; Rescission and Annulment of Declaration of Default**

If an event of default with respect to the Notes occurs and is continuing, then in every such case the Trustee or the holders of not less than fifty percent (50%) in the principal amount of the outstanding Notes may declare all of the Notes to be due and payable immediately, by a notice in writing to the Company (and to the Trustee if given by Holders), and upon any such declaration such principal amount shall become immediately due and payable.

Notwithstanding the foregoing, at any time after such a declaration of acceleration with respect to the Notes has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee, the Company, by written notice to the Trustee, may rescind and annul such declaration and its consequences if:

(1) the Company has paid or deposited with the Trustee a sum sufficient to pay:

    a. the principal amount of the Notes which have become due otherwise than by such declaration of acceleration and interest thereon at the rate or rates prescribed therefore in such Notes;

    b. to the extent that payment of such interest is lawful, interest upon overdue interest at the rate or rates prescribed therefore in such Notes, and

    c. all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

(2) all Events of Default with respect to the Securities, other than the non-payment of the principal of Securities which have become due solely by such declaration of acceleration, have been cured or waived.

No such rescission shall affect any subsequent default or impair any right consequent thereon.

23-01124-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1060 of 1366    Exhibit 10, Page 1060

## Global Securities

The debt securities of a series may be issued in whole or in part in global form. A debt security in global form will be deposited with, or on behalf of, a depository, which will be identified in an applicable prospectus supplement. A global debt security may be issued in either registered or bearer form and in either temporary or permanent form. A debt security in global form may not be transferred except as a whole by the depository for the debt security to a nominee of the depository or by a nominee of the depository to the depository or another nominee of the depository or by the depository or any nominee to a successor of the depository or a nominee of the successor depository. If any debt securities of a series are issuable in global form, the applicable prospectus supplement will describe the circumstances, if any, under which beneficial owners of interests in the global debt security may exchange their interests for definitive debt securities of the series and of like tenor and principal amount in any authorized form and denomination, the manner of payment of principal of, premium and interest, if any, on, the global debt security and the material terms of the depository arrangement with respect to the global debt security.

## Supplemental Indentures

Supplemental indentures may be entered into by the Company and the Trustee for a series of debt securities with the consent of the Holders of a majority of the outstanding principal amount of that series, for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture or of modifying in any manner the rights of the Holders of each such series affected by such modification or amendment. However, no supplemental indenture may, among other things, without the consent of each Holder of any debt security affected:

- reduce the principal amount of, or interest accrued on, any debt security;

- change the maturity date of the principal, the interest payment dates or the place where, or currency in which, any debt securities are payable;

- adversely affect the right of repayment at the option of any Holder for such debt securities that provide such right; or

- reduce the percentage in principal amount of outstanding debt securities of any series, the consent of whose Holders is necessary to modify or amend the Indenture.

Under certain circumstances, supplemental indentures may also be entered into without the consent of the Holders.

## Rights on Default

The Trustee, by notice to the Company, or the holders of at least 50% in principal amount of Notes, by notice to the Company and the Trustee, may declare the principal of and accrued but unpaid interest on all Notes due upon the happening of any of the events of default specified in the Indenture, but the holders of a majority of the outstanding principal amount of Notes may waive any default and rescind such declaration if the default is cured within the 30 day period thereafter, except a default in the payment of the principal of or interest on any Note. The holders of a majority of the outstanding principal amount of the Notes may direct the time, method and place of conducting any proceeding for any remedy available to, or exercising any power or trust conferred upon, the Trustee, but the Trustee may decline to follow any direction that conflicts with law or any provision of the Indenture, or is unduly prejudicial to the rights of the other holders of Notes or would involve the Trustee in personal liability. Holders may not institute any proceeding to enforce the Indenture unless the Trustee refuses to act for 90 days after request from the holders of a majority of the principal amount of the Notes and during that 90 day period the holders of a majority in principal amount do not give the Trustee a direction inconsistent with the request, and tender to the Trustee a satisfactory indemnity. Nevertheless, any holder may enforce the payment of the principal of and interest on that holder's Notes upon a request therefore.

## Concerning the Trustee

The Indenture contains certain limitations on the right of the Trustee, as a creditor of ours, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. In addition, the Trustee may be deemed to have a conflicting interest and may be required to resign as Trustee if at the time of a

default under the Indenture it is a creditor of ours.

60

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1062 of 1366

Exhibit 10, Page 1062

American Stock Transfer & Trust Company, LLC is the Trustee under the Indenture. The Trustee may serve in the future, as trustee or agent under other indentures and agreements pursuant to which securities of the Company and of certain of its affiliates are outstanding.

**Evidence to be Furnished to the Trustee**

The Indenture provides that, upon any application or request by us to the Trustee to act, we will provide the Trustee an officer's certificate and an opinion of counsel stating that any necessary conditions precedent have been met.

Before the Trustee acts, it may also require satisfactory indemnification as provided in the Indenture. Within 120 days after the end of each fiscal year, we are required to deliver to the Trustee an officer's certificate stating whether or not, to the knowledge of the signer, we are in default in the performance of any covenant, agreement or condition in the Indenture and, if so, specifying each such default and, with respect to each, the action taken or proposed to be taken by us to remedy such default.

**Transfers**

The Notes are not negotiable debt instruments and, subject to certain limited exceptions, will be issued only in book-entry form. The purchase confirmation issued upon our acceptance of a subscription is not a certificated security or negotiable instrument, and no rights of record ownership can be transferred without our prior written consent.

Ownership of Notes may be transferred on the Note register only as follows:

- The holder must deliver to us written notice requesting a transfer signed by the holder(s) or such holder's duly authorized representative on a form to be supplied by us;
- We must provide our written consent to the proposed transfer;
- We may require a legal opinion from counsel satisfactory to us that the proposed transfer will not violate any applicable securities laws; and
- We may require a signature guarantee in connection with such transfer.

Upon transfer of a Note, we will provide the new holder of the Note with a purchase confirmation that will evidence the transfer of the account on our records. We may charge a reasonable service charge in connection with the transfer of any Note.

**Yearly Statements**

We will provide holders of the Notes with yearly statements, which will indicate the account balance at the end of the year interest credited, redemptions or requested repayments made, if any, and the average interest rate paid during the year. These statements will be mailed or electronically transmitted not later than the 20th business day following the end of each calendar year. We may charge such holders a reasonable fee to cover the charges incurred in providing such information.

**Governing Law**

The indenture and the Notes will be governed by, and construed in accordance with, the laws of the State of Delaware.

**Resignation or Removal of the Trustee**

The trustee may resign at any time, or may be removed by the holders of a majority of the aggregate principal amount of the outstanding Notes or, if there is no event of default continuing, by the Company at any time. In addition, upon the occurrence of contingencies relating generally to the insolvency of the trustee or the trustee's ineligibility to serve as

trustee under the Trust Indenture Act, we may remove the trustee. However, no resignation or removal of the trustee may become effective until a successor trustee has accepted the appointment as provided in the indenture.

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1064 of 1366

Exhibit 10, Page 1064

**Reports to Trustee**

We will provide the trustee with quarterly reports containing any information reasonably requested by the trustee. These quarterly reports will include information on each Note outstanding during the preceding quarter, including outstanding principal balance, interest credited and paid, transfers made, any redemption or repurchase and interest rate paid.

**No Personal Liability of Our Directors, Officers, Employees and Members**

No director, officer, employee, organizer or member of ours will have any liability for any of our obligations under the Notes, the indenture or for any claim based on, in respect to, or by reason of, these obligations or their creation. Each holder of the Notes waives and releases these persons from any liability, excluding any liability arising under federal securities laws, rules and regulations. The waiver and release are part of the consideration for issuance of the Notes.

**Service Charges**

We may assess service charges for changing the registration of any Note to reflect a change in name of the holder, multiple changes in interest payment dates, or transfers, whether by operation of law or otherwise, of a Note by the holder to another person.

**Interest Withholding**

We may withhold 30% of any interest paid to any investor who has not provided us with a social security number, employer identification number, or other satisfactory equivalent in the subscription agreement, or another document, or where the Internal Revenue Service has notified us that backup withholding is otherwise required.

**Liquidity**

Currently, there is no trading market for the Notes, and we do not expect that a trading market for the Notes will develop.

**Satisfaction and Discharge of Indenture**

The indenture shall cease to be of further effect upon the payment in full of all of the outstanding Notes and the delivery of an officer's certificate to the trustee stating that we do not intend to issue additional Notes under the indenture or, with certain limitations, upon deposit with the trustee of funds sufficient for the payment in full of all of the outstanding Notes.

**Reports**

We will publish annual reports containing consolidated financial statements and quarterly reports containing financial information for the first three quarters of each fiscal year. We will send copies of these reports, at no charge, to any holder of Notes who sends a written request to:

iCap Vault Management, LLC
Attn: Investor Relations Department
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006
Telephone: (425) 453-7497

Our annual and quarterly reports will be filed with the Securities and Exchange Commission ("SEC") and will also be available for your review on the SEC's website at http://www.sec.gov. You may also read and copy any document we file with the SEC at its Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. You may also obtain copies of these documents at prescribed rates by writing to the Public Reference Section of the SEC at 100 F Street, N.E., Washington, D.C. 20549.

23-01243-WLH11   Doc 408   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1066 of 1366   Exhibit 10, Page 1066

**Private Placement and Tendering Private Placement Notes for Offered Notes**

Prior to the effectiveness of this Offering by the SEC, we are currently conducting and anticipate closing a private placement in a transaction that is exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") pursuant to Regulation 506(c) and Regulation S (the "Private Placement") of 2% Senior Secured Notes ("Private Placement Notes").

As of February 14, 2020, we have repaid the noteholders of the Private Placement Notes $14,277,260 of the principal and accrued interest of Private Placement Notes. As of February 14, 2020, we estimate the value of the aggregate principal amount and accrued interest estimated to be $700,710 of the outstanding Private Placement Notes held by our noteholders.

The Notes of this Offering may be acquired by existing noteholders in exchange for tendered Private Placement Notes and cancellation of those Private Placement Notes by us. We anticipate the aggregate principal amount of all Private Placement Notes, together with accrued interest thereon, to be no more than $5,000,000, including (i) the existing principal and accrued interest of $700,710 of outstanding Private Placement Notes, (ii) the prospective accrued interest of outstanding Private Placement Notes between the filing date and the offering, and (iii) the principal and accrued interest of prospective issuances by us of Private Placement notes between the filing date and the offering. If a holder does tender a Private Placement Note as payment for such Notes in the Offering, each $1.00 of principal or interest so tendered will equal $1.00 of purchase price of the Notes; the Notes will not be issued at discount (original issue discount) to such holders.

<center>SUMMARY OF OPERATING AGREEMENT</center>

The Amended and Restated Limited Liability Company Operating Agreement ("Operating Agreement"), in the form attached as Exhibit 3.3 to the registration statement of which this prospectus is a part, is the governing instrument establishing the terms and conditions pursuant to which the Company will conduct business and the rights and obligations between and among the Company, the Members and the Manager, as well as other important terms and provisions relating to the Company. A prospective investor is urged and expected to read and fully understand the Operating Agreement in its entirety prior to making a decision to purchase Notes. The following is a brief and incomplete summary of the terms of the Operating Agreement and is qualified in its entirety by reference to the entire text of the Operating Agreement.

**Management**

The Company is a manager-managed limited liability company. Except as otherwise expressly provided in the Operating Agreement or as required by Chapter 18 of Subtitle II of Title 6 of the Delaware Code, referred to as the Delaware Limited Liability Company Act, as amended from time to time, and any successor thereto (the "Delaware Act"), the Manager has complete and exclusive discretion in the management and control of the affairs and business of the Company. The Manager may be replaced by the affirmative vote of Members holding a majority of the "Membership Interests", which means a majority of the Units then outstanding.

The Manager may, without the approval of any of the Members or Noteholders, create new classes of Units and set the rights and preferences of the new class, and may amend the Operating Agreement to reflect the creation of the new class(es) of Units.

The Manager may designate any officers of the Company to have control or authority with respect to one or more decisions or areas of operation of the Company, and may include such limitations or restrictions on such power as the Manager deems reasonable. The Manager shall, to the extent it determines that it would be advisable in connection with or incidental to the activities contemplated by the Operating Agreement, arrange for and coordinate the services of other professionals, experts and consultants to provide any or all of the services provided by the Manager, in which case, the costs and expenses of such third parties for providing such services shall be borne by the Manager other than as set forth in the Operating Agreement.

<center>63</center>

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1067 of 1366

Exhibit 10, Page 1067

The Manager shall, on behalf of the Company, directly, or indirectly through one or more affiliates or third parties, engage and maintain personnel for the purpose of providing the following services (collectively, the "Services") to the Company: (i) entity-level services for the Company, including: (A) evaluation and acquisitions of investments; (B) oversight and management of banking activities; (C) management of preparation and filing of Securities and Exchange Commission and other corporate filings; (D) financial, accounting and bookkeeping services, including retention of an auditor for the Company; (E) record-keeping, shareholder or Noteholder registrar and regulatory compliance, Collateral Agent and Paying Agent services; (F) providing listing services, subject to the applicable law; (G) tax reporting services; (H) bill payment; (I) selecting and negotiating insurance coverage for the Company, including operational errors and omissions coverage and managers' and officers' coverage; (J) maintain the Company's membership and Unit ledger and coordinating activities of the Company's transfer agent, escrow agent and related parties; (K) software and technology services; and (ii) transactional, extraordinary or non-routine services, including: (A) legal and professional transactional services; (B) negotiation of terms of potential acquisition and sale of assets and the execution of documents related thereto; (C) obtaining appraisals and statements of condition in connection with a sale transaction relating to the assets of the Company; (D) other transaction-related services, cost, payments and expenditures relating to the assets of the Company or the Company; (E) administrative services in connection with liquidation or winding up of the Company; (F) managing litigation, judicial proceedings or arbitration, including the defense and or settlement of any claims; (G) other non-routine or extraordinary services; and (H) additional services as contemplated in the Operating Agreement.

No Member, in its capacity as such, shall participate in the operation or management of the Company's business, transact any business in the Company's name or have the power to sign documents for or otherwise bind the Company by reason of being a Member.

**Other Activities of Manager: Affiliates**

The obligations of the Manager to the Company are not exclusive. The Manager may, in its discretion, render the same or similar services as rendered to the Company to any persons or entities whose business may be in direct or indirect competition with the Company, including other affiliates of the Manager.

The Manager need not devote its full time to the Company's business, but shall devote such time as the Manager in its discretion, deems necessary to manage the Company's affairs in an efficient manner. Subject to the other express provisions of the Operating Agreement, the Manager, at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ventures in competition with the Company, with no obligation to offer to the Company or any Member the right to participate therein, The Company may transact business with any Manager, Member, officer, agent or affiliate thereof provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties.

**Management Fee**

In return for the provision of the Services and for the other actions of the Manager under the Operating Agreement, the Company shall pay the Manager an annual management fee equal to 1% of the outstanding aggregate principal balances of the Notes ("Management Fee"). The Management Fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the Notes during the applicable quarter.

**Profits and Losses**

All adjustments to the Capital Accounts and allocations of the taxable and economic elements of the Company shall comply with applicable provisions of the Internal Revenue Code and Treasury Regulations, including Section 704 of the Internal Revenue Code and its corresponding Treasury Regulations, including, but not limited to, those respective to the following (the "Regulatory Allocations"): (a) qualified income offsets; (b) minimum gain chargebacks; (c) deductions attributable to nonrecourse debt; and (d) non-deductible expenditures. The Operating Agreement will be interpreted as if each such Regulatory Allocations, and all of the penultimate provisions of Section 704 and its corresponding Treasury Regulations and any other applicable provisions of the Internal Revenue Code and Treasury Regulations, were expressly recited within the Operating Agreement.

## Distributions

The Company, in the sole discretion of the Manager, in the event there are Available Funds, may make distributions thereof ("Distributions") to Members on a pro rata basis in accordance with the Members' Membership Interests at any time. "Available Funds" means the Company's cash, including cash from loan proceeds, Note proceeds, and gross cash receipts from operations, which includes the excess of Net Income, less the sum of: (1) payments of principal, interest, charges and fees pertaining to any of the Company's indebtedness; (2) costs and expenses incurred in the conduct of the Company's business; and (3) amounts reserved to meet the reasonable needs of the Company's business. Notwithstanding anything in the Operating Agreement to the contrary, no Member may receive a Distribution to the extent that, after giving effect to the Distribution, all known and currently existing liabilities of the Company outstanding as of the date of such Distribution (other than to a Member on account of its Membership Interests and liabilities for which the recourse of creditors is limited to specific property of the Company) including the principal amounts due to Noteholders, exceed the Fair Value (as defined in the Operating Agreement) of the assets of the Company (except that property that is subject to a liability for which the recourse of the creditors is limited to such property shall be included in the assets of the Company only to the extent the Fair Value of such property exceeds that liability). In the event of a Distribution to a Member that would be deemed violative of applicable law, the applicable Member may be required to return such Distribution to the Company. Notwithstanding the foregoing, within ninety (90) days of the end of each Fiscal Year or such later date at which the Company's accountants have completed their tax preparation for the Company, the Company shall make a Distribution to each holder of Units in an amount necessary to cover any taxes due from such Unit holder to federal, state or local tax authorities, as a result of his/her/its holding Units of the Company ("Tax Distribution"). The Tax Distribution is a required annual payment of the Company, and if the Company has insufficient cash to make the Tax Distribution when due, the Manager is authorized to borrow, including against the assets of the Company or those of its subsidiaries, or liquidate certain assets of the Company or those of its subsidiaries, to meet such obligations.

## Limited Liability

The liability of each member of our Company shall be limited as provided in the Delaware Limited Liability Company Act and as set forth in the Operating Agreement. No member of our Company shall be obligated to restore by way of capital contribution or otherwise any deficits in its capital account (if such deficits occur).

The Delaware Limited Liability Company Act provides that a member of a Delaware limited liability company who receives a distribution from such company and knew at the time of the distribution that the distribution was in violation of the Delaware Limited Liability Company Act shall be liable to the Company for the distribution for three years. Under the Delaware Limited Liability Company Act, a limited liability company may not make a distribution to a member if, after the distribution, all liabilities of the Company, other than liabilities to members on account of their units and liabilities for which the recourse of creditors is limited to specific property of the company, would exceed the fair value of the assets of the Company. The fair value of property subject to liability for which recourse of creditors is limited shall be included in the assets of the Company only to the extent that the fair value of that property exceeds the nonrecourse liability. Under the Delaware Limited Liability Company Act, an assignee who becomes a substituted member of a company is liable for the obligations of his assignor to make contributions to the Company, except the assignee is not obligated for liabilities unknown to him at the time the assignee became a member and that could not be ascertained from the Operating Agreement.

## Voting Rights of the Members

The Members will have no right to participate in the management of the Company and will have limited voting rights. Each Unit has one vote on any matters submitted to the Members for a vote, and the Members only have the right to vote on the following matters:

*Removal or Replacement of the Manager:* The Members, by an affirmative vote of a majority of Units entitled to vote, shall have the right to remove or replace the Manager at any time.

65

23-01243-WLH11    Doc 268    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1069 of 1366    Exhibit 10, Page 1069

*Dissolution of the Company:* The Members holding a majority of units entitled to vote can vote to dissolve the Company with the approval of the Manager. However, the Company can be dissolved as a result of other actions that do not require the vote of the Members, as set forth in the Operating Agreement.

*Delaware Act:* The Members are entitled to vote on any other matter on which the Members are required or entitled to vote pursuant to the Delaware Act

## Exculpation and Indemnification of the Manager and Others

Subject to certain limitations, our Operating Agreement limits the liability of the Manager and its affiliates, any of our members, any person who is our officer and any person who serves at the request of the Manager on behalf of us as an officer, director, partner, member, stockholder or employee of any other person or entity (referred to together as the "Protected Persons" or in the singular as the "Protected Person").

### Exculpation

No Protected Person shall be liable to us or the Manager or any other member of our Company for any action taken or omitted to be taken by it or by other person with respect to us, including any negligent act or failure to act, except in the case of a liability resulting from such Protected Person's own actual fraud, gross negligence, willful misconduct, bad faith, breach of fiduciary duty, reckless disregard of duty or any intentional and material breach of our Operating Agreement or conduct that is subject of a criminal proceeding (where such Protected Person has reasonable cause to believe that such conduct was unlawful). With the prior consent of the Manager, any Protected Person may consult with legal counsel and accountants with respect to our affairs (including interpretations of our Operating Agreement) and shall be fully protected and justified in any action or inaction which is taken or omitted in good faith, in reliance upon and in accordance with the opinion or advice of such counsel or accountants. In determining whether a Protected Person acted with the requisite degree of care, such Protected Person shall be entitled to rely on written or oral reports, opinions, certificates and other statements of the board members, officers, employees, consultants, attorneys, accountants and professional advisors of our Company selected with reasonable care; provided, that no such Protected Person may rely upon such statements if it believed that such statements were materially false.

### Indemnification

To the fullest extent permitted by law, we will indemnify, hold harmless, protect and defend each Protected Person against any losses, claims, damages or liabilities, including reasonable legal fees, costs and expenses incurred in investigating or defending against any such losses, claims, damages or liabilities or in enforcing a Protected Person's right to indemnification under the Operating Agreement, and any amounts expended in respect of settlements of any claims approved by the Manager (collectively referred to herein as the "Liabilities"), to which any Protected Person may become subject:

(i)        by reason of any act or omission or alleged act or omission (even if negligent) arising out of or in connection with the activities of our Company;

(ii)       by reason of the fact that it is or was acting in connection with the activities of our Company in any capacity or that it is or was serving at the request of our Company as a partner, shareholder, member, board member, manager of the Manager, the independent representative, officer, employee, or agent of any Person;

unless, such Liability results from such Protected Person's own actual fraud, gross negligence, willful misconduct, bad faith, breach of fiduciary duty, reckless disregard of duty or intentional and material breach of our Operating Agreement or conduct that is subject of a criminal proceeding (where such Protected Person has reasonable cause to believe that such conduct was unlawful).

66

23-01243-WLH11   Doc 268   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1070 of 1366   Exhibit 10, Page 1070

The indemnification provisions of the Operating Agreement continue to afford protection to each Protected Person regardless of whether such Protected Person remains in the position or capacity pursuant to which such Protected Person became entitled to indemnification under the Operating Agreement and regardless of any subsequent amendment to the Operating Agreement, provided, that, no such amendment shall reduce or restrict the extent to which the indemnification provisions apply to actions taken or omissions made prior to the date of the amendment. Any indemnification provided under our Operating Agreement is limited thereunder to the extent of our assets only. Further, insofar as the foregoing provisions permit indemnification of board members, officers or persons controlling us for liability arising under the Securities Act, we have been informed that, in the opinion of the SEC, this indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

*Reimbursement of Expenses*

The Manager may, on behalf of the Company, reimburse (and/or advance to the extent reasonably required) each Protected Person for reasonable legal or other costs and expenses (as incurred) of such Protected Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Liabilities for which the Protected Person may be indemnified pursuant to our Operating Agreement and for all costs and expenses, including fees, expenses and disbursements of attorneys, reasonably incurred by such Protected Person in enforcing the indemnification provisions of our Operating Agreement; provided, that such Protected Person executes a written undertaking to repay us for such reimbursed or advanced costs and expenses if it is finally judicially determined that such Protected Person is not entitled to the indemnification provided by our Operating Agreement.

## Transfers of Interests

A Member may transfer his, her or its Interests only if certain conditions set forth in the Operating Agreement are satisfied. Except as otherwise consented to by the Manager, the transferee must meet all suitability standards and other requirements applicable to other original subscribers and must consent in writing to be bound by all the terms of the Operating Agreement. In addition, the Company must receive written evidence of the transfer in a form approved by the Manager and the Manager must have consented in writing to the assignment. Provided that the conditions in the Operating Agreement are satisfied, the Manager will not unreasonably withhold its consent to a proposed transfer. In addition, certain of the procedures and approval requirements do not apply to any transfer of Units to an existing Member who is a Member as of the date of such proposed or actual transfer. Prior to the completing a transfer and as a condition thereto, the transferee must pay all reasonable expenses, including accounting and attorneys' fees, incurred by the Company in connection with the transfer.

Any transfer of Units is also subject to a right of first refusal as set forth in the Operating Agreement. A Member who voluntarily desires to transfer its Unit(s) to any person or entity (the "Offering Member"), must send a written notice to the Company and the other Members containing the terms and conditions of the proposed transfer, the proportion of its Unit(s)s that the Offering Member proposes to transfer, the price on a per-Unit basis, which price must be equal for each Unit proposed to be transferred and the proposed date for the closing of the transfer, which must be between 50 and 80 days from the date of the notice. The other Members then have a right of first refusal, for a period of 30 days to elect to purchase all or a portion of the selling Member's Units at the offer price, and if more than one Member elects to purchase the available Unit(s), then they will be apportioned pro-rata amongst the electing Members. In the event that the Members do not elect to purchase 100% of the available offering Member's Unit(s), then the offering Member has the right to transfer the remaining portion of the Unit(s) in accordance with the terms and conditions set forth in the notice. If the terms and conditions of the proposed transfer are modified, then a new notice and compliance with these procedures is required.

Upon any "Involuntary Transfer" of Units, which means any transfer or proposed transfer of Units, (i) upon any foreclosure of any pledge, encumbrance, hypothecation or mortgage which would result in the transfer of one or more Units, (ii) in the case of a Member that is a trust, the termination of the trust, (iii) in the case of a Member that is a partnership, the dissolution and commencement of winding up of the partnership; (iv) in the case of a Member that is an estate, the distribution by the fiduciary of the estate's interest in the Company; and (v) in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter, the Company has the right, for a period of 30 days, to acquire the Units at a purchase price equal to the (i) the capital account of the transferring Member less (ii) any net income attributable to such capital account as of the proposed or contemplated date for the transfer.

Any transfer or attempted transfer of any Unit(s) in contravention of the Operating Agreement will be null and void and of no force or effect.

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1071 of 1366

23-01243-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1072 of 1366

Exhibit 10, Page 1072

**Withdrawal and Redemption Policy**

Except to the extent expressly provided in the Operating Agreement: (i) no Member shall be entitled to the withdrawal or return of any Capital Contribution, except to the extent, if any, that distributions made pursuant to the Operating Agreement or upon dissolution of the Company may be considered as such by law and then only to the extent provided for in the Operating Agreement; (ii) no Member shall have priority over any other Member either as to the return of Capital Contributions or as to profits, losses or distributions; (iii) no interest shall be paid by the Company on Capital Contributions.

**Exit Strategies**

The Manager does not have an exit strategy currently as it intends to operate the Company in perpetuity.

**Termination and Dissolution of the Company, Liquidation and Distribution of Assets**

The Company will continue as a limited liability company until terminated under the Operating Agreement. The Company shall commence its winding up upon the first to occur of the following (the "Dissolution Event"): (a) upon the determination of the Members with the approval of the Manager, at any time; (b) the insolvency or bankruptcy of the Company; (c) the sale of all or substantially all of the Company's assets; or (d) the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act.

The Dissolution Event shall be effective on the day on which such event occurs and immediately thereafter we will commence its winding up during which our affairs shall be wound up in accordance with the terms of the Operating Agreement. The Company's assets (except for assets reserved and pending claims) shall be applied and distributed in the following manner and order of priority: (i) the claims of all creditors of the Company (including Members except to the extent not permitted by law) shall be paid and discharged other than liabilities for which reasonable provision for payment has been made; and (ii) to the Members on a pro rata basis in accordance with the Members' Membership Interests.

**Power of Attorney**

By becoming a party to the Operating Agreement, each Member will appoint the Chief Executive Officer, the Chief Financial Officer and the Secretary of the Company and a liquidating trustee if selected, as his or her attorney-in-fact and empower and authorize them to make, execute, acknowledge, publish and file on behalf of the Member in all necessary or appropriate places, such documents as may be necessary or appropriate to carry out the intent and purposes of the Operating Agreement.

**Amendment of Operating Agreement**

The Operating Agreement may be amended or modified from time to time only by a written instrument adopted by the Manager and executed and agreed to by the Members holding a majority of the Units entitled to vote. However, the Operating Agreement may be amended by the Manager without the consent of the Members: (i) to evidence the joinder of a new Member of the Company; (ii) in connection with the transfer of membership interests by members; (iii) as otherwise required to reflect capital contributions, distributions and similar actions; or (iv) in connection with the creation of a new class of Units.

**Books and Reports**

We are required to keep appropriate books of our business at our principal offices. The books will be maintained for both tax and financial reporting purposes on a basis that permits the preparation of financial statements in accordance with Generally Accepted Accounting Principles in the U.S. ("GAAP"). For financial reporting purposes and federal income tax purposes, our fiscal year and tax year are the calendar year, provided, however, that, upon a termination or dissolution of the Company, the fiscal year will be the period from the January 1 to the date of such termination or dissolution.

**Anti-Takeover Effects under Delaware Law**

We are a limited liability company organized under Delaware law. Some provisions of Delaware law may delay or prevent a transaction that would cause a change in our control. Section 203 of the Delaware General Corporation Law, which restricts certain business combinations with interested members in certain situations, does not apply to limited liability companies unless they elect to utilize it. Our Operating Agreement does not currently elect to have Section 203 of the Delaware General Corporation Law apply to us. In general, this statute prohibits a publicly held Delaware corporation from engaging in a business combination with an interested member for a period of three years after the date of the transaction by which that person became an interested member, unless the business combination is approved in a prescribed manner. For purposes of Section 203, a business combination includes a merger, asset sale or other transaction resulting in a financial benefit to the interested member, and an interested member is a person who, together with affiliates and associates, owns, or within three years prior did own, 15% or more of voting units The Manager may elect to amend the Operating Agreement, subject to majority approval by the members holding the units, at any time to have Section 203 apply to the Company

<div align="center">

**DESCRIPTION OF BUSINESS**

</div>

**Business Overview**

iCap Vault 1, LLC is an emerging growth company which was formed on July 30, 2018. We have commenced only limited operations, primarily focused on organizational matters in connection with this offering. We currently do not have any real properties. We do not lease or own any real property now. We are currently developing our website. We intend on generating revenues in two ways: from net rental income on our properties and from price appreciation of the properties.

We plan to acquire income-producing real estate properties and financing instruments related to real properties in selected metropolitan statistical areas in the U.S. (each, a "Portfolio Investment") with the objective of generating a rate of return from the acquired U.S. real estate that is greater than the costs necessary to purchase, finance and service the U.S. real estate. We are not a real estate investment trust and do not intend to be treated as such. We have provided a detailed plan for the next twelve (12) months throughout our prospectus.

We intend on engaging in the following activities:

- Purchase single, multi-family, and commercial properties that have potential to be or are cash flow positive, meaning properties that have a positive monthly income after all expenses (e.g. mortgages, operating expenses, taxes) and maintenance reserves are paid. In order to determine if a property is "cash flow positive", our Manager will review the total gross rent, income, or receipts from the property and subtract any and all expenses including utilities, taxes, maintenance, and other reserve expenses. If this number is a positive number, the Company will deem the property "cash flow positive." Depending on how positive the cash flow is, coupled with the estimated market value of the property relative to the purchase price and the potential for price appreciation will determine whether management will purchase the property or not on behalf of the Company.

- Purchase additional properties or make other real estate investments that relate to varying property types including office, retail and industrial properties. Such property types may include operating properties and properties under development or construction and may be purchased from affiliates of the Company.

- Invest in any opportunity our Manager sees fit within the confines of the market, marketplace and economy so long as those investments are real estate related and within the investment objectives of the Company, including, but not limited to, real estate-based financial instruments, such as loans or investment funds that invest in real estate. To this end, the Company may invest in financial instruments that bear a relation to real estate, such as preferred equity, common equity, or loan instruments that are secured or unsecured by the properties, investments into real estate operating companies, real estate holding companies, pooled investment funds, some of which may be affiliates of the Company or its Manager or entities with whom the management of the Company has had prior relationships.

<div align="center">69</div>

We have no plans to change our business activities or to combine with another business, and we are not aware of any events or circumstances that might cause our plans to change. Neither management of the Company, nor the sole member of the Company, have any plans or arrangements to enter into a change of control, business combination or similar transaction or to change management.

We are offering the Notes herein on a "best efforts" basis. We expect to use the net proceeds from this Offering to pay for our operating costs, including on-going legal and accounting fees, and to finance costs associated with acquiring primarily multifamily properties and single-family residences, such as broker price opinions, title reports, recording fees, accounting costs and legal fees.

There is an opportunity in the domestic marketplace to create and further, to operate a successful investment strategy that is secured by US real estate. The Manager has recognized this opportunity and has decided to create and go forward with the creation of the Company. The Company intends to provide an opportunity for investors to obtain an above-market rate of return that is secured by US real estate, while having access to their capital at any time.

## Objectives

The Company has definite objectives in order to fulfill its strategy. These include:

- Provide an exceptional user experience for investors, which allows investors to see their investment balances and interest earned at any time; and

- Identify strong properties in the most resilient markets in the US. These markets include locations that have historically performed better than other US markets and include strong economic foundations that rebound well from negative economic pressures.

The Company will place a particular emphasis on purchasing properties that are capable of generating positive cash flows, and in particular single family, multifamily, and commercial properties. The Company seeks to purchase properties for the best possible price and is able to leverage the network of the management team to have these opportunities. A potential investor should note that the above criteria is subject to change according to market conditions.

## Keys to Success

The Company intends to identify primarily single family, multifamily, and commercial properties for investment. These properties will serve as the security for the Notes, and the Manager intends to obtain and grow as much value within these properties as is possible through smart acquisition strategies and cost management. The Manager has extensive experience in evaluating and managing these types of real estate, as well as other types of properties.

The Manager of the Company is staffed with highly educated and experienced professionals that provide personalized and courteous service to their tenants, investors, loan officers, realtors, brokers, financial advisors, and other vendors.

## Investment Strategy

The Company's Portfolio Investments will consist of income-producing properties, including single-family homes, multi-family apartments, townhomes, commercial properties and mixed-use properties. The revenue generated from the Portfolio Investments will be used to pay interest and principal on the Notes and fund its operations. Additionally, the Company's Portfolio Investments will consist of properties that the Company may acquire at a discount from market values, with the intention of selling the property at market prices for a gain. These properties may be held for short-term or long-term periods of time as the Company may determine in its discretion, and may or may not generate revenue during the period of ownership by the Company. The Company's Portfolio Investments may also consist of financial instruments related to real estate, including loans, debentures, unsecured loans backed by guarantees of real estate entities, fund investments, REIT holdings and joint ventures, any of which may involve transactions with affiliates of the Company. See the section titled "Certain Relationships and Related Transactions" herein.

23-01245-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1075 of 1366   Exhibit 10, Page 1075

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1076 of Exhibit 10, Page 1076
1366

Portfolio Investments may be held directly by the Company or held in a standalone wholly owned limited liability company (a "Portfolio SPE") and one or more Portfolio SPEs may be held by a holding company that is wholly owned by the Company, rather than by the Company directly. The rental and interest income allows us to provide a rate of return to investors who acquire the Notes. The Notes will be secured by the membership interests in Vault Holding, LLC. The Company's business plan targets primarily income-producing properties and seeks to acquire the properties debt-free at the subsidiary level, and the Company expects to generate income from the financial instruments that it may hold. Notwithstanding, we may leverage our properties with up to 85% of their value. In all cases, the debt on any given property must be such that it fits with the "Investment Policies of the Company" as discussed in this prospectus. The Portfolio Investments will serve as collateral for one or more credit facilities entered into by the Company or an affiliate of us. The Company has the right to subordinate the obligations and the security interests of the Notes to those of a third party lender, if doing so is required by the lender to secure a loan for the benefit of the Company. Vault Holding, LLC has the right to subordinate the obligations and guaranty of Vault Holding, LLC and the security interests pledged by Vault Holding, LLC to those of a third party lender, if doing so is required by the lender to secure a loan for the benefit of Vault Holding, LLC.

The locations of the properties are determined by selecting metropolitan statistical areas upon consultation with market professionals and in-depth review of economic data. The Company may adjust its investment criteria to accommodate changing market conditions, but will generally seek attractive locations with strong rental income and a likelihood of long-term appreciation of value.

The Company's management has developed proven processes and controls to evaluate possible investment opportunities. The process begins by identifying metropolitan statistical areas within the U.S. ("Markets") with strong economic fundamentals that are likely to result in long-term property appreciation and increased rents. The Markets are selected after review of reports and analysis provided by economics professionals, as well as the Company's internal staff. After reviewing the reports, a committee consisting of key members of the management team (the "Investment Committee") may approve a Market. After a Market has been approved, the Company's acquisition team will search for purchase opportunities for the Company that meet the criteria of the applicable investment policies of the Company.

Every investment opportunity will undergo due diligence performed by the Company's underwriters, who will then present investment opportunities to the Investment Committee for its review and approval. The Investment Committee may delegate investment decision-making authority to sub-teams, provided such investments meet the criteria established by the Investment Committee. The Company will complete due diligence on prospective investments and maintain closing procedures that provide for the safety of the invested funds, generally through a third-party escrow company. The investment process has three major areas of focus: analysis and approval, documentation and closing, and post-closing management. Post-closing management of the real estate portfolio will be done by real estate management companies, who will manage the leasing, cash flows, and maintenance of the properties.

The Company is seeking to invest in a diversified portfolio of income-producing real estate assets and real estate related assets throughout the United States. Initially, the Company intends to target single family, multifamily, and commercial properties, but may acquire other property types that meet its investment objectives. Additionally, we plan to invest in financial instruments that are related to real estate, which will help diversify the Portfolio Investments and provide favorable positions intended to lower risk and increase the security for our investors.

We believe that there is an opportunity to create attractive returns by employing a strategy of investing in a diversified portfolio of such investments which are well-selected, well-managed and disposed of at an optimal time. Our principal targeted assets are investments in properties, and other real estate investments that relate to properties, that have quality construction and desirable locations which can attract quality tenants. These types of investments are, or relate to, properties generally located in key markets within the Unites States. We intend to invest in a geographically diverse portfolio in order to reduce the risk of reliance on a particular market, a particular property and/or a particular tenant.

23-01243-WLH11    Doc 708    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1077 of 1366

Exhibit 10, Page 1077

*Step 1 Property Identification:*

Subject Properties are typically identified by*:*

- The Company's use of its current network databases and internal information;
- Recommendations received from colleagues within the Company's network that have ties to a specific community, and in particular its deep connections within the construction and development industries;
- Donations from the property owner (private individual, city, county or federal entities, or bank);
- Leads generated by local real estate professionals.

*Step 2 Project Underwriting:*

Once the Manager identifies a subject Property, it ensures that it meets stringent underwriting criteria and guidelines. This process is driven by property valuations, market feasibility assessments, time on market analysis, construction and development budgets, and projected project timelines. These metrics are measured by the management team and presented to the Investment Committee for review and approval.

*Step 3 Project Commencement:*

Once the subject Property is successfully approved, the closing team purchases the property and commences the plan for lease-up and property management. The Company then begins receiving rental income, while monitoring market conditions and evaluating exit strategies. In the event cash is needed to honor redemption requests of investors, the Company may temporarily leverage one or more properties to provide such cash.

*Step 4 Sale of Property*

The Manager determines when it is appropriate to sell a property within the Investment Portfolio. In doing so the Manager considers such factors as the property type, location, timing within an economic cycle, and cash needs of the Company. The manager may choose to reposition the Investment Portfolio by selling some properties in order to acquire others.

**Due Diligence & Financing**

When the Company identifies a location or a potential property, it will sign a contract and place an escrow deposit to be held with the designated escrow agent. The Company will complete all its due diligence for the property including: title review, comparative market analysis, valuation, insurance, rental analysis, legal review and other matters. After the due diligence process has been completed, the Investment Committee must determine whether the property is suitable or not.

If the property is not suitable, the Company will cancel the contract and look for the next opportunity. If the property is suitable, the Company will proceed to closing.

**Special Purpose Entities**

When the Company does acquire real estate assets, it intends to hold title to the properties through separate LLCs or through special purpose entities ("SPE's"), which may hold a single property or several similar asset types as determined by the Manager. Each separate LLC or SPE will be a 100% wholly-owned subsidiary of Vault Holding, LLC, which is wholly owned by the Company.

72

23-01124-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1078 of 1366   Exhibit 10, Page 1078

**Leverage**

The Company intends to hold its Portfolio Investments without the use of leverage. However, the Company maintains the right to obtain leverage for the purposes of honoring cash redemptions that are requested by its investors or for other business purposes of the Company. The Company will evaluate the appropriate amount of debt based on market conditions, the needs of the Company, and the demands of the investors. The Company, Vault Holding, LLC, or the SPEs may incur indebtedness provided the total of all indebtedness does not exceed 85% of the value of the Portfolio Investments, as determined by the Manager using its then-current valuation methodology. We may incur indebtedness in the form of bank borrowings, purchase money obligations to the sellers of properties and publicly or privately placed debt instruments or financing from institutional investors or other lenders. The indebtedness may be secured or unsecured. Security may be in the form of mortgages or other interests in our properties; equity interests in entities which own our properties or investments; cash or cash equivalents; securities; letters of credit; guarantees or a security interest in one or more of our other assets.

The Company may use borrowing proceeds to finance acquisitions of new properties, make other real estate investments, make payments to the Manager, honor investor redemption demands, pay for capital improvements, repairs or tenant buildouts, refinance existing indebtedness, pay distributions or provide working capital. Financing for acquisitions and investments may be obtained at the time an asset is acquired or an investment is made or at such later time as the management determines to be appropriate. The form of our indebtedness may be long-term or short-term debt or in the form of a revolving credit facility. Notwithstanding the above, depending on market conditions and other factors, management may choose not to place debt on our portfolio or assets and may choose not to borrow to finance operations or to acquire properties. The Company's financing strategy and policies do not eliminate or reduce the risks inherent in using leverage to purchase properties.

**Geographic Scope**

The Company will not limit itself geographically, however it intends to invest primarily in metropolitan statistical areas within the United States. The Company will search for properties that it may purchase at a discount. The Company believes it can successfully identify such potential target acquisitions based upon the depth and the breadth of the industry experience, contacts and industry knowledge of the Company's Manager. See "Management" for a discussion of the Manager's real estate experience.

**Competition**

We will face competition from other owners, investors and financial institutions that are looking to acquire similar properties and who may implement or are already implementing a similar business plan to ours. Further, we may be at a disadvantage to our competition who may have greater capital resources than we do, specifically cash. It has become increasingly difficult to obtain lending on many properties and those buyers that are able to close without financing and pay the full purchase price of a property in cash may be able to close on more properties or will be able to negotiate better purchasing terms.

**Meeting Noteholder Demand Payment Obligations**

The Company will establish two sources of liquidity to address demand payments: First, the Company will set aside up to 10% of the outstanding principal balances in available cash reserves; provided, however, the Company reserves the right to increase the amount set aside for available cash reserve; second, the Company plans to establish accounts with lending sources (each a "Liquidity Source"), including, but not limited to, lines of credit, pursuant to which funds will be advanced to the Company.

73

One or all of these Liquidity Sources may place a lien on one or more of the Portfolio Investments. If the amount of monies extended by the Liquidity Sources exceeds 85% of the Company's aggregate Portfolio Investment value (the "Lending Ratio"), then the Company will be required to sell certain of its Portfolio Investments at such amount needed to satisfy its demand payment obligations and achieve a Lending Ratio of 85% or less. Except for the security that may be required by the Liquidity Sources, the Company intends to maintain the Portfolio Investments free and clear of liens and encumbrances. The Notes will be subordinate at times to the rights of the Liquidity Sources as well as to other higher-ranking obligations of the Company, including property taxes and management fees.

The Company may, in its discretion, dispose of some or all of its Portfolio Investments to reposition the portfolio or to meet the Company's payment obligations. The Company will maintain cash reserves, which may be used to purchase properties, honor demand payment requests of Noteholders, make tax or other distributions to its member, or cover the costs of the Company's day-to-day operations.

## Members and Management

The sole member of the Company is iCap Vault, LLC, which is owned by iCap Enterprises, Inc., which is a Washington corporation wholly owned by Chris Christensen. The primary officers of iCap Enterprises, Inc. are Chris Christensen, Jim Christensen, and Jonathan Siegel.

The manager of the Company is iCap Vault Management, LLC, a Delaware limited liability company (the "Manager"). The officers of the Manager are the same as the officers of iCap Enterprises, Inc. The management and supervision of the Company is vested exclusively in the Manager (including its duly appointed agents), which has full control over the business and affairs of the Company pursuant to the Company's Amended and Restated Limited Liability Company Operating Agreement (the "Operating Agreement"). The members of the Manager intend to devote a majority of their working hours to the Company, but may be less. Even if we sell all the securities offered, the majority of the proceeds of the offering will be spent for ongoing operational and property acquisition costs. Investors should realize that following this Offering we may be required to raise additional capital to cover the costs associated with our plans of operation.

74

23-01243-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1080 of 1366

Exhibit 10, Page 1080

The following diagram reflects our planned organizational structure following the completion of the Offering:



23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1081 of 1366    Exhibit 10, Page 1081

The Manager may delegate day-to-day management responsibility of the Company to any person, provided that the Manager will retain ultimate responsibility for the management and conduct of the activities of the Company and all decisions relating to the selection and disposition of the Company's investments.

The Company anticipates that the Company will be exempt from the registration requirements of the Investment Company Act of 1940, as amended (the "Investment Company Act"), by reason of the exemption specified in Section 3(c)(5)(C) of the Investment Company Act (excludes from regulation as an "investment company" any entity that is primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate).

**Organizational Strength and Experience**

The members of the senior management team have overseen many pooled investment funds based in real estate and have collectively closed in excess of $8 billion in transactions in the small and mid-cap spaces throughout their careers. iCap Enterprises, Inc. ("iCap") also maintains a network of strategic relationships. The team leverages relationships with sourcing, development, construction, and fund administration constituents to maintain a pipeline of real estate purchase opportunities. Property owners, builders, developers, lenders and brokers are the primary entities for deal sourcing.

75

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1082 of 1366

Exhibit 10, Page 1082

iCap has capacity to expand its team to manage large amounts of capital from the sale of the Notes and to deploy such proceeds towards real estate that meets its investment criteria. iCap has invested significant resources to build the technology and infrastructure needed to manage large amounts of noteholders, capital, and real estate. The number of employees who manage this infrastructure will grow as the capital under management increases.

The Manager and its affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

**Investment Experience**

As a newly formed investment vehicle, the Company has no operating or prior performance history. The information presented in this section represents the limited historical experience of the principals of the Manager and its affiliates. Prospective investors in the Company should not rely on the information below as being indicative of the types of investments the Company may make or of the types of returns the Company's investments may generate. Prospective investors should not assume that the Company will experience returns, if any, comparable to those described herein.

iCap has significant prior experience in investing in single-family, multi-family, light commercial and land development properties. Although this prospectus refers to "iCap" as though it were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. The Company will not acquire an interest in any of iCap's affiliated entities, but may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Manager, and therefore the Company, as it conducts its business.

**Management Fees; Transactions with Related Parties**

In return for the provision of the services by Manager and for the other actions of the Manager under the Operating Agreement, the Company will pay the Manager an annual management fee equal to 1% of the outstanding aggregate principal balances of the Notes ("Management Fee"). The Management Fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the Notes during the applicable quarter.

The Company will pay all expenses related to the operation of the Company, other than the costs of the payroll and benefits of the personnel of the Manager. The costs that will be paid by the Company include the fees and expenses related to any securities offering of the Company, office rent and fees, office common area maintenance charges, phone, fax, and internet access, computer hardware and related supplies, general office supplies, office rental of fax, printers, or scanners and maintenance costs related thereto, consulting, legal, accounting, and professional fees, marketing and travel expenses and any business licenses and registrations required of the Company or the Manager as a result of its management of the Company. The Manager or an affiliate of the Manager may elect to pay any of these Company expenses, in which event the Company will reimburse such party for those out-of-pocket costs. Additionally, in the event any personnel of the Manager or its affiliates perform any professional service for the Company, the Company shall pay the Manager or such affiliate(s) for such services at rates that are no higher than is standard in the market.

The Manager may charge the Company or any of its subsidiaries an underwriting fee to cover the costs of due diligence and underwriting involved in closing a real estate purchase or disposition. The underwriting fee will be paid at the time of purchase or disposition, will be non-refundable, and is expected to generally be less than $10,000 per transaction. Additionally, in the event the Company or the Manager acquires or becomes an affiliate of a real estate brokerage company, the Company may pay customary brokerage fees to such entity for the acquisition or disposition of the Company's assets.

76

25-01125-WLH11 Doc 468 Filed 02/23/24 Entered 02/23/24 19:33:15 Pg 1083 of 1366 Exhibit 10, Page 1083

If the Manager, or an affiliate of the Manager or the Company, guarantees, whether personally or otherwise, a loan, bond or other obligation of the Company, a holding company, or a Portfolio SPE, that guarantor will be entitled to receive from the benefiting entity an annual fee equal to 1% of the total amount of the credit facility, bond amount, or other obligation that is the subject of the guarantee.

Under the Operating Agreement, the Company, in the sole discretion of the Manager, in the event there are Available Funds, may make distributions thereof ("Distributions") to Members on a pro rata basis in accordance with the Members' Membership Interests at any time. "Available Funds" means the Company's cash, including cash from loan proceeds, Note proceeds, and gross cash receipts from operations, which includes the excess of Net Income, less the sum of: (1) payments of principal, interest, charges and fees pertaining to any of the Company's indebtedness; (2) costs and expenses incurred in the conduct of the Company's business; and (3) amounts reserved to meet the reasonable needs of the Company's business. Additionally, the Company may in its discretion make in-kind distributions, which would not be subject to availability of Available Funds. Notwithstanding anything in the Operating Agreement to the contrary, no Member may receive a Distribution to the extent that, after giving effect to the Distribution, all known and currently existing liabilities of the Company outstanding as of the date of such Distribution (other than to a Member on account of its Membership Interests and liabilities for which the recourse of creditors is limited to specific property of the Company) including the principal amounts due to Noteholders, exceed the Fair Value (as defined in the Operating Agreement) of the assets of the Company (except that property that is subject to a liability for which the recourse of the creditors is limited to such property shall be included in the assets of the Company only to the extent the Fair Value of such property exceeds that liability). In the event of a Distribution to a Member that would be deemed violative of applicable law, the applicable Member may be required to return such Distribution to the Company. Notwithstanding the foregoing, within ninety (90) days of the end of each Fiscal Year or such later date at which the Company's accountants have completed their tax preparation for the Company, the Company shall make a Distribution to each holder of Units in an amount necessary to cover any taxes due from such Unit holder to federal, state or local tax authorities, as a result of his/her/its holding Units of the Company ("Tax Distribution"). The Tax Distribution is a required annual payment of the Company, and if the Company has insufficient cash to make the Tax Distribution when due, the Manager is authorized to borrow, including against the assets of the Company or those of its subsidiaries, or liquidate certain assets of the Company or those of its subsidiaries, to meet such obligations. The Manager may engage one or more affiliates or third parties to provide the Manager's services. The Manager shall, to the extent it determines that it would be advisable in connection with its management of the Company, arrange for and coordinate the services of other professionals, experts and consultants to provide any or all of the management services, in which case, the costs and expenses of such third parties for providing such services shall be borne by the Manager other than as set forth in the Operating Agreement. The Manager will not charge the Company any additional fees with respect to these outsourced services, but the Manager will be entitled to reimbursement for these third-party costs incurred in connection with such Services.

Edge Construction, LLC, an affiliated general contractor, is expected to provide general contracting services, including those related to new construction of and rehabilitation of real estate projects, and is expected to receive a fee sufficient to cover the costs of a project plus 10%. Costs include all project costs, as well as the costs of management of a project, including costs of project management, supervision, materials and labor, each of which will be billed at hourly rates, which are currently between $30 and $180 per hour.

iCap Enterprises, Inc. is expected to provide consulting services, as well as accounting and administrative support at hourly rates which are currently between $30 and $200 per hour.

**Public Notes Offering**

We are offering (the "Offering") up to $500,000,000 aggregate principal amount of our Notes, on a "self-underwritten" basis, which means our officers and directors will attempt to sell the Notes (including up to $5,000,000 aggregate principal amount of the Notes to existing noteholders in exchange for tendered Private Placement Notes, and cancellation of those Private Placement Notes by us, and the balance of aggregate principal amount of the Notes offered hereby to new and existing investors).

77

23-01243-WLH11   Doc 768   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1084 of 1366
Exhibit 10, Page 1084
41/192

The Notes will be issued by us under an indenture, among iCap Vault 1, LLC, Vault Holding, LLC, and American Stock Transfer & Trust Company, LLC, as trustee (the "trustee"), referred to herein as the "indenture."

The Notes will be general senior secured obligations of iCap Vault 1, LLC. The Notes will bear interest at a floating rate per annum that is determined from time to time by the Company in its sole discretion. Interest payable on the Notes will accrue based on a 365-day year, compounds daily and will be credited to your Notes on the last business day of each calendar month and will be reinvested. The interest rate may be, but is not required to be, different for certain Note balances or ranges of Note balances.

## Collateral and Guarantee

The Notes will be secured by a pledge of the membership interests in Vault Holding, LLC, our direct and wholly-owned subsidiary, that holds interests in real estate, through wholly owned subsidiaries (Portfolio SPEs), and real estate-based financial instruments. The assets of the Portfolio SPEs will consist primarily of real estate and all other cash and investments they hold in various accounts. The Notes' security interest in the collateral will be subordinated to the security interest in favor of lenders of credit facilities.

The payment of principal and interest on the Notes are fully and unconditionally guaranteed by our wholly owned direct subsidiary, Vault Holding, LLC, but otherwise not guaranteed by any other person or entity. Therefore, the Notes will be structurally subordinated to indebtedness or other liabilities of special purpose entity subsidiaries (as our special purpose entity subsidiaries are not guaranteeing the notes). The indenture does not restrict the ability of our subsidiaries to incur indebtedness.

## Repurchase at Option of Noteholder

You may redeem all or any part of your Notes at any time by following the procedures described herein. See "Description of the Notes – How to Redeem." Interest on redeemed investments will accrue to, but not including, the redemption date. We may also offer other methods of redemption from time to time, at our option. There is no minimum amount which you may redeem.

## Optional Redemption by Company

We may redeem, in our discretion, any particular Note that maintains a principal amount of less than $25 for a period consisting of the three consecutive months immediately following the month in which the principal amount of the Note is below $25 as of the last day of the month. The first month your Note is below the required minimum, you will be sent a notice informing you that your Note will be redeemed at the end of the third month. Unless you have brought your Note above the required minimum, your Note will automatically be redeemed at the end of the third month. We may redeem, in our discretion, the portion of a particular Note that exceeds $50,000,000. In addition, we may also redeem, at any time at our option, the Notes of any investor who is not or is no longer eligible to invest in the Notes as we determine in our sole judgment and discretion. Further, we may redeem the entire amount of, or any portion of, any of the outstanding Notes in our sole judgment and discretion. Any such partial redemption of outstanding Notes may be effected by lot or pro rata or by any other method that is deemed fair and appropriate by us. See "Description of the Notes – Optional Redemption by the Company".

## Events of Default

An event of default is generally defined by the Indenture to mean any of the following:

- the Company's failure to pay principal or interest on any Note upon a request for redemption therefore, which failure continues for 30 days;

- the Company's failure to comply with any of its covenants or obligations contained in the Indenture or the Notes and, after notice thereof from the Trustee or holders of at least 50% in principal amount of the Notes, such failure continues for 90 days;

- the occurrence of certain events of bankruptcy, insolvency or reorganization.

23-01224-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1085 of 1366

Exhibit 10, Page 1085

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1086 of 1366
Exhibit 10, Page 1086

The Indenture provides that the Trustee will, within 90 days after the occurrence of any default that is continuing and known to the Trustee, give the registered holders of Notes notice thereof, but, except in case of a default in the payment of principal or interest, the Trustee may withhold such notice if and for so long as the Trustee in good faith determines that withholding such notice is in the interest of those holders.

## Private Placements during 2018 – Notes

During the period from July 30, 2018 (inception) through December 31, 2018, we issued $370,869 aggregate principal amount of 2% Senior Secured Notes ("2018 Private Placement Notes") to accredited investors in a private placement under Rule 506(c) of Regulation D of the Securities Act.

## Private Placements during the Nine Months Ended September 30, 2019 – Notes

During the period from January 1, 2019 through September 30, 2019, we issued $13,145,892 aggregate principal amount of 2% Senior Secured Notes ("2019 Private Placement Notes") to accredited investors in a private placement under Rule 506(c) of Regulation D of the Securities Act.

## Recent Developments

Prior to the effectiveness of this Offering by the SEC, we are currently conducting a private placement in a transaction that is exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") pursuant to Regulation 506(c) and Regulation S of 2% Senior Secured Notes in which we have issued $1,407,964 during the period from October 1, 2019 through the filing date ("Current Private Placement Notes"; together with 2018 Private Placement Notes and 2019 Private Placement Notes, collectively referred to as "Private Placement Notes").

As of February 14, 2020, we have repaid the noteholders of the Private Placement Notes $14,277,260 of the principal and accrued interest of Private Placement Notes. As of February 14, 2020, we estimate the value of the aggregate principal amount and accrued interest estimated to be $700,710 of the outstanding Private Placement Notes held by our noteholders.

The Notes of this Offering may be acquired by existing noteholders in exchange for tendered Private Placement Notes and cancellation of those Private Placement Notes by us. We anticipate the aggregate principal amount of all Private Placement Notes, together with accrued interest thereon, to be no more than $5,000,000, including (i) the existing principal and accrued interest of $700,710 of outstanding Private Placement Notes, (ii) the prospective accrued interest of outstanding Private Placement Notes between the filing date and the offering, and (iii) the principal and accrued interest of prospective issuances by us of Private Placement notes between the filing date and the offering. If a holder does tender a Private Placement Note as payment for such Notes in the Offering, each $1.00 of principal or interest so tendered will equal $1.00 of purchase price of the Notes; the Notes will not be issued at discount (original issue discount) to such holders.

## Employees

As of February 14, 2020, we had no full-time employees and no part-time employees. All of our day-to-day operations are administered by our Manager.

<div align="center">

**DESCRIPTION OF PROPERTY**

</div>

Our corporate office located at 3535 Factoria Blvd. SE, Suite 500, Bellevue, WA 98006. iCap Enterprises, Inc., our affiliate, leases this location, which is approximately 7,000 rentable square feet of office space, from an unaffiliated third party. This lease expires on July 2026. Terms of the office lease provide for a base rent payment of $23,820 per month and a share of the buildings operating expenses such as taxes and maintenance estimated at $1,050 per month. We believe this facility is adequate for our current and near-term future needs.

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1088 of
1366

Exhibit 10, Page 1088

85/192

# LEGAL PROCEEDINGS

We are not involved in any pending legal proceeding nor are we aware of any pending or threatened litigation against us.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following discussion of our financial condition and results of operations should be read in conjunction with the consolidated financial statements and the notes to those financial statements that are included elsewhere in this prospectus. Our discussion includes forward-looking statements based upon current expectations that involve risks and uncertainties, such as our plans, objectives, expectations and intentions. Actual results and the timing of events could differ materially from those anticipated in these forward-looking statements as a result of a number of factors, including those set forth under the Risk Factors, Cautionary Statement Regarding Forward-Looking Statements and Business sections in this prospectus. We use words such as "anticipate," "estimate," "plan," "project," "continuing," "ongoing," "expect," "believe," "intend," "may," "will," "should," "could," and similar expressions to identify forward-looking statements.

## OVERVIEW

iCap Vault 1, LLC was formed as a Delaware limited liability company on July 30, 2018 to acquire through subsidiaries income-producing real estate and financial instruments related to real estate in selected metropolitan statistical areas in the U.S. (each, a "Portfolio Investment") with the objective of generating a rate of return from the Portfolio Investments that is greater than the costs necessary to purchase, finance and service them. The Company does not currently own any Portfolio Investments.

We have no plans to change our business activities or to combine with another business, and we are not aware of any events or circumstances that might cause our plans to change. Neither management of the Company, nor the sole member of the Company, have any plans or arrangements to enter into a change of control, business combination or similar transaction or to change management.

Portfolio Investments may be held directly by the Company or held in a standalone wholly owned limited liability company (a "Portfolio SPE") and one or more Portfolio SPEs may be held by a holding company that is wholly owned by the Company, rather than by the Company directly. The rental and interest income allows us to provide a rate of return to investors who acquire the Notes. The Notes will be secured by the membership interests in Vault Holding, LLC. The Company's business plan targets primarily income-producing properties and seeks to acquire the properties debt-free, and the Company expects to generate income from the financial instruments that it may hold. The Portfolio Investments will serve as collateral for one or more credit facilities entered into by the Company or an affiliate of us.

The locations of the properties are determined by selecting metropolitan statistical areas upon consultation with market professionals and in-depth review of economic data. The Company may adjust its investment criteria to accommodate changing market conditions, but will generally seek Portfolio Investments in attractive locations with strong rental income and a likelihood of long-term appreciation of value.

For the period from July 30, 2018 (inception) through December 31, 2018, we generated no revenues, reported a net loss of $289,877, and cash flow used in operating activities of $1. For the nine months ended September 30, 2019, we generated no revenues, reported a net loss of $172,513, and had negative cash flow from operating activities of $37,935. As of the nine months ended September 30, 2019, we had an accumulated deficit of approximately $462,390. Our auditors have raised substantial doubt regarding our ability to continue as a going concern in the independent auditors' report to the financial statements included in this prospectus as a result of our accumulated deficit and no source of revenue sufficient to cover our cost of operation. See "Risk Factors—We have a history of operating losses and our auditors have indicated that there is a substantial doubt about our ability to continue as a going concern."

80

23-01245-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1089 of 1366                    Exhibit 10, Page 1089

Since our inception, we have not generated any revenues and have incurred a net loss of $462,390 through September 30, 2019. We anticipate the commencement of generating revenues in the next twelve months. The capital raised in this offering has been budgeted to cover the costs associated with beginning to operate our company, marketing expense, and acquisition related costs. We intend on using the majority of the proceeds from this Offering for the acquisition of properties and financial instruments. However, closing and other acquisition related costs such as title insurance, professional fees and taxes will likely require cash. We do not have the ability to quantify any of the expenses as they will all depend on size of deal, price, and place versus procuring new financing, due diligence performed (such as appraisal, environmental, property condition reports), legal and accounting, etc. There is no way to predict or otherwise detail the expenses.

**Recent Financings**

*Private Placements during 2018 – Notes*

During the period from July 30, 2018 (inception) through December 31, 2018, we issued $370,869 aggregate principal amount of 2% Senior Secured Notes ("2018 Private Placement Notes") to accredited investors in a private placement under Rule 506(c) of Regulation D of the Securities Act.

*Private Placements during the Nine Months Ended September 30, 2019 – Notes*

During the period from January 1, 2019 through September 30, 2019, we issued $13,145,892 aggregate principal amount of 2% Senior Secured Notes ("2019 Private Placement Notes") to accredited investors in a private placement under Rule 506(c) of Regulation D of the Securities Act.

*Recent Developments*

Prior to the effectiveness of this Offering by the SEC, we are currently conducting a private placement in a transaction that is exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") pursuant to Regulation 506(c) and Regulation S of 2% Senior Secured Notes in which we have issued $1,407,964 during the period from October 1, 2019 through the filing date ("Current Private Placement Notes"; together with 2018 Private Placement Notes and 2019 Private Placement Notes, collectively referred to as "Private Placement Notes").

As of February 14, 2020, we have repaid the noteholders of the Private Placement Notes $14,277,260 of the principal and accrued interest of Private Placement Notes. As of February 14, 2020, we estimate the value of the aggregate principal amount and accrued interest estimated to be $700,710 of the outstanding Private Placement Notes held by our noteholders.

The Notes of this Offering may be acquired by existing noteholders in exchange for tendered Private Placement Notes and cancellation of those Private Placement Notes by us. We anticipate the aggregate principal amount of all Private Placement Notes, together with accrued interest thereon, to be no more than $5,000,000, including (i) the existing principal and accrued interest of $700,710 of outstanding Private Placement Notes, (ii) the prospective accrued interest of outstanding Private Placement Notes between the filing date and the offering, and (iii) the principal and accrued interest of prospective issuances by us of Private Placement notes between the filing date and the offering. If a holder does tender a Private Placement Note as payment for such Notes in the Offering, each $1.00 of principal or interest so tendered will equal $1.00 of purchase price of the Notes; the Notes will not be issued at discount (original issue discount) to such holders.

**Plan of Operations**

We believe we will need at least $500,000 to provide working capital and $500,000 for professional fees for the next 12 months. We will utilize from the initial $500,000 raised in the offering for such required amounts for working capital and professional fees for the next 12 months.

81

23-01273 WLH11  Doc 268  Filed 02/23/24  Entered 02/23/24 19:33:15  Pg 1090 of 1366

Exhibit 10, Page 1090

We hope to reach the following milestones in the next 12 months:

- May 2020 – Anticipated effectiveness of Form S-11
- June 2020 - Begin fundraising.
- August 2020 - Search for properties to purchase.
- September 2020 - Purchase first property.

Acquisition will depend highly on our funds, the availability of those funds, availability of assets that meet our investment criteria and the size of the assets to be acquired. There can be no assurance that we will be able to successfully complete such acquisition.

**RESULTS OF OPERATIONS**

***Results of Operations for the Three Months Ended September 30, 2019 Compared to the Period from July 30, 2018 (inception) to September 30, 2018***

**Operating Expenses**

Operating expenses for the three months Ended September 30, 2019 were $77,374 as compared to $242,172 for the period from July 30, 2018 (inception) to September 30, 2018. The decrease in expenses is primarily due to reduced general and administrative expenses. These expenses were higher in the earlier period due to significant start-up costs.

**Other Expense**

Interest expense increased to $31,536 for the three months ended September 30, 2019 as compared to $2 for the period from July 30, 2018 (inception) to September 30, 2018. At September 30, 2019 there were $2,229,897 of demand notes payable as compared to $1,200 in notes at September 30,2018.

**Net Loss**

Net loss for the three months ended September 30, 2019 was $108,910 compared to a net loss of $242,174 for the period from July 30, 2018 (inception) to September 30, 2018. The decrease in net loss was due to reduced start-up costs during the three months ended September 30, 2019 as compared to the period from July 30, 2018 (inception) to September 30, 2018.

***Results of Operations for the Nine Months Ended September 30, 2019 Compared to the Period from July 30, 2018 (inception) to September 30, 2018***

**Operating Expenses**

Operating expenses for the nine months ended September 30, 2019 were $130,550 as compared to $242,172 for the period from July 30, 2018 (inception) to September 30, 2018. The decrease in expenses is primarily due to reduced general and administrative expenses. These expenses were higher in the earlier period due to significant start-up costs.

**Other Expense**

Interest expense increased to $41,963 for the nine months ended September 30, 2019 as compared to $2 for the period from July 30, 2018 (inception) to September 30, 2018. At September 30, 2019 there were $2,229,897 of demand notes payable as compared to $1,200 in notes at September 30,2018.

**Net Loss**

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1091 of 1366

Exhibit 10, Page 1091

Net loss for the nine months ended September 30, 2019 was $172,513 compared to a net loss of $242,174 for the period from July 30, 2018 (inception) to September 30, 2018. The decrease in net loss was due to reduced start-up costs during the nine months ended September 30, 2019 as compared to the period from July 30, 2018 (inception) to September 30, 2018.

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1092 of 1366

Exhibit 10, Page 1092

*Results of Operations for the Period from July 30, 2018 (inception) to December 31, 2018*

**Operating Expenses**

Operating expenses for the period from July 30, 2018 (inception) to December 31, 2018 were $288,944. These costs are primarily related to the startup of the Company.

**Other Expense**

Interest expenses were $933 for the period from July 30, 2018 (inception) to December 31, 2018. At December 31, 2018 the Company had notes payable of $330,802.

**Net Loss**

Net loss for the period from July 30, 2018 (inception) to December 31, 2018 was $289,877. This loss was primarily due to start-up costs.

**LIQUIDITY AND CAPITAL RESOURCES**

*Nine Months Ended September 30, 2019 and September 30, 2018*

The following table sets forth a summary of our net cash flows for the periods indicated:

| | For the Nine Months Ended September 30, 2019 | | For the Period from July 30, 2018 (inception) to September 30, 2018 | |
|---|---|---|---|---|
| Net cash flows used in total operating activities | $ | (37,935) | $ | - |
| Net cash flows from total investing activities | | - | | |
| Net cash flows from total financing activities | $ | 1,857,132 | $ | 1,200 |

The Company used cash in operating activities of $37,935 for nine months ended September 30, 2019 as compared to no cashed used in the period from July 30, 2018 (inception) to September 30, 2018. The increased use of cash is primarily the result of a net operating loss of $172,513 without having all these expenses paid by affiliated companies. Interest accrued on private placement secured demand notes of $41,963 was reinvested by holders into private placement secured demand notes. For the period from the period from July 30, 2018 (inception) to September 30, 2018, operating expenses were paid by affiliated companies.

During the nine months ended September 30, 2019, the Company received $13,145,892 of proceeds from the issuance of private placement secured demand notes and repaid $11,288,760 of principal on notes payable. During the period from July 30, 2018 (inception) to September 30, 2018, the Company received $1,200 of proceeds from the issuance of private placement secured demand notes.

| | For the Period from July 30, 2018 (inception) to December 31, 2018 | |
|---|---|---|
| Net cash flows used in total operating activities | $ | (1) |
| Net cash flows from total investing activities | | - |

| Net cash flows from total financing activities | $ | 329,869 |

The Company used cash in operating activities of $1 for the period from July 30, 2018 (inception) to December 31, 2018. The Company's operating expenses were primarily paid by affiliated companies. Interest accrued on private placement secured demand notes of $933 was reinvested into private placement secured demand notes.

During the period from July 30, 2018 (inception) to December 31, 2018, the Company received $370,869 in proceeds from the issuance of private placement secured demand notes. In the same period, the Company repaid $41,000 of private placement secured demand notes.

<div align="center">83</div>

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1094 of 1366
Exhibit 10, Page 1094

## Liquidity and Going Concern

The consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, which contemplate continuation of the Company as a going concern. The Company has reported losses and has not generated positive net cash flows from operations. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Our auditors have raised substantial doubt regarding our ability to continue as a going concern in the independent auditors' report to the financial statements included in this prospectus as a result of our accumulated deficit and no source of revenue sufficient to cover our cost of operations. If the Company is not successful in raising sufficient capital, or if it does not have access to sufficient credit from outside parties or related parties, it may have to delay or reduce expenses, or curtail operations, due to the fact that its current cash and capital resources are not sufficient to meet its needs for the 12 months following the date of this filing. The accompanying consolidated financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that could result should the Company not continue as a going concern.

## Assets

At September 30, 2019 and December 31, 2018, we had total assets of $2,149,065 and $329,868, respectively. Assets consist solely of the cash accounts held by the Company, inclusive of $222,989 and $33,080 of restricted cash on September 30, 2019 and December 31, 2018, respectively.

## Liabilities

At September 30, 2019 and December 31, 2018, we had total liabilities of $2,611,455 and $619,745, respectively. The increase was primarily due to the issuance of notes payable in 2019, an increase in related party payables, and offset by the payment of accrued expenses.

## Off-Balance Sheet Arrangements

As of February 14, 2020, we did not have any off-balance sheet arrangements that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources that are material to investors. The term "off-balance sheet arrangement" generally means any transaction, agreement or other contractual arrangement to which an entity unconsolidated with us is a party, under which we have any obligation arising under a guarantee contract, derivative instrument or variable interest or a retained or contingent interest in assets transferred to such entity or similar arrangement that serves as credit, liquidity or market risk support for such assets.

## CRITICAL ACCOUNTING POLICIES

*Use of Estimates:*

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

84

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1095 of 1366

*Income Taxes:*

As a limited liability company, the Company's taxable income or loss is allocated to the member. Therefore, no provision or liability for income taxes has been included in the condensed consolidated financial statements.

Holding is a subsidiary, and as a single member LLC is considered a disregarded entity for income tax purposes.

The Company's policy, if it had any uncertain tax positions, would be to recognize accrued interest and penalties related to uncertain tax positions as interest expense and other expense, respectively.

Management evaluated the Company's tax positions and concluded the Company had no uncertain tax positions that would require disclosure. Since its formation, the Company is subject to income tax examinations by the U.S. federal, state or local tax authorities.

*Organizational and Offering Costs:*

Costs incurred in the private placement offering and the organization of the Limited Liability Company (collectively "Offering Costs") are expensed as incurred.

*Notes Payable and Related Costs:*

The Company has been conducting a private placement of up to $500,000,000 of senior secured notes ("private placement secured demand notes") to fund its investment and operational activities, which private placement will be terminated by the Company upon the date of effectiveness of a registration statement of the Company registering variable denomination floating rate demand notes. Notes payable are recorded at the principal amount of the notes sold, plus reinvested interest.

Interest expense is expensed in the period incurred.

**RECENT ACCOUNTING PRONOUNCEMENTS**

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2014-09, Revenue from Contracts with Customers. ASU 2014-09 provides a single comprehensive model for entities to use in accounting for revenue arising from contracts with customers and supersedes most current revenue recognition guidance, including industry-specific guidance. ASU 2014-09 will require an entity to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In August 2015, the FASB issued ASU 2015-14, which deferred the effective date of ASU 2014-09 for one year, which would make the guidance effective for the Company's first fiscal year beginning after December 15, 2018. The Company has elected to adopt this standard under the modified retrospective approach, effective at July 30, 2018 (inception), which did not have a significant impact on the consolidated financial statements.

In November 2016, the FASB issued Accounting Standards Update 2016-18, Statement of Cash Flows: Restricted Cash, which clarifies the presentation requirements of restricted cash within the statement of cash flows. The changes in restricted cash and restricted cash equivalents during the period should be included in the beginning and ending cash and cash equivalents balance reconciliation on the statement of cash flows. When cash, cash equivalents, restricted cash or restricted cash equivalents are presented in more than one-line item within the statement of financial position, an entity shall calculate a total cash amount in a narrative or tabular format that agrees to the amount shown on the statement of cash flows. Details on the nature and amounts of restricted cash should also be disclosed. This standard is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. The Company adopted this standard at Inception.

23-01224-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1096 of 1366
Exhibit 10, Page 1096
93/192

## MANAGEMENT

**Our Manager**

Pursuant to the terms and conditions of the Amended and Restated Limited Liability Company Operating Agreement ("Operating Agreement"), all decisions regarding the management and operations of the Company will be made by the Manager, provided, however, that the Manager may designate any officers of the Company to have control or authority with respect to one or more decisions or areas of operation, and may include such limitations or restrictions on such power as they may deem reasonable. We were formed by iCap Vault, LLC which adopted our Operating Agreement which elected our Manager. The Manager and its affiliates have the exclusive right and power to manage and operate our Company.

The following summarizes some of the key provisions of the Operating Agreement. This summary is qualified in its entirety by the Operating Agreement itself, which is included as Exhibit 3.3 of the registration statement of which this prospectus is a part.

**Operating Agreement**

*Services to be Provided*

Pursuant to the terms and conditions of the Operating Agreement, the Manager will provide us, through itself directly or through its affiliates, with the following services to the Company:

(i)    entity-level services for the Company, including:

    (A)    evaluation and acquisitions of investments;
    (B)    oversight and management of banking activities;
    (C)    management of preparation and filing of Securities and Exchange Commission and other corporate filings;
    (D)    financial, accounting and bookkeeping services, including retention of an auditor for the Company;
    (E)    record keeping, shareholder or Noteholder registrar and regulatory compliance, including Indenture Trustee, Collateral Agent, and Paying Agent services;
    (F)    tax reporting services;
    (G)    bill payment;
    (H)    selecting and negotiating insurance coverage for the Company and its subsidiaries, which may include operational errors and omissions coverage and managers' and officers' coverage;
    (I)    maintain the Company's membership and Unit ledger and coordinating activities of the Company's related parties;
    (J)    software and technology services; and

(ii)    transactional, extraordinary or non-routine services, including:

    (A)    legal and professional transactional services;
    (B)    negotiation of terms of potential acquisition and sale of assets and the execution of documents related thereto;
    (C)    obtaining appraisals and statements of condition in connection with a sale transaction relating to the assets of the Company;
    (D)    other transaction-related services, including management of costs, payments and expenditures relating to the assets of the Company or the Company;
    (E)    administrative services in connection with liquidation or winding up of the Company;
    (F)    managing litigation, judicial proceedings or arbitration, including the defense and or settlement of any claims;
    (G)    other non-routine or extraordinary services; and

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1097 of 1366    Exhibit 10, Page 1097

(H)        additional services as contemplated in the Operating Agreement

23-01243-WLH11    Doc 408    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1098 of 1366

Exhibit 10, Page 1098

*Third Parties and Exclusivity*

Pursuant to the Operating Agreement, the Manager may to the extent it determines that it would be advisable, arrange for and coordinate the services of other professionals, experts and consultants to provide any or all of the services under the Operating Agreement in which case, the costs and expenses of such third parties for providing such services shall be borne by the Company with it being understood that the Manager shall not charge any fees in addition thereto with respect to such outsourced services but the Manager shall be entitled to reimbursement for third party costs incurred in connection with such services.

The obligations of the Manager to us are not exclusive. The Manager may, in its discretion, render the same or similar services as rendered to us to any person or persons whose business may be in direct or indirect competition with us.

*Compensation of the Manager and Reimbursement*

In return for the provision of the services by Manager and for the other actions of the Manager under the Operating Agreement, the Company will pay the Manager an annual management fee equal to 1% of the outstanding aggregate principal balances of the Notes and interest accrued thereon ("Management Fee"). The Management Fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the Notes during the applicable quarter.

The Company will pay all expenses related to the operation of the Company, other than the costs of the payroll and benefits of the personnel of the Manager. The costs that will be paid by the Company include the fees and expenses related to any securities offering of the Company, office rent and fees, office common area maintenance charges, phone, fax, and internet access, computer hardware and related supplies, general office supplies, office rental of fax, printers, or scanners and maintenance costs related thereto, consulting, legal, accounting, and professional fees, marketing and travel expenses and any business licenses and registrations required of the Company or the Manager as a result of its management of the Company. The Manager or an affiliate of the Manager may elect to pay any of these Company expenses, in which event the Company will reimburse such party for those out-of-pocket costs. Additionally, in the event any personnel of the Manager or its affiliates perform any professional service for the Company, the Company shall pay the Manager or such affiliate(s) for such services at rates that are no higher than is standard in the market.

The Manager may charge the Company or any of its subsidiaries an underwriting fee to cover the costs of due diligence and underwriting involved in closing a real estate purchase or disposition. The underwriting fee will be paid at the time of purchase or disposition, will be non-refundable, and is expected to generally be less than $10,000 per transaction. Additionally, in the event the Company or the Manager acquires or becomes an affiliate of a real estate brokerage company, the Company may pay customary brokerage fees to such entity for the acquisition or disposition of the Company's assets.

If the Manager, or an affiliate of the Manager or the Company, guarantees, whether personally or otherwise, a loan, bond or other obligation, including an indemnification agreement, of the Company or any of its subsidiaries, such guarantor will be entitled to receive from the benefiting entity an annual fee equal to 1% of the total amount of the credit facility, bond amount, or other obligation subject to the guarantee.

23-01243-WLH11    Doc 263    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1099 of 1366    Exhibit 10, Page 1099

## Appointment of Officers

At any time, the Manager may appoint and replace individuals as officers or agents of the Company ("Officers") with such titles as the Manager may elect to act on behalf of the Company with such power and authority as the Manager may delegate to such persons. Any number of offices may be held by the same person. Officers shall hold their offices for such terms as shall be determined from time to time by the Manager. Unless otherwise determined and set forth by the Manager and subject to the policies and procedures of the Company applicable to Officers and employees, each Officer shall have the powers, rights and obligations as are customarily held and exercised by other persons in similar positions in limited liability companies organized under the Delaware Act. The Officers shall hold office until their successors are chosen and qualified. Any Officer may be removed at any time, with or without cause, by the Manager. The Officers may also be officers or employees of other Persons. The Officers, to the extent of their powers set forth in the Operating Agreement or otherwise vested in them by action of the Manager not inconsistent with the Operating Agreement, are agents of the Company for the purpose of the Company's business and the actions of the Officers taken in accordance with such powers shall bind the Company.

## Indemnification

To the fullest extent permitted by law, we will indemnify, hold harmless, protect and defend each Protected Person (as defined in the Operating Agreement) against any losses, claims, damages or liabilities, including reasonable legal fees, costs and expenses incurred in investigating or defending against any such losses, claims, damages or liabilities or in enforcing a Protected Person's right to indemnification under the Operating Agreement, and any amounts expended in respect of settlements of any claims approved by the Manager (collectively referred to herein as the "Liabilities"), to which any Protected Person may become subject:

(i)     by reason of any act or omission or alleged act or omission (even if negligent) arising out of or in connection with the activities of our Company;

(ii)    by reason of the fact that it is or was acting in connection with the activities of our Company in any capacity or that it is or was serving at the request of our Company as a partner, shareholder, member, board member, manager of the Manager, the independent representative, officer, employee, or agent of any Person;

unless, such Liability results from such Protected Person's own actual fraud, gross negligence, willful misconduct, bad faith, breach of fiduciary duty, reckless disregard of duty or intentional and material breach of our Operating Agreement or conduct that is subject of a criminal proceeding (where such Protected Person has reasonable cause to believe that such conduct was unlawful).

## Amendment of Operating Agreement

The Operating Agreement may be amended or modified from time to time only by a written instrument adopted by the Manager and executed and agreed to by the Members holding a majority of the units entitled to vote. The Operating Agreement may be amended by the Managers without the consent of the Members: (i) to evidence the joinder of a new Member of the Company; (ii) in connection with the transfer of membership interests by members; (iii) as otherwise required to reflect capital contributions, distributions and similar actions.

## Executive Officers and Members of the Board of Managers

As of the date of this prospectus, the executive officers and members of the Board of Managers of the Manager and their positions and offices are as follows:

| Name | Age | Position |
|------|-----|----------|
| Chris Christensen | 44 | Chief Executive Officer of iCap Vault 1, LLC and Manager; Board Member of Manager |
| Jim Christensen | 35 | Chief Operating Officer of iCap Vault I, LLC and Manager; Board Member of Manager |

23-01243  WLH-11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1100 of 1366          Exhibit 10, Page 1100

| Jonathan Siegel | 50 | Chief Financial Officer of iCap Vault I, LLC and Manager; Board Member of Manager |

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1101 of 1366

Exhibit 10, Page 1101

***Chris Christensen.*** Mr. Christensen has served as the Chief Executive Officer of the Company since July 30, 2018 and Chief Executive Officer and Board Member of the Manager since November, 2018. Since 2011, he has served as the Chief Executive Officer of iCap Enterprises, Inc. From August 2007 to August 2011, Mr. Christensen served as President of Altius Development, Inc., the predecessor to iCap Enterprises, Inc. Mr. Christensen brings knowledge and experience in the legal, finance and real estate industries, where he previously served as a licensed attorney. His experience in financial structuring, legal compliance, and fund management will help the Company achieve its goals of providing a reliable investment experience for its investors. He is a graduate of the University of Utah with a B.S. in Economics in May 2001, Seattle University School of Law with a J.D. in May 2004, and Seattle University Albers School of Business and Economics with a Master of International Business degree in November 2005. Mr. Christensen was joined as a party to a civil lawsuit initiated in July 2014 claiming Breach of Contract, in which he won on all claims against him, the claims were dismissed, and he was awarded attorney's fees. Chris Christensen is the brother of Jim Christensen. Mr. Christensen does not hold, and has not previously held, any directorships in any reporting companies.

***Jim Christensen.*** Mr. Christensen has served as the Chief Operating Officer of the Company since July 30, 2018 and Chief Operating Officer and Board Member of the Manager since November, 2018. Since 2011, Mr. Christensen has also served as the Chief Operating Officer of iCap Enterprises, Inc. He assists the Chief Executive Officer with the day-to-day operations of iCap Enterprises, Inc. and its investment funds, including overseeing investment underwriting, project and construction management, project financing, and processes related to acquisition and disposition of Portfolio Investments. Prior to the formation of the prior funds, Mr. Christensen managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington State for iCap Enterprises, Inc. He has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Mr. Christensen holds a Master of Business Administration degree and a Bachelor of Arts degree in Economics from the University of Washington. Jim Christensen is the brother of Chris Christensen. Mr. Christensen does not hold, and has not previously held, any directorships in any reporting companies.

***Jonathan Siegel.*** Mr. Siegel has served as the Chief Financial Officer of the Company and Chief Financial Officer and Board Member of the Manager since October 2019. Mr. Siegel has also worked at iCap Enterprises, Inc. since October 2019 where he serves as Chief Financial Officer. From January 2013 to July 2018, he worked at LabConnect Holdings, Inc. and LabConnect, LLC where he served as Chief Financial Officer. From June 2008 to December 2012, Mr. Siegel worked at Emmet Consulting where he served as Principal, providing C-level consulting on operational, financial and economic issues. Mr. Siegel brings knowledge and experience in the financial services, professional services, and corporate governance aspects of companies. His experience in the management of financial processes and controls at rapidly growing companies will help iCap Vault 1, LLC with regard to sustainable growth, efficient processes and client security. Mr. Siegel is a graduate of the University of Chicago with an MBA in Finance and Strategy in 1998 and a BA in Economics in 1991. Mr. Siegel does not hold, and has not previously held, any directorships in any reporting companies.

***Trace ("TD") Croshaw***. Prior to Jonathan Siegel joining the Company, Trace ("TD") Croshaw served as the Controller and Chief Financial Officer of the Company from May, 2015 through August, 2019. He is a licensed CPA. Prior to joining iCap, Mr. Croshaw had 15 years of experience as an audit manager at an accounting firm performing financial audits for businesses. He holds a Bachelor of Arts degree in Accounting from the University of Utah, and a Master of Business Administration degree from the University of Phoenix, and he is a member of the AICPA. Mr. Croshaw does not hold, and has not previously held, any directorships in any reporting companies.

**Limited Liability and Indemnification of the Manager and Others**

Our Operating Agreement limits the liability of the Manager and its affiliates, any members of our Company, any person who is an officer of our Company and any person who serves at the request of the Manager on behalf of us as an officer, board member, partner, member, stockholder or employee of such person. None of the foregoing persons shall be liable to us or the Manager or any other of our members for any action taken or omitted to be taken by it or by other person with respect to us, including any negligent act or failure to act, except in the case of a liability resulting from any of the foregoing person's own actual fraud, gross negligence, willful misconduct, bad faith, breach of fiduciary duty, reckless disregard of duty or any intentional and material breach of our Operating Agreement or conduct that is subject of a criminal proceeding (where such person has reasonable cause to believe that such conduct was unlawful). With the prior consent of the Manager, any of the foregoing persons may consult with legal counsel and accountants with respect to our affairs (including interpretations of the Operating Agreement) and shall be fully protected and justified in any action or inaction which is taken or omitted in good faith, in reliance upon and in accordance with the opinion or advice of such counsel or accountants. In determining whether any of the foregoing persons acted with the requisite degree of care, such person shall be entitled to rely on written or oral reports, opinions, certificates and other statements of the board members, officers, employees, consultants, attorneys,

23-01243-WLH11    Doc 763    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1102 of 1366    Exhibit 10, Page 1102

accountants and professional advisors of our Company selected with reasonable care; provided, that no such person may rely upon such statements if it believed that such statements were materially false.

89

23-01243-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1103 of 1366   Exhibit 10, Page 1103

Insofar as the foregoing provisions permit indemnification of board members, officers or persons controlling us for liability arising under the Securities Act, we have been informed that, in the opinion of the SEC, this indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

**Term and Removal of the Manager**

Our Operating Agreement provides that the Manager will serve as our manager, but that the Manager may be removed or replaced by a vote of the members holding a majority of the units.

In the event of the removal of the Manager, the Manager will cooperate with us and take all reasonable steps to assist in making an orderly transition of the management function.

**Involvement in Certain Legal Proceedings**

No executive officer of the Manager, member of the board of managers of the Manager, or significant employee or control person of our Company has been involved in any legal proceeding listed in Item 401(f) of Regulation S-K in the past 10 years.

## MANAGEMENT COMPENSATION

The Manager, and its affiliates will receive certain fees and expense reimbursements for services relating to this offering and the acquisition, maintenance and sale of real estate constituting the Portfolio Investments. The items of compensation are summarized below. Neither the Manager nor their affiliates will receive any selling commissions or dealer manager fees in connection with the offer and sale of the Notes.

The following table sets forth the form of compensation and the recipient of such compensation together with the determination of the amount and the estimated amount.

| Form of Compensation and Recipient | Determination of Amount | Estimated Amount |
|---|---|---|
| Annual Fund Management fee paid to our Manager | In return for the provision of the services by Manager and for the other actions of the Manager under the Operating Agreement, the Company will pay the Manager an annual management fee. | Annual management fee equal to 1% of the outstanding aggregate principal balances of the Notes and interest accrued thereon ("Management Fee"). The Management Fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the Notes during the applicable quarter. |
| Underwriting Fees paid to our Manager | The Manager may charge the Company or any of its subsidiaries an underwriting fee to cover the costs of due diligence and underwriting involved in closing a real estate purchase or disposition. The underwriting fee will be paid at the time of purchase or disposition and will be non-refundable. | Actual amounts are dependent upon the costs of due diligence and underwriting involved in closing a real estate purchase or disposition and we cannot determine these amounts at the present time. |
| Guarantor Fee paid to any guarantor of debt or other obligations | If the Manager, or an affiliate of the Manager or the Company, guarantees or provides indemnification, whether personally or otherwise, on a loan, bond or other obligation of the Company or any of its subsidiaries, such guarantor will be entitled to receive from the benefiting entity an annual fee equal to 1% of the total amount of | Annual fee equal to 1% of the total amount of the credit facility, bond amount, indemnification contract, or other obligation subject to the guarantee. |

23-01224-WLH11  Doc 466  Filed 02/23/24  Entered 02/23/24 19:33:15  Pg 1104 of 1366

Exhibit 10, Page 1104

the credit facility, bond amount, indemnification contract
or other obligation subject to the guarantee.

90

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1105 of
1366

Exhibit 10, Page 1105

| Reimbursement of Expenses paid to our Manager | The Company will pay all expenses related to the operation of the Company, other than the costs of the payroll and benefits of the personnel of the Manager. The costs that will be paid by the Company include the fees and expenses related to any securities offering of the Company, office rent and fees, office common area maintenance charges, phone, fax, and internet access, computer hardware and related supplies, general office supplies, office rental of fax, printers, or scanners and maintenance costs related thereto, consulting, legal, accounting, and professional fees, marketing and travel expenses and any business licenses and registrations required of the Company or the Manager as a result of its management of the Company. The Manager may elect to pay any of the Company expenses, in which event the Company will reimburse the Manager for those out-of-pocket costs. | Actual amounts are dependent upon the amount and timing of payments received and we cannot determine these amounts at the present time. |
|---|---|---|

## Compensation of Executive Officers of Manager

We do not currently have any employees nor do we currently intend to hire any employees who will be compensated directly by us. Each of the executive officers of the Manager receive compensation for his or her services, including services performed for us on behalf of the Manager, from iCap. As executive officers of the Manager, these individuals will serve to manage our day-to-day affairs and acquire, maintain, promote and sell the assets constituting the Portfolio Investments. Although we will indirectly bear some of the costs of the compensation paid to these individuals, through fees we pay to the Manager, we do not intend to pay any compensation directly to these individuals.

## Compensation of the Manager's Board of Managers

We do not compensate anyone on the Board of Managers of the Manager.

23-01243-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1106 of 1366   Exhibit 10, Page 1106

# CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

*We are subject to various conflicts of interest arising out of our relationship with our Manager and its affiliates. These conflicts are discussed below and this section is concluded with a discussion of the corporate governance measures we have adopted to mitigate some of the risks posed by these conflicts.*

In addition to the compensation arrangements discussed in the section titled "Management Compensation," the following is a description of each transaction since July 30, 2018 (our inception) and each currently proposed transaction in which:

- We have been or will be a participant;

- The amount involved exceeds one percent of our total assets; and

- In which our Manager, any of the Manager's executive officers, or members of the Manager's board of managers, any of the related iCap entities or their applicable beneficial owners, or beneficial owners of more than 5% of the membership interests or any immediate family member of, or person sharing the household with, any of these individuals, had or will have a direct or indirect material interest.

## Funding of iCap

Chris Christensen, is the individual responsible for funding iCap and is also able to control the activities of all of the iCap entities as well as our Company. Mr. Christensen is also the Chief Executive Officer of our Company and a member of the Board of Managers of our Manager. He owns a majority interest in the entities that control the Company and has the ability to select or replace members of the Board of Managers of our Manager, as well as any officers of the Company and our Manager.

## Operating Agreement and Fees Paid to Affiliates

In return for the provision of the services by Manager and for the other actions of the Manager under the Operating Agreement, the Company will pay the Manager an annual management fee equal to 1% of the outstanding aggregate principal balances of the Notes and interest accrued thereon ("Management Fee"). The Management Fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the Notes during the applicable quarter.

The Company will pay all expenses related to the operation of the Company, other than the costs of the payroll and benefits of the personnel of the Manager. The costs that will be paid by the Company include the fees and expenses related to any securities offering of the Company, office rent and fees, office common area maintenance charges, phone, fax, and internet access, computer hardware and related supplies, general office supplies, office rental of fax, printers, or scanners and maintenance costs related thereto, consulting, legal, accounting, and professional fees, marketing and travel expenses and any business licenses and registrations required of the Company or the Manager as a result of its management of the Company. The Manager or an affiliate of the Manager may elect to pay any of these Company expenses, in which event the Company will reimburse such party for those out-of-pocket costs.

The Manager may charge the Company or any of its subsidiaries an underwriting fee to cover the costs of due diligence and underwriting involved in closing a real estate purchase or disposition. The underwriting fee will be paid at the time of purchase or disposition and will be non-refundable. Additionally, in the event the Company or the Manager acquires or becomes an affiliate of a real estate brokerage company, the Company may pay customary brokerage fees to such entity for the acquisition or disposition of the Company's assets.

If the Manager, or an affiliate of the Manager or the Company, guarantees, whether personally or otherwise, a loan, bond or other obligation, including an indemnification agreement, of the Company or any of its subsidiaries, such guarantor will be entitled to receive from the benefiting entity an annual fee equal to 1% of the total amount of the credit facility, bond amount, or other obligation subject to the guarantee.

23-01243-WLH11   Doc 768   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1107 of 1366   Exhibit 10, Page 1107

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1108 of
1366

Exhibit 10, Page 1108

185/192

## Beneficial Owner of Affiliated Entities

Chris Christensen is the indirect beneficial owner of all of the iCap affiliated entities. Mr. Christensen is the individual responsible for funding iCap and is also able to control the activities of all of the iCap entities as well as our Company and the Manager. Mr. Christensen could have conflicts with his personal real estate investments and the collection of real estate constituting Portfolio Investments, or Mr. Christensen could simply stop funding iCap and cause it to cease to exist.

## Our Affiliates' Interests in Other iCap Entities

### General

The officers and board members of the Manager and the key professionals of iCap who perform services for us on behalf of the Manager are also officers, board members, managers, and/or key professionals of iCap and other iCap entities. These persons have legal obligations with respect to those entities that are similar to their obligations to us. In the future, these persons and other affiliates of iCap may organize other real estate acquisition programs and acquire for their own account real estate. In addition, iCap may grant equity interests in the Manager, iCap, or any of the iCap subsidiaries to certain management personnel performing services.

### Allocation of Our Affiliates' Time

We rely on iCap and its key professionals who act on behalf of the Manager, including Chris Christensen, Jim Christensen, and Jonathan Siegel for the day-to-day operations of our business. Messrs. Chris Christensen, Jim Christensen and Jonathan Siegel are also the Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer of the Manager, respectively, and are officers of the other iCap entities. As a result of their interests in other iCap entities, their obligations to other investors and the fact that they engage in and will continue to engage in other business activities on behalf of themselves and others, they will face conflicts of interest in allocating their time among us, the Manager and other iCap entities and other business activities in which they are involved. However, we believe that the Manager and its affiliates have sufficient professionals to fully discharge their responsibilities to the iCap entities for which they work.

### Investments with Affiliate Entities

When assembling our Portfolio Investments, we will from time to time enter into transactions with affiliates of the Manager. These transactions may include the purchase of real estate owned by an affiliate, the sale of real estate to an affiliate, a loan to an entity owned or controlled by an affiliate including an existing fund entity, the use of affiliate owned property as collateral or security for a financial instrument of an affiliate, the use of one or more Portfolio Investment properties as collateral for an obligation of, or an obligation that benefits, an affiliate, the guaranty by Vault Holding, LLC of a loan or other obligation involving an affiliate, the purchase, restructure, or other payoff of notes or other securities owned by creditors of an affiliate, payment for services performed by affiliates, and loans to affiliate fund entities that invest in real estate strategies. Although each of these potential transactions is subject to audits and reporting, investors should understand that the transactions will not necessarily be executed at arms-length, may be on terms less favorable than market conditions would otherwise allow, and may cause the Company to lose money.

### Duties Owed by Some of Our Affiliates to the Manager and the Manager's Affiliates

The Manager's officers and members of its board of managers and the key professionals of iCap performing services on behalf of the Manager are also officers, board members, managers and/or key professionals of:

- iCap Enterprises, Inc., which is the sole member of iCap Vault, LLC and iCap Equity, LLC;

- iCap Equity, LLC;

- iCap Vault Management, LLC, which is our Manager;

- iCap Vault, LLC, which is the sole member of the Company; and

- Vault Holding, LLC, which will hold many of our assets.

As a result, they owe duties to each of these entities, their equity holders, members and limited partners. These duties may from time to time conflict with the duties that they owe to us.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1110 of 1366

Exhibit 10, Page 1110

## Certain Conflict Resolution Measures

### *Other Operating Agreement Provisions Relating to Conflicts of Interest*

Our Operating Agreement contains other restrictions relating to conflicts of interest including the following:

*Term of the Manager.* Our Operating Agreement provides that the Manager will serve as our manager, but that the Manager may be removed or replaced by a vote of the members holding a majority of the units.

### Other Related Party Transactions

For the period from July 30, 2018 (inception) through December 31, 2018 expenses of affiliated entities allocated to the Company were $206,925. For the nine months ended September 30, 2019, expenses of affiliated entities allocated to the Company were $56,453. Amounts due to affiliated entities, inclusive of allocated expenses and direct expenses paid by affiliated entities, were $284,818 and $380,550 at December 31, 2018 and September 30, 2019, respectively.

As of September 30, 2019, private placement secured demand notes included $1,023 payable to the CEO related to a purchase of $1,000 made on August 8, 2018; as of December 31, 2018, this note had a balance inclusive of unpaid interest of $1,006. As of September 30, 2019, a balance of $852 is payable to a Director of Capital Markets, related to a purchase of $1,000 on August 20, 2019.

Additionally, other non-key management employees of affiliated entities held $89,429 of private placement secured demand notes, which are included in the private placement secured demand notes on the Company's unaudited condensed consolidated balance sheet as of September 30, 2019.

Subsequent to September 30, 2019 through February 14, 2020, the related party private placement secured demand notes have increased by $15, due to reinvested interest. During such subsequent period, private placement secured demand notes payable due to non-key management employees have decreased by $19,469 due to repayments to noteholders of $30,000, and offset by additional investments of $10,300 and reinvestment of interest of $531.

<div align="center">

## SECURITY OWNERSHIP OF
## MANAGEMENT AND CERTAIN SECURITYHOLDERS

</div>

The following table sets forth information about the current beneficial ownership of the Company at February 14, 2020 for:

- each person known to us to be the beneficial owner of more than 5% of the membership interests;

- each named executive officer of the Manager;

- each member of the Board of Managers of the Manager; and

- all of the executive officers of the Manager and members of the Board of Managers of the Manager as a group.

Unless otherwise noted below, the address for each beneficial owner listed on the table is in care of our Company, 3535 Factoria Blvd. SE, Suite 500, Bellevue, WA 98006. We have determined beneficial ownership in accordance with the rules of the SEC. We believe, based on the information furnished to us, that the persons and entities named in the tables below have sole voting and investment power with respect to all membership interests that they beneficially own, subject to applicable community property laws.

23-01224-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1111 of 1366    Exhibit 10, Page 1111

| Name of Beneficial Owner | Membership Interests Beneficially Owned | |
| --- | --- | --- |
| | Number | Percent |
| **_Named Executive Officers and Board of Managers of the Manager:_** | | |
| Chris Christensen, Chief Executive Officer[1][2] | 1,000 | 100% |
| Jim Christensen, Chief Operating Officer[1] | - | 0% |
| Jonathan Siegel, Chief Financial Officer[1] | - | 0% |
| All named executive officers and Members of the Board of Managers of the Manager as a group (3 persons) | 1,000 | 100% |
| | | |
| **_5% holders:_** | | |
| iCap Vault, LLC[3] | 1,000 | 100% |

(1)  All named individuals are also members of the Board of Managers of the Manager.

(2)  Chris Christensen indirectly beneficially owns 1,000 membership interests in iCap Vault 1, LLC, representing 100% of the membership interests in iCap Vault 1, LLC. In light of this beneficial ownership, Mr. Christensen has the power to vote and dispose of 100% of the membership interests of iCap Vault 1, LLC and controls iCap and the Company.

(3)  iCap Vault, LLC directly beneficially owns 1,000 membership interests in iCap Vault 1, LLC, representing 100% of the membership interests in iCap Vault 1, LLC.

94

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1112 of 1366    Exhibit 10, Page 1112

## INVESTMENT POLICIES OF COMPANY

In all types of investments, our policies may be changed by our Manager without a vote by Members.

We will seek out multifamily properties, single family residences, and commercial properties for purchase throughout the United States. Additionally, we will invest in financial instruments that are related to or secured by interests in the foregoing property types, such as promissory notes, debentures, preferred equity, common equity, and common equity interests. We believe 100% of our portfolio will consist of real estate properties or financial instruments related to real estate properties.

As part of our investment criteria, we intend to evaluate the following:

1. Property information and its condition, estimated costs for rehabilitation, and feasibility of possible improvements;
2. Historical rental rates and vacancy rates if such information is available and useful;
3. Available information of comparable properties in the area including recent sales prices; rental values, vacancy rates and operating expenses; school information; and any other relevant market information; and
4. For financial instruments related to real estate, the loan-to-value ratio, quality of the borrower, strength of the location, duration of the loan, and overall market conditions;
5. We do not intend to invest more than 25% of Company assets into any single asset upon full capitalization of the Company.

Further, potential investors should be advised:

a) We may issue senior securities at some time in the future.
b) We may borrow money collateralized by our properties with up to a 85% value of our Portfolio Investments.
c) We have no intention of initiating personal loans to other persons.
d) We have no intention of investing in the securities of other issuers for the purpose of exercising control.
e) We have no intention to underwrite securities of other issuers.
f) We may engage in the purchase and sale (or turnover) of investments that are not real estate related at some time in the future.
g) We may offer our securities in exchange for property.
h) We may acquire other securities of other funds, or make loans to other funds, so long as those funds are real estate related.
i) We intend to make annual, quarterly or other reports to security holders including, but not limited to, 10-Ks and 10-Qs. Such reports will include the required financial statements.

As market conditions change, our policies for both investments and borrowing will be evaluated and updated as necessary to safeguard member equity and increase member returns. Upon completion of the offering, we will update our members via 8-Ks within four business days, 10-Qs quarterly, 10-Ks annually and other member reports if there are any changes in our investment policy or our borrowing policies.

## POLICIES WITH RESPECT TO CERTAIN TRANSACTIONS

Our policy with respect to our Manager concerning certain transactions is as follows:

We have no interest, currently, in underwriting securities of others or purchasing securities or assets other than real property assets and financial instruments or securities related to real property assets. In the event that we foreclose on a property, which we hope to be rare, we may encumber our properties that we acquire with a credit facility but we intend that such financing will generally not exceed 85% of the value of the total of the property. The purpose of such financing would be for rehabilitation of the underlying property and for other sales costs so that we may successfully and profitably dispose of a property.

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1114 of Exhibit 10, Page 1114
1366

## Conflicts of Interest

There are currently no conflicts of interest between the Company, our Manager, our Manager's Principals, or affiliates. However, if it is in the best interest of the Company and its Members, the following conflicts may arise. The Manager is currently managing other investments outside of this offering. The Manager is currently in the process of winding down those other investment vehicles.

i) Our Manager does have the authority to invest the Company's funds in other entities in which our Manager or an affiliate has an interest.

ii) The Company may purchase properties from or sell to our Manager or its known affiliates.

The Company will maintain the following policies to avoid certain conflicts of interest:

i) Our Manager and its affiliates do not own or have an interest in properties adjacent to those to be purchased that may directly compete with such purchased property.

ii) No affiliate of the Company places mortgages for the Company or otherwise acts as a finance broker or as insurance agent or broker receiving commissions for such services.

iii) No affiliate of the Company acts (a) as an underwriter for the offering, or (b) as a principal underwriter for the offering thereby creating conflicts in performance of the underwriter's due diligence inquiries under the Securities Act.

## MATERIAL FEDERAL INCOME TAX CONSIDERATIONS

The following is a general discussion of the material United States ("U.S.") federal income tax considerations relating to the initial purchase, ownership and disposition of the Notes by U.S. and non-U.S. holders. This discussion is a summary only and is not a complete analysis of all the potential tax considerations relating to the purchase, ownership and disposition of the Notes. We have based this summary on current provisions of the Code of 1986, as amended (the "Code"), applicable U.S. Treasury Regulations promulgated thereunder, judicial opinions, and published rulings of the Internal Revenue Service (the "IRS"), all as in effect on the date of this prospectus. However, these laws and other guidance are subject to differing interpretations or change, possibly with retroactive effect. In addition, we have not sought, and will not seek, a ruling from the U.S. Internal Revenue Service ("IRS") or an opinion of counsel with respect to any tax consequences of purchasing, owning or disposing of Notes. Thus, the IRS could challenge one or more of the tax consequences or matters described in this prospectus; and there can be no assurance that any position taken by the IRS would not be sustained.

This discussion is limited to purchasers of Notes who acquire the Notes from us in this offering and hold the Notes as capital assets for federal income tax purposes. This discussion does not address all possible tax consequences that may be applicable to you in light of your specific circumstances. For instance, this discussion does not address the alternative minimum tax provisions of the Code, or special rules applicable to some categories of investors such as financial institutions, insurance companies, tax-exempt organizations, dealers in securities, real estate investment trusts, regulated investment companies, or persons who hold Notes as part of a hedge, conversion or constructive sale transaction, straddle or other risk reduction transaction that may be subject to special rules. This discussion also does not address the tax consequences arising under the laws of any foreign, state or local jurisdiction; or any U.S. estate or gift tax laws.

If you are considering the purchase of a Note, you should consult your own tax advisors as to the particular tax consequences to you of acquiring, holding or otherwise disposing of the Notes, including the effect and applicability of state, local or foreign tax laws, or any U.S. estate and gift tax laws.

96

23-01224-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1115 of 1366        Exhibit 10, Page 1115

As used in this discussion, the term "U.S. holder" means a holder of a Note that is:

(i)    for United States federal income tax purposes, a citizen or resident of the United States;

(ii)   a corporation, partnership or other entity created or organized in or under the laws of the United States or of any political subdivision thereof or other entity characterized as a corporation or partnership for federal income tax purposes;

(iii)  an estate, the income of which is subject to United States federal income taxation regardless of its source; or

(iv)  a trust, the administration of which is subject to the primary supervision of a court within the United States and which has one or more United States persons with authority to control all substantial decisions, or if the trust was in existence on August 20, 1996, and has elected to continue to be treated as a United States trust.

For the purposes of this discussion, a "non-U.S. holder" means any holder of Notes other than a U.S. holder. Any Note purchaser who is not a U.S. citizen will be required to furnish documentation, on IRS Form W-8BEN, that clearly states whether it is subject to U.S. withholding taxes, in accordance with applicable requirements of the United States taxing authority.

## Characterization of the Notes

The federal income tax consequences of owning Notes depend on characterization of the Notes as debt for federal income tax purposes, rather than as equity interests or a partnership among the holders of the Notes. We believe that the Notes have been structured in a manner that will allow the Notes to be characterized as debt for federal income tax purposes. However, this is only our belief; and no ruling from the IRS or an opinion of counsel has been sought in this regard. Thus, the IRS could successfully challenge this characterization.

If the Notes were treated as equity interests, there could be adverse effects on some holders. For example, payments on the Notes could (1) if paid to non-U.S. holders, be subject to federal income tax withholding; (2) constitute unrelated business taxable income to some tax-exempt entities, including pension funds and some retirement accounts (if the relationship were characterized as a partnership for tax purposes); and (3) cause the timing and amount of income that accrues to holders of Notes to be different from that described below.

Because of these potential adverse effects, you are urged to consult your own tax advisors as to the tax consequences that may apply to your particular situation in the event the Notes are re-characterized as equity interests; and as to the likelihood that the Notes could be so re-characterized. The remainder of this discussion assumes that the Notes are characterized as debt.

## Taxation of U.S. Holders

### Stated Interest

Under general federal income tax principles, you must include stated interest in income in accordance with the method of accounting you use for federal income tax purposes. Accordingly, if you are using the accrual method of tax accounting, you must include stated interest in income as it accrues. If you are using the cash method of tax accounting, you must include stated interest in income as it is actually or constructively received. Payments of interest to taxable holders of Notes will constitute portfolio income, and not passive activity income, for the purposes of the passive loss limitations of the Code. Accordingly, income arising from payments on the Notes will not be subject to reduction by losses from passive activities of a holder.

23-01247-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1116 of 1366

Exhibit 10, Page 1116

Income attributable to interest payments on the Notes may be offset by investment expense deductions, subject to the limitation that individual investors may only deduct miscellaneous itemized deductions, including investment expenses other than interest, to the extent these deductions exceed 2% of the investor's adjusted gross income.

If a partnership (or other entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds Notes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in a partnership purchasing Notes, we urge you to consult your tax advisor.

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1117 of 1366

Exhibit 10, Page 1117

*Disposition of Notes*

In general, a U.S. holder will recognize gain or loss upon the sale, exchange or other taxable disposition of a Note measured by the difference between (1) the sum of the cash and the fair market value of all other property received on such disposition, excluding any portion of the payment that is attributable to accrued interest on the Notes; and (2) your adjusted tax basis in the Note. A U.S. holder's adjusted tax basis in a Note generally will be equal to the price the U.S. holder paid for the Note. Any of this gain or loss generally will be long-term capital gain or loss if, at the time of any such taxable disposition, the Note was a capital asset in the hands of the holder and was held for more than one year. Under current law, net long-term capital gain recognized by individual U.S. holders in tax years beginning before January 1, 2013, is eligible for a reduced rate of taxation. The deductibility of capital losses is subject to annual limitations.

The terms of the Notes may be modified upon the consent of a specified percentage of holders and, in some cases, without consent of the holders. In addition, the Notes may be assumed upon the occurrence of specific transactions. The modification or assumption of a Note could, in some instances, give rise to a deemed exchange of a Note for a new debt instrument for federal income tax purposes. If an exchange is deemed to occur by reason of a modification or assumption, you could realize gain or loss without receiving any cash.

*Additional Tax on Net Investment Income*

For taxable years beginning after December 31, 2012, if you are a U.S. holder other than a corporation, you generally will be subject to a 3.8% additional tax (the "Medicare tax") on the lesser of (1) your "net investment income" for the taxable year, and (2) the excess of your modified adjusted gross income for the taxable year over a certain threshold. Your net investment income generally will include any income or gain recognized by you with respect to our Notes, unless such income or gain is derived in the ordinary course of the conduct of your trade or business (other than a trade or business that consists of certain passive or trading activities).

**Considerations for Tax-Exempt Holders of Notes**

Tax-exempt entities, including charitable corporations, pension plans, profit sharing or stock bonus plans, individual retirement accounts and some other employee benefit plans are subject to federal income tax on unrelated business taxable income. For example, net income derived from the conduct of a trade or business regularly carried on by a tax-exempt entity or by a partnership in which it is a partner is treated as unrelated business taxable income.

A $1,000 special deduction is allowed in determining the amount of unrelated business taxable income subject to tax. Tax-exempt entities taxed on their unrelated business taxable income are also subject to the alternative minimum tax for items of tax preference which enter into the computation of unrelated business taxable income.

In general, interest income does not constitute unrelated business taxable income. However, under the debt-financed property rules, if tax-exempt holders of Notes finance the acquisition or holding of Notes with debt, interest on the Notes will be taxable as unrelated business taxable income. The Notes will be treated as debt-financed property if the debt was incurred to acquire the Notes or was incurred after the acquisition of the Notes, so long as the debt would not have been incurred but for the acquisition and, at the time of the acquisition, the incurrence of the debt has already occurred or was foreseeable.

**Non-U.S. Holders**

The following discussion is a summary of the principal U.S. federal income consequences resulting from the ownership of the Notes by non-U.S. holders. However, application of the U.S. federal income tax rules associated with non-U.S. holders is complex and factually sensitive. Thus, if you could be considered to be a non-U.S. holder, you are urged to consult your own tax advisors with respect to the application of the federal income tax rules for your particular situation.

*Payments of Interest to Non-U.S. Holders*

23-01243-WLH11    Doc 408    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1118 of 1366    Exhibit 10, Page 1118

Subject to the discussion below under "Backup Withholding and Information Reporting," payments of interest received by a non-U.S. holder generally will not be subject to U.S. federal withholding tax, provided (1) that (a) the non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote; (b) the non-U.S. holder is not a controlled foreign corporation, actually or constructively, through stock ownership; and (c) the beneficial owner of the Note complies with the certification requirements, including delivery of a statement, signed by the holder under penalties of perjury, certifying that the holder is a foreign person and provides its name and address; or (2) that the non-U.S. holder is entitled to the benefits of an income tax treaty under which the interest is exempt from U.S. withholding tax and the non-U.S. holder complies with the reporting requirements. If a Note is held through a securities clearing organization or other specified financial institutions (an "Intermediary"), the Intermediary may provide the relevant signed statement and, unless the Intermediary is a "qualified" intermediary as defined under the Code, the signed statement provided by the Intermediary must be accompanied by a copy of a valid Form W-8BEN provided by the non-U.S. beneficial holder of the Note.

98

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1119 of 1366

Exhibit 10, Page 1119

Payments of interest not exempt from United States federal withholding tax as described above will be subject to a withholding tax at the rate of 30%, subject to reduction under an applicable income tax treaty. Payments of interest on a Note to a non-U.S. holder generally will not be subject to U.S. federal income tax, as opposed to withholding tax, unless the income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States. To claim the benefit of a lower treaty withholding rate, a Non-U.S. holder must provide a properly executed IRS Form W-8BEN to us or our paying agent before the payment of stated interest; and may be required to obtain a U.S. taxpayer identification number and provide documentary evidence issued by foreign governmental authorities to prove residence in the foreign country. You should consult your own tax advisor to determine the effects of the application of the U.S. federal withholding tax to your particular situation.

### Disposition of the Notes by Non-U.S. Holders

Subject to the discussion below under "Backup Withholding and Information Reporting," a non-U.S. holder generally will not be subject to United States federal income tax, and generally no tax will be withheld with respect to gains realized on the disposition of a Note, unless (a) the gain is effectively connected with a United States trade or business conducted by the non-U.S. holder or (b) the non-U.S. holder is an individual who is present in the United States for 183 or more days during the taxable year of the disposition and other requirements are satisfied.

### Non-U.S. Holders Subject to U.S. Income Taxation

If interest and other payments received by a non-U.S. holder with respect to the Notes, including proceeds from the disposition of the Notes, are effectively connected with the conduct by the non-U.S. holder of a trade or business within the United States, or the non-U.S. holder is otherwise subject to United States federal income taxation on a net basis with respect to the holder's ownership of the Notes, or are individuals that have by operation of law become residents in the United States for federal income tax purposes, the non-U.S. holder generally will be subject to the rules described above applicable to U.S. holders of Notes, subject to any modification provided under an applicable income tax treaty. If any of these non-U.S. holders is a corporation, it may also be subject to a U.S. "branch profits tax" at a 30% rate.

## Backup Withholding and Information Reporting

Non-corporate U.S. holders may be subject to backup withholding at a rate of 31% on payments of principal, premium, and interest on, and the proceeds of the disposition of the Notes. In general, backup withholding will be imposed only if the U.S. holder (1) fails to furnish its taxpayer identification number ("TIN"), which for an individual would be his or her Social Security number; (2) furnishes an incorrect TIN; (3) is notified by the IRS that it has failed to report payments of interest or dividends; or (4) under some circumstances, fails to certify under penalty of perjury that it has furnished a correct TIN and has been notified by the IRS that it is subject to backup withholding tax for failure to report interest or dividend payments. In addition, the payments of principal and interest to U.S. holders generally will be subject to information reporting. You should consult your tax advisors regarding your qualification for exemption from backup withholding and the procedure for obtaining an exemption, if applicable.

Backup withholding generally will not apply to payments made to a non-U.S. holder of a Note who provides the certification that it is a non-U.S. holder, and the payor does not have actual knowledge that a certificate is false, or otherwise establishes an exemption from backup withholding. Payments by United States office of a broker of the proceeds of a disposition of the Notes generally will be subject to backup withholding at a rate of 31% unless the non-U.S. holder certifies it is a non-U.S. holder under penalties of perjury or otherwise establishes an exemption. In addition, if a foreign office of a foreign custodian, foreign nominee or other foreign agent of the beneficial owner, or if a foreign office of a foreign "broker" pays the proceeds of the sale of a Note to the seller, backup withholding and information reporting will not apply; provided that the nominee, custodian, agent or broker is not a "United States related person," or a person which derives more than 50% of its gross income for some periods from the conduct of a trade or business in the United States or is a controlled foreign corporation. The payment by a foreign office of a broker that is a United States person or a United States related person of the proceeds of the sale of Notes will not be subject to backup withholding, but will be subject to information reporting unless the broker has documentary evidence in its records that the beneficial owner is not a United States person for purposes of the backup withholding and information reporting requirements and other conditions are met, or the beneficial owner otherwise establishes an exemption.

99

23-01123-WLH11   Doc 766   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1120 of 1366

Exhibit 10, Page 1120

The amount of any backup withholding imposed on a payment to a holder of a Note will be allowed as a credit against the holder's United States federal income tax liability and may entitle the holder to a refund; provided that the required information is furnished to the IRS.

## STATE, LOCAL AND FOREIGN TAXES

We make no representations regarding the tax consequences of the purchase, ownership or disposition of the Notes under the tax laws of any state, locality or foreign country. You should consult your own tax advisors regarding these state and foreign tax consequences.

## ERISA CONSIDERATIONS

**General**

Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code impose restrictions on employee benefit plans that are subject to ERISA, or plans or arrangements that are subject to Code Section 4975, and on persons who are parties in interest or disqualified persons with respect to those plans or arrangements. Some employee benefit plans, like governmental plans and church plans (if no election has been made under Section 410(d) of the Code), are not subject to the restrictions of Title I of ERISA or Code Section 4975, and assets of these plans may be invested in the Notes without regard to the ERISA considerations described below, subject to the Code and other applicable federal and state laws affecting tax-exempt organizations generally. Any plan fiduciary that proposes to cause a plan to acquire any of the Notes should consult with its counsel with respect to the potential consequences under ERISA and the Code of the plan's acquisition and ownership of the Notes. Investments by plans are also subject to ERISA's and the Code's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a plan's investments be made in accordance with the documents governing the plan.

**Prohibited Transactions**

*General*

Section 406 of ERISA and Section 4975 of the Code prohibits certain "parties in interest" and "disqualified persons" with respect to a plan from engaging in select transactions involving a plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes, or in some cases a civil penalty may be assessed under Section 502(i) of ERISA, on parties in interest that engage in non-exempt "prohibited transactions." Section 502(i) of ERISA requires the Secretary of the U.S. Department of Labor ("Labor") to assess a civil penalty against a fiduciary who breaches any fiduciary responsibility under, or commits any other violation of, part 4 of Title I of ERISA, or any other person who knowingly participates in a breach or violation.

*Plan Asset Regulations*

Labor has issued regulations concerning the definition of what constitutes the assets of a plan for purposes of ERISA and the prohibited transaction provisions of the Code. The plan asset regulations describe the circumstances where the assets of an entity in which a plan invests will be considered to be "plan assets," so that any person who exercises control over the assets would be subject to ERISA's fiduciary standards. Generally, under the plan asset regulation, when a plan invests in another entity, the plan's assets do not include, solely by reason of the investment, any of the underlying assets of the entity. However, the plain asset regulation provides that, if a plan acquires an "equity interest" in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940 the assets of the entity will be treated as assets of the plan investor unless exceptions apply. Under the plan asset regulation the term "equity interest" is defined as any interest in an entity other than an instrument that is treated as indebtedness under "applicable local law" and that has no "substantial equity features." Although the plan asset regulation is silent with respect to the question of which law constitutes "applicable local law" for this purpose, Labor has stated that these determinations should be made under the state law governing interpretation of the instrument in question. In the preamble to the plan asset regulation, Labor declined to provide a precise definition of what features are equity features or the circumstances under which the features would be considered "substantial," noting that the question of whether a plan's interest has substantial equity features is an inherently factual one, but that in

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1121 of 1366    Exhibit 10, Page 1121

making that determination it would be appropriate to take into account whether the equity features are such that a plan's investment would be a practical vehicle for the indirect provision of investment management services. We believe that the Notes will be classified as indebtedness without substantial equity features for ERISA purposes. Each investor who purchases a Note will be required to represent and warrant, in the subscription agreement for the investment, whether or not the assets being invested constitute "plan assets" for purposes of ERISA.

100

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1122 of 1366

Exhibit 10, Page 1122

If the Notes were deemed to be equity interests for this purpose and no statutory, regulatory, or administrative exception applies, we could be considered to hold plan assets by reason of a plan's investment in the Notes. These plan assets would include an undivided interest in all of our assets. In this case, we may be considered a fiduciary with respect to the investing plans. We would be subject to the fiduciary responsibility provisions of Title I of ERISA, including the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code, and to Section 4975 of the Code with respect to transactions involving any of our assets. The ERISA fiduciary standards could affect the way we conduct the business, which would have consequences for all investors, not just those that are employee benefit plans.

Depending on the relevant facts and circumstances, prohibited transaction exemptions may apply to the purchase or holding of the Notes. See, for example, Prohibited Transaction Class Exemption ("PTE") 96-23, which exempts some transactions effected on behalf of a plan or by an "in-house asset manager;" PTE 95-60, which exempts some transactions between insurance company general accounts and parties in interest; PTE 91-38, which exempts some transactions between bank collective investment funds and parties in interest; PTE 90-1, which exempts some transactions between insurance company pooled separate accounts and parties in interest; or PTE 84-14, which exempts some transactions effected on behalf of a plan by a "qualified professional asset manager." However, there can be no assurance that any of these exemptions will apply with respect to any plan's investment in the Notes, or that the exemption, if it did apply, would apply to all prohibited transactions that may occur in connection with the investment.

Any plan fiduciary considering whether to purchase Notes on behalf of a plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code. Before purchasing any Notes, a fiduciary of a plan should make its own determination as to (1) whether the Company, as borrower on the Notes, is a "party in interest" under ERISA or a "disqualified person" under the Code with respect to the plan; (2) the availability of the relief provided in the plan asset regulation and (3) the availability of any other prohibited transaction exemptions. In addition, purchasers that are insurance companies should consult their own ERISA counsel with respect to their fiduciary responsibilities associated with their purchase and ownership of the Notes, including any responsibility under the Supreme Court case *John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank*.

## LEGAL MATTERS

The validity of the securities offered by this prospectus will be passed upon for us by Anthony L.G., PLLC, 625 N. Flagler Drive, Suite 600, West Palm Beach, Florida 33401.

## EXPERTS

Our consolidated balance sheet as of December 31, 2018 and the related consolidated statement of operations, changes in member's deficit and cash flows for the period from July 30, 2018 (inception) through December 31, 2018 included in this prospectus and registration statement have been audited by Friedman LLP, independent registered public accounting firm, as indicated in their report with respect thereto, and have been so included in reliance upon the report of such firm given on their authority as experts in accounting and auditing.

101

## APPOINTMENT OF AUDITOR

On December 14, 2018, our Manager appointed Friedman LLP as our independent registered public accounting firm. Friedman LLP audited our consolidated financial statements for the period from July 30, 2018 (inception) through December 31, 2018 which have been included in this prospectus and registration statement and Friedman LLP has been engaged as our independent registered public accounting firm for our fiscal year ended December 31, 2018. Prior to engaging Friedman LLP as our independent registered public accounting firm, we did not have an independent registered public accounting firm to audit our financial statements.

## DISCLOSURE OF COMMISSION'S POSITION ON INDEMNIFICATION FOR SECURITIES ACT LIABILITIES

Any person who is our officer and any person who serves at the request of the Manager on behalf of us as an officer, board member, managers of the Manager, independent representative, partner, member, or employee of such person are indemnified as provided by Delaware law and our Operating Agreement. We have agreed to indemnify such persons against certain liabilities, including liabilities under the Securities Act. We have been advised that in the opinion of the Securities and Exchange Commission, insofar as indemnification for liabilities arising under the Securities Act may be permitted to our governors, officers and controlling persons pursuant to the foregoing provisions, or otherwise, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable. In the event a claim for indemnification against such liabilities (other than our payment of expenses incurred or paid by its governor, officer or controlling person in the successful defense of any action, suit or proceeding) is asserted by such governor, officer or controlling person in connection with the securities being registered, we will, unless in the opinion of our counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question of whether such indemnification by us is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the SEC the registration statement on Form S-11 under the Securities Act for the securities offered by this prospectus. This prospectus, which is a part of the registration statement, does not contain all of the information in the registration statement and the exhibits filed with it, portions of which have been omitted as permitted by SEC rules and regulations. For further information concerning us and the securities offered by this prospectus, we refer to the registration statement and to the exhibits filed with it. Statements contained in this prospectus as to the content of any contract or other document referred to are not necessarily complete. In each instance, we refer you to the copy of the contracts and/or other documents filed as exhibits to the registration statement.

The registration statement on Form S-11, of which this prospectus forms a part, including exhibits, is available at the SEC's website at *http://www.sec.gov*. You may also read and copy any document we file with, or furnish to, the SEC at its public reference facilities:

Public Reference Room Office
100 F Street, N.E.
Room 1580
Washington, D.C. 20549

You may also obtain copies of the documents at prescribed rates by writing to the Public Reference Section of the SEC at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Callers in the United States can also call (202) 551-8090 for further information on the operations of the public reference facilities.

102

23-01243-WLH11    Doc 408    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1124 of 1366    Exhibit 10, Page 1124

## INDEX TO FINANCIAL STATEMENTS

|  | Page |
| --- | --- |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheet as of December 31, 2018 | F-3 |
| Consolidated Statement of Operations for the period from July 30, 2018 (inception) through December 31, 2018 | F-4 |
| Consolidated Statement of Member's Deficit for the period from July 30, 2018 (inception) through December 31, 2018 | F-5 |
| Consolidated Statement of Cash Flows for the period from July 30, 2018 (inception) through December 31, 2018 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |
| Condensed Consolidated Balance Sheets as of September 30, 2019 and December 31, 2018 (Unaudited) | F-10 |
| Condensed Consolidated Statements of Operations for the nine months ended September 30, 2019 and for the period from July 30, 2018 (inception) through September 30, 2018 (Unaudited) | F-11 |
| Condensed Consolidated Statements of Operations for the three months ended September 30, 2019 and for the period from July 30, 2018 (inception) through September 30, 2018 (Unaudited) | F-12 |
| Condensed Consolidated Statements of Member's Deficit for the three and nine months ended September 30, 2019 and for the period from July 30, 2018 (inception) through September 30, 2018 (Unaudited) | F-13 |
| Condensed Consolidated Statements of Cash Flows for the nine months ended September 30, 2019 and for the period from July 30, 2018 (inception) through September 30, 2018 (Unaudited) | F-14 |
| Notes to Unaudited Condensed Consolidated Financial Statements | F-15 |

F-1

23-01224-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1125 of 1366
Exhibit 10, Page 1125

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Management and
Member of iCap Vault 1, LLC

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheet of iCap Vault 1, LLC (the "Company") as of December 31, 2018, and the related consolidated statements of operations, member's deficit, and cash flows for the period from July 30, 2018 (inception) through December 31, 2018, and the related notes (collectively referred to as the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018, and the results of its operations and its cash flows for the period from July 30, 2018 (inception) through December 31, 2018, in conformity with accounting principles generally accepted in the United States of America.

**Substantial Doubt about the Company's Ability to Continue as a Going Concern**

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Company has a working capital deficit, as well as an accumulated deficit, and no source of revenue sufficient to cover its costs of operation, which raises substantial doubt about its ability to continue as a going concern. Management's evaluation of the events and conditions and management's plans regarding those matters are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to that matter.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

*/s/ Friedman LLP*

We have served as the Company's auditor since 2018.

Marlton, New Jersey

February 14, 2020

<div align="center">F-2</div>

---

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1127 of Exhibit 10, Page 1127
1366

**iCap Vault 1, LLC and Subsidiary**
**Consolidated Balance Sheet**

|                                                              |     | December 31, 2018 |
| ------------------------------------------------------------ | --- | ----------------: |
| **ASSETS**                                                   |     |                   |
| Cash                                                         | $   | 296,788           |
| Restricted cash                                              |     | 33,080            |
| **TOTAL ASSETS**                                             | $   | **329,868**       |
|                                                              |     |                   |
| **LIABILITIES AND MEMBER'S DEFICIT**                         |     |                   |
| Liabilities:                                                 |     |                   |
| Private placement secured demand notes                       | $   | 329,796           |
| Related party private placement secured demand notes         |     | 1,006             |
| Accrued expenses                                             |     | 4,125             |
| Related party payables                                       |     | 284,818           |
| **Total Liabilities**                                        |     | **619,745**       |
|                                                              |     |                   |
| Member's deficit                                             |     | (289,877)         |
|                                                              |     |                   |
| **TOTAL LIABILITIES AND MEMBER'S DEFICIT**                   | $   | **329,868**       |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

**iCap Vault 1, LLC and Subsidiary**
**Consolidated Statement of Operations**

|  | For the period from July 30, 2018 (inception) to December 31, 2018 |
|---|---|
| **OPERATING EXPENSES** |  |
| General and administrative expenses | $ 288,524 |
| Management fee expense - related party | 420 |
| Total operating expenses | 288,944 |
| **LOSS FROM OPERATIONS** | **(288,944)** |
| **OTHER EXPENSE** |  |
| Interest | (933) |
| **NET LOSS** | $ **(289,877)** |
| Net loss per membership unit | $ (290) |
| Weighted average number of membership units outstanding | 1,000 |

The accompanying notes are an integral part of these consolidated financial statements.

F-4

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1129 of 1366    Exhibit 10, Page 1129

**iCap Vault 1, LLC and Subsidiary**
**Consolidated Statement of Member's Deficit**

**MEMBER'S DEFICIT**

| | | |
|---|---|---:|
| Beginning Balance - July 30, 2018 (inception) - 1,000 units issued | $ | - |
| | | |
| Net loss - from July 30, 2018 (inception) to December 31, 2018 | | (289,877) |
| Member's Deficit - December 31, 2018 – 1,000 units outstanding | $ | (289,877) |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

23-01249-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1130 of 1366
Exhibit 10, Page 1130

**iCap Vault 1, LLC and Subsidiary**
**Consolidated Statement of Cash Flows**

|  | For the period from July 30, 2018 (inception) to December 31, 2018 |
|---|---:|
| Cash flows from operating activities: |  |
| Net loss | $ (289,877) |
| Changes in operating assets & liabilities: |  |
| Accrued expenses | 4,125 |
| Reinvestment of interest on private placement secured demand notes | 933 |
| Related party payables | 284,818 |
| **Net cash used in operating activities** | **(1)** |
|  |  |
| Cash flow from financing activities: |  |
| Proceeds from the issuance of private placement secured demand notes | 369,869 |
| Proceeds from the issuance of related party private placement secured demand notes | 1,000 |
| Repayments of private placement secured demand notes | (41,000) |
| **Net cash provided by financing activities** | **329,869** |
|  |  |
| Net increase in cash and restricted cash | 329,868 |
| Cash and restricted cash at beginning of period | - |
| Cash and restricted cash at end of period | $ 329,868 |
|  |  |
| Reconciliation of cash and restricted cash - beginning of period |  |
| Cash | $ - |
| Restricted cash | - |
| Total | $ - |
|  |  |
| Reconciliation of cash and restricted cash - end of period |  |
| Cash | $ 296,788 |
| Restricted cash | 33,080 |
| Total | $ 329,868 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

23-01243-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1131 of 1366   Exhibit 10, Page 1131

**iCap Vault 1, LLC and Subsidiary**
**Notes to Consolidated Financial Statements**
**For the Period from July 30, 2018 (Inception) through December 31, 2018**

**Note 1. Nature of Business and Summary of Significant Accounting Policies**

*Organization and Nature of Business:*

iCap Vault 1, LLC (the "Company"), a Delaware Limited Liability Company (LLC), was formed on July 30, 2018 ("Inception") pursuant to and in accordance with the Delaware Limited Liability Company Act for the purpose of acquiring real estate investments in the United States and providing a rate of return to its investors. The Company was organized for the principal purposes of (a) sourcing, acquiring, financing and managing a portfolio of investments and (b) engaging in all activities incidental or ancillary thereto as the Managing Member, iCap Vault Management, LLC (the "Manager"), deems necessary or advisable. The Company's Limited Liability Company Agreement (the "Operating Agreement") provides for one class of membership units that have the same rights, powers and duties. The Company had 1,000 units issued and outstanding as of December 31, 2018, which were issued at the time of formation. All units are held by one member.

The Company has one wholly owned subsidiary, Vault Holding, LLC ("Holding"). Holding shall own one or more standalone subsidiaries (each a "Portfolio SPE"), which will then hold real property investments. There was no activity in Holding since its inception.

The Company executed the Operating Agreement as of August 1, 2018. Each member's liability is limited to their respective member's equity plus any debt for which a personal guarantee has been given. The Agreement continues until the Company is dissolved.

*Basis of Accounting:*

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP").

*Use of Estimates:*

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Principles of Consolidation:*

The consolidated financial statements represent the consolidation of the Company and its wholly owned subsidiary. All intercompany accounts and transactions have been eliminated in consolidation.

*Cash and Cash Equivalents:*

The Company considers all highly liquid investments with original maturities of three months or less when purchased to be cash equivalents. The Company's cash and cash equivalents are held at major commercial banks which hold balances that at times may exceed the Federal Deposit Insurance Corporation limit. At December 31, 2018, the amounts held by the Company exceeded these limits by approximately $80,000. The Company has not experienced any losses in such accounts with these financial institutions. There are no cash equivalents as of December 31, 2018.

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1132 of 1366

The Company sets aside reserves of between 5-10% of the outstanding principal balances in available cash reserves to address demand payments of its private placement secured demand notes pursuant to the private placement memorandum (see Note 3).

F-7

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1133 of 1366

Exhibit 10, Page 1133

*Income Taxes:*

As a limited liability company, the Company's taxable income or loss is allocated to the member. Therefore, no provision or liability for income taxes has been included in the consolidated financial statements.

Holding is a subsidiary, and as a single member LLC is considered a disregarded entity for income tax purposes.

The Company's policy, if it had any uncertain tax positions, would be to recognize accrued interest and penalties related to uncertain tax positions as interest expense and other expense, respectively.

Management evaluated the Company's tax positions and concluded the Company had no uncertain tax positions that would require disclosure. Since its formation, the Company is subject to income tax examinations by the U.S. federal, state or local tax authorities.

*Organizational and Offering Costs:*

Costs incurred in the private placement offering and the organization of the Limited Liability Company (collectively "Offering Costs") are expensed as incurred.

*Notes Payable and Related Costs:*

The Company has been conducting a private placement of up to $500,000,000 of senior secured notes ("private placement secured demand notes") to fund its investment and operational activities, which private placement will be terminated by the Company upon the date of effectiveness of a registration statement of the Company registering variable denomination floating rate demand notes. Notes payable are recorded at the principal amount of the notes sold, plus reinvested interest.

Interest is expensed in the period incurred.

*Recent Accounting Pronouncements:*

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2014-09, Revenue from Contracts with Customers. ASU 2014-09 provides a single comprehensive model for entities to use in accounting for revenue arising from contracts with customers and supersedes most current revenue recognition guidance, including industry-specific guidance. ASU 2014-09 will require an entity to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In August 2015, the FASB issued ASU 2015-14, which deferred the effective date of ASU 2014-09 for one year, which would make the guidance effective for the Company's first fiscal year beginning after December 15, 2018. The Company has elected to adopt this standard under the modified retrospective approach at July 30, 2018 (inception). Adoption of this standard did not have a significant impact on the consolidated financial statements.

In November 2016, the FASB issued Accounting Standards Update 2016-18, Statement of Cash Flows: Restricted Cash, which clarifies the presentation requirements of restricted cash within the statement of cash flows. The changes in restricted cash and restricted cash equivalents during the period should be included in the beginning and ending cash and cash equivalents balance reconciliation on the statement of cash flows. When cash, cash equivalents, restricted cash or restricted cash equivalents are presented in more than one-line item within the statement of financial position, an entity shall calculate a total cash amount in a narrative or tabular format that agrees to the amount shown on the statement of cash flows. Details on the nature and amounts of restricted cash should also be disclosed. This standard is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. The Company adopted this standard at Inception.

*Liquidity and Going Concern:*

23-01124-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1134 of 1366

Exhibit 10, Page 1134

As of December 31, 2018, the Company has a working capital and accumulated deficit of $289,877. The Company has not yet begun its public offering raise; and, as of the date of this writing does not have sufficient cash or a source of revenue sufficient to cover its operation costs. These factors raise substantial doubt regarding the Company's ability to continue as a going concern within one year after the date these consolidated financial statements are available to be issued. The accompanying consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. These consolidated financial statements do not include any adjustments relating to the realization of the carrying value of assets or the amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern. The Company will be dependent upon the raising of additional capital through issuance of debt in order to implement its business plan. There can be no assurance that the Company will be successful in this situation in order to continue as a going concern. The Company is funding its initial operations from payments of expenses by its related entities, which are included in related party payables on the consolidated balance sheet.

<div align="center">F-8</div>

23-01243-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1135 of 1366

Exhibit 10, Page 1135

## Note 2. Related-Party Transactions

In consideration for the Manager's services in managing the investments of the Company, the Company shall pay to the Manager an annual management fee equal to one percent of the outstanding aggregate principal balances of the private placement secured demand notes. The management fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the private placement secured demand notes during the applicable quarter. There were $420 in management fees incurred during the period from July 30, 2018 (inception) to December 31, 2018 which are included in management fee expense-related party on the consolidated statements of operations. There were $420 in management fees accrued at December 31, 2018, which are included in related party payables on the consolidated balance sheet.

Additionally, certain expenses of the Company's affiliated entities are allocated to the Company. These allocations are based on several factors including size of notes payable, number of individual investors, and term of operations with an allocation period. Allocated expenses for the period ending December 31, 2018 were $206,925 which were included in general and administrative expenses on the consolidated statement of operations.

As of December 31, 2018, private placement secured demand notes of $1,006 payable to the CEO, related to a note purchase of $1,000 made on August 8, 2018, are included in related party private placement secured demand notes on the balance sheet.

The initial expenses incurred by the Company were paid by related party entities, iCap Equity, LLC and iCap PNW Management, LLC. These entities paid direct expenses of $77,893 and allocated expenses of $206,925 to the Company. The balances owed to these entities are included in related party payables of $284,818 on the consolidated balance sheet. There is a concentration of payables to related parties of approximately 99% of the Company's payables and accrued expenses.

## Note 3. Private Placement Secured Demand Notes

The Company has been conducting a private placement of up to $500,000,000 of secured notes ("private placement secured demand notes") to fund its investment and operational activities, which private placement will be terminated by the Company upon the date of effectiveness of a registration statement of the Company registering variable denomination floating rate demand notes. The outstanding private placement secured demand notes are subordinate to the Company's and its subsidiaries' future secured bank debt and credit facilities and structurally subordinated to indebtedness or other liabilities of special purpose entity subsidiaries.

Until the time of the registered offering, the private placement secured demand notes will be secured by a pledge of Holding's equity interests in the Portfolio SPEs. Vault Holding, LLC entered into a guaranty agreement with the Company for the benefit of the Noteholders, which shall automatically terminate on the 30-day anniversary of the effectiveness of the registered offering.

The private placement secured demand notes accrue interest at the rate of 2.00% per annum, based on a 365-day year, compounded daily; provided, however, that if an investor agrees to forego the right to make a demand for payment during the first year after issuance, the interest rate for that year will be 3.00%, and then will revert to the standard 2.00% for following periods. The interest rate may be increased, and subsequently decreased, in the Company's discretion, provided it does not drop below 2.00% (or 3.00% for the first year as applicable).

The private placement secured demand notes are sold through a private placement that expires on August 31, 2020, with an option to extend, through August 31, 2022, unless terminated by the Company upon the effectiveness of a registration statement registering variable denomination floating rate demand notes.

The private placement secured demand notes, inclusive of accrued but unpaid interest, can be redeemed, in whole or in part, through a demand payment. Should an entire private placement secured demand note not be redeemed through demand payments, any remaining balances have a maturity date 15 years following the issuance date of the private placement secured demand note.

23-01273 WEH11   Doc 166   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1136 of 1366

The Company will establish two sources of liquidity to address demand payments: first, the Company will set aside reserves of between 5-10% of the outstanding principal balances in available cash reserves (see Note 1); second, the Company plans to establish accounts with lending sources pursuant to which funds will be advanced to the Company. These lending sources have not been established at present and are not expected to be established until the Company establishes a registered offering.

The Company is restricted from making distributions to its members when the value of the real estate held at the Company's subsidiaries is less than 70% of the value of the outstanding private placement secured demand notes. Tax distributions and other distributions that may be legally required are exempted from this condition.

As of December 31, 2018, the outstanding private placement secured demand notes payable totaled $330,802. Approximately 86% of these private placement secured demand notes are held with foreign investors.

**Note 4. Subsequent Events**

The Company has evaluated subsequent events for potential recognition or disclosure through February 14, 2020, the date the consolidated financial statements were available to be issued.

*Additional Private Placement Secured Demand Notes Sold*

As of February 14, 2020, the Company has sold additional private placement secured demand notes of $14,553,858 and redeemed private placement secured demand notes worth $14,236,260.

<div align="center">F-9</div>

23-01243-WLH11    Doc 460    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1137 of 1366

**iCap Vault 1, LLC and Subsidiary**
**Condensed Consolidated Balance Sheets (Unaudited)**

|  | September 30, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** |  |  |
| Cash | $ 1,926,076 | $ 296,788 |
| Restricted cash | 222,989 | 33,080 |
| **TOTAL ASSETS** | **$ 2,149,065** | **$ 329,868** |
|  |  |  |
| **LIABILITIES AND MEMBER'S DEFICIT** |  |  |
| Liabilities: |  |  |
| Private placement secured demand notes | $ 2,228,022 | $ 329,796 |
| Related party private placement secured demand notes | 1,875 | 1,006 |
| Accrued expenses | 1,008 | 4,125 |
| Related party payables | 380,550 | 284,818 |
| **Total Liabilities** | **2,611,455** | **619,745** |
|  |  |  |
| Member's deficit | (462,390) | (289,877) |
|  |  |  |
| **TOTAL LIABILITIES AND MEMBER'S DEFICIT** | **$ 2,149,065** | **$ 329,868** |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

F-10

**iCap Vault 1, LLC and Subsidiary**
**Condensed Consolidated Statements of Operations (Unaudited)**

|  | For the nine months ended September 30, 2019 | For the period from July 30, 2018 (inception) through September 30, 2018 |
|---|---|---|
| **OPERATING EXPENSES** |  |  |
| General and administrative expenses | $ 109,949 | $ 242,172 |
| Management fee expense - related party | 20,601 | - |
| Total operating expenses | 130,550 | 242,172 |
| **LOSS FROM OPERATIONS** | **(130,550)** | **(242,172)** |
| **OTHER EXPENSE** |  |  |
| Interest | (41,963) | (2) |
| **NET LOSS** | $ **(172,513)** | $ **(242,174)** |
| Net loss per membership unit | $ (173) | $ (242) |
| Weighted average number of membership units outstanding | 1,000 | 1,000 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

F-11

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1139 of 1366    Exhibit 10, Page 1139

**iCap Vault 1, LLC and Subsidiary**
**Condensed Consolidated Statements of Operations (Unaudited)**

| | For the three months ended September 30, 2019 | For the period from July 30, 2018 (inception) through September 30, 2018 |
|---|---|---|
| **OPERATING EXPENSES** | | |
| General and administrative expenses | $ 61,648 | $ 242,172 |
| Management fee expense - related party | 15,726 | - |
| Total operating expenses | 77,374 | 242,172 |
| **LOSS FROM OPERATIONS** | **(77,374)** | **(242,172)** |
| **OTHER EXPENSE** | | |
| Interest | (31,536) | (2) |
| **NET LOSS** | **$ (108,910)** | **$ (242,174)** |
| Net loss per membership unit | $ (109) | $ (242) |
| Weighted average number of membership units outstanding | 1,000 | 1,000 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

F-12

23-01243-WLH11 Doc 468 Filed 02/23/24 Entered 02/23/24 19:33:15 Pg 1140 of 1366

**iCap Vault 1, LLC and Subsidiary**
**Condensed Consolidated Statements of Member's Deficit (Unaudited)**

**MEMBER'S DEFICIT**

| | |
|---|---:|
| Beginning Balance - July 30, 2018 (inception) – 1,000 units issued | $ - |
| Net loss - 3 months ended September 30, 2018 | (242,174) |
| Member's Deficit - September 30, 2018 – 1,000 units outstanding | $ (242,174) |
| Beginning balance – January 1, 2019 – 1,000 units outstanding | $ (289,877) |
| Net loss - 6 months ended June 30, 2019 | (63,603) |
| Member's Deficit - June 30, 2019 | $ (385,016) |
| Net loss - 3 months ended September 30, 2019 | (108,910) |
| Member's Deficit - September 30, 2019 – 1,000 units outstanding | $ (462,390) |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

F-13

23-01243-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1141 of 1366   Exhibit 10, Page 1141

**iCap Vault 1, LLC and Subsidiary**
**Condensed Consolidated Statements of Cash Flows (Unaudited)**

| | For the nine months ended September 30, 2019 | For the period from July 30, 2018 (inception) through September 30, 2018 |
|---|---:|---:|
| Cash flows from operating activities: | | |
| Net loss | $ (172,513) | $ (242,174) |
| Changes in operating assets & liabilities: | | |
| Accrued expenses | (3,117) | - |
| Reinvestment of interest on private placement secured demand notes | 41,963 | 2 |
| Related party payables | 95,732 | 242,172 |
| **Net cash used in operating activities** | **(37,935)** | **-** |
| | | |
| Cash flow from financing activities: | | |
| Proceeds from the issuance of private placement secured demand notes | 13,144,792 | 200 |
| Proceeds from the issuance of related party private placement secured demand notes | 1,100 | 1,000 |
| Repayments of private placement secured demand notes and accrued interest | (11,288,510) | - |
| Repayments of related party private placement secured demand notes | (250) | - |
| **Net cash provided by financing activities** | **1,857,132** | **1,200** |
| | | |
| Net increase in cash and restricted cash | 1,819,197 | 1,200 |
| Cash and restricted cash at beginning of period | 329,868 | - |
| Cash and restricted cash at end of period | $ 2,149,065 | $ 1,200 |
| | | |
| Reconciliation of cash and restricted cash - beginning of period | | |
| Cash | $ 296,788 | $ - |
| Restricted cash | 33,080 | - |
| Total | $ 329,868 | $ - |
| | | |
| Reconciliation of cash and restricted cash - end of period | | |
| Cash | $ 1,926,076 | $ 1,080 |
| Restricted cash | 222,989 | 120 |
| Total | $ 2,149,065 | $ 1,200 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1142 of 1366   Exhibit 10, Page 1142

**iCap Vault 1, LLC and Subsidiary**
**Notes to Unaudited Condensed Consolidated Financial Statements**
**For the Period ended September 30, 2019**

**Note 1. Nature of Business and Summary of Significant Accounting Policies**

*Organization and Nature of Business:*

iCap Vault 1, LLC (the "Company"), a Delaware Limited Liability Company (LLC), was formed on July 30, 2018 pursuant to and in accordance with the Delaware Limited Liability Company Act for the purpose of acquiring real estate investments in the United States and providing a rate of return to its investors. The Company was organized for the principal purposes of (a) sourcing, acquiring, financing and managing a portfolio of investments; (b) engaging in all activities incidental or ancillary thereto as the Managing Member, iCap Vault Management, LLC (the "Manager"), deems necessary or advisable. The Company's Limited Liability Company Agreement (the "Operating Agreement") provides for one class of membership units that have the same rights, powers and duties. The Company had 1,000 units issued and outstanding as of September 30, 2019, which were issued at the time of formation. All units are held by one member.

The Company has one wholly owned subsidiary, Vault Holding, LLC ("Holding"). Holding shall own one or more standalone subsidiaries (each a "Portfolio SPE"), which will then hold real property investments. There has been no activity in Holding since its inception.

The Company executed the Operating Agreement as of August 1, 2018. Each member's liability is limited to their respective member's equity plus any debt for which a personal guarantee has been given. The Agreement continues until the Company is dissolved.

*Basis of Accounting:*

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC") and have been consistently applied. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included. These financial statements should be read in conjunction with the audited financial statements and notes thereto for the period from July 30, 2018 (inception) to December 31, 2018.

*Use of Estimates:*

The preparation of unaudited condensed consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the unaudited condensed consolidated financial statements and reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Principles of Consolidation:*

The unaudited condensed consolidated financial statements represent the consolidation of the Company and its wholly owned subsidiary. All intercompany accounts and transactions have been eliminated in consolidation.

*Cash and Cash Equivalents:*

The Company considers all highly liquid investments with original maturities of three months or less when purchased to be cash equivalents. The Company's cash and cash equivalents are held at major commercial banks which hold balances that at times may exceed the Federal Deposit Insurance Corporation limit. At September 30, 2019, the amounts

23-01224-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1143 of 1366   Exhibit 10, Page 1143

held by the Company exceeded these limits by approximately $1,899,000. The Company has not experienced any losses in such accounts with these financial institutions. There are no cash equivalents as of September 30, 2019.

The Company sets aside reserves of between 5-10% of the outstanding principal balances in available cash reserves to address demand payments of its private placement secured demand notes pursuant to the private placement memorandum (see note 3).

<div align="center">F-15</div>

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1144 of 1366

Exhibit 10, Page 1144

*Income Taxes:*

As a limited liability company, the Company's taxable income or loss is allocated to the member. Therefore, no provision or liability for income taxes has been included in the condensed consolidated financial statements.

Holding is a subsidiary, and as a single member LLC is considered a disregarded entity for income tax purposes.

The Company's policy, if it had any uncertain tax positions, would be to recognize accrued interest and penalties related to uncertain tax positions as interest expense and other expense, respectively.

Management evaluated the Company's tax positions and concluded the Company had no uncertain tax positions that would require disclosure. Since its formation, the Company is subject to income tax examinations by the U.S. federal, state or local tax authorities.

*Organizational and Offering Costs:*

Costs incurred in the private placement offering and the organization of the Limited Liability Company interests (collectively "Offering Costs") are expensed as incurred.

*Notes Payable and Related Costs:*

The Company has been conducting a private placement of up to $500,000,000 of senior secured notes ("private placement secured demand notes") to fund its investment and operational activities, which private placement will be terminated by the Company upon the date of effectiveness of a registration statement of the Company registering variable denomination floating rate demand notes. Notes payable are recorded at the principal amount of the notes sold, plus reinvested interest.

Interest is expensed in the period incurred.

F-16

23-01243-WLH11   Doc 460   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1145 of 1366
Exhibit 10, Page 1145

*Liquidity and Going Concern:*

As of September 30, 2019, the Company has a working capital and accumulated deficit of $462,390. The Company has not yet begun its public offering raise; and, as of the date of this writing does not have sufficient cash or a source of revenue sufficient to cover its operation costs. These factors raise substantial doubt regarding the Company's ability to continue as a going concern within one year after the date these unaudited condensed consolidated financial statements are available to be issued. The accompanying unaudited condensed consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. These unaudited condensed consolidated financial statements do not include any adjustments relating to the realization of the carrying value of assets or the amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern. The Company will be dependent upon the raising of additional capital through issuance of debt in order to implement its business plan. There can be no assurance that the Company will be successful in this situation in order to continue as a going concern. The Company is funding its initial operations from payments of expenses by its related entities, which are included in related party payables on the unaudited condensed consolidated balance sheets.

## Note 2. Related-Party Transactions

In consideration for the Manager's services in managing the investments of the Company, the Company shall pay to the Manager an annual management fee equal to one percent of the outstanding aggregate principal balances of the private placement secured demand notes. The management fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the private placement secured demand notes during the applicable quarter. There were $15,726 and $20,601 in management fees incurred in the three and nine months ending September 30, 2019, respectively, which are included in management fee expense-related party on the unaudited condensed consolidated statements of operations. In the period from July 30, 2018 (inception) to September 30, 2018 there were $0 in management fees incurred. On September 30, 2019 and December 31, 2018, $21,021 and $420, respectively, were included in related party payables on the unaudited condensed consolidated balance sheets.

Additionally, certain expenses of the Company's affiliated entities are allocated to the Company. These allocations are based on several factors including size of notes payable, number of individual investors, and term of operations with an allocation period. For the three months and nine months ended September 30, 2019, expenses of affiliated entities allocated to the Company were $18,702 and $56,453, respectively, which were included in general and administrative expenses on the unaudited condensed consolidated statements of operations. In the period from July 30, 2018 (inception) to September 30, 2018, $167,591 in allocated expenses were included in general and administrative expenses on the unaudited condensed consolidated statements of operations. Amounts due to affiliated entities, inclusive of allocated expenses and direct expenses paid by affiliated entities, were $284,818 and $380,550 at December 31, 2018 and September 30, 2019, respectively.

As of September 30, 2019, private placement secured demand notes included $1,023 payable to the CEO related to a purchase of $1,000 made on August 8, 2018; as of December 31, 2018, this note had a balance inclusive of unpaid interest of $1,006. As of September 30, 2019, a balance of $852 is payable to a Director of Capital Markets, related to a purchase of $1,000 on August 20, 2019.

Additionally, other non-key management employees of affiliated entities held $89,429 of private placement secured demand notes, which are included in the private placement secured demand notes on the unaudited condensed consolidated balance sheet as of September 30, 2019.

Subsequent to September 30, 2019 through February 14, 2020, the related party private placement secured demand notes have increased by $15, due to reinvested interest. During such subsequent period, private placement secured demand notes payable due to non-key management employees have decreased by $19,469 due to repayments to noteholders of $30,000, and offset by additional investments of $10,300 and reinvestment of interest of $531.

The initial expenses incurred by the Company were paid by related party entities, iCap Equity, LLC and iCap PNW Management, LLC. The balances owed to these entities are included in the related party payables on the unaudited condensed consolidated balance sheets. There is a concentration of payables to related parties of $380,550, approximately 100% of the Company's operating liabilities.

**Note 3. Private Placement Secured Demand Notes**

The Company has been conducting a private placement of up to $500,000,000 of senior secured notes ("private placement secured demand notes") to fund its investment and operational activities, which private placement will be terminated by the Company upon the date of effectiveness of a registration statement of the Company registering variable denomination floating rate demand notes. The outstanding private placement secured demand notes are subordinate to the Company's and its subsidiaries' future secured bank debt and credit facilities and structurally subordinated to indebtedness or other liabilities of special purpose entity subsidiaries.

Until the time of the registered offering, the private placement secured demand notes will be secured by a pledge of Holding's equity interests in the Portfolio SPEs. Vault Holding, LLC entered into a guaranty agreement with the Company for the benefit of the Noteholders, which shall automatically terminate on the 30-day anniversary of the effectiveness of the registered offering.

<div align="center">F-17</div>

23-01249-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1147 of 1366

Exhibit 10, Page 1147

74/192

The private placement secured demand notes accrue interest at the rate of 2.00% per annum, based on a 365-day year, compounded daily; provided, however, that if an investor agrees to forego the right to make a demand for payment during the first year after issuance, the interest rate for that year will be 3.00%, and then will revert to the standard 2.00% for following periods. The interest rate may be increased, and subsequently decreased, in the Company's discretion, provided it does not drop below 2.00% (or 3.00% for the first year as applicable).

The private placement secured demand notes are sold through a private placement that expires on August 31, 2020, with an option to extend through August 31, 2022, unless terminated by the Company upon the effectiveness of a registration statement registering variable denomination floating rate demand notes.

The private placement secured demand notes, inclusive of accrued but unpaid interest, can be redeemed, in whole or in part, through a demand payment. Should an entire private placement secured demand note not be redeemed through demand payments, any remaining balances have a maturity date 15 years following the issuance date of the private placement secured demand note.

The Company will establish two sources of liquidity to address demand payments: first, the Company will set aside reserves of between 5-10% of the outstanding principal balances in available cash reserves (see Note 1); second, the Company plans to establish accounts with lending sources pursuant to which funds will be advanced to the Company. These lending sources have not been established at present and are not expected to be established until the Company establishes a registered offering.

The Company is restricted from making distributions to its members when the value of the real estate held at the Company's subsidiaries is less than 70% of the value of the outstanding private placement secured demand notes. Tax distributions and other distributions that may be legally required are exempted from this condition.

As of September 30, 2019, the outstanding private placement secured demand notes payable totaled $2,229,897. Approximately 97% of these private placement secured demand notes are held with foreign investors. At December 31, 2018, the outstanding private placement secured demand notes payable were $330,802. At December 31, 2018, approximately 86% of private placement secured demand notes payable were held by foreign investors.

**Note 4. Subsequent Events**

The Company has evaluated subsequent events for potential recognition or disclosure through February 14, 2020, the date the financial statements were available to be issued.

*Additional Private Placement Secured Demand Notes Sold*

As of February 14, 2020, the Company has sold additional private placement secured demand notes of $1,407,964 and redeemed private placement secured demand notes worth $2,947,500.

F-18

**Up to $500,000,000 of Senior Secured Demand Notes**



**ICAP VAULT 1, LLC**

**PROSPECTUS**

_____, 2020

Until _____, 2020 (90 days after the date of this prospectus), all dealers that effect transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

23-01243-WLH11    Doc 466    Filed 02/23/24    Entered 02/23/24 19:33:15    Pg 1149 of 1366

Exhibit 10, Page 1149

# PART II

## INFORMATION NOT REQUIRED IN THE PROSPECTUS

### Item 31. Other Expenses of Issuance and Distribution

The table below lists various expenses payable in connection with the sale and distribution of the securities being registered hereby. All the expenses are estimates, except the Securities and Exchange Commission ("SEC") registration fee. All such expenses will be borne by the Company.

| Type | Amount |
|------|-------:|
| SEC Registration Fee | $ 64,900 |
| FINRA Fee | 20,000 |
| Roadshow and Presentation Costs | 300,000 |
| Printing and Mailing Costs | 250,000 |
| Legal Fees and Expenses | 250,000 |
| Accounting Fees and Expenses | 150,000 |
| Miscellaneous Expenses | 165,100 |
| Total Expenses | $ 1,200,000 |

### Item 32. Sales to Special Parties

On July 30, 2018, in connection with the initial capitalization of our company, we issued 1,000 membership interests to iCap Vault, LLC, an affiliate of us, as the sole member for a capital contribution to us of $0.01.

Since our formation on July 30, 2018, we have only issued 1,000 membership interests to iCap Vault, LLC, our sole member, in exchange for a capital contribution to us of $0.01. The issuance was exempt from registration under Section 4(2) of the Securities Act of 1933 because the transaction did not involve a public offering.

### Item 34. Indemnification of Directors and Officers

The section of the prospectus entitled "Summary of Operating Agreement — Exculpation and Indemnification of the Manager and Others" discloses that we will generally indemnify Manager and its affiliates, any of our members, any person who is our officer and any person who serves at the request of the Manager on behalf of us as an officer, board member, managers of the Manager, independent representative, partner, member, stockholder or employee of such person to the fullest extent permitted by the law against all losses, claims, damages or similar events and is incorporated herein by this reference. Subject to any terms, conditions or restrictions set forth in the limited liability company agreement, Section 18-108 of the Delaware Limited Liability Company Act empowers a Delaware limited liability company to indemnify and hold harmless any member or manager or other person from and against all claims and demands whatsoever.

To the extent that the indemnification provisions of our limited liability company agreement purport to include indemnification for liabilities arising under the Securities Act of 1933, in the opinion of the SEC, such indemnification is contrary to public policy and is therefore unenforceable.

### Item 35. Treatment of Proceeds from Stock Being Registered

Not applicable

23-01224-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1150 of 1366   Exhibit 10, Page 1150

23-01243-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1151 of Exhibit 10, Page 1151
1366

**Item 36. Financial Statements and Exhibits**

(a) Financial Statements.

See page F-1 for an index of the financial statements that are being filed as part of this registration statement.

(b) Exhibits.

The list of exhibits following the signature page of this registration statement is incorporated herein by reference.

**Item 37. Undertakings**

Insofar as indemnification for liabilities arising under the Securities Act "may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(a) Rule 415 Offering. The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement.

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

23-01243  WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1152 of 1366   Exhibit 10, Page 1152

# SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement on Form S-11 to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Bellevue, State of Washington, on February 14, 2020.

ICAP VAULT 1, LLC
By: iCap Vault Management, LLC, its manager

By: */s/ Chris Christensen*
Chris Christensen
Chief Executive Officer

# POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Chris Christensen as his true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments and registration statements filed pursuant to Rule 462(b) under the Securities Act of 1933) to this Registration Statement and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney-in-fact and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that each of said attorney-in-fact and agent or his substitutes or substitute, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement on Form S-11 has been signed by the following persons in the capacities indicated on February 14, 2020.

| Name | Title |
|---|---|
| */s/ Chris Christensen*<br>Chris Christensen | Chief Executive Officer and Member of Board of Managers of iCap Vault Management, LLC<br>(Principal Executive Officer) |
| */s/ Jonathan Siegel*<br>Jonathan Siegel | Chief Financial Officer and Member of the Board of Managers of iCap Vault Management, LLC<br>(Principal Financial Officer and Principal Accounting Officer) |
| */s/ Jim Christensen*<br>Jim Christensen | Chief Operating Officer and Member of the Board of Managers of iCap Vault Management, LLC |

105

23-01224-WLH11 Doc 466 Filed 02/23/24 Entered 02/23/24 19:33:15 Pg 1153 of 1366    Exhibit 10, Page 1153

## PART III – EXHIBITS

## EXHIBIT INDEX

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 3.1* | Certificate of Formation of iCap Vault 1, LLC dated July 30, 2018 |
| 3.2* | Limited Liability Company Operating Agreement of iCap Vault 1, LLC dated August 1, 2018 |
| 3.3* | Form of Amended and Restated Limited Liability Company Operating Agreement of iCap Vault 1, LLC |
| 4.1* | Form of Indenture among iCap Vault 1, LLC, Vault Holding, LLC and American Stock Transfer & Trust Company, LLC |
| 4.2* | Form of Note |
| 4.3* | Form of Subscription Agreement (for use with the Notes) |
| 4.4* | Form of Pledge and Security Agreement by and among Vault Holding, LLC and American Stock Transfer & Trust Company, LLC, as trustee, in favor of Notes. |
| 4.5* | Form of Guaranty Agreement from Vault Holding, LLC in favor of Notes |
| 4.6* | Form of Paying Agent Agreement |
| 4.7* | Form of Collateral Agent Agreement between iCap Vault 1, LLC, Vault Holding, LLC and Marketplace Realty Advisors, LLC, as collateral agent, with joinder for Noteholders. |
| 5.1* | Opinion of Anthony L.G., PLLC. |
| 21.1* | List of Subsidiaries |
| 23.1* | Consent of Independent Registered Public Accounting Firm |
| 23.2* | Consent of Anthony L.G., PLLC (included in Exhibit 5.1). |
| 24.1* | Power of Attorney (included on the signature page). |
| 25.1** | Statement of Eligibility of Trustee |

* Filed herewith.
** To be filed by amendment.

23-01224-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1154 of 1366   Exhibit 10, Page 1154

23-01243-WLH11   Doc 466   Filed 02/23/24   Entered 02/23/24 19:33:15   Pg 1155 of
1366
Exhibit 10, Page 1155

# EXHIBIT 11

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM CONTAINS MATERIAL NON-PUBLIC INFORMATION REGARDING ICAP FUNDING, LLC (THE "COMPANY"). BY ACCEPTING THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS HERETO (COLLECTIVELY THIS "MEMORANDUM"), THE RECIPIENT AGREES WITH THE COMPANY TO MAINTAIN IN STRICT CONFIDENCE ALL NON-PUBLIC INFORMATION, INCLUDING, BUT NOT LIMITED TO, THE EXISTENCE OF THE PROPOSED FINANCING AND ANY OTHER NON-PUBLIC INFORMATION REGARDING THE COMPANY OBTAINED FROM THIS MEMORANDUM, ANY OTHER TRANSACTION DOCUMENT OR THE COMPANY.

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# FOR ACCREDITED INVESTORS AND NON-U.S. PERSONS

# iCap Funding, LLC

## $50,000,000 of

## Secured Promissory Notes

## May 13, 2021

AN INVESTMENT IN OUR SECURITIES INVOLVES A HIGH DEGREE OF RISK. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF US AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD ONLY INVEST IN OUR SECURITIES IF YOU CAN AFFORD A COMPLETE LOSS OF YOUR INVESTMENT. YOU SHOULD READ THE COMPLETE DISCUSSION OF THE RISK FACTORS SET FORTH IN THIS MEMORANDUM.

DUE TO THE FACT THAT THE OFFERING IS A PRIVATE PLACEMENT AND EXEMPT FROM REGISTRATION, NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. SEE "CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS."

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
## FOR
## ACCREDITED INVESTORS AND NON-U.S. PERSONS

## ICAP FUNDING, LLC

### $50,000,000 OF AGGREGATE PRINCIPAL AMOUNT
### OF
### SECURED PROMISSORY NOTES

———————————

This Confidential Offering Memorandum ("***Memorandum***") summarizes the principal terms of the offering ("***Offering***") of the Secured Promissory Notes ("***Notes***") of iCap Funding, LLC (the "***Company***"). The Notes have not been, nor will they be registered or qualified under the Securities Act. They are being offered and sold in the United States only to non-US investors under Regulation S, and accredited investors in reliance on Rule 506(b) of Regulation D, promulgated under the Securities Act or under any applicable state securities laws. Neither the securities and exchange commission nor any state securities commission has approved or disapproved of these securities or determined if this memorandum is truthful or complete; any representation to the contrary is a criminal offense.

The information contained in this Memorandum is confidential. By acceptance of this Memorandum, each recipient agrees (a) not to reproduce or distribute this Memorandum to other persons (except the recipient's professional advisors) without the prior written consent of the Manager; (b) that the recipient and his, her or its professional advisors will keep confidential all information contained herein not already in the public domain; and (c) that the recipient will use this Memorandum for the sole purpose of evaluating a possible investment in the Notes. Each recipient also agrees to return this Memorandum and any other documents or information furnished by the Company to the recipient (and any and all copies thereof) upon request of the Company if the recipient declines to purchase any Notes.

There will be no public market for the Notes and there is no obligation on the part of the Company or any person to register the Notes under the Securities Act or any state securities laws.

This Memorandum includes data and information obtained from independent third-party sources. Although the Company does not have any reason to believe that such data and information is not accurate, the Company did not independently verify such data and information and cannot assure the accuracy or completeness of such data and information. Prospective investors must rely upon their own investigations and evaluations with respect to making an investment in the Notes being offered hereby.

Prospective investors will be advised of any material modifications to the terms of the offering or the Notes in writing prior to any sale of Notes to the prospective investors.

Nothing contained in this Memorandum is, or should be relied upon as, a promise or representation as to the Company's future performance. Prospective investors must rely upon their own examination of the Company and the terms of the Offering, including the merits and risks involved.

———————————

# SUMMARY OF MATERIAL TERMS

The following summarizes a number of the material provisions relating to the Notes being offered by iCap Funding, LLC, a Delaware limited liability company (the "***Company***"). This Memorandum is qualified in its entirety by the full text of the Note, Subscription Agreement, Pledge and Security Agreement, and the exhibits attached thereto. Capitalized terms used in this summary not separately defined herein have the meanings assigned to such terms in the Note and Subscription Agreement. No person will be permitted to invest in the Notes unless such person has received and reviewed the Note, Subscription Agreement, Pledge and Security Agreement, this Memorandum and other offering-related documents.

| | |
|---|---|
| **Amount to be Raised** | Up to $50,000,000 in aggregate principal amount of Senior Secured Promissory Notes (the "***Notes***") or such additional amount as determined by the Manager in its sole discretion. |
| **Investors** | Each investor in the Notes must be a non-US resident under Regulation S or an "accredited investor" as defined under Regulation D of the Securities Act (the "***Investors***"). |
| **Pledge and Security Agreement** | Each Note is secured by the membership interests of the Company through the Pledge and Security Agreement attached hereto as **Exhibit C**. |
| **Minimum Investment** | An investment of at least $500,000, unless a smaller investment is permitted by the Manager in its discretion. |
| **Target Closing Date** | The initial closing is anticipated to occur in May 2021, with subsequent closings permitted through May 31, 2022, unless extended up to 12-months by the Manager. |
| **Definitive Agreement** | The Notes will be issued and sold pursuant to a subscription agreement and will contain customary representations and warranties of the Company and the Investors (the "***Subscription Agreement***") in the form attached as **Exhibit B**. |
| **Maturity Date** | Each Note will mature 24-months after the date of investment (the "***Maturity Date***"), and principal and unpaid accrued interest will be due on the Maturity Date. The Notes may be prepaid prior to the Maturity Date without penalty. |
| **Interest Rate** | The Notes will accrue interest at the rate of 12% per annum, which will be compounded monthly through automatic interest reinvestment. Interest shall be a per annum rate of interest based on a 360-day year. Accrued interest will be due and payable in full at the Maturity Date, unless earlier prepaid. The Company may issue Notes with interest rates or maturity dates that are different from the options set forth in the Subscription Agreement. |
| **Security and Priority** | Each of the Notes will be secured by a Pledge and Security Agreement granting a security interest in the ownership interests of the Company. Each Note will be of equal seniority to the promissory notes issued by the Company to other investors. |
| **Events of Default** | Upon the occurrence of an Event of Default, the Holder may declare the Loan Amount to be due and payable and may exercise all legal enforcement rights available in the United States. |
| **Fees and Expenses** | Each party will bear its own fees and expenses incurred in the transactions contemplated by this Memorandum. |
| **Management Fee** | 5% annually |

| **Company Contact Information** | iCap Funding, LLC |
| | 3535 Factoria Blvd. SE, Suite 500 |
| | Bellevue, WA 98006 |
| | ATTN: CHRIS CHRISTENSEN |
| | OFC: (425) 278-9030; FAX: (425) 278-9025 |
| | EMAIL: investor@icapequity.com |

## FORWARD-LOOKING STATEMENTS

This Memorandum and its exhibits may contain statements that constitute forward-looking statements, as defined by federal securities laws. Forward- looking statements can be identified by the use of terminology such as "anticipates," "expects," "intends," "opportunity," "plans," "should," "predicts," "potential," "continue," "believes," "seeks," "would," "may," "will be," "likely to become," "estimates" and variations of these words and similar expressions. Forward-looking statements are subject to risks and uncertainties and include statements made regarding events, financial trends, future operating-results, financial position, cash flows and other general information concerning possible or assumed future results of operations of the Company or any project. Investors are cautioned that such statements are only predictions, forecasts or estimates of what may occur and are not guarantees of future performance or of the occurrence of events or other factors used to make such predictions, forecasts or estimates. Actual results may differ materially from the results expressed, implied or inferred from the forward-looking statements and may be worse due to a variety of factors, including changes in laws, adverse changes in real estate prices, adverse changes in interest rates, and adverse changes in the credit and capital markets. These forward-looking statements speak only as of the date on which the statements were made and the Company undertakes no obligation to update or revise any forward-looking statements made in this Memorandum or elsewhere as a result of new information, future events, future developments or otherwise, except as required by law.

## INVESTMENTS

To subscribe for the Notes, you must complete, execute and deliver to the Company the investment documents attached to this Memorandum, including the Subscription Documents, in the form attached to this Memorandum as **Exhibit B**. The Subscription Agreement requires you to represent, among other things, that you are an accredited investor or a non-US person, are acquiring Notes for your own account for investment and not with a view to resale or distribution, and that you are aware that transfer of the Notes is restricted by the absence of a market for the Notes. The Subscription Agreement also requires you to acknowledge that you have received and have had an opportunity to read this Memorandum and are aware of the risks associated with an investment in the Notes.

THE COMPANY'S ACCEPTANCE OF YOUR SUBSCRIPTION FOR NOTES DOES NOT CONSTITUTE A DETERMINATION BY THE COMPANY THAT THE INVESTMENT IS SUITABLE FOR YOU. THE FINAL DETERMINATION AS TO THE SUITABILITY OF AN INVESTMENT IN THE NOTES FOR YOU MUST BE MADE BY YOU AND YOUR ADVISORS.

# USE OF PROCEEDS

The following table sets forth the details of the fees and the funds available for use by the Company upon the sale of the Notes:

|  | Minimum Investment | Maximum Offering |
|---|---|---|
| Gross Offering Proceeds | $500,000 | $50,000,000 |
| Offering Expenses[1] | $5,000 | $5,000 |
| Organizational Expenses[2] | $5,000 | $5,000 |
| Management Fees (5%) | $25,000 | $2,500,000 |
| Amount Available for Company investment | $465,000 | $47,490,000 |

1    The Company may incur additional offering costs, including brokerage and finders fees of up to a maximum of 15% of the capital such brokers and finders raise, and other expenses, the aggregate amount of which is not yet known. Such expenses, to the extent incurred, will reduce the net proceeds realized by the Company.

2    Organizational expenses include the cost of preparing this Memorandum and other offering documents.

## Allocation of Offering Proceeds

We intend to use the net proceeds for the following purposes in the following order: (a) first towards the fees and expenses associated with organization of the Offering, including legal, accounting, and other professional fees; (b) second towards the acquisition of Portfolio Investments (defined below) for the Company; (c) third towards the cost of marketing and management associated with the Company's operations, including technology infrastructure and maintenance and fees to Manager; and (d) the balance towards working capital and general corporate purposes. This offering is being conducted on a self-underwritten, best efforts basis. The total proceeds from this offering will not be escrowed or segregated but will be available to us immediately. There is no minimum amount of Notes that must be sold before we access investor funds. The exact amount of proceeds we receive may vary considerably depending on a variety of factors, including how long the Notes are offered. No proceeds will be used to compensate or otherwise make payments to officers or directors except for ordinary payments under employment or consulting agreements.

## Portfolio Investments

At any time, the Company may use offering proceedsto retire any debt obligation of the Company, including those held by other investors, or to purchase the position of an Affiliate of the Company in another entity or venture. The foregoing table is an estimate of the Company's allocation of the available offering proceeds. The Manager has discretion to utilize all proceeds as it deems necessary to accomplish the Company's business purposes.

The Company's "Portfolio Investments" may consist of any one or more of the following: income-producing properties, including single-family homes, multi-family apartments, townhomes, commercial properties and mixed-use properties; properties that the Company may acquire at a discount from market values, with the intention of selling the property at market prices for a gain; financial instruments that bear a relation to real estate, such as preferred equity, common equity, or loan instruments that are secured or unsecured by the properties; investments into real estate operating companies, real estate holding companies, REIT holdings, joint ventures, and pooled investment funds, any of which may be Affiliates of, or transactions with, the Company or its Manager or entities with whom management of the Company has had prior relationships. In particular, the Company expects to invest in debt funds or debt instruments of Affiliates of the Manager. These include, but are not limited to, iCap Pacific Northwest Opportunity and Income Fund, LLC, iCap Northwest Opportunity Fund, LLC, iCap Equity, LLC, iCap Pacific Income Fund 4, LLC, iCap Pacific Income Fund 5, LLC, and other entities controlled by the Affiliates of the Manager including the iCap Vault entities. These entities currently, or at the time of investment, have or will have negative cash flows and negative equity and there may be substantial doubt as to their ability to continue as a going concern. The Company may make loans to such entities or invest in equity positions and may do so either directly or through a secondary market transaction with the individual investors in such entities.

Portfolio Investments may be held directly by the Company or held in a standalone wholly owned limited liability company (a "Portfolio SPE") and one or more Portfolio SPEs may be held by a holding company that is wholly owned by the Company, rather than by the Company directly.

## COMPANY OVERVIEW

**The Company**

The Company is a Delaware limited liability company, whose sole member is iCap Enterprises, Inc., a Washington corporation, which is wholly owned by Chris Christensen.

The Company primarily derives its income from the gains it receives from its Portfolio Investments. The Company seeks investments that have high yield potential and are related to real estate. Many of the Portfolio Investments may be purchased at a discount. Some or all of the Portfolio Investments will be transactions with Affiliates of the Manager, whether directly with such Affiliates or with investors of Affiliates of the Manager, and such transactions may occur through a secondary market.

Although this Memorandum refers to "iCap" and the Company as though each were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this Affiliated group of companies. By investing in the Company, the Investor will not acquire an interest in any of its Affiliated entities, but it may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Company as it conducts its business.

**Prior Performance of the Manager**

Members of the management team previously established iCap B1, LLC, and iCap B2, LLC in 2013, which raised a total of $6,915,664 for the purpose of making investments into various real estate projects. These special purpose vehicles made 10 investments and generated a gross IRR to investors of 20%. The management team also issued a total of $93 Million in debentures across two pooled investment funds, iCap Pacific NW Opportunity and Income Fund, LLC, and its follow-on fund, iCap Northwest Opportunity Fund, LLC. Investors in these two funds earned a 12% annualized rate of interest and 11% annualized rate of interest respectively. Additional Affiliate entities include iCap Equity, LLC, which pays a 10% rate of interest annually to its investors, iCap Pacific Income Fund 4, LLC, which pays a 10% annual rate of interest, iCap Pacific Income Fund 5, LLC, which pays a 9% annual rate of interest, and iCap Investments, LLC, which pays a 4% annual rate of interest for 1-year investments and a 6% annual rate of interest for 2-year investments. Additionally, iCap Vault, LLC holds various subsidiary entities that offer demand note programs to investors ranging from 2.04-5.04% interest. iCap 134th Street, LLC pays between 10-15% interest. As of the date of this Memorandum, iCap has approximately $154 Million in assets under management (including reserves and committed capital for investments), which has been invested across 75 projects.

YOU SHOULD RECOGNIZE THAT BY PURCHASING NOTES IN THE COMPANY YOU WILL NOT THEREBY ACQUIRE ANY OWNERSHIP INTEREST IN ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. YOU SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES IS GIVEN SOLELY TO ALLOW YOU TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. YOU SHOULD NOT ASSUME THAT THE INVESTORS IN THIS OFFERING WILL EXPERIENCE RETURNS, IF ANY, ON THEIR INVESTMENTS SIMILAR TO THOSE EXPERIENCED BY INVESTORS IN THE PRIOR PROGRAMS SPONSORED BY THE MANAGER AND ITS AFFILIATES.

**Investment Process**

The Manager of the Company will have discretion to select the investment opportunities in which the Company will invest. The Manager will consult with trusted advisors and obtain legal and tax counsel in structuring the investments, but will ultimately have the discretion to make the investment decisions. The Company completes diligence on prospective investments and maintains post-closing procedures that provide for the ongoing supervision of the investments. The investment process has four major areas of focus: analysis and approval, documentation and closing, and post-closing and management.

**Risk Controls**

The Company's entity structure and investment strategy have been designed to mitigate risk and increase the likelihood of success. Each investor will receive a Note upon closing, which will provide the investor with a priority return for repayment over equity holders, and an ongoing interest rate. Lastly, the Company has targeted strong markets for its investments in the Pacific Northwest.

**Management of the Company**

The management and supervision of the Company is vested exclusively in the Manager, iCap Enterprises, Inc. (including its duly appointed agents), who has full control over the business and affairs of the Company. The Manager has the power on behalf and in the name of the Company to carry out any and all of the objects and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings that the Manager, in its sole discretion, deems necessary or advisable or incidental thereto. Investors must rely upon the judgment and experience of the Manager to manage the Company.

The Manager and its Affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

Chris Christensen leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. He is also primarily responsible for tax and accounting decisions. Chris is 45, and prior to forming the Company, he managed affiliated funds, formed and managed operating entities, including Edge Construction, LLC and iCap Enterprises, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a Juris Doctor degree from Seattle University School of Law, a Master's degree in International Business from Seattle University, and a Bachelor of Arts degree in Economics from the University of Utah. He is the brother of Jim Christensen.

**Issuance of Prior Notes and Future Notes**

The Notes in this Offering will be of equal seniority to any previously issued notes of the Company. In the future, the Company may issue Notes with interest rates, maturity dates, or other terms under this Offering that are different from the rates, maturity dates, and terms offered to other investors. Such notes will be of equal seniority and priority as the other promissory notes that have been issued.

## POTENTIAL CONFLICTS OF INTEREST

The Manager and its Affiliates will be entitled to certain types of compensation, fees, income, distributions or other payments from the Company or in connection with a Company investment. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Company. The Manager has no obligation to advance funds to cover the Company's expenses. However, to the extent that such advances are made, the Company will repay such amounts out of its funds as soon as they are available, whether such funds are from the Company's operating revenues or third-party loans. Below is a summary of these key payment obligations of the Company and potential conflicts of interest that could arise from these obligations.

**Compensation and Other Payments to the Manager**

At any time, the Company may choose to impose an annual management fee, provided such fee does not exceed 5.0% per annum of the funds raised.

In addition to the annual management fee, the Company will reimburse the Manager and its Affiliates for any reasonable expenses paid by either Person that properly be borne by the Company. Such expenses include costs incurred before and after the formation of the offering, such as organizational and offering expenses; consulting, legal, accounting, and professional fees; and marketing and travel expenses.

The Company must distribute to the Manager, as a member of the Company, in cash the Estimated Tax Amount within 90 days after the close of each fiscal year, unless (a) the Manager determines the tax distribution would render the Company insolvent or would necessitate borrowing by the Company; (b) an Event of Default (as defined in the Notes) has occurred under the Notes or is continuing; or (c) the Manager determines that the tax distribution would otherwise be materially adverse to the Company. The Company is not required to make any distributions to its members prior to dissolution other than tax distributions.

The Manager may authorize non-tax-related distributions of net cash flow as long as the Company is not in default under the terms of any Note. Additionally, after the Company has paid the outstanding principal and annual interest due and payable under the Notes, the Company may distribute any remaining profits to the Manager. The Manager's profit interest in the Company may create an incentive for the Manager to make more speculative investments on behalf of the Company than the Manager otherwise would make in the absence of such profit potential.

The Manager is owned and controlled by Chris Christensen, and he has much involvement with the operations of the Company. Additionally, Mr. Christensen may sign personal guaranties for loans to the Company that are secured by the assets of the Company. Customary fees may be paid to Mr. Christensen as a result of the risks involved in such guarantees, which typically are 1.0% per year of the debt being guaranteed.

**Transactions with the Manager and its Affiliates**

The Company may enter into various transactions with the Manager and its Affiliates, including performance of services for a Project Entity or an entity related to a Portfolio Investment, providing financing, guarantying financing, purchasing or selling property or other assets, or participating in an investment in a Project Entity alongside a subsidiary of the Company provided the terms are commercially reasonable. Compensation and fees could be paid with respect to these transactions as described below. To the extent any such transaction may pose a conflict of interest between the Company and the Manager or its Affiliates this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company.

In the event the Company enlists the services of any Affiliate of the Manager, the rates of compensation of these Affiliates for the performance of their various services will be at arms-length rates no higher than what the Company could obtain from unaffiliated third parties and all payments will be subject to inspection by auditors upon request.

Additionally, in the event the Manager, or an Affiliate of the Manager, guaranties, whether personally or otherwise, a loan,

bond or other obligation of the Company or of any of its subsidiary entities, such Manager or Affiliate will be entitled to an annual fee equal to 1% of the outstanding loan amount, bond amount, or other obligation.

The Company's "Portfolio Investments" may consist of any one or more of the following: income-producing properties, including single-family homes, multi-family apartments, townhomes, commercial properties and mixed-use properties; properties that the Company may acquire at a discount from market values, with the intention of selling the property at market prices for a gain; financial instruments that bear a relation to real estate, such as preferred equity, common equity, or loan instruments that are secured or unsecured by the properties; investments into real estate operating companies, real estate holding companies, REIT holdings, joint ventures, and pooled investment funds, any of which may be Affiliates of, or transactions with, the Company or its Manager or entities with whom management of the Company has had prior relationships. In particular, the Company expects to invest in debt funds or debt instruments of Affiliates of the Manager. These include, but are not limited to, iCap Pacific Northwest Opportunity and Income Fund, LLC, iCap Northwest Opportunity Fund, LLC, iCap Equity, LLC, iCap Pacific Income Fund 4, LLC, iCap Pacific Income Fund 5, LLC, and other entities controlled by the Affiliates of the Manager including the iCap Vault entities. These entities currently, or at the time of investment, have or will have negative cash flows and negative equity and there may be substantial doubt as to their ability to continue as a going concern. The Company may make loans to such entities or invest in equity positions and may do so either directly or through a secondary market transaction with the individual investors in such entities.

**Fees Payable by Project Entities**

In some instances, an Affiliate of the Manager may perform services for a subsidiary entity or a Project Entity in order to provide better pricing or efficiency than would otherwise be available from third parties. In these instances, such Affiliates may be paid customary service fees for time, material, or labor.

In some instances, an Affiliate of the Manager may provide lending to a Project Entity in connection with or in lieu of financing from non-affiliated third parties. In such circumstances, the Affiliate may charge customary fees in connection with the issuance of such loans such as interest, origination fees, exit fees, and other fees.

**Acquisition, Transfer, and Divestiture of Investments to or from Affiliates**

The Company may acquire investments previously entered into by Affiliates of the Manager, or may partially or wholly transfer an investment to or from Affiliate entities, subject to underwriting and investment criteria of the Company and the Manager's Affiliates. Any investment acquisition or transfer that occurs may require a determination of the value of the investment, which may pose a conflict of interest between the Company and the Manager or its Affiliates, which must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company. Notwithstanding the foregoing, the Manager is not obligated to cause the Company or any Affiliate to enter into any such transactions.

**Devotion of Time and Attention**

The Manager will cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the Company's investments, and other activities of the Company as much time as may be reasonably necessary for the performance of their respective duties in their capacities as managing principals. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Company's investment objectives; (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund, any pre-existing funds, and any investments of those successor or pre-existing funds; (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his/her own account; (e) engage in civic, professional, industry and charitable activities; and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

The Manager and its Affiliates have established, and may establish, other pooled investment funds that have investment objectives identical to those of the Company or its Affiliates, and the principals of the Manager may devote such time and attention as they deem necessary for the success of such funds.

## RISK FACTORS

As with all investments, a purchase of the Notes is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. In addition to the information set forth elsewhere in this Memorandum, you should consider the following risks before deciding whether to invest.

**Operation and Company Risks**

> ***Control is vested in the Manager; no Investor should purchase the Notes unless the Investor is comfortable with the Manager's judgment and experience in running the Company's affairs.***

Control over all decisions affecting the Company, including decisions regarding the investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, refinancing of Project Entities, whether to make an investment, whether an Affiliate is eligible for an investment, extensions of investments and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors. No assurance can be given that sufficient investments will be presented to the Company to deploy all of the capital available for investment.

When you subscribe for Notes that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the investments that the Manager subsequently identifies. You should not invest in the Company, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

> ***Proceeds from Investments will be re-invested during the life of the Company.***

The Manager has the discretion to retain all or a portion of the proceeds from investments to make new investments, and intends to do so over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

> ***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Company or the Project Entities, provided the terms are commercially reasonable. These measures may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. In addition, before the Company invests all of its investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between investment opportunities that may meet the investment criteria of Affiliates of the Company or of the Manager.

> ***Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Notes.***

The Manager has not arranged for Investors to be separately represented by independent counsel. The legal counsel who has performed services for the Company has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

Pursuant to the terms of the Subscription Agreement, the Notes may be issued with original issue discount (or "OID") for U.S. federal income tax purposes. As such, if you are a U.S. Holder (as defined herein), you may be required to include OID (taxable as ordinary income) in taxable income each year in excess of the amount of interest payments actually received by you in that year.

> *You will not be investing in a fund vehicle. The prior performance data presented should provide you relevant information regarding fund entities overseen by the Company, but should not be construed as an indication of the likely financial performance of the Company.*

By investing in the Company, you will not be a creditor to the Affiliates of the Company nor in any of the prior investments sponsored by its Affiliates. The Company has provided selected information regarding its prior investments because it felt investors might consider those investments to be relevant in assessing the experience and judgment of the Manager or the Company's management team. Investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique and the Company may not be able to replicate the success of prior Affiliated investments, even if the investments assembled for the Company's portfolio are similar to those obtained for prior investments.

> *The Company may prepay the principal and interest on the Notes at any time.*

The Company may prepay the principal amount of the Notes, in whole or in part, at any time after one year from the date of investment. The Company may also choose to pay off some of the investor Notes while waiting to pay off the Notes of other investors. After the one-year mark, no prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Investors will not have certainty as to how long their respective Notes may be outstanding.

## Investment Risks

> *The Company will have limited control over the underlying investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the investments.*

The Company expects to acquire preferred equity in Project Entities, acquire and hold real estate through Project Entities, or, occasionally, issue debt interests to Project Entities. Accordingly, the Company will not likely have control over such Project Entities (except in certain circumstances relating to the Company enforcing its creditor rights or contractual rights) and will be required to rely on the Project Partners of such Project Entities to use their skill, expertise and background to generate value from the investments.

> *Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.*

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that Investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

Real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without reviewing detailed budgets, such budgets may understate the expenses.

> *The Company is subject to a number of risks in the enforcement of its rights relating to investments.*

The Company's real estate investments will typically involve preferred equity investments in Project Entities secured by a

deed of trust in the underlying real property and a pledge of the Project Partner's membership interest in the Project Entity. The Company also has the authority to issue or purchase debt collateralized by real property. These investments are subject to the following risks:

(a)    The Company's investment structure is unique. Although the Company generally requires a Project Entity to grant a deed of trust in the underlying real property owned by the Project Entity to secure the Company's investment and return, and requires the Project Partners to pledge their equity interest in the Project Entity to the Company, there can be no assurance that such interests will be enforceable or that, in the event of non-performance by the Project Partner or a default by the Project Entity, that the real estate will be readily transferred to the Company or that the Company can obtain control of the Project Entity. There is a risk that Project Partners or other third parties may oppose or contest the enforceability or priority of such security.

(b)    During the course of an investment, or in the event the Company exercises its contractual remedies upon non-performance by the Project Partner or a default by the Project Entity, there is a risk that a Project Partner or other third party oppose or contest the enforceability of the Company's investment documentation, or assert claims or defenses against the Company or the Manager, including claims relating to the Company's ability to remove the Project Partner and take over management of a project. Such claims and potential litigation may result in the Company incurring substantial legal fees, and adversely affect the Manager's ability to mitigate losses resulting from a Project Partner's failure to perform.

(c)    There is no assurance that the Company will subsequently acquire title to the collateral property. The Project Partner may cure defaults or arrange for the Company's investment to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third-party may be prepared to outbid the Company to purchase the collateral property.

(d)    A debtor or Project Partner may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent debtors. These protections are at the expense of the Company, and may result in staying the Company's foreclosure proceedings, proceedings against the Project Partner, restructuring of the terms of the Company's investment, or otherwise delaying or interfering with the enforcement of the Company's rights under its investment documentation.

***Uninsured losses on the investments could materially reduce investment returns, which may impact the ability to return principal balances under the Note.***

The Project Partner or the Manager will obtain insurance policies for the Projects that are commercially prudent given the local market and circumstances of the Project (typically, including liability, fire and extended coverage). However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Projects should be partially or totally destroyed, the Company, as an investor in the Project Entity, may suffer a substantial loss of capital as well as profits. Even if the Project Partner's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Project Entity will sustain a substantial uninsured loss as a result of the casualty.

***The Company Expects to invest in Affiliate entities that have little or negative cash flow, negative equity, and substantial doubt as to their ability to continue as a going concern, which could prevent the Company from paying its obligations under the Notes.***

The Company will make loans or investments in Affiliates of the Manager. Such entities have operated with negative cash flows since inception, have more liabilities than assets, and have substantial doubt as to their ability to continue as a going concern. If these Affiliates are unable to pay back the Company's investment amounts, there is a risk that the Company will be unable to pay back the Notes in this Offering when due, if at all, and investors could lose all of their investment.

## Private Offering and Liquidity Risks

***This offering of the Notes is being made in reliance on an exemption from registration requirements and there is no guarantee that it will comply with the regulatory requirements for such exemption.***

This private placement of Notes will not be registered with the Securities and Exchange Commission ("***SEC***"). The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to Investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, Investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

***This is a private offering and as such you will not have the benefit of review of this Memorandum by***

*the SEC or other agency.*

Since this offering is a private placement of securities and, as such, is not registered under federal or state securities laws, you will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

### *The Notes will be Illiquid*

The Company expects its investments to be illiquid. Accordingly, the timing of its returns on those investments will be dependent upon various market factors. If the underlying assets in those investments are held for long periods or if any income streams of the Company are delayed or reduced, the Investors will be compelled to wait until the underlying assets are sold or improved, before being in a position to liquidate their investments. The Manager expects the Project to have an investment time frame of 2 years or less. However, the Company may have little or no control over when the underlying properties are liquidated.

You must represent that you are purchasing the Notes for your own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, encumber or otherwise dispose of your Notes unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Code or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans and you may not be able to liquidate your investment in the event of emergency or for any other reason, or may be able to liquidate your investment only at a substantial discount.

## U.S. FEDERAL INCOME TAX MATTERS

### Introduction

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Notes.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Notes, that purchased Notes at their original issue price for cash, and that hold such Notes as capital assets within the meaning of Section 1221 of the Code.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Notes by certain investors that are subject to special tax rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Notes in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Notes, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Notes, including the applicability of any U.S. federal tax laws or any state, local,

or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

**Considerations Relating to U.S. Holders of the Notes**

As used herein, the term "***U.S. Holder***" means a beneficial owner of a Note that is, for U.S. federal income tax purposes:

- An individual citizen or resident of the U.S.;

- A corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- An estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- A trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Notes that is a partnership and the partners in such a partnership should consult their tax advisors.


**Classification of the Notes**

Pursuant to the terms of the Note, the Company and each holder of Notes will agree to treat the Notes, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Company's determination that the Notes constitute debt for U.S. federal income tax purposes. If any portion of the Notes is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Note could differ from the timing and character of income, gain or loss recognized in respect of the Notes described below. The remainder of this discussion assumes that the Notes will be treated as indebtedness in accordance with that agreement and our determination.

**Interest Income and Original Issue Discount**

Payments of "qualified stated interest" (as defined below) on a Note will be taxable to a U.S. Holder as ordinary income at the time that such payments are accrued or are received (in accordance with the U.S. Holder's method of tax accounting).

It is anticipated that the Notes may be issued at a discount from their stated redemption price at maturity and that such discount will be equal to or greater than the product of on-fourth of one percent (0.25%) of the stated redemption price at maturity multiplied by the number of full years to their maturity. As such, it is anticipated that the Holders of the Notes may be required to report original issue discount ("***OID***") over the term of the Notes. U.S. Holders of the Notes should be aware that, as described in greater detail below, they generally must include OID in ordinary gross income for U.S. federalincome tax purposes as it accrues, in advance of the receipt of cash attributable to that income.

In general, each U.S. Holder of the Notes, whether such U.S. Holder uses the cash or the accrual method of tax accounting, will be required to include in ordinary gross income the sum of the "daily portions" of OID on the Notes for all days during the taxable year that the U.S. Holder owns the debt security. The daily portions of OID on the Notes are determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of an OID debt security, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. In the case of an initial holder, the amount of OID on a Note allocable to each accrual period is determined by (a) multiplying the "adjusted issue price" (as defined below) of the Note at the beginning of the accrual period by the yield to maturity of the Note (appropriately adjusted to reflect the length of the accrual period) and (b) subtracting from that product the amount (if any) of qualified stated interest (as defined below) allocable to that accrual period. The yield to maturity of a Note is the discount rate that causes the present value of all payments on the Note as of its original issue date to equal the issue price of such Note. The "adjusted issue price" of a Note at the beginning of any accrual period generally will be the sum of its issue price and the amount of OID allocable to all prior accrual periods, reduced by the amount of all payments other than payments of qualified stated interest (if any) made with respect to such Note in all prior accrual periods. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of a Note at a single fixed rate of interest or, subject to certain conditions, based on one or more interest indices.

**Sale, retirement or disposition of Notes**

Upon the sale, retirement or other disposition of a Note, an Investor generally will recognize taxable gain or loss equal to

the difference between the amount realized on the disposition and the Investor's adjusted tax basis in the Note. A U.S. Holder's adjusted tax basis in a Note generally will be equal to its adjusted issue price (as described above) in the Note. Gain recognized on the disposition of a Note generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Note generally will be treated as an ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Note is more than one year). The deductibility of capital losses is subject to limitations.

**Backup withholding and information reporting**

Information reporting requirements generally will apply to payments of interest and OID made by the Company on, or the proceeds of the sale or other disposition prior to maturity of, the Notes. Backup withholding tax, currently at a rate of 28%, may apply to such payments if an Investor fails to:

- Furnish his, her or its taxpayer identification number (social security or employer identification number);

- Certify that such number is correct;


- Certify that he, she or it is not subject to backup withholding; or

- Otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, *provided* that the required information is furnished timely to the Internal Revenue Service (the "***IRS***").


## ERISA MATTERS

**Benefit Plan Investor Considerations**

The Notes offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or an individual retirement account ("***IRA***") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "***Similar Law***"). A fiduciary of an employee benefit plan must determine that the purchase and holding of a Note is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Notes offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Note offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Note that its acquisition and holding of the Note does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

## REPORTS TO THE INVESTORS

The Company has adopted a calendar fiscal year ending December 31. For so long as the Holder continues to hold the Note, the Company will provide to the Holder, as soon as practicable after the end of each fiscal year upon written request of Holder, consolidated balance sheets of the Company as of the end of such fiscal year and consolidated statements of income of the Company for such fiscal year, prepared in reasonable detail.

## GLOSSARY

To understand the rights associated with the Notes, Investor must review carefully the defined terms used in this Memorandum. Some of these definitions are set forth in this "GLOSSARY" and others in the body of this Memorandum. These definitions (some of which have been slightly modified) have been taken from the Note, which defines the preferences, privileges, rights, interests and obligations of the Notes. Many of these definitions are technical in nature, involve complicated relationships, and can only be understood by reference to other defined terms and, in some cases, to other provisions of the Note and Subscription Agreement. Section references in the definitions refer to sections in the Note and Subscription Agreement. Prospective investors should understand that the definitions in the Note and Subscription Agreement will, for all purposes, be controlling, notwithstanding any simplification of such definitions in this Memorandum. Moreover, you should bear in mind that this GLOSSARY does not include many of the definitions included in the Note and Subscription Agreement.

"*Affiliate*" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"*Estimated Tax Amount*" means, with respect to each member of the Company, the amount equal to (a) the sum of (i) the greater of the highest statutory marginal ordinary federal income tax rate for individuals or corporations for a given tax year plus (ii) the unearned income Medicare contribution tax rate under Internal Revenue Code Section 1411 for a given year, multiplied by (b) the taxable income allocated to that member for the taxable year.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"*Project Entity*" means any special purpose entity that the Company creates to execute an investment into a Portfolio Investment or into its real estate strategy.

"*Project Partner*" means any person engaged by the Company to manage a real estate project in which the Company invests.

## THE OFFERING

The following description of certain matters relating to the Notes does not purport to be complete and is subject in all respects to applicable Delaware Law and to the provisions of the Note and Subscription Agreement.

### General

The Offering has not been registered under the Securities Act and is intended by the Company not to involve a public offering within the meaning of the Securities Act and Regulation D and S promulgated thereunder and, therefore, to be exempt from the registration provisions of the Securities Act. Accordingly, the Offering is being made pursuant to certain conditions which, if satisfied, will qualify the Offering for exemption from registration as provided by the Securities Act and Regulation D and S. These conditions relate to limitations on the manner of Offering, the nature of the Investors, access to or furnishing information about the issuer, and restrictions on transferability. This Offering is not being offered pursuant to Regulation S and Rule 506(b) of Regulation D.

Subject to the terms of the Note and Subscription Agreement, the Company is authorized to raise up to $50,000,000 through the Offering. Investors must make a minimum investment of $500,000, unless a smaller purchase is permitted by the Manager. The Notes are secured by a Pledge and Security Agreement, the form of which is set forth in Exhibit C.

The Manager will have an initial closing for the Company as soon as practicable after a sufficient quantity of funds is raised

in the Manager's sole determination. To accommodate the admission of additional Investors and permit existing Investors to increase their investment amounts, the Manager may, in its discretion, hold one or more additional closings on or before May 31, 2022, unless extended up to 12-months by the Manager.

**Payment of Investments**

Each payment to the Company will be made in United States dollars by means of a certified or cashier's check payable to "iCap Funding, LLC" or by wire or electronic funds transfer, to a bank account designated by the Company, of immediately available funds through the federal wire transfer system, in the amount that the Holder has agreed to lend to the Company in the Note and Subscription Agreement.

**Acceptance of Subscriptions; Eligibility Requirements**

Purchases for the Notes will be accepted on a "first come, first-served" basis. The Manager reserves the right to reject any tendered investment for whatever reason the Manager deems appropriate. If the Manager rejects an investment, the Manager will give notice of such rejection, and return the tendered initial investment payment, no later than 10 business days after the Note, Subscription Agreement and the accompanying funds have been received by the Manager.

## TRANSFERABILITY OF THE NOTES

Subject to compliance with the requirements of the Note and Subscription Agreement, Investors shall have the right to transfer the Note to any qualifying third party of its choice contingent upon securing the Company's written consent in advance of the proposed transfer. The Company is under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under the Note or Subscription Agreement, until the Holder has surrendered the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Company. A new Note for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing any documentation required by the Company, and executing a Certificate of Accredited Investor. Interest and principal are payable only to the registered holder of the Note.

The Holder and any successor Holder agree(s) to provide to the Company a Form W-9 upon request. Until registration of a transfer occurs, the Company shall be entitled to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by the Subscription Agreement and the applicable Note.

**State Securities: Blue Sky Laws**

Transfer of the Notes may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Notes may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be registered for resale under the Blue Sky laws of any state, the Holders and any persons who desire to purchase them in any trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Notes and of purchasers to purchase the Notes. Accordingly, Investors should be prepared to hold the Notes until their maturity date as may be extended.

## FINANCIAL INFORMATION

This Memorandum does not include current balance sheets for either the Company or the Manager. The Manager has limited capitalization. As of the date hereof, the Company has incurred certain liabilities in connection with the offering and will incur substantial expenses in connection with the offering and sale of the Notes.

# NOTICES

The following notices apply in certain states where the Notes, which are referred to below as "securities," may be sold. Compliance with the notice exemption requirements of applicable state securities laws will be undertaken by the Company as needed.

**Notice to Residents of all States:**

THE SECURITIES OFFERED IN THE OFFERING HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND OTHER LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ACT AND THE SECURITIES LAWS OF CERTAIN JURISDICTIONS GRANT PURCHASERS OF SECURITIES SOLD IN VIOLATION OF THE REGISTRATION OR QUALIFICATION PROVISIONS OF SUCH LAWS THE RIGHT TO RESCIND THEIR PURCHASE OF SUCH SECURITIES AND TO RECEIVE BACK THEIR CONSIDERATION PAID. THE COMPANY BELIEVES THAT THE OFFERING DESCRIBED IN THIS MEMORANDUM IS NOT REQUIRED TO BE REGISTERED OR QUALIFIED. MANY OF THESE LAWS GRANTING THE RIGHT OF RESCISSION ALSO PROVIDE THAT SUITS FOR SUCH VIOLATIONS MUST BE BROUGHT WITHIN A SPECIFIED TIME, USUALLY ONE YEAR FROM DISCOVERY OF FACTS CONSTITUTING SUCH VIOLATION. SHOULD ANY INVESTOR INSTITUTE SUCH AN ACTION ON THE THEORY THAT THE OFFERING CONDUCTED AS DESCRIBED HEREIN WAS REQUIRED TO BE REGISTERED OR QUALIFIED, THE COMPANY WILL CONTEND THAT THE CONTENTS OF THIS MEMORANDUM CONSTITUTED NOTICE OF THE FACTS CONSTITUTING SUCH VIOLATION.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS ATTACHED TO THIS MEMORANDUM. NO ONE HAS BEEN AUTHORIZED TO PROVIDE YOU WITH ANY INFORMATION THAT IS DIFFERENT. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN GIVEN BY THE ISSUER OF THE SECURITIES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE ON THE COVER PAGE AND IS AN OFFER ONLY TO SUCH NAMED OFFEREE.

NEITHER THE INFORMATION CONTAINED HEREIN, NOR ANY PRIOR, CONTEMPORANEOUS OR SUBSEQUENT COMMUNICATION SHOULD BE CONSTRUED BY THE PROSPECTIVE INVESTOR AS FINANCIAL, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS, HER OR ITS OWN FINANCIAL, LEGAL, AND TAX ADVISORS TO ASCERTAIN THE MERITS AND RISKS OF THE OFFERING AND AN INVESTMENT IN THE COMPANY PRIOR TO SUBSCRIBING TO PURCHASE THE SECURITIES.

**Notice to New York Residents:**

THIS CONFIDENTIAL OFFERING MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

**Notice to Florida Residents:**

THE SECURITIES OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE SECURITIES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER OF THE SECURITIES OR AN AGENT OF SUCH ISSUER, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**Notice to New Hampshire Residents:**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

DURING THE COURSE OF THIS OFFERING, EACH PROSPECTIVE INVESTOR MAY OBTAIN ADDITIONAL INFORMATION WHICH SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY PROSPECTIVE INVESTOR WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE INVESTOR'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE COMPANY IF THE RECIPIENT DOES NOT PURCHASE THE SECURITIES OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE TO:

**EXHIBIT A**

**NOTE**

THIS SECURED PROMISSORY NOTE (THIS "NOTE") HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C.§15b ET SEQ., AS AMENDED ("SECURITIES ACT"), IN RELIANCE UPON ONE (1) OR MORE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE FEDERAL ACT. IN ADDITION, THE ISSUANCE OF THIS NOTE HAS NOT BEEN QUALIFIED UNDER THE SECURITIES STATUTES OF DELAWARE, OR ANY OTHER STATE SECURITIES LAWS (COLLECTIVELY, THE "STATE ACTS"), IN RELIANCE UPON ONE OR MORE EXEMPTIONS FROM THE REGISTRATION PROVISIONS OF THE STATE ACTS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFER AS SET FORTH IN THE SUBSCRIPTION AGREEMENT.

**Loan Amount $**_____          **Issue Date:**_____, 202____

<div align="center">

**iCap Funding, LLC**

**SECURED PROMISSORY NOTE**

</div>

Pursuant to the terms and conditions of this Secured Promissory Note (the "Note") iCap Funding, LLC, a Delaware limited liability company (the "Company"), for value received, promises to pay to _____ (the "Holder"), or the Holder's permitted assigns, the Loan Amount plus interest thereon as set forth herein. The Company and the Holder may be referred to herein individually as a "Party" and collectively as the "Parties."

This Note is issued pursuant to the terms of a Subscription Agreement between the Company and the Holder (the "Subscription Agreement") and is subject to the terms thereof.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, to which the Holder, by the acceptance of this Note, agrees:

**Section 1. Definitions.** In addition to the other terms defined herein, as used in this Note, the following capitalized terms have the meanings set forth below unless the context clearly indicates otherwise. All nouns, pronouns and verbs used in this Note shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable.

    **(a)** "Act" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

    **(b)** "Affiliate" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

    **(c)** "Business Day," when used with respect to any place of payment or any other particular location referred to in this Note or in the Note, means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions or trust companies in the City of Seattle are authorized or obligated by law or executive order to close.

    **(d)** "Notes" refer to, collectively, each Note issued by the Company whether individually or pursuant to the Offering (as defined in the PPM).

    **(e)** "Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

**(f)** "PPM" means the Confidential Private Placement Memorandum of the Company dated May 13, 2021.

**Section 2.**       **Payments and Prepayment.**

**(a)** Subject to the terms and conditions herein, the Company shall repay to Holder, to the extent not prepaid as set forth herein, the outstanding Loan Amount and all accrued and unpaid interest, on the date selected in the Subscription Agreement (the "Maturity Date").

**(b)** All principal and interest will be due and payable on the Maturity Date.

**(c)** The Company may choose to prepay part or all of the Note without penalty at any time prior to the Maturity Date. Any such prepayment will be credited first to any accrued and unpaid interest and then to the payment of the outstanding Loan Amount.

**Section 3.**       **Interest.**

**(a)** This Note shall bear interest at the per annum rate of 12%, compounded monthly, unless more frequent payments have been agreed to by the Company in which case simple interest shall be paid as agreed. Interest computation shall be based upon twelve 30-day months. Interest will accrue on the loan made to the Holder under this Note from the Issue Date as set forth above and shall be due and payable on the Maturity Date.

**(b)** In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of fifteen percent (15%) from and after proper delivery of written notice to the Company of the Event of Default, until all amounts due hereunder have been paid in full or the Event of Default has been cured.

**Section 4.**       **Representations and Warranties of the Company.** To induce the Holder to loan monies to the Company, the Company represents and warrants to the Holder as follows as of the Issue Date:

**(a) Organization and Authority.** The Company is a limited liability company, validly existing and in good standing under the laws of the State of Delaware, with full power and authority to enter into and perform this Note and the other agreements contemplated hereby to which it is now, or will be, a party. The Company has all requisite power and authority to, directly or indirectly, own its properties, to carry on its business as now conducted, and to enter into and perform its obligations under this Note.

**(b) Authorization; Binding Effect**. The Company has taken all actions that are necessary to authorize the execution, delivery and performance of this Note and the consummation of the transactions contemplated hereby. This Note and the other agreements contemplated hereby to which the Company is a party constitute the legal and binding obligations of the parties thereto, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights and the enforcement of debtors' obligations generally and by general principles of equity, regardless of whether enforcement is pursuant to a proceeding in equity or at law.

**(c) No Bankruptcy or Insolvency.** The Company has not filed any voluntary petition in bankruptcy or been adjudicated bankrupt or insolvent, filed any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any federal bankruptcy, insolvency, or other debtor relief law, or sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator of all or any substantial part of its properties. No court of competent jurisdiction has entered an order, judgment or decree (and the Company knows of no action or petition requesting such) approving a petition filed against

the Company seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any federal bankruptcy act, or other debtor relief law, and no other liquidator, trustee or conservator has been appointed of the Company or of all or any substantial part of its properties.

**(d) Valid Issuance of the Note**. This Note, when issued by the Company to the Holder for the consideration expressed therein, will be duly and validly issued, and, based in part upon the representations of the Holder in this Note, will be issued in compliance with all applicable federal and state securities laws.

**(e) Restricted Securities**. The Company acknowledges that the Note has not been and will not be registered with the Securities and Exchange Commission ("SEC") under the Act, and covenants that the Note will be offered and sold in compliance with an exemption from registration provided by (i) Rule 506 of Regulation D of the Act or (ii) Regulation S of the Act.

**(f) Governmental Consents and Notices.** No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Note, or the offer, sale or issuance of the Note, or the consummation of any other transaction contemplated hereby, except qualification (or taking such action as may be necessary to secure an exemption from qualification, if available) of the offer and sale of the Note under applicable state and federal securities laws, which qualification, if required, will be accomplished in a timely manner.

**(g) No Litigation.** There are no actions, suits or proceedings of any type pending or, to the knowledge of the Company, threatened, against the Company, its properties or assets which is likely to if adversely determined, individually or in the aggregate, have a material adverse effect on (a) the Company's ability to perform the obligations contemplated under this Note or other agreements contemplated hereby or (b) the business, operations, prospects, properties, assets or condition (financial or otherwise) of the Company. The Company is not operating under, or subject to, or in default with respect to, any order, writ, injunction or decree, including any of the foregoing affecting the ability of the Company to enter into this Note or perform its obligations contemplated under this Note and other agreements contemplated hereby.

**(h) No Breach; No Default.** To the best of the Company's knowledge, neither the execution, delivery or performance of this Note or the other agreements contemplated hereby to which the Company is a party, nor the consummation of the transactions contemplated hereby or thereby by the Company, (a) materially conflicts with or results in any material breach of, (b) constitutes a material default under, or (c) results in a material violation of: (i) any contract, commitment, lease, license, note or other instrument, including voting or limited liability company operating agreements, to which the Company is a party or by which any of its assets are bound, judgment, order, writ or decree or (ii) any provision of the Company's Certificate of Formation.

**(i) Taxes.** The Company has timely filed or will timely file or cause to be timely filed, all material tax returns (or extensions) required by applicable law to be filed by it prior to or as of the Issue Date, and paid (a) all amounts of taxes shown thereon to be due (including interest and penalties) and (b) all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangibles taxes) owing by it, except for such taxes (i) which are not yet delinquent or (ii) that are being contested in good faith and by proper proceedings, and against which adequate reserves are being maintained in accordance with United States generally acceptable accounting procedures.

**Section 5.** **Representations, Warranties and Notes of the Holder.** To induce the Company to accept the loan from the Holder, the Holder represents and warrants to the Company as of the date of the Issue Date as follows:

**(a) Purchase Entirely for Own Account.** The Note will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to distributing all or any part of the Note; the Holder has no present intention of selling, granting any participation in or otherwise distributing the Note in a manner contrary to the Act or any applicable state securities law; and the Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person with respect to the Note.

**(b) Due Diligence.** The Holder has been solely responsible for his, her or its own due diligence investigation of the Company and its business, and his, her or its analysis of merits and risks of the investment and subscription made pursuant to this Note, and is not relying on anyone else's analysis or investigation of the Company, its business or the merits and risks of the Note other than professional advisors employed specifically by the Holder to assist the Holder. In taking any action or performing any role relative to arranging the investment being made pursuant to this Note, the Holder has acted solely in his, her or its own interest and not in that of any other party, and no other party has acted as an agent or fiduciary for the Holder.

**(c) Access to Information; Modification of Offering.** If applicable, the Holder has received and reviewed in its entirety the PPM. The Holder has been offered access to full and complete information regarding the Company and has assessed to his, her, or its satisfaction the risks associated with an investment in the Note. In particular, the Holder has been given the opportunity to ask questions of, and receive answers from, the Company's officers concerning the terms and conditions of this Note, the PPM if applicable, and any other matters pertaining to the Company and an investment in the Note and has been given the opportunity to obtain such additional information necessary to verify the accuracy of such information. No information has been provided and no representations have been made to the Holder which are inconsistent with any information delivered to Holder or contained in the PPM. The Holder acknowledges that the Company may, in its sole discretion and for any reason whatsoever, modify, amend, increase or withdraw all or a portion of the Offering. In the event of the foregoing, the Company will not have any liability whatsoever to the Holder, except that the Company will be obligated to return any moneys transmitted to the Company by the Holder that have not been applied by the Company for the purchase of Notes, without interest or deduction.

**(d) Sophistication.** The Holder, either alone or with the assistance of his, her or its professional advisor, is a sophisticated investor, is able to fend for himself, herself or itself in the transactions contemplated by this Note, and has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of acquiring the Note.

**(e) Suitability.** The investment in the Note is suitable for the Holder based upon his, her or its investment objectives and financial needs, and the Holder has adequate net worth and means for providing for his, her or its current financial needs and contingencies and has no need for liquidity of investment with respect to the Note. The Holder's overall commitment to investments that are illiquid or not readily marketable is not disproportionate to his, her or its net worth, and investment in the Note will not cause such overall commitment to become excessive.

**(f) Professional Advice.** The Holder has obtained, or has had the opportunity to obtain, to the extent he, she or it deems necessary, his, her or its own professional advice with respect to the risks inherent in the investment in the Note, the condition and terms of this Note and the suitability of the investment in the Note in light of the Holder's financial condition and investment needs. The Holder is not relying on the Company or any of its directors, officers, employees or agents with respect to the legal, tax, economic and related considerations of an investment in the Note, nor is the Holder relying on the Company or any of its directors,

officers, employees or agents (including those of any Affiliates) with respect to the appropriateness of this investment for the Holder.

**(g) Ability to Bear Risk.** The Holder understands that the Company has limited prior operating history. The Holder recognizes that there is no market for the Notes and none is expected to develop; accordingly, his, her or its interest in the Note will be illiquid as well as subject to substantial contractual restrictions upon transferability. The Holder is in a financial position to purchase and hold the Note and is able to bear the economic risk and withstand a complete loss of his, her or its investment in the Note. The Holder agrees to waive any present or future claim against the Company, its officers, directors, representatives or Affiliates that the Note was not an appropriate investment for the Holder.

**(h) Risk Factors.** The Holder recognizes that an investment in the Note is subject to certain risks, the occurrence of which might result in a loss of the principal and interest due to the Holder. To the extent the Note was purchased as part of the Offering, the Holder has carefully reviewed and understands the risk factors set forth in the PPM.

**(i) Restricted Securities.** The Holder realizes that (a) neither the Notes nor the offering of the Notes have been registered under the Act or applicable state securities laws; (b) that the Notes are characterized under the Act as "restricted securities" and, therefore, cannot be sold or transferred unless they are subsequently registered under the Act or an exemption from such registration is available; (c) the Company is not being registered as an "investment company" as the term "investment company" is defined in Section 3(a) of the 1940 Act, and (d) there is presently no public market for the Note and the Holder would most likely not be able to liquidate his, her or its investment in the event of an emergency or to pledge the Note as collateral security for loans. The Holder's financial condition is such that it is unlikely that the Holder would need to dispose of any of the Note in the foreseeable future. In this connection, the Holder represents that he, she or it is familiar with Rule 144 of the Securities Act, as promulgated by the Securities and Exchange Commission, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

**(j) Further Limitations on Disposition.** Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Note unless and until there is compliance with the requirements herein, and, if requested by the Company, the Holder shall have furnished to the Company a detailed statement of the circumstances surrounding the proposed disposition and shall have furnished to the Company an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such Note under the Act and any applicable state Blue Sky laws.

**(k) Age; Residency.** The Holder, if an individual, is over 21 years of age and legally competent to execute this Note. For purposes of the application of state securities laws, the Holder represents that he, she or it is a bona fide resident of, and/or is domiciled in, the state or jurisdiction as set forth in the Subscription Agreement.

**(l) Investor Status and Subscription Agreement.** Holder hereby confirms and restates the representations and warranties as given by the Holder in the Subscription Agreement. The Holder is aware that the Company has been and is relying upon the representations and warranties set forth in the Subscription Agreement and in is Note, in part, in determining whether the Offering will qualify for an exemption from the registration provisions of the Act and applicable state securities laws. All of the information which the Holder has furnished the Company here, previously or in the documents or instruments contemplated by this Note with respect to the Holder's financial position and business experience is correct and complete as of the date hereof, and, if there should be any material change in such information, the Holder will immediately furnish the revised and corrected information to the Company. The Holder agrees to indemnify and hold harmless the Company and its Affiliates and their respective officers,

managers, directors, members or employees and their successors and assigns from and against any and all losses, damages, liabilities or expenses, including costs and attorneys' fees incurred by reason of any misrepresentation by the Holder or any breach of the Holder's warranties.

**(m) Tax Identification; Withholding.** Under penalties of perjury, the Holder, if a US citizen, certifies that (a) the number listed with the Holder's name on the signature page to this Note is the Holder's correct social security number or federal tax identification number, (b) the Holder is not subject to back-up withholding, either because he, she or it has not been notified that he, she or it is subject to back-up withholding as a result of a failure to report all interest and dividends or because the Internal Revenue Service has notified the Holder that he, she or it is no longer subject to back-up withholding and (c) Holder is not a "foreign person," "foreign corporation" or a person which is not a "United States person" within the meaning of Sections 1441, 1442, 1445 and 1446 of the Internal Revenue Code of 1986, as amended. (If the Holder has at any time received notice from the Internal Revenue Service that he, she or it is subject to back-up withholding and has not subsequently received a notice advising the Holder of the termination of back-up withholding, strike clause (b) above).

**(n) No View to Tax Benefits.** The Holder is not acquiring the Note with a view toward realizing any benefits under United States federal income tax laws, and no representations have been made to the Holder that any such benefits will be available as a result of the Holder's acquisition, ownership or disposition of the Note.

**(o) Confidential Information.** The Holder understands that the information delivered to him/her/it or contained in the PPM and this Note, is confidential and non-public information and agrees that all such information shall be kept in confidence by Holder and used by Holder solely for purposes of determining whether to purchase the Note. In addition, except as required by law, regulation or regulatory process, each Holder shall keep confidential, and shall cause each of its employees, agents, representatives, advisors or consultants to keep confidential all non-public information received by them with respect to the Company and its Affiliates following the Issue Date. The Holder, if an entity, represents and warrants that, as of the Issue Date, none of its beneficial owners are public agencies which are subject to state, federal or foreign laws providing for the possible public disclosure of certain records and information relating to the activities of such public agencies. The Holder agrees to notify the Company in the event such a public agency becomes a beneficial owner of the Holder and agrees to reasonably cooperate with the Company in such event to take steps, including entering into confidentiality agreements that restrict the access of certain of the Holder's beneficial owners to certain information, to protect information about the Company and its investments from being publicly disclosed by such public agency.

**(p) No General Solicitation.** The Holder is unaware of, is in no way relying on, and did not become aware of, the offering of the Note through, or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television, radio or Internet and is not subscribing for the Note, and did not become aware of the offering of the Note through, or as a result of, any seminar or meeting to which the Holder was invited, or any solicitation otherwise initiated, by a person not previously known to the Holder in connection with investments in securities generally.

**(q) Representations and Warranties of Organization.** If the Holder is a corporation, partnership or other association, trust or similar entity, the Holder hereby represents and warrants to the Company that the Holder is authorized and otherwise duly qualified to acquire the Note, and the individual executing this Note on behalf of the Holder has been duly authorized to do so and to bind the Holder by this Note (if the Holder is an individual who is investing through a revocable trust, an IRA or an account in a self-directed employee benefit plan (a "Self-Directed

Entity"), such representation and warranty applies to the Self-Directed Entity, and, for this purpose, the term "Holder" shall be deemed to refer to the Self-Directed Entity).

**Section 6.**        **Covenants**.

(a) **Tax Statements.** The Company will furnish to Holder as soon as available, and in any event within sixty (60) days after December 31 of each year, all reasonably required tax information applicable to the Holder.

(b) **Use of Proceeds.** The proceeds from the sale and issuance of the Notes are expected to be used for the purposes of the Company, and for the fees, costs and expenses incurred in connection with the Offering. However, the Manager retains sole discretion to determine how such proceeds are ultimately used. Distributions may be made so long as the Company is not in default under the Note obligations.

(c) **Information Rights**. For so long as the Holder continues to hold the Note, the Company will provide to the Holder annual financial statements of the Company and such information relative to the Company's business operations and performance as its management may deem useful or appropriate.

(d) **Notice of Default**. The Company hereby covenants and agrees, as of the Issue Date and thereafter until the Notes and all other obligations arising under this Note have been repaid in full, the Company shall give notice in writing to the Holders (promptly, but in any event within thirty (30) business days after the Company knows or has reason to know thereof), of the occurrence of any Event of Default.

**Section 7.**        **Defaults and Remedies**.

(a) **Events of Default.** An "Event of Default" occurs if any of the following occur, regardless of the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

   (i)   With regard to an individual Note, the Company defaults in the payment of such Loan Amount or interest on the outstanding Note, when the same becomes due and payable and such default continues for a period of thirty (30) Business Days after notice of such default has been delivered to Company by the applicable holder thereof (such period, a "Grace Period");

   (ii)  the Company fails to observe or perform any covenant or warranty of the Company in this Note (other than a covenant or warranty a default in whose performance or whose breach is specifically dealt with elsewhere in this Section), and such failure continues for a period of thirty (30) calendar days after the Holder has given written notice to the Company specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

   (iii) the Company, pursuant to or within the meaning of any Bankruptcy Law (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

   (iv)  a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Company in an involuntary case, (ii) appoints a

custodian of the Company for all or substantially all of its property, or (iii) orders the liquidation of the Company; and the order or decree remains unstayed and in effect for ninety (90) consecutive calendar days.

**(b)** The term "Bankruptcy Law" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

**(c)** Upon the occurrence of an Event of Default and the expiration of any required time periods for notice, cure or other reasons, the Holder may declare the Loan Amount (including the Loan Amount or interest on the Holder's Note) to be due and payable. Upon such a declaration, such principal and interest, if any, shall be immediately due and payable.

**Section 8.     Transfer of the Note**. Holder may not sell, assign or transfer this Note or the Note or any portion thereof, including, without limitation, the Holder's rights, title, interests, remedies, powers and/or duties hereunder or thereunder, as the case may be, without the express written consent of the Company, which consent may be granted or withheld in the Company's sole discretion, and without complying with the terms of this Note and any other requirements set forth by the Company, as well as all applicable federal and state securities laws.

**Section 9.     Waivers.** The Company waives presentment for payment, demand, notice of nonpayment, notice of protest and protest of this Note, and all notices in connection with the delivery, acceptance, or dishonor of this Note.

**Section 10.   Anti-Terrorism Matters.** The Holder hereby authorizes the Company to take, without prior notice to the Holder, such action as the Company determines to be reasonably necessary or advisable to comply, or to cause the Company to comply, with any anti-terrorism laws, rules, regulations, directives or special measures. Without limiting the foregoing, the Company may disclose any information concerning the Company or the undersigned necessary to comply with such laws, rules, regulations, directives or special measures, and the Holder shall provide the Company, promptly upon request, all information the Company reasonably deems necessary or advisable to comply with such laws, rules, regulations, directives or special measures.

**Section 11.   Survival**. The representations and warranties of the Parties shall survive the consummation of the sale of the Note to Holder hereunder.

**Section 12. Oral Agreements. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**Section 13.     Deemed Consent.**

**(a)** Each request for consent, approval or waiver under this Note, for an amendment hereof or other matter, which is sent by the Company, shall be made in writing to the Holder, and shall include all information necessary for Holder to make an informed decision as to whether to agree to such consent, approval, waiver or amendment, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN SECURED PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND ICAP FUNDING, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

**(b)** If the Holder does not approve or reject the proposed matter within ten (10) days of receipt of such notice and all necessary information, via delivery of the same to the Company within such time period, for further distribution to the Holder, the Company may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A SECOND AND FINAL REQUEST FOR CONSENT,

APPROVAL OR WAIVER UNDER THAT CERTAIN SECURED PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND ICAP FUNDING, LLC. OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT.

**(c)** If the Holder does not approve or reject the proposed or requested consent, approval, waiver or amendment or other matter within ten (10) days of receipt of such second and final notice, via delivery of the same to the Company within such time period, Holder shall be deemed to have approved, in writing, the proposed consent, approval, waiver or amendment or other matter as set forth in the notice, and the Company may effect the actions set forth therein in reliance on such consent.

## Section 14. Miscellaneous.

**(a)** **Assignment**. The Company may not assign this Note or any of its rights, interests or obligations hereunder without the prior written consent the Holder. Except as otherwise provided herein, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the Parties. Nothing in this Note, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note.

**(b)** **Governing Law**. This Note shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware residents, entered into and to be performed entirely within the State of Delaware, without giving effect to principles of conflicts of law. The Parties irrevocably consent to the jurisdiction and venue of and in King County, Washington in connection with any action arising from or relating to this Note or the transaction it contemplates. In the event of any dispute arising from or relating to this Note, the prevailing party shall be entitled to an award of its reasonable attorneys' fees and costs.

**(c)** **Waiver of Jury Trial.** EACH PARTY, TO THE EXTENT PERMITTED BY LAW, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE AND THE TRANSACTIONS IT CONTEMPLATES. THIS WAIVER APPLIES TO ANY ACTION OR LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

**(d)** **Titles and Subtitles.** The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

**(e)** **Notices.** Subject to Section 13, unless otherwise provided, any notice required or permitted under this Note shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be notified, (b) 48-hours after being sent by electronic means to the email address set forth in the Subscription Agreement, if to Holder, or to the email address below if to the Company, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (d), or (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated below, or at such other address as such party may designate by ten (10 days' advance written notice to the other party given in the foregoing manner.

If to the Company:

      iCap Funding, LLC

Attn: Chris Christensen
3535 Factoria Blvd SE Ste 500
Bellevue, WA 98006
Fax: 425-278-9025
chris@icapequity.com

If to Holder, to the address for Holder as set forth in Subscription Agreement.

**(f)** **Expenses.** Other than as set forth herein or in the Subscription Agreement, each Party shall pay its own costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Note, the related agreements and the transactions contemplated herein and therein.

**(g)** **Entire Agreement**. This Note, the Subscription Agreement, and the other documents delivered pursuant hereto or thereto constitute the full and entire understanding and agreement between the Parties with regard to the subjects hereof and thereof.

**(h)** **Amendments and Waivers.** Subject to the provisions of Section 13, any term of this Note may be amended and the observance of any term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Holder.

**(i)** **Severability.** If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

**(j)** **Costs of Collection.** If this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note in accordance with the terms of the Note Purchase Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action, including, but not limited to, attorneys' fees and disbursements, provided Holder finally prevails on such proceedings.

**(k)** **Holder as Owner.** The Company may deem and treat the holder of record of this Note as the absolute owner for all purposes regardless of any notice to the contrary from third parties.

**(l)** **No Member or Ownership Rights.** This Note confers no ownership rights whatsoever in the Company, and shall not entitle the Holder to any voting rights, any management rights, any ownership rights, any rights to distribution, anystatutory rights conferred on members, or any other rights as an owner of the Company or to any other rights except the rights stated herein.

**(m)** **Counterparts**. This Note may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the Parties, it being understood that each Party need not sign the same counterpart. A facsimile copy or electronic transmission of a signature page to this Note shall be deemed to be an original signature page.

*[Signatures appear on following page]*

In witness whereof, the undersigned have executed this Note as of the Issue Date.

iCap Funding, LLC

By: _____
Its: _____

**EXHIBIT B**

**SUBSCRIPTION DOCUMENTS**
**OF**
**iCap Funding, LLC**

# iCap Funding, LLC

The undersigned "Subscriber", on the terms and conditions herein set forth, hereby irrevocable submits this subscription agreement (the "Subscription Agreement") to iCap Funding, LLC, a Delaware limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise working capital of up to $50,000,000 through the sale to Subscriber as an accredited investor of a Secured Promissory Note of the Company (the "Note").

1. **Subscription for the Purchase of Notes.**
The undersigned, intending to be legally bound, hereby subscribes for the amount set forth on the Investment Summary page below (the "Principal Balance"). The undersigned acknowledges that the Company is offering the Notes to those who are "accredited investors" as defined herein, pursuant to the terms and provisions of the Confidential Private Placement Memorandum of the Company dated December 1, 2020 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. In this regard, Investor agrees to forward payment in the amount of the Principal Balance indicated on the Investment Summary form below. The Company's private offering of Notes is being made to "accredited" investors within the meaning of Rule 506 of Regulation D promulgated by the Securities Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"). By signing this Subscription Agreement, Subscriber acknowledges receipt of the Memorandum and its Exhibits, including the Note and the Pledge and Security Agreement (collectively the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents.

The undersigned agrees to execute this Subscription Agreement and if by mail, send to the Company. You as an individual or you on behalf of the subscribing entity are being asked to complete this Subscription Agreement so that a determination can be made as to whether or not you (it) are qualified to purchase the Note under applicable federal and state securities laws. Your answers to the questions contained herein must be true and correct in all respects, and a false representation by you may constitute a violation of law for which a claim for damages may be made against you. Your answers will be kept strictly confidential; however, by signing this Subscription Agreement, you will be authorizing the Company to present a completed copy of this Subscription Agreement to such parties as they may deem appropriate in order to make certain that the offer and sale of the securities will not result in a violation of the Securities Act or of the securities laws of any state. All questions must be answered. If the appropriate answer is "None" or "Not Applicable," please state so. Please print or type your answers to all questions and attach additional sheets if necessary to complete your answers to any item. Please initial any corrections.

2. **Offer to Purchase.** Subscriber hereby irrevocably offers to purchase the Note and tenders herewith the total price noted above. Subscriber recognizes and agrees that (i) this subscription is irrevocable and, if Subscriber is a natural person, shall survive Subscriber's death, disability or other incapacity, and (ii) the Company has complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement. This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

3. **Effect of Acceptance.** Subscriber hereby acknowledges and agrees that on the Company's acceptance of this Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Subscriber. As a result, upon acceptance by the Company of this Subscription Agreement, Subscriber will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note as specified herein.

4. **Representation as to Investor Status.** Investor agrees to complete all applicable portions of the Investor Representations page at the end of this Agreement. Additionally, attached to this Subscription Agreement as Annex 1 is an Accredited Status Certification Letter that Subscriber who is claiming to be an "accredited investor" under the definitions in Section 4(a)(i) or Section 4(a)(ii) may provide to the Company to assist it in its determination of whether Subscriber meets the accredited investor requirements discussed above. A Subscriber who is claiming to be an "accredited investor" under the definitions in Section 4(a)(i) or Section 4(a)(ii) should provide this form of Accredited Status Certification Letter to the applicable person (CPA, investment adviser, etc.) and ask them to complete it and return it to the Company. (In this Letter, you as the Subscriber are the "Client").

5. **Additional Representations and Warranties of Subscriber.** Subscriber hereby represents and warrants to the Company as follows:

(a) Subscriber has been furnished the Memorandum and, if requested by the Subscriber, other documents. The Subscriber has carefully read the Memorandum and any such other requested documents. Subscriber has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Subscriber requested and deemed material to making an informed investment decision regarding its purchase of the Note. Subscriber has been afforded the opportunity to review such documents and materials and the information contained therein. Subscriber has been afforded the opportunity to ask questions of the Company and its management. Subscriber understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Subscriber understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Subscriber has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Subscriber shall modify, amend or affect such Subscriber's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Subscriber has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

(b) Subscriber has read and understood, and is familiar with, this Subscription Agreement, the Note and the business and financial affairs of the Company.

(c) Subscriber, either personally, or together with its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum. The Subscriber and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Note. Subscriber's financial condition is such that Subscriber is able to bear the risk of holding the Note that Subscriber may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Subscriber's entire investment in the Company.

(d) Subscriber has investigated the acquisition of the Note to the extent Subscriber deemed necessary or desirable and the Company has provided Subscriber with any reasonable assistance Subscriber has requested in connection therewith.

(e) The Note is being acquired for Subscriber's own account for investment, with no intention by Subscriber to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Subscriber in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Subscriber has any interest in or any right to acquire the Note. Subscriber understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Subscriber.

(f) No representations or warranties have been made to Subscriber by the Company, or any representative of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

(g) Subscriber is aware that Subscriber's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Subscriber will not offer for sale, sell or otherwise transfer the Note without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

**(h)** Subscriber understands and agrees that the Note it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

**(i)** The Subscriber has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Subscriber understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

**(j)** Subscriber understands that the Notes are being offered under Rule 506(b) of Regulation D under the Securities Act only to "accredited investors," as defined by the Securities and Exchange Commission ("SEC").Subscriber meets the definition of "accredited investor" under the Act.

**(k)** Subscriber understands that the Note shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such certificates):

"NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT."

**(l)** Subscriber also acknowledges and agrees to the following:

  **(i)** an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire investment in the Company; and

  **(ii)** there is no assurance that a public market for the will be available and that, as a result, Subscriber may not be able to liquidate Subscriber's investment in the Note should a need arise to do so.

**(m)** Subscriber is not dependent for liquidity on any of the amounts Subscriber is investing in the Note.

**(n)** Subscriber's address set forth below is his or her correct residence address.

**(o)** Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

**(p)** Subscriber understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

6. **Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The Subscriber should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations. Subscriber hereby represents and warrants to the Company as follows:

**(a)** The Subscriber represents that (i) no part of the funds used by the Subscriber to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Subscriber and no distribution to the Subscriber shall cause the Company to be in violation of any applicable anti-money laundering laws or regulations including, without

limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Note, and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[1] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

**(b)** To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations. The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges that the Company may, by written notice to the Subscriber, suspend the redemption rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

**(c)** To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a senior foreign political figure[2], or any immediate family[3] member or close associate[4] of a senior foreign political figure, as such terms are defined in the footnotes below.

---

[1] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

[2] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[3] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[4] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

**(d)** If the Subscriber is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Subscriber represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

**(e)** The Subscriber acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Subscriber agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information, may result in the withholding of amounts with respect to, or other limitations on, distributions made to the Subscriber and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Subscriber shall give prompt notice of such fact to the Company by telegram, or facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

**7. Indemnification.** Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations and warranties made by Subscriber herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Subscriber hereby agrees to indemnify and hold harmless the Company and each employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Subscriber contained in this Subscription Agreement.

**8. Transferability.** Subscriber agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

**9. Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Subscriber any money tendered hereunder without interest or deduction.

**10. Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Subscriber at the address set forth below and to the Company at investor@icapequity.com, or (c) at such other place as the Company may designate by written notice to Subscriber.

**11. Amendments.** Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Subscriber and the Company.

**12. Governing Law.** This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

**13. Headings.** The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

14. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

15. **Continuing Obligation of Subscriber to Confirm Investor Status**.  Upon the request of the Company and for as long as the Subscriber holds the Note or other securities in the Company, the Subscriber shall confirm Subscriber's investor status as an "Accredited Investor," as defined by the Securities and Exchange Commission at the time of such request. In connection therewith, the Company shall deliver to the Subscriber a questionnaire that elicits the necessary information to determine the Subscriber's investor status. Upon receipt of the questionnaire, the Subscriber shall: (i) complete it, (ii) execute the signature page therein, and (iii) return it to the Company, or its designee, in accordance with the instructions therein, no later than ten (10) days after receipt of the questionnaire.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## INVESTOR REPRESENTATIONS

**(a) Type of Subscriber.** Indicate the form of entity of Subscriber:

| | | | |
|---|---|---|---|
| ☐ | Individual | ☐ | Limited Liability Company |
| | | ☐ | IRA, 401K, Keogh or SEP |
| ☐ | Corporation | ☐ | Other Type of Trust (indicate type): |
| ☐ | Revocable Trust | | _____ |

☐   Other (indicate form of organization): _____

**(b) Accredited Investor.** In order for the Company to sell the Note (in conformance with state and federal securities laws), the following information must be obtained regarding Subscriber's investor status. Please **initial each item applicable** to you as an investor in the Company.

**(i)** _____ A natural person whose net worth, either individually or jointly with such person's spouse, at the time of Subscriber's purchase, exceeds $1,000,000.

**(ii)** _____ A natural person who had an individual income in excess of $200,000, or joint income with that person's spouse in excess of $300,000, in each of the two most recent years and reasonably expects to reach the same income level in the current year.

**(iii)** _____ A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

**(iv)** _____ A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

**(v)** _____ An insurance company as defined in section 2(13) of the Exchange Act.

**(vi)** _____ An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act.

**(vii)** _____ A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

**(viii)** _____ A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state, or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

**(ix)** _____ An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

**(x)** _____ A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

**(xi)** _____ An organization described in Section 501(c)(3) of the Internal Revenue Code, or a corporation, business trust or partnership, not formed for the specific purpose of acquiring the Note, with total assets in excess of $5,000,000.

**(xii)** _____ A director or executive officer of the Company.

**(xiii)** _____ A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Note, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of investing in the Company.

**(xiv)** _____ An entity in which all of the equity owners qualify under any of the above subparagraphs.

_____ Subscriber does <u>not</u> qualify under any of the investor categories set forth in Section 4(a)(i)(i) through Section 4(a)(xiv).

**(c)** **Net Worth.** The term "net worth" means the excess of total assets over total liabilities (including personal and real property, but excluding the estimated fair market value of a person's primary home).

**(d)** **Income.** In determining individual "income," Subscriber should add to Subscriber's individual taxable adjusted gross income (exclusive of any spousal income) any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

## INVESTMENT SUMMARY

**Initial Investment Amount**

Investor agrees to invest the following initial amount ("Principal Balance"):

$ _____

**Interest Rate:**  Interest will be compounded monthly and due at the Maturity Date unless the Company agrees otherwise, as set forth below.

**Other Agreement**: _____

**Payment Method**

Investor agrees to forward payment of the Principal Balance in <u>one</u> of the following methods (select one):

☐    **Wire Transfer or ACH**:  by wiring payment of the Principal Balance to the account set forthbelow:

|  |  |
|---|---|
| Account Name: | iCap Funding, LLC |
| ABA Routing Number: | 123205054 |
| Account Number: | _____ |
| Bank Name: | Umpqua Bank |
| Bank Address: | 705 Gilman Blvd. NW, Issaquah, WA 98027 |
| SWIFT CODE: | UMPQUS6P |

☐    **Check**:  by mailing a check made payable to "iCap Funding, LLC" along with a completed subscription document to:

iCap Funding, LLC
Attn: Investor Relations Department
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

☐    **Other**: _____

*Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

## INDIVIDUALS, JOINT ACCOUNTS, OR REVOCABLE LIVING TRUSTS

| Investor Name(s) | 1 |
| | 2 |
| Registered As | |
| Address of Principal Place of Residence *(please do not use PO Box)* | |

| City | | State | | Zip Code | |
|---|---|---|---|---|---|
| | | | | | |

| Mailing Address(if different fromabove) | |
|---|---|

| Home Telephone No. | ( ) | Business Telephone No. | ( ) |
| Cell Phone No. | ( ) | Email Address(es) | |

| **Birth Date(s) (required)** | 1 | 2 | Occupation(s) | 1 |
| **SSN or TIN**[1] | | | | 2 |
| **SSN or TIN**[2] | | | | |

Status, if individual:

- ☐ U.S. Citizen
- ☐ U.S. Resident Alien
- ☐ U.S. Citizen Residing Outside of U.S.

*Prospective Investors must fill out the Form W-9 or Form W-8*

**IF INVESTING THROUGH AN IRA, KEOGH OR OTHER RETIREMENT OR PROFIT SHARING PLAN, PLEASE COMPLETE THE FOLLOWING (IN ADDITION TO THE INVESTOR INFORMATION ON THE PREVIOUS PAGE):**

Account Name

Custodian's EIN

Custodian's Address

City                     State          Zip Code

**CORPORATIONS, PARTNERSHIPS, IRREVOCABLE TRUSTS OR OTHER ENTITIES**

1.    Name of entity_____

    ☐    Partnership

    ☐    Limited Liability Company

    ☐    Corporation

    ☐    Trust or Pension Plan

    ☐    Other _____

            (Specify)

Taxpayer Identification Number: _____

Business Address:_____

State in which organized or incorporated _____

Date of formation or incorporation: _____

2.    Was this partnership, corporation, trust or other entity formed for the specific purpose of purchasing the Note?

    ☐ Yes    ☐ No

    If yes, each person participating in the entity will be required to fill out a Subscription Agreement.

3.    Has this partnership, corporation, trust or other entity made other investments?

    ☐ Yes    ☐ No

    If no, each person participating in the entity will be required to fill out a Subscription Agreement.

4.    How many persons own an equity interest in this partnership, corporation, trust or other entity (including the investor)?

    _____

    EACH EQUITY OWNER (OTHER THAN A SPOUSE OR CHILD OF AN EQUITY OWNER LIVING WITH SUCH EQUITY OWNER) MUST COMPLETE AND SIGN THIS QUESTIONNAIRE.

5.    If a Trust, does the Trust have assets of at least $5,000,000?

    ☐ Yes    ☐ No    ☐ N/A

    If the prospective investor is an EMPLOYEE BENEFIT PLAN within the meaning of Title 1 of the Employee

    Retirement Income Security Act of 1974, as amended ("ERISA"), please answer question 12.

6.    (a) If an Employee Benefit Plan, does the Employee Benefit Plan have assets of at least $5,000,000?

    ☐ Yes    ☐ No    ☐ N/A

    (b) Is this investment decision being made or directed by the beneficiaries of the Employee Benefit Plan?

    ☐ Yes    ☐ No    ☐ N/A

| | |
|---|---|
| SIGNATURES-**ALL INVESTORS MUST SIGN** | THE UNDERSIGNED HAS THE AUTHORITY TO ENTER INTO THIS SUBSCRIPTION AGREEMENT ON BEHALF OF THE PERSON(S) OR ENTITY REGISTERED ABOVE. |

Executed on_____ _____ _____

X_____
Signature (Investor, or authorized signatory)

X_____
Signature (Investor, or authorized signatory)

*Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

<u>ACCEPTANCE</u>
iCap Funding, LLC

Date:_____.

By:      _____

Name:   _____

Title:    Manager

**Counterpart Signature Page**

The undersigned hereby accepts, and becomes a party to, the Pledge and Security Agreement (the "Agreement"), dated as of May 13, 2021, in connection with the acquisition of a Note (as defined in the Agreement), and by its signaturebelow signifies its agreement to be bound by the terms and conditions of the Agreement.

**INDIVIDUAL**

Name: _____

Signature: _____

Date: _____

_____

**ENTITY**

Entity Name: _____

Signature: _____

Name: _____

Title: _____

Date: _____

| Form **W-9**<br>(Rev. October 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification**<br>► Go to *www.irs.gov/FormW9* for instructions and the latest information. | **Give Form to the<br>requester. Do not<br>send to the IRS.** |
|---|---|---|

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ►_____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ►

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

Requester's name and address (optional)

**6** City, state, and ZIP code

**7** List account number(s) here (optional)

---

**Part I  Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

[ ] [ ] [ ] – [ ] [ ] – [ ] [ ] [ ] [ ]

or

Employer identification number

[ ] [ ] – [ ] [ ] [ ] [ ] [ ] [ ] [ ]

---

**Part II  Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| **Sign<br>Here** | Signature of<br>U.S. person ► | Date ► |
|---|---|---|

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

**EXHIBIT B**

**SUBSCRIPTION DOCUMENTS**
**OF**
**iCap Funding, LLC**

**iCap Funding, LLC**

---

## SUBSCRIPTION AGREEMENT FOR NON-U.S. RESIDENTS

### 非美国居民认购协议

---

The undersigned "Subscriber", on the terms and conditions herein set forth, hereby irrevocably submits this subscription agreement (the "Subscription Agreement") to iCap Funding, LLC, a Delaware limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise capital of up to $50,000,000 US Dollars through the sale to Subscriber as a "Non US Person" (as defined below) of a Secured Promissory Note of the Company (the "Note").

签署本协议的'认购者',依据本协议的条款,谨此向**艾珂橪134街有限责任公司**提交本《认购协议》('《认购协议》'),以认购该公司发行的有抵押私募债卷('私募债卷')。此认购协议提交后不可撤销。**艾珂橪134街有限责任公司**是一家在华盛顿州注册的有限责任公司(以下简称'该公司'),上述私募证券通过面向'非美国人士'(定义见下文)的认购者发售该公司的有担保的本票(以下简称'本票'),最高募集50,000,000美元。

**1. Subscription for the Purchase of Notes.** The undersigned, intending to be legally bound, hereby subscribes for the amount set forth on the Investment Summary page below (the "Principal Balance"). The undersigned acknowledges that the Company is offering the Notes to those who are "Non U.S. Persons" pursuant to the terms and provisions of the Confidential Private Placement Memorandum of the Company dated December 1, 2020 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. In this regard, the Investor agrees to forward payment in the amount of the Principal Balance indicated on the Investment Summary form below. The Company's private offering of Notes is being made to Non US Persons (as defined below) pursuant to Regulation S ("Regulation S") under the Securities Act of 1933, as amended (the "Securities Act"). By signing this Subscription Agreement, Subscriber acknowledges receipt of the Memorandum and its Exhibits, including the Note and Pledge and Security Agreement (collectively the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents.

1. **认购本票。** 签署本协议的认购者以此协议为据,认购下文的"投资摘要"中所述的金额(以下统称"本 金金额")。认购者声明,该公司正依据保密私募备忘录的条款向'非美国人士'发行该本票,该私募备忘录的内容详见2020年12月1日公布的与本私募计划相关的《保密私募备忘录》(与本备忘录的所有附录和附件统称'《备忘录》')。因此,投资人同意支付下文的'投资摘要'中所示的本金金额。依据《1933年证券法》及其不定期修订的版本('《证券法》')下的S条例("S条例"),该公司就该本票推出的私募证券仅面向非美国人士(定义见下文)发售。《认购协议》一经签署,认购者即确认收到了《备忘录》及其附录,包括该本票、以及《抵押与担保协议》(统称'《本票协议》'),并同意他/她/其已阅读该《本票协议》的所有条款,并自愿受其约束。

2.     **Offer to Purchase.** Subscriber hereby irrevocably offers to purchase the Note and tenders herewith the Principal Balance. Subscriber recognizes and agrees that (i) this subscription is irrevocable and, if Subscriber is a natural person, shall survive Subscriber's death, disability or other incapacity, and (ii) the Company has

complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement. This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

2. **认购要约。**认购者自愿认购该本票并在签署本协议时支付上述的本金金额，且知悉并接受此认购协议是不可更改的。认购者清楚并同意，(i)　　此认购协议不可更改，且若认购者是自然人，即使认购者死亡、出现残疾或其他失能的情况，该认购仍然有效，且(ii) 该公司可以其完全的自由裁量权，决定完全接受或拒绝本《认购协议》，且不需因拒绝本《认购协议》而承担任何责任。本《认购协议》应经该公司签署后才能被视为已被该公司接受。

3. **Effect of Acceptance.** Subscriber hereby acknowledges and agrees that on the Company's acceptance of this Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Subscriber. As a result, upon acceptance by the Company of this Subscription Agreement, Subscriber will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note as specified herein.

3. **接受的效力。**认购者承认并同意，一旦被该公司接受，该《认购协议》将成为该公司和认购者之间具有约束力的协议，并可完全强制执行。因此，在该公司接受该《认购协议》后，认购者将成为该本票的注册持有人和受益人，且该公司将有权收取本协议所述的该本票的购买价款。

4. **Representations and Warranties of Non - US Persons.** Subscriber hereby represents and warrants to the Company as of the date hereof that:

4. **非美国人士的陈述和保证。**认购者向该公司陈述及保证，截至签署本协议之日：

   **(a)** Subscriber understands that the investment offered hereunder has not been registered under the Securities Act and is acquiring the Note for Subscriber's own account, for investment purposes only, and not with a view towards resale or distribution.

   认购者理解，本协议所述的投资尚未依据《证券法》注册，并且投资者将通过认购者本人名下的账户获得该本票。该本票仅用作投资，并非为了转售或进行分配。

   **(b)** Subscriber is <u>not</u> a "US Person" which is defined as:
   认购者<u>不</u>是一位'美国人'，'美国人'定义如下：

   **(i)** Any natural person resident in the United States (as defined below);
   居住在美国（定义见下文）的所有自然人；

   **(ii)** Any partnership or corporation organized or incorporated under the laws of the United States;
   根据美国法律组建或注册的所有合伙企业或公司；

   **(iii)** Any estate of which any executor or administrator is a US Person;
   遗产执行人或管理者是一位美国人；

   **(iv)** Any trust of which any trustee is a US Person;
   信托机构的受托人是一位美国人；

**(v)** Any agency or branch of a foreign entity located in the United States;
位于美国境内的任何代理机构或外国实体分支机构；

**(vi)** Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US Person;
因任何美国人获益的所有由交易商或其他由任何美国受托人持有的非全权委托账户或
类似账户（不含任何财产账户或信托账户）；

**(vii)** Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident of the United States; and
对任何全权委托的账户或类似账户（不含任何财产账户或信托账户）而言，其持有人
是一家在美国境内组织或成立的交易商或其他受托人，或是一位美国居民（对个人而
言）；以及

**(viii)** Any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a US Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) who are not natural persons, estates or trusts.
任何合伙企业或公司，若(i)　其是依据任何外国司法管辖权下的法律组织或注册成立的
，且(ii)　是由一位美国人创立的，主要是为了投资那些未依照《证券法》注册的证券，
除非是由非自然人、财产管理机构或信托机构的合格投资人（其定义见根据《证券法
》颁布的 D 条例的 501(a)条款）组织、注册及持有。

"United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.
"美国"指美利坚合众国、其领土和财产、美国所有的州和哥伦比亚特区。

**(c)** Subscriber, as of the execution date of this Agreement, (i) is not located within the United States, and (ii) is not purchasing the Note for the benefit of any US Person.

截至本协议签署之日，认购者，(i)本人并不在美国境内，且(ii)该本票的受益人为非美国人。

**(d)** Subscriber will not resell the Note except in accordance with the provisions of Regulation S (Rule 901 through 905 and Preliminary Notes thereto), pursuant to a registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

除非符合S条例的规定（第901条至905条及其附注），并且已根据《证券法》进行注册，或根据
任何适用的豁免注册的规定，否则认购者不得转售该本票；　　并同意不参与该证券有关的对冲交易
，符合《证券法》的规定的情况除外。

**(e)** Subscriber has not acquired the Note as a result of, and will not itself engage in, any "directed selling efforts" (as defined in Regulation S under the Securities Act) in the United States in respect of the Note which would include any activities undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the resale of any of the Note;

provided, however, that the Subscriber may sell or otherwise dispose of the Note pursuant to registration thereof under the Securities Act and any applicable state and federal securities laws or under an exemption from such registration requirements.

认购者获得该本票，并非因为其受美国境内关于本协议项下的本票的导向性销售行为的影响，或因为参加关于该本票的相关一系列能影响本票转售市场的活动；然而，根据《证券法》和任何适用的州和联邦的证券法，若符合有关该本票注册的规定或符合豁免注册的规定，认购者可以出售或以其他方式处置该本票。

5. **Additional Representations and Warranties of Subscriber.** Subscriber hereby represents and warrants to the Company as follows:

**认购者的补充陈述和保证**。认购者谨此向该公司做出如下陈述和保证：

(a) Subscriber has been furnished the Memorandum, the Note Documents, and, if requested by the Subscriber, other documents. The Subscriber has carefully read the Memorandum, the Note Documents (together with all Exhibits thereto), and any such other requested documents, and Subscriber agrees to be bound by the terms of the Note Documents and the Note. Subscriber has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Subscriber requested and deemed material to making an informed investment decision regarding its purchase of the Note. Subscriber has been afforded the opportunity to review such documents and materials and the information contained therein. Subscriber has been afforded the opportunity to ask questions of the Company and its management. Subscriber understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Subscriber understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Subscriber has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Subscriber shall modify, amend or affect such Subscriber's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Subscriber has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

认购者已收到《备忘录》、该《本票协议》和认购者要求的其他文件。认购者已仔细阅读该《备忘录》、《本票协议》（及其所有附录）及任何认购者要求的其他文件，且同意受该《本票协议》及本票的条款和该本票的约束。认购者已获得所有与该公司的业务、财务及营运有关的文件及资料，以及认购者要求及认为对认购本票的投资决定有重要影响的信息。认购者已获得审查了上述文件、材料和信息的机会。认购者已获得询问该公司及其管理的机会。认购者理

解，此类讨论以及该公司提供的任何书面信息旨在描述该公司的业务和其认为重要的方面，但不一定是全面或详尽的描述，且除非本《认购协议》明确规定，该公司不保证上述信息的完整性，也不保证该公司以外的任何机构提供的任何信息的准确性和完整性。上述部分信息可能包括对公司未来业绩的预测，这些预测可能无法实现，也可能基于一些假设，并可能受到公司无法控制的众多因素的影响。此外，认购者理解并表示，尽管该公司可能会在未来披露认购者尚未收到的某些重要信息，包括该公司当前财政季度的财务业绩，他、她或其仍会认购该本票。无论认购者做出任何询问或任何其他尽职调查均不得改变、修改或影响该认购者相信该《认购协议》包含的该公司的陈述和保证的权利（若有）。为确保这次认购本票是一个明智的投资行为，认购者已咨询了所有其认为必要的会计、法律和税务等方面的专业建议。就认购本票和签署及交付本《认购协议》的行为，认购者拥有完全的权力和权限做出本协议包含的相关陈述。

**(b)** Subscriber has read and understood, and is familiar with, this Subscription Agreement, the Note, and the business and financial affairs of the Company.

认购者已阅读及理解，并熟悉本《认购协议》、本票、和该公司的业务和财务状况。

**(c)** Subscriber, either personally, or together with his/her/its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum.  The Subscriber and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Note. Subscriber's financial condition is such that Subscriber is able to bear the risk of holding the Note that Subscriber may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Subscriber's entire investment in the Company.

认购者个人或在其顾问（任何可能从销售该本票的交易中获得报酬的证券经纪/交易商）的协助下，有足够的评估投资该本票的益处和风险的财务和商务知识和经验，并能够承担投资的风险，并理解认购本票相关的风险和其他需考虑的因素，包括《备忘录》中"风险因素"一节中提及的情况。 认购者及其顾问已有机会向该公司询问与本票相关的问题并获得回复。认购者的财务状况使其能够承担因依据本协议获得的本票而需要无限期持有的风险，以及认购者在该公司的全 部投资额亏损的风险。

**(d)** Subscriber has investigated the acquisition of the Note to the extent Subscriber deemed necessary or desirable and the Company has provided Subscriber with any reasonable assistance Subscriber has requested in connection therewith.

认购者已在其认为必要或需要的范围内对购买该本票的相关事宜进行了调查，且该公司已向认购者提供了相关合理的协助。

**(e)** The Note is being acquired for Subscriber's own account for investment, with no intention bySubscriber to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Subscriber in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Subscriber has any interest in or any right to acquire the

Note.  Subscriber understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Subscriber.

认购者仅为其自己账户作投资之用而认购该本票，并不打算按照《证券法》的规定对其任何部分进行分配或出售，且认购者不会违反《证券法》或适用的法规转让该本票。除认购者外，其他任何人均没有权力获得该本票或作为该本票的受益人。认购者理解并承认，除认购者外，该公司没有义务承认任何其他人士对该本票的所有权、受益权或其他权利。

**(f)**  No representations or warranties have been made to Subscriber by the Company, or any representative of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

除了本《认购协议》中所述外，该公司或其任何代表或任何证券经纪/交易商均未对认购者做出    任何陈述或保证。

**(g)**  Subscriber is aware that Subscriber's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Subscriber will not offer for sale, sell or otherwise transfer the Note without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

认购者知晓，认购者转让该本票的权利受到《证券法》及适用的州证券法的限制，且除非已依据《证券法》进行注册或依据所有适用的州的证券法律获得出售的资质或该本票可免注册出售的情况外，认购者不会发出出售要约、出售或以其他方式转让该本票。

**(h)**  Subscriber understands and agrees that the Note he/she/it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

认购者理解并同意，其购买的本票依据《证券法》中有关豁免注册的规定豁免注册，并未依据《证券法》或任何州的证券法律进行注册，且该公司无义务对其发行的上述本票进行注册。

**(i)**  The Subscriber has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Subscriber understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

认购者已向该公司的代表就本次投资的条款提出相关问题并已获得满意的答复。认购者理解，该公司并未授权任何其他个人或机构做出任何陈述。如有相关陈述，需经公司签署书面同意方能生效。但是，该公司从未向签署本协议的认购者就是否适合投资的问题提出任何建议。

**(j)**  Subscriber understands that Notes shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such Note):

认购者理解，该本票存在以下实质形式的销售限制（且该本票有相应的停止转让的指示）：

THESE SECURITIES WERE ISSUED IN AN OFFSHORE TRANSACTION TO PERSONS WHO ARE NOT U.S. PERSONS (AS DEFINED HEREIN) PURSUANT TO REGULATION S UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"). ACCORDINGLY, NONE OF THE SECURITIES TO WHICH THIS CERTIFICATE RELATES HAVE BEEN REGISTERED UNDER THE 1933 ACT, OR ANY U.S. STATE SECURITIES LAWS, AND, UNLESS SO REGISTERED, NONE MAY BE OFFERED OR SOLD IN THE UNITED STATES OR, DIRECTLY OR INDIRECTLY, TO U.S. PERSONS (AS DEFINED HEREIN) EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND IN EACH CASE ONLY IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. IN ADDITION, HEDGING TRANSACTIONS INVOLVING THE SECURITIES MAY NOT BE CONDUCTED UNLESS IN ACCORDANCE WITH THE 1933 ACT.

上述证券是依据《1933年美国证券法》及其修订版（'《1933年法》'）下的S条例向海外交易中的非美国人（定义见下文）发售的。因此，本文涉及的证券均未依据《1933年证券法》或任何美国的州证券法进行注册，且除非特别要求注册，否则任何上述证券均不得在美国任何州直接或间接向任何美国人（定义见下文）发售（依据一份有效的注册声明或依据豁免注册的声明，或其交易行为无需受《1933年证券法》的约束的情况除外）。且在上述任何情况下，均须遵守适用的州的证券法。此外，除非符合《1933年证券法》的规定，否则不得进行与该证券相关的任何对冲交易。

The Subscriber hereby acknowledges and agrees to the Company making a notation on its records or giving instructions to any registrar and transfer agent of the Company in order to implement the restrictions on transfer set forth and described in this Subscription Agreement.

认购者承认并同意该公司在其注册记录上注明上述内容或向该公司的任何注册人和转让代理人发出指示，以执行本《认购协议》规定及描述的转让限制。

**(k)** Subscriber also acknowledges and agrees to the following:

认购者同时承认并同意以下内容：

⑴ an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire investment in the Note; and

对该本票的投资具有很高的投机性，而其在该本票的投资也存在损失全部投资额的风险；及

⑵ there is no assurance that a public market for the Notes will be available and, as a result, Subscriber may not be able to liquidate Subscriber's investment in the Note should a need arise to do so.

无法保证日后会有可供该本票公开交易的市场，因此，该本票在认购者需要流通变现时有可能不具备流通性。

**(l)** Subscriber is not dependent for liquidity on any of the amounts Subscriber is investing in the Note.

认购者将不会依赖于投资该本票的资金的流动性。

**(m)** Subscriber's address set forth below is his or her correct residence address.

认购者在下方提供的地址是他或她的正确的居住地址。

**(n)** Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

认购者拥有全部的权力和权限做出本协议所述的陈述以认购该本票和签署及提交本《认购协议》。

**(o)** Subscriber understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

认购者理解，该公司以上述陈述及保证作为其豁免注册或依据联邦及州的证券法律获得销售该本票的资格和其他用途的基础。

6. **Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The Subscriber should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations. Subscriber hereby represents and warrants to the Company as follows:

*《爱国者法案》、反洗钱和海外资产控制办公室相关的陈述和保证。*在做出下述陈述前，认购者应访问海外资产控制办公室（'OFAC"）的网站http://www.treas.gov/ofac。认购者谨此向该公司做出下列陈述和保证：

**(a)** The Subscriber represents that (i) no part of the funds used by the Subscriber to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Subscriber and no payment of principal or interest to the Subscriber shall cause the Company to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit investments, restrict principal or interest payments, or take any other reasonably necessary or advisable action with respect to the Note, and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs

administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[1] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

认购者声明：（i）　　认购者用于认购该本票或履行其相关的资本投入义务的任何资金均未或不得直接或间接来自任何可能违反美国联邦或州或非美国的法律或法规的活动，包 括反洗钱的法律和法规，以及（ii）　　认购者向该公司做出的任何资本投入、出资或付款以 及向认购者支付的本金或利息均不得致使该公司违反任何相应的反洗钱法律或法规，　包括但不限于，'2001年颁布的使用适当之手段阻止或避免恐怖主义以团结并强化美国 的法律'（《美国爱国者法案》）第三部分和美国财政部海外资产控制办公室的规定。 认购者承认并同意，即使《备忘录》或任何其他协议中有任何相反的规定，但在任何 反洗钱法律或法规要求的范围内，该公司可以禁止与该本票相关的出资，限制其分配 或采取任何其他与该本票相关的合理必要或有预见性的措施，而认购者不得对该公司 或与此相关的任何其他人提出索赔。除其他限制外，美国联邦法规和OFAC管理的行政 命令均禁止与某些国家、地区、团体和个人进行交易和向其提供服务。OFAC禁止的国 家、地区、个人和团体的名单可以在OFAC网站http://www.treas.gov/ofac上找到。此外， OFAC管理的计划（'OFAC计划'）禁止与个别国家的个人或团体产生业务，无论这些个 人或团体是否出现在OFAC名单里。

**(b)** To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations. The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber, declining any demand for repayment requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges that the Company may, by written notice to the Subscriber, suspend the repayment rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

据认购者所知，以下任何一方：（1）认购者；（2）任何控制认购者或由认购者控制的个人；⑶ 若认购者是一家私人控制的团体，任何从认购者的认购中受益的个人；或(4) 任何以认购者作为投资代理人的个人，均不在OFAC名单里或者是OFAC禁止涉及的个人或团 体。请注意：若潜在投资者无法做出本段中规定的声明或陈述，该公司有权不接受其

所有的投资款。认购者同意，若认购者知晓若陈述中的信息发生任何变化，应立即告  知该公司。认购者理解并承认，根据法律规定，该公司可'冻结认购者的账户'，即可以  禁止该认购者继续认购，或依据政府法规拒绝任何偿还请求和/或隔离账户中的资产，  而所有证券经纪需要报告此类行为，并向OFAC披露认购者的身份。认购者进一步知悉，  若该公司合理地认为，该公司或任何证券经纪或该公司的任何其他服务提供商为了遵  守反洗钱法规，有必要暂停认购者的还款权利（若有），则可以向认购者发出书面通  知。上述个人包括特定国家的国民、特定的毒品贩运者和受OFAC制裁和禁运计划限制  的其他各方。[2]

(c) To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a senior foreign political figure[2], or any immediate family[3] member or close associate[4] of a senior foreign political figure, as such terms are defined in the footnotes below.

就认购者所知，以下任何一方：（1） 认购者；（2） 任何控制认购者或由认购者控制的个人；（3） 若认购者是一家私人控制的团体，任何从认购者的认购中受益的个人；或（4） 任何以认购者作为投资代理的个人，均不是外国高级政治人物[3]，或其任何直系家庭成员[1]或亲密伙伴[5]，其定义见下方脚注。

(d) If the Subscriber is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Subscriber represents and warrants to the Company

---

[1]  These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

这些人士包括特定国家的国民、特定的毒品贩运者和受 OFAC 制裁和禁运计划限制的其他各方。

[2]  A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

"外国高级政治人物"被定义为外国政府（无论是否选举产生）的执行、立法、行政，军事或司法分支机构中的高级官员，主要外国政党的高级官员，或外国政府所有的公司的高级管理人员。此外，"外国高级政治人物"也包括由高级外国政治人物组成或为其谋利的任何公司、企业或其他团体。

[3]  "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

外国高级政治人物的"直系亲属"通常包括其父母、兄弟姐妹、配偶、子女和姻亲。

[4]  A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

如果认购者是一家非美国银行机构（'外国银行'）的附属机构，或者若认购者从一家外国银行收取存款、代表该外国银行支付款项或处理与外国银行有关的其他金融交易，则该认购者 向该公司陈述及保证：(1) 该外国银行在一个其被授权从事银行业务的国家拥有固定地址，而不仅仅是电子地址；(2) 该外国银行维持着与其银行业务有关的经营记录；(3) 该外国银行受其金融活动牌照发放机构的监管；且(4) 该外国银行不向在其他任何国家都没有实体机构且并非其附属机构的外国银行提供金融服务。

**(e)** The Subscriber acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Subscriber agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, the Note Documents, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information, may result in the withholding of amounts with respect to, or other limitations on, repayments of principal or interest made to the Subscriber and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith.

认购者承认，在适用的范围内，该公司将遵守《美国国内税收法》中的《海外账户税收合规法案》的条款以及与之相关的任何规则、条例、形式、指示或其他指引（'FATCA条款'）。为了实行这些措施，认购者同意，若该公司为了遵守FATCA规定而提出要求，将及时配合提供任何补充文件或信息，并及时更新。认购者承认并同意，尽管《备忘录》、该《本票协议》及其相关文件、任何附函或任何其他协议中另有规定，若其未能及时满足这些要求、或提供补充信息，可能导致该公司向认购者偿还本金或利息时扣除相应的费用或设置一定的限制，或导致该公司采取与本协议项下的本票相关的合理必要的措施（包括但不限于要求认购者撤回投资），但认购者不得因此对该公司或与其相关的任何其他人士提出任何索赔。

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Subscriber shall give prompt notice of such fact to the Company by facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

截至本协议签署之日，上述陈述和保证均为真实准确，并且应在签署后依然有效。如果上述任何陈述和保证在该公司接受本《认购协议》之前不再真实准确，则认购者应立即通过电报、传真或电子邮件等方式及时通知该公司，详述不真实或不准确的部分，并做出解释。

7. **Indemnification.** Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations and warranties made by Subscriber herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Subscriber hereby agrees to indemnify and hold harmless the Company and each employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Subscriber contained in this Subscription Agreement.

**保护。**认购者确认理解其在本协议中所作出的陈述和保证的含义和法律后果，并且该公司正是基于这些陈述和保证做出了接受或拒绝该《认购协议》的决定。 认购者同意保护该公司及其员工和代理人使其免于承担因认购者违反在本《认购协议》中作出的任何声明或保证而导致的部分或所有损失、损害或责任。

8. **Transferability.** Subscriber agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

**不可转让。**认购者同意不转让或出让本《认购协议》或其中的任何权益，并进一步同意在转让和出让该本票时以相关的联邦和州的证券法为唯一依据。

9. **Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Subscriber any money tendered hereunder without interest or deduction.

**本协议的终止；资金返还。**若因任何原因，该公司拒绝签署本《认购协议》，则本《认购协议》无效，并不再具有任何效力，且任何一方均不得据此对另一方享有任何权利。若该公司拒绝签署本《认购协议》，该公司应立即向认购者返还认购者支付的所有款项，但不计利息，亦不扣除任何费用。

10. **Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Subscriber at the address set forth below and to the Company at the address set forth on the first page of this Agreement, or (c) at such other place and in such other method as the Company may designate by written notice to Subscriber.

**通知。**依据本协议或本协议项下的本票发送或发出的所有通知或其他信息均应以书面形式发出，并在以下情况下被视为送达：(a) 通过认证邮件或挂号信邮寄，将有收到回执且已预付邮资，(b) 通过传真或电子邮件按照下文所示的地址发送至认购者，或按照本协议第一页所示的地址发送至该公司，或(c) 认购者指定该公司寄送的其他地址或其他送达方式送达。

11. **Amendments**. Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Subscriber and the Company. In the event Subscriber

purchases additional Notes in the future, Subscriber and the Company may execute an adoption form, in which the Subscriber and Company agree that all terms of this Subscription Agreement apply to any additional Note purchase. In the event the Parties sign an adoption form, the provisions of this Subscription Agreement shall be binding on the additional Notes as though Subscriber had signed this Subscription Agreement at the time of each purchase.

**修订**。除以书面形式列出并经认购者和该公司签署确认外，本《认购协议》或其任何条款均不得被更改、豁免、废除或终止。如果认购者在将来购买更多本票，认购者和该公司应执行一份额外协议，双方同意本《认购协议》中的所有条款在购买任何附加本票时都适用。如果双方签署额外协议，则本《认购协议》的条款对附加本票具有约束力，等同于认购者在每次购买时签署本《认购协议》。

12. **Governing Law.** This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

   **适用法律**。本《认购协议》及其所有修订应遵守特拉华州法律的约束并按其解释。

13. **Headings.** The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

   **标题**。本《认购协议》的标题仅为阅读方便而设，标题自身并不能决定本《认购协议》或其任何部分的含义。

14. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. Additionally this Subscription Agreement may be executed by means of digital or electronic signature of the Parties. The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

   **副本**。本《认购协议》可以签署任意数量的副本，但具有相同的效力和效果，如同签署的是同一份文件。另外双方可以以数码或电子签名形式签署本《认购协议》。若本《认购协议》以传真或其他电子传送形式进行签署或提交，应等同于提交一份已签署的原件，已签署的协议上所有的签署者均受本协议约束。

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

<u>**INVESTMENT SUMMARY**</u>

<u>**投资摘要**</u>

<u>**Initial Investment Amount**</u>

<u>**初始投资金额**</u>

Investor agrees to invest the following initial amount ("Principal Balance"):

投资人同意以下述初始投资额（'本金金额'）投资：

$ _____

<u>**Interest Rate:**</u>  Interest will be compounded monthly and due at the Maturity Date unless the Company agrees otherwise, as set forth below.

<u>**Other Agreement**</u>: _____

<u>**Payment Method**</u>

<u>**支付方式**</u>

Investor agrees to forward payment of the Principal Balance in <u>one</u> of the following methods (select one):

投资人同意按照以下一种方式（请选择一种）支付该《认购协议》中的本金金额：

☐ **Electronic Funds Transfer**: by wiring or ACH payment of the Principal Balance to theaccount set forth below:

**电子转账：** 以电汇或银行转款的方式向以下账户支付本金金额：

| | |
|---|---|
| Account Name 账户名称： | iCap Funding, LLC |
| ABA Routing Number 美国国内银行代码： 123205054 | |
| Account Number 账号： | 4868034077 |
| Bank Name 银行名称： | Umpqua Bank |
| Bank Address 银行地址： | 705 Gilman Blvd. NW |
| | Issaquah, WA 98027 |
| SWIFT Code 国际转账代码： | UMPQUS6P |

☐ **Check**: by mailing a check made payable to "iCap Funding, LLC" along with a completed subscription document to:

**支票：** 邮寄一张收款人为 iCap Funding, LLC 的支票连同一份填写完整的认购文件至如下地址：

iCap Funding, LLC

Attn: Investor Relations Department

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006 U.S.A.

☐ **Other 其他:** _____

\* Interest will accrue only after the Subscription Agreement and Note have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

\*只有在本《认购协议》已完全签署并被该公司接受，且本金已按照该公司的汇款方式汇至该公司才会开始计算利息。

## SIGNATURE PAGE

## 签名页

INDIVIDUALS

个人

In witness whereof, the parties hereto have executed this Subscription Agreement and hereby agree to the provisions of the Note Documents and their exhibits, as of the date set forth below.

为示信守，在下述日期之日开始，本协议双方已同意签署本《认购协议》，并同意接受《本票协议》及其附属协议。

Dated 日期:  _____

Signature(s) 签名:  _____

_____

Executed at 签名地点:  _____

*(location outside the U.S. 美国境外)*

Name(s) (Please Print) 名字(楷体):  _____

Residence Address 住址:  _____

_____

Phone Number 电话号码:  _____

Passport Number 护照号码:  _____

Email address 电子信箱:  _____

## SIGNATURE PAGE

## 签名页

### CORPORATIONS, PARTNERSHIPS, TRUSTS OR OTHER ENTITIES

### 公司、合伙企业、信托机构或其他实体

In witness whereof, the parties hereto have executed this Subscription Agreement and hereby agree to the provisions of the Note Documents and their exhibits as of the date set forth below.

为示信守，在下述日期之日开始，本协议双方已同意签署本《认购协议》，并同意接受《本票协议》及其附属协议。

Dated 日期: _____

Name of Entity (Please Print) 公司名(楷体): _____

Signature 签名: _____

Executed at 签名地点: _____

*(location outside the U.S.)*

Name (Please Print) 名字(楷体): _____

Title 职位: _____

Address 地址: _____

_____

Phone Number 电话号码: _____

Taxpayer ID Number 纳税人ID号码: _____

Email address 电子信箱: _____

<u>ACCEPTANCE</u>

<u>接受方</u>

iCap Funding, LLC

Date 日期: _____

By 签署人: _____

Name 姓名: _____

Title 职位: _____



# <u>Payment Remittance Information:</u>

Please complete the following authorization:

<span>☐</span> **ACH (Direct Deposit) Authorization:**

I hereby authorize **iCap Funding, LLC** ("the Company") to initiate credit entries to the account(s) listed below. I further authorize the financial institution(s) named below to credit such account(s).

| Name of Financial Institution | Checking or Savings | Bank Routing Number | Bank Account Number | % or Amount of Deposit |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

I understand that this authorization remains in effect until the Company receives from me, in writing, notification to terminate/change the authorization in such a time and manner as to afford the Company a reasonable time to act on it.

_____

Account Holder Signature          Date

_____

Joint Account Holder Signature       Date



# 汇款支付信息

请完成以下授权：

### ACH（直接存款）授权：

本人在此授权 **iCap Funding, LLC**（"公司"）发起向下列银行账户的汇款。本人进一步授权下述金融机构为下列帐户支付款项。

| 金融机构名称 | 账户类别<br>（支票账户/储蓄账户） | 银行汇款<br>路径号码 | 银行账户号码 | 取出款项**%**或金额 |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

本人明白，本授权书将持续有效直至公司收到本人书面通知以终止/更改此授权，并给予公司在收到本人书面通知后合理的时间来采取行动。

_____                           _____
账户持有人签名                                                                                       日期

_____                           _____
账户联名持有人签名                                                                                   日期

**EXHIBIT C**

**PLEDGE AND SECURITY AGREEMENT**

# PLEDGE AND SECURITY AGREEMENT

This Pledge and Security Agreement (this "Agreement"), dated as of May 13, 2021 (the "Effective Date"), is entered into by and between iCap Enterprises, Inc. a Washington corporation ("Pledgor") and the holders of promissory notes issued by iCap Funding, LLC, a Delaware limited liability company (the "Company") to an offering of up to $50,000,000 of Secured Promissory Notes (the "Notes") pursuant to Regulation D and Regulation S promulgated under the Securities Act of 1933, as amended, commencing on or about May 13, 2021, who execute a counterpart signature page to this Agreement and become a party hereto(each a "Pledgee" and collectively the "Pledgees"), and for the benefit of the Pledgees. Pledgor and each Pledgee may be referred to herein as a "Party" and collectively as the "Parties." Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, the Pledgor is or shall be a member or shareholder of the Company which shall hold ownership interests in one or more loans or other real estate based investments, the interests in which may be financed or acquired with the proceeds of the Notes and the proceeds from which will be used to pay amounts due to the Pledgees pursuant to the Notes (the "Pledged Interests"); and

WHEREAS, the Pledgor has agreed to execute and deliver this Agreement pursuant to the terms of the Notes;

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1. PLEDGE. To secure the prompt payment and full and faithful performance of the obligations of Pledgor to Pledgees pursuant to the Notes, whether direct, contingent, fixed or otherwise, now or hereafter from time to time arising pursuant to the Notes (collectively, the "Indebtedness"), the Pledgor hereby grants a security interest in and to, does hereby pledge and assign to, Pledgees, under Articles 8 and 9 of the UCC (as defined below), all its right, title, share and interest in, to and in respect of (i) the Pledged Interests; (ii) together with only so much of any distribution, whether of cash or in kind, in connection with, relating to or in respect of the applicable Pledged Interests, whether any such distribution or payment is a distribution, is in partial or complete liquidation, or is the result of reclassification, readjustment or other changes in the capital structure of the entity issuing the same, or otherwise, and any and all subscriptions, warrants, options and other rights issued upon and/or in connection therewith; (iii) any and all substitutions, renewals, improvements and replacements of the Pledged Interests and additions thereto; and (iv) all proceeds arising from any of the foregoing. All of the foregoing items are referred to herein individually and/or collectively as the "Collateral." Capitalized terms not otherwise defined herein or in the Notes shall have the meaning given them in the UCC. For purposes of this Agreement, "UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Delaware; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of Pledgees' security interest in the Pledged Interests is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

2. VOTING AND TRADING RIGHTS. If no Event of Default has occurred and is continuing, the Pledgor may exercise any voting rights that the Pledgor may have as to the Pledged Interests. If an Event of Default has occurred and is continuing, Pledgor shall deliver the Pledged Interests to such party as directed by a Majority-in-Interest of the Noteholders (the "Designated Party"), and thereafter Pledgees may exercise all voting rights as to any of the Pledged Interests and the Pledgor shall deliver to the Designated Party all notices, proxies and other information relating to the exercise of such rights received by the Pledgor promptly upon receipt and, at the request of Designated Party, shall execute and deliver to the Designated Party any proxies or other instruments which are, in the judgment of the Designated Party, necessary for Pledgees to exercise such voting rights.

3. DUTY OF PLEDGEE. Pledgees shall have no liability or duty, either before or after the occurrence of an Event of Default to collect or enforce any of its rights against, the Pledged Interests. If Pledgees actually

receive any notices requiring action with respect to Pledged Interests in Pledgees' possession, Pledgees shall take reasonable steps to forward such notices to the Pledgor. Except as provided in Section 2, the Pledgor is responsible for responding to notices concerning the Pledged Interests, voting the Pledged Interests, and exercising any rights and options, calls or conversions in respect of the Pledged Interests.

4.  REPRESENTATIONS AND WARRANTIES. The Pledgor represents and warrants to Pledgees that:

    **(a)** The Interests do, or shall, constitute all of Pledgor's ownership interest in the Company.

    **(b)** The Pledgor is a corporation duly organized, validly existing, and in good standing under the laws of the State of Washington and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the Pledgor's organizational documents. The Pledgor has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Agreement.

    **(c)** The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Pledgor is a party or to which any of its assets, properties or operations are subject.

    **(d)** This Agreement and all agreements and other documents executed by the Pledgor in connection herewith constitute the valid and binding obligation of the Pledgor, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

    **(e)** No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Agreement, the pledge of a security interest in the Pledged Interests in favor of Pledgees or the valid and lawful exercise by Pledgees of remedies available to them under this Agreement or applicable law or of the voting and other rights granted to it in this Agreement, except as may be required for the offer or sale of securities under applicable securities laws.

    **(f)** The Pledgor is the sole owner of the Pledged Interests, has the right to grant the security interest provided for herein to Pledgees and, to the knowledge of the Pledgor, has granted to Pledgees a valid and perfected first priority security interest in the Pledged Interests, free of all liens, encumbrances, transfer restrictions and adverse claims.

5.  COVENANTS. The Pledgor covenants and agrees that so long as this Agreement shall be in effect:

    **(a)** Provided that an Event of Default does not exist and is continuing, then the Pledgor and the Company may make distributions to their respective members as they determine. At any time that an Event of Default exists and is continuing, none of Pledgor or the Company shall make any distributions to their members, other than tax distributions (i.e., distributions in the amount of taxes payable by such members on the apportioned income of the entities) or as otherwise required by law. Distributions as referenced herein does not include Management Fees, origination fees, or other fees owed to Affiliates of Pledgor. Pledgor may cause the real estate owned by the Company to be sold, encumbered, transferred, pledged, liened, or otherwise disposed of as it sees fit.

**(b)** The Pledgor shall defend the Pledgor's title to the Pledged Interests and the security interest of Pledgees against the claims of any person claiming rights in the Pledged Interests.

**(c)** Without the prior written consent of a Majority-in-Interest of the Noteholders, (i) the Pledgor shall not sell, gift, pledge, exchange or otherwise transfer the Pledged Interests. In the event of any such sale, exchange or transfer consented to by Pledgees, the Pledgor shall upon receipt the proceeds of such sale, exchange or transfer to pay any such distribution with respect to the Pledged Interests to the Pledgees for application to the Indebtedness.

**(d)** The Pledgor will pay and discharge when due all of its material obligations and liabilities (including, without limitation, tax liabilities) which if unpaid when due might by law give rise to a lien on the Pledged Interests, except where the same may be contested in good faith by appropriate proceedings.

**(e)** At the Pledgor's expense, it will do such further facts and execute and deliver such additional conveyances, certificates, instruments, legal opinions and other assurances as a Majority-in-Interest of the Noteholders may reasonably request to protect, assure or enforce their interests, rights and remedies under this Agreement.

6. INDEMNIFICATION. Each Party shall jointly and severally indemnify and hold harmless the other Parties and such other Parties' agents, beneficiaries, Affiliates, representatives and their respective successors and assigns (collectively, the "Indemnified Persons") from and against any and all damages, losses, liabilities, taxes and costs and expenses (including, without limitation, attorneys' fees and costs) resulting directly or indirectly from (a) any inaccuracy, misrepresentation, breach of warranty or nonfulfillment of any of the representations and warranties of such Party in this Agreement, or any actions, omissions or statements of fact inconsistent with in any material respect any such representation or warranty, (b) any failure by such Party to perform or comply with any agreement, covenant or obligation in this Agreement.

7. TERMINATION. This Agreement shall automatically terminate and be of no further force or effect, and any security interest in the Pledged Interests shall automatically terminate and be released, on the earlier to occur of the date on which the Notes are repaid in full.

8. EXPENSES. The Pledgor agrees that, following an Event of Default, the Pledgor will pay to the Pledgees upon demand the amount of any out-of-pocket expenses, including the fees and disbursements of counsel, that Pledgees incurs in connection with the enforcement of this Agreement, including expenses incurred to preserve the value of the Pledged Interests, the sale or other disposition of any of the Pledged Interests, the exercise by Pledgees of any of its rights, or any action to enforce its rights under this Agreement.

9. NOTICES. Any notices, communications and waivers under this Agreement shall be in writing and sent in accordance with the provisions for notices as set forth in the Notes.

10. INCORPORATION.  Section 10, Section 12, Section 13 and Section 15 of the Notes are incorporated herein by reference and shall apply to this Agreement as though fully set forth herein, provided that any reference therein to the "Note" shall be deemed a reference to this Agreement.

11. INTERPRETATION. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore shall not be construed against a Party or Parties on the ground that such Party or Parties drafted or was more responsible for the drafting of any such provision(s). The Parties further agree that they have each carefully read the terms and conditions of this Agreement, that they know and understand the contents and effect of this Agreement and that the legal effect of this Agreement has been fully explained to its satisfaction by counsel of its own choosing.

12. AMENDMENT AND SUBORDINATION. This Agreement may be amended by the Pledgor at any time, without any approval of the Pledgees being required, if requested to do so by a lender for the purpose of providing financing to any of the properties owned by the Company or any subsidiary entity of the Company. Additionally, all rights of Pledgees under this Agreement are and shall be subordinated to those of any such

lender, and Pledgor shall have the unconditional right to execute any agreement required by a lender to provide additional assurances, subordination, and agreements needed to obtain financing from such lender.

13. COUNTERPARTS. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which taken together shall be but a single instrument. The Pledgees may join this Agreement at or following the Effective Date by the execution of a Counterpart Signature Page as set forth herein, provided, however, that such Counterpart Signature Page shall not be effective unless and until the Company accepts the applicable proposed Pledgee's subscription for a Note pursuant to the Subscription Agreement. The execution and delivery of a facsimile or other electronic transmission of a signature to this Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date or as of the date of their joinder hereto.

**Pledgor**:

ICAP ENTERPRISES, INC.

_____

By:_____

Its::      _____

**Annex 1**

附录1

**Counterpart Signature Page to Pledge and Security Agreement**

承诺和保证协议签名页

The undersigned hereby accepts, and becomes a party to, the Pledge and Security Agreement (the "Agreement"), dated as of May 13, 2021, in connection with the acquisition of a Note (as defined in the Agreement), and by its signature below signifies its agreement to be bound by the terms and conditions of the Agreement.

自2020年12月1日起，下方签署者接受并成为关于获得债券（其定义见该协议）的《质押和担保协议 》中的一方，受本协议中的相关条款约束。

**INDIVIDUAL 个人**

Date 日期：

Name(s) 姓名： _____

_____

Signature(s) 签字： _____

_____

Date 日期： _____

**ENTITY 企业**

Entity Name 企业名称： _____

Signature 签字： _____

Name 姓名： _____

Title 职位： _____

Date 日期： _____

# EXHIBIT 12

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM CONTAINS MATERIAL NON-PUBLIC INFORMATION REGARDING ICAP PACIFIC INCOME FUND 5, LLC (THE "COMPANY"). BY ACCEPTING THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS HERETO (COLLECTIVELY THIS "MEMORANDUM" OR THESE "OFFERING DOCUMENTS"), THE RECIPIENT AGREES WITH THE COMPANY TO MAINTAIN IN STRICT CONFIDENCE ALL NON-PUBLIC INFORMATION, INCLUDING, BUT NOT LIMITED TO, THE EXISTENCE OF THE PROPOSED FINANCING AND ANY OTHER NON-PUBLIC INFORMATION REGARDING THE COMPANY OBTAINED FROM THIS MEMORANDUM, ANY OTHER TRANSACTION DOCUMENT OR THE COMPANY.**

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## FOR ACCREDITED INVESTORS PURSUANT TO RULE 506(b) UNDER REGULATION D UNDER THE SECURITIES ACT OF 1933, AS AMENDED.



### iCap Pacific Income Fund 5, LLC

### $50,000,000 of

### Secured Promissory Notes

### (with an over-allotment amount of $25,000,000)

### September 5, 2019

**AN INVESTMENT IN OUR SECURITIES INVOLVES A HIGH DEGREE OF RISK. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF US AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD ONLY INVEST IN OUR SECURITIES IF YOU CAN AFFORD A COMPLETE LOSS OF YOUR INVESTMENT. YOU SHOULD READ THE COMPLETE DISCUSSION OF THE RISK FACTORS SET FORTH IN THIS MEMORANDUM.**

**DUE TO THE FACT THAT THE OFFERING IS A PRIVATE PLACEMENT AND IS EXEMPT FROM REGISTRATION, NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. SEE "CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS."**

**Supplement No. 1 to Confidential Private Placement Memorandum**



**iCap Pacific Income Fund 5, LLC has determined to extend the Offering Period as described in this Memorandum for an additional 12 months, to June 30, 2021. Any references in this Memorandum to the "Offering Period" shall now be deemed to reflect such extension.**

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
## FOR
## ACCREDITED INVESTORS

## iCap Pacific Income Fund 5, LLC
## $50,000,000 OF AGGREGATE PRINCIPAL AMOUNT
## OF
## SECURED PROMISSORY NOTES

## (WITH AN OVER-ALLOTMENT AMOUNT OF $25,000,000)

**Minimum subscription per investor of $50,000 of principal amount, although iCap Pacific Income Fund 5, LLC reserves the right to accept subscriptions for a lower principal amount.**

**No minimum offering amount.**

This Confidential Offering Memorandum (this "Memorandum") is being furnished in connection with the offer and sale (the "Offering") of up to $50,000,000 of Secured Promissory Notes, with an over-allotment amount of $25,000,000 (the "Notes") by iCap Pacific Income Fund 5, LLC, a Delaware limited liability company (the "Company"). Notes will be issued in denominations of at least $50,000 (and any amounts in excess of $50,000). The Company may accept subscriptions in lesser amounts in its sole discretion. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines.

The Company is a private investment vehicle that seeks to hold real estate investments as described herein. This Memorandum contains certain information that prospective investors should know about the Offering. The manager of the Company is iCap Pacific NW Management, LLC, a Washington limited liability company (the "Manager"). The Company's address is iCap Pacific Income Fund 5, LLC, PO Box 53232, Bellevue, Washington 98015.

The Offering is being made by the Company to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to Rule 506(b) under Regulation D, on a "Best Efforts" basis, which means there is no guaranty that any of the Notes will be sold or that a sufficient number of Notes will be sold to fulfill the Company's business plan. The Company has engaged Cobalt Capital, Inc. as the Managing Broker Dealer in this Offering, and the Company will pay commissions as set forth in the Plan of Distribution commencing on page 14 set forth below, based on the aggregate principal amount of the Notes sold to investors. Investors who purchase notes are referred to herein as the "Noteholders." The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on June 30, 2020, unless extended by us for up to 12 months, subject to earlier termination as set forth herein.

**THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. NO INVESTMENT IN THE NOTES SHOULD BE MADE BY ANY INVESTOR NOT FINANCIALLY ABLE TO LOSE THE ENTIRE AMOUNT OF ITS INVESTMENT.**

i

## RISK DISCLOSURE STATEMENT

THE ATTORNEYS THAT PREPARED THIS MEMORANDUM ("ATTORNEYS") HEREBY DISCLAIM ANY OPINION OR ASSURANCE OF ANY NATURE WHATSOEVER REGARDING THE ACCURACY, COMPLETENESS, REASONABLENESS, TIMELINESS OR VERACITY OF ANY OF THE ASSERTIONS, REPRESENTATIONS OR OTHER INFORMATION CONTAINED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, OR REGARDING THE INVESTMENT-WORTHINESS OF THE SECURITIES DISCUSSED HEREIN ("SECURITIES"). ANY ASSERTION OR REPRESENTATION MADE HEREIN, AND ALL OTHER INFORMATION DISCLOSED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, HAS BEEN MADE OR PROVIDED BY THE PROMOTER. IN CONNECTION WITH THE PREPARATION OF THESE CONFIDENTIAL OFFERING DOCUMENTS, THE ATTORNEYS HAVE NOT BEEN ENGAGED TO ATTEST HERETO, OR TO OPINE IN RESPECT HEREOF. ACCORDINGLY, THE ATTORNEYS HAVE NOT PERFORMED ANY ANALYTICAL, CONFIRMATION, VALIDATION, VERIFICATION OR OTHER PROCEDURES IN RESPECT OF THE ASSERTIONS AND REPRESENTATIONS CONTAINED HEREIN, NOR IN RESPECT OF ANY OF THE OTHER INFORMATION DISCLOSED HEREIN, INCLUDING ANY SIMILAR TO THOSE PROCEDURES UNDERTAKEN BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT IN CONNECTION WITH AN AUDIT OF THE FINANCIAL STATEMENTS OF AN ISSUER OF SECURITIES FOR PURPOSES OF RENDERING AN OPINION THEREON. CONSEQUENTLY, POTENTIAL INVESTORS, IN DECIDING WHETHER OR NOT TO INVEST IN THE SECURITIES, ARE CAUTIONED NOT TO ASCRIBE ANY SPECIAL RELIANCE WHATSOEVER ON THIS MEMORANDUM BY REASON THAT ATTORNEYS HAVE PREPARED THIS MEMORANDUM.

THIS BRIEF STATEMENT CANNOT DISCLOSE ALL THE RISKS AND OTHER FACTORS NECESSARY TO EVALUATE YOUR INVESTMENT IN THE NOTES. THEREFORE, BEFORE YOU DECIDE TO MAKE AN INVESTMENT IN THE NOTES, YOU SHOULD CAREFULLY STUDY THIS MEMORANDUM, INCLUDING A DISCUSSION OF CERTAIN RISK FACTORS OF THIS INVESTMENT.

## CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS

FOR ALL PROSPECTIVE INVESTORS: THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT SET FORTH IN SECTION 4(A)(2) THEREOF AND RULE 506(B) OF REGULATION D PROMULGATED THEREUNDER TO ACCREDITED INVESTORS. RULE 506 OF REGULATION D SETS FORTH CERTAIN RESTRICTIONS AS TO THE NUMBER AND NATURE OF PURCHASERS OF SECURITIES OFFERED PURSUANT THERETO. WE HAVE ELECTED TO SELL SECURITIES ONLY TO ACCREDITED INVESTORS AS SUCH TERM IS DEFINED IN RULE 501(A) OF REGULATION D. EACH PROSPECTIVE INVESTOR WILL BE REQUIRED TO MAKE REPRESENTATIONS AS TO THE BASIS UPON WHICH IT QUALIFIES AS AN ACCREDITED INVESTOR.

THE SECURITIES OFFERED HEREBY WILL BE SUBJECT TO RESTRICTIONS ON

ii

Exhibit 21 Page 1366

TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. ONLY PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT IN THE NOTES SHOULD PURCHASE THE NOTES.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION ("SEC"), NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE INFORMATION PRESENTED HEREIN WAS PRESENTED AND SUPPLIED SOLELY BY THE COMPANY AND IS BEING FURNISHED SOLELY FOR USE BY PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING. THE COMPANY MAKES NO REPRESENTATIONS AS TO THE FUTURE PERFORMANCE OF THE COMPANY. THIS MEMORANDUM WERE PREPARED BY THE COMPANY.

THIS OFFERING IS SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION BY THE COMPANY AT ANY TIME AND WITHOUT NOTICE. WE RESERVE THE RIGHT IN OUR SOLE DISCRETION TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART NOTWITHSTANDING TENDER OF PAYMENT OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AGGREGATE PRINCIPAL AMOUNT OF NOTES SUBSCRIBED FOR BY SUCH INVESTOR.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY ANY SECURITY OTHER THAN THE SECURITIES OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY SUCH SECURITIES BY ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN OUR AFFAIRS SINCE THE DATE HEREOF. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN PERTINENT DOCUMENTS, APPLICABLE LAWS AND REGULATIONS. SUCH SUMMARIES ARE NOT COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE COMPLETE TEXTS THEREOF.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES.

THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM OR IN ANY ADDITIONAL EVALUATION MATERIAL, WHETHER WRITTEN OR ORAL, MADE AVAILABLE IN CONNECTION WITH ANY FURTHER INVESTIGATION OF THE COMPANY. THE COMPANY EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY THAT MAY BE BASED UPON SUCH INFORMATION, ERRORS THEREIN OR OMISSIONS THEREFROM. ONLY THOSE PARTICULAR REPRESENTATIONS AND

WARRANTIES, IF ANY, WHICH MAY BE MADE TO A PARTY IN A DEFINITIVE WRITTEN AGREEMENT REGARDING A TRANSACTION INVOLVING THE COMPANY, WHEN, AS AND IF EXECUTED, AND SUBJECT TO SUCH LIMITATIONS AND RESTRICTIONS AS MAY BE SPECIFIED THEREIN, WILL HAVE ANY LEGAL EFFECT. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED TO THE CONTRARY IN WRITING, THIS MEMORANDUM SPEAKS AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE OF NOTES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY AFTER THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE OFFERING OF NOTES BEING MADE PURSUANT HERETO, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

THERE IS NO MARKET FOR THE NOTES AND THERE IS NO ASSURANCES A PUBLIC MARKET WILL EVER BE ESTABLISHED. PURCHASERS OF THE NOTES ARE NOT BEING GRANTED ANY REGISTRATION RIGHTS. A PURCHASE OF THE NOTES SHOULD BE CONSIDERED AN ILLIQUID INVESTMENT.

BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR HEREBY EXPRESSLY AGREES WITH THE COMPANY TO KEEP CONFIDENTIAL ALL OF THE CONTENTS HEREOF, INCLUDING, BUT NOT LIMITED TO, THE OFFERING AND ALL INFORMATION RELATED TO THE COMPANY, AND NOT TO DISCLOSE THE SAME TO ANY THIRD PARTY AND/OR OTHERWISE USE THE SAME FOR ANY PURPOSE OTHER THAN AN EVALUATION BY SUCH OFFEREE OF A POTENTIAL INVESTMENT IN THE NOTES OFFERED PURSUANT HERETO. WE HAVE CAUSED THIS MEMORANDUM TO BE DELIVERED TO YOU IN RELIANCE UPON SUCH AGREEMENT BY YOU.

EACH PROSPECTIVE SUBSCRIBER BY RECEIVING THIS MEMORANDUM AGREES TO RETURN THE SAME TO US IF (A) THE OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY SECURITIES OFFERED HEREBY; (B) THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, AND/OR (C) THE OFFERING IS TERMINATED OR WITHDRAWN.

THIS MEMORANDUM IS SUBJECT TO AMENDMENT AND SUPPLEMENTATION AS APPROPRIATE. WE DO NOT INTEND TO UPDATE THE INFORMATION CONTAINED IN THE OFFERING DOCUMENTS FOR ANY INVESTOR WHO HAS ALREADY MADE AN INVESTMENT. WE MAY UPDATE THE INFORMATION CONTAINED HEREIN FROM TIME TO TIME AND PROVIDE SUCH UPDATED DOCUMENT TO POTENTIAL INVESTORS BUT UNDERTAKE NO OBLIGATION TO PROVIDE SUCH UPDATED DOCUMENTS TO AN INVESTOR WHO HAS ALREADY MADE HIS OR HER INVESTMENT.

**FOR RESIDENTS OF ALL STATES:**

**THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN A PARTICULAR STATE. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE HEREBY ADVISED TO CONTACT THE COMPANY. THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS (COMMONLY CALLED "BLUE SKY" LAWS). THESE SECURITIES MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THE STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OF SALE MAY BE MADE IN ANY PARTICULAR STATE.**

**IN MAKING ANY INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. NO FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS RECOMMENDED THESE SECURITIES. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

1. **NOTICE TO ALABAMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

2. **NOTICE TO ALASKA RESIDENTS ONLY**: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHER-MORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD

EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

3. **NOTICE TO ARIZONA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ARIZONA SECURITIES ACT IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PURSUANT TO A.R.S. SECTION 44-1844 (1) AND THEREFORE CANNOT BE RESOLD UNLESS THEY ARE ALSO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

4. **NOTICE TO ARKANSAS RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN RELIANCE UPON CLAIMS OF EXEMPTION UNDER THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING OR PASSED UPON THE ADEQUACY OR ACCURACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

5. **NOTICE TO CALIFORNIA RESIDENTS:** THESE SECURITIES HAVE NOT BEEN QUALIFIED OR OTHERWISE APPROVED OR DISAPPROVED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS UNDER THE CALIFORNIA CORPORATIONS CODE. THESE SECURITIES ARE OFFERED IN CALIFORNIA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PROVIDED BY SECTIONS 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. ACCORDINGLY, DISTRIBUTION OF THIS MEMORANDUM AND OFFERS AND SALES OF THE SECURITIES REFERRED TO HEREIN ARE STRICTLY LIMITED TO PERSONS WHO THE COMPANY DETERMINES TO HAVE MET CERTAIN FINANCIAL AND OTHER REQUIREMENTS. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY WITH RESPECT TO ANY OTHER PERSON. IN ORDER TO RELY ON THE FOREGOING EXEMPTIONS, THE COMPANY WILL RELY IN TURN ON CERTAIN REPRESENTATIONS AND WARRANTIES MADE TO THE COMPANY BY THE INVESTORS IN THIS OFFERING. THOSE REPRESENTATIONS AND WARRANTIES ARE CONTAINED IN THE SUBSCRIPTION AGREEMENT, ATTACHED HERETO AS EXHIBIT A.

6. **FOR COLORADO RESIDENTS ONLY:** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS OFFERING HAS NOT BEEN QUALIFIED WITH COMMISSIONER OF CORPORATIONS OF THE STATE OF COLORADO AND THE ISSUANCE OF SUCH SECURITIES OR PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATIONS IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPTED FROM QUALIFICATION BY SECTION 25100, 25102, OR 25104 OF THE COLORADO CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS OFFERING ARE EXPRESSLY CONDITION UPON SUCH QUALIFICATIONS BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933,

AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991, IF SUCH REGISTRATION IS REQUIRED.

7. **NOTICE TO CONNECTICUT RESIDENTS ONLY:** SECURITIES ACQUIRED BY CONNECTICUT RESIDENTS ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 36B-31-21B-9B OF THE CONNECTICUT, UNIFORM SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF CONNECTICUT. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

8. **NOTICE TO DELAWARE RESIDENTS ONLY:** IF YOU ARE A DELAWARE RESIDENT, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE DELAWARE SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

9. **NOTICE TO DISTRICT OF COLUMBIA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES BUREAU OF THE DISTRICT OF COLUMBIA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

10. **NOTICE TO FLORIDA RESIDENTS ONLY:** THE SECURITIES DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES AND INVESTOR PROTECTION UNDER THE FLORIDA SECURITIES ACT. THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF SAID ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. EACH FLORIDA RESIDENT WHO SUBSCRIBES FOR NOTES HAS THE RIGHT, PURSUANT TO SECTION 517.061(11)(A)(5) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, TO WITHDRAW HIS SUBSCRIPTION AND RECEIVE A FULL REFUND OF ALL MONEYS PAID, WITHIN THREE (3) BUSINESS DAYS AFTER THE EXECUTION OF THE SUBSCRIPTION AGREEMENT AND POWER OF ATTORNEY OR THE PAYMENT FOR AN INTEREST HAS BEEN MADE, WHICH EVER IS LATER. WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER NEED ONLY SEND A LETTER OR A FACSIMILE TO THE COMPANY AT THE ADDRESS SET FORTH IN THIS MEMORANDUM, INDICATING HIS INTENTION TO WITHDRAW. SUCH LETTER OR FACSIMILE MUST BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED THIRD BUSINESS DAY. IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED.

11. **NOTICE TO GEORGIA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE GEORGIA SECURITIES ACT PURSUANT TO REGULATION 590-4-5-04 AND -01. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:54    Exhibit Pt. 2 Page 1241
1366

12. **NOTICE TO HAWAII RESIDENTS ONLY:** NEITHER THESE CONFIDENTIAL OFFERING DOCUMENTS NOR THE SECURITIES DESCRIBED HEREIN BEEN APPROVED OR DISAPPROVED BY THE COMMISSIONER OF SECURITIES OF THE STATE OF HAWAII NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS.

13. **NOTICE TO IDAHO RESIDENTS ONLY:** THESE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT IN RELIANCE UPON EXEMPTION FROM REGISTRATION PURSUANT TO SECTION 30-14-203 OR 302(C) THEREOF AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SAID ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SAID ACT.

14. **NOTICE TO ILLINOIS RESIDENTS:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF THE STATE OF ILLINOIS NOR HAS THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

15. **NOTICE TO INDIANA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-2-1-2 OF THE INDIANA SECURITIES LAW AND HAVE NOT BEEN REGISTERED UNDER SECTION 23-2-1-3. THEY CANNOT THEREFORE BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID LAW OR UNLESS AN EXEMPTION FORM REGISTRATION IS AVAILABLE. A CLAIM OF EXEMPTION UNDER SAID LAW HAS BEEN FILED, AND IF SUCH EXEMPTION IS NOT DISALLOWED SALES OF THESE SECURITIES MAY BE MADE. HOWEVER, UNTIL SUCH EXEMPTION IS GRANTED, ANY OFFER MADE PURSUANT HERETO IS PRELIMINARY AND SUBJECT TO MATERIAL CHANGE.

16. **NOTICE TO IOWA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED; THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

17. **NOTICE TO KANSAS RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 81-5-15 OF THE KANSAS SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

18. **NOTICE TO KENTUCKY RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE

SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER TITLE 808 KAR 10:210 OF THE KENTUCKY SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

19. **NOTICE TO LOUISIANA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER RULE 1 OF THE LOUISIANA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

20. **NOTICE TO MAINE RESIDENTS ONLY:** THE ISSUER IS REQUIRED TO MAKE A REASONABLE FINDING THAT THE SECURITIES OFFERED ARE A SUITABLE INVESTMENT FOR THE PURCHASER AND THAT THE PURCHASER IS FINANCIALLY ABLE TO BEAR THE RISK OF LOSING THE ENTIRE AMOUNT INVESTED. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION UNDER §16202(15) OF THE MAINE UNIFORM SECURITIES ACT AND ARE NOT REGISTERED WITH THE SECURITIES ADMINISTRATOR OF THE STATE OF MAINE. THE SECURITIES OFFERED FOR SALE MAY BE RESTRICTED SECURITIES AND THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS: (1) THE SECURITIES ARE REGISTERED UNDER STATE AND FEDERAL SECURITIES LAWS, OR (2) AN EXEMPTION IS AVAILABLE UNDER THOSE LAWS.

21. **NOTICE TO MARYLAND RESIDENTS ONLY:** IF YOU ARE A MARYLAND RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 11-602(9) OF THE MARYLAND SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MARYLAND. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

22. **NOTICE TO MASSACHUSETTS RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MASSACHUSETTS UNIFORM SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THIS OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

23. **NOTICE TO MICHIGAN RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE MICHIGAN SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

24. **NOTICE TO MINNESOTA RESIDENTS ONLY:** THESE SECURITIES BEING OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA

SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

25. **NOTICE TO MISSISSIPPI RESIDENTS ONLY:** THE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE MISSISSIPPI SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE MISSISSIPPI SECRETARY OF STATE OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE SECRETARY OF STATE NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, OR APPROVED OR DISAPPROVED THIS OFFERING. THE SECRETARY OF STATE DOES NOT RECOMMEND THE PURCHASE OF THESE OR ANY OTHER SECURITIES. EACH PURCHASER OF THE SECURITIES MUST MEET CERTAIN SUITABILITY STANDARDS AND MUST BE ABLE TO BEAR AN ENTIRE LOSS OF THIS INVESTMENT. THE SECURITIES MAY NOT BE TRANSFERRED FOR A PERIOD OF ONE (1) YEAR EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE MISSISSIPPI SECURITIES ACT OR IN A TRANSACTION IN COMPLIANCE WITH THE MISSISSIPPI SECURITIES ACT.

26. **FOR MISSOURI RESIDENTS ONLY:** THE SECURITIES OFFERED HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE PURCHASER IN A TRANSACTION EXEMPT UNDER SECTION 4.G OF THE MISSOURI SECURITIES LAW OF 1953, AS AMENDED. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MISSOURI. UNLESS THE SECURITIES ARE SO REGISTERED, THEY MAY NOT BE OFFERED FOR SALE OR RESOLD IN THE STATE OF MISSOURI, EXCEPT AS A SECURITY, OR IN A TRANSACTION EXEMPT UNDER SAID ACT.

27. **NOTICE TO MONTANA RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A MONTANA RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF FIVE (5) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES.

28. **NOTICE TO NEBRASKA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER CHAPTER 15 OF THE NEBRASKA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

29. **NOTICE TO NEVADA RESIDENTS ONLY:** IF ANY INVESTOR ACCEPTS ANY OFFER TO PURCHASE THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION NRS 90.530 OF THE NEVADA SECURITIES LAW. THE INVESTOR IS HEREBY ADVISED THAT THE ATTORNEY GENERAL OF THE STATE OF NEVADA HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING AND THE FILING OF THE OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE, OR SALE THEREOF, BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEVADA. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. NEVADA ALLOWS THE SALE OF SECURITIES TO 25 OR FEWER PURCHASERS IN THE STATE WITHOUT REGISTRATION. HOWEVER, CERTAIN CONDITIONS APPLY, I.E., THERE CAN BE NO GENERAL ADVERTISING OR SOLICITATION AND COMMISSIONS ARE LIMITED TO LICENSED

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:41    Exhibit Pt. 2 Page 1244
1366

BROKER-DEALERS. THIS EXEMPTION IS GENERALLY USED WHERE THE PROSPECTIVE INVESTOR IS ALREADY KNOWN AND HAS A PRE-EXISTING RELATIONSHIP WITH THE COMPANY. (SEE NRS 90.530.11.)

30. **NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY:** NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE UNDER THIS CHAPTER HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

31. **NOTICE TO NEW JERSEY RESIDENTS ONLY:** IF YOU ARE A NEW JERSEY RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE CONFIDENTIAL OFFERING DOCUMENTS HAVE NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

32. **NOTICE TO NEW MEXICO RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE NEW MEXICO DEPARTMENT OF BANKING NOR HAS THE SECURITIES DIVISION PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

33. **NOTICE TO NEW YORK RESIDENTS ONLY:** THIS MEMORANDUM HAVE NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE COMPANY HAS TAKEN NO STEPS TO CREATE AN AFTER MARKET FOR THE SECURITIES OFFERED HEREIN AND HAS MADE NO ARRANGEMENTS WITH BROKERS OF OTHERS TO TRADE OR MAKE A MARKET IN THE SECURITIES. AT SOME TIME IN THE FUTURE, THE COMPANY MAY ATTEMPT TO ARRANGE FOR INTERESTED BROKERS TO TRADE OR MAKE A MARKET IN THE SECURITIES AND TO QUOTE THE SAME IN A PUBLISHED QUOTATION MEDIUM, HOWEVER, NO SUCH ARRANGEMENTS HAVE BEEN MADE AND THERE IS NO ASSURANCE THAT ANY BROKERS WILL EVER HAVE SUCH AN INTEREST IN THE SECURITIES OF THE COMPANY OR THAT THERE WILL EVER BE A MARKET THEREFORE.

34. **NOTICE TO NORTH CAROLINA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit Pt. 2 Page 1245
1366

FURTHERMORE, THE FORGOING AUTHORITIES HAVE NOT CONFIRMED ACCURACY OR DETERMINED ADEQUACY OF THIS MEMORANDUM. REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

35. **NOTICE TO NORTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES COMMISSIONER OF THE STATE OF NORTH DAKOTA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

36. **NOTICE TO OHIO RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 1707.03(X) OF THE OHIO SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

37. **NOTICE TO OKLAHOMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF OKLAHOMA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION FOR PRIVATE OFFERINGS. ALTHOUGH A PRIOR FILING OF THESE CONFIDENTIAL OFFERING DOCUMENTS AND THE INFORMATION HAS BEEN MADE WITH THE OKLAHOMA SECURITIES COMMISSION, SUCH FILING IS PERMISSIVE ONLY AND DOES NOT CONSTITUTE AN APPROVAL, RECOMMENDATION OR ENDORSEMENT, AND IN NO SENSE IS TO BE REPRESENTED AS AN INDICATION OF THE INVESTMENT MERIT OF SUCH SECURITIES. ANY SUCH REPRESENTATION IS UNLAWFUL.

38. **NOTICE TO OREGON RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE CORPORATION COMMISSION OF THE STATE OF OREGON UNDER PROVISIONS OF ORS 59.049. THE INVESTOR IS ADVISED THAT THE COMMISSIONER HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS MEMORANDUM SINCE THIS MEMORANDUM IS NOT REQUIRED TO BE FILED WITH THE COMMISSIONER. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE COMPANY CREATING THE SECURITIES, AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

39. **NOTICE TO PENNSYLVANIA RESIDENTS ONLY:** EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(D), DIRECTLY FROM THE ISSUER OR AFFILIATE OF THIS ISSUER, SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER HE

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:54    Exhibit Pt. 2 Page 1246 of 1366

MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED. IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 (70 PS § 1-207(M), YOU MAY ELECT, WITHIN TWO (2) BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONEYS PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A LETTER OR TELEGRAM TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE CONFIDENTIAL OFFERING DOCUMENTS) INDICATING YOUR INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU SHOULD ASK WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. NO SALE OF THE SECURITIES WILL BE MADE TO RESIDENTS OF THE STATE OF PENNSYLVANIA WHO ARE NON-ACCREDITED INVESTORS. EACH PENNSYLVANIA RESIDENT MUST AGREE NOT TO SELL THESE SECURITIES FOR A PERIOD OF TWELVE (12) MONTHS AFTER THE DATE OF PURCHASE, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION. THE SECURITIES HAVE BEEN ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE PENNSYLVANIA SECURITIES ACT OF 1972. NO SUBSEQUENT RESALE OR OTHER DISPOSITION OF THE SECURITIES MAY BE MADE WITHIN 12 MONTHS FOLLOWING THEIR INITIAL SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION, AND THEREAFTER ONLY PURSUANT TO AN EFFECTIVE REGISTRATION OR EXEMPTION.

40. **NOTICE TO RHODE ISLAND RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE DEPARTMENT OF BUSINESS REGULATION OF THE STATE OF RHODE ISLAND NOR HAS THE DIRECTOR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

41. **NOTICE TO SOUTH CAROLINA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE SOUTH CAROLINA UNIFORM SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE SOUTH CAROLINA SECURITIES COMMISSIONER. THE COMMISSIONER DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

42. **NOTICE TO SOUTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THESE CONFIDENTIAL OFFERING DOCUMENTS ARE TRUE, COMPLETE, AND NOT MISLEADING, NOR HAS THE DIRECTOR

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:10    Exhibit Pt 2 Page 1247
1366

OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

43. **NOTICE TO TENNESSEE RESIDENT ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD. EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

44. **NOTICE TO TEXAS RESIDENTS ONLY:** THE SECURITIES OFFERED HEREUNDER HAVE NOT BEEN REGISTERED UNDER APPLICABLE TEXAS SECURITIES LAWS AND, THEREFORE, ANY PURCHASER THEREOF MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. FURTHER, PURSUANT TO §109.13 UNDER THE TEXAS SECURITIES ACT, THE COMPANY IS REQUIRED TO APPRISE PROSPECTIVE INVESTORS OF THE FOLLOWING: A LEGEND SHALL BE PLACED, UPON ISSUANCE, ON CERTIFICATES REPRESENTING SECURITIES PURCHASED HEREUNDER, AND ANY PURCHASER HEREUNDER SHALL BE REQUIRED TO SIGN A WRITTEN AGREEMENT THAT HE WILL NOT SELL THE SUBJECT SECURITIES WITHOUT REGISTRATION UNDER APPLICABLE SECURITIES LAWS, OR EXEMPTIONS THEREFROM.

45. **NOTICE TO UTAH RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE UTAH SECURITIES ACT. THE SECURITIES CANNOT BE TRANSFERRED OR SOLD EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

46. **NOTICE TO VERMONT RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE STATE OF VERMONT NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

47. **NOTICE TO VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION UNDER SECTION 13.1-514 OF THE VIRGINIA SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

48. **NOTICE TO WASHINGTON RESIDENTS ONLY:** THE ADMINISTRATOR OF SECURITIES HAS NOT REVIEWED THE OFFERING OR CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE SECURITIES HAVE NOT BEEN REGISTERED IN RELIANCE UPON THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, AND THEREFORE, CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, OR UNLESS AN EXEMPTION FROM REGISTRATION IS MADE AVAILABLE.

49. **NOTICE TO WEST VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 15.06(B)(9) OF THE WEST VIRGINIA SECURITIES LAW AND MAY NOT BE REOFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

50. **NOTICE TO WISCONSIN RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A WISCONSIN RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF THREE AND ONE-THIRD (3 1/3) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES OFFERED HEREIN.

51. **FOR WYOMING RESIDENTS ONLY:** ALL WYOMING RESIDENTS WHO SUBSCRIBE TO PURCHASE SECURITIES OFFERED BY THE COMPANY MUST SATISFY THE FOLLOWING MINIMUM FINANCIAL SUITABILITY REQUIREMENTS IN ORDER TO PURCHASE SECURITIES: (1) A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) OF TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000); AND (2) THE PURCHASE PRICE OF SECURITIES SUBSCRIBED FOR MAY NOT EXCEED TWENTY PERCENT (20%) OF THE NET WORTH OF THE SUBSCRIBER; AND (3) "TAXABLE INCOME" AS DEFINED IN SECTION 63 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, DURING THE LAST TAX YEAR AND ESTIMATED "TAXABLE INCOME" DURING THE CURRENT TAX YEAR SUBJECT TO A FEDERAL INCOME TAX RATE OF NOT LESS THAN THIRTY-THREE PERCENT (33%).  IN ORDER TO VERIFY THE FOREGOING, ALL SUBSCRIBERS WHO ARE WYOMING RESIDENTS WILL BE REQUIRED TO REPRESENT IN THE SUBSCRIPTION AGREEMENT THAT THEY MEET THESE WYOMING SPECIAL INVESTOR SUITABILITY REQUIREMENTS.

---

## BASIS OF PRESENTATION

In this Memorandum, unless the context otherwise requires, we," "us," "our,"  or the "Company," refers collectively to iCap Pacific Income Fund 5, LLC, a Delaware limited liability company, formed on June 25, 2019, the issuer of the Notes in this Offering, and its subsidiaries.

We use a twelve-month fiscal year ending on December 31st of each calendar year. In a twelve-month fiscal year, each quarter includes three-months of operations; the first, second, third and fourth quarters end on March 31, June 30, September 30 and December 31, respectively.

Certain monetary amounts, percentages and other figures included in this Memorandum have been subject to rounding adjustments. Percentage amounts included in this Memorandum have not in all cases been calculated on the basis of such rounded figures but on the basis of such amounts prior to rounding. For this reason, percentage amounts in this Memorandum may vary from those obtained by performing the same calculations using the figures in our consolidated financial statements. Certain other amounts that appear in this Memorandum may not sum due to rounding.

Unless otherwise indicated, all references to "dollars" and "$" in this Memorandum are to, and amounts are presented in, U.S. dollars.

Unless otherwise indicated or the context otherwise requires, financial and operating data in this Memorandum reflect the consolidated business and operations of the Company and its subsidiaries.

## MARKET AND INDUSTRY DATA AND FORECASTS

Certain market and industry data included in this Memorandum is derived from information provided by third-party market research firms, or third-party financial or analytics firms that we believe to be reliable. Market estimates are calculated by using independent industry publications, government publications and third-party forecasts in conjunction with our assumptions about our markets. We have not independently verified such third-party information. The market data used in this Memorandum involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates.  Certain data are also based on our good faith estimates, which are derived from management's knowledge of the industry and independent sources. Industry publications, surveys and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but there can be no assurance as to the accuracy or completeness of included information. We have not independently verified any of the data from third-party sources nor have we ascertained the underlying economic assumptions relied upon therein. Statements as to our market position are based on market data currently available to us. While we are not aware of any misstatements regarding any market, industry or similar data presented herein, such data involves risks and uncertainties and are subject to change based on various factors, including those discussed under the headings "Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors" in this Memorandum. These and other factors could cause results to differ materially from those expressed in the estimates made by the independent parties and by us. While we are not aware of any misstatements regarding the above matters presented herein, the information described above and our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "Risk Factors" in this Memorandum. Similarly, we believe our internal research is reliable, even though such research has not been verified by any independent sources.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This Memorandum contains certain forward-looking statements that are subject to various risks and uncertainties. Forward-looking statements are generally identifiable by use of forward-looking terminology such as "may," "will," "should," "potential," "intend," "expect," "outlook," "seek,"

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:44    Exhibit Pt. 2 Page 1250
1366

"anticipate," "estimate," "approximately," "believe," "could," "project," "predict," or other similar words or expressions. Forward-looking statements are based on certain assumptions, discuss future expectations, describe future plans and strategies, contain financial and operating projections or state other forward-looking information. Our ability to predict results or the actual effect of future events, actions, plans or strategies is inherently uncertain. Although we believe that the expectations reflected in our forward-looking statements are based on reasonable assumptions, our actual results and performance could differ materially from those set forth or anticipated in our forward-looking statements. Factors that could have a material adverse effect on our forward-looking statements and upon our business, results of operations, financial condition, funds derived from operations, cash available for dividends, cash flows, liquidity and prospects include, but are not limited to, the factors referenced in this Memorandum, including those set forth below.

When considering forward-looking statements, you should keep in mind the risk factors and other cautionary statements in this Memorandum. Readers are cautioned not to place undue reliance on any of these forward-looking statements, which reflect our views as of the date of this Memorandum. The matters summarized below and elsewhere in this Memorandum could cause our actual results and performance to differ materially from those set forth or anticipated in forward-looking statements. Accordingly, we cannot guarantee future results or performance. Furthermore, except as required by law, we are under no duty to, and we do not intend to, update any of our forward-looking statements after the date of this Memorandum, whether as a result of new information, future events or otherwise.

## CONFIDENTIALITY AND RELATED MATTERS

Each recipient hereof agrees by accepting this Memorandum that the information contained herein is of a confidential nature and that such recipient will treat such information in a strictly confidential manner and that such recipient will not, directly or indirectly, disclose or permit its affiliates or representatives to disclose, any information to any other person or entity, or reproduce such information, in whole or in part, without the prior written consent of the Company.

Each recipient of this Memorandum further agrees to use the information solely for the purpose of analyzing the desirability of an investment in the Notes to such recipient and for no other purpose whatsoever.

ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM AND EXHIBITS, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED.  NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM OR AN AUTHORIZED SUMMARY HEREOF, OR IN ANY AGREEMENT CONTEMPLATED HEREBY, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR IN SUCH AUTHORIZED SUMMARY OR AGREEMENT MUST NOT BE RELIED UPON.

## RESTRICTIONS ON TRANSFERABILITY

SINCE THE SECURITIES OFFERED HEREBY ARE NOT BEING REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES CANNOT BE SOLD BY AN INVESTOR UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH ACT, OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE AT THE TIME OF DESIRED SALE.  THEREFORE, A PURCHASER MUST BE ABLE TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## TAXES

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. THE TAX ASPECTS OF AN INVESTMENT IN THE NOTES REQUIRE CAREFUL AND INFORMED STUDY WITH RESPECT TO AN INVESTOR'S PERSONAL TAX AND FINANCIAL POSITION. ACCORDINGLY, NO PERSON SHOULD INVEST IN THE NOTES WITHOUT PRIOR INDEPENDENT EXPERT ADVICE AS TO THE TAX IMPACT OF AN INVESTMENT IN THE NOTES. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES. NOTHING IN THIS MEMORANDUM SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO POTENTIAL INVESTORS.

A COPY OF THIS MEMORANDUM AND THE SUBSCRIPTION AGREEMENTS SHALL BE DELIVERED TO EVERY PERSON SOLICITED TO BUY ANY OF THE SECURITIES HEREBY OFFERED, AT THE TIME OF THE INITIAL OFFER TO SELL.

## WHERE YOU CAN OBTAIN MORE INFORMATION

This Memorandum contains limited information on the Company. While we believe the information contained in this Memorandum is accurate, this Memorandum is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective investor that the abbreviated nature of this Memorandum will not omit to state a material fact, which a prospective investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such investor. As a result, prospective investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **An investment in the Notes is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

Prospective investors may make an independent examination of our books, records and other documents to the extent an investor deems it necessary, and should not rely on us or any of our employees or agents with respect to judgments relating to an investment in the Notes.

Each offeree may, if he, she or it so desires, make inquiries of appropriate members of our management with respect to our business or any other matters set forth herein, and may obtain any additional information which such person deems to be necessary in order to verify the accuracy of the information contained in this Memorandum (to the extent that we possess such information or can acquire it without unreasonable effort or expense) upon the execution and delivery of an agreement to maintain the confidentiality of such information for the benefit of the Company.

Any such inquiries or requests for additional information or documents should be made in writing to us, addressed as follows:

<div align="center">

iCap Pacific Income Fund 5, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006
ATTN: Investor Relations
OFC: (425) 278-9030; FAX: (425) 278-9025
EMAIL: inquiry@icapequity.com

</div>

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:54    Exhibit Pt. 1 Page 1252
1366

## Table of Contents

SUMMARY ........................................................................................................................... 1

THE OFFERING ................................................................................................................... 3

THE NOTES .......................................................................................................................... 3

SECURITY AND GUARANTY; COLLATERAL AGENT ................................................ 5

THE COMPANY ................................................................................................................... 8

    The Company and its Operations .................................................................................... 8
    Investment Strategy ........................................................................................................ 8
    Meeting Demand Payment Obligations .......................................................................... 9
    Members and Management .............................................................................................. 9
    Biographies of Management Personnel ......................................................................... 10
    Organizational Strength and Experience ....................................................................... 10
    Investment Experience .................................................................................................. 11
    Management Fees; Transactions with Related Parties ................................................... 13

USE OF PROCEEDS .......................................................................................................... 14

PLAN OF DISTRIBUTION ............................................................................................... 14

INVESTOR SUITABILITY STANDARDS ....................................................................... 16

SUBSCRIPTION PROCEDURES ...................................................................................... 18

RESTRICTIONS ON TRANSFERABILITY ..................................................................... 19

STATEMENT AS TO INDEMNIFICATION .................................................................... 19

RISK FACTORS ................................................................................................................. 20

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ..................................... 32

## Exhibits

| | |
|---|---|
| Exhibit A | Subscription Agreement |
| Exhibit B | Form of Promissory Note |
| Exhibit C | Pledge and Security Agreement |
| Exhibit D | Guaranty Agreement |
| Exhibit E | Collateral Agent Agreement |

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:41    Pg 1253
1366          Exhibit Pt 21 Page

# SUMMARY

*This summary of this Memorandum highlights material information concerning our business and this Offering. This summary does not contain all of the information that you should consider before making your investment decision. You should carefully read this entire Memorandum, including the information presented under the section entitled "Risk Factors" and the financial data and related notes, before making an investment decision. This summary contains forward-looking statements that involve risks and uncertainties. Our actual results may differ significantly from future results contemplated in the forward-looking statements as a result of factors such as those set forth in "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements."*

The following is a summary of selected terms of the Company and the Notes. This summary is not intended as a summary of all principal terms and is qualified in its entirety by the more detailed descriptions set forth below, including the Subscription Agreements attached hereto as Exhibit A (the "Subscription Agreement"). Capitalized terms used in this Summary and not otherwise defined have the meanings given to them elsewhere in this Memorandum.

| | |
|---|---|
| **The Company** | iCap Pacific Income Fund 5, LLC, a Delaware limited liability company is an affiliate of iCap Equity, LLC, a Bellevue, Washington-based investment firm formed in 2011. "iCap Equity" or "iCap," as used in this Memorandum, refers to iCap Enterprises, Inc. (the parent company of iCap Equity, LLC) and its affiliated group of companies (excluding the Company). See "The Company" commencing on page 8. |
| **Purpose** | The primary purpose of the Company is to acquire real estate investments in the United States and provide a rate of return to its investors. The Company has formed iCap Holding 5, LLC ("Holding") as a wholly owned subsidiary of the Company, and Holding shall own an interest in one or more standalone subsidiaries (each a "Portfolio SPE"), which will then hold real property investments. The Company's business plan targets preferred equity investments into construction and development projects, with individual investment amounts generally in the $500,000 to $2,000,000 range. There is no specific limit or requirement as to the size of the projects that the Company may undertake. See "The Company" commencing on page 8. |
| **Manager** | The Company is managed by iCap Pacific NW Management, LLC, a Washington limited liability company (the "Manager"). The Company will pay the Manager an annual management fee equal to 2% of the outstanding aggregate principal balances of the Notes outstanding from time to time. See "The Company – Members and Management" commencing on page 9. |
| **The Offering** | The Company is issuing up to $50,000,000 (with an over-allotment amount of $25,000,000, for a maximum total of $75,000,000) in aggregate principal amount of Notes, provided that the Company may issue other additional promissory notes or other instruments at any time, subject to the limitations set forth below. The minimum individual investment is $50,000, with any amounts in excess thereof being permitted, and all subscriptions, whether for |

1

the minimum investment amount, or more or less than this amount, are subject to the acceptance or rejection by the Manager in its sole discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one Noteholder or its affiliates.

The Company will offer the Notes for a period commencing on the date of this Memorandum and expiring on June 30, 2020, unless extended by us for up to 12 months. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines.

The Company may terminate, or amend the terms of, this Offering at any time.

See "The Offering" commencing on page 3.

**The Notes**

The Notes will accrue interest at the rate of 9% per annum, simple interest, non-compounding, based on a 365-day year, provided, however, that the interest rate applicable to the first $10 million of aggregate principal amount of Notes issued in this Offering will be 10% per annum for the first year and thereafter 9% per year (as applicable, the "Interest Rate"). Interest will be paid monthly commencing the month after the issuance date. Investors will have the option of directing their monthly interest to an account of their choosing. Investors will have the option of demanding repayment of all or any part of their outstanding principal and unpaid accrued interest, any time after the 1-year anniversary of their investment date, subject to a limit of no more repayments than 5% of the combined Notes of the Company per quarter. Upon any demand for repayment prior to the 5th anniversary of the issuance date of the Note, a discount will be applied to the amount outstanding under the Note, depending on the time from the issuance of the Note at which the repayment demand is received by the Company.

Upon a request for demand repayment, the Company will pay the principal within 180 days after the date notice is delivered. The Company may prepay all or any part of the Notes without penalty at any time prior to the Maturity Date. If not earlier paid, the outstanding principal and unpaid accrued interest on the Notes will be due and payable 5 years after the issue date of the Note.

See "The Notes" commencing on page 3.

**Security and Guaranty; Collateral Agent**

The Notes will be secured by a pledge of Holding's equity interests in the Portfolio SPEs, and Holding shall enter into a guaranty agreement for the benefit of the Noteholders.

The Company has entered into a Collateral Agent Agreement with MarketPlace Realty Advisors, LLC, pursuant to which MarketPlace Realty Advisors, LLC will act as "Collateral Agent" for the benefit of the Noteholders.

See "The Notes" commencing on page 3 and "Security and Guaranty; Collateral Agent" on page 5.

| Expenses | The Company will bear all costs and expenses incurred in the organization of the Company and this Offering and potential future offerings, and will reimburse Manager for any such costs and expenses advanced by Manager. The Company will also pay the Manager an annual management fee of 2% of the aggregate principal balances of the Notes outstanding from time to time. With the exception of employee payroll expenses, which will be paid by the Manager, all other expenses will be borne by the Company. Each investor will bear his, her or its own fees and expenses incurred in connection with this Offering. |
|---|---|

See "The Company - Management Fees; Transactions with Related Parties" on page 13.

## THE OFFERING

The Company is offering for sale up to $50,000,000 of aggregate principal amount (with an over-allotment amount of $25,000,000, for a maximum total of $75,000,000) of promissory notes. The Offering is being made by the Company on a "best efforts" basis only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act. The Company has engaged Cobalt Capital, Inc. as the Managing Broker Dealer in this Offering, and the Company will pay commissions as set forth in the Plan of Distribution commencing on page 14, based on the aggregate principal amount of the Notes sold to investors.

The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on June 30, 2020, unless extended by us for up to 12 month (the "Offering Period") or earlier terminated as set forth herein.

The minimum individual investment is $50,000, with any amount in excess of $50,000 being permissible at the Manager's discretion. All subscriptions are subject to acceptance or rejection by the Manager in its sole discretion. The Manager may change, or accept less than, the minimum investment amount in its discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one investor or its affiliates. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines. In order to subscribe for a Note, prospective investors must follow the directions set forth in "Subscription Procedures" commencing on page 18.

An investor must be prepared to bear the economic risk of an investment in the Notes for an indefinite period of time. An investor in the Notes, pursuant to the Subscription Agreement and applicable law, will not be permitted to transfer or dispose of the Notes, unless they are registered for resale or such transaction is exempt from registration under the Securities Act and other applicable securities laws, and in the case of a purportedly exempt sale, such investor provides (at his or her own expense) an opinion of counsel satisfactory to us that such exemption is, in fact, available. The Notes will bear a legend relating to such restrictions on transfer.

This Offering may be withdrawn or terminated by the Company at any time. The Manager reserves the right to reject a subscription for Notes, in whole or in part in its sole discretion.

## THE NOTES

The Notes will bear interest at a rate of 9% per year, provided, however, that the first $10 million of aggregate principal amount of Notes issued in this Offering will bear interest at the rate of 10% per annum for the first year and then 9% per annum thereafter. Interest will be simple interest, non-

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:34    Exhibit Pt. 2 Page 1256
1366

compounding. The Notes will have a maturity date 5 years following the issuance date (the "Maturity Date"); however, an Investor may request repayment of funds any time after the 1-year anniversary of the date of Investment, as discussed below. In order to allow the Company to continue its operations successfully, no more than 5% of the aggregate Note balances may be repaid in a given calendar quarter. Interest will accrue based on a 365-day year, and will be paid monthly. All remaining principal and interest will be due and payable on the Maturity Date, other than as set forth below. The Company may prepay all or any part of the Notes without penalty at any time prior to the Maturity Date. If the Company makes any prepayment, the prepayments need not be made ratably against all outstanding Notes, and the Company may prepay some Notes while not prepaying others. If not earlier paid, whether pursuant to a Demand Notice (as described below) or full prepayment by the Company, outstanding principal and unpaid accrued interest on the Notes will be due and payable on the Maturity Date.

At any time following the 1-year anniversary of the issuance date, a Noteholder may require the Company to repay all or a portion of principal and accrued interest on the Note, subject to the limitations and deductions below, by providing a demand notice to the Company ("Demand Notice"). Such notice may be delivered via First Class US mail, or electronically via email to an account representative, or through the Company's website at www.icapequity.com or its licensed software application (the "App"). The App, which will be available to Noteholders through mobile devices and desktops, will allow the Noteholder to review his/her transaction history, provide Demand Notice requests, purchase additional Notes, agree to investment documentation, send messages to the Company, and receive notices from the Company. Information on the foregoing website is not incorporated into this Memorandum.

Upon delivery of a demand for redemption, a discount will be applied to the amount outstanding under the Note which is to be repaid, as follows:

- For redemption demands received by the Company prior to the second anniversary of the issuance date of the Note, the repayment amount requested will be reduced by 10%, such that 90% of the repayment amount in the demand repayment will be repaid, and the remaining 10% of the repayment amount in the demand repayment will be deemed forgiven and satisfied in full.

- For redemption demands received by the Company after the second anniversary of the issuance date of the Note but prior to the third anniversary of the issuance date of the Note, the repayment amount requested will be reduced by 7.5%, such that 92.5% of the repayment amount in the demand repayment will be repaid, and the remaining 7.5% of the repayment amount in the demand repayment will be deemed forgiven and satisfied in full.

- For redemption demands received by the Company after the third anniversary of the issuance date of the Note but prior to the fourth anniversary of the issuance date of the Note, the repayment amount requested will be reduced by 5%, such that 95% of the repayment amount in the demand repayment will be repaid, and the remaining 5% of the repayment amount in the demand repayment will be deemed forgiven and satisfied in full.

- For redemption demands received by the Company after the fourth anniversary of the issuance date of the Note but prior to the fifth anniversary of the issuance date of the Note, the repayment amount requested will be reduced by 2.5%, such that 97.5% of the repayment amount in the demand repayment will be repaid, and the remaining 2.5% of the repayment amount in the demand repayment will be deemed forgiven and satisfied in full.

Upon receipt of a Demand Notice, the Company will pay the requested amount subject to the deductions as set forth above (the "Demand Payment") within 180 days after the Demand Notice was received. For those investors not wishing to utilize the Company website at www.icapequity.com or the App, a form of the Demand Notice is attached as Exhibit A to the Note, a form of which is attached hereto

as Exhibit B.

The Company may not incur additional indebtedness for the sole purpose of making any Demand Repayments.

Each Note may be amended by the Company and the applicable Noteholder. However, the Note also contains a "deemed consent" provision, which provides that if the Company has provided the Noteholder with two notices of a proposed amendment (or any other consent, approval or waiver required or requested) and the Noteholder has not responded to either notice within 10 days of delivery, the Noteholder will be deemed to have consented, in writing, to the proposed amendment, approval, consent or waiver, and the Company may rely on such deemed consent.

The description of the Notes set forth herein is qualified in its entirety by the form of Note as attached hereto as Exhibit B.

### SECURITY AND GUARANTY; COLLATERAL AGENT

The Notes will be secured by a Pledge and Security Agreement entered into on September 5, 2019, by the Company, Holding and MarketPlace Realty Advisors, LLC ("Collateral Agent") in its capacity as collateral agent for the benefit of the Noteholders (the "Security Agreement"), pursuant to which Holding will pledge all of the membership interests of the Portfolio SPEs for the benefit of the Noteholders. The Security Agreement is attached hereto as Exhibit C.

The Company and the Collateral Agent have entered into the Collateral Agent Agreement, dated as of September 5, 2019 (the "Collateral Agent Agreement"), pursuant to which the Collateral Agent will receive and distribute certain notices with respect to the Notes, the Security Agreement and the Guaranty, and will generally act as the agent of the Holder with respect to the Pledged Interests and the Guaranty. All notices from the Noteholders will be transmitted through the Collateral Agent, other than Demand Repayments and similar communications which pertain to solely one Noteholder, as opposed to the Noteholders as a group, and the Company may send notices either directly to a Noteholder or through the Collateral Agent to the Noteholder(s). Each investor in this Offering, as a condition thereto, shall be required to execute a counterpart signature page to the Collateral Agent Agreement and become a party thereto. Investors will not join the Security Agreement or the Guaranty Agreement as a party, as their rights thereunder will be represented by the Collateral Agent. The Collateral Agent Agreement is attached hereto as Exhibit E, and a counterpart signature page thereto is attached to the Subscription Agreement.

Pursuant to the Security Agreement and to secure the prompt payment and full and faithful performance of the obligations of the Company to the Noteholders pursuant to the Notes, Holding will grant a security interest in its membership interests in the Portfolio SPEs for the benefit of the Noteholders (the "Pledged Interests"). In the event that an Event of Default (as defined below) occurs, as determined and claimed by Noteholders holding a majority of the principal amount of the Notes then outstanding (subject to the limitation on voting as set forth below, a "Majority-in-Interest of the Noteholders"), then, as determined by a Majority-in-Interest of the Noteholders, the Noteholders may direct the Agent to exercise the rights and pursue the remedies provided under Articles 8 and 9 of the Uniform Commercial Code (the "UCC") with respect to the Pledged Interests, including the right to exercise all voting rights with respect to the Pledged Interests, collecting all dividends and other distributions with respect to the Pledged Interests, and foreclosing the liens and security interest created under the Security Agreement by any available judicial procedure or without judicial process and selling the Pledged Interests.

The Security Agreement provides that the Company may make tax distributions to its members, subject to any limitations in the operating agreement of the Company (the "Operating Agreement") which provides that, if there are any Notes issued and outstanding, the Company may not make any distributions to its members (other than tax distributions, which are required to be made, as further discussed below)

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:15    Exhibit Pt. 2 Page 1258
1366

unless approved by a Majority-in-Interest of the Noteholders. The Operating Agreement requires the payment of tax distributions (i.e., distributions in the amount of taxes payable by such members on the apportioned income of the entities) to the members of the Company, regardless of whether an Event of Default exists and without any approval of the Noteholders being required. Management Fees and other fees and costs payable to the Manager as described below are not distributions, and will be paid regardless of whether a default or an Event of Default has occurred and is continuing or the value of the Company's assets, and without any approval of the Noteholders being required.

The Security Agreement provides that the Company, Holding and their respective subsidiaries may utilize leverage in making investments, but the maximum amount of leverage that the Company may incur, without the approval of a Majority-in-Interest of the Noteholders, will be 25% of the total outstanding Note balances (e.g. if there are $50 million of Notes outstanding, then the maximum leverage incurable without such approval will be $12.5 million). The Security Agreement also provides that the Company, Holding and their respective subsidiaries may issue promissory notes that are senior to the Notes, but that any such issuances in excess of 25% of the total outstanding Note balances will require the approval of a Majority-in-Interest of the Noteholders.

In addition, Holding has entered into a Guaranty Agreement in favor of the Noteholders with the Company pursuant to which Holding has guaranteed the obligations of the Company under the Notes (the "Guaranty Agreement"), which is attached hereto as Exhibit D. The Guaranty Agreement provides that, during the continuation of an Event of Default, the Agent, on behalf of the Noteholders, may enforce the guaranty against Holding, but only after attempting to collect or exhausting the Agent's efforts to collect from the Company. Any actions with respect to the Guaranty Agreement must similarly be agreed to by a Majority-in-Interest of the Noteholders pursuant to the Collateral Agent Agreement.

The Security Agreement, the Guaranty Agreement and the Collateral Agent Agreement may each be amended by the Company entities a party thereto, with the approval of Noteholders holding a majority of the aggregate principal amount of the Notes then outstanding, and with the approval of the Collateral Agent with respect to the Collateral Agent Agreement. However, the Security Agreement, the Guaranty Agreement and the Collateral Agent Agreement each also contain a "deemed consent" provision, which provides that if the Company entity (the Company or Holding, as applicable) has provided the Investor with two notices of the proposed amendment (or any other consent, approval or waiver requested or required) and the Investor has not responded to either notice within 10 days, the Investor will be deemed to have consented, in writing, to the proposed amendment, approval, consent or waiver, and the Company entities may rely on such deemed consent.

The description of the Security Agreement set forth herein is qualified in its entirety by the Security Agreement as attached hereto as Exhibit C, the description of the Guaranty Agreement set forth herein is qualified in its entirety by the Guaranty Agreement as attached hereto as Exhibit D, and the description of the Collateral Agent Agreement set forth herein is qualified in its entirety by the Collateral Agent Agreement as attached hereto as Exhibit E.

The Notes will be junior to any credit facilities that are put in place by the Company related to its operations, and the real property assets of the Company and its direct or indirect subsidiaries may be used as collateral for such credit facilities. Additionally, the Notes will be junior to any project related financing of the Portfolio SPEs, such as construction and other loans of such Portfolio SPEs.

The Portfolio SPEs will be controlled by the Company, but the Company will not be the sole member of the Portfolio SPEs, as the developers of the projects will also have an interest therein; however, profits distributions on the Portfolio SPE level cannot be paid to the developers until the Company has been paid as agreed under the operating agreements of the Portfolio SPEs. These developers, however, may still receive payment for their customary fees and costs, including the construction and other loans as described above, which will be charged on an arms'-length basis, and will be paid prior to the Company receiving

any payment under the operating agreements of the Portfolio SPEs. In this regard, the Notes will be subordinate to the obligations due under the SPEs.

Prior to the time that the Company utilizes the proceeds from this Offering to acquire real estate, and other than for the use of proceeds related to this Offering and the formation of the Company as set forth below, the Company will retain the funds from this Offering in its non-segregated operating accounts at commercial banks.

The Notes are subject to four possible "Events of Default." It is an "Event of Default" if any of the following occur, and the Company has not rectified such event within 90 days of receipt of notice thereof signed by a Majority-in-Interest (subject to the discussion below) of the Noteholders:

(i)   The Company fails to make a Demand Payment when due;

(ii)  the Company fails to perform any of its material obligations under the Note, or is in breach in any material respect of any representation, warranty, covenant or agreement on the part of the Company set forth in the Note;

(iii) the Company commences any liquidation or dissolution proceedings or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consents to the filing of any bankruptcy petition against it under any similar law; or

(iv)  the Company fails to pay all amounts due under the Notes on the Maturity Date.

Only a Majority-in-Interest of the Noteholders can declare an Event of Default, and then only after the 90-day cure period has expired without the Company rectifying the applicable situation. However, a particular Noteholder is not entitled to vote for (or against) the declaration of an "Event of Default" unless, as of the time of such vote, the applicable Event of Default has occurred and is continuing under the Note held by such Noteholder, provided, however, that the principal amount under that Noteholder's Note will continue to be counted for purposes of determining the aggregate principal amount of Notes then outstanding for purposes of determining whether Noteholders holding a sufficient principal amount of Notes have elected to declare an "Event of Default."

If an Event of Default occurs, the interest rate will be increased to 15% per annum (the "Default Rate"), which Default Rate will remain in place until the Note is either paid as due or such Event of Default is cured.

If the Event of Default is as described in clause (i), (ii), or (iv) above, a Majority-in-Interest of the Noteholders will have the right to declare only the applicable Note(s) which are subject to the Event of Default due and payable. If the Event of Default is as described in clause (iii) above, a Majority-in-Interest of the Noteholders will have the right to declare all of the Notes due and payable.

Upon delivery of written notice to the Company of such default, the Company will have 30 days to honor the payment obligation. If the Company fails to honor the repayment obligation within this time period, then a Majority-in-Interest of the Noteholders will have the right to direct the Collateral Agent to proceed to enforce the security granted to the noteholders pursuant to the Security Agreement and to enforce the Guaranty Agreement.

Notwithstanding the above, the Notes provide that in the event that the Company defaults on the terms of any particular Note, but such default is not applicable to a sufficient quantity of the Notes such that an "Event of Default" can be declared, the Default Rate will apply to that particular Note, and that particular Note will be immediately due and payable. In such an instance, the holder of the defaulted Note may still proceed against the Company for damages and payment of the principal amount of such Note;

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:54    Exhibit Pt 2 Page 1260
1366

however such particular Noteholder would not be able to enforce the rights under the Security Agreement or the Guaranty Agreement, without first obtaining the majority approval of Noteholders which is required to declare an "Event of Default" thereunder.

## THE COMPANY

### The Company and its Operations

iCap Pacific Income Fund 5, LLC is a newly formed Delaware limited liability company and is an affiliate of iCap Equity, LLC, a Bellevue, Washington-based investment firm formed in 2011. The Company has been established to provide an investment vehicle that generates an ongoing rate of return, is secured by interests of the Portfolio SPEs, and has a liquidity mechanism for investors.

The primary purpose of the Company is to acquire preferred equity interests in real estate holdings, which primarily consist of construction and development projects in selected metropolitan statistical areas in the United States (each, a "Portfolio Investment"). Portfolio Investments will be held in standalone Portfolio SPEs, which will be owned by Holding and the builders or developers who manage the projects (each a "Project Partner"). The Company's business plan targets the acquisition of short-term (less than 24-months) real estate investments with Project Partners who have strong track records of success. The equity interests of the Portfolio SPEs will secure the amounts due under the Notes. Portfolio investments are typically in the $500,000 to $2,000,000 range, although there is no limit or requirement on the size of the investments that the Company may make.

The geographic areas in which the Company invests are determined by selecting metropolitan statistical areas upon consultation with market professionals and in-depth review of economic data. The Company may adjust its investment criteria to accommodate changing market conditions, but will generally seek attractive locations with strong exit potential and proven Project Partners.

The Manager anticipates that the Company will be exempt from the registration requirements of the Investment Company Act of 1940, as amended.

POTENTIAL INVESTORS SHOULD RECOGNIZE THAT BY PURCHASING NOTES THEY WILL NOT THEREBY ACQUIRE ANY INTEREST, DIRECTLY OR INDIRECTLY, IN THE COMPANY OR ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. INVESTORS SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES AS SET FORTH HEREIN IS GIVEN SOLELY TO ALLOW INVESTORS TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. THE MANAGER AND ITS AFFILIATES MAY CONTINUE TO ENGAGE IN MANAGEMENT AND INVESTMENT ACTIVITIES RELATED TO PRE-EXISTING INVESTMENTS AND ACTIVITIES OR OPERATIONS OF THE PRIOR FUNDS AS WELL AS FUTURE INVESTMENTS OR FUNDS.

### Investment Strategy

The Company's portfolio investments will consist of a variety of real estate types, including without limitation single-family homes, multi-family apartments, townhomes, and mixed-use properties, generally in construction and development phases. The revenue generated from the Investment Portfolio will be used to pay interest and principal on the Notes and fund its operations.

To build its Investment Portfolio, the Company will identify metropolitan statistical areas within which to purchase properties. The Company has developed proven processes and controls to evaluate possible investment opportunities. The process begins by identifying metropolitan statistical areas within the U.S. ("Markets") with strong economic fundamentals that are likely to result in reliable exit strategies

8

and strong returns. The Markets are selected after review of reports and analysis provided by economics professionals, as well as the Company's internal staff. After reviewing the information, a committee consisting of key members of the management team (the "Investment Committee") may approve a Market. After a Market has been approved, the Company's acquisition team will search for investment opportunities for the Company that meet the criteria of the applicable investment policies of the Company.

Every investment opportunity will undergo due diligence performed by the Company's underwriting staff, who will then present investment opportunities to the Investment Committee for its review and approval. The Investment Committee may delegate investment decision-making authority to sub-teams, provided such investments meet the fundamental criteria established by the Investment Committee. The Company will complete diligence on prospective investments and maintain closing procedures that provide for the safety of the invested funds, such as the involvement of a third-party escrow company. The investment process has three major areas of focus: analysis and approval, documentation and closing, and post-closing management.

**Meeting Demand Payment Obligations**

The Company will have cash reserves available to honor Demand Repayments and the Company may, in its discretion, cause Holding to dispose of some or all of its investment holdings to reposition the portfolio or to meet the Company's payment obligations. The cash reserves maintained by the Company may also be used to purchase properties, make tax or other distributions to its member (subject to the approval rights of the Noteholders as discussed below), make interest payments under the Notes, or cover the costs of the Company's day-to-day operations. The Company is not required to incur additional indebtedness (and may not issue additional promissory notes) for the sole purpose of making any Demand Repayments.

**Members and Management**

The sole member of the Company is iCap Equity, LLC, which is owned by iCap Enterprises, Inc., a Washington corporation wholly owned by Chris Christensen. The primary officers of iCap Enterprises, Inc. are Chris Christensen and Jim Christensen, whose biographies are below.

The manager of the Company is iCap Pacific NW Management, LLC, a Washington limited liability company (the "Manager"). The officers of the Manager are also the officers of iCap Enterprises, Inc. The management and supervision of the Company is vested exclusively in the Manager (including its duly appointed agents), which has full control over the business and affairs of the Company pursuant to the Operating Agreement.

Our direct organizational structure is as shown in the chart below.



The Manager may delegate day-to-day management responsibility of the Company to any person, provided that the Manager will retain ultimate responsibility for the management and conduct of the activities of the Company and all decisions relating to the selection and disposition of the Company's investments.

**Biographies of Management Personnel**

*Chris Christensen, President*

Chris leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. Prior to forming the Company, Chris managed affiliated funds, formed and managed affiliates of the Manager, including Edge Construction, LLC and iCap Enterprises, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a Juris Doctor degree from Seattle University School of Law, a Master's degree in International Business from Seattle University, and a Bachelor of Arts degree in Economics from the University of Utah. He is the brother of Jim Christensen.

*Jim Christensen, Chief Operating Officer*

Jim is iCap's Chief Operating Officer and assists the President with the day-to-day operations of iCap and its investment funds, including overseeing investment underwriting, project and construction management, project financing, disposition of distressed assets, and management of the various strategic relationships involving iCap and its affiliates. In addition, he is responsible for the technology-related underpinnings of iCap. This includes electronic document storage, electronic process automation, and software management. Prior to the formation of the Company, Jim managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington State for iCap Enterprises, Inc. Jim has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Jim holds a Master of Business Administration degree and a Bachelor of Arts degree in Economics from the University of Washington. Jim is the brother of Chris Christensen.

**Organizational Strength and Experience**

The members of the senior management team have completed a variety of projects in the small-cap real estate space. The team, through its combined experience, has closed in excess of $8 billion in transactions in the small and mid-cap spaces.

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:54    Exhibit Pt. 1 Page 1263
1366

iCap also maintains a network of strategic relationships. The team leverages relationships with sourcing, development, construction, and fund administration constituents to maintain a pipeline of real estate investment opportunities. Property owners, builders, developers, lenders and brokers are the primary sources for deal flow.

iCap has capacity to expand its team to manage large amounts of capital from the sale of the Notes and to deploy such proceeds towards real estate that meets its investment criteria. iCap has invested significant resources to build the technology and infrastructure needed to manage large amounts of noteholders, capital, and real estate-based investments. The number of employees who manage this infrastructure will grow as the capital under management increases.

The Manager and its affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

**Investment Experience**

As a newly formed investment vehicle, the Company has no operating or prior performance history. The information presented in this section represents the limited historical experience of the principals of the Manager and its affiliates. Prospective investors in the Company should not rely on the information below as being indicative of the types of investments the Company may make or of the types of returns the Company's investments may generate. Prospective investors should not assume that the Company will experience returns, if any, comparable to those described herein.

Although this Memorandum refers to "iCap" as though it were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. The Company will not acquire an interest in any of iCap's affiliated entities other than Holding, but may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Manager, and therefore the Company, as it conducts its business.

The Company's management team has overseen 57 full-cycle investments in this strategy among its other funds. As the following table illustrates, these investments achieved an average ROI of 27.39%, an average annualized ROI of 18.30%, and an average IRR of 20.26%.

| Fund | Project: Project Name | Project: Project Type | Investment Amount | Payoff Amount | Net Gain/Loss on Investment | Days Held | Actual ROI | Actual Annualized ROI | Actual IRR |
|---|---|---|---|---|---|---|---|---|---|
| iCap Northwest Opportunity Fund, LLC | 13th & Emerson, LLC | Townhome | $957,600.00 | $1,035,844.78 | $78,244.78 | 66 | 8% | 54% | 54% |
| iCap Northwest Opportunity Fund, LLC | 1756 NW 60th St, LLC | Townhome | $266,590.30 | $331,871.94 | $65,281.64 | 363 | 24% | 25% | 55% |
| iCap Northwest Opportunity Fund, LLC | 23rd and Gilman, LLC | Townhome | $729,127.80 | $1,050,000.00 | $320,872.20 | 460 | 44% | 34% | 34% |
| iCap Northwest Opportunity Fund, LLC | 313 Prospect Residence, LLC | Single Family Residence | $317,098.60 | $555,976.53 | $238,877.93 | 765 | 75% | 31% | 33% |
| iCap Northwest Opportunity Fund, LLC | 76th Ave SE Partners, LLC | Single Family Residence | $536,500.00 | $925,098.84 | $388,598.84 | 821 | 72% | 27% | 27% |
| iCap Northwest Opportunity Fund, LLC | 9041 48th, LLC | Townhome | $530,910.00 | $597,095.33 | $66,185.33 | 167 | 12% | 29% | 30% |
| iCap Northwest Opportunity Fund, LLC | BDR Kirkland V, LLC | Single Family Residence | $1,246,000.00 | $1,505,508.55 | $259,508.55 | 206 | 21% | 40% | 41% |
| iCap Northwest Opportunity Fund, LLC | Hayden Meadows, LLC | Single Family Residence | $1,084,010.80 | $1,301,575.81 | $217,565.01 | 398 | 20% | 18% | 30% |
| iCap Northwest Opportunity Fund, LLC | iCap Finn Hill LLC | Single Family Residence | $1,491,229.99 | $1,062,689.63 | -$428,540.36 | 1238 | -29% | -10% | -29% |
| iCap Northwest Opportunity Fund, LLC | iCap Finn Meadows LLC | Single Family Residence | $2,141,131.84 | $1,912,409.99 | -$228,721.85 | 1213 | -11% | -3% | -6% |
| iCap Northwest Opportunity Fund, LLC | iCap Lakeview LLC | Single Family Residence | $2,445,151.59 | $1,804,800.00 | -$640,351.59 | 1528 | -26% | -7% | -14% |
| iCap Northwest Opportunity Fund, LLC | iCap Northcreek, LLC | Single Family Residence | $1,933,253.14 | $1,432,035.44 | -$501,217.70 | 1036 | -26% | -10% | -19% |
| iCap Northwest Opportunity Fund, LLC | iCap Rhody Ridge LLC | Single Family Residence | $3,441,509.02 | $3,388,887.17 | -$52,621.85 | 1296 | -2% | 0% | -1% |
| iCap Northwest Opportunity Fund, LLC | KBR16, LLC | Single Family Residence | $890,266.94 | $780,563.41 | -$109,703.53 | 1022 | -12% | -5% | -5% |
| iCap Northwest Opportunity Fund, LLC | Lake Union Estates, LLC | Apartment | $4,433,765.01 | $4,671,980.27 | $238,215.26 | 552 | 5% | 4% | 4% |
| iCap Northwest Opportunity Fund, LLC | Mercer 36, LLC | Single Family Residence | $264,609.60 | $493,156.91 | $228,547.31 | 753 | 86% | 35% | 35% |
| iCap Northwest Opportunity Fund, LLC | Pearl and Delores, LLC | Townhome | $678,239.60 | $1,047,141.28 | $368,901.68 | 590 | 54% | 31% | 34% |
| iCap Northwest Opportunity Fund, LLC | Senza Sammamish, LLC | Single Family Residence | $2,870,876.03 | $3,019,997.94 | $149,121.51 | 926 | 5% | 2% | 2% |
| iCap Northwest Opportunity Fund, LLC | Seward Park Partners, LLC | Single Family Residence | $535,200.00 | $984,312.14 | $449,112.14 | 673 | 84% | 39% | 39% |
| iCap Northwest Opportunity Fund, LLC | TCG Investments, LLC | Apartment | $1,276,618.50 | $1,572,627.25 | $296,008.75 | 426 | 23% | 20% | 57% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 13 Ave W, LLC | Townhome | $525,000.00 | $1,015,053.35 | $490,053.35 | 789 | 93% | 36% | 40% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 13th & Emerson, LLC | Townhome | $601,310.00 | $923,129.92 | $321,819.92 | 742 | 54% | 23% | 50% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 1st Ave NE Development, LLC | Townhome | $630,240.00 | $1,061,631.89 | $431,391.89 | 491 | 68% | 47% | 47% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 4422 Woodlawn, LLC | Townhome | $182,100.00 | $268,735.41 | $86,635.41 | 346 | 48% | 51% | 51% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 725 Broadway LLC | Apartment | $1,064,373.57 | $1,136,561.35 | $72,187.78 | 1851 | 7% | 1% | 1% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 9041 48th, LLC | Townhome | $820,528.36 | $995,907.52 | $175,379.16 | 506 | 21% | 8% | 8% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Alamo NW, LLC | Commercial | $1,396,404.14 | $1,738,657.36 | $342,253.22 | 461 | 25% | 19% | 21% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Aloha Ventures, LLC | Townhome | $372,500.00 | $646,517.47 | $274,017.47 | 585 | 74% | 41% | 41% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Ankeny Building, LLC | Apartment | $1,704,500.00 | $2,665,223.38 | $960,723.38 | 554 | 56% | 34% | 35% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Barcelo Madison Park, LLC | Condo | $840,414.35 | $1,882,548.49 | $1,042,134.14 | 1547 | 124% | 21% | 26% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | BDR Kirkland II, LLC | Single Family Residence | $833,000.00 | $1,678,742.88 | $845,742.88 | 853 | 102% | 35% | 38% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | BDR Medina III, LLC | Single Family Residence | $1,296,032.50 | $2,362,705.15 | $1,066,673.05 | 738 | 82% | 35% | 40% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | BDR Yarrow Point II, LLC | Single Family Residence | $724,999.99 | $1,432,610.91 | $707,610.92 | 702 | 98% | 42% | 44% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Capitol Hill Development, LLC | Apartment | $1,034,752.86 | $1,713,268.20 | $678,515.34 | 481 | 66% | 47% | 34% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Charlestown Street, LLC | Townhome | $1,039,999.90 | $1,466,392.26 | $426,392.36 | 453 | 41% | 32% | 34% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Colpitts Sunset LLC | Apartment | $1,579,074.68 | $3,000,000.00 | $1,420,925.32 | 814 | 90% | 33% | 34% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Denali Townhomes LLC | Apartment | $199,321.89 | $0.00 | -$199,321.89 | 1783 | -100% | -100% | -100% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | ENT Ventures I, LLC | Apartment | $1,948,884.00 | $2,531,472.56 | $582,588.56 | 613 | 30% | 17% | 18% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | ENT Ventures II, LLC | Apartment | $430,389.42 | $596,604.98 | $166,215.16 | 868 | 39% | 15% | 18% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | ENT Ventures IV, LLC | Apartment | $400,358.79 | $527,567.34 | $127,208.55 | 1323 | 32% | 8% | 14% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | High Country Soundview Manor, LLC | Single Family Residence | $3,329,207.99 | $1,147,270.90 | -$2,181,937.09 | 1444 | -66% | -24% | -54% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Hillsboro Acquisition I, LLC | Commercial | $1,606,500.00 | $1,777,012.23 | $170,512.23 | 102 | 11% | 43% | 43% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | iCap Delridge Way, LLC | Townhome | $408,652.84 | $512,531.62 | $103,878.78 | 1173 | 25% | 7% | -25% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | iCap Finn Hill LLC | Single Family Residence | $3,061,618.00 | $2,314,707.59 | -$746,910.41 | 1334 | -24% | -7% | -25% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | iCap Finn Meadows LLC | Single Family Residence | $150,949.35 | $199,161.65 | $48,212.30 | 518 | 32% | 22% | 21% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | iCap Lakeview LLC | Single Family Residence | $1,040,852.42 | $1,201,937.73 | $161,085.31 | 138 | 15% | 46% | 46% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | iCap Rhody Ridge LLC | Single Family Residence | $1,308,845.98 | $1,282,931.62 | -$25,914.36 | 1281 | -2% | -1% | -2% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | KR3, LLC | Single Family Residence | $357,892.44 | $500,000.00 | $142,107.56 | 468 | 40% | 30% | 31% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Lake Sammamish Home 1, LLC | Single Family Residence | $404,518.60 | $835,024.98 | $430,506.38 | 274 | 106% | 163% | 227% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Lyle 113th Ave, LLC | Single Family Residence | $883,648.75 | $735,724.67 | -$147,924.08 | 815 | -17% | -8% | -12% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Meridian Greens Holdings, LLC | Apartment | $2,410,825.27 | $21,078.22 | -$2,389,747.05 | 1401 | -99% | -71% | -91% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Ruby 62 Holdings, LLC | Apartment | $1,795,428.77 | $217,159.69 | -$1,578,269.08 | 1539 | -88% | -39% | -39% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Sampson 45th Avenue, LLC | Single Family Residence | $1,782,998.71 | $1,181,026.15 | -$601,972.56 | 861 | -34% | -16% | -47% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Steadman 170th, LLC | Single Family Residence | $569,656.14 | $686,798.62 | $117,142.48 | 880 | 21% | 8% | 14% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | TCG Investments, LLC | Apartment | $1,100,002.00 | $2,165,208.47 | $1,065,206.47 | 1173 | 97% | 23% | 31% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Volare Ventures, LLC | Single Family Residence | $916,221.50 | $1,079,103.42 | $162,881.92 | 329 | 18% | 20% | 27% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Woodlawn Ave Townhomes, LLC | Townhome | $401,876.25 | $592,679.58 | $190,803.33 | 346 | 47% | 51% | 51% |
| Total | 57 | | $67,223,568.62 | | | | 27.39% | 18.30% | 20.26% |

The performance of these prior investments should not be considered any guaranty or representation of the results to be achieved by the Company, or by an Investor in this Offering.

**Management Fees; Transactions with Related Parties**

The Company will pay the Manager an annual management fee equal to 2% of the outstanding aggregate principal balances of the Notes outstanding from time to time ("Management Fee"). The Management Fee for the first year will be fully earned and paid at the time of investment. Thereafter, the Management Fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the Notes during the applicable quarter.

The Company will pay all expenses related to the operation of the Company, other than the payroll of the Manager. These costs that will be paid by the Company include the fees and expenses related to this Offering, as well as a share of the office rent and fees, office common area maintenance charges, phone, fax, and internet access, computer hardware and related supplies, general office supplies, office rental of fax, printers, or scanners and maintenance costs related thereto, consulting, legal, accounting, and professional fees, marketing and travel expenses and any business licenses and registrations required of the Company or the Manager as a result of its management of the Company.

The Manager may elect to pay any of these Company expenses, in which event the Company will reimburse the Manager for those out-of-pocket costs.

The Manager may charge a Portfolio SPE a fee to cover the costs of due diligence and underwriting involved in closing a real estate purchase or disposition. This fee, which may be payable by the Portfolio SPE or the Project Partner on or after closing of the purchase or disposition, will be non-refundable and will typically be less than $15,000. Additionally, in the event the Company or the Manager acquires or becomes an affiliate of a real estate brokerage company, the Company may pay customary brokerage fees to such entity for the acquisition or disposition of the Company's assets.

Under the Operating Agreement the Manager is required to cause the Company to distribute to any member of the Company, a cash distribution equal to the taxes that such member would owe on the income attributed to it from the Company pursuant to the Internal Revenue Code, less any amounts that have been distributed to such member(s) in the applicable year. At any time when any Notes remain issued and outstanding, the Company and the Manager may not make any other distributions to the members of the Company (other than the tax distributions above) without the prior written approval of a Majority-in-Interest of the Noteholders. In the event that there are no Notes then issued and outstanding, the Company may made such other distributions to its members as determined by the Manager.

The Company may engage, or cause a Portfolio SPE to engage, an affiliate of the Company to provide the Portfolio SPEs with services. The Company shall not pay compensation to such affiliated entity at a rate that is higher than is standard in the market. In the event the Company enlists the services of any affiliate of the Manager identified below, the rates of compensation of these affiliates for the performance of their various services will be limited and all payments will be subject to inspection by auditors upon request by an investor. A description of the affiliated entities and the agreed upon rates are set forth below. To the extent the market rates for these services increase over time, the Company may pay rates in excess of the rates set forth below. Additionally, to the extent the Company in the future provides services that are not listed below, such services must be provided at reasonable market rates.

If the Manager, or an affiliate of the Manager or the Company, guarantees, whether personally or otherwise, a loan, bond or other obligation of the Company, a holding company, or a Portfolio SPE, that guarantor will be entitled to receive from the benefiting entity an annual fee equal to 1% of the total amount of the credit facility, bond amount, or other obligation that is the subject of the guarantee.

The Company may engage the services of certain related or affiliated parties to provide services to the Company in connection with its operations. These include the following:

*Edge Construction, LLC or an affiliated general contractor:* Expected to provide general contracting services, including those related to new construction of and rehabilitation of real estate projects, and is expected to receive a fee of cost plus 10%. Costs include the costs of management of a project, including costs of project management, supervision, materials and labor, each of which will be billed at hourly rates, which are currently between $30 and $180 per hour.

*iCap Enterprises, Inc.:* Expected to Provide development and consulting services, as well as accounting and administrative support at hourly rates which are currently between $30 and $200 per hour.

The Manager or any affiliate of the Manager may also charge the Company or any of its subsidiaries a fee for any professional service rendered for the benefit of the Company or any of its subsidiaries in accordance with the rates outlined by the Manager or any affiliate of the Manager from time to time, which will be within the range of standard market rates for such services. The Manager may also charge the project SPEs of the Company or the builders and developers, as a project cost, an origination fee for placing capital into each real estate investment, which fees will be no more than what is typically charged for private real estate-based financing investments, but which will generally be less than 5% of the capital placed. The Manager may charge a due diligence fee to any potential sponsor, builder, developer, or owner of a real estate project or investment opportunity in which the Company might reasonably make an investment, to cover the expenses related to due diligence and underwriting of the investment.

## USE OF PROCEEDS

The proceeds of this Offering will be used to pay expenses related to the Company's formation and operations and for this Offering, including as set forth below in "PLAN OF DISTRIBUTION" and to purchase and manage preferred equity real estate positions through Portfolio SPEs. The proceeds will be used to cover costs associated with this process, such as marketing, management fees, and professional service fees. The Company expects to pay organizational expenses of approximately $450,000, which include the cost of forming the Company, Holding and the Portfolio SPEs and the cost of marketing and management associated with the Company's fundraising efforts, including technology infrastructure and the cost of preparing this Memorandum, but excluding selling commissions and similar costs. As discussed above, the Company has engaged Cobalt Capital, Inc. as the Managing Broker Dealer in this Offering, who will assemble a selling group of other broker dealers and registered investment advisors. Proceeds from this Offering will also be used to pay the management fee to the Manager as discussed above.

## PLAN OF DISTRIBUTION

The Company has entered into an exclusive engagement agreement (the "Engagement Agreement") with Cobalt Capital, Inc. ("Cobalt") to serve as managing broker dealer of the Offering. The exclusivity period continues until the Offering has been closed.

The Notes will be offered on a "best efforts" basis (which means that there is no guarantee that any minimum amount will be sold). There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines. Cobalt will engage other broker dealers ("Selling Group Members") to assist in privately placing the Notes. Cobalt will retain a fee of 2.25% of the Gross Proceeds of this Offering for serving as the managing dealer in the Offering.

Cobalt and its officers, employees and affiliates may purchase Notes in the Offering. Such Notes will be counted toward the maximum offering amount of $50,000,000 (not including the $25,000,000 over-allotment amount, the "Maximum Offering Amount"). Cobalt and the Company may, in their sole discretion, accept offers to purchase Notes net (or partially net) of the commissions and expense reimbursements described in this Memorandum in certain circumstances deemed appropriate by either of them, including by way of illustration, from Investors purchasing through a registered investment advisor

14

("RIA"), or from Investors who are affiliates of the Company or any member of the Selling Group. The Company may also make sales to registered representatives of the Selling Group or to their spouses and affiliates, in each case net of sales commissions.

The amount of selling commission payable to Cobalt or any Selling Group member may be reduced or waived by Cobalt or the Selling Group member, as applicable, in their sole discretion, with respect to investments by those investors (i) who buy at least $350,000 of Notes themselves or whose direct family members buy at the same time at least $350,000 of Notes in the aggregate (for this purpose, a "direct family member" shall mean the investor and his or her grandparents, parents, siblings, spouse, children and grandchildren), (ii) who have engaged the services of a registered investment advisor who is paid a fixed or "wrap" fee in lieu of Selling Commissions, or (iii) who are "registered representatives" of a Selling Group member.

We have agreed to indemnify Cobalt from and against losses, claims, damages or liabilities (collectively, the "Damages") arising out of the Offering, except for Damages resulting from Cobalt's breach of the Engagement Agreement, including gross negligence or willful misconduct as more fully set forth in the Engagement Agreement.

The Company is offering a maximum offering amount of up to $50,000,000 in Notes, with an over-allotment amount of an additional $25,000,000. If the Maximum Offering Amount ($50,000,000) is subscribed, the net proceeds to the Company from the sale of Notes, after deducting selling commissions and related fees, and estimated organizational and Offering expenses, is anticipated to be $44,675,000. The following table sets forth the details of these fees and the funds available for investment in the Company's real estate strategy as described in this Memorandum.

|  | Sale of Maximum Offering Amount | Percentage of Gross Proceeds |
| --- | --- | --- |
| Gross Proceeds From Investors | $50,000,000 | 100.00% |
| Less: Selling Commission (1) | $3,000,000 | 6.00% |
| Less: Due Diligence Fee (2) | $750,000 | 1.50% |
| Less: Managing Dealer Fee (3) | $1,125,000 | 2.25% |
| Less: Organizational and Offering Expenses | $450,000 | 0.90% |
| Available for Investment (before reserves) | $44,675,000 | 89.35% |

(1) The Managing Dealer will receive a Selling Commission in an amount up to 6% of the aggregate principal amount of Notes issued ("Gross Proceeds"), which it will re-allocate to the Selling Group Members.

(2) The Managing Dealer will receive a marketing and due diligence fee of 1.5% of the Gross Proceeds which it will re-allocate to Selling Group Members.

(3) The Managing Dealer will also receive a fee of 2.25% of the Gross Proceeds for serving as the managing dealer in the Offering.

At any given time, the Company will maintain cash reserves to meet demand payments, interest payments, and operational requirements. With the exception of employee payroll expenses, which will be covered by the Manager, all other expenses will be borne by the Company.

# INVESTOR SUITABILITY STANDARDS

*General*

An investment in our Notes involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in their investment. Our Notes are only suitable for those who desire a relatively long-term investment for which they do not need liquidity until the anticipated return on investment as set forth in this Memorandum.

The offer, offer for sale, and sale of our Notes is intended to be exempt from the registration requirements of the Securities Act pursuant to Rule 506(b) of Regulation D promulgated thereunder as to "accredited investors" and is intended to be exempt from the registration requirements of applicable state securities laws as a federally covered security. This Offering is directed to "accredited investors," as that term is defined in Rule 501(a) of Regulation D as promulgated by the SEC.

A subscriber must be an accredited investor as defined in Rule 501(a) of Regulation D and meet one (or more) of the investor suitability standards below to purchase Notes. Fiduciaries must also meet one of these conditions. If the investment is a gift to a minor, the custodian or the donor must meet these conditions. For purposes of the net worth calculations below, net worth is the amount by which assets exceed liabilities, but excluding your house, home furnishings or automobile(s) among your assets. In the subscription agreement, a subscriber will have to confirm satisfaction of these minimum standards:

- Each investor must have the ability to bear the economic risks of investing in the Notes.

- Each investor must have sufficient knowledge and experience in financial, business or investment matters to evaluate the merits and risks of the investment.

- Each investor must represent and warrant that the Notes to be purchased are being acquired for investment and not with a view to distribution.

- Each investor will make other representations to us in connection with the purchase of the Notes, including representations concerning the investor's degree of sophistication, access to information concerning the Company, and ability to bear the economic risk of the investment.

*Suitability Requirements*

Rule 501(a) of Regulation D defines an "accredited investor" as any person who comes within any of the following categories, or whom the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1) Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Exchange Act; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration undersection 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:33   Exhibit Pt 2 Page 1269
1366

either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

For purposes of calculating net worth:

(A) The person's primary residence shall not be included as an asset;

(B) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

In determining income, a subscriber should add to the subscriber's adjusted gross income any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deduction claimed for depletion, contribution to an IRA or Keogh plan, alimony payments, and any amount by which income for long-term capital gains has been reduced in arriving at adjusted gross income.

<u>Additional Requirements</u>

In addition to the foregoing suitability standards, we cannot accept subscriptions from anyone if the representations required are either not provided or are provided but are inconsistent with our determination that the investment is suitable for the subscriber. In addition to the financial information we require, the representations we require of you state that you:

- Have received this Memorandum, together with the Exhibits attached hereto;

- understand that no federal or state agency has made any finding or determination as to the fairness for investment in, nor made any recommendation or endorsement of, the Notes; and

- understand that an investment in the Notes will not, in itself, create a qualified retirement plan as described in the Internal Revenue Code and that you must comply with all applicable provisions of the Internal Revenue Code in order to create a qualified retirement plan.

You will also represent that you are familiar with the risk factors we describe and that this investment matches your investment objectives. Specifically, you will represent to us that you:

- Understand that there will be no public market for the Notes, that there are substantial restrictions on repurchase, sale, assignment or transfer of the Notes and that it may not be possible to readily liquidate an investment in the Notes; and

- have investment objectives that correspond to those described elsewhere in this Memorandum.

You will also represent to us that you have the capacity to invest in our Notes by confirming that:

- You are legally able to enter into a contractual relationship with us, and, if you are an individual, have attained the age of majority in the state in which you live; and

- if you are a manager, that you are the manager for the trust on behalf of which you are purchasing the Notes, and have due authority to purchase Notes on behalf of the trust.

If you are purchasing as a fiduciary, you will also represent that the above representations and warranties are accurate for the person(s) for whom you are purchasing Notes. By executing the subscription agreement, you will not be waiving any rights under the Securities Act or the Exchange Act.

We have the right to refuse a subscription for Notes if in our sole discretion we believe that the prospective investor does not meet the suitability requirements. It is anticipated that comparable suitability standards (including state law standards applicable in particular circumstances) may be imposed by us in various jurisdictions in connection with any resale of the Notes.

## SUBSCRIPTION PROCEDURES

All subscriptions for the Notes must be made by the execution and delivery of the Subscription Agreement as attached hereto as Exhibit A and a counterpart signature page to the Collateral Agent Agreement, which is attached to the Subscription Agreement. This process may be completed either electronically via the Company's website through its "Investor Portal," or by delivery of hard copy as outlined below.

Prospective investors may do so via the App, the Company's website, electronic signature, or in hard copy delivered to the Company as follows:

iCap Pacific Income Fund 5, LLC
ATTN: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

18

With the Subscription Agreement (regardless of the method used for completing), prospective investors should send their funds via ACH transfer through the App, wire transfer pursuant to the instructions as set forth in the Subscription Agreement, or check payable to "iCap Pacific Income Fund 5, LLC" for the total cost of the Notes being subscribed.

Subscriptions are not binding on the Company until accepted in writing by the Company. We will refuse any subscription by giving written notice to the subscriber by personal delivery or first-class mail. We have the right to refuse to sell the Notes to any prospective investor for any reason in our sole discretion, including, without limitation, if such prospective investor does not promptly supply all information requested by us in connection with such prospective investor's subscription. In addition, in our sole discretion, we may establish a limit on the purchase of Notes by particular prospective investors.

As noted above, this Memorandum and the Subscription Agreements are available electronically through the App or the Company's website and may be completed on the App, the website or by electronic signature.

## RESTRICTIONS ON TRANSFERABILITY

The Notes offered hereby are restricted securities as that term is defined in Rule 144 promulgated under the Securities Act. These securities have not been registered under the Securities Act and are being offered and will be sold without benefit of registration under the applicable federal or state securities acts by reason of specific exemptions from registration provided by such acts. The availability of such exemptions is also dependent, in part, upon the "investment intent" of the investors. The exemptions would not be available if an investor were purchasing the Notes with a view to redistributing them. Accordingly, each investor when executing the Subscription Agreement will be required to acknowledge that his or her purchase is for investment, for its, his or her own account, and without any view to resale of the Notes except pursuant to an effective registration statement under the Securities Act, or a valid exemption from the registration requirements of the Securities Act, and subject to the terms of the Subscription Agreement.

## STATEMENT AS TO INDEMNIFICATION

Our Operating Agreement provides for indemnification of members and officers of the Company and of the Manager under certain circumstances, which could include liabilities relating to securities laws. The SEC mandates the following disclosure of its position on indemnification for liabilities under the federal securities laws:

"Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling an issuer, the Company has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable."

## TRADEMARKS AND COPYRIGHTS

We may own or have rights to trademarks or trade names that we use in connection with the operation of our business, including our corporate names, logos and website names. In addition, we own or have the rights to copyrights, trade secrets and other proprietary rights that protect the content of our products and the formulations for such products. This Memorandum may also contain trademarks, service marks and trade names of other companies, which are the property of their respective owners. Our use or display of third parties' trademarks, service marks, trade names or products in this Memorandum is not intended to, and should not be read to, imply a relationship with or endorsement or sponsorship of us. Solely for convenience, some of the copyrights, trade names and trademarks referred to in this Memorandum are listed without their ©, ® and ™ symbols, but we will assert, to the fullest extent under applicable law, our

rights to our copyrights, trade names and trademarks. All other trademarks are the property of their respective owners.

<div align="center">

**RISK FACTORS**

</div>

AN INVESTMENT IN THE NOTES INVOLVES SIGNIFICANT RISK AND IS SUITABLE ONLY FOR PERSONS WHO ARE CAPABLE OF BEARING THE RISKS, INCLUDING THE RISK OF LOSS OF A SUBSTANTIAL PART OR ALL OF THEIR INVESTMENT. CAREFUL CONSIDERATION OF THE FOLLOWING RISK FACTORS, AS WELL AS OTHER INFORMATION IN THIS MEMORANDUM IS ADVISABLE PRIOR TO INVESTING. PROSPECTIVE INVESTORS SHOULD READ ALL SECTIONS OF THIS MEMORANDUM AND ARE STRONGLY URGED AND EXPECTED TO CONSULT THEIR OWN LEGAL AND FINANCIAL ADVISERS BEFORE INVESTING IN THE NOTES. THE INFORMATION IN THIS MEMORANDUM CONTAINS BOTH HISTORICAL AND FORWARD-LOOKING STATEMENTS. PLEASE BE ADVISED THAT THE COMPANY'S ACTUAL FINANCIAL CONDITION, OPERATING RESULTS AND BUSINESS PERFORMANCE MAY DIFFER MATERIALLY FROM THAT ESTIMATED BY THE COMPANY IN FORWARD-LOOKING STATEMENTS. THE COMPANY HAS ATTEMPTED TO IDENTIFY, IN CONTEXT, CERTAIN OF THE FACTORS THAT IT CURRENTLY BELIEVES COULD CAUSE ACTUAL FUTURE RESULTS TO DIFFER FROM THE COMPANY'S CURRENT EXPECTATIONS. THE DIFFERENCES MAY BE CAUSED BY A VARIETY OF FACTORS, INCLUDING BUT NOT LIMITED TO, ADVERSE ECONOMIC CONDITIONS, COMPETITORS (INCLUDING THE ENTRY OF NEW COMPETITORS), INADEQUATE CAPITAL, UNEXPECTED COSTS, LOWER REVENUES AND NET INCOME THAN ANTICIPATED, FLUCTUATION AND VOLATILITY OF THE COMPANY'S OPERATING RESULTS AND FINANCIAL CONDITION, INABILITY TO CARRY OUT MARKETING AND SALES PLANS, LOSS OF KEY EXECUTIVES OR OTHER PERSONNEL, AND OTHER RISKS THAT MAY OR MAY NOT BE REFERRED TO IN THESE RISK FACTORS.

**Operation and Company Risks**

*Our business prospects are difficult to predict because we have no operating history.*

The Company is a newly organized entity and does not have an operating history upon which investors may base an evaluation of its likely performance. The Company's results will depend upon the availability of suitable investment opportunities for the Company and the performance of the Company's Portfolio Investments. The Company's proposed operations are subject to all business risks associated with new enterprises. The likelihood of the Company's success must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with the expansion of a business, operation in a competitive industry, and the continued development of advertising, promotions and a corresponding customer base. There is a possibility that the Company could sustain losses in the future.

There can be no assurance that the Company's efforts will result in successful commercialization or further development of the Company' operations, that the Company's marketing efforts will be successful, or that the Company will ever achieve significant (or any) revenue. If the Company fails to achieve its goals, the Company may run out of money to run its operation and as such, the Company would need to raise additional working capital. Failure to do so could result in Noteholders losing part or all of their money invested.

*Noteholders must rely on the Manager to acquire appropriate Portfolio Investments for the Company's portfolio.*

The Company is conducting the Offering as a "blind pool," meaning that the Company is proceeding to raise funds through the sale of the Notes, without having specifically identified any real estate

<div align="center">

20

</div>

properties in which the Company intends to invest. When you subscribe for Notes, that subscription is binding, and you will not have the right to revoke that subscription even if you do not approve of the Portfolio Investments that the Company subsequently identifies. Prospective investors should not invest in the Company unless they are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

***If the Company is not as successful with the Offering as desired, it may not acquire as diversified a portfolio as is planned.***

It is not known how many Portfolio Investments the Company will be able to obtain, or the number of opportunities that will be presented by the market for it to evaluate. The number of Portfolio Investments ultimately made by the Company will depend primarily upon the capital raised through the sale of the Notes, the availability of suitable Portfolio Investments, the number of investors who choose to withdraw their funds through demand notices, and the extent to which the Manager arranges for Portfolio Investments to be held with co-investors. There is no certainty as to the number of Portfolio Investments that the Company will ultimately be able to obtain, and since one of the Company's objectives is diversification, no assurance can be given as to the Company's achievement of that objective.

***Competition with third parties in our contemplated industry is intense, which could reduce our profitability and our ability to pay interest or raise additional funds.***

It is possible that over time we may compete with other entities seeking to undertake similar activities to those that we do. These same potential competitors may have significantly greater capital resources, research and development, manufacturing, testing, regulatory compliance, and marketing capabilities. Competitive products and services may render any services, products or product candidates that we may acquire or develop uneconomic or obsolete. We cannot assure investors that we will be able to invest in or develop resources that are required to successfully compete with these competitors .

***Our planned business is inherently expensive, risky and may not be understood by or accepted in the marketplace, which could adversely affect our future value.***

The business currently conducted by the Company is at an early stage and is financially speculative. To date, very few companies have been successful in their efforts to commercialize such a business. Furthermore, the number of people who may use our services is difficult to forecast with accuracy. Our future success is dependent on the establishment of the market for our services and our ability to capture a share of this market with the services and offerings we plan to develop.

***Negative publicity could adversely affect our business and operating results.***

Negative publicity about our industry or the Company, even if inaccurate, could adversely affect our reputation and the confidence in our operations, which could harm our business and operating results. Harm to our reputation can arise from many sources, including employee misconduct, misconduct by our partners, outsourced service providers or other counterparties, failure by us or our partners to meet minimum standards of service and quality, compliance failures and claims and any such sources related to our affiliate entities.

***Rapid growth may strain our resources.***

We expect to experience significant and rapid growth in the scope and complexity of our business, which may place a significant strain on our management team and our financial and other resources. Such growth, if experienced, may expose us to greater costs and other risks associated with growth and expansion. Although the Company does not expect to have employees, we may be required to hire employees, including other support personnel, among others, in order to successfully advance our

operations. We may be unsuccessful in these efforts or we may be unable to project accurately the rate or timing of these increases.

This growth may place a strain on our management and operational resources. The failure to develop and implement effective systems or the failure to manage growth effectively could have a materially adverse effect on our business, financial condition, and results of operations. In addition, difficulties in effectively managing the budgeting, forecasting, and other process control issues presented by such a rapid expansion could harm our business, financial condition, and results of operations.

***Control is vested in the Manager; no investor should purchase the Notes unless the investor is comfortable with the Manager's judgment and experience in running the Company's affairs.***

Control over all decisions affecting the Company, including decisions regarding the Portfolio Investments that are to be made, will be made by the Manager and its management team. Material decisions, such as decisions regarding the purchase or sale of assets, the refinancing of Portfolio SPEs, whether to make an investment, and the incurrence of third-party-debt will be made without separate concurrence from Noteholders. No assurance can be given that sufficient investment opportunities will be presented to the Company to deploy all of the capital available for investment.

***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its affiliates may provide certain services to, and enter into transactions with, the Company, its holding companies, or the Portfolio SPEs, provided that the terms are commercially reasonable. This limitation may not fully protect the Company or the Portfolio SPEs against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Noteholders, the Trustee, or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its affiliates. In addition, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities for affiliated entities that may generate different fees for the Manager.

***The Manager may retain and reinvest all or a portion of the revenue generated by, or proceeds of a sale of, a Portfolio Investment.***

The Manager has the discretion to sell the investments or related properties the Company acquires and to use the cash proceeds from such sale (or cash proceeds from rental income) to, among other things, satisfy its obligations under the Notes, whether or not then due and payable, or other Company obligations, or to enter into new Portfolio Investments. The Manager intends to make new investments over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

***Without obtaining advice from their personal advisors, potential investors may not be aware of the legal, tax or economic consequences of an investment in the Notes.***

The Manager has not arranged for potential investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Company has not acted as if it had been retained by the potential investors. Potential investors should not construe the contents of this Memorandum or any prior or subsequent communication from the Manager, its affiliates or any professional associated with this Offering, as legal or tax advice. Potential investors should consult their

own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability.

***Fees to the Manager will be paid while interest and principal remain outstanding under the Notes.***

Fees payable to the Manager will be paid while interest and principal remain outstanding under the Notes. The Management Fee is based on the aggregate outstanding principal balance of the Notes. The Manager will receive the Management Fee whether or not the Portfolio Investments operate profitably even upon a default or Event of Default. These fees (like other operating expenses) reduce the amount of cash that otherwise would be available for payment of the Notes.

***You will not be investing in the Company, iCap or any of their affiliates and, while the prior performance data presented provides relevant information regarding affiliates of the Manager, it should not be construed as an indication of the likely financial performance of the Company.***

By investing in the Notes, you will not be investing in the Portfolio Investments, iCap, or in any of the prior investments sponsored by iCap's affiliates. iCap has provided selected information regarding its prior investments because investors might consider those investments to be relevant in assessing the experience and judgment of the Manager, and the iCap management team. Potential investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments have performed. Each investment opportunity is unique, and the Company may not be able to replicate the success of prior investments, even if the Portfolio Investments assembled for the Company's portfolio are similar to those obtained for the prior funds.

***A Majority-in-Interest of the Noteholders is required to take certain actions with respect to the Notes, and a Noteholder does not have a right to vote on an "Event of Default" under their Note(s) unless the Event of Default has occurred with respect to their particular Note.***

The Notes, the Security Agreement and the Guaranty require the consent of a Majority-in-Interest of the Noteholders to declare an Event of Default and to take certain actions related thereto. Therefore, individual Noteholders will not be able to take certain actions unilaterally and any individual Noteholder will not be entitled to vote for or against the declaration of an "Event of Default" unless, as of the time of such vote, the applicable Event of Default has occurred and is continuing under such Noteholder's individual Note(s).

***The Company may prepay the principal and interest on the Notes at any time.***

The Company may prepay all or a part of the principal amount and accrued interest in the Notes at any time. No prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Noteholders will not have certainty as to how long their respective Note(s) may be outstanding. If the Company makes any prepayment, the prepayments need not be made ratably against all outstanding Notes.

***Various factors could negatively impact the profitability of the Company's Portfolio Investments***

The Company may obtain insurance policies for the Portfolio Investments that are commercially prudent given the local market and circumstances of the Portfolio Investments. However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Portfolio Investments should be partially or totally destroyed, the Company may suffer a substantial loss of capital as well as profits. Even if the Company's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Company will sustain a substantial uninsured loss as a result of a fire or other casualty.

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:36     Exhibit Pt 21 Page 1276
1366

Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making a Portfolio Investment, the Company may undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation could include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the Portfolio Investment's site had environmental contamination not detected prior to the Company's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Company undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Company may incur environmental clean-up costs or be subject to liability exposure that may reduce the net profits of the Company.

Under the Americans With Disabilities Act of 1990 ("ADA"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing properties to allow disabled persons to access such facilities. Most of the properties the Company considers will likely be in compliance with the present access requirements. If, however, the properties the Company acquires are not in compliance with the ADA, the Company will be required to make modifications to the properties to bring them into compliance or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

The real estate industry in general, and the multifamily, residential, and commercial sectors, in particular, are highly competitive, and the Company will be competing with numerous other entities, some having substantially greater financial resources and experience than the Company, in seeking attractive investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available Portfolio Investments or resulting in other less favorable terms to the purchasers.

The investment returns available from investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, prolonged timing of permit issuance by cities and counties, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers' decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could have a material adverse impact on the Company's results of operations or financial condition. In addition, real estate investments are difficult to sell quickly and the Company may not be able to adjust the Company's portfolio of owned properties quickly in response to economic or other conditions in order to meet Note obligations. If the Company's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Company's income will be adversely affected.

***Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.***

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be

realized or that investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

***Real estate development projects are subject to numerous risks outside the Company's control such as delays in permitting and other governmental approvals, increased costs, and labor shortages.***

Any properties in which the Company invests relating to real estate development or construction are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development and construction projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, and thus lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. The Company may enter into contracts to purchase properties before they are finished, and the foregoing risks could adversely impact the purchase prices, valuations, or closings dates of those properties. Although the Manager will not undertake such transactions without reviewing detailed budgets, such budgets may understate the expenses.

***There may be unanticipated obstacles to execution of our business plan.***

Our proposed plan of operation and prospects will depend largely upon our ability to successfully establish the Company' presence in a timely fashion, retain and continue to hire skilled management, technical, marketing, and other personnel, and attract and retain significant numbers of quality business partners and corporate clients. There can be no assurance that we will be able to successfully implement our business plan or develop or maintain future business relationships, or that unanticipated expenses, problems or technical difficulties which would result in material delays in implementation will not occur.

***The volatile credit and capital markets could have a material adverse effect on our financial condition.***

Our ability to manage our future debt and liquidity will be dependent on our level of positive cash flow. An economic downturn may negatively impact our cash flows. Credit and capital markets can be volatile, which could make it more difficult for us to refinance our debt or to obtain additional debt or equity financings in the future. Such constraints could increase our costs of borrowing and could restrict our access to other potential sources of future liquidity. Our failure to have sufficient liquidity to make interest and other payments required by our debt or our Notes could result in a default of such debt or the Notes and acceleration of our borrowings, which would have a material adverse effect on our business and financial condition.

***An economic downturn could materially affect us in the future.***

The recession from late 2007 to mid-2009 reduced consumer confidence to historic lows, impacting the public's ability and desire to spend discretionary dollars as a result of job losses, home foreclosures, significantly reduced home values, investment losses, bankruptcies and reduced access to credit, resulting in lower levels of customer traffic. If the economy experiences another significant decline, our business and results of operations could be materially adversely affected.

***Information technology system failures or breaches of our network security could interrupt our operations and adversely affect our business.***

We rely on our computer systems and network infrastructure to facilitate our operations. Our operations depend upon our ability to protect our computer equipment and systems against damage from physical theft, fire, power loss, telecommunications failure or other catastrophic events, as well as from internal and external security breaches, viruses and other disruptive problems. Any damage or failure of

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:14    Exhibit Pt. 2 Page 1278
of
1366

our computer systems or network infrastructure that causes an interruption in our operations could have a material adverse effect on our business and subject us to litigation or to actions by regulatory authorities.

***The failure to enforce and maintain our trademarks and protect our other intellectual property could materially adversely affect our business, including our ability to establish and maintain brand awareness.***

The success of our business strategy depends on our continued ability to obtain and use trademarks and service marks in order to increase brand awareness and develop our branded products. If our efforts to protect our intellectual property are not adequate, or if any third-party misappropriates or infringes on our intellectual property, whether in print, on the Internet or through other media, the value of our brands may be harmed, which could have a material adverse effect on our business, including the failure of our brands and branded products to achieve and maintain market acceptance. There can be no assurance that all of the steps we have taken to protect our intellectual property in the United States and in foreign countries will be adequate. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent, as do the laws of the United States.

***Third-party claims with respect to intellectual property assets, if decided against us, may result in competing uses or require adoption of new, non-infringing intellectual property, which may in turn adversely affect sales and revenues.***

There can be no assurance that third parties will not assert infringement or misappropriation claims against us, or assert claims that our rights in our trademarks, service marks, trade dress and other intellectual property assets are invalid or unenforceable. Any such claims could have a material adverse effect on us if such claims were to be decided against us. If our rights in any intellectual property were invalidated or deemed unenforceable, it could permit competing uses of intellectual property, which, in turn, could lead to a decline in our results of operations. If the intellectual property became subject to third-party infringement, misappropriation or other claims, and such claims were decided against us, we may be forced to pay damages, be required to develop or adopt non-infringing intellectual property or be obligated to acquire a license to the intellectual property that is the subject of the asserted claim. There could be significant expenses associated with the defense of any infringement, misappropriation, or other third-party claims.

***We depend on certain officers of the Manager, the loss of whom could materially harm our business.***

We rely upon the accumulated knowledge, skills and experience of the officers and personnel of our Manager and its affiliates. If they were to leave the Manager or become incapacitated, we might suffer in our planning and execution of business strategy and operations, impacting our brand and financial results. We also do not maintain any key man life insurance policies for any such persons.

***We are exposed to the risk of natural disasters, unusual weather conditions, pandemic outbreaks, political events, war and terrorism that could disrupt business and result in lower sales, increased operating costs and capital expenditures.***

Our headquarters and company-operated locations, as well as certain of our vendors and customers, are located in areas which have been and could be subject to natural disasters such as floods, hurricanes, tornadoes, fires or earthquakes. Adverse weather conditions or other extreme changes in the weather, including resulting electrical and technological failures, may disrupt our business and may adversely affect our ability to continue our operations. These events also could have indirect consequences such as increases in the costs of insurance if they result in significant loss of property or other insurable damage. Any of these factors, or any combination thereof, could adversely affect our operations.

*Members of our Manager will have other business interests and obligations to other entities.*

None of the members and officers of the Manager will be required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company, provided that such activities do not otherwise breach their agreements with the Company. We are dependent on these persons to successfully operate the Company. Their other business interests and activities could divert time and attention from operating the Company.

## Risks Related to this Offering and the Notes and Other Agreements

*There is no minimum Offering size required to be raised by the Company in order to conduct a closing, and the Company may not receive or accept sufficient subscriptions to undertake its business.*

This Offering is not subject to any minimum amount required to be subscribed for by investors in order for the Notes to be sold to any investors or for the Company to access or receive and use such funds. Therefore there is no assurance that the Company will raise sufficient funds to commence or continue operations. If the Company is not able to raise sufficient funds to commence operations and undertake its business plan, investors may lose all of their investment.

*This private placement of Notes is being made in reliance on an exemption from registration requirements, and there is no guarantee that it will comply with the regulatory requirements for such exemption.*

This private placement of Notes will not be registered with the SEC. The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

*If investors successfully seek rescission, we would face severe financial demands that we may not be able to meet.*

We represent that this Memorandum and its exhibits do not contain any untrue statements of material fact or omit to state any material fact necessary to make the statements made, in light of all the circumstances under which they are made, not misleading. However, if this representation is inaccurate with respect to a material fact, if this Offering fails to qualify for exemption from registration under the federal securities laws, or if we fail to register the Notes or find an exemption under the securities laws of each state in which we offer the Notes, each investor may have the right to rescind his, her or its purchase of the Notes and to receive back from the Company his, her or its purchase price. Such investors, however, may be unable to collect on any judgment, and the cost of obtaining such judgment may outweigh the benefits. If investors successfully seek rescission, we would face severe financial demands and may not be able to meet our capital needs, which may adversely affect any non-rescinding investors.

*We may invest or spend the proceeds of this Offering in ways with which you may not agree or in ways which may not yield a return.*

While we have provided guidance on priorities for the use of proceeds, the timing and amount of sales will impact our actual use of proceeds within the uses identified. Our management will have broad discretion in determining how the proceeds of the Offering will be used in each of the identified use categories.

We currently intend to use the proceeds we receive from this Offering after deducting estimated fees and expenses associated with this private placement, including legal, accounting, transfer agent, financial, acquisitions and other professional fees, primarily for the purposes as described above. Our management will have considerable discretion in the application of the net proceeds, and you will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. Investors in this Offering will need to rely upon the judgment of our management with respect to the use of proceeds. If we do not use the net proceeds that we receive in this Offering effectively, our business, financial condition, results of operations and prospects could be harmed, and the market price or value of the Notes could decline as well as the Company's ability to repay the Notes when due.

**This is a private offering, and as such investors will not have the benefit of review of this Memorandum by the SEC or any other agency.**

Since this Offering is a private placement of securities and, as such, is not registered under federal or state securities laws, potential investors will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

**There is no assurance that the Company will be profitable, and there is no assurance of any returns.**

There is no assurance as to whether the Company will be profitable, or earn revenues, or whether the Company will be able to meet its operating expenses. The initial expenses the Company incurs could result in operating losses for the Company for the foreseeable future. No assurance can be made that a subscriber for the Notes offered hereby will not lose his or her entire investment.

**The Company is obligated to pay certain fees and expenses.**

The Company will pay various fees and expenses related to its ongoing operations regardless of whether or not the Company's activities are profitable. These fees and expenses will require dependence on third-party relationships. The Company is generally dependent on relationships with its strategic partners and vendors, and the Company may enter into similar agreements with future potential strategic partners and alliances. The Company must be successful in securing and maintaining its third-party relationships to be successful. There can be no assurance that such third parties may regard their relationship with the Company as important to their own business and operations, that they will not reassess their commitment to the business at any time in the future, or that they will not develop their own competitive services or products, either during their relationship with the Company or after their relations with the Company expire. Accordingly, there can be no assurance that the Company' existing relationships or future relationships will result in sustained business partnerships, successful service offerings, or significant revenues for the Company.

*Prospective investors must undertake their own due diligence*.

This Memorandum and its exhibits include limited information regarding the Company, our current and future business and operations, our management and our financial condition. While we believe the information contained in this Memorandum is accurate, such document is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective Investor that the abbreviated nature of this Memorandum will not omit to state a material fact which a prospective Investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such Investor. As a result, prospective Investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **This investment is suitable only for investors who have the knowledge and experience**

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:54    Exhibit Pt. 1 Page 1281
1366

to independently evaluate the Company, our business and prospects.

***The limited marketability of the Notes may adversely affect your ability to transfer and pledge the Notes.***

Noteholders must represent that they are purchasing the Notes for their own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, or encumber your Note(s) unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute unlawful trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Internal Revenue Code of 1986, as amended (the "Code") or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans.

***The Notes constitute restricted securities and are subject to limited transferability.***

The Notes should be considered a long-term, illiquid investment. The Notes have not been registered under the Securities Act, and cannot be sold without registration under the Securities Act or any exemption from registration. In addition, the Notes are not registered under any state securities laws that would permit their transfer. Because of these restrictions and the absence of an active trading market for our securities, a Noteholder will likely be unable to liquidate an investment even though other personal financial circumstances would dictate such liquidation.

***There is no public trading market for our Notes.***

There is no established public trading marketing for the Notes and there can be no assurance that one will ever develop. Market liquidity will depend on the perception of our operating business and any steps that our management might take to bring us to the awareness of investors. There can be no assurance given that there will be any awareness generated. Consequently, investors may not be able to liquidate their investment or liquidate it at a price that reflects the value of the Notes. As a result, Investors may not find purchasers for their Notes. Only accredited investors with no need for immediate short-term liquidity should purchase the Notes.

***The market value of the Notes may decrease due to factors beyond our control.***

Broad market fluctuations may adversely affect the market value of our Notes. The market value of our Notes may also fluctuate significantly in response to the following factors, most of which are beyond our control:

- variations in our quarterly operating results,
- changes in general economic conditions,
- changes in market valuations of similar companies issuing similar investment products,
- announcements by us or our competitors of significant acquisitions, strategic partnerships or joint ventures, or capital commitments,
- poor reviews;
- loss of a major customer, partner or joint venture participant; and
- the addition or loss of key managerial and collaborative personnel.

Any such fluctuations may adversely affect the market value of our Notes, regardless of our actual operating performance. As a result, Noteholders may be unable to sell their Notes (even if permitted by applicable securities laws and the terms of the Notes), or may be forced to sell them at a loss.

***The characteristics of the Notes, including maturity, interest rate, lack of guarantee, and lack of liquidity, may not satisfy your investment objectives.***

The Notes may not be a suitable investment for you, and we advise you to consult your investment, tax and other professional financial advisors prior to purchasing Notes. The characteristics of the Notes, including maturity, interest rate, lack of guarantee and lack of liquidity may not satisfy your investment objectives. The Notes may not be a suitable investment for you based on your ability to withstand a loss of interest or principal or other aspects of your financial situation, including your income, net worth, financial needs, investment risk profile, return objectives, investment experience and other factors. Prior to purchasing any Notes, you should consider your investment allocation with respect to the amount of your contemplated investment in the Notes in relation to your other investment holdings and the diversity of those holdings.

***The Notes will be effectively subordinated to any of our debt that is secured and subordinated to our existing and future unsecured debts.***

The Notes will be junior to any of our secured debt obligations, to the extent of the value of any assets securing such debt. The effect of this subordination is that if we are involved in a bankruptcy, liquidation, dissolution, reorganization or similar proceeding, or upon a default in payment on, or the acceleration of, any of our secured debt, if any, our assets will be available to pay obligations on the Notes only after all debt under our secured debt, if any, has been paid in full from those assets. As of the date of this Memorandum, we had no secured indebtedness outstanding. In such circumstances, Holders of the Notes will participate in any remaining assets ratably with all of our other unsubordinated creditors, including trade creditors. We may not have sufficient assets remaining to pay amounts due on any or all of the Notes then outstanding.

***The Company may sell promissory notes that have earlier maturity dates or higher interest rates than the 9% or 10%, as applicable, to the Notes.***

The Company may sell promissory notes that have earlier maturity dates or higher interest rates than the 9% or 10%, as applicable, to the Notes. In such event the Company would be obligated to pay such higher rates of return, and the security of the noteholders in this Offering would therefore be negatively impacted as the Company will have greater payment obligations from the same pool of assets as compared to the situation where all promissory notes had a 9% or 10% interest rate.

***Because the Notes will have no sinking fund, insurance, or guarantee (other than from Holding), you could lose all or a part of your investment if we do not have enough cash to pay.***

There is no sinking fund, insurance or guarantee of our obligation to make payments on the Notes. We will not contribute funds to a separate account, commonly known as a sinking fund, to make interest or principal payments on the Notes. The Notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation, or any other governmental or private fund or entity. Therefore, if you invest in the Notes, you will have to rely only on our cash flow from operations and other sources of funds for repayment of principal at maturity or upon repayment demand by you and for payment of interest when due. Any future cash flows from operations could be impaired under the circumstances described herein. If our cash flow from operations and other sources of funds are not sufficient to pay any amounts owed under the Notes, then you may lose all or part of your investment.

***We do not expect that the Notes will be rated, but if they are, ratings of the Notes may change and affect the market price and marketability of the Notes.***

We do not currently expect that, upon issuance, the Notes will be rated by any rating agencies. If they are, such ratings are limited in scope, and do not address all material risks relating to an investment in the Notes, but rather reflect only the view of each rating agency at the time the rating is issued. There is no assurance that such credit ratings will be issued or remain in effect for any given period of time or that such

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:54    Exhibit Pt. 1 Page 1283
1366

ratings will not be lowered, suspended or withdrawn entirely by the rating agencies. It is also possible that such ratings may be lowered in connection with future events, such as future acquisitions. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market price or marketability of the Notes. In addition, any decline in the ratings of the Notes may make it more difficult for us to raise capital on acceptable terms.

***Because we may pay off the Notes at any time prior to their maturity, you may be subject to reinvestment risk.***

We have the right to pay off any Note at any time prior to its stated maturity. The Notes would be paid off at 100% of the principal amount plus accrued but unpaid interest up to but not including the date of pay off. Any such pay off may have the effect of reducing the income or return on investment that any investor may receive on an investment in the Notes by reducing the term of the investment. If this occurs, you may not be able to reinvest the proceeds at an interest rate comparable to the rate paid on the Notes.

***The Note, the Security Agreement and the Guaranty contain "deemed consent" provisions.***

Each of the Note, the Security Agreement and the Guaranty contain "deemed consent" provisions which provide that the Company or Holding does not actually have to obtain written confirmation from the Investor as to any approval or consent related to, or amendment of or waiver related to, the applicable agreement or document. The Company or Holding is required to send the Investor a notice of the requested consent or approval, or the requested amendment or waiver, and if the Investor does not respond within 10 days, then to send a second notice. If the Investor does not respond within an additional 10 days the Investor will be deemed to have consented, in writing, to the requested approval, consent, amendment of or waiver.

***We have not retained independent professionals for investors.***

We have not retained any independent professionals to comment on or otherwise protect the interests of potential investors. Although we have retained our own counsel, neither such counsel nor any other independent professionals have made any examination of any factual matters herein, and potential investors should not rely on our counsel regarding any matters herein described.

***We have no firm commitments to purchase any Notes.***

We have no firm commitment for the purchase of any Notes. The Company may be unable to identify investors to purchase the Notes and as a result may have inadequate capital to support its ongoing business obligations.

***The Company may not be able to meet all of the payment demands of its Investors if a large number of Investors desires to be repaid or if the Company does not have the liquidity to meet such demands.***

The Company will use its commercially reasonable efforts to maintain sufficient cash reserves on hand and access to liquidity sources to honor repayment demands of Investors. However, in the event there are more demands for repayment than the Company has cash available to meet, the Company may be delayed in the delivery of funds and may be required to sell some of its assets, which may take significant amounts of time and may yield less than is needed to meet the Company's obligations.

## Tax Risks

***You are urged to consider the United States federal income tax consequences of owning the Notes.***

Pursuant to the terms of the Notes, the Company and each Noteholder will agree to treat the Notes for U.S. federal income tax purposes as contingent payment debt instruments subject to U.S. federal income

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:51    Exhibit Pt 2 Page 1284
1366

tax rules applicable to contingent payment debt instruments. Under that treatment, if you are a U.S. Holder (as defined herein), you may be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by you in that year. You will recognize gain or loss on the sale, repurchase, exchange, conversion or repayment of a Note in an amount equal to the difference between the amount realized and your adjusted tax basis in the Note. Any gain recognized by you on the sale, repurchase, exchange, conversion or repayment of a Note generally will be treated as ordinary interest income and any loss will be treated as ordinary loss to the extent of the interest previously included in income and, thereafter, as capital loss.

***Interest on Notes Could be Characterized as Unrelated Business Taxable Income.***

We intend to take the position that the Notes should be classified as debt instruments for U.S. federal income tax purposes and the stated interest should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("UBTI") with respect to tax exempt Noteholders. However, there is no assurance that the IRS will agree with this position and it is possible that the Notes may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Notes may be characterized as UBTI with respect to tax exempt Noteholders.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

This Memorandum does not address any tax considerations that may be relevant to you. You are urged to consult your own tax advisors as to the specific tax consequences of purchasing, owning and disposing of any Notes, including any federal, state or local tax consideration.

**WE URGE YOU TO CONSULT AND RELY UPON YOUR OWN TAX ADVISOR WITH RESPECT TO YOUR OWN TAX SITUATION, POTENTIAL CHANGES IN APPLICABLE LAWS AND REGULATIONS AND THE FEDERAL AND STATE CONSEQUENCES ARISING FROM AN INVESTMENT IN THE NOTES. THE COST OF THE CONSULTATION COULD, DEPENDING ON THE AMOUNT CHARGED TO YOU, DECREASE ANY RETURN ANTICIPATED ON YOUR INVESTMENT. NOTHING IN THIS MEMORANDUM IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY SPECIFIC INVESTOR, AS INDIVIDUAL CIRCUMSTANCES MAY VARY. YOU SHOULD BE AWARE THAT THE INTERNAL REVENUE SERVICE MAY NOT AGREE WITH ALL TAX POSITIONS TAKEN BY US AND THAT LEGISLATIVE, ADMINISTRATIVE OR COURT DECISIONS MAY REDUCE OR ELIMINATE ANY ANTICIPATED TAX BENEFITS OF AN INVESTMENT IN THE NOTES.**

***

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:16     Exhibit Pt 2 Page 1285
1366

**EXHIBIT A**

**SUBSCRIPTION AGREEMENT**

**(Attached)**

497269.v19



**iCap Pacific Income Fund 5, LLC**

---

**SUBSCRIPTION AGREEMENT FOR ACCREDITED INVESTORS**

---

Investor's Name

Representative's Name

Broker-Dealer Affiliation

### 1. Subscription Amount

$ _____

### 2. Payment Method

Investor's payment of the Principal Balance must be in <u>one</u> of the following methods (select one):

☐ **Wire Transfer**: by wiring payment of the Principal Balance to the account set forth below:

| | |
|---|---|
| Account Name: | iCap Pacific Income Fund 5, LLC |
| ABA Routing Number: | 063116083 |
| Account Number: | 2000086468 |
| Bank Name: | Seaside Bank |
| Bank Address: | 201 S. Orange Ave., Suite 1350, Orlando, FL 32801 |

☐ **Check**: by mailing a check made payable to "iCap Pacific Income Fund 5, LLC" to the processing dealer at:

Cobalt Capital, Inc.
600 Wilkinson Street, Suite 300
Orlando, FL 32803
Phone: 407.649.3150
Fax: 321.400.1359

☐ **Vault Account**:  By checking this box you acknowledge and agree that (1) you currently have funds in a Vault account with iCap Vault 1, LLC (the "Vault"), an Affiliate of the Company, and (2) you do hereby direct the Company to provide notice to iCap Vault 1, LLC on your behalf to withdraw your investment in the Vault, in the amount set forth above, and to send those funds to the Company for the purchase of a Note.

☐ **Other**:  _____

### 3.  Delivery of Documents

☐ **Completed Electronically (either through Docusign or emailed to investor@icapequity.com)**: no need to mail documents.

☐ **Completed in Paper Form**:  please mail all documents to the processing dealer at "Cobalt Capital, Inc., 600 Wilkinson Street, Suite 300, Orlando, FL 328036."  If paying by check, then please include the check with the documents.

*Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

The undersigned "Subscriber", on the terms and conditions herein set forth, hereby irrevocably submits this subscription agreement (the "Subscription Agreement") to iCap Pacific Income Fund 5, LLC, a Delaware limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise working capital of up to $50,000,000, with an over-allotment amount of an additional $25,000,000, through the sale to Subscriber as an accredited investor of a Secured Promissory Note of the Company (the "Note").

1.   **Subscription for the Purchase of Notes.**

The undersigned, intending to be legally bound, hereby subscribes for the amount set forth on the Investment Summary page below (the "Principal Balance"). The undersigned acknowledges that the Company is offering the Notes to those who are "accredited investors" as defined herein, pursuant to the terms and provisions of the Offering documented in the Confidential Private Placement Memorandum dated September 5, 2019 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. In this regard, Investor agrees to forward payment in the amount of the Principal Balance indicated on the Investment Summary form below.  The Company's private offering of Notes is being made to "accredited" investors within the meaning of Rule 506(b) of Regulation D promulgated by the Securities Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act").  By signing this Subscription Agreement, Subscriber acknowledges receipt of the Memorandum and its Exhibits, including the Note, the Pledge and Security Agreement, Collateral Agent Agreement and the Guaranty (collectively the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents.

The undersigned agrees to execute this Subscription Agreement and if by mail, send to the Company.  You as an individual or you on behalf of the subscribing entity are being asked to complete this Subscription Agreement so that a determination can be made as to whether or not you (it) are qualified to purchase the Note under applicable federal and state securities laws. Your answers to the questions contained herein must be true and correct in all respects, and a false representation by you may constitute a violation of law for which a claim for damages may be made against you. Your answers will be kept strictly confidential; however, by signing this Subscription Agreement, you will be authorizing the Company to present a completed copy of this Subscription Agreement to such parties as they may deem appropriate in order to make certain that the offer and sale of the securities will not result in a violation of the Securities Act or of the securities laws of any state.  All questions must be answered. If the appropriate answer is "None" or "Not Applicable," please state so. Please print or type your answers to all questions and attach additional sheets if necessary to complete your answers to any item. Please initial any corrections.

2.   **Offer to Purchase.**  Subscriber hereby irrevocably offers to purchase the Note and tenders herewith the total price noted above. Subscriber recognizes and agrees that (i) this subscription is irrevocable and, if Subscriber is a natural person, shall survive Subscriber's death, disability or other incapacity, and (ii) the Company has complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement.  This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

3.   **Effect of Acceptance.** Subscriber hereby acknowledges and agrees that on the Company's acceptance of this Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Subscriber.  As a result, upon acceptance by the Company of this Subscription Agreement, Subscriber will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note as specified herein.

4.   **Representation as to Investor Status.**  Investor agrees to complete all applicable portions of the Investor Representations page at the end of this Agreement.

5.   **Additional Representations and Warranties of Subscriber.**  Subscriber hereby represents and warrants to the Company as follows:

**(a)** Subscriber has been furnished the Memorandum and, if requested by the Subscriber, other documents. The Subscriber has carefully read the Memorandum and any such other requested documents. Subscriber has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Subscriber requested and deemed material to making an informed investment decision regarding its purchase of the Note. Subscriber has been afforded the opportunity to review such documents and materials and the information contained therein. Subscriber has been afforded the opportunity to ask questions of the Company and its management. Subscriber understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Subscriber understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Subscriber has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Subscriber shall modify, amend or affect such Subscriber's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Subscriber has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

**(b)** Subscriber has read and understood, and is familiar with, this Subscription Agreement, the Note and the business and financial affairs of the Company.

**(c)** Subscriber, either personally, or together with its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum. The Subscriber and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Note. Subscriber's financial condition is such that Subscriber is able to bear the risk of holding the Note that Subscriber may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Subscriber's entire investment in the Notes.

**(d)** Subscriber has investigated the acquisition of the Note to the extent Subscriber deemed necessary or desirable and the Company has provided Subscriber with any reasonable assistance Subscriber has requested in connection therewith.

**(e)** The Note is being acquired for Subscriber's own account for investment, with no intention by Subscriber to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Subscriber in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Subscriber has any interest in or any right to acquire the Note. Subscriber understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Subscriber.

**(f)** No representations or warranties have been made to Subscriber by the Company, or any representative

of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

**(g)** Subscriber is aware that Subscriber's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Subscriber will not offer for sale, sell or otherwise transfer the Note without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

**(h)** Subscriber understands and agrees that the Note it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

**(i)** The Subscriber has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Subscriber understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

**(j)** Subscriber understands that the Note shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such certificates):

"NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT."

**(k)** Subscriber also acknowledges and agrees to the following:

**(i)** an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire investment in the Notes; and

**(ii)** there is no assurance that a public market for the Notes will be available and that, as a result, Subscriber may not be able to liquidate Subscriber's investment in the Note should a need arise to do so.

**(l)** Subscriber is not dependent for liquidity on any of the amounts Subscriber is investing in the Note.

**(m)** Subscriber's address set forth below is his or her correct residence address.

**(n)** Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

**(o)** Subscriber understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

**6. Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The

Subscriber should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations. Subscriber hereby represents and warrants to the Company as follows:

**(a)** The Subscriber represents that (i) no part of the funds used by the Subscriber to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Subscriber and no distribution to the Subscriber shall cause the Company to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Note, and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals [1] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

**(b)** To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations. The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges that the Company may, by written notice to the Subscriber, suspend the redemption rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

**(c)** To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or

---

[1] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a senior foreign political figure[2], or any immediate family[3] member or close associate[4] of a senior foreign political figure, as such terms are defined in the footnotes below.

**(d)** If the Subscriber is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Subscriber represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

**(e)** The Subscriber acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Subscriber agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information, may result in the withholding of amounts with respect to, or other limitations on, distributions made to the Subscriber and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith.

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Subscriber shall give prompt notice of such fact to the Company by telegram, or facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

**7. Indemnification.** Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations and warranties made by Subscriber herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Subscriber hereby agrees to indemnify and hold harmless the Company and each

---

[2] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[3] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[4] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Subscriber contained in this Subscription Agreement.

8. **Transferability.** Subscriber agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

9. **Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Subscriber any money tendered hereunder without interest or deduction.

10. **Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Subscriber at the address set forth below and to the Company at investor@icapequity.com, or (c) at such other place as the Company may designate by written notice to Subscriber.

11. **Amendments.** Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Subscriber and the Company.

12. **Governing Law.** This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

13. **Headings.** The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

14. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

15. **Continuing Obligation of Subscriber to Confirm Investor Status**. Upon the request of the Company and for as long as the Subscriber holds the Note or other securities in the Company, the Subscriber shall confirm Subscriber's investor status as an "Accredited Investor," as defined by the Securities and Exchange Commission at the time of such request. In connection therewith, the Company shall deliver to the Subscriber a questionnaire that elicits the necessary information to determine the Subscriber's investor status. Upon receipt of the questionnaire, the Subscriber shall: (i) complete it, (ii) execute the signature page therein, and (iii) return it to the Company, or its designee, in accordance with the instructions therein, no later than ten (10) days after receipt of the questionnaire.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## INVESTOR REPRESENTATIONS

**(a) Type of Subscriber.** Indicate the form of entity of Subscriber:

☐ Individual ☐ Corporation or Limited Liability Company (LLC)

☐ Husband and Wife ☐ Partnership

☐ Joint Tenants ☐ Irrevocable Trust

☐ IRA ☐ Other Type of Trust (indicate type): _____

☐ Keogh/SEP ☐ Other Retirement Plan

☐ Profit Sharing Plan:_____

☐ Other (indicate form of organization): _____

**(b) Accredited Investor.** In order for the Company to sell the Note (in conformance with state and federal securities laws), the following information must be obtained regarding Subscriber's investor status. Please **initial each item applicable** to you as an investor in the Company.  I am:

**(i)** _____ A natural person whose net worth, either individually or jointly with such person's spouse, at the time of Subscriber's purchase, exceeds $1,000,000.

**(ii)** _____ A natural person who had an individual income in excess of $200,000, or joint income with that person's spouse in excess of $300,000, in each of the two most recent years and reasonably expects to reach the same income level in the current year.  In determining individual "income," Subscriber should add to Subscriber's individual taxable adjusted gross income (exclusive of any spousal income) and amounts attributable to tax exempt income received, losses claimed as a limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

**(iii)** _____ A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

**(iv)** _____ A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

**(v)** _____ An insurance company as defined in section 2(13) of the Exchange Act.

**(vi)** _____ An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act.

**(vii)** _____ A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

**(viii)** _____ A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state, or its political subdivisions for the benefit of its employees, if such

plan has total assets in excess of $5,000,000.

**(ix)** _____ An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

**(x)** _____ A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

**(xi)** _____ An organization described in Section 501(c)(3) of the Internal Revenue Code, or a corporation, business trust or partnership, not formed for the specific purpose of acquiring the Note, with total assets in excess of $5,000,000.

**(xii)** _____ A director or executive officer of the Company.

**(xiii)** _____ A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Note, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of investing in the Company.

**(xiv)** _____ An entity in which all of the equity owners qualify under any of the above subparagraphs.

_____ Subscriber does <u>not</u> qualify under any of the investor categories set forth in Section (b)(i) through Section (b)(xiv).

**(c) Net Worth.** The term "net worth" means the excess of total assets over total liabilities (including personal and real property, but excluding the estimated fair market value of a person's primary home).

## INDIVIDUALS, JOINT ACCOUNTS, OR REVOCABLE LIVING TRUSTS

| | |
|---|---|
| Investor Name(s) | 1 |
| | 2 |
| Registered As | |
| Address of Principal Place of Residence *(please do not use PO Box)* | |

| | | State | | Zip Code | |
|---|---|---|---|---|---|
| City | | | | | |

| Mailing Address (if different from above) | |
|---|---|

| | | | |
|---|---|---|---|
| Home Telephone No. | ( ) | Business Telephone No. | ( ) |
| Cell Phone No. | ( ) | Email Address(es) | |

| Birth Date(s) (required) | 1 | 2 | Occupation(s) | 1 |
|---|---|---|---|---|
| | | | | 2 |

| SSN or TIN[1] | | | 2 |
|---|---|---|---|
| SSN or TIN[2] | | | |

Status, if individual:

☐ U.S. Citizen    ☐ U.S. Resident Alien    ☐ U.S. Citizen Residing Outside of U.S.

*\*Prospective Investors must fill out the Form W-9 attached hereto\**

**IF INVESTING THROUGH AN IRA, KEOGH OR OTHER RETIREMENT OR PROFIT SHARING PLAN, PLEASE COMPLETE THE FOLLOWING (IN ADDITION TO THE INVESTOR INFORMATION ON THE PREVIOUS PAGE):**

| | |
|---|---|
| **Account Name** | |
| **Custodian's EIN** | |
| **Custodian's Address** | |
| **City** | **State** **Zip Code** |

*__Together with this Subscription Agreement, please sign and return a counterpart signature page to the Collateral Agent Agreement, which is attached hereto as Annex 1.__*

<u>ACCEPTANCE</u>

iCap Pacific Income Fund 5, LLC

Date: _____.

By:  iCap Pacific NW Management, LLC
Its:   Manager

By: _____

Name: _____

Title:    Manager

## CORPORATIONS, PARTNERSHIPS, IRREVOCABLE TRUSTS OR OTHER ENTITIES

1.  Name of entity_____

    ☐   Partnership

    ☐   Limited Liability Company

    ☐   Corporation

    ☐   Trust or Pension Plan

    ☐   Other
        _____
             (Specify)

Taxpayer Identification Number: _____

Business Address:_____

State in which organized or incorporated _____

Date of formation or incorporation: _____

2.  Was this partnership, corporation, trust or other entity formed for the specific purpose of purchasing the Note?

    ☐ Yes    ☐ No

    If yes, each person participating in the entity will be required to fill out a Subscription Agreement.

3.  Has this partnership, corporation, trust or other entity made other investments?

    ☐ Yes    ☐ No

If no, each person participating in the entity will be required to fill out a Subscription Agreement.

4.   How many persons own an equity interest in this partnership, corporation, trust or other entity (including the investor)?

_____

EACH EQUITY OWNER (OTHER THAN A SPOUSE OR CHILD OF AN EQUITY OWNER LIVING WITH SUCH EQUITY OWNER) MUST COMPLETE AND SIGN THIS QUESTIONNAIRE.

5.   If a Trust, does the Trust have assets of at least $5,000,000?

☐ Yes    ☐ No    ☐ N/A

If the prospective investor is an EMPLOYEE BENEFIT PLAN within the meaning of Title 1 of the Employee

Retirement Income Security Act of 1974, as amended ("ERISA"), please answer question 12.

6.   (a) If an Employee Benefit Plan, does the Employee Benefit Plan have assets of at least $5,000,000?

☐ Yes    ☐ No    ☐ N/A

(b) Is this investment decision being made or directed by the beneficiaries of the Employee Benefit Plan?

☐ Yes    ☐ No    ☐ N/A

SIGNATURE
S-
**ALL
INVESTORS
MUST SIGN**

THE UNDERSIGNED HAS THE AUTHORITY TO ENTER INTO THIS SUBSCRIPTION AGREEMENT ON BEHALF OF THE PERSON(S) OR ENTITY REGISTERED ABOVE.

Executed on_____   _____

X_____
                    Signature (Investor, or authorized signatory)

X_____
                    Signature (Investor, or authorized signatory)

*Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

*Together with this Subscription Agreement, please sign and return a counterpart signature page to the Collateral Agent Agreement, which is attached hereto as Annex 1.*

ACCEPTANCE
iCap Pacific Income Fund 5, LLC

Date: _____.

By:  iCap Pacific NW Management, LLC
Its:   Manager

By:      _____

Name:  _____

Title:     Manager

**BROKER DEALER/REGISTERED INVESTMENT ADVISOR**

**TO BE COMPLETED BY REGISTERED REPRESENTATIVE**

The Registered Representative of record for this transaction and a Registered Principal authorized by the Broker/Dealer or Registered Investment Advisor to review and approve such securities transactions must sign and date below. The Registered Principal warrants that the Broker/Dealer (or Registered Investment Advisor) is a duly licensed Broker/Dealer (or Registered Investment Advisor) and may lawfully offer the Notes in the state designated as the investor's address of residence. The Registered Representative and the Registered Principal represent that they have reasonable grounds to believe this investment is suitable for the investor and that the investor has been provided full information regarding the risks of this investment including liquidity and marketability.

| B-D/RIA Name | | Telephone No. | ( ) |
|---|---|---|---|

| B-D/RIA Street Address or P.O. Box | |
|---|---|

| City | | State | | Zip Code | |
|---|---|---|---|---|---|

| Registered Representative Name | | Telephone No. | ( ) |
|---|---|---|---|
| Email Address: | | | |

| Reg. Rep. Street Address or P.O. Box | |
|---|---|

| City | | State | | Zip code | |
|---|---|---|---|---|---|

☐ **Registered Representative: please check this box to verify that you have personally seen and recorded a government issued identification document from the Investor.**

| | |
|---|---|
| Registered Representative's Signature & Date | Registered Principal's Approval Signature & Date |



**Payment Remittance Information:**

Please complete the following authorization:

I would like my payment remittance to be sent to me in the following way:

☐     **ACH Authorization (Direct Deposit):**

I hereby authorize **iCap Pacific Income Fund 5, LLC** ("the Company") to initiate credit entries to the bank account(s) listed below. I further authorize the financial institution(s) named below to credit such account(s).

| Name of Financial Institution | Checking or Savings | Bank Routing Number | Bank Account Number | % or Amount of Deposit |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

For iCap to verify bank account and routing numbers, investors are encouraged to attach a **VOIDED CHECK** for each investor account to be credited. Investors should retain completed copies of this form for their records.

☐     Check:

I hereby authorize **iCap Pacific Income Fund 5, LLC** ("the Company") to mail my payment remittance to the following:

Name: _____

Institution (if applicable): _____

Account Number (if applicable): _____

Address: _____

_____

I understand that this authorization remains in effect until the Company receives from me, in writing, notification to terminate/change the authorization in such a time and manner as to afford the Company a reasonable time to act on it.

_____

Account Holder Signature                         Date

_____

Account Holder Signature                         Date

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer
## Identification Number and Certification

► Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC
☐ C Corporation
☐ S Corporation
☐ Partnership
☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ► _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ►

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.

Requester's name and address (optional)

6 City, state, and ZIP code

7 List account number(s) here (optional)

**Print or type.**
**See Specific Instructions on page 3.**

---

### Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

☐☐☐ – ☐☐ – ☐☐☐☐

or

**Employer identification number**

☐☐ – ☐☐☐☐☐☐☐

---

### Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**

Signature of U.S. person ►

Date ►

---

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding*, later.

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

**Annex 1**

Counterparty Signature Page to Collateral Agent Agreement

By execution hereof, the undersigned Holder hereby joins in and becomes a Holder under that certain Collateral Agent Agreement dated as of September 5, 2019, by and between iCap Pacific Income Fund 5, LLC, a Delaware limited liability company ("Company"), the holders of the Notes (as defined in such therein) and MarketPlace Realty Advisors, LLC in its capacity as collateral agent (in such capacity "Agent") (the "Collateral Agent Agreement").

The undersigned Holder has received and read a copy of the Collateral Agent Agreement and understands its provisions. Holder hereby adopts and agrees to be bound by all of the provisions of the Collateral Agent Agreement and all of the provisions of the Collateral Agent Agreement are hereby incorporated herein.

IN WITNESS WHEREOF, the Parties hereto have caused this Counterpart Signature Page to Collateral Agent Agreement to be executed as of the date set forth below.

Holder Name: _____

Signature _____
Title: _____
*(if applicable)*

Date: _____


Agreed and accepted:

iCap Pacific Income Fund 5, LLC

By: iCap Pacific NW Management, LLC
Its: Manager

By: _____
Name: _____
Title: _____

**EXHIBIT B**

**FORM OF PROMISSORY NOTE**

**(Attached)**

**NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.**

**Principal Amount: $_____**          **Issue Date: _____**

                                                        **Account Number: _____**

### SECURED PROMISSORY NOTE

FOR VALUE RECEIVED, iCap Pacific Income Fund 5, LLC, a Delaware limited liability company (the "Company"), hereby promises to pay to the order of _____, or registered assigns (the "Holder"), in the form of lawful money of the United States of America by the fifth (5th) anniversary of the Issue Date (as defined below) (the "Maturity Date"), the amount first set forth above ("Principal Amount"), and to pay interest on the unpaid Principal Amount hereof at the rate of *[nine percent (9%) per annum, simple interest, non-compounding][10% per annum for the first year from the Issue Date and 9% per annum thereafter]* (the "Interest Rate"), from the Issue Date until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise, pursuant to the terms of this Secured Promissory Note (this "Note"). The "Issue Date" is defined as the date on which the Subscription Agreement and all related documents are executed in full, and the Principal Amount is made available to the Company as determined by the Company's financial institution; provided, however, that if this Note is signed by Company, and the entire Principal Amount is not made available to the Company within 21 days of the date first set forth above, then this Note, the Subscription Agreement, and all related documents shall be automatically terminated, cancelled, or rescinded and of no effect. This Note is one of a Series of Secured Promissory notes being issued by the Company up to a total principal amount of $50,000,000, with an over-allotment amount of an additional $25,000,000 (collectively, the "Notes"). This Note is issued to Holder pursuant to a Subscription Agreement dated as of _____, 20\_\_\_ (the "Subscription Agreement") by and between the Company and Holder and is subject to the terms and conditions thereof.

1. <u>Payments</u>.

    (a) This Note is a balloon note and although interest will be paid monthly as set forth below, there are no scheduled payments of the Principal Amount prior to the Maturity Date except as otherwise set forth herein. Unless otherwise paid, the outstanding Principal Amount and all unpaid Interest shall be paid on the Maturity Date. The Company may prepay all or any portion of the Principal Amount and unpaid Interest prior to the Maturity Date without penalty.

    (b) At any time following the first anniversary of the Issue Date, Holder may require the Company to repay all or a portion of the Principal Amount and all unpaid Interest then due and payable (a "Demand Repayment"). Any Demand Repayment may be made through the Company's investor portal accessible at www.icapequity.com, an electronic application as provided by the Company to Holder, or by delivery to the Company of a demand notice in the form as attached hereto as Exhibit A (each as so delivered, a "Demand Notice"). Upon receipt of a Demand Notice, the Company will pay the requested amount in four equal installments due within 15-days of the beginning of each calendar quarter (the "Demand Payment"). The first payment will be made in the next calendar quarter that follows delivery of proper

notice, provided 45-days' notice is provided to the Company. Notwithstanding the foregoing, the Company's demand payment obligation is subject to a limit of 5% of the combined notes of the Company requested per year. If more than 5% of the combined notes provide Demand Notice within a given year, then the Notes of Investors who provide subsequent Demand Notice will be paid in the order received after the combined total, including the subsequent Note, has been reduced to less than 5%. All repayments pursuant to this Section 1(b) shall be applied first to accrued and unpaid Interest and thereafter to the Principal Amount. Notwithstanding the foregoing, Demand Repayments will be subject to the following reductions in the requested repayment amounts:

(i) For Demand Repayments received by the Company prior to the second anniversary of the Issue Date, the repayment amount will be subject to a 10% reduction, such that 90% of the repayment amount in the Demand Repayment shall be repaid and the remaining 10% of the repayment amount in the Demand Repayment shall be deemed forgiven and satisfied in full.

(ii) For Demand Repayments received by the Company after the second anniversary of the Issue Date but prior to the third anniversary of the Issue Date, the repayment amount will be subject to a 7.5% reduction, such that 92.5% of the repayment amount in the Demand Repayment shall be repaid and the remaining 7.5% of the repayment amount in the Demand Repayment shall be deemed forgiven and satisfied in full.

(iii) For Demand Repayments received by the Company after the third anniversary of the Issue Date but prior to the fourth anniversary of the Issue Date, the repayment amount will be subject to a 5% reduction, such that 95% of the repayment amount in the Demand Repayment shall be repaid and the remaining 5% of the repayment amount in the Demand Repayment shall be deemed forgiven and satisfied in full.

(iv) For Demand Repayments received by the Company after the fourth anniversary of the Issue Date but prior to the fifth anniversary of the Issue Date, the repayment amount will be subject to a 2.5% reduction, such that 97.5% of the repayment amount in the Demand Repayment shall be repaid and the remaining 2.5% of the repayment amount in the Demand Repayment shall be deemed forgiven and satisfied in full.

(c) Unless otherwise agreed between Company and Holder, all accrued monthly interest payments will be paid to the Holder on or before the 15th of each month following the Issue Date.

(d) The Company may not, and shall not, incur additional indebtedness for the sole purpose of making any Demand Repayments hereunder.

2. <u>Security and Guaranty; Exchange.</u>

(a) Payment of this Note and the Interest and Principal Amount hereunder shall be secured by a pledge of the equity securities of any direct wholly owned subsidiaries held by iCap Holding 5, LLC a wholly owned subsidiary of the Company ("iCap Holding"), pursuant to a Pledge and Security Agreement entered into on September 5, 2019 by and between MarketPlace Realty Advisors, LLC in its capacity as collateral agent for the holders of the Notes (in such capacity "Agent"), the Company and iCap Holding (the "Security Agreement") provided that such security interest may be junior to any financing in place related to the real estate holdings of such subsidiaries; and payment of this Note and the Interest and Principal Amount hereunder shall be guaranteed by iCap Holding pursuant to the Guaranty Agreement entered into on September 5, 2019 by iCap Holding for the benefit of the holders of the Notes pursuant to which iCap Holding 5, LLC guaranteed the obligations of the Company hereunder (the "Guaranty Agreement. This Note, the Subscription Agreement pursuant to which Holder acquired this Note, the Pledge and Security Agreement, Collateral Agent Agreement and the Guaranty Agreement may be

497269.v19
23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:51    Exhibit Pt. 2 Page 1308

referred to collectively as the "Transaction Documents."

(b) This Note will be subordinate at times to the rights of any lender of the Company or its subsidiaries, as well as to other higher-ranking obligations of the Company, including property taxes and management fees, as further set forth in the Security Agreement.

3. <u>Application of Payments</u>. Unless otherwise expressly provided in this Note, all payments made on this Note shall be applied, (i) first to the payment of the Interest and other charges then accrued and due on the unpaid Principal Amount of this Note; and then (ii) the remainder of all such payments shall be applied to the reduction of the unpaid Principal Amount.

4. <u>Events of Default</u>.

(a) <u>Definition</u>. Subject to the provisions of Section 4(c), for the purpose of the Transaction Documents, an event of default ("Event of Default") will be deemed to have occurred if, and at the time, holders holding a majority of the principal amount of the Notes then outstanding (a "Majority-in-Interest of the Noteholders") elect to declare such an Event of Default, which a Majority-in-Interest of the Noteholders may only do in the event that any of the following occur, and after the Company has not rectified such event within 90 days of receipt of notice thereof signed by a Majority-in-Interest of the Noteholders:

(i) The Company fails to make a Demand Payment when due pursuant to Section 1(b);

(ii) the Company fails to perform any of its material obligations under this Note, or being in breach in any material respect of any representation, warranty, covenant or agreement on the part of the Company set forth in this Note;

(iii) the Company commences any liquidation or dissolution proceedings or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consents to the filing of any bankruptcy petition against it under any similar law; or

(iv) the Company fails to pay all amounts due under the Notes on the Maturity Date.

(b) <u>Consequences of Events of Default</u>. If, and at the time, an Event of Default occurs, then, as of the date that the Event of Default is declared as required hereunder, the Interest Rate relating to the Note(s) to which the Event of Default relates shall be increased to fifteen percent (15%) per annum (the "Default Rate"), which Default Rate shall remain in place until this Note is either paid as due or such Event of Default is cured. If an Event of Default as set forth in Section 1(a)(i), Section 1(a)(ii), or Section 1(a)(iv) occurs, a Majority-in-Interest of the Noteholders will have the right to declare only the applicable Note(s) which are subject to the Event of Default due and payable, which determination will be delivered to the Agent pursuant to the Collateral Agent Agreement and will be forwarded to the Company as set forth herein. If an Event of Default as set forth in Section 1(a)(iii) occurs, a Majority-in-Interest of the Noteholders will have the right to declare all of the Notes due and payable and, if the Security Agreement and Guaranty Agreement are still in effect as of such time, a Majority-in-Interest of the Noteholders shall have the right to direct the Collateral Agent to proceed to enforce the security granted to the noteholders pursuant to the Pledge and Security Agreement and to enforce the Guaranty Agreement.

(c) <u>Power to Vote</u>. Notwithstanding Section 4(a), Holder shall not be entitled to vote for or against the declaration of an "Event of Default" unless, as of the time of such vote, the applicable Event of Default has occurred and is continuing under this Note, provided, however, that the Principal Amount hereunder shall continue to be counted for purposes of determining the aggregate principal amount of Notes then outstanding for purposes of determining whether holders of a sufficient aggregate principal amount of Notes have elected to declare an "Event of Default."

(d) Notwithstanding Section 4(a), Section 4(b) and Section 4(c), in the event that any of the events set forth in Section 4(a) occurs with respect to this particular Note which could result in an Event of Default occurring following the completion of the actions set forth in provisions of Section 4(b) and Section 4(c), but an Event of Default is not declared or is not declarable due to the provisions of Section 4(b) and Section 4(c) within 90 days of the occurrence of such event, the Holder hereunder may send a notice of such event to the Company. In the event that the Company has not rectified such event within an additional 90 days of receipt of notice thereof signed by the Holder hereof, it shall be an "Individual Note Default" hereunder. In the event of an Individual Note Default, the Default Rate shall apply to this particular Note, subject to the terms and conditions above, this Note shall be immediately due and payable, and the Holder hereunder shall be permitted to bring a claim for payment under this particular Note against the Company as a result of such Individual Note Default, notwithstanding the fact that the Holder shall not have any rights pursuant to the Security Agreement and the Guaranty Agreement due to the fact that an Event of Default has not been declared.

5. <u>Cancellation</u>. After all obligations for the payment of money arising under this Note have been paid in full this Note will be surrendered to the Company for cancellation.

6. <u>Failure or Indulgence Not Waiver.</u> No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies of the Holder existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

7. <u>Notices.</u> All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, if sent from the Holder shall be sent to the Agent as set forth in the Collateral Agent Agreement, who shall thereafter forward such notices to the Company, and if sent by the Company shall either be sent directly to the Holder to the addresses as set forth in the Collateral Agent Agreement or to the Agent who shall thereafter forward such notices to the Holder, and, in the case of notices sent to the Holder, shall be subject to the provisions of Section 9.

8. <u>Amendments.</u> This Note may be amended at any time by the written consent of the Holder and Company, subject to the provisions of Section 9.

9. <u>Deemed Consent.</u>

(a) Each request for consent, approval or waiver under this Note, for an amendment hereof of other matter, which is sent by the Company, shall be made in writing to the Agent on behalf of the Holders, and which the Agent shall forward to the Holders, and shall include all information necessary for Holder to make an informed decision as to whether to agree to such consent, approval, waiver or amendment, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN SECURED PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND iCap Pacific Income Fund 5, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

(b) If the Holder does not approve or reject the proposed matter within ten (10) days of receipt of such notice and all necessary information, via delivery of the same to the Agent within such time period, for further distribution to the Company, the Company may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A SECOND AND FINAL REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN SECURED PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND iCap Pacific Income Fund 5, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED

HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT.

(c) If the Holder does not approve or reject the proposed or requested consent, approval, waiver or amendment or other matter within ten (10) days of receipt of such second and final notice, via delivery of the same to the Agent within such time period, for further distribution to the Company, Holder shall be deemed to have approved, in writing, the proposed consent, approval, waiver or amendment or other matter as set forth in the notice, and the Company may effect the actions set forth therein in reliance on such consent.

10. <u>Assignability.</u> This Note shall be binding upon the Company and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns. Each transferee of this Note must be an "Accredited Investor" (as defined in the Subscription Agreement) and any transfer is subject to the terms and conditions thereof.

11. <u>Governing Law; Venue; Attorney's Fees.</u> This Note shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS NOTE, THE OTHER TRANSACTION DOCUMENTS OR THE CONTEMPLATED TRANSACTIONS SHALL BE INSTITUTED SOLELY IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF WASHINGTON, IN EACH CASE LOCATED IN KING COUNTY, WASHINGTON, AND EACH PARTY IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. **THE COMPANY AND THE HOLDER EACH HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Note or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.  The prevailing party in any action or dispute brought in connection with this Note or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorneys' fees and costs.

12. <u>Other Agreements.</u> The Company, the Agent and the Holder shall be bound by the applicable terms of the Subscription Agreement, and, for such time as they are in effect, the Security Agreement and the Guaranty Agreement. The Subscription Agreement, the Security Agreement, the Guaranty Agreement, the Collateral Agent Agreement and this Note constitute the sole and entire agreement of the Company, the Agent and the Holder with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

13. <u>Remedies.</u> The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, except as expressly set forth herein or in the Transaction Documents the Company acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without

497269.v19

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:20   Exhibit Pt. 21 Page 1311
1366

any bond or other security being required. If default is made in the payment of this Note, the Company shall pay the Holder costs of collection, including reasonable attorneys' fees.

14. <u>Construction; Headings</u>.  This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof.  The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

15. <u>Usury</u>.  To the extent it may lawfully do so, the Company hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any action or proceeding that may be brought by the Holder in order to enforce any right or remedy under this Note.  Notwithstanding any provision to the contrary contained in this Note, it is expressly agreed and provided that the total liability of the Company under this Note for payments which under Delaware law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums which under Delaware law in the nature of interest that the Company may be obligated to pay under this Note exceed such Maximum Rate.  It is agreed that if the maximum contract rate of interest allowed by Delaware law and applicable to this Note is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to this Note from the effective date thereof forward, unless such application is precluded by applicable law.  If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to the Holder with respect to indebtedness evidenced by this the Note, such excess shall be applied by the Holder to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at the Holder's election.

16. <u>Severability.</u>  In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law (including any judicial ruling), then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Company has executed and delivered this Note on the Issue Date.

iCap Pacific Income Fund 5, LLC

By: iCap Pacific NW Management, LLC

Its: Manager

By: _____

Name: _____

Title: _____

Exhibit A

Demand Repayment Notice

This is a Demand Notice pursuant to that certain Secured Promissory Note of iCap Pacific Income Fund 5, LLC, a Delaware limited liability company (the "Company"), issued to the undersigned ("Holder") on _____, 20___ in the original Principal Balance of $_____ (the "Note"). Defined terms used herein shall have the meaning given to them in the Note. Pursuant to the provisions of the Note, Holder hereby demands prepayment of the following amount:

**Amount (Select One)**

☐ Full repayment of all Principal Balance and all unpaid Interest (subject to discounts as set forth in the Note); OR

☐ Repayment of the following amount:  $_____

**Payment Method (Select One)**

☐ Via ACH transfer to:
  Account Name: _____
  ABA Routing Number: _____
  Account Number: _____
  Bank Name: _____

  SWIFT CODE: _____

☐ Via Check to the address of Holder as set forth in the Subscription Agreement.

Name of Holder: _____

Signature: _____

Title: _____

Date: _____

497269.v19

<u>**EXHIBIT C**</u>

**PLEDGE AND SECURITY AGREEMENT**

**(Attached)**

497269.v19

# PLEDGE AND SECURITY AGREEMENT

This Pledge and Security Agreement (this "Agreement"), dated as of September 5, 2019 (the "Effective Date"), is entered into by and between iCap Pacific Income Fund 5, LLC, a Delaware limited liability company (the "Company"), iCap Holding 5, LLC, a Delaware limited liability company and a wholly owned subsidiary of the Company ("iCap Holding") and MarketPlace Realty Advisors, LLC in its capacity as collateral agent (in such capacity "Agent") for the benefit of the holders of promissory notes issued by the Company pursuant to an offering of up to $50,000,000 of promissory notes, with an over-allotment amount of an additional $25,000,000, of the Company (the "Notes") pursuant to Regulation D promulgated under the Securities Act of 1933, as amended, commencing on or about September 5, 2019 (each a "Holder" and collectively the "Holders"), who execute a counterpart signature page to the Collateral Agent Agreement, dated as of the Effective Date, between the Company, the Agent and the Holders for the benefit of the Holders (the "Collateral Agent Agreement"). Each of the Company, iCap Holding and each Holder may be referred to herein as a "Party" and collectively as the "Parties." Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, iCap Holding is or shall be a member or shareholder of certain subsidiaries of iCap Holding which shall hold real estate investment properties, the interests in which will be acquired with the proceeds of the Notes and the proceeds from which will be used to pay amounts due to the Holders pursuant to the Notes (the "Portfolio SPEs"), holding all of the Class A membership interests or shares of capital stock of such Portfolio SPEs (the "Pledged Interests"); and

WHEREAS, iCap Holding has agreed to execute and deliver this Agreement pursuant to the terms of the Notes;

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1. PLEDGE.   To secure the prompt payment and full and faithful performance of the obligations of the Company to the Holders pursuant to the Notes, whether direct, contingent, fixed or otherwise, now or hereafter from time to time arising pursuant to the Notes (collectively, the "Indebtedness"), iCap Holding hereby grants a security interest in and to, does hereby pledge and assign to, Holders, under Articles 8 and 9 of the UCC (as defined below), all its right, title, share and interest in, to and in respect of (i) the Pledged Interests; (ii) together with only so much of any distribution, whether of cash or in kind, in connection with, relating to or in respect of the applicable Pledged Interests, whether any such distribution or payment is a distribution, is in partial or complete liquidation, or is the result of reclassification, readjustment or other changes in the capital structure of the entity issuing the same, or otherwise, and any and all subscriptions, warrants, options and other rights issued upon and/or in connection therewith; (iii) any and all substitutions, renewals, improvements and replacements of the Pledged Interests and additions thereto; and (iv) all proceeds arising from any of the foregoing.  All of the foregoing items are referred to herein individually and/or collectively as the "Collateral." Capitalized terms not otherwise defined herein or in the Notes shall have the meaning given them in the UCC. For purposes of this Agreement, "UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Delaware; provided, however, in the event that, by reason of mandatory  provisions of law, any or all of the attachment, perfection or priority of Holders' security interest in the Pledged Interests is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

2. VOTING AND TRADING RIGHTS. If no Event of Default has occurred and is continuing, iCap

Exhibit C – Page 1

Holding may exercise any voting rights that iCap Holding may have as to the Pledged Interests. If an Event of Default has occurred and is continuing, iCap Holding shall deliver the Pledged Interests to such party as directed by the Agent on the direction of a Majority-in-Interest of the Noteholders pursuant to the Collateral Agent Agreement (the "Designated Party"), and thereafter Holders may exercise all voting rights as to any of the Pledged Interests and iCap Holding shall deliver to the Designated Party all notices, proxies and other information relating to the exercise of such rights received by iCap Holding promptly upon receipt and, at the request of Designated Party, shall execute and deliver to the Designated Party any proxies or other instruments which are, in the judgment of the Designated Party, necessary for Holders to exercise such voting rights, and a Majority-in-Interest of the Noteholders may direct the Agent to exercise the rights and pursue the remedies provided under Articles 8 and 9 of the Uniform Commercial Code.

3. DUTY OF PLEDGEE. Agent, on behalf of the Holders, shall have no liability or duty, either before or after the occurrence of an Event of Default, to collect or enforce any of its rights against, the Pledged Interests. If the Agent or the Holders actually receive any notices requiring action with respect to Pledged Interests in Holders' possession, Holders shall take reasonable steps to forward such notices to iCap Holding. Except as provided herein, iCap Holding is responsible for responding to notices concerning the Pledged Interests, voting the Pledged Interests, and exercising any rights and options, calls or conversions in respect of the Pledged Interests.

4. REPRESENTATIONS AND WARRANTIES. iCap Holding represents and warrants to the Holders that:

(a) The Pledged Interests do, or shall, constitute all of iCap Holding's ownership interest in the Portfolio SPEs.

(b) iCap Holding is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate any provision of iCap Holding's organizational documents. iCap Holding has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Agreement.

(c) The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which iCap Holding is a party or to which any of its assets, properties or operations are subject.

(d) This Agreement and all agreements and other documents executed by iCap Holding in connection herewith constitute the valid and binding obligation of iCap Holding, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

(e) No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Agreement, the pledge of a security interest in the Pledged Interests in favor of Holders or the valid and lawful exercise by Holders of remedies available to them under this Agreement or applicable law or of the voting

Exhibit C – Page 2

and other rights granted to it in this Agreement, except as may be required for the offer or sale of securities under applicable securities laws.

(f) iCap Holding is the sole owner of the Pledged Interests, has the right to grant the security interest provided for herein to Holders and, to the knowledge of iCap Holding, has granted to Holders a valid and perfected first priority security interest in the Pledged Interests, free of all liens, encumbrances, transfer restrictions and adverse claims.

5. COVENANTS. iCap Holding covenants and agrees that so long as this Agreement shall be in effect:

(a) Provided that an Event of Default does not exist and is continuing, then the Company, iCap Holding and the Portfolio SPEs may make distributions to their respective members as they determine, subject to any limitations thereon as set forth in the limited liability company agreement of the Company. At any time that an Event of Default exists and is continuing, none of the Company, iCap Holding or the Portfolio SPEs shall make any distributions to their members, other than tax distributions (i.e., distributions in the amount of taxes payable by such members on the apportioned income of the entities) or as otherwise required by law. Distributions as referenced herein does not include Management Fees, origination fees, or other fees owed to affiliates of iCap Holding.  The Company may cause the real estate owned by the Portfolio SPEs to be sold, encumbered, transferred, pledged, liened, or otherwise disposed of as it sees fit.

(b) iCap Holding shall defend iCap Holding's title to the Pledged Interests and the security interest of Holders against the claims of any person claiming rights in the Pledged Interests.

(c) Without the prior written consent of a Majority-in-Interest of the Noteholders, delivered to the Agent pursuant to the Collateral Agent Agreement, (i) iCap Holding shall not sell, gift, pledge, exchange or otherwise transfer the Pledged Interests.  In the event of any such sale, exchange or transfer consented to by Holders, iCap Holding shall upon receipt the proceeds of such sale, exchange or transfer to pay any such distribution with respect to the Pledged Interests to the Agent for further distribution to the Holders for application to the Indebtedness.

(d) iCap Holding will pay and discharge when due all of its material obligations and liabilities (including, without limitation, tax liabilities) which if unpaid when due might by law give rise to a lien on the Pledged Interests, except where the same may be contested in good faith by appropriate proceedings.

(e) At iCap Holding's expense, do such further facts and execute and deliver such additional conveyances, certificates, instruments, legal opinions and other assurances as a Majority-in-Interest of the Noteholders may direct the Agent to reasonably request to protect, assure or enforce the interests, rights and remedies of the Holders under this Agreement.

(f) Without the prior approval of Majority-in-Interest of the Noteholders, delivered to the Agent pursuant to the Collateral Agent Agreement, none of the Company, iCap Holding nor any of their subsidiaries shall (i) incur any leverage or borrowings on the their respective assets in excess of 25% of the total principal amount of Notes then issued and outstanding, or (ii) issue any promissory notes which are senior to the Notes if the principal amount of such senior promissory notes exceed 25% of the total principal amount of Notes then issued and outstanding.

6. INDEMNIFICATION. Each Party shall indemnify and hold harmless the other Parties and such other Parties' agents, beneficiaries, affiliates, representatives and their respective successors and assigns

(collectively, the "Indemnified Persons") from and against any and all damages, losses, liabilities, taxes and costs and expenses (including, without limitation, attorneys' fees and costs) resulting directly or indirectly from (a) any inaccuracy, misrepresentation, breach of warranty or nonfulfillment of any of the representations and warranties of such Party in this Agreement, or any actions, omissions or statements of fact inconsistent with in any material respect any such representation or warranty, (b) any failure by such Party to perform or comply with any agreement, covenant or obligation in this Agreement.

7. TERMINATION. This Agreement shall automatically terminate and be of no further force or effect, and any security interest in the Pledged Interests shall automatically terminate and be released, as of the full payment of the Notes.

8. EXPENSES. iCap Holding agrees that, following an Event of Default, iCap Holding will pay to the Agent, on behalf of and for further distribution to, the Holders upon demand the amount of any out-of-pocket expenses, including the fees and disbursements of counsel, that Holders incur in connection with the enforcement of this Agreement, including expenses incurred to preserve the value of the Pledged Interests, the sale or other disposition of any of the Pledged Interests, the exercise by Holders of any of its rights, or any action to enforce its rights under this Agreement.

9. NOTICES. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, if to a Holder shall either be sent to the Agent pursuant to the Collateral Agent Agreement, who shall thereafter forward such notices to the Holder to the addresses as set forth in the Collateral Agent Agreement, or sent directly to the Holder by iCap Holding or the Company to the addresses set forth in the Collateral Agent Agreement, and if to Company or iCap Holding shall be sent to the Collateral Agent, who shall thereafter forward such notices to the intended party.  In the case of notices sent to a Holder, such notices shall be subject to the provisions of Section 11.

10. AMENDMENTS. This Agreement may be amended at any time by the written consent of the Company, iCap Holding and the Agent following receipt by the Agent of the consent of a Majority-in-Interest of the Noteholders, subject to the provisions of Section 11.

11. DEEMED CONSENT.

(a) Each request for consent, approval or waiver under this Agreement, for an amendment hereof or other matter, which is sent by the Company or iCap Holding to the Agent on behalf of the Holders, and which the Agent shall forward to the Holders, shall be made in writing and shall include all information necessary for Holder to make an informed decision as to whether to agree to such consent or approval, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN PLEDGE AND SECURITY AGREEMENT BETWEEN iCap Pacific Income Fund 5, LLC, iCap Holding 5, LLC and MarketPlace Realty Advisors, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

(b) If a Holder does not approve or reject the proposed or requested consent, approval, waiver or amendment within ten (10) days of receipt of such notice and all necessary information, via delivery of the same to the Agent within such time period, for further distribution to the Company, the Company or iCap Holding, as applicable, may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A SECOND AND FINAL REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN PLEDGE AND SECURITY AGREEMENT BETWEEN iCap Pacific Income Fund 5, LLC, iCap Holding 5, LLC and MarketPlace Realty Advisors, LLC, OR AN AMENDMENT

Exhibit C – Page 4

THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT.

(c) If a Holder does not approve or reject the proposed or requested consent, approval, waiver or amendment, or other matter, within ten (10) days of receipt of such second and final notice, via delivery of the same to the Agent within such time period, for further distribution to the Company, such Holder shall be deemed to have approved, in writing, the proposed or requested consent, approval, waiver or amendment, or other matter as set forth in the notice, and the Company, iCap Holding and the Agent may effect the actions set forth therein in reliance on such consent.

12. GOVERNING LAW; VENUE; ATTORNEY'S FEES. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE CONTEMPLATED TRANSACTIONS SHALL BE INSTITUTED SOLELY IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF WASHINGTON, IN EACH CASE LOCATED IN KING COUNTY, WASHINGTON, AND EACH PARTY IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. **THE PARTIES EACH HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** Each Party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The prevailing party in any action or dispute brought in connection with this Agreement or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorneys' fees and costs.

13. OTHER AGREEMENTS. The Parties shall be bound by the applicable terms of the Subscription Agreement, and, for such time as they are in effect, the Note, this Agreement and the Guaranty Agreement. The Subscription Agreement, the Note, this Agreement and the Guaranty Agreement constitute the sole and entire agreement of the parties hereto and thereto with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

14. CONSTRUCTION; HEADINGS. This Agreement shall be deemed to be jointly drafted by the Parties and shall not be construed against any person as the drafter hereof. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

15. SEVERABILITY. In the event that any provision of this Agreement is invalid or unenforceable under any applicable statute or rule of law (including any judicial ruling), then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Agreement.

16. INTERPRETATION. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore shall not be construed

against a Party or Parties on the ground that such Party or Parties drafted or was more responsible for the drafting of any such provision(s). The Parties further agree that they have each carefully read the terms and conditions of this Agreement, that they know and understand the contents and effect of this Agreement and that the legal effect of this Agreement has been fully explained to its satisfaction by counsel of its own choosing.

17. COUNTERPARTS. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which taken together shall be but a single instrument. The execution and delivery of a facsimile or other electronic transmission of a signature to this Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

*[Signatures appear on following pages]*

Exhibit C – Page 6

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date or as of the date of their joinder hereto.

iCap Holding 5, LLC

By:
Name: Chris Christensen
Title: Manager

iCap Pacific Income Fund 5, LLC

By: iCap Pacific NW Management, LLC
Its: Manager

By:
Name: Chris Christensen
Title: Manager

MarketPlace Realty Advisors, LLC

By:
Name: Ron Thomas
Title: General Manager

Exhibit C – Page 7

497269.v19

**EXHIBIT D**

**GUARANTY AGREEMENT**

**(Attached)**

# GUARANTY AGREEMENT

This Guaranty (this "Guaranty") is made and entered into as of September 5, 2019 (the "Effective Date") by iCap Holding 5, LLC, a Delaware limited liability company ("iCap Holding"), to and for the benefit of each of the holders (each, a "Holder") of promissory notes (the "Notes") issued by iCap Pacific Income Fund 5, LLC, a Delaware limited liability company and the sole member of iCap Holding (the "Company") pursuant to an offering of up to $50,000,000 of promissory notes, with an over-allotment amount of an additional $25,000,000, of the Company pursuant to Regulation D promulgated under the Securities Act of 1933, as amended, commencing on or about September 5, 2019 (the "Offering"). Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, following the execution of this Guaranty, the Company shall issue certain Notes to the Holders, pursuant to a subscription agreement between the Company and the applicable Holder in connection with the Offering (the "Subscription Agreement");

WHEREAS, iCap Holding acknowledges the provisions of the Notes contemplate iCap Holding's entering into this Guaranty and iCap Holding is financially interested in the Company and will receive certain benefits as a result of iCap Holding's promises herein as a result of making this Guaranty for the benefit of the Holders; and

WHEREAS, on the Effective Date, the Company and MarketPlace Realty Advisors, LLC in its capacity as collateral agent (in such capacity "Agent"), are entering into that certain Collateral Agent Agreement, pursuant to which the Agent shall have the power to enforce the rights of the Holders hereunder (the "Collateral Agent Agreement");

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, iCap Holding agrees as follows:

1. iCap Holding hereby unconditionally, absolutely and irrevocably guarantees the full and timely performance of all of the obligations of the Company under the Notes, including the due and punctual payment of the principal and interest of the Note and all money due or that may become due under the Notes, whether (a) according to the present terms of any of those documents or at any earlier or accelerated date or dates as provided therein, (b) pursuant to any extension of time or (c) pursuant to any amendment, modification or replacement of those documents hereafter made or granted, and whether the Company may be liable individually or jointly with others, or whether recovery upon such indebtedness may be or hereafter becomes unenforceable (collectively, "Obligations").

2. iCap Holding agrees that settlement of any claim by Holder against the Company, whether in any proceeding or not, and whether voluntarily or involuntarily, will not reduce the amount due under this Guaranty except to the extent of the amount actually paid by the Company or any other party and retained by Holder.

3. Notwithstanding any other provision of this Guaranty, during the continuation of an Event of Default at a time when this Guaranty is in full force and effect, the Agent may enforce this guaranty against iCap Holding on behalf of the Holders, but only after attempting to collect or exhausting Agent's efforts on behalf of the Holders to collect from the Company, in accordance with the provisions of the Notes.

4. iCap Holding agrees that its obligation to make payment under the terms of this Guaranty shall not be impaired, modified, changed, released or limited in any manner by any impairment, modification, change, release, defense or limitation of the liability of the Company or of a receiver, trustee,

497269v49

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:24    Exhibit Pt 2 Page 1324

Exhibit Pt. 2 Page 1366

debtor-in-possession or estate under any bankruptcy or receivership proceeding. If any payment made by the Company is reclaimed in a bankruptcy or receivership proceeding, iCap Holding shall pay to the Agent on behalf of the Holders the dollar amount of the amount reclaimed. iCap Holding further assigns to Holders all rights iCap Holding may have in any proceeding under the U.S. Bankruptcy Code or any receivership or insolvency proceeding until all indebtedness of the Company to Holders has been paid in full. This assignment includes all rights of iCap Holding to be paid by the Company even if those rights have nothing to do with this Guaranty. This assignment does not prevent the Agent on behalf of the Holders from enforcing iCap Holding's obligations under this Guaranty in any way.

5.  iCap Holding is now adequately informed of the Company's financial condition, and iCap Holding agrees to keep so informed. None of the Agent nor any Holder need provide iCap Holding with any present or future information concerning the financial condition of the Company or any other guarantor, and changes in the Company's or iCap Holding's financial condition shall not affect iCap Holding's obligations under this Guaranty. iCap Holding has not relied on financial information furnished by any Holder or Agent, nor will iCap Holding do so in the future.

6.  iCap Holding represents and warrants to the Agent and the Holders as follows:

    (a) iCap Holding is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Guaranty does not, and the consummation of the transactions contemplated hereby will not, violate any provision of iCap Holding's organizational documents. iCap Holding has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Guaranty.

    (b) The execution of this Guaranty and the consummation of the transactions contemplated by this Guaranty will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which iCap Holding is a party or to which any of its assets, properties or operations are subject.

    (c) This Guaranty and all agreements and other documents executed by iCap Holding in connection herewith constitute the valid and binding obligation of iCap Holding, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

    (d) No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Guaranty or the valid and lawful exercise by the Agent on behalf of the Holders of remedies available to them under this Guaranty or applicable law.

    (e) iCap Holding is fully familiar with all the covenants, terms and conditions of the Notes.

7.  If an Event of Default occurs hereunder, the Agent on behalf of the Holders shall have all other remedies provided by law that do not conflict with the Note. iCap Holding agrees that (a) this Guaranty shall inure to the benefit of and may be enforced by the Agent on behalf of the Holders as set forth in the Notes, and (b) this Guaranty shall be binding upon and enforceable against iCap Holding and its

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:14    Pg 1325 of 1366
Exhibit Pt. 1 Page 1325

successors and assigns.

8.  This Guaranty shall automatically terminate and be of no further force or effect as of the full repayment of the Notes.

9.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be sent to the addresses as set forth, and subject to the terms, in the Collateral Agent Agreement, and shall be subject to the provisions of Section 11.

10. This Guaranty may be amended at any time by the written consent of iCap Holding and a Majority-in-Interest of the Noteholders (as defined in the Notes), subject to the provisions of Section 11.

11. Deemed Consent.

    (a) Each request for consent, approval or waiver under this Guaranty, for an amendment hereof of other matter, which is sent by iCap Holding to the Agent on behalf of the Holders, shall be made in writing to Agent, who shall thereafter distribute such notice to the Holders and shall include all information necessary for a Holder to make an informed decision as to whether to agree to such consent or approval, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT UNDER THAT CERTAIN GUARANTY AGREEMENT by iCap Holding 5, LLC TO AND FOR THE BENEFIT OF EACH OF THE HOLDERS OF PROMISSORY NOTES ISSUED BY iCap Pacific Income Fund 5 OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

    (b) If a Holder does not approve or reject the proposed consent, approval or waiver, amendment of other matter within ten (10) days of receipt of such notice and all necessary information, via the delivery of a response to the Agent in such time frame, which the Agent shall thereafter forward to iCap Holding as set forth in the Collateral Agent Agreement, iCap Holding may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A REQUEST FOR CONSENT UNDER THAT CERTAIN GUARANTY AGREEMENT by iCap Holding 5, LLC TO AND FOR THE BENEFIT OF EACH OF THE HOLDERS OF PROMISSORY NOTES ISSUED BY iCap Pacific Income Fund 5 OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

    (c) If a Holder does not approve or reject the proposed consent, approval or waiver, amendment of other matter within ten (10) days of receipt of such second and final notice, in the manner as set forth in Section 11(b) such Holder shall be deemed to have approved, in writing, the proposed consent, approval or waiver, amendment of other matter as set forth in the notice, and iCap Holding may effect the actions set forth therein in reliance on such consent.

12. This Guaranty shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS GUARANTY, THE OTHER TRANSACTION DOCUMENTS OR THE CONTEMPLATED TRANSACTIONS SHALL BE INSTITUTED SOLELY IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF WASHINGTON, IN EACH CASE LOCATED IN KING COUNTY, WASHINGTON, AND EACH PARTY IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. **THE**

**PARTIES EACH HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS GUARANTY OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** Each Party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Guaranty or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Guaranty and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The prevailing party in any action or dispute brought in connection with this Guaranty or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorneys' fees and costs.

13. The headings of this Guaranty are for convenience of reference and shall not form part of, or affect the interpretation of, this Guaranty.

14. In the event that any provision of this Guaranty is invalid or unenforceable under any applicable statute or rule of law (including any judicial ruling), then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Guaranty.

IN WITNESS WHEREOF, iCap Holding has duly executed this Guaranty as of the Effective Date.

iCap Holding 5, LLC

By:
Name: Chris Christensen
Title: Manager

**EXHIBIT E**

**COLLATERAL AGENT AGREEMENT**

**(Attached)**

# COLLATERAL AGENT AGREEMENT

This Collateral Agent Agreement (this "Agreement"), dated as of September 5, 2019 (the "Effective Date"), is entered into by and among iCap Pacific Income Fund 5, LLC, a Delaware limited liability company ("Company"), the holders of the Notes (defined below) as may join this Agreement as set forth below (the "Holders"), and MarketPlace Realty Advisors, LLC in its capacity as collateral agent (in such capacity "Agent") for the Holders. Any party who executes a counterpart signature page in the form as attached hereto as Exhibit A shall become a Holder under this Agreement for all periods from and after the date thereof to the same extent as if such party had originally executed this Agreement. The Company, the Holders and the Agent may be referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Company is offering (the "Offering") up to $50,000,000 of secured notes, with an over-allotment amount of an additional $25,000,000 (collectively, the "Notes") to Holders pursuant to that certain Confidential Private Placement Memorandum dated as of September 5, 2019 (as the same may be amended and supplemented from time to time, the "Memorandum");

WHEREAS, pursuant to the Pledge and Security Agreement, dated as of the Effective Date, by and between the Company, iCap Holding 5, LLC, a Delaware limited liability company and a wholly owned subsidiary of the Company ("iCap Holding") and the Agent (the "Security Agreement"), the Company has granted to Agent, for the benefit of Holders, a security interest in certain Collateral (as defined in the Security Agreement);

WHEREAS, pursuant to the Guaranty Agreement, dated as of the Effective Date, executed by iCap Holding for the benefit of the Holders (the "Guaranty Agreement"), iCap Holding has guaranteed the obligations of the Company in the Offering; and

WHEREAS, in connection with the Offering and purchasing the Notes, the Parties have agreed to enter into this Agreement to set forth (i) their respective rights and obligations with respect to the Notes and (ii) the exercise of rights with respect to the Collateral and certain other matters;

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## Article I.    DEFINITIONS AND CONSTRUCTION

**Section 1.01    Definitions.** As used in this Agreement, the following terms shall have the following definitions:

(a)    "Agent" has the meaning given in the introductory paragraph hereto.

(b)    "Agreement" has the meaning given in the introductory paragraph hereto.

(c)    "Bankruptcy Code" means the federal bankruptcy law of the United States as from time to time in effect, currently as Title 11 of the United States Code and section references to current sections of the Bankruptcy Code shall refer to comparable sections of any revised version thereof if section numbering is changed.

(d) "Claim" means any and all present and future "claims" (used in its broadest sense, as contemplated by and defined in Section 101(5) of the Bankruptcy Code, but without regard to whether such claim would be disallowed under the Bankruptcy Code) of any Holder or Agent now or hereafter arising or existing under or relating to the Notes, whether joint, several, or joint and several, whether fixed or indeterminate, due or not yet due, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, or disputed or undisputed, and whether arising under contract, in tort, by law, or otherwise, any interest or fees thereon (including interest or fees that accrue after the filing of a petition by or against Company under the Bankruptcy Code, irrespective of whether allowable under the Bankruptcy Code), any costs of Enforcement Actions, including reasonable attorneys' fees and costs, and any prepayment or termination premiums.

(e) "Collateral" has the meaning given in the recitals.

(f) "Company" has the meaning given in the introductory paragraph hereto.

(g) "Enforcement Action" means, (i) with respect to any Holder and with respect to any Claim of such Holder or any item of Collateral in which such Holder has or claims a security interest, lien or right of offset, any action, whether judicial or nonjudicial, to repossess, collect, accelerate, offset, recoup, give notification to third parties with respect to, sell, dispose of, foreclose upon, give notice of sale, disposition, or foreclosure with respect to, or obtain equitable or injunctive relief with respect to, such Claim or Collateral or (ii) the filing, or the joining in the filing, by any Holder of an involuntary bankruptcy or insolvency proceeding against Company.

(h) "Guaranty Agreement" has the meaning given in the recitals.

(i) "Holder" and "Holders" have the meanings given in the introductory paragraph hereto.

(j) "iCap Holding" has the meaning given in the recitals.

(k) "Indemnified Holder" has the meaning given to such term in Section 4.03.

(l) "Indemnified Payment" has the meaning given to such term in Section 4.03.

(m) "Indemnifying Holder" has the meaning given to such term in Section 4.03.

(n) "Majority-in-Interest of the Noteholders" has the meaning given in the Notes.

(o) "Memorandum" has the meaning given in the recitals.

(p) "Offering" has the meaning given in the recitals.

(q) "Party" and "Parties" have the meanings given in the introductory paragraph hereto.

(r) "Security Agreement" has the meaning given in the recitals.

**Section 1.02  Other Interpretive Provisions**. References in this Agreement to "Recitals," "Sections," and "Exhibits" are to recitals, sections, and exhibits herein and hereto unless otherwise indicated. References in this Agreement to any document, instrument or agreement shall include (a) all exhibits, schedules, annexes and other attachments thereto; (b) all documents, instruments

500907.v7

or agreements issued or executed in restatement or replacement thereof; and (c) such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time. The words "include" and "including" and words of similar import when used in this Agreement shall not be construed to be limiting or exclusive.

## Article II.    APPOINTMENT AND INTERCREDITOR ARRANGEMENTS

**Section 2.01    Intent**. The primary intent of this Agreement is to set forth the rights, duties and obligations of the Agent, and Holders as co-Holders under the Notes, the Security Agreement and the Guaranty Agreement.

**Section 2.02    Appointment**. Pursuant to the terms set forth herein, each Holder appoints Agent to act as collateral agent under the Notes, the Security Agreement and the Guaranty Agreement, and each Holder authorizes Agent to act thereunder as agent of such Holder. Agent agrees to act as such upon the express conditions contained in this Agreement. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Holders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Company, nor shall Agent be deemed to be a fiduciary for Holders, this Agreement being solely a contractual relationship.

**Section 2.03    Proportionate Interests**. Except as otherwise provided in this Agreement, all of the rights, interests and obligations of each Holder under the Notes, including security interests in the Collateral and rights under the Guaranty Agreement, shall be shared by the Holders in the ratio of (a) the aggregate outstanding Principal Amount (as defined in the Notes) and unpaid Interest (as defined in the Notes) of such Holder's Note to (b) the aggregate outstanding Principal Amount and unpaid Interest of all Notes, as determined by the books and records of the Company. Any reference in this Agreement to an allocation between or sharing by the Holders of any right, interest or obligation "ratably," "proportionally" or in similar terms shall refer to this ratio.

**Section 2.04    Possession of Collateral**. If any Holder shall obtain possession of any Collateral, it shall hold such Collateral as agent and bailee for all Holders for purposes of perfecting Agent's and/or Holders' security interest therein.

## Article III.    Events of Default and Payments.

**Section 3.01    Event of Default**. An Event of Default (as defined in the Notes) may occur pursuant to the terms and conditions of the Notes, by a Majority-in-Interest of the Noteholders declaring (subject to such terms) and providing notice to the Agent of such determination and the Company thereafter not curing such Event of Default within 90 days. The Agent shall deliver such notice to the Company within one (1) business day to the address as set forth in Section 7.01.

**Section 3.02    Payments to the Holders**.

(a)    Prior to the date on which a declaration of an Event of Default (as defined in the Note) occurs pursuant to Section 3.01, the Company shall pay all amounts to the Holders as set for in the applicable Note for the applicable Holder.

(b)    Following the occurrence of an Event of Default pursuant to the Notes, all amounts received by Holders for the account of Company under the Notes after an Event of Default, whether by payment, set-off or otherwise shall be allocated ratably among the Holders.

500907.v7

Each Holder shall promptly remit to the other Holder such sums as may be necessary to ensure the ratable repayment of each Holder's Debenture. Notwithstanding the foregoing, a Holder receiving a scheduled payment shall not be responsible for determining whether the other Holder also received its scheduled payment on such date; provided, however, if it is later determined that a Holder received more than its ratable share of scheduled payments made on any date or dates, then such Holder shall remit to the other Holder such sums as may be necessary to ensure the ratable payment of such scheduled payments, as instructed by Agent

**Section 3.03    Decision to Exercise Remedies**. Upon the occurrence of an Event of Default pursuant to the Notes, Agent shall take such actions and only such actions as a Majority-in-Interest of the Noteholders mutually agree to take in accordance with the direction the Noteholders provide to Agent in writing with regard to enforcing the rights and remedies under the Notes. No Holder shall be entitled to undertake any Enforcement Action without the written consent of a Majority-in-Interest of the Noteholders.

**Section 3.04    Application of Proceeds after an Event of Default**. Notwithstanding anything to the contrary in the Notes, as among the Agent and the Holders, the proceeds of the Collateral, or any part thereof, and the proceeds of any remedy under the Notes after the occurrence and during the continuance of an Event of Default shall upon receipt by the Agent be paid to and applied as follows:

(a) First, to the payment of then outstanding out-of-pocket costs and expenses of the Agent including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made under the Notes or this Agreement by the Agent (including indemnification claims not otherwise satisfied pursuant to this Agreement).

(b) Second to the Holders (in proportion to such costs and expenses theretofore incurred by each), including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made under the Notes or this Agreement;

(c) Third, to the Holders ratably, in an amount up to the sum of all accrued interest owing to the Holders on the Notes;

(d) Fourth, to the Holders ratably, in an amount up to the sums of the outstanding principal, if any, owing to the Holders on the Notes;

(e) Fifth, to the Holders ratably (in proportion to all remaining obligations owing to each), in an amount up to the sum of all other outstanding and unpaid obligations (including indemnification claims not otherwise satisfied pursuant to the preceding clauses); and

(f) Sixth, to Company, as the case may be, or its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

**Section 3.05    Return of Payments**. To the extent any payment for the account of Company is required to be returned as a voidable transfer or otherwise, the Holders shall contribute to one another as is necessary to ensure that such return of payment is on a pro rata basis. To the extent

500907.v7

23-01243-WLH11    Doc 468    Filed 02/23/24    Entered 02/23/24 19:33:54    Exhibit Pt 2 Page 1332 of 1366

any proceeds of the Collateral, or any part thereof, and the proceeds of any remedy under the Notes after the declaration and during the continuance of an Event of Default shall be received by any Holder, such Holder shall forward the funds to the Agent and upon receipt by the Agent to be applied as set forth in Section 3.04.

**Section 3.06    Foreclosure.**

(a) <u>Credit Bid By Holders</u>. Only by agreement of a Majority-in-Interest of the Noteholders shall the Holders make or cause to be made a credit bid at any foreclosure sale or other sale of any of the Collateral on behalf of the Holders. If Holders are the successful bidders at the sale, then (a) the amount to be credited against their respective Claims shall be allocated pro rata among the Holders according to the balances of such Claims, and (b) Holders shall take title to the Collateral so purchased together, each holding a pro rata undivided interest in such Collateral. The parties shall mutually agree as to the most favorable disposition of any Collateral purchased with any such credit bid.

(b) <u>Cash Bid for Account of One Holder</u>. No Holder shall make or cause to be made a cash bid at any foreclosure sale or other sale of any of the Collateral without the prior written consent of a Majority-in-Interest of the Noteholders. If a cash bid is made and is successful, then (a) the proceeds of the sale shall be allocated as set forth in Section 3.04, and (b) the Holder that entered the successful bid shall acquire the Collateral so purchased for its own account, and the other Holders shall have no further interest in that Collateral upon the payment to such other Holders of the shares of the proceeds in accordance with Section 3.04.

## Article IV.    EXCULPATION; DELEGATION; AND INDEMNIFICATION OF HOLDERS

**Section 4.01    Exculpation**. In connection with any exercise of Enforcement Actions hereunder, neither Agent nor any Holder or any of its partners, or any of their respective directors, officers, employees, attorneys, accountants, or agents shall be liable as such for any action taken or omitted by it or them, except for its or their own gross negligence or willful misconduct with respect to its duties under this Agreement.

**Section 4.02    Delegation of Duties**. Each Holder and Agent may execute any of its powers and perform any duties hereunder either directly or by or through agents or attorneys-in-fact. Each Holder and Agent shall be entitled to advice of counsel concerning all matters pertaining to such powers and duties. No Holder or Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it, if the selection of such agents or attorneys-in-fact was done without gross negligence or willful misconduct.

**Section 4.03    Indemnification**.

(a) To the extent not reimbursed by Company or from the application of Collateral proceeds pursuant to Section 3.04, a Holder (the "Indemnified Holder") shall be indemnified by the other Holders (an "Indemnifying Holder"), on a several basis in proportion to each Holder's pro rata share, and each Indemnifying Holder agrees to reimburse the Indemnified Holder for the Indemnifying Holder's pro rata share of the following items (an "Indemnified Payment"):

(i)    all reasonable out-of-pocket costs and expenses of the Indemnified Holder incurred

by the Indemnified Holder in connection with the discharge of its activities under this Agreement and the Notes, including reasonable legal expenses and attorneys' fees; and

(ii) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, which may be imposed on, incurred by or asserted against the Indemnified Holder in any way relating to or arising out of this Agreement, or any action taken or omitted by the Indemnified Holder hereunder; provided that the Indemnifying Holder shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements, if the same results from the Indemnified Holder's gross negligence or willful misconduct or from undertaking Enforcement Actions in violation of Section 3.03.

(b) Notwithstanding the foregoing, the Indemnified Holder shall not be reimbursed or indemnified for an Indemnified Payment, except to the extent that the Indemnified Holder paid more than its ratable share of such payment. All Indemnified Payments (as set forth in this Section 4.03) to an Indemnified Holder are intended to be paid ratably by the other Holder.

## Article V.      REPRESENTATIONS AND WARRANTIES

**Section 5.01**    Authority. Each Party represents and warrants that it has all necessary power and authority to execute, deliver and perform this Agreement in accordance with the terms hereof and that it has all requisite power and authority to own and operate its properties and to carry on its business as now conducted.

**Section 5.02**    Authorization; Enforceability. Each Party represents and warrants that (a) the execution and delivery of this Agreement and the consummation of the transactions contemplated herein have each been duly authorized by all necessary action on the part of such Party and (b) this Agreement has been duly executed and delivered and constitutes a legal, valid and binding obligation of such Party, enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws of general application relating to or affecting the enforcement of creditors' rights or by general principles of equity.

## Article VI.      AGENT

**Section 6.01**    Appointment, Powers and Immunities. Each Holder irrevocably authorizes Agent to take such action on such Holder's behalf and to exercise such powers hereunder as are specifically delegated to Agent by the terms hereof, together with such powers as are reasonably incidental thereto. Agent undertakes to perform only such duties as are expressly set forth herein and in the Offering, which shall be deemed purely ministerial in nature, and no other duties shall be implied and it may perform such duties by or through its agents, representatives or employees. Under no circumstances will the Agent be deemed to be an escrow company, trust company or a fiduciary to any Party or any other person under this Agreement. Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Agreement. The Agent is authorized to take such action and to exercise such powers granted hereunder upon the written request or direction of a Majority-in-Interest of the Noteholders in accordance with the terms hereof, together with such powers as are reasonably incidental thereto. At the written

direction of a Majority-in-Interest of the Noteholders, Agent shall release any items of Collateral at any time without affecting or diminishing the liability of the Company to the Holders for any remaining or future indebtedness. Upon written request by a Holder, Agent will promptly deliver to such Holder copies of any statements or notices provided to Agent by Company under the Notes. Agent shall not be responsible by any Holder for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of the Notes, or for any representations, warranties, recitals or statements made therein or made in any written or oral statement or in any financial or other statements, instruments, reports, certificates or any other documents furnished or delivered in connection herewith or therewith by Agent to any Holder or by or on behalf of Company to Agent or any Holder, or be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained herein or therein or as to the use of the proceeds of the Notes. Agent shall not be responsible for insuring the Collateral or for the payment of any taxes, assessments, charges or any other charges or liens of any nature whatsoever upon the Collateral or otherwise for the maintenance of the Collateral, except in the event Agent enters into possession of a part or all of the Collateral, in which event Agent shall preserve the part in its possession. Unless the officers of Agent acting in their capacity as officer of Agent on Company's account have actual knowledge thereof or have been notified in writing thereof by Holders, Agent shall not be required to ascertain or inquire as to the existence or possible existence of any Event of Default. Neither Agent nor any of its officers, directors, employees, attorneys, representatives or agents shall be liable to Holders for any action taken or omitted hereunder or under the Notes or in connection herewith or therewith unless caused by its or their gross negligence or willful misconduct. No provision of this Agreement or the Notes, shall be deemed to impose any duty or obligation on Agent to perform any act or to exercise any power in any jurisdiction in which it shall be illegal, or shall be deemed to impose any duty or obligation on Agent to perform any act or exercise any right or power if such performance or exercise (a) would subject Agent to a tax in a jurisdiction where it is not then subject to a tax or (b) would require Agent to qualify to do business in any jurisdiction where it is not so qualified. No Holder shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or the Notes in accordance with the written instructions of a Majority-in-Interest of the Noteholders. Agent shall be entitled to refrain from exercising any power, discretion or authority vested in it under this Agreement or the Notes unless and until it has obtained the written instructions of a Majority-in-Interest of the Noteholders. The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon Agent in its individual capacity.

**Section 6.02    <u>Reliance by Agent.</u>**

(a)    Agent may, at the expense of Holders, consult with counsel, and any opinion or legal advice of such counsel shall be full and complete authorization and protection in respect of any action taken, not taken or suffered by Agent hereunder or under the Notes in accordance therewith. Agent shall have the right at any time to seek instructions concerning the administration of the Collateral from any court of competent jurisdiction.

(b)    Agent may rely, and shall be fully protected in acting, or refraining to act, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, bond or other paper or document that it has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of cables, telecopies and telexes, to have been sent by the proper party or parties. In the absence of its gross negligence or willful misconduct, Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any

certificates or opinions furnished to Agent and conforming to the requirements of the Notes.

(c) Agent shall not be under any obligation to exercise any of the rights or powers granted to Agent by this Agreement or the Notes at the request or written direction of a Majority-in-Interest of the Noteholders unless Agent shall have been provided by Holders with security and indemnity satisfactory to Agent against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction.

**Section 6.03   Delegation of Duties By Agent**. Agent may execute any of the powers hereof and perform any duty hereunder either directly or by or through agents or attorneys-in-fact. Agent shall be entitled to advice of counsel concerning all matters pertaining to such powers and duties. Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it, if the selection of such agents or attorneys-in-fact was done without gross negligence or willful misconduct.

**Section 6.04   Right to Indemnity and Reimbursement**. Each Holder jointly and severally agrees (a) to indemnify and hold Agent (and any Person acting on behalf of Agent) harmless from and against and (b) promptly upon receipt by each Holder of Agent's statement, to reimburse Agent, according to such Holder's ratable share, to the extent Agent shall not otherwise have been reimbursed by Company on account of and for, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind of nature whatsoever with respect to Agent's performance of its duties under this Agreement and the Notes; provided, however, that each Holder shall be jointly and severally liable to Agent to the extent any other Holder has failed to pay its pro rata share of amounts owed to Agent and provided further, however, that no Holder shall be liable for the payment to Agent of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from Agent's gross negligence or willful misconduct. Such reimbursement shall not in any respect release Company from any liability or obligation. If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished. Agent's right to indemnification shall survive termination of this Agreement and the resignation or removal of Agent.

**Section 6.05   Resignation and Appointment of Successor Agent**. Agent may resign at any time by giving sixty (60) days' prior written notice thereof to Holders and Company. Upon any such notice, a Majority-in-Interest of the Noteholders may appoint a successor Agent. In addition, the person or entity serving as Agent may be removed or replaced from time to time by a Majority-in-Interest of the Noteholders, with such removal or replacement being effective immediately upon written notice to the Agent and Company, with a copy to each Holder. If Agent shall be unable or unwilling to serve in such capacity, its successor shall be named by a Majority-in-Interest of the Noteholders. Upon the acceptance of any appointment as an Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Agent's resignation hereunder as Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

**Section 6.06   Financing Statements Not Reviewed by Agent**. Holders acknowledge that (1) Agent has not reviewed and has no responsibility or obligation to review any financing statements

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:34   Pg 1 of 1366   Exhibit Pt 2, Page 1336

related to the Collateral and (2) filing financial statements and maintaining a perfected security interest in the Collateral are solely the responsibilities of the Company.

**Section 6.07   Notes Not Reviewed**. Holders acknowledge that Agent has not reviewed and has no responsibility or obligation to review the Notes.

**Section 6.08   Compensation**. Company shall compensate Agent a quarterly fee of $2,000 for its services as Agent under this Agreement, such initial fee to be paid out of the proceeds of the first Closing of the Offering and shall reimburse Agent for all costs and fees, including reasonable attorney's fees (whether or not incurred by an attorney in the employ of Agent), incurred as a result of the authority given Agent under this Agreement. Company shall remit to Agent all such costs and fees, including reasonable attorney's fees, within ten (10) days of Company's receipt of a reasonably detailed invoice from Agent. Agent agrees that the hourly rate for any hourly fees by Agent pursuant to this Section 6.08 will not exceed $250.00 per hour and will be invoiced in 1/10th of an hour increments.

## Article VII.   MISCELLANEOUS.

**Section 7.01   Notices**.

(a)   All notices to be sent by the Company or iCap Holding to the Holders pursuant to the Notes, the Security Agreement or the Guaranty shall be sent by the Company to the Agent, which shall thereafter distribute such notices to the Holders. All notices to be sent by any Holder to the Company or iCap Holding pursuant to the Notes, the Security Agreement or the Guaranty shall be sent by such Holder to the Agent, which shall thereafter distribute such notices to the Company or iCap Holding, as applicable.

(b)   Notwithstanding Section 7.01(a), the Parties acknowledge and agree that any communications with respect to a Demand Payment (as defined in the Notes), or with respect to any default which is not an "Event of Default," may be made directly between the Company and the applicable Holder, and may be made in such manner as set forth in the Note or the Memorandum, including through the Company's website at www.icapequity.com or its licensed software application.

(c)   Unless otherwise provided in this Agreement, all notices or demands by any Party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and shall be (i) delivered personally; (ii) sent by a nationally recognized overnight carrier via overnight or second day delivery, or (iii) sent via email with return receipt requested, to the Parties as follows:

If to the Agent:

MarketPlace Realty Advisors, LLC
23515 NE Novelty Hill Rd., STE B-221
Redmond, WA 98053
Attention: Ronald Thomas
Email: ronth12@gmail.com

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:34   Pg 21 of 1366   Exhibit Pt. 2 Page 1337

If to the Company:

        iCap Pacific Income Fund 5, LLC
        3535 Factoria Blvd. SE, Suite 500
        Bellevue, WA 98009
        Attention:  Chris Christensen
        Email: investor@icapequity.com

If to a Holder, to the addresses as set forth on such Holder's subscription agreement.

(d)    Other than those notices as set forth in Section 7.01(b), notice and shall be deemed to have been given (a) when delivered by hand; (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) upon receipt of a return receipt if sent via email.

(e)    The Parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

**Section 7.02**   <u>No Third-Party Beneficiaries</u>. Other than as specifically set forth herein, the terms and provisions of this Agreement shall be for the sole benefit of the Parties and their respective successors and permitted assigns, and no other person or entity shall have any right, benefit, priority, or interest under or because of this Agreement.

**Section 7.03**   <u>Holders</u>.  The relationship among the Holders is, and at all times shall remain solely that of co-Holders. Holders shall not under any circumstances be construed to be partners or joint venturers of one another; nor shall the Holders under any circumstances be deemed to be in a relationship of confidence or trust or a fiduciary relationship with one another, or to owe any fiduciary duty to one another. Holders do not undertake or assume any responsibility or duty to one another to select, review, inspect, supervise, pass judgment upon or otherwise inform each other of any matter in connection with Company's property, any Collateral held by any Holder or the operations of Company. Each Holder shall rely entirely on its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information undertaken or assumed by any Holder in connection with such matters is solely for the protection of such Holder.

**Section 7.04**   <u>Expenses</u>. Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated herein shall be paid by the Party incurring such costs and expenses.

**Section 7.05**   <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 7.06**   <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision herein is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the Contemplated Transactions be consummated as originally

23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:12   Pg 21 of 28
Exhibit Pt. 2 Page 1338
1366

contemplated to the greatest extent possible.

**Section 7.07   Entire Agreement.** This Agreement, the Notes, the Security Agreement, the Guaranty and the applicable subscription agreements constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

**Section 7.08   Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. No Holder may assign its rights or obligations hereunder without the prior written consent of the Company. The Company may not assign its rights or obligations hereunder unless all Notes have been paid in full.

**Section 7.09   Amendment and Modification; Waiver**.

(a)   This Agreement may only be amended, modified or supplemented by an agreement in writing signed by the Company, the Agent and a Majority-in-Interest of the Noteholders, provided that the Parties acknowledge and agree that additional Holders may join this Agreement as set forth in the introductory paragraph hereto and in Section 7.15(b), and such joinder(s) shall not be deemed an amendment of this Agreement.

(b)   Each request for consent, approval or waiver under this Agreement, for an amendment hereof of other matter, which is sent by the Company to the Agent on behalf of the Holders, shall be made in writing to Agent, who shall thereafter distribute such notice to the Holders and shall include all information necessary for a Holder to make an informed decision as to whether to agree to such consent or approval, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT UNDER THAT CERTAIN COLLATERAL AGENT AGREEMENT BY AND BETWEEN iCap Pacific Income Fund 5, LLC, THE HOLDERS OF PROMISSORY NOTES ISSUED BY iCap Pacific Income Fund 5, LLC AND MarketPlace Realty Advisors, LLC IN ITS CAPACITY AS COLLATERAL AGENT, OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

(c)   If a Holder does not approve or reject the proposed consent, approval or waiver, amendment of other matter within ten (10) days of receipt of such notice and all necessary information, via the delivery of a response to the Agent in such time frame, which the Agent shall thereafter forward to iCap Holding as set forth herein, iCap Holding may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A REQUEST FOR CONSENT UNDER THAT CERTAIN COLLATERAL AGENT AGREEMENT BY AND BETWEEN iCap Pacific Income Fund 5, LLC, THE HOLDERS OF PROMISSORY NOTES ISSUED BY iCap Pacific Income Fund 5, LLC AND MarketPlace Realty Advisors, LLC IN ITS CAPACITY AS COLLATERAL AGENT, OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

(d)   If a Holder does not approve or reject the proposed consent, approval or waiver, amendment of other matter within ten (10) days of receipt of such second and final notice, in the manner as set forth in Section 7.09(c) such Holder shall be deemed to have approved,

23-01243-WLH11     Doc 468     Filed 02/23/24     Entered 02/23/24 19:33:21     Pg 1 of 1339
1366
Exhibit Pt. 2, Page 1339

in writing, the proposed consent, approval or waiver, amendment of other matter as set forth in the notice, and the other Parties may effect the actions set forth therein in reliance on such consent.

**Section 7.10**   **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

(b)   ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE CONTEMPLATED TRANSACTIONS SHALL BE INSTITUTED SOLELY IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF WASHINGTON, IN EACH CASE LOCATED IN KING COUNTY, WASHINGTON, AND EACH PARTY IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.

(c)   **THE PARTIES EACH HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY.**

(d)   Each Party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Guaranty and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.  The prevailing party in any action or dispute brought in connection with this Agreement or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorneys' fees and costs.

**Section 7.11**   **Specific Performance**. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that each Party shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which such Party is entitled at law or in equity.  In the event that specific performance is granted to a Party pursuant to the terms and conditions herein, such Party shall also be entitled to be awarded its costs and expenses (including reasonable attorneys' fees and expenses) incurred solely in connection with obtaining such specific performance, together with interest on such amounts from the date of the commencement of such proceeding until the date of payment at the prime lending rate as published in The Wall Street Journal in effect on the date of the commencement of such proceeding.

**Section 7.12**   **Termination.** This Agreement shall terminate upon the irrevocable payment in full to Agent and each Holder of all amounts owing to them under the Notes and this Agreement. When all Indebtedness (as defined in the Security Agreement, other than inchoate indemnity obligations)

have been paid in full, the Company shall provide Agent with an officer's certificate confirming such payment in full or conversion; and thereafter, no Party shall have any further rights or obligations hereunder. Notwithstanding the prior termination of this Agreement, the respective obligations of Holders to indemnify Agent and each other shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Agent or Holder have run.

**Section 7.13** <u>**Reinstatement**</u>. Notwithstanding any provision of this Agreement to the contrary, the rights and obligations of the Parties with respect to Company shall be reinstated and revived if and to the extent that for any reason any payment by or on behalf of Company is rescinded, or must be otherwise restored by any Party, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid. To the extent any payment is rescinded or restored, the obligations of the Company under the Notes shall be revived in full force and effect without reduction or discharge for that payment.

**Section 7.14** <u>**Survival**</u>. All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any obligations remain outstanding hereunder.

**Section 7.15** <u>**Counterparts and Joinder.**</u>

(a) This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(b) One or more Holders may join this Agreement at or following the Effective Date by the execution of a Counterpart Signature Page as attached hereto, provided, however, that such Counterpart Signature Page shall not be effective unless and until the Company accepts the applicable proposed Holder's subscription for a Note pursuant to the Subscription Agreement and countersigned such Counterpart Signature Page.

*[Signatures appear on following pages]*

500907.v7
23-01243-WLH11   Doc 468   Filed 02/23/24   Entered 02/23/24 19:33:21   Exhibit Pt 1 Page 1341
1366

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

iCap Pacific Income Fund 5, LLC

By:   iCap Pacific NW Management, LLC
Its:   Manager

By: _____
Name: Chris Christensen
Title:  Manager

iCap Holding 5, LLC

By: _____
Name: Chris Christensen
Title:  Manager

MarketPlace Realty Advisors, LLC

By: _____
Name:      Ron Thomas
Title:      General Manager

500907.v7

<u>Counterparty Signature Page to Collateral Agent Agreement</u>

By execution hereof, the undersigned Holder hereby joins in and becomes a Holder under that certain Collateral Agent Agreement dated as of September 5, 2019, by and between iCap Pacific Income Fund 5, LLC, a Delaware limited liability company ("Company"), the holders of the Notes (as defined in such therein) and MarketPlace Realty Advisors, LLC in its capacity as collateral agent (in such capacity "Agent") (the "Collateral Agent Agreement").

The undersigned Holder has received and read a copy of the Collateral Agent Agreement and understands its provisions. Holder hereby adopts and agrees to be bound by all of the provisions of the Collateral Agent Agreement and all of the provisions of the Collateral Agent Agreement are hereby incorporated herein.

IN WITNESS WHEREOF, the Parties hereto have caused this Counterpart Signature Page to Collateral Agent Agreement to be executed as of the date set forth below.

Holder Name: _____

Signature: _____
Title: _____
    *(if applicable)*

Date: _____

Agreed and accepted:

iCap Pacific Income Fund 5, LLC

    By: iCap Pacific NW Management, LLC
    Its: Manager

    By: _____
    Name: _____
    Title: _____

500907.v7

# EXHIBIT 13



THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM CONTAINS MATERIAL NON-PUBLIC INFORMATION REGARDING ICAP BROADWAY, LLC (THE "COMPANY"). BY ACCEPTING THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS HERETO (COLLECTIVELY THIS "MEMORANDUM"), THE RECIPIENT AGREES WITH THE COMPANY TO MAINTAIN IN STRICT CONFIDENCE ALL NON-PUBLIC INFORMATION, INCLUDING, BUT NOT LIMITED TO, THE EXISTENCE OF THE PROPOSED FINANCING AND ANY OTHER NON-PUBLIC INFORMATION REGARDING THE COMPANY OBTAINED FROM THIS MEMORANDUM, ANY OTHER TRANSACTION DOCUMENT OR THE COMPANY.

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## FOR ACCREDITED INVESTORS AND NON-U.S. PERSONS

# iCap Broadway, LLC

### $20,000,000 of

### Secured Promissory Notes

### April 1, 2022

AN INVESTMENT IN OUR SECURITIES INVOLVES A HIGH DEGREE OF RISK. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF US AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD ONLY INVEST IN OUR SECURITIES IF YOU CAN AFFORD A COMPLETE LOSS OF YOUR INVESTMENT. YOU SHOULD READ THE COMPLETE DISCUSSION OF THE RISK FACTORS SET FORTH IN THIS MEMORANDUM.

DUE TO THE FACT THAT THE OFFERING IS A PRIVATE PLACEMENT AND EXEMPT FROM REGISTRATION, NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. SEE "CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS."

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
## FOR
## ACCREDITED INVESTORS AND NON-U.S. PERSONS

## ICAP BROADWAY, LLC

## $20,000,000 OF AGGREGATE PRINCIPAL AMOUNT
## OF
## SECURED PROMISSORY NOTES

This Confidential Offering Memorandum ("**_Memorandum_**") summarizes the principal terms of the offering ("**_Offering_**") of the Secured Promissory Notes ("**_Notes_**") of iCap Broadway, LLC (the "**_Company_**"). The Notes have not been, nor will they be registered or qualified under the Securities Act. They are being offered and sold in the United States only to accredited investors in reliance on Rule 506(b) of Regulation D and to non-US investors under Regulation S, promulgated under the Securities Act or under any applicable state securities laws. Neither the securities and exchange commission nor any state securities commission has approved or disapproved of these securities or determined if this memorandum is truthful or complete; any representation to the contrary is a criminal offense.

The information contained in this Memorandum is confidential. By acceptance of this Memorandum, each recipient agrees (a) not to reproduce or distribute this Memorandum to other persons (except the recipient's professional advisors) without the prior written consent of the Manager; (b) that the recipient and his, her or its professional advisors will keep confidential all information contained herein not already in the public domain; and (c) that the recipient will use this Memorandum for the sole purpose of evaluating a possible investment in the Notes. Each recipient also agrees to return this Memorandum and any other documents or information furnished by the Company to the recipient (and any and all copies thereof) upon request of the Company if the recipient declines to purchase any Notes.

There will be no public market for the Notes and there is no obligation on the part of the Company or any person to register the Notes under the Securities Act or any state securities laws.

This Memorandum includes data and information obtained from independent third-party sources. Although the Company does not have any reason to believe that such data and information is not accurate, the Company did not independently verify such data and information and cannot assure the accuracy or completeness of such data and information. Prospective investors must rely upon their own investigations and evaluations with respect to making an investment in the Notes being offered hereby.

Prospective investors will be advised of any material modifications to the terms of the offering or the Notes in writing prior to any sale of Notes to the prospective investors.

Nothing contained in this Memorandum is, or should be relied upon as, a promise or representation as to the Company's future performance. Prospective investors must rely upon their own examination of the Company and the terms of the Offering, including the merits and risks involved.

## SUMMARY OF MATERIAL TERMS

The following summarizes a number of the material provisions relating to the Notes being offered by iCap Broadway, LLC, a Washington limited liability company (the "**Company**"). This Memorandum is qualified in its entirety by the full text of the Note, Subscription Agreement, Pledge and Security Agreement, and the exhibits attached thereto. Capitalized terms used in this summary not separately defined herein have the meanings assigned to such terms in the Note and Subscription Agreement. No person will be permitted to invest in the Notes unless such person has received and reviewed the Note, Subscription Agreement, Pledge and Security Agreement, this Memorandum and other offering-related documents.

| | |
|---|---|
| **Amount to be Raised** | Up to $20,000,000 in aggregate principal amount of Senior Secured Promissory Notes (the "*Notes*") or such additional amount as determined by the Manager in its sole discretion. |
| **Investors** | Each investor in the Notes must be a non-US resident under Regulation S or an "accredited investor" as defined under Regulation D of the Securities Act (the "*Investors*"). |
| **Pledge and Security Agreement** | Each Note is secured by the membership interests of the Company through the Pledge and Security Agreement attached hereto as **Exhibit C**. |
| **Minimum Investment** | An investment of at least $500,000, unless a smaller investment is permitted by the Manager in its discretion. |
| **Target Closing Date** | The initial closing is anticipated to occur in April of 2022, with subsequent closings permitted through April 30, 2023, unless extended up to 12-months by the Manager. |
| **Definitive Agreement** | The Notes will be issued and sold pursuant to a subscription agreement and will contain customary representations and warranties of the Company and the Investors (the "*Subscription Agreement*") in the form attached as **Exhibit B**. |
| **Maturity Date** | Each Note will mature on the date elected by Investor in the Subscription Agreement (the "*Maturity Date*"), and principal and unpaid accrued interest will be due on the Maturity Date. The Notes may be prepaid prior to the Maturity Date without penalty. |
| **Interest Rate** | Simple interest will accrue on an annual basis at the interest rate that pertains the principal investment amount as set forth in the Subscription Agreement. Interest shall be a per annum rate of interest based on a 360-day year. Accrued interest will be due and payable either in full at the Maturity Date, or paid semi-annually on June 30 and December 31 of each year to a US bank account or a Vault account, according as Investor elects on the Subscription Agreement. The Company may issue Notes with interest rates or maturity dates that are different from the options set forth in the Subscription Agreement. |
| **Security and Priority** | Each of the Notes, regardless of their maturity dates or interest rates, will be secured by the ownership interests of the Company through a Pledge and Security Agreement granting a security interest in the ownership interests of the Company. Each Note will be of equal seniority to the promissory notes issued by the Company to other investors. |
| **Events of Default** | Upon the occurrence of an Event of Default, the Holder may declare the Loan Amount to be due and payable and may exercise all legal enforcement rights available in the United States. |
| **Fees and Expenses** | Each party will bear its own fees and expenses incurred in the transactions contemplated by this Memorandum. |
| **Annual Manager Fee** | The Company will pay the Manager an annual manager fee of 2.00% of the total funds raised in this Offering (the "Manager Fee"). The Manager Fee will be fully earned and paid by the Company at the time of investment for the first year of investment and will be paid quarterly thereafter. |

| **Company Contact Information** | iCap Broadway, LLC<br>3535 Factoria Blvd. SE, Suite 500<br>Bellevue, WA 98006<br>ATTN: Investor Relations Department<br>OFC: (425) 278-9030; FAX: (425) 278-9025<br>EMAIL: investor@icapequity.com |
|---|---|

## FORWARD-LOOKING STATEMENTS

This Memorandum and its exhibits may contain statements that constitute forward-looking statements, as defined by federal securities laws. Forward- looking statements can be identified by the use of terminology such as "anticipates," "expects," "intends," "opportunity," "plans," "should," "predicts," "potential," "continue," "believes," "seeks," "would," "may," "will be," "likely to become," "estimates" and variations of these words and similar expressions. Forward-looking statements are subject to risks and uncertainties and include statements made regarding events, financial trends, future operating-results, financial position, cash flows and other general information concerning possible or assumed future results of operations of the Company or any project. Investors are cautioned that such statements are only predictions, forecasts or estimates of what may occur and are not guarantees of future performance or of the occurrence of events or other factors used to make such predictions, forecasts or estimates. Actual results may differ materially from the results expressed, implied or inferred from the forward-looking statements and may be worse due to a variety of factors, including changes in laws, adverse changes in real estate prices, adverse changes in interest rates, and adverse changes in the credit and capital markets. These forward-looking statements speak only as of the date on which the statements were made and the Company undertakes no obligation to update or revise any forward-looking statements made in this Memorandum or elsewhere as a result of new information, future events, future developments or otherwise, except as required by law.

## INVESTMENTS

To subscribe for the Notes, you must complete, execute and deliver to the Company the investment documents attached to this Memorandum, including the Subscription Documents, in the form attached to this Memorandum as **Exhibit B**. The Subscription Agreement requires you to represent, among other things, that you are an accredited investor or a non-US person, are acquiring Notes for your own account for investment and not with a view to resale or distribution, and that you are aware that transfer of the Notes is restricted by the absence of a market for the Notes. The Subscription Agreement also requires you to acknowledge that you have received and have had an opportunity to read this Memorandum and are aware of the risks associated with an investment in the Notes.

THE COMPANY'S ACCEPTANCE OF YOUR SUBSCRIPTION FOR NOTES DOES NOT CONSTITUTE A DETERMINATION BY THE COMPANY THAT THE INVESTMENT IS SUITABLE FOR YOU. THE FINAL DETERMINATION AS TO THE SUITABILITY OF AN INVESTMENT IN THE NOTES FOR YOU MUST BE MADE BY YOU AND YOUR ADVISORS.

# USE OF PROCEEDS

The following table sets forth the details of the fees and the funds available for use by the Company upon the sale of the Notes:

|  | Minimum Investment | Maximum Offering |
|---|---|---|
| Gross Offering Proceeds | $500,000 | $20,000,000 |
| Offering Expenses[1] | $50,000 | 10% |
| Organizational Expenses[2] | $5,000 | 1% |
| Amount Available for Company investment | $445,000 | 89% |

1  Offering expenses include the cost of preparing this Memorandum and other offering documents. The Company may incur additional offering costs, including brokerage and finders fees of up to a maximum of 10% of the capital such brokers and finders raise, and other expenses, the aggregate amount of which is not yet known. Such expenses, to the extent incurred, will reduce the net proceeds realized by the Company. Offering costs may be paid by an Affiliate of the Company or the Manager and reimbursed with Offering proceeds.

2  Organizational expenses include the cost of creating the Company, the accounting records, technology tools, and other related costs that are necessary for the existence of the investment opportunity contained in this Offering. Organizational costs may be paid by an Affiliate of the Company or the Manager and reimbursed with Offering proceeds.

## Allocation of Offering Proceeds

The proceeds of this offering will be used to invest into a multifamily construction project located at 715-775 Broadway, Tacoma, WA 98402 (the "Project"). The investment into the project will be through 725 Broadway, LLC, which is a special purpose entity ("SPE") for the Project. The investment proceeds will be used to recapitalize the debt and equity for the Project and may be used to pay for construction, design, marketing, furnishing, professional services, financing, debt service, and all other expenses related to the Project. At any time, the Company may use offering proceeds to retire any debt obligation of the Company or the Project SPE, including those held by other investors or Affiliates, or to purchase the position of an Affiliate of the Company or its Manager in the Project. The following table is an estimate of the Company's allocation of the available offering proceeds. If less than the maximum Offering amount is raised, the Manager will determine which line items will receive less than the estimated allocation. The Manager has discretion to utilize all proceeds as it deems necessary to accomplish the Company's business purposes.

| SOURCES | % | /Unit | Amount | USES | % | Buildable SF | /Unit | Amount |
|---|---|---|---|---|---|---|---|---|
| Construction Loan | 70.0% | 292,886 | 38,075,193 | Land Costs | 4.4% | 14.66 | 18,462 | 2,400,000 |
| Mezzanine Loan | 0.0% | - | - | Hard Costs | 84.5% | 280.80 | 353,678 | 45,978,131 |
| iCap Broadway | 27.0% | 112,970 | 14,686,140 | Soft Costs | 6.0% | 20.00 | 25,193 | 3,275,100 |
| iCap Equity | 3.0% | 12,552 | 1,631,793 | Carry Costs | 5.0% | 16.73 | 21,076 | 2,739,895 |
| Total Sources | 100.0% | 418,409 | 54,393,126 | Total Uses | 100.0% | 332.19 | 418,409 | 54,393,126 |

**The Company**

The Company is a Washington limited liability company, whose sole member is iCap Equity, LLC, a Delaware limited liability company. iCap Equity, LLC is wholly owned by iCap Enterprises, Inc., which is wholly owned by Chris Christensen. iCap Equity, LLC is the 100% owner of iCap Pacific Income Fund 4, LLC which has invested $750,000 into the Project. The Project SPE has issued Class A units and Class B units, and each of the foregoing subsidiary entities of iCap Equity, LLC holds Class B Units. The Project requires an estimated additional $15 million to close on the new loan and complete the Project work, and the Company is raising capital to meet this additional need. In the event the Company raises more than the minimum of $15 million, the excess proceeds will be used to purchase the Class B units of the other iCap Affiliates in the Project. If less than the $15 million is raised, then the Project SPE will obtain the additional capital either through issuance of additional Class A units or through a loan or other financing source.

The Company current indebtedness is $2.7M in the form of a first trust deed and promissory note on the Project with an interest rate of 10% and a maturity date of June 30 2023, with the beneficiary being Vault Holding, LLC. Vault Holding, LLC a Delaware limited liability company is 100% owned by iCap Vault 1, LLC a Delaware limited liability company, which is 100% owned by iCap Vault, LLC a Delaware limited liability company, which is 100% owned by iCap Enterprises, Inc.

The Company primarily derives its income from buying real estate and developing the properties for sale. It also generates income from rents on such properties and may hold properties after completion of construction and development. The Company's primary investment strategy focuses on equity investments in Pacific Northwest real estate projects. The Company has identified the Project as its sole investment strategy and will place equity capital into the Project alongside the other above-mentioned iCap affiliated entities.

Although this Memorandum refers to "iCap" and the Company as though each were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. By investing in the Company, the Investor will not acquire an interest in any of its affiliated entities, but it may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Company as it conducts its business.

**The Project**

The Project is currently under review for building permits and it is estimated to achieve the permits in September of 2022, and an estimated completion date of September 2024. The property consists of as single building with 130 market-rate apartment units with approximately 12,000 SF of commercial retail space on street levels. The building will also include a podium-built parking garage providing 76 covered parking spaces. Upon completion of construction, the property will be leased at market rates. After stabilization of rents, the Project SPE will seek to sell the property. The proceeds from the sale will be used to pay off the underlying construction loan, return the capital contributions of the Class A and Class B unit holders, and pay an additional profit. Upon receipt of its payoff, the Company will pay off the Notes, plus interest, of its investors.

**Prior Performance of the Manager**

Members of the management team previously established iCap B1, LLC, and iCap B2, LLC in 2013, which raised a total of $6,915,664 for the purpose of making investments into various real estate projects. These special purpose vehicles made 10 investments and generated a gross IRR to investors of 20%. The management team also issued a total of $93 Million in debentures across two pooled investment funds, iCap Pacific NW Opportunity and Income Fund, LLC, and its follow-on fund, iCap Northwest Opportunity Fund, LLC. Investors in these two funds earned a 12% annualized rate of interest and 11% annualized rate of interest respectively. Additional Affiliate entities include iCap Equity, LLC, which pays a 10% rate of interest annually to its investors, iCap Pacific Income Fund 4, LLC, which pays a 10% annual rate of interest, iCap Pacific Income Fund 5, LLC, which pays a 9% annual rate of interest, and iCap Investments, LLC, which pays a 6-8% annual rate of interest for 1-year investments and a 8-10% annual rate of interest for 2-year investments. Additionally, iCap Vault, LLC holds various subsidiary entities that offer demand note programs to investors ranging from 2.06-5.06% interest. As of the date of this Memorandum, iCap manages approximately $195 Million in cash investments from investors (including reserves and committed capital for investments), which has been invested across 89 projects. The financial statements of the Company and its Affiliates can be viewed in the Data Room, which is available to all potential Investors upon request.

YOU SHOULD RECOGNIZE THAT BY PURCHASING NOTES IN THE COMPANY YOU WILL NOT THEREBY ACQUIRE ANY OWNERSHIP INTEREST IN ANY OF THE PRIOR PROGRAMS OR ANY FUTURE

PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. YOU SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES IS GIVEN SOLELY TO ALLOW YOU TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. YOU SHOULD NOT ASSUME THAT THE INVESTORS IN THIS OFFERING WILL EXPERIENCE RETURNS, IF ANY, ON THEIR INVESTMENTS SIMILAR TO THOSE EXPERIENCED BY INVESTORS IN THE PRIOR PROGRAMS SPONSORED BY THE MANAGER AND ITS AFFILIATES.

**Investment Process**

The Manager of the Company will have discretion to select the investment opportunities in which the Company will invest. The Manager will consult with trusted advisors and obtain legal and tax counsel in structuring the investments, but will ultimately have the discretion to make the investment decisions. The Company completes diligence on prospective investments and maintains post-closing procedures that provide for the ongoing supervision of the investments. The investment process has four major areas of focus: analysis and approval, documentation and closing, and post-closing and management.

**Risk Controls**

The Company's entity structure and investment strategy have been designed to mitigate risk and increase the likelihood of success. Each investor will receive a Note upon closing, which will provide the investor with a priority return for repayment over equity holders, and a rate of interest. Lastly, the Company has targeted strong markets for its investments in the Pacific Northwest.

**Management of the Company**

The management and supervision of the Company is vested exclusively in the Manager, iCap Pacific NW Management, LLC (including its duly appointed agents), who has full control over the business and affairs of the Company. The Manager has the power on behalf and in the name of the Company to carry out any and all of the objects and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings that the Manager, in its sole discretion, deems necessary or advisable or incidental thereto. Investors must rely upon the judgment and experience of the Manager to manage the Company.

The Manager and its Affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

Chris Christensen leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. He is also primarily responsible for tax and accounting decisions. Chris is 46, and prior to forming the Company, he managed Affiliated funds, formed and managed operating entities, including Edge Construction, LLC and iCap Enterprises, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a Juris Doctor degree from Seattle University School of Law, a Master's degree in International Business from Seattle University, and a Bachelor of Arts degree in Economics from the University of Utah.

**Issuance of Prior Notes and Future Notes**

The Notes in this Offering will be of equal seniority to the previously issued notes. In the future, the Company may issue Notes with interest rates or maturity dates under this Offering that are different from the rates and maturity dates offered to other investors. Such notes will be of equal seniority and priority as the other promissory notes that have been issued.

## POTENTIAL CONFLICTS OF INTEREST

The Manager and its Affiliates will be entitled to certain types of compensation, fees, income, distributions or other payments from the Company or in connection with a Company investment. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Company. The Manager has no obligation to advance funds to cover the Company's expenses. However, to the extent that such advances are made, the Company will repay such amounts out of its funds as soon as they are available, whether such funds are from the Company's operating revenues or third-party loans. Below is a summary of these key payment obligations of the Company and potential conflicts of interest that could arise from these obligations.

### Compensation and Other Payments to the Manager

The Company will pay the Manager an annual manager fee of 2.00% of the total funds raised in this Offering (the "Manager Fee"). The Manager Fee will be fully earned and paid by the Company at the time of investment for the first year of investment and will be paid quarterly thereafter. The Company will also pay sums to the Manager as are necessary to allow the Manager to perform those functions that relate to the Company's business purpose, such as payroll, rent, marketing, debt service, and all other such costs.

In addition to the fees set forth above, the Company will reimburse the Manager and its Affiliates for any reasonable expenses paid by either Person that properly should be borne by the Company. Such expenses include costs incurred before and after the formation of the offering, such as organizational and offering expenses; consulting, legal, accounting, and professional fees; and marketing and travel expenses.

The Company must distribute to its members, in cash, the Estimated Tax Amount within 90 days after the close of each fiscal year, even if (a) the Manager determines the tax distribution would necessitate borrowing by the Company; (b) an Event of Default (as defined in the Notes) has occurred under the Notes or is continuing; or (c) the Manager determines that the tax distribution would otherwise be materially adverse to the Company. The Company is not required to make any distributions to its members prior to dissolution other than tax distributions.

The Manager may authorize non-tax-related distributions of net cash flow as long as the Company is not in default under the terms of any Note. Additionally, after the Company has paid the outstanding principal and annual interest due and payable under the Notes, the Company may distribute any remaining profits to the Manager. The Manager's profit interest in the Company may create an incentive for the Manager to make more speculative investments on behalf of the Company than the Manager otherwise would make in the absence of such profit potential.

The Manager is controlled by Chris Christensen, and he has much involvement with the operations of the Company. Additionally, Mr. Christensen may sign personal guaranties for the Project loans or the Company that are secured by the Project. Customary fees may be paid to Mr. Christensen as a result of the risks involved in such guarantees, which typically are 1.0% per year of the debt being guaranteed.

### Transactions with the Manager and its Affiliates

The Company may enter into various transactions with the Manager and its Affiliates, including performance of services for a Project Entity, providing financing, guarantying financing, purchasing or selling property, or participating in an investment in a Project Entity alongside a subsidiary of the Company provided the terms are commercially reasonable. Compensation and fees could be paid with respect to these transactions as described below. To the extent any such transaction may pose a conflict of interest between the Company and the Manager or its Affiliates this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company.

In the event the Company enlists the services of any Affiliate of the Manager, the rates of compensation of these Affiliates for the performance of their various services will be at rates no higher than what the Company could obtain from unaffiliated third parties and all payments will be subject to inspection by auditors upon request.

The Company current indebtedness is $2.7M in the form of a first trust deed and promissory note on the Project with an interest rate of 10% and a maturity date of June 30 2023, with the beneficiary being Vault Holding, LLC an affiliate of iCap.

Additionally, in the event the Manager, or an Affiliate of the Manager, guaranties, whether personally or otherwise, a loan, bond or other obligation of the Company or of any of its subsidiary entities, such Manager or Affiliate will be entitled to an annual fee equal to 1% of the outstanding loan amount, bond amount, or other obligation.

**Fees Payable by the Project Entity**

In some instances, an Affiliate of the Manager may perform services for a Project Entity in order to provide better pricing or efficiency than would otherwise be available from third parties. In these instances, such Affiliates may be paid customary service fees for time, material, or labor. The Project Entity for the Project in which the Company plans to invest expects to engage Affiliates of the Manager for many services, including construction and development services, accounting, legal, sales, technology, property management, analysis, and other services.

In some instances, an Affiliate of the Manager may provide lending to a Project Entity in connection with or in lieu of financing from non-affiliated third parties. In such circumstances, the Affiliate may charge customary fees in connection with the issuance of such loans such as interest, origination fees, exit fees, and other fees. The Company current indebtedness is $2.7M in the form of a first trust deed and promissory note on the Project with an interest rate of 10% and a maturity date of June 30 2023, with the beneficiary being Vault Holding, LLC, and affiliate of iCap.

**Acquisition, Transfer, and Divestiture of Investments to or from Affiliates**

The Company may acquire investments previously entered into by Affiliates of the Manager, or may partially or wholly transfer an investment to or from Affiliate entities, subject to underwriting and investment criteria of the Company and the Manager's Affiliates. Any investment acquisition or transfer that occurs may require a determination of the value of the investment, which may pose a conflict of interest between the Company and the Manager or its Affiliates, which must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company. Notwithstanding the foregoing, the Manager is not obligated to cause the Company or any Affiliate to enter into any such transactions.

**Devotion of Time and Attention**

The Manager will cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the Company's investments, and other activities of the Company as much time as may be reasonably necessary for the performance of their respective duties in their capacities as managing principals. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that may or may not be substantially similar to the Company's investment objectives; (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund, any pre-existing funds, and any investments of those successor or pre-existing funds; (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his/her own account; (e) engage in civic, professional, industry and charitable activities; and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

The Manager and its Affiliates have established, and may establish, other pooled investment funds that have investment objectives identical to those of the Company or its Affiliates, and the principals of the Manager may devote such time and attention as they deem necessary for the success of such funds.

## RISK FACTORS

As with all investments, a purchase of the Notes is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. In addition to the information set forth elsewhere in this Memorandum, you should consider the following risks before deciding whether to invest.

**Operation and Company Risks**

> *Control is vested in the Manager; no Investor should purchase the Notes unless the Investor is comfortable with the Manager's judgment and experience in running the Company's affairs.*

Control over all decisions affecting the Company, including decisions regarding the investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, refinancing of Project Entities, whether to make an investment, whether an Affiliate is eligible for an investment, extensions of investments and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors. No assurance can be given that sufficient investments will be presented to the Company to deploy all of the capital available for investment.

When you subscribe for Notes that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the investments that the Manager subsequently identifies. You should not invest in the Company, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

> *Proceeds from Investments will be re-invested during the life of the Company.*

The Manager has the discretion to retain all or a portion of the proceeds from investments to make new investments, and intends to do so over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

> *The Manager's conflicts of interest may result in transactions unfavorable to the Company.*

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Company or the Project Entities, provided the terms are commercially reasonable. These measures may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. In addition, before the Company invests all of its investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between investment opportunities that may meet the investment criteria of Affiliates of the Company or of the Manager.

> *Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Notes.*

The Manager has not arranged for Investors to be separately represented by independent counsel. The legal counsel who has performed services for the Company has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

Pursuant to the terms of the Subscription Agreement, the Notes may be issued with original issue discount (or "OID") for U.S. federal income tax purposes. As such, if you are a U.S. Holder (as defined herein), you may be required to include OID (taxable as ordinary income) in taxable income each year in excess of the amount of interest payments actually received by you in that year.

> *You will not be investing in a fund vehicle. The prior performance data presented should provide you relevant information regarding fund entities overseen by the Company, but should not be construed as an indication of the likely financial performance of the Company.*

By investing in the Company, you will not be a creditor to the Affiliates of the Company nor in any of the prior investments sponsored by its Affiliates. The Company has provided selected information regarding its prior investments because it felt investors might consider those investments to be relevant in assessing the experience and judgment of the Manager or the Company's management team. Investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique and the Company may not be able to replicate the success of prior Affiliated investments, even if the investments assembled for the Company's portfolio are similar to those obtained for prior investments.

### *The Company may prepay the principal and interest on the Notes at any time.*

The Company may prepay the principal amount of the Notes, in whole or in part, at any time after the date of investment. The Company may also choose to pay off some of the investor Notes while waiting to pay off the Notes of other investors. No prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Investors will not have certainty as to how long their respective Notes may be outstanding.

**Investment Risks**

### *The Company will have limited control over the underlying investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the investments.*

The Company expects to acquire equity positions in Project Entities, acquire and hold real estate through Project Entities, or, occasionally, issue debt interests to Project Entities. Accordingly, the Company may not have control over such Project Entities (except in certain circumstances relating to the Company enforcing its creditor rights or contractual rights) and may be required to rely on the Project Partners of such Project Entities to use their skill, expertise and background to generate value from the investments.

### *Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.*

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that Investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

Real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without reviewing detailed budgets, such budgets may understate the expenses.

### *The Company is subject to a number of risks in the enforcement of its rights relating to investments.*

The Company's real estate investments will typically involve equity investments in Project Entities. The Company also has the authority to issue or purchase debt collateralized by real property. These investments are subject to the following risks:

(a)      The Company's investment structure is unique. Although the Company may require a Project Entity to secure the Company's investment and return, which requires the Project Partners to pledge their equity interest in the Project Entity to the Company, there can be no assurance that such interests will be enforceable or that, in the event of non-performance by the Project Partner or a default by the Project Entity, that the real estate will be readily transferred to the Company or that the Company can obtain control of the Project Entity. There is a risk that Project Partners or other third parties may oppose or contest the enforceability or priority of such security.

(b)     During the course of an investment, or in the event the Company exercises its contractual remedies upon non-performance by the Project Partner or a default by the Project Entity, there is a risk that a Project Partner or other third party opposes or contests the enforceability of the Company's investment documentation, or asserts claims or defenses against the Company or the Manager, including claims relating to the Company's ability to remove the Project Partner and take over management of a project. Such claims and potential litigation may result in the Company incurring substantial legal fees, and adversely affect the Manager's ability to mitigate losses resulting from a Project Partner's failure to perform.

(c)     There is no assurance that the Company will subsequently acquire title to the collateral property. The Project Partner may cure defaults or arrange for the Company's investment to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third-party may be prepared to outbid the Company to purchase the collateral property.

(d)     A debtor or Project Partner may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent debtors. These protections are at the expense of the Company, and may result in staying the Company's foreclosure proceedings, proceedings against the Project Partner, restructuring of the terms of the Company's investment, or otherwise delaying or interfering with the enforcement of the Company's rights under its investment documentation.

> ***Uninsured losses on the investments could materially reduce investment returns, which may impact the ability to return principal balances under the Notes.***

The Project Partner or the Manager will obtain insurance policies for the Projects that are commercially prudent given the local market and circumstances of the Project. However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Projects should be partially or totally destroyed, the Company, as an investor in the Project Entity, may suffer a substantial loss of capital as well as profits. Even if the Project Partner's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Project Entity will sustain a substantial uninsured loss as a result of the casualty.

### Private Offering and Liquidity Risks

> ***This offering of the Notes is being made in reliance on an exemption from registration requirements and there is no guarantee that it will comply with the regulatory requirements for such exemption.***

This private placement of Notes will not be registered with the Securities and Exchange Commission ("**SEC**"). The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to Investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, Investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

> ***This is a private offering and as such you will not have the benefit of review of this Memorandum by the SEC or other agency.***

Since this offering is a private placement of securities and, as such, is not registered under federal or state securities laws, you will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

> ***The Notes will be Illiquid***

The Company expects its investments to be illiquid. Accordingly, the timing of its returns on those investments will be dependent upon various market factors. If the underlying assets in those investments are held for long periods or if any income streams of the Company are delayed or reduced, the Investors will be compelled to wait until the underlying assets are sold or improved, before being in a position to liquidate their investments. The Manager expects the Projects to have an investment time frame of 4 years or less. However, the Company may have little or no control over when the underlying properties are liquidated.

You must represent that you are purchasing the Notes for your own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, encumber or otherwise dispose of your Notes unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Code or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans and you may not be able to liquidate your investment in the event of emergency or for any other reason, or may be able to liquidate your investment only at a substantial discount.

# U.S. FEDERAL INCOME TAX MATTERS

## Introduction

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Notes.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Notes, that purchased Notes at their original issue price for cash, and that hold such Notes as capital assets within the meaning of Section 1221 of the Code.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Notes by certain investors that are subject to special tax rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Notes in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Notes, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Notes, including the applicability of any U.S. federal laws or any state, local or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

## Considerations Relating to U.S. Holders of the Notes

As used herein, the term "*U.S. Holder*" means a beneficial owner of a Note that is, for U.S. federal income tax purposes:

- An individual citizen or resident of the U.S.;

- A corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- An estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- A trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Notes that is a partnership and the partners in such a partnership should consult their tax advisors.

**Classification of the Notes**

Pursuant to the terms of the Notes, the Company and each holder of Notes will agree to treat the Notes, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Company's determination that the Notes constitute debt for U.S. federal income tax purposes. If any portion of the Notes is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Note could differ from the timing and character of income, gain or loss recognized in respect of the Notes described below. The remainder of this discussion assumes that the Notes will be treated as indebtedness in accordance with that agreement and our determination.

**Interest Income and Original Issue Discount**

Payments of "qualified stated interest" (as defined below) on a Note will be taxable to a U.S. Holder as ordinary income at the time that such payments are accrued or are received (in accordance with the U.S. Holder's method of tax accounting).

It is anticipated that the Notes may be issued at a discount from their stated redemption price at maturity and that such discount will be equal to or greater than the product of one-fourth of one percent (0.25%) of the stated redemption price at maturity multiplied by the number of full years to their maturity. As such, it is anticipated that the Holders of the Notes may be required to report original issue discount ("*OID*") over the term of the Notes. U.S. Holders of the Notes should be aware that, as described in greater detail below, they generally must include OID in ordinary gross income for U.S. federal income tax purposes as it accrues, in advance of the receipt of cash attributable to that income.

In general, each U.S. Holder of the Notes, whether such U.S. Holder uses the cash or the accrual method of tax accounting, will be required to include in ordinary gross income the sum of the "daily portions" of OID on the Notes for all days during the taxable year that the U.S. Holder owns the debt security. The daily portions of OID on the Notes are determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of an OID debt security, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. In the case of an initial holder, the amount of OID on a Note allocable to each accrual period is determined by (a) multiplying the "adjusted issue price" (as defined below) of the Note at the beginning of the accrual period by the yield to maturity of the Note (appropriately adjusted to reflect the length of the accrual period) and (b) subtracting from that product the amount (if any) of qualified stated interest (as defined below) allocable to that accrual period. The yield to maturity of a Note is the discount rate that causes the present value of all payments on the Note as of its original issue date to equal the issue price of such Note. The "adjusted issue price" of a Note at the beginning of any accrual period generally will be the sum of its issue price and the amount of OID allocable to all prior accrual periods, reduced by the amount of all payments other than payments of qualified stated interest (if any) made with respect to such Note in all prior accrual periods. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of a Note at a single fixed rate of interest or, subject to certain conditions, based on one or more interest indices.

**Sale, retirement or disposition of Notes**

Upon the sale, retirement or other disposition of a Note, an Investor generally will recognize taxable gain or loss equal to the difference between the amount realized on the disposition and the Investor's adjusted tax basis in the Note. A U.S. Holder's adjusted tax basis in a Note generally will be equal to its adjusted issue price (as described above) in the Note. Gain recognized on the disposition of a Note generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Note generally will be treated as an ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Note is more than one year). The deductibility of capital losses is subject to limitations.

**Backup withholding and information reporting**

Information reporting requirements generally will apply to payments of interest and OID made by the Company on, or the proceeds of the sale or other disposition prior to maturity of, the Notes. Backup withholding tax, currently at a rate of 24%, may apply to such payments if an Investor fails to:

- Furnish his, her or its taxpayer identification number (social security or employer identification number);

- Certify that such number is correct;

- Certify that he, she or it is not subject to backup withholding; or

- Otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, *provided* that the required information is furnished timely to the Internal Revenue Service (the "***IRS***").

# ERISA MATTERS

**Benefit Plan Investor Considerations**

The Notes offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or an individual retirement account ("***IRA***") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "***Similar Law***"). A fiduciary of an employee benefit plan must determine that the purchase and holding of a Note is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Notes offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Note offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Note that its acquisition and holding of the Note does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

## REPORTS TO THE INVESTORS

The Company has adopted a calendar fiscal year ending December 31. For so long as the Holder continues to hold the Note, the Company will provide to the Holder, as soon as practicable after the end of each fiscal year and in any event within one hundred eighty (180) days after each fiscal year, consolidated balance sheets of the Company as of the end of such fiscal year and consolidated statements of income of the Company for such fiscal year, prepared in reasonable detail.

## GLOSSARY

To understand the rights associated with the Notes, Investor must review carefully the defined terms used in this Memorandum. Some of these definitions are set forth in this "GLOSSARY" and others in the body of this Memorandum. These definitions (some of which have been slightly modified) have been taken from the Note, which defines the preferences, privileges, rights, interests and obligations of the Notes. Many of these definitions are technical in nature, involve complicated relationships, and can only be understood by reference to other defined terms and, in some cases, to other provisions of the Note and Subscription Agreement. Section references in the definitions refer to sections in the Note and Subscription Agreement. Prospective investors should understand that the definitions in the Note and Subscription Agreement will, for all purposes, be controlling, notwithstanding any simplification of such definitions in this Memorandum. Moreover, you should bear in mind that this GLOSSARY does not include many of the definitions included in the Note and Subscription Agreement.

"*Affiliate*" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"*Estimated Tax Amount*" means, with respect to each member of the Company, the amount equal to (a) the sum of (i) the greater of the highest statutory marginal ordinary federal income tax rate for individuals or corporations for a given tax year plus (ii) the unearned income Medicare contribution tax rate under Internal Revenue Code Section 1411 for a given year, multiplied by (b) the taxable income allocated to that member for the taxable year.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"*Project Entity*" means any special purpose entity in which the Company has a direct or indirect investment, created to execute an investment in a real estate strategy.

"*Project Partner*" means any Person, including Affiliates, engaged by the Company to manage a real estate project in which the Company invests.

# THE OFFERING

The following description of certain matters relating to the Notes does not purport to be complete and is subject in all respects to applicable Washington Law and to the provisions of the Note and Subscription Agreement.

## General

The Offering has not been registered under the Securities Act and is intended by the Company not to involve a public offering within the meaning of the Securities Act and Regulation D and S promulgated thereunder and, therefore, to be exempt from the registration provisions of the Securities Act. Accordingly, the Offering is being made pursuant to certain conditions which, if satisfied, will qualify the Offering for exemption from registration as provided by the Securities Act and Regulation D and S. These conditions relate to limitations on the manner of Offering, the nature of the Investors, access to or furnishing information about the issuer, and restrictions on transferability. This Offering is being offered pursuant to Regulation S and Rule 506(b) of Regulation D.

Subject to the terms of the Note and Subscription Agreement, the Company is authorized to raise up to $20,000,000 through the Offering. Investors must make a minimum investment of $500,000, unless a smaller purchase is permitted by the Manager. The Notes are secured by a Pledge and Security Agreement, the form of which is set forth in Exhibit C.

The Manager will have an initial closing for the Company as soon as practicable after a sufficient quantity of funds is raised in the Manager's sole determination. To accommodate the admission of additional Investors and permit existing Investors to increase their investment amounts, the Manager may, in its discretion, hold one or more additional closings on or before April 30, 2023, unless extended up to 12-months by the Manager.

## Payment of Investments

Each payment to the Company will be made in United States dollars by means of a certified or cashier's check payable to "iCap Broadway, LLC" or by wire or electronic funds transfer, to a bank account designated by the Company, of immediately available funds through the federal wire transfer system, in the amount that the Holder has agreed to lend to the Company in the Note and Subscription Agreement.

## Acceptance of Subscriptions; Eligibility Requirements

Purchases for the Notes will be accepted on a "first come, first-served" basis. The Manager reserves the right to reject any tendered investment for whatever reason the Manager deems appropriate. If the Manager rejects an investment, the Manager will give notice of such rejection, and return the tendered initial investment payment, no later than 10 business days after the Note, Subscription Agreement and the accompanying funds have been received by the Manager.

# TRANSFERABILITY OF THE NOTES

Subject to compliance with the requirements of the Note and Subscription Agreement, Investors shall have the right to transfer the Note to any qualifying third party of its choice contingent upon securing the Company's written consent in advance of the proposed transfer. The Company is under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under the Note or Subscription Agreement, until the Holder has surrendered the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Company. A new Note for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing any documentation required by the Company. Interest and principal are payable only to the registered holder of the Note.

The Holder and any successor Holder agree(s) to provide to the Company a Form W-9 (for US investors) or Form W-8 (for non-US investors) upon request, and the Company may withhold acceptance of a Subscription Agreement for failure to deliver such form. Until registration of a transfer occurs, the Company shall be entitled to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by the Subscription Agreement and the applicable Note.

## State Securities: Blue Sky Laws

Transfer of the Notes may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Notes may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be

registered for resale under the Blue Sky laws of any state, the Holders and any persons who desire to purchase them in any trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Notes and of purchasers to purchase the Notes. Accordingly, Investors should be prepared to hold the Notes until their maturity date as may be extended.

## FINANCIAL INFORMATION

This Memorandum does not include current balance sheets for either the Company or the Manager. The Manager has limited capitalization. As of the date hereof, the Company has incurred certain liabilities in connection with the offering and will incur substantial expenses in connection with the offering and sale of the Notes.

# NOTICES

The following notices apply in certain states where the Notes, which are referred to below as "securities," may be sold. Compliance with the notice exemption requirements of applicable state securities laws will be undertaken by the Company as needed.

**Notice to Residents of all States:**

THE SECURITIES OFFERED IN THE OFFERING HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND OTHER LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ACT AND THE SECURITIES LAWS OF CERTAIN JURISDICTIONS GRANT PURCHASERS OF SECURITIES SOLD IN VIOLATION OF THE REGISTRATION OR QUALIFICATION PROVISIONS OF SUCH LAWS THE RIGHT TO RESCIND THEIR PURCHASE OF SUCH SECURITIES AND TO RECEIVE BACK THEIR CONSIDERATION PAID. THE COMPANY BELIEVES THAT THE OFFERING DESCRIBED IN THIS MEMORANDUM IS NOT REQUIRED TO BE REGISTERED OR QUALIFIED. MANY OF THESE LAWS GRANTING THE RIGHT OF RESCISSION ALSO PROVIDE THAT SUITS FOR SUCH VIOLATIONS MUST BE BROUGHT WITHIN A SPECIFIED TIME, USUALLY ONE YEAR FROM DISCOVERY OF FACTS CONSTITUTING SUCH VIOLATION. SHOULD ANY INVESTOR INSTITUTE SUCH AN ACTION ON THE THEORY THAT THE OFFERING CONDUCTED AS DESCRIBED HEREIN WAS REQUIRED TO BE REGISTERED OR QUALIFIED, THE COMPANY WILL CONTEND THAT THE CONTENTS OF THIS MEMORANDUM CONSTITUTED NOTICE OF THE FACTS CONSTITUTING SUCH VIOLATION.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS ATTACHED TO THIS MEMORANDUM. NO ONE HAS BEEN AUTHORIZED TO PROVIDE YOU WITH ANY INFORMATION THAT IS DIFFERENT. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN GIVEN BY THE ISSUER OF THE SECURITIES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE ON THE COVER PAGE AND IS AN OFFER ONLY TO SUCH NAMED OFFEREE.

NEITHER THE INFORMATION CONTAINED HEREIN, NOR ANY PRIOR, CONTEMPORANEOUS OR SUBSEQUENT COMMUNICATION SHOULD BE CONSTRUED BY THE PROSPECTIVE INVESTOR AS FINANCIAL, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS, HER OR ITS OWN FINANCIAL, LEGAL, AND TAX ADVISORS TO ASCERTAIN THE MERITS AND RISKS OF THE OFFERING AND AN INVESTMENT IN THE COMPANY PRIOR TO SUBSCRIBING TO PURCHASE THE SECURITIES.

**Notice to New York Residents:**

THIS CONFIDENTIAL OFFERING MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

**Notice to Florida Residents:**

THE SECURITIES OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE SECURITIES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER OF THE SECURITIES OR AN AGENT OF SUCH ISSUER, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**Notice to New Hampshire Residents:**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

DURING THE COURSE OF THIS OFFERING, EACH PROSPECTIVE INVESTOR MAY OBTAIN ADDITIONAL INFORMATION WHICH SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY PROSPECTIVE INVESTOR WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE INVESTOR'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE COMPANY IF THE RECIPIENT DOES NOT PURCHASE THE SECURITIES OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE TO : INVESTOR@ICAPEQUITY.COM.