Julian I. Gurule (CA SBN: 251260)*
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone: (213) 430-6067
Email: jgurule@omm.com

*Co-Counsel to Debtors and
Debtors in Possession*

Dakota Pearce (WSBA #57011)
BUCHALTER
1420 5th Avenue, Suite 3100
Seattle, Washington 98101
Telephone: (206) 319-7052
Email: dpearce@buchalter.com

Bernard D. Bollinger, Jr. (CA SBN: 132817)*
David E. Mark (CA SBN: 247283)*
Khaled Tarazi (AZ SBN: 032446)*
BUCHALTER
1000 Wilshire Blvd., Suite 1500
Los Angeles, California 90017
Telephone: (213) 891-0700
Email: bbollinger@buchalter.com
        ktarazi@buchalter.com

*Admitted *Pro Hac Vice*

Counsel to Debtors and Debtors in
Possession*

HONORABLE WHITMAN L. HOLT

HEARING DATE: March 27, 2024
HEARING TIME: 10:00 A.M.
LOCATION:  Tower Bldg
             2nd Floor Courtroom
             402 East Yakima Avenue
             Yakima, WA 98901

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Chapter 11 |
| ICAP ENTERPRISES, INC., *et al.*, | Lead Case No. 23-01243-WLH11 |
| Debtors.[1] | Jointly Administered |

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01265-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01248-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund, LLC (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); iCap Broadway, LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH 2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding LLC (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11); Vault Holding, LLC (23-01270-11); iCap Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); iCap Holding 6 LLC (23-01274-11); Colpitts Sunset, LLC (23-01432-11); CS2 Real Estate Development LLC (23-01434-11); and iCap International Investments, LLC (23-01464-11).

**SUPPLEMENTAL DECLARATION OF JEFFREY H. KINRICH IN SUPPORT OF POSTPETITION FINANCING AND RELATED RELIEF PURSUANT TO FED. R. CIV. PRO. 26(A)(2)(B) AND 7026**

**SUPPLEMENTAL DECLARATION OF JEFFREY H. KINRICH IN SUPPORT OF POSTPETITION FINANCING AND RELATED RELIEF PURSUANT TO FED. R. CIV. PRO. 26(A)(2)(B) AND BANKRUPTCY RULE 7026**

## DECLARATION OF JEFFREY H. KINRICH

I, Jeffrey H. Kinrich, hereby declare as follows:

1.　I have been engaged by counsel for the above-captioned Debtors and Debtors-in-Possession to provide expert testimony in the above-captioned jointly administered bankruptcy cases. Specifically, I have been asked to provide an opinion as to whether the Debtors' prepetition transactions with their investors have the economic and financial indicia of a Ponzi scheme.

2.　As an expert consultant, I am providing my written report in compliance with Federal Rules of Civil Procedure 26(a)(2)(B) and Bankruptcy Rule 7026.

3.　The opinions contained in my report are based on materials reviewed or considered as of the date of my report. Discovery in this action is not complete. I reserve the right to supplement my opinions or express additional opinions should additional and/or presently unknown information about this matter become known to me at or before trial.

4.　I am a Certified Public Accountant (CPA) and Managing Principal at Analysis Group, an economic consulting firm with over 1,000 employees across the United States and around the world. I can be contacted through Julian I. Gurule and David E. Mark, counsel for the Debtors.

5.　Attached hereto as **Exhibit 1** is a true and correct copy of the Expert Report of Jeffrey H. Kinrich, dated February 23, 2024, which I prepared on behalf of the Debtors pursuant to Federal Rules of Civil Procedure 26(a)(2)(B) and Bankruptcy

Buchalter
A Professional Corporation
Seattle

**SUPPLEMENTAL DECLARATION OF JEFFREY H. KINRICH IN SUPPORT OF POSTPETITION FINANCING AND RELATED RELIEF PURSUANT TO FED. R. CIV. PRO. 26(A)(2)(B) AND 7026**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Pg 2 of 630

Rule 7026. **Exhibit 1** includes a copy of my curriculum vitae and a list of materials I considered in formulating my opinions in this matter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed on February 23, 2024, in Los Angeles, California.

_Jeffrey H. Kinrich_
Jeffrey H. Kinrich

**SUPPLEMENTAL DECLARATION OF JEFFREY H. KINRICH IN SUPPORT OF POSTPETITION FINANCING AND RELATED RELIEF PURSUANT TO FED. R. CIV. PRO. 26(A)(2)(B) AND 7026**

BUCHALTER
A PROFESSIONAL CORPORATION
SEATTLE

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Pg 3 of 630

# Exhibit 1

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF WASHINGTON**

In re:

ICAP ENTERPRISES, INC., et al.,

Debtor.

Chapter 11

Lead Case No. 23-01243-WLH11

**EXPERT REPORT OF JEFFREY H. KINRICH PURSUANT TO FED. R. CIV. PRO.**
**26(A)(2)(B) AND 7026**
**FEBRUARY 23, 2024**

# TABLE OF CONTENTS

I.    INTRODUCTION AND QUALIFICATIONS ....................................................1

     A.   Assignment ...................................................................................1

     B.   Qualifications ...............................................................................1

     C.   Facts and Data Considered...........................................................2

II.   BACKGROUND .............................................................................................2

     A.   Overview of iCAP Enterprises, Inc. ...........................................2

     B.   Relevant Timeframe of Financial Records .................................4

     C.   Accounting and Transaction Data Relied Upon .........................5

III.  SUMMARY OF OPINIONS ...........................................................................5

IV.  PONZI SCHEME DEFINED ..........................................................................6

     A.   General Factors of a Ponzi Scheme ...........................................6

          1.  Deposits were made by investors;.................................................7

          2.  Unrealistic returns promised to investors with little or no risk; ..............................................................................................7

          3.  The company operating the Ponzi scheme conducted little or no legitimate business operations as represented to investors; ........................................................................................7

          4.  Purported business operations of the Ponzi scheme entity produced little or no profits or earnings;....................................7

          5.  Source of payments to investors was not obtained by any business venture of the Ponzi scheme entity but was taken from cash infused by new investors;....................................7

          6.  Investors' funds cannot be traced to a specific investment; ....7

          7.  The Ponzi scheme entity failed to invest all of the investors' funds in promised investments;....................................7

          8.  The Ponzi scheme entity used investor funds for non-investor purposes; ........................................................................7

          9.  Later investors in the Ponzi scheme entity received lower returns than earlier investors; and .............................................8

         10. Money was transferred between related entities within the Ponzi scheme entity for no business purpose. ..........................8

V.    DEVELOPMENT OF THE SOURCES & USES OF FUNDS............................8

VI.  ANALYSIS AND OPINIONS ........................................................................11

     A.   Analysis of iCAP's Sources and Uses of Funds ......................11

          1.  Deposits and Receipts ................................................................. 11

          2.  Disbursements and Withdrawals................................................. 13

          3.  Analysis of Individual Fund Sources & Uses ............................ 15

23-01243-WLH11     Doc 469     Filed 02/23/24     Entered 02/23/24 19:45:30     Exhibit 1, Page 6

B.     Analysis of iCAP's Real Estate Business ................................................................18

C.     Analysis of Intercompany Transfers and Evidence of Commingling.........................21

D.     Analysis of the Unrealistic Returns Required for iCAP to Make its Promised Payments to Subscribers ................................................................28

E.     Analysis of Other Ponzi Scheme Factors................................................................35

       1.    Organizer failed to invest (all of) the investors' funds in promised investments................................................................ 35

       2.    Later investors received lower returns than earlier investors. ................................................................ 36

23-01243-WLH11     Doc 469     Filed 02/23/24     Entered 02/23/24 19:45:30     Exhibit 1   Page 7

# I.   INTRODUCTION AND QUALIFICATIONS

## A.   Assignment

1.      I have been engaged by counsel for the above-captioned Debtors and Debtors-in-Possession to provide expert testimony in the matter of In re iCAP Enterprises, Inc., et al., pending in the United States Bankruptcy Court for the Eastern District of Washington under Case No. 23-01243-WLH11. Specifically, I have been asked to provide an opinion as to whether the iCAP Enterprises, Inc.'s ("iCAP" or "Debtors") transactions with their investors have the economic and financial indicia of a Ponzi scheme.

2.      As an expert consultant, I am providing this written report in compliance with Federal Rules of Civil Procedure 26(a)(2)(B) and 7026.

3.      The opinions contained in this report are based on materials reviewed or considered as of the date of this report. Discovery in this action is not complete. I reserve the right to supplement my opinions or express additional opinions should additional and/or presently unknown information about this matter become known to me at or before trial.

## B.   Qualifications

4.      I am a Certified Public Accountant (CPA) and Managing Principal at Analysis Group, an economic consulting firm with over 1000 employees across the United States and around the world. I have testified at trial, arbitration, or deposition on financial and economic issues over 400 times. A copy of my CV, together with a list of the trial and deposition testimony I have given in the last six years, is attached as **Appendix A**. Analysis Group is compensated at the rate of $985 per hour for my time. Research and analysis for this declaration was also

performed by other Analysis Group personnel under my direction and guidance. Neither my compensation nor that of Analysis Group is contingent upon my findings, the testimony I may give, or the outcome of this litigation.

### C.    Facts and Data Considered

5.      In forming my opinions, I have reviewed documents and other materials provided to me by the Debtors and their professionals, or obtained from publicly available sources. These sources include data from Accounting Seed (the accounting platform within Salesforce that iCAP utilized for its operational accounting), iCAP bank statements and bank production, iCAP financial statements, and internal iCAP spreadsheets, among others. The sources on which I rely are identified in this report or in **Appendix B**. Should additional relevant documents or information be made available to me, I may adjust or supplement my opinions as appropriate.

## II.    BACKGROUND

### A.    Overview of iCAP Enterprises, Inc.

6.      iCAP was founded to invest in real estate opportunities in the Pacific Northwest region of the United States ("U.S."). iCAP operated two divisions with different investment strategies: the "Portfolio Business" and the "Vault Business." The Portfolio Business raised its first fund in 2014 and ostensibly focused on multifamily real estate projects with development potential, ranging from completely new construction to improving existing structures. The Portfolio Business operated under the entity iCAP Equity, LLC, and various subsidiaries.[1]

---

[1] Declaration of Lance Miller in Support of First Day Motions ("Miller First Day Declaration"), ¶¶ 5-8. Attached hereto as **Exhibit 7** is a copy of the Miller First Day Declaration.

7.     iCAP started its "Vault Business" in 2018. The Vault Business ostensibly focused on investing in real estate that already was or had the potential to be cash flow positive.[2] The Vault Business was primarily operated under the entity iCAP Vault, LLC as well as various subsidiaries such as iCAP Vault 1 ("Vault 1"), LLC, an SEC registered entity, with cash flows in and out of the entity made via a Vault 1 bank account held with Umpqua Bank.[3]

8.     Both the Portfolio Business and the Vault Business operated under iCAP Enterprises, Inc. ("iCAP Enterprises") in the organization's corporate structure; their properties were held by various single purpose entities (SPE's).[4] iCAP Enterprises operated as the parent for all entities (other than iCAP Investments, LLC) that directly owned equity in the various SPEs. Chris Christensen was the sole shareholder of both iCAP Enterprises and iCAP Investments, LLC.[5]

9.     iCAP funded its operations by raising debt capital from investors and from cash flows from business operations.[6] iCAP primarily relied on private placements to fund its investments.[7] For example, the Portfolio Business was funded through private placements of debentures and promissory notes under which investors were promised interest rates ranging from 6% to 15% to the investors.[8] Similarly, the Vault Business financed its operations through

---

[2] Miller First Day Declaration, ¶ 9.

[3] The iCAP Vault 1 account with Umpqua Bank is bank account number xxxxxx4804. *See e.g.,* Umpqua Bank, iCAP Vault 1 LLC, December 31, 2020 account statement; *see also,* Miller First Day Declaration, ¶¶ 9, 14. Attached hereto as **Exhibit 8** is a copy of the iCAP Vault 1 Umpqua Bank account statement from December 2020.

[4] Miller First Day Declaration, ¶ 10.

[5] iCAP Organizational Chart_v5 092223.pptx. Attached hereto as **Exhibit 9** is a copy of the iCAP Organizational Chart.

[6] Miller First Day Declaration, ¶ 15.

[7] Miller First Day Declaration, ¶¶ 17-19.

[8] Miller First Day Declaration, ¶ 17.

Private Placement Notes and Public Demand notes.[9] In 2018, iCAP initiated a private placement of up to $500M to fund the Vault Business. In the same year, Vault 1 authorized up to $500 million in Variable Denomination Floating Rate Demand Notes that accrued interest at a floating rate equal to the Average Savings Account Rate posted by the FDIC plus a 2% premium, which was reset every quarter. Both businesses had investors from the United States and abroad, including China, Taiwan, the United Kingdom, and the British Virgin Islands.[10]

### B.     Relevant Timeframe of Financial Records

10.     In 2014, iCAP raised its first fund, the iCAP Pacific Northwest Opportunity and Income Fund, LLC ("Fund 1"). To date, I have received investor trackers for various funds, including Fund 1, that track money to and from individual subscribers. These trackers do not contain information on internal accounting transactions at iCAP or any indication as to transactions involving its real estate business.[11]

11.     I have more complete iCAP accounting data from its Accounting Seed database for the period October 2018 to September 2023, as well as various iCAP entity monthly bank statements for the period November 2019 to September 2023, as discussed further below. Accordingly, certain analyses in this Declaration are limited to the period for which I have the necessary data.

---

[9] Miller First Day Declaration, ¶ 19-20.

[10] Miller First Day Declaration, ¶¶ 20, 22.

[11] I understand iCAP initially used QuickBooks as its accounting software, but switched to Accounting Seed around October 2018. As of this filing, iCAP has been unable to gain access to the QuickBooks.

**C.     Accounting and Transaction Data Relied Upon**

12.     I understand iCAP used Accounting Seed to house its accounting data from at least October 2018 to September 2023. I have been provided with summary financial statements and transaction detail from Accounting Seed for this timeframe.

13.     I have also been provided with iCAP entity bank statements and related records for November 2019 to September 2023. Within these bank statements, I have identified 56 unique iCAP bank accounts -- 49 of which are with Umpqua Bank -- with at least one monthly statement during this period. As discussed further below, I primarily rely on these bank records to cross-check the accuracy of the Accounting Seed data and to identify cashflows in and out of iCAP entities.

**III.     SUMMARY OF OPINIONS**

14.     On the basis of my review of the information identified herein, I have reached the following opinions:

> a.  The majority of iCAP's funds from October 2018 to September 2023 were from fund subscribers and loans from third parties, rather than cash generated from its business operations. *See* **Exhibit 1.1**.
>
> b.  The majority of iCAP's funds from October 2018 to September 2023 were used to make interest and principal payments to subscribers rather than investing in real estate and related operations. *See* **Exhibit 1.1**.
>
> c.  iCAP's real estate business from 2014 through 2022 did not generate sufficient cash flow to meet its interest and principal obligations to subscribers.

5

d.  There were several large dollar transfers between iCAP entities from October 2018 to September 2023, indicating that subscriber funds from one entity were used to pay subscribers in another entity. This is indicative of commingling.

e.  iCAP could only meet its obligations to repay its subscribers using proceeds from its real estate business if its real estate investments generated unrealistic (and unrealized) returns.

f.  iCAP failed to invest subscribers' funds in the promised investments or as otherwise represented to subscribers.

g.  Later investors in iCAP received lower returns than earlier investors.

## IV.  PONZI SCHEME DEFINED

### A.  General Factors of a Ponzi Scheme

15.  A Ponzi scheme is an investor fraud scheme in which some or all of the returns generated from an investment are not legitimate and are merely transfers of funds from new investors to existing investors.[12] The SEC identifies this as the primary determinant of a Ponzi scheme. In a Ponzi scheme, new investors are often encouraged to invest through the promise of high returns with low risk. Some or all of these funds are not invested in legitimate businesses, resulting in little to no legitimate returns.[13] In the absence of legitimate returns, these funds rely

---

[12] "Ponzi Scheme," Investor.gov, U.S. Securities and Exchange Commission, accessed on January 12, 2024, available at: https://www.investor.gov/protect-your-investments/fraud/types-fraud/ponzi-scheme; "Investor Protection Guide: Ponzi Scheme," Legal Information Institute, Cornell Law School, accessed on January 12, 2024, available at: https://www.law.cornell.edu/wex/investor_protection_guide_ponzi_scheme; "Ponzi Schemes," Michigan Consumer Protection," accessed on January 12, 2024, available at: https://www.michigan.gov/consumerprotection/protect-yourself/consumer-alerts/invest/ponzi. Attached hereto as **Exhibit 10**, **Exhibit 11**, and **Exhibit 12**, respectively, are downloaded copies of these three websites.

[13] "Ponzi Scheme," Investor.gov, U.S. Securities and Exchange Commission, accessed on January 12, 2024, available at: https://www.investor.gov/protect-your-investments/fraud/types-fraud/ponzi-scheme.

on the recruitment of new investors to pay existing investors in order to sustain the scheme. As a result, the early investors usually get relatively higher returns compared to the later investors, and particularly those that subscribe near the collapse of the scheme, suffer either partial or complete loss of their investments.[14] While Ponzi schemes manifest in different forms, they generally exhibit the following characteristics:[15]

1.  *Deposits were made by investors;*

2.  *Unrealistic returns promised to investors with little or no risk;*

3.  *The company operating the Ponzi scheme conducted little or no legitimate business operations as represented to investors;*

4.  *Purported business operations of the Ponzi scheme entity produced little or no profits or earnings;*

5.  *Source of payments to investors was not obtained by any business venture of the Ponzi scheme entity but was taken from cash infused by new investors;*

6.  *Investors' funds cannot be traced to a specific investment;*

7.  *The Ponzi scheme entity failed to invest all of the investors' funds in promised investments;*

8.  *The Ponzi scheme entity used investor funds for non-investor purposes;*

---

[14] "Ponzi Schemes," Michigan Consumer Protection," accessed on January 12, 2024, available at: https://www.michigan.gov/consumerprotection/protect-yourself/consumer-alerts/invest/ponzi.

[15] *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006)); *Fisher v. Sellas (In re Lake States Commodities, Inc.)*, 272 B.R. 233, 242 (Bankr.N.D.Ill.2002) (citing *Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 431 (Bankr.S.D.Tex.1997), aff'd sub nom. *Fisher v. Page*, 2002 WL 31749262 (N.D. Ill. Dec. 3, 2002); *see also Scholes v. Lehman*, 56 F.3d 750, 757 (7th Cir. 1995); *O'Halloran v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1199 (11th Cir. 2003); *United States v.* Benson, 79 Fed. App'x 813, 817 (6th Cir. 2003); *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993); *Wing v. Williams*, 2011 U.S. Dist. LEXIS 25607, at *10 (D. Utah Mar. 11, 2011); *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 656-57 (Bankr. M.D. Fla. 2002); *Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 440 (Bankr. S.D. Tex. 2009); *Emerson v. Maples (In re Mark Benskin & Co.)*, 161 B.R. 664, 650 (Bankr. W.D. Tenn. 1993); *Wing v. Dockstader*, 2010 U.S. Dist. LEXIS 128571, at *11 (D. Utah Dec. 3, 2010).

9.      *Later investors in the Ponzi scheme entity received lower returns than earlier investors; and*

10.     *Money was transferred between related entities within the Ponzi scheme entity for no business purpose.*

## V.      DEVELOPMENT OF THE SOURCES & USES OF FUNDS

16.     Several of the Ponzi Scheme characteristics listed above can be investigated at least in part through a Sources and Uses analysis. A Sources and Uses analysis attempts to identify and categorize all money coming into an entity (sources), and all money being withdrawn from an entity (uses). Generally, in a Ponzi Scheme, the Sources and Uses analysis would find that the cash inflows and outflows were more focused on investor activity rather than on the stated business purpose (in iCAP's case, real estate investment and related operations).

17.     To develop a Sources and Uses analysis, I reviewed iCAP's Accounting Seed "Consolidated Funds Cash Detail" data ("Accounting Seed Data"), which contains transaction data on cash deposits and withdrawals from October 2018 through September 2023.[16] I understand that Debtors used their bank accounts at Umpqua bank to conduct their ordinary course of business, and that the Accounting Seed Data reflects this cash activity.[17] In particular, I reviewed the cash transaction activity recorded in the "1000-Checking:Umpqua" account in the Accounting Seed Data, which appears to have been used to conduct the ordinary course of

---

[16] Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx and other Accounting Seed data for individual iCAP entities. Due to the volume of transactions in these files and resulting document size, these documents are not attached as an exhibit to this declaration, but can be produced upon request.

[17] Miller First Day Declaration, ¶ 14.

business of all major entities within iCAP.[18] This dataset contains over 75,000 records of cash activity.

18.     As a check on the reliability of the Accounting Seed Data, I compared the dollar value of deposits and withdrawals to the iCAP bank statements produced to me. As discussed, the monthly bank account statements are in PDF format and cover the period November 2019 to September 2023. To make the comparison easier, I converted the PDF bank statements to a structured Excel database, which allowed me to easily calculate totals across multiple months and years. Filtering the Accounting Seed Data for transactions occurring during the same period as the provided bank statements results in the amounts in the table below.

**Table 1: Comparison of Deposits and Withdrawals in iCAP Accounting Seed Data to iCAP Bank Statements**

|  | Total Deposits | Total Withdrawals |
|---|---|---|
| iCAP Accounting Seed Data | $537.4 million | $546.4 million |
| iCAP Bank Statements | $556.7 million | $553.8 million |
| Percentage Difference | (3.5%) | (1.3%) |

19.     As presented in Table 1 above, while not an exact match, the deposits and withdrawals per the Accounting Seed Data, as compared to the iCAP bank statements are similar, with the difference in deposits being approximately 3.5% and the difference in

---

[18] Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx and other Accounting Seed data for individual iCAP entities.

withdrawals being 1.3%. As such, the available data provides a reliable basis for these Ponzi scheme related analyses, including the Sources and Uses analysis.

20.     I first considered iCAP as a whole, without consideration of individual entities. **Exhibit 1.1** provides a summary of the Sources and Uses of iCAP's funds per the Accounting Seed Data. To determine the appropriate category for deposits and withdrawals, I relied on three main data elements from the Accounting Seed Data: (1) the name of the entity involved (referred to as "Entity (GLAV1)" in the Accounting Seed Data), (2) the name of the counter-party involved in the transaction (referred to as "Account: Account Name" in the Accounting Seed Data), and (3) the description of the transaction (referred to as "Source Reference" in the Accounting Seed Data). Certain transactions were also informed by the subscriber number contained in the "Subscription: Subscription Name" column and the entity name contained in the "Fund Project for Report" column.[19]

21.     The results of the Sources and Uses analysis are shown in **Exhibit 1.1**. In summary, I identified four categories of deposits: (1) "Investments from Subscribers," (2) "Loans Obtained from Third Party Lenders," (3) "Money Received from Business Operations," and (4) "Intercompany Transfers." The deposits are further subdivided into sub-categories based on the nature of the deposits identified using the descriptions of the deposits as well as the parties involved in the deposits.

22.     Similarly, I identified seven categories of withdrawals: (1) "Returns to Subscribers," (2) "Commission Payments," (3) "Real Estate Acquisition, Development, and

---

[19] Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx and other Accounting Seed data for individual iCAP entities.

Investment," (4) "Loan Repayment," (5) "General, Operating, and Admin Expenses," (6) "Money to Owner," and (7) "Intercompany Transfers."[20]

23.      Of note, both the deposits and withdrawals sections of the Sources and Uses analysis contain a category called "Intercompany Transfers." This element is necessary to account for all deposits and withdrawals into and out of the company accounts, and it is relevant when analyzing individual funds. However, it should be (and will be) eliminated when considering the company as a whole, as discussed below.

24.      The results of the Sources and Uses analysis are relied on in conducting several of the analyses discussed below.

## VI.    ANALYSIS AND OPINIONS

### A.    Analysis of iCAP's Sources and Uses of Funds

#### *1.    Deposits and Receipts*

25.      As discussed above in **Section V**, several indicators of a Ponzi scheme can be observed in a Sources and Uses analysis. The summary of the consolidated iCAP Sources and Uses, including deposits and receipts, per the Accounting Seed data is shown in **Exhibit 1.1**. The analysis indicates that approximately 84% of the amounts deposited to iCAP bank accounts from October 2018 to September 2023 were related to either investments from subscribers or intercompany transfers. Specifically, deposits and receipts totaled $580.2 million. Of this amount, $286.8 million, or 49.4%, was related to investments from subscribers.[21]

---

[20] For additional detail on the Sources and Uses categorizations, see **Exhibit 1.2**.

[21] Included in this amount is $21.7 million, or 3.7% of total deposits, of subscriber funds that were reallocated to other funds and are not necessarily "new" investments from subscribers.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 1 Page 18

26. The next largest category of cash deposits is intercompany transfers, totaling $202.6 million, or 34.9% of total deposits. This category is not "new" money to iCAP, as it is money moving between iCAP entity accounts. Although it is not "new" money being deposited, the volume of transfers is still instructive in comparison to other deposit amounts. The purpose of these transfers is also important, as it could be for iCAP's stated business purpose (i.e., investing in real estate) or for a non-business purpose (i.e., returning money to investors). In this case, most intercompany transfers were not for business purposes, but funded payments to investors.

27. The third category of deposits is loans iCAP obtained from third party lenders. My understanding is that these were typically mortgage loans. This category totaled $55.8 million, or 9.6% of total deposits.

28. The fourth category of deposits is from iCAP's business operations. This category totaled $34.9 million, or 6.0%, of total deposits.

29. Thus, deposits to iCAP entities were largely comprised of money from subscribers (49.4%), intercompany transfers (34.9%), and third-party loans (9.6%), more so than from business operations (6.0%). In other words, only approximately 6% of deposits were from iCAP's business operations. Taken by itself, this could have an innocent explanation; for example, the business could be in an investment mode where investments were not yet paying off. A look at the disbursements of cash (below), however, shows this is not the case.

30. As another check, I remove the intercompany transfer amounts and compare the investments from subscribers and money received from iCAP's business operations, as these are the deposits that iCAP received from external sources. The results indicate that iCAP received 76.0% of its funds from subscribers, 14.8% from third party lenders, and 9.2% from business operations. *See* **Exhibit 2**. That is, even when excluding intercompany transfers, the majority of

funds received by iCAP were from subscribers and external lenders rather than business operations.

31.     The Sources and Uses analyses described thus far incorporate cash flows from both funds that subscribers were directly investing in as well as special purpose entities created for specific projects that iCAP invested in. As a further check on iCAP's Sources and Uses, and to better determine how iCAP was using cash received directly from subscribers, I isolate the funds that subscribers invested in and develop a consolidated Sources and Uses for these funds. I understand that these entities are Funds 1 through 5, iCAP Funding, iCAP Investments, and iCAP Vault. The consolidated Sources and Uses for these funds is shown in **Exhibit 3**. The results indicate that 65.6% of deposits to these funds were investments from subscribers, 29.4% were intercompany transfers, and 4.1% were from business operations. Thus, 95.0% of the cash deposited to these funds were either from subscribers or other iCAP entities.

32.     Again, the relatively low amount of deposits from business activity could be reasonable if iCAP was in a real estate investment phase and was using the cash from subscribers to invest in the possibility of future cash flows from operations. The disbursements discussed below, however, indicate this is not the case, which in turn indicates that the deposits being mainly comprised of cash from subscribers and intercompany transfers are indicative of a Ponzi scheme.

### 2.     *Disbursements and Withdrawals*

33.     If iCAP's disbursements and withdrawals were to fund its investments, then perhaps its operations might make sense. But they were not. The majority of disbursements and

withdrawals from iCAP entities were returns to subscribers and intercompany transfers. *See* **Exhibit 1.1**.

34.    In total, the Sources and Uses Analysis indicates that $584.8 million was withdrawn from iCAP accounts from October 2018 to September 2023. Of this, $236.1 million, or 40.4%, was returned to subscribers and $205.2 million, or 35.1%, was intercompany transfers. That is, transactions related to returns to subscribers and intercompany transfers comprised 75.5% of total withdrawals.

35.    Certain withdrawals from iCAP were related to real estate acquisition, development, and investment. These withdrawals totaled just $78.9 million, or 13.5% of the total. Other transactions, while not specifically related to real estate, involved withdrawals for iCAP's general, operating, and administrative expenses. These withdrawals totaled $45.0 million, or 7.7% of the total. Combining the two, withdrawal transactions related to real estate or the operation of iCAP comprised just 21.2% of total withdrawals.

36.    Thus, similar to deposits, withdrawals from iCAP entities were largely comprised of money paid to subscribers (40.4%) and intercompany transfers (35.1%), more so than for real estate investment activities (13.5%) and business operations (7.7%).

37.    Alternatively, I once again excluded intercompany transfers and compared the remaining withdrawal amounts. Returns to subscribers comprise 62.2% of total withdrawals, with real estate acquisition, development, and investment (20.8%), and general, operating, and administrative (11.8%), totaling 32.6% combined. *See* **Exhibit 2**. Thus, after removing intercompany transfers, more than half of withdrawals were returns to subscribers, with approximately one-third of withdrawals related to the real estate and business operations side of iCAP.

38. Combining the results of the Sources and Uses analysis, with intercompany transfers excluded, I find that 76.0% of sources were from investors, and only 9.2% were from business operations. Similarly, 62.2% of the funds were used to repay investors, while only 20.8% were used to make real estate investments (other amounts were used to pay for business operations, commissions, etc.). Combined, this is highly indicative of a Ponzi scheme.

39. In addition to these analyses, I once again consider the Sources and Uses for only the funds that subscribers invested in, Funds 1-5, iCAP Funding, iCAP Investments, and iCAP Vault. *See* **Exhibit 3**. The results indicate that 51.3% of withdrawals were returns to subscribers, 35.3% were intercompany transfers, 5.3% were related to real estate acquisition, development, and investment, and 4.1% were related to general, operating, and administrative expenses. Thus, 86.6% of withdrawals were returns to subscribers or intercompany transfers while only 5.3% were related to real estate activity. Taken together with the deposit activity in **Exhibit 3**, this is again indicative of a Ponzi scheme.

### 3. *Analysis of Individual Fund Sources & Uses*

40. The analysis above is based on the Sources and Uses of funds for the consolidated iCAP entity and certain aggregated iCAP entities. Similar analyses can be conducted at the individual fund level. To do this, the Accounting Seed Data can be filtered for the individual fund name in the field "Entity (GLAV1)." The resulting transactions can be used to prepare a fund-level Sources and Uses schedule for iCAP funds 1 through 5, iCAP Funding, iCAP Investments, and iCAP Vault. *See* **Exhibits 4.1-4.8** for the results.

41. The iCAP Equity (Fund 3) Sources and Uses analysis, for example, indicates almost no real estate activity. *See* **Exhibit 4.3**. Deposits total $81.6 million, of which $36.3

million, or 44.4%, are investments from subscribers and $44.5 million, or 54.5%, are intercompany transfers received from other iCAP entities. Only $0.9 million, or 1.1%, is money received from business operations.

42.     Withdrawals from iCAP Equity total $85.3 million. Returns to subscribers total $18.8 million, or 22.0%, with intercompany transfers to other iCAP entities totaling $58.6 million, or 68.6%. General, operating, and administrative expenses total $3.5 million, or 4.1%, while real estate acquisition, development, and investment total only $229 thousand, or 0.3% of total withdrawals. Thus, for both deposits and withdrawals, iCAP Equity (Fund 3) has almost no real estate related activity and the deposits and withdrawals are mostly money from and to subscribers, along with intercompany transfers. These data are highly indicative of a Ponzi scheme.

43.     The iCAP Pacific Northwest Opportunity & Income Fund (Fund 1) tells a similar story. *See* **Exhibit 4.1**. Total deposits to the fund were $17.5 million. As this fund was raised in 2014, there were almost no investments received from subscribers during the Accounting Seed Data period (October 2018 to September 2023). Instead, the fund received $16.0 million, or 91.0%, of its cash inflows via intercompany transfers from other iCAP entities. Only $1.5 million, or 8.7%, was received from business operations. Again, these data are highly indicative of a Ponzi scheme.

44.     Total withdrawals from iCAP Pacific Northwest Opportunity & Income Fund (Fund 1) were $19.8 million. Of this, returns to subscribers were $18.1 million, or 91.4%. Another $1.3 million, or 6.6%, was for general, operating, and administrative expenses, while only $65 thousand, or 0.3%, of withdrawals were for real estate acquisition, development, and investment. Thus, for both deposits and withdrawals, Fund 1 had almost no real estate related

16

activity. In fact, the analysis indicates that Fund 1 primarily received funds from other entities (91.0% of sources) and used that money to pay Fund 1 subscribers (91.4% of uses). These data are highly indicative of a Ponzi scheme.

45.    iCAP Vault 1 is similar to Fund 1. *See* **Exhibit 4.8**. Deposits totaled $208.7 million, of which $193.1 million, or 92.5%, were investments from subscribers. Another $12.7 million, or 6.1%, was transferred from other iCAP entities. Thus, approximately 98.6% of iCAP Vault 1's funds were from subscribers or other iCAP entities. Withdrawals from iCAP Vault 1 totaled $204.2 million. Of this, $142.3 million, or 69.7%, was returned to subscribers and $39.6 million, or 19.4%, was transferred to other iCAP entities. Only $16.4 million, or 8.1%, was used for real estate acquisition, development, and investment.

46.    iCAP Funding tells more of the same story. *See* **Exhibit 4.6**. Total deposits to the fund were $12.4 million, of which $11.5 million, or 92.8%, were investments from subscribers and $0.6 million (5.1%) were intercompany transfers from other iCAP entities. Withdrawals from iCAP Funding total $12.4 million. Returns to subscribers totaled $5.5 million, or 44.4%, with intercompany transfers to other iCAP entities totaling $4.7 million, or 37.9%. Another $1.7 million, or 13.8%, was for commissions. There was no real estate activity. These data are highly indicative of a Ponzi scheme.

47.    Lastly, iCAP Investments had $38.3 million in total deposits. *See* **Exhibit 4.7**. Of this amount, $20.6 million, or 54.0%, was investments from subscribers, with another $12.6 million or, 33.0%, in intercompany transfers. This is compared to the $4.3 million, or 11.1%, in deposits from business operations.

48.    iCAP Investments had $38.2 million in total withdrawals. This was mostly comprised of returns to subscribers, $7.5 million or 19.7% and intercompany transfers, $21.5

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 1, Page 24

million or 56.3%. This fund also had $2.0 million or 5.3% in general, operating, and administrative expenses and $1.9 million or 5.0% in commissions, with only $0.9 million or 2.3% in real estate disbursements. These data are highly indicative of a Ponzi scheme.

49. To summarize, taken both at the consolidated level and the individual fund level, iCAP's sources of funds were primarily investments from subscribers and intercompany transfers and its uses of funds were returns to subscribers and intercompany transfers, with relatively little cash generated or invested in real estate activity. *See* **Exhibits 1, 3 and 4.1-4.8**. This pattern follows the characteristics discussed in **Section IV** and is highly indicative of a Ponzi scheme.[22]

**B.  Analysis of iCAP's Real Estate Business**

50. I next turn to a review of the performance of iCAP's real estate business.

51. There are two primary ways iCAP can generate revenue from its real estate business: (1) selling owned properties and (2) earning rental revenue and other revenue on a property while it is owned. As to selling properties, a schedule has been produced that provides detail on all properties invested in by iCAP from September 2013 through December 2020.[23] The schedule indicates that iCAP invested $103.4 million in total across these properties. The schedule also provides an exit date when iCAP sold the property or otherwise exited its investment and the net gain or loss on the exit. The schedule indicates that iCAP generated a

---

[22] I note that Chris Christensen himself, in an email to Jim Christensen on October 9, 2019, included a bullet point in an agenda that stated, "Address Ponzi idea." *See* Attached hereto as **Exhibit 13** is a copy of an October 2019 email with the title, "Delegation List."

[23] Project Divestitures.xlsx, tab "Completed Project Investments." Attached hereto as **Exhibit 14** is a copy of this document.

cumulative net gain of $1.4 million from sales on its $103.4 million in real estate investments.[24] This relatively low cumulative net gain of 1.3% across an over seven-year investment period indicates that iCAP would not be able to rely on its real estate investments appreciating in value in order to make its required payments to subscribers.

52.    To evaluate rental revenue and other revenue earned while iCAP owned properties, I reviewed the revenue detail as reported in Accounting Seed for the years 2018 to 2023. I understand based on my review of the data and discussions with iCAP personnel that a majority of the revenue booked by iCAP was revenue earned by one iCAP entity for services performed for another iCAP entity. That is, the revenue earned was not from external sources, but rather intercompany revenue and expenses. As such, I exclude these revenue categories from my calculation.[25]

53.    To determine whether iCAP was generating enough revenue to meet its obligations to its subscribers, I combined the revenue earned by iCAP while owning its properties and the net gain or loss upon exiting its properties. I then compare this amount to the payments made to subscribers during the same year. The results are as follows:

**Table 2: Comparison of iCAP Annual Revenue and Net Gains/Losses on Property Sales to Payments Made to Subscribers, 2018 to 2023**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | |
|---|---|---|---|---|---|---|---|---|
| Rental Revenue and Net Gain/Loss on Property Sales | ($6,303,071) | ($3,417,638) | $340,492 | $1,056,418 | ($2,284,304) | $251,106 | **($10,356,996)** | A= B+C+D |
| *Rental Revenue* | *$97,035* | *$55,480* | *$198,411* | *$596,774* | *$1,745,312* | *$251,106* | ***$2,944,118*** | B |
| *Other Revenue* | *–* | *–* | *–* | *$146,000* | *$90,667* | *–* | ***$236,667*** | C |
| *Net Gain/Loss on Property Sales* | *($6,400,106)* | *($3,473,118)* | *$142,081* | *$313,644* | *($4,120,282)* | *–* | ***($13,537,780)*** | D |
| Returns to Subscribers | ($2,766,135) | ($24,480,866) | ($19,264,741) | ($54,630,918) | ($112,580,636) | ($22,404,658) | **($236,127,953)** | E |
| **Net Amount Required from Other Sources** | **($9,069,206)** | **($27,898,504)** | **($18,924,248)** | **($53,574,500)** | **($114,864,940)** | **($22,153,551)** | **($246,484,944)** | F=A+E |

[24] Project Divestitures.xlsx, tab "Completed Project Investments."

[25] I understand that Rental Income and certain Interest Income amounts are the only revenue sources that iCAP earned from external sources. Excluded revenue categories include Professional Service Fee Income, Management Fee Income, Construction Income, Commissions Income, and Miscellaneous Income. Discussion with Nickisha Haine, internal accountant for iCAP.

19

54.     As shown in Table 2 above, from October 2018 through September 2023, iCAP

earned $3.2 million in rental and other revenue from external sources and lost $13.5 million on

the sale of properties, while returning $236.1 million to subscribers. This indicates that iCAP's

business operations were insufficient to make its payments to subscribers. iCAP's only other

sources of funds according to the Accounting Seed Data were third party loans, approximately

$55.8 million (*see* **Exhibit 1.1**), and subscribers' money used to pay other subscribers—in other

words, a Ponzi scheme.

55.     iCAP's internal communications call into question whether the purported

investments were being recorded correctly. In an email from October 6, 2022, Jim Christensen,

iCAP President, circulated a spreadsheet for an upcoming "Finance Leadership Meeting"

containing information on iCAP's real estate investments. Neil Peritz, iCAP's Vice President of

Finance, responded saying that certain numbers were "not even in the ball park" of what iCAP

was showing on its consolidated balance sheet. Mr. Peritz then added, "UW and 725 Broadway

numbers make no sense to me. UW hasn't started development and 725 Broadway is a parking

garage we are demolishing soon to develop so how [do] you get $19.3 [million] in equity on that

one?"[26]

56.     In addition to internal numbers not matching, iCAP's subscribers also questioned

iCAP's investment choices. In an email dated June 26, 2018, Michael Norvet of Evolution Real

Estate communicated to Chris Christensen and others at iCAP that (1) they were not properly

---

[26] Attached hereto as **Exhibit 15** is a copy of an October 2022 email chain with the title, "iCap Summary
Spreadsheet – Finance Leadership Meeting."

informed of pending real estate transactions and (2) if they were, they would not have accepted the sales price that Mr. Christensen agreed to. Mr. Norvet then noted that the estimated loss of $500 thousand on the transaction was "completely unacceptable" and that "we reserve the right to take the necessary steps to cancel the sales contracts." Mr. Norvet then requested certain documents and a plan to return investor money, further stating "this affair has shaken our trust in iCAP."[27]

57.     Thus, data indicates that iCAP's real estate business did not generate sufficient returns, while internal communications and communications from subscribers call into question the reporting of the state of the business and the business decisions being made.

### C.     Analysis of Intercompany Transfers and Evidence of Commingling

58.     Two common characteristics of a Ponzi scheme are (1) lack of profits from the purported business operations and (2) transfer of funds from later investors to early investors. This implies that in the absence of profits generated from the purported businesses, investors are paid through an infusion of additional cash from new investors. Because of these transfers of funds from one set of investors to another, investors' funds cannot be traced to specific business operations. Therefore, in a typical Ponzi scheme, one would expect large transfers of funds among businesses, often unrelated to business-related operations or investments, to sustain the scheme. Evidence from the iCAP Sources and Uses analysis indicates that intercompany transfers made up a large share of the overall cash activity, and that there was commingling of funds. Commingling of investor funds is evidence of a Ponzi scheme because the funds are

---

[27] Attached hereto as **Exhibit 16** is a copy of a June and July 2018 email chain with the title, "Lakeview and Brislawn."

pooled in one common fund, thereby making it impossible to trace. When a company commingles funds and operates at a loss while continuing to pay the old investors, the money to pay the old investors necessarily comes from new investments.[28]

59.     As discussed in **Section VI.A**, the analysis of Sources and Uses of iCAP's funds shows that intercompany transfers accounted for 34.9% of deposits and 35.1% of withdrawals. *See* **Exhibit 1.1**. The relatively large amount of intercompany transfers is confirmed by iCAP internal communications. Neil Peritz, Vice President of Finance at iCAP, stated in an email from October 24, 2022, that "there are still intercompany entries going all over the place and nobody seems to know what's up… The [balance sheet] has intercompany balances that don't eliminate and not sure why, but the debt makes sense at over $200 [million]."[29]

60.     An analysis of these intercompany transfers provides further evidence for commingling of funds. For example, **Exhibit 4.1** shows the Sources and Uses analysis for iCAP Pacific Northwest Opportunity and Income Fund (Fund 1). As discussed above, from October 2018 through September 2023, Fund 1 obtained 91.0% of its deposits via intercompany transfers. The majority of these funds were received from iCAP Equity, LLC. While it is theoretically possible that some of these funds may have had a business purpose, the accounting records show otherwise. iCAP's accounting records show these transfers as intercompany loans without any indication of the purpose for such transfers. Further, during the same period, 91.4% percent of Fund 1's withdrawals were used to pay subscribers. In this instance, all or most of the transfers

---

[28] *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1273–74 (D. Utah), aff'd, 632 F. App'x 937 (10th Cir. 2015); se*e also In re Hedged–Invs. Assocs., Inc.*, 48 F.3d 470, 474 (10th Cir. 1995).

[29] Attached hereto as **Exhibit 17** is a copy of an October 2022 email chain titled, "Combined F/S."

from iCAP Equity, LLC were used to pay off investors of Fund 1. This is highly indicative of both the commingling of funds among iCAP's entities and a Ponzi scheme.

61.    iCAP Northwest Fund (Fund 2) is another example of a fund that was infused with cash from iCAP Equity, LLC, primarily to pay off investors. *See* **Exhibit 4.2**. Fund 2's Sources and Uses analysis indicates that $22.9 million, or 68.8% of deposits, were from intercompany transfers, with $10.4 million, or 31.1%, of deposits from business operations. Fund 2's withdrawals were then comprised of $20.2 million, or 55.2%, in returns to subscribers and $11.8 million, or 32.3%, in intercompany transfers. Again, this is highly indicative of commingling and the use of other funds' subscriber investments to make payments to Fund 2's subscribers.

62.    The Sources and Uses analysis of iCAP Pacific Income Fund 4 (Fund 4) raises similar concerns. **Exhibit 4.4** shows that the fund received $23.9 million in deposits, of which 51.9%, or $12.4 million, was from subscribers and 47.9% percent, or $11.4 million, was from intercompany transfers. Meanwhile, Fund 4 generated only $41 thousand in deposits from business operations. A total of $22.6 million was withdrawn from the fund's account. $9.5 million, or 42.1%, was transferred to other iCAP entities while $2.2 million, or 9.7%, was used for "Real Estate Acquisition, Development, and Investment" as well as $3.0 million, or 13.1%, to pay "General, Operating, and Admin Expenses." Approximately $4.9 million, or 21.6%, was returned to investors. Thus, this fund barely generated any net revenue, but paid almost $5 million to subscribers, expensed over $3.0 million in general, operating, and admin expenses, while also redistributing $9.5 million to other entities within the organization.

23

63.     To further illustrate, certain internal email communications provide evidence of requests for fund transfers between iCAP entities and indicate that those transfers were necessary to return money to subscribers of the fund receiving the transfer.

64.     As a first example, below is an email from Chris Christensen dated April 14, 2022. In the email, Mr. Christensen indicates that transfers are made between funds "two times each month" and that "The 15th of the month is the big one for the interest payments." The email then goes on to state that "iCAP Equity is covering a big portion of the expenses from funds we have raised" and that Senza Kenmore was transferring $285 thousand "to Fund 4 to cover Fund 4 investor payoffs." The schedule included in the email then indicates that iCAP Investment was transferring $885 thousand to iCAP Equity, which was then transferring that money to several funds, including Fund 1, Fund 2, and Fund 5.[30]

---

[30] Attached hereto as **Exhibit 18** is a copy of an April 2022 email titled, "Cash Follow Up."

Cash Follow Up

Chris Christensen <chris@icapequity.com>

Thu 4/14/2022 7:47 AM

To:Cindy Fang <cindy@icapequity.com>;Jim Christensen <jim@icapequity.com>

📎 1 attachments (43 KB)

220415 - Semi-monthly Expense Projections.xlsx;

Hi Cindy and Jim,

Since we are going to be working together on the operating cash needs, I wanted to share with you the proposed plan for today's transfers.  As we discussed, we do transfers two times each month.  The 15th of the month is the big one for the interest payments.  Below are the proposed cash transfers.  Here are the highlights:

1. iCap Equity is covering a big portion of the expenses from funds we have raised.
2. Senza Kenmore is transferring $285K to Fund 4 to cover Fund 4 investor payoffs (these funds belong to Fund 4, but we have not distributed them out of Senza Kenmore yet)
3. iCap Investments would need to transfer $885K.  There is currently $1.5M in the account for iCap Investments.

We are planning to raise more funds in iCap Equity over the next few weeks.  Let me know if you have any questions.

| Proposed Transfers | | | |
|---|---|---|---|
| | **From** | **To** | **Amount** |
| 1 | iCap Investment | Equity | $ 885,000.00 |
| 2 | iCap Funding | Equity | $ - |
| 3 | Equity | Fund 1 | $ 265,000.00 |
| 4 | Equity | Fund 2 | $ 277,000.00 |
| 5 | Senza Kenmore | Fund 4 | $ 285,000.00 |
| 6 | Equity | Fund 5 | $ 35,000.00 |
| 7 | Equity | iCap 134th Street | $ 8,000.00 |
| 8 | Equity | iCap PNWM | $ 52,000.00 |
| 9 | Equity | iCap Enterprises | $ - |
| 10 | Fund 5 | Campbell | $ 4,200.00 |

Done trnf on 4/13

65.     In another email dated December 22, 2022, Vera Rohlfing, Accounting Manager at iCAP, emailed a proposed list of transfers to Chris Christensen. The email indicated that in order for iCAP International to make a disbursement to a subscriber, money needed to be transferred from other iCAP entities. In this case, the proposed transfer included $500 thousand from iCAP Investments. iCAP Investments, however, first received this $500 thousand from 725 Broadway as an intercompany loan. 725 Broadway in turn received this money from iCAP Vault in the form of an intercompany loan repayment.[31]

---

[31] Attached hereto as **Exhibit 19** is a copy of a December 2022 email chain with the title, "Jinan wiring instruction – transfers and wire are ready for approval in Umpqua."

**RE: Jinan wiring instruction -transfers and wire are ready for approval in Umpqua.**

**Chris Christensen** <chris@icapequity.com>
Thu 12/22/2022 12:57 PM
To:Vera Rohlfing <vera@icapequity.com>
Cc:Jian Lu <kristyjian@icapequity.com>;Jane Li <Jane@icapequity.com>

Excellent. I will work on that now.

---

**From:** Vera Rohlfing <vera@icapequity.com>
**Sent:** Thursday, December 22, 2022 12:04 PM
**To:** Chris Christensen <chris@icapequity.com>
**Cc:** Jian Lu <kristyjian@icapequity.com>; Jane Li <Jane@icapequity.com>; Vera Rohlfing <vera@icapequity.com>
**Subject:** FW: Jinan wiring instruction -transfers and wire are ready for approval in Umpqua.

Hi Chris,

To pay from the iCap International Investments bank account we need cash there. I added #1 and modified #3.
Please see below the transfers that were setup in the bank and approve in order, then approve the wire out of iCap International investments LLC.

1. Repayment of intercompany balance of $500K, from Vault to 725 Broadway - ready
2. Intercompany loan of $500K, from 725 Broadway to iCap Investments- ready
3. Intercompany loan of $500K from iCap Investments to iCap International Investments- will do transfer between the companies
4. Vault Withdrawal of $1,500,075 by iCap International Investments – Sub S-001867 balance is $1,584,763.93. $1,500,075 from it to iCap International investments company-ready. Need a withdrawal form
5. Wire from iCap International Investments to the recipient below-ready

66.     Cindy Fang, iCAP Director of International Markets, emailed Chris Christensen on February 9, 2023, "we will have 1.6 [million] in Vault today or tomorrow that you can leverage to pay back [a subscriber.]" Mr. Christensen responded the same day, "if you can somehow bring in $2 [million] more by Tuesday, we could pay a special amount. It would only need to stay for about 1-month." Ms. Fang responded by stating that two subscribers had resumed making investments, and that they could potentially obtain "a couple million" from another subscriber."[32]

67.     In another email from March 27, 2023, Cindy Fang, now with a title of Project Consultant, updated Chris Christensen on the status of several transfers, including an indication that one subscriber's withdrawal request for $940 thousand would be paid from newly received

---

[32] Attached hereto as **Exhibit 20** is a copy of a February 2023 email chain titled, "Steve's mom's payback."

funds from other subscribers.[33] The next month, on April 21, 2023, Chris Christensen sent an email to Cindy Fang and others at iCAP providing a proposed payment schedule to the subscriber. Cindy Fang responded three days later indicating that they were expecting $600 thousand in subscriber deposits that week, and that $100 thousand could go to this subscriber's request. The other $500 thousand would go to one of two other subscribers, depending on whether they were able to "negotiate a deal" with one of the subscribers.[34]

68. As another example, a series of emails in March 2023 show Cindy Fang communicating with other iCAP employees that $200 thousand was expected from the subscriber Yulan Ren. Once the $200 thousand was received, it would then be combined with money from two other subscribers to pay $900 thousand back to a different subscriber.[35]

69. In an internal email chain on May 17, 2019, a Senior Accountant at iCAP questioned why $200 thousand was transferred to Fund 1, to which the Chief Financial Officer, TD Croshaw, responded "I transferred it to cover the interest payment."[36]

70. In another internal email chain in July 2022, Jian Lu, accountant at iCAP, provided Chris Christensen with a schedule of forecasted payments to investors. The email includes the question "Please review and advise on where we can transfer money to cover the month end pay run." The email chain then indicates that $210 thousand would be transferred from iCAP Investments to iCAP Equity to iCAP Enterprise, along with a "short-term" loan from iCAP @ UW to cover the required payments. The final email from Tatiana Pantchenko, iCAP's

---

[33] Attached hereto as **Exhibit 21** is a copy of a March 2023 email chain with the title, "This week's withdrawal requests."

[34] Attached hereto as **Exhibit 22** is a copy of an April 2023 email chain titled, "Evergreen."

[35] Attached hereto as **Exhibit 23** is a copy of a March 2023 email chain titled, "Incoming wire."

[36] Attached hereto as **Exhibit 24** is a copy of a May 2019 email chain titled, "$200K Transfer into Fund 1 on 5/13."

Director of Accounting, states that iCAP Equity received $182 thousand in checks and that this "should help" cover the payments.[37]

71.     Taken together, the Sources and Uses analyses of these funds, along with internal iCAP communications, provide a strong indication that iCAP was sustaining a Ponzi scheme through these intercompany transfers and commingling of funds. Further, there is a strong indication that these intercompany transfers were largely made to repay subscribers in the fund receiving the transfer.

### D.     Analysis of the Unrealistic Returns Required for iCAP to Make its Promised Payments to Subscribers

72.     Another characteristic of a Ponzi scheme is the promise of consistent unrealistically high returns to investors. These consistent high returns are key to attracting new investors that eventually help sustain a Ponzi Scheme.[38] These returns are unrealistic because the returns promised are not commensurate with the business operations underlying the investments. In Ponzi schemes, Debtors either do not operate legitimate business operations or do not generate profits high enough to pay back the investors and are reliant on attracting new investors to pay off older investors. A review of iCAP's financial records shows that its funds promised consistent high returns to its subscribers while failing to generate enough profits to service such payments.

---

[37] Attached hereto as **Exhibit 25** is a copy of a July 2022 email chain titled, "7/15/2022 Cash Forecast for review."

[38] "Ponzi Scheme," Investor.gov, U.S. Securities and Exchange Commission, accessed on January 12, 2024, available at: https://www.investor.gov/protect-your-investments/fraud/types-fraud/ponzi-scheme; "Investor Protection Guide: Ponzi Scheme," Legal Information Institute, Cornell Law School, accessed on January 12, 2024, available at: https://www.law.cornell.edu/wex/investor_protection_guide_ponzi_scheme; "Ponzi Schemes," Michigan Consumer Protection," accessed on January 12, 2024, available at: https://www.michigan.gov/consumerprotection/protect-yourself/consumer-alerts/invest/ponzi.

73.     The entities under iCAP's Portfolio Business primarily raised capital through Debentures or Promissory Note offerings that offered to pay subscribers between 6 percent and 15 percent in annual interest.[39] A review of Private Placement Memorandums ("PPM") of the Portfolio Business's various debentures and promissory note-offerings shows that majority of the offerings promised between 9 and 12 percent annual interest rates that were payable monthly immediately after the closing of the loan. Certain offerings also included a "payoff premium," a one-time additional payment (i.e., 5% of the subscriber's investment) on the date of principal repayment.[40] The primary investment strategy for Portfolio Businesses, including Fund 1, Fund 2, and Fund 3, as stated in the PPMs, was to invest these funds to acquire preferred equity in the form of joint ventures with qualified builders and developers, and required payoffs within 12 to 18 months from the time of original investment.[41] These funds were invested with the objective of generating approximately a 12 percent rate of return, in addition to an exit fee which ranged from 3 percent to 5 percent.[42]

74.     A review of term sheets on a handful of real estate investments (preferred equity) made from Fund 1 confirmed that investments were made with a 12% annual return plus closing

---

[39] I understand the Portfolio Business to include iCAP Equity, LLC and all of its subsidiaries. *See* Miller First Day Declaration, ¶¶ 8, 17.

[40] *See e.g.* Private Placement Memorandum for iCAP Equity, LLC's $50 million offering of Senior Promissory Notes, July 1, 2020, p. 2, Exhibit B, Section 3(c)(ii); Private Placement Memorandum for iCAP Northwest Opportunity Fund, LLC's $30 million offering of 10% Senior Secured Debentures, April 20, 2015, p. 1; Private Placement Memorandum for iCAP Northwest Opportunity and Income Fund, LLC.'s $30 million offering of 12% Senior Secured Debentures, December 19, 2013, p. 1; Private Placement Memorandum for iCAP Pacific Income Fund 4, LLC's $50 million offering of 10% Secured Promissory Notes, October 1, 2018, p. 2; Private Placement Memorandum for iCAP Pacific Income Fund 5, LLC's $50 million offering of 9% Secured Promissory Notes, September 5, 2019, p. 2. Attached hereto as **Exhibit 26, Exhibit 27, Exhibit 28, Exhibit 29,** and **Exhibit 30,** respectively, are copies of the five PPMs.

[41] Private Placement Memorandum for iCAP Equity, LLC.'s $50 million offering of Senior Promissory Notes, July 1, 2020, pp. 8-9.

[42] Private Placement Memorandum for iCAP Equity, LLC.'s $50 million offering of Senior Promissory Notes, July 1, 2020, pp. 8-9.

fees of 3% as well as an exit fee determined by the overall proceeds of the project and dependent upon the borrower's successful divestiture of the underlying property. Turning these investments quickly and deploying capital just as quickly was critical in order for the iCAP funds to generate sufficient returns to cover subscriber interest and principal.

75.     I reviewed a schedule prepared by iCAP in November 2016 reflecting data on the 42 investments made by Fund 1 & Fund 2 up to that date.[43] This schedule reflects that 22 investments had been realized (sold) by the fund. Of these exited investments, three were repaid within six months of loan origination, with another six properties exiting within one year of loan origination. The average loan period for these 22 exited properties was 443 days. This schedule also included data on twenty additional investments made (totaling $19.5M) that were still outstanding at the time. At the date of this schedule (November 2016), the average outstanding period for these twenty investments was 708 days. This schedule alone shows that iCAP's investments as a whole never generated sufficient returns to service the indenture interest and ultimate principal, indicating that iCAP would need to obtain funding for its returns to investors from other sources.

76.     To this end, iCAP's investment strategy for iCAP's various Portfolio Businesses did not align with the terms of the debt instruments they issued to raise capital from subscribers. First, almost all of the debentures and promissory notes issued by iCAP's Portfolio Businesses offered the option of monthly interest payments to subscribers immediately after the closing of the loan.[44] Considering the fund primarily invested in new real estate developments, iCAP's

---

[43] Fund Buyout Projection 2017 – Fund 1 & 2.xlsx. Attached hereto as **Exhibit 31** is a copy of this document.

[44] *See e.g.* Private Placement Memorandum for iCAP Equity, LLC.'s $50 million offering of Senior Promissory Notes, July 1, 2020, p. 2, Exhibit B Section2(c)(ii); Private Placement Memorandum for iCAP Northwest Opportunity Fund, LLC.'s $30 million offering of 10% Senior Secured Debentures, April 20, 2015, p. 1; Private

representation that it could begin generating near-immediate returns on such real estate was unrealistic and misleading.

77.     Even assuming that all their investments would be fully paid off within 12 to 18 months, it is unclear how the funds would service the monthly interest payments promised to the subscribers without generating any ongoing revenue from such investments. iCAP could have addressed this concern by setting up interest reserve accounts; the PPMs of iCAP's debt offerings even state that some of the capital may be deposited into interest reserve accounts or that the funds "will maintain cash reserves to meet interest payments []."[45] I understand that there is no indication that any such cash and interest reserves were ever utilized.[46] Even if they were, establishing such reserves would decrease the net capital available for iCAP to invest in real estate projects, thereby requiring the remaining investable funds to generate even higher returns to pay off the loan.

78.     iCAP internal projections as early as January 2017 shed light on the company's cash flow concerns. TD Croshaw, iCAP Controller, provided a management budget to Chris Christensen on January 24, 2017, and stated "we are going to be in a significant deficit at the end of February and the first of March… January was a bad month for us."[47] Later than year, Mr. Croshaw provided another management budget to Mr. Christensen in an email dated November

---

Placement Memorandum for iCAP Northwest Opportunity and Income Fund, LLC.'s $30 million offering of 12% Senior Secured Debentures, December 19, 2013, p. 1; Private Placement Memorandum for iCAP Pacific Income Fund 4, LLC.'s $50 million offering of Secured Promissory Notes, October 1, 2018, p. 2; Private Placement Memorandum for iCAP Pacific Income Fund 5, LLC.'s $50 million offering of 9% Secured Promissory Notes, September 5, 2019, p. 1.

[45] *See e.g.* Private Placement Memorandum for iCAP Equity, LLC.'s $50 million offering of Senior Promissory Notes, July 1, 2020, p. 14.

[46] I have reviewed the balance sheets of the various funds and see no indication of any interest reserves. *See, e.g.,* 2019 – Balance Sheet by Entity by Period-2023-12-19-16-03-13.xlsx. Attached hereto as **Exhibit 32** is a copy of this document.

[47] Attached hereto as **Exhibit 33** is a copy of a January 2017 email titled, "2017 Budget."

10, 2017. In the email, Mr. Croshaw stated "as you can see we are significantly in the Red for [November and December 2017]." Mr. Croshaw went on to state that iCAP would "need to come up with" $320 thousand in order to make its November and December 2017 payroll payments.[48]

79.     Mr. Christensen failed to acknowledge these concerns publicly. In a call with Fund 2 investors in November 2018, in response to a question about the sources of funds that iCAP relies on to pay the investors, Mr. Christensen represented that interest payments were carved out of payoffs from real estate projects and that such payments were not serviced using funds received from other investors.[49] However, based on the Sources and Uses analyses of iCAP's funds, Mr. Christensen's statement was false. For example, **Exhibit 4.2** shows that between October 2018 and September 2023, Fund 2 paid out a sum of $20.2 million to its subscribers. However, during the same period, the fund generated only $10.4 million in funds from business operations including rent and project payoff, which, even before accounting for $1.7 million in general, operating, and administrative expenses during the same period, is approximately half of what was paid out to subscribers. The fund also received $22.9 million in intercompany transfers and transferred $11.8 million to other entities.

80.     Even assuming the funds' investments in real estate development projects happened to be unique in generating ongoing returns immediately upon closing, the funds would need to generate very high annual returns to service the interest payments as well as make the final principal payment. For example, iCAP Pacific Northwest Opportunity and Income Fund, LLC (Fund 1) raised capital in December 2013 through a private placement of senior debentures

---

[48] Attached hereto as **Exhibit 34** is a copy of a November 2017 email titled, "Budget."

[49] Investor Call Audio Clip, November 21, 2018. As this document is an audio clip, it is not attached as an exhibit to this Declaration.

that matured in December 2016.[50] The terms of the offering stated that investors were entitled to 12% annual simple interest paid monthly.[51] As part of the offering, the fund expected to incur 13% in commissions and administrative fees related to the offering, which brought down the overall proceeds from investors that would be available for investment to about 87% of the total proceeds.[52] In addition, Fund 1 owed a 2% management fee annually and an up to 3% origination fee on every investment made.[53] Assuming a 36-month term on the loan, the fund would need a 17.6% annual return on their overall investment to service the interest payments and pay the principal at maturity. *See* **Exhibit 5.1**. A review of Fund 1's project divestitures shows that the fund did not generate nearly as much as the 17.6% in annual returns it needed to pay its investors. In fact, Fund 1 made a total net gain of only $1.3 million on the total $44.1 million that the fund invested in various real estate projects from March 2014 (date of first investment) to January 2022 (date of most recent exit), or an average return of 0.4% per year.[54]

81.     Similarly, iCAP Northwest Opportunity Fund, LLC (Fund 2) raised capital through a private placement of Senior Secured Debentures at 10 percent annual interest rate, paid monthly.[55] Given the terms of this offering, the fund would need to generate 16.4% annual returns to pay its investors. *See* **Exhibit 5.2**. A review of the real estate project divestitures for

---

[50] Private Placement Memorandum for iCAP Pacific Northwest Opportunity and Income Fund, LLC.'s $30 million offering of 12% Senior Secured Debentures, December 19, 2013, p. 1.

[51] Private Placement Memorandum for iCAP Pacific Northwest Opportunity and Income Fund, LLC.'s $30 million offering of 12% Senior Secured Debentures, December 19, 2013, pp. 1, 30.

[52] Private Placement Memorandum for iCAP Pacific Northwest Opportunity and Income Fund, LLC.'s $30 million offering of 12% Senior Secured Debentures, December 19, 2013, p. 5.

[53] Private Placement Memorandum for iCAP Pacific Northwest Opportunity and Income Fund, LLC.'s $30 million offering of 12% Senior Secured Debentures, December 19, 2013, p. 4.

[54] (($1.3 million + $44.1 million)/$44.1 million)^(1/7.75 years)-1 = 0.4%. Project Divestitures.xlsx.

[55] Private Placement Memorandum for iCAP Northwest Opportunity Fund, LLC.'s $30 million offering of 10% Senior Secured Debentures, April 20, 2015, p. 1.

this fund shows that the fund invested $40.4 million in real estate projects from May 2015 through December 2018, and generated a total return of $2.7 million upon exiting these properties from October 2015 to July 2022, or an average return of 0.9% per year.[56]

82.     In total, iCAP invested $103 million in real estate projects from 2013 to 2022 across its Portfolio Businesses and received approximately $104.4 million in total upon exiting the projects, an astonishingly low total net return of only $1.4 million. This extremely low return implies that iCAP would not have been able to pay off the investors from the appreciation in its real estate investments, but had to use funds raised from others. This is highly indicative of a Ponzi scheme.

83.     iCAP's internal communications indicate the unrealistic nature of its required returns. In an analysis of a potential Fund 6, Andy Willett, iCAP Director of Capital Markets, concluded that in order to meet the repayment demand of raising between $310 million and $470 million, iCAP would have to invest in between 959 projects and 1,056 projects. This is in stark contrast to produced data indicating that iCAP only made 87 investments from September 2013 through December 2020, which it then exited from January 2014 through December 2022.[57] Mr. Willett concluded that "the numbers look daunting to me" and that iCAP would need to have most or all of the Fund 1 and Fund 2 investors roll over to Fund 6, while agreeing to not receive a monthly interest payment.[58]

---

[56] (($2.7 million + $40.4 million)/$40.4 million)^(1/7 years)-1 = 0.9%. Project Divestitures.xlsx.

[57] This includes multiple iCAP funds investing in the same property, so the number of "unique" projects invested in and exited during this period is less than 87. *See* Project Divestitures.xlsx.

[58] Attached hereto as **Exhibit 35** is a copy of a May 2020 email chain titled, "Fund 6 Financial Model."

E.      **Analysis of Other Ponzi Scheme Factors**

1.      *Organizer failed to invest (all of) the investors' funds in promised investments*

84.      In a Ponzi Scheme, the organizer often fails to invest the investors' funds in promised investments. This is particularly true for the investments from later investors, whose funds are either transferred to earlier investors or are used to cover costs of the purported underlying business operations. This appears to have been the case for iCAP's later funds.

85.      A review of PPMs of iCAP's offerings and the Sources and Uses analyses of its funds reveals that the capital invested in some of iCAP's funds – especially the latter funds such as iCAP Pacific Income Fund 4 (Fund 4) – was not invested in accordance with the representations in the PPMs. For example, Fund 4 sought to raise $50 million in capital through an offering of Secured Promissory Notes in October 2018.[59] The promissory notes had a maturity of 20 years but allowed the subscribers to redeem their investments in full after 3 years. The PPM for this offering states that "the primary purpose of the Company is to acquire real estate investments in the United States and provide a rate of return to its investors."[60] The PPM also makes representations about the potential use of the funds. In particular, the PPM states that the "proceeds [] will be used to pay expenses related to its formation and operations and for this Offering, and to purchase and manage preferred equity real estate positions through Portfolio SPEs. The proceeds will be used to cover costs associated with this process[]."[61] The PPM also

---

[59] Private Placement Memorandum for iCAP Pacific Income Fund 4, LLC.'s $50 million offering of Secured Promissory Notes, October 1, 2018, p. 1.

[60] Private Placement Memorandum for iCAP Pacific Income Fund 4, LLC.'s $50 million offering of Secured Promissory Notes, October 1, 2018, p. 1.

[61] Private Placement Memorandum for iCAP Pacific Income Fund 4, LLC.'s $50 million offering of Secured Promissory Notes, October 1, 2018, p. 11.

made provisions for organizational expenses approximating $250,000 as well as additional expenses of approximately $200,000 in addition to commission charges for placement agents.[62]

86.    A comparison of these representations with the actual allocation of funds as shown by the Sources and Uses analysis for this fund reveals that the funds received from subscribers were not allocated in accordance with the PPM. **Exhibit 4.4** shows that, for Fund 4, a total of $23.9 million was deposited into the fund's account between October 2018 and September 2023. Of these deposits, $12.4 million were funds from subscribers and $11.4 million were intercompany transfers, with almost no funds from other sources. Fund 4 then disbursed $4.9 million to subscribers and transferred $9.5 million to other iCAP entities, while only using $2.2 million for real estate acquisition, development, and investment. This means only 9.7% of Fund 4's withdrawals were for investments in real estate projects even though raising capital for new real estate investments was the primary objective of this fund. Furthermore, while the PPM does make provisions for expenses and commissions, the fund allocated more money to expenses and commissions than to investments in real estate projects.

    2.    *Later investors received lower returns than earlier investors.*

87.    In a Ponzi Scheme, companies typically are incapable of generating adequate revenue to fulfill the promised returns to their investors. Consequently, they resort to using funds from later investors to pay off earlier investors. Thus, one of the characteristics of Ponzi schemes is that later investors tend to receive lower returns compared to their earlier counterparts.

---

[62] Private Placement Memorandum for iCAP Pacific Income Fund 4, LLC.'s $50 million offering of Secured Promissory Notes, October 1, 2018, p. 11.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 1, Page 43

88.     This is exactly what happened to iCAP subscribers, as only subscribers who invested in Fund 1 received distributions in excess of their investments on average, while subsequent fund subscribers on average received less than they invested. *See* **Exhibit 6**. That is, Fund 1 on average managed to achieve 12% distributions in excess of investments, while Funds 2 through 5, iCAP Vault, iCAP Investments, and iCAP Funding all returned less than the original investment. These amounts returned for Funds 2 through 5, iCAP Vault, iCAP Investments, and iCAP Funding ranged from 8% to 81% less than the original investment amount. This pattern aligns with the characteristic commonly associated with Ponzi schemes, where later investors typically receive lower returns compared to the earlier investors.

* * *

Signed on the 23rd day of February, 2024, at Los Angeles, CA.

Jeffrey H. Kinrich

# JEFFREY H. KINRICH
## Managing Principal

Phone: 213 896 4544                                                    333 South Hope Street
Fax: 213 623 4112                                                                27th Floor
jeff.kinrich@analysisgroup.com                               Los Angeles, CA 90071

Jeff Kinrich has over four decades of litigation consulting experience with business clients and individuals on engagements involving applications of financial and economic analysis, accounting, business valuation and statistics. He specializes in damage quantification and valuation in the areas of commercial litigation and intellectual property. Mr. Kinrich has testified frequently on damages, valuation, and accounting issues in numerous state and federal courts. He is a Certified Public Accountant and holds an Accreditation in Business Valuation.

## EDUCATION

| | |
|---|---|
| 1980 | M.B.A., Finance and Quantitative Methods (with honors, first in class), University of Maryland |
| 1977 | M.S., Statistics, Stanford University |
| 1976 | B.A., Mathematics (*summa cum laude*, *Phi Beta Kappa*, first in class), Pomona College |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2001–Present | Analysis Group, Inc. *Managing Principal* |
| 1981–2001 | PricewaterhouseCoopers LLP *Partner, Financial Advisory Services* |
| 1978–1980 | BDM Corporation *Statistical Analyst* |
| 1977–1978 | Lawrence Livermore Laboratory *Statistician* |

## AWARDS

Elijah Watts Sells Silver Medal for second highest score in the US on CPA Examination

Forbes Gold Medal for the highest CPA examination score in California

Volunteer of the Year, AICPA Forensic and Litigation Services

## PROFESSIONAL AND BUSINESS AFFILIATIONS

Certified Public Accountant

Member of the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants

Accredited in Business Valuation (ABV)

Certified in Financial Forensics (CFF)

California Society of CPAs Litigation Sections, Steering Committee

American Institute of CPAs, Forensic and Litigation Services Committee (former)

Phi Beta Kappa

Board of Directors and Chair of Audit Committee, Bet Tzedek Legal Services

Board of Directors and Chair of Audit Committee, Jewish Community Foundation, Los Angeles

## SELECTED EXPERIENCE

### Commercial Damages

- Evaluated lost profits damages for hundreds of commercial litigation engagements, including breach of contract, employment, and business tort matters. Matters involved dozens of different industries.

- Analyzed revenue, cost, profit, and typicality issues in connection with consumer class actions. Evaluated class action damages, including actual loss to plaintiffs and unjust enrichment to defendants.

- Evaluated impact of mergers on value of combined firms; computed damages resulting from failed or improperly implemented mergers.

- Measured losses due to business interruption.

- Determined damages from breach of distribution and franchising agreements.

- Valued assets and evaluated accounting issues in connection with merger and purchase price disputes.

- Conducted several forensic accounting analyses involving large volumes of transaction-level data to address issues of causation and damages in matters involving misappropriation of funds, corporate fraud, and collectability of a potential judgment.

- Conducted several alter ego studies. Searched for commingling of funds, violation of corporate formalities, and other improper transactions between the company and shareholder/parent.

- Analyzed and testified about Generally Accepted Accounting Principles, cost accounting issues, accounting records, and related matters.

- Computed damages from loss of individual earnings in connection with wrongful termination, employment, and personal injury claims. Such claims included loss of wages, commissions, and bonuses. Considered issues of mitigation and discounting.

- Provided technical consulting on many applications of statistics to litigation, including statistical sampling, regression analysis, time series, probability theory, and survey design.

- Served as an arbitrator or court-appointed special master in several commercial disputes.

### Intellectual Property

- Analyzed patent infringement damages under both lost profits and reasonable royalty approaches for a wide variety of patents. Industries include medical and surgical products, semiconductors, digital

and optical switches, HIV diagnostic test kits, cable television, cell phones, smart phones, aircraft engine housings, telephone equipment, toys, computer printer cartridges, disposable diapers, automobile components and accessories, cigarette lighters, photographic equipment, oil tools, satellite antenna feeds, water coolers, athletic shoes, contact lenses, sprinkler systems, computer disks, magnetic insoles, robotic surgery equipment, compact disk cases, superconducting amplifiers, food products, bottle inspection machinery, molded dog houses, landscape lighting systems, disposable respirators, airport security equipment, smart watches, communications networks, and bicycle seats.

- Measured patent damages for business method patents, including stock/security management software, insurance processing systems, space orbital trajectories, encryption algorithms, and farming methods.

- Negotiated a reasonable royalty in settlement of a patent dispute.

- Measured damages from various trademark, false advertising, and copyright infringement matters, including consumer and industrial products, software, and entertainment properties. Apportioned profits between infringing and non-infringing elements.

- Computed damages for trade secrets and non-compete agreements. Issues involved theft of customer lists, business plans, technology, and manufacturing methods and technologies.

- Assessed compliance with royalty agreements in connection with computer sales, pharmaceuticals, medical devices, semiconductors, online gaming, and music licensing agreements, and other industries.

## Technology/Computers

- Conducted numerous damage studies related to high tech intellectual property, including semiconductors, space systems, computers, printers, medical products, and search engine design. Computed both lost profits and reasonable royalties.

- Measured damages in connection with several Internet issues, including cybersquatting, communications protocols, and misuse of website names.

- Computed lost profits and disgorgement from sale of counterfeit software.

- Testified as to the value of a software VAR agreement.

- Conducted international transfer pricing analysis for computer manufacturer.

- Determined damages from breach of a software/firmware development agreement.

## Real Estate/Construction/Environmental

- On several matters, measured the diminution in value and lost rents due to a construction delay claims resulting from, among other things, contractor non-performance, construction defects, and environmental contamination.

- Evaluated statistical methods for invasive testing of construction defects.

- Performed and critiqued statistical sampling and extrapolation in connection with construction defects litigation.

- Opined about appropriate expenditures by homeowner's associations in connection with maintenance and capital expenditures.

- Testified for a construction contractor as to the amount due in a breach of contract dispute, and provided opinion on alter ego issues.

**Business Valuation**

- Valued numerous businesses in connection with commercial or personal disputes.

- Valued intangibles, including patents, trademarks, copyrights, trade secrets, and business protocols.

- Assessed issues of fair market value, minority discounts, control premiums, and other important valuation concepts.

- Appraised businesses in connection with corporate mergers, acquisitions, shareholder disputes, minority shareholder buyouts, and personal divorces.

- Valued numerous businesses in connection with commercial or personal disputes.

**Entertainment**

- Determined royalties owed to entertainers and managers.

- Computed damages for copyright and breach of contract issues related to infomercial sales.

- Measured actual losses and disgorgement of profits from copyright infringement related to scripts, story ideas, photographic images, video, and software.

- Assessed damages from a breach of contract in connection with the development of a major videogame franchise.

- Assisted numerous entertainment executives and performers in valuing personal, professional, and entertainment assets.

- Computed lost profits from a breach of an agreement to lease movie projection equipment.

- Valued the overseas rights to a catalog of films.

- Estimated damages related to failure to execute a film financing guarantee.

- Analyzed cost savings and antitrust issues resulting from selling box-lot quantities of recorded music at a discounted price.

- Evaluated the likely impact of a new video distribution technology.

- Measured value of broadcast and publicity rights.

- Computed damages related to breach of radio advertising sales contract.

- Evaluated reasonable fees to be paid for a broadcast television series.

- Computed royalties due for film rights distributed through various media.

- Measured unjust enrichment and disgorgement from misappropriation of the Academy Award® of Merit Oscar statuette image.

- Valued movie download rights in connection with a distribution deal.

**Employment**

- Measured statistical likelihood of differential results in employment decisions.

- Conducted numerous employment-related damages analyses, including assessing claims for lost wages, lost commissions, and loss associated with alleged inadequate expense reimbursements.

- Conducted analyses in connection with both class action and individual claims.

**Telecommunications**

- Conducted a lost profits study for a major telecommunications antitrust suit.

- Measured damages in connection with various telecommunications patents and trade secrets.

- Testified as to damages from alleged below cost pricing of telecommunications services.

- Critiqued plaintiff's claim in an offshore telecom litigation.

- Worked for a cellular telephone service provider defending against breach of contract claims from a former agent.

- Testified concerning the value of stock in two privately held communications companies in conjunction with a purchase price dispute.

- Analyzed claim of predatory pricing in the cellular industry.

- Acted as arbitrator in a telecommunications contract dispute.

**Automobile Industry**

- Conducted various damages analyses involving automobile dealership disputes, including dealer terminations, dealer relocations, and failure to award a dealership. Analyzed deal financial records and other economic information to quantify the value of automobile dealerships.

- Analyzed losses from a breach of an acquisition/sale agreement for an automobile parts manufacturer.

- Computed damages for patent infringement of an automobile parts manufacturing patent.

- Conducted transfer pricing study for automobile importer.

- Investigated alternative causes for failure of auto dealerships. Searched for diverted funds.

- Acted as a neutral arbitrator in dispute between automobile manufacturer and insurer over extended warranty payments.

- Assisted automobile manufacturer in investigating fraud and diversion of funds in connection with a collection dispute.

- Analyzed accounting issues in connection with the sale of a dealer network.

**Class Action/Class Certification**

- Provided financial and statistical analyses in opposition to class certification and class damage computations in late fee cases filed by consumers against various companies.

- Worked on behalf of a major car rental company in a class action matter alleging failure to comply with the law in advertising rental rates.

- Evaluated whether the alleged violations had common impact across class members and whether a common damages methodology could be applied in a matter concerning overcharges.

- Worked on class action suits alleging false advertising related to various consumer products including collectable dolls and energy drinks.

- Addressed class certification in an action brought by consumers alleging false advertising related to a consumer hygiene product.

- Worked with several companies in defending wage and hour class action matters.

**Family and Partnership Law**

- Conducted valuations of numerous private businesses.

- Performed analyses of lifestyle and cash available for support.

- Valued professional practices, including law firms and accounting firms. Performed valuations for divorce purposes and to wrap up partnerships under *Jewel v. Boxer*.

- Determined community portion of earnings and assets under various circumstances. Apportioned and valued stock options and profit participations.

- Traced and valued separate vs. community property. Conducted Pereira-Van Camp analyses of pre-marital property (as well as conducted similar tracings in connection with commercial litigation).

**Tax Disputes**

- Conducted transfer pricing studies for an automobile importer, semiconductor manufacturer, computer maker, and consumer electronics manufacturer.

- Designed sampling methodology to evaluate customs duty drawback claims.

- Measured damages from improper conversion from an S-Corp. to a C-Corp.

**PUBLICATIONS**

*Lost Profits Damages: Principles, Methods, and Applications, 2nd edition*, co-edited with Everett P. Harry, Valuation Products and Services (2022)

"Analysis of Cost Behavior," with Elizabeth Eccher and James Rosberg, Chapter 12 of *Lost Profits Damages: Principles, Methods and Applications, 2nd edition*, Harry and Kinrich, editors (2022)

"Analysis of Cost Behavior When Calculating Damages," Parts 1 and 2, *Business Law Today*, American Bar Association (2018)

*Lost Profits Damages: Principles, Methods, and Applications*, co-edited with Everett P. Harry, Valuation Products and Services (2017)

"Analysis of Cost Behavior," with Elizabeth Eccher and James Rosberg, Chapter 11 of *Lost Profits Damages: Principles, Methods and Applications*, Harry and Kinrich, editors (2017)

"Risk and Economic Damages: Theoretical and Practical Issues," with Brian Brinig, *Dunn on Damages,* Issue 7 (Summer 2012)

"Can a Reasonable Royalty Ever Be Zero?" with Michael Hsu, *Intellectual Property Today* (May 2011)

"Discount Rate, Risk & Economic Damages: Practical Considerations," with Brian Brinig, *Business Valuation Update*, Vol. 15, No. 9 (September 2009)

"Analysis and Measurement of Damages in Patent Infringement Actions," *Calculating Patent Damages*, Law Seminars International (2009)

"Engagement Letters for Litigation Services: Business Valuation and Forensic & Litigation Services Practice Aid 04-1," coauthor, *American Institute of Certified Public Accountants* (2004)

"Trademark Misuse," *Litigation Support Report Writing: Accounting, Finance, and Economic Issues*, Friedman and Weil, eds., John Wiley & Sons (2003)

"Analysis and Measurement of Damages in Patent Infringement Actions," coauthor, *Patent Litigation 2001*, Practising Law Institute (2001)

"Cost Estimation," *Litigation Services Handbook: The Role of the Accountant as Expert Witness, 3rd ed.,* Weil, Wagner, and Frank, eds., John Wiley (2001)

"Preparing for Daubert Challenges in Antitrust Cases," coauthor, *Antitrust Section of the American Bar Association, Economic Committee Newsletter* (Spring 2001)

"Conflicting Rulings About Conflicts," coauthor, *The Witness Chair*, California Society of CPAs (Fall 1996)

"Damage Measures in Patent Infringement Actions," coauthor, *Second Annual Institute for Intellectual Property Law*, Practising Law Institute (1996)

"Damages on the Internet," *Proceedings of the AIPLA Winter Conference*, AIPLA (1996)

"Section 482 and Technology Transfers," coauthor, *Price Waterhouse, Intellectual Property Conference* (1993)

"Dull Witnesses*," Litigation*, American Bar Association, Vol. 19, No. 3 (Spring 1993)

"Economic Damages in Patent Infringement Cases," coauthor, *Patent Litigation 1991*, Practising Law Institute (1991)

"Forensic Accounting and Litigation Consulting Services," coauthor, *The Accountant's Handbook, 7th ed.*, John Wiley (1990)

# Testimony List of Jeffrey H. Kinrich (2017 - Present)

| MATTER | YEAR | COURT | DEPOSITION | TRIAL |
|---|---|---|---|---|
| 4 Corners v Nazarian | 2017 | California Superior Court, Los Angeles | X | |
| Cone v Causeway | 2017 | California Superior Court, Los Angeles | X | |
| Kaufman v Blue Shield | 2017 | California Superior Court, Los Angeles | | X |
| Kennedy v Regency Outdoor | 2017 | California Superior Court, Los Angeles | X | |
| Craven v Centex | 2017, 2018 | California Superior Court, Orange | X | X |
| UM Corp v Tsuburaya | 2017 | Federal District Court, Los Angeles | X | |
| Simkhai & Grindr Holdings Co v KL Grindr et al | 2017 | American Arbitration Association | X | |
| The Mark Condominium Owners Assoc. v Hensel Phelps et al | 2017 | California Superior Court, San Diego | X | X (402) |
| ICSOP v County of San Bernardino | 2017 | Federal District Court, Central District of California | X | |
| Alstatt v Centex Homes | 2017 | Nevada State Court | X | |
| SwiftAir v Row44 and Southwest Air | 2017 | California Superior Court, Los Angeles | X | |

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 1, Page 52

# Testimony List of Jeffrey H. Kinrich (2017 - Present)

| MATTER | YEAR | COURT | DEPOSITION | TRIAL |
|---|---|---|---|---|
| Toyo Tire v Atturo Tire | 2017 | Federal District Court, ND of Illinois | X | |
| Carducci v Centex Homes | 2018 | Nevada State Court | X | |
| ALS Scan v Cloudflare | 2018 | Federal District Court, ND of California | X | |
| Sarkisian v University of Southern California | 2018 | Arbitration | X | X |
| Lincoln Electric v Harbor Freight Tools | 2018 | Federal District Court, ND of Ohio | X | |
| Estate of Chui | 2018, 2019 | California Superior Court, Los Angeles | X | |
| Scopely v Kung Fu Factory | 2018 | JAMS | X | |
| Golden, as trustee for Aletheia v. O'Melveny & Myers | 2018 | Phillips ADR | X | X |
| Solid 21 v Hublot | 2018 | Federal District Court, Central District of California | X | |
| Newmark Realty Capital v BGC Partners, Newmark & Co., et al. | 2018 | Federal District Court, Northern District of California | X | |
| Jet Edge v Schembari | 2018, 2019 | Federal District Court, Central District of California | X | X |

2

## Testimony List of Jeffrey H. Kinrich (2017 - Present)

| MATTER | YEAR | COURT | DEPOSITION | TRIAL |
|---|---|---|---|---|
| Kjaer Weis v Kimsaprincess | 2018 | Federal District Court, Central District of California | X | |
| Wi-LAN v Vizio | 2018 | Federal District Court, District of Delaware | X | |
| Marriage of Stoddard & Treacy | 2018, 2019 | California Superior Court; Los Angeles | X | X |
| Marriage of Bower | 2018 | California Superior Court, San Diego | X | X |
| Tempic Five v Kingsco | 2018, 2019 | California Superior Court, Orange County | X | X |
| Safinia v Voltage Pictures | 2018 | Federal District Court, Central District of California | X | |
| Ballet Beauty v Lionsgate | 2019 | JAMS Arbitration | X | |
| Sanchez v CalPERS | 2019 | California Superior Court, Los Angeles | X | |
| Disney et al v VidAngel | 2019 | Federal District Court, Central District of California | X | X |
| Menendez v Seterus | 2019 | California Superior Court, Los Angeles | X | |
| Obagi v ZO | 2019 | JAMS Arbitration | X | X |

3

# Testimony List of Jeffrey H. Kinrich (2017 - Present)

| MATTER | YEAR | COURT | DEPOSITION | TRIAL |
|---|---|---|---|---|
| Marriage of Temmerman | 2019 | California Superior Court, Santa Clara | X | X |
| Tesla v Tripp | 2019 | Federal District Court, District of Nevada | X | |
| Manchester v Sivantos | 2019 | Federal District Court, Central District of California | X | |
| Applied Medical Resources v Southern California Edison | 2019 | California Superior Court, Orange | X | |
| Siena at Sorrento HOA v Toll Brothers et al. | 2019 | JAMS Arbitration, Walnut Creek | X | X |
| Fantasy Cookie v Bar Bakers | 2019, 2020 | California Superior Court, Los Angeles | X | X |
| Saxco International v Anchor Glass Container Corp. | 2019, 2020 | AAA Arbitration, Philadelphia | X | X |
| MRC v Spacey | 2020 | JAMS Arbitration, Los Angeles | X | X |
| Amalfi at Sorrento v Toll Brothers | 2020 | JAMS Arbitration, Walnut Creek | X | |
| Yu v Forest Surgical | 2020 | California Superior Court, San Francisco | X | |
| Network-1 Technologies, Inc. v Google, Inc and YouTube LLC | 2020 | Federal District Court, Southern District of New York | X | |

4

# Testimony List of Jeffrey H. Kinrich (2017 - Present)

| MATTER | YEAR | COURT | DEPOSITION | TRIAL |
|---|---|---|---|---|
| Altair v Telebrands | 2020 | Federal District Court, Central District of California | X | |
| Sorrento at Dublin Ranch v Toll Brothers | 2020 | JAMS Arbitration, Walnut Creek | X | |
| Cardinal v Gregory | 2020 | AAA Arbitration, Dallas TX | | X |
| Kessler v Wollmuth Maher & Deutsch | 2020 | AAA Arbitration, New York, NY | | X |
| Karpiuk et al v Wargaming World, Ltd. | 2020 | International Centre for Dispute Resolution, Nicosia, Cyprus | | X |
| Get Kaisered, Inc. v AKT Franchise, LLC | 2020 | Federal District Court, Delaware | X | |
| SPS Technologies, LLC d/b/a PB Fasteners v. Briles Aerospace, Inc. | 2020 | Federal District Court, Central District of California | X | |
| QC Manufacturing, Inc. v Solatube International | 2020 | JAMS Arbitration, Los Angeles | | X |
| Miner v. Olsen & Larson | 2020, 2021 | Utah Alternative Dispute Resolution Services | X | X |
| Workspot v Citrix | 2021 | Federal District Court, Delaware | X | |
| Zeitlin v Bank of America | 2021 | Federal District Court, Nevada | X | |

5

**Testimony List of Jeffrey H. Kinrich (2017 - Present)**

| MATTER | YEAR | COURT | DEPOSITION | TRIAL |
|---|---|---|---|---|
| RevPAR Collective dba Stash Rewards v Synchrony Bank | 2021 | California Superior Court, San Francisco | X | |
| CP III Rincon Towers v Richard Cohen | 2021 | Federal District Court, SD of New York | X | |
| JTS Communities v ZB dba California Bank & Trust | 2021 | California Superior Court, Sacramento | X | |
| Skyhawke v GolfzonDeca | 2021 | Federal District Court, CD of California | X | |
| Fahrenheit Homeowners Ass'n v CityMark Fahrenheit LLC | 2021 | California Superior Court, San Diego | X | |
| PGA v Trump National Bedminster | 2021 | JAMS Arbitration | X | |
| Microvention, Inc. v Balt | 2021 | Federal District Court, Central District of California | X | |
| Honey Bum v Fashion Nova | 2021 | Federal District Court, Central District of California | X | |
| Level 1 HOA v Taylor Morrison | 2021 | JAMS Arbitration | X | X |
| Aramark & HPSI v Borgquist, Beacon Holdings | 2021 | Federal District Court, Central District of California | | X |
| Honda Trading America v BASF | 2021 | Federal District Court, Central District of California | X | |

6

## Testimony List of Jeffrey H. Kinrich (2017 - Present)

| MATTER | YEAR | COURT | DEPOSITION | TRIAL |
|---|---|---|---|---|
| Marriage of Temmerman (II) | 2022 | California Superior Court, Santa Clara | X | |
| USA v Bychak (Amobee) | 2022 | Federal District Court, Southern District of California | | X (privilege hearing) |
| USA ex rel Stahl, et al. v Orthopedic Alliance, LLC et al. | 2022 | Federal District Court, Central District of California | X | |
| InComm Holdings v Quality Investment Properties Suwanee LLP | 2022 | Gwinnett County Superior Court, Georgia | X | |
| SEC v Yin | 2022 | Federal District Court, Southern District of New York | X | |
| American Career College et al. v Pronto, Medina et al. | 2022 | Federal District Court, Central District of California | X | |
| Gilead v Royalty Pharma Trust | 2022, 2023 | American Arbitration Ass'n, Atlanta, GA | X | X |
| Wedding v CalPERS | 2022 | California Superior Court, Los Angeles | X | |
| PennyMac v BlackKnight | 2022, 2023 | American Arbitration Ass'n, Jacksonville, FL | X | X |
| Masimo v Apple | 2023 | Federal District Court, Central District of California | X | X |

7

## Testimony List of Jeffrey H. Kinrich (2017 - Present)

| MATTER | YEAR | COURT | DEPOSITION | TRIAL |
|---|---|---|---|---|
| Ryan Martin v Agency for the Performing Arts | 2023 | California Superior Court, Los Angeles | X | X |
| BVK Gaming v Polvora | 2023 | California Superior Court, Napa | X | |
| Wisk Aero LLC v Archer Aviation | 2023 | Federal District Court, Northern District of California | X | |
| Guild Mortgage v Flowers | 2023 | JAMS Arbitration, Seattle | X | X |
| Krafton v NetEase | 2023 | California Superior Court, San Mateo | X | X |
| County of San Bernardino v ICSOP | 2023 | Federal District Court, Central District of California | X | |
| CCSCLA v Astroturf | 2023 | California Superior Court, Los Angeles | X | |
| Rensselaer Polytechnic Institute and CF Dynamic Advances LLC v Amazon.com | 2023 | Federal District Court, Northern District of New York | X | |
| Modern Ice Owners Association v Taylor Morrison of California | 2023 | California Superior Court, Santa Clara | X | X |
| Rinsch & Home VFX v Netflix | 2023 | ADR Services Arbitration | | X |
| In the Matter of The Donald W. Callender Family Trust (Ammerman & Feldmar) | 2023 | California Superior Court, Orange County | X | |

8

## Testimony List of Jeffrey H. Kinrich (2017 - Present)

| MATTER | YEAR | COURT | DEPOSITION | TRIAL |
|---|---|---|---|---|
| Yucaipa Companies LLC, et al. v Lantern Asset Management GP, LLC, et al. | 2024 | California Superior Court, Los Angeles | X | |
| loanDepot.com, LLC v Johnson | 2024 | JAMS Arbitration, Washington, DC | X | X |

9

# Appendix B
# Documents Relied Upon

**iCAP Internal Documents and Data**

2019 – Balance Sheet by Entity by Period-2023-12-19-16-03-13.xlsx.

Accounting Seed Data for iCAP entities: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx and other individual fund Accounting Seed data.

Declaration of Lance Miller in Support of First Day Motion, *In Re Icap Enterprises, INC., et al., Debtor* , Case No. 23-01243-WLH11, Dated October 3, 2023.

Fund Buyout Projection 2017 – Fund 1 & 2.xlsx.

iCAP Organizational Chart_v5 092223.pptx.

Investor Call Audio Clip, November 21, 2018.

Investor Tracker for iCAP Fund 1, Fund 2, Fund 3, Fund 4, Fund 5, Funding, Investments, and Vault.

Private Placement Memorandum for iCAP Equity, LLC.'s $50 million offering of Senior Promissory Notes, July 1, 2020.

Private Placement Memorandum for iCAP Pacific Northwest Opportunity and Income Fund, LLC.'s $30 million offering of 12% Senior Secured Debentures, December 19, 2013.

Private Placement Memorandum for iCAP Northwest Opportunity Fund, LLC.'s $30 million offering of 10% Senior Secured Debentures, April 20, 2015.

Private Placement Memorandum for iCAP Pacific Income Fund 4, LLC.'s $50 million offering of Secured Promissory Notes, October 1, 2018, p. 2.

Private Placement Memorandum for iCAP Pacific Income Fund 5, LLC.'s $50 million offering of 9% Secured Promissory Notes, September 5, 2019, p. 1.

Project Divestitures.xlsx.

**Bank Statements**

iCAP Bank Statements Produced from 11.1.2019 to 9.20.2023: Sources from Umpqua Bank, EastWest Bank, Seaside National Bank & Trust, Wells Fargo, JPMorgan Chase Bank, N.A.

**Emails and Attachments**

January 2017 email titled, "2017 Budget."

November 2017 email titled, "Budget."

June and July 2018 email chain with the title, "Lakeview and Brislawn."

May 2019 email chain titled, "$200K Transfer into Fund 1 on 5/13."

October 2019 email with the title, "Delegation List."

May 2020 email chain titled, "Fund 6 Financial Model."

April 2022 email titled, "Cash Follow Up."

July 2022 email chain titled, "7/15/2022 Cash Forecast for review."

October 2022 email chain titled, "Combined F/S."

October 2022 email chain with the title, "iCap Summary Spreadsheet – Finance Leadership Meeting."

December 2022 email chain with the title, "Jinan wiring instruction – transfers and wire are ready for approval in Umpqua."

February 2023 email chain titled, "Steve's mom's payback."

March 2023 email chain titled, "Incoming wire."

March 2023 email chain with the title, "This week's withdrawal requests."

April 2023 email chain titled, "Evergreen."

**Publicly Available Sources**

"Investor Protection Guide: Ponzi Scheme," Legal Information Institute, Cornell Law School, accessed on January 12, 2024, available at: https://www.law.cornell.edu/wex/investor_protection_guide_ponzi_scheme.

"Ponzi Scheme," Investor.gov, U.S. Securities and Exchange Commission, accessed on January 12, 2024, available at: https://www.investor.gov/protect-your-investments/fraud/types-fraud/ponzi-scheme.

"Ponzi Schemes," Michigan Consumer Protection," accessed on January 12, 2024, available at: https://www.michigan.gov/consumerprotection/protect-yourself/consumer-alerts/invest/ponzi.

**Ponzi Scheme Legal References**

Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.), 275 B.R. 641, 656-57 (Bankr. M.D. Fla. 2002).

Emerson v. Maples (In re Mark Benskin & Co.), 161 B.R. 664, 650 (Bankr. W.D. Tenn. 1993).

Fisher v. Sellas (In re Lake States Commodities, Inc.), 272 B.R. 233, 242 (Bankr.N.D.Ill.2002) (citing *Floyd v. Dunson (In re Ramirez Rodriguez)* , 209 B.R. 424, 431 (Bankr.S.D.Tex.1997), aff'd sub nom. *Fisher v. Page* , 2002 WL 31749262 (N.D. Ill. Dec. 3, 2002).

In re Hedged–Invs. Assocs., Inc., 48 F.3d 470, 474 (10th Cir. 1995).

In re Taubman, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993).

Miller v. Wulf, 84 F. Supp. 3d 1266, 1273–74 (D. Utah), aff'd, 632 F. App'x 937 (10th Cir. 2015).

O'Halloran v. First Union Nat'l Bank of Fla., 350 F.3d 1197, 1199 (11th Cir. 2003).

Rieser v. Hayslip (In re Canyon Sys. Corp.), 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006)).

Scholes v. Lehman, 56 F.3d 750, 757 (7th Cir. 1995).

Smith v. Suarez (In re IFS Fin. Corp.), 417 B.R. 419, 440 (Bankr. S.D. Tex. 2009).

United States v. Benson, 79 Fed. App'x 813, 817 (6th Cir. 2003).

Wing v. Dockstader, 2010 U.S. Dist. LEXIS 128571, at *11 (D. Utah Dec. 3, 2010).

Wing v. Williams, 2011 U.S. Dist. LEXIS 25607, at *10 (D. Utah Mar. 11, 2011).

**Exhibit 1.1**

**Consolidated iCAP Sources and Uses by Category, Including Intercompany Transfers**

*10.1.2018 – 9.30.2023*

| Deposits | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Investments from Subscribers** | **$1,675,573** | **$29,253,165** | **$27,652,816** | **$85,278,426** | **$120,563,913** | **$22,423,557** | **$286,847,450** | **49.4%** |
| *Funds from Subscribers* | *$1,486.0* | *$26,976.3* | *$26,464.0* | *$75,458,033* | *$97,755,454* | *$21,856.8* | *$249,996,675* | 43.1% |
| *Wire Fees* | – | – | *$655* | *$1,625* | *$3,075* | *$1,285* | *$6,640* | 0.0% |
| *Reinvestment of Investor Interest* | *$14,910* | *$36,819* | *$142,850* | *$1,446,572* | *$3,903,392* | *$511,058* | *$6,055,601* | 1.0% |
| *Reinvestment from Other iCAP Entities* | – | *$104,724* | *$384,877* | *$105,923* | – | – | *$595,524* | 0.1% |
| *Subscriber Reallocation* | – | *$1,028,536* | *$361,279* | *$4,256,510* | *$16,054,077* | – | *$21,700,401* | 3.7% |
| *Reinvestment of Commissions* | *$52,623* | *$637,258* | *$260,900* | *$1,922,749* | *$2,393,437* | *$43,000* | *$5,309,967* | 0.9% |
| *Other* | *$122,014* | *$469,513* | *$38,210* | *$2,087,014* | *$454,478* | *$11,413* | *$3,182,642* | 0.5% |
| **Loans Obtained from Third Party Lenders** | – | **$2,390,664** | **$5,375,334** | **$20,145,328** | **$24,885,146** | **$2,994,563** | **$55,791,035** | **9.6%** |
| *Loan Related* | – | *$2,390,664* | *$5,375,334* | *$7,446,220* | *$13,139,255* | *$2,000,000* | *$30,351,472* | 5.2% |
| *Draw Deposit* | – | – | – | *$12,699,108* | *$11,745,891* | *$994,563* | *$25,439,562* | 4.4% |
| **Money Received from Business Operations** | **$5,066,010** | **$10,042,189** | **$1,829,207** | **$5,647,557** | **$9,167,188** | **$3,157,567** | **$34,909,718** | **6.0%** |
| *Revenue: Rent & Project Payoff* | *$1,217,986* | *$8,358,263* | *$1,224,496* | *$5,106,054* | *$8,292,905* | *$1,412.1* | *$25,611,759* | 4.4% |
| *Interest Credit* | *$75,370* | *$103* | *$492* | *$595* | *$635* | *$76* | *$77,271* | 0.0% |
| *Refund/Reimbursement* | *$45,447* | *$163,665* | *$110,102* | *$216,197* | *$845,574* | *$55,890* | *$1,436,876* | 0.2% |
| *Escrow Deposit* | – | – | – | – | – | *$1,283,768* | *$1,283,768* | 0.2% |
| *Account Close* | *$527,805* | *$383,600* | – | *$100* | *$2,288* | – | *$913,793* | 0.2% |
| *Other* | *$3,199,402* | *$1,136,557* | *$494,117* | *$324,611* | *$25,786* | *$405,778* | *$5,586,251* | 1.0% |
| **Intercompany Transfers** | **$1,570,636** | **$13,212,683** | **$23,912,135** | **$37,894,862** | **$106,721,387** | **$19,298,366** | **$202,610,068** | **34.9%** |
| **Total Deposits** | **$8,312,219** | **$54,898,701** | **$58,769,491** | **$148,966,173** | **$261,337,634** | **$47,874,053** | **$580,158,272** | **100.0%** |
| **Withdrawals** | | | | | | | | |
| **Returns to Subscribers** | **($2,766,135)** | **($24,480,866)** | **($19,264,741)** | **($54,630,918)** | **($112,580,636)** | **($22,404,658)** | **($236,127,953)** | **40.4%** |
| *Subscriber Interest Payments, Principal Payments, & Other* | *($2,766,135)* | *($23,991,632)* | *($18,287,453)* | *($49,757,779)* | *($84,619,255)* | *($21,901,328)* | *($201,325,580)* | 34.4% |
| *Subscriber Reallocation* | – | *($489,235)* | *($976,553)* | *($4,872,289)* | *($15,921,310)* | – | *($22,259,387)* | 3.8% |
| *Wire Fees* | – | – | *($735)* | *($850)* | *($2,635)* | *($1,285)* | *($5,505)* | 0.0% |
| **Commission Payments** | **($91,012)** | **($1,152,927)** | **($1,412,564)** | **($3,314,558)** | **($3,047,257)** | **($332,999)** | **($9,351,317)** | **1.6%** |
| **Real Estate Acquisition, Development, and Investment** | **($926,014)** | **($7,693,951)** | **($8,963,969)** | **($28,201,002)** | **($30,745,134)** | **($2,327,421)** | **($78,857,492)** | **13.5%** |
| **Loan Repayment** | **($199,191)** | **($406,072)** | **($2,033,731)** | **($332,500)** | **($500,000)** | **($1,155,048)** | **($4,326,541)** | **0.7%** |
| **General, Operating, and Admin Expenses** | **($2,119,743)** | **($8,056,901)** | **($7,747,026)** | **($10,712,552)** | **($12,658,772)** | **($3,669,754)** | **($44,964,748)** | **7.7%** |
| **Money to Owner** | **($9,320)** | **($1,139,550)** | **($2,434,063)** | **($951,275)** | **($1,109,146)** | **($337,597)** | **($5,980,951)** | **1.0%** |
| **Intercompany Transfers** | **($1,269,160)** | **($11,992,857)** | **($23,995,374)** | **($40,383,239)** | **($107,096,096)** | **($20,466,380)** | **($205,203,106)** | **35.1%** |
| **Total Withdrawals** | **($7,380,574)** | **($54,923,125)** | **($65,851,469)** | **($138,226,044)** | **($267,737,040)** | **($50,691,856)** | **($584,812,108)** | **100.0%** |

Sources:

[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.

[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al., Debtor, No. 23-01243-WLH11, October 3, 2023.

Note:

[1] Please refer to Exhibit 1.2 for the descriptions of the line items.

**Exhibit 1.2**
**iCAP Sources and Uses Category Description**
*10.1.2018 – 9.30.2023*

| Category | Description |
|---|---|
| **Deposits** | |
| **Investments from Subscribers** | **Funds transferred to iCAP entities** |
| | **Funds received from investor subscription** |
| *Funds from Subscribers* | *Funds received as additional investments to iCAP entities* |
| *Reinvestment of Investor Interest* | *Interest payment made to a subscriber that has been reinvested in iCAP entities* |
| *Wire Fees* | *Wire or bank service fees related to the investment transactions* |
| *Reinvestment from Other iCAP Entities* | *Reinvestment of funds from one iCAP entity to another* |
| *Subscriber Reallocation* | *Reallocation of funds from one subscription number to another* |
| *Reinvestment of Commissions* | *Commissions paid that were reinvested by the subscriber receiving the commissions* |
| *Other* | *Investments made for general or unspecified purposes, such as consulting fee, refund, bonus, etc.* |
| **Loans Obtained from Third Party Lenders** | **Funds borrowed by iCAP from third party entities** |
| *Loan Related* | *Loan received from third party financing agencies* |
| *Draw Deposit* | *Loan Draws related to Colpitts Sunset property* |
| **Money Received from Business Operationss** | **Funds deposited in iCAP entity accounts for Business Operations or real estate investment activities** |
| *Revenue: Rent & Project Payoff* | *iCAP entity revenues from real estate investments, including rent, sale of a unit, etc.* |
| *Interest Credit* | *Interest received from iCAP deposits in third party agencies* |
| *Refund/Reimbursement* | *Refund/Reimbursement for Business Operations activities, such as payroll, utility, maintenance, service fee, etc.* |
| *Escrow Deposit* | *Escrow deposits related to assets owned by iCAP entities* |
| *Account Close* | *Transfers received due to bank account closure* |
| *Other* | *Money received for general or unspecified purposes, such as call down payment, cash adjustment, etc.* |
| **Intercompany Transfers** | **Transfers from one iCAP entity to another iCAP entity/property** |
| | |
| **Withdrawals** | **Funds withdrawn by iCAP entities** |
| **Returns to Subscribers** | **Withdrawals from an iCAP entity to a subscriber** |
| *Subscriber Interest Payments, Principal Payments, & Other* | *Transfers from one iCAP entity to a subscriber account for various payments, mostly interest and principal payback* |
| *Wire Fees* | *Wire fees associated with withdrawals from one iCAP entity to a subscriber account* |
| *Subscriber Reallocation* | *Reallocation of funds from one subscription number to another* |
| **Commission Payments** | **Withdrawals from an iCAP entity to an investment broker or other party** |
| **Real Estate Acquisition, Development, and Investment** | **Withdrawals from an iCAP entity to a third party related to a real estate transaction** |
| **Loan Repayment** | **Withdrawals from an iCAP entity to a third party related to loan payments** |
| **General, Operating, and Admin Expenses** | **Withdrawals from an iCAP entity to a third party for general, operating, and administrative expenses** |
| **Money to Owner** | **Transfers from iCAP entities to Chris Christensen** |
| **Intercompany Transfers** | **Transfers from one iCAP entity to another iCAP entity/property** |

Sources:
[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.
[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al., Debtor, No. 23-01243-WLH11, October 3, 2023.

## Exhibit 2
### Consolidated iCAP Sources and Uses by Category, Excluding Intercompany Transfers
#### 10.1.2018 – 9.30.2023

| Deposits | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Investments from Subscribers** | $1,675,573 | $29,253,165 | $27,652,816 | $85,278,426 | $120,563,913 | $22,423,557 | $286,847,450 | 76.0% |
| Funds from Subscribers | $1,486.0 | $26,976.3 | $26,464.0 | $75,458,033 | $97,755,454 | $21,856.8 | $249,996,675 | 66.2% |
| Wire Fees | — | | $655 | $1,625 | $3,075 | $1,285 | $6,640 | 0.0% |
| Reinvestment of Investor Interest | $14,910 | $36,819 | $142,850 | $1,446,572 | $3,903,392 | $511,058 | $6,055,601 | 1.6% |
| Reinvestment from Other iCAP Entities | | $104,724 | $384,877 | $105,923 | | | $595,524 | 0.2% |
| Subscriber Reallocation | | $1,028,536 | $361,279 | $4,236,510 | $16,054,077 | | $21,700,401 | 5.7% |
| Reinvestment of Commissions | $52,623 | $637,258 | $260,900 | $1,922,749 | $2,393,437 | $43,000 | $5,309,967 | 1.4% |
| Other | $122,014 | $469,513 | $38,210 | $2,087,014 | $454,478 | $11,413 | $3,182,642 | 0.8% |
| **Loans Obtained from Third Party Lenders** | — | $2,390,664 | $5,375,334 | $20,145,328 | $24,885,146 | $2,994,563 | $55,791,035 | 14.8% |
| Loan Related | | $2,390,664 | $5,375,334 | $7,446,220 | $13,139,255 | $2,000,000 | $30,351,472 | 8.0% |
| Draw Deposit | | | | $12,699,108 | $11,745,891 | $994,563 | $25,439,562 | 6.7% |
| **Money Received from Business Operations** | $5,066,010 | $10,042,189 | $1,829,207 | $5,647,557 | $9,167,188 | $3,157,567 | $34,909,718 | 9.2% |
| Revenue: Rent & Project Payoff | $1,217,986 | $8,358,263 | $1,224,496 | $5,106,054 | $8,292,905 | $1,412.1 | $25,611,759 | 6.8% |
| Interest Credit | $75,370 | $103 | $492 | $595 | $635 | $76 | $77,271 | 0.0% |
| Refund/Reimbursement | $45,447 | $163,665 | $110,102 | $216,197 | $845,574 | $55,890 | $1,436,876 | 0.4% |
| Escrow Deposit | | | | | | $1,283,768 | $1,283,768 | 0.3% |
| Account Close | $527,805 | $383,600 | | $0.1 | $2.3 | | $913,793 | 0.2% |
| Other | $3,199,402 | $1,136,557 | $494,117 | $324,611 | $25,786 | $405,778 | $5,586,251 | 1.5% |
| **Total Deposits** | $6,741,584 | $41,686,018 | $34,857,357 | $111,071,311 | $154,616,247 | $28,575,688 | $377,548,203 | 100.0% |
| **Withdrawals** | | | | | | | | |
| **Returns to Subscribers** | ($2,766,135) | ($24,480,866) | ($19,264,741) | ($54,630,918) | ($112,580,636) | ($22,404,658) | ($236,127,953) | 62.2% |
| Subscriber Interest Payments, Principal Payments, & Other | ($2,766,135) | ($23,991,632) | ($18,287,453) | ($49,757,779) | ($84,619,255) | ($21,903.328) | ($201,325,580) | 53.0% |
| Subscriber Reallocation | | ($489,235) | ($976,553) | ($4,872,289) | ($15,921,310) | | ($22,259,387) | 5.9% |
| Wire Fees | | | ($735) | ($850) | ($2,635) | ($1,285) | ($5,505) | 0.0% |
| **Commission Payments** | ($91,012) | ($1,152,927) | ($1,412,564) | ($3,314,558) | ($3,047,257) | ($332,999) | ($9,351,317) | 2.5% |
| **Real Estate Acquisition, Development, and Investment** | ($926,014) | ($57,693,951) | ($8,963,969) | ($28,201,002) | ($30,745,134) | ($2,327,421) | ($78,857,492) | 20.8% |
| **Loan Repayment** | ($199,191) | ($406,072) | ($2,033,731) | ($32,500) | ($500,000) | ($1,155,048) | ($4,326,541) | 1.1% |
| **General, Operating, and Admin Expenses** | ($2,119,743) | ($8,056,901) | ($7,747,026) | ($10,712,552) | ($12,658,772) | ($3,669,754) | ($44,964,748) | 11.8% |
| **Money to Owner** | ($9,320) | ($1,139,550) | ($2,434,063) | ($951,275) | ($1,109,146) | ($337,597) | ($5,980,951) | 1.6% |
| **Total Withdrawals** | ($6,111,414) | ($42,930,268) | ($41,856,095) | ($97,842,805) | ($160,640,944) | ($30,227,476) | ($379,609,001) | 100.0% |

**Sources:**
[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.
[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al., Debtor, No. 23-01243-WLH11, October 3, 2023.

**Note:**
[1] Please refer to Exhibit 1.2 for the descriptions of the line items.

## Exhibit 3
### Consolidated iCAP Sources and Uses For Funds 1-5, iCAP Funding, iCAP Investments, and iCAP Vault
#### 2018.10.1 – 2023.9.30

| Deposits | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Investments from Subscribers** | $1,675,573 | $29,253,165 | $26,402,869 | $85,278,426 | $111,992,870 | $22,423,557 | $277,026,461 | 65.6% |
| Funds from Subscribers | $1,486,026 | $26,976,314 | $25,214,098 | $75,458,033 | $95,273,954 | $21,856,802 | $246,265,228 | 58.4% |
| Wire Fees | — | — | $655 | $1,625 | $3,075 | $1,285 | $6,640 | 0.0% |
| Reinvestment of Investor Interest | $14,910 | $36,819 | $142,850 | $1,446,572 | $3,903,392 | $511,058 | $6,055,601 | 1.4% |
| Reinvestment from Other iCAP Entities | — | $104,724 | $384,877 | $105,923 | — | — | $595,524 | 0.1% |
| Subscriber Reallocation | — | $1,028,536 | $361,279 | $4,256,510 | $9,964,534 | — | $15,610,859 | 3.7% |
| Reinvestment of Commissions | $52,623 | $637,258 | $260,900 | $1,922,749 | $2,393,437 | $43,000 | $5,309,967 | 1.3% |
| Other | $122,014 | $469,513 | $38,210 | $2,087,014 | $454,478 | $11,413 | $3,182,642 | 0.8% |
| **Loans Obtained from Third Party Lenders** | — | — | $717,097 | $1,077,380 | $1,862,000 | — | $3,656,477 | 0.9% |
| Loan Related | — | — | $717,097 | $1,077,380 | $1,862,000 | — | $3,656,477 | 0.9% |
| Draw Deposit | — | — | — | — | — | — | — | 0.0% |
| **Money Received from Business Operations** | $4,234,935 | $5,770,323 | $1,057,827 | $5,037,626 | $881,525 | $332,329 | $17,314,564 | 4.1% |
| Revenue: Rent & Project Payoff | $1,003,680 | $4,673,612 | $967,993 | $4,607,583 | $45,872 | — | $11,298,740 | 2.7% |
| Interest Credit | $75,370 | $101 | $470 | $585 | $600 | $27 | $77,152 | 0.0% |
| Refund/Reimbursement | $30,506 | $45,003 | $12,607 | $132,609 | $822,758 | $38,932 | $1,082,414 | 0.3% |
| Escrow Deposit | — | — | — | — | — | $143,500 | $143,500 | 0.0% |
| Account Close | $252,690 | $383,600 | — | $100 | $2,288 | — | $638,678 | 0.2% |
| Other | $2,872,689 | $668,008 | $76,757 | $296,749 | $10,007 | $149,870 | $4,074,081 | 1.0% |
| **Intercompany Transfers** | $10,225 | $8,978,790 | $13,771,355 | $29,014,710 | $60,693,485 | $14,544,171 | $124,012,735 | 29.4% |
| **Total Deposits** | $5,920,733 | $44,002,279 | $41,949,147 | $120,408,142 | $175,429,880 | $34,300,057 | $422,010,237 | 100.0% |
| **Withdrawals** | | | | | | | | |
| **Returns to Subscribers** | ($2,766,135) | ($24,480,866) | ($19,264,741) | ($54,534,305) | ($95,486,112) | ($21,762,688) | ($218,294,847) | 51.3% |
| Subscriber Interest Payments, Principal Payments, & Other | ($2,766,135) | ($23,991,632) | ($18,287,453) | ($49,661,166) | ($83,024,927) | ($21,761,403) | ($199,492,714) | 46.9% |
| Subscriber Reallocation | — | ($489,235) | ($976,553) | ($4,872,289) | ($15,421,310) | — | ($21,759,387) | 5.1% |
| Wire Fees | — | — | ($735) | ($850) | ($2,635) | ($1,285) | ($5,505) | 0.0% |
| **Commission Payments** | ($91,012) | ($1,152,927) | ($1,412,564) | ($3,314,558) | ($2,404,406) | ($289,999) | ($8,665,466) | 2.0% |
| **Real Estate Acquisition, Development, and Investment** | ($569,266) | ($3,421,516) | ($443,144) | ($7,147,566) | ($10,974,200) | ($794) | ($22,556,487) | 5.3% |
| **Loan Repayment** | ($64,250) | ($373,970) | ($1,998,731) | ($7,500) | ($500,000) | — | ($2,944,452) | 0.7% |
| **General, Operating, and Admin Expenses** | ($561,534) | ($3,975,135) | ($3,707,705) | ($5,602,264) | ($3,246,663) | ($376,329) | ($17,469,630) | 4.1% |
| **Money to Owner** | ($7,320) | ($829,000) | ($2,420,365) | ($690,275) | ($902,225) | ($259,740) | ($5,108,924) | 1.2% |
| **Intercompany Transfers** | ($921,490) | ($9,779,367) | ($19,739,480) | ($38,389,931) | ($68,829,245) | ($12,666,332) | ($150,325,846) | 35.3% |
| **Total Withdrawals** | ($4,981,006) | ($44,012,783) | ($48,986,730) | ($109,686,399) | ($182,342,852) | ($35,355,882) | ($425,365,651) | 100.0% |

**Sources:**

[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.

[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al., Debtor, No. 23-01243-WLH11, October 3, 2023.

**Note:**

[1] Please refer to Exhibit 1.2 for the descriptions of the line items.

## Exhibit 4.1
### iCAP Pacific Northwest Opportunity & Income Fund - Fund 1 Sources and Uses
2018.10.1 – 2023.9.30

| Deposits | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Investments from Subscribers** | | | | | | | | |
| Funds from Subscribers | $1,000 | $26,514 | $500 | – | $22,634 | $2,000 | $52,648 | 0.3% |
| Wire Fees | – | – | – | – | – | – | – | 0.0% |
| Reinvestment of Investor Interest | – | $500 | – | – | – | – | $500 | 0.0% |
| Reinvestment from Other iCAP Entities | – | – | – | – | – | – | – | 0.0% |
| Subscriber Reallocation | – | – | – | – | – | – | – | 0.0% |
| Reinvestment of Commissions | – | – | – | – | – | – | – | 0.0% |
| *Other* | *$1,000* | *$26,014* | *$500* | – | *$22,634* | *$2,000* | *$52,148* | 0.3% |
| **Loans Obtained From Third Party Lenders** | | | | | | | | |
| Loan Related | – | – | – | – | – | – | – | 0.0% |
| Draw Deposit | – | – | – | – | – | – | – | 0.0% |
| **Money Received from Business Operations** | $279,769 | $971,608 | $11,315 | $70,011 | $31,940 | $152,389 | $1,517,033 | 8.7% |
| *Revenue: Rent & Project Payoff* | – | *$940,615* | – | *$70,000* | *$30,000* | – | *$1,040,615* | 5.9% |
| *Interest Credit* | – | *$5* | *$19* | *$11* | *$22* | *$3* | *$59* | 0.0% |
| *Refund/Reimbursement* | *$30,506* | *$9,468* | *$978* | – | *$1,919* | *$8,887* | *$51,757* | 0.3% |
| *Escrow Deposit* | – | – | – | – | – | *$143,500* | *$143,500* | 0.8% |
| *Account Close* | *$238,568* | *$100* | – | – | – | – | *$238,668* | 1.4% |
| *Other* | *$10,695* | *$21,420* | *$10,319* | – | – | – | *$42,434* | 0.2% |
| **Intercompany Transfers** | $5,000 | $3,056,994 | $4,340,800 | $4,033,611 | $3,791,150 | $726,467 | $15,954,022 | 91.0% |
| **Total Deposits** | $285,769 | $4,055,116 | $4,352,615 | $4,103,622 | $3,845,724 | $880,856 | $17,523,703 | 100.0% |
| **Withdrawals** | | | | | | | | |
| **Returns to Subscribers** | ($1,142,111) | ($4,419,547) | ($4,387,982) | ($3,824,539) | ($3,603,565) | ($705,134) | ($18,082,879) | 91.4% |
| *Subscriber Interest Payments, Principal Payments, & Other* | *($1,142,111)* | *($4,419,547)* | *($4,387,982)* | *($3,824,539)* | *($3,603,565)* | *($705,134)* | *($18,082,879)* | 91.4% |
| *Subscriber Reallocation* | – | – | – | – | – | – | – | 0.0% |
| *Wire Fees* | – | – | – | – | – | – | – | 0.0% |
| **Commission Payments** | – | – | – | – | – | – | – | 0.0% |
| **Real Estate Acquisition, Development, and Investment** | ($42,145) | ($18,917) | ($3,740) | – | – | – | ($64,802) | 0.3% |
| **Loan Repayment** | – | – | – | – | – | – | – | 0.0% |
| **General, Operating, and Admin Expenses** | ($151,137) | ($323,580) | ($294,763) | ($252,975) | ($229,320) | ($44,994) | ($1,296,768) | 6.6% |
| **Money to Owner** | – | – | – | – | – | – | – | 0.0% |
| **Intercompany Transfers** | ($244) | ($19,590) | ($120,056) | – | ($20,691) | ($170,622) | ($331,202) | 1.7% |
| **Total Withdrawals** | ($1,335,637) | ($4,781,634) | ($4,806,540) | ($4,077,514) | ($3,853,576) | ($920,751) | ($19,775,652) | 100.0% |

**Sources:**

[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.

[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al, Debtor, No. 23-01243-WLH11, October 3, 2023.

**Note:**

[1] Please refer to Exhibit 1.2 for the descriptions of the line items.

**Exhibit 4.2**

**iCAP Northwest Fund - Fund 2 Sources and Uses**

2018.10.1 – 2023.9.30

| Deposits | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Investments from Subscribers** | | | | | | | | |
| **Funds from Subscribers** | $7,544 | $7,379 | $5,491 | $3,536 | $2,750 | – | $26,701 | 0.1% |
| *Wire Fees* | $4,583 | – | – | – | – | – | $4,583 | 0.0% |
| *Reinvestment of Investor Interest* | – | – | – | – | – | – | – | 0.0% |
| *Reinvestment from Other iCAP Entities* | – | – | – | – | – | – | – | 0.0% |
| *Subscriber Reallocation* | – | – | – | – | – | – | – | 0.0% |
| *Reinvestment of Commissions* | – | – | – | – | – | – | – | 0.0% |
| *Other* | $2,961 | $7,379 | $5,491 | $3,536 | $2,750 | – | $22,117 | 0.1% |
| **Loans Obtained From Third Party Lenders** | – | – | $7,250 | – | – | – | $7,250 | 0.0% |
| *Loan Related* | – | – | $7,250 | – | – | – | $7,250 | 0.0% |
| *Draw Deposit* | – | – | – | – | – | – | – | 0.0% |
| **Money Received from Business Operations** | $3,916,524 | $4,029,064 | $826,639 | $1,587,306 | $6 | $1 | $10,359,540 | 31.1% |
| *Revenue: Rent & Project Payoff* | $1,003,680 | $3,613,187 | $800,000 | $1,519,887 | – | – | $6,936,754 | 20.8% |
| *Interest Credit* | $75,370 | $12 | $22 | $18 | $6 | $1 | $75,429 | 0.2% |
| *Refund/Reimbursement* | – | $3,873 | $6,014 | $67,370 | – | – | $77,257 | 0.2% |
| *Escrow Deposit* | $14,122 | – | – | – | – | – | $14,122 | 0.0% |
| *Account Close* | – | – | – | – | – | – | – | 0.0% |
| *Other* | $2,823,353 | $411,993 | $20,602 | $30 | – | – | $3,255,978 | 9.8% |
| **Intercompany Transfers** | – | $4,280,331 | $3,360,865 | $5,779,632 | $8,380,047 | $1,121,209 | $22,922,084 | 68.8% |
| **Total Deposits** | $3,924,069 | $8,316,775 | $4,200,244 | $7,370,474 | $8,382,804 | $1,121,210 | $33,315,575 | 100.0% |
| **Withdrawals** | | | | | | | | |
| **Returns to Subscribers** | ($1,298,775) | ($5,306,261) | ($5,141,367) | ($4,005,663) | ($3,868,785) | ($603,649) | ($20,224,500) | 55.2% |
| *Subscriber Interest Payments, Principal Payments, & Other* | ($1,298,775) | ($5,306,261) | ($5,141,367) | ($4,005,663) | ($3,868,785) | ($603,649) | ($20,224,500) | 55.2% |
| *Subscriber Reallocation* | – | – | – | – | – | – | – | 0.0% |
| *Wire Fees* | – | – | – | – | – | – | – | 0.0% |
| **Commission Payments** | – | – | – | – | – | – | – | 0.0% |
| **Real Estate Acquisition, Development, and Investment** | ($486,130) | ($2,018,127) | ($25,934) | ($320) | – | – | ($2,530,510) | 6.9% |
| **Loan Repayment** | ($64,250) | ($246,433) | ($52,750) | – | – | – | ($363,433) | 1.0% |
| **General, Operating, and Admin Expenses** | ($188,196) | ($1,202,579) | ($256,024) | ($35,199) | ($338,867) | ($0) | ($1,720,865) | 4.7% |
| **Money to Owner** | – | – | – | – | – | – | – | 0.0% |
| **Intercompany Transfers** | ($750,247) | ($1,980,968) | ($752,098) | ($3,323,236) | ($4,482,492) | ($536,278) | ($11,825,318) | 32.3% |
| **Total Withdrawals** | ($2,787,598) | ($10,754,367) | ($6,228,172) | ($7,364,418) | ($8,390,144) | ($1,139,927) | ($36,664,627) | 100.0% |

**Sources:**

[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.

[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al., Debtor, No. 23-01243-WLH11, October 3, 2023.

**Note:**

[1] Please refer to Exhibit 1.2 for the descriptions of the line items.

## Exhibit 4.3
## iCAP Equity, LLC - Fund 3 Sources and Uses
### 2018.10.1 – 2023.9.30

| Deposits | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Investments from Subscribers** | | | | | | | | |
| Funds from Subscribers | $552,527 | $4,916,738 | $10,596,592 | $9,362,562 | $10,318,217 | $514,584 | $36,261,220 | 44.4% |
| *Funds from Subscribers* | *$552,527* | *$4,736,738* | *$10,367,592* | *$9,012,562* | *$10,198,405* | *$514,584* | *$35,382,408* | *43.3%* |
| *Wire Fees* | — | — | — | — | — | — | — | *0.0%* |
| *Reinvestment of Investor Interest* | — | — | *$140,000* | — | — | — | *$140,000* | *0.2%* |
| *Reinvestment from Other iCAP Entities* | — | — | — | — | — | — | — | *0.0%* |
| *Subscriber Reallocation* | — | *$80,000* | *$89,000* | *$350,000* | *$112,500* | — | *$631,500* | *0.8%* |
| *Reinvestment of Commissions* | — | — | — | — | — | — | — | *0.0%* |
| *Other* | — | *$100,000* | — | — | *$7,312* | — | *$107,312* | *0.1%* |
| **Loans Obtained From Third Party Lenders** | | | | | | | | |
| *Loan Related* | — | — | — | — | — | — | — | *0.0%* |
| *Draw Deposit* | — | — | — | — | — | — | — | *0.0%* |
| **Money Received from Business Operations** | $38,551 | $611,662 | $43,898 | $110,537 | $24,011 | $48,167 | $876,826 | 1.1% |
| *Revenue: Rent & Project Payoff* | — | — | — | — | — | — | — | *0.0%* |
| *Interest Credit* | — | *$13* | *$74* | *$29* | *$38* | *$6* | *$160* | *0.0%* |
| *Refund/Reimbursement* | — | *$1,732* | — | *$15,968* | *$11,786* | *$26,200* | *$55,685* | *0.1%* |
| *Escrow Deposit* | — | — | — | — | — | — | — | *0.0%* |
| *Account Close* | — | *$383,500* | — | *$100* | *$2,188* | — | *$385,788* | *0.0%* |
| *Other* | *$38,551* | *$226,417* | *$43,824* | *$94,440* | *$10,000* | *$21,961* | *$435,193* | *0.5%* |
| **Intercompany Transfers** | — | $1,251,264 | $3,722,570 | $12,939,690 | $20,606,530 | $5,986,050 | $44,506,103 | 54.5% |
| **Total Deposits** | $591,078 | $6,779,664 | $14,363,060 | $22,412,789 | $30,948,758 | $6,548,801 | $81,644,150 | 100.0% |
| **Withdrawals** | | | | | | | | |
| **Returns to Subscribers** | ($243,901) | ($1,148,297) | ($1,673,240) | ($6,472,119) | ($7,987,764) | ($1,270,048) | ($18,795,369) | 22.0% |
| *Subscriber Interest Payments, Principal Payments, & Other* | *($243,901)* | *($1,137,598)* | *($1,673,240)* | *($6,472,119)* | *($7,987,664)* | *($1,270,048)* | *($18,784,570)* | *22.0%* |
| *Subscriber Reallocation* | — | *($10,699)* | — | — | *($100)* | — | *($10,799)* | *0.0%* |
| *Wire Fees* | — | — | — | — | — | — | — | *0.0%* |
| **Commission Payments** | ($59,512) | ($506,092) | ($1,255,713) | ($1,408,610) | — | — | ($4,212,245) | 4.9% |
| **Real Estate Acquisition, Development, and Investment** | ($40,990) | ($156,637) | ($31,134) | ($870) | — | — | ($229,631) | 0.3% |
| **Loan Repayment** | — | ($50,000) | — | — | — | — | ($50,000) | 0.1% |
| **General, Operating, and Admin Expenses** | ($195,701) | ($753,927) | ($931,437) | ($1,059,171) | ($441,276) | ($95,649) | ($3,477,160) | 4.1% |
| **Money to Owner** | ($7,320) | — | ($40) | — | — | — | ($7,359) | 0.0% |
| **Intercompany Transfers** | ($171,000) | ($5,731,171) | ($11,958,575) | ($13,962,930) | ($21,687,072) | ($5,045,726) | ($58,556,473) | 68.6% |
| **Total Withdrawals** | ($718,423) | ($8,346,124) | ($15,850,139) | ($22,903,700) | ($30,829,931) | ($6,679,921) | ($85,328,238) | 100.0% |

**Sources:**

[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.

[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al., Debtor, No. 23-01243-WLH11, October 3, 2023.

**Note:**

[1] Please refer to Exhibit 1.2 for the descriptions of the line items.

# Exhibit 4.4
## iCAP Pacific Income - Fund 4 Sources and Uses
### 2018.10.1 – 2023.9.30

| Deposits | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Investments from Subscribers** | $749,959 | $8,447,373 | $1,575,482 | $1,175,000 | $457,405 | -- | $12,405,218 | 51.9% |
| Funds from Subscribers | $709,959 | $7,697,373 | $1,525,000 | $899,975 | $420,000 | -- | $11,252,307 | 47.1% |
| Wire Fees | -- | -- | $263 | -- | -- | -- | $263 | 0.0% |
| Reinvestment of Investor Interest | -- | -- | -- | -- | -- | -- | -- | 0.0% |
| Reinvestment from Other iCAP Entities | -- | -- | -- | -- | -- | -- | -- | 0.0% |
| Subscriber Reallocation | -- | $750,000 | $50,000 | $275,025 | -- | -- | $1,075,025 | 4.5% |
| Reinvestment of Commissions | -- | -- | -- | -- | -- | -- | -- | 0.0% |
| Other | $40,000 | -- | $219 | -- | $37,405 | -- | $77,624 | 0.3% |
| **Loans Obtained From Third Party Lenders** | -- | -- | -- | -- | -- | -- | -- | 0.0% |
| Loan Related | -- | -- | -- | -- | -- | -- | -- | 0.0% |
| Draw Deposit | -- | -- | -- | -- | -- | -- | -- | 0.0% |
| **Money Received from Business Operations** | -- | $32,429 | $3,414 | $2,267 | $2,580 | $306 | $40,996 | 0.2% |
| Revenue: Rent & Project Payoff | -- | -- | $2,526 | $2,096 | $2,570 | -- | $7,191 | 0.0% |
| Interest Credit | -- | $44 | $144 | $7 | $10 | $0 | $205 | 0.0% |
| Refund/Reimbursement | -- | $29,930 | $250 | $164 | -- | $306 | $30,649 | 0.1% |
| Escrow Deposit | -- | -- | -- | -- | -- | -- | -- | 0.0% |
| Account Close | -- | -- | -- | -- | -- | -- | -- | 0.0% |
| Other | -- | $2,455 | $495 | -- | -- | -- | $2,950 | 0.0% |
| **Intercompany Transfers** | $100 | -- | -- | -- | $6,811,596 | $473,045 | $11,446,855 | 47.9% |
| **Total Deposits** | $750,059 | $8,479,802 | $2,093,959 | $4,824,318 | $7,271,581 | $473,351 | $23,893,070 | 100.0% |

| Withdrawals | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Returns to Subscribers** | ($40,347) | ($323,502) | ($943,935) | ($1,056,952) | ($2,043,067) | ($478,516) | ($4,886,320) | 21.6% |
| Subscriber Interest Payments, Principal Payments, & Other | ($40,347) | ($323,502) | ($943,935) | ($1,056,952) | ($1,975,522) | ($478,516) | ($4,818,775) | 21.3% |
| Subscriber Reallocation | -- | -- | -- | -- | ($67,500) | -- | ($67,500) | 0.3% |
| Wire Fees | -- | -- | -- | -- | ($45) | -- | ($45) | 0.0% |
| **Commission Payments** | ($31,500) | ($646,835) | ($4,000) | ($80,000) | ($53,600) | -- | ($815,935) | 3.6% |
| **Real Estate Acquisition, Development, and Investment** | -- | ($1,227,835) | ($159,143) | ($432,449) | ($373,628) | -- | ($2,193,055) | 9.7% |
| **Loan Repayment** | -- | ($77,537) | ($1,945,981) | ($7,500) | -- | -- | ($2,031,018) | 9.0% |
| **General, Operating, and Admin Expenses** | ($26,500) | ($1,553,729) | ($212,132) | ($553,258) | ($615,577) | -- | ($2,961,197) | 13.1% |
| **Money to Owner** | -- | -- | ($180,250) | -- | -- | -- | ($180,250) | 0.8% |
| **Intercompany Transfers** | -- | ($1,988,488) | -- | ($2,211,459) | ($4,802,764) | ($1,000) | ($9,515,726) | 42.1% |
| **Total Withdrawals** | ($98,347) | ($5,817,927) | ($3,957,456) | ($4,341,618) | ($7,888,637) | ($479,516) | ($22,583,501) | 100.0% |

**Sources:**

[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.

[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al., Debtor, No. 23-01243-WLH11, October 3, 2023.

**Note:**

[1] Please refer to Exhibit 1.2 for the descriptions of the line items.

**Exhibit 4.5**
**iCAP Pacific Income - Fund 5 Sources and Uses**
*2018.10.1 – 2023.9.30*

| Deposits | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Investments from Subscribers** | – | **$1,646,732** | **$1,356,398** | **$563** | **$563** | **$1,688** | **$3,005,943** | **48.2%** |
| *Funds from Subscribers* | | *$1,646,732* | *$1,356,398* | | | | *$3,003,130* | *48.2%* |
| *Wire Fees* | – | – | – | – | – | – | – | *0.0%* |
| *Reinvestment of Investor Interest* | – | – | – | – | – | – | – | *0.0%* |
| *Reinvestment from Other iCAP Entities* | – | – | – | – | – | – | – | *0.0%* |
| *Subscriber Reallocation* | – | – | – | – | – | – | – | *0.0%* |
| *Reinvestment of Commissions* | – | – | – | – | – | – | – | *0.0%* |
| *Other* | | | | *$563* | *$563* | *$1,688* | *$2,813* | *0.0%* |
| **Loans Obtained From Third Party Lenders** | – | – | – | – | – | – | – | **0.0%** |
| *Loan Related* | – | – | – | – | – | – | – | *0.0%* |
| *Draw Deposit* | – | – | – | – | – | – | – | *0.0%* |
| **Money Received from Business Operations** | – | **$16** | **$1,631** | **$4,623** | **$18,250** | **$758** | **$25,277** | **0.4%** |
| *Revenue: Rent & Project Payoff* | – | | | | | | – | *0.0%* |
| *Interest Credit* | | *$16* | *$115* | *$3* | *$1* | *$0* | *$135* | *0.0%* |
| *Refund/Reimbursement* | | | | *$4,620* | *$18,249* | *$758* | *$23,627* | *0.4%* |
| *Escrow Deposit* | – | – | – | – | – | – | – | *0.0%* |
| *Account Close* | | | – | | | | – | *0.0%* |
| *Other* | | *$0* | *$1,516* | | | | *$1,516* | *0.0%* |
| **Intercompany Transfers** | – | **$200** | – | **$1,691,567** | **$346,946** | **$1,167,000** | **$3,205,713** | **51.4%** |
| **Total Deposits** | – | **$1,646,948** | **$1,358,029** | **$1,696,752** | **$365,759** | **$1,169,445** | **$6,236,933** | **100.0%** |

| Withdrawals | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Returns to Subscribers** | – | **($12,266)** | **($274,639)** | **($330,279)** | **($327,789)** | **($56,100)** | **($1,001,074)** | **16.1%** |
| *Subscriber Interest Payments, Principal Payments, & Other* | | *($12,266)* | *($274,639)* | *($330,279)* | *($327,789)* | *($56,100)* | *($1,001,074)* | *16.1%* |
| *Subscriber Reallocation* | – | – | – | – | – | – | – | *0.0%* |
| *Wire Fees* | – | – | – | – | – | – | – | *0.0%* |
| **Commission Payments** | – | – | – | – | – | – | – | **0.0%** |
| **Real Estate Acquisition, Development, and Investment** | – | – | **($216,000)** | – | **($307)** | **($794)** | **($217,101)** | **3.5%** |
| **Loan Repayment** | – | – | – | – | – | – | – | **0.0%** |
| **General, Operating, and Admin Expenses** | – | **($30,040)** | **($520,035)** | **($149,289)** | **($21,281)** | **($2,000)** | **($722,645)** | **11.6%** |
| **Money to Owner** | – | – | – | – | – | – | – | **0.0%** |
| **Intercompany Transfers** | – | **($59,151)** | **($1,782,817)** | **($1,287,277)** | **($55,233)** | **($1,110,000)** | **($4,294,478)** | **68.9%** |
| **Total Withdrawals** | – | **($101,458)** | **($2,793,491)** | **($1,766,846)** | **($404,609)** | **($1,168,895)** | **($6,235,299)** | **100.0%** |

**Sources:**
[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.
[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al., Debtor, No. 23-01243-WLH11, October 3, 2023.

**Note:**
[1] Please refer to Exhibit 1.2 for the descriptions of the line items.

**Exhibit 4.6**

**iCAP Funding, LLC Sources and Uses**

*2018.10.1 – 2023.9.30*

| Deposits | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Investments from Subscribers** | — | — | — | $9,136,650 | $2,400,017 | — | **$11,536,667** | **92.8%** |
| *Funds from Subscribers* | — | — | — | *$8,137,625* | *$1,799,983* | — | *$9,937,608* | *80.0%* |
| *Wire Fees* | — | — | — | — | — | — | — | *0.0%* |
| *Reinvestment of Investor Interest* | — | — | — | — | — | — | — | *0.0%* |
| *Reinvestment from Other iCAP Entities* | — | — | — | — | — | — | — | *0.0%* |
| *Subscriber Reallocation* | — | — | — | *$999,025* | *$600,034* | — | *$1,599,059* | *12.9%* |
| *Reinvestment of Commissions* | — | — | — | — | — | — | — | *0.0%* |
| *Other* | — | — | — | — | — | — | — | *0.0%* |
| **Loans Obtained from Third Party Lenders** | — | — | — | — | $262,000 | — | **$262,000** | **2.1%** |
| *Loan Related* | — | — | — | — | *$262,000* | — | *$262,000* | *2.1%* |
| *Draw Deposit* | — | — | — | — | — | — | — | *0.0%* |
| **Money Received from Business Operations** | — | — | — | — | — | — | — | **0.0%** |
| *Revenue: Rent & Project Payoff* | — | — | — | — | — | — | — | *0.0%* |
| *Interest Credit* | — | — | — | — | — | — | — | *0.0%* |
| *Refund/Reimbursement* | — | — | — | — | — | — | — | *0.0%* |
| *Escrow Deposit* | — | — | — | — | — | — | — | *0.0%* |
| *Account Close* | — | — | — | — | — | — | — | *0.0%* |
| *Other* | — | — | — | — | — | — | — | *0.0%* |
| **Intercompany Transfers** | — | — | — | — | $567,100 | $62,000 | **$629,100** | **5.1%** |
| **Total Deposits** | — | — | — | $9,136.6 | $3,229.1 | $62.0 | **$12,427,767** | **100.0%** |

| Withdrawals | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Returns to Subscribers** | — | — | — | ($3,743,385) | ($1,709,195) | ($63,122) | **($5,515,702)** | **44.4%** |
| *Subscriber Interest Payments, Principal Payments, & Other* | — | — | — | *($3,743,385)* | *($1,709,195)* | *($63,122)* | *($5,515,702)* | *44.4%* |
| *Subscriber Reallocation* | — | — | — | — | — | — | — | *0.0%* |
| *Wire Fees* | — | — | — | — | — | — | — | *0.0%* |
| **Commission Payments** | — | — | — | ($1,199,749) | ($517,500) | — | **($1,717,249)** | **13.8%** |
| **Real Estate Acquisition, Development, and Investment** | — | — | — | — | — | — | — | **0.0%** |
| **Loan Repayment** | — | — | — | — | — | — | — | **0.0%** |
| **General, Operating, and Admin Expenses** | — | — | — | — | ($425) | — | **($425)** | **0.0%** |
| **Money to Owner** | — | — | — | ($250,000) | ($240,000) | — | **($490,000)** | **3.9%** |
| **Intercompany Transfers** | — | — | — | ($2,872,489) | ($1,831,563) | — | **($4,704,052)** | **37.9%** |
| **Total Withdrawals** | — | — | — | ($8,065,623) | ($4,298,683) | ($63,122) | **($12,427,428)** | **100.0%** |

**Sources:**

[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.

[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al., Debtor, No. 23-01243-WLH11, October 3, 2023.

**Note:**

[1] Please refer to Exhibit 1.2 for the descriptions of the line items.

## Exhibit 4.7
## iCAP Investments Sources and Uses
### 2018.10.1 – 2023.9.30

| Deposits | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Investments from Subscribers** | – | $325,000 | $4,842,250 | $6,125,000 | $9,350,000 | – | $20,642,250 | 54.0% |
| *Funds from Subscribers* | | | $4,633,500 | $3,625,000 | $1,150,000 | | $9,408,500 | 24.6% |
| *Wire Fees* | | | | | | | | 0.0% |
| *Reinvestment of Investor Interest* | | | | | | | | 0.0% |
| *Reinvestment from Other iCAP Entities* | | | | | | | | 0.0% |
| *Subscriber Reallocation* | | $70,000 | $130,000 | $2,500,000 | $8,200,000 | | $10,900,000 | 28.5% |
| *Reinvestment of Commissions* | | | $78,750 | | | | $78,750 | 0.2% |
| *Other* | | $255,000 | | | | | $255,000 | 0.7% |
| **Loans Obtained From Third Party Lenders** | | | $709,847 | $4,113 | | | $713,960 | 1.9% |
| *Loan Related* | | | $709,847 | $4,113 | | | $713,960 | 1.9% |
| *Draw Deposit* | | | | | | | | 0.0% |
| **Money Received from Business Operations** | $90 | $119,810 | $168,284 | $3,230,538 | $740,817 | $1,997 | $4,261,534 | 11.1% |
| *Revenue: Rent & Project Payoff* | | $119,809 | $165,468 | $2,988,794 | | | $3,274,071 | 8.6% |
| *Interest Credit* | | | $23 | $38 | $54 | $0 | $116 | 0.0% |
| *Refund/Reimbursement* | | | $2,793 | $41,705 | $740,663 | $1,997 | $787,157 | 2.1% |
| *Escrow Deposit* | | | | | | | | 0.0% |
| *Account Close* | | | | | $100 | | $100 | 0.0% |
| *Other* | $90 | | | $200,000 | | | $200,090 | 0.5% |
| **Intercompany Transfers** | | $390,000 | $675,000 | $752,759 | $9,254,911 | $1,567,000 | $12,639,670 | 33.0% |
| **Total Deposits** | $90 | $834,810 | $6,395,381 | $10,112,409 | $19,345,728 | $1,568,997 | $38,257,414 | 100.0% |
| **Withdrawals** | | | | | | | | |
| **Returns to Subscribers** | | | ($147,110) | ($920,830) | ($6,077,684) | ($375,133) | ($7,520,758) | 19.7% |
| *Subscriber Interest Payments, Principal Payments, & Other* | | | ($121,351) | ($828,637) | ($4,756,851) | ($375,133) | ($6,081,972) | 15.9% |
| *Subscriber Reallocation* | | | ($25,759) | ($92,193) | ($1,320,833) | | ($1,438,786) | 3.8% |
| *Wire Fees* | | | | | | | | 0.0% |
| **Commission Payments** | | | ($152,851) | ($626,200) | ($1,119,486) | | ($1,898,537) | 5.0% |
| **Real Estate Acquisition, Development, and Investment** | | | ($7,194) | ($15,725) | ($851,234) | | ($874,153) | 2.3% |
| **Loan Repayment** | | | | | | | | 0.0% |
| **General, Operating, and Admin Expenses** | | ($5,000) | ($432,494) | ($451,222) | ($1,038,418) | ($100,437) | ($2,027,571) | 5.3% |
| **Money to Owner** | | ($829,000) | ($2,240,075) | ($440,275) | ($662,225) | ($200,150) | ($4,371,725) | 11.4% |
| **Intercompany Transfers** | | | ($3,327,300) | ($7,732,497) | ($9,543,003) | ($895,000) | ($21,497,800) | 56.3% |
| **Total Withdrawals** | | ($834,000) | ($6,307,024) | ($10,186,748) | ($19,292,051) | ($1,570,721) | ($38,190,544) | 100.0% |

**Sources:**

[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.

[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al., Debtor, No. 23-01243-WLH11, October 3, 2023.

**Note:**

[1] Please refer to Exhibit 1.2 for the descriptions of the line items.

## Exhibit 4.8
### iCAP Vault I Sources and Uses
#### 2018.10.1 – 2023.9.30

| Deposits | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total | % Total |
|---|---|---|---|---|---|---|---|---|
| **Investments from Subscribers** | **$364,543** | **$13,883,430** | **$8,026,157** | **$59,475,115** | **$89,441,285** | **$21,905,285** | **$193,095,814** | **92.5%** |
| Funds from Subscribers | $218,957 | $12,895,472 | $7,331,609 | $53,782,871 | $81,705,566 | $21,342,217 | $177,276,692 | 84.9% |
| Wire Fees | | | $655 | $1,625 | $3,075 | $1,285 | $6,640 | 0.0% |
| Reinvestment of Investor Interest | $14,910 | $36,319 | $2,588 | $1,446,572 | $3,903,392 | $511,058 | $5,914,838 | 2.8% |
| Reinvestment from Other iCAP Entities | | $104,724 | $384,877 | $105,923 | | | $595,524 | 0.3% |
| Subscriber Reallocation | | $128,536 | $92,279 | $132,460 | $1,052,000 | | $1,405,275 | 0.7% |
| Reinvestment of Commissions | $52,623 | $637,258 | $182,150 | $1,922,749 | $2,393,437 | $43,000 | $5,231,217 | 2.5% |
| Other | $78,054 | $81,120 | $32,000 | $2,082,915 | $383,815 | $7,725 | $2,665,629 | 1.3% |
| **Loans Obtained from Third Party Lenders** | | | | **$1,073,267** | **$1,600,000** | | **$2,673,267** | **1.3%** |
| Loan Related | | | | $1,073,267 | $1,600,000 | | $2,673,267 | 1.3% |
| Draw Deposit | | | | | | | | 0.0% |
| **Money Received from Business Operations** | | **$5,734** | **$2,646** | **$32,345** | **$63,920** | **$128,712** | **$233,357** | **0.1%** |
| Revenue: Rent & Project Payoff | | | | $26,805 | $13,302 | | $40,108 | 0.0% |
| Interest Credit | | $11 | $72 | $479 | $469 | $17 | $1,048 | 0.0% |
| Refund/Reimbursement | | | $2,572 | $2,782 | $50,142 | $786 | $56,282 | 0.0% |
| Escrow Deposit | | | | | | | | 0.0% |
| Account Close | | | | | | | | 0.0% |
| Other | | $5,723 | $2 | $2,279 | $7 | $127,909 | $135,920 | 0.1% |
| **Intercompany Transfers** | $5,125 | | $1,157,058 | $170,400 | $10,935,204 | $441,400 | $12,709,186 | 6.1% |
| **Total Deposits** | **$369,668** | **$13,889,164** | **$9,185,860** | **$60,751,128** | **$102,040,409** | **$22,475,397** | **$208,711,625** | **100.0%** |
| **Withdrawals** | | | | | | | | |
| **Returns to Subscribers** | **($41,000)** | **($13,270,994)** | **($6,696,467)** | **($34,180,537)** | **($69,868,262)** | **($18,210,986)** | **($142,268,245)** | **69.7%** |
| Subscriber Interest Payments, Principal Payments, & Other | ($41,000) | ($12,792,457) | ($5,744,939) | ($29,399,591) | ($58,795,555) | ($18,209,701) | ($124,983,242) | 61.2% |
| Subscriber Reallocation | | ($478,536) | ($950,793) | ($4,780,096) | ($14,032,877) | | ($20,242,302) | 9.9% |
| Wire Fees | | | ($735) | ($850) | ($2,590) | ($1,285) | ($5,460) | 0.0% |
| Commission Payments | | | | | | ($21,500) | ($21,500) | 0.0% |
| Real Estate Acquisition, Development, and Investment | | | | ($6,698,202) | ($9,749,031) | | ($16,447,234) | 8.1% |
| Loan Repayment | | | | | ($500,000) | | ($500,000) | 0.2% |
| General, Operating, and Admin Expenses | | ($106,280) | ($1,060,821) | ($3,101,150) | ($861,500) | ($133,247) | ($5,262,999) | 2.6% |
| Money to Owner | | | | | | ($59,590) | ($59,590) | 0.0% |
| **Intercompany Transfers** | | | ($3,529,332) | ($4,757,330) | ($26,406,427) | ($4,907,706) | ($39,600,795) | 19.4% |
| **Total Withdrawals** | **($41,000)** | **($13,377,273)** | **($11,286,620)** | **($48,737,219)** | **($107,385,220)** | **($23,333,029)** | **($204,160,363)** | **100.0%** |

Sources:
[A] Accounting Seed Data for iCAP entity transactions: Consolidated Funds Cash Detail - 10.1.18-9.30.23.xlsx.
[B] Declaration of Lance Miller in support of First Day Motion, In Re Icap Enterprises, INC., et al., Debtor, No. 23-01243-WLH11, October 3, 2023.

Note:
[1] Please refer to Exhibit 1.2 for the descriptions of the line items.

## Exhibit 5.1
## Amortization Schedule For iCAP Pacific Northwest Opportunity and Income Fund (Fund 1)

| | Initial Gross Investment per PPM | Less Fees (13%) | Net Amount to Invest | Annual Rate of Return Required |
|---|---|---|---|---|
| | $30,000,000 | ($3,900,000) | $26,100,000 | 17.61% |
| Month | Monthly Interest Payment @12% Simple Annual Interest [A] | Required Monthly Investment Returns [B] | Net Monthly Returns [C]=[B]-[A] | Net Investment Balance [D] |
| | — | — | — | $26,100,000 |
| 1 | ($300,000) | $383,001 | $83,001 | $26,183,001 |
| 2 | ($300,000) | $384,219 | $84,219 | $26,267,220 |
| 3 | ($300,000) | $385,455 | $85,455 | $26,352,675 |
| 4 | ($300,000) | $386,709 | $86,709 | $26,439,384 |
| 5 | ($300,000) | $387,981 | $87,981 | $26,527,365 |
| 6 | ($300,000) | $389,272 | $89,272 | $26,616,637 |
| 7 | ($300,000) | $390,582 | $90,582 | $26,707,219 |
| 8 | ($300,000) | $391,912 | $91,912 | $26,799,131 |
| 9 | ($300,000) | $393,260 | $93,260 | $26,892,391 |
| 10 | ($300,000) | $394,629 | $94,629 | $26,987,020 |
| 11 | ($300,000) | $396,017 | $96,017 | $27,083,038 |
| 12 | ($300,000) | $397,426 | $97,426 | $27,180,464 |
| 13 | ($300,000) | $398,856 | $98,856 | $27,279,320 |
| 14 | ($300,000) | $400,307 | $100,307 | $27,379,627 |
| 15 | ($300,000) | $401,779 | $101,779 | $27,481,406 |
| 16 | ($300,000) | $403,272 | $103,272 | $27,584,678 |
| 17 | ($300,000) | $404,788 | $104,788 | $27,689,466 |
| 18 | ($300,000) | $406,325 | $106,325 | $27,795,791 |
| 19 | ($300,000) | $407,886 | $107,886 | $27,903,677 |
| 20 | ($300,000) | $409,469 | $109,469 | $28,013,145 |
| 21 | ($300,000) | $411,075 | $111,075 | $28,124,221 |
| 22 | ($300,000) | $412,705 | $112,705 | $28,236,926 |
| 23 | ($300,000) | $414,359 | $114,359 | $28,351,285 |
| 24 | ($300,000) | $416,037 | $116,037 | $28,467,322 |
| 25 | ($300,000) | $417,740 | $117,740 | $28,585,062 |
| 26 | ($300,000) | $419,468 | $119,468 | $28,704,530 |
| 27 | ($300,000) | $421,221 | $121,221 | $28,825,750 |
| 28 | ($300,000) | $423,000 | $123,000 | $28,948,750 |
| 29 | ($300,000) | $424,805 | $124,805 | $29,073,555 |
| 30 | ($300,000) | $426,636 | $126,636 | $29,200,191 |
| 31 | ($300,000) | $428,494 | $128,494 | $29,328,685 |

## Exhibit 5.1
## Amortization Schedule For iCAP Pacific Northwest Opportunity and Income Fund (Fund 1)

| | Initial Gross Investment per PPM | Less Fees (13%) | Net Amount to Invest | Annual Rate of Return Required |
| --- | --- | --- | --- | --- |
| | $30,000,000 | ($3,900,000) | $26,100,000 | 17.61% |

| Month | Monthly Interest Payment @12% Simple Annual Interest [A] | Required Monthly Investment Returns [B] | Net Monthly Returns [C]=[B]-[A] | Net Investment Balance [D] |
| --- | --- | --- | --- | --- |
| 32 | ($300,000) | $430,380 | $130,380 | $29,459,065 |
| 33 | ($300,000) | $432,293 | $132,293 | $29,591,358 |
| 34 | ($300,000) | $434,234 | $134,234 | $29,725,593 |
| 35 | ($300,000) | $436,204 | $136,204 | $29,861,797 |
| 36 | ($300,000) | $438,203 | $138,203 | $30,000,000 |

**Source:**

[A] iCAP Pacific Northwest Opportunity and Income Fund PPM.

**Notes:**

[1] Investors are entitled to receive 12% per annum simple interest rate on their investment, paid monthly. Monthly interest payments are calculated as (12%÷12) × $30,000,000.

[2] Required monthly returns are the monthly returns required to service the monthly interest payments as well as to generate enough returns to pay back the initial principal amount borrowed from the investors in 36 months. Total loan term is calculated as the number of months between December 19, 2013, the date of the PPM, and December 31, 2016, the date on which the debentures in this offering matured. An annual return rate of 17.61% is required to generate enough returns each month to service the monthly interest payments as well as to generate enough returns to pay back initial principal amount borrowed. Required Monthly Investment Returns is calculated as (17.61% ÷ 12) × Ending Invested Balance as of the prior month.

[3] Net monthly returns are calculated by subtracting monthly interest payments from the total monthly returns generated on the net principal balance invested.

[4] The Net Investment Balance is calculated as the previous month's balance less the monthly interest payment plus the monthly returns. The calculation assumes that both interest payments and returns start the month after the Fund 1 PPM issuance. The calculation ignores the Fund Level Management Fee, equal to 2.0% of the outstanding aggregate principal balance each year, and an up to 3% origination fee on every investment made. Including the management fees and origination fees would increase the required rate of return.

## Exhibit 5.2
## Amortization Schedule For iCAP Pacific Northwest Opportunity Fund (Fund 2)

| Initial Gross Investment per PPM | Less Fees (13.67%) | Net Amount to Invest | Rate of Return Required |
|---|---|---|---|
| $30,000,000 | ($4,101,000) | $25,899,000 | 16.36% |

| Month | Monthly Interest Payment @10% Annual Simple Interest [A] | Required Monthly Investment Returns [B] | Net Monthly Returns [C]=[B]-[A] | Net Investment Balance [D] |
|---|---|---|---|---|
|  | – | – | $ – | 25,899,000 |
| 1 | ($250,000) | $353,086 | $103,086 | $26,002,086 |
| 2 | ($250,000) | $354,491 | $104,491 | $26,106,577 |
| 3 | ($250,000) | $355,916 | $105,916 | $26,212,492 |
| 4 | ($250,000) | $357,360 | $107,360 | $26,319,852 |
| 5 | ($250,000) | $358,823 | $108,823 | $26,428,675 |
| 6 | ($250,000) | $360,307 | $110,307 | $26,538,982 |
| 7 | ($250,000) | $361,811 | $111,811 | $26,650,792 |
| 8 | ($250,000) | $363,335 | $113,335 | $26,764,127 |
| 9 | ($250,000) | $364,880 | $114,880 | $26,879,007 |
| 10 | ($250,000) | $366,446 | $116,446 | $26,995,453 |
| 11 | ($250,000) | $368,034 | $118,034 | $27,113,487 |
| 12 | ($250,000) | $369,643 | $119,643 | $27,233,130 |
| 13 | ($250,000) | $371,274 | $121,274 | $27,354,404 |
| 14 | ($250,000) | $372,927 | $122,927 | $27,477,332 |
| 15 | ($250,000) | $374,603 | $124,603 | $27,601,935 |
| 16 | ($250,000) | $376,302 | $126,302 | $27,728,237 |
| 17 | ($250,000) | $378,024 | $128,024 | $27,856,261 |
| 18 | ($250,000) | $379,769 | $129,769 | $27,986,030 |
| 19 | ($250,000) | $381,538 | $131,538 | $28,117,569 |
| 20 | ($250,000) | $383,332 | $133,332 | $28,250,900 |
| 21 | ($250,000) | $385,149 | $135,149 | $28,386,050 |
| 22 | ($250,000) | $386,992 | $136,992 | $28,523,042 |
| 23 | ($250,000) | $388,860 | $138,860 | $28,661,902 |
| 24 | ($250,000) | $390,753 | $140,753 | $28,802,654 |
| 25 | ($250,000) | $392,672 | $142,672 | $28,945,326 |
| 26 | ($250,000) | $394,617 | $144,617 | $29,089,943 |
| 27 | ($250,000) | $396,588 | $146,588 | $29,236,531 |
| 28 | ($250,000) | $398,587 | $148,587 | $29,385,118 |
| 29 | ($250,000) | $400,612 | $150,612 | $29,535,730 |
| 30 | ($250,000) | $402,666 | $152,666 | $29,688,396 |

**Exhibit 5.2**

**Amortization Schedule For iCAP Pacific Northwest Opportunity Fund (Fund 2)**

| | Initial Gross Investment per PPM | Less Fees (13.67%) | Net Amount to Invest | Rate of Return Required |
|---|---|---|---|---|
| | $30,000,000 | ($4,101,000) | $25,899,000 | 16.36% |

| | Monthly Interest Payment (@10% Annual Simple Interest | Required Monthly Investment Returns | Net Monthly Returns | Net Investment Balance |
|---|---|---|---|---|
| Month | [A] | [B] | [C]=[B]-[A] | [D] |
| 31 | ($250,000) | $404,747 | $154,747 | $29,843,143 |
| 32 | ($250,000) | $406,857 | $156,857 | $30,000,000 |

**Source:**

[A] iCAP Pacific Northwest Opportunity and Income Fund PPM.

**Notes:**

[A] Investors are entitled to receive 10% per annum simple interest rate on their investment, per month. Monthly interest payments are calculated as (10% ÷ 12) × $30,000,000.

[B] Required monthly returns are the monthly returns required to service the monthly interest payments as well as to generate enough returns to pay back the initial principal amount borrowed from the investors in 32 months. Total loan term is calculated as the number of months between April 15, 2015, the date of the PPM, and December 31, 2017, the date on which the debentures in this offering matured. An annual return rate of 16.36% is required to generate enough returns each month to service the monthly interest payments as well as to generate enough returns to pay back initial principal amount borrowed. Required Monthly Investment Returns is calculated as (16.36% ÷ 12) × Ending Invested Balance as of the prior month.

[C] Net monthly returns are calculated by subtracting monthly interest payments from the total monthly returns generated on the net principal balance invested.

[D] The Net Investment Balance is calculated as the previous month's balance less the monthly interest payment plus the monthly returns. The calculation assumes that both interest payments and returns start the month after the Fund 2 PPM issuance. The calculation ignores the Fund Level Management Fee, equal to 1.85% of the outstanding aggregate principal balance each year, and an origination fee of up to 3% of each investment made. Including the management fees and origination fees would increase the required rate of return.

## Exhibit 6
## Summary of Distributions to Subscribers by Fund
### As of February 20, 2024

| Fund | Range of Investment Date | Number of Subscriptions | Investment Amount | Total Distribution to Subscribers | Distributions in Excess of (or Less Than) Investments[1] |
|---|---|---|---|---|---|
| iCAP Fund 1 | 2014-2020 | 470 | $46,922,364 | $52,738,879 | 12% |
| *Stayed in Fund 1* | *2014-2020* | *408* | *$42,752,159* | *$49,214,420* | *15%* |
| *Transferred to Fund 3[2]* | *2014-2020* | *62* | *$4,170,205* | *$4,279,349* | *3%* |
| iCAP Fund 2 | 2015-2022 | 646 | $48,551,746 | $32,908,177 | -32% |
| *Stayed in Fund 2* | *2015-2022* | *456* | *$34,699,699* | *$25,388,493* | *-27%* |
| *Transferred To Fund 3[2]* | *2015-2020* | *190* | *$13,852,047* | *$10,121,773* | *-27%* |
| Fund 3-iCAP Equity | 2020-2023 | 863 | | | |
| *Started and Stayed in Fund 3[3]* | *2017-2023* | *647* | *$17,688,282* | *$10,345,393* | *-42%* |
| iCAP Fund 4 | 2018-2021 | 49 | $12,325,446 | $11,361,291 | -8% |
| iCAP Fund 5 | 2019-2021 | 51 | $3,552,518 | $1,024,759 | -71% |
| iCAP Vault 1 Fund | N/A | 234 | $237,781,135 | $206,822,907 | -13% |
| iCAP Investments | 2020-2022 | 56 | $26,888,690 | $9,502,934 | -65% |
| iCAP Funding | 2021-2022 | 40 | $11,649,512 | $2,212,109 | -81% |

**Source:**
[A] Investor Tracker for iCAP Fund 1, Fund 2, Fund 3, Fund 4, Fund 5, Vault, Investments, and Funding.

**Notes:**
[1] Distributions in Excess of (or Less Than) Investments is calculated as (principal repayment + interest repayment) / total investment amount - 1.
[2] Certain subscribers in Fund 1 and 2 had investments rolled over to Fund 3. For the rolled over investments, the investors continued to receive interest payment in Fund 3 after the investments were transferred. The calculations include a cumulative return from cross-funds, from Fund 1 to Fund 3 and Fund 2 to Fund 3, in which a subscriber has invested. Proration methodology (Interest Amount * O/S Balance of Fund 1 or 2 / O/S Balance of Fund 3) is applied when the outstanding balance does not match across funds.
[3] Started and Stayed in Fund 3 are the subscriptions not rolled over from Fund 1 and Fund 2.

**Exhibit 7**

Dakota Pearce (WSBA #57011)
BUCHALTER
1420 5th Avenue, Suite 3100
Seattle, Washington 98101
Telephone: (206) 319-7052
Email: dpearce@buchalter.com

Bernard D. Bollinger, Jr. (*pro hac vice* pending) (CA SBN: 132817)
Julian I. Gurule (*pro hac vice* pending) (CA SBN: 251260)
Khaled Tarazi (*pro hac vice* pending) (AZ SBN: 032446)
BUCHALTER
1000 Wilshire Blvd., Suite 1500
Los Angeles, California 90017
Telephone: (213) 891-0700
Email: jgurule@buchalter.com

*Proposed Counsel to Debtors and Debtors in Possession*

HONORABLE WHITMAN L. HOLT

HEARING DATE: October 4, 2023
HEARING TIME: 2:00 p.m. PST
RESPONSE DUE: At Hearing
LOCATION: TELEPHONIC

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

| In re: | Chapter 11 |
|---|---|
| ICAP ENTERPRISES, INC., *et al.,* | Lead Case No. 23-01243-WLH11 |
| Debtor.[1] | Jointly Administered |
| | **DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS** |

---

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01256-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01253-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund, LLC (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); iCap Broadway, LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care LLC (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH 2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding LLC (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11) ; Vault Holding, LLC (23-01270-11); iCap Pacific Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); and iCap Holding 6 LLC (23-01274-11).

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 1 -

BN 78594745v13

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

I, Lance Miller, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

1. I am the Chief Restructuring Officer and Manager, as applicable, of the above-captioned debtors and debtors in possession (together, the "Debtors"). I am generally familiar with the Debtors' business and financial affairs, and books and records. I am above 18 years of age and I am competent to testify.

2. I am a Partner at Paladin Management Group ("Paladin"), a financial advisory firm with an office located at 633 West 5th Street, 28th Floor, Los Angeles, California, 90071. Paladin provides a broad range of corporate advisory services to its clients including, without limitation, restructuring, strategic and transaction advisory, and strategic communications services. As a partner at Paladin, I have extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 proceedings. My experience includes representations in the following matters, among other things: *In re PP Group, LLC*, Case No. 20-10910 (Bankr. D. Del.); *In re Easterday Ranches, Inc.*, Case No. 21-00141 (Bankr. E.D. Wash.); *In re MD America Energy, LLC*, Case No. 20-34966 (Bankr. S.D. Tex.); *In re Yogaworks, Inc.*, Case No. 20-12599 (Bankr. D. Del.); *In re Chesapeake Energy Corp.*, Case No. 20-32333 (Bankr. S.D. Tex.); *In re Lear Capital, Inc.*, Case No. 22-10165 (Bankr. D. Del.); *In re CalPlant I Holdco, LLC*, Case No. 21-11302 (Bankr. D. Del.). Prior to joining Paladin, I was the general counsel and chief restructuring officer at Sugarfina, Inc., and general counsel at American Apparel, Inc. I earned a B.A. degree from the University of California, San Diego, and a juris doctor degree from Boston University School of Law. I have approximately 18 years of experience as an advisor and investor in corporate restructurings and distressed situations. I have advised companies, creditors, shareholders, and other stakeholders regarding restructurings and recapitalizations, chapter 11 reorganizations, and mergers and acquisitions.

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 2 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

3.      I am authorized to submit this declaration on behalf of the Debtors.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from the Debtors' advisors.  If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

4.      This Declaration is divided into three sections. Section I provides an introduction, a brief overview of the Debtors' business operations, and a discussion of the Debtors' capital structure. Section II contains a discussion of the events giving rise to these cases.  Finally, Section III provides the factual and evidentiary basis for the emergency and other relief that the Debtors have requested from the Court pursuant to the First Day Motions.

## SECTION I

## Background

5.      The Debtors were founded beginning in 2007 by Chris Christensen ("Christensen") to invest in real estate opportunities in the Pacific Northwest. Beginning in 2014, the Debtors grew quickly, raising more than $245 million in capital and deploying those funds toward real estate investments.  By early 2023, the Debtors employed more than 35 employees in its headquarters based in Bellevue, Washington.

6.      On September 28, 2023, Christensen resigned all positions at the Debtors and I was appointed Chief Restructuring Officer and Manager, as applicable, with full and exclusive control and authority over the Debtors and the prosecution of these chapter 11 cases (the "Chapter 11 Cases").

Business Divisions and Organization

7.      The Debtors invested in two categories of real estate, across two divisions of operations known as the "Portfolio Business" and the "Vault Business."

---

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 3 -

BN 78594745v13

8.     The Portfolio Business is the oldest of the Debtors' business lines.  It operates under Debtor iCap Equity, LLC and various subsidiaries.  The Portfolio Business focused on development opportunities for multifamily real estate projects.  In some cases, these projects started with raw and unentitled land, and in other cases the projects began with building permits in place or the improvement of existing structures.

9.     The Vault Business was started in 2018 for the purpose of investing in standalone real estate investments that have the potential to be or already were cash flow positive.  The Vault Business operates under Debtor iCap Vault, LLC and various subsidiaries.  Among these subsidiaries, iCap Vault 1, LLC ("Vault 1"), is registered with the U.S. Securities and Exchange Commission and issued publicly registered, non-traded debt under CIK # 1800199.

10.     Both Businesses exist under iCap Enterprises, Inc. ("Enterprises") in the Debtors' corporate structure.  Properties within both Businesses are held by single purpose entities (the "SPE Debtors").  The Debtors' organizational structure is reflected in Exhibit A attached hereto.

11.     Enterprises maintained the Debtors' headquarters and retained the majority of the Debtors' employees.

Real Estate Assets

12.     On the Petition Date,[2] the Debtors owned or controlled the real estate properties set forth in the table below, spread across both Businesses.  Many of these properties are subject to mortgages or other first deeds of trust.  The table reflects the Debtors' property assets,[3] and estimated third-party, first-position mortgage balances:

---

[2] Twenty-six of the Debtors filed their chapter 11 bankruptcy petitions on September 29, 2023.  An additional five of the Debtors filed their petitions on September 30, 2023.  "Petition Date" as used herein refers to either of the petition dates, as applicable.

[3] The Debtor entities marked with * are non-Debtor entities that are controlled by the Debtors.  The Mortgage Lender marked with ^ is the Debtors' proposed DIP lender.  These liens were granted to the DIP lender in connection with a

DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST
DAY MOTIONS
- 4 -
BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052
BN 78594745v13

| Debtor Owner | Address | City/State | Appx. 1st Position Mortgage Debt | Mortgage Lender |
|---|---|---|---|---|
| 725 Broadway, LLC | 715-775 Broadway | Tacoma, WA | $500,000 | Serene Investment Management^ |
| CS2 Real Estate Development, LLC* | 18416 Bothell Everett Hwy | Bothell, WA | $8,870,000 | Broadmark – Ready Capital |
| iCap Campbell Way LLC | 1231 Campbell Way | Bremerton, WA | $500,000 | Serene Investment Management^ |
| Lofts @ Camas Meadows Phase I, LLC* and Lofts @ Camas Meadows Phase II, LLC* | 4525 NW Camas Meadows Dr. | Camas, WA | $650,000 | Alera |
| Senza Kenmore, LLC | 15550 84th Ave SE | Kenmore, WA | N/A | N/A |
| UW 17th Ave, LLC | 4740 17th Ave NE | Seattle, WA | N/A | N/A |
| VH 1121 14th LLC | 1117 A 14th Ave. 1117 B 14th Ave. 1119 A 14th Ave. 1119 B 14th Ave. 1121 14th Ave. | Seattle, WA | $3,000,000 | Lima One Capital, LLC |
| VH 2nd Street Office LLC | 2818 E. 2nd St. | Vancouver, WA | $3,000,000 | Socotra REIT 1, LLC |
| VH Pioneer Village LLC | 4318 S. Settler Dr. | Ridgefield, WA | $2,000,000 | Tritalent Funding Group, Inc. |
| VH Senior Care LLC | 302 SE 146th St. | Burien, WA | $612,800 | Redmond Funding Group |
| VH Senior Care LLC | 1226 160th St. SW | Lynwood, WA | $1,041,400 | Redmond Funding Group |

prepetition bridge loan, which the Debtors are proposing to roll up as part of their DIP financing motion.

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

| Debtor Owner | Address | City/State | Appx. 1st Position Mortgage Debt | Mortgage Lender |
|---|---|---|---|---|
| VH Willows Townhomes LLC | 4906 A, Willow St. 4910 B Willow St. 4912 B Willow St. | Seattle, WA | $1,492,500 | Lima One Capital, LLC |
| VH Willows Townhomes LLC | 4918 C Willow St. | Seattle, WA | $336,235 | Lima One Capital, LLC |

13. As referenced above, the Debtors hold ownership or other interests in other projects, along with other investors. For example, the Debtors hold a 15% interest in a non-Debtor entity named CS2 Real Estate Development LLC ("CS2"), which, in turn, owns real property currently under development in Bothell, Washington. Under the operating agreement for this project, whereas the Debtors only own 15% of the ownership in CS2, the Debtors serve as the entity's Manager and are entitled to a larger portion of property proceeds following a sale. Similarly, the Debtors own the Class B membership interests and serve as Manager in Senza Kenmore, LLC, which, in turn, owns real property currently under development in Kenmore, Washington.

**The Debtors' Bank Accounts and Cash Management System**

14. The Debtors maintain bank accounts at Umpqua Bank and Axos Bank. The Debtors historically used the bank accounts at Umpqua Bank to conduct their business in the ordinary course. In early September, the Debtors opened the bank accounts at Axos Bank. The Debtors understand that Axos Bank is on the United States Trustee's list of approved depository institutions. As of the Petition Date, the Debtors intend to utilize the new Axos Bank accounts to process postpetition payments and otherwise abide by the US Trustee's Guidelines with respect to their bank accounts and, accordingly, do not currently intend to seek any "first day" cash management relief.

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 6 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

Case 23-12342-WLH11 Doc 69 Filed 10/23/23 Entered 10/23/23 19:45:30 Exhibit 5 Page 85

## A.    The Debtors' Capital Structure

15.    The Debtors funded their operations with a combination of cash flow from business operations and funded indebtedness.

### Property-Level Secured Obligations

16.    Various of the SPE Debtors and their real estate properties are subject to deeds of trust for mortgages and other secured debt arising from the acquisition, development, and/or ownership of real property.  These obligations are generally owed by the SPE Debtor that owns the property at issue.

### Portfolio Notes

17.    The Debtors raised debt financing in connection with the Portfolio Business through private placements of debentures and promissory notes issued by various Debtors (the "Portfolio Notes").  The Portfolio Notes provided for interest rates ranging from 6% to 15% per annum.  Portfolio Notes were not issued by the SPE Debtors (which owned the Portfolio real estate assets), but instead were issued by Debtor entities that owned equity, directly or indirectly, in the SPE Debtors.  The table below reflects the original issuance amounts of the Portfolio Notes, along with their balances as of the Petition Date according to the Debtors' books and records.[4]

| Issuing Debtor | Original Issued Amount | Oustanding Principal And Interest |
|---|---|---|
| iCap @ UW, LLC | $    5,930,000 | $    6,275,917 |
| iCap Broadway, LLC | 5,760,074 | 6,184,415 |
| iCap Equity, LLC | 61,168,000 | 65,420,586 |
| iCap Funding, LLC | 11,688,245 | 13,931,419 |
| iCap Investments, LLC | 23,357,759 | 23,384,392 |
| iCap Northwest Opportunity Fund, LLC | 47,776,000 | 34,299,310 |
| iCap Pacific Income Fund 4, LLC | 12,341,146 | 4,825,609 |
| iCap Pacific Income Fund 5, LLC | 3,628,000 | 3,817,963 |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 45,361,000 | 34,690,015 |
| iCap 134th Street LLC | 1,250,000 | - |
| **Total Portfolio** | **$ 218,260,224** | **$    192,829,625** |

[4] The Company's books and records are subject to ongoing review and assessment.  Amounts listed herein with respect to claims or debt may differ from final or confirmed results.

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 7 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

Vault Notes

18.     The Vault Business financed its operations through the issuance of both private placement notes and public demand notes.

19.     *Private Placement Notes*.  Beginning in July 2018, Vault 1 commenced a private placement of up to $500 million of Private Placement Notes (the "Vault Notes"). Approximately $2.0 million of the Vault Notes are held by a joint venture owned and controlled by Christensen.  The Vault Notes were secured by assets of Vault 1 through a Pledge and Security Agreement, including its equity interests in subsidiaries and certain SPE Debtors.  The Vault Notes were also guaranteed by Vault Holding, LLC through a Guaranty Agreement.

20.     *Vault Public Demand Notes*.  Pursuant to an Indenture dated September 18, 2020, Vault 1 authorized up to $500 million in Variable Denomination Floating Rate Demand Notes (the "Vault Debentures").  American Stock Transfer & Trust Company, LLC, serves as the Trustee for the Vault Debentures.  The Vault Debentures accrue interest at a floating rate per annum equal to the Average Savings Account Rate as posted by the FDIC plus 2.00%, reset quarterly.  The Vault Debentures are guaranteed by Debtor Vault Holding 1, LLC ("Holding 1"), and pursuant to a Pledge and Security Agreement dated September 18, 2020, the Vault Debentures were purportedly secured by a pledge of the ownership interests in Holding 1.  Pursuant to the Indenture, the Vault Debentures are subordinate to right of payment with respect to third party credit facilities.

21.     As of the Petition Date and according to the Debtors' books and records, the total amount of Vault Notes and Vault Debentures totaled approximately $36.2 million.

///

///

DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS

- 8 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

23-31243-WLH11 Doc 69 Filed 02/03/23 Entered 02/03/23 19:45:39 Ex 1 Pg 87

<u>The Debtors' Capital Raising Efforts from Individual Investors</u>

22.     Based upon the Debtors books and records, as of the Petition Date, I understand that the Debtors' note obligations are held by approximately 1,800 individual investors.  The Debtors' prepetition fundraising efforts relied substantially on raising debt capital from individual investors both within and outside of the United States, including China, Taiwan, the United Kingdom, and the British Virgin Islands. All of the Debtors' top 30 creditors are investors, with claims ranging from $730,000 to $10.5 million.

23.     Importantly, since the Debtors' retention of Paladin, the Debtors have not offered for sale, issued, or sold any securities to individual investors.

<u>Intercompany Obligations</u>

24.     In the ordinary course of business, the Debtors advanced funds to each other.  Some of those advances were recorded as loans in the Debtors' books and records, and others were formally documented as loan agreements.  The Debtors are in the process of investigating these transfers to confirm their extent, appropriate treatment, and priority.

<u>Equity Ownership</u>

25.     Enterprises is the ultimate parent for all of the Debtors other than iCap Investments, LLC ("<u>Investments</u>").  Christensen is the sole shareholder/member of both of those Debtors.  On September 28, 2023, Christensen resigned all positions at the Debtors and I was appointed as the sole member of the Board of Directors and Chief Restructuring Officer of Enterprises, as well as Manager of Investments, and all of their direct and indirect subsidiary limited liability companies, with full and exclusive control and authority over the Debtors and the prosecution of these Chapter 11 Cases.

/ / /

/ / /

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

26. By early 2022, the Debtors had 18 properties across both the Portfolio and the Vault Businesses with 22 employees. The Debtors' growth, however, was financed largely through investor capital which was structured as indebtedness. By November 2022, total indebtedness (not including intercompany obligations) reached $230 million, with reported consolidated assets of $93 million. At the same time, the national and state economies were experiencing significant disruption, with slowing growth, substantial inflation, and successive increases in interest rates. The Debtors were no longer able to service their ongoing interest payments without raising additional liquidity. On November 15, 2022, the Debtors announced a 12-month extension of maturity dates for certain of the Portfolio Notes. This was followed, on March 20, 2023, with the Debtors' announcement that they were suspending interest payments on all Portfolio Notes.

27. The Debtors' liquidity continued to decline, and on April 15, 2023, the Debtors terminated substantially all of their employees.

28. It is my understanding that between March and July 2023, the Debtors attempted to find ways to raise liquidity and address their obligations out of court. Those efforts were ultimately unsuccessful.

29. On July 14, 2023, the Debtors engaged the services of my firm, Paladin, in order to assist in evaluating options for addressing their liquidity needs and/or restructuring their obligations.

Investor Litigation

30. Over the course of the summer of 2023, investors began sending demand letters and threatening or commencing litigation against the Debtors, Christensen, and others involved with the Debtors' prior operations.

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 10 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

23-01243-WLH11    Doc 49    Filed 09/03/23    Entered 09/03/23 19:53:29    Exhibit 1, Page 89

31.     Below is a chart listing the active lawsuits against the Debtors relating to the Debtors' debt obligations (the "Active Prepetition Lawsuits"):

| Case Title | King County Superior Court | Amount Sought/Dispute |
|---|---|---|
| Julie A. Bosia, *et al.* v. iCap Pacific Northwest Opportunity and Income Fund, LLC, and iCap Northwest Opportunity Fund, LLC | KCSC 23-2-16200-5 | *Undefined in Complaint.* |
| Yongzhi Liang, *et al.* v. Chris Christensen and Debra Christensen, *et al.* <br><br> *\*Pending Motion to Consolidate with Li Tan.* | KCSC 23-2-13456-7 | $11,500,000 |
| Li Tan, *et al.* v. Chris Christensen and Debra Christensen, *et al.* <br><br> *\*Pending Motion to Consolidate with Liang* | KCSC 23-2-12786-2 | $35,429,941* |
| Paul Weiss v. iCap Vault 1, LLC, *et al.* | KCSC 23-2-13897-0 | $135,000 |
| Chen Xi v. iCap Vault 1, LLC, *et al.* | KCSC 23-2-14401-5 | $113,000 |

32.     The complaints in the Active Prepetition Lawsuits include allegations and causes of action for fraud, violation of state consumer protection laws, breach of contract, and civil conspiracy.  In addition to the foregoing lawsuits, the Debtors have received numerous inquiries as well as demand letters from investors.

33.     In addition, on August 30, 2023, the Debtors received a letter from the State of Washington Department of Financial Institutions, Securities Division (the "DFI

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 11 -

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

BN 78594745v13

23-01243-WLH11    Doc 409    Filed 02/03/24    Entered 02/03/24 19:52:30    Exhibit 1, Page 90

Letter"), which demanded that the Debtors cease and desist from selling any unregistered securities and requested the delivery of certain documents by October 6, 2023. The Debtors have not yet formally responded to the DFI Letter, but do intend to engage with state regulators in connection with the Chapter 11 Cases.

34. The Debtors' obligation to defend against the Active Prepetition Lawsuits placed a substantial financial burden on the Debtors, straining the Debtors' already limited liquidity. The Active Prepetition Lawsuits also required substantial attention from the Debtors' restructuring advisors. Accordingly, I believe that the automatic stay imposed by the Bankruptcy Code will provide critical breathing room for the Debtors, and allow them to focus on maximizing the value of the estates' assets and building consensus regarding a path forward for the Debtors.

### Temporary Restraining Order and Prepetition Term Sheet

35. On August 14, 2023, the Washington Superior Court for King County (the "Superior Court") issued a Temporary Restraining Order (the "TRO") in *Li Tan, et al. v. Chris Christensen, et al.*, Case No. 23-2-12786-2, which was commenced by an *ad hoc* group of the Debtors' noteholders (the "Ad Hoc Group"). The TRO restricted the Debtors from encumbering certain assets, restricted the Debtors' access to their bank accounts, and generally placed restrictions on the Debtors' use of cash. The issuance of the TRO accelerated the Debtors' need to prepare for an expedited chapter 11 filing or other insolvency proceeding and, accordingly, the Debtors and their advisors were required to devote substantial energy and resources to negotiations with the Ad Hoc Group regarding an acceptable restructuring path.

36. I worked with the Debtors' counsel and other advisors to organize and lead negotiations with the Ad Hoc Group and Christensen. These negotiations were robust and constructive, and on August 23, 2023, the negotiating parties executed a Term Sheet (the "Filing Support Agreement" or "FSA") that paved the way for the commencement

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 12 -

BN 78594745v13

23-01243-WLH11    Doc 189    Filed 00/03/23    Entered 00/03/23 19:52:20    Exhibit 1, Page 91

of these Chapter 11 Cases. A copy of the FSA is attached hereto as <u>Exhibit B</u>. Among other things, the FSA provided for the following:

<u>Commitments by Christensen</u>:

A.    Execute corporate resolutions and an engagement agreement with me (as CRO), in form and substance approved by the CRO, (i) irrevocably authorizing the appointment of the CRO with a scope of authority to include the exercise of all powers and duties previously enjoyed or exercisable by the Company's[5] CEO, and (ii) authorizing bankruptcy filings on behalf of the Company.

B.    Resign all positions with the Company, including his office as CEO, such that Christensen shall have no authority to take any action on behalf of the Company.

C.    Upon request by the CRO, sign all documents and take all steps reasonably necessary to provide a personal, conditional, non-recourse guaranty in support of DIP financing for the Company, in a form acceptable to Christensen and secured by a deed of trust on certain real property owned by the Christensens (the "<u>Guaranty</u>"). The Guaranty shall provide, among other things, that the DIP lender shall exhaust all remedies against the Company prior to enforcing the Guaranty. The Company shall seek Bankruptcy Court approval of the Consulting Agreement (defined below) concurrently with approval of the DIP financing and the Stay Motion (defined below). The Guaranty shall be contingent on Bankruptcy Court approval of the Consulting Agreement and the filing of the Stay Motion.

D.    Enter into a one-year consulting agreement with the Company, in a form mutually acceptable to Christensen and the Company, pursuant to which he will reasonably cooperate with the CRO's efforts to (i) assess the Company, its businesses, and assets, (ii) administer the Chapter 11 Cases, (iii) market and sell Company assets through the Chapter 11 Cases, and (iv) otherwise discharge his duties owed to the Company (the "<u>Consulting Agreement</u>") with compensation of

---

[5] The term the "<u>Company</u>" is defined in the Filing Support Agreement as "iCap Enterprises, Inc. and iCap Investments, LLC, and each of their respective direct and indirect subsidiaries but excluding Airlink Holding, LLC and its direct and indirect wholly owned subsidiaries."

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 13 -

BN 78594745v13

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

$16,666.67 per month commencing on the Petition Date; provided, however, that amounts owed from the Petition Date until entry of the final order approving DIP financing shall be accrued but not paid. The Consulting Agreement shall contain reasonable and customary provisions regarding termination for cause to be agreed upon by the CRO and Christensen.

E.     By no later than 14 days following the Petition Date and as a condition to the Stay Motion, Christensen shall provide to the Company and counsel for the Ad Hoc Group a financial statement from Christensen, under penalty of perjury, providing the following detailed information: (i) a personal financial statement setting forth all assets, liabilities, and retirement accounts; (ii) a list of all bank accounts maintained in the name of or for the benefit of Christensen since January 1, 2018 (whether or not Christensen was a signator), including identity of the bank and account numbers; and (iii) a list of any assets with a fair market value of more than $50,000 that Christensen has sold, gifted, or transferred, in any form, since January 1, 2018 ("Christensen Financial Information").

Commitments by the Company:

A.     Use commercially reasonable efforts to negotiate and obtain DIP financing on the most favorable terms possible, including with respect to the Guaranty.

B.     Upon obtaining or securing the DIP financing, commence the Chapter 11 Cases.

C.     Execute and seek approval of the Consulting Agreement in the Chapter 11 Cases.

D.     File a motion with the Bankruptcy Court, on an expedited basis, seeking the extension of the automatic stay (the "Stay Motion") to include actions or legal process by any noteholders against the Christensens through the earliest of the following events in the Chapter 11 Cases: (i) dismissal; (ii) conversion to chapter 7, or (iii) confirmation of a chapter 11 plan of reorganization (the "Stay Termination Date").

/ / /

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

E.     The Company shall prepare and file with the bankruptcy petition all required Schedules of assets and liabilities and other required financial information and the Statement of Financial Affairs for each entity by no later than 30 days following the Petition Date.

<u>Commitments by the Ad Hoc Group:</u>

A.     Provide the Company with a written consent, in form satisfactory to the Ad Hoc Group in its sole discretion, for purposes of the TRO, to use Company assets (including the use of cash and the consent to liens and encumbrances) for purposes of: (i) securing the DIP Facility (defined below), subject to Bankruptcy Court approval and to the Ad Hoc Group's right to object to such DIP Facility and/or any of its terms; provided that, for the avoidance of doubt, the DIP Facility shall include a pre-petition advance, which shall be obtained prior to approval by the Bankruptcy Court; (ii) retaining and paying fees and expenses of the CRO, his financial advisory firm, and counsel for the Company in an amount sufficient to effectuate the terms of the FSA, subject to Bankruptcy Court approval and to the Ad Hoc Group's right to object to such DIP Facility and/or any of its terms; and (iii) preparation for and commencing of the Chapter 11 Cases.

B.     Enter into a consensual modification consistent with the FSA, in form satisfactory to the Ad Hoc Group and the Christensens, each in their sole discretion, of the TRO with the Christensens to permit them to: (i) use their real property for purposes of providing the Guaranty in favor of the DIP Facility, subject to approval of the Bankruptcy Court; (ii) use their personal assets to pay ordinary living expenses, subject to an agreed budget and a periodic report setting forth the actual expenses as compared to the budget (including, without limitation, mortgage payments on their real property) and reasonable legal and professional fees (including, without limitation, a reasonable retainer for personal bankruptcy counsel in the event one or both of the Christensens decides to seek personal bankruptcy relief); (iii) address an entity known as Airlink Holding, LLC in a manner consistent with the FSA;[6] and (iv) release Chistensen's daughter's checking account, and not seeking

---

[6] This item is addressed in detail in the contemporaneously filed motion to approve the Consulting Agreement and a separate declaration submitted therewith.

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 15 -

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

BN 78594745v13

further provisional relief.

C.  Enter into a stipulation with the Company and the Christensens, staying the state court litigation as to the Company and the Christensens until the Stay Termination Date, with the modified TRO remaining in place (and enforceable such that the Company and the Christensens will continue to be bound by the terms of the same, except as modified by the terms of the FSA).

D.  File pleadings affirmatively supporting the Stay Motion, so long as Christensen has complied with all of the terms of the FSA at the time the Stay Motion is filed.

37.  The Filing Support Agreement paved the way for these Chapter 11 Cases to be filed in an orderly fashion. Among other things, the FSA provided the Debtors with the time to prepare these Chapter 11 Cases, and also enabled the Debtors to secure critical debtor in possession financing. In exchange, the Debtors agreed to a number of provisions that benefit the Ad Hoc Group and which ultimately benefit the creditors of these estates, in general.

38.  On September 25, 2023, the Superior Court entered an amended, agreed-upon TRO Order that embodied certain of the terms of the FSA, as well as certain additional relief requested by the Ad Hoc Group, Christensen, and the Debtors.

39.  In addition, the Liang plaintiffs group (the "Liang Plaintiffs") have stipulated to consolidate its lawsuit against the Christensens and be bound by the TRO Order entered in the action brought by the Ad Hoc Group. The Liang Plaintiffs hold approximately $11.5 million in claims, which together with the approximately $35.4 million in claims held by the Ad Hoc Group, means that holders of nearly $47 million in investor claims are generally supportive of the Debtors' process and goals outlined for these Chapter 11 Cases.

/ / /

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 16 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

40.     The aggregate amount of asserted claims held by the other plaintiffs in the Active Prepetition Lawsuits totals less than $250,000.

<u>Additional Investor Support and Outreach</u>

41.     I believe that the Debtors and their stakeholders will be best served by an expeditious, transparent, and consensus-oriented approach to these Chapter 11 Cases. Accordingly, over the weeks preceding the Petition Date, the Debtors and their advisors engaged with many investors, investor groups, and their respective advisors regarding the Debtors' financial status and, increasingly as the Petition Date approached, the intended pathway to a restructuring. Based upon these discussions, I believe that there exists broad investor support for these proceedings as a means to ensure that the value of the Debtors' assets are maximized for the benefit of creditors through an open, orderly, and efficient process.

42.     With the FSA in place, the Debtors completed solicitation efforts to locate debtor in possession financing, and proceeded to negotiate the final terms for that facility. On September 28, 2023, Christensen executed resolutions resigning all positions at the Debtors and I was appointed as the sole member of the Board of Directors and Chief Restructuring Officer of Enterprises, as well as Manager of Investments, and all of their direct and indirect subsidiary limited liability companies, with full and exclusive control and authority over the Debtors and the prosecution of these Chapter 11 Cases. On September 29, 2023, I authorized the filing of these Chapter 11 Cases.

/ / /

/ / /

/ / /

/ / /

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 17 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

23-01243-WLH11    Doc 429    Filed 02/03/24    Entered 02/03/24 19:52:20    Exhibit, Page 96

## SECTION III

## Chapter 11 Objectives

43.     The Debtors and their advisors, in consultation with certain creditor constituencies, including the Ad Hoc Group, have developed three primary objectives for these Chapter 11 Cases.

44.     *Real Estate Assessment*.  As described above, the Debtors maintained a portfolio of owned real property assets, as well as ownership or other interests in other real property projects.  The Debtors intend to quickly develop a comprehensive plan to maximize the value of these real estate holdings, which will likely require the services of a specialized real estate advisor and/or broker.  The Debtors' path forward with respect to the real estate assets may involve a sale process of all or some assets or a longer-term development plan.  The Debtors anticipate that the availability and terms of development financing will be a substantial factor in formulating their real estate strategy.

45.     *Investigation and Assessment of Legal Allegations*.  The Active Prepetition Lawsuits contain serious allegations, including securities claims.  These issues must be addressed.  To date, the Debtors' restructuring advisors have not had the time or resources to undertake a comprehensive examination of the Debtors' historical financial information, but intend to do so during these Chapter 11 Cases.  Needless to say, the estates may hold claims arising from, *inter alia*, the raising of investor capital.

46.     *Plan of Liquidation*.  The Debtors intend to pursue a confirmation process for a plan of liquidation.  The plan will address any assets that have not already been sold or liquidated, address disposition of causes of action previously identified, and provide a final outcome for all creditors in these cases.

/ / /

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 18

BN 78594745v13

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11   Doc 49   Filed 02/03/23   Entered 02/03/23 19:52:20   Exhibit 1, Page 97

### The Debtors' Liquidity and DIP Financing

47.     Given that the Debtors have extremely limited liquidity and that most of their capital is tied up in illiquid real property investments, the Debtors require debtor in possession financing for these Chapter 11 Cases.  Simply put, the Debtors cannot achieve their objectives in the Chapter 11 Cases without DIP financing.  The Debtors' efforts to secure DIP financing and the terms of the proposed DIP financing (the "<u>DIP Facility</u>") are discussed in greater detail in my declaration submitted in support of the Debtors' DIP motion.  However, it is critical to emphasize here how interconnected the DIP Facility is with other relief sought by the Debtors.

48.     For example, a substantial amount of the collateral support for the DIP Facility is proposed to be provided by Christensen, a non-Debtor.  The DIP Facility lender will not fund the DIP Facility absent this additional collateral support.  In turn, Christensen is not required to post his non-estate assets as DIP Facility collateral unless the Debtors: (i) obtain approval of Christensen's proposed Consulting Agreement with the Debtors; and (ii) file the Stay Motion on an expedited basis.

49.     It is therefore critical to the Debtors' overall chapter 11 strategy that the Court approve the Debtors' entry into the Consulting Agreement and likewise enjoin any noteholder litigation against the Christensens through approval of the Stay Motion.  Both such relief requests will be filed by separate motion in advance of the first day hearing.

### SECTION III

50.     To enable the Debtors to continue operating effectively and minimize potential adverse effects from the commencement of the Chapter 11 Cases, the Debtors are requesting certain emergency and other relief from the Court pursuant to the First Day Motions.  I have reviewed each of the First Day Motions, including the exhibits thereto.  All facts set forth in the First Day Motions are true and correct based upon my

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 19 -

BN 78594745v13

personal knowledge; information provided to me by certain of the Debtors' former employees and professionals; my review of relevant documents; or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtors. Accordingly, for the reasons stated herein and in the First Day Motions, I believe that the relief requested in each of the First Day Motions is in the best interests of the Debtors, their estates, and their creditors, and, therefore, should be approved.

## **Schedules and SOFAs Motion**

51.     Along with the Debtors' professionals, I have been and continue to be focused on stabilizing the Debtors' business in the wake of the filing of the Active Prepetition Lawsuits (including negotiating the FSA), the recent change of the Debtors' management, my appointment as Chief Restructuring Officer, and the emergent filing of these Chapter 11 Cases, as well as addressing issues surrounding or caused by the foregoing.

52.     Paladin is also in the process of reviewing and verifying the information in the Debtors' books and records, which is of course integral to the process of preparing Schedules and SOFAs.

53.     The Debtors are in the process of preparing their Schedules and SOFAs. However, given that the Debtors' professionals and I have been focused on various matters critical to the Debtors' business and the administration of these Chapter 11 Cases, the Debtors require additional time to prepare and file the Schedules and SOFAs.

54.     Additionally, based upon my initial review of the Debtors' books and records, I do not believe it will be practicable to prepare complete and accurate Schedules and SOFAs within the 14-day period required under the Bankruptcy Rules. Based upon my experience, I believe an extension of the deadline of approximately 30

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 20 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

23-90147-WLH11  Doc 89  Filed 02/03/23  Entered 02/03/23 19:53:20  Exhibit 1 Page 99

days (through and including November 15, 2023) is warranted to allow time for this process to be completed.

55.     If the Debtors are forced to file their Schedules and SOFAs by the filing deadlines set forth in the Bankruptcy Rules, it is very likely that the Debtors will have to later revise or amend the Schedules and SOFAs. Doing so will require the Debtors and their professionals to spend additional time and effort and ultimately increase the administrative expenses of the Debtors' estates.

## Insurance Motion

56.     In the ordinary course of business, the Debtors maintain various insurance policies issued by various insurance carriers. Collectively, these policies provide for coverage for general liability, commercial property, vacant land, and pollution liability.

57.     The Debtors pay premiums to various insurance carriers, generally on an annual basis, but some policies are also maintained on a monthly basis (collectively, the "Insurance Premiums"). Insurance Premiums typically range from approximately $3,000 to $13,000 per year for general liability and property insurance.

58.     Debtor 725 Broadway LLC also currently has insurance coverage for environmental/pollution issues at its site that are in the process of being remediated. That policy has an annual premium in the amount of approximately $50,000 and is paid current through February 15, 2024.

59.     Just prior to the Petition Date, Paladin discovered in reviewing the Debtors' books and records that, due to the Debtors' severe liquidity problems, the Debtors had not paid premiums for certain policies and those policies had lapsed, including the Debtors' commercial umbrella policy (which also included coverage for vacant land owned by certain of the Debtors) and coverage for real property owned by Debtor VH 2nd Street Office, LLC.

/ / /

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

60.     The Debtors hold the following insurance policies that are current as of the Petition Date:

| Debtor | Insurance Carrier | Policy Type |
|---|---|---|
| 725 Broadway LLC | The Hartford | Environmental / Pollution |
| Senza Kenmore LLC | Colony Insurance Company | Property Insurance |
| VH 1121 14th LLC | Nationwide General Insurance Company | Property Insurance |
| VH Pioneer Village LLC | The Hanover | Property Insurance |
| VH Senior Care LLC | Maxum Indemnity Company | Property Insurance |
| VH Willows Townhomes LLC | Mutual of ENUMCLAW | Property Insurance |

61.     The foregoing description of the Insurance Premiums is based upon my best efforts, in conjunction with the Debtors' advisors, in reviewing the Debtors' books and records.

62.     It is of course imperative that the Debtors obtain insurance coverage to replace the policies that have lapsed. Without general liability coverage and insurance coverage for certain assets, the Debtors and their uninsured assets are exposed to significant, obvious liability risks.

63.     I am not currently aware of any policies that require the payment of past-due, prepetition Insurance Premiums in order to prevent the lapsing of such policies. But to the extent that I discover any such policies in my ongoing review of the Debtors' books and records, it may be in the Debtors' best interests that I bring those policies

DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST
DAY MOTIONS

- 22 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

23-10243-WLH11 Doc 69 Filed 02/03/23 Entered 02/03/23 11:45:30 Exhibit 1, Page 101

current, rather than allow them to lapse and replace them (if, for example, replacement policies would be more expensive).

64.     If the Debtors do not timely meet their postpetition obligations with respect to Insurance Premiums, insurance carriers may refuse to renew insurance policies, which will require the Debtors to obtain replacement policies and possibly reconfigure their risk management program.

65.     Obtaining replacement policies would require the Debtors to commit significant resources and could result in less favorable coverage or terms from the Debtors' insurers.  Insurance carriers could also attempt to terminate the Debtors' existing Insurance Policies or deny coverage.  Any disruption in insurance coverage could threaten the Debtors' ability to preserve their property and proceed expeditiously through this chapter 11 process.

## Taxes Motion

66.     In the ordinary course of their current business, the Debtors incur primarily real property taxes (the "Taxes").  The Debtors pay the Taxes to various governmental authorities, generally on a semi-annual basis, with the Taxes for the first half of a calendar year due in October of that year, and the Taxes for the second half of a calendar year due in April of the following year.

67.     As of the Petition Date, the owe or will owe pre- and post-petition Taxes, where either: (i) Taxes have accrued or were incurred prepetition and became due and payable prior to the Petition Date (*i.e.*, past due); (ii) Taxes were incurred for prepetition periods and become due and payable after the Petition Date; (iii) Taxes are for a period that straddles the Petition Date;[7] or (iv) Taxes accrued or are incurred postpetition.

/ / /

---

[7]     For example, taxes due April of 2024 will be for the period of July 1, 2023 through December 31, 2023, thereby including both pre- and postpetition periods.

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 23 -

BN 78594745v13

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-91043-WLH11    Doc 469    Filed 02/03/23    Entered 02/03/23 19:42:39    Exhibit 2, Page 0102

68.    A schedule identifying the real property Taxes owed by Debtors is included as follows:

| Debtor | Past Due | October 2023 | April 2024 |
|---|---|---|---|
| 725 Broadway LLC | $11,582 | $10,160 | $10,160 |
| iCap Campbell Way LLC | $1,403 | $1,226 | $1,226 |
| Senza Kenmore LLC | $8,031 | $7,226 | $7,226 |
| Uw 17th Ave LLC | $35,355 | $15,960 | $15,960 |
| VH 1121 14th LLC | | $12,908 | $12,908 |
| VH 2nd Street Office LLC | $22,383 | $19,634 | $19,634 |
| VH Pioneer Village LLC | | $8,107 | $8,107 |
| VH Senior Care LLC | $10,058 | $9,489 | $9,489 |
| VH Willows Townhomes LLC | | $12,968 | $12,968 |
| Totals: | $88,812 | $97,678 | $97,678 |

69.    To the best of the best of my knowledge, the Debtors do not currently owe or collect on an ongoing basis any trust fund taxes (*e.g.*, sales or payroll taxes).

70.    As of the Petition Date, I have not had the ability to investigate the existence of any liens on the Debtors' real property in connection with delinquent Taxes, and I am therefore concerned that there may exist liens that continue to accrue interest, penalties, and/or fees.

71.    The foregoing description of the Taxes is based upon my best efforts, in conjunction with the Debtors' advisors, in reviewing the Debtors' books and records.

72.    Payment of the prepetition Taxes is critical to the Debtors' ability to preserve the value of their estates.  The Debtors intend to expeditiously sell their real

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 24 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

Case 23-01243-WLH11    Doc 469    Filed 02/03/23    Entered 02/03/23 19:45:39    Exhibit 13, Page 103

estate assets, not hold them long term. Failure to promptly pay prepetition Taxes will likely result in the imposition of interest, fees, and penalties that will harm the estates. Thus, if left unpaid, the Taxes can ultimately result in lower proceeds from the sale of the Debtors' assets due to additional accrued interest and penalties on these claims that will need to be paid at the closing of any sales. Such a result would be contrary to the best interests of the Debtors' estates and all stakeholders.

73. Any unexpected or inopportune interruption of the Debtors' efforts to administer their estates and propose a plan could greatly diminish estate value and frustrate the Debtors' chapter 11 efforts. To ensure the Debtors have adequate flexibility to meet their fiduciary duties as debtors in possession, they must be permitted to make payment of the Taxes as they determine is necessary to maximize the value of their estates.

## 401K Withholdings

74. Finally, while not the subject of a First Day Motion, I wish to inform the Court of a payment inadvertently made postpetition in connection with a prepetition obligation.

75. Prior to the Petition Date, the Debtors owed approximately $14,000 to the administrator of the Debtors' 401(k) ERISA plan (the "Administrator"). These amounts were for funds that had been withdrawn from employee paychecks but not timely remitted to the Administrator.

76. All of these payments were for former rank-and-file employees, and none of them were paid to the Debtors' former management. The Debtors attempted to pay these amounts prior to the Petition Date, but due to an administrative issue, the funds were withdrawn from the Debtors' bank account postpetition.

77. The Debtors will promptly address this issue by separate motion.

/ / /

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST DAY MOTIONS**

- 25 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

1    I declare under penalty of perjury under the laws of the State of California that

2    the foregoing is true and correct.

3

4                                    /s/ Lance Miller
                                     Lance Miller

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**DECLARATION OF LANCE MILLER IN SUPPORT OF FIRST
DAY MOTIONS**
                                    - 26 -

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

BN 78594745v13

23-90124-3-WLH11    Doc 469    Filed 02/03/23    Entered 02/03/23 19:45:39    Exhibit, Page 105

# EXHIBIT A

23-01243-WLH11   Doc 23   Filed 10/03/23   Entered 10/03/23 12:52:29   Pg 28 of 35   Exhibit A Page 28

# iCap Debtor Organizational Chart



1   Box A consists of the Class A Units holders of Senza Kenmore, LLC: (i) Devout Capital Limited, (ii) Shiyu Zhang, (iii) Qiong Huang, and (iv) Fengdi Chen.

2   VH Property Owner Entities consists of the following prop co. Debtors, all of which are Delaware limited liability companies: (i) VH Willows Townhomes, LLC; (ii) VH Senior Care, LLC; (iii) VH 1121 14th, LLC; (iv) VH 2nd Street Office, LLC; and (v) VH Pioneer Village, LLC.

3   iCap Vault Management, LLC is the Manager of (i) all prop co. Debtors included in VH Property Owner Entities, (ii) Vault Holding, LLC, (iii) Vault Holding 1, LLC, and (iv) iCap Vault 1, LLC.

4   iCap Pacific NW Management, LLC is the Manager of (i) 725 Broadway, LLC; (ii) iCap Campbell Way, LLC; (iii) UW 17th Ave, LLC; (iv) Senza Kenmore, LLC; (v) iCap Pacific Income Fund 4, LLC; (vi) iCap Pacific Income Fund 5, LLC; (vii) iCap Northwest Opportunity Fund, LLC; (viii) iCap Northwest Opportunity and Income Fund, LLC; and (viii) iCap Equity LLC.

5   Highlighted entities in green are prop co. Debtors.

6   See property specific organizational charts for further details and ownership percentages.

# EXHIBIT B

DocuSign Envelope ID: FC125F42-784D-472E-A822-F34B4FD10A4D

## TERM SHEET

The following is a binding Term Sheet regarding commitments by the Company, Christopher Christensen, and the Ad Hoc Noteholder Group (defined below). Once executed and following the Effective Date (defined below), the terms below shall be binding on all parties, and enforceable as a binding agreement under applicable law.

### Defined Terms

| | |
|---|---|
| ***Ad Hoc Noteholder Group:*** | That certain group of noteholders represented by John Bender of Corr Cronin LLP ("Corr Cronin LLP") and Jay Kornfeld of Bush Kornfeld LLP ("BK"), including Li Tan, Ting Shao, Zhu Hua Li, Yuan Mu, Fan Zhang, Haiyan Li, Yuanyuan Li, Shiyu Zhang, Yi Shan, and Jia Lu, Zhiduo Wu, Shiying Chen, Ping Zhang, Sizhen Wang, Ming Li, Li Li, Baoguo Long, Ruzhen Zhang, Fan Yang, Minyao Zheng, Chunying Tian, Xingzhi Zhu, Yao Wang, Chen Shen, Youzhen Lu, Weisu Ge, Qiong Huang, Kun Wang. |
| ***Christensen:*** | Mr. Christopher Christensen, a resident of the State of Washington and the owner and CEO of the Company and, together with his wife, Debra Christensen, the "Christensens." |
| ***Company:*** | iCap Enterprises, Inc. and iCap Investments, LLC, and each of their respective direct and indirect subsidiaries but excluding Airlink Holding, LLC and its direct and indirect wholly owned subsidiaries. |
| ***Chief Restructuring Officer (CRO):*** | Lance E. Miller |
| ***DIP Financing:*** | Debtor in Possession Financing in an amount reasonably anticipated to finance the Bankruptcy Cases, as reasonably determined by the CRO. |
| ***Effective Date:*** | The first business day following execution by all parties of this Term Sheet. |
| ***Grand Ridge Property:*** | That certain property and real estate located at 27112 SE Grand Ridge Drive, Issaquah, Washington. |
| ***TRO:*** | That certain Temporary Restraining Order entered in favor of the Ad Hoc Noteholder Group by King County Superior Court. |

### Party Obligations

| | |
|---|---|
| Christensen Obligations: | As promptly as reasonably practicable (but, in any event no later than 5 business days following the Effective Date), Christensen shall do the following: |

1

DocuSign Envelope ID: FC125F42-784D-472E-A822-F34B4FD10A4D

1. Execute corporate resolutions and an engagement agreement with the CRO, in form and substance approved by the CRO, copies of which shall be provided in advance to counsel for the Ad Hoc Noteholder Group, (i) irrevocably authorizing the appointment of the CRO with a scope of authority to include the exercise of all powers and duties previously enjoyed or exercisable by the Company's CEO, and (ii) authorizing filings by or on behalf of the Company under chapter 11 of Title 11 of the U.S. Code (the "***Bankruptcy Cases***").

2. Resign all positions with the Company, including his office as CEO such that Christensen shall have no authority to take any action on behalf of the Company.

3. Upon request by the CRO, sign all documents and take all steps reasonably necessary to provide a personal, conditional, non-recourse guaranty in support of DIP Financing for the Company, in a form acceptable to Christensen and secured by a deed of trust on certain real property owned by the Christensens, including at least the Grand Ridge Property (the "***Guaranty***"). The Guaranty shall provide, among other things, that the DIP lender shall exhaust all remedies against the Company prior to enforcing the Guaranty. The Company shall seek Bankruptcy Court approval of the Consulting Agreement concurrently with approval of the DIP Financing and the Stay Motion. The Guaranty shall be contingent on Bankruptcy Court approval of the Consulting Agreement and the filing of the Stay Motion.

4. Enter into a one-year consulting agreement with the Company, in a form mutually acceptable to Christensen and the Company, pursuant to which he will reasonably cooperate with the CRO's efforts to (i) assess the Company, its businesses, and assets, (ii) administer the Bankruptcy Cases, (iii) market and sell Company assets through the Bankruptcy Cases, and (iv) otherwise discharge his duties owed to the Company (the "Consulting Agreement") with compensation of $16,666.67 per month commencing on the petition date for the Bankruptcy Cases; provided, however, that amounts owed from the petition date until entry of the final order approving the DIP shall be accrued but not paid. The Consulting Agreement shall contain reasonable and customary provisions regarding termination for cause to be agreed upon by the CRO and Christensen. The Ad Hoc Noteholder Group shall be provided with a copy of the Consulting Agreement.

5. Enter into a stipulation with the Ad Hoc Noteholder Group for release of the $50,000 bond posted by the Ad Hoc Noteholder

Group into the King County Superior Court Registry to secure the TRO.

6. By no later than 14 days following the Petition Date and as a condition to the Stay Motion (as defined below), Christensen shall provide to the Company and counsel for the Ad Hoc Noteholder Group a financial statement from Christensen, under penalty of perjury, providing the following detailed information: (a) a personal financial statement setting forth all assets, liabilities, and retirement accounts; (b) a list of all bank accounts maintained in the name of or for the benefit of Christensen since January 1, 2018 (whether or not Christensen was a signator), including identity of the bank and account numbers; and (c) a list of any assets with a fair market value of more than $50,000 that Christensen has sold, gifted, or transferred, in any form, since January 1, 2018 ("Christensen Financial Information").

**Company Obligations:** Promptly following the Effective Date, the Company shall do the following:

1. Use commercially reasonable efforts to negotiate and obtain DIP Financing on the most favorable possible, including with respect to the Guaranty.

2. Upon obtaining or securing the DIP Financing, commence the Bankruptcy Cases.

3. Execute and seek approval of the Consulting Agreement in the Bankruptcy Cases.

4. File a motion with the Bankruptcy Court, on an expedited basis, seeking the extension of the automatic stay (the "Stay Motion") to include actions or legal process by any Noteholders against the Christensens through the earliest of the following events in the Bankruptcy Cases: (a) dismissal; (b) conversion to chapter 7, or (c) confirmation of a chapter 11 plan of reorganization (the "Stay Termination Date").

5. Permit Christensen to tender one or more claims to any Company insurance carrier for his costs of defense of any litigation. Christensen and the CRO shall provide counsel for the Ad Hoc Noteholder Group with the following prior to Christensen's tender of any claims: (a) a list and copy of any and all D&O/E&O/Fidelity insurance policies maintained by the Company.

6. Enter into a stipulation with Ad Hoc Noteholder Group for release of the $50,000 bond paid by Ad Hoc Noteholder Group

3

into the King County Superior Court Registry to secure the TRO.

7. The Company shall prepare and file with the bankruptcy petition all required Schedules of assets and liabilities and other required financial and Statement of Financial Affairs for each entity by no later than 30 days following the Petition Date.

| | |
|---|---|
| Ad Hoc Noteholder Group Obligations: | Promptly following the Effective Date, the Ad Hoc Noteholder Group will do the following: |

1. Provide the Company with a written consent, in form satisfactory to Ad Hoc Noteholder Group in its sole discretion, for purposes of the TRO, to use of Company assets (including the use of cash and the consent to liens and encumbrances) for purposes of (i) securing the DIP Facility, subject Bankruptcy Court approval and to the Ad Hoc Noteholder Group's to right to object to DIP Facility and/or any of its terms; provided that, for the avoidance of doubt, the DIP Facility shall include a pre-petition advance, which shall be obtained prior to approval by the Bankruptcy Court, (ii) retaining and paying fees and expenses of the CRO, his financial advisory firm, and counsel for the Company in an amount sufficient to effectuate the terms of this agreement, subject Bankruptcy Court approval and to the Ad Hoc Noteholder Group's to right to object to DIP Facility and/or any of its terms, and (iii) preparation for and commencing the Bankruptcy Cases.

2. Enter into a consensual modification consistent with this agreement, in form satisfactory to the Ad Hoc Noteholder Group and the Christensens, each in their sole discretion, of the TRO with the Christensens to permit them to (i) use their real property for purposes of providing the Guaranty in favor of the DIP Facility, subject to approval of the Bankruptcy Court, (ii) use their personal assets to pay ordinary living expenses, subject to an agreed budget and a periodic report setting for the actual expenses as compared to the budget (including, without limitation, mortgage payments on their real property) and reasonable legal and professional fees (including, without limitation, a reasonable retainer for personal bankruptcy counsel in the event one or both of the Christensens decides to seek personal bankruptcy relief), (iii) address Airlink in a manner consistent with this Term Sheet, and (iv) release Chistensen's daughter's checking account (the "TRO Modification"), and not seeking further provisional relief.

4

3. Enter into a stipulation with the Company and the Christensens, staying the state court litigation as to the Company and the Christensens until the Stay Termination Date, with the modified TRO remaining in place (and enforceable such that the Company and the Christensens will continue to be bound by the terms of the same, except as modified by the terms of this Term Sheet).

4. File pleadings affirmatively supporting the Stay Motion, so long as Christensen has complied with all of the terms of this Term Sheet at the time the Stay Motion is filed.

CRO Consultation: The CRO will reasonably confer with the Ad Hoc Noteholder Group, including by telephone with counsel, regarding the status of the Bankruptcy Cases, results of any investigations regarding the Debtors' past practices or claims, the terms of any proposed chapter 11 plan, administration and prosecution of the Bankruptcy Estate's claims against insiders and third parties, and other information requests reasonably submitted by the Ad Hoc Noteholder Group.

Reservation of Rights: Subject to the terms of this Term Sheet, the Ad Hoc Noteholder Group reserves all of its rights to pursue claims and/or object to any and all relief that may be proposed by the Company, CRO, or Christensen.

Governing Law: The terms hereof shall be governed by the laws of the State of Washington, without regarding to choice of law principles or rules.

DocuSign Envelope ID: FC125F42-784D-472E-A822-F34B4FD10A4D

**Agreed and Acknowledged:**

CHRISTOPHER CHRISTENSEN



Chris Christensen                    8/23/2023

79FF05F15514443...


CORR CRONIN LLP, on behalf of the Ad
Hoc Noteholder Group and each member
thereof

John Bender                    8/23/2023

8EE5952258DB418...

By: John Bender

Its: Attorney


ICAP INVESTMENTS, LLC, on behalf of
itself and each of its direct and indirect
subsidiaries

By: Lance Miller                    8/23/2023

65E6F19F7D8847F...

Lance E. Miller
Chief Restructuring Officer (as proposed
herein)

ICAP ENTERPRISES, INC., on behalf of
itself and each of its direct and indirect
subsidiaries

By: Lance Miller                    8/23/2023

65E6F19F7D8847F...

Lance E. Miller
Chief Restructuring Officer (as proposed
herein)

6

**Exhibit 8**



Customer  Service:
1-866-486-7782

ICAP VAULT 1 LLC
3535 FACTORIA BLVD SE # 500
BELLEVUE WA 98006-1298

Last statement: November 30, 2020
This statement: December 31, 2020

Umpqua Bank Rules & Regulations updates go into effect 7-1-2020. This update mainly includes changes to Umpqua Bank's Funds Availability Policy. Next business day funds availability has increased to $225, if there is a hold on a check. For more info, and to review other changes, you may request a copy by calling us at 1-866-486-7782 or visiting umpquabank.com/disclosures.

## ANALYZED INTEREST CHECKING

| | | | |
|---|---|---|---|
| Account number | 4864314804 | Beginning balance | $1,709,738.88 |
| Low balance | $940,292.44 | Additions/Deposits | $220,464.46 |
| Average balance | $1,051,530.50 | Withdrawals/Subtractions | $946,492.81 |
| Interest paid year to date | $71.77 | Ending balance | $983,710.53 |
| Interest earned | $8.91 | | |

### Deposits/Additions

| Date | Description | Additions |
|---|---|---|
| 12-04 | Deposit | 5,000.00 |
| 12-10 | Deposit | 30,000.00 |
| 12-15 | Deposit | 12,200.00 |
| 12-23 | Deposit | 10,000.00 |
| **Total Deposits/Additions** | | **$57,200.00** |

### Other Deposits/ Additions

| Date | Description | Additions |
|---|---|---|
| 12-01 | Cash Mgmt Trsfr Cr  Ref 3361747I Funds Transfer Frm Dep 9690211801 From Yi Zheng Monthly T Ransfer | 2,500.00 |
| 12-03 | Remote Capture Dep | 30,000.00 |
| 12-07 | Cash Mgmt Trsfr Cr  Ref 3421402I Funds Transfer Frm Dep 9690216925 From Caifeng Yu S001288 | 5,000.00 |
| 12-08 | Remote Capture Dep | 10,000.00 |
| 12-23 | Cash Mgmt Trsfr Cr  Ref 3581559I Funds Transfer Frm Dep 9690216925 From Marketer Payment O N S001608 | 10,000.00 |
| 12-31 | Interest Credit | 8.91 |
| **Total Other Deposits/ Additions** | | **$57,508.91** |

Member FDIC        Equal Housing Lender 🏠        SBA Preferred Lender

## ACH Electronic Payments/Subtractions

| Date | Description | Subtractions |
|---|---|---|
| 12-01 | ACH DebitDwolla5152801000 Dwolla 20201201 | 66.67 |
| 12-02 | ACH DebitDwolla5152801000 Dwolla 20201202 | 1,000.00 |
| 12-03 | ACH DebitRef 3381720I Funds Transfer To Dep Xxxxxx7206 From | 812.50 |
| 12-03 | ACH DebitRef 3381720I Funds Transfer To Dep Xxxxxx7206 From | 2,890.00 |
| 12-03 | ACH DebitRef 3381820I Funds Transfer To Dep Xxxxxx7206 From | 84,443.75 |
| 12-08 | ACH DebitHeb Certified Pu Bill Paymt 20201208 | 750.00 |
| 12-14 | ACH DebitRef 3491834I Funds Transfer To Dep Xxxxxx7206 From | 30,000.00 |
| 12-16 | ACH DebitRef 3511146I Funds Transfer To Dep Xxxxxx7206 From | 136.50 |
| 12-16 | ACH DebitM2 Compliance In Bill Paymt 20201216 | 846.00 |
| 12-18 | ACH DebitRef 3531719I Funds Transfer To Dep Xxxxxx7206 From | 3,456.00 |
| 12-18 | ACH DebitRef 3531719I Funds Transfer To Dep Xxxxxx7206 From | 6,858.75 |
| 12-22 | ACH DebitRef 3571903I Funds Transfer To Dep Xxxxxx7206 From | 3,758.75 |
| 12-22 | ACH DebitRef 3571903I Funds Transfer To Dep Xxxxxx7206 From | 4,546.37 |
| 12-22 | ACH DebitRef 3571903I Funds Transfer To Dep Xxxxxx7206 From | 28,732.50 |
| 12-22 | ACH DebitRef 3571903I Funds Transfer To Dep Xxxxxx7206 From | 40,163.00 |
| 12-23 | ACH DebitEfd - Nasaa Efd Filing 20201223 | 1,300.00 |
| **Total ACH Electronic Payments/Subtractions** | | **$209,760.79** |

## ACH and Electronic Deposits/Additions

| Date | Description | Additions |
|---|---|---|
| 12-11 | ACH Credit Emerald City Int Sender 20201211 498154708 | 4,748.50 |
| 12-15 | ACH Credit Icap Investments Investment Devont Capital Lim Ited  Vault S-0015 39 | 25,000.00 |
| 12-15 | ACH Credit Icap Equity Interest Reinvest In Vaults -001173 | 8,770.43 |
| 12-15 | ACH Credit Icap Investments Investment Mu-chen Tzou Vault S-001569 | 8,750.00 |
| 12-15 | ACH Credit Icap Equity Interest Reinvest In Vault S-001541 | 750.00 |
| 12-15 | ACH Credit Icap Equity Interest Note Offering Ii R Einvest In Vaults- 001288 | 666.67 |
| 12-15 | ACH Credit Icap Investments Investment Liya Jin  Vault S- 001609 | 266.67 |
| 12-15 | ACH Credit Icap Equity Interest Reinvest In Vaults -001464 | 226.45 |
| 12-15 | ACH Credit Icap Investments Investment Fengdi Chen Vault S-001498 | 133.33 |
| 12-15 | ACH Credit Icap Investments Investment Xinlu Bao Vault S- 001478 | 133.33 |
| 12-15 | ACH Credit Icap Pacific Nor Mnthly Int Reinvest Into Vaul T S-001539 | 41,666.67 |
| 12-15 | ACH Credit Icap Pacific Nor Mnthly Int Reinvest Into Vaul T S-001539 | 8,333.33 |
| 12-15 | ACH Credit Icap Pacific Nor Mnthly Int Reinvest Into Vaul T S-001539 | 4,166.67 |
| 12-15 | ACH Credit Icap Pacific Pac Int Pymt Reinvest In Vault S-001542 | 825.00 |
| 12-15 | ACH Credit Icap NW Fund 2r Interest Reinvest Into Vaul Ts-001291 | 458.33 |
| 12-15 | ACH Credit Icap Pacific Pac Int Pymt Icap Vault S-00131 0 | 361.94 |
| 12-15 | ACH Credit Icap Pacific Nor Mnthly Int Reinvest Into Vaul T S-001170 | 262.50 |
| 12-15 | ACH Credit Icap NW Fund 2r Interest Reinvest In Vault S-001463 | 118.25 |
| 12-15 | ACH Credit Icap Pacific Pac Int Pymt Icap Vault S-00130 9 | 117.48 |
| **Total ACH and Electronic Deposits/Additions** | | **$105,755.55** |

## Other Withdrawals/Subtractions

| Date | Description | Subtractions |
|---|---|---|
| 12-02 | INTL Wire Xfer Debit Bob INTL Wires Acct#4864314804 Li Ling China Merc Hants Bank Co., Li Mited S-001211 Min Yao Zheng | 550,000.00 |
| 12-04 | INTL Wire Xfer Debit Bob INTL Wires Acct#4864314804 Zhou Jun Standard Chartered Bank (Ho Ng Kong) S-001498 Fengdi Chen | 29,955.00 |
| 12-11 | INTL Wire Xfer Debit Bob INTL Wires Acct#4864314804 Unit5a Vb2 Holding S Ltd The Toronto- Dominion Bank S001 538 Donald And Lin | 143,277.02 |
| 12-11 | INTL Wire Xfer Debit Bob INTL Wires Acct#4864314804 Inmo San Carlos Sa Decv Banco Del Baj Io, S.A. S001538 D Onald And Linda WI | 13,500.00 |
| **Total Other Withdrawals/Subtractions** | | **$736,732.02** |

Member FDIC     Equal Housing Lender ⌂     SBA Preferred Lender

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 11-30 | 1,709,738.88 | 12-08 | 1,092,320.96 | 12-16 | 1,052,516.99 |
| 12-01 | 1,712,172.21 | 12-10 | 1,122,320.96 | 12-18 | 1,042,202.24 |
| 12-02 | 1,161,172.21 | 12-11 | 970,292.44 | 12-22 | 965,001.62 |
| 12-03 | 1,103,025.96 | 12-14 | 940,292.44 | 12-23 | 983,701.62 |
| 12-04 | 1,078,070.96 | 12-15 | 1,053,499.49 | 12-31 | 983,710.53 |
| 12-07 | 1,083,070.96 | | | | |

### Interest Information

| | |
|---|---|
| Annual percentage yield earned | .01% |
| Interest-bearing days | 31 |
| Average balance for APY | $1,048,724.05 |
| Interest earned | $8.91 |
| Interest paid year to date | $71.77 |
| Statement period | 12/01 to 12/31 |

### Overdraft Fee Summary

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| **Total Overdraft Fees** | $0.00 | $0.00 |
| **Total Returned Item Fees** | $0.00 | $0.00 |

### Checks

(* Skip in check sequence, R-Check has been returned, + Electronified check))

Total Checks paid: 0 for **-$0.00**

Member FDIC          Equal Housing Lender 🏠          SBA Preferred Lender

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS**

Call us at 1-866-486-7782 or write us at Umpqua Bank, P.O. Box 19243, Spokane, WA 99219, as soon as you can if you think you statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we send you the FIRST statement on which the error or problem appears.

    (1) Tell us your name and account number (if any).

    (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.

    (3) Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point-of-sale, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question. For new accounts, we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation.

You may ask for copies of the documents that we used in our investigation.

Member FDIC    Equal Housing Lender    SBA Preferred Lender

**Exhibit 9**

# iCap Debtor Organizational Chart





725 Broadway, LLC

Property Address:
715-755 Broadway,
Tacoma, WA

23-01243-WLH11   Doc 469   Filed 02/23/24   Entered 02/23/24 19:45:30   Pg 122 of 630

iCap Pacific NW Management, LLC is the Manager of (i) 725 Broadway, LLC, (ii) iCap Pacific Income Fund 4, LLC, (iii) iCap Pacific Income Fund 5, LLC, (iv) iCap Northwest Opportunity Fund, and (v) iCap Equity LLC.

Exhibit 1, Page 122

131 Campbell Way, LLC

Property Address:
1231 Campbell Way,
Bremerton, WA



- Class A Units Ownership total is 99.99% per Operating Agreement

Exhibit 1, Page 123

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Pg 123 of 630



- iCAP Pacific NW Management, LLC is the Manager of UW 17th Ave, LLC
- Class A Units: 5,000,000 issued to iCap@UW, LLC
- Class B Units: 1,000,000 issued to iCap Investments, LLC

UW 17th Ave, LLC

Property Address:
4740 17th Ave. NE,
Seattle, WA



Senza Kenmore, LLC

**Property Address:** 15550 84th Ave. SE, Kenmore, WA

Exhibit 1, Page 125

Dotted Line indicates Class A Member. Class B Units were not issued with respect to: (i) iCap Northwest Opportunity Fund, LLC and (ii) iCap Pacific Northwest Opportunity and Income Fund, LLC

- Class B Units Ownership total is 99.99% per Operating Agreement
- iCap Pacific NW Management, LLC is the Manager of Senza Kenmore, LLC

VH Willows Townhomes, LLC

Property Address:
4918C, 4906A, 4912B, 4910B South Willow St.,
Seattle, WA



iCap Vault Management, LLC is Manager of VH Willows Townhomes, LLC

VH Senior Care, LLC
Property Address: 302 SW 146th St.,
Burien, WA



Christopher J. Christensen

100% Sole Shareholder

iCap Enterprises, Inc. (WA)

100% Sole Member

iCap Vault, LLC (DE)

100% Sole Member

iCap Vault 1, LLC (DE)

100% Sole Member

Vault Holding, LLC (DE)

100% Sole Member

VH Senior Care, LLC (DE)
(302 SW 146th St., Burien, WA)

100% Sole Member

iCap Vault Management, LLC (DE)

iCap Vault Management, LLC is Manager of VH Senior Care, LLC



Christopher J. Christensen

100% Sole Shareholder

iCap Enterprises, Inc. (WA)

100% Sole Member

iCap Vault, LLC (DE)

100% Sole Member

iCap Vault 1, LLC (DE)

100% Sole Member

Vault Holding, LLC (DE)

100% Sole Member

VH 1121 14th, LLC (DE)

(1121 14th Ave., Seattle, WA)

iCap Vault Management, LLC (DE)

100% Sole Member

iCap Vault Management, LLC is Manager of VH 1121 14th, LLC

VH 2nd Street Office, LLC

Property Address:
2818 E. 2nd Street,
Vancouver, WA 98661



Christopher J. Christensen

100% Sole Shareholder

iCap Enterprises, Inc. (WA)

100% Sole Member

iCap Vault, LLC (DE)

100% Sole Member

iCap Vault 1, LLC (DE)

100% Sole Member

Vault Holding, LLC (DE)

100% Sole Member

VH 2nd Street Office, LLC (DE)

(2818 E. 2nd Street, Vancouver, WA 98661)

100% Sole Member

iCap Vault Management, LLC (DE)

iCap Vault Management, LLC is Manager of VH 2nd Street Office, LLC

VH Pioneer Village, LLC
Property Address:
4318 S. Settler Drive,
Ridgefield, WA 98642



iCap Vault Management, LLC is Manager of VH Pioneer Village, LLC

Christopher J. Christensen

100% Sole Shareholder

iCap Enterprises, Inc. (WA)

100% Sole Member

iCap Vault, LLC (DE)

100% Sole Member

iCap Vault 1, LLC (DE)

100% Sole Member

Vault Holding, LLC (DE)

100% Sole Member

VH 1121 14th, LLC (DE)

(4318 S. Settler Drive, Ridgefield, WA 98642)

100% Sole Member

iCap Vault Management, LLC (DE)

**Exhibit 10**



**Investor.gov**

**U.S. SECURITIES AND
EXCHANGE COMMISSION**

# Ponzi Scheme

A Ponzi scheme is an investment fraud that pays existing investors with funds collected from new investors. Ponzi scheme organizers often promise to invest your money and generate high returns with little or no risk. But in many Ponzi schemes, the fraudsters do not invest the money. Instead, they use it to pay those who invested earlier and may keep some for themselves.

With little or no legitimate earnings, Ponzi schemes require a constant flow of new money to survive. When it becomes hard to recruit new investors, or when large numbers of existing investors cash out, these schemes tend to collapse.

Ponzi schemes are named after Charles Ponzi, who duped investors in the 1920s with a postage stamp speculation scheme.

## Ponzi scheme "red flags"

Many Ponzi schemes share common characteristics. Look for these warning signs:

- **High returns with little or no risk.** Every investment carries some degree of risk, and investments yielding higher returns typically involve more risk. Be highly suspicious of any "guaranteed" investment opportunity.
- **Overly consistent returns.** Investments tend to go up and down over time. Be skeptical about an investment that regularly generates positive returns regardless of overall market conditions.
- **Unregistered investments.** Ponzi schemes typically involve investments that are not registered with the SEC or with state regulators. Registration is important because it provides investors with access to information about the company's management, products, services, and finances.
- **Unlicensed sellers.** Federal and state securities laws require investment professionals and firms to be licensed or registered. Most Ponzi schemes involve unlicensed individuals or unregistered firms.
- **Secretive, complex strategies.** Avoid investments if you don't understand them or can't get complete information about them.

Case 1:23-cv-11775-JLR-RWL   Doc 409   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 32   Page 131 of 132

- **Issues with paperwork.** Account statement errors may be a sign that funds are not being invested as promised.
- **Difficulty receiving payments.** Be suspicious if you don't receive a payment or have difficulty cashing out. Ponzi scheme promoters sometimes try to prevent participants from cashing out by offering even higher returns for staying put.

## Additional Information

Investor Alert: Ponzi Schemes Targeting Seniors (/additional-resources/news-alerts/alerts-bulletins/investor-alert-ponzi-schemes-targeting-seniors)

Investor Alert: Ponzi Schemes Using Virtual Currencies (/additional-resources/news-alerts/alerts-bulletins/investor-alert-ponzi-schemes-using-virtual)

**Exhibit 11**

LII  > Wex  > **Investor Protection Guide: Ponzi Scheme**

# Investor Protection Guide: Ponzi Scheme

Named after Charles Ponzi, who infamously bilked investors out of millions of dollars in the 1920s, a Ponzi scheme is an investment scam that involves the payment of abnormally high "returns" to investors that are actually paid from money contributed by newer investors. While it's possible that a Ponzi scheme may involve some real investment, the distinction between a legitimate investment and a Ponzi scheme is that, in a Ponzi scheme, some of the returns are not from legitimate investments, but are merely a transfer of money from new investors to earlier investors.

Much like a pyramid scheme, this type of investment scheme depends on the recruitment of a sufficient number of new investors to pay high returns to older investors. At some point the stream of new recruits stops growing and this leads to the collapse of the scheme.

While some Ponzi schemes may be sufficiently sophisticated that even the most cautious investors may be duped, there are certain characteristics one can look for in many Ponzi schemes:

- Promises of high returns with little or no risk;
- Unclear investments about which there is limited information; and
- Restricted access to assets.

Often, Ponzi scheme operators will offer investors even more favorable returns if the investors agree not to withdraw their cash.

In a well-publicized case, in 2009 Bernie Madoff was sentenced to a 150-year prison term for carrying out one of the largest Ponzi schemes in history. In 2014, Madoff died in Federal prison.

For more information, see:

23-01213-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 35 Page 0135

- Securities and Exchange Commission (SEC): general information about Ponzi schemes, including common warning signs.
- Investor.gov: Ponzi Scheme
- NPR: Charles Ponzi's scheme
- Business Insider: How Bernie Madoff's Ponzi scheme worked
- Justice Department: Justice Department Announces Total Distribution of Over $4 Billion to Victims of Madoff Ponzi Scheme

[Last updated in June of 2023 by the Wex Definitions Team]

- wex
  - ACADEMIC TOPICS
  - law and economics
  - COMMERCE
  - commercial activities
  - accounting
  - banking
  - finance
  - securities
  - financial events
  - criminal law
  - business sectors
  - commercial transactions
  - criminal law and procedure
  - money and financial problems
  - wex backgrounders

- Keywords
  - securities law
  - investor protection guide

---

📼 Wex Toolbox

---

25-01123-JAW    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 36 Page 136

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy

Case 23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 37 Page 137

**Exhibit 12**



# AG Consumer Protection
Ponzi Schemes

## PONZI SCHEMES

The largest recent example of a Ponzi scheme was that operated by Bernard Madoff, who scammed investors out of billions of dollars. Even though many consumers may think Ponzi schemes are rare and easy to spot, in reality, Ponzi schemes are common, and can fool even very experienced investors into investing large sums of money. This Consumer Alert will provide you with some helpful tips on how to avoid falling for a Ponzi scheme, what to do if you become a victim and where to find additional information.

## A Ponzi scheme? What's that?

A Ponzi scheme is named after Charles Ponzi, who is believed to be the inventor of this type of scam. In the early 20th century, Mr. Ponzi convinced investors that they would get a 40 to 50% on their investment in International Postal Reply Coupons (IPRCs) within 90 days. Early investors received payouts as promised because Mr. Ponzi was using funds from later investors to give the promised payouts to earlier investors. The scam continued to grow, as more and more investors, lured by stories of huge payouts, invested their money in IPRCs. Eventually, the scheme collapsed, but not before investors paid Mr. Ponzi several million dollars - which was an astronomical sum, especially in the early 20th century.

Present day Ponzi schemes operate in essentially the same way as their namesake. Early investors, lured by promises of huge payouts in a short amount of time, invest large sums of money (sometimes even millions of dollars) in whatever investment the perpetrator is selling at a given time. The perpetrator may be offering investments in real estate, natural resources (i.e. oil or natural gas reserves), or any other type of investment a creative perpetrator can come up with.

The hallmark of a "successful" Ponzi scheme is that early investors will receive their payouts as promised. Early investors spread their tales of success to unwittingly entice

2:20-cv-12455-JEL-RSW   Doc # 169-9   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 39   Page 139 of 139

new investors into the scam. Ponzi schemes may continue to grow for several months, or possibly several years, before people eventually catch on, and the scheme collapses.

If experienced investors fall for Ponzi schemes, how can I spot and avoid them?

1. **If it sounds too good to be true, it probably is**. Perpetrators of Ponzi schemes usually guarantee high returns in a short amount of time. Legitimate investments always involve risk, especially in the volatile economic environment that we are currently experiencing. If you are promised a guaranteed return on your investment, or if you are promised a huge return on your investment for very little risk, beware!

2. **Watch out for promoters who do not provide you with clear explanations of how the investment works, or who refuse to provide you with detailed information in writing**. If the person selling the investment refuses to explain how the investment works because it is "too complicated" or "not something you need to worry about", this is a warning sign of potential trouble. The same is true if a seller refuses to provide you with written information on the investment, and how it works. It is very important that you understand your investments and how they work.

3. **Do your homework before you invest**. Most Ponzi schemes are set up as investment contracts, which are considered securities. All securities sold in the State of Michigan must be registered, and for the most part, anyone selling securities is required to be licensed. To check to see if the seller is licensed, visit the Department of Licensing and Regulatory Affairs (LARA) website, or call LARA Securities Division at 517-241-6345.

4. **Sleep on it**. Don't allow yourself to be rushed into investing your money. If a promoter is trying to rush you into investing with promises of huge returns "but only if you act now," walk away.

# I Think I've Invested in a Ponzi Scheme. Now What?

If you've been approached to invest in what appears to be a Ponzi scheme, or if you have invested in what you believe to be a Ponzi scheme, file a complaint with LARA's Bureau of Commercial Services. Visit LARA's website for more information on how to file a securities complaint, or call 517-335-5237.

# For More Information on Investment Scams

If you would like additional information on how to spot investment scams, you may wish to visit the following websites:

- The National Association of Securities Administrators.

- The National Association of Securities Administrators also provides a helpful podcast on how to spot Ponzi schemes.

- The Federal Trade Commission.

25-01243-WLH11   Doc 463   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 40 Page 140

- [The Securities and Exchange Commission](#).

# For General Consumer Complaints, Contact the Attorney General's Consumer Protection Division

If you have a general consumer complaint, please file a complaint with the Attorney General's Consumer Protection Division at:

Consumer Protection Division
P.O. Box 30213
Lansing, MI 48909
517-335-7599
Fax: 517-241-3771
Toll free: 877-765-8388
[Online complaint form](#)



**Ponzi Schemes**

Copyright State of Michigan

25-01242-WLH11   Doc 469   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 41 Page 141

**Exhibit 13**

# Delegation List

Chris Christensen <chris@icapequity.com>

Wed 10/9/2019 4:39 PM

To:Jim Christensen <jim@icapequity.com>

1. **Finish List**
2. **Prioritize**
3. **Delegate**
   a. Jim
   b. Andy
   c. Jonathan
4. **Commitment Table**

**TOP OF LIST**
- East West:  Piper access
- Seaside Bank pw
- Big Picture Goals -- Cash Plan (Shared)
- S-11 by Friday
- Trademark:  review and sign
- Harbor questions:  Jim to educate China team and arrange a demo
  - How can Chinese buy on marketplace?
  - Need to show the team how it works
  - Foreign exchanges?
- Harbor:  Fund 1 summary doc
- Cindy's security concern
- Hohimer

**CHINA**
- Raymond Holiday pay (9/11 email):  follow up with Lisa
- Huasheng/Froton: Chris to copy Ron
- Review proposal from Kevin Liu's team (email 9/13)
- Send Kevin Liu's resume to some firms (email 9/13)

**VAULT**
- ~~Subdocs: Update for custodians (Andy email 9/11)~~
- ~~Selling Agreement - Legal Counsel email:  payments to Chinese marketers (non-US)~~
- Expense allocation document review
- Indenture Agreement:  waiting for review
- S-11 Review
- Deck:  Chris to review
- Selling Agreement (China):
  - Verify agreement
  - Verify payment timing/amount
- Trademark follow up (PC attorney email 7/16)
- Vault Audit: Andy to meet with Tatiana

**FUND 5**
- Engage Auditor:  wait for CFO
- Andy:
  - Website

· **Follow Up with Chris Carsley (Chris to email)**
· OA for each entity:  Jim to verify that agreements are signed and saved (iCap Pacific Income Fund 5, LLC and iCap Holdings, LLC)
· Marketing Materials

   **FUND 6**
· Public Offering

   **HARBOR**
· Harbor:
   · read the summary page draft by Andy (Jim and Andy to finish)
   · Jim to have John C. review documents and collateral agent signature


   **GENERAL**
· iCap Equity:
   · cash flow projections; Fund 1 properties selling?
   · Meet with Piper:  reimbursements; fund 4 office rent
· Tax Planning (Suite 500, LLC; C-corp; etc.)
· Prepare a track record presentation
   · Address Weighted average ROI:
   · Every problem and the solution to go with it
   · Create a marketing brochure
   · Pair it with pro forma and plan going forward
   · apply the new rules to the prior data.
   · Going forward we have the benefit of this.
   · Address Ponzi idea
· AML/KYC checks for Fund 4 (all non-BD investors)
· Update Linkedin (9/16 email from Jami):  Jim to talk with Lisa
· Review Yi Zheng Consulting Agreement (Lisa email 9/5)
· Accounting IPP review (Piper email 9/13)
· Remove TD from credit card


**Chris Christensen**  / *President, JD, MIB*
425-278-9030  x131  /  icapequity.com

iCAP EQUITY

3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

**Exhibit 14**

| Project: Project Name ↑ | Fund | AUM Status | Net Gain/Loss on Investment | Investment Amount | IRR | Sale Price | Project: Sponsor or Purchaser | Date of Investment | Equity Exit Date | Project: Project Address |
|---|---|---|---|---|---|---|---|---|---|---|
| 134th Street Lofts LLC | iCap 134th Street LLC | Take Back | -$235,809.54 | $2,789,630.89 | -6% | | | 12/23/2020 | 7/20/2022 | 13414 NE 23rd Ave, Vancouver, WA 98686 |
| | iCap Northwest Opportunity Fund, LLC | Take Back | -$2,453,311.40 | $3,953,311.40 | -28% | | | 11/16/2015 | 7/31/2022 | 13414 NE 23rd Ave, Vancouver, WA 98686 |
| | iCap Pacific Income Fund 4, LLC | Take Back | -$372,279.54 | $4,499,307.55 | -4% | | | 10/3/2019 | 12/31/2022 | 13414 NE 23rd Ave, Vancouver, WA 98686 |
| Subtotal | | | -$3,061,400.48 | $11,242,249.84 | -38% | $ 38,750,000.00 | Sold to 134th Street Lofts Investors, LLC, Xchange Solutions, Inc, Buchbinder Leverich, LLC | | | |
| 13 Ave W LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $490,053.35 | $525,000.00 | 40% | | Hardly Development Companies | 6/11/2014 | 8/8/2016 | 3637 13th Avenue W, Seattle, WA |
| Subtotal | | | $490,053.35 | $525,000.00 | 40% | | | | | |
| 13th & Emerson LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $321,819.92 | $601,310.00 | 50% | | Hardly Development Companies | 7/23/2014 | 8/3/2016 | 3802 13th Ave. W. & 1208 W. Emerson St., Seattle, WA 98121 |
| | iCap Northwest Opportunity Fund, LLC | Good | $78,244.78 | $957,600.00 | 54% | | Hardly Development Companies | 8/5/2015 | 10/10/2015 | 3802 13th Ave. W. & 1208 W. Emerson St., Seattle, WA 98121 |
| Subtotal | | | $400,064.70 | $1,558,910.00 | 104% | | | | | |
| 1756 NW 60th St LLC | iCap Northwest Opportunity Fund, LLC | Good | $65,281.64 | $266,590.30 | 55% | | Triple Point, LLC | 5/28/2014 | 5/25/2016 | 1756 NW 60th Street, Seattle, WA 98107 |
| Subtotal | | | $65,281.64 | $266,590.30 | 55% | | | | | |
| 17th Ave Group LLC | iCap B2, LLC | Good | $585,331.90 | $669,237.56 | 87% | | Domus Homes, LLC | 11/19/2013 | 7/24/2015 | 111 17th Ave, Seattle, 98122 |
| Subtotal | | | $585,331.90 | $669,237.56 | 87% | | | | | |
| 1st Ave NE Development LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $431,391.89 | $630,240.00 | 47% | | Hardly Development Companies | 5/29/2014 | 10/2/2015 | 3918 1st Avenue NE, Seattle, WA 98105 |
| Subtotal | | | $431,391.89 | $630,240.00 | 47% | | | | | |
| 23rd and Gilman, LLC | iCap Northwest Opportunity Fund, LLC | Good | $320,872.20 | $729,127.80 | 34% | | Domus Homes, LLC | 10/28/2015 | 1/30/2017 | 3816 23rd Ave. W. 3818 23rd Ave W., 3817 Gilman Ave. W., Seattle, WA 98199 |
| Subtotal | | | $320,872.20 | $729,127.80 | 34% | | | | | |
| 313 Prospect Residence, LLC | iCap Northwest Opportunity Fund, LLC | Good | $238,877.93 | $317,098.60 | 33% | | Barcelo Homes Inc | 6/16/2015 | 7/20/2017 | 313 Prospect St, Seattle, WA 98118 |
| Subtotal | | | $238,877.93 | $317,098.60 | 33% | | | | | |
| 4422 Woodlawn LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $86,635.41 | $182,100.00 | 51% | | Hardly Development Companies | 7/21/2014 | 7/2/2015 | 4422 Woodlawn Avenue N, Seattle, WA 98121 |
| Subtotal | | | $86,635.41 | $182,100.00 | 51% | | | | | |
| 725 Broadway LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | $69,152.78 | $1,067,408.57 | 2% | | Boulevard Group Not Sold but investment was paid off by another fund | 7/1/2014 | 7/26/2019 | 725 Broadway, Tacoma, WA 98402 |
| Subtotal | | | $69,152.78 | $1,067,408.57 | 2% | | | | | |
| 76th Ave SE Partners LLC | iCap Northwest Opportunity Fund, LLC | Good | $388,598.84 | $536,500.00 | 27% | | Build Urban | 9/2/2015 | 12/1/2017 | 3847 76th Avenue SE, Mercer Island, WA 98040 |
| Subtotal | | | $388,598.84 | $536,500.00 | 27% | | | | | |
| 9041 48th LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | $175,379.16 | $820,528.36 | 8% | | Chris Brown | 4/30/2014 | 6/14/2018 | 9041 48th Ave South, Seattle, WA 98118 |
| | iCap Northwest Opportunity Fund, LLC | Take Back | $66,185.33 | $530,910.00 | 30% | | Chris Brown | 2/13/2018 | 7/30/2018 | 9041 48th Ave South, Seattle, WA 98118 |

| Project: Project Name ↑ | Fund | AUM Status | Net Gain/Loss on Investment | Investment Amount | IRR | Sale Price | Project: Sponsor or Purchaser | Date of Investment | Equity Exit Date | Project: Project Address |
|---|---|---|---|---|---|---|---|---|---|---|
| Subtotal | | | $241,564.49 | $1,351,438.36 | 38% | $ 1,200,000 | Sold to: Trillium Green LLC | | | |
| Alamo NW LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $342,253.22 | $1,396,404.14 | 21% | | Don Gaube | 6/10/2014 | 9/14/2015 | 15615 Pacific Ave S., Spanaway, Washington 98444 |
| Subtotal | | | $342,253.22 | $1,396,404.14 | 21% | | | | | |
| Alexis Modern LLC | iCap B2, LLC | Default | -$954,352.16 | $954,352.16 | -100% | | Boulevard Group | 12/16/2013 | 7/13/2018 | 1336 W. 6th Avenue, Anchorage, AK 99501 |
| Subtotal | | | -$954,352.16 | $954,352.16 | -100% | | *Cant find docs of sale or foreclosure - my assumption is that it was foreclosed* | | | |
| Aloha Ventures LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $274,017.47 | $372,500.00 | 41% | | Hardly Development Companies | 3/7/2014 | 10/13/2015 | 748 11th Avenue E, Seattle, WA 98102 |
| Subtotal | | | $274,017.47 | $372,500.00 | 41% | | | | | |
| Ankeny Building LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $960,723.38 | $1,704,500.00 | 35% | | Parker McNulty | 3/26/2015 | 9/30/2016 | 1452 E. Burnside Street, Portland, OR 97214 |
| Subtotal | | | $960,723.38 | $1,704,500.00 | 35% | | | | | |
| Barcelo Madison Park LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Alert | $1,042,134.14 | $840,414.35 | 26% | | Barcelo Homes, Inc | 12/29/2014 | 3/25/2019 | 2307 43rd Ave SE, Seattle, WA 98112 |
| Subtotal | | | $1,042,134.14 | $840,414.35 | 26% | | | | | |
| BDR Kirkland II LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $845,742.88 | $833,000.00 | 38% | | BDR Capital Partners | 6/27/2014 | 10/27/2016 | 420 7th Ave. / 1118 2nd St., Kirkland, WA 98034 |
| Subtotal | | | $845,742.88 | $833,000.00 | 38% | | | | | |
| BDR Kirkland V, LLC | iCap Northwest Opportunity Fund, LLC | Good | $259,508.55 | $1,246,000.00 | 41% | | BDR Capital Partners | 8/7/2015 | 2/29/2016 | 6214 NE Lake Washington Blvd., Kirkland, WA 98033 |
| Subtotal | | | $259,508.55 | $1,246,000.00 | 41% | | | | | |
| BDR Medina III LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $1,066,673.05 | $1,296,032.50 | 40% | | BDR Capital Partners | 10/24/2014 | 10/31/2016 | 2038 79th Ave. NE, Medina, WA 98039 |
| Subtotal | | | $1,066,673.05 | $1,296,032.50 | 40% | | | | | |
| BDR Yarrow Point II LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $707,610.92 | $724,999.99 | 44% | | BDR Capital Partners | 4/15/2014 | 3/17/2016 | 3823 94TH AVENUE NORTHEAST, Bellevue, WA 98004 |
| Subtotal | | | $707,610.92 | $724,999.99 | 44% | | | | | |
| Belvidere Investors LLC | iCap Northwest Opportunity Fund, LLC | Default | -$479,346.63 | $479,346.63 | -100% | | MK West | 12/8/2015 | 7/23/2021 | 2318 Belvidere Ave SW, Seattle, WA 98126 |
| Subtotal | | | -$479,346.63 | $479,346.63 | -100% | | | | | |
| BU 1121 14th LLC | iCap Northwest Opportunity Fund, LLC | Take Back | $144,648.63 | $460,613.19 | 18% | | Build Urban | 12/21/2018 | 12/2/2021 | 1121 14th Ave, Seattle, WA 98122 |
| | iCap Pacific Income Fund 5, LLC | Take Back | -$30,307.39 | $1,041,676.86 | -2% | | Build Urban | 6/9/2020 | 12/2/2021 | 1121 14th Ave, Seattle, WA 98122 |
| Subtotal | | | $114,341.24 | $1,482,290.05 | 16% | | $ 3,875,000 | Sold to: VH 1121 14th Ave | | | |
| BU 2412 10th LLC | iCap Pacific Income Fund 4, LLC | Take Back | -$839,045.20 | $839,045.20 | -100% | | Build Urban | 11/5/2019 | 11/30/2021 | 2412 10th Ave E, Seattle, WA 98102 |

| Project: Project Name ↑ | Fund | AUM Status | Net Gain/Loss on Investment | Investment Amount | IRR | Sale Price | Project: Sponsor or Purchaser | Date of Investment | Equity Exit Date | Project: Project Address |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | *This project is in a receivership with Sound Equity. The receiver will build out the project with the potential for a profit share at the sale of the units.* | | | |
| Subtotal | | | -$839,045.20 | $839,045.20 | -100% | | | | | |
| BU 6647 Windermere LLC | iCap Pacific Income Fund 5, LLC | Take Back | -$259,062.92 | $259,062.92 | -100% | | Build Urban *Foreclosure* | 2/21/2020 | 9/30/2021 | 6659 NE Windermere Road, Seattle, WA 98115 |
| Subtotal | | | -$259,062.92 | $259,062.92 | -100% | | | | | |
| BU 7902 Greenlake LLC | iCap Equity, LLC | Take Back | -$606,731.97 | $606,731.97 | -100% | | Build Urban | 8/17/2018 | 11/30/2021 | 7902 Green Lake Drive N, Seattle, WA 98103 |
| | | | | | | | *This project is in a receivership with Sound Equity. The receiver will build out the project with the potential for a profit share at the sale of the units.* | | | |
| Subtotal | | | -$606,731.97 | $606,731.97 | -100% | | | | | |
| Calafia LLC | iCap B2, LLC | Good | $147,390.35 | $109,000.00 | 135% | | Domus Homes, LLC | 12/23/2013 | 5/6/2014 | 1633 A California Avenue Southwest, Seattle, WA 98116 |
| Subtotal | | | $147,390.35 | $109,000.00 | 135% | | | | | |
| Capital Hill Development LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $678,515.34 | $1,034,752.86 | 54% | | Hardy Development Companies | 11/5/2014 | 2/29/2016 | 1123 E. John St., Seattle, Washington 98102 |
| Subtotal | | | $678,515.34 | $1,034,752.86 | 54% | | | | | |
| Charlestown Street LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $426,392.36 | $1,039,999.90 | 34% | | Domus Homes, LLC | 3/20/2015 | 6/15/2016 | 3801 Martin Luther King Way S, Seattle, WA 98108 |
| Subtotal | | | $426,392.36 | $1,039,999.90 | 34% | | | | | |
| Colpitts Sunset LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | $1,420,925.32 | $1,579,074.68 | 34% | | | 1/7/2015 | 3/31/2017 | 2715 Sunset Lane NE, Renton, WA 98056 |
| | iCap B1, LLC | Take Back | $743,108.31 | $1,571,509.00 | 47% | | Sold to: Olympia Hotel Group, LLC, Sunset Living, LLC, Sunset Terrace WA, LLC | 9/20/2013 | 1/8/2015 | 2715 Sunset Lane NE, Renton, WA 98056 |
| Subtotal | | | $2,164,033.63 | $3,150,583.68 | 81% | $ 44,000,000 | | | | |
| Columbia Property Managers LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | -$1,058,881.90 | $1,088,881.90 | -53% | | Olympic Cascade Drive Ins LLC Sold to: NuGrowth Capital II | 12/26/2014 | 1/5/2022 | 21895 Viking Ave NW, Poulsbo, WA 98370 |
| Subtotal | | | -$1,058,881.90 | $1,088,881.90 | -53% | $ 30,000 | | | | |
| Denali Townhomes LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Alert | -$199,321.89 | $199,321.89 | -100% | | Steve White | 9/17/2014 | 8/5/2019 | 3426 W. 7th Avenue, Kennewick, WA 99366 |
| Subtotal | | | -$199,321.89 | $199,321.89 | -100% | | | | | |
| Drake 93rd LLC | iCap B2, LLC | | -$73,018.23 | $211,272.89 | -35% | | | 11/8/2013 | 7/20/2017 | 2008 and 2010 93rd Avenue SE, Olympia, WA 98501 |
| Subtotal | | | -$73,018.23 | $211,272.89 | -35% | | | | | |
| ENT Ventures II LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $166,215.16 | $430,389.82 | 18% | | Parker McNulty | 12/29/2014 | 5/15/2017 | 2240- 2248 NE MLK Jr Blvd, Portland, OR 97201 |
| Subtotal | | | $166,215.16 | $430,389.82 | 18% | | | | | |

| Project: Project Name ↑ | Fund | AUM Status | Net Gain/Loss on Investment | Investment Amount | IRR | Sale Price | Project: Sponsor or Purchaser | Date of Investment | Equity Exit Date | Project: Project Address |
|---|---|---|---|---|---|---|---|---|---|---|
| ENT Ventures LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $582,588.56 | $1,948,884.00 | 18% | | Parker McNulty | 12/29/2014 | 9/2/2016 | 1825 NW 23rd Avenue, Portland, OR 97210 |
| Subtotal | | | $582,588.56 | $1,948,884.00 | 18% | | | | | |
| ENT Ventures IV LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $127,208.55 | $400,358.79 | 14% | | Parker McNulty | 2/13/2015 | 9/28/2018 | 422 NE Ivy Street, Portland, OR 97212 |
| Subtotal | | | $127,208.55 | $400,358.79 | 14% | | | | | |
| Hayden Meadows LLC | iCap Northwest Opportunity Fund, LLC | Good | $217,565.01 | $1,084,010.80 | 30% | | Taliesin Homes NW, LLC | 3/10/2016 | 4/12/2017 | SW Binford Ave. and SW 43rd St., Pleasant Valley, OR 97080 |
| Subtotal | | | $217,565.01 | $1,084,010.80 | 30% | | | | | |
| High Country Soundview Manor LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | -$2,181,937.09 | $3,329,207.99 | -54% | | High Country Homes 1, Inc. | 4/17/2014 | 3/31/2018 | 4400 SW Dash Point Road, Federal Way, WA 98034 |
| Subtotal | | | -$2,181,937.09 | $3,329,207.99 | -54% | | | | | |
| Hillsboro Acquisition I LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $170,512.23 | $1,606,500.00 | 43% | | Kirkland Development, LLC | 5/21/2015 | 8/31/2015 | 21685 NW Cherry Lane, Hillsboro, OR 97123 |
| Subtotal | | | $170,512.23 | $1,606,500.00 | 43% | | | | | |
| iCap Brislawn LLC | iCap Northwest Opportunity Fund, LLC | Good | $115.94 | $1,473,725.59 | 0% | | Hultquist Homes Inc | 8/17/2015 | 12/30/2019 | 7918 120th Place SE, Newcastle, WA 98055 |
| | iCap EVO, LLC | Good | -$46,927.00 | $468,927.00 | 8% | | Hultquist Homes Inc | 9/30/2016 | 3/26/2020 | 7918 120th Place SE, Newcastle, WA 98055 |
| Subtotal | | | -$46,811.06 | $1,942,652.59 | 8% | | | | | |
| iCap Campbell Way LLC | iCap B1, LLC | Good | $145,294.87 | $632,038.00 | 23% | | iCap Equity, LLC | 9/20/2013 | 10/31/2014 | 1231 Campbell Way, Bremerton, WA 98310 |
| Subtotal | | | $145,294.87 | $632,038.00 | 23% | | | | | |
| iCap Delridge Way LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $103,878.78 | $408,652.84 | 9% | | iCap Equity, LLC | 2/21/2014 | 5/9/2017 | 5206 Delridge Way SW, Seattle, WA 98106 |
| Subtotal | | | $103,878.78 | $408,652.84 | 9% | | | | | |
| iCap Finn Hill LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | -$746,910.41 | $3,061,618.00 | -25% | | iCap Equity, LLC | 10/29/2015 | 6/24/2019 | 11907 84th Avenue NE, Kirkland, WA 98034 |
| | iCap Northwest Opportunity Fund, LLC | Good | -$284,826.07 | $1,491,229.99 | -29% | | iCap Equity, LLC | 2/2/2016 | 6/24/2019 | 11907 84th Avenue NE, Kirkland, WA 98034 |
| Subtotal | | | -$1,031,736.48 | $4,552,847.99 | -54% | | | | | |
| iCap Finn Meadows LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $48,212.30 | $150,949.35 | 21% | | iCap Equity, LLC | 4/17/2015 | 9/16/2016 | 12606 82nd Ave, Kirkland, WA 98034 |
| | iCap Northwest Opportunity Fund, LLC | Good | -$252,259.06 | $2,141,131.84 | -6% | | iCap Equity, LLC | 1/11/2016 | 5/8/2019 | 12606 82nd Ave, Kirkland, WA 98034 |
| Subtotal | | | -$204,046.76 | $2,292,081.19 | 15% | | | | | |
| iCap Lakeview LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $108,947.45 | $1,092,990.28 | 46% | | iCap Equity, LLC | 5/7/2015 | 9/22/2015 | 1125 N 40th St., Renton, WA 98056 |
| | iCap Northwest Opportunity Fund, LLC | Good | -$528,516.35 | $2,393,013.73 | -14% | | iCap Equity, LLC | 5/6/2015 | 7/12/2019 | 1125 N 40th St., Renton, WA 98056 |
| | iCap EVO, LLC | Good | -$729,945.00 | $2,685,145.00 | -17% | | iCap Equity, LLC | 5/6/2015 | 7/12/2019 | 1125 N 40th St., Renton, WA 98056 |
| Subtotal | | | -$1,149,513.90 | $6,171,149.01 | 15% | | | | | |
| iCap Rhody Ridge LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | -$48,959.71 | $1,331,891.33 | -2% | | iCap Equity, LLC | 10/16/2015 | 4/19/2019 | 11230 SE 80th St., Newcastle, WA 98056 |
| | iCap Northwest Opportunity Fund, LLC | Good | -$25,936.51 | $3,418,463.67 | -1% | | iCap Equity, LLC | 10/1/2015 | 4/19/2019 | 11230 SE 80th St., Newcastle, WA 98056 |
| Subtotal | | | -$74,896.22 | $4,750,355.00 | -3% | | | | | |

| Project: Project Name ↑ | Fund | AUM Status | Net Gain/Loss on Investment | Investment Amount | Sale Price | IRR | Project: Sponsor or Purchaser | Date of Investment | Equity Exit Date | Project: Project Address |
|---|---|---|---|---|---|---|---|---|---|---|
| KBRI6 LLC | iCap Northwest Opportunity Fund, LLC | Good | -$109,703.53 | $890,266.94 | | -5% | Nexus Homes, LLC | 6/29/2015 | 4/16/2018 | 7718 NE 141st Street, Kirkland, WA 98034 |
| Subtotal | | | -$109,703.53 | $890,266.94 | | -5% | | | | |
| KR3 LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | $142,107.56 | $357,892.44 | | 31% | Nexus Homes, LLC | 3/27/2015 | 7/7/2016 | 126XX 80th Ave NE, Kirkland, WA 98034 |
| Subtotal | | | $142,107.56 | $357,892.44 | | 31% | | | | |
| Lake Sammamish Home 1 LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $430,506.38 | $404,518.60 | | 227% | Michael Rundle | 6/30/2014 | 3/31/2015 | 20929 SE 14th Place, Sammamish, WA 98075 |
| Subtotal | | | $430,506.38 | $404,518.60 | | 227% | | | | |
| Lake Union Estates LLC | iCap Northwest Opportunity Fund, LLC | Take Back | $238,215.26 | $4,433,765.01 | | 4% | Hardly Development Companies | 4/15/2016 | 10/19/2017 | 2236 Fairview Ave. E, Seattle, WA 98102 |
| Subtotal | | | $238,215.26 | $4,433,765.01 | | 4% | | | | |
| Lyle 113th Ave LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | -$147,924.08 | $883,648.75 | | -12% | Lyle Homes, Inc. | 11/21/2013 | 2/13/2017 | 3218 113th Avenue SE, Bellevue, WA 98004 |
| | iCap B1, LLC | Take Back | $168,829.59 | $445,348.00 | | 38% | Lyle Homes, Inc. | 9/20/2013 | 11/18/2014 | 3218 113th Avenue SE, Bellevue, WA 98004 |
| Subtotal | | | $20,905.51 | $1,328,996.75 | | 26% | | | | |
| Mercer 36 LLC | iCap Northwest Opportunity Fund, LLC | Good | $228,547.31 | $264,609.60 | | 35% | Noble Ridge Construction, Inc. | 6/1/2015 | 6/23/2017 | 8435 SE 36th St., Mercer Island, WA 98040 |
| Subtotal | | | $228,547.31 | $264,609.60 | | 35% | | | | |
| Meridian Greens Holdings LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | -$2,389,747.05 | $2,410,825.27 | | -91% | JR Sampson Company | 5/30/2014 | 3/31/2018 | 1359 97th Ave. E, Puyallup, WA 98373 |
| Subtotal | | | -$2,389,747.05 | $2,410,825.27 | | -91% | | | | |
| Mill Slope LLC | iCap B2, LLC | | $0.00 | $78,287.40 | | 0% | Domus Homes, LLC | 11/19/2013 | 3/3/2014 | 1622 E. Yesler Way, Seattle, WA 98122 |
| Subtotal | | | $0.00 | $78,287.40 | | 0% | | | | |
| Pearl and Delores LLC | iCap Northwest Opportunity Fund, LLC | Good | $368,901.68 | $676,239.60 | | 34% | Domus Homes, LLC | 12/29/2015 | 8/10/2017 | 5153 and 5159 42nd Ave. S., Seattle, WA 98118 |
| Subtotal | | | $368,901.68 | $676,239.60 | | 34% | | | | |
| Richland Acquisition LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | $1,042,348.88 | $1,739,848.37 | | -29% | Kirkland Development, LLC | 9/18/2015 | 12/6/2019 | 345 George Washington Way, Richland, WA 99352 |
| Subtotal | | | $1,042,348.88 | $1,739,848.37 | | -29% | | | | |
| Ruby 62 Holdings LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | -$1,578,269.08 | $1,795,428.77 | | -39% | JR Sampson Company | 6/3/2014 | 8/20/2018 | 7701 Ruby Drive SW, Lakewood, WA 98498 |
| Subtotal | | | -$1,578,269.08 | $1,795,428.77 | | -39% | | | | |
| Sampson 45th Avenue LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | -$601,972.56 | $1,782,998.71 | | -47% | JR Sampson Company | 11/21/2014 | 3/31/2017 | 4109 45th Avenue NE, Tacoma, WA 98422 |
| | iCap B1, LLC | Take Back | -$12,305.91 | $602,529.00 | | -2% | JR Sampson Company | 9/30/2013 | 12/9/2014 | 4109 45th Avenue NE, Tacoma, WA 98422 |
| Subtotal | | | -$614,278.47 | $2,385,527.71 | | -49% | | | | |
| Senza Kenmore LLC | iCap Northwest Opportunity Fund, LLC | Good | $189,008.35 | $1,268,273.65 | | 5% | iCap Equity, LLC | 1/10/2016 | 4/13/2020 | 15550 84th Avenue NE, Kenmore, WA 98028 |
| Subtotal | | | $189,008.35 | $1,268,273.65 | | 5% | | | | |
| Senza Sammamish LLC | iCap Northwest Opportunity Fund, LLC | Good | $149,121.51 | $2,870,876.03 | | 2% | iCap Equity, LLC | 12/16/2015 | 6/29/2018 | 24906 SE 14th St., Sammamish, WA 98075 |

| Project: Project Name ↑ | Fund | AUM Status | Net Gain/Loss on Investment | Investment Amount | IRR | Sale Price | Project: Sponsor or Purchaser | Date of Investment | Equity Exit Date | Project: Project Address |
|---|---|---|---|---|---|---|---|---|---|---|
| Subtotal | | | $149,121.51 | $2,870,876.03 | 2% | | | | | |
| Seward Park Partners, LLC | iCap Northwest Opportunity Fund, LLC | Good | $449,112.14 | $535,200.00 | 39% | | | 10/6/2015 | 8/9/2017 | 7740 Seward Park Ave., Seattle, WA 98118 |
| Subtotal | | | $449,112.14 | $535,200.00 | 39% | | | | | |
| Sherwin Roosevelt LLC | iCap B1, LLC | Good | $33,300.00 | $107,741.00 | 31% | | | 9/20/2013 | 1/15/2014 | 1203 Roosevelt Blvd, Bremerton, WA 98312 |
| Subtotal | | | $33,300.00 | $107,741.00 | 31% | | | | | |
| Steadman 170th LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | $117,142.48 | $569,656.14 | 14% | | | 7/31/2014 | 12/27/2016 | 3831 170th Avenue SE, Bellevue, WA 98008 |
| | iCap B2, LLC | Take Back | -$271,204.26 | $271,204.26 | 0% | | | 11/15/2013 | 10/31/2016 | 3831 170th Avenue SE, Bellevue, WA 98008 |
| Subtotal | | | -$154,061.78 | $840,860.40 | 14% | | | | | |
| TCG Investments LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | $1,065,206.47 | $1,100,002.00 | 31% | | Hang Ngoc Hoang | 6/30/2014 | 9/15/2017 | 18628 Highway 99, Lynnwood, WA 98037 |
| | iCap Northwest Opportunity Fund, LLC | Take Back | $296,008.75 | $1,276,618.50 | 23% | | Hang Ngoc Hoang | 9/15/2017 | 11/15/2018 | 18628 Highway 99, Lynnwood, WA 98037 |
| Subtotal | | | $1,361,215.22 | $2,376,620.50 | 54% | | | | | |
| Timberland Hotel Group LLC | iCap Northwest Opportunity Fund, LLC | Alert | $2,383,489.45 | $4,336,398.00 | 21% | | Kirkland Development, LLC | 4/21/2016 | 7/19/2021 | NW Barnes Road & 118th Ave, Portland, OR 97229 |
| Subtotal | | | $2,383,489.45 | $4,336,398.00 | 21% | | | | | |
| USAsia- Seattle Modern Living LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | -$1,408,075.91 | $1,567,472.91 | -49% | | Hultquist Homes Inc | 4/23/2014 | 5/31/2019 | 4912 S. Willow Street, Seattle, WA 98118 |
| | iCap Northwest Opportunity Fund, LLC | Take Back | $768,702.26 | $2,381,320.25 | 8% | | Hultquist Homes Inc | 11/1/2017 | 12/26/2019 | 4912 S. Willow Street, Seattle, WA 98118 |
| | iCap Investments, LLC | Take Back | $0.00 | $0.00 | 0% | | Hultquist Homes Inc | 12/1/2019 | 12/1/2019 | 4912 S. Willow Street, Seattle, WA 98118 |
| Subtotal | | | -$639,373.65 | $3,948,793.16 | -41% | | | | | |
| Volare Townhomes LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $162,881.92 | $916,221.50 | 27% | | Taliesin Homes NW, LLC | 2/20/2015 | 1/15/2016 | 11295 SE Aquila Street, Happy Valley, OR 97086 |
| Subtotal | | | $162,881.92 | $916,221.50 | 27% | | | | | |
| Wild Creek Estates LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Take Back | -$86,123.08 | $511,534.21 | -17% | | | 4/21/2014 | 9/3/2019 | 4981 SE Natchez Court, Port Orchard, WA 98366 |
| Subtotal | | | -$86,123.08 | $511,534.21 | -17% | | | | | |
| Woodlawn Ave Townhomes LLC | iCap Pacific Northwest Opportunity & Income Fund, LLC | Good | $190,803.33 | $401,876.25 | 51% | | Hardy Development Companies | 7/21/2014 | 7/2/2015 | 4426 Woodlawn Ave N, Seattle, WA 98103 |
| Subtotal | | | $190,803.33 | $401,876.25 | 51% | | | | | |
| Total | | | $1,374,532.03 | $103,376,123.24 | 909% | | | | | |

**Exhibit 15**

## RE: iCap Summary Spreadsheet - Finance Leadership Meeting

Neil Peritz <neil@icapequity.com>

Tue 10/25/2022 7:03 PM

To:Rich Jackson <rich@icapequity.com>

Some look close others not even in the ball park.  UW and 725 Broadway numbers make no sense to me.  UW hasn't started development and 725 Broadway is a parking garage we are demolishing soon to develop so how to you get $19.3MM in equity on that one?  I went through the schedule I sent you earlier with Nikki to see if she can update the property basis through June 30, 2022 that include millions of overhead costs.   May not be ready for meeting tomorrow.

Neil

**Neil Peritz**  /  *Vice President, Finance*

425-278-9030 ext. 149  /  icapequity.com

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

**From:** Rich Jackson <rich@icapequity.com>
**Sent:** Tuesday, October 25, 2022 6:31 PM
**To:** Neil Peritz <neil@icapequity.com>
**Subject:** FW: iCap Summary Spreadsheet - Finance Leadership Meeting

Do the numbers on this spreadsheet tie to our consolidated balance sheet?

**From:** Jim Christensen <jim@icapequity.com>
**Sent:** Thursday, October 6, 2022 11:34 AM
**To:** Rich Jackson <rich@icapequity.com>; Chris Christensen <chris@icapequity.com>; Neil Peritz <neil@icapequity.com>
**Cc:** Lisa Yeager <lisa@icapequity.com>; Skye Belote <skyeb@icapequity.com>
**Subject:** iCap Summary Spreadsheet - Finance Leadership Meeting

Hi Team,

Attached is the spreadsheet in its current form.  It is still a work in progress, and I will continue to work on it.

Thanks,

**Jim Christensen**  /  *President*

425-278-9030 ext. 132  /  icapequity.com

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

-----Original Appointment-----
**From:** Rich Jackson <rich@icapequity.com>
**Sent:** Friday, August 12, 2022 11:01 AM
**To:** Rich Jackson; Chris Christensen; Jim Christensen; Neil Peritz
**Cc:** Lisa Yeager; Skye Belote
**Subject:** Finance Leadership Meeting (bi-monthly)
**When:** Thursday, October 6, 2022 12:00 PM-1:00 PM (UTC-07:00) Mountain Time (US & Canada).
**Where:**

Setting up a bi-monthly meeting to review financial matters. Over time our goal is to bring more structure and rigor to financial planning, forecasting and treasury processes.

In this first meeting, we will follow the same current processes for financial updates and money movement, and discuss ideas for iterative improvement or additional needs for financial reporting for the leadership team.

---

# Microsoft Teams meeting

**Join on your computer or mobile app**
[Click here to join the meeting](#)

Meeting ID: 292 462 891 881
Passcode: df4Axs
[Download Teams](#) | [Join on the web](#)

**Or call in (audio only)**
[+1 469-225-3558,,537989739#](#)   United States, Dallas
Phone Conference ID: 537 989 739#
[Find a local number](#) | [Reset PIN](#)

[Learn More](#) | [Meeting options](#)

---

**Exhibit 16**

### RE: Lakeview and Brislawn

Chris Christensen <chris@icapequity.com>

Thu 7/12/2018 1:01 PM

To:Jim Christensen <jim@icapequity.com>;TD Croshaw <td@icapequity.com>

Thanks!

---

**From:** Jim Christensen
**Sent:** Thursday, July 12, 2018 12:52 PM
**To:** Chris Christensen <chris@icapequity.com>; TD Croshaw <td@icapequity.com>
**Subject:** RE: Lakeview and Brislawn

That's the idea, but there is more that I need to put together for him before we send an email today.  I will have it out today.

Thanks,

**Jim Christensen**  /  *Chief Operating Officer*
425-278-9030 ext. 132  /  icapequity.com
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Chris Christensen
**Sent:** Thursday, July 12, 2018 12:50 PM
**To:** TD Croshaw <td@icapequity.com>
**Cc:** Jim Christensen <jim@icapequity.com>
**Subject:** RE: Lakeview and Brislawn

Should we send what we have now, and let him know the rest is coming?

---

**From:** TD Croshaw
**Sent:** Thursday, July 12, 2018 11:53 AM
**To:** Chris Christensen <chris@icapequity.com>
**Cc:** Jim Christensen <jim@icapequity.com>
**Subject:** RE: Lakeview and Brislawn

Chris,
I have given all this information to Jim to send in one email.  Jim is working on the other information.
Thank you,

**TD Croshaw**  /  *Chief Financial Officer, CPA, MBA*
425-278-9030  x127  /  icapequity.com



3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Chris Christensen
**Sent:** Thursday, July 12, 2018 11:50 AM
**To:** TD Croshaw <td@icapequity.com>
**Cc:** Jim Christensen <jim@icapequity.com>

**Subject:** FW: Lakeview and Brislawn

TD,

Can you provide some of this?

**From:** Michael Norvet <mnorvet@titansecurities.com>
**Sent:** Wednesday, July 11, 2018 5:24 AM
**To:** Chris Christensen <chris@icapequity.com>
**Subject:** FW: Lakeview and Brislawn

Chris,
Please see the email chain below. I have not received any of the information requested as of this morning. In addition, I have repeatedly requested that someone at ICAP contact Daniel Hoffman (Don Wells client; $25,000 in Fund I) to discuss a redemption. You indicated in an email on June 27th that you would provide the information.
mn

**From:** Michael Norvet
**Sent:** Wednesday, June 27, 2018 9:49 AM
**To:** 'Chris Christensen' <chris@icapequity.com>
**Subject:** RE: Lakeview and Brislawn

Thank You

**From:** Chris Christensen <chris@icapequity.com>
**Sent:** Wednesday, June 27, 2018 9:43 AM
**To:** Michael Norvet <mnorvet@titansecurities.com>; Jim Christensen <jim@icapequity.com>; TD Croshaw <td@icapequity.com>
**Subject:** RE: Lakeview and Brislawn

Michael,

We will send the information you requested.

Chris

**From:** Michael Norvet [mailto:mnorvet@titansecurities.com]
**Sent:** Tuesday, June 26, 2018 12:01 PM
**To:** Chris Christensen <chris@icapequity.com>; Jim Christensen <jim@icapequity.com>; TD Croshaw <td@icapequity.com>
**Subject:** Lakeview and Brislawn

Chris,

Brad and I have talked to Roger Overby who we understand has also spoken to you regarding the Evolution Real Estate investments in Lakeview and Brislawn. Brad and I are both of the opinion that had we been informed of the transactions in January (as was required under the ICAP EVO, LLC Company Agreement) we would have **NEVER** accepted the sales price you unilaterally agreed to. As a result, we reserve the right to take the necessary steps to cancel the sales contracts.

Our many attempts to determine the true loss on the investments has been difficult. The closing statement has changed after each time we have spoken. The best estimate at this time is a loss of approximately $500,000 which is completely unacceptable. After three years of investment in the hottest real estate market in the country according to the ICAP newsletters, we expected and

deserved better.

In order for Evolution Real Estate to determine the next course of action we will require the following by July 5, 2018:

1. Copies of the bank statement where the Earnest Money is deposited.
2. An executed copy of the $4,300,000 note between Lakeview and ICAP Pacific Northwest Fund.
3. A reliable copy of the Closing statement for each property with a detailed explanation of every item over $50,000.
4. The exact cash investment by ICAP in the Lakeview and Brislawn properties.
5. A detailed **Plan of Action** that includes the return of our investors' money and an IRR of 8%. As of August 31, 2018, that amount equals $4,180,000.

We are not opposed to seeking a resolution to this problem but is incumbent upon you and ICAP to take the necessary steps to offer alternatives. This affair has shaken our trust in ICAP. We are asking you to begin the process of restoring our relationship.

Michael Norvet
Managing Member
Evolution Real Estate
16775 Addison Road, Suite 202
Addison, Texas 75001
972-980-5923 – O
214-491-7212 – M
mnorvet@titansecurities.com

**Exhibit 17**

## RE: Combined F/S

**Rich Jackson** <rich@icapequity.com>

Tue 10/25/2022 3:27 PM

To:Neil Peritz <neil@icapequity.com>
Bcc:Rich Jackson <rich@icapequity.com>

Thank you for pulling this together.  A lot to sort through, but this is a good start.

The numbers seem consistent with other reports I've seen.  I think we will have enough here for our Finance conversation tomorrow.

I am still trying to think through the relationship between the assets and funds.  If there are situations were more than one fund invests in the real estate assets, then there could be some discrepancies. So, I'd like to think through how to value the specific properties, and if we need to decouple from the funds so they are not double counted (or just make sure they are only tied to one fund).

---

**From:** Neil Peritz <neil@icapequity.com>
**Sent:** Tuesday, October 25, 2022 9:24 AM
**To:** Rich Jackson <rich@icapequity.com>
**Subject:** RE: Combined F/S

Updated for 134th street LLC.  I now agree all the debt to the outstanding amounts.  You still need to add in all the projects which will take better part of day and I need to focus on Vault and legacy fund audits and updates for 2022.

Neil

**Neil Peritz**  /  *Vice President, Finance*
425-278-9030 ext. 149  /  icapequity.com
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Neil Peritz
**Sent:** Monday, October 24, 2022 8:28 PM
**To:** Rich Jackson <rich@icapequity.com>
**Subject:** Combined F/S

I spent a lot of time on this and there are still intercompany entries going all over the place and nobody seems to know what's up.   I have no idea of all the entities out there to consolidate so I ran an earlier debt schedule of all entities that had outstanding debentures and used them for reporting. The BS has intercompany balances that don't eliminate and not sure why, but the debt makes sense at over $200MM.

So here is the deal, I spent the better part of the day and still working after 8PM my time.  The Vault auditors are now threatening me if I don't get 10Q to them very soon, we will not be able to issue on time.  I need to put pencils down on this and the only other supporting schedule to this file is the schedule of properties.  I will try to get Nikki to do that tomorrow to back up the BS.  You must run reports in SalesForce and manipulate it in Excel and it takes awhile and no easy way to do it.   The HEB auditors came up with last minute requests for analysis on Friday or they won't release funds 4 and 5 so that's killing me too.

The way things are booked are so convoluted and this is the 1st time I've ever tried putting them together.  These are basically the funds and not the projects underneath the funds.   If I add the

projects then the investments are duplicated.


Neil

**Neil Peritz** / *Vice President, Finance*
425-278-9030 ext. 149 / icapequity.com
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

**Exhibit 18**

# Cash Follow Up

Chris Christensen <chris@icapequity.com>

Thu 4/14/2022 7:47 AM

To:Cindy Fang <cindy@icapequity.com>;Jim Christensen <jim@icapequity.com>

📎 1 attachments (43 KB)

220415 – Semi-monthly Expense Projections.xlsx;

Hi Cindy and Jim,

Since we are going to be working together on the operating cash needs, I wanted to share with you the proposed plan for today's transfers.  As we discussed, we do transfers two times each month. The 15th of the month is the big one for the interest payments.  Below are the proposed cash transfers.  Here are the highlights:

1. iCap Equity is covering a big portion of the expenses from funds we have raised.
2. Senza Kenmore is transferring $285K to Fund 4 to cover Fund 4 investor payoffs (these funds belong to Fund 4, but we have not distributed them out of Senza Kenmore yet)
3. iCap Investments would need to transfer $885K.  There is currently $1.5M in the account for iCap Investments.

We are planning to raise more funds in iCap Equity over the next few weeks.  Let me know if you have any questions.

| | Proposed Transfers | | |
|---|---|---|---|
| | **From** | **To** | **Amount** |
| 1 | iCap Investment | Equity | $ 885,000.00 |
| 2 | iCap Funding | Equity | $ - |
| 3 | Equity | Fund 1 | $ 265,000.00 |
| 4 | Equity | Fund 2 | $ 277,000.00 |
| 5 | Senza Kenmore | Fund 4 | $ 285,000.00 |
| 6 | Equity | Fund 5 | $ 35,000.00 |
| 7 | Equity | iCap 134th Street | $ 8,000.00 |
| 8 | Equity | iCap PNWM | $ 52,000.00 |
| 9 | Equity | iCap Enterprises | $ - | Done trnf on 4/13 |
| 10 | Fund 5 | Campbell | $ 4,200.00 |

**Chris Christensen** / *CEO, JD, MIB*

425-278-9031 / icapequity.com



3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

**Exhibit 19**

**RE: Jinan wiring instruction -transfers and wire are ready for approval in Umpqua.**

Chris Christensen <chris@icapequity.com>
Thu 12/22/2022 12:57 PM

To:Vera Rohlfing <vera@icapequity.com>
Cc:Jian Lu <kristyjian@icapequity.com>;Jane Li <Jane@icapequity.com>

Excellent.  I will work on that now.

---

**From:** Vera Rohlfing <vera@icapequity.com>
**Sent:** Thursday, December 22, 2022 12:04 PM
**To:** Chris Christensen <chris@icapequity.com>
**Cc:** Jian Lu <kristyjian@icapequity.com>; Jane Li <Jane@icapequity.com>; Vera Rohlfing <vera@icapequity.com>
**Subject:** FW: Jinan wiring instruction -transfers and wire are ready for approval in Umpqua.

Hi Chris,

To pay from the iCap International Investments bank account we need cash there. I added #1 and modified #3.
Please see below the transfers that were setup in the bank and approve in order, then approve the wire out of iCap International investments LLC.

1. **Repayment of intercompany balance of $500K, from Vault to 725 Broadway** - ready
2. Intercompany loan of $500K, from 725 Broadway to iCap Investments- ready
3. Intercompany loan of $500K from iCap Investments to iCap International Investments- will do transfer between the companies
4. Vault Withdrawal of **$1,500,075** by iCap International Investments – **Sub S-001867 balance is $1,584,763.93. $1,500,075 from it to iCap International investments company-ready. Need a withdrawal form**
5. Wire from iCap International Investments to the recipient below-**ready**

| Confirmation: | 4111819538 |
| Approval Status: | 0 of 1 received |
| Approved: | 12/22/2022 02:56:06 pm (ET) |
| Approved By: | VROHLFING |

### Debit Information

| Account: | Icap International Investments LLC - Checking - *5069 - Avai |
| Wire Type: | USD international wire |
| Send on Date: | 12/22/2022 |
| Amount: | 2,000,075.00 |
| Currency: | USD |

### Recipient Information

| Bank ID Type: | SWIFT |
| Bank ID: | CMBCCNBS361 |
| Bank Name: | CHINA MERCHANTS BANK CO LTD |
| Bank Address 1: | JINAN |
| Bank Address 2 : | JINAN BRANCH |
| Bank Address 3: | NO. 7 GONGQINGTUAN RD, SHIZHONG DIS |
| Recipient Account (If appropriate enter the IBAN): | 531907863532505 |
| Recipient Name: | Shandong Yongchang International Co |
| Recipient Address 1: | Room303, 3rdFloorCorridor, No.1399, |
| Recipient Address 2: | XinyuanAvenue, TianqiaoDistrict, |
| Recipient Address 3: | JinanCity |
| Additional Information for Recipient: | to Shandong Yongchang International Cooperation Park Co. |

Wire Initiator Information

Thank you,
**Vera Rohlfing** / *Accounting Manager*
vera@icapequity.com   www.icapequity.com

iCAP EQUITY

3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Vera Rohlfing
**Sent:** Thursday, December 22, 2022 11:25 AM
**To:** Chris Christensen <chris@icapequity.com>
**Cc:** Jian Lu <kristyjian@icapequity.com>; Jane Li <Jane@icapequity.com>
**Subject:** RE: Jinan wiring instruction

We can **reduce intercompany balance by $500K by transferring funds from Vault to 725 Broadway**. We still have outstanding balance $790K. **Please confirm.**



| 1274-iCap Broadway, LLC | ($790,000.00) |

Thank you,
**Vera Rohlfing** / *Accounting Manager*

vera@icapequity.com    www.icapequity.com



3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Vera Rohlfing <vera@icapequity.com>
**Sent:** Thursday, December 22, 2022 11:19 AM
**To:** Chris Christensen <chris@icapequity.com>
**Cc:** Jian Lu <kristyjian@icapequity.com>; Jane Li <Jane@icapequity.com>; Vera Rohlfing <vera@icapequity.com>
**Subject:** RE: Jinan wiring instruction
**Importance:** High

Hi Chris,

725 Broadway balance is $ 160,998.38. We don't have $500K to move.

Thank you,
**Vera Rohlfing** / *Accounting Manager*
vera@icapequity.com    www.icapequity.com



3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Vera Rohlfing <vera@icapequity.com>
**Sent:** Thursday, December 22, 2022 11:12 AM
**To:** Chris Christensen <chris@icapequity.com>
**Cc:** Jian Lu <kristyjian@icapequity.com>; Jane Li <Jane@icapequity.com>; Vera Rohlfing <vera@icapequity.com>
**Subject:** RE: Jinan wiring instruction

Hi Chris,

See comments below and confirm #3.

Thank you,
**Vera Rohlfing** / *Accounting Manager*
vera@icapequity.com    www.icapequity.com



3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Chris Christensen <chris@icapequity.com>
**Sent:** Thursday, December 22, 2022 11:02 AM
**To:** Vera Rohlfing <vera@icapequity.com>

Vera,

We need to send out a wire transaction today.  Here is how we need to do it:

1. Intercompany loan of $500K, from Broadway to iCap Investments- will do transfer between the companies
2. Intercompany loan of $500K from iCap Investments to iCap International Investments- will do transfer between the companies
3. Vault Withdrawal of $2,000,075 by iCap International Investments – **Sub S-001867 balance is $ 1,584,763.93. Can move $1,500,0075 from it to iCap International investments company. Need a withdrawal form**
4. Wire from iCap International Investments to the recipient below-will do

Can you let me know if this can be done today?  Transfers 1-3 will be cashless.

Thanks.

Chris

---

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Wednesday, December 21, 2022 4:30 PM
**To:** Chris Christensen <chris@icapequity.com>
**Subject:** Re: Jinan wiring instruction

The total amount is $2,000,075

Thank you

**Cindy Fang** / *Director of International Markets*

425-278-9030 / icapequity.com

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

---

**From:** Chris Christensen <chris@icapequity.com>
**Sent:** Wednesday, December 21, 2022 4:09 PM
**To:** Cindy Fang <cindy@icapequity.com>
**Subject:** RE: Jinan wiring instruction

Is the total amount for the wire $2,000,000?

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Wednesday, December 21, 2022 1:24 PM
**To:** Chris Christensen <chris@icapequity.com>
**Subject:** Fw: Jinan wiring instruction

Hi Chris,

Friendly reminder: please wire the money to Jinan ASAP.

Thank you so much

**Cindy Fang** / *Director of International Markets*

425-278-9030 / icapequity.com

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Monday, December 19, 2022 4:34 PM
**To:** Chris Christensen <chris@icapequity.com>
**Subject:** Jinan wiring instruction

Hi Chris,

Here are the wiring instructions(the money has to wire out from Umpqua Bank's iCap international investment, LLC):

- Bank name: China Merchants Bank, Jinan Branch
- Bank address: No. 7000 Jingshiroad, CMBBLDG, Jinan, China
- Account number: 531907863532505
- SWIFT: CMBCCNBS361
- Account name: Shandong Yongchang International Cooperation Park Co.,   Ltd.
- Receiver address: Room303,   3rdFloorCorridor,   No.1399,   XinyuanAvenue,   TianqiaoDistrict,   JinanCity
- Note: Investment fund

Let me know if you have any questions.

Thank you

**Cindy Fang**  / *Director of International Markets*

425-278-9030  /  icapequity.com

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

**Exhibit 20**

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

**From:** Chris Christensen <chris@icapequity.com>
**Sent:** Thursday, February 9, 2023 9:17 AM
**To:** Cindy Fang <cindy@icapequity.com>
**Subject:** RE: Steve's mom's payback

OK, great. I will be in touch today on everything.

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Thursday, February 9, 2023 9:15 AM
**To:** Chris Christensen <chris@icapequity.com>
**Subject:** Re: Steve's mom's payback

Joanna and Jinan are resumed. I will talk to Eddie tomorrow and hopefully, he can either open a Vault account with us deposit a couple million with us or he can loan to us.

Let's see

**Cindy Fang** / *Director of International Markets*

425-278-9030 / icapequity.com

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

**From:** Chris Christensen <chris@icapequity.com>
**Sent:** Thursday, February 9, 2023 9:08 AM
**To:** Cindy Fang <cindy@icapequity.com>
**Subject:** RE: Steve's mom's payback

Cindy,

If you can somehow bring in $2 million more by Tuesday, we could pay a special amount. It would only need to stay for about 1-month.

Chris

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Thursday, February 9, 2023 8:40 AM
**To:** Chris Christensen <chris@icapequity.com>; Lisa Yeager <lisa@icapequity.com>; Jim Christensen <jim@icapequity.com>
**Subject:** Steve's mom's payback
**Importance:** High

Hi Chris,

We will have 1.6M in Vault today or tomorrow that you can leverage to pay back Steve's mom. I talked to her yesterday and settled with her. I promised her that I am going to manage a Vault account and that her Vault account would be under my management. She is so happy with it.

I will ask Wanlu to record my side of the Vault transactions from today, and I will start to keep track of and manage it.

Thank you

**Cindy Fang** / *Director of International Markets*

425-278-9030 / icapequity.com

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

**Exhibit 21**

**Sent:** Tuesday, March 28, 2023 8:16 AM
**To:** Chris Christensen <chris@icapequity.com>
**Cc:** Jim Christensen <jim@icapequity.com>; Joanna Ping Zhang <Joanna@icapequity.cn>
**Subject:** Re: This week's withdrawal requests

Hi Chris,

I am following up with the blow case. I would like to talk to you about a lot of the potential deposits from NY. Would you happen to have time today to talk?

Thank you

**Cindy Fang** / Project consultant

425-278-9030 / icapequity.com

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

---

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Monday, March 27, 2023 9:19 AM
**To:** Chris Christensen <chris@icapequity.com>
**Cc:** Jim Christensen <jim@icapequity.com>; Joanna Ping Zhang <Joanna@icapequity.cn>
**Subject:** This week's withdrawal requests

Hi Chris,

I am writing to you to talk about this week's withdrawal requests that require urgent attention.

Last night, Joanna and I reviewed our swapped numbers and found that we have swapped around 2M since March. Today, I will be depositing 120K.

Raymond committed that the 1M from Jinan amounted to 650K, and 350K will arrive today. This brings our total to around 3M. So far, Baoguo Long has received 2.1M, and we still owe him 530K. He had two remaining withdrawal requests, one for 300K and the other for 230K. Please process her withdrawals as soon as possible.

Our records show we should have a surplus of approximately 470K, including Raymond's funds. This week, I will receive 120K, and Joanna will receive 400K. Therefore, we should have nearly 1M in the total fund. This amount will be sufficient to pay Adam's withdrawal request of 940K. It is crucial that we can handle Baogu Long and Adam's withdrawals this week. Otherwise, I will have difficulty holding Adam off any longer.

**Exhibit 22**

**RE: Evergreen**

Chris Christensen <chris@icapequity.com>

Thu 4/27/2023 9:36 AM

To:Cindy Fang <cindy@icapequity.com>;Raymond Zhang <raymond@icapequity.com>;Joanna Ping Zhang <Joanna@icapequity.cn>

Thanks for letting me know.  Yes, I will confirm with everyone.

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Thursday, April 27, 2023 8:49 AM
**To:** Chris Christensen <chris@icapequity.com>; Raymond Zhang <raymond@icapequity.com>; Joanna Ping Zhang <Joanna@icapequity.cn>
**Subject:** Re: Evergreen

Hi Chris,

We will receive Joanna's investor wired around 410,000 K today and will have another $190,000 wire tomorrow.

Please approve the withdrawal coordinately and update us on who you approve of every day.

Thank you

**Cindy Fang** / Project consultant

425-278-9030  /  icapequity.com

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Wednesday, April 26, 2023 9:43 AM
**To:** Chris Christensen <chris@icapequity.com>; Raymond Zhang <raymond@icapequity.com>; Joanna Ping Zhang <Joanna@icapequity.cn>
**Subject:** Re: Evergreen

Hi Chris,

I'm just following up with the email below.  When Fan Yang's $600,000 is in, we should have around $800,000 account balance from last week.

Please follow below the payback request:

1. Adam $100,000
2. Lilian $31,000
3. Mr.Zheng: $50,000
4. Ming Li: $201,150
5. Yulan Zheng: $382,150

Feel free to let me know if you have any questions.

Thank you

**Cindy Fang** / Project consultant

425-278-9030 / icapequity.com

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

---

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Monday, April 24, 2023 3:50 PM
**To:** Chris Christensen <chris@icapequity.com>; Raymond Zhang <raymond@icapequity.com>; Joanna Ping Zhang <Joanna@icapequity.cn>
**Subject:** Re: Evergreen

Hi Chris,

After the payment to Joanna's investor Baoguo Long, we should have a balance of more than $300,000 remaining, and we are expecting an additional $600,000 this week. Following our discussion with Raymond and Joanna, please arrange the following payments this week:

1. Pay $100,000 to Adam,
2. Pay $50,000 to Mr. Zheng in Hangzhou

Additionally, there is a sum of $500,000 to be allocated to either Jinan or my aunt. Raymond will negotiate a deal with the Jinan. If the negotiation goes well, please make the payment to Jinan. If not, please make the payment to my aunt instead.

Thank you

**Cindy Fang** / Project consultant

425-278-9030 / icapequity.com

3535 Factoria Blvd. SE, Suite 500

Bellevue, WA 98006

---

**From:** Chris Christensen <chris@icapequity.com>
**Sent:** Friday, April 21, 2023 10:25 AM
**To:** Cindy Fang <cindy@icapequity.com>; Raymond Zhang <raymond@icapequity.com>; Joanna Ping Zhang <Joanna@icapequity.cn>
**Subject:** Evergreen

Hi Cindy, Raymond and Joanna,

I want to talk with you about an investor in the Vault. This is for Evergreen Management Capital (Adam). They are owed about $700,000, and we have been working with them for a number of weeks now. They are willing to agree to a repayment plan under the following timeline. I want to check with our team and see what you think, before I agree to anything. I had proposed a smaller amount for the first payment, but he asked if we could make it higher. I need to respond to him today (asap). This one is urgent.

- April 28:  $300,000
- May 5:  $100,000
- May 12:  $100,000
- May 17:  $200,000 (remainder)

Please let me know.

Thanks.

**Chris Christensen**  */ CEO, JD, MIB*
425-278-9031  /  icapequity.com



3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

**Exhibit 23**

## Re: Incoming wire

Cindy Fang <cindy@icapequity.com>
Wed 3/15/2023 8:29 AM

To:Chris Christensen <chris@icapequity.com>
Cc:Jim Christensen <jim@icapequity.com>;Lisa Yeager <lisa@icapequity.com>;Joanna Ping Zhang
<Joanna@icapequity.cn>

Hi Chris,

From Monday, we swapped: 20(Yulan Ren)+10(Guifang Wang)+19(Yulan Ren)+5(Yulan
Ren)+17.7(Yulan Ren)+43.3(Bolong Huang)=115M in. Those are the money for Joanna's
investor's withdrawal.

Please approve the $900K withdrawal after all the funds are cleared. The investor already
signed three times $300K withdrawal forms.

We will have 250K left over, and we will resume the swap tomorrow again.

Thank you

**Cindy Fang** / Project consultant
425-278-9030 / icapequity.com

151113 Email Logo

3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Chris Christensen <chris@icapequity.com>
**Sent:** Tuesday, March 14, 2023 9:02 AM
**To:** Cindy Fang <cindy@icapequity.com>
**Cc:** Jim Christensen <jim@icapequity.com>; Lisa Yeager <lisa@icapequity.com>; Joanna Ping
Zhang <Joanna@icapequity.cn>
**Subject:** RE: Incoming wire

Yes, received.

---

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Tuesday, March 14, 2023 9:02 AM
**To:** Chris Christensen <chris@icapequity.com>
**Cc:** Jim Christensen <jim@icapequity.com>; Lisa Yeager <lisa@icapequity.com>; Joanna Ping
Zhang <Joanna@icapequity.cn>
**Subject:** Fw: Incoming wire
**Importance:** High

Hi Chris,

Pleas confirm that you received the email below.

Thank you

**Cindy Fang** / Project consultant
425-278-9030 / icapequity.com

3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Monday, March 13, 2023 2:24 PM
**To:** Chris Christensen <chris@icapequity.com>; Jim Christensen <jim@icapequity.com>
**Cc:** Lisa Yeager <lisa@icapequity.com>
**Subject:** Fw: Incoming wire

Hi Chris,

The $200,000 arrived today. Please keep it for Jonna's investor's withdrawal.

Thank you

**Cindy Fang** / Project consultant
425-278-9030 / icapequity.com

3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Wanlu Huang <Wanlu@icapequity.com>
**Sent:** Monday, March 13, 2023 2:22 PM
**To:** Cindy Fang <cindy@icapequity.com>
**Cc:** Skye Belote <skyeb@icapequity.com>; Jessica Jackson <Jessica@icapequity.com>; Joyce Zhong <Joyce@icapequity.com>
**Subject:** RE: Incoming wire

Hi Cindy,

It is received today, additional funds form has been sent to client for a sign, thank you.

**Wanlu Huang**
iCAP EQUITY
(o) 425.332.4179 ext. 144 |Wanlu@icapequity.com
icapequity.com

---

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Monday, March 13, 2023 2:15 PM
**To:** Wanlu Huang <Wanlu@icapequity.com>
**Cc:** Skye Belote <skyeb@icapequity.com>; Jessica Jackson <Jessica@icapequity.com>; Joyce Zhong <Joyce@icapequity.com>
**Subject:** Re: Incoming wire

Please see attached file.

Thank you

**Cindy Fang** / Project consultant
425-278-9030  /  icapequity.com

3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Wanlu Huang <Wanlu@icapequity.com>
**Sent:** Monday, March 13, 2023 2:12 PM
**To:** Cindy Fang <cindy@icapequity.com>
**Cc:** Skye Belote <skyeb@icapequity.com>; Jessica Jackson <Jessica@icapequity.com>; Joyce Zhong <Joyce@icapequity.com>
**Subject:** RE: Incoming wire

Hi Cindy,

Could you please resend a screenshot? The file somehow is not supported to open. Thank you!

**Wanlu Huang**

i C A P  E Q U I T Y

(o) 425.332.4179 ext. 144 |Wanlu@icapequity.com
icapequity.com

---

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Monday, March 13, 2023 2:09 PM
**To:** Wanlu Huang <Wanlu@icapequity.com>
**Cc:** Skye Belote <skyeb@icapequity.com>; Jessica Jackson <Jessica@icapequity.com>; Joyce Zhong <Joyce@icapequity.com>
**Subject:** Re: Incoming wire

Hi Wanlu,

Please see attached file.

Thank you

**Cindy Fang** / Project consultant
425-278-9030  /  icapequity.com

3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Wanlu Huang <Wanlu@icapequity.com>

**Sent:** Monday, March 13, 2023 2:04 PM
**To:** Cindy Fang <cindy@icapequity.com>
**Cc:** Skye Belote <skyeb@icapequity.com>; Jessica Jackson <Jessica@icapequity.com>; Joyce Zhong <Joyce@icapequity.com>
**Subject:** RE: Incoming wire

Hi Cindy,

Do you know when and where the money would be coming from? Thank you!

**Wanlu Huang**

iCAP ⬤ EQUITY

(o) 425.332.4179 ext. 144 |Wanlu@icapequity.com
icapequity.com

---

**From:** Cindy Fang <cindy@icapequity.com>
**Sent:** Monday, March 13, 2023 2:01 PM
**To:** Wanlu Huang <Wanlu@icapequity.com>
**Cc:** Skye Belote <skyeb@icapequity.com>; Jessica Jackson <Jessica@icapequity.com>; Joyce Zhong <Joyce@icapequity.com>
**Subject:** Incoming wire

Hi Wanlu,

Please notify me if you receive the $200,000 wire under Yulan Ren.

Thank you

**Cindy Fang** / Project consultant
425-278-9030 / icapequity.com

3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

**Exhibit 24**

## RE: $200K Transfer into Fund 1 on 5/13

Tatiana N Pantchenko <Tatiana@icapequity.com>

Fri 5/17/2019 2:02 PM

To:TD Croshaw <td@icapequity.com>;Piper Bagley <piper@icapequity.com>

📎 1 attachments (32 KB)

20190514102157.pdf;

Fyi CD and CR attached.

**Tatiana Pantchenko** / *Senior Accountant*
tatiana@icapequity.com / [www.icapequity.com](http://www.icapequity.com)



3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** TD Croshaw <td@icapequity.com>
**Sent:** Friday, May 17, 2019 12:08 PM
**To:** Piper Bagley <piper@icapequity.com>; Tatiana N Pantchenko <Tatiana@icapequity.com>
**Subject:** RE: $200K Transfer into Fund 1 on 5/13

I transferred it to cover the interest payment

**TD Croshaw** / *Chief Financial Officer, CPA, MBA*
425-278-9030  x127 / icapequity.com



3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

---

**From:** Piper Bagley <[piper@icapequity.com](mailto:piper@icapequity.com)>
**Sent:** Friday, May 17, 2019 12:07 PM
**To:** TD Croshaw <[td@icapequity.com](mailto:td@icapequity.com)>; Tatiana N Pantchenko <[Tatiana@icapequity.com](mailto:Tatiana@icapequity.com)>
**Subject:** $200K Transfer into Fund 1 on 5/13

Hello,

It looks like Monday there was a transfer in of $200K into Fund 1R.  May I ask if either of you knows anything about this?  It did not appear on the Bank Transactions to Approve doc.

Thank you,

**Piper Bagley**
Senior Accountant, CPA, CGMA
iCAP EQUITY
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA  98006

**Exhibit 25**

RE: 7/15/2022 Cash Forecast for review - update

Chris Christensen <chris@icapequity.com>

Thu 7/14/2022 10:19 AM

To:Tatiana N Pantchenko <Tatiana@icapequity.com>;Jian Lu <kristyjian@icapequity.com>;Jim Christensen <jim@icapequity.com>

Got it.  Thanks.

**From:** Tatiana N Pantchenko <Tatiana@icapequity.com>
**Sent:** Thursday, July 14, 2022 10:17 AM
**To:** Chris Christensen <chris@icapequity.com>; Jian Lu <kristyjian@icapequity.com>; Jim Christensen <jim@icapequity.com>
**Subject:** RE: 7/15/2022 Cash Forecast for review - update

Thanks Chris. We also just deposited $182K in checks in iCap Equity. It should help.  @Jian Lu you can't see it right now, but it will post towards noon.

T.

**Tatiana Pantchenko** · _Director - Accounting_
tatiana@icapequity.com   www.icapequity.com



3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

**From:** Chris Christensen <chris@icapequity.com>
**Sent:** Thursday, July 14, 2022 10:11 AM
**To:** Jian Lu <kristyjian@icapequity.com>; Tatiana N Pantchenko <Tatiana@icapequity.com>; Jim Christensen <jim@icapequity.com>
**Subject:** RE: 7/15/2022 Cash Forecast for review - update

Let's approve Tatiana's plan regarding a short-term loan from iCap@UW.  I talked with Cindy, and she is recommended that.  Let us know when the transfers are ready.

Thanks.

**From:** Jian Lu <kristyjian@icapequity.com>
**Sent:** Thursday, July 14, 2022 8:06 AM
**To:** Tatiana N Pantchenko <Tatiana@icapequity.com>; Chris Christensen <chris@icapequity.com>; Jim Christensen <jim@icapequity.com>
**Subject:** RE: 7/15/2022 Cash Forecast for review - update

Good morning,

Below's screenshot is the most current update.  iCap @UW is now with $2.9M.  Please approve the transfer for $210k from Investments →Equity → Enterprise this morning for the payroll.

Let us know if you have any questions.  Thank you.

Cash Forecast
As of 7/15/2022

| | iCap Equity | iCap Investments | iCap Enterprises | iCap UW | Fund 1 | Fund 2 | Fund 4 | Fund 5 | iCap Funding | iCap EVO | iCap 134th |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash** | 138,441 | 843,604 | 28,576 | 2,930,000 | 3,502 | (5,024) | 9,924 | 1,057 | 850 | 43 | 201 |
| **Investor Payments 7/15** | (402,813) | (163,628) | | | (279,474) | (277,599) | (86,263) | (27,206) | (31,561) | - | (8,333) |
| **Investor Distributions** | - | | | | | | | | | | |
| **Other Outflows** | (78,192) | (430,874) | (238,300) | 2,769 | (74,815) | (64,775) | (341,629) | (7,323) | - | - | - |
| **Pending Deposits** | | | | | | | | | | | |
| **Pending Transfers** | | | | | | | | | | | |
| | (342,564) | 249,102 | (209,724) | 2,932,769 | (350,787) | (347,398) | (417,968) | (33,473) | (30,711) | 43 | (8,132) |

Regards,

Jian (Kristy)

**From:** Tatiana N Pantchenko <Tatiana@icapequity.com>
**Sent:** Wednesday, July 13, 2022 9:18 PM
**To:** Jian Lu <kristyjian@icapequity.com>; Chris Christensen <chris@icapequity.com>; Jim Christensen <jim@icapequity.com>
**Subject:** RE: 7/15/2022 Cash Forecast for review

Forgot updated screenshot. Please see below.

**Cash Forecast**
**As of 7/15/2022**

| | iCap Equity | iCap Investments | iCap Enterprises | iCap UW | Fund 1 | Fund 2 | Fund 4 | Fund 5 | iCap Funding | iCap EVO | iCap 134th | iCap PNWM | iCap Realty | Oceanaire | VH Senior Care | Bro |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | 138,441 | 843,604 | 35,420 | 1,580,100 | 3,502 | (5,024) | 9,924 | 1,057 | 850 | 43 | 201 | 13,425 | 97 | 878 | 42,137 | |
| Investor Payments 7/15 | (402,813) | (163,628) | | | (279,474) | (277,599) | (86,263) | (27,206) | (31,561) | - | (8,333) | | | | | |
| Investor Distributions | | | | | | | | | | | | | | | | |
| Other Outflows | (78,192) | (430,874) | (246,300) | 2,769 | (74,815) | (64,775) | (341,629) | (7,323) | - | - | | (73,135) | - | (248) | - | |
| Pending Deposits | | | | | | | | | | | | | | | | |
| Pending Transfers | | | | | | | | | | | | | | | | |
| | (342,564) | 249,102 | (210,880) | 1,582,869 | (350,787) | (347,398) | (417,968) | (33,473) | (30,711) | 43 | (8,132) | (59,709) | 97 | 630 | 42,137 | |

**Tatiana Pantchenko**  *Director - Accounting*
tatiana@icapequity.com   www.icapequity.com



iCAP EQUITY
3535 Factoria Blvd, SE, Suite 500
Bellevue, WA 98006

**From:** Tatiana N Pantchenko
**Sent:** Wednesday, July 13, 2022 9:16 PM
**To:** Jian Lu <kristyjian@icapequity.com>; Chris Christensen <chris@icapequity.com>; Jim Christensen <jim@icapequity.com>
**Subject:** RE: 7/15/2022 Cash Forecast for review

**Jim and Chris,**

Would you like us to use iCap UW's funds for one day tomorrow to send out investor ACHs and the rest of payables? When 134th Street closes on the 15th, we will move borrowed funds back. This would include Senza Kenmore and other places that we had to borrow from.

We have to send ACHs tomorrow Thursday 14th if we want the effective date to be the 15th.

Thank you.

**Tatiana Pantchenko**  *Director - Accounting*
tatiana@icapequity.com   www.icapequity.com

iCAP EQUITY
3535 Factoria Blvd, SE, Suite 500
Bellevue, WA 98006

**From:** Jian Lu <kristyjian@icapequity.com>
**Sent:** Tuesday, July 12, 2022 11:40 AM
**To:** Chris Christensen <chris@icapequity.com>; Jim Christensen <jim@icapequity.com>
**Cc:** Tatiana N Pantchenko <Tatiana@icapequity.com>
**Subject:** 7/15/2022 Cash Forecast for review

Hi Chris

Attached is the 7/15/22 cash forecast for the invoices I have at this moment.

There're notes below highlighting specific transactions within the forecast, noted that second half of July's payoffs are not included.

Please review and advise on where we can transfer money to cover the month end pay run.  Thank you.

**Cash Forecast**
**As of 7/15/2022**

| | iCap Equity | iCap Investments | iCap Enterprises | iCap UW | Fund 1 | Fund 2 | Fund 4 | Fund 5 | iCap Funding | iCap EVO | iCap 134th |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | 138,441 | 703,604 | 35,420 | 1,580,100 | 3,502 | (5,024) | 9,924 | 1,057 | 850 | 43 | 201 |
| Investor Payments 7/15 | (402,813) | (163,628) | | | (279,474) | (277,599) | (86,263) | (27,206) | (31,561) | - | (8,333) |
| Investor Distributions | | | | | | | | | | | |
| Other Outflows | (78,192) | (430,874) | (238,800) | 2,769 | (74,815) | (64,775) | (341,629) | (7,323) | - | | - |
| Pending Deposits | | | | | | | | | | | |
| Pending Transfers | | | | | | | | | | | |
| | (342,564) | 109,102 | (203,380) | 1,582,869 | (350,787) | (347,398) | (417,968) | (33,473) | (30,711) | 43 | (8,132) |

**Notes: Investor Payoffs**
- 6/30/22 - $50k - S-000019 - Terrence - Pay off – Fund 1
- 6/30/22 - $50k - S-000019 - Terrence - Pay off – Fund 2
- 7/15/15 - $400k - S-001523 - Yuanqing Shan - Pay off - iCap Investment
- 7/15/22 - $33,450 - S-001279 - Jerome and Anastasia Angel Intervivos Rev. Trust Declaration of 1985 - Payoff – Equity
- 7/13/22 $100,425 - S-001247 - Yibing Luo - Partial Payoff – Fund 4
- 7/13/22 - $141,426.47 - S-001249 - Mingjuan Dong - Partial Payoff – Fund 4
- 7/13/22 - $7,875 - S-001214 - Qing Wu - Partial Payoff – Fund 4
- 7/13/22 - $17,500 - S-001269 - Yanfei Han - Partial Payoff - Fund 4
- 7/13/22 - $29,000 - S-001188 - Bolong Huang - Partial Payoff - Fund 4
- 7/13/22 - $15,000 - S-001213 - Ying Zheng - Partial Payoff - Fund 4

- 7/13/22 - $13,290 - S-001206 - Qing Wu - Partial Payoff - Fund 4
- 7/13/22 - $17,113 - S-001233 - Jing Lu - Partial Payoff - Fund 4

**Below Investor Payoffs for July are not in the current forecast, it will be included in the next time.**

## Equity Total for July: $429K
- 7/22/22 - $50,000 - S-001286 - The Edwards Family Trust dtd 10/12/2002, - Rolled to S-002365 – Equity
- 7/24/22 - $26,672.5 - S-001133 - Elaine Land Dexter - Payoff – Equity
- 7/24/22 - $53,345 - S-001132 - The Stanley and Marian Praver Trust of 1985 - Payoff – Equity
- 7/25/22 - $52,500 - S-001285 - David and Emily Troutman W/Rights of survivorship – Equity
- 7/31/22 - $210,000 - S-001145 - Qiong Huang - Equity
- 7/31/22 - $3,345 - S-001274 - Reich Family Trust - Equity

## Fund 4 total for July: $412K
- 7/28/22 - $70,000 - S-001280 - Yi Zheng - Payoff - Fund 4

Jian (Kristy) Lu | Accountant
Jian (Kristy) Lu | i5f1@ip5equity.com
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

**Exhibit 26**

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM CONTAINS MATERIAL NON-PUBLIC INFORMATION REGARDING ICAP EQUITY, LLC (THE "COMPANY"). BY ACCEPTING THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS HERETO (COLLECTIVELY THIS "MEMORANDUM" OR THESE "OFFERING DOCUMENTS"), THE RECIPIENT AGREES WITH THE COMPANY TO MAINTAIN IN STRICT CONFIDENCE ALL NON-PUBLIC INFORMATION, INCLUDING, BUT NOT LIMITED TO, THE EXISTENCE OF THE PROPOSED FINANCING AND ANY OTHER NON-PUBLIC INFORMATION REGARDING THE COMPANY OBTAINED FROM THIS MEMORANDUM, ANY OTHER TRANSACTION DOCUMENT OR THE COMPANY.

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## FOR ACCREDITED INVESTORS AND NON-U.S. PERSONS



## iCap Equity, LLC

### $50,000,000 Offering of Series 3 - Senior Promissory Notes

## Pursuant to Rule 506(c) under Regulation D pursuant to the Securities Act of 1933, as amended (the "Securities Act"), and pursuant to Regulation S pursuant to the Securities Act

### July 1, 2020

AN INVESTMENT IN OUR SECURITIES INVOLVES A HIGH DEGREE OF RISK. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF US AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD ONLY INVEST IN OUR SECURITIES IF YOU CAN AFFORD A COMPLETE LOSS OF YOUR INVESTMENT. YOU SHOULD READ THE COMPLETE DISCUSSION OF THE RISK FACTORS SET FORTH IN THIS MEMORANDUM.

DUE TO THE FACT THAT THE OFFERING IS A PRIVATE PLACEMENT AND IS EXEMPT FROM REGISTRATION, NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. SEE "CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS."



SUPPLEMENT NO. 1 TO

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

DATED July 1, 2020

iCap Equity, LLC has determined to extend the Offering Period as described in this Memorandum for an additional 12-months, to May 1, 2022. Any references in this Memorandum to the "Offering Period" shall now be deemed to reflect such extension.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 93 Page 0193



SUPPLEMENT NO. 2 TO

CONFIDENTIAL PRIVATE PLACEMENT

MEMORANDUM DATED July 1, 2020

August 31, 2021

iCap Equity, LLC has determined to extend the Maximum Offering Amount as described in this Memorandum to $75,000,000. Any references in this Memorandum to the "Offering Amount" shall now be deemed to reflect such extension.

23-01243-WLH11     Doc 469     Filed 02/23/24     Entered 02/23/24 19:45:30     Exhibit 94 Page 194



## SUPPLEMENT NO. 3 TO

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## DATED July 1, 2020

iCap Equity, LLC has determined to extend the Offering Period as described in this Memorandum for an additional 8 months, to December 31, 2022. Any references in this Memorandum to the "Offering Period" shall now be deemed to reflect such extension.



## SUPPLEMENT NO. 4 TO

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## DATED July 1, 2020

iCap Equity, LLC (the "Company") has determined to extend the Offering Period as described in this Memorandum for an additional 12 months to December 31, 2023. Any references in this Memorandum to the "Offering Period" shall now be deemed to reflect such extension. The Company may, in its sole discretion, terminate the Offering Period at any time before the end of this extended Offering Period.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 96 Page 196

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
# FOR
# ACCREDITED INVESTORS AND NON-U.S. PERSONS

## iCap Equity, LLC

## $50,000,000 OF AGGREGATE PRINCIPAL AMOUNT
## OF
## SERIES 3 - SENIOR PROMISSORY NOTES

**Minimum subscription per investor of $5,000 of principal amount, although iCap Equity, LLC reserves the right to accept subscriptions for a lower principal amount.**

**No minimum offering amount.**

This Confidential Private Placement Memorandum for Accredited Investors and Non-U.S. Persons (this "Memorandum") is being furnished in connection with the offer and sale (the "Offering") of up to $50,000,000 of Series 3 - Senior Promissory Notes (the "Notes"), with no over-allotment amount, by iCap Equity, LLC, a Delaware limited liability company (the "Company"). Notes will be issued in denominations of at least $5,000 (and any amounts in excess of $5,000). The Company may accept subscriptions in lesser amounts in its sole discretion. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines.

The Company is a private investment vehicle that seeks to hold and operate real estate investments, both directly and through fund investment vehicles, as described herein. This Memorandum contains certain information that prospective investors should know about the Offering. The manager of the Company is iCap Enterprises, Inc., a Washington limited liability company (the "Manager"). The Company's address is iCap Equity, LLC, Factoria Blvd. SE, Suite 500, Bellevue, Washington 98006.

The Offering is being made by the Company to persons who are either "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to Rule 506(c) under Regulation D, or "Non-U.S. Persons" (as defined below) pursuant to Regulation S promulgated under the Securities Act. The Offering is being made on a "Best Efforts" basis, which means there is no guaranty that any of the Notes will be sold or that a sufficient number of Notes will be sold to fulfill the Company's business plan. The Company expects to engage one or more registered broker-dealers to act as placement agent(s) for the Offering (as applicable, the "Placement Agents") and expects to pay commissions to the Placement Agents as set forth in the Plan of Distribution commencing on page 14, based on the aggregate principal amount of the Notes sold to investors. Investors who purchase Notes are referred to herein as the "Noteholders." The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on May 1, 2021, subject to earlier termination as set forth herein.

**THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. NO INVESTMENT IN THE NOTES SHOULD BE MADE BY ANY INVESTOR NOT FINANCIALLY ABLE TO LOSE THE ENTIRE AMOUNT OF ITS INVESTMENT.**

i

## RISK DISCLOSURE STATEMENT

THE ATTORNEYS THAT PREPARED THIS MEMORANDUM ("ATTORNEYS") HEREBY DISCLAIM ANY OPINION OR ASSURANCE OF ANY NATURE WHATSOEVER REGARDING THE ACCURACY, COMPLETENESS, REASONABLENESS, TIMELINESS OR VERACITY OF ANY OF THE ASSERTIONS, REPRESENTATIONS OR OTHER INFORMATION CONTAINED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, OR REGARDING THE INVESTMENT-WORTHINESS OF THE SECURITIES DISCUSSED HEREIN ("SECURITIES"). ANY ASSERTION OR REPRESENTATION MADE HEREIN, AND ALL OTHER INFORMATION DISCLOSED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, HAS BEEN MADE OR PROVIDED BY THE PROMOTER. IN CONNECTION WITH THE PREPARATION OF THESE CONFIDENTIAL OFFERING DOCUMENTS, THE ATTORNEYS HAVE NOT BEEN ENGAGED TO ATTEST HERETO, OR TO OPINE IN RESPECT HEREOF. ACCORDINGLY, THE ATTORNEYS HAVE NOT PERFORMED ANY ANALYTICAL, CONFIRMATION, VALIDATION, VERIFICATION OR OTHER PROCEDURES IN RESPECT OF THE ASSERTIONS AND REPRESENTATIONS CONTAINED HEREIN, NOR IN RESPECT OF ANY OF THE OTHER INFORMATION DISCLOSED HEREIN, INCLUDING ANY SIMILAR TO THOSE PROCEDURES UNDERTAKEN BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT IN CONNECTION WITH AN AUDIT OF THE FINANCIAL STATEMENTS OF AN ISSUER OF SECURITIES FOR PURPOSES OF RENDERING AN OPINION THEREON. CONSEQUENTLY, POTENTIAL INVESTORS, IN DECIDING WHETHER OR NOT TO INVEST IN THE SECURITIES, ARE CAUTIONED NOT TO ASCRIBE ANY SPECIAL RELIANCE WHATSOEVER ON THIS MEMORANDUM BY REASON THAT ATTORNEYS HAVE PREPARED THIS MEMORANDUM.

THIS BRIEF STATEMENT CANNOT DISCLOSE ALL THE RISKS AND OTHER FACTORS NECESSARY TO EVALUATE YOUR INVESTMENT IN THE NOTES. THEREFORE, BEFORE YOU DECIDE TO MAKE AN INVESTMENT IN THE NOTES, YOU SHOULD CAREFULLY STUDY THIS MEMORANDUM, INCLUDING A DISCUSSION OF CERTAIN RISK FACTORS OF THIS INVESTMENT.

## CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS

FOR ALL PROSPECTIVE INVESTORS: THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT SET FORTH IN SECTION 4(A)(2) THEREOF AND RULE 506(C) OF REGULATION D PROMULGATED THEREUNDER TO ACCREDITED INVESTORS. RULE 506 OF REGULATION D SETS FORTH CERTAIN RESTRICTIONS AS TO THE NUMBER AND NATURE OF PURCHASERS OF SECURITIES OFFERED PURSUANT THERETO. WE HAVE ELECTED TO SELL SECURITIES ONLY TO ACCREDITED INVESTORS AS SUCH TERM IS DEFINED IN RULE 501(A) OF REGULATION D. EACH PROSPECTIVE INVESTOR WILL BE REQUIRED TO MAKE REPRESENTATIONS AS TO THE BASIS UPON WHICH IT QUALIFIES AS AN ACCREDITED INVESTOR.

THE SECURITIES OFFERED HEREBY WILL BE SUBJECT TO RESTRICTIONS ON

TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. ONLY PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT IN THE NOTES SHOULD PURCHASE THE NOTES.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE INFORMATION PRESENTED HEREIN WAS PRESENTED AND SUPPLIED SOLELY BY THE COMPANY AND IS BEING FURNISHED SOLELY FOR USE BY PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING. THE COMPANY MAKES NO REPRESENTATIONS AS TO THE FUTURE PERFORMANCE OF THE COMPANY. THIS MEMORANDUM WERE PREPARED BY THE COMPANY.

THIS OFFERING IS SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION BY THE COMPANY AT ANY TIME AND WITHOUT NOTICE. WE RESERVE THE RIGHT IN OUR SOLE DISCRETION TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART NOTWITHSTANDING TENDER OF PAYMENT OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AGGREGATE PRINCIPAL AMOUNT OF NOTES SUBSCRIBED FOR BY SUCH INVESTOR.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY ANY SECURITY OTHER THAN THE SECURITIES OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY SUCH SECURITIES BY ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN OUR AFFAIRS SINCE THE DATE HEREOF. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN PERTINENT DOCUMENTS, APPLICABLE LAWS AND REGULATIONS. SUCH SUMMARIES ARE NOT COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE COMPLETE TEXTS THEREOF.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES.

THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM OR IN ANY ADDITIONAL EVALUATION MATERIAL, WHETHER WRITTEN OR ORAL, MADE AVAILABLE IN CONNECTION WITH ANY FURTHER INVESTIGATION OF THE COMPANY. THE COMPANY EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY THAT MAY BE BASED UPON SUCH INFORMATION, ERRORS THEREIN OR OMISSIONS THEREFROM. ONLY THOSE PARTICULAR REPRESENTATIONS AND

WARRANTIES, IF ANY, WHICH MAY BE MADE TO A PARTY IN A DEFINITIVE WRITTEN AGREEMENT REGARDING A TRANSACTION INVOLVING THE COMPANY, WHEN, AS AND IF EXECUTED, AND SUBJECT TO SUCH LIMITATIONS AND RESTRICTIONS AS MAY BE SPECIFIED THEREIN, WILL HAVE ANY LEGAL EFFECT. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED TO THE CONTRARY IN WRITING, THIS MEMORANDUM SPEAKS AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE OF NOTES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY AFTER THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE OFFERING OF NOTES BEING MADE PURSUANT HERETO, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

THERE IS NO MARKET FOR THE NOTES AND THERE IS NO ASSURANCES A PUBLIC MARKET WILL EVER BE ESTABLISHED. PURCHASERS OF THE NOTES ARE NOT BEING GRANTED ANY REGISTRATION RIGHTS. A PURCHASE OF THE NOTES SHOULD BE CONSIDERED AN ILLIQUID INVESTMENT.

BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR HEREBY EXPRESSLY AGREES WITH THE COMPANY TO KEEP CONFIDENTIAL ALL OF THE CONTENTS HEREOF, INCLUDING, BUT NOT LIMITED TO, THE OFFERING AND ALL INFORMATION RELATED TO THE COMPANY, AND NOT TO DISCLOSE THE SAME TO ANY THIRD PARTY AND/OR OTHERWISE USE THE SAME FOR ANY PURPOSE OTHER THAN AN EVALUATION BY SUCH OFFEREE OF A POTENTIAL INVESTMENT IN THE NOTES OFFERED PURSUANT HERETO. WE HAVE CAUSED THIS MEMORANDUM TO BE DELIVERED TO YOU IN RELIANCE UPON SUCH AGREEMENT BY YOU.

EACH PROSPECTIVE SUBSCRIBER BY RECEIVING THIS MEMORANDUM AGREES TO RETURN THE SAME TO US IF (A) THE OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY SECURITIES OFFERED HEREBY; (B) THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, AND/OR (C) THE OFFERING IS TERMINATED OR WITHDRAWN.

THIS MEMORANDUM IS SUBJECT TO AMENDMENT AND SUPPLEMENTATION AS APPROPRIATE. WE DO NOT INTEND TO UPDATE THE INFORMATION CONTAINED IN THE OFFERING DOCUMENTS FOR ANY INVESTOR WHO HAS ALREADY MADE AN INVESTMENT. WE MAY UPDATE THE INFORMATION CONTAINED HEREIN FROM TIME TO TIME AND PROVIDE SUCH UPDATED DOCUMENT TO POTENTIAL INVESTORS BUT UNDERTAKE NO OBLIGATION TO PROVIDE SUCH UPDATED DOCUMENTS TO AN INVESTOR WHO HAS ALREADY MADE HIS OR HER INVESTMENT.

**JURISDICTIONAL NOTICES**

**FOR RESIDENTS OF ALL STATES:**

THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN A PARTICULAR STATE. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE HEREBY ADVISED TO CONTACT THE COMPANY. THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS (COMMONLY CALLED "BLUE SKY" LAWS). THESE SECURITIES MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THE STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OF SALE MAY BE MADE IN ANY PARTICULAR STATE.

IN MAKING ANY INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. NO FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS RECOMMENDED THESE SECURITIES. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

1.  **NOTICE TO ALABAMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

2.  **NOTICE TO ALASKA RESIDENTS ONLY**: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHER-MORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD

EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

3. **NOTICE TO ARIZONA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ARIZONA SECURITIES ACT IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PURSUANT TO A.R.S. SECTION 44-1844 (1) AND THEREFORE CANNOT BE RESOLD UNLESS THEY ARE ALSO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

4. **NOTICE TO ARKANSAS RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN RELIANCE UPON CLAIMS OF EXEMPTION UNDER THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING OR PASSED UPON THE ADEQUACY OR ACCURACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

5. **NOTICE TO CALIFORNIA RESIDENTS:** THESE SECURITIES HAVE NOT BEEN QUALIFIED OR OTHERWISE APPROVED OR DISAPPROVED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS UNDER THE CALIFORNIA CORPORATIONS CODE. THESE SECURITIES ARE OFFERED IN CALIFORNIA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PROVIDED BY SECTIONS 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. ACCORDINGLY, DISTRIBUTION OF THIS MEMORANDUM AND OFFERS AND SALES OF THE SECURITIES REFERRED TO HEREIN ARE STRICTLY LIMITED TO PERSONS WHO THE COMPANY DETERMINES TO HAVE MET CERTAIN FINANCIAL AND OTHER REQUIREMENTS. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY WITH RESPECT TO ANY OTHER PERSON. IN ORDER TO RELY ON THE FOREGOING EXEMPTIONS, THE COMPANY WILL RELY IN TURN ON CERTAIN REPRESENTATIONS AND WARRANTIES MADE TO THE COMPANY BY THE INVESTORS IN THIS OFFERING. THOSE REPRESENTATIONS AND WARRANTIES ARE CONTAINED IN THE SUBSCRIPTION AGREEMENT, ATTACHED HERETO AS EXHIBIT A.

6. **FOR COLORADO RESIDENTS ONLY:** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS OFFERING HAS NOT BEEN QUALIFIED WITH COMMISSIONER OF CORPORATIONS OF THE STATE OF COLORADO AND THE ISSUANCE OF SUCH SECURITIES OR PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATIONS IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPTED FROM QUALIFICATION BY SECTION 25100, 25102, OR 25104 OF THE COLORADO CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS OFFERING ARE EXPRESSLY CONDITION UPON SUCH QUALIFICATIONS BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933,

AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991, IF SUCH REGISTRATION IS REQUIRED.

7. **NOTICE TO CONNECTICUT RESIDENTS ONLY:** SECURITIES ACQUIRED BY CONNECTICUT RESIDENTS ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 36B-31-21B-9B OF THE CONNECTICUT, UNIFORM SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF CONNECTICUT. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

8. **NOTICE TO DELAWARE RESIDENTS ONLY:** IF YOU ARE A DELAWARE RESIDENT, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE DELAWARE SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

9. **NOTICE TO DISTRICT OF COLUMBIA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES BUREAU OF THE DISTRICT OF COLUMBIA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

10. **NOTICE TO FLORIDA RESIDENTS ONLY:** THE SECURITIES DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES AND INVESTOR PROTECTION UNDER THE FLORIDA SECURITIES ACT. THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF SAID ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. EACH FLORIDA RESIDENT WHO SUBSCRIBES FOR NOTES HAS THE RIGHT, PURSUANT TO SECTION 517.061(11)(A)(5) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, TO WITHDRAW HIS SUBSCRIPTION AND RECEIVE A FULL REFUND OF ALL MONEYS PAID, WITHIN THREE (3) BUSINESS DAYS AFTER THE EXECUTION OF THE SUBSCRIPTION AGREEMENT AND POWER OF ATTORNEY OR THE PAYMENT FOR AN INTEREST HAS BEEN MADE, WHICH EVER IS LATER. WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER NEED ONLY SEND A LETTER OR A FACSIMILE TO THE COMPANY AT THE ADDRESS SET FORTH IN THIS MEMORANDUM, INDICATING HIS INTENTION TO WITHDRAW. SUCH LETTER OR FACSIMILE MUST BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED THIRD BUSINESS DAY. IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED.

11. **NOTICE TO GEORGIA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE GEORGIA SECURITIES ACT PURSUANT TO REGULATION 590-4-5-04 AND -01. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

12. **NOTICE TO HAWAII RESIDENTS ONLY:** NEITHER THESE CONFIDENTIAL OFFERING DOCUMENTS NOR THE SECURITIES DESCRIBED HEREIN BEEN APPROVED OR DISAPPROVED BY THE COMMISSIONER OF SECURITIES OF THE STATE OF HAWAII NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS.

13. **NOTICE TO IDAHO RESIDENTS ONLY:** THESE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT IN RELIANCE UPON EXEMPTION FROM REGISTRATION PURSUANT TO SECTION 30-14-203 OR 302(C) THEREOF AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SAID ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SAID ACT.

14. **NOTICE TO ILLINOIS RESIDENTS:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF THE STATE OF ILLINOIS NOR HAS THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

15. **NOTICE TO INDIANA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-2-1-2 OF THE INDIANA SECURITIES LAW AND HAVE NOT BEEN REGISTERED UNDER SECTION 23-2-1-3. THEY CANNOT THEREFORE BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID LAW OR UNLESS AN EXEMPTION FORM REGISTRATION IS AVAILABLE. A CLAIM OF EXEMPTION UNDER SAID LAW HAS BEEN FILED, AND IF SUCH EXEMPTION IS NOT DISALLOWED SALES OF THESE SECURITIES MAY BE MADE. HOWEVER, UNTIL SUCH EXEMPTION IS GRANTED, ANY OFFER MADE PURSUANT HERETO IS PRELIMINARY AND SUBJECT TO MATERIAL CHANGE.

16. **NOTICE TO IOWA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED; THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

17. **NOTICE TO KANSAS RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 81-5-15 OF THE KANSAS SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

18. **NOTICE TO KENTUCKY RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE

SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER TITLE 808 KAR 10:210 OF THE KENTUCKY SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

19. **NOTICE TO LOUISIANA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER RULE 1 OF THE LOUISIANA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

20. **NOTICE TO MAINE RESIDENTS ONLY:** THE ISSUER IS REQUIRED TO MAKE A REASONABLE FINDING THAT THE SECURITIES OFFERED ARE A SUITABLE INVESTMENT FOR THE PURCHASER AND THAT THE PURCHASER IS FINANCIALLY ABLE TO BEAR THE RISK OF LOSING THE ENTIRE AMOUNT INVESTED. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION UNDER §16202(15) OF THE MAINE UNIFORM SECURITIES ACT AND ARE NOT REGISTERED WITH THE SECURITIES ADMINISTRATOR OF THE STATE OF MAINE. THE SECURITIES OFFERED FOR SALE MAY BE RESTRICTED SECURITIES AND THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS: (1) THE SECURITIES ARE REGISTERED UNDER STATE AND FEDERAL SECURITIES LAWS, OR (2) AN EXEMPTION IS AVAILABLE UNDER THOSE LAWS.

21. **NOTICE TO MARYLAND RESIDENTS ONLY:** IF YOU ARE A MARYLAND RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 11-602(9) OF THE MARYLAND SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MARYLAND. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

22. **NOTICE TO MASSACHUSETTS RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MASSACHUSETTS UNIFORM SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THIS OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

23. **NOTICE TO MICHIGAN RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE MICHIGAN SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

24. **NOTICE TO MINNESOTA RESIDENTS ONLY:** THESE SECURITIES BEING OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA

SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

25. **NOTICE TO MISSISSIPPI RESIDENTS ONLY:** THE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE MISSISSIPPI SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE MISSISSIPPI SECRETARY OF STATE OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE SECRETARY OF STATE NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, OR APPROVED OR DISAPPROVED THIS OFFERING. THE SECRETARY OF STATE DOES NOT RECOMMEND THE PURCHASE OF THESE OR ANY OTHER SECURITIES. EACH PURCHASER OF THE SECURITIES MUST MEET CERTAIN SUITABILITY STANDARDS AND MUST BE ABLE TO BEAR AN ENTIRE LOSS OF THIS INVESTMENT. THE SECURITIES MAY NOT BE TRANSFERRED FOR A PERIOD OF ONE (1) YEAR EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE MISSISSIPPI SECURITIES ACT OR IN A TRANSACTION IN COMPLIANCE WITH THE MISSISSIPPI SECURITIES ACT.

26. **FOR MISSOURI RESIDENTS ONLY:** THE SECURITIES OFFERED HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE PURCHASER IN A TRANSACTION EXEMPT UNDER SECTION 4.G OF THE MISSOURI SECURITIES LAW OF 1953, AS AMENDED. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MISSOURI. UNLESS THE SECURITIES ARE SO REGISTERED, THEY MAY NOT BE OFFERED FOR SALE OR RESOLD IN THE STATE OF MISSOURI, EXCEPT AS A SECURITY, OR IN A TRANSACTION EXEMPT UNDER SAID ACT.

27. **NOTICE TO MONTANA RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A MONTANA RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF FIVE (5) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES.

28. **NOTICE TO NEBRASKA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER CHAPTER 15 OF THE NEBRASKA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

29. **NOTICE TO NEVADA RESIDENTS ONLY:** IF ANY INVESTOR ACCEPTS ANY OFFER TO PURCHASE THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION NRS 90.530 OF THE NEVADA SECURITIES LAW. THE INVESTOR IS HEREBY ADVISED THAT THE ATTORNEY GENERAL OF THE STATE OF NEVADA HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING AND THE FILING OF THE OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE, OR SALE THEREOF, BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEVADA. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. NEVADA ALLOWS THE SALE OF SECURITIES TO 25 OR FEWER PURCHASERS IN THE STATE WITHOUT REGISTRATION. HOWEVER, CERTAIN CONDITIONS APPLY, I.E., THERE CAN BE NO GENERAL ADVERTISING OR SOLICITATION AND COMMISSIONS ARE LIMITED TO LICENSED

BROKER-DEALERS. THIS EXEMPTION IS GENERALLY USED WHERE THE PROSPECTIVE INVESTOR IS ALREADY KNOWN AND HAS A PRE-EXISTING RELATIONSHIP WITH THE COMPANY. (SEE NRS 90.530.11.)

30. **NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY:** NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE UNDER THIS CHAPTER HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

31. **NOTICE TO NEW JERSEY RESIDENTS ONLY:** IF YOU ARE A NEW JERSEY RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE CONFIDENTIAL OFFERING DOCUMENTS HAVE NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

32. **NOTICE TO NEW MEXICO RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE NEW MEXICO DEPARTMENT OF BANKING NOR HAS THE SECURITIES DIVISION PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

33. **NOTICE TO NEW YORK RESIDENTS ONLY:** THIS MEMORANDUM HAVE NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE COMPANY HAS TAKEN NO STEPS TO CREATE AN AFTER MARKET FOR THE SECURITIES OFFERED HEREIN AND HAS MADE NO ARRANGEMENTS WITH BROKERS OF OTHERS TO TRADE OR MAKE A MARKET IN THE SECURITIES. AT SOME TIME IN THE FUTURE, THE COMPANY MAY ATTEMPT TO ARRANGE FOR INTERESTED BROKERS TO TRADE OR MAKE A MARKET IN THE SECURITIES AND TO QUOTE THE SAME IN A PUBLISHED QUOTATION MEDIUM, HOWEVER, NO SUCH ARRANGEMENTS HAVE BEEN MADE AND THERE IS NO ASSURANCE THAT ANY BROKERS WILL EVER HAVE SUCH AN INTEREST IN THE SECURITIES OF THE COMPANY OR THAT THERE WILL EVER BE A MARKET THEREFORE.

34. **NOTICE TO NORTH CAROLINA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.

FURTHERMORE, THE FORGOING AUTHORITIES HAVE NOT CONFIRMED ACCURACY OR DETERMINED ADEQUACY OF THIS MEMORANDUM. REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

35. **NOTICE TO NORTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES COMMISSIONER OF THE STATE OF NORTH DAKOTA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

36. **NOTICE TO OHIO RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 1707.03(X) OF THE OHIO SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

37. **NOTICE TO OKLAHOMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF OKLAHOMA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION FOR PRIVATE OFFERINGS. ALTHOUGH A PRIOR FILING OF THESE CONFIDENTIAL OFFERING DOCUMENTS AND THE INFORMATION HAS BEEN MADE WITH THE OKLAHOMA SECURITIES COMMISSION, SUCH FILING IS PERMISSIVE ONLY AND DOES NOT CONSTITUTE AN APPROVAL, RECOMMENDATION OR ENDORSEMENT, AND IN NO SENSE IS TO BE REPRESENTED AS AN INDICATION OF THE INVESTMENT MERIT OF SUCH SECURITIES. ANY SUCH REPRESENTATION IS UNLAWFUL.

38. **NOTICE TO OREGON RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE CORPORATION COMMISSION OF THE STATE OF OREGON UNDER PROVISIONS OF ORS 59.049. THE INVESTOR IS ADVISED THAT THE COMMISSIONER HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS MEMORANDUM SINCE THIS MEMORANDUM IS NOT REQUIRED TO BE FILED WITH THE COMMISSIONER. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE COMPANY CREATING THE SECURITIES, AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

39. **NOTICE TO PENNSYLVANIA RESIDENTS ONLY:** EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(D), DIRECTLY FROM THE ISSUER OR AFFILIATE OF THIS ISSUER, SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER HE

MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED. IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 (70 PS § 1-207(M), YOU MAY ELECT, WITHIN TWO (2) BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONEYS PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A LETTER OR TELEGRAM TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE CONFIDENTIAL OFFERING DOCUMENTS) INDICATING YOUR INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU SHOULD ASK WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. NO SALE OF THE SECURITIES WILL BE MADE TO RESIDENTS OF THE STATE OF PENNSYLVANIA WHO ARE NON-ACCREDITED INVESTORS. EACH PENNSYLVANIA RESIDENT MUST AGREE NOT TO SELL THESE SECURITIES FOR A PERIOD OF TWELVE (12) MONTHS AFTER THE DATE OF PURCHASE, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION. THE SECURITIES HAVE BEEN ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE PENNSYLVANIA SECURITIES ACT OF 1972. NO SUBSEQUENT RESALE OR OTHER DISPOSITION OF THE SECURITIES MAY BE MADE WITHIN 12 MONTHS FOLLOWING THEIR INITIAL SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION, AND THEREAFTER ONLY PURSUANT TO AN EFFECTIVE REGISTRATION OR EXEMPTION.

40. **NOTICE TO RHODE ISLAND RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE DEPARTMENT OF BUSINESS REGULATION OF THE STATE OF RHODE ISLAND NOR HAS THE DIRECTOR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

41. **NOTICE TO SOUTH CAROLINA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE SOUTH CAROLINA UNIFORM SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE SOUTH CAROLINA SECURITIES COMMISSIONER. THE COMMISSIONER DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

42. **NOTICE TO SOUTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THESE CONFIDENTIAL OFFERING DOCUMENTS ARE TRUE, COMPLETE, AND NOT MISLEADING, NOR HAS THE DIRECTOR

OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

43. **NOTICE TO TENNESSEE RESIDENT ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD. EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

44. **NOTICE TO TEXAS RESIDENTS ONLY:** THE SECURITIES OFFERED HEREUNDER HAVE NOT BEEN REGISTERED UNDER APPLICABLE TEXAS SECURITIES LAWS AND, THEREFORE, ANY PURCHASER THEREOF MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. FURTHER, PURSUANT TO §109.13 UNDER THE TEXAS SECURITIES ACT, THE COMPANY IS REQUIRED TO APPRISE PROSPECTIVE INVESTORS OF THE FOLLOWING: A LEGEND SHALL BE PLACED, UPON ISSUANCE, ON CERTIFICATES REPRESENTING SECURITIES PURCHASED HEREUNDER, AND ANY PURCHASER HEREUNDER SHALL BE REQUIRED TO SIGN A WRITTEN AGREEMENT THAT HE WILL NOT SELL THE SUBJECT SECURITIES WITHOUT REGISTRATION UNDER APPLICABLE SECURITIES LAWS, OR EXEMPTIONS THEREFROM.

45. **NOTICE TO UTAH RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE UTAH SECURITIES ACT. THE SECURITIES CANNOT BE TRANSFERRED OR SOLD EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

46. **NOTICE TO VERMONT RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE STATE OF VERMONT NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

47. **NOTICE TO VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION UNDER SECTION 13.1-514 OF THE VIRGINIA SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

48. **NOTICE TO WASHINGTON RESIDENTS ONLY:** THE ADMINISTRATOR OF SECURITIES HAS NOT REVIEWED THE OFFERING OR CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE SECURITIES HAVE NOT BEEN REGISTERED IN RELIANCE UPON THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, AND THEREFORE, CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, OR UNLESS AN EXEMPTION FROM REGISTRATION IS MADE AVAILABLE.

49. **NOTICE TO WEST VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 15.06(B)(9) OF THE WEST VIRGINIA SECURITIES LAW AND MAY NOT BE REOFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

50. **NOTICE TO WISCONSIN RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A WISCONSIN RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF THREE AND ONE-THIRD (3 1/3) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES OFFERED HEREIN.

51. **FOR WYOMING RESIDENTS ONLY:** ALL WYOMING RESIDENTS WHO SUBSCRIBE TO PURCHASE SECURITIES OFFERED BY THE COMPANY MUST SATISFY THE FOLLOWING MINIMUM FINANCIAL SUITABILITY REQUIREMENTS IN ORDER TO PURCHASE SECURITIES: (1) A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) OF TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000); AND (2) THE PURCHASE PRICE OF SECURITIES SUBSCRIBED FOR MAY NOT EXCEED TWENTY PERCENT (20%) OF THE NET WORTH OF THE SUBSCRIBER; AND (3) "TAXABLE INCOME" AS DEFINED IN SECTION 63 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, DURING THE LAST TAX YEAR AND ESTIMATED "TAXABLE INCOME" DURING THE CURRENT TAX YEAR SUBJECT TO A FEDERAL INCOME TAX RATE OF NOT LESS THAN THIRTY-THREE PERCENT (33%). IN ORDER TO VERIFY THE FOREGOING, ALL SUBSCRIBERS WHO ARE WYOMING RESIDENTS WILL BE REQUIRED TO REPRESENT IN THE SUBSCRIPTION AGREEMENT THAT THEY MEET THESE WYOMING SPECIAL INVESTOR SUITABILITY REQUIREMENTS.

## BASIS OF PRESENTATION

In this Memorandum, unless the context otherwise requires, we," "us," "our," or the "Company," refers collectively to iCap Equity, LLC, a Delaware limited liability company, the issuer of the Notes in this Offering, and its subsidiaries. The Company was initially formed on August 15, 2011 as a Washington limited liability company, and converted to a Delaware limited liability company on September 21, 2017.

We use a twelve-month fiscal year ending on December 31st of each calendar year. In a twelve-month fiscal year, each quarter includes three-months of operations; the first, second, third and fourth quarters end on March 31, June 30, September 30 and December 31, respectively.

Certain monetary amounts, percentages and other figures included in this Memorandum have been subject to rounding adjustments. Percentage amounts included in this Memorandum have not in all cases been calculated on the basis of such rounded figures but on the basis of such amounts prior to rounding. For this reason, percentage amounts in this Memorandum may vary from those obtained by performing the same calculations using the figures in our consolidated financial statements. Certain other amounts that appear in this Memorandum may not sum due to rounding.

Unless otherwise indicated, all references to "dollars" and "$" in this Memorandum are to, and amounts are presented in, U.S. dollars.

Unless otherwise indicated or the context otherwise requires, financial and operating data in this Memorandum reflect the consolidated business and operations of the Company and its subsidiaries.

## MARKET AND INDUSTRY DATA AND FORECASTS

Certain market and industry data included in this Memorandum is derived from information provided by third-party market research firms, or third-party financial or analytics firms that we believe to be reliable. Market estimates are calculated by using independent industry publications, government publications and third-party forecasts in conjunction with our assumptions about our markets. We have not independently verified such third-party information. The market data used in this Memorandum involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates. Certain data are also based on our good faith estimates, which are derived from management's knowledge of the industry and independent sources. Industry publications, surveys and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but there can be no assurance as to the accuracy or completeness of included information. We have not independently verified any of the data from third-party sources nor have we ascertained the underlying economic assumptions relied upon therein. Statements as to our market position are based on market data currently available to us. While we are not aware of any misstatements regarding any market, industry or similar data presented herein, such data involves risks and uncertainties and are subject to change based on various factors, including those discussed under the headings "Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors" in this Memorandum. These and other factors could cause results to differ materially from those expressed in the estimates made by the independent parties and by us. While we are not aware of any misstatements regarding the above matters presented herein, the information described above and our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "Risk Factors" in this Memorandum. Similarly, we believe our internal research is reliable, even though such research has not been verified by any independent sources.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This Memorandum contains certain forward-looking statements that are subject to various risks and uncertainties. Forward-looking statements are generally identifiable by use of forward-looking

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 12 Page 212

terminology such as "may," "will," "should," "potential," "intend," "expect," "outlook," "seek," "anticipate," "estimate," "approximately," "believe," "could," "project," "predict," or other similar words or expressions. Forward-looking statements are based on certain assumptions, discuss future expectations, describe future plans and strategies, contain financial and operating projections or state other forward-looking information. Our ability to predict results or the actual effect of future events, actions, plans or strategies is inherently uncertain. Although we believe that the expectations reflected in our forward-looking statements are based on reasonable assumptions, our actual results and performance could differ materially from those set forth or anticipated in our forward-looking statements. Factors that could have a material adverse effect on our forward-looking statements and upon our business, results of operations, financial condition, funds derived from operations, cash available for dividends and interest payments, cash flows, liquidity and prospects include, but are not limited to, the factors referenced in this Memorandum, including those set forth below.

When considering forward-looking statements, you should keep in mind the risk factors and other cautionary statements in this Memorandum. Readers are cautioned not to place undue reliance on any of these forward-looking statements, which reflect our views as of the date of this Memorandum. The matters summarized below and elsewhere in this Memorandum could cause our actual results and performance to differ materially from those set forth or anticipated in forward-looking statements. Accordingly, we cannot guarantee future results or performance. Furthermore, except as required by law, we are under no duty to, and we do not intend to, update any of our forward-looking statements after the date of this Memorandum, whether as a result of new information, future events or otherwise.

## CONFIDENTIALITY AND RELATED MATTERS

Each recipient hereof agrees by accepting this Memorandum that the information contained herein is of a confidential nature and that such recipient will treat such information in a strictly confidential manner and that such recipient will not, directly or indirectly, disclose or permit its affiliates or representatives to disclose, any information to any other person or entity, or reproduce such information, in whole or in part, without the prior written consent of the Company.

Each recipient of this Memorandum further agrees to use the information solely for the purpose of analyzing the desirability of an investment in the Notes to such recipient and for no other purpose whatsoever.

ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM AND EXHIBITS, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED. NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM OR AN AUTHORIZED SUMMARY HEREOF, OR IN ANY AGREEMENT CONTEMPLATED HEREBY, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR IN SUCH AUTHORIZED SUMMARY OR AGREEMENT MUST NOT BE RELIED UPON.

## RESTRICTIONS ON TRANSFERABILITY

SINCE THE SECURITIES OFFERED HEREBY ARE NOT BEING REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES CANNOT BE SOLD BY AN INVESTOR UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH ACT, OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE AT THE TIME OF DESIRED SALE. THEREFORE, A PURCHASER MUST BE ABLE TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 13 Page 213

## TAXES

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. THE TAX ASPECTS OF AN INVESTMENT IN THE NOTES REQUIRE CAREFUL AND INFORMED STUDY WITH RESPECT TO AN INVESTOR'S PERSONAL TAX AND FINANCIAL POSITION. ACCORDINGLY, NO PERSON SHOULD INVEST IN THE NOTES WITHOUT PRIOR INDEPENDENT EXPERT ADVICE AS TO THE TAX IMPACT OF AN INVESTMENT IN THE NOTES. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES. NOTHING IN THIS MEMORANDUM SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO POTENTIAL INVESTORS.

A COPY OF THIS MEMORANDUM AND THE SUBSCRIPTION AGREEMENTS SHALL BE DELIVERED TO EVERY PERSON (EITHER IN PERSON OR VIA MAIL OR ELECTRONIC DELIVERY) SOLICITED TO BUY ANY OF THE SECURITIES HEREBY OFFERED, AT THE TIME OF THE INITIAL OFFER TO SELL.

## WHERE YOU CAN OBTAIN MORE INFORMATION

This Memorandum contains limited information on the Company. While we believe the information contained in this Memorandum is accurate, this Memorandum is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective investor that the abbreviated nature of this Memorandum will not omit to state a material fact, which a prospective investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such investor. As a result, prospective investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **An investment in the Notes is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

Prospective investors may make an independent examination of our books, records and other documents to the extent an investor deems it necessary, and should not rely on us or any of our employees or agents with respect to judgments relating to an investment in the Notes.

Each offeree may, if he, she or it so desires, make inquiries of appropriate members of our management with respect to our business or any other matters set forth herein, and may obtain any additional information which such person deems to be necessary in order to verify the accuracy of the information contained in this Memorandum (to the extent that we possess such information or can acquire it without unreasonable effort or expense) upon the execution and delivery of an agreement to maintain the confidentiality of such information for the benefit of the Company.

Any such inquiries or requests for additional information or documents should be made in writing to us, addressed as follows:

iCap Equity, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006
ATTN: Investor Relations
OFC: (425) 278-9030; FAX: (425) 278-9025
EMAIL: investor@icapequity.com

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 14 Page 214

# Table of Contents

SUMMARY ................................................................................................................................... 1

THE OFFERING ........................................................................................................................... 2

THE NOTES ................................................................................................................................. 3

    General ..................................................................................................................................... 3

    Transfers ................................................................................................................................... 4

    Events of Default ..................................................................................................................... 4

    Covenants ................................................................................................................................. 5

    Guaranty ................................................................................................................................... 5

    Deemed Consent ...................................................................................................................... 5

THE COMPANY .......................................................................................................................... 5

    The Company and its Operations ............................................................................................ 5

Investment Strategy of the Enterprises Group Overall .............................................................. 7

Vision and Values ....................................................................................................................... 7

    Real Estate Investment Structure ............................................................................................ 8

    Investment Process ................................................................................................................... 9

    Risk Controls ............................................................................................................................ 9

    Members and Management ...................................................................................................... 9

    Biographies of Management Personnel ................................................................................... 9

    Organizational Strength and Experience ............................................................................... 10

    Transactions with Related Parties ......................................................................................... 11

USE OF PROCEEDS .................................................................................................................. 13

PLAN OF DISTRIBUTION ....................................................................................................... 14

INVESTOR SUITABILITY STANDARDS ............................................................................... 14

SUBSCRIPTION PROCEDURES ............................................................................................. 18

RESTRICTIONS ON TRANSFERABILITY ............................................................................ 19

STATEMENT AS TO INDEMNIFICATION ............................................................................ 19

RISK FACTORS ......................................................................................................................... 20

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ........................................... 34

ERISA MATTERS ...................................................................................................................... 37

REPORTS TO THE INVESTORS ............................................................................................. 37

## Exhibits

Exhibit A-1    Subscription Agreement for Accredited Investors

Exhibit A-2    Subscription Agreement for Non-U.S. Persons

Exhibit B       Form of Promissory Note

Exhibit C       Guaranty Agreement

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 15    Page 215

# SUMMARY

*This summary of this Memorandum highlights material information concerning our business and this Offering. This summary does not contain all of the information that you should consider before making your investment decision. You should carefully read this entire Memorandum, including the information presented under the section entitled "Risk Factors" and the financial data and related notes, before making an investment decision. This summary contains forward-looking statements that involve risks and uncertainties. Our actual results may differ significantly from future results contemplated in the forward-looking statements as a result of factors such as those set forth in "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements."*

The following is a summary of selected terms of the Company and the Notes. This summary is not intended as a summary of all principal terms and is qualified in its entirety by the more detailed descriptions set forth below, the Subscription Agreements attached hereto as Exhibit A-1 and Exhibit A-2 (the "Subscription Agreement"), and the Note itself. Capitalized terms used in this Summary and not otherwise defined have the meanings given to them elsewhere in this Memorandum.

**The Company**

iCap Equity, LLC, a Delaware limited liability company is a Bellevue, Washington-based investment firm formed in 2011. The parent company of iCap Equity, LLC is iCap Enterprises, Inc. ('iCap Enterprises"). Any references herein to "Enterprises Group" refers to iCap Enterprises and its affiliated group of companies, including the Company.

See "The Company" commencing on page 5.

**Manager**

The Company is managed by its parent company, iCap Enterprises, whom we also refer to herein as the "Manager". The Company will not pay a fixed annual management fee to the Manager. However, the Company will pay sums to the Manager as are necessary to allow the Manager to perform those functions that relate to the Company's business purpose, such as payroll, rent, marketing, debt service, and all other such costs. The Company may only make distributions to the Manager if the issued and outstanding Notes are not in default.

See "The Company – Members and Management" commencing on page 9.

**The Offering**

The Company is issuing up to $50,000,000 in aggregate principal amount of Notes, provided that the Company may issue other additional promissory notes or other instruments at any time, subject to the limitations set forth below. The minimum individual investment is $5,000, with any amounts in excess thereof being permitted, and all subscriptions, whether for the minimum investment amount, or more or less than this amount, are subject to the acceptance or rejection by the Manager in its sole discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one Noteholder or its affiliates.

The Company will offer the Notes for a period commencing on the date of this Memorandum and expiring on May 1, 2021. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines.

The Company may terminate, or amend the terms of, this Offering at any time.

|              | See "The Offering" commencing on page 2. |
|--------------|------------------------------------------|
| **The Notes** | Principal and unpaid accrued interest will be due and payable three years after the date of the initial investment (subject to a one-year extension at the discretion of the Manager as set forth below, the "Maturity Date"). The Notes may be prepaid prior to the Maturity Date without penalty. The outstanding loan amount will shall bear interest at 10% per annum and will be calculated based on twelve 30-day months. At the time of subscribing for a Note, Holders will have the option of electing whether accrued interest is to be paid monthly, or is to be accrued, compounded monthly and added to the outstanding principle amount. On the Maturity Date, or at the time the Company pays off the entire principal balance of the Note, the Holder will be entitled to a one-time payment of 5% of the original Note balance ("Payoff Premium"). The Company reserves the right to issue Notes in the future with a different interest rate or without the Payoff Premium. The Notes will be unsecured and will be of equal seniority to the promissory notes issued by the Company to investors in previous offerings, the general terms of which are available to all potential investors upon request. Upon the occurrence of an Event of Default (as defined below), the Holder may declare the principal balance to be due and payable. The Notes are general unsecured obligations of the Company.

See "The Notes" commencing on page 3. |
| **Guaranty** | iCap Pacific NW Management LLC, a wholly owned subsidiary of the Company, has entered into a guaranty agreement with the Company for the benefit of the Noteholders.

See "The Notes - Guaranty" commencing on page 5. |
| **Purpose** | The proceeds of this Offering will be used for the Company's business purposes, which include operations, technology implementation, new fund formation, real estate acquisition, investments into or loans to affiliate entities (both existing and yet-to-be-formed), consultant and professional engagements, and real estate based investments, including loans and preferred equity investments.

See "The Company" commencing on page 5 and "Use of Proceeds" commencing on page 13. |
| **Expenses** | The Company will bear all costs and expenses incurred in the organization of the Company and this Offering and potential future offerings, and will reimburse Manager for any such costs and expenses advanced by Manager. Each investor will bear his, her or its own fees and expenses incurred in connection with this Offering.

See "The Company - Transactions with Related Parties" on page 11. |

## THE OFFERING

The Company is offering for sale up to $50,000,000 of aggregate principal amount of Notes. The Offering is being made by the Company on a "best efforts" basis only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act and to persons who are Non-U.S. Persons pursuant to Regulation S promulgated under the Securities Act. The Company expects to engage one or more registered broker-dealers to act as placement agent(s) for the Offering (as applicable, the "Placement Agents") and expects to pay commissions to the Placement Agents as set forth in the Plan of Distribution commencing on page 14, based on the aggregate principal amount of the Notes sold to investors.

The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on May 1, 2021 (the "Offering Period") or earlier terminated as set forth herein.

The minimum individual investment is $5,000, with any amount in excess of $5,000 being permissible at the Manager's discretion. All subscriptions are subject to acceptance or rejection by the Manager in its sole discretion. The Manager may change, or accept less than, the minimum investment amount in its discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one investor or its affiliates. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines. In order to subscribe for a Note, prospective investors must follow the directions set forth in "Subscription Procedures" commencing on page 18.

An investor must be prepared to bear the economic risk of an investment in the Notes for an indefinite period of time. An investor in the Notes, pursuant to the Subscription Agreement and applicable law, will not be permitted to transfer or dispose of the Notes, unless they are registered for resale or such transaction is exempt from registration under the Securities Act and other applicable securities laws, and in the case of a purportedly exempt sale, such investor provides (at his or her own expense) an opinion of counsel satisfactory to us that such exemption is, in fact, available. The Notes will bear a legend relating to such restrictions on transfer.

This Offering may be withdrawn or terminated by the Company at any time. The Manager reserves the right to reject a subscription for Notes, in whole or in part in its sole discretion.

## THE NOTES

### General

Interest will accrue on the Notes from the date that the purchase price of the Note (which we refer to as the "Loan Amount") is paid to the company and the Company has accepted the applicable Subscription Agreement. The outstanding Loan Amount under a Note will bear interest at 10% per annum, and the interest computation will be based upon twelve 30-day months. In addition, if the Company exercises its right to extend the Maturity Date as discussed below, the outstanding Loan Amount will bear simple interest at 11% per annum during the extension period. In the event of an Event of Default (as described below), the outstanding Loan Amount will accrue interest at a default interest rate of 15% per year, simple interest from and after the date that the Company receives written notice of the Event of Default, until all amounts due under the Note have been paid in full or the Event of Default has been cured.

The full Loan Amount, together with accrued and unpaid interest, is due and payable to the noteholder (the "Holder"), on or before the end of the 36th calendar month following the issuance of the applicable Note, subject to the below. So long as an Event of Default has not occurred and is continuing, the Company has the option to extend the Maturity Date for an additional 12 months. This option may be exercised by the Company at any time prior to the Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Maturity Date.

Prospective investors will have the option of electing, on the signature page of the Note, whether the Company will make monthly interest payments on the Note, which will include all interest accrued through the end of the prior calendar month, or if the interest on the outstanding Loan Amount will accrue and be compounded monthly and added to the then-outstanding Loan Amount on the last day of each calendar month. If no election is made, the accrual option will be the operative provision.

On the Maturity Date, or at the time the Company pays off the entire principal balance of the Note, the Holder will be entitled to a one-time payment of 5% of the original Note balance ("Payoff Premium"). The Company may issue additional promissory notes in the future in later offerings by the Company, which

may be issued with or without a similar payoff premium.

The Company may choose to prepay part or all of the Note without penalty at any time prior to the Maturity Date, or extension thereof. Any such prepayment will be credited first to any accrued and unpaid interest and then to the payment of the outstanding Loan Amount.

**Transfers**

Subject to compliance with the requirements of the Note, Holders will have the right to transfer the Note to any qualifying third party of its choice contingent upon securing the Company's written consent in advance of the proposed transfer. The Company is under no obligation to recognize the transferee as a successor "Holder", until the Holder has surrendered the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Company. A new Note for a like principal amount and interest will be issued to, and registered in the name of, the transferee.

Transfer of the Notes may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Notes may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be registered for resale under the Blue Sky laws of any state, the Holders and any persons who desire to purchase them in any trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Notes and of purchasers to purchase the Notes. Accordingly, Investors should be prepared to hold the Notes until their maturity date as may be extended.

**Events of Default**

An "Event of Default" under a Note is the occurrence of any of the following:

- The Company defaults in the payment of any Loan Amount or interest on the applicable Note, when the same becomes due and payable and such default continues for a period of 30 business says after notice of such default has been delivered to Company by a Holder;

- the Company fails to observe or perform any covenant or warranty of the Company in the applicable Note (other than a covenant or warranty a default in whose performance or whose breach is specifically dealt with elsewhere in the Event of Default provisions, and such failure continues for a period of 30 calendar days after the Holder has given written notice to the Company;

- the Company commences a voluntary case under the bankruptcy laws, consents to the entry of an order for relief against it in an involuntary bankruptcy case, consents to the appointment of a custodian of it for all or substantially all of its property, or makes a general assignment for the benefit of its creditors; or

- a court of competent jurisdiction enters an order or decree under any bankruptcy law that is for relief against the Company in an involuntary bankruptcy case, appoints a custodian of the Company for all or substantially all of its property, or orders the liquidation of the Company; and the order or decree remains unstayed and in effect for 90 consecutive calendar days.

Upon the occurrence of an Event of Default and the expiration of any required time periods for notice, cure or other reasons, the Holder may declare the Loan Amount to be due and payable. Upon such a declaration, such principal and interest, if any, will be immediately due and payable. The occurrence of an Event of Default for one Note in this Offering will not be an Event of Default for any other Note issued

in this Offering.

**Covenants**

The Company has agreed to certain covenants with respect to the Notes, as follows:

- The Company will furnish to each Holder as soon as available, and in any event within 60 days after December 31 of each year, all reasonably required tax information applicable to the Holder.

- The proceeds from the sale and issuance of the Notes are expected to be used for the purposes set forth in this Memorandum, and for the fees, costs and expenses incurred in connection with the Offering. However, the Manager retains sole discretion to determine how such proceeds are ultimately used. Distributions may be made so long as the Company is not in default under the Note obligations.

- For so long as a Holder continues to hold the Note, the Company will provide to the Holder annual financial statements of the Company and such information relative to the Company's business operations and performance as its management may deem useful or appropriate.

**Guaranty**

iCap Pacific NW Management LLC, a wholly owned subsidiary of the Company ("iCap Pacific NW") which holds the equity interests of the Company's operating subsidiaries has entered into a Guaranty Agreement with the Company pursuant to which iCap Pacific NW has guaranteed the obligations of the Company pursuant to the Notes (the "Guaranty Agreement"). The Guaranty Agreement provides that, during the continuation of an Event of Default with respect to a particular Note, the holder of that Note may enforce the guaranty against iCap Pacific NW, but only after attempting to collect or exhausting the applicable Noteholder's efforts to collect from the Company.

**Deemed Consent**

Each Note may be amended by the Company and the applicable Holder. However, the Note also contains a "deemed consent" provision, which provides that if the Company has provided the Holder with two notices of a proposed amendment (or any other consent, approval or waiver required or requested) and the Holder has not responded to either notice within 10 days of delivery, the Holder will be deemed to have consented, in writing, to the proposed amendment, approval, consent or waiver, and the Company may rely on such deemed consent.

\*\*\*

The descriptions of the Notes and the Guaranty Agreement set forth herein are not a full description of the terms of the Notes or the Guaranty Agreement and are qualified in their entirety to the form of Note as attached hereto as Exhibit B and the Guaranty Agreement as attached hereto as Exhibit C. Prospective investors are urged to read the Note and the Guaranty Agreement in their entireties prior to subscribing for the purchase of a Note.

## THE COMPANY

**The Company and its Operations**

iCap Equity, LLC is a Delaware limited liability company based in Bellevue, Washington, formed in 2011. The Company's sole member is iCap Enterprises, which is also the Company's Manager. The

Manager is wholly owned by Chris Christensen. The Company primarily derives its income from fees generated through the operations of its subsidiary entities, all of which are held by iCap Pacific NW Management LLC. It will also receive income from investments that it plans to make with the proceeds of this Offering, whether into real estate or affiliated funds. The Company's primary investment strategy focuses on preferred equity investments in Pacific Northwest real estate projects, but the Company also structures other investment opportunities that are based in real estate. The Company's subsidiary funds have primarily made secured, short-term investments in single-family, multi-family, light commercial and land development projects. Most investments of the past involve some element of construction or development.

Although this Memorandum refers to "iCap" and the Company as though each were an entity capable of taking action, prospective Investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. By investing in a Note, an Investor will not acquire an interest in any of its affiliated entities, but it may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Company as it conducts its business.

The following chart illustrates the relationship among the various members of the Enterprises Group.



Members of the management team previously established iCap B1, LLC, and iCap B2, LLC in 2013, which raised a total of $6,915,664 for the purpose of making investments into various real estate projects. These special purpose vehicles made 10 investments and generated a gross IRR to investors of 20%. The management team also issued a total of $93 Million in debentures across two pooled investment funds, iCap Pacific NW Opportunity and Income Fund, LLC, and its follow-on fund, iCap Northwest Opportunity Fund, LLC. Investors in these two funds earned a 12% annualized rate of interest and 11% annualized rate of interest, respectively. Additional affiliate entities include iCap Pacific Income Fund 4, LLC, which has raised $10.6 million and pays a 10% annual rate of interest, and iCap Pacific Income Fund 5, LLC, which has raised $2.8 million and pays a 9% annual rate of interest, and iCap Vault 1, LLC which is being registered with the SEC and currently pays a 2% annual rate of interest. As of the date of this Memorandum, iCap has approximately $119 Million in assets under management (including reserves and committed capital for investments), which has been invested across 75 projects.

In November of 2017 and May of 2019, the Company undertook a prior offering of promissory notes, which had substantially the same terms as the Notes in this Offering, other than the deemed consent

provisions above and certain other features (the "Prior Offering"). The Prior Offering resulted in the Company issuing $21.7 million in aggregate principal amount of promissory notes, which are currently issued and outstanding. The Prior Offering was terminated upon commencement of this Offering.

POTENTIAL INVESTORS SHOULD RECOGNIZE THAT BY PURCHASING NOTES THEY WILL NOT THEREBY ACQUIRE ANY INTEREST, DIRECTLY OR INDIRECTLY, IN THE COMPANY OR ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. INVESTORS SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES AS SET FORTH HEREIN IS GIVEN SOLELY TO ALLOW INVESTORS TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. THE MANAGER AND ITS AFFILIATES MAY CONTINUE TO ENGAGE IN MANAGEMENT AND INVESTMENT ACTIVITIES RELATED TO PRE-EXISTING INVESTMENTS AND ACTIVITIES OR OPERATIONS OF THE PRIOR FUNDS AS WELL AS FUTURE INVESTMENTS OR FUNDS.

**Investment Strategy of the Enterprises Group Overall**

The Enterprises Group, of which the Company is a part, creates entities such as the Company, that offer investors high-yield income funds backed by real estate. The Enterprises Group differentiates itself through its innovative investment structures and use of technology. The Enterprises Group has over $118M in Assets Under Management, more than 1,100 investors and is currently raising its 6th fund (the individual funds are collectively referred to herein as the "Funds"). The Enterprises Group's first fund was created to provide preferred equity investments for construction and development projects in the Pacific Northwest, and it is continuously working on new investment products and plans to introduce two new publicly registered offerings over the next six to twelve months.

Additional related parties include Edge Construction, LLC, which is an affiliate general contractor entity that was initially used to develop real estate projects directly, but which is no longer an active part of the Enterprises Group's strategy and is being phased out. The Enterprises Group now relies on its growing network of third-party building and development companies to perform construction and development services. The Enterprises Group recently established offices in Shanghai and Hangzhou, China and has a growing number of Chinese investors, and we use those offices to service their needs.

**Vision and Values**

The Enterprises Group adheres to the following vision and values:

- **Purpose**: to empower people to build and preserve value through real estate
- **Vision**: To be the world's most innovative and reliable real estate investment business
- **Values**:
  - *Integrity* – Do what is right
  - *Accountability* – Hold each other accountable
  - *Open & Clear Communication* – Be direct. Listen to others. Communicate frequently.
  - *Innovation* – identify inefficiencies and find innovative ways to improve them
  - *Smart Business* – Make solid business decisions based on good information
  - *Respect* – Treat everyone professionally. Acknowledge and listen.
  - *Excellence* – Don't just do it. Do it well.

The Enterprises Group desires to be a place where investors can find extraordinary investment opportunities that have unique features. We have established a place where savvy investors can find high yield investments providing both income and liquidity. Our investments typically provide for monthly payments to investors at rates that are among the best available in the market. Additionally, we utilize new technologies that allow for efficient investor onboarding and access to statements and other reports. Our

investors reside all over the world, and we seek to provide each of them with the best tools for managing their investments with iCap.

**Real Estate Investment Structure**

The Company will invest using three real estate investment structures: (a) joint ventures, (b) wholly-owned projects, and (c) credit lending. This mix of investment structures is designed to mitigate risk, while still allowing the Company to take advantage of market opportunities within each type of investment. The structure of investments also allows the Company to take advantage of short-term opportunities, while still maintaining flexibility to benefit from similar gains in the longer term. Each of these three structures is capable of complementing the others, resulting in strong deal flow for the funds.

***Equity Investment & Joint Ventures***

The Company's beginning business model was built on providing preferred equity in the form of a joint venture, relationship structured through a limited liability company (LLC), with a qualified builder or developer (referred to as a "***Project Partner***"). Each investment is structured to provide priority repayment of the iCap investment plus a preferred return and an exit fee in the Project Entity. For example, if iCap were to invest $1 million into a Project, iCap would be entitled to a priority repayment of the $1 million, a preferred return as negotiated with the Project Partner, and a share in the liquidation proceeds in the form of an exit fee. The legal agreements with the Project Entity provide for these returns to be delivered at a specific date, which is generally within 12-18 months from the time of the original investment.

Typical financing for real estate projects consists of two primary capital sources: (a) debt financing, usually through a first-position secured lender; and (b) equity contributions of the project sponsor and other partners. In most cases, a first-position senior lender will provide 70-75% of the total cost of a project, but will require that the project sponsor contribute the remaining capital either directly, or by bringing additional equity partners into the project. This equity contribution is the need that the current iCap funds address by bridging the gap between the cash provided by the senior debt and the developer's available equity contribution.

iCap's Funds receive a preferred membership interest in the Project Entity that accrues a 12% rate of return on its invested capital as well as an exit fee. This exit fee is calculated as a percentage of the total project value (usually 3-5% of the proceeds from a liquidation event, such as a sale or refinance). The exit fee is paid prior to the developer receiving any return of its capital or distribution of profits. Through this structure, the Funds target a gross annualized return on investment of 18-22%. The exit fee, which is based on the entire value of the project, is a key component to iCap's ability to maximize returns, which is enhanced by reinvestment of capital to create multiple exit fees using the same base of capital.

The Fund incorporates a focused investment strategy that is intended to align both the strengths of the management team and the demands of the market. The investment strategy targets a typical investment size for each project ranging from $500,000 to $3,000,000, and an average Investment holding period of 12-18 months per investment. The combined loan to value is the amount of the senior loan plus the Fund's investment and is generally not higher than 75% of the value of the property. The Funds invest in projects that have well established exit strategies and builders with proven track records.

**Investment Process**

The Company's portfolio of investments will consist of a variety of real estate types, including without limitation single-family homes, multi-family apartments, townhomes, condos, and mixed-use properties, generally in construction and development phases. The revenue generated from the investment portfolio will be used to pay interest and principal on the Notes and fund its operations.

To build its investment portfolio, the Company will identify metropolitan statistical areas within which to purchase properties. The Company has developed proven processes and controls to evaluate possible investment opportunities. The process begins by identifying metropolitan statistical areas within the U.S. ("Markets") with strong economic fundamentals that are likely to result in reliable exit strategies and strong returns. The Markets are selected after review of reports and analysis provided by economics professionals, as well as the Company's internal staff. The Markets are thereafter initially reviewed by a committee consisting of key members of the management team (the "Investment Committee"). Specifically, the Investment Committee is comprised of the Company's CEO, Chief Operating Officer, and Chief Financial Officer. Every investment opportunity is subject to preliminary due diligence performed by the Company's asset management team, who in turn will present investment opportunities to the Investment Committee for its review and approval. The Investment Committee meets weekly to review new opportunities. The Company completes diligence on prospective investments and maintains post-closing procedures that provide for the ongoing supervision of the investments. The investment process has three major areas of focus: (1) analysis and approval, (2) documentation and closing, and (3) post-closing and management.

The Investment Committee may delegate investment decision-making authority to sub-teams, provided such investments meet the fundamental criteria established by the Investment Committee. The Company will complete diligence on prospective investments and maintain closing procedures that provide for the safety of the invested funds. The investment process has three major areas of focus: analysis and approval, documentation and closing, and post-closing management.

**Risk Controls**

The Company's entity structure and investment strategy have been designed to mitigate risk and increase the likelihood of success. Each Investor whose subscription is accepted will receive a Note upon closing, which will provide the Investor with a priority return for repayment over equity holders, an ongoing interest rate payment, and a payoff premium. The Company's subsidiary management entity will then offer a corporate guaranty. By making the Notes a senior obligation of the Company, providing additional legal protections through a guaranty, and restricting the ability to make distributions in the event of default, the Company aligns the parties' incentives and limits the investment risk. Additionally, the Company has devised an investment strategy to ensure multiple income streams and has assembled an experienced and proven management team to oversee the business.

**Members and Management**

As discussed above, the sole member of the Company is iCap Enterprises, Inc., the Manager. The Manager is wholly owned by Chris Christensen.

**Biographies of Management Personnel**

*Chris Christensen.* Mr. Christensen has served as the Chief Executive Officer of the Company since its inception in 2011. Since 2011, he has served as the Chief Executive Officer of iCap Enterprises, Inc. From August 2007 to August 2011, Mr. Christensen served as President of Altius Development, Inc., the predecessor to iCap Enterprises, Inc. Mr. Christensen brings knowledge and experience in the legal, finance and real estate industries, where he previously served as a licensed attorney. His experience in financial structuring, legal compliance, and fund management will help the Company achieve its goals of providing a reliable investment experience for its investors. He is a graduate of the University of Utah with a B.S. in Economics in May 2001, Seattle University School of Law with a J.D. in May 2004, and Seattle University Albers School of Business and Economics with a Master of International Business degree in November 2005. Mr. Christensen was joined as a party to a civil lawsuit initiated in July 2014 claiming Breach of Contract, in which he won on all claims against him, the claims were dismissed, and he was awarded attorney's fees. Chris Christensen is the brother of Jim Christensen. Mr. Christensen does not hold, and has not previously held, any directorships in any reporting companies.

*Jim Christensen.* Mr. Christensen has served as the Chief Operating Officer of the Company since 2011. Mr. Christensen has also served as the Chief Operating Officer of iCap Enterprises, Inc. He assists the Chief Executive Officer with the day-to-day operations of iCap Enterprises, Inc. and its investment funds, including overseeing investment underwriting, project and construction management, project financing, and processes related to acquisition and disposition of Portfolio Investments. Prior to the formation of the prior funds, Mr. Christensen managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington State for iCap Enterprises, Inc. He has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Mr. Christensen holds a Master of Business Administration degree and a Bachelor of Arts degree in Economics from the University of Washington. Jim Christensen is the brother of Chris Christensen. Mr. Christensen does not hold, and has not previously held, any directorships in any reporting companies.

*Jonathan Siegel.* Mr. Siegel has served as the Chief Financial Officer of the Company since October 2019. Mr. Siegel has also worked at iCap Enterprises, Inc. since October 2019 where he serves as Chief Financial Officer. From January 2013 to July 2018, he worked at LabConnect Holdings, Inc. and LabConnect, LLC where he served as Chief Financial Officer. From June 2008 to December 2012, Mr. Siegel worked at Emmet Consulting where he served as Principal, providing C-level consulting on operational, financial and economic issues. Mr. Siegel brings knowledge and experience in the financial services, professional services, and corporate governance aspects of companies. His experience in the management of financial processes and controls at rapidly growing companies will help iCap Pacific Income Fund 6, LLC with regard to sustainable growth, efficient processes and client security. Mr. Siegel is a graduate of the University of Chicago with an MBA in Finance and Strategy in 1998 and a BA in Economics in 1991. Mr. Siegel does not hold, and has not previously held, any directorships in any reporting companies.

**Organizational Strength and Experience**

The members of the senior management team have completed a variety of projects in the small-cap real estate space. The team, through its combined experience, has closed in excess of $8 billion in transactions in the small and mid-cap spaces.

The Enterprises Group has capacity to accept additional capital and to deploy such proceeds towards real estate projects meeting its investment criteria. iCap intends to grow as an organization with the expected increase in capital under management. With regards to human capital, various support staff will be hired to assist the Enterprises Group's existing personnel to leverage the systems described above, consistent with the Enterprises Group's growth plan. As the Enterprises Group deploys additional capital raised through the Company, the Enterprises Group plans to add additional staff members to assist with the increased transaction volume and asset management. The Enterprises Group also plans to add additional support staff for its in-house accounting and legal departments.

The Enterprises Group also maintains a network of strategic relationships. The team leverages relationships with sourcing, development, construction, and fund administration constituents to maintain a pipeline of real estate investment opportunities. Property owners, builders, developers, lenders and brokers are the primary sources for deal flow.

The Enterprises Group has capacity to expand its team to manage large amounts of capital from the sale of the Notes and to deploy such proceeds towards real estate that meets its investment criteria. The Enterprises Group has invested significant resources to build the technology and infrastructure needed to manage large amounts of noteholders, capital, and real estate-based investments. The number of employees who manage this infrastructure will grow as the capital under management increases.

The Manager and its affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

## Transactions with Related Parties

The Manager and its affiliates will be entitled to certain types of compensation, fees, income, distributions or other payments from the Company or in connection with a Company investment. Additionally, the Manager may make loans to or preferred equity investments in affiliated iCap entities, whether now formed or yet-to-be-formed, and may do so in such amounts and on such terms as the Manager deems appropriate. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Company. The Manager has no obligation to advance funds to cover the Company's expenses. However, to the extent that such advances are made, the Company will repay such amounts out of its funds as soon as they are available, whether such funds are from the Company's operating revenues or third-party loans. Below is a summary of these key payment obligations of the Company and potential conflicts of interest that could arise from these obligations.

*Compensation and Other Payments to the Manager and Affiliates*

The Company will not pay a fixed annual management fee to the Manager. However, the Company will pay sums to the Manager as are necessary to allow the Manager to perform those functions that relate to the Company's business purpose, such as payroll, rent, marketing, technology, professional services, debt service, and all other such costs.

In addition to the fees set forth above, the Company will reimburse the Manager and its affiliates for any reasonable expenses paid by such Person that properly should be borne by the Company. Such expenses include costs incurred before and after the formation of the Offering, such as organizational and offering expenses; consulting, legal, accounting, and professional fees; and marketing and travel expenses.

The Company is required to distribute to the Manager, as a member of the Company, in cash the amount of taxes that are estimated to be payable by the Manager within 90 days after the close of each fiscal year. The Company is not required to make any distributions to its members prior to dissolution other than tax distributions.

The Manager may authorize non-tax-related distributions as long as an Event of Default has not occurred and is continuing under the terms of any Note, as evidenced by properly delivered notice by Holder to the Company under the terms of the Note. Additionally, after the Company has paid the outstanding principal and annual interest due and payable under the Notes, the Company may distribute any remaining profits to the Manager. Given the ongoing operational nature of the Company, the Company expects to make ongoing distributions to the Manager. The Manager's profit interest in the Company may create an incentive for the Manager to make more speculative investments on behalf of the Company than the Manager otherwise would make in the absence of such profit potential.

The Company is the parent company to various fund entities. The Company may make loans to, or preferred equity investments in, such entities, as well as to or in the Manager or any affiliate of the Manager, whether now existing or yet-to-be-formed. Such entities include, without limitation, iCap Pacific Opportunity and Income Fund, LLC, iCap Northwest Opportunity Fund, LLC, iCap Pacific Income Fund 4, LLC, iCap Pacific Income Fund 5, LLC, iCap Pacific Income Fund 6, LLC, iCap Vault, LLC, iCap Vault 1, LLC, Vault Holding 1, LLC, and any subsidiaries of such entities. Entities in which the Company makes loans, or preferred equity investments in, may have negative cash flows and could result in losses to the Company. Any transactions entered into by the Company with such entities will likely not be made at arm's length terms, and rates of interest, maturity dates, and other material terms will be determined by the management personnel of the Company which also manages these affiliates. Additionally, the Company may choose not enforce its legal rights in the event of default of any investment made to or with an affiliate.

The Company may enter into various transactions with the Manager and its affiliates, including performance of services for entities which hold project investments of the Company (each a "Project Entity"), providing financing, guarantying financing, purchasing or selling property, or participating in an investment in a Project Entity alongside a subsidiary of the Company provided the terms are commercially reasonable. Compensation and fees could be paid with respect to these transactions as described below. To the extent any such transaction may pose a conflict of interest between the Company and the Manager or its affiliates, this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company.

In the event the Company enlists the services of any affiliate of the Manager, the rates of compensation of these affiliates for the performance of their various services will be at arms-length rates no higher than what the Company could obtain from unaffiliated third parties and all payments will be subject to inspection by auditors upon request.

Additionally, in the event the Manager, or an affiliate of the Manager, guaranties, whether personally or otherwise, a loan, bond or other obligation of the Company or of any of its subsidiary entities, such Manager or affiliate will be entitled to an annual fee equal to 1% of the outstanding loan amount, bond amount, or other obligation.

*Fees Payable by the Project Entity*

In some instances, an affiliate of the Manager may perform services for a Project Entity in order to provide better pricing or efficiency than would otherwise be available from third parties. In these instances, such affiliates may be paid customary service fees for time, material, or labor.

In some instances, an affiliate of the Manager may provide lending to a Project Entity in connection with or in lieu of financing from non-affiliated third parties. In such circumstances, the affiliate may charge customary fees in connection with the issuance of such loans such as interest, origination fees, exit fees, and other fees.

*Acquisition, Transfer, and Divestiture of Investments to or from Affiliates*

The Company may acquire investments previously entered into by affiliates of the Manager, or may partially or wholly transfer an investment to or from affiliate entities, subject to underwriting and investment criteria of the Company and the Manager's affiliates. Any investment acquisition or transfer that occurs may require a determination of the value of the investment, which may pose a conflict of interest between the Company and the Manager or its affiliates, which must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Company. Notwithstanding the foregoing, the Manager is not obligated to cause the Company or any affiliate to enter into any such transactions.

*Devotion of Time and Attention*

The Manager will cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its affiliates, to devote to the Manager, the Company's investments, and other activities of the Company as much time as may be reasonably necessary for the performance of their respective duties in their capacities as managing principals. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Company's investment objectives; (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund, any pre-existing funds, and any investments of those successor or pre-existing funds; (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his/her own account; (e) engage in civic, professional, industry and charitable activities; and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

The Manager and its affiliates have established, and may establish, other pooled investment funds that have investment objectives identical to those of the Company or its affiliates, and the principals of the Manager may devote such time and attention as they deem necessary for the success of such funds.

## USE OF PROCEEDS

The proceeds of this Offering will be used for the Company's business purposes, which include operations, technology implementation, new fund formation, investments into and loans to affiliate entities (both existing and yet-to-be-formed), consultant and professional engagements, real estate based investments, including acquisitions, loans and preferred equity investments. At any time, the Company may use Offering proceeds to retire any debt obligation of the Company, including those held by other investors. The following table is an estimate of the Company's allocation of the available Offering proceeds. Given that the Offering proceeds will be combined with the Company's existing cash, and that the Company has been in operation for many years, the table illustrates primarily those items that are in addition to the standard operating expenses of the Company. If less than the maximum Offering amount is raised, the Manager will determine which line items will receive less than the estimated allocation. The Manager has discretion to utilize all proceeds as it deems necessary to accomplish the Company's business purposes, regardless of the estimates below.

| Line Item | Estimated Amount |
|---|---|
| Reserves and Miscellaneous Expense | $5,000,000 |
| Commissions | $4,500,000 |
| Marketing | $500,000 |
| Website and Technology | $1,500,000 |
| Portfolio Investments: Real Estate and Affiliate Entities | $38,500,000 |
| Total | $50,000,000 |

*Each time the Company launches a new investment fund vehicle, it advances the initial capital for the organizational and offering expenses, including preparation of the offering documents, entity formation, and marketing expenses. The Company is reimbursed for these expenses when the fund's first closing is held, and the newly formed fund begins generating management fee income that may be distributed to the Company.

The proceeds of this Offering will be used to pay expenses related to this Offering, including as set forth below in "PLAN OF DISTRIBUTION". The proceeds will be used to cover costs associated with this process, such as marketing, management fees, and professional service fees. The Company expects to pay expenses of approximately $5,000,000 related to the Offering, which include the cost of the Company's fundraising efforts, and the cost of preparing this Memorandum, selling commissions and similar costs.

# PLAN OF DISTRIBUTION

The Company expects to engage one or more registered broker-dealers to act as placement agent(s) for the Offering (as applicable, the "Placement Agents") and expects to pay commissions to the Placement Agents in the amount of up to approximately 9% of the aggregate principal amount of the Notes sold to investors.

The Notes will be offered on a "best efforts" basis (which means that there is no guarantee that any minimum amount will be sold). There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines.

The Placement Agents may purchase Notes in the Offering. Such Notes will be counted toward the maximum offering amount of $50,000,000. The Company and the Placement Agent, in their sole discretion, may accept offers to purchase Notes net (or partially net) of the commissions and expense reimbursements described in this Memorandum in certain circumstances deemed appropriate by either of them, including by way of illustration, from Investors purchasing through a registered investment advisor ("RIA"), or from Investors who are affiliates of the Company or any Placement Agent (the "Selling Group"). The Company may also make sales to registered representatives of the Selling Group or to their spouses and affiliates, in each case net of sales commissions.

The Company is offering a maximum offering amount of up to $50,000,000 in Notes. The Company may also elect to sell Notes to particular investors with an "original issue discount", which means that the acquisition price of the particular Note for such invest is less than the Loan Amount for such Note.

If the Maximum Offering Amount is subscribed, the net proceeds to the Company from the sale of Notes, after deducting selling commissions and related fees, and estimated organizational and Offering expenses, is anticipated to be approximately $45,000,000. The following table sets forth the details of these fees and the funds available for investment in the Company's real estate strategy as described in this Memorandum.

|  | Sale of Maximum Offering Amount | Percentage of Gross Proceeds |
|---|---|---|
| Gross Proceeds From Investors | $50,000,000 | 100.00% |
| Less: Selling Commission (1) | $4,500,000 | 9.00% |
| Less: Offering Expenses | $500,000 | 1.00% |
| Available for Investment (before reserves) | $45,000,000 | 90.00% |

At any given time, the Company will maintain cash reserves to meet interest payments and operational requirements.

# INVESTOR SUITABILITY STANDARDS

*General*

An investment in our Notes involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in their investment. Our Notes are only suitable for those who desire a relatively long-term investment for which they do not need liquidity until the anticipated Maturity Date of the Note as set forth in this Memorandum.

The offer, offer for sale, and sale of our Notes is intended to be exempt from the registration requirements of the Securities Act pursuant to Rule 506(c) of Regulation D promulgated thereunder as to

"accredited investors" or to "non-U.S. persons" in an "offshore transaction" pursuant to Regulation S under the Securities Act, in each case as further discussed below, and is intended to be exempt from the registration requirements of applicable state securities laws as a federally covered security.

A subscriber must meet one (or more) of the investor suitability standards (be an "accredited investor" or "non-U.S. person") below to purchase a Note. Fiduciaries must also meet one of these conditions. If the investment is a gift to a minor, the custodian or the donor must meet these conditions. For purposes of the net worth calculations below, net worth is the amount by which assets exceed liabilities, but excluding your house, home furnishings or automobile(s) among your assets. In addition, in the subscription agreement, a subscriber will have to confirm satisfaction of these minimum standards:

- Each Investor must have the ability to bear the economic risks of investing in the Notes.

- Each Investor must have sufficient knowledge and experience in financial, business or investment matters to evaluate the merits and risks of the investment.

- Each Investor must represent and warrant that the Note to be purchased are being acquired for investment and not with a view to distribution.

- Each Investor will make other representations to us in connection with purchase of the Note, including representations concerning the Investor's degree of sophistication, access to information concerning the Company, and ability to bear the economic risk of the investment.

*Suitability Requirements*

<u>Accredited Investors</u>

Rule 501(a) of Regulation D defines an "accredited investor" as any person who comes within any of the following categories, or whom the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1)     Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Exchange Act; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2)     Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(3)     Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)     Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)     Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

(6)     Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)     Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in §230.506(b)(2)(ii) of the rules and regulations pursuant to the Securities Act; and

(8)     Any entity in which all of the equity owners are accredited investors.

For purposes of calculating net worth:

(A)     The person's primary residence shall not be included as an asset;

(B)     Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C)     Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

In determining income, a subscriber should add to the subscriber's adjusted gross income any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deduction claimed for depletion, contribution to an IRA or Keogh plan, alimony payments, and any amount by which income for long-term capital gains has been reduced in arriving at adjusted gross income.

<u>Non-U.S. Persons</u>

This Offering is also being made pursuant to Regulation S under the Securities Act, to non-U.S. persons. A non-U.S. person is any person who is <u>not</u> one of the following:

● Any natural person resident in the United States (as defined below);

● Any partnership or corporation organized or incorporated under the laws of the United States;

● Any estate of which any executor or administrator is a US Person;

● Any trust of which any trustee is a US Person;

● Any agency or branch of a foreign entity located in the United States;

● Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US Person;

- Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident of the United States; or

- Any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a US Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) who are not natural persons, estates or trusts.

"United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

As required by Regulation S, sales to non-U.S. persons will be made in "offshore transactions." These are transactions where:

- no offer is made to a person in the United States; and

- either (1) at the time the buy order is originated, the buyer is (or is reasonably believed to be by the seller) physically outside the United States, or (2) the transaction is for purposes of Rule 903, executed on a physical trading floor of an established foreign securities exchange, or for purposes of Rule 904, executed on a "designated offshore securities market" and the seller is not aware that the transaction has been pre-arranged with a U.S. purchaser.

<u>Additional Provisions and Requirements</u>

In addition to the foregoing suitability standards, we cannot accept subscriptions from anyone if the representations required are either not provided or are provided but are inconsistent with our determination that the investment is suitable for the subscriber. In addition to the financial information we require, the representations we require of you state that you:

- Have received this Memorandum, together with the Exhibits attached hereto;

- understand that no federal or state agency has made any finding or determination as to the fairness for investment in, nor made any recommendation or endorsement of, the Notes; and

- understand that an investment in the Company will not, in itself, create a qualified retirement plan as described in the Internal Revenue Code and that you must comply with all applicable provisions of the Internal Revenue Code in order to create a qualified retirement plan.

You will also represent that you are familiar with the risk factors we describe and that this investment matches your investment objectives. Specifically, you will represent to us that you:

- Understand that there will be no public market for the Notes, that there are substantial restrictions on repurchase, sale, assignment or transfer of the Notes and that it may not be possible to readily liquidate an investment in the Notes; and

- have investment objectives that correspond to those described elsewhere in this Memorandum.

You will also represent to us that you have the capacity to invest in our Notes by confirming that:

- You are legally able to enter into a contractual relationship with us, and, if you are an

individual, have attained the age of majority in the state in which you live; and

- if you are a manager, that you are the manager for the trust on behalf of which you are purchasing the Note, and have due authority to purchase the Note on behalf of the trust.

If you are purchasing as a fiduciary, you will also represent that the above representations and warranties are accurate for the person(s) for whom you are purchasing Note. By executing the subscription agreement, you will not be waiving any rights under the Securities Act or the Exchange Act.

We have the right to refuse a subscription for a Note if in our sole discretion if we believe that the prospective Investor does not meet the suitability requirements. It is anticipated that comparable suitability standards (including state law standards applicable in particular circumstances) may be imposed by us in various jurisdictions in connection with any resale of the Notes.

## SUBSCRIPTION PROCEDURES

To subscribe for a Note, each prospective Investor will be required to do the following:

1. Complete, sign and deliver to us <u>one</u> of the Subscription Agreements attached hereto as Exhibit A-1 and Exhibit A-2, as discussed below;

2. Execute a signature page to the Note, which is attached hereto as Exhibit B (i.e., complete the prospective Investor's legal name in the place indicated on the last page of the Note, in "Holder:_____", and execute the Note in the space provided and also complete the election below the signature block as to whether the Investor elects monthly interest payments or for interest to accrue and be added to the principle amount); and

3. Deliver payment by wire pursuant, ACH transfer or certified check pursuant to the instructions on the Subscription Agreement.

*The Subscription Agreement that must be completed by prospective investors who are subscribing based on being an "accredited investor" is attached hereto as Exhibit A-1.*

*The Subscription Agreement that must be completed by prospective investors who are subscribing based on being a "non-U.S. Person" is attached hereto as Exhibit A-2.*

*<u>Investors should complete only one of the Subscription Agreements, depending on which basis they are subscribing.</u>*

Investors who are both accredited investors and non-U.S. persons may elect on which basis to subscribe.

The executed documents should be delivered to the Company as follows:

iCap Equity, LLC
ATTN: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

Or:

Investors may scan and email executed documents to: investor@icapequity.com

With the Subscription Agreement and the executed signature page of the Note (regardless of the

method used for completing), prospective Investors should send their funds via wire transfer or ACH payment pursuant to the instructions as set forth in the Subscription Agreement, or check payable to "iCap Equity, LLC" to the address above, for the total cost of the Note being subscribed.

As opposed to delivery of the executed documents via hard copy or email as set forth above, this process above may also be completed electronically via the Company's website. At any time, the Company may require that investors complete all required documents through its website.

Subscriptions are not binding on the Company until investor funds have cleared and are available, and the subscription has been accepted in writing by the Company. We will refuse any subscription by giving written notice to the prospective Investor by personal delivery or first-class mail. We have the right to refuse to sell the Notes to any prospective Investor for any reason in our sole discretion, including, without limitation, if such prospective Investor does not promptly supply all information requested by us in connection with such prospective Investor's subscription. In addition, in our sole discretion, we may establish a limit on the purchase of Notes by particular prospective Investor.

As noted above, this Memorandum and the Subscription Agreements are available electronically through the Company's website and may in the future be completed through an application developed by iCap or the Company.

The execution of a Subscription Agreement and the signature page to the Note by an Investor constitutes a binding offer to purchase the Note subscribed for. Once an Investor subscribes for a Note, that Investor will not be able to withdraw such subscription. If a subscription is not accepted, subscription funds will be promptly returned to the Investor, without interest or deduction (except for any wire transfer fee). Even though a prospective Investor has executed the Note, the Note will not be issued unless and until the Company accepts the prospective Investor's subscription and returns countersigned copies of the Subscription Agreement and the Note.

By submitting the completed and signed Subscription Agreement with payment for the purchase of Note, you represent and warrant that you meet the relevant suitability standards and are eligible to purchase the Note.

We do not permit sales to discretionary accounts without prior specific written approval of the owner of the account.

## RESTRICTIONS ON TRANSFERABILITY

The Notes offered hereby are restricted securities as that term is defined in Rule 144 promulgated under the Securities Act. These securities have not been registered under the Securities Act and are being offered and will be sold without benefit of registration under the applicable federal or state securities acts by reason of specific exemptions from registration provided by such acts. The availability of such exemptions is also dependent, in part, upon the "investment intent" of the investors. The exemptions would not be available if an investor were purchasing the Notes with a view to redistributing them. Accordingly, each investor when executing the Subscription Agreement will be required to acknowledge that his or her purchase is for investment, for its, his or her own account, and without any view to resale of the Notes except pursuant to an effective registration statement under the Securities Act, or a valid exemption from the registration requirements of the Securities Act, and subject to the terms of the Subscription Agreement.

## STATEMENT AS TO INDEMNIFICATION

Our Operating Agreement provides for indemnification of members and officers of the Company and of the Manager under certain circumstances, which could include liabilities relating to securities laws. The SEC mandates the following disclosure of its position on indemnification for

liabilities under the federal securities laws:

> "Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling an issuer, the Company has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable."

## TRADEMARKS AND COPYRIGHTS

We may own or have rights to trademarks or trade names that we use in connection with the operation of our business, including our corporate names, logos and website names. In addition, we own or have the rights to copyrights, trade secrets and other proprietary rights that protect the content of our products and the formulations for such products. This Memorandum may also contain trademarks, service marks and trade names of other companies, which are the property of their respective owners. Our use or display of third parties' trademarks, service marks, trade names or products in this Memorandum is not intended to, and should not be read to, imply a relationship with or endorsement or sponsorship of us. Solely for convenience, some of the copyrights, trade names and trademarks referred to in this Memorandum are listed without their ©, ® and ™ symbols, but we will assert, to the fullest extent under applicable law, our rights to our copyrights, trade names and trademarks. All other trademarks are the property of their respective owners.

## RISK FACTORS

AN INVESTMENT IN THE NOTES INVOLVES SIGNIFICANT RISK AND IS SUITABLE ONLY FOR PERSONS WHO ARE CAPABLE OF BEARING THE RISKS, INCLUDING THE RISK OF LOSS OF A SUBSTANTIAL PART OR ALL OF THEIR INVESTMENT. CAREFUL CONSIDERATION OF THE FOLLOWING RISK FACTORS, AS WELL AS OTHER INFORMATION IN THIS MEMORANDUM IS ADVISABLE PRIOR TO INVESTING. PROSPECTIVE INVESTORS SHOULD READ ALL SECTIONS OF THIS MEMORANDUM AND ARE STRONGLY URGED AND EXPECTED TO CONSULT THEIR OWN LEGAL AND FINANCIAL ADVISERS BEFORE INVEST-ING IN THE NOTES. THE INFORMATION IN THIS MEMORANDUM CONTAINS BOTH HISTORICAL AND FORWARD-LOOKING STATEMENTS. PLEASE BE ADVISED THAT THE COMPANY'S ACTUAL FINANCIAL CONDITION, OPERATING RESULTS AND BUSINESS PERFORMANCE MAY DIFFER MATERIALLY FROM THAT ESTIMATED BY THE COMPANY IN FORWARD-LOOKING STATEMENTS. THE COMPANY HAS ATTEMPTED TO IDENTIFY, IN CONTEXT, CERTAIN OF THE FACTORS THAT IT CURRENTLY BELIEVES COULD CAUSE ACTUAL FUTURE RESULTS TO DIFFER FROM THE COMPANY'S CURRENT EXPECTATIONS. THE DIFFERENCES MAY BE CAUSED BY A VARIETY OF FACTORS, INCLUDING BUT NOT LIMITED TO, ADVERSE ECONOMIC CONDITIONS, COMPETITORS (INCLUDING THE ENTRY OF NEW COMPETITORS), INADEQUATE CAPITAL, UNEXPECTED COSTS, LOWER REVENUES AND NET INCOME THAN ANTICIPATED, FLUCTUATION AND VOLATILITY OF THE COMPANY'S OPERATING RESULTS AND FINANCIAL CONDITION, INABILITY TO CARRY OUT MARKETING AND SALES PLANS, LOSS OF KEY EXECUTIVES OR OTHER PERSONNEL, AND OTHER RISKS THAT MAY OR MAY NOT BE REFERRED TO IN THESE RISK FACTORS.

**Operation and Company Risks**

> ***Control is vested in the Manager; no Investor should purchase the Notes unless the Investor is comfortable with the Manager's judgment and experience in running the Company's affairs.***

Control over all decisions affecting the Company, including decisions regarding the investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, refinancing of Project Entities, whether to make an investment, whether an Affiliate is eligible for an

investment, extensions of investments and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors. No assurance can be given that sufficient investments will be presented to the Company to deploy all of the capital available for investment.

When you subscribe for Notes that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the investments that the Manager subsequently identifies. You should not invest in the Company, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

***The Company will have limited or no control over the underlying investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the investments.***

The Company expects to acquire preferred equity in Project Entities, acquire and hold real estate through Project Entities, or, occasionally, issue debt interests to Project Entities. Accordingly, the Company will not likely have control over such Project Entities (except in certain circumstances relating to the Company enforcing its creditor rights or contractual rights) and will be required to rely on the project partners of such Project Entities to use their skill, expertise and background to generate value from the investments.

***Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.***

The Company's business will involve a high degree of financial risk. Markets in which the Company and its subsidiaries are anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that Investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

Real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without reviewing detailed budgets, such budgets may understate the expenses.

***The Company is subject to a number of risks in the enforcement of its rights relating to investments.***

The Company's real estate investments will typically involve preferred equity investments in Project Entities, secured by a deed of trust in the underlying real property when possible and a pledge of the project partner's membership interest in the Project Entity. The Company also has the authority to issue or purchase debt collateralized by real property and to make unsecured loans to or preferred equity investments in Affiliate companies. These investments are subject to the following risks:

- The Company's investment structure is unique. Although the Company generally requires a Project Entity to grant a deed of trust in the underlying real property owned by the Project Entity to secure the Company's investment and return, and requires the project partners to pledge their equity interest in the Project Entity to the Company, there can be no assurance that such interests will be enforceable or that, in the event of non-performance by the project partner or a default by the Project Entity, that the real estate will be readily transferred to the Company or that the Company can obtain control of the Project Entity.

There is a risk that project partners or other third parties may oppose or contest the enforceability or priority of such security.

- During the course of an investment, or in the event the Company exercises its contractual remedies upon non-performance by the project partner or a default by the Project Entity, there is a risk that a project partner or other third party oppose or contest the enforceability of the Company's investment documentation, or assert claims or defenses against the Company or the Manager, including claims relating to the Company's ability to remove the project partner and take over management of a project. Such claims and potential litigation may result in the Company incurring substantial legal fees, and adversely affect the Manager's ability to mitigate losses resulting from a project partner's failure to perform.

- There is no assurance that the Company will subsequently acquire title to the collateral property. The project partner may cure defaults or arrange for the Company's investment to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third-party may be prepared to outbid the Company to purchase the collateral property.

- A debtor or project partner may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent debtors. These protections are at the expense of the Company, and may result in staying the Company's foreclosure proceedings, proceedings against the project partner, restructuring of the terms of the Company's investment, or otherwise delaying or interfering with the enforcement of the Company's rights under its investment documentation.

***Uninsured losses on the investments could materially reduce investment returns, which may impact the ability to return principal balances under the Note.***

The project partner will obtain insurance policies for the projects that are commercially prudent given the local market and circumstances of the project (typically, including liability, fire and extended coverage). However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the projects should be partially or totally destroyed, the Company, as an investor in the Project Entity, may suffer a substantial loss of capital as well as profits. Even if the project partner's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Project Entity will sustain a substantial uninsured loss as a result of the casualty.

***Proceeds from Investments will be re-invested during the life of the Company.***

The Manager has the discretion to retain all or a portion of the proceeds from investments to make new investments, and intends to do so over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Company or the Project Entities, provided the terms are commercially reasonable. The Company may make loans to or preferred equity investments in Affiliates of the Manager on terms determined by the Manager. These measures may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. In addition, before the Company invests all of its capital, the Manager will be subject to

potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between investment opportunities that may meet the investment criteria of Affiliates of the Company or of the Manager.

***Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Notes.***

The Manager has not arranged for Investors to be separately represented by independent counsel. The legal counsel who has performed services for the Company has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

The Notes may be issued with original issue discount (or "OID") for U.S. federal income tax purposes. As such, if you are a U.S. Holder (as defined herein), you may be required to include OID (taxable as ordinary income) in taxable income each year in excess of the amount of interest payments actually received by you in that year.

***You will not be investing in a fund vehicle. The prior performance data presented should provide you relevant information regarding fund entities overseen by the Company, but should not be construed as an indication of the likely financial performance of the Company.***

By investing in the Company, you will not be a creditor to the Affiliates of the Company nor in any of the prior investments sponsored by its Affiliates. The Company has provided selected information regarding its prior investments because it felt investors might consider those investments to be relevant in assessing the experience and judgment of the Manager or the Company's management team. Investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique and the Company may not be able to replicate the success of prior Affiliated investments, even if the investments assembled for the Company's portfolio are similar to those obtained for prior investments.

***Our business prospects are difficult to predict because we have a limited operating history.***

The Company is a relatively newly organized entity and does not have an extensive operating history upon which investors may base an evaluation of its likely performance. The Company's results will depend upon the availability of suitable investment opportunities for the Company and the performance of the Company's investments. The Company's proposed operations are subject to all business risks associated with relatively new enterprises. The likelihood of the Company's success must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with the expansion of a business, operation in a competitive industry, and the continued development of advertising, promotions and a corresponding customer base. There is a possibility that the Company could sustain losses in the future.

There can be no assurance that the Company's efforts will result in successful commercialization or further development of the Company' operations, that the Company's marketing efforts will be successful, or that the Company will ever achieve significant (or any) revenue. If the Company fails to achieve its goals, the Company may run out of money to run its operation and as such, the Company would need to raise additional working capital. Failure to do so could result in Noteholders losing part or all of their money invested.

***Noteholders must rely on the Manager to acquire appropriate investment for the Company.***

The Company is conducting the Offering as a "blind pool," meaning that the Company is proceeding to raise funds through the sale of the Notes, without having specifically identified any investments. When you subscribe for Notes, that subscription is binding, and you will not have the right to revoke that subscription even if you do not approve of the investments that the Company subsequently identifies. Prospective investors should not invest in the Company unless they are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

***Competition with third parties in our contemplated industry is intense, which could reduce our profitability and our ability to pay interest or raise additional funds.***

It is possible that over time we may compete with other entities seeking to undertake similar activities to those that we do. These same potential competitors may have significantly greater capital resources, research and development, manufacturing, testing, regulatory compliance, and marketing capabilities. Competitive products and services may render any services, products or product candidates that we may acquire or develop uneconomic or obsolete. We cannot assure investors that we will be able to invest in or develop resources that are required to successfully compete with these competitors .

***Negative publicity could adversely affect our business and operating results.***

Negative publicity about our industry or the Company or its Affiliates, even if inaccurate, could adversely affect our reputation and the confidence in our operations, which could harm our business and operating results. Harm to our reputation can arise from many sources, including employee misconduct, misconduct by our partners, outsourced service providers or other counterparties, failure by us or our partners to meet minimum standards of service and quality, compliance failures and claims and any such sources related to our affiliate entities.

***Rapid growth may strain our resources.***

We expect to experience significant and rapid growth in the scope and complexity of our business, which may place a significant strain on our management team and our financial and other resources. Such growth, if experienced, may expose us to greater costs and other risks associated with growth and expansion. Although the Company does not expect to have employees, the Company is dependent upon our parent company, iCap Enterprises, Inc., to hire employees who provide services to the Company, and we may be required to hire employees, including other support personnel, among others, in order to successfully advance our operations. We, and our parent company, may be unsuccessful in these efforts or may be unable to project accurately the rate or timing of these increases.

This growth may place a strain on our management and operational resources. The failure to develop and implement effective systems or the failure to manage growth effectively could have a materially adverse effect on our business, financial condition, and results of operations. In addition, difficulties in effectively managing the budgeting, forecasting, and other process control issues presented by such a rapid expansion could harm our business, financial condition, and results of operations.

***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its affiliates may provide certain services to, and enter into transactions with, the Company, its holding companies, any Affiliate of the Manager, or the Project Entities, provided that the terms are commercially reasonable. This limitation may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its affiliates. In addition, the Manager will be subject to potential conflicts

of interest when choosing between investment opportunities for affiliated entities that may generate different fees for the Manager.

**The Manager may retain and reinvest all or a portion of the revenue generated by, or proceeds of a sale of, an investment.**

The Manager has the discretion to sell the investments or related properties the Company acquires and to use the cash proceeds from such sale (or cash proceeds from rental income) to, among other things, satisfy its obligations under the Notes, whether or not then due and payable, or other Company obligations, or to enter into new investments. The Manager intends to make new investments over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

**Without obtaining advice from their personal advisors, potential investors may not be aware of the legal, tax or economic consequences of an investment in the Notes.**

The Manager has not arranged for potential investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Company has not acted as if it had been retained by the potential investors. Potential investors should not construe the contents of this Memorandum or any prior or subsequent communication from the Manager, its affiliates or any professional associated with this Offering, as legal or tax advice. Potential investors should consult their own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability.

**Prior performance data presented provides relevant information regarding affiliates of the Manager, it should not be construed as an indication of the likely financial performance of the Company.**

Potential investors should not consider the prior performance of any investments by the Company or the Manager or their respective affiliates to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments have performed. Each investment opportunity is unique, and the Company may not be able to replicate the success of prior investments, even if the investments assembled for the Company's portfolio are similar to those obtained for the prior funds.

**Various factors could negatively impact the profitability of the Company's investments**

The Company may obtain insurance policies for the investments that are commercially prudent given the local market and circumstances of the investments. However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the investments should be partially or totally destroyed, the Company may suffer a substantial loss of capital as well as profits. Even if the Company's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Company will sustain a substantial uninsured loss as a result of a fire or other casualty.

Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making a investment, the Company may undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation could include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the investment's site had environmental

contamination not detected prior to the Company's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Company undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Company may incur environmental clean-up costs or be subject to liability exposure that may reduce the net profits of the Company.

Under the Americans With Disabilities Act of 1990 ("ADA"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing properties to allow disabled persons to access such facilities. Most of the properties the Company considers will likely be in compliance with the present access requirements. If, however, the properties the Company acquires are not in compliance with the ADA, the Company will be required to make modifications to the properties to bring them into compliance or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

The real estate industry in general, and the multifamily, residential, and commercial sectors, in particular, are highly competitive, and the Company will be competing with numerous other entities, some having substantially greater financial resources and experience than the Company, in seeking attractive investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available investments or resulting in other less favorable terms to the purchasers.

The investment returns available from investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, prolonged timing of permit issuance by cities and counties, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers' decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could have a material adverse impact on the Company's results of operations or financial condition. In addition, real estate investments are difficult to sell quickly and the Company may not be able to adjust the Company's portfolio of owned properties quickly in response to economic or other conditions in order to meet Note obligations. If the Company's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Company's income will be adversely affected.

***Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.***

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

***Real estate development projects are subject to numerous risks outside the Company's control such as delays in permitting and other governmental approvals, increased costs, and labor shortages.***

Any properties in which the Company invests relating to real estate development or construction are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development and construction projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, and thus lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability,

delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. The Company may enter into contracts to purchase properties before they are finished, and the foregoing risks could adversely impact the purchase prices, valuations, or closings dates of those properties. Although the Manager will not undertake such transactions without reviewing detailed budgets, such budgets may understate the expenses.

### The Company's investments will be illiquid.

The Company expects its investments to be illiquid. Accordingly, the timing of its returns on those investments will be dependent upon various market factors. If the underlying assets in those investments are held for long periods or if any income streams of the Company are delayed or reduced, the Investors will be compelled to wait until the underlying assets are sold or improved, before being in a position to liquidate their investments. The Manager expects most of its real estate investments to have an investment time frame of 2 years or less. However, the Company may have little or no control over when the underlying properties are liquidated.

### There may be unanticipated obstacles to execution of our business plan.

Our proposed plan of operation and prospects will depend largely upon our ability to successfully establish the Company's presence in a timely fashion, retain and continue to hire skilled management, technical, marketing, and other personnel through our parent company, and attract and retain significant numbers of quality business partners and corporate clients. There can be no assurance that we will be able to successfully implement our business plan or develop or maintain future business relationships, or that unanticipated expenses, problems or technical difficulties which would result in material delays in implementation will not occur.

### The volatile credit and capital markets could have a material adverse effect on our financial condition.

Our ability to manage our future debt and liquidity will be dependent on our level of positive cash flow. An economic downturn may negatively impact our cash flows. Credit and capital markets can be volatile, which could make it more difficult for us to refinance our debt or to obtain additional debt or equity financings in the future. Such constraints could increase our costs of borrowing and could restrict our access to other potential sources of future liquidity. Our failure to have sufficient liquidity to make interest and other payments required by our debt or our Notes could result in a default of such debt or the Notes and acceleration of our borrowings, which would have a material adverse effect on our business and financial condition.

### An economic downturn could materially affect us in the future.

The recession from late 2007 to mid-2009 reduced consumer confidence to historic lows, impacting the public's ability and desire to spend discretionary dollars as a result of job losses, home foreclosures, significantly reduced home values, investment losses, bankruptcies and reduced access to credit, resulting in lower levels of customer traffic. If the economy experiences another significant decline, our business and results of operations could be materially adversely affected.

### Information technology system failures or breaches of our network security could interrupt our operations and adversely affect our business.

We rely on our computer systems and network infrastructure to facilitate our operations. Our operations depend upon our ability to protect our computer equipment and systems against damage from physical theft, fire, power loss, telecommunications failure or other catastrophic events, as well as from internal and external security breaches, viruses and other disruptive problems. Any damage or failure of

our computer systems or network infrastructure that causes an interruption in our operations could have a material adverse effect on our business and subject us to litigation or to actions by regulatory authorities.

***The failure to enforce and maintain our trademarks and protect our other intellectual property could materially adversely affect our business, including our ability to establish and maintain brand awareness.***

The success of our business strategy depends on our continued ability to obtain and use trademarks and service marks in order to increase brand awareness and develop our branded products. If our efforts to protect our intellectual property are not adequate, or if any third-party misappropriates or infringes on our intellectual property, whether in print, on the Internet or through other media, the value of our brands may be harmed, which could have a material adverse effect on our business, including the failure of our brands and branded products to achieve and maintain market acceptance. There can be no assurance that all of the steps we have taken to protect our intellectual property in the United States and in foreign countries will be adequate. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent, as do the laws of the United States.

***Third-party claims with respect to intellectual property assets, if decided against us, may result in competing uses or require adoption of new, non-infringing intellectual property, which may in turn adversely affect sales and revenues.***

There can be no assurance that third parties will not assert infringement or misappropriation claims against us, or assert claims that our rights in our trademarks, service marks, trade dress and other intellectual property assets are invalid or unenforceable. Any such claims could have a material adverse effect on us if such claims were to be decided against us. If our rights in any intellectual property were invalidated or deemed unenforceable, it could permit competing uses of intellectual property, which, in turn, could lead to a decline in our results of operations. If the intellectual property became subject to third-party infringement, misappropriation or other claims, and such claims were decided against us, we may be forced to pay damages, be required to develop or adopt non-infringing intellectual property or be obligated to acquire a license to the intellectual property that is the subject of the asserted claim. There could be significant expenses associated with the defense of any infringement, misappropriation, or other third-party claims.

***We depend on certain officers of the Manager, the loss of whom could materially harm our business.***

We rely upon the accumulated knowledge, skills and experience of the officers and personnel of our Manager and its affiliates. If they were to leave the Manager or become incapacitated, we might suffer in our planning and execution of business strategy and operations, impacting our brand and financial results. We also are not required to maintain any key man life insurance policies for any such persons.

***We are exposed to the risk of natural disasters, unusual weather conditions, pandemic outbreaks, political events, war and terrorism that could disrupt business and result in lower sales, increased operating costs and capital expenditures.***

Our headquarters and company-operated locations, as well as certain of our vendors and customers, are located in areas which have been and could be subject to natural disasters such as floods, hurricanes, tornadoes, fires or earthquakes. Adverse weather conditions or other extreme changes in the weather, including resulting electrical and technological failures, may disrupt our business and may adversely affect our ability to continue our operations. These events also could have indirect consequences such as increases in the costs of insurance if they result in significant loss of property or other insurable damage. Any of these factors, or any combination thereof, could adversely affect our operations.

*Members of our Manager will have other business interests and obligations to other entities.*

None of the members and officers of the Manager will be required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company, provided that such activities do not otherwise breach their agreements with the Company. We are dependent on these persons to successfully operate the Company. Their other business interests and activities could divert time and attention from operating the Company.

*We expect that the Covid-19/Coronavirus pandemic will materially impact our ability to move forward with our intended operations.*

Of all the markets that have been impacted by the Coronavirus pandemic, the markets and industries in which the Company expects to operate have been some of the worst hit. As a result, our ability to source and close such investments will be materially impacted and we have no way of knowing when these abilities will be returned to pre-pandemic levels.

*Declining economic conditions could negatively impact our business.*

Our operations are affected by local, national and worldwide economic conditions. Markets in the United States and elsewhere have been experiencing extreme volatility and disruption since the commencement of the Coronavirus pandemic and the consequences of a potential or prolonged recession may include a lower level of economic activity and uncertainty regarding real estate pricing. While the ultimate outcome and impact of the current economic conditions cannot be predicted, a lower level of economic activity might result in a decline in consumer spending and resulting instability in the financial markets, as a result of recession or otherwise, and also may affect the cost of capital and our ability to raise capital and conduct our operations.

*Our operations overall will be impaired by the Coronavirus pandemic.*

The Coronavirus pandemic is expected to cause continued interruptions to, and negative effects on, our business overall. While we are attempting to manage the negative effects of the pandemic, and we currently expect that the Company will be able to ultimately weather the effects of the pandemic, there can be no assurance as to the overall effect on our business.

**Risks Related to this Offering and the Notes**

*The Company may prepay the principal and interest on the Notes at any time.*

The Company may prepay the principal amount and accrued interest of the Notes, in whole or in part, at any time. The Company may also choose to pay off some of the investor Notes while waiting to pay off the Notes of other investors. No prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Investors will not have certainty as to how long their respective Notes may be outstanding.

*There is no minimum Offering size required to be raised by the Company in order to conduct a closing, and the Company may not receive or accept sufficient subscriptions to undertake its business.*

This Offering is not subject to any minimum amount required to be subscribed for by investors in order for the Notes to be sold to any investors or for the Company to access or receive and use such funds. Therefore there is no assurance that the Company will raise sufficient funds to commence or continue operations. If the Company is not able to raise sufficient funds to commence operations and undertake its business plan, investors may lose all of their investment.

*This private placement of Notes is being made in reliance on an exemption from registration*

*requirements, and there is no guarantee that it will comply with the regulatory requirements for such exemption.*

This private placement of Notes will not be registered with the SEC. The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

*If investors successfully seek rescission, we would face severe financial demands that we may not be able to meet.*

We represent that this Memorandum and its exhibits do not contain any untrue statements of material fact or omit to state any material fact necessary to make the statements made, in light of all the circumstances under which they are made, not misleading. However, if this representation is inaccurate with respect to a material fact, if this Offering fails to qualify for exemption from registration under the federal securities laws, or if we fail to register the Notes or find an exemption under the securities laws of each state in which we offer the Notes, each investor may have the right to rescind his, her or its purchase of the Notes and to receive back from the Company his, her or its purchase price. Such investors, however, may be unable to collect on any judgment, and the cost of obtaining such judgment may outweigh the benefits. If investors successfully seek rescission, we would face severe financial demands and may not be able to meet our capital needs, which may adversely affect any non-rescinding investors.

*We may invest or spend the proceeds of this Offering in ways with which you may not agree or in ways which may not yield a return.*

While we have provided guidance on priorities for the use of proceeds, the timing and amount of sales will impact our actual use of proceeds within the uses identified. Our management will have broad discretion in determining how the proceeds of the Offering will be used in each of the identified use categories.

We currently intend to use the proceeds we receive from this Offering after deducting estimated fees and expenses associated with this private placement, including legal, accounting, transfer agent, financial, acquisitions and other professional fees, primarily for the purposes as described above. Our management will have considerable discretion in the application of the net proceeds, and you will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. Investors in this Offering will need to rely upon the judgment of our management with respect to the use of proceeds. If we do not use the net proceeds that we receive in this Offering effectively, our business, financial condition, results of operations and prospects could be harmed, and the market price or value of the Notes could decline as well as the Company's ability to repay the Notes when due.

*This is a private offering, and as such investors will not have the benefit of review of this Memorandum by the SEC or any other agency.*

Since this Offering is a private placement of securities and, as such, is not registered under federal or state securities laws, potential investors will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

*There is no assurance that the Company will be profitable, and there is no assurance of any*

*returns.*

There is no assurance as to whether the Company will be profitable, or earn revenues, or whether the Company will be able to meet its operating expenses. The initial expenses the Company incurs could result in operating losses for the Company for the foreseeable future. No assurance can be made that a subscriber for the Notes offered hereby will not lose his or her entire investment.

### *The Company is obligated to pay certain fees and expenses.*

The Company will pay various fees and expenses related to its ongoing operations regardless of whether or not the Company's activities are profitable. These fees and expenses will require dependence on third-party relationships. The Company is generally dependent on relationships with its strategic partners and vendors, and the Company may enter into similar agreements with future potential strategic partners and alliances. The Company must be successful in securing and maintaining its third-party relationships to be successful. There can be no assurance that such third parties may regard their relationship with the Company as important to their own business and operations, that they will not reassess their commitment to the business at any time in the future, or that they will not develop their own competitive services or products, either during their relationship with the Company or after their relations with the Company expire. Accordingly, there can be no assurance that the Company' existing relationships or future relationships will result in sustained business partnerships, successful service offerings, or significant revenues for the Company.

### *Prospective investors must undertake their own due diligence.*

This Memorandum and its exhibits include limited information regarding the Company, our current and future business and operations, our management and our financial condition. While we believe the information contained in this Memorandum is accurate, such document is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective Investor that the abbreviated nature of this Memorandum will not omit to state a material fact which a prospective Investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such Investor. As a result, prospective Investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **This investment is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

### *The limited marketability of the Notes may adversely affect your ability to transfer and pledge the Notes.*

Noteholders must represent that they are purchasing the Notes for their own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, or encumber your Note(s) unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute unlawful trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Internal Revenue Code of 1986, as amended (the "Code") or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans.

### *The Notes constitute restricted securities and are subject to limited transferability.*

The Notes should be considered a long-term, illiquid investment. The Notes have not been registered under the Securities Act, and cannot be sold without registration under the Securities Act or any exemption from registration. In addition, the Notes are not registered under any state securities laws that would permit their transfer. Because of these restrictions and the absence of an active trading market for our securities, a Noteholder will likely be unable to liquidate an investment even though other personal

financial circumstances would dictate such liquidation.

*There is no public trading market for our Notes.*

There is no established public trading market for the Notes and there can be no assurance that one will ever develop. Market liquidity will depend on the perception of our operating business and any steps that our management might take to bring us to the awareness of investors. There can be no assurance given that there will be any awareness generated. Consequently, investors may not be able to liquidate their investment or liquidate it at a price that reflects the value of the Notes. As a result, Investors may not find purchasers for their Notes. Only accredited investors with no need for immediate short-term liquidity should purchase the Notes.

*The market value of the Notes may decrease due to factors beyond our control.*

Broad market fluctuations may adversely affect the market value of our Notes. The market value of our Notes may also fluctuate significantly in response to the following factors, most of which are beyond our control:

- variations in our quarterly operating results,
- changes in general economic conditions,
- changes in market valuations of similar companies issuing similar investment products,
- announcements by us or our competitors of significant acquisitions, strategic partnerships or joint ventures, or capital commitments,
- poor reviews;
- loss of a major customer, partner or joint venture participant; and
- the addition or loss of key managerial and collaborative personnel.

Any such fluctuations may adversely affect the market value of our Notes, regardless of our actual operating performance. As a result, Noteholders may be unable to sell their Notes (even if permitted by applicable securities laws and the terms of the Notes), or may be forced to sell them at a loss.

*The characteristics of the Notes, including maturity, interest rate, lack of adequate guarantee, and lack of liquidity, may not satisfy your investment objectives.*

The Notes may not be a suitable investment for you, and we advise you to consult your investment, tax and other professional financial advisors prior to purchasing Notes. The characteristics of the Notes, including maturity, interest rate, lack of adequate guarantee and lack of liquidity may not satisfy your investment objectives. The Notes may not be a suitable investment for you based on your ability to withstand a loss of interest or principal or other aspects of your financial situation, including your income, net worth, financial needs, investment risk profile, return objectives, investment experience and other factors. Prior to purchasing any Notes, you should consider your investment allocation with respect to the amount of your contemplated investment in the Notes in relation to your other investment holdings and the diversity of those holdings.

*The Notes will be effectively subordinated to any of our debt that is secured and subordinated to our existing and future unsecured debts.*

The Notes will be junior to any of our secured debt obligations, to the extent of the value of any assets securing such debt. The effect of this subordination is that if we are involved in a bankruptcy, liquidation, dissolution, reorganization or similar proceeding, or upon a default in payment on, or the acceleration of, any of our secured debt, if any, our assets will be available to pay obligations on the Notes only after all debt under our secured debt, if any, has been paid in full from those assets. As of the date of this Memorandum, we had no secured indebtedness outstanding. In such circumstances, Holders of the Notes will participate in any remaining assets ratably with all of our other unsubordinated creditors,

including trade creditors. We may not have sufficient assets remaining to pay amounts due on any or all of the Notes then outstanding.

**The Company may sell promissory notes that have earlier maturity dates or higher interest rates or payoff premiums than those applicable to the Notes.**

The Company may sell promissory notes that have earlier maturity dates or higher interest rates or payoff premiums than those applicable to the Notes. In such event the Company would be obligated to pay such higher rates of return, and the security of the noteholders in this Offering would therefore be negatively impacted as the Company will have greater payment obligations from the same pool of assets as compared to the situation where all promissory notes had equal interest rates.

**Because the Notes will have no sinking fund, insurance, or guarantee, you could lose all or a part of your investment if we do not have enough cash to pay.**

There is no sinking fund, insurance or guarantee of our obligation to make payments on the Notes. We will not contribute funds to a separate account, commonly known as a sinking fund, to make interest or principal payments on the Notes. The Notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation, or any other governmental or private fund or entity. Therefore, if you invest in the Notes, you will have to rely only on our cash flow from operations and other sources of funds for repayment of principal at maturity and for payment of interest when due. Any future cash flows from operations could be impaired under the circumstances described herein. If our cash flow from operations and other sources of funds are not sufficient to pay any amounts owed under the Notes, then you may lose all or part of your investment.

**We do not expect that the Notes will be rated, but if they are, ratings of the Notes may change and affect the market price and marketability of the Notes.**

We do not currently expect that, upon issuance, the Notes will be rated by any rating agencies. If they are, such ratings are limited in scope, and do not address all material risks relating to an investment in the Notes, but rather reflect only the view of each rating agency at the time the rating is issued. There is no assurance that such credit ratings will be issued or remain in effect for any given period of time or that such ratings will not be lowered, suspended or withdrawn entirely by the rating agencies. It is also possible that such ratings may be lowered in connection with future events, such as future acquisitions. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market price or marketability of the Notes. In addition, any decline in the ratings of the Notes may make it more difficult for us to raise capital on acceptable terms.

**Because we may pay off the Notes at any time prior to their maturity, you may be subject to reinvestment risk.**

We have the right to pay off any Note at any time prior to its stated maturity. The Notes would be paid off at 100% of the principal amount plus accrued but unpaid interest, including the payoff premium, up to but not including the date of pay off. Any such pay off may have the effect of reducing the income or return on investment that any investor may receive on an investment in the Notes by reducing the term of the investment. If this occurs, you may not be able to reinvest the proceeds at an interest rate comparable to the rate paid on the Notes.

**The Note contains "deemed consent" provisions.**

The Note contains "deemed consent" provisions which provide that the Company does not actually have to obtain written confirmation from the Investor as to any approval or consent related to, or amendment of or waiver related to, the applicable agreement or document. The Company is required to send the Investor

a notice of the requested consent or approval, or the requested amendment or waiver, and if the Investor does not respond within 10 days, then to send a second notice. If the Investor does not respond within an additional 10 days the Investor will be deemed to have consented, in writing, to the requested approval, consent, amendment of or waiver.

### *We have not retained independent professionals for investors.*

We have not retained any independent professionals to comment on or otherwise protect the interests of potential investors. Although we have retained our own counsel, neither such counsel nor any other independent professionals have made any examination of any factual matters herein, and potential investors should not rely on our counsel regarding any matters herein described.

### *We have no firm commitments to purchase any Notes.*

We have no firm commitment for the purchase of any Notes. The Company may be unable to identify investors to purchase the Notes and as a result may have inadequate capital to support its ongoing business obligations.

## Tax Risks

### *You are urged to consider the United States federal and State tax consequences of owning the Notes.*

This Memorandum does not address material federal or state tax considerations relating to an investment in the Notes. Investors are urged to consult their own tax advisors on these matters prior to investing.

### *Interest on Notes Could be Characterized as Unrelated Business Taxable Income.*

We intend to take the position that the Notes should be classified as debt instruments for U.S. federal income tax purposes and the stated interest should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("UBTI") with respect to tax exempt Noteholders. However, there is no assurance that the IRS will agree with this position and it is possible that the Notes may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Notes may be characterized as UBTI with respect to tax exempt Noteholders.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

This Memorandum does not address all tax considerations that may be relevant to you. You are urged to consult your own tax advisors as to the specific tax consequences of purchasing, owning and disposing of any Notes, including any federal, state or local tax consideration.

**WE URGE YOU TO CONSULT AND RELY UPON YOUR OWN TAX ADVISOR WITH RESPECT TO YOUR OWN TAX SITUATION, POTENTIAL CHANGES IN APPLICABLE LAWS AND REGULATIONS AND THE FEDERAL AND STATE CONSEQUENCES ARISING FROM AN INVESTMENT IN THE NOTES. THE COST OF THE CONSULTATION COULD, DEPENDING ON THE AMOUNT CHARGED TO YOU, DECREASE ANY RETURN ANTICIPATED ON YOUR INVESTMENT. NOTHING IN THIS MEMORANDUM IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY SPECIFIC INVESTOR, AS INDIVIDUAL CIRCUMSTANCES MAY VARY. YOU SHOULD BE AWARE THAT THE INTERNAL REVENUE SERVICE MAY NOT AGREE WITH ALL TAX POSITIONS TAKEN BY US AND THAT LEGISLATIVE, ADMINISTRATIVE OR COURT DECISIONS MAY REDUCE OR ELIMINATE ANY ANTICIPATED TAX BENEFITS OF AN INVESTMENT IN THE NOTES.**

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Notes.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Notes, that purchased Notes at their original issue price for cash, and that hold such Notes as capital assets within the meaning of Section 1221 of the Code. This discussion does not necessarily apply to Investors in the Notes who are Non-U.S. Persons.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Notes by certain investors that are subject to special rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Notes in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Notes, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Notes, including the applicability of any U.S. federal tax laws or any state, local or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

*Considerations Relating to U.S. Holders of the Notes*

As used herein, the term "U.S. Holder" means a beneficial owner of a Note that is, for U.S. federal income tax purposes:

- An individual citizen or resident of the U.S.;

- A corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- An estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- A trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Notes that is a partnership and the partners in such a partnership should consult their tax advisors.

*Classification of the Notes*

Pursuant to the terms of the Notes, the Company and each holder of Notes will agree to treat the Notes, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Company's determination that the Notes constitute debt for U.S. federal income tax purposes. If any portion of the Notes is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Note could differ from the timing and character of income, gain or loss recognized in respect of the Notes described below. The remainder of this discussion assumes that the Notes will be treated as indebtedness in accordance with that agreement and our determination.

*Interest Income and Original Issue Discount*

Payments of "qualified stated interest" (as defined below) on a Note will be taxable to a U.S. Holder as ordinary income at the time that such payments are accrued or are received (in accordance with the U.S. Holder's method of tax accounting).

It is anticipated that the Notes may be issued at a discount from their stated price at maturity. As such, it is anticipated that the Holders of the Notes may be required to report original issue discount ("OID") over the term of the Notes. U.S. Holders of the Notes should be aware that, as described in greater detail below, they generally must include OID in ordinary gross income for U.S. federal income tax purposes as it accrues, in advance of the receipt of cash attributable to that income.

In general, each U.S. Holder of the Notes, whether such U.S. Holder uses the cash or the accrual method of tax accounting, will be required to include in ordinary gross income the sum of the "daily portions" of OID on the Notes for all days during the taxable year that the U.S. Holder owns the debt security. The daily portions of OID on the Notes are determined by allocating to each day in any accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of an OID debt security, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. In the case of an initial holder, the amount of OID on a Note allocable to each accrual period is determined by (a) multiplying the "adjusted issue price" (as defined below) of the Note at the beginning of the accrual period by the yield to maturity of the Note (appropriately adjusted to reflect the length of the accrual period) and (b) subtracting from that product the amount (if any) of qualified stated interest (as defined below) allocable to that accrual period. The yield to maturity of a Note is the discount rate that causes the present value of all payments on the Note as of its original issue date to equal the issue price of such Note. The "adjusted issue price" of a Note at the beginning of any accrual period generally will be the sum of its issue price and the amount of OID allocable to all prior accrual periods, reduced by the amount of all payments other than payments of qualified stated interest (if any) made with respect to such Note in all prior accrual periods. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of a Note at a single fixed rate of interest or, subject to certain conditions, based on one or more interest indices.

*Sale, Retirement or Disposition of Notes*

Upon the sale, retirement or other disposition of a Note, an Investor generally will recognize taxable gain or loss equal to the difference between the amount realized on the disposition and the Investor's adjusted tax basis in the Note. A U.S. Holder's adjusted tax basis in a Note generally will be equal to its issue price in the Note. Gain recognized on the disposition of a Note generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Note generally will be treated as an

ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Note is more than one year). The deductibility of capital losses is subject to limitations.

*Backup Withholding and Information Reporting*

Information reporting requirements generally will apply to payments of interest made by the Company on, or the proceeds of the sale or other disposition prior to maturity of, the Notes. Backup withholding tax, currently at a rate of 28%, may apply to such payments if an Investor fails to:

- Furnish his, her or its taxpayer identification number (social security or employer identification number);

- Certify that such number is correct;

- Certify that he, she or it is not subject to backup withholding; or

- Otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, provided that the required information is furnished timely to the Internal Revenue Service.

## ERISA MATTERS

The Notes offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or an individual retirement account ("IRA") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "Similar Law").

A fiduciary of an employee benefit plan must determine that the purchase and holding of a Note is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Notes offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Note offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Note that its acquisition and holding of the Note does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

## REPORTS TO THE INVESTORS

The Company has adopted a calendar fiscal year ending December 31. For so long as a Holder continues to hold the Note, the Company will provide to the Holder annual financial statements of the Company and such information relative to the Company's business operations and performance as its management may deem useful or appropriate.

**EXHIBIT A-1**

**SUBSCRIPTION AGREEMENT FOR ACCREDITED INVESTORS**

**(Attached)**

---

*This Subscription Agreement should be used only by investors who are investing on the basis of being an "Accredited Investor" (as defined below).*

*Investors who are investing on the basis of being a "Non-U.S. Person" should complete the Subscription Agreement attached to the Memorandum (as defined below) as Exhibit A-2.*

---



**iCap Equity, LLC**

---

**SUBSCRIPTION AGREEMENT FOR ACCREDITED INVESTORS**

---

**PART I:  Investor Information**

(a) **Investor Name**: _____
(hereinafter referred to as "***Investor***").

(b) **Investment Amount**:  Investor agrees to invest the below amount ("Investment Amount") in accordance with the provisions of this Subscription Agreement:

$\underline{\$\phantom{xxxxxxxxxxxxxxxxxx}}$

(c) **Type of Investor.**  Indicate the form of Investor:

| **Individual Investors** | **Entity Investors** |
|---|---|
| ☐ Individual | ☐ Corporation or Limited Liability Company (LLC) |
| ☐ Husband and Wife | ☐ Partnership |
| ☐ Joint Tenants | ☐ Irrevocable Trust |
| ☐ Revocable Trust | ☐ Other Entities (indicate form of organization): |
| Please complete pages 2, 5, 6, 7, 15, 16, 17, 22 | Please complete pages 4-8, 15, 16, 17, 22 |
| **Individual Investors - Retirement Funds** | |
| ☐ IRA | |
| ☐ ROTH IRA | |
| ☐ Keogh-SEP IRA | |
| ☐ Other Retirement Plan | |
| Please complete pages 2, 3, 5, 6, 7, 15, 16, 17, 22 | |

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 54 Page 0254

## **INDIVIDUAL INVESTORS**

## **JOINT ACCOUNTS, REVOCABLE TRUSTS & RETIREMENT FUNDS**

Investor Name (Please Print): (1) _____

Investor Name (Please Print): (2) _____

Registered As (Please Print): _____

Physical Address (no PO Box) _____

_____

Mailing Address (if Different) _____

_____

Phone Number: (_____) _____-_____

Birth Date (1): _____

Birth Date (2): _____

Social Security Number (1) : _____

Social Security Number (2) : _____

Primary Email Address (required): _____

Status, if individual(s):

☐ U.S. Citizen (1)    ☐ U.S. Resident Alien    ☐ U.S. Citizen Residing Outside of U.S.

☐ U.S. Citizen (2)    ☐ U.S. Resident Alien    ☐ U.S. Citizen Residing Outside of U.S.

Subscription Agreement

Page | 2

## Individual Investors

## For Retirement Funds Only

IF INVESTING THROUGH AN IRA, KEOGH OR OTHER RETIREMENT OR PROFIT SHARING PLAN, PLEASE COMPLETE THE FOLLOWING (IN ADDITION TO THE INVESTOR INFORMATION ON THE PREVIOUS PAGE):

**Account Name**

**Custodian's EIN**

**Custodian's Address**

**City** **State** **Zip Code**

*Prospective Investors must fill out the Form W-9 attached hereto*

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 56 Page 0256

## CORPORATIONS, PARTNERSHIPS, IRREVOCABLE TRUSTS OR OTHER ENTITIES

Investor Entity Name (Please Print): _____

Registered As (Please Print): _____

_____

Name (Please Print): _____

Title: _____

Address: _____

_____

_____

Phone Number: (_____) _____-_____

Date of Formation: _____

State of Incorporation/Formation: _____

SSN or Taxpayer ID Number: _____

Primary Email Address (required): _____

If Investor is a Partnership, LLC, Irrevocable Trust or other Entity, initial the line below which correctly describes the application of the following statement to Investor's situation: *Investor was not organized or reorganized for the specific purpose of acquiring the Notes and has made investments prior to the date hereof, and each beneficial owner thereof has and will share in the investment in proportion to his or her ownership interest in Investor.*

☐ True

☐ False

Initials: _____

If the "False" Box is checked, each person participating in the entity will be required to fill out a subscription agreement.

***Prospective Investors must fill out the Form W-9 attached hereto***

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 57 Page 0257

## PART II:  Payment Information

**A. Making Your Investment with the Company.**  Please provide payment by one of the following methods (select one):

[ ] **Wire Transfer or ACH Transfer to**:

| | |
|---|---|
| Receiving Financial Institution: | Umpqua Bank |
| Receiving Financial Institution Address: | 705 NW Gilman Blvd. |
| | Issaquah, WA 98027 |
| ABA/Routing Number: | 123205054 |
| Account Number: | 9690211801 |
| Special Instructions: | iCap Equity, LLC FBO *Investor Name* |

[ ] **Check made out to**:

iCap Equity, LLC
Attn: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

[ ] **Vault account transfer**:

By checking this box you acknowledge and agree that (1) you currently have funds in a Vault account with iCap Vault 1, LLC (the "Vault"), an Affiliate of the Company, and (2) you do hereby direct the Company to provide notice to iCap Vault 1, LLC on your behalf to withdraw your investment in the Vault, in the amount set forth above, and to send those funds to the Company for the purchase of a Note.

**Regardless of whether paying by wire transfer, ACH, check or from an iCap Vault account, you must also deliver a fully completed and executed copy of this Subscription Agreement and a completed and executed signature page of the Note (as attached to the Memorandum (as defined below) as Exhibit B) to the Company EITHER:**

| **In Hard Copy to:** | **OR** | **Electronically** |
|---|---|---|
| iCap Equity, LLC | | Either through DocuSign or other means, and |
| Attn: Investor Relations | | emailed to investor@icapequity.com. If this |
| 3535 Factoria Blvd. SE, Suite 500 | | option is selected there is no need to mail hard |
| Bellevue, WA 98006 | | copies of the documents. |

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 58 Page 258 of 630

**B. Where the Company Should Send Your Payments of Interest and Principal (Select One)**

    a. <u>Direct Deposit to my Bank Account</u>

I hereby authorize **iCap Equity, LLC** ("the Company") to send any payments to me at the bank account(s) listed below. I further authorize the financial institution(s) named below to accept such payments and credit such account(s).

| Name of Financial Institution | Checking or Savings | Bank Routing Number | Bank Account Number |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

For iCap to verify bank account and routing numbers, investors are encouraged to attach a **VOIDED CHECK** for each investor account to be credited. Investors should retain completed copies of this form for their records.

    b. <u>Direct Deposit to my iCap Vault Account</u>[1]. No need to provide additional information for this option. We can look you up in our records or help you set this up.

I understand that this authorization remains in effect until the Company receives from me, in writing, notification to terminate or change the authorization, provided such notification is delivered in such a time and manner as to afford the Company a reasonable time to act on it.

_____

Account Holder Signature                                 Date

_____

Account Holder Signature                                 Date

---

[1] iCap Vault is an affiliated program in which investors can invest cash into publicly registered demand notes. An iCap Vault account can be linked to an investor's bank account so that an investor can withdraw funds at any time. The details of the program can be found at www.icapequity.com/vault. Many investors choose to send their interest payments to their iCap Vault account as a means of earning additional interest.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 59 Page 259

**PART III:  Investor Status**

1. **Representation as to Investor Status.**  In order for the Company to sell the Note in conformance with state and federal securities laws, the following information must be obtained regarding Investor's investor status. Please **initial each item applicable** to you as an investor in the Company.

(a) **Accredited Investor.**  Rule 501(a) of Regulation D defines an "accredited investor" as any person who comes within any of the following categories, or whom the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(i) _____ A natural person whose net worth, either individually or jointly with such person's spouse, at the time of Investor's purchase, exceeds $1,000,000.  The term "net worth" means the excess of total assets over total liabilities (including personal and real property but excluding the estimated fair market value of a person's primary home).

(ii) _____ A natural person who had an individual income in excess of $200,000, or joint income with that person's spouse in excess of $300,000, in each of the two most recent years and reasonably expects to reach the same income level in the current year.

(iii) _____ A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

(iv) _____ A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

(v) _____ An insurance company as defined in section 2(13) of the Exchange Act.

(vi) _____ An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act.

(vii) _____ A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

(viii) _____ A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state, or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

(ix) _____ An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

(x) _____ A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

(xi) _____ An organization described in Section 501(c)(3) of the Internal Revenue Code, or a

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 60 Page 260

corporation, business trust or partnership, not formed for the specific purpose of acquiring the Shares, with total assets in excess of $5,000,000.

**(xii)** _____ A director or executive officer of the Company.

**(xiii)** _____ A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Shares, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of investing in the Company.

**(xiv)** _____ An entity in which all of the equity owners qualify under any of the above subparagraphs.

Attached to this Subscription Agreement as Annex 1 is an Accredited Status Certification Letter that Investor who is claiming to be an "accredited investor" under the definitions in Section 4(b)(i) or Section 4(b)(ii) above may provide to the Company to assist it in its determination of whether Investor meets the accredited investor requirements discussed above. An Investor who is claiming to be an "accredited investor" under the definitions in Section 4(b)(i) or Section 4(b)(ii) above should provide this form of Accredited Status Certification Letter to the applicable person (CPA, investment adviser, etc.) and ask them to complete it and return it to the Company. (In this Letter, you as the Investor are the "Client").

_____ Investor does <u>not</u> qualify under any of the investor categories set forth in Section 4(a)(i) through Section 4(a)(xiv).

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 1   Page 261

# PART IV: Covenants and Provisions

**1. Subscription for the Purchase of a Note.**

The undersigned "Investor", on the terms and conditions herein set forth, hereby irrevocably submits this subscription agreement (the "Subscription Agreement") to iCap Equity, LLC, a Delaware limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise capital of up to $50,000,000 through the sale to Investor as an accredited investor of a Series 3 - Senior Promissory Note of the Company (the "Note").

The undersigned, intending to be legally bound, hereby subscribes for a Note in the aggregate principal amount as set forth on Page 1 hereto (the "Subscription Amount") and, in this regard, Investor agrees to forward payment in the amount of the Subscription Amount in accordance with the provision selected in **Part II, Section A**, above.

**Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution**.

The undersigned acknowledges that the Company is offering the Notes pursuant to the terms and provisions of the Offering documented in the Confidential Private Placement Memorandum dated July 1, 2020 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. The Company's private offering of Notes is being made to "accredited" investors within the meaning of Rule 506(c) of Regulation D promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"). By signing this Subscription Agreement, Investor acknowledges receipt of the Memorandum and its Exhibits, including the Note (collectively the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents. Furthermore Investor represents and warrants that all information entered in Parts I-IV of this document are correct and Investor agrees to be bound by all provisions of such sections of this Agreement.

The undersigned agrees to execute this Subscription Agreement and if by mail, send to the Company. You as an individual or on behalf of the subscribing entity are being asked to complete this Subscription Agreement so that a determination can be made as to whether or not you (it) are qualified to purchase the Note under applicable federal and state securities laws. Your answers to the questions contained herein must be true and correct in all respects, and a false representation by you may constitute a violation of law for which a claim for damages may be made against you. Your answers will be kept strictly confidential; however, by signing this Subscription Agreement, you will be authorizing the Company to present a completed copy of this Subscription Agreement to such parties as they may deem appropriate in order to make certain that the offer and sale of the securities will not result in a violation of the Securities Act or of the securities laws of any state. All questions must be answered. If the appropriate answer is "None" or "Not Applicable," please state so. Please print or type your answers to all questions and attach additional sheets if necessary to complete your answers to any item. Please initial any corrections.

2. **Offer to Purchase.** Investor hereby irrevocably offers to purchase the Note and tenders herewith the total Subscription Amount as set forth herein. Investor recognizes and agrees that (i) this subscription is irrevocable and, if Investor is a natural person, shall survive Investor's death, disability or other incapacity, and (ii) the Company has complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement. This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

3. **Effect of Acceptance.** Investor hereby acknowledges and agrees that on the Company's acceptance of this

23-01243-WLH11   Doc 469   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 2 Page 262

Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Investor. As a result, upon acceptance by the Company of this Subscription Agreement, Investor will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note (the Subscription Amount) as specified herein.

In determining individual "income," Investor should add to Investor's individual taxable adjusted gross income (exclusive of any spousal income) any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

4. **Additional Representations and Warranties of Investor.** Investor hereby represents and warrants to the Company as follows:

(a) Investor has been furnished the Memorandum and, if requested by the Investor, other documents. The Investor has carefully read the Memorandum and any such other requested documents. Investor has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Investor requested and deemed material to making an informed investment decision regarding its purchase of the Note. Investor has been afforded the opportunity to review such documents and materials and the information contained therein. Investor has been afforded the opportunity to ask questions of the Company and its management. Investor understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Investor understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Investor has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Investor shall modify, amend or affect such Investor's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Investor has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Investor has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

(b) Investor has read and understood, and is familiar with, this Subscription Agreement, the Note and the business and financial affairs of the Company.

(c) Investor, either personally, or together with its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum. The Investor and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Note. Investor's financial condition is such that Investor is able to bear the risk of holding the Note that Investor may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Investor's entire investment in

the Notes.

**(d)** Investor has investigated the acquisition of the Note to the extent Investor deemed necessary or desirable and the Company has provided Investor with any reasonable assistance Investor has requested in connection therewith.

**(e)** The Note is being acquired for Investor's own account for investment, with no intention by Investor to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Investor in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Investor has any interest in or any right to acquire the Note. Investor understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Investor.

**(f)** No representations or warranties have been made to Investor by the Company, or any representative of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

**(g)** Investor is aware that Investor's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Investor will not offer for sale, sell or otherwise transfer the Note without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

**(h)** Investor understands and agrees that the Note it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

**(i)** The Investor has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Investor understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

**(j)** Investor understands that the Note shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such certificates):

"NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT."

The Investor hereby acknowledges and agrees to the Company's making a notation on its records or giving instructions to any registrar and transfer agent of the Company in order to implement the restrictions on transfer set forth and described in this Subscription Agreement.

**(k)** Investor also acknowledges and agrees to the following:

**(i)** an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire

investment in the Notes; and

**(ii)** there is no assurance that a public market for the Notes will be available and that, as a result, Investor may not be able to liquidate Investor's investment in the Note should a need arise to do so.

**(l)** Investor is not dependent for liquidity on any of the amounts Investor is investing in the Note.

**(m)** Investor's address set forth below is his or her correct residence address.

**(n)** Investor has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

**(o)** Investor understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

5. **Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The Investor should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations. Investor hereby represents and warrants to the Company as follows:

**(a)** The Investor represents that (i) no part of the funds used by the Investor to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Investor and no distribution to the Investor shall cause the Company to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Investor acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Note, and the Investor shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[2] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

**(b)** To the best of the Investor's knowledge, none of: (1) the Investor; (2) any person controlling or controlled by the Investor; (3) if the Investor is a privately-held entity, any person having a beneficial interest in the Investor; or (4) any person for whom the Investor is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a

---

[2] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 5 Page 265

person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Investor agrees to promptly notify the Company should the Investor become aware of any change in the information set forth in these representations. The Investor understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Investor, either by prohibiting additional subscriptions from the Investor, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Investor's identity to OFAC. The Investor further acknowledges that the Company may, by written notice to the Investor, suspend the redemption rights, if any, of the Investor if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

(c) To the best of the Investor's knowledge, none of: (1) the Investor; (2) any person controlling or controlled by the Investor; (3) if the Investor is a privately-held entity, any person having a beneficial interest in the Investor; or (4) any person for whom the Investor is acting as agent or nominee in connection with this investment is a senior foreign political figure[3], or any immediate family[4] member or close associate[5] of a senior foreign political figure, as such terms are defined in the footnotes below.

(d) If the Investor is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Investor receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Investor represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

(e) The Investor acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Investor agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Investor acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information,

---

[3] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[4] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[5] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

may result in the withholding of amounts with respect to, or other limitations on, distributions made to the Investor and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Investor shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith.

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Investor shall give prompt notice of such fact to the Company by telegram, or facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

6. **Indemnification.** Investor acknowledges that Investor understands the meaning and legal consequences of the representations and warranties made by Investor herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Investor hereby agrees to indemnify and hold harmless the Company and each employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Investor contained in this Subscription Agreement.

7. **Transferability.** Investor agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

8. **Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Investor any money tendered hereunder without interest or deduction.

9. **Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Investor at the address set forth below and to the Company at investor@icapequity.com, or (c) at such other place as the Company may designate by written notice to Investor.

10. **Amendments.** Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Investor and the Company.

11. **Governing Law.** This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

12. **Headings.** The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

13. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

14. **Continuing Obligation of Investor to Confirm Investor Status**. Upon the request of the Company and for as long as the Investor holds the Note or other securities in the Company, the Investor shall confirm Investor's investor status as an "Accredited Investor," as defined by the Securities and Exchange

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 7 Page 267 of 630

Commission at the time of such request. In connection therewith, the Company shall deliver to the Investor a questionnaire that elicits the necessary information to determine the Investor's investor status. Upon receipt of the questionnaire, the Investor shall: (i) complete it, (ii) execute the signature page therein, and (iii) return it to the Company, or its designee, in accordance with the instructions therein, no later than ten (10) days after receipt of the questionnaire.

**SIGNATURES - ALL INVESTORS MUST SIGN**

THE UNDERSIGNED HAS THE AUTHORITY TO ENTER INTO THIS SUBSCRIPTION AGREEMENT ON BEHALF OF THE PERSON(S) OR ENTITY REGISTERED ABOVE.

Executed on_____ _____

X_____
Signature (Investor, or authorized signatory)

X_____
Signature (Investor, or authorized signatory)

<u>ACCEPTANCE</u>

iCap Equity, LLC

By:     iCap Enterprises, Inc.
Its:    Manager

By:     _____
Name:   _____
Title:  _____

23-01243-WLH11     Doc 469     Filed 02/23/24     Entered 02/23/24 19:45:30     Exhibit 08 Page 268

SERIES 3 – SENIOR PROMISSORY NOTE

**Loan Amount $**_____        **Date: _____, 202\_\_\_**

**Monthly Interest Payment Election (optional)**:  by initialing below, Holder hereby elects to receive simple interest, paid monthly, and for this Note to be governed by the provisions of Section 2(c)(ii) instead of the provisions of Section 2(c)(i).

Investor Initials:  _____        _____

*Agreed and accepted:*

HOLDER:

Name (*Individual Holder or entity Holder*):        _____

Signature:        _____

Name:        _____

Title:        _____
                *(if applicable)*

---

In witness whereof, the undersigned has executed this Note as of the Date above.

iCap Equity, LLC

By:        iCap Enterprises, Inc.
Its:        Manager

By:        _____
Name:        _____
Its:        _____

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 9 Page 269

**Form W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

## Request for Taxpayer Identification Number and Certification

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.

6 City, state, and ZIP code

Requester's name and address (optional)

7 List account number(s) here (optional)

*Print or type.*
*See Specific Instructions on page 3.*

### Part I — Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

or

Employer identification number

| | | – | | | | | | | |

### Part II — Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**   Signature of U.S. person ▶                          Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

Form **W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
## Identification Number and Certification

► Go to *www.irs.gov/FormW9* for instructions and the latest information.

**Give Form to the requester. Do not send to the IRS.**

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ►

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ►

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.

6 City, state, and ZIP code

Requester's name and address (optional)

7 List account number(s) here (optional)

Print or type.
See **Specific Instructions** on page 3.

---

**Part I**  **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

☐☐☐ – ☐☐ – ☐☐☐☐

or

**Employer identification number**

☐☐ – ☐☐☐☐☐☐☐

---

**Part II**  **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**  Signature of U.S. person ►          Date ►

---

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

**PART V:  Registered Representatives and Investment Advisors**

**BROKER DEALER/REGISTERED INVESTMENT ADVISOR**

**TO BE COMPLETED BY REGISTERED REPRESENTATIVE**

The Registered Representative of record for this transaction or a Registered Principal authorized by the Broker/Dealer or Registered Investment Advisor to review and approve such securities transactions must sign and date below. The Registered Principal warrants that the Broker/Dealer (or Registered Investment Advisor) is a duly licensed Broker/Dealer (or Registered Investment Advisor) and may lawfully offer the Notes in the state designated as the investor's address of residence. The Registered Representative and the Registered Principal represent that they have reasonable grounds to believe this investment is suitable for the investor and that the investor has been provided full information regarding the risks of this investment including liquidity and marketability.

| B-D/RIA Name | | Telephone No. | |
|---|---|---|---|

| B-D/RIA Street Address or P.O. Box | |
|---|---|

| City | | State | | Zip Code | |
|---|---|---|---|---|---|

| Registered Representative Name | | Telephone No. | |
|---|---|---|---|

| Email Address: | | | |
|---|---|---|---|

| Reg. Rep. Street Address or P.O. Box if different | |
|---|---|

| City | | State | | Zip code | |
|---|---|---|---|---|---|

☐ **Registered Representative: please check this box to verify that you have personally seen and recorded a government issued identification document from the Investor.**

☐ **Check this box if the subscriber's investment in the company is made through a RIA**

| | |
|---|---|
| Registered Representative's Signature & Date | Registered Principal's Approval Signature & Date |

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 72 Page 272

Annex 1

Accredited Status Certification Letter

Date: _____

iCap Equity, LLC
Attn: Investor Relations Team
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

  Re: Determination of Accredited Status

Dear iCap Equity, LLC

_____ ("Client") has asked us to provide iCap Equity, LLC with this letter to assist you in your determination of whether Client is an "accredited investor" as defined in Rule 501(a) of the Securities Act of 1933, as amended (the "Securities Act").

[I/We] hereby certify that [I/we] [am/are] (please check the appropriate box):

 ☐ a registered representative of a registered broker-dealer, as defined in the Securities Exchange Act of 1934;

 ☐ an investment adviser registered with the Securities and Exchange Commission;

 ☐ a licensed attorney in good standing under the laws of the jurisdictions in which I am admitted to practice law; or

 ☐ a certified public accountant in good standing under the laws of the place of my residence or principal office.

Based solely on a review of the Client Materials (as defined below), the undersigned hereby advises you that Client satisfies one or more of the following criteria (check all boxes that apply):

 ☐ a natural person whose individual "net worth," or joint net worth with Client's spouse, exceeds $1,000,000; or

 ☐ a natural person who had an individual income in excess of $200,000 in each of the two most-recent years or joint income with Client's spouse in excess of $300,000 in each of those years.

  In connection with this letter, we have examined and relied upon the original or copies of **one or more** of the following documents (the "Client Materials"):

 • A certificate executed by Client and [his/her] spouse, attached hereto, addressed to the Issuer and us, stating such persons: (i) have had a joint income in excess of $300,000 in each of the two most-recent years and a reasonable expectation of joint income in the current year in excess of $300,000; or (ii) have a joint "net worth" with Client's spouse in excess of $1,000,000.

 • A certificate executed by Client, attached hereto, addressed to the Issuer and us, stating such person: (i) has had an individual income in excess of $200,000 in each of the two most-recent years and a reasonable

23-01243-WLH11  Doc 469  Filed 02/23/24  Entered 02/23/24 19:45:30  Exhibit 73 Page 273

expectation of income in the current year in excess of $200,000; or (ii) has an individual "net worth" in excess of $1,000,000.

- The following tax documents to the extent applicable to Client:

  o Tax returns for the years [    ] and [    ] (each, a "Tax Year") filed by Client and [his/her] spouse on Form 1040 (the "Tax Returns"), accompanied by a certificate of the Client that that the copies of the Tax Returns provided were true, correct and complete, filed with the appropriate office of the Internal Revenue Service, prepared in full compliance with applicable law and governmental regulations and have not been amended.

  o Form 1099 filed with the Internal Revenue Service by Client [and [his/her] spouse] for the two most-recent years.

  o Schedule K-1 of Form 1065 filed with the Internal Revenue Service by Client [and [his/her] spouse] for the two most recent-years.

  o Form W-2 issued by the Internal Revenue Service to Client [and [his/her] spouse] for the two most recent-years.

  o Other Internal Revenue Service documents (please specify): _____.

- Bank statements, brokerage statements and other statements of securities holdings, certificates of deposit, tax assessments, or appraisal reports issued by independent third parties to Client, dated within three months of the date of this Letter.

- A consumer or credit report from at least one of the nationwide consumer reporting agencies indicating Client's liabilities, dated within three months of the date of this Letter;

- Other documents (please specify): _____.

We have not conducted any other investigation or inquiries of Client, and have not determined whether the above documents were accurately prepared, agree with source documents, were properly filed or otherwise.

By rendering this letter, we do not intend to waive any attorney-client privilege, as applicable.  This letter is limited to the matters set forth herein and speaks only as of the date hereof.  Nothing may be inferred or implied beyond the matters expressly contained herein. This letter may be relied upon by you and only you in connection with an offering under Rule 506(c) and only for 30 days from the date of this letter.  This letter may not be used, quoted from, referred to or relied upon by you or by any other person for any other purpose, nor may copies be delivered to any other person, without in each instance our express prior written consent.  We assume no obligation to update this letter.

 Very truly yours,

[CERTIFIER]:

By:_____

Name:_____

Title:_____

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 74 Page 0274

<u>CERTIFICATION OF CLIENT</u>

The undersigned, being the Client identified above, by my signature below, hereby represents and warrants that the following statements are true, correct, and complete as of the date of my signature below (the "Certification Date"):

- All Client Materials referenced above that have been delivered are true, correct and complete as of the Certification Date;

- If I am relying on my "net worth," either individually or jointly with my spouse, to satisfy the requirements for being an accredited investor, I/we have fully and accurately disclosed all liabilities that are required to be included in the calculation of "net worth" as described above; and

- At least one of the following applies to me:

  o If I am relying on my income and/or that of my spouse to satisfy the requirements for being an accredited investor, I have a reasonable expectation of reaching individual income in excess of $200,000 or joint income with my spouse in excess of $300,000 in the current year.

  o If I am relying on my "net worth," either individually or jointly with my spouse, to satisfy the requirements for being an accredited investor, I/we have a "net worth" in excess of $1,000,000

I hereby affirm that the foregoing is accurate and complete.

Date: _____

Client Signature:_____

Client Name: _____

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 5 Page 275

# EXHIBIT A-2

## SUBSCRIPTION AGREEMENT FOR NON-U.S. PERSONS

### (Attached)

---

*This Subscription Agreement should be used only by investors who are investing on the basis of being a "Non-U.S. Person" (as defined below).*

*Investors who are investing on the basis of being an "Accredited Investor" should complete the Subscription Agreement attached to the Memorandum (as defined below) as Exhibit A-1.*

---



**iCap Equity, LLC**

SUBSCRIPTION AGREEMENT FOR NON-U.S. PERSONS

**PART I:   Investor Information**

第一部分：投资者信息

(a) **Investor Name 投资者姓名**:

(hereinafter referred to as "***Investor***")（以下简称" 投资者"）

(b) **Investment Amount**:  Investor agrees to invest the below amount ("Investment Amount") in accordance with the provisions of this Subscription Agreement:
投资金额：投资者同意根据本"认购协议"的规定投资以下金额（以下简称"投资金额"）：

$ _____

(c) **Type of Investor.**  Indicate the form of Investor:

投资者类型。 说明投资者的形式：

| Individual Investors<br>个人投资者 | Entity Investors<br>实体投资者 |
|---|---|
| ☐ Individual 个人 | ☐ Corporation or Limited Liability Company (LLC)<br>公司或有限责任公司（LLC） |
| ☐ Husband and Wife 夫妻 | ☐ Partnership 合伙企业 |
| ☐ Joint Tenants 联名共有人 | ☐ Irrevocable Trust 不可撤销信托 |
| ☐ Revocable Trust 可撤销信托 | ☐ Other Entities (indicate form of organization):<br>其他实体（注明组织形式）： |
| Please complete pages 1, 2, 5, 7, 8, 23, 24, 25<br><br>请完成第 1、2、5、7、8、23 和 24 页, 25 | Please complete pages 1, 3, 4, 5, 7, 8, 23, 24 and Form W-8BEN-E<br><br>请完成第 1、3、4、5、7、8、23、24 页以及 W-8BEN-E 表。 |

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 17 Page 277 of 630

# INDIVIDUAL INVESTORS
## 个人投资者

## JOINT ACCOUNTS, REVOCABLE TRUSTS & RETIREMENT FUNDS
### 联合账户，可撤销信托和退休基金

Investor Name (Please Print) (1):
投资者名称（请以楷体书写）(1): _____

Investor Name (Please Print) (2) :
投资者名称（请以楷体书写）(2): _____

Registered As (Please Print):
注册为（请以楷体书写）: _____

Physical Address (no PO Box) :
居住地址（不可填写邮政信箱）: _____

_____

Mailing Address (if Different)：
邮寄地址（如与居住地址不同）: _____

_____

Phone Number 电话号码:     (_____) _____-_____

Birth Date 生日 (1): _____

Birth Date 生日(2): _____

Passport Number 护照号码 (1) : _____

Passport Number 护照号码(2) : _____

Primary Email Address 主要电子邮件地址(required 必填): _____

## **CORPORATIONS, PARTNERSHIPS, IRREVOCALBE TRUSTS OR OTHER ENTITIES**

## **公司，合伙企业，不可撤销信托或其他实体**

Investor Entity Name (Please Print):
投资实体名称（请以楷体书写）： _____

Registered As (Please Print):
注册为（请以楷体书写）： _____

Name (Please Print):
姓名（请以楷体书写）： _____

Title:
称谓/职位： _____

Address:
地址： _____

_____

Phone Number 电话号码 ： (_____) _____-_____

Date of Formation 成立日期： _____

State of Incorporation/Formation 公司注册地： _____

SSN or Taxpayer ID Number 公司社安号或纳税人 ID 号: _____

Primary Email Address (required) 主要电子邮件地址 （必填）:_____

If Investor is a Partnership, LLC, Irrevocable Trust or other Entity, initial the line below which correctly describes the application of the following statement to Investor's situation:  *Investor was not organized or reorganized for the specific purpose of acquiring the Notes and has made investments prior to the date hereof, and each beneficial owner thereof has and will share in the investment in proportion to his or her ownership interest in Investor.*

如果投资者是一个合作企业、有限责任公司、不可撤销的信托或其他实体，请勾选下面一行中对投资者情况描述正确的选项，并用姓名首字母签名："投资者不是为了获得本票据的具体

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 79 Page 0279

目的而组织或重组的，且已在本协议日期之前进行了投资。其各个受益所有人拥有并将按照其在投资者中的所有者权益比例分享投资。"

☐ True 正确

☐ False 错误

Initials: _____

If the "False" Box is checked, each person participating in the entity will be required to fill out a subscription agreement.
如果勾选"错误"选项，则该实体的每个参与人都需要填写"认购协议"。

***Prospective Investors must fill out the Form W-8BEN attached hereto***
***准投资者必须填写随附的 W- 8BEN 表格***

## PART II:  Payment Information

## 第二部分： 支付信息

A. **Making Your Investment with the Company.**  Please provide payment by one of the following methods (select one):

投资"**本公司**"。 请通过以下方式（选择一种）支付款项：

☐ **Wire Transfer or ACH Transfer to 电汇或 ACH 方式支付:**

| | |
|---|---|
| Receiving Financial Institution: | Umpqua Bank |
| Receiving Financial Institution Address: | 705 NW Gilman Blvd. |
| | Issaquah, WA 98027 |
| ABA/Routing Number: | 123205054 |
| Account Number: | 9690211801 |
| Special Instructions: | iCap Equity, LLC FBO *Investor Name* |

☐ **Check made out to 支票方式支付:**

iCap Equity, LLC
Attn: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

☐ **Vault account transfer 小金库帐户转帐:**

By checking this box you acknowledge and agree that (1) you currently have funds in a Vault account with iCap Vault 1, LLC (the "Vault"), an Affiliate of the Company, and (2) you do hereby direct the Company to provide notice to iCap Vault 1, LLC on your behalf to withdraw your investment in the Vault, in the amount set forth above, and to send those funds to the Company for the purchase of a Note.

若您勾选本选项，您知悉并同意(1)您目前在艾珂荣小金库 1 号有限责任公司（"本公司"的附属公司）的小金库账户（以下简称"小金库"）中有资金；（2）您在此指示"本公司"代表您向艾珂荣小金库 1 有限责任公司发送通知，从您的"小金库"资金中提取上述投资款项，并将此款转账至"本公司"以购买一份"本票"。

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 81 Page 281

**Regardless of whether paying by wire transfer, ACH, Swift, check or from an iCap Vault account, you must also deliver a fully completed and executed copy of this Subscription Agreement and a completed and executed signature page of the Note (as attached to the Memorandum (as defined below) as Exhibit B) to the Company EITHER:**

无论通过电汇、ACH、SWIFT、支票还是小金库帐户转账方式支付投资款，您必须另外向本公司通过以下一种方式交付本认购协议的完整已签署副本和票据的完整已签署的签署页各一份（即备忘录（定义见下文）的附件 B）：

|  |  |  |
|---|---|---|
| **In Hard Copy to:** | **OR** | **Electronically** 电子签 |
| 发纸质副本至： | 或 | Either through DocuSign or other means, and emailed to investor@icapequity.com. If this option is selected there is no need to mail hard copies of the documents. |
| iCap Equity, LLC | | |
| Attn: Investor Relations | | |
| 3535 Factoria Blvd. SE, Suite 500 | | |
| Bellevue, WA 98006 | | 通过 DocuSign 或其他方式，通过电子邮件发送至 investor@icapequity.com。如果选择此方式，则无需再邮寄文档的纸质副本。 |

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 2 Page 282

**B. Where the Company Should Send Your Payments of Interest and Principal (Select One)**

**"本公司"应将您的利息和本金支付至（选择一项）**

☐ Direct Deposit to my Bank Account 直接存款到我的银行帐户

I hereby authorize **iCap Equity, LLC** ("the Company") to send any payments to me at the bank account(s) listed below. I further authorize the financial institution(s) named below to accept such payments and credit such account(s).

本人特此授权**艾珂荣资本有限责任公司**（以下简称"本公司"）通过下面列出的银行帐户向我发送任何付款。我进一步授权以下指定的金融机构接受此类付款并将这些付款记入下述银行账户。

| Name of Financial Institution<br>金融机构名称 | Checking or Savings<br>账户类别<br>（支票账户/储蓄账户） | Bank Routing Number<br>银行汇款路径号码 | Bank Account Number<br>银行账户号码 |
|---|---|---|---|
|  |  |  |  |

For iCap to verify bank account and routing numbers, investors are encouraged to attach a **VOIDED CHECK** for each investor account to be credited. Investors should retain completed copies of this form for their records.
为了让艾珂荣可以验证银行帐户和银行汇款路径号码，我们鼓励投资者为每个存入利息与本金的投资者帐户附加一张**"作废的支票"**。投资者应保留此表格的完整副本作为记录。

☐ Direct Deposit to my iCap Vault Account[1]. No need to provide additional information for this option. We can look you up in our records or help you set this up.
直接存入我的艾珂荣小金库帐户[1]。您无需为此选项提供其他信息。我们可以在记录中查找您的信息或帮助您设置。

I understand that this authorization remains in effect until the Company receives from me, in writing, notification to terminate or change the authorization, provided such notification is delivered in such a time and manner as to afford the Company a reasonable time to act on it.

---

[1] iCap Vault is an affiliated program in which investors can invest cash into publicly registered demand notes. An iCap Vault account can be linked to an investor's bank account and an investor can withdraw funds at any time. The details of the program can be found at www.icapequity.com/vault. Many investors choose to send their interest payments to their iCap Vault account as a means of earning additional interest.

[1] iCap Vault 是 Icap 的子项目，投资者可通过该子项目将现金投资到公开注册的即期票据。投资者可以将 iCap Vault 帐户链接到其银行帐户，以便投资者随时提取资金。有关该产品的详细信息，请访问 www.icapequity.com/vault。许多投资者选择将其利息付款发送到其 iCap Vault 帐户，以获得附加利息。

本人明白，本授权书将持续有效直至"本公司"收到本人终止/更改此授权的书面通知，并给予"本公司"在收到本人书面通知后一定合理时间来采取行动。

_____

Account Holder Signature 帐户持有人签名                 Date 日期

_____

Account Holder Signature 帐户持有人签名                 Date 日期

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 4    Page 284

## PART III: <u>Investor Status</u>
## 第三部分： 投资者状态

1. **Representation as to Investor Status.** Subscriber hereby represents and warrants to the Company as of the date hereof that:

   **关于投资者身份的陈述。** 认购人特此向"本公司"声明并保证，自本协议所述日期之日起：

   **(a)** Subscriber understands that the investment offered hereunder has not been registered under the Securities Act and Subscriber's acquiring the Note for Subscriber's own account, for investment purposes only, and not with a view towards resale or distribution.

   投资者须知：本协议所述的投资尚未依据《证券法》登记；认购人是为自己名下帐户获得"本票"；认购人获取"本票"仅出于投资目的，而非转售或分销。

   **(b)** Subscriber is <u>not a</u> "US Person" which is defined as:

   投资者不是"美国人"（不属于如下定义中的任何一项）：

   **(i)** Any natural person resident in the United States (as defined below);

   居住在美国（定义见下文）的任何自然人；

   **(ii)** Any partnership or corporation organized or incorporated under the laws of the United States;

   根据美国法律组建或注册的合伙企业或公司；

   **(iii)** Any estate of which any executor or administrator is a US Person;

   遗产的执行人或管理者是一位美国人；

   **(iv)** Any trust of which any trustee is a US Person;

   信托的受托人是一位美国人；

   **(v)** Any agency or branch of a foreign entity located in the United States;

   位于美国境内的外国实体的代理机构或分支机构；

   **(vi)** Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US Person;

   为美国人利益或帐户而持有非全权委托账户或类似帐户(遗产或信托除外）的经销商或其他受托人；

   **(vii)** Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident of the United States; and

   对任何全权委托的账户或类似账户（不含任何财产账户或信托账户）而言，其持有人是一家在美国境内组织或成立的经销商或其他受托人，或是一位美国居民（对个人而言）；以及

   **(viii)** Any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a US Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) who are not natural persons, estates or trusts.

   (i) 依据外国管辖法组织或注册成立的，且(ii)由一位美国人成立的，主要目的是投资未依照《证券法》注册的证券的合伙企业或公司，但该合伙企业或公司是由作为非自然人、财产管理机构或信托机构的合格投资人（其定义见《证券法》 D 条例501(a)条款）组织、注册及持有的除外。

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 5 Page 285

"United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

美国"指美利坚合众国、其领土和财产、美国所有的州和哥伦比亚特区。

**(c)** Subscriber, as of the execution date of this Agreement, (i) is not located within the United States, and (ii) is not purchasing the Note for the benefit of any US Person.

截至本协议签署之日，投资者，(i)本人并不在美国境内，且(ii)不是为使任何"美国人"受益而购买的"本票"。

**(d)** Subscriber will not resell any Note except in accordance with the provisions of Regulation S (Rule 901 through 905 and Preliminary Notes thereto), pursuant to a registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

除非"本票"符合 S 条例的规定（第 901 条至 905 条及其附注），已根据《证券法》进行注册，或根据任何适用豁免注册的规定，否则投资者不得转售"本票"; 并同意不参与该证券有关的对冲交易，但符合《证券法》的规定的情况除外。

Subscriber has not acquired the Note as a result of, and will not itself engage in, any "directed selling efforts" (as defined in Regulation S under the Securities Act) in the United States in respect of the Note which would include any activities undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the resale of any of the Note; provided, however, that the Subscriber may sell or otherwise dispose of the Note pursuant to registration thereof under the Securities Act and any applicable state and federal securities laws or under an exemption from such registration requirements.

投资者获得"本票"，并非因"本票"能够"定向销售"且投资者本人将不会采取任何"定向销售行为"（定义见《证券法》颁布的 S 条例），包括为达成在美国市场有条件转售的目的或为促成"本票"在美国市场有条件转售的合理预期，而进行的任何活动；然而，若符合《证券法》和任何适用的州和联邦的证券法有关"本票"注册的规定或符合此类豁免注册的规定，投资者可以出售或以其他方式处置"本票"。

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 6 Page 286

# PART IV: Covenants and Provisions

## 第四部分： 承诺和规定

**1.      Subscription for the Purchase of a Note. 认购一份"本票"。**

The undersigned "Investor", on the terms and conditions herein set forth, hereby irrevocably submits this subscription agreement (the "Subscription Agreement") to iCap Equity, LLC, a Delaware limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise capital of up to $50,000,000 through the sale to Investor as an accredited investor of a Series 3 - Senior Promissory Note of the Company (the "Note").

以下签名的"投资者"，根据此协议的条款和条件，谨此不可撤销地向艾珂荣资本有限责任公司，一家特拉华州的有限责任公司（以下简称"本公司"）提交本《认购协议》（以下简称《认购协议》"）。前述《认购协议》"内容是"本公司"通过向拥有合格投资者身份的投资者发行"本公司"高级本票系列三（以下简称"本票"），私募（以下简称"发售要约"）最高 5000 万美元的资金。

The undersigned, intending to be legally bound, hereby subscribes for a Note in the aggregate principal amount as set forth on Page 1 hereto (the "Subscription Amount") and, in this regard, Investor agrees to forward payment in the amount of the Subscription Amount in accordance with the provision selected in **Part II, Section A**, above.

拟受法律约束的签字人，在此认购本协议第 1 页所载的本金总额（以下简称"认购金额"）的一份"本票"，并且"投资者"同意根据上文**第二部分** A **节**所选择的规定支付认购的金额。

**Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.**

**只有在"本公司"完全签署并接受了"《认购协议》"以及与该"本票"有关的所有协议，并且"本公司"金融机构指示"本金"已经交付并提供给"本公司"之后，才会开始计算利息。**

The undersigned acknowledges that the Company is offering the Notes pursuant to the terms and provisions of the Offering documented in the Confidential Private Placement Memorandum dated July 1, 2020 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. The Company's private offering of Notes is being made to "accredited" investors within the meaning of Rule 506(c) of Regulation D promulgated by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"). By signing this Subscription Agreement, Investor acknowledges receipt of the Memorandum and its Exhibits, including the Note (collectively, the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents. Furthermore Investor represents and warrants that all information entered in Parts I-IV of this document are correct and Investor agrees to be bound by all provisions of such sections of this Agreement.

"投资者"认同"本公司"是依据 2020 年 07 月 01 日发布的机密私募备忘录（与本备忘录的所有附录和附件统称"备忘录"）的条款与规定，发行该"本票"。"本公司"依据美国证券交易委员会经 1933 年修订的《证券法》（以下简称"《证券法》"）下的 S 条例颁布的 D 条第 506（c）条的规定，向"合格"投资者进行"本票"的私募发行。"《认购协议》"一经签署，即代表"投资者"确认其已收到"备忘录"及其附录，包括"本票"（上述几项统称"本票文件"），并同意他/她/其已阅读"本票文件

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 37 Page 287 of 630

"的所有规定，并同意受其约束。此外，"投资者"声明并保证在本文件第一至四部分中输入的所有信息均正确，并且"投资者"同意受本"协议"这些部分的所有条款约束。

The undersigned agrees to execute this Subscription Agreement and if by mail, send to the Company. You as an individual or you on behalf of the subscribing entity are being asked to complete this Subscription Agreement so that a determination can be made as to whether or not you (it) are qualified to purchase the Note under applicable federal and state securities laws. Your answers to the questions contained herein must be true and correct in all respects, and a false representation by you may constitute a violation of law for which a claim for damages may be made against you. Your answers will be kept strictly confidential; however, by signing this Subscription Agreement, you will be authorizing the Company to present a completed copy of this Subscription Agreement to such parties as they may deem appropriate in order to make certain that the offer and sale of the securities will not result in a violation of the Securities Act or of the securities laws of any state. All questions must be answered. If the appropriate answer is "None" or "Not Applicable," please state so. Please print or type your answers to all questions and attach additional sheets if necessary to complete your answers to any item. Please initial any corrections.

签署人同意签署本"《认购协议》"，且如果通过邮件将其发送给"本公司"。您，作为一个个人或代表认购实体将被要求填写完成本"《认购协议》"，以便可以确定您（它）是否有资格根据适用的联邦和州证券法购买"本票"。您对此文件包含的问题的回答在所有方面都必须是真实、正确的。您的虚假陈述可能违反法律，并且因此您可能会被要求赔偿损失。您的回答将严格保密；但是，通过签署本"《认购协议》"，您将授权"本公司"向其认为适当的各方出示本"《认购协议》"的完整副本，以确保要约和出售证券不会违反《证券法》或任何州的证券法。所有问题都必须被回答。如果答案是"无"或"不适用"，请说明。请整洁地书写或键入您对所有问题的答案，并在必要时附加更多纸张以完成对任何项目的答案。请以姓名首字母在任何更正处签字。

2. **Offer to Purchase.** Investor hereby irrevocably offers to purchase the Note and tenders herewith the total Subscription Amount as set forth herein. Investor recognizes and agrees that (i) this subscription is irrevocable and, if Investor is a natural person, shall survive Investor's death, disability or other incapacity, and (ii) the Company has complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement. This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

认购要约。"投资者"在此不可撤回地提出购买"本票"并投标本文所述的总"认购金额"。"投资者"清楚并同意，(i) 此认购协议不可撤销，且若"投资者"是自然人，即使"投资者"死亡、出现残疾或其他失能的情况下，该认购仍然有效，且(ii) "本公司"可以其完全的自由裁量权，全权决定完全接受或拒绝本"《认购协议》"，且不需因拒绝本"《认购协议》"承担任何责任。本"《认购协议》"应经"本公司"签署后才能被视为已被"本公司"接受。

3. **Effect of Acceptance.** Investor hereby acknowledges and agrees that on the Company's acceptance of this Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Investor. As a result, upon acceptance by the Company of this Subscription Agreement, Investor will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note (the Subscription Amount) as specified herein.

接受的效力。"投资者"承认并同意，一旦被"本公司"接受，该"《认购协议》"将成为"本公司"和"投资者"之间具有约束力且可被完全地强制执行的协议。因此，在"本公司"接受该"《认购协议》"后，"投资者"将成为该"本票"记录在案的持有人和受益人，且"本公司"将有权收取本协议

所述的"本票"的购买价格（此指"认购金额"）。

In determining individual "income," Investor should add to Investor's individual taxable adjusted gross income (exclusive of any spousal income) any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

在确定个人"收入"时，投资者"应在其个人调整后应税总收入（不包括任何配偶收入）中加上任何应纳的免税收入，在任何有限合伙企业中作为有限合伙人所声明的损失，折损扣除，对IRA 或 Keogh 退休计划的供款、赡养费以及为取得调整后的总收入而扣除的长期资本收益的任何金额。

4. **Additional Representations and Warranties of Investor.** Investor hereby represents and warrants to the Company as follows:

**投资者的补充陈述和保证。** 投资者谨此向"本公司"做出如下陈述和保证：

**(a)** Investor has been furnished the Memorandum and, if requested by the Investor, other documents. The Investor has carefully read the Memorandum and any such other requested documents. Investor has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Investor requested and deemed material to making an informed investment decision regarding its purchase of the Note. Investor has been afforded the opportunity to review such documents and materials and the information contained therein. Investor has been afforded the opportunity to ask questions of the Company and its management. Investor understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Investor understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Investor has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Investor shall modify, amend or affect such Investor's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Investor has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Investor has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

投资者已收到"备忘录"及相关文件和投资者要求的其他文件。投资者已仔细阅读"备忘录"及任何投资者要求的其他文件。投资者已获得所有与"本公司"的业务、财务及营运有关的文件及资料，以及投资者要求的其认为对作出有关其购买"本票"的知情投资决定具有重要意义的材料。投资者已获得审阅上述文件、材料和其中包含信息的机会。投资者已获得询问该公司及其管理的机会。投资者理解：此类讨论及"本公司"提供的任何书面信息旨在描述"本公司"的业务和其认为重要的方面，但不一定是全面或详尽的描述，且除非本"《认购协议》"明确规定，"本公司"不保证上述信息的完整性，也不保证"本公司"以外的任何机构提供的任何信息的准确性和完整性。上

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 89 Page 289

述部分信息可能包括对"本公司"未来业绩的预测，而这些预测可能无法实现，也可能基于一些不实的假设，并可能受到"本公司"无法控制的众多因素的影响。此外，投资者理解并陈述，他、她或其仍会认购"本票"，尽管"本公司"可能会在未来披露投资者尚未收到的某些重要信息，包括"本公司"当前财政季度的财务业绩。无论投资者做出的任何询问或任何其他尽职调查均不得改变、修改或影响该投资者参照"《认购协议》"包含的"本公司"所作出的陈述和保证的权利（若有）。为确保这次认购"本票"是一个知晓情况的投资行为，投资者已咨询了所有其认为必要的会计、法律和税务等方面的专业建议。"投资者"拥有完全的权利和权限做出就认购"本票"和签署及交付"《认购协议》"的行为相关的陈述。

**(b)** Investor has read and understood, and is familiar with, this Subscription Agreement, the Note and the business and financial affairs of the Company.

"投资者"已阅读及理解，并熟悉"《认购协议》"、"本票"及"本公司"的业务和财务状况。

**(c)** Investor, either personally, or together with its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum. The Investor and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Note. Investor's financial condition is such that Investor is able to bear the risk of holding the Note that Investor may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Investor's entire investment in the Notes.

"投资者"个人或在其顾问（非任何可能从销售该"本票"的交易中获得报酬的证券经纪/交易商）的协助下，在财务和商务方面有足够的知识和经验来评估投资"本票"的益处和风险，并能够承担投资的风险，并理解认购"本票"相关的风险和其他需考虑的因素，包括"备忘录"中"风险因素"一节中提及的情况。"投资者"及其顾问已有向"本公司"询问与"本票"相关的问题并获得关于其回复的机会。"投资者"的财务状况使其能够承担因依据本协议获得的"本票"而需要无限期持有的风险，以及投资者在"本公司"的全部投资额亏损的风险。

**(d)** Investor has investigated the acquisition of the Note to the extent Investor deemed necessary or desirable and the Company has provided Investor with any reasonable assistance Investor has requested in connection therewith.

"投资者"已在其认为必要或需要的范围内对"本票"的购买事宜进行了调查，且"本公司"已为"投资者"提供了相关合理的协助。

**(e)** The Note is being acquired for Investor's own account for investment, with no intention by Investor to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Investor in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Investor has any interest in or any right to acquire the Note. Investor understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Investor.

"投资者"是通过自己名下账户认购的"本票"，且仅作投资之用，且"投资者"无意按照《证券法》的规定对"本票"的任何部分进行分配或出售，且"投资者"不会违反《证券法》或其中

适用的法则或法规转让"本票"。除"投资者"外，其他任何人均没有任何权利购买"本票"或成为"本票"的受益人。"投资者"理解并承认，除"投资者"外，该公司没有义务承认任何其他人士对"本票"的所有权、受益权或其他权利。

**(f)** No representations or warranties have been made to Investor by the Company, or any representative of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

除了本"《认购协议》"中所述外，"投资者"或任何其代表或任何证券经纪/交易商均未对"投资者"做出任何陈述或保证。

**(g)** Investor is aware that Investor's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Investor will not offer for sale, sell or otherwise transfer the Note without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

"投资者"知晓，"投资者"转让"本票"的权利受到《证券法》及适用的州证券法的限制，且除非已依据《证券法》进行注册或依据所有适用的州的证券法律获得出售的资质或"本票"可免注册出售的情况外，"投资者"不会发出出售要约、出售或以其他方式转让"本票"。

**(h)** Investor understands and agrees that the Note it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

"投资者"理解并同意，其购买的"本票"根据《证券法》或任何州的证券法律有关规定被豁免注册，因此该"本票"尚未依据《证券法》或任何州的证券法律进行注册，且"本公司"无义务对其发行的上述"本票"进行注册。

**(i)** The Investor has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Investor understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

"投资者"已有向"本公司"的代表就本次投资的条款和条件提出相关问题并获得答复的机会，且签字人已获得了满意的答复。"投资者"理解，"本公司"并未授权任何除"本公司"外的任何人做出任何陈述。如有相关陈述，需经"本公司"签署书面同意方能生效。但是，"本公司"从未向签署本协议的签署人就是否适合投资的问题提出任何建议。

**(j)** Investor understands that the Note shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such certificates):

"投资者"理解，该"本票"存在以下实质形式的限制转让标记（且可能会针对转让"本票"下达禁止转让令）：

"NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED

23-01243-WLH11   Doc 469   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 91 Page 291

UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT."

"本证券的销售以及其发行均依据 1933 年颁布的《美国证券法》及其修订版或适用州证券法进行注册。本证券（I）不能在没有（A）根据 1933 年《证券法》（经修订）的有效证券登记声明，或（B）律师（由持有人选择）以一般可接受的形式下，发表其认为根据《销售税法》本证券不需要注册的意见，或者（II）除非根据《销售法》第 144 条或第 144A 条的规定售出的情况下销售，出售，转让或分配。"

The Subscriber hereby acknowledges and agrees to the Company making a notation on its records or giving instructions to any registrar and transfer agent of the Company in order to implement the restrictions on transfer set forth and described in this Subscription Agreement.

"投资者"承认并同意"本公司"在其注册记录上注明或向"本公司"的任何注册服务商和转让代理人发出指示，以执行本《认购协议》规定及描述的转让限制。

(k) Investor also acknowledges and agrees to the following "投资者"同时承认并同意以下内容:

(i) an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire investment in the Notes; and

对"本票"的投资具有很高的投机性，而其对"本票"的投资也存在很高的损失全部投资款的风险；及

(ii) there is no assurance that a public market for the Notes will be available and that, as a result, Investor may not be able to liquidate Investor's investment in the Note should a need arise to do so.

无法保证日后会有可供"本票"公开交易的市场，因此，"本票"在"投资者"需要流通变现时有可能无法流通变现。

(l) Investor is not dependent for liquidity on any of the amounts Investor is investing in the Note.

"投资者"并不依赖于其投资于"本票"的任何金额的流动性。

(m) Investor's address set forth below is his or her correct residence address.

"投资者"在下方提供的地址是他或她正确的居住地址。

(n) Investor has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

"投资者"拥有全部的权利和权限做出本协议所述的陈述以认购"本票"和签署及交付本《认购协议》"。

**(o)** Investor understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

"投资者"理解，"本公司"将上述陈述及保证作为其豁免注册和依据联邦及州的证券法律获得销售"本票"的资格和其他用途的基础。

5. **Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The Investor should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations. Investor hereby represents and warrants to the Company as follows:

**《爱国者法案》、反洗钱和海外资产控制办公室相关的陈述和保证。** 在做出下述陈述前，"投资者"应访问海外资产控制办公室（"OFAC"）的网站http://www.treas.gov/ofac。"投资者"谨此向"本公司"做出下列陈述和保证：

**(a)** The Investor represents that (i) no part of the funds used by the Investor to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Investor and no distribution to the Investor shall cause the Company to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Investor acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Note, and the Investor shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[2] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

投资者声明：(i) "投资者"用于认购"本票"或履行其相关的资本投入义务的任何资金均未或不得直接或间接来自任何可能违反美国联邦或州或非美国的法律或法规的活动，包括反洗钱的法律和法规，以及(ii) "投资者"向"本公司"做出的任何资本投入、出资或付款以及向"投资者"支付的本金或利息均不得致使"本公司"违反任何适用的反洗钱法律或法规，包括但不限于，2001年颁布的使用适当之手段阻止或避免恐怖主义以团结并强化美国的法律"（《美国爱国者法案》）第三部分和美国财政部海外资产控制办公室的规定。"投资者"知晓并同意，即使有违"《备忘录》"或任何其他协议中的规定，但在任何反洗钱法律或法规要求的范围内，"本公司"可以禁止与该"本票"相关的出资，限制其分配或采取任何其他与

该"本票"相关的合理且必要或有预见性的措施，而投资者不应且不得对"本公司"或与此相关的任何其他人提出索赔。此外，OFAC管理的美国联邦法规和行政命令尤其禁止与某些国家、地区、团体和个人进行交易和向其提供服务。OFAC禁止的国家、地区、个人和团体的名单可以在OFAC网站http://www.treas.gov/ofac上找到。此外，OFAC管理的计划（"OFAC计划"）禁止与个别国家的个人或团体产生业务，无论这些个人或团体是否出现在OFAC名单里。

**(b)** To the best of the Investor's knowledge, none of: (1) the Investor; (2) any person controlling or controlled by the Investor; (3) if the Investor is a privately-held entity, any person having a beneficial interest in the Investor; or (4) any person for whom the Investor is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Investor agrees to promptly notify the Company should the Investor become aware of any change in the information set forth in these representations. The Investor understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Investor, either by prohibiting additional subscriptions from the Investor, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Investor's identity to OFAC. The Investor further acknowledges that the Company may, by written notice to the Investor, suspend the redemption rights, if any, of the Investor if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

尽"投资者"所知，以下任何一方不是在OFAC名单中的国家、地区、个人或实体，或OFAC计划禁止的个人或实体：(1)"投资者"；(2)任何控制"投资者"或由"投资者"控制的个人；(3)若"投资者"是一家私人控制的实体，任何在"投资者"中拥有收益权的个人；或(4)将"投资者"作为其投资代理人、名义持有者的委托人。请注意：若潜在投资者无法做出本段中规定的声明或陈述，"本公司"有权不接受其任何数额的投资款。"投资者"同意，若投资者知晓上述陈述中的信息发生任何变化，应立即告知"本公司"。"投资者"理解并承认，根据法律规定，"本公司"有权"冻结'投资者'的账户"，即禁止"投资者"继续认购，拒绝任何偿还请求和/或依据政府法规隔离账户中的资产，且任何证券经纪人均有义务向OFAC报告此类行为，并向OFAC披露"投资者"的身份。"投资者"进一步知悉，若"本公司"合理地认为，行使前述行为是遵守适用于"本公司"、任何证券经纪、"本公司"的任何其他服务提供商的反洗钱法规的条件，则"本公司"可以向投资者发出书面通知，暂停"投资者"的还款权利（若有）。前述个人包括特定国家的国民、特定的毒品贩运者和受OFAC制裁和禁运计划限制的其他各方。

---

[2] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

这些人士包括特定国家的国民、特定的毒品贩运者和受OFAC制裁和禁运计划限制的其他各方。

**(c)** To the best of the Investor's knowledge, none of: (1) the Investor; (2) any person controlling or controlled by the Investor; (3) if the Investor is a privately-held entity, any person having a beneficial interest in the Investor; or (4) any person for whom the Investor is acting as agent or nominee in

connection with this investment is a senior foreign political figure[3], or any immediate family[4] member or close associate[5] of a senior foreign political figure, as such terms are defined in the footnotes below. 就"投资者"所知，以下任何一方均不是外国高级政治人物[3]，或其任何直系家庭成员[4]或亲密伙伴[5]（其定义见下方脚注）。：(1) "投资者"；(2) 任何控制"投资者"或由"投资者"控制的个人；(3) 若"投资者"是一家私人控制的团体，任何在"投资者"中拥有收益权的个人；或(4) 将"投资者"作为其投资代理人或名义持有人的委托人。

**(d)** If the Investor is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Investor receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Investor represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.
如果"投资者"附属于一家非美国银行机构（以下简称"外国银行"），或者若"投资者"从一家外国银行收取存款、代表一家 "外国银行"支付款项或处理与一家"外国银行"有关的其他金融交易，则该"投资者"向"本公司"陈述及保证：(1) 该"外国银行"在被授权从事银行业务的国家拥有固定地址，而不仅仅是电子地址；(2) 该"外国银行"维持着与其银行业务有关的经营记录；(3) 该"外国银行"受其金融活动牌照发放机构的监管；且(4) 该"外国银行"不向任何国家没有实体机构的"外国银行"提供金融服务且不是被监管的附属机构。

**(e)** The Investor acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Investor agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Investor acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information, may result in the withholding of amounts with respect to, or other limitations on, distributions made to the Investor and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Investor shall have no claim, and shall

---

[3] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

"外国高级政治人物"被定义为外国政府（无论是否选举产生）的执行、立法、行政、军事或司法分支机构中的高级官员，主要外国政党的高级官员，或外国政府所有的公司的高级管理人员。此外，"外国高级政治人物"也包括由高级外国政治人物组成或为其谋利的任何公司、企业或其他团体。

[4] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

外国高级政治人物的 "直系亲属" 通常包括其父母、兄弟姐妹、配偶、子女和姻亲。

[5] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

外国高级政治人物的 "亲密伙伴" 系指广为人知、且公开与高级外国政治人物保持异常密切关系的人士，包括代表该高级外国政治人物进行重要的国内和国际金融交易的人士。

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 5 Page 295 of 630

not pursue any claim, against the Company or any other person in connection therewith.

"投资者"承认，在适用的范围内，"本公司"将遵守《美国国内税收法》中的《海外账户税收合规法案》的条款以及与之相关的任何规则、条例、表格、指示或其他指引（以下简称"FATCA条款"）。为了实行这些措施，"投资者"同意，若"本公司"为了遵守FATCA规定而要求"投资者"配合提供任何补充文件或信息要求，"投资者"将会及时提供并在需要时及时向""本公司"更新此类文件或信息。"投资者"承认并同意，尽管可能与"备忘录"、任何附函或任何其他协议中规定相抵，若其未能及时满足"本公司"为遵守FATCA规定而提出的要求、或提供补充信息，将会导致"本公司"向"投资者"偿还本金或支付利息时扣除相应的费用或设置其他限制，或导致"本公司"采取与本协议项下的"本票"相关的合理必要的措施（包括没有限制地提款请求）。但"投资者"不得因此对"本公司"或与其相关的任何其他人士提出任何索赔。

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Investor shall give prompt notice of such fact to the Company by telegram, or facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

截至本协议签署之日，上述陈述和保证均为真实准确，并且应在签署后依旧有效。如果上述任何陈述和保证在"本公司"接受本《认购协议》之前不再真实准确，则"投资者"应立即通过电报、传真或电子邮件等方式及时通知"本公司"，详述不真实或不准确的部分，并做出解释。

6. **Indemnification.** Investor acknowledges that Investor understands the meaning and legal consequences of the representations and warranties made by Investor herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Investor hereby agrees to indemnify and hold harmless the Company and each employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Investor contained in this Subscription Agreement.

赔偿。"认购者"承认其理解在本协议中所作出的陈述和保证的含义和法律后果，并且"本公司"是基于这些陈述和保证做出了接受或拒绝该"《认购协议》"的决定。投资者在此同意赔偿公司及其每一位雇员和代理人，因投资者违反本《认购协议》"而遭受的任何和所有损失，并使公司及其每一位雇员和代理人免受损害。

7. **Transferability.** Investor agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

可转让性。"认购者"同意不转让或出让本《认购协议》"或其中的任何权益，并进一步同意在转让和出让其获得的该"本票"时，将以相关的联邦和州的证券法作为唯一依据。

8. **Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Investor any money tendered hereunder without interest or deduction.

本协议的终止；资金返还。若因任何原因，本"《认购协议》"被"本公司"全部拒绝，则本"《认购协议》"无效，并不再具有任何效力，且任何一方均不得据此对另一方享有任何权利。若"本公司"拒绝签署本"《认购协议》"，"本公司"应及时向"认购者"返还认购者支付的所有款项，但不计利息，亦不扣除任何费用。

9. **Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 6 Page 296

writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Investor at the address set forth below and to the Company at investor@icapequity.com, or (c) at such other place as the Company may designate by written notice to Investor.

通知。依据本协议或"本票"发送或发出的所有通知或其他信息均应以书面形式发出，并在以下情况下被视为送达：(a) 通过认证邮件或挂号信邮寄，将要求签收回执且已预付邮资，(b) 通过传真或电子邮件按照下文所示的地址发送至"认购者"，或按照本协议第一页所示的地址发送至"本公司"，或(c) 以"本公司"通过书面形式指定并通知"认购者"的其他地点和方式。

10. **Amendments.** Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Investor and the Company.

修订。除以书面形式列出并经认购者和"本公司"签署外，本《认购协议》或其任何条款均不得被更改、放弃、废除或终止。

11. **Governing Law.** This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

适用法律。本《认购协议》及其所有修订应遵守特拉华州法律的约束并按其解释，而不适用其他与之冲突的法律规定。

12. **Headings.** The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

标题。本《认购协议》的标题仅为阅读方便而设，标题自身并不能决定本《认购协议》或其任何部分的含义。

13. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

副本。本《认购协议》可以签署任意数量的副本，但具有相同的效力，效果如同签署同一份文件。另外双方可以以何种形式数码或电子签署本《认购协议》。以传真或其他电子传送形式签署或递送本《认购协议》的，将被视为等同于递送了一份已签署的原件，已签署的协议上所有的签署者均受本协议约束。

14. **Continuing Obligation of Investor to Confirm Investor Status**. Upon the request of the Company and for as long as the Investor holds the Note or other securities in the Company, the Investor shall confirm Investor's investor status as an "Non-US Person," as defined by the Securities and Exchange Commission at the time of such request. In connection therewith, the Company may at any time deliver to the Investor a questionnaire that elicits the necessary information to determine the Investor's investor status. Upon receipt of the questionnaire, the Investor shall: (i) complete it, (ii) execute the signature page therein, and (iii) return it to the Company, or its designee, in accordance with the instructions therein, no later than ten (10) days after receipt of the questionnaire.

投资者持续确认投资者身份的义务。应"本公司"的要求，只要该"投资者"仍持有"本公司"的"本票"或其他证券，投资者应确认投资者为"非美国人"的投资者身份（定义见投资者收到此类请求时美国证券交易委员会的规定）。与此相关地，公司可以随时向投资者发送调查问卷，

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 7 Page 297 of 630

以获取确定投资者的投资者身份所需的信息。收到调查表后，投资者应在收到问卷的十（10）天内：（ⅰ）完成调查表，（ⅱ）在签名页签字，并且（ⅲ）根据调查表中的指示将调查表送返至"本公司"或其指定人。

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[本页剩余部分特意留白]

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 98 Page 298

| | |
|---|---|
| SIGNATURES - 签名- | THE UNDERSIGNED HAS THE AUTHORITY TO ENTER INTO THIS SUBSCRIPTION AGREEMENT ON BEHALF OF THE PERSON(S) OR ENTITY REGISTERED ABOVE.<br><br>**签署人具有代表上述个人或实体签署本认购协议的权限。** |
| **ALL INVESTORS MUST SIGN 所有投资者必须签字** | Executed on 签署于_____ _____<br><br>X_____<br>Signature (Investor, or authorized signatory)<br>签名（投资者或授权签字人）<br><br>X_____<br>Signature (Investor, or authorized signatory)<br>签名（投资者或授权签字人） |

<u>ACCEPTANCE</u>
接收

iCap Equity, LLC

By:    iCap Enterprises, Inc.
由：iCap Enterprises, Inc.

Its:    Manager
其：经理

By:
接收人签字：_____

Name:
接收人姓名：_____

Title:
接收人职位：_____

23-01243-WLH11   Doc 469   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 99 Page 299

# SIGNATURE PAGE
# 签字页

### SERIES 3 – SENIOR PROMISSORY NOTE
### 系列三-高级本票

**Loan Amount $**_____  **Date : _____, 202___**
借贷金额 （美元）                            日期

**Monthly Interest Payment Election (optional)**:  by initialing below, Holder hereby elects to receive simple interest, paid monthly, and for this Note to be governed by the provisions of Section 2(c)(ii) instead of the provisions of Section 2(c)(i).

**每月支付利息的选择（非必选）**：若"持有人"在以下横线处用姓名首字母签字，则"持有人"特此选择按月接受单利，并使此"本票"受第 2（c）（ii）节规定的约束，而非受第 2（c）(i)节规定的约束。

Investor Initials:  _____  _____
投资人以姓名首字母签字处

*Agreed and accepted:*
*由下述签字人同意并接受：*

HOLDER:
持有人

Name (*Individual Holder or entity Holder*) :  _____
姓名（*个人"持有者"或实体"持有者"*）

Signature:  _____
签字

Name:  _____
姓名

Title:  _____
职务                    *(if applicable)*
                       （*如适用*）

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 10 Page 300

Form **W-8BEN**

(Rev. July 2017)

Department of the Treasury
Internal Revenue Service

**Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individuals)**

▶ For use by individuals. Entities must use Form W-8BEN-E.
▶ Go to *www.irs.gov/FormW8BEN* for instructions and the latest information.
▶ Give this form to the withholding agent or payer. Do not send to the IRS.

OMB No. 1545-1621

**Do NOT use this form if:**  Instead, use Form:

• You are NOT an individual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8BEN-E

• You are a U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . . . . W-9

• You are a beneficial owner claiming that income is effectively connected with the conduct of trade or business within the U.S. (other than personal services) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . W-8ECI

• You are a beneficial owner who is receiving compensation for personal services performed in the United States . . . . . . . 8233 or W-4

• You are a person acting as an intermediary . . . . . . . . . . . . . . . . . . . . . . . . . W-8IMY

**Note:** If you are resident in a FATCA partner jurisdiction (i.e., a Model 1 IGA jurisdiction with reciprocity), certain tax account information may be provided to your jurisdiction of residence.

**Part I**  **Identification of Beneficial Owner (see instructions)**

| 1 | Name of individual who is the beneficial owner | 2 | Country of citizenship |
|---|---|---|---|

3    Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**

| City or town, state or province. Include postal code where appropriate. | Country |
|---|---|

4    Mailing address (if different from above)

| City or town, state or province. Include postal code where appropriate. | Country |
|---|---|

| 5 | U.S. taxpayer identification number (SSN or ITIN), if required (see instructions) | 6 | Foreign tax identifying number (see instructions) |
|---|---|---|---|

| 7 | Reference number(s) (see instructions) | 8 | Date of birth (MM-DD-YYYY) (see instructions) |
|---|---|---|---|

**Part II**  **Claim of Tax Treaty Benefits (for chapter 3 purposes only) (see instructions)**

9    I certify that the beneficial owner is a resident of _____ within the meaning of the income tax treaty between the United States and that country.

10    **Special rates and conditions** (if applicable—see instructions): The beneficial owner is claiming the provisions of Article and paragraph _____ of the treaty identified on line 9 above to claim a _____ % rate of withholding on (specify type of income): _____.

Explain the additional conditions in the Article and paragraph the beneficial owner meets to be eligible for the rate of withholding: _____

**Part III**  **Certification**

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

• I am the individual that is the beneficial owner (or am authorized to sign for the individual that is the beneficial owner) of all the income to which this form relates or am using this form to document myself for chapter 4 purposes,

• The person named on line 1 of this form is not a U.S. person,

• The income to which this form relates is:

(a) not effectively connected with the conduct of a trade or business in the United States,

(b) effectively connected but is not subject to tax under an applicable income tax treaty, or

(c) the partner's share of a partnership's effectively connected income,

• The person named on line 1 of this form is a resident of the treaty country listed on line 9 of the form (if any) within the meaning of the income tax treaty between the United States and that country, and

• For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner. **I agree that I will submit a new form within 30 days if any certification made on this form becomes incorrect.**

**Sign Here** ▶

_____    _____
Signature of beneficial owner (or individual authorized to sign for beneficial owner)    Date (MM-DD-YYYY)

_____    _____
Print name of signer    Capacity in which acting (if form is not signed by beneficial owner)

**For Paperwork Reduction Act Notice, see separate instructions.**     Cat. No. 25047Z     Form **W-8BEN** (Rev. 7-2017)

Subscription Agreement – Non-US Investors

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 1    Page 301

| Form **W-8BEN** | Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individuals) | OMB No. 1545-1621 |
| --- | --- | --- |

(Rev. July 2017)
Department of the Treasury
Internal Revenue Service

▶ For use by individuals. Entities must use Form W-8BEN-E.
▶ Go to *www.irs.gov/FormW8BEN* for instructions and the latest information.
▶ Give this form to the withholding agent or payer. Do not send to the IRS.

**Do NOT use this form if:**                  **Instead, use Form:**

• You are NOT an individual . . . . . . . . . . . . . . . . . . . . . . . . . . W-8BEN-E

• You are a U.S. citizen or other U.S. person, including a resident alien individual . . . . . . . . . . W-9

• You are a beneficial owner claiming that income is effectively connected with the conduct of trade or business within the U.S.
(other than personal services) . . . . . . . . . . . . . . . . . . . . . . . W-8ECI

• You are a beneficial owner who is receiving compensation for personal services performed in the United States . . . . . . . 8233 or W-4

• You are a person acting as an intermediary . . . . . . . . . . . . . . . . . . . . W-8IMY

**Note:** If you are resident in a FATCA partner jurisdiction (i.e., a Model 1 IGA jurisdiction with reciprocity), certain tax account information may be provided to your jurisdiction of residence.

**Part I**    **Identification of Beneficial Owner** (see instructions)

| 1 | Name of individual who is the beneficial owner | 2 | Country of citizenship |
| --- | --- | --- | --- |

| 3 | Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.** |
| --- | --- |

| City or town, state or province. Include postal code where appropriate. | Country |
| --- | --- |

| 4 | Mailing address (if different from above) |
| --- | --- |

| City or town, state or province. Include postal code where appropriate. | Country |
| --- | --- |

| 5 | U.S. taxpayer identification number (SSN or ITIN), if required (see instructions) | 6 | Foreign tax identifying number (see instructions) |
| --- | --- | --- | --- |

| 7 | Reference number(s) (see instructions) | 8 | Date of birth (MM-DD-YYYY) (see instructions) |
| --- | --- | --- | --- |

**Part II**    **Claim of Tax Treaty Benefits** (for chapter 3 purposes only) (see instructions)

9   I certify that the beneficial owner is a resident of _____ within the meaning of the income tax treaty between the United States and that country.

10   **Special rates and conditions** (if applicable—see instructions): The beneficial owner is claiming the provisions of Article and paragraph _____ of the treaty identified on line 9 above to claim a _____ % rate of withholding on (specify type of income): _____ .

Explain the additional conditions in the Article and paragraph the beneficial owner meets to be eligible for the rate of withholding: _____

**Part III**    **Certification**

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

• I am the individual that is the beneficial owner (or am authorized to sign for the individual that is the beneficial owner) of all the income to which this form relates or am using this form to document myself for chapter 4 purposes,

• The person named on line 1 of this form is not a U.S. person,

• The income to which this form relates is:

(a) not effectively connected with the conduct of a trade or business in the United States,

(b) effectively connected but is not subject to tax under an applicable income tax treaty, or

(c) the partner's share of a partnership's effectively connected income,

• The person named on line 1 of this form is a resident of the treaty country listed on line 9 of the form (if any) within the meaning of the income tax treaty between the United States and that country, and

• For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner. **I agree that I will submit a new form within 30 days if any certification made on this form becomes incorrect.**

**Sign Here** ▶

| Signature of beneficial owner (or individual authorized to sign for beneficial owner) | Date (MM-DD-YYYY) |
| --- | --- |

| Print name of signer | Capacity in which acting (if form is not signed by beneficial owner) |
| --- | --- |

**For Paperwork Reduction Act Notice, see separate instructions.**      Cat. No. 25047Z      Form **W-8BEN** (Rev. 7-2017)

Subscription Agreement – Non-US Investors

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 2    Page 302

**EXHIBIT B**

**FORM OF NOTE**

**(Attached)**

THIS SERIES 3 - SENIOR PROMISSORY NOTE (THIS "NOTE") HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C.§15b ET SEQ., AS AMENDED ("SECURITIES ACT"), IN RELIANCE UPON ONE (1) OR MORE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE FEDERAL ACT. IN ADDITION, THE ISSUANCE OF THIS NOTE HAS NOT BEEN QUALIFIED UNDER THE SECURITIES ACT OF WASHINGTON, OR ANY OTHER STATE SECURITIES LAWS (COLLECTIVELY, THE "STATE ACTS"), IN RELIANCE UPON ONE OR MORE EXEMPTIONS FROM THE REGISTRATION PROVISIONS OF THE STATE ACTS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFER AS SET FORTH HEREIN.

## ICAP EQUITY, LLC

## SERIES 3 - SENIOR PROMISSORY NOTE

Pursuant to the terms and conditions of this Series 3 – Senior Promissory Note (the "Note") iCap Equity, LLC, a Delaware limited liability company (the "Company"), for value received, promises to pay to the undersigned holder (the "Holder"), or the Holder's permitted assigns, the loan amount set forth on the signature page hereto ("Loan Amount") plus interest thereon as set forth herein. The Company and the Holder may be referred to herein individually as a "Party" and collectively as the "Parties."

This Note is issued pursuant to the terms of a Subscription Agreement between the Company and the Holder (the "Subscription Agreement") and is subject to the terms thereof.

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, to which the Holder, by the acceptance of this Note, agrees:

**Section 1.** **Definitions.** In addition to the other terms defined herein, as used in this Note, the following capitalized terms have the meanings set forth below unless the context clearly indicates otherwise. All nouns, pronouns and verbs used in this Note shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable.

    **(a)** "Act" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

    **(b)** "Affiliate" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

    **(c)** "Business Day," when used with respect to any place of payment or any other particular location referred to in this Note , means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions or trust companies in the City of Seattle are authorized or obligated by law or executive order to close.

    **(d)** "Issue Date" means the date on which (a) this Note and the Subscription Agreement, together with all exhibits thereto, have been fully completed and executed by all parties, and (b) Holder has delivered the entire Loan Amount to the Company, and such funds become available to the Company having cleared the Company's bank account.

    **(e)** "Notes" refer to, collectively, each Note issued by the Company pursuant to the Offering (as defined in the PPM).

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 4 Page 304 of 630

**(f)** "Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

**(g)** "PPM" means the Confidential Private Placement Memorandum for Accredited Investors and Non-U.S. Persons of the Company, dated as of July 1, 2020.

**Section 2.**    **Payments and Prepayment.**

**(a)** Subject to the terms and conditions herein, the Company shall repay to Holder, to the extent not prepaid as set forth herein, the outstanding Loan Amount and all accrued and unpaid interest, on the 36-month anniversary of the Issue Date (the "Original Maturity Date").

**(b)** So long as an Event of Default (as defined below) has not occurred and is continuing, the Company shall have the option to extend the Original Maturity Date for an additional twelve (12) months (such Original Maturity Date if so extended, or the Original Maturity Date if not so extended, the "Maturity Date"). This option may be exercised by the Company at any time prior to the Original Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Original Maturity Date. If the Company fails to give such notice, this Note will mature upon the expiration of the Original Maturity Date.

**(c)** With respect to the payment of interest, the provisions of Section 2(c)(i) shall control in the absence of the Holder making the election, on the signature page hereto, to be governed by the provisions of Section 2(c)(ii), in which event the provisions of Section 2(c)(ii) shall control with respect to the payment of interest.

**(i)** Subject to the other terms and conditions herein, prior to the Maturity Date, interest on the outstanding Loan Amount shall be accrue and shall be compounded monthly and added to the then-outstanding Loan Amount on the last day of each calendar month.

**(ii)** Subject to the other terms and conditions herein, interest hereunder shall be calculated as simple interest, and prior to the Maturity Date the Company will make monthly interest payments to the Holder. Such monthly payments shall include all interest accrued hereunder through the end of the prior calendar month, and shall be due and payable to the Holder on the fifteenth (15th) calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter, unless otherwise agreed between Company and Holder.

**(d)** At the Maturity Date, or at the time the Company sooner pays off the entire principal balance of the Note, Holder shall be entitled to a one-time payment of 5% of the original Note balance ("Payoff Premium").

**(e)** The Company may choose to prepay part or all of the Note without penalty at any time prior to the Maturity Date. Any such prepayment will be credited first to any accrued and unpaid interest and then to the payment of the outstanding Loan Amount.

**Section 3.**    **Interest.**

**(a)** This Note shall bear interest at ten percent (10%) per annum, to be calculated, accrued and paid as set forth in Section 2(c)(i) or Section 2(c)(ii), as applicable. Interest computation shall be based upon a 365-day year and calculated in twelve equal monthly installments each year, except for the first and last months of any investment or payment in which case exact interest will be calculated. Interest will accrue on the loan made by the Holder under this Note from the Issue Date. If the

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 5 Page 305

Company exercises its right to extend the Maturity Date as set forth in Section 2(b), the outstanding Loan Amount will bear simple interest at 11% per annum during the extension period.

(b) In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of fifteen (15%) percent per annum, simple interest from and after written notice to the Company of the Event of Default, until all amounts due hereunder have been paid in full or the Event of Default has been cured.

**Section 4.** **Representations and Warranties of the Company.** To induce the Holder to loan monies to the Company, the Company represents and warrants to the Holder as follows as of the Issue Date:

(a) **Organization and Authority.** The Company is a limited liability company, validly existing and in good standing under the laws of the State of Delaware, with full power and authority to enter into and perform this Note and the other agreements contemplated hereby to which it is now, or will be, a party. The Company has all requisite power and authority to, directly or indirectly, own its properties, to carry on its business as now conducted, and to enter into and perform its obligations under this Note.

(b) **Authorization; Binding Effect**. The Company has taken all actions that are necessary to authorize the execution, delivery and performance of this Note and the consummation of the transactions contemplated hereby. This Note and the other agreements contemplated hereby to which the Company is a party constitute the legal and binding obligations of the parties thereto, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights and the enforcement of debtors' obligations generally and by general principles of equity, regardless of whether enforcement is pursuant to a proceeding in equity or at law.

(c) **No Bankruptcy or Insolvency.** The Company has not filed any voluntary petition in bankruptcy or been adjudicated bankrupt or insolvent, filed any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any federal bankruptcy, insolvency, or other debtor relief law, or sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator of all or any substantial part of its properties. No court of competent jurisdiction has entered an order, judgment or decree (and the Company knows of no action or petition requesting such) approving a petition filed against the Company seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any federal bankruptcy act, or other debtor relief law, and no other liquidator, trustee or conservator has been appointed of the Company or of all or any substantial part of its properties.

(d) **Valid Issuance of the Note**. This Note, when issued by the Company to the Holder for the consideration expressed therein, will be duly and validly issued, and, based in part upon the representations of the Holder in this Note, will be issued in compliance with all applicable federal and state securities laws.

(e) **Restricted Securities**. The Company acknowledges that the Note has not been and will not be registered with the Securities and Exchange Commission ("SEC") under the Act, and covenants that the Note will be offered and sold in compliance with an exemption from registration provided by (i) Rule 506 of Regulation D of the Act or (ii) Regulation S of the Act.

(f) **Governmental Consents and Notices.** No consent, approval or authorization of or designation, declaration or filing with any governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Note, or the offer, sale or issuance of the Note, or the consummation of any other transaction contemplated hereby, except qualification (or taking such action as may be necessary to secure an exemption from qualification, if available) of

the offer and sale of the Note under applicable state and federal securities laws, which qualification, if required, will be accomplished in a timely manner.

(g) **No Litigation.** There are no actions, suits or proceedings of any type pending or, to the knowledge of the Company, threatened, against the Company, its properties or assets which is likely to if adversely determined, individually or in the aggregate, have a material adverse effect on (a) the Company's ability to perform the obligations contemplated under this Note or other agreements contemplated hereby or (b) the business, operations, prospects, properties, assets or condition (financial or otherwise) of the Company. The Company is not operating under, or subject to, or in default with respect to, any order, writ, injunction or decree, including any of the foregoing affecting the ability of the Company to enter into this Note or perform its obligations contemplated under this Note and other agreements contemplated hereby.

(h) **No Breach; No Default.** To the best of the Company's knowledge, neither the execution, delivery or performance of this Note or the other agreements contemplated hereby to which the Company is a party, nor the consummation of the transactions contemplated hereby or thereby by the Company, (a) materially conflicts with or results in any material breach of, (b) constitutes a material default under, or (c) results in a material violation of: (i) any contract, commitment, lease, license, note or other instrument, including voting or limited liability company operating agreements, to which the Company is a party or by which any of its assets are bound, judgment, order, writ or decree or (ii) any provision of the Company's Certificate of Formation.

(i) **Taxes.** The Company has timely filed or will timely file or cause to be timely filed, all material tax returns (or extensions) required by applicable law to be filed by it prior to or as of the Issue Date, and paid (a) all amounts of taxes shown thereon to be due (including interest and penalties) and (b) all other taxes, fees, assessments and other governmental charges (including mortgage recording taxes, documentary stamp taxes and intangibles taxes) owing by it, except for such taxes (i) which are not yet delinquent or (ii) that are being contested in good faith and by proper proceedings, and against which adequate reserves are being maintained in accordance with United States generally acceptable accounting procedures.

**Section 5.     Representations, Warranties and Notes of the Holder.** To induce the Company to accept the loan from the Holder, the Holder represents and warrants to the Company as of the date of the Issue Date as follows:

(a) **Purchase Entirely for Own Account.** The Note will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to distributing all or any part of the Note; the Holder has no present intention of selling, granting any participation in or otherwise distributing the Note in a manner contrary to the Act or any applicable state securities law; and the Holder does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person with respect to the Note.

(b) **Due Diligence.** The Holder has been solely responsible for his, her or its own due diligence investigation of the Company and its business, and his, her or its analysis of merits and risks of the investment and subscription made pursuant to this Note, and is not relying on anyone else's analysis or investigation of the Company, its business or the merits and risks of the Note other than professional advisors employed specifically by the Holder to assist the Holder. In taking any action or performing any role relative to arranging the investment being made pursuant to this Note, the Holder has acted solely in his, her or its own interest and not in that of any other party, and no other party has acted as an agent or fiduciary for the Holder.

(c) **Access to Information; Modification of Offering.** The Holder has received and reviewed in its entirety the PPM. The Holder has been offered access to full and complete information regarding

the Company and has assessed to his, her, or its satisfaction the risks associated with an investment in the Note. In particular, the Holder has been given the opportunity to ask questions of, and receive answers from, the Company's officers concerning the terms and conditions of this Note, the Note, the PPM, and any other matters pertaining to the Company and an investment in the Note and has been given the opportunity to obtain such additional information necessary to verify the accuracy of such information. No information has been provided and no representations have been made to the Holder which are inconsistent with any information contained in the PPM. The Holder acknowledges that the Company may, in its sole discretion and for any reason whatsoever, modify, amend, increase or withdraw all or a portion of the Offering. In the event of the foregoing, the Company will not have any liability whatsoever to the Holder, except that the Company will be obligated to return any moneys transmitted to the Company by the Holder that have not been applied by the Company for the purchase of Notes, without interest or deduction.

(d) **Sophistication.** The Holder, either alone or with the assistance of his, her or its professional advisor, is a sophisticated investor, is able to fend for himself, herself or itself in the transactions contemplated by this Note, and has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of acquiring the Note.

(e) **Suitability.** The investment in the Note is suitable for the Holder based upon his, her or its investment objectives and financial needs, and the Holder has adequate net worth and means for providing for his, her or its current financial needs and contingencies and has no need for liquidity of investment with respect to the Note. The Holder's overall commitment to investments that are illiquid or not readily marketable is not disproportionate to his, her or its net worth, and investment in the Note will not cause such overall commitment to become excessive.

(f) **Professional Advice.** The Holder has obtained, or has had the opportunity to obtain, to the extent he, she or it deems necessary, his, her or its own professional advice with respect to the risks inherent in the investment in the Note, the condition and terms of this Note and the suitability of the investment in the Note in light of the Holder's financial condition and investment needs. The Holder is not relying on the Company or any of its directors, officers, employees or agents with respect to the legal, tax, economic and related considerations of an investment in the Note, nor is the Holder relying on the Company or any of its directors, officers, employees or agents (including those of any Affiliates) with respect to the appropriateness of this investment for the Holder.

(g) **Ability to Bear Risk.** The Holder understands that the Company has limited prior operating history. The Holder recognizes that there is no market for the Notes and none is expected to develop; accordingly, his, her or its interest in the Note will be illiquid as well as subject to substantial contractual restrictions upon transferability. The Holder is in a financial position to purchase and hold the Note and is able to bear the economic risk and withstand a complete loss of his, her or its investment in the Note. The Holder agrees to waive any present or future claim against the Company, its officers, directors, representatives or Affiliates that the Note was not an appropriate investment for the Holder.

(h) **Risk Factors.** The Holder recognizes that an investment in the Note is subject to certain risks, the occurrence of which might result in a loss of the principal and interest due to the Holder. The Holder has carefully reviewed and understands the risk factors set forth in the PPM.

(i) **Restricted Securities.** The Holder realizes that (a) neither the Notes nor the offering of the Notes have been registered under the Act or applicable state securities laws; (b) that the Notes are characterized under the Act as "restricted securities" and, therefore, cannot be sold or transferred unless they are subsequently registered under the Act or an exemption from such registration is available; (c) the Company is not being registered as an "investment company" as the term "investment company" is defined in Section 3(a) of the 1940 Act, and (d) there is presently no

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 8 Page 308

public market for the Note and the Holder would most likely not be able to liquidate his, her or its investment in the event of an emergency or to pledge the Note as collateral security for loans. The Holder's financial condition is such that it is unlikely that the Holder would need to dispose of any of the Note in the foreseeable future. In this connection, the Holder represents that he, she or it is familiar with Rule 144 of the Securities Act, as promulgated by the Securities and Exchange Commission, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

(j) **Further Limitations on Disposition.** Without in any way limiting the representations set forth above, the Holder further agrees not to make any disposition of all or any portion of the Note unless and until there is compliance with the requirements herein, and, if requested by the Company, the Holder shall have furnished to the Company a detailed statement of the circumstances surrounding the proposed disposition and shall have furnished to the Company an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such Note under the Act and any applicable state Blue Sky laws.

(k) **Age; Residency.** The Holder, if an individual, is over 21 years of age and legally competent to execute this Note. For purposes of the application of state securities laws, the Holder represents that he, she or it is a bona fide resident of, and/or is domiciled in, the state or jurisdiction as set forth in the Subscription Agreement.

(l) **Investor Status and Subscription Agreement.** Holder hereby confirms and restates the representations and warranties as given by the Holder in the Subscription Agreement. The Holder is aware that the Company has been and is relying upon the representations and warranties set forth in the Subscription Agreement and in is Note, in part, in determining whether the Offering will qualify for an exemption from the registration provisions of the Act and applicable state securities laws. All of the information which the Holder has furnished the Company here, previously or in the documents or instruments contemplated by this Note with respect to the Holder's financial position and business experience is correct and complete as of the date hereof, and, if there should be any material change in such information, the Holder will immediately furnish the revised and corrected information to the Company. The Holder agrees to indemnify and hold harmless the Company and its Affiliates and their respective officers, managers, directors, members or employees and their successors and assigns from and against any and all losses, damages, liabilities or expenses, including costs and attorneys' fees incurred by reason of any misrepresentation by the Holder or any breach of the Holder's warranties.

(m) **Tax Identification; Withholding.** Under penalties of perjury, the Holder certifies that (a) the number listed with the Holder's name on the signature page to this Note is the Holder's correct social security number or federal tax identification number, (b) the Holder is not subject to back-up withholding, either because he, she or it has not been notified that he, she or it is subject to back-up withholding as a result of a failure to report all interest and dividends or because the Internal Revenue Service has notified the Holder that he, she or it is no longer subject to back-up withholding and (c) Holder is not a "foreign person," "foreign corporation" or a person which is not a "United States person" within the meaning of Sections 1441, 1442, 1445 and 1446 of the Internal Revenue Code of 1986, as amended. (If the Holder has at any time received notice from the Internal Revenue Service that he, she or it is subject to back-up withholding and has not subsequently received a notice advising the Holder of the termination of back-up withholding, strike clause (b) above).

(n) **No View to Tax Benefits.** The Holder is not acquiring the Note with a view toward realizing any benefits under United States federal income tax laws, and no representations have been made to

the Holder that any such benefits will be available as a result of the Holder's acquisition, ownership or disposition of the Note.

(o) **Confidential Information.** The Holder understands that the information contained in the PPM and this Note, is confidential and non-public information and agrees that all such information shall be kept in confidence by Holder and used by Holder solely for purposes of determining whether to purchase the Note. In addition, except as required by law, regulation or regulatory process, each Holder shall keep confidential, and shall cause each of its employees, agents, representatives, advisors or consultants to keep confidential all non-public information received by them with respect to the Company and its Affiliates following the Issue Date. The Holder, if an entity, represents and warrants that, as of the Issue Date, none of its beneficial owners are public agencies which are subject to state, federal or foreign laws providing for the possible public disclosure of certain records and information relating to the activities of such public agencies. The Holder agrees to notify the Company in the event such a public agency becomes a beneficial owner of the Holder and agrees to reasonably cooperate with the Company in such event to take steps, including entering into confidentiality agreements that restrict the access of certain of the Holder's beneficial owners to certain information, to protect information about the Company and its investments from being publicly disclosed by such public agency.

(p) **No General Solicitation.** The Holder is unaware of, is in no way relying on, and did not become aware of, the offering of the Note through, or as a result of, any form of general solicitation or general advertising including, without limitation, any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television, radio or Internet and is not subscribing for the Note, and did not become aware of the offering of the Note through, or as a result of, any seminar or meeting to which the Holder was invited, or any solicitation otherwise initiated, by a person not previously known to the Holder in connection with investments in securities generally.

(q) **Representations and Warranties of Organization.** If the Holder is a corporation, partnership or other association, trust or similar entity, the Holder hereby represents and warrants to the Company that the Holder is authorized and otherwise duly qualified to acquire the Note, and the individual executing this Note on behalf of the Holder has been duly authorized to do so and to bind the Holder by this Note (if the Holder is an individual who is investing through a revocable trust, an IRA or an account in a self-directed employee benefit plan (a "Self-Directed Entity"), such representation and warranty applies to the Self-Directed Entity, and, for this purpose, the term "Holder" shall be deemed to refer to the Self-Directed Entity).

**Section 6.**      **Covenants**.

(a) **Tax Statements.** The Company will furnish to Holder as soon as available, and in any event within sixty (60) days after December 31 of each year, all reasonably required tax information applicable to the Holder.

(b) **Use of Proceeds.** The proceeds from the sale and issuance of the Notes are expected to be used for the purposes set forth in the PPM, and for the fees, costs and expenses incurred in connection with the Offering. However, the Manager retains sole discretion to determine how such proceeds are ultimately used. Distributions may be made so long as the Company is not in default under the Note obligations.

(c) **Information Rights**. For so long as the Holder continues to hold the Note, the Company will make available to the Holder annual financial statements of the Company and such information relative to the Company's business operations and performance as its management may deem useful or appropriate.

**Section 7.** **Defaults and Remedies.**

    **(a)** **Events of Default.** An "Event of Default" occurs if any of the following occur, regardless of the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

        **(i)** the Company defaults in the payment of the Loan Amount or interest on this Note, when the same becomes due and payable and such default continues for a period of thirty (30) Business Days after notice of such default has been delivered to Company by Holder (such period, a "Grace Period");

        **(ii)** the Company fails to observe or perform any covenant or warranty of the Company in this Note (other than a covenant or warranty a default in whose performance or whose breach is specifically dealt with elsewhere in this Section), and such failure continues for a period of thirty (30) calendar days after the Holder has given written notice to the Company specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

        **(iii)** the Company, pursuant to or within the meaning of any Bankruptcy Law (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

        **(iv)** a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Company in an involuntary case, (ii) appoints a custodian of the Company for all or substantially all of its property, or (iii) orders the liquidation of the Company; and the order or decree remains unstayed and in effect for ninety (90) consecutive calendar days.

    **(b)** The term "Bankruptcy Law" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

    **(c)** Upon the occurrence of an Event of Default under this Note, and the expiration of any required time periods for notice, cure or other actions, the Holder may declare the Loan Amount to be due and payable. Upon such a declaration, such principal and interest, if any, shall be immediately due and payable. If an Event of Default as set forth in Section 7(a)(iii) or Section 7(a)(iv) occurs, Holder will have the right to enforce the Guaranty Agreement entered into between the Company and iCap Pacific NW Management LLC, pursuant to which iCap Pacific NW Management LLC guaranteed the obligations of the Company hereunder for the benefit of the Holder.

    **(d)** The occurrence of an Event of Default for one Note in the Offering shall not be deemed an Event of Default for any other Note issued in the Offering.

**Section 8.** **Transfer of the Note**. Holder may not sell, assign or transfer this Note or the Note or any portion thereof, including, without limitation, the Holder's rights, title, interests, remedies, powers and/or duties hereunder or thereunder, as the case may be, without the express written consent of the Company, which consent may be granted or withheld in the Company's sole discretion, and without complying with the terms of this Note and any other requirements set forth by the Company, as well as all applicable federal and state securities laws.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Pg 311 of 630    Exhibit 11 Page 311

**Section 9.**      **Waivers.** The Company waives presentment for payment, demand, notice of nonpayment, notice of protest and protest of this Note, and all notices in connection with the delivery, acceptance, or dishonor of this Note.

**Section 10.**      **Anti-Terrorism Matters.** The Holder hereby authorizes the Company to take, without prior notice to the Holder, such action as the Company determines to be reasonably necessary or advisable to comply, or to cause the Company to comply, with any anti-terrorism laws, rules, regulations, directives or special measures. Without limiting the foregoing, the Company may disclose any information concerning the Company or the undersigned necessary to comply with such laws, rules, regulations, directives or special measures, and the Holder shall provide the Company, promptly upon request, all information the Company reasonably deems necessary or advisable to comply with such laws, rules, regulations, directives or special measures.

**Section 11.**      **Survival**. The representations and warranties of the Parties shall survive the consummation of the sale of the Note to Holder hereunder.

**Section 12.**      **Oral Agreements. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

**Section 13.**      **Deemed Consent.**

    **(a)** Each request for consent, approval or waiver under this Note, for an amendment hereof or other matter, which is sent by the Company, shall be made in writing to the Holder, and shall include all information necessary for Holder to make an informed decision as to whether to agree to such consent, approval, waiver or amendment, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN SERIES 3 - SENIOR PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND ICAP EQUITY, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

    **(b)** If the Holder does not approve or reject the proposed matter within ten (10) days of receipt of such notice and all necessary information, via delivery of the same to the Company within such time period, for further distribution to the Company, the Company may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A SECOND AND FINAL REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN SERIES 3 - SENIOR PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND ICAP EQUITY, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT.

    **(c)** If the Holder does not approve or reject the proposed or requested consent, approval, waiver or amendment or other matter within ten (10) days of receipt of such second and final notice, via delivery of the same to the Company within such time period, Holder shall be deemed to have approved, in writing, the proposed consent, approval, waiver or amendment or other matter as set forth in the notice, and the Company may effect the actions set forth therein in reliance on such consent.

**Section 14.**      **Miscellaneous.**

    **(a) Assignment**. The Company may not assign this Note or any of its rights, interests or obligations hereunder without the prior written consent of the Holder, which consent may be granted pursuant to the deemed consent provisions of Section 13. Except as otherwise provided herein, the terms

and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the Parties. Nothing in this Note, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Note, except as expressly provided in this Note.

(b) **Governing Law**. This Note shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Washington residents, entered into and to be performed entirely within the State of Washington, without giving effect to principles of conflicts of law. The Parties irrevocably consent to the jurisdiction and venue of and in King County, Washington in connection with any action arising from or relating to this Note or the transaction it contemplates. In the event of any dispute arising from or relating to this Note, the prevailing party shall be entitled to an award of its reasonable attorneys' fees and costs.

(c) **Waiver of Jury Trial.** EACH PARTY, TO THE EXTENT PERMITTED BY LAW, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE AND THE TRANSACTIONS IT CONTEMPLATES.  THIS WAIVER APPLIES TO ANY ACTION OR LEGAL PROCEEDING, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

(d) **Titles and Subtitles.** The titles and subtitles used in this Note are used for convenience only and are not to be considered in construing or interpreting this Note.

(e) **Notices.** Subject to Section 13, unless otherwise provided, any notice required or permitted under this Note shall be given in writing and shall be deemed effectively delivered (a) upon personal delivery to the party to be  notified, (b) upon confirmation of receipt by fax by the party to be notified if received on or before 5:00 p.m. (local time) on any Business Day or, if received later on such day, upon the close of business on the next Business Day, (c) one (1) Business Day after deposit with a reputable overnight courier, prepaid for overnight delivery and addressed as set forth in (e), (d) three (3) days after deposit with the United States Post Office, postage prepaid, registered or certified with return receipt requested (provided that such notice shall be valid if sent via such method without receipt by sender of the return receipt being required) and addressed to the party to be notified; or (e) via email with return receipt requested (provided that such notice shall be valid if sent via such method without receipt by sender of the return receipt being required), in each case at the address indicated below, or at such other address as such party may designate by ten (10) days' advance written notice to the other party given in the foregoing manner(s).

If to the Company:

> iCap Equity, LLC
> Attn: Investor Relations Department
> 3535 Factoria Blvd SE Ste 500
> Bellevue, WA 98006
> Fax:  425-278-9025
> Email:  investor@icapequity.com

If to Holder, to the physical address and email address for Holder as set forth in Subscription Agreement.

(f) **Expenses. Other than as set forth herein or in the Subscription Agreement, e**ach Party shall pay its own costs and expenses that it incurs with respect to the negotiation, execution, delivery

23-01243-WLH11   Doc 469   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 13 Page 313

and performance of this Note, the related agreements and the transactions contemplated herein and therein.

**(g) Entire Agreement**. This Note, the Subscription Agreement, and the other documents delivered pursuant hereto or thereto constitute the full and entire understanding and agreement between the Parties with regard to the subjects hereof and thereof.

**(h) Amendments and Waivers.** No term of this Note may be amended, nor the observance of any term of this Note waived (whether generally or in a particular instance and whether retroactively or prospectively), except by the written consent of the Company and the Holder, or pursuant to Section 13 above.

**(i) Severability.** If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

**(j) Costs of Collection.** If this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note in accordance with the terms of the Note Purchase Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action, including, but not limited to, attorneys' fees and disbursements, provided Holder finally prevails on such proceedings.

**(k) Holder as Owner.** The Company may deem and treat the holder of record of this Note as the absolute owner for all purposes regardless of any notice to the contrary from third parties.

**(l) No Member or Ownership Rights.** This Note confers no ownership rights whatsoever in the Company, and shall not entitle the Holder to any voting rights, any management rights, any ownership rights, any rights to distribution, any statutory rights conferred on members, or any other rights as an owner of the Company or to any other rights except the rights stated herein.

**(m) Counterparts**. This Note may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the Parties, it being understood that each Party need not sign the same counterpart. A facsimile copy or electronic transmission of a signature page to this Note shall be deemed to be an original signature page.

*[Signatures appear on following page]*

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 14 Page 314

**SIGNATURE PAGE**

SERIES 3 – SENIOR PROMISSORY NOTE

Loan Amount $_____          Date: _____, 202____

**Monthly Interest Payment Election (optional)**:  by initialing below, Holder hereby elects to receive simple interest, paid monthly, and for this Note to be governed by the provisions of Section 2(c)(ii) instead of the provisions of Section 2(c)(i).

Investor Initials:  _____        _____

*Agreed and accepted:*

HOLDER:

Name (*Individual Holder or entity Holder*):  _____

Signature:  _____

Name:  _____

Title:  _____
                    *(if applicable)*

_____

In witness whereof, the undersigned has executed this Note as of the Date above.

iCap Equity, LLC

By:        iCap Enterprises, Inc.
Its:        Manager

By:        _____
Name:      _____
Its:        _____

23-01243-WLH11     Doc 469     Filed 02/23/24     Entered 02/23/24 19:45:30     Exhibit 15 Page 315

**EXHIBIT C**

**GUARANTY AGREEMENT**

**(Attached)**

# GUARANTY AGREEMENT

This Guaranty (this "Guaranty") is made and entered into as of July 1, 2020 (the "Effective Date") by iCap Pacific NW Management LLC, a Washington limited liability company ("Guarantor"), to and for the benefit of each and of the holders (each, a "Holder") of promissory notes (the "Notes") issued by iCap Equity, LLC, a Delaware limited liability company and the sole member of Guarantor ("Borrower") pursuant to an offering of up to $50,000,000 of promissory notes of Borrower pursuant to Regulation D and Regulation S promulgated under the Securities Act of 1933, as amended, commencing on or about the Effective Date (the "Offering"). Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, following the execution of this Guaranty, Borrower shall issue certain Notes to the Holders, pursuant to a subscription agreement between the Borrower and the applicable Holder in connection with the Offering; and

WHEREAS, Guarantor acknowledges the provisions of the Notes require Guarantor to enter into this Agreement and Guarantor is financially interested in Borrower and will receive certain benefits as a result of Guarantor's promises herein as a result of making this Guaranty for the benefit of the Holders;

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Guarantor agrees as follows:

1. Guarantor hereby unconditionally, absolutely and irrevocably guarantees the full and timely performance of all of the obligations of Borrower under the Notes, including the due and punctual payment of the principal and interest of the Note and all money due or that may become due under the Notes, whether (a) according to the present terms of any of those documents or at any earlier or accelerated date or dates as provided therein, (b) pursuant to any extension of time or (c) pursuant to any amendment, modification or replacement of those documents hereafter made or granted, and whether Borrower may be liable individually or jointly with others, or whether recovery upon such indebtedness may be or hereafter becomes unenforceable (collectively, "Obligations").

2. Guarantor agrees that settlement of any claim by Holder against Borrower, whether in any proceeding or not, and whether voluntarily or involuntarily, will not reduce the amount due under this Guaranty except to the extent of the amount actually paid by Borrower or any other party and retained by Holder.

3. During the continuation of an Event of Default with respect to a particular Note at a time when this Guaranty is in full force and effect, the Holder of such applicable Note may enforce this guaranty against Guarantor, subject to the terms of the applicable Note, but only after attempting to collect or exhausting Holder's efforts to collect from Borrower, in accordance with the provisions of the Notes.

4. Guarantor agrees that its obligation to make payment under the terms of this Guaranty shall not be impaired, modified, changed, released or limited in any manner by any impairment, modification, change, release, defense or limitation of the liability of Borrower or of a receiver,

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 17 Page 317

trustee, debtor-in-possession or estate under any bankruptcy or receivership proceeding. If any payment made by Borrower is reclaimed in a bankruptcy or receivership proceeding, Guarantor shall pay to the applicable Holder(s) the dollar amount of the amount reclaimed. Guarantor further assigns to Holders all rights Guarantor may have in any proceeding under the U.S. Bankruptcy Code or any receivership or insolvency proceeding until all indebtedness of Borrower to Holders has been paid in full. This assignment includes all rights of Guarantor to be paid by Borrower even if those rights have nothing to do with this Guaranty. This assignment does not prevent Holder from enforcing Guarantor's obligations under this Guaranty in any way.

5. Guarantor is now adequately informed of Borrower's financial condition, and Guarantor agrees to keep so informed. Holder need not provide Guarantor with any present or future information concerning the financial condition of Borrower or any other guarantor, and changes in Borrower's or Guarantor's financial condition shall not affect Guarantor's obligations under this Guaranty. Guarantor has not relied on financial information furnished by Holder, nor will Guarantor do so in the future.

6. Guarantor represents and warrants to the Holders as follows:

   (a) The Guarantor is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Guaranty does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the Guarantor's organizational documents. The Guarantor has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Guaranty.

   (b) The execution of this Guaranty and the consummation of the transactions contemplated by this Guaranty will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which the Guarantor is a party or to which any of its assets, properties or operations are subject.

   (c) This Guaranty and all agreements and other documents executed by the Guarantor in connection herewith constitute the valid and binding obligation of the Guarantor, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

   (d) No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Guaranty or the valid and lawful exercise by Holders of remedies available to them under this Guaranty or applicable law.

   (e) Guarantor is fully familiar with all the covenants, terms and conditions of the Notes.

7. If an Event of Default occurs hereunder, a Holder shall have all other remedies provided by law and as set forth in the Note. Guarantor agrees that (a) this Guaranty shall inure to the benefit of and may be enforced by the Holder as set forth in the Notes, and (b) this Guaranty shall be binding upon and enforceable against Guarantor and its successors and assigns.

8. Any notices, communications and waivers under this Agreement shall be in writing and sent in accordance with the provisions for notices as set forth in the Notes.

9. Section 10, Section 12, Section 13 and Section 15 of the Notes are incorporated herein by reference and shall apply to this Agreement as though fully set forth herein, provided that any reference therein to the "Note" shall be deemed a reference to this Agreement.

10. This Agreement may be amended by Parent and the Pledgor at any time, without any approval of the Holders being required.

IN WITNESS WHEREOF, the Guarantor has duly executed this Agreement as of the Effective Date.

iCap Pacific NW Management LLC

By: _____
Name: Chris Christensen
Title: Manager

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 19 Page 319

**Exhibit 27**

Name: _____

Memorandum No. _____

# iCap Northwest Opportunity Fund, LLC

# $30,000,000 of

# 10% Senior Secured Debentures

———————————

This Confidential Offering Memorandum (this "***Memorandum***") is being furnished in connection with the offer and sale (the "***Offering***") of up to $30,000,000 of 10% Senior Secured Debentures due 2017 (the "***Debentures***") by iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company (the "***Fund***"). Offers will be made only to accredited investors, as defined under Rule 501 promulgated under the Securities Act of 1933, as amended (the "***Securities Act***") on a "best efforts" basis. Debentures will be issued in denominations of at least $100,000. The Fund may accept lower denominations at its discretion.

The aggregate amount of Debentures being offered is up to $30,000,000 (the "***Maximum Offering Amount***"). The Fund reserves the right, in its sole discretion, to increase the Maximum Offering Amount to $50,000,000 to accommodate oversubscriptions for the Debentures. The Debentures are being offered on a "Best Efforts" basis, which means there is no guarantee that any Debentures will be sold. The Fund may hold closings, in the Fund's sole discretion, as subscriptions for the Debentures are received. The Fund will offer the Debentures as of the date of this Memorandum through the earlier of (a) the date on which the Fund closes on the sale of the Maximum Offering Amount; (b) such time, if any, as the Fund, in its sole discretion, elects to withdraw or terminate this Offering; or (c) December 17, 2015 (the "***Offering Period***"), unless extended up to ninety (90) days by the Manager.

The Fund will pay interest on the Debentures at the rate of 10% per annum. Interest will be payable monthly in arrears on or before the 15th day of the following month. The Debentures will mature on December 31, 2017.

**THIS OFFERING INVOLVES CERTAIN RISKS. <u>See</u> "Risks Factors."**

THE DEBENTURES HAVE NOT BEEN, NOR WILL THEY BE REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT. THEY ARE BEING OFFERED AND SOLD IN THE UNITED STATES ONLY TO ACCREDITED INVESTORS IN RELIANCE ON RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OR UNDER ANY APPLICABLE STATE SECURITIES LAWS. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS MEMORANDUM IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

———————————

# StillPoint Capital, LLC

**The date of this Memorandum is April 20, 2015.**

The information contained in this Memorandum is confidential. By acceptance of this Memorandum, each recipient agrees (a) not to reproduce or distribute this Memorandum to other persons (except the recipient's professional advisors) without the prior written consent of the Manager; (b) that the recipient and his, her or its professional advisors will keep permanently confidential all information contained herein not already in the public domain; and (c) that the recipient will use this Memorandum for the sole purpose of evaluating a possible investment in the Debentures. Each recipient also agrees to return this Memorandum and any other documents or information furnished by the Fund (and any and all copies thereof) to the recipient upon request of the Fund if the recipient declines to purchase any Debentures.

There will be no public market for the Debentures and there is no obligation on the part of the Fund or any person to register the Debentures under the Securities Act or any state securities laws.

This Memorandum includes data and information obtained from independent third party sources. Although the Fund does not have any reason to believe that such data and information is not accurate, the Fund did not independently verify such data and information and cannot assure the accuracy or completeness of such data and information. Prospective investors must rely upon their own investigations and evaluations with respect to making an investment in the Debentures being offered hereby.

Prospective investors will be advised of any material modifications to the terms of the Offering or the Debentures in writing prior to any sale of Debentures to the prospective investors.

Nothing contained in this Memorandum is, or should be relied upon as, a promise or representation as to the Fund's future performance. Prospective investors must rely upon their own examination of the Fund and the terms of the Offering, including the merits and risks involved.

This Memorandum is qualified in its entirety by the Senior Secured Debenture Purchase Agreement attached hereto as Exhibit A. The Senior Secured Debenture Purchase Agreement, is hereinafter referred to in this Memorandum as the "***Debenture Agreement***."

The Debentures are offered when, as, and if issued, subject to the right of the Manager, in its sole discretion, to cause the Fund to approve or reject any subscription in whole or in part and subject to certain other conditions described herein. Subscriptions for Debentures can only be made by delivery to the Fund of an executed Debenture Agreement, together with the Debenture, in the form attached as Exhibit A to the Debenture Agreement by completing and returning the subscription instruction packet (the "***Subscription Documents***") attached hereto as Exhibit C.

This offer may be withdrawn at any time and is specifically made subject to the terms described in this Memorandum. The Fund reserves the right to reject any subscription, in whole or in part, for any reason whatsoever or to allot to any prospective investor less than the proposed principal amount of a Debenture delivered by the prospective investor. Rejected subscriptions will be promptly returned to the subscriber with the amount of the rejected subscription funds without interest.

———————————————

## NOTICES

The following notices apply in certain states where the Debentures, which are referred to below as "securities," may be sold. Compliance with the notice exemption requirements of applicable state securities laws will be undertaken by the Fund as needed.

**Notice to Residents of all States:**

THE SECURITIES OFFERED IN THE OFFERING HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND OTHER LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ACT AND THE SECURITIES LAWS OF CERTAIN JURISDICTIONS GRANT PURCHASERS OF SECURITIES SOLD IN VIOLATION OF THE REGISTRATION OR QUALIFICATION PROVISIONS OF SUCH LAWS THE RIGHT TO RESCIND THEIR PURCHASE OF SUCH SECURITIES AND TO RECEIVE BACK THEIR CONSIDERATION PAID. THE FUND BELIEVES THAT THE OFFERING DESCRIBED IN THIS MEMORANDUM IS NOT REQUIRED TO BE REGISTERED OR QUALIFIED. MANY OF THESE LAWS GRANTING THE RIGHT OF RESCISSION ALSO PROVIDE THAT SUITS FOR SUCH VIOLATIONS MUST BE BROUGHT WITHIN A SPECIFIED TIME, USUALLY ONE YEAR FROM DISCOVERY OF FACTS CONSTITUTING SUCH VIOLATION. SHOULD ANY INVESTOR INSTITUTE SUCH AN ACTION ON THE THEORY THAT THE OFFERING CONDUCTED AS DESCRIBED HEREIN WAS REQUIRED TO BE REGISTERED OR QUALIFIED, THE FUND WILL CONTEND THAT THE CONTENTS OF THIS MEMORANDUM CONSTITUTED NOTICE OF THE FACTS CONSTITUTING SUCH VIOLATION.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS ATTACHED TO THIS MEMORANDUM. NO ONE HAS BEEN AUTHORIZED TO PROVIDE YOU WITH ANY INFORMATION THAT IS DIFFERENT. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN GIVEN BY THE ISSUER OF THE SECURITIES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE ON THE COVER PAGE AND IS AN OFFER ONLY TO SUCH NAMED OFFEREE.

NEITHER THE INFORMATION CONTAINED HEREIN, NOR ANY PRIOR, CONTEMPORANEOUS OR SUBSEQUENT COMMUNICATION SHOULD BE CONSTRUED BY THE PROSPECTIVE INVESTOR AS FINANCIAL, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS, HER OR ITS OWN FINANCIAL, LEGAL, AND TAX ADVISORS TO ASCERTAIN THE MERITS AND RISKS OF THE OFFERING AND AN INVESTMENT IN THE FUND PRIOR TO SUBSCRIBING TO PURCHASE THE SECURITIES.

23-01243-WLH11     Doc 469     Filed 02/23/24     Entered 02/23/24 19:45:30     Exhibit 23 Page 323

**Notice to New York Residents:**

THIS CONFIDENTIAL OFFERING MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

**Notice to Florida Residents:**

THE SECURITIES OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE SECURITIES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER OF THE SECURITIES OR AN AGENT OF SUCH ISSUER, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**Notice to New Hampshire Residents:**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

DURING THE COURSE OF THIS OFFERING, EACH PROSPECTIVE INVESTOR MAY OBTAIN ADDITIONAL INFORMATION WHICH SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (TO THE EXTENT THE FUND POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY PROSPECTIVE INVESTOR WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE INVESTOR'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE FUND IF THE RECIPIENT DOES NOT PURCHASE THE SECURITIES OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE TO:

**ICAP NORTHWEST OPPORTUNITY FUND, LLC**
**10900 NE 8th Street, Suite 1000**
**Bellevue, WA 98004**

**ATTN: CHRIS CHRISTENSEN**
**(425) 372-7114**
**FAX: (425) 214-4776**
**EMAIL: info@icapequity.com**

NOTICES..................................................................................................................................................I

FORWARD-LOOKING STATEMENTS...............................................................................................1

WHO MAY INVEST ..............................................................................................................................1

SUMMARY OF THE OFFERING .........................................................................................................2

USE OF PROCEEDS ..............................................................................................................................5

COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES ..........................................6

CONFLICTS OF INTEREST .................................................................................................................8

RISK FACTORS ...................................................................................................................................10

PRIOR PERFORMANCE OF THE MANAGER AND ITS AFFILIATES .........................................17

MANAGEMENT OF THE FUND........................................................................................................19

DESCRIPTION OF THE BUSINESS ..................................................................................................22

U.S. FEDERAL INCOME TAX MATTERS........................................................................................28

ERISA MATTERS ................................................................................................................................31

GLOSSARY ..........................................................................................................................................32

SUMMARY OF THE DEBENTURE AGREEMENT ..........................................................................33

REPORTS TO THE INVESTORS ........................................................................................................37

THE OFFERING....................................................................................................................................38

TRANSFERABILITY OF THE DEBENTURES .................................................................................39

FINANCIAL INFORMATION.............................................................................................................39

LEGAL REPRESENTATION...............................................................................................................39

PLAN OF DISTRIBUTION .................................................................................................................40

EXHIBITS

    A      SENIOR SECURED DEBENTURE PURCHASE AGREEMENT

    B      LLC AGREEMENT

## FORWARD-LOOKING STATEMENTS

This Memorandum and its exhibits may contain statements that constitute forward-looking statements, as defined by federal securities laws. Forward- looking statements can be identified by the use of terminology such as "anticipates," "expects," "intends," "opportunity," "plans," "should," "predicts," "potential," "continue," "believes," "seeks," "would," "may," "will be," "likely to become," "estimates" and variations of these words and similar expressions. Forward-looking statements are subject to risks and uncertainties and include statements made regarding events, financial trends, future operating-results, financial position, cash flows and other general information concerning possible or assumed future results of operations of the Fund or any project. Investors are cautioned that such statements are only predictions, forecasts or estimates of what may occur and are not guarantees of future performance or of the occurrence of events or other factors used to make such predictions, forecasts or estimates. Actual results may differ materially from the results expressed, implied or inferred from the forward-looking statements and may be worse due to a variety of factors, including changes in laws, adverse changes in real estate prices, adverse changes in interest rates, and adverse changes in the credit and capital markets. These forward-looking statements speak only as of the date on which the statements were made and the Fund undertakes no obligation to update or revise any forward-looking statements made in this Memorandum or elsewhere as a result of new information, future events, future developments or otherwise, except as required by law.

## WHO MAY INVEST

**General**

The Fund intends to sell the Debentures to persons qualifying as "accredited investors" as defined in Regulation D under the Securities Act ("***Investors***").

The term "accredited investors" is defined to include, among others, (a) a natural person with a net worth, or joint net worth with such purchaser's spouse, at the time of purchase in excess of $1,000,000 (exclusive of the equity in the person's primary residence); (b) a natural person who had an individual gross income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or (c) any entity in which all of the equity owners are "accredited investors." Other classes of Investors also qualify as "accredited investors" under Regulation D. If you are unsure as to whether you qualify as an accredited investor, you should contact a legal advisor of your choice for advice.

With respect to a prospective Investor wishing to invest in his or her individual capacity, the value of the individual's primary residence should be excluded in determining his or her net worth. In addition, the mortgage or other indebtedness secured by the individual's primary residence to the extent that such indebtedness does not exceed the value of the residence need not be considered as a liability. When the indebtedness secured by the primary residency exceeds the value of the residence and the lender has other recourse against the individual for payment of the excess liability, the excess liability (and only such excess) should be deducted from the individual's net worth in determining net worth.

**Subscription**

To subscribe for the Debentures, you must complete, execute and deliver to the Fund the Subscription Documents attached hereto as Exhibit C. The Debenture Agreement requires you to represent, among other things, that you are an accredited investor, are acquiring Debentures for your own account for investment and not with a view to resale or distribution, and that you are aware that transfer of the Debentures is restricted by the terms of the Debenture Agreement and by the absence of a market for the Debentures. The Debenture Agreement also requires you to acknowledge that you have received and have had an opportunity to read this Memorandum and are aware of the risks associated with an investment in the Debentures.

THE FUND'S ACCEPTANCE OF YOUR SUBSCRIPTION FOR DEBENTURES DOES NOT CONSTITUTE A DETERMINATION BY THE FUND THAT THE INVESTMENT IS SUITABLE FOR YOU. THE FINAL DETERMINATION AS TO THE SUITABILITY OF AN INVESTMENT IN THE DEBENTURES FOR YOU MUST BE MADE BY YOU AND YOUR ADVISORS.

# SUMMARY OF THE OFFERING

The following summarizes a number of the material provisions of the Offering and certain provisions of the Debenture Agreement and is qualified in its entirety by the full text of the Debenture Agreement and exhibits attached thereto. Capitalized terms used in this Summary not separately defined herein have the meanings assigned to such terms in the Debenture Agreement. No person will be permitted to invest in the Fund unless such person has received and reviewed the Debenture Agreement, this Memorandum and other offering-related documents. This summary does not constitute an offer to sell, or the solicitation of an offer to buy, the securities referenced herein, and any such offer will be made only to selected persons pursuant to the offering documents prepared and delivered by the Fund.

## General Information

| | |
|---|---|
| Fund | iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company. |
| Manager | iCap Pacific NW Management, LLC, a Washington limited liability company (the "***Manager***"). |
| Agreement | The Fund's affairs will be governed by the terms of the Debenture Agreement and by the Fund's Limited Liability Company Agreement dated as of April 20, 2015, as may be amended from time to time (the "***LLC Agreement***") attached hereto as <u>Exhibit B</u>. |
| Business Purpose | The primary purpose of the Fund is to invest in real estate projects in the Pacific Northwest ("***Project Entities***"), which will be held in a limited liability company specifically formed for each investment. The Fund's business model is designed to fill the funding gap between lenders, on the one hand, and developers or builders on the other hand (referred to as "***Project Partners***"), although the Fund may also invest in projects without a Project Partner and may effectively act as the developer of the project ("***Fund Project***"), within certain limits prescribed herein. The Fund may issue debt instruments to Project Entities, acquire an equity interest in Project Entities, acquire Project Entities directly for development of Fund Projects or acquire real estate investments held by Affiliates of the Fund or of the Manager. These activities are referred to in this Memorandum as "***Investments***." We anticipate these opportunities to be available to the Fund based on its Affiliates' relationships with members of the real estate and banking communities in the Pacific Northwest. |
| Target Investments | The Fund intends to initially seek Investments in the greater Puget Sound region; however, Investment opportunities in other parts of the Pacific Northwest, including Oregon, will also be sought and considered. We anticipate Investments being made in Project Entities holding the following types of real estate: |

- Single and multi-unit residential properties;
- Multi-family residential projects;
- Commercial properties; and
- Land acquired for entitlement purposes.

| | |
|---|---|
| Investment Time Frame | The Fund plans to hold each Investment for 12 months on average and no longer than 24 months. The Fund does not anticipate entering into Investments whose term would extend beyond the Maturity Date. |
| Limitations on Investment | The Fund will not make any single Investment that exceeds 10% of the aggregate principal balances of the outstanding Debentures (the "***Gross Offering Proceeds***") as of the closing date of such Investment; *however*, once Gross Offering Proceeds equal at least $3,000,000 the Fund may make a single investment equal to the greater of 10% of the aggregate principal balances of the outstanding Debentures, or |

23-01243-WLH11   Doc 469   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 27, Page 327

$1,500,000. In addition, no more than 15% of the Gross Offering Proceeds will be invested in Fund Projects in the aggregate in which there is no Project Partner.

## Terms of the Offering

| | |
|---|---|
| Offering Size | Up to $30,000,000 may be raised through the sale of Debentures, with an option by the Manager to increase the Offering size to $50,000,000. |
| Minimum Investment | An investment of at least $100,000, unless a smaller investment is permitted by the Manager in its discretion. |
| Period of Offering | Debentures may be offered by the Fund through December 17, 2015, but such date may be extended for up to ninety (90) days by the Manager in its discretion. |
| Eligible Investors | Offering limited to persons qualifying as "accredited investors" under Regulation D of the Securities Act. |
| No Minimum Offering Amount | The Fund may hold an initial closing upon receipt of any amount of debenture proceeds. |

## Economic Terms of Investment

| | |
|---|---|
| Maturity Date | The Fund shall pay back the principal balances of the Debentures to Investors on or before December 31, 2017, subject to a one (1) year extension period available to the Fund (the "***Maturity Date***"). The Fund may prepay all or part of the Debentures without penalty at any time prior to the Maturity Date. The date of any prepayment in full, shall be referred to as the "***Prepayment Date***." |
| Interest Payment | An Investor is entitled to receive a 10%, per annum simple interest rate on the outstanding principal balance of his, her or its Debenture, paid monthly in arrears on or before the 15th day of the following month. If the Fund exercises its right to extend the Maturity Date, an Investor will be entitled to receive an 11% per annum simple interest rate on the outstanding principal balance of his, her or its Debenture during the extension period. |
| Payoff Premium | Subsequent to the Fund's complete satisfaction of its obligations under the Debentures, Investors are entitled to a Payoff Premium equal to each Investor's *pro rata* share of 35% of the Net Profits generated by the Fund. <u>See</u> "SUMMARY OF THE DEBENTURE AGREEMENT—Payoff Premium." |
| Secured Debentures | The Debentures are secured by all of the assets of the Fund, a pledge of the Manager's interest in the Fund, and by a pledge of the Project Partner's membership interest in the Project Entity. The Fund's assets include the rights and collateral granted to the Fund in connection with each individual Investment, including the following: |

- A first position or, where allowed under senior debt instruments, a second position deed of trust (i.e., mortgage) in the real estate owned by or thereafter owned by the Project Entities;
- A secured interest in the Project Partner's membership interest in the Project Entity; and
- The Fund's right to assume control of the Project Entity and the project owned by it in the event of a failure by the Project Partner or Project Entity to meet applicable project milestones or requirements.

| | |
|---|---|
| Seniority of Debentures | Unless otherwise approved by Holders holding a majority of the principal amount of the outstanding Debentures, the Debentures will rank senior to all of the Fund's future indebtedness, including any class of debt security that the Fund may issue; *provided, however*, that the Fund may obtain a senior ranking credit facility to be |

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 18 Page 328

used for, among other things, working capital purposes or loans to Project Entities in an amount not to exceed 15% of the Fund's Gross Offering Proceeds ("**Credit Facility**").

**Related Party Transactions and Investor Reports**

| | |
|---|---|
| Compensation and Fees to Manager and Affiliates | The Fund will pay to the Manager an annual management fee ("**Management Fee**") equal to 1.85% of the outstanding aggregate principal balances of each Debenture. The first year Management Fee will be fully earned and paid at the time of each Closing. Thereafter, the Management Fee will be paid in advance each calendar quarter, commencing on the anniversary of the Closing of the Debenture to which it pertains, but will not be due and payable from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) other than a payment default that has been cured, whether or not the cure occurs during or after the Grace Period (as defined in the Debenture Agreement). In the event the anniversary of a Closing occurs mid-calendar quarter, the quarterly payment of the Management Fee as of such anniversary will be pro-ratably paid for that calendar quarter. <u>See</u> "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." |
| | In addition to fees payable by the Fund, with respect to any Investment, the Manager may receive an origination fee from each Project Entity equal to up to 3.0% of the total Investment amount. Such origination fee will be charged directly to the Project Entity and the Project Partner, and not to the Fund, and will be paid at the time the Fund invests in the Project Entity. |
| Leverage Restrictions | The Fund may only make Investments if the total amount of debt encumbering the underlying property, together with the Fund's Investment, is less than 80% of the anticipated finished value of the underlying project. <u>See</u> "DESCRIPTION OF THE BUSINESS—Risk Controls." |
| Co-Investments with Affiliates | The Fund may, at the Manager's discretion, enter into Investments with Affiliates of the Fund or the Manager. These Investments may, among other things, be new Investment opportunities for the Affiliated parties, existing and continuing Investments of an Affiliate, or an existing Investment of an Affiliate that the Affiliate is exiting. |
| | Any participation allocated to the Fund in any Investment in which any Affiliate of the Fund or its Manager participates will be determined according to an allocation process established by the Manager. <u>See</u> "CONFLICTS OF INTEREST— Avoidance of Conflicts" for a description of this allocation process. |
| Investor Reports | The Fund will provide the following reports to each Investor: |

- Within 120 days after the end of the fiscal year, audited Fund financial statements; and
- Within 60 days after the end of each fiscal quarter, quarterly financial statements.

| | |
|---|---|
| Annual Audit | The Fund has engaged McGladrey LLP to perform an annual audit, and the audit opinion and related audited financial statements will be provided to the Investors. |

4

# USE OF PROCEEDS

The Fund is offering a Maximum Offering Amount of up to $30,000,000 in Debentures (which may be increased to $50,000,000 in the Fund's discretion). If the Maximum Offering Amount is subscribed, the net proceeds to the Fund from the sale of Debentures, after deducting selling commissions and related fees, and estimated organizational and offering expenses, is anticipated to be $25,900,000. The following table sets forth the details of these fees and the funds available for investment in real estate projects as described in this PPM.

| | Sale of Maximum Offering Amount | Percentage of Gross Proceeds |
|---|---|---|
| Gross Proceeds From Investors | $30,000,000 | 100.00% |
| Less: Selling Commission (1) | $2,100,000 | 7.00% |
| Less: Due Diligence Fee (2) | $300,000 | 1.00% |
| Less: Managing Dealer Fee (3) | $1,500,000 | 5.00% |
| Less: Organizational and Offering Expenses | $200,000 | 0.67% |
| Available for Investment (before reserves) | $25,900,000 | 86.33% |

(1) The Managing Dealer will receive a Selling Commission in an amount up to 7% of the aggregate principal amount of Debentures issued ("***Gross Proceeds***"), which it will re-allocate to the Selling Group Members.

(2) The Managing Dealer will receive a marketing reallowance fee of 1% of the Gross Proceeds which it will re-allocate to Selling Group Members.

(3) The Managing Dealer will also receive a fee of 5% of the Gross Proceeds for serving as the managing dealer in the Offering. The Managing Dealer, as managing broker-dealer for the Offering, will be responsible for all "wholesaling fees" and marketing expenses relating to the Offering, as well as for paying its own expenses associated with the Offering.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 30 Page 330

## COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES

The following summarizes the types of compensation, fees, income, distributions or other payments that the Fund or Project Entities may pay to the Manager and its Affiliates in connection with the Fund's or a Project Entity's organization, operation and liquidation. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Fund. The Manager has no obligation to advance funds to cover the Fund's expenses. However, to the extent that such advances are made, the Fund will repay such loans out of its funds as soon as they are available, whether such funds are from the Fund's operating revenues or third-party loans (not including the Debentures).

**Fund Level Management Fee**

The Fund will pay to the Manager an annual Management Fee equal to 1.85% of the outstanding aggregate principal balances of each Debenture. The first year Management Fee will be fully earned and paid at the time of each Closing. Thereafter, the Management Fee will be paid in advance each calendar quarter, commencing on the anniversary of the Closing of the Debenture to which it pertains, but will not be due and payable from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) other than a payment default that has been cured, whether or not the cure occurs during or after the Grace Period (as defined in the Debenture Agreement). In the event the anniversary of a Closing occurs mid-calendar quarter, the quarterly payment of the Management Fee as of such anniversary will be pro-ratably paid for that calendar quarter.

**Compensation Rates of Affiliates**

The engagement by the Fund, or by one of the Project Entities, of any Person considered to be an Affiliate of the Fund is designed to provide the Fund with more efficient service at a cost that is no higher than is standard in the market. In the event the Fund enlists the services of the Affiliates of the Manager identified below, the rates of compensation of these Affiliates for the performance of their various services will be limited and all payments will be subject to inspection by auditors upon request. The Affiliates below have agreed to the following rates:

<u>Edge Construction, LLC</u>: Provides general contracting services, including those related to new construction of and rehabilitation of real estate projects.

<u>General Contractor Fee: Cost* plus 10%</u>
*Cost includes costs of labor, materials and management of a project, including but not limited to costs of project management, supervision, and labor, each of which shall be billed at hourly rates. The hourly rates for 2015 are set forth below.

<u>Project Management Rates</u>:
| | |
|---|---|
| Executive: | $150/hr |
| Project Manager: | $125/hr |
| Onsite Superintendent: | $80/hr |
| Labor: | $40/hr |
| Administrative: | $30/hr |

<u>Altius Development, Inc.</u>: Provides development and consulting services, as well as accounting and administrative support, to real estate projects.

<u>Project Management Rates</u>:
| | |
|---|---|
| Executive: | $150/hr |
| Project Manager: | $125/hr |
| Administrative | $30/hr |

| <u>Accounting Support Rates</u>: | | <u>In-House Legal Support Rates</u>: | |
|---|---|---|---|
| Controller | $190/hr | Attorney | $200/hr |
| Accounting Associate: | $110/hr | Legal Assistant | $100/hr |

6

**Fees Payable by Project Entity**

The Manager may charge the Project Partner a due diligence fee to cover the costs of business due diligence and underwriting involved in considering the potential Investment. The due diligence fee, which will be payable by the Project Partner prior to commencement of due diligence, will be non-refundable and will typically be around $10,000. Additionally, in the event a Project Partner's project is approved for funding, the Manager may charge a processing fee to the Project Entity, payable at closing, to cover in-house processing costs associated with document preparation and closing tasks related to such Investment. The processing fees are typically less than $5,000 per project, but may increase depending on the complexity of the Investment. Additionally, the Manager or an Affiliate of the Manager may charge each Project Entity a one-time origination fee in an amount equal to up to 3% of the total investment amount. The origination fee will be payable by the Project Entity at the time the Fund invests in the Project Entity. The foregoing payments to the Manager will be the obligations of the Project Entities and the Project Partners, and not of the Fund.

In some instances an Affiliate of the Manager may perform services for a Project Entity in order to provide better pricing or efficiency to the Fund than would otherwise be available from third parties. In these instances, such Affiliates may be paid customary service fees for time, material, or labor. These fees will be capped at the rates and amounts set under "Compensation Rates of Affiliates." Any payment to Affiliates for work performed on behalf of the Project Entities will be the obligations of the Project Entities, and not of the Fund.

**Expenses Paid by the Manager**

The Manager will cover all of the following expenses: office rent and fees; office common area maintenance charges; payroll expense of the employees of the Manager; employee parking, phone, fax, and internet access; computer hardware and related supplies; general office supplies; office rental of fax, printers, or scanners and maintenance costs related thereto; and any business licenses and registrations related to the Manager entity. All other expenses will be borne by the Fund.

**Reimbursements**

In addition to the fees set forth above, the Fund will reimburse the Manager and its Affiliates for any reasonable expenses paid by the Manager and its Affiliates that properly should be borne by the Fund.

**Distributions**

The Fund must distribute to its Members, equal to the Estimated Tax Amount within 90 days after the close of each fiscal year, unless (a) the Manager determines the tax distribution would render the Fund insolvent or would necessitate borrowing by the Fund; (b) an Event of Default (as defined in the Debentures) has occurred under the Debentures or is continuing, or (c) if the tax distribution would otherwise be materially adverse to the Fund. The Fund may not make any distributions of profit until the Fund's obligations under the Debentures have been fully satisfied.

7

# CONFLICTS OF INTEREST

## Transactions with the Manager and its Affiliates

The Fund may enter into various transactions with the Manager and its Affiliates, and compensation and fees could be paid with respect to these transactions as disclosed in the section entitled "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." To the extent any such transaction may pose a conflict of interest between the Fund and the Manager or its Affiliates this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Fund.

## Independent Activities of the Manager; Exclusivity

The Manager will cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the Fund Projects, and other activities of the Fund as much time as may be reasonably necessary for the performance of their respective duties in their capacities as managing principals. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Fund's investment objectives; (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund, including a fund which is expected to be released by an Affiliate of the Manager in 2015, any pre-existing funds, and any investments of those successor or pre-existing funds; (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates; (d) serve on boards of directors of public and private companies and retain fees for such services for his/her own account; (e) engage in civic, professional, industry and charitable activities; and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

## Receipt of Compensation by the Manager or its Affiliates

The Manager and its Affiliates will receive certain compensation from the Fund, regardless of whether the Fund ever makes payments to the Investors. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." Although the Fund believes that the fees to be paid to these Persons will be competitive with those that otherwise could be paid to third-parties (taking into account the quality, amount, and degree of specialization of services provided), these fees will not be determined by arm's-length negotiations. These fees and expenses will be paid prior to any repayment of the Debentures or interest therein, although the Management Fee will not be payable from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) other than a payment default that has been cured, whether or not the cure occurs during or after the Grace Period (as defined in the Debenture Agreement).

## Manager's Profits

After the Fund has paid 100% of the principal, the 10% annual interest due and payable under the Debentures, and the Payoff Premium, the Fund will distribute any remaining profits to its members, including the Manager. Distributions to the Manager represent a distribution that will reward the Manager for establishing and managing the Fund and its assets. The Manager's profit interest in the Fund may create an incentive for the Manager to make more speculative investments on behalf of the Fund than the Manager otherwise would make in the absence of such profit potential.

## Avoidance of Conflicts

Neither the Manager nor any of its Affiliates may make any investment on behalf of a new pooled investment fund with investment objectives that are identical to those of the Fund until the earlier of: (a) the date on which at least 75% of the Gross Offering Proceeds (less payment of expenses for consulting fees and professional fees, and the setting aside of reserves) have been committed to or invested in Investments or (b) the end of the Offering Period. Notwithstanding the foregoing, Affiliates of the Manager (y) have established other pooled investment funds that were formed prior to the date of this Fund and which have investment objectives identical to the Fund's and (z) are permitted to raise capital for and operate another pooled investment fund that is anticipated to be established in 2015

8

that will have investment objectives identical to the Fund (the "***Second 2015 Fund***"). The Second 2015 Fund intends to target institutional investors, but will not be limited to institutional investors and seeks to raise up to $100,000,000 in debt investments.

During the Offering Period and thereafter, any investment that is presented to the Manager or its members or managing officers that the Manager believes is consistent with the investment objectives of the Fund and is otherwise suitable for the Fund, will be offered by the Manager to the Fund subject to the following:

1.  In the event the Investment is also suitable for one or more Affiliate pooled investment vehicles, including the Second 2015 Fund (an "***Affiliate Fund***"), and the Fund and Affiliate Fund(s) each have sufficient capital available to singularly finance the Investment, after setting aside reserves (each such fund, an "***Eligible Party***"), then the Investment will be offered to each Eligible Party on a rotating basis, with the order of rotation determined by the Manager.
2.  To be an "Eligible Party," the Fund or Affiliate Fund must have sufficient capital available to make the entire Investment amount, net of reserves for the Management Fee and Fund expenses throughout the expected term of such entity, and the Investment must be suitable for the Fund or Affiliate Fund based on the criteria established by the Manager for underwriting such investments, which may be dependent upon, among other things, projected timing of the Investment payoff, location of the Investment, the dollar amount of the Investment relative to the Fund's or Affiliate Fund's other investments, the type of property underlying the Investment, and economic forecasts relating to the likelihood of a successful exit for the Investment.

For the avoidance of doubt, neither the Manager nor its members or managing officers will be required to offer to the Fund any real estate investment that is not consistent with the investment guidelines, investment objectives, and principles of the Fund or is otherwise not suitable for the Fund. Notwithstanding any provision to the contrary, the Fund and its Affiliates may engage in management and investment activities related to pre-existing Investments and activities or operations of an Affiliate.

# RISK FACTORS

As with all investments, a purchase of the Debentures is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. In addition to the information set forth elsewhere in this Memorandum, you should consider the following risks before deciding whether to invest.

## Operation and Fund Risks

### *Our business prospects are difficult to predict because we are a newly organized entity.*

The Fund is a newly organized entity and does not have an operating history upon which Investors may base an evaluation of its likely performance. The Fund's results will depend upon the availability of suitable investment opportunities for the Fund and the performance of the Fund's Investments. Payment of the principal and interest on the Debentures is subordinated to the prior payment of certain Fund liabilities and expenses and other third party debt to institutional lenders. Before payments are made on the Debentures, the Fund must first pay any senior current liabilities and expenses, including principal and interest payments due on any third-party institutional debt. This includes fees payable to the Manager and its Affiliates.

### *Investors must rely on the Manager to acquire appropriate Investments for the Fund's portfolio.*

The Fund is conducting the offering as a "blind pool," meaning that the Fund is proceeding to raise funds through the sale of the Debentures, without having specifically identified any Investments in which the Fund intends to invest. When you subscribe for Debentures, however, that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the Investments that the Fund subsequently identifies. You should not invest in the Fund, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum. The Fund may have limited access to financial information regarding the Investments, which may limit the Fund's ability to conduct comprehensive due diligence regarding the Investment and its likelihood of success.

### *If the Fund is not as successful with the Offering as desired, it may not acquire as diversified a portfolio as is planned.*

The Fund does not know how many Investments it will be able to obtain. The number of Investments ultimately purchased will depend primarily upon the equity raised through the sale of the Debentures, the availability of suitable Investments, the eligibility of the Fund to make an Investment relative to Affiliate Funds with similar investment objectives, and the extent to which the Manager arranges for Investments to be held with co-investors. There is no certainty as to the number of Investments that the Fund will be ultimately be able to obtain and, since one of the Fund's objectives is diversification, no assurance can be given as to the Fund's achievement of that objective.

### *Control is vested in the Manager; no Investor should purchase the Debentures unless the Investor is comfortable with the Manager's judgment and experience in running the Fund's affairs.*

Control over all decisions affecting the Fund, including decisions regarding the Investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, participation in mergers, consolidation and other restructurings, refinancings of Project Entities, whether to make an Investment, whether an Affiliate Fund is eligible for an Investment, extensions of Investments and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors.  No assurance can be given that sufficient Investments will be presented to the Fund to deploy all of its investible capital.

### *The Manager's conflicts of interest may result in transactions unfavorable to the Fund.*

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Fund or the Project Entities, *provided* the terms are commercially reasonable. These measures may not fully protect the Fund or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Fund as they would have been if the transaction had been with unrelated third parties. Moreover, the

Fund will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. See "CONFLICTS OF INTEREST." In addition, before the Fund invests all of its Investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between Investment opportunities that may meet the Investment criteria of Affiliates of the Fund or of the Manager.

The Manager has the discretion to retain all or a portion of the proceeds from Investments to make new Investments. If the Manager were to take such action, this would place the Investment returns at the risk of new investment opportunities and would delay payments of the Payoff Premium to the Members.

>*Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Debentures.*

The Manager has not arranged for Investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Fund has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

>*The Fund will have limited or no control over the underlying Investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the Investments.*

The Fund expects to acquire preferred equity and, occasionally, debt interests in the Investments. Accordingly, the Fund will not likely have control over those Investments (except in certain circumstances relating to the Fund enforcing its creditor rights or contractual rights) and will be required to rely on the Project Partners of such Investments to use their skill, expertise and background to generate value from the Project Entities. Although the Fund routinely requires the Project Partners to grant a mortgage or to pledge their equity interest in the Project Entity as collateral, there can be no assurance that in the event of non-performance by the Project Partner or a default by the Project Entity that the equity interest or real estate can be readily transferred to the Fund or that the Fund can obtain control of the Project Entity. There is a risk that courts or other governmental parties may oppose such transfers.

>*The Fund may take over control and management of properties in which the Fund originally held a passive equity interest if the entity owning such property is in default (as defined in the entity's governing document). Such properties may entail additional risks and lower cash flow during the development period and the subsequent lease up or sale.*

The Fund may acquire an equity position in entities in need of additional capital in order to meet debt service obligations, refinance existing debt or finish developing or renovating the underlying property. The Fund would not be in control of the day-to-day operations of the underlying company, but would have the ability to take control of the company in the event certain conditions were not maintained by the Project Partner. Even though the Fund may take over management of the underlying property, it might not be a majority owner of the Project Entity and its management authority may be restricted. In the event of default and subsequent acquisition of the underlying property, the Manager may underestimate the costs and time needed to effectuate necessary construction, renovations and repairs. This may present unexpected capital demands upon the Fund, and reduce the potential return on the Investment because of the additional capital needed to renovate the property.

Development projects may take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, lowering the property's cash flow or other income potential. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without preparing detailed budgets, such budgets may understate the expenses.

11

*Markets in which the Fund is anticipated to invest are subject to a high degree of volatility and therefore the Fund's performance may be volatile.*

The Fund's business will involve a high degree of financial risk. Markets in which the Fund is anticipated to invest are subject to a high degree of volatility and therefore the Fund's performance may be volatile. There can be no assurance that the Fund's investment objective will be realized or that Investors will receive any Payoff Premium. The Fund may invest in various interests related to single, multi-unit and multifamily residential properties, as well as commercial properties and land. These investments include direct investments in such properties; debt instruments issued by entities owning such properties, which may or may not be collateralized by mortgages against such properties or the equity interests in the ownership entities; equity interests in entities holding title to such properties, or rights to participate in the cash flow generated by such entities. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

*If the Fund were to acquire debt collateralized by properties suitable for Investment, the Fund will be subject to a number of additional risks not present when investing directly in properties.*

The Fund has the authority to purchase debt collateralized by residential properties. If such collateralized debt is acquired, the Fund will be subject to the following risks:

(a)     The Fund's due diligence must cover not only an assessment of the value of the underlying collateral (since there is the possibility that the Fund will acquire title to the property in satisfaction of the debt), but also an assessment as to whether the Fund will take the debt free from the claims of others and whether the debtor has defenses that might be asserted to forestall or defend against the collection of the debt. To the extent possible, when acquiring debt, the Fund will try to make certain that it is a bona fide purchaser of the debt entitled to be treated as a "holder" in due course under the applicable Uniform Commercial Code.

(b)     The debtor may default in its obligations under the debt, forcing the Fund to institute collection actions and proceed against the underlying collateral in order to protect its investment. The Fund must, before proceeding with such acquisition, be comfortable that the risk-reward profile of the Investment is favorable. Such an analysis will require the Fund to take into account the factors likely to impact the ultimate return on the Investment, including among others, the price at which the debt was acquired (whether and to what extent the debt is acquired at a discount to the outstanding principal), the likelihood of default, the stated principal and interest payments, an assessment of the underlying value of the collateral, the possibility of competing claims to the debt itself or defenses that might be tendered by the debtor in a collection action, the likely costs and delays in proceeding against the collateral, the risk of debtor bankruptcy proceedings and the presence of personal guaranties from creditworthy/solvent guarantors.

(c)     The Fund may encounter delays or difficulties in foreclosing upon its interest in the collateral if the debtor cannot pay the debt as and when it becomes due. Moreover, the Fund may incur substantial expenses in foreclosing upon the collateral or pursuing claims against the debtor and, if applicable, the guarantors of the debt. Such costs will increase the Fund's costs in the property, if the Fund subsequently acquires title to the property through foreclosure or a deed in lieu of foreclosure.

(d)     There is no assurance that the Fund will subsequently acquire title to the collateral property. The debtor may keep the debt current, cure prior events of default or arrange for the debt to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third party may be prepared to outbid the Fund to purchase the collateral property. It would be customary for the Fund to submit as its bid the amount of the outstanding debt at foreclosure sale, but the Fund may not be prepared to bid more than that amount to win the property over other bidders. In those instances, where the Fund does not take title to the collateral, its return on investment will be determined by the terms of the promissory note and related collateral documents (such as a deed of trust, mortgage, or other security agreement). The Fund's rate of return on such an investment may be determined by a number of factors, not the least of which is the price of which the debt was acquired. The investment's potential return will be significantly enhanced if the collateralized debt can be purchased at a deep discount to the then outstanding debt. Should that be the case, the Fund's

12

return, even if the debt is subsequently retired, will be substantially greater than would have been the return of the debt in the hands of the originating lender.

(e)      The debtor may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent borrowers. These protections are at the expense of the Fund as a creditor. Such actions may result in staying the Fund's foreclosure proceedings, restructuring of the debt terms, or otherwise delaying or interfering with the enforcement of the creditor's rights under the applicable security agreements. The Fund will need to balance such considerations before deciding whether it is advisable to acquire the collateralized debt and, in particular, assess whether the price at which the debt is acquired (including the discount if any) is sufficient to compensate the Fund from the possible risks of delays, additional costs, and debt restructuring on less favorable terms to the creditor.

### *Fees to Manager will be paid while interest and principal remain outstanding under the Debentures.*

Provided that an Event of Default has not occurred under the Debentures, fees payable to the Manager will be paid while interest and principal remain outstanding under the Debentures. The Management Fee is based on the outstanding principal balance of the Debentures. The Manager will receive the Management Fee whether or not the Investments operate profitably. These fees (like other expenses) reduce the amount of cash that otherwise would be available for payment of the Payoff Premium. <u>See</u> "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES."

### *You will not be investing in iCap. The prior performance data presented should provide you relevant information regarding Affiliates of the Manager, but should not be construed as an indication of the likely financial performance of the Fund.*

By investing in the Fund, you will not be a creditor to iCap nor in any of the prior programs sponsored by iCap Affiliates (other than the Fund). iCap has provided selected information regarding its prior programs because it felt investors might consider those investments to be relevant in assessing the experience and judgment of the Manager or the iCap management team. Investors should not consider the prior performance of those programs to be indicative of the financial performance that may be experienced by the Fund. The Fund may not perform as favorably as the prior programs. Each investment opportunity is unique and the Fund may not be able to replicate the success of prior Affiliated programs, even if the Investments assembled for the Fund's portfolio are similar to those obtained for prior investments.

### *Uninsured losses on the Investments could materially reduce Investment returns, which may impact the Payoff Premium Payment payable under the Debenture.*

The Project Partner will obtain insurance policies for the Projects that are commercially prudent given the local market and circumstances of the Project (typically, including liability, fire and extended coverage). However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Projects should be partially or totally destroyed, the Fund, as an investor in the Project Entity, may suffer a substantial loss of capital as well as profits. Even if the Project Partner's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Project Entity will sustain a substantial uninsured loss as a result of the casualty.

### *The Collateral Agent will have the authority to act on behalf of all holders of Debentures in dealing with the Fund.*

The Debenture Agreement vests control over matters related to the enforcement of the security interest, the exercise of any rights or remedies with respect to the collateral supporting the Debenture and any remedies under the Debenture in the hands of the Collateral Agent. If an action is brought by the Collateral Agent, such action must be for the collective benefit of all Holders.

### *The Fund may prepay the principal and interest on the Debentures at any time.*

The Fund may prepay the principal amount of the Debentures, in whole or in part, at any time. No prepayment penalty is imposed that would discourage the Fund from exercising this right. Accordingly, Investors will not have

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Page 338 of 630    Exhibit 38, Page 338

certainty as to how long their respective Debentures may be outstanding. If, however, the Fund makes any prepayment, the prepayments must be made ratably against all outstanding Debentures.

***Various factors could negatively impact the amount of Net Profits generated by the Fund during the Measurement Period; thereby reducing the Payoff Premium that may be paid to the Investors.***

(a)     At this stage, it is not known how much information, including financial information, the Fund will have available to review when conducting due diligence regarding potential Investments. The content and accessibility of such information will be determined by the manager of the respective Investment. While the Manager will not cause the Fund to make an investment in an Investment unless it has what it considers to be reasonable access to a material amount of such information, the information may not be as comprehensive as the Fund would like. Moreover, neither the Manager nor the Fund will audit the affairs of the Investments and will rely upon the accuracy of the information provided to it regarding the Investments.

(b)     The Fund may obtain insurance policies for the Investments that are commercially prudent given the local market and circumstances of the Investment. However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Investments should be partially or totally destroyed, the Fund may suffer a substantial loss of capital as well as profits. Even if the Fund's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Fund will sustain a substantial uninsured loss as a result of a fire or other casualty.

(c)     Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making an Investment, the Fund may undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation is expected to include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the Investment's site had environmental contamination not detected prior to the Fund's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Fund undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Fund may incur environmental clean-up costs or be subject to liability exposure that may reduce the Net Profits of the Fund.

(d)     Under the Americans With Disabilities Act of 1990 ("***ADA***"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing Investments to allow disabled persons to access such facilities. Most of the Investments the Fund considers will likely be in compliance with the present access requirements. If, however, the Investments the Fund acquires are not in compliance with the ADA, the Fund will be required to make modifications to the Investments to bring them into compliance, or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

(e)     The real estate industry in general, and the multifamily, residential, and commercial sectors in particular, are highly competitive, and the Fund will be competing with numerous other entities, some having substantially greater financial resources and experience than the Fund, in seeking attractive investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available Investments or resulting in other less favorable terms to the purchasers.

(f)     The investment returns available from equity investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses

incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could have a material adverse impact on the Fund's results of operations or financial condition. In addition, equity real estate investments are difficult to sell quickly and the Fund may not be able to adjust the Fund's portfolio of owned properties quickly in response to economic or other conditions. If the Fund's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Fund's income will be adversely affected.

**Private Offering and Liquidity Risks**

*This private placement of Debentures is being made in reliance on an exemption from registration requirements and there is no guarantee that it will comply with the regulatory requirements for such exemption.*

This private placement of Debentures will not be registered with the Securities and Exchange Commission ("*SEC*"). The Debentures are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to Investors meeting the investor suitability criteria set forth in this Memorandum. If the Fund should fail to comply with the exemption, Investors may have the right to rescind their purchases of Debentures. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Debentures will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Fund's assets to satisfy the claims of the claimants.

*This is a private offering and as such you will not have the benefit of review of this Memorandum by the SEC or other agency.*

Since this offering is a private placement of securities and, as such, is not registered under federal or state securities laws, you will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

*The limited liquidity of the Debentures may adversely affect your ability to transfer and pledge the Debentures.*

You must represent that you are purchasing the Debentures for your own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, encumber or otherwise dispose of your Debentures unless the Fund obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Code or cause the Fund's termination under Section 708 of the Code. Accordingly, the Debentures may not be readily accepted as collateral for loans and you may not be able to liquidate your investment in the event of emergency or for any other reason, or may be able to liquidate your investment only at a substantial discount. See "TRANSFERABILITY OF THE DEBENTURES," and See also "U.S. FEDERAL INCOME TAX MATTERS."

*Investments will be illiquid.*

The Fund expects the Investments to be illiquid. Accordingly, the timing of its returns on those Investments will be dependent upon various market factors. If the underlying assets in those Investments are held for long periods, the Investors will be compelled to wait until the underlying assets are sold, before being in a position to liquidate their investments. The Manager expects most of its Investments to have an investment time frame of 2 years or less. However, the Fund may have little or no control over when the underlying properties are liquidated.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Pg 340 of 630    Exhibit 40 Page 340

**Tax Risks**

*You are urged to consider the United States federal income tax consequences of owning the Debentures*

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to treat the Debentures for U.S. federal income tax purposes as contingent payment debt instruments subject to U.S. federal income tax rules applicable to contingent payment debt instruments. Under that treatment, if you are a U.S. Holder (as defined herein), you may be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by you in that year. You will recognize gain or loss on the sale, repurchase, exchange, conversion or redemption of a Debenture in an amount equal to the difference between the amount realized and your adjusted tax basis in the Debenture. Any gain recognized by you on the sale, repurchase, exchange, conversion or redemption of a Debenture generally will be treated as ordinary interest income and any loss will be treated as ordinary loss to the extent of the interest previously included in income and, thereafter, as capital loss. See "U.S. FEDERAL INCOME TAX MATTERS."

*Interest on Debentures Could be Characterized as Unrelated Business Taxable Income*

We intend to take the position that the Debentures should be classified as debt instruments for U.S. federal income tax purposes and both the stated interest and the Payoff Premium should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("*UBTI*") with respect to tax exempt Investors. However, there is no assurance that the IRS will agree with this position and it is possible that the debentures may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Debentures may be characterized as UBTI with respect to tax exempt Investors.

16

## PRIOR PERFORMANCE OF THE MANAGER AND ITS AFFILIATES

As a newly formed investment vehicle, the Fund has no operating or prior performance history. The information presented in this section represents the limited historical experience of the principals of the Manager and their Affiliates. Prospective investors in the Fund should not rely on the information below as being indicative of the types of investments the Fund may make or of the types of returns the Fund's Investments may generate. It should be understood that neither the Fund nor the Investors will have any interest in the properties described below. Prospective investors should not assume that the Fund will experience returns, if any, comparable to those described herein.

iCap, as used in this Memorandum, refers to an affiliated group of companies (excluding the Fund) specializing in investing in single-family, multi-family, light commercial and land development properties. This section contains certain summary information regarding this affiliated group, and the primary entities through which iCap conducts its business activities. The Manager is one of these entities, recently formed for the purpose of serving as the Manager of the Fund. Although this Memorandum refers to "iCap" as though it were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of iCap. By investing in the Fund, the Investor will not acquire an interest in any such entities, but it may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Fund as it conducts its business.

In September 2013, members of the management team established an entity named iCap B1, LLC, which obtained a loan from a foundation in the amount of $3,359,165 for the purpose of making investments into various real estate projects. As of the date of this Memorandum, the remaining balance of the loan is $108,468, which is scheduled to be paid off in full on or before May 1, 2015.

In November 2013, members of the management team established an entity named iCap B2, LLC, which obtained a loan from a high net worth individual in the amount of $3,556,499 for the purpose of making investments into various real estate projects. As of the date of this Memorandum, the loan had been paid down to a remaining balance of $2,145,216. The management team intends to seek an extension of the May 1, 2015 maturity date to November 2015.

Members of the management team recently completed the fundraise for their first pooled investment fund ("*iCap 1*"), having raised $46.2M. The following investment has liquidated:

> On June 24, 2014, iCap 1 made an investment in Lake Sammamish Home 1, LLC in the amount of $514,345. iCap 1's Investment was used to provide equity capital to help cover the costs related to the development of 8, single family lots, each with beach access to Lake Sammamish. The Investment was paid back in approximately 9 months, on March 31, 2015, at the time the project was refinanced. iCap 1 received a total payoff of $835,025. The total return on funds invested was 62.35% and the annualized return on investment was 81.27%.

The table on the next page illustrates certain additional investment activities of iCap 1.

17

| Project Name | Property Type | Investment | Period | City |
|---|---|---|---|---|
| Barcelo Madison Park LLC | Condominium | $ 885,500 | 12 months | Seattle |
| Columbia Property Managers LLC | Commercial | $ 805,000 | 6 months | Poulsbo |
| ENT Ventures II, LLC | Apartments | $ 419,000 | 18 months | Portland |
| Alamo - Alamo NW, LLC | Commercial | $ 1,212,500 | 12 months | Tacoma |
| Longview - Wild Creek Estates, LLC | Single Family Residence(s) | $ 319,000 | 12 months | Port Orchard |
| Sampson - Meridian Greens Holdings LLC | Apartments | $ 1,036,515 | 18 months | Puyallup |
| BDR Kirkland II LLC | Single Family Residence(s) | $ 833,000 | 12 months | Kirkland |
| BDR Medina III LLC | Single Family Residence(s) | $ 935,000 | 15 months | Medina |
| iCap Finn Hill, LLC | Single Family Residence(s) | $ 2,085,000 | 18 months | Kirkland |
| HCH - High Country Soundview Manor, LLC | Single Family Residence(s) | $ 1,479,000 | 18 months | Federal Way |
| BDR Yarrow Point II, LLC | Single Family Residence(s) | $ 725,000 | 12 months | Bellevue |
| ENT Ventures I LLC | Apartments | $ 1,941,250 | 18 months | Portland |
| White - Denali Townhomes LLC | Apartments | $ 196,000 | 6 months | Kennewick |
| Lofts @ Camas Meadows Phase I, LLC | Apartments | $ 1,059,570 | 18 months | Camas |
| Bown - 9041 48th, LLC | Townhomes | $ 235,920 | 15 months | Seattle |
| iCap - iCap Delridge Way, LLC | Townhomes | $ 264,000 | 18 months | Seattle |
| USAsia- Seattle Modern Living, LLC | Townhomes | $ 617,750 | 18 months | Seattle |
| Hardy - 1st Ave NE Development, LLC | Townhomes | $ 630,240 | 15 months | Seattle |
| Hardy - Woodlawn Ave Townhomes LLC | Mixed Use - Apartment | $ 401,876 | 18 months | Seattle |
| Hardy - Aloha Ventures, LLC | Townhomes - Fee Simple | $ 371,500 | 12 months | Seattle |
| TCG Investments, LLC | Mixed Use - Apartment | $ 1,060,000 | 18 months | Lynwood |
| Colpitts Sunset, LLC | Mixed Use - Apartment | $ 1,562,849 | 12 months | Renton |
| Sampson 45th Avenue, LLC | Single Family Residence(s) | $ 497,500 | 6 months | Tacoma |
| Lyle 113th Ave, LLC | Single Family Residence(s) | $ 562,080 | 12 months | Bellevue |
| Blvd - 725 Broadway, LLC | Apartments | $ 1,062,000 | 12 months | Tacoma |
| Hardy - Capitol Hill Development, LLC | Apartments | $ 1,035,730 | 12 months | Seattle |
| Sampson - Ruby 62 Holdings LLC | Apartments | $ 1,478,000 | 18 months | Lakewood |
| Hardy - 13th & Emerson, LLC | Townhomes | $ 601,310 | 18 months | Seattle |
| Hardy - 4422 Woodlawn, LLC | Townhomes | $ 182,100 | 12 months | Seattle |
| Hardy - 13 Ave W LLC | Townhomes | $ 525,000 | 12 months | Seattle |
| iCap - iCap Campbell Way, LLC | Condominium | $ 895,800 | 18 months | Bremerton |
| iCap - Steadman 170th, LLC | Single Family Residence(s) | $ 240,000 | 12 months | Bellevue |
| Volare Townhomes, LLC | Townhomes | $ 916,183 | 12 months | Happy Valley |
| Lofts @ Camas Meadows Phase II, LLC | Apartments | $ 1,056,570 | 18 months | Camas |
| Domus - Charlestown Street, LLC | Townhomes | $ 1,040,000 | 15 months | Seattle |
| ENT Ventures IV LLC | Apartments | $ 368,500 | 12 months | Portland |
| Ankeny Building LLC | Apartments | $ 1,709,500 | 15 months | Portland |

YOU SHOULD RECOGNIZE THAT BY PURCHASING DEBENTURES IN THE FUND YOU WILL NOT THEREBY ACQUIRE ANY OWNERSHIP INTEREST IN ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. YOU SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES IS GIVEN SOLELY TO ALLOW YOU TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. YOU SHOULD NOT ASSUME THAT THE INVESTORS IN THIS OFFERING WILL EXPERIENCE RETURNS, IF ANY, ON THEIR INVESTMENTS SIMILAR TO THOSE EXPERIENCED BY INVESTORS IN THE PRIOR PROGRAMS SPONSORED BY THE MANAGER AND ITS AFFILIATES.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 43 Page 343

# MANAGEMENT OF THE FUND

**General**

The management and supervision of the Fund is vested exclusively in the Manager (including its duly appointed agents), and the Manager (and its duly appointed agents) has full control over the business and affairs of the Fund. Subject to the terms of this Agreement, the Manager has the power on behalf and in the name of the Fund to carry out any and all of the objects and purposes of the Fund and to perform all acts and enter into and perform all contracts and other undertakings that the Manager, in its sole discretion, deems necessary or advisable or incidental thereto. Investors must rely upon the judgment and experience of the Manager to manage the Fund.

**The Fund's Manager**

The Fund has selected iCap Pacific NW Management, LLC, a Washington limited liability company, to serve as its Manager. For its services, the Manager will receive an annual management fee as described elsewhere in this Memorandum. <u>See</u> "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." In addition, the Fund will reimburse the Manager for any Fund expenses that are borne by the Manager on behalf of the Fund.

**Affiliates of the Manager**

The Fund has two affiliated companies specializing in the acquisition and development of real estate properties: Altius Development, Inc., which is solely owned by Chris Christensen, and Edge Construction, LLC, which is solely owned by Altius Development, Inc. Altius was formed in 2007 and has completed a number of projects through its subsidiaries, in areas of condos, multi-family and single family subdivisions. Edge Construction was formed in 2007 and has been involved in the construction of condos, multi-family, single family subdivisions, remodels, commercial structures and a number of custom homes. Each of these Affiliates may provide services to the Fund. <u>See</u> "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES—Compensation Rates of Affiliates" for the fee rates of these Affiliates.

**Key Executives and Employees of Manager**

The following provides a brief description and position of the Manager's principal executives and employees as of the date hereof.

**Chris Christensen, *President, Chief Investment Officer***

Chris leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. He is also primarily responsible for tax and accounting decisions. Chris is 39 and prior to forming the Fund has managed an affiliated fund, formed and managed Affiliates of the Manager, including Edge Construction, LLC and Altius Development, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a J.D. from Seattle University School of Law, a Master's Degree in International Business from Seattle University and a Bachelor of Arts Degree from the University of Utah, and is the brother of Jim Christensen.

**Jim Christensen, *Chief Operating Officer***

Jim is the Chief Operating Officer and primary underwriter for new Investments. He manages due diligence, letter of intent preparation, legal documentation, closing processes and sponsor relationships. In addition, he is responsible for the technology-related underpinnings of the Fund. This includes electronic document storage, electronic process automation, and software management. Jim previously was the Chief Operating Officer at Altius Development, Inc., where he managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington state. At Altius Development, Inc., Jim managed over $30 million in development projects and also consulted property owners on the strategy, finance and execution of the development of their properties. Jim has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Jim is 30, holds a Bachelor of Arts Degree from the University of Washington, and is the brother of Chris Christensen.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 44 Page 344

**John Carlson,** *Senior Project Manager*

John is responsible for overseeing management of all Projects in which the Fund invests. His duties include budget and pro forma preparation, feasibility studies, and the organization of lien waivers, draw requests and final inspections. Furthermore, John oversees contract negotiation and contract management among various service providers and subcontractors. John handles monthly reports for sponsors with whom the Fund invests, in addition to ongoing supervision of sponsors to ensure agreed upon milestones are satisfied. John is 46 and prior to working with the Fund, John served as a senior project manager for McKinstry, a national construction company located in the Pacific Northwest, for 8 years.

**Bryan Brown,** *Senior Construction Manager*

Bryan is responsible for all general contracting functions relevant to Fund Investment Projects. He supervises various activities pertinent to successful construction including due diligence, contract negotiations with subcontractors and suppliers, budget monitoring and overall construction management. Bryan is 38 and has 19 years of experience in new home construction, multifamily construction and commercial construction. Bryan has overseen all activities of Edge Construction, LLC, the Fund's Affiliate general contractor, for the last 8 years. He has built over 1,600 structures and has trained many construction managers and superintendents.

**Organizational Growth**

iCap currently has capacity to accept additional capital from Investors and to deploy such proceeds towards real estate projects meeting the Fund's Investment criteria. iCap intends to grow as an organization with increases in capital under management and Investment transaction activity. With regards to human capital, various support staff will be hired to assist the senior officers, consistent with iCap's growth plan.

For example, a full-time experienced project manager can effectively oversee 30-35 sponsor Projects at a time and 8-10 wholly owned Fund Projects at a given time. This equates to approximately $40 million of capital under management. Additional project managers will be retained as these Project activity thresholds are reached to ensure the Senior Project Manager, and subsequently hired project managers, can perform their respective work effectively.



The iCap growth plan also calls for supplementary support staff in other functional areas of the business. This includes additional underwriters and due diligence specialists to work under the Chief Operating Officer, as well as additional accountants to support the Controller. An experienced underwriter or paralegal can close 5-6 new Fund real estate Investments in a month, translating to 60-65 in a year time frame. With each additional $60 million in capital under management, iCap intends to retain an additional closer to manage this increased transaction volume. As it pertains to the accounting function, Clark Nuber PS, a regional accounting firm, advises iCap on bookkeeping and McGladrey LLP, a national accounting firm, completes audits and tax returns. Each of these third party firms can be relied upon as needed and as iCap scales.

23-01243-WLH11   Doc 469   Filed 02/23/24   Entered 02/23/24 19:45:30   Ex 8 45 Page 345

**Organizational Strength**

iCap maintains a network of strategic relationships. The team leverages relationships with sourcing, development, construction, and fund administration constituents to attain return objectives for Investors. Property owners, lenders and brokers are the primary entities for deal sourcing. With regards to development, iCap relies upon numerous environmental analysts, land biologists, water biologists and permitting experts to gather important insights for prospective Investments and to effectively manage existing Fund Projects. iCap turns to its relationships with architects, engineers and various consultants to provide pertinent construction knowledge. Such information is imperative to the various phases of the Investment process and to project management of Investments.

iCap maintains connections with a vast network of sourcing partners who provide potential Fund Projects. iCap evaluates more than $50 million worth of prospective investments each month. Sourcing relationships fall into three categories: property owners, lenders and brokers. Property owners include builders, commercial entities and developers. Meanwhile, lenders include banks, private direct lenders and mortgage companies. Finally, brokers encompass real estate professionals, commercial financing brokers and mortgage brokers. Lenders tend to offer the most abundant and valuable deal flow for iCap, typically representing about 50% of aggregate deal flow. The remaining 50% is usually evenly split between property owners and brokers.

**Miscellaneous**

The Manager and its Affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

On July 29, 2014 Stalwart Capital, LLC served a summons and complaint upon iCap Pacific Northwest Opportunity and Income Fund, LLC ("iCap 1") seeking a fee on capital raised by iCap 1 and up to 10% of its profits on the claim that iCap 1 is a related party of an entity who had entered into an engagement letter with Stalwart Capital, LLC for broker-dealer services on that affiliated fund. iCap 1 believes this complaint is without merit and is defending itself vigorously. In the event a court finds that the Fund is liable because of its relationship to iCap 1, as a successor or otherwise, the Fund may be required to pay the amounts ordered by the court. Such payments could have the effect of reducing the Fund's Net Profits, thereby reducing the Payoff Premium Payment payable under the Debentures.

In November 2007, Chris Christensen signed as a personal guarantor on a commercial loan from Timberland Bank for a condominium development of an Affiliate of the Manager. The project did not sell as planned, and the bank foreclosed. After the foreclosure, the bank sought recourse from the personal guarantors for the deficiency amount, and eventually recorded a judgment of $2,000,000 against Chris personally. The bank has not sought collection of the judgment and Chris has been in negotiations with the bank to have the judgment removed.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 46 Page 346

# DESCRIPTION OF THE BUSINESS

The Fund has been formed to invest in real estate opportunities in the Pacific Northwest. The Fund may also acquire real estate directly, as well as debt instruments in other real estate companies. The target investment properties include single and multi-unit residential properties, multi-family residential projects, commercial properties and land acquired for entitlement purposes.

## Market Opportunity

### Demand for Equity

Virtually all real estate transactions require an equity investment in order to obtain lender financing. The Great Recession increased the demand for equity investment in real estate transactions because banks and other real estate lenders tightened their lending criteria. Several years ago lenders routinely loaned up to 90% of a project's bulk value or 80% of retail value. Now they are commonly lending no more than 65-70% of a project's cost and are requiring the Project Partner to supply the remainder of the money to complete a project. Additionally, lenders require borrowers to meet rigorous liquidity requirements, which result in borrowers keeping their cash in banks as reserves rather than using the funds for their own real estate projects. As a result of Project Partners not having the necessary capital to fund their real estate projects, a funding gap exists that results in short-term and long-term investment opportunities for the Fund.

### Capitalizing on the Market Opportunity

The Fund's business model is designed to fill the funding gap between lenders, on the one hand, and developers or builders ("**Project Partners**"), on the other hand, by providing the additional cash equity needed for real estate projects. The primary difference between the Fund and other equity investors is that the Fund maintains control of each Project Entity.

iCap's business model has been attractive to banks and other lenders, we believe because it brings additional assurance to lenders that they will be repaid through the Fund's and its Affiliates' efforts. Local lenders screen hundreds of potential projects and perform much of the upfront due diligence required to put a project together. For example, a lender who has approved a Project Partner on a loan for a project that the lender likes, will have already performed the appraisal, background checks, financial analysis, and other items for the loan to be approved. The Fund can then review the due diligence information prepared for the lender and begin its own due diligence process. After reviewing the lender's due diligence information and completing its own due diligence process, the Fund will negotiate an investment structure with the Project Partner. The investment with the Project Partner will be structured in a way that requires a priority return of the Fund's original investment plus a share of the profits. The Fund will then provide the capital needed to meet the cash requirement under the loan. Recently, many banks have reported that they have more cash to lend than ever before; however, they commonly state that there are not enough borrowers capable of qualifying for loans under their new guidelines. This situation is generally the result of low liquidity on the part of the borrower, which can be met by the Fund.

We believe the Fund provides a needed service in particular to developers and builders. Most developers and builders who could not otherwise finance a real estate project without additional cash are willing to agree to the Fund's guidelines and investment criteria. From the Project Partners' (developers and builders) point of view, she, he or it would rather agree to give a share of a project's profits to the Fund and have the chance to earn a smaller profit for himself, herself or itself than to miss the opportunities altogether.

### Market Opportunity's Longevity

Many investors seek to take advantage of the short-term opportunities that have arisen from banks needing to liquidate assets at low prices but do not have the capital or relationships to fund the opportunities. The Fund's investment strategy allows it to participate in both short-term and long-term opportunities. For example, the Fund's business model allows it to provide the necessary capital for a Project Partner to acquire high quality assets now (a short-term opportunity). The Fund will also provide funding for the projects performed by Project Partners who need cash to meet the revised lending criteria of banks (a long-term opportunity). In both scenarios, the Fund structures its investments such that the Project Partner and its guarantors bear most of the economic risk, while the Fund gets a

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 47 Page 347

priority return of its original investment and shares in the profits of the Project Entity and maintains control of the exit strategy.

**Target Market: Pacific Northwest**

The Seattle-Tacoma-Bellevue Metro Area is the second strongest regional economy in the United States[1]. This region contains nearly 65% of the 6.8 million people living in Washington and a majority of manufacturing, research, and technology jobs generated by some of the most stable companies in the world. The Puget Sound Region is home to several Fortune 500 companies: Microsoft, Nordstrom, Amazon.com, Costco, Starbucks, and several more. These companies have contributed to the job growth rate of the region. In the first three months of 2015, Washington added 31,600 jobs, which is a 4.1% growth rate[2].



The Puget Sound Market has recovered faster from the Great Recession than any other region in the country. Since 2010, jobs in the Greater Puget Sound area have grown annually at an average rate of 2.4% compared to the national average growth rate of 1.6%[3]. This continued growth results in a need for more housing for the people who move into the region, which in turn creates real estate investment opportunities for the Fund.

**Regional Housing Demand**

• 112,000 people moved into the greater Puget Sound area from January 2014 to January 2015. That is a 15% increase from the previous year of 97,000 move-ins.
• The average price per apartment unit in 2014 was $156,000, which is a 5.5% increase from 2013 and an over 60% increase from 2005[4].

The Fund will focus its Investments in three types of properties: multi-family (condos and apartments), residential, and commercial. Given that the Fund and its Affiliates are based in the Seattle-Tacoma area, the Fund will primarily invest in Project Entities located in western Washington. The Fund is also making investments in the greater Portland market.

**Market Segment**

iCap's model addresses the $50 billion gap between the $176 billion amount that lenders are willing to lend and the $25 billion sponsors contribute of their own money (based on $251 billion annual capital activity in small-cap real

---

[1] Source: www.policom.com
[2] Source: www.erfc.wa.gov/publications/documents/mar15.pdf
[3] Source: www.economicforecaster.com - Puget Sound Economic Forecaster Vol. 22, #4, dated March 12, 2015.
[4] Source: www.duprescott.com/articles - Articles: *More people…good or bad?* & *Record sales?*

23

estate)[5]. The Fund provides the equity piece (i.e. the gap funding) that enables builders and property owners to secure capital for the completion of their projects.

**Investment Focus and Structure**

The Fund intends to focus its investments on new construction properties and income-producing properties located in the Pacific Northwest and to seek projects in which the Fund's investments can be repaid within 12 to 18 months after acquisition. Affiliates of the Fund will add value through legal, development, or construction services, as needed.

Projects are sourced primarily through private lenders, banks, brokers, and property owners. The Manager has existing relationships with various banks and private lenders that are attempting to dispose of Real Estate Owned (REO) properties. A bank will often contact the Manager as they know that the Fund is interested in these types of investment opportunities. A second source of projects is developers and builders. The Manager works with those developers that have quality projects and who are in need of cash so that the developer can have all of the required equity in place prior to approaching the bank for a loan. Specific examples of types of investments the Fund may target include the following:

### *Equity Investments*

An equity investment for the Fund involves the purchase of an ownership position in a Project Entity. An example of this type of investment might be a developer who desires to obtain a loan from a bank to build an apartment building. In the typical situation, the bank's lending guidelines will limit the loan amount to 70% of the construction costs, requiring the developer to pay for the remainder of the construction costs with cash. In this instance, the developer would supply as much cash as he, she or it has, and the Fund would fill the gap in exchange for a priority return of its original investment plus a portion of ownership (and profits) of the Project Entity.

The Project Entity LLC Agreement will be structured first to provide a preferred return, followed by a priority repayment of the Fund's capital investment and then a share of the profits in the Project Entity in the form of an exit fee. For example, if the Fund were to invest $500,000 into a project, the Fund would be entitled to a priority repayment of the $500,000, plus interest, and would further be given an exit fee that is typically an amount equal to 2-6% of the total value of the Project. The Fund's legal agreements with the Project Partner will provide for the Investment in each project to be repaid as soon as possible, but generally no later than 18 months from the time of the Fund's Investment. This structure allows the Fund to re-invest the returned capital received from Project Entities, while continuing to maintain a share of the profits. Failure of the Project Partner to perform on the terms of the Fund's financing, or failure to adequately perform its contractual obligations to the Project Entity, would result in the Fund receiving a larger share of the profits or the ability to take control of the Project Entity and the Project Partner's interest thereto. Such failure will also permit the Fund to demand the return of its investment in the Project Entity.

### *Cash Acquisitions*

Many current real estate opportunities can be found by buying properties from banks or property owners. Quite frequently, banks and other lending institutions are required by the FDIC to liquidate properties they own in order to meet mandatory ratio requirements with regard to their loans and deposits. This situation often requires lenders to sell their REO properties very quickly, often at discounts. The Fund has a growing network of relationships with lenders who are willing to sell their properties to private parties in off-market transactions before listing them for sale to the general public. The Fund will utilize this network to position itself to purchase properties that meet management's approval. Once an REO asset is acquired from a lender at a discount, the Fund has the option of either selling the property immediately or adding value to the property through entitlement, development, construction, or any combination of these things. Then, depending on market demand, the developed parcels or structures could be sold.

---

[5] Source: Wall Street Journal, "New Lenders Enter Property Market and Think Small," July 22nd, 2014, 2014; US Loans of $5M or Less in 2013

In these instances, the Fund would acquire such properties through a wholly-owned special purpose entity and may engage the Manager's Affiliates to perform the value-added work.

### Loans

In the event the Fund makes loans to real estate projects, it will do so in exchange for a first position mortgage (deed of trust) on the underlying property. These loans will typically be underwritten to ensure that the loan is no more than 80% of the property's value. The loans are intended to be short-term loans to be repaid in less than 15 months. The Fund may also provide additional cash as an equity investment to those borrowers. Additionally, the Fund may purchase existing loans from lenders at a discount. In that case, the fund will receive interest payments until the loan is sold or paid off. The Fund intends to enter into a limited number of these types of Investments, if any.

### Acquisition of Bank Notes

A number of banks are in a position where they need to divest portions of their loan portfolios in order to comply with various FDIC requirements. The Fund believes it is in a position to opportunistically step in and acquire such bank notes at a discount. The Fund intends to enter into a limited number of these types of Investments, if any.

### Other Investments

The Manager may pursue other investment opportunities so long as they are believed to have attractive yield potential.

## Legal Structure of Projects

Each Project Entity will be organized as a limited liability company with assets consisting of the real property and any fixtures and improvements relating to the same. This organizational structure allows the Fund to limit potential liabilities that may come from unrelated matters of the Project Partner and provides protective measures for the Fund. Unlike traditional real estate investment vehicles, in which the real estate itself serves as the primary or only source of collateral, the Fund will also secure the return of its investment in the Project Entity with the Project Partner's equity interest in the Project Entity. Thus, in addition to recording second position or sometimes first position mortgages (deeds of trust) against the property to secure the return of the Fund's investment in the Project Entity, the Project Partner must also pledge his, her or its equity interest in the Project Entity to the Fund. The Fund will be entitled to foreclose against this pledge or exercise its contractual rights under the governing documents of the Project Entity in the event of the Project Partner's failure to meet the performance obligations it has contractually agreed to. The Fund believes these measures will help ensure the project is completed on time and on budget. In order for the Fund to invest in a Project Entity, the Project Partner must contractually agree to:

- Pay all subcontractors, vendors, or service providers of the Project Entity when due;
- File tax returns and pay taxes when due;
- Generate any other report due to government authorities or to the members of the Project Entity when requested or when due;
- Obtain approval from the Fund before incurring expenses that are not included in, or which exceed the line items of, the budget of the project that will be agreed to by the Fund;
- Prohibit any lien, security interest, or other encumbrance to be filed or recorded against any property owned by the Project Entity which has not been previously approved by the Fund;
- Obtain and maintain all permits or licenses, necessary to the operation or development of the Project Entity;
- Meet the project milestones and timelines to be set forth in the Project Entity LLC Agreement;
- Maintain property sale prices or rents within 10% of the values set forth in the Project Entity governing documents unless consent is first obtained from the Fund;
- Maintain financial solvency of the Project Partner or any entity owned by the Project Partner;
- Avoid litigation, disputes, arbitration, or violation of any law or ordinance;
- Not enter into any agreement on behalf of the Project Entity, the terms of which in the reasonable determination of the Fund manager are likely to reduce the Project Entity's profits;

- Meet with the Fund manager monthly; maintain and produce accurate books and records; and deliver the documents or reports requested by the Fund;
- Maintain adequate insurance for the project or for any affiliate thereof performing work on the project;
- Deliver copies of any notices received by the project manager; and
- Not encumber, hypothecate, or pledge as collateral, or attempt to encumber, hypothecate, or pledge as collateral, any interest of the Project Entity contrary to the provisions of the Project Entity LLC Agreement or without the prior written consent of the Fund Manager.

## Identifying and Monitoring Investments

The Fund's due diligence process typically starts with a phone call from a bank, broker or builder and is followed by phases of review, which serve to eliminate those projects that do not meet the Fund's investment criteria. The due diligence process encompasses a methodical and comprehensive review of material elements pertaining to the specific project in question and the real estate market in general. The Fund will consider whether to fund a project based on the following investment criteria:

### *Location of Property*

Each Fund investment must fall within an approved geographic area. Due to the strength and diversity of the Pacific Northwest economy, the Fund is currently investing in projects located in the Greater Puget Sound area. The Fund will also invest in the greater Portland area.

### *Strength of Exit*

Prior to funding a project, the Fund will establish multiple potential exit strategies, thus generating multiple avenues for providing returns to the Fund. The strength of an exit is determined by the number of exits available, current market conditions, available take out finance options, and/or the sponsor's ability to refinance. Current market conditions are assessed based on supply and demand of the type of finished products and their locations.

### *CLTV less than 80%*

Combined loan to value ("*CLTV*") is a ratio used by the Fund to determine the downside risk on each prospective project. It is calculated by taking the sum of the Fund's investment and the first mortgage loan and dividing it by the anticipated value of the property at the completion of the project. The Fund will not invest in projects whose CLTV exceeds 80%.

### *Timing of Exit*

The Fund seeks to invest in projects that will exit in 18 months or less, and preferably 12-months or less. This relatively short investment period is important to minimize changing market conditions. In the event that market conditions change, the Fund is able to adjust the exit strategy quickly to take advantage of every opportunity available.

### *Background of the Sponsor and their ability to complete the Project*

Each prospective Project Partner is required to provide a resume, financial statement, a list of current and past projects as well as attend a face-to-face meeting. Through this process the Fund is able to measure the character of each Project Partner and his, her or its ability to execute a project.

### *Cash invested by Sponsor*

Aligning the interests of the Project Partner with those of the Fund is an important goal of the Fund. The Fund will require each Project Partner to make a cash contribution into the project. This investment of capital by a Project Partner is returned only after the Fund receives its return of principal investment and a predetermined preferred return. The amount required to be contributed by a Project Partner will be determined on a case-by-case basis, including conditions of the project and the capability of the Project Sponsor.

26

***Signed Letter of Intent ("LOI")***

Prior to investing in a project, the Fund will issue an LOI, outlining the investment terms and anticipated returns. Before proceeding with the due diligence, the Fund will require a signed LOI from the Project Partner, which will usually be accompanied by a nonrefundable due diligence deposit of around $10,000.

Assuming that the maximum amount of this Offering is raised, the Fund expects to have between 65 – 85 Investments while the Fund has obligations outstanding under the Debenture Agreement, none of which will, individually, be in an amount in excess of 10% of the Gross Offering Proceeds received by the Fund as of the closing date of such Investment; however, the Fund may invest up to $1,500,000 into a single Investment once the Fund has raised at least $3,000,000 of Gross Offering Proceeds. In addition, no more than 15% of the Gross Offering Proceeds will be invested in projects in which there is no Project Partner (i.e. projects in which the Fund will effectively act as developer). The Fund expects to have 35 to 45 Investments in its portfolio under management at any given time. Additionally, prior to making an Investment, the Fund identifies multiple exit strategies, thus identifying multiple avenues for providing returns to the Fund. The Fund expects most Investments to range in size between $500,000 and $1,500,000.

Once an Investment is made, the Manager will require the respective Project Partners to send monthly reports and to update all documentation, gather information, offer advice, and maintain familiarity with the Investment. The Fund believes this steady supervision will help Fund management track each project's progress and allows for a more seamless transition if the Project Partner fails to meet the Fund's requirements. In the course of managing its portfolio, the Fund expects that as part of its diversified portfolio some Investments will perform at a loss, while others will perform positively. In the event the Fund needs to step in to protect the Investment, the Project Entity may engage the Manager's Affiliates to perform the work at the predetermined rates. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES—Compensation Rates of Affiliates."

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 2 Page 352

## U.S. FEDERAL INCOME TAX MATTERS

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF FEDERAL TAX CONSEQUENCES CONTAINED OR REFERRED TO IN THIS MEMORANDUM WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY DEBENTURE HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE CODE; (II) SUCH DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (III) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### Introduction

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Debentures.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Debentures, that purchased Debentures at their original issue price for cash, and that hold such Debentures as capital assets within the meaning of Section 1221 of the Code.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Debentures by certain investors that are subject to special tax rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Debentures in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Debentures, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Debentures, including the applicability of any U.S. federal tax laws or any state, local or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

### Considerations Relating to U.S. Holders of the Debentures

As used herein, the term "***U.S. Holder***" means a beneficial owner of a Debenture that is, for U.S. federal income tax purposes:

- An individual citizen or resident of the U.S.;

- A corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- An estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- A trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Debentures, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Debentures that is a partnership and the partners in such a partnership should consult their tax advisors.

### *Classification of the Debentures*

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to treat the Debentures, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Fund's determination that the Debentures constitute debt for U.S. federal income tax purposes. The IRS could take the position, for example, that the Payoff Premium should be treated as a separate instrument and classified as equity. If any portion of the Debentures is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Debenture could differ from the timing and character of income, gain or loss recognized in respect of the Debentures described below. The remainder of this discussion assumes that the Debentures will be treated as indebtedness in accordance with that agreement and our determination.

### *Interest Income*

Holders of the Debentures will be required to report original issue discount ("**OID**") over the term of the Debentures under Treasury Regulations that govern "contingent payment debt instruments" (the "**CPDI Regulations**"). The Debentures will be subject to the CPDI Regulations because they provide for the payment of the Payoff Premium, which is contingent on the Net Profits of the Fund. The reporting of OID under the CPDI Regulations will be the exclusive method of reporting interest income under the Debentures, including the interest payments required by the Debentures.

Under the CPDI Regulations, each Investor generally will be required to report interest income on the Debentures each year in an amount equal to the OID that accrues each year, regardless of whether such Investor uses the cash or accrual method of tax accounting. The amount of each year's accrual will be calculated under a method that takes into account (in the manner specified below) a portion of our projection of the Payoff Premium. Consequently, an Investor would be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by such Investor in that year.

Under the CPDI Regulations, the amount of OID on a Debenture that is allocable to each annual accrual period will be the product of the "adjusted issue price" of the Debenture as of the beginning of each such annual period and the "comparable yield" for the Debentures. The "adjusted issue price" of a Debenture on any particular date is its "issue price" (i.e., the first price at which a substantial amount of the Debentures is sold to investors), increased by any interest income previously accrued (determined without regard to any adjustments to interest accruals described in "Adjustments to Interest Accruals on the Debentures" below), and decreased by the amount of any non-contingent payments previously made and the projected amount of any contingent payments scheduled to be made on the Debenture through the date on which the adjusted issue price is being calculated (i.e., without regard to the actual amount of the contingent payments made).

Under the CPDI Regulations, the Fund is required to establish the "comparable yield" for the Debentures. The comparable yield for the Debentures is the annual yield the Fund would incur, as of the initial issue date, on a fixed rate nonconvertible debt instrument with no contingent payments, but with terms and conditions otherwise comparable to those of the Debentures. Accordingly, the Fund has determined the comparable yield to be 10% compounded annually.

The Fund is required to provide to Investor, solely for U.S. federal income tax purposes, a schedule of the projected amounts of all payments required to be made on the Debentures (including the Payoff Premium). This schedule must include a projected amount of Payoff Premium sufficient to cause the yield on the Debentures to equal the comparable yield. The Fund's determination of the projected payment schedule for the Debentures, including the

monthly interest payments and an estimate of the timing of payment and amount of the Payoff Premium, is below. In certain limited situations in which the Payoff Premium is expected to be larger than originally contemplated, the Fund may be required to revise the projected payment schedule, which could result in a change to the amount of OID allocable to each annual accrual period.

| Projected Payment Schedule Per $100,000 of Debentures | | | | |
|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 |
| January | | $833.33 | $833.33 | $0 |
| February | | $833.33 | $833.33 | $0 |
| March | $0 | $833.33 | $833.33 | $0 |
| April | $833.33 | $833.33 | $833.33 | $0 |
| May | $833.33 | $833.33 | $833.33 | $0 |
| June | $833.33 | $833.33 | $833.33 | $0 |
| July | $833.33 | $833.33 | $833.33 | $0 |
| August | $833.33 | $833.33 | $833.33 | $0 |
| September | $833.33 | $833.33 | $833.33 | $0 |
| October | $833.33 | $833.33 | $833.33 | $0 |
| November | $833.33 | $833.33 | $833.33 | $0 |
| December | $833.33 | $833.33 | $833.33 | $0 |

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to be bound by the Fund's application of the CPDI Regulations to the Debentures, including our determination of comparable yield and the related "projected payment schedule" set forth above). The comparable yield and the projected payment schedule are solely for purposes of determining your (and the Fund's) interest accruals and adjustments thereof in respect of the Debentures for U.S. federal income tax purposes and do not constitute a projection or representation regarding the actual amounts payable to you with respect to the Debentures.

### Adjustments to Interest Accruals on the Debentures

If Investor receives actual payments of Payoff Premium with respect to the Debentures in a tax year in excess of the total amount of projected payments of Payoff Premium for that tax year, Investor will have a "net positive adjustment" equal to the amount of such excess. Investor will be required to treat the "net positive adjustment" as additional interest income for the tax year.

If you receive actual payments of Payoff Premium with respect to the Debentures in a tax year that in the aggregate are less than the amount of the projected payments of Payoff Premium for that tax year, Investor will have a "net negative adjustment" equal to the amount of such deficit. This adjustment will be applied to reduce Investor's interest income on the Debentures for that tax year, and any remainder will give rise to an ordinary loss to the extent of Investor's interest income on the Debentures during prior tax years, reduced to the extent such interest income was offset by prior net negative adjustments, if any. Any negative adjustment in excess of the amounts described in the

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 55 Page 355

preceding sentence will be carried forward to offset future interest income in respect of the Debentures or to reduce the amount realized upon a sale, exchange, repurchase or redemption of the Debentures.

**Sale, retirement or disposition of Debentures**

Upon the sale, retirement or other disposition of a Debenture, Investor generally will recognize taxable gain or loss equal to the difference between the amount realized on the disposition and Investor's adjusted tax basis in the Debenture. A U.S. Holder's adjusted tax basis in a Debenture generally will be equal to its adjusted issue price (as described above) in the Debenture. Gain recognized on the disposition of a Debenture generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Debenture generally will be treated as an ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Debenture is more than one year). The deductibility of capital losses is subject to limitations.

**Backup withholding and information reporting**

Information reporting requirements generally will apply to payments of interest (including any amounts treated as interest pursuant to the CPDI Regulations) made by the Fund on, or the proceeds of the sale or other disposition prior to maturity of, the Debentures. Backup withholding tax, currently at a rate of 28%, may apply to such payments if Investor fails to:

- Furnish his, her or its taxpayer identification number (social security or employer identification number);
- Certify that such number is correct;
- Certify that he, she or it is not subject to backup withholding; or
- Otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, *provided* that the required information is furnished timely to the Internal Revenue Service (the "***IRS***").

## ERISA MATTERS

### Benefit Plan Investor Considerations

The Debentures offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or an individual retirement account ("***IRA***") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "***Similar Law***"). A fiduciary of an employee benefit plan must determine that the purchase and holding of a Debenture is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Debentures offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Debenture offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Debenture that its acquisition and holding of the Debenture does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 56 Page 356

# GLOSSARY

To understand the rights associated with the Debentures, Investor must review carefully the defined terms used in this Memorandum. Some of these definitions are set forth in this "GLOSSARY" and others in the body of this Memorandum. These definitions (some of which have been slightly modified) have been taken from the Debenture Agreement, which defines the preferences, privileges, rights, interests and obligations of the Debentures. Many of these definitions are technical in nature, involve complicated relationships, and can only be understood by reference to other defined terms and, in some cases, to other provisions of the Debenture Agreement. Section references in the definitions refer to sections in the Debenture Agreement. Prospective investors should understand that the definitions in the Debenture Agreement will, for all purposes, be controlling, notwithstanding any simplification of such definitions in this Memorandum. Moreover, you should bear in mind that this GLOSSARY does not include many of the definitions included in the Debenture Agreement.

"***Act***" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

"***Affiliate***" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"***Collateral Agent***" means Experts Counsel Inc., a Florida corporation.

"***Debenture***" means the secured payment obligation, to be issued by the Fund in favor of the Holder, pursuant to the terms of the Debenture Agreement, with an original principal amount equal to the loan made by the Holder to the Fund at Closing (i.e. the Loan Amount). The Debenture shall be in the form attached to the Debenture Agreement, which is attached hereto as Exhibit A.

"***Debenture Agreement***" means the Senior Secured Debenture Purchase Agreement, as originally executed or as amended by the Parties, and shall include the forms and exhibits attached thereto.

"***Estimated Tax Amount***" means, with respect to each member of the Fund, the amount equal to (a) the sum of (i) the greater of the highest statutory marginal ordinary federal income tax rate for individuals or corporations for a given tax year plus (ii) the unearned income Medicare contribution tax rate under Internal Revenue Code Section 1411 for a given year, multiplied by (b) the taxable income allocated to that member for the taxable year pursuant to the allocation provisions in Article IV of the LLC Agreement.

"***Fund***" means iCap Northwest Opportunity Fund, LLC, a Delaware limited liability company, which is the obligor under the Debenture.

"***Holder***" means any Person who has purchased a Debenture pursuant to this Agreement, together with any transferee thereof permitted under Section 9 of the Debenture Agreement.

"***Manager***" means iCap Pacific NW Management, LLC, a Washington limited liability company, which was formed for the sole purpose of being the Manager.

"***Person***" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"***SEC***" means the Securities and Exchange Commission.

# SUMMARY OF THE DEBENTURE AGREEMENT

The following summarizes certain provisions of the Debenture Agreement, and the Debenture document contained therein, not described elsewhere in this Memorandum. All statements made below and elsewhere in this Memorandum relating to the Debenture Agreement are hereby qualified in their entirety by the actual language of the Debenture Agreement. Such statements do not purport to be complete and in no way modify or amend the Debenture Agreement. The parenthetical references included in this section refer to the referenced sections of the Debenture Agreement. **Prospective investors should read the entire Debenture Agreement, attached as <u>Exhibit A</u>, before deciding to purchase Debentures.**

The Debentures will be issued without coupons, in denominations of at least $100,000. The Fund reserves the right, in its sole discretion, to accept subscriptions for amounts less than the minimum.

## Collateral Agent

Each Investor, as a Holder, must appoint Experts Counsel Inc. as its collateral agent under the Debenture Agreement (the "***Collateral Agent***") and authorizes the Collateral Agent to act thereunder as the Holder's agent. The Debenture Agreement vests control over matters related to the enforcement of any rights or remedies with respect to the collateral supporting the Debenture and any remedies under the Debenture in the hands of the Collateral Agent. If an action is brought by the Collateral Agent, such action must be for the collective benefit of all Holders. In performing its function and duties as a Collateral Agent, the Collateral Agent will act solely as agent of Holders and will not assume and will not be deemed to have assumed any obligations towards or relationship of agency or trust with or for the Fund, nor will the Collateral Agent be deemed to be a fiduciary for the Holders.

## Economic Terms

### *Interest*

Except as described in "Repayment; Fund's Extension Right" or in the this paragraph, the outstanding Loan Amount shall bear simple interest at 10% per annum. Interest computation shall be based on a 360-day year, actual days elapsed. Interest will accrue as of the Closing Date of the Debenture. In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of 16% per annum, simple interest, from and after written notice to the Fund of the Event of Default until all amounts due thereunder have been paid in full or the Event of Default has been cured. Prior to the Maturity Date, or extension thereof, the Fund will be required to make only monthly interest payments to the Holder. Such monthly payments will include all interest accrued as of the Closing date of the Debenture through the end of the prior calendar month, and shall be due and payable to the Holder on the 15th calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter. The Fund may deposit into an interest reserve account proceeds from the issuance of Debentures to cover up to 12 months of interest expense on the Debentures.

### *Repayment; Fund's Extension Right*

The full Loan Amount will be due and payable, together with all accrued but unpaid interest, on or before December 31, 2017 (the "***Maturity Date***"). The Fund has the option to extend the Maturity Date for an additional one year period, provided an Event of Default has not occurred. This option may be exercised by the Fund at any time prior to the Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Maturity Date. If the Fund fails to give such notice, the Debentures will mature upon the expiration of the Maturity Date. If the Fund exercises its right to extend the Maturity Date, an Investor will be entitled to receive an 11% per annum simple interest rate on the outstanding principal balance of his, her or its Debenture during the extension period. The Fund may choose to prepay part or all of the Debenture without penalty at any time prior to the Maturity Date, or extension thereof. The date the Fund prepays in full the Debentures is hereafter referred to as the "***Prepayment Date***."

### *Payoff Premium*

Within 12 months after the payment of the Debenture, the Holder is entitled to a "Payoff Premium Payment" equal to Holder's *pro rata* share of 35% of the Net Profits generated by the Fund. "***Net Profits***" means an amount equal to the

net cash available to the Fund from liquidation of its Investments after full satisfaction of is obligations under the Debenture Agreement and the Debentures, plus a credit for any prior Tax Distributions made to the Manager previously under the Fund's LLC Agreement, less any amounts set aside by the Manager to cover liabilities, obligations, capital expenditures, expenses, and reasonable reserves of the Fund. A Holder's *pro rata* share of the Payoff Premium Payment shall be equal to 35% of the Net Profits multiplied by a fraction, the numerator of which is such Holder's Loan Amount and the denominator of which is the aggregate loan amount of all other holders of Debentures. The Fund will calculate and pay the first Payoff Premium Payment on the date of final payoff of the Debenture balances, and then on the last day of each calendar quarter thereafter with respect to any Investments that may liquidate during such subsequent period(s). The Payoff Premium Payment is not intended to constitute an equity interest in the Fund, but rather is intended to constitute additional interest on the Loan Amount, and shall be paid in addition to all principal, penalties and other interest otherwise due to each Holder.

### Secured Obligation

The Debenture represents a secured obligation of the Fund. The Debentures are secured by all of the assets of the Fund, by a pledge of the Manager's membership interest in the Fund, and the Fund's right, title and interest in the membership interest of the Project Partner in the limited liability company specifically formed to hold the Investment, as pledged by the Project Partner to the Fund. The Fund's assets will include the following:

- A first or, where allowed under senior debt instruments, a second position deed of trust (i.e., mortgage) in the real estate owned by or thereafter owned by the Project Entities;
- A secured interest in the Project Partner's membership interest in the Project Entity; and
- The Fund's right to assume control of the Project Entity and the project owned by it in the event of a failure by the Project Partner or the Project Entity to meet applicable project milestones or requirements.

### Events of Default

The following is a summary of events constituting an "***Event of Default***" under the Debenture and triggering the rights of the Holder to accelerate amounts due thereunder as set forth in the Debenture Agreement:

(a)     The Fund defaults in the payment of any Loan Amount or interest on any of the outstanding Debentures, when the same becomes due and payable and such default continues for a period of 10 Business Days (such period, a "**Grace Period**"), *provided, however,* that no such Grace Period will be available should the Fund default twice in the payment of interest on any of the outstanding Debentures when such interest is due and payable (even if such payments were subsequently made during the Grace Period), such that should the Fund default in the payment of interest on any of the outstanding Debentures when such interest is due and payable after the 2 prior defaults, then an Event of Default shall occur on the date such payment was due and payable;

(b)     The Fund fails to observe or perform any covenant or agreement of the Fund in the Debenture Agreement (other than a covenant or agreement a default in whose performance or whose breach is specifically dealt with elsewhere in the "Events of Default" provision in the Debenture Agreement), and such failure continues for a period of 30 calendar days after there has been given, by registered or certified mail, to the Fund by the Holder, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" thereunder;

(c)     A final judgment or judgments for the payment of money aggregating in excess of $500,000 is rendered against the Fund and which judgments are not, within 90 calendar days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within 90 calendar days after the expiration of such stay; *provided*, *however*, that any judgment which is covered by insurance or an indemnity from a creditworthy party shall not be included in calculating the $500,000 amount set forth above;

(d)     The Fund violates or otherwise defaults on any material contractual obligation that would, as a result of such violation or default, cause the acceleration of the Fund's obligations thereunder and result in the incurrence of a liability, damages or loss to the Fund in excess of $500,000;

34

(e)     The Fund, pursuant to or within the meaning of any Bankruptcy Law (i) commences a voluntary case; (ii) consents to the entry of an order for relief against it in an involuntary case; (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

(f)     A court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Fund in an involuntary case; (ii) appoints a custodian of the Fund for all or substantially all of its property, or (iii) orders the liquidation of the Fund; and the order or decree remains unstayed and in effect for 90 consecutive calendar days.

The term "**Bankruptcy Law**" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "**Custodian**" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

### *Acceleration, Rescission and Annulment*

Upon the occurrence of an Event of Default, with the consent of the Holder of more than 10% in aggregate loan amount of the outstanding Debentures, the Collateral Agent may declare the loan amount of and accrued but unpaid interest, if any, on all the Debentures (including the Loan Amount or interest on the Holder's Debenture) to be immediately due and payable. If an Event of Default pursuant to paragraphs (e) and (f) under "Events of Default" above occurs, the loan amount and interest on all Debentures will *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Collateral Agent or any Holders of the Debentures.

The Holders of more than 50% in aggregate loan amount of the outstanding Debentures by notice to the Collateral Agent may rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of acceleration. No such rescission shall affect any subsequent default or impair any right consequent thereon.

**Fund's Rights Regarding Other Indebtedness**

For so long as any Debentures remain outstanding, neither the Fund nor any subsidiary of the Fund (other than a special purpose entity organized for the purpose of an investment to be made by the Fund in a real property project) shall, without the prior written consent of the Holders holding a majority of the aggregate outstanding principal amount of the Debentures, incur or otherwise become liable with respect to any indebtedness other than (a) Permitted Indebtedness (as defined below) or (b) indebtedness to trade creditors in the ordinary course of business.

**Registered Debentures; Notices; Changes of Address**

Each Debenture will be registered in the name of the Investor who subscribed for such Debenture or any transferee of a Debenture (See "TRANSFERABILITY OF THE DEBENTURES"). Unless otherwise provided by the Fund, all payments will be made by the Fund by electronic transfer or check to the registered holder of each Debenture at the registered address of such Holder. In the event that a Holder changes his, her or its address, the Holder is required to notify the Fund under the terms of the Debenture.

**Governing Law**

The Debentures will be governed by Washington law.

**Covenants of the Fund or the Manager**

The Debentures provide that neither the Fund nor any of its subsidiaries shall (a) directly or indirectly, declare, order, make or set apart any sum for or pay any distribution (other than tax distributions as set forth in the LLC Agreement); (b) establish any deposit account other than the account identified in that certain Deposit Account Control Agreement, to be entered into by and among the Company, the Collateral Agent and Umpqua Bank, or otherwise deposit or fund any cash or cash equivalents of the Company in any deposit account other than the account identified in the Account Control Agreement; or (c) contract, create, incur, assume or permit to exist any indebtedness, except for (i) indebtedness arising or existing under the Debenture Agreement; (ii) indebtedness arising from the issuance of the Debentures in the Offering; (iii) indebtedness arising from trade payables incurred by the Fund in the ordinary

course of business; (iv) indebtedness junior to the Holder's interest; (v) with respect to a wholly-owned subsidiary of the Fund organized for the purpose of an Investment, indebtedness that results from a commercial loan from a commercial lender made in such lender's ordinary course of business or (vi) the Credit Facility ("**Permitted Indebtedness**").

The Fund will not make any single Investment that exceeds 10% of the aggregate principal balances of the outstanding Debentures (the "**Gross Offering Proceeds**") as of the closing date of such Investment; *however*, once Gross Offering Proceeds equals at least $3,000,000 the Fund may make a single investment equal to the greater of 10% of the aggregate principal balances of the outstanding Debentures or $1,500,000. In addition, no more than 15% of the aggregate Gross Offering Proceeds will be invested in Fund Projects in which there is no Project Partner (i.e., Fund Projects in which the Fund will effectively act as the developer). Also, the Fund may only make Investments if the total amount of debt encumbering the underlying property, together with the Company's Investment, is less than 80% of the anticipated finished value of the underlying project.

Neither the Manager nor any of its Affiliates may make any investment on behalf of a new pooled investment fund with investment objectives that are identical to those of the Fund until the earlier of: (a) the date on which at least 75% of the Gross Offering Proceeds (less payment of expenses for consulting fees and professional fees, and the setting aside of reserves) have been committed to or invested in Investments or (b) the end of the Offering Period. Notwithstanding the foregoing, Affiliates of the Manager (y) have established other pooled investment funds that were formed prior to the date of this Fund and which have investment objectives identical to the Fund's and (z) are permitted to raise capital for and operate the Second 2015 Fund. The Second 2015 Fund intends to target institutional investors, but will not be limited to institutional investors and seeks to raise up to $100,000,000 in debt investments. In the event the Investment is also suitable for one or more Affiliate pooled investment vehicles, including the Second 2015 Fund (an "**Affiliate Fund**"), and the Fund and the Affiliate Fund(s) each have sufficient capital available to singularly finance the Investment, after setting aside reserves, then the Investment will be offered to each Eligible Party on a rotating basis, with the order of rotation determined by the Manager.

For the avoidance of doubt, neither the Manager nor its members or managing officers will be required to offer to the Fund any real estate investment that is not consistent with the investment guidelines, investment objectives, and principles of the Fund or is otherwise not suitable for the Fund. Notwithstanding any provision to the contrary, the Fund and its Affiliates may engage in management and investment activities related to pre-existing Investments and activities or operations of an Affiliate.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 1 Page 361

## REPORTS TO THE INVESTORS

The Fund has adopted a calendar fiscal year ending December 31. For so long as the Holder continues to hold the Debenture, the Fund will provide to the Holder:

      (a)      As soon as practicable after the end of each fiscal year and in any event within one hundred twenty (120) days after each fiscal year, consolidated balance sheets of the Fund as of the end of such fiscal year and consolidated statements of income of the Fund for such fiscal year, prepared in reasonable detail, certified by an officer of the Fund. The Fund's financial statements will be audited by an independent certified public accountant; and

      (b)      As soon as practicable after the end of each fiscal quarter and in any event within 60 days after the end of each fiscal quarter, quarterly financial statements.

# THE OFFERING

The following description of certain matters relating to the Debentures does not purport to be complete and is subject in all respects to applicable Delaware Law and to the provisions of the Debenture Agreement.

## General

The Offering has not been registered under the Securities Act and is intended by the Fund not to involve a public offering within the meaning of the Securities Act and Regulation D promulgated thereunder and, therefore, to be exempt from the registration provisions of the Securities Act. Accordingly, the Offering is being made pursuant to certain conditions which, if satisfied, will qualify the Offering for exemption from registration as provided by the Securities Act and Regulation D. These conditions relate to limitations on the manner of Offering, the nature of the Investors, access to or furnishing information about the issuer, and restrictions on transferability. This Offering is not being offered pursuant to Rule 506(c) of Regulation D.

Subject to the terms of the Debenture Agreement, the Fund is authorized to raise up to $30,000,000 through the Offering at a purchase price of $100,000 per Debenture. Investors must make a minimum investment of $100,000, representing the purchase of one Debenture, unless a smaller purchase is permitted by the Manager.

The Manager will have an initial closing for the Fund as soon as practicable after the first investments are raised (the "*Initial Closing Date*"). To accommodate the admission of additional Investors and permit existing Investors to increase their investment amounts (each, an "*Additional Investor*"), the Manager may, in its discretion, hold one or more additional closings on or before December 17, 2015, unless extended for ninety (90) days by the Manager, (each such closing to take place on an "*Additional Closing Date*").

Following the Initial Closing, additional investments in Debentures under the Offering will be accepted from time to time by the Manager. The Fund will not offer any of the Debentures pursuant to the Offering after December 17, 2015, but such date may be extended up to ninety (90) days by the Manager in its discretion.

## Payment of Investments

Each payment to the Fund will be made in United States dollars by means of a certified or cashier's check payable to "Gulfshore Bank as escrow agent for iCap" or by wire transfer, to a bank account designated by the Fund, of immediately available funds through the federal wire transfer system, in the amount that the Holder has agreed to lend to the Fund in the Debenture Purchase Agreement.

## Acceptance of Subscriptions; Eligibility Requirements

Purchases for the Debentures will be accepted on a "first come, first-served" basis. The Manager reserves the right to reject any tendered investment for whatever reason the Manager deems appropriate. If the Manager rejects an investment, the Manager will give notice of such rejection, and return the tendered initial investment payment, no later than 10 business days after the Debenture Purchase Agreement and the accompanying funds have been received by the Manager. As to the eligibility requirements of prospective investors, <u>See</u> "WHO MAY INVEST."

## TRANSFERABILITY OF THE DEBENTURES

Subject to compliance with the requirements of the Debenture Agreement, Investors shall have the right to transfer the Debenture to any qualifying third party of its choice contingent upon securing the Fund's written consent in advance of the proposed transfer. The Fund is under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under the Debenture Agreement, until the Holder has surrendered the original Debenture for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Fund. A new Debenture for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing a Debenture Agreement, and executing a Certificate of Accredited Investor. Interest and principal are payable only to the registered holder of the Debenture.

The Holder and any successor Holder agree(s) to provide to the Fund a Form W-9 upon request. Until registration of a transfer occurs, the Fund shall be entitled to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by the Debenture Agreement and the applicable Debenture.

### State Securities: Blue Sky Laws

Transfer of the Debentures may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Debentures may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be registered for resale under the Blue Sky laws of any state, the Holders and any Persons who desire to purchase them in any trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Debentures and of purchasers to purchase the Debentures. Accordingly, Investors should be prepared to hold the Debentures until their maturity date as may be extended.

## FINANCIAL INFORMATION

This Memorandum does not include current balance sheets for either the Fund or the Manager. The Manager has limited capitalization. As of the date hereof, the Fund has incurred certain liabilities in connection with the offering of the Debentures, but has no significant assets. The Fund is a newly-organized entity, has no capital (other than the capital to be raised through the sale of the Debentures), and has and will incur substantial expenses in connection with the offering and sale of the Debentures.

## LEGAL REPRESENTATION

The Manager has engaged Perkins Coie LLP as its legal counsel to assist in connection with transactions contemplated by this Memorandum and in preparing the Debenture Agreement, this Memorandum and related documents. Perkins Coie LLP, in providing such advice has represented the Manager's interests and did not represent nor purport to represent the interests of any other Investor or potential investor. The Fund urges you to engage your own legal counsel and, as necessary, financial consultants for advice regarding the desirability of purchasing the Debentures offered pursuant to this Memorandum. Perkins Coie LLP may in the future represent the Fund, the Manager or related parties on various matters, subject to complying with applicable legal principles for resolving conflicts of interest.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 1 Page 364

## PLAN OF DISTRIBUTION

**Compensation**

The Fund has entered into an exclusive engagement agreement (the "***Engagement Agreement***") with StillPoint Capital, LLC ("***SPC***") to serve as managing broker dealer of the Offering. The exclusivity period continues until the Offering has been closed.

The Debentures will be offered on a "best efforts" basis (which means that there is no guarantee that any minimum amount will be sold). SPC will engage other broker dealers ("***Selling Group Members***") to assist in privately placing the Debentures. SPC will receive a selling commission of 7% of the Gross Proceeds of this Offering, which it will re-allow to the Selling Group Members. SPC will also receive a marketing re-allowance fee of 1% of the Gross Proceeds of this Offering, which it will re-allow to the Selling Group Members. SPC will receive a fee of 5% of the Gross Proceeds of this Offering for serving as the managing dealer in the Offering. SPC will be responsible for all wholesaling fees and marketing expenses relating to this Offering, as well as paying its own expenses associated with the Offering.

SPC and its officers, employees and affiliates may purchase Debentures in the Offering. Such Debentures will be counted toward the Maximum Offering Amount. SPC and the Fund may, in their sole discretion, accept offers to purchase Debentures net (or partially net) of the commissions and expense reimbursements described in this Memorandum in certain circumstances deemed appropriate by either of them, including by way of illustration, from Investors purchasing through a registered investment advisor ("***RIA***"), or from Investors who are affiliates of the Fund or any member of the Selling Group. The Fund may also make sales to registered representatives of the Selling Group or to their spouses and affiliates, in each case net of sales commissions.

In addition to the commissions paid at the time of each closing, SPC will be issued a profits interest in the Fund, pursuant to which SPC and its Affiliates or assigns, as one class of members, will have a right to share in 23% of the cash or property distributions of the Fund as set forth in the LLC Agreement after the Investors have been paid their principal Debenture balances and Payoff Premium.

We have agreed to indemnify SPC from and against losses, claims, damages or liabilities (collectively, the "**Damages**") arising out of the Offering, except for Damages resulting from SPC's breach of the Engagement Agreement, including gross negligence or willful misconduct as more fully set forth in the Engagement Agreement.

# EXHIBIT A

## SENIOR SECURED DEBENTURE PURCHASE AGREEMENT

**EXHIBIT B**

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**ICAP NORTHWEST OPPORTUNITY FUND, LLC**

**EXHIBIT C**

**SUBSCRIPTION DOCUMENTS**
**OF**
**ICAP NORTHWEST OPPORTUNITY FUND, LLC**

**Exhibit 28**

Name: _____

Memorandum No. _____

# iCAP Pacific Northwest Opportunity and Income Fund, LLC

## $30,000,000 of

## 12% Senior Debentures due 2016

———————————

This Confidential Offering Memorandum (this "*Memorandum*") is being furnished in connection with the offer and sale (the "*Offering*") of up to $30,000,000 of 12% Senior Secured Debentures due 2016 (the "*Debentures*") by iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company (the "*Fund*"). Offers will be made only to accredited investors, as defined under Rule 501 promulgated under the Securities Act of 1933, as amended (the "*Securities Act*"). Debentures will be issued in denominations of at least $100,000 with additional integral multiples of $10,000. The Fund may accept lower denominations at its discretion.

The minimum amount that the Fund must sell in order to consummate the Offering is $2,000,000 (the "*Minimum Offering Amount*") and the maximum aggregate amount of Debentures being offered is $30,000,000 (the "*Maximum Offering Amount*"). The Fund reserves the right, in its sole discretion, to increase the Maximum Offering Amount to $50,000,000 to accommodate oversubscriptions for the Debentures. The Fund may hold an initial closing any time after the Minimum Offering Amount has been received and may hold additional subsequent closings from time to time thereafter, in the Fund's sole discretion, as subscriptions for the Debentures are received. The Fund will offer the Debentures as of the date of this Memorandum through the earlier of (a) the date on which the Fund closes on the sale of the Maximum Offering Amount, (b) such time, if any, as the Fund, in its sole discretion, elects to withdraw or terminate this Offering; or (c) April 30, 2014 (the "*Offering Period*"), unless extended up to three (3) months by the Manager.

The Fund will pay interest on the Debentures at the rate of 12% per annum. Interest will be payable monthly in arrears on or before the 15th day of the following month. The Debentures will mature on December 31, 2016.

The Debentures will be the Fund's secured senior obligations. Unless otherwise approved by Holders of a majority of the principal amount of the outstanding Debentures, the Debentures will rank senior to all of the Fund's future indebtedness, including any class of debt or equity security that the Fund may issue.

**THIS OFFERING INVOLVES CERTAIN RISKS. See "Risks Factors".**

THE DEBENTURES HAVE NOT BEEN, NOR WILL THEY BE REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT. THEY ARE BEING OFFERED AND SOLD IN THE UNITED STATES ONLY TO ACCREDITED INVESTORS IN RELIANCE ON RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR DETERMINED IF THIS MEMORANDUM IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

———————————

# Skyway Advisors, LLC

**The date of this Memorandum is December 19, 2013.**

The information contained in this Memorandum is confidential. By acceptance of this Memorandum, each recipient agrees not to reproduce or distribute this Memorandum to others (except the recipient's professional advisors) without the prior written consent of the Fund, that the recipient and his, her or its professional advisors will keep permanently confidential all information contained herein not already in the public domain, and will use this Memorandum for the sole purpose of evaluating a possible investment in the Debentures. Each recipient also agrees to return this Memorandum and any other documents or information furnished by the Fund (and any and all copies thereof) to the recipient upon request of the Fund if the recipient declines to purchase any Debentures.

There will be no public market for the Debentures and there is no obligation on the part of the Fund or any person to register the Debentures under the Securities Act or any state securities laws.

This Memorandum includes data and information obtained from independent third party sources. Although the Fund does not have any reason to believe that such data and information is not accurate, the Fund did not independently verify such data and information and cannot assure the accuracy or completeness of such data and information. Prospective investors must rely upon their own investigations and evaluations with respect to making an investment in the Debentures being offered hereby.

Prospective investors will be advised of any material modifications to the terms of the Offering or the Debentures in writing prior to any sale of Debentures to such prospective investors.

Nothing contained in this Memorandum is, or should be relied upon as, a promise or representation as to the Fund's future performance. Prospective investors must rely upon their own examination of the Fund and the terms of the Offering, including the merits and risks involved.

This Memorandum is qualified in its entirety by the Senior Secured Debenture Purchase Agreement attached hereto as Exhibit A. The Senior Secured Debenture Purchase Agreement, is hereinafter referred to in this Memorandum as the "***Debenture Agreement***".

The Debentures are offered when, as, and if issued, subject to the right of the Fund, in its sole discretion, to approve or reject any subscription in whole or in part and subject to certain other conditions described herein. Subscriptions for Debentures can only be made by delivery to the Fund of an executed Debenture Agreement, together with the form Debenture, in the form attached as Exhibit A to the Debenture Agreement attached hereto as Exhibit A

This offer may be withdrawn at any time before the initial closing or any subsequent closing and is specifically made subject to the terms described in this Memorandum. The Fund reserves the right to reject any subscription, in whole or in part, for any reason whatsoever or to allot to any prospective investor less than the aggregate value of Debentures subscribed for by such prospective investor. Rejected subscriptions will be promptly returned to the subscriber with the amount of the rejected subscription funds without interest.

_____

## NOTICES

The following notices apply in certain states where the Debentures, which are referred to below as "securities," may be sold. Compliance with the notice exemption requirements of applicable state securities laws will be undertaken by the Fund as needed.

**Notice to Residents of all States:**

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR THE SECURITIES LAWS OF ANY STATE OR JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND OTHER LAWS. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND OTHER LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE SECURITIES HAVE NOT BEEN RECOMMENDED OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES ACT AND THE SECURITIES LAWS OF CERTAIN JURISDICTIONS GRANT PURCHASERS OF SECURITIES SOLD IN VIOLATION OF THE REGISTRATION OR QUALIFICATION PROVISIONS OF SUCH LAWS THE RIGHT TO RESCIND THEIR PURCHASE OF SUCH SECURITIES AND TO RECEIVE BACK THEIR CONSIDERATION PAID. THE FUND BELIEVES THAT THE OFFERING DESCRIBED IN THIS MEMORANDUM IS NOT REQUIRED TO BE REGISTERED OR QUALIFIED. MANY OF THESE LAWS GRANTING THE RIGHT OF RESCISSION ALSO PROVIDE THAT SUITS FOR SUCH VIOLATIONS MUST BE BROUGHT WITHIN A SPECIFIED TIME, USUALLY ONE YEAR FROM DISCOVERY OF FACTS CONSTITUTING SUCH VIOLATION. SHOULD ANY INVESTOR INSTITUTE SUCH AN ACTION ON THE THEORY THAT THE OFFERING CONDUCTED AS DESCRIBED HEREIN WAS REQUIRED TO BE REGISTERED OR QUALIFIED, THE FUND WILL CONTEND THAT THE CONTENTS OF THIS MEMORANDUM CONSTITUTED NOTICE OF THE FACTS CONSTITUTING SUCH VIOLATION.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS MEMORANDUM OR THE DOCUMENTS ATTACHED TO THIS MEMORANDUM. NO ONE HAS BEEN AUTHORIZED TO PROVIDE YOU WITH ANY INFORMATION THAT IS DIFFERENT. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN GIVEN BY THE ISSUER OF THE SECURITIES.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH AN OFFER IS NOT QUALIFIED TO DO SO, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE AN OFFER OR SOLICITATION. IN ADDITION, THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF AN OFFEREE APPEARS IN THE APPROPRIATE SPACE ON THE COVER PAGE AND IS AN OFFER ONLY TO SUCH NAMED OFFEREE.

NEITHER THE INFORMATION CONTAINED HEREIN, NOR ANY PRIOR, CONTEMPORANEOUS OR SUBSEQUENT COMMUNICATION SHOULD BE CONSTRUED BY THE PROSPECTIVE INVESTOR AS FINANCIAL, LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS, HER OR ITS OWN FINANCIAL LEGAL AND TAX ADVISORS TO ASCERTAIN THE MERITS AND RISKS OF THE OFFERING AND AN INVESTMENT IN THE FUND PRIOR TO SUBSCRIBING TO PURCHASE THE SECURITIES.

THIS MEMORANDUM AND ITS EXHIBITS MAY CONTAIN STATEMENTS THAT CONSTITUTE FORWARD-LOOKING STATEMENTS, AS DEFINED BY FEDERAL SECURITIES LAWS. FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF TERMINOLOGY SUCH AS "ANTICIPATES," "EXPECTS," "INTENDS," "PLANS," "BELIEVES," "SEEKS," "ESTIMATES" AND VARIATIONS OF THESE WORDS AND SIMILAR EXPRESSIONS. FORWARD-LOOKING STATEMENTS ARE SUBJECT TO RISKS AND UNCERTAINTIES AND INCLUDE STATEMENTS MADE REGARDING EVENTS, FINANCIAL TRENDS, FUTURE OPERATING-RESULTS, FINANCIAL POSITION, CASH FLOWS AND OTHER GENERAL INFORMATION CONCERNING POSSIBLE OR ASSUMED FUTURE RESULTS OF OPERATIONS OF THE FUND OR ANY PROJECT. INVESTORS ARE CAUTIONED THAT SUCH STATEMENTS ARE ONLY PREDICTIONS, FORECASTS OR ESTIMATES OF WHAT MAY OCCUR AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE OR OF THE OCCURRENCE OF EVENTS OR OTHER FACTORS USED TO MAKE SUCH PREDICTIONS, FORECASTS OR ESTIMATES. ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE RESULTS EXPRESSED, IMPLIED OR INFERRED FROM THE FORWARD-LOOKING STATEMENTS AND MAY BE WORSE DUE TO A VARIETY OF FACTORS, INCLUDING, WITHOUT LIMITATION, CHANGES IN LAWS, ADVERSE CHANGES IN REAL ESTATE PRICES, ADVERSE CHANGES IN INTEREST RATES, AND ADVERSE CHANGES IN THE CREDIT AND CAPITAL MARKETS. SUCH STATEMENTS REFLECT THE FUND'S CURRENT VIEWS AND THE FUND UNDERTAKES NO OBLIGATION TO REVISE THE FORWARD-LOOKING STATEMENTS MADE HEREIN OR IN THE EXHIBITS HERETO TO REFLECT EVENTS OR CIRCUMSTANCES THAT OCCUR AFTER THE DATE HEREOF OR THEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS; *PROVIDED*, *HOWEVER*, THAT THE FUND UNDERTAKES TO UPDATE THIS MEMORANDUM TO REFLECT EVENTS THAT OCCUR PRIOR TO THE TERMINATION OF THE OFFERING AND MATERIALLY CHANGE THE NATURE OF THE OFFERING.

**Notice to New York Residents:**

THIS CONFIDENTIAL OFFERING MEMORANDUM HAS NOT BEEN REVIEWED BY THE ATTORNEY GENERAL PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONTAIN AN UNTRUE STATEMENT OF A MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE, NOT MISLEADING. IT CONTAINS A FAIR SUMMARY OF THE MATERIAL TERMS AND DOCUMENTS PURPORTED TO BE SUMMARIZED HEREIN.

**Notice to Florida Residents:**

THE SECURITIES OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, INVESTORS IN A TRANSACTION EXEMPT UNDER §517.061 OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, WHERE SALES OF THE SECURITIES ARE MADE TO FIVE (5) OR MORE PERSONS IN FLORIDA, EACH FLORIDA PURCHASER SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE ISSUER OF THE SECURITIES OR AN AGENT OF SUCH ISSUER, OR WITHIN THREE (3) DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER.

**Notice to New Hampshire Residents:**

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT

THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

DURING THE COURSE OF THIS OFFERING, EACH PROSPECTIVE INVESTOR MAY OBTAIN ADDITIONAL INFORMATION WHICH SUCH PERSON DEEMS TO BE NECESSARY IN CONNECTION WITH MAKING AN INVESTMENT DECISION IN ORDER TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM (TO THE EXTENT THE FUND POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE). IN CONNECTION WITH SUCH INQUIRY, ANY DOCUMENTS WHICH ANY PROSPECTIVE INVESTOR WISHES TO REVIEW WILL BE MADE AVAILABLE FOR INSPECTION AND COPYING OR FURNISHED, UPON REQUEST, SUBJECT TO THE PROSPECTIVE INVESTOR'S AGREEMENT TO MAINTAIN SUCH INFORMATION IN CONFIDENCE AND TO RETURN THE SAME TO THE FUND IF THE RECIPIENT DOES NOT PURCHASE THE SECURITIES OFFERED HEREUNDER. ANY SUCH INQUIRIES OR REQUESTS FOR ADDITIONAL INFORMATION OR DOCUMENTS SHOULD BE MADE TO:

**ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC**
**PO Box 3907**
**Bellevue, WA 98009**

**ATTN: CHRIS CHRISTENSEN**
**(425) 372-7114**
**FAX: (425) 214-4776**

NOTICES ........................................................................................................................................i

FORWARD-LOOKING STATEMENTS .......................................................................................1

WHO MAY INVEST ....................................................................................................................1

SUMMARY OF THE OFFERING ................................................................................................2

USE OF PROCEEDS ....................................................................................................................5

COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES ...................................6

CONFLICTS OF INTEREST .........................................................................................................8

RISK FACTORS ...........................................................................................................................10

PRIOR PERFORMANCE OF THE MANAGER AND ITS AFFILIATES ..................................16

MANAGEMENT OF THE FUND ...............................................................................................17

DESCRIPTION OF THE BUSINESS ..........................................................................................19

U.S. FEDERAL INCOME TAX MATTERS ................................................................................25

ERISA MATTERS ......................................................................................................................28

GLOSSARY ................................................................................................................................29

SUMMARY OF THE SENIOR SECURED DEBENTURE PURCHASE AGREEMENT .............30

REPORTS TO THE INVESTORS ..............................................................................................33

THE OFFERING .........................................................................................................................34

TRANSFERABILITY OF THE DEBENTURES .........................................................................35

FINANCIAL INFORMATION ...................................................................................................35

PLAN OF DISTRIBUTION ........................................................................................................36

EXHIBITS

    A   SENIOR SECURED DEBENTURE PURCHASE AGREEMENT

    B   LLC AGREEMENT

## FORWARD-LOOKING STATEMENTS

This Memorandum contains forward-looking statements that involve risks and uncertainties. These statements relate to future events, future developments or the Fund's future financial performance. In some cases, you can identify forward looking statements by terminology including "could," "would," "may," "will be," "will continue," "likely to become," "should," "expect," "intend," "plan," "anticipate," "believe," "estimate," "predict," "potential," "continue," "opportunity," or the negative of these terms or other comparable terminology. These statements are only predictions. Actual events or results may differ materially. In evaluating these statements, you should specifically consider various factors, including the risks described in this Memorandum, specifically those risks listed under "RISK FACTORS." These factors may cause the Fund's actual results to differ materially from any forward-looking statements. Although the Fund believes the expectations reflected in the forward-looking statements are reasonable, the Fund cannot guarantee future results, levels of activity, performance or achievements. These forward-looking statements speak only as of the date on which the statements were made and the Fund undertakes no obligation to update or revise any forward-looking statements made in this Memorandum or elsewhere as a result of new information, future events, future developments or otherwise, except as required by law.

## WHO MAY INVEST

**General**

The Fund intends to sell the Debentures to Investors qualifying as "accredited investors" as defined in Regulation D under the Securities Act.

The term "accredited investors" is defined to include, among others, (a) a natural person with a net worth, or joint net worth with such purchaser's spouse, at the time of purchase in excess of $1,000,000 (exclusive of the equity in the person's primary residence), (b) a natural person who had an individual gross income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year, or (c) any entity in which all of the equity owners are "accredited investors." Other classes of Investors also qualify as "accredited investors" under Regulation D. If you are unsure as to whether you qualify as an accredited investor, you should contact a legal advisor of your choice for advice.

With respect to a prospective investor wishing to invest in his or her individual capacity, the value of the individual's primary residence should be excluded in determining the Investor's net worth. In addition, the mortgage or other indebtedness secured by the individual's primary residence to the extent that such indebtedness does not exceed the value of the residence need not be considered as a liability. When the indebtedness secured by the primary residency exceeds the value of the residence and the lender has other recourse against the individual for payment of the excess liability, the excess liability (and only such excess) should be deducted from the individual's net worth in determining net worth.

**Subscription**

To subscribe for the Debentures, you must complete, execute and deliver to the Fund the Debenture Agreement, in the form attached to this Memorandum as <u>Exhibit A</u>. The Debenture Agreement requires you to represent, among other things, that you are an accredited investor, are acquiring Debentures for your own account for investment and not with a view to resale or distribution, and that you are aware that transfer of the Debentures is restricted by the terms of the Debenture Agreement and by the absence of a market for the Debentures. The Debenture Agreement also requires you to acknowledge that you have received and have had an opportunity to read this Memorandum and are aware of the risks associated with an investment in the Debentures.

THE FUND'S ACCEPTANCE OF YOUR SUBSCRIPTION FOR DEBENTURES DOES NOT CONSTITUTE A DETERMINATION BY THE FUND THAT THE INVESTMENT IS SUITABLE FOR YOU. THE FINAL DETERMINATION AS TO THE SUITABILITY OF AN INVESTMENT IN THE DEBENTURES FOR YOU MUST BE MADE BY YOU AND YOUR ADVISORS.

## SUMMARY OF THE OFFERING

The following summary summarizes a number of the material provisions of the Offering and certain provisions of the Debenture Agreement and is qualified in its entirety by the full text of the Debenture Agreement. Capitalized terms used in this Summary not separately defined herein have the meanings assigned to such terms in the Debenture Agreement. No person will be permitted to invest in the Fund unless such person has received and reviewed the Debenture Agreement, this Memorandum and other offering-related documents. This Summary does not constitute an offer to sell, or the solicitation of an offer to buy, the securities referenced herein, and any such offer will be made only to selected persons pursuant to the offering documents prepared and delivered by the Fund.

### General Information

| | |
|---|---|
| Fund | iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company. |
| Manager | iCap Pacific NW Management, LLC, a Washington limited liability company (the "***Manager***"). The Manager was specifically formed for the purpose of serving as the Manager of the Fund. The key executives of the Manager are Chris Christensen (principal and president); Mike Christensen (Chief Investment Officer); Jim Christensen (Chief Operating Officer) and Bryan Brown (Vice President, Construction). |
| Agreement | The Fund's affairs will be governed by the terms of the Debenture Agreement and by the Fund's Limited Liability Company Agreement dated as of December 19, 2013, as may be amended from time to time (the "***LLC Agreement***") attached hereto as <u>Exhibit B</u>. |
| Business Purpose | The primary purpose of the Fund is to invest in real estate projects in the Pacific Northwest ("***Project Entities***"). The Fund's business model is designed to fill the funding gap between lenders, on the one hand, and developers or builders on the other hand (referred to as "***Project Partners***"), although in certain situations the Fund may invest in projects without a Project Partner and may effectively act as the developer of the project. The Fund may also issue debt instruments to Project Entities, acquire Project Entities directly or debt instruments of Project Entities. These activities shall be referred to as "***Investments***." We anticipate such opportunities to be available to the Fund based on its officers' relationships with members of the real estate and banking communities in the Pacific Northwest. |
| Target Investments | The Fund expects that most of its Investments will be in the form of preferred equity positions in Project Entities primarily in the greater Puget Sound and Portland areas. We anticipate Investments being made in Project Entities holding the following types of real estate: |

- single and multi-unit residential properties;
- multi-family residential projects;
- commercial properties; and
- land acquired for entitlement purposes.

| | |
|---|---|
| Investment Time Frame | The Fund plans to hold each Investment for 6 – 18 months. The Fund does not anticipate entering into new Investments within six (6) months of the Maturity Date. |
| Limitations on Investment | The Fund will not make any single Investment that is greater than 10% of the gross Offering proceeds received by the Fund as of the closing date of such Investment. In addition, no more than 15% of the gross Offering proceeds will be invested in projects in which there is no Project Partner (i.e. projects in which the Fund will effectively act as developer). |

2

## Terms of the Offering

**Offering Size**

$30,000,000 to be raised through the sale of Debentures, with an option by the Manager to increase the Offering Size to $50,000,000. Each Debenture represents a minimum investment of $100,000, with additional increased amounts available in $10,000 increments, as set forth below.

**Minimum Investment**

An investment of at least $100,000 (as represented by 1 Debenture), unless a smaller investment is permitted by the Manager in its discretion.

**Minimum Offering**

The Fund must receive a minimum aggregate investment of $2,000,000 before the Fund may break escrow and begin making Investments.

**Term of Offering**

Debentures may be offered by the Fund through April 30, 2014, but such date may be extended for up to three (3) months by the Manager in its discretion.

**Eligible Investors**

Offering limited to persons qualifying as "accredited investors" under Regulation D of the Securities Act.

## Economic Terms of Investment

**Interest Payment**

Investors are entitled to receive a 12%, per annum simple interest rate on their investment, paid monthly in arrears.

**Maturity Date**

The Fund shall pay back the principal balances of the Senior Debentures to Investors on or before December 31, 2016, subject to a three (3) month extension period available to the Fund (the "***Maturity Date***"). The Fund may prepay all or part of the Debentures without penalty at any time prior to the Maturity Date. The date of any such prepayment in full, shall be referred to as the "***Prepayment Date***".

**Payoff Premium**

Investors are additionally entitled to a Payoff Premium equal to each Investor's pro-rata share of 25% of the cumulative net profits of the Fund through the date on which the Debentures are paid in full, payable within 12-months after the Fund has fully satisfied its obligations under such Investor's Debenture.

**Secured Debentures**

The Debentures are secured by all of the assets of the Fund and by a pledge of the Manager's membership interest in the Fund. The Fund's assets are comprised principally of the Fund's cash and bank accounts, the Fund's equity interest in each Project Entity, and the rights and collateral interests granted to the Fund in connection with each individual Investment. The Fund's rights and collateral will include the following:

- a second position or sometimes a first position deed of trust (i.e., mortgage) in the real estate owned by or hereafter owned by the Project Entities to secure the return of the Fund's investment; and
- a secured interest in the Membership Interest held by the Fund's Project Partner; and
- the Fund's right to assume control of the Project Entity and the project owned by it in the event of a default by the Project Entity or a failure to meet applicable project milestones or requirements.

**Seniority of Debentures**

Unless otherwise approved by Holders of a majority of the principal amount of the outstanding Debentures, the Debentures will rank senior to all of the Fund's future indebtedness, including any class of debt or equity security that the Fund may issue.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 18 Page 378

**Related Party Transactions and Investor Reports**

| | |
|---|---|
| Compensation and Fees to Manager and Affiliates | The Fund will pay to the Manager an annual management fee equal to 2% of the outstanding principal balance of the Debentures. The annual management fee for the first year will be paid in advance on a pro-rated basis at each closing that occurs during the first year. For subsequent years, the management fee will be paid in advance on a quarterly basis, but will not be paid from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) other than a payment default which has been cured, whether or not such cure occurs during or after the Grace Period (as defined in the Debenture Agreement). For clarification purposes, if the initial closing occurs on January 15, 2014, the annual management fee for the proceeds for the initial closing will be paid on such date and quarterly payments will be paid in advance, beginning January 15, 2015. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES."

In addition to fees payable by the Fund, with respect to any investment by the Fund, the Manager may receive a fee from the Project Entity equal to 3.0% of the total investment amount. Such origination fee will be charged directly to the Project Entity and will be paid at the time the Fund invests in the Project Entity. |
| Expense Reimbursement | The Manager has covered or is obligated to cover all out-of-pocket expenses incurred in connection with the Fund's organization and the Offering, up to a maximum amount of $500,000. Any organizational or Offering expenses in excess of $500,000 will be paid from the Offering proceeds. |
| Co-Investments | The Fund may hold its interest in the Investments directly or indirectly through one or more subsidiaries. In addition, the Fund may co-invest with others, subject to any restrictions set forth in the LLC Agreement. |
| Leverage Restrictions | The Fund may only make Investments if the total amount of debt encumbering the underlying property, together with the Fund's Investment, is less than 80% of the finished value of the underlying project. The Fund will not finance any amount above the total cost of the project and will not invest in projects whose combined loan to value ratio exceeds 80%. See "DESCRIPTION OF BUSINESS—Identifying and Monitoring Investments—CLTV Less than 80%." |
| Investor Reports | The Fund will provide the following reports to each Investor: |

- Within 120 days after the end of the fiscal year, audited Fund financial statements; and
- Within 60 days after the end of each fiscal quarter, quarterly financial statements.

| | |
|---|---|
| Annual Audit | The Fund has engaged McGladrey LLP to perform an annual audit, and the audit opinion and related audited financial statements will be provided to the Investors. |

4

## USE OF PROCEEDS

The Fund is offering a Maximum Offering Amount of $30,000,000 in Debentures (which may be increased to $50,000,000 in the Fund's discretion). The net proceeds to the Fund from the sale of Debentures in this Offering, after deducting the selling commissions, due diligence fee, Placement Agent fee, and Offering and organizational expenses (the "***Net Proceeds***") will be $25,500,000 if the Maximum Offering Amount is subscribed. The following table sets forth the details of these fees and funds available for investment.

| | Sale of Minimum Subscription Amount | Percentage of Gross Proceeds | Sale of Maximum Offering Amount | Percentage of Gross Proceeds |
|---|---|---|---|---|
| Gross Proceeds from Investors | $2,000,000 | 100% | $30,000,000 | 100% |
| Less: Selling Commission (1) | $140,000 | 7% | $2,100,000 | 7% |
| Less: Due Diligence Fee (2) | $20,000 | 1% | $300,000 | 1% |
| Less: Managing Dealer Fee (3) | $40,000 | 2% | $600,000 | 2% |
| Less: Marketing and Underwriting Fee (3) | $60,000 | 3% | $900,000 | 3% |
| Less: Management Fee for one Year (4) | $40,000 | 2% | $600,000 | 2% |
| Available for Investment (before reserves) | $1,700,000 | 85% | $25,500,000 | 85% |

(1) A Selling Commission in an amount up to 7% of the aggregate principal amount of Debentures issued ("***Gross Proceeds***") will be paid to the Placement Agent which it will re-allocate to the Selling Group Members.

(2) The Placement Agent will receive a Due Diligence Fee of 1% of the Gross Proceeds which it will re-allocate to Selling Group Members.

(3) The Placement Agent will also receive a fee of 2% of the Gross Proceeds for serving as the managing dealer in the Offering as well as a marketing and underwriting fee of 3% of the Gross Proceeds, each payable at the time of closing. The Placement Agent, as managing broker-dealer for the Offering, will be responsible for all "wholesaling fees" relating to the selling group, as well as for paying its own expenses associated with the Offering up to $50,000.

(4) The Manager will receive an annual management fee equal to 2% of the outstanding principal balance of the Debentures. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES."

## COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES

The following table and discussion show all of the types of compensation, fees, income, distributions or other payments that the Fund may pay to the Manager and its Affiliates in connection with the Fund's organization, operation and liquidation. Such arrangements have not and will not be determined through arm's-length negotiations between such parties and the Fund. The Manager has no obligation to advance funds to cover the Fund's expenses, beyond the initial Offering and organizational expenses. However, to the extent that such advances are made, the Fund will repay such loans out of the Fund's funds as soon as they are available, whether such funds are from the Fund's operating revenues or third-party loans.

| Form of Compensation | Person(s) to Whom Paid | Method of Determination |
|---|---|---|
| Organization and Offering Expenses | Manager | The Manager shall cover up to $500,000 of all organizational and other expenses incurred in connection with the Offering, but shall be reimbursed by the Fund (from the Offering proceeds) for any such expenses incurred which are in excess of $500,000. The Manager does not anticipate that such expenses will exceed $500,000. |
| Fund-Level Management Fee | Manager | The Fund will pay to the Manager an annual management fee equal to 2% of the outstanding principal balance of the Debentures outstanding. The annual management fee for the first year will be paid in advance on a pro-rated basis at the closings that occur during the first year. For subsequent years, the management fee will be paid in advance on a quarterly basis. For clarification purposes, if the initial closing occurs on January 15, 2014, the annual management fee on the proceeds from the initial closing will be paid on such date and quarterly payments will be paid in advance, beginning January 15, 2015. Notwithstanding the foregoing, the management fee shall not be due and payable from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) under the Debentures other than a payment default which has been cured, whether or not such cure occurs during or after the Grace Period (as defined in the Debenture Agreement). |
| Service Fees | Affiliated Entities of the Manager | In some instances an Affiliate of the Manager may perform services for a project in which the Fund invests in order to provide better pricing and/or efficiency to the Fund than other third parties might provide for similar services. In these instances, such Affiliates may be paid customary service fees for time, material, or labor, but shall be capped at the rates and amounts set forth in this Memorandum below. |

In addition to the fees set forth above, the Fund will reimburse the Manager and its Affiliates for any reasonable expenses paid by either such Person that properly is to be borne by the Fund.

6

**Compensation Rates of Affiliates**

The engagement by the Fund of any Person considered to be an Affiliate is designed to achieve an optimal outcome for the Fund by obtaining more efficient service at a cost that is no higher than is standard in the market. In the event the Fund enlists the services of those certain Affiliates of the Manager identified below, the rates of compensation of such Affiliates for their various services shall be limited and all payments subject to inspection by auditors. The Affiliates below have agreed to the following rates:

Edge Construction, LLC: provides general contracting services, including those related to new construction of and rehabilitation of real estate projects.

General Contractor Fee: Cost* plus 10%
*Cost includes all costs of labor, materials and management of a project, including but not limited to costs of project management, supervision, and labor, each of which shall be billed at the hourly rates set forth below.

Project Management Rates:
| | |
|---|---|
| Executive: | $125/hr |
| Project Manager: | $115/hr |
| Onsite Superintendent: | $65/hr |
| Labor: | $35/hr |
| Admin.: | $30/hr |

Altius Development, Inc.: provides development and consulting services to real estate projects.

Project Management Rates:
| | |
|---|---|
| Executive: | $125/hr |
| Project Manager: | $115/hr |
| Admin. | $30/hr |

**Fees Payable by Project Entity**

In addition to the fees charged against the Offering proceeds, the Manager or an Affiliate of the Manager may charge each Project Entity an origination fee in an amount equal to 3% of the total investment amount. In addition, the Manager may charge the Project Partner a non-refundable due diligence fee to cover the costs of due diligence and underwriting. The origination fee will be payable by the Project Entity at the time the Fund invests in the Project Entity. The due diligence fee will be payable by the Project Partner prior to commencement of due diligence, will be non-refundable, and will typically be less than $5,000. Additionally, in the event a Project Partner's project is approved for funding, the Manager may charge a legal fee to the Project Entity, payable at closing, to cover the legal costs associated with such Investment.

## CONFLICTS OF INTEREST

A number of conflicts of interest are inherent in the relationships among the Manager, its Affiliates and the Fund. Certain of these conflicts of interest are summarized below.

### Transactions with the Manager and its Affiliates

The Fund may enter into various transactions with the Manager and its Affiliates, and compensation and fees could be paid with respect to these transactions as disclosed in the section entitled "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." To the extent any such transaction may pose a conflict of interest between the Fund, on the one hand, and the Manager or its Affiliates, on the other hand, this conflict must be resolved by the Manager in exercising its fiduciary duty to ensure the fairness of the transactions involving the Fund.

### Independent Activities of the Manager; Exclusivity

The Manager shall cause each managing principal, for so long as such managing principal is employed by, or an advisor to, the Manager or any of its Affiliates, to devote to the Manager, the projects in which the Fund invests, and other activities of the Fund as much time as may be reasonably necessary for the performance of their respective duties in such capacities as managing principals, which shall be no less than a majority of their full business time during the Offering Period. Notwithstanding the foregoing, each managing principal may (a) devote such time and effort as s/he deems reasonably necessary to the affairs of any partnership or other entity with an investment objective that is not substantially similar to the Fund's investment objectives, (b) devote such time and effort as s/he deems reasonably necessary to the affairs of any successor fund and any pre-existing Investments or undersized Investments, (c) devote such time and effort as s/he deems reasonably necessary to the affairs of any real estate construction or development business in which the managing principal currently participates, (d) serve on boards of directors of public and private companies and retain fees for such services for his own account, (e) engage in civic, professional, industry and charitable activities, and (f) conduct and manage personal and family investment activities. Subject to the express limitations set forth in this Agreement, each managing principal may engage independently or with others in other investments or business ventures of any kind.

### Manager's Representation of the Fund in Audit Proceedings

Situations may arise in which the Manager may act on the Fund's behalf in administrative and judicial proceedings involving the IRS or other enforcement authorities. Such proceedings may involve or affect other business entities for which the Manager or its Affiliates act as managers or general partners. In such situations, the positions taken by the Manager may have differing effects on the Fund and such other business entities. Any decisions made by the Manager with respect to such matters will be made in good faith consistent with the Manager's fiduciary duties both to the Fund and the Members and to any other business entity for which the Manager or its affiliates act as a Manager or general partner. However, any Investor who desires not to be bound by any settlement reached by the Manager with the IRS may file a statement within a period prescribed by Regulations stating that the Manager does not have authority to enter into a settlement on his, her or its behalf.

### Legal Representation

The Manager has engaged Perkins Coie LLP as its legal counsel to assist in connection with certain of the transactions contemplated by this Memorandum and in preparing the Debenture Agreement, this Memorandum and the Debenture Agreement. Perkins Coie LLP, in providing such advice has represented the Manager's interests and did not represent nor purport to represent the interests of any other Investor or potential investor. The Fund urges you to engage your own legal counsel and, as necessary, financial consultants for advice regarding the desirability of purchasing the Debentures offered pursuant to this Memorandum. Perkins Coie LLP may in the future represent the Fund, the Manager or related parties on various matters, subject to complying with applicable legal principles for resolving conflicts of interest.

**Receipt of Compensation by the Manager, Placement Agent, Selling Group Members or their respective Affiliates**

The Manager, the Placement Agent, Selling Group Members, or their respective Affiliates will receive certain compensation from the Fund, regardless of whether the Fund ever makes payments to the Investors. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." Although the Fund believes that the fees to be paid to such Persons will be competitive with those that otherwise could be provided by third-parties (taking into account the quality, amount, and degree of specialization of services provided), any such fees will not be determined by arm's-length negotiations. These fees and expenses will be paid prior to any repayment of the Debentures or interest therein, although the Manager's management fee will not be payable from and after the occurrence of an Event of Default (as defined in the Debenture Agreement) other than a payment default which has been cured, whether or not such cure occurs during or after the Grace Period (as defined in the Debenture Agreement).

**Manager's Profits**

After the Fund has paid the principal and 12% annual interest due and payable under the Debentures and paid the Payoff Premium, the Fund will distribute a large portion of any remaining profits to the Manager. These distributions to the Manager represent a distribution that will reward the Manager for establishing and managing the Fund and its assets and is not reliant upon making any capital contributions to the Fund. Manager's profit interest in the Fund may create an incentive for the Manager to make more speculative investments on behalf of the Fund than the Manager otherwise would make in the absence of such profit potential.

By the same token, the Manager has agreed to share a portion of the Fund profits with the Placement Agent. This sharing arrangement may reduce the Manager's incentive to maximize the Fund's investment performance and return to Investors. The Placement Agent will pay a portion of its distributions or profits interest, on a *pro rata* basis, to broker-dealer members of the Selling Group responsible for Investments. Investors are hereby advised that the payment of such incentive compensation, or even the possibility of such payment, may create an additional conflict

**Avoidance of Conflicts**

Neither the Manager nor any of its Affiliates may make any investment on behalf of a new pooled investment fund with investment objectives that are identical to those of the Fund until the earlier of: (a) the date on which at least 75% of the aggregate net Offering proceeds, after payment of commissions and fees and the setting aside of reserves, have been committed to or invested in Investments or (b) November 1, 2015. During the Offering Period, any investment that is presented to the Manager or its members or managing officers that the Manager believes is consistent with the investment objectives of the Fund and is otherwise suitable for the Fund, will be offered by the Manager to the Fund to the extent the Fund has funds available to make such Investments, net of reserves for the management fee and Fund expenses throughout the term of the Fund. For the avoidance of doubt, neither the Manager nor its members or managing officers will be required to offer to the Fund any real estate investment that is not consistent with the investment guidelines, investment objectives, and principles of the Fund or is otherwise not suitable for the Fund. Notwithstanding any provision to the contrary, the Fund and its Affiliates may engage in management and investment activities related to pre-existing Investments and activities or operations related to a successor fund.

# RISK FACTORS

As with all investments, investment in the Debentures is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment. In addition to the information set forth elsewhere in this Memorandum, you should consider the following risks before deciding whether to invest.

**Operation and Fund Risks**

*Our business prospects are difficult to predict because we are a newly organized entity.*

The Fund is a newly organized entity and does not have an operating history upon which Investors may base an evaluation of its likely performance. The Fund's results will depend upon the availability of suitable investment opportunities for the Fund and the performance of the Fund's Investments. Payment of the principal and interest on the Debentures is subordinated to the prior payment of certain Fund liabilities and expenses and other third party debt to institutional lenders. Before payments are made on the Debentures, the Fund must first pay any senior current liabilities and expenses, including principal and interest payments due on any third-party institutional debt. This includes fees payable to the Manager and its Affiliates.

*Investors must rely on the Manager to acquire appropriate Investments for the Fund's portfolio.*

The Fund is conducting the offering as a "blind pool," meaning that the Fund is proceeding to raise funds through the sale of the Debentures, without having specifically identified all Investments in which the Fund intends to invest. When you subscribe for Debentures, however, that subscription is binding upon you, and you will not have the right to revoke that subscription even if you do not approve of the Investments that the Fund subsequently identifies. You should not invest in the Fund, unless you are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum. The Fund may have limited access to financial information regarding the Investments, which may limit the Fund's ability to conduct comprehensive due diligence regarding the Investment and its likelihood of request.

*If the Fund is not as successful with the Offering as desired, it may not acquire as diversified a portfolio as is planned.*

The Fund does not know how many Investments it will be able to obtain. The number of Investments ultimately purchased will depend primarily upon the equity raised through the sale of the Debentures, the availability of suitable Investments, and the extent to which the Manager arranges for Investments to be held with co-investors. There is no certainty as to the number of Investments that the Fund will be ultimately be able to obtain and, since one of the Fund's objectives is diversification, no assurance can be given as to the Fund's achievement of that objective.

*Control is vested in the Manager; no Investor should purchase the Debentures unless such Investor is comfortable with the Manager's judgment and experience in running the Fund's affairs.*

Control over all decisions affecting the Fund, including decisions regarding the Investments that are to be made, will be made by the Manager. Many material decisions, such as the sale of assets, participation in mergers, consolidation and other restructurings, and the incurrence of third-party debt may be made by the Manager without separate concurrence from the Investors.

*The Manager's conflicts of interest may result in transactions unfavorable to the Fund.*

The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Fund, provided the terms are commercially reasonable. These measures may not fully protect the Fund against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Fund as they would have been if the transaction had been with unrelated third parties. Moreover, the Fund will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. See "CONFLICTS OF INTEREST." In addition, before the Fund invests all of its Investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager.

The Manager has the discretion to retain all or a portion of the proceeds from Investments to make new Investments. If the Manager were to take such action, this would place such investment returns at the risk of new investment opportunities and delay payments of the Payoff Premium to the Members.

*Without obtaining advice from your personal advisors, you may not be aware of the legal, tax or economic consequences of an investment in the Debentures.*

The Manager has not arranged for Investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Fund has performed such services for the Manager and has not acted as if it had been retained by the potential investors or the Members. You are not to construe the contents of this Memorandum or any prior or subsequent communication from the Manager, or its Affiliates or any professional associated with this Offering, as legal or tax advice. You should consult your own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability for you.

*The Fund will have limited or no control over the underlying Investments and must instead rely exclusively upon the skill, expertise and background of the persons controlling the Investments.*

The Fund expects to acquire preferred equity and, occasionally, debt interests in the Investments. Accordingly, the Fund will not likely have control over those Investments (except in certain circumstances relating to the Fund enforcing its creditor rights or contractual rights) and will be required to rely on the Project Partners of such Investments to use their skill, expertise and background to generate value from the Project Entities. Although the Fund routinely requires the Project Partners to grant a mortgage (deed of trust) or to pledge their equity interest in the Project Entity as collateral, there can be no assurance that in the event of a default by the members or managers of such Project Entity that the equity interest or real estate can be readily transferred to the Fund or that the Fund can obtain control of the Project Entity. There is a risk that courts or other governmental parties may oppose such transfers.

*The Fund may take over control and management of properties in which the Fund originally held a passive equity interest if the entity owning such property is in default (as defined in the entity's governing document). Such properties may entail additional risks and lower cash flow during the development period and the subsequent lease up or sale.*

The Fund may acquire a preferred equity position in entities in need of additional capital in order to meet debt service obligations, refinance existing debt or finish developing or renovating the underlying property. The Fund would not be in control of the day-to-day operations of the underlying company, but would have the ability to take control of the company in the event certain conditions were not maintained by the existing manager. Even though the Fund may take over management of the underlying property, it might not be a majority owner of the underlying property and its management authority may be restricted. In the event of default and subsequent acquisition of the underlying property, the Manager may underestimate the costs and time needed to effectuate necessary construction, renovations and repairs. This may present unexpected capital demands upon the Fund, and reduce the potential return on the Investment because of the additional capital needed to renovate the property. Development projects may take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent, lowering the property's cash flow potential. The costs of construction have increased dramatically during recent years and may continue to increase. Although the Manager will not undertake such projects without preparing detailed budgets, such budgets may understate the expenses.

*Markets in which the Fund is anticipated to invest are subject to a high degree of volatility and therefore the Fund's performance may be volatile.*

The Fund's business will involve a high degree of financial risk. Markets in which the Fund is anticipated to invest are subject to a high degree of volatility and therefore the Fund's performance may be volatile. There can be no assurance that the Fund's investment objective will be realized or that Investors will receive any Payoff Premium. The Fund may invest in various interests related to single, multi-unit and multifamily residential properties, including direct investments in such properties; debt instruments issued by entities owning such properties, which may or may not be collateralized by mortgages against such properties or the equity interests in the ownership entities; equity

interests, such as general and limited partnership and membership interests, in entities holding title to such properties, as well as interests to participate in the cash flow generated by such entities. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

***If the Fund were to acquire debt collateralized by residential properties suitable for investment, the Fund will be subject to a number of additional risks not present when investing directly in residential properties.***

The Fund has the authority to purchase debt collateralized by residential properties. If such collateralized debt is acquired, the Fund will be subject to the following risks:

(a)     The Manager's due diligence must cover not only an assessment of the value of the underlying collateral (since there is the possibility that the Fund will acquire title to the property in satisfaction of the debt), but also an assessment as to whether the Fund will take the debt free from the claims of others and whether the debtor has defenses that might be asserted to forestall or defend against the collection of the debt. To the extent possible, when acquiring debt, the Fund will try to make certain that it is a bona fide purchaser of the debt entitled to be treated as a "holder" in due course under the applicable Uniform Commercial Code.

(b)     The debtor may default in its obligations under the debt, forcing the Fund to institute collection actions and proceed against the underlying collateral in order to protect its investment. The Manager must, before proceeding with such acquisition, be comfortable that the risk reward profile of the Investment is favorable. Such an analysis will require the Manager to take into account the factors likely to impact the ultimate return on the Investment, including among others, the price at which the debt was acquired (whether and to what extent the debt is acquired at a discount to the outstanding principal), the likelihood of default, the stated principal and interest payments, an assessment of the underlying collateral value of the collateral, the possibility of competing claims to the debt itself or defenses that might be tendered by the debtor in a collection action, the likely costs and delays in proceeding against the collateral, the risk of a debtor bankruptcy proceedings and the presence of personal guaranties from creditworthy/solvent guarantors.

(c)     The Fund may encounter delays or difficulties in foreclosing upon its interest in the collateral if the debtor cannot pay the debt as and when it becomes due. Moreover, the Fund may incur substantial expenses in foreclosing upon the collateral or pursuing claims against the debtor and, if applicable, the guarantors of the debt. Such costs will increase the Fund's costs in the property, if the Fund subsequently acquires title to the property through foreclosure or a deed in lieu of foreclosure.

(d)     There is no assurance that the Fund will subsequently acquire title to the collateral property. The debtor may keep the debt current, cure prior events of default or arrange for the debt to be refinanced. Even in cases where the property is sold through a foreclosure sale, a third party may be prepared to outbid the Fund to purchase the collateral property. It would be customary for the Fund to submit as its bid the amount of the outstanding debt at foreclosure sale, but the Fund may not be prepared to bid more than that amount to win the property over other bidders. In those instances, where the Fund does not take title to the collateral, its return on investment will be determined by the terms of the promissory note and related collateral document (such as the deed of trust, mortgage, or other security agreement). The Fund's rate of return on such an investment may be determined by a number of factors, not the least of which is the price of which the debt was acquired. The investment's potential return will be significantly enhanced if the collateralized debt can be purchased at a deep discount to the then outstanding debt. Should that be the case, the Fund's return, even if the debt is subsequently retired, will be substantially greater than would have been the return of the debt in the hands of the originating lender.

(e)     The debtor may evoke the protection of the Federal Bankruptcy Code or similar state insolvency laws designed to protect the interests of insolvent borrowers. These protections are at the expense of the Fund as a creditor. Such actions may result in staying the Fund's foreclosure proceedings, restructuring of the debt terms, or otherwise delaying or interfering with the enforcement of the creditor's rights under the applicable security agreements. The Manager will need to balance such considerations before deciding

12

whether it is advisable to acquire the collateralized debt and, in particular, assess whether the price at which the debt is acquired (including the discount if any) is sufficient to compensate the Fund from the possible risks of delays, additional costs, and debt restructuring on less favorable terms to the creditor.

***Fees to Manager will be paid while interest and principal remain outstanding under the Debentures.***

Provided that an Event of Default has not occurred, fees payable to the Manager will be paid while interest and principal remain outstanding under the Debentures. The management fee is based on the outstanding principal balance of the Debentures. The Manager will receive such fees whether or not the Investments operate profitably. These fees (like other operating expenses) reduce the amount of cash that otherwise would be available for payment of the Payoff Premium. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES."

***Various factors could negatively impact the amount of net profits generated by the Fund during the Measurement Date (as defined in the Debenture Agreement); thereby reducing the Payoff Premium that may be paid to the Investors.***

(a)       At this stage, it is not known how much information, including financial information, the Fund will have available to review when conducting due diligence regarding potential Investments. The content and accessibility of such information will be determined by the manager of the respective Investment. While the Manager will not cause the Fund to make an investment in an Investment unless it has what it considers to be reasonable access to such information, the information may not be as comprehensive as the Manager would like. Moreover, neither the Manager nor the Fund will audit the affairs of the Investments and will rely upon the accuracy of the information provided to it regarding the Investments.

(b)       The Fund will obtain insurance policies for the Investments that are commercially prudent given the local market and circumstances of the Investment (typically including liability, fire and extended coverage). However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Investments should be partially or totally destroyed, the Fund may suffer a substantial loss of capital as well as profits. Even if the Fund's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Fund will sustain a substantial uninsured loss as a result of a fire or other casualty.

(c)       Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making an Investment, the Manager will undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation is expected to include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the Investment's site had environmental contamination not detected prior the Fund's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Fund undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Fund may incur environmental clean-up costs or be subject to liability exposure that may reduce the net profits of the Fund.

(d)       Under the Americans With Disabilities Act of 1990 ("***ADA***"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing Investments to allow disabled persons to access to such facility. Most of the Investments the Fund considers will likely be in compliance with the present access requirements. If, however, the Investments the Fund acquires were not in compliance with the ADA, the Fund will be required to make modifications to the Investments to bring them into compliance, or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

(e)     The real estate industry in general, and the multifamily residential sector in particular, are highly competitive, and the Fund will be competing with numerous other entities, some having substantially greater financial resources and experience than the Fund, in seeking attractive investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available Investments or resulting in other less favorable terms to the purchasers.

(f)     The investment returns available from equity investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could have a material adverse impact on the Fund's results of operations or financial condition. In addition, equity real estate investments are difficult to sell quickly and the Fund may not be able to adjust the Fund's portfolio of owned properties quickly in response to economic or other conditions. If the Fund's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Fund's income will be adversely affected.

**Private Offering and Liquidity Risks**

*This private placement of Debentures is being made in reliance on an exemption from registration requirements and there is no guarantee that it will comply with the regulatory requirements for such exemption.*

This private placement of Debentures will not be registered with the Securities and Exchange Commission. The Debentures are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to Investors meeting the investor suitability criteria set forth in this Memorandum. If the Fund should fail to comply with the exemption, Investors may have the right to rescind their purchases of Debentures. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Debentures will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Fund's assets to satisfy the claims of the claimants.

*This is a private offering and as such you will not have the benefit of review of this Memorandum by the SEC or other agency.*

Since this offering is a private placement of securities and, as such, is not registered under federal or state securities laws, you will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

*The limited liquidity of the Debentures may adversely affect your ability to transfer and pledge the Debentures.*

You must represent that you are purchasing the Debentures for your own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, encumber or otherwise dispose of your Debentures unless the Fund obtains an opinion or are otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Code or cause the Fund's termination under Section 708 of the Code. Accordingly, the Debentures may not be readily accepted as collateral for loans and you may not be able to liquidate your investment in the event of emergency or for any other reason, or may be able to liquidate your investment only at a substantial discount. See "TRANSFERABILITY OF THE DEBENTURES," and "U.S. FEDERAL INCOME TAX MATTERS."

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 9 Page 389

*Investments will be illiquid.*

The Fund expects its investments in the Investments to be illiquid. Accordingly, its returns on those investments will be dependent, and be outstanding, over the life time of the Investments. If the underlying assets in those Investments are held for long periods, the Investors will be compelled to wait until the underlying assets are sold, before being in a position to liquidate their investments. The Manager expects most of its Investments to have an investment time frame of 2 to 3 years. The Fund may have little or no control over when the underlying properties are liquidated.

## Tax Risks

*You are urged to consider the United States federal income tax consequences of owning the Debentures*

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to treat the Debentures for U.S. federal income tax purposes as contingent payment debt instruments subject to U.S. federal income tax rules applicable to contingent payment debt instruments. Under that treatment, if you are a U.S. Holder (as defined herein), you will be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by you in that year. You will recognize gain or loss on the sale, repurchase, exchange, conversion or redemption of a Debenture in an amount equal to the difference between the amount realized and your adjusted tax basis in the Debenture. Any gain recognized by you on the sale, repurchase, exchange, conversion or redemption of a Debenture generally will be treated as ordinary interest income and any loss will be treated as ordinary loss to the extent of the interest previously included in income and, thereafter, as capital loss. See "U.S. FEDERAL INCOME TAX MATTERS."

*Interest on Debentures Could be Characterized as Unrelated Business Taxable Income*

We intend to take the position that the Debentures should be classified as debt instruments for U.S. federal income tax purposes and both the stated interest and the Payoff Premium should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("*UBTI*") with respect to tax exempt Investors. However, there is no assurance that the IRS will agree with this position and it is possible that the debentures may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Debentures may be characterized as UBTI with respect to tax exempt Investors.

## PRIOR PERFORMANCE OF THE MANAGER AND ITS AFFILIATES

As a newly formed investment vehicle, the Fund has no operating or prior performance history. The information presented in this section represents the limited historical experience of the principals of the Manager and their Affiliates. Prospective investors in the Fund should not rely on the information below as being indicative of the types of investments the Fund may make or of the types of returns the Fund's Investments may generate. It should be understood that neither the Fund nor the Investors will have any interest in the properties described below. Prospective investors should not assume that the Fund will experience returns, if any, comparable to those described herein.

| Track Record | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property | Acquisition Date | Location | Total Invested Cash Equity | Project Cost | Exit Value | Exit Date | Net Gain to Cash Investors | ROE |
| **Acquisitions** | | | | | | | | |
| Belcera - 11 Unit Condos | 11/1/2006 | Bellevue, WA | $ 240,000 | $ 3,029,612 | $ 3,120,150 | 11/12/2008 | $ 90,538 | 38% |
| Ambaum - 45 Unit Condos | 11/1/2007 | Burien, WA | $ 200,000 | $ 8,511,377 | $ 5,946,368 | 11/1/2010 | $ 20,000 | 10% |
| Oceanaire - Single Family Rental | 8/27/2010 | Pacific Beach, WA | $ 650,000 | $ 1,290,874 | $ 1,695,000 | 12/31/2010 | $ 404,126 | 62% |
| Front Street Townhomes - 9 Unit Townhome | 6/15/2010 | Pacific Beach, WA | $ 75,000 | $ 1,134,000 | $ 1,134,000 | 9/27/2012 | $ 27,000 | 36% |
| Ashton/Ryegate - 126 Unit Apartment | 12/31/2012 | Ellensburg, WA | $ 50,000 | $ 1,766,107 | $ 2,059,702 | 6/3/2013 | $ 293,595 | 587% |
| | | | | | | | | |
| **Construction** | | | | | | | | |
| Madeline Woods - 60 Single Family Duplexes | 1/1/2009 | Bremerton, WA | $ 650,000 | $ 9,531,118 | $ 10,878,210 | 3/1/2011 | $ 775,225 | 119% |
| Mill Terrace - 12 Single Family Homes | 1/1/2010 | Bothell, WA | $ 500,000 | $ 2,430,000 | $ 3,012,642 | 7/1/2010 | $ 486,142 | 97% |
| McRea - Single Family Home* | 2/1/2011 | Elma, WA | N/A | $ 160,000 | $ 240,000 | 7/1/2011 | $ 80,000 | 50% |
| Parker - Single Family Home* | 3/15/2011 | Bellevue, WA | N/A | $ 550,000 | $ 1,000,000 | 9/15/2011 | $ 450,000 | 82% |
| Snelling - Single Family Home* | 8/3/2010 | Bonney Lake, WA | N/A | $ 165,000 | $ 230,000 | 12/15/2011 | $ 65,000 | 39% |

* ROE calculated using total project cost as equity component

YOU SHOULD RECOGNIZE THAT BY PURCHASING DEBENTURES IN THE FUND YOU WILL NOT THEREBY ACQUIRE ANY OWNERSHIP INTEREST IN ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. YOU SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES IS GIVEN SOLELY TO ALLOW YOU TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. YOU SHOULD NOT ASSUME THAT THE INVESTORS IN THIS OFFERING WILL EXPERIENCE RETURNS, IF ANY, ON THEIR INVESTMENTS SIMILAR TO THOSE EXPERIENCED BY INVESTORS IN THE PRIOR PROGRAMS SPONSORED BY THE MANAGER AND ITS AFFILIATES.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 91 Page 391

# MANAGEMENT OF THE FUND

**General**

The management and supervision of the Fund is vested exclusively in the Manager (including its duly appointed agents), and the Manager (and its duly appointed agents) shall have full control over the business and affairs of the Fund. Subject to the terms of this Agreement, the Manager shall have the power on behalf and in the name of the Fund to carry out any and all of the objects and purposes of the Fund and to perform all acts and enter into and perform all contracts and other undertakings that the Manager, in its sole discretion, deems necessary or advisable or incidental thereto.

You will have no right to participate in the management and control of the Fund and will have no voice in its affairs except for certain limited matters which may be submitted to a vote of the Members under the terms of the Debenture Agreement. The Members must rely upon the judgment and experience of the Manager to manage the Fund.

**The Fund's Manager**

The Fund has selected iCap Pacific NW Management, LLC, a Washington limited liability company solely owned by Chris Christensen, to serve as its Manager. For its services, the Manager will receive an annual management fee as described elsewhere in this Memorandum. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES." In addition, the Fund will reimburse the Manager for any Fund expenses that are borne by the Manager on behalf of the Fund; provided, however, that the Manager will not be reimbursed for initial organizational and offering expenses which are less than $500,000.

**Affiliates of the Manager**

The Fund has two affiliated companies specializing in the acquisition and development of real estate properties: Altius Development, Inc., which is solely owned by Chris Christensen, and Edge Construction, LLC, which is solely owned by Altius Development, Inc. Altius was formed in 2007 and has completed a number of projects in areas of condos, multi-family and single family subdivisions. Edge Construction was formed in 2007 and has been involved in the construction of condos, multi-family, single family subdivisions, remodels, commercial structures and a number of custom homes. Additionally, Chris Christensen is the principal attorney and owner of Altius Legal, PLLC, a law firm specializing in business and real estate law. Each of these Affiliates may provide services to the Fund and may provide additional exit strategies at predetermined rates where needed. See "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES—Compensation Rates of Affiliates" for the fee rates of these Affiliates.

**Key Executives of Manager**

Certain biographical information regarding some of the key members of the Manager's senior management team is summarized below.

**Chris Christensen – President**. Prior to forming the Fund, Mr. Christensen formed Altius Development, its subsidiary construction company, Edge Construction, and Altius Legal, PLLC. Mr. Christensen has also advised numerous lenders, developers, and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection, as well as the use of funds in their businesses. He has structured and completed numerous real estate transactions. Mr. Christensen is 37 and holds a J.D. from Seattle University School of Law, a Master's Degree in International Business from Seattle University and a Bachelor of Arts Degree from the University of Utah, and is the brother of Mike and Jim Christensen.

**Michael ("Mike") Christensen – Chief Investment Officer**. Prior to joining the Fund team, Mike was the founder and Managing Director of Vision Ventures Capital & Consulting, LLC, a venture capital firm headquartered in Utah providing consulting with regard to capital raises and corporate financial matters. Mike and his team managed the Dixie Angel Investor group, in addition to a debt fund consisting of pooled money from local banks. Prior to founding Vision Ventures, Mike worked at the Utah Fund of Funds on a small team managing a $300,000,000 fund. Mike is 32, holds an M.B.A. from Pepperdine Graziadio School of Business Management, a Master of Dispute Resolution from Pepperdine University School of Law, and a Bachelor of Arts Degree from the University of Utah, and is the brother of Chris and Jim Christensen.

17

**Jim Christensen - Chief Operating Officer**.  Prior to his role at iCap Equity, Jim was the Chief Operating Officer at Altius Development, Inc., where he managed all aspects of construction, development, finance, and risk control of multifamily, residential, and commercial real estate projects throughout Washington state. While at Altius Development, Jim managed over $30 million in development projects and also consulted property owners on the strategy, finance, and execution of the development of their properties. He has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting, and legal structuring. Jim is 29, holds a Bachelor of Arts Degree from the University of Washington, and is the brother of Chris and Mike Christensen.

**Bryan Brown – Vice President, Construction**. In addition to Mr. Brown's role at the Manager, he is the president of Edge Construction,. Mr. Brown is 37 and has 18 years of experience in new home construction, multifamily construction, and commercial construction. He has built over 1,500 structures. Mr. Brown has trained many construction managers and superintendents. He will perform due diligence, construction management, and budget monitoring for the Fund's Investments.

**Miscellaneous**

The Manager and its Affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding. In addition, the Fund and the Manager have never been involved in or subject to any pending litigation or claims.

18

## DESCRIPTION OF THE BUSINESS

The Fund has been formed to invest in real estate opportunities in the Pacific Northwest. The Fund may also acquire real estate directly, as well as debt instruments in other real estate companies. The target investment properties include single and multi-unit residential properties, multi-family residential projects, commercial properties and land acquired for entitlement purposes.

### Market Opportunity

#### *Demand for Equity*

Virtually all real estate transactions require an equity investment in order to obtain lender financing. The recent economic downturn has further increased the demand for equity investment in real estate transactions. This need is the result of banks and other real estate lenders tightening their lending criteria. Several years ago lenders routinely loaned up to 90% of a project's bulk value or 80% of retail value. Now they are commonly lending no more than 65-70% of a project's cost and



are requiring the Project Partner to supply the remainder of the money to complete a project. Thirty percent of US banks said their standards for commercial real estate loans are the tightest they have been in six years, while another 37% said that their standards are only slightly easier than their tightest in that same period, according to a Federal Reserve survey of senior bank loan officers (Federal Reserve, http://www.federalreserve.gov/boarddocs/snloansurvey/).

In the past two years 80% of banks have reported a stronger demand for real estate loans, while lending volume has decreased by over $4 trillion nationally (Federal Reserve Bank of St. Louis). Most real estate developers and builders have been severely affected by the economic downturn and may not have the necessary capital to complete attractive real estate projects. As a result of their not having the necessary capital, a funding gap exists that results in short-term and long-term investment opportunities for the Fund.

#### *Capitalizing on the Market Opportunity*

The Fund's business model is designed to fill the funding gap between lenders, on the one hand, and developers or builders ("**Project Partners**"), on the other hand, by providing the additional cash equity needed for real estate projects. The primary difference between the Fund and other equity investors is that the Fund maintains control of each Project Entity.

The Fund's business model is attractive to banks and other lenders because the Fund brings an additional assurance to lenders that they will be repaid through the Fund's and its Affiliates' efforts. Local lenders screen hundreds of potential projects and perform much of the upfront due diligence required to put a project together. For example, a lender who has approved a Project Partner on a loan for a project that the lender likes, will have already performed the appraisal, background checks, financial analysis, and other items for the loan to be approved. The Fund can then review the due diligence file prepared by the lender and then begin its own due diligence process. After reviewing the lender's due diligence file and completing its own due diligence process, the Fund will negotiate an investment structure with the Project Partner. The investment with the Project Partner will be structured in a way that requires a priority return of the Fund's original investment plus a share of the profits. The Fund will then provide the funds needed to meet the cash requirement under the loan. Recently, many banks have reported that they have more cash to lend than ever before; however, they commonly state that there are not enough borrowers capable of qualifying for loans under their new guidelines. This situation is generally the result of low liquidity on the part of the borrower, which can be met by the Fund.

We believe the Fund provides a needed service to developers and builders. Most developers and builders who could not otherwise finance a real estate project without additional cash are willing to agree to the Fund's guidelines and

19

investment criteria. From the Project Partners' (developers and builders) point of view, she, he or it would rather agree to give a share of a project's profits to the Fund and have the chance to earn a smaller profit for himself, herself or itself than to miss the opportunities altogether.

### *Market Opportunity's Longevity*

Many investors seek to take advantage of the short-term opportunities that have arisen from banks needing to liquidate assets at low prices but do not have the capital or relationships to fund the opportunities. The Fund's investment strategy allows it to participate in both short-term and long-term opportunities. For example, the Fund's business model allows it to provide the necessary capital for a Project Partner to acquire bank owned assets now (a short-term opportunity). The Fund will also provide funding for future projects by Project Partners who need cash to meet the revised lending criteria of banks (a long-term opportunity). In both scenarios, the Fund structures its investments such that the Project Partner and its guarantors bear most of the economic risk, while the Fund gets a priority return of its original investment and shares in the profits of the Project Entity and maintains control of the exit strategy.

## Target Market: Pacific Northwest

The Seattle-Tacoma-Bellevue Metro Area is the third strongest regional economy in the United States[1]. This region contains nearly 65% of the 6.8 million people living in Washington and a majority of manufacturing, research, and technology jobs generated by some of the most stable companies in the world. With several Fortune 500 companies headquartered in the Puget Sound Region, the job growth rate is more than double that of the United States, with a large number of jobs requiring well-educated labor where employees are highly paid, such as aerospace, technology, and life sciences. A projected 4.4% wage growth for adults 18-29 years old[2] makes the Puget Sound region appealing to young professionals, which in return increases the demand across all sectors of real estate development. Below are some of the regional employment and housing statistics:



- Aerospace: 85,000 currently employed at an average wage of $80,000 with an expected 5% industry growth rate for the next 10 years.
- Technology: 70,000 currently employed at an average wage of $90,000 with an expected 12% job growth rate over next 5 years.
- Life Sciences: 33,500 currently employed at a median wage of $88,000 with an expected 10% job growth rate over the next 5 years.[3]

## Regional Housing Demand

- Seasonally adjusted average home prices rose 12% from $335,089 in Q3 of 2012 to $375,300 in 2013.
- Total housing inventory has decreased an average of 22% quarterly from a year ago for 2013.

---

[1] www.policom.com

[2] www.payscale.com

[3] www.researchcouncil.org

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 95 Page 395

- The Case-Shiller Index has risen 19% from January 2012 to August 2013, indicating a trend in rising home prices independent of home quality changes.
- Five years of pent up demand, affordability, rising home prices, and an improved economy all bode well for the construction and real estate sector in the region.

The Fund will focus its Investments in three types of properties: multi-family (condos and apartments), residential, and commercial. Given that the Fund and its Affiliates are based in the Seattle-Tacoma area, the Fund will primarily invest in Project Entities located in western Washington. The Seattle-area economy has been among the most resilient economies in the country during the recession.

### Market Segment

More than 88% of U.S. commercial real estate transactions are less than $5 million in size.[4] Nevertheless, fewer than 5% of private equity firms invest in transactions that are less than $5 million. There is a $16 billion funding gap that exists today in these smaller transactions, which has been widened by the recent recession.[5] As a result of tightened lending standards, namely more rigid loan-to-cost requirements, many builders and property owners are unable to secure the necessary capital to complete projects. The Fund provides the equity piece (i.e. the gap funding) that enables builders and property owners to secure capital for the completion of their projects.





### Investment Focus and Structure

The Fund intends to focus its investments on new construction properties and income-producing properties located in the Pacific Northwest and to seek projects in which Fund's investments can be repaid within six (6) to 18 months after acquisition. Affiliates of the Fund will add value through legal, development, or construction services, as needed.

Projects are sourced primarily through private lenders, banks, brokers, and property owners. The Manager has existing relationships with various banks and private lenders that are attempting to dispose of Real Estate Owned (REO) properties. A bank will often contact the Manager as they know that the Fund is interested in these types of investment opportunities. A second source of projects is developers and builders. The Manager works with those developers that have quality projects and who are in need of cash so that the developer can have all of the required equity in place prior to approaching the bank for a loan. Specific examples of types of investments the Fund may target include the following:

### *Equity Investments*

An equity investment for the Fund involves the purchase of an ownership position in a Project Entity. An example of this type of investment might be a developer who desires to obtain a loan from a bank to build an apartment building. In the typical situation, the bank's lending guidelines will limit the loan amount to 70% of the construction costs, requiring the developer to pay for the remainder of the construction costs with cash. In this instance, the developer would supply as much cash as he, she or it had, and the Fund would fill the gap in exchange for a priority return of its original investment plus a portion of ownership (and profits) of the Project Entity.

---

[4] ³http://www.corelogic.com/landing-pages/commercial-real-estate-data-and-analytic-capabilities.aspx

[5] ⁴Federal Reserve, http://www.federalreserve.gov/boarddocs/snloansurvey/

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 96 Page 396

The Project Entity LLC Agreement will be structured first to provide a preferred return, followed by a priority repayment of the Fund's capital investment and then a share of the profits in the Project Entity. For example, if the Fund were to invest $100,000 into a project, the Fund would be entitled to a priority repayment of the $100,000, plus interest, and would further be given a share of the profits in the development entity. The Fund's legal agreements with the Project Partner will provide for the Investment in each project to be repaid as soon as possible, but generally no later than 12 months from the time of the Fund's Investment. This structure allows the Fund to re-invest the returned capital received from Project Entities, while continuing to maintain a share of the profits. Failure of the Project Partner to perform on the terms of the Fund's financing, or failure to adequately perform its contractual obligations to the Project Entity, would result in the Fund receiving a larger share of the profits or the ability to take control of the Project Entity and the Project Partner's interest thereto. Such failure will also permit the Fund to demand the return of its investment in the Project Entity.

### Cash Acquisitions

Many current real estate opportunities can be found by buying properties from banks or property owners. Quite frequently, banks and other lending institutions are required by the FDIC to liquidate properties they own in order to meet mandatory ratio requirements with regard to their loans and deposits. This situation often requires lenders to sell their REO properties very quickly, often at discounts. The Fund has a growing network of relationships with lenders who are willing to sell their properties to private parties in off-market transactions before listing them for sale to the general public. The Fund will utilize this network to position itself to purchase properties that meet management's approval. Once an REO asset is acquired from a lender at a discount, the Fund has the option of either selling the property immediately or adding value to the property through entitlement, development, construction, or any combination of these things. Then, depending on market demand, the developed parcels or structures could be sold. In these instances, the Fund would acquire such properties through a wholly-owned special purpose entity and may engage the Manager's Affiliates to perform the value-added work.

### Loans

In the event the Fund makes loans, it will do so in exchange for a first position mortgage (deed of trust) on the underlying property. These loans will typically be underwritten to ensure that the loan is no more than 80% of the property's value. The loans are intended to be short-term loans to be repaid in less than 15 months. The Fund may also provide additional cash as an equity investment to those borrowers. Additionally, the Fund may purchase existing loans from lenders at a discount. In that case, the fund will receive interest payments until the loan is sold or paid off.

### Acquisition of Bank Notes

A number of banks are in a position where they need to divest portions of their loan portfolios in order to comply with various FDIC requirements. The Fund believes it is in a position to opportunistically step in and acquire such bank notes at a discount.

### Other Investments

The Manager may pursue other investment opportunities so long as they are believed to have attractive yield potential.

## Legal Structure of Projects

Each Project Entity will be organized as a new limited liability company with assets consisting of the real property and any fixtures and improvements relating to the same. This organizational structure allows the Fund to limit potential liabilities that may come from unrelated matters of the Project Partner and provides protective measures for the Fund. Unlike traditional real estate investment vehicles, in which the real estate itself serves as the primary or only source of collateral, the Fund will also secure the return of its investment in the Project Entity with the Project Partner's equity interest in the Project Entity. Thus, in addition to recording second position or sometimes first position mortgage (deed of trust) against the property to secure the return of the Fund's investment in the Project Entity, the Project Partner must also pledge his, her or its equity interest in the Project Entity to the Fund. The Fund will be entitled to foreclose against this pledge or exercise its contractual rights under the governing documents of the

Project Entity in the event of the Project Partner's failure to meet the performance obligations it has contractually agreed to. The Fund believes these measures will help ensure the project is completed on time and on budget. In order for the Fund to invest in and form a Project Entity, the Project Partner must contractually agree to:

- Pay all subcontractors, vendors, or service providers of the Project Entity when due;
- File tax returns and pay taxes when due;
- Generate any other report due to government authorities or to the members of the Project Entity when requested or when due;
- Obtain approval from the Fund before incurring expenses that are not included in, or which exceed the line items of, the budget of the project that will be agreed to by the Fund;
- Prohibit any lien, security interest, or other encumbrance to be filed or recorded against any property owned by the Project Entity which has not been previously approved by the Fund;
- Obtain and maintain all permits or licenses, necessary to the operation or development of the Project Entity;
- Meet the project milestones and timelines to be set forth in the Project Entity LLC Agreement;
- Maintain property sale prices or rents within 5% of the values set forth in the Project Entity governing documents unless consent is first obtained from the Fund;
- Maintain financial solvency of the Project Partner or any entity owned by the Project Partner;
- Avoid litigation, disputes, arbitration, or violation of any law or ordinance;
- Do not enter into any agreement on behalf of the Project Entity, the terms of which in the reasonable determination of the Fund manager are likely to reduce the Project Entity's profits;
- Meet with the Fund manager monthly; maintain and produce accurate books and records; and deliver the documents or reports requested by the Fund;
- Maintain adequate insurance for the project or for any affiliate thereof performing work on the project;
- Deliver copies of any notices received by the project manager; and
- Do not encumber, hypothecate, or pledge as collateral, or attempt to encumber, hypothecate, or pledge as collateral, any interest of the Project Entity contrary to the provisions of the Project Entity LLC Agreement or without the prior written consent of the Fund Manager.

**Identifying and Monitoring Investments**

The Fund's due diligence process typically starts with a phone call from a bank, broker or builder and is followed by phases of review, which serve to eliminate those projects that do not meet the Fund's investment criteria. The due diligence process encompasses a methodical and comprehensive review of material elements pertaining to the specific project in question and the real estate market in general. The Fund will consider whether to fund a project based on the following investment criteria:

### *Location of property*

Each Fund investment must fall within an approved geographic area. Due to the strength and diversity of the Pacific Northwest economy, the Fund is currently investing in projects located in the Greater Puget Sound area.

### *Strength of Exit*

Prior to funding a project, the Fund will establish multiple potential exit strategies, thus generating multiple avenues for providing returns to the Company. The strength of an exit is determined by the number of exits available, current market conditions, available take out finance options, and/or the sponsor's ability to refinance. Current market conditions are assessed based on supply and demand of the type of finished products and their locations.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 3 Page 398

### CLTV less than 80%

Combined loan to value ("**CLTV**") is a ratio used by the Fund to determine the downside risk on each prospective project. It is calculated by taking the sum of the Fund's investment and the first mortgage loan and dividing it by the anticipated value of the property at the completion of the project. The Fund will not finance any amount above the total cost of the project and will not invest in projects whose CLTV exceeds 80%.

### Timing of exit

The Fund invests into projects that will exit in 18 months or less, and preferably 12-months or less. This relatively short investment period is important to minimize changing market conditions. In the event that market conditions change, the Fund is able to adjust the exit strategy quickly to take advantage of every opportunity available.

### Background of the sponsor and their ability to complete the project

Each prospective Project Partner is required to provide a resume, financial statement, a list of current and past projects as well as attend a face-to-face meeting. Through this process the Fund is able to measure the character of each Project Partner and his, her or its ability to execute a project.

### Cash invested by sponsor

Aligning the interests of the Project Partner with those of the Fund is an important goal of the Company. The Fund will require each Project Partner to make a cash contribution into the project. This investment of capital by a Project Partner is returned only after the Fund receives its return of principal investment and a predetermined preferred return. The amount required to be contributed by a Project Partner will be determined on a case-by-case basis, including conditions of the project and the capability of the Project Sponsor.

### Signed Letter of Intent ("LOI")

Prior to investing in a project, the Fund will issue an LOI, outlining the investment terms and anticipated returns. Before proceeding with the due diligence, the Fund will require a signed LOI from the Project Partner, which will usually be accompanied by a nonrefundable due diligence deposit of no more than $5,000.

Assuming that the maximum amount of this Offering is raised, the Fund expects to have between 75 – 100 Investments over the life of the Fund, none of which will, individually, be in an amount greater than 10% of the gross Offering proceeds received by the Fund as of the closing date of such Investment. In addition, no more than 15% of the gross Offering proceeds will be invested in projects in which there is no Project Partner (i.e. projects in which the Fund will effectively act as developer). The Fund expects to have 40 to 60 Investments under management at any given time. Additionally, prior to making an Investment, the Fund identifies multiple exit strategies, thus identifying multiple avenues for providing returns to the Fund. The Fund expects most Investments to range in size between $250,000 and $1,500,000.

Once an Investment is made, the Manager will hold monthly meetings with the respective Project Partner to update all documentation, gather information, offer advice, and maintain familiarity with the Investment. The Fund believes this steady supervision will help Fund management track each project's progress and allows for a more seamless transition if the Project Partner fails to meet the Fund's requirements. In the event the Fund needs to step in to protect the Investment, the Project Entity may engage the Manager's Affiliates to perform the work at the predetermined rates. <u>See</u> "COMPENSATION AND FEES TO THE MANAGER AND AFFILIATES: Compensation Rates of Affiliates."

24

## U.S. FEDERAL INCOME TAX MATTERS

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF FEDERAL TAX CONSEQUENCES CONTAINED OR REFERRED TO IN THIS MEMORANDUM WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY DEBENTURE HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE CODE; (II) SUCH DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (III) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### Introduction

The following is a general discussion of the material U.S. federal income tax considerations relating to the purchase, ownership and disposition of the Debentures.

This discussion is based on currently existing provisions of the Code, existing, temporary and proposed Treasury regulations promulgated thereunder, and administrative and judicial interpretations thereof, all as in effect or proposed on the date hereof and all of which are subject to change, possibly with retroactive effect, or different interpretations. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum. We have not sought and will not seek any rulings from the Internal Revenue Service with respect to the statements made and the conclusions reached in the following summary, and accordingly, there can be no assurance that the Internal Revenue Service will not successfully challenge the tax consequences described below.

This discussion only applies to U.S. Holders (as defined below) and is limited to the tax consequences to U.S. Holders that are original beneficial owners of the Debentures, that purchased Debentures at their original issue price for cash, and that hold such Debentures as capital assets within the meaning of Section 1221 of the Code.

This discussion is for general information only and does not address all of the tax consequences that may be relevant to you in light of your personal circumstances. Furthermore, this summary does not discuss the tax consequences of an investment in Debentures by certain investors that are subject to special tax rules, such as U.S. Holders having a functional currency other than the U.S. dollar, persons subject to special rules applicable to former citizens and residents of the U.S., certain financial institutions, persons subject to the alternative minimum tax, grantor trusts, real estate investment trusts, insurance companies, tax-exempt entities, dealers in securities or currencies, persons holding the Debentures in connection with a hedging transaction, straddle, conversion transaction or other integrated transaction, pension funds, partners in partnerships or owners of interests in entities treated as partnerships under U.S. federal income tax laws, corporations treated as personal holding companies, or non-U.S. Holders (which include any holders of the Debentures, other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes, that is not a U.S. Holders). This discussion also does not discuss the effect of any state, local, foreign or other tax laws or any U.S. federal estate, gift or alternative minimum tax considerations.

This summary is of a general nature and is not intended as legal or tax advice to prospective investors. Accordingly, you are urged to consult your own tax advisors as to the particular tax consequences to you of your participation in the offering and your ownership and disposition of the Debentures, including the applicability of any U.S. federal tax laws or any state, local or foreign tax laws or any treaty, and any changes (or proposed changes) in applicable tax laws or interpretations thereof.

### Considerations Relating to U.S. Holders of the Debentures

As used herein, the term "***U.S. Holder***" means a beneficial owner of a Debenture that is, for U.S. federal income tax purposes:

- an individual citizen or resident of the U.S.;

- a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- an estate whose income is includible in gross income for U.S. federal income tax purposes, regardless of its source; or

- a trust that either is subject to the supervision of a court within the United States and has one or more U.S. persons with authority to control all of its substantial decisions, or has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership holds Debentures, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A holder of Debentures that is a partnership and the partners in such a partnership should consult their tax advisors.

### Classification of the Debentures

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to treat the Debentures, for U.S. federal income tax purposes, as debt instruments. Holders should be aware, however, that the IRS is not bound by the Fund's determination that the Debentures constitute debt for U.S. federal income tax purposes. The IRS could take the position, for example, that the Payoff Premium should be treated as a separate instrument and classified as equity. If any portion of the Debentures is not treated as indebtedness, the timing and character of income, gain, or loss recognized in respect of a Debenture could differ from the timing and character of income, gain or loss recognized in respect of the Debentures described below. The remainder of this discussion assumes that the Debentures will be treated as indebtedness in accordance with that agreement and our determination.

### Interest Income

Holders of the Debentures will be required to report original issue discount ("*OID*") over the term of the Debentures under Treasury Regulations that govern "contingent payment debt instruments" (the "*CPDI Regulations*"). The Debentures will be subject to the CPDI Regulations because they provide for the payment of the Payoff Premium, which is contingent on the net profits of the Fund. The reporting of OID under the CPDI Regulations will be the exclusive method of reporting interest income under the Debentures, including the interest payments required by the Debentures.

Under the CPDI Regulations, each Investor generally will be required to report interest income on the Debentures each year in an amount equal to the OID that accrues each year, regardless of whether such Investor uses the cash or accrual method of tax accounting. The amount of each year's accrual will be calculated under a method that takes into account (in the manner specified below) a portion of our projection of the Payoff Premium. Consequently, an Investor will be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by such Investor in that year.

Under the CPDI Regulations, the amount of OID on a Debenture that is allocable to each annual accrual period will be the product of the "adjusted issue price" of the Debenture as of the beginning of each such annual period and the "comparable yield" for the Debentures. The "adjusted issue price" of a Debenture on any particular date is its "issue price" (i.e., the first price at which a substantial amount of the Debentures is sold to investors), increased by any interest income previously accrued (determined without regard to any adjustments to interest accruals described in "Adjustments to Interest Accruals on the Debentures" below), and decreased by the amount of any non-contingent payments previously made and the projected amount of any contingent payments scheduled to be made on the Debenture through the date on which the adjusted issue price is being calculated (i.e., without regard to the actual amount of the contingent payments made).

Under the CPDI Regulations, the Fund is required to establish the "comparable yield" for the Debentures. The comparable yield for the Debentures is the annual yield we would incur, as of the initial issue date, on a fixed rate nonconvertible debt instrument with no contingent payments, but with terms and conditions otherwise comparable to those of the Debentures. Accordingly, the Fund has determined the comparable yield to be 12% compounded annually.

26

The Fund is required to provide to Investor, solely for U.S. federal income tax purposes, a schedule of the projected amounts of all payments required to be made on the Debentures (including the Payoff Premium). This schedule must include a projected amount of Payoff Premium sufficient to cause the yield on the Debentures to equal the comparable yield. The Fund's determination of the projected payment schedule for the Debentures, including the monthly interest payments and an estimate of the timing of payment and amount of the Payoff Premium, is below.

| Projected Payment Schedule Per $100,000 of Debentures | | | | |
|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 |
| January | $1,000 | $1,000 | $1,000 | $0 |
| February | $1,000 | $1,000 | $1,000 | $0 |
| March | $1,000 | $1,000 | $1,000 | $0 |
| April | $1,000 | $1,000 | $1,000 | $0 |
| May | $1,000 | $1,000 | $1,000 | $0 |
| June | $1,000 | $1,000 | $1,000 | $0 |
| July | $1,000 | $1,000 | $1,000 | $0 |
| August | $1,000 | $1,000 | $1,000 | $0 |
| September | $1,000 | $1,000 | $1,000 | $0 |
| October | $1,000 | $1,000 | $1,000 | $0 |
| November | $1,000 | $1,000 | $1,000 | $0 |
| December | $1,000 | $1,000 | $1,000 | $0 |

Pursuant to the terms of the Debenture Agreement, the Fund and each holder of Debentures will agree to be bound by the Fund's application of the CPDI Regulations to the Debentures, including our determination of comparable yield and the related "projected payment schedule" set forth above). The comparable yield and the projected payment schedule are solely for purposes of determining your (and the Fund's) interest accruals and adjustments thereof in respect of the Debentures for U.S. federal income tax purposes and do not constitute a projection or representation regarding the actual amounts payable to you with respect to the Debentures.

**Adjustments to Interest Accruals on the Debentures**

If Investor receives actual payments of Payoff Premium with respect to the Debentures in a tax year in excess of the total amount of projected payments of Payoff Premium for that tax year, Investor will have a "net positive adjustment" equal to the amount of such excess. Investor will be required to treat the "net positive adjustment" as additional interest income for the tax year.

If you receive actual payments of Payoff Premium with respect to the Debentures in a tax year that in the aggregate are less than the amount of the projected payments of Payoff Premium for that tax year, Investor will have a "net negative adjustment" equal to the amount of such deficit. This adjustment will be applied to reduce Investor's interest income on the Debentures for that tax year, and any remainder will give rise to an ordinary loss to the extent of Investor's interest income on the Debentures during prior tax years, reduced to the extent such interest income was offset by prior net negative adjustments, if any. Any negative adjustment in excess of the amounts described in the

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 02 Page 402

preceding sentence will be carried forward to offset future interest income in respect of the Debentures or to reduce the amount realized upon a sale, exchange, repurchase or redemption of the Debentures.

**Sale, retirement or disposition of Debentures**

Upon the sale, retirement or other disposition of a Debenture, Investor generally will recognize taxable gain or loss equal to the difference between the amount realized on the disposition and Investor's adjusted tax basis in the Debenture. A U.S. Holder's adjusted tax basis in a Debenture generally will be equal to its adjusted issue price (as described above) in the Debenture. Gain recognized on the disposition of a Debenture generally will be treated as additional ordinary interest income. Any loss recognized on the disposition of a Debenture generally will be treated as an ordinary loss to the extent of the excess of previous interest inclusions over the total net negative adjustments previously taken into account as ordinary loss, and thereafter, as capital loss (which will be long-term if, at the time of such disposition, your holding period for the Debenture is more than one year). The deductibility of capital losses is subject to limitations.

**Backup withholding and information reporting**

Information reporting requirements generally will apply to payments of interest (including any amounts treated as interest pursuant to the CPDI Regulations) made by the Fund on, or the proceeds of the sale or other disposition prior to maturity of, the Debentures. Backup withholding tax, currently at a rate of 28%, may apply to such payments if Investor fails to:

- furnish his, her or its taxpayer identification number (social security or employer identification number);
- certify that such number is correct;
- certify that he, she or it is not subject to backup withholding; or
- otherwise comply with the applicable requirements of the backup withholding rules.

Certain U.S. Holders are not subject to backup withholding and information reporting requirements. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to Investor generally will be allowed as a credit against Investor's U.S. federal income tax liability and may entitle Investor to a refund, *provided* that the required information is furnished timely to the Internal Revenue Service (the "***IRS***").

<div align="center">

**ERISA MATTERS**

</div>

**Benefit Plan Investor Considerations**

The Debentures offered in the Offering may be purchased and held by an employee benefit plan subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or an individual retirement account ("***IRA***") or other plan subject to Section 4975 of the Code or by a plan or other arrangement subject to provisions of federal, state, local, or non-U.S. law substantially similar to such provisions of ERISA and the Code "***Similar Law***"). A fiduciary of an employee benefit plan must determine that the purchase and holding of a Debenture is consistent with its fiduciary duties under ERISA or other applicable law. The fiduciary of an ERISA plan, as well as any other prospective Investor subject to Section 4975 of the Code (including, without limitation, IRAs) or any Similar Law, must also determine that its purchase and holding of Debentures offered hereby does not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (including, without limitation, the prohibition against the lending of money or other extension of credit between a plan or IRA that is subject to either such section and a "party in interest" as defined in Section 3(14) of ERISA, or "disqualified person," as defined in Section 4975(e)(7) of the Code) or violate any Similar Law. Each purchaser and transferee of a Debenture offered hereby who is subject to ERISA or Section 4975 of the Code or any Similar Law will be deemed to have represented by its acquisition and holding of such Debenture that its acquisition and holding of the Debenture does not constitute or give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or violate any Similar Law.

# GLOSSARY

To understand the rights associated with the Debentures, Investor must review carefully the defined terms used in this Memorandum. Some of these definitions are set forth in this "GLOSSARY" and others in the body of this Memorandum. These definitions (some of which have been slightly modified) have been taken from the Debenture Agreement, which defines the preferences, privileges, rights, interests and obligations of the Debentures. Many of these definitions are technical in nature, involve complicated relationships, and can only be understood by reference to other defined terms and, in some cases, to other provisions of the Debenture Agreement. Section references in the definitions refer to sections in the Debenture Agreement. Prospective investors should understand that the definitions in the Debenture Agreement will, for all purposes, be controlling, notwithstanding any simplification of such definitions in this Memorandum. Moreover, you should bear in mind that this GLOSSARY does not include many of the definitions included in the Debenture Agreement.

"*Act*" means the Securities Act of 1933, 15 U.S.C. § 15b et seq., as amended.

"*Affiliate*" of any specified Person means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with such specified Person. For purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or the corresponding provisions of any succeeding law.

"*CLTV*" means the combined loan to value. It is calculated by taking the sum of the Fund's investment and the first mortgage loan and dividing it by the anticipated value of the applicable property upon completion of the project.

"*Collateral Agent*" means Kevin A. Carreno, P.A., a Florida professional association.

"*Debenture*" means the secured payment obligation, to be issued by the Fund in favor of the Holder, pursuant to the terms of the Debenture Agreement, with an original principal amount equal to the loan made by the Holder to the Fund at Closing (i.e. the Loan Amount). The Debenture shall be in the form attached hereto as Exhibit A.

"*Debenture Agreement*" means the Senior Secured Debenture Purchase Agreement, as originally executed or as amended by the Parties, and shall include the forms and exhibits attached thereto.

"*Fund*" means iCap Pacific Northwest Opportunity and Income Fund, LLC, a Delaware limited liability company, which is the obligor under the Debenture.

"*Holder*" means any Person who has purchased a Debenture pursuant to this Agreement, together with any transferee thereof permitted under Section 9 of the Debenture Agreement.

"*Manager*" means iCap Pacific NW Management, LLC, a Washington limited liability company, which was formed for the sole purpose of being the Manager.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"*Placement Agent*" means Skyway Advisors, LLC, a FINRA licensed broker-dealer.

"*SEC*" means the Securities and Exchange Commission.

## SUMMARY OF THE SENIOR SECURED DEBENTURE PURCHASE AGREEMENT

The following summarizes certain provisions of the Debenture Agreement, and the Debenture document contained therein, not described elsewhere in this Memorandum. All statements made below and elsewhere in this Memorandum relating to the Debenture Agreement are hereby qualified in their entirety by the actual language of the Debenture Agreement. Such statements do not purport to be complete and in no way modify or amend the Debenture Agreement. The parenthetical references included in this section refer to the referenced sections of the Debenture Agreement. **Prospective investors should read the entire Debenture Agreement, attached as <u>Exhibit A</u>, before deciding to purchase Debentures.**

The Debentures will be issued without coupons, in denominations of at least $100,000 with additional integral multiples of $10,000. The Fund reserves the right, in its sole discretion, to accept subscriptions for amounts less than the minimum.

**Economic Terms**

### *Interest*

The outstanding Loan Amount shall bear simple interest at 12% per annum. Interest computation shall be based upon 12, 30-day months. Interest will accrue on the loan made to the Holder under the Debenture from the date that such monies are paid to and are available for use by the Fund. In the event of an Event of Default, the outstanding Loan Amount shall accrue interest at a default interest rate of 18% per annum, simple interest, until all amounts due thereunder have been paid in full. Prior to the Maturity Date, or extension thereof, the Fund will be required to make only monthly interest payments to the Holder. Such monthly payments shall include all interest accrued under the Debenture through the end of the prior calendar month, and shall be due and payable to the Holder on the 15th calendar day of the following month or, if such date is not a Business Day, on the first Business Day thereafter. The Fund may deposit into an interest reserve account proceeds from the issuance of Debentures to cover up to nine (9) months of interest expense on the Debentures.

### *Repayment; Fund's Extension Right*

The full Loan Amount will be due and payable, together with all accrued but unpaid interest, on or before December 31, 2016 (the "***Maturity Date***"). The Fund has the option to extend the Maturity Date for an additional three (3) months, provided an Event of Default has not occurred. This option may be exercised by the Fund at any time prior to the Maturity Date as long as a written notice of such election is provided to the Holder no later than 30 days prior to the expiration of the Maturity Date. If the Fund fails to give such notice, the Debentures will mature upon the expiration of the Maturity Date. The Fund may choose to prepay part or all of the Debenture without penalty at any time prior to the Maturity Date, or extension thereof. The date the Fund prepays in full the Debentures is hereafter referred to as the "***Prepayment Date***". During any time in which the Debentures and Payoff Premium are outstanding, the Fund may not make any distributions to its Members, other than tax distributions.

### *Payoff Premium*

Within 12 months after the earlier of (i) the Prepayment Date or (ii) the Maturity Date, including any extension thereof (such earlier date being the "***Measurement Date***"), the Fund will be required to pay to the Holder a "***Payoff Premium***." The Payoff Premium is an amount equal to Holder's *pro rata* share of an amount equal to 25% of the cumulative net profit generated by the Fund through the date on which the Debentures (including all accrued interest thereon) are paid in full (the "***Aggregate Premium Amount***"). The Payoff Premium amount is not intended to constitute an equity interest in the Fund, but rather is intended to constitute additional interest on the Loan Amount, and shall be paid in addition to all principal, penalties and other interest otherwise due to Holder.

### *Secured Obligation*

The Debenture represents a secured obligation of the Fund. The Debentures are secured by all of the assets of the Fund and by a pledge of the Manager's membership interest in the Fund. The Fund's assets are comprised principally of the Fund's cash and bank accounts, the Fund's equity interest in each Project Entity, and the rights and collateral interests granted to the Fund in connection with each individual Investment, which will include the following:

30

- a first or second position deed of trust (i.e., mortgage) in the real estate owned by or hereafter owned by the Project Entities; and
- a secured interest in the Membership Interest held by the Project Partner; and
- the Fund's right to assume control of the Project Entity and the project owned by it in the event of a default by the Project Entity or a failure to meet applicable project milestones or requirements.

### Events of Default

The following is a summary of events constituting an "***Event of Default***" under the Debenture and triggering the rights of the Holder to accelerate amounts due thereunder as set forth in the Debenture Agreement:

(a)  The Fund defaults in the payment of any Loan Amount or interest on any of the outstanding Debentures, when the same becomes due and payable and such default continues for a period of 10 Business Days (such period, a "***Grace Period***"), *provided, however,* that no such Grace Period will be available should the Fund default twice in the payment of interest on any of the outstanding Debentures when such interest is due and payable (even if such payments were subsequently made during the Grace Period), such that should the Fund default in the payment of interest on any of the outstanding Debentures when such interest is due and payable after the 2 prior defaults, then an Event of Default shall occur on the date such payment was due and payable;

(c)  The Fund fails to observe or perform any covenant or agreement of the Fund in the Debenture Agreement (other than a covenant or agreement a default in whose performance or whose breach is specifically dealt with elsewhere in this "Events of Default" provision), and such failure continues for a period of 30 calendar days after there has been given, by registered or certified mail, to the Fund by the Holder, a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" thereunder;

(e)  A final judgment or judgments for the payment of money aggregating in excess of $500,000 is rendered against the Fund and which judgments are not, within 90 calendar days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within 90 calendar days after the expiration of such stay; *provided, however,* that any judgment which is covered by insurance or an indemnity from a creditworthy party shall not be included in calculating the $500,000 amount set forth above;

(f)  The Fund violates or otherwise defaults on any material contractual obligation that would, as a result of such violation or default, cause the acceleration of the Fund's obligations thereunder and result in the incurrence of a liability, damages or loss to the Fund in excess of $500,000;

(g)  The Fund, pursuant to or within the meaning of any Bankruptcy Law (a) commences a voluntary case; (ii) consents to the entry of an order for relief against it in an involuntary case; (iii) consents to the appointment of a custodian of it for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors; or

(h)  A court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (i) is for relief against the Fund in an involuntary case; (ii) appoints a custodian of the Fund for all or substantially all of its property, or (iii) orders the liquidation of the Fund; and the order or decree remains unstayed and in effect for 90 consecutive calendar days.

The term "***Bankruptcy Law***" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors. The term "***Custodian***" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

### Acceleration, Rescission and Annulment

Upon the occurrence of an Event of Default, with the consent of the Holder of more than 10% in aggregate loan amount of the outstanding Debentures, the Collateral Agent may declare the loan amount of and accrued but unpaid interest, if any, on all the Debentures (including the Loan Amount or interest on the Holder's Debenture) to be

immediately due and payable. If an Event of Default pursuant to paragraphs (g) and (h) under "Events of Default" above occurs, the loan amount and interest on all Debentures will *ipso facto* become and be immediately due and payable without any declaration or other act on the part of the Collateral Agent or any Holders of the Debentures.

The Holders of more than 50% in aggregate loan amount of the outstanding Debentures by notice to the Collateral Agent may rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default have been cured or waived except nonpayment of principal or interest that has become due solely because of acceleration. No such rescission shall affect any subsequent default or impair any right consequent thereon.

**Fund's Rights Regarding Other Indebtedness**

For so long as any Debentures remain outstanding, neither the Fund nor any subsidiary of the Fund (other than a special purpose entity organized for the purpose of an investment to be made by the Fund in a real property project) shall, without the prior written consent of the Holders holding a majority of the aggregate outstanding principal amount of the Debentures, incur or otherwise become liable with respect any indebtedness other than (a) Permitted Indebtedness (as defined below) or (b) indebtedness to trade creditors in the ordinary course of business.

**Registered Debentures; Notices; Changes of Address**

Each Debenture will be registered in the name of the Investor who subscribed for such Debenture or any transferee of a Debenture (See "TRANSFERABILITY OF THE DEBENTURES"). Unless otherwise provided by the Fund, all payments will be made by the Fund by electronic transfer or check to the registered holder of each Debenture at the registered address of such Holder. In the event that a Holder changes his, her or its address, the Holder is required to notify the Fund under the terms of the Debenture.

**Governing Law**

The Debentures will be governed by Washington law.

**Covenants of the Fund**

The Debentures provide that the Fund will be prohibited from making any distributions until the Debentures and all other obligations under the Debenture have been repaid in full (including payment of the Payoff Premium). In addition, neither the Fund nor any of its subsidiaries shall: (a) directly or indirectly, declare, order, make or set apart any sum for or pay any Distribution (other than tax distributions as set forth in the LLC Agreement); (b) establish any deposit account other than the account identified in that certain Deposit Account Control Agreement, to be entered into by and among the Company, the Collateral Agent and Sterling Savings Bank (the "*Account Control Agreement*"), or otherwise deposit or fund any cash or cash equivalents of the Fund in any deposit account other than the account identified in the Account Control Agreement; or (c) contract, create, incur, assume or permit to exist any indebtedness, except for (i) indebtedness arising or existing under the Debenture; (ii) indebtedness arising from the issuance of the Debentures in the Offering; (iii) indebtedness arising from trade payables incurred by the Fund in the ordinary course of business; (iv) indebtedness junior to the Holder's interest; or (iv) with respect to a wholly-owned subsidiary of the Fund organized for the purpose of an Investment, indebtedness that results from a commercial loan from a third party commercial lender made in such lender's ordinary course of business ("*Permitted Indebtedness*").

Neither the Manager nor any of its Affiliates may make any investment on behalf of a new pooled investment fund with investment objectives that are identical to those of the Fund until the earlier of: (a) the date on which at least 75% of the aggregate net Offering proceeds, after payment of commissions and fees and the setting aside of reserves, have been committed to or invested in Investments or (b) November 1, 2015.

## REPORTS TO THE INVESTORS

The Fund has adopted a calendar fiscal year ending December 31. For so long as the Holder continues to hold the Debenture, the Fund will provide to the Holder:

      (a)    as soon as practicable after the end of each fiscal year and in any event within one hundred twenty (120) days after each fiscal year, consolidated balance sheets of the Fund as of the end of such fiscal year and consolidated statements of income of the Fund for such fiscal year, prepared in accordance with U.S. generally accepted accounting principles, all in reasonable detail, certified by an officer of the Fund. The Fund's financial statements will be audited by an independent certified public accountant; and

      (b)    quarterly newsletter reports on the Fund's investments, which may be accessed by the Holder at www.iCap.com.

# THE OFFERING

The following description of certain matters relating to the Debentures does not purport to be complete and is subject in all respects to applicable Delaware Law and to the provisions of the Debenture Agreement.

## General

The Offering has not been registered under the Securities Act and is intended by the Fund not to involve a public offering within the meaning of the Securities Act and Regulation D promulgated thereunder and, therefore, to be exempt from the registration provisions of the Securities Act. Accordingly, the Offering is being made pursuant to certain conditions which, if satisfied, will qualify the Offering for exemption from registration as provided by the Securities Act and Regulation D. These conditions relate to limitations on the manner of Offering, the nature of the Investors, access to or furnishing information about the issuer, and restrictions on transferability. This Offering is not being offered pursuant to Rule 506(c) of Regulation D.

Subject to the terms of the Debenture Agreement, the Fund is authorized to raise up to $30,000,000, through the Offering at a purchase price of $100,000 per Debenture, with additional incremental increases available in segments of $10,000. Investors must make a minimum investment of $100,000, representing the purchase of one Debenture, unless a smaller purchase is permitted by the Manager.

The minimum amount that the Fund must sell in order to break escrow is $2,000,000. The Manager will have an initial closing for the Fund as soon as practicable after obtaining subscriptions of at least Two Million Dollars ($2,000,000 USD) (the "***Initial Closing Date***"). All cash payments for subscriptions paid by potential Investors prior to the Initial Closing Date will be held in a non-interest bearing escrow account at GulfShore Bank. The Fund will be responsible for all compensation, fees and other expenses relating to maintaining such escrow account. To accommodate the admission of additional Investors and permit existing Investors to increase their subscriptions (each, an "***Additional Investor***"), the Manager may, in its discretion, hold one or more additional closings on or before April 30, 2014, unless extended for three (3) months by the Manager, (each such closing to take place on an "***Additional Closing Date***"). If the Fund does not obtain subscriptions of at least $2,000,000 on or before April 30, 2014, or within the three (3) month extension thereof, the Offering will terminate and all subscription payments that have been deposited in the escrow account will be returned to the potential investors who paid such amounts as promptly as practicable.

Following the initial closing of the Offering, additional investments in Debentures under the Offering will be accepted from time to time by the Manager. The Fund will not offer any of the Debentures pursuant to the Offering after April 30, 2014, but such date may be extended up to 3 months by the Manager in its discretion. Any payments received from prospective investors prior to the applicable closing date will be held in a non-interest bearing escrow account.

## Payment of Investments

Each payment to the Fund will be made in United States dollars by means of a personal check or a certified or cashier's check or by wire transfer of immediately available funds to GulfShore Bank, as escrow agent for iCap Pacific Northwest Opportunity and Income Fund, LLC.

## Acceptance of Subscriptions; Eligibility Requirements

Purchases for the Debentures will be accepted on a "first come, first-served" basis. The Manager reserves the right to reject any tendered investment for whatever reason the Manager deems appropriate. If the Manager rejects an investment, the Manager will give notice of such rejection, and return the tendered initial investment payment, no later than 10 business days after the Debenture Purchase Agreement and the accompanying funds have been received by the Manager. As to the eligibility requirements of prospective investors, See "WHO MAY INVEST."

## TRANSFERABILITY OF THE DEBENTURES

Subject to compliance with the requirements of the Debenture Agreement, Investors shall have the right to transfer the Debenture to any qualifying third party of its choice contingent upon securing the Fund's written consent in advance of the proposed transfer. The Fund is under no obligation to recognize such Person as a successor Holder, nor shall such Person have any of the rights of a Holder under the Debenture Agreement, until the Holder has surrendered the original Debenture for registration of transfer, duly endorsed, or accompanied by a duly executed written assignment of transfer in a form reasonably satisfactory to the Fund. A new Debenture for a like principal amount and interest will be issued to, and registered in the name of, the transferee, contingent upon the Transferee executing a Debenture Agreement, and executing a Certificate of Accredited Investor. Interest and principal are payable only to the registered holder of the Debenture.

The Holder and any successor Holder agree(s) to provide to the Fund a Form W-9 upon request. Until registration of a transfer occurs, the Fund shall be entitled to treat the transferring Holder in all respects as the Holder of record, fully entitled to exercise all of the rights, privileges and interest bestowed by the Debenture Agreement and the applicable Debenture.

### State Securities: Blue Sky Laws

Transfer of the Debentures may also be restricted under the securities laws or securities regulations promulgated by various states and foreign jurisdictions, commonly referred to as "Blue Sky" laws. Absent compliance with such individual state laws, the Debentures may not be traded in such jurisdictions. Because the securities sold under this Offering have not and will not be registered for resale under the Blue Sky laws of any state, the Holders and any Persons who desire to purchase them in any trading market that might develop in the future, should be aware that there may be significant state Blue Sky law restrictions upon the ability of Investors to resell the Debentures and of purchasers to purchase the Debentures. Accordingly, Investors should be prepared to hold the Debentures until their maturity date as may be extended.

## FINANCIAL INFORMATION

This Memorandum does not include current balance sheets for either the Fund or the Manager. The Manager has limited capitalization. As of the date hereof, the Fund has incurred certain liabilities in connection with the offering of the Debentures, but has no significant assets. The Fund is a newly-organized entity, has no capital (other than the capital to be raised through the sale of the Debentures), and has and will incur substantial expenses in connection with the offering and sale of the Debentures.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 10 Page 410

# PLAN OF DISTRIBUTION

**Placement Agent Compensation**

The Fund has entered into an exclusive engagement agreement (the "***Engagement Agreement***") with the Placement Agent to assist in privately placing the Debentures. The exclusivity period continues until the Offering has been closed. Subsequent to the Engagement Agreement, the Fund and Placement Agent entered into a Placement Agent Agreement (the "***Placement Agent Agreement***") setting forth more specifically the terms of the relationship between the Fund and the Placement Agreement with respect to this Offering.

The Debentures will be offered by the Placement Agent on a "best efforts" basis (which means that there is no guarantee that any minimum amount will be sold). The Placement Agent will engage sub-placement agents for this Offering. The Placement Agent and the Selling Group will collectively receive a selling commission of 7% of the Gross Proceeds of this Offering. The Placement Agent and the Selling Group will also receive a due diligence allowance of 1% of the Gross Proceeds of this Offering. The Placement Agent will also receive a fee for serving as managing broker-dealer in the amount of 2% of the Gross Proceeds of this Offering and a marketing and underwriting fee of 3% of the Gross Proceeds of this Offering. The Placement Agent, as managing broker-dealer of the Offering, will be responsible for all "wholesaling fees" relating to the Selling Group, as well as paying its own expenses associated with the Offering up to $50,000.

The Placement Agent and its officers, employees and affiliates may purchase Debentures in the Offering. Such Debentures will be counted toward the Maximum Offering Amount. The Placement Agent and the Fund may, in their sole discretion, accept offers to purchase Debentures net (or partially net) of the commissions and expense reimbursements described in this Memorandum in certain circumstances deemed appropriate by either of them, including by way of illustration, from Investors purchasing through a registered investment advisor, or from Investors who are affiliates of the Fund or any member of the Selling Group. The Fund may also make sales to registered representatives of the Selling Group or to their spouses and affiliates, in each case net of sales commissions.

In addition to the commissions paid at the time of each closing, the Placement Agent will be issued a profits interest in the Fund, pursuant to which the Placement Agent and its Affiliates or assigns, as one class of members, will have a right to share in 33% of the cash or property distributions of the Fund as set forth in the LLC Agreement after the Debentures and Payoff Premium have been paid.

We have agreed to indemnify the Placement Agent from and against losses, claims, damages or liabilities (collectively, the "***Damages***") arising out of the Offering, except for Damages resulting from the Placement Agent's breach of the Engagement Agreement or Placement Agent Agreement, gross negligence or willful misconduct.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 11 Page 411

**EXHIBIT A**

**SENIOR SECURED DEBENTURE PURCHASE AGREEMENT**

**EXHIBIT B**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**ICAP PACIFIC NORTHWEST OPPORTUNITY AND INCOME FUND, LLC**

**Exhibit 29**

**THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM CONTAINS MATERIAL NON-PUBLIC INFORMATION REGARDING ICAP PACIFIC INCOME FUND 4, LLC (THE "COMPANY"). BY ACCEPTING THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS HERETO (COLLECTIVELY THIS "MEMORANDUM"), THE RECIPIENT AGREES WITH THE COMPANY TO MAINTAIN IN STRICT CONFIDENCE ALL NON-PUBLIC INFORMATION, INCLUDING, BUT NOT LIMITED TO, THE EXISTENCE OF THE PROPOSED FINANCING AND ANY OTHER NON-PUBLIC INFORMATION REGARDING THE COMPANY OBTAINED FROM THIS MEMORANDUM, ANY OTHER TRANSACTION DOCUMENT OR THE COMPANY.**

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## FOR ACCREDITED INVESTORS AND NON-U.S. PERSONS



### iCap Pacific Income Fund 4, LLC

### $50,000,000 of

### Secured Promissory Notes

### October 1, 2018

**AN INVESTMENT IN OUR SECURITIES INVOLVES A HIGH DEGREE OF RISK. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF US AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD ONLY INVEST IN OUR SECURITIES IF YOU CAN AFFORD A COMPLETE LOSS OF YOUR INVESTMENT. YOU SHOULD READ THE COMPLETE DISCUSSION OF THE RISK FACTORS SET FORTH IN THIS MEMORANDUM.**

**DUE TO THE FACT THAT THE OFFERING IS A PRIVATE PLACEMENT AND EXEMPT FROM REGISTRATION, NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. SEE "CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS."**

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
## FOR
## ACCREDITED INVESTORS AND NON-U.S. PERSONS

## iCap Pacific Income Fund 4, LLC
## $50,000,000 OF AGGREGATE PRINCIPAL AMOUNT
## OF
## SECURED PROMISSORY NOTES

**Minimum subscription per investor of $50,000 of principal amount, although iCap Pacific Income Fund 4, LLC reserves the right to accept subscriptions for a lower principal amount.**

This Confidential Offering Memorandum (this "Memorandum") is being furnished in connection with the offer and sale (the "Offering") of up to $50,000,000 of secured promissory notes (the "Notes") by iCap Pacific Income Fund 4, LLC, a Delaware limited liability company (the "Company"). Notes will be issued in denominations of at least $50,000 (and any amounts in excess of $50,000). The Company may accept subscriptions in lesser amounts in its sole discretion.

The Company is a private investment vehicle that seeks to hold real estate investments as described herein. This Memorandum contains certain information that prospective investors should know about the Offering. The manager of the Company is iCap Pacific NW Management, LLC, a Washington limited liability company (the "Manager"). The Company's address is iCap Pacific Income Fund 4, LLC, PO Box 53232, Bellevue, Washington 98015.

The Offering is being made by the Company through its directors and officers only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act") and to non-U.S. Persons in an "offshore transaction," as defined in Rule 902 of Regulation S promulgated under the Securities Act. No commissions will be paid on any sales made by the Company's officers and directors. The Company may elect to engage one or more FINRA member firms (the "Placement Agents"), as placement agents for this Offering, in which event the Placement Agents will also conduct the Offering on a "best efforts" basis, and the Company would expect in such case to pay estimated total commissions based on 10% of the aggregate principal amount of the Notes sold to investors. Investors who purchase notes are referred to herein as the "Noteholders." The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on June 30, 2019, unless extended by us for up to 180-days, subject to earlier termination as set forth herein.

**THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. NO INVESTMENT IN THE NOTES SHOULD BE MADE BY ANY INVESTOR NOT FINANCIALLY ABLE TO LOSE THE ENTIRE AMOUNT OF ITS INVESTMENT.**

---

## RISK DISCLOSURE STATEMENT

---

**THE ATTORNEYS THAT PREPARED THIS MEMORANDUM ("ATTORNEYS") HEREBY DISCLAIM ANY OPINION OR ASSURANCE OF ANY NATURE WHATSOEVER**

i

REGARDING THE ACCURACY, COMPLETENESS, REASONABLENESS, TIMELINESS OR VERACITY OF ANY OF THE ASSERTIONS, REPRESENTATIONS OR OTHER INFORMATION CONTAINED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, OR REGARDING THE INVESTMENT-WORTHINESS OF THE SECURITIES DISCUSSED HEREIN ("SECURITIES"). ANY ASSERTION OR REPRESENTATION MADE HEREIN, AND ALL OTHER INFORMATION DISCLOSED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, HAS BEEN MADE OR PROVIDED BY THE PROMOTER. IN CONNECTION WITH THE PREPARATION OF THESE CONFIDENTIAL OFFERING DOCUMENTS, THE ATTORNEYS HAVE NOT BEEN ENGAGED TO ATTEST HERETO, OR TO OPINE IN RESPECT HEREOF. ACCORDINGLY, THE ATTORNEYS HAVE NOT PERFORMED ANY ANALYTICAL, CONFIRMATION, VALIDATION, VERIFICATION OR OTHER PROCEDURES IN RESPECT OF THE ASSERTIONS AND REPRESENTATIONS CONTAINED HEREIN, NOR IN RESPECT OF ANY OF THE OTHER INFORMATION DISCLOSED HEREIN, INCLUDING ANY SIMILAR TO THOSE PROCEDURES UNDERTAKEN BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT IN CONNECTION WITH AN AUDIT OF THE FINANCIAL STATEMENTS OF AN ISSUER OF SECURITIES FOR PURPOSES OF RENDERING AN OPINION THEREON. CONSEQUENTLY, POTENTIAL INVESTORS, IN DECIDING WHETHER OR NOT TO INVEST IN THE SECURITIES, ARE CAUTIONED NOT TO ASCRIBE ANY SPECIAL RELIANCE WHATSOEVER ON THIS MEMORANDUM BY REASON THAT ATTORNEYS HAVE PREPARED THIS MEMORANDUM.

THIS BRIEF STATEMENT CANNOT DISCLOSE ALL THE RISKS AND OTHER FACTORS NECESSARY TO EVALUATE YOUR PARTICIPATION IN THIS COMPANY. THEREFORE, BEFORE YOU DECIDE TO PARTICIPATE IN AN INVESTMENT IN THIS COMPANY, YOU SHOULD CAREFULLY STUDY THIS MEMORANDUM, INCLUDING A DISCUSSION OF CERTAIN RISK FACTORS OF THIS INVESTMENT.

## CERTAIN NOTICES REGARDING THIS MEMORANDUM AND

## UNDER STATE SECURITIES LAWS

**FOR ALL PROSPECTIVE INVESTORS:** THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT SET FORTH IN (I) SECTION 4(A)(2) THEREOF AND RULE 506(C) OF REGULATION D PROMULGATED THEREUNDER TO ACCREDITED INVESTORS AND (II) REGULATION S PROMULGATED THEREUNDER TO NON-US PERSONS. RULE 506 OF REGULATION D SETS FORTH CERTAIN RESTRICTIONS AS TO THE NUMBER AND NATURE OF PURCHASERS OF SECURITIES OFFERED PURSUANT THERETO. WE HAVE ELECTED TO SELL SECURITIES ONLY TO ACCREDITED INVESTORS AS SUCH TERM IS DEFINED IN RULE 501(A) OF REGULATION D AND TO NON-US PERSONS AS DEFINED IN REGULATION S. EACH PROSPECTIVE INVESTOR WILL BE REQUIRED TO MAKE REPRESENTATIONS AS TO THE BASIS UPON WHICH IT QUALIFIES AS AN ACCREDITED INVESTOR OR NON-U.S. PERSON. PURSUANT TO RULE 506(C) INDEPENDENT VERIFICATION OF ACCREDITED INVESTOR STATUS FOR INVESTORS INVESTING PURSUANT TO RULE 506(C) WILL BE REQUIRED.

THE SECURITIES OFFERED HEREBY WILL BE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES

LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. ONLY PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT IN THE NOTES SHOULD PURCHASE THE NOTES.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION ("SEC"), NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE INFORMATION PRESENTED HEREIN WAS PRESENTED AND SUPPLIED SOLELY BY THE COMPANY AND IS BEING FURNISHED SOLELY FOR USE BY PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING. THE COMPANY MAKES NO REPRESENTATIONS AS TO THE FUTURE PERFORMANCE OF THE COMPANY. THIS MEMORANDUM WERE PREPARED BY THE COMPANY.

THIS OFFERING IS SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION BY THE COMPANY AT ANY TIME AND WITHOUT NOTICE. WE RESERVE THE RIGHT IN OUR SOLE DISCRETION TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART NOTWITHSTANDING TENDER OF PAYMENT OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AGGREGATE PRINCIPAL AMOUNT OF NOTES SUBSCRIBED FOR BY SUCH INVESTOR.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY ANY SECURITY OTHER THAN THE SECURITIES OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY SUCH SECURITIES BY ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN OUR AFFAIRS SINCE THE DATE HEREOF. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN PERTINENT DOCUMENTS, APPLICABLE LAWS AND REGULATIONS. SUCH SUMMARIES ARE NOT COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE COMPLETE TEXTS THEREOF.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES.

THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM OR IN ANY ADDITIONAL EVALUATION MATERIAL, WHETHER WRITTEN OR ORAL, MADE AVAILABLE IN CONNECTION WITH ANY FURTHER INVESTIGATION OF THE COMPANY. THE COMPANY EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY THAT MAY BE BASED UPON SUCH INFORMATION, ERRORS THEREIN OR OMISSIONS THEREFROM. ONLY THOSE PARTICULAR REPRESENTATIONS AND WARRANTIES, IF ANY, WHICH MAY BE MADE TO A PARTY IN A DEFINITIVE WRITTEN AGREEMENT REGARDING A TRANSACTION INVOLVING THE COMPANY, WHEN, AS AND IF

23-90248-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 18 Page 418 of 630

EXECUTED, AND SUBJECT TO SUCH LIMITATIONS AND RESTRICTIONS AS MAY BE SPECIFIED THEREIN, WILL HAVE ANY LEGAL EFFECT. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED TO THE CONTRARY IN WRITING, THIS MEMORANDUM SPEAKS AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE OF NOTES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY AFTER THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE OFFERING OF NOTES BEING MADE PURSUANT HERETO, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

THERE IS NO MARKET FOR THE NOTES AND THERE IS NO ASSURANCES A PUBLIC MARKET WILL EVER BE ESTABLISHED. PURCHASERS OF THE NOTES ARE NOT BEING GRANTED ANY REGISTRATION RIGHTS. A PURCHASE OF THE NOTES SHOULD BE CONSIDERED AN ILLIQUID INVESTMENT.

BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR HEREBY EXPRESSLY AGREES WITH THE COMPANY TO KEEP CONFIDENTIAL ALL OF THE CONTENTS HEREOF, INCLUDING, BUT NOT LIMITED TO, THE OFFERING AND ALL INFORMATION RELATED TO THE COMPANY, AND NOT TO DISCLOSE THE SAME TO ANY THIRD PARTY AND/OR OTHERWISE USE THE SAME FOR ANY PURPOSE OTHER THAN AN EVALUATION BY SUCH OFFEREE OF A POTENTIAL INVESTMENT IN THE COMPANY OF THE NOTES OFFERED PURSUANT HERETO. WE HAVE CAUSED THIS MEMORANDUM TO BE DELIVERED TO YOU IN RELIANCE UPON SUCH AGREEMENT BY YOU.

EACH PROSPECTIVE SUBSCRIBER BY RECEIVING THIS MEMORANDUM AGREES TO RETURN THE SAME TO US IF (A) THE OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY SECURITIES OFFERED HEREBY; (B) THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, AND/OR (C) THE OFFERING IS TERMINATED OR WITHDRAWN.

THIS MEMORANDUM IS SUBJECT TO AMENDMENT AND SUPPLEMENTATION AS APPROPRIATE. WE DO NOT INTEND TO UPDATE THE INFORMATION CONTAINED IN THE OFFERING DOCUMENTS FOR ANY INVESTOR WHO HAS ALREADY MADE AN INVESTMENT. WE MAY UPDATE THE INFORMATION CONTAINED HEREIN FROM TIME TO TIME AND PROVIDE SUCH UPDATED DOCUMENT TO POTENTIAL INVESTORS BUT UNDERTAKE NO OBLIGATION TO PROVIDE SUCH UPDATED DOCUMENTS TO AN INVESTOR WHO HAS ALREADY MADE HIS OR HER INVESTMENT.

# JURISDICTIONAL NOTICES

**FOR RESIDENTS OF ALL STATES:**

**THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN A PARTICULAR STATE. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE HEREBY ADVISED TO CONTACT THE COMPANY. THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS (COMMONLY CALLED "BLUE SKY" LAWS). THESE SECURITIES MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THE STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OF SALE MAY BE MADE IN ANY PARTICULAR STATE.**

**IN MAKING ANY INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. NO FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS RECOMMENDED THESE SECURITIES. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

1. **NOTICE TO ALABAMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

2. **NOTICE TO ALASKA RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE NOT BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISIONS OF 3 AAC 08.500 - 3 AAC 08.504. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS MEMORANDUM SINCE THE OFFERING DOCUMENTS ARE NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED, OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF 45.55.170. THE INVESTOR

MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

3.  **NOTICE TO ARIZONA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ARIZONA SECURITIES ACT IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PURSUANT TO A.R.S. SECTION 44-1844 (1) AND THEREFORE CANNOT BE RESOLD UNLESS THEY ARE ALSO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

4.  **NOTICE TO ARKANSAS RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN RELIANCE UPON CLAIMS OF EXEMPTION UNDER THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING OR PASSED UPON THE ADEQUACY OR ACCURACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

5.  **NOTICE TO CALIFORNIA RESIDENTS:** THESE SECURITIES HAVE NOT BEEN QUALIFIED OR OTHERWISE APPROVED OR DISAPPROVED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS UNDER THE CALIFORNIA CORPORATIONS CODE. THESE SECURITIES ARE OFFERED IN CALIFORNIA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PROVIDED BY SECTIONS 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. ACCORDINGLY, DISTRIBUTION OF THIS MEMORANDUM AND OFFERS AND SALES OF THE SECURITIES REFERRED TO HEREIN ARE STRICTLY LIMITED TO PERSONS WHO THE COMPANY DETERMINES TO HAVE MET CERTAIN FINANCIAL AND OTHER REQUIREMENTS. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY WITH RESPECT TO ANY OTHER PERSON. IN ORDER TO RELY ON THE FOREGOING EXEMPTIONS, THE COMPANY WILL RELY IN TURN ON CERTAIN REPRESENTATIONS AND WARRANTIES MADE TO THE COMPANY BY THE INVESTORS IN THIS OFFERING. THOSE REPRESENTATIONS AND WARRANTIES ARE CONTAINED IN THE SUBSCRIPTION AGREEMENT, ATTACHED HERETO AS EXHIBIT A.

6.  **FOR COLORADO RESIDENTS ONLY:** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS OFFERING HAS NOT BEEN QUALIFIED WITH COMMISSIONER OF CORPORATIONS OF THE STATE OF COLORADO AND THE ISSUANCE OF SUCH SECURITIES OR PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATIONS IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPTED FROM QUALIFICATION BY SECTION 25100, 25102, OR 25104 OF THE COLORADO CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS OFFERING ARE EXPRESSLY CONDITION UPON SUCH QUALIFICATIONS BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933,

AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991, IF SUCH REGISTRATION IS REQUIRED.

7.  **NOTICE TO CONNECTICUT RESIDENTS ONLY:** SECURITIES ACQUIRED BY CONNECTICUT RESIDENTS ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 36B-31-21B-9B OF THE CONNECTICUT, UNIFORM SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF CONNECTICUT. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

8.  **NOTICE TO DELAWARE RESIDENTS ONLY:** IF YOU ARE A DELAWARE RESIDENT, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE DELAWARE SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

9.  **NOTICE TO DISTRICT OF COLUMBIA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES BUREAU OF THE DISTRICT OF COLUMBIA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

10. **NOTICE TO FLORIDA RESIDENTS ONLY:** THE SECURITIES DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES AND INVESTOR PROTECTION UNDER THE FLORIDA SECURITIES ACT. THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF SAID ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, ALL OFFEREES WHO ARE FLORIDA RESIDENTS SHOULD BE AWARE THAT SECTION 517.061(11)(A)(5) OF THE ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "WHEN SALES ARE MADE TO FIVE OR MORE PERSONS IN [FLORIDA], ANY SALE IN [FLORIDA] MADE PURSUANT TO [THIS SECTION] IS VOIDABLE BY THE PURCHASER IN SUCH SALE EITHER WITHIN 3 DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR AN ESCROW AGENT OR WITHIN 3 DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER." THE AVAILABILITY OF THE PRIVILEGE TO VOID SALES PURSUANT TO SECTION 517.061(11) IS HEREBY COMMUNICATED TO EACH FLORIDA OFFEREE. EACH PERSON ENTITLED TO EXERCISE THE PRIVILEGE TO AVOID SALES GRANTED BY SECTION 517.061 (11) (A)(5) AND WHO WISHES TO EXERCISE SUCH RIGHT, MUST, WITHIN 3 DAYS AFTER THE TENDER OF ANY AMOUNT TO THE COMPANY OR TO ANY AGENT OF THE COMPANY (INCLUDING THE SELLING AGENT OR ANY OTHER DEALER ACTING ON BEHALF OF THE PARTNERSHIP OR ANY SALESMAN OF SUCH DEALER) OR AN ESCROW AGENT CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE COMPANY AT THE ADDRESS PROVIDED IN THIS CONFIDENTIAL EXECUTIVE SUMMARY. SUCH LETTER OR TELEGRAM MUST BE SENT AND, IF POSTMARKED, POSTMARKED ON OR PRIOR TO THE END OF THE AFOREMENTIONED THIRD DAY. IF A PERSON IS SENDING A LETTER, IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ASSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME IT WAS MAILED. SHOULD A PERSON MAKE THIS REQUEST ORALLY, HE MUST ASK FOR WRITTEN CONFIRMATION

THAT HIS REQUEST HAS BEEN RECEIVED.

11. **NOTICE TO GEORGIA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE GEORGIA SECURITIES ACT PURSUANT TO REGULATION 590-4-5-04 AND -01. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

12. **NOTICE TO HAWAII RESIDENTS ONLY:** NEITHER THESE CONFIDENTIAL OFFERING DOCUMENTS NOR THE SECURITIES DESCRIBED HEREIN BEEN APPROVED OR DISAPPROVED BY THE COMMISSIONER OF SECURITIES OF THE STATE OF HAWAII NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS.

13. **NOTICE TO IDAHO RESIDENTS ONLY:** THESE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT IN RELIANCE UPON EXEMPTION FROM REGISTRATION PURSUANT TO SECTION 30-14-203 OR 302(C) THEREOF AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SAID ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SAID ACT.

14. **NOTICE TO ILLINOIS RESIDENTS:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF THE STATE OF ILLINOIS NOR HAS THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

15. **NOTICE TO INDIANA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-2-1-2 OF THE INDIANA SECURITIES LAW AND HAVE NOT BEEN REGISTERED UNDER SECTION 23-2-1-3. THEY CANNOT THEREFORE BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID LAW OR UNLESS AN EXEMPTION FORM REGISTRATION IS AVAILABLE. A CLAIM OF EXEMPTION UNDER SAID LAW HAS BEEN FILED, AND IF SUCH EXEMPTION IS NOT DISALLOWED SALES OF THESE SECURITIES MAY BE MADE. HOWEVER, UNTIL SUCH EXEMPTION IS GRANTED, ANY OFFER MADE PURSUANT HERETO IS PRELIMINARY AND SUBJECT TO MATERIAL CHANGE.

16. **NOTICE TO IOWA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED; THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

17. **NOTICE TO KANSAS RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 81-5-15 OF THE KANSAS SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

18. **NOTICE TO KENTUCKY RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER TITLE 808 KAR 10:210 OF THE KENTUCKY SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

19. **NOTICE TO LOUISIANA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER RULE 1 OF THE LOUISIANA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

20. **NOTICE TO MAINE RESIDENTS ONLY:** THE ISSUER IS REQUIRED TO MAKE A REASONABLE FINDING THAT THE SECURITIES OFFERED ARE A SUITABLE INVESTMENT FOR THE PURCHASER AND THAT THE PURCHASER IS FINANCIALLY ABLE TO BEAR THE RISK OF LOSING THE ENTIRE AMOUNT INVESTED. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION UNDER §16202(15) OF THE MAINE UNIFORM SECURITIES ACT AND ARE NOT REGISTERED WITH THE SECURITIES ADMINISTRATOR OF THE STATE OF MAINE. THE SECURITIES OFFERED FOR SALE MAY BE RESTRICTED SECURITIES AND THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS: (1) THE SECURITIES ARE REGISTERED UNDER STATE AND FEDERAL SECURITIES LAWS, OR (2) AN EXEMPTION IS AVAILABLE UNDER THOSE LAWS.

21. **NOTICE TO MARYLAND RESIDENTS ONLY:** IF YOU ARE A MARYLAND RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 11-602(9) OF THE MARYLAND SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MARYLAND. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

22. **NOTICE TO MASSACHUSETTS RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MASSACHUSETTS UNIFORM SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THIS OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

23. **NOTICE TO MICHIGAN RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE MICHIGAN SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

24. **NOTICE TO MINNESOTA RESIDENTS ONLY:** THESE SECURITIES BEING OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

25. **NOTICE TO MISSISSIPPI RESIDENTS ONLY:** THE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE MISSISSIPPI SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE MISSISSIPPI SECRETARY OF STATE OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE SECRETARY OF STATE NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, OR APPROVED OR DISAPPROVED THIS OFFERING. THE SECRETARY OF STATE DOES NOT RECOMMEND THE PURCHASE OF THESE OR ANY OTHER SECURITIES. EACH PURCHASER OF THE SECURITIES MUST MEET CERTAIN SUITABILITY STANDARDS AND MUST BE ABLE TO BEAR AN ENTIRE LOSS OF THIS INVESTMENT. THE SECURITIES MAY NOT BE TRANSFERRED FOR A PERIOD OF ONE (1) YEAR EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE MISSISSIPPI SECURITIES ACT OR IN A TRANSACTION IN COMPLIANCE WITH THE MISSISSIPPI SECURITIES ACT.

26. **FOR MISSOURI RESIDENTS ONLY:** THE SECURITIES OFFERED HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE PURCHASER IN A TRANSACTION EXEMPT UNDER SECTION 4.G OF THE MISSOURI SECURITIES LAW OF 1953, AS AMENDED. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MISSOURI. UNLESS THE SECURITIES ARE SO REGISTERED, THEY MAY NOT BE OFFERED FOR SALE OR RESOLD IN THE STATE OF MISSOURI, EXCEPT AS A SECURITY, OR IN A TRANSACTION EXEMPT UNDER SAID ACT.

27. **NOTICE TO MONTANA RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A MONTANA RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF FIVE (5) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES.

28. **NOTICE TO NEBRASKA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER CHAPTER 15 OF THE NEBRASKA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

29. **NOTICE TO NEVADA RESIDENTS ONLY:** IF ANY INVESTOR ACCEPTS ANY OFFER TO PURCHASE THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION NRS 90.530 OF THE NEVADA SECURITIES LAW. THE

INVESTOR IS HEREBY ADVISED THAT THE ATTORNEY GENERAL OF THE STATE OF NEVADA HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING AND THE FILING OF THE OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE, OR SALE THEREOF, BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEVADA. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. NEVADA ALLOWS THE SALE OF SECURITIES TO 25 OR FEWER PURCHASERS IN THE STATE WITHOUT REGISTRATION. HOWEVER, CERTAIN CONDITIONS APPLY, I.E., THERE CAN BE NO GENERAL ADVERTISING OR SOLICITATION AND COMMISSIONS ARE LIMITED TO LICENSED BROKER-DEALERS. THIS EXEMPTION IS GENERALLY USED WHERE THE PROSPECTIVE INVESTOR IS ALREADY KNOWN AND HAS A PRE-EXISTING RELATIONSHIP WITH THE COMPANY. (SEE NRS 90.530.11.)

30. **NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY:** NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE UNDER THIS CHAPTER HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

31. **NOTICE TO NEW JERSEY RESIDENTS ONLY:** IF YOU ARE A NEW JERSEY RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE CONFIDENTIAL OFFERING DOCUMENTS HAVE NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

32. **NOTICE TO NEW MEXICO RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE NEW MEXICO DEPARTMENT OF BANKING NOR HAS THE SECURITIES DIVISION PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

33. **NOTICE TO NEW YORK RESIDENTS ONLY:** THIS MEMORANDUM HAVE NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE COMPANY HAS TAKEN NO STEPS TO CREATE AN AFTER MARKET FOR THE SECURITIES OFFERED HEREIN AND HAS MADE NO ARRANGEMENTS WITH BROKERS OF OTHERS TO TRADE OR MAKE A MARKET IN THE SECURITIES. AT SOME TIME IN THE FUTURE, THE COMPANY MAY ATTEMPT TO ARRANGE FOR INTERESTED BROKERS TO TRADE OR MAKE A MARKET IN THE SECURITIES AND TO QUOTE THE SAME IN A PUBLISHED QUOTATION MEDIUM,

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 26 Page 426

HOWEVER, NO SUCH ARRANGEMENTS HAVE BEEN MADE AND THERE IS NO ASSURANCE THAT ANY BROKERS WILL EVER HAVE SUCH AN INTEREST IN THE SECURITIES OF THE COMPANY OR THAT THERE WILL EVER BE A MARKET THEREFORE.

34. **NOTICE TO NORTH CAROLINA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FORGOING AUTHORITIES HAVE NOT CONFIRMED ACCURACY OR DETERMINED ADEQUACY OF THIS MEMORANDUM. REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

35. **NOTICE TO NORTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES COMMISSIONER OF THE STATE OF NORTH DAKOTA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

36. **NOTICE TO OHIO RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 1707.03(X) OF THE OHIO SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

37. **NOTICE TO OKLAHOMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF OKLAHOMA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION FOR PRIVATE OFFERINGS. ALTHOUGH A PRIOR FILING OF THESE CONFIDENTIAL OFFERING DOCUMENTS AND THE INFORMATION HAS BEEN MADE WITH THE OKLAHOMA SECURITIES COMMISSION, SUCH FILING IS PERMISSIVE ONLY AND DOES NOT CONSTITUTE AN APPROVAL, RECOMMENDATION OR ENDORSEMENT, AND IN NO SENSE IS TO BE REPRESENTED AS AN INDICATION OF THE INVESTMENT MERIT OF SUCH SECURITIES. ANY SUCH REPRESENTATION IS UNLAWFUL.

38. **NOTICE TO OREGON RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE CORPORATION COMMISSION OF THE STATE OF OREGON UNDER PROVISIONS OF ORS 59.049. THE INVESTOR IS ADVISED THAT THE COMMISSIONER HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS MEMORANDUM SINCE THIS MEMORANDUM IS NOT REQUIRED TO BE FILED WITH THE COMMISSIONER. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE COMPANY CREATING THE SECURITIES, AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

39. **NOTICE TO PENNSYLVANIA RESIDENTS ONLY:** EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(D), DIRECTLY FROM THE ISSUER OR AFFILIATE OF THIS ISSUER, SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER HE MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED. IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 (70 PS § 1-207(M), YOU MAY ELECT, WITHIN TWO (2) BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONEYS PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A LETTER OR TELEGRAM TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE CONFIDENTIAL OFFERING DOCUMENTS) INDICATING YOUR INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU SHOULD ASK WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. NO SALE OF THE SECURITIES WILL BE MADE TO RESIDENTS OF THE STATE OF PENNSYLVANIA WHO ARE NON-ACCREDITED INVESTORS. EACH PENNSYLVANIA RESIDENT MUST AGREE NOT TO SELL THESE SECURITIES FOR A PERIOD OF TWELVE (12) MONTHS AFTER THE DATE OF PURCHASE, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION. THE SECURITIES HAVE BEEN ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE PENNSYLVANIA SECURITIES ACT OF 1972. NO SUBSEQUENT RESALE OR OTHER DISPOSITION OF THE SECURITIES MAY BE MADE WITHIN 12 MONTHS FOLLOWING THEIR INITIAL SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION, AND THEREAFTER ONLY PURSUANT TO AN EFFECTIVE REGISTRATION OR EXEMPTION.

40. **NOTICE TO RHODE ISLAND RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE DEPARTMENT OF BUSINESS REGULATION OF THE STATE OF RHODE ISLAND NOR HAS THE DIRECTOR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

41. **NOTICE TO SOUTH CAROLINA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE SOUTH CAROLINA UNIFORM SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE SOUTH CAROLINA SECURITIES COMMISSIONER. THE COMMISSIONER DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY

REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

42. **NOTICE TO SOUTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THESE CONFIDENTIAL OFFERING DOCUMENTS ARE TRUE, COMPLETE, AND NOT MISLEADING, NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

43. **NOTICE TO TENNESSEE RESIDENT ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD. EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

44. **NOTICE TO TEXAS RESIDENTS ONLY:** THE SECURITIES OFFERED HEREUNDER HAVE NOT BEEN REGISTERED UNDER APPLICABLE TEXAS SECURITIES LAWS AND, THEREFORE, ANY PURCHASER THEREOF MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. FURTHER, PURSUANT TO §109.13 UNDER THE TEXAS SECURITIES ACT, THE COMPANY IS REQUIRED TO APPRISE PROSPECTIVE INVESTORS OF THE FOLLOWING: A LEGEND SHALL BE PLACED, UPON ISSUANCE, ON CERTIFICATES REPRESENTING SECURITIES PURCHASED HEREUNDER, AND ANY PURCHASER HEREUNDER SHALL BE REQUIRED TO SIGN A WRITTEN AGREEMENT THAT HE WILL NOT SELL THE SUBJECT SECURITIES WITHOUT REGISTRATION UNDER APPLICABLE SECURITIES LAWS, OR EXEMPTIONS THEREFROM.

45. **NOTICE TO UTAH RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE UTAH SECURITIES ACT. THE SECURITIES CANNOT BE TRANSFERRED OR SOLD EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

46. **NOTICE TO VERMONT RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE STATE OF VERMONT NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS

UNLAWFUL.

47. **NOTICE TO VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION UNDER SECTION 13.1-514 OF THE VIRGINIA SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

48. **NOTICE TO WASHINGTON RESIDENTS ONLY:** THE ADMINISTRATOR OF SECURITIES HAS NOT REVIEWED THE OFFERING OR CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE SECURITIES HAVE NOT BEEN REGISTERED IN RELIANCE UPON THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, AND THEREFORE, CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, OR UNLESS AN EXEMPTION FROM REGISTRATION IS MADE AVAILABLE.

49. **NOTICE TO WEST VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 15.06(B)(9) OF THE WEST VIRGINIA SECURITIES LAW AND MAY NOT BE REOFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

50. **NOTICE TO WISCONSIN RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A WISCONSIN RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF THREE AND ONE-THIRD (3 1/3) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES OFFERED HEREIN.

51. **FOR WYOMING RESIDENTS ONLY:** ALL WYOMING RESIDENTS WHO SUBSCRIBE TO PURCHASE SECURITIES OFFERED BY THE COMPANY MUST SATISFY THE FOLLOWING MINIMUM FINANCIAL SUITABILITY REQUIREMENTS IN ORDER TO PURCHASE SECURITIES: (1) A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) OF TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000); AND (2) THE PURCHASE PRICE OF SECURITIES SUBSCRIBED FOR MAY NOT EXCEED TWENTY PERCENT (20%) OF THE NET WORTH OF THE SUBSCRIBER; AND (3) "TAXABLE INCOME" AS DEFINED IN SECTION 63 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, DURING THE LAST TAX YEAR AND ESTIMATED "TAXABLE INCOME" DURING THE CURRENT TAX YEAR SUBJECT TO A FEDERAL INCOME TAX RATE OF NOT LESS THAN THIRTY-THREE PERCENT (33%). IN ORDER TO VERIFY THE FOREGOING, ALL SUBSCRIBERS WHO ARE WYOMING RESIDENTS WILL BE REQUIRED TO REPRESENT IN THE SUBSCRIPTION AGREEMENT THAT THEY MEET THESE WYOMING SPECIAL INVESTOR SUITABILITY REQUIREMENTS.

## BASIS OF PRESENTATION

In this Memorandum, unless the context otherwise requires, we," "us," "our," the "Company" or the "Company," refers collectively to iCap Pacific Income Fund 4, LLC, a Delaware limited liability company, formed on October 11, 2018, the issuer of the Notes in this Offering, and its subsidiaries.

We use a twelve-month fiscal year ending on December 31st of each calendar year. In a twelve-month fiscal year, each quarter includes three-months of operations; the first, second, third and fourth quarters end on March 31, June 30, September 30 and December 31, respectively.

Certain monetary amounts, percentages and other figures included in this Memorandum have been subject to rounding adjustments. Percentage amounts included in this Memorandum have not in all cases been calculated on the basis of such rounded figures but on the basis of such amounts prior to rounding. For this reason, percentage amounts in this Memorandum may vary from those obtained by performing the same calculations using the figures in our consolidated financial statements. Certain other amounts that appear in this Memorandum may not sum due to rounding.

Unless otherwise indicated, all references to "dollars" and "$" in this Memorandum are to, and amounts are presented in, U.S. dollars.

Unless otherwise indicated or the context otherwise requires, financial and operating data in this Memorandum reflect the consolidated business and operations of the Company and its subsidiaries.

## MARKET AND INDUSTRY DATA AND FORECASTS

Certain market and industry data included in this Memorandum is derived from information provided by third-party market research firms, or third-party financial or analytics firms that we believe to be reliable. Market estimates are calculated by using independent industry publications, government publications and third-party forecasts in conjunction with our assumptions about our markets. We have not independently verified such third-party information. The market data used in this Memorandum involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates. While we are not aware of any misstatements regarding any market, industry or similar data presented herein, such data involves risks and uncertainties and are subject to change based on various factors, including those discussed under the headings "Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors" in this Memorandum. These and other factors could cause results to differ materially from those expressed in the estimates made by the independent parties and by us.

Certain data are also based on our good faith estimates, which are derived from management's knowledge of the industry and independent sources. Industry publications, surveys and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but there can be no assurance as to the accuracy or completeness of included information. We have not independently verified any of the data from third-party sources nor have we ascertained the underlying economic assumptions relied upon therein. Statements as to our market position are based on market data currently available to us. While we are not aware of any misstatements regarding the industry data presented herein, our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "Risk Factors" in this Memorandum. Similarly, we believe our internal research is reliable, even though such research has not been verified by any independent sources.

## TRADEMARKS AND COPYRIGHTS

We may own or have rights to trademarks or trade names that we use in connection with the operation of our business, including our corporate names, logos and website names. In addition, we own or

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 31    Page 431

have the rights to copyrights, trade secrets and other proprietary rights that protect the content of our products and the formulations for such products. This Memorandum may also contain trademarks, service marks and trade names of other companies, which are the property of their respective owners. Our use or display of third parties' trademarks, service marks, trade names or products in this Memorandum is not intended to, and should not be read to, imply a relationship with or endorsement or sponsorship of us. Solely for convenience, some of the copyrights, trade names and trademarks referred to in this Memorandum are listed without their ©, ® and ™ symbols, but we will assert, to the fullest extent under applicable law, our rights to our copyrights, trade names and trademarks. All other trademarks are the property of their respective owners.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This Memorandum contains certain forward-looking statements that are subject to various risks and uncertainties. Forward-looking statements are generally identifiable by use of forward-looking terminology such as "may," "will," "should," "potential," "intend," "expect," "outlook," "seek," "anticipate," "estimate," "approximately," "believe," "could," "project," "predict," or other similar words or expressions. Forward-looking statements are based on certain assumptions, discuss future expectations, describe future plans and strategies, contain financial and operating projections or state other forward-looking information. Our ability to predict results or the actual effect of future events, actions, plans or strategies is inherently uncertain. Although we believe that the expectations reflected in our forward-looking statements are based on reasonable assumptions, our actual results and performance could differ materially from those set forth or anticipated in our forward-looking statements. Factors that could have a material adverse effect on our forward-looking statements and upon our business, results of operations, financial condition, funds derived from operations, cash available for dividends, cash flows, liquidity and prospects include, but are not limited to, the factors referenced in this Memorandum, including those set forth below.

When considering forward-looking statements, you should keep in mind the risk factors and other cautionary statements in this Memorandum. Readers are cautioned not to place undue reliance on any of these forward-looking statements, which reflect our views as of the date of this Memorandum. The matters summarized below and elsewhere in this Memorandum could cause our actual results and performance to differ materially from those set forth or anticipated in forward-looking statements. Accordingly, we cannot guarantee future results or performance. Furthermore, except as required by law, we are under no duty to, and we do not intend to, update any of our forward-looking statements after the date of this Memorandum, whether as a result of new information, future events or otherwise.

## CONFIDENTIALITY AND RELATED MATTERS

Each recipient hereof agrees by accepting this Memorandum that the information contained herein is of a confidential nature and that such recipient will treat such information in a strictly confidential manner and that such recipient will not, directly or indirectly, disclose or permit its affiliates or representatives to disclose, any information to any other person or entity, or reproduce such information, in whole or in part, without the prior written consent of the Company.

Each recipient of this Memorandum further agrees to use the information solely for the purpose of analyzing the desirability of an investment in the Company to such recipient and for no other purpose whatsoever.

ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM AND EXHIBITS, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED. NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION NOT CONTAINED IN THIS

23-01240-WLH11     Doc 469     Filed 02/23/24     Entered 02/23/24 19:45:30     Exhibit 32 Page 432

MEMORANDUM OR AN AUTHORIZED SUMMARY HEREOF, OR IN ANY AGREEMENT CONTEMPLATED HEREBY, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR IN SUCH AUTHORIZED SUMMARY OR AGREEMENT MUST NOT BE RELIED UPON.

## RESTRICTIONS ON TRANSFERABILITY

SINCE THE SECURITIES OFFERED HEREBY ARE NOT BEING REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES CANNOT BE SOLD BY AN INVESTOR UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH ACT, OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE AT THE TIME OF DESIRED SALE. THEREFORE, A PURCHASER MUST BE ABLE TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## TAXES

EXCEPT AS SPECIFICALLY SET FORTH HEREIN PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. THE TAX ASPECTS OF AN INVESTMENT IN THE NOTES REQUIRE CAREFUL AND INFORMED STUDY WITH RESPECT TO AN INVESTOR'S PERSONAL TAX AND FINANCIAL POSITION. ACCORDINGLY, NO PERSON SHOULD INVEST IN THE NOTES WITHOUT PRIOR INDEPENDENT EXPERT ADVICE AS TO THE TAX IMPACT OF AN INVESTMENT IN THE SECURITIES. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES. NOTHING IN THIS MEMORANDUM SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO POTENTIAL INVESTORS.

A COPY OF THIS MEMORANDUM AND THE SUBSCRIPTION AGREEMENTS SHALL BE DELIVERED TO EVERY PERSON SOLICITED TO BUY ANY OF THE SECURITIES HEREBY OFFERED, AT THE TIME OF THE INITIAL OFFER TO SELL.

## WHERE YOU CAN OBTAIN MORE INFORMATION

This Memorandum contains limited information on the Company. While we believe the information contained in this Memorandum is accurate, this Memorandum is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective investor that the abbreviated nature of this Memorandum will not omit to state a material fact, which a prospective investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such investor. As a result, prospective investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **An investment in the Notes is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

Prospective investors may make an independent examination of our books, records and other documents to the extent an investor deems it necessary, and should not rely on us or any of our employees or agents with respect to judgments relating to an investment in the Company.

Each offeree may, if he, she or it so desires, make inquiries of appropriate members of our management with respect to our business or any other matters set forth herein, and may obtain any additional information which such person deems to be necessary in order to verify the accuracy of the information contained in this Memorandum (to the extent that we possess such information or can acquire

it without unreasonable effort or expense) upon the execution and delivery of an agreement to maintain the confidentiality of such information for the benefit of the Company.

Any such inquiries or requests for additional information or documents should be made in writing to us, addressed as follows:

<div align="center">

iCap Pacific Income Fund 4, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006
ATTN: Investor Relations
OFC: (425) 278-9030; FAX: (425) 278-9025
EMAIL: inquiry@icapequity.com

</div>

**Table of Contents**

SUMMARY ......................................................................................................................................... 1

THE OFFERING ............................................................................................................................... 3

THE NOTES ...................................................................................................................................... 3

SECURITY AND GUARANTY; REGISTERED OFFERING ....................................................... 4

THE COMPANY ............................................................................................................................... 6

    The Company and its Operations ................................................................................................. 6

    Investment Strategy ..................................................................................................................... 7

    Meeting Demand Payment Obligations ...................................................................................... 7

    Members and Management .......................................................................................................... 7

    Biographies of Management Personnel ....................................................................................... 8

    Organizational Strength and Experience ..................................................................................... 9

    Investment Experience ................................................................................................................ 9

    Management Fees; Transactions with Related Parties ............................................................... 10

USE OF PROCEEDS ....................................................................................................................... 11

INVESTOR SUITABILITY STANDARDS .................................................................................... 11

SUBSCRIPTION PROCEDURES ................................................................................................... 14

RESTRICTIONS ON TRANSFERABILITY .................................................................................. 16

STATEMENT AS TO INDEMNIFICATION .................................................................................. 16

RISK FACTORS .............................................................................................................................. 16

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS .................................................. 28

**Exhibits**

| | |
|---|---|
| Exhibit A-1 | Subscription Agreement for Accredited Investors |
| Exhibit A-2 | Subscription Agreement for non-U.S. Persons |
| Exhibit B | Form of Promissory Note |
| Exhibit C | Pledge and Security Agreement |
| Exhibit D | Guaranty Agreement |

# SUMMARY

*This summary of this Memorandum highlights material information concerning our business and this Offering. This summary does not contain all of the information that you should consider before making your investment decision. You should carefully read this entire Memorandum, including the information presented under the section entitled "Risk Factors" and the financial data and related notes, before making an investment decision. This summary contains forward-looking statements that involve risks and uncertainties. Our actual results may differ significantly from future results contemplated in the forward-looking statements as a result of factors such as those set forth in "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements."*

The following is a summary of selected terms of the Company and the Notes. This summary is not intended as a summary of all principal terms and is qualified in its entirety by the more detailed descriptions set forth below, including the Subscription Agreements attached hereto as Exhibit A-1 and Exhibit A-2 (the "**Subscription Agreements**"). Capitalized terms used in this Summary and not otherwise defined have the meanings given to them elsewhere in this Memorandum.

| | |
|---|---|
| **The Company** | iCap Pacific Income Fund 4, LLC, a Delaware limited liability company is an affiliate of iCap Equity, LLC, a Bellevue, Washington-based investment firm formed in 2011. "iCap Equity" or "iCap," as used in this Memorandum, refers to iCap Enterprises, Inc. (the parent company of iCap Equity, LLC) and its affiliated group of companies (excluding the Company). |
| | See "The Company" commencing on page 6. |
| **Purpose** | The primary purpose of the Company is to acquire real estate investments in the United States and provide a rate of return to its investors. The Company has formed iCap Holding, LLC ("Holding") as a wholly owned subsidiary of the Company, and Holding shall own an interest in one or more standalone subsidiaries (each a "Portfolio SPE"), which will then hold real property investments. The Company's business plan targets construction and development projects. |
| | See "The Company" commencing on page 6. |
| **Manager** | The Company is managed by iCap Pacific NW Management, LLC, a Washington limited liability company (the "Manager"). The Company will pay the Manager an annual management fee equal to 2% of the outstanding aggregate principal balances of the Notes. |
| | See "The Company – Members and Management" commencing on page 7. |
| **The Offering** | The Company is issuing up to $50,000,000 in aggregate principal amount of Notes. The minimum individual investment is $50,000, with any amounts in excess thereof being permitted, subject to the acceptance by the Manager. The Manager may change, or accept less than, the minimum investment amount in its discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one Noteholder or its affiliates. |
| | The Company will offer the Notes for a period commencing on the date of |

1

this Memorandum and expiring on June 30, 2019, unless extended by us for up to 180 days.

The Company may terminate, or amend the terms of, this Offering at any time. The Offering will automatically terminate upon the commencement of the Registered Offering, as defined and described below.

See "The Offering" commencing on page 3.

**The Notes**

The Notes will accrue interest at the rate of 10.00% ("Interest Rate"), per annum, compounded monthly, based on a 365-day year. Investors will have their interest paid monthly by adding such interest to their principal balances each month. Investors will have the option of directing their monthly interest to another account of their choosing.

Investors will have the option of demanding repayment of all or any part of their outstanding principal and unpaid accrued interest, any time after the 3-year anniversary of their investment date, subject to a limit of no more repayments than 25% of the combined notes of the Company per year. Upon a request for demand repayment, the Company will pay the principal over four quarters. The Company may prepay all or any part of the Notes without penalty at any time prior to the Maturity Date. If not earlier paid, the outstanding principal and unpaid accrued interest on the Notes will be due and payable 20 years after the date of the investor's initial investment.

See "The Notes" commencing on page 3.

**Security and Guaranty**

Until the time of the Registered Offering the Notes will be secured by a pledge of Holding's equity interests in the Portfolio SPEs, and Holding shall enter into a guaranty agreement with the Company for the benefit of the Noteholders.

See "The Notes" commencing on page 3 and "Security and Guaranty; Registered Offering" on page 4.

**Expenses**

The Company will bear all costs and expenses incurred in the organization of the Company and this Offering and potential future offerings, and will reimburse Manager for any such costs and expenses advanced by Manager. The Company will also pay the Manager a management fee of 2% of the outstanding aggregate principal balances of the Notes. With the exception of employee payroll expenses, which will be paid by the Manager, all other expenses will be borne by the Company. Each investor will bear his, her or its own fees and expenses incurred in connection with this Offering.

See "The Company - Management Fees; Transactions with Related Parties" on page 10.

## THE OFFERING

The Company is offering for sale up to $50,000,000 of aggregate principal amount of promissory notes. The Offering is being made by the Company through its directors and officers only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act and non-U.S. Persons (as defined below) who meet certain suitability standards established. No commissions will be paid on any sales made by the Company's officers and directors. The Company may elect to engage one or more Placement Agents for this Offering, in which event the Placement Agents will also conduct the Offering on a "best efforts" basis, and the Company would expect in such case to pay estimated total commissions based on 8% of the aggregate principal amount of the Notes sold to investors.

The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on June 30, 2019, unless extended by us for up to 180-days (the "Offering Period") or earlier terminated as set forth herein.

The minimum individual investment is $50,000, with any amount in excess of $50,000 being permissible, subject to the Manager's discretion. The Manager may change, or accept less than, the minimum investment amount in its discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one investor or its affiliates. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines. In order to subscribe for a Note, prospective investors must follow the directions set forth in "Subscription Procedures" commencing on page 14.

An investor must be prepared to bear the economic risk of an investment in the Notes for an indefinite period of time. An investor in the Notes, pursuant to the Subscription Agreement and applicable law, will not be permitted to transfer or dispose of the Notes, unless they are registered for resale or such transaction is exempt from registration under the Securities Act and other applicable securities laws, and in the case of a purportedly exempt sale, such investor provides (at his or her own expense) an opinion of counsel satisfactory to us that such exemption is, in fact, available. The Notes will bear a legend relating to such restrictions on transfer.

This Offering may be withdrawn or terminated by the Company at any time. The Manager reserves the right to reject a subscription for Notes, in whole or in part in its sole discretion.

## THE NOTES

The Notes will bear interest at a rate of 10% per year, and will have a maturity date 20 years following the issuance date (the "Maturity Date"); however, an Investor may request repayment of funds anytime after the 3-year anniversary of the date of Investment. In order to allow the Company to continue its operations successfully, no more than 25% of the aggregate Note balances may be repaid in a given calendar year. Interest will accrue based on a 365-day year and will be paid monthly. Unless otherwise elected by US Investors, the interest will be added to the principal balances of the Notes each month for the first three years. The Company may prepay all or any part of the Notes without penalty at any time prior to the Maturity Date. If the Company makes any prepayment, the prepayments need not be made ratably against all outstanding Notes. If not earlier paid, whether pursuant to a Demand Notice (as described below) or full prepayment by the Company, outstanding principal and unpaid accrued interest on the Notes will be due and payable on the Maturity Date.

At any time following the 3-year anniversary of the issuance date, a Noteholder may require the Company to repay all or a portion of the Note and the accrued interest thereon by providing a demand notice to the Company ("Demand Notice"). Such notice may be delivered via First Class US mail, or

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 38 Page 0438

electronically via email to an account representative or through the Company's licensed software application ("App"). The App, which will be available to Noteholders through mobile devices and desktops, will allow the Noteholder to review his/her transaction history, provide Demand Notice requests, purchase additional Notes, agree to investment documentation, send messages to the Company, and receive notices from the Company. Upon receipt of a Demand Notice, the Company will pay the requested amount in four equal installments due within 15-days of the beginning of each calendar quarter (the "Demand Payment"). The first Demand Payment will be made in the next calendar quarter that follows delivery of proper notice, provided 45-days notice is provided to the Company. For those investors not wishing to utilize the App, a form of the Demand Notice is attached as Exhibit A to the Note, a form of which is attached hereto as Exhibit B.

The description of the Notes set forth herein is qualified in its entirety by the form of Note as attached hereto as Exhibit B.

## SECURITY AND GUARANTY; REGISTERED OFFERING

Prior to the commencement of the Registered Offering (as described below), the Notes will be secured by a Pledge and Security Agreement to be entered into by Holding and the Noteholders (the "Security Agreement"), pursuant to which Holding will pledge the membership interests of the Portfolio SPEs for the benefit of the Noteholders. Each investor in this Offering, as a condition thereto, shall be required to execute a counterpart signature page to the Security Agreement and become a party thereto. The Security Agreement is attached hereto as Exhibit C, and a counterpart signature page thereto is attached to the Subscription Agreement.

Pursuant to the Security Agreement and to secure the prompt payment and full and faithful performance of the obligations of the Company to the Noteholders pursuant to the Notes, Holding will grant a security interest in its membership interests of the Portfolio SPEs for the benefit of the Noteholders (the "Interests"). In the event that an Event of Default (as defined below) occurs, as determined and claimed by Noteholders holding a majority of the principal amount of the Notes then outstanding (a "Majority-in-Interest of the Noteholders"), then, as determined by a Majority-in-Interest of the Noteholders, the Noteholders may exercise the rights and pursue the remedies provided under Articles 8 and 9 of the Uniform Commercial Code (the "UCC") with respect to the Interests, including the right to exercise all voting rights with respect to the Interests, collecting all dividends and other distributions with respect to the Interests, and foreclosing the liens and security interest created under this Security Agreement by any available judicial procedure or without judicial process and selling the Interests.

The Security Agreement also provides that the Company may make distributions to its Members provided the Company an Event of Default has not occurred and is continuing under the Notes. It further allows the payment of tax distributions (i.e., distributions in the amount of taxes payable by such members on the apportioned income of the entities) regardless of whether an Event of Default exists. Management Fees are not distributions, and will be paid regardless of the value of the Company's assets.

In addition, Holding has entered into a Guaranty Agreement with the Company pursuant to which Holding has guaranteed the obligations of the Company pursuant to the Notes (the "Guaranty Agreement"), which is attached hereto as Exhibit D. The Guaranty Agreement provides that, during the continuation of an Event of Default, the Noteholders may enforce this guaranty against Holding, but only after attempting to collect or exhausting the Noteholders' efforts to collect from Borrower. Any actions under the Guaranty Agreement must similarly be agreed to by a Majority-in-Interest of the Noteholders.

The Company may prepare a registration statement for a registered offering of promissory notes which will be in form and substance materially the same as the Notes being offered in this Offering, to be registered under the Securities Act (the "Registered Offering"). The promissory notes to be registered and

4

sold in the Registered Offering are referred to herein as the "Registered Notes." At the time of the effectiveness of the registration statement for the Registered Offering, the Company shall terminate this Offering and no additional Notes shall be sold hereunder. In addition, at the commencement of the Registered Offering the Security Agreement shall be terminated and a new security agreement shall be put into place for the Registered Notes, and the Company shall appoint a trustee to act on behalf of the noteholders who acquire Registered Notes in the Registered Offering, and for the Noteholders in this Offering who exchange their Notes for Registered Notes (the "Trustee"), as described below. The duties of the Trustee are further discussed below. In addition, at such time, the Guaranty Agreement shall be terminated and replaced with a guaranty to the holders of the Registered Notes.

At the time of the Registered Offering, Noteholders shall have the right to exchange their Notes acquired in this Offering for the Registered Notes in the Registered Offering, and therefore to continue to have the benefit of the security and guaranty as they had prior to the commencement of the Registered Offering.

Investors in this Offering will not be required to exchange their Notes for Registered Notes, but if such investors elect to continue to hold the Notes from this Offering, such Noteholders will not have any ongoing security interest or guaranty.

We expect that the Registered Notes will be secured by a similar pledge of the Interests, and by the new guaranty agreement as described above, which security interest will be governed by the Trustee. However, the form, terms and conditions of the security documents which will secure the Registered Notes, and the terms of the new guaranty agreement, shall be determined by the Manager and the Trustee.

The description of the Security Agreement set forth herein is qualified in its entirety by the Security Agreement as attached hereto as Exhibit C and the description of the Guaranty Agreement set forth herein is qualified in its entirety to the Guaranty Agreement as attached hereto as Exhibit D.

The Notes, and the Registered Notes at the time of the Registered Offering, will be junior to any credit facilities that are put in place by the Company related to its operations, and the real property assets of the Company may be used as collateral for such credit facilities.

Prior to the time that the Company utilizes the proceeds from this Offering to acquire real estate, and other than for the use of proceeds related to this Offering and the formation of the Company as set forth below, the Company will retain the funds from this Offering in its accounts at commercial banks.

The Notes are subject to four possible "Events of Default." It is an "Event of Default" if any of the following occur, and the Company has not rectified such event within 90 days of receipt of notice thereof signed by a Majority-in-Interest of the Noteholders:

(i)   The Company fails to make a Demand Payment when due;

(ii)  the Company fails to perform any of its material obligations under the Note, or is in breach in any material respect of any representation, warranty, covenant or agreement on the part of the Company set forth in the Note;

(iii) the Company commences any liquidation or dissolution proceedings or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consents to the filing of any bankruptcy petition against it under any similar law; or

(iv)  the Company fails to pay all amounts due under the Notes on the Maturity Date.

23-01240-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 40 Page 440

Only a Majority-in-Interest of the Noteholders can declare an Event of Default, and then only after the 90-day cure period has expired without the Company rectifying the applicable situation.

If an Event of Default occurs, the interest rate will be increased to 15% per annum (the "Default Rate"), which Default Rate will remain in place until the Note is either paid as due or such Event of Default is cured.

If the Event of Default is as described in clause (i), (ii), or (iv) above, a Majority-in-Interest of the Noteholders will have the right to declare only the applicable Note(s) which are subject to the Event of Default due and payable. If the Event of Default is as described in clause (iii) above, a Majority-in-Interest of the Noteholders will have the right to declare all of the Notes (including the Notes sold in the Registered Offering) due and payable.

Upon delivery of written notice to the Company of such default, the Company will have 30 days to honor the payment obligation. If the Company fails to honor the repayment obligation within this time period, then a Majority-in-Interest of the Noteholders will have the right to proceed to enforce the security granted to the noteholders pursuant to the Security Agreement and to enforce the Guaranty Agreement.

## THE COMPANY

### The Company and its Operations

iCap Pacific Income Fund 4, LLC is a newly formed Delaware limited liability company and is an affiliate of iCap Equity, LLC, a Bellevue, Washington-based investment firm formed in 2011. The Company has been established to provide an investment vehicle that generates a good rate of return, is secured by interests of the Portfolio LLCs, and has a liquidity mechanism for investors.

The primary purpose of the Company is to acquire preferred equity interests in construction and development projects in selected metropolitan statistical areas in the United States (each, a "Portfolio Investment"). Portfolio Investments will be held in standalone Portfolio SPEs, which will be held by Holding and the builders or developers who manage the projects (each a "Project Partner"). The Company's business plan targets the acquisition of short-term (less than 24-months) real estate investments with Project Partners who have strong track records of success. The equity interests of the Portfolio SPEs will, until the time of the Registered Offering, secure the amounts due under the Notes.

The geographic areas in which the Company invests are determined by selecting metropolitan statistical areas upon consultation with market professionals and in-depth review of economic data. The Company may adjust its investment criteria to accommodate changing market conditions, but will generally seek attractive locations with strong exit potential and proven Project Partners.

The Manager anticipates that the Company will be exempt from the registration requirements of the Investment Company Act of 1940, as amended (the "Investment Company Act"), by reason of the exemption specified in Section 3(c)(1) of the Investment Company Act (for issuers whose securities are not beneficially owned by more than 100 persons) or Section 3(c)(7) of the Investment Company Act (for issuers whose securities are owned exclusively by "qualified purchasers" within the meaning of Section 2(a)(51) of the Investment Company Act) or other provisions of the Investment Company Act.

POTENTIAL INVESTORS SHOULD RECOGNIZE THAT BY PURCHASING NOTES THEY WILL NOT THEREBY ACQUIRE ANY INTEREST, DIRECTLY OR INDIRECTLY, IN THE COMPANY OR ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. INVESTORS SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE

MANAGER AND ITS AFFILIATES AS SET FORTH HEREIN IS GIVEN SOLELY TO ALLOW INVESTORS TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. THE MANAGER AND ITS AFFILIATES MAY CONTINUE TO ENGAGE IN MANAGEMENT AND INVESTMENT ACTIVITIES RELATED TO PRE-EXISTING INVESTMENTS AND ACTIVITIES OR OPERATIONS OF THE PRIOR FUNDS AS WELL AS FUTURE FUNDS.

**Investment Strategy**

The Company's Investment Portfolio will consist of single-family homes, multi-family apartments, townhomes, and mixed-use properties, often in construction and development projects phases. The revenue generated from the Investment Portfolio will be used to pay interest and principal on the Notes and fund its operations.

To build its Investment Portfolio, the Company will identify metropolitan statistical areas within which to purchase properties. The Company has developed proven processes and controls to evaluate possible investment opportunities. The process begins by identifying metropolitan statistical areas within the U.S. ("Markets") with strong economic fundamentals that are likely to result in strong exit strategies and strong returns. The Markets are selected after review of reports and analysis provided by economics professionals, as well as the Company's internal staff. After reviewing the reports, a committee consisting of key members of the management team (the "Investment Committee") may approve a Market. After a Market has been approved, the Company's acquisition team will search for purchase opportunities for the Company that meet the criteria of the applicable investment policies of the Company.

Every investment opportunity will undergo due diligence performed by the Company's underwriters, who will then present investment opportunities to the Investment Committee for its review and approval. The Investment Committee may delegate investment decision-making authority to sub-teams, provided such investments meet the criteria established by the Investment Committee. The Company will complete diligence on prospective investments and maintain closing procedures that provide for the safety of the invested funds, such as a third-party escrow company. The investment process has three major areas of focus: analysis and approval, documentation and closing, and post-closing management. Post-closing management of the real estate portfolio will be done by real estate management companies, who will manage the leasing, cash flows, and maintenance of the properties.

**Meeting Demand Payment Obligations**

The Company will establish two sources of liquidity to address demand payments: First, the Company will have cash reserves available to honor demand payments; second, the Company may refinance the Note by issuing additional notes, allowing other investors to purchase the notes, or obtaining institutional financing (each a "Liquidity Source") pursuant to which funds will be advanced to the Company. These Liquidity Sources have not been established at present, are not expected to be established until the Registered Offering commences.

The Notes will be subordinate at times to the rights of the Liquidity Sources as well as to other higher-ranking obligations of the Company, including property taxes and management fees.

The Company may, in its discretion, dispose of some or all of its investment properties to reposition the portfolio or to meet the Company's payment obligations. The Company will maintain cash reserves, which may be used to purchase properties, honor demand payment requests of Noteholders, make tax or other distributions to its member, or cover the costs of the Company's day-to-day operations.

**Members and Management**

The sole member of the Company is iCap Equity, LLC, which is owned by iCap Enterprises, Inc., a Washington corporation wholly owned by Chris Christensen. The primary officers of iCap Enterprises, Inc. are Chris Christensen and Jim Christensen, whose biographies are below.

The manager of the Company is iCap Pacific NW Management, LLC, a Washington limited liability company (the "**Manager**"). The officers of the Manager are the same as officers of iCap Enterprises, Inc. The management and supervision of the Company is vested exclusively in the Manager (including its duly appointed agents), which has full control over the business and affairs of the Company pursuant to the Company's limited liability company operating agreement (the "Operating Agreement").

Our direct organizational structure is as shown in the chart below.



The Manager may delegate day-to-day management responsibility of the Company to any person, provided that the Manager will retain ultimate responsibility for the management and conduct of the activities of the Company and all decisions relating to the selection and disposition of the Company's investments.

**Biographies of Management Personnel**

*Chris Christensen, President*

Chris leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. He is also primarily responsible for tax and accounting decisions. Prior to forming the Company, Chris managed affiliated funds, formed and managed affiliates of the Manager, including Edge Construction, LLC and iCap Enterprises, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a Juris Doctor degree from Seattle University School of Law, a Master's degree in International Business from Seattle University, and a Bachelor of Arts degree in Economics from the University of Utah. He is the brother of Jim Christensen.

*Jim Christensen, Chief Operating Officer*

Jim is iCap's Chief Operating Officer and assists the President with the day-to-day operations of iCap and its investment funds, including overseeing investment underwriting, project and construction management, project financing, disposition of distressed assets, and management of the various strategic relationships involving iCap and its affiliates. In addition, he is responsible for the technology-related underpinnings of iCap. This includes electronic document storage, electronic process automation, and software management. Prior to the formation of the prior funds, Jim managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington State for iCap Enterprises, Inc. Jim has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Jim holds a Master of Business Administration degree and a

8

Bachelor of Arts degree in Economics from the University of Washington. Jim is the brother of Chris Christensen.

*Trace ("TD") Croshaw, Chief Financial Officer*

As Chief Financial Officer, TD is responsible for managing financial controls and accounting procedures of the Company and its investments. TD provides forecasts, budgets and other financial analysis of the Company and its investments, assists with investor reports and communications, manages cash flows and cash flow projections, and establishes and ensures adherence to internal control policies and procedures within the Company. TD also supervises iCap's accounting personnel, and manages the Company's third-party audit, tax and accounting firms, to complete annual audit and tax returns. TD is a licensed CPA. Prior to joining iCap, TD had 15 years of experience as an audit manager at an accounting firm performing financial audits for businesses. TD holds a Bachelor of Arts degree in Accounting from the University of Utah, and a Master of Business Administration degree from the University of Phoenix, and he is a member of the AICPA.

**Organizational Strength and Experience**

The members of the senior management team have completed a variety of projects in the small-cap real estate space. The team, through its combined experience, has closed in excess of $8 billion in transactions in the small and mid-cap spaces.

iCap also maintains a network of strategic relationships. The team leverages relationships with sourcing, development, construction, and fund administration constituents to maintain a pipeline of real estate purchase opportunities. Property owners, builders, developers, lenders and brokers are the primary entities for deal sourcing.

iCap has capacity to expand its team to manage large amounts of capital from the sale of the Notes and to deploy such proceeds towards real estate that meets its investment criteria. iCap has invested significant resources to build the technology and infrastructure needed to manage large amounts of noteholders, capital, and real estate. The number of employees who manage this infrastructure will grow as the capital under management increases.

The Manager and its affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

**Investment Experience**

As a newly formed investment vehicle, the Company has no operating or prior performance history. The information presented in this section represents the limited historical experience of the principals of the Manager and its affiliates. Prospective investors in the Company should not rely on the information below as being indicative of the types of investments the Company may make or of the types of returns the Company's investments may generate. Prospective investors should not assume that the Company will experience returns, if any, comparable to those described herein.

iCap has significant prior experience in investing in single-family, multi-family, light commercial and land development properties. Although this Memorandum refers to "iCap" as though it were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. The Company will not acquire an interest in any of iCap's affiliated entities,

but may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Manager, and therefore the Company, as it conducts its business.

**Management Fees; Transactions with Related Parties**

The Company will pay the Manager an annual management fee equal to 2% of the outstanding aggregate principal balances of the Notes ("Management Fee"). The Management Fee for the first year will be fully earned and paid at the time of investment.  Thereafter, the Management Fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the Notes during the applicable quarter.

The Company will pay all expenses related to the operation of the Company, other than the costs of the personnel of the Manager. These costs that will be paid by the Company include the fees and expenses related to this Offering, office rent and fees, office common area maintenance charges, phone, fax, and internet access, computer hardware and related supplies, general office supplies, office rental of fax, printers, or scanners and maintenance costs related thereto, consulting, legal, accounting, and professional fees, marketing and travel expenses and any business licenses and registrations required of the Company or the Manager as a result of its management of the Company.

The Manager may elect to pay any of these Company expenses, in which event the Company will reimburse the Manager for those out-of-pocket costs.

The Manager may charge a Portfolio SPE a fee to cover the costs of due diligence and underwriting involved in closing a real estate purchase or disposition. This fee, which may be payable by the Portfolio SPE on or after closing of the purchase or disposition, will be non-refundable and will typically be less than $15,000.  Additionally, in the event the Company or the Manager acquires or becomes an affiliate of a real estate brokerage company, the Company may pay customary brokerage fees to such entity for the acquisition or disposition of the Company's assets.

Under the Operating Agreement the Manager may elect to cause the Company to distribute to any member of the Company, a cash distribution equal to the taxes that such member would owe on the income attributed to it from the Company pursuant to the Internal Revenue Code, less any amounts that have been distributed to such member(s) in the applicable year. The Company is not required to make any distributions to its members prior to dissolution. Additionally, the Company may make non-tax distributions to its members in cash or in kind at any time, provided an Event of Default has not occurred and is continuing.

The Company may engage, or cause a Portfolio SPE to engage, an affiliate of the Company to provide the Portfolio SPEs with services. The Company shall not pay compensation to such affiliated entity at a rate that is higher than is standard in the market. In the event the Company enlists the services of any affiliate of the Manager identified below, the rates of compensation of these affiliates for the performance of their various services will be limited and all payments will be subject to inspection by auditors upon request. A description of the affiliated entities and the agreed upon rates are set forth below. To the extent the market rates for these services increase over time, the Company may pay rates in excess of the rates set forth below.  Additionally, to the extent the Company in the future provides services that are not listed below, such services must be provided at reasonable market rates.

If the Manager, or an affiliate of the Manager or the Company, guarantees, whether personally or otherwise, a loan, bond or other obligation of the Company, a holding company, or a Portfolio SPE, that guarantor will be entitled to receive from the benefiting entity an annual fee equal to 1% of the total amount of the credit facility, bond amount, or other obligation that is the subject of the guarantee.

The Company may engage the services of certain related or affiliated parties to provide services to

the Company un connection with is operations. These include the following:

*Edge Construction, LLC or an affiliated general contractor:* Expected to provide general contracting services, including those related to new construction of and rehabilitation of real estate projects, and is expected to receive a fee of cost plus 10%. Costs include the costs of management of a project, including costs of project management, supervision, materials and labor, each of which will be billed at hourly rates, which are currently between $30 and $180 per hour.

*iCap Enterprises, Inc.:* Expected to Provide development and consulting services, as well as accounting and administrative support at hourly rates which are currently between $30 and $200 per hour.

## USE OF PROCEEDS

The proceeds of this Offering will be used to pay expenses related to its formation and operations and for this Offering, and to purchase and manage preferred equity real estate positions through Portfolio SPEs. The proceeds will be used to cover costs associated with this process, such as marketing, management fees, and professional service fees. The Company expects to pay organizational expenses of approximately $250,000, which include the cost of forming the Company, Holding and the Portfolio SPEs and the cost of marketing and management associated with the Company's operations, including technology infrastructure and maintenance, and Offering expenses of approximately $200,000, which includes the cost of preparing this Memorandum and marketing for this Offering as well as the costs associated with the Registration Statement. As discussed above, the Company may elect to engage one or more Placement Agents in the Offering, Any commissions payable to such Placement Agents are not included in the estimate above.

Proceeds from this Offering will also be used to pay the management fee to the Manager as discussed above, and such amounts are not included in the figures above.

At any given time, the Company will maintain cash reserves to meet demand payments, interest payments, and operational requirements. Such cash may be in the form of the Offering proceeds, cash from operations, or credit facilities available to the Company. With the exception of employee payroll expenses, which will be covered by the Manager, all other expenses will be borne by the Company.

## INVESTOR SUITABILITY STANDARDS

*General*

An investment in our Notes involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in their investment. Our Notes are only suitable for those who desire a relatively long-term investment for which they do not need liquidity until the anticipated return on investment as set forth in this Memorandum.

The offer, offer for sale, and sale of our Notes is intended to be exempt from the registration requirements of the Securities Act pursuant to Rule 506(c) of Regulation D promulgated thereunder as to "accredited investors" and to non-U.S. Persons, as defined in, and pursuant to, Regulation S promulgated pursuant to the Securities Act, and is intended to be exempt from the registration requirements of applicable state securities laws as a federally covered security. This Offering is directed to "accredited investors," as that term is defined in Rule 501(a) of Regulation D as promulgated by the SEC and to non-U.S. Persons as defined in Regulation S as promulgated by the SEC.

A subscriber must meet one (or more) of the investor suitability standards below (be an "accredited investor" or non-U.S. Person) to purchase Notes. Fiduciaries must also meet one of these conditions. If the investment is a gift to a minor, the custodian or the donor must meet these conditions. For purposes of the

net worth calculations below, net worth is the amount by which assets exceed liabilities, but excluding your house, home furnishings or automobile(s) among your assets. In the subscription agreement, a subscriber will have to confirm satisfaction of these minimum standards:

- Each investor must have the ability to bear the economic risks of investing in the Notes.

- Each investor must have sufficient knowledge and experience in financial, business or investment matters to evaluate the merits and risks of the investment.

- Each investor must represent and warrant that the Notes to be purchased are being acquired for investment and not with a view to distribution.

- Each investor will make other representations to us in connection with the purchase of the Notes, including representations concerning the investor's degree of sophistication, access to information concerning the Company, and ability to bear the economic risk of the investment.

*Suitability Requirements*

Rule 501(a) of Regulation D defines an "accredited investor" as any person who comes within any of the following categories, or whom the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1) Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Exchange Act; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration undersection 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

12

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

For purposes of calculating net worth:

(A) The person's primary residence shall not be included as an asset;

(B) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

In determining income, a subscriber should add to the subscriber's adjusted gross income any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deduction claimed for depletion, contribution to an IRA or Keogh plan, alimony payments, and any amount by which income for long-term capital gains has been reduced in arriving at adjusted gross income.

<u>Non-U.S. Persons</u>

A "non-U.S. Person" is any person who is not a "US Person", which is any of the following:

(a) Any natural person resident in the United States (as defined below);

(b) Any partnership or corporation organized or incorporated under the laws of the United States;

(c) Any estate of which any executor or administrator is a US Person;

(d) Any trust of which any trustee is a US Person;

(e) Any agency or branch of a foreign entity located in the United States;

(f) Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US Person;

(g) Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident of the United States; and

(h) Any partnership or corporation if (i) organized or incorporated under the laws of any foreign jurisdiction and (ii) formed by a US Person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by

13

accredited investors (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) who are not natural persons, estates or trusts.

"United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

<u>Additional Requirements</u>

In addition to the foregoing suitability standards, we cannot accept subscriptions from anyone if the representations required are either not provided or are provided but are inconsistent with our determination that the investment is suitable for the subscriber. In addition to the financial information we require, the representations we require of you state that you:

- Have received this Memorandum, together with the Exhibits attached hereto;

- understand that no federal or state agency has made any finding or determination as to the fairness for investment in, nor made any recommendation or endorsement of, the Notes; and

- understand that an investment in the Company will not, in itself, create a qualified retirement plan as described in the Internal Revenue Code and that you must comply with all applicable provisions of the Internal Revenue Code in order to create a qualified retirement plan.

You will also represent that you are familiar with the risk factors we describe and that this investment matches your investment objectives. Specifically, you will represent to us that you:

- Understand that there will be no public market for the Notes, that there are substantial restrictions on repurchase, sale, assignment or transfer of the Notes and that it may not be possible to readily liquidate an investment in the Notes; and

- have investment objectives that correspond to those described elsewhere in this Memorandum.

You will also represent to us that you have the capacity to invest in our Notes by confirming that:

- You are legally able to enter into a contractual relationship with us, and, if you are an individual, have attained the age of majority in the state in which you live; and

- if you are a manager, that you are the manager for the trust on behalf of which you are purchasing the Notes, and have due authority to purchase Notes on behalf of the trust.

If you are purchasing as a fiduciary, you will also represent that the above representations and warranties are accurate for the person(s) for whom you are purchasing Notes. By executing the subscription agreement, you will not be waiving any rights under the Securities Act or the Exchange Act.

We have the right to refuse a subscription for Notes if in our sole discretion we believe that the prospective investor does not meet the suitability requirements. It is anticipated that comparable suitability standards (including state law standards applicable in particular circumstances) may be imposed by us in various jurisdictions in connection with any resale of the Notes.

## SUBSCRIPTION PROCEDURES

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 49 Page 449

All subscriptions for the Notes must be made by the execution and delivery of the applicable Subscription Agreement and a counterpart signature page to the Security Agreement, which is attached to the Subscription Agreement.

The Subscription Agreement that must be completed by prospective investors who are subscribing based on being an "accredited investor" is attached hereto as Exhibit A-1.

The Subscription Agreement that must be completed by prospective investors who are subscribing based on being a "non-U.S. Person" is attached hereto as Exhibit A-2.

*Investors should complete only one of the Subscription Agreements, depending on which basis they are subscribing.*

Subscriptions are not binding on the Company until accepted in writing by the Company. We will refuse any subscription by giving written notice to the subscriber by personal delivery or first-class mail. We have the right to refuse to sell the Notes to any prospective investor for any reason in our sole discretion, including, without limitation, if such prospective investor does not promptly supply all information requested by us in connection with such prospective investor's subscription. In addition, in our sole discretion, we may establish a limit on the purchase of Notes by particular prospective investors.

To subscribe for the Notes, each prospective investor must agree to the Subscription Agreement as attached hereto as Exhibit A-1 or Exhibit A-2, as applicable.

Prospective investors may do so via the App[1], the Company's website, electronic signature, or in hard copy delivered to the Company as follows:

<div align="center">

iCap Pacific Income Fund 4, LLC
ATTN: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

</div>

Regardless of the method of subscribing, for accredited investors (i.e., person who are not subscribing based on being a non-U.S. Person) verification of accredited status will still be required, and one method of such verification is through the procedures as set forth in the Subscription Agreement as set forth on Exhibit A. Other methods may be made available or added to the App.

With the Subscription Agreement (regardless of the method used for completing), prospective investors should send their funds via ACH transfer through the App, wire transfer pursuant to the instructions as set forth in the Subscription Agreement, or check payable to "iCap Pacific Income Fund 4, LLC" for the total cost of the Notes being subscribed.

As noted above, this Memorandum and the Subscription Agreements are available electronically through the App or the Company's website and may be completed on the App, the website or by electronic signature, provided the verification of accredited investor status is sent to the Company either electronically or at the address set forth in the Subscription Agreement.

## RESTRICTIONS ON TRANSFERABILITY

The Notes offered hereby are restricted securities as that term is defined in Rule 144 promulgated under the Securities Act. These securities have not been registered under the Securities Act and are being offered and will be sold without benefit of registration under the applicable federal or state securities acts by reason of specific exemptions from registration provided by such acts. The availability of such exemptions is also dependent, in part, upon the "investment intent" of the investors. The exemptions would not be available if an investor were purchasing the Notes with a view to redistributing them. Accordingly, each investor when executing the Subscription Agreement will be required to acknowledge that his or her purchase is for investment, for its, his or her own account, and without any view to resale of the Notes except pursuant to an effective registration statement under the Securities Act, or a valid exemption from the registration requirements of the Securities Act, and subject to the terms of the Subscription Agreement.

## STATEMENT AS TO INDEMNIFICATION

Our Operating Agreement provides for indemnification of members and officers of the Company and of the Manager under certain circumstances, which could include liabilities relating to securities laws. The SEC mandates the following disclosure of its position on indemnification for liabilities under the federal securities laws:

> "Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling an issuer, the Company has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable."

## RISK FACTORS

AN INVESTMENT IN THE COMPANY AND THE NOTES INVOLVES SIGNIFICANT RISK AND IS SUITABLE ONLY FOR PERSONS WHO ARE CAPABLE OF BEARING THE RISKS, INCLUDING THE RISK OF LOSS OF A SUBSTANTIAL PART OR ALL OF THEIR INVESTMENT. CAREFUL CONSIDERATION OF THE FOLLOWING RISK FACTORS, AS WELL AS OTHER INFORMATION IN THIS MEMORANDUM IS ADVISABLE PRIOR TO INVESTING. PROSPECTIVE INVESTORS SHOULD READ ALL SECTIONS OF THIS MEMORANDUM AND ARE STRONGLY URGED AND EXPECTED TO CONSULT THEIR OWN LEGAL AND FINANCIAL ADVISERS BEFORE INVESTING IN THE NOTES. THE INFORMATION IN THIS MEMORANDUM CONTAINS BOTH HISTORICAL AND FORWARD-LOOKING STATEMENTS. PLEASE BE ADVISED THAT THE COMPANY'S ACTUAL FINANCIAL CONDITION, OPERATING RESULTS AND BUSINESS PERFORMANCE MAY DIFFER MATERIALLY FROM THAT ESTIMATED BY THE COMPANY IN FORWARD-LOOKING STATEMENTS. THE COMPANY HAS ATTEMPTED TO IDENTIFY, IN CONTEXT, CERTAIN OF THE FACTORS THAT IT CURRENTLY BELIEVES COULD CAUSE ACTUAL FUTURE RESULTS TO DIFFER FROM THE COMPANY'S CURRENT EXPECTATIONS. THE DIFFERENCES MAY BE CAUSED BY A VARIETY OF FACTORS, INCLUDING BUT NOT LIMITED TO, ADVERSE ECONOMIC CONDITIONS, COMPETITORS (INCLUDING THE ENTRY OF NEW COMPETITORS), INADEQUATE CAPITAL, UNEXPECTED COSTS, LOWER REVENUES AND NET INCOME THAN ANTICIPATED, FLUCTUATION AND VOLATILITY OF THE COMPANY'S OPERATING RESULTS AND FINANCIAL CONDITION, INABILITY TO CARRY OUT MARKETING AND SALES PLANS, LOSS OF KEY EXECUTIVES OR OTHER PERSONNEL, AND OTHER RISKS THAT MAY OR MAY NOT BE REFERRED TO IN THESE RISK FACTORS.

**Operation and Company Risks**

***Our business prospects are difficult to predict because we have no operating history.***

The Company is a newly organized entity and does not have an operating history upon which investors may base an evaluation of its likely performance. The Company's results will depend upon the availability of suitable investment opportunities for the Company and the performance of the Company's Portfolio Investments. The Company's proposed operations are subject to all business risks associated with new enterprises. The likelihood of the Company's success must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with the expansion of a business, operation in a competitive industry, and the continued development of advertising, promotions and a corresponding customer base. There is a possibility that the Company could sustain losses in the future.

There can be no assurance that the Company's efforts will result in successful commercialization or further development of the Company' operations, that the Company's marketing efforts will be successful, or that the Company will ever achieve significant (or any) revenue. If the Company fails to achieve its goals outlined, the Company may run out of money to run its operation and as such, the Company would need to raise additional working capital. Failure to do so could result in Noteholders losing part or all of their money invested.

***Noteholders must rely on the Manager to acquire appropriate Portfolio Investments for the Company's portfolio.***

The Company is conducting the Offering as a "blind pool," meaning that the Company is proceeding to raise funds through the sale of the Notes, without having specifically identified any real estate properties in which the Company intends to invest. When you subscribe for Notes, that subscription is binding, and you will not have the right to revoke that subscription even if you do not approve of the Portfolio Investments that the Company subsequently identifies. Prospective investors should not invest in the Company unless they are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

***If the Company is not as successful with the Offering as desired, it may not acquire as diversified a portfolio as is planned.***

It is not known how many Portfolio Investments the Company will be able to obtain, or the number of opportunities that will be presented by the market for it to evaluate. The number of Portfolio Investments ultimately made by the Company will depend primarily upon the capital raised through the sale of the Notes, the availability of suitable Portfolio Investments, the number of investors who choose to withdraw their funds through demand notices, and the extent to which the Manager arranges for Portfolio Investments to be held with co-investors. There is no certainty as to the number of Portfolio Investments that the Company will ultimately be able to obtain, and since one of the Company's objectives is diversification, no assurance can be given as to the Company's achievement of that objective.

***Competition with third parties in our contemplated industry is intense, which could reduce our profitability and our ability to pay interest or raise additional funds.***

It is possible that over time we may compete with other entities seeking to undertake similar activities as we do. These same potential competitors may have significantly greater capital resources and research and development, manufacturing, testing, regulatory compliance, and marketing capabilities. Competitive products and services may render any services, products or product candidates that we may acquire or develop uneconomic or obsolete. We cannot assure investors that we will be able to invest or develop

17

resources for required capabilities successfully or as expediently as necessary.

***Our planned business is inherently expensive, risky and may not be understood by or accepted in the marketplace, which could adversely affect our future value.***

The business currently conducted by the Company is at an early stage and is financially speculative. To date, very few companies have been successful in their efforts to commercialize such a business. Furthermore, the number of people who may use our services is difficult to forecast with accuracy. Our future success is dependent on the establishment of the market for our services and our ability to capture a share of this market with the services and offerings we plan to develop.

***Negative publicity could adversely affect our business and operating results.***

Negative publicity about our industry or the Company, even if inaccurate, could adversely affect our reputation and the confidence in our operations, which could harm our business and operating results. Harm to our reputation can arise from many sources, including employee misconduct, misconduct by our partners, outsourced service providers or other counterparties, failure by us or our partners to meet minimum standards of service and quality and compliance failures and claims.

***Rapid growth may strain our resources.***

We expect to experience significant and rapid growth in the scope and complexity of our business, which may place a significant strain on our management team and our financial and other resources. Such growth, if experienced, may expose us to greater costs and other risks associated with growth and expansion. We may be required to hire a broad range of additional employees, including other support personnel, among others, in order to successfully advance our operations. We may be unsuccessful in these efforts or we may be unable to project accurately the rate or timing of these increases.

This growth may place a strain on our management and operational resources. The failure to develop and implement effective systems or the failure to manage growth effectively could have a materially adverse effect on our business, financial condition, and results of operations. In addition, difficulties in effectively managing the budgeting, forecasting, and other process control issues presented by such a rapid expansion could harm our business, financial condition, and results of operations.

***Control is vested in the Manager; no investor should purchase the Notes unless the investor is comfortable with the Manager's judgment and experience in running the Company's affairs.***

Control over all decisions affecting the Company, including decisions regarding the Portfolio Investments that are to be made, will be made by the Manager and its management team. Many material decisions, such as decisions regarding the purchase or sale of assets, the refinancing of Portfolio SPEs, whether to make an investment, and the incurrence of third-party-debt will be made without separate concurrence from Noteholders. No assurance can be given that sufficient investment opportunities will be presented to the Company to deploy all of the capital available for investment.

***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its affiliates may provide certain services to, and enter into transactions with, the Company, its holding companies, or the Portfolio SPEs, provided that the terms are commercially reasonable. This limitation may not fully protect the Company or the Portfolio SPEs against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Noteholders, the Trustee, or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover,

18

the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its affiliates. In addition, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities for affiliated entities that may generate different fees for the Manager.

***The Manager may retain and reinvest all or a portion of the revenue generated by, or proceeds of a sale of, a Portfolio Investment.***

The Manager has the discretion to sell the properties the Company acquires and to use the cash proceeds from such sale (or cash proceeds from rental income) to, among other things, satisfy its obligations under the Notes, whether then due and payable, or other Company obligations, or to enter into new Portfolio Investments. The Manager intends to make new investments over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

***Without obtaining advice from their personal advisors, potential investors may not be aware of the legal, tax or economic consequences of an investment in the Notes.***

The Manager has not arranged for potential investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Company has not acted as if it had been retained by the potential investors. Potential investors should not construe the contents of this Memorandum or any prior or subsequent communication from the Manager, its affiliates or any professional associated with this Offering, as legal or tax advice. Potential investors should consult their own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability.

***Fees to Manager will be paid while interest and principal remain outstanding under the Notes.***

Fees payable to the Manager will be paid while interest and principal remain outstanding under the Notes. The Management Fee is based on the outstanding principal balance of the Notes. The Manager will receive the Management Fee whether or not the Portfolio Investments operate profitably. These fees (like other operating expenses) reduce the amount of cash that otherwise would be available for payment of the Notes.

***You will not be investing in the Company, iCap or any of their affiliates. The prior performance data presented provides relevant information regarding affiliates of the Manager, but should not be construed as an indication of the likely financial performance of the Company.***

By investing in the Notes, you will not be investing in the Portfolio Investments, iCap, or in any of the prior investments sponsored by iCap's affiliates. iCap has provided selected information regarding its prior investments because investors might consider those investments to be relevant in assessing the experience and judgment of the Manager, and the iCap management team. Potential investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments. Each investment opportunity is unique, and the Company may not be able to replicate the success of prior investments, even if the Portfolio Investments assembled for the Company's portfolio are similar to those obtained for the prior funds.

19

***A Majority-in-Interest of the Noteholders is required to take certain actions with respect to the Notes.***

The Notes, the Security Agreement and the Guaranty require the consent of a Majority-in-Interest of the Noteholders to declare an Event of Default and to take certain actions related thereto. Therefore, individual Noteholders will not be able to take certain actions unilaterally.

***The Company may prepay the principal and interest on the Notes at any time.***

The Company may prepay all or a part of the principal amount and accrued interest in the Notes at any time. No prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Noteholders will not have certainty as to how long their respective Note(s) may be outstanding. If the Company makes any prepayment, the prepayments need not be made ratably against all outstanding Notes.

***Various factors could negatively impact the profitability of the Company's Portfolio Investments***

The Company may obtain insurance policies for the Portfolio Investments that are commercially prudent given the local market and circumstances of the Portfolio Investments. However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Portfolio Investments should be partially or totally destroyed, the Company may suffer a substantial loss of capital as well as profits. Even if the Company's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Company will sustain a substantial uninsured loss as a result of a fire or other casualty.

Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making a Portfolio Investment, the Company may undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation could include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the Portfolio Investment's site had environmental contamination not detected prior to the Company's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Company undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Company may incur environmental clean-up costs or be subject to liability exposure that may reduce the net profits of the Company.

Under the Americans With Disabilities Act of 1990 ("ADA"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing properties to allow disabled persons to access such facilities. Most of the properties the Company considers will likely be in compliance with the present access requirements. If, however, the properties the Company acquires are not in compliance with the ADA, the Company will be required to make modifications to the properties to bring them into compliance or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

The real estate industry in general, and the multifamily, residential, and commercial sectors, in particular, are highly competitive, and the Company will be competing with numerous other entities, some having substantially greater financial resources and experience than the Company, in seeking attractive

investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available Portfolio Investments or resulting in other less favorable terms to the purchasers.

The investment returns available from investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers' decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could have a material adverse impact on the Company's results of operations or financial condition. In addition, real estate investments are difficult to sell quickly and the Company may not be able to adjust the Company's portfolio of owned properties quickly in response to economic or other conditions in order to meet Note obligations. If the Company's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Company's income will be adversely affected.

***Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.***

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be realized or that investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

***Real estate development projects are subject to numerous risks outside the Company's control such as delays in permitting and other governmental approvals, increased costs, and labor shortages.***

Any properties in which the Company invests relating to real estate development projects are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, and thus lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. The Company may enter into contracts to purchase properties before they are finished, and the foregoing risks could adversely impact the purchase prices, valuations, or closings dates of those properties. Although the Manager will not undertake such transactions without reviewing detailed budgets, such budgets may understate the expenses.

***There may be unanticipated obstacles to execution of our business plan.***

Our proposed plan of operation and prospects will depend largely upon our ability to successfully establish the Company' presence in a timely fashion, retain and continue to hire skilled management, technical, marketing, and other personnel, and attract and retain significant numbers of quality business partners and corporate clients. There can be no assurance that we will be able to successfully implement our business plan or develop or maintain future business relationships, or that unanticipated expenses, problems or technical difficulties which would result in material delays in implementation will not occur.

***The volatile credit and capital markets could have a material adverse effect on our financial condition.***

Our ability to manage our future debt and liquidity will be dependent on our level of positive cash flow. An economic downturn may negatively impact our cash flows. Credit and capital markets can be volatile, which could make it more difficult for us to refinance our debt or to obtain additional debt or equity financings in the future. Such constraints could increase our costs of borrowing and could restrict our access to other potential sources of future liquidity. Our failure to have sufficient liquidity to make interest and other payments required by our debt or our Notes could result in a default of such debt or the Notes and acceleration of our borrowings, which would have a material adverse effect on our business and financial condition.

***A prolonged economic downturn could materially affect us in the future.***

The recession from late 2007 to mid-2009 reduced consumer confidence to historic lows, impacting the public's ability and desire to spend discretionary dollars as a result of job losses, home foreclosures, significantly reduced home values, investment losses, bankruptcies and reduced access to credit, resulting in lower levels of customer traffic. If the economy experiences another significant decline, our business and results of operations could be materially adversely affected.

***Information technology system failures or breaches of our network security could interrupt our operations and adversely affect our business.***

We rely on our computer systems and network infrastructure across our operations. Our operations depend upon our ability to protect our computer equipment and systems against damage from physical theft, fire, power loss, telecommunications failure or other catastrophic events, as well as from internal and external security breaches, viruses and other disruptive problems. Any damage or failure of our computer systems or network infrastructure that causes an interruption in our operations could have a material adverse effect on our business and subject us to litigation or to actions by regulatory authorities.

We are continuing to develop our information technology capabilities, and if we are unable to successfully upgrade or expand our technological capabilities, we may not have the ability to take advantage of market opportunities, manage our costs and transactional data effectively, satisfy customer requirements, execute our business plan or respond to competitive pressures.

***The failure to enforce and maintain our trademarks and protect our other intellectual property could materially adversely affect our business, including our ability to establish and maintain brand awareness.***

The success of our business strategy depends on our continued ability to obtain and use trademarks and service marks in order to increase brand awareness and develop our branded products. If our efforts to protect our intellectual property are not adequate, or if any third-party misappropriates or infringes on our intellectual property, whether in print, on the Internet or through other media, the value of our brands may be harmed, which could have a material adverse effect on our business, including the failure of our brands and branded products to achieve and maintain market acceptance. There can be no assurance that all of the steps we have taken to protect our intellectual property in the United States and in foreign countries will be adequate. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent, as do the laws of the United States.

***Third-party claims with respect to intellectual property assets, if decided against us, may result in competing uses or require adoption of new, non-infringing intellectual property, which may in turn adversely affect sales and revenues.***

There can be no assurance that third parties will not assert infringement or misappropriation claims against us, or assert claims that our rights in our trademarks, service marks, trade dress and other intellectual property assets are invalid or unenforceable. Any such claims could have a material adverse effect on us if such claims were to be decided against us. If our rights in any intellectual property were invalidated or deemed unenforceable, it could permit competing uses of intellectual property, which, in turn, could lead to a decline in our results of operations. If the intellectual property became subject to third-party infringement, misappropriation or other claims, and such claims were decided against us, we may be forced to pay damages, be required to develop or adopt non-infringing intellectual property or be obligated to acquire a license to the intellectual property that is the subject of the asserted claim. There could be significant expenses associated with the defense of any infringement, misappropriation, or other third-party claims.

***We depend on certain officers of the Manager, the loss of whom could materially harm our business.***

We rely upon the accumulated knowledge, skills and experience of the officers and personnel of our Manager and its affiliates. If they were to leave the Manager or become incapacitated, we might suffer in our planning and execution of business strategy and operations, impacting our brand and financial results. We also do not maintain any key man life insurance policies for any such persons.

***We are exposed to the risk of natural disasters, unusual weather conditions, pandemic outbreaks, political events, war and terrorism that could disrupt business and result in lower sales, increased operating costs and capital expenditures.***

Our headquarters and company-operated locations, as well as certain of our vendors and customers, are located in areas which have been and could be subject to natural disasters such as floods, hurricanes, tornadoes, fires or earthquakes. Adverse weather conditions or other extreme changes in the weather, including resulting electrical and technological failures, may disrupt our business and may adversely affect our ability to continue our operations. These events also could have indirect consequences such as increases in the costs of insurance if they result in significant loss of property or other insurable damage. Any of these factors, or any combination thereof, could adversely affect our operations.

***Members of our Manager will have other business interests and obligations to other entities.***

None of the members and officers of the Manager will be required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company, provided that such activities do not otherwise breach their agreements with the Company. We are dependent on these persons to successfully operate the Company. Their other business interests and activities could divert time and attention from operating the Company.

## <u>Risks Related to this Offering and the Notes</u>

***This private placement of Notes is being made in reliance on an exemption from registration requirements, and there is no guarantee that it will comply with the regulatory requirements for such exemption.***

This private placement of Notes will not be registered with the SEC. The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant

to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

***If investors successfully seek rescission, we would face severe financial demands that we may not be able to meet.***

We represent that this Memorandum and its exhibits do not contain any untrue statements of material fact or omit to state any material fact necessary to make the statements made, in light of all the circumstances under which they are made, not misleading. However, if this representation is inaccurate with respect to a material fact, if this Offering fails to qualify for exemption from registration under the federal securities laws, or if we fail to register the Notes or find an exemption under the securities laws of each state in which we offer the Notes, each investor may have the right to rescind his, her or its purchase of the Notes and to receive back from the Company his, her or its purchase price. Such investors, however, may be unable to collect on any judgment, and the cost of obtaining such judgment may outweigh the benefits. If investors successfully seek rescission, we would face severe financial demands and may not be able to meet our capital needs, which may adversely affect any non-rescinding investors.

***We may invest or spend the proceeds of this Offering in ways with which you may not agree or in ways which may not yield a return.***

While we have provided guidance on priorities for the use of proceeds, the timing and amount of sales will impact our actual use of proceeds within the uses identified. Our management will have broad discretion in determining how the proceeds of the Offering will be used in each of the identified use categories.

We currently intend to use the proceeds we receive from this Offering after deducting estimated fees and expenses associated with this private placement, including legal, accounting, transfer agent, financial, acquisitions and other professional fees, primarily for the purposes as described above. Our management will have considerable discretion in the application of the net proceeds, and you will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. Investors in this Offering will need to rely upon the judgment of our management with respect to the use of proceeds. If we do not use the net proceeds that we receive in this Offering effectively, our business, financial condition, results of operations and prospects could be harmed, and the market price or value of the Notes could decline.

***This is a private offering, and as such investors will not have the benefit of review of this Memorandum by the SEC or other agency.***

Since this Offering is a private placement of securities and, as such, is not registered under federal or state securities laws, potential investors will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

***There is no assurance that the Company will be profitable, and there is no assurance of any returns.***

There is no assurance as to whether the Company will be profitable, or earn revenues, or whether the Company will be able to meet its operating expenses. The initial expenses the Company incurs could result in operating losses for the Company for the foreseeable future. No assurance can be made that a subscriber for the Notes offered hereby will not lose his or her entire investment.

***The Company is obligated to pay certain fees and expenses.***

24

The Company will pay various fees and expenses related to its ongoing operations regardless of whether or not the Company' activities are profitable. These fees and expenses will require dependence on third-party relationships. The Company is generally dependent on relationships with its strategic partners and vendors, and the Company may enter into similar agreements with future potential strategic partners and alliances. The Company must be successful in securing and maintaining its third-party relationships to be successful. There can be no assurance that such third parties may regard their relationship with the Company as important to their own business and operations, that they will not reassess their commitment to the business at any time in the future, or that they will not develop their own competitive services or products, either during their relationship with the Company or after their relations with the Company expire. Accordingly, there can be no assurance that the Company' existing relationships or future relationships will result in sustained business partnerships, successful service offerings, or significant revenues for the Company.

*Prospective investors must undertake their own due diligence*.

This Memorandum and its exhibits include limited information regarding the Company, our current and future business and operations, our management and our financial condition. While we believe the information contained in this Memorandum is accurate, such document is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective Investor that the abbreviated nature of this Memorandum will not omit to state a material fact which a prospective Investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such Investor. As a result, prospective Investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **This investment is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

*The limited marketability of the Notes may adversely affect your ability to transfer and pledge the Notes.*

Noteholders must represent that they are purchasing the Notes for their own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, or encumber your Note(s) unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Internal Revenue Code of 1986, as amended (the "Code") or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans.

*The Notes constitute restricted securities and are subject to limited transferability.*

The Notes should be considered a long-term, illiquid investment. The Notes have not been registered under the Securities Act, and cannot be sold without registration under the Securities Act or any exemption from registration. In addition, the Notes are not registered under any state securities laws that would permit their transfer. Because of these restrictions and the absence of an active trading market for our securities, a Noteholder will likely be unable to liquidate an investment even though other personal financial circumstances would dictate such liquidation.

*There is no public trading market for our Notes.*

There is no established public trading marketing for the Notes and there can be no assurance that one will ever develop. Market liquidity will depend on the perception of our operating business and any steps that our management might take to bring us to the awareness of investors. There can be no assurance given that there will be any awareness generated. Consequently, investors may not be able to liquidate their

investment or liquidate it at a price that reflects the value of the business. As a result, holders of our securities may not find purchasers for our securities should they to sell securities held by them. Only non-U.S. Persons, accredited investors or institutions with no need for immediate short-term liquidity should purchase the Notes.

***The market value of the Notes may decrease due to factors beyond our control.***

The stock market from time to time has experienced extreme price and volume fluctuations, which have particularly affected the market prices for emerging growth companies and which often have been unrelated to the operating performance of the companies. These broad market fluctuations may adversely affect the market value of our Notes. The market value of our Notes may also fluctuate significantly in response to the following factors, most of which are beyond our control:

- variations in our quarterly operating results,
- changes in general economic conditions,
- changes in market valuations of similar companies,
- announcements by us or our competitors of significant acquisitions, strategic partnerships or joint ventures, or capital commitments,
- poor reviews;
- loss of a major customer, partner or joint venture participant; and
- the addition or loss of key managerial and collaborative personnel.

Any such fluctuations may adversely affect the market value of our Notes, regardless of our actual operating performance. As a result, Noteholders may be unable to sell their Notes (even if permitted by applicable securities laws and the terms of the Notes), or may be forced to sell them at a loss.

***The characteristics of the Notes, including maturity, interest rate, lack of guarantee, and lack of liquidity, may not satisfy your investment objectives.***

The Notes may not be a suitable investment for you, and we advise you to consult your investment, tax and other professional financial advisors prior to purchasing Notes. The characteristics of the Notes, including maturity, interest rate, lack of guarantee and lack of liquidity may not satisfy your investment objectives. The Notes may not be a suitable investment for you based on your ability to withstand a loss of interest or principal or other aspects of your financial situation, including your income, net worth, financial needs, investment risk profile, return objectives, investment experience and other factors. Prior to purchasing any Notes, you should consider your investment allocation with respect to the amount of your contemplated investment in the Notes in relation to your other investment holdings and the diversity of those holdings.

***The Notes will be effectively subordinated to any of our debt that is secured and subordinated to our existing and future unsecured debts.***

The Notes will be junior to any of our secured debt obligations, to the extent of the value of any assets securing such debt. The effect of this subordination is that if we are involved in a bankruptcy, liquidation, dissolution, reorganization or similar proceeding, or upon a default in payment on, or the acceleration of, any of our secured debt, if any, our assets will be available to pay obligations on the Notes only after all debt under our secured debt, if any, has been paid in full from those assets. As of the date of this Memorandum, we had no secured indebtedness outstanding. In such circumstances, Holders of the Notes will participate in any remaining assets ratably with all of our other unsubordinated creditors, including trade creditors. We may not have sufficient assets remaining to pay amounts due on any or all of the Notes then outstanding.

***The Company may sell promissory notes, in the Registered Offering or otherwise, that have higher interest rates than the 10% applicable to the Notes.***

The Company may sell promissory notes in this Offering, or in the Registered Offering, that have higher interest rates than the 10% applicable to the Notes. In such event the Company would be obligated to pay such higher rates of return, and the security of the noteholders in this Offering would therefore be negatively impacted as the Company will have greater payment obligations from the same pool of assets as compared to the situation where all promissory notes had a 10% interest rate.

***Because the Notes will have no sinking fund, insurance, or guarantee, you could lose all or a part of your investment if we do not have enough cash to pay.***

There is no sinking fund, insurance or guarantee of our obligation to make payments on the Notes. We will not contribute funds to a separate account, commonly known as a sinking fund, to make interest or principal payments on the Notes. The Notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation, or any other governmental or private fund or entity. Therefore, if you invest in the Notes, you will have to rely only on our cash flow from operations and other sources of funds for repayment of principal at maturity or upon repayment demand by you and for payment of interest when due. Any future cash flows from operations could be impaired under the circumstances described herein. If our cash flow from operations and other sources of funds are not sufficient to pay any amounts owed under the Notes, then you may lose all or part of your investment.

***We do not expect that the Notes will be rated, but if they are, ratings of the Notes may change and affect the market price and marketability of the Notes.***

We do not currently expect that, upon issuance, the Notes will be rated by any rating agencies. If they are, such ratings are limited in scope, and do not address all material risks relating to an investment in the Notes, but rather reflect only the view of each rating agency at the time the rating is issued. There is no assurance that such credit ratings will be issued or remain in effect for any given period of time or that such ratings will not be lowered, suspended or withdrawn entirely by the rating agencies. It is also possible that such ratings may be lowered in connection with future events, such as future acquisitions. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market price or marketability of the Notes. In addition, any decline in the ratings of the Notes may make it more difficult for us to raise capital on acceptable terms.

***Because we may pay off the Notes at any time prior to their maturity, you may be subject to reinvestment risk.***

We have the right to pay off any Note at any time prior to its stated maturity. The Notes would be paid off at 100% of the principal amount plus accrued but unpaid interest up to but not including the date of pay off. Any such pay off may have the effect of reducing the income or return on investment that any investor may receive on an investment in the Notes by reducing the term of the investment. If this occurs, you may not be able to reinvest the proceeds at an interest rate comparable to the rate paid on the Notes.

***We have not retained independent professionals for investors.***

We have not retained any independent professionals to comment on or otherwise protect the interests of potential investors. Although we have retained our own counsel, neither such counsel nor any other independent professionals have made any examination of any factual matters herein, and potential investors should not rely on our counsel regarding any matters herein described.

23-01240-WLH11     Doc 469     Filed 02/23/24     Entered 02/23/24 19:45:30     Exhibit 2 Page 462

*We have no firm commitments to purchase any Notes.*

We have no firm commitment for the purchase of any Notes. The Company has not yet engaged a placement agent or broker for the sale of the Notes, although we may do so in the future. The Company may be unable to identify investors to purchase the Notes and as a result may have inadequate capital to support its ongoing business obligations.

*The Company may not be able to meet all of the payment demands of its Investors if a large number of Investors desires to be repaid or if the Company does not have the liquidity to meet such demands.*

The Company will use its commercially reasonable efforts to maintain sufficient cash reserves on hand and access to liquidity sources to honor repayment demands of Investors. However, in the event there are more demands for repayment than the Company has cash available to meet, the Company may be delayed in the delivery of funds and may be required to sell some of its assets, which may take significant amounts of time and may yield less than is needed to meet the Company's obligations.

## Tax Risks

*You are urged to consider the United States federal income tax consequences of owning the Notes.*

Pursuant to the terms of the Notes, the Company and each Noteholder will agree to treat the Notes for U.S. federal income tax purposes as contingent payment debt instruments subject to U.S. federal income tax rules applicable to contingent payment debt instruments. Under that treatment, if you are a U.S. Holder (as defined herein), you may be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by you in that year. You will recognize gain or loss on the sale, repurchase, exchange, conversion or repayment of a Note in an amount equal to the difference between the amount realized and your adjusted tax basis in the Note. Any gain recognized by you on the sale, repurchase, exchange, conversion or repayment of a Note generally will be treated as ordinary interest income and any loss will be treated as ordinary loss to the extent of the interest previously included in income and, thereafter, as capital loss.

*Interest on Notes Could be Characterized as Unrelated Business Taxable Income.*

We intend to take the position that the Notes should be classified as debt instruments for U.S. federal income tax purposes and the stated interest should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("UBTI") with respect to tax exempt Noteholders. However, there is no assurance that the IRS will agree with this position and it is possible that the Notes may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Notes may be characterized as UBTI with respect to tax exempt Noteholders.

<div align="center">

**CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS**

</div>

This Memorandum does not address any tax considerations that may be relevant to you. You are urged to consult your own tax advisors as to the specific tax consequences of purchasing, owning and disposing of any Notes, including any federal, state or local tax consideration.

**WE URGE YOU TO CONSULT AND RELY UPON YOUR OWN TAX ADVISOR WITH RESPECT TO YOUR OWN TAX SITUATION, POTENTIAL CHANGES IN APPLICABLE LAWS AND REGULATIONS AND THE FEDERAL AND STATE CONSEQUENCES ARISING FROM AN INVESTMENT IN THE NOTES. THE COST OF THE CONSULTATION COULD, DEPENDING ON THE AMOUNT CHARGED TO YOU, DECREASE ANY RETURN**

**ANTICIPATED ON YOUR INVESTMENT. NOTHING IN THIS MEMORANDUM IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY SPECIFIC INVESTOR, AS INDIVIDUAL CIRCUMSTANCES MAY VARY. YOU SHOULD BE AWARE THAT THE INTERNAL REVENUE SERVICE MAY NOT AGREE WITH ALL TAX POSITIONS TAKEN BY US AND THAT LEGISLATIVE, ADMINISTRATIVE OR COURT DECISIONS MAY REDUCE OR ELIMINATE ANY ANTICIPATED TAX BENEFITS OF AN INVESTMENT IN THE NOTES.**

**Exhibit 30**

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM CONTAINS MATERIAL NON-PUBLIC INFORMATION REGARDING ICAP PACIFIC INCOME FUND 5, LLC (THE "COMPANY"). BY ACCEPTING THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE EXHIBITS HERETO (COLLECTIVELY THIS "MEMORANDUM" OR THESE "OFFERING DOCUMENTS"), THE RECIPIENT AGREES WITH THE COMPANY TO MAINTAIN IN STRICT CONFIDENCE ALL NON-PUBLIC INFORMATION, INCLUDING, BUT NOT LIMITED TO, THE EXISTENCE OF THE PROPOSED FINANCING AND ANY OTHER NON-PUBLIC INFORMATION REGARDING THE COMPANY OBTAINED FROM THIS MEMORANDUM, ANY OTHER TRANSACTION DOCUMENT OR THE COMPANY.**

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## FOR ACCREDITED INVESTORS PURSUANT TO RULE 506(b) UNDER REGULATION D UNDER THE SECURITIES ACT OF 1933, AS AMENDED.



### iCap Pacific Income Fund 5, LLC

### $50,000,000 of

### Secured Promissory Notes

### (with an over-allotment amount of $25,000,000)

### September 5, 2019

**AN INVESTMENT IN OUR SECURITIES INVOLVES A HIGH DEGREE OF RISK. IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF US AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. YOU SHOULD ONLY INVEST IN OUR SECURITIES IF YOU CAN AFFORD A COMPLETE LOSS OF YOUR INVESTMENT. YOU SHOULD READ THE COMPLETE DISCUSSION OF THE RISK FACTORS SET FORTH IN THIS MEMORANDUM.**

**DUE TO THE FACT THAT THE OFFERING IS A PRIVATE PLACEMENT AND IS EXEMPT FROM REGISTRATION, NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. SEE "CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS."**

**Supplement No. 1 to Confidential Private Placement Memorandum**



**iCap Pacific Income Fund 5, LLC has determined to extend the Offering Period as described in this Memorandum for an additional 12 months, to June 30, 2021. Any references in this Memorandum to the "Offering Period" shall now be deemed to reflect such extension.**

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
# FOR
# ACCREDITED INVESTORS

## iCap Pacific Income Fund 5, LLC
## $50,000,000 OF AGGREGATE PRINCIPAL AMOUNT
## OF
## SECURED PROMISSORY NOTES

## (WITH AN OVER-ALLOTMENT AMOUNT OF $25,000,000)

**Minimum subscription per investor of $50,000 of principal amount, although iCap Pacific Income Fund 5, LLC reserves the right to accept subscriptions for a lower principal amount.**

**No minimum offering amount.**

This Confidential Offering Memorandum (this "Memorandum") is being furnished in connection with the offer and sale (the "Offering") of up to $50,000,000 of Secured Promissory Notes, with an over-allotment amount of $25,000,000 (the "Notes") by iCap Pacific Income Fund 5, LLC, a Delaware limited liability company (the "Company"). Notes will be issued in denominations of at least $50,000 (and any amounts in excess of $50,000). The Company may accept subscriptions in lesser amounts in its sole discretion. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines.

The Company is a private investment vehicle that seeks to hold real estate investments as described herein. This Memorandum contains certain information that prospective investors should know about the Offering. The manager of the Company is iCap Pacific NW Management, LLC, a Washington limited liability company (the "Manager"). The Company's address is iCap Pacific Income Fund 5, LLC, PO Box 53232, Bellevue, Washington 98015.

The Offering is being made by the Company to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to Rule 506(b) under Regulation D, on a "Best Efforts" basis, which means there is no guaranty that any of the Notes will be sold or that a sufficient number of Notes will be sold to fulfill the Company's business plan. The Company has engaged Cobalt Capital, Inc. as the Managing Broker Dealer in this Offering, and the Company will pay commissions as set forth in the Plan of Distribution commencing on page 14 set forth below, based on the aggregate principal amount of the Notes sold to investors. Investors who purchase notes are referred to herein as the "Noteholders." The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on June 30, 2020, unless extended by us for up to 12 months, subject to earlier termination as set forth herein.

**THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. NO INVESTMENT IN THE NOTES SHOULD BE MADE BY ANY INVESTOR NOT FINANCIALLY ABLE TO LOSE THE ENTIRE AMOUNT OF ITS INVESTMENT.**

i

## RISK DISCLOSURE STATEMENT

THE ATTORNEYS THAT PREPARED THIS MEMORANDUM ("ATTORNEYS") HEREBY DISCLAIM ANY OPINION OR ASSURANCE OF ANY NATURE WHATSOEVER REGARDING THE ACCURACY, COMPLETENESS, REASONABLENESS, TIMELINESS OR VERACITY OF ANY OF THE ASSERTIONS, REPRESENTATIONS OR OTHER INFORMATION CONTAINED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, OR REGARDING THE INVESTMENT-WORTHINESS OF THE SECURITIES DISCUSSED HEREIN ("SECURITIES"). ANY ASSERTION OR REPRESENTATION MADE HEREIN, AND ALL OTHER INFORMATION DISCLOSED HEREIN, WHETHER QUALITATIVE OR QUANTITATIVE, HAS BEEN MADE OR PROVIDED BY THE PROMOTER. IN CONNECTION WITH THE PREPARATION OF THESE CONFIDENTIAL OFFERING DOCUMENTS, THE ATTORNEYS HAVE NOT BEEN ENGAGED TO ATTEST HERETO, OR TO OPINE IN RESPECT HEREOF. ACCORDINGLY, THE ATTORNEYS HAVE NOT PERFORMED ANY ANALYTICAL, CONFIRMATION, VALIDATION, VERIFICATION OR OTHER PROCEDURES IN RESPECT OF THE ASSERTIONS AND REPRESENTATIONS CONTAINED HEREIN, NOR IN RESPECT OF ANY OF THE OTHER INFORMATION DISCLOSED HEREIN, INCLUDING ANY SIMILAR TO THOSE PROCEDURES UNDERTAKEN BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT IN CONNECTION WITH AN AUDIT OF THE FINANCIAL STATEMENTS OF AN ISSUER OF SECURITIES FOR PURPOSES OF RENDERING AN OPINION THEREON. CONSEQUENTLY, POTENTIAL INVESTORS, IN DECIDING WHETHER OR NOT TO INVEST IN THE SECURITIES, ARE CAUTIONED NOT TO ASCRIBE ANY SPECIAL RELIANCE WHATSOEVER ON THIS MEMORANDUM BY REASON THAT ATTORNEYS HAVE PREPARED THIS MEMORANDUM.

THIS BRIEF STATEMENT CANNOT DISCLOSE ALL THE RISKS AND OTHER FACTORS NECESSARY TO EVALUATE YOUR INVESTMENT IN THE NOTES. THEREFORE, BEFORE YOU DECIDE TO MAKE AN INVESTMENT IN THE NOTES, YOU SHOULD CAREFULLY STUDY THIS MEMORANDUM, INCLUDING A DISCUSSION OF CERTAIN RISK FACTORS OF THIS INVESTMENT.

## CERTAIN NOTICES REGARDING THIS MEMORANDUM AND UNDER STATE SECURITIES LAWS

FOR ALL PROSPECTIVE INVESTORS: THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT SET FORTH IN SECTION 4(A)(2) THEREOF AND RULE 506(B) OF REGULATION D PROMULGATED THEREUNDER TO ACCREDITED INVESTORS. RULE 506 OF REGULATION D SETS FORTH CERTAIN RESTRICTIONS AS TO THE NUMBER AND NATURE OF PURCHASERS OF SECURITIES OFFERED PURSUANT THERETO. WE HAVE ELECTED TO SELL SECURITIES ONLY TO ACCREDITED INVESTORS AS SUCH TERM IS DEFINED IN RULE 501(A) OF REGULATION D. EACH PROSPECTIVE INVESTOR WILL BE REQUIRED TO MAKE REPRESENTATIONS AS TO THE BASIS UPON WHICH IT QUALIFIES AS AN ACCREDITED INVESTOR.

THE SECURITIES OFFERED HEREBY WILL BE SUBJECT TO RESTRICTIONS ON

TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. ONLY PERSONS WHO CAN AFFORD TO LOSE THEIR ENTIRE INVESTMENT IN THE NOTES SHOULD PURCHASE THE NOTES.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION ("SEC"), NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE INFORMATION PRESENTED HEREIN WAS PRESENTED AND SUPPLIED SOLELY BY THE COMPANY AND IS BEING FURNISHED SOLELY FOR USE BY PROSPECTIVE INVESTORS IN CONNECTION WITH THE OFFERING. THE COMPANY MAKES NO REPRESENTATIONS AS TO THE FUTURE PERFORMANCE OF THE COMPANY. THIS MEMORANDUM WERE PREPARED BY THE COMPANY.

THIS OFFERING IS SUBJECT TO WITHDRAWAL, CANCELLATION OR MODIFICATION BY THE COMPANY AT ANY TIME AND WITHOUT NOTICE. WE RESERVE THE RIGHT IN OUR SOLE DISCRETION TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART NOTWITHSTANDING TENDER OF PAYMENT OR TO ALLOT TO ANY PROSPECTIVE INVESTOR LESS THAN THE AGGREGATE PRINCIPAL AMOUNT OF NOTES SUBSCRIBED FOR BY SUCH INVESTOR.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY ANY SECURITY OTHER THAN THE SECURITIES OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY SUCH SECURITIES BY ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN OUR AFFAIRS SINCE THE DATE HEREOF. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN PERTINENT DOCUMENTS, APPLICABLE LAWS AND REGULATIONS. SUCH SUMMARIES ARE NOT COMPLETE AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE COMPLETE TEXTS THEREOF.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES.

THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM OR IN ANY ADDITIONAL EVALUATION MATERIAL, WHETHER WRITTEN OR ORAL, MADE AVAILABLE IN CONNECTION WITH ANY FURTHER INVESTIGATION OF THE COMPANY. THE COMPANY EXPRESSLY DISCLAIMS ANY AND ALL LIABILITY THAT MAY BE BASED UPON SUCH INFORMATION, ERRORS THEREIN OR OMISSIONS THEREFROM. ONLY THOSE PARTICULAR REPRESENTATIONS AND

WARRANTIES, IF ANY, WHICH MAY BE MADE TO A PARTY IN A DEFINITIVE WRITTEN AGREEMENT REGARDING A TRANSACTION INVOLVING THE COMPANY, WHEN, AS AND IF EXECUTED, AND SUBJECT TO SUCH LIMITATIONS AND RESTRICTIONS AS MAY BE SPECIFIED THEREIN, WILL HAVE ANY LEGAL EFFECT. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED TO THE CONTRARY IN WRITING, THIS MEMORANDUM SPEAKS AS OF THE DATE HEREOF. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE OF NOTES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY AFTER THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE OFFERING OF NOTES BEING MADE PURSUANT HERETO, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY.

THERE IS NO MARKET FOR THE NOTES AND THERE IS NO ASSURANCES A PUBLIC MARKET WILL EVER BE ESTABLISHED. PURCHASERS OF THE NOTES ARE NOT BEING GRANTED ANY REGISTRATION RIGHTS. A PURCHASE OF THE NOTES SHOULD BE CONSIDERED AN ILLIQUID INVESTMENT.

BY ACCEPTING DELIVERY OF THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR HEREBY EXPRESSLY AGREES WITH THE COMPANY TO KEEP CONFIDENTIAL ALL OF THE CONTENTS HEREOF, INCLUDING, BUT NOT LIMITED TO, THE OFFERING AND ALL INFORMATION RELATED TO THE COMPANY, AND NOT TO DISCLOSE THE SAME TO ANY THIRD PARTY AND/OR OTHERWISE USE THE SAME FOR ANY PURPOSE OTHER THAN AN EVALUATION BY SUCH OFFEREE OF A POTENTIAL INVESTMENT IN THE NOTES OFFERED PURSUANT HERETO. WE HAVE CAUSED THIS MEMORANDUM TO BE DELIVERED TO YOU IN RELIANCE UPON SUCH AGREEMENT BY YOU.

EACH PROSPECTIVE SUBSCRIBER BY RECEIVING THIS MEMORANDUM AGREES TO RETURN THE SAME TO US IF (A) THE OFFEREE DOES NOT SUBSCRIBE TO PURCHASE ANY SECURITIES OFFERED HEREBY; (B) THE OFFEREE'S SUBSCRIPTION IS NOT ACCEPTED, AND/OR (C) THE OFFERING IS TERMINATED OR WITHDRAWN.

THIS MEMORANDUM IS SUBJECT TO AMENDMENT AND SUPPLEMENTATION AS APPROPRIATE. WE DO NOT INTEND TO UPDATE THE INFORMATION CONTAINED IN THE OFFERING DOCUMENTS FOR ANY INVESTOR WHO HAS ALREADY MADE AN INVESTMENT. WE MAY UPDATE THE INFORMATION CONTAINED HEREIN FROM TIME TO TIME AND PROVIDE SUCH UPDATED DOCUMENT TO POTENTIAL INVESTORS BUT UNDERTAKE NO OBLIGATION TO PROVIDE SUCH UPDATED DOCUMENTS TO AN INVESTOR WHO HAS ALREADY MADE HIS OR HER INVESTMENT.

**FOR RESIDENTS OF ALL STATES:**

**THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN A PARTICULAR STATE. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE HEREBY ADVISED TO CONTACT THE COMPANY. THE SECURITIES DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS (COMMONLY CALLED "BLUE SKY" LAWS). THESE SECURITIES MUST BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THE STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OF SALE MAY BE MADE IN ANY PARTICULAR STATE.**

**IN MAKING ANY INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. NO FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS RECOMMENDED THESE SECURITIES. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

1. **NOTICE TO ALABAMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

2. **NOTICE TO ALASKA RESIDENTS ONLY**: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHER-MORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD

EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

3. **NOTICE TO ARIZONA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE ARIZONA SECURITIES ACT IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PURSUANT TO A.R.S. SECTION 44-1844 (1) AND THEREFORE CANNOT BE RESOLD UNLESS THEY ARE ALSO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

4. **NOTICE TO ARKANSAS RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN RELIANCE UPON CLAIMS OF EXEMPTION UNDER THE ARKANSAS SECURITIES ACT AND SECTION 4(2) OF THE SECURITIES ACT OF 1933. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING OR PASSED UPON THE ADEQUACY OR ACCURACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

5. **NOTICE TO CALIFORNIA RESIDENTS:** THESE SECURITIES HAVE NOT BEEN QUALIFIED OR OTHERWISE APPROVED OR DISAPPROVED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS UNDER THE CALIFORNIA CORPORATIONS CODE. THESE SECURITIES ARE OFFERED IN CALIFORNIA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PROVIDED BY SECTIONS 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. ACCORDINGLY, DISTRIBUTION OF THIS MEMORANDUM AND OFFERS AND SALES OF THE SECURITIES REFERRED TO HEREIN ARE STRICTLY LIMITED TO PERSONS WHO THE COMPANY DETERMINES TO HAVE MET CERTAIN FINANCIAL AND OTHER REQUIREMENTS. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY WITH RESPECT TO ANY OTHER PERSON. IN ORDER TO RELY ON THE FOREGOING EXEMPTIONS, THE COMPANY WILL RELY IN TURN ON CERTAIN REPRESENTATIONS AND WARRANTIES MADE TO THE COMPANY BY THE INVESTORS IN THIS OFFERING. THOSE REPRESENTATIONS AND WARRANTIES ARE CONTAINED IN THE SUBSCRIPTION AGREEMENT, ATTACHED HERETO AS EXHIBIT A.

6. **FOR COLORADO RESIDENTS ONLY:** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS OFFERING HAS NOT BEEN QUALIFIED WITH COMMISSIONER OF CORPORATIONS OF THE STATE OF COLORADO AND THE ISSUANCE OF SUCH SECURITIES OR PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFORE PRIOR TO SUCH QUALIFICATIONS IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPTED FROM QUALIFICATION BY SECTION 25100, 25102, OR 25104 OF THE COLORADO CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS OFFERING ARE EXPRESSLY CONDITION UPON SUCH QUALIFICATIONS BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE RESOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933,

AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1991, IF SUCH REGISTRATION IS REQUIRED.

7. **NOTICE TO CONNECTICUT RESIDENTS ONLY:** SECURITIES ACQUIRED BY CONNECTICUT RESIDENTS ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 36B-31-21B-9B OF THE CONNECTICUT, UNIFORM SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF CONNECTICUT. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

8. **NOTICE TO DELAWARE RESIDENTS ONLY:** IF YOU ARE A DELAWARE RESIDENT, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE DELAWARE SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

9. **NOTICE TO DISTRICT OF COLUMBIA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES BUREAU OF THE DISTRICT OF COLUMBIA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

10. **NOTICE TO FLORIDA RESIDENTS ONLY:** THE SECURITIES DESCRIBED HEREIN HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES AND INVESTOR PROTECTION UNDER THE FLORIDA SECURITIES ACT. THE SECURITIES REFERRED TO HEREIN WILL BE SOLD TO, AND ACQUIRED BY THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF SAID ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. EACH FLORIDA RESIDENT WHO SUBSCRIBES FOR NOTES HAS THE RIGHT, PURSUANT TO SECTION 517.061(11)(A)(5) OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, TO WITHDRAW HIS SUBSCRIPTION AND RECEIVE A FULL REFUND OF ALL MONEYS PAID, WITHIN THREE (3) BUSINESS DAYS AFTER THE EXECUTION OF THE SUBSCRIPTION AGREEMENT AND POWER OF ATTORNEY OR THE PAYMENT FOR AN INTEREST HAS BEEN MADE, WHICH EVER IS LATER. WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER NEED ONLY SEND A LETTER OR A FACSIMILE TO THE COMPANY AT THE ADDRESS SET FORTH IN THIS MEMORANDUM, INDICATING HIS INTENTION TO WITHDRAW. SUCH LETTER OR FACSIMILE MUST BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED THIRD BUSINESS DAY. IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED.

11. **NOTICE TO GEORGIA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE GEORGIA SECURITIES ACT PURSUANT TO REGULATION 590-4-5-04 AND -01. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

12. **NOTICE TO HAWAII RESIDENTS ONLY:** NEITHER THESE CONFIDENTIAL OFFERING DOCUMENTS NOR THE SECURITIES DESCRIBED HEREIN BEEN APPROVED OR DISAPPROVED BY THE COMMISSIONER OF SECURITIES OF THE STATE OF HAWAII NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS.

13. **NOTICE TO IDAHO RESIDENTS ONLY:** THESE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT IN RELIANCE UPON EXEMPTION FROM REGISTRATION PURSUANT TO SECTION 30-14-203 OR 302(C) THEREOF AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SAID ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SAID ACT.

14. **NOTICE TO ILLINOIS RESIDENTS:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF THE STATE OF ILLINOIS NOR HAS THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

15. **NOTICE TO INDIANA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-2-1-2 OF THE INDIANA SECURITIES LAW AND HAVE NOT BEEN REGISTERED UNDER SECTION 23-2-1-3. THEY CANNOT THEREFORE BE RESOLD UNLESS THEY ARE REGISTERED UNDER SAID LAW OR UNLESS AN EXEMPTION FORM REGISTRATION IS AVAILABLE. A CLAIM OF EXEMPTION UNDER SAID LAW HAS BEEN FILED, AND IF SUCH EXEMPTION IS NOT DISALLOWED SALES OF THESE SECURITIES MAY BE MADE. HOWEVER, UNTIL SUCH EXEMPTION IS GRANTED, ANY OFFER MADE PURSUANT HERETO IS PRELIMINARY AND SUBJECT TO MATERIAL CHANGE.

16. **NOTICE TO IOWA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED; THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

17. **NOTICE TO KANSAS RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 81-5-15 OF THE KANSAS SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

18. **NOTICE TO KENTUCKY RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE

SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER TITLE 808 KAR 10:210 OF THE KENTUCKY SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

19. **NOTICE TO LOUISIANA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER RULE 1 OF THE LOUISIANA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

20. **NOTICE TO MAINE RESIDENTS ONLY:** THE ISSUER IS REQUIRED TO MAKE A REASONABLE FINDING THAT THE SECURITIES OFFERED ARE A SUITABLE INVESTMENT FOR THE PURCHASER AND THAT THE PURCHASER IS FINANCIALLY ABLE TO BEAR THE RISK OF LOSING THE ENTIRE AMOUNT INVESTED. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION UNDER §16202(15) OF THE MAINE UNIFORM SECURITIES ACT AND ARE NOT REGISTERED WITH THE SECURITIES ADMINISTRATOR OF THE STATE OF MAINE. THE SECURITIES OFFERED FOR SALE MAY BE RESTRICTED SECURITIES AND THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS: (1) THE SECURITIES ARE REGISTERED UNDER STATE AND FEDERAL SECURITIES LAWS, OR (2) AN EXEMPTION IS AVAILABLE UNDER THOSE LAWS.

21. **NOTICE TO MARYLAND RESIDENTS ONLY:** IF YOU ARE A MARYLAND RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE SECURITIES ARE BEING SOLD AS A TRANSACTION EXEMPT UNDER SECTION 11-602(9) OF THE MARYLAND SECURITIES ACT. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MARYLAND. ALL INVESTORS SHOULD BE AWARE THAT THERE ARE CERTAIN RESTRICTIONS AS TO THE TRANSFERABILITY OF THE SECURITIES.

22. **NOTICE TO MASSACHUSETTS RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MASSACHUSETTS UNIFORM SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THIS OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

23. **NOTICE TO MICHIGAN RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE MICHIGAN SECURITIES ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

24. **NOTICE TO MINNESOTA RESIDENTS ONLY:** THESE SECURITIES BEING OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA

SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

25. **NOTICE TO MISSISSIPPI RESIDENTS ONLY:** THE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE MISSISSIPPI SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE MISSISSIPPI SECRETARY OF STATE OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE SECRETARY OF STATE NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, OR APPROVED OR DISAPPROVED THIS OFFERING. THE SECRETARY OF STATE DOES NOT RECOMMEND THE PURCHASE OF THESE OR ANY OTHER SECURITIES. EACH PURCHASER OF THE SECURITIES MUST MEET CERTAIN SUITABILITY STANDARDS AND MUST BE ABLE TO BEAR AN ENTIRE LOSS OF THIS INVESTMENT. THE SECURITIES MAY NOT BE TRANSFERRED FOR A PERIOD OF ONE (1) YEAR EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE MISSISSIPPI SECURITIES ACT OR IN A TRANSACTION IN COMPLIANCE WITH THE MISSISSIPPI SECURITIES ACT.

26. **FOR MISSOURI RESIDENTS ONLY:** THE SECURITIES OFFERED HEREIN WILL BE SOLD TO, AND ACQUIRED BY, THE PURCHASER IN A TRANSACTION EXEMPT UNDER SECTION 4.G OF THE MISSOURI SECURITIES LAW OF 1953, AS AMENDED. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF MISSOURI. UNLESS THE SECURITIES ARE SO REGISTERED, THEY MAY NOT BE OFFERED FOR SALE OR RESOLD IN THE STATE OF MISSOURI, EXCEPT AS A SECURITY, OR IN A TRANSACTION EXEMPT UNDER SAID ACT.

27. **NOTICE TO MONTANA RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A MONTANA RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF FIVE (5) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES.

28. **NOTICE TO NEBRASKA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER CHAPTER 15 OF THE NEBRASKA SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

29. **NOTICE TO NEVADA RESIDENTS ONLY:** IF ANY INVESTOR ACCEPTS ANY OFFER TO PURCHASE THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION NRS 90.530 OF THE NEVADA SECURITIES LAW. THE INVESTOR IS HEREBY ADVISED THAT THE ATTORNEY GENERAL OF THE STATE OF NEVADA HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING AND THE FILING OF THE OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE, OR SALE THEREOF, BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEVADA. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. NEVADA ALLOWS THE SALE OF SECURITIES TO 25 OR FEWER PURCHASERS IN THE STATE WITHOUT REGISTRATION. HOWEVER, CERTAIN CONDITIONS APPLY, I.E., THERE CAN BE NO GENERAL ADVERTISING OR SOLICITATION AND COMMISSIONS ARE LIMITED TO LICENSED

BROKER-DEALERS. THIS EXEMPTION IS GENERALLY USED WHERE THE PROSPECTIVE INVESTOR IS ALREADY KNOWN AND HAS A PRE-EXISTING RELATIONSHIP WITH THE COMPANY. (SEE NRS 90.530.11.)

30. **NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY:** NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE UNDER THIS CHAPTER HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

31. **NOTICE TO NEW JERSEY RESIDENTS ONLY:** IF YOU ARE A NEW JERSEY RESIDENT AND YOU ACCEPT AN OFFER TO PURCHASE THESE SECURITIES PURSUANT TO THESE CONFIDENTIAL OFFERING DOCUMENTS, YOU ARE HEREBY ADVISED THAT THESE CONFIDENTIAL OFFERING DOCUMENTS HAVE NOT BEEN FILED WITH OR REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

32. **NOTICE TO NEW MEXICO RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE NEW MEXICO DEPARTMENT OF BANKING NOR HAS THE SECURITIES DIVISION PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

33. **NOTICE TO NEW YORK RESIDENTS ONLY:** THIS MEMORANDUM HAVE NOT BEEN REVIEWED BY THE ATTORNEY GENERAL OF THE STATE OF NEW YORK PRIOR TO ITS ISSUANCE AND USE. THE ATTORNEY GENERAL OF THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THE COMPANY HAS TAKEN NO STEPS TO CREATE AN AFTER MARKET FOR THE SECURITIES OFFERED HEREIN AND HAS MADE NO ARRANGEMENTS WITH BROKERS OF OTHERS TO TRADE OR MAKE A MARKET IN THE SECURITIES. AT SOME TIME IN THE FUTURE, THE COMPANY MAY ATTEMPT TO ARRANGE FOR INTERESTED BROKERS TO TRADE OR MAKE A MARKET IN THE SECURITIES AND TO QUOTE THE SAME IN A PUBLISHED QUOTATION MEDIUM, HOWEVER, NO SUCH ARRANGEMENTS HAVE BEEN MADE AND THERE IS NO ASSURANCE THAT ANY BROKERS WILL EVER HAVE SUCH AN INTEREST IN THE SECURITIES OF THE COMPANY OR THAT THERE WILL EVER BE A MARKET THEREFORE.

34. **NOTICE TO NORTH CAROLINA RESIDENTS ONLY:** IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.

FURTHERMORE, THE FORGOING AUTHORITIES HAVE NOT CONFIRMED ACCURACY OR DETERMINED ADEQUACY OF THIS MEMORANDUM. REPRESENTATION TO THE CONTRARY IS UNLAWFUL. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

35. **NOTICE TO NORTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES COMMISSIONER OF THE STATE OF NORTH DAKOTA NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

36. **NOTICE TO OHIO RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 1707.03(X) OF THE OHIO SECURITIES LAW AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

37. **NOTICE TO OKLAHOMA RESIDENTS ONLY:** THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF OKLAHOMA IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION FOR PRIVATE OFFERINGS. ALTHOUGH A PRIOR FILING OF THESE CONFIDENTIAL OFFERING DOCUMENTS AND THE INFORMATION HAS BEEN MADE WITH THE OKLAHOMA SECURITIES COMMISSION, SUCH FILING IS PERMISSIVE ONLY AND DOES NOT CONSTITUTE AN APPROVAL, RECOMMENDATION OR ENDORSEMENT, AND IN NO SENSE IS TO BE REPRESENTED AS AN INDICATION OF THE INVESTMENT MERIT OF SUCH SECURITIES. ANY SUCH REPRESENTATION IS UNLAWFUL.

38. **NOTICE TO OREGON RESIDENTS ONLY:** THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE CORPORATION COMMISSION OF THE STATE OF OREGON UNDER PROVISIONS OF ORS 59.049. THE INVESTOR IS ADVISED THAT THE COMMISSIONER HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS MEMORANDUM SINCE THIS MEMORANDUM IS NOT REQUIRED TO BE FILED WITH THE COMMISSIONER. THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE COMPANY CREATING THE SECURITIES, AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

39. **NOTICE TO PENNSYLVANIA RESIDENTS ONLY:** EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE SECURITIES EXEMPTED FROM REGISTRATION BY SECTION 203(D), DIRECTLY FROM THE ISSUER OR AFFILIATE OF THIS ISSUER, SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE WITHOUT INCURRING ANY LIABILITY TO THE SELLER, UNDERWRITER (IF ANY) OR ANY OTHER PERSON WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING CONTRACT OF PURCHASE OR, IN THE CASE OF A TRANSACTION IN WHICH THERE IS NO BINDING CONTRACT OF PURCHASE, WITHIN TWO (2) BUSINESS DAYS AFTER HE

MAKES THE INITIAL PAYMENT FOR THE SECURITIES BEING OFFERED. IF YOU HAVE ACCEPTED AN OFFER TO PURCHASE THESE SECURITIES MADE PURSUANT TO A PROSPECTUS WHICH CONTAINS A NOTICE EXPLAINING YOUR RIGHT TO WITHDRAW YOUR ACCEPTANCE PURSUANT TO SECTION 207(M) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 (70 PS § 1-207(M), YOU MAY ELECT, WITHIN TWO (2) BUSINESS DAYS AFTER THE FIRST TIME YOU HAVE RECEIVED THIS NOTICE AND A PROSPECTUS TO WITHDRAW FROM YOUR PURCHASE AGREEMENT AND RECEIVE A FULL REFUND OF ALL MONEYS PAID BY YOU. YOUR WITHDRAWAL WILL BE WITHOUT ANY FURTHER LIABILITY TO ANY PERSON. TO ACCOMPLISH THIS WITHDRAWAL, YOU NEED ONLY SEND A LETTER OR TELEGRAM TO THE ISSUER (OR UNDERWRITER IF ONE IS LISTED ON THE FRONT PAGE OF THE CONFIDENTIAL OFFERING DOCUMENTS) INDICATING YOUR INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF YOU ARE SENDING A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD YOU MAKE THIS REQUEST ORALLY, YOU SHOULD ASK WRITTEN CONFIRMATION THAT YOUR REQUEST HAS BEEN RECEIVED. NO SALE OF THE SECURITIES WILL BE MADE TO RESIDENTS OF THE STATE OF PENNSYLVANIA WHO ARE NON-ACCREDITED INVESTORS. EACH PENNSYLVANIA RESIDENT MUST AGREE NOT TO SELL THESE SECURITIES FOR A PERIOD OF TWELVE (12) MONTHS AFTER THE DATE OF PURCHASE, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION. THE SECURITIES HAVE BEEN ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE PENNSYLVANIA SECURITIES ACT OF 1972. NO SUBSEQUENT RESALE OR OTHER DISPOSITION OF THE SECURITIES MAY BE MADE WITHIN 12 MONTHS FOLLOWING THEIR INITIAL SALE IN THE ABSENCE OF AN EFFECTIVE REGISTRATION, EXCEPT IN ACCORDANCE WITH WAIVERS ESTABLISHED BY RULE OR ORDER OF THE COMMISSION, AND THEREAFTER ONLY PURSUANT TO AN EFFECTIVE REGISTRATION OR EXEMPTION.

40. **NOTICE TO RHODE ISLAND RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE DEPARTMENT OF BUSINESS REGULATION OF THE STATE OF RHODE ISLAND NOR HAS THE DIRECTOR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

41. **NOTICE TO SOUTH CAROLINA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE SOUTH CAROLINA UNIFORM SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE SOUTH CAROLINA SECURITIES COMMISSIONER. THE COMMISSIONER DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THESE CONFIDENTIAL OFFERING DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

42. **NOTICE TO SOUTH DAKOTA RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATION OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THESE CONFIDENTIAL OFFERING DOCUMENTS ARE TRUE, COMPLETE, AND NOT MISLEADING, NOR HAS THE DIRECTOR

OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**43. NOTICE TO TENNESSEE RESIDENT ONLY:** IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD. EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**44. NOTICE TO TEXAS RESIDENTS ONLY:** THE SECURITIES OFFERED HEREUNDER HAVE NOT BEEN REGISTERED UNDER APPLICABLE TEXAS SECURITIES LAWS AND, THEREFORE, ANY PURCHASER THEREOF MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME BECAUSE THE SECURITIES CANNOT BE RESOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH SECURITIES LAWS OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. FURTHER, PURSUANT TO §109.13 UNDER THE TEXAS SECURITIES ACT, THE COMPANY IS REQUIRED TO APPRISE PROSPECTIVE INVESTORS OF THE FOLLOWING: A LEGEND SHALL BE PLACED, UPON ISSUANCE, ON CERTIFICATES REPRESENTING SECURITIES PURCHASED HEREUNDER, AND ANY PURCHASER HEREUNDER SHALL BE REQUIRED TO SIGN A WRITTEN AGREEMENT THAT HE WILL NOT SELL THE SUBJECT SECURITIES WITHOUT REGISTRATION UNDER APPLICABLE SECURITIES LAWS, OR EXEMPTIONS THEREFROM.

**45. NOTICE TO UTAH RESIDENTS ONLY:** THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE UTAH SECURITIES ACT. THE SECURITIES CANNOT BE TRANSFERRED OR SOLD EXCEPT IN TRANSACTIONS WHICH ARE EXEMPT UNDER THE ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT.

**46. NOTICE TO VERMONT RESIDENTS ONLY:** THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES DIVISION OF THE STATE OF VERMONT NOR HAS THE COMMISSIONER PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**47. NOTICE TO VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION UNDER SECTION 13.1-514 OF THE VIRGINIA SECURITIES ACT AND MAY NOT BE RE-OFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

23-90248-WLH11   Doc 469   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 31   Page 481 of 481

48. **NOTICE TO WASHINGTON RESIDENTS ONLY:** THE ADMINISTRATOR OF SECURITIES HAS NOT REVIEWED THE OFFERING OR CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM AND THE SECURITIES HAVE NOT BEEN REGISTERED IN RELIANCE UPON THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, AND THEREFORE, CANNOT BE RESOLD UNLESS THEY ARE REGISTERED UNDER THE SECURITIES ACT OF WASHINGTON, CHAPTER 21.20 RCW, OR UNLESS AN EXEMPTION FROM REGISTRATION IS MADE AVAILABLE.

49. **NOTICE TO WEST VIRGINIA RESIDENTS ONLY:** IF AN INVESTOR ACCEPTS AN OFFER TO PURCHASE ANY OF THE SECURITIES, THE INVESTOR IS HEREBY ADVISED THE SECURITIES WILL BE SOLD TO AND ACQUIRED BY IT/HIM/HER IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 15.06(B)(9) OF THE WEST VIRGINIA SECURITIES LAW AND MAY NOT BE REOFFERED FOR SALE, TRANSFERRED, OR RESOLD EXCEPT IN COMPLIANCE WITH SUCH ACT AND APPLICABLE RULES PROMULGATED THEREUNDER.

50. **NOTICE TO WISCONSIN RESIDENTS ONLY:** IN ADDITION TO THE INVESTOR SUITABILITY STANDARDS THAT ARE OTHERWISE APPLICABLE, ANY INVESTOR WHO IS A WISCONSIN RESIDENT MUST HAVE A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) IN EXCESS OF THREE AND ONE-THIRD (3 1/3) TIMES THE AGGREGATE AMOUNT INVESTED BY SUCH INVESTOR IN THE SECURITIES OFFERED HEREIN.

51. **FOR WYOMING RESIDENTS ONLY:** ALL WYOMING RESIDENTS WHO SUBSCRIBE TO PURCHASE SECURITIES OFFERED BY THE COMPANY MUST SATISFY THE FOLLOWING MINIMUM FINANCIAL SUITABILITY REQUIREMENTS IN ORDER TO PURCHASE SECURITIES: (1) A NET WORTH (EXCLUSIVE OF HOME, FURNISHINGS AND AUTOMOBILES) OF TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000); AND (2) THE PURCHASE PRICE OF SECURITIES SUBSCRIBED FOR MAY NOT EXCEED TWENTY PERCENT (20%) OF THE NET WORTH OF THE SUBSCRIBER; AND (3) "TAXABLE INCOME" AS DEFINED IN SECTION 63 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, DURING THE LAST TAX YEAR AND ESTIMATED "TAXABLE INCOME" DURING THE CURRENT TAX YEAR SUBJECT TO A FEDERAL INCOME TAX RATE OF NOT LESS THAN THIRTY-THREE PERCENT (33%).  IN ORDER TO VERIFY THE FOREGOING, ALL SUBSCRIBERS WHO ARE WYOMING RESIDENTS WILL BE REQUIRED TO REPRESENT IN THE SUBSCRIPTION AGREEMENT THAT THEY MEET THESE WYOMING SPECIAL INVESTOR SUITABILITY REQUIREMENTS.

## BASIS OF PRESENTATION

In this Memorandum, unless the context otherwise requires, we," "us," "our,"  or the "Company," refers collectively to iCap Pacific Income Fund 5, LLC, a Delaware limited liability company, formed on June 25, 2019, the issuer of the Notes in this Offering, and its subsidiaries.

We use a twelve-month fiscal year ending on December 31st of each calendar year. In a twelve-month fiscal year, each quarter includes three-months of operations; the first, second, third and fourth quarters end on March 31, June 30, September 30 and December 31, respectively.

Certain monetary amounts, percentages and other figures included in this Memorandum have been subject to rounding adjustments. Percentage amounts included in this Memorandum have not in all cases been calculated on the basis of such rounded figures but on the basis of such amounts prior to rounding. For this reason, percentage amounts in this Memorandum may vary from those obtained by performing the same calculations using the figures in our consolidated financial statements. Certain other amounts that appear in this Memorandum may not sum due to rounding.

Unless otherwise indicated, all references to "dollars" and "$" in this Memorandum are to, and amounts are presented in, U.S. dollars.

Unless otherwise indicated or the context otherwise requires, financial and operating data in this Memorandum reflect the consolidated business and operations of the Company and its subsidiaries.

## MARKET AND INDUSTRY DATA AND FORECASTS

Certain market and industry data included in this Memorandum is derived from information provided by third-party market research firms, or third-party financial or analytics firms that we believe to be reliable. Market estimates are calculated by using independent industry publications, government publications and third-party forecasts in conjunction with our assumptions about our markets. We have not independently verified such third-party information. The market data used in this Memorandum involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates.  Certain data are also based on our good faith estimates, which are derived from management's knowledge of the industry and independent sources. Industry publications, surveys and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but there can be no assurance as to the accuracy or completeness of included information. We have not independently verified any of the data from third-party sources nor have we ascertained the underlying economic assumptions relied upon therein. Statements as to our market position are based on market data currently available to us. While we are not aware of any misstatements regarding any market, industry or similar data presented herein, such data involves risks and uncertainties and are subject to change based on various factors, including those discussed under the headings "Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors" in this Memorandum. These and other factors could cause results to differ materially from those expressed in the estimates made by the independent parties and by us. While we are not aware of any misstatements regarding the above matters presented herein, the information described above and our estimates involve risks and uncertainties and are subject to change based on various factors, including those discussed under the heading "Risk Factors" in this Memorandum. Similarly, we believe our internal research is reliable, even though such research has not been verified by any independent sources.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This Memorandum contains certain forward-looking statements that are subject to various risks and uncertainties. Forward-looking statements are generally identifiable by use of forward-looking terminology such as "may," "will," "should," "potential," "intend," "expect," "outlook," "seek,"

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 3 Page 483

"anticipate," "estimate," "approximately," "believe," "could," "project," "predict," or other similar words or expressions. Forward-looking statements are based on certain assumptions, discuss future expectations, describe future plans and strategies, contain financial and operating projections or state other forward-looking information. Our ability to predict results or the actual effect of future events, actions, plans or strategies is inherently uncertain. Although we believe that the expectations reflected in our forward-looking statements are based on reasonable assumptions, our actual results and performance could differ materially from those set forth or anticipated in our forward-looking statements. Factors that could have a material adverse effect on our forward-looking statements and upon our business, results of operations, financial condition, funds derived from operations, cash available for dividends, cash flows, liquidity and prospects include, but are not limited to, the factors referenced in this Memorandum, including those set forth below.

When considering forward-looking statements, you should keep in mind the risk factors and other cautionary statements in this Memorandum. Readers are cautioned not to place undue reliance on any of these forward-looking statements, which reflect our views as of the date of this Memorandum. The matters summarized below and elsewhere in this Memorandum could cause our actual results and performance to differ materially from those set forth or anticipated in forward-looking statements. Accordingly, we cannot guarantee future results or performance. Furthermore, except as required by law, we are under no duty to, and we do not intend to, update any of our forward-looking statements after the date of this Memorandum, whether as a result of new information, future events or otherwise.

## CONFIDENTIALITY AND RELATED MATTERS

Each recipient hereof agrees by accepting this Memorandum that the information contained herein is of a confidential nature and that such recipient will treat such information in a strictly confidential manner and that such recipient will not, directly or indirectly, disclose or permit its affiliates or representatives to disclose, any information to any other person or entity, or reproduce such information, in whole or in part, without the prior written consent of the Company.

Each recipient of this Memorandum further agrees to use the information solely for the purpose of analyzing the desirability of an investment in the Notes to such recipient and for no other purpose whatsoever.

ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM AND EXHIBITS, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY IS PROHIBITED. NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM OR AN AUTHORIZED SUMMARY HEREOF, OR IN ANY AGREEMENT CONTEMPLATED HEREBY, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR IN SUCH AUTHORIZED SUMMARY OR AGREEMENT MUST NOT BE RELIED UPON.

## RESTRICTIONS ON TRANSFERABILITY

SINCE THE SECURITIES OFFERED HEREBY ARE NOT BEING REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES CANNOT BE SOLD BY AN INVESTOR UNLESS THEY ARE SUBSEQUENTLY REGISTERED UNDER SUCH ACT, OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE AT THE TIME OF DESIRED SALE. THEREFORE, A PURCHASER MUST BE ABLE TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## TAXES

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL OR TAX ADVICE. THE TAX ASPECTS OF AN INVESTMENT IN THE NOTES REQUIRE CAREFUL AND INFORMED STUDY WITH RESPECT TO AN INVESTOR'S PERSONAL TAX AND FINANCIAL POSITION. ACCORDINGLY, NO PERSON SHOULD INVEST IN THE NOTES WITHOUT PRIOR INDEPENDENT EXPERT ADVICE AS TO THE TAX IMPACT OF AN INVESTMENT IN THE NOTES. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS PRIOR TO PURCHASING ANY NOTES. NOTHING IN THIS MEMORANDUM SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO POTENTIAL INVESTORS.

A COPY OF THIS MEMORANDUM AND THE SUBSCRIPTION AGREEMENTS SHALL BE DELIVERED TO EVERY PERSON SOLICITED TO BUY ANY OF THE SECURITIES HEREBY OFFERED, AT THE TIME OF THE INITIAL OFFER TO SELL.

## WHERE YOU CAN OBTAIN MORE INFORMATION

This Memorandum contains limited information on the Company. While we believe the information contained in this Memorandum is accurate, this Memorandum is not meant to contain an exhaustive discussion regarding the Company. We cannot guarantee a prospective investor that the abbreviated nature of this Memorandum will not omit to state a material fact, which a prospective investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such investor. As a result, prospective investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **An investment in the Notes is suitable only for investors who have the knowledge and experience to independently evaluate the Company, our business and prospects.**

Prospective investors may make an independent examination of our books, records and other documents to the extent an investor deems it necessary, and should not rely on us or any of our employees or agents with respect to judgments relating to an investment in the Notes.

Each offeree may, if he, she or it so desires, make inquiries of appropriate members of our management with respect to our business or any other matters set forth herein, and may obtain any additional information which such person deems to be necessary in order to verify the accuracy of the information contained in this Memorandum (to the extent that we possess such information or can acquire it without unreasonable effort or expense) upon the execution and delivery of an agreement to maintain the confidentiality of such information for the benefit of the Company.

Any such inquiries or requests for additional information or documents should be made in writing to us, addressed as follows:

<div align="center">

iCap Pacific Income Fund 5, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006
ATTN: Investor Relations
OFC: (425) 278-9030; FAX: (425) 278-9025
EMAIL: inquiry@icapequity.com

</div>

# Table of Contents

SUMMARY ............................................................................................................................ 1

THE OFFERING ................................................................................................................... 3

THE NOTES ......................................................................................................................... 3

SECURITY AND GUARANTY; COLLATERAL AGENT ................................................ 5

THE COMPANY ................................................................................................................... 8

    The Company and its Operations ....................................................................................... 8

    Investment Strategy .......................................................................................................... 8

    Meeting Demand Payment Obligations ............................................................................. 9

    Members and Management ................................................................................................ 9

    Biographies of Management Personnel ........................................................................... 10

    Organizational Strength and Experience ......................................................................... 10

    Investment Experience .................................................................................................... 11

    Management Fees; Transactions with Related Parties ..................................................... 13

USE OF PROCEEDS .......................................................................................................... 14

PLAN OF DISTRIBUTION ............................................................................................... 14

INVESTOR SUITABILITY STANDARDS ....................................................................... 16

SUBSCRIPTION PROCEDURES ...................................................................................... 18

RESTRICTIONS ON TRANSFERABILITY ..................................................................... 19

STATEMENT AS TO INDEMNIFICATION ..................................................................... 19

RISK FACTORS ................................................................................................................. 20

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ..................................... 32

## Exhibits

Exhibit A         Subscription Agreement
Exhibit B         Form of Promissory Note
Exhibit C         Pledge and Security Agreement
Exhibit D         Guaranty Agreement
Exhibit E         Collateral Agent Agreement

# SUMMARY

*This summary of this Memorandum highlights material information concerning our business and this Offering. This summary does not contain all of the information that you should consider before making your investment decision. You should carefully read this entire Memorandum, including the information presented under the section entitled "Risk Factors" and the financial data and related notes, before making an investment decision. This summary contains forward-looking statements that involve risks and uncertainties. Our actual results may differ significantly from future results contemplated in the forward-looking statements as a result of factors such as those set forth in "Risk Factors" and "Cautionary Statement Regarding Forward-Looking Statements."*

The following is a summary of selected terms of the Company and the Notes. This summary is not intended as a summary of all principal terms and is qualified in its entirety by the more detailed descriptions set forth below, including the Subscription Agreements attached hereto as Exhibit A (the "Subscription Agreement"). Capitalized terms used in this Summary and not otherwise defined have the meanings given to them elsewhere in this Memorandum.

| | |
|---|---|
| **The Company** | iCap Pacific Income Fund 5, LLC, a Delaware limited liability company is an affiliate of iCap Equity, LLC, a Bellevue, Washington-based investment firm formed in 2011. "iCap Equity" or "iCap," as used in this Memorandum, refers to iCap Enterprises, Inc. (the parent company of iCap Equity, LLC) and its affiliated group of companies (excluding the Company). |
| | See "The Company" commencing on page 8. |
| **Purpose** | The primary purpose of the Company is to acquire real estate investments in the United States and provide a rate of return to its investors. The Company has formed iCap Holding 5, LLC ("Holding") as a wholly owned subsidiary of the Company, and Holding shall own an interest in one or more standalone subsidiaries (each a "Portfolio SPE"), which will then hold real property investments. The Company's business plan targets preferred equity investments into construction and development projects, with individual investment amounts generally in the $500,000 to $2,000,000 range. There is no specific limit or requirement as to the size of the projects that the Company may undertake. |
| | See "The Company" commencing on page 8. |
| **Manager** | The Company is managed by iCap Pacific NW Management, LLC, a Washington limited liability company (the "Manager"). The Company will pay the Manager an annual management fee equal to 2% of the outstanding aggregate principal balances of the Notes outstanding from time to time. |
| | See "The Company – Members and Management" commencing on page 9. |
| **The Offering** | The Company is issuing up to $50,000,000 (with an over-allotment amount of $25,000,000, for a maximum total of $75,000,000) in aggregate principal amount of Notes, provided that the Company may issue other additional promissory notes or other instruments at any time, subject to the limitations set forth below. The minimum individual investment is $50,000, with any amounts in excess thereof being permitted, and all subscriptions, whether for |

23-01243-WLH11     Doc 469     Filed 02/23/24     Entered 02/23/24 19:45:30     Exhibit 7 Page 487

the minimum investment amount, or more or less than this amount, are subject to the acceptance or rejection by the Manager in its sole discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one Noteholder or its affiliates.

The Company will offer the Notes for a period commencing on the date of this Memorandum and expiring on June 30, 2020, unless extended by us for up to 12 months. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines.

The Company may terminate, or amend the terms of, this Offering at any time.

See "The Offering" commencing on page 3.

**The Notes**

The Notes will accrue interest at the rate of 9% per annum, simple interest, non-compounding, based on a 365-day year, provided, however, that the interest rate applicable to the first $10 million of aggregate principal amount of Notes issued in this Offering will be 10% per annum for the first year and thereafter 9% per year (as applicable, the "Interest Rate"). Interest will be paid monthly commencing the month after the issuance date. Investors will have the option of directing their monthly interest to an account of their choosing. Investors will have the option of demanding repayment of all or any part of their outstanding principal and unpaid accrued interest, any time after the 1-year anniversary of their investment date, subject to a limit of no more repayments than 5% of the combined Notes of the Company per quarter. Upon any demand for repayment prior to the 5th anniversary of the issuance date of the Note, a discount will be applied to the amount outstanding under the Note, depending on the time from the issuance of the Note at which the repayment demand is received by the Company.

Upon a request for demand repayment, the Company will pay the principal within 180 days after the date notice is delivered. The Company may prepay all or any part of the Notes without penalty at any time prior to the Maturity Date. If not earlier paid, the outstanding principal and unpaid accrued interest on the Notes will be due and payable 5 years after the issue date of the Note.

See "The Notes" commencing on page 3.

**Security and Guaranty; Collateral Agent**

The Notes will be secured by a pledge of Holding's equity interests in the Portfolio SPEs, and Holding shall enter into a guaranty agreement for the benefit of the Noteholders.

The Company has entered into a Collateral Agent Agreement with MarketPlace Realty Advisors, LLC, pursuant to which MarketPlace Realty Advisors, LLC will act as "Collateral Agent" for the benefit of the Noteholders.

See "The Notes" commencing on page 3 and "Security and Guaranty; Collateral Agent" on page 5.

| Expenses | The Company will bear all costs and expenses incurred in the organization of the Company and this Offering and potential future offerings, and will reimburse Manager for any such costs and expenses advanced by Manager. The Company will also pay the Manager an annual management fee of 2% of the aggregate principal balances of the Notes outstanding from time to time. With the exception of employee payroll expenses, which will be paid by the Manager, all other expenses will be borne by the Company. Each investor will bear his, her or its own fees and expenses incurred in connection with this Offering. |
| | |

See "The Company -  Management Fees; Transactions with Related Parties" on page 13.

## THE OFFERING

The Company is offering for sale up to $50,000,000 of aggregate principal amount (with an over-allotment amount of $25,000,000, for a maximum total of $75,000,000) of promissory notes. The Offering is being made by the Company on a "best efforts" basis only to persons who are "accredited investors" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.  The Company has engaged Cobalt Capital, Inc. as the Managing Broker Dealer in this Offering, and the Company will pay commissions as set forth in the Plan of Distribution commencing on page 14, based on the aggregate principal amount of the Notes sold to investors.

The Company will attempt to sell the Notes during an offering period commencing on the date of this Memorandum and expiring on June 30, 2020, unless extended by us for up to 12 month (the "Offering Period") or earlier terminated as set forth herein.

The minimum individual investment is $50,000, with any amount in excess of $50,000 being permissible at the Manager's discretion.  All subscriptions are subject to acceptance or rejection by the Manager in its sole discretion. The Manager may change, or accept less than, the minimum investment amount in its discretion. The Company may limit the maximum amount of outstanding principal payment obligations owed to any one investor or its affiliates. There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines. In order to subscribe for a Note, prospective investors must follow the directions set forth in "Subscription Procedures" commencing on page 18.

An investor must be prepared to bear the economic risk of an investment in the Notes for an indefinite period of time.  An investor in the Notes, pursuant to the Subscription Agreement and applicable law, will not be permitted to transfer or dispose of the Notes, unless they are registered for resale or such transaction is exempt from registration under the Securities Act and other applicable securities laws, and in the case of a purportedly exempt sale, such investor provides (at his or her own expense) an opinion of counsel satisfactory to us that such exemption is, in fact, available.  The Notes will bear a legend relating to such restrictions on transfer.

This Offering may be withdrawn or terminated by the Company at any time. The Manager reserves the right to reject a subscription for Notes, in whole or in part in its sole discretion.

## THE NOTES

The Notes will bear interest at a rate of 9% per year, provided, however, that the first $10 million of aggregate principal amount of Notes issued in this Offering will bear interest at the rate of 10% per annum for the first year and then 9% per annum thereafter. Interest will be simple interest, non-

compounding. The Notes will have a maturity date 5 years following the issuance date (the "Maturity Date"); however, an Investor may request repayment of funds any time after the 1-year anniversary of the date of Investment, as discussed below. In order to allow the Company to continue its operations successfully, no more than 5% of the aggregate Note balances may be repaid in a given calendar quarter. Interest will accrue based on a 365-day year, and will be paid monthly. All remaining principal and interest will be due and payable on the Maturity Date, other than as set forth below. The Company may prepay all or any part of the Notes without penalty at any time prior to the Maturity Date. If the Company makes any prepayment, the prepayments need not be made ratably against all outstanding Notes, and the Company may prepay some Notes while not prepaying others. If not earlier paid, whether pursuant to a Demand Notice (as described below) or full prepayment by the Company, outstanding principal and unpaid accrued interest on the Notes will be due and payable on the Maturity Date.

At any time following the 1-year anniversary of the issuance date, a Noteholder may require the Company to repay all or a portion of principal and accrued interest on the Note, subject to the limitations and deductions below, by providing a demand notice to the Company ("Demand Notice"). Such notice may be delivered via First Class US mail, or electronically via email to an account representative, or through the Company's website at www.icapequity.com or its licensed software application (the "App"). The App, which will be available to Noteholders through mobile devices and desktops, will allow the Noteholder to review his/her transaction history, provide Demand Notice requests, purchase additional Notes, agree to investment documentation, send messages to the Company, and receive notices from the Company. Information on the foregoing website is not incorporated into this Memorandum.

Upon delivery of a demand for redemption, a discount will be applied to the amount outstanding under the Note which is to be repaid, as follows:

- For redemption demands received by the Company prior to the second anniversary of the issuance date of the Note, the repayment amount requested will be reduced by 10%, such that 90% of the repayment amount in the demand repayment will be repaid, and the remaining 10% of the repayment amount in the demand repayment will be deemed forgiven and satisfied in full.

- For redemption demands received by the Company after the second anniversary of the issuance date of the Note but prior to the third anniversary of the issuance date of the Note, the repayment amount requested will be reduced by 7.5%, such that 92.5% of the repayment amount in the demand repayment will be repaid, and the remaining 7.5% of the repayment amount in the demand repayment will be deemed forgiven and satisfied in full.

- For redemption demands received by the Company after the third anniversary of the issuance date of the Note but prior to the fourth anniversary of the issuance date of the Note, the repayment amount requested will be reduced by 5%, such that 95% of the repayment amount in the demand repayment will be repaid, and the remaining 5% of the repayment amount in the demand repayment will be deemed forgiven and satisfied in full.

- For redemption demands received by the Company after the fourth anniversary of the issuance date of the Note but prior to the fifth anniversary of the issuance date of the Note, the repayment amount requested will be reduced by 2.5%, such that 97.5% of the repayment amount in the demand repayment will be repaid, and the remaining 2.5% of the repayment amount in the demand repayment will be deemed forgiven and satisfied in full.

Upon receipt of a Demand Notice, the Company will pay the requested amount subject to the deductions as set forth above (the "Demand Payment") within 180 days after the Demand Notice was received. For those investors not wishing to utilize the Company website at www.icapequity.com or the App, a form of the Demand Notice is attached as Exhibit A to the Note, a form of which is attached hereto

as Exhibit B.

The Company may not incur additional indebtedness for the sole purpose of making any Demand Repayments.

Each Note may be amended by the Company and the applicable Noteholder. However, the Note also contains a "deemed consent" provision, which provides that if the Company has provided the Noteholder with two notices of a proposed amendment (or any other consent, approval or waiver required or requested) and the Noteholder has not responded to either notice within 10 days of delivery, the Noteholder will be deemed to have consented, in writing, to the proposed amendment, approval, consent or waiver, and the Company may rely on such deemed consent.

The description of the Notes set forth herein is qualified in its entirety by the form of Note as attached hereto as Exhibit B.

## SECURITY AND GUARANTY; COLLATERAL AGENT

The Notes will be secured by a Pledge and Security Agreement entered into on September 5, 2019, by the Company, Holding and MarketPlace Realty Advisors, LLC ("Collateral Agent") in its capacity as collateral agent for the benefit of the Noteholders (the "Security Agreement"), pursuant to which Holding will pledge all of the membership interests of the Portfolio SPEs for the benefit of the Noteholders. The Security Agreement is attached hereto as Exhibit C.

The Company and the Collateral Agent have entered into the Collateral Agent Agreement, dated as of September 5, 2019 (the "Collateral Agent Agreement"), pursuant to which the Collateral Agent will receive and distribute certain notices with respect to the Notes, the Security Agreement and the Guaranty, and will generally act as the agent of the Holder with respect to the Pledged Interests and the Guaranty. All notices from the Noteholders will be transmitted through the Collateral Agent, other than Demand Repayments and similar communications which pertain to solely one Noteholder, as opposed to the Noteholders as a group, and the Company may send notices either directly to a Noteholder or through the Collateral Agent to the Noteholder(s). Each investor in this Offering, as a condition thereto, shall be required to execute a counterpart signature page to the Collateral Agent Agreement and become a party thereto. Investors will not join the Security Agreement or the Guaranty Agreement as a party, as their rights thereunder will be represented by the Collateral Agent. The Collateral Agent Agreement is attached hereto as Exhibit E, and a counterpart signature page thereto is attached to the Subscription Agreement.

Pursuant to the Security Agreement and to secure the prompt payment and full and faithful performance of the obligations of the Company to the Noteholders pursuant to the Notes, Holding will grant a security interest in its membership interests in the Portfolio SPEs for the benefit of the Noteholders (the "Pledged Interests"). In the event that an Event of Default (as defined below) occurs, as determined and claimed by Noteholders holding a majority of the principal amount of the Notes then outstanding (subject to the limitation on voting as set forth below, a "Majority-in-Interest of the Noteholders"), then, as determined by a Majority-in-Interest of the Noteholders, the Noteholders may direct the Agent to exercise the rights and pursue the remedies provided under Articles 8 and 9 of the Uniform Commercial Code (the "UCC") with respect to the Pledged Interests, including the right to exercise all voting rights with respect to the Pledged Interests, collecting all dividends and other distributions with respect to the Pledged Interests, and foreclosing the liens and security interest created under the Security Agreement by any available judicial procedure or without judicial process and selling the Pledged Interests.

The Security Agreement provides that the Company may make tax distributions to its members, subject to any limitations in the operating agreement of the Company (the "Operating Agreement") which provides that, if there are any Notes issued and outstanding, the Company may not make any distributions to its members (other than tax distributions, which are required to be made, as further discussed below)

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 91 Page 491

unless approved by a Majority-in-Interest of the Noteholders. The Operating Agreement requires the payment of tax distributions (i.e., distributions in the amount of taxes payable by such members on the apportioned income of the entities) to the members of the Company, regardless of whether an Event of Default exists and without any approval of the Noteholders being required. Management Fees and other fees and costs payable to the Manager as described below are not distributions, and will be paid regardless of whether a default or an Event of Default has occurred and is continuing or the value of the Company's assets, and without any approval of the Noteholders being required.

The Security Agreement provides that the Company, Holding and their respective subsidiaries may utilize leverage in making investments, but the maximum amount of leverage that the Company may incur, without the approval of a Majority-in-Interest of the Noteholders, will be 25% of the total outstanding Note balances (e.g. if there are $50 million of Notes outstanding, then the maximum leverage incurable without such approval will be $12.5 million). The Security Agreement also provides that the Company, Holding and their respective subsidiaries may issue promissory notes that are senior to the Notes, but that any such issuances in excess of 25% of the total outstanding Note balances will require the approval of a Majority-in-Interest of the Noteholders.

In addition, Holding has entered into a Guaranty Agreement in favor of the Noteholders with the Company pursuant to which Holding has guaranteed the obligations of the Company under the Notes (the "Guaranty Agreement"), which is attached hereto as Exhibit D. The Guaranty Agreement provides that, during the continuation of an Event of Default, the Agent, on behalf of the Noteholders, may enforce the guaranty against Holding, but only after attempting to collect or exhausting the Agent's efforts to collect from the Company. Any actions with respect to the Guaranty Agreement must similarly be agreed to by a Majority-in-Interest of the Noteholders pursuant to the Collateral Agent Agreement.

The Security Agreement, the Guaranty Agreement and the Collateral Agent Agreement may each be amended by the Company entities a party thereto, with the approval of Noteholders holding a majority of the aggregate principal amount of the Notes then outstanding, and with the approval of the Collateral Agent with respect to the Collateral Agent Agreement. However, the Security Agreement, the Guaranty Agreement and the Collateral Agent Agreement each also contain a "deemed consent" provision, which provides that if the Company entity (the Company or Holding, as applicable) has provided the Investor with two notices of the proposed amendment (or any other consent, approval or waiver requested or required) and the Investor has not responded to either notice within 10 days, the Investor will be deemed to have consented, in writing, to the proposed amendment, approval, consent or waiver, and the Company entities may rely on such deemed consent.

The description of the Security Agreement set forth herein is qualified in its entirety by the Security Agreement as attached hereto as Exhibit C, the description of the Guaranty Agreement set forth herein is qualified in its entirety by the Guaranty Agreement as attached hereto as Exhibit D, and the description of the Collateral Agent Agreement set forth herein is qualified in its entirety by the Collateral Agent Agreement as attached hereto as Exhibit E.

The Notes will be junior to any credit facilities that are put in place by the Company related to its operations, and the real property assets of the Company and its direct or indirect subsidiaries may be used as collateral for such credit facilities. Additionally, the Notes will be junior to any project related financing of the Portfolio SPEs, such as construction and other loans of such Portfolio SPEs.

The Portfolio SPEs will be controlled by the Company, but the Company will not be the sole member of the Portfolio SPEs, as the developers of the projects will also have an interest therein; however, profits distributions on the Portfolio SPE level cannot be paid to the developers until the Company has been paid as agreed under the operating agreements of the Portfolio SPEs. These developers, however, may still receive payment for their customary fees and costs, including the construction and other loans as described above, which will be charged on an arms'-length basis, and will be paid prior to the Company receiving

any payment under the operating agreements of the Portfolio SPEs. In this regard, the Notes will be subordinate to the obligations due under the SPEs.

Prior to the time that the Company utilizes the proceeds from this Offering to acquire real estate, and other than for the use of proceeds related to this Offering and the formation of the Company as set forth below, the Company will retain the funds from this Offering in its non-segregated operating accounts at commercial banks.

The Notes are subject to four possible "Events of Default." It is an "Event of Default" if any of the following occur, and the Company has not rectified such event within 90 days of receipt of notice thereof signed by a Majority-in-Interest (subject to the discussion below) of the Noteholders:

(i) The Company fails to make a Demand Payment when due;

(ii) the Company fails to perform any of its material obligations under the Note, or is in breach in any material respect of any representation, warranty, covenant or agreement on the part of the Company set forth in the Note;

(iii) the Company commences any liquidation or dissolution proceedings or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consents to the filing of any bankruptcy petition against it under any similar law; or

(iv) the Company fails to pay all amounts due under the Notes on the Maturity Date.

Only a Majority-in-Interest of the Noteholders can declare an Event of Default, and then only after the 90-day cure period has expired without the Company rectifying the applicable situation. However, a particular Noteholder is not entitled to vote for (or against) the declaration of an "Event of Default" unless, as of the time of such vote, the applicable Event of Default has occurred and is continuing under the Note held by such Noteholder, provided, however, that the principal amount under that Noteholder's Note will continue to be counted for purposes of determining the aggregate principal amount of Notes then outstanding for purposes of determining whether Noteholders holding a sufficient principal amount of Notes have elected to declare an "Event of Default."

If an Event of Default occurs, the interest rate will be increased to 15% per annum (the "Default Rate"), which Default Rate will remain in place until the Note is either paid as due or such Event of Default is cured.

If the Event of Default is as described in clause (i), (ii), or (iv) above, a Majority-in-Interest of the Noteholders will have the right to declare only the applicable Note(s) which are subject to the Event of Default due and payable. If the Event of Default is as described in clause (iii) above, a Majority-in-Interest of the Noteholders will have the right to declare all of the Notes due and payable.

Upon delivery of written notice to the Company of such default, the Company will have 30 days to honor the payment obligation. If the Company fails to honor the repayment obligation within this time period, then a Majority-in-Interest of the Noteholders will have the right to direct the Collateral Agent to proceed to enforce the security granted to the noteholders pursuant to the Security Agreement and to enforce the Guaranty Agreement.

Notwithstanding the above, the Notes provide that in the event that the Company defaults on the terms of any particular Note, but such default is not applicable to a sufficient quantity of the Notes such that an "Event of Default" can be declared, the Default Rate will apply to that particular Note, and that particular Note will be immediately due and payable. In such an instance, the holder of the defaulted Note may still proceed against the Company for damages and payment of the principal amount of such Note;

however such particular Noteholder would not be able to enforce the rights under the Security Agreement or the Guaranty Agreement, without first obtaining the majority approval of Noteholders which is required to declare an "Event of Default" thereunder.

## THE COMPANY

**The Company and its Operations**

iCap Pacific Income Fund 5, LLC is a newly formed Delaware limited liability company and is an affiliate of iCap Equity, LLC, a Bellevue, Washington-based investment firm formed in 2011. The Company has been established to provide an investment vehicle that generates an ongoing rate of return, is secured by interests of the Portfolio SPEs, and has a liquidity mechanism for investors.

The primary purpose of the Company is to acquire preferred equity interests in real estate holdings, which primarily consist of construction and development projects in selected metropolitan statistical areas in the United States (each, a "Portfolio Investment"). Portfolio Investments will be held in standalone Portfolio SPEs, which will be owned by Holding and the builders or developers who manage the projects (each a "Project Partner"). The Company's business plan targets the acquisition of short-term (less than 24-months) real estate investments with Project Partners who have strong track records of success. The equity interests of the Portfolio SPEs will secure the amounts due under the Notes. Portfolio investments are typically in the $500,000 to $2,000,000 range, although there is no limit or requirement on the size of the investments that the Company may make.

The geographic areas in which the Company invests are determined by selecting metropolitan statistical areas upon consultation with market professionals and in-depth review of economic data. The Company may adjust its investment criteria to accommodate changing market conditions, but will generally seek attractive locations with strong exit potential and proven Project Partners.

The Manager anticipates that the Company will be exempt from the registration requirements of the Investment Company Act of 1940, as amended.

POTENTIAL INVESTORS SHOULD RECOGNIZE THAT BY PURCHASING NOTES THEY WILL NOT THEREBY ACQUIRE ANY INTEREST, DIRECTLY OR INDIRECTLY, IN THE COMPANY OR ANY OF THE PRIOR PROGRAMS OR ANY FUTURE PROGRAM SPONSORED BY THE MANAGER OR ITS AFFILIATES. INVESTORS SHOULD RECOGNIZE THAT ANY PRIOR PERFORMANCE OR TRACK RECORD INFORMATION RECEIVED REGARDING THE MANAGER AND ITS AFFILIATES AS SET FORTH HEREIN IS GIVEN SOLELY TO ALLOW INVESTORS TO ASSESS THE EXPERIENCE OF THE MANAGER AND ITS AFFILIATES. THE MANAGER AND ITS AFFILIATES MAY CONTINUE TO ENGAGE IN MANAGEMENT AND INVESTMENT ACTIVITIES RELATED TO PRE-EXISTING INVESTMENTS AND ACTIVITIES OR OPERATIONS OF THE PRIOR FUNDS AS WELL AS FUTURE INVESTMENTS OR FUNDS.

**Investment Strategy**

The Company's portfolio investments will consist of a variety of real estate types, including without limitation single-family homes, multi-family apartments, townhomes, and mixed-use properties, generally in construction and development phases. The revenue generated from the Investment Portfolio will be used to pay interest and principal on the Notes and fund its operations.

To build its Investment Portfolio, the Company will identify metropolitan statistical areas within which to purchase properties. The Company has developed proven processes and controls to evaluate possible investment opportunities. The process begins by identifying metropolitan statistical areas within the U.S. ("Markets") with strong economic fundamentals that are likely to result in reliable exit strategies

and strong returns. The Markets are selected after review of reports and analysis provided by economics professionals, as well as the Company's internal staff. After reviewing the information, a committee consisting of key members of the management team (the "Investment Committee") may approve a Market. After a Market has been approved, the Company's acquisition team will search for investment opportunities for the Company that meet the criteria of the applicable investment policies of the Company.

Every investment opportunity will undergo due diligence performed by the Company's underwriting staff, who will then present investment opportunities to the Investment Committee for its review and approval. The Investment Committee may delegate investment decision-making authority to sub-teams, provided such investments meet the fundamental criteria established by the Investment Committee. The Company will complete diligence on prospective investments and maintain closing procedures that provide for the safety of the invested funds, such as the involvement of a third-party escrow company. The investment process has three major areas of focus: analysis and approval, documentation and closing, and post-closing management.

**Meeting Demand Payment Obligations**

The Company will have cash reserves available to honor Demand Repayments and the Company may, in its discretion, cause Holding to dispose of some or all of its investment holdings to reposition the portfolio or to meet the Company's payment obligations. The cash reserves maintained by the Company may also be used to purchase properties, make tax or other distributions to its member (subject to the approval rights of the Noteholders as discussed below), make interest payments under the Notes, or cover the costs of the Company's day-to-day operations. The Company is not required to incur additional indebtedness (and may not issue additional promissory notes) for the sole purpose of making any Demand Repayments.

**Members and Management**

The sole member of the Company is iCap Equity, LLC, which is owned by iCap Enterprises, Inc., a Washington corporation wholly owned by Chris Christensen. The primary officers of iCap Enterprises, Inc. are Chris Christensen and Jim Christensen, whose biographies are below.

The manager of the Company is iCap Pacific NW Management, LLC, a Washington limited liability company (the "Manager"). The officers of the Manager are also the officers of iCap Enterprises, Inc. The management and supervision of the Company is vested exclusively in the Manager (including its duly appointed agents), which has full control over the business and affairs of the Company pursuant to the Operating Agreement.

Our direct organizational structure is as shown in the chart below.



The Manager may delegate day-to-day management responsibility of the Company to any person, provided that the Manager will retain ultimate responsibility for the management and conduct of the activities of the Company and all decisions relating to the selection and disposition of the Company's investments.

## Biographies of Management Personnel

*Chris Christensen, President*

Chris leads the senior management team and oversees all facets of the organization, with a particular emphasis on business strategy, legal and finance structuring. Prior to forming the Company, Chris managed affiliated funds, formed and managed affiliates of the Manager, including Edge Construction, LLC and iCap Enterprises, Inc., and has advised numerous lenders, developers and borrowers with regard to their start-up and operating needs, including financial structuring and asset protection. Chris holds a Juris Doctor degree from Seattle University School of Law, a Master's degree in International Business from Seattle University, and a Bachelor of Arts degree in Economics from the University of Utah. He is the brother of Jim Christensen.

*Jim Christensen, Chief Operating Officer*

Jim is iCap's Chief Operating Officer and assists the President with the day-to-day operations of iCap and its investment funds, including overseeing investment underwriting, project and construction management, project financing, disposition of distressed assets, and management of the various strategic relationships involving iCap and its affiliates. In addition, he is responsible for the technology-related underpinnings of iCap. This includes electronic document storage, electronic process automation, and software management. Prior to the formation of the Company, Jim managed all aspects of construction, development, finance and risk control of multifamily and single family residential and commercial real estate projects throughout Washington State for iCap Enterprises, Inc. Jim has experience dealing with jurisdictional issues relating to site development and vertical construction, as well as budget preparation, project underwriting and legal structuring. Jim holds a Master of Business Administration degree and a Bachelor of Arts degree in Economics from the University of Washington. Jim is the brother of Chris Christensen.

## Organizational Strength and Experience

The members of the senior management team have completed a variety of projects in the small-cap real estate space. The team, through its combined experience, has closed in excess of $8 billion in transactions in the small and mid-cap spaces.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 46 Page 496

iCap also maintains a network of strategic relationships. The team leverages relationships with sourcing, development, construction, and fund administration constituents to maintain a pipeline of real estate investment opportunities. Property owners, builders, developers, lenders and brokers are the primary sources for deal flow.

iCap has capacity to expand its team to manage large amounts of capital from the sale of the Notes and to deploy such proceeds towards real estate that meets its investment criteria. iCap has invested significant resources to build the technology and infrastructure needed to manage large amounts of noteholders, capital, and real estate-based investments. The number of employees who manage this infrastructure will grow as the capital under management increases.

The Manager and its affiliates have never been denied a license to practice a trade or business or ever experienced an event of bankruptcy, receivership, assignment for the benefit of creditors or similar proceeding.

**Investment Experience**

As a newly formed investment vehicle, the Company has no operating or prior performance history. The information presented in this section represents the limited historical experience of the principals of the Manager and its affiliates. Prospective investors in the Company should not rely on the information below as being indicative of the types of investments the Company may make or of the types of returns the Company's investments may generate. Prospective investors should not assume that the Company will experience returns, if any, comparable to those described herein.

Although this Memorandum refers to "iCap" as though it were an entity capable of taking action, prospective investors should bear in mind that such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. The Company will not acquire an interest in any of iCap's affiliated entities other than Holding, but may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Manager, and therefore the Company, as it conducts its business.

The Company's management team has overseen 57 full-cycle investments in this strategy among its other funds. As the following table illustrates, these investments achieved an average ROI of 27.39%, an average annualized ROI of 18.30%, and an average IRR of 20.26%.

| Fund | Project: Project Name | Project: Project Type | Investment Amount | Payoff Amount | Net Gain/Loss on Investment | Days Held | Actual ROI | Actual Annualized ROI | Actual IRR |
|---|---|---|---|---|---|---|---|---|---|
| iCap Northwest Opportunity Fund, LLC | 13th & Emerson, LLC | Townhome | $957,600.00 | $1,035,844.78 | $78,244.78 | 66 | 8% | 54% | 54% |
| iCap Northwest Opportunity Fund, LLC | 1756 NW 60th St, LLC | Townhome | $266,590.30 | $331,871.94 | $65,281.64 | 363 | 24% | 25% | 55% |
| iCap Northwest Opportunity Fund, LLC | 23rd and Gilman, LLC | Townhome | $729,127.80 | $1,050,000.00 | $320,872.20 | 460 | 44% | 34% | 34% |
| iCap Northwest Opportunity Fund, LLC | 313 Prospect Residence, LLC | Single Family Residence | $317,098.60 | $555,976.53 | $238,877.93 | 765 | 75% | 31% | 33% |
| iCap Northwest Opportunity Fund, LLC | 76th Ave SE Partners, LLC | Single Family Residence | $536,500.00 | $925,098.84 | $388,598.84 | 821 | 72% | 27% | 27% |
| iCap Northwest Opportunity Fund, LLC | 9041 48th, LLC | Townhome | $530,910.00 | $597,095.33 | $66,185.33 | 167 | 12% | 29% | 30% |
| iCap Northwest Opportunity Fund, LLC | BDR Kirkland V, LLC | Single Family Residence | $1,246,000.00 | $1,505,508.55 | $259,508.55 | 206 | 21% | 40% | 41% |
| iCap Northwest Opportunity Fund, LLC | Hayden Meadows, LLC | Single Family Residence | $1,084,010.80 | $1,301,575.81 | $217,565.01 | 398 | 20% | 18% | 30% |
| iCap Northwest Opportunity Fund, LLC | iCap Finn Hill LLC | Single Family Residence | $1,491,229.99 | $1,062,689.63 | -$428,540.36 | 1238 | -29% | -10% | -29% |
| iCap Northwest Opportunity Fund, LLC | iCap Finn Meadows LLC | Single Family Residence | $2,141,131.84 | $1,912,409.99 | -$228,721.85 | 1213 | -11% | -3% | -6% |
| iCap Northwest Opportunity Fund, LLC | iCap Lakeview LLC | Single Family Residence | $2,445,151.59 | $1,804,800.00 | -$640,351.59 | 1528 | -26% | -7% | -14% |
| iCap Northwest Opportunity Fund, LLC | iCap Northcreek, LLC | Single Family Residence | $1,933,253.14 | $1,432,035.44 | -$501,217.70 | 1036 | -26% | -10% | 0% |
| iCap Northwest Opportunity Fund, LLC | iCap Rhody Ridge LLC | Single Family Residence | $3,441,509.02 | $3,388,887.17 | -$52,621.85 | 1296 | -2% | 0% | -1% |
| iCap Northwest Opportunity Fund, LLC | KBR16, LLC | Single Family Residence | $890,266.94 | $780,563.41 | -$109,703.53 | 1022 | -12% | -5% | -5% |
| iCap Northwest Opportunity Fund, LLC | Lake Union Estates, LLC | Apartment | $4,433,765.01 | $4,671,980.27 | $238,215.26 | 552 | 5% | 4% | 4% |
| iCap Northwest Opportunity Fund, LLC | Mercer 36, LLC | Single Family Residence | $264,609.60 | $493,156.91 | $228,547.31 | 753 | 86% | 35% | 35% |
| iCap Northwest Opportunity Fund, LLC | Pearl and Delores, LLC | Townhome | $678,239.60 | $1,047,141.28 | $368,901.68 | 590 | 54% | 31% | 34% |
| iCap Northwest Opportunity Fund, LLC | Senza Sammamish, LLC | Single Family Residence | $2,870,876.03 | $3,019,997.54 | $149,121.51 | 926 | 5% | 2% | 2% |
| iCap Northwest Opportunity Fund, LLC | Seward Park Partners, LLC | Single Family Residence | $535,200.00 | $984,312.14 | $449,112.14 | 673 | 84% | 39% | 39% |
| iCap Northwest Opportunity Fund, LLC | TCG Investments, LLC | Apartment | $1,276,618.50 | $1,572,627.25 | $296,008.75 | 426 | 23% | 20% | 57% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 13 Ave W, LLC | Townhome | $525,000.00 | $1,015,053.35 | $490,053.35 | 789 | 93% | 36% | 40% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 13th & Emerson, LLC | Townhome | $601,310.00 | $923,129.92 | $321,819.92 | 742 | 54% | 23% | 50% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 1st Ave NE Development, LLC | Townhome | $630,240.00 | $1,061,631.89 | $431,391.89 | 491 | 68% | 47% | 47% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 4422 Woodlawn, LLC | Single Family Residence | $182,100.00 | $268,735.41 | $86,635.41 | 346 | 48% | 51% | 51% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 725 Broadway LLC | Apartment | $1,064,373.57 | $1,136,561.35 | $72,187.78 | 1851 | 7% | 1% | 1% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | 9041 48th, LLC | Townhome | $820,528.36 | $995,907.52 | $175,379.16 | 1506 | 21% | 5% | 8% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Alamo NW, LLC | Commercial | $1,396,404.14 | $1,738,657.36 | $342,253.22 | 461 | 25% | 19% | 21% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Aloha Ventures, LLC | Townhome | $372,500.00 | $646,517.47 | $274,017.47 | 585 | 74% | 41% | 41% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Ankeny Building, LLC | Apartment | $1,704,500.00 | $2,665,223.38 | $960,723.38 | 554 | 56% | 34% | 35% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Barcelo Madison Park, LLC | Condo | $840,414.35 | $1,882,548.49 | $1,042,134.14 | 1547 | 124% | 21% | 26% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | BDR Kirkland II, LLC | Single Family Residence | $833,000.00 | $1,678,742.88 | $845,742.88 | 853 | 102% | 35% | 38% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | BDR Medina III, LLC | Single Family Residence | $1,296,032.50 | $2,362,705.55 | $1,066,673.05 | 738 | 82% | 35% | 40% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | BDR Yarrow Point II, LLC | Single Family Residence | $724,999.99 | $1,432,610.91 | $707,610.92 | 702 | 98% | 42% | 44% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Capitol Hill Development, LLC | Apartment | $1,034,752.86 | $1,713,268.20 | $678,515.34 | 481 | 66% | 47% | 54% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Charlestown Street, LLC | Townhome | $1,039,999.90 | $1,466,392.26 | $426,392.36 | 453 | 41% | 32% | 34% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Colpitts Sunset LLC | Apartment | $1,579,074.68 | $3,000,000.00 | $1,420,925.32 | 814 | 90% | 33% | 34% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Denali Townhomes LLC | Apartment | $199,321.89 | $0.00 | -$199,321.89 | 1783 | -100% | -100% | -100% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | ENT Ventures I, LLC | Apartment | $1,948,884.00 | $2,531,472.56 | $582,588.56 | 613 | 30% | 17% | 18% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | ENT Ventures II, LLC | Apartment | $430,389.42 | $596,604.98 | $166,215.16 | 868 | 39% | 15% | 18% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | ENT Ventures IV, LLC | Apartment | $400,358.79 | $527,567.34 | $127,208.55 | 1323 | 32% | 8% | 14% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | High Country Soundview Manor, LLC | Single Family Residence | $3,329,207.99 | $1,147,270.90 | -$2,181,937.09 | 1444 | -66% | -24% | -54% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Hillsboro Acquisition I, LLC | Commercial | $1,606,500.00 | $1,777,012.23 | $170,512.23 | 102 | 11% | 43% | 43% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | iCap Delridge Way, LLC | Townhome | $408,652.84 | $512,531.62 | $103,878.78 | 1173 | 25% | 7% | 9% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | iCap Finn Hill LLC | Single Family Residence | $3,061,618.00 | $2,314,707.59 | -$746,910.41 | 1334 | -24% | -7% | -25% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | iCap Finn Meadows LLC | Single Family Residence | $150,949.35 | $199,161.65 | $48,212.30 | 518 | 32% | 22% | 21% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | iCap Lakeview LLC | Single Family Residence | $1,040,852.42 | $1,201,937.73 | $161,085.31 | 138 | 15% | 46% | 46% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | iCap Rhody Ridge LLC | Single Family Residence | $1,308,845.98 | $1,282,931.62 | -$25,914.36 | 1281 | -2% | -1% | -2% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | KR3, LLC | Single Family Residence | $357,892.44 | $500,000.00 | $142,107.56 | 468 | 40% | 30% | 31% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Lake Sammamish Home 1, LLC | Single Family Residence | $404,518.60 | $835,024.98 | $430,506.38 | 274 | 106% | 163% | 227% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Lyle 113th Ave, LLC | Single Family Residence | $883,648.75 | $735,724.67 | -$147,924.08 | 815 | -17% | -8% | -12% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Meridian Greens Holdings, LLC | Apartment | $2,410,825.27 | $21,078.22 | -$2,389,747.05 | 1401 | -99% | -71% | -91% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Ruby 62 Holdings, LLC | Apartment | $1,795,428.77 | $217,159.69 | -$1,578,269.08 | 1539 | -88% | -39% | -39% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Sampson 45th Avenue, LLC | Single Family Residence | $1,782,998.71 | $1,181,026.15 | -$601,972.56 | 861 | -34% | -16% | -47% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Steadman 170th, LLC | Single Family Residence | $569,656.14 | $686,798.62 | $117,142.48 | 880 | 21% | 8% | 14% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | TCG Investments, LLC | Apartment | $1,100,002.00 | $2,165,208.47 | $1,065,206.47 | 1173 | 97% | 23% | 31% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Volare Townhomes, LLC | Single Family Residence | $916,221.50 | $1,079,103.42 | $162,881.92 | 329 | 18% | 20% | 27% |
| iCap Pacific Northwest Opportunity & Income Fund, LLC | Woodlawn Ave Townhomes, LLC | Townhome | $401,876.25 | $592,679.58 | $190,803.33 | 346 | 47% | 51% | 51% |
| Total | 57 | | $67,223,568.62 | | | | 27.39% | 18.30% | 20.26% |

The performance of these prior investments should not be considered any guaranty or representation of the results to be achieved by the Company, or by an Investor in this Offering.

**Management Fees; Transactions with Related Parties**

The Company will pay the Manager an annual management fee equal to 2% of the outstanding aggregate principal balances of the Notes outstanding from time to time ("Management Fee"). The Management Fee for the first year will be fully earned and paid at the time of investment. Thereafter, the Management Fee will be paid in arrears on the last day of each calendar quarter and will be calculated on the average daily outstanding principal balances of the Notes during the applicable quarter.

The Company will pay all expenses related to the operation of the Company, other than the payroll of the Manager. These costs that will be paid by the Company include the fees and expenses related to this Offering, as well as a share of the office rent and fees, office common area maintenance charges, phone, fax, and internet access, computer hardware and related supplies, general office supplies, office rental of fax, printers, or scanners and maintenance costs related thereto, consulting, legal, accounting, and professional fees, marketing and travel expenses and any business licenses and registrations required of the Company or the Manager as a result of its management of the Company.

The Manager may elect to pay any of these Company expenses, in which event the Company will reimburse the Manager for those out-of-pocket costs.

The Manager may charge a Portfolio SPE a fee to cover the costs of due diligence and underwriting involved in closing a real estate purchase or disposition. This fee, which may be payable by the Portfolio SPE or the Project Partner on or after closing of the purchase or disposition, will be non-refundable and will typically be less than $15,000. Additionally, in the event the Company or the Manager acquires or becomes an affiliate of a real estate brokerage company, the Company may pay customary brokerage fees to such entity for the acquisition or disposition of the Company's assets.

Under the Operating Agreement the Manager is required to cause the Company to distribute to any member of the Company, a cash distribution equal to the taxes that such member would owe on the income attributed to it from the Company pursuant to the Internal Revenue Code, less any amounts that have been distributed to such member(s) in the applicable year. At any time when any Notes remain issued and outstanding, the Company and the Manager may not make any other distributions to the members of the Company (other than the tax distributions above) without the prior written approval of a Majority-in-Interest of the Noteholders. In the event that there are no Notes then issued and outstanding, the Company may made such other distributions to its members as determined by the Manager.

The Company may engage, or cause a Portfolio SPE to engage, an affiliate of the Company to provide the Portfolio SPEs with services. The Company shall not pay compensation to such affiliated entity at a rate that is higher than is standard in the market. In the event the Company enlists the services of any affiliate of the Manager identified below, the rates of compensation of these affiliates for the performance of their various services will be limited and all payments will be subject to inspection by auditors upon request by an investor. A description of the affiliated entities and the agreed upon rates are set forth below. To the extent the market rates for these services increase over time, the Company may pay rates in excess of the rates set forth below. Additionally, to the extent the Company in the future provides services that are not listed below, such services must be provided at reasonable market rates.

If the Manager, or an affiliate of the Manager or the Company, guarantees, whether personally or otherwise, a loan, bond or other obligation of the Company, a holding company, or a Portfolio SPE, that guarantor will be entitled to receive from the benefiting entity an annual fee equal to 1% of the total amount of the credit facility, bond amount, or other obligation that is the subject of the guarantee.

The Company may engage the services of certain related or affiliated parties to provide services to the Company in connection with its operations. These include the following:

*Edge Construction, LLC or an affiliated general contractor:* Expected to provide general contracting services, including those related to new construction of and rehabilitation of real estate projects, and is expected to receive a fee of cost plus 10%. Costs include the costs of management of a project, including costs of project management, supervision, materials and labor, each of which will be billed at hourly rates, which are currently between $30 and $180 per hour.

*iCap Enterprises, Inc.:* Expected to Provide development and consulting services, as well as accounting and administrative support at hourly rates which are currently between $30 and $200 per hour.

The Manager or any affiliate of the Manager may also charge the Company or any of its subsidiaries a fee for any professional service rendered for the benefit of the Company or any of its subsidiaries in accordance with the rates outlined by the Manager or any affiliate of the Manager from time to time, which will be within the range of standard market rates for such services. The Manager may also charge the project SPEs of the Company or the builders and developers, as a project cost, an origination fee for placing capital into each real estate investment, which fees will be no more than what is typically charged for private real estate-based financing investments, but which will generally be less than 5% of the capital placed. The Manager may charge a due diligence fee to any potential sponsor, builder, developer, or owner of a real estate project or investment opportunity in which the Company might reasonably make an investment, to cover the expenses related to due diligence and underwriting of the investment.

## USE OF PROCEEDS

The proceeds of this Offering will be used to pay expenses related to the Company's formation and operations and for this Offering, including as set forth below in "PLAN OF DISTRIBUTION" and to purchase and manage preferred equity real estate positions through Portfolio SPEs. The proceeds will be used to cover costs associated with this process, such as marketing, management fees, and professional service fees. The Company expects to pay organizational expenses of approximately $450,000, which include the cost of forming the Company, Holding and the Portfolio SPEs and the cost of marketing and management associated with the Company's fundraising efforts, including technology infrastructure and the cost of preparing this Memorandum, but excluding selling commissions and similar costs. As discussed above, the Company has engaged Cobalt Capital, Inc. as the Managing Broker Dealer in this Offering, who will assemble a selling group of other broker dealers and registered investment advisors. Proceeds from this Offering will also be used to pay the management fee to the Manager as discussed above.

## PLAN OF DISTRIBUTION

The Company has entered into an exclusive engagement agreement (the "Engagement Agreement") with Cobalt Capital, Inc. ("Cobalt") to serve as managing broker dealer of the Offering. The exclusivity period continues until the Offering has been closed.

The Notes will be offered on a "best efforts" basis (which means that there is no guarantee that any minimum amount will be sold). There is no minimum amount that must be subscribed for in order for this Offering to close and for the subscription funds to be released to the Company, and the Company may conduct one or more closings as it determines. Cobalt will engage other broker dealers ("Selling Group Members") to assist in privately placing the Notes. Cobalt will retain a fee of 2.25% of the Gross Proceeds of this Offering for serving as the managing dealer in the Offering.

Cobalt and its officers, employees and affiliates may purchase Notes in the Offering. Such Notes will be counted toward the maximum offering amount of $50,000,000 (not including the $25,000,000 over-allotment amount, the "Maximum Offering Amount"). Cobalt and the Company may, in their sole discretion, accept offers to purchase Notes net (or partially net) of the commissions and expense reimbursements described in this Memorandum in certain circumstances deemed appropriate by either of them, including by way of illustration, from Investors purchasing through a registered investment advisor

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 10 Page 500
9071243                                                                                  Page 500 of 500

("RIA"), or from Investors who are affiliates of the Company or any member of the Selling Group. The Company may also make sales to registered representatives of the Selling Group or to their spouses and affiliates, in each case net of sales commissions.

The amount of selling commission payable to Cobalt or any Selling Group member may be reduced or waived by Cobalt or the Selling Group member, as applicable, in their sole discretion, with respect to investments by those investors (i) who buy at least $350,000 of Notes themselves or whose direct family members buy at the same time at least $350,000 of Notes in the aggregate (for this purpose, a "direct family member" shall mean the investor and his or her grandparents, parents, siblings, spouse, children and grandchildren), (ii) who have engaged the services of a registered investment advisor who is paid a fixed or "wrap" fee in lieu of Selling Commissions, or (iii) who are "registered representatives" of a Selling Group member.

We have agreed to indemnify Cobalt from and against losses, claims, damages or liabilities (collectively, the "Damages") arising out of the Offering, except for Damages resulting from Cobalt's breach of the Engagement Agreement, including gross negligence or willful misconduct as more fully set forth in the Engagement Agreement.

The Company is offering a maximum offering amount of up to $50,000,000 in Notes, with an over-allotment amount of an additional $25,000,000. If the Maximum Offering Amount ($50,000,000) is subscribed, the net proceeds to the Company from the sale of Notes, after deducting selling commissions and related fees, and estimated organizational and Offering expenses, is anticipated to be $44,675,000. The following table sets forth the details of these fees and the funds available for investment in the Company's real estate strategy as described in this Memorandum.

|  | Sale of Maximum Offering Amount | Percentage of Gross Proceeds |
|---|---|---|
| Gross Proceeds From Investors | $50,000,000 | 100.00% |
| Less: Selling Commission (1) | $3,000,000 | 6.00% |
| Less: Due Diligence Fee (2) | $750,000 | 1.50% |
| Less: Managing Dealer Fee (3) | $1,125,000 | 2.25% |
| Less: Organizational and Offering Expenses | $450,000 | 0.90% |
| Available for Investment (before reserves) | $44,675,000 | 89.35% |

(1) The Managing Dealer will receive a Selling Commission in an amount up to 6% of the aggregate principal amount of Notes issued ("Gross Proceeds"), which it will re-allocate to the Selling Group Members.

(2) The Managing Dealer will receive a marketing and due diligence fee of 1.5% of the Gross Proceeds which it will re-allocate to Selling Group Members.

(3) The Managing Dealer will also receive a fee of 2.25% of the Gross Proceeds for serving as the managing dealer in the Offering.

At any given time, the Company will maintain cash reserves to meet demand payments, interest payments, and operational requirements. With the exception of employee payroll expenses, which will be covered by the Manager, all other expenses will be borne by the Company.

23-90148-WLH11   Doc 469   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 1 Page 501

# INVESTOR SUITABILITY STANDARDS

*General*

An investment in our Notes involves a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in their investment. Our Notes are only suitable for those who desire a relatively long-term investment for which they do not need liquidity until the anticipated return on investment as set forth in this Memorandum.

The offer, offer for sale, and sale of our Notes is intended to be exempt from the registration requirements of the Securities Act pursuant to Rule 506(b) of Regulation D promulgated thereunder as to "accredited investors" and is intended to be exempt from the registration requirements of applicable state securities laws as a federally covered security. This Offering is directed to "accredited investors," as that term is defined in Rule 501(a) of Regulation D as promulgated by the SEC.

A subscriber must be an accredited investor as defined in Rule 501(a) of Regulation D and meet one (or more) of the investor suitability standards below to purchase Notes. Fiduciaries must also meet one of these conditions. If the investment is a gift to a minor, the custodian or the donor must meet these conditions. For purposes of the net worth calculations below, net worth is the amount by which assets exceed liabilities, but excluding your house, home furnishings or automobile(s) among your assets. In the subscription agreement, a subscriber will have to confirm satisfaction of these minimum standards:

- Each investor must have the ability to bear the economic risks of investing in the Notes.

- Each investor must have sufficient knowledge and experience in financial, business or investment matters to evaluate the merits and risks of the investment.

- Each investor must represent and warrant that the Notes to be purchased are being acquired for investment and not with a view to distribution.

- Each investor will make other representations to us in connection with the purchase of the Notes, including representations concerning the investor's degree of sophistication, access to information concerning the Company, and ability to bear the economic risk of the investment.

*Suitability Requirements*

Rule 501(a) of Regulation D defines an "accredited investor" as any person who comes within any of the following categories, or whom the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1) Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Exchange Act; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration undersection 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 2 Page 502

either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

For purposes of calculating net worth:

(A) The person's primary residence shall not be included as an asset;

(B) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

In determining income, a subscriber should add to the subscriber's adjusted gross income any amounts attributable to tax exempt income received, losses claimed as a limited partner in any limited partnership, deduction claimed for depletion, contribution to an IRA or Keogh plan, alimony payments, and any amount by which income for long-term capital gains has been reduced in arriving at adjusted gross income.

<u>Additional Requirements</u>

In addition to the foregoing suitability standards, we cannot accept subscriptions from anyone if the representations required are either not provided or are provided but are inconsistent with our determination that the investment is suitable for the subscriber. In addition to the financial information we require, the representations we require of you state that you:

- Have received this Memorandum, together with the Exhibits attached hereto;

- understand that no federal or state agency has made any finding or determination as to the fairness for investment in, nor made any recommendation or endorsement of, the Notes; and

- understand that an investment in the Notes will not, in itself, create a qualified retirement plan as described in the Internal Revenue Code and that you must comply with all applicable provisions of the Internal Revenue Code in order to create a qualified retirement plan.

You will also represent that you are familiar with the risk factors we describe and that this investment matches your investment objectives. Specifically, you will represent to us that you:

- Understand that there will be no public market for the Notes, that there are substantial restrictions on repurchase, sale, assignment or transfer of the Notes and that it may not be possible to readily liquidate an investment in the Notes; and

- have investment objectives that correspond to those described elsewhere in this Memorandum.

You will also represent to us that you have the capacity to invest in our Notes by confirming that:

- You are legally able to enter into a contractual relationship with us, and, if you are an individual, have attained the age of majority in the state in which you live; and

- if you are a manager, that you are the manager for the trust on behalf of which you are purchasing the Notes, and have due authority to purchase Notes on behalf of the trust.

If you are purchasing as a fiduciary, you will also represent that the above representations and warranties are accurate for the person(s) for whom you are purchasing Notes. By executing the subscription agreement, you will not be waiving any rights under the Securities Act or the Exchange Act.

We have the right to refuse a subscription for Notes if in our sole discretion we believe that the prospective investor does not meet the suitability requirements. It is anticipated that comparable suitability standards (including state law standards applicable in particular circumstances) may be imposed by us in various jurisdictions in connection with any resale of the Notes.

## SUBSCRIPTION PROCEDURES

All subscriptions for the Notes must be made by the execution and delivery of the Subscription Agreement as attached hereto as Exhibit A and a counterpart signature page to the Collateral Agent Agreement, which is attached to the Subscription Agreement. This process may be completed either electronically via the Company's website through its "Investor Portal," or by delivery of hard copy as outlined below.

Prospective investors may do so via the App, the Company's website, electronic signature, or in hard copy delivered to the Company as follows:

iCap Pacific Income Fund 5, LLC
ATTN: Investor Relations
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

With the Subscription Agreement (regardless of the method used for completing), prospective investors should send their funds via ACH transfer through the App, wire transfer pursuant to the instructions as set forth in the Subscription Agreement, or check payable to "iCap Pacific Income Fund 5, LLC" for the total cost of the Notes being subscribed.

Subscriptions are not binding on the Company until accepted in writing by the Company.  We will refuse any subscription by giving written notice to the subscriber by personal delivery or first-class mail. We have the right to refuse to sell the Notes to any prospective investor for any reason in our sole discretion, including, without limitation, if such prospective investor does not promptly supply all information requested by us in connection with such prospective investor's subscription.  In addition, in our sole discretion, we may establish a limit on the purchase of Notes by particular prospective investors.

As noted above, this Memorandum and the Subscription Agreements are available electronically through the App or the Company's website and may be completed on the App, the website or by electronic signature.

## RESTRICTIONS ON TRANSFERABILITY

The Notes offered hereby are restricted securities as that term is defined in Rule 144 promulgated under the Securities Act.  These securities have not been registered under the Securities Act and are being offered and will be sold without benefit of registration under the applicable federal or state securities acts by reason of specific exemptions from registration provided by such acts. The availability of such exemptions is also dependent, in part, upon the "investment intent" of the investors. The exemptions would not be available if an investor were purchasing the Notes with a view to redistributing them. Accordingly, each investor when executing the Subscription Agreement will be required to acknowledge that his or her purchase is for investment, for its, his or her own account, and without any view to resale of the Notes except pursuant to an effective registration statement under the Securities Act, or a valid exemption from the registration requirements of the Securities Act, and subject to the terms of the Subscription Agreement.

## STATEMENT AS TO INDEMNIFICATION

Our Operating Agreement provides for indemnification of members and officers of the Company and of the Manager under certain circumstances, which could include liabilities relating to securities laws. The SEC mandates the following disclosure of its position on indemnification for liabilities under the federal securities laws:

"Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling an issuer, the Company has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is therefore unenforceable."

## TRADEMARKS AND COPYRIGHTS

We may own or have rights to trademarks or trade names that we use in connection with the operation of our business, including our corporate names, logos and website names. In addition, we own or have the rights to copyrights, trade secrets and other proprietary rights that protect the content of our products and the formulations for such products. This Memorandum may also contain trademarks, service marks and trade names of other companies, which are the property of their respective owners. Our use or display of third parties' trademarks, service marks, trade names or products in this Memorandum is not intended to, and should not be read to, imply a relationship with or endorsement or sponsorship of us. Solely for convenience, some of the copyrights, trade names and trademarks referred to in this Memorandum are listed without their ©, ® and ™ symbols, but we will assert, to the fullest extent under applicable law, our

19

rights to our copyrights, trade names and trademarks. All other trademarks are the property of their respective owners.

<div align="center">

**RISK FACTORS**

</div>

AN INVESTMENT IN THE NOTES INVOLVES SIGNIFICANT RISK AND IS SUITABLE ONLY FOR PERSONS WHO ARE CAPABLE OF BEARING THE RISKS, INCLUDING THE RISK OF LOSS OF A SUBSTANTIAL PART OR ALL OF THEIR INVESTMENT. CAREFUL CONSIDERATION OF THE FOLLOWING RISK FACTORS, AS WELL AS OTHER INFORMATION IN THIS MEMORANDUM IS ADVISABLE PRIOR TO INVESTING. PROSPECTIVE INVESTORS SHOULD READ ALL SECTIONS OF THIS MEMORANDUM AND ARE STRONGLY URGED AND EXPECTED TO CONSULT THEIR OWN LEGAL AND FINANCIAL ADVISERS BEFORE INVEST-ING IN THE NOTES. THE INFORMATION IN THIS MEMORANDUM CONTAINS BOTH HISTORICAL AND FORWARD-LOOKING STATEMENTS. PLEASE BE ADVISED THAT THE COMPANY'S ACTUAL FINANCIAL CONDITION, OPERATING RESULTS AND BUSINESS PERFORMANCE MAY DIFFER MATERIALLY FROM THAT ESTIMATED BY THE COMPANY IN FORWARD-LOOKING STATEMENTS. THE COMPANY HAS ATTEMPTED TO IDENTIFY, IN CONTEXT, CERTAIN OF THE FACTORS THAT IT CURRENTLY BELIEVES COULD CAUSE ACTUAL FUTURE RESULTS TO DIFFER FROM THE COMPANY'S CURRENT EXPECTATIONS. THE DIFFERENCES MAY BE CAUSED BY A VARIETY OF FACTORS, INCLUDING BUT NOT LIMITED TO, ADVERSE ECONOMIC CONDITIONS, COMPETITORS (INCLUDING THE ENTRY OF NEW COMPETITORS), INADEQUATE CAPITAL, UNEXPECTED COSTS, LOWER REVENUES AND NET INCOME THAN ANTICIPATED, FLUCTUATION AND VOLATILITY OF THE COMPANY'S OPERATING RESULTS AND FINANCIAL CONDITION, INABILITY TO CARRY OUT MARKETING AND SALES PLANS, LOSS OF KEY EXECUTIVES OR OTHER PERSONNEL, AND OTHER RISKS THAT MAY OR MAY NOT BE REFERRED TO IN THESE RISK FACTORS.

**Operation and Company Risks**

***Our business prospects are difficult to predict because we have no operating history.***

The Company is a newly organized entity and does not have an operating history upon which investors may base an evaluation of its likely performance. The Company's results will depend upon the availability of suitable investment opportunities for the Company and the performance of the Company's Portfolio Investments. The Company's proposed operations are subject to all business risks associated with new enterprises. The likelihood of the Company's success must be considered in light of the problems, expenses, difficulties, complications, and delays frequently encountered in connection with the expansion of a business, operation in a competitive industry, and the continued development of advertising, promotions and a corresponding customer base. There is a possibility that the Company could sustain losses in the future.

There can be no assurance that the Company's efforts will result in successful commercialization or further development of the Company' operations, that the Company's marketing efforts will be successful, or that the Company will ever achieve significant (or any) revenue. If the Company fails to achieve its goals, the Company may run out of money to run its operation and as such, the Company would need to raise additional working capital. Failure to do so could result in Noteholders losing part or all of their money invested.

***Noteholders must rely on the Manager to acquire appropriate Portfolio Investments for the Company's portfolio.***

The Company is conducting the Offering as a "blind pool," meaning that the Company is proceeding to raise funds through the sale of the Notes, without having specifically identified any real estate

<div align="center">20</div>

properties in which the Company intends to invest. When you subscribe for Notes, that subscription is binding, and you will not have the right to revoke that subscription even if you do not approve of the Portfolio Investments that the Company subsequently identifies. Prospective investors should not invest in the Company unless they are prepared to rely upon the judgment of the Manager to make investments consistent with the general guidelines described in this Memorandum.

***If the Company is not as successful with the Offering as desired, it may not acquire as diversified a portfolio as is planned.***

It is not known how many Portfolio Investments the Company will be able to obtain, or the number of opportunities that will be presented by the market for it to evaluate. The number of Portfolio Investments ultimately made by the Company will depend primarily upon the capital raised through the sale of the Notes, the availability of suitable Portfolio Investments, the number of investors who choose to withdraw their funds through demand notices, and the extent to which the Manager arranges for Portfolio Investments to be held with co-investors. There is no certainty as to the number of Portfolio Investments that the Company will ultimately be able to obtain, and since one of the Company's objectives is diversification, no assurance can be given as to the Company's achievement of that objective.

***Competition with third parties in our contemplated industry is intense, which could reduce our profitability and our ability to pay interest or raise additional funds.***

It is possible that over time we may compete with other entities seeking to undertake similar activities to those that we do. These same potential competitors may have significantly greater capital resources, research and development, manufacturing, testing, regulatory compliance, and marketing capabilities. Competitive products and services may render any services, products or product candidates that we may acquire or develop uneconomic or obsolete. We cannot assure investors that we will be able to invest in or develop resources that are required to successfully compete with these competitors .

***Our planned business is inherently expensive, risky and may not be understood by or accepted in the marketplace, which could adversely affect our future value.***

The business currently conducted by the Company is at an early stage and is financially speculative. To date, very few companies have been successful in their efforts to commercialize such a business. Furthermore, the number of people who may use our services is difficult to forecast with accuracy. Our future success is dependent on the establishment of the market for our services and our ability to capture a share of this market with the services and offerings we plan to develop.

***Negative publicity could adversely affect our business and operating results.***

Negative publicity about our industry or the Company, even if inaccurate, could adversely affect our reputation and the confidence in our operations, which could harm our business and operating results. Harm to our reputation can arise from many sources, including employee misconduct, misconduct by our partners, outsourced service providers or other counterparties, failure by us or our partners to meet minimum standards of service and quality, compliance failures and claims and any such sources related to our affiliate entities.

***Rapid growth may strain our resources.***

We expect to experience significant and rapid growth in the scope and complexity of our business, which may place a significant strain on our management team and our financial and other resources. Such growth, if experienced, may expose us to greater costs and other risks associated with growth and expansion. Although the Company does not expect to have employees, we may be required to hire employees, including other support personnel, among others, in order to successfully advance our

operations. We may be unsuccessful in these efforts or we may be unable to project accurately the rate or timing of these increases.

This growth may place a strain on our management and operational resources. The failure to develop and implement effective systems or the failure to manage growth effectively could have a materially adverse effect on our business, financial condition, and results of operations. In addition, difficulties in effectively managing the budgeting, forecasting, and other process control issues presented by such a rapid expansion could harm our business, financial condition, and results of operations.

***Control is vested in the Manager; no investor should purchase the Notes unless the investor is comfortable with the Manager's judgment and experience in running the Company's affairs.***

Control over all decisions affecting the Company, including decisions regarding the Portfolio Investments that are to be made, will be made by the Manager and its management team. Material decisions, such as decisions regarding the purchase or sale of assets, the refinancing of Portfolio SPEs, whether to make an investment, and the incurrence of third-party-debt will be made without separate concurrence from Noteholders. No assurance can be given that sufficient investment opportunities will be presented to the Company to deploy all of the capital available for investment.

***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***

The Manager and its affiliates may provide certain services to, and enter into transactions with, the Company, its holding companies, or the Portfolio SPEs, provided that the terms are commercially reasonable. This limitation may not fully protect the Company or the Portfolio SPEs against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Noteholders, the Trustee, or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its affiliates. In addition, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities for affiliated entities that may generate different fees for the Manager.

***The Manager may retain and reinvest all or a portion of the revenue generated by, or proceeds of a sale of, a Portfolio Investment.***

The Manager has the discretion to sell the investments or related properties the Company acquires and to use the cash proceeds from such sale (or cash proceeds from rental income) to, among other things, satisfy its obligations under the Notes, whether or not then due and payable, or other Company obligations, or to enter into new Portfolio Investments. The Manager intends to make new investments over the life of the Company. This will place investment returns at the risk of new investment opportunities and may delay payments of the principal balances.

***Without obtaining advice from their personal advisors, potential investors may not be aware of the legal, tax or economic consequences of an investment in the Notes.***

The Manager has not arranged for potential investors in this Offering to be separately represented by independent counsel. The legal counsel who has performed services for the Company has not acted as if it had been retained by the potential investors. Potential investors should not construe the contents of this Memorandum or any prior or subsequent communication from the Manager, its affiliates or any professional associated with this Offering, as legal or tax advice. Potential investors should consult their

own personal counsel, accountant and other advisors as to legal, tax, economic and related matters concerning the investment described herein and its suitability.

***Fees to the Manager will be paid while interest and principal remain outstanding under the Notes.***

Fees payable to the Manager will be paid while interest and principal remain outstanding under the Notes. The Management Fee is based on the aggregate outstanding principal balance of the Notes. The Manager will receive the Management Fee whether or not the Portfolio Investments operate profitably even upon a default or Event of Default. These fees (like other operating expenses) reduce the amount of cash that otherwise would be available for payment of the Notes.

***You will not be investing in the Company, iCap or any of their affiliates and, while the prior performance data presented provides relevant information regarding affiliates of the Manager, it should not be construed as an indication of the likely financial performance of the Company.***

By investing in the Notes, you will not be investing in the Portfolio Investments, iCap, or in any of the prior investments sponsored by iCap's affiliates. iCap has provided selected information regarding its prior investments because investors might consider those investments to be relevant in assessing the experience and judgment of the Manager, and the iCap management team. Potential investors should not consider the prior performance of those investments to be indicative of the financial performance that may be experienced by the Company. The Company may not perform as favorably as the prior investments have performed. Each investment opportunity is unique, and the Company may not be able to replicate the success of prior investments, even if the Portfolio Investments assembled for the Company's portfolio are similar to those obtained for the prior funds.

***A Majority-in-Interest of the Noteholders is required to take certain actions with respect to the Notes, and a Noteholder does not have a right to vote on an "Event of Default" under their Note(s) unless the Event of Default has occurred with respect to their particular Note.***

The Notes, the Security Agreement and the Guaranty require the consent of a Majority-in-Interest of the Noteholders to declare an Event of Default and to take certain actions related thereto. Therefore, individual Noteholders will not be able to take certain actions unilaterally and any individual Noteholder will not be entitled to vote for or against the declaration of an "Event of Default" unless, as of the time of such vote, the applicable Event of Default has occurred and is continuing under such Noteholder's individual Note(s).

***The Company may prepay the principal and interest on the Notes at any time.***

The Company may prepay all or a part of the principal amount and accrued interest in the Notes at any time. No prepayment penalty is imposed that would discourage the Company from exercising this right. Accordingly, Noteholders will not have certainty as to how long their respective Note(s) may be outstanding. If the Company makes any prepayment, the prepayments need not be made ratably against all outstanding Notes.

***Various factors could negatively impact the profitability of the Company's Portfolio Investments***

The Company may obtain insurance policies for the Portfolio Investments that are commercially prudent given the local market and circumstances of the Portfolio Investments. However, certain losses are either uninsurable or may be insured only upon payment of prohibitively high insurance premiums. If any such loss should occur and the Portfolio Investments should be partially or totally destroyed, the Company may suffer a substantial loss of capital as well as profits. Even if the Company's insurance policy provides coverage for the loss, the deductible for such policy may be so large that the Company will sustain a substantial uninsured loss as a result of a fire or other casualty.

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 9 Page 509

Under various federal, state and local laws, ordinances and regulations, an owner or operator of real property may become liable for the costs of removal or remediation of certain hazardous substances released on or in its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect the owner's ability to sell such real estate or to borrow funds using such real estate as collateral. Before making a Portfolio Investment, the Company may undertake such environmental due diligence as it considers appropriate under the circumstances to assess the potential environmental risks. Such investigation could include the review of all available environmental reports, such as Phase I studies. No assurance can be given that such due diligence will identify all potential environmental problems. Moreover, to the extent that the Portfolio Investment's site had environmental contamination not detected prior to the Company's acquisition of that property, or subsequent environmental contamination were to occur, remedial efforts, if any, the Company undertakes may not be sufficient to eliminate potential liability, and, as a consequence, the Company may incur environmental clean-up costs or be subject to liability exposure that may reduce the net profits of the Company.

Under the Americans With Disabilities Act of 1990 ("ADA"), all places of public accommodation are required to meet certain federal requirements related to access and use by disabled persons. A number of additional federal, state and local laws exist that may require modification to existing properties to allow disabled persons to access such facilities. Most of the properties the Company considers will likely be in compliance with the present access requirements. If, however, the properties the Company acquires are not in compliance with the ADA, the Company will be required to make modifications to the properties to bring them into compliance or face the possibility of an imposition of fines or an award of damages to private litigants. In addition, further legislation may impose additional burdens or restrictions related to access by disabled persons, and the cost of compliance could be substantial.

The real estate industry in general, and the multifamily, residential, and commercial sectors, in particular, are highly competitive, and the Company will be competing with numerous other entities, some having substantially greater financial resources and experience than the Company, in seeking attractive investment opportunities. Competition will reduce the number of suitable properties available for purchase and increase the bargaining power of sellers, inflating the purchase prices of the available Portfolio Investments or resulting in other less favorable terms to the purchasers.

The investment returns available from investments in real estate depend in large part on the amount of income earned and capital appreciation generated by the related properties, and the expenses incurred. In addition, a variety of other factors affect income from properties and real estate values, including governmental regulations, prolonged timing of permit issuance by cities and counties, insurance, zoning, tax, interest rate levels and the availability of financing. When interest rates increase, the cost of acquiring, expanding or renovating real property increases and real property values may decrease as the number of potential buyers' decreases. Similarly, as financing becomes less available, it becomes more difficult both to acquire and to sell real property. Any of these factors could have a material adverse impact on the Company's results of operations or financial condition. In addition, real estate investments are difficult to sell quickly and the Company may not be able to adjust the Company's portfolio of owned properties quickly in response to economic or other conditions in order to meet Note obligations. If the Company's properties do not generate revenue sufficient to meet operating expenses, including debt service and capital expenditures, the Company's income will be adversely affected.

***Markets in which the Company is anticipated to invest are subject to a high degree of volatility and, therefore, the Company's performance may be volatile.***

The Company's business will involve a high degree of financial risk. Markets in which the Company is anticipated to invest are subject to a high degree of volatility and therefore the Company's performance may be volatile. There can be no assurance that the Company's investment objective will be

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 10 Page 510

realized or that investors will receive a full return of their investment. The Manager in its sole discretion may employ such investment strategies and methods as it determines to adopt.

***Real estate development projects are subject to numerous risks outside the Company's control such as delays in permitting and other governmental approvals, increased costs, and labor shortages.***

Any properties in which the Company invests relating to real estate development or construction are subject to a variety of risks that will be outside of the Company's control, including delays in obtaining entitlements, permits, and other governmental approvals. Development and construction projects may also take longer than anticipated, increasing the time that part or all of the residential or commercial units are not available for rent or sale, and thus lowering the property's cash flow or other income potential. Strong demand for skilled laborers and contractors may result in labor shortages and contractor unavailability, delaying project schedules and/or increasing costs. The costs of construction have increased dramatically during recent years and may continue to increase. The Company may enter into contracts to purchase properties before they are finished, and the foregoing risks could adversely impact the purchase prices, valuations, or closings dates of those properties. Although the Manager will not undertake such transactions without reviewing detailed budgets, such budgets may understate the expenses.

***There may be unanticipated obstacles to execution of our business plan.***

Our proposed plan of operation and prospects will depend largely upon our ability to successfully establish the Company' presence in a timely fashion, retain and continue to hire skilled management, technical, marketing, and other personnel, and attract and retain significant numbers of quality business partners and corporate clients. There can be no assurance that we will be able to successfully implement our business plan or develop or maintain future business relationships, or that unanticipated expenses, problems or technical difficulties which would result in material delays in implementation will not occur.

***The volatile credit and capital markets could have a material adverse effect on our financial condition.***

Our ability to manage our future debt and liquidity will be dependent on our level of positive cash flow. An economic downturn may negatively impact our cash flows. Credit and capital markets can be volatile, which could make it more difficult for us to refinance our debt or to obtain additional debt or equity financings in the future. Such constraints could increase our costs of borrowing and could restrict our access to other potential sources of future liquidity. Our failure to have sufficient liquidity to make interest and other payments required by our debt or our Notes could result in a default of such debt or the Notes and acceleration of our borrowings, which would have a material adverse effect on our business and financial condition.

***An economic downturn could materially affect us in the future.***

The recession from late 2007 to mid-2009 reduced consumer confidence to historic lows, impacting the public's ability and desire to spend discretionary dollars as a result of job losses, home foreclosures, significantly reduced home values, investment losses, bankruptcies and reduced access to credit, resulting in lower levels of customer traffic. If the economy experiences another significant decline, our business and results of operations could be materially adversely affected.

***Information technology system failures or breaches of our network security could interrupt our operations and adversely affect our business.***

We rely on our computer systems and network infrastructure to facilitate our operations. Our operations depend upon our ability to protect our computer equipment and systems against damage from physical theft, fire, power loss, telecommunications failure or other catastrophic events, as well as from internal and external security breaches, viruses and other disruptive problems. Any damage or failure of

our computer systems or network infrastructure that causes an interruption in our operations could have a material adverse effect on our business and subject us to litigation or to actions by regulatory authorities.

***The failure to enforce and maintain our trademarks and protect our other intellectual property could materially adversely affect our business, including our ability to establish and maintain brand awareness.***

The success of our business strategy depends on our continued ability to obtain and use trademarks and service marks in order to increase brand awareness and develop our branded products. If our efforts to protect our intellectual property are not adequate, or if any third-party misappropriates or infringes on our intellectual property, whether in print, on the Internet or through other media, the value of our brands may be harmed, which could have a material adverse effect on our business, including the failure of our brands and branded products to achieve and maintain market acceptance. There can be no assurance that all of the steps we have taken to protect our intellectual property in the United States and in foreign countries will be adequate. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent, as do the laws of the United States.

***Third-party claims with respect to intellectual property assets, if decided against us, may result in competing uses or require adoption of new, non-infringing intellectual property, which may in turn adversely affect sales and revenues.***

There can be no assurance that third parties will not assert infringement or misappropriation claims against us, or assert claims that our rights in our trademarks, service marks, trade dress and other intellectual property assets are invalid or unenforceable. Any such claims could have a material adverse effect on us if such claims were to be decided against us. If our rights in any intellectual property were invalidated or deemed unenforceable, it could permit competing uses of intellectual property, which, in turn, could lead to a decline in our results of operations. If the intellectual property became subject to third-party infringement, misappropriation or other claims, and such claims were decided against us, we may be forced to pay damages, be required to develop or adopt non-infringing intellectual property or be obligated to acquire a license to the intellectual property that is the subject of the asserted claim. There could be significant expenses associated with the defense of any infringement, misappropriation, or other third-party claims.

***We depend on certain officers of the Manager, the loss of whom could materially harm our business.***

We rely upon the accumulated knowledge, skills and experience of the officers and personnel of our Manager and its affiliates. If they were to leave the Manager or become incapacitated, we might suffer in our planning and execution of business strategy and operations, impacting our brand and financial results. We also do not maintain any key man life insurance policies for any such persons.

***We are exposed to the risk of natural disasters, unusual weather conditions, pandemic outbreaks, political events, war and terrorism that could disrupt business and result in lower sales, increased operating costs and capital expenditures.***

Our headquarters and company-operated locations, as well as certain of our vendors and customers, are located in areas which have been and could be subject to natural disasters such as floods, hurricanes, tornadoes, fires or earthquakes. Adverse weather conditions or other extreme changes in the weather, including resulting electrical and technological failures, may disrupt our business and may adversely affect our ability to continue our operations. These events also could have indirect consequences such as increases in the costs of insurance if they result in significant loss of property or other insurable damage. Any of these factors, or any combination thereof, could adversely affect our operations.

*Members of our Manager will have other business interests and obligations to other entities.*

None of the members and officers of the Manager will be required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company, provided that such activities do not otherwise breach their agreements with the Company. We are dependent on these persons to successfully operate the Company. Their other business interests and activities could divert time and attention from operating the Company.

## Risks Related to this Offering and the Notes and Other Agreements

*There is no minimum Offering size required to be raised by the Company in order to conduct a closing, and the Company may not receive or accept sufficient subscriptions to undertake its business.*

This Offering is not subject to any minimum amount required to be subscribed for by investors in order for the Notes to be sold to any investors or for the Company to access or receive and use such funds. Therefore there is no assurance that the Company will raise sufficient funds to commence or continue operations. If the Company is not able to raise sufficient funds to commence operations and undertake its business plan, investors may lose all of their investment.

*This private placement of Notes is being made in reliance on an exemption from registration requirements, and there is no guarantee that it will comply with the regulatory requirements for such exemption.*

This private placement of Notes will not be registered with the SEC. The Notes are being offered in reliance on an exemption from the registration provisions of the Securities Act and state securities laws applicable to offers and sales to investors meeting the investor suitability criteria set forth in this Memorandum. If the Company should fail to comply with the exemption, investors may have the right to rescind their purchases of Notes. This might also occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Notes will be offered without registration or qualification pursuant to a private offering or other exemption. Such claims, if brought, would be disruptive and could force a sale of the Company's assets to satisfy the claims of the claimants.

*If investors successfully seek rescission, we would face severe financial demands that we may not be able to meet.*

We represent that this Memorandum and its exhibits do not contain any untrue statements of material fact or omit to state any material fact necessary to make the statements made, in light of all the circumstances under which they are made, not misleading. However, if this representation is inaccurate with respect to a material fact, if this Offering fails to qualify for exemption from registration under the federal securities laws, or if we fail to register the Notes or find an exemption under the securities laws of each state in which we offer the Notes, each investor may have the right to rescind his, her or its purchase of the Notes and to receive back from the Company his, her or its purchase price. Such investors, however, may be unable to collect on any judgment, and the cost of obtaining such judgment may outweigh the benefits. If investors successfully seek rescission, we would face severe financial demands and may not be able to meet our capital needs, which may adversely affect any non-rescinding investors.

*We may invest or spend the proceeds of this Offering in ways with which you may not agree or in ways which may not yield a return.*

While we have provided guidance on priorities for the use of proceeds, the timing and amount of sales will impact our actual use of proceeds within the uses identified. Our management will have broad discretion in determining how the proceeds of the Offering will be used in each of the identified use categories.

We currently intend to use the proceeds we receive from this Offering after deducting estimated fees and expenses associated with this private placement, including legal, accounting, transfer agent, financial, acquisitions and other professional fees, primarily for the purposes as described above. Our management will have considerable discretion in the application of the net proceeds, and you will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. Investors in this Offering will need to rely upon the judgment of our management with respect to the use of proceeds. If we do not use the net proceeds that we receive in this Offering effectively, our business, financial condition, results of operations and prospects could be harmed, and the market price or value of the Notes could decline as well as the Company's ability to repay the Notes when due.

***This is a private offering, and as such investors will not have the benefit of review of this Memorandum by the SEC or any other agency.***

Since this Offering is a private placement of securities and, as such, is not registered under federal or state securities laws, potential investors will not have the benefit of review of this Memorandum by the SEC or any state securities commission. The terms and conditions of this private placement may not comply with the guidelines and regulations established for offerings that are registered and qualified with those agencies.

***There is no assurance that the Company will be profitable, and there is no assurance of any returns.***

There is no assurance as to whether the Company will be profitable, or earn revenues, or whether the Company will be able to meet its operating expenses. The initial expenses the Company incurs could result in operating losses for the Company for the foreseeable future. No assurance can be made that a subscriber for the Notes offered hereby will not lose his or her entire investment.

***The Company is obligated to pay certain fees and expenses.***

The Company will pay various fees and expenses related to its ongoing operations regardless of whether or not the Company's activities are profitable. These fees and expenses will require dependence on third-party relationships. The Company is generally dependent on relationships with its strategic partners and vendors, and the Company may enter into similar agreements with future potential strategic partners and alliances. The Company must be successful in securing and maintaining its third-party relationships to be successful. There can be no assurance that such third parties may regard their relationship with the Company as important to their own business and operations, that they will not reassess their commitment to the business at any time in the future, or that they will not develop their own competitive services or products, either during their relationship with the Company or after their relations with the Company expire. Accordingly, there can be no assurance that the Company' existing relationships or future relationships will result in sustained business partnerships, successful service offerings, or significant revenues for the Company.

***Prospective investors must undertake their own due diligence***.

This Memorandum and its exhibits include limited information regarding the Company, our current and future business and operations, our management and our financial condition.  While we believe the information contained in this Memorandum is accurate, such document is not meant to contain an exhaustive discussion regarding the Company.  We cannot guarantee a prospective Investor that the abbreviated nature of this Memorandum will not omit to state a material fact which a prospective Investor may believe to be an important factor in determining if an investment in the Notes offered hereby is appropriate for such Investor.  As a result, prospective Investors are required to undertake their own due diligence of the Company, our current and proposed business and operations, our management and our financial condition to verify the accuracy and completeness of the information we are providing in this Memorandum. **This investment is suitable only for investors who have the knowledge and experience**

28

to independently evaluate the Company, our business and prospects.

*The limited marketability of the Notes may adversely affect your ability to transfer and pledge the Notes.*

Noteholders must represent that they are purchasing the Notes for their own account for investment purposes and not with a view to resale or future distribution. You may not sell, assign, transfer, or encumber your Note(s) unless the Company obtains an opinion or is otherwise satisfied that such sale, assignment, encumbrance or transfer does not violate applicable federal or state securities laws, constitute unlawful trading on a secondary market, or on an equivalent thereof, for purposes of Section 7704 of the Internal Revenue Code of 1986, as amended (the "Code") or cause the Company's termination under Section 708 of the Code. Accordingly, the Notes may not be readily accepted as collateral for loans.

*The Notes constitute restricted securities and are subject to limited transferability.*

The Notes should be considered a long-term, illiquid investment. The Notes have not been registered under the Securities Act, and cannot be sold without registration under the Securities Act or any exemption from registration. In addition, the Notes are not registered under any state securities laws that would permit their transfer. Because of these restrictions and the absence of an active trading market for our securities, a Noteholder will likely be unable to liquidate an investment even though other personal financial circumstances would dictate such liquidation.

*There is no public trading market for our Notes.*

There is no established public trading marketing for the Notes and there can be no assurance that one will ever develop. Market liquidity will depend on the perception of our operating business and any steps that our management might take to bring us to the awareness of investors. There can be no assurance given that there will be any awareness generated. Consequently, investors may not be able to liquidate their investment or liquidate it at a price that reflects the value of the Notes. As a result, Investors may not find purchasers for their Notes. Only accredited investors with no need for immediate short-term liquidity should purchase the Notes.

*The market value of the Notes may decrease due to factors beyond our control.*

Broad market fluctuations may adversely affect the market value of our Notes. The market value of our Notes may also fluctuate significantly in response to the following factors, most of which are beyond our control:

- variations in our quarterly operating results,
- changes in general economic conditions,
- changes in market valuations of similar companies issuing similar investment products,
- announcements by us or our competitors of significant acquisitions, strategic partnerships or joint ventures, or capital commitments,
- poor reviews;
- loss of a major customer, partner or joint venture participant; and
- the addition or loss of key managerial and collaborative personnel.

Any such fluctuations may adversely affect the market value of our Notes, regardless of our actual operating performance. As a result, Noteholders may be unable to sell their Notes (even if permitted by applicable securities laws and the terms of the Notes), or may be forced to sell them at a loss.

*The characteristics of the Notes, including maturity, interest rate, lack of guarantee, and lack of liquidity, may not satisfy your investment objectives.*

The Notes may not be a suitable investment for you, and we advise you to consult your investment, tax and other professional financial advisors prior to purchasing Notes. The characteristics of the Notes, including maturity, interest rate, lack of guarantee and lack of liquidity may not satisfy your investment objectives. The Notes may not be a suitable investment for you based on your ability to withstand a loss of interest or principal or other aspects of your financial situation, including your income, net worth, financial needs, investment risk profile, return objectives, investment experience and other factors. Prior to purchasing any Notes, you should consider your investment allocation with respect to the amount of your contemplated investment in the Notes in relation to your other investment holdings and the diversity of those holdings.

***The Notes will be effectively subordinated to any of our debt that is secured and subordinated to our existing and future unsecured debts.***

The Notes will be junior to any of our secured debt obligations, to the extent of the value of any assets securing such debt. The effect of this subordination is that if we are involved in a bankruptcy, liquidation, dissolution, reorganization or similar proceeding, or upon a default in payment on, or the acceleration of, any of our secured debt, if any, our assets will be available to pay obligations on the Notes only after all debt under our secured debt, if any, has been paid in full from those assets. As of the date of this Memorandum, we had no secured indebtedness outstanding. In such circumstances, Holders of the Notes will participate in any remaining assets ratably with all of our other unsubordinated creditors, including trade creditors. We may not have sufficient assets remaining to pay amounts due on any or all of the Notes then outstanding.

***The Company may sell promissory notes that have earlier maturity dates or higher interest rates than the 9% or 10%, as applicable, to the Notes.***

The Company may sell promissory notes that have earlier maturity dates or higher interest rates than the 9% or 10%, as applicable, to the Notes. In such event the Company would be obligated to pay such higher rates of return, and the security of the noteholders in this Offering would therefore be negatively impacted as the Company will have greater payment obligations from the same pool of assets as compared to the situation where all promissory notes had a 9% or 10% interest rate.

***Because the Notes will have no sinking fund, insurance, or guarantee (other than from Holding), you could lose all or a part of your investment if we do not have enough cash to pay.***

There is no sinking fund, insurance or guarantee of our obligation to make payments on the Notes. We will not contribute funds to a separate account, commonly known as a sinking fund, to make interest or principal payments on the Notes. The Notes are not certificates of deposit or similar obligations of, and are not guaranteed or insured by, any depository institution, the Federal Deposit Insurance Corporation, the Securities Investor Protection Corporation, or any other governmental or private fund or entity. Therefore, if you invest in the Notes, you will have to rely only on our cash flow from operations and other sources of funds for repayment of principal at maturity or upon repayment demand by you and for payment of interest when due. Any future cash flows from operations could be impaired under the circumstances described herein. If our cash flow from operations and other sources of funds are not sufficient to pay any amounts owed under the Notes, then you may lose all or part of your investment.

***We do not expect that the Notes will be rated, but if they are, ratings of the Notes may change and affect the market price and marketability of the Notes.***

We do not currently expect that, upon issuance, the Notes will be rated by any rating agencies. If they are, such ratings are limited in scope, and do not address all material risks relating to an investment in the Notes, but rather reflect only the view of each rating agency at the time the rating is issued. There is no assurance that such credit ratings will be issued or remain in effect for any given period of time or that such

ratings will not be lowered, suspended or withdrawn entirely by the rating agencies. It is also possible that such ratings may be lowered in connection with future events, such as future acquisitions. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market price or marketability of the Notes. In addition, any decline in the ratings of the Notes may make it more difficult for us to raise capital on acceptable terms.

***Because we may pay off the Notes at any time prior to their maturity, you may be subject to reinvestment risk.***

We have the right to pay off any Note at any time prior to its stated maturity. The Notes would be paid off at 100% of the principal amount plus accrued but unpaid interest up to but not including the date of pay off. Any such pay off may have the effect of reducing the income or return on investment that any investor may receive on an investment in the Notes by reducing the term of the investment. If this occurs, you may not be able to reinvest the proceeds at an interest rate comparable to the rate paid on the Notes.

***The Note, the Security Agreement and the Guaranty contain "deemed consent" provisions.***

Each of the Note, the Security Agreement and the Guaranty contain "deemed consent" provisions which provide that the Company or Holding does not actually have to obtain written confirmation from the Investor as to any approval or consent related to, or amendment of or waiver related to, the applicable agreement or document. The Company or Holding is required to send the Investor a notice of the requested consent or approval, or the requested amendment or waiver, and if the Investor does not respond within 10 days, then to send a second notice. If the Investor does not respond within an additional 10 days the Investor will be deemed to have consented, in writing, to the requested approval, consent, amendment of or waiver.

***We have not retained independent professionals for investors.***

We have not retained any independent professionals to comment on or otherwise protect the interests of potential investors. Although we have retained our own counsel, neither such counsel nor any other independent professionals have made any examination of any factual matters herein, and potential investors should not rely on our counsel regarding any matters herein described.

***We have no firm commitments to purchase any Notes.***

We have no firm commitment for the purchase of any Notes. The Company may be unable to identify investors to purchase the Notes and as a result may have inadequate capital to support its ongoing business obligations.

***The Company may not be able to meet all of the payment demands of its Investors if a large number of Investors desires to be repaid or if the Company does not have the liquidity to meet such demands.***

The Company will use its commercially reasonable efforts to maintain sufficient cash reserves on hand and access to liquidity sources to honor repayment demands of Investors. However, in the event there are more demands for repayment than the Company has cash available to meet, the Company may be delayed in the delivery of funds and may be required to sell some of its assets, which may take significant amounts of time and may yield less than is needed to meet the Company's obligations.

## Tax Risks

***You are urged to consider the United States federal income tax consequences of owning the Notes.***

Pursuant to the terms of the Notes, the Company and each Noteholder will agree to treat the Notes for U.S. federal income tax purposes as contingent payment debt instruments subject to U.S. federal income

tax rules applicable to contingent payment debt instruments. Under that treatment, if you are a U.S. Holder (as defined herein), you may be required to include interest in taxable income in each year in excess of the amount of interest payments actually received by you in that year. You will recognize gain or loss on the sale, repurchase, exchange, conversion or repayment of a Note in an amount equal to the difference between the amount realized and your adjusted tax basis in the Note. Any gain recognized by you on the sale, repurchase, exchange, conversion or repayment of a Note generally will be treated as ordinary interest income and any loss will be treated as ordinary loss to the extent of the interest previously included in income and, thereafter, as capital loss.

***Interest on Notes Could be Characterized as Unrelated Business Taxable Income.***

We intend to take the position that the Notes should be classified as debt instruments for U.S. federal income tax purposes and the stated interest should constitute interest. In general, interest on debt instruments is not characterized as Unrelated Business Taxable Income ("UBTI") with respect to tax exempt Noteholders. However, there is no assurance that the IRS will agree with this position and it is possible that the Notes may be treated as equity securities or as hybrid debt/equity securities. In such case, all or a portion of the interest on the Notes may be characterized as UBTI with respect to tax exempt Noteholders.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

This Memorandum does not address any tax considerations that may be relevant to you. You are urged to consult your own tax advisors as to the specific tax consequences of purchasing, owning and disposing of any Notes, including any federal, state or local tax consideration.

**WE URGE YOU TO CONSULT AND RELY UPON YOUR OWN TAX ADVISOR WITH RESPECT TO YOUR OWN TAX SITUATION, POTENTIAL CHANGES IN APPLICABLE LAWS AND REGULATIONS AND THE FEDERAL AND STATE CONSEQUENCES ARISING FROM AN INVESTMENT IN THE NOTES. THE COST OF THE CONSULTATION COULD, DEPENDING ON THE AMOUNT CHARGED TO YOU, DECREASE ANY RETURN ANTICIPATED ON YOUR INVESTMENT. NOTHING IN THIS MEMORANDUM IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO ANY SPECIFIC INVESTOR, AS INDIVIDUAL CIRCUMSTANCES MAY VARY. YOU SHOULD BE AWARE THAT THE INTERNAL REVENUE SERVICE MAY NOT AGREE WITH ALL TAX POSITIONS TAKEN BY US AND THAT LEGISLATIVE, ADMINISTRATIVE OR COURT DECISIONS MAY REDUCE OR ELIMINATE ANY ANTICIPATED TAX BENEFITS OF AN INVESTMENT IN THE NOTES.**

***

**EXHIBIT A**

**SUBSCRIPTION AGREEMENT**

**(Attached)**



## iCap Pacific Income Fund 5, LLC

---

**SUBSCRIPTION AGREEMENT FOR ACCREDITED INVESTORS**

---

Investor's Name

Representative's Name

Broker-Dealer Affiliation

**1. Subscription Amount**

$ _____

**2. Payment Method**

Investor's payment of the Principal Balance must be in <u>one</u> of the following methods (select one):

☐ **Wire Transfer**: by wiring payment of the Principal Balance to the account set forth below:

| | |
|---|---|
| Account Name: | iCap Pacific Income Fund 5, LLC |
| ABA Routing Number: | 063116083 |
| Account Number: | 2000086468 |
| Bank Name: | Seaside Bank |
| Bank Address: | 201 S. Orange Ave., Suite 1350, Orlando, FL 32801 |

☐ **Check**: by mailing a check made payable to "iCap Pacific Income Fund 5, LLC" to the processing dealer at:

Cobalt Capital, Inc.
600 Wilkinson Street, Suite 300
Orlando, FL 32803
Phone: 407.649.3150
Fax: 321.400.1359

☐ **Vault Account**:  By checking this box you acknowledge and agree that (1) you currently have funds in a Vault account with iCap Vault 1, LLC (the "Vault"), an Affiliate of the Company, and (2) you do hereby direct the Company to provide notice to iCap Vault 1, LLC on your behalf to withdraw your investment in the Vault, in the amount set forth above, and to send those funds to the Company for the purchase of a Note.

☐ **Other**: _____

### 3.   Delivery of Documents

☐ **Completed Electronically (either through Docusign or emailed to investor@icapequity.com)**: no need to mail documents.

☐ **Completed in Paper Form**:  please mail all documents to the processing dealer at "Cobalt Capital, Inc., 600 Wilkinson Street, Suite 300, Orlando, FL 328036."  If paying by check, then please include the check with the documents.

\*Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

The undersigned "Subscriber", on the terms and conditions herein set forth, hereby irrevocably submits this subscription agreement (the "Subscription Agreement") to iCap Pacific Income Fund 5, LLC, a Delaware limited liability company (the "Company"), in connection with a private offering by the Company (the "Offering") to raise working capital of up to $50,000,000, with an over-allotment amount of an additional $25,000,000, through the sale to Subscriber as an accredited investor of a Secured Promissory Note of the Company (the "Note").

1. **Subscription for the Purchase of Notes.**

The undersigned, intending to be legally bound, hereby subscribes for the amount set forth on the Investment Summary page below (the "Principal Balance"). The undersigned acknowledges that the Company is offering the Notes to those who are "accredited investors" as defined herein, pursuant to the terms and provisions of the Offering documented in the Confidential Private Placement Memorandum dated September 5, 2019 (together with all exhibits attached thereto, the "Memorandum") relating to the Offering. In this regard, Investor agrees to forward payment in the amount of the Principal Balance indicated on the Investment Summary form below. The Company's private offering of Notes is being made to "accredited" investors within the meaning of Rule 506(b) of Regulation D promulgated by the Securities Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"). By signing this Subscription Agreement, Subscriber acknowledges receipt of the Memorandum and its Exhibits, including the Note, the Pledge and Security Agreement, Collateral Agent Agreement and the Guaranty (collectively the "Note Documents"), and agrees that he/she/it has read all of its provisions and agrees to be bound by such Note Documents.

The undersigned agrees to execute this Subscription Agreement and if by mail, send to the Company. You as an individual or you on behalf of the subscribing entity are being asked to complete this Subscription Agreement so that a determination can be made as to whether or not you (it) are qualified to purchase the Note under applicable federal and state securities laws. Your answers to the questions contained herein must be true and correct in all respects, and a false representation by you may constitute a violation of law for which a claim for damages may be made against you. Your answers will be kept strictly confidential; however, by signing this Subscription Agreement, you will be authorizing the Company to present a completed copy of this Subscription Agreement to such parties as they may deem appropriate in order to make certain that the offer and sale of the securities will not result in a violation of the Securities Act or of the securities laws of any state. All questions must be answered. If the appropriate answer is "None" or "Not Applicable," please state so. Please print or type your answers to all questions and attach additional sheets if necessary to complete your answers to any item. Please initial any corrections.

2. **Offer to Purchase.** Subscriber hereby irrevocably offers to purchase the Note and tenders herewith the total price noted above. Subscriber recognizes and agrees that (i) this subscription is irrevocable and, if Subscriber is a natural person, shall survive Subscriber's death, disability or other incapacity, and (ii) the Company has complete discretion to accept or to reject this Subscription Agreement in its entirety and shall have no liability for any rejection of this Subscription Agreement. This Subscription Agreement shall be deemed to be accepted by the Company only when it is executed by the Company.

3. **Effect of Acceptance.** Subscriber hereby acknowledges and agrees that on the Company's acceptance of this Subscription Agreement, it shall become a binding and fully enforceable agreement between the Company and the Subscriber. As a result, upon acceptance by the Company of this Subscription Agreement, Subscriber will become the record and beneficial holder of the Note and the Company will be entitled to receive the purchase price of the Note as specified herein.

4. **Representation as to Investor Status.** Investor agrees to complete all applicable portions of the Investor Representations page at the end of this Agreement.

5. **Additional Representations and Warranties of Subscriber.** Subscriber hereby represents and warrants to the Company as follows:

**(a)** Subscriber has been furnished the Memorandum and, if requested by the Subscriber, other documents. The Subscriber has carefully read the Memorandum and any such other requested documents. Subscriber has been furnished with all documents and materials relating to the business, finances and operations of the Company and information that Subscriber requested and deemed material to making an informed investment decision regarding its purchase of the Note. Subscriber has been afforded the opportunity to review such documents and materials and the information contained therein. Subscriber has been afforded the opportunity to ask questions of the Company and its management. Subscriber understands that such discussions, as well as any written information provided by the Company, were intended to describe the aspects of the Company's business and prospects which the Company believes to be material, but were not necessarily a thorough or exhaustive description, and except as expressly set forth in this Subscription Agreement, the Company makes no representation or warranty with respect to the completeness of such information and makes no representation or warranty of any kind with respect to any information provided by any entity other than the Company. Some of such information may include projections as to the future performance of the Company, which projections may not be realized, may be based on assumptions which may not be correct and may be subject to numerous factors beyond the Company's control. Additionally, Subscriber understands and represents that he, she or it is purchasing the Note notwithstanding the fact that the Company may disclose in the future certain material information that the Subscriber has not received, including the financial results of the Company for their current fiscal quarters. Neither such inquiries nor any other due diligence investigations conducted by such Subscriber shall modify, amend or affect such Subscriber's right to rely on the Company's representations and warranties, if any, contained in this Subscription Agreement. Subscriber has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Note. Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

**(b)** Subscriber has read and understood, and is familiar with, this Subscription Agreement, the Note and the business and financial affairs of the Company.

**(c)** Subscriber, either personally, or together with its advisors (other than any securities broker/dealers who may receive compensation from the sale of any of the Notes), has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Note, is able to bear the risks of an investment in the Note and understands the risks of, and other considerations relating to, a purchase of a Note, including the matters set forth under the caption "Risk Factors" in the Memorandum. The Subscriber and its advisors have had a reasonable opportunity to ask questions of and receive answers from the Company concerning the Note. Subscriber's financial condition is such that Subscriber is able to bear the risk of holding the Note that Subscriber may acquire pursuant to this Agreement, for an indefinite period of time, and the risk of loss of Subscriber's entire investment in the Notes.

**(d)** Subscriber has investigated the acquisition of the Note to the extent Subscriber deemed necessary or desirable and the Company has provided Subscriber with any reasonable assistance Subscriber has requested in connection therewith.

**(e)** The Note is being acquired for Subscriber's own account for investment, with no intention by Subscriber to distribute or sell any portion thereof within the meaning of the Securities Act, and will not be transferred by Subscriber in violation of the Securities Act or the then applicable rules or regulations thereunder. No one other than Subscriber has any interest in or any right to acquire the Note. Subscriber understands and acknowledges that the Company will have no obligation to recognize the ownership, beneficial or otherwise, of the Note by anyone but Subscriber.

**(f)** No representations or warranties have been made to Subscriber by the Company, or any representative

of the Company, or any securities broker/dealer, other than as set forth in this Subscription Agreement.

**(g)** Subscriber is aware that Subscriber's rights to transfer the Note is restricted by the Securities Act and applicable state securities laws, and Subscriber will not offer for sale, sell or otherwise transfer the Note without registration under the Securities Act and qualification under the securities laws of all applicable states, unless such sale would be exempt therefrom.

**(h)** Subscriber understands and agrees that the Note it acquires has not been registered under the Securities Act or any state securities act in reliance on exemptions therefrom and that the Company has no obligation to register any of the Notes offered by the Company.

**(i)** The Subscriber has had an opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of this investment and all such questions have been answered to the full satisfaction of the undersigned. Subscriber understands that no person other than the Company has been authorized to make any representation and if made, such representation may not be relied on unless it is made in writing and signed by the Company. The Company has not, however, rendered any investment advice to the undersigned with respect to the suitability.

**(j)** Subscriber understands that the Note shall bear a restrictive legend in substantially the following form (and a stop transfer order may be placed against transfer of such certificates):

"NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT."

**(k)** Subscriber also acknowledges and agrees to the following:

**(i)** an investment in the Note is highly speculative and involves a high degree of risk of loss of the entire investment in the Notes; and

**(ii)** there is no assurance that a public market for the Notes will be available and that, as a result, Subscriber may not be able to liquidate Subscriber's investment in the Note should a need arise to do so.

**(l)** Subscriber is not dependent for liquidity on any of the amounts Subscriber is investing in the Note.

**(m)** Subscriber's address set forth below is his or her correct residence address.

**(n)** Subscriber has full power and authority to make the representations referred to herein, to purchase the Note and to execute and deliver this Subscription Agreement.

**(o)** Subscriber understands that the foregoing representations and warranties are to be relied upon by the Company as a basis for the exemptions from registration and qualification of the sale of the Note under the federal and state securities laws and for other purposes.

**6. Representations and Warranties Regarding Patriot Act; Anti-Money Laundering; OFAC.** The

Subscriber should check the Office of Foreign Assets Control ("OFAC") website at http://www.treas.gov/ofac before making the following representations. Subscriber hereby represents and warrants to the Company as follows:

(a)  The Subscriber represents that (i) no part of the funds used by the Subscriber to acquire the Note or to satisfy his/her capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene United States federal or state or non-United States laws or regulations, including anti-money laundering laws and regulations, and (ii) no capital commitment, contribution or payment to the Company by the Subscriber and no distribution to the Subscriber shall cause the Company to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum or any other agreement, to the extent required by any anti-money laundering law or regulation, the Company may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Note, and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals [1] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

(b)  To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Company may not accept any amounts from a prospective investor if such prospective investor cannot make the representation set forth in this paragraph. The Subscriber agrees to promptly notify the Company should the Subscriber become aware of any change in the information set forth in these representations. The Subscriber understands and acknowledges that, by law, the Company may be obligated to "freeze the account" of the Subscriber, either by prohibiting additional subscriptions from the Subscriber, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and any broker may also be required to report such action and to disclose the Subscriber's identity to OFAC. The Subscriber further acknowledges that the Company may, by written notice to the Subscriber, suspend the redemption rights, if any, of the Subscriber if the Company reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Company or any Broker or any of the Company's other service providers. These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

(c)  To the best of the Subscriber's knowledge, none of: (1) the Subscriber; (2) any person controlling or

---

[1] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

controlled by the Subscriber; (3) if the Subscriber is a privately-held entity, any person having a beneficial interest in the Subscriber; or (4) any person for whom the Subscriber is acting as agent or nominee in connection with this investment is a senior foreign political figure[2], or any immediate family[3] member or close associate[4] of a senior foreign political figure, as such terms are defined in the footnotes below.

**(d)** If the Subscriber is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Subscriber receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Subscriber represents and warrants to the Company that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

**(e)** The Subscriber acknowledges that, to the extent applicable, the Company will seek to comply with the Foreign Account Tax Compliance Act provisions of the U.S. Internal Revenue Code and any rules, regulations, forms, instructions or other guidance issued in connection therewith (the "FATCA Provisions"). In furtherance of these efforts, the Subscriber agrees to promptly deliver any additional documentation or information, and updates thereto as applicable, which the Company may request in order to comply with the FATCA Provisions. The Subscriber acknowledges and agrees that, notwithstanding anything to the contrary contained in the Memorandum, any side letter or any other agreement, the failure to promptly comply with such requests, or to provide such additional information, may result in the withholding of amounts with respect to, or other limitations on, distributions made to the Subscriber and such other reasonably necessary or advisable action by the Company with respect to the Note (including, without limitation, required withdrawal), and the Subscriber shall have no claim, and shall not pursue any claim, against the Company or any other person in connection therewith.

The foregoing representations and warranties are true and accurate as of the date hereof and shall survive such date. If any of the above representations and warranties shall cease to be true and accurate prior to the acceptance of this Subscription Agreement, Subscriber shall give prompt notice of such fact to the Company by telegram, or facsimile or e-mail, specifying which representations and warranties are not true and accurate and the reasons therefor.

**7. Indemnification.** Subscriber acknowledges that Subscriber understands the meaning and legal consequences of the representations and warranties made by Subscriber herein, and that the Company is relying on such representations and warranties in making the determination to accept or reject this Subscription Agreement. Subscriber hereby agrees to indemnify and hold harmless the Company and each

---

[2] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[3] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[4] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

employee and agent thereof from and against any and all losses, damages or liabilities due to or arising out of a breach of any representation or warranty of Subscriber contained in this Subscription Agreement.

8. **Transferability.** Subscriber agrees not to transfer or assign this Subscription Agreement, or any interest herein, and further agrees that the assignment and transferability of the Note acquired pursuant hereto shall be made only in accordance with applicable federal and state securities laws.

9. **Termination of Agreement; Return of Funds.** In the event that, for any reason, this Subscription Agreement is rejected in its entirety by the Company, this Subscription Agreement shall be null and void and of no further force and effect, and no party shall have any rights against any other party hereunder. In the event that the Company rejects this Subscription Agreement, the Company shall promptly return or cause to be returned to Subscriber any money tendered hereunder without interest or deduction.

10. **Notices.** All notices or other communications given or made hereunder, or pursuant to the Note, shall be in writing and shall be deemed delivered if (a) mailed by registered or certified mail, return receipt requested, postage prepaid, (b) delivered by facsimile or e-mail to Subscriber at the address set forth below and to the Company at investor@icapequity.com, or (c) at such other place as the Company may designate by written notice to Subscriber.

11. **Amendments.** Neither this Subscription Agreement nor any term hereof may be changed, waived, discharged or terminated except in a writing signed by Subscriber and the Company.

12. **Governing Law.** This Subscription Agreement and all amendments hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without application of the conflicts of laws provisions thereof.

13. **Headings.** The headings in this Subscription Agreement are for convenience of reference, and shall not by themselves determine the meaning of this Subscription Agreement or of any part hereof.

14. **Counterparts.** This Subscription Agreement may be executed in any number of counterparts with the same force and effect as if all parties had executed the same document. The execution and delivery of a facsimile or other electronic transmission of this Subscription Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

15. **Continuing Obligation of Subscriber to Confirm Investor Status**. Upon the request of the Company and for as long as the Subscriber holds the Note or other securities in the Company, the Subscriber shall confirm Subscriber's investor status as an "Accredited Investor," as defined by the Securities and Exchange Commission at the time of such request. In connection therewith, the Company shall deliver to the Subscriber a questionnaire that elicits the necessary information to determine the Subscriber's investor status. Upon receipt of the questionnaire, the Subscriber shall: (i) complete it, (ii) execute the signature page therein, and (iii) return it to the Company, or its designee, in accordance with the instructions therein, no later than ten (10) days after receipt of the questionnaire.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## INVESTOR REPRESENTATIONS

**(a) Type of Subscriber.** Indicate the form of entity of Subscriber:

| | | | |
|---|---|---|---|
| ☐ | Individual | ☐ | Corporation or Limited Liability Company (LLC) |
| ☐ | Husband and Wife | ☐ | Partnership |
| ☐ | Joint Tenants | ☐ | Irrevocable Trust |
| ☐ | IRA | ☐ | Other Type of Trust (indicate type): _____ |
| ☐ | Keogh/SEP | ☐ | Other Retirement Plan |

☐    Profit Sharing Plan:_____

☐    Other (indicate form of organization): _____

**(b) Accredited Investor.** In order for the Company to sell the Note (in conformance with state and federal securities laws), the following information must be obtained regarding Subscriber's investor status. Please **initial each item applicable** to you as an investor in the Company. I am:

**(i)**   \_\_\_\_\_ A natural person whose net worth, either individually or jointly with such person's spouse, at the time of Subscriber's purchase, exceeds $1,000,000.

**(ii)**   \_\_\_\_\_ A natural person who had an individual income in excess of $200,000, or joint income with that person's spouse in excess of $300,000, in each of the two most recent years and reasonably expects to reach the same income level in the current year. In determining individual "income," Subscriber should add to Subscriber's individual taxable adjusted gross income (exclusive of any spousal income) and amounts attributable to tax exempt income received, losses claimed as a limited partnership, deductions claimed for depletion, contributions to an IRA or Keogh retirement plan, alimony payments, and any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income.

**(iii)**   \_\_\_\_\_ A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

**(iv)**   \_\_\_\_\_ A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

**(v)**   \_\_\_\_\_ An insurance company as defined in section 2(13) of the Exchange Act.

**(vi)**   \_\_\_\_\_ An investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act.

**(vii)**   \_\_\_\_\_ A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

**(viii)**   \_\_\_\_\_ A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state, or its political subdivisions for the benefit of its employees, if such

plan has total assets in excess of $5,000,000.

**(ix)** _____ An employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

**(x)** _____ A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

**(xi)** _____ An organization described in Section 501(c)(3) of the Internal Revenue Code, or a corporation, business trust or partnership, not formed for the specific purpose of acquiring the Note, with total assets in excess of $5,000,000.

**(xii)** _____ A director or executive officer of the Company.

**(xiii)** _____ A trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Note, whose purchase is directed by a sophisticated person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of investing in the Company.

**(xiv)** _____ An entity in which all of the equity owners qualify under any of the above subparagraphs.

_____ Subscriber does <u>not</u> qualify under any of the investor categories set forth in Section (b)(i) through Section (b)(xiv).

**(c) Net Worth.** The term "net worth" means the excess of total assets over total liabilities (including personal and real property, but excluding the estimated fair market value of a person's primary home).

## INDIVIDUALS, JOINT ACCOUNTS, OR REVOCABLE LIVING TRUSTS

| | |
|---|---|
| Investor Name(s) | 1 |
| | 2 |
| Registered As | |
| Address of Principal Place of Residence *(please do not use PO Box)* | |

| City | | State | | Zip Code | |
|---|---|---|---|---|---|

| Mailing Address (if different from above) | |
|---|---|

| Home Telephone No. | ( ) | Business Telephone No. | ( ) |
|---|---|---|---|
| Cell Phone No. | ( ) | Email Address(es) | |

| **Birth Date(s) (required)** | 1 | 2 | Occupation(s) | 1 |
|---|---|---|---|---|
| **SSN or TIN**[1] | | | | 2 |
| **SSN or TIN**[2] | | | | |

Status, if individual:

☐ U.S. Citizen    ☐ U.S. Resident Alien    ☐ U.S. Citizen Residing Outside of U.S.

### *Prospective Investors must fill out the Form W-9 attached hereto*

**IF INVESTING THROUGH AN IRA, KEOGH OR OTHER RETIREMENT OR PROFIT SHARING PLAN, PLEASE COMPLETE THE FOLLOWING (IN ADDITION TO THE INVESTOR INFORMATION ON THE PREVIOUS PAGE):**

| | |
|---|---|
| **Account Name** | |
| **Custodian's EIN** | |
| **Custodian's Address** | |
| **City** | **State** | **Zip Code** |

_____

_**Together with this Subscription Agreement, please sign and return a counterpart signature page to the Collateral Agent Agreement, which is attached hereto as Annex 1.**_

<u>ACCEPTANCE</u>

iCap Pacific Income Fund 5, LLC

Date: _____.

By: iCap Pacific NW Management, LLC
Its: Manager

By: _____

Name: _____

Title: Manager

## CORPORATIONS, PARTNERSHIPS, IRREVOCABLE TRUSTS OR OTHER ENTITIES

1.  Name of
    entity_____

    ☐   Partnership

    ☐   Limited Liability Company

    ☐   Corporation

    ☐   Trust or Pension Plan

    ☐   Other
        _____
                (Specify)

Taxpayer Identification Number: _____

Business
Address:_____

State in which organized or incorporated _____

Date of formation or incorporation: _____

2.  Was this partnership, corporation, trust or other entity formed for the specific purpose of
    purchasing the Note?

    ☐ Yes   ☐ No

    If yes, each person participating in the entity will be required to fill out a Subscription Agreement.

3.  Has this partnership, corporation, trust or other entity made other investments?

    ☐ Yes   ☐ No

If no, each person participating in the entity will be required to fill out a Subscription Agreement.

4.  How many persons own an equity interest in this partnership, corporation, trust or other entity (including the investor)?

_____

EACH EQUITY OWNER (OTHER THAN A SPOUSE OR CHILD OF AN EQUITY OWNER LIVING WITH SUCH EQUITY OWNER) MUST COMPLETE AND SIGN THIS QUESTIONNAIRE.

5.  If a Trust, does the Trust have assets of at least $5,000,000?

☐ Yes    ☐ No    ☐ N/A

If the prospective investor is an EMPLOYEE BENEFIT PLAN within the meaning of Title 1 of the Employee

Retirement Income Security Act of 1974, as amended ("ERISA"), please answer question 12.

6.  (a) If an Employee Benefit Plan, does the Employee Benefit Plan have assets of at least $5,000,000?

☐ Yes    ☐ No    ☐ N/A

(b) Is this investment decision being made or directed by the beneficiaries of the Employee Benefit Plan?

☐ Yes    ☐ No    ☐ N/A

**SIGNATURES- ALL INVESTORS MUST SIGN**

THE UNDERSIGNED HAS THE AUTHORITY TO ENTER INTO THIS SUBSCRIPTION AGREEMENT ON BEHALF OF THE PERSON(S) OR ENTITY REGISTERED ABOVE.

Executed on_____  _____

X_____
                    Signature (Investor, or authorized signatory)

X_____
                    Signature (Investor, or authorized signatory)

*Interest will accrue only after the Subscription Agreement, and all agreements relating to the Note, have been fully executed and accepted by the Company, and the Principal Balance has been delivered and made available to the Company as indicated by the Company's financial institution.

***Together with this Subscription Agreement, please sign and return a counterpart signature page to the Collateral Agent Agreement, which is attached hereto as Annex 1.***

<u>ACCEPTANCE</u>
iCap Pacific Income Fund 5, LLC

Date: _____.

By:  iCap Pacific NW Management, LLC
Its:  Manager


By: _____

Name: _____

Title:    Manager

**BROKER DEALER/REGISTERED INVESTMENT ADVISOR**

**TO BE COMPLETED BY REGISTERED REPRESENTATIVE**

The Registered Representative of record for this transaction and a Registered Principal authorized by the Broker/Dealer or Registered Investment Advisor to review and approve such securities transactions must sign and date below. The Registered Principal warrants that the Broker/Dealer (or Registered Investment Advisor) is a duly licensed Broker/Dealer (or Registered Investment Advisor) and may lawfully offer the Notes in the state designated as the investor's address of residence. The Registered Representative and the Registered Principal represent that they have reasonable grounds to believe this investment is suitable for the investor and that the investor has been provided full information regarding the risks of this investment including liquidity and marketability.

| | | | |
|---|---|---|---|
| B-D/RIA Name | | Telephone No. | ( ) |
| B-D/RIA Street Address or P.O. Box | | | |
| City | | State | Zip Code |
| Registered Representative Name | | Telephone No. | ( ) |
| Email Address: | | | |
| Reg. Rep. Street Address or P.O. Box | | | |
| City | | State | Zip code |

☐ **Registered Representative: please check this box to verify that you have personally seen and recorded a government issued identification document from the Investor.**

| | |
|---|---|
| | |

Registered Representative's Signature & Date      Registered Principal's Approval Signature & Date



**Payment Remittance Information:**

Please complete the following authorization:

I would like my payment remittance to be sent to me in the following way:

☐     **ACH Authorization (Direct Deposit):**

I hereby authorize **iCap Pacific Income Fund 5, LLC** ("the Company") to initiate credit entries to the bank account(s) listed below. I further authorize the financial institution(s) named below to credit such account(s).

| Name of Financial Institution | Checking or Savings | Bank Routing Number | Bank Account Number | % or Amount of Deposit |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

For iCap to verify bank account and routing numbers, investors are encouraged to attach a **VOIDED CHECK** for each investor account to be credited. Investors should retain completed copies of this form for their records.

☐     Check:

I hereby authorize **iCap Pacific Income Fund 5, LLC** ("the Company") to mail my payment remittance to the following:

Name:                           _____

Institution (if applicable):       _____

Account Number (if applicable):   _____

Address:                     _____

                                 _____

I understand that this authorization remains in effect until the Company receives from me, in writing, notification to terminate/change the authorization in such a time and manner as to afford the Company a reasonable time to act on it.

_____

Account Holder Signature                                    Date

_____

Account Holder Signature                                    Date

| Form **W-9**<br>(Rev. October 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification**<br>▶ Go to *www.irs.gov/FormW9* for instructions and the latest information. | **Give Form to the requester. Do not send to the IRS.** |
| --- | --- | --- |

**See Specific Instructions on page 3. Print or type.**

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC    ☐ C Corporation    ☐ S Corporation    ☐ Partnership    ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

Requester's name and address (optional)

**6** City, state, and ZIP code

**7** List account number(s) here (optional)

---

### Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

☐☐☐ – ☐☐ – ☐☐☐☐

or

**Employer identification number**

☐☐ – ☐☐☐☐☐☐☐

---

### Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| **Sign Here** | Signature of U.S. person ▶ | Date ▶ |
| --- | --- | --- |

---

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

Form **W-9** (Rev. 10-2018)

**Annex 1**

Counterparty Signature Page to Collateral Agent Agreement

By execution hereof, the undersigned Holder hereby joins in and becomes a Holder under that certain Collateral Agent Agreement dated as of September 5, 2019, by and between iCap Pacific Income Fund 5, LLC, a Delaware limited liability company ("Company"), the holders of the Notes (as defined in such therein) and MarketPlace Realty Advisors, LLC in its capacity as collateral agent (in such capacity "Agent") (the "Collateral Agent Agreement").

The undersigned Holder has received and read a copy of the Collateral Agent Agreement and understands its provisions. Holder hereby adopts and agrees to be bound by all of the provisions of the Collateral Agent Agreement and all of the provisions of the Collateral Agent Agreement are hereby incorporated herein.

IN WITNESS WHEREOF, the Parties hereto have caused this Counterpart Signature Page to Collateral Agent Agreement to be executed as of the date set forth below.

Holder Name: _____

Signature _____
Title: _____
*(if applicable)*

Date: _____

Agreed and accepted:

iCap Pacific Income Fund 5, LLC

By: iCap Pacific NW Management, LLC
Its: Manager

By: _____
Name: _____
Title: _____

**EXHIBIT B**

**FORM OF PROMISSORY NOTE**

**(Attached)**

**NEITHER THE ISSUANCE NOR SALE OF THIS SECURITY HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THIS SECURITY MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITY UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT.**

**Principal Amount: $_____**

**Issue Date: _____**

**Account Number: _____**

### SECURED PROMISSORY NOTE

FOR VALUE RECEIVED, iCap Pacific Income Fund 5, LLC, a Delaware limited liability company (the "Company"), hereby promises to pay to the order of _____, or registered assigns (the "Holder"), in the form of lawful money of the United States of America by the fifth (5th) anniversary of the Issue Date (as defined below) (the "Maturity Date"), the amount first set forth above ("Principal Amount"), and to pay interest on the unpaid Principal Amount hereof at the rate of *[nine percent (9%) per annum, simple interest, non-compounding][10% per annum for the first year from the Issue Date and 9% per annum thereafter]* (the "Interest Rate"), from the Issue Date until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise, pursuant to the terms of this Secured Promissory Note (this "Note"). The "Issue Date" is defined as the date on which the Subscription Agreement and all related documents are executed in full, and the Principal Amount is made available to the Company as determined by the Company's financial institution; provided, however, that if this Note is signed by Company, and the entire Principal Amount is not made available to the Company within 21 days of the date first set forth above, then this Note, the Subscription Agreement, and all related documents shall be automatically terminated, cancelled, or rescinded and of no effect. This Note is one of a Series of Secured Promissory Notes being issued by the Company up to a total principal amount of $50,000,000, with an over-allotment amount of an additional $25,000,000 (collectively, the "Notes"). This Note is issued to Holder pursuant to a Subscription Agreement dated as of _____, 20\_\_\_ (the "Subscription Agreement") by and between the Company and Holder and is subject to the terms and conditions thereof.

1. <u>Payments</u>.

    (a) This Note is a balloon note and although interest will be paid monthly as set forth below, there are no scheduled payments of the Principal Amount prior to the Maturity Date except as otherwise set forth herein. Unless otherwise paid, the outstanding Principal Amount and all unpaid Interest shall be paid on the Maturity Date. The Company may prepay all or any portion of the Principal Amount and unpaid Interest prior to the Maturity Date without penalty.

    (b) At any time following the first anniversary of the Issue Date, Holder may require the Company to repay all or a portion of the Principal Amount and all unpaid Interest then due and payable (a "Demand Repayment"). Any Demand Repayment may be made through the Company's investor portal accessible at www.icapequity.com, an electronic application as provided by the Company to Holder, or by delivery to the Company of a demand notice in the form as attached hereto as Exhibit A (each as so delivered, a "Demand Notice"). Upon receipt of a Demand Notice, the Company will pay the requested amount in four equal installments due within 15-days of the beginning of each calendar quarter (the "Demand Payment"). The first payment will be made in the next calendar quarter that follows delivery of proper

497269.v19

notice, provided 45-days' notice is provided to the Company. Notwithstanding the foregoing, the Company's demand payment obligation is subject to a limit of 5% of the combined notes of the Company requested per year. If more than 5% of the combined notes provide Demand Notice within a given year, then the Notes of Investors who provide subsequent Demand Notice will be paid in the order received after the combined total, including the subsequent Note, has been reduced to less than 5%. All repayments pursuant to this Section 1(b) shall be applied first to accrued and unpaid Interest and thereafter to the Principal Amount. Notwithstanding the foregoing, Demand Repayments will be subject to the following reductions in the requested repayment amounts:

(i) For Demand Repayments received by the Company prior to the second anniversary of the Issue Date, the repayment amount will be subject to a 10% reduction, such that 90% of the repayment amount in the Demand Repayment shall be repaid and the remaining 10% of the repayment amount in the Demand Repayment shall be deemed forgiven and satisfied in full.

(ii) For Demand Repayments received by the Company after the second anniversary of the Issue Date but prior to the third anniversary of the Issue Date, the repayment amount will be subject to a 7.5% reduction, such that 92.5% of the repayment amount in the Demand Repayment shall be repaid and the remaining 7.5% of the repayment amount in the Demand Repayment shall be deemed forgiven and satisfied in full.

(iii) For Demand Repayments received by the Company after the third anniversary of the Issue Date but prior to the fourth anniversary of the Issue Date, the repayment amount will be subject to a 5% reduction, such that 95% of the repayment amount in the Demand Repayment shall be repaid and the remaining 5% of the repayment amount in the Demand Repayment shall be deemed forgiven and satisfied in full.

(iv) For Demand Repayments received by the Company after the fourth anniversary of the Issue Date but prior to the fifth anniversary of the Issue Date, the repayment amount will be subject to a 2.5% reduction, such that 97.5% of the repayment amount in the Demand Repayment shall be repaid and the remaining 2.5% of the repayment amount in the Demand Repayment shall be deemed forgiven and satisfied in full.

(c) Unless otherwise agreed between Company and Holder, all accrued monthly interest payments will be paid to the Holder on or before the 15th of each month following the Issue Date.

(d) The Company may not, and shall not, incur additional indebtedness for the sole purpose of making any Demand Repayments hereunder.

2. <u>Security and Guaranty; Exchange.</u>

(a) Payment of this Note and the Interest and Principal Amount hereunder shall be secured by a pledge of the equity securities of any direct wholly owned subsidiaries held by iCap Holding 5, LLC a wholly owned subsidiary of the Company ("iCap Holding"), pursuant to a Pledge and Security Agreement entered into on September 5, 2019 by and between MarketPlace Realty Advisors, LLC in its capacity as collateral agent for the holders of the Notes (in such capacity "Agent"), the Company and iCap Holding (the "Security Agreement") provided that such security interest may be junior to any financing in place related to the real estate holdings of such subsidiaries; and payment of this Note and the Interest and Principal Amount hereunder shall be guaranteed by iCap Holding pursuant to the Guaranty Agreement entered into on September 5, 2019 by iCap Holding for the benefit of the holders of the Notes pursuant to which iCap Holding 5, LLC guaranteed the obligations of the Company hereunder (the "Guaranty Agreement. This Note, the Subscription Agreement pursuant to which Holder acquired this Note, the Pledge and Security Agreement, Collateral Agent Agreement and the Guaranty Agreement may be

497269.v19
23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 1 Page 541
Exhibit 41 Page 541

referred to collectively as the "Transaction Documents."

(b) This Note will be subordinate at times to the rights of any lender of the Company or its subsidiaries, as well as to other higher-ranking obligations of the Company, including property taxes and management fees, as further set forth in the Security Agreement.

3. <u>Application of Payments</u>. Unless otherwise expressly provided in this Note, all payments made on this Note shall be applied, (i) first to the payment of the Interest and other charges then accrued and due on the unpaid Principal Amount of this Note; and then (ii) the remainder of all such payments shall be applied to the reduction of the unpaid Principal Amount.

4. <u>Events of Default</u>.

(a) <u>Definition</u>. Subject to the provisions of Section 4(c), for the purpose of the Transaction Documents, an event of default ("Event of Default") will be deemed to have occurred if, and at the time, holders holding a majority of the principal amount of the Notes then outstanding (a "Majority-in-Interest of the Noteholders") elect to declare such an Event of Default, which a Majority-in-Interest of the Noteholders may only do in the event that any of the following occur, and after the Company has not rectified such event within 90 days of receipt of notice thereof signed by a Majority-in-Interest of the Noteholders:

(i) The Company fails to make a Demand Payment when due pursuant to Section 1(b);

(ii) the Company fails to perform any of its material obligations under this Note, or being in breach in any material respect of any representation, warranty, covenant or agreement on the part of the Company set forth in this Note;

(iii) the Company commences any liquidation or dissolution proceedings or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy law or consents to the filing of any bankruptcy petition against it under any similar law; or

(iv) the Company fails to pay all amounts due under the Notes on the Maturity Date.

(b) <u>Consequences of Events of Default</u>. If, and at the time, an Event of Default occurs, then, as of the date that the Event of Default is declared as required hereunder, the Interest Rate relating to the Note(s) to which the Event of Default relates shall be increased to fifteen percent (15%) per annum (the "Default Rate"), which Default Rate shall remain in place until this Note is either paid as due or such Event of Default is cured. If an Event of Default as set forth in Section 1(a)(i), Section 1(a)(ii), or Section 1(a)(iv) occurs, a Majority-in-Interest of the Noteholders will have the right to declare only the applicable Note(s) which are subject to the Event of Default due and payable, which determination will be delivered to the Agent pursuant to the Collateral Agent Agreement and will be forwarded to the Company as set forth herein. If an Event of Default as set forth in Section 1(a)(iii) occurs, a Majority-in-Interest of the Noteholders will have the right to declare all of the Notes due and payable and, if the Security Agreement and Guaranty Agreement are still in effect as of such time, a Majority-in-Interest of the Noteholders shall have the right to direct the Collateral Agent to proceed to enforce the security granted to the noteholders pursuant to the Pledge and Security Agreement and to enforce the Guaranty Agreement.

(c) <u>Power to Vote</u>. Notwithstanding Section 4(a), Holder shall not be entitled to vote for or against the declaration of an "Event of Default" unless, as of the time of such vote, the applicable Event of Default has occurred and is continuing under this Note, provided, however, that the Principal Amount hereunder shall continue to be counted for purposes of determining the aggregate principal amount of Notes then outstanding for purposes of determining whether holders of a sufficient aggregate principal amount of Notes have elected to declare an "Event of Default."

(d) Notwithstanding Section 4(a), Section 4(b) and Section 4(c), in the event that any of the events set forth in Section 4(a) occurs with respect to this particular Note which could result in an Event of Default occurring following the completion of the actions set forth in provisions of Section 4(b) and Section 4(c), but an Event of Default is not declared or is not declarable due to the provisions of Section 4(b) and Section 4(c) within 90 days of the occurrence of such event, the Holder hereunder may send a notice of such event to the Company. In the event that the Company has not rectified such event within an additional 90 days of receipt of notice thereof signed by the Holder hereof, it shall be an "Individual Note Default" hereunder. In the event of an Individual Note Default, the Default Rate shall apply to this particular Note, subject to the terms and conditions above, this Note shall be immediately due and payable, and the Holder hereunder shall be permitted to bring a claim for payment under this particular Note against the Company as a result of such Individual Note Default, notwithstanding the fact that the Holder shall not have any rights pursuant to the Security Agreement and the Guaranty Agreement due to the fact that an Event of Default has not been declared.

5. <u>Cancellation</u>. After all obligations for the payment of money arising under this Note have been paid in full this Note will be surrendered to the Company for cancellation.

6. <u>Failure or Indulgence Not Waiver.</u> No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies of the Holder existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available<u>.</u>

7. <u>Notices.</u> All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, if sent from the Holder shall be sent to the Agent as set forth in the Collateral Agent Agreement, who shall thereafter forward such notices to the Company, and if sent by the Company shall either be sent directly to the Holder to the addresses as set forth in the Collateral Agent Agreement or to the Agent who shall thereafter forward such notices to the Holder, and, in the case of notices sent to the Holder, shall be subject to the provisions of Section 9.

8. <u>Amendments.</u> This Note may be amended at any time by the written consent of the Holder and Company, subject to the provisions of Section 9.

9. <u>Deemed Consent.</u>

(a) Each request for consent, approval or waiver under this Note, for an amendment hereof of other matter, which is sent by the Company, shall be made in writing to the Agent on behalf of the Holders, and which the Agent shall forward to the Holders, and shall include all information necessary for Holder to make an informed decision as to whether to agree to such consent, approval, waiver or amendment, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN SECURED PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND iCap Pacific Income Fund 5, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

(b) If the Holder does not approve or reject the proposed matter within ten (10) days of receipt of such notice and all necessary information, via delivery of the same to the Agent within such time period, for further distribution to the Company, the Company may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A SECOND AND FINAL REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN SECURED PROMISSORY NOTE BETWEEN YOU AS THE HOLDER AND iCap Pacific Income Fund 5, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED

HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT.

(c) If the Holder does not approve or reject the proposed or requested consent, approval, waiver or amendment or other matter within ten (10) days of receipt of such second and final notice, via delivery of the same to the Agent within such time period, for further distribution to the Company, Holder shall be deemed to have approved, in writing, the proposed consent, approval, waiver or amendment or other matter as set forth in the notice, and the Company may effect the actions set forth therein in reliance on such consent.

10. <u>Assignability.</u> This Note shall be binding upon the Company and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns. Each transferee of this Note must be an "Accredited Investor" (as defined in the Subscription Agreement) and any transfer is subject to the terms and conditions thereof.

11. <u>Governing Law; Venue; Attorney's Fees.</u> This Note shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS NOTE, THE OTHER TRANSACTION DOCUMENTS OR THE CONTEMPLATED TRANSACTIONS SHALL BE INSTITUTED SOLELY IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF WASHINGTON, IN EACH CASE LOCATED IN KING COUNTY, WASHINGTON, AND EACH PARTY IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. **THE COMPANY AND THE HOLDER EACH HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Note or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The prevailing party in any action or dispute brought in connection with this Note or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorneys' fees and costs.

12. <u>Other Agreements.</u> The Company, the Agent and the Holder shall be bound by the applicable terms of the Subscription Agreement, and, for such time as they are in effect, the Security Agreement and the Guaranty Agreement. The Subscription Agreement, the Security Agreement, the Guaranty Agreement, the Collateral Agent Agreement and this Note constitute the sole and entire agreement of the Company, the Agent and the Holder with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

13. <u>Remedies.</u> The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, except as expressly set forth herein or in the Transaction Documents the Company acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without

any bond or other security being required. If default is made in the payment of this Note, the Company shall pay the Holder costs of collection, including reasonable attorneys' fees.

14. <u>Construction; Headings</u>. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

15. <u>Usury</u>. To the extent it may lawfully do so, the Company hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any action or proceeding that may be brought by the Holder in order to enforce any right or remedy under this Note. Notwithstanding any provision to the contrary contained in this Note, it is expressly agreed and provided that the total liability of the Company under this Note for payments which under Delaware law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums which under Delaware law in the nature of interest that the Company may be obligated to pay under this Note exceed such Maximum Rate. It is agreed that if the maximum contract rate of interest allowed by Delaware law and applicable to this Note is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to this Note from the effective date thereof forward, unless such application is precluded by applicable law. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to the Holder with respect to indebtedness evidenced by this the Note, such excess shall be applied by the Holder to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at the Holder's election.

16. <u>Severability.</u> In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law (including any judicial ruling), then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Company has executed and delivered this Note on the Issue Date.

iCap Pacific Income Fund 5, LLC

By: iCap Pacific NW Management, LLC

Its: Manager

By: _____

Name: _____

Title: _____

Exhibit A

Demand Repayment Notice

This is a Demand Notice pursuant to that certain Secured Promissory Note of iCap Pacific Income Fund 5, LLC, a Delaware limited liability company (the "Company"), issued to the undersigned ("Holder") on _____, 20___ in the original Principal Balance of $_____ (the "Note"). Defined terms used herein shall have the meaning given to them in the Note. Pursuant to the provisions of the Note, Holder hereby demands prepayment of the following amount:

**Amount (Select One)**

☐ Full repayment of all Principal Balance and all unpaid Interest (subject to discounts as set forth in the Note); OR

☐ Repayment of the following amount:        $_____

**Payment Method (Select One)**

☐ Via ACH transfer to:
  Account Name:            _____
  ABA Routing Number:      _____
  Account Number:          _____
  Bank Name:               _____

  SWIFT CODE:              _____

☐ Via Check to the address of Holder as set forth in the Subscription Agreement.

Name of Holder: _____

Signature: _____

Title: _____

Date: _____

497269.v19

**EXHIBIT C**

**PLEDGE AND SECURITY AGREEMENT**

**(Attached)**

497269.v19

# PLEDGE AND SECURITY AGREEMENT

This Pledge and Security Agreement (this "Agreement"), dated as of September 5, 2019 (the "Effective Date"), is entered into by and between iCap Pacific Income Fund 5, LLC, a Delaware limited liability company (the "Company"), iCap Holding 5, LLC, a Delaware limited liability company and a wholly owned subsidiary of the Company ("iCap Holding") and MarketPlace Realty Advisors, LLC in its capacity as collateral agent (in such capacity "Agent") for the benefit of the holders of promissory notes issued by the Company pursuant to an offering of up to $50,000,000 of promissory notes, with an over-allotment amount of an additional $25,000,000, of the Company (the "Notes") pursuant to Regulation D promulgated under the Securities Act of 1933, as amended, commencing on or about September 5, 2019 (each a "Holder" and collectively the "Holders"), who execute a counterpart signature page to the Collateral Agent Agreement, dated as of the Effective Date, between the Company, the Agent and the Holders for the benefit of the Holders (the "Collateral Agent Agreement"). Each of the Company, iCap Holding and each Holder may be referred to herein as a "Party" and collectively as the "Parties." Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, iCap Holding is or shall be a member or shareholder of certain subsidiaries of iCap Holding which shall hold real estate investment properties, the interests in which will be acquired with the proceeds of the Notes and the proceeds from which will be used to pay amounts due to the Holders pursuant to the Notes (the "Portfolio SPEs"), holding all of the Class A membership interests or shares of capital stock of such Portfolio SPEs (the "Pledged Interests"); and

WHEREAS, iCap Holding has agreed to execute and deliver this Agreement pursuant to the terms of the Notes;

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1.  PLEDGE.  To secure the prompt payment and full and faithful performance of the obligations of the Company to the Holders pursuant to the Notes, whether direct, contingent, fixed or otherwise, now or hereafter from time to time arising pursuant to the Notes (collectively, the "Indebtedness"), iCap Holding hereby grants a security interest in and to, does hereby pledge and assign to, Holders, under Articles 8 and 9 of the UCC (as defined below), all its right, title, share and interest in, to and in respect of (i) the Pledged Interests; (ii) together with only so much of any distribution, whether of cash or in kind, in connection with, relating to or in respect of the applicable Pledged Interests, whether any such distribution or payment is a distribution, is in partial or complete liquidation, or is the result of reclassification, readjustment or other changes in the capital structure of the entity issuing the same, or otherwise, and any and all subscriptions, warrants, options and other rights issued upon and/or in connection therewith; (iii) any and all substitutions, renewals, improvements and replacements of the Pledged Interests and additions thereto; and (iv) all proceeds arising from any of the foregoing.  All of the foregoing items are referred to herein individually and/or collectively as the "Collateral." Capitalized terms not otherwise defined herein or in the Notes shall have the meaning given them in the UCC. For purposes of this Agreement, "UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Delaware; provided, however, in the event that, by reason of mandatory  provisions of law, any or all of the attachment, perfection or priority of Holders' security interest in the Pledged Interests is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

2.  VOTING AND TRADING RIGHTS. If no Event of Default has occurred and is continuing, iCap

Exhibit C – Page 1

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 49 Page 549

Holding may exercise any voting rights that iCap Holding may have as to the Pledged Interests. If an Event of Default has occurred and is continuing, iCap Holding shall deliver the Pledged Interests to such party as directed by the Agent on the direction of a Majority-in-Interest of the Noteholders pursuant to the Collateral Agent Agreement (the "Designated Party"), and thereafter Holders may exercise all voting rights as to any of the Pledged Interests and iCap Holding shall deliver to the Designated Party all notices, proxies and other information relating to the exercise of such rights received by iCap Holding promptly upon receipt and, at the request of Designated Party, shall execute and deliver to the Designated Party any proxies or other instruments which are, in the judgment of the Designated Party, necessary for Holders to exercise such voting rights, and a Majority-in-Interest of the Noteholders may direct the Agent to exercise the rights and pursue the remedies provided under Articles 8 and 9 of the Uniform Commercial Code.

3.  DUTY OF PLEDGEE. Agent, on behalf of the Holders, shall have no liability or duty, either before or after the occurrence of an Event of Default, to collect or enforce any of its rights against, the Pledged Interests. If the Agent or the Holders actually receive any notices requiring action with respect to Pledged Interests in Holders' possession, Holders shall take reasonable steps to forward such notices to iCap Holding. Except as provided herein, iCap Holding is responsible for responding to notices concerning the Pledged Interests, voting the Pledged Interests, and exercising any rights and options, calls or conversions in respect of the Pledged Interests.

4.  REPRESENTATIONS AND WARRANTIES. iCap Holding represents and warrants to the Holders that:

    (a) The Pledged Interests do, or shall, constitute all of iCap Holding's ownership interest in the Portfolio SPEs.

    (b) iCap Holding is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby will not, violate any provision of iCap Holding's organizational documents. iCap Holding has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Agreement.

    (c) The execution of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which iCap Holding is a party or to which any of its assets, properties or operations are subject.

    (d) This Agreement and all agreements and other documents executed by iCap Holding in connection herewith constitute the valid and binding obligation of iCap Holding, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

    (e) No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Agreement, the pledge of a security interest in the Pledged Interests in favor of Holders or the valid and lawful exercise by Holders of remedies available to them under this Agreement or applicable law or of the voting

and other rights granted to it in this Agreement, except as may be required for the offer or sale of securities under applicable securities laws.

(f) iCap Holding is the sole owner of the Pledged Interests, has the right to grant the security interest provided for herein to Holders and, to the knowledge of iCap Holding, has granted to Holders a valid and perfected first priority security interest in the Pledged Interests, free of all liens, encumbrances, transfer restrictions and adverse claims.

5.  COVENANTS. iCap Holding covenants and agrees that so long as this Agreement shall be in effect:

(a) Provided that an Event of Default does not exist and is continuing, then the Company, iCap Holding and the Portfolio SPEs may make distributions to their respective members as they determine, subject to any limitations thereon as set forth in the limited liability company agreement of the Company. At any time that an Event of Default exists and is continuing, none of the Company, iCap Holding or the Portfolio SPEs shall make any distributions to their members, other than tax distributions (i.e., distributions in the amount of taxes payable by such members on the apportioned income of the entities) or as otherwise required by law. Distributions as referenced herein does not include Management Fees, origination fees, or other fees owed to affiliates of iCap Holding. The Company may cause the real estate owned by the Portfolio SPEs to be sold, encumbered, transferred, pledged, liened, or otherwise disposed of as it sees fit.

(b) iCap Holding shall defend iCap Holding's title to the Pledged Interests and the security interest of Holders against the claims of any person claiming rights in the Pledged Interests.

(c) Without the prior written consent of a Majority-in-Interest of the Noteholders, delivered to the Agent pursuant to the Collateral Agent Agreement, (i) iCap Holding shall not sell, gift, pledge, exchange or otherwise transfer the Pledged Interests. In the event of any such sale, exchange or transfer consented to by Holders, iCap Holding shall upon receipt the proceeds of such sale, exchange or transfer to pay any such distribution with respect to the Pledged Interests to the Agent for further distribution to the Holders for application to the Indebtedness.

(d) iCap Holding will pay and discharge when due all of its material obligations and liabilities (including, without limitation, tax liabilities) which if unpaid when due might by law give rise to a lien on the Pledged Interests, except where the same may be contested in good faith by appropriate proceedings.

(e) At iCap Holding's expense, do such further facts and execute and deliver such additional conveyances, certificates, instruments, legal opinions and other assurances as a Majority-in-Interest of the Noteholders may direct the Agent to reasonably request to protect, assure or enforce the interests, rights and remedies of the Holders under this Agreement.

(f) Without the prior approval of Majority-in-Interest of the Noteholders, delivered to the Agent pursuant to the Collateral Agent Agreement, none of the Company, iCap Holding nor any of their subsidiaries shall (i) incur any leverage or borrowings on the their respective assets in excess of 25% of the total principal amount of Notes then issued and outstanding, or (ii) issue any promissory notes which are senior to the Notes if the principal amount of such senior promissory notes exceed 25% of the total principal amount of Notes then issued and outstanding.

6.  INDEMNIFICATION. Each Party shall indemnify and hold harmless the other Parties and such other Parties' agents, beneficiaries, affiliates, representatives and their respective successors and assigns

Exhibit C – Page 3

(collectively, the "Indemnified Persons") from and against any and all damages, losses, liabilities, taxes and costs and expenses (including, without limitation, attorneys' fees and costs) resulting directly or indirectly from (a) any inaccuracy, misrepresentation, breach of warranty or nonfulfillment of any of the representations and warranties of such Party in this Agreement, or any actions, omissions or statements of fact inconsistent with in any material respect any such representation or warranty, (b) any failure by such Party to perform or comply with any agreement, covenant or obligation in this Agreement.

7. TERMINATION. This Agreement shall automatically terminate and be of no further force or effect, and any security interest in the Pledged Interests shall automatically terminate and be released, as of the full payment of the Notes.

8. EXPENSES. iCap Holding agrees that, following an Event of Default, iCap Holding will pay to the Agent, on behalf of and for further distribution to, the Holders upon demand the amount of any out-of-pocket expenses, including the fees and disbursements of counsel, that Holders incur in connection with the enforcement of this Agreement, including expenses incurred to preserve the value of the Pledged Interests, the sale or other disposition of any of the Pledged Interests, the exercise by Holders of any of its rights, or any action to enforce its rights under this Agreement.

9. NOTICES. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, if to a Holder shall either be sent to the Agent pursuant to the Collateral Agent Agreement, who shall thereafter forward such notices to the Holder to the addresses as set forth in the Collateral Agent Agreement, or sent directly to the Holder by iCap Holding or the Company to the addresses set forth in the Collateral Agent Agreement, and if to Company or iCap Holding shall be sent to the Collateral Agent, who shall thereafter forward such notices to the intended party. In the case of notices sent to a Holder, such notices shall be subject to the provisions of Section 11.

10. AMENDMENTS. This Agreement may be amended at any time by the written consent of the Company, iCap Holding and the Agent following receipt by the Agent of the consent of a Majority-in-Interest of the Noteholders, subject to the provisions of Section 11.

11. DEEMED CONSENT.

(a) Each request for consent, approval or waiver under this Agreement, for an amendment hereof or other matter, which is sent by the Company or iCap Holding to the Agent on behalf of the Holders, and which the Agent shall forward to the Holders, shall be made in writing and shall include all information necessary for Holder to make an informed decision as to whether to agree to such consent or approval, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN PLEDGE AND SECURITY AGREEMENT BETWEEN iCap Pacific Income Fund 5, LLC, iCap Holding 5, LLC and MarketPlace Realty Advisors, LLC, OR AN AMENDMENT THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

(b) If a Holder does not approve or reject the proposed or requested consent, approval, waiver or amendment within ten (10) days of receipt of such notice and all necessary information, via delivery of the same to the Agent within such time period, for further distribution to the Company, the Company or iCap Holding, as applicable, may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A SECOND AND FINAL REQUEST FOR CONSENT, APPROVAL OR WAIVER UNDER THAT CERTAIN PLEDGE AND SECURITY AGREEMENT BETWEEN iCap Pacific Income Fund 5, LLC, iCap Holding 5, LLC and MarketPlace Realty Advisors, LLC, OR AN AMENDMENT

Exhibit C – Page 4

THEREOF OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT.

(c) If a Holder does not approve or reject the proposed or requested consent, approval, waiver or amendment, or other matter, within ten (10) days of receipt of such second and final notice, via delivery of the same to the Agent within such time period, for further distribution to the Company, such Holder shall be deemed to have approved, in writing, the proposed or requested consent, approval, waiver or amendment, or other matter as set forth in the notice, and the Company, iCap Holding and the Agent may effect the actions set forth therein in reliance on such consent.

12. GOVERNING LAW; VENUE; ATTORNEY'S FEES. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE CONTEMPLATED TRANSACTIONS SHALL BE INSTITUTED SOLELY IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF WASHINGTON, IN EACH CASE LOCATED IN KING COUNTY, WASHINGTON, AND EACH PARTY IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. **THE PARTIES EACH HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** Each Party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The prevailing party in any action or dispute brought in connection with this Agreement or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorneys' fees and costs.

13. OTHER AGREEMENTS. The Parties shall be bound by the applicable terms of the Subscription Agreement, and, for such time as they are in effect, the Note, this Agreement and the Guaranty Agreement. The Subscription Agreement, the Note, this Agreement and the Guaranty Agreement constitute the sole and entire agreement of the parties hereto and thereto with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

14. CONSTRUCTION; HEADINGS. This Agreement shall be deemed to be jointly drafted by the Parties and shall not be construed against any person as the drafter hereof. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

15. SEVERABILITY. In the event that any provision of this Agreement is invalid or unenforceable under any applicable statute or rule of law (including any judicial ruling), then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Agreement.

16. INTERPRETATION. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore shall not be construed

against a Party or Parties on the ground that such Party or Parties drafted or was more responsible for the drafting of any such provision(s). The Parties further agree that they have each carefully read the terms and conditions of this Agreement, that they know and understand the contents and effect of this Agreement and that the legal effect of this Agreement has been fully explained to its satisfaction by counsel of its own choosing.

17. COUNTERPARTS. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which taken together shall be but a single instrument. The execution and delivery of a facsimile or other electronic transmission of a signature to this Agreement shall constitute delivery of an executed original and shall be binding upon the person whose signature appears on the transmitted copy.

*[Signatures appear on following pages]*

Exhibit C – Page 6

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date or as of the date of their joinder hereto.

iCap Holding 5, LLC

By:
Name: Chris Christensen
Title: Manager

iCap Pacific Income Fund 5, LLC

By: iCap Pacific NW Management, LLC
Its: Manager

By:
Name: Chris Christensen
Title: Manager

MarketPlace Realty Advisors, LLC

By:
Name: Ron Thomas
Title: General Manager

**EXHIBIT D**

**GUARANTY AGREEMENT**

**(Attached)**

# GUARANTY AGREEMENT

This Guaranty (this "Guaranty") is made and entered into as of September 5, 2019 (the "Effective Date") by iCap Holding 5, LLC, a Delaware limited liability company ("iCap Holding"), to and for the benefit of each of the holders (each, a "Holder") of promissory notes (the "Notes") issued by iCap Pacific Income Fund 5, LLC, a Delaware limited liability company and the sole member of iCap Holding (the "Company") pursuant to an offering of up to $50,000,000 of promissory notes, with an over-allotment amount of an additional $25,000,000, of the Company pursuant to Regulation D promulgated under the Securities Act of 1933, as amended, commencing on or about September 5, 2019 (the "Offering"). Defined terms used herein without definition shall have the meaning given to them in the Notes.

WHEREAS, following the execution of this Guaranty, the Company shall issue certain Notes to the Holders, pursuant to a subscription agreement between the Company and the applicable Holder in connection with the Offering (the "Subscription Agreement");

WHEREAS, iCap Holding acknowledges the provisions of the Notes contemplate iCap Holding's entering into this Guaranty and iCap Holding is financially interested in the Company and will receive certain benefits as a result of iCap Holding's promises herein as a result of making this Guaranty for the benefit of the Holders; and

WHEREAS, on the Effective Date, the Company and MarketPlace Realty Advisors, LLC in its capacity as collateral agent (in such capacity "Agent"), are entering into that certain Collateral Agent Agreement, pursuant to which the Agent shall have the power to enforce the rights of the Holders hereunder (the "Collateral Agent Agreement");

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, iCap Holding agrees as follows:

1. iCap Holding hereby unconditionally, absolutely and irrevocably guarantees the full and timely performance of all of the obligations of the Company under the Notes, including the due and punctual payment of the principal and interest of the Note and all money due or that may become due under the Notes, whether (a) according to the present terms of any of those documents or at any earlier or accelerated date or dates as provided therein, (b) pursuant to any extension of time or (c) pursuant to any amendment, modification or replacement of those documents hereafter made or granted**,** and whether the Company may be liable individually or jointly with others, or whether recovery upon such indebtedness may be or hereafter becomes unenforceable (collectively, "Obligations").

2. iCap Holding agrees that settlement of any claim by Holder against the Company, whether in any proceeding or not, and whether voluntarily or involuntarily, will not reduce the amount due under this Guaranty except to the extent of the amount actually paid by the Company or any other party and retained by Holder.

3. Notwithstanding any other provision of this Guaranty, during the continuation of an Event of Default at a time when this Guaranty is in full force and effect, the Agent may enforce this guaranty against iCap Holding on behalf of the Holders, but only after attempting to collect or exhausting Agent's efforts on behalf of the Holders to collect from the Company, in accordance with the provisions of the Notes.

4. iCap Holding agrees that its obligation to make payment under the terms of this Guaranty shall not be impaired, modified, changed, released or limited in any manner by any impairment, modification, change, release, defense or limitation of the liability of the Company or of a receiver, trustee,

debtor-in-possession or estate under any bankruptcy or receivership proceeding. If any payment made by the Company is reclaimed in a bankruptcy or receivership proceeding, iCap Holding shall pay to the Agent on behalf of the Holders the dollar amount of the amount reclaimed. iCap Holding further assigns to Holders all rights iCap Holding may have in any proceeding under the U.S. Bankruptcy Code or any receivership or insolvency proceeding until all indebtedness of the Company to Holders has been paid in full. This assignment includes all rights of iCap Holding to be paid by the Company even if those rights have nothing to do with this Guaranty. This assignment does not prevent the Agent on behalf of the Holders from enforcing iCap Holding's obligations under this Guaranty in any way.

5.  iCap Holding is now adequately informed of the Company's financial condition, and iCap Holding agrees to keep so informed. None of the Agent nor any Holder need provide iCap Holding with any present or future information concerning the financial condition of the Company or any other guarantor, and changes in the Company's or iCap Holding's financial condition shall not affect iCap Holding's obligations under this Guaranty. iCap Holding has not relied on financial information furnished by any Holder or Agent, nor will iCap Holding do so in the future.

6.  iCap Holding represents and warrants to the Agent and the Holders as follows:

    (a) iCap Holding is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and has the limited liability company power and is duly authorized under all applicable laws, regulations, ordinances, and orders of public authorities to carry on its business in all material respects as it is now being conducted. The execution and delivery of this Guaranty does not, and the consummation of the transactions contemplated hereby will not, violate any provision of iCap Holding's organizational documents. iCap Holding has taken all action required by law, its organizational documents, or otherwise to authorize the execution and delivery of this Guaranty.

    (b) The execution of this Guaranty and the consummation of the transactions contemplated by this Guaranty will not result in the breach of any term or provision of, constitute a default under, or terminate, accelerate or modify the terms of, any indenture, mortgage, deed of trust, or other material agreement or instrument to which iCap Holding is a party or to which any of its assets, properties or operations are subject.

    (c) This Guaranty and all agreements and other documents executed by iCap Holding in connection herewith constitute the valid and binding obligation of iCap Holding, enforceable in accordance with its or their terms, except as may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

    (d) No consent, approval or authorization of any third party or any governmental body or officer is required for the valid and lawful execution and delivery of this Guaranty or the valid and lawful exercise by the Agent on behalf of the Holders of remedies available to them under this Guaranty or applicable law.

    (e) iCap Holding is fully familiar with all the covenants, terms and conditions of the Notes.

7.  If an Event of Default occurs hereunder, the Agent on behalf of the Holders shall have all other remedies provided by law that do not conflict with the Note. iCap Holding agrees that (a) this Guaranty shall inure to the benefit of and may be enforced by the Agent on behalf of the Holders as set forth in the Notes, and (b) this Guaranty shall be binding upon and enforceable against iCap Holding and its

successors and assigns.

8. This Guaranty shall automatically terminate and be of no further force or effect as of the full repayment of the Notes.

9. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be sent to the addresses as set forth, and subject to the terms, in the Collateral Agent Agreement, and shall be subject to the provisions of Section 11.

10. This Guaranty may be amended at any time by the written consent of iCap Holding and a Majority-in-Interest of the Noteholders (as defined in the Notes), subject to the provisions of Section 11.

11. Deemed Consent.

   (a) Each request for consent, approval or waiver under this Guaranty, for an amendment hereof of other matter, which is sent by iCap Holding to the Agent on behalf of the Holders, shall be made in writing to Agent, who shall thereafter distribute such notice to the Holders and shall include all information necessary for a Holder to make an informed decision as to whether to agree to such consent or approval, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT UNDER THAT CERTAIN GUARANTY AGREEMENT by iCap Holding 5, LLC TO AND FOR THE BENEFIT OF EACH OF THE HOLDERS OF PROMISSORY NOTES ISSUED BY iCap Pacific Income Fund 5 OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

   (b) If a Holder does not approve or reject the proposed consent, approval or waiver, amendment of other matter within ten (10) days of receipt of such notice and all necessary information, via the delivery of a response to the Agent in such time frame, which the Agent shall thereafter forward to iCap Holding as set forth in the Collateral Agent Agreement, iCap Holding may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A REQUEST FOR CONSENT UNDER THAT CERTAIN GUARANTY AGREEMENT by iCap Holding 5, LLC TO AND FOR THE BENEFIT OF EACH OF THE HOLDERS OF PROMISSORY NOTES ISSUED BY iCap Pacific Income Fund 5 OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

   (c) If a Holder does not approve or reject the proposed consent, approval or waiver, amendment of other matter within ten (10) days of receipt of such second and final notice, in the manner as set forth in Section 11(b) such Holder shall be deemed to have approved, in writing, the proposed consent, approval or waiver, amendment of other matter as set forth in the notice, and iCap Holding may effect the actions set forth therein in reliance on such consent.

12. This Guaranty shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS GUARANTY, THE OTHER TRANSACTION DOCUMENTS OR THE CONTEMPLATED TRANSACTIONS SHALL BE INSTITUTED SOLELY IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF WASHINGTON, IN EACH CASE LOCATED IN KING COUNTY, WASHINGTON, AND EACH PARTY IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. **THE**

**PARTIES EACH HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS GUARANTY OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** Each Party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Guaranty or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Guaranty and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The prevailing party in any action or dispute brought in connection with this Guaranty or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorneys' fees and costs.

13. The headings of this Guaranty are for convenience of reference and shall not form part of, or affect the interpretation of, this Guaranty.

14. In the event that any provision of this Guaranty is invalid or unenforceable under any applicable statute or rule of law (including any judicial ruling), then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Guaranty.

IN WITNESS WHEREOF, iCap Holding has duly executed this Guaranty as of the Effective Date.


iCap Holding 5, LLC


By: _____
Name: Chris Christensen
Title: Manager

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit D Page 560

## EXHIBIT E

## COLLATERAL AGENT AGREEMENT

**(Attached)**

# COLLATERAL AGENT AGREEMENT

This Collateral Agent Agreement (this "Agreement"), dated as of September 5, 2019 (the "Effective Date"), is entered into by and among iCap Pacific Income Fund 5, LLC, a Delaware limited liability company ("Company"), the holders of the Notes (defined below) as may join this Agreement as set forth below (the "Holders"), and MarketPlace Realty Advisors, LLC in its capacity as collateral agent (in such capacity "Agent") for the Holders. Any party who executes a counterpart signature page in the form as attached hereto as Exhibit A shall become a Holder under this Agreement for all periods from and after the date thereof to the same extent as if such party had originally executed this Agreement. The Company, the Holders and the Agent may be referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Company is offering (the "Offering") up to $50,000,000 of secured notes, with an over-allotment amount of an additional $25,000,000 (collectively, the "Notes") to Holders pursuant to that certain Confidential Private Placement Memorandum dated as of September 5, 2019 (as the same may be amended and supplemented from time to time, the "Memorandum");

WHEREAS, pursuant to the Pledge and Security Agreement, dated as of the Effective Date, by and between the Company, iCap Holding 5, LLC, a Delaware limited liability company and a wholly owned subsidiary of the Company ("iCap Holding") and the Agent (the "Security Agreement"), the Company has granted to Agent, for the benefit of Holders, a security interest in certain Collateral (as defined in the Security Agreement);

WHEREAS, pursuant to the Guaranty Agreement, dated as of the Effective Date, executed by iCap Holding for the benefit of the Holders (the "Guaranty Agreement"), iCap Holding has guaranteed the obligations of the Company in the Offering; and

WHEREAS, in connection with the Offering and purchasing the Notes, the Parties have agreed to enter into this Agreement to set forth (i) their respective rights and obligations with respect to the Notes and (ii) the exercise of rights with respect to the Collateral and certain other matters;

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## Article I.      DEFINITIONS AND CONSTRUCTION

**Section 1.01   <u>Definitions</u>.** As used in this Agreement, the following terms shall have the following definitions:

(a)   "Agent" has the meaning given in the introductory paragraph hereto.

(b)   "Agreement" has the meaning given in the introductory paragraph hereto.

(c)   "Bankruptcy Code" means the federal bankruptcy law of the United States as from time to time in effect, currently as Title 11 of the United States Code and section references to current sections of the Bankruptcy Code shall refer to comparable sections of any revised version thereof if section numbering is changed.

500907.v7

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 2 Page 562

(d) "Claim" means any and all present and future "claims" (used in its broadest sense, as contemplated by and defined in Section 101(5) of the Bankruptcy Code, but without regard to whether such claim would be disallowed under the Bankruptcy Code) of any Holder or Agent now or hereafter arising or existing under or relating to the Notes, whether joint, several, or joint and several, whether fixed or indeterminate, due or not yet due, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, or disputed or undisputed, and whether arising under contract, in tort, by law, or otherwise, any interest or fees thereon (including interest or fees that accrue after the filing of a petition by or against Company under the Bankruptcy Code, irrespective of whether allowable under the Bankruptcy Code), any costs of Enforcement Actions, including reasonable attorneys' fees and costs, and any prepayment or termination premiums.

(e) "Collateral" has the meaning given in the recitals.

(f) "Company" has the meaning given in the introductory paragraph hereto.

(g) "Enforcement Action" means, (i) with respect to any Holder and with respect to any Claim of such Holder or any item of Collateral in which such Holder has or claims a security interest, lien or right of offset, any action, whether judicial or nonjudicial, to repossess, collect, accelerate, offset, recoup, give notification to third parties with respect to, sell, dispose of, foreclose upon, give notice of sale, disposition, or foreclosure with respect to, or obtain equitable or injunctive relief with respect to, such Claim or Collateral or (ii) the filing, or the joining in the filing, by any Holder of an involuntary bankruptcy or insolvency proceeding against Company.

(h) "Guaranty Agreement" has the meaning given in the recitals.

(i) "Holder" and "Holders" have the meanings given in the introductory paragraph hereto.

(j) "iCap Holding" has the meaning given in the recitals.

(k) "Indemnified Holder" has the meaning given to such term in Section 4.03.

(l) "Indemnified Payment" has the meaning given to such term in Section 4.03.

(m) "Indemnifying Holder" has the meaning given to such term in Section 4.03.

(n) "Majority-in-Interest of the Noteholders" has the meaning given in the Notes.

(o) "Memorandum" has the meaning given in the recitals.

(p) "Offering" has the meaning given in the recitals.

(q) "Party" and "Parties" have the meanings given in the introductory paragraph hereto.

(r) "Security Agreement" has the meaning given in the recitals.

**Section 1.02  Other Interpretive Provisions**. References in this Agreement to "Recitals," "Sections," and "Exhibits" are to recitals, sections, and exhibits herein and hereto unless otherwise indicated. References in this Agreement to any document, instrument or agreement shall include (a) all exhibits, schedules, annexes and other attachments thereto; (b) all documents, instruments

or agreements issued or executed in restatement or replacement thereof; and (c) such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time. The words "include" and "including" and words of similar import when used in this Agreement shall not be construed to be limiting or exclusive.

## Article II.    APPOINTMENT AND INTERCREDITOR ARRANGEMENTS

**Section 2.01    Intent**. The primary intent of this Agreement is to set forth the rights, duties and obligations of the Agent, and Holders as co-Holders under the Notes, the Security Agreement and the Guaranty Agreement.

**Section 2.02    Appointment**. Pursuant to the terms set forth herein, each Holder appoints Agent to act as collateral agent under the Notes, the Security Agreement and the Guaranty Agreement, and each Holder authorizes Agent to act thereunder as agent of such Holder. Agent agrees to act as such upon the express conditions contained in this Agreement. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Holders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Company, nor shall Agent be deemed to be a fiduciary for Holders, this Agreement being solely a contractual relationship.

**Section 2.03    Proportionate Interests**. Except as otherwise provided in this Agreement, all of the rights, interests and obligations of each Holder under the Notes, including security interests in the Collateral and rights under the Guaranty Agreement, shall be shared by the Holders in the ratio of (a) the aggregate outstanding Principal Amount (as defined in the Notes) and unpaid Interest (as defined in the Notes) of such Holder's Note to (b) the aggregate outstanding Principal Amount and unpaid Interest of all Notes, as determined by the books and records of the Company. Any reference in this Agreement to an allocation between or sharing by the Holders of any right, interest or obligation "ratably," "proportionally" or in similar terms shall refer to this ratio.

**Section 2.04    Possession of Collateral**. If any Holder shall obtain possession of any Collateral, it shall hold such Collateral as agent and bailee for all Holders for purposes of perfecting Agent's and/or Holders' security interest therein.

## Article III.    Events of Default and Payments.

**Section 3.01    Event of Default**. An Event of Default (as defined in the Notes) may occur pursuant to the terms and conditions of the Notes, by a Majority-in-Interest of the Noteholders declaring (subject to such terms) and providing notice to the Agent of such determination and the Company thereafter not curing such Event of Default within 90 days. The Agent shall deliver such notice to the Company within one (1) business day to the address as set forth in Section 7.01.

**Section 3.02    Payments to the Holders**.

(a)  Prior to the date on which a declaration of an Event of Default (as defined in the Note) occurs pursuant to Section 3.01, the Company shall pay all amounts to the Holders as set for in the applicable Note for the applicable Holder.

(b)  Following the occurrence of an Event of Default pursuant to the Notes, all amounts received by Holders for the account of Company under the Notes after an Event of Default, whether by payment, set-off or otherwise shall be allocated ratably among the Holders.

500907.v7

Each Holder shall promptly remit to the other Holder such sums as may be necessary to ensure the ratable repayment of each Holder's Debenture. Notwithstanding the foregoing, a Holder receiving a scheduled payment shall not be responsible for determining whether the other Holder also received its scheduled payment on such date; provided, however, if it is later determined that a Holder received more than its ratable share of scheduled payments made on any date or dates, then such Holder shall remit to the other Holder such sums as may be necessary to ensure the ratable payment of such scheduled payments, as instructed by Agent

**Section 3.03   Decision to Exercise Remedies**. Upon the occurrence of an Event of Default pursuant to the Notes, Agent shall take such actions and only such actions as a Majority-in-Interest of the Noteholders mutually agree to take in accordance with the direction the Noteholders provide to Agent in writing with regard to enforcing the rights and remedies under the Notes. No Holder shall be entitled to undertake any Enforcement Action without the written consent of a Majority-in-Interest of the Noteholders.

**Section 3.04   Application of Proceeds after an Event of Default**. Notwithstanding anything to the contrary in the Notes, as among the Agent and the Holders, the proceeds of the Collateral, or any part thereof, and the proceeds of any remedy under the Notes after the occurrence and during the continuance of an Event of Default shall upon receipt by the Agent be paid to and applied as follows:

(a)  First, to the payment of then outstanding out-of-pocket costs and expenses of the Agent including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made under the Notes or this Agreement by the Agent (including indemnification claims not otherwise satisfied pursuant to this Agreement).

(b)  Second to the Holders (in proportion to such costs and expenses theretofore incurred by each), including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made under the Notes or this Agreement;

(c)  Third, to the Holders ratably, in an amount up to the sum of all accrued interest owing to the Holders on the Notes;

(d)  Fourth, to the Holders ratably, in an amount up to the sums of the outstanding principal, if any, owing to the Holders on the Notes;

(e)  Fifth, to the Holders ratably (in proportion to all remaining obligations owing to each), in an amount up to the sum of all other outstanding and unpaid obligations (including indemnification claims not otherwise satisfied pursuant to the preceding clauses); and

(f)  Sixth, to Company, as the case may be, or its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

**Section 3.05   Return of Payments**. To the extent any payment for the account of Company is required to be returned as a voidable transfer or otherwise, the Holders shall contribute to one another as is necessary to ensure that such return of payment is on a pro rata basis. To the extent

any proceeds of the Collateral, or any part thereof, and the proceeds of any remedy under the Notes after the declaration and during the continuance of an Event of Default shall be received by any Holder, such Holder shall forward the funds to the Agent and upon receipt by the Agent to be applied as set forth in Section 3.04.

**Section 3.06    Foreclosure.**

(a) <u>Credit Bid By Holders</u>. Only by agreement of a Majority-in-Interest of the Noteholders shall the Holders make or cause to be made a credit bid at any foreclosure sale or other sale of any of the Collateral on behalf of the Holders. If Holders are the successful bidders at the sale, then (a) the amount to be credited against their respective Claims shall be allocated pro rata among the Holders according to the balances of such Claims, and (b) Holders shall take title to the Collateral so purchased together, each holding a pro rata undivided interest in such Collateral. The parties shall mutually agree as to the most favorable disposition of any Collateral purchased with any such credit bid.

(b) <u>Cash Bid for Account of One Holder</u>. No Holder shall make or cause to be made a cash bid at any foreclosure sale or other sale of any of the Collateral without the prior written consent of a Majority-in-Interest of the Noteholders. If a cash bid is made and is successful, then (a) the proceeds of the sale shall be allocated as set forth in Section 3.04, and (b) the Holder that entered the successful bid shall acquire the Collateral so purchased for its own account, and the other Holders shall have no further interest in that Collateral upon the payment to such other Holders of the shares of the proceeds in accordance with Section 3.04.

## Article IV.    EXCULPATION; DELEGATION; AND INDEMNIFICATION OF HOLDERS

**Section 4.01    Exculpation**. In connection with any exercise of Enforcement Actions hereunder, neither Agent nor any Holder or any of its partners, or any of their respective directors, officers, employees, attorneys, accountants, or agents shall be liable as such for any action taken or omitted by it or them, except for its or their own gross negligence or willful misconduct with respect to its duties under this Agreement.

**Section 4.02    Delegation of Duties**. Each Holder and Agent may execute any of its powers and perform any duties hereunder either directly or by or through agents or attorneys-in-fact. Each Holder and Agent shall be entitled to advice of counsel concerning all matters pertaining to such powers and duties. No Holder or Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it, if the selection of such agents or attorneys-in-fact was done without gross negligence or willful misconduct.

**Section 4.03    Indemnification**.

(a) To the extent not reimbursed by Company or from the application of Collateral proceeds pursuant to Section 3.04, a Holder (the "Indemnified Holder") shall be indemnified by the other Holders (an "Indemnifying Holder"), on a several basis in proportion to each Holder's pro rata share, and each Indemnifying Holder agrees to reimburse the Indemnified Holder for the Indemnifying Holder's pro rata share of the following items (an "Indemnified Payment"):

(i)    all reasonable out-of-pocket costs and expenses of the Indemnified Holder incurred

by the Indemnified Holder in connection with the discharge of its activities under this Agreement and the Notes, including reasonable legal expenses and attorneys' fees; and

(ii)    from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, which may be imposed on, incurred by or asserted against the Indemnified Holder in any way relating to or arising out of this Agreement, or any action taken or omitted by the Indemnified Holder hereunder; provided that the Indemnifying Holder shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements, if the same results from the Indemnified Holder's gross negligence or willful misconduct or from undertaking Enforcement Actions in violation of Section 3.03.

(b)    Notwithstanding the foregoing, the Indemnified Holder shall not be reimbursed or indemnified for an Indemnified Payment, except to the extent that the Indemnified Holder paid more than its ratable share of such payment. All Indemnified Payments (as set forth in this Section 4.03) to an Indemnified Holder are intended to be paid ratably by the other Holder.

## Article V.    REPRESENTATIONS AND WARRANTIES

**Section 5.01**  <u>Authority</u>. Each Party represents and warrants that it has all necessary power and authority to execute, deliver and perform this Agreement in accordance with the terms hereof and that it has all requisite power and authority to own and operate its properties and to carry on its business as now conducted.

**Section 5.02**  <u>Authorization; Enforceability</u>. Each Party represents and warrants that (a) the execution and delivery of this Agreement and the consummation of the transactions contemplated herein have each been duly authorized by all necessary action on the part of such Party and (b) this Agreement has been duly executed and delivered and constitutes a legal, valid and binding obligation of such Party, enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws of general application relating to or affecting the enforcement of creditors' rights or by general principles of equity.

## Article VI.    AGENT

**Section 6.01**  <u>Appointment, Powers and Immunities</u>. Each Holder irrevocably authorizes Agent to take such action on such Holder's behalf and to exercise such powers hereunder as are specifically delegated to Agent by the terms hereof, together with such powers as are reasonably incidental thereto. Agent undertakes to perform only such duties as are expressly set forth herein and in the Offering, which shall be deemed purely ministerial in nature, and no other duties shall be implied and it may perform such duties by or through its agents, representatives or employees. Under no circumstances will the Agent be deemed to be an escrow company, trust company or a fiduciary to any Party or any other person under this Agreement. Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Agreement. The Agent is authorized to take such action and to exercise such powers granted hereunder upon the written request or direction of a Majority-in-Interest of the Noteholders in accordance with the terms hereof, together with such powers as are reasonably incidental thereto. At the written

500907.v7
23-01243-WLH11   Doc 469   Filed 02/23/24   Entered 02/23/24 19:45:30   Exhibit 7 Page 567

direction of a Majority-in-Interest of the Noteholders, Agent shall release any items of Collateral at any time without affecting or diminishing the liability of the Company to the Holders for any remaining or future indebtedness. Upon written request by a Holder, Agent will promptly deliver to such Holder copies of any statements or notices provided to Agent by Company under the Notes. Agent shall not be responsible by any Holder for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of the Notes, or for any representations, warranties, recitals or statements made therein or made in any written or oral statement or in any financial or other statements, instruments, reports, certificates or any other documents furnished or delivered in connection herewith or therewith by Agent to any Holder or by or on behalf of Company to Agent or any Holder, or be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained herein or therein or as to the use of the proceeds of the Notes. Agent shall not be responsible for insuring the Collateral or for the payment of any taxes, assessments, charges or any other charges or liens of any nature whatsoever upon the Collateral or otherwise for the maintenance of the Collateral, except in the event Agent enters into possession of a part or all of the Collateral, in which event Agent shall preserve the part in its possession. Unless the officers of Agent acting in their capacity as officer of Agent on Company's account have actual knowledge thereof or have been notified in writing thereof by Holders, Agent shall not be required to ascertain or inquire as to the existence or possible existence of any Event of Default. Neither Agent nor any of its officers, directors, employees, attorneys, representatives or agents shall be liable to Holders for any action taken or omitted hereunder or under the Notes or in connection herewith or therewith unless caused by its or their gross negligence or willful misconduct. No provision of this Agreement or the Notes, shall be deemed to impose any duty or obligation on Agent to perform any act or to exercise any power in any jurisdiction in which it shall be illegal, or shall be deemed to impose any duty or obligation on Agent to perform any act or exercise any right or power if such performance or exercise (a) would subject Agent to a tax in a jurisdiction where it is not then subject to a tax or (b) would require Agent to qualify to do business in any jurisdiction where it is not so qualified. No Holder shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or the Notes in accordance with the written instructions of a Majority-in-Interest of the Noteholders. Agent shall be entitled to refrain from exercising any power, discretion or authority vested in it under this Agreement or the Notes unless and until it has obtained the written instructions of a Majority-in-Interest of the Noteholders. The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon Agent in its individual capacity.

**Section 6.02    <u>Reliance by Agent.</u>**

(a)    Agent may, at the expense of Holders, consult with counsel, and any opinion or legal advice of such counsel shall be full and complete authorization and protection in respect of any action taken, not taken or suffered by Agent hereunder or under the Notes in accordance therewith. Agent shall have the right at any time to seek instructions concerning the administration of the Collateral from any court of competent jurisdiction.

(b)    Agent may rely, and shall be fully protected in acting, or refraining to act, upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, bond or other paper or document that it has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of cables, telecopies and telexes, to have been sent by the proper party or parties. In the absence of its gross negligence or willful misconduct, Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit E Page 568

certificates or opinions furnished to Agent and conforming to the requirements of the Notes.

(c) Agent shall not be under any obligation to exercise any of the rights or powers granted to Agent by this Agreement or the Notes at the request or written direction of a Majority-in-Interest of the Noteholders unless Agent shall have been provided by Holders with security and indemnity satisfactory to Agent against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction.

**Section 6.03   Delegation of Duties By Agent**. Agent may execute any of the powers hereof and perform any duty hereunder either directly or by or through agents or attorneys-in-fact. Agent shall be entitled to advice of counsel concerning all matters pertaining to such powers and duties. Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it, if the selection of such agents or attorneys-in-fact was done without gross negligence or willful misconduct.

**Section 6.04   Right to Indemnity and Reimbursement**. Each Holder jointly and severally agrees (a) to indemnify and hold Agent (and any Person acting on behalf of Agent) harmless from and against and (b) promptly upon receipt by each Holder of Agent's statement, to reimburse Agent, according to such Holder's ratable share, to the extent Agent shall not otherwise have been reimbursed by Company on account of and for, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind of nature whatsoever with respect to Agent's performance of its duties under this Agreement and the Notes; provided, however, that each Holder shall be jointly and severally liable to Agent to the extent any other Holder has failed to pay its pro rata share of amounts owed to Agent and provided further, however, that no Holder shall be liable for the payment to Agent of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from Agent's gross negligence or willful misconduct. Such reimbursement shall not in any respect release Company from any liability or obligation. If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished. Agent's right to indemnification shall survive termination of this Agreement and the resignation or removal of Agent.

**Section 6.05   Resignation and Appointment of Successor Agent**. Agent may resign at any time by giving sixty (60) days' prior written notice thereof to Holders and Company. Upon any such notice, a Majority-in-Interest of the Noteholders may appoint a successor Agent. In addition, the person or entity serving as Agent may be removed or replaced from time to time by a Majority-in-Interest of the Noteholders, with such removal or replacement being effective immediately upon written notice to the Agent and Company, with a copy to each Holder. If Agent shall be unable or unwilling to serve in such capacity, its successor shall be named by a Majority-in-Interest of the Noteholders. Upon the acceptance of any appointment as an Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement. After any retiring Agent's resignation hereunder as Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

**Section 6.06   Financing Statements Not Reviewed by Agent**. Holders acknowledge that (1) Agent has not reviewed and has no responsibility or obligation to review any financing statements

related to the Collateral and (2) filing financial statements and maintaining a perfected security interest in the Collateral are solely the responsibilities of the Company.

**Section 6.07** <u>**Notes Not Reviewed**</u>. Holders acknowledge that Agent has not reviewed and has no responsibility or obligation to review the Notes.

**Section 6.08** <u>**Compensation**</u>. Company shall compensate Agent a quarterly fee of $2,000 for its services as Agent under this Agreement, such initial fee to be paid out of the proceeds of the first Closing of the Offering and shall reimburse Agent for all costs and fees, including reasonable attorney's fees (whether or not incurred by an attorney in the employ of Agent), incurred as a result of the authority given Agent under this Agreement. Company shall remit to Agent all such costs and fees, including reasonable attorney's fees, within ten (10) days of Company's receipt of a reasonably detailed invoice from Agent. Agent agrees that the hourly rate for any hourly fees by Agent pursuant to this Section 6.08 will not exceed $250.00 per hour and will be invoiced in 1/10th of an hour increments.

<div align="center">

**Article VII.    MISCELLANEOUS.**

</div>

**Section 7.01** <u>**Notices**</u>.

(a)   All notices to be sent by the Company or iCap Holding to the Holders pursuant to the Notes, the Security Agreement or the Guaranty shall be sent by the Company to the Agent, which shall thereafter distribute such notices to the Holders. All notices to be sent by any Holder to the Company or iCap Holding pursuant to the Notes, the Security Agreement or the Guaranty shall be sent by such Holder to the Agent, which shall thereafter distribute such notices to the Company or iCap Holding, as applicable.

(b)   Notwithstanding Section 7.01(a), the Parties acknowledge and agree that any communications with respect to a Demand Payment (as defined in the Notes), or with respect to any default which is not an "Event of Default," may be made directly between the Company and the applicable Holder, and may be made in such manner as set forth in the Note or the Memorandum, including through the Company's website at www.icapequity.com or its licensed software application.

(c)   Unless otherwise provided in this Agreement, all notices or demands by any Party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and shall be (i) delivered personally; (ii) sent by a nationally recognized overnight carrier via overnight or second day delivery, or (iii) sent via email with return receipt requested, to the Parties as follows:

If to the Agent:

   MarketPlace Realty Advisors, LLC
   23515 NE Novelty Hill Rd., STE B-221
   Redmond, WA 98053
   Attention: Ronald Thomas
   Email: ronth12@gmail.com

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 10 Page 570

If to the Company:

iCap Pacific Income Fund 5, LLC
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98009
Attention: Chris Christensen
Email: investor@icapequity.com

If to a Holder, to the addresses as set forth on such Holder's subscription agreement.

(d) Other than those notices as set forth in Section 7.01(b), notice and shall be deemed to have been given (a) when delivered by hand; (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) upon receipt of a return receipt if sent via email.

(e) The Parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

**Section 7.02    No Third-Party Beneficiaries**. Other than as specifically set forth herein, the terms and provisions of this Agreement shall be for the sole benefit of the Parties and their respective successors and permitted assigns, and no other person or entity shall have any right, benefit, priority, or interest under or because of this Agreement.

**Section 7.03    Holders**. The relationship among the Holders is, and at all times shall remain solely that of co-Holders. Holders shall not under any circumstances be construed to be partners or joint venturers of one another; nor shall the Holders under any circumstances be deemed to be in a relationship of confidence or trust or a fiduciary relationship with one another, or to owe any fiduciary duty to one another. Holders do not undertake or assume any responsibility or duty to one another to select, review, inspect, supervise, pass judgment upon or otherwise inform each other of any matter in connection with Company's property, any Collateral held by any Holder or the operations of Company. Each Holder shall rely entirely on its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information undertaken or assumed by any Holder in connection with such matters is solely for the protection of such Holder.

**Section 7.04    Expenses**. Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated herein shall be paid by the Party incurring such costs and expenses.

**Section 7.05    Headings**. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 7.06    Severability**. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision herein is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the Contemplated Transactions be consummated as originally

contemplated to the greatest extent possible.

**Section 7.07   Entire Agreement.** This Agreement, the Notes, the Security Agreement, the Guaranty and the applicable subscription agreements constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

**Section 7.08   Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. No Holder may assign its rights or obligations hereunder without the prior written consent of the Company. The Company may not assign its rights or obligations hereunder unless all Notes have been paid in full.

**Section 7.09   Amendment and Modification; Waiver**.

(a)   This Agreement may only be amended, modified or supplemented by an agreement in writing signed by the Company, the Agent and a Majority-in-Interest of the Noteholders, provided that the Parties acknowledge and agree that additional Holders may join this Agreement as set forth in the introductory paragraph hereto and in Section 7.15(b), and such joinder(s) shall not be deemed an amendment of this Agreement.

(b)   Each request for consent, approval or waiver under this Agreement, for an amendment hereof of other matter, which is sent by the Company to the Agent on behalf of the Holders, shall be made in writing to Agent, who shall thereafter distribute such notice to the Holders and shall include all information necessary for a Holder to make an informed decision as to whether to agree to such consent or approval, and shall include the following in capital, bold and block letters: "FIRST NOTICE – THIS IS A REQUEST FOR CONSENT UNDER THAT CERTAIN COLLATERAL AGENT AGREEMENT BY AND BETWEEN iCap Pacific Income Fund 5, LLC, THE HOLDERS OF PROMISSORY NOTES ISSUED BY iCap Pacific Income Fund 5, LLC AND MarketPlace Realty Advisors, LLC IN ITS CAPACITY AS COLLATERAL AGENT, OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

(c)   If a Holder does not approve or reject the proposed consent, approval or waiver, amendment of other matter within ten (10) days of receipt of such notice and all necessary information, via the delivery of a response to the Agent in such time frame, which the Agent shall thereafter forward to iCap Holding as set forth herein, iCap Holding may request a consent or approval again by delivery of a notice including the following in capital, bold and block letters: "SECOND NOTICE – THIS IS A REQUEST FOR CONSENT UNDER THAT CERTAIN COLLATERAL AGENT AGREEMENT BY AND BETWEEN iCap Pacific Income Fund 5, LLC, THE HOLDERS OF PROMISSORY NOTES ISSUED BY iCap Pacific Income Fund 5, LLC AND MarketPlace Realty Advisors, LLC IN ITS CAPACITY AS COLLATERAL AGENT, OR OTHER MATTER AS DESCRIBED HEREIN. THE FOLLOWING REQUEST REQUIRES A RESPONSE WITHIN TEN (10) DAYS OF RECEIPT."

(d)   If a Holder does not approve or reject the proposed consent, approval or waiver, amendment of other matter within ten (10) days of receipt of such second and final notice, in the manner as set forth in Section 7.09(c) such Holder shall be deemed to have approved,

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 1 Page 572

in writing, the proposed consent, approval or waiver, amendment of other matter as set forth in the notice, and the other Parties may effect the actions set forth therein in reliance on such consent.

**Section 7.10    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE CONTEMPLATED TRANSACTIONS SHALL BE INSTITUTED SOLELY IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF WASHINGTON, IN EACH CASE LOCATED IN KING COUNTY, WASHINGTON, AND EACH PARTY IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.

(c)    **THE PARTIES EACH HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY.**

(d)    Each Party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Guaranty and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.  The prevailing party in any action or dispute brought in connection with this Agreement or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorneys' fees and costs.

**Section 7.11    Specific Performance**. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that each Party shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which such Party is entitled at law or in equity.  In the event that specific performance is granted to a Party pursuant to the terms and conditions herein, such Party shall also be entitled to be awarded its costs and expenses (including reasonable attorneys' fees and expenses) incurred solely in connection with obtaining such specific performance, together with interest on such amounts from the date of the commencement of such proceeding until the date of payment at the prime lending rate as published in The Wall Street Journal in effect on the date of the commencement of such proceeding.

**Section 7.12    Termination.** This Agreement shall terminate upon the irrevocable payment in full to Agent and each Holder of all amounts owing to them under the Notes and this Agreement. When all Indebtedness (as defined in the Security Agreement, other than inchoate indemnity obligations)

have been paid in full, the Company shall provide Agent with an officer's certificate confirming such payment in full or conversion; and thereafter, no Party shall have any further rights or obligations hereunder. Notwithstanding the prior termination of this Agreement, the respective obligations of Holders to indemnify Agent and each other shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Agent or Holder have run.

**Section 7.13** <u>**Reinstatement**</u>. Notwithstanding any provision of this Agreement to the contrary, the rights and obligations of the Parties with respect to Company shall be reinstated and revived if and to the extent that for any reason any payment by or on behalf of Company is rescinded, or must be otherwise restored by any Party, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid. To the extent any payment is rescinded or restored, the obligations of the Company under the Notes shall be revived in full force and effect without reduction or discharge for that payment.

**Section 7.14** <u>**Survival**</u>. All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any obligations remain outstanding hereunder.

**Section 7.15** <u>**Counterparts and Joinder.**</u>

(a) This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(b) One or more Holders may join this Agreement at or following the Effective Date by the execution of a Counterpart Signature Page as attached hereto, provided, however, that such Counterpart Signature Page shall not be effective unless and until the Company accepts the applicable proposed Holder's subscription for a Note pursuant to the Subscription Agreement and countersigned such Counterpart Signature Page.

*[Signatures appear on following pages]*

23-01243-WLH11    Doc 469    Filed 02/23/24    Entered 02/23/24 19:45:30    Exhibit 14 Page 574

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

iCap Pacific Income Fund 5, LLC

By:    iCap Pacific NW Management, LLC
Its:    Manager

By: _____
Name: Chris Christensen
Title:  Manager

iCap Holding 5, LLC

By: _____
Name: Chris Christensen
Title:  Manager

MarketPlace Realty Advisors, LLC

By: _____
Name:    Ron Thomas
Title:    General Manager

500907.v7

<u>Counterparty Signature Page to Collateral Agent Agreement</u>

By execution hereof, the undersigned Holder hereby joins in and becomes a Holder under that certain Collateral Agent Agreement dated as of September 5, 2019, by and between iCap Pacific Income Fund 5, LLC, a Delaware limited liability company ("Company"), the holders of the Notes (as defined in such therein) and MarketPlace Realty Advisors, LLC in its capacity as collateral agent (in such capacity "Agent") (the "Collateral Agent Agreement").

The undersigned Holder has received and read a copy of the Collateral Agent Agreement and understands its provisions. Holder hereby adopts and agrees to be bound by all of the provisions of the Collateral Agent Agreement and all of the provisions of the Collateral Agent Agreement are hereby incorporated herein.

IN WITNESS WHEREOF, the Parties hereto have caused this Counterpart Signature Page to Collateral Agent Agreement to be executed as of the date set forth below.

Holder Name: _____

Signature: _____
Title: _____
*(if applicable)*

Date: _____

Agreed and accepted:

iCap Pacific Income Fund 5, LLC

By: iCap Pacific NW Management, LLC
Its: Manager

By: _____
Name: _____
Title: _____

**Exhibit 31**



**iCap/Family Office Joint Investment**
*Summary Assumptions*

| | 1. Sale of Investments | 2. Build-Out of Investments |
|---|---|---|
| Investment Amount | $ 94,000,000.00 | $ 94,000,000.00 |
| Management Fee | 2.00% | 2.00% |
| Average Return on Investment (Expected) | 33.26% | 33.26% |
| Average Annualized Return on Investment | 24.26% | 24.26% |
| Average Investment Days | 575 | 575 |
| Average Investment Months | 19 | 19 |
| Operating Reserve Balance | $ 5,000,000.00 | $ 5,000,000.00 |
| Investment Period (in Years) | 3 | 3 |
| Net Return on Investment | $ 62,614,521.46 | $ 72,671,522.06 |
| Return on Investment | 66.61% | 77.31% |
| Annualized Return on Investment | 13.32% | 15.46% |
| Preferred Interest Payment | 0% | 0% |

**iCap Family Office Joint Investment**
Cash Flow Projections - As of November 8, 2016 (Sale of Investments)

| | Apr. 2017 | May. 2017 | Jun. 2017 | Jul. 2017 | Aug. 2017 | Sep. 2017 | Oct. 2017 | Nov. 2017 | Dec. 2017 | Jan. 2018 | Feb. 2018 | Mar. 2018 | Apr. 2018 | May. 2018 | Jun. 2018 | Jul. 2018 | Aug. 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash:** | $ 30,798,192 | $ 22,650,802 | $ 13,862,810 | $ 8,287,907 | $ 8,523,954 | $ 12,215,502 | $ 6,860,370 | $ 8,298,775 | $ 14,722,986 | $ 6,660,851 | $ 11,383,539 | $ 14,179,217 | $ 6,804,399 | $ 8,885,200 | $ 12,014,642 | $ 7,976,270 | $ 12,022,754 |
| *Deductions:* | | | | | | | | | | | | | | | | | |
| Management Fees | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) |
| Professional Fees | | | | | | | | | | | | | | | | | |
| Expense Reimbursement | | | | | | | | | | | | | | | | | |
| Distributions | | | | | | | | | | | | | | | | | |
| Total Monthly Deductions | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) | (470,000) |
| *Current AUM Portfolio:* | | | | | | | | | | | | | | | | | |
| Seattle Modern Living | | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | | | | | |
| Meridian Greens Holdings | | | | | | 2,455,194 | | | | | 2,291,054 | | 767,368 | 819,664 | | | |
| Ruby 62 Holdings | | (116,667) | (116,667) | (116,667) | (116,667) | | | | | | | | | | | | |
| Ent. Ventures II | | | | | | | | 526,000 | | | | | | 647,524 | | | |
| Ent. Ventures IV | | | | | | | | | | | | | | | | | |
| Barcelo Madison Park | 1,643,650 | | | | | | | | | | | | | | | | |
| iCap Detridge Way, LLC | | | | | | 92,000 | 184,000 | 423,900 | | 821,179 | | | | | | | |
| iCap Finn Hill | 385,990 | 385,990 | | | | 385,990 | 385,990 | 410,359 | | | | | | | | | |
| iCap Campbell Way | | | 920,000 | | (66,667) | | | | | | 143,750 | | | | | | |
| iCap Rhody Ridge, LLC | | | (141,667) | (141,667) | 1,317,481 | 439,160 | 439,160 | | 878,320 | 439,160 | | | | | | | |
| iCap Lake View | | | | | 1,347,869 | 449,290 | 449,290 | | | 449,290 | 287,500 | 287,500 | 287,500 | | 287,500 | 287,500 | 287,500 |
| iCap Rhody Ridge | | | | | | | | | 898,579 | | 878,320 | 878,320 | 439,160 | | 1,781,085 | 1,664,596 | |
| iCap Brislawn | | | | 220,833 | 220,833 | 411,358 | | | | | 898,579 | 898,579 | 220,080 | | | | |
| Mercer 36, LLC | 115,000 | 322,747 | | | | | | | | | | | | | | | |
| K8R6, LLC | 214,632 | 214,632 | 318,122 | 266,800 | 266,800 | 1,000,455 | | | | | | | | | | | |
| 23rd & Gilman, LLC | 214,632 | 214,632 | | | 266,800 | | | | | | | | | | | | |
| 134th Street, LLC | | | | | | | | 4,902,986 | | | | | | | | | |
| Senca Sammamish, LLC | | | | | | | | | | | 199,909 | 399,818 | 399,818 | 399,818 | 630,606 | 920,700 | 1,477,747 |
| iCap Finn Meadows | | | | | | | | | | | 399,818 | | 436,875 | 436,875 | 436,875 | 436,875 | 190,625 |
| Senca Kenmore, LLC | | | | | | | | | | | | | | | | 381,250 | |
| Pearl and Delores | | 164,335 | 164,335 | 275,780 | 480,928 | 250,456 | 289,000 | | | | | | | | | | |
| Hayden Meadows, LLC | 80,006 | 80,006 | 120,008 | 40,003 | 80,006 | | | | | | | | | | | | |
| Lake Union Estates, LLC | | 120,008 | 80,006 | | | | | | | | | | | 825,563 | 825,563 | 825,563 | |
| Timberland, LLC | | | | | | | | | | 3,322,095 | | | | | | | |
| *Future AUM Investments:* | | | | | | | | | | | | | | | | | |
| Investment Placement #1 | (10,000,000) | | | | | | | | | | | | | | | | |
| Investment Placement #2 | | (10,000,000) | | | | | | | | | | | | | | | |
| Investment Placement #3 | | | (7,000,000) | | | | | | | | | | | | | | |
| Investment Placement #4 | | | | | | (11,000,000) | | | | | | | | | | | |
| Investment Placement #5 | | | | | | | | | (10,000,000) | | | | | | | | |
| Investment Placement #6 | | | | | | | | | | | | (10,000,000) | | | | | |
| Investment Placement #7 | | | | | | | | | | | | | | | (8,000,000) | | |
| Investment Placement #8 | | | | | | | | | | | | | | | | | |
| Investment Placement #9 | | | | | | | | | | | | | | | | | |
| Investment Placement #10 | | | | | | | | | | | | | | | | | |
| Investment Placement #11 | | | | | | | | | | | | | | | | | |
| Investment Placement #12 | | | | | | | | | | | | | | | | | |
| Investment Placement #13 | | | | | | | | | | | | | | | | | |
| Investment Placement #14 | | | | | | | | | | | | | | | | | |
| Investment Placement #15 | | | | | | | | | | | | | | | | | |
| Investment Placement #16 | | | | | | | | | | | | | | | | | |
| Investment Placement #17 | | | | | | | | | | | | | | | | | |
| Total AUM Payoffs | (7,677,390) | (8,787,992) | (5,574,903) | 706,047 | 3,691,548 | (5,355,132) | 1,908,405 | 6,424,211 | (8,062,135) | 5,192,688 | 2,795,678 | (7,374,818) | 2,550,801 | 3,129,442 | (4,038,372) | 4,516,484 | 1,955,872 |
| **Ending Cash Account** | $ 22,650,802 | $ 13,862,810 | $ 8,287,907 | $ 8,523,954 | $ 12,215,502 | $ 6,860,370 | $ 8,298,775 | $ 14,722,986 | $ 6,660,851 | $ 11,383,539 | $ 14,179,217 | $ 6,804,399 | $ 8,885,200 | $ 12,014,642 | $ 7,976,270 | $ 12,022,754 | $ 13,978,625 |

Exhibit 1, Page 579

**iCap Family Office Joint Investment**
**Cash Flow Projections - As of Novemb[er]**

| | Sep. 2018 | Oct. 2018 | Nov. 2018 | Dec. 2018 | Jan. 2019 | Feb. 2019 | Mar. 2019 | Apr. 2019 | May 2019 | Jun. 2019 | July 2019 | Aug. 2019 | Sept. 2019 | Oct. 2019 | Nov. 2019 | Dec. 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash:** | $ 13,978,625 | $ 2,017,237 | $ 2,825,674 | $ 5,713,893 | $ 5,865,455 | $ 15,549,218 | $ 16,374,780 | $ 5,481,971 | $ 7,251,321 | $ 7,251,321 | $ 7,251,321 | $ 5,107,321 | $ 5,107,321 | $ 5,107,321 | $ 17,963,321 | $ 5,963,321 |
| *Deductions:* | | | | | | | | | | | | | | | | |
| Management Fees | | (470,000) | | | (470,000) | | | (470,000) | | | (470,000) | | | (470,000) | | |
| Professional Fees | | | | | | | | | | | | | | | | |
| Expense Reimbursement | | | | | | | | | | | | | | | | |
| Distributions | | | | | | | | | | | | | | | | |
| **Total Monthly Deductions** | | (470,000) | | | (470,000) | | | (470,000) | | | (470,000) | | | (470,000) | | |
| | | | | | | | | | | | | | | | | |
| *Current AUM Portfolio:* | | | | | | | | | | | | | | | | |
| Seattle Modern Living | | | | | | | | | | | | | | | | |
| Meridian Greens Holdings | | | | | | | | | | | | | | | | |
| Ruby 62 Holdings | | | | | | | | | | | | | | | | |
| Ent. Ventures II | | | | | | | | | | | | | | | | |
| Ent. Ventures IV | | | | | | | | | | | | | | | | |
| Barcelo Madison Park | | | | | | | | | | | | | | | | |
| iCap Delridge Way, LLC | | | | | | | | | | | | | | | | |
| iCap Finn Hill | | | | | | | | | | | | | | | | |
| iCap Campbell Way | 38,612 | | | | | | | | | | | | | | | |
| iCap Rhody Ridge, LLC | | 897,187 | | | | | | | | | | | | | | |
| iCap Lake View | | | | | | | | | | | | | | | | |
| iCap Rhody Ridge | | | | | | | | | | | | | | | | |
| iCap Brickwn | | | | | | | | | | | | | | | | |
| Mercer 36, LLC | | 381,250 | 736,656 | | | | | | | | | | | | | |
| KBHill, LLC | | | | | | | | | | | | | | | | |
| 23rd & Gilman, LLC | | | | | | | | | | | | | | | | |
| 134th Street, LLC | | | | | | | | | | | | | | | | |
| Senza Summamish, LLC | | | | | | | | | | | | | | | | |
| iCap Finn Meadows | | | | | | | | | | | | | | | | |
| Senza Kenmore, LLC | | | | | | | | | | | | | | | | |
| Pearl and Delores | | | | | | | | | | | | | | | | |
| Hayden Meadows, LLC | | | 825,563 | 825,563 | 825,563 | 825,563 | | | | | | | | | | |
| Lake Union Estates, LLC | | | | | | | 2,107,191 | | | | | | | | | |
| Timberland, LLC | | | | | | | | 2,580,750 | | | | | | | | |
| | 38,612 | 1,278,437 | 1,562,219 | 825,563 | 825,563 | 825,563 | 2,107,191 | 2,580,750 | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| *Future AUM Investments:* | | | | | | | | | | | | | | | | |
| Investment Placement #1 | | | 13,326,000 | | | | | | | | | | | | | |
| Investment Placement #2 | | | | 13,326,000 | | | | | | | | | | | | |
| Investment Placement #3 | | | | | 9,328,200 | | | | | | | | | | | |
| Investment Placement #4 | | | | | | | | 14,658,600 | | | | | | | | |
| Investment Placement #5 | | | | | | | | | | | 13,326,000 | | | | | |
| Investment Placement #6 | | | | | | | | | | | | | | 13,326,000 | | |
| Investment Placement #7 | (12,000,000) | | | | | | | | | | | | | | | |
| Investment Placement #8 | | | (12,000,000) | | | | | | | | | | | | | |
| Investment Placement #9 | | | | (14,000,000) | | | | | | | | | | | | |
| Investment Placement #10 | | | | | | | (13,000,000) | | | | | | | | | |
| Investment Placement #11 | | | | | | | | (15,000,000) | | | | | | | | |
| Investment Placement #12 | | | | | | | | | | | (15,000,000) | | | | | |
| Investment Placement #13 | | | | | | | | | | | | | | | (12,000,000) | |
| Investment Placement #14 | | | | | | | | | | | | | | | | |
| Investment Placement #15 | | | | | | | | | | | | | | | | |
| Investment Placement #16 | | | | | | | | | | | | | | | | |
| Investment Placement #17 | | | | | | | | | | | | | | | | |
| | (12,000,000) | | 1,326,000 | (674,000) | 9,328,200 | | (13,000,000) | (341,400) | | | (1,674,000) | | | 13,326,000 | (12,000,000) | |
| **Total AUM Payoffs** | (11,961,388) | 1,278,437 | 2,888,219 | 151,563 | 10,153,763 | 825,563 | (10,892,809) | 2,239,350 | | | (1,674,000) | | | 13,326,000 | (12,000,000) | |
| **Ending Cash Account** | $ 2,017,237 | $ 2,825,674 | $ 5,713,893 | $ 5,865,455 | $ 15,549,218 | $ 16,374,780 | $ 5,481,971 | $ 7,251,321 | $ 7,251,321 | $ 7,251,321 | $ 5,107,321 | $ 5,107,321 | $ 5,107,321 | $ 17,963,321 | $ 5,963,321 | $ 5,963,321 |

iCAP EQU

**iCap/Family Office Joint Investment**
**Cash Flow Projections - As of Novemb**

| | Jan. 2020 | Feb. 2020 | Mar. 2020 | Apr. 2020 | May. 2019 | Jun. 2020 | July 2020 | Aug. 2020 | Sept. 2020 | Oct. 2020 | Nov. 2020 | Dec. 2020 | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash:** | $ 5,963,321 | $ 16,154,121 | $ 5,154,121 | $ 5,154,121 | $ 20,675,321 | $ 5,675,321 | $ 21,666,521 | $ 4,852,921 | $ 4,852,921 | $ 4,852,921 | $ 21,706,721 | $ 41,695,721 | $ 41,695,721 | $ 41,225,721 | $ 61,214,721 | $ 61,214,721 |
| *Deductions:* | | | | | | | | | | | | | | | | |
| Management Fees | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Expense Reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Distributions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Monthly Deductions** | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) |
| *Current AUM Portfolio:* | | | | | | | | | | | | | | | | |
| Seattle Modern Living | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Meridian Greens Holdings | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ruby 62 Holdings | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures II | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures IV | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Barcelo Madison Park | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Delridge Way, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Finn Hill | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Campbell Way | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Lake View | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Brickwn | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mercer 36, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| KBHill, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 23rd & Gilman, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 134th Street, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Senza Sammamish, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Firm Meadows | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Senza Kenmore, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pearl and Delores | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Hayden Meadows, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lake Union Estates, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Timberland, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *Future AUM Investments:* | | | | | | | | | | | | | | | | |
| Investment Placement #1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #3 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #4 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #6 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #7 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #8 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #9 | 10,660,800 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #10 | - | - | - | 15,991,200 | - | 15,991,200 | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #11 | - | - | - | - | - | - | 18,656,400 | - | - | - | - | - | - | - | - | - |
| Investment Placement #12 | - | - | - | - | - | - | - | - | - | 17,323,800 | - | - | - | - | - | - |
| Investment Placement #13 | - | - | - | - | - | - | - | - | - | - | 19,989,000 | - | - | - | - | - |
| Investment Placement #14 | - | - | - | - | - | - | - | - | - | - | - | - | - | 19,989,000 | - | - |
| Investment Placement #15 | - | - | - | - | (15,000,000) | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #16 | - | (11,000,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #17 | - | - | - | - | - | - | (35,000,000) | - | - | - | - | - | - | - | - | - |
| **Total AUM Payoffs** | 10,660,800 | (11,000,000) | - | 15,991,200 | (15,000,000) | 15,991,200 | (16,343,600) | - | - | 17,323,800 | 19,989,000 | - | - | 19,989,000 | - | - |
| **Ending Cash Account** | $ 16,154,121 | $ 5,154,121 | $ 5,154,121 | $ 20,675,321 | $ 5,675,321 | $ 21,666,521 | $ 4,852,921 | $ 4,852,921 | $ 4,852,921 | $ 21,706,721 | $ 41,695,721 | $ 41,695,721 | $ 41,225,721 | $ 61,214,721 | $ 61,214,721 | $ 60,744,721 |

**iCap ⬤ EQU**

**iCap/Family Office Joint Investment**
**Cash Flow Projections - As of Novemb...**

| | May. 2021 | Jun. 2021 | July. 2021 | Aug. 2021 | Sept. 2021 | Oct. 2021 | Nov. 2021 | Dec. 2021 | Jan. 2022 | Feb. 2022 | Mar. 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash:** | $ 60,744,721 | $ 60,744,721 | $ 76,735,921 | $ 76,265,921 | $ 76,265,921 | $ 90,924,521 | $ 90,454,521 | $ 90,454,521 | $ 110,443,521 | $ 109,973,521 | $ 156,614,521 |
| *Deductions:* | | | | | | | | | | | |
| Management Fees | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - |
| Expense Reimbursement | - | - | - | - | - | - | - | - | - | - | - |
| Distributions | - | - | - | - | - | - | - | - | - | - | - |
| Total Monthly Deductions | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - |
| | | | | | | | | | | | |
| *Current AUM Portfolio:* | | | | | | | | | | | |
| Seattle Modern Living | - | - | - | - | - | - | - | - | - | - | - |
| Meridian Greens Holdings | - | - | - | - | - | - | - | - | - | - | - |
| Ruby 62 Holdings | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures II | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures IV | - | - | - | - | - | - | - | - | - | - | - |
| Barcelo Madison Park | - | - | - | - | - | - | - | - | - | - | - |
| iCap Delridge Way, LLC | - | - | - | - | - | - | - | - | - | - | - |
| iCap Finn Hill | - | - | - | - | - | - | - | - | - | - | - |
| iCap Campbell Way | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge, LLC | - | - | - | - | - | - | - | - | - | - | - |
| iCap Lake View | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge | - | - | - | - | - | - | - | - | - | - | - |
| iCap Brislawn | - | - | - | - | - | - | - | - | - | - | - |
| Mercer 36, LLC | - | - | - | - | - | - | - | - | - | - | - |
| KBR6, LLC | - | - | - | - | - | - | - | - | - | - | - |
| 23rd & Gilman, LLC | - | - | - | - | - | - | - | - | - | - | - |
| 134th Street, LLC | - | - | - | - | - | - | - | - | - | - | - |
| Senza Sammamish, LLC | - | - | - | - | - | - | - | - | - | - | - |
| iCap Finn Meadows | - | - | - | - | - | - | - | - | - | - | - |
| Senza Kenmore, LLC | 15,991,200 | - | - | - | - | - | - | - | - | - | - |
| Pearl and Delores | - | - | - | - | 14,658,600 | - | - | - | - | - | - |
| Hayden Meadows, LLC | - | - | - | - | - | - | - | 19,989,000 | - | - | - |
| Lake Union Estates, LLC | - | - | - | - | - | - | - | - | - | 46,641,000 | - |
| Timberland, LLC | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| *Future AUM Investments:* | | | | | | | | | | | |
| Investment Placement #1 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #2 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #3 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #4 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #5 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #6 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #7 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #8 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #9 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #10 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #11 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #12 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #13 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #14 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #15 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #16 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #17 | - | - | - | - | - | - | - | - | - | - | - |
| Total AUM Payoffs | 15,991,200 | - | - | - | 14,658,600 | - | - | 19,989,000 | - | 46,641,000 | - |
| **Ending Cash Account** | $ 60,744,721 | $ 76,735,921 | $ 76,265,921 | $ 76,265,921 | $ 90,924,521 | $ 90,454,521 | $ 90,454,521 | $ 110,443,521 | $ 109,973,521 | $ 156,614,521 | $ 156,614,521 |

iCAP EQUITY

**iCap/Family Office Joint Investment**
*Cash Flow Projections - As of November 8, 2016 (Build Out of Investments)*

| | Apr. 2017 | May. 2017 | Jun. 2017 | Jul. 2017 | Aug. 2017 | Sep. 2017 | Oct. 2017 | Nov. 2017 | Dec. 2017 | Jan. 2018 | Feb. 2018 | Mar. 2018 | Apr. 2018 | May. 2018 | Jun. 2018 | Jul. 2018 | Aug. 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash** | $24,032,892 | $11,881,335 | $8,089,176 | $1,130,200 | $1,362,081 | $5,049,462 | $5,690,163 | $7,124,401 | $13,544,444 | $10,200,830 | $5,478,142 | $17,455,876 | $5,081,058 | $7,161,859 | $10,291,301 | $5,252,928 | $9,299,412 |
| *Deductions:* | | | | | | | | | | | | | | | | | |
| Management Fees | | | | | | | | | | | | | | | | | |
| Professional Fees | | | | | | | | | | | | | | | | | |
| Expense Reimbursement | | | | | | | | | | | | | | | | | |
| Distributions | (470,000) | - | - | (470,000) | - | (470,000) | - | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - |
| **Total Monthly Deductions** | (470,000) | - | - | (470,000) | - | (470,000) | - | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - |
| *Current AUM Portfolio:* | | | | | | | | | | | | | | | | | |
| Seattle Modern Living | - | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | - | - | - | - | - |
| Meridian/Greens Holdings | - | (116,667) | (116,667) | (116,667) | (116,667) | 2,455,194 | - | - | - | - | 2,291,054 | - | 767,368 | 819,664 | - | - | - |
| Ruby 62 Holdings | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures II | - | - | - | - | - | - | - | 526,000 | - | - | - | - | - | - | - | - | - |
| Ent. Ventures IV | - | - | - | - | - | - | - | - | - | - | - | - | - | 647,524 | - | - | - |
| Barcelo Madison Park | 1,643,650 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 723 Broadway | - | - | (8,379,905) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 9041 48th | - | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows I | - | - | - | - | - | - | - | - | - | - | 2,415,535 | - | - | - | - | - | - |
| Lofts @ Camas Meadows II | - | - | - | - | - | - | - | - | - | - | 2,039,832 | - | - | - | - | - | - |
| TCG Investments | (4,000,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Delridge Way, LLC | 385,990 | 385,990 | - | 92,000 | - | 92,000 | 184,000 | 423,900 | - | - | - | - | - | - | - | - | - |
| iCap Fern Hill | - | - | 920,000 | 385,590 | - | 385,590 | 385,590 | 410,359 | - | 821,179 | - | - | - | - | - | - | - |
| iCap Campbell Way | - | - | (141,667) | (141,667) | (66,667) | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge, LLC | - | - | - | 1,317,481 | 439,160 | 439,160 | 439,160 | - | 878,320 | 439,160 | 143,750 | 878,320 | 439,160 | - | 287,500 | 287,500 | 287,500 |
| iCap Rhody Ridge | - | - | - | 1,347,869 | 449,290 | 449,290 | 449,290 | - | 898,579 | 449,290 | - | 898,579 | 220,080 | - | 1,781,085 | 1,664,596 | - |
| iCap Brixton | - | - | 220,833 | 220,833 | 411,358 | - | - | - | - | - | - | - | - | - | - | - | - |
| Mercer 36, LLC | 115,000 | 322,747 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| KBR6, LLC | 214,632 | 214,632 | - | 266,800 | 266,800 | 1,000,455 | - | - | - | - | - | - | - | - | - | - | - |
| 23rd & Gilman, LLC | - | - | 318,122 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 134th Street, LLC | - | - | - | - | - | - | - | 4,902,986 | - | - | - | - | - | - | - | - | - |
| Senza Sammamish, LLC | - | - | - | - | - | - | - | - | - | 199,909 | 399,818 | 399,818 | 399,818 | 399,818 | - | - | - |
| iCap Fern Meadows | - | - | - | - | - | - | - | - | - | - | 436,875 | 436,875 | 436,875 | 436,875 | 630,606 | 436,875 | - |
| Senza Kenmore, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 920,700 | - |
| Pearl and Delores | - | 164,335 | 164,335 | 275,780 | 480,928 | - | - | - | - | - | - | - | - | - | - | 436,875 | - |
| Hayden Meadows, LLC | 80,006 | 80,006 | 120,008 | 40,003 | 80,006 | 250,656 | 289,000 | - | - | - | - | - | - | - | - | 381,250 | - |
| Lake Union Estates, LLC | - | - | - | - | - | - | - | - | - | - | - | 825,563 | 825,563 | 825,563 | 825,563 | 825,563 | - |
| Timberland, LLC | - | - | - | - | - | - | - | - | - | 3,322,095 | - | - | - | - | - | - | - |
| *Future AUM Investments:* | | | | | | | | | | | | | | | | | |
| Investment Placement #1 | (10,000,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #2 | - | (5,000,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #3 | - | - | - | - | - | (5,000,000) | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #4 | - | - | - | - | - | (5,000,000) | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #5 | - | - | - | - | - | - | - | - | (10,000,000) | - | - | - | - | - | - | - | - |
| Investment Placement #6 | - | - | - | - | - | - | - | - | - | - | - | (15,000,000) | - | - | - | - | - |
| Investment Placement #7 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (9,000,000) | - | - |
| Investment Placement #8 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1,477,747 | - |
| Investment Placement #9 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 190,625 | - |
| Investment Placement #10 | | | | | | | | | | | | | | | | | |
| Investment Placement #11 | | | | | | | | | | | | | | | | | |
| Investment Placement #12 | | | | | | | | | | | | | | | | | |
| Investment Placement #13 | | | | | | | | | | | | | | | | | |
| Investment Placement #14 | | | | | | | | | | | | | | | | | |
| Investment Placement #15 | | | | | | | | | | | | | | | | | |
| Investment Placement #16 | | | | | | | | | | | | | | | | | |
| **Total AUM Payoffs** | (11,683,557) | (3,792,159) | (6,958,975) | 701,880 | 3,687,381 | 640,701 | 1,904,238 | 6,420,044 | 1,933,616 | 5,192,688 | 7,255,045 | (12,374,818) | 2,550,801 | 3,129,442 | (5,038,372) | 4,516,484 | 1,955,872 |
| **Ending Cash Account** | $11,881,335 | $8,089,176 | $1,130,200 | $1,362,081 | $5,049,462 | $5,690,163 | $7,124,401 | $13,544,444 | $10,200,830 | $5,478,142 | $17,455,876 | $5,081,058 | $7,161,859 | $10,291,301 | $5,252,928 | $9,299,412 | $11,255,284 |

Exhibit 1, Page 583

**iCap/Family Office Joint Investment**
**Cash Flow Projections - As of November**

| | Sep. 2018 | Oct. 2018 | Nov. 2018 | Dec. 2018 | Jan. 2019 | Feb. 2019 | Mar. 2019 | Apr. 2019 | May. 2019 | Jun. 2019 | July 2019 | Aug. 2019 | Sept. 2019 | Oct. 2019 | Nov. 2019 | Dec. 2019 | Jan. 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash:** | $ 11,255,284 | $ 6,293,896 | $ 17,469,133 | $ 9,357,352 | $ 5,845,914 | $ 6,466,285 | $ 7,556,655 | $ 5,928,654 | $ 4,967,212 | $ 5,591,340 | $ 5,591,340 | $ 5,447,340 | $ 5,447,340 | $ 5,447,340 | $ 24,966,340 | $ 5,966,340 | $ 5,966,340 |
| **Deductions:** | | | | | | | | | | | | | | | | | |
| Management Fees | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Expense Reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Distributions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Monthly Deductions** | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) |
| **Current AUM Portfolio:** | | | | | | | | | | | | | | | | | |
| Seattle Modern Living | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Meridian Greens Holdings | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ruby 62 Holdings | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures IV | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Barcelo Madison Park | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 725 Broadway | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 9041 48th | - | - | - | - | 264,808 | 264,808 | 264,808 | 264,808 | 624,128 | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows I | - | 10,366,800 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows II | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TCG Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Delridge Way, LLC | - | - | 736,656 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Finn Hill | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Campbell Way | 38,612 | 897,187 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge, LLC | - | 381,250 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Lake View | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Division | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mercer 36, LLC | - | - | 825,563 | 825,563 | 825,563 | 825,563 | 2,107,191 | 2,580,750 | - | - | - | - | - | - | - | - | - |
| K8th6, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 23rd & Gilman, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 134th Street, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Senza Sammamish, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Finn Meadows | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Senza Kenmore, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pearl and Delores | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Hayden Meadows, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lake Union Estates, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Timberland, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Current AUM** | 38,612 | 11,645,237 | 1,562,219 | 825,563 | 1,090,371 | 1,090,371 | 2,371,999 | 2,845,558 | 624,128 | - | - | - | - | - | - | - | - |
| **Future AUM Investments:** | | | | | | | | | | | | | | | | | |
| Investment Placement #1 | - | - | 13,326,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #3 | - | - | - | 6,663,000 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #4 | - | - | - | - | - | - | - | - | - | - | 13,326,000 | - | - | - | - | - | - |
| Investment Placement #5 | - | - | - | - | - | - | - | 6,663,000 | - | - | - | - | - | - | - | - | - |
| Investment Placement #6 | - | - | - | - | - | - | - | - | - | - | - | - | - | 19,989,000 | - | - | - |
| Investment Placement #7 | (5,000,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 11,993,400 |
| Investment Placement #8 | - | - | (23,000,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #9 | - | - | - | (11,000,000) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #10 | - | - | - | - | - | - | (4,000,000) | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #11 | - | - | - | - | - | - | - | (10,000,000) | - | - | - | - | - | - | - | - | - |
| Investment Placement #12 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #13 | - | - | - | - | - | - | - | - | - | - | (13,000,000) | - | - | - | (19,000,000) | - | - |
| Investment Placement #14 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #15 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #16 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total AUM Payoffs** | (4,961,388) | 11,645,237 | (8,111,781) | (3,511,438) | 1,090,371 | 1,090,371 | (1,628,001) | (491,442) | 624,128 | - | 326,000 | - | - | 19,989,000 | (19,000,000) | - | 11,993,400 |
| **Ending Cash Account** | $ 6,293,896 | $ 17,469,133 | $ 9,357,352 | $ 5,845,914 | $ 6,466,285 | $ 7,556,655 | $ 5,928,654 | $ 4,967,212 | $ 5,591,340 | $ 5,591,340 | $ 5,447,340 | $ 5,447,340 | $ 5,447,340 | $ 24,966,340 | $ 5,966,340 | $ 5,966,340 | $ 17,489,740 |

**iCap EQU**

**iCap Family Office Joint Investment**
*Cash Flow Projections - As of November*

| | Feb. 2020 | Mar. 2020 | Apr. 2020 | May. 2019 | Jun. 2020 | July 2020 | Aug. 2020 | Sept. 2020 | Oct. 2020 | Nov. 2020 | Dec. 2020 | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May. 2021 | Jun. 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash:** | $ 17,489,740 | $ 5,489,740 | $ 5,489,740 | $ 11,682,740 | $ 5,682,740 | $ 36,332,540 | $ 5,521,140 | $ 5,521,140 | $ 5,521,140 | $ 10,381,540 | $ 23,707,540 | $ 23,707,540 | $ 23,237,540 | $ 40,561,340 | $ 40,561,340 | $ 40,091,340 | $ 58,808,322 |
| **Deductions:** | | | | | | | | | | | | | | | | | |
| Management Fees | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Expense Reimbursement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Distributions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Monthly Deductions** | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - |
| **Current AUM Portfolio:** | | | | | | | | | | | | | | | | | |
| Seattle Modern Living | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Meridian Greens Holdings | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ruby 62 Holdings | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures IV | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures II | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Barcelo Madison Park | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 725 Broadway | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 18,716,982 | - |
| 9041 48th | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows I | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows II | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TCG Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Delridge Way, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Finn Hill | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Campbell Way | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Lake View | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Division | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mercer 36, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| K8R46, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 23rd & Gilman, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 134th Street, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Senza Sammamish, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Meadows | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Senza Kenmore, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Pearl and Delores | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Hayden Meadows, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lake Union Estates, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Timberland, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 18,716,982 | - |
| **Future AUM Investments:** | | | | | | | | | | | | | | | | | |
| Investment Placement #1 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #3 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #4 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #5 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #6 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #7 | - | - | - | - | 30,649,800 | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #8 | - | - | 6,663,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #9 | - | - | - | - | - | 14,658,600 | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #10 | - | - | - | - | - | - | - | - | - | 13,326,000 | - | - | - | - | - | - | - |
| Investment Placement #11 | - | - | - | - | - | - | - | - | 5,330,400 | - | - | - | - | - | - | - | - |
| Investment Placement #12 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #13 | - | - | - | - | - | - | - | - | - | - | - | - | 17,323,800 | - | - | - | - |
| Investment Placement #14 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 25,319,400 |
| Investment Placement #15 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investment Placement #16 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Distributions | (12,000,000) | - | - | (6,000,000) | - | (45,000,000) | - | - | - | - | - | - | - | - | - | - | - |
| | (12,000,000) | - | 6,663,000 | (6,000,000) | 30,649,800 | (30,341,400) | - | - | 5,330,400 | 13,326,000 | - | - | 17,323,800 | - | - | - | 25,319,400 |
| **Total AUM Payoffs** | (12,000,000) | - | 6,663,000 | (6,000,000) | 30,649,800 | (30,341,400) | - | - | 5,330,400 | 13,326,000 | - | - | 17,323,800 | - | - | 18,716,982 | 25,319,400 |
| **Ending Cash Account** | $ 5,489,740 | $ 5,489,740 | $ 11,682,740 | $ 5,682,740 | $ 36,332,540 | $ 5,521,140 | $ 5,521,140 | $ 5,521,140 | $ 10,381,540 | $ 23,707,540 | $ 23,707,540 | $ 23,237,540 | $ 40,561,340 | $ 40,561,340 | $ 40,091,340 | $ 58,808,322 | $ 84,127,722 |

Exhibit 1, Page 585

iCap Family Office Joint Investment
Cash Flow Projections - As of Novembe

| | July 2021 | Aug. 2021 | Sept. 2021 | Oct. 2021 | Nov. 2021 | Dec. 2021 | Jan. 2022 | Feb. 2022 | Mar. 2022 |
|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash: | $ 84,127,722 | $ 83,657,722 | $ 83,657,722 | $ 99,648,922 | $ 99,178,922 | $ 99,178,922 | $ 107,174,522 | $ 106,704,522 | $ 166,671,522 |
| *Deductions:* | | | | | | | | | |
| Management Fees | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - |
| Professional Fees | - | - | - | - | - | - | - | - | - |
| Expense Reimbursement | - | - | - | - | - | - | - | - | - |
| Distributions | - | - | - | - | - | - | - | - | - |
| Total Monthly Deductions | (470,000) | - | - | (470,000) | - | - | (470,000) | - | - |
| | | | | | | | | | |
| *Current AUM Portfolio:* | | | | | | | | | |
| Seattle Modern Living | - | - | - | - | - | - | - | - | - |
| Meridian Greens Holdings | - | - | - | - | - | - | - | - | - |
| Ruby 62 Holdings | - | - | - | - | - | - | - | - | - |
| Ent. Ventures II | - | - | - | - | - | - | - | - | - |
| Ent. Ventures IV | - | - | - | - | - | - | - | - | - |
| Barcelo Madison Park | - | - | - | - | - | - | - | - | - |
| 725 Broadway | - | - | - | - | - | - | - | - | - |
| 9041 48th | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows I | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows II | - | - | - | - | - | - | - | - | - |
| TCG Investments | - | - | - | - | - | - | - | - | - |
| iCap Delridge Way, LLC | - | - | - | - | - | - | - | - | - |
| iCap Firm Hill | - | - | - | - | - | - | - | - | - |
| iCap Campbell Way | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge, LLC | - | - | - | - | - | - | - | - | - |
| iCap Lake View | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge | - | - | - | - | - | - | - | - | - |
| iCap Brixtawn | - | - | - | - | - | - | - | - | - |
| Mercer 36, LLC | - | - | - | - | - | - | - | - | - |
| K8R6, LLC | - | - | - | - | - | - | - | - | - |
| 23rd & Gilman, LLC | - | - | - | - | - | - | - | - | - |
| 134th Street, LLC | - | - | - | - | - | - | - | - | - |
| Senza Sammamish, LLC | - | - | - | - | - | - | - | - | - |
| iCap Firm Meadows | - | - | - | - | - | - | - | - | - |
| Senza Kenmore, LLC | - | - | - | - | - | - | - | - | - |
| Pearl and Delores | - | - | - | - | - | - | - | - | - |
| Hayden Meadows, LLC | - | - | - | - | - | - | - | - | - |
| Lake Union Estates, LLC | - | - | - | - | - | - | - | - | - |
| Timberland, LLC | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | |
| *Future AUM Investments:* | | | | | | | | | |
| Investment Placement #1 | | | | | | | | | |
| Investment Placement #2 | | | | | | | | | |
| Investment Placement #3 | | | | | | | | | |
| Investment Placement #4 | | | | | | | | | |
| Investment Placement #5 | | | | | | | | | |
| Investment Placement #6 | | | | | | | | | |
| Investment Placement #7 | | | | | | | | | |
| Investment Placement #8 | | | | | | | | | |
| Investment Placement #9 | | | | | | | | | |
| Investment Placement #10 | | | | | | | | | |
| Investment Placement #11 | | | | | | | | | |
| Investment Placement #12 | | | | | | | | | |
| Investment Placement #13 | | | 15,991,200 | | | | | | |
| Investment Placement #14 | | | | | | | | | |
| Investment Placement #15 | | | | | | 7,995,600 | | | |
| Investment Placement #16 | | | | | | | | 59,967,000 | |
| | | | | | | | | | |
| Total AUM Payoffs | - | - | 15,991,200 | - | - | 7,995,600 | - | 59,967,000 | - |
| **Ending Cash Account** | $ 83,657,722 | $ 83,657,722 | $ 99,648,922 | $ 99,178,922 | $ 99,178,922 | $ 107,174,522 | $ 106,704,522 | $ 166,671,522 | $ 166,671,522 |



**iCAP EQUITY**
*Calculated Return on Investment (Sale of Investments)*

| Investments in Projects: | Investment Amount | Investment Return | Net Gain/Loss | ROI | Annualized ROI | # of Days | Investment Date | Estimated Payoff Date |
|---|---|---|---|---|---|---|---|---|
| Seattle Modern Living | $ 2,336,651.23 | $ 3,357,647 | $ 1,020,995.30 | 43.69% | 37.53% | 425 | 4/1/2017 | 5/31/2018 |
| Meridian Greens Holdings | 2,961,067.52 | 2,291,054 | (670,013.18) | -22.63% | -24.80% | 333 | 4/1/2017 | 2/28/2018 |
| Ruby 62 Holdings | 3,252,662.57 | 2,455,194 | (797,468.56) | -24.52% | -49.17% | 182 | 4/1/2017 | 9/30/2017 |
| Ent. Ventures II | 674,462.08 | 526,000 | (148,462.08) | -22.01% | -33.06% | 243 | 4/1/2017 | 11/30/2017 |
| Ent. Ventures IV | 621,490.74 | 647,524 | 26,032.98 | 4.19% | 3.60% | 425 | 4/1/2017 | 5/31/2018 |
| Barcelo Madison Park | 1,420,274.28 | 1,643,650 | 223,375.45 | 15.73% | 197.95% | 29 | 4/1/2017 | 4/30/2017 |
| iCap Delridge Way, LLC | 654,049.81 | 699,900 | 45,850.19 | 7.01% | 10.53% | 243 | 4/1/2017 | 11/30/2017 |
| iCap Finn Hill | 4,193,989.32 | 2,775,497 | (1,418,492.08) | -33.82% | -40.48% | 305 | 4/1/2017 | 1/31/2018 |
| iCap Campbell Way | 1,366,191.67 | 920,000 | (446,191.67) | -32.66% | -132.45% | 90 | 4/1/2017 | 6/30/2017 |
| iCap Rhody Ridge, LLC | 2,523,353.71 | 2,517,049 | (6,304.71) | -0.25% | -0.16% | 578 | 4/1/2017 | 10/31/2018 |
| iCap Lake View | 4,571,539.05 | 8,276,443 | 3,704,904.34 | 81.04% | 51.18% | 578 | 4/1/2017 | 10/31/2018 |
| iCap Rhody Ridge | 3,281,697.75 | 4,712,977 | 1,431,279.18 | 43.61% | 40.40% | 394 | 4/1/2017 | 4/30/2018 |
| iCap Brislawn | 446,783.00 | 853,024 | 406,241.46 | 90.93% | 182.35% | 182 | 4/1/2017 | 9/30/2017 |
| Mercer 36, LLC | 445,870.15 | 437,747 | (8,122.93) | -1.82% | -11.08% | 60 | 4/1/2017 | 5/31/2017 |
| K8806, LLC | 1,251,066.14 | 1,534,055 | 282,988.75 | 22.62% | 45.36% | 182 | 4/1/2017 | 9/30/2017 |
| 23rd & Gilman, LLC | 1,228,882.20 | 747,386 | (481,496.40) | -39.18% | -158.90% | 90 | 4/1/2017 | 6/30/2017 |
| 134th Street, LLC | 5,918,141.59 | 4,902,986 | (1,015,155.29) | -17.15% | -25.77% | 243 | 4/1/2017 | 11/30/2017 |
| Senza Sammamish, LLC | 4,755,585.32 | 2,950,667 | (1,804,918.48) | -37.95% | -28.50% | 486 | 4/1/2017 | 7/31/2018 |
| iCap Finn Meadows | 3,872,252.69 | 3,225,247 | (647,005.99) | -16.71% | -11.80% | 517 | 4/1/2017 | 8/31/2018 |
| Senza Kenmore, LLC | 2,193,657.51 | 1,689,781 | (503,876.32) | -22.97% | -13.79% | 608 | 4/1/2017 | 11/30/2018 |
| Pearl and Delores | 1,143,130.16 | 1,085,378 | (57,752.07) | -5.05% | -12.13% | 152 | 4/1/2017 | 8/31/2017 |
| Hayden Meadows, LLC | 899,160.23 | 939,484 | 40,323.98 | 4.48% | 7.68% | 213 | 4/1/2017 | 10/31/2017 |
| Lake Union Estates, LLC | 6,817,318.83 | 10,466,878 | 3,649,559.64 | 53.53% | 25.74% | 759 | 4/1/2017 | 4/30/2019 |
| Timberland, LLC | 7,305,864.83 | 3,322,095 | (3,983,770.03) | -54.53% | -65.26% | 305 | 4/1/2017 | 1/31/2018 |
| Investment Placement #1 | 10,000,000.00 | 13,326,000 | 3,326,000.00 | 33.26% | 20.97% | 579 | 4/30/2017 | 11/30/2018 |
| Investment Placement #2 | 10,000,000.00 | 13,326,000 | 3,326,000.00 | 33.26% | 20.97% | 579 | 5/31/2017 | 12/31/2018 |
| Investment Placement #3 | 7,000,000.00 | 9,328,200 | 2,328,200.00 | 33.26% | 20.93% | 580 | 6/30/2017 | 1/31/2019 |
| Investment Placement #4 | 11,000,000.00 | 14,658,600 | 3,658,600.00 | 33.26% | 21.04% | 577 | 9/30/2017 | 4/30/2019 |
| Investment Placement #5 | 10,000,000.00 | 13,326,000 | 3,326,000.00 | 33.26% | 21.04% | 577 | 12/31/2017 | 7/31/2019 |
| Investment Placement #6 | 10,000,000.00 | 13,326,000 | 3,326,000.00 | 33.26% | 20.97% | 579 | 3/31/2018 | 10/31/2019 |
| Investment Placement #7 | 8,000,000.00 | 10,660,800 | 2,660,800.00 | 33.26% | 20.93% | 580 | 6/30/2018 | 1/31/2020 |
| Investment Placement #8 | 12,000,000.00 | 15,991,200 | 3,991,200.00 | 33.26% | 21.00% | 578 | 9/30/2018 | 4/30/2020 |
| Investment Placement #9 | 12,000,000.00 | 15,991,200 | 3,991,200.00 | 33.26% | 21.00% | 578 | 11/30/2018 | 6/30/2020 |
| Investment Placement #10 | 14,000,000.00 | 18,656,400 | 4,656,400.00 | 33.26% | 21.00% | 578 | 12/31/2018 | 7/31/2020 |
| Investment Placement #11 | 13,000,000.00 | 17,323,800 | 4,323,800.00 | 33.26% | 20.93% | 580 | 3/31/2019 | 10/31/2020 |
| Investment Placement #12 | 15,000,000.00 | 19,989,000 | 4,989,000.00 | 33.26% | 20.93% | 580 | 4/30/2019 | 11/30/2020 |
| Investment Placement #13 | 15,000,000.00 | 19,989,000 | 4,989,000.00 | 33.26% | 21.00% | 578 | 7/31/2019 | 2/28/2021 |
| Investment Placement #14 | 12,000,000.00 | 15,991,200 | 3,991,200.00 | 33.26% | 21.00% | 578 | 11/30/2019 | 6/30/2021 |
| Investment Placement #15 | 11,000,000.00 | 14,658,600 | 3,658,600.00 | 33.26% | 20.93% | 580 | 2/28/2020 | 9/30/2021 |
| Investment Placement #16 | 15,000,000.00 | 19,989,000 | 4,989,000.00 | 33.26% | 20.97% | 579 | 5/31/2020 | 12/31/2021 |
| Investment Placement #17 | 35,000,000.00 | 46,641,000 | 11,641,000.00 | 33.26% | 21.04% | 577 | 7/31/2020 | 2/28/2022 |
| | $ 284,135,142.38 | $ 356,149,663.84 | $ 72,014,521.46 | 25.35% | | | | |



**iCAP EQUITY**
*Calculated Return on Investment (Build Out of Investments)*

| Investments in Projects: | Investment Amount (Based on Exit Value) | Investment Return | Net Gain/Loss | ROI | Annualized ROI | # of Days | Investment Date | Estimated Payoff Date |
|---|---|---|---|---|---|---|---|---|
| Seattle Modern Living | $ 2,698,643.26 | 3,357,647 | $ 659,003.27 | 24.42% | 20.97% | 425 | 4/1/2017 | 5/31/2018 |
| Meridian Greens Holdings | 1,603,880.36 | 2,291,054 | 687,173.99 | 42.84% | 46.96% | 333 | 4/1/2017 | 2/28/2018 |
| Ruby 62 Holdings | 604,892.02 | 2,455,194 | 1,850,301.98 | 305.89% | 613.46% | 182 | 4/1/2017 | 9/30/2017 |
| Ent. Ventures II | 120,291.03 | 526,000 | 405,708.97 | 337.27% | 506.60% | 243 | 4/1/2017 | 11/30/2017 |
| Ent. Ventures IV | 481,332.06 | 647,524 | 166,191.66 | 34.53% | 29.65% | 425 | 4/1/2017 | 5/31/2018 |
| Barceló Madison Park | 1,913,200.14 | 1,643,650 | (269,550.40) | -14.09% | -177.33% | 29 | 4/1/2017 | 4/30/2017 |
| 725 Broadway | 15,253,677.96 | 18,716,982 | 3,463,304.04 | 22.70% | 5.45% | 1521 | 4/1/2017 | 5/31/2021 |
| 9041 48th | 724,880.30 | 1,683,360 | 958,479.70 | 132.23% | 61.09% | 790 | 4/1/2017 | 5/31/2019 |
| Lofts @ Camas Meadows I | 3,660,284.10 | 2,419,535 | (1,240,749.10) | -33.90% | -37.16% | 333 | 4/1/2017 | 2/28/2018 |
| Lofts @ Camas Meadows II | 3,660,284.10 | 2,039,832 | (1,620,452.10) | -44.27% | -48.53% | 333 | 4/1/2017 | 2/28/2018 |
| TCG Investments | 5,260,191.71 | 10,366,800 | 5,106,608.29 | 97.08% | 61.31% | 578 | 4/1/2017 | 10/31/2018 |
| iCap Delridge Way, LLC | 544,173.69 | 699,900 | 155,726.31 | 28.62% | 42.98% | 243 | 4/1/2017 | 11/30/2017 |
| iCap Finn Hill | 1,833,006.12 | 2,775,497 | 942,491.12 | 51.42% | 61.53% | 305 | 4/1/2017 | 1/31/2018 |
| iCap Campbell Way | 229,125.77 | 920,000 | 690,874.23 | 301.53% | 1222.86% | 90 | 4/1/2017 | 6/30/2017 |
| iCap Rhody Ridge, LLC | 3,786,887.48 | 2,517,049 | (1,269,838.48) | -33.53% | -21.18% | 578 | 4/1/2017 | 10/31/2018 |
| iCap Lake View | 5,063,679.41 | 8,276,443 | 3,212,763.98 | 63.45% | 40.07% | 578 | 4/1/2017 | 10/31/2018 |
| iCap Rhody Ridge | 3,265,042.15 | 4,712,977 | 1,447,934.77 | 44.35% | 41.08% | 394 | 4/1/2017 | 4/30/2018 |
| iCap Brislawn | 687,377.30 | 853,024 | 165,647.16 | 24.10% | 48.33% | 182 | 4/1/2017 | 9/30/2017 |
| Mercer 36, LLC | 916,503.06 | 437,747 | (478,755.84) | -52.24% | -317.78% | 60 | 4/1/2017 | 5/31/2017 |
| K8M6, LLC | 1,346,113.87 | 1,534,055 | 187,941.02 | 13.96% | 28.00% | 182 | 4/1/2017 | 9/30/2017 |
| 23rd & Gilman, LLC | 1,587,841.55 | 747,386 | (840,455.75) | -52.93% | -214.66% | 90 | 4/1/2017 | 6/30/2017 |
| 134th Street, LLC | 8,038,775.74 | 4,902,986 | (3,135,789.44) | -39.01% | -58.59% | 243 | 4/1/2017 | 11/30/2017 |
| Senza Sammamish, LLC | 2,268,345.08 | 2,950,667 | 682,321.76 | 30.08% | 22.59% | 486 | 4/1/2017 | 7/31/2018 |
| iCap Finn Meadows | 2,291,257.65 | 3,225,247 | 933,989.04 | 40.76% | 28.78% | 517 | 4/1/2017 | 8/31/2018 |
| Senza Kenmore, LLC | 1,306,016.86 | 1,689,781 | 383,764.33 | 29.38% | 17.64% | 608 | 4/1/2017 | 11/30/2018 |
| Pearl and Delores | 1,518,645.57 | 1,085,378 | (433,267.48) | -28.53% | -68.51% | 152 | 4/1/2017 | 8/31/2017 |
| Hayden Meadows, LLC | 2,886,297.26 | 939,484 | (1,946,813.06) | -67.45% | -115.58% | 213 | 4/1/2017 | 10/31/2017 |
| Lake Union Estates, LLC | 5,722,415.99 | 10,466,878 | 4,744,462.49 | 82.91% | 39.87% | 759 | 4/1/2017 | 4/30/2019 |
| Timberland, LLC | 3,461,455.86 | 3,322,095 | (139,361.07) | -4.03% | -4.82% | 305 | 4/1/2017 | 1/31/2018 |
| Investment Placement #1 | 10,000,000.00 | 13,326,000 | 3,326,000.00 | 33.26% | 20.97% | 579 | 4/30/2017 | 11/30/2018 |
| Investment Placement #2 | 5,000,000.00 | 6,663,000 | 1,663,000.00 | 33.26% | 20.97% | 579 | 5/31/2017 | 12/31/2018 |
| Investment Placement #3 | 5,000,000.00 | 6,663,000 | 1,663,000.00 | 33.26% | 21.04% | 577 | 9/30/2017 | 4/30/2019 |
| Investment Placement #4 | 10,000,000.00 | 13,326,000 | 3,326,000.00 | 33.26% | 21.04% | 577 | 12/31/2017 | 7/31/2019 |
| Investment Placement #5 | 15,000,000.00 | 19,989,000 | 4,989,000.00 | 33.26% | 20.97% | 579 | 3/31/2018 | 10/31/2019 |
| Investment Placement #6 | 9,000,000.00 | 11,993,400 | 2,993,400.00 | 33.26% | 20.93% | 580 | 6/30/2018 | 1/31/2020 |
| Investment Placement #7 | 5,000,000.00 | 6,663,000 | 1,663,000.00 | 33.26% | 21.00% | 578 | 9/30/2018 | 4/30/2020 |
| Investment Placement #8 | 23,000,000.00 | 30,649,800 | 7,649,800.00 | 33.26% | 21.00% | 578 | 11/30/2018 | 6/30/2020 |
| Investment Placement #9 | 11,000,000.00 | 14,658,600 | 3,658,600.00 | 33.26% | 21.00% | 578 | 12/31/2018 | 7/31/2020 |
| Investment Placement #10 | 4,000,000.00 | 5,330,400 | 1,330,400.00 | 33.26% | 20.93% | 580 | 3/31/2019 | 10/31/2020 |
| Investment Placement #11 | 10,000,000.00 | 13,326,000 | 3,326,000.00 | 33.26% | 20.93% | 580 | 4/30/2019 | 11/30/2020 |
| Investment Placement #12 | 13,000,000.00 | 17,323,800 | 4,323,800.00 | 33.26% | 21.00% | 578 | 7/31/2019 | 2/28/2021 |
| Investment Placement #13 | 19,000,000.00 | 25,319,400 | 6,319,400.00 | 33.26% | 21.00% | 578 | 11/30/2019 | 6/30/2021 |
| Investment Placement #14 | 12,000,000.00 | 15,991,200 | 3,991,200.00 | 33.26% | 20.93% | 580 | 2/28/2020 | 9/30/2021 |
| Investment Placement #15 | 6,000,000.00 | 7,995,600 | 1,995,600.00 | 33.26% | 20.97% | 579 | 5/31/2020 | 12/31/2021 |
| Investment Placement #16 | 45,000,000.00 | 59,967,000 | 14,967,000.00 | 33.26% | 21.04% | 577 | 7/31/2020 | 2/28/2022 |
| | $ 284,734,517.44 | $ 367,389,372.84 | $ 82,654,855.40 | 29.03% | | | | |

**iCAP EQUITY**

*Calculated Return on Investment (Build Out of Investments)*

| Investments in Projects: | Investment Amount (Based on Cost Basis) | Investment Return | Net Gain/Loss | ROI | Annualized ROI | # of Days | Investment Date | Estimated Payoff Date |
|---|---|---|---|---|---|---|---|---|
| Seattle Modern Living | $ 2,295,238.48 | $ 3,357,647 | $ 1,062,408.06 | 46.29% | 39.75% | 425 | 4/1/2017 | 5/31/2018 |
| Meridian Greens Holdings | 2,908,588.16 | 2,291,054 | (617,533.82) | -21.23% | -23.27% | 333 | 4/1/2017 | 2/28/2018 |
| Ruby 62 Holdings | 2,622,020.38 | 2,455,194 | (166,826.38) | -6.36% | -12.76% | 182 | 4/1/2017 | 9/30/2017 |
| Ent. Ventures II | 662,508.51 | 526,000 | (136,508.51) | -20.60% | -30.95% | 243 | 4/1/2017 | 11/30/2017 |
| Ent. Ventures IV | 610,475.98 | 647,524 | 37,047.73 | 6.07% | 5.21% | 425 | 4/1/2017 | 5/31/2018 |
| Barcelo Madison Park | 1,395,102.59 | 1,643,650 | 248,547.15 | 17.82% | 224.23% | 29 | 4/1/2017 | 4/30/2017 |
| 725 Broadway | 10,078,231.52 | 18,716,982 | 8,638,750.48 | 85.72% | 20.57% | 1521 | 4/1/2017 | 5/31/2021 |
| 9041 48th | 1,350,343.19 | 1,683,360 | 333,016.81 | 24.66% | 11.39% | 790 | 4/1/2017 | 5/31/2019 |
| Lofts @ Camas Meadows I | 1,755,056.77 | 2,419,535 | 664,478.23 | 37.86% | 41.50% | 333 | 4/1/2017 | 2/28/2018 |
| Lofts @ Camas Meadows II | 1,754,471.43 | 2,039,832 | 285,360.57 | 16.26% | 17.83% | 333 | 4/1/2017 | 2/28/2018 |
| TCG Investments | 5,364,738.87 | 10,366,800 | 5,002,061.13 | 93.24% | 58.88% | 578 | 4/1/2017 | 10/31/2018 |
| iCap Delridge Way, LLC | 642,458.01 | 699,900 | 57,441.99 | 8.94% | 13.43% | 243 | 4/1/2017 | 11/30/2017 |
| iCap Finn Hill | 4,119,658.73 | 2,775,497 | (1,344,161.50) | -32.63% | -39.05% | 305 | 4/1/2017 | 1/31/2018 |
| iCap Campbell Way | 1,341,978.48 | 920,000 | (421,978.48) | -31.44% | -127.52% | 90 | 4/1/2017 | 6/30/2017 |
| iCap Rhody Ridge, LLC | 2,484,835.12 | 2,517,049 | 32,213.88 | 1.30% | 0.82% | 578 | 4/1/2017 | 10/31/2018 |
| iCap Lake View | 4,490,517.11 | 8,276,443 | 3,785,926.28 | 84.31% | 53.24% | 578 | 4/1/2017 | 10/31/2018 |
| iCap Rhody Ridge | 3,223,535.82 | 4,712,977 | 1,489,441.11 | 46.21% | 42.80% | 394 | 4/1/2017 | 4/30/2018 |
| iCap Brislawn | 438,864.61 | 853,024 | 414,159.85 | 94.37% | 189.26% | 182 | 4/1/2017 | 9/30/2017 |
| Mercer 36, LLC | 437,967.94 | 437,747 | (220.72) | -0.05% | -0.31% | 60 | 4/1/2017 | 5/31/2017 |
| KBRI6, LLC | 1,228,893.34 | 1,534,055 | 305,161.55 | 24.83% | 49.80% | 182 | 4/1/2017 | 9/30/2017 |
| 23rd & Gilman, LLC | 1,207,102.57 | 747,386 | (459,716.77) | -38.08% | -154.45% | 90 | 4/1/2017 | 6/30/2017 |
| 134th Street, LLC | 5,813,253.65 | 4,902,986 | (910,267.34) | -15.66% | -23.52% | 243 | 4/1/2017 | 11/30/2017 |
| Senza Sammamish, LLC | 4,671,301.50 | 2,950,667 | (1,720,634.66) | -36.83% | -27.66% | 486 | 4/1/2017 | 7/31/2018 |
| iCap Finn Meadows | 3,803,624.28 | 3,225,247 | (578,377.59) | -15.21% | -10.74% | 517 | 5/31/2017 | 8/31/2018 |
| Senza Kenmore, LLC | 2,154,779.05 | 1,689,781 | (464,997.86) | -21.58% | -12.96% | 608 | 12/31/2017 | 7/31/2019 |
| Pearl and Delores | 1,122,870.32 | 1,085,378 | (37,492.24) | -3.34% | -8.02% | 152 | 4/1/2017 | 8/31/2017 |
| Hayden Meadows, LLC | 883,224.30 | 939,484 | 56,259.90 | 6.37% | 10.92% | 213 | 4/1/2017 | 10/31/2017 |
| Lake Union Estates, 878 | 6,696,494.65 | 10,466,878 | 3,770,383.82 | 56.30% | 27.08% | 759 | 4/1/2017 | 4/30/2019 |
| Timberland, LLC | 7,176,382.09 | 3,322,095 | (3,854,287.29) | -53.71% | -64.27% | 305 | 4/1/2017 | 1/31/2018 |
| Investment Placement #1 | 10,000,000.00 | 13,326,000 | 3,326,000.00 | 33.26% | 20.97% | 579 | 4/30/2017 | 11/30/2018 |
| Investment Placement #2 | 5,000,000.00 | 6,663,000 | 1,663,000.00 | 33.26% | 20.97% | 579 | 5/31/2017 | 12/31/2018 |
| Investment Placement #3 | 5,000,000.00 | 6,663,000 | 1,663,000.00 | 33.26% | 21.04% | 577 | 9/30/2017 | 4/30/2019 |
| Investment Placement #4 | 10,000,000.00 | 13,326,000 | 3,326,000.00 | 33.26% | 21.04% | 577 | 12/31/2017 | 7/31/2019 |
| Investment Placement #5 | 15,000,000.00 | 19,989,000 | 4,989,000.00 | 33.26% | 20.97% | 579 | 3/31/2018 | 10/31/2019 |
| Investment Placement #6 | 9,000,000.00 | 11,993,400 | 2,993,400.00 | 33.26% | 20.93% | 580 | 6/30/2018 | 1/31/2020 |
| Investment Placement #7 | 5,000,000.00 | 6,663,000 | 1,663,000.00 | 33.26% | 21.00% | 578 | 9/30/2018 | 4/30/2020 |
| Investment Placement #8 | 23,000,000.00 | 30,649,800 | 7,649,800.00 | 33.26% | 21.00% | 578 | 11/30/2018 | 6/30/2020 |
| Investment Placement #9 | 11,000,000.00 | 14,658,600 | 3,658,600.00 | 33.26% | 21.00% | 578 | 12/31/2018 | 7/31/2020 |
| Investment Placement #10 | 4,000,000.00 | 5,330,400 | 1,330,400.00 | 33.26% | 20.93% | 580 | 3/31/2019 | 10/31/2020 |
| Investment Placement #11 | 10,000,000.00 | 13,326,000 | 3,326,000.00 | 33.26% | 20.93% | 580 | 4/30/2019 | 11/30/2020 |
| Investment Placement #12 | 13,000,000.00 | 17,323,800 | 4,323,800.00 | 33.26% | 21.00% | 578 | 7/31/2019 | 2/28/2021 |
| Investment Placement #13 | 19,000,000.00 | 25,319,400 | 6,319,400.00 | 33.26% | 21.00% | 578 | 11/30/2019 | 6/30/2021 |
| Investment Placement #14 | 12,000,000.00 | 15,991,200 | 3,991,200.00 | 33.26% | 20.93% | 580 | 2/28/2020 | 9/30/2021 |
| Investment Placement #15 | 6,000,000.00 | 7,995,600 | 1,995,600.00 | 33.26% | 20.97% | 579 | 5/31/2020 | 12/31/2021 |
| Investment Placement #16 | 45,000,000.00 | 59,967,000 | 14,967,000.00 | 33.26% | 21.04% | 577 | 7/31/2020 | 2/28/2022 |
| | $ 284,734,517.44 | $ 367,389,372.84 | $ 82,654,855.40 | 29.03% | | | | |

# iCap Pacific NW Opportunity & Income Fund
## Cash Flow Projection & Analysis - Updated 11/8/2016 (Sale of Investments)

| | Actual/Projected Nov. 2016 | Dec. 2016 | Jan. 2017 | Feb. 2017 | Mar. 2017 | Apr. 2017 | May 2017 | Jun. 2017 | Jul. 2017 | Aug. 2017 | Sep. 2017 | Oct. 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance:** | 5,382,109 | 13,093,543 | 13,938,241 | 13,315,998 | 16,938,003 | 18,614,838 | 20,645,811 | 21,076,099 | 21,898,731 | 21,801,362 | 21,778,993 | 24,873,142 |
| **Deductions:** | | | | | | | | | | | | |
| Investor Interest Payments | (462,045) | (462,045) | (462,045) | (462,045) | (462,045) | - | - | - | - | - | - | - |
| Debenture Payments | - | - | - | - | - | - | - | - | - | - | - | - |
| Management Fees | - | - | (231,023) | - | - | - | - | - | - | - | - | - |
| Computer Expenses | - | - | - | - | - | - | - | - | - | - | - | - |
| Dues & Subscriptions | (500) | (500) | (500) | (500) | (500) | - | - | - | - | - | - | - |
| Meals & Entertainment | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | - | - | - | - | - | - | - |
| Rent & Office Expense | (500) | (500) | (500) | (500) | (500) | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | (141,870) | (200,000) | (200,000) | (200,000) | (200,000) | - | - | - | - | - | - | - |
| Salaries and Wages | (35,061) | (25,000) | (25,000) | (25,000) | (25,000) | - | - | - | - | - | - | - |
| **Total Monthly Expenses** | (649,976) | (698,045) | (929,068) | (698,045) | (698,045) | - | - | - | - | - | - | - |
| **AUM Payoffs:** | | | | | | | | | | | | |
| High Country Soundview Manor | (56,145) | (216,667) | - | - | - | - | - | - | - | - | - | - |
| Wild Creek Estates | (68,401) | (2,100,000) | 82,800 | 1,325,500 | 328,308 | - | - | - | - | - | - | - |
| Seattle Modern Living | - | - | - | - | - | - | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 |
| Meridian Greens Holdings | - | - | - | - | 828,000 | - | - | - | - | - | - | - |
| 9041 48th, LLC | (18,750) | (18,750) | (18,750) | (18,750) | (135,417) | (116,667) | (116,667) | (116,667) | (116,667) | (116,667) | - | - |
| Ruby 62 Holdings | - | 900,000 | - | - | - | - | - | - | - | - | - | - |
| TCG Investments | - | - | - | - | - | - | - | - | - | - | 2,455,194 | - |
| 725 Broadway | 690,000 | - | - | - | - | - | - | - | - | - | - | - |
| Steadman 170th | - | - | - | 1,724,799 | - | - | - | - | - | - | - | - |
| Denali Townhomes, LLC | - | - | - | 301,510 | - | - | - | - | - | - | - | - |
| Lyle 113th Ave, LLC | - | - | 124,775 | - | - | - | - | - | - | - | - | - |
| Sampson 45th Ave, LLC | 118,000 | 118,000 | 118,000 | 118,000 | 118,000 | 118,000 | - | - | - | - | - | - |
| Lofts @ Camas Meadows I | 1,650,000 | - | - | - | - | - | - | - | - | - | - | - |
| Columbia Property Mgmt. | - | - | - | - | - | - | - | 920,000 | - | - | - | - |
| Ent. Ventures II | - | - | - | 483,000 | 850,000 | - | - | - | - | - | - | - |
| Ent. Ventures IV | - | - | - | - | - | 1,643,650 | - | - | - | - | - | - |
| Barcelo Madison Park | - | 2,860,160 | - | - | - | - | - | - | - | - | - | - |
| Colpitts Development | 1,650,000 | - | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows II | - | - | - | 385,990 | 385,990 | 385,990 | 385,990 | - | - | - | 385,990 | 385,990 |
| iCap Delridge Way, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Firm Hill | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Campbell Way | 2,034,000 | - | - | - | - | - | - | - | - | - | 92,000 | 184,000 |
| Richland Acquisition I, LLC | - | - | - | - | - | - | - | (141,667) | (141,667) | (66,667) | - | - |
| iCap Rhody Ridge, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total AUM Payoffs** | 8,361,410 | 1,542,743 | 306,825 | 4,320,049 | 2,374,881 | 2,030,973 | 430,288 | 822,631 | (97,369) | (22,369) | 3,094,149 | 730,955 |
| **Ending Cash Balance** | 13,093,543 | 13,938,241 | 13,315,998 | 16,938,003 | 18,614,838 | 20,645,811 | 21,076,099 | 21,898,731 | 21,801,362 | 21,778,993 | 24,873,142 | 25,604,097 |

iCap EQUITY

iCAP EQUITY

**iCap Pacific NW Opportunity & Income Fund**
*Cash Flow Projection & Analysis - Updated 11/8/2016 (Sale of Investm*

| | Nov. 2017 | Dec. 2017 | Jan. 2018 | Feb. 2018 | Mar. 2018 | Apr. 2018 | May. 2018 | Jun. 2018 | Jul. 2018 | Aug. 2018 | Sep. 2018 | Oct. 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance: | 25,604,097 | 27,125,321 | 27,286,286 | 28,268,430 | 30,864,199 | 31,312,664 | 32,367,532 | 33,834,720 | 34,122,220 | 34,409,720 | 34,697,220 | 34,735,832 |
| **Deductions:** | | | | | | | | | | | | |
| Investor Interest Payments | - | - | - | - | - | - | - | - | - | - | - | - |
| Debenture Payments | - | - | - | - | - | - | - | - | - | - | - | - |
| Management Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| Computer Expenses | - | - | - | - | - | - | - | - | - | - | - | - |
| Dues & Subscriptions | - | - | - | - | - | - | - | - | - | - | - | - |
| Meals & Entertainment | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| Rent & Office Expense | - | - | - | - | - | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | - | - | - | - | - | - | - | - | - | - | - | - |
| Salaries and Wages | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Monthly Expenses | - | - | - | - | - | - | - | - | - | - | - | - |
| **AUM Payoffs:** | | | | | | | | | | | | |
| High Country Soundview Manor | | | | | | | | | | | | |
| Wild Creek Estates | | | | | | | | | | | | |
| Seattle Modern Living | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | | | | | | | |
| Meridian Greens Holdings | | | | 2,291,054 | | | | | | | | |
| 9041 48th, LLC | | | | | | | | | | | | |
| Ruby 62 Holdings | | | | | | | | | | | | |
| TCG Investments | | | 821,179 | | | | | | | | | |
| 725 Broadway | | | | | | | | | | | | |
| Steadman 170th | | | | | | | | | | | | |
| Denali Townhomes, LLC | | | | | | | | | | | | |
| Lyle 113th Ave, LLC | | | | | | | | | | | | |
| Sampson 45th Ave, LLC | | | | | | | | | | | | |
| Lofts @ Camas Meadows I | | | | | | 767,368 | | | | | | |
| Columbia Property Mgmt. | | | | | | | | | | | | |
| Ent. Ventures II | | | | | | | | | | | | |
| Ent. Ventures IV | 526,000 | | | | | | | | | | | |
| Barcelo Madison Park | | | | | | | | | | | | |
| Colpitts Development | | | | | | | | | | | | |
| Lofts @ Camas Meadows II | | | | | | | 819,664 | | | | | |
| iCap Delridge Way, LLC | 423,900 | | | | | | | | | | | |
| iCap Firm Hill | 410,359 | | | | | | | | | | | |
| iCap Campbell Way | | | | | | | | | | | | |
| Richland Acquisition I, LLC | | | | | | | 647,524 | | | | | |
| iCap Rhody Ridge, LLC | | | | 143,750 | 287,500 | 287,500 | | 287,500 | 287,500 | 287,500 | 38,612 | 897,187 |
| Total AUM Payoffs | 1,521,224 | 160,965 | 982,144 | 2,595,769 | 448,465 | 1,054,868 | 1,467,187 | 287,500 | 287,500 | 287,500 | 38,612 | 897,187 |
| Ending Cash Balance | 27,125,321 | 27,286,286 | 28,268,430 | 30,864,199 | 31,312,664 | 32,367,532 | 33,834,720 | 34,122,220 | 34,409,720 | 34,697,220 | 34,735,832 | 35,633,019 |



**iCAP EQUITY**

*iCap Pacific NW Opportunity & Income Fund*
*Cash Flow Projection & Analysis - Updated 11/8/2016 (Sale of Investm...*

| | Nov. 2018 | Dec. 2018 | Jan. 2019 | Feb. 2019 | Mar. 2019 | Apr. 2019 | May. 2019 | Jun. 2019 |
|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance: | 35,633,019 | 35,633,019 | 35,633,019 | 35,633,019 | 35,633,019 | 35,633,019 | 35,633,019 | 35,633,019 |
| Deductions: | | | | | | | | |
| Investor Interest Payments | - | - | - | - | - | - | - | - |
| Debenture Payments | - | - | - | - | - | - | - | - |
| Management Fees | - | - | - | - | - | - | - | - |
| Computer Expenses | - | - | - | - | - | - | - | - |
| Dues & Subscriptions | - | - | - | - | - | - | - | - |
| Meals & Entertainment | - | - | - | - | - | - | - | - |
| Professional Fees | - | - | - | - | - | - | - | - |
| Rent & Office Expense | - | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | - | - | - | - | - | - | - | - |
| Salaries and Wages | - | - | - | - | - | - | - | - |
| Total Monthly Expenses | - | - | - | - | - | - | - | - |
| | | | | | | | | |
| AUM Payoffs: | | | | | | | | |
| High Country Soundview Manor | - | - | - | - | - | - | - | - |
| Wild Creek Estates | - | - | - | - | - | - | - | - |
| Seattle Modern Living | - | - | - | - | - | - | - | - |
| Meridian Greens Holdings | - | - | - | - | - | - | - | - |
| 9041 48th, LLC | - | - | - | - | - | - | - | - |
| Ruby 62 Holdings | - | - | - | - | - | - | - | - |
| TCG Investments | - | - | - | - | - | - | - | - |
| 725 Broadway | - | - | - | - | - | - | - | - |
| Steadman 170th | - | - | - | - | - | - | - | - |
| Denali Townhomes, LLC | - | - | - | - | - | - | - | - |
| Lyle 113th Ave, LLC | - | - | - | - | - | - | - | - |
| Sampson 45th Ave, LLC | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows I | - | - | - | - | - | - | - | - |
| Columbia Property Mgmt. | - | - | - | - | - | - | - | - |
| Ent. Ventures II | - | - | - | - | - | - | - | - |
| Ent. Ventures IV | - | - | - | - | - | - | - | - |
| Barcelo Madison Park | - | - | - | - | - | - | - | - |
| Coljatts Development | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows II | - | - | - | - | - | - | - | - |
| iCap Delridge Way, LLC | - | - | - | - | - | - | - | - |
| iCap Firm Hill | - | - | - | - | - | - | - | - |
| iCap Campbell Way | - | - | - | - | - | - | - | - |
| Richland Acquisition I, LLC | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge, LLC | - | - | - | - | - | - | - | - |
| Total AUM Payoffs | - | - | - | - | - | - | - | - |
| | | | | | | | | |
| Ending Cash Balance | 35,633,019 | 35,633,019 | 35,633,019 | 35,633,019 | 35,633,019 | 35,633,019 | 35,633,019 | 35,633,019 |

iCAP EQUITY

**iCap Pacific NW Opportunity & Income Fund**
Cash Flow Projection & Analysis - Updated 11/8/2016 (Build Out of Investments)

| | Actual/Projected Nov. 2016 | Dec. 2016 | Jan. 2017 | Feb. 2017 | Mar. 2017 | Apr. 2017 | May. 2017 | Jun. 2017 | Jul. 2017 | Aug. 2017 | Sep. 2017 | Oct. 2017 | Nov. 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance: | 5,382,109 | 9,793,543 | 9,738,241 | 9,111,831 | 11,004,869 | 11,849,538 | 9,876,344 | 10,302,465 | 2,741,024 | 2,639,489 | 2,612,953 | 5,702,935 | 6,429,723 |
| **Deductions:** | | | | | | | | | | | | | |
| Investor Interest Payments | (462,045) | (462,045) | (462,045) | (462,045) | (462,045) | - | - | - | - | - | - | - | - |
| Debenture Payments | - | - | (231,023) | - | - | - | - | - | - | - | - | - | - |
| Management Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Computer Expenses | (500) | (500) | (500) | (500) | (500) | - | - | - | - | - | - | - | - |
| Dues & Subscriptions | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Meals & Entertainment | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | - | - | - | - | - | - | - | - |
| Professional Fees | (500) | (500) | (500) | (500) | (500) | - | - | - | - | - | - | - | - |
| Rent & Office Expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | (141,870) | (200,000) | (200,000) | (200,000) | (200,000) | - | - | - | - | - | - | - | - |
| Salaries and Wages | (35,061) | (25,000) | (25,000) | (25,000) | (25,000) | - | - | - | - | - | - | - | - |
| **Total Monthly Expenses** | (649,976) | (698,045) | (929,068) | (698,045) | (698,045) | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | |
| **AUM Payoffs:** | | | | | | | | | | | | | |
| High Country Soundview Manor | (56,145) | (216,667) | - | - | - | - | - | - | - | - | - | - | - |
| Wild Creek Estates | (68,401) | (2,100,000) | - | - | - | - | - | - | - | - | - | - | - |
| Seattle Modern Living | - | - | 82,800 | 1,325,500 | 328,308 | - | - | - | - | - | - | - | - |
| Meridian Greens Holdings | - | - | - | - | - | - | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 | 160,965 |
| 9041 48th, LLC | (18,750) | - | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) | (4,167) |
| Ruby 62 Holdings | (18,750) | (18,750) | (18,750) | (18,750) | - | (116,667) | (116,667) | (116,667) | (116,667) | (116,667) | - | - | - |
| TCG Investments | - | - | - | - | (135,417) | (4,000,000) | - | (8,379,905) | - | - | 2,455,194 | - | - |
| 725 Broadway | 690,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| Steadman 170th | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Denali Townhomes, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lyle 113th Ave, LLC | - | - | 124,775 | 301,510 | - | - | - | - | - | - | - | - | - |
| Sampson 45th Ave, LLC | 118,000 | 118,000 | 118,000 | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows I | - | - | - | 118,000 | 118,000 | 118,000 | - | - | - | - | - | - | - |
| Columbia Property Mgmt. | - | - | - | 483,000 | 850,000 | - | - | 920,000 | - | - | - | - | - |
| Ent. Ventures II | - | - | - | - | - | 1,643,650 | - | - | - | - | - | - | - |
| Ent. Ventures IV | 2,860,160 | - | - | - | - | - | - | - | - | - | - | - | 526,000 |
| Barcelo Madison Park | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Colpitts Development | - | 2,860,160 | - | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows II | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Deltridge Way, LLC | - | - | - | 385,990 | 385,990 | 385,990 | 385,990 | - | - | - | 385,990 | 385,990 | - |
| iCap Finn Hill | - | - | - | - | - | - | - | (141,667) | (141,667) | (66,667) | - | - | - |
| iCap Campbell Way | - | - | - | - | - | - | - | - | - | - | 92,000 | 184,000 | 423,900 |
| Richland Acquisition 1 LLC | 2,034,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge, LLC | - | - | - | - | - | - | - | - | - | - | - | - | 410,359 |
| **Total AUM Payoffs** | 5,061,410 | 642,743 | 302,658 | 2,591,083 | 1,542,714 | (1,973,194) | 426,121 | (7,561,441) | (101,536) | (26,536) | 3,089,982 | 726,788 | 1,517,057 |
| | | | | | | | | | | | | | |
| Ending Cash Balance | 9,793,543 | 9,738,241 | 9,111,831 | 11,004,869 | 11,849,538 | 9,876,344 | 10,302,465 | 2,741,024 | 2,639,489 | 2,612,953 | 5,702,935 | 6,429,723 | 7,946,780 |

Exhibit 1, Page 593

iCap Pacific NW Opportunity & Income Fund
Cash Flow Projection & Analysis - Updated 11/8/2016 (Build Out of Inv...

| | Dec. 2017 | Jan. 2018 | Feb. 2018 | Mar. 2018 | Apr. 2018 | May. 2018 | Jun. 2018 | Jul. 2018 | Aug. 2018 | Sep. 2018 | Oct. 2018 | Nov. 2018 | Dec. 2018 | Jan. 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance: | 7,946,760 | 8,103,578 | 9,085,722 | 16,140,858 | 16,589,323 | 17,644,191 | 19,111,378 | 19,398,878 | 19,686,378 | 19,973,878 | 20,012,490 | 31,276,477 | 31,276,477 | 31,276,477 |
| Deductions: | | | | | | | | | | | | | | |
| Investor Interest Payments | | | | | | | | | | | | | | |
| Debenture Payments | | | | | | | | | | | | | | |
| Management Fees | | | | | | | | | | | | | | |
| Computer Expenses | | | | | | | | | | | | | | |
| Dues & Subscriptions | | | | | | | | | | | | | | |
| Meals & Entertainment | | | | | | | | | | | | | | |
| Professional Fees | | | | | | | | | | | | | | |
| Rent & Office Expense | | | | | | | | | | | | | | |
| Project Costs (Draws, Loans, etc) | | | | | | | | | | | | | | |
| Salaries and Wages | | | | | | | | | | | | | | |
| Total Monthly Expenses | | | | | | | | | | | | | | |
| AUM Payoffs: | | | | | | | | | | | | | | |
| High Country Soundview Manor | | | | | | | | | | | | | | |
| Wild Creek Estates | | | | | | | | | | | | | | |
| Seattle Modern Living | 160,965 | 160,965 | 160,965 | 160,965 | | | | | | | | | | |
| Meridian Greens Holdings | | | 2,291,054 | | 767,368 | 819,664 | | | | | | | | |
| 9041 48th, LLC | (4,167) | | | | | | | | | | | | | 264,808 |
| Ruby42 Holdings | | | | | | | | | | | | | | |
| TCG Investments | | | | | | | | | | | 10,366,800 | | | |
| 72S Broadway | | | | | | | | | | | | | | |
| Steadman 170th | | | | | | | | | | | | | | |
| Denali Townhomes, LLC | | | | | | | | | | | | | | |
| Lyle 113th Ave, LLC | | | 2,419,535 | | | | | | | | | | | |
| Sampson 45th Ave, LLC | | | | | | | | | | | | | | |
| Lofts @ Camas Meadows I | | | | | | | | | | | | | | |
| Columbia Property Mgmt. | | | | | | | | | | | | | | |
| Ent. Ventures II | | | | | | | | | | | | | | |
| Ent. Ventures IV | | | | | | 647,524 | | | | | | | | |
| Barcelo Madison Park | | | | | | | | | | | | | | |
| Colpitts Development | | | | | | | | | | | | | | |
| Lofts @ Camas Meadows II | | | 2,039,832 | | | | | | | | | | | |
| iCap Delridge Way, LLC | | | | | | | | | | | | | | |
| iCap Finn Hill | | 821,179 | | | | | | | | | | | | |
| iCap Campbell Way | | | 143,750 | 287,500 | 287,500 | | 287,500 | 287,500 | 287,500 | | | | | |
| Richland Acquisition I, LLC | | | | | | | | | | 38,612 | | | | |
| iCap Rhody Ridge, LLC | | | | | | | | | | | 897,187 | | | |
| Total AUM Payoffs | 156,798 | 982,144 | 7,055,136 | 448,465 | 1,054,868 | 1,467,187 | 287,500 | 287,500 | 287,500 | 38,612 | 11,263,987 | | | 264,808 |
| Ending Cash Balance | 8,103,578 | 9,085,722 | 16,140,858 | 16,589,323 | 17,644,191 | 19,111,378 | 19,398,878 | 19,686,378 | 19,973,878 | 20,012,490 | 31,276,477 | 31,276,477 | 31,276,477 | 31,541,285 |

**iCap Pacific NW Opportunity & Income Fund**
*Cash Flow Projection & Analysis - Updated 11/8/2016 (Build Out of Inv*

| | Feb. 2019 | Mar. 2019 | Apr. 2019 | May. 2019 | Jun. 2019 | July 2019 | Aug. 2019 | Sept. 2019 | Oct. 2019 | Nov. 2019 | Dec. 2019 | Jan. 2020 | Feb. 2020 | Mar. 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance: | 31,541,285 | 31,806,093 | 32,070,901 | 32,335,709 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 |
| **Deductions:** | | | | | | | | | | | | | | |
| Investor Interest Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debenture Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Management Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Computer Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dues & Subscriptions | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Meals & Entertainment | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rent & Office Expense | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Salaries and Wages | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Monthly Expenses | | | | | | | | | | | | | | |
| **AUM Payoffs:** | | | | | | | | | | | | | | |
| High Country Soundview Manor | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wild Creek Estates | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Seattle Modern Living | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Meridian Greens Holdings | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 9041 48th, LLC | 264,808 | 264,808 | 264,808 | 624,128 | - | - | - | - | - | - | - | - | - | - |
| Ruby 62 Holdings | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TCG Investments | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 725 Broadway | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Steadman 170th | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Denali Townhomes, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lyle 113th Ave, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sampson 45th Ave, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows I | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Columbia Property Mgmt. | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures II | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures IV | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Barcelo Madison Park | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Colpitts Development | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows II | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Delridge Way, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Finn Hill | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Campbell Way | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Richland Acquisition I, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total AUM Payoffs | 264,808 | 264,808 | 264,808 | 624,128 | | | | | | | | | | |
| Ending Cash Balance | 31,806,093 | 32,070,901 | 32,335,709 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 |

iCAP EQUITY

| | Apr. 2020 | May. 2019 | Jun. 2020 | July 2020 | Aug. 2020 | Sept. 2020 | Oct. 2020 | Nov. 2020 | Dec. 2020 | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance:** | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 |
| **Deductions:** | | | | | | | | | | | | | |
| Investor Interest Payments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debenture Payments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Management Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Computer Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Dues & Subscriptions | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Meals & Entertainment | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rent & Office Expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Salaries and Wages | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Monthly Expenses** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **AUM Payoffs:** | | | | | | | | | | | | | |
| High Country Soundview Manor | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wild Creek Estates | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Seattle Modern Living | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Meridian Greens Holdings | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 9041 48th, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ruby 62 Holdings | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TCG Investments | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 725 Broadway | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Steadman 170th | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Denali Townhomes, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lyle 113th Ave, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sampson 45th Ave, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows I | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Columbia Property Mgmt. | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures II | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures IV | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Barcelo Madison Park | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Colpitts Development | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows II | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Delridge Way, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Finn Hill | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Campbell Way | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Richland Acquisition I, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total AUM Payoffs** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance** | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 | 32,959,837 |

Exhibit 1, Page 596

# iCAP EQUITY

**iCap Pacific NW Opportunity & Income Fund**
*Cash Flow Projection & Analysis - Updated 11/8/2016 (Build Out of Inv...)*

| | May 2021 | Jun. 2021 | July 2021 | Aug. 2021 | Sept. 2021 | Oct. 2021 | Nov. 2021 | Dec. 2021 | Jan. 2022 | Feb. 2022 | Mar. 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance: | 32,959,837 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 |
| Deductions: | | | | | | | | | | | |
| Investor Interest Payments | - | - | - | - | - | - | - | - | - | - | - |
| Debenture Payments | - | - | - | - | - | - | - | - | - | - | - |
| Management Fees | - | - | - | - | - | - | - | - | - | - | - |
| Computer Expenses | - | - | - | - | - | - | - | - | - | - | - |
| Dues & Subcriptions | - | - | - | - | - | - | - | - | - | - | - |
| Meals & Entertainment | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | - | - | - | - | - | - | - | - | - | - | - |
| Rent & Office Expense | - | - | - | - | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | - | - | - | - | - | - | - | - | - | - | - |
| Salaries and Wages | - | - | - | - | - | - | - | - | - | - | - |
| Total Monthly Expenses | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| AUM Payoffs: | | | | | | | | | | | |
| High Country Soundview Manor | - | - | - | - | - | - | - | - | - | - | - |
| Wild Creek Estates | - | - | - | - | - | - | - | - | - | - | - |
| Seattle Modern Living | - | - | - | - | - | - | - | - | - | - | - |
| Meridian Greens Holdings | - | - | - | - | - | - | - | - | - | - | - |
| 9041 48th, LLC | - | - | - | - | - | - | - | - | - | - | - |
| Ruby 62 Holdings | - | - | - | - | - | - | - | - | - | - | - |
| TCG Investments | 18,716,982 | - | - | - | - | - | - | - | - | - | - |
| 725 Broadway | - | - | - | - | - | - | - | - | - | - | - |
| Steadman 170th | - | - | - | - | - | - | - | - | - | - | - |
| Denali Townhomes, LLC | - | - | - | - | - | - | - | - | - | - | - |
| Lyle 113th Ave, LLC | - | - | - | - | - | - | - | - | - | - | - |
| Sampson 45th Ave, LLC | - | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows I | - | - | - | - | - | - | - | - | - | - | - |
| Columbia Property Mgmt. | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures II | - | - | - | - | - | - | - | - | - | - | - |
| Ent. Ventures IV | - | - | - | - | - | - | - | - | - | - | - |
| Barcelo Madison Park | - | - | - | - | - | - | - | - | - | - | - |
| Colpitts Development | - | - | - | - | - | - | - | - | - | - | - |
| Lofts @ Camas Meadows II | - | - | - | - | - | - | - | - | - | - | - |
| iCap Delridge Way, LLC | - | - | - | - | - | - | - | - | - | - | - |
| iCap Finn Hill | - | - | - | - | - | - | - | - | - | - | - |
| iCap Campbell Way | - | - | - | - | - | - | - | - | - | - | - |
| Richland Acquisition I, LLC | - | - | - | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge, LLC | - | - | - | - | - | - | - | - | - | - | - |
| Total AUM Payoffs | 18,716,982 | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| Ending Cash Balance | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 | 51,676,819 |

# iCAP EQUITY

**iCap Northwest Opportunity Fund**
*Cash Flow Projection & Analysis - Updated 11/7/2016 (Sale of Investments)*

| | Nov. 2016 | Dec. 2016 | Jan. 2017 | Feb. 2017 | Mar. 2017 | Apr. 2017 | May. 2017 | Jun. 2017 | Jul. 2017 | Aug. 2017 | Sep. 2017 | Oct. 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance:** | 3,791,793 | 3,389,435 | 2,981,484 | 6,736,761 | 10,473,297 | 11,341,753 | 11,113,607 | 11,474,044 | 11,655,228 | 11,784,507 | 15,077,142 | 17,206,579 |
| **Deductions:** | | | | | | | | | | | | |
| Investor Interest Payments | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) |
| Debenture Payments | | | | | | | | | | | | |
| Management Fees | (14,593) | (3,879) | (168,733) | (7,047) | (2,203) | (216,502) | | | (217,855) | | | (217,855) |
| Computer Expenses | | | | | | | | | | | | |
| Dues & Subscriptions | | | | | | | | | | | | |
| Meals & Entertainment | | | | | | | | | | | | |
| Professional Fees | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (40,000) | (5,000) | (5,000) | (5,000) |
| Rent & Office Expense | | | | | | | | | | | | |
| Project Costs (Draws, Loans, etc) | | | | | | | | | | | | |
| Salaries and Wages | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| **Total Monthly Expenses** | (435,875) | (425,161) | (590,015) | (428,329) | (423,485) | (637,784) | (421,282) | (421,282) | (674,137) | (421,282) | (421,282) | (639,137) |
| **AUM Payoffs:** | | | | | | | | | | | | |
| iCap Lake View | | | | | | | | | | 1,317,481 | 439,160 | 439,160 |
| iCap Rhody Ridge | | | | | | | | | | 1,347,869 | 449,290 | 449,290 |
| iCap Brislawn | | | | | | | | | 220,833 | 220,833 | 411,358 | |
| iCap Northcreek | | | 1,931,605 | | | | | | | | | |
| Mercer 36, LLC | | | | | | 115,000 | 322,747 | | | | | |
| KBRi6, LLC | | | | | | | | | 266,800 | 266,800 | 1,000,455 | |
| 313 Prospect Street | | | 489,956 | | | | | | | | | |
| 76th Ave SE Partners, LLC | | | | 751,522 | 798,528 | | | | | | | |
| Seward Park Partners, LLC | | | | 214,632 | 214,632 | 214,632 | 214,632 | | | | | |
| 23rd & Gilman, LLC | | | | | | | | 318,122 | | | | |
| 134th Street, LLC | | | | | | | | | | | | |
| Senza Sammamish, LLC | | | 553,477 | | | | | | | | | |
| Belvidere Investors, LLC | | | 1,330,252 | | | | | | | | | |
| Colpitts Sunset, LLC | | | | | | | | | | | | |
| iCap Finn Meadows | | | | | | | | | | | | |
| Senza Kenmore, LLC | | | | | | | | | | | | |
| Pearl and Delores | | | | | | | | | | | | |
| iCap Finn Hill, LLC | | | | 385,990 | 278,781 | | 164,335 | 164,335 | 275,780 | 480,928 | | |
| Hayden Meadows, LLC | 33,517 | 17,210 | 40,003 | 80,006 | | 80,006 | 80,006 | 120,008 | 40,003 | 80,006 | 250,456 | 289,000 |
| Lake Union Estates, LLC | | | | 2,732,716 | | | | | | | | |
| Timberland, LLC | | | | | | | | | | | | |
| **Total AUM Payoffs** | 33,517 | 17,210 | 4,345,292 | 4,164,865 | 1,291,942 | 409,637 | 781,720 | 602,466 | 803,416 | 3,713,917 | 2,550,719 | 1,177,450 |
| **Ending Cash Balance** | 3,389,435 | 2,981,484 | 6,736,761 | 10,473,297 | 11,341,753 | 11,113,607 | 11,474,044 | 11,655,228 | 11,784,507 | 15,077,142 | 17,206,579 | 17,744,892 |

Exhibit 1, Page 598

**iCAP EQUITY**

**iCap Northwest Opportunity Fund**
*Cash Flow Projection & Analysis - Updated 11/7/2016 (Sale of Investr...*

| | Nov. 2017 | Dec. 2017 | Jan. 2018 | Feb. 2018 | Mar. 2018 | Apr. 2018 | May 2018 | Jun. 2018 | Jul. 2018 | Aug. 2018 | Sep. 2018 | Oct. 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance: | 17,744,892 | 22,226,596 | 23,582,214 | 27,153,621 | 26,932,248 | 28,687,684 | 29,544,479 | 30,785,452 | 34,038,298 | 37,628,145 | 38,875,234 | 38,453,952 |
| **Deductions:** | | | | | | | | | | | | |
| Investor Interest Payments | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) |
| Debenture Payments | - | - | - | - | - | - | - | - | - | - | - | - |
| Management Fees | - | (217,855) | (217,855) | - | - | (217,855) | - | - | (217,855) | - | - | (217,855) |
| Computer Expenses | - | - | - | - | - | - | - | - | - | - | - | - |
| Dues & Subscriptions | - | - | - | - | - | - | - | - | - | - | - | - |
| Meals & Entertainment | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| Rent & Office Expense | - | - | - | - | - | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | - | - | - | - | - | - | - | - | - | - | - | - |
| Salaries and Wages | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| **Total Monthly Expenses** | (421,282) | (639,137) | (639,137) | (421,282) | (421,282) | (639,137) | (421,282) | (421,282) | (639,137) | (421,282) | (421,282) | (639,137) |
| **AUM Payoffs:** | | | | | | | | | | | | |
| iCap Lake View | - | 878,320 | 439,160 | - | 878,320 | 439,160 | - | - | - | - | - | - |
| iCap Rhody Ridge | - | 898,579 | 449,290 | - | 898,579 | 220,080 | - | - | - | - | - | - |
| iCap Brislawn | - | - | - | - | - | - | - | 1,781,085 | 1,664,596 | - | - | - |
| iCap Northcreek | - | - | - | - | - | - | - | - | - | - | - | - |
| Mercer 36, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| K8R6, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| 313 Prospect Street | - | - | - | - | - | - | - | - | - | - | - | - |
| 76th Ave SE Partners, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| Seward Park Partners, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| 23rd & Gilman, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| 134th Street, LLC | 4,902,986 | - | - | - | - | - | - | - | - | - | - | - |
| Senza Sammamish, LLC | - | - | - | 199,909 | 399,818 | 399,818 | 399,818 | 630,606 | 920,700 | - | - | - |
| Belvidere Investors, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| Colpitts Sunset, LLC | - | - | - | - | - | 436,875 | 436,875 | 436,875 | 436,875 | - | - | - |
| iCap Finn Meadows | - | - | - | - | - | - | - | - | 381,250 | 1,477,747 | - | - |
| Senza Kenmore, LLC | - | - | - | - | - | - | - | - | - | 190,625 | - | - |
| Pearl and Delores | - | - | - | - | - | - | - | - | 825,563 | - | - | - |
| iCap Finn Hill, LLC | - | - | - | - | - | - | - | - | - | - | - | 381,250 |
| Hayden Meadows, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| Lake Union Estates, LLC | - | - | - | - | - | - | 825,563 | 825,563 | - | - | - | - |
| Timberland, LLC | - | - | 3,322,095 | - | - | - | - | - | - | - | - | - |
| **Total AUM Payoffs** | 4,902,986 | 1,776,900 | 4,210,545 | 199,909 | 2,176,717 | 1,495,933 | 1,662,255 | 3,674,128 | 4,228,984 | 1,668,372 | - | 381,250 |
| **Ending Cash Balance** | 22,226,596 | 23,582,214 | 27,153,621 | 26,932,248 | 28,687,684 | 29,544,479 | 30,785,452 | 34,038,298 | 37,628,145 | 38,875,234 | 38,453,952 | 38,196,065 |



**iCap Northwest Opportunity Fund**
*Cash Flow Projection & Analysis - Updated 11/7/2016  [Sale of Investr]*

| | Nov. 2018 | Dec. 2018 | Jan. 2019 | Feb. 2019 | Mar. 2019 | Apr. 2019 | May. 2019 | Jun. 2019 |
|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance:** | 38,196,065 | 39,337,002 | 39,741,282 | 40,566,845 | 41,392,407 | 43,499,598 | 46,080,348 | 46,080,348 |
| **Deductions:** | | | | | | | | |
| Investor Interest Payments | (391,282) | (391,282) | - | - | - | - | - | - |
| Debenture Payments | - | - | - | - | - | - | - | - |
| Management Fees | - | - | - | - | - | - | - | - |
| Computer Expenses | - | - | - | - | - | - | - | - |
| Dues & Subscriptions | - | - | - | - | - | - | - | - |
| Meals & Entertainment | - | - | - | - | - | - | - | - |
| Professional Fees | (5,000) | (5,000) | - | - | - | - | - | - |
| Rent & Office Expense | - | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | - | - | - | - | - | - | - | - |
| Salaries and Wages | (25,000) | (25,000) | - | - | - | - | - | - |
| **Total Monthly Expenses** | (421,282) | (421,282) | - | - | - | - | - | - |
| | | | | | | | | |
| **AUM Payoffs:** | | | | | | | | |
| iCap Lake View | | | | | | | | |
| iCap Rhody Ridge | | | | | | | | |
| iCap Brislawn | | | | | | | | |
| iCap Northcreek | | | | | | | | |
| Mercer 36, LLC | | | | | | | | |
| K8Ri6, LLC | | | | | | | | |
| 313 Prospect Street | | | | | | | | |
| 76th Ave SE Partners, LLC | | | | | | | | |
| Seward Park Partners, LLC | | | | | | | | |
| 23rd & Gilman, LLC | | | | | | | | |
| 134th Street, LLC | | | | | | | | |
| Senza Sammamish, LLC | | | | | | | | |
| Belvidere Investors, LLC | | | | | | | | |
| Colpitts Sunset, LLC | | | | | | | | |
| iCap Finn Meadows | 736,656 | | | | | | | |
| Senza Kenmore, LLC | | | | | | | | |
| Pearl and Delores | | | | | | | | |
| iCap Finn Hill, LLC | 825,563 | 825,563 | 825,563 | 825,563 | | | | |
| Hayden Meadows, LLC | | | | | 2,107,191 | | | |
| Lake Union Estates, LLC | | | | | | 2,580,750 | | |
| Timberland, LLC | | | | | | | | |
| **Total AUM Payoffs** | 1,562,219 | 825,563 | 825,563 | 825,563 | 2,107,191 | 2,580,750 | - | - |
| **Ending Cash Balance** | 39,337,002 | 39,741,282 | 40,566,845 | 41,392,407 | 43,499,598 | 46,080,348 | 46,080,348 | 46,080,348 |

# iCAP EQUITY

**iCap Northwest Opportunity Fund**
*Cash Flow Projection & Analysis - Updated 11/7/2016 - Build Out of Investments*

| | Nov. 2016 | Dec. 2016 | Jan. 2017 | Feb. 2017 | Mar. 2017 | Apr. 2017 | May. 2017 | Jun. 2017 | Jul. 2017 | Aug. 2017 | Sep. 2017 | Oct. 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance: | 3,791,793 | 3,389,435 | 2,981,484 | 6,736,761 | 10,473,297 | 11,341,753 | 11,113,607 | 11,474,044 | 11,655,228 | 11,784,507 | 15,077,142 | 17,206,579 |
| Deductions: | | | | | | | | | | | | |
| Investor Interest Payments | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) |
| Debenture Payments | - | - | (168,733) | - | - | (216,502) | - | - | (217,855) | - | - | (217,855) |
| Management Fees | (14,593) | (3,879) | - | (7,047) | (2,203) | - | - | - | - | - | - | - |
| Computer Expenses | - | - | - | - | - | - | - | - | - | - | - | - |
| Dues & Subscriptions | - | - | - | - | - | - | - | - | - | - | - | - |
| Meals & Entertainment | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (40,000) | (5,000) | (5,000) | (5,000) |
| Rent & Office Expense | - | - | - | - | - | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | - | - | - | - | - | - | - | - | - | - | - | - |
| Salaries and Wages | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| Total Monthly Expenses | (435,875) | (425,161) | (590,015) | (428,329) | (423,485) | (637,784) | (421,282) | (421,282) | (674,137) | (421,282) | (421,282) | (639,137) |
| | | | | | | | | | | | | |
| AUM Payoffs: | | | | | | | | | | | | |
| iCap Lake View | - | - | - | - | - | - | - | - | - | 1,317,481 | 439,160 | 439,160 |
| iCap Rhody Ridge | - | - | - | - | - | - | - | - | - | 1,347,869 | 449,290 | 449,290 |
| iCap Brislawn | - | - | - | - | - | - | - | - | 220,833 | 220,833 | 411,358 | - |
| iCap Northcreek | - | - | 1,931,605 | - | - | - | - | - | - | - | - | - |
| Mercer 36, LLC | - | - | - | - | - | 115,000 | 322,747 | - | - | - | - | - |
| KBRi6, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| 313 Prospect Street | - | - | 489,956 | - | - | - | - | - | 266,800 | 266,800 | 1,000,455 | - |
| 76th Ave SE Partners, LLC | - | - | - | - | 798,528 | - | - | - | - | - | - | - |
| Seward Park Partners, LLC | - | - | - | 751,522 | - | - | - | - | - | - | - | - |
| 23rd & Gilman, LLC | - | - | - | 214,632 | 214,632 | 214,632 | 214,632 | 318,122 | - | - | - | - |
| 134th Street, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| Senza Sammamish, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| Belvidere Investors, LLC | - | - | 553,477 | - | - | - | - | - | - | - | - | - |
| Colpitts Sunset, LLC | - | - | 1,330,252 | - | - | - | - | - | - | - | - | - |
| iCap Finn Meadows | - | - | - | - | - | - | - | - | - | - | - | - |
| Senza Kenmore, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| Pearl and Delores | - | - | - | 385,990 | 278,781 | - | 164,335 | 164,335 | 275,780 | 480,928 | - | - |
| iCap Finn Hill, LLC | 33,517 | 17,210 | - | - | - | - | - | 120,008 | - | - | - | - |
| Hayden Meadows, LLC | - | - | 40,003 | 80,006 | - | 80,006 | 80,006 | - | 40,003 | 80,006 | 250,456 | 289,000 |
| Lake Union Estates, LLC | - | - | - | 2,732,716 | - | - | - | - | - | - | - | - |
| Timberland, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| Total AUM Payoffs | 33,517 | 17,210 | 4,345,292 | 4,164,865 | 1,291,942 | 409,637 | 781,720 | 602,466 | 803,416 | 3,713,917 | 2,550,719 | 1,177,450 |
| Ending Cash Balance | 3,389,435 | 2,981,484 | 6,736,761 | 10,473,297 | 11,341,753 | 11,113,607 | 11,474,044 | 11,655,228 | 11,784,507 | 15,077,142 | 17,206,579 | 17,744,892 |

Exhibit 1, Page 601

## iCAP EQUITY

**iCap Northwest Opportunity Fund**
*Cash Flow Projection & Analysis - Updated 11/7/2016 - Build Out of In*

| | Nov. 2017 | Dec. 2017 | Jan. 2018 | Feb. 2018 | Mar. 2018 | Apr. 2018 | May. 2018 | Jun. 2018 | Jul. 2018 | Aug. 2018 | Sep. 2018 | Oct. 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance:** | 17,744,892 | 22,226,596 | 23,582,214 | 27,153,621 | 26,932,248 | 28,687,684 | 29,544,479 | 30,785,452 | 34,038,298 | 37,628,145 | 38,875,234 | 38,453,952 |
| **Deductions:** | | | | | | | | | | | | |
| Investor Interest Payments | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) | (391,282) |
| Debenture Payments | - | - | - | - | - | - | - | - | - | - | - | - |
| Management Fees | - | - | (217,855) | - | - | (217,855) | - | - | (217,855) | - | - | (217,855) |
| Computer Expenses | - | - | - | - | - | - | - | - | - | - | - | - |
| Dues & Subscriptions | - | - | - | - | - | - | - | - | - | - | - | - |
| Meals & Entertainment | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| Rent & Office Expense | - | - | - | - | - | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | - | - | - | - | - | - | - | - | - | - | - | - |
| Salaries and Wages | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| **Total Monthly Expenses** | (421,282) | (421,282) | (639,137) | (421,282) | (421,282) | (639,137) | (421,282) | (421,282) | (639,137) | (421,282) | (421,282) | (639,137) |
| **AUM Payoffs:** | | | | | | | | | | | | |
| iCap Lake View | - | 878,320 | 439,160 | - | 878,320 | 439,160 | - | 1,781,085 | 1,664,596 | - | - | - |
| iCap Rhody Ridge | - | 898,579 | 449,290 | - | 898,579 | 220,080 | - | - | - | - | - | - |
| iCap Brislawn | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Northcreek | - | - | - | - | - | - | - | - | - | - | - | - |
| Mercer 36, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| K8R6, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| 313 Prospect Street | - | - | - | - | - | - | - | - | - | - | - | - |
| 76th Ave SE Partners, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| Seward Park Partners, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| 23rd & Gilman, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| 134th Street, LLC | 4,902,986 | - | - | - | - | - | - | - | - | - | - | - |
| Senza Sammamish, LLC | - | - | - | 199,909 | 399,818 | 399,818 | 399,818 | 630,606 | 920,700 | - | - | - |
| Belvidere Investors, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| Colpitts Sunset, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Finn Meadows | - | - | - | - | - | 436,875 | 436,875 | 436,875 | 436,875 | 1,477,747 | - | 381,250 |
| Senza Kenmore, LLC | - | - | - | - | - | - | - | - | 381,250 | 190,625 | - | - |
| Pearl and Delores | - | - | - | - | - | - | - | - | - | - | - | - |
| iCap Finn Hill, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| Hayden Meadows, LLC | - | - | - | - | - | - | - | - | - | - | - | - |
| Lake Union Estates, LLC | - | - | - | - | - | - | 825,563 | 825,563 | 825,563 | - | - | - |
| Timberland, LLC | - | - | 3,322,095 | - | - | - | - | - | - | - | - | - |
| **Total AUM Payoffs** | 4,902,986 | 1,776,900 | 4,210,545 | 199,909 | 2,176,717 | 1,495,933 | 1,662,255 | 3,674,128 | 4,228,984 | 1,668,372 | - | 381,250 |
| **Ending Cash Balance** | 22,226,596 | 23,582,214 | 27,153,621 | 26,932,248 | 28,687,684 | 29,544,479 | 30,785,452 | 34,038,298 | 37,628,145 | 38,875,234 | 38,453,952 | 38,196,065 |



**iCap Northwest Opportunity Fund**
*Cash Flow Projection & Analysis - Updated 11/7/2016 - Build Out of In*

| | Nov. 2018 | Dec. 2018 | Jan. 2019 | Feb. 2019 | Mar. 2019 | Apr. 2019 | May. 2019 | Jun. 2019 |
|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance: | 38,196,065 | 39,337,002 | 39,741,282 | 40,566,845 | 41,392,407 | 43,499,598 | 46,080,348 | 46,080,348 |
| Deductions: | | | | | | | | |
| Investor Interest Payments | (391,282) | (391,282) | - | - | - | - | - | - |
| Debenture Payments | - | - | - | - | - | - | - | - |
| Management Fees | - | - | - | - | - | - | - | - |
| Computer Expenses | - | - | - | - | - | - | - | - |
| Dues & Subscriptions | - | - | - | - | - | - | - | - |
| Meals & Entertainment | - | - | - | - | - | - | - | - |
| Professional Fees | (5,000) | (5,000) | - | - | - | - | - | - |
| Rent & Office Expense | - | - | - | - | - | - | - | - |
| Project Costs (Draws, Loans, etc) | - | - | - | - | - | - | - | - |
| Salaries and Wages | (25,000) | (25,000) | - | - | - | - | - | - |
| Total Monthly Expenses | (421,282) | (421,282) | - | - | - | - | - | - |
| | | | | | | | | |
| | | | | | | | | |
| AUM Payoffs: | | | | | | | | |
| iCap Lake View | - | - | - | - | - | - | - | - |
| iCap Rhody Ridge | - | - | - | - | - | - | - | - |
| iCap Brislawn | - | - | - | - | - | - | - | - |
| iCap Northcreek | - | - | - | - | - | - | - | - |
| Mercer 36, LLC | - | - | - | - | - | - | - | - |
| K8Ri6, LLC | - | - | - | - | - | - | - | - |
| 313 Prospect Street | - | - | - | - | - | - | - | - |
| 76th Ave SE Partners, LLC | - | - | - | - | - | - | - | - |
| Seward Park Partners, LLC | - | - | - | - | - | - | - | - |
| 23rd & Gilman, LLC | - | - | - | - | - | - | - | - |
| 134th Street, LLC | - | - | - | - | - | - | - | - |
| Senza Sammamish, LLC | 736,656 | - | - | - | - | - | - | - |
| Belvidere Investors, LLC | - | - | - | - | - | - | - | - |
| Colpitts Sunset, LLC | - | - | - | - | - | - | - | - |
| iCap Finn Meadows | - | - | - | - | - | - | - | - |
| Senza Kenmore, LLC | - | - | - | - | - | - | - | - |
| Pearl and Delores | - | - | - | - | - | - | - | - |
| iCap Finn Hill, LLC | - | - | - | - | - | - | - | - |
| Hayden Meadows, LLC | 825,563 | 825,563 | 825,563 | 825,563 | 2,107,191 | - | - | - |
| Lake Union Estates, LLC | - | - | - | - | - | 2,580,750 | - | - |
| Timberland, LLC | - | - | - | - | - | - | - | - |
| Total AUM Payoffs | 1,562,219 | 825,563 | 825,563 | 825,563 | 2,107,191 | 2,580,750 | - | - |
| | | | | | | | | |
| Ending Cash Balance | 39,337,002 | 39,741,282 | 40,566,845 | 41,392,407 | 43,499,598 | 46,080,348 | 46,080,348 | 46,080,348 |


iCAP EQUITY

**Purchased Projects - Step Up Basis _(Sale of Investments)_**

| | | | Step Up Basis |
|---|---|---|---|
| _Purchase Price:_ | $ 93,158,399.92 | | |
| _Rounded:_ | $ 94,000,000.00 | | |
| | | | |
| Cash in Bank | 30,798,191.95 | | |
| Investments: | | | |
| Seattle Modern Living | 1,386,153.00 | 3.70% | 2,336,651.23 |
| Meridian Greens Holdings | 1,756,570.50 | 4.69% | 2,961,067.52 |
| Ruby 62 Holdings | 1,583,504.92 | 4.22% | 2,669,329.23 |
| Ent. Ventures II | 400,105.77 | 1.07% | 674,462.08 |
| Ent. Ventures IV | 368,682.00 | 0.98% | 621,490.74 |
| Barcelo Madison Park | 842,538.00 | 2.25% | 1,420,274.28 |
| iCap Delridge Way, LLC | 387,996.76 | 1.03% | 654,049.81 |
| iCap Finn Hill | 2,487,966.88 | 6.64% | 4,193,989.32 |
| iCap Campbell Way | 810,455.00 | 2.16% | 1,366,191.67 |
| iCap Rhody Ridge, LLC | 1,289,280.72 | 3.44% | 2,173,352.71 |
| iCap Lake View | 2,711,937.70 | 7.23% | 4,571,539.05 |
| iCap Rhody Ridge | 1,946,775.42 | 5.19% | 3,281,697.75 |
| iCap Brislawn | 265,041.52 | 0.71% | 446,783.00 |
| Mercer 36, LLC | 264,500.00 | 0.71% | 445,870.15 |
| KBRI6, LLC | 742,160.00 | 1.98% | 1,251,066.14 |
| 23rd & Gilman, LLC | 729,000.00 | 1.94% | 1,228,882.20 |
| 134th Street, LLC | 3,510,772.00 | 9.36% | 5,918,141.59 |
| Senza Sammamish, LLC | 2,821,118.00 | 7.52% | 4,755,585.32 |
| iCap Finn Meadows | 2,297,105.62 | 6.13% | 3,872,252.69 |
| Senza Kenmore, LLC | 1,301,325.97 | 3.47% | 2,193,657.51 |
| Pearl and Delores | 678,130.00 | 1.81% | 1,143,130.16 |
| Hayden Meadows, LLC | 533,401.66 | 1.42% | 899,160.23 |
| Lake Union Estates, LLC | 4,044,183.75 | 10.79% | 6,817,318.83 |
| Timberland, LLC | 4,334,000.00 | 11.56% | 7,305,864.83 |
| | 37,492,705.19 | | 63,201,808.05 |



**iCAP EQUITY**

**Purchased Projects - Step Up Basis - Build Out of Investments**

| Purchase Price: | $ 93,158,399.92 |
| Rounded: | $ 94,000,000.00 |

| Cash in Bank | 24,032,891.56 |

| Investments: | Cost Basis | | Step Up Basis | Exit Value | | Step Up Basis |
|---|---|---|---|---|---|---|
| Seattle Modern Living | 1,386,153.00 | 3.28% | 2,295,238.48 | 11,778,000 | 3.86% | 2,698,643.26 |
| Meridian Greens Holdings | 1,756,570.50 | 4.16% | 2,908,588.16 | 7,000,000 | 2.29% | 1,603,880.36 |
| Ruby 62 Holdings | 1,583,504.92 | 3.75% | 2,622,020.38 | 2,640,000 | 0.86% | 604,892.02 |
| Ent. Ventures II | 400,105.77 | 0.95% | 662,508.51 | 525,000 | 0.17% | 120,291.03 |
| Ent. Ventures IV | 368,682.00 | 0.87% | 610,475.98 | 2,100,733 | 0.69% | 481,332.06 |
| Barcelo Madison Park | 842,538.00 | 1.99% | 1,395,102.59 | 8,350,000 | 2.73% | 1,913,200.14 |
| 725 Broadway | 1,025,662.66 | 2.43% | 1,698,326.52 | 30,000,000 | 9.82% | 6,873,772.96 |
| 9041 48th | 792,857.64 | 1.88% | 1,312,840.19 | 3,000,000 | 0.98% | 687,377.30 |
| Lofts @ Camas Meadows I | 1,059,923.50 | 2.51% | 1,755,056.77 | 15,975,000 | 5.23% | 3,660,284.10 |
| Lofts @ Camas Meadows II | 1,059,570.00 | 2.51% | 1,754,471.43 | 15,975,000 | 5.23% | 3,660,284.10 |
| TCG Investments | 824,200.58 | 1.95% | 1,364,738.87 | 5,500,000 | 1.80% | 1,260,191.71 |
| iCap Delridge Way, LLC | 387,996.76 | 0.92% | 642,458.01 | 2,375,000 | 0.78% | 544,173.69 |
| iCap Finn Hill | 2,487,966.88 | 5.89% | 4,119,658.73 | 8,000,000 | 2.62% | 1,833,006.12 |
| iCap Campbell Way | 810,455.00 | 1.92% | 1,341,978.48 | 1,000,000 | 0.33% | 229,125.77 |
| iCap Rhody Ridge, LLC | 1,289,280.72 | 3.05% | 2,134,834.12 | 15,000,000 | 4.91% | 3,436,886.48 |
| iCap Lake View | 2,711,937.70 | 6.42% | 4,490,517.11 | 22,100,000 | 7.24% | 5,063,679.41 |
| iCap Rhody Ridge | 1,946,775.42 | 4.61% | 3,223,535.82 | 14,250,000 | 4.67% | 3,265,042.15 |
| iCap Brislawn | 265,041.52 | 0.63% | 438,864.61 | 3,000,000 | 0.98% | 687,377.30 |
| Mercer 36, LLC | 264,500.00 | 0.63% | 437,967.94 | 4,000,000 | 1.31% | 916,503.06 |
| KBRI6, LLC | 742,160.00 | 1.76% | 1,228,893.34 | 5,875,000 | 1.92% | 1,346,113.87 |
| 23rd & Gilman, LLC | 729,000.00 | 1.73% | 1,207,102.57 | 6,930,000 | 2.27% | 1,587,841.55 |
| 134th Street, LLC | 3,510,772.00 | 8.31% | 5,813,253.65 | 35,084,556 | 11.49% | 8,038,775.74 |
| Senza Sammamish, LLC | 2,821,118.00 | 6.68% | 4,671,301.50 | 9,900,000 | 3.24% | 2,268,345.08 |
| iCap Finn Meadows | 2,297,105.62 | 5.44% | 3,803,624.28 | 10,000,000 | 3.27% | 2,291,257.65 |
| Senza Kenmore, LLC | 1,301,325.97 | 3.08% | 2,154,779.05 | 5,700,000 | 1.87% | 1,306,016.86 |
| Pearl and Delores | 678,130.00 | 1.60% | 1,122,870.32 | 6,628,000 | 2.17% | 1,518,645.57 |
| Hayden Meadows, LLC | 533,401.66 | 1.26% | 883,224.30 | 12,597,000 | 4.13% | 2,886,297.26 |
| Lake Union Estates, LLC | 4,044,183.75 | 9.57% | 6,696,494.65 | 24,975,000 | 8.18% | 5,722,415.99 |
| Timberland, LLC | 4,334,000.00 | 10.26% | 7,176,382.09 | 15,107,231 | 4.95% | 3,461,455.86 |
| | 42,254,919.57 | | 69,967,108.44 | 305,365,520 | | 69,967,108.44 |



**iCAP EQUITY**

*Investment Payoff Summary*
As of November 8, 2016

| Project Name | Project Type | iCap Investment | Actual iCap Return | Investment Days Held | ROI | Annualized ROI | Payoff Date | Investment Date |
|---|---|---|---|---|---|---|---|---|
| Lake Sammamish Home 1, LLC | Single Family Lots | $ 404,518.60 | $ 835,024.98 | 274 | 106.42% | 141.77% | 3/31/2015 | 6/30/2014 |
| 4422 Woodlawn, LLC | Apartment | $ 182,100.00 | $ 268,735.41 | 346 | 47.58% | 50.19% | 7/2/2015 | 7/21/2014 |
| Woodlawn Ave Townhomes, LLC | Apartment | $ 401,876.25 | $ 592,679.58 | 346 | 47.48% | 50.09% | 7/2/2015 | 7/21/2014 |
| 13th and Emerson, LLC | Townhomes | $ 601,310.00 | $ 923,129.92 | 383 | 53.52% | 51.00% | 8/10/2015 | 7/23/2014 |
| Hillsboro Acquisition I, LLC | Commercial | $ 1,606,500.00 | $ 1,777,012.23 | 102 | 10.61% | 37.98% | 8/31/2015 | 5/21/2015 |
| Alamo NW, LLC | Commercial | $ 1,396,404.14 | $ 1,738,657.36 | 461 | 24.51% | 19.41% | 9/14/2015 | 6/10/2014 |
| iCap Lake View, LLC | Single Family Lots | $ 1,037,011.42 | $ 1,201,937.73 | 138 | 15.90% | 42.06% | 9/22/2015 | 5/7/2015 |
| 1st Ave NE Development, LLC | Townhomes | $ 630,240.00 | $ 1,061,631.89 | 491 | 68.45% | 50.88% | 10/2/2015 | 5/29/2014 |
| Aloha Ventures, LLC | Townhomes | $ 372,500.00 | $ 646,517.47 | 585 | 73.56% | 45.90% | 10/13/2015 | 3/7/2014 |
| Volare Townhomes, LLC | Townhomes | $ 916,221.50 | $ 1,079,103.42 | 329 | 17.78% | 19.72% | 1/15/2016 | 2/20/2015 |
| Capitol Hill Development, LLC | Apartment | $ 1,035,730.00 | $ 1,717,524.63 | 481 | 65.83% | 49.95% | 2/29/2016 | 11/5/2014 |
| BDR Yarrow Point II, LLC | Single Family Lots | $ 725,000.00 | $ 1,432,610.91 | 702 | 97.60% | 50.75% | 3/17/2016 | 4/15/2014 |
| Charlestown Street, LLC | Townhomes | $ 1,040,000.00 | $ 1,466,392.26 | 453 | 41.00% | 33.03% | 6/15/2016 | 3/20/2015 |
| KR3, LLC | Single Family Lots | $ 356,149.34 | $ 500,000.00 | 468 | 40.39% | 31.50% | 7/7/2016 | 3/27/2015 |
| 13th Avenue W, LLC | Townhomes | $ 525,000.00 | $ 1,015,053.35 | 784 | 93.34% | 43.46% | 8/3/2016 | 6/11/2014 |
| ENT Ventures I, LLC | Apartment | $ 1,948,884.00 | $ 2,531,472.56 | 613 | 29.89% | 17.80% | 9/2/2016 | 12/29/2014 |
| Ankeny Building, LLC | Apartment | $ 1,704,500.00 | $ 2,665,223.38 | 554 | 56.36% | 37.14% | 9/30/2016 | 3/26/2015 |
| BDR Kirkland II, LLC | Single Family Lots | $ 833,000.00 | $ 1,678,742.88 | 853 | 101.53% | 43.44% | 10/27/2016 | 6/27/2014 |
| BDR Medina, LLC | Single Family Lots | $ 1,296,032.50 | $ 2,362,705.55 | 738 | 82.30% | 40.71% | 10/31/2016 | 10/24/2014 |
| 13th & Emerson, LLC | Townhomes | $ 957,600.00 | $ 1,035,844.78 | 66 | 8.17% | 45.19% | 10/10/2015 | 8/5/2015 |
| BDR Kirkland V, LLC | Single Family Lots | $ 1,246,000.00 | $ 1,505,508.55 | 206 | 20.83% | 36.90% | 2/29/2016 | 8/7/2015 |
| 1756 N. 60th, LLC | Townhomes | $ 216,500.00 | $ 331,871.94 | 363 | 53.29% | 53.58% | 5/25/2016 | 5/28/2015 |
| | | $ 19,433,077.75 | $ 28,367,380.78 | 443 | 45.97% | 37.92% | | |
| | | | | | **Average** | | | |



**iCAP EQUITY**

*Investment Payoff Summary*
As of November 8, 2016

| Project Name | Project Type | iCap Investment | iCap Return | Investment Days Held | ROI | Annualized ROI | Payoff Date | Investment Date |
|---|---|---|---|---|---|---|---|---|
| | | | *Projected per Cash Flow before Fund buyout* | | | | | |
| High Country Soundview Manor | Single Family Lots | 2,143,744 | 1,325,500 | 1,047 | -38.17% | -13.31% | 2/28/2017 | 4/18/2014 |
| Wild Creek Estates | Single Family Lots | 419,356 | 411,108 | 1,075 | -1.97% | -0.67% | 3/31/2017 | 4/21/2014 |
| 9041 48th, LLC | Townhomes | 775,998 | 828,000 | 1,065 | 6.70% | 2.30% | 3/31/2017 | 5/1/2014 |
| TCG Investments | Apartments | 1,060,000 | 1,825,208 | 915 | 72.19% | 28.80% | 12/31/2016 | 6/30/2014 |
| 725 Broadway | Commercial | 1,025,663 | 1,724,799 | 972 | 68.16% | 25.60% | 2/28/2017 | 7/2/2014 |
| Steadman 170th | Single Family Lot | 560,340 | 690,000 | 831 | 23.14% | 10.16% | 11/8/2016 | 7/31/2014 |
| Lyle 113th Ave, LLC | Single Family Lot | 501,268 | 426,285 | 834 | -14.96% | -6.55% | 2/28/2017 | 11/17/2014 |
| Sampson 45th Ave, LLC | Single Family Lot | 1,677,760 | 708,000 | 861 | -57.80% | -24.50% | 3/31/2017 | 11/21/2014 |
| Lofts @ Camas Meadows I | Townhomes | 1,059,570 | 1,650,000 | 736 | 55.72% | 27.63% | 11/30/2016 | 11/25/2014 |
| Columbia Property Mgmt. | Commercial | 1,042,300 | 850,000 | 828 | -18.45% | -8.13% | 3/31/2017 | 12/24/2014 |
| Colpitts Development | Single Family Lot | 1,552,463 | 2,860,160 | 724 | 84.23% | 42.47% | 12/31/2016 | 1/7/2015 |
| Lofts @ Camas Meadows II | Townhomes | 1,059,570 | 1,650,000 | 623 | 55.72% | 32.65% | 11/30/2016 | 3/18/2015 |
| Richland Acquisition I, LLC | Townhomes | 1,491,200 | 2,034,000 | 439 | 36.40% | 30.26% | 11/30/2016 | 9/18/2015 |
| iCap Northcreek | Single Family Lots | 1,933,080 | 1,931,605 | 376 | -0.08% | -0.07% | 1/31/2017 | 1/21/2016 |
| 313 Prospect Street | Single Family Home | 316,649 | 489,956 | 595 | 54.73% | 33.57% | 1/31/2017 | 6/16/2015 |
| 76th Ave SE Partners, LLC | Single Family Home | 536,500 | 798,528 | 576 | 48.84% | 30.95% | 3/31/2017 | 9/2/2015 |
| Seward Park Partners, LLC | Single Family Home | 536,538 | 751,522 | 511 | 40.07% | 28.62% | 2/28/2017 | 10/6/2015 |
| Belvidere Investors, LLC | Single Family Home | 359,961 | 553,477 | 418 | 53.76% | 46.94% | 1/31/2017 | 12/10/2015 |
| iCap Finn Hill, LLC | Single Family Lots | 550,923 | 664,771 | 338 | 20.67% | 22.32% | 3/31/2017 | 4/27/2016 |
| Colpitts Sunset LLC | Single Family Lots | 893,779 | 1,330,252 | 392 | 48.83% | 45.47% | 1/31/2017 | 1/5/2016 |
| | | $ 19,496,662.00 | $ 23,503,170.23 | 708 | 20.55% | 10.60% | | |
| | | | | | **Average** | | | |
| | | | *Average* | 575 | 33.26% | 24.26% | | |

**Exhibit 32**

Filtered By
Show: All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity: Accounting Variable Name → GL Account: GL Account Name ↑ | 725 Broadway, LLC Sum of Current Period | Colpitts Sunset, LLC Sum of Current Period | iCap B1, LLC Sum of Current Period | iCap B2, LLC Sum of Current Period | iCap Bridwein, LLC Sum of Current Period | iCap Campbell Way, LLC Sum of Current Period | iCap Delridge Way, LLC Sum of Current Period |
|---|---|---|---|---|---|---|---|
| **Sub Type 1 ↑** | | | | | | | |
| **Assets** | | | | | | | |
| 1000-Checking: Umpqua | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1010-Checking: Chase Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1012-Checking: Wells Fargo | $0.00 | $0.00 | $0.00 | $100.00 | $10,427.63 | $0.00 | $76.44 |
| 1015-Checking: Seaside Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1020-Checking: Sponor Account | $553.01 | $121.85 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1050-Unapplied Cash | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1051-Reinvestment Clearing Account | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1060-Checking: East West Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1100-Accounts Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1200-iCap Vault, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1210-iCap Enterprises, Inc. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1220-iCap PNW Fund 1R | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1225-iCap NW Fund 2R | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1226-iCap Pacific Income Fund 5R | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1227-iCapPacific Income Fund 6R | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1228-iCap EVO, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1229-iCap PNW Fund 2i | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1230-iCap Equity, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1231-iCap China Office | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1235-iCap Pacific Income Fund 4R | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1240-Oceanaire, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1250-iCap Management, LLC | $0.00 | $0.00 | $0.00 | -$441,284.77 | $0.00 | $0.00 | $0.00 |
| 1251-iCap Equity Real Estate Fund I, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1252-iCap Investments, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1255-Suite 500 Company, Inc. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1256-Altus Legal, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1260-Edge Construction, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1270-iCap PNW Management, LLC | $0.00 | $0.00 | $0.00 | -$119,769.35 | $0.00 | $0.00 | $0.00 |
| 1280-iCap B1, LLC | $0.00 | $0.00 | $119,769.35 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1285-iCap B2, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1290-Chris Christensen | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1300-Property & Equipment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1310-Furniture | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1320-Computers & Software | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1330-Automobiles | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1340-Buildings & Improvements | $329,355.12 | $3,959,177.59 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1350-Work In Progress | $406,394.58 | $474,055.48 | $0.00 | $0.00 | $0.00 | $26,549.38 | $0.00 |
| 1355-Capitalized Interest | $0.00 | $3,263,737.12 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1360-Land | $515,145.20 | $800,206.74 | $0.00 | $0.00 | $0.00 | $724,354.91 | $0.00 |
| 1365-Land Development | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $137,320.40 | $0.00 |
| 1370-Tenant Improvements | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1380-Intangible Assets - Branding | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1381-Intangible Assets - Loan Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1385-Accumulated Depreciation | -$29,206.00 | $10,740.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1390-Organizational Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1391-Start Up Costs | $0.00 | -$3,103.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1395-Accumulated Amortization | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1400-Equity Investments | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Filtered By
Show: All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity / Accounting Variable Name → GL Accounts GL Account Name | 725 Broadway, LLC Sum of Current Period | Colpitts Sunset, LLC Sum of Current Period | iCap B1, LLC Sum of Current Period | iCap B2, LLC Sum of Current Period | iCap Bridwum, LLC Sum of Current Period | iCap Campbell Way, LLC Sum of Current Period | iCap Delridge Way, LLC Sum of Current Period |
|---|---|---|---|---|---|---|---|
| **Sub Type 1 ↑** | | | | | | | |
| 1500-Investment in Project | $0.00 | $0.00 | $3,335,865.00 | $2,293,354.27 | $0.00 | $0.00 | $0.00 |
| 1510-Payoff from Project | $0.00 | $0.00 | -$4,437,391.86 | -$1,727,501.87 | $0.00 | $0.00 | $0.00 |
| 1520-Basis Adjustment: Allocated Costs | $0.00 | $0.00 | $853,409.15 | $1,511,149.34 | $0.00 | $0.00 | $0.00 |
| 1530-Income/Loss Allocation | $0.00 | $0.00 | $258,117.71 | -$2,077,001.74 | $0.00 | $0.00 | $0.00 |
| 1600-Commissions | $0.00 | $0.00 | $243,196.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 161D-Debt Issuance Costs | $0.00 | $0.00 | $44,044.54 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1620-Management Fees | $0.00 | $0.00 | $60,801.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1630-Investor Interest | $0.00 | $0.00 | $751,781.59 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1700-A/A: Commissions | $0.00 | $0.00 | -$243,196.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1710-A/A: Debt Issuance Costs | $0.00 | $0.00 | -$44,044.54 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1720-A/A: Management Fees | $0.00 | $0.00 | -$60,801.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1730-A/A: Investor Interest | $0.00 | $0.00 | -$751,781.59 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1740-A/A: NAV Discount | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1800-Prepaid Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1810-Employee Loan Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1820-Security Deposit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1840-Escrow Deposit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1900-Note Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $888,301.13 | $0.00 |
| **Subtotal** | $1,222,241.91 | $8,504,935.78 | $119,769.35 | -$560,954.12 | $10,427.63 | $888,301.13 | $0.00 |
| **Liabilities** | | | | | | | |
| 2000-Accounts Payable | -$11,521.68 | $0.00 | $119,769.35 | $0.00 | -$2,173.28 | -$32.34 | $0.00 |
| 2010-Investor Interest Payable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2100-Accrued Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2300-Loan from Sponsor | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2350-Escrow Deposit | $0.00 | -$12,527.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2450-Profit Sharing Plan Payable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2500-Note Payable: Alliant | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2501-Note Payable: SJ Fox Ridge, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2502-Note Payable: Bob Walsh | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2503-Note Payable: T&L One, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2504-Note Payable: Grogan/Blair | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2505-Note Payable: Claus Mueller | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2506-Note Payable: YI Shan | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2507-Note Payable: Eric Ni & Ying Wu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2508-Note Payable: Weifan Peng | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2509-Note Payable: Qing Wu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2511-Note Payable: Eastside Fund, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2512-Note Payable: Mike Gould | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2513-Note Payable: Gould Trust | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2515-Note Payable: SPS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2516-Note Payable: Caifeng Yu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2520-Note Payable: David Straz Jr. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2530-Note Payable: Titan Securities | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2550-Note Payable: Loan on Project | $0.00 | -$699,500.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2551-Note Payable: Construction Holdback | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2552-Note Payable: Interest Reserve | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2553-Construction Holdback Clearing Account | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2555-Note Payable: Loan on Project | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2600-Debentures Payable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Filtered by
Show: All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity: Accounting Variable Name → | 725 Broadway, LLC | Colpitts Sunset, LLC | iCap B1, LLC | iCap B2, LLC | iCap Bridlwn, LLC | iCap Campbell Way, LLC | iCap Delridge Way, LLC |
|---|---|---|---|---|---|---|---|
| GL Account: GL Account Name ↑ | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period |
| Sub Type 1 ↑ | | | | | | | |
| 2610-NAV Discount | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2700-Deferred Investment Deposit | $0.00 | $0.00 | $0.00 | $0.00 | -$2,173.28 | -$32.34 | $0.00 |
| Subtotal | -$11,521.68 | -$712,027.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Owners Equity | | | | | | | |
| 3060-Current Year Earnings | $0.00 | $0.00 | -$104,921.14 | $1,508,392.34 | $88.64 | $8,292.72 | -$103,878.78 |
| 3100-Additional Paid in Capital | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3200-Members Equity | $0.00 | $975.95 | -$14,848.21 | -$48,967.56 | $0.00 | -$7,813.83 | $0.00 |
| 3210-iCap Pacific NW Opportunity & Income Fund, LLC | $72,187.78 | $0.00 | $0.00 | $0.00 | $0.00 | -$888,869.70 | $103,878.78 |
| 3220-iCap Northwest Opportunity Fund, LLC | $0.00 | -$6,508,544.73 | $0.00 | $0.00 | -$1,092,225.59 | $0.00 | $0.00 |
| 3230-iCap EVO, LLC | $0.00 | $0.00 | $0.00 | $0.00 | -$46,927.00 | $0.00 | $0.00 |
| 3240-iCap B2, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3250-AUM Sponsor Capital | $0.00 | -$1,285,340.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3260-iCap Pacific Income Fund 4R, LLC | -$1,677,466.53 | $0.00 | $0.00 | -$2,055,303.88 | $0.00 | $0.00 | $0.00 |
| 3300-Members Contribution | $0.00 | $0.00 | $0.00 | $5,000.00 | $0.00 | $0.00 | $0.00 |
| 3400-Members Draw | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Subtotal | -$1,605,278.75 | -$7,792,908.78 | -$119,769.35 | -$590,879.10 | -$1,139,063.95 | -$888,390.81 | $0.00 |

Filtered By
Show: All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Sub Type 1 ↑ | GL Account: GL Account Name ↑ | Entity: Accounting Variable Name → iCap Enterprises, Inc. Sum of Current Period | iCap Equity, LLC Sum of Current Period | iCap Equity Real Estate Fund I, LLC Sum of Current Period | iCap EVO, LLC Sum of Current Period | iCap Fin Hill, LLC Sum of Current Period | iCap Fin Meadows, LLC Sum of Current Period | iCap Investments, LLC Sum of Current Period |
|---|---|---|---|---|---|---|---|---|
| Assets | 1000-Checking: Umpqua | $5,246.27 | $1,989,980.03 | $0.00 | $545.01 | $10,224.98 | $0.00 | $899.59 |
| | 1010-Checking: Chase Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1012-Checking: Wells Fargo | $0.00 | $1,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1015-Checking: Seaside Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1020-Checking: Sponor Account | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1050-Unapplied Cash | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1051-Reinvestment Clearing Account | $0.00 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1060-Checking: East West Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1100-Accounts Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1200-Cap Vault, LLC | $0.00 | $168,912.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1210-Cap Enterprises, Inc. | $0.00 | $727,684.99 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1220-Cap PNW Fund 1R | $0.00 | $3,443,560.48 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1225-Cap NW Fund 2R | $0.00 | $174,764.47 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1226-Cap Pacific Income Fund 5R | $0.00 | $14,957.70 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1227-CapPacific Income Fund 6R | $0.00 | $29,553.33 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1228-Cap EVO, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1229-Cap PNW Fund 2J | $0.00 | $125.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1230-Cap Equity, LLC | -$727,684.99 | $0.00 | $1,969.25 | $0.00 | $0.00 | $0.00 | -$240,680.50 |
| | 1231-Cap China Office | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1235-Cap Pacific Income Fund 4R | $0.00 | $60,502.06 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1240-Oceanaire, LLC | -$43,320.33 | $1,162,059.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1250-Cap Management, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1251-iCap Equity Real Estate Fund J, LLC | $206,446.12 | $1,969.25 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1252-Cap Investments, LLC | $0.00 | $240,680.50 | $0.00 | $0.00 | $0.00 | $0.00 | $829,000.00 |
| | 1255-Suite 500 Company, Inc. | $0.00 | $235.50 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1256-Atlas Legal, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1260-Edge Construction, LLC | -$2,000.00 | $51,643.33 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1270-Cap PNW Management, LLC | -$46,174.26 | -$14,273.05 | $0.00 | -$1,920.25 | $0.00 | -$155,000.00 | $0.00 |
| | 1280-Cap B1, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1285-Cap B2, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1290-Chris Christensen | $100,000.00 | $1,057.92 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1300-Property & Equipment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1310-Furniture | $604.13 | $0.00 | $3,933.93 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1320-Computers & Software | $0.00 | $10,556.78 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1330-Automobiles | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1340-Buildings & Improvements | $0.00 | $0.00 | $0.00 | $0.00 | $189.88 | $0.00 | $0.00 |
| | 1350-Work in Progress | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1355-Capitalized Interest | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1360-Land | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1365-Land Development | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1370-Tenant Improvements | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1380-Intangible Assets - Branding | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1381-Intangible Assets - Loan Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1385-Accumulated Depreciation | -$604.13 | -$10,556.78 | -$3,933.93 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1390-Organizational Costs | $0.00 | $0.00 | $40,085.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1391-Start Up Costs | $0.00 | $0.00 | $79,995.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1395-Accumulated Amortization | $0.00 | $0.00 | -$27,074.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 1400-Equity Investments | $0.00 | -$49.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Filtered By
Show: All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity: Accounting Variable Name → GL Account: GL Account Name ↑ | iCap Enterprises, Inc. Sum of Current Period | iCap Equity, LLC Sum of Current Period | iCap Equity Real Estate Fund, LLC Sum of Current Period | iCap EVO, LLC Sum of Current Period | iCap Fin Hill, LLC Sum of Current Period | iCap Fin Meadows, LLC Sum of Current Period | iCap Investments, LLC Sum of Current Period |
|---|---|---|---|---|---|---|---|
| **Sub Type 1 ↑** | | | | | | | |
| 1500-Investment in Project | $0.00 | $501,693.50 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1510-Payoff from Project | $0.00 | $0.00 | $0.00 | $3,154,072.00 | $0.00 | $0.00 | $0.00 |
| 1520-Basis Adjustment: Allocated Costs | $0.00 | $0.00 | $0.00 | -$1,955,200.00 | $0.00 | $0.00 | $0.00 |
| 1530-Income/Loss Allocation | $0.00 | $0.00 | $0.00 | $1,199,247.45 | $0.00 | $0.00 | $0.00 |
| 1600-Commissions | $0.00 | $1,051,500.49 | $0.00 | $85,800.00 | $0.00 | $0.00 | $0.00 |
| 1610-Debt Issuance Costs | $0.00 | $0.00 | $0.00 | -$1,783,034.54 | $0.00 | $0.00 | $0.00 |
| 1620-Management Fees | $0.00 | $0.00 | $0.00 | $31,735.00 | $0.00 | $0.00 | $0.00 |
| 1630-Investor Interest | $0.00 | $2,224,438.75 | $0.00 | $57,200.00 | $0.00 | $0.00 | $0.00 |
| 1700-A/A: Commissions | $0.00 | $0.00 | $0.00 | $993,444.45 | $0.00 | $0.00 | $0.00 |
| 1710-A/A: Debt Issuance Costs | $0.00 | $0.00 | $0.00 | -$85,800.00 | $0.00 | $0.00 | $0.00 |
| 1720-A/A: Management Fees | $0.00 | $0.00 | $0.00 | -$31,735.00 | $0.00 | $0.00 | $0.00 |
| 1730-A/A: Investor Interest | $0.00 | $0.00 | $0.00 | -$57,200.00 | $0.00 | $0.00 | $0.00 |
| 1740-A/A: NAV Discount | $0.00 | $0.00 | $0.00 | -$993,444.45 | $0.00 | $0.00 | $0.00 |
| 1800-Prepaid Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1810-Employee Loan Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1820-Security Deposit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1840-Escrow Deposit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1900-Note Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Subtotal** | -$509,487.19 | $11,831,996.26 | $91,036.75 | $613,709.67 | $10,414.86 | $0.00 | $434,219.09 |
| **Liabilities** | | | | | | | |
| 2000-Accounts Payable | $0.00 | -$166,483.89 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2010-Investor Interest Payable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2100-Accrued Expenses | $0.00 | -$1,165.03 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2300-Loan from Sponsor | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2350-Escrow Deposit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2450-Profit Sharing Plan Payable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2500-Note Payable: Alliant | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2501-Note Payable: SI Fox Ridge, LLC | -$23,105.78 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2502-Note Payable: Bob Walsh | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2503-Note Payable: T&L One, LLC | -$226,682.77 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2504-Note Payable: Grogan/Blair | -$112,844.36 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2505-Note Payable: Claus Mueller | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2506-Note Payable: Yi Shan | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2507-Note Payable: Eric Fu & Ying Wu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2508-Note Payable: Weifan Peng | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2509-Note Payable: Qing Wu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2511-Note Payable: Eastside Fund, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2512-Note Payable: Mike Gould | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2513-Note Payable: Gould Trust | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2515-Note Payable: SPS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2516-Note Payable: Caifeng Yu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2520-Note Payable: David Straz Jr. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2530-Note Payable: Titan Securities | $0.00 | $0.00 | $0.00 | -$1,976,244.45 | $0.00 | $0.00 | $0.00 |
| 2550-Note Payable: Loan on Project | $0.00 | $0.00 | $0.00 | -$127,062.90 | $0.00 | $0.00 | $0.00 |
| 2551-Note Payable: Construction Holdback | $0.00 | $0.00 | $0.00 | -$103,600.00 | $0.00 | $0.00 | $0.00 |
| 2552-Note Payable: Interest Reserve | $0.00 | $0.00 | $0.00 | -$550,791.67 | $0.00 | $0.00 | $0.00 |
| 2553-Construction Holdback Clearing Account | $0.00 | $0.00 | $0.00 | -$30,319.35 | $0.00 | $0.00 | $0.00 |
| 2555-Note Payable: Loan on Project | $0.00 | $0.00 | $0.00 | -$20,038.71 | $0.00 | $0.00 | $0.00 |
| 2600-Debentures Payable | -$18,723,212.78 | $0.00 | -$187,908.43 | $0.00 | $0.00 | $0.00 | $0.00 |

Filtered By
Show: All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity: Accounting Variable Name → GL Account: GL Account Name ↑ | iCap Enterprises, Inc. Sum of Current Period | iCap Equity, LLC Sum of Current Period | iCap Equity Real Estate Fund I, LLC Sum of Current Period | iCap EVO, LLC Sum of Current Period | iCap Fim Hill, LLC Sum of Current Period | iCap Fim Meadows, LLC Sum of Current Period | iCap Investments, LLC Sum of Current Period |
|---|---|---|---|---|---|---|---|
| **Sub Type 1 ↑** | | | | | | | |
| 2610-MAV Discount | | $139,728.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2700-Deferred Investment Deposit | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$329,812.63 |
| Subtotal | -$362,632.91 | -$18,751,133.70 | $187,908.43 | -$1,976,244.45 | $28,495.75 | $0.00 | $0.00 |
| **Owners Equity** | | | | | | | |
| 3060-Current Year Earnings | $660,821.52 | $1,084,851.16 | $182,838.21 | $107.00 | $0.00 | $0.00 | $0.00 |
| 3100-Additional Paid in Capital | -$11,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3200-Members Equity | $391,173.46 | -$274,147.54 | -$21,935.78 | $0.00 | $0.00 | $0.00 | -$100.00 |
| 3210-iCap Pacific NW Opportunity & Income Fund, LLC | $0.00 | $0.00 | $0.00 | $0.00 | -$746,910.41 | $0.00 | $0.00 |
| 3220-iCap Northwest Opportunity Fund, LLC | $0.00 | $0.00 | $0.00 | $0.00 | -$353,565.31 | -$252,259.06 | $0.00 |
| 3230-iCap EVO, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3240-iCap 82, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3250-AUM Sponsor Capital | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3260-iCap Pacific Income Fund 4R, LLC | $0.00 | $0.00 | -$66,000.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3300-Members Contribution | -$116,446.12 | -$180,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3400-Members Draw | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Subtotal | $923,748.86 | $2,866,602.43 | $94,902.43 | $107.00 | -$1,071,979.97 | -$252,259.06 | -$100.00 |

Balance Sheet by Entity by Period
As of 2023-12-19 16:03:13 Pacific Standard Time/PST • Generated by Nickisha Haine

Filtered By
Show: All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity Accounting Variable Name contains iCap, 725, LW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| GL Account : GL Account Name ↑ | iCap Lake View, LLC Sum of Current Period | iCap Management, LLC Sum of Current Period | iCap Northcreek, LLC Sum of Current Period | iCap Northwest Opportunity Fund, LLC Sum of Current Period | iCap Pacific Income Fund 4, LLC Sum of Current Period | iCap Pacific Income Fund 5, LLC Sum of Current Period |
|---|---|---|---|---|---|---|
| **Sub Type 1** ↑ | | | | | | |
| **Assets** | | | | | | |
| 1000-Checking: Umpqua | $0.00 | $33.32 | $0.00 | $748,120.77 | $3,313,586.85 | $1,545,490.49 |
| 1010-Checking: Chase Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1012-Checking: Wells Fargo | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1015-Checking: Seaside Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $109,092.56 |
| 1020-Checking: Sponsor Account | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1050-Unapplied Cash | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1051-Reinvestment Clearing Account | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1060-Checking: East West Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1100-Accounts Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1200-iCap Vault, LLC | $0.00 | $0.00 | $0.00 | $2,145.10 | $0.00 | -$7,057.50 |
| 1210-iCap Enterprises, Inc. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1220-iCap PNW Fund 1R | $0.00 | $0.00 | $0.00 | $14.74 | $0.00 | $0.00 |
| 1225-iCap NW Fund 2R | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1226-iCap Pacific Income Fund 5R | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1227-iCapPacific Income Fund 6R | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1228-iCap EVO, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1229-iCap PNW Fund 2I | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1239-iCap Equity, LLC | $0.00 | $0.00 | $0.00 | -$166,065.53 | $0.00 | -$15,167.71 |
| 1231-iCap China Office | $0.00 | $0.00 | $0.00 | $134,912.89 | $0.00 | $0.00 |
| 1235-iCap Pacific Income Fund 4R | $0.00 | $0.00 | $0.00 | $0.00 | -$560,502.04 | $0.00 |
| 1240-Oceanaire, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1250-iCap Management, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1251-iCap Equity Real Estate Fund I, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1252-iCap Investments, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1255-iCute 500 Company, Inc. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1256-Altus Legal, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1260-Edge Construction, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1270-iCap PNW Management, LLC | $0.00 | $0.00 | $0.00 | -$45,600.84 | -$777,782.50 | -$2,189.30 |
| 1280-iCap B1, LLC | $0.00 | $0.00 | $0.00 | $0.00 | -$2,189.30 | $0.00 |
| 1285-iCap B2, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1290-Chris Christensen | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1300-Property & Equipment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1310-Furniture | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1320-Computers & Software | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1330-Automobiles | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1340-Buildings & Improvements | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1350-Work in Progress | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1355-Capitalized Interest | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1360-Land | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1365-Land Development | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1370-Tenant Improvements | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1380-Intangible Assets - Branding | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1381-Intangible Assets - Loan Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1385-Accumulated Depreciation | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1390-Organizational Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1391-Start Up Costs | $0.00 | $0.00 | $0.00 | $21,667.56 | $27,042.50 | $77,628.28 |
| 1395-Accumulated Amortization | $0.00 | $0.00 | $0.00 | -$6,861.64 | $0.00 | $0.00 |
| 1400-Equity Investments | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

# Balance Sheet by Entity by Period

As of 2023-12-19 16:03:13 Pacific Standard Time/PST • Generated by Nicklsha Haine

Filtered By
Show All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| GL Account: GL Account Name | iCap Lake View, LLC Sum of Current Period | iCap Management, LLC Sum of Current Period | iCap Northcreek, LLC Sum of Current Period | iCap Northwest Opportunity Fund, LLC Sum of Current Period | iCap Pacific Income Fund 4, LLC Sum of Current Period | iCap Pacific Income Fund 5, LLC Sum of Current Period |
|---|---|---|---|---|---|---|
| **Sub Type 1 ↑** | | | | | | |
| 1500-Investment in Project | $0.00 | $0.00 | $0.00 | $48,939,138.38 | $4,489,228.77 | $0.00 |
| 1510-Payoff from Project | $0.00 | $0.00 | $0.00 | -$35,692,245.62 | $0.00 | $0.00 |
| 1520-Basis Adjustment: Allocated Costs | $0.00 | $0.00 | $0.00 | $31,619,787.81 | $0.00 | $0.00 |
| 1530-Income/Loss Allocation | $0.00 | $0.00 | $0.00 | -$19,705,854.20 | $0.00 | $0.00 |
| 1600-Commissions | $0.00 | $0.00 | $0.00 | $5,476,347.74 | $691,835.30 | $153,646.48 |
| 1610-Debt Issuance Costs | $0.00 | $0.00 | $0.00 | $30,000.00 | $0.00 | $0.00 |
| 1620-Management Fees | $0.00 | $0.00 | $0.00 | $3,915,573.58 | $182,098.82 | $0.00 |
| 1630-Investor Interest | $0.00 | $0.00 | $0.00 | $20,322,901.05 | $480,377.12 | $27,171.41 |
| 1700-A/A: Commissions | $0.00 | $0.00 | $0.00 | -$55,476,347.74 | $0.00 | $0.00 |
| 1710-A/A: Debt Issuance Costs | $0.00 | $0.00 | $0.00 | -$30,000.00 | $0.00 | $0.00 |
| 1720-A/A: Management Fees | $0.00 | $0.00 | $0.00 | -$3,915,573.58 | $0.00 | $0.00 |
| 1730-A/A: Investor Interest | $0.00 | $0.00 | $0.00 | -$20,322,901.05 | $0.00 | $0.00 |
| 1740-A/A: NAV Discount | $0.00 | $0.00 | $0.00 | -$627,653.49 | $0.00 | $0.00 |
| 1800-Prepaid Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1810-Employee Loan Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1820-Security Deposit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1840-Escrow Deposit | $0.00 | $0.00 | $0.00 | $1,800,000.00 | $0.00 | $0.00 |
| 1900-Note Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Subtotal** | | $33.32 | | $27,086,593.04 | $9,130,797.71 | $1,888,614.71 |
| **Liabilities** | | | | | | |
| 2000-Accounts Payable | $0.00 | $0.00 | $0.00 | -$473,217.99 | -$599,378.29 | -$15,591.44 |
| 2010-Investor Interest Payable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2100-Accrued Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2300-Loan from Sponsor | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2350-Escrow Deposit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2450-Profit Sharing Plan Payable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2500-Note Payable: Alliant | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2501-Note Payable: SJ Fox Ridge, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2502-Note Payable: Bob Walsh | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2503-Note Payable: T&L One, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2504-Note Payable: Grogan/Blair | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2505-Note Payable: Claus Mueller | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2506-Note Payable: Yi Shan | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2507-Note Payable: Eric Fu & Ying Wu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2508-Note Payable: Weifan Peng | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2509-Note Payable: Qing Wu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2511-Note Payable: Eastside Fund, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2512-Note Payable: Mike Gould | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2513-Note Payable: Gould Trust | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2515-Note Payable: SPS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2516-Note Payable: Caifeng Yu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2520-Note Payable: David Straz Jr. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2530-Note Payable: Titan Securities | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2550-Note Payable: Loan on Project | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2551-Note Payable: Construction Holdback | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2552-Note Payable: Interest Reserve | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2553-Construction Holdback Clearing Account | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2555-Note Payable: Loan on Project | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2600-Debentures Payable | $0.00 | $0.00 | $0.00 | -$46,783,563.77 | -$9,200,998.82 | -$1,933,726.34 |

Filtered By
Show All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity Accounting Variable Name → | iCap Lake View, LLC | iCap Management, LLC | iCap Northcreek, LLC | iCap Northwest Opportunity Fund, LLC | iCap Pacific Income Fund 4, LLC | iCap Pacific Income Fund 5, LLC |
|---|---|---|---|---|---|---|
| GL Account: GL Account Name ↑ | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period |
| **Sub Type 1 ↑** | | | | | | |
| 2610-NAV Discount | $0.00 | $0.00 | $0.00 | $627,653.49 | $15,700.00 | $24,255.32 |
| 2700-Deferred Investment Deposit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Subtotal** | $0.00 | $0.00 | $0.00 | -$46,629,128.27 | -$9,284,677.11 | -$1,935,426.46 |
| **Owners Equity** | | | | | | |
| 3060-Current Year Earnings | $115.00 | $138,451.84 | $0.00 | $1,442,084.58 | $0.00 | $0.00 |
| 3100-Additional Paid in Capital | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3200-Members Equity | $0.00 | -$138,484.25 | $0.00 | -$168,215.31 | $0.00 | $0.00 |
| 3210-iCap Pacific NW Opportunity & Income Fund, LLC | -$580,654.21 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3220-iCap Northwest Opportunity Fund, LLC | $0.00 | $0.00 | -$614,717.70 | $0.00 | $0.00 | $0.00 |
| 3230-iCap EVO, LLC | -$729,945.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3240-iCap 82, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3250-AUM Sponsor Capital | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3260-iCap Pacific Income Fund 4R, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 3300-Members Contribution | $0.00 | $0.00 | $0.00 | $0.00 | -$100.00 | $0.00 |
| 3400-Members Draw | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Subtotal** | -$1,310,484.21 | -$32.41 | -$614,717.70 | $1,273,869.27 | -$100.00 | $0.00 |

Filtered By
Show : All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity / Accounting Variable Name → GL Account - GL Account Name ↑ | iCap Pacific Income Fund 6, LLC Sum of Current Period | iCap Pacific Northwest Opportunity & Income Fund, LLC Sum of Current Period | iCap Pacific Income Fund, LLC Sum of Current Period | iCap Pacific NW Management, LLC Sum of Current Period | iCap PNW Opportunity & Income Fund 2), LLC Sum of Current Period |
|---|---|---|---|---|---|
| **Sub Type 1 ↑** | | | | | |
| **Assets** | | | | | |
| 1000-Checking: Umpqua | $0.00 | $333,915.44 | $0.00 | $21,290.51 | $85.02 |
| 1010-Checking: Chase Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1012-Checking: Wells Fargo | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1015-Checking: Seaside Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1020-Checking: Sponor Account | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1050-Unapplied Cash | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1051-Reinvestment Clearing Account | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1060-Checking: East West Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1100-Accounts Receivable | $0.00 | -$5190.60 | $0.00 | $2,090.00 | $0.00 |
| 1200-Cap Vault, LLC | $0.00 | $0.00 | $0.00 | $88,749.97 | $0.00 |
| 1210-Cap Enterprises, Inc. | $0.00 | $0.00 | $0.00 | $46,174.26 | $0.00 |
| 1220-Cap PNW Fund 1R | $0.00 | $0.00 | $0.00 | $2,069,054.06 | $0.00 |
| 1225-Cap NW Fund 2R | $0.00 | $14.74 | $0.00 | $45,600.81 | $0.00 |
| 1226-Cap Pacific Income Fund 5R | $0.00 | $0.00 | $0.00 | $16,304.38 | $0.00 |
| 1227-CapPacific Income Fund 6R | $0.00 | $0.00 | $0.00 | $200.00 | $0.00 |
| 1228-Cap EVO, LLC | $0.00 | $0.00 | $0.00 | $5,920.25 | $0.00 |
| 1229-Cap PNW Fund 2) | $0.00 | $0.00 | $0.00 | $5,727.08 | -$125.00 |
| 1230-Cap Equity, LLC | -$29,553.33 | -$3,443,560.46 | $0.00 | $14,272.41 | $0.00 |
| 1231-Cap China Office | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1235-Cap Pacific Income Fund 4R | $0.00 | $0.00 | $0.00 | $77,781.91 | $0.00 |
| 1240-Oceanaire, LLC | $0.00 | $0.00 | $0.00 | $696,565.05 | $0.00 |
| 1250-Cap Management, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1251-iCap Equity Real Estate Fund I, LLC | $0.00 | $0.00 | $0.00 | $155,000.00 | $0.00 |
| 1252-iCap Investments, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1255-Suite 500 Company, Inc. | $0.00 | $0.00 | $0.00 | $145.56 | $0.00 |
| 1256-Altus Legal, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1260-Edge Construction, LLC | $0.00 | $0.00 | $0.00 | $113.08 | $0.00 |
| 1270-Edge PNW Management, LLC | -$200.00 | -$2,069,054.06 | $0.00 | $0.00 | -$5,727.08 |
| 1280-Cap B1, LLC | $0.00 | $0.00 | $0.00 | $441,284.77 | $0.00 |
| 1285-Cap B2, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1290-Chris Christensen | $0.00 | $0.00 | $0.00 | $211,945.92 | $0.00 |
| 1300-Property & Equipment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1310-Furniture | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1320-Computers & Software | $0.00 | $0.00 | $0.00 | $87,456.60 | $0.00 |
| 1330-Automobiles | $0.00 | $0.00 | $0.00 | $16,200.69 | $0.00 |
| 1340-Buildings & Improvements | $0.00 | $0.00 | $0.00 | $93,758.77 | $0.00 |
| 1350-Work in Progress | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1355-Capitalized Interest | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1360-Land | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1365-Land Development | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1370-Tenant Improvements | $0.00 | $0.00 | $0.00 | $54,888.65 | $0.00 |
| 1380-Intangible Assets - Branding | $0.00 | $0.00 | $0.00 | $37,748.38 | $0.00 |
| 1381-Intangible Assets - Loan Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1385-Accumulated Depreciation | $0.00 | $0.00 | $0.00 | -$180,193.00 | $0.00 |
| 1390-Organizational Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1391-Start Up Costs | $26,845.83 | $53,962.77 | $0.00 | $0.00 | $0.00 |
| 1395-Accumulated Amortization | $0.00 | -$21,884.71 | $0.00 | $0.00 | $0.00 |
| 1400-Equity Investments | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Exhibit 1, Page 618

Filtered By
Show: All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity/Accounting Variable Name → GL Accounts GL Account Name ↑ | iCap Pacific Income Fund 6, LLC — Sum of Current Period | iCap Pacific Northwest Opportunity & Income Fund, LLC — Sum of Current Period | iCap Pacific NW Management, LLC — Sum of Current Period | iCap PNW Opportunity & Income Fund 2), LLC — Sum of Current Period |
|---|---|---|---|---|
| **Sub Type 1 ↑** | | | | |
| 1500-Investment in Project | $0.00 | $47,330,145.68 | $0.00 | $0.00 |
| 1510-Payoff from Project | $0.00 | -$45,694,321.13 | $0.00 | $0.00 |
| 1520-Basis Adjustment: Allocated Costs | $0.00 | $39,437,394.52 | $0.00 | $0.00 |
| 1530-Income/Loss Allocation | $0.00 | -$18,817,974.15 | $0.00 | $0.00 |
| 1600-Commissions | $0.00 | $5,161,820.31 | $0.00 | $0.00 |
| 1610-Debt Issuance Costs | $0.00 | $206,246.14 | $0.00 | $0.00 |
| 1620-Management Fees | $0.00 | $4,445,773.23 | $0.00 | $0.00 |
| 1630-Investor Interest | $0.00 | $36,865,287.03 | $0.00 | $0.00 |
| 1700-A/A: Commissions | $0.00 | -$5,161,820.31 | $0.00 | $0.00 |
| 1710-A/A: Debt Issuance Costs | $0.00 | -$206,246.14 | $0.00 | $0.00 |
| 1720-A/A: Management Fees | $0.00 | -$4,445,773.23 | $0.00 | $0.00 |
| 1730-A/A: Investor Interest | $0.00 | -$36,865,287.03 | $0.00 | $0.00 |
| 1740-A/A: NAV Discount | $0.00 | -$843,456.15 | $0.00 | $0.00 |
| 1800-Prepaid Expenses | $0.00 | $0.00 | $0.00 | $0.00 |
| 1810-Employee Loan Receivable | $0.00 | $0.00 | $641.16 | $0.00 |
| 1820-Security Deposit | $0.00 | $0.00 | $49,080.01 | $0.00 |
| 1840-Escrow Deposit | $0.00 | $0.00 | $0.00 | $0.00 |
| 1900-Note Receivable | -$2,907.50 | $0.00 | $0.00 | $0.00 |
| **Subtotal** | -$2,907.50 | $16,264,962.41 | $4,053,841.28 | -$5,767.06 |
| **Liabilities** | | | | |
| 2000-Accounts Payable | $0.00 | -$409,406.29 | $806.15 | $0.00 |
| 2010-Investor Interest Payable | $0.00 | $0.00 | $0.00 | $0.00 |
| 2100-Accrued Expenses | $0.00 | $0.00 | -$6,582.92 | $0.00 |
| 2300-Loan from Sponsor | $0.00 | $0.00 | $0.00 | $0.00 |
| 2350-Escrow Deposit | $0.00 | $0.00 | $0.00 | $0.00 |
| 2450-Profit Sharing Plan Payable | $0.00 | $0.00 | $0.00 | $0.00 |
| 2500-Note Payable: Alliant | $0.00 | $0.00 | -$36,058.91 | $0.00 |
| 2501-Note Payable: SJ Fox Ridge, LLC | $0.00 | $0.00 | $0.00 | $0.00 |
| 2502-Note Payable: Bob Walsh | $0.00 | $0.00 | $0.00 | $0.00 |
| 2503-Note Payable: T&L Onc, LLC | $0.00 | $0.00 | $0.00 | $0.00 |
| 2504-Note Payable: Grogan/Blair | $0.00 | $0.00 | $0.00 | $0.00 |
| 2505-Note Payable: Claus Mueller | $0.00 | $0.00 | $0.00 | $0.00 |
| 2506-Note Payable: YI Shan | $0.00 | $0.00 | $0.00 | $0.00 |
| 2507-Note Payable: Eric & Ying Wu | $0.00 | $0.00 | $0.00 | $0.00 |
| 2508-Note Payable: Weifan Peng | $0.00 | $0.00 | $0.00 | $0.00 |
| 2509-Note Payable: Qing Wu | $0.00 | $0.00 | $0.00 | $0.00 |
| 2511-Note Payable: Eastside Fund, LLC | $0.00 | $0.00 | $0.00 | $0.00 |
| 2512-Note Payable: Mike Gould | $0.00 | $0.00 | $0.00 | $0.00 |
| 2513-Note Payable: Gould Trust | $0.00 | $0.00 | $0.00 | $0.00 |
| 2515-Note Payable: SPS | $0.00 | $0.00 | $0.00 | $0.00 |
| 2516-Note Payable: Caifeng Yu | $0.00 | $0.00 | $0.00 | $0.00 |
| 2520-Note Payable: David Straz Jr. | $0.00 | $0.00 | $0.00 | $0.00 |
| 2530-Note Payable: Titan Securities | $0.00 | $0.00 | $0.00 | $0.00 |
| 2550-Note Payable: Loan on Project | $0.00 | $0.00 | $0.00 | $0.00 |
| 2551-Note Payable: Construction Holdback | $0.00 | $0.00 | $0.00 | $0.00 |
| 2552-Note Payable: Interest Reserve | $0.00 | $0.00 | $0.00 | $0.00 |
| 2553-Construction Holdback Clearing Account | $0.00 | $0.00 | $0.00 | $0.00 |
| 2555-Note Payable: Loan on Project | $0.00 | $0.00 | $0.00 | $0.00 |
| 2600-Debentures Payable | $0.00 | -$36,483,754.90 | $0.00 | $0.00 |

Filtered By
Show - All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity: Accounting Variable Name → / GL Account: GL Account Name ↑ | iCap Pacific Income Fund 6, LLC — Sum of Current Period | iCap Pacific Northwest Opportunity & Income Fund, LLC — Sum of Current Period | iCap Pacific NW Management, LLC — Sum of Current Period | iCap PNW Opportunity & Income Fund 2), LLC — Sum of Current Period |
|---|---|---|---|---|
| **Sub Type 1** ↑ | | | | |
| 2610-NAV Discount | $0.00 | $843,456.15 | $0.00 | $0.00 |
| 2700-Deferred Investment Deposit | $0.00 | $0.00 | $0.00 | $0.00 |
| **Subtotal** | $0.00 | -$36,049,705.04 | -$41,835.68 | $0.00 |
| **Owners Equity** | | | | |
| 3060-Current Year Earnings | $0.00 | $2,025,332.93 | -$4,031,617.13 | $0.00 |
| 3100-Additional Paid in Capital | $0.00 | $0.00 | $0.00 | $0.00 |
| 3200-Members Equity | $0.00 | $259,669.63 | $2,793,749.99 | $0.00 |
| 3210-iCap Pacific NW Opportunity & Income Fund, LLC | $0.00 | $0.00 | $0.00 | $0.00 |
| 3220-iCap Northwest Opportunity Fund, LLC | $0.00 | $0.00 | $0.00 | $0.00 |
| 3230-iCap EVO, LLC | $0.00 | $0.00 | $0.00 | $0.00 |
| 3240-iCap B2, LLC | $0.00 | $0.00 | $0.00 | $0.00 |
| 3250-AUM Sponsor Capital | $0.00 | $0.00 | $0.00 | $0.00 |
| 3260-iCap Pacific Income Fund 4R, LLC | $0.00 | $0.00 | $0.00 | $0.00 |
| 3300-Members Contribution | $0.00 | $3,504.06 | $0.00 | $0.00 |
| 3400-Members Draw | $0.00 | $0.00 | $4,727.00 | $85.02 |
| **Subtotal** | $0.00 | $2,288,506.62 | -$1,233,140.14 | -$85.02 |

**Balance Sheet by Entity by Period**
As of 2023-12-19 16:03:13 Pacific Standard Time/PST • Generated by Nickisha Haine

Filtered By
Show: All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity / Accounting Variable Name → GL Account: GL Account Name ↑ | iCap Rhody Ridge, LLC Sum of Current Period | iCap Steadman 170th, LLC Sum of Current Period | iCap Vault I, LLC Sum of Current Period | Oceanaire, LLC Sum of Current Period | Senza Kenmore, LLC Sum of Current Period | Senza Sammamish, LLC Sum of Current Period | Subtotal Sum of Current Period |
|---|---|---|---|---|---|---|---|
| **Sub Type 1 ↑** | | | | | | | |
| **Assets** | | | | | | | |
| 1000-Checking: Umpqua | $0.00 | $0.00 | $841,759.05 | $2,729.73 | $100.01 | $0.00 | $8,824,611.14 |
| 1010-Checking: Chase Bank | $0.00 | $0.00 | $0.00 | $141.06 | $0.00 | $0.00 | $141.06 |
| 1012-Checking: Wells Fargo | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,000.00 |
| 1015-Checking: Seaside Bank | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $109,092.56 |
| 1020-Checking: Sponor Account | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $674.86 |
| 1050-Unapplied Cash | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1051-Reinvestment Clearing Account | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$0.01 |
| 1060-Checking: East West Bank | $0.00 | $0.00 | $82,553.98 | $0.00 | $0.00 | $0.00 | $82,553.98 |
| 1100-Accounts Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1200-iCap Vault, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,090.00 |
| 1210-iCap Enterprises, Inc. | $0.00 | $0.00 | $0.00 | $43,320.33 | $0.00 | $0.00 | $252,558.98 |
| 1220-iCap PNW Fund 1R | $0.00 | $0.00 | $190.60 | $0.00 | $0.00 | $0.00 | $817,179.58 |
| 1225-iCap NW Fund 2R | $0.00 | $0.00 | -$2,145.00 | $0.00 | $0.00 | $0.00 | $5,512,819.88 |
| 1226-iCap Pacific Income Fund 5R | $0.00 | $0.00 | $7,657.50 | $0.00 | $0.00 | $0.00 | $218,205.54 |
| 1227-iCapPacific Income Fund 6R | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $38,319.58 |
| 1228-iCap EVO, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $29,753.33 |
| 1229-iCap PNW Fund 2i | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $5,920.25 |
| 1230-iCap Equity, LLC | $0.00 | $0.00 | $0.00 | -$1,162,059.01 | $0.00 | $0.00 | $5,852.08 |
| 1231-iCap China Office | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$6,002,007.41 |
| 1235-iCap Pacific Income Fund 4R | $0.00 | $0.00 | -$168,912.00 | $0.00 | $0.00 | $0.00 | $134,912.89 |
| 1240-Oceanaire, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $138,283.97 |
| 1250-iCap Management, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,815,303.73 |
| 1251-iCap Equity Real Estate Fund I, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1252-iCap Investments, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $206,415.37 |
| 1255-Suite 500 Company, Inc. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $395,680.50 |
| 1256-Altius Legal, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $381.06 |
| 1260-Edge Construction, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1270-iCap PNW Management, LLC | $0.00 | $0.00 | -$88,746.07 | -$696,565.05 | $0.00 | $0.00 | -$3,644,517.23 |
| 1280-iCap B1, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$119,769.35 |
| 1285-iCap B2, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $561,054.12 |
| 1290-Chris Christensen | $0.00 | $0.00 | $0.00 | -$44,909.86 | $0.00 | $0.00 | $1,097,093.98 |
| 1300-Property & Equipment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1310-Furniture | $0.00 | $0.00 | $0.00 | $5,481.83 | $0.00 | $0.00 | $97,476.49 |
| 1320-Computers & Software | $0.00 | $0.00 | $0.00 | $35,727.26 | $0.00 | $0.00 | $26,757.47 |
| 1330-Automobiles | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $93,758.77 |
| 1340-Buildings & Improvements | $0.00 | $0.00 | $0.00 | $962,335.93 | $0.00 | $0.00 | $1,291,691.05 |
| 1350-Work in Progress | $0.00 | $0.00 | $0.00 | $0.00 | $195,460.00 | $0.00 | $4,587,771.43 |
| 1355-Capitalized Interest | $0.00 | $0.00 | $0.00 | $77,750.00 | $77,750.00 | $0.00 | $551,805.48 |
| 1360-Land | $0.00 | $0.00 | $0.00 | $767,560.00 | $0.00 | $0.00 | $66,595,151.64 |
| 1365-Land Development | $0.00 | $0.00 | $0.00 | $0.00 | $1,324,354.41 | $0.00 | $1,027,185.14 |
| 1370-Tenant Improvements | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $56,888.65 |
| 1380-Intangible Assets - Branding | $0.00 | $0.00 | $0.00 | $0.00 | $89,658.00 | $0.00 | $37,748.38 |
| 1381-Intangible Assets - Loan Costs | $0.00 | $0.00 | $0.00 | -$101,642.00 | $0.00 | $0.00 | $35,727.26 |
| 1385-Accumulated Depreciation | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$326,095.84 |
| 1390-Organizational Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $50,825.00 |
| 1391-Start Up Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $287,141.94 |
| 1395-Accumulated Amortization | $0.00 | $0.00 | $0.00 | -$14,521.00 | $0.00 | $0.00 | -$73,444.35 |
| 1400-Equity Investments | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$49.00 |

Filtered By
Show: All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity / Accounting Variable Name → | iCap Rhody Ridge, LLC | iCap Steadman 170th, LLC | iCap Vault, LLC | Oceanaire, LLC | Senza Kenmore, LLC | Senza Sammamish, LLC | Subtotal |
|---|---|---|---|---|---|---|---|
| GL Account: GL Account Name ↓ | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period |
| **Sub Type 1 ↑** | | | | | | | |
| 1500-Investment in Project | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$110,033,497.60 |
| 1510-Payoff from Project | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$89,306,660.48 |
| 1520-Basis Adjustment: Allocated Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $74,620,988.27 |
| 1530-Income/Loss Allocation | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$42,125,746.92 |
| 1600-Commissions | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $12,864,146.32 |
| 1610-Debt Issuance Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $312,025.68 |
| 1620-Management Fees | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8,661,446.63 |
| 1630-Investor Interest | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $51,615,401.40 |
| 1700-A/A: Commissions | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$10,967,164.05 |
| 1710-A/A: Debt Issuance Costs | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$312,025.68 |
| 1720-A/A: Management Fees | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$8,479,347.81 |
| 1730-A/A: Investor Interest | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$48,933,414.12 |
| 1740-A/A: NAV Discount | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$1,471,109.64 |
| 1800-Prepaid Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 1810-Employee Loan Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $641.16 |
| 1820-Security Deposit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $49,080.01 |
| 1840-Escrow Deposit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,800,000.00 |
| 1900-Note Receivable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Subtotal** | $0.00 | $0.00 | $671,758.06 | -$202,400.78 | $1,687,322.42 | $0.00 | $83,229,458.73 |
| **Liabilities** | | | | | | | |
| 2000-Accounts Payable | $0.00 | $0.00 | -$30,126.00 | -$8,888.81 | $0.00 | $0.00 | -$1,216,377.86 |
| 2010-Investor Interest Payable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2100-Accrued Expenses | $0.00 | $0.00 | $62,370.00 | $0.00 | $0.00 | $0.00 | $54,622.05 |
| 2300-Loan from Sponsor | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$12,527.00 |
| 2350-Escrow Deposit | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2450-Profit Sharing Plan Payable | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2500-Note Payable: Alliant | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$36,058.91 |
| 2501-Note Payable: SI Fox Ridge, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$23,105.78 |
| 2502-Note Payable: Bob Walsh | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2503-Note Payable: T&L One, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$226,682.77 |
| 2504-Note Payable: Grogan/Blair | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$112,844.36 |
| 2505-Note Payable: Claus Mueller | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2506-Note Payable: Yi Shan | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$127,062.90 |
| 2507-Note Payable: Eric Fu & Ying Wu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$101,600.00 |
| 2508-Note Payable: Weifan Peng | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$50,791.67 |
| 2509-Note Payable: Qing Wu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$30,319.35 |
| 2511-Note Payable: Eastside Fund, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2512-Note Payable: Mike Gould | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2513-Note Payable: Gould Trust | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2515-Note Payable: SPS | $0.00 | $0.00 | $0.00 | -$1,127,000.00 | $0.00 | $0.00 | -$1,127,000.00 |
| 2516-Note Payable: Caifeng Yu | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2520-Note Payable: David Straz Jr. | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$20,038.71 |
| 2530-Note Payable: Titan Securities | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2550-Note Payable: Loan on Project | $0.00 | $0.00 | $0.00 | $0.00 | -$450,000.00 | $0.00 | -$1,976,244.45 |
| 2551-Note Payable: Construction Holdback | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$1,149,500.00 |
| 2552-Note Payable: Interest Reserve | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2553-Construction Holdback Clearing Account | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2555-Note Payable: Loan on Project | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 2600-Debentures Payable | $0.00 | $0.00 | -$1,053,340.13 | $0.00 | $0.00 | $0.00 | -$114,366,505.17 |

Exhibit 1, Page 622

Filtered By
Show: All financial cubes
Date Field: Created Date equals Custom (null to 12/31/2019)
Entity: Accounting Variable Name contains iCap, 725, UW, Senza, VH, Colpitts, Ocean
GL Account Type equals Balance Sheet
Ledger Type equals Transactional
Accounting Period: Accounting Period Name contains

| Entity: Accounting Variable Name → | | iCap Rhody Ridge, LLC | iCap Steadman 170th, LLC | iCap Vault I, LLC | Oceanaire, LLC | Senza Kenmore, LLC | Senza Sammamish, LLC | Subtotal |
|---|---|---|---|---|---|---|---|---|
| Sub Type 1 ↑ | GL Account: GL Account Name ↑ | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period | Sum of Current Period |
| | 2610-NAV Discount | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,650,792.96 |
| | 2700-Deferred Investment Deposit | $0.00 | $0.00 | $0.00 | -$1,135,888.81 | -$450,000.00 | $0.00 | $0.00 |
| Subtotal | | $0.00 | $0.00 | -$1,021,096.13 | $0.00 | $0.00 | $0.00 | -$118,871,243.92 |
| Owners Equity | 3060-Current Year Earnings | $18.64 | $154,356.23 | $0.00 | $1,083,404.04 | $18.64 | $18.64 | $4,077,270.83 |
| | 3100-Additional Paid in Capital | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$11,800.00 |
| | 3200-Members Equity | $0.00 | $0.00 | $0.00 | -$319,407.09 | $0.00 | $0.00 | $2,451,649.46 |
| | 3210-iCap Pacific NW Opportunity & Income Fund, LLC | -$13,349.10 | -$569,950.59 | $0.00 | $0.00 | $0.00 | $0.00 | -$2,043,013.24 |
| | 3220-iCap Northwest Opportunity Fund, LLC | -$61,547.12 | $0.00 | $0.00 | $0.00 | -$1,237,366.05 | $149,121.51 | -$10,551,758.26 |
| | 3230-iCap EVO, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$776,872.00 |
| | 3240-iCap B2, LLC | $0.00 | -$271,204.26 | $0.00 | $0.00 | $0.00 | $0.00 | -$271,204.26 |
| | 3250-AUM Sponsor Capital | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$1,285,340.00 |
| | 3260-iCap Pacific Income Fund 4R, LLC | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$1,677,466.53 |
| | 3300-Members Contribution | $0.00 | $0.00 | $0.00 | -$141.06 | $0.00 | $0.00 | -$2,418,076.08 |
| | 3400-Members Draw | $0.00 | $686,798.62 | $0.00 | $29,800.70 | $0.00 | $0.00 | $2,965,729.19 |
| Subtotal | | -$74,877.58 | $0.00 | $0.00 | $793,656.59 | -$1,237,347.41 | $149,140.15 | -$9,540,880.89 |

**Exhibit 33**

# 2017 Budget

TD Croshaw <td@icapequity.com>

Tue 1/24/2017 12:57 PM

To:Chris Christensen <chris@icapequity.com>

 1 attachments (43 KB)

2017 - Management Budget.xlsx;

Looks like we are going to be in a significant deficit at the end of February and the first of March.
January actuals are on the second tab, January was a bad month for us.
Thank you,

**TD Croshaw** / *Controller, CPA, MBA*
3535 Factoria Blvd, SE, Suite 500
Bellevue, WA 98006
425-278-9030 x127 / icapequity.com



**Exhibit 34**

## Budget

TD Croshaw <td@icapequity.com>

Fri 11/10/2017 3:18 PM

To:Chris Christensen <chris@icapequity.com>

 1 attachments (115 KB)

2017 - Management Budget.xlsx;

Chris,
Here is the updated budget.  Please note on the tabs "Nov 17 Actual" and "Dec 17 Actual" are the estimated budget amounts.  As you can see we are significantly in the Red for these two months.  I have estimated your payroll at $250k per year.  This will net you $7,539.53 every two weeks and have added this to the payroll expense.  I have reduced your draw amount to zero in this assumption since you will be on payroll.  Please review and let me know if you have any questions or comments. We are will not have enough money in the amount of $160k for both months so a total of $320k that we will need to come up with.
Thank you,

**TD Croshaw**  /  *Controller, CPA, MBA*
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006
425-278-9030  x127  /  icapequity.com

**Exhibit 35**

## RE: Fund 6 Financial Model

**Andy Willett <andy@icapequity.com>**

Tue 5/26/2020 9:18 AM

To:Jim Christensen <jim@icapequity.com>;Mike Olson <mike@icapequity.com>;Jonathan Siegel <jonathan@icapequity.com>;Chris Christensen <chris@icapequity.com>

All,

I ran a few scenarios to test the model and also see how we could minimize the amount of capital we needed to raise and still absorb F1 and F2 (I used $60M rather than $65M because of a fat finger). I assumed a 3 year fund raise in all cases, and ran the model so that ending profit was between $5M and $8M. The chart below shows the results.

|       |     | **% Zero Coupon** |      |      |          |           |
|-------|-----|------|------|------|----------|-----------|
|       |     | **100%** | **75%** | **50%** |      |       |
| **IRR** | **17%** | $ 310 | $ 340 | $ 380 | **9.0%** | **Yield** |
|       | **16%** | $ 340 | $ 378 | $ 419 | **8.5%** |       |
|       | **15%** | $ 380 | $ 425 | $ 470 | **8.0%** |       |

My primary take-away (other than the #'s seem to make sense relative to each other meaning the model is working) are that not making coupon payments makes a big difference in the amount of money we need to raise, and that we'd be better off offering a higher yield with a zero coupon than a lower yield with a coupon.

The other implication is that we'd have to find fewer projects. The model predicts we'd need 1,056 projects in the $470M raise scenario vs. 959 in the $310M raise scenario.

The only strange behavior I saw with the model was when I tried running it assuming a 17% IRR, 100% zero coupon and an 8% yield (the best case scenario). I could not get the model to deliver a solution with anything less than $15M in profitability. This scenario showed a $260M raise and 906 projects.

Regardless of the scenario, the numbers look daunting to me. To give ourselves a shot, we have to incent/force most, if not all, F1 and F2 investors to roll-over, and we have to incent/force most, if not all, to not take a monthly payment – either by not offering an option with a coupon, or offering a significantly higher yield.

Andy

**Andy Willett** | Director Capital Markets
(o) 425.278.9036 | (c) 206.310.7847
icapequity.com
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006

**From:** Jim Christensen <jim@icapequity.com>
**Sent:** Friday, May 22, 2020 11:20 AM
**To:** Mike Olson <mike@icapequity.com>; Andy Willett <andy@icapequity.com>; Jonathan Siegel <jonathan@icapequity.com>; Chris Christensen <chris@icapequity.com>
**Subject:** Fund 6 Financial Model

Hi everyone,

Attached is the updated spreadsheet.

Here are the main variables we have to work with:

1. New Fundraising $
2. IRR
3. Fundraising Period
4. Interest rate (zero Coupon)

Assumption: $65M rollover investor

Here are some questions we want to answer:
1. What is the maximum rollover Fund 6 can handle? If yes, then:
   a. Are the assumptions reasonable?
   b. What is the % of rollover to funds raised?  Is it reasonable?
   c. Are there other scenarios that make sense that get us close to absorbing all more rollover investors?
   d. Etc.

Thanks,

**Jim Christensen** / *Chief Operating Officer*
425-278-9030 ext. 132  /  icapequity.com
3535 Factoria Blvd. SE, Suite 500
Bellevue, WA 98006