Julian I. Gurule (CA SBN: 251260)*
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone: (213) 430-6067
Email: jgurule@omm.com

*Co-Counsel to Debtors and
Debtors in Possession*

Dakota Pearce (WSBA #57011)
BUCHALTER
1420 5th Avenue, Suite 3100
Seattle, Washington 98101
Telephone: (206) 319-7052
Email: dpearce@buchalter.com

Bernard D. Bollinger, Jr. (CA SBN: 132817)*
David E. Mark (CA SBN: 247283)*
Khaled Tarazi (AZ SBN: 032446)*
BUCHALTER
1000 Wilshire Blvd., Suite 1500
Los Angeles, California 90017
Telephone: (213) 891-0700
Email: bbollinger@buchalter.com
        ktarazi@buchalter.com

*Admitted *Pro Hac Vice*

*Counsel to Debtors and Debtors in
Possession*

HONORABLE WHITMAN L. HOLT

HEARING DATE: March 27, 2024
HEARING TIME: 10:00 A.M.
LOCATION:  Tower Bldg
           2nd Floor Courtroom
           402 East Yakima Avenue
           Yakima, WA 98901

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re:<br><br>ICAP ENTERPRISES, INC., *et al.*,<br><br>                    Debtors.[1] | Chapter 11<br><br>Lead Case No. 23-01243-WLH11<br>Jointly Administered |

---

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01265-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01248-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund, LLC (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); iCap Broadway, LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care LLC (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF**

- 1

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

I, Lance Miller, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

1. I am the Chief Restructuring Officer and/or Manager of the above-captioned debtors and debtors in possession (together, the "Debtors" or the "Company"). I am generally familiar with the Company's business and financial affairs, and books and records. I am above 18 years of age and I am competent to testify.

2. I am a Partner at Paladin Management Group ("Paladin"), a financial advisory firm with an office located at 633 West 5th Street, 28th Floor, Los Angeles, California, 90071.

3. Paladin provides a broad range of corporate advisory services to its clients including, without limitation, restructuring, strategic and transaction advisory, and strategic communications services. As a partner at Paladin, I have extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 proceedings. My experience includes representations in the following matters, among other things: *In re PP Group, LLC*, Case No. 20-10910 (Bankr. D. Del.); *In re Easterday Ranches, Inc.*, Case No. 21-00141 (Bankr. E.D. Wash.); *In re MD America Energy, LLC*, Case No. 20-34966 (Bankr. S.D. Tex.); *In re Yogaworks, Inc.*, Case No. 20-12599 (Bankr. D. Del.); *In re Chesapeake Energy Corp.*, Case No. 20-32333 (Bankr. S.D. Tex.); *In re Lear Capital, Inc.*, Case No. 22-10165 (Bankr. D. Del.);

2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding LLC (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11); Vault Holding, LLC (23-01270-11); iCap Pacific Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); iCap Holding 6 LLC (23-01274-11); Colpitts Sunset, LLC (23-01432-11); CS2 Real Estate Development LLC (23-01434-11); and iCap International Investments, LLC (23-01464-11).

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF

- 2-

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 473    Filed 02/26/24    Entered 02/26/24 11:12:57    Pg 2 of 35

*In re CalPlant I Holdco, LLC*, Case No. 21-11302 (Bankr. D. Del.). Prior to joining Paladin, I was the general counsel and chief restructuring officer at Sugarfina, Inc., and general counsel at American Apparel, Inc. I earned a B.A. degree from the University of California, San Diego, and a juris doctor degree from Boston University School of Law. I have approximately 18 years of experience as an advisor and investor in corporate restructurings and distressed situations. I have advised companies, creditors, shareholders, and other stakeholders regarding restructurings and recapitalizations, chapter 11 re-organizations, and mergers and acquisitions.

4. I am authorized to submit this declaration on behalf of the Debtors. I am one of the Paladin employees that has possession, custody, and control of Paladin's records. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Company's operations, finances, records, and information learned from my review of relevant documents, and information I have received from the Company's advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

## **General Background**

5. A general background of the Company and its assets and liabilities was provided in that certain Declaration of Lance Miller in Support of First Day Motions [Dkt. No. 23] (the "First Day Declaration"), the contents of which are incorporated herein by reference.

6. As discussed in the First Day Declaration, the Company commenced these bankruptcy cases amidst allegations involving fraud, violations of state consumer protection laws, breach of contract, and civil conspiracy, arising from the Debtors' pre-petition fundraising practices. Also as discussed in the First Day Declaration, a core goal of these bankruptcy cases is to undertake a comprehensive investigation and assessment of these allegations.

7.     Since the commencement of these cases, the Debtors' professionals, working in cooperation with the Official Committee of Unsecured Creditors (the "Committee"), have undertaken a robust investigation of the Debtors' books and records and prepetition activities.  The investigation has been far reaching, involving the following efforts, among other things:

  a.     More than ten requests for production and/or examination, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure;

  b.     Review of the Company's books and records, including its accounting systems, bank statements, email systems, and retained files;

  c.     Interviews of more than 15 key former employees;

  d.     Interviews of important brokers and other parties involved in prepetition fundraising; and

  e.     Interviews of professionals and counterparties involved in prepetition transactions with the Debtors.

8.     The Company's investigation is not completed and will continue. Nevertheless, I am able to make the conclusions and determinations described in this Declaration based on information received thus far and the investigation to date.  The investigation supports the following overarching conclusions:

- The Company raised investment almost exclusively through debt instruments that required monthly interest payments.

- The Company's business model – investing in real estate development opportunities – lacked a regular source of cash flow, and development completion was difficult to project.

- The Company's first two "funds," called Fund 1 and Fund 2 (each defined below), lost substantial amounts of money and could not support investor repayment obligations.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 4-

- The Company increasingly relied on new fundraised proceeds in order to pay ongoing investor interest obligations. The Company told investors that its real estate development projects were highly profitable, and that its business performance was strong. It also told investors that new fundraised proceeds would be "secured" by real estate assets and would be used for development needs. In reality, however, these statements were untrue.

- As the Company's business performance suffered, the Company doubled down on its use of fundraising to cover operating expenses and investor interest expenses. Between October 2018 and September 2023, fundraising activities represented more than 75% of total receipts (excluding intercompany advances), and were 10 times greater than revenues from real estate activities. In reality, fundraising new debt **was the Company's business; real estate development was an incidental activity.**

A.      **Corporate Founding**

9.      The Company was founded by Christopher Christensen in 2011. Mr. Christensen is a licensed attorney in the State of Washington. Prior to founding the Company, Mr. Christensen focused his practice on advising clients with respect to financing for real estate transactions in the Greater Seattle area.

10.      The original vision for the Company was primarily focused on investing as a passive investor in developers who would then be required by contract or operating agreement to develop specific projects. Under this structure, the Company would take a preferred equity position in the developer. The Company's activities would then be focused on finding new deals and monitoring the activity of development partners.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 5 -

11. My understanding is that most real estate investments of the kind envisioned for the Company are typically completed through various forms of equity. Financing through debt can be challenging for real estate developers because of the difficulty in predicting the timeframe and amount of commercial real estate sales and the industry's sensitivities to macroeconomic conditions. Nevertheless, for reasons currently unclear, the Company chose to raise capital from investors through debentures that required monthly interest payments – payments that would be required regardless of whether the underlying real estate investments were themselves producing positive cash flow.

