1 | Matthew J. Campos, WSBA 40777 | Hon. Whitman L. Holt
McNaul Ebel Nawrot & Helgren PLLC
2 | 600 University Street, Suite 2700 | Hearing Date: March 27, 2024
Seattle, WA 98101 | Hearing Time: 10:00 a.m.
3 | Phone: (206) 467-1816 | Location: Tower Bldg.
mcampos@mcnaul.com | 2nd Fl. Courtroom
4 | | 402 E. Yakima Ave.
Matthew A. Lesnick, CSBN 177594 | Yakima, WA 98901
5 | Lesnick Prince & Pappas LLP
315 West Ninth Street, Suite 705
6 | Los Angeles, CA 90015
Phone: (310) 396-0964
7 | matt@lesnickprince.com
(Admitted *Pro Hac Vice*)
8
*Attorneys for Interested Party*
9 | *Christopher Christensen*

10
11 | UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

12 | In re | Chapter 11

13 | ICAP ENTERPRISES, INC., et al. | Lead Case No. 23-01243-WLH11
Jointly Administered
14 | Debtors.[1]

15 | | **CHRISTOPHER
CHRISTENSEN'S MOTION**
16 | | **FOR STAY AND OPPOSITION
TO JOINT MOTION OF THE
DEBTORS AND COMMITTEE**
17 | | **FOR ORDER: (I)
AUTHORIZING THE
DEBTORS TO OBTAIN**
18

19
---
20 | [1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (Case No. 23-01243-11); iCap Pacific NW Management, LLC (Case No. 23-01261-11); iCap Vault Management, LLC; (Case No. 23-01258-11); iCap Vault, LLC (Case No. 23- 01256-11); iCap Vault 1, LLC (Case No. 23-01257-11); Vault Holding 1, LLC (Case No. 23-01256-11); iCap Investments, LLC (Case No. 23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (Case No. 23-01253-11);iCap Equity, LLC (Case No. 23-01247-11); iCap Pacific Income 4 Fund, LLC (Case No. 23-01251-11); iCap Pacific Income 5 Fund, LLC (Case No. 23-01249-11); iCap Northwest Opportunity Fund, LLC (Case No. 23-01253-11); 725 Broadway, LLC (Case No. 23-01245-11); Senza Kenmore, LLC (Case No. 23-01254-11); iCap Campbell Way, LLC (Case No. 23-01250-11); UW 17th Ave, LLC (Case No. 23- 01267-11); iCap Broadway, LLC (Case No. 23-01252-11); VH 1121 14th LLC (Case No. 23-01264-11); VH Senior Care LLC (Case No. 23-01266-11); VH Willows Townhomes LLC (Case No. 23-01262-11); iCap @ UW, LLC (Case No. 23-01244- 11); VH 2nd Street Office, LLC (Case No. 23-01259-11); VH Pioneer Village LLC (Case No. 23-01263-11); iCap Funding LLC (Case No. 23-01246-11); iCap Management LLC (Case No. 23-01268-11); iCap Realty, LLC (Case No. 23-01260- 11).

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page i



SUPPLEMENTAL POSTPETITION SECURED FINANCING; (II) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; AND (III) GRANTING RELATED RELIEF

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

OPPOSITION TO SUPPLEMENT DIP FINANCING MOTION – Page ii

**<u>TABLE OF CONTENTS</u>**

I.       INTRODUCTION ......................................................................... 1

II.      BACKGROUND ........................................................................... 3

III.     OPPOSITION ............................................................................... 4

     A.    The Motion Should be Denied for Lack of Due Process ........... 4

        1.    Joinder In United States Trustee's Opposition ................. 4

        2.    Notice is Insufficient ......................................................... 4

     B.    Any Ponzi Litigation is Premature and Should be Stayed .......... 7

     C.    The Court Should Not Consider Making a Ponzi Finding in the Context of a DIP Motion ............................................................ 12

     D.    The Ponzi Issues Cannot Possibly be Litigated Within the Timeframe of the DIP Motion ................................................... 15

     E.    The Debtors Have Failed to Prove the Existence of a Ponzi Scheme ...................................................................................... 19

        1.    Legal Standard ................................................................ 20

        2.    The Supporting Declarations Do Not Prove a Ponzi Scheme ............................................................................ 24

            a.    The Kinrich Report is Fatally Flawed, Incomplete and Unreliable ....................................... 24

            b.    Mr. Miller's Declaration is Inadmissible as Either Percipient or Expert Testimony ............................ 29

            c.    Mr. Ho's Declaration is Inadmissible as Either Percipient or Expert Testimony ............................ 30

        3.    The Debtors Fail to Allege When the Alleged Ponzi Scheme Began ................................................................. 31

        4.    The Debtors Fail to Prove Fraudulent Intent ................. 32

5. The Debtors Conducted Legitimate Business Operations That Produced Substantial Earnings ................................. 33

6. The Returns on the Debtors' Investments Were Reasonable and Risks Were Adequately Disclosed ....... 34

F. Proposed DIP Financing Should not be Approved ................... 36

1. No Analysis of Use of Loan Proceeds or Litigation ....... 37

2. No Benefit of Business Judgment Rule ........................... 38

3. The Debtors Have Not Shown that the Terms of the DIP Loan Facility are Fair and Reasonable ........................... 39

4. The Debtors Have Not Shown that they Failed to Obtain Unsecured Financing or that the DIP Loan Facility is Necessary ...................................................................... 41

IV. CONCLUSION ........................................................................ 43

# TABLE OF AUTHORITIES

## CASES

*Afro-Lecon, Inc. v. United States*
   820 F.2d 1198 (Fed. Cir. 1987) ................................................................. 10

*Baxter v. Palmigiano*
   425 U.S. 308 (1976) ....................................................................... 8, 11

*Brock v. Tolkow*
   109 F.R.D. 116 (E.D.N.Y.1985) ...................................................... 11

*Davis v. Mut. Life Ins. Co. of N.Y.*
   6 F.3d 367 (6th Cir. 1993) ............................................................ 8

*Evangelista v. Inlandboatmen's Union of Pac.*
   777 F.2d 1390 (9th Cir. 1985) ..................................................... 24

*Ex Parte Antonucci*
   917 So.2d 825 (2005) ..................................................................... 11

*Ex Parte Bernard J. Ebbers*
   871 So.2d 776 (2003) ..................................................................... 10

*Fisher v. United States*
   425 U.S. 391 (1976) ........................................................................ 8

*Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc.*
   87 F.R.D. 53 (E.D. Pa. 1980) ....................................................... 10

*In re Ames Dep't Stores, Inc.*
   115 B.R. 34 (Bankr. S.D.N.Y. 1990) ............................... 37, 41, 42

*In re Aqua Assocs.*
   123 B.R. 192 (Bankr. E.D. Pa. 1991) ............................... 37, 39, 42

*In re ATM Fin. Servs., LLC*
   2011 WL 2580763 (Bankr. M.D. Fla. June 24, 2011) ............... 17

*In re Bayou Grp., LLC*
   439 B.R. 284 (S.D.N.Y. 2010) ..................................................... 21

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page v

*In re Beta Intern., Inc.*
    210 B.R. 279 (E.D.Mich.1996) ........................................................ 13

*In re Canyon Sys. Corp.*
    343 B.R. 615 (Bankr. S.D Ohio 2006) ........................................ 17, 22, 34

*In re Crouse Grp., Inc.*
    71 B.R. 544 (Bankr. E.D. Pa. 1987) ............................................... 37

*In re DBSI, Inc.*
    476 B.R. 413 (Bankr. D. Del. 2012) ............................................... 17

*In re Fin. Res. Mortg., Inc.*
    454 B.R. 6 (Bankr. D.N.H. 2011) ................................................... 18

*In re Fox Ortega Enterprises, Inc.*
    631 B.R. 425 (Bankr. N.D. Cal. 2021) ............................................ 17

*In re Harry C. Partridge, Jr. & Sons, Inc.*
    43 B.R. 669 (Bankr. S.D.N.Y. 1984) ............................................. 13

*In re Hayden*
    477 B.R. 260 (Bankr. N.D. Ga. 2012) ........................................... 14

*In re IFS Fin. Corp.*
    417 B.R. 419 (Bankr. S.D. Tex. 2009) ....................................... 16, 23

*In re Indep. Clearing House Co.*
    77 B.R. 843 (D. Utah 1987) ....................................................... 22

*In re LLS America LLC*
    E.D. Wash. 2:09-bk-06194 ......................................................... 18

*In re Passavant*
    444 B.R. 378 (Bankr. S.D. Ohio 2010) ......................................... 13

*In re Pearlman*
    440 B.R. 569 (Bankr. M.D. Fla. 2010) ..................................... 20, 22, 33

*In re Petters Co., Inc.*
    495 B.R. 887 (Bankr. D. Minn. 2013) ........................................... 32

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page vi

*In re Ramirez Rodriguez*
    209 B.R. 424 (Bankr. S.D. Tex. 1997)............................................. 17, 23, 34

*In re St. Mary Hospital*
    86 B.R. 393 (Bankr. E.D. Pa. 1988)............................................. 37

*In re Sun Belt Elec. Constructors, Inc.*
    56 B.R. 686 (Bankr. N.D. Ga. 1986)............................................. 13

*In re Taneja*
    2012 WL 3073175 (Bankr. E.D. Va. July 30, 2012) ................................. 35

*In re Taubman*
    160 B.R. 964 (Bankr. S.D. Ohio 1993)............................................. 17, 22, 34

*In re The Acad., Inc.*
    289 B.R. 230 (Bankr. M.D. Fla. 2003) ............................................. 13

*In re The Educ. Res. Inst., Inc.*
    442 B.R. 20 (Bankr. D. Mass. 2010) ............................................. 13

*In re United Energy Corp.*
    944 F.2d 589 (9th Cir. 1991)............................................. 20

