1  Gary W. Dyer, CSBA #106701        Hon.  WHITMAN L. HOLT

2  Assistant United States Trustee

3  United States Dept. of Justice
   920 West Riverside, Room 593

4  Spokane, WA  99201

5  Telephone (509) 353-2999
   Fax (509) 353-3124

6

7

8  **UNITED STATES BANKRUPTCY COURT**
   **EASTERN DISTRICT OF WASHINGTON**

9

| | |
|---|---|
| In re: | Case No. 23-01243 FPC11 [and jointly administered cases]1 Chapter 11 |
| iCAP ENTERPRISES, LLC [and jointly administered estates], | OBJECTION TO BUCHALTER'S SUPPLEMENTAL EMPLOYMENT APPLICATION |
| Debtors. | [DOCKET #669] |

1 The Debtors (along with their case numbers) are iCap Enterprises, Inc. (Case No. 23-01243- 11); iCap Pacific NW Management, LLC (Case No. 23-01261-11); iCap Vault Management, LLC (Case No. 23-01258-11); iCap Vault, LLC (Case No. 23- 01256-11); iCap Vault 1, LLC (Case No. 23-01257-11); Vault Holding 1, LLC (Case No. 23-01256-11); iCap Investments, LLC (Case No. 23- 01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (Case No. 23-01253-11); iCap Equity, LLC (Case No. 23-01247-11); iCap Pacific Income 4 Fund, LLC (Case No. 23-01251- 11); iCap Pacific Income 5 Fund, LLC (Case No. 23-01249-11); iCap Northwest Opportunity Fund, LLC (Case No. 23-01253-11); 725 Broadway, LLC (Case No. 23-01254-11); iCap Campbell Way, LLC (Case No. 23-01250-11); UW 17th Ave, LLC (Case No. 23- 01267-11); iCap Broadway, LLC (Case No. 23-01252-11); VH 1121 14th LLC (Case No. 23-01264-11); VH Senior Care LLC (Case No. 23-01266-11); VH Willows Townhomes LLC (Case No. 23-01262-11); iCap @ UW, LLC (Case No. 23-01244-11); VH 2nd Street Office, LLC (Case No. 23-01259-11); VH Pioneer Village LLC (Case No. 23-01263-11); iCap Funding LLC (Case No. 23-01246-11); iCap Management LLC (Case No. 23-01268-11); iCap Realty, LLC (Case No. 23-01260- 11); Vault Holdings, LLC (23-01270-11); iCAP Pacific Development LLC (23-01271-11); iCAP Holding LLC (23-01272-11); iCAP Holding 5 LLC (23-01273-11); iCAP Holding 6 LLC (23-01274-11); Colpitts Sunset, LLC (23-01432-11); CS2 Real Estate Development LLC (23-01434-11); and iCAP International Investments, LLC (23-01464-11).

OBJECTION TO BUCHALTER'S SUPPLEMENTAL EMPLOYMENT APPLICATION     Page 1

The United States Trustee objects to the Buchalter's Supplemental

Employment Application [Docket #669] for the following reasons:

## 1. JURISDICTION

Jurisdiction is based upon 28 U.S.C. §§ 157(a) and (b), and 1334, and 11

U.S.C. § 307, FRBP, Rules 9013 and 9014 and Eastern District Court Local Rules,

LCivR 83.5(a). The supplemental application is primarily premised on section 327

of Title 11 and Rule 2014 of the F.B.R.P.

The United States Trustee is a proper party to raise these issues. 28 U.S.C. §

586(a)(3)(G) and 11 U.S.C. § 307. See H.Rep. No. 99–764, at 27 (1986), reprinted

in, 1986 U.S.C.C.A.N. 5227, 5240. *In re Donovon Corp.*, 215 F.3d 929 (9th Cir.

2000).

