Julian I. Gurule (CA SBN: 252160)*
O'MELVENY & MYERS LLP
400 South Hope Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 430-6067
Email: jgurule@omm.com

*Co-Counsel to Debtors and Debtors in Possession*

OREN B. HAKER (WSBA No. 48725)
BLACK HELTERLINE LLP
805 SW Broadway
Suite 1900
Portland, OR 97205
Telephone: 503 224-5560
Email: oren.haker@bhlaw.com

*Admitted Pro Hac Vice*

*Proposed Co-Counsel to Debtors and Debtors in Possession*

HONORABLE WHITMAN L. HOLT

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

In re:

ICAP ENTERPRISES, INC., et al.,

Debtors.[1]

Chapter 11

Lead Case No. 23-01243-WLH11
Jointly Administered

**NOTICE OF FILING OF REVISED PROPOSED ORDER APPROVING DEBTOR IN POSSESSION FINANCING**

**PLEASE TAKE NOTICE** that a hearing on the *Motion of the Debtors for Order: (I) Authorizing the Debtors to Obtain Supplemental Postpetition Secured Financing; (II) Granting*

---

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01265-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01248-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund, LLC (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); iCap Broadway, LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care LLC (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH 2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding LLC (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11); Vault Holding, LLC (23-01270-11); iCap Pacific Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); iCap Holding 6 LLC (23-01274-11); Colpitts Sunset, LLC (23-01432-11); CS2 Real Estate Development LLC (23-01434-11); and iCap International Investments, LLC (23-01464-11).

NOTICE OF FILING OF REVISED PROPOSED ORDER
APPROVING DEBTOR IN POSSESSION FINANCING

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11   Doc 1087   Filed 07/16/24   Entered 07/16/24 17:29:53   Pg 1 of 151

*Superpriority Administrative Expense Claims; and (III) Granting Related Relief* [ECF No. 1063] (the "DIP Motion") is set to be held on July 17, 2024 at 10:30 A.M. (PT) (the "Hearing"). As exhibits to the DIP Motion, the Debtors also filed (i) a form of proposed order granting the DIP Motion, attached to the DIP Motion as Exhibit 1 (the "Proposed Order") and (ii) the *Debtor-in-Possession Loan and Security Agreement* between the Debtors and Socotra REIT I, LLC, WE Alliance Secured Income Fund, LLC, iCap DIP Finance Group LLC, and the Jason Yelowitz Trust, Dated March 31, 2006, attached to the DIP Motion as Exhibit 2 (the "DIP Agreement").

**PLEASE TAKE FURTHER NOTICE** that after the filing of the DIP Motion, the Debtors agreed to certain revisions to the Proposed Order in connection with informal comments received from various parties ("Revised Proposed Order"). A clean version of the Revised Proposed Order is attached hereto as **Exhibit 1** and a redline showing the changes from the Proposed Order to the Revised Proposed Order is attached as **Exhibit 2**.

**PLEASE TAKE FURTHER NOTICE** that after the filing of the DIP Motion, the Debtors agreed to certain revisions to the DIP Agreement originally attached to the DIP Motion in connection with informal comments received from various parties ("Revised DIP Agreement"). A clean version of the Revised DIP Agreement is attached hereto as **Exhibit 3** and a redline showing the changes from the DIP Agreement to the Revised DIP Agreement is attached as **Exhibit 4**.

**PLEASE TAKE FURTHER NOTICE** that the parties have agreed to the terms of the Subordination Agreement, which will be attached as Exhibit B to the Settlement Agreement filed in connection with the *Debtors' Motion to Approve Entry Into and Performance Under the Socotra Settlement Agreement* [ECF No. 1064] and as Exhibit C to the Revised DIP Agreement. A copy of the Subordination Agreement is attached hereto as **Exhibit 5**.

///

///

**NOTICE OF FILING OF REVISED PROPOSED ORDER APPROVING DEBTOR IN POSSESSION FINANCING**

Black Helterline LLP
805 SW Broadway
Suite 1900
Portland, OR 97205
Telephone: 503 224-5560

DATED this 16th day of July 2024.

BLACK HELTERLINE LLP

By _____ */s/ Oren B. Haker* _____
OREN B. HAKER, WSBA No. 48725
BLACK HELTERLINE LLP

*Proposed Co-Counsel to Debtors and Debtors in Possession*

And

JULIAN I. GURULE (Admitted *Pro Hac Vice*)
O'MELVENY & MYERS LLP

*Co-Counsel to Debtors and Debtors in Possession*

**NOTICE OF FILING OF REVISED PROPOSED ORDER APPROVING DEBTOR IN POSSESSION FINANCING**

## Exhibit 1

### Revised Proposed Order

**NOTICE OF FILING OF REVISED PROPOSED ORDER**
**APPROVING DEBTOR IN POSSESSION FINANCING**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 4 of 151

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Chapter 11 |
| ICAP ENTERPRISES, INC., *et al.,* | Lead Case No. 23-01243-WLH11 |
| Debtors.[1] | Jointly Administered |
| | **ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN SUPPLEMENTAL POSTPETITION SECURED FINANCING; (II) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; AND (III) GRANTING RELATED RELIEF** |

---

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01256-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01253-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund, LLC (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); iCap Broadway, LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care LLC (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH 2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding LLC (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11); Vault Holding, LLC (23-01270-11); iCap Pacific Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); and iCap Holding 6 LLC (23-01274-11).

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL DEBTOR-
IN-POSSESSION FINANCING

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (the "Debtors"), in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2), and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the corresponding local rules of the United States Bankruptcy Court for the Eastern District of Washington (the "Local Rules"), seeking authorization for the Debtors to, among other things:

i.    obtain post-petition loans (the "DIP Loans") in an aggregate principal amount of $2,014,414.00 pursuant to the terms and conditions of the DIP Documents (as defined below) and this order (the "Order");

ii.    enter into, be bound by, and perform under (a) a debtor-in-possession credit facility (the "DIP Loan Facility"), pursuant to the Debtor-In-Possession Loan and Security Agreement by and among the Debtors and Socotra REIT I, LLC, WE Alliance Secured Income Fund, LLC, the Jason Yelowitz 2006 Trust, Dated March 31, 2006, and Keith Holdings, LLC (collectively, the "DIP Lenders"), which agreement is attached hereto as **Exhibit 1** (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Agreement") and (b) the documents related to the DIP Agreement (together with the DIP Agreement, the "DIP Documents");

iii.    grant to the DIP Lenders valid, perfected first priority liens on all Causes of Action and all proceeds recovered by the Loan Parties or any

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the DIP Agreement, as applicable.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

2

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

other Person pursuant to the Causes of Action including, without limitation, any real property assets, but excluding the settlement of claims against Tritalent prior to confirmation of a chapter 11 plan in the Chapter 11 Cases to the extent that such settlement includes an extension of credit to the Debtors subordinate in all respects to the Credit Extensions, to secure the DIP Loan Facility and all obligations owing and outstanding thereunder and under the DIP Agreement, as applicable, and this Order, as applicable (collectively, the "DIP Obligations"), subject only to prior payment of the Carve-Out (as defined below), pursuant to section 364(c)(2) of the Bankruptcy Code;

iv.     grant to Socotra REIT I, LLC and WE Alliance Secured Income Fund, LLC (collectively, the "Socotra DIP Lenders") a valid, perfected first priority Lien on the CS2 Loan Receivable to the extent of one million and 00/100 Dollars ($1,000,000.00) in principal and accrued interest, including all proceeds thereof, subject only to prior payment of the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code;

v.      grant to the DIP Lenders allowed superpriority administrative expense claims  pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all amounts advanced to the Debtors under the DIP Agreement; provided, however, that such claim shall be junior to the Carve-Out and any superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code held by Serene (the "Serene Superpriority Claim");

vi.     use the proceeds of the DIP Loans, subject to the terms, restrictions, and other conditions of the DIP Agreement and the DIP Order, to (a) pay the Fees, (b) pay certain costs, premiums, fees, and expenses related

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

3

to the Chapter 11 Cases, and (c) fund working capital and other needs of the Debtors, including, but not limited to, funding the investigation and/or pursuit of any litigation claims held by the Debtors;

vii.  vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents; and

viii.  waive, to the extent applicable, any stay of the immediate effectiveness of this Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Order is immediately effective upon its entry on the court's docket.

The hearing on the Motion having been held by this court on [_____], 2024 (the "Hearing"); and

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Hearing was served by the Debtors on the Limited Mailing List approved by this court [ECF Nos. 63 and 164]; and

This court having reviewed the Motion and any responses and objections thereto, the *Declaration of Lance Miller in Support of the Debtors' (I) Motion for Order Authorizing the Debtors to Obtain Supplemental Postpetition Secured Financing and (II) Motion to Approve Entry Into and Performance Under the Socotra Settlement Agreement* [ECF No. 1066], the other filings made by the Debtors and the evidence and testimony presented at the Hearing; and it appearing that granting the relief requested in the Motion on a final basis is necessary to avoid immediate and irreparable harm to the Debtors, and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and their creditors, and is essential for the preservation of the value of the Debtors' property; and all objections, if any, to the entry of this Order having been withdrawn, resolved, or

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

4

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 8 of 151

overruled by the court; and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.  <u>Petition</u>. On September 29 and 30, 2023 (as applicable, the "<u>Petition Date</u>"),[3] the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code. The Debtors continue to control their business and affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.  <u>Jurisdiction and Venue</u>. The court has jurisdiction over the Chapter 11 Cases and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this court over the Chapter 11 Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.  <u>Notice</u>. Under the circumstances, the notice given by the Debtors of the Motion, the Hearing, and the relief granted under this Order constitutes due and sufficient notice thereof and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(c) and Local Rule 4001-2.

D.  <u>Findings Regarding the Post-Petition Financing</u>. Without prejudice to the rights of any other non-Debtor party in interest, the Debtors admit, stipulate, acknowledge and agree that:

(i)  The Debtors have requested from the DIP Lenders, and the DIP Lenders are willing to extend, the DIP Loans on the terms and conditions set forth in this Order and the DIP Agreement.

---

[3] Certain of the Debtors filed their own chapter 11 cases on September 29, September 30, November 8, and November 14, 2023. "Petition Date" as used herein will refer to the earliest of the Debtors' respective filing dates, and "Chapter 11 Cases" includes all of the Debtors' cases, irrespective of when they were filed.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

5

(ii)  *Need for Post-petition Financing*. The Debtors have limited cash resources to administer these Chapter 11 Cases, confirm a plan of liquidation, and fund litigation efforts to pursue recoveries from third parties and maximize the ultimate distribution to investor creditors without the financing requested under the Motion. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with the DIP Lenders as set forth in this Order and the DIP Agreement is vital to the Debtors' ability to maximize the value of the assets of their bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates"). Accordingly, the Debtors have an immediate need to obtain the post-petition financing to, among other things, preserve and maximize the value of the assets of their Estates.

(iii)  *No Credit Available on More Favorable Terms*. The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or solely based on the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable solely under sections 364(c)(2) or 364(c)(3) of the Bankruptcy Code. The Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Lenders pursuant to the DIP Agreement.

(iv)  *No Additional Post-Petition Borrowing.*  Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time seek allowance of any administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 552(b), 726,

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

6

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 10 of 151

1113, or 1114 of the Bankruptcy Code that is superior to or *pari passu* with the Superpriority Claim (as defined below) provided herein, except with respect to the Carve-Out and the Serene Superpriority Claim.

(v) *No Priming of DIP Liens.* Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens provided to the DIP Lenders by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim with respect to the DIP Collateral (as defined below) pursuant to section 364(d) of the Bankruptcy Code or otherwise, except with respect to the Carve-Out.

(vi) *Business Judgment and Good Faith Pursuant to Section 364(e).* The terms of the DIP Loan Facility and this Order reflect the Debtors' exercise of their prudent business judgment, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Agreement and this Order have been negotiated in good faith and at arm's-length by and among the Debtors and the DIP Lenders, with all parties being represented by counsel. Any credit extended under the terms of this Order shall be deemed to have been extended in good faith by the DIP Lenders, as that term is used in section 364(e) of the Bankruptcy Code.

(vii) *Good Cause.* The relief requested in the Motion and granted pursuant to the terms of this Order is necessary, essential, and appropriate, and is in the best interests of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and avoid immediate and irreparable harm to the Debtors, their creditors, and their assets.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

7

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 11 of 151

(viii) *Immediate Entry*. Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2). No party appearing in these Chapter 11 Cases has filed or made an objection to the relief sought in the Motion or the entry of this Order, or any objections that were made (to the extent such objections have not been withdrawn or resolved) are overruled.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, THAT:**

**Section 1.** Authorization and Conditions to Financing.

1.1 <u>Motion Granted</u>. The Motion [ECF No. 1063] is GRANTED in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Order. Any objections to the Motion with respect to entry of this Order to the extent not withdrawn, waived, or otherwise resolved, and all reservations of rights included therein, are denied and overruled on the merits.

1.2 <u>Authorization to Borrow and Use Loan Proceeds</u>. To enable the Debtors to continue to preserve the value of their Estates, and subject to the terms and conditions of this Order and the DIP Documents, the Debtors are authorized to enter into, be bound by, and perform under the DIP Documents and to borrow in an aggregate principal amount not to exceed $2,014,414.00, provided that the disbursement of such amount is in accordance with the DIP Agreement and this Order. Upon the entry of this Order, the Debtors shall be authorized to continue to use the DIP Collateral to execute and deliver all instruments and documents that may be required or necessary for the performance by the Debtors under the DIP Loan Facility and the creation and perfection of the DIP Liens (as defined below) described in and provided for by this Order and the DIP Documents, and to draw on the DIP Loan Facility to make any disbursement in accordance with the terms and conditions set forth in this Order and the DIP Agreement.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

8

Black Helterline LLP
805 SW Broadway
Suite 1900
Portland, OR 97205
Telephone: 503 224-5560

1.3    <u>DIP Agreement</u>.

    1.3.1  <u>Approval</u>. The DIP Agreement and each term, condition, and covenant set forth therein are approved. All of such terms, conditions, and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among the Debtors and the DIP Lenders, and of each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Agreement for all purposes, including, without limitation, to the extent applicable, the payment when due of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, and fees and expenses, including, without limitation, all of the Lender Expenses and the Transaction Fee as more fully set forth in the DIP Agreement and further provided below, are approved.

    1.3.2  <u>Amendment</u>. Subject to the terms and conditions of the DIP Agreement, the Debtors and the DIP Lenders may amend, modify, supplement, or waive any provision of the DIP Agreement (an "<u>Amendment</u>") without further approval or order of the court, provided that any Amendment shall require advance notice and opportunity to object of no less than five business days to the U.S. Trustee and the Committee, and if any party objects to the Amendment within the five-day notice period, the Debtors may not agree to the Amendment without further order of the court.

**Section 2.**    <u>Authorization and Conditions to Financing</u>. The DIP Lenders shall have no obligation to make any loans under the DIP Agreement unless the conditions precedent to making such loans under the DIP Agreement have been satisfied in full or waived by the DIP Lenders in their sole discretion.

2.1    <u>Priority and Liens</u>.

    2.1.1  <u>Lien Grant</u>. To secure the prompt payment and performance of any and all obligations of the Debtors to the DIP Lenders of whatever

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

9

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11   Doc 1087   Filed 07/16/24   Entered 07/16/24 17:29:53   Pg 13 of 151

kind, nature or description, absolute or contingent, now existing or hereafter arising, the Loan Parties shall grant pursuant to this Order the following valid and perfected liens (such liens, the "<u>DIP Liens</u>"):

(i)      Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, perfected first priority Lien on the Litigation Collateral granted to the DIP Lenders; and

(ii)      Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, perfected first priority Lien on the CS2 Loan Receivable to the extent of one million and 00/100 Dollars ($1,000,000.00) in principal and accrued interest, including all proceeds thereof granted to the Socotra DIP Lenders.

2.1.2  <u>DIP Collateral</u>. For purposes of this Order, the term "<u>DIP Collateral</u>" shall have the meaning ascribed to the term "Collateral" in the DIP Agreement, which term includes the Causes of Action and proceeds thereof and the CS2 Loan Receivable, but does not include the settlement of claims against Tritalent prior to confirmation of a chapter 11 plan in the Chapter 11 Cases to the extent that such settlement includes an extension of credit to the Debtors subordinate in all respects to the Credit Extensions.

2.1.3  <u>Superpriority Administrative Expense.</u> For all DIP Obligations now existing or hereafter arising pursuant to this Order, the DIP Agreement, or otherwise, the DIP Lenders are granted allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expenses, diminution claims, and all other claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330,

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 552(b), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "Superpriority Claim"); provided, however, that the Superpriority Claim shall be junior to the Carve-Out and the Serene Superpriority Claim. The Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, subject only to the Carve-Out and the Serene Superpriority Claim. Other than as expressly provided in the DIP Agreement and this Order with respect to the Carve-Out and the Serene Superiority Claim, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 326, 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Chapter 11 Cases, or in any Successor Case (as defined below), and no priority claims are, or will be, senior to, prior to, or on a parity with the Superpriority Claim or the DIP Obligations, or with any other claims of the DIP Lenders arising hereunder.

2.1.4  Nature of DIP Liens; Section 552(b); Section 506(c) Lien Priority. The DIP Liens shall be subject to the Carve-Out to the extent provided in Section 2.2 of this Order. The DIP Liens and the Superpriority Claim (a) shall not be subject to sections 510, 542, 549, 550, or 551 of the Bankruptcy Code, the "equities of the case" exception of section 552 of the Bankruptcy Code, or section 506(c) of the Bankruptcy Code, (b) shall be senior in priority and right of payment to (y) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise but subordinate to the Serene Superpriority Claim and Serene's priority with respect to such avoided

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

and preserved lien and (z) any intercompany or affiliate liens or claims of the Debtors, and (c) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Chapter 11 Cases, whether upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or appointed in these Chapter 11 Cases prior to conversion, or in any other proceedings related to any of the foregoing (each, a "Successor Case"), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.

2.1.5 <u>Enforceable Obligations</u>. The DIP Agreement shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their Estates, and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and their creditors, in accordance with their terms. No obligation, payment, transfer, or grant of security under the DIP Agreement or this Order shall be stayed, restrained, voidable, avoidable, disallowable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d)), or subject to any avoidance, disallowance, impairment, reduction, setoff, offset, recoupment, recharacterization, disgorgement, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, surcharge, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity. All fees, costs, and expenses referred to in the DIP Documents including, without limitation, the Lender Expenses and Transaction Fee, payable by the Debtors to a DIP Lender are approved.

2.1.6 <u>Post-Petition Lien Perfection</u>. This Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, without any further act and without regard to any other federal, state, or local

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien (each, a "Perfection Act"). Notwithstanding the foregoing, if the DIP Lenders shall, in their sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the DIP Lenders are authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or reasonably required by the DIP Lenders, notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law. The DIP Lenders may choose to file, record, or present a certified copy of this Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, and/or record such certified copy of this Order in accordance with applicable law. Should the DIP Lenders so choose and attempt to file, record, and/or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Order.

          2.1.7 <u>Mechanics' Lien Claims.</u> The DIP Liens granted pursuant to this Order shall not prime any mechanics' liens that constitute valid, binding, perfected, and enforceable security interests asserted against the Debtors' assets as of the Petition Date; <u>provided</u>, <u>further</u> that all parties' rights to object or otherwise challenge the validity, priority, and extent of such mechanics' liens shall be preserved, notwithstanding anything herein to the contrary.

          2.2 <u>Carve-Out</u>. The "Carve-Out" is an amount equal to the sum of (i) all fees required to be paid to the clerk of this court and to the Office of the U.S.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

13

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 17 of 151

Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (which is included in the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "Professional Fees") incurred by persons or firms ("Professional Persons") retained by the Debtors or the Committee whose retention is approved by this court pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code (all Professional Persons shall be paid *pro rata* from the Carve-Out), subject in all respects to the terms of and amendments set forth in this Order and any other interim or other compensation orders entered by this court that are incurred at any time before delivery to the Debtors of a Carve-Out Trigger Notice (as defined below), whether allowed by this court prior to the delivery of a Carve-Out Trigger Notice, subject to any limits imposed by this Order; provided that after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "Carve-Out Trigger Notice") thereof (which may be by email) to the Debtors, the Debtors' counsel, the U.S. Trustee, and lead counsel for the Committee, if any, in an aggregate amount not to exceed $200,000; provided further, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii), or (iii) above, on any grounds. The Carve-Out may be funded to an administrative reserve account (the "Carve-Out Account"), which account shall be used to pay Professional Fees and any unpaid fees to the U.S. Trustee. As cash flow permits, and assuming no issuance of a Carve-Out Trigger Notice, the Debtors may pay the amounts set forth for Professional Fees into the Carve-Out Account. Notwithstanding the foregoing, the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with (a) the

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

14

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the DIP Lenders or any of their officers, directors, and professionals; (b) attempts to modify any of the rights granted to the DIP Lenders; (c) attempts to prevent, hinder, or otherwise delay the DIP Lenders' assertion, enforcement, or realization upon any DIP Collateral in accordance with the DIP Agreement or this Order (as applicable); provided that nothing in this section shall restrict the rights of parties in interest during the Remedies Notice Period (as defined below); (d) paying any amount on account of any claims arising before the commencement of the Chapter 11 Cases unless such payments are approved by an order of the court; or (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end, or similar fees. For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims securing the DIP Loans, the Superpriority Claim, and any and all other liens or claims existing pursuant to the DIP Loan Facility.

2.3     Covenant to Subordinate. Upon the earlier of (i) a partial paydown of the Socotra DIP Loan in the amount of one million and 00/100 Dollars ($1,000,000.00) plus accrued interest on the Socotra DIP Loan ("Paydown") or (ii) receipt by the Socotra DIP Lenders of a restated CS2 Loan Receivable acceptable to the Socotra DIP Lenders in their reasonable discretion plus accrued interest on the Socotra DIP Loan, the Subordinated Lenders' Lien on the Litigation Collateral shall be subordinated to the Lien granted to the Senior Lender in connection with the Senior Financing Facility on the terms and conditions set forth in the Subordination Agreement. Upon a Paydown, the Socotra DIP Lenders' Lien on the CS2 Loan Receivable shall be released.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

**Section 3.**     Default; Rights and Remedies; Relief from Stay.

3.1     Events of Default. It shall be an "Event of Default" under this Order if an "Event of Default" as defined in the DIP Agreement occurs (together with the passage of any applicable cure period set forth therein).

3.2     Rights and Remedies Upon Events of Default. Upon the occurrence and continuance of an Event of Default, (x) the DIP Lenders may declare (i) the termination, reduction, or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Loan Parties, and (iii) the termination of the DIP Loan Facility and the DIP Documents as to any future liability or obligation of the DIP Lenders, but without affecting any of the liens or the obligations under the DIP Loan Facility; or (y) upon the giving of five business days' notice (the "Remedies Notice Period") to the Debtors, the U.S. Trustee, and the Committee, the DIP Lenders may exercise all other rights and remedies provided for in this Order or the applicable DIP Documents and applicable law, free of the automatic stay of section 362 of the Bankruptcy Code. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.

**Section 4.**     Good Faith. The terms of this Order were negotiated in good faith and at arm's-length by and among the Debtors and the DIP Lenders. The DIP Lenders shall be entitled to the full protections of section 364(e) of the Bankruptcy Code.

**Section 5.**     DIP Lender Rights.

5.1     Collateral Rights. Until all of the DIP Obligations shall have been indefeasibly paid and satisfied in full, no other party shall seek to enforce any

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

lien or claim in any DIP Collateral subject to the terms of this Order and the DIP Documents.

5.2 <u>No Marshaling</u>. The DIP Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

5.3 <u>Responsive Pleadings</u>. The DIP Lenders may make other filings and make any arguments, pleadings, and motions that are, in each case, not otherwise prohibited by the terms of this Order or the DIP Agreement, *provided* that no such filings, arguments, pleadings, or motions shall propose to treat any claims or security interests in a manner inconsistent with this Order.

**Section 6.** <u>Other Rights and Obligations</u>.

6.1 <u>No Modification or Stay of This Order</u>. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order. Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation, or reversal of this Order, any of the DIP Documents or any term hereunder or thereunder or (b) the dismissal or conversion of one or more of the Chapter 11 Cases (each, a "<u>Subject Event</u>"), (i) the acts taken by the DIP Lenders in accordance with this Order, and (ii) the DIP Obligations incurred or arising prior to the DIP Lenders' actual receipt of written notice from the Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Order, and the acts taken by the DIP Lenders in accordance with this Order and the DIP Agreement, and the DIP Liens granted to the DIP Lenders in the DIP Collateral, and all other rights, remedies, privileges, and benefits in favor of the DIP

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

17

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11   Doc 1087   Filed 07/16/24   Entered 07/16/24 17:29:53   Pg 21 of 151

Lenders pursuant to this Order and the DIP Agreement, shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.

6.2 <u>Power to Waive Rights; Duties to Third Parties</u>. The DIP Lenders, in their sole and absolute discretion, shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Order in respect of the DIP Lenders (the "<u>DIP Lender Rights</u>"), with any such waiver to be made in writing by the DIP Lenders, and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Rights. Any waiver by the DIP Lenders of any DIP Lender Rights shall not be or constitute a continuing waiver. Any delay in or failure to exercise or enforce any DIP Lenders Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Lenders to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert a defense to any obligation owed by the Debtors to the DIP Lenders. Notwithstanding the above, upon execution of the Subordination Agreement, such agreement shall control the exercise of any of the above DIP Lender Rights.

6.3 <u>Reservation of Rights</u>. The terms, conditions, and provisions of this Order are in addition to and without prejudice to the rights of the DIP Lenders to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Agreement, or any other applicable agreement or law, including, without limitation, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Debtors' Estates.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

18

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11   Doc 1087   Filed 07/16/24   Entered 07/16/24 17:29:53   Pg 22 of 151

6.4     Binding Effect of Order.

6.4.1  Immediately upon entry by this court, this Order shall be valid and binding upon and inure to the benefit of the DIP Lenders, the Debtors, the property of the Debtors' Estates, all other creditors of any of the Debtors, the Committee, and all other parties in interest and their respective successors and assigns (including any chapter 11 or chapter 7 trustee or any other fiduciary hereafter appointed as a legal representative of the Debtors), in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

6.4.2  Any order dismissing one or more of the Chapter 11 Cases or any Successor Case under section 1112 or otherwise shall be deemed to provide (in accordance with sections 105 and 349 the Bankruptcy Code) that (a) the Superpriority Claim and the DIP Liens shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full and (b) this court shall retain jurisdiction to the greatest extent permitted by applicable law, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and the DIP Liens. In the event any court modifies any of the provisions of this Order or the DIP Documents following the Hearing, (i) such modifications shall not affect the rights or priorities of the DIP Lenders pursuant to this Order with respect to the DIP Collateral or any portion of the DIP Obligations that arise or are incurred or are advanced prior to such modifications, and (ii) this Order shall remain in full force and effect except as specifically amended or modified at the Hearing.

