Matthew J. Campos, WSBA 40777
McNaul Ebel Nawrot & Helgren PLLC
600 University Street, Suite 2700
Seattle, WA 98101
Phone: (206) 467-1816
mcampos@mcnaul.com

Matthew A. Lesnick, CSBN 177594
Lesnick Prince & Pappas LLP
315 West Ninth Street, Suite 705
Los Angeles, CA 90015
Phone: (310) 396-0964
matt@lesnickprince.com
(Admitted *Pro Hac Vice*)

*Attorneys for Interested Party*
*Christopher Christensen*

Hon. Whitman L. Holt

Hearing Date: August 21, 2024
Hearing Time: 10:30 a.m.
Location:      Telephonic

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re | Chapter 11 |
| ICAP ENTERPRISES, INC., et al. | Lead Case No. 23-01243-WLH11 |
| Debtors.[1] | Jointly Administered |

---

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (Case No. 23-01243-11); iCap Pacific NW Management, LLC (Case No. 23-01261-11); iCap Vault Management, LLC; (Case No. 23-01258-11); iCap Vault, LLC (Case No. 23- 01256-11); iCap Vault 1, LLC (Case No. 23-01257-11); Vault Holding 1, LLC (Case No. 23-01256-11); iCap Investments, LLC (Case No. 23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (Case No. 23-01253-11);iCap Equity, LLC (Case No. 23-01247-11); iCap Pacific Income 4 Fund, LLC (Case No. 23-01251-11); iCap Pacific Income 5 Fund, LLC (Case No. 23-01249-11); iCap Northwest Opportunity Fund, LLC (Case No. 23-01253-11); 725 Broadway, LLC (Case No. 23-01245-11); Senza Kenmore, LLC (Case No. 23-01254-11); iCap Campbell Way, LLC (Case No. 23-01250-11); UW 17th Ave, LLC (Case No. 23- 01267-11); iCap Broadway, LLC (Case No. 23-01252-11); VH 1121 14th LLC (Case No. 23-01264-11); VH Senior Care LLC (Case No. 23-01266-11); VH Willows Townhomes LLC (Case No. 23-01262-11); iCap @ UW, LLC (Case No. 23-01244- 11); VH 2nd Street Office, LLC (Case No. 23-01259-11); VH Pioneer Village LLC (Case

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT

<table>
<tr><td>1</td><td></td><td>**CHRISTOPHER CHRISTENSEN'S OBJECTION TO APPROVAL OF DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF ICAP ENTERPRISES, INC. AND ITS AFFILIATED DEBTORS PROPOSED BY THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS**</td></tr>
</table>

/ / /

---

No. 23-01263-11); iCap Funding LLC (Case No. 23-01246-11); iCap Management LLC (Case No. 23-01268-11); iCap Realty, LLC (Case No. 23-01260- 11).

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT

# **TABLE OF CONTENTS**

I.     LEGAL STANDARD .............................................................. 1

II.    LACK OF ADEQUATE INFORMATION .......................................... 2

     A.     Inappropriate, Unsupported and Inflammatory Opinions
           Disguised as Facts ......................................................... 2

     B.     Misstatements of Fact .................................................... 3

     C.     Omissions of Important Facts and Documents .......................... 6

     D.     Plan Supplement......................................................... 7

     E.     No Financial Statements, Projections or Useful Information
           Regarding Anticipated Return to Creditors ............................... 8

     F.     Inadequate Information About Professional and Management
           Fees and the Economics of Proposed Litigation...................... 12

III.   PROPOSED PLAN CONFIRMATION PROCESS SHOULD BE
      DENIED FOR LACK OF DUE PROCESS AND INADEQUATE
      TIME 15

     A.     Any Ponzi Litigation is Premature and Should be Stayed........ 16

     B.     The Ponzi Issues Cannot Possibly be Litigated Within the
           Suggested Timeframe................................................. 23

IV.   RESERVATION OF RIGHTS.................................................. 27

V.    CONCLUSION ................................................................ 27

# TABLE OF AUTHORITIES

**CASES**

*Afro-Lecon, Inc. v. United States*
    820 F.2d 1198 (Fed. Cir. 1987) ............................................................ 20

*Baxter v. Palmigiano*
    425 U.S. 308 (1976) ............................................................................ 19

*Brock v. Tolkow*
    109 F.R.D. 116 (E.D.N.Y.1985) ........................................................ 22

*Davis v. Mut. Life Ins. Co. of N.Y.*
    6 F.3d 367 (6th Cir. 1993) ................................................................. 19

*Ex Parte Antonucci*
    917 So.2d 825 (2005) ......................................................................... 21

*Ex Parte Bernard J. Ebbers*
    871 So.2d 776 (2003) ......................................................................... 21

*Fisher v. United States*
    425 U.S. 391 (1976) ............................................................................ 17

*Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc.*
    87 F.R.D. 53 (E.D. Pa. 1980) ............................................................. 20

*In re ATM Fin. Servs., LLC*
    2011 WL 2580763 (Bankr. M.D. Fla. June 24, 2011) ........................ 24

*In re Canyon Sys. Corp.*
    343 B.R. 615 (Bankr. S.D. Ohio 2006) .............................................. 24

*In re DBSI, Inc.*
    476 B.R. 413 (Bankr. D. Del. 2012) ................................................... 24

*In re Fin. Res. Mortg., Inc.*
    454 B.R. 6 (Bankr. D.N.H. 2011) ....................................................... 25

*In re Fox Ortega Enterprises, Inc.*
    631 B.R. 425 (Bankr. N.D. Cal. 2021) ............................................... 24

*In re IFS Fin. Corp.*
    417 B.R. 419 (Bankr. S.D. Tex. 2009) ............................................... 23

*In re LLS America LLC*
    E.D. Wash. 2:09-bk-06194 .................................................................. 25

