Julian I. Gurule (CA SBN: 252160)*
O'MELVENY & MYERS LLP
400 South Hope Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 430-6067
Email: jgurule@omm.com

*Co-Counsel to Debtors and Debtors in
Possession*

OREN B. HAKER (WSBA No. 48725)
BLACK HELTERLINE LLP
805 SW Broadway
Suite 1900
Portland, OR 97205
Telephone: 503 224-5560
Email: oren.haker@bhlaw.com

*Admitted Pro Hac Vice

*Co-Counsel to Debtors and Debtors in
Possession*

HONORABLE WHITMAN L. HOLT

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Chapter 11 |
| ICAP ENTERPRISES, INC., *et al.*, | Lead Case No. 23-01243-WLH11<br>Jointly Administered |
| Debtors.[1] | **SECOND AMENDED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF ICAP ENTERPRISES, INC. AND ITS AFFILIATED DEBTORS PROPOSED BY THE DEBTORS** |

[1] The Debtors (along with their case numbers) are iCap Enterprises, Inc. (23-01243-11); iCap Pacific NW Management, LLC (23-01261-11); iCap Vault Management, LLC (23-01258-11); iCap Vault, LLC (23-01256-11); iCap Vault 1, LLC (23-01257-11); Vault Holding 1, LLC (23-01265-11); iCap Investments, LLC (23-01255-11); iCap Pacific Northwest Opportunity and Income Fund, LLC (23-01248-11); iCap Equity, LLC (23-01247-11); iCap Pacific Income 4 Fund, LLC (23-01251-11); iCap Pacific Income 5 Fund, LLC (23-01249-11); iCap Northwest Opportunity Fund, LLC (23-01253-11); 725 Broadway, LLC (23-01245-11); Senza Kenmore, LLC (23-01254-11); iCap Campbell Way, LLC (23-01250-11); UW 17th Ave, LLC (23-01267-11); VH 1121 14th LLC (23-01252-11); VH 1121 14th LLC (23-01264-11); VH Senior Care LLC (23-01266-11); VH Willows Townhomes LLC (23-01262-11); iCap @ UW, LLC (23-01244-11); VH 2nd Street Office, LLC (23-01259-11); VH Pioneer Village LLC (23-01263-11); iCap Funding (23-01246-11); iCap Management LLC (23-01268-11); iCap Realty, LLC (23-01260-11); Vault Holding, LLC (23-01270-11); iCap Pacific Development LLC (23-01271-11); iCap Holding LLC (23-01272-11); iCap Holding 5 LLC (23-01273-11); iCap Holding 6 LLC (23-01274-11); Colpitts Sunset, LLC (23-01432-11); CS2 Real Estate Development LLC (23-01434-11); and iCap International Investments, LLC (23-01464-11).

**SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

**AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**DISCLAIMER**

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. THE DEBTORS MAY NOT SOLICIT ACCEPTANCES OR REJECTIONS UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS ARE SUBMITTING THIS DISCLOSURE STATEMENT FOR APPROVAL, BUT THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT. THE DEBTORS MAY REVISE THIS DISCLOSURE STATEMENT TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF, BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE *SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF ICAP ENTERPRISES, INC. AND ITS AFFILIATED DEBTORS PROPOSED BY THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS*, WHICH BANKRUPTCY PLAN THE DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD

SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION
ii

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN. ALTHOUGH THE DEBTORS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERIES UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OR DO NOT OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ALL PERSONS OR ENTITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER THE FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE DEBTORS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE DEBTORS' PLAN OR DISTRIBUTIONS THEREUNDER. IN ADDITION TO STATEMENTS THAT EXPLICITLY DESCRIBE SUCH

SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION
iii

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

**RISKS AND UNCERTAINTIES, READERS ARE URGED TO CONSIDER STATEMENTS LABELED WITH THE TERMS "BELIEVES," "BELIEF," "EXPECTS," "INTENDS," "ANTICIPATES," "PLANS," OR SIMILAR TERMS TO BE UNCERTAIN AND FORWARD-LOOKING. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.**

**SECOND AMENDED DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION**
iv

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 4 of 141

# TABLE OF CONTENTS

**ARTICLE I . INTRODUCTION** ................................................................ **6**

  A.    Overview of the Plan ................................................................... 6

    1.   General Structure of the Plan ................................................. 6

    2.   Material Terms of the Plan ..................................................... 6

    3.   Summary of Treatment of Claims and Equity Interests Under the Plan ....... 7

  B.    Plan Voting Instructions and Procedures ................................... 8

    1.   Voting Rights ............................................................................ 8

    2.   Solicitation Materials ............................................................... 9

    3.   Voting Instructions and Procedures ....................................... 11

    4.   Election on Investor Ballots to Contribute Certain Claims .......... 14

**ARTICLE II . BACKGROUND** ............................................................... **14**

  A.    Debtors' Organizational Structure .............................................. 15

    1.   Business Divisions and Organization ..................................... 15

    2.   Real Estate Assets ................................................................. 16

  B.    The Debtors' Capital Structure .................................................. 18

    1.   Property-Level Secured Obligations ....................................... 18

    2.   Portfolio Notes ....................................................................... 19

    3.   Vault Notes ............................................................................. 19

    4.   The Debtors' Capital Raising Efforts from Individual Investors ........ 20

    5.   Intercompany Obligations ....................................................... 20

    6.   Equity Ownership ................................................................... 20

  C.    Overview of the iCap Funds ...................................................... 20

    1.   Fund 1 ..................................................................................... 21

    2.   Fund 2 ..................................................................................... 22

    3.   Fund 3 ..................................................................................... 24

    4.   Fund 4 ..................................................................................... 25

    5.   Investments ............................................................................. 26

**SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

v

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 5 of 141

6.   Vault ......................................................................................... 27

7.   Funding ................................................................................... 30

8.   Fund 5 ..................................................................................... 30

9.   Fund 6 ..................................................................................... 31

10.  Broadway ................................................................................ 31

D.   Events Leading to the Bankruptcy Filing ................................. 31

1.   Investor Litigation .................................................................. 32

2.   Temporary Restraining Order and Prepetition Term Sheet........... 33

**ARTICLE III . THE CHAPTER 11 CASES ................................. 33**

A.   First Day Motions and Orders.................................................. 34

B.   Retention of Advisors .............................................................. 34

C.   DIP Financing Motions ............................................................ 35

1.   Serene DIP Motion.................................................................. 35

2.   Supplemental DIP Motion....................................................... 36

D.   Exit Financing .......................................................................... 37

1.   First Lien Exit Financing ........................................................ 37

2.   Tritalent Exit Financing .......................................................... 38

E.   Appointment of the Unsecured Creditors' Committee............... 38

F.   Professional Fee Payments ...................................................... 38

G.   United States Trustee ............................................................... 39

H.   Meeting of Creditors ................................................................ 39

I.   Schedules of Assets and Liability and Statements of Financial Affairs...... 39

J.   Claims Bar Dates and Filed Claims ......................................... 40

K.   Sales of Real Property .............................................................. 41

L.   Abandonment of the Airlink Membership Interests .................. 44

M.   Extension of Exclusivity Periods ............................................. 46

N.   SEC Investigation .................................................................... 47

O.   Shandong Yongchang Logistics Adversary Proceeding............. 47

P.   Wilmington Adversary Proceeding........................................... 47

**SECOND AMENDED DISCLOSURE STATEMENT FOR
JOIN CHAPTER 11 PLAN OF LIQUIDATION**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

vi

Q.   Plan Negotiations and Settlement Under the Plan ......................................... 48

**ARTICLE IV . DETERMINATION THAT CHRISTENSEN OPERATED THE PREPETITION DEBTORS AS A PONZI SCHEME ............................... 48**

**ARTICLE V . SUMMARY OF THE JOINT CHAPTER 11 PLAN .................. 50**

A.   Purpose and Effect of the Plan ....................................................... 51

B.   Comprehensive Compromise and Settlement Under the Plan ..................... 51

   1.   Substantive Consolidation Issues ................................................ 52

   2.   Ponzi Scheme Issues ................................................................ 55

C.   Estimated Recoveries for Holders of Investor Claims and General Unsecured Claims ................................................................................. 57

D.   Treatment of Claims and Equity Interests ........................................... 58

   1.   Unclassified Claims ................................................................. 58

   2.   Classified Claims and Interests .................................................. 61

   3.   Special Provisions Relating to Investor Claims ............................. 65

   4.   Special Provisions Relating to Individual Investor-Specific Claims ... 66

E.   Acceptance or Rejection of the Plan ................................................. 67

   1.   Impaired Claims Entitled to Vote ............................................... 67

   2.   Acceptance by an Impaired Class ............................................... 67

   3.   Presumed Acceptance by Unimpaired Classes ............................... 68

   4.   Certain Impaired Classes Deemed to Reject the Plan ...................... 68

   5.   Modification of Votes Already Cast ............................................ 68

   6.   Vacant Classes Eliminated ....................................................... 68

F.   Implementation of the Plan ............................................................ 68

   1.   Streamlining the Debtors' Structure and Governance ..................... 69

   2.   Cancellation of Indebtedness .................................................... 70

   3.   iCap Trust ............................................................................. 70

   4.   Substantive Consolidation ........................................................ 77

   5.   Preservation of Rights of Action ............................................... 79

   6.   Exit Financing ....................................................................... 81

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
vii

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11   Doc 1236   Filed 08/26/24   Entered 08/26/24 12:50:06   Pg 7 of 141

7. Abandonment of Certain Estate Assets ........................................................ 81

G. Executory Contracts and Unexpired Leases ................................................ 82

H. Conditions Precedent to the Effective Date ................................................ 82

1. Occurrence of Effective Date .................................................................... 82

2. Waiver of Conditions ................................................................................ 83

3. Non-Occurrence of Effective Date Conditions ........................................ 83

4. Effective Date Notice ................................................................................ 83

I. Certain Miscellaneous Provisions ................................................................ 83

1. Payment of Statutory Fees ........................................................................ 83

2. Mailing List ............................................................................................... 84

3. Employment of Professional Persons ...................................................... 84

4. Payments Shall Be Timely ........................................................................ 84

5. Treatment of Negotiable Instruments ...................................................... 84

6. Stay of Confirmation Order Shall Not Apply .......................................... 84

7. Preservation of Privileges and Defenses ................................................. 85

8. Releases and Related Matters ................................................................... 85

9. Exculpation ............................................................................................... 86

10. Injunction ................................................................................................. 86

11. Injunction Against Interference with the Plan ........................................ 87

12. SEC Rights ............................................................................................... 87

13. Insurance Policies .................................................................................... 88

14. Books and Records .................................................................................. 88

15. Severability .............................................................................................. 89

16. Revocation or Withdrawal of the Plan .................................................... 89

17. Notices ...................................................................................................... 89

18. Exhibits/Schedules ................................................................................... 91

19. Successors and Assigns ............................................................................ 91

20. Reservation of Rights ............................................................................... 91

21. Dissolution of the Unsecured Creditors' Committee ............................... 91

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

22. Votes Solicited in Good Faith ...................................................... 92

**ARTICLE VI . RISK FACTORS** ............................................................ **92**

A.  Parties May Object to the Plan's Classification of Claims and Equity
Interests ................................................................................................. 92

B.  The Plan Proponents May Not Be Able to Obtain Confirmation of
the Plan ................................................................................................. 92

C.  The Conditions Precedent to the Effective Date of the Plan May Not
Occur ..................................................................................................... 93

D.  Claims Estimation and Allowance of Claims ..................................... 93

E.  Potential Pursuit of iCap Trust Actions Against Creditors and Others ....... 94

F.  Delay in Liquidating iCap Trust Actions ............................................ 95

G.  Risks Regarding Real Estate .............................................................. 95

H.  Securities Law Considerations ........................................................... 96

I.  Tax Considerations ............................................................................. 97

J.  No Duty to Update Disclosures .......................................................... 97

**ARTICLE VII . CONFIRMATION OF THE PLAN** .................................... **98**

A.  The Confirmation Hearing .................................................................. 98

B.  Requirements for Confirmation of the Plan ....................................... 98

C.  Best Interests of Creditors ................................................................ 100

D.  Feasibility ......................................................................................... 101

E.  Acceptance by Impaired Classes ...................................................... 101

F.  Confirmation Without Acceptance by All Impaired Classes ............ 102

1.  No Unfair Discrimination ............................................................. 102

2.  Fair and Equitable Test ................................................................. 103

G.  Classification of Claims and Equity Interests ................................... 104

H.  Alternatives to Confirmation and Consummation of the Plan .......... 104

**ARTICLE VIII . CERTAIN SECURITIES LAW CONSEQUENCES OF THE
PLAN** ........................................................................................................ **105**

A.  General .............................................................................................. 105

1.  Status as Securities ....................................................................... 105

**SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

ix

2.  Transfer Restrictions on Beneficial Interests .............................................. 105

B.  Exemption From Offer and Sale of Securities Act and Blue Sky Laws.... 106

1.  Issuance of Beneficial Interests under Plan ................................................. 106

2.  Resale of Beneficial Interests After Plan Effective Date .......................... 107

3.  Exchange Act and Other Securities Law Compliance ............................... 107

**ARTICLE IX . CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................................................................ 109**

A.  Certain U.S. Federal Income Tax Consequences of the iCap Trust .......... 112

B.  Consequences to Holders of Claims Generally ........................................ 114

C.  Consequences to the iCap Trust Beneficiaries ......................................... 115

D.  Withholding on Distributions and Information Reporting ........................ 118

**ARTICLE X . RECOMMENDATION ................................................................ 120**

**EXHIBITS TO THE DISCLOSURE STATEMENT**

**Exhibit A: Joint Chapter 11 Plan of Liquidation**

**Exhibit B: Liquidation Analysis**

**Exhibit C: Recovery Analysis**

SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

x

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 10 of 141

# GENERAL OVERVIEW AND SUMMARY

This disclosure statement (the "<u>Disclosure Statement</u>") describes in detail the historical background that led to the chapter 11 cases of iCap Enterprises, Inc. and its affiliated debtors and debtors in possession (collectively, "<u>iCap</u>" or the "<u>Debtors</u>"), explains what has happened in the months since the Debtors commenced their bankruptcy cases, and sets forth the treatment of creditors in the *First Amended Joint Chapter 11 Plan of Liquidation of iCap Enterprises, Inc. and its Affiliated Debtors Proposed by the Debtors and Official Committee of Unsecured Creditors* (as amended, modified, or supplemented from time to time pursuant to its terms, the "<u>Plan</u>"). This overview and summary highlights the main points discussed in the Disclosure Statement, and should be read in conjunction with the remainder of the Disclosure Statement and Plan. A copy of the Plan is attached hereto as **<u>Exhibit A</u>**.[2] This general overview and summary is qualified by the express terms of the Plan.

**Provided herewith as a separate document is a statement of the Unsecured Creditors' Committee in support of the Plan, which should be reviewed by all Investors, Creditors, and other parties in interest.**

The Debtors were founded in 2007 by Chris Christensen ("<u>Christensen</u>") to invest in real estate opportunities in the Pacific Northwest. The Debtors, working collaboratively with the unsecured creditors' committee (the "<u>Unsecured Creditors' Committee</u>") appointed in these chapter 11 cases (the "<u>Chapter 11 Cases</u>"), expended significant efforts to analyze the facts and circumstances surrounding the failure of the iCap business and potential causes of action related to such failure, and both have independently determined that the iCap business enterprise operated as a "Ponzi scheme" during the prepetition period.[3]

**Christensen disagrees with the Debtors' and Unsecured Creditors' Committee's conclusions set forth herein, including any allegations of wrongdoing on his part, which he believes will be subject to further dispute.**

---

[2] All capitalized terms used but not defined herein shall have the meanings provided to such terms in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan will control and govern. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, any other order entered in the Chapter 11 Cases, or any other agreement to be executed by any Person pursuant to the Plan, the provisions of the Plan shall control and take precedence, except as otherwise expressly stated in the Plan; *provided, however,* that the Confirmation Order shall control and take precedence in the event of any inconsistency between the Confirmation Order, any provision of the Plan, and any of the foregoing documents.

[3] The Debtors' history, prepetition operations, and circumstances leading to the Debtors' Chapter 11 Cases, including further facts relating to the Ponzi scheme perpetuated by Christensen, are discussed further below in Article II and Article IV.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Following the revelation of the massive Ponzi scheme, the Debtors, together with the Unsecured Creditors' Committee, have worked diligently to maximize recoveries for the Debtors' Investors and other Creditors. The Debtors and the Unsecured Creditors' Committee, through months of open cooperation, information gathering, and negotiation for the benefit of all Investors, reached a global resolution, embodied in the proposed Plan, aimed at: (i) mitigating the damage inflicted by Christensen (and others) having operated the Debtors as a Ponzi scheme; and (ii) developing a level playing field that attempts to treat all aggrieved Investors equally and fairly.

Significantly, the proposed Plan is a "single pot" plan, meaning that under the Plan, generally, all of the assets and liabilities of all the Debtors will be pooled and consolidated for distribution purposes. This is legally referred to under the Plan as "substantive consolidation."[4] As a result of such substantive consolidation, among other things:

- Creditors of any Debtor entity are treated as if they have a Claim against the entire iCap enterprise, rather than a particular Debtor.

- Any and all purported equity interests of an Investor in any Debtor shall be automatically cancelled and extinguished as of the Effective Date, and deemed and treated as Investor Claims pursuant to the Plan, regardless of the prepetition designations or labels used by the Debtors and/or Investors.

- Investors will not receive a "premium" or other benefit based on the type of investment they held. Rather, all Investor Claims will be calculated in the same manner, and each Investor will receive a proportional recovery from the iCap Trust based on such Investor's Allowed Claim amount.

- Under the Plan, Investors are free to pursue recoveries that they may own directly against third parties. A couple of examples would be claims against an Investor's professional advisors or retirement servicers. These claims are defined in the Plan as Individual Investor-Specific Claims. Individual Investor-Specific Claims are those owned by an Investor that are **not** owned by the Debtors and, in turn, the iCap Trust under bankruptcy law. The Plan defines the claims that will be exclusively owned by the iCap Trust with

---

[4] By way of example, if Entity A holds $100 of assets and owes $0 of liabilities, and Entity B holds $0 of assets and owes $100 of liabilities, and if those two entities are substantively consolidated, the resulting entity will hold $100 of assets and owe $100 of liabilities.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

the exclusive right to pursue those claims. Specifically, the Plan defines these claims as Avoidance Actions and Causes of Action.

- If an Investor has questions about whether a claim is an Individual Investor-Specific Claim that the Investor can pursue directly, or an Avoidance Action or Cause of Action that only the iCap Trust can pursue, the Investor is encouraged to seek legal advice on the issue.

- In order to keep Investors informed of the iCap Trust's pursuit of Avoidance Actions and Causes of Action, the iCap Trustees will provide a quarterly report to Investors summarizing the recovery actions the iCap Trust has engaged in during the quarter and whether the iCap Trust is abandoning any specific Avoidance Actions or Causes of Action that it has determined it will not pursue, thus allowing Investors to pursue such actions, at their option.

- If an Investor does successfully recover from third parties, the Plan obligates the Investor to report that information within thirty (30) days of the recovery to the iCap Trustees. (*See* Plan, Article III.C.2.b.) The Plan also obligates Investors to respond within twenty-one (21) days to requests for information from the iCap Trustees. (*See* Plan, Article III.C.1.e.) If an Investor fails to comply with these requirements, the Plan provides that that Investor's Claim may be disallowed, in the iCap Trustees' discretion.

**The following disclosure and information is not intended in any way to provide tax advice to any Investor or third party. It is provided to identify what is reasonably believed to be a substantial benefit to the iCap Investors.**

Following the Madoff Ponzi scheme, the Internal Revenue Service (the "IRS") enacted special rules that address the possibility for victims of Ponzi schemes to deduct losses for income tax purposes pursuant to 26 U.S.C. § 165 that may allow Ponzi victims to deduct unlimited losses as a theft loss, instead of capital losses from an investment. Capital losses are normally limited to a maximum of $3,000 per year. Section 165(a) of the Internal Revenue Code of 1986, as amended (the "IRC") allows taxpayers to deduct theft losses sustained during the tax year in which the theft loss is discovered, to the extent not compensated by insurance or otherwise. Investors will need to consult their tax advisors to determine each of their specific rights under IRC section 165, if any.

In this case, Investors in iCap are owed an estimated $250,000,000. While deductions for losses will not begin to make these Investors whole, the ability to

SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION
3

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

deduct losses suffered in a Ponzi scheme, to the extent available, will likely provide a substantial and important benefit to the investor community.

To effectuate Distributions to Investors and other Creditors, the Plan provides for the creation of the iCap Trust, a liquidating trust, which will own the Estates' remaining assets and will sell or otherwise dispose of those assets to generate cash, and will distribute that (and other) cash to Creditors (including to Investors). Significantly, the iCap Trust will own all of the Debtors' litigation claims against third parties and may generate cash through prosecution or settlement of those claims. Cash will be distributed by the iCap Trust to Investors and other Creditors over time at the direction of the iCap Trustees.

As further detailed in the Plan, the Plan contemplates that:

- Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Claims, and Allowed Secured Claims are all unimpaired under the Plan. The Plan provides for the satisfaction in full of such Claims as described in Article III of the Plan.

- Holders of Allowed Investor Claims will receive (i) on the later of the Effective Date and thirty (30) calendar days following the date on which such Investor Claim becomes an Allowed Investor Claim, one (1) Class A iCap Trust Interest for each dollar of Allowed Investor Class A Claims and one (1) Class B iCap Trust Interest for each dollar of Allowed Investor Class B Claims held by the applicable Investor (any resulting fractional iCap Trust Interests will be rounded to the nearest hundredth of such iCap Trust Interest), and (ii) the other consideration provided for in the Investor Claims Special Provisions set forth in Article III.C.1 of the Plan.

- Holders of Allowed General Unsecured Claims will receive on the later of the Effective Date and thirty (30) calendar days following the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, one (1) Class A iCap Trust Interest for each dollar of Allowed General Unsecured Class A Claims and one (1) Class B iCap Trust Interest for each dollar of Allowed General Unsecured Class B Claims held by the applicable Holder (any resulting fractional iCap Trust Interests will be rounded to the nearest hundredth of such iCap Trust Interest).

- Holders of Allowed Subordinated Claims will retain a residual right to receive Available Cash that remains in the iCap Trust after the final administration of all iCap Trust Assets, and the complete satisfaction of all

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
4

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

senior payment rights within the iCap Trust Interests Waterfall, including satisfaction of all Investor Class B Claims and General Unsecured Class B Claims.

Critically, the Plan Proponents have ensured that Creditors continue to have an advisory role in connection with certain key decisions that will be made by the iCap Trust by creating the iCap Trust Supervisory Board to serve in conjunction with the iCap Trustees. Lance Miller, the Debtors' current Chief Restructuring Officer, and Seth Freeman will serve as the initial iCap Trustees. The initial members of the iCap Trust Supervisory Board will be Lilian Tan, Thomas Temple, and Jay Kornfeld of Bush Kornfeld LLP.

**ARTICLE X OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, WHICH ARE DISCUSSED IN ARTICLE V.I OF THIS DISCLOSURE STATEMENT. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE IT MAY AFFECT YOUR RIGHTS.**

The Plan Proponents understand the precarious financial position that many Investors are in as a result of the Ponzi scheme. The Plan Proponents believe that the settlement reflected in the Plan, which is the result of extensive negotiations with significant Investor input, represents the best outcome of these unfortunate circumstances, and importantly, provides the best prospect for Investors and other Creditors to receive Distributions as soon as reasonably possible. **The Unsecured Creditors' Committee supports the Confirmation of the Plan.**

## <u>QUESTIONS AND ADDITIONAL INFORMATION</u>

If you would like to obtain copies of this Disclosure Statement, the Plan, the Plan Supplement, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Chapter 11 Cases generally, please contact BMC Group, Inc. by (i) visiting the Debtors' case website at https://cases.creditorinfo.com/iCap, (ii) calling BMC at (888) 909-0100, or (iii) sending email correspondence to iCap@bmcgroup.com (please reference "iCap" in the subject line).

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
5

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 15 of 141

# ARTICLE I.
## INTRODUCTION

The purpose of this Disclosure Statement is to enable Creditors (including Investors) whose Claims are Impaired under the Plan and who are entitled to vote on the Plan to make an informed decision when exercising their right to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection under chapter 11 of the Bankruptcy Code, the course of these Chapter 11 Cases, and the anticipated orderly liquidation of the Estate Assets. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting and election procedures that Creditors entitled to vote under the Plan must follow for their votes to be counted.

## A.  Overview of the Plan[5]

### 1.  General Structure of the Plan

A bankruptcy plan is a vehicle for satisfying the rights of holders of claims against and equity interests in a debtor. Consummation of a plan is the overriding purpose of a chapter 11 case. Upon confirmation and effectiveness, a plan becomes binding on the debtor and all of its creditors and equity interest holders.

In these Chapter 11 Cases, the Plan contemplates a liquidation of each of the Debtors and is therefore referred to as a "plan of liquidation." The Debtors' assets largely consist of interests in real properties, Cash, and the iCap Trust Actions under the Plan. The iCap Trust Actions include all Avoidance Actions and Causes of Action held by the Debtors or the Estates and any Causes of Action that are contributed to the iCap Trust as Contributed Claims, in each case as against any Person that is not a Released Party.

### 2.  Material Terms of the Plan

The Plan provides for the creation of the iCap Trust, as well as the appointment of the iCap Trustees, who will administer and liquidate all remaining property of the Debtors and their Estates, subject to the supervision and oversight of the iCap Trust Supervisory Board, all as described more fully in Article V.D of this Disclosure

---

[5] The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
6

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Statement. The Plan also provides for Distributions to be made to certain Holders of Administrative Expense Claims, Priority Tax Claims, Priority Claims, Secured Claims, Investor Claims, General Unsecured Claims, and potentially Subordinated Claims, and for the funding of the iCap Trust. The Plan also provides for substantive consolidation of the Debtors and their Estates as of the Effective Date. Finally, the Plan provides for the approval of the Exit Financing, the dissolution and wind-up of the affairs of the Debtors, and the administration of any remaining assets of the Debtors' Estates by the iCap Trustees.

3. <u>Summary of Treatment of Claims and Equity Interests Under the Plan</u>

The table below summarizes the classification and treatment of Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES FOR THE CLAIMS SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES MAY DIFFER. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE PLAN.**

| CLASS | DESCRIPTION | IMPAIRED / UNIMPAIRED | ENTITLED TO VOTE? | PROJECTED RECOVERY[6] |
|-------|-------------|----------------------|-------------------|----------------------|
| Class 1 | Priority Claims | Unimpaired | No | 100% |
| Class 2 | Secured Claims | Unimpaired | No | 100% |
| Class 3 | Investor Claims | Impaired | Yes | 1–34% |
| Class 4 | General Unsecured Claims | Impaired | Yes | 1–34% |
| Class 5 | Subordinated Claims | Impaired | No | 0% |
| Class 6 | Equity Interests | Impaired | No | 0% |

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR**

---

[6] The projected recoveries to Creditors set forth in this Disclosure Statement estimate a range of $25 million to $125 million for the ultimate recoveries on the iCap Trust Actions. The potential proceeds of the iCap Trust Actions, however, are unpredictable and highly contingent. Among other things, although the Plan Proponents believe that strong litigation claims may exist, the ability to collect any judgment on those claims remains unknown at this time.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

CONSTITUENTS. FOR THESE REASONS, THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN.

THE PLAN IS THE PRODUCT OF EXTENSIVE NEGOTIATION WITH, AND IS SUPPORTED BY, THE UNSECURED CREDITORS' COMMITTEE APPOINTED IN THE CHAPTER 11 CASES, WHO WILL BE PROVIDING THEIR OWN STATEMENT SIMILARLY URGING HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN.

**B.     Plan Voting Instructions and Procedures**

1.     <u>Voting Rights</u>

Under the Bankruptcy Code, only classes of claims or equity interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under Bankruptcy Code section 1126 are entitled to vote to accept or reject such plan. Any class that is "unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted such plan. As set forth in Bankruptcy Code section 1124, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered by the proposed plan. Holders of claims or equity interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under Bankruptcy Code section 502.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the amount of allowed claims voting to accept such plan. Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan; only those non-insider holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Under the Plan, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their Ballots in favor of acceptance.

Only Holders of Claims in Class 3 (Investor Claims) and Class 4 (General Unsecured Claims) as of August 26, 2024 (the "<u>Voting Record Date</u>") may vote to accept or reject the Plan. Pursuant to the Plan, Claims in Class 3 (Investor Claims)

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

and Class 4 (General Unsecured Claims) are impaired by, and entitled to receive a Distribution under, the Plan, and only the Holders of Claims in those Classes that are Allowed Claims or have been deemed allowed for voting purposes are entitled to vote to accept or reject the Plan.

Pursuant to the Plan, Claims in Class 1 (Priority Claims) and Class 2 (Secured Claims) are unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

The Plan Proponents have determined not to solicit the votes of Holders of any Subordinated Claims in Class 5, and such Holders shall be deemed to have rejected the Plan and, therefore, such Holders are not entitled to vote on the Plan. Pursuant to the Plan, Equity Interests in Class 6 will not receive or retain any property under the Plan on account of such Equity Interests, and are therefore deemed to reject the Plan and are not entitled to vote on the Plan.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to Bankruptcy Code section 1126(e), that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

2.  Solicitation Materials

The Debtors, with the approval of the Bankruptcy Court, have engaged BMC Group, Inc. (the "Voting Agent") to serve as the voting agent to process and tabulate Ballots and to generally oversee the voting process. The following materials constitute the solicitation package (the "Solicitation Package"):

– This Disclosure Statement, including the Plan and all other exhibits and schedules thereto;
– The Bankruptcy Court order approving this Disclosure Statement (the "Disclosure Statement Order") (excluding exhibits);
– The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters, (ii) the deadline to vote on the Plan, and (iii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");
– For Holders of Claims in Class 3 (Investor Claims) or Class 4 (General Unsecured Claims), one or more Ballots, to be used in voting to accept or to reject the Plan and the applicable instructions to vote on the Plan (the

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
9

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

"Voting Instructions") and, in the case of Investors, instructions on how to elect to contribute their Contributing Claims to the iCap Trust;[7]
– A pre-addressed, postage pre-paid return envelope; and
– Such other materials as the Bankruptcy Court may direct or approve.

The Plan Proponents, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order. In accordance with the *Order Granting Debtors' Ex Parte Motion for Entry of Order: (I) Limiting Scope of Notice; (II) Authorizing Service to Investors by Email; and (III) Granting Related Relief* [ECF No. 63], the Solicitation Package will be served via email on the Investors. The Solicitation Package, exclusive of Ballots, is also available free of charge on the Debtors' case website located at https://cases.creditorinfo.com/iCap.

On or before the date that is fourteen (14) calendar days prior to the Voting Deadline, the Plan Proponents will file a Plan Supplement, which will contain additional information relating to the Plan and its implementation that you are encouraged to read, including, without limitation, the iCap Trust Agreement and the Exit Financing documents. As the Plan Supplement is updated or otherwise modified, it will be made available free of charge at the Debtors' case website at https://cases.creditorinfo.com/iCap.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by emailing iCap@bmcgroup.com or calling the Voting Agent at (888) 909-0100.

You are encouraged to read all of the materials in the Solicitation Package in their entirety, including, without limitation, the Disclosure Statement Order and the Voting Instructions for important information about how and when to cast your vote.

If your Claim is subject to a pending claim objection and you wish to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes and your Claim or portion thereof, as applicable, must be temporarily allowed by the Bankruptcy Court for voting purposes by the Voting Deadline or you will not be entitled to vote to accept or reject the Plan.