**B.    Fund 1**

12. The Company's first "fund," iCap Pacific Northwest Opportunity and Income Fund, LLC ("Fund 1"), was formed in December 2013.[2] Fund 1 raised $46.2 million in private placement debentures. Fund 1 investments were offered in partnership with Skyway Advisors, LLC as a Managing Dealer under the terms of a Selling Agreement. The debentures were marketed as secured instruments, with liens on substantially all of Fund 1's assets, including the following:

(a)    a first or second position deed of trust in the real estate owned by the special purpose entities now owned or hereafter acquired by the Company;

(b)    all of the assets of the Company, which primarily consist of its membership interests in the special purpose entities now owned or hereafter acquired by the Company;

(c)    all of the Company's partners' membership interests in the special purpose entities now owned, pledged or hereafter acquired by the Company;

(d)    the rights of the Company to take control of the special purpose entities holding the fund's investments, including, by way of illustration, removal and replacement of the manager, the making of investment decisions relating to individual projects, and decisions regarding the manner and

---

[2] Prior to Fund 1, the Company had two earlier investment vehicles, iCap B1, LLC (formed in September 2013) and iCap B2, LLC (formed in October 2013). My current understanding is that these investment vehicles each had a single investor. The circumstances involving these entities are the subject of ongoing investigations.

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF

- 6-

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 473    Filed 02/26/24    Entered 02/26/24 11:12:57    Pg 6 of 35

timing of exits from the projects;

    (e)    all products, proceeds, rents and profits of the foregoing;

    (f)    all of the Company's books and records related to any of the foregoing; and

    (g)    all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Company now has or hereafter acquires any rights.

*See* Senior Secured Debenture Purchase Agreement (the "Fund 1 Purchase Agreement"), Exhibit A to Confidential Offering Memorandum, iCap Pacific Northwest Opportunity and Income Fund, LLC, for 12% Senior Debentures due 2016 (the "Fund 1 OM"), a copy of which is attached hereto as Exhibit 1, at § 7.3. The Fund 1 Purchase Agreement further required the Company to enter into a Security Agreement, Pledge and Security Agreement, Deposit Account Control Agreement, and UCC Financing Statements, all of which were attached as exhibits to the Fund 1 OM. *Id.* at *C-1-2 through C-5-1. Finally, the Fund 1 Purchase Agreement provided for appointment of a collateral agent, Kevin A. Carreno, P.A., as the exclusive agent for enforcing rights under the Fund 1 Purchase Agreement.

    13.    As would become important later, the Fund 1 Purchase Agreement prohibited Fund 1 from incurring indebtedness beyond a specific list of "Permitted Indebtedness." Exhibit 1 at *32. Notably, permitted indebtedness did not include loans made to Fund 1 from other iCap affiliates.

    14.    The Fund 1 offering was designed to be attractive to both investors and the brokers and registered investment advisors who connected them with the Company. The Fund 1 debentures offered investors a 12% interest rate per annum, paid monthly, plus a premium of 25% of net profits paid upon repayment. In addition, the Company offered brokers, including the Managing Dealer, total compensation of $3.9 million, including a 7.0% selling commission, a 1% due diligence fee, a 2% managing dealer

fee, and a 3% fee for marketing and underwriting. These attractants proved powerful, with the Company oversubscribing the Fund 1 debentures for a total raise of $45.4 million.

15. Our investigation thus far indicates that the Company ultimately ***did not honor*** its promises made in the Fund 1 OM and Fund 1 Purchase Agreement to secure the Fund 1 debentures with liens on substantially all assets of Fund 1 and its special purpose entities. Specifically and among other things, title reports for some of the properties acquired with Fund 1's proceeds ***do not*** reflect deeds of trust to secure liens held by the Fund 1 investors. Similarly, whereas Fund 1 had its own bank account, it does not appear that a Deposit Account Control Agreement was ultimately placed on that account.

16. The principal for the Collateral Agent died in a March 2016 plane crash. My understanding is that a replacement Agent was not appointed, leaving investors with no ability to enforce rights under the Fund 1 Purchase Agreement or related agreements.

17. The Company deployed the Fund 1 debenture proceeds between February 2014 and October 2015, investing in more than 30 projects.[3]

**C. Fund 2**

18. The Company's second "fund," iCap Northwest Opportunity Fund, LLC ("Fund 2"), was formed in April 2015 – almost exactly a year from closure of Fund 1's subscription period. Its structure and fundraising resembled Fund 1 in most respects, with a Managing Dealer (Stillpoint Capital, LLC), a Collateral Agent (Experts Counsel, Inc.), referenced accountants and outside counsel. It raised $46.5 million through private placement debentures. Fund 2's debentures matured December 31, 2017, and

---

[3] In August 2015, the Company formed iCap EVO, LLC, an investment vehicle for one or a small group of investors. We are continuing to investigate the circumstances involving this vehicle. It is unclear as to whether those facts form part of the narrative discussed herein.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 8-

promised interest of 10% per annum, paid monthly in arrears, with a Payoff Premium of 35% of Fund 2's net profits. Brokerage fees and commissions matched those of Fund 1, totaling $4.0 million (albeit comprised of different individual fees).

19. As with Fund 1, the Fund 2 Purchase Agreement anticipated that the debentures would be secured by liens on substantially all assets of Fund 2 and the underlying real estate. *See* Senior Secured Debenture Purchase Agreement (the "Fund 2 Purchase Agreement"), Exhibit A to Confidential Offering Memorandum, iCap Northwest Opportunity Fund, LLC, for 10% Senior Debentures (the "Fund 2 OM"), a copy of which is attached hereto as Exhibit 2, at § 7.3 (granting, among other things, "(a) a first or, where allowed under senior debt instruments, a second position deed of trust in the real estate now owned or hereafter acquired by the special purpose entities in which the Company now owns or hereafter acquires a security interest . . . [and] (b) all of the assets of the Company, which primarily consist of its membership interest in the Project Entities."). As with Fund 1, our investigation thus far indicates that the Company ultimately ***did not honor*** its promises to grant these liens. Similarly, the principal for the Collateral Agent was the same principal for Fund 1's Collateral Agent, and was not replaced after his death, leaving investors in the same position as Fund 1 investors, with no ability to enforce rights under the Fund 2 Purchase Agreement or related agreements.

20. The Company deployed the Fund 2 debenture proceeds between May 2015 and December 2018, investing in more than 25 projects.