*In re Vaughan Co. Realtors*
    500 B.R. 778 (Bankr. D.N.M. 2013)............................................. 23

*In re World Vision Ent., Inc.*
    275 B.R. 641 (Bankr. M.D. Fla. 2002) ................................. 17, 22, 23, 33

*In re Zavala*
    444 B.R. 181 (Bankr. E.D. Cal. 2011) ............................................. 13

*In re Zimmer*
    586 B.R. 413 (Bankr. W.D. Pa. 2018) ............................................. 13

*Javier H. v. Garcia-Botello*
    218 F.R.D. 72 (W.D.N.Y. 2003) ............................................. 11

*Keating v. Office of Thrift Supervision*
    45 F.3d 322 (9th Cir. 1995)............................................. 9

*Ohio v. Reiner*
    532 U.S. 17 (2001) ........................................................... 8

*Radio Parts Co. v. Lowry*
    125 B.R. 932 (D. Md. 1991) ........................................... 31

*Sec. & Exch. Comm'n v. Dresser Indus., Inc.*
    628 F.2d 1368 (D.C. Cir. 1980) ...................................... 9

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*
    603 B.R. 682 (Bankr. S.D.N.Y. 2019) .................... 20, 21, 22, 33

*Torres v. Cnty. of Oakland*
    758 F.2d 147 (6th Cir. 1985) .......................................... 25

*United States v. Geter*
    927 F.2d 611 (9th Cir. 1991) .......................................... 25

*United States v. Hearst*
    563 F.2d 1331 (9th Cir.1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656,
    56 L.Ed.2d 90 (1978) ................................................... 25

*United States v. Scrushy*
    366 F. Supp. 2d 1134 (N.D. Ala. 2005) ...................... 11

*United States v. Silvestri*
    409 F.3d 1311 (11th Cir. 2005)...................................... 20

*Walsh Securities, Inc. v. Cristo Property Management, Ltd.*
    7 F. Supp. 2d 523 (D.N.J. 1998) ................................... 10

**STATUTES**

31 U.S.C. § 3733(h)(7) .......................................................... 8

Revised Code of Washington 30A.12.115 ............................ 39

**OTHER AUTHORITIES**

Kathy Bazoian Phelps and Hon. Steven Rhodes, *The Ponzi Book: A Legal
    Resource for Unraveling Ponzi Schemes*, § 2.03(1)(e)(i) (2012) ........ 21, 23

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page viii

*King County Home Values*, Zillow.com, https://www.zillow.com/home-
   values/207/king-county-wa/ ......................................................... 35

Milton Pollack, *Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201
   (1990) ................................................................................... 9, 10

U.S. Securities and Exchange Commission, *Types of Fraud: Ponzi Scheme*,
   Investor.gov, https://www.investor.gov/protect-your-
   investments/fraud/types-fraud/ponzi-scheme ........................................ 20

## **RULES**

Federal Rule of Bankruptcy Procedure 7001 ..................................... 12, 14, 15

Federal Rule of Evidence 1006 .......................................................... 25, 30, 31

Federal Rule of Evidence 701 ..................................................................... 24

Federal Rule of Evidence 702 ..................................................................... 24

Federal Rule of Evidence 704 ..................................................................... 24

## **CONSTITUTION**

U.S. Constitution, Amendment V .................................................................. 8

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page ix

Christopher Christensen ("Christensen") hereby opposes the Joint Motion for Order: (I) Authorizing the Debtors to Obtain Supplemental Postpetition Secured Financing; (II) Granting Superpriority Administrative Expense Claims; and (III) Granting Related Relief [Dkt. Nos. 467 & 542] (the "Motion") filed by Debtors iCap Enterprises, Inc., et al. (the "Debtors") and the Official Committee of Unsecured Creditors' (the "Committee").

## I.    INTRODUCTION

In the context of a DIP financing motion, and before any discovery or litigation has taken place, the Debtors ask that the Court make a judicial determination that the iCap entities operated as a Ponzi scheme. The Debtors' request is unprecedented. Other courts that have made Ponzi findings have done so only after years of discovery and litigation and after the defendants have been identified – a key component of protecting the constitutional rights of all and fairness in the proceedings. This motion is an attempt by the Debtors to run roughshod over the rights of dozens, if not hundreds, of yet unidentified parties and Mr. Christensen on an expedited basis.

The Debtors have identified no exigent circumstances that require the Court to make a Ponzi determination on an expedited basis and at such an early stage in the bankruptcy case. The only reason the Debtors have provided for this express timetable is that the proposed DIP lender requires a Ponzi finding before it will make the loan. But that is not a sufficient reason for the Court to ignore due process and make such an important determination regarding such a complicated issue. Of course the lender would prefer that the Court make a ruling that enhances the estate's ability to recover money. But it would be a dangerous precedent and rather unseemly to permit lenders to dictate that

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 1

courts make specific substantive rulings about issues that do not relate to the lender or the proposed loan.

The Motion also should be denied because the Debtors have failed to make a prima facie case that iCap was a Ponzi scheme. As explained below, the argument is based on incomplete information, inadmissible opinion testimony, and unfounded conclusions that extrapolate well beyond the evidence.

Additionally, the Debtors have failed to show that the proposed DIP financing is reasonable, necessary, or in the best interests of the estate. The effective interest rate of the loan is approximately 40% -- equal to a typical contingency fee arrangement. The Debtors have already borrowed up to $6 million and still have millions of dollars of cash remaining to fund professional fees. It is premature, unnecessary and ill advised to incur this additional very expensive debt now. Nor do the Debtors provide any analysis of how much money they expect to recover through the proposed litigation, the projected professional fees they will incur, or any description of the defendants or the anticipated timing. Similarly, there is no analysis of whether the proposed loan will be sufficient to fund litigation costs.

Most importantly, any litigation regarding Ponzi issues should be stayed due to an ongoing criminal investigation of the Debtors and other parties. The SEC and FBI recently opened a criminal investigation into iCap. It is too soon to know whether the investigation will lead to any indictments or who the targets are. However, given the existence of the investigation, any party or witness with even the possibility of any exposure likely will be unavailable to testify at this stage. This will prejudice not only those potential witnesses, but also every other potential defendant that wants to contest a Ponzi finding. For

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 2

this reason alone, the Court should stay any Ponzi litigation for approximately 6 months until the parties have a clearer understanding of the criminal investigation.

Finally, if the Court is inclined to set a litigation schedule for the Ponzi issue, it must permit the parties a full and fair opportunity to conduct discovery. Realistically, this discovery will take at least 6-12 months to complete.

For all these reasons, the Court should either deny the Motion or stay consideration of the motion until discovery is complete.

## II.    BACKGROUND

In 2023, iCap founder, Chris Christensen, resigned and Lance Miller, was appointed Chief Restructuring Officer. The Debtors filed for bankruptcy on September 29, 2023.

In February 2024, the SEC notified Mr. Christensen of its investigation of iCap and iCap entities. In March 2024, the federal government confirmed its investigation of the same.

The Debtors have not yet identified the targets of any litigation or engaged in any formal discovery. And yet, on February 23, 2024, the Debtors filed a motion for a Ponzi finding, buried in a DIP motion to fund their efforts to sell company assets, and supported by a declaration by Mr. Miller ("Miller Report"), as well as Jeffrey Kinrich ("Kinrich Report").

The Debtors were founded in 2007 to purchase and develop real estate and invest in other real estate opportunities in the Pacific Northwest. [*See* Dkt. No. 23 (Lance Miller Decl. in Support of First Day Motions) ¶ 5.] By early 2023, the Debtors employed more than 35 people in their headquarters based in Bellevue, Washington. [*Id.*]

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 3

The Debtors bought, developed and sold or otherwise exited out of approximately 60-70 real estate projects in Vancouver, Seattle, Tacoma, Bellevue and Renton, generating hundreds of millions of dollars in proceeds. [*See* Kinrich Report Ex. 14.] In some cases, these projects started with raw and unentitled land that required substantial work to complete. In other cases, the projects began with building permits in place or the improvement of existing structures. [Dkt. No. 23 ¶ 8.] In all cases, throughout their years of operation, the Debtors expended many millions of dollars and a huge number of man-hours obtaining entitlements and permits, and architectural, design, engineering, legal and construction work for the properties, among other things. It was a large business operation that completed a large number of complicated real property projects.

## III.  OPPOSITION

### A.  The Motion Should be Denied for Lack of Due Process

#### 1.  Joinder In United States Trustee's Opposition

Christensen joins in and adopts the arguments of the Office of the United States Trustee ("UST") in opposition to the Motion as though fully set forth herein, particularly regarding due process issues. [Dkt. No. 583.] In the interest of not burdening the Court unnecessarily, Christensen does not repeat the UST's arguments here. Christensen also reserves the right to join in and adopt any arguments in opposition to the Motion submitted by other parties.

#### 2.  Notice is Insufficient

Although styled as a motion to approve DIP financing, the Motion requests that the Court find that the Debtors operated as a Ponzi scheme. It is highly unusual and inappropriate to include such a request in a DIP motion. Indeed, Christensen is not aware of any procedural precedent for such a request.

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 4

It is so unusual that it would not be reasonable for anyone to expect that such a request would be contained in a DIP motion. Because burying the Ponzi request in a DIP motion is so surprising and unlikely, and because the Ponzi request is being requested in the form of a motion, near the outset of the case and before any litigation has been commenced or litigation targets named, the notice is insufficient and lacks due process.

First, it is not clear that the Motion was served on all parties that might be litigation targets affected by a Ponzi finding. It is easy to imagine potential defendants who were not creditors as of the petition date but could be potential targets. And, in fact, the Debtors have indicated that law firms, consultants or other professionals could be sued. But many of those professionals – who completed their work years ago – were not creditors by the time the bankruptcy case was filed. Those parties likely have received no notice of the Motion at all.