## 2. APPLICABLE LAW

Section 327 of Title 11 requires a professional must not hold or represent an

interest adverse to the estate and to be a "disinterested person" to serve as Counsel

for a chapter 11 estate. Section 1007 of Title 11 refers to the debtor in possession's

ability to hire professionals pursuant to section 327. "Disinterested person" is

defined by section 101(14) of Title 11 and subsection (C) is the applicable part:

The term "disinterested person" means a person that-- (C) does not have an

interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

Rule 2014 requires the disclosure of "all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." "If the duty to properly disclose is neglected, however innocently, the attorney performs services at his peril. Should the undisclosed interest turn out to be adverse, or if appointment of this attorney would not have been in the best interest of the estate, the court is empowered to take the punitive measure of denying all compensation. See *In re Rogers-Pyatt Shellac Co*., 51 F.2d 988, 991 (2d Cir.1931); *In re Haldeman Pipe & Supply Co., supra,* 417 F.2d at 1304." *In re Coastal Equities, Inc.,* 39 B.R. 304, 308 (Bankr. S.D. Cal. 1984). *In re Jore,* 298 B.R. 703 (Bankr. D.MT. 2003). The disclosure requirements of Rule 2014 are strictly applied. *In re Park-Helena Corp*., 63 F3d 877 (9th Cir. 1995*) cert. denied, Neben & Starrett, Inc. v Chartwell Financial Corp*., 516 U.S. 1049, 116 S.Ct. 712, 133 L.Ed.2d 667 (1996).

Lack of disclosure of material information means the court may deny all fees. *In re Triple Star Welding, Inc*., 324 B.R. 778 (9th Cir. BAP 2005). *In re*

*Park-Helena Corp.,* supra; *In re Mehdipour*, 202 B.R. 474 (9th Cir. BAP 1996). The court has discretion to excuse failure(s) of the professional under the particular circumstances of a case. *In re Film Ventures Intern, Inc.*, 75 B.R. 250 (9th Cir. BAP 1987). *In re Lee*, 146 B.R. 13 (Bankr. E.D. Cal. 1992).

Section 328(c) permits the court to deny compensation for services of a professional who is not disinterested or becomes "not a disinterested person, or represents or holds an interest adverse to the estate with respect to the matter on which such professional person is employed." *In re Marine Power & Equipment Co., Inc.,* 67 B.R. 643 (Bankr. W.D. WA. 1986). *In re Jore*, 298 B.R. 703 (Bankr. D.MT. 2003)

A conflict of interest refers to the "representation by a given attorney or law firm of two or more entities holding or claiming adverse interests." *In re Roberts*, 46 B.R. 815, 827 (Bankr. D. Utah 1985). aff'd 75 B.R. 402 (D. Utah 1987). The anti-conflict of interest section of Title 11 is a policy designed to avoid the potential for conflicts of interests, by "requiring that parties and their attorneys not only avoid conflicts, but be above suspicion." *Id*, at 838. An actual conflict exists when there is an "active competition between two competing interests, in which one interest can only be served at the expense of the other." *In re BH & P Inc.,* 103 B.R. 556, 563 (Bankr. D.N.J. 1989) *aff'd in part, rev'd in part*, 119 B.R. 35 (D.N.J.

1990), aff'd, 949 F.2d 1300 (3rd Cir. 1991).

There is no ambiguity in the Code, and equitable principles may not be used to disregard the unambiguous language prohibiting DIPs and trustees from employing professionals who are not disinterested. *U.S. Trustee v. Price Waterhouse*, 19 F.3d 138 (3rd Cir. 1994). Negligent or inadvertent nature of attorney's omission will not vitiate attorney's violation of disclosure obligations under the Bankruptcy Rules. *In re Jore*, 298 B.R. 703 (Bankr. D.Mt. 2003).

Washington's RPC 1.7 provides that:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
    (1) the representation of one client will be directly adverse to another client;
…
(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
    …
    (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
(4) each affected client gives informed consent, confirmed in writing (following authorization from the other client to make any required disclosures).

Comment 6 to this rule provides, in part, "absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some

other matter, even when the matters are wholly unrelated."

## 3. OBJECTION

### Summary

The Ponzi aspects of and considerations in this case were known from the outset of the case. Mr., Miller's investigation in the first four months of the case provides the factual basis for the conclusions. The Ponzi Scheme findings have been described as "pivotal" in this case by the debtors and the Committee. The participation of debtors' counsel certainly cannot have avoided discussions and advice regarding this pivotal issue. The debtors have confirmed that Umpqua is a target of the Ponzi Scheme findings. Buchalter had confirmed Umpqua is a prior and present client of the firm.

This Supplement confirms, from day one, that Umpqua was and is a client of the firm. The Supplement fails to provide complete disclosure including dates of when Buchalter became aware of Umpqua Bank as a *possible* target, *probable* target and an *actual* target of any aiding and abetting claim related to the Ponzi Scheme. Nor are the dates of the Cooperation Agreement iterations identified when the Committee was given sole litigation authority "as required for compliance with professional ethics obligations (including with respect to conflicts)."