6.5     Restrictions on Additional Financing, Plan Treatment. Except as otherwise provided herein, all postpetition advances and other financial accommodations under the DIP Agreement and the other DIP Documents are made in reliance on this Order and there shall not at any time be entered in the Chapter 11

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Cases, or in any Successor Case, any order (other than this Order) that authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest that is equal or senior to a lien or security interest in property in which the DIP Lenders hold a lien or security interest, or which is entitled to priority administrative claim status that is equal or superior to that granted to the DIP Lenders herein, except with respect to the Serene Superpriority Claim, unless, in each instance (i) the DIP Lenders shall have given their express prior written consent with respect thereto (such consent to be in the DIP Lenders' absolute and sole discretion and no such consent being implied from any other action, inaction, or acquiescence by the DIP Lenders) or (ii) such other order requires that all DIP Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of the DIP Agreement, including, without limitation, all debts and obligations of the Debtors to the DIP Lenders that arise or result from the obligations, loans, security interests, and liens authorized herein, on terms and conditions acceptable to the DIP Lenders. Except as otherwise provided herein, the security interests and liens granted to or for the benefit of the DIP Lenders hereunder, the terms of the DIP Loan Facility approved hereby, and the rights of the DIP Lenders pursuant to this Order shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of the Debtors without the express prior written consent of the DIP Lenders (such consent to be in the DIP Lenders' absolute and sole discretion).

6.6     Term; Termination. Notwithstanding any provision of this Order to the contrary, the term of the DIP Agreement among the Debtors and the DIP Lenders authorized by this Order may be terminated pursuant to the terms of the DIP Agreement.

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL DEBTOR-
IN-POSSESSION FINANCING

20

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

6.7    <u>Objections Overruled</u>. All objections to the entry of this Order are, to the extent not withdrawn or resolved, overruled.

6.8    <u>No Liability to Third Parties</u>. The DIP Lenders shall not: (a) be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 or any similar federal or state statute).

6.9    <u>Payments Free and Clear</u>. Any and all payments or proceeds remitted to the DIP Lenders pursuant to the provisions of this Order, the DIP Agreement, or any subsequent order of this court shall be received free and clear of any claim, charge, assessment, or other liability to the Debtors or the Debtors' Estates.

**Section 7.**    <u>Findings and Conclusions</u>. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Order.

**Section 8.**    <u>Order Governs</u>. In the event that any provision of this Order conflicts with any term of the DIP Documents, this Order shall govern.

**Section 9.**    <u>Retention of Jurisdiction</u>. The court has and will retain jurisdiction to interpret and enforce the provisions of this Order.

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL DEBTOR-
IN-POSSESSION FINANCING

21

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

///END OF ORDER///

PRESENTED BY:

BLACK HELTERLINE LLP


By_____
OREN B. HAKER, WSBA No. 4875
BLACK HELTERLINE LLP

*Proposed Co-Counsel to Debtors and Debtors in Possession*

And


By_____
JULIAN I. GURULE (Admitted *Pro Hac Vice*)
O'MELVENY & MYERS LLP

*Co-Counsel to Debtors and Debtors in Possession*

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL DEBTOR-
IN-POSSESSION FINANCING

22

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

**Exhibit 2**

**Redline of Revised Proposed Order**

**NOTICE OF FILING OF REVISED PROPOSED ORDER**
**APPROVING DEBTOR IN POSSESSION FINANCING**

Black Helterline LLP
805 SW Broadway
Suite 1900
Portland, OR 97205
Telephone: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 27 of 151

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF WASHINGTON**

In re:                                          Chapter 11

ICAP ENTERPRISES, INC., *et al.,*               Lead Case No. 23-01243-WLH11
                                                Jointly Administered
                        Debtors.[1]
                                                **ORDER (I) AUTHORIZING THE**
                                                **DEBTORS TO OBTAIN**
                                                **SUPPLEMENTAL POSTPETITION**
                                                **SECURED FINANCING; (II)**
                                                **GRANTING SUPERPRIORITY**
                                                **ADMINISTRATIVE EXPENSE**
                                                **CLAIMS; AND (III) GRANTING**
                                                **RELATED RELIEF**

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01256-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01253-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund, LLC (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); iCap Broadway, LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care LLC (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH 2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding LLC (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11); Vault Holding, LLC (23-01270-11); iCap Pacific Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); and iCap Holding 6 LLC (23-01274-11).

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION FINANCING

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (the "Debtors"), in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2), and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the corresponding local rules of the United States Bankruptcy Court for the Eastern District of Washington (the "Local Rules"), seeking authorization for the Debtors to, among other things:

i.  obtain post-petition loans (the "DIP Loans") in an aggregate principal amount of $~~$~~$2,014,414.00 pursuant to the terms and conditions of the DIP Documents (as defined below) and this order (the "Order");

ii.  enter into, be bound by, and perform under (a) a debtor-in-possession credit facility (the "DIP Loan Facility"), pursuant to the Debtor-In-Possession Loan and Security Agreement by and among the Debtors and Socotra REIT I, LLC, WE Alliance Secured Income Fund, LLC, the Jason Yelowitz 2006 Trust, Dated March 31, 2006, and ~~iCap DIP Finance Group~~Keith Holdings, LLC (collectively, the "DIP Lenders"), which agreement is attached hereto as **Exhibit 1** (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Agreement") and (b) the documents related to the DIP Agreement (together with the DIP Agreement, the "DIP Documents");

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the DIP Agreement, as applicable.

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

2

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 29 of 151

iii. grant to the DIP Lenders valid, perfected first priority liens on all Causes of Action and all proceeds recovered by the Loan Parties or any other Person pursuant to the Causes of Action including, without limitation, any real property assets, but excluding the settlement of claims against Tritalent prior to confirmation of a chapter 11 plan in the Chapter 11 Cases to the extent that such settlement includes an extension of credit to the Debtors subordinate in all respects to the Credit Extensions, to secure the DIP Loan Facility and all obligations owing and outstanding thereunder and under the DIP Agreement, as applicable, and this Order, as applicable (collectively, the "DIP Obligations"), subject only to prior payment of the Carve-Out (as defined below), pursuant to section 364(c)(2) of the Bankruptcy Code;

iv. grant to Socotra REIT I, LLC and WE Alliance Secured Income Fund, LLC (collectively, the "Socotra DIP Lenders") a valid, perfected first priority Lien on the CS2 Loan Receivable to the extent of one million and 00/100 Dollars ($1,000,000.00) in principal and accrued interest, including all proceeds thereof, subject only to prior payment of the Carve-Out (as defined below), pursuant to section 364(c)(2) of the Bankruptcy Code; provided, however, that such claim shall be junior to the Carve-Out and any superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code held by Serene (the "Serene Superpriority Claim");

v. grant to the DIP Lenders allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all amounts advanced to the Debtors under the

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

3

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 30 of 151

DIP Agreement; provided, however, that such claim shall be junior to the Carve-Out and any superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code held by Serene (the "Serene Superpriority Claim");

vi. use the proceeds of the DIP Loans, subject to the terms, restrictions, and other conditions of the DIP Agreement and the DIP Order, to (a) pay the Fees, (b) pay certain costs, premiums, fees, and expenses related to the Chapter 11 Cases, and (c) fund working capital and other needs of the Debtors, including, but not limited to, funding the investigation and/or pursuit of any litigation claims held by the Debtors;

vii. vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents; and

viii. waive, to the extent applicable, any stay of the immediate effectiveness of this Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Order is immediately effective upon its entry on the court's docket.

The hearing on the Motion having been held by this court on [_____], 2024 (the "Hearing"); and

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the Hearing was served by the Debtors on the Limited Mailing List approved by this court [ECF Nos. 63 and 164]; and

This court having reviewed the Motion and any responses and objections thereto, the *Declaration of Lance Miller in Support of the Debtors' (I) Motion for Order Authorizing the Debtors to Obtain Supplemental Postpetition Secured*

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

4

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 31 of 151

*Financing and (II) Motion to Approve Entry Into and Performance Under the Socotra Settlement Agreement* ~~(the "Miller Declaration")~~[ECF No. 1066], the other filings made by the ~~Movants~~Debtors and the evidence and testimony presented at the Hearing; and it appearing that granting the relief requested in the Motion on a final basis is necessary to avoid immediate and irreparable harm to the Debtors, and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and their creditors, and is essential for the preservation of the value of the Debtors' property; and all objections, if any, to the entry of this Order having been withdrawn, resolved, or overruled by the court; and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    <u>Petition</u>. On September 29 and 30, 2023 (as applicable, the "<u>Petition Date</u>"),[3] the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code. The Debtors continue to control their business and affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.    <u>Jurisdiction and Venue</u>. The court has jurisdiction over ~~this case~~the Chapter 11 Cases and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this court over the Chapter 11 Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    <u>Notice</u>. Under the circumstances, the notice given by the Debtors of the Motion, the Hearing, and the relief granted under this Order constitutes due and sufficient notice thereof and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(c) and Local Rule 4001-2.

---

[3] Certain of the Debtors filed their own chapter 11 cases on September 29, September 30, November 8, and November 14, 2023. "Petition Date" as used herein will refer to the earliest of the Debtors' respective filing dates, and "Chapter 11 Cases" includes all of the Debtors' cases, irrespective of when they were filed.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

5

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 32 of 151

D.  <u>Findings Regarding the Post-Petition Financing</u>. Without prejudice to the rights of any other non-Debtor party in interest, the Debtors admit, stipulate, acknowledge and agree that:

(i)  The Debtors have requested from the DIP Lenders, and the DIP Lenders are willing to extend, the DIP Loans on the terms and conditions set forth in this Order and the DIP Agreement.

(ii)  *Need for Post-petition Financing*. The Debtors have limited cash resources to administer these Chapter 11 Cases, confirm a plan of liquidation, and fund litigation efforts to pursue recoveries from third parties and maximize the ultimate distribution to investor creditors without the financing requested under the Motion. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with the DIP Lenders as set forth in this Order and the DIP Agreement is vital to the Debtors' ability to maximize the value of the assets of their bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "<u>Estates</u>"). Accordingly, the Debtors have an immediate need to obtain the post-petition financing to, among other things, preserve and maximize the value of the assets of their Estates.

(iii)  *No Credit Available on More Favorable Terms*. The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or solely based on the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable solely under ~~section~~ sections 364(c)(2) or 364(c)(3) of the Bankruptcy Code. The Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Lenders pursuant to the DIP Agreement.

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

6

Black Helterline llp
805 SW Broadway
Suite 1900
Portland, OR 97205
Telephone: 503 224-5560

(iv) *No Additional Post-Petition Borrowing.* Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time seek allowance of any administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 552(b), 726, 1113, or 1114 of the Bankruptcy Code that is superior to or *pari passu* with the Superpriority Claim (as defined below) provided herein, except with respect to the Carve-Out and the Serene Superpriority Claim.

(v) *No Priming of DIP Liens.* Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens provided to the DIP Lenders by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim with respect to the DIP Collateral (as defined below) pursuant to section 364(d) of the Bankruptcy Code or otherwise, except with respect to the Carve-Out;.

(vi) *Business Judgment and Good Faith Pursuant to Section 364(e).* The terms of the DIP Loan Facility and this Order reflect the Debtors' exercise of their prudent business judgment, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Agreement and this Order have been negotiated in good faith and at ~~arms' length~~arm's-length by and among the Debtors and the DIP Lenders, with all parties being represented by counsel. Any credit extended under the terms of this Order shall be deemed to have been extended in good faith by the DIP Lenders, as that term is used in section 364(e) of the Bankruptcy Code.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

7

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11   Doc 1087   Filed 07/16/24   Entered 07/16/24 17:29:53   Pg 34 of 151

(vii) *Good Cause*. The relief requested in the Motion and granted pursuant to the terms of this Order is necessary, essential, and appropriate, and is in the best interests of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and avoid immediate and irreparable harm to the Debtors, their creditors, and their assets.

(viii) *Immediate Entry*. Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2). No party appearing in these Chapter 11 Cases has filed or made an objection to the relief sought in the Motion or the entry of this Order, or any objections that were made (to the extent such objections have not been withdrawn or resolved) are overruled.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, THAT:**

**Section 1.** Authorization and Conditions to Financing.

    1.1 Motion Granted. The Motion [ECF No. —1063] is GRANTED in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Order. Any objections to the Motion with respect to entry of this Order to the extent not withdrawn, waived, or otherwise resolved, and all reservations of rights included therein, are denied and overruled on the merits.

    1.2 Authorization to Borrow and Use Loan Proceeds. To enable the Debtors to continue to preserve the value of their estatesEstates, and subject to the terms and conditions of this Order and the DIP Documents, the Debtors are authorized to enter into, be bound by, and perform under the DIP Documents and to borrow in an aggregate principal amount not to exceed $2,014,414.00, provided that the disbursement of such amount is in accordance with the DIP Agreement and this Order. Upon the entry of this Order, the Debtors shall be authorized to

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

8

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

continue to use the DIP Collateral to execute and deliver all instruments and documents that may be required or necessary for the performance by the Debtors under the DIP Loan Facility and the creation and perfection of the DIP Liens (as defined below) described in and provided for by this Order and the DIP Documents, and to draw on the DIP Loan Facility to make any disbursement in accordance with the terms and conditions set forth in this Order and the DIP Agreement.

1.3 <u>DIP Agreement</u>.

1.3.1 <u>Approval</u>. The DIP Agreement and each term, condition, and covenant set forth therein are approved. All of such terms, conditions, and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among the Debtors and the DIP Lenders, and of each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Agreement for all purposes, including, without limitation, to the extent applicable, the payment when due of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, and fees and expenses, including, without limitation, all of the Lender Expenses and the Transaction Fee as more fully set forth in the DIP Agreement and further provided below, are approved.

1.3.2 <u>Amendment</u>. Subject to the terms and conditions of the DIP Agreement, the Debtors and the DIP Lenders may amend, modify, supplement, or waive any provision of the DIP Agreement (an "<u>Amendment</u>") without further approval or order of the court, provided that any Amendment shall require advance notice and opportunity to object of no less than five business days to the U.S. Trustee and the Committee, and if any party objects to the Amendment

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

9

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

within the ~~five day~~ five-day notice period, the Debtors may not agree to the Amendment without further order of the court.

**Section 2.**     Authorization and Conditions to Financing. The DIP Lenders shall have no obligation to make any loans under the DIP Agreement unless the conditions precedent to making such loans under the DIP Agreement have been satisfied in full or waived by the DIP Lenders in their sole discretion.

2.1     Priority and Liens.

2.1.1 Lien Grant. To secure the prompt payment and performance of any and all obligations of the Debtors to the DIP Lenders of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the Loan Parties shall grant pursuant to this Order the following valid and perfected liens (such liens, the "DIP Liens"):

(i)     Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, perfected first priority Lien on the Litigation Collateral granted to the DIP Lenders; and

(ii)     Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, perfected first priority Lien on the CS2 Loan Receivable to the extent of one million and 00/100 Dollars ($1,000,000.00) in principal and accrued interest, including all proceeds thereof granted to the Socotra DIP Lenders.

2.1.2 DIP Collateral. For purposes of this Order, the term "DIP Collateral" shall have the meaning ascribed to the term "Collateral" in the DIP Agreement, which term includes the Causes of Action and proceeds thereof and the CS2 Loan Receivable, but does not include the settlement of claims against Tritalent prior to confirmation of a chapter 11 plan in the Chapter 11 Cases to the extent that such settlement includes an extension of credit to the Debtors subordinate in all respects to the Credit Extensions.

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

10

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

2.1.3 <u>Superpriority Administrative Expense.</u> For all DIP Obligations now existing or hereafter arising pursuant to this Order, the DIP Agreement, or otherwise, the DIP Lenders are granted allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expenses, diminution claims, and all other claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 552(b), 726, 1113, or 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment (the "<u>Superpriority Claim</u>"); <u>provided</u>, <u>however</u>, that the Superpriority Claim shall be junior to the Carve-Out and the Serene Superpriority Claim. The Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, subject only to the Carve-Out and the Serene Superpriority Claim. Other than as expressly provided in the DIP Agreement and this Order with respect to the Carve-Out and the Serene Superiority Claim, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 326, 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these Chapter 11 Cases, or in any Successor Case (as defined below), and no priority claims are, or will be, senior

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

11

Black Helterline LLP
805 SW Broadway
Suite 1900
Portland, OR 97205
Telephone: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 38 of 151

to, prior to, or on a parity with the Superpriority Claim or the DIP Obligations, or with any other claims of the DIP Lenders arising hereunder.

2.1.4 <u>Nature of DIP Liens; Section 552(b); Section 506(c) Lien Priority</u>. The DIP Liens shall be subject to the Carve-Out to the extent provided in Section 2.2 of this Order. The DIP Liens and the Superpriority Claim (a) shall not be subject to sections 510, 542, 549, 550, or 551 of the Bankruptcy Code, the "equities of the case" exception of section 552 of the Bankruptcy Code, or section 506(c) of the Bankruptcy Code, (b) shall be senior in priority and right of payment to (y) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise but subordinate to the Serene Superpriority Claim and Serene's priority with respect to such avoided and preserved lien and (z) any intercompany or affiliate liens or claims of the Debtors, and (c) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Chapter 11 Cases, whether upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or appointed in these Chapter 11 Cases prior to conversion, or in any other proceedings related to any of the foregoing (each, a "<u>Successor Case</u>"), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.

2.1.5 <u>Enforceable Obligations</u>. The DIP Agreement shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their Estates, and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and their creditors, in accordance with their terms. No obligation, payment, transfer, or grant of security under the DIP Agreement or this Order shall be stayed, restrained, voidable, avoidable,

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

12

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11   Doc 1087   Filed 07/16/24   Entered 07/16/24 17:29:53   Pg 39 of 151

disallowable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d)), or subject to any avoidance, disallowance, impairment, reduction, setoff, offset, recoupment, recharacterization, disgorgement, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, surcharge, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity. All fees, costs, and expenses referred to in the DIP Documents including, without limitation, the Lender Expenses and Transaction Fee, payable by the Debtors to a DIP Lender are approved.

2.1.6 <u>Post-Petition Lien Perfection</u>. This Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien (each, a "<u>Perfection Act</u>"). Notwithstanding the foregoing, if the DIP Lenders shall, in their sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the DIP Lenders are authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or reasonably required by the DIP Lenders, notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law. The DIP Lenders may choose to file, record, or present a certified copy of this Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, and/or record such certified copy of this Order in accordance with applicable

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

13

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

law. Should the DIP Lenders so choose and attempt to file, record, and/or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Order.

    2.1.7 <u>Mechanics' Lien Claims.</u> The DIP Liens granted pursuant to this Order shall not prime any mechanics' liens that constitute valid, binding, perfected, and enforceable security interests asserted against the Debtors' assets as of the Petition Date; provided, further that all parties' rights to object or otherwise challenge the validity, priority, and extent of such mechanics' liens shall be preserved, notwithstanding anything herein to the contrary.

    2.2 <u>Carve-Out</u>. The "<u>Carve-Out</u>" is an amount equal to the sum of (i) all fees required to be paid to the clerk of this court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (which is included in the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "<u>Professional Fees</u>") incurred by persons or firms ("<u>Professional Persons</u>") retained by the Debtors or the Committee whose retention is approved by this court pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code (all Professional Persons shall be paid *pro rata* from the Carve-Out), subject in all respects to the terms of and amendments set forth in this Order and any other interim or other compensation orders entered by this court that are incurred at any time before delivery to the Debtors of a Carve-Out Trigger Notice (as defined below), whether allowed by this court prior to the delivery of a Carve-Out Trigger

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

14

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 41 of 151

Notice, subject to any limits imposed by this Order; provided that after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "Carve-Out Trigger Notice") thereof (which may be by email) to the Debtors, the Debtors' counsel, the U.S. Trustee, and lead counsel for the Committee, if any, in an aggregate amount not to exceed $200,000; provided further, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in clauses (i), (ii), or (iii) above, on any grounds.  The Carve-Out may be funded to an administrative reserve account (the "Carve-Out Account"), which account shall be used to pay Professional Fees and any unpaid fees to the U.S. Trustee.  As cash flow permits, and assuming no issuance of a Carve-Out Trigger Notice, the Debtors may pay the amounts set forth for Professional Fees into the Carve-Out Account. Notwithstanding the foregoing, the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the DIP Lenders or any of their officers, directors, and professionals; (b) attempts to modify any of the rights granted to the DIP Lenders; (c) attempts to prevent, hinder, or otherwise delay the DIP Lenders' assertion, enforcement, or realization upon any DIP Collateral in accordance with the DIP Agreement or this Order (as applicable); provided that nothing in this section shall restrict the rights of parties in interest during the Remedies Notice Period (as defined below); (d) paying any amount on account of any claims arising before the commencement of the Chapter 11 Cases unless such payments are approved by an order of the court; or (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end, or similar fees. For the avoidance of doubt and notwithstanding anything to the contrary herein,

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

15

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

the Carve-Out shall be senior to all liens and claims securing the DIP Loans, the Superpriority Claim, and any and all other liens or claims existing pursuant to the DIP Loan Facility.

      2.3    <u>Covenant to Subordinate.</u> Upon the earlier of (i) a partial paydown of the Socotra DIP Loan in the amount of one million and 00/100 Dollars ($1,000,000.00) plus accrued interest on the Socotra DIP Loan ("<u>Paydown</u>") or (ii) receipt by the Socotra DIP Lenders of a restated CS2 Loan Receivable acceptable to the Socotra DIP Lenders in their reasonable discretion plus accrued interest on the Socotra DIP Loan, the Subordinated Lenders' Lien on the Litigation Collateral shall be subordinated to the Lien granted to the Senior Lender in connection with the Senior Financing Facility on the terms and conditions set forth in the Subordination Agreement. Upon a Paydown, the Socotra DIP Lenders' Lien on the CS2 Loan Receivable shall be released.

**Section 3.**   <u>Default; Rights and Remedies; Relief from Stay.</u>

      3.1    <u>Events of Default</u>. It shall be an "<u>Event of Default</u>" under this Order if an "Event of Default" as defined in the DIP Agreement occurs (together with the passage of any applicable cure period set forth therein).

      3.2    <u>Rights and Remedies Upon Events of Default</u>. Upon the occurrence and continuance of an Event of Default, (x) the DIP Lenders may declare (i) the termination, reduction, or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Loan Parties, and (iii) the termination of the DIP Loan Facility and the DIP Documents as to any future liability or obligation of the DIP Lenders, but without affecting any of the liens or the obligations under the DIP Loan Facility; or (y) upon the giving of five

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

business days' notice (the "Remedies Notice Period") to the Debtors, the U.S. Trustee, and the Committee (the "Notice Parties"), the DIP Lenders may exercise all other rights and remedies provided for in this Order or the applicable DIP Documents and applicable law, free of the automatic stay of section 362 of the Bankruptcy Code. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.

**Section 4.**     Good Faith. The terms of this Order were negotiated in good faith and at arm's length arm's-length by and among the Debtors and the DIP Lenders. The DIP Lenders shall be entitled to the full protections of section 364(e) of the Bankruptcy Code.

**Section 5.**     DIP Lender Rights.

        5.1     Collateral Rights. Until all of the DIP Obligations shall have been indefeasibly paid and satisfied in full, no other party shall seek to enforce any lien or claim in any DIP Collateral subject to the terms of this Order and the DIP Documents.

        5.2     No Marshaling. The DIP Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

        5.3     Voting and Responsive Pleadings. The DIP Lenders may vote on any chapter 11 plan, make other filings and make any arguments, pleadings, and motions that are, in each case, not otherwise prohibited by the terms of this Order or the DIP Agreement, *provided* that no such filings, arguments, pleadings, or motions or chapter 11 plans shall propose to treat any claims or security interests in a manner inconsistent with this Order.

**Section 6.**     Other Rights and Obligations.

ORDER AUTHORIZING DEBTORS TO OBTAIN SUPPLEMENTAL DEBTOR-IN-POSSESSION FINANCING

17

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11     Doc 1087     Filed 07/16/24     Entered 07/16/24 17:29:53     Pg 44 of 151

6.1    No Modification or Stay of This Order. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order. Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation, or reversal of this Order, any of the DIP Documents or any term hereunder or thereunder or (b) the dismissal or conversion of one or more of the Chapter 11 Cases (each, a "Subject Event"), (i) the acts taken by the DIP Lenders in accordance with this Order, and (ii) the DIP Obligations incurred or arising prior to the DIP Lenders' actual receipt of written notice from the Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of this Order, and the acts taken by the DIP Lenders in accordance with this Order and the DIP Agreement, and the DIP Liens granted to the DIP Lenders in the DIP Collateral, and all other rights, remedies, privileges, and benefits in favor of the DIP Lenders pursuant to this Order and the DIP Agreement, shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.

6.2    Power to Waive Rights; Duties to Third Parties. The DIP Lenders, in their sole and absolute discretion, shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Order in respect of the DIP Lenders (the "DIP Lender Rights"), with any such waiver to be made in writing by the DIP Lenders, and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Rights. Any waiver by the DIP Lenders of any DIP Lender Rights shall not be or constitute a continuing waiver. Any delay in or failure to exercise

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

18

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 45 of 151

or enforce any DIP Lenders Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Lenders to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert a defense to any obligation owed by the Debtors to the DIP Lenders. Notwithstanding the above, upon execution of the Subordination Agreement, such agreement shall control the exercise of any of the above DIP Lender Rights.

6.3    <u>Reservation of Rights</u>. The terms, conditions, and provisions of this Order are in addition to and without prejudice to the rights of the DIP Lenders to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Agreement, or any other applicable agreement or law, including, without limitation, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Debtors' Estates.

6.4    <u>Binding Effect of Order</u>.

6.4.1   Immediately upon entry by this court, this Order shall be valid and binding upon and inure to the benefit of the DIP Lenders, the Debtors, the property of the Debtors' Estates, all other creditors of any of the Debtors, the Committee, and all other parties in interest and their respective successors and assigns (including any chapter 11 or chapter 7 trustee or any other fiduciary hereafter appointed as a legal representative of the Debtors), in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

19

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

6.4.2 Any order dismissing one or more of the Chapter 11 Cases or any Successor Case under section 1112 or otherwise shall be deemed to provide (in accordance with sections 105 and 349 the Bankruptcy Code) that (a) the Superpriority Claim and the DIP Liens shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations are indefeasibly paid and satisfied in full and (b) this court shall retain jurisdiction to the greatest extent permitted by applicable law, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and the DIP Liens. In the event any court modifies any of the provisions of this Order or the DIP Documents following the Hearing, (i) such modifications shall not affect the rights or priorities of the DIP Lenders pursuant to this Order with respect to the DIP Collateral or any portion of the DIP Obligations that arise or are incurred or are advanced prior to such modifications, and (ii) this Order shall remain in full force and effect except as specifically amended or modified at the Hearing.

6.5 <u>Restrictions on Additional Financing, Plan Treatment</u>. ~~All~~<u>Except as otherwise provided herein, all</u> postpetition advances and other financial accommodations under the DIP Agreement and the other DIP Documents are made in reliance on this Order and there shall not at any time be entered in the Chapter 11 Cases, or in any Successor Case, any order (other than this Order) that authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest that is equal or senior to a lien or security interest in property in which the DIP Lenders hold a lien or security interest, or which is entitled to priority administrative claim status that is equal or superior to that granted to the DIP Lenders <u>herein</u>, except with respect to the Serene Superpriority Claim, ~~herein~~ unless, in each instance (i) the DIP Lenders shall have given their express prior

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

20

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

written consent with respect thereto (such consent to be in the DIP Lenders' absolute and sole discretion and no such consent being implied from any other action, inaction, or acquiescence by the DIP Lenders) or (ii) such other order requires that all DIP Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of the DIP Agreement, including, without limitation, all debts and obligations of the Debtors to the DIP Lenders that arise or result from the obligations, loans, security interests, and liens authorized herein, on terms and conditions acceptable to the DIP Lenders. ~~The~~Except as otherwise provided herein, the security interests and liens granted to or for the benefit of the DIP Lenders hereunder, the terms of the DIP Loan Facility approved hereby, and the rights of the DIP Lenders pursuant to this Order shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of the Debtors without the express prior written consent of the DIP Lenders (such consent to be in the DIP Lenders' absolute and sole discretion).