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page ii

*In re Ramirez Rodriguez*
  209 B.R. 424 (Bankr. S.D. Tex. 1997)........................................................ 23

*In re Taubman*
  160 B.R. 964 (Bankr. S.D. Ohio 1993) ..................................................... 24

*In re World Vision Ent., Inc.*
  275 B.R. 641 (Bankr. M.D. Fla. 2002)...................................................... 24

*Javier H. v. Garcia-Botello*
  218 F.R.D. 72 (W.D.N.Y. 2003) .............................................................. 21

*Keating v. Office of Thrift Supervision*
  45 F.3d 322 (9th Cir. 1995)..................................................................... 19

*Ohio v. Reiner*
  532 U.S. 17 (2001) ................................................................................. 17

*United States v. Scrushy*
  366 F. Supp. 2d 1134 (N.D. Ala. 2005) ................................................... 21

*Walsh Securities, Inc. v. Cristo Property Management, Ltd.*
  7 F. Supp. 2d 523 (D.N.J. 1998) ............................................................. 21

**OTHER AUTHORITIES**

Milton Pollack, *Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201
  (1990) ..................................................................................................... 20

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution, Amendendment V ............................................................ 17

Interested party Christopher Christensen ("Christensen") hereby opposes the "Motion for an Order Approving (I) Proposed Disclosure Statement; (II) Solicitation and Voting Procedures; (III) Notice and Objection Procedures for Confirmation of Joint Plan of Liquidation; and (IV) Granting Related Relief" (the "Motion") [Dkt. No. 1142] and objects to the approval of the "Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of iCap Enterprises, Inc. and its Affiliated Debtors Proposed by the Debtors and Official Committee of Unsecured Creditors" (the "Disclosure Statement." [Dkt. No. 1088]

## I.    LEGAL STANDARD

A chapter 11 disclosure statement must contain adequate information. The Bankruptcy Code defines adequate information as follows:

> [A]dequate information means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of debtor and the condition of debtor's books and records ... that would enable... a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan.

11 U.S.C. § 1125(a). The disclosure level will vary depending upon the facts of the case. *See In re Aspen Limousine Service Inc.*, 193 B.R. 325, 334 (D. Colo. 1996); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973 979 (Bankr. N.D.N.Y. 1988); *see also In re Texas Extrusion* Corp., 844 F.2d 1142, 1157 (5th Cir. 1988).

"A disclosure statement is a solicitation document approved by a bankruptcy court as containing adequate information so that an informed determination can be made whether to accept or reject a reorganization plan."

*In re 266 Washington Assocs*., 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992). "The length of a document should not be the test of its effectiveness since complex and numerous additions to a disclosure statement may be self-defeating in regard to the average investor's overall understanding." *In re Copy Crafters Quickprint, Inc*., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988).

And while the determination of what is "adequate information" is a subjective determination made on a case-by-case basis, the information in a disclosure statement must be reliable, substantiated and sufficiently detailed so that the Court and creditors can make an informed decision about the plan.

## II. LACK OF ADEQUATE INFORMATION

As explained below, the Disclosure Statement should not be approved because it does not contain adequate information according to the standards articulated above.

### A. Inappropriate, Unsupported and Inflammatory Opinions Disguised as Facts

The Disclosure Statement contains gratuitous and inflammatory unsupported, unproven allegations that are disguised as statements of fact. For example:

- "Following the revelation of the massive Ponzi scheme ..." [DS at 10];
- "The Plan Proponents understand the precarious financial position that many investors are in as a result of the Ponzi scheme." [DS at 13];
- "Beginning no later than July 2018 through January 2023 Christensen used the web of iCap Entities, including the prepetition

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 2

Debtors, to conduct a massive Ponzi scheme raising more than $230 million from nearly 2,000 unsuspecting Investors." [DS at 53.] These statements, and the many others like them, should be removed from the Disclosure Statement or, at a minimum, re-phrased to make it clear that these are disputed allegations that the Plan proponents hope to be able to prove following litigation. Otherwise, it is simply misinformation designed to inflame the opinions of creditors based on incomplete and unfounded conclusions. In either case, these statements cannot be said to be reliable, substantiated and in sufficient detail for the court and the creditors to make an informed decision.

### B. Misstatements of Fact

The Disclosure Statement is replete with misstatements that the Plan proponents will not be able to prove and which Christensen strongly disputes. The misstatements are misleading to creditors. Examples of these misstatements include, without limitation, incorrect dollar amounts of capital raised, incorrect dates describing fundraising periods, incorrect descriptions of the Debtors' businesses, incorrect statements of how the investment proceeds were used, incorrect statements regarding the types of real estate that the iCap entities invested in, and inaccurate descriptions of documents and agreements of the Debtors. In addition to the foregoing inaccuracies, which pertain to the most basic information of the Debtors, the Disclosure Statement has many more statements that are couched as facts, but which are simply unproven opinions of the Plan proponents' professionals designed to mislead creditors and investors. Nearly every paragraph of the Disclosure Statement's description of the Debtors contains these types of statements. They include conclusory statements regarding whether investors had legal rights,

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 3

characterization of entities as something different than their legal structure, the proffering of partial information in a manner designed to encourage the reader to make false negative assumptions, opinions of whether investors had security, assertions that the Debtors avoided audit requirements, and many, many more such incorrect and misleading statements.

These are just some examples of the types of statements that Christensen believes are false and misleading and which therefore do not provide adequate information to creditors.

At a minimum, the Disclosure Statement should be edited to make it clear to creditors that these and other statements are just unproven allegations that are strongly disputed and which the Plan proponents may or may not be able to prove.

Similarly, the Plan proponents repeatedly add self-serving commentary and opinions in furtherance of their pet theory that iCap was a Ponzi scheme.

These unsupported allegations are, yet again, another attempt to smear Christensen and make him the scapegoat in order to justify incurring millions of dollars in new debt to finance litigation premised on the allegation that iCap operated as a Ponzi scheme.