---

[7] **The amount of the Claim on the Ballot is for voting purposes only.** The allowance of Claims in Class 3 (Investor Claims) and Class 4 (General Unsecured Claims) for distribution purposes shall be determined separately in accordance with the process and procedures described in the Plan.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**

10

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

**THE DEBTORS AND THE ICAP TRUST, AS APPLICABLE, RESERVE THE RIGHT, THROUGH THE CLAIM OBJECTION PROCESS, TO OBJECT TO OR SEEK TO DISALLOW OR SUBORDINATE ANY CLAIM FOR DISTRIBUTION PURPOSES, EXCEPT AS MAY BE EXPRESSLY PROVIDED OTHERWISE IN THE PLAN OR CONFIRMATION ORDER.**

3. <u>Voting Instructions and Procedures</u>

As set forth in the Disclosure Statement Order, all votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Plan Proponents or the Voting Agent. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed the Voting Record Date for the determination of the Holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot and making any applicable elections.

**The deadline to vote on the Plan is October 2, 2024 at 4:00 p.m. (prevailing Pacific Time) (the "<u>Voting Deadline</u>").** In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and actually received no later than the Voting Deadline. You can submit your Ballot electronically via the Voting Agent's online balloting portal (the "<u>E-Balloting Portal</u>") at https://cases.creditorinfo.com/iCap by clicking the "Submit E-Ballot" section on the Debtors' case website and following the instructions to submit your Ballot. You can also submit your Ballot by mailing your completed Ballot to the Voting Agent at the following address:

> **<u>By Regular Mail:</u>**
> BMC Group
> Attention: iCap Ballot Processing
> P.O. Box 90100
> Los Angeles, CA 90009

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

11

23-01243-WLH11   Doc 1236   Filed 08/26/24   Entered 08/26/24 12:50:06   Pg 21 of 141

**By Overnight Courier or Hand Delivery:**
BMC Group
Attention: iCap Ballot Processing
3732 W. 120th St.
Hawthorne, CA 90250

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

Only the Holders of Allowed Claims or Claims that are deemed allowed for purposes of voting on the Plan in Class 3 (Investor Claims) and Class 4 (General Unsecured Claims) as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and either (i) submitting those Ballots electronically via the Voting Agent's E-Balloting Portal at https://cases.creditorinfo.com/iCap by clicking the "Submit E-Ballot" button and following the instructions to submit your Ballot, or (ii) returning those Ballots in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim must vote its entire Claim either to accept or to reject the Plan and may not split such vote. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific Voting Instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions accompanying the Ballots, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

- Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;
- Any Ballot received after the Voting Deadline, except if the Plan Proponents have granted an extension of the Voting Deadline with respect to such Ballot in writing, or by order of the Bankruptcy Court;
- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;
- Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;
- Any Ballot cast by a Person that does not hold a Claim in a voting Class;
- Any Ballot that is not signed or does not contain an original signature; and

**SECOND AMENDED DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION**
12

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

– Any Ballot sent by facsimile, email, or electronic method other than via the Voting Agent's E-Balloting Portal.

Any party who has previously submitted a properly completed Ballot to the Voting Agent prior to the Voting Deadline may revoke such Ballot and change its vote or elections by submitting to the Voting Agent, prior to the Voting Deadline, a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

If you have any questions about (a) the procedure for voting your Claim or making elections on your Ballot, (b) the Solicitation Package that you have received, or (c) the amount of your Claim (which is for VOTING PURPOSES ONLY), or if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan, this Disclosure Statement, or any appendices, schedules, or exhibits to such documents, please contact the Voting Agent. Copies of the Plan, Disclosure Statement, and other documents filed in these Chapter 11 Cases may be obtained free of charge on the Debtors' case website at https://cases.creditorinfo.com/iCap. Documents filed in these Chapter 11 Cases may also be viewed at the United States Bankruptcy Court PACER website at http://www.waeb.uscourts.gov.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") on or before October 9, 2024. The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
13

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

**THE DEBTORS, TOGETHER WITH THE UNSECURED CREDITORS' COMMITTEE, URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN BY THE VOTING DEADLINE.**

  4.  <u>Election on Investor Ballots to Contribute Certain Claims</u>

   The Ballots also permit each Holder of a Class 3 Investor Claim to elect to assign its Contributed Claims to the iCap Trust. By electing such option on its Ballot, the applicable Investor agrees that, subject to the occurrence of the Effective Date and the formation of the iCap Trust, it will be deemed to have, among other things, assigned its Contributed Claims to the iCap Trust. Pursuant to the Plan, "Contributed Claims" are all Causes of Action that a Creditor has against any Person that is not a Released Party and that are related in any way to the Debtors, their predecessors, their respective affiliates, or any Excluded Parties, excluding any Individual Investor-Specific Claims. The relative share of iCap Trust recoveries for any electing Investor will be enhanced by having the amounts that otherwise would be its Allowed Investor Class A Claim and its Allowed Investor Class B Claim each increased by the Contributing Claimants' Enhancement Multiplier – *i.e.*, 10%.

   In the event a Holder intends to apply certain IRS safe harbor procedures relating to the deduction of losses realized by Investors in certain fraudulent investment schemes (discussed more fully below in Article IX.C), the transfer by such Holder of a claim against a third party to the iCap Trust may affect the manner in which such safe harbor procedures can be applied. Accordingly, Holders are urged to consult with their own tax advisors regarding the potential tax consequences to them of transferring third party claims to the iCap Trust, including the effect of such transfer on the manner in which the IRS safe harbor procedures relating to the deduction of losses realized by Investors in certain fraudulent investment schemes may be applied.

**ARTICLE II.**
**<u>BACKGROUND</u>**

   The information provided in this Article is based on the Debtors' books and records as well as the Debtors' ongoing investigation into the facts and circumstances surrounding the failure of the iCap business and potential causes of action related to such failure. The Debtors' investigation was overseen by their independent Board of Directors and spearheaded by Lance Miller, the Debtors' Chief Restructuring Officer ("CRO"), with substantial support from the Debtors' advisors and counsel. The Debtors conducted the investigation in collaboration with the Unsecured Creditors'

**SECOND AMENDED DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION**
14

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Committee and its advisors, including forensic accounting professionals at B. Riley, the Unsecured Creditors' Committee's financial advisor, and the Unsecured Creditors' Committee's lawyers. The investigation included an analysis of the Debtors' accounting platform, bank statements, financial statements, and other financial records, as well as interviews with former employees willing to speak to the Debtors. The Debtors' investigation was further supported by a forensic accounting professional, Jeffrey H. Kinrich of Analysis Group, who is a certified public accountant, with extensive experience investigating and testifying on financial and accounting issues related to distressed companies. The summary contained in this Article is largely based on materials disseminated by Christensen, on behalf of the Debtors.

## A.    Debtors' Organizational Structure

The Debtors are part of a group of affiliated entities (collectively, the "iCap Entities") formed by, and formerly controlled by, Christensen.

The Debtors were founded beginning in 2007 by Christensen to allegedly invest in real estate opportunities in the Pacific Northwest. Beginning in 2014, the Debtors grew quickly, raising more than $245 million in capital and deploying those funds toward real estate investments.  By early 2023, the Debtors employed more than 35 employees in their headquarters based in Bellevue, Washington.

On September 28, 2023, Christensen resigned all positions at the Debtors and Lance Miller of Pivot Management Group (formerly of Paladin Management Group) was appointed CRO and Manager, as applicable, with full and exclusive control and authority over the Debtors and the prosecution of these Chapter 11 Cases.

### 1.    Business Divisions and Organization

The Debtors invested in two categories of real estate, across two divisions of operations known as the "Portfolio Business" and the "Vault Business."

The Portfolio Business is the oldest of the Debtors' business lines. It operated under Debtor iCap Equity, LLC and various subsidiaries. According to Christensen, the Portfolio Business focused on development opportunities for multifamily real estate projects. In some cases, these projects started with raw and unentitled land, and in other cases the projects began with building permits in place or the improvement of existing structures.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

According to Christensen, the Vault Business was started in 2018 for the purpose of investing in standalone real estate investments that had the potential to be or already were cash flow positive. The Vault Business operated under Debtor iCap Vault, LLC and various subsidiaries. Among these subsidiaries, iCap Vault 1, LLC ("Vault 1"), is registered with the U.S. Securities and Exchange Commission and issued publicly registered, non-traded debt under CIK # 1800199.

Both businesses existed under iCap Enterprises, Inc. ("Enterprises") in the Debtors' corporate structure. Properties within both businesses were held by single purpose entities (the "SPE Debtors"). The Debtors' organizational structure is reflected below.



iCap Debtor Organizational Chart

1. Box A consists of the Class A Units holders of Senza Kenmore, LLC: (i) Devout Capital Limited, (ii) Shiyu Zhang, (iii) Qiong Huang, and (iv) Fengdi Chen.
2. VH Property Owner Entities consists of the following prop co. Debtors, all of which are Delaware limited liability companies: (i) VH Willows Townhomes, LLC; (ii) VH Senior Care, LLC; (iii) VH 1121 14th, LLC; (iv) VH 2nd Street Office, LLC; and (v) VH Pioneer Village, LLC.
3. iCap Vault Management, LLC is the Manager of (i) all prop co. Debtors included in VH Property Owner Entities, (ii) Vault Holding, LLC, (iii) Vault Holding 1, LLC, and (iv) iCap Vault 1, LLC.
4. iCap Pacific NW Management, LLC is the Manager of (i) 725 Broadway, LLC (ii) iCap Campbell Way, LLC; (iii) UW 17th Ave, LLC; (iv) Senza Kenmore, LLC; (v) iCap Pacific Income Fund 4, LLC; (vi) iCap Pacific Income Fund 5, LLC; (vii) iCap Northwest Opportunity Fund, LLC; (viii) iCap Northwest Opportunity and Income Fund, LLC; and (viiii) iCap Equity Inc.
5. Highlighted entities in green are prop co. Debtors.
6. See property specific organizational charts for further details and ownership percentages.

Enterprises also maintained the Debtors' headquarters and employed the majority of the Debtors' employees.

2.    Real Estate Assets

On the Petition Date, the Debtors owned or controlled the real estate properties set forth in the table below, spread across both businesses. Many of these properties are subject to mortgages or other first deeds of trust. The table reflects the Debtors' property assets, and estimated third-party, first-position mortgage balances as of the Petition Date:

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
16

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

| Debtor Owner | Address | Appx. 1st Asserted Position Mortgage Debt | Mortgage Lender | Status of Property |
|---|---|---|---|---|
| 725 Broadway, LLC | 715-775 Broadway, Tacoma, WA | $500,000 | Serene Investment Management[8] | Subject to settlement agreement with Serene Investment Management (*see* Article III.C.1) |
| CS2 Real Estate Development, LLC | 18416 Bothell Everett Hwy, Bothell, WA | Scheduled in the amount of $16,724,500.00 as contingent, unliquidated, and disputed. | Ready Capital / Broadmark Lending, LLC | Subject to ongoing sale negotiations (*see* Article III.K) |
| iCap Campbell Way LLC | 1231 Campbell Way, Bremerton, WA | $500,000 | Serene Investment Management | Sale approved [ECF No. 1179] |
| Senza Kenmore, LLC | 15550 84th Ave SE, Kenmore, WA | N/A | N/A | Sale approved [ECF No. 562] |
| UW 17th Ave, LLC | 4740 17th Ave NE, Seattle, WA | N/A | N/A | Sale approved [ECF No. 762] |
| VH 1121 14th LLC | 1117 A 14th Ave., Seattle, WA 1117 B 14th Ave., Seattle, WA 1119 A 14th Ave., Seattle, WA 1119 B 14th Ave., Seattle, WA 1121 14th Ave., Seattle, WA | $3,211,693.75 [POC 160] | Wilmington Savings Fund Society, FSB as Owner Trustee of MFA 2022-RTL1 Trust LLC | Sales approved [ECF Nos. 717, 814, 815, 816, 817] |
| VH 2nd Street Office LLC | 2818 E. 2nd St., Vancouver, WA | $3,231,457.50 [POC 159] | Socotra Reit I LLC; WE Alliance Secured Income Fund, LLC; Jason A. Yelowitz, Trustee of the Jason Yelowitz 2006 | Sale approved [ECF No. 361] |

---

[8] As discussed in further detail below, Serene Investment Management, LLC is one of the Debtors' DIP lenders. These liens were granted to Serene Investment Management in connection with a prepetition bridge loan, which the Debtors rolled up as part of the Serene DIP Loan (as defined below).

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
17

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

| Debtor Owner | Address | Appx. 1st Asserted Position Mortgage Debt | Mortgage Lender | Status of Property |
|---|---|---|---|---|
| | | | Trust, Dated March 31, 2006 | |
| VH Pioneer Village LLC | 4318 S. Settler Dr., Ridgefield, WA | $2,102,641.56 as of March 31, 2024 [POC 116] | Tritalent Funding Group, Inc. | Sale approved [ECF No. 1180] |
| VH Senior Care LLC | 302 SE 146th St., Burien, WA | $1,797,629,16 [POC 117] | Redmond Funding Group | Subject to ongoing sale negotiations (*see* Article III.K) |
| | 1226 160th St. SW, Lynwood, WA | | | Sale approved [ECF No. 721] |
| VH Willows Townhomes LLC | 4906 A Willow St., Seattle, WA 4910 B Willow St., Seattle, WA 4912 B Willow St., Seattle, WA | $1,962,519.58 [POC 124] | Wilmington Savings Fund Society, FSB as Owner Trustee of MFA 2022-RTL1 Trust | Sales approved [ECF No. 718, 719, 904] |
| | 4918 C Willow St., Seattle, WA | | | Sale approved [ECF No. 720] |

## B.     The Debtors' Capital Structure

Based on the materials prepared and disseminated by Christensen and the Debtors, the Debtors funded their operations with a combination of minimal cash flow from business operations and primarily funded indebtedness.

### 1.     Property-Level Secured Obligations

Various of the SPE Debtors and their real estate properties are subject to deeds of trust for mortgages and other secured debt arising from the acquisition, development, and/or ownership of real property.  These obligations are generally owed by the SPE Debtor that owns the property at issue.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
18

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

## 2. Portfolio Notes

The Debtors purportedly raised debt financing in connection with the Portfolio Business through private placements of debentures and promissory notes issued by various Debtors (the "Portfolio Notes"). The Portfolio Notes provided for interest rates ranging from 6% to 15% per annum. Portfolio Notes were not issued by the SPE Debtors (which owned the Portfolio real estate assets), but instead were issued by Debtor entities that owned equity, directly or indirectly, in the SPE Debtors.

## 3. Vault Notes

The Vault Business financed its operations through the issuance of both private placement notes and public demand notes.

*Private Placement Notes.* Beginning in July 2018, Vault 1 commenced a private placement of up to $500 million of private placement notes (the "Vault Notes"). Approximately $2.0 million of the Vault Notes are held by a joint venture owned and controlled by Christensen. As stated in materials disseminated by the Debtors, the Vault Notes were secured by assets of Vault 1 through a Pledge and Security Agreement, including its equity interests in subsidiaries and certain SPE Debtors. The Vault Notes were also guaranteed by Vault Holding, LLC through a Guaranty Agreement.

*Vault Public Demand Notes.* Pursuant to an Indenture dated September 18, 2020, Vault 1 authorized up to $500 million in Variable Denomination Floating Rate Demand Notes (the "Vault Debentures"). American Stock Transfer & Trust Company, LLC, serves as the trustee for the Vault Debentures. The Vault Debentures accrue interest at a floating rate per annum equal to the average savings account rate as posted by the Federal Deposit Insurance Corporation plus 2.00%, reset quarterly. As stated in materials disseminated by the Debtors, the Vault Debentures are guaranteed by Debtor Vault Holding 1, LLC ("Holding 1"), and pursuant to a Pledge and Security Agreement dated September 18, 2020, the Vault Debentures were purportedly secured by a pledge of the ownership interests in Holding 1. Pursuant to the Indenture, the Vault Debentures are subordinate to right of payment with respect to third party credit facilities.

As of the Petition Date and according to the Debtors' books and records, the total amount of outstanding Vault Notes and Vault Debentures totaled approximately $36.2 million.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
19

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

### 4. The Debtors' Capital Raising Efforts from Individual Investors

Based upon the Debtors' books and records, as of the Petition Date, the Debtors' note obligations are held by approximately 1,800 individual Investors. The Debtors' prepetition fundraising efforts relied substantially on raising debt capital from individual Investors both within and outside of the United States, including China, Taiwan, the United Kingdom, and the British Virgin Islands. All of the Debtors' top 30 creditors are Investors, with claims ranging from $730,000 to $10.5 million.

### 5. Intercompany Obligations

In the ordinary course of business, the Debtors advanced funds to each other. Some of those advances were recorded as loans in the Debtors' books and records, and others were formally documented as loan agreements.

### 6. Equity Ownership

Enterprises is the ultimate parent for all of the Debtors other than iCap Investments, LLC ("Investments"). Christensen is the sole shareholder/member of both Enterprises and Investments. On September 28, 2023, Christensen resigned all positions at the Debtors and Lance Miller was appointed as the sole member of the Board of Directors and Chief Restructuring Officer of Enterprises, as well as Manager of Investments, and all of their direct and indirect subsidiary limited liability companies, with full and exclusive control and authority over the Debtors and the prosecution of these Chapter 11 Cases.

## C. Overview of the iCap Funds

According to Christensen, the original vision for the Debtors was primarily focused on investing as a passive investor in developers who would then be required by contract or operating agreement to develop specific projects. Under this structure, the Debtors would take a preferred equity position in the developer. The Debtors' activities would then be focused on finding new deals and monitoring the activity of development partners.

The Debtors chose to raise capital from Investors through debentures that required monthly interest payments – payments that would be required regardless of whether the underlying real estate investments were themselves producing positive cash flow.

**SECOND AMENDED DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION**
20

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

1.   Fund 1

The first "fund," iCap Pacific Northwest Opportunity and Income Fund, LLC ("Fund 1"), was formed in December 2013.[9] Fund 1 raised $46.2 million in private placement debentures. Fund 1 investments were offered in partnership with Skyway Advisors, LLC as a managing dealer under the terms of a Selling Agreement. As stated in materials disseminated by the Debtors, the debentures were marketed as secured instruments, with liens on substantially all of Fund 1's assets. The Fund 1 Purchase Agreement further required the Debtors to enter into a Security Agreement, Pledge and Security Agreement, Deposit Account Control Agreement, and UCC Financing Statements, all of which were attached as exhibits to the Fund 1 offering memorandum. The Fund 1 Purchase Agreement also provided for appointment of a collateral agent, Kevin A. Carreno, P.A., as the exclusive agent for enforcing rights under the Fund 1 Purchase Agreement.

The Fund 1 offering was designed to be attractive to both Investors and the brokers and registered investment advisors who connected them with the Debtors. As reflected in the materials prepared by Christensen and the Debtors, the Fund 1 debentures offered Investors a 12% interest rate per annum, paid monthly, plus a premium of 25% of net profits paid upon repayment. In addition, the Debtors offered brokers, including the managing dealer, total compensation of $3.9 million, including a 7.0% selling commission, a 1% due diligence fee, a 2% managing dealer fee, and a 3% fee for marketing and underwriting. These attractants proved powerful, with the Debtors oversubscribing the Fund 1 debentures for a total raise of $45.4 million.

The Debtors' investigation indicates that the Debtors ultimately did not honor its promises made in the Fund 1 offering memorandum and Fund 1 Purchase Agreement to secure the Fund 1 debentures with liens on substantially all assets of Fund 1 and its special purpose entities. Specifically and among other things, title reports for some of the properties acquired with Fund 1's proceeds do not reflect deeds of trust to secure liens held by the Fund 1 Investors. Similarly, whereas Fund 1 had its own bank account, it does not appear that a Deposit Account Control Agreement was ultimately placed on that account.

When the principal for the collateral agent died in March 2016, a replacement agent was not appointed, leaving Investors with no ability to enforce rights under the Fund 1 Purchase Agreement or related agreements.

---

[9] Prior to Fund 1, the Debtors had two earlier investment vehicles, iCap B1, LLC (formed in September 2013) and iCap B2, LLC (formed in October 2013).

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

The Debtors purportedly deployed the Fund 1 debenture proceeds between February 2014 and October 2015, investing in more than 30 projects.

## 2. Fund 2

The second "fund," iCap Northwest Opportunity Fund, LLC ("Fund 2"), was formed in April 2015 – almost exactly a year from closure of Fund 1's subscription period. Its structure and fundraising resembled Fund 1 in most respects, with a managing dealer (Stillpoint Capital, LLC), a collateral agent (Experts Counsel, Inc.), referenced accountants and outside counsel. It raised $46.5 million through private placement debentures. As stated in materials prepared by Christensen and the Debtors, Fund 2's debentures matured December 31, 2017, and promised interest of 10% per annum, paid monthly in arrears, with a payoff premium of 35% of Fund 2's net profits. Brokerage fees and commissions matched those of Fund 1, totaling $4.0 million (albeit comprised of different individual fees).

As with Fund 1, the Fund 2 Purchase Agreement anticipated that the debentures would be secured by liens on substantially all assets of Fund 2 and the underlying real estate. As with Fund 1, the Debtors' investigation indicates that the Debtors ultimately did not honor their promises to grant these liens.

The principal for the collateral agent was the same principal for Fund 1's collateral agent, and was not replaced after his death, leaving Investors in the same position as Fund 1 Investors, with no ability to enforce rights under the Fund 2 Purchase Agreement or related agreements.

The Debtors deployed the Fund 2 debenture proceeds between May 2015 and December 2018, investing in more than 25 projects.

### a. *Fund 1 and Fund 2 Extensions*

The Debtors modeled Funds 1 and 2 on the assumption that individual investments would conclude within 24 months. In reality, however, the Debtors' expectations proved too optimistic. By November 2016 (one month before maturity of Fund 1 and only a year before Fund 2 matured), the Debtors had exited 22 of its original investments with an average hold period of 441 days. Only nine of those projects were exited within one year of the initial investment date. Another 20 original investments were still pending, with an average hold period of 661 days. In addition, despite consistent statements by the Debtors in quarterly newsletters and investor calls that both funds were performing well, according to the Debtors' books

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
22

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

and records, Fund 1's real estate investments lost approximately $38 million through 2021, and Fund 2's investments lost $18.5 million through 2021.

*Fund 1 Extensions*. Fund 1 matured in December 2016. The Debtors were unable to repay the Fund 1 debentures. In advance of that maturity date, in May 2016 the Debtors asked Investors to agree to extend the maturity date to December 31, 2017 (the "Fund 1 First Extended Maturity Date"). The extension letter provided Investors with the option to either extend the maturity date for their investments, or keep the existing maturity date.

A number of Investors elected not to extend their maturity dates but did not receive repayment of their principal at that time. The Debtors' books and records do not reflect payment of any principal amounts made in response to this letter.

The Fund 1 First Extended Maturity Date occurred on December 31, 2017. The Debtors were still unable to repay the Fund 1 debentures. The Debtors therefore delivered notice to Fund 1 Investors, dated November 30, 2017, purporting to extend the maturity date to March 31, 2018 (the "Fund 1 Second Extended Maturity Date"). Even by the Fund 1 Second Extended Maturity Date, the Debtors were unable to and did not repay the Fund 1 debentures. On March 1, 2018, the Debtors again contacted Investors and requested an extension to December 31, 2020, with two one-year extensions (the "Fund 1 Third Extended Maturity Date"). This time, the correspondence warned Investors that their monthly interest payments would stop unless they agreed to the extension.

The Debtors were unable to repay the Fund 1 debentures by the Fund 1 Third Extended Maturity Date. On November 5, 2020, the Debtors contacted Investors and provided them with a choice to either "roll over" their Fund 1 debentures into another iCap fund, or stay with Fund 1 but subject to a one-year extension of the maturity date (to December 31, 2021).

Despite all of these extensions, the Debtors continued to pay interest to Investors.

*Fund 2 Extensions*. Fund 2 matured on December 31, 2017. The Debtors were unable to repay the Fund 2 debentures, and therefore exercised an option to extend the maturity date by a year, to December 31, 2018 (the "Fund 2 First Extended Maturity Date"). The Debtors' books and records do not reflect payment of any principal amounts made in response to this letter.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
23

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

The Debtors were still unable to repay the Fund 2 debentures by the Fund 2 First Extended Maturity Date. On November 9, 2018, the Debtors emailed Investors and asked for an additional extension to December 31, 2020, and two additional one-year extensions (the "Fund 2 Second Extended Maturity Date"). By the further extended maturity date, the Debtors were unable to and did not repay the Fund 2 debentures. On November 5, 2020, the Debtors contacted Investors and provided them with a choice to either "roll over" their Fund 2 debentures into another iCap fund, or stay with Fund 2 but subject to a one-year extension of the maturity date (to December 31, 2021).

As with Fund 1, despite all of these extensions, the Debtors continued to pay interest to Investors.

3.    Fund 3

In November 2017 – a month before Fund 2's original maturity date and the Fund 1 First Extended Maturity Date – the Debtors launched "Fund 3," iCap Equity, LLC. Fund 3 was unique in that it did not own or invest in real estate projects directly. Instead, as stated in materials prepared by Christensen and the Debtors, Fund 3 was marketed as a parent vehicle or "fund of funds" that owned equity interests in Funds 1 and 2 and could benefit from income generated from those Funds. In addition, Fund 3 would ultimately serve as a vehicle to facilitate "rollovers" of investments in Funds 1 and 2. With an initial raise of $10 million ("Fund 3 Round 1"), the Debtors purportedly sought to raise capital primarily to address expansion plans. As part of this round, the Debtors represented that Fund 3's income streams already supported profitable operations, such that proceeds from the proposed investments would be used for corporate growth and expansion plans of the Debtors as they launched additional investment fund vehicles, made direct real estate investments, and retired prior obligations.

Fund 3 Round 1 raised a total of $33.6 million in new investment. The Debtors began deploying the proceeds of Fund 3 Round 1 to address payments owed to Fund 1 and Fund 2 Investors.

Following the close of Fund 3 Round 1, the Debtors expanded Fund 3 with two additional rounds ("Fund 3 Round 2" and "Fund 3 Round 3," respectively). Fund 3 Round 2, for up to $10 million, launched on June 1, 2019 (one month before conclusion of the raise period for Fund 4, discussed below), and Fund 3 Round 3, for up to $50 million, launched on July 1, 2020 (one month after conclusion of Fund 3 Round 2's raise period and two months after launch of iCap Investments, discussed below).

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
24

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 34 of 141

As reflected above, Fund 3 was structured differently from Funds 1 and 2. It was the first fund raised without a managing dealer, and investments were styled as unsecured. Interest, paid monthly, accrued at 10% per annum and no payment premium was offered. And whereas Funds 1 and 2 provided for two-year maturities, Fund 3 anticipated a three-year maturity with a right to extend for a fourth year. Each of the offering documents underlying Fund 3's three rounds of fundraising delineated anticipated use of proceeds, however, none of those disclosures mentioned an intention to pay interest to existing Investors. The Debtors' investigation indicates that, in actuality, the majority of the fundraised amounts were used for that purpose.

The notes issued under Fund 3 Round 1 began to mature in November 2020 – during the Debtors' fundraising period for Fund 3 Round 3. The Debtors lacked the ability to repay these notes, and instead elected to extend the maturity dates for a year. The Debtors continued to fundraise under Fund 3 Round 3 after these extensions, but did not amend the Fund 3 Round 3 private placement memorandum to disclose the extensions.

### 4. Fund 4

In late 2017 – as Fund 3 Round 1 was commencing – the Debtors began to focus their fundraising efforts on foreign Investors, particularly those residing in China and/or the Chinese-American community in Washington. Among other things, the Debtors retained employees from the Chinese community to focus on their targeted fundraising initiatives and ultimately opened a foreign office in China staffed with local fundraising professionals. Initially, these efforts centered around two new fundraises that each commenced on October 1, 2018 – six months after the maturity date for Fund 3 Round 1.

According to Christensen, iCap Pacific Income Fund 4, LLC ("Fund 4") was tailored to the Chinese community, employing a private placement memorandum and other transaction documents translated into Chinese. This fundraise purportedly returned to the concept of investing directly in real estate projects, to be held by subsidiary special purpose entities (SPEs).

Whereas Funds 1 and 2 promised security interests in substantially all assets of those Funds, including liens on the underlying real property, Fund 4 was structured differently. It was still marketed as "secured," but the security was limited to a pledge of the equity interest in Fund 4 itself (an interest that structurally was junior to repayment of the debentures, and therefore not true security for repayment), along with a guaranty from the owner of the equity in Fund 4. As with Funds 1 and 2, Fund

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
25

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

4 was marketed as a newly formed entity that would invest in real estate. Fund 4 raised a total of $12.4 million.

Shortly after Fund 4 was launched, Investors indicated a preference for Vault (discussed below) and Fund 3. Fund 4 therefore was not fully subscribed and the Debtors pivoted their fundraising efforts elsewhere.

    5.    Investments

One month before Fund 3 Round 2's offering expired, on May 1, 2020, the Debtors began marketing a $10 million raise for a new fund called iCap Investments, LLC ("iCap Investments"). The iCap Investments notes were marketed primarily to Chinese investors, and the subscription documents were all written in English and Chinese. These notes were structured similarly to Fund 3, with one- or two-year maturities (depending on which interest rate the Investors chose), and an interest rate of 4.0% per annum or 6.0% per annum. As with Fund 4, the iCap Investment notes were marketed as "secured," although the only form of security was a pledge of the equity interests in iCap Investments itself. iCap Investments, however, had an ownership structure distinct from the other funds in that it was wholly-owned and managed directly by Christensen.

The iCap Investments offering memorandum prepared by Christensen and the Debtors represented to Investors that iCap Investments owned three properties: "a single-family home located in Issaquah, Washington, which it owns directly; a 26-unit townhome project located in Seattle, Washington, which is owned through Seattle Modern Living, LLC; and a development site for 108 apartment units, located in Renton, Washington, which is owned through Colpitts Sunset, LLC." Based upon the Debtors' records and investigation, each of these statements was misleading; in reality, iCap Investments' assets at the time of its fundraising were materially less than represented.

Issaquah Property. The iCap Investments offering memorandum represented ownership of a single-family home located in Issaquah, Washington. This was a reference to a large home that the Debtors had been developing for several years for eventual use as Christensen's personal residence. iCap Investments owned this property and spent approximately $2.9 million to develop it between September 2019 and September 2020. When the home was completed in November 2020, iCap Investments transferred this property to Christensen directly in exchange for his refinance of the construction loan and for no additional consideration. Notably, this transfer occurred seven months after iCap Investments began fundraising under the iCap Investments offering memorandum (which, as discussed, represented iCap

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
26

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Investments' ownership of the property). iCap Investments did not amend the iCap Investments offering memorandum to clarify that the property was no longer a company asset; instead, the Debtors continued to fundraise under the iCap Investments offering memorandum, raising an additional $15 million between November 2020 and November 2022.

Willows Properties. The iCap Investments offering memorandum represented ownership of a 26-unit townhouse project located in Seattle, Washington through an entity named Seattle Modern Living, LLC. Prior to December 2019, this development, commonly referred to as the "Willows Townhomes," was owned by Fund 2, subject to $9.4 million of debt and with recorded book value of $13.5 million. According to Christensen, in December 2019 and during the lead-up to launch of the iCap Investments offering memorandum, iCap Investments "purchased" the Willows Townhomes development from Fund 2 for an intercompany account payable (not cash) of $4.9 million and assumption of the $9.4 million in debt. At the time of issuance of the iCap Investments offering memorandum, whereas iCap Investments owned the Willows Townhomes project, it was subject to more debt than the book value of the property – debt that was not disclosed in the iCap Investments offering memorandum itself.