**D. Fund 1 and Fund 2 Extensions**

21. The Company modeled Funds 1 and 2 on the assumption that individual investments would conclude within 24 months. *See* Fund 1 OM at *2 ("The Fund plans to hold each Investment for 6-18 months."); Fund 2 OM at *2 ("The Fund plans to hold each Investment for 12 months on average and no longer than 24 months."). In reality,

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 9-

however, the Company's expectations proved too optimistic. By November 2016 (one month before maturity of Fund 1 and only a year before Fund 2 matured), the Company had exited twenty-two (22) of its original investments with an average hold period of four hundred and forty one (441) days. Only nine (9) of those projects were exited within one year of the initial investment date. Another 20 original investments were still pending, with an average hold period of 661 days. In addition, despite consistent statements by the Company in quarterly newsletters and investor calls that both funds were performing well, both Fund 1 and Fund 2 results were abysmal – according to the Company's books and records, Fund 1's real estate investments **lost approximately $38 million** through 2021, and Fund 2's investments **lost $18.5 million** through 2021.[4] Years later, in May 2021, the Company admitted, deep in another Offering Memorandum, that its entities "have operated with negative cash flows *since inception.*" *See* iCap Funding OM (defined below), at *13 (emphasis added).

Fund 1 Extensions

22.     Fund 1 matured in December 2016. The Company was unable to repay the Fund 1 debentures. In advance of that maturity date, in May 2016 the Company asked investors to agree to extend the maturity date to December 31, 2017 (the "Fund 1 First Extended Maturity Date"). The extension letter, a copy of which is attached hereto as Exhibit 3, provided investors with the option to either extend the maturity date for their investments, or keep the existing maturity date. The letter stated as follows:

> Given the strong demand for new homes and rental units resulting from the large number of new jobs created in the Pacific Northwest over the last few years, the cities and counties region-wide have experienced longer than anticipated processing times for issuing construction and development permits. Although the real estate investment environment

---

[4] The Debtors did not report EBITDA in a reliable fashion. These figures are reflective of cumulative negative equity reflected on the Fund 1 and Fund 2 balance sheets.

remains very strong in this region, the additional time needed to obtain permits has extended the anticipated exit dates of a number of the projects in which the Fund has invested, some of which will now be completed after the current Maturity Date of December 31, 2016. In extending the Maturity Date, we anticipate that we will be able to complete these projects that need more time, as well as take advantage of additional investment opportunities.

To that end, the enclosed Holder Election Form provides you with two options: i) you may elect to extend your Debenture Maturity Date to December 31, 2017, or ii) you may elect to keep the current Debenture Maturity Date of December 31, 2016. In the event you choose to extend, all other terms of your Debenture will remain unchanged, including your receiving monthly interest payments at the 12% rate during the extension period. ***Given the additional time needed to exit the current projects in the portfolio, we do not expect that any Payoff Premium under Section 3(b) of the Debentures will exist on the current Maturity Date of December 31, 2016.[5]***

Please note that, for those Holders who elect not to extend their Maturity Date, the Measurement Date for the Payoff Premium, if any, under Section 3(b) of the Debentures will remain the date on which the Loan Amount is repaid in full or December 31, 2016 (as may be extended by 3 months under Section 2(b) of the Debenture). Such Holders will have no right to participate in the Payoff Premium, if any, that may exist as of December 31, 2017, which will be shared pro rata only among those Holders who elect to extend.

Exhibit 3 (emphasis added).

23.     A number of investors elected not to extend their maturity dates, but my understanding is that they did not receive repayment of their principal at that time. We continue to investigate the numbers of investors who did agree to extend.   The Company's books and records do not reflect payment of any principal amounts made in response to this letter.

---

[5] The Fund 1 debentures provided for a payoff premium equal to 25% of net profits of the Fund.  As of May 2016, Fund 1 did not have any net profits.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 11-

24.     The Fund 1 First Extended Maturity Date occurred on December 31, 2017. The Company was still unable to repay the Fund 1 debentures. The Company therefore delivered notice to Fund 1 investors, dated November 30, 2017, purporting to extend the maturity date to March 31, 2018 (the "Fund 1 Second Extended Maturity Date"). Even by the Fund 1 Second Extended Maturity Date, the Company was unable to and did not repay the Fund 1 debentures. On March 1, 2018, the Company again contacted investors and requested an extension to December 31, 2020 with two one-year extensions (the "Fund 1 Third Extended Maturity Date"). This time, the correspondence warned investors that their monthly interest payments would stop unless they agreed to the extension.

25.     The Company was unable to repay the Fund 1 debentures by the Fund 1 Third Extended Maturity Date. On November 5, 2020, the Company contacted investors and provided them with a choice to either "rollover" their Fund 1 debentures into another iCap fund, or stay with Fund 1, but subject to a one-year extension of the maturity date (this time to December 31, 2021). We continue to investigate how many investors chose to roll over their investments, and how many stayed with Fund 1.

Despite all of these extensions, the Company continued to pay interest to investors.

Fund 2 Extensions

26.     Fund 2 matured on December 31, 2017. The Company was unable to repay the Fund 2 debentures, and therefore exercised an option to extend the maturity date by a year, to December 31, 2018 (the "Fund 2 First Extended Maturity Date"). We continue to investigate whether all Fund 2 investors agreed to extend their maturity dates as requested. The Company's books and records do not reflect payment of any principal amounts made in response to this letter.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 12-

23-01243-WLH11     Doc 473     Filed 02/26/24     Entered 02/26/24 11:12:57     Pg 12 of 35

27.     The Company was still unable to repay the Fund 2 debentures by the Fund 2 First Extended Maturity Date.  In advance, on November 9, 2018, the Company emailed investors and asked for an additional extension to December 31, 2020 and two additional one-year extensions (the "Fund 2 Second Extended Maturity Date").  Even by the further extended maturity date, the Company was unable to and did not repay the Fund 2 debentures.  On November 5, 2020, the Company contacted investors and provided them with a choice to either "rollover" their Fund 2 debentures into another iCap fund, or stay with Fund 2 but subject to a one-year extension of the maturity date (this time to December 31, 2021).  We continue to investigate how many investors chose to roll over their investments, and how many stayed with Fund 2.

As with Fund 1, despite all of these extensions, the Company continued to find ways to pay interest to investors.

**E.     Fund 3**

28.     In November 2017 – a month before Fund 2's original maturity date and the Fund 1 First Extended Maturity Date – the Company launched "Fund 3," iCap Equity, LLC.  Fund 3 was unique in that it did not own or invest in real estate projects directly.  Instead, Fund 3 was marketed as a parent vehicle or "fund of funds" that owned equity interests in Funds 1 and 2 and could benefit from income generated from those Funds.  In addition, Fund 3 would ultimately serve as a vehicle to facilitate "rollovers" of investments in Funds 1 and 2.  With an initial raise of $10 million ("Fund 3 Round 1"), the Company sought to raise capital primarily to address "expansion plans."  *See* Memorandum of Terms For the Private Placement of Debt Securities of iCap Equity, LLC (the "Fund 3 Round 1 OM"), a copy of which is attached hereto as Exhibit 4, at *3.  As part of this round, the Company represented that Fund 3's income streams already supported profitable operations, such that proceeds from the proposed investments would be used for corporate growth and expansion:

The proceeds of this offering will be used to fund the expansion plans of the Company as it launches additional investment fund vehicles, makes direct real estate investments, and retires prior Company obligations. The following table is an estimate of the Company's allocation of the available offering proceeds. ***Given that the offering proceeds will be combined with the Company's existing streams of income, and that the Company is already operating profitably, the table illustrates primarily those items that are in addition to the standard operating expenses of the Company.*** If less than the maximum Offering amount is raised, the Manager will determine which line items will receive less than the estimated allocation. The Manager has discretion to utilize all proceeds as it deems necessary to accomplish the Company's business purposes.