Second, the Notice fails to adequately convey that the Motion seeks a Ponzi finding or the implications of such a finding. The caption page of the Notice reads "Notice of (I) Joint Motion for Order Authorizing the Debtors to Obtain Supplemental Postpetition Secured Financing and (II) Motion to Approve Cooperation Agreement." [Dkt. No. 471 at 2.] Based on this, it would be fair for readers not interested in the Debtors' financing efforts to stop reading the Notice under the assumption that the Motion relates only to DIP financing. Many readers probably never got past the title of the Motion, which fails to specifically mention the request for a Ponzi finding, instead categorizing it under "related relief." [See Dkt. No. 467 at 2 ("Joint Motion of the Debtors and Committee for Order: (I) Authorizing Debtors to Obtain Supplemental Postpetition Secured Financing; (II) Granting Superpriority Administrative Expense Claims; and (III) Granted Related Relief").] It is quite a stretch to refer

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 5

to a request for a Ponzi finding as "Related Relief" in the context of a DIP Motion. They normally have nothing to do with one another.

Even if readers continued to the bottom of the second page of the Notice, where the request for a Ponzi finding is first referenced, the implications of the request are not at all clear. The Notice states simply, "If Ponzi Findings are made, they **will affect** litigation claims and recovery efforts that may be pursued against various third parties that did business with the Debtors…" [Dkt. No. 471 at 2 (emphasis added).] The Notice also states, "If the Ponzi Findings are made, the Debtors…will be **entitled to the benefit** of the Ponzi scheme presumption in recovery efforts and litigation against third parties…[which] **may aid** recovery and litigation efforts…" [*Id*. at 3 (emphasis added).] Thus, in the midst of highly technical legal language, the Debtors describe the Ponzi scheme presumption as "affecting" and "aiding" litigation efforts by "entitling" the Debtors to the "benefit" of the presumption. But the Debtors do not describe the litigation efforts or list who may be sued, so readers would have no way of knowing whether the Motion may affect them. Nor do the Debtors describe the significance of a Ponzi finding and how it would specifically impact potential defendants. It is not reasonable to expect the average recipient of this Notice to understand how, and whether, their rights could be affected by this.

Further, even if a third party read the Notice and understood that the presumption would work against them if they were to be sued by the Debtors, it is unfair to expect such a third party to retain counsel to oppose the Motion when they are not even sure if they will be sued in the first place.

On March 11, 2024, 17 days after the Motion was filed, the Debtors filed an Amended Notice. [Dkt. No. 585.] While the Amended Notice addresses some of the issues with the Notice, it was filed only 4 court days before the deadline

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 6

to file oppositions to the Motion. This is not enough time for a third party to consult an attorney and for that attorney to review over 3,500 pages of Motion papers and draft an opposition. Further, the Amended Notice does not cure the basic of problem of parties not knowing if they are potential defendants who should respond to the Motion. Therefore, the Amended Notice is also insufficient.

As a result of these myriad due process issues, granting the Motion would likely lead to significant unnecessary litigation later in the case. It is entirely predictable that scores of future defendants will argue that the finding is not binding on them due to lack of effective notice. It is also easy to imagine years of appeals flowing from these arguments. In short, this could create a serious mess. This is a problem that would potentially require years to unravel and result in extensive legal fees. Thus, it is not even in the best interest of the estate for the Court to make a Ponzi finding in this context. To avoid this problem, the Court should deny the Debtors' request for a Ponzi finding in the context of the current Motion.

### B.   Any Ponzi Litigation is Premature and Should be Stayed

Litigating the Ponzi issue right now would be prejudicial and unfair for an additional reason. Christensen, the Debtors, and other parties have been served with subpoenas from the United States Securities and Exchange Commission ("SEC") and the State of Washington Department of Financial Institutions ("DFI"). Further, to counsel's knowledge,  the Debtors have met with the SEC and other government agencies. In fact, the federal government has confirmed that it is conducting a criminal investigation of iCap and, likely, other related parties. While these investigations are in their nascent stages and no conclusions have been drawn, the fact that parallel investigations are pending,

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 7

most importantly a criminal investigation, puts any party that was involved with iCap's operations, finances or securities in an untenable position. As explained below, under these circumstances, any litigation regarding Ponzi findings should be stayed at least until the governments' investigations are farther along and their intentions have been clarified, if not resolved so Mr. Christensen and others can make an informed decision moving forward in these proceedings.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. Amend. V. The Fifth Amendment "protects a person ... against being incriminated by his own compelled testimonial communications." *Fisher v. United States*, 425 U.S. 391, 409 (1976).

One of the most basic functions of the Fifth Amendment is to protect *innocent* persons:

> [W]e have emphasized that one of the Fifth Amendment's "basic functions ... is to protect *innocent* men ... 'who otherwise might be ensnared by ambiguous circumstances.'" *Grunewald v. United States,* 353 U.S. 391, 421 (1957) (quoting *Slochower v. Board of Higher Ed. of New York City,* 350 U.S. 551, 557–558 (1956)). In *Grunewald,* we recognized that truthful responses of an innocent witness, as well as those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth. 353 U.S. at 421–422.

*Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (emphasis and alterations in original).

A person may invoke his Fifth Amendment privilege during the course of a civil deposition. *See, e.g.*, 31 U.S.C. § 3733(h)(7). Doing so, however, "gives rise to a legitimate inference that the witness was engaged in criminal activity." *Davis v. Mut. Life Ins. Co. of N.Y.*, 6 F.3d 367, 384 (6th Cir. 1993) (citing *Baxter v. Palmigiano*, 425 U.S. 308 (1976)). Thus, a witness forced to appear in a civil proceeding while a parallel criminal investigation is also

underway faces a difficult Hobson's Choice. For this reason, a court may, in its discretion:

> stay civil proceedings, postpone civil discovery, or impose protective orders and conditions "**when the interests of justice seem ( ) to require such action**, sometimes at the request of the prosecution, * * * sometimes at the request of the defense(.)" *United States v. Kordel*, *supra*, 397 U.S. at 12 n.27, 90 S.Ct. at 770 (citations omitted); *see Horne Brothers, Inc. v. Laird*, 463 F.2d 1268, 1271-1272 (D.C.Cir.1972). The court must make such determinations in the light of the particular circumstances of the case.

*Sec. & Exch. Comm'n v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980) (alterations in original; emphasis added). To determine whether "the interests of justice" require a stay, courts consider the extent to which the petitioner's Fifth Amendment rights are implicated, as well as:

> (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation.

*Keating v. Office of Thrift Supervision*, 45 F.3d 322, 325 (9th Cir. 1995).

As noted by Judge Milton Pollack:

> Resolution of the criminal case may increase prospects for settlement of the civil case. Due to differences in the standards of proof between civil suits and criminal prosecutions, the possibility always exists for a collateral estoppel or res judicata effect on some or all of the overlapping issues.

Milton Pollack, *Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201, 204 (1990).

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 9

The Federal Circuit has also noted that it is a "passive abuse" of the civil discovery system "when [a] civil party, who asserts fifth amendment rights, is compelled to refuse to answer questions individually, revealing his weak points to the criminal prosecutor." *Afro-Lecon, Inc. v. United States*, 820 F.2d 1198, 1203 (Fed. Cir. 1987). That court went on to note that, "[t]his point-by-point review of the civil case may lead to a 'link in the chain of evidence' that unconstitutionally contributes to the defendant's conviction." *Id.*

Likewise, resolving the criminal investigation could ease the burden on the court in any subsequent civil matter, as contemplated by Judge Pollack. *See Parallel Proceedings*, 129 F.R.D. at 204; *see also Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc.*, 87 F.R.D. 53, 57 (E.D. Pa. 1980) ("The mere possibility that a substantial amount of the court's work, if undertaken now, may shortly prove to have been unnecessary, cautions against undue haste in proceeding with this civil action.").

"[A] strong case for a stay" exists pre-indictment where the defendant in the civil action is a potential target of a known ongoing criminal investigation for the same conduct as that alleged in the civil investigation and there is substantial overlap in the facts and evidence in the cases. *See Walsh Securities, Inc. v. Cristo Property Management, Ltd.*, 7 F. Supp. 2d 523, 527 (D.N.J. 1998). In the pre-indictment context, the similarity of the issues underlying the civil and criminal actions is "the most important issue at the threshold in determining whether or not to grant a stay." *Id.*; *see also Ex Parte Bernard J. Ebbers*, 871 So.2d 776 (2003) (criminal charges not necessary to justify assertion of Fifth Amendment privilege where party moving for stay is subject to ongoing criminal investigation into "substantially overlapping" issues).

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 10

Additionally, the substantial overlap of evidence and issues in the civil investigation and the simultaneous criminal investigation creates a considerable risk that the civil investigation could be used by the government as a tool "to gain premature access to evidence and information pertinent to the criminal case." *Javier H. v. Garcia-Botello*, 218 F.R.D. 72, 75 (W.D.N.Y. 2003); *see also United States v. Scrushy*, 366 F. Supp. 2d 1134, 1139 (N.D. Ala. 2005) (a defendant who knows he is under criminal investigation can take actions to prevent providing information that could be used against him); *Ex Parte Antonucci*, 917 So.2d 825, 830 (2005) (stay request was particularly appropriate because FBI "confirmed that [civil defendant] was the 'subject of an investigation by the federal government'").

The potential tactical coordination between the Debtors and the government could be calculated to trigger either Fifth Amendment waivers, which the government will use in the criminal investigation, or a Fifth Amendment invocation, which the Debtors will use to gain a tactical advantage in any civil case. Although the Supreme Court has held that it is not unconstitutional to force a defendant into this choice of rights dilemma, *see Baxter v. Palmigiano*, 425 U.S. 308, 318–19 (1976), a court may nevertheless exercise its discretion to stay the civil case and prevent this Hobson's choice when it concludes it is in the interest of justice to do so. *Brock v. Tolkow*, 109 F.R.D. 116, 119 (E.D.N.Y.1985).