The aid and abet allegations against Umpqua are directly adverse to Umpqua. The investigation into and strategizing around the Ponzi Scheme facts are directly linked as the foundation to the claim against Umpqua, and hence are directly adverse, and demonstrate a significant risk that the representation of the debtors is materially limited by the firm's responsibility to Umpqua as a client. The drafting of a motion that requests the court to make conclusive Ponzi Scheme findings for the future use in all litigation would necessarily include the use in any aid and abet claim against Umpqua. Hence, Buchalter is not disinterested on the major aspect of these cases and their liquidation plan and cannot serve as counsel to the estates.

## 4. ARGUMENT

### A. Background

The case was begun because the certain investors had acquired a state court's temporary restraining order freezing the assets of the debtors. These investors and the debtors negotiated a path forward using chapter 11 to liquidate the debtors and investigate the debtors' activities. Buchalter became involved with the debtors about September 15, 2023. The negotiated term sheet from the state court litigation provided a path for the liquidation of the iCAP debtors.

In its application for approval to be employed in these cases and its

accompanying declaration, Buchalter represented itself to be a full-service law firm with more than 20 attorneys devoted solely to insolvency-related matters and to be well qualified to represent these debtors in these chapter 11 cases. Further, it represented

> "Buchalter conducted an internal conflicts check in regards to the representation of other clients as required by any code or rules of professional conduct and has addressed any such issue as required."

Further, Buchalter had a "New Attorney" who had represented a creditor and that it "walled off from any and all matters concerning the Debtors in accordance with Washington Rule of Professional Conduct 1.9(c)."

Buchalter further represented

> "Buchalter and certain of its partners, of counsel, and associates may currently represent, may have represented in the past, and may represent in the future creditors of the Debtors in connection with matters unrelated to the Debtors and these Chapter 11 Cases. To the best of the Debtors' knowledge, other than those listed in this declaration, Buchalter has no connection with creditors or any other party in interest. Buchalter has disclosed these representations to the Debtors. Buchalter will not, while employed by the Debtors, represent any other entity having an adverse interest in connection with these Chapter 11 Cases."

Notwithstanding these representations of an internal conflicts check to identify "connections" as listed in Schedule 1 and 2 to the declaration, Buchalter presently admits it omitted any reference to Umpqua Bank in its application despite seeing Umpqua in their conflicts check results, thus knowing of their

representation of Umpqua in other matters.  Thus, Schedules 1 and 2 to the declaration did not reveal Umpqua or the nature of the connections. Nor was a specific representation made about any waiver of conflicts but only the general waiver in paragraph 15(h).

Finally, Buchalter promised it

"will periodically review its files during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new or relevant facts or relationships are discovered or arise, Buchalter will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Bankruptcy Rule 2014(a)."

See paragraph 20 of Docket # 85.

On November 20, 2023, an examination of Umpqua Bank pursuant to Rule 2004 was filed by the Committee (using Mr. Bender) along with a request production of documents. The Committee did so "in consultation with the Debtors and their counsel" in pursuit of "records relevant to the Committee's and the Debtors' joint investigation into the Debtors' prepetition financial affairs." Docket # 171.

In the first four months of the case, the debtor in possession, through Buchalter, represented to the court in various status conferences of its progress in the investigation of the books and records of the debtors to determine what causes

of action may be available for liquidation for the benefit of the creditors. As a result of the investigation, in February of 2023, Buchalter filed a motion for DIP Financing to fund litigation and in that motion, positioned, as a condition of the financing, a necessary finding that the debtors had engaged in a pre-petition Ponzi Scheme. These findings were to be binding on all parties – "lenders, brokers, investors, consultants, and professional firms" and "Third Parties that received transfers from the Debtors." Docket # 467, 468, 469 and 471, and later 541, 542, 543 and 544.

Concurrently, Buchalter filed a motion to approve a Compromise and Settlement Agreement ("Cooperation Agreement") with the Committee by which the Committee and the Debtors would share different parts of the litigation to be funded by the financing. Docket # 470. The notice for the DIP Financing and to approve the Cooperation Agreement was combined. See Docket # 471.