6.6    <u>Term; Termination</u>. Notwithstanding any provision of this Order to the contrary, the term of the DIP Agreement among the Debtors and the DIP Lenders authorized by this Order may be terminated pursuant to the terms of the DIP Agreement.

6.7    <u>Objections Overruled</u>. All objections to the entry of this Order are, to the extent not withdrawn or resolved, overruled.

6.8    <u>No Liability to Third Parties</u>. The DIP Lenders shall not: (a) be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 or any similar federal or state statute).

6.9     Payments Free and Clear. Any and all payments or proceeds remitted to the DIP Lenders pursuant to the provisions of this Order, the DIP Agreement, or any subsequent order of this court shall be received free and clear of any claim, charge, assessment, or other liability to the Debtors or the Debtors' Estates.

**Section 7.**     Findings and Conclusions. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or ~~Rule~~rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Order.

**Section 8.**     Order Governs. In the event that any provision of this Order conflicts with any term of the DIP Documents, this Order shall govern.

**Section 9.**     Retention of Jurisdiction. The court has and will retain jurisdiction to interpret and enforce the provisions of this Order.

///END OF ORDER///

PRESENTED BY:


BLACK HELTERLINE LLP


By /s/
_____
OREN B. HAKER, WSBA No. 4875
BLACK HELTERLINE LLP

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

22

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

*Proposed Co-Counsel to Debtors and Debtors in Possession*

And


By */s/*
JULIAN I. GURULE (Admitted *Pro Hac Vice*)
O'MELVENY & MYERS LLP


*Co-Counsel to Debtors and Debtors in Possession*

ORDER AUTHORIZING DEBTORS TO
OBTAIN SUPPLEMENTAL
DEBTOR-IN-POSSESSION
FINANCING

23

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 50 of 151

**Exhibit 3**

**Revised DIP Agreement**

**NOTICE OF FILING OF REVISED PROPOSED ORDER
APPROVING DEBTOR IN POSSESSION FINANCING**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 51 of 151

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** is entered into as of July [___], 2024 (this "**Agreement**"), by and among the Lenders party hereto, and the parties listed on **Schedule I** attached hereto (each, a debtor or debtor-in-possession under Chapter 11 of the Bankruptcy Code, and each individually a "**Loan Party**," and also referred to as a "**Debtor**," and collectively, the "**Loan Parties**" or "**Debtors**").

### RECITALS

WHEREAS, on September 29 and 30, 2023 (the "**Petition Date**"), the Loan Parties filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (the "**Cases**" and each, a "**Case**") and have continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Loan Parties have requested that the Lenders make available to the Loan Parties debtor-in-possession secured term loans in an aggregate principal amount of two million fourteen thousand four hundred fourteen and 00/100 Dollars ($2,014,414.00); and

WHEREAS, the Lenders are willing to make the DIP Loans (as such term is defined in this Agreement) described herein on the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Lenders and Loan Parties agree as follows:

1. **DEFINITIONS AND CONSTRUCTION**.

    **1.1** **Definitions**. As used in this Agreement, the following terms shall have the following definitions:

    "**Affiliate**" means, with respect to any Person, any other Person that owns or controls directly or indirectly such Person, or any Person that controls or is controlled by or is under common control with such Person.

    "**Applicable Law**" means, as to any Person, any law (statutory or common), treaty, rule or regulation of a Governmental Authority or determination of a court or binding arbitrator, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

    "**Bankruptcy Code**" means title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Washington.

    "**Bankruptcy Sale**" means a sale pursuant to section 363 of the Bankruptcy Code of all or substantially all assets (measured by both aggregate value and number of assets) and other rights of the Debtor(s) on such terms acceptable to Lenders in their Permitted Discretion.

    "**Bankruptcy Sale Order**" means an order of the Bankruptcy Court, in form and substance acceptable to the Lenders approving and authorizing a Bankruptcy Sale.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Washington are authorized or required to close.

"**Case**" and "**Cases**" have the respective meanings set forth in the recitals.

"**Causes of Action**" means claims or causes of action of any kind or nature that are held or controlled by the Loan Parties, or that constitute property of the Loan Parties or their bankruptcy estates including, without limitation, claims pursuant to sections 544, 547, 548, 549 and 550 of the Bankruptcy Code, as well as any claims or causes of action of any kind or nature that are administered by any trust (including any liquidating trust created pursuant to the terms of a chapter 11 plan), any trustee (including liquidating trustee appointed pursuant to the terms of a chapter 11 plan), other estate representative, the reorganized Loan Parties to the extent that they confirm a chapter 11 plan of reorganization, or any successor in interest of each Loan Party in the Cases or any subsequent case commenced under the Bankruptcy Code;

"**Chief Restructuring Officer**" means Lance Miller.

"**Closing Date**" means the date on which the conditions specified in <u>Section 3.1</u> are satisfied.

"**Code**" means the Uniform Commercial Code as enacted in the State of Washington and the State of Delaware, as applicable.

"**Collateral**" means (i) the Litigation Collateral and (ii) the CS2 Loan Receivable to the extent of $1,000,000 in principal and accrued interest, including all proceeds thereof; provided that, for the avoidance of doubt, the Collateral shall not include the proceeds of any settlement of claims against Tritalent prior to confirmation of a chapter 11 plan in the Cases to the extent that such settlement includes an extension of credit to the Debtors subordinate in all respects to the Credit Extensions.

"**Commitment**" means, with respect to each Lender, such Lender's commitment to make the DIP Loans as set forth on the Commitment Schedule.

"**Commitment Schedule**" means the Schedule attached hereto as **<u>Exhibit A</u>**.

"**Committee**" means the official committee of unsecured creditors appointed in the Cases by the U.S. Trustee.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another; (ii) any reimbursement obligations with respect to undrawn letters of credit; and (iii) all obligations arising under any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; <u>provided</u>, <u>however</u>, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Lenders in good faith; <u>provided</u>, <u>however</u>, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"**Copyrights**" means any and all copyright rights, copyright applications, copyright registrations, and like protections in each work or authorship and derivative work thereof.

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 53 of 151

"**Credit Extension**" means any extension of credit by the Lenders for the benefit of the Loan Parties hereunder, including the DIP Loans.

"**CS2 Loan Receivable**" means (i) the loan that CS2 Real Estate Development LLC owes to Vault Holding LLC (the "**CS2 Property**") and any proceeds thereof; and (ii) any other funds or proceeds that CS2 Real Estate Development LLC receives on account of or in connection with the sale or disposition of the any of the Debtors' interest in the CS2 Property or the real property identified in that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated as of July [__], 2024, by and between CS2 Real Estate Development LLC, CS Real Estate Development LLC, Tiffany LuLu Yi, Qing Zhong, and JM 1 Holdings, LLC, as subsequently amended or modified.

"**Debtor**" has the meaning set forth in the recitals.

"**Default**" means any event or circumstance that, with the passage of time or giving of notice, would unless cured or waived, constitute an Event of Default.

"**Default Rate**" has the meaning given to such term in <u>Section 2.2(b)</u> hereof.

"**DIP Loans**" has the meaning given to such term in <u>Section 2.1(a)</u> hereof.

"**DIP Loan Commitment**" means each Commitment, which in the aggregate, is not to exceed two million fourteen thousand four hundred fourteen and 00/100 Dollars ($2,014,414.00).

"**DIP Loan Facility**" means the credit facility and loans evidenced by, and pursuant to the terms and conditions set forth in, this Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"**Event of Default**" has the meaning assigned in <u>Section 8</u>.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Lenders or required to be withheld or deducted from a payment to Lenders, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of a Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any U.S. federal withholding Taxes imposed on amounts payable to or for the account of a Lender with respect to any obligations under this Agreement pursuant to a law in effect on the date the Lender acquired its interest in such obligations or on the date that Lender changes its lending office, except, in each case, to the extent that amounts with respect to such Taxes were payable to Lender immediately before the date it acquired such interest or changed its lending office, (c) Taxes that are attributable to Lender's failure to comply with <u>Section 2.5</u>, and (d) any U.S. federal withholding Taxes imposed under FATCA. For purposes of this definition, any reference to Lender shall be deemed to include a Foreign Lender.

"**Extended Maturity Date**" means the first day of the month that is one year after the Original Maturity Date.

"**FATCA**" means sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any

agreement entered into pursuant to section 1471(b)(1) of the Internal Revenue Code, any intergovernmental agreement entered into in connection with the implementation of such sections of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to, or official interpretations implementing such, intergovernmental agreements.

"**Fees**" means each and all of the amounts set forth in <u>Section 2.3</u>.

"**Final Order**" means a final order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof with the consent of the Lenders, which consent shall not be unreasonably withheld) authorizing the DIP Loans, with changes to such form as are satisfactory to the Lenders, approving the Loan Documents and authorizing the Obligations and DIP Loans in such amounts as are contemplated by <u>Section 2.1(a)</u>, and authorizing the granting of Liens provided for herein.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**GAAP**" means generally accepted accounting principles as in effect from time to time.

"**Governmental Authority**" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Highest Lawful Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations evidenced by this Agreement and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the DIP Loans.

"**Indebtedness**" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all Contingent Obligations, and (d) all capital lease obligations.

"**Indemnified Party**" has the meaning given to such term in <u>Section 15.2</u> hereof.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Lenders under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Insolvency Proceeding**" means any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extension generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"**Intellectual Property**" means all right, title, and interest owned by Loan Parties in and to the following: Copyrights, Trademarks (excluding any U.S. intent-to-use trademark application for which a statement of use has not been filed with and duly accepted by the United States Patent and Trademark Office, but only until such statement is accepted by the United States Patent and Trademark Office), and Patents; trade secrets, design rights, claims for damages by way of past, present and future

infringement of any of the rights included above, and all license fees and royalties arising from licenses or rights to use such intellectual property rights; all amendments, renewals and extensions of any of such Copyrights, Trademarks, or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"**Interest Rate**" has the meaning given to such term in Section 2.2(a) hereof.

"**Investment**" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**KH DIP Lender**" means Keith Holdings, LLC.

"**Lenders**" means the Persons listed on the Commitment Schedule.

"**Lender Expenses**" means all reasonable and documented out-of-pocket expenses and costs (including reasonable attorneys' fees and expenses) incurred by (i) the KH DIP Lender in connection with (a) preparing, negotiating, defending and enforcing the Loan Documents (including, without limitation, with respect to prior versions of the Loan Documents), or (b) with respect to the Cases (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings), all reasonable search, filing, recording, and title insurance charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by or otherwise incurred by the KH DIP Lender; and (ii) the Socotra DIP Lenders in connection with the enforcement of the obligations of the Debtors under this Agreement and the exercise of any rights and remedies of the Socotra DIP Lenders against the Debtors, whether under the terms of this Agreement or applicable law.

"**Lien**" means with respect to the Collateral, any mortgage, lien, deed of trust, charge, pledge, security interest, or other encumbrance.

"**Litigation Collateral**" means the Causes of Action and all proceeds recovered by Loan Parties, any trust (including any liquidating trust created pursuant to the terms of a chapter 11 plan), any trustee (including liquidating trustee appointed pursuant to the terms of a chapter 11 plan), other estate representative, the reorganized Loan Parties to the extent that they confirm a chapter 11 plan of reorganization, or any successor in interest of each Loan Party in the Cases or any subsequent case commenced under the Bankruptcy Code, or any other Person pursuant to the Causes of Action, including, without limitation, any real property assets; provided that, for the avoidance of doubt, the Collateral shall not include the proceeds of any settlement of claims against Tritalent prior to confirmation of a chapter 11 plan in the Cases to the extent that such settlement includes an extension of credit to the Debtors subordinate in all respects to the Credit Extensions.

"**Loan Documents**" means, collectively, this Agreement, any note or notes executed by Loan Parties, the Final Order and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"**Loan Party**" and "**Loan Parties**" have the meanings set forth in the recitals.

"**Loan Parties' Books**" means all of the Loan Parties' books and records including: ledgers; records concerning Loan Parties' assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"**Material Adverse Effect**" means a material adverse effect on (i) the business, operations, condition (financial or otherwise), or prospects of any Loan Party, (ii) the value of the Collateral taken as a whole or the validity or priority of Lender's security interests in any Collateral, (iii) the validity or enforceability of this Agreement or any of the other Loan Documents, (iv) the Lenders' ability to enforce their rights or remedies hereunder or under any of the other Loan Documents, or (v) the Loan Parties' ability to perform their payment and other material obligations under the Loan Documents to which they are parties; <u>provided</u> that the term "Material Adverse Effect" will not be deemed to exist as a result of the Cases or the circumstances and events leading up thereto.

"**Maturity Date**" means the earlier of: (i) the Original Maturity Date, unless extended in accordance with <u>Section 2.1(e)</u>, in which case the Maturity Date shall be the Extended Maturity Date, or (ii) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loan in accordance with the terms of this Agreement.

"**Negotiable Collateral**" means all letters of credit of which a Loan Party is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and a Loan Party's Books relating to any of the foregoing.

"**Obligations**" means all indebtedness, debt, principal, interest, Fees, and other amounts owed to Lenders by the Loan Parties pursuant to this Agreement.

"**Option to Extend**" has the meaning given to such term in <u>Section 2.1(e)</u> hereof.

"**Original Maturity Date**" means the date that is eighteen (18) months after the Final Order Entry Date.

"**Other Connection Taxes**" means, with respect to the Lenders, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Tax (other than connections arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any loan hereunder or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Paydown**" has the meaning given to such term in <u>Section 4.2</u> hereof.

"**Payment Date**" has the meaning given to such term in <u>Section 2.2(c)</u> hereof.

"**Patents**" means all patents, patent applications, and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 57 of 151

"**Patriot Act**" has the meaning given to such term in <u>Section 15.12</u> hereof.

"**Perfection Certificate**" means that certain Perfection Certificate in the form provided by Lenders dated as of the Closing Date and delivered by the Loan Parties to the Lenders.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of its commercially reasonable (from the perspective of a first priority perfected secured asset based lender) business judgment based on how an asset based lender with similar rights providing a credit facility of the type provided under this Agreement would act in similar circumstances at the time with the information then available to it.

"**Permitted Indebtedness**" means:

      (a)      Indebtedness of the Loan Parties in favor of Lenders arising under this Agreement, any other Loan Document;

      (b)      the Serene Obligations;

      (c)      Indebtedness in the form of accrued and unpaid administrative claims in the Cases;

      (d)      Indebtedness to trade creditors incurred in the ordinary course of business;

      (e)      Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business; and

      (f)      Indebtedness of the Loan Parties in connection with the Senior Financing Facility.

"**Permitted Investment**" means:

      (a)      Investments existing on the Closing Date disclosed to Lenders in writing on or before the Closing Date; and

      (b)      Investments held by the Loan Parties in (i) cash and cash deposits that are maintained at a bank or other financial institution that is insured by the Federal Deposit Insurance Corporation, or (ii) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one (1) year from the date of acquisition thereof, and/or (iii) money market account funds held at financial institutions reasonably acceptable to Lenders in Lenders' Permitted Discretion.

"**Permitted Liens**" means the following:

      (a)      Any Liens existing on the Closing Date and disclosed to Lenders in writing on or before the Closing Date;

      (b)      [Reserved];

      (c)      any Liens arising under this Agreement or the other Loan Documents;

      (d)      Liens for taxes, fees, assessments, or other governmental charges or levies, either not yet delinquent or being contested in good faith by appropriate proceedings;

      (e)      [Reserved];

(f)  pledges or deposits in connection with workers' compensation, unemployment insurance, and other social security legislation, or letters of credit or guarantees issued in respect thereof, other than any Lien imposed by ERISA;

(g)  Liens arising from judgments, decrees, or attachments in circumstances not constituting an Event of Default under Sections 8.4 (attachment) or 8.8 (judgments/settlements);

(h)  the filing of UCC financing statements solely as a precautionary measure in connection with operating leases and consignment arrangements;

(i)  Subject to Section 6.7, Liens in favor of other financial institutions arising in connection with a Loan Party's deposit accounts held at such institutions to secure standard fees for deposit services charged by, but not financing made available by such institutions;

(j)  [Reserved];

(k)  [Reserved];

(l)  Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (i) above, provided that any extension, renewal, or replacement Lien shall be limited to the property encumbered by the existing Lien in the existing priority of such existing Lien, and the principal amount of the indebtedness being extended, renewed or refinanced does not increase;

(m)  Liens granted in connection with a contingency fee arrangement for legal fees incurred in connection with pursuing Causes of Action; and

(n)  Liens granted to secure the Indebtedness of the Loan Parties in connection with the Senior Financing Facility.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity, or governmental agency.

"**Petition Date**" has the meaning set forth in the recitals.

"**Pre-petition Socotra Deed of Trust**" means that certain Deed of Trust, Assignment of Leases and Rents, Fixture Filing, and Security Agreement dated December 15, 2022, executed by debtor VH 2nd Street Office, LLC.

"**Pre-petition Socotra Lender**" means Socotra REIT I, LLC.

"**Pre-petition Socotra Loans**" means the loan made by Socotra REIT I, LLC to debtor VH 2nd Street Office, LLC in the original principal amount of $3,000,000.00 evidenced by the Pre-petition Socotra Loan Agreement, and further evidenced by the Pre-petition Socotra Note.

"**Pre-petition Socotra Loan Agreement**" means that certain Loan and Security Agreement dated December 15, 2022 by and between the Pre-petition Socotra Lender and debtor VH 2nd Street Office, LLC.

"**Pre-petition Socotra Loan Documents**" means the Pre-petition Socotra Loan Agreement, the Pre-petition Socotra Note, the Pre-petition Socotra Deed of Trust, and any other documents relating to or executed in connection with the Pre-petition Socotra Loans.

"**Pre-petition Socotra Note**" means that certain Secured Note dated December 15, 2022, executed and delivered by debtor VH 2nd Street Office, LLC and payable to the Pre-petition Socotra Lender. The Pre-petition Socotra Note was partially assigned to WE Alliance Secured Income Fund, LLC ("**WE Alliance**") and Jason Yelowitz, Trustee of the Yelowitz Trust.

"**Pre-petition Socotra Obligations**" means all Indebtedness, including but not limited to, principal, interest, fees, costs and expenses, owed by VH 2nd Street Office, LLC pursuant to the Pre-petition Socotra Loan Documents.

"**Professional Fees Cap**" has the meaning given to such term in Section 2.3(c)(i) hereof.

"**Responsible Officer**" means the Chief Restructuring Officer.

"**Second Street Reserve**" means the approximately $3,240,000 in sale proceeds held by VH 2nd Street Office, LLC in a reserve account that are subject to Liens in favor of the Socotra DIP Lenders.

"**Senior Financing Facility**" means a secured credit facility that may be extended by the Senior Lender or an alternative lender to one or more of the Debtors, or their successors, as applicable, in an original principal amount not to exceed seven million and 00/100 Dollars ($7,000,000).

"**Senior Lender**" means iCap DIP Finance Group LLC or an alternative lender that executes the Subordination Agreement.

"**Serene**" means Serene Investment Management, LLC.

"**Serene Obligations**" means all debt, principal, interest, fees, and other amounts owned to Serene by the Loan Parties pursuant to that certain Debtor-in-Possession Loan and Security Agreement dated October 3, 2023.

"**Socotra DIP Lenders**" means Socotra REIT I, LLC and WE Alliance Secured Income Fund, LLC.

"**Socotra DIP Loan**" means the DIP Loan extended by the Socotra DIP Lenders.

"**Socotra Settlement Agreement**" means that certain Settlement Agreement by and among the Loan Parties, the Socotra DIP Lenders, and the Yelowitz Trust dated July [__], 2024.

"**Subordinated Lenders**" means the Socotra DIP Lenders and the Yelowitz Trust.

"**Subordination Agreement**" means that certain Subordination Agreement by and between the Senior Lender, and the Subordinated Lenders, attached as Exhibit B to this Agreement.

"**Subordination Date**" has the meaning given to such term in Section 4.2 hereof.

"**Superpriority Claim**" means a claim against any Debtor in a Case that is an administrative expense claim having priority over any and all administrative expenses, diminution claims, and all other claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever,

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 60 of 151

including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 552(b), 726, 1113, or 1114 of the Bankruptcy Code.

"**Tax**" or "**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or other charges imposed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto.

"**Trademarks**" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of the Loan Parties connected with and symbolized by such trademarks.

"**Transaction Fee**" has the meaning given to such term in <u>Section 2.3(d)</u> hereof.

"**Tritalent**" means Tritalent Funding Group, Inc. and Halton Co.

"**UCC**" means the Uniform Commercial Code, as from time to time in effect in the State of California.

"**U.S. Trustee**" means the United States Trustee for the Eastern District of Washington.

"**Yelowitz Trust**" means the Jason Yelowitz 2006 Trust, Dated March 31, 2006.

**Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lenders) and all calculations made hereunder shall be made in accordance with GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lenders).  When used herein, the terms "financial statements" shall include the notes and schedules thereto.

2. **LOAN AND TERMS OF PAYMENT**.

2.1 **Credit Extensions**.  The Loan Parties promise to pay to the order of Lenders, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lenders to the Loan Parties hereunder.

(a) **Term Loan**. Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in <u>Section 3.1</u>), each Lender agrees, severally and not jointly, to make Credit Extensions in an amount not to exceed their DIP Loan Commitment (each such Credit Extension, a "**DIP Loan**"). Notwithstanding anything to the contrary herein, the Socotra DIP Loan shall be funded by the Second Street Reserve. For the avoidance of doubt, the Socotra DIP Lenders shall have no obligation under this Agreement or otherwise to make any Credit Extension in cash. The DIP Loans shall be subject to the conditions precedent set forth in <u>Section 3.1</u> and shall be extended to the Loan Parties substantially concurrent with the Final Order Entry Date.  Amounts borrowed under this <u>Section 2.1(a)</u> may not be reborrowed once repaid.

(b) [Intentionally Omitted].

(c) [Intentionally Omitted].

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 61 of 151

(d)      All Credit Extensions under this <u>Section 2.1</u> and all accrued and unpaid interest thereon shall be repaid in full by the Loan Parties on the Maturity Date, subject to the terms of the Subordination Agreement.

(e)      The Loan Parties shall have a one-time option to extend the term of the Loan from the Original Maturity Date to the Extended Maturity Date (the "**Option to Extend**"). The Loan Parties shall provide Lenders with written notice of Loan Parties' request to exercise the Option to Extend not less than thirty (30) days prior to the Original Maturity Date. The effectiveness of the Loan Parties' exercise of the Option to Extend shall be conditioned upon the Loan Parties' payment in cash of all accrued and unpaid interest on the Socotra DIP Loan to the Socotra DIP Lenders.

(f)      Upon the closing of the Senior Financing Facility with the Senior Lender, the portion of the Obligations owed to the KH DIP Lender shall convert into obligations under such Senior Financing Facility.

**2.2**      **Payment of Interest on the DIP Loans**.

(a)      <u>Interest Rate</u>.  Subject to <u>Section 2.2(b)</u>, the principal amount advanced and outstanding by the Lenders under the DIP Loan Facility shall accrue interest at a per annum rate equal to 13% (the "**Interest Rate**").

(b)      <u>Default Rate</u>.  After the occurrence and during the continuance of an Event of Default, to the extent permitted by Applicable Law, the principal balance advanced and outstanding shall bear interest at a rate per annum which is four percentage points (4%) above the Interest Rate that is otherwise applicable thereto (the "**Default Rate**").  Payment or acceptance of the increased interest rate provided in this <u>Section 2.2(b)</u> is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Lenders.

(c)      <u>Payment</u>.  Accrued interest on the DIP Loans shall be (i) payable with respect to the DIP Loans other than the Socotra DIP Loan monthly in arrears on the first calendar day of each month (each a "**Payment Date**"); <u>provided</u> that such interest shall be capitalized and added to the aggregate outstanding principal amount of the DIP Loans on such Payment Date in lieu of cash payment (and shall be treated as advanced hereunder and as principal amount of the DIP Loans at all times thereafter), and (ii) with respect to the Socotra DIP Loan, payment of accrued interest shall be deferred until the Subordination Date, and on the Subordination Date, accrued and unpaid interest with respect to the Socotra DIP Loan shall be paid in cash to Socotra DIP Lenders, and thereafter, accrued interest on the Socotra DIP Loans shall be payable in accordance with clause (i) hereof. For the avoidance of doubt, the Loan Parties shall remit payment in cash of all accrued and unpaid interest on the Socotra DIP Loan to the Socotra DIP Lenders as a condition to exercising the Option to Extend, and the Loan Parties continue to make all monthly payments of interest on the Socotra DIP Loan to the Socotra DIP Lenders in accordance with this <u>Schedule 2.2(c)</u> during the period between the Original Maturity Date and the Extended Maturity Date.

(d)      [Intentionally Omitted].

**2.3**      **Fees**.  The Loan Parties shall pay to Lenders:

(a)      [Intentionally Omitted].

(b)      [Intentionally Omitted].

23-01243-WLH11   Doc 1087   Filed 07/16/24   Entered 07/16/24 17:29:53   Pg 62 of 151

(c)     Lender Expenses.

(i)     All Lender Expenses (including reasonable and documented attorneys' fees and expenses for documentation and negotiation of this Agreement, incurred through and after the Final Order Entry Date, shall be paid when due (or, if no stated due date, within ten (10) days of written demand from the KH DIP Lender or the Socotra DIP Lenders, as applicable, which Lender Expenses must be fully paid upon the Maturity Date). Lender Expenses are subject to a professionals fee expense cap of $150,000.00 in the aggregate (the "**Professional Fees Cap**"). For the avoidance of doubt, the Loan Parties shall be responsible for all Lender Expenses, including, without limitation, any and all reasonable and documented expenses of the KH DIP Lender's and the Socotra DIP Lenders' attorneys, professional advisors, or in house administration, but not to exceed the Professional Fees Cap; provided, however, that if there is an Event of Default at any time, the Professional Fees Cap shall not apply with respect to Lender Expenses incurred during or relating to such Event of Default.

(ii)     None of Lenders' attorneys' fees or disbursements shall be subject to the prior approval of the Bankruptcy Court and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court. Notwithstanding the foregoing, the Bankruptcy Court retains all jurisdiction in regard to a dispute between the Loan Parties regarding the reasonableness of the asserted Lender Expenses.

(d)     Transaction Fee. Separate from and in addition to the Lender Expenses, the Loan Parties shall pay a transaction fee in the amount of twenty-five thousand dollars ($25,000.00) (the "**Transaction Fee**") for fees and costs relating to the due diligence, documentation, and other services performed by the KH DIP Lender's counsel with respect to the KH DIP Lender's agreement to provide a DIP Loan and participate in an exit facility financing. The Transaction Fee shall be paid directly to the law firm of Shulman Bastian Friedman & Bui, LLP, immediately upon execution of this Agreement, but shall be subject to confirmation by the Bankruptcy Court pursuant to the Final Order. The Loan Parties shall seek approval of the Transaction Fee in connection with approval of this DIP Loan Facility.