In fact, none of the allegations against Christensen and others have been proven. It is therefore misleading for the Debtors and the Committee to include statements that make it appear that their allegations and theories are factual. Even when those allegations are stated in the form of opinions, they are still inappropriate attempts to curry favor with the voting creditors to support a plan that will continue to employ many of the professionals proposing it. In addition, such statements make it appear to be a foregone conclusion that the

Debtors/Creditor Trust will be successful in litigation regarding such allegations.

Further, the Disclosure Statement does not state that Christensen strongly denies these allegations and any wrong-doing and does not adequately discuss the risks of such litigation or the arguments raised in opposition to the Debtors' previous attempt to obtain a Ponzi finding. [*See* Dkt. No. 620 at 16.]

Nor is there adequate discussion about the economics of the proposed litigation, such as the number and identity of defendants, the anticipated costs of litigation, the anticipated timing of such litigation, and the risks of litigation, including collectability. Most notably, as articulated by Redmond Funding Group in its objection to the Disclosure Statement, the Debtors and Committee are refusing to disclose the list of target defendants for their forthcoming Ponzi litigation, even though they surely know who most, if not all, of the defendants are. [*See* Dkt. No. 1173 at 2 and 5.]

Finally, for example, the Disclosure Statement purportedly "describes in detail the historical background that led to the chapter 11 cases of [iCap]." [DS at 10.]  It is important to note, however, that neither the CRO nor any party that drafted any part of the Disclosure Statement was involved with iCap during the periods that are described in the Plan. That, too, should be disclosed.

In *In re New Haven Radio, Inc.*, 18 B.R. 977, 980-81 (Bankr. D. Conn. 1982), the Bankruptcy Court refused to approve a disclosure statement in part because the plan proponent "injected his statement with innumerable claims and statements which range from inaccurate to misleading and from inappropriate to defamatory," noting further that such statements "have no place in a disclosure statement."  Other courts have found that "allegations or

opinions, unsupported by factual information, do not meet the required standard." *In re Civitella*, 15 B.R. 206, 208 (Bankr. E.D. Pa. 1981). Here too, the allegations are inappropriate and misleading to creditors and should be stricken from the Disclosure Statement or presented in a way to make it clear that these are unproven, disputed opinions.

### C. Omissions of Important Facts and Documents

Perhaps most concerning is what the Debtors and Committee have left out of the Disclosure Statement. The Disclosure Statement omits crucial information regarding the iCap companies that is important for creditors to know when assessing the Plan. The proponents have failed to include references to critical documents, such as reports, analyses, appraisals, audits and recommendations, that the Debtors have within their possession that, if disclosed, would undermine their allegation that iCap was a Ponzi scheme. These documents include thousands of pages of reports, analysis, audits, recommendations and appraisals from independent third parties during the course of iCap's structure and operation, all of which validate the legitimacy of iCap's business model and disprove the Ponzi assertions. The Disclosure Statement also fails to recognize market conditions, real estate data, and many other relevant factors that preceded the company's chapter 11 filing, all of which further undermine the Ponzi allegations.

Further, the Ponzi allegations themselves are incomplete in important respects. For example, the proponents have failed to include a proposed Ponzi start date. This is important information that investors need to try to determine whether they themselves are potential targets of the proposed litigation, which would factor in their decision of whether to vote for or against the Plan.

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 6

### D. Plan Supplement

The Disclosure Statement provides that, "On or before the date that is seven calendar days prior to the Voting Deadline, the Plan Proponents will file a Plan Supplement, which will contain additional information relating to the Plan and its implementation that you are encouraged to read, including, without limitation, the iCap Trust Agreement and the Exit Financing documents." [DS at 18.] This too does not constitute adequate information for several reasons.

First, as pointed out by Redmond Funding Group, the timing is inadequate. Many creditors may already have voted by the time the Plan Supplement is filed.

Second, the Plan Supplement is not being served on creditors. The Debtors and Committee have simply included a URL in the Disclosure Statement.

Third, the Plan Supplement proposes to include the iCap Trust Agreement and the Exit Financing documents. But these are core pieces of the Plan that creditors, parties in interest and the Court are entitled to review before the Disclosure Statement is approved to make sure that they contain adequate information. And, because those documents literally govern the functioning and financing of the post-confirmation enterprise, it is not possible for creditors to make informed decisions about whether to vote for or against the Plan without reviewing them *prior to voting*. In effect, the Debtors and Committee are asking the Court to approve only one-half of a disclosure statement and are asking creditors to vote on one-half of a plan, without revealing the critical details of the plan that are necessary for an intelligent decision by either the Court or the creditors. While plan supplements are

commonplace, they typically contain information such as a list of executory contracts to be assumed and other information that are not critical core pieces of the plan.

Fourth, the Debtors and the Committee have not even disclosed everything that will be included in the Plan Supplement. Instead, they say that the Plan Supplement will contain additional information "*including, without limitation* …" the Trust Agreement and Exit Financing document. [DS at 18 (emphasis added).] In other words, the Plan Supplement could include anything. Further, the Debtors and Committee say that the Plan Supplement may be "updated" or "modified" over time. [DS at 18.] So, even if an unusually diligent creditor reviews the Plan Supplement online, the materials could be modified after that creditor reviews them.

The Debtors' and Committee's decision to hide key pieces of the Plan in a last-minute supplement that is not served on creditors, may be modified over time, and may contain information and documents not described in the Disclosure Statement is not appropriate and does not comply with the Bankruptcy Code. There is simply no way for the Court to determine that the Plan Supplement – and therefore the Disclosure Statement – contains adequate information.