Colpitts Development. The iCap Investments offering memorandum represented ownership of a development site for 108 apartment units, located in Renton, Washington, which is owned through Colpitts Sunset, LLC. According to Debtors records, however, at the time the iCap Investments offering memorandum was issued, iCap Investments owned no interest in the Colpitts Sunset development. Instead, in February 2021 iCap Investments used a portion of newly raised Investor proceeds to purchase a minority interest (less than 35%) in Colpitts Sunset, LLC.

iCap Investments ultimately raised a total of $20.6 million in cash receipts from debenture subscriptions.

6.    Vault

While launching Fund 4, the Debtors also launched a new fundraising vehicle called iCap Vault 1, LLC ("Vault"). Vault raised funds first through a $500 million private placement memorandum, and later through publicly registered senior secured demand notes.

According to Christensen, Vault was envisioned as an alternative to a bank account, whereby Investors could place or withdraw funds from their accounts on a daily basis and earn a modest interest rate, calculated daily. Among other things,

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
27

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Vault investments had a low minimum initial investment requirement ($25), and an even lower minimum outstanding investment requirement ($1.00). In addition, as reflected in the materials prepared by Christensen and the Debtors, Vault was marketed for its convenience, allowing Investors to seamlessly transfer funds in and out of their accounts through a dedicated app and website that could be linked to Investor bank accounts. The Debtors' investigation indicates that the Vault concept was regularly referred to internally as an unregulated bank, and the Debtors marketed the Vault opportunity by comparing it with banking options.

Vault was not registered with any governmental entity as a banking institution, it was not regulated as a banking institution, and it lacked the typical controls and procedures used at a bank (including "Know Your Customer" requirements). In addition, whereas Investors were encouraged to think of Vault as a banking alternative and although Investors were promised that Vault would maintain cash reserves equal to 10% of outstanding principal balances, Vault did not maintain any specific capital reserve requirements and often fell below this 10% reserve promise. And whereas Vault was advertised as using an app for ease of access to funds, the Debtors' investigation indicates that no such app existed or was accessible to Investors (Investors were instead required to fill out manual transfer forms that were processed by the Debtors' finance team).

        a.    *Vault Fundraising Issues*

The Debtors' investigation indicates that Vault was a favorite investment vehicle for foreign Chinese investors. That was due, in part, to emphasis by the Debtors' China-based international marketing team. It may have also been due, however, to the ease with which Investors were told they could deposit and withdraw funds, a benefit resulting from the Debtors' lack of policies and procedures for conducting any diligence or scrutiny towards the sources or uses of invested amounts. Specifically, the Debtors made virtually no effort to implement customary "Know Your Customer" protocols. Among other things, for example:

- Investors were not asked to provide information to confirm their identities, affiliations, or the sources of the funds invested.
- Investments were accepted in all manner of forms and denominations (including ACH, wire, and check), and in some instances deposits were made in the form of cash delivered physically to the Debtors' headquarters in Bellevue, Washington.
- Investors were permitted to transfer title to their investments to third parties with the submission of a simple form. When these accounts were

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
28

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

transferred, the Debtors did not complete any diligence to confirm the reason for the transfer, whether consideration was exchanged by the parties, or the identity of the recipient holder.

- In some instances, investment withdrawals were received in the form of cash.
- In some instances, investments were made for reasons other than economic gain. For example, some investments were made into Vault for purposes of supporting applications under the United States EB-5 Immigrant Investor Program. As another example, several sizeable investments were made in order to make Chinese funds look like foreign investments (*i.e.*, non-Chinese) when brought back into China and invested in Chinese projects.

### b.   *Vault Proceed Uses*

Vault's stated business model was to invest in income-producing real estate assets. According to Christensen, Vault initially invested some investor funds into nursing homes and other properties that generated rental income. The Debtors' investigation indicates that as Vault's tenure extended its invested capital was increasingly used to prop up both the Debtors' real estate development projects (projects that were not completed or even close to completion, and therefore would not produce income in the near future), and the Debtors' faltering ability to satisfy Investor interest payments.

Some of the disbursements were not utilized by the recipient and were instead forwarded to other iCap entities (resembling an intercompany transfer more than a real estate investment).

The Debtors' investigation indicates that Vault was an integral part of the Debtors' continued ability to maintain interest payments for Investors in the various funds. The Debtors had for years been in the practice of moving cash among subsidiary bank accounts as needed to pay Investor interest obligations, recording those movements as intercompany loans and payables. But that approach could not work with Vault because, as a publicly registered entity, those types of intercompany loans would not satisfy an audit. To circumvent audit requirements, when Vault's funds were needed to pay Investor obligations elsewhere, Vault made an investment in a specific construction project (an SPE) and recorded a deed of trust against that property. Debtors records show, however, that as soon as the funds were transferred from Vault to the project's bank account, they were immediately transferred to a different affiliate (Fund 1, Fund 2, or Fund 3) and paid to Investors.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

7.    Funding

On May 13, 2021 (one month after close of Fund 3 Round 3), the Debtors began marketing another $50 million raise, this time for a new fund called iCap Funding, LLC ("Funding"). As with iCap Investments, the Funding notes were marketed primarily to Chinese investors, and the subscription documents were all written in English and Chinese. According to the materials prepared by Christensen and the Debtors, these notes had a two-year maturity with no extension period, and an interest rate of 12% per annum. As with the iCap Investment notes, the Funding notes were marketed as "secured" despite the only form of security being a pledge of the equity interests in Funding itself.

Although Funding had no assets when it commenced fundraising, the Funding offering memorandum referred to "income from the gains [Funding] receives from its Portfolio Investments" and described its investment focus as seeking "investments that have high yield potential and are related to real estate." The Funding offering memorandum was more explicit than prior offering documents about an intention to invest fundraising proceeds in other Funds.

8.    Fund 5

iCap Pacific Income Fund 5, LLC ("Fund 5") was launched on September 5, 2019. With a maximum subscription amount of $50 million (with an over-allotment of $25 million), Fund 5 was marketed as investing directly in real estate projects, to be held by subsidiary SPEs. According to the materials prepared by Christensen and the Debtors, interest was 9% per annum, paid monthly, with the first $10 million of invested amounts benefitting from a 10% interest rate for the first year. Unlike other notes, Fund 5 limited Investors to making a redemption request any time after the 1-year anniversary of their investment date, subject to a limit of no more repayments than 5% of the combined notes of the Debtors per quarter. Upon any demand for repayment prior to the 5th anniversary of the issuance date of the note, a discount would be applied to the amount outstanding under the note, depending on the time from the issuance of the note at which the repayment demand is received by the Debtors.

Fund 5 was marketed as secured, with a pledge of the membership interests in the underlying SPEs. Unlike Funds 1 and 2, however, Fund 5 notes were not secured by other collateral, such as cash accounts or underlying properties themselves.

Fund 5 was the first fund since Funds 1 and 2 to have a managing dealer, Cobalt Capital, Inc., and a collateral agent, MarketPlace Realty Advisors, LLC. In

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
30

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

exchange for its services, the Fund 5 private placement memorandum disclosed total fees to be paid to the managing dealer of $4.9 million, assuming the round was fully subscribed. Fund 5 raised a total of $3.0 million.

### 9. Fund 6

In the fall of 2019, alongside the rollout of Fund 5, the Debtors formed iCap Pacific Income Fund 6, LLC ("Fund 6"), with the claimed purpose of launching another publicly registered investment vehicle similar to Vault. Fund 6 never launched.

### 10. Broadway

The last of the Debtors' funds, called iCap Broadway, LLC ("Broadway"), launched on April 1, 2022 – two months before expiration of the fundraise period for Funding and two weeks after the last investment in Funding. Unlike prior funds, Broadway was focused on a specific real estate project and purported to be raising funds specifically for that project. The Broadway notes had a two-year maturity, bearing interest of 8% per annum, paid monthly. As with Fund 3, the Broadway notes were marketed as "secured" despite the only form of security being a pledge of the equity interests in Broadway itself.

The Broadway Fund raised zero dollars in cash receipts. Instead, it raised $5.8 million in rollovers from Investors, plus $313,000 in intercompany investments (primarily from Vault). There were no material disbursements from the Broadway Fund.

## D. Events Leading to the Bankruptcy Filing

By early 2022, the Debtors had 18 properties across both the Portfolio Business and the Vault Businesses with 22 employees. According to Christensen, however, the Debtors' growth was financed largely through Investor capital that was structured as indebtedness. By November 2022, total indebtedness (not including intercompany obligations) reached $230 million, with reported consolidated assets of $93 million. At the same time, the national and state economies were experiencing significant disruption, with slowing growth, substantial inflation, and successive increases in interest rates. The Debtors were no longer able to service their ongoing interest payments without raising additional liquidity. On November 15, 2022, the Debtors announced a 12-month extension of maturity dates for certain of the Portfolio Notes. This was followed, on March 20, 2023, with the Debtors' announcement that they were suspending interest payments on all Portfolio Notes.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
31

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

The Debtors' liquidity continued to decline, and on April 15, 2023, the Debtors terminated substantially all of their employees.

On July 14, 2023, the Debtors engaged the services of Paladin Management Group to assist in evaluating options for addressing their liquidity needs and/or restructuring their obligations.

1. Investor Litigation

Over the course of the summer of 2023, Investors began sending demand letters and threatening or commencing litigation against the Debtors, Christensen, and others allegedly involved with the Debtors' prior operations. Below is a chart listing active lawsuits against the Debtors relating to the Debtors' debt obligations (the "Active Prepetition Lawsuits"):

| Case Title | King County Superior Court | Amount Sought/ Dispute |
|---|---|---|
| Julie A. Bosia, *et al.* v. iCap Pacific Northwest Opportunity and Income Fund, LLC, and iCap Northwest Opportunity Fund, LLC | KCSC 23-2-16200-5 | *Undefined in Complaint.* |
| Yongzhi Liang, *et al.* v. Chris Christensen and Debra Christensen, *et al.*  *Pending Motion to Consolidate with Li Tan.* | KCSC 23-2-13456-7 | $11,500,000 |
| Li Tan, *et al.* v. Chris Christensen and Debra Christensen, *et al.*  *Pending Motion to Consolidate with Liang* | KCSC 23-2-12786-2 | $35,429,941 |
| Paul Weiss v. iCap Vault 1, LLC, *et al.* | KCSC 23-2-13897-0 | $135,000 |
| Chen Xi v. iCap Vault 1, LLC, *et al.* | KCSC 23-2-14401-5 | $113,000 |

The complaints in the Active Prepetition Lawsuits include allegations and causes of action for fraud, violation of state consumer protection laws, breach of

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

contract, and civil conspiracy. In addition to the foregoing lawsuits, the Debtors have received numerous inquiries as well as demand letters from Investors.

On August 30, 2023, the Debtors received a letter from the State of Washington Department of Financial Institutions, Securities Division, which demanded that the Debtors cease and desist from selling any unregistered securities and requested the delivery of certain documents by October 6, 2023.

The Debtors' obligation to defend against the Active Prepetition Lawsuits placed a substantial financial burden on the Debtors, straining the Debtors' already limited liquidity. The Active Prepetition Lawsuits also required substantial attention from the Debtors' restructuring advisors.

2.     Temporary Restraining Order and Prepetition Term Sheet

On August 14, 2023, the Washington Superior Court for King County (the "Superior Court") issued a temporary restraining order (the "TRO") in *Li Tan, et al. v. Chris Christensen, et al.*, Case No. 23-2-12786-2, which was commenced by an ad hoc group of the Debtors' noteholders (the "Ad Hoc Group"). The TRO restricted the Debtors from encumbering certain assets, restricted the Debtors' access to their bank accounts, and generally placed restrictions on the Debtors' use of cash. The issuance of the TRO accelerated the Debtors' need to prepare for an expedited chapter 11 filing or other insolvency proceeding and, accordingly, the Debtors and their advisors were required to devote substantial energy and resources to negotiations with the Ad Hoc Group regarding an acceptable restructuring path.

The Debtors' counsel and other advisors worked to organize and lead negotiations with the Ad Hoc Group and Christensen. These negotiations were robust and constructive, and on August 23, 2023, the negotiating parties executed a term sheet (the "FSA"), which paved the way for the commencement of these Chapter 11 Cases. On September 25, 2023, the Superior Court entered an amended, agreed-upon TRO order that embodied certain of the terms of the FSA, as well as certain additional relief requested by the Ad Hoc Group, Christensen, and the Debtors. In addition, the Liang plaintiffs group stipulated to consolidate its lawsuit against the Christensens and be bound by the TRO order entered in the action brought by the Ad Hoc Group.

## ARTICLE III.
## THE CHAPTER 11 CASES

On September 29 and 30, 2023, 31 of the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for

SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION
33

Black Helterline LLP
805 SW Broadway
Suite 1900
Portland, OR 97205
Telephone: 503 224-5560

the Eastern District of Washington. Subsequently, Colpitts Sunset, LLC, CS2 Real Estate Development, LLC, and iCap International Investments, LLC (the "Additional Debtors") filed voluntary petitions on the following dates: (i) November 8, 2023 and (ii) November 14, 2023. The Chapter 11 Cases are being jointly administered under the case caption *In re iCap Enterprises, Inc., et al.*, Case No. 23-01243-WLH11 (Bankr. E.D. Wash.). An immediate effect of commencement of the Chapter 11 Cases was the imposition of the automatic stay under Bankruptcy Code section 362(a), which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of Liens against property of the Debtors, and the continuation of litigation against the Debtors during the pendency of the Chapter 11 Cases. The automatic stay will remain in effect, unless modified by the Bankruptcy Court, until the Chapter 11 Cases are closed.

## A.    First Day Motions and Orders

On or about the Petition Date, the Debtors filed certain "first day" motions and applications with the Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of these Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in-possession status. *See* ECF Nos. 2, 3 ,4 ,14, 15, 16, 17, 33.

The Bankruptcy Court held hearings on the "first-day" motions on October 4, 2023, and October 30, 2023. In connection with these hearings, the Bankruptcy Court entered a series of customary "first day" and "second day" orders, permitting the Debtors to, among other things, use cash collateral, pay certain taxes and fees, pay insurance premiums, enter into a consulting agreement with Christensen, and establish notice procedures for the Chapter 11 Cases. *See* ECF Nos. 9, 63, 64, 65, 66, 67, 68, 152, 153, 154. After the Additional Debtors filed their bankruptcy petitions, the Debtors filed the *Ex Parte Supplemental Motion for Entry of Order (I) Directing Joint Administration; and (II) Limiting Scope of Notice with Respect to Newly-Filed Cases* [ECF No. 159], seeking entry of an order (i) authorizing joint administration of the Additional Debtors' cases along with the 31 previously-filed Debtors' cases, for procedural purposes only and (ii) approving the use of the Limited Mailing List and approved notice procedures in the Additional Debtors' cases. On November 16, 2023, the Bankruptcy Court granted the Additional Debtors' joint administration motion. *See* ECF No. 164.

## B.    Retention of Advisors

Shortly after the Petition Date, the Debtors filed applications to employ Buchalter, a Professional Corporation ("Buchalter"), as bankruptcy counsel, and Lance Miller and Paladin Management Group LLC ("Paladin"), as the Debtors' CRO

**SECOND AMENDED DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION**
34

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 44 of 141

with additional support personnel. *See* ECF Nos. 84, 86. On October 31, 2023 and December 12, 2023, respectively, the Bankruptcy Court entered orders approving each of the foregoing applications. *See* ECF Nos. 119, 218.

Subsequently, the Debtors filed applications to employ O'Melveny & Myers LLP ("O'Melveny"), as lead bankruptcy counsel, Pivot Management Group, LLC ("Pivot") to replace Paladin with respect to providing additional support personnel for the CRO, and Black Helterline LLP, as bankruptcy co-counsel. *See* ECF Nos. 376, 801, 1133. On February 22, 2024, June 7, 2024, and August 2, 2024, respectively, the Bankruptcy Court entered orders approving each of the foregoing applications. *See* ECF Nos. 461, 986, 1155.

## C. DIP Financing Motions

### 1. Serene DIP Motion

Given that the Debtors had extremely limited liquidity and that most of their capital was tied up in illiquid real property investments, the Debtors required debtor-in-possession financing at the outset of these Chapter 11 Cases. On October 3, 2023, the Debtors filed a motion (the "Serene DIP Motion")[10] seeking interim and final orders authorizing the Debtors to, among other things, (i) borrow up to $5,250,000 pursuant to the terms and conditions of the DIP Documents and the DIP Orders (with up to $2.5 million to be available on an interim basis) (the "Serene DIP Loan") in postpetition financing from Serene Investment Management, LLC ("Serene"); (ii) grant priming liens and security interests to Serene to secure the applicable Debtors' obligations under the Serene DIP Loan; (iii) subject to the terms and conditions set forth in the Serene DIP Motion, use Serene's cash collateral; and (iv) provide adequate protection to the holders of alleged prepetition liens. *See* ECF No. 33.

On October 5, 2023, the Bankruptcy Court entered an order granting the relief requested in the Serene DIP Motion on an interim basis and authorized the Debtors to borrow up to $2,500,000.00 during the interim period. *See* ECF No. 68.

On November 13, 2023, the Bankruptcy Court entered an order granting the Serene DIP Motion on a final basis. *See* ECF No. 154 (the "Final Serene DIP Order"). The Final Serene DIP Order provides, among other things, (i) authorization for the Debtors to borrow from Serene in an amount not to exceed $5,250,000; (ii) priming Liens and security interests to Serene to secure the Debtors' obligations under the

---

[10] Capitalized terms used in this Article III.C but not defined shall have the meaning given to such terms in the Serene DIP Motion or Final Serene DIP Order, as applicable.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

DIP Documents; (iii) Serene with Allowed Administrative Expense Claims pursuant to Bankruptcy Code section 364(c)(1) in respect of all amounts advanced to the Debtors under the DIP Documents; and (iv) approval to use the Cash Collateral in accordance with the Approved Budget.

On April 26, 2024, the Debtors filed the *Debtors' Motion for an Order Authorizing Interim Distribution to DIP Lender Serene Investment Management, LLC* [ECF No. 819], seeking an order authorizing an interim distribution to Serene on account of the Serene DIP Loan. On May 16, 2024, the Bankruptcy Court entered an order granting the Debtors' motion and authorized the Debtors to make an interim distribution to Serene in the amount of $2,942,500.00, plus additional fees and costs. *See* ECF No. 911.

On July 15, 2024, the Debtors made an additional voluntary payment of $2,242,000.00 to Serene in substantial satisfaction of the Serene DIP Loan. In connection with the payoff of the Serene DIP Loan, the Debtors and Serene have reached an agreement to resolve any remaining claims Serene may assert under the Serene DIP Loan.

On August 21, 2024, the Debtors filed a motion pursuant to Bankruptcy Code section 363(b) and Bankruptcy Rule 9019 seeking approval of a settlement agreement (the "Serene Settlement Agreement") by and between the Debtors and Serene. *See* ECF No. 1225. Among other things, the Serene Settlement Agreement (i) resolves Serene's remaining claims under the Serene DIP Loan, (ii) provides for the resolution, or transfer to the Debtors, of certain claims against Christensen arising under the Serene DIP Loan, (iii) provides for mutual releases among Serene and the Debtors, and (iv) grants Serene an exclusive option to purchase the real property commonly known as 715–775 Broadway, Tacoma, WA (subject to the assumption of certain liabilities).

2.      Supplemental DIP Motion

On July 2, 2024, the Debtors filed the *Motion of the Debtors for Order: (I) Authorizing the Debtors to Obtain Supplemental Postpetition Secured Financing; (II) Granting Superpriority Administrative Expense Claims; and (III) Granting Related Relief* [ECF No. 1063] (the "Supplemental DIP Motion"), seeking authority for the Debtors to, among other things, (i) borrow $2,014,414 (the "Supplemental DIP Loan") in postpetition financing from Socotra REIT 1, LLC, WE Alliance Secured Income Fund, LLC, the Jason Yelowitz 2006 Trust Dated March 31, 2006, and Keith Holdings LLC (collectively, the "Supplemental DIP Lenders"); (ii) grant liens and security interests to the Supplemental DIP Lenders to secure the Debtors'

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
36

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

obligations under the Supplemental DIP Loan; and (iii) grant the Supplemental DIP Lenders Administrative Expense Claims for amounts advanced in connection with the Supplemental DIP Loan. *See* ECF No. 1063.

On July 19, 2024, the Bankruptcy Court entered an order granting the relief requested in the Supplemental DIP Motion and authorized the Debtors to borrow the full amount of the Supplemental DIP Loan. *See* ECF No. 1139. Pursuant to Article III.A.3 of the Plan, (i) all obligations of the Debtors under the Supplemental DIP Loan will be assumed by the iCap Trust; (ii) all Liens and security interests granted to secure the Debtors' obligations under the Supplemental DIP Loan will remain in place; and (c) the legal, equitable, and contractual rights of the parties under the Supplemental DIP Loan will be unaltered by the Plan.

Concurrently with the Supplemental DIP Motion, the Debtors filed the *Debtors' Motion to Approve Entry Into and Performance Under the Socotra Settlement Agreement* [ECF No. 1064] (the "Socotra Settlement Motion"), seeking to approve the Debtors' settlement agreement (the "Socotra Settlement Agreement") with Socotra REIT 1, LLC, WE Alliance Secured Income Fund, LLC, and Jason Yelowitz, in his capacity as trustee of the Jason Yelowitz 2006 Trust Dated March 31, 2006 (the "Socotra Settlement Parties"). Among other things, the Socotra Settlement Agreement provides for the distribution to the Socotra Settlement Parties of certain of the proceeds from the sale of the real property commonly known as 2818 E. 2nd Street, Vancouver, WA 98661 in full and final satisfaction of the Socotra Settlement Parties' Claims against the Debtors. Further, in exchange for a release of any claims that the Debtors may have against the Socotra Settlement Parties, the Socotra Settlement Parties agreed to convert $1,764,414.00 of their approximately $3,200,000.00 Claim against the Debtors into DIP financing, as reflected in the Supplemental DIP Motion.

On July 19, 2024, the Bankruptcy Court entered an order approving entry into and performance under the Socotra Settlement Agreement. *See* ECF No. 1140.

**D.    Exit Financing**

1.    First Lien Exit Financing

On July 8, 2024, the Debtors and iCap DIP Finance Group LLC (the "First Lien Exit Lender") entered into that certain *Exit Facility Commitment Letter*, which provides for the First Lien Exit Lender's commitment to provide exit financing to the Debtors in the form of a $5,000,000.00 term loan (the "First Lien Exit Financing") in exchange for, among other things, a first priority lien on the Causes of Action and

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
37

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

all proceeds thereof. The terms of the First Lien Exit Financing will be disclosed in the Plan Supplement.

2.     Tritalent Exit Financing

The Debtors anticipate that they will file a motion pursuant to Bankruptcy Code section 363(b) and Bankruptcy Rule 9019 seeking approval of a settlement agreement (the "Tritalent Settlement Agreement") by and between the Debtors and Tritalent Funding Group, Inc. and Halton Co. (collectively, "Tritalent") pursuant to which, among other things, (i) the Debtors will pay Tritalent the net proceeds from the sale of the real property commonly known as 4318 South Settler Drive, Ridgefield, WA in full and final satisfaction of Tritalent's Claims against the Debtors and (ii) Tritalent will provide $500,000.00 in exit financing to the Debtors (the "Tritalent Exit Financing")[11] in exchange for, among other things, junior liens on the Causes of Action and all proceeds thereof. The Tritalent Settlement Agreement also provides for mutual releases among the Debtors and Tritalent.

**E.     Appointment of the Unsecured Creditors' Committee**

On October 20, 2023, the U.S. Trustee appointed the Unsecured Creditors' Committee in these Chapter 11 Cases. *See* ECF No. 102. The initial members of the Unsecured Creditors' Committee were Yongzhi Liang, Lin Lan Sun, Chunying Tian, Ruzhen Zhang, Zhuhua Li, Thomas Temple, and Elizabeth Plaza. *See* ECF No. 102. The members of the Unsecured Creditors' Committee were amended twice. *See* ECF No. 112 (replacing Ruzhen Zhang with Ping Zhang), ECF No. 147 (replacing Ping Zhang with Huiman Zhang). The Unsecured Creditors' Committee retained Bush Kornfeld LLP, as its bankruptcy counsel, B. Riley Advisory Services, as its financial advisor, and Corr Cronin LLP, as its special litigation counsel. *See* ECF Nos. 184 (Bush Kornfeld Order), 186 (B. Riley Order), and 185 (Corr Cronin Order).

**F.     Professional Fee Payments**

As of the filing of this Disclosure Statement, the total amounts owed and/or requested by the Professionals retained on behalf of the Debtors and the Unsecured Creditors' Committee totals $6,645,020.40. In accordance with the interim compensation procedures approved by this court [ECF No. 168], the Debtors have paid the following amounts to the Professionals.

---

[11] The "Exit Financing" shall refer to the First Lien Exit Financing and the Tritalent Exit Financing.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
38

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11     Doc 1236     Filed 08/26/24     Entered 08/26/24 12:50:06     Pg 48 of 141

| Professional | Total Requested | Total Paid |
|---|---|---|
| Buchalter | $1,018,456.26 | $1,009,281.65 |
| Bush Kornfeld LLP | $535,989.23 | $274,534.44 |
| Corr Cronin LLP | $133,826.74 | $86,486.48 |
| GlassRatner Advisory & Capital Group, LLC dba B. Riley Advisory Services | $140,385.08 | $140,385.08 |
| O'Melveny & Myers LLP | $1,541,937.51 | $757,260.00 |
| Paladin Management Group LLC | $2,967,424.08 | $2,205,563.96 |
| Pivot Group | $307,001.50 | $0.00 |
| **Total** | **$6,645,020.40** | **$4,473,511.61** |

## G.  United States Trustee

Gary Dyer, Esq. is the Assistant U.S. Trustee assigned to these Chapter 11 Cases. The Debtors and the Unsecured Creditors' Committee have worked cooperatively to address concerns and comments from the U.S. Trustee's office during these Chapter 11 Cases.

## H.  Meeting of Creditors

The initial meeting of creditors under Bankruptcy Code section 341(a) was held remotely on November 17, 2023 at 9:30 a.m. At the initial meeting of creditors, the U.S. Trustee and creditors asked questions of a representative of the Debtors.

## I.  Schedules of Assets and Liability and Statements of Financial Affairs

On or about November 15 and 22, 2023, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements").[12]

---

[12] The Schedules and Statements are filed on each Debtor's individual case docket. *See* iCap Enterprises, Inc., Case No. 23-01243-WLH11, ECF No. 162; iCap Pacific NW Management, LLC Case No. 23-01261-WLH11, ECF No. 4; iCap Vault Management, LLC Case No. 23-01258-WLH11, ECF No. 4; iCap Vault, LLC Case No. 23-01256-WLH11, ECF No. 4; iCap Vault 1, LLC Case No. 23-01257-WLH11, ECF No. 4; Vault Holding 1, LLC Case No. 23-01265-WLH11, ECF No. 4; iCap Investments, LLC Case No. 23-01255-WLH11, ECF No. 4; iCap Pacific Northwest Opportunity and Income Fund, LLC Case No. 23-01248-WLH11, ECF No. 4; iCap Equity, LLC Case No. 23-01247-WLH11, ECF No. 4; iCap Pacific Income 4 Fund, LLC Case No. 23-01251-WLH11, ECF No. 4; iCap Pacific Income 5 Fund, LLC Case No. 23-01249-WLH11, ECF No. 4; iCap Northwest Opportunity Fund, LLC Case No. 23-01253-WLH11, ECF No. 4; 725 Broadway, LLC Case No. 23-01245-WLH11, ECF No. 4; Senza Kenmore, LLC Case No. 23-01254-WLH11, ECF No. 4; iCap Campbell Way, LLC Case No. 23-01250-WLH11, ECF No. 4; UW 17th Ave, LLC Case No. 23-01267-WLH11, ECF No. 4; iCap Broadway, LLC Case No. 23-01252-WLH11, ECF No. 4; VH 1121 14th LLC Case No. 23-01264-WLH11, ECF No. 5; VH Senior Care LLC Case No. 23-01266-WLH11, ECF

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
39

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 49 of 141

## J. Claims Bar Dates and Filed Claims

On October 10, 2023, the Clerk of the Court filed the *Notice of Chapter 11 Bankruptcy Case* establishing (i) December 8, 2023 as the deadline for Creditors (other than Governmental Units) to file proofs of Claim against the Debtors (including Claims arising under Bankruptcy Code section 503(b)(9)) (the "Initial Bar Date") and (ii) March 27, 2024 as the deadline for Governmental Units to file proofs of Claim (the "Governmental Bar Date"). *See* ECF No. 73.

On November 16, 2023, the Debtors filed an *Ex Parte Motion for Order Vacating General Bar Date* [ECF No. 166], requesting that the Bankruptcy Court vacate the Initial Bar Date, which the Bankruptcy Court granted on November 17, 2023 [ECF No. 170].

On May 22, 2024, the Debtors filed the *Debtors' Ex Parte Motion for Order Establishing the Deadline to File Proofs of Claim* [ECF No. 925], which the Bankruptcy Court granted on May 24, 2024 [ECF No. 929] (the "Bar Date Order"). Pursuant to the Bar Date Order, the deadline for all non-governmental Creditors to file proofs of claim against the Debtors in these Chapter 11 Cases was July 10, 2024 at 5:00 p.m. (prevailing Pacific Time) (the "General Bar Date"). The General Bar Date applies to all persons and entities (excluding Governmental Units) holding Claims against the Debtors that arose or are deemed to have arisen before the respective Petition Date, including Secured Claims, unsecured Priority Claims (including, without limitation, Claims entitled to priority under Bankruptcy Code sections 507(a)(4), (5), and (8) and 503(b)(9)), and unsecured nonpriority Claims. The Bar Date Order did not modify the Governmental Bar Date.

As of the General Bar Date, approximately 345 proofs of Claim appear on the official claims register, although some of those Claims have been withdrawn or superseded by other Claims. The Debtors have not completed Claim reconciliation work and do not anticipate doing so before the Effective Date.

---

4; VH Willows Townhomes LLC Case No. 23-01262-WLH11, ECF No. 5; iCap @ UW, LLC Case No. 23-01244-WLH11, ECF No. 4; VH 2nd Street Office, LLC Case No. 23-01259-WLH11, ECF No. 4; VH Pioneer Village LLC Case No. 23-01263-WLH11, ECF No. 4; iCap Funding LLC Case No. 23-01246-WLH11, ECF No. 4; iCap Management LLC Case No. 23-01268-WLH11, ECF No. 4; iCap Realty, LLC Case No. 23-01260-WLH11, ECF No. 4; Vault Holding, LLC Case No. 23-01270-WLH11, ECF No. 4; iCap Pacific Development LLC Case No. 23-01271-WLH11, ECF No. 5; iCap Holding LLC Case No. 23-01272-WLH11, ECF No. 6; iCap Holding 5 LLC Case No. 23-01273-WLH11, ECF No. 5; iCap Holding 6 LLC Case No. 23-01274-WLH11, ECF No. 4; Colpitts Sunset, LLC Case No. 23-01432-WLH11, ECF No. 5; CS2 Real Estate Development LLC Case No. 23-01434-WLH11, ECF No. 4; and iCap International Investments, LLC Case No. 23-01464-WLH11, ECF No. 4.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

40

## K.    Sales of Real Property

During the Chapter 11 Cases, the Debtors have sought to maximize the value of their Estates by selling several parcels of real property owned by the Estates, in each case subject to Bankruptcy Court approval. As of the date hereof, the Debtors have filed the following motions to sell real property pursuant to Bankruptcy Code section 363:

- On November 27, 2023, the Debtors filed the *Debtors' Motion for (I) an Order (A) Approving Bidding Procedures for the Sale of Real Property; (B) Scheduling the Auction and Sale Hearing; and (C) Granting Related Relief; and (II) an Order Approving the Sale Free and Clear of All Claims, Liens, and Encumbrances* [ECF No. 187] for the Senza Kenmore Property. The order approving the sale was entered on March 4, 2024. *See* ECF No. 562.