Fund 3 Round 1 OM, at *3 (emphasis added).

29.    In reality, however, iCap Equity ***had no external source of income and therefore was not operating profitably***.

30.    Fund 3 Round 1 raised a total of $33.6 million in new investment. The Company began deploying the proceeds to address payments owed to Fund 1 and Fund 2 investors.

31.    Following the close of Fund 3 Round 1, the Company expanded Fund 3 with two additional rounds ("Fund 3 Round 2" and "Fund 3 Round 3," respectively). Fund 3 Round 2, for up to $10 million, launched on June 1, 2019 (one month before conclusion of the raise period for Fund 4, discussed below), and Fund 3 Round 3, for up to $50 million, launched on July 1, 2020 (one month after conclusion of Fund 3 Round 2's raise period and two months after launch of Investments, discussed below). The table below compares the primary aspects of the Fund 3 rounds.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

- 14-

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

23-01243-WLH11    Doc 473    Filed 02/26/24    Entered 02/26/24 11:12:57    Pg 14 of 35

| Fund 3 Fundraising Rounds | | | |
|---|---|---|---|
| | **Round 1** | **Round 2** | **Round 3** |
| Raise Periods: | 11/1/17 – 3/31/18 | 6/1/19 – 5/31/20 | 7/1/20 – 5/1/21 |
| Round Limit: | $10 million | $10 million | $50 million |
| Maturity: | 3 Years, with 1 Year Extension Option | 3 Years, with 1 Year Extension Option | 3 Years, with 1 Year Extension Option |
| Interest: | 10% | 10% | 10% |
| Payoff Premium: | None | 5% if investing more than $2.5M | 5% |
| Security: | None | None | Guaranty from iCap Pacific NW Management, LLC |

*See* Fund 3 Round 1 OM, at *1; Memorandum of Terms for the Private Placement of Debt Securities, iCap Equity, LLC for 10% Senior Note Offering II, a copy of which is attached hereto as <u>Exhibit 5</u> (the "<u>Fund 3 Round 2 OM</u>"), at *1; Confidential Private Placement Memorandum, iCap Equity, LLC, $50,000,000 Offering of Series 3 – Senior Promissory Notes, a copy of which is attached hereto as <u>Exhibit 6</u> (the "<u>Fund 3 Round 3 PPM</u>"), at *3.

32.     As reflected above, Fund 3 was structured differently from Funds 1 and 2. It was the first fund raised without a Managing Dealer (also avoiding broker fees), and investments were styled as unsecured.  Interest, paid monthly, accrued at 10% per annum and no payment premium was offered.  And whereas Funds 1 and 2 provided for two-year maturities, Fund 3 anticipated a three-year maturity with a right to extend for a fourth year.  Critically, whereas each of the offering documents underlying Fund 3's three rounds of fundraising delineated anticipated use of proceeds, ***none of those disclosures mentioned an intention to pay interest to existing investors***.[6]  In actuality,

---

[6] The offering documents for Rounds 2 and 3 stated that "at any time, the Company may use offering proceeds to retire any debt obligation of the Company, including those held by other investors." *See* Fund 3 Round 2 OM, at *4; Fund 3

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 15-

23-01243-WLH11     Doc 473     Filed 02/26/24     Entered 02/26/24 11:12:57     Pg 15 of 35

the majority of the fundraised amounts were used for that purpose. The table below reflects the anticipated uses disclosed in the offering documents.

| (in $000's) | Rd 1 | Rd 2 | Rd 3 | Total | |
|---|---|---|---|---|---|
| New Hires and Growth Plans | $100 | $0 | $0 | $100 | 0.14% |
| New Company/Investment Vehicle Formation Costs | $50 | $1,000 | $0 | $1,050 | 1.50% |
| Reserves | $1,000 | $1,000 | $5,000 | $7,000 | 10.01% |
| Retirement of Debt (Payables) | $3,720 | $0 | $0 | $3,720 | 5.32% |
| Taxes and Licenses | $100 | $0 | $0 | $100 | 0.14% |
| Marketing | $100 | $500 | $500 | $1,100 | 1.57% |
| Website and Technology Upgrades | $150 | $500 | $1,500 | $2,150 | 3.07% |
| Real Estate Investments and Affiliate Entity Investments | $4,705 | $6,000 | $38,500 | $49,205 | 70.37% |
| General Operations | $0 | $1,000 | $0 | $1,000 | 1.43% |
| Commissions | $0 | $0 | $4,500 | $4,500 | 6.44% |
| **Totals:** | **$9,925** | **$10,000** | **$50,000** | **$69,925** | |

In contrast, the table below reflects how the total amounts raised for Fund 3 were actually spent.

| Fund 3 Disbursements | Total % |
|---|---|
| Intercompany Transfers | 68.6% |
| Investor Interest & Redemptions | 22.0% |
| Broker Fees | 5.0% |
| General & Operating Costs | 4.4% |
| Real Estate Investments | 0.0% |

33.     The table below reflects the total amounts raised under each of the Fund 3 rounds. Notably, the notes issued under Fund 3 Round 1 began to mature in November 2020 – during the Company's fundraising period for Fund 3 Round 3. The Company lacked the ability to repay these notes, and instead elected to extend the maturity dates for a year. The Company continued to fundraise under Fund 3 Round 3 after these extensions, but I do not believe that it amended the Fund 3 Round 3 PPM to disclose the extensions.

---

Round 3 PPM, at *3. These disclosures, however, related only to debt obligations of the Company itself (not affiliates) and said nothing about the fact that prior funds had already been used to pay investor interest owed by affiliated entities. Nor did it refer to payment of interest for ongoing debt obligations.

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 16-

| Fund 3 Actual Fundraising Amounts by Round | | | |
|---|---|---|---|
| Round | Cash Receipts for Debenture Subscriptions | Fundraise Period | Earliest Maturity |
| Round 1 | $2.9 million | 11/1/17 – 3/31/18 | November 2020 |
| Round 2 | $7.2 million | 6/1/19 – 5/31/20 | June 2022 |
| Round 3 | $8.4 million | 7/1/20 – 5/1/21 | July 2023 |
| Additional | $13.6 million | 5/1/21-12/31/23 | Post |
| **Totals:** | **$33.6 million** | | |

## F.     Fund 4

34.     In late 2017 – as Fund 3 Round 1 was commencing – the Company began to focus its fundraising efforts on foreign investors, particularly those residing in China and/or the Chinese-American community in Washington.  Among other things, the Company retained employees from the Chinese community to focus on its targeted fundraising initiatives and ultimately opened a foreign office in China staffed with local fundraising professionals.  Initially, these efforts centered around two new fundraises that each commenced on October 1, 2018 – six months after the maturity date for Fund 3 Round 1.