Further, this dilemma would not just prejudice people who worked for iCap, like Mr. Christensen. It could also unfairly impact all other defendants in future adversary proceedings. For example, it would be in the interest of all defendants to prove that iCap was not a Ponzi scheme. In order to help prove that defense, parties will want to depose Mr. Christensen and numerous other

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 11

former employees and outside professionals. If those witnesses exercise their Fifth Amendment rights as a result of the on-going government investigation, all defendants will be prejudiced because the witnesses who could prove up their defense will not be in a position to testify.

This is another example of how the timing of the Motion is simply unfair, in violation of due process. The Court should stay all Ponzi litigation at least until the parties have a clearer understanding of the government investigations and the Debtors disclose any knowledge they have of such investigations.

**C.  The Court Should Not Consider Making a Ponzi Finding in the Context of a DIP Motion**

The Court should not make Ponzi findings in connection with a DIP motion. The Debtors' request for a Ponzi finding is a request for declaratory relief that relates to avoidance and recovery actions that the Debtors intend to bring. Under normal circumstances, the Debtors would file their adversary complaints, which would include allegations that the Debtors operated as a Ponzi scheme. Under Federal Rule of Bankruptcy Procedure ("FRBP") 7001 (1) and (9), "a proceeding to obtain a declaratory judgment relating to…" "a proceeding to recover money or property…" must be commenced as an adversary proceeding. Here, the Debtors are attempting to put the proverbial cart before the horse, to the prejudice of all other potentially impacted parties. Thus, the Debtors can only seek the requested finding within the context of an adversary proceeding.

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 12

In fact, almost without exception, declaratory relief can only be obtained through an adversary proceeding.[2] *See In re Sun Belt Elec. Constructors, Inc.*, 56 B.R. 686, 688 (Bankr. N.D. Ga. 1986) (denying motion to enforce contract "request[ing] injunctive or equitable or, at least, a declaratory judgment" as "such relief may only be obtained in an adversary proceeding); *In re Harry C. Partridge, Jr. & Sons, Inc.*, 43 B.R. 669, 672 (Bankr. S.D.N.Y. 1984) ("An action to obtain a declaratory judgment relating to such a [breach of contract] dispute is expressly delineated in Bankruptcy Rule 7001(9) as an adversary proceeding…"); *see also In re The Acad., Inc.*, 289 B.R. 230, 232 (Bankr. M.D. Fla. 2003) ("A claim for declaratory relief, of course, is an adversary proceeding under F.R.B.P. 7001(a)"); *In re Zimmer*, 586 B.R. 413, 414 (Bankr. W.D. Pa. 2018) ("[A]ctions for declaratory relief are commenced by way of filing an adversary complaint"); *In re Zavala*, 444 B.R. 181, 191, n.7 (Bankr. E.D. Cal. 2011) ("Rule 7001, Federal Rules of Bankruptcy Procedure require that injunctive relief, declaratory relief, or an interpleader be commenced as an adversary proceeding"); *In re Hayden*, 477 B.R. 260, 265

---

[2] There are certain types of relief that are similar to declaratory relief that may be obtained by motion. For example, courts are permitted to issue orders interpreting or clarifying their own orders. *See, e.g.*, *In re The Educ. Res. Inst., Inc.*, 442 B.R. 20, 23 (Bankr. D. Mass. 2010) ("[T]o the extent the motion asks the Court merely to interpret the [court's prior order], a request which *does* strike the Court as one for declaratory relief, an adversary proceeding is not required"). Similarly, in some circumstances, courts can issue orders clarifying provisions in chapter 11 or chapter 13 plans. *See, e.g., In re Passavant*, 444 B.R. 378, 384 (Bankr. S.D. Ohio 2010) (citing *In re Beta Intern., Inc.,* 210 B.R. 279, 282 (E.D.Mich.1996)) ("[T]o the extent the relief the Trustee seeks is, as Wells Fargo contends, a declaratory judgment, it is a judgment expressly provided for by the Plan, making an adversary proceeding unnecessary"). These exceptions do not apply here.

(Bankr. N.D. Ga. 2012) ("A request for declaratory relief must be brought by complaint, rather than by motion").

Further, counsel is not aware of any instance where a Ponzi scheme finding has been made outside of an established adversary proceeding or in the context of a plan confirmation trial. Not surprisingly, the Debtors do not reference any such precedent.

The Debtors nevertheless argue that the Court can enter the Ponzi scheme finding as part of a contested matter. [*See* Dkt. No. 542 at 7-8.] The Debtors are incorrect.

The Debtors state that "Bankruptcy Rule 7001 defines ten categories of proceedings that must be treated as adversary proceedings." [*Id*. at 7.] The Debtors then claim that "[t]he requested Ponzi Scheme Findings do not fall within any of the enumerated categories in Rule 7001," apparently relying on the fact "[t]he Supplemental DIP Motion is not a proceeding to recover money or property under Bankruptcy Rule 7001(1)…" [*Id*. at 7-9.] This is misleading—as the Debtors know, the requested Ponzi scheme finding will not just affect the Debtors' ability to obtain the subject DIP financing. It is declaratory relief that would affect every single avoidance and recovery action initiated by the Debtors. Thus, it must be brought as an adversary proceeding. *See* FRBP 7001 ("The following are adversary proceedings…(1) a proceeding to recover money or property… [and] (9) a proceeding to obtain a declaratory judgment relating to any of the foregoing.")

The Debtors go on to argue that, "it is appropriate for the Debtors to seek the requested relief by motion as a contested matter" because a Ponzi finding is "tied to a core contested matter—the Supplemental DIP Motion." [Dkt. No. 542 at 7-8.] In other words, the Debtors are attempting to pull

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 14

themselves up by their own bootstraps by arguing that because the subject DIP financing is expressly conditioned on the Court making the Ponzi finding, the Court is authorized to make such a finding by motion. This argument is not supported by any law.[3] Under the Debtors' theory, the Court could order a creditor to disgorge a preferential transfer in the context of a DIP motion as long as the potential lender made it a pre-condition to the loan. That would render Rule 7001 practically meaningless.

The Debtors' attempt to obtain a judgment by motion practice that would adversely impact future unknown adversary proceeding defendants is inappropriate. Because the relief the Debtors seek can only be obtained through an adversary proceeding, the Debtors' request for a Ponzi finding must be denied.

### D. The Ponzi Issues Cannot Possibly be Litigated Within the Timeframe of the DIP Motion

In their *ex parte* emergency motion to establish a schedule on the Motion, the Debtors requested that the Court set the following pre-hearing deadlines, among others:

- Discovery to be completed by March 15, 2024;
- Objections to the Motion to be filed by March 18, 2024; and

---

[3] The Debtors cite to *In re PNW Healthcare Holdings, LLC*, 617 B.R. 354, 356 (Bankr. W.D. Wash. 2020) in support of their position that the requested relief can be obtained in a contested matter. This case is inapposite simply because the relief requested in that case did not fall under any of the types of proceedings enumerated in FRBP 7001, unlike the relief requested by the Debtors. The Debtors themselves admit to this. *See* Dkt. No. 542 at 8 ("[T]he requested declaratory judgment [in *PNW*] did not fall within Rule 7001(9) and, therefore, could be resolved as part of a contested matter"). The Debtors also cite to *In re Tubman*, 364 B.R. 574 (Bankr. D. Md. 2007), in which the debtor filed an untimely motion to extend the automatic stay. This is not a request for declaratory relief and therefore *Tubman* is also inapposite.

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 15

- A list of witnesses to be called at the hearing and an estimate of the duration of their testimony must be filed by March 20, 2024.

[Dkt. No. 553 at 5.] The Debtors' proposed schedule on the Motion may be charitably described as unreasonably compressed. The Debtors' supplemental brief regarding the Ponzi scheme finding was only filed on March 1, 2023 [Dkt. No. 542] and yet the Debtors wanted discovery to be completed by March 15. This is an irrational and untenable request. The time it will take to fairly litigate the Ponzi issues makes the DIP Motion unfeasible.

It is crucial to appreciate the complexity and magnitude of the litigation required to properly make a Ponzi finding, in keeping with due process. To assist the Court in determining a reasonable litigation schedule for these issues, the table below reviews cases, including cases cited by both Christensen and the Debtors in which a Ponzi finding was made. The table provides the timing of such a finding relative to the start of the bankruptcy and adversary proceedings in which the finding was made. On average, the Ponzi finding was made about **4 years, 6 months and 16 days** after the petition date, and **2 years, 3 months and 4 days** after the initiation of the adversary proceeding. This makes sense given the breadth of information needed to make a Ponzi finding. It also illustrates the unreasonableness of the Debtors' proposed timeline.

| Case | Petition Date | Adversary (ies) Initiated | Ponzi Finding Made |
|---|---|---|---|
| *In re IFS Fin. Corp.*, 417 B.R. 419 (Bankr. S.D. Tex. 2009) | 8/23/2002 | 10/8/2004 | 9/9/2009<br><br>(7 years, 17 days after petition; 4 years, 11 months, 1 day after adversary) |