The Cooperation Agreement provided derivative standing to the Committee and stated the Committee and the Debtors had concluded that the Debtors had operated a pre-petition Ponzi Scheme citing their conclusions came from "input from legal and financial advisors and experts in the field." The parties agreed to jointly pursue these listed "Specified Claims." The Cooperation Agreement identified one of these claims to be the Umpqua Claims. These

Umpqua claims were to be pursued by John Bender/Corr Cronin in coordination and strategy with the Debtors. The Debtors hold the power to seek a settlement whether or not the Committee agreed, and the Committee reserved its rights to object to any settlement.  Further, the Cooperation Agreement defined a joint duty to support the Ponzi Scheme findings "for purposes of Bankruptcy Code sections 544 and 548 and any other applicable fraudulent transfer, debtor/creditor law, avoidance and recovery statute or other cause of action, claim or argument."  These findings were described as "integral" to each party's decisions to enter the Agreement.

In an *ex parte* emergency motion to set deadlines for discovery and objections filed on March 3, 2024, setting it before the court on March 4, 2024. (Docket # 553), Buchalter described the motions and process it wished, including the very shortened time for any discovery related to the DIP Financing and the Ponzi Scheme findings. These motions and findings were described a "pivotal" to the case.  In that hearing, the court postponed any setting of deadlines to the Status Conference on March 12, 2024.

Objections to the notice and the Ponzi Scheme filings were filed by various parties including Umpqua. For the first time in the record, the concurrent representation of Umpqua by Buchalter was revealed. Docket 626 and 628.

In the Ex Parte Renewed and Amended Emergency Motion to establish Schedule on DIP and 9019 Motion (Docket # 632), which was filed one day before the March 20th Status Conference, the Debtors confirmed that Umpqua (and all other objecting parties) was a target of the Ponzi Scheme findings.

Buchalter then supplemented its employment declaration. Docket # 641. And filed this present application ("Supplement") seeking the court's further approval of its employment and requesting the court to not impose any penalty for its omission(s).

In response to the inquiry of the United States Trustee, Buchalter stated:

- The potential for Ponzi Scheme causes of action was recognized from the outset of these cases

- From the outset, the Committee counsel contemplated that the services provided by that firm would include "to take all necessary actions to protect and serve the Committee, including, without limitation, the prosecution of actions on its behalf or *on the Debtors' behalf…*" (paragraph 9 of the Committee Employment Application at p.4)(emphasis added).

- The problem with cases that could include Ponzi Scheme allegations is that all creditors have the potential to be defendants in

a future lawsuit. That potential was the basis for including debtors' depository bank, a non-creditor that typically would not be included in a search of this type…

- That conflict check was run on September 21, 2023 at 2:01 pm and demonstrated concurrent representation of Umpqua on unrelated matters.

- After Umpqua did not provide bank statements via an informal request, the debtors then drafted a routine Rule 2004 request for their bank records, but by early November, the Committee had been appointed, and out of an abundance of caution and to avoid even the potential for the appearance of adversity, the draft 2004 documents were sent to the Committee to handle.

- the work done by Buchalter attorneys concerned the generalized concept of the flow of funds in and out of Debtors' accounts and whether that constituted evidence of a Ponzi Scheme (i.e., sources and uses). Buchalter also worked on legal research related to the general contours of Ponzi schemes, the Ponzi presumption, and related fraudulent transfer claims. That work did not concern facts specific to any particular defendant and did not include any research

or investigation related to aiding and abetting claims.

- the Cooperation Agreement was entered into to recognize that because all creditors could be the subject of causes of action if this case developed into a Ponzi Scheme case there needed to be an allocation of responsibilities for the ultimate pursuit of these causes of action in order to avoid conflicts. Otherwise no party that had previously worked on these matters could be employed in these cases and the cost of bringing completely unrelated counsel up to speed would have been increased exponentially.

Hence, Buchalter knew from the outset of the possible claim against the debtors' bank, Umpqua, included it in the conflicts check, omitted it from the disclosures in this case, did not acquire any RPC based waivers (nor advise their Umpqua client of the connections), knew the connection held an "appearance" problem and still observed the connection as a non-conflict because it was not yet a "direct" action or cause of action yet moved the public aspect of any work related to Umpqua to the Committee, and never supplemented the Rule 2014 disclosures (that is, until Umpqua made the connection public). The court should not permit this violation of the requirements of section 327 and Rule 2014, nor the continuing failure to supplement the Rule 2014 disclosures. It should penalize Buchalter.