(e)     Fees Fully Earned. Unless otherwise provided in this Agreement or in a separate writing by Lenders, the Loan Parties shall not be entitled to any credit, rebate, or repayment of any Lender Expenses paid or other fees earned by Lenders pursuant to this Agreement, notwithstanding any termination of this Agreement.

**2.4     Crediting Payments**. Lenders have the exclusive right to determine the order and manner in which all payments with respect to the Obligations may be applied. The Loan Parties shall have no right to specify the order or the accounts to which Lenders shall allocate or apply any payments required to be made by the Loan Parties to Lenders or otherwise received by Lenders under this Agreement when any such allocation or application is not specified elsewhere in this Agreement. Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lenders after 2:00 p.m. Pacific Time shall be deemed to have been received by Lenders as of the opening of business on the immediately following Business Day. Whenever any payment to Lenders under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day.

**2.5     Withholding**.

(a)     Payments received by Lenders from the Loan Parties under this Agreement will be made free and clear of and without deduction for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of the Loan Parties) requires the Loan Parties to make any withholding or deduction of any Tax from any such payment, then the Loan Parties shall be

entitled to make such deduction or withholding and, if such Tax is an Indemnified Tax, then the sum payable by the Loan Parties shall be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lenders receive a net sum equal to the sum which they would have received had no withholding or deduction been required.

(b)     The Loan Parties shall pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable law, the Bankruptcy Code, and orders of the Bankruptcy Court, and the Loan Parties will, upon request, furnish Lenders with proof reasonably satisfactory to Lenders indicating that the Loan Parties has made such withholding payment.

(c)     Notwithstanding anything to the contrary in this Section 2.5, the Loan Parties need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings or as to which payment in full is bonded or reserved against by the Loan Parties.  The agreements and obligations of the Loan Parties contained in this Section 2.5 shall survive the termination of this Agreement.

(d)     Lenders, if reasonably requested by the Loan Parties, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Loan Parties as will enable the Loan Parties to determine whether or not Lenders are subject to backup withholding or information reporting requirements.

(e)     If a Lender determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.5 (including by the payment of additional amounts pursuant to this Section 2.5), it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made by the Loan Parties under this Section 2.5 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Parties, upon the request of Lender, agrees to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant taxing authority) to the Lender in the event the Lender is required to repay such refund to such taxing authority.

**2.6     Term**.  This Agreement shall become effective on the Closing Date and, subject to Section 15.8, shall continue in full force and effect for so long as any Obligations remain outstanding.

**2.7     Right to Credit Bid**.  In connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by Lenders, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, section 363(k) of the Bankruptcy Code, the Loan Parties hereby give Lenders the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

3.     **CONDITIONS OF THE DIP LOANS**.

**3.1     Conditions Precedent to DIP Loans**.  The obligation of the Lenders to make the DIP Loans is subject to the satisfaction of the following conditions precedent:

(a)     Lenders shall have received, in form and substance satisfactory to Lenders, the following:

(i)        executed copies of this Agreement and the other Loan Documents;

(ii)       such other documents, and completion of such other matters, as Lenders may reasonably deem necessary or appropriate;

(b)      the Final Order Entry Date shall have occurred, and the Final Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Lenders and shall not be subject to a stay;

(c)      The Loan Parties, the Socotra DIP Lenders, and the Yelowitz Trust shall have executed the Socotra Settlement Agreement, and the Bankruptcy Court shall have entered a final order approving the Socotra Settlement Agreement;

(d)      The Loan Parties shall have paid Socotra $1,139,586 from the Second Street Reserve, leaving a balance of $486,000 on account of the principal portion of the Pre-petition Socotra Note held by the Yelowitz Trust, in accordance with the terms of the Socotra Settlement Agreement;

(e)      The Lenders shall be satisfied that there is no action or proceeding pending before any court or Governmental Authority, litigation, or investigation, pending or threatened in writing against any Loan Party wherein an unfavorable judgment, decree, or order could (i) result in a Material Adverse Effect, (ii) declare unlawful any of the Loan Documents, or (iii) reasonably be expected to cause any of the Loan Documents or DIP Loans to be rescinded; and

(f)      The funding of the DIP Loans shall not cause the aggregate amount of DIP Loans to exceed the amount authorized by the Final Order.

      **3.2**      **[Intentionally Omitted].**

**4.**      **CREATION OF SECURITY INTEREST**.

      **4.1**      **Grant of Security Interest**.  To secure prompt repayment of any and all Obligations and prompt performance by the Loan Parties of each of their covenants and duties under the Loan Documents, the Loan Parties grant to the Lenders, as set forth below, continuing security interests in all presently existing and hereafter acquired or arising Collateral. Such security interests shall constitute:

(a)      a valid, perfected, priming first priority Lien on the Litigation Collateral granted to the Lenders;

(b)      a valid, perfected, priming first priority Lien on the CS2 Loan Receivable and all proceeds thereof up to a sum of one million and 00/100 Dollars ($1,000,000.00) in principal and accrued interest granted to the Socotra DIP Lenders.

      **4.2**      **Covenant to Subordinate.** The Subordinated Lenders agree that upon the earlier of (i) a partial paydown of the Socotra DIP Loan in the amount of one million and 00/100 Dollars ($1,000,000.00) plus payment of accrued interest on the Socotra DIP Loan ("**Paydown**") or (ii) receipt by the Socotra DIP Lenders of a restated CS2 Loan Receivable acceptable to the Socotra DIP Lenders in their reasonable discretion plus payment of accrued interest on the Socotra DIP Loan (such date, the "**Subordination Date**"), the Subordinated Lenders' Lien on the Litigation Collateral will be subordinated to the Lien granted to the Senior Lender in connection with the Senior Financing Facility on the terms and conditions set forth in the Subordination Agreement. The Socotra DIP Lenders further agree that upon a Paydown, the Socotra DIP Lenders' Lien on the CS2 Loan Receivable shall be released.

**4.3** **Delivery of Additional Documentation Required**. The Loan Parties shall from time to time execute and deliver to Lenders, at the request of any Lender, all Negotiable Collateral, all financing statements, deeds, deeds of trust, bills of sale, security agreements, mortgages, hypothecations, real estate transfer documentation, and other documents that such Lender may reasonably request, in form satisfactory to such Lender, to perfect and continue the perfection of Lenders' security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents. Notwithstanding the foregoing, the Liens granted hereunder shall be and hereby are, immediately deemed duly perfected and recorded under all applicable federal or state or other laws as of the date of this Agreement, and no notice, filing, mortgage recordation, possession, or other third party consent or act shall be required to effect such perfection.

**4.4** **Authorization to File Financing Statements**. The Loan Parties hereby authorize Lenders to file financing statements with all appropriate jurisdictions to perfect or protect Lenders' interests or rights hereunder.

**5.** **REPRESENTATIONS AND WARRANTIES**.

Each Loan Party represents and warrants as follows:

**5.1** **Due Organization and Qualification**. The Loan Parties are corporations or limited liability companies duly existing under the laws of their respective states of incorporation or registration and qualified and licensed to do business in any state in which the conduct of their respective businesses or ownership of property requires that it be so qualified, except in each case (other than with respect to their states of incorporation) where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.

**5.2** **Due Authorization; No Conflict**. Subject to the entry of the Final Order and the terms hereof, the execution, delivery, and performance of the Loan Documents are within each Loan Party's powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in any Loan Party's Certificate of Incorporation, Article of Organization, or Bylaws, as applicable, nor will they constitute an event of default under any material agreement to which any Loan Party is a party or by which a Loan Party is bound. No Loan Party is in default under any post-petition agreements to which it is a party or by which it is bound, except to the extent such default would not reasonably be expected to cause a Material Adverse Effect.

**5.3** **No Prior Encumbrances**. Each Loan Party holds the Collateral free and clear of Liens, except for Permitted Liens and subject to any liens set forth in the title commitment delivered to Lenders and approved at Closing. Each Loan Party represents that the Collateral is not subject to any Liens in favor of Serene.

**5.4** **Diligence**. The Loan Parties are not aware of any fact, condition or circumstance that may materially and adversely affect the assets, liabilities, business, prospects, condition, or results of operations of the Loan Parties that has not been previously disclosed to the Lenders in writing

**5.5** **Name; Location of Business**. The Loan Parties will advise Lenders not less than ten (10) Business Days in advance of any change in the business headquarters of any Loan Party. Except as disclosed in the Perfection Certificate, the Loan Parties have not done business under any names other than those specified on the relevant signature page hereof.

**5.6    Litigation**.  Except as disclosed in writing to Lenders, there are no actions or proceedings (other than the Cases) pending by or against Loan Party before any court or administrative agency in which an adverse decision could reasonably be expected to have a Material Adverse Effect.

**5.7    Regulatory Compliance**.  Except for a prepetition deficiency under the Loan Parties' 401(k) plan, to the best of the Loan Parties' knowledge, the Loan Parties have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from the Loan Parties' failure to comply with ERISA that is reasonably likely to result in the Loan Parties' incurring any liability that could reasonably be expected to have a Material Adverse Effect.  No Loan Party is required to be registered as an "investment company" under the Investment Company Act of 1940.  The Loan Parties are not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System).  To the best of the Loan Parties' knowledge, the Loan Parties have complied with all the provisions of the Federal Fair Labor Standards Act except in each case where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.  To the best of the Loan Parties' knowledge, the Loan Parties have not violated any statutes, laws, ordinances or rules applicable to it, the violation of which could reasonably be expected to cause a Material Adverse Effect.

**5.8    [Intentionally Omitted]**.

**5.9    Taxes**.  Except as otherwise disclosed to Lenders, as of the Closing Date, the Loan Parties have filed or caused to be filed all material tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein, except (i) for taxes for which filing is not yet due, or (ii) for taxes that are being contested in good faith by appropriate proceedings and are reserved against (to the extent required by GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lenders) by the Loan Parties, or (iii) to the extent taxes are pre-petition taxes, or (iv) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.10    Subsidiaries**.  The Loan Parties do not own any stock, partnership interest, or other equity securities of any Person, except for Permitted Investments.

**5.11    Government Consents**.  The Loan Parties have obtained (or will obtain, as and when required under Applicable Law) all material consents, approvals, and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of the Loan Parties' business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

**5.12    Deposit and Securities Accounts**.  The Loan Parties maintain deposit or securities accounts only as set forth in the Perfection Certificate.

**5.13    Full Disclosure**.  No representation, warranty, or other statement made by the Loan Parties in any of the Loan Documents contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements not misleading when made, it being recognized by Lenders that the projections and forecasts provided by the Loan Parties in good faith and based upon assumptions that were reasonable at the time such projections were delivered and are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results.  No Loan Document has been amended.  To the Loan Parties actual knowledge, the Loan Documents are each in full force and effect and are not subject to any offset, claim, counterclaim or defense in favor of the Loan Parties.

**5.14    Use of Proceeds**. The Loan Parties shall use the proceeds of the DIP Loans in accordance with the Final Order exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds set forth in the Final Order):

(a)        to pay the Fees;

(b)        to the extent not included in Section 5.14(a), to pay certain costs, premiums, fees and expenses related to the Cases; and

(c)        to fund working capital and other needs of the Loan Parties, including, but not limited to, funding the investigation and/or pursuit of any litigation claims held by the Debtors.

Proceeds of the DIP Loan Facility shall not be used (a) by the Debtors, or any other party-in-interest, including the Committee, or any of their representatives, to challenge or otherwise contest or institute any proceeding of any kind or nature to determine the validity, perfection, enforceability, or priority of claims or security interests in favor of the Lenders, including, but not limited to, in relation to the Obligations and the Liens evidencing and securing the Obligations, and the Pre-petition Socotra Obligations and the Liens evidencing and securing the Pre-petition Socotra Obligations, or (b) to commence, prosecute, or defend any claim, motion, proceeding or cause of action of any kind or nature against Lenders and their agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims.  Notwithstanding the foregoing, nothing herein shall prohibit the Loan Parties or Committee from disputing the alleged occurrence of a default or Event of Default hereunder.

## 6.    AFFIRMATIVE COVENANTS.

Each Loan Party shall do all of the following:

**6.1    Good Standing**.  Each Loan Party shall maintain its corporate existence and good standing in its jurisdiction of incorporation and maintain qualification in each other jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect.  Each Loan Party shall maintain in force all necessary licenses, approvals, and agreements, the loss of which could have a Material Adverse Effect.

**6.2    Government Compliance**.  To the extent applicable, each Loan Party shall meet the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA.  Each Loan Party shall comply with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a Material Adverse Effect.

**6.3    Financial Statements, Reports, Certificates**.  The Loan Parties shall deliver the following to the Lenders:

(a)        Commencing 120 days after the Final Order Entry Date, and thereafter on a quarterly basis, within 30 days after the end of such quarter, a status report regarding the Causes of Action;

(b)        all reports filed, including monthly operating reports, filed with the Office of the United States Trustee;

(c)        [Intentionally Omitted].

(d)        (i) together with the reports described in clause (e) below, a report of any legal actions (other than claims asserted in the Cases) for worker's compensation, unemployment, or counter-

17

claims in intellectual property infringement proceedings that are pending against any Loan Party that could if adversely determined reasonably be expected to result in a Material Adverse Effect; and (ii) promptly upon receipt of notice thereof, a report of (x) any other legal actions (other than the Cases) pending against a Loan Party that could reasonably be expected to result in liability to a Loan Party of one hundred thousand dollars ($100,000.00) or more, or (y) any commercial tort claim acquired by a Loan Party;

(e)     [Intentionally Omitted];

(f)     written notice within five (5) Business Days' of the resignation from or termination of employment of any Responsible Officer; and

(g)     such other financial information as Lenders may request from time to time in their Permitted Discretion.

To the extent any of the foregoing reports or financial information are due on a day that is not a Business Day, the Loan Parties shall instead deliver such reports or financial information on the next Business Day.

**6.4     Right to Inspect**.  Each Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during a Loan Party's usual business hours to inspect Loan Party's Books and to make copies thereof and to check, test, and appraise the Collateral in order to verify a Loan Party's financial condition or the amount, condition of, or any other matter relating to, the Collateral; <u>provided</u> that no notice is required if an Event of Default has occurred and is continuing and provided further that during the continuance of an Event of Default all cost and fees associated with Lender's inspection shall be borne by the Loan Parties.

**6.5     Taxes**.  The Loan Parties shall make due and timely payment or deposit of all material Taxes required of it by law (including the Bankruptcy Code), provided that the Loan Parties need not make any payment if (i) the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender)) by Loan Parties and (ii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.6     [Intentionally Omitted]**.

**6.7     [Intentionally Omitted]**.

**6.8     Notice of Disputes, Claims**.  The Loan Parties must promptly notify Lenders of all returns, recoveries, disputes, claims, or litigation proceedings that involve more than one hundred thousand dollars ($100,000.00).

**6.9     Bankruptcy Filings**.  Not less than two (2) Business Days prior to filing any motion requesting approval for debtor-in-possession financing and use of cash collateral, the Loan Parties shall send copies of such motions to Lenders.

**6.10     Further Assurances**.  At any time and from time to time, the Loan Parties shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lenders to effect the purposes of this Agreement.

23-01243-WLH11     Doc 1087     Filed 07/16/24     Entered 07/16/24 17:29:53     Pg 69 of 151

**6.11    Debtor-in-Possession Obligations**.  To the extent applicable, each Loan Party shall comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

**6.12    [Intentionally Omitted].**

**6.13    [Intentionally Omitted].**

**6.14    Filing of Motions and Applications**.  Without the prior written consent of the Lenders, the Loan Parties shall not apply to the Bankruptcy Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the Loan Documents or the Final Order, (b) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Final Order, or (c) permit any Indebtedness (other than any Permitted Indebtedness), except as expressly stated in this Agreement or the Final Order.

**6.15    Superpriority Claim**.  The Debtors shall not incur, create, assume, suffer to exist or permit any other Superpriority Claim that is *pari passu* with or senior to the claims of the Lenders against the Loan Parties and/or the Collateral (other than any Superpriority Claims granted to professionals in connection with a contingency fee arrangement for legal fees incurred in connection with pursuing Causes of Action); provided however, that the Debtors may grant or allow to continue Superpriority Claims with respect to the Serene Obligations.

## 7.    NEGATIVE COVENANTS.

No Loan Party shall do any of the following:

**7.1    Dispositions**.  Convey, sell, lease, transfer, or otherwise dispose of any Collateral, except in connection with a chapter 11 plan in form and substance acceptable to the Lenders and confirmed by the Bankruptcy Court.

**7.2    [Intentionally Omitted]**.

**7.3    Mergers or Acquisitions**.  Other than in accordance with a Bankruptcy Sale Order or a chapter 11 plan confirmed by the Bankruptcy Court, merge, divide, or consolidate, with or into any other business organization, or acquire, all or substantially all of the capital stock or property of another Person.

**7.4    Indebtedness**.  Create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness.

**7.5    Encumbrances**.  (i) Create, incur, assume, or suffer to exist any Lien with respect to any of its Collateral except for Permitted Liens or (ii) enter into any agreement with any Person other than Lenders not to grant a security interest in, or otherwise encumber, any of its Collateral except with respect to any Permitted Liens.

**7.6    [Intentionally Omitted]**.

**7.7    Investments**.  Other than in accordance with a Bankruptcy Sale Order or a chapter 11 plan confirmed by the Bankruptcy Court, directly or indirectly acquire or own, or make any Investment

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 70 of 151

in or to any Person, other than Permitted Investments and any Loan Party's ownership interest in any subsidiary company in effect as of the Closing Date.

**7.8** **[Intentionally Omitted]**.

**7.9** **[Intentionally Omitted]**.

**8. EVENTS OF DEFAULT**.

Any one or more of the following events shall constitute an Event of Default by the Loan Parties under this Agreement:

**8.1** **Payment Default**. Except to the extent the holder thereof would be stayed from exercising remedies as a result of the Cases after accounting for the relief provided in the Final Order, if the Loan Parties fail to pay, when due, the Obligations. In the event of non-payment default, Lenders shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for non-payment has occurred;

**8.2** **Covenant Default**.

(a) If a Loan Party violates or fails to perform any obligation under Article 6 or Article 7 and such failure continues for ten (10) Business Days after Lenders deliver written notice thereof to the Loan Parties. In such event Lenders shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for non-compliance of a specified obligation under Article 6 or Article 7 has occurred; and

(b) If a Loan Party fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement not specified in Section 8.2 above, or in any of the other Loan Documents, for five (5) Business Days after Lenders deliver written notice thereof to the Loan Parties, provided, however, that if the default cannot by its nature be cured within the five (5) Business Days period or cannot after diligent attempts by the Loan Parties be cured within such five (5) Business Days period, and such default is likely to be cured within a reasonable time, then the Loan Parties shall have an additional reasonable period (which shall not in any case exceed thirty (30) calendar days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default. In such case and if an Event of Default is triggered under this Section 8.2(b), Lenders may notify the Committee, and the U.S. Trustee;

**8.3** **[Intentionally Omitted]**.

**8.4** **Attachment**. Other than in connection with the Cases in each case, if any material portion of the Loan Parties' assets are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any trustee, receiver, or Person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within thirty (30) calendar days without the same being contested by the Loan Parties in good faith, or if the Loan Parties are enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of their business affairs, or if a judgment or other claim becomes a Lien or material monetary encumbrance upon any material portion of the Loan Parties' assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of the Loan Parties' assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not removed, discharged, rescinded, or paid within thirty (30) calendar days after receipt of written notice from Lenders delivered to the Loan Parties, the

Committee, and the U.S. Trustee, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by the Loan Parties (provided that no Credit Extensions will be required to be made during such cure period);

**8.5     Assets**.  Provided that such conditions are not cured within thirty (30) calendar days after receipt of written notice from Lenders delivered to the Loan Parties, the Committee, and the U.S. Trustee: (a) the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any Collateral, which rights under section 506(c) of the Bankruptcy Code shall be waived (subject only to and effective upon entry of the Final Order), (b) any Person attempts to apply the doctrine of marshalling with respect to the Lenders, which shall be waived (subject only to and effective upon entry of the Final Order), or (c) any Person attempts to apply the "equities of the case" exception set forth in section 552(b) of the Bankruptcy Code, which shall be waived (subject only to and effective upon entry of the Final Order);

**8.6     Other Agreements**.  Except to the extent the counterparty thereto would be stayed from exercising remedies as a result of the Case, if there is an event of default in any material agreement to which any of the Loan Parties is a party or by which it is bound resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of one hundred thousand dollars ($100,000.00) or which could have a Material Adverse Effect;

**8.7     Lien Priority**.  If the Obligations shall not have the priority contemplated by this Agreement, or the entry of any order in the Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations;

**8.8     Judgments**.  If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least one hundred thousand dollars ($100,000.00) (excluding amounts covered by insurance or third party indemnification) shall be rendered against the Loan Parties and shall remain unsatisfied, unvacated or unstayed pending appeal for a period of sixty (60) calendar days after entry of such judgement;

**8.9     Misrepresentations**.  If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth herein or in any Loan Document or certificate delivered to Lenders and prepared by any Responsible Officer pursuant to this Agreement.  In such event Lenders shall provide the Loan Parties, the Committee and the U.S. Trustee written notice that an Event of Default for breach of this <u>Section 8.9</u> has occurred;

**8.10     Cases**.  Other than in accordance with a chapter 11 plan confirmed by the Bankruptcy Court, any Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code without the consent of the Lenders;

**8.11     Trustee**.  A trustee under chapter 7 or chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in the Cases;

**8.12     [Intentionally Omitted]**;

**8.13     Relief from Stay**.  The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties constituting Collateral

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 72 of 151

for the DIP Loans or (ii) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole);

**8.14    Final Order**. The Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected first priority Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lenders;

**8.15    Compliance with Orders**. Any of the Loan Parties shall fail to comply with the Final Order (on and after the Final Order Entry Date) in any material respect;

**8.16    Other Financing**. (a) Except as permitted in the Final Order, the entry of any order of the Bankruptcy Court granting to any third party a Superpriority Claim or Lien *pari passu* with or senior to that granted to and/or for the benefit of the Lenders hereunder without the prior written consent of the Lenders in Lenders' Permitted Discretion (other than in connection with any financing that would repay the Obligations in full), (b) the Loan Parties shall file a motion or other pleading or support a motion or other pleading filed by any other Person requesting a Superpriority Claim or Lien *pari passu* with or senior to that granted to and/or for the benefit of the Lenders without the prior written consent of the Lenders in Lenders' Permitted Discretion (other than in connection with any financing that would repay the Obligations in full), (c) the Loan Parties shall make any payment of principal or interest or otherwise on account of any Indebtedness or payables other than (i) the Obligations under this Agreement, or (ii) the Serene Obligations, or (d) any Loan Party shall file or support a motion or other pleading seeking any of the foregoing; provided, however, that the Loan Parties are authorized, without the need for further consent of the Lenders, to grant a Lien or Superpriority Claim *pari passu* with or senior to that granted to for the benefit of the Lenders hereunder in connection with (a) a contingency fee arrangement for legal fees incurred in connection with pursuing Causes of Action) and (b) the Senior Financing Facility subject to the terms of the Subordination Agreement.

**8.17    Avoidance**. (a) Any suit or action is commenced against a Lender by the Loan Parties, or by any other Person with the Loan Parties' consent, that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender, or (b) the Bankruptcy Court rules in favor of any Person in any suit or action commenced against a Lender by or on behalf of such Person (after the Bankruptcy Court has granted such Person standing to commence such suit or action);

**8.18    Other Bankruptcy-Related Events of Default.** (a) any Loan Party contests the validity or enforceability of any provision of any Loan Document or the validity, extent, perfection, or priority of a Lien in favor of the Lenders on the Collateral or shall support or consent to any other Person contesting the foregoing; (b) any Loan Party, or any Person claiming by or through a Loan Party, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any Lender; or (c) any Loan Party attempts to consummate a sale of all or substantially all of its assets without the consent of the Lenders; or

**8.19    Impairment of Security, etc.** Any Loan Document, or any Lien granted thereunder, in whole or in part, shall terminate, cease to be effective or cease to be the legally valid, binding, and enforceable obligation of any Loan Party thereto, or any Loan Party or other Person shall contest in writing such effectiveness, validity, binding nature, or enforceability; or, except as permitted under any Loan Document, any Lien on any of the Collateral shall cease to be perfected.

The Court shall have jurisdiction to resolve any dispute between the Loan Parties and the Lenders regarding whether an Event of Default has occurred.

9. **LENDER'S RIGHTS AND REMEDIES**.

9.1 **Rights and Remedies**. During the continuance of an Event of Default, the Lenders may, at their election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by the Loan Parties:

(a) Subject to the Final Order, if any Event of Default has occurred and is continuing, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, the rate of interest applicable to the Loan shall be increased to the Default Rate.

(b) Subject to the Final Order, Lenders may, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from, the Bankruptcy Court: (i) declare all or any portion of the Obligations, including all or any portion of the DIP Loans to be forthwith due and payable, all without presentment, demand, protest, or further notice of any kind, all of which are expressly waived by the Loan Parties or (ii) exercise any rights and remedies provided to Lenders under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and pursuant to the Final Order, the automatic stay of section 362 of the Bankruptcy Code shall be modified and vacated to permit Lenders to exercise their remedies under this Agreement and the Loan Documents, without further notice, application, or motion to, hearing before, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, that Lenders shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of the Loan Parties in the Collateral only upon five (5) Business Days' prior written notice to the Loan Parties, counsel approved by the Bankruptcy Court for the Committee ,and the U.S. Trustee and as set forth in the Final Order (when applicable).

(c) **Waivers by the Loan Parties**. Except as otherwise provided for in this Agreement (including any notice required pursuant to any of the other Loan Documents) or that is not capable of being waived by Applicable Law, each Loan Party waives: (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lenders on which a Loan Party may in any way be liable, and hereby ratifies and confirms whatever Lenders may do in this regard, (ii) all rights to notice and a hearing prior to Lenders' taking possession or control of, or to Lenders' attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Lenders to exercise any of their remedies, and (iii) the benefit of all valuation, appraisal, marshaling, and exemption laws.

9.2 **Lenders' Liability for Collateral**. So long as the Lenders comply with reasonable commercial lending practices, Lenders shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever. All risk of loss, damage, or destruction of the Collateral shall be borne by the Loan Parties.

9.3 **Remedies Cumulative**. Lenders' rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Lenders shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity, subject to the requirements of the Bankruptcy Code. No exercise by Lenders of one right or remedy shall be deemed an election, and no waiver by Lenders of any Event of Default on the Loan Parties' part shall be deemed a continuing waiver. No delay by Lenders shall constitute a waiver, election, or acquiescence by it. No

waiver by Lenders shall be effective unless made in a written document signed on behalf of the Lenders and then shall be effective only in the instance and for the purpose for which it was given.