### E. No Financial Statements, Projections or Useful Information Regarding Anticipated Return to Creditors

The Disclosure Statement fails for an additional reason. It does not provide adequate information about the Plan because it does not include any current financial statements or future financial projections for the life of the Plan. Nor does it contain any useful information that will enable creditors to understand their likely recovery under the Plan. In fact, not only are investors unable to estimate their potential recovery, but they also cannot even

determine whether they themselves will be sued and be asked to disgorge money instead. The Disclosure Statement should not imply, as it does currently, that investors who are going to be sued and asked to disgorge money should expect any return under the Plan. Presumably, the Plan proponents did not include this unquestionably material information because any investor that is identified as a defendant that is going to be sued is likely to vote against the Plan. Surely, the Disclosure Statement cannot be said to contain adequate information as to these investors.

      As for estimated recoveries, the Disclosure Statement states:

> The Plan Proponents estimate that Holders of Allowed Investor Claims and Allowed General Unsecured Claims in these Chapter 11 Cases should recover approximately [___]% of the total amount of their Investor Claims or General Unsecured Claim. For further details regarding estimated recoveries, please refer to **Exhibit [___]** of the Disclosure Statement.

[DS at 61.] The Debtors and Committee have not yet provided an estimated recovery, and they have not included, or even identified, what appears to be a crucial exhibit providing details about how they have estimated potential recoveries. It is unclear whether they intend this information to be included in the Plan Supplement or provided at some other time, but this is among the most important pieces of information that a disclosure statement needs to provide. The Plan proponents need to supply this information and analysis before the Disclosure Statement is approved.

      The Disclosure Statement continues:

> The Plan Proponents have calculated the foregoing ranges of projected recoveries taking into account three variables: (i) the total estimated amount of Investor Claims and General

Unsecured Claims, in accordance with filed Claims and the Debtors' Schedules and (ii) the total estimated amount of value expected to be available for Distributions to iCap Trust Beneficiaries in accordance with the Plan and the Liquidation Analysis.

[DS at 61.] If in fact the "Plan Proponents have calculated the foregoing ranges of projected recoveries," then they should provide those calculated ranges. None of this information is provided, so this paragraph is not useful, if not misleading. Next, the Disclosure statement says:

It is important to emphasize that many factors will bear on the amount of Cash available for Distributions to iCap Trust Beneficiaries. The Cash available for 7 Distributions consists or will consist primarily of (i) the Cash in the Estates on the Effective Date, after payment, allocation, or reserve in accordance with the Plan for unpaid or unutilized amounts for iCap Trust Funding; (ii) Cash realized after the Effective Date from the sale, collection, or other disposition of the Estates Assets; and (iii) Cash realized by the iCap Trustees from the prosecution of the iCap Trust Actions. However, this Cash has been or will be reduced by, among other things, (i) the Distributions to be made under the Plan with respect to Allowed Administrative Expense Claims, Allowed Claims of Professional Persons, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Priority Claims; (ii) certain statutory and other fees payable in connection with the Chapter 11 Cases; and (iii) the iCap Trust Expenses. Only after these amounts have been paid or reserved will there be any Available Cash available for periodic Distributions to be made to the iCap Trust Beneficiaries.

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 10

[DS at 62.] Again, the Plan proponents need to provide the information they have about each of these factors, such as the amount of cash available, the best estimate of the value of the litigation, the anticipated professional fees, etc. Although the preceding paragraph lists a lot of factors, it is just a generic list of categories of potential sources of funds and expenses; but, without including the actual data, it fails to provide adequate information upon which the Court and creditors can exercise their own independent judgment about the efficacy, viability or merit of the proposed Plan.

It also suggests to the Court and the creditors that there will in fact be cash to be distributed after the enumerated expenses are paid; but without showing the projected data, no one can understand whether or not a net recovery of any cash is a likely outcome. Inclusion of the actual data could potentially reveal that it is only the professionals (who are also the Plan Proponents) who will profit from this proposed litigation strategy, while the actual investors get little or nothing. That would seem to be information that a reasonable investor would want to know.

Financial projections are among the most important pieces of information to be included in a disclosure statement. Here, the omission of actual financial projections should be fatal.

If the Debtors and the Committee intend to submit projections after the Court has already approved the Disclosure Statement, that would be backwards and potentially dangerous. The danger is that the proponents could disseminate incomplete, inaccurate, confusing or misleading financial projections as part of the ballot pack or Plan Supplement. In that instance, creditors and parties in interest could be voting based on defective financial information. This defeats the entire purpose of disclosure statements.

As one Bankruptcy Court stated in denying a disclosure statement that did not include financial projections, "The creditors are not expected to be mindreaders or clairvoyant." *In re Adana Mortgage Bankers, Inc.*, 14 B.R. 29, 31 (Bankr. N.D. Ga. 1981).

## F. Inadequate Information About Professional and Management Fees and the Economics of Proposed Litigation

Similarly, the Disclosure Statement should not be approved because it does not provide adequate information about the fees being charged by professionals and management. Fees are a big issue in this case and an even bigger issue with respect to the Plan. The Debtors previously borrowed approximately $6 million to fund professional fees and are now proposing to borrow an additional approximately $7 million almost entirely to fund professional fees.

The Debtors have liquidated almost all their hard assets and are not an operating company. The Plan is based entirely on the litigation of claims and administration of the Trust and estate. In other words, post-confirmation, the business of the Debtors/Trust is litigation and financial analysis (i.e., professional fees). Accordingly, for creditors to make informed decisions about the economics of the Plan, they need to understand past and projected legal and professional fees. The Disclosure Statement contains little or no information about how much the estate has incurred in professional fees for its multiple law firms, the Committee's professionals, and the Chief Restructuring Officer and his firms.[2] Considering that this is literally the

---

[2] While diligent creditors can find some information about legal fees incurred thus far by researching the Debtors' docket and looking at monthly fee statements and fee applications, there does not appear to be any information

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 12

Debtors' business now, this information needs to be disclosed clearly in the Disclosure Statement.