- On January 5, 2024, the Debtors filed the *Debtors' Motion for an Order: (I) Approving the Sale of Real Property; and (II) Approving the Sale Free and Clear of All Claims, Liens, and Encumbrances* [ECF No. 249] for the Pioneer Village and 2nd Street Properties. The order approving the sale was entered on January 30, 2024. *See* ECF No. 361.

- On March 13, 2024, the Debtors filed the *Debtors' Motion for an Order (I) Approving the Sale of Real Property; and (II) Approving the Sale Free and Clear of All Claims, Liens, and Encumbrance* [ECF No. 607] for the 17th Avenue Property. The order approving the sale was entered on April 18, 2024. *See* ECF No. 762.

- The Debtors are negotiating the sale for the real property commonly known as 18416 Bothell Everett Hwy, Bothell, WA (the "CS2 Sale"). In connection with the CS2 Sale, the Debtors may seek to dismiss the Chapter 11 Case for Debtor CS2 Real Estate Development, LLC. Dismissal of the CS2 Chapter 11 Case would not affect the treatment of, or Distributions on account of, any Claims under the Plan.

In furtherance of the Debtors' sale efforts, the Debtors filed the *Debtors' Motion for Order Establishing Procedures for Sale of Property of the Estates* [ECF No. 370] seeking approval of procedures to sell or transfer real property of the Debtors' Estates (the "Property Transaction Procedures"). The Bankruptcy Court approved the Transaction Sale Procedures [ECF No. 611] on March 14, 2024.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Pursuant to the Property Transaction Procedures, the Bankruptcy Court has approved the following sales of real property pursuant to Bankruptcy Code section 363:

- On April 4, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (1121 14th Avenue, Unit E, Seattle, WA 98122)* [ECF No. 717], approving the sale of 1121 14th Avenue, Unit E, Seattle, WA 98122.

- On April 4, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (4906 S. Willow Street, Unit A Seattle, WA 98118)* [ECF No. 718], approving the sale of 4906 S. Willow Street, Unit A Seattle, WA 98118.

- On April 4, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (4910 S. Willow Street, Unit B, Seattle, WA 98118)* [ECF No. 719], approving the sale of 4910 S. Willow Street, Unit B, Seattle, WA 98118.

- On April 4, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (4918 S. Willow Street, Unit C, Seattle, WA 98118)* [ECF No. 720], approving the sale of 4918 S. Willow Street, Unit C, Seattle, WA 98118.

- On April 4, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (1226 160th St. SW, Lynnwood, WA 98087)* [ECF No. 721], approving the sale of 1226 160th St. SW, Lynnwood, WA 98087.

- On April 26, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (1117 14th Avenue, Unit A, Seattle, WA 98122)* [ECF No. 814], approving the sale of 1117 14th Avenue, Unit A, Seattle, WA 98122.

- On April 26, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (1117 14th Avenue, Unit B, Seattle, WA 98122)* [ECF No.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
42

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

815], approving the sale of 1117 14th Avenue, Unit B, Seattle, WA 98122.

- On April 26, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (1119 14th Avenue, Unit C, Seattle, WA 98122)* [ECF No. 816], approving the sale of 1119 14th Avenue, Unit C, Seattle, WA 98122.

- On April 26, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (1117 14th Avenue, Unit D, Seattle, WA 98122)* [ECF No. 817], approving the sale of 1119 14th Avenue, Unit D, Seattle, WA 98122.

- On May 15, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (4912 S. Willow Street, Unit B, Seattle, WA 98118)* [ECF No. 904], approving the sale of 4912 S. Willow Street, Unit B, Seattle, WA 98118.

- On August 15, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (1231 Campbell Way, Bremerton, WA 98310)* [ECF No. 1179], approving the sale of 1231 Campbell Way, Bremerton, WA 98310.

- On August 15, 2024, the Bankruptcy Court entered the *Order Approving Sale of Property of the Estates Pursuant to Property Transaction Procedures (4318 S. Settler Drive, Ridgefield, WA 98642)* [ECF No. 1180], approving the sale of 4318 S. Settler Drive, Ridgefield, WA 98642.

- On August 7, 2024, the Debtors served parties with the *Transaction Notice Pursuant to Property Transaction Procedures* for the sale of real property located at 302 SW 146th Street, Burien, WA 98166 (the "Burien Property"). On August 9, 2024, Redmond Funding Group, LLC filed an objection to the sale of the Burien Property [ECF No. 1171].

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
43

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 53 of 141

The Debtors intend to continue marketing certain of the real properties owned by the Estates and may sell additional properties prior to the Effective Date, subject to the Transaction Sale Procedures and Bankruptcy Court approval.

## L.    Abandonment of the Airlink Membership Interests

On October 2, 2023, the Debtors filed the *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors' Entry into a Consulting Agreement with Chris Christensen; and (II) Granting Related Relief* [ECF No. 17] (the "Consulting Agreement Motion"), which sought approval of a consulting agreement with Christensen.

In connection with the Consulting Agreement Motion, the Debtors agreed to "use commercially reasonable efforts to confirm that their interests in [Airlink] cannot reasonably be sold for more than de minimis value, net of costs of sale (including attorneys' fees)." *See* Consulting Agreement Motion, ¶ 16. The Consulting Agreement Motion sought approval of an assignment of the interest of Airlink Holding, LLC ("Holding") (referred to in the Consulting Agreement Motion as "Airlink") to Christensen if the Debtors determined that Holding was of *de minimis* value, subject to a final order on the Consulting Agreement Motion.

As of the final hearing on the Consulting Agreement Motion, the Debtors had not yet determined whether the value of their interest in Holding was more than *de minimis*. Therefore, on October 5, 2023, the Bankruptcy Court entered the *Final Order Authorizing the Debtors' Entry into a Consulting Agreement with Chris Christensen, and Granting Related Relief* [ECF No. 153] (the "Consulting Agreement Order"), which provided two alternatives upon the completion of the Debtors' diligence with respect to the value of Holding.

Specifically, if the Debtors determined that their interests in Holding could not be sold for more than a *de minimis* value, the Debtors would file a declaration in support of such determination along with a related notice and form of order authorizing the assignment of any interest in Holding to Christensen. If the Debtors determined that their interests in Holding exceeded a *de minimis* value, any disposition of Holding could be accomplished only through a subsequent motion and order. *See* Consulting Agreement Order at 2.

Through continued investigation of the Debtors' pre-petition assets and financial affairs, the Debtors determined that: (1) the broker dealer license thought to be Holding's only asset of material value was actually held by Airlink Markets, LLC ("Markets"), a wholly-owned subsidiary of Holding; and (2) the broker dealer license

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
44

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 54 of 141

was of greater than *de minimis* value. Because Holding was not itself in bankruptcy, its membership interests in Markets were not the assets of the Estates and could be sold by the Debtors.

To address the ownership issue, and to comply with the Bankruptcy Court's requirements in the Consulting Agreement Order, on March 26, 2024, the Debtors filed the *Motion for Order: (1) Substantively Consolidating Airlink Holdings, LLC and Airlink Markets, LLC; (2) Authorizing the Sale of Airlink Markets, LLC Free and Clear of Liens, Claims, and Interests; and (3) Granting Related Relief* [ECF No. 654] (the "Airlink Sale Motion"). In the Airlink Sale Motion, among other things, the Debtors sought substantive consolidation of Markets into Holding so that the Debtors could effectively sell Holding's membership interests in Markets (the "Airlink Membership Interests") as assets of the Estates. The Bankruptcy Court entered an order granting the Airlink Sale Motion on April 23, 2024 [ECF No. 778] (the "Airlink Sale Order").

Pursuant to the Airlink Sale Motion, closing on the sale of the Airlink Membership Interests involved a two-step process. After entry of the Airlink Sale Order, 20% of the Airlink Membership Interests were to be sold (*i.e.*, the "First Closing"). Thereafter, the parties were to work in good faith to ensure the filing of applications with FINRA for approval of the transfer of the remaining 80% of the Airlink Membership Interests. The "Second Closing" was set to take place shortly after FINRA granted approval. Under the Purchase and Sale Agreement entered into between Holding and Cathay Holding Group Co., Limited (the "Purchaser"), the Purchaser was required to "reimburse iCap Enterprises, Inc. and its affiliates for any and all expenses and other amounts incurred or assumed by iCap that arise directly or indirectly out of or otherwise relate to [Markets] and its continued operation . . . including, without limitation, rent, payroll, taxes, technology costs, regulatory expenses, audit and accounting expenses, required regulatory capital, legal fees and expenses and insurance expenses" (the "Carrying Costs"). *See* Purchase and Sale Agreement, ECF No. 654, Exh. A.

On March 6, 2024, while the Airlink Sale Motion was pending, the State of Washington Department of Financial Institutions Securities Division entered the *Summary Order to Suspend Registration and Notice of Intent to Revoke Registration, Deny Future Registration, Impose a Fine, and Charge Costs* (the "Summary Order"), which temporarily revoked Markets' broker-dealer registration and denied future securities registrations for Markets. Despite that the Purchaser followed through with the First Closing, the Purchaser refused to begin the FINRA approval process due to the complications posed by entry of the Summary Order. The Purchaser also refused

**SECOND AMENDED DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION**
45

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

to pay certain Carrying Costs required under the Purchase and Sale Agreement and began attempting to sell its rights under the Purchase and Sale Agreement, in contravention of its terms. Due to the failure of the Purchaser to pay the Carrying Costs, the directors and officers of Markets resigned, leaving Markets without management and the ability to operate.

The Debtors tried to reach a consensual resolution with the Purchaser by, among other things, lowering the original purchase price for the Airlink Membership Interests (subject to court approval). After extensive, unproductive negotiations, the Debtors determined in their business judgment that the Airlink Membership Interests had become overly burdensome and of inconsequential value and benefit to the Estates. For those reasons, on July 8, 2024, the Debtors gave the Purchaser notice of the Purchaser's repudiation of the Purchase and Sale Agreement. Pursuant to the Purchase and Sale Agreement, the Debtors retained the funds received on account of the First Closing and the original deposit. Upon the Effective Date, all of the Debtors' interests in Holding and Markets including, without limitation, the Airlink Membership Interests, will be deemed abandoned.

**M.  Extension of Exclusivity Periods**

On February 15, 2024, the Debtors filed the *Debtors' Motion to Extend the Debtors' Exclusive Periods to File and Solicit Votes on a Chapter 11 Plan* [ECF No. 380] (the "First Exclusivity Motion"), requesting an extension of the Debtors' exclusive periods to (i) file a proposed chapter 11 plan (the "Plan Exclusivity Period") by 90 days, and (ii) solicit acceptances of the plan without competing plan filings (the "Solicitation Exclusivity Period") by 91 days. On March 13, 2024, the Bankruptcy Court entered an order granting the First Exclusivity Motion, extending (i) the Plan Exclusivity Period to May 15, 2024, and (ii) the Solicitation Exclusivity Period to July 15, 2024. *See* ECF No. 605.

On April 24, 2024, the Debtors filed the *Debtors' Second Motion to Extend the Debtors' Exclusive Periods to File and Solicit Votes on a Chapter 11 Plan* [ECF No. 787] (the "Second Exclusivity Motion"), seeking to further extend the Plan Exclusivity Period and the Solicitation Exclusivity Period, each by 61 days and 60 days, respectively. On May 15, 2024, the Bankruptcy Court entered an order granting the Second Exclusivity Motion, extending (i) the Plan Exclusivity Period to July 15, 2024, and (ii) the Solicitation Exclusivity Period to September 13, 2024. *See* ECF No. 907.

On July 11, 2024, the Debtors filed the *Debtors' Third Motion to Extend the Debtors' Exclusive Periods to File and Solicit Votes on a Chapter 11 Plan* [ECF No.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
46

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

1072] (the "<u>Third Exclusivity Motion</u>"), seeking to further extend the Plan Exclusivity Period and the Solicitation Exclusivity Period, each by 45 days. On August 8, 2024, the Bankruptcy Court entered an order granting the Third Exclusivity Motion, extending (i) the Plan Exclusivity Period to August 29, 2024, and (ii) the Solicitation Exclusivity Period to October 28, 2024. *See* ECF No. 1165.

## N. SEC Investigation

On January 24, February 27, and May 2, 2024, the SEC issued subpoenas to the Debtors pursuant to a formal order of investigation. The SEC's investigation is captioned *In the Matter of Certain iCap Securities* (SF-04623). The subpoenas seek, among other things, (1) financial information related to the Debtors and investment funds managed by the Debtors and Christensen, (2) marketing materials to be used for iCap and the funds it managed, (3) communications to, from, and about actual and potential Investors, (4) documents and communications about transactions between the Debtors, (5) documents about communications with auditors, and (6) documents and communications about the relationship between the iCap Entities and other entities.

## O. Shandong Yongchang Logistics Adversary Proceeding

On June 27, 2024, Shandong Yongchang Logistics Group Co., Ltd. commenced an adversary proceeding against Debtor iCap Vault 1, LLC, seeking a declaratory judgment that certain funds in the amount of $3,614,521.65 are held by the Debtor in trust for the plaintiff and are not property of the Debtor's Estate. *See* Adv. Proc. No. 24-80018. The Debtors are in the process of evaluating the claims asserted in the adversary proceeding and will be responding to the claims as necessary.

## P. Wilmington Adversary Proceeding

On August 16, 2024, Wilmington Savings Fund Society, FSB and Lima One Capital commenced an adversary proceeding against Debtors VH 1121 14th LLC and VH Willows Townhomes, LLC, seeking declaratory relief with respect to the plaintiffs' Claims against the Debtors and the prepetition loans that are the basis for such Claims. *See* Adv. Proc. No. 24-80022. The Debtors are in the process of evaluating the claims asserted in the Wilmington adversary proceeding and will be responding to the claims as necessary.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
47

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 57 of 141

**Q. Plan Negotiations and Settlement Under the Plan**

Throughout these Chapter 11 Cases, the Debtors and their professionals have worked consensually with the Unsecured Creditors' Committee and other key constituencies to reach an agreement that would provide for a prompt and orderly path out of bankruptcy for the Debtors and would conserve the Estates' resources for the benefit of all Investors and other Creditors.

The negotiations were ultimately fruitful, as they resulted in the Debtors and the Unsecured Creditors' Committee reaching an agreement in principle regarding the fundamental terms of a chapter 11 plan. After many weeks of further discussion and negotiations the Plan Proponents finalized and filed the Plan, which incorporates the parties' settlement.

## ARTICLE IV.
## DETERMINATION THAT CHRISTENSEN OPERATED
## THE PREPETITION DEBTORS AS A PONZI SCHEME

Upon filing these Chapter 11 Cases, the Debtors' professionals, working in cooperation with the Unsecured Creditors' Committee, began a robust investigation of the Debtors' books and records and prepetition activities to analyze the facts and circumstances surrounding the failure of the iCap business and potential causes of action related to such failure. The Debtors' investigation revealed that, in classic Ponzi scheme fashion, the prepetition Debtors were reliant on funds from new Investors to make the payments promised to existing Investors. When new investments dried up, the Debtors were unable to continue making required payments on the Debtors' debt obligations.

The iCap Entities are all directly or indirectly owned by Christensen. Christensen was formerly, but is no longer, the owner and CEO of the Debtors. As a result of the Debtors' investigation, the Debtors believe that Christensen used the prepetition Debtors to perpetrate a massive Ponzi scheme. The Debtors' prepetition business enterprise bears all the hallmarks of a Ponzi scheme:[13]

    (i)    Beginning no later than October 2018 through January 2023, Christensen used the web of iCap Entities, including the prepetition Debtors, to conduct a massive Ponzi scheme raising more than $230 million from nearly 2,000 unsuspecting Investors.

---

[13] The Plan will acknowledge and admit that the Debtors operated as a Ponzi scheme since at least the Ponzi Start Date. To the extent that the Bankruptcy Court does not confirm the Plan, the Plan Proponents reserve all of their respective rights (and/or defenses) respecting the characterization and the ramifications of the Debtors' prepetition transactions.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
48

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

(ii)     iCap's businesses operated with negative cash flow since inception. For example, Fund 1's real estate investments lost approximately $38 million through 2021, and Fund 2's investments lost $18.5 million through 2021.

(iii)    The source of payments to initial iCap Investors was from cash infused by new iCap Investors. This is reflected in the declining returns for initial Investors as compared to later Investors.

(iv)     iCap's business revenue was not sufficient to continue operations and, accordingly, iCap relied upon increasing fundraising and commingling cash. Fundraising became the near-exclusive source for the Debtors' capital. Between October 2018 and September 2023, fundraising activities represented more than 75% of total receipts (excluding intercompany advances), and were almost 10 times greater than revenues from real estate activities.

(v)      The vast majority of funds received by iCap were from Investors and external lenders rather than generated through business operations.

(vi)     Deposits to the iCap Entities were largely comprised of money from Investors (49.4%), intercompany transfers (34.9%), and third-party loans (9.6%), more so than from business operations (6.0%).

(vii)    To attract new Investors, iCap management repeatedly disseminated false and misleading financial information through quarterly newsletters and investment calls.

(viii)   Rather than structure its real estate investments as equity investments, iCap chose to raise capital from Investors through privately placed debentures under which Investors were promised interest rates ranging from 6% to 15%.

(ix)     iCap consistently encouraged Investors to "roll over" their investments, rather than be paid in full at maturity. For example, when Fund 1 and Fund 2 matured in December 2016 and December 2017, respectively, iCap was unable to repay either Fund's debentures. After several maturity date extensions, iCap gave Investors the option to "roll over" their debentures into the newly created Fund 3.

(x)      Fund 3 never owned or invested in real estate projects directly. Fund 3 was marketed as a "fund of funds" that owned equity interests in Funds 1 and 2 and would benefit from the income generated from those funds.

The Debtors' investigation was further supported by a forensic accounting professional, Jeffrey H. Kinrich of Analysis Group, who is a certified public accountant, with extensive experience investigating and testifying on financial and accounting issues related to distressed companies. He reached similar conclusions:

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

(i)    The majority of iCap's funds from October 2018 to September 2023 were from fund subscribers and loans from third parties, rather than cash generated from its business operations.

(ii)    The majority of iCap's funds from October 2018 to September 2023 were used to make interest and principal payments to subscribers rather than investing in real estate and related operations.

(iii)    iCap's real estate business from 2014 through 2022 did not generate sufficient cash flow to meet its interest and principal obligations to subscribers.

(iv)    There were several large dollar transfers between iCap Entities from October 2018 to September 2023, indicating that subscriber funds from one entity were used to pay subscribers in another entity. This is indicative of commingling.

(v)    iCap could only meet its obligations to repay its subscribers using proceeds from its real estate business if its real estate investments generated unrealistic (and unrealized) returns.

(vi)    iCap failed to invest subscribers' funds in the promised investments or as otherwise represented to subscribers.

(vii)    Later Investors in iCap received lower returns than earlier Investors.

Christensen is no longer in control of the Debtors and no longer has any involvement with the Debtors or these Chapter 11 Cases. The Plan described by this Disclosure Statement has been formulated by the Debtors, overseen by Lance Miller, the Debtors' CRO and the Debtors' independent Board of Directors, and the Unsecured Creditors' Committee, and each of their advisors, all of whom are completely independent of Christensen.

## ARTICLE V.
## SUMMARY OF THE JOINT CHAPTER 11 PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein). The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against, and Equity Interests in, the Debtors under the Plan and

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
50

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 60 of 141

will, upon the occurrence of the Effective Date, be binding on all Holders of Claims against, and Equity Interests in, the Debtors.

## A. Purpose and Effect of the Plan

Chapter 11 of the Bankruptcy Code allows a debtor to formulate and consummate a plan of liquidation. *See* 11 U.S.C. § 1129(a)(11). A plan of liquidation sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan of liquidation by a bankruptcy court makes that plan binding on the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The Plan provides for the Distribution of the proceeds of the liquidation of all Estate Assets to Investors and other Creditors as contemplated under the Plan. More specifically, the Plan provides for the creation and funding of the iCap Trust to administer and liquidate all remaining property of the Debtors, including (i) any real properties owned by the Debtors immediately prior to the Effective Date and (ii) the iCap Trust Actions, which include, among other things, any and all causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under Bankruptcy Code sections 542, 544, 547, 548, 549, 550, 551, or 553, or under related state or federal statutes, or pursuant to any theory or cause of action under common law, regardless whether such action has been commenced prior to the Effective Date.

Under the Plan, Claims against, and Equity Interests in, the Debtors are divided into Classes according to their relative seniority and other criteria. If the Plan is confirmed by the Bankruptcy Court and consummated, the Claims and Equity Interests of the various Classes will be treated in accordance with the provisions in the Plan for each such Class and the iCap Trust will make Distributions as provided in the Plan.

## B. Comprehensive Compromise and Settlement Under the Plan

Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims and controversies relating to the rights that a Holder of a Claim or an Equity Interest may have against any Debtor with respect to any Claim, Equity Interest, or any Distribution on account thereof, as well as of all potential Intercompany Claims, Intercompany Liens, and Causes of Action

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
51

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 61 of 141

against any Debtor. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (i) in the best interest of the Debtors, the Estates, and their respective property and stakeholders; and (ii) fair, equitable, and reasonable.

The Plan Proponents believe that the comprehensive compromise and settlement to be effected by the Plan is appropriate for several reasons and intend to request that the Bankruptcy Court approve such compromise and settlement. The Plan provides a mechanism to resolve the myriad complex legal issues and disputes present in these Chapter 11 Cases and to ultimately make Distributions to Creditors in a timely and orderly fashion.

The Plan Proponents are strongly of the view that all elements of the comprehensive compromise and settlement to be effected under the Plan are superior to the disorderly and uncertain alternatives. The terms of the global resolution under the Plan were heavily negotiated by the Debtors and the Unsecured Creditors' Committee, each of which acted at arm's length and had the benefit of sophisticated external advisers.

The Plan Proponents believe that consideration of the foregoing factors demonstrates that the terms of the comprehensive compromise and settlement to be effected by the Plan are fair and reasonable, and that its approval is in the best interests of the Estates and all stakeholders. The Plan Proponents will provide further evidence and argument supporting approval of this comprehensive compromise and settlement, including the elements detailed above, at the Confirmation Hearing.

Among those many disputed issues that will be resolved through the Plan are the following complex matters, any one of which could be the subject of years of expensive, complicated, and uncertain litigation.

1.  Substantive Consolidation Issues

Substantive consolidation is a construct of federal common law, emanating from equity, which treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities, save for inter-entity liabilities, which are erased. *See, e.g.*, *In re Mihranian*, 937 F.3d 1214, 1216 (9th Cir. 2019) (quoting *In re Bonham*, 229 F.3d 750, 764 (9th Cir. 2000)); *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005). Bankrupt entities can be substantively consolidated either on a consensual basis under a chapter 11 plan, or on a non-

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
52

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

consensual basis if (i) prepetition they disregarded entity separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and harms all creditors. *See id.* at 210.

In these Chapter 11 Cases, a compelling argument could be made for complete substantive consolidation of all the Debtors. Although Creditors generally may not have treated all of the Debtors as one legal entity, there is substantial commingling of assets and liabilities among the Debtors. *See In re Bonham*, 229 F.3d 750, 764-65 (9th Cir. 2000). The Debtors believe it is impossible to trace the flow of funds with respect to the Debtors' prepetition transactions since the majority of the proceeds received were commingled and distributed without regard to corporate formalities, which entanglement warrants substantive consolidation of all the Debtors. Moreover, the Chapter 11 Cases are unique—the perpetration of a fraudulent scheme by a common corporate enterprise, one that in the process did not keep accurate records of the multitude of intercompany transactions that have occurred, making an unscrambling of the enterprise's accounts impossible—but that has justified substantive consolidation in other cases. *See, e.g.*, *In re Bonham*, 229 F.3d at 764-65 (consolidating entities in Ponzi scheme case); *In re DBSI, Inc.*, Case No. 08-12687, ECF No. 5924 (Bankr. D. Del. Jan. 19, 2010) (same); *In re Bernard L. Madoff Investment Securities LLC*, No. 08-01789, ECF No. 252 (Bankr. S.D.N.Y. June 10, 2009) (same). Put differently, the particular facts and circumstances of these Chapter 11 Cases present unique arguments about whether and to what extent substantive consolidation is warranted.

On the Effective Date, the Debtors, other than the Excluded Debtors with respect to Claims in Classes 2B and 2C, will be substantively consolidated pursuant to Bankruptcy Code sections 105(a), 541, 1123, and 1129; *provided, however,* that the Debtors or iCap Trustees, as applicable, reserve the right to effectuate substantive consolidation of the Excluded Debtors after the Claims in Classes 2B and 2C are resolved upon filing notice with the Bankruptcy Court. As a result of the substantive consolidation, on the Effective Date, all property, rights, and claims of the Debtors and all Claims against the Debtors (other than Claims in Classes 2B and 2C) will be deemed to be pooled for purposes of Distributions under the Plan and, in the iCap Trustees' discretion, other purposes. Further, as a result of this substantive consolidation, all Claims between and among the Debtors will be cancelled. Holders of Allowed Claims shall be entitled to only one satisfaction on account of such Claims, and any contingent or otherwise duplicative Claims against one or more of the Debtors based upon claims for which one or more of the Debtors are also liable will be disallowed. Holders of Claims in Classes 2B and 2C shall be entitled to

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
53

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

recover up to the full amount of their Allowed Secured Claim from the sale proceeds for their Collateral.

Entry of the Confirmation Order will constitute the approval, pursuant to Bankruptcy Code sections 105(a), 541, 1123, and 1129, of the substantive consolidation of the Debtors in the manner set forth in the Plan; *provided*, *however*, that while the Debtors will be substantively consolidated for purposes of Distribution to creditors, such that all Investors shall have Claims against a single pool of the Debtors' consolidated assets, the actual substantive consolidation of entities, particularly for tax purposes, will be at the option of the Debtors or the iCap Trust, as applicable. Notwithstanding such substantive consolidation, however, fees payable pursuant to 28 U.S.C. § 1930 will be due and payable by each individual Debtor through the Effective Date.

Substantive consolidation under the Plan will not affect, without limitation, any defenses or rights the Debtors or the iCap Trust may have to any Claim, Cause of Action, or Avoidance Action, including the ability to assert a counterclaim.

Any Intercompany Claims that could be asserted by one Debtor against another Debtor will be extinguished immediately before the Effective Date with no separate recovery on account of any such Claims and any Intercompany Liens that could be asserted by one Debtor regarding any Estate Assets owned by another Debtor will be deemed released and discharged on the Effective Date; *provided*, *however*, that solely with respect to any Secured Claim of a non-debtor as to which the associated Lien would be junior to any Intercompany Lien, the otherwise released Intercompany Claim and associated Intercompany Lien will be preserved for the benefit of, and may be asserted by the iCap Trust as to any Collateral so as to retain the relative priority and seniority of such Intercompany Claim and associated Intercompany Lien.

The Disclosure Statement and the Plan together form a request for the Bankruptcy Court's approval of the substantive consolidation outlined in the Plan. Unless a Creditor, purportedly impacted by this consolidation, submits a written objection before the Plan's confirmation deadline, the consolidation described in the Plan may receive approval during the Confirmation Hearing. Should objections be filed within the specified timeframe, the Bankruptcy Court will address such objections at the Confirmation Hearing.

If the Bankruptcy Court determines that substantive consolidation of any given Debtors is not appropriate, then the Debtors may request that the Bankruptcy Court otherwise confirm the Plan and approve the treatment of and Distributions to the different Classes under the Plan on an adjusted, Debtor-by-Debtor basis.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Furthermore, the Debtors reserve their rights (i) to seek confirmation of the Plan without implementing substantive consolidation of any given Debtor, and, in the Debtors' reasonable discretion after consultation with the Unsecured Creditors' Committee, to request that the Bankruptcy Court approve the treatment of and Distributions to any given Class under the Plan on an adjusted, Debtor-by-Debtor basis; (ii) to seek substantive consolidation of the Excluded Debtors; and (iii) after consultation with the Unsecured Creditors' Committee, to seek to substantively consolidate all Debtors into iCap Enterprises, Inc. if all impaired Classes entitled to vote on the Plan vote to accept the Plan.

Consistent with the substantive consolidation contemplated by the Plan and in order to reduce administrative costs, on the Effective Date, some the Debtors may be dissolved automatically without the need for any corporate action or approval, without the need for any corporate filings, and without the need for any other or further actions to be taken on behalf of such dissolving Debtor or any other Person or any payments to be made in connection therewith.

This proposed substantive consolidation is the result of careful analysis and key stakeholder negotiation regarding ownership, operational entanglements, and creditor expectations based on the creditor's prepetition dealings with the Debtors, which makes it an appropriate element of a comprehensive plan settlement. *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 279-81 (Bankr. D. Del. 2016).

2.    Ponzi Scheme Issues

Additional disputes and possible litigation could arise regarding whether the Debtors were operating a Ponzi scheme, when that scheme began, and the implications of such conduct.

The Plan Proponents will seek findings in the Confirmation Order (the "Ponzi Findings") that (i) beginning no later than the Ponzi Start Date through the conclusion of the prepetition time period analyzed by the CRO and his advisors (which, for the avoidance of doubt, ended prior to the retention of new counsel and financial advisors by the Debtors in July 2023), the iCap enterprise operated as a Ponzi scheme raising approximately $230 million from over 1,800 Investors in the United States and abroad; and (ii) the Ponzi scheme involved the payment of purported returns to existing Investors from funds contributed by new Investors. The Plan Proponents are not seeking Ponzi Findings that would be binding on any other court or governmental or regulatory authority.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

This comprehensive compromise and settlement is a critical component of the Plan and is designed to provide a resolution of the innumerable disputed intercompany and intercreditor Claims, Liens, and Causes of Action that otherwise could take years to resolve, which would delay and undoubtedly reduce the Distributions that ultimately would be available for all Creditors.

Following a judicial determination that the Debtors were operating a Ponzi scheme, any payments of "interest" or other consideration that was transferred from any Person to an Investor, during the period before the Petition Date could potentially be avoided and recovered as an "actual" fraudulent transfer. *See, e.g., Donell v. Kowell*, 533 F.3d 762, 770-72 (9th Cir. 2008); *AFI Holding, Inc. v. Mackenzie*, 525 F.3d 700, 708-09 (9th Cir. 2008); *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011); *Geltzer v. Barish (In re Geltzer)*, 502 B.R. 760, 770 (Bankr. S.D.N.Y. 2013); *Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 871-72 (Bankr. N.D. Ill. 2000).

The Plan Proponents' legal position is that entry of the Confirmation Order and the making of the Ponzi Findings therein may have a preclusive effect in future proceedings before the Bankruptcy Court. The Plan Proponents fully reserve the ability to advance that legal position in subsequent litigation in the Bankruptcy Court. Moreover, upon entry of the Confirmation Order and the making of the Ponzi Findings, the Bankruptcy Court is determining that the iCap enterprise operated as a Ponzi scheme. Therefore, The Ponzi Findings, if asserted and relied on in proceedings in the Bankruptcy Court, may create a legal presumption that any payments to third parties during the Ponzi period were done with actual intent to hinder, delay, or defraud creditors. Accordingly, any such transfer could be avoided and recovered as an "actual" fraudulent transfer.