35.     iCap Pacific Income Fund 4, LLC ("Fund 4") was tailored to the Chinese community, employing a Private Placement Memorandum and other transaction documents  translated into Chinese.  This fundraise returned to the concept of investing directly in real estate projects, to be held by subsidiary special purpose entities (SPEs). Fund 4, however, differed in important and notable ways from Funds 1 and 2, including the following:

|  | **Funds 1 and 2** | **Fund 4** |
|---|---|---|
| Term: | 2 years, with limited extension options. | 20 years, with a right to redeem after 3 years. |
| Round Limit: | $30 million, each Fund | $50 million |
| Interest: | 10-12% per annum, paid monthly | 10% per annum, PIK for first 3 years |
| Repayment Premium: | 25-35% of Net Profits | None |
| Security: | All Assets | None |

*See* Confidential Private Placement Memorandum, iCap Pacific Income Fund 4, LLC, for $50,000,000 of Secured Promissory Notes (the "Fund 4 OM"), a copy of which is attached hereto as Exhibit 7, at *1-2.

36.     Whereas Funds 1 and 2 promised security interests in substantially all assets of those Funds, including liens on the underlying real property, Fund 4 was structured differently. It was still marketed as "secured," but the security was limited to a pledge of the equity interest in Fund 4 itself (an interest that structurally was junior to repayment of the debentures, and therefore not true security for repayment), along with a guaranty from the owner of the equity in Fund 4.

37.     As with Funds 1 and 2, Fund 4 was marketed as a newly formed entity that would invest in real estate: "The Company has been established to provide an investment vehicle that generates a good rate of return, is secured by interests of the Portfolio LLCs, and has a liquidity mechanism for investors."  Exhibit 7 at * 6.

38.     Fund 4 raised a total of $12.4 million.

39.     Shortly after Fund 4 was launched, investors indicated a preference for Vault (discussed below) and Fund 3.  Fund 4 therefore was not fully subscribed and the Company pivoted its fundraising efforts elsewhere.

## G.  Investments

40.  One month before Fund 3 Round 2's offering expired, on May 1, 2020, the Company began marketing a $10 million raise for a new fund called iCap Investments, LLC ("iCap <u>Investments</u>").  The iCap Investments notes were marketed primarily to Chinese investors, and the subscription documents were all written in English and Chinese.  These notes were structured similarly to Fund 3, with one- or two-year maturities (depending on which interest rate the investors chose), and an interest rate of 4.0% per annum or 6.0% per annum.  As with Fund 4, the Investment notes were marketed as "secured," although the only form of security was a pledge of the equity interests in iCap Investments itself.  *See* Confidential Private Placement Memorandum, iCap Investments, LLC, for $10,000,000 of Secured Promissory Notes dated May 1, 2020, a copy of which is attached hereto as <u>Exhibit 8</u> (the "iCap <u>Investments</u> OM"), at *1.  iCap Investments, however, had an ownership structure distinct from the other funds in that it was wholly-owned and managed directly by Mr. Christensen.

41.  The iCap Investments OM represented to investors that iCap Investments owned three properties: "[A] single family home located in Issaquah, Washington, which it owns directly; a 26-unit townhome project located in Seattle, Washington, which is owned through Seattle Modern Living, LLC; and a development site for 108 apartment units, located in Renton, Washington, which is owned through Colpitts Sunset, LLC."  *Id*. at *5.  Based upon the Company's records, each of these statements was misleading; in reality, iCap Investments' assets at the time of its fundraising were materially less than represented.

42.  _Issaquah Property_.  The iCap Investments OM represented ownership of "a single family home located in Issaquah, Washington."  Exhibit 8 at *5.  This was a reference to a large home that the Company had been developing for several years for eventual use as Mr. Christensen's personal residence.  iCap Investments owned this property and spent approximately $2.9 million to develop it between September 2019 and September 2020.  ***When the home was completed in November 2020, iCap Investments transferred this property to Mr. Christensen directly in exchange for his refinance of the construction loan and for no additional consideration.***  Notably, this transfer occurred seven (7) months after iCap Investments began fundraising under the iCap Investments OM (which, as discussed, represented iCap Investments' ownership of the property).  To my knowledge, iCap Investments did not amend the iCap Investments OM to clarify that the property was no longer a company asset; instead, the Company continued to fundraise under the iCap Investments OM, raising an additional $15 million between November 2020 and November 2022.[7]

---

[7] The iCap Investments OM disclosed Mr. Christensen's intentions to take ownership of the Issaquah property, but it did not specify the terms of that transaction and did not discuss transfer of the property for no payments to the Company:

> ***The Manager's conflicts of interest may result in transactions unfavorable to the Company.***
> The Manager and its Affiliates may provide certain services to, and enter into transactions with, the Company or the Project Entities, provided the terms are commercially reasonable. Additionally, Chris Christensen will lease or purchase the single family property owned by the Company and located at 27112 SE Grand Ridge Drive, Issaquah, WA. These measures may not fully protect the Company or the Project Entities against the inherent conflicts of interest in these transactions. The transactions have not been, and will not be, subject to review by the Investors or an independent party. The transactions' terms might not be as favorable to the Company as they would have been if the transaction had been with unrelated third parties. Moreover, the Company will not ask any third party to oversee the quality of the services that will be provided by the Manager and its Affiliates. In addition, before the Company invests all of its investments, the Manager will be subject to potential conflicts of interest when choosing between investment opportunities that may generate different fees for the Manager or between investment opportunities that may meet the investment criteria of Affiliates of the Company or of the Manager.

iCap Investments OM, at *11; _see also id._, Ex. C (Pledge and Security Agreement) at § 5 ("Pledgor may cause the real estate owned by the Company to be sold, encumbered, transferred, pledged, liened, or otherwise disposed of as it sees fit.").

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

43. <u>Willows Properties</u>. The iCap Investments OM represented ownership of a "26-unit townhouse project located in Seattle, Washington" through an entity named Seattle Modern Living, LLC. Exhibit 8 at *5. According to the Company's records, this statement was misleading. Prior to December 2019, this development, commonly referred to as the "Willows Townhomes," was owned by Fund 2, subject to $9.4 million of debt and with recorded book value of $13.5 million. In December 2019 and during the lead-up to launch of the iCap Investments OM, iCap Investments "purchased" the Willows Townhomes development from Fund 2 for an intercompany account payable (not cash) of $4.9 million and assumption of the $9.4 million in debt. At the time of the iCap Investments OM, whereas iCap Investments owned the Willows Townhomes project, it was subject to more debt than the book value of the property – debt that was not disclosed in the iCap Investments OM itself.

44. <u>Colpitts Development</u>. The iCap Investments OM represented ownership of "a development site for 108 apartment units, located in Renton, Washington, which is owned through Colpitts Sunset, LLC." *Id*. at *5. According to Company records, however, at the time the iCap Investments OM was issued, iCap Investments owned ***no*** interest in the Colpitts Sunset development. Instead, in February 2021 iCap Investments used a portion of newly raised investor proceeds to purchase a minority interest (less than 35%) in Colpitts Sunset, LLC.