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 16

| | | | |
|---|---|---|---|
| *In re Ramirez Rodriguez*, 209 B.R. 424 (Bankr. S.D. Tex. 1997) | 5/7/1993 | 5/5/1995 | 6/5/1997<br><br>(4 years, 29 days after petition; 2 years 1 month after adversary) |
| *In re DBSI, Inc.*, 476 B.R. 413 (Bankr. D. Del. 2012) | 11/10/2008 | 11/5/2010 | 8/1/2012<br><br>(3 years, 8 months, 22 days after petition; 1 year, 8 months, 27 days after adversary) |
| *In re Canyon Sys. Corp.*, 343 B.R. 615 (Bankr. S.D. Ohio 2006) | 7/7/1997 | 7/6/1999 | 3/31/2006<br><br>(8 years, 8 months, 24 days after petition; 6 years, 8 months, 25 days after adversary) |
| *In re World Vision Ent., Inc.*, 275 B.R. 641 (Bankr. M.D. Fla. 2002) | 9/3/1999 | 10/17/2000 | 3/29/2002<br><br>(2 years, 6 months, 26 days after petition; 1 year, 5 months, 12 days after adversary) |
| *In re Taubman*, 160 B.R. 964 (Bankr. S.D. Ohio 1993) | 5/3/1989 | 1/17/1992 | 10/25/1993<br><br>(4 years, 5 months, 22 days after petition; 1 year, 9 months, 8 days after adversary) |
| *In re Fox Ortega Enterprises, Inc.*, 631 B.R. 425 (Bankr. N.D. Cal. 2021) | 1/8/2016 | 1/5/2018 | 4/23/2021<br><br>(5 years, 3 months, 15 days after petition; 3 years, 3 months, 18 days after adversary) |
| *In re ATM Fin. Servs., LLC*, 2011 WL 2580763 (Bankr. | 1/12/2008 | 2/8/2010 | 6/24/2011<br><br>(3 years, 4 months, 12 days after petition; 1 year, 4 |

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 17

| | | | |
|---|---|---|---|
| M.D. Fla. June 24, 2011) | | | months, 16 days after adversary) |
| *In re Fin. Res. Mortg., Inc.*, 454 B.R. 6 (Bankr. D.N.H. 2011) | 11/20/2009 | 7/7/2010 | 7/8/2011<br><br>(1 year, 7 months, 18 days after petition; 1 year, 1 day after adversary) |
| *In re LLS America LLC* E.D. Wash. 2:09-bk-06194 | 7/21/2009 | July 2011 | 7/13/2013<br><br>(almost 4 years after petition, and 2 years after adversary proceedings) |

The *LLS America* case, from this district, is instructive. In that case, an examiner was appointed to review the Debtor's finances. The examiner issued 3 reports over the course of the next 11 months. As a result, a chapter 11 trustee was appointed. The trustee filed Ponzi complaints against more than 400 defendants. The Court consolidated the adversary proceedings for purposes of dealing with "common questions" (mainly, whether the Debtor operated a Ponzi scheme). Eventually, after significant discovery involving all the defendants, the Trustee filed a motion for partial summary judgment. On July 13, 2013, the Bankruptcy Court issued its report and recommendation to the District Court, finding that the Debtors operated a Ponzi scheme. (It is also worth noting that multiple defendants filed motions to withdraw the reference, which was granted. This raises the further complicating factor that future defendants may argue that they are entitled to a ruling from the District Court, and that any prior Ponzi finding by the Bankruptcy Court is not binding.)

It is clear from the above examples (and many other cases) that there is no way to complete litigation of the Ponzi issues in anything resembling the Debtors' proposed timeframe. Parties need the opportunity to conduct full and fair discovery.

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 18

Given that there are 25 debtors, litigation on the issue of whether the Debtors operated as a Ponzi scheme will be complex, requiring extensive discovery on the topics of the Debtors' operations, finances, and interactions with each other. The parties will also need to depose former officers, employees, advisors, investors and broker-dealers, among others, to fully understand the Debtors' operations and to issue document requests and subpoenas. The Debtors' motion papers alone are approximately 3,500 pages. The Debtors are presumably in possession of hundreds of thousands of potentially relevant documents given the company was founded in or around 2007. Further, every potential defendant is entitled to discovery on this issue, which will increase the amount of time needed to complete the process. It will take many months – at a minimum – to do this correctly. Additionally, the parties will need experts in the relevant fields, including finance, securities, forensic accounting and real estate development. The experts cannot complete their work until after fact discovery is complete. The parties also need an opportunity to depose each other's experts. All of this will take time. There is simply no way around it. Thus, if the Court is not inclined to deny the Debtors' motion outright, it should set a reasonable discovery and litigation schedule after the parties meet and confer pursuant to Rule 26(f) and propose their schedules. It is unlikely that *fact* discovery can be completed in less than 6 months.

### E. The Debtors Have Failed to Prove the Existence of a Ponzi Scheme

In the absence of a stay, the Motion should be denied because the evidence proffered by the Debtors does not establish a business or entity that is knowingly taking in new funds with a full awareness that it could never repay them rather than a legitimate business that has unfortunately and unintentionally overextended itself.

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 19

### 1. Legal Standard

"A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 603 B.R. 682, 689 (Bankr. S.D.N.Y. 2019) (internal citations omitted); *see also In re United Energy Corp.*, 944 F.2d 589, 590 (9th Cir. 1991) ("The fraud consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment"); *In re Pearlman*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010) (quoting *United States v. Silvestri*, 409 F.3d 1311, 1317 n. 6 (11th Cir. 2005)) ("A Ponzi scheme is generally defined as a 'phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors'").

The Securities and Exchange Commission describes a Ponzi scheme as follows:

> A Ponzi scheme is an investment fraud that pays existing investors with funds collected from new investors. Ponzi scheme organizers often promise to invest your money and generate high returns with little or no risk. But in many Ponzi schemes, the fraudsters do not invest the money. Instead, they use it to pay those who invested earlier and may keep some for themselves.

[https://www.investor.gov/protect-your-investments/fraud/types-fraud/ponzi-scheme.]

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 20

In the classic Ponzi scheme, such as the eponymous stamp scheme orchestrated by Charles Ponzi, there is no underlying business at all. The entire thing is fictitious, and the only transactions that occur involve money flowing to and from investors. Although that is not a strict requirement for finding the existence of a Ponzi scheme, it is important to keep in mind. Once the Court determines that there was a legitimate business, the Ponzi analysis becomes much more complicated.

> It may often be difficult to distinguish between (a) a legitimate business that has overextended itself and is merely being creative in moving money around among investors, and (b) a business that is knowingly taking in new funds with a full awareness that it could never repay them. If it is ambiguous whether the business was a Ponzi scheme, **then the Ponzi presumption should not apply**, and the plaintiff must establish that debtor was engaged in a scheme to defraud investors.

> If the debtor is engaged in legitimate business activities alongside Ponzi-like activities, or if the nature of the business changed over time, then Ponzi presumption may be problematic to establish.

Kathy Bazoian Phelps and Hon. Steven Rhodes, *The Ponzi Book: A Legal Resource for Unraveling Ponzi Schemes*, § 2.03(1)(e)(i) (2012) (emphasis added).

The Ponzi presumption "is based on a recognition that a Ponzi scheme operator knows that the scheme will eventually collapse when the pool of investors runs dry and the remaining investors will lose their money." *Madoff*, 603 B.R. at 689 (citing *In re Bayou Grp., LLC*, 439 B.R. 284, 306 n. 19 (S.D.N.Y. 2010) ("Knowledge to a substantial certainty constitutes intent in the eyes of the law, and awareness that some investors will not be paid is

sufficient to establish actual intent to defraud"); *In re Indep. Clearing House Co.*, 77 B.R. 843, 860 (D. Utah 1987) ("The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money").

"Some courts have used the following four-factor test to determine the existence of a Ponzi scheme: 1) deposits were made by investors; 2) the Debtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors." *Madoff*, 603 B.R. at 689 (citations omitted); *see also Pearlman*, 440 B.R. at 575.

In addition, the following factors have been found to weigh in favor of applying the Ponzi presumption:

- The Ponzi perpetrator did not have any legitimate business operation to which its alleged investment program is connected. *See In re World Vision Ent., Inc.*, 275 B.R. 641, 656-57 (Bankr. M.D. Fla. 2002) (finding Ponzi scheme existed where "none of the debtor's investments ever produced any income or revenue"); *In re Taubman*, 160 B.R. 964, 978–79 (Bankr. S.D. Ohio 1993).

- The perpetrator made unrealistic promises of returns on their investments. *See In re Canyon Sys. Corp.*, 343 B.R. 615, 631 (Bankr. S.D. Ohio 2006) (finding Ponzi scheme were investors told "they could earn up to a 35% return on a one-time purchase

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 22

of gold coins…"); *In re Vaughan Co. Realtors*, 500 B.R. 778, 789 (Bankr. D.N.M. 2013) (finding Ponzi scheme where investors "were promised returns ranging from 8% to 40% for their investments"); *In re Ramirez Rodriguez*, 209 B.R. 424, 428 (Bankr. S.D. Tex. 1997) (finding Ponzi scheme where "the participation profit estimate ranged from seven percent (7%) to forty percent (40%) for a short term investment").

- The perpetrator diverted funds for personal use. *See Vaughan*, 500 B.R. at 789.

- The risks associated with the investment program were downplayed or not discussed. *See World Vision*, 275 B.R. at 646; *Ramirez Rodriguez*, 209 B.R. at 428 (finding Ponzi scheme where debtors "unconditionally guaranteed payment of the subcontract purchase price and profit interest within five (5) business days after completion of the transaction to which the subcontract allegedly related").

- The perpetrator paid brokers high commissions to induce them to continue the sales. *See World Vision*, 275 B.R. at 657.

- The commission structure with sales people provided incentives "to discourage investors from requesting withdrawal." *See In re IFS Fin. Corp.*, 417 B.R. 419, 440 (Bankr. S.D. Tex. 2009).

Accordingly, as explained in the section from the *Ponzi Book* quoted above, the analysis is fact-intensive and complicated. The Debtors must show not only that money raised from some investors was used to pay other investors, or that the business was "unrealistic;" they must also "establish that debtor was engaged in a scheme to defraud investors." *Ponzi Book* § 2.03(1)(e)(i) (2012).

Here, the only fact that cannot be disputed is that the Debtors operated a legitimate real estate investment business. The Debtors bought, developed, and sold hundreds of millions of dollars worth of real property. As explained in more detail below, the Debtors have completely failed to prove that the Debtors were operated as a Ponzi scheme.