## B. Buchalter Still Has Incomplete Disclosures

This Supplement confirms, from day one, that Umpqua was and is a client of the firm. The Supplement fails to provide complete disclosure including dates of when Buchalter became aware of Umpqua Bank as a possible target, probable target and an actual target of any aiding and abetting claim related to the Ponzi Scheme. Nor are the dates of the Cooperation Agreement iterations identified when the Committee was given sole litigation authority "as required for compliance with professional ethics obligations (including with respect to conflicts)."

While Buchalter has provided answers to the United States Trustee, it has not made its full disclosure in this case. While we advocate that Buchalter cannot continue under these circumstances in this case, the dates and facts may be operative for certain considerations by the court of if and how to penalize Buchalter.

Further, Buchalter's statement that all creditors may be targets in a Ponzi scheme case means all concurrent clients should be treated as Umpqua from the outset of the case. Schedule 2 to the original application (Docket # 85) lists five other current clients. Socotra REIT I, LLC is another creditor mentioned by a further supplemental disclosure of Buchalter. See Docket # 726.

This is the applicant's burden to make its qualifications clear for the court

to authorize employment. Buchalter has not done so.

## C. Ponzi Scheme as Pivotal to the Whole Case

Buchalter and the Committee describe the Ponzi Scheme findings to be pivotal, both in court and in the Cooperation Agreement. Debtors have significant factual declarations and legal briefing in support of these findings filed with the motions. These findings and the hoped-for recoveries have been described as more valuable than the real property assets in the various debtors by both the Debtors and the Committee's counsel. They are, thus, the central part of this case and the forthcoming plan of liquidation. Even more telling of the parties' belief in the Ponzi recoveries, the sale of the real property before a plan is confirmed suggests the excise tax concerns are minor in comparison to the hope-for recoveries from the targets.

Buchalter's role in the Ponzi Scheme findings case cannot be understated. Buchalter could not be blind to the implications of the investigation as it developed and as the facts were developed to find and identify targets. Buchalter states in the email to the United States Trustee that it did legal research on the "general" aspects of a Ponzi scheme, Ponzi presumption and fraudulent avoidance claims. The impact of those findings on concurrent clients such as Umpqua would be plain, and with the 2004 examination of Umpqua, as filed in November of 2023, Buchalter

was not unobservant of the impact on Umpqua and the potential for the conflict – while it drafted the 2004 motion, it moved the work to the Committee. The time records in their respective November and December monthly fee applications show the discussions about Umpqua and the 2004 examination between Mr. Bender and Buchalter.

The Cooperation Agreement was negotiated before the motion for the second DIP Financing and appears to be first noted in the time records in November as the common interest and privilege agreement, or a "MOU" in December, and the Buchalter, Committee and Mr. Bender's time reflect reviews and revisions. Again, Buchalter's email to the United States Trustee notes these were in part to attempt to alleviate any conflicts. Further, in the end of December, Mr. Bender research the aid and abet cause of action against Umpqua. Docket #265.

As a result of the investigation, in February of 2023, Buchalter filed a motion for DIP Financing to fund litigation and in that motion, positioned, as a condition of the financing, a necessary finding that the debtors had engaged in a pre-petition Ponzi Scheme. These findings were to be binding on all parties – as described in the notice as "lenders, brokers, investors, consultants, and professional firms" and "Third Parties that received transfers from the Debtors." Docket # 467,

468, 469 and 471, and later 541, 542, 543 and 544. Concurrently, Buchalter filed a motion to approve a Compromise and Settlement Agreement ("Cooperation Agreement") with the Committee by which the Committee and the Debtors would share different parts of the litigation to be funded by the financing. Docket # 470. The notice for the DIP Financing and to approve the Cooperation Agreement was combined. See Docket # 471.

For both motions, the Ponzi Scheme findings are a vital and integral part of the motions and will frame up the plan provisions. The concurrent representation of one of the targets of those Ponzi Scheme findings is a significant and impermissible conflict.

### D. Negligent disclosure and Delay in Supplemental Disclosures Merit Denying this Supplement and Disqualification.

The case law is clear that negligent disclosure is not an excuse. *In re Jore*, 298 B.R. 703 (Bankr. D.Mt. 2003). This case is remarkably like *Jore.* Buchalter knew of the connection and omitted it. The limitation on Perkins Coie was significant under the circumstances of the *Jore* case as Wells Fargo was a significant player in the case. The same is true here, if Buchalter had contact its client, Umpqua. Buchalter would not have been able to pursue the Ponzi Scheme findings which are critical to the case. In *Jore*, Wells Fargo "strongly opposed"

the debtor's request for the use of cash collateral motion which Perkins Coie advanced in favor of the debtor, which the court granted, and Wells Fargo appealed. In *Jore,* other instances of adversity by Perkins Coie against Wells Fargo occurred, but the case came to a head after the sale of the business with a carve out of the sales proceeds and the battle turned to a 506(c) surcharge of Wells Fargo came into focus. That is to say, Wells Fargo became a target for the recovery of money. In *Jore*, Wells Fargo was the largest creditor, and here, because the Debtors have chosen not to identify or quantify all the targets of the Ponzi Scheme, we do not know if Umpqua is the largest target. But we do know at least two of the objecting parties and concurrent clients (Umpqua and Socotra) are targets.