**9.4    Protective Payments**.  If any Loan Party fails to obtain the insurance called for by Section 6.6 or fails to pay any premium thereon or fails to pay any other amount that a Loan Party is obligated to pay under this Agreement or any other Loan Document or that may be required to preserve the Collateral, Lenders may obtain such insurance or make such payment, and all amounts so paid by Lenders are immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral.  Lenders will make reasonable efforts to provide the Loan Parties with notice of Lenders obtaining such insurance at the time it is obtained or within a reasonable time thereafter.  No payments by Lenders are deemed an agreement to make similar payments in the future or Lenders' waiver of any Event of Default.

**9.5    Demand; Protest**.  Except for any notice required pursuant to the Loan Documents or that is not capable of being waived by Applicable Law, the Loan Parties waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lenders on which the Loan Parties may in any way be liable.

**9.6    Savings Clause**.  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the DIP Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest that would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the DIP Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest that would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Loan Parties shall pay to Lenders an amount equal to the difference between the amount of interest due hereunder and the amount of interest that would have been due if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and the Loan Parties to conform strictly to any applicable usury laws. Accordingly, if Lenders contract for, charge, or receive any consideration that constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lenders' option be applied to the outstanding amount of the DIP Loans made hereunder or be refunded to the Loan Parties.

**9.7    Waiver of Consequential Damages; Etc.**  To the fullest extent permitted by Applicable Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnified Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnified Party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the fraud, bad faith, gross negligence, or willful misconduct of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction, **WHICH**

24

**LIMITATION OF LIABILITY SHALL APPLY REGARDLESS OF WHETHER THE LIABILITY ARISES FROM THE SOLE, CONCURRENT, CONTRIBUTORY, OR COMPARATIVE NEGLIGENCE OF THE INDEMNIFIED PARTY.**

**10.    NOTICES**.

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below.  Lenders or the Loan Parties may change their mailing or electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this <u>Section 10</u>:

| | |
|---|---|
| If to the Loan Parties: | Pivot Management Group, LLC<br>1230 Rosecrans Ave, Suite 530<br>Manhattan Beach, CA 90266<br>Attention:  Lance Miller<br>Email:  lance.miller@pivotgrp.com |
| | With a copy to (which does not constitute notice): |
| | O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, CA 90071<br>Attention:  Julian Gurule, Esq.<br>Email:  jgurule@omm.com |
| If to the KH DIP Lender: | Keith Holdings, LLC<br>1990 S. Bundy Dr., Suite 650<br>Los Angeles, CA 90025<br>Attention:  Kevin DeMeritt<br>Email:  k_demeritt@learcapital.com |
| | With a copy to (which does not constitute notice): |
| | Shulman Bastian Friedman & Bui LLP<br>100 Spectrum Center Drive, Suite 600<br>Irvine, CA 92618<br>Attention:  Alan J. Friedman, Esq. and Mimi Lin, Esq.<br>Emails:  AFriedman@shulmanbastian.com; MLin@shulmanbastian.com |
| If to the Socotra DIP Lenders: | Socotra REIT I, LLC<br>2714 V Street<br>Sacramento, CA 95818<br>Attention: Adham Sbeih and Paul Cotter |

Email: adham@socotracapital.com;
paul@socotracapital.com

With a copy to (which does not constitute notice):

K&L Gates
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Attention: Brian T. Peterson, Esq.
Email: Brian.Peterson@klgates.com

If to the Yelowitz Trust:           Jason Yelowitz
2976 Stonebridge Trail
Reno, NV 85911
Email: jyelowitz@yahoo.com

With a copy to (which does not constitute notice):

Tonkon Torp
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
Attention: Danny Newman
Email: danny.newman@tonkon.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

**11.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE**.

This Agreement was negotiated in the State of California, the DIP Loans were made by Lenders and accepted by the Loan Parties in the State of California, and the proceeds of the DIP Loans delivered pursuant hereto were disbursed from the State of California, which state the parties irrevocably and unconditionally agree has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects, including, without limiting the generality of the foregoing, matters of construction, validity and performance, each and all of this Agreement and the other Loan Documents, and the obligations arising hereunder and thereunder shall be governed by, and construed in accordance with, the laws of the State of California applicable to contracts made and performed in such state (without regard to principles of conflicts of laws) and any applicable law of the United States of America, except that at all times the attachment, creation, perfection, and enforcement of the liens and security interests created under the deeds of trust in favor of Lenders in respect of real property and/or personal property shall be governed by and construed according to the law of the state in which such real property is located, it being understood that, to the fullest extent permitted by the law of such state, the law of the State of California shall govern

the construction, validity, and enforceability of this Agreement, the DIP Loans, and all of the obligations arising hereunder or thereunder.

To the fullest extent permitted by law, each of the Loan Parties and each of the Lenders hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Agreement and/or the DIP Loans.

The Loan Parties and Lenders each further submit to the exclusive jurisdiction of the Bankruptcy Court; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Lenders from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations located in such other jurisdiction, or to enforce a judgment or other court order in favor of Lenders. The Loan Parties expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, and the Loan Parties hereby waive any objection that they may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consent to the granting of such legal or equitable relief as is deemed appropriate by such court. The Loan Parties hereby waive personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to the Loan Parties at the address set forth in, or subsequently provided by the Loan Parties in accordance with, Section 10 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of the Loan Parties' actual receipt thereof or three (3) calendar days after deposit in the U.S. mails, proper postage prepaid

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE LOAN PARTIES AND LENDERS EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS, OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY, AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

This Section 11 shall survive the termination of this Agreement.

## 12. BANKRUPTCY COURT.

For the avoidance of doubt, to the extent there is conflict between the terms of this Agreement and the terms of the Final Order, the Final Order shall control.

## 13. MULTIPLE BORROWERS.

**13.1 Joint and Several Liability; Surety Provisions.** Each Loan Party agrees that it is jointly and severally liable for, and absolutely, irrevocably and unconditionally guarantees to Lenders the prompt payment and performance of, all Obligations. Each Loan Party acknowledges and agrees that its Collateral secures and cross-collateralizes each Loan made hereunder.

**13.2 Marshalling.** Each Loan Party expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel Lenders to marshal assets or to proceed against any Loan Party, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Loan Party. Each Loan Party waives all defenses available to a surety, guarantor, or accommodation co-obligor other than full payment of all Obligations and waives, to the maximum extent permitted by law, any right to revoke any guaranty of any Obligations as long as it is a Loan Party. It is agreed among each Loan Party and each Lender that the

27

provisions of this Section 13.2 are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Lenders would decline to make DIP Loans.

**13.3     Consolidated Credit Facility.**  Each Loan Party has requested that Lenders make this DIP Credit Facility available to the Loan Parties on a combined basis, in order to finance the Loan Parties' business most efficiently and economically.  The Loan Parties' business is a mutual and collective enterprise, and the successful operation of each Loan Party is dependent upon the successful performance of the integrated group.  The Loan Parties believe that consolidation of their credit facility will enhance the borrowing power of each Loan Party and ease administration of the facility, all to their mutual advantage.

**13.4     Loan Party Subordination.**  Each Loan Party hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Loan Party, howsoever arising, to the full payment of all Obligations.

**13.5     One Obligation.**  The DIP Loans and other Obligations constitute one general obligation of the Loan Parties and are secured by Lenders' first priority Lien on all Collateral; provided, however, that Lenders shall be deemed to be a creditor of, and the holder of a separate claim against, each Loan Party to the extent of any Obligations jointly or severally owed by such Loan Party.

## 14.     OBLIGATIONS OF LENDERS SEVERAL.

The obligations of the Lenders hereunder to make the DIP Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to loan its respective portion of the  DIP Loans.

## 15.     GENERAL PROVISIONS.

**15.1     Successors and Assigns**.  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Loan Parties, the bankruptcy estate of each Loan Party, any trust (including any liquidating trust created pursuant to the terms of a chapter 11 plan), any trustee (including liquidating trustee appointed pursuant to the terms of a chapter 11 plan), other estate representative, the reorganized Loan Parties to the extent that they confirm a chapter 11 plan of reorganization, or any successor in interest of each Loan Party in the Cases or any subsequent case commenced under the Bankruptcy Code. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by the Loan Parties or, prior to the occurrence of an Event of Default, Lenders, without the other's prior written consent, which consent may be granted or withheld in such party's sole discretion. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Cases or any other bankruptcy case of the Loan Parties to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lenders file financing statements or otherwise perfect their Liens under applicable law.

**15.2     Indemnification**.  The Loan Parties shall defend, indemnify and hold harmless each Lender and its officers, employees, and agents (each an "**Indemnified Party**") against: (i)  all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (ii) all actual losses or actual Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or

consequential to transactions between Lender and the Loan Parties whether under this Agreement or the other Loan Documents, the DIP Loan Facility, the Cases, or otherwise (including without limitation reasonable attorneys' fees and expenses), provided, the foregoing shall specifically expressly exclude (a) any special, exemplary, punitive, or consequential damages (unless the same are asserted by a third party against Lender and awarded to such third party in a legal proceeding against Lender and paid (or payable) by Lender), lost profits and diminution in value and any (b) any losses caused by an Indemnified Party's fraud, bad faith, gross negligence, or willful misconduct. This Section 15.2 shall not apply to Taxes.

      **15.3**    **Time of Essence**. Time is of the essence for the performance of all obligations set forth in this Agreement.

      **15.4**    **Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

      **15.5**    **Amendments in Writing, Integration**. Except as expressly set forth herein, all amendments to or terminations of this Agreement or the Loan Documents must be in writing signed by each of the parties hereto. All prior agreements, understandings, representations, warranties, and negotiations between any of the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

      **15.6**    **Counterparts**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

      **15.7**    **Electronic Execution of Documents**. The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

      **15.8**    **Survival**. All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding (excluding any contingent payment obligations that expressly survive repayment of the DIP Loans and which, as of the date of such full repayment, have not yet ripened). The obligations of the Loan Parties to indemnify Lenders with respect to the expenses, damages, losses, costs, and liabilities described in Section 15.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lenders have run.

      **15.9**    **Confidentiality; Disclosure**. In handling any confidential information each Lender and all employees and agents of such Lender, including, but not limited to, accountants, shall exercise the same degree of care that they exercise with respect to their own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (i) to prospective transferees or purchasers of any interest in the DIP Loans, provided that they are similarly bound by confidentiality obligations, (ii) as required by law, regulations, rule or order, subpoena, judicial order, or

similar order (including in connection with the Cases), (iii) as may be required in connection with the examination, audit, or similar investigation of the Lenders and  as the Lenders may determine in connection with the enforcement of any remedies hereunder.  Confidential information hereunder shall not include information that either: (a)  is in the public domain or in the knowledge or possession of a Lender when disclosed to the Lender, or becomes part of the public domain after disclosure to the Lender through no fault of the Lender; or (b) is disclosed to the Lender by a third party, provided the Lender does not have actual knowledge that such third party is prohibited from disclosing such information.  The Loan Parties authorize the Lenders to disclose their relationship with the Loan Parties, including use of the Loan Parties' logo in Lenders' promotional materials.

       **15.10**    **[Intentionally Omitted**].

       **15.11**    **Transfer of the Loan.**  Lenders may, at any time, upon five (5) Business Days advance written notice to the Loan Parties (except following the occurrence and during the continuance of an Event of Default, during which time no advance written notice shall be necessary), sell, transfer, or assign a partial interest in the DIP Loan (but not their entire interest in the DIP Loan), or grant participations therein.  Any assignee shall be treated as a Lender for all purposes hereunder.

       **15.12**    **Patriot Act Notice**.  Lenders notify the Loan Parties that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**Patriot Act**"), they are required to obtain, verify, and record information that identifies the Loan Parties, which information includes names and addresses and other information that will allow Lenders to identify the Loan Parties in accordance with the Patriot Act.

       **15.13**    **Correction of Loan Documents**.  Lenders may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**<u>LOAN PARTIES</u>**

**UW 17TH AVE, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**725 Broadway, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**iCap Campbell Way, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**VH 1121 14TH, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**VH Senior Care LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**VH Willows Townhomes, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**CS2 Real Estate Development LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**Colpitts Sunset, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap @ UW, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


[Signature Page 2 to Debtor-in-Possession Loan and Security Agreement]

**iCap Broadway LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Enterprises, Inc. f/k/a Altius Development, Inc.**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Equity, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Funding LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Holding LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


[Signature Page 3 to Debtor-in-Possession Loan and Security Agreement]

**iCap International Investments, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Investments, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Management LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Northwest Opportunity Fund, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Pacific Income Fund 4, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


[Signature Page 4 to Debtor-in-Possession Loan and Security Agreement]

**iCap Pacific Income Fund 5, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Pacific Northwest Opportunity and Income Fund, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Pacific NW Management, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Realty LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


**iCap Vault 1, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager


[Signature Page 5 to Debtor-in-Possession Loan and Security Agreement]

**iCap Vault Management, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager


**iCap Vault, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager

**iCap Holding 5 LLC**,
a Washington limited liability company

By: _____
Name: Lance Miller
Title: Manager

**iCap Holding 6 LLC**
a Washington limited liability company

By: _____
Name: Lance Miller
Title: Manager

**iCap Pacific Development LLC**
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager

[Signature Page 6 to Debtor-in-Possession Loan and Security Agreement]

**Senza Kenmore, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager


**Vault Holding LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager


**Vault Holding 1, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager


**VH 2ⁿᵈ Street Office, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager


**VH Pioneer Village, LLC**,
a Delaware limited liability company

By: _____
Name: Lance Miller
Title: Manager

**Lender:**


By: _____
    Kevin DeMeritt

**Lender:**


By:_____


[Signature Page 9 to Debtor-in-Possession Loan and Security Agreement]

**Lender:**


By:_____

## EXHIBIT A

## COMMITMENT SCHEDULE

| Lender | Commitment | Percentage of DIP Loan Facility |
|---|---|---|
| Keith Holdings, LLC | $250,000.00 | 12.41% |
| Socotra DIP Lenders | $1,614,414.00 | 80.14% |
| Jason Yelowitz Trust | $150,000.00 | 7.44% |

**EXHIBIT B**

**SUBORDINATION AGREEMENT**

**SCHEDULE I**

**Loan Parties**

725 Broadway, LLC
Colpitts Sunset, LLC
CS2 Real Estate Development LLC
iCap @ UW, LLC
iCap Broadway LLC
iCap Campbell Way, LLC
iCap Enterprises, Inc. f/k/a Altius Development, Inc.
iCap Equity, LLC
iCap Funding LLC
iCap Holding 5 LLC
iCap Holding 6 LLC
iCap Holding LLC
iCap International Investments, LLC
iCap Investments, LLC
iCap Management LLC
iCap Northwest Opportunity Fund, LLC
iCap Pacific Development LLC
iCap Pacific Income 4 Fund, LLC
iCap Pacific Income 5 Fund, LLC
iCap Pacific Northwest Opportunity and Income Fund, LLC
iCap Pacific NW Management, LLC
iCap Realty LLC
iCap Vault 1, LLC
iCap Vault Management, LLC
iCap Vault, LLC
Senza Kenmore, LLC
UW 17TH AVE, LLC
Vault Holding 1, LLC
Vault Holding, LLC
Vault Holding, LLC
VH 1121 14TH LLC
VH 2nd Street Office, LLC
VH Pioneer Village, LLC
VH Senior Care LLC
VH Senior Care LLC
VH Willows Townhomes, LLC
VH Willows Townhomes, LLC
VH Willows Townhomes, LLC
VH Willows Townhomes, LLC

**Exhibit 4**

**Redline of Revised DIP Agreement**

**NOTICE OF FILING OF REVISED PROPOSED ORDER
APPROVING DEBTOR IN POSSESSION FINANCING**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** is entered into as of July [__], 2024 (this "**Agreement**"), by and among the Lenders party hereto, and the parties listed on **Schedule I** attached hereto (each, a debtor or debtor-in-possession under Chapter 11 of the Bankruptcy Code, and each individually a "**Loan Party**," and also referred to as a "**Debtor**," and collectively, the "**Loan Parties**" or "**Debtors**").

### RECITALS

WHEREAS, on September 29 and 30, 2023 (the "**Petition Date**"), the Loan Parties filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (the "**Cases**" and each, a **"Case"**) and have continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Loan Parties have requested that the Lenders make available to the Loan Parties debtor-in-possession secured term loans in an aggregate principal amount of two million fourteen thousand four hundred fourteen and 00/100 Dollars ($2,014,414.00); and

WHEREAS, the Lenders are willing to make the DIP Loans (as such term is defined in this Agreement) described herein on the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Lenders and Loan Parties agree as follows:

1. **DEFINITIONS AND CONSTRUCTION**.

    1.1     **Definitions**.  As used in this Agreement, the following terms shall have the following definitions:

    "**Affiliate**" means, with respect to any Person, any other Person that owns or controls directly or indirectly such Person, or any Person that controls or is controlled by or is under common control with such Person.

    "**Applicable Law**" means, as to any Person, any law (statutory or common), treaty, rule or regulation of a Governmental Authority or determination of a court or binding arbitrator, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

    "**Bankruptcy Code**" means title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Washington.

    "**Bankruptcy Sale**" means a sale pursuant to section 363 of the Bankruptcy Code of all or substantially all assets (measured by both aggregate value and number of assets) and other rights of the Debtor(s) on such terms acceptable to Lenders in their Permitted Discretion.

"**Bankruptcy Sale Order**" means an order of the Bankruptcy Court, in form and substance acceptable to the Lenders approving and authorizing a Bankruptcy Sale.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Washington are authorized or required to close.

"**Case**" and "**Cases**" have the respective meanings set forth in the recitals.

"**Causes of Action**" means claims or causes of action of any kind or nature that are held or controlled by the Loan Parties, or that constitute property of the Loan Parties or their bankruptcy estates including, without limitation, claims pursuant to sections 544, 547, 548, 549 and 550 of the Bankruptcy Code, as well as any claims or causes of action of any kind or nature that are administered by any trust (including any liquidating trust created pursuant to the terms of a chapter 11 plan), any trustee (including liquidating trustee appointed pursuant to the terms of a chapter 11 plan), other estate representative, the reorganized Loan Parties to the extent that they confirm a chapter 11 plan of reorganization, or any successor in interest of each Loan Party in the Cases or any subsequent case commenced under the Bankruptcy Code;

"**Chief Restructuring Officer**" means Lance Miller.

"**Closing Date**" means the date on which the conditions specified in <u>Section 3.1</u> are satisfied.

"**Code**" means the Uniform Commercial Code as enacted in the State of Washington and the State of Delaware, as applicable.

"**Collateral**" means (i) the Litigation Collateral and (ii) the CS2 Loan Receivable to the extent of $1,000,000 in principal and accrued interest, including all proceeds thereof; provided that, for the avoidance of doubt, the Collateral shall not include the proceeds of any settlement of claims against Tritalent prior to confirmation of a chapter 11 plan in the Cases to the extent that such settlement includes an extension of credit to the Debtors subordinate in all respects to the Credit Extensions.

"**Commitment**" means, with respect to each Lender, such Lender's commitment to make the DIP Loans as set forth on the Commitment Schedule.

"**Commitment Schedule**" means the Schedule attached hereto as **<u>Exhibit A</u>**.

"**Committee**" means the official committee of unsecured creditors appointed in the Cases by the U.S. Trustee.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another; (ii) any reimbursement obligations with respect to undrawn letters of credit; and (iii) all obligations arising under any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Lenders in good faith; provided, however, that such amount

shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"**Copyrights**" means any and all copyright rights, copyright applications, copyright registrations, and like protections in each work or authorship and derivative work thereof.

"**Credit Extension**" means any extension of credit by the Lenders for the benefit of the Loan Parties hereunder, including the DIP Loans.

"**CS2 Loan Receivable**" means (i) the loan that CS2 Real Estate Development LLC owes to Vault Holding LLC (the "**CS2 Property**") and any proceeds thereof; and (ii) any other funds or proceeds that CS2 Real Estate Development LLC receives on account of or in connection with the sale or disposition of the any of the Debtors' interest in the CS2 Property or the real property identified in that certain Purchase and Sale Agreement and Joint Escrow Instructions, dated as of ~~June~~July [__], 2024, by and between CS2 Real Estate Development LLC, CS Real Estate Development LLC, Tiffany LuLu Yi, Qing Zhong, and JM 1 Holdings, LLC, as subsequently amended or modified.

"**Debtor**" has the meaning set forth in the recitals.

"**Default**" means any event or circumstance that, with the passage of time or giving of notice, would unless cured or waived, constitute an Event of Default.

"**Default Rate**" has the meaning given to such term in Section 2.2(b) hereof.

"**DIP Loans**" has the meaning given to such term in Section 2.1(a) hereof.

"**DIP Loan Commitment**" means each Commitment, which in the aggregate, is not to exceed two million fourteen thousand four hundred fourteen and 00/100 Dollars ($2,014,414.00).

"**DIP Loan Facility**" means the credit facility and loans evidenced by, and pursuant to the terms and conditions set forth in, this Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"**Event of Default**" has the meaning assigned in Section 8.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Lenders or required to be withheld or deducted from a payment to Lenders, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case (i) imposed as a result of a Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any U.S. federal withholding Taxes imposed on amounts payable to or for the account of a Lender with respect to any obligations under this Agreement pursuant to a law in effect on the date the Lender acquired its interest in such obligations or on the date that Lender changes its lending office, except, in each case, to the extent that amounts with respect to such Taxes were payable to Lender immediately before the date it acquired such interest or changed its lending office, (c) Taxes that are attributable to Lender's failure to comply with Section 2.5, and (d) any U.S. federal withholding Taxes imposed under FATCA. For purposes of this definition, any reference to Lender shall be deemed to include a Foreign Lender.

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 98 of 151

"**Extended Maturity Date**" means the first day of the month that is one year after the Original Maturity Date.

"**FATCA**" means sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to section 1471(b)(1) of the Internal Revenue Code, any intergovernmental agreement entered into in connection with the implementation of such sections of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to, or official interpretations implementing such, intergovernmental agreements.

"**Fees**" means each and all of the amounts set forth in Section 2.3.

"**Final Order**" means a final order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof with the consent of the Lenders, which consent shall not be unreasonably withheld) authorizing the DIP Loans, with changes to such form as are satisfactory to the Lenders, approving the Loan Documents and authorizing the Obligations and DIP Loans in such amounts as are contemplated by Section 2.1(a), and authorizing the granting of Liens provided for herein.

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**GAAP**" means generally accepted accounting principles as in effect from time to time.

"**Governmental Authority**" is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Highest Lawful Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations evidenced by this Agreement and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the DIP Loans.

"**Indebtedness**" means (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all Contingent Obligations, and (d) all capital lease obligations.

"**Indemnified Party**" has the meaning given to such term in Section 15.2 hereof.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Lenders under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Insolvency Proceeding**" means any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extension generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

4

"**Intellectual Property**" means all right, title, and interest owned by Loan Parties in and to the following: Copyrights, Trademarks (excluding any U.S. intent-to-use trademark application for which a statement of use has not been filed with and duly accepted by the United States Patent and Trademark Office, but only until such statement is accepted by the United States Patent and Trademark Office), and Patents; trade secrets, design rights, claims for damages by way of past, present and future infringement of any of the rights included above, and all license fees and royalties arising from licenses or rights to use such intellectual property rights; all amendments, renewals and extensions of any of such Copyrights, Trademarks, or Patents; and all proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"**Interest Rate**" has the meaning given to such term in <u>Section 2.2(a)</u> hereof.

"**Investment**" means any beneficial ownership of (including stock, partnership interest or other securities) any Person, or any loan, advance or capital contribution to any Person.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

<u>"**KH DIP Lender**" means Keith Holdings, LLC.</u>

"**Lenders**" means the Persons listed on the Commitment Schedule.

"**Lender Expenses**" means all reasonable and documented out-of-pocket expenses and costs (including reasonable attorneys' fees and expenses) incurred by (i) the ~~Senior~~<u>KH DIP</u> Lender in connection with (a) preparing, negotiating, defending and enforcing the Loan Documents (including, without limitation, with respect to prior versions of the Loan Documents), or (b) with respect to the Cases (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings), all reasonable search, filing, recording, and title insurance charges and fees related thereto, and other reasonable and documented out-of-pocket expenses incurred by or otherwise incurred by the ~~Senior~~<u>KH DIP</u> Lender; and (ii) the Socotra DIP Lenders in connection with the enforcement of the obligations of the Debtors under this Agreement and the exercise of any rights and remedies of the Socotra DIP Lenders against the Debtors, whether under the terms of this Agreement or applicable law.

"**Lien**" means with respect to the Collateral, any mortgage, lien, deed of trust, charge, pledge, security interest, or other encumbrance.

"**Litigation Collateral**" means the Causes of Action and all proceeds recovered by Loan Parties, any trust (including any liquidating trust created pursuant to the terms of a chapter 11 plan), any trustee (including liquidating trustee appointed pursuant to the terms of a chapter 11 plan), other estate representative, the reorganized Loan Parties to the extent that they confirm a chapter 11 plan of reorganization, or any successor in interest of each Loan Party in the Cases or any subsequent case commenced under the Bankruptcy Code, or any other Person pursuant to the Causes of Action, including, without limitation, any real property assets; provided that, for the avoidance of doubt, the Collateral shall not include the proceeds of any settlement of claims against Tritalent prior to confirmation of a chapter 11 plan in the Cases to the extent that such settlement includes an extension of credit to the Debtors subordinate in all respects to the Credit Extensions.

"**Loan Documents**" means, collectively, this Agreement, any note or notes executed by Loan Parties, the Final Order and any other agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"**Loan Party**" and "**Loan Parties**" have the meanings set forth in the recitals.

"**Loan Parties' Books**" means all of the Loan Parties' books and records including: ledgers; records concerning Loan Parties' assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"**Material Adverse Effect**" means a material adverse effect on (i) the business, operations, condition (financial or otherwise), or prospects of any Loan Party, (ii) the value of the Collateral taken as a whole or the validity or priority of Lender's security interests in any Collateral, (iii) the validity or enforceability of this Agreement or any of the other Loan Documents, (iv) the Lenders' ability to enforce their rights or remedies hereunder or under any of the other Loan Documents, or (v) the Loan Parties' ability to perform their payment and other material obligations under the Loan Documents to which they are parties; <u>provided</u> that the term "Material Adverse Effect" will not be deemed to exist as a result of the Cases or the circumstances and events leading up thereto.

"**Maturity Date**" means the earlier of: (i) the Original Maturity Date, unless extended in accordance with Section 2.1(e), in which case the Maturity Date shall be the Extended Maturity Date, or (ii) the date of termination of the DIP Loan Commitments and the acceleration of any outstanding extensions of credit under the Loan in accordance with the terms of this Agreement.

"**Negotiable Collateral**" means all letters of credit of which a Loan Party is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and a Loan Party's Books relating to any of the foregoing.

"**Obligations**" means all indebtedness, debt, principal, interest, Fees, and other amounts owed to Lenders by the Loan Parties pursuant to this Agreement.

"**Option to Extend**" has the meaning given to such term in Section 2.1(e) hereof.

"**Original Maturity Date**" means the date that is eighteen (18) months after the Final Order Entry Date.

"**Other Connection Taxes**" means, with respect to the Lenders, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Tax (other than connections arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any loan hereunder or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Paydown**" has the meaning given to such term in Section 4.2 hereof.

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 101 of 151

"**Payment Date**" has the meaning given to such term in Section 2.2(c) hereof.