Tellingly, the estate's professionals appear unwilling to pursue the proposed litigation without first securing $7 million in exit financing. While perhaps not dispositive, that fact certainly suggests that the professionals in charge of the estate's interests have concerns about the value of the litigation. Put differently, if the professionals were not concerned about breaking even, they presumably would be willing to pursue the litigation without millions of dollars of guaranteed funding at expensive interest rates. It is unlikely that the estate's professionals made this determination without any analysis. That analysis and associated risks should be plainly described to creditors so that the court and creditors can meaningfully evaluate the Plan.

Similarly, the proposed exit financier apparently is only willing to advance the expensive Exit Financing if the court first makes a Ponzi finding. In other words, the proposed litigation lender appears to have concerns about the success of the proposed litigation and will only fund it if there is first a major legal victory in the form of a Ponzi finding. So, although the Disclosure Statement has been carefully drafted to paint a picture that implies that iCap was an obvious Ponzi scheme and that the litigation is likely to be successful, the economic analysis of the parties who know best – the estate's lawyers, financial advisors and litigation financier – tells a different story. This needs to be spelled out in detail for the court and creditors.

---

regarding fees incurred by the CRO, and his current and former firms. Even a review of the Debtors' Monthly Operating Reports does not shed light on this category of expenses.

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 13

One thing that is clear, however, is that the professionals and Trustees will extract millions of dollars of value from this Plan, whether or not there is any net recovery for creditors. This is critically important and should be very transparently disclosed because creditors need to understand whether the proposed Plan is being offered because it is in the best interest of creditors or, alternatively, because it benefits the professionals. In most cases, this is much less of an issue because the estate is not being controlled by the professionals billing the largest fees, and the debtor has an opportunity to approve or object to the fees. Here, however, the estate and the proposed Trust are being run by professionals all incentivized to charge high fees. Indeed, as explained below, the Trustees are actually incentivized to encourage as much litigation as possible, even if it is not in the best interest of creditors.

Given the large amount of professional and management fees incurred thus far, creditors should without question be privy to the expected professional and management fees going forward. At a minimum, the Disclosure Statement should disclose the following information:

        a.    <u>Professional Fees to Date</u>. The Disclosure Statement should clearly and prominently set forth the amount of professional fees incurred to date, including a break-down by professional, including the CRO. This is important information for creditors to know – particularly since it appears that many of the same professionals will continue to be involved in the implementation of the Plan.

        b.    <u>Trustee Commissions and Potential Conflict of Interest</u>. The Disclosure Statement provides that, "The iCap Trustees' shared compensation will be set at five percent (5%) of the iCap Trust's gross recoveries …." [DS at 74.] This commission on *gross* revenues could be

23-01243-WLH11   Doc 1184   Filed 08/16/24   Entered 08/16/24 15:24:00   Pg 19 of 33

a significant factor under the Plan and could materially impact the recovery to creditors.  This provision is important for creditors to understand because it gives the Trustees the perverse incentive, with no oversight, to bring as much litigation as possible, even if the litigation would result in a net loss to the Trust. Normally, clients have economic incentive to only pursue litigation that will generate net gains. That is not the case here. This information is crucial to creditors because the Trustees have substantial economic incentives to operate the Trust and pursue litigation strategies that benefit professionals and the Trustees more than creditors.  Put another way – this is a potential conflict of interest that deserves a prominent and detailed discussion in the Disclosure Statement and projections so that creditors can decide whether the proposed Plan is truly in their best interests.  The Disclosure Statement should clearly state the amount of the projected commissions to the Trustees, along with a calculation of the basis for such fees, and a comparison to the net recoveries to creditors.

      c.   <u>Summary of Fees</u>.  The Disclosure Statement should include a chart summarizing and totaling the pre-confirmation and anticipated post-confirmation fees to all professionals.  This is important information that should be prominently disclosed to creditors.

## III. PROPOSED PLAN CONFIRMATION PROCESS SHOULD BE DENIED FOR LACK OF DUE PROCESS AND INADEQUATE TIME

The Plan requires the Court to make a determination that the Debtors operated as a Ponzi scheme. The Debtors propose that the Court make this determination at a confirmation hearing to be held on September 23, 2024 – roughly one month after the solicitation packages are sent out. As the Court

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 15

will recall, the Debtors previously tried to obtain a Ponzi finding from the Court on an expedited timetable. In response, Christensen and several other creditors and the United States Trustee objected to the process as unrealistic premature, and a matter that should be stayed, among other concerns. [*See, e.g.*, Dkt. No. 620 at 16.] Many of those same objections still apply here to the Debtor and Committee's proposed timetable and are repeated here.

### A. Any Ponzi Litigation is Premature and Should be Stayed

Litigating the Ponzi issue right now would be prejudicial and unfair for an additional reason. Christensen, the Debtors, and other parties have been served with subpoenas from the United States Securities and Exchange Commission ("SEC") and the State of Washington Department of Financial Institutions ("DFI"). Further, to counsel's knowledge, the Debtors and their counsel have met with the SEC and other government agencies. The United States Department of Justice has confirmed that it is currently conducting a federal criminal investigation of iCap and other related parties, entities, and individuals. While these investigations are in their nascent stages with no conclusions having been drawn, the fact that parallel investigations are pending, most importantly a federal criminal investigation, puts any party that was involved with iCap's operations, finances or securities in an untenable position. As explained below, under these circumstances, any litigation regarding Ponzi findings should be stayed at least until the governments' investigations are completed and the legal status of these entities and individual parties as regards these federal and state law enforcement investigations can be resolved or at least clarified, and these individuals – including Mr. Christensen – and entities can make informed decisions moving forward in these proceedings.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. Amend. V. The Fifth Amendment "protects a person … against being incriminated by his own compelled testimonial communications." *Fisher v. United States*, 425 U.S. 391, 409 (1976).