The iCap Trustees will have the discretion, subject to the iCap Trust Agreement, to determine whether and how to make demand upon, or sue, Investors liable for a Net Prepetition Investor Recovery, including, but not limited to, the discretion not to bring suit or make a demand because of the Investor's financial hardship. This discretion will be exercised in accordance with guidelines developed by the iCap Trustees in consultation with the iCap Trust Supervisory Board subject to the iCap Trust Agreement. No party should assume that they will be entitled to the exercise of such discretion. With respect to a specific Investor, the Net Prepetition Recovery means (a) the total Cash value remitted to the Investor from the Ponzi Start Date until the Petition Date (whether the payment was considered a return on the investment, interest, a referral fee, or a repayment of principal), minus (b) the total Cash value invested prepetition as principal by the Investor, (provided that the value

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
56

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 66 of 141

of (a) is greater than the value of (b)), capped by the amount of total Cash value remitted to the Investor.

Nothing in the Plan will impair the right of Investors to independently pursue claims in which they have independent legal standing against third parties that are unique to such Investors ("Individual Investor-Specific Claims"). By way of example, and not limitation, such unique claims include claims based on loss of lien or loss of lien priority, claims against Investor's professional advisors, claims against retirement servicers and similar claims that may be asserted based on such Investor's particular circumstances. The Individual Investor-Specific Claims do not include Investor Claims common to all Investors and/or claims to recover commissions or referral fees paid by the Debtors to third parties in connection with an Investor's investment with the Debtors.

For purposes of the Debtors' Plan, any Ponzi Finding by this court, including any finding of a Ponzi scheme or a Ponzi Start Date, shall not be preclusive nor binding on Umpqua Bank in any other court or governmental or regulatory authority, and neither the Debtors, the Unsecured Creditors Committee, the iCap Trust, nor the iCap Trustees will seek to enforce the same against Umpqua Bank in this bankruptcy court. In addition, to the extent the Debtors are substantively consolidated as of the Effective Date, such substantive consolidation shall not affect or diminish any defenses or rights of Umpqua Bank with respect to any claims associated with the Debtors or any individual Debtor, including any deposit accounts held by a Debtor at Umpqua Bank. The Plan Proponents acknowledge and agree that: Umpqua Bank is not a Creditor or party to this proceeding, that Umpqua Bank has not had a full or fair opportunity to litigate any Ponzi Findings to a final order or judgment, and that no claims have been specifically asserted against Umpqua Bank, or otherwise adjudicated in any manner in relation to the Plan or through Confirmation of the Plan. The above reservation will be included in the Confirmation Order in conjunction with the provisions of the Confirmation Order that include a Ponzi Finding.

## C. Estimated Recoveries for Holders of Investor Claims and General Unsecured Claims

The Plan Proponents estimate that Holders of Allowed Investor Claims and Allowed General Unsecured Claims in these Chapter 11 Cases should recover approximately 1–34% of the total amount of their Investor Claims or General Unsecured Claims. For further details regarding estimated recoveries, please refer to the Recovery Analysis attached as **Exhibit C** to the Disclosure Statement.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
57

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

The Plan Proponents have calculated the foregoing ranges of projected recoveries taking into account the following variables: (i) the total estimated amount of Investor Claims and General Unsecured Claims, in accordance with filed Claims and the Debtors' Schedules and (ii) the total estimated amount of value expected to be available for Distributions to iCap Trust Beneficiaries in accordance with the Plan and the Recovery Analysis.

It is important to emphasize that many factors will bear on the amount of Cash available for Distributions to iCap Trust Beneficiaries. The Cash available for Distributions consists or will consist primarily of (i) the Cash in the Estates on the Effective Date, after payment, allocation, or reserve in accordance with the Plan for unpaid or unutilized amounts for iCap Trust Funding; (ii) Cash realized after the Effective Date from the sale, collection, or other disposition of the Estates Assets; and (iii) Cash realized by the iCap Trustees from the prosecution of the iCap Trust Actions. However, this Cash has been or will be reduced by, among other things, (i) the Distributions to be made under the Plan with respect to Allowed Administrative Expense Claims, Allowed Claims of Professional Persons, Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Priority Claims; (ii) certain statutory and other fees payable in connection with the Chapter 11 Cases; and (iii) the iCap Trust Expenses. Only after these amounts have been paid or reserved will there be any Available Cash available for periodic Distributions to be made to the iCap Trust Beneficiaries.

## D. Treatment of Claims and Equity Interests

The treatment of all Allowed Claims and Allowed Equity Interests shall be as follows:

 1. Unclassified Claims

  a. *Administrative Expense Claims*. Administrative Expense Claims incurred in the ordinary course of the Debtors' business following the Petition Date (including fees owed to the CRO and/or either of Paladin Management Group, LLC and Pivot Management Group, LLC) shall be paid in the ordinary course of business in accordance with the terms and conditions of the particular agreements governing such obligations (as such terms were modified by any orders approving such agreements), or on such other terms as the Holder of such Claim and the Debtors (prior to the Effective Date) or the iCap Trustees (from the Effective Date forward) shall agree to in writing. All other Administrative

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Expense Claims, including Claims of Professional Persons, shall be paid on the later of the Effective Date or the date each such Claim becomes an Allowed Claim or on such other terms as the Holder of such Claim and the Debtors (prior to the Effective Date) or the iCap Trustees (from the Effective Date forward) shall agree to in writing. Claims arising under 28 U.S.C. § 1930 shall be paid as required by that statute.

(i) <u>Administrative Expense Claims Bar Date</u>. Administrative expense requests asserting Administrative Expense Claims arising from the Petition Date through and including the Effective Date, excluding (a) Claims of Professional Persons in the Chapter 11 Cases and (b) claims arising in the ordinary course of business, must be filed no later than 30 days after the notice of the Effective Date is filed with the Bankruptcy Court or such later date as may be established by order of the Bankruptcy Court.

(ii) <u>Final Fee Applications</u>. All final requests for compensation or reimbursement of Professional Persons retained in these Chapter 11 Cases for services performed and expenses incurred prior to the Effective Date shall be filed and served on: (a) the iCap Trustees, (i) Pivot Management Group, LLC, 1230 Rosecrans Ave., Suite 530, Manhattan Beach, CA 90266 (Attn: Lance Miller (Lance.miller@pivotgrp.com)) and (ii) B. Riley Advisory Services, 19800 MacArthur Boulevard, Suite 820, Irvine, CA 92612 (Attn: Seth Freeman (SFreeman@brileyfin.com)); (b) counsel to the Debtors, O'Melveny & Myers LLP (i) 400 South Hope Street, Suite 1900, Los Angeles, CA 90071 (Attn: Julian Gurule (jgurule@omm.com)) and (ii) 1301 Avenue of the Americas, Suite 1700, New York, NY 10019 (Attn: Diana Perez (dperez@omm.com)); (c) counsel to the Unsecured Creditors' Committee, (i) Bush Kornfeld LLP, 601 Union Street, Suite 5000, Seattle, WA 98101 (Attn: Armand J. Kornfeld (jkornfeld@bskd.com) and Aimee S. Willig (awillig@bskd.com)) and (ii) Corr Cronin LLP, 1015 Second Ave., Floor 10, Seattle, WA 98104 (Attn: John T. Bender (jbender@corrcronin.com)); (d) the Office of the

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
59

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 69 of 141

United States Trustee, United States Department of Justice, 920 West Riverside Avenue, Room 593, Spokane, WA 99201 (Attn: Gary W. Dyer (Gary.W.Dyer@usdoj.gov)); and (e) such other Persons who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, by no later than sixty (60) days after the Effective Date, unless otherwise agreed by the Debtors or the iCap Trustees, as applicable. Objections to any Claims of Professional Fees must be filed with the Bankruptcy Court and served on the iCap Trustees and the applicable Professional Person no later than fourteen (14) days after service of such applicable final fee application, unless otherwise ordered by the Bankruptcy Court. After Notice and Hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Claims shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in Cash.

b. *Priority Tax Claims*. Allowed Priority Tax Claims shall be paid, at the iCap Trust's option, as follows: (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim on the later of the Effective Date and thirty (30) calendar days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; (ii) in regular installment payments in Cash over a period not exceeding five (5) years after the Petition Date, plus interest on the unpaid portion thereof at the rate determined under applicable nonbankruptcy law as of the calendar month in which the Effective Date occurs (*provided* that such election shall be without prejudice to the right to prepay any such Allowed Priority Tax Claim in full or in part without penalty); or (iii) such other treatment as to which the Holder of an Allowed Priority Tax Claim and the iCap Trust shall have agreed upon in writing.

c. *Supplemental DIP Claims*. On the Effective Date, (i) all obligations of the Debtors under the Supplemental DIP Credit Agreement shall be assumed by the iCap Trust; (ii) all Liens and security interests granted to secure the Debtors' obligations under the Supplemental DIP Credit Agreement shall remain in place and

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
60

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

shall be otherwise subject to the terms and conditions of the Supplemental DIP Credit Agreement and any related subordination terms; and (iii) the legal, equitable, and contractual rights of the parties under the Supplemental DIP Credit Agreement shall be unaltered by the Plan.

2. <u>Classified Claims and Interests</u>

a. *Class 1: Priority Claims*

Class 1 consists of Priority Claims. Class 1 is unimpaired and deemed to accept the Plan.

On the later of (i) the Effective Date and (ii) thirty (30) calendar days following the date on which a Priority Claim becomes an Allowed Priority Claim, the Holder of such Allowed Priority Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Claim, either (a) Cash from the iCap Trust equal to the unpaid portion of such Allowed Priority Claim or (b) such other less favorable treatment from the iCap Trust to which such Holder and the iCap Trust shall have agreed upon in writing.

b. *Class 2: Secured Claims*

Class 2 consists of the following sub-classes of Secured Claims:

    (i)   **Class 2A: UW 17th Ave, LLC Secured Claims**

        (A) Class 2A.1 Studio 19 Architects Secured Claim

        (B) Class 2A.2 UW 17th Davido Consulting Group

        (C) Class 2A.3 Dhillon Secured Claim

    (ii)   **Class 2B: VH 1121 14th LLC Secured Claims**

        (A) Class 2B.1 14th Wilmington Savings Fund Secured Claim

    (iii)   **Class 2C: VH Willows Townhomes, LLC Secured Claims**

        (A) Class 2C.1 Willows Wilmington Savings Secured Claim

    (iv)   **Class 2D: VH Senior Care, LLC Secured Claims**

        (A) Class 2D.1 Redmond Funding Group Secured Claim

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
61

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

(v) **Class 2E: 725 Broadway, LLC Secured Claims**

        (A) Class 2E.1 Christopher Jones Architects Secured Claim

        (B) Class 2E.2 Broadway Davido Consulting Secured Claim

        (C) Class 2E.3 Malsam Tsang Engineering Secured Claim

        (D) Class 2E.4 Broadway Davido Consulting Secured Claim

        (E) Class 2E.5 Broadway Oak Hills Construction LLC

(vi) **Class 2F: Senza Kenmore, LLC Secured Claims**

        (A) Class 2F.1 Van Hoof Construction Secured Claim

        (B) Class 2F.2 T.S. Dance Construction Secured Claim

(vii) **Class 2G: iCap Campbell Way, LLC Secured Claims**

        (A) Class 2G.1 Campbell Davido Consulting Secured Claim

        (B) Class 2G.2 Deed of Trust of Pacific NW Opportunity & Income Fund, LLC

(viii) **Class 2H: VH Pioneer Village, LLC Secured Claims**

        (A) Class 2H.1 Tritalent Funding Group Secured Claim

(ix) **Class 2I: CS2 Real Estate Development Secured Claims**

        (A) Class 2I.1 BRMK Management Secured Claim

        (B) Class 2I.2 United Rentals Secured Claim

        (C) Class 2I.3 Sunbelt Rentals Secured Claim

        (D) Class 2I.4 CS2 Oak Hills Construction Secured Claim

        (E) Class 2I.5 Rexel USA, Inc. dba Platt Electric Supply Claim

(x) **Class 2J: Secured Real Property Tax Claims**

Class 2 is unimpaired and deemed to accept the Plan.

Except as explicitly provided for in the Plan, the legal, equitable, and contractual rights of Holders of Allowed Secured Claims are unaltered by the Plan, and, notwithstanding substantive consolidation of the Debtors and vesting of the iCap Trust Assets in the iCap Trust, the Liens of the Holders of Allowed Secured Claims will continue to attach to their respective Collateral, *provided* that all such Claims

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

shall remain subject to any and all defenses, counterclaims, and setoff or recoupment rights with respect thereto. On the later of (i) the Effective Date and (ii) thirty (30) calendar days following the date on which a Secured Claim becomes an Allowed Secured Claim, the Holder of such Allowed Secured Claim shall receive, in full satisfaction, settlement, and release of and in exchange for such Allowed Secured Claim, at the option of the Debtors or the iCap Trust, either (a) the net proceeds from the sale of the Collateral securing such Allowed Secured Claim; *provided, however*, that if the sale of the Collateral securing an Allowed Secured Claim closes after the occurrence of the Effective Date, the payment of the net proceeds shall be delivered to the Holder of the Allowed Secured Claim within thirty (30) calendar days of the closing of such sale, (b) the surrender of the Collateral securing such Allowed Secured Claim, or (c) such other less favorable treatment from the iCap Trust to which such Holder and the iCap Trust shall have agreed upon in writing. Pending allowance of a Secured Claim, the Debtors or the iCap Trust, as applicable, will segregate the proceeds from the sale of the Collateral securing such Secured Claim in the individual Secured Claims Reserve for the Holder of such Claim.

  c. *Class 3: Investor Claims*

  Class 3 consists of Investor Claims, as more particularly described below. Class 3 is impaired under the Plan and entitled to vote on the Plan.

  In full satisfaction, settlement, and release of and in exchange for such Claims, the Holders of Allowed Investor Claims will receive (i) on the later of the Effective Date and thirty (30) calendar days following the date on which such Investor Claim becomes an Allowed Investor Claim, one (1) Class A iCap Trust Interest for each dollar of Allowed Investor Class A Claims and one (1) Class B iCap Trust Interest for each dollar of Allowed Investor Class B Claims held by the applicable Investor (any resulting fractional iCap Trust Interests will be rounded to the nearest hundredth of such iCap Trust Interest), and (ii) the other consideration provided for in the Investor Claims Special Provisions set forth in Article III.C.1 of the Plan. All Distributions of Cash on account of the iCap Trust Interests will be made by the iCap Trust in accordance with the iCap Trust Interests Waterfall.

  For clarity, the practical effect of the above is the following:

  Class A iCap Trust Interests, which consist of Investors' principal balance owed on the Petition Date, will be paid through Distributions by the iCap Trust until fully satisfied. Once all of the Class A iCap Trust Interests are paid in full, then Distributions will be made to Class B iCap Trust Interests, which consist of Investors' accrued interest due as of the Petition Date.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
63

Black Helterline llp
805 SW Broadway
Suite 1900
Portland, OR 97205
Telephone: 503 224-5560

As an example, if Investor X invested $100,000 one year before the Petition Date with the Debtors, under the Plan, Investor X will receive (i) a $100,000 Investor Class A Claim (i.e., the original principal investment of $100,000); and (ii) a $7,000 Investor Class B Claim (representing 7% per annum interest on the $100,000 investment).

The treatment of any and all Investor Claims under the Plan is not intended to and will not reduce, impair, satisfy, limit, or otherwise affect any rights that any Investor may have against any Person that is not a Released Party (including those rights that may be included in the Contributed Claims and contributed to the iCap Trust by making the Ballot election described below).

Each Holder of an Investor Claim may agree by electing on its Ballot to contribute its Contributed Claims to the iCap Trust. By electing such option on its Ballot, the Investor agrees that, subject to the occurrence of the Effective Date and the formation of the iCap Trust, it will be deemed, without further action, (i) to have contributed its Contributed Claims to the iCap Trust and (ii) to have agreed to execute any documents reasonably requested to memorialize its contribution. The relative share of iCap Trust recoveries for any electing Investor will be enhanced by having the amounts that otherwise would be its Allowed Investor Class A Claim and its Allowed Investor Class B Claim each increased by the Contributing Claimants' Enhancement Multiplier – *i.e.,* **10%**.

> d. *Class 4: General Unsecured Claims*

Class 4 consists of General Unsecured Claims, as more particularly described below. Class 4 is impaired under the Plan and entitled to vote on the Plan.

In full satisfaction, settlement, and release of and in exchange for such Claims, the Holders of Allowed General Unsecured Claims will receive on the later of the Effective Date and thirty (30) calendar days following the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, one (1) Class A iCap Trust Interest for each dollar of Allowed General Unsecured Class A Claims and one (1) Class B iCap Trust Interest for each dollar of Allowed General Unsecured Class B Claims held by the applicable Holder (any resulting fractional iCap Trust Interests will be rounded to the nearest hundredth of such iCap Trust Interest). All Distributions of Cash on account of the iCap Trust Interests will be made by the iCap Trust in accordance with the iCap Trust Interests Waterfall.

> e. *Class 5: Subordinated Claims*

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
64

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 74 of 141

Class 5 consists of all Subordinated Claims. Class 5 is impaired under the Plan and deemed to reject the Plan.

The Holders of Allowed Subordinated Claims will retain a residual right to receive Available Cash that remains in the iCap Trust after the final administration of all iCap Trust Assets, and the complete satisfaction of all senior payment rights within the iCap Trust Interests Waterfall, including satisfaction of all Investor Class B Claims and General Unsecured Class B Claims. The Plan Proponents have decided not to solicit the votes of the Holders of any Subordinated Claims, and such Holders are therefore deemed to have rejected the Plan.

### f.    *Class 6: Equity Interests*

Class 6 consists of all Equity Interests and purported Equity Interests in the Debtors. Class 6 is impaired under the Plan and deemed to reject the Plan.

On and after the Effective Date, (i) Holders of Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan on account of such Equity Interests and (ii) the Equity Interests shall be deemed to be held by the iCap Trust under applicable non-bankruptcy law and the iCap Trustees shall be authorized to exercise all of the rights and powers of a sole member as provided by the Plan.

Any purported Equity Interests or Liens on Equity Interests held by an Investor in any Debtor will be considered void, cancelled, and of no further force and effect. These Claims will be regarded as Class 3 Investor Claims in accordance with the Plan, irrespective of any labels used by the Debtors and/or Investors prior to the Petition Date.

### 3.    Special Provisions Relating to Investor Claims.

The following provisions apply to Investor Claims (the "Investor Claims Special Provisions"):

a.    The Holders of Allowed Investor Claims will receive the treatment provided for such Holders under the Plan. For the avoidance of doubt, any and all purported Equity Interests of an Investor in any Debtor shall be deemed and treated as Investor Claims of the Investor pursuant to the Plan, regardless of the prepetition designations used by the Debtors and/or Investors.

b.    The iCap Trust will be created to pursue the iCap Trust Actions for the benefit of all the iCap Trust Beneficiaries; to establish and hold the

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
65

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 75 of 141

Distribution Reserves; and to receive and distribute to the holders of iCap Trust Interests the net proceeds of the monetization or other disposition of the iCap Trust Assets in accordance with the Plan and the iCap Trust Agreement.

      c.      The iCap Trustees shall have discretion, subject to the iCap Trust Agreement, to determine whether and how to make demand upon, or sue, Investors liable for a Net Prepetition Investor Recovery, including, but not limited to, the discretion not to bring suit or make a demand because of the Investor's financial hardship. That discretion shall be exercised in accordance with guidelines developed by the iCap Trustees in consultation with the iCap Trust Supervisory Board subject to the iCap Trust Agreement. No party should assume that they will be entitled to the exercise of such discretion.

      d.      In the event that an Investor Claim has been transferred or assigned, all Collateral Source Recoveries that were received by a prior Holder of the Claim shall be included for purposes of determining the Allowed amount of an Investor Claim as if such transferee or assignee had received such Distribution or recovery.

      e.      Upon request, Investors must, within twenty-one (21) calendar days of receipt of such request, respond to requests for information by the iCap Trustees with respect to Investor Claims. Failure to respond to a request for information may subject the Investor's Claim to disallowance in the iCap Trustees' full discretion.

      f.      At the end of each quarter, beginning with the first full quarter after the iCap Trust is established, the iCap Trustees will provide a report to the Investors summarizing the recovery actions the iCap Trust has engaged in during the quarter and detailing whether the iCap Trust is abandoning any specific Avoidance Actions or Causes of Action that it has determined it will not pursue, thus allowing Investors to pursue such actions, at their option.

    4.    <u>Special Provisions Relating to Individual Investor-Specific Claims.</u>

    Investors retain the right to independently pursue any Individual Investor-Specific Claims. Examples of such claims include, but are not limited to: loss of lien or lien priority; claims against the Investor's own professional advisors; claims against retirement service providers; and other claims arising from an Investor's specific situation. For the avoidance of doubt, Individual Investor-Specific Claims do not encompass claims shared by all Investors or claims to recover commissions or referral fees paid by the Debtors to third parties in relation to an Investor's

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
66

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

investment with the Debtors. The Plan will not interfere with an Investor's right to pursue these Individual Investor-Specific Claims, except as required (as determined by the iCap Trustees) to preserve iCap Trust Assets.

a. Any recovery by an Investor on an Individual Investor-Specific Claim shall reduce that Investor's entitlement to receive Distributions from the iCap Trust as follows:

(i) Any recovery, net of reasonable fees and expenses actually incurred by or on behalf of the Investor, shall be first applied to reduce the applicable Investor Class A Claim, if any, and then after the Investor Class A Claim is reduced to $0, shall be applied to reduce the applicable Investor Class B Claim.

b. Each Investor must promptly notify the Debtors or the iCap Trustees, as applicable, in writing, if such Investor receives any consideration on account of an Individual Investor-Specific Claim. This notification must be submitted within thirty (30) days of receiving said consideration and must detail the total amount recovered, along with any associated fees and expenses incurred. Failure to adhere to this reporting obligation may subject the Investor's Claim to disallowance in the iCap Trustees' full discretion, and the clawback of any Distributions previously received under the Plan.

**E. Acceptance or Rejection of the Plan**

1. Impaired Claims Entitled to Vote

The Plan Proponents shall only solicit the votes of Holders of Allowed Claims in Class 3 (Investor Claims) and Class 4 (General Unsecured Claims).

2. Acceptance by an Impaired Class

Pursuant to Bankruptcy Code section 1126(c), except as provided in Bankruptcy Code section 1126(e), acceptance of the Plan by Holders of Claims in any Class eligible to vote on it occurs when the Plan receives approval from Holders representing at least two-thirds (⅔) in dollar amount and over one-half (½) in number of the Allowed Claims in that Class who have duly voted to accept or reject the Plan within the stipulated timeframe.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
67

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 77 of 141

### 3. Presumed Acceptance by Unimpaired Classes

Class 1 (Priority Claims) and Class 2 (Secured Claims) are unimpaired under the Plan. Pursuant to Bankruptcy Code section 1126(f), Holders of unimpaired Claims are presumed to have accepted the Plan and the Plan Proponents therefore will not solicit their votes.

### 4. Certain Impaired Classes Deemed to Reject the Plan

The Plan Proponents have decided not to solicit the votes of Holders of any Claims in Class 5 (Subordinated Claims) and Holders of those Claims will therefore be deemed to have rejected the Plan and will not be entitled to vote on the Plan. Holders of Class 6 Equity Interests are not entitled to receive or retain any property or interests in property under the Plan and are therefore deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g). They are not entitled to vote on the Plan and their votes will not be solicited by the Plan Proponents.

### 5. Modification of Votes Already Cast

After the Voting Deadline, Creditors eligible to vote on the Plan cannot modify their cast votes or any related elections without obtaining written consent from the Plan Proponents. Such consent is subject to the reasonable discretion of the Plan Proponents.

### 6. Vacant Classes Eliminated

Any Class that does not contain a Holder of an Allowed Claim, or a Holder of a Claim that is temporarily allowed under Bankruptcy Rule 3018, measured as of the date on which the Confirmation Hearing begins, shall be deemed deleted from the Plan for the purpose of determining whether the Plan was accepted by that Class pursuant to Bankruptcy Code section 1129(a)(8).

## F. Implementation of the Plan

As detailed below, the Plan will be implemented through, among other things, the establishment of the iCap Trust and the appointment of the iCap Trustees and the iCap Trust Supervisory Board. The iCap Trust will make Distributions in accordance with the Plan.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

1.     <u>Streamlining the Debtors' Structure and Governance</u>

    a.     *Corporate Action.* On the Effective Date, all matters under the Plan involving or requiring action of the directors, members, managers, or officers of the Debtors, including, but not limited to, actions requiring a vote or other approval of the board of directors or any of the members or officers of the Debtors or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date, without any further action by the Bankruptcy Court or the directors, members, managers, or officers of the Debtors.

    b.     *Debtors' Existing Directors and Officers.* On the Effective Date, each of the Debtors' existing directors and officers including, without limitation, the CRO, shall be terminated automatically without the need for any further action and without the need for any corporate or limited liability company filings, and they shall have no ongoing rights against or obligations to the Debtors or the Estates, including under any applicable prepetition agreements (all of which will be deemed terminated); *provided, however*, that the Debtors' indemnification and defense obligations under any such agreements shall survive the foregoing termination and remain unaltered by the Plan. On the Effective Date, the iCap Trustees shall succeed to all such powers as would have been applicable to the Debtors' officers and directors in respect of all iCap Trust Assets.

    c.     *Dissolution of the Debtors.* On and as of the earlier of the Case Closing Date and the date on which the iCap Trustees file with the Bankruptcy Court a notice of dissolution as to a Debtor, such Debtor will be dissolved automatically without the need for any further action, including the filing of any corporate or limited liability company filings; *provided, however*, that the iCap Trust may in its discretion file any certificates of cancellation as may be appropriate in connection with dissolution of any Debtor. All applicable regulatory or governmental agencies shall take all steps necessary to allow and effect the prompt dissolution of the Debtors as provided herein, without the payment of any fee, tax, or charge and without need for the filing of any certificates.

    d.     *Corporate Documents and Corporate Authority.* On the Effective Date, the certificates of incorporation, bylaws, operating agreements, and articles of organization, as applicable, of all the Debtors shall be deemed amended to the extent necessary to carry out the provisions of the Plan. The entry of the Confirmation Order shall constitute authorization for the Debtors and the iCap Trustees, as applicable, to take or cause to be taken all actions (including, if applicable, corporate actions) necessary or appropriate to implement all provisions of, and to consummate, the Plan

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
69

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

prior to, on, and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation.

2.    Cancellation of Indebtedness

On the Effective Date, except for the purpose of evidencing a right to Distribution under the Plan, any Notes or other instruments or documents evidencing or creating any indebtedness or obligations of, or interest in, the Debtors, except assumed executory contracts and assumed unexpired leases, and/or such Notes or other instruments evidencing indebtedness or obligations of the Debtors that are unimpaired, reinstated, assumed, or amended and restated under the Plan, shall be cancelled and terminated and of no further force or effect.

3.    iCap Trust

a.    *Appointments*. On and after the Effective Date, the initial iCap Trustees shall become and serve as iCap Trustees. The iCap Trustees' shared compensation will be set at five percent (5%) of the iCap Trust's gross recoveries, the payment terms and timing of which will be set forth in the iCap Trust Agreement and the Plan Supplement.

On and after the Effective Date, the initial iCap Trust Supervisory Board shall begin to serve without further action consistent with the terms of the Plan and iCap Trust Agreement. The purpose of the iCap Trust Supervisory Board is to oversee the performance of the iCap Trustees' duties and to otherwise carry out and serve the functions described in the Plan and in the iCap Trust Agreement. Compensation for the iCap Trust Supervisory Board will be set forth in the iCap Trust Agreement and the Plan Supplement.

At the time of Confirmation of the Plan and formation of the iCap Trust, John Bender shall serve as litigation counsel to the iCap Trust and Bush Kornfeld LLP shall serve as restructuring counsel to the iCap Trust.

b.    *Creation and Governance of the iCap Trust*. On the Effective Date, the iCap Trustees shall execute the iCap Trust Agreement and shall take any other steps necessary to establish the iCap Trust in accordance with the Plan. For federal income tax purposes, the transfer of the assets to the iCap Trust will be treated as a sale or other disposition of assets to the iCap Trust Beneficiaries in exchange for their Claims in the Chapter 11 Cases. Any income or loss from the transfer of assets

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
70

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 80 of 141

to the iCap Trust shall flow through to the ultimate taxpaying member of each Debtor who will be responsible to pay the tax liability.

For federal income tax purposes, the iCap Trust Beneficiaries shall be treated as the grantors of the iCap Trust and deemed to be the owners of the assets of the iCap Trust. The transfer of the iCap Trust Assets to the iCap Trust shall be deemed a transfer to the iCap Trust Beneficiaries by the Debtors, followed by a deemed transfer by such iCap Trust Beneficiaries to the iCap Trust. The Debtors, the iCap Trust Beneficiaries, and the iCap Trust will consistently report the valuation of the assets transferred to the iCap Trust. Such consistent valuations and revised reporting will be used for all federal income tax purposes. Income deductions, gain, or loss from the iCap Trust shall be reported to the beneficiaries of the iCap Trust in conjunction with the filing of the iCap Trust's income tax returns. Each iCap Trust Beneficiary shall report income, deductions, gain, or loss on such iCap Trust Beneficiary's income tax returns. The iCap Trust shall be governed by the iCap Trust Agreement and administered by the iCap Trustees and the iCap Trust Supervisory Board. The powers, rights, and responsibilities of the iCap Trustees shall be specified in the iCap Trust Agreement.

c. *Vesting of iCap Trust Assets.* On the Effective Date, the iCap Trust will be automatically vested with all the Debtors' and the Estates' respective rights, title, and interest in and to all iCap Trust Assets. Except as specifically provided in the Plan or the Confirmation Order, the iCap Trust Assets shall automatically vest in the iCap Trust free and clear of all Claims, Liens, or interests subject only to the iCap Trust Interests and the iCap Trust Expenses, as provided for in the iCap Trust Agreement, and such vesting shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. The iCap Trustees shall be the exclusive trustee of the iCap Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3) regarding all iCap Trust Assets. The iCap Trust shall hold and distribute the iCap Trust Assets in accordance with the provisions of the Plan and the iCap Trust Agreement.

Notwithstanding the foregoing or any other provision in the Plan, in the event that the iCap Trust receives any monies from the United States or any other Governmental Unit, obtained as forfeited assets (or otherwise) by the Governmental Unit for the benefit of the Investor victims of the Debtors' prepetition Ponzi scheme, all such monies shall not constitute Estate Assets or iCap Trust Assets, and the iCap Trustees are authorized to and shall distribute all such monies only to Investors who are Holders of Class A iCap Trust Interests or Class B iCap Trust Interests on account

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

thereof, subject to the Plan and the iCap Trust Agreement; *provided* that the iCap Trustees and their agents will be reimbursed from such monies for reasonable costs and expenses incurred by said parties related to the iCap Trust's collection, administration, and Distribution of such monies to the applicable Investors.

d. *Sales of Estate Assets*. In accordance with Bankruptcy Code section 1146(a), no stamp tax, conveyance fee, real estate, excise, or other transfer tax, mortgage tax, mortgage recording tax, Uniform Commercial Code filing or recording filing fee or similar tax shall apply to (1) the sale or transfer of iCap Trust Assets to the iCap Trust; (2) the issuance, Distribution, transfer, or exchange of Notes or equity securities under the Plan; or (3) the establishment of any mortgage, deed of trust, Lien, pledge, or other security interest, or the execution or delivery of any lease, sublease, deed, or other transfer instrument related to or in support of the Plan. Upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents and any third party shall forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or assessment.