45. iCap Investments ultimately raised a total of $20.6 million in cash receipts from debenture subscriptions. It used the proceeds as follows:

| iCap Investments Disbursements | Total % |
|---|---|
| Intercompany Transfers | 56.3% |
| Investor Interest & Redemptions | 19.7% |
| Advances to Company Principals | 11.4% |
| General & Operating Costs | 7.6% |
| Broker Fees | 5.0% |

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF**

- 21-

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

**H. Vault**

46. While launching Fund 4, the Company also launched a new fundraising vehicle called iCap Vault 1, LLC ("Vault"). Vault raised funds first through a $500 million Private Placement Memorandum, *See* Confidential Private Placement Memorandum, iCap Vault 1, LLC, for $500,000,000 of Secured Promissory Notes, October 1, 2018, a copy of which is attached hereto as Exhibit 9 (the "Vault OM"), and later through publicly registered Senior Secured Demand Notes, *see* Form S-11, iCap Vault 1, LLC (the "Vault S-11"), a copy of which is attached hereto as Exhibit 10.

47. Based on my discussions with former Company employees and a review of the Company's books and records, I believe that Vault was envisioned as an alternative to a bank account, whereby investors could place or withdraw funds from their accounts on a daily basis and earn a modest interest rate, calculated daily. *See* Vault OM, at *4-5. Among other things, Vault investments had a low minimum initial investment requirement ($25), and an even lower minimum outstanding investment requirement ($1.00). *See* Vault S-11, at *13. In addition, Vault was marketed for its convenience, allowing investors to seamlessly transfer funds in and out of their accounts through a dedicated app and website that could be linked to investor bank accounts. Indeed, according to former employees, the Vault concept was regularly referred to internally as an unregulated bank, and the Company marketed the Vault opportunity by comparing it with banking options. As discussed in the Vault OM:

> At any time following the issuance date, a Noteholder may require the Company to repay all or a portion of the Note and the accrued interest thereon by providing a demand notice to the Company ("Demand Notice") which will generally be done electronically through the Company's website at www.icapvault.com or through a licensed software application (collectively the "App") once it is made available. The App will allow the Noteholder to review his/her transaction history, provide Demand Notice requests, purchase additional Notes, agree to

investment documentation, send messages to the Company, and receive notices from the Company. Additionally, the App will allow Noteholders to link their iCap Vault account to their bank account to facilitate fund transfers. Upon receipt of a Demand Notice, the Company will have up to 30 days to deliver the requested funds to the Noteholder (the "Demand Payment"), but will use its commercially reasonable efforts to deliver funds for the Demand Payment within 2-5 business days.

*Id.*

48. The following are examples of how the Vault opportunity was marketed:





49. Notably, however, Vault **was not** registered with any governmental entity as a banking institution, it was not regulated as a banking institution, and it lacked the typical controls and procedures used at a bank (including "Know Your Customer" requirements). *See* Vault S-11, at *50 ("The Notes do not constitute a savings, deposit or other bank account and are not insured by or subject to the protections of the Federal Deposit Insurance Corporation (the 'FDIC'), the Securities Investor Protection Corporation (the 'SIPC') or any other federal or state agency or company."). In addition, whereas investors were encouraged to think of Vault as a banking alternative *and although investors were promised that Vault would maintain cash reserves equal to 10% of outstanding principal balances*, *see* Vault S-11, at *72, Vault **did not** maintain any specific capital reserve requirements and often fell below this 10% reserve promise. And whereas Vault was advertised as using an app for ease of access to funds, to my knowledge no such app existed or was accessible to investors (investors were instead required to fill out manual transfer forms that were processed by the Company's finance team).

### a. Vault Fundraising Issues

50. Vault was a favorite investment vehicle for foreign Chinese investors. That was due, in part, to emphasis by the Company's China-based international marketing team. It may have also been due, however, to the ease with which investors were told they could deposit and withdraw funds, a benefit resulting from the Company's lack of policies and procedures for conducting any diligence or scrutiny towards the sources or uses of invested amounts. Specifically, the Company made virtually no effort to implement customary "Know Your Customer" protocols. Among other things, I understand as follows based on my discussions with former Company employees and a review of the Company's books and records, for example:

- Investors were not asked to provide information to confirm their identities,

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF

- 24-

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

affiliations, or the sources of the funds invested.

- Investments were accepted in all manner of forms and denominations (including ACH, wire, and check), and in some instances deposits were made in the form of cash delivered physically to the Company's headquarters in Bellevue, Washington.

- Investors were permitted to transfer title to their investments to third parties with the submission of a simple form. When these accounts were transferred, the Company did not complete any diligence to confirm the reason for the transfer, whether consideration was exchanged by the parties, or the identity of the recipient holder.

- In some instances, investment withdrawals were received in the form of cash.

- In some instances, investments were made for reasons other than economic gain. For example, some investments were made into Vault for purposes of supporting applications under the United States EB-5 Immigrant Investor Program. As another example, several sizeable investments were made in order to make Chinese funds look like foreign (i.e., non-Chinese) investment when brought back into China and invested in Chinese projects.

### b. Vault Proceed Uses

51. Vault's stated business model was to invest in income-producing real estate assets. *See, e.g.,* Vault S-11, at \*13 ("We are engaged in the business of acquiring income-producing residential properties in selected metropolitan statistical areas in the U.S. with the objective of generating a rate of return from the acquired U.S. real estate that is greater than the costs necessary to purchase, finance and service the U.S. real estate. We also invest in financial instruments secured by such real estate."). Vault initially invested some investor funds into nursing homes and other properties that generated rental income. As Vault's tenure extended, however, its invested capital was increasingly used to prop up both the Company's real estate development projects (projects that were not completed or even close to completion, and therefore would not produce income in the near future), and the Company's faltering ability to satisfy

investor interest payments. The chart below reflects the real estate disbursements that Vault made between December 2021 and January 2023.

| iCap Vault 1, LLC - Project | Project Type | Cash Disbursed Amount $ | Date of First Transaction |
|---|---|---|---|
| 725 Broadway | Undeveloped iCap Project | 1,633,988 | 2021-12-14 |
| Colpitts Development | Undeveloped iCap Project | 8,551,382 | 2022-08-31 |
| CS Real Estate Development | Undeveloped iCap Project | 500,000 | 2022-10-17 |
| iCap @ UW | Undeveloped iCap Project | 2,500,000 | 2022-09-14 |
| UW 17th Ave | Undeveloped iCap Project | 1,085,000 | 2023-01-17 |
| VH 1121 14th Ave | Undeveloped iCap Project | 3,274,436 | 2021-12-03 |
| VH 2nd Street Office | Rent-Producing Property | 2,000,100 | 2022-06-22 |
| VH Pioneer Village | Rent-Producing Property | 3,502,299 | 2022-06-30 |
| VH Senior Care - Burien | Rent-Producing Property | 1,003,768 | 2022-03-25 |
| VH Senior Care - Lynnwood | Rent-Producing Property | 1,754,531 | 2022-03-22 |
| Willow Street Townhomes | Rent-Producing Property | 20,000 | 2022-12-08 |
| | Total | 25,825,504 | |

| Total by Project Type | Cash Disbursed Amount $ | % of Total |
|---|---|---|
| Undeveloped iCap Project | 17,544,806 | 68% |
| Rent Producing Property | 8,280,698 | 32% |

Some of the disbursements reflected above were not utilized by the recipient and were instead forwarded to other iCap entities (resembling an intercompany transfer more than a real estate investment).