### 2. The Supporting Declarations Do Not Prove a Ponzi Scheme

The Debtors rely primarily on the declaration and report of Jeffrey H. Kinrich ("Kinrich Report") [Dkt. No. 469] to support their contention that the iCap entities operated as a Ponzi scheme. However, the Kinrich Report is fatally flawed, incomplete, and unreliable in multiple respects.

### a. The Kinrich Report is Fatally Flawed, Incomplete and Unreliable

First, the Kinrich Report should be disregarded by the Court because it consists primarily of improper legal conclusions.[4] Federal Rule of Evidence ("FRE") 704 permits expert testimony on an "ultimate issue" only when the expert testimony is "otherwise admissible." Expert testimony which merely offers legal conclusions is inadmissible because it is not helpful to a trier of fact as required by FRE 701 and 702. *Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390, 1398 (9th Cir. 1985); Fed. R. Evid. 704 advisory committee notes (Rule 701 "affords ample [assurance] against the admission of opinions which would merely tell the jury what result to reach.... [The Rule] also stand[s] ready to exclude opinions phrased in terms of inadequately explored legal criteria.").

---

[4] To avoid unnecessary and duplicative papers, Christensen respectfully requests that the Court treat this section of the brief as an evidentiary objection to Mr. Kinrich's declaration.

The use of experts to convey legal conclusions is improper because it invades the province of the judge and jury. *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985) ("The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury."); *United States v. Geter*, 927 F.2d 611 (9th Cir. 1991) (citing *Torres*).

The distinction between an opinion regarding an ultimate fact and a legal conclusion can be blurry, but if an expert uses terms that have a "separate, distinct and specialized meaning in the law different from that present in the vernacular," the opinion should be excluded. *Torres*, 758 F.2d at 151 (citing *United States v. Hearst,* 563 F.2d 1331, 1351 (9th Cir.1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978)).

Here, the entire point of Mr. Kinrich's declaration is to opine on a subject that has a highly specialized legal meaning – the indicia of a Ponzi scheme. The real nature of Mr. Kinrich's report is that of a legal brief with a thin veneer of factual analysis. For example, Mr. Kinrich repeatedly opines that particular facts are "highly indicative of a Ponzi scheme." This is nothing other than a legal conclusion. Without these legal conclusions, Mr. Kinrich's report mostly consists of summaries and compilations of accounting information in the Debtors' possession. As such, Mr. Kinrich's testimony is also improper because it is based on underlying evidence that was not made available to potential objecting parties. FRE 1006 permits a party to present summaries, charts or calculations, but "[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place."

Second, even if Mr. Kinrich's opinion were a proper subject for expert testimony, Mr. Kinrich has not demonstrated the expertise necessary to offer that opinion. At the risk of stating the obvious, to offer an expert opinion about the characteristics of Ponzi schemes, an expert should have special experience and expertise with respect to Ponzi schemes.

Mr. Kinrich's background and experience are impressive, but he appears to be a damages and valuation expert. Nothing in his declaration, report or CV suggest that he has any special expertise with Ponzi schemes. Mr. Kinrich also does not appear to have any background or experience with regard to the types of business issues implicated by his analysis. For instance, he has no background in real estate development or investment fund operations and, thus, cannot reliably opine on what is appropriate in that industry.

Third, Mr. Kinrich's report lacks a basic element of reliability because it relies on incomplete accounting information. Experts are allowed to rely on inadmissible evidence to support their opinions, but if the expert consistently relies on unreliable material, the expert's conclusions may be disregarded. Mr. Kinrich admits that he has not reviewed accounting or bank records for a significant portion of iCap's existence (i.e., from 2014 to 2018). Given the nature of a Ponzi scheme, the failure to review these records makes Mr. Kinrich's report so unreliable as to be useless. Mr. Kinrich's report specifically reaches conclusions regarding so-called "sources and uses" of deposits and withdrawals. Because he only had access to records from the period from October 2018 to September 2023, these conclusions are meaningless.

On pages 5 and 6 of his report, Mr. Kinrich gives his substantive opinions:

a. The majority of iCAP's funds from October 2018 to September 2023 were from fund subscribers and loans from third parties, rather than cash generated from its business operations. *See* **Exhibit 1.1**.

b. The majority of iCAP's funds from October 2018 to September 2023 were used to make interest and principal payments to subscribers rather than investing in real estate and related operations. *See* **Exhibit 1.1**.

c. iCAP's real estate business from 2014 through 2022 did not generate sufficient cash flow to meet its interest and principal obligations to subscribers.

d. There were several large dollar transfers between iCAP entities from October 2018 to September 2023, indicating that subscriber funds from one entity were used to pay subscribers in another entity. This is indicative of commingling.

e. iCAP could only meet its obligations to repay its subscribers using proceeds from its real estate business if its real estate investments generated unrealistic (and unrealized) returns.

f. iCAP failed to invest subscribers' funds in the promised investments or as otherwise represented to subscribers.

g. Later investors in iCAP received lower returns than earlier investors.

Mr. Kinrich based these "opinions" on incomplete accounting data that excluded 2014 through 2018, but included the years from 2020 to 2023, a period encompassing the COVID-19 pandemic and the recent unprecedented increase in interest rates. Given that context, these "conclusions" provide no

meaningful evidence to support the opinion that iCap was operating a Ponzi scheme.

Put differently, Mr. Kinrich's analysis relies on innuendo rather than accurate information and expertise. He states that – during the period he considered –iCap spent "just" $78.9 million on real estate acquisition and $45 million on operations which he characterizes as "just" 21.2% of total withdrawals.

The available documents reveal iCap was a real estate development business, i.e., it acquired real estate suitable for development and attempted to develop it. Because Mr. Kinrich only considered incomplete accounting information and because Mr. Kinrich lacks any professional expertise or background in real estate development, his characterizations are not valid expert opinion. Is $78.9 million an unreasonably small amount to spend on real estate acquisition for this particular company at this particular time? Mr. Kinrich cannot answer that question. Instead, he can only use adjectives like "just" to imply a conclusion he cannot actually make.

For example, in paragraph 38, he concludes that the percentages of sources and uses related to investors compared to business operations and real estate investments are "highly indicative of a Ponzi scheme." He offers a similar conclusion in subsequent paragraphs. Lacking any background in Ponzi schemes or real estate development (or business operations generally), relying on seriously incomplete financial information, his conclusions are neither justified nor appropriate.

Mr. Kinrich's analysis of iCap's real estate business is similarly flawed. As a threshold matter, Mr. Kinrich states that – from September 2013 to December 2020 – iCap invested $103.4 million in real estate that it sold during

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 28

that same period and that it generated a net gain of $1.4 million on those transactions. This statement, by itself, is substantial evidence that iCap was **not** a Ponzi scheme. A classic Ponzi scheme operates no legitimate business; it does not profitably invest over $100 million in real estate. And, even if the Debtors dispute that the investments were "profitable" when factoring in the investor notes, these facts do not prove the existence of a Ponzi scheme.

From this statement, however, Mr. Kinrich leaps to a number of conclusions which he is not qualified to make.

Buried at the end of Mr. Kinrich's report is a most telling section. In it, Mr. Kinrich purports to analyze "other Ponzi scheme factors." In reality, he can only say that money from **one** of iCap's funds **"**appears" to have been used for purposes that he characterizes as outside the scope of the fund.

For all these reasons, the Court should disregard the Kinrich Report.

### b. Mr. Miller's Declaration is Inadmissible as Either Percipient or Expert Testimony

The Debtors do not explain whether they are offering Mr. Miller's testimony as a percipient witness or as an expert. In either case, his testimony is almost entirely inadmissible.

As a percipient witness, Mr. Miller establishes no personal knowledge of the facts in his testimony, authenticates none of documents he reviewed, and lays no foundation for the admissibility of any evidence. His declaration contains the statement that, "all facts set forth in this declaration are based upon my personal knowledge of the Company's operations, finances, records, and information learned from my review of relevant documents, and information I have received from the Company's advisors." This makes no sense. Information gleaned from speaking with others and reviewing

unauthenticated and inadmissible documents is, by definition, not personal knowledge. Further, Mr. Miller does not identify what documents he reviewed, what information he received from the company's advisors, or even which advisors he means. This pervasive lack of information makes the declaration unreliable and inadmissible.

As expert testimony, Mr. Miller's declaration is equally flawed because it suffers from all the same defects as Mr. Kinrich's. Mr. Miller offers legal conclusions, relies on incomplete information, offers opinions without having relevant expertise, and summarizes information without complying with FRE 1006. For these reasons, the Court should disregard Mr. Miller's testimony, as well.

### c. Mr. Ho's Declaration is Inadmissible as Either Percipient or Expert Testimony

In his declaration, Mr. Ho purportedly summarizes the Debtors' accounting data. Again, the Debtors do not explain whether they are offering Mr. Ho's testimony as that of a percipient witness or as an expert. Either way, Mr. Ho's testimony is inadmissible.

If Mr. Ho is being treated as a percipient witness, his testimony is inadmissible because he fails to establish any personal knowledge of the facts contained in his declaration—nor could he, given that he has only been involved with the Debtors since October 2023. [Dkt. No. 541 ¶ 2.] Mr. Ho's review of unauthenticated and inadmissible documents does not give him personal knowledge of the facts he testifies to.