Here, the connection was not even addressed with the client, Umpqua. Rather, Buchalter told the court in its original application it had no conflicts and where there was a connection, it "conducted an internal conflicts check in regards to the representation of other clients as required by any code or rules of professional conduct and has addressed any such issue as required." It did not. According to the Umpqua's objection, it had not received any disclosure, nor did it consent, at any time. The Buchalter supplement regarding Socotra implies it also was not approached for any waiver.

In contrast to the treatment of the concurrent representation of Umpqua

and these Debtors, in the original employment application, Buchalter noted it had walled off a "New Attorney" who recently joined the firm and had represented a creditor. It is difficult to comprehend the oversight regarding concurrent clients when a "New Attorney" issues were addressed.

Further, the delay in supplementing their disclosure, and the negligence in the original disclosure, cannot be white washed under these circumstances where the Ponzi Scheme findings are so central and critical to the case and its plan of liquidation. Further, this firm is no newcomer (as self-avowed in the original application) to the bankruptcy system and the disclosures required by Rule 2014 to form the basis for the approval of employment. There is no justification put forward for the failure to "periodically review its files during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise" especially as the Ponzi Scheme findings were coming into focus and firming up, and as Mr. Kinrich as an expert was hired to provide an opinion as to "whether the iCAP Enterprises, Inc's ("iCAP" or "Debtors") transactions with their investors have the economic and financial indicia of a Ponzi scheme." Docket # 469, Ex. 1. Thus, it is logical to conclude that in November the Ponzi Scheme findings were in focus because Mr. Kinrich of Analysis Group was hired somewhere around November 1st (see Docket # 214, page 58) and the Committee

and Mr. Bender were tasked with the 2004 examination of Umpqua to acquire the bank's records. While the final conclusion may not have been made in November, the engagement of Mr. Kinrich by Buchalter as an expert and their participation in the pursuit of the adverse findings by Buchalter to be used against Umpqua (and others) is the concern. Buchalter knew at that point of what Mr. Miller's investigation was indicating, and hiring an outside forensic expert to review and bolster Mr. Miller's expected conclusions is strongly indicative the Ponzi claims coming into focus, putting the direct adversity against Umpqua and others on the table.

Because Buchalter is an experienced bankruptcy firm, which did not disclose the connection with Umpqua Bank, a concurrent client who is a target of a Ponzi Scheme recovery, and pursued the legal basis for the Ponzi Scheme findings which are adverse to Umpqua, and did not supplement its disclosures once Umpqua was squarely in focus as a target but rather negotiated with the Committee to have sole authority over any Umpqua litigation, and did not supplement the record until after Umpqua revealed the conflict, the court should deny Buchalter's continued authority to represent the Debtors.

As this motion requests the court to deny any reduction in fees, by implication the court may and should provide an opposite remedy. The court

should deny that remedy and enter a denial of approval of any fees of Buchalter because of the undisclosed conflict and the centrality in this case of the Ponzi Scheme findings now entangled into the conflict with Umpqua's concurrent representation.

Wherefore, the court is respectfully requested to decline to authorize the employment of Buchalter from further representation of the debtors and to deny the fees requested. Alternatively, if it is possible to segregate the duties related to a proposing a plan or pursuing the Ponzi Scheme findings, Buchalter's scope of employment cannot be adverse to Umpqua without their consent, and  under any order the court may issue related to this matter, the court should not award any fees for the time related to the Ponzi Scheme findings, their investigation, any strategizing with the Debtors about them or the DIP Financing motion pending before the court.

\\\\

\\\\

\\\\

\\\\

\\\\

Date: April 12, 2024.

Respectfully submitted,

GREGORY M. GARVIN
Acting United States Trustee

*/s/ Gary W. Dyer*
GARY W. DYER
Assistant U.S. Trustee