"**Patents**" means all patents, patent applications, and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"**Patriot Act**" has the meaning given to such term in Section 15.12 hereof.

"**Perfection Certificate**" means that certain Perfection Certificate in the form provided by Lenders dated as of the Closing Date and delivered by the Loan Parties to the Lenders.

"**Permitted Discretion**" means a determination made in good faith and in the exercise of its commercially reasonable (from the perspective of a first priority perfected secured asset based lender) business judgment based on how an asset based lender with similar rights providing a credit facility of the type provided under this Agreement would act in similar circumstances at the time with the information then available to it.

"**Permitted Indebtedness**" means:

(a)     Indebtedness of the Loan Parties in favor of Lenders arising under this Agreement, any other Loan Document;

(b)     the Serene Obligations;

(c)     Indebtedness in the form of accrued and unpaid administrative claims in the Cases;

(d)     Indebtedness to trade creditors incurred in the ordinary course of business;

(e)     Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business; and

(f)     Indebtedness of the Loan Parties in connection with the Senior Financing Facility.

"**Permitted Investment**" means:

(a)     Investments existing on the Closing Date disclosed to Lenders in writing on or before the Closing Date; and

(b)     Investments held by the Loan Parties in (i) cash and cash deposits that are maintained at a bank or other financial institution that is insured by the Federal Deposit Insurance Corporation, or (ii) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one (1) year from the date of acquisition thereof, and/or (iii) money market account funds held at financial institutions reasonably acceptable to Lenders in Lenders' Permitted Discretion.

"**Permitted Liens**" means the following:

(a)     Any Liens existing on the Closing Date and disclosed to Lenders in writing on or before the Closing Date;

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 102 of 151

(a) Any Liens, encumbrances, and other matters disclosed in "Schedule B I" of each lender's title policy issued to Serene;

(b)     [Reserved];

(c)     any Liens arising under this Agreement or the other Loan Documents;

(d)     Liens for taxes, fees, assessments, or other governmental charges or levies, either not yet delinquent or being contested in good faith by appropriate proceedings;

(e)     carriers', warehousemen's, mechanics', materialmen's, repairmen's, or other like Liens arising in the ordinary course of business which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the applicable Person, as set forth on Exhibit C;[Reserved];

(f)     pledges or deposits in connection with workers' compensation, unemployment insurance, and other social security legislation, or letters of credit or guarantees issued in respect thereof, other than any Lien imposed by ERISA;

(g)     Liens arising from judgments, decrees, or attachments in circumstances not constituting an Event of Default under Sections 8.4 (attachment) or 8.8 (judgments/settlements);

(h)     the filing of UCC financing statements solely as a precautionary measure in connection with operating leases and consignment arrangements;

(i)     Subject to Section 6.7, Liens in favor of other financial institutions arising in connection with a Loan Party's deposit accounts held at such institutions to secure standard fees for deposit services charged by, but not financing made available by such institutions;

(j)     [Reserved];

(k)     [Reserved];

(l)     Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (i) above, provided that any extension, renewal, or replacement Lien shall be limited to the property encumbered by the existing Lien in the existing priority of such existing Lien, and the principal amount of the indebtedness being extended, renewed or refinanced does not increase;

(m)     Liens granted in connection with a contingency fee arrangement for legal fees incurred in connection with pursuing Causes of Action; and

(n)     Liens granted to secure the Indebtedness of the Loan Parties in connection with the Senior Financing Facility.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity, or governmental agency.

"**Petition Date**" has the meaning set forth in the recitals.

8

"**Pre-petition Socotra Deed of Trust**" means that certain Deed of Trust, Assignment of Leases and Rents, Fixture Filing, and Security Agreement dated December 15, 2022, executed by debtor VH 2nd Street Office, LLC.

"**Pre-petition Socotra Lender**" means Socotra REIT I, LLC.

"**Pre-petition Socotra Loans**" means the loan made by Socotra REIT I, LLC to debtor VH 2nd Street Office, LLC in the original principal amount of $3,000,000.00 evidenced by the Pre-petition Socotra Loan Agreement, and further evidenced by the Pre-petition Socotra Note.

"**Pre-petition Socotra Loan Agreement**" means that certain Loan and Security Agreement dated December 15, 2022 by and between the Pre-petition Socotra Lender and debtor VH 2nd Street Office, LLC.

"**Pre-petition Socotra Loan Documents**" means the Pre-petition Socotra Loan Agreement, the Pre-petition Socotra Note, the Pre-petition Socotra Deed of Trust, and any other documents relating to or executed in connection with the Pre-petition Socotra Loans.

"**Pre-petition Socotra Note**" means that certain Secured Note dated December 15, 2022, executed and delivered by debtor VH 2nd Street Office, LLC and payable to the Pre-petition Socotra Lender. The Pre-petition Socotra Note was partially assigned to WE Alliance Secured Income Fund, LLC ("**WE Alliance**") and Jason Yelowitz, Trustee of the Yelowitz Trust.

"**Pre-petition Socotra Obligations**" means all Indebtedness, including but not limited to, principal, interest, fees, costs and expenses, owed by VH 2nd Street Office, LLC pursuant to the Pre-petition Socotra Loan Documents.

"**Professional Fees Cap**" has the meaning given to such term in Section 2.3(c)(i) hereof.

"**Responsible Officer**" means the Chief Restructuring Officer.

"**Second Street Reserve**" means the approximately $3,240,000 in sale proceeds held by VH 2nd Street Office, LLC in a reserve account that are subject to Liens in favor of the Socotra DIP Lenders.

"**Senior Financing Facility**" means a secured credit facility that may be extended by the Senior Lender or an alternative lender to one or more of the Debtors, or their successors, as applicable, in an original principal amount not to exceed seven million and 00/100 Dollars ($7,000,000).

"**Senior Lender**" means iCap DIP Finance Group LLC or an alternative lender that executes the Subordination Agreement.

"**Serene**" means Serene Investment Management, LLC.

"**Serene Obligations**" means all debt, principal, interest, fees, and other amounts owned to Serene by the Loan Parties pursuant to that certain Debtor-in-Possession Loan and Security Agreement dated October 3, 2023.

"**Socotra DIP Lenders**" means Socotra REIT I, LLC and WE Alliance Secured Income Fund, LLC.

"**Socotra DIP Loan**" means the DIP Loan extended by the Socotra DIP Lenders.

"**Socotra Settlement Agreement**" means that certain Settlement Agreement by and among the Loan Parties, the Socotra DIP Lenders, and the Yelowitz Trust dated July [___], 2024.

"**Subordinated Lenders**" means the Socotra DIP Lenders and the Yelowitz Trust.

"**Subordination Agreement**" means that certain Subordination Agreement by and between the Senior Lender, and the Subordinated Lenders, attached as Exhibit [ ]B to this Agreement.

"**Subordination Date**" has the meaning given to such term in Section 4.2 hereof.

"**Superpriority Claim**" means a claim against any Debtor in a Case that is an administrative expense claim having priority over any and all administrative expenses, diminution claims, and all other claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 552(b), 726, 1113, or 1114 of the Bankruptcy Code.

"**Tax**" or "**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or other charges imposed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto.

"**Trademarks**" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of the Loan Parties connected with and symbolized by such trademarks.

"**Transaction Fee**" has the meaning given to such term in Section 2.3(d) hereof.

"**Tritalent**" means Tritalent Funding Group, Inc. and Halton Co.

"**UCC**" means the Uniform Commercial Code, as from time to time in effect in the State of California.

"**U.S. Trustee**" means the United States Trustee for the Eastern District of Washington.

"**Yelowitz Trust**" means the Jason Yelowitz 2006 Trust, Dated March 31, 2006.

**Accounting Terms**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lenders) and all calculations made hereunder shall be made in accordance with GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lenders).  When used herein, the terms "financial statements" shall include the notes and schedules thereto.

2. **LOAN AND TERMS OF PAYMENT**.

      2.1    **Credit Extensions**.  The Loan Parties promise to pay to the order of Lenders, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lenders to the Loan Parties hereunder.

      (a)    **Term Loan**. Subject to and upon the terms and conditions of this Agreement (including the satisfaction (or waiver) of the conditions precedent set forth in Section 3.1), each Lender agrees, severally and not jointly, to make Credit Extensions in an amount not to exceed their DIP Loan Commitment (each such Credit Extension, a "**DIP Loan**"). Notwithstanding anything to the contrary herein, the Socotra DIP Loan shall be funded by the Second Street Reserve. For the avoidance of doubt, the Socotra DIP Lenders shall have no obligation under this Agreement or otherwise to make any Credit Extension in cash. The DIP Loans shall be subject to the conditions precedent set forth in Section 3.1 and shall be extended to the Loan Parties substantially concurrent with the Final Order Entry Date.  Amounts borrowed under this Section 2.1(a) may not be reborrowed once repaid.

      (b)    [Intentionally Omitted].

      (c)    [Intentionally Omitted].

      (d)    All Credit Extensions under this Section 2.1 and all accrued and unpaid interest thereon shall be repaid in full by the Loan Parties on the Maturity Date, subject to the terms of the Subordination Agreement.

      (e)    The Loan Parties shall have a one-time option to extend the term of the Loan from the Original Maturity Date to the Extended Maturity Date (the "**Option to Extend**"). The Loan Parties shall provide Lenders with written notice of Loan Parties' request to exercise the Option to Extend not less than thirty (30) days prior to the Original Maturity Date. The effectiveness of the Loan Parties' exercise of the Option to Extend shall be conditioned upon the Loan Parties' payment in cash of all accrued and unpaid interest on the Socotra DIP Loan to the Socotra DIP Lenders.

      (f)    Upon the closing of the Senior Financing Facility with the Senior Lender, the portion of the Obligations owed to the ~~Senior~~KH DIP Lender shall convert into obligations under such Senior Financing Facility.

      2.2    **Payment of Interest on the DIP Loans**.

      (a)    Interest Rate.  Subject to Section 2.2(b), the principal amount advanced and outstanding by the Lenders under the DIP Loan Facility shall accrue interest at a per annum rate equal to 13% (the "**Interest Rate**").

      (b)    Default Rate.  After the occurrence and during the continuance of an Event of Default, to the extent permitted by Applicable Law, the principal balance advanced and outstanding shall bear interest at a rate per annum which is four percentage points (4%) above the Interest Rate that is otherwise applicable thereto (the "**Default Rate**").  Payment or acceptance of the increased interest rate provided in this Section 2.2(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Lenders.

      (c)    Payment.  Accrued interest on the DIP Loans shall be (i) payable with respect to the DIP Loans other than the Socotra DIP Loan monthly in arrears on the first calendar day of each month (each a "**Payment Date**"); provided that such interest shall be capitalized and added to the

aggregate outstanding principal amount of the DIP Loans on such Payment Date in lieu of cash payment (and shall be treated as advanced hereunder and as principal amount of the DIP Loans at all times thereafter), and (ii) with respect to the Socotra DIP Loan, payment of accrued interest shall be deferred until the Subordination Date, and on the Subordination Date, accrued and unpaid interest with respect to the Socotra DIP Loan shall be paid in cash to Socotra DIP Lenders, and thereafter, accrued interest on the Socotra DIP Loans shall be payable in accordance with clause (i) hereof. For the avoidance of doubt, the Loan Parties shall remit payment in cash of all accrued and unpaid interest on the Socotra DIP Loan to the Socotra DIP Lenders as a condition to exercising the Option to Extend, and the Loan Parties continue to make all monthly payments of interest on the Socotra DIP Loan to the Socotra DIP Lenders in accordance with this <u>Schedule 2.2(c)</u> during the period between the Original Maturity Date and the Extended Maturity Date.

(d)     [Intentionally Omitted].

**2.3     Fees**.  The Loan Parties shall pay to Lenders:

(a)     [Intentionally Omitted].

(b)     [Intentionally Omitted].

(c)     <u>Lender Expenses</u>.

(i)     All Lender Expenses (including reasonable and documented attorneys' fees and expenses for documentation and negotiation of this Agreement, incurred through and after the Final Order Entry Date, shall be paid when due (or, if no stated due date, within ten (10) days of written demand from the ~~Senior~~KH DIP Lender or the Socotra DIP Lenders, as applicable, which Lender Expenses must be fully paid upon the Maturity Date). Lender Expenses are subject to a professionals fee expense cap of $150,000.00 in the aggregate (the "**Professional Fees Cap**").  For the avoidance of doubt, the Loan Parties shall be responsible for all Lender Expenses, including, without limitation, any and all reasonable and documented expenses of the ~~Senior~~KH DIP Lender's and the Socotra DIP Lenders' attorneys, professional advisors, or in house administration, but not to exceed the Professional Fees Cap; <u>provided</u>, <u>however</u>, that if there is an Event of Default at any time, the Professional Fees Cap shall not apply with respect to Lender Expenses incurred during or relating to such Event of Default.

(ii)     None of Lenders' attorneys' fees or disbursements shall be subject to the prior approval of the Bankruptcy Court and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court. Notwithstanding the foregoing, the Bankruptcy Court retains all jurisdiction in regard to a dispute between the Loan Parties regarding the reasonableness of the asserted Lender Expenses.

(d)     <u>Transaction Fee</u>.  Separate from and in addition to the Lender Expenses, the Loan Parties shall pay a transaction fee in the amount of twenty-five thousand dollars ($25,000.00) (the "**Transaction Fee**") for fees and costs relating to the due diligence, documentation, and other services performed by the ~~Senior~~KH DIP Lender's counsel with respect to the ~~Senior~~KH DIP Lender's agreement to provide a DIP Loan and participate in an exit facility financing. The Transaction Fee shall be paid directly to the law firm of Shulman Bastian Friedman & Bui, LLP, immediately upon execution of this Agreement, but shall be subject to confirmation by the Bankruptcy Court pursuant to the Final Order. The Loan Parties shall seek approval of the Transaction Fee in connection with approval of this DIP Loan Facility.

(e)     Fees Fully Earned.  Unless otherwise provided in this Agreement or in a separate writing by Lenders, the Loan Parties shall not be entitled to any credit, rebate, or repayment of any Lender Expenses paid or other fees earned by Lenders pursuant to this Agreement, notwithstanding any termination of this Agreement.

2.4     **Crediting Payments**.  Lenders have the exclusive right to determine the order and manner in which all payments with respect to the Obligations may be applied.  The Loan Parties shall have no right to specify the order or the accounts to which Lenders shall allocate or apply any payments required to be made by the Loan Parties to Lenders or otherwise received by Lenders under this Agreement when any such allocation or application is not specified elsewhere in this Agreement.  Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lenders after 2:00 p.m. Pacific Time shall be deemed to have been received by Lenders as of the opening of business on the immediately following Business Day.  Whenever any payment to Lenders under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day.

2.5     **Withholding**.

(a)     Payments received by Lenders from the Loan Parties under this Agreement will be made free and clear of and without deduction for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of the Loan Parties) requires the Loan Parties to make any withholding or deduction of any Tax from any such payment, then the Loan Parties shall be entitled to make such deduction or withholding and, if such Tax is an Indemnified Tax, then the sum payable by the Loan Parties shall be increased to the extent necessary to ensure that, after the making of such required withholding or deduction, Lenders receive a net sum equal to the sum which they would have received had no withholding or deduction been required.

(b)     The Loan Parties shall pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable law, the Bankruptcy Code, and orders of the Bankruptcy Court, and the Loan Parties will, upon request, furnish Lenders with proof reasonably satisfactory to Lenders indicating that the Loan Parties has made such withholding payment.

(c)     Notwithstanding anything to the contrary in this Section 2.5, the Loan Parties need not make any withholding payment if the amount or validity of such withholding payment is contested in good faith by appropriate and timely proceedings or as to which payment in full is bonded or reserved against by the Loan Parties.  The agreements and obligations of the Loan Parties contained in this Section 2.5 shall survive the termination of this Agreement.

(d)     Lenders, if reasonably requested by the Loan Parties, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Loan Parties as will enable the Loan Parties to determine whether or not Lenders are subject to backup withholding or information reporting requirements.

(e)     If a Lender determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.5 (including by the payment of additional amounts pursuant to this Section 2.5), it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made by the Loan Parties under this Section 2.5 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Parties, upon the request of Lender, agrees to repay the amount paid over

to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant taxing authority) to the Lender in the event the Lender is required to repay such refund to such taxing authority.

**2.6 Term**. This Agreement shall become effective on the Closing Date and, subject to Section 15.8, shall continue in full force and effect for so long as any Obligations remain outstanding.

**2.7 Right to Credit Bid**. In connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by Lenders, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, section 363(k) of the Bankruptcy Code, the Loan Parties hereby give Lenders the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

## 3. CONDITIONS OF THE DIP LOANS.

**3.1 Conditions Precedent to DIP Loans**. The obligation of the Lenders to make the DIP Loans is subject to the satisfaction of the following conditions precedent:

(a) Lenders shall have received, in form and substance satisfactory to Lenders, the following:

(i) executed copies of this Agreement and the other Loan Documents;

(ii) such other documents, and completion of such other matters, as Lenders may reasonably deem necessary or appropriate;

(b) the Final Order Entry Date shall have occurred, and the Final Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Lenders and shall not be subject to a stay;

(c) The Loan Parties, the Socotra DIP Lenders, and the Yelowitz Trust shall have executed the Socotra Settlement Agreement, and the Bankruptcy Court shall have entered a final order approving the Socotra Settlement Agreement;

(d) The Loan Parties shall have paid Socotra $1,139,586 from the Second Street Reserve, leaving a balance of $486,000 on account of the principal portion of the Pre-petition Socotra Note held by the Yelowitz Trust, in accordance with the terms of the Socotra Settlement Agreement;

(e) The Lenders shall be satisfied that there is no action or proceeding pending before any court or Governmental Authority, litigation, or investigation, pending or threatened in writing against any Loan Party wherein an unfavorable judgment, decree, or order could (i) result in a Material Adverse Effect, (ii) declare unlawful any of the Loan Documents, or (iii) reasonably be expected to cause any of the Loan Documents or DIP Loans to be rescinded; and

(f) The funding of the DIP Loans shall not cause the aggregate amount of DIP Loans to exceed the amount authorized by the Final Order.

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 109 of 151

3.2     [Intentionally Omitted].

4.     **CREATION OF SECURITY INTEREST**.

4.1     **Grant of Security Interest**.  To secure prompt repayment of any and all Obligations and prompt performance by the Loan Parties of each of their covenants and duties under the Loan Documents, the Loan Parties grant to the Lenders, as set forth below, continuing security interests in all presently existing and hereafter acquired or arising Collateral. Such security interests shall constitute:

(a)     a valid, perfected, priming first priority Lien on the Litigation Collateral granted to the Lenders;

(b)     a valid, perfected, priming first priority Lien on the CS2 Loan Receivable and all proceeds thereof up to a sum of one million and 00/100 Dollars ($1,000,000.00) in principal and accrued interest granted to the Socotra DIP Lenders.

4.2     **Covenant to Subordinate.** The Subordinated Lenders agree that upon the earlier of (i) a partial paydown of the Socotra DIP Loan in the amount of one million and 00/100 Dollars ($1,000,000.00) plus payment of accrued interest on the Socotra DIP Loan ("**Paydown**") or (ii) receipt by the Socotra DIP Lenders of a restated CS2 Loan Receivable acceptable to the Socotra DIP Lenders in their reasonable discretion plus payment of accrued interest on the Socotra DIP Loan (such date, the "**Subordination Date**"), the Subordinated Lenders' Lien on the Litigation Collateral will be subordinated to the Lien granted to the Senior Lender in connection with the Senior Financing Facility on the terms and conditions set forth in the Subordination Agreement. The Socotra DIP Lenders further agree that upon a Paydown, the Socotra DIP Lenders' Lien on the CS2 Loan Receivable shall be released.

4.3     **Delivery of Additional Documentation Required**.  The Loan Parties shall from time to time execute and deliver to Lenders, at the request of any Lender, all Negotiable Collateral, all financing statements, deeds, deeds of trust, bills of sale, security agreements, mortgages, hypothecations, real estate transfer documentation, and other documents that such Lender may reasonably request, in form satisfactory to such Lender, to perfect and continue the perfection of Lenders' security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents.  Notwithstanding the foregoing, the Liens granted hereunder shall be and hereby are, immediately deemed duly perfected and recorded under all applicable federal or state or other laws as of the date of this Agreement, and no notice, filing, mortgage recordation, possession, or other third party consent or act shall be required to effect such perfection.

4.4     **Authorization to File Financing Statements**.  The Loan Parties hereby authorize Lenders to file financing statements with all appropriate jurisdictions to perfect or protect Lenders' interests or rights hereunder.

5.     **REPRESENTATIONS AND WARRANTIES**.

Each Loan Party represents and warrants as follows:

5.1     **Due Organization and Qualification**.  The Loan Parties are corporations or limited liability companies duly existing under the laws of their respective states of incorporation or registration and qualified and licensed to do business in any state in which the conduct of their respective businesses or ownership of property requires that it be so qualified, except in each case (other than with

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 110 of 151

respect to their states of incorporation) where the failure to do so could not reasonably be expected to cause a Material Adverse Effect.

**5.2 Due Authorization; No Conflict**. Subject to the entry of the Final Order and the terms hereof, the execution, delivery, and performance of the Loan Documents are within each Loan Party's powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in any Loan Party's Certificate of Incorporation, Article of Organization, or Bylaws, as applicable, nor will they constitute an event of default under any material agreement to which any Loan Party is a party or by which a Loan Party is bound. No Loan Party is in default under any post-petition agreements to which it is a party or by which it is bound, except to the extent such default would not reasonably be expected to cause a Material Adverse Effect.

**5.3 No Prior Encumbrances**. Each Loan Party holds the Collateral free and clear of Liens, except for Permitted Liens and subject to any liens set forth in the title commitment delivered to Lenders and approved at Closing. Each Loan Party represents that the Collateral is not subject to any Liens in favor of Serene.

**5.4 Diligence**. The Loan Parties are not aware of any fact, condition or circumstance that may materially and adversely affect the assets, liabilities, business, prospects, condition, or results of operations of the Loan Parties that has not been previously disclosed to the Lenders in writing

**5.5 Name; Location of Business**. The Loan Parties will advise Lenders not less than ten (10) Business Days in advance of any change in the business headquarters of any Loan Party. Except as disclosed in the Perfection Certificate, the Loan Parties have not done business under any names other than those specified on the relevant signature page hereof.

**5.6 Litigation**. Except as disclosed in writing to Lenders, there are no actions or proceedings (other than the Cases) pending by or against Loan Party before any court or administrative agency in which an adverse decision could reasonably be expected to have a Material Adverse Effect.

**5.7 Regulatory Compliance**. Except for a prepetition deficiency under the Loan Parties' 401(k) plan, to the best of the Loan Parties' knowledge, the Loan Parties have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from the Loan Parties' failure to comply with ERISA that is reasonably likely to result in the Loan Parties' incurring any liability that could reasonably be expected to have a Material Adverse Effect. No Loan Party is required to be registered as an "investment company" under the Investment Company Act of 1940. The Loan Parties are not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System). To the best of the Loan Parties' knowledge, the Loan Parties have complied with all the provisions of the Federal Fair Labor Standards Act except in each case where the failure to do so could not reasonably be expected to cause a Material Adverse Effect. To the best of the Loan Parties' knowledge, the Loan Parties have not violated any statutes, laws, ordinances or rules applicable to it, the violation of which could reasonably be expected to cause a Material Adverse Effect.

**5.8 [Intentionally Omitted]**.

**5.9 Taxes**. Except as otherwise disclosed to Lenders, as of the Closing Date, the Loan Parties have filed or caused to be filed all material tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein, except (i) for taxes for

which filing is not yet due, or (ii) for taxes that are being contested in good faith by appropriate proceedings and are reserved against (to the extent required by GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lenders) by the Loan Parties, or (iii) to the extent taxes are pre-petition taxes, or (iv) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

       **5.10 Subsidiaries**. The Loan Parties do not own any stock, partnership interest, or other equity securities of any Person, except for Permitted Investments.

       **5.11 Government Consents**. The Loan Parties have obtained (or will obtain, as and when required under Applicable Law) all material consents, approvals, and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of the Loan Parties' business as currently conducted, except where the failure to do so would not reasonably be expected to cause a Material Adverse Effect.

       **5.12 Deposit and Securities Accounts**. The Loan Parties maintain deposit or securities accounts only as set forth in the Perfection Certificate.

       **5.13 Full Disclosure**. No representation, warranty, or other statement made by the Loan Parties in any of the Loan Documents contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements not misleading when made, it being recognized by Lenders that the projections and forecasts provided by the Loan Parties in good faith and based upon assumptions that were reasonable at the time such projections were delivered and are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results. No Loan Document has been amended. To the Loan Parties actual knowledge, the Loan Documents are each in full force and effect and are not subject to any offset, claim, counterclaim or defense in favor of the Loan Parties.

       **5.14 Use of Proceeds**. The Loan Parties shall use the proceeds of the DIP Loans in accordance with the Final Order exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds set forth in the Final Order):

       (a)      to pay the Fees;

       (b)      to the extent not included in Section 5.14(a), to pay certain costs, premiums, fees and expenses related to the Cases; and

       (c)      to fund working capital and other needs of the Loan Parties, including, but not limited to, funding the investigation and/or pursuit of any litigation claims held by the Debtors.

       Proceeds of the DIP Loan Facility shall not be used (a) by the Debtors, or any other party-in-interest, including the Committee, or any of their representatives, to challenge or otherwise contest or institute any proceeding of any kind or nature to determine the validity, perfection, enforceability, or priority of claims or security interests in favor of the Lenders, including, but not limited to, in relation to the Obligations and the Liens evidencing and securing the Obligations, and the Pre-petition Socotra Obligations and the Liens evidencing and securing the Pre-petition Socotra Obligations, or (b) to commence, prosecute, or defend any claim, motion, proceeding or cause of action of any kind or nature against Lenders and their agents, attorneys, advisors or representatives including, without limitation, any lender liability claims or subordination claims. Notwithstanding the foregoing,

nothing herein shall prohibit the Loan Parties or Committee from disputing the alleged occurrence of a default or Event of Default hereunder.

**6. AFFIRMATIVE COVENANTS**.

Each Loan Party shall do all of the following:

**6.1 Good Standing**. Each Loan Party shall maintain its corporate existence and good standing in its jurisdiction of incorporation and maintain qualification in each other jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Each Loan Party shall maintain in force all necessary licenses, approvals, and agreements, the loss of which could have a Material Adverse Effect.

**6.2 Government Compliance**. To the extent applicable, each Loan Party shall meet the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA. Each Loan Party shall comply with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a Material Adverse Effect.

**6.3 Financial Statements, Reports, Certificates**. The Loan Parties shall deliver the following to the Lenders:

(a) Commencing 120 days after the Final Order Entry Date, and thereafter on a quarterly basis, within 30 days after the end of such quarter, a status report regarding the Causes of Action;

(b) all reports filed, including monthly operating reports, filed with the Office of the United States Trustee;

(c) [Intentionally Omitted].