One of the most basic functions of the Fifth Amendment is to protect *innocent* persons:

> [W]e have emphasized that one of the Fifth Amendment's "basic functions ... is to protect *innocent* men ... 'who otherwise might be ensnared by ambiguous circumstances.'" *Grunewald v. United States,* 353 U.S. 391, 421 (1957) (quoting *Slochower v. Board of Higher Ed. of New York City,* 350 U.S. 551, 557–558 (1956)). In *Grunewald,* we recognized that truthful responses of an innocent witness, as well as those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth. 353 U.S. at 421–422.

*Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (emphasis and alterations in original).

The privilege against self-incrimination applies with equal force "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory[.]" *Kastigar v. United States*, 406 U.S. 441, 444 (1972) (emphasis supplied). Washington State law is in accord about the type of proceedings to which the privilege applies. These protections against self-incrimination apply with equal force "in any proceeding civil or criminal, administrative or judicial, investigatory or adjudicatory." *Eastham v. Arndt*, 28 Wn. App. 524, 527 (1981). *Accord King v. Olympic Pipeline Co.*, 104 Wn. App. 338, 351 (2000), *as amended on reconsideration* (Feb. 14, 2001) (trial court's order denying stay of proceedings on Fifth Amendment grounds *reversed and*

23-01243-WLH11   Doc 1184   Filed 08/16/24   Entered 08/16/24 15:24:00   Pg 22 of 33

remanded)[3]; *Chaffee v. Keller Rohrback LLP*, 200 Wn. App. 66, 401 P3d 418 (2017)(trial court's order denying stay of proceedings on Fifth Amendment grounds *reversed*)[4].

Invoking one's Fifth Amendment right to refuse to answer questions or interrogatories or otherwise provide evidence in a civil proceeding, may, however, "give[s] rise to a legitimate inference that the witness was engaged

---

[3] *Olympic Pipeline* was a wrongful death action resulting from a petroleum pipeline leak that resulted in a huge fire and the deaths of several individuals. At the time the state court wrongful death action was pending, federal prosecutors were also conducting a federal criminal grand jury investigation of the pipeline failure, with an eye toward potential criminal indictment of several individuals alleged to have some level of responsibility for the pipeline failure. At the time, no one had been charged with any crimes.

Several of the individual defendants in the wrongful death action moved for a stay of the civil proceeding based on their privileges against self-incrimination under the state and federal constitutions. These persons were also potential criminal defendants, although no one could be sure that anyone would ever be charged with a crime based on these events. After the trial court denied the motion, the Court of Appeals reversed and remanded to the trial to conduct the appropriate analysis of several factors.

[4] *Chaffee* was an action for damages against a Seattle law firm and its managing partners for legal malpractice related to the acquisition of a bank. During discovery proceedings, the defendants learned of an ongoing federal criminal investigation into the bank acquisition. Believing that they were also the subjects or targets of the criminal investigation, the defendants moved for a stay of the civil proceeding pending the resolution of the criminal investigation. The motion for a stay was based on the defendants' privileges against self-incrimination under the state and federal constitutions. The trial court denied the stay. Adhering to the *Olympic Pipeline* factors, and despite the fact that there were no pending criminal charges and that the status of the civil defendants in the criminal investigation was unclear, the Court of Appeals reversed the trial court's order denying the stay. *Id.*

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 18

in criminal activity." *Davis v. Mut. Life Ins. Co. of N.Y.*, 6 F.3d 367, 384 (6th Cir. 1993) (citing *Baxter v. Palmigiano*, 425 U.S. 308 (1976)).

Thus, a person forced to participate in a federal (such as a federal bankruptcy litigation) or state financial regulatory agency investigation, or other civil proceeding while a federal parallel criminal investigation is also underway faces a difficult Hobson's Choice. For this reason, a court may, in its discretion:

> stay civil proceedings, postpone civil discovery, or impose protective orders and conditions "when the interests of justice seem ( ) to require such action, sometimes at the request of the prosecution, * * * sometimes at the request of the defense(.)" United States v. Kordel, supra, 397 U.S. at 12 n.27, 90 S.Ct. at 770 (citations omitted); see Horne Brothers, Inc. v. Laird, 463 F.2d 1268, 1271-1272 (D.C.Cir.1972). The court must make such determinations in the light of the particular circumstances of the case.

*Sec. & Exch. Comm'n v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980) (alterations in original; emphasis added).

To determine whether "the interests of justice" require a stay, courts consider the extent to which the petitioner's Fifth Amendment rights are implicated, as well as:

> (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation.

*Keating v. Office of Thrift Supervision*, 45 F.3d 322, 325 (9th Cir. 1995).

As noted by Judge Milton Pollack:

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 19

> Resolution of the criminal case may increase prospects for settlement of the civil case. Due to differences in the standards of proof between civil suits and criminal prosecutions, the possibility always exists for a collateral estoppel or res judicata effect on some or all of the overlapping issues.

Milton Pollack, *Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201, 204 (1990).

The Federal Circuit has also noted that it is a "passive abuse" of the civil discovery system "when [a] civil party, who asserts fifth amendment rights, is compelled to refuse to answer questions individually, revealing his weak points to the criminal prosecutor." *Afro-Lecon, Inc. v. United States*, 820 F.2d 1198, 1203 (Fed. Cir. 1987). That court went on to note that, "[t]his point-by-point review of the civil case may lead to a 'link in the chain of evidence' that unconstitutionally contributes to the defendant's conviction." *Id.*

Likewise, resolving the criminal investigation could ease the burden on the court in any subsequent civil matter, as contemplated by Judge Pollack. *See Parallel Proceedings*, 129 F.R.D. at 204; *see also Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc.*, 87 F.R.D. 53, 57 (E.D. Pa. 1980) ("The mere possibility that a substantial amount of the court's work, if undertaken now, may shortly prove to have been unnecessary, cautions against undue haste in proceeding with this civil action.").