As part of implementation of the Plan, following Confirmation, the iCap Trustees will sell iCap Trust Assets. No further order of the court will be necessary to sell iCap Trust Assets. All sales of real property contemplated by the Plan shall be free and clear of all Liens, claims, encumbrances, and/or interests of any kind pursuant to Bankruptcy Code sections 1123(a)(5)(D) and 1141(c), with the proceeds of such sales being paid pursuant to the terms of the Plan. Pursuant to Washington Administrative Code 458-61A-207, the iCap Trust will be exempt from the imposition of real estate excise taxes that would otherwise be payable under Revised Code of Washington 82.45.060 and/or other applicable law as to any sale of the iCap Trust Assets at any time following Confirmation. Pursuant to Bankruptcy Code section 1146, the iCap Trust's making or delivery of an instrument of transfer as to any iCap Trust Assets following Confirmation may not be taxed under any law imposing a stamp tax or similar tax.

e. *Purpose of the iCap Trust.* The iCap Trust shall be established for the purpose of pursuing or liquidating the iCap Trust Assets and making Distributions to the iCap Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d) and the terms of the Plan.

f. *Authority*. Subject to the supervision of the iCap Trust Supervisory Board as set forth in the iCap Trust Agreement, the iCap Trustees shall have the authority without the need for Bankruptcy Court approval (in each case,

**SECOND AMENDED DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION**
72

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

unless otherwise provided in the Plan) to carry out and implement all applicable provisions of the Plan, including to:

(i)     review, reconcile, compromise, settle, or object to Claims and resolve such objections as set forth in the Plan;

(ii)    assert and enforce all legal or equitable remedies and defenses belonging to the Debtors or their Estates, including setoff, recoupment, and any rights under Bankruptcy Code section 502(d);

(iii)   calculate and make Distributions and calculate and establish reserves under and in accordance with the Plan;

(iv)    retain, compensate, and employ professionals and other Persons to represent the iCap Trustees with respect to and in connection with their rights and responsibilities;

(v)     establish, maintain, and administer documents and accounts of the Debtors as appropriate, which shall be segregated to the extent appropriate in accordance with the Plan;

(vi)    maintain, conserve, collect, settle, and protect the iCap Trust Assets, including, but not limited to, pursuing, engaging in, and consummating any Investor Avoidance Settlements and/or Broker Settlements;

(vii)   pursue, prosecute, settle, or abandon any iCap Trust Actions, including, but not limited to, Investor Avoidance Settlements and/or Broker Settlements;

(viii)  act on behalf of the Debtors in all adversary proceedings and contested matters then pending or that can be commenced in the Bankruptcy Court and in all actions and proceedings pending or commenced elsewhere;

(ix)    proceed with and employ all discovery devices permitted under applicable law, including Bankruptcy Rule 2004, in order to investigate any Claims, iCap Trust Actions, or iCap Trust Assets;

(x)     sell, liquidate, transfer, assign, distribute, abandon, or otherwise dispose of the iCap Trust Assets or any part thereof or interest

**SECOND AMENDED DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION**
73

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 83 of 141

therein upon such terms as the iCap Trustees determine to be necessary, appropriate, or desirable;

(xi) negotiate, incur, and pay the iCap Trust Expenses;

(xii) prepare and file any and all informational returns, reports, statements, returns, and other documents or disclosures relating to the Debtors that are required under the Plan, by any Governmental Unit, or by applicable law;

(xiii) compile and maintain the official claims register, including for purposes of making initial and subsequent Distributions under the Plan;

(xiv) take such actions as are necessary or appropriate to wind-down and dissolve the Debtors;

(xv) effect all actions and execute all agreements, instruments, and other documents, and take all actions, necessary to consummate the Plan;

(xvi) comply with the Plan, exercise the iCap Trustees' rights, and perform the iCap Trustees' obligations; and

(xvii) exercise such other powers as deemed by the iCap Trustees to be necessary and proper to implement the Plan.

To the extent necessary to give full effect to their administrative rights and duties under the Plan, the iCap Trustees shall be deemed to be vested with all rights, powers, privileges, and authorities of (i) an appropriate corporate or limited liability company officer or manager of each of the Debtors under any applicable nonbankruptcy law and (ii) a "trustee" of each of the Debtors under Bankruptcy Code sections 704 and 1106. The iCap Trust Supervisory Board will have all rights and powers of a corporate board appointed under Washington law.

g. *Limitation of Liability.* The iCap Trustees and the iCap Trust Supervisory Board shall enjoy all the rights, powers, immunities, and privileges applicable to a Bankruptcy Code chapter 7 trustee with respect to limitations of liability. The iCap Trustees may, in connection with the performance of their functions, in their sole and absolute discretion, consult with their attorneys, accountants, advisors, and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions were in writing. Notwithstanding such authority, the iCap Trustees shall be under no obligation to

**SECOND AMENDED DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF LIQUIDATION**
74

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 84 of 141

consult with any such attorneys, accountants, advisors, or agents, and their determination not to do so shall not result in the imposition of liability on the iCap Trustees unless such determination is based on willful misconduct, gross negligence, or fraud. Persons dealing with the iCap Trustees shall look only to the iCap Trust Assets to satisfy any liability incurred by the iCap Trustees to such Person in carrying out the terms of the Plan or the iCap Trust Agreement. No recourse will ever be had, directly or indirectly, against the iCap Trustees or their members, officers, directors, employees, professionals, representatives, agents, successors, or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or agreement whatsoever executed by the iCap Trustees under the Plan or by reason of the creation of any indebtedness by the iCap Trustees under the Plan.

h. *Indemnification*. The iCap Trust Agreement will include customary indemnification provisions.

i. *Insurance*. The iCap Trustees shall be authorized, but not required, to obtain any insurance coverages deemed to be reasonably necessary, at the iCap Trust's sole expense, for themselves, the iCap Trustees, and their respective agents, including coverage with respect to the liabilities, duties, and obligations of the iCap Trustees, which insurance coverage may, at the sole discretion of the iCap Trustees, be extended for a reasonable period after the termination of the iCap Trust.

j. *Tax Reporting*. The iCap Trust shall timely file tax returns for the iCap Trust treating the iCap Trust as a grantor trust pursuant to Treasury Regulation section 1.671- 4(a).

The iCap Trust shall be responsible for timely payment of all taxes (if any) imposed on and payable by the iCap Trust, the Debtors, or any iCap Trust Assets.

The iCap Trust shall distribute such tax-related notices, beneficiary statements, and informational returns, as applicable, to the applicable Holders of Allowed Claims as are required by applicable law or that the iCap Trustees determine are otherwise necessary or desirable.

The iCap Trust is authorized to file a request for expedited determination under Bankruptcy Code section 505(b) for any tax returns filed with respect to the Debtors.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
75

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

**k.** *Distributions to iCap Trust Beneficiaries.* After payment of or reserve for all senior claims (including without limitation, Administrative Expense Claims, Priority Claims, Priority Tax Claims, and Secured Claims) in accordance with the Plan and the iCap Trust Agreement, the iCap Trust shall make Distributions to iCap Trust Beneficiaries pursuant to the iCap Trust Interests Waterfall.

The iCap Trust, in the iCap Trustees' sole discretion, may make periodic Distributions to the iCap Trust Beneficiaries at any time following the Effective Date, provided that such Distributions are otherwise permitted under, and not inconsistent with, the iCap Trust Interests Waterfall, the other terms of the Plan, the iCap Trust Agreement, and applicable law.

**l.** *Cash Investments.* The iCap Trustees may invest Cash of the iCap Trust, including any earnings or proceeds from such investment, and such investments will not be required to comply with Bankruptcy Code section 345(b); *provided, however*, that such investments must be investments that are permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable guidelines, rulings, or other controlling authorities.

**m.** *Securities Act Exemption.* To the extent the iCap Trust Interests are deemed to be "securities," the issuance of those interests under the Plan is exempt from registration under the Securities Act and any applicable state and local securities laws pursuant to Bankruptcy Code section 1145.

**n.** *Contribution of Contributed Claims.* On the Effective Date, all Contributed Claims are irrevocably contributed to the iCap Trust and shall thereafter be iCap Trust Actions for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Confirmation Order, the iCap Trust Agreement, or the Disclosure Statement to any Contributed Claims against such Person as any indication that the iCap Trust will not pursue any and all available Contributed Claims against such Person. The objection to the Allowance of any Claims will not in any way limit the ability or the right of the iCap Trust to assert, commence, or prosecute any Contributed Claims. Nothing contained in the Plan, the Confirmation Order, the iCap Trust Agreement, or the Disclosure Statement will be deemed to be a waiver, release, or relinquishment of any Contributed Claims that the Contributing Claimants had immediately prior to the Effective Date. The iCap Trust shall have, retain, reserve, and be entitled to assert all Contributed Claims fully as if the Contributed Claims had not been contributed to the iCap Trust in accordance with the Plan and the iCap Trust Agreement.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

o.  *Authority to Pursue and Resolve iCap Trust Actions*. The iCap Trust, as a successor in interest to the Debtors, the Estates, and the Contributing Claimants will have the exclusive right, power, and interest on behalf of itself, the Debtors, the Estates, and the Contributing Claimants to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all iCap Trust Actions without any further order of the Bankruptcy Court, except as otherwise provided in the iCap Trust Agreement. From and after the Effective Date, the iCap Trust, in accordance with Bankruptcy Code section 1123(b)(3), shall serve as a representative of the Estates with respect to any and all iCap Trust Actions that were Estate Assets and shall retain and possess the right to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all iCap Trust Actions in any court or other tribunal.

p.  *Termination*. The iCap Trustees and the iCap Trust shall be discharged or terminated, as the case may be, at such time as: (i) the iCap Trustees determine that the pursuit of additional iCap Trust Actions is not likely to yield sufficient additional proceeds to justify further pursuit of such iCap Trust Actions and (ii) all Distributions required to be made by the iCap Trust to Holders of Allowed Claims and to the iCap Trust Beneficiaries under the Plan and the iCap Trust Agreement have been made, but in no event shall the iCap Trust be terminated later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six (6) months before the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, unless a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the iCap Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the iCap Trust Assets. Upon termination of the iCap Trust, any remaining iCap Trust Assets that exceed the amounts required to be paid under the Plan may be transferred by the iCap Trustees to a non-profit organization of their choice.

q.  *Interpretation*. To the extent there is any inconsistency between the Plan and the iCap Trust Agreement, the Plan shall control.

4.  <u>Substantive Consolidation</u>

On the Effective Date, the Debtors, other than the Excluded Debtors with respect to Claims in Classes 2B and 2C, shall be substantively consolidated pursuant to Bankruptcy Code sections 105(a), 541, 1123, and 1129; *provided, however,* that

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

the Debtors or iCap Trustees, as applicable, reserve the right to effectuate substantive consolidation of the Excluded Debtors after the Claims in Classes 2B and 2C are resolved upon filing notice with the Bankruptcy Court. As a result of the substantive consolidation, on the Effective Date, all property, rights, and claims of the Debtors and all Claims against the Debtors (other than Claims in Classes 2B and 2C) shall be deemed to be pooled for purposes of Distributions under the Plan and, in the iCap Trustees' discretion, other purposes. Further, as a result of this substantive consolidation, all claims between and among the Debtors shall be cancelled. Holders of Allowed Claims shall be entitled to only one satisfaction on account of such Claims, and any contingent or otherwise duplicative Claims against one or more of the Debtors based upon claims for which one or more of the Debtors are also liable shall be disallowed. Holders of Claims in Classes 2B and 2C shall be entitled to recover up to the full amount of their Allowed Secured Claim from the sale proceeds for their Collateral.

Entry of the Confirmation Order shall constitute the approval, pursuant to Bankruptcy Code sections 105(a), 541, 1123, and 1129, of the substantive consolidation of the Debtors in the manner set forth in Article V.E of the Plan; *provided, however*, that while the Debtors shall be substantively consolidated for purposes of Distributions to Creditors, such that all Investors shall have claims against a single pool of the Debtors' consolidated assets, the actual substantive consolidation of entities, particularly for tax purposes, shall be at the option of the Debtors or the iCap Trust, as applicable. Notwithstanding such substantive consolidation, however, fees payable pursuant to 28 U.S.C. § 1930 shall be due and payable by each individual Debtor through the Effective Date.

Substantive consolidation under the Plan shall not affect, without limitation, any defenses or rights the Debtors or the iCap Trust may have to any Claim, Cause of Action, or Avoidance Action, including the ability to assert a counterclaim.

Any Intercompany Claims that could be asserted by one Debtor against another Debtor will be extinguished immediately before the Effective Date with no separate recovery on account of any such Claims and any Intercompany Liens that could be asserted by one Debtor regarding any Estate Assets owned by another Debtor will be deemed released and discharged on the Effective Date; *provided, however*, that solely with respect to any Secured Claim of a non-debtor as to which the associated Lien would be junior to any Intercompany Lien, the otherwise released Intercompany Claim and associated Intercompany Lien will be preserved for the benefit of, and may be asserted by the iCap Trust as to any Collateral so as to retain the relative priority and seniority of such Intercompany Claim and associated Intercompany Lien.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

The Disclosure Statement and the Plan together form a request for the Bankruptcy Court's approval of the substantive consolidation outlined in the Plan. Unless a Creditor, purportedly impacted by this consolidation, submits a written objection before the Plan's confirmation objection deadline, the consolidation described in the Plan may receive approval during the Confirmation Hearing. Should objections be filed within the specified timeframe, the Bankruptcy Court will address such objections at the Confirmation Hearing.

If the Bankruptcy Court determines that substantive consolidation of any given Debtor is not appropriate, then the Debtors may request that the Bankruptcy Court otherwise confirm the Plan and approve the treatment of and Distributions to the different Classes under the Plan on an adjusted, Debtor-by-Debtor basis. Furthermore, the Debtors reserve their rights (i) to seek confirmation of the Plan without implementing substantive consolidation of any given Debtor, and, in the Debtors' reasonable discretion after consultation with the Unsecured Creditors' Committee, to request that the Bankruptcy Court approve the treatment of and Distributions to any given Class under the Plan on an adjusted, Debtor-by-Debtor basis; and (ii) after consultation with the Unsecured Creditors' Committee, to seek to substantively consolidate all Debtors into iCap Enterprises, Inc. if all impaired Classes entitled to vote on the Plan vote to accept the Plan.

5.    <u>Preservation of Rights of Action</u>

a.    *Avoidance Actions and Causes of Action*. Except as otherwise provided in the Plan or the Confirmation Order (including in the Investor Claims Special Provisions), in accordance with Bankruptcy Code section 1123(b), from and after the Effective Date, the iCap Trust will retain all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or Estates' Causes of Action and Causes of Action that are Contributed Claims (whether existing as of the Petition Date or thereafter arising), and all Avoidance Actions, all as iCap Trust Actions, in each case in any court or other tribunal, including in an adversary proceeding filed in the Chapter 11 Cases, subject to the requirements set forth in the Plan and the iCap Trust Agreement. The iCap Trust shall have the exclusive right, power, and interest on behalf of itself, the Debtors, the Estates, and the Contributing Claimants to, enforce, sue on, settle, compromise, transfer, or assign (or decline to do any of the foregoing) any or all of the iCap Trust Actions without notice to or approval from the Bankruptcy Court, subject to the iCap Trust Agreement. In accordance with the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court, from and after the Effective Date, the iCap Trust may compromise and settle iCap

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

Trust Actions, subject to the iCap Trust Agreement. It is anticipated that the iCap Trust will pursue iCap Trust Actions primarily under alternate fee arrangements and not a typical hourly fee structure, employing the services of professionals selected by (i) the Debtors, in consultation with the Unsecured Creditors' Committee, prior to the Effective Date or (ii) the iCap Trustees, as provided in the iCap Trust Agreement, on and after the Effective Date. For the avoidance of doubt, nothing in this Disclosure Statement or the Plan shall require the iCap Trust to commence or pursue litigation concerning any iCap Trust Action.

b. *Preservation of All iCap Trust Actions Not Expressly Settled or Released.* The failure to specifically identify in the Disclosure Statement (including its exhibits and schedules) or the Plan any potential or existing Avoidance Actions or Causes of Action as an iCap Trust Action is not intended to and shall not limit the rights of the iCap Trust to pursue any such Avoidance Actions or Causes of Action. Unless an iCap Trust Action is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such iCap Trust Action for later resolution by the iCap Trust (including any Avoidance Actions or Causes of Action not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist). In addition, the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor or the iCap Trust is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to any iCap Trust Actions upon, after, or as a consequence of the confirmation of the Plan.

c. *Categories of Preserved Claims.* The Plan specifically preserves the right for the iCap Trust and iCap Trustees to pursue any and all claims that the Debtors and/or their Estates have the right to pursue, including **all** Causes of Action and Avoidance Actions, as defined in the Plan. Without in any way limiting the iCap Trust's and the iCap Trustees' rights to pursue claims against third parties, the following are illustrative categories of claims that the iCap Trust will have the right to pursue:

1. Insider and non-Insider preference actions arising under bankruptcy and/or state law;

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
80

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

2. Fraudulent transfer actions arising under bankruptcy and/or state law;

3. Turnover actions under bankruptcy law;

4. Any and all other rights and/or claims arising under the bankruptcy laws;

5. Claims against third parties that aided and abetted the Debtors' conduct;

6. Intentional and unintentional tort claims against third parties, including professional firms and former iCap principals and employees;

7. Claims against third parties that may arise out of or relate to the conduct of an alleged Ponzi scheme;

8. Breach of contract claims;

9. Employment claims against former iCap employees, including breach of duties and breach of non-compete agreements and/or other agreements;

10. Claims against third parties for return of commissions paid;

11. Claims against former principals, directors, and officers for breach of fiduciary duties, breach of duty of loyalty, and similar claims; and

12. All other claims not included in these categories that are Causes of Action and Avoidance Actions, as defined in the Plan.

6. Exit Financing

On the Effective Date, without the need for further action, the iCap Trust shall enter into the Exit Financing, including the First Lien Exit Loan Facility and the Tritalent Exit Loan Facility.

7. Abandonment of Certain Estate Assets

Unless previously sold or disposed of, on the Effective Date, and without the need for further action, the following Estate Assets shall be deemed abandoned by

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
81

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 91 of 141

the Debtors and their Estates pursuant to Bankruptcy Code section 554 and shall not be considered iCap Trust Assets:

– the real property commonly known as 715–775 Broadway, Tacoma, WA; and
– the Debtors' interests in Holding and Markets including, without limitation, the Airlink Membership Interests.

**G.  Executory Contracts and Unexpired Leases**

The Debtors have no executory contracts or unexpired leases within the meaning of Bankruptcy Code section 365.

**H.  Conditions Precedent to the Effective Date**

1.  Occurrence of Effective Date

The Effective Date shall not occur and the Plan shall not be considered consummated until each of the following conditions has either been satisfied or waived as set forth in Article IX.B of the Plan:

a. Entry of the Confirmation Order by the Bankruptcy Court in a form reasonably acceptable to both the Debtors and the Unsecured Creditors' Committee, and no request for revocation of the Confirmation Order under Bankruptcy Code section 1144 shall have been made, or, if made, shall remain pending;

b. The Confirmation Order shall have become a Final Order in full force and effect and shall not be subject to any stay of effectiveness;

c. The iCap Trustees shall be duly appointed, qualified, and acting in that capacity;

d. The iCap Trust shall have access to funding under the Exit Financing;

e. There shall not be in effect any (i) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (ii) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan; and

**SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION**
82

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

f.  All necessary actions, agreements, instruments, or other documents to implement the terms and provisions of the Plan have been completed or executed and delivered, as required.

## 2.  Waiver of Conditions

The conditions set forth in Article IX.A of the Plan may be waived, in whole or in part, in writing by agreement of the Debtors, at any time, without notice or further order of the Bankruptcy Court.

## 3.  Non-Occurrence of Effective Date Conditions

If the conditions necessary for the Effective Date are not met or duly waived as outlined in Articles IX.A and B of the Plan, upon notification filed by the Debtors with the Bankruptcy Court, the following shall occur: (i) the Confirmation Order will be vacated; (ii) no Distributions will be made; (iii) the Debtors, the Estates, the Unsecured Creditors' Committee, and all Creditors will revert to the status quo as of the day immediately preceding the Confirmation Hearing as if the Confirmation Order had not been entered; and (iv) all obligations of the Debtors and the Estates regarding Claims will remain unchanged. Nothing in the Plan will constitute a waiver or release of any Claims by or against the Debtors, the Estates, or any other Person, nor will it prejudice the rights, claims, or defenses of the Debtors, the Estates, or any other Person.

## 4.  Effective Date Notice

Following the Effective Date, the iCap Trust or its representatives will promptly send notices to all Creditors and the U.S. Trustee. These notices will include information regarding: (i) the Confirmation Order and the Plan's Confirmation; (ii) the Effective Date; (iii) the assumption, assignment, and rejection of executory contracts and unexpired leases pursuant to the Plan, if any, along with the deadline for filing any Claims resulting from such rejection; (iv) the deadline set forth in the Plan for filing Administrative Expense Claims; (v) the deadline by which Professional Persons must file and serve any requests for payment of professional fees; and (vi) any other pertinent matters deemed appropriate by the iCap Trustees.

## I.  Certain Miscellaneous Provisions

## 1.  Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
83

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

before the Effective Date. All such fees that relate to Distributions by each Debtor after the Effective Date shall be paid by the iCap Trustees. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

2. Mailing List

The official listing of Creditor identities and mailing addresses is maintained by the Claims Agent (the "Official Mailing List"). It shall be the obligation of each Creditor and/or party in interest to assure that the Official Mailing List is current and accurate as to each such person or entity.

3. Employment of Professional Persons

The Debtors shall be authorized to employ and compensate Professional Persons following Confirmation upon such terms as the Debtors deem reasonable and appropriate without further notice or order of the Bankruptcy Court.

4. Payments Shall Be Timely

The Debtors shall timely make all payments required under the Plan. Without limiting the generality of the foregoing, the iCap Trust shall be responsible for the timely payment of quarterly fees incurred pursuant to 28 U.S.C. § 1930(a)(6) following Confirmation until the Case Closing Date. After Confirmation, the iCap Trust shall serve on the U.S. Trustee quarterly a financial report for each quarter (or portion thereof) the Chapter 11 Cases remain open. The financial report shall include a statement of all disbursements made during the course of the relevant quarter, whether or not pursuant to the Plan.

5. Treatment of Negotiable Instruments

Any negotiable instrument held by the Holder of a Claim shall be deemed exchanged, canceled, or satisfied, as the case may be, on the Effective Date.

6. Stay of Confirmation Order Shall Not Apply

The stay of enforceability of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall not apply, and the Confirmation Order shall be enforceable according to its terms absent further order of the Bankruptcy Court.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
84

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 94 of 141

### 7. Preservation of Privileges and Defenses

The actions taken by the Debtors, the iCap Trust, or any of their respective Related Parties in connection with the Plan shall not be a waiver of any privilege or defense of the Debtors or the iCap Trust. Notwithstanding any Debtors providing any privileged information related to any iCap Trust Actions to the iCap Trustees, the iCap Trust, or any Person associated with any of the foregoing, such privileged information shall be without waiver in recognition of the joint, common, or successor interest in prosecuting the iCap Trust Actions and shall remain privileged. The iCap Trust shall retain the right to waive its own privileges. Only the iCap Trustees shall have the right to waive the attorney-client privilege, work-product doctrine, or other protections as to the Debtors and the iCap Trust.

### 8. Releases and Related Matters

On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the Releasing Parties shall be deemed, to the fullest extent permitted under applicable law, to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, whether foreseen or unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, or the Plan, except for acts or omissions that are determined by Final Order to have constituted actual fraud or willful misconduct; *provided, however*, that nothing in Article X.G of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order.

Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Article X.G of the Plan; and (ii) the Bankruptcy Court's findings that such releases are (a) in exchange for good and valuable consideration provided by the Released Parties (including performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (b) in the best interests of the Debtors, the Estates, and any Holders of Claims that are Releasing Parties, (c) fair, equitable, and reasonable, (d) given and made after due notice and opportunity for hearing, and (e) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

### 9. Exculpation

On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, to the maximum extent permitted by law, none of the Exculpated Parties shall have or incur any liability to any Person, including to any Holder of a Claim or an Equity Interest, for any prepetition or postpetition act or omission in connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the formulation, negotiation, preparation, dissemination, solicitation of acceptances, implementation, Confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with the Plan, or the administration of the Plan or the property to be distributed under the Plan, or any other postpetition act taken or omission originating or occurring in connection with or in contemplation of the restructuring, sale, or liquidation of the Debtors; *provided*, *however*, that nothing in Article X.H of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order; and *provided*, *further*, that the exculpation provisions of Article X.H of the Plan shall not apply to acts or omissions constituting actual fraud, willful misconduct, or gross negligence by such Exculpated Party as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting the Exculpated Parties from liability. The Confirmation Order shall serve as a permanent injunction against any Person seeking to enforce any Causes of Action against the Exculpated Parties that are encompassed by the exculpation provided by Article X.H of the Plan.

### 10. Injunction

Except as otherwise expressly provided in the Plan, and except in connection with the enforcement of the Plan or any documents provided for or contemplated in the Plan, all Persons who have held, hold, or may hold Claims against or Equity Interests in the Debtors or the Estates that (i) have been released pursuant to Article X.G of the Plan or (ii) are subject to exculpation pursuant to Article X.H of the Plan, are permanently enjoined from and after the Effective Date from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Estates, or their successors and assignees, or any of their assets and property, with respect to any such Claim or Equity Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Debtors, the Estates, or their successors and assignees, or any of their assets and property, with respect to any such Claim or Equity Interest; (c) creating, perfecting, or enforcing,

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
86

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 96 of 141

directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Estates, or their successors and assignees, or any of their assets and property, with respect to any such Claim or Equity Interest; (d) asserting, directly or indirectly, any setoff, or recoupment of any kind against any obligation due to the Debtors, the Estates, or their successors and assignees, or any of their assets and property, with respect to any such Claim or Equity Interest, unless approved by the Bankruptcy Court; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Equity Interest. Without limiting the foregoing, the automatic stay provided under Bankruptcy Code section 362(a) shall remain in effect until the Chapter 11 Cases are closed. Nothing contained in Article X.I of the Plan shall prohibit the Holder of a filed proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of such Claim or Equity Interest of any of the obligations of the Debtors or the iCap Trustees under the Plan. The iCap Trust shall be entitled, as liquidated damages, to the payment of any fees and costs incurred by the iCap Trust to address any violation of the injunction contained in Article X.I of the Plan.

11. Injunction Against Interference with the Plan

Upon entry of the Confirmation Order, all Holders of Claims and Equity Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions of any kind against the iCap Trustees, the iCap Trust, or any of the iCap Trust Assets that interfere with the implementation or consummation of the Plan. The iCap Trust shall be entitled, as liquidated damages, to the payment of any fees and costs incurred by the iCap Trust to address any violation of the injunction contained in Article X.J of the Plan.

12. SEC Rights

Notwithstanding any language to the contrary in this Disclosure Statement, the Plan, and/or the Confirmation Order, no provision shall (a) preclude the SEC from enforcing its police or regulatory powers; or, (b) enjoin, limit, impair, or delay the SEC from commencing or continuing any claims, Causes of Action, proceeding, or investigations against any non-Debtor Person or non-Debtor entity in any forum.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
87

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

### 13. Insurance Policies

Nothing in the Plan or the Confirmation Order shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights and obligations of the Debtors (and their Estates), third party beneficiaries or named insureds, and the Debtors' insurers (and third-party claims administrators) under any of the Debtors' insurance policies (including any D&O Insurance) or modify the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the insurance policies. For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Debtors' insurance policies shall control. For the avoidance of doubt, nothing herein (a) constitutes a rejection of any insurance policy (including the D&O Insurance) or (b) relieves any party from any injunction or stay created or preserved under the Plan.

### 14. Books and Records

On the Effective Date, the Debtors' books and records shall be transferred to the iCap Trustees. The iCap Trustees shall be free, in their discretion to abandon, destroy, or otherwise dispose of the books and records in compliance with applicable non-bankruptcy law, or any other order of the Bankruptcy Court, at any time on and after the Effective Date, without the need for any other or further order; *provided, however*, that neither the Debtors nor the iCap Trustees shall destroy or otherwise abandon any books, records, electronically stored information, or other documents without providing advance notice to the SEC (c/o William M. Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV), which shall have seven (7) days to object to any proposed destruction or abandonment, and with authorization from the Bankruptcy Court; *provided further* that, nothing in the Plan or the Confirmation Order shall affect the obligations of the Debtors, the iCap Trust, and/or any transferee or custodian to maintain any books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency. In the event that the iCap Trust becomes the subject of a directive or requirement to retain any books and records, the iCap Trust may provide notice to the parties who requested or obtained such directive or requirement (the "Document Destruction Notice Parties") of an intent to destroy such documents. In the event a Document Destruction Notice Party objects to the destruction, it shall provide the iCap Trust with a written agreement and assurance, each of which is reasonably acceptable to the iCap Trust, providing for the reimbursement and payment of all costs and expenses associated with the continued maintenance of such

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
88

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 98 of 141

documents and records by the iCap Trust. Such costs and expenses shall include, but may not be limited to, third party fees and expenses, storage device costs, copying fees, the fees and expenses of counsel or other professionals to address any subpoenas or document production demands, and, if such extended maintenance precludes entry of the final decree, any fees (including U.S. Trustee fees) associated with such delay.

15. <u>Severability</u>

In the event the Bankruptcy Court determines, before Confirmation, that any provision in the Plan is invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without consent of the Debtors; and (c) nonseverable and mutually dependent.

16. <u>Revocation or Withdrawal of the Plan</u>

The Debtors reserve the right to revoke or withdraw the Plan before Confirmation and to file a subsequent plan. If the Debtors revoke or withdraw the Plan before Confirmation, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any claims by or against the Debtors or to prejudice in any manner the rights of the Debtors in any further proceedings involving the Debtors.

17. <u>Notices</u>

All notices, requests, and demands to or upon the iCap Trustees or the Debtors, as applicable, to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered and addressed as follows:

If to the Debtors, to:

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
89

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 99 of 141

iCap Enterprises, Inc. *et al.*
c/o Pivot Management Group, LLC
1230 Rosecrans Ave., Suite 530
Manhattan Beach, CA 90266
Attn:  Lance Miller (Lance.miller@pivotgrp.com)

With copies to:

O'Melveny & Myers LLP
400 South Hope Street, Suite 1900
Los Angeles, CA 90071
Attn:  Julian Gurule (jgurule@omm.com)

and

O'Melveny & Myers LLP
1301 Avenue of the Americas, Suite 1700
New York, NY 10019
Attn:  Diana Perez (dperez@omm.com)

If to the Unsecured Creditors' Committee, to:

Bush Kornfeld LLP
601 Union Street, Suite 5000
Seattle, WA 98101
Attn:  Armand J. Kornfeld (jkornfeld@bskd.com)
        Aimee S. Willig (awillig@bskd.com)
        Jason Wax (jwax@bskd.com)

and

Corr Cronin LLP
1015 Second Ave., Floor 10
Seattle, WA 98104
Attn:  John T. Bender (jbender@corrcronin.com)

If to the iCap Trustees, to:

Pivot Management Group, LLC
1230 Rosecrans Ave., Suite 530
Manhattan Beach, CA 90266
Attn:  Lance Miller (Lance.miller@pivotgrp.com)

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

and

B. Riley Advisory Services
19800 MacArthur Boulevard, Suite 820
Irvine, CA 92612
Attn: Seth Freeman (sfreeman@brileyfin.com)

18. Exhibits/Schedules

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full therein. After the exhibits and documents are filed, copies of such exhibits and documents shall be available free of charge on the Debtors' case website at: https://cases.creditorinfo.com/iCap/documents/docket. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan shall control.