52. As reflected above, Vault was an integral part of the Company's continued ability to maintain interest payments for investors in the various funds. As discussed above, the Company had for years been in the practice of moving cash among subsidiary bank accounts as needed to pay investor interest obligations, recording those movements as intercompany loans and payables. But that approach could not work with Vault because, as a publicly registered entity, those types of intercompany loans would not satisfy an audit. To circumvent audit requirements, when Vault's funds were needed to pay investor obligations elsewhere, Vault made an investment in a specific construction project (an SPE) and recorded a deed of trust against that property. Company records show, however, that as soon as the funds were transferred from Vault

to the project's bank account, they were immediately transferred to a different affiliate (Fund 1, Fund 2, or Fund 3) and paid to investors. As demonstrated in the table below, this fact-pattern was followed with respect to several "investments" made by Vault:

**Vault Transfers to Related Entitites and Out - Same Day**

| | Tranfer In | Transfer Out | Forwarded to Fund |
|---|---|---|---|
| 725 Broadway | | | |
| 12/22/2022 | $ 500,000 | $ (500,000) | iCap Equity |
| 2/1/2023 | 610,000 | (610,000) | iCap Equity |
| 2/7/2023 | 265,000 | (265,000) | iCap Equity |
| 2/8/2023 | 90,000 | (90,000) | iCap Equity |
| 2/15/2023 | 30,000 | (30,000) | iCap Equity |
| 2/24/2023 | 170,000 | (170,000) | iCap Equity |
| 3/3/2023 | 430,000 | (430,000) | iCap Equity |
| 3/15/2023 | 210,000 | (210,000) | iCap Equity |
| 3/27/2023 | 32,000 | (32,000) | iCap Equity |
| 3/31/2023 | 200,000 | (200,000) | iCap Equity |
| 4/10/2023 | 200,000 | (200,000) | iCap Equity |
| Colpitts Development | | | |
| 1/14/2021 | 350,000 | (350,000) | Fund 2 |
| 1/17/2021 | 696,000 | (640,000) | Fund 5 |
| 11/14/2021 | 1,451,382 | (1,451,382) | Fund 2 |
| 12/21/2022 | 693,000 | (585,000) | Fund 2 |
| 9/14/2022 | 1,500,000 | (1,500,000) | iCap Investments |
| iCap @ UW | | | |
| 9/14/2022 | 2,500,000 | (2,000,000) | iCap Investments |
| UW 17th Ave | | | |
| 1/17/2023 | 750,000 | (750,000) | iCap Investments |
| 1/17/2023 | 335,000 | (335,000) | iCap Investments |
| Totals | $ 11,012,382 | $ (10,348,382) | |

**I.    Funding**

53.    On May 13, 2021 (one month after close of Fund 3 Round 3), the Company began marketing another $50 million raise, this time for a new fund called iCap Funding, LLC ("Funding"). As with iCap Investments, the Funding notes were marketed primarily to Chinese investors, and the subscription documents were all written in English and Chinese. These notes had a two-year maturity with no extension period, and an interest rate of 12% per annum. As with the Investment notes, the Funding notes were marketed as "secured" despite the only form of security being a pledge of the equity interests in Funding itself. *See* Confidential Private Placement Memorandum, iCap Funding, LLC, for $50,000,000 of Secured Promissory Notes dated May 13, 2021, a copy of which is attached hereto as Exhibit 11 (the "Funding OM"), at *1.

54.     Although Funding had **no assets** when it commenced fundraising, the Funding OM referred to "income from the gains [Funding] receives from its Portfolio Investments" and described its investment focus as seeking "investments that have high yield potential and are related to real estate."  *Id.* at *7.  The Funding OM was more explicit than prior offering documents about an intention to invest fundraising proceeds in other Funds:

> The Company's "Portfolio Investments" may consist of any one or more of the following: income-producing properties, including single-family homes, multi-family apartments, townhomes, commercial properties and mixed-use properties; properties that the Company may acquire at a discount from market values, with the intention of selling the property at market prices for a gain; financial instruments that bear a relation to real estate, such as preferred equity, common equity, or loan instruments that are secured or unsecured by the properties; investments into real estate operating companies, real estate holding companies, REIT holdings, joint ventures, and pooled investment funds, any of which may be Affiliates of, or transactions with, the Company or its Manager or entities with whom management of the Company has had prior relationships. ***In particular, the Company expects to invest in debt funds or debt instruments of Affiliates of the Manager. These include, but are not limited to, iCap Pacific Northwest Opportunity and Income Fund, LLC, iCap Northwest Opportunity Fund, LLC, iCap Equity, LLC, iCap Pacific Income Fund 4, LLC, iCap Pacific Income Fund 5, LLC, and other entities controlled by the Affiliates of the Manager including the iCap Vault entities. These entities currently, or at the time of investment, have or will have negative cash flows and negative equity and there may be substantial doubt as to their ability to continue as a going concern.*** The Company may make loans to such entities or invest in equity positions and may do so either directly or through a secondary market transaction with the individual investors in such entities.

Funding OM, at *7 (emphasis added).

55.     While acknowledging that the Company's entities had negative equity (e.g., were insolvent), the Funding OM also stated that at least some of the Company's entities had ***always*** been unprofitable:

> The Company Expects to invest in Affiliate entities that have little or negative cash flow, negative equity, and substantial doubt as to their ability to continue as a going concern, which could prevent the Company from paying its obligations under the Notes.

> The Company will make loans or investments in Affiliates of the Manager. ***Such entities have operated with negative cash flows since inception, have more liabilities than assets, and have substantial doubt as to their ability to continue as a going concern.*** If these Affiliates are unable to pay back the Company's investment amounts, there is a risk that the Company will be unable to pay back the Notes in this Offering when due, if at all, and investors could lose all of their investment.

*Id.* at *13 (emphasis added).

56.     Funding raised approximately $11.5 million from investors. As reflected in the table below, a majority of these funds were used either to purchase existing Fund 1 and Fund 2 notes and/or to advance additional funds to Fund 3 for purposes of paying investor interest.

| iCap Funding Disbursements | Total % |
| --- | --- |
| Intercompany Transfers | 37.9% |
| Fund 1 & Fund 2 Redemptions | 39.7% |
| General & Operating Costs | 17.7% |
| iCap Funding Investor Interest | 4.7% |

**J.    Fund 5**

57.    iCap Pacific Income Fund 5, LLC ("Fund 5") was launched on September 5, 2019.  With a maximum subscription amount of $50 million (with an over-allotment of $25 million), Fund 5 was marketed as investing directly in real estate projects, to be held by subsidiary special purposes entities (SPEs).  Interest was 9% per annum, paid monthly, with the first $10 million of invested amounts benefitting from a 10% interest rate for the first year.  Unlike other notes, Fund 5 contained a limitation on redemption requests:

> Investors will have the option of demanding repayment of all or any part of their outstanding principal and unpaid accrued interest, any time after the 1-year anniversary of their investment date, subject to a limit of no more repayments than 5% of the combined Notes of the Company per quarter. Upon any demand for repayment prior to the 5th anniversary of the issuance date of the Note, a discount will be applied to the amount outstanding under the Note, depending on the time from the issuance of the Note at which the repayment demand is received by the Company.