If Mr. Ho is being as an expert witness, his declaration is inadmissible for the same reasons as Mr. Kinrich and Mr. Miller. First, Mr. Ho is not qualified as an expert in accounting; rather, he is a financial advisory

consultant. [Dkt. No. 541 ¶ 1.] Thus, Mr. Ho fails to establish the expertise necessary to come up with a "common fact pattern" relating to the Debtors' accounting records. [*See Id*. ¶ 11.] Additionally, Mr. Ho's testimony should be disregarded as it relies on incomplete information, like Kinrich's report. Mr. Ho admits that his "common fact pattern" relies only on information from June 2019 to the Petition Date. [*Id*. ¶ 10.] Thus, his conclusions are based on information that excludes most of the Debtors' existence. Lastly, Mr. Ho's testimony is inadmissible because he summarizes data and records without demonstrating that the underlying evidence is authentic or admissible. *See Radio Parts Co. v. Lowry*, 125 B.R. 932, 945 (D. Md. 1991) (admissibility of testimony summarizing business records relies, in part, on whether evidence underlying the summary is admissible). And, again, the evidence underlying Mr. Ho's summary was not made available for examination per FRE 1006.

For all these reasons, the Court should disregard Mr. Ho's testimony.

### 3. The Debtors Fail to Allege When the Alleged Ponzi Scheme Began

The Debtors request that the Court make a finding "that during the prepetition period, [the Debtors] operated as a Ponzi scheme" and that the Debtors "are entitled to the benefit of the Ponzi Presumption – i.e., that transfers and business transactions were done with actual intent to hinder, delay, or defraud creditors – in recovery efforts and litigation against third parties." [Dkt. No. 542 at 2-3.] Conspicuously absent from the Motion, however, is any allegation about when the alleged Ponzi scheme began. In fact, the Debtors' Proposed Order states, "the court finds and concludes that for years during the prepetition period (the 'Ponzi Period') the Debtors' business enterprise operated as a Ponzi scheme." [Dkt. No. 467 at 33.]

1     This is problematic. In order for the Ponzi presumption to apply to a given
2     transfer, the transfer necessarily must have occurred after Ponzi activity began.
3     *See In re Petters Co., Inc.*, 495 B.R. 887, 908 (Bankr. D. Minn. 2013) ("[T]he
4     qualifier is a key part of the presumption – the transfer must be 'in furtherance
5     of' the larger scheme. It is central to the presumption's defensibility"). Thus,
6     the Debtors' definition of the "Ponzi Period" – "years during the prepetition
7     period" – is not tenable.
8         This issue also relates back to the section above regarding insufficient
9     notice of the Debtors' requested relief. Because the Debtors do not allege when
10    any Ponzi activity began, those who received prepetition transfers from the
11    Debtors are unfairly left guessing whether this Motion could affect them.
12        Further, to the extent the Debtors wish to argue that iCap was a Ponzi
13    scheme from the start, they have fallen even farther short from proving that. The
14    Debtors' Ponzi analysis – and particularly the Kinrich Report – is based on
15    accounting records from after 2018. They do not include the first decade of
16    iCap's business. Moreover, arguing that iCap was a Ponzi scheme from the start
17    is a much more difficult theory to prove. The Debtors would have to prove that,
18    despite the undisputed existence of a large number of real property transactions
19    and developments that is revealed by the available documents, the whole
20    purpose of the operation was really a scheme to defraud investors. The Debtors
21    have not introduced any evidence at all to support that theory.
22                    **4.      The Debtors Fail to Prove Fraudulent Intent**
23        The Debtors' attempts to show that there was an intent to defraud are
24    unconvincing and often misleading.
25        For example, the Debtors claim that, "iCAP made numerous misleading
26    and fraudulent statements and acts in furtherance of the Ponzi scheme." [Dkt.

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 32

No. 542 at 15.] In support of this, the Debtors first argue that Fund I "did not generate the necessary returns" to support investor payment obligations, and that "it appears iCAP made no effort to achieve those types of returns." [*Id*. at 16.] This is an overreaching, conclusory statement that is not based on any facts. In fact, in the same paragraph, the Debtors state that Fund 1 invested in 87 projects. This cannot be squared with the conclusion that the Debtors "made no effort" to achieve returns. This is but one example of the Debtors' conclusory statements of fraudulent intent unsubstantiated by reliable evidence.

The Debtors also argue that "iCAP used [PPMs] to cultivate the illusion that iCAP's Funds were legitimate business operations." [*Id*.] But the Debtors again fail to show that any representations in any PPMs were intended to defraud. There is simply no evidence of this. The Debtors' argument is again nothing more than a conclusory statement.

In short, the Debtors yet again fail to show that the Debtors were operated as a business knowingly taking in new funds with awareness that it could not repay them without later-acquired investments. Thus, the Debtors have failed to show that iCap was a Ponzi scheme.

### 5. The Debtors Conducted Legitimate Business Operations That Produced Substantial Earnings

To show the existence of a Ponzi scheme, the Debtors must show that the Debtors conducted little or no legitimate business operations. *See Madoff*, 603 B.R. at 689 (citations omitted); *see also Pearlman*, 440 B.R. at 575. But this was not the case here. The Debtors have entered into and exited out of approximately 60-70 real estate projects that generated hundreds of millions of dollars. This stands in stark contrast to the typical Ponzi scheme. *See, e.g.*, *In re World Vision Ent., Inc.*, 275 B.R. 641, 656-57 (Bankr. M.D. Fla. 2002) (finding Ponzi scheme existed where "none of the debtor's investments ever

produced any income or revenue"); *In re Taubman*, 160 B.R. 964, 978–79 (Bankr. S.D. Ohio 1993); *In re Ramirez Rodriguez*, 209 B.R. 424, 428 (Bankr. S.D. Tex. 1997); *In re Canyon Sys. Corp.*, 343 B.R. 615, 632 (Bankr. S.D. Ohio 2006) (finding Ponzi scheme where the debtor had no business that could generate returns).

Exhibit 14 of the Kinrich Report,[5] purportedly a schedule of projects invested in by the Debtors from September 2013 to December 2020, supports the fact that the Debtors conducted extensive and legitimate business operations. Even an unprofitable business is not synonymous with a Ponzi scheme.

### 6. The Returns on the Debtors' Investments Were Reasonable and Risks Were Adequately Disclosed

As discussed above, whether an alleged Ponzi perpetrator made unrealistic promises of returns on investments and whether the risks associated with such investments were downplayed or not discussed are factors that have been found to weigh in favor of applying the Ponzi presumption. Neither of these factors are present here.

---

[5] The Kinrich Report provides no detail as to who created this schedule, based off of what information, or when. [*See* Dkt. No. 469 at 25 ("As to selling properties, a schedule has been produced that provides detail on all properties invested in by iCAP from September 2013 through December 2020."] Christensen does not waive any evidentiary objections to Exhibit 14.

Documentary evidence will show that hundreds of millions of dollars was generated through various real estate projects. Company documents, including, without limitation, purchase and sale agreements, leases, deeds, loan documents, draw requests, project folders, appraisals, receipts, permits and entitlements, will demonstrate this.

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 34

The Debtors contend that iCap promised investors "unrealistically high returns" on their investments. [*See, e.g.*, Kinrich Decl. ¶ 72.]  According to Mr. Kinrich, "A review of Private Placement Memorandums ("PPM") of the Portfolio Business's various debentures and promissory note-offerings shows that majority of the offerings promised between 9 and 12 percent annual interest rates …." [*Id*. ¶ 73.] These rates are reasonable and in line with other real estate investments. Indeed, if the Debtors' offered rates materially lower than 9%, the investors likely would have preferred more traditional investment vehicles, such as index funds or other publicly-traded offerings. A return on investment (ROI) of 9-12% is hardly unrealistic for West Coast real estate investments over the last 10 years.

For example, according to Zillow, the median price for homes in King County, Washington increased from $439,724 in November 2015 to $831,108 in February 2024. [*See* https://www.zillow.com/home-values/207/king-county-wa/] This represents a nominal annual return of 8.02%. However, assuming, for example, an initial investment of 20% down, the annual ROI could be over 25% per year.[6]

This indicates the rates of return associated with the Debtors' funds are reasonable. *See In re Taneja*, 2012 WL 3073175, at *7 (Bankr. E.D. Va. July 30, 2012) (market interest rates not unrealistically high or artificial).

---

[6] This calculation is based on the following assumptions: 20% down payment, with 80% financed at an interest rate of 5.00% amortized over 30 years, and 6% cost of sale. Using the 2015 median purchase price of $439,724, a buyer could have invested a down payment of $87,944.80. Assuming the buyer sold the property in February 2024 for the median price of $831,108, subtracting 6% costs of sale ($49,866.48) and financing costs of $187,082.70, and then adding back in the principal paydown of $51,000 yields a net return of $557,214.02, for an average ROI of 25.07%.

Moreover, the Debtors disclosed a multitude of risks associated with their investments. For example, on the first page of the Offering Memorandum for iCAP Pacific Northwest Opportunity and Income Fund, LLC is the following capitalized and bolded language: **"THIS OFFERING INVOLVES CERTAIN RISKS. <u>See</u> 'Risks Factors.'"** [Dkt. No. 543 at 8.] The section entitled "Risk Factors," almost six pages long, includes the warnings that, "[a]s with all investments, investment in the Debentures is speculative and involves a high degree of risk and therefore is suitable only for persons who understand those risks and their consequences and who are able to bear the risk of loss of their investment." [*Id*. at 25.] The "Risk Factors" section of the OM goes on to disclose specific operation and fund risks, private offering and liquidity risks, and tax risks. [*Id.* at 25-30.]

In fact, lengthy discussion of risk factors is common to all investment memoranda provided by the Debtors. [*See, e.g.*, Dkt. No. 543 at 202, 217-223 (Offering Memorandum for iCap Northwest Opportunity Fund, LLC); 401, 413-416 (Memorandum of Terms for iCap Equity, LLC); 666-67, (Confidential Private Placement Memorandum for iCap Pacific Income Fund 4, LLC).]

The facts that the rates of return on the Debtors' investment were reasonable and that the Debtors sufficiently disclosed the risks associated with their investments undermine the Debtors' Ponzi allegations.