(d) (i) together with the reports described in clause (e) below, a report of any legal actions (other than claims asserted in the Cases) for worker's compensation, unemployment, or counter-claims in intellectual property infringement proceedings that are pending against any Loan Party that could if adversely determined reasonably be expected to result in a Material Adverse Effect; and (ii) promptly upon receipt of notice thereof, a report of (x) any other legal actions (other than the Cases) pending against a Loan Party that could reasonably be expected to result in liability to a Loan Party of one hundred thousand dollars ($100,000.00) or more, or (y) any commercial tort claim acquired by a Loan Party;

(e) [Intentionally Omitted];

(f) written notice within five (5) Business Days' of the resignation from or termination of employment of any Responsible Officer; and

(g) such other financial information as Lenders may request from time to time in their Permitted Discretion.

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 113 of 151

To the extent any of the foregoing reports or financial information are due on a day that is not a Business Day, the Loan Parties shall instead deliver such reports or financial information on the next Business Day.

**6.4    Right to Inspect**.  Each Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during a Loan Party's usual business hours to inspect Loan Party's Books and to make copies thereof and to check, test, and appraise the Collateral in order to verify a Loan Party's financial condition or the amount, condition of, or any other matter relating to, the Collateral; <u>provided</u> that no notice is required if an Event of Default has occurred and is continuing and provided further that during the continuance of an Event of Default all cost and fees associated with Lender's inspection shall be borne by the Loan Parties.

**6.5    Taxes**.  The Loan Parties shall make due and timely payment or deposit of all material Taxes required of it by law (including the Bankruptcy Code), provided that the Loan Parties need not make any payment if (i) the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP (or such other accounting basis selected by the Loan Parties, consistently applied and reasonably acceptable to Lender)) by Loan Parties and (ii) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**6.6    [Intentionally Omitted]**.

**6.7    [Intentionally Omitted]**.

**6.8    Notice of Disputes, Claims**.  The Loan Parties must promptly notify Lenders of all returns, recoveries, disputes, claims, or litigation proceedings that involve more than one hundred thousand dollars ($100,000.00).

**6.9    Bankruptcy Filings**.  Not less than two (2) Business Days prior to filing any motion requesting approval for debtor-in-possession financing and use of cash collateral, the Loan Parties shall send copies of such motions to Lenders.

**6.10    Further Assurances**.  At any time and from time to time, the Loan Parties shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lenders to effect the purposes of this Agreement.

**6.11    Debtor-in-Possession Obligations**.  To the extent applicable, each Loan Party shall comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the rules of procedure of the Bankruptcy Court, and any order of the Bankruptcy Court.

**6.12    [Intentionally Omitted]**.

~~**6.13  Additional Waivers**.    The Loan Parties further acknowledge and agree to the matters set forth on **Exhibit C**.~~

**<u>6.13</u>    <u>[Intentionally Omitted]</u>.**

**6.14    Filing of Motions and Applications**.  Without the prior written consent of the Lenders, the Loan Parties shall not apply to the Bankruptcy Court for, or join in or support any motion or application seeking, authority to (a) take any action that is prohibited by the terms of any of the Loan Documents or the Final Order, (b) refrain from taking any action that is required to be taken by the terms

19

of any of the Loan Documents or the Final Order, or (c) permit any Indebtedness (other than any Permitted Indebtedness), except as expressly stated in this Agreement or the Final Order.

**6.15     Superpriority Claim**.  The Debtors shall not incur, create, assume, suffer to exist or permit any other Superpriority Claim that is *pari passu* with or senior to the claims of the Lenders against the Loan Parties and/or the Collateral (other than any Superpriority Claims granted to professionals in connection with a contingency fee arrangement for legal fees incurred in connection with pursuing Causes of Action); provided however, that the Debtors may grant or allow to continue Superpriority Claims with respect to the Serene Obligations.

**7.     NEGATIVE COVENANTS**.

No Loan Party shall do any of the following:

**7.1     Dispositions**.  Convey, sell, lease, transfer, or otherwise dispose of any Collateral, except in connection with a chapter 11 plan in form and substance acceptable to the Lenders and confirmed by the Bankruptcy Court.

**7.2     [Intentionally Omitted]**.

**7.3     Mergers or Acquisitions**.  Other than in accordance with a Bankruptcy Sale Order or a chapter 11 plan confirmed by the Bankruptcy Court, merge, divide, or consolidate, with or into any other business organization, or acquire, all or substantially all of the capital stock or property of another Person.

**7.4     Indebtedness**.  Create, incur, guarantee, assume or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness.

**7.5     Encumbrances**.  (i) Create, incur, assume, or suffer to exist any Lien with respect to any of its Collateral except for Permitted Liens or (ii) enter into any agreement with any Person other than Lenders not to grant a security interest in, or otherwise encumber, any of its Collateral except with respect to any Permitted Liens.

**7.6     [Intentionally Omitted]**.

**7.7     Investments**.  Other than in accordance with a Bankruptcy Sale Order or a chapter 11 plan confirmed by the Bankruptcy Court, directly or indirectly acquire or own, or make any Investment in or to any Person, other than Permitted Investments and any Loan Party's ownership interest in any subsidiary company in effect as of the Closing Date.

**7.8     [Intentionally Omitted]**.

**7.9     [Intentionally Omitted]**.

**8.     EVENTS OF DEFAULT**.

Any one or more of the following events shall constitute an Event of Default by the Loan Parties under this Agreement:

**8.1     Payment Default**.  Except to the extent the holder thereof would be stayed from exercising remedies as a result of the Cases after accounting for the relief provided in the Final Order, if the Loan Parties fail to pay, when due, the Obligations.  In the event of non-payment default, Lenders

shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for non-payment has occurred;

### 8.2 Covenant Default.

(a) If a Loan Party violates or fails to perform any obligation under Article 6 or Article 7 and such failure continues for ten (10) Business Days after Lenders deliver written notice thereof to the Loan Parties. In such event Lenders shall provide the Loan Parties, the Committee, and the U.S. Trustee written notice that an Event of Default for non-compliance of a specified obligation under Article 6 or Article 7 has occurred; and

(b) If a Loan Party fails or neglects to perform or observe any other material term, provision, condition, covenant contained in this Agreement not specified in Section 8.2 above, or in any of the other Loan Documents, for five (5) Business Days after Lenders deliver written notice thereof to the Loan Parties, provided, however, that if the default cannot by its nature be cured within the five (5) Business Days period or cannot after diligent attempts by the Loan Parties be cured within such five (5) Business Days period, and such default is likely to be cured within a reasonable time, then the Loan Parties shall have an additional reasonable period (which shall not in any case exceed thirty (30) calendar days) to attempt to cure such default, and within such reasonable time period the failure to have cured such default shall not be deemed an Event of Default. In such case and if an Event of Default is triggered under this Section 8.2(b), Lenders may notify the Committee, and the U.S. Trustee;

### 8.3 [Intentionally Omitted].

### 8.4 Attachment. Other than in connection with the Cases in each case, if any material portion of the Loan Parties' assets are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any trustee, receiver, or Person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within thirty (30) calendar days without the same being contested by the Loan Parties in good faith, or if the Loan Parties are enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of their business affairs, or if a judgment or other claim becomes a Lien or material monetary encumbrance upon any material portion of the Loan Parties' assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of the Loan Parties' assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not removed, discharged, rescinded, or paid within thirty (30) calendar days after receipt of written notice from Lenders delivered to the Loan Parties, the Committee, and the U.S. Trustee, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by the Loan Parties (provided that no Credit Extensions will be required to be made during such cure period);

### 8.5 Assets. Provided that such conditions are not cured within thirty (30) calendar days after receipt of written notice from Lenders delivered to the Loan Parties, the Committee, and the U.S. Trustee: (a) the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any Collateral, which rights under section 506(c) of the Bankruptcy Code shall be waived (subject only to and effective upon entry of the Final Order), (b) any Person attempts to apply the doctrine of marshalling with respect to the Lenders, which shall be waived (subject only to and effective upon entry of the Final Order), or (c) any Person attempts to apply the "equities of the case" exception set forth in section 552(b) of the Bankruptcy Code, which shall be waived (subject only to and effective upon entry of the Final Order);

23-01243-WLH11   Doc 1087   Filed 07/16/24   Entered 07/16/24 17:29:53   Pg 116 of 151

**8.6** **Other Agreements**. Except to the extent the counterparty thereto would be stayed from exercising remedies as a result of the Case, if there is an event of default in any material agreement to which any of the Loan Parties is a party or by which it is bound resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount in excess of one hundred thousand dollars ($100,000.00) or which could have a Material Adverse Effect;

**8.7** **Lien Priority**. If the Obligations shall not have the priority contemplated by this Agreement, or the entry of any order in the Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations;

**8.8** **Judgments**. If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least one hundred thousand dollars ($100,000.00) (excluding amounts covered by insurance or third party indemnification) shall be rendered against the Loan Parties and shall remain unsatisfied, unvacated or unstayed pending appeal for a period of sixty (60) calendar days after entry of such judgement;

**8.9** **Misrepresentations**. If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth herein or in any Loan Document or certificate delivered to Lenders and prepared by any Responsible Officer pursuant to this Agreement. In such event Lenders shall provide the Loan Parties, the Committee and the U.S. Trustee written notice that an Event of Default for breach of this Section 8.9 has occurred;

**8.10** **Cases**. Other than in accordance with a chapter 11 plan confirmed by the Bankruptcy Court, any Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code without the consent of the Lenders;

**8.11** **Trustee**. A trustee under chapter 7 or chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code shall be appointed in the Cases;

**8.12** **[Intentionally Omitted]**;

**8.13** **Relief from Stay**. The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties constituting Collateral for the DIP Loans or (ii) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole);

**8.14** **Final Order**. The Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected first priority Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lenders;

**8.15** **Compliance with Orders**. Any of the Loan Parties shall fail to comply with the Final Order (on and after the Final Order Entry Date) in any material respect;

**8.16** **Other Financing**. (a) Except as permitted in the Final Order, the entry of any order of the Bankruptcy Court granting to any third party a Superpriority Claim or Lien *pari passu* with

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 117 of 151

or senior to that granted to and/or for the benefit of the Lenders hereunder without the prior written consent of the Lenders in Lenders' Permitted Discretion (other than in connection with any financing that would repay the Obligations in full), (b) the Loan Parties shall file a motion or other pleading or support a motion or other pleading filed by any other Person requesting a Superpriority Claim or Lien *pari passu* with or senior to that granted to and/or for the benefit of the Lenders without the prior written consent of the Lenders in Lenders' Permitted Discretion (other than in connection with any financing that would repay the Obligations in full), (c) the Loan Parties shall make any payment of principal or interest or otherwise on account of any Indebtedness or payables other than (i) the Obligations under this Agreement, or (ii) the Serene Obligations, or (d) any Loan Party shall file or support a motion or other pleading seeking any of the foregoing; provided, however, that the Loan Parties are authorized, without the need for further consent of the Lenders, to grant a Lien or Superpriority Claim *pari passu* with or senior to that granted to for the benefit of the Lenders hereunder in connection with (a) a contingency fee arrangement for legal fees incurred in connection with pursuing Causes of Action); and (b) the Senior Financing Facility subject to the terms of the Subordination Agreement.

   **8.17 Avoidance**.  (a) Any suit or action is commenced against a Lender by the Loan Parties, or by any other Person with the Loan Parties' consent, that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender, or (b) the Bankruptcy Court rules in favor of any Person in any suit or action commenced against a Lender by or on behalf of such Person (after the Bankruptcy Court has granted such Person standing to commence such suit or action);

   **8.18 Other Bankruptcy-Related Events of Default.** (a) any Loan Party contests the validity or enforceability of any provision of any Loan Document or the validity, extent, perfection, or priority of a Lien in favor of the Lenders on the Collateral or shall support or consent to any other Person contesting the foregoing; (b) any Loan Party, or any Person claiming by or through a Loan Party, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any Lender; or (c) any Loan Party attempts to consummate a sale of all or substantially all of its assets without the consent of the Lenders; or

   **8.19 Impairment of Security, etc.**  Any Loan Document, or any Lien granted thereunder, in whole or in part, shall terminate, cease to be effective or cease to be the legally valid, binding, and enforceable obligation of any Loan Party thereto, or any Loan Party or other Person shall contest in writing such effectiveness, validity, binding nature, or enforceability; or, except as permitted under any Loan Document, any Lien on any of the Collateral shall cease to be perfected.

  The Court shall have jurisdiction to resolve any dispute between the Loan Parties and the Lenders regarding whether an Event of Default has occurred.

  **9.  LENDER'S RIGHTS AND REMEDIES**.

   **9.1 Rights and Remedies**.  During the continuance of an Event of Default, the Lenders may, at their election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by the Loan Parties:

   (a) Subject to the Final Order, if any Event of Default has occurred and is continuing, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from, the Bankruptcy Court, except as otherwise expressly provided herein, the rate of interest applicable to the Loan shall be increased to the Default Rate.

(b)     Subject to the Final Order, Lenders may, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from, the Bankruptcy Court: (i) declare all or any portion of the Obligations, including all or any portion of the DIP Loans to be forthwith due and payable, all without presentment, demand, protest, or further notice of any kind, all of which are expressly waived by the Loan Parties or (ii) exercise any rights and remedies provided to Lenders under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and pursuant to the Final Order, the automatic stay of section 362 of the Bankruptcy Code shall be modified and vacated to permit Lenders to exercise their remedies under this Agreement and the Loan Documents, without further notice, application, or motion to, hearing before, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, that Lenders shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of the Loan Parties in the Collateral only upon five (5) Business Days' prior written notice to the Loan Parties, counsel approved by the Bankruptcy Court for the Committee ,and the U.S. Trustee and as set forth in the Final Order (when applicable).

(c)     **Waivers by the Loan Parties**.  Except as otherwise provided for in this Agreement (including any notice required pursuant to any of the other Loan Documents) or that is not capable of being waived by Applicable Law, each Loan Party waives: (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lenders on which a Loan Party may in any way be liable, and hereby ratifies and confirms whatever Lenders may do in this regard, (ii) all rights to notice and a hearing prior to Lenders' taking possession or control of, or to Lenders' attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Lenders to exercise any of their remedies, and (iii) the benefit of all valuation, appraisal, marshaling, and exemption laws.

**9.2     Lenders' Liability for Collateral**.  So long as the Lenders comply with reasonable commercial lending practices, Lenders shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever.  All risk of loss, damage, or destruction of the Collateral shall be borne by the Loan Parties.

**9.3     Remedies Cumulative**.  Lenders' rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative.  Lenders shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity, subject to the requirements of the Bankruptcy Code.  No exercise by Lenders of one right or remedy shall be deemed an election, and no waiver by Lenders of any Event of Default on the Loan Parties' part shall be deemed a continuing waiver.  No delay by Lenders shall constitute a waiver, election, or acquiescence by it.  No waiver by Lenders shall be effective unless made in a written document signed on behalf of the Lenders and then shall be effective only in the instance and for the purpose for which it was given.

**9.4     Protective Payments**.  If any Loan Party fails to obtain the insurance called for by Section 6.6 or fails to pay any premium thereon or fails to pay any other amount that a Loan Party is obligated to pay under this Agreement or any other Loan Document or that may be required to preserve the Collateral, Lenders may obtain such insurance or make such payment, and all amounts so paid by Lenders are immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral.  Lenders will make reasonable efforts to provide the Loan Parties with notice of Lenders obtaining such insurance at the time it is obtained or within a reasonable

23-01243-WLH11     Doc 1087     Filed 07/16/24     Entered 07/16/24 17:29:53     Pg 119 of 151

time thereafter. No payments by Lenders are deemed an agreement to make similar payments in the future or Lenders' waiver of any Event of Default.

**9.5    Demand; Protest**.    Except for any notice required pursuant to the Loan Documents or that is not capable of being waived by Applicable Law, the Loan Parties waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lenders on which the Loan Parties may in any way be liable.

**9.6    Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the DIP Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest that would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the DIP Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest that would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Loan Parties shall pay to Lenders an amount equal to the difference between the amount of interest due hereunder and the amount of interest that would have been due if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and the Loan Parties to conform strictly to any applicable usury laws. Accordingly, if Lenders contract for, charge, or receive any consideration that constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at Lenders' option be applied to the outstanding amount of the DIP Loans made hereunder or be refunded to the Loan Parties.

**9.7    Waiver of Consequential Damages; Etc.**  To the fullest extent permitted by Applicable Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnified Party shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnified Party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the fraud, bad faith, gross negligence, or willful misconduct of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction, **WHICH LIMITATION OF LIABILITY SHALL APPLY REGARDLESS OF WHETHER THE LIABILITY ARISES FROM THE SOLE, CONCURRENT, CONTRIBUTORY, OR COMPARATIVE NEGLIGENCE OF THE INDEMNIFIED PARTY.**

**10.    NOTICES**.

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage

prepaid; (b) upon transmission, when sent by electronic mail; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below.  Lenders or the Loan Parties may change their mailing or electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this <u>Section 10</u>:

|  |  |
|---|---|
| If to the Loan Parties: | Pivot Management Group, LLC<br>1230 Rosecrans Ave, Suite 530<br>Manhattan Beach, CA 90266<br>Attention:  Lance Miller<br>Email:  lance.miller@pivotgrp.com |
|  | With a copy to (which does not constitute notice): |
|  | O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, CA 90071<br>Attention:  Julian Gurule, Esq.<br>Email:  jgurule@omm.com |
| If to the ~~Senior~~KH DIP Lender: | ~~iCap DIP Finance Group~~Keith Holdings, LLC<br>1990 S. Bundy Dr., Suite 650<br>Los Angeles, CA 90025<br>Attention:  Kevin DeMeritt<br>Email:  k_demeritt@learcapital.com |
|  | With a copy to (which does not constitute notice): |
|  | Shulman Bastian Friedman & Bui LLP<br>100 Spectrum Center Drive, Suite 600<br>Irvine, CA 92618<br>Attention:  Alan J. Friedman, Esq. and Mimi Lin, Esq.<br>Emails:  AFriedman@shulmanbastian.com; MLin@shulmanbastian.com |
| If to the Socotra DIP Lenders: | Socotra REIT I, LLC<br>2714 V Street<br>Sacramento, CA 95818<br>Attention: Adham Sbeih and Paul Cotter<br>Email: adham@socotracapital.com; paul@socotracapital.com |
|  | With a copy to (which does not constitute notice): |
|  | K&L Gates<br>925 Fourth Avenue, Suite 2900<br>Seattle, WA 98104<br>Attention: Brian T. Peterson, Esq.<br>Email: Brian.Peterson@klgates.com |

If to the Yelowitz Trust:     Jason Yelowitz
2976 Stonebridge Trail
Reno, NV 85911
Email: jyelowitz@yahoo.com

With a copy to (which does not constitute notice):

Tonkon Torp
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
Attention: Danny Newman
Email: danny.newman@tonkon.com

  The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

27

**11. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE**.

This Agreement was negotiated in the State of California, the DIP Loans were made by Lenders and accepted by the Loan Parties in the State of California, and the proceeds of the DIP Loans delivered pursuant hereto were disbursed from the State of California, which state the parties irrevocably and unconditionally agree has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects, including, without limiting the generality of the foregoing, matters of construction, validity and performance, each and all of this Agreement and the other Loan Documents, and the obligations arising hereunder and thereunder shall be governed by, and construed in accordance with, the laws of the State of California applicable to contracts made and performed in such state (without regard to principles of conflicts of laws) and any applicable law of the United States of America, except that at all times the attachment, creation, perfection, and enforcement of the liens and security interests created under the deeds of trust in favor of Lenders in respect of real property and/or personal property shall be governed by and construed according to the law of the state in which such real property is located, it being understood that, to the fullest extent permitted by the law of such state, the law of the State of California shall govern the construction, validity, and enforceability of this Agreement, the DIP Loans, and all of the obligations arising hereunder or thereunder.

To the fullest extent permitted by law, each of the Loan Parties and each of the Lenders hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Agreement and/or the DIP Loans.

The Loan Parties and Lenders each further submit to the exclusive jurisdiction of the Bankruptcy Court; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Lenders from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations located in such other jurisdiction, or to enforce a judgment or other court order in favor of Lenders. The Loan Parties expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, and the Loan Parties hereby waive any objection that they may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consent to the granting of such legal or equitable relief as is deemed appropriate by such court. The Loan Parties hereby waive personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to the Loan Parties at the address set forth in, or subsequently provided by the Loan Parties in accordance with, Section 10 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of the Loan Parties' actual receipt thereof or three (3) calendar days after deposit in the U.S. mails, proper postage prepaid

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE LOAN PARTIES AND LENDERS EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS, OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY, AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

This Section 11 shall survive the termination of this Agreement.

## 12.     BANKRUPTCY COURT.

For the avoidance of doubt, to the extent there is conflict between the terms of this Agreement and the terms of the Final Order, the Final Order shall control.

## 13.     MULTIPLE BORROWERS.

**13.1     Joint and Several Liability; Surety Provisions.**  Each Loan Party agrees that it is jointly and severally liable for, and absolutely, irrevocably and unconditionally guarantees to Lenders the prompt payment and performance of, all Obligations.  Each Loan Party acknowledges and agrees that its Collateral secures and cross-collateralizes each Loan made hereunder.  ~~Each Loan Party further acknowledges and agrees to the matters set forth on **Exhibit C**.~~

**13.2     Marshalling.**  Each Loan Party expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel Lenders to marshal assets or to proceed against any Loan Party, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Loan Party.  Each Loan Party waives all defenses available to a surety, guarantor, or accommodation co-obligor other than full payment of all Obligations and waives, to the maximum extent permitted by law, any right to revoke any guaranty of any Obligations as long as it is a Loan Party.  It is agreed among each Loan Party and each Lender that the provisions of this Section 13.2 are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Lenders would decline to make DIP Loans.

**13.3     Consolidated Credit Facility.**  Each Loan Party has requested that Lenders make this DIP Credit Facility available to the Loan Parties on a combined basis, in order to finance the Loan Parties' business most efficiently and economically.  The Loan Parties' business is a mutual and collective enterprise, and the successful operation of each Loan Party is dependent upon the successful performance of the integrated group.  The Loan Parties believe that consolidation of their credit facility will enhance the borrowing power of each Loan Party and ease administration of the facility, all to their mutual advantage.

**13.4     Loan Party Subordination.**  Each Loan Party hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Loan Party, howsoever arising, to the full payment of all Obligations.

**13.5     One Obligation.**  The DIP Loans and other Obligations constitute one general obligation of the Loan Parties and are secured by Lenders' first priority Lien on all Collateral; provided, however, that Lenders shall be deemed to be a creditor of, and the holder of a separate claim against, each Loan Party to the extent of any Obligations jointly or severally owed by such Loan Party.

29

## 14.   OBLIGATIONS OF LENDERS SEVERAL.

The obligations of the Lenders hereunder to make the DIP Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to loan its respective portion of the  DIP Loans.

## 15.   GENERAL PROVISIONS.

**15.1   Successors and Assigns**.  This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon the Loan Parties, the bankruptcy estate of each Loan Party, any trust (including any liquidating trust created pursuant to the terms of a chapter 11 plan), any trustee (including liquidating trustee appointed pursuant to the terms of a chapter 11 plan), other estate representative, the reorganized Loan Parties to the extent that they confirm a chapter 11 plan of reorganization, or any successor in interest of each Loan Party in the Cases or any subsequent case commenced under the Bankruptcy Code. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by the Loan Parties or, prior to the occurrence of an Event of Default, Lenders, without the other's prior written consent, which consent may be granted or withheld in such party's sole discretion. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Cases or any other bankruptcy case of the Loan Parties to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lenders file financing statements or otherwise perfect their Liens under applicable law.

**15.2   Indemnification**.  The Loan Parties shall defend, indemnify and hold harmless each Lender and its officers, employees, and agents (each an "**Indemnified Party**") against: (i) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (ii) all actual losses or actual Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and the Loan Parties whether under this Agreement or the other Loan Documents, the DIP Loan Facility, the Cases, or otherwise (including without limitation reasonable attorneys' fees and expenses), provided, the foregoing shall specifically expressly exclude (a) any special, exemplary, punitive, or consequential damages (unless the same are asserted by a third party against Lender and awarded to such third party in a legal proceeding against Lender and paid (or payable) by Lender), lost profits and diminution in value and any (b) any losses caused by an Indemnified Party's fraud, bad faith, gross negligence, or willful misconduct.  This Section 15.2 shall not apply to Taxes.

**15.3   Time of Essence**.  Time is of the essence for the performance of all obligations set forth in this Agreement.

**15.4   Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**15.5   Amendments in Writing, Integration**.  Except as expressly set forth herein, all amendments to or terminations of this Agreement or the Loan Documents must be in writing signed by each of the parties hereto.  All prior agreements, understandings, representations, warranties, and

23-01243-WLH11   Doc 1087   Filed 07/16/24   Entered 07/16/24 17:29:53   Pg 125 of 151

negotiations between any of the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

15.6     **Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or ".pdf" signature page were an original thereof.

15.7     **Electronic Execution of Documents**.  The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

15.8     **Survival**.  All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding (excluding any contingent payment obligations that expressly survive repayment of the DIP Loans and which, as of the date of such full repayment, have not yet ripened).  The obligations of the Loan Parties to indemnify Lenders with respect to the expenses, damages, losses, costs, and liabilities described in Section 15.2 shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lenders have run.

15.9     **Confidentiality; Disclosure**.  In handling any confidential information each Lender and all employees and agents of such Lender, including, but not limited to, accountants, shall exercise the same degree of care that they exercise with respect to their own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (i) to prospective transferees or purchasers of any interest in the DIP Loans, provided that they are similarly bound by confidentiality obligations, (ii) as required by law, regulations, rule or order, subpoena, judicial order, or similar order (including in connection with the Cases), (iii) as may be required in connection with the examination, audit, or similar investigation of the Lenders and  as the Lenders may determine in connection with the enforcement of any remedies hereunder.  Confidential information hereunder shall not include information that either: (a)  is in the public domain or in the knowledge or possession of a Lender when disclosed to the Lender, or becomes part of the public domain after disclosure to the Lender through no fault of the Lender; or (b) is disclosed to the Lender by a third party, provided the Lender does not have actual knowledge that such third party is prohibited from disclosing such information.  The Loan Parties authorize the Lenders to disclose their relationship with the Loan Parties, including use of the Loan Parties' logo in Lenders' promotional materials.

15.10   **[Intentionally Omitted**].

15.11   **Transfer of the Loan.**  Lenders may, at any time, upon five (5) Business Days advance written notice to the Loan Parties (except following the occurrence and during the continuance of an Event of Default, during which time no advance written notice shall be necessary), sell, transfer, or assign a partial interest in the DIP Loan (but not their entire interest in the DIP Loan), or grant participations therein.  Any assignee shall be treated as a Lender for all purposes hereunder.

15.12 **Patriot Act Notice**. Lenders notify the Loan Parties that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**Patriot Act**"), they are required to obtain, verify, and record information that identifies the Loan Parties, which information includes names and addresses and other information that will allow Lenders to identify the Loan Parties in accordance with the Patriot Act.