"[A] strong case for a stay" exists pre-indictment where the defendant in the civil action is a potential target of a known ongoing criminal investigation for the same conduct as that alleged in the civil investigation and there is substantial overlap in the facts and evidence in the cases. *See Walsh Securities, Inc. v. Cristo Property Management, Ltd.*, 7 F. Supp. 2d 523, 527 (D. N.J. 1998). In the pre-indictment context, the similarity of the issues

underlying the civil and criminal actions is "the most important issue at the threshold in determining whether or not to grant a stay." *Id.*; *see also Ex Parte Bernard J. Ebbers*, 871 So.2d 776 (2003) (criminal charges not necessary to justify assertion of Fifth Amendment privilege where party moving for stay is subject to ongoing criminal investigation into "substantially overlapping" issues).

Additionally, the substantial overlap of evidence and issues in the civil investigation and the simultaneous criminal investigation creates a considerable risk that the civil investigation could be used by the government as a tool "to gain premature access to evidence and information pertinent to the criminal case." *Javier H. v. Garcia-Botello*, 218 F.R.D. 72, 75 (W.D.N.Y. 2003); *see also United States v. Scrushy*, 366 F. Supp. 2d 1134, 1139 (N.D. Ala. 2005) (a defendant who knows he is under criminal investigation can take actions to prevent providing information that could be used against him); *Ex Parte Antonucci*, 917 So.2d 825, 830 (2005) (stay request was particularly appropriate because FBI "confirmed that [civil defendant] was the 'subject of an investigation by the federal government'").

The potential tactical coordination between the Debtors and the government could be calculated to trigger either Fifth Amendment waivers, which the government will use in the criminal investigation, or a Fifth Amendment invocation, which the Debtors will attempt to use to gain a tactical advantage in any civil case and indeed, in these bankruptcy proceedings.

By attempting to force this court to make a "Ponzi" finding while Mr. Christensen and iCap are, at the least, subjects of a parallel federal criminal investigation – as well as other state and federal law enforcement investigations – the Plan proponents are doing exactly that. The Plan

proponents are attempting to unfairly manipulate Mr. Christensen's status as a related party in this bankruptcy litigation in order to gain tactical advantage which will greatly benefit them, but which may not, on the other hand, benefit disappointed investors at all. If successful, this ploy may well have permanent deleterious impacts on the constitutional rights of Mr. Christensen and other individuals and entities, but render no palpable relief to the investors whatsoever.

That is why this Court has, and should exercise, its discretion to stay any aspect of the bankruptcy case and prevent this Hobson's choice because it is in the interest of justice to do so. *Brock v. Tolkow*, 109 F.R.D. 116, 119 (E.D.N.Y.1985).

Further, this dilemma would not just prejudice people who worked for iCap, like Mr. Christensen. It could also unfairly impact all other defendants in future adversary proceedings. For example, it would be in the interest of all defendants to prove that iCap was not a Ponzi scheme. In order to help prove that defense, parties will want to depose Mr. Christensen and numerous other former employees and outside professionals. If those witnesses exercise their Fifth Amendment rights because of the on-going federal criminal investigation, all defendants will be prejudiced because the witnesses who could prove up their defense will not be in a position to testify.

The Court should either reject the disclosure statement on this basis alone, strike from it any Ponzi allegations, or stay all Ponzi-related litigation, at least until the parties have a clearer understanding of the government investigations and the Debtors have disclosed their knowledge of, and participation in, such investigations.

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 22

**B.    The Ponzi Issues Cannot Possibly be Litigated Within the Suggested Timeframe**

The Plan proponents request that the Court confirm the Plan on September 23, 2024. Because confirmation of the proposed Plan requires the Court to make a Ponzi finding, that schedule is unfairly and unreasonably compressed.

As previously pointed out by Christensen in the context of the Debtor's earlier DIP Motion, it is crucial to appreciate the complexity and magnitude of the litigation required to properly make a Ponzi finding, in keeping with due process. First, to assist the Court in determining a reasonable litigation schedule for these issues, the following table reflects cases in which a Ponzi finding was made relative to the start of the bankruptcy and adversary proceedings in which the finding was made. On average, a Ponzi finding was made about **4 years, 6 months and 16 days** after the petition date, and **2 years, 3 months and 4 days** after the initiation of the adversary proceeding. This makes sense given the breadth of information needed to make a Ponzi finding and is possibly linked to the fact that Ponzi litigation may be stayed for periods of time to allow government investigations to develop first. It also illustrates the unfairness and unreasonableness of the Debtors' proposed timeline.

| Case | Petition Date | Adversary (ies) Initiated | Ponzi Finding Made |
|---|---|---|---|
| *In re IFS Fin. Corp.*, 417 B.R. 419 (Bankr. S.D. Tex. 2009) | 8/23/2002 | 10/8/2004 | 9/9/2009 <br><br> (7 years, 17 days after petition; 4 years, 11 months, 1 day after adversary) |
| *In re Ramirez Rodriguez*, 209 B.R. 424 (Bankr. S.D. Tex. 1997) | 5/7/1993 | 5/5/1995 | 6/5/1997 <br><br> (4 years, 29 days after petition; 2 years 1 month after adversary) |