19. Successors and Assigns

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Person.

20. Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by any Debtor with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interest before the Effective Date.

21. Dissolution of the Unsecured Creditors' Committee

Upon the occurrence of the Effective Date, the Unsecured Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code (except with respect to (a) obligations arising under confidentiality agreements, which shall remain in full force and effect, (b) applications for allowance and payment of the fees of Professional Persons, and

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
91

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 101 of 141

(c) any pending motions or other actions seeking enforcement or implementation of the provisions of the Plan).

22. <u>Votes Solicited in Good Faith</u>

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), the CRO, the Debtors, the Unsecured Creditors' Committee, and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys shall have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes the Plan.

# ARTICLE VI.
# RISK FACTORS

Prior to voting on the Plan, each Holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all other information contained in this Disclosure Statement, including the exhibits hereto. These risk factors should not be regarded as the only risks involved in connection with the Plan and its implementation.

**A.    Parties May Object to the Plan's Classification of Claims and Equity Interests**

Bankruptcy Code section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Plan Proponents believe that the classification of the Claims and Equity Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**B.    The Plan Proponents May Not Be Able to Obtain Confirmation of the Plan**

With regard to any proposed plan, the Plan Proponents may not receive the requisite acceptances to confirm the plan. In the event that votes with respect to Claims in the Classes entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponents intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Plan Proponents may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of the Plan are received, the Bankruptcy Court

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

still might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements discussed below for Confirmation of the Plan under Bankruptcy Code section 1129 have not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan would be on terms as favorable to Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Plan Proponents will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' Creditors.

## C.     The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in the Plan, the Effective Date is subject to several conditions precedent. There can be no assurance that any or all of such conditions will be satisfied (or waived). If such conditions precedent are not met or waived, the Effective Date will not occur. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

## D.     Claims Estimation and Allowance of Claims

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual amount of Allowed Claims may differ significantly from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

Distributions to Holders of Allowed Investor Claims and Allowed General Unsecured Claims will be affected by the pool of Allowed Claims in each respective Class. Upon completion of further analysis of filed Claims, which will likely lead to Claims objection litigation and related matters, the total amount of Claims that ultimately become Allowed Claims in each of the foregoing Classes may differ from the Plan Proponents' estimates, which are reflected in this Disclosure Statement, and such difference could be material. As a result, the amount of Distributions that may be received by a particular Holder of an Allowed Claim may be either adversely or favorably affected by the aggregate amount of Investor Claims or General Unsecured Claims ultimately Allowed.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
93

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 103 of 141

## E.    Potential Pursuit of iCap Trust Actions Against Creditors and Others

In accordance with Bankruptcy Code section 1123(b), after the Effective Date, the iCap Trustees shall have and retain and may enforce any iCap Trust Actions. Accordingly, a Holder of a Claim may be subject to one or more such iCap Trust Actions being asserted against it.

The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action as an iCap Trust Action is not intended to and shall not limit the rights of the iCap Trust to pursue any such Avoidance Actions or Causes of Action. The Debtors expressly reserve all Avoidance Actions and Causes of Action, other than those Avoidance Actions and Causes of Action that are expressly waived, relinquished, released, compromised, or settled in the Plan, pursuant to the Confirmation Order, or pursuant to any other order of the Bankruptcy Court, as iCap Trust Actions for later adjudication, and no preclusion doctrine (including the doctrines of res judicata, collateral estoppel, judicial estoppel, equitable estoppel, issue preclusion, claim preclusion, and laches) shall apply to such Avoidance Actions or Causes of Action as iCap Trust Actions on or after the Effective Date.

Moreover, no Person may rely on the absence of a specific reference in the Plan, the Confirmation Order, the iCap Trust Agreement, or the Disclosure Statement to any Contributed Claims against such Person as any indication that the iCap Trust will not pursue any and all available Contributed Claims against such Person. The objection to the Allowance of any Claims will not in any way limit the ability or the right of the iCap Trust to assert, commence, or prosecute any Contributed Claims. Nothing contained in the Plan, the Confirmation Order, the iCap Trust Agreement, or the Disclosure Statement will be deemed to be a waiver, release, or relinquishment of any Contributed Claims that the Contributing Claimants had immediately prior to the Effective Date. The iCap Trust shall have, retain, reserve, and be entitled to assert all Contributed Claims fully as if the Contributed Claims had not been contributed to the iCap Trust in accordance with the Plan and the iCap Trust Agreement.

Without limiting the generality of the preceding two paragraphs and associated reservations, the Plan Proponents note that all parties in interest should review the categories of claims that the iCap Trust will have the right to pursue set forth in Article V.F.3 of the Plan.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
94

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 104 of 141

## F.    Delay in Liquidating iCap Trust Actions

Distributions to Holders of Allowed Claims under the Plan are partly dependent on the iCap Trustees' ability to litigate to judgment and/or settle the iCap Trust Actions. The Debtors cannot predict the ultimate outcome regarding the liquidation and/or settlement of the iCap Trust Actions. Even if the iCap Trust Actions are ultimately liquidated and/or settled, the Debtors cannot predict the time necessary to accomplish that result. Any delay in liquidating and/or the iCap Trustees' inability to liquidate the iCap Trust Actions may negatively impact Distributions to Holders of Allowed Claims under the Plan.

## G.    Risks Regarding Real Estate

The Plan relies, in part, on generating proceeds from real estate sales to produce Cash for remittance to the iCap Trust for Distribution to Creditors. In the event that sales are delayed, costs incurred with respect to real property prior to sale exceed estimates, or markets decline due to economic conditions or other constraints, payments may be correspondingly delayed.

The ability to monetize the Estate Assets is subject to certain risks associated with the real estate industry in general, including: local, national, and international economic conditions; the supply and demand for properties; the financial conditions for tenants, buyers, and sellers of properties; changes in interest rates; changes in environmental laws or regulations, planning laws and other governmental roles and fiscal and monetary policies; changes in real property tax rates and related tax deductions; negative developments in the economy that depress travel and retail activity; uninsured casualties; force majeure acts, terrorist events, under-insured or uninsurable losses; and other factors that are beyond the reasonable control of the iCap Trust. In addition, real estate assets are subject to long-term cyclical trends that can give rise to significant volatility in values. Real estate investing and development may be subject to a higher degree of market risk because of concentration in a specific industry, sector, or geographic sector; here, most of the Estate Assets are located in the greater Seattle area. Real estate investments may be subject to other general and specific risks, including declines in the value of real estate generally, risks related to general and economic conditions, changes in the value of the comparable properties, and defaults by real estate borrowers within the particular market or the broader economy.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

## H. Securities Law Considerations

There are several material securities law considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Equity Interests, and other interested parties should read carefully the discussion set forth in Article VIII.

Holders of Claims or Equity Interests should consult their own advisors regarding any securities law consequences of the treatment of their Claims or Equity Interests under the Plan.

Under the terms of the iCap Trust Agreement, the iCap Trust Interests initially will be uncertificated and subject to the Transfer Restrictions (as defined below) as set forth in the iCap Trust Agreement. Under the Transfer Restrictions, the iCap Trust Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession upon the death of such holder or otherwise by operation of law. Accordingly, unless and until the Transfer Restrictions lapse or are terminated, Holders of Allowed Investor Claims will be subject to substantial restrictions on their ability to sell or otherwise dispose of their iCap Trust Interests and should be prepared to retain their iCap Trust Interests.

The Transfer Restrictions applicable to Class A iCap Trust Interests are not expected to lapse or be terminated until such time as such Class A iCap Trust Interests are effectively registered under the Exchange Act (as defined below). Although the iCap Trust is required to use its commercially reasonable best efforts to register, and under the Exchange Act may become required to register, the Class A iCap Trust Interests, no assurance can be given that the iCap Trust will be able to satisfy all applicable requirements for such Exchange Act registration. The Transfer Restrictions applicable to the Class B iCap Trust Interests are not expected to lapse or be terminated.

The iCap Trust may, by reason of the amount of its total assets and the number of the holders of record of its iCap Trust Interests as of the last day of its first fiscal year, become subject to the registration requirements of the Exchange Act. It is likely that the iCap Trust will need to seek relief from or modification of certain technical requirements of the Exchange Act (such as the filing of pre-Effective Date financial information of the Debtors), which the iCap Trust intends to do in connection with such registration. While the Debtors have been advised that such relief and modifications have been granted by the SEC in the past with respect to other liquidation trusts formed in connection with chapter 11 bankruptcies, such relief and modification have not yet been obtained with respect to the iCap Trust and no

**SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION**
96

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

assurance can be given that such relief or modification will become available. If the iCap Trust becomes required to register and fails to do so in accordance with the requirements of the Exchange Act, it may become subject to civil fines, injunctive relief, or other disciplinary action on the part of the SEC.

In the event that the iCap Trust successfully registers the Class A iCap Trust Interests or other class of equity securities under Section 12(g) of the Exchange Act, the iCap Trust is expected to become a reporting issuer under such act. Accordingly, at such time the iCap Trust will be required to prepare and timely file, as and when required, quarterly reports on Form 10-Q, annual reports on Form 10-K, and current report on Form 8-K. Additionally, at such time the iCap Trust is expected to become subject to all other requirements applicable to an issuer with a class of equity securities registered under Section 12(g). Although such registration of the Class A iCap Trust Interests and the following termination or modification of the Transfer Restrictions may increase the liquidity of such iCap Trust Interests, such registration and the iCap Trust's compliance with such regulations will impose substantial costs on the iCap Trust, and thereby may reduce Distributions made in respect of Beneficial Interests (as defined below) to the holders thereof.

## I. Tax Considerations

There are several material income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Equity Interests, and other interested parties should read carefully the discussion set forth in Article IX for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

## J. No Duty to Update Disclosures

The Plan Proponents have no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Plan Proponents are required to do so under an order of the Bankruptcy Court. Delivery of this Disclosure Statement after the date hereof does not imply that the information contained herein remained unchanged.

**SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION**
97

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 107 of 141

# ARTICLE VII.
## CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing regarding Confirmation of the Plan. Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **October 16, 2024, at 9:30 a.m. (prevailing Pacific Time)**, before the Honorable Whitman L. Holt, Tower Bldg, 2nd Floor Courtroom, 402 East Yakima Avenue, Yakima, WA 98901. The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served so that they are actually received by no later than **October 2, 2024, at 4:00 p.m. (prevailing Pacific Time). Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.**

### B.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all impaired Classes of Claims, or, if rejected by an impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code section 1129. The Plan Proponents believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Plan Proponents have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. More specifically, the Plan Proponents believe that the Plan satisfies or will satisfy the following applicable Confirmation requirements of Bankruptcy Code section 1129:

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
98

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 108 of 141

- The Plan complies with the applicable provisions of the Bankruptcy Code.
- The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.
- The Plan has been proposed in good faith and not by any means forbidden by law.
- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.
- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and Holders of Equity Interests and with public policy.
- Either each Holder of a Claim in an impaired Class of Claims has accepted the Plan, or each such Holder will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.
- The Classes of Claims that are entitled to vote on the Plan will have accepted the Plan, or at least one Class of impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class, and the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.
- Except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Expense Claims and Allowed Priority Claims will be paid in full, in Cash, on the Effective Date, or as soon thereafter as is reasonably practicable and that Holders of Allowed Priority Tax Claims may receive on account of such Claims deferred Cash payments, over a period not exceeding five years after the Petition Date, of a value as of the Effective Date, equal to the Allowed amount of such Claims with interest from the Effective Date.
- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor

**SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION**
99

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11   Doc 1236   Filed 08/26/24   Entered 08/26/24 12:50:06   Pg 109 of 141

of the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility," below.

– All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid through the Effective Date.

## C.    Best Interests of Creditors

Often called the "best interests of creditors" test, Bankruptcy Code section 1129(a)(7) requires that a bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the effective date of the plan.

The Plan is a plan of liquidation. The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, and the fees that would be payable to the professional advisors that such a trustee may engage.

Conversion to chapter 7 of the Bankruptcy Code would mean the establishment of a new claims bar date, which could result in additional General Unsecured Claims being asserted against the Estates, thereby diluting the recoveries of Holders of Allowed Claims.

Significantly, the Plan embodies a comprehensive, extensively negotiated settlement and compromise of myriad novel and complex legal and factual issues. In the event of conversion, the chapter 7 trustee would have to initiate extensive litigation to resolve these and other issues, or would need to try to negotiate an alternative settlement, all without the benefit of committee representation for Creditors. This process would be extremely time-consuming and costly, and would reduce and delay any recoveries available for Creditors of the Estates.

In addition, a chapter 7 trustee likely would act quickly to sell or otherwise monetize the Estate Assets because a chapter 7 trustee probably would not have adequate staffing or funding to dispose of the Estate Assets over an extended period of time. Such a forced sale by a chapter 7 trustee would likely ultimately result in significantly lower recoveries from the sale of the Estate Assets, as set forth in the Liquidation Analysis.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
100

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 110 of 141

Additionally, the designation of the CRO as one of the initial iCap Trustees will minimize additional costs and expenses to the Estates because the CRO is familiar with the Estate Assets and will be able to liquidate such assets faster and more efficiently than a chapter 7 trustee.

On balance, the Plan Proponents believe that a chapter 7 trustee would be less likely to maximize the value available from all the Estate Assets and would be unable to obtain the benefits of the compromises and settlements available under the Plan. Therefore, the Plan Proponents believe that confirmation of the Plan will provide each Holder of a Claim with an equal or greater recovery than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**D.      Feasibility**

Bankruptcy Code section 1129(a)(11) requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors, or any successor to the Debtors (unless such liquidation or reorganization is proposed in the plan). This requirement is satisfied as the Plan specifically proposes a liquidation and the Plan Proponents believe the Debtors' Cash and any additional proceeds from the Estate Assets and the iCap Trust Assets will be sufficient to allow the iCap Trustees to make all payments required to be made under the Plan. Accordingly, the Plan Proponents believe that the Plan is feasible.

**E.      Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

**SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION**
101

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11   Doc 1236   Filed 08/26/24   Entered 08/26/24 12:50:06   Pg 111 of 141

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims held by creditors that actually voted to accept or reject the plan. Thus, a Class of impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

## F. Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted that plan, *provided* that the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, the Plan Proponents will request Confirmation of the Plan under Bankruptcy Code section 1129(b). The Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair" under the circumstances. In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account various factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. Because the Plan Proponents are treating all similarly situated creditors the same, the Plan does not discriminate unfairly.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
102

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

## 2.    Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending on the type of claims or interests in such rejecting class. The Plan Proponents are requesting that the Bankruptcy Court confirm the Plan notwithstanding the deemed rejection of the Plan by Class 5 (Subordinated Claims) and Class 6 (Equity Interests).

To be fair and equitable with respect to a dissenting class of impaired secured creditors, a chapter 11 plan must provide that each holder in such class either (a) retains its liens on the property subject to such liens (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of consummation of the chapter 11 plan, of at least such allowed amount or (b) receives the "indubitable equivalent" of its secured claim.

To be fair and equitable with respect to a dissenting class of impaired unsecured creditors, a chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the chapter 11 plan, equal to the allowed amount of its unsecured claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan.

To be fair and equitable with respect to a dissenting class of impaired equity interest holders, a chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the chapter 11 plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference or fixed redemption price of its equity interest and (ii) the value of its equity interest or (b) the holders of equity interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan.

The Plan Proponents believe that the Plan is structured in a way that does not "discriminate unfairly" and satisfies the "fair and equitable" requirement for "cramdown" under Bankruptcy Code section 1129(b) with respect to Class 5 (Subordinated Claims) and Class 6 (Equity Interests) because there are no Holders of Claims or Equity Interests junior to the Claims in Class 5 and the Equity Interests in Class 6 that will receive Distributions or retain property under the Plan. The Plan Proponents also may amend the Plan in accordance with Article XII of the Plan and

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
103

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 113 of 141

applicable provisions of the Bankruptcy Code to ensure compliance with the "cramdown" requirements.

### G. Classification of Claims and Equity Interests

Bankruptcy Code section 1122 requires the Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class. The Plan creates separate Classes to deal respectively with Claims and Equity Interests. The Plan Proponents believe that the Plan's classifications place substantially similar Claims or Equity Interests in the same Class and thus, meet the requirements of Bankruptcy Code section 1122.

### H. Alternatives to Confirmation and Consummation of the Plan

The Plan Proponents believe that the Plan affords Holders of Claims the potential for a materially better realization on the Estate Assets than a chapter 7 liquidation, and, therefore, is in the best interests of all such Holders. If, however, the requisite acceptances of the voting Classes of Claims are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative chapter 11 plan or plans, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the requisite acceptances are not received or if the Plan is not confirmed, the Plan Proponents or another party in interest could attempt to formulate and propose a different plan or plans. The Plan Proponents believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan, has the greatest chance to be confirmed and consummated.

The Chapter 11 Cases may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a statutory trustee would be elected or appointed to complete the liquidation of the Estate Assets for Distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Plan Proponents believe that the Plan will provide each Holder of an Allowed Claim with an equal or greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
104

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

# ARTICLE VIII.
## CERTAIN SECURITIES LAW CONSEQUENCES OF THE PLAN

**A.    General**

   1.    Status as Securities

The Plan provides for the establishment of the iCap Trust and for the issuance of beneficial interests therein issued in respect of Allowed Investor Claims and Allowed General Unsecured Claims. In general, beneficial interests in trusts may sometimes be subject to regulation under applicable non-bankruptcy law, including federal and state securities laws. As discussed below, the Debtors believe that the beneficial interests in the iCap Trust (the "Beneficial Interests") will either (a) not constitute "securities" or (b) will be issued in compliance with such federal and state securities laws.

   2.    Transfer Restrictions on Beneficial Interests

Under the terms of the iCap Trust Agreement, the Beneficial Interests initially will be uncertificated and subject to transfer restrictions set forth in the iCap Trust Agreement (the "Transfer Restrictions"). Under the Transfer Restrictions, the Beneficial Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession upon the death of such holder or otherwise by operation of law.

The Transfer Restrictions will be effective upon issuance of the Beneficial Interests on the Effective Date of the Plan and will remain in effect during the initial and any renewal term of the iCap Trust unless sooner terminated or modified by the iCap Trustees in accordance with the iCap Trust Agreement. Under the iCap Trust Agreement, the iCap Trustees will use their commercially reasonable best efforts to file with the SEC, as soon as reasonably practicable following the Effective Date of the Plan, but in no event later than may be required under Section 12(g) of the Exchange Act or the rules and regulations promulgated thereunder, a registration statement on Form 10 for the purpose of registering the Beneficial Interests under Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and to cause the Beneficial Interests to be accepted for trading on the Over-the-Counter Bulletin Board (OTCBB) or other organized trading market in the United States. Upon the effectiveness of the Form 10 and the acceptance of the Beneficial Interests for trading on such a market, the iCap Trustees shall amend the iCap Trust Agreement to terminate or modify the Transfer Restrictions as necessary to permit trading of the Beneficial Interests and shall promptly give notice of such amendment

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
105

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

to the holders of record of the Beneficial Interests as of the effective date thereof, which notice will include a copy of the amendment and a summary description of the termination or modification of the Transfer Restrictions effected thereby and the terms, conditions, and effective date of such termination or modification. Under the iCap Trust Agreement, the iCap Trustees will give any such notice of termination or modification of the Transfer Restrictions reasonably promptly after the effectiveness of the Form 10 and the acceptance of the Beneficial Interests for trading on the Over-the-Counter Bulletin Board (OTCBB).

## B.    Exemption From Offer and Sale of Securities Act and Blue Sky Laws

### 1.    Issuance of Beneficial Interests under Plan

Unless an exemption is available, the offer and sale of a security generally is subject to registration with the SEC under Section 5 of the Securities Act of 1933, as amended (the "Securities Act"). In the event that the Beneficial Interests are deemed to constitute securities, Bankruptcy Code section 1145(a)(1) exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws and regulations ("Blue Sky Laws") if three principal requirements are satisfied:

– the securities are offered or sold under a plan and are securities of the debtor, of an affiliate of the debtor participating in a joint plan with the debtor, or of a successor to the debtor under the plan;
– the recipients of the securities hold a prepetition or administrative claim against the debtor or an interest in the debtor; and
– the securities are issued entirely in exchange for recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.

If and to the extent that the Beneficial Interests may constitute securities, the Debtors believe that the Beneficial Interests, which are being issued in respect of Allowed Investor Claims and Allowed General Unsecured Claims, will qualify as securities "of the debtor . . . or of a successor to the debtor" pursuant to section 1145(a)(1). In addition, the Beneficial Interests will be issued entirely in exchange for such Claims. Thus, the Debtors believe that the issuance of the Beneficial Interests pursuant to the Plan will satisfy the applicable requirements of Bankruptcy Code section 1145(a)(1) and that such issuance should be exempt from registration under the Securities Act and any applicable Blue Sky Law.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
106

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 116 of 141

The Debtors believe that their reliance upon the foregoing exemption in respect of the issuance of the Beneficial Interests is consistent with positions taken by the SEC with respect to similar transactions and arrangements by other debtors-in-possession. However, the Debtors have not sought any "no-action" letter by the SEC with respect to any such matters, and therefore no assurance can be given regarding the availability of any exemptions from registration with respect to any securities, if any, issued pursuant to the Plan.

2.    Resale of Beneficial Interests After Plan Effective Date

As discussed above, during the continuation of the Transfer Restrictions, the Beneficial Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession upon the death of such holder or otherwise by operation of law. Under the iCap Trust Agreement, the iCap Trustees will terminate or modify the Transfer Restrictions as necessary following the effectiveness of the registration of the Beneficial Interests under Section 12(g) of the Exchange Act and the acceptance of the Beneficial Interests for quotation on the Over-the-Counter Bulletin Board (OTCBB) or other organized over-the-counter trading market in the United States. If the Transfer Restrictions are so terminated or modified, the Beneficial Interests may become transferable to the extent otherwise permissible under applicable law. However, no assurance can be given that the iCap Trustees will be successful in causing the registration of the Beneficial Interests or their acceptance for trading on any such organized trading market. None of the Debtors or the iCap Trustees will be obliged to, and it is expected that none of them will, seek the listing of any Beneficial Interest on any national stock exchange such as the NYSE, NASDAQ Stock Market, or NASDAQ National Market.

3.    Exchange Act and Other Securities Law Compliance

Section 12(g) of the Exchange Act, and the Exchange Act rules and regulations promulgated thereunder, requires a company to register a class of equity securities pursuant to the Exchange Act unless, on the last day of such company's most recent fiscal year, (i) the company had total assets not exceeding $10.0 million and (ii) the class of equity securities was held of record by fewer than 2,000 persons and fewer than 500 of those persons were not "accredited investors" as defined under the securities laws. Such registration must be effected by the filing of a registration statement within 120 days after the last day of the company's most recent fiscal year in which both such conditions (i) and (ii) are satisfied. Based on the iCap Trust's anticipated total assets and number of holders of record of Class A iCap Trust Interests as of the last day of its first (partial) fiscal year, the Debtors currently expect that the iCap Trust, will be required to register the Class A iCap Trust Interests under

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

the Exchange Act within 120 days thereafter. It is anticipated that there will be fewer than 2,000 holders of record of Class B iCap Trust Interests and, as such, the iCap Trust currently does not intend to make any effort to cause the Class B iCap Trust Interests to be registered under the Exchange Act. To the extent that the total assets of the iCap Trust and the number of the holders of record of Class B iCap Trust Interests as of the last day of the iCap Trust's fiscal year exceeds the specified limits under the Exchange Act, the iCap Trust shall take any and all steps as may be necessary to comply with the Exchange Act and the rules and regulations promulgated thereunder.

As discussed above, during the continuation of the Transfer Restrictions, the Beneficial Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession upon the death of such holder or otherwise by operation of law. Under the iCap Trust Agreement, the iCap Trustees will terminate or modify the Transfer Restrictions as necessary following the effectiveness of the registration of the Beneficial Interests under Section 12(g) of the Exchange Act and the acceptance of the Beneficial Interests for trading on the Over-the-Counter Bulletin Board (OTCBB) or other organized trading market in the United States. If the Transfer Restrictions are so terminated or modified, the Beneficial Interests may become transferable under the iCap Trust Agreement to the extent otherwise permissible under applicable law. In such case, the Beneficial Interests may be permitted to be represented by certificates and/or may become transferable. However, no assurance can be given regarding these matters.

If the Beneficial Interests are successfully registered as one or more classes of equity securities under Section 12(g) of the Exchange Act, the iCap Trust will become subject to regulation under the Exchange Act. Such regulation will include periodic reporting such as the filing of annual reports on Form 10-K and quarterly reports on Form 10-Q, current reporting of certain material events on Form 8-K, proxy statements, and disclosures regarding various other events affecting the iCap Trust, such as mergers, acquisitions, tender offers, and changes in beneficial ownership. Although such registration of the Beneficial Interests and the following termination or modification of the Transfer Restrictions may benefit iCap Trust Beneficiaries by increasing the liquidity of their iCap Trust Interests, such registration and the iCap Trust's compliance with such regulations will impose substantial costs on the iCap Trust, and thereby may reduce Distributions made in respect of Beneficial Interests to the holders thereof.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
108

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 118 of 141

## ARTICLE IX.
## CERTAIN UNITED STATES FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

This discussion is provided for informational purposes only, and is based on provisions of the IRC, Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Equity Interests, the Holder's status and method of accounting (including the Holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to Holders of Claims and Equity Interests. Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the United States federal income tax consequences of the Plan.

The following summary does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote to accept or reject the Plan. In addition, to the extent that the following discussion relates to the consequences to Holders of Claims entitled to vote to accept or reject the Plan, it is limited to the Holders that are United States persons within the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

- An individual who is a citizen or resident of the United States;

- A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION
109

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

- An estate, the income of which is subject to federal income taxation regardless of its source; or

- A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances, or to certain types of Holders subject to special treatment under the IRC. Examples of Holders subject to special treatment under the IRC include, without limitation, governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, persons that have a functional currency other than the U.S. dollar, and persons holding Claims that are part of a hedging, straddle, constructive sale, conversion transaction, or other risk-reduction transaction. This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local, or estate and gift taxation is addressed. The tax consequences to a partner in a partnership holding Claims will depend on the status of the partner and the activities of the partnership. Partnerships holding Allowed Claims and partners in such partnerships should consult their tax advisors as to the particular United States federal income tax consequences of owning and disposing of Allowed Claims.

The tax consequences to Holders of Allowed Claims and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the Holder in exchange for the Claim, and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held;

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
110

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 120 of 141

(vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the Holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules apply to the Holder. Therefore, each Holder should consult such Holder's own tax advisor for tax advice with respect to that Holder's particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

This discussion is based on the IRC, Treasury Regulations promulgated thereunder, administrative rulings, and other guidance and court decisions, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling will be sought from the IRS and no representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all Distributions to Holders of Claims will be taxed accordingly.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT SUCH HOLDER'S INDEPENDENT**

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
111

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

**TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

**A.     Certain U.S. Federal Income Tax Consequences of the iCap Trust**

Under the terms of the Plan, the iCap Trust Assets will be transferred to the iCap Trust in a taxable disposition. Any income or gain from the transfer of assets to the iCap Trust shall flow through to the ultimate taxpaying owner or member of the transferring Debtor who will be responsible to pay any resulting tax liability. The tax consequences of the Plan, however, are subject to many uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law. Uncertainties with regard to federal income tax consequences of the Plan also arise due to the inherent nature of estimates of value that will impact the determination of the amount of income or gain from the transfer of assets to the iCap Trust. As of the Effective Date, the iCap Trust shall be established for the benefit of all iCap Trust Beneficiaries. The iCap Trustees will make a good faith valuation of the iCap Trust Assets. All parties (including, without limitation, the iCap Trustees and the iCap Trust Beneficiaries) must consistently use such valuation for all federal income tax purposes. Allocations of taxable income of the iCap Trust (other than taxable income allocable to a Distribution Reserve) among the iCap Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the iCap Trust had distributed all of its assets (valued at their tax book value, and other than assets allocable to a Distribution Reserve) to the Holders of the beneficial interests in the iCap Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the iCap Trust. Similarly, taxable loss of the iCap Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a Distribution in liquidation of the remaining iCap Trust Assets. The tax book value of the iCap Trust Assets for this purpose shall be equal to the fair market value of the iCap Trust Assets on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the iCap Trustees of an IRS private letter ruling if the iCap Trustees so request one, or the receipt of an adverse determination by the IRS upon audit if not contested by the iCap Trustees), the iCap Trustees may (a) elect to treat any iCap Trust Assets allocable to a Distribution Reserve (a reserve for amounts and iCap Trust Interests retained on account of, Contingent Claims, Disputed Claims, or Unliquidated Claims) as a

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

"disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, the Distribution Reserves may be subject to tax annually on a separate entity basis on any net income earned with respect to the iCap Trust Assets in such reserves, and all Distributions from such reserves will be treated as received by the Holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the iCap Trustees and the Holders of Beneficial Interests in the iCap Trust) will be required to report for tax purposes consistently with the foregoing.

The iCap Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidation trust under a chapter 11 plan. The iCap Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the iCap Trustees and the Holders of Beneficial Interests in the iCap Trust) are required to treat for federal income tax purposes, the iCap Trust as a grantor trust of which Holders of iCap Trust Interests are the owners and grantors. Although the following discussion assumes that the iCap Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the iCap Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the iCap Trust as a grantor trust. If the IRS were to successfully challenge such classification, the federal income tax consequences to the iCap Trust and Holders of iCap Trust Interests could vary from those discussed herein, and, thus, there could be less Available Cash than projected, resulting in lower recoveries for Holders of iCap Trust Interests.

The iCap Trust may create a single member limited liability company (the "Wind-Down Entity") to facilitate administration of the assets to be liquidated. In such case, the Wind-Down Entity shall (a) be wholly owned by the iCap Trust, (b) be disregarded as separate from the iCap Trust for U.S. federal income tax purposes, (c) have a purpose consistent with the purpose of the iCap Trust as set forth in Section D.5 of Article V of the Plan, and (d) be subject to the same limitations imposed on the iCap Trustees under the terms of the Plan and the iCap Trust Agreement. Consequently, the existence of, and the activities conducted by, the Wind-Down Entity (if any), should not alter the federal income tax treatment of the iCap Trust or the iCap Trust Beneficiaries as described herein.

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

## B. Consequences to Holders of Claims Generally

In general, each Holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Holder in satisfaction of its Claim, and (ii) such Holder's adjusted tax basis in such Claim (which, for certain iCap Trust Beneficiaries, could be impacted by the Debtors' filing of amended IRS Forms 1099 for the iCap Trust Beneficiaries with respect to the 2023 calendar year in accordance with a determination that the Debtors were operating a Ponzi scheme and any amounts paid by the Debtors to such iCap Trust Beneficiaries in 2023 were not in fact taxable income). The "amount realized" by a Holder will equal the sum of cash and the aggregate fair market value of the property received by such Holder pursuant to the Plan (such as a Holder's undivided Beneficial Interest in the assets transferred to the iCap Trust). Where gain or loss is recognized by a Holder in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the Holder, whether the Claim constituted a capital asset in the hands of the Holder and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction or theft loss in respect of the Claim. Each Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

A Holder of an Allowed Claim who receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC section 166(a) or a theft loss deduction under IRC section 165(e). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take a bad debt deduction. Rules relating to theft loss deductions, which are described in more detail below, are also potentially complex, and the timing and amount of any such loss may be affected by whether a Holder elects to apply certain IRS safe harbor procedures relating to losses realized by Investors in certain fraudulent investment schemes. Holders of Allowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take either a bad debt or theft loss deduction. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

Holders of Allowed Claims who were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A Holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A Holder of an Allowed Claim constituting an installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than at face value or distributed, transmitted, sold, or otherwise disposed of within the meaning of IRC section 453B.