*See* Confidential Private Placement Memorandum, iCap Pacific Income Fund 5, LLC, for $50,000,000 of Secured Promissory Notes (with an over-allotment amount of $25,000,000), dated September 5, 2019 (the "Fund 5 PPM"), a copy of which is attached hereto as Exhibit 12, at *2.

58.    Fund 5 was marketed as secured, with a pledge of the membership interests in the underlying SPEs.  *Id*. at *5.  Unlike Funds 1 and 2, however, Fund 5 notes were not secured by other collateral, such as cash accounts or underlying properties themselves.

59.    In describing the Company's investment experience, the Fund 5 PPM provided as follows:

> Although this Memorandum refers to "iCap" as though it were an entity capable of taking action, prospective investors should bear in mind that

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

- 30-

such references are intended to refer to the business activities undertaken by one or more of the companies constituting a part of this affiliated group of companies. The Company will not acquire an interest in any of iCap's affiliated entities other than Holding, but may benefit from their collective experience, inasmuch as those entities, as well as their respective employees, will be available to assist the Manager, and therefore the Company, as it conducts its business.

The Company's management team has overseen 57 full-cycle investments in this strategy among its other funds. As the following table illustrates, these investments achieved an average ROI of 27.39%, an average annualized ROI of 18.30%, and an average IRR of 20.26%.

*Id*. at *11. The Fund 5 PPM ***did not mention, however, that the Company's prior funds were unprofitable.***

60.     Fund 5 was the first fund since Funds 1 and 2 to have a Managing Dealer, Cobalt Capital, Inc., and a Collateral Agent, MarketPlace Realty Advisors, LLC.  In exchange for its services, the Fund 5 PPM disclosed total fees to be paid to the Managing Dealer of $4.9 million, assuming the round was fully subscribed. *Id*. at *15.

61.     Fund 5 raised a total of $3.0 million.  The table below summarizes how fundraise proceeds were used:

| Fund 5 Disbursements | Total % |
|---|---|
| Intercompany Transfers | 68.9% |
| Investor Interest & Redemptions | 16.1% |
| General & Operating Costs | 11.6% |
| Real Estate Investment | 3.4% |

## K. Fund 6

62. In the fall of 2019, alongside the rollout of Fund 5, the Company formed iCap Pacific Income Fund 6, LLC ("Fund 6"), with the purpose of launching another publicly registered investment vehicle similar to Vault. Fund 6 never launched. The table below compares certain aspects of the Vault S-11 with the draft S-11 prepared for Fund 6 (which remained in draft form as of the petition dates in these cases).

| | Vault | Fund 6 |
|---|---|---|
| Offering/Concept: | Demand Notes, paid on demand | Income Demand Notes, paid on demand following a five-year lock-up period. |
| Investment Thesis: | We are engaged in the business of acquiring income-producing residential properties in selected metropolitan statistical areas in the U.S. with the objective of generating a rate of return from the acquired U.S. real estate that is greater than the costs necessary to purchase, finance and service the U.S. real estate. We also invest in financial instruments secured by such real estate. | We are engaged in the business of acquiring interests in real estate construction and development projects in selected metropolitan statistical areas in the U.S. (each, a "Portfolio Investment"). . . . We also originate and purchase loans secured by real estate. |
| Interest Rate: | A floating rate in the Company's discretion. | 7% per annum during the lockup period, and thereafter the Average Savings Account Rate published by the FDIC plus a markup in amount TBD. |
| Management Fees: | 1.3% of outstanding principal balances | 1.5% of outstanding principal balances |

## L. Broadway

63. The last of the Company's funds, called iCap Broadway, LLC ("Broadway"), launched on April 1, 2022 – two months before expiration of the fundraise period for Funding and two weeks after the last investment in Funding. Unlike prior funds, Broadway was focused on a specific real estate project and purported to be raising funds specifically for that project. *See* Confidential Private

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

Placement Memorandum, iCap Broadway, LLC, for $20,000,000 of Secured Promissory Notes, dated April 1, 2022, a copy of which is attached hereto as <u>Exhibit 13</u> (the "<u>Broadway PPM</u>"), at *7 ("The investment proceeds will be used to recapitalize the debt and equity for the Project and may be used for construction, design, marketing, furnishing, professional services, financing, debt service, and all other expenses related to the Project."). The Broadway notes had a two-year maturity, bearing interest of 8% per annum, paid monthly. As with Fund 3, the Broadway notes were marketed as "secured" despite the only form of security being a pledge of the equity interests in Broadway itself.

64. The Broadway Fund raised **zero dollars** in cash receipts. Instead, it raised $5.8 million in rollovers from investors, plus $313,000 in intercompany investments (primarily from Vault). There were no material disbursements from the Broadway Fund.[8]

## THEMES IN THE COMPANY'S FUNDRAISING HISTORY

65. The foregoing facts, when combined, display a picture of liquidity problems from the inception of Funds 1 and 2. In order to stay afloat, the Company increasingly relied on new fundraising. This picture is reflected in the following charts and tables.

66. The timeline below reflects the inadequacy of real estate proceeds to cover *either* project-related disbursements or investor interest obligations. Real estate receipts are depicted in blue, project-related costs/disbursements are reflected in tan, and investor interest obligations is reflected in the red line at the bottom.

---

[8] Some investor funds and intercompany transfers were transferred directly to the SPE owned by the Broadway Fund. Those amounts are not included here.

SUPPLEMENTAL DECLARATION OF LANCE MILLER IN SUPPORT OF POST-PETITION FINANCING AND RELATED RELIEF

BUCHALTER
1420 Fifth Avenue, Suite 3100
Seattle, WA 98101-1337
Telephone: 206.319.7052

- 33-



67.     The timeline below shows how the Company used fundraising to fill the gap between project-related receipts and its disbursement obligations.  As above, project-related receipts are reflected in dark blue, project-related disbursements are reflected in tan, investor interest is reflected in red, and the yellow line tracks investor receipts.  As business revenue suffered, fundraising became the near-exclusive source for the Company's capital.



SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA  98101-1337
TELEPHONE: 206.319.7052

- 34 -

23-01243-WLH11     Doc 473     Filed 02/26/24     Entered 02/26/24 11:12:57     Pg 34 of 35

Respectfully submitted,

Dated: February 23, 2024        LANCE E. MILLER

_____

**SUPPLEMENTAL DECLARATION OF LANCE MILLER IN
SUPPORT OF POST-PETITION FINANCING AND RELATED
RELIEF**

- 35-

BUCHALTER
1420 FIFTH AVENUE, SUITE 3100
SEATTLE, WA 98101-1337
TELEPHONE: 206.319.7052

23-01243-WLH11    Doc 473    Filed 02/26/24    Entered 02/26/24 11:12:57    Pg 35 of 35