### F. Proposed DIP Financing Should not be Approved

This case was filed just over 5 months ago. The Debtors already borrowed up to approximately $6 million in connection with the first DIP loan. The Debtors ceased operating before the petition date. The Debtors are not completing development of any of their remaining properties. They are simply liquidating the portfolio. Accordingly, almost all of the borrowed funds are being

used for professional fees. Despite this massive war chest, the Debtors have not commenced any litigation and are already asking the Court to allow the Debtors to borrow another $5 million to fund additional professional fees for future litigation. The Motion states that the Debtors "have limited cash resources" but contains no explanation of how the Debtors have managed to burn through the bulk of $6 million in 6 months with a non-operating company.

To obtain authority to enter into the DIP Loan Facility, the Debtors must establish that: "(1) They are unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A); (2) The credit transaction is necessary to preserve the assets of the estate; and (3) The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender." *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) ("[A] Motion pursuant to 11 U.S.C. § 364(c) can be approved only if the debtor meets its burden on each of [these] three (3) elements"); *see also In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hospital,* 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988).

Because the Debtors fail to meet their burden on each of these elements, the Court should deny the Debtors' request for authority to enter into the DIP Loan Facility.

### 1.    No Analysis of Use of Loan Proceeds or Litigation

Tellingly, the Debtors provide absolutely no analysis of the proposed litigation, including how much it will cost, who it will be against, how long it will take, and, most of all, how much they project to recover. Without this

analysis, it is impossible to know whether the proposed additional debt burden is in the best interest of the estate.

Instead of an analysis, the Debtors merely contend that the proposed DIP loan "reflects the Debtors' reasonable business judgment." [Dkt. No. 467 at 21.] Mr. Miller's declaration provides nothing more than conclusory statements:

> 7. The Debtors have limited cash resources to fund litigation efforts, and will require additional financing. I believe that the relief requested in the Motion is in the best interests of the Debtors, their estates, and their creditors, and, therefore, should be approved.
>
> * * *
>
> 10. Without access to the proceeds of the DIP Loan Facility, the Debtors will lack sufficient liquidity to administer these cases and pursue litigation as contemplated and in order to maximize the value of the Debtors' estate.
>
> * * *
>
> 12. For these reasons, I believe that the terms of the DIP Agreement will maximize value for the Debtors' stakeholders and are ultimately in the best interests of the Debtors' estates and creditors. Under these circumstances, I further believe that the terms of the DIP Agreement are appropriate, fair, equitable, and should be approved by the Court.

[Dkt. No. 467-1.] These generic, self-serving statements provide no useful information at all.

### 2.    No Benefit of Business Judgment Rule

To the extent the Debtors are relying only on the business judgment rule, the Motion should be denied. Mr. Miller has a direct pecuniary interest in the proposed DIP loan. Accordingly, he cannot avail himself of the business judgment rule. Mr. Miller is compensated on an hourly basis for this case. [*See* Dkt. No. 87 (Miller Decl. in support of Paladin Employment App.) at 3, n. 4 ("Additionally, for the Services rendered by me as the CRO or Manager, as

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 38

applicable, pursuant to the Engagement Letter, the Debtors will pay Paladin a monthly fee of $50,000, plus an hourly rate of $850 per hour."). And Mr. Miller's fees will be paid from the proposed DIP loan. As such, he has an indirect financial interest in the loan transaction which will fund his fees going forward. Under Washington corporate law,

> (2) In any proceeding seeking to invalidate a transaction with the corporation in which a director or an officer had a direct or indirect interest in a transaction with the corporation, the person asserting the validity of the transaction has the burden of proving fairness unless:
>
>> (a) The material facts of the transaction and the director's or officer's interest was disclosed or known to the board of directors, or a committee of the board, and the board or committee authorized, approved, or ratified the transaction; or
>>
>> (b) The material facts of the transaction and the director's or officer's interest was disclosed or known to the shareholders entitled to vote, and they authorized, approved, or ratified the transaction.

RCW 30A.12.115. Because Mr. Miller has an indirect interest in the transaction, the Debtors have the burden of proof to show that the proposed DIP loan is fair. They have failed to do so.

### 3. The Debtors Have Not Shown that the Terms of the DIP Loan Facility are Fair and Reasonable

The Debtors conclude that the terms of the DIP Loan Facility are fair and reasonable, but they make no attempt to demonstrate this. [*See* Dkt. No. 467 at 20-21.] The fact that the proposed lender is, purportedly, the only lender willing to provide financing does not automatically make the terms of the DIP Loan Facility fair and reasonable. *See In re Aqua Assocs.*, 123 B.R. at 196 ("Obtaining credit should be permitted not only because it is not available

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 39

elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere").

Most importantly, the Debtors fail to address the reasonableness of the extremely high cost of the loan. The Motion includes a chart of the DIP Loan Facility's material terms. [Dkt. No. 467 at 11-16]. The loan carries a nominal interest rate of 18%, and a default interest rate of an additional 4%. [*Id*. at 11.] Importantly, the maturity date of the loan is 1 year. Presumably, the Debtors intend to repay the loan from litigation proceeds, but there is no analysis of whether the Debtors will be able to recover enough from litigation in only 1 year to repay the loan plus considerable interest.

Even more important, the loan also includes numerous fees that raise the cost of the loan considerably, including:

- "Facility Fee" equal to 10% of the Initial Funding Amount. The Initial Funding Amount is $3 million. [*See* Dkt. 467, Ex. 2 at 58.]
- "Repayment Premium" which grants the lender a guaranteed *30% return of the amount of the credit extensions actually made by the lender.* The DIP Loan Facility's actual interest rate is 30%—the inclusion of the repayment premium in the "fees" section of the chart of material terms is misleading.
- Lender Fees of up to $150,000
- Transaction Fees of $25,000.

[See Dkt. 467 at 15-16.] Thus, if the Debtors borrow the full $5 million, after one year, they will incur non-default interest and fees totaling $1.975 million,

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 40

equivalent to a 39.5% interest rate. If the Debtors do not repay the loan by the maturity date or otherwise default, the effective interest rate will be 43.5%.

This does not appear to be reasonable, and the Debtors do not even attempt to explain how it might be. Interest rates of 40% are typical of hard money lenders. For that price or less, the Debtors could pursue the proposed litigation on a contingency fee basis. The benefit of a contingency fee arrangement is that the Debtors and their professionals will have no incentive to pursue litigation unless it is likely to yield a net recovery. That is not the case under the Debtor's current proposal. As such, the Debtors have failed to meet their burden of showing that the terms of the DIP Loan Facility are fair and reasonable.

### 4. The Debtors Have Not Shown that they Failed to Obtain Unsecured Financing or that the DIP Loan Facility is Necessary

The Debtors have also failed to establish that they reasonably attempted but failed to obtain credit on an unsecured basis with administrative priority. In *Ames*, the court found that the debtors sufficiently demonstrated the unavailability of unsecured financing where it was demonstrated that the debtors "approached four lending institutions with the capability of loaning the large sums necessary to maintain the Debtors' operations," "[t]wo of the lenders could not meet the Debtors' time demands," and that the debtors "then initiated discussions with Citibank and Chemical and accepted Chemical's less onerous offer and rejected the offer by Citibank." *In re Ames*, 115 B.R. at 40.

Here, the Debtors state they "are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1)…as an administrative expense…or solely based on the grant of an administrative expense priority…" [Dkt. No. 467 at 17.] But the Debtors do not provide enough information to

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 41

allow the Court to conclude this to be true. The Debtors only state that they called six lenders, three of the lenders signed non-disclosure agreements and received access to diligence information, and only one "provided an indication of interest towards a DIP facility." [Dkt. No. 467 at 17; *see also* Dkt. No. 467-1 ¶ 9.] Unlike in *Ames*, the Debtors submitted no evidence regarding which potential lenders were approached, whether they even had the capacity to loan the sums required by the Debtors, and what negotiations occurred between the Debtors and the potential lenders. Without this information, it is impossible for the Court to ascertain whether the Debtors reasonably attempted to obtain credit on an unsecured basis or on better terms.

Finally, the Debtors have failed to demonstrate that the DIP Loan Facility is necessary to preserve the assets of the estate. Notably, the Debtors have not shown why they are not seeking to hire counsel on a contingency fee basis to pursue the litigation the DIP Loan Facility is meant to fund—this would not require any loan. Because this information is not before the Court, the Debtors have not demonstrated that the DIP Loan Facility is necessary. *See In re Aqua Assocs.*, 123 B.R. at 196 ("[I]t is important for a bankruptcy court to make a qualitative assessment of the credit transaction in light of readily-available alternatives before granting *any* § 364 motion"). In addition, the Debtors have provided no analysis of the amount of money they anticipate recovering through the litigation they seek to initiate. Thus, the Court cannot reasonably assess whether a $5 million facility is necessary.

For all these reasons, the proposed DIP loan should not be approved at this time.

OPPOSITION TO SUPPLEMENT DIP
FINANCING MOTION – Page 42

## IV.    CONCLUSION

For the foregoing reasons, Mr. Christensen, by counsel, respectfully requests that the Court enter an order (1) denying the Debtors' Motion in its entirety, (2) staying all discovery and litigation of the Ponzi issue for approximately 6 months, and (3) granting such further relief as the Court may deem just and proper.

Dated:  March 18, 2024

By:  */s/ Matthew J. Campos*

Matthew J. Campos, WSBA 40777
McNaul Ebel Nawrot & Helgren PLLC
600 University Street, Suite 2700
Seattle, WA 98101
Phone: (206) 467-1816
mcampos@mcnaul.com

and

Matthew A. Lesnick, CSBN 177594
Lesnick Prince & Pappas LLP
315 West Ninth Street, Suite 705
Los Angeles, CA 90015
Phone: (310) 396-0964
matt@lesnickprince.com
(Admitted Pro Hac Vice)

*Attorneys for Interested Party*
*Christopher Christensen*

# CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record who receives CM/ECF notification.

Dated: March 18, 2024                    By: */s/ Nancy Hedges*
                                                    Nancy Hedges