15.13 **Correction of Loan Documents**. Lenders may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**LOAN PARTIES**

**UW 17TH AVE, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**725 Broadway, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**iCap Campbell Way, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**VH 1121 14TH, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**VH Senior Care LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**VH Willows Townhomes, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**CS2 Real Estate Development LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**Colpitts Sunset, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap @ UW, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


[Signature Page 2 to Debtor-in-Possession Loan and Security Agreement]

**iCap Broadway LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Enterprises, Inc. f/k/a Altius Development, Inc.**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Equity, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Funding LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Holding LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


[Signature Page 3 to Debtor-in-Possession Loan and Security Agreement]

**iCap International Investments, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Investments, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Management LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Northwest Opportunity Fund, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Pacific Income Fund 4, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


[Signature Page 4 to Debtor-in-Possession Loan and Security Agreement]

**iCap Pacific Income Fund 5, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Pacific Northwest Opportunity and Income Fund, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Pacific NW Management, LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Realty LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


**iCap Vault 1, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager


[Signature Page 5 to Debtor-in-Possession Loan and Security Agreement]

**iCap Vault Management, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**iCap Vault, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**iCap Holding 5 LLC**,
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**iCap Holding 6 LLC**
a Washington limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**iCap Pacific Development LLC**
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

**Senza Kenmore, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:   Manager

[Signature Page 6 to Debtor-in-Possession Loan and Security Agreement]

**Vault Holding LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**Vault Holding 1, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**VH 2nd Street Office, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

**VH Pioneer Village, LLC**,
a Delaware limited liability company

By: _____
Name:  Lance Miller
Title:  Manager

[Signature Page 7 to Debtor-in-Possession Loan and Security Agreement]

**Lender:**


By:_____
    Kevin DeMeritt

[Signature Page 8 to Debtor-in-Possession Loan and Security Agreement]

**Lender:**

By:_____

[Signature Page 9 to Debtor-in-Possession Loan and Security Agreement]

**Lender:**

By:_____

[Signature Page 10 to Debtor-in-Possession Loan and Security Agreement]

## EXHIBIT A

## COMMITMENT SCHEDULE

| Lender | Commitment | Percentage of DIP Loan Facility |
|---|---|---|
| ~~iCap DIP Finance Group~~<u>Keith Holdings,</u> LLC | $250,000.00 | 12.41% |
| Socotra DIP Lenders | $1,614,414.00 | 80.14% |
| Jason Yelowitz Trust | $150,000.00 | 7.44% |

## EXHIBIT B

~~FORM OF FINAL ORDER~~

~~See attached~~ <u>SUBORDINATION AGREEMENT</u>

**EXHIBIT C**

**SURETYSHIP PROVISIONS AND WAIVERS**

1.    Condition of Other Loan Parties.   Each Loan Party represents and warrants to each Lender that such Loan Party has established adequate means of obtaining from the other Loan Parties, on a continuing basis, financial and other information pertaining to the business, operations, and condition (financial and otherwise) of the other Loan Parties and their assets, and each Loan Party now is and hereafter will be completely familiar with the business, operations, and condition (financial and otherwise) of the other Loan Parties and their assets.  Each Loan Party hereby expressly waives and relinquishes any duty on the part of Lenders to disclose to such Loan Party any matter, fact, or thing related to the businesses, operations, or condition (financial or otherwise) of the other Loan Parties and their assets, whether now known or hereafter known by Lenders during the life of this Agreement.  With respect to any of the Obligations, Lenders need not inquire into the powers of any Loan Party, or the officers or employees acting or purporting to act on its behalf, and all Obligations made or created in good faith reliance upon the professed exercise of such powers shall be secured hereby.

2.    Waiver of Rights of Subrogation.   Until no part of any commitment of any Lender to lend to Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations that expressly survive the full repayment of the DIP Loans and that, as of the date of such full repayment, have not yet ripened), notwithstanding anything to the contrary elsewhere contained herein or in any other Loan Document to which each Loan Party is a party, each Loan Party hereby waives to the extent if may lawfully do so with respect to the other Loan Parties any and all rights at law or in equity, to subrogation, to reimbursement, to exoneration, to indemnity, to contribution, to setoff or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, or to a holder or transferee against a maker and which any Loan Party may have or hereafter acquire against any other Loan Party in connection with or as a result of such Loan Party's execution, delivery and/or performance of this Agreement or any other Loan Document to which each Loan Party is a party.  Until no part of any commitment of any Lender to lend to the Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations that expressly survive the full repayment of the Loan and that, as of the date of such full repayment, have not yet ripened), each Loan Party agrees that it shall not have or assert any such rights against any other Loan Party or its successors and assigns either directly or as an attempted setoff or as action commenced against any Loan Party by any other Loan Party (as a borrower or in any other capacity) or any other Person.  Each Loan Party hereby acknowledges and agrees that this waiver is intended to benefit Lenders and shall not limit or otherwise affect each Loan Party's liability hereunder, under any other Loan Document to which any Loan Party is a party, or the enforceability hereof or thereof.  Until no part of any commitment of any Lender to lend to the Loan Parties remains outstanding and all of the Obligations have been paid and performed in full (excluding any contingent payment obligations that expressly survive the full repayment of the DIP Loans and that, as of the date of such full repayment, have not yet ripened), each Loan Party expressly waives any right to enforce any remedy that Lenders now have or hereafter may have against any other Person and waives the benefit of, or any right to participate in, any other security now or hereafter held by Lenders.

3.    Liens on Real Property.   In the event that all or any part of the Obligations at any time are secured by any one or more deeds of trust or mortgages or other instruments creating or granting liens on any interests in real property, subject to the terms of the Agreement, each Loan Party authorizes Lenders, upon the occurrence of and during the continuance of any Event of Default, at their sole option, without notice or demand, but subject to any all notice required by Applicable Law in the jurisdiction where such real property is located and any notice which cannot be waived and without affecting any obligations of

any Loan Party hereunder and under the other Loan Documents, the enforceability of this Agreement, or the validity or enforceability of any liens of Lenders on any collateral, to foreclose any or all of such deeds of trust or mortgages or other instruments by judicial or nonjudicial sale.

4. To the extent a court of competent jurisdiction deems each of the Loan Parties guarantors of the Obligations instead of primary obligors as intended by the parties and to the fullest extent permitted by Applicable Law, each of the Loan Parties expressly waives all rights and defenses that each Loan Party may have if the Obligations become secured by real property. This means, among other things, that Lenders may collect from any Loan Party without first foreclosing on any real or personal property pledged by any Loan Party, and that if Lenders foreclose on any real property collateral pledged by any Loan Party, the amount of the Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if that collateral is worth more than the sale price, and that Lenders may collect from any Loan Party even if Lenders, by foreclosing on the real property collateral, have destroyed any right any Loan Party may have to collect from any other Loan Party. This is an unconditional and irrevocable waiver of any rights and defenses each Loan Party may have if the Obligations become secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon California Code of Civil Procedure §§ 580a, 580b, 580d or 726, or comparable provisions of the laws of any other jurisdiction, and all other suretyship defenses each Loan Party otherwise might or would have under California law or other applicable law. Further, each of the Loan Parties waive all rights and defenses arising out of an election of remedies by Lenders, even though that election of remedies, such as nonjudicial foreclosure with respect to security for the Obligations, has destroyed any Loan Party's rights of subrogation and reimbursement against any other Loan Party by the operation of California Code of Civil Procedure § 580d or otherwise. Each Loan Party expressly waives any right to receive notice of any judicial or nonjudicial foreclosure or sale of any real property or interest therein subject to any such deeds of trust or mortgages or other instruments and each Loan Party's failure to receive any such notice shall not impair or affect each Loan Party's obligations hereunder and under the other Loan Documents or the enforceability of this Agreement or any liens created or granted hereby.

5. Waiver of Discharge. Without limiting the generality of the foregoing, each Loan Party hereby waives discharge by waiving all defenses based on suretyship or impairment of collateral.

6. Understandings with Respect to Waivers and Consents. Each Loan Party warrants and agrees that each of the waivers and consents set forth herein is made after consultation with legal counsel and with full knowledge of its significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which any Loan Party otherwise may have against any other Loan Party, Lender or others, or against collateral, and that, under the circumstances, the waivers and consents herein given are reasonable and not contrary to public policy or law. If any of the waivers or consents herein are determined to be contrary to any applicable law or public policy, such waivers and consents shall be effective to the maximum extent permitted by law.

## SCHEDULE I

## Loan Parties

725 Broadway, LLC
Colpitts Sunset, LLC
CS2 Real Estate Development LLC
iCap @ UW, LLC
iCap Broadway LLC
iCap Campbell Way, LLC
iCap Enterprises, Inc. f/k/a Altius Development, Inc.
iCap Equity, LLC
iCap Funding LLC
iCap Holding 5 LLC
iCap Holding 6 LLC
iCap Holding LLC
iCap International Investments, LLC
iCap Investments, LLC
iCap Management LLC
iCap Northwest Opportunity Fund, LLC
iCap Pacific Development LLC
iCap Pacific Income 4 Fund, LLC
iCap Pacific Income 5 Fund, LLC
iCap Pacific Northwest Opportunity and Income Fund, LLC
iCap Pacific NW Management, LLC
iCap Realty LLC
iCap Vault 1, LLC
iCap Vault Management, LLC
iCap Vault, LLC
Senza Kenmore, LLC
UW 17TH AVE, LLC
Vault Holding 1, LLC
Vault Holding, LLC
Vault Holding, LLC
VH 1121 14TH LLC
VH 2nd Street Office, LLC
VH Pioneer Village, LLC
VH Senior Care LLC
VH Senior Care LLC
VH Willows Townhomes, LLC
VH Willows Townhomes, LLC
VH Willows Townhomes, LLC
VH Willows Townhomes, LLC

1

## Exhibit 5

2

**Subordination Agreement**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF FILING OF REVISED PROPOSED ORDER
APPROVING DEBTOR IN POSSESSION FINANCING**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

# SUBORDINATION AGREEMENT

This SUBORDINATION AGREEMENT (hereinafter "***Agreement***") is entered into and is effective [_____], 2024, by and between iCap DIP Finance Group LLC, a California limited liability company (hereinafter "***Senior Lender***"), and Socotra REIT I, LLC and WE Alliance Secured Income Fund, LLC (together, "***Socotra***"), and the Jason Yelowitz 2006 Trust Dated March 31, 2006 ("***Yelowitz***," and collectively with Socotra and Senior Lender, the "***Parties***").

## RECITALS

A.       On July [__], 2024, the Socotra, Yelowitz, and the Keith Holdings LLC (the "***DIP Lenders***") entered into that certain Debtor-in-Possession Loan and Security Agreement (the "***DIP Credit Agreement***")[1] with iCap Enterprises, Inc. and its debtor subsidiaries and/or affiliates (collectively, the "***Debtors***"), by which the DIP Lenders loaned the Debtors two million fourteen thousand four hundred fourteen and 00/100 Dollars ($2,014,414.00) in debtor-in-possession financing (the "***DIP Financing***") in exchange for, among other things, (i) valid, perfected first priority liens on the Litigation Collateral (as defined herein) granted to the DIP Lenders and (ii) a valid, perfected first priority lien on the CS2 Loan Receivable  and all proceeds thereof to the extent of one million and 00/100 Dollars ($1,000,000) in principal and accrued interest granted to Socotra (hereinafter, the "***Collateral***").

B.       On July [___], 2024, the Debtors filed the *Joint Chapter 11 Plan of Liquidation of iCap Enterprises, Inc. and its Affiliated Debtors Proposed by the Debtors and Official Committee of Unsecured Creditors* (as may be amended or modified pursuant to its terms, the "***Plan***"), which provides for the liquidation of the Debtors' estates, creation of a liquidation trust (the "***iCap Trust***"), and appointment of a liquidation trustee, who will administer and liquidate all remaining property of the Debtors and their estates.

C.       The Parties desire to agree upon the extent and priority of certain security interests in certain of the Collateral, and the Senior Lender may extend or may continue to extend financing to Debtors in reliance on the priority of such security interests as set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the Parties hereto, the Parties hereto agree as follows:

1.       Definitions.  For purposes of this Agreement, the following terms shall have the following definitions:

"***Causes of Action***" means claims or causes of action of any kind or nature that are held or controlled by the Debtors, or that constitute property of the Debtors or their bankruptcy estates including, without limitation, claims pursuant to sections 544, 547, 548, 549, and 550 of the Bankruptcy Code, as well as any claims or causes of action of any kind or nature that are

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the DIP Credit Agreement.

administered by any trust (including any liquidating trust created pursuant to the terms of a chapter 11 plan), any trustee (including any liquidating trustee appointed pursuant to the terms of a chapter 11 plan), other estate representative, the reorganized Debtors to the extent that they confirm a chapter 11 plan of reorganization, or any successor in interest of each Debtor in the Cases or any subsequent case commenced under the Bankruptcy Code.

"*Lender Senior Collateral*" means a valid, first priority lien on the Litigation Collateral granted to the Senior Lender.

"*Litigation Collateral*" means the Causes of Action and all proceeds recovered by the Debtors, any trust (including any liquidating trust created pursuant to the terms of a chapter 11 plan), any trustee (including any liquidating trustee appointed pursuant to the terms of a chapter 11 plan), other estate representative, the reorganized Debtors to the extent that they confirm a chapter 11 plan of reorganization, or any successor in interest of each Debtor in the Cases or any subsequent case commenced under the Bankruptcy Code.

"*Person*" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity, or governmental agency, including the iCap Trust.

"*Senior Debt*" means the principal, interest, and other obligations, in an aggregate amount not to exceed $7,000,000, at any time due and owing by Debtors or the iCap Trust, as applicable, to the Senior Lender in respect of the Senior Financing, as modified, extended, renewed, or restated in accordance with this Agreement, and whether now existing or hereafter created.

"*Senior Debt Documents*" means any document executed in connection with or in furtherance of the Senior Financing in accordance with this Agreement.

"*Senior Financing*" means a secured credit facility that may be extended by the Senior Lender to one or more of the Debtors or the iCap Trust, as applicable, in the principal amount of up to seven million and 00/100 Dollars ($7,000,000).

"*Subordinated Debt*" means all of the Debtors' indebtedness and obligations to the Subordinated Lenders (including, without limitation, principal, premium (if any), interest, fees, charges, expenses, costs, professional fees and expenses, and reimbursement obligations) in connection with the DIP Financing.

"*Subordinated Lenders*" means Socotra and Yelowitz, solely in connection with the Subordinated Debt.

2.     Subordination by the Subordinated Lenders.  Upon the earlier of (each, a "*Socotra Paydown*") (i) the partial paydown of the Socotra DIP Loan (as defined in the DIP Credit Agreement) in the amount of one million and 00/100 Dollars ($1,000,000) plus payment of accrued interest on the Socotra DIP Loan or (ii) receipt by Socotra of a restated CS2 Loan Receivable acceptable to Socotra in its reasonable discretion plus payment of accrued interest on the Socotra DIP Loan (each, a "*Subordination Date*"), the Subordinated Lenders shall subordinate to the Senior Lender any security interest or lien that the Subordinated Lenders may have in the Lender

Senior Collateral but only to the extent of the Senior Debt. After the Subordination Date, notwithstanding the respective dates of attachment or perfection of the security interests of the Subordinated Lenders and the security interests of the Senior Lender, all now existing and hereafter arising security interests of the Senior Lender in the Lender Senior Collateral, to the extent of the Senior Debt, shall at all times be senior to the security interests of the Subordinated Lenders. The Subordinated Lenders hereby (a) acknowledge and consent to (i) the Debtors or the iCap Trust, as applicable, granting to the Senior Lender a security interest in the Lender Senior Collateral, (ii) the Senior Lender filing any and all financing statements, deeds of trust, and other documents as deemed necessary by Senior Lender in order to perfect Senior Lender's security interest in the Lender Senior Collateral, and (iii) the entering into of any and all documents in connection therewith by the Debtors or the iCap Trust, as applicable; and (b) acknowledge and agree that the entering into of any and all documents in connection therewith by Debtors or the iCap Trust, as applicable, and the security interest granted by the Debtors or the iCap Trust, as applicable, to the Senior Lender in the Lender Senior Collateral shall be permitted under the Subordinated Debt (notwithstanding anything to the contrary in any document relating to the Subordinated Debt). Each of the Parties hereby (a) acknowledges, agrees, and covenants that such Party shall not contest, challenge, or dispute the validity, attachment, perfection, priority, or enforceability of any other Party's security interest in the Lender Senior Collateral or the Collateral, as applicable, or the validity, priority, or enforceability of the Senior Debt or the Subordinated Debt, as applicable; and (b) acknowledges and agrees that the provisions of this Agreement will apply fully and unconditionally even in the event that any Party's security interest in the Lender Senior Collateral (or any portion thereof) shall be unperfected.

3. <u>Enforcement Actions with Respect to Lender Senior Collateral</u>. After the occurrence of a Subordination Date, the Subordinated Lenders will not demand or receive from the Debtors or the iCap Trust, as applicable, (and the Debtors or the iCap Trust, as applicable, will not pay to the Subordinated Lenders) all or any part of the Subordinated Debt, by way of payment, prepayment, setoff, lawsuit, or otherwise, nor will the Subordinated Lenders exercise any remedy with respect to the Lender Senior Collateral, or commence, or cause to commence, prosecute, or participate in any administrative, legal, or equitable action against the Debtors or the iCap Trust, as applicable, until as the earlier of: (a) the obligations of the Debtors or the iCap Trust, as applicable, with respect to the Senior Financing are paid to the extent of the Senior Debt; (b) all commitments from Senior Lender to the Debtors or the iCap Trust, as applicable, with respect to the Senior Financing (to the extent of the Senior Debt) are terminated; and (c) the maturity date of the Senior Financing, including all applicable extensions of maturity dates, have passed (collectively, the "***Satisfaction in Full***"). For clarity, after the Subordination Date, the Subordinated Lenders may not exercise any rights or remedies against the Lender Senior Collateral, in their capacity as a secured creditor, including by foreclosure or other form of execution, until Satisfaction in Full has occurred; <u>provided</u>, that the Subordinated Lenders shall be entitled to, among other things: (a) commence legal proceedings to the extent necessary to prevent the running of any applicable statute of limitations or similar restriction on claims related to the Subordinated Debt; (b) exercise rights and remedies for specific performance or equitable relief to compel the Debtors to comply with any non-monetary obligations relating to the Subordinated Debt so long as it is not accompanied by any collection action; (c) accelerate all or any portion of the Subordinated Debt; (d) impose and accrue interest at the default rate provided for in the DIP Credit Agreement, and deliver customary notices of default, reservation of rights letters and similar letters, notices and correspondence in respect of the Subordinated Debt; (e) bid for or purchase

3

Collateral at any public, private or judicial foreclosure upon such Collateral initiated by Senior Lender; (f) join (but not control) any foreclosure or other judicial lien enforcement proceeding with respect to the Collateral initiated by Senior Lender for the sole purpose of protecting Subordinated Lenders' lien on the Collateral, so long as it does not materially delay or interfere with the exercise by Senior Lender of its rights under this Agreement, the Senior Debt Documents, and under applicable law and is not adverse to the priority status of the liens on the Collateral contemplated by this Agreement. Further, after the Subordination Date, the Subordinated Lenders agree that notwithstanding anything to the contrary in any documents relating to the Subordinated Debt, in the event the Senior Lender elects to extend the maturity date of the Senior Financing, the Subordinated Lenders shall, if necessary, extend the maturity date of the Subordinated Debt to the date that is at least one day after the extended maturity date of the Senior Financing. Notwithstanding the prohibition herein on the Subordinated Lenders receiving (and Debtors or the iCap Trust, as applicable, paying) any of the Subordinated Debt, Socotra shall be entitled to receive the Socotra Paydown, and the Subordinated Lenders shall be entitled to receive regularly scheduled, non-accelerated payments of interest (including at the default rate), principal, fees, costs, expenses, indemnification, reimbursement, and other payments in respect of the Subordinated Debt as and when due and payable in accordance with the terms of the Subordinated Debt in effect on the date hereof or as modified with the written consent of the Senior Lender, provided that (x) an event of default under the Senior Debt has not occurred and is not continuing and would not exist immediately after such payment and (y) Debtors or the iCap Trust, as applicable, will be in compliance with the terms of the Senior Debt on a pro-forma basis taking into account such payments.

4.     Payments To Be Delivered to Senior Lender. After the occurrence of the Subordination Date, the Subordinated Lenders shall promptly deliver to Senior Lender in the form received (except for endorsement or assignment by the Subordinated Lenders where required by Senior Lender) for application to the Senior Debt any payment, distribution, security, or proceeds received by the Subordinated Lenders with respect to the Subordinated Debt other than in accordance with this Agreement.

5.     Continuing Agreement. This Agreement shall constitute a continuing agreement of subordination and Senior Lender may, in connection with the Senior Financing, without notice to the other party, lend money or extend credit up to the amount of the Senior Debt, extend the term of the Senior Debt, and provide other financial services to or on behalf of the Debtors or the iCap Trust, as applicable, on the basis of this Agreement, to the extent not inconsistent with the terms of this Agreement; provided, that Senior Lender shall not (a) increase the applicable interest rate with respect to the Senior Debt, except in connection with the imposition of a default rate of interest in accordance with the terms of the Senior Debt Documents; (b) add or increase any premiums provided for in the Senior Debt Documents; (c) change any redemption or prepayment provisions of the Senior Debt in a manner that would adversely affect Subordinated Lenders; (d) alter the contractual subordination provisions with respect to the Senior Debt, including, without limitation, contractually subordinating the Senior Debt to any other debt for borrowed money; or (e) change or amend any provision in a Senior Debt Document in a manner that violates this agreement. This Agreement shall constitute the entire agreement between the Parties with respect to the subject matter hereof and shall not be amended except with the written consent of both Senior Lender and the Subordinated Lenders. After the Subordination Date, the subordinations and priorities specified herein shall remain in full force and effect, regardless of whether either party rescinds, amends,

4

waives any provision of, terminates or reforms, by litigation or otherwise its respective financing agreement or agreements or any other agreement with the Debtors or the iCap Trust, as applicable.

6. <u>No Amendment of Subordinated Debt</u>. No amendment of the documents evidencing or relating to the Subordinated Debt shall be permitted that modify the provisions of this Agreement in any manner that might terminate or impair the subordination of the Subordinated Debt after the Subordination Date or the subordination of the security interest or lien that the Subordinated Lenders may have in the Lender Senior Collateral after the Subordination Date. After the Subordination Date, Senior Lender shall have the sole and exclusive right to restrict or permit, or approve or disapprove, the sale, transfer, or other disposition of the Lender Senior Collateral. After the Subordination Date, upon written notice from Senior Lender to the Subordinated Lenders of Senior Lender's agreement to release its lien on all or any portion of the Lender Senior Collateral in connection with the sale, transfer, or other disposition thereof by Senior Lender (or by the Debtors or the iCap Trust, as applicable, with Senior Lender's consent), the Subordinated Lenders shall be deemed to have also, automatically and simultaneously, released their lien on the Lender Senior Collateral, and the Subordinated Lenders shall upon written request by Senior Lender, immediately take such action as shall be necessary or appropriate to evidence and confirm such release. All proceeds resulting from any such sale, transfer, or other disposition occurring after the Subordination Date shall be applied first to the Senior Debt until payment in full thereof, with the balance, if any, to the Subordinated Debt, or to any other entitled party, except as otherwise agreed to in writing by the Senior Lender. If a Subordinated Lender fails to release its lien as required hereunder, such Subordinated Lender hereby appoints Senior Lender as attorney in fact for the Subordinated Lender with full power of substitution to release the Subordinated Lender's liens as provided hereunder. Such power of attorney being coupled with an interest shall be irrevocable.

7. <u>Notifications</u>. Senior Lender and Subordinated Lenders shall each provide the other notice in writing as promptly as possible, but in no event later than 3 business days, of a default by Debtors or the iCap Trust, as applicable, under the Senior Debt or the Subordinated Debt, as applicable.

8. <u>Waivers</u>. No delay on the part of Senior Lender or the Subordinated Lenders in exercising any right, power or privilege granted hereunder shall operate as a waiver thereof, and no purported waiver of any default, breach or violation of any term or provision contained herein shall be deemed to be a waiver of such term or provision unless the waiver is in writing and signed by Senior Lender or Subordinated Lenders, as applicable. No such waiver shall in any event be deemed a waiver of any subsequent or other default, breach or violation. The rights or remedies herein expressed are cumulative and not exclusive of any other rights and remedies which the parties would otherwise have.

9. <u>Binding Obligation</u>. This Agreement constitutes the legal, valid and binding obligation of the Subordinated Lenders and the Senior Lender, enforceable against the Subordinated Lenders and the Senior Lender in accordance with its terms. The execution, delivery and performance of and compliance with this Agreement by the Subordinated Lenders and the Senior Lender will not violate any material applicable law, rule, or regulation.

10.     Disgorgement. If, at any time after satisfaction in full of the Senior Debt any payments of the Senior Debt must be disgorged by Senior Lender for any reason, this Agreement and the relative rights and priorities set forth herein shall be reinstated as to all such disgorged payments as though such payments had not been made and the Subordinated Lenders shall immediately pay over to Senior Lender all payments received with respect to the Subordinated Debt to the extent that such payments would have been prohibited hereunder.

11.     Successors and Assigns; Assignment. This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns. References herein to each party shall be deemed to refer to such party and its successors and assigns. This Agreement is solely for the benefit of Senior Lender and the Subordinated Lenders and not for the benefit of Debtors, the iCap Trust, or any other party. Each of the Subordinated Lenders and the Senior Lender represents that it has not assigned any security interest, lien, or claim in any Lender Senior Collateral or any financing statement or deed of trust covering the same. Neither the Subordinated Lenders nor the Senior Lender shall sell, assign, pledge, dispose of, or otherwise transfer all or any portion of the Subordinated Debt or any documents relating thereto, or the Senior Debt or any documents relating thereto, as applicable, without the prior written consent of the Senior Lender or the Subordinated Lenders, as applicable. Any assignment by the Subordinated Lenders or Senior Lender of any security interest, lien, or claim in any Lender Senior Collateral or any financing statement or deed of trust covering the same shall be subject to this Agreement.

12.     Entire Agreement. This Agreement represents the entire agreement with respect to the subject matter hereof, and supersedes all prior negotiations, agreements, and commitments. Neither the Subordinated Lenders nor the Senior Lender is relying on any representations by any other Party in entering into this Agreement. This Agreement may be amended only by written instrument signed by the Subordinated Lenders and the Senior Lender.

13.     Attorneys, Fees and Costs. In the event of any dispute between the parties arising in relation to this Agreement, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and costs, in addition to all other sums to which it may be entitled.

14.     **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER**.

(i)     THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD FOR PRINCIPLES OF CONFLICTS OF LAWS.

(ii)     THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF CALIFORNIA, PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE

6

BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. THE PARTIES WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 14.

(iii)     THE PARTIES EACH HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. THE PARTIES REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto.

**SUBORDINATED LENDER**:                **SENIOR LENDER**:

SOCOTRA REIT I, LLC                     ICAP DIP FINANCE GROUP LLC


By: _____            By: _____

Name: _____              Name: _____

Title: _____           Title: _____

**SUBORDINATED LENDER**:

WE ALLIANCE SECURED INCOME
FUND, LLC

By: _____

Name: _____

Title: _____

**SUBORDINATED LENDER**:

JASON YELOWITZ 2006 TRUST DATED
MARCH 31, 2006

By: _____

Name: _____

Title: _____

23-01243-WLH11    Doc 1087    Filed 07/16/24    Entered 07/16/24 17:29:53    Pg 151 of 151