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 23

| | | | |
|---|---|---|---|
| *In re DBSI, Inc.*, 476 B.R. 413 (Bankr. D. Del. 2012) | 11/10/2008 | 11/5/2010 | 8/1/2012<br><br>(3 years, 8 months, 22 days after petition; 1 year, 8 months, 27 days after adversary) |
| *In re Canyon Sys. Corp.*, 343 B.R. 615 (Bankr. S.D. Ohio 2006) | 7/7/1997 | 7/6/1999 | 3/31/2006<br><br>(8 years, 8 months, 24 days after petition; 6 years, 8 months, 25 days after adversary) |
| *In re World Vision Ent., Inc.*, 275 B.R. 641 (Bankr. M.D. Fla. 2002) | 9/3/1999 | 10/17/2000 | 3/29/2002<br><br>(2 years, 6 months, 26 days after petition; 1 year, 5 months, 12 days after adversary) |
| *In re Taubman*, 160 B.R. 964 (Bankr. S.D. Ohio 1993) | 5/3/1989 | 1/17/1992 | 10/25/1993<br><br>(4 years, 5 months, 22 days after petition; 1 year, 9 months, 8 days after adversary) |
| *In re Fox Ortega Enterprises, Inc.*, 631 B.R. 425 (Bankr. N.D. Cal. 2021) | 1/8/2016 | 1/5/2018 | 4/23/2021<br><br>(5 years, 3 months, 15 days after petition; 3 years, 3 months, 18 days after adversary) |
| *In re ATM Fin. Servs., LLC*, 2011 WL 2580763 (Bankr. M.D. Fla. June 24, 2011) | 1/12/2008 | 2/8/2010 | 6/24/2011<br><br>(3 years, 4 months, 12 days after petition; 1 year, 4 months, 16 days after adversary) |
| *In re Fin. Res. Mortg., Inc.*, 454 | 11/20/2009 | 7/7/2010 | 7/8/2011 |

| | | | |
|---|---|---|---|
| B.R. 6 (Bankr. D.N.H. 2011) | | | (1 year, 7 months, 18 days after petition; 1 year, 1 day after adversary) |
| *In re LLS America LLC* E.D. Wash. 2:09-bk-06194 | 7/21/2009 | July 2011 | 7/13/2013 (almost 4 years after petition, and 2 years after adversary proceedings) |

The *LLS America* case, from this district, is particularly instructive. In that case, an examiner was appointed to review the Debtor's finances. The examiner issued three reports over the course of the next 11 months. As a result, a chapter 11 trustee was appointed. The trustee filed Ponzi complaints against more than 400 defendants. The Court consolidated the adversary proceedings for purposes of dealing with "common questions" (mainly, whether the Debtor operated a Ponzi scheme). Eventually, after significant discovery involving all the defendants, the Trustee filed a motion for partial summary judgment. On July 13, 2013, the Bankruptcy Court issued its report and recommendation to the District Court, finding that the Debtors operated a Ponzi scheme. (It is also worth noting that multiple defendants filed motions to withdraw the reference, which was granted. This raises the further complicating factor that future defendants may argue that they are entitled to a ruling from the District Court, and that any prior Ponzi finding by the Bankruptcy Court is not binding.)

It is clear from the above examples (and many other cases) that there is no way to complete litigation of the Ponzi issues in anything resembling the Plan proponents' proposed timeframe. There is certainly no legitimate justification to rush to ram through a Ponzi finding before the parties have the opportunity to conduct full and fair discovery, particularly if the goal is largely to meet the Plan

proponents' needs for additional funding for their own fees, and not the interests of the disappointed investors.

Here, given that there are 25 debtors, litigation on the issue of whether the Debtors operated as a Ponzi scheme will be complex, requiring extensive discovery on the topics of the Debtors' operations, finances, and interactions with each other. For example, the parties will need to depose former officers, employees, advisors, investors and broker-dealers, among others, to fully understand the Debtors' operations and to issue document requests and subpoenas. The prior DIP motion, in which the Debtors sought a Ponzi finding, included approximately 3,500 pages of materials – and that was far from complete. The Debtors are presumably in possession of hundreds of thousands of potentially relevant documents given the company was founded in or around 2007. Further, every potential defendant is entitled to discovery on this issue, which will increase the amount of time needed to complete the process. It will take many months – at a minimum – to do this correctly. Additionally, the parties will need experts in the relevant fields, including finance, securities, forensic accounting and real estate development. The experts cannot complete their work until after fact discovery is complete. The parties also need an opportunity to depose each other's experts. All of this will take time. There is simply no way around it. Thus, if the Court is not inclined to deny confirmation of the Plan on other grounds, it should, at a minimum, set a reasonable discovery and litigation schedule after the parties meet and confer pursuant to Rule 26(f) and propose their schedules in keeping with the fact that it is unlikely that *fact* discovery can be completed in less than 6 months.

## IV. RESERVATION OF RIGHTS

This objection is intended only to address the obvious deficiencies with the Disclosure Statement and problems with the proposed Plan confirmation schedule. Christensen reserves the right to object to confirmation of the Plan on any and all available grounds including, without limitation, that the Debtors were not operated as a Ponzi scheme.

## V. CONCLUSION

For the foregoing reasons, Mr. Christensen, by counsel, respectfully requests that the court enter an order: (1) denying the Debtors' Motion in its entirety; (2) denying approval of the Disclosure Statement; or, in the alternative, (3) staying all litigation of issues relating to any Ponzi allegations for a period of no less than 6 months; or, in the alternative, (4) setting a reasonable schedule for the litigation of Ponzi and Plan confirmation issues; and (5) granting such further relief as the Court may deem just and proper.

Dated: August 16, 2024

By: */s/ Matthew J. Campos*
Matthew J. Campos, WSBA 40777
McNaul Ebel Nawrot & Helgren PLLC
600 University Street, Suite 2700
Seattle, WA 98101
Phone: (206) 467-1816
mcampos@mcnaul.com

and

Matthew A. Lesnick, CSBN 177594
Lesnick Prince & Pappas LLP
315 West Ninth Street, Suite 705
Los Angeles, CA 90015
Phone: (310) 396-0964
matt@lesnickprince.com
(Admitted Pro Hac Vice)

*Attorneys for Interested Party*
*Christopher Christensen*

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 27

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on August 16, 2024, I electronically filed the

3    foregoing with the Clerk of the Court using the CM/ECF system, which will

4    send notification of such filing to all counsel of record who receives

5    CM/ECF notification.

6

7    Dated:  August 16, 2024          By: */s/ Nancy Hedges*
                                            Nancy Hedges
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CHRISTOPHER CHRISTENSEN'S
OBJECTION TO DISCLOSURE STATEMENT
– Page 28