Holders of Disallowed Claims will not receive any Distribution as part of the Plan. Accordingly, because such a Holder may receive an amount that is less than that Holder's tax basis in such Claim, such Holder may be entitled to a bad debt deduction under IRC section 166(a) or a theft loss deduction under IRC section 165(e). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a bad debt deduction is claimed. Holders of Disallowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take a bad debt deduction.

## C. Consequences to the iCap Trust Beneficiaries

After the Effective Date, any amount that an iCap Trust Beneficiary (as a Holder of an iCap Trust Interest) receives as a Distribution from the iCap Trust in respect of its Beneficial Interest in the iCap Trust should not be included in the Holder's amount realized in respect of its Allowed Claim for U.S. federal income tax purposes, but should be separately treated as a Distribution received in respect of such Holder's Beneficial Interest in the iCap Trust. In general, a Holder's aggregate tax basis in its undivided Beneficial Interest in the assets transferred to the iCap Trust will equal the fair market value of such undivided Beneficial Interest as of the Effective Date and the Holder's holding period in such assets will begin the day following the Effective Date. Distributions to any Holder of an Allowed Claim will be allocated first to the original principal portion of such Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount,

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
115

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 125 of 141

to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the iCap Trustees and the Holders of Beneficial Interests in the iCap Trust) shall treat the transfer of the iCap Trust Assets to the iCap Trust, in accordance with the terms of the Plan, as a transfer of those assets directly to Holders of Allowed Claims (and, with respect to the Contingent Claims, Disputed Claims, and Unliquidated Claims, to the Distribution Reserve) followed by the transfer of such assets by such Holders to the iCap Trust. Consistent therewith, all parties shall treat the iCap Trust as a grantor trust of which such Holders are to be the owners and grantors. Thus, such Holders (and any subsequent Holders of interests in the iCap Trust) shall be treated as the direct owners of an undivided Beneficial Interest in the assets of the iCap Trust. Accordingly, each Holder of a Beneficial Interest in the iCap Trust will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction, or credit recognized or incurred by the iCap Trust. The iCap Trust's taxable income will be allocated to the Holders of Beneficial Interests in the iCap Trust in accordance with each such Holder's pro rata share of the Beneficial Interests in the iCap Trust Assets. The character of items of income, deduction, and credit to any Holder and the ability of such Holder to benefit from any deductions or losses may depend on the particular situation of such Holder. The federal income tax reporting obligation of a Holder of a Beneficial Interest in the iCap Trust is not dependent upon the iCap Trust distributing any cash or other proceeds. Therefore, a Holder of a Beneficial Interest in the iCap Trust may incur a federal income tax liability regardless of the fact that the iCap Trust has not made, or will not make, any concurrent or subsequent Distributions to the Holder. If a Holder incurs a federal tax liability but does not receive Distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the iCap Trust, the Holder may be allowed a subsequent or offsetting loss.

The iCap Trustees will file with the IRS returns for the iCap Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The iCap Trustees will also send to each Holder of a Beneficial Interest in the iCap Trust a separate statement setting forth the Holder's share of items of income, gain, loss, deduction, or credit and will instruct the Holder to report such items on its federal income tax return. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
116

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 126 of 141

An iCap Trust Beneficiary who is a victim of a Ponzi scheme might be entitled to claim a loss dependent on its individual circumstances. Such losses that arise out of property used in a trade or business or a transaction entered into for profit are deductible in the year in which the loss is sustained and in an amount not to exceed the adjusted tax basis of the property involved. A theft loss generally cannot be deducted in a tax year to the extent that there are reasonable prospects of a recovery of some or all of the loss. In that event, the deduction is postponed until it can be ascertained with reasonable certainty the likelihood and amount of any reimbursement that will be received. The loss generally must be deducted in the first year a reasonable prospect of recovery no longer exists, and cannot be claimed in any subsequent year. The reasonable prospect of reimbursement rule applies only to that part of the loss for which reimbursement is available. However, in 2009, the IRS issued Rev. Proc. 2009-20, 2009-14 I.R.B. 735, to provide an optional safe harbor treatment for taxpayers that experienced losses in certain investment arrangements discovered to be fraudulent and in which a lead figure has been charged with a crime. Under these safe harbor provisions, a qualified investor (as defined in Rev. Proc. 2009-20) may deduct 95% of its qualified investment (as defined in Rev. Proc. 2009-20) in the discovery year (*i.e.*, the year in which an indictment, information, or complaint described in section 4.02 of Revenue Procedure 2009-20 is filed) if the qualified investor does not pursue any potential third-party recovery minus the sum of any actual recovery and any potential insurance / SIPC recovery. A 75% deduction is available in the discovery year if a qualified investor is pursuing or intends to pursue any potential third-party recovery minus the sum of any actual recovery and any potential insurance / SIPC recovery. The details for qualification for the safe harbor deduction are set forth in Rev. Proc. 2009-20.

In 2011, the IRS issued Rev. Proc. 2011-58, 2011-58 I.R.B. 849, which modified certain provisions of Rev. Proc. 2009-20. Under Rev. Proc. 2011-58, the safe harbor provisions of Rev. Proc. 2009-20 may be utilized if a lead figure, or an associated entity involved in the specified fraudulent arrangement, was the subject of one or more civil complaints or similar documents that a state or federal governmental entity filed with a court or in an administrative agency enforcement proceeding, and:

(a)     The civil complaint or similar documents together allege facts that comprise substantially all of the elements of a specified fraudulent arrangement conducted by the lead figure;

(b)     The death of the lead figure precludes a charge by indictment, information, or criminal complaint against that lead figure; and

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
117

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11   Doc 1236   Filed 08/26/24   Entered 08/26/24 12:50:06   Pg 127 of 141

(c) A receiver or trustee was appointed with respect to the arrangement or assets of the arrangement were frozen.

A strict reading of Rev. Proc. 2011-58 would require that, unless the lead figure's death precludes the filing of a criminal indictment or criminal complaint, there must be an indictment or criminal complaint filed against the lead figure in order for safe harbor rules of Rev. Proc. 2009-20 to be available to victims of a Ponzi scheme. To date, no lead figure has been charged with a crime or is deceased, so the necessary prerequisites for the safe harbor for a deduction in 2024 do not appear to have been satisfied. The Revenue Procedures simply provide a safe harbor, however, and there might be individual circumstances outside the safe harbor that warrant an iCap Trust Beneficiary taking a position that the theft loss occurred with respect to the 2023 taxable year. The iCap Trust Beneficiaries should consult with their own tax advisors to determine if a theft loss deduction is permissible, as well as the timing, amount, and applicable limitations for any such theft loss deduction.

## D. Withholding on Distributions and Information Reporting

All Distributions to Holders of Allowed Claims under the Plan and any Distributions to the Holders of Beneficial Interests in the iCap Trust are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the payment recipient (i) fails to furnish the recipient's social security number or other taxpayer identification number; (ii) furnishes an incorrect taxpayer identification number; (iii) fails to properly report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the taxpayer's identification number provided is the recipient's correct taxpayer identification number and that such recipient is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain Persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, a Holder of an Allowed Claim that is a not a U.S. entity may be subject to additional withholding, the imposition and amount of which may depend on, among other things, the particular type of income and whether the Holder is eligible to claim benefits under an income tax treaty with the United States. As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtor making such Distribution or by the iCap Trust, as

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
118

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

applicable, even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Non-U.S. Holders are urged to consult their own tax advisors regarding potential withholding on Distributions under the Plan.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. The Holders are urged to consult their own tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

*[Remainder of page intentionally left blank]*

**SECOND AMENDED DISCLOSURE STATEMENT FOR
JOINT CHAPTER 11 PLAN OF LIQUIDATION**
119

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 129 of 141

# ARTICLE X.
## RECOMMENDATION

The Plan Proponents believe that Confirmation and implementation of the Plan are the best alternative under the circumstances and urge all impaired Creditors entitled to vote on the Plan to vote in favor of and support confirmation of the Plan.

DATED this 26th day of August 2024.


BLACK HELTERLINE LLP



By    */s/ DRAFT*
OREN B. HAKER, WSBA No. 48725
BLACK HELTERLINE LLP

*Co-Counsel to Debtors and Debtors in Possession*

And

JULIAN I. GURULE (Admitted *Pro Hac Vice*)
O'MELVENY & MYERS LLP

*Co-Counsel to Debtors and Debtors in Possession*

**SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
120

BLACK HELTERLINE LLP
805 SW BROADWAY
SUITE 1900
PORTLAND, OR 97205
TELEPHONE: 503 224-5560

## EXHIBIT A

**Joint Chapter 11 Plan**

# EXHIBIT B

## Liquidation Analysis

## ICAP ENTERPRISES, INC., ET AL.
## LIQUIDATION ANALYSIS

A chapter 11 plan cannot be confirmed unless the bankruptcy court determines that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Debtors have prepared this liquidation analysis ("Liquidation Analysis"), based on a hypothetical liquidation under chapter 7 of the Bankruptcy Code. It is assumed, among other things, that the hypothetical liquidation under chapter 7 would commence under the direction of a court-appointed trustee (the "Trustee") and would continue for a period of time, during which all of the Debtors' material assets would be sold, potential litigation claims would be settled or resolved, and the cash proceeds, net of liquidation related costs, would be distributed to Creditors in accordance with applicable law.

The Liquidation Analysis has been prepared assuming that the Debtors converted to chapter 7 bankruptcy on September 23, 2024 (the "Conversion Date").

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation.

THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED IN AN ACTUAL LIQUIDATION. THIS ANALYSIS ASSUMES "LIQUIDATION VALUES" BASED ON THE DEBTORS' BUSINESS JUDGEMENT. THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF BUSINESS UNITS ON A GOING CONCERN BASIS.

THE UNDERLYING FINANCIAL INFORMATION IN THE LIQUIDATION ANALYSIS WAS NOT COMPILED OR EXAMINED BY ANY INDEPENDENT ACCOUNTANTS. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

The Debtors have already commenced efforts towards an orderly liquidation of their assets. In order to maximize recoveries to the Debtors' Creditors, this Liquidation Analysis assumes that the Trustee would continue those efforts as currently contemplated, spanning a six month period following the Conversion Date (the "<u>Liquidation Period</u>"). This Liquidation Analysis assumes that, during the Liquidation Period, the Trustee would, among other things, (i) employ one former employee for the Liquidation Period at current compensation levels, plus a stay bonus pool equal to one month of compensation, and (ii) employ professionals and advisors (including a real estate broker and tax professionals) to complete liquidation.

The Liquidation Analysis is appended hereto, and should be read in conjunction with the following notes and assumptions:

<u>**Summary Notes to Liquidation Analysis**</u>

     1.    *Additional claims*. A liquidation under chapter 7 of the Bankruptcy Code is likely to trigger certain Claims that otherwise would not exist under the Plan. Some of these Claims could be significant and may be entitled to priority in payment over General Unsecured Claims. Those Priority Claims would be paid in full before any proceeds from liquidation would be made available to pay General Unsecured Claims or to make any distribution in respect of Equity Interests. While some of these Claims could be significant, no adjustment has been made for these potential Claims unless specified in the assumptions to the Liquidation Analysis.

     2.    *Dependence on unaudited financial statements*. This Liquidation Analysis is based, in part, on unaudited financial statements, which may differ from audited results.

     3.    *Litigation claims significantly discounted*. Pursuit of Causes of Action will require significant additional investment. Under the Plan, the Debtors will secure the benefit of an Exit Financing Facility to finance this investment, but the Exit Financing Facility will be unavailable to the Trustee. The Liquidation Analysis therefore assumes that the Trustee will seek to resolve Causes of Action through a series of settlements, following a relatively quick and efficient investigation.

     4.    *Distribution of net proceeds*. Priority Claims, Administrative Expense Claims, Professional fees, Trustee fees, and other such Claims that may arise in a liquidation scenario would be paid in full from the liquidation proceeds before the balance of those proceeds is made available to pay prepetition priority, secured, and unsecured claims. Under the absolute priority rule, no junior Creditor would receive any distribution until all senior Creditors are paid in full, and no Holder of an Equity Interest would receive any distribution until all Creditors are paid in full. The assumed distributions to Creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

<u>**Projected Distributable Assets**</u>

     A.    <u>Cash and Cash Equivalents</u>. Cash is the estimated unrestricted cash at the end of September 2024. These amounts include the benefit of amounts paid or made available to the Debtors in connection with that certain Supplemental DIP Loan from Socotra, Jason Yelowitz, and Keith Holdings.

3

B.     Secured Claims Reserves.  Secured Claims Reserves comprise amounts that the Debtors are holding or will be holding on the Effective Date in reserve accounts with respect to asserted mortgage claims encumbering real property that has been sold and liquidated.  The table below in connection with Note 3 reflects the total amounts estimated for Secured Claims Reserves.

C.     Real Estate Assets.  The Debtors anticipate that following Confirmation of the Plan, they will either be in possession of or will have recently liquidated certain real estate properties.  The table below reflects the properties anticipated to be remaining in the Debtors' possession following Confirmation of the Plan, along with the gross amount of asserted mortgage claims and the net projected value of the properties (assuming the mortgages are allowed in full).  The Pioneer Village property is not included, because the Debtors expect that by the Conversion Date a settlement will have been approved with respect to that lender.  The Liquidation Analysis assumes that the Trustee will expedite sales of these properties, such that the total realized values in a chapter 7 would be between 70% and 80% of current estimated value.

| Property | Ch. 7 Value | Mortgage | Net |
|---|---|---|---|
| Campbell Way | 162 | - | 162 |
| Burien | 683 | 300 | 383 |
| Pioneer Village | | | - |
| Totals: | 845 | 300 | 545 |

D.     AR from CS2 Property.  The Debtors are owed a secured loan from Debtor CS2 Real Estate Development LLC for $2.0 million in principal amount.  The Debtors believe that this loan is recoverable in full. The loan is collateral for the Debtors' current debtor in possession financing facility with Socotra REIT 1, LLC and WE Alliance Secured Income Fund, LLC, totaling $1.61 million in principal amount.

E.     Causes of Action.  Pursuit of Causes of Action will require significant additional investment.  Under the Plan, the Debtors will secure the benefit of an Exit Financing Facility to finance this investment, but that Exit Financing Facility will be unavailable to the Trustee.  The Liquidation Analysis therefore assumes that the Trustee will seek to resolve Causes of Action through a series of settlements, following a relatively quick and efficient investigation.  The Liquidation Analysis assumes that total recoveries would range between $0 and $15 million.  It is possible, however, that recoveries in a chapter 7 could be worse (e.g., negative), after accounting for Administrative Expense Claims incurred to investigate and/or pursue the Claims in an expedited fashion.

**Chapter 7 Administrative Expenses**

F.     Wind-Down Expenses.  The Liquidation Analysis assumes that the Trustee will continue with existing liquidation and wind-down plans that have already commenced.  Wind-down efforts are anticipated to extend for a 6-month period. Material expenses include $30,000 for document retention costs, and $95,000 for payroll-related expenses to retain a former employee for support in pursuing the wind-down, understanding the Debtors' pre-petition activities, and completing an investigation of Causes of Action.

G.     Trustee Fees.  Trustee fees are calculated according to section 326 of the Bankruptcy Code.

4

H.      Legal and Financial Advisors.  The Liquidation Analysis includes amounts for the Trustee to retain outside advisors for purposes of aiding in the wind-down and completing a cursory investigation of Causes of Action.  These fees are estimated to range between $500,000 and $600,000.

**Projected Distributions**

1.      DIP Claims.  The Debtors' current debtor in possession claims total $2.06M in principal amount, secured by substantially all of the Debtors' assets.  This total includes $300,000 owed under the Debtors' first DIP facility with Serene; this balance is proposed to be waived or otherwise addressed under a settlement with Serene, but the Liquidation Analysis assumes that the settlement will not go forward in the event of a conversion to chapter 7.  These amounts will be senior to any recoveries in a chapter 7.

2.      Administrative Expense Claims.  Administrative Expense Claims are equal to projected unpaid fees and expenses for Professional Persons prior to the Effective Date.

3.      Class 2: Secured Claims.  The table below reflects assumed amounts for Class 2 Secured Claims.  As discussed, certain Claims are anticipated to be worth less than their filed amounts, due to available Collateral values.  Secured Claims with respect to the CS2 Property are not included, because the Debtors anticipate that the CS2 Property will be sold, and the attendant Secured Claims will be extinguished, prior to entry of the Confirmation Order.

| Creditor | SubClass Ref. | Collateral | (in $000's) POC/Scheduled Amt. | (in $000's) Reserved Amt. | Notes |
|---|---|---|---|---|---|
| Studio 19 Architects | Class 2A.1 | UW 17th | 52 | 52 | |
| Davido Consulting Grp | Class 2A.2 | UW 17th | 18 | 18 | |
| Dhillons | Class 2A.3 | UW 17th | 1,120 | 668 | Amt. reserved is the remaining balance from collateral, following payment of the Serene DIP and senior liens. |
| Wilmington Savings | Classes 2B/2C | 14th Street/Willows | 5,175 | 5,155 | Amt. is total proceeds from collateral |
| Redmond Funding | Class 2D | Lynnwood/Burien | 1,798 | 1,757 | Reserve is full proceeds from Lynnwood sale |
| Christopher Jones Archit | Class 2E.1 | Broadway | - | - | Under the Plan, Broadway will be abandoned. |
| Davido Consulting Grp | Class 2E.2 | Broadway | - | - | See note above re Broadway |
| Malsam Tsang Engineer | Class 2E.3 | Broadway | 12 | - | See note above re Broadway |
| Davido Consulting Grp | Class 2E.4 | Broadway | - | - | See note above re Broadway |
| Oak Hills Construction | Class 2E.5 | Broadway | 197 | - | See note above re Broadway |
| Van Hoof Construction | Class 2F.2 | Senza Kenmore | 9 | - | No collateral proceeds remaining, following repayment of DIP |
| Dance Construction | Class 2F.3 | Senza Kenmore | 52 | - | No collateral proceeds remaining, following repayment of DIP |
| Davido Consulting Grp | Class 2G.1 | Campbell | 15 | 15 | |
| Tritalent | Class 2H.1 | Pioneer Village | 2,103 | - | Settlement with Tritalent will govern |
| | | Totals: | 10,550 | 7,664 | |

4.      Class 3 Investor Claims and Class 4 General Unsecured Claims.  For purposes of the Liquidation Analysis, the Debtors estimate Claims in these Classes based on the total face amount of proofs of Claim and/or Scheduled Claims.  These estimates do not include the benefit of a review of the underlying Claims, and the estimates for Claims in Class 3 and Class 4 may overlap.

5

*(000's)*

| Grosss Liquidation Proceeds: | Notes | Est. Balance Sheet 9/30/2024 | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|---|
| Cash and cash equivalents - Unrestricted | A | $ 425 | $ 425 | 100% | $ 425 | 100% |
| Real Estate Cash Reserves | | $ 7,664 | $ 7,664 | 100% | $ 7,664 | 100% |
| Real Estate Assets Owned | B | 545 | 381 | 70% | 436 | 80% |
| AR from CS2 Property | C | 2,000 | 1,400 | 70% | 1,600 | 80% |
| Causes of Action | D | - | - | | 15,000 | |
| **TOTAL GROSS LIQUIDATION PROCEEDS** | | $ 10,634 | $ 9,871 | | $ 25,125 | |
| (-) Wind-Down Expenses | E | | (112) | | (89) | |
| (-) Trustee Fees | E | | (296) | 3% | (754) | 3% |
| (-) Legal & Financial Advisors | E | | (600) | | (500) | |
| **TOTAL NET LIQUIDATION PROCEEDS** | | | $ 8,863 | | $ 23,782 | |

**Claims Recovery Analysis (in $000s)**

| Class | Claims | Notes | Claims Estimate | Low Recovery Estimate $ | % | High Recovery Estimate $ | % |
|---|---|---|---|---|---|---|---|
| | DIP Claims | 1 | 2,060 | 1,199 | 58% | 2,060 | 100% |
| | Administrative Expenses | 2 | 6,383 | - | 0% | 6,383 | 100% |
| 1 | Priority Claims | | - | | 100% | - | 100% |
| 2 | Secured Claims | 3 | 7,664 | 7,664 | 100% | 7,664 | 100% |
| 3 | Investor Claims | 4 | 284,328 | 1,194 | 0% | 7,645 | 3% |
| 4 | General Unsecured Claims | 4 | 1,126 | 5 | 0% | 30 | 3% |
| 5 | Subordinated Claims | | - | (0.00) | 0% | - | 0% |
| 6 | Equity Interests | | - | - | 0% | - | 0% |

**Best Interests of Creditors Analysis**

| Class | Claims | Claim Amt. | Liquidation Analysis Low $ | Low % | High $ | High % | Median $ | Median % | Plan Recovery Projections Low $ | Low % | High $ | High % | Median $ | Median % | BIC Test |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DIP Claims | 1,760 - 2,060 | 1,199 | 58% | 2,060 | 100% | 1,629 | 79% | 1,760 | 100% | 1,760 | 100% | 1,760 | 100% | PASS |
| | Administrative Expenses | 6,383 | - | 0% | 6,383 | 100% | 3,192 | 50% | 6,383 | 100% | 6,383 | 100% | 6,383 | 100% | PASS |
| 1 | Priority Claims | - | - | 100% | - | 100% | - | 0% | - | 100% | - | 100% | - | 100% | PASS |
| 2 | Secured Claims | 7,664 | 7,664 | 100% | 7,664 | 100% | 7,664 | 100% | 7,664 | 100% | 7,664 | 100% | 7,664 | 100% | PASS |
| 3 | Investor Claims | 284,328 | 1,194 | 0% | 7,645 | 3% | 4,419 | 2% | 2,534 | 1% | 97,268 | 34% | 49,901 | 18% | PASS |
| 4 | General Unsecured Claims | 1,126 | 5 | 0% | 30 | 3% | 17 | 2% | 10 | 1% | 385 | 34% | 198 | 18% | PASS |
| 5 | Subordinated Claims | - | (0) | 0% | - | 0% | (0) | 0% | - | 0% | - | 0% | - | 0% | PASS |
| 6 | Equity Interests | - | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% | - | 0% | PASS |

23-01243-WLH11    Doc 1236    Filed 08/26/24    Entered 08/26/24 12:50:06    Pg 137 of 141

# EXHIBIT C

**Recovery Analysis**

| (000's) Gross Proceeds: | Notes | Est. Balance Sheet 9/30/2024 | Low $ | Low % | High $ | High % |
|---|---|---|---|---|---|---|
| Cash and cash equivalents - Unrestricted | A | $ 425 | $ 425 | 100% | $ 425 | 100% |
| Real Estate Cash Reserves | B | $ 7,664 | $ 7,664 | 100% | $ 7,664 | 100% |
| Exit Financing | | $ 4,750 | $ 4,750 | 100% | $ 4,750 | 100% |
| Real Estate Assets Owned | C | 545 | 436 | 80% | 545 | 100% |
| AR from CS Property | D | 1,000 | 1,000 | 100% | 1,000 | 100% |
| Causes of Action | E | | 25,000 | | 125,000 | |
| **TOTAL GROSS LIQUIDATION PROCEEDS** | | $ 14,384 | $ 39,275 | | $ 139,384 | |
| (-) Trust Expenses | F | | (578) | | (578) | |
| (-) Trustee Fees | G | | (1,250) | | (6,250) | |
| (-) Exit Facility Repayments | | | (8,418) | | (8,418) | |
| (-) Legal & Financial Advisors | H | | (1,680) | | (1,680) | |
| **TOTAL NET LIQUIDATION PROCEEDS** | | | $ 27,349 | | $ 122,458 | |

**Claims Recovery Analysis (in $000s)**

| Class | Claims | Notes | Claims Estimate | Low Recovery Estimate $ | Low Recovery Estimate % | High Recovery Estimate $ | High Recovery Estimate % |
|---|---|---|---|---|---|---|---|
| | Exit Facility Claims | 1 | 9,588 | 9,588 | 100% | 9,588 | 100% |
| | Administrative Expenses | 2 | 6,383 | 6,383 | 100% | 6,383 | 100% |
| 1 | Priority Claims | | - | - | 100% | - | 100% |
| 2 | Secured Claims | 3 | 7,664 | 7,664 | 100% | 7,664 | 100% |
| 3 | Investor Claims | 4 | 284,328 | 2,534 | 1% | 97,268 | 34% |
| 4 | General Unsecured Claims | 4 | 1,126 | 10 | 1% | 385 | 34% |
| 5 | Subordinated Claims | | - | - | 0% | - | 0% |
| 6 | Equity Interests | | - | - | 0% | - | 0% |

## NOTES

## Assets

A.  <u>Cash and Cash Equivalents</u>.  Cash is the estimated unrestricted cash at the end of September 2024.  These amounts include the benefit of amounts paid or made available to the Debtors in connection with that certain Supplemental DIP Loan from Socotra, Jason Yelowitz, and Keith Holdings.  Amounts also assume the benefit of an anticipated settlement with Tritalent, which would provide an additional $500,000 in exit financing.

B.  <u>Secured Claims Reserves</u>.  Secured Claims Reserves comprise amounts that the Debtors are holding or will be holding on the Effective Date in reserve accounts with respect to asserted mortgage claims encumbering real property that has been sold and liquidated.  The table below in connection with Note 2 reflects the total amounts estimated for Secured Claims Reserves.

C.  <u>Real Estate Assets</u>.  The Debtors anticipate that following Confirmation of the Plan, they will either be in possession of or will have recently liquidated certain real estate properties.  The table below reflects the properties anticipated to be remaining in the Debtors' possession following Confirmation of the Plan, along with the gross amount of asserted mortgage claims and the net projected value of the properties (assuming the mortgages are allowed in full).  To the extent that any of these properties are instead liquidated prior to entry of the Confirmation Order, the mortgage amounts will be placed in a reserve account and the net amounts will be available for use by the iCap Trust.  Estimated values are based

on the Debtors' best current estimates, net of transaction costs. For purposes of the recovery analysis, the Debtors assume that in a low recovery scenario, ultimate sales values are 80% of current estimates.

| Property | Ch. 7 Value | Mortgage | Net |
|---|---|---|---|
| Campbell Way | 162 | - | 162 |
| Burien | 683 | 300 | 383 |
| Pioneer Village | | | - |
| Totals: | 845 | 300 | 545 |

D.    <u>AR from CS2 Property</u>. The Debtors are owed a secured loan from Debtor CS2 Real Estate Development LLC for $2.0 million in principal amount. The Debtors believe that this loan is recoverable in full. The recovery analysis assumes a value of $1.0 million, with the other $1.0 million being used to pay Socotra REIT 1, LLC and WE Alliance Secured Income Fund, LLC as part of an exit facility.

E.    <u>Causes of Action</u>. As with any litigation, the ultimate recoveries on Causes of Action pursued by the iCap Trust are uncertain. The recovery analysis estimates a range of $25 million to $125 million. This range is for illustrative purposes only. The Debtors believe that the Causes of Action may ultimately be worth significantly more than $125 million, but developing and pursuing those claims will depend on myriad variables (including discovery and evidence not yet reviewed or received) that cannot be fully accounted for at this time.

## iCap Trust Costs and Expenses

F.    <u>iCap Trust Expenses</u>. The table below summarizes estimated expenses for the iCap Trust. Among other things, the Debtors estimate that the iCap Trust will operate for 24 months.

| | |
|---|---|
| Assumed Duration (Mos): | 24 |
| | |
| Monthly Carry Costs | |
| Monthly Doc Retention Costs: | 3,000 |
| Consultant Costs: | 13,600 |
| Subtotal: | 16,600 |
| | |
| Director Monthly Costs: | 7,500 |
| | |
| Total Carry Costs: | **578,400** |

G.    <u>iCap Trustees Fees</u>. Under the Plan, the iCap Trustees will receive compensation equal to 5.0% of the iCap Trust's total gross recoveries.

H.    <u>Professionals Fees</u>. Professional fee expenses include costs for (i) a financial advisor to complete a claims review process and to support investigation needs, and (ii) a general counsel to support day-to-day iCap Trust operations, including responding to governmental inquiries and discovery needs. Actual fees may vary significantly from estimates. Estimates are for illustrative purposes only.

## Recoveries/Distributions

1. <u>Exit Facility</u>. The Debtors anticipate a total exit facility balance of $9.5M, assuming amounts are paid by their maturity date. These amounts will be secured by litigation proceeds, and will therefore be paid before other recoveries.

2. <u>Administrative Expense Claims</u>. Administrative Expense Claims are equal to projected unpaid fees and expenses for Professional Persons prior to the Effective Date.

3. <u>Class 2: Secured Claims</u>. The table below reflects assumed amounts for Class 2 Secured Claims. As discussed, certain Claims are anticipated to be worth less than their filed amounts, due to available Collateral values. Secured Claims with respect to the CS2 Property are not included because the Debtors anticipate that the CS2 Property will be sold, and the attendant Secured Claims will be extinguished, prior to entry of the Confirmation Order. Secured Claims also do not include amounts owed to Serene under its existing DIP Facility, with the anticipation that a settlement with Serene will be approved that resolves the Claim.

| Creditor | SubClass Ref. | Collateral | (in $000's) POC/Scheduled Amt. | (in $000's) Reserved Amt. | Notes |
|---|---|---|---|---|---|
| Studio 19 Architects | Class 2A.1 | UW 17th | 52 | 52 | |
| Davido Consulting Grp | Class 2A.2 | UW 17th | 18 | 18 | |
| Dhillons | Class 2A.3 | UW 17th | 1,120 | 668 | Amt. reserved is the remaining balance from collateral, following payment of the Serene DIP and senior liens. |
| Wilmington Savings | Classes 2B/2C | 14th Street/Willows | 5,175 | 5,155 | Amt. is total proceeds from collateral |
| Redmond Funding | Class 2D | Lynnwood/Burien | 1,798 | 1,757 | Reserve is full proceeds from Lynnwood sale |
| Christopher Jones Archit | Class 2E.1 | Broadway | - | - | Under the Plan, Broadway will be abandoned. |
| Davido Consulting Grp | Class 2E.2 | Broadway | - | - | See note above re Broadway |
| Malsam Tsang Engineer | Class 2E.3 | Broadway | 12 | - | See note above re Broadway |
| Davido Consulting Grp | Class 2E.4 | Broadway | - | - | See note above re Broadway |
| Oak Hills Construction | Class 2E.5 | Broadway | 197 | - | See note above re Broadway |
| Van Hoof Construction | Class 2F.2 | Senza Kenmore | 9 | - | No collateral proceeds remaining, following repayment of DIP |
| Dance Construction | Class 2F.3 | Senza Kenmore | 52 | - | No collateral proceeds remaining, following repayment of DIP |
| Davido Consulting Grp | Class 2G.1 | Campbell | 15 | 15 | |
| Tritalent | Class 2H.1 | Pioneer Village | 2,103 | | Settlement with Tritalent will govern |
| | | **Totals:** | **10,550** | **7,664** | |

4. <u>Class 3 Investor Claims and Class 4 General Unsecured Claims</u>. For purposes of the recovery analysis, the Debtors estimate Claims in these Classes based on the total face amount of proofs of Claim and/or Scheduled Claims. These estimates do not include the benefit of a review of the underlying Claims, and the estimates for Claims in Class 3 and Class 4 